UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LAWRENCE E. JAFFE PENSION PLAN,  )
On Behalf of Itself and All Others Similarly  )
Situated,  )
)
Plaintiffs,  )
)
v.  )     No. 02 C 5893
)
HOUSEHOLD INTERNATIONAL, INC., et al.,  )     Judge Nan R. Nolan
)
Defendants.  )

## MEMORANDUM OPINION AND ORDER

Plaintiffs have filed this securities fraud class action alleging that Defendants Household International, Inc., Household Finance Corporation, and certain individuals (collectively, "Household") engaged in predatory lending practices between July 30, 1999 and October 11, 2002 (the "Class Period"). Currently before the court are (1) Plaintiffs' Motion to Compel Production of Documents Pertaining to Household's Consultations with Ernst & Young LLP, and (2) Plaintiffs' Motion to Compel Further Responses to the Class' Questions for Per Eckholdt Concerning Exhibit 13 and the Production of Documents Underlying Wilmer, Cutler & Pickering Reports. For the reasons set forth below, the motion regarding Ernst & Young is granted, but the motion regarding Wilmer, Cutler & Pickering is denied.

## BACKGROUND

### A.    Ernst & Young LLP

Sometime prior to July 1, 2002, the State of California filed a lawsuit against Household alleging that the Company had overcharged, or charged excessive lending fees to California customers. Household was concerned about the possibility of similar claims in other states and, indeed, had already received formal inquiries from the Attorneys General of Arizona and Washington. In response to this concern, Household retained Ernst & Young ("E&Y") on July 1,

2002 to conduct a compliance study of its Consumer Lending operation (the "Compliance Engagement"). At the time, Household was involved in negotiation sessions with a Multistate Working Group of state Attorneys General (the "Working Group") regarding threatened claims arising from the Company's consumer lending practices.

The Compliance Engagement letter explained that E&Y would review possible overcharges associated with such loan features as administrative fees, late fees, and prepayment penalties. The letter also stated that E&Y was assisting Household's General Counsel in providing legal advice regarding existing and threatened litigation relating to the compliance issues under review:

> We understand that you will be utilizing the Work Product in order to provide legal advice to your client, Household, in your capacity as General Counsel. As such, all Work Product shall be deemed covered by the attorney-client privilege. Furthermore, it is our understanding that Household companies are currently involved in various types of litigation for which the Work Product may be used and anticipate such litigation in the future. As such, all Work Product shall be treated by E&Y as privileged under the attorney work product privilege.

(Ex. 1 to Robin Decl.) According to Defendants, Household's General Counsel needed E&Y's assistance in conducting the compliance study because it required expertise in sophisticated quantitative analyses and in identifying and addressing compliance issues, as well as a substantial commitment of personnel. In Defendants' view, "it would not have been possible for Household personnel to have performed all of the tasks that E&Y performed." (Def. E&Y Resp., at 2.)

On September 24, 2002, Household's General Counsel wrote a letter to the Working Group regarding possible means of resolving the Group's stated concerns and the threat of litigation. Household views the letter as a confidential settlement negotiation and, indeed, the letter states that it is "Confidential - For Settlement Discussion Purposes Only." (Ex. F to Baker Decl.) The letter expressly informed the Working Group about the E&Y study, explaining that:

> The Ernst & Young engagement is designed to monitor the company's compliance with certain company policies and state regulation. In addition, Ernst & Young shall (1) identify the root causes of noncompliance; and (ii) recommend process improvements to enhance controls over compliance.

2

(*Id.* at 5.) Household further explained that E&Y "will be retained to audit our ongoing compliance with the commitments incorporated into a Settlement Agreement. We are amenable to sharing these audit results with the parties to the Settlement Agreement, provided strictest confidentiality can be maintained." (*Id.*)

In conducting its study, E&Y focused on the following areas of Household's lending operations: administrative fees; involuntary unemployment insurance; late fees; prepayment penalties; "points on points" arising from refinancing; and inaccurate/inconsistent information on disclosure documents, especially regarding points and appraisal fees. (Ex. A to Baker Decl., at 5.) E&Y ultimately authored a number of documents, including Excel spreadsheets, using information obtained from Household employee interviews and documents prepared by Household's Technology & Services Department of the Consumer Lending Business Unit. (Ex. C to Baker Decl.)

On October 11, 2002, Household entered into a Settlement Agreement with the Multistate Working Group, resolving the predatory lending allegations against Household. The Settlement Agreement provided that Household would retain an "independent monitor" who would "ensure compliance with the terms of the agreement" (the "Settlement Audit"). (Ex. 2 to Robin Decl.) The reports generated by the independent auditor in connection with the Settlement Audit were to be provided to the Attorneys General. This did not include, however, any of the materials relating to the pre-existing Compliance Engagement.

On May 19, 2006, Plaintiffs served a subpoena on E&Y seeking documents relating to the Compliance Engagement, and a witness to depose on that issue. E&Y objected to the subpoena by letter dated June 6, 2006. On June 29, 2006, Defendants sent Plaintiffs a letter notifying them that they were in the process of gathering information relating to the E&Y engagement to determine whether the work was protected by the attorney-client and/or work product privileges. Defendants indicated at that time that they believed both privileges did in fact apply. (Ex. 2 to Buckley Decl.)

3

On July 13, 2006, Defendants sent Plaintiffs another letter confirming that the E&Y materials were privileged and would not be produced. Approximately one week later on July 21, 2006, Defendants recalled several privileged documents relating to the Compliance Engagement that "had been inadvertently produced during the course of Defendants' document production." (Def. E&Y Resp., at 4.) Plaintiffs refused to return the documents and have now filed a motion to compel production of all the E&Y documents.

## B.    Wilmer, Cutler & Pickering

In or about November 2002, Elaine Markell, Vice President of Default Services for Household Mortgage Services ("HMS"), a division of Household Finance Corporation, threatened suit against Household and submitted a draft complaint alleging that the Company had illegally used loan restructures to manipulate financial performance data, and violated bankruptcy laws. (Ex. 1 to Beer Decl.) Household's Internal Audit Department promptly commenced an initial inquiry into these allegations. On December 5, 2002, the Securities and Exchange Commission ("SEC"), which was already conducting an informal, non-public inquiry into various Household practices, sent the Company a letter request for documents relating to a number of subjects, including the loan restructuring policies addressed in Markell's complaint. (Ex. 2 to Beer Decl.)

Shortly thereafter, in mid-January 2003, the SEC changed its informal, non-public inquiry into a formal, public one, and served a document subpoena on Household seeking, among other things, information related to the Markell allegations. (Ex. 5 to Pl. WCP Mot.) At a January 27, 2003 Audit Committee meeting, Household's outside auditor, KPMG, indicated that it "would be unable to issue its audit opinion on Household's consolidated financial statements as of and for the year ended December 31, 2002 until Household engaged outside counsel and conducted an independent investigation of the Markell Allegations." (Id. at 2.) On February 13, 2003, the Audit Committee retained the law firm of Wilmer, Cutler & Pickering (now known as "WilmerHale") to

4

investigate Markell's allegations, as well as "the extent to which the loan restructuring practices of HMS were inconsistent either with public disclosures of HI [Household International, Inc.] and HFC [Household Finance Corporation] regarding those matters or with HMS internal policies for restructuring."[1] (Ex. 2 to Pl. WCP Mot., at 2.)

In conducting its investigation, WilmerHale (1) reviewed more than 2,000 documents, including email messages, draft and final policy and procedure manuals, internal audit files, financial information, and several SEC transcripts; and (2) interviewed more than 40 Company personnel, including Markell. (Id.) On March 17, 2003, WilmerHale provided the Audit Committee with a draft of its loan "Restructuring Report." (Ex. 7 to Pl. WCP Mot.) Defendants apparently mistakenly produced a copy of this draft report to Plaintiffs during the course of discovery, even though two other copies of the same document appear on Defendants' privilege log. (Ex. E to Beer Decl., Nos. 2626 and 3913.) In any event, WilmerHale submitted its final Restructuring Report on March 24, 2003. Defendants produced this report – and the Bankruptcy Report – to Plaintiffs in or about February 2005 pursuant to a detailed non-waiver agreement that permits the use of the reports in this litigation. (Ex. 6 to Pl. WCP Mot.)

On March 28, 2006, Plaintiffs deposed Per Eckholdt, former Group Director of Credit Risk for HMS. During the deposition, Defendants' counsel directed Mr. Eckholdt not to answer, on the grounds of privilege, questions regarding "Exhibit 13," a document Mr. Eckholdt had given to WilmerHale to assist in its investigation. On April 3, 2006, Defendants withdrew the privilege objection and agreed that Mr. Eckholdt, who resides overseas, would answer written deposition questions about the document. Plaintiffs served those questions on September 5, 2006, and Defendants responded on September 29, 2006. Plaintiffs object that Defendants have still refused

---

[1]     WilmerHale also investigated and submitted a report regarding the bankruptcy allegations (the "Bankruptcy Report") which is not at issue here.

to answer certain questions on privilege grounds, and move to compel complete responses and production of all documents relating to the Restructuring Report.

## DISCUSSION

The attorney-client privilege provides that (1) where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived. *United States v. White*, 950 F.2d 426, 430 (7th Cir. 1991). The purpose of the privilege is to "encourage full disclosure and to facilitate open communication between attorneys and their clients." *United States v. BDO Seidman*, 337 F.3d 802, 810 (7th Cir. 2003). The privilege may be waived by disclosing documents to third parties, or by submitting similar documents in response to a discovery request. *Evans v. City of Chicago*, 231 F.R.D. 302, 312 (N.D. Ill. 2005). That said, an unintentional disclosure to a third party does not necessarily waive the privilege, nor does an intentional disclosure if (1) the disclosure is for the purpose of assisting the attorney in rendering legal advice, or (2) the third party shares a common legal interest with the party claiming the privilege. *United States v. Seidman*, 368 F. Supp. 2d 858, 861 (N.D. Ill. 2005).

A document may be protected by the work-product privilege if it is created by an attorney "in anticipation of litigation." FED. R. CIV. P. 26(b)(3); *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 976 (7th Cir. 1996). An assertion of work-product privilege may be overcome upon a showing of "substantial need" and "undue hardship," but the courts are cautioned to give even greater protection to attorney opinions which include mental impressions, conclusions, or legal theories concerning prospective litigation. *Logan*, 96 F.3d at 976 n.4 (stating FED. R. CIV. P. 26(b)(3) "expressly admonishes courts to give even greater protection against disclosure of opinion work product, meaning 'the mental impressions, conclusion, opinions, or legal theories of an attorney

6

or other representative of a party concerning the litigation.'") In addition, it is well-established that the work product privilege may be waived by disclosures to third parties "in a manner which substantially increases the opportunity for potential adversaries to obtain the information." *Vardon Golf Co. v. Karsten Mfg. Corp.*, 213 F.R.D. 528, 534 (N.D. Ill. 2003) (quoting *Blanchard v. EdgeMark Fin. Corp.*, 192 F.R.D. 233, 237 (N.D. Ill. 2000)).

Plaintiffs argue that the E&Y and WilmerHale documents at issue here are not protected by the attorney-client or work product privileges, and that Defendants have waived any such privileges in any event. The court addresses each argument in turn.

**A.    Ernst & Young LLP**

      **1.    Attorney-Client Privilege**

           **a.    E&Y Provided Necessary Legal Assistance**

Plaintiffs insist that the E&Y documents are not covered by the attorney-client privilege because they do not reflect communications between a lawyer and a client for the purpose of obtaining or providing legal assistance. (Pl. E&Y Mot., at 3.) In Plaintiffs' view, E&Y performed "what in essence was an independent factual evaluation, an audit, of Household's lending practices." (*Id.* at 3-4.) They note, for example, that Household's General Counsel's September 24, 2002 letter to the Multistate Working Group described factual findings E&Y would make in conducting its evaluation, including: "(I) identify[ing] the root causes of noncompliance; and (ii) recommend[ing] process improvements to enhance controls over compliance." (*Id.* at 4; Ex. F to Baker Decl., at 5.) Plaintiffs argue that Household could have conducted the evaluation internally, did not need E&Y's assistance in order to obtain pertinent legal advice about its compliance practices and, thus, cannot hide behind the attorney-client privilege. (*Id.* at 4-5; Pl. E&Y Reply, at 2.) The court disagrees.

It is clear from the Compliance Engagement letter that E&Y was acting as an agent of Household's General Counsel's office: "[T]he Attorneys have retained Ernst & Young to assist the Attorneys rendering legal advice to Household Finance Corporation and certain of its affiliates." (Ex. 1 to Robin Decl, Appendix B.) *Cf. Cavallaro v. United States*, 284 F.3d 236 (1st Cir. 2002) (no privilege where "[e]veryone . . . agrees that Camelot hired Ernst & Young to provide financial advice, not to assist any lawyers.") Both Household and E&Y understood that the engagement was to assist in-house counsel in providing legal advice regarding pending or anticipated litigation. Indeed, at the time Household retained E&Y, it was preparing for a negotiation with the Multistate Working Group regarding threatened claims arising from the Company's consumer lending practices. (Def. E&Y Resp., at 7.) *See, e.g., In re Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000) ("[M]aterial transmitted to accountants may fall under the attorney-client privilege if the accountant is acting as an agent of an attorney for the purpose of assisting with the provision of legal advice.")

Plaintiffs insist that the Compliance Engagement letter is "a sham." (Pl. E&Y Reply, at 4.) They note that a June 24, 2002 email from Stephen L. Hicks of Household's Policy & Compliance department states that "HI" (as opposed to counsel) "has engaged Ernst & Young to develop fair lending and other models to identify patterns and practices in our lending process." (Ex. B to Pl. E&Y Mot.) In addition, Household's counsel "worked with" E&Y for some two weeks to draft the retention letter. (Ex. K to Pl. E&Y Mot., memo from K. Robin dated 6/20/02.) The mere fact that it took Household's counsel and E&Y a couple of weeks to finalize a retention agreement does not demonstrate that the retention letter is a sham. Nor is the court persuaded that the arrangement was false based on a single internal email stating generically that "HI" retained E&Y. Notably, the same email states that Kenneth Robin, Household's Senior Executive Vice President, General Counsel, "indicated to E&Y that they expect progress on this project . . . ." (Ex. B to Pl. E&Y Mot.)

Plaintiffs argue that E&Y's assistance was not necessary for Household's in-house lawyers to understand the Company's business practices or to calculate refunds. (Pl. E&Y Mot., at 5 (citing *Cellco P'ship v. Certain Underwriters at Lloyd's London*, No. Civ. A. 05-3158 (SRC), 2006 WL 1320067, at *2 (D.N.J. May 12, 2006) ("[W]hen the third party is a professional, such as an accountant, capable of rendering advice independent of the lawyer's advice to the client, the claimant must show that the third party served some specialized purpose in facilitating the attorney-client communications and was essentially indispensable in that regard.").) The court is satisfied, however, that Defendants have demonstrated the necessity of E&Y's services in this case. Household retained E&Y to conduct complex quantitative analyses and extensive information-gathering that was beyond Household counsel's resources and abilities, but was uniquely within E&Y's qualifications. *Cf. Cavallaro*, 284 F.3d at 249 (E&Y's services not indispensable where plaintiffs claimed only that the company "had the capacity to benefit the quality of the legal advice that Hale and Dorr would render.") As the *Cavallaro* court recognized, "the complexities of modern existence prevent attorneys from effectively handling clients' affairs without the help of others, [and] the attorney-client privilege must include all the persons who act as the attorney's agents." 284 F.3d at 247 (quoting *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961)).

Plaintiffs claim that "Household's in-house counsel were not signing [the engagement letter] as counsel, but on behalf of the corporate entities." (Pl. E&Y Mot., at 4, n.4; Pl. E&Y Reply, at 3.) In support of this argument, Plaintiffs cite a June 20, 2002 memorandum in which attorney Ken Robin states that "Kay [Curtin, General Counsel of HFC] can sign in my absence on behalf of HFC and I will also sign upon my return on behalf of HI." (Ex. K to Baker Decl.) Notwithstanding this single internal memo, as explained earlier, the Compliance Engagement letter confirms that Mr. Robin and Ms. Curtin intended to use E&Y's work product to provide legal advice to Household "in [their] capacity as General Counsel." (Ex. 1 to Robin Decl., at 1.)

9

Plaintiffs also object that Household offered to make the E&Y compliance audit available to the Multistate Working Group for their review, and that Household cannot now claim that it intended to keep the documents confidential. (Pl. E&Y Mot., at 5 (citing *In re Syncor ERISA Litig.*, 229 F.R.D. 636, 645 (C.D. Cal. 2005) ("[D]ocuments . . . created with the intent to disclose them to the Government, if necessary, to benefit Syncor in any governmental investigation . . . were never privileged.").) This is not entirely accurate. The Settlement Agreement with the Attorneys General provided that Household would retain an "independent monitor" whose future reports generated in connection with the Settlement Audit would be provided to the Attorneys General upon request. (Ex. 2 to Robin Decl.) (*See also* Ex. F to Baker Decl., at 5 (E&Y "will be retained to monitor our ongoing compliance with the commitments incorporated into a Settlement Agreement. We are amenable to sharing *these audit results* with the parties to the Settlement Agreement . . . .") (emphasis added).) There is nothing to indicate that Household was willing to, or did in fact provide the Working Group with the audit results of the Compliance Engagement. Indeed, Defendants confirm that Household never shared the results with "the Attorneys General, with the S.E.C., or with any other governmental agency, authority, or entity, and has maintained the results of that engagement in strictest confidence." (Def. E&Y Resp., at 9.) Thus, the E&Y documents in question are protected by the attorney-client privilege.

b.    The *Garner* Exception

Even accepting that the attorney-client privilege applies, Plaintiffs argue, "there is a well-recognized exception . . . that allows shareholders access to communications between the corporation and its attorneys." (Pl. E&Y Mot., at 6.) In *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970), shareholders filed a derivative action against a corporation and its officers seeking to recover the purchase price that they and others similarly situated paid for their company stock. *Id.* at 1095. The plaintiffs served the corporation with a subpoena for documents, but the corporation

objected on privilege grounds. *Id.* at 1096. The Fifth Circuit considered the attorney-client privilege "in a particularized context: where the client asserting the privilege is an entity which in the performance of its functions acts wholly or partly in the interests of others, and those others, or some of them, seek access to the subject matter of the communications." *Id.* at 1101. The court concluded that "where the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests, protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance." *Id.* at 1103-04.

In reaching this conclusion, the Fifth Circuit cautioned that "[d]ue regard must be paid to the interests of nonparty stockholders, which may be affected by impinging on the privilege, sometimes injuriously." As the court explained, "[t]he corporation is vulnerable to suit by shareholders whose interests or intention may be inconsistent with those of other shareholders, even others constituting a majority." *Id.* at 1101 n.17. The court further confirmed that "[t]he attorney-client privilege still has viability for the corporate client," and that "[t]he corporation is not barred from asserting it merely because those demanding information enjoy the status of stockholders." *Id.* at 1103.

Defendants argue that the *Garner* doctrine does not apply outside the context of derivative actions. Defendants direct the court to *Weil v. Investment/Indicators, Research and Mgmt., Inc.*, 647 F.2d 18 (9th Cir. 1981), in which the Ninth Circuit found *Garner* "inapposite" where the plaintiff had filed a securities class action "to recover damages from the corporation for herself and the members of her proposed class" and not a derivative suit seeking damages on behalf of the corporation. *Id.* at 23. Defendants note that in *Swidler & Berlin v. United States*, 524 U.S. 399 (1998), the Supreme Court confirmed that "we have rejected use of a balancing test in defining the contours of the [attorney-client] privilege." *Id.* at 409. In Defendants' view, "the Supreme Court has made perfectly clear that, under the federal common law of privilege, balancing tests employed to determine whether the attorney-client privilege should be honored are forbidden, because such

11

tests create impermissible uncertainty and frustrate the very purpose of the privilege." (Def. E&Y Resp., at 12.)

Most courts, including the Seventh Circuit, have recognized the existence of a fiduciary exception to the attorney-client privilege. In *J.H. Chapman Group, Ltd. v. Chapman*, No.95 C 7716, 1996 WL 238863 (N.D. Ill. May 2, 1996), for example, the court explained that "[t]he fiduciary duty exception 'is based on the notion that a communication between an attorney and a client is not privileged from those to whom the client owes a fiduciary duty.'" *Id.* at *1 (quoting *Ferguson v. Lurie*, 139 F.R.D. 362 (N.D. Ill. 1991)). The exception applies upon a showing of a fiduciary relation and good cause for overcoming the privilege. *Id.* To determine good cause, the court considers several factors, including:

> whether the party seeking the information asserts a colorable claim, whether the information sought is not available elsewhere, whether the information sought is related to past or present actions, and whether the information sought may risk a revelation of trade secrets or other confidential information.

*Id.* (citing *Heyman v. Beatrice Co.*, No. 89 C 7381, 1992 WL 245682, at *2 (N.D. Ill. Sept. 23, 1992)). *See also Bland v. Fiatallis North America, Inc.*, 401 F.3d 779, 787 (7th Cir. 2005) (recognizing fiduciary exception in the ERISA context).

The Seventh Circuit has not decided whether this fiduciary exception applies where shareholders are suing a corporation in a non-derivative action. The Third and Fifth Circuits have held that it does, as have several district courts. *See, e.g., Fausek v. White*, 965 F.2d 126, 130-31 (6th Cir. 1992) (applying *Garner* to non-derivative claims against a corporation); *Ward v. Succession of Freeman*, 854 F.2d 780, 786 (5th Cir. 1988) (same); *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587PKLRLE, 2003 WL 41996 (S.D.N.Y. Jan. 6, 2003) (applying *Garner* in securities fraud class action); *In re Pfizer Inc. Sec. Litig.*, No. 90 Civ. 1260 (SS), 1993 WL 561125, at *11-14 (S.D.N.Y. Dec. 23, 1993); *In re Int'l Business Machines Corp. Sec. Litig.*, No. 92 Civ. 9076 (GLG), 1993 WL 760214 (S.D.N.Y. Nov. 30, 1993) (applying *Garner* in securities fraud

case); *Cohen v. Uniroyal, Inc.*, 80 F.R.D. 480 (E.D. Pa. 1978) (applying *Garner* in securities fraud class action). These courts have not, however, adopted a uniform method of applying the exception.

Some courts "appear to assume that in any securities fraud case, the plaintiff class - insofar as it consists of current shareholders - will be entitled, on a showing of good cause, to pierce the privilege . . . even if the communications predate plaintiffs' status as shareholders." *In re Omnicom Group, Inc. Sec. Litig.*, 233 F.R.D. 400, 411 (S.D.N.Y. 2006) (citing *RMED Int'l*, 2003 WL 41996, at *4.) These courts view the distinction between a derivative action and a private securities fraud lawsuit as "but one factor to be considered in assessing whether the plaintiffs have shown good cause for piercing the privilege." *Id.* Other courts, however, "have suggested that the rationale for the fiduciary exception limits its application, at the very least, to plaintiffs who were shareholders at the time of the privileged communication." *Id.* (citing *In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 475 (S.D.N.Y. 1996) and *In re Atlantic Fin. Mgmt. Sec. Litig.*, 121 F.R.D. 141, 146 (D. Mass. 1988)).

The *In re Omnicom Group* court questioned whether the fiduciary exception should apply routinely in securities fraud lawsuits, noting that the plaintiffs in such cases "are seeking personal benefit and are not seeking to benefit the company," and are "complaining of alleged misconduct injurious to them as members of the investing public rather than injurious to the corporation." *Id.* at 412. *See also Weil*, 647 F.2d at 23 (finding *Garner* inapplicable where the plaintiff "seeks to recover damages from the corporation for herself and the members of her proposed class.") This court has similar reservations about applying the fiduciary exception as a matter of course in securities fraud cases and views the non-derivative nature of the claim as a strong factor to consider in determining whether to prevent invocation of the attorney-client privilege.

In this case, Plaintiffs have not filed a derivative action and their interests are clearly personal in that they seek to recover financially for Household's alleged fraud. In addition, Plaintiffs

13

are seeking to recover for, and have charged Household with, injuries sustained by the investing public, not the corporation. *Cf. Garner*, 430 F.2d at 1103 (addressing situation "where the corporation is in suit against its shareholders on charges of acting *inimically to stockholder interests* . . . .") (emphasis added). Notably, Plaintiffs have not raised any breach of fiduciary duty claims in this lawsuit. *Cf. In re Transocean Tender Offer Sec. Litig.*, 78 F.R.D. 692, 697 (N.D. Ill. 1978) (applying *Garner* in case alleging securities fraud and breach of fiduciary duty owed to minority shareholders); *Panter v. Marshall Field & Co.*, 80 F.R.D. 718 (N.D. Ill. 1978) (applying *Garner* where shareholders filed suit against corporation alleging breach of fiduciary duty and violations relating to tender offer).)

Nevertheless, unlike the plaintiffs in *In re Omnicom Group*, Plaintiffs have presented evidence – and Defendants do not dispute – that the Class represents a substantial majority of shareholders who owned stock at the time of the communications in question. (Pl. Reply, at 7 n.7.) Thus, it appears that Household did owe a majority of Plaintiffs a fiduciary duty. *Cf. In re Omnicom Group*, 233 F.R.D. at 412 ("[T]he transactions that are at the heart of the complaint and that formed the trigger for the targeted attorney-client communications were undertaken in the absence of a fiduciary relationship to a substantial portion of the class members.") In addition, Plaintiffs have established good cause to overcome the privilege. Specifically, Plaintiffs have a colorable claim that has withstood a motion to dismiss; there do not appear to be any trade secrets at risk; there is a Protective Order in place in any event; and the requested information concerns past actions that are the subject of this litigation. *See In re General Instrument Corp. Sec. Litig.*, 190 F.R.D. 527, 529 (N.D. Ill. 2000); (Ex. A to Pl. E&Y Mot., at 2.) On the limited facts of this case, the court finds that the fiduciary exception applies to the communications between E&Y and Household.

The court stresses that this holding should be narrowly construed. Significantly, E&Y is not a law firm and was not acting as outside counsel on behalf of Household. In addition, though E&Y was acting as an agent of in-house counsel, its investigation did not require separate legal analysis

14

or expertise (though E&Y was assisting Household's counsel in forming its legal opinions). Plaintiffs' request is also limited to a particular topic and investigation, and it does not appear that they could obtain from another source the underlying data E&Y utilized in conducting its investigation.

This does not end the inquiry, however. Courts have declined to extend *Garner* to the work product doctrine, so the court must still determine whether the documents in question here are covered by that privilege as well. *See, e.g., In re Int'l Sys. and Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1239 (5th Cir. 1982); *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1423 (11th Cir. 1994) ("[T]he Fifth Circuit has held that the *Garner* doctrine does not apply to attorney work product. . . . We agree."); *Lugosch v. Congel*, 219 F.R.D. 220, 243 (N.D.N.Y. 2003).

### 2. Work Product Privilege

Plaintiffs claim that the E&Y documents are not protected by the work product privilege because they were not prepared "in anticipation of litigation." (Pl. E&Y Mot., at 7.) This court has already determined that "documents are protected by the work product privilege if they were prepared 'because of' the prospect of litigation.'" *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, 237 F.R.D. 176, 181 (N.D. Ill. 2006) (citing *Hollinger Int'l Inc. v. Hollinger Inc.*, 230 F.R.D. 508 514 (N.D. Ill. 2005) ("The standard . . . that the documents must be 'created principally or exclusively to assist in contemplated litigation' is . . . not the applicable legal standard in the Seventh Circuit.")).[2] Here, E&Y conducted the Compliance Engagement in response to the lawsuit filed by the State of California and in anticipation of other similar lawsuits from other states.

Plaintiffs deny this assertion, noting that Household settled the California lawsuit in January 2002, several months before the Company retained E&Y. (Pl. E&Y Reply, at 8.) Plaintiffs acknowledge, however, that Arizona and Washington had made formal inquiries, and that

---

[2]     Plaintiffs have appealed this court's decision in *Lawrence E. Jaffe Pension Plan* to the district court, where it remains pending. (*See* Doc. 612.)

Household was involved in settlement talks with the Multistate Working Group at the time of E&Y's retention. Plaintiffs insist that "[t]here are no objective facts as to why Household feared litigation from . . . 20 [additional] states" when only two had made formal inquiries. Plaintiffs also question why Household asked E&Y to review 20 states when only 11 states had participated in the initial May 23, 2002 settlement discussion. (*Id.*) The fact that Household decided to conduct a more expansive review does not, however, contradict its assertion that it retained E&Y because of the prospect of litigation. The court is satisfied that Defendants have met their burden of showing that the E&Y documents constitute privileged work product.

Plaintiffs argue that the documents constitute "fact" and not "opinion" work product, and insist that they have overcome any qualified privilege. *See Hobley v. Burge*, 433 F.3d 946, 949-50 (7th Cir. 2006) ("The work-product privilege may be overcome 'only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.'") According to Plaintiffs, the documents "go to the heart of the substantive claims in this case" by establishing the falsity of Household's statements, Household's knowledge that the statements were false, and the materiality of revenues Household received from its alleged predatory lending practices. (Pl. E&Y Mot., at 7-8.) Plaintiffs also claim that they cannot obtain the documents from any other source without undue hardship, noting that the Class "does not have the same unfettered ability to interview Household employees nor does the Class have access to the specific data provided to E&Y." (*Id.* at 8.)

Defendants insist that the E&Y documents constitute "opinion" work product. As Defendants explain, "[a]n analysis of documents created in connection with the Compliance Engagement, even if those documents were not themselves prepared by an attorney, would undoubtedly reveal to Plaintiffs the nature and focus of the work being conducted by E&Y at the request of Household's attorneys, thereby invading the inviolable area of opinion work product."

16

(Def. E&Y Resp., at 13.) Opinion work product includes the "mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." FED. R. CIV. P. 26(b)(3); *Hollinger Int'l*, 230 F.R.D. at 511.

The court agrees that the E&Y documents constitute work product in that E&Y conducted its evaluation as an agent of Household's General Counsel's office. *See, e.g., National Jockey Club v. Ganassi*, No. 04 C 3743, 2006 WL 733549, at *1 (N.D. Ill. Mar. 22, 2006) ("The work product doctrine encompasses documents prepared in anticipation of litigation by a party's representative or agent.") The court is less certain that the documents constitute "opinion" work product as contemplated by Rule 26, and finds that Household has not met its burden on this issue. As for the fact work product, the court believes that Plaintiffs have met their burden of overcoming the privilege. *Eagle Compressors, Inc. v. HEC Liquidating Corp.*, 206 F.R.D. 474, 478 (N.D. Ill. 2002) (quoting *Trustmark Ins. Co. v. General & Cologne Life Re of America*, No. 00 C 1926, 2000 WL 1898518, at *3 (N.D. Ill. Dec. 20, 2000)). Plaintiffs have demonstrated a substantial need for the E&Y information in that it may assist Plaintiffs in establishing falsity, scienter, and materiality. Plaintiffs do not have the underlying data E&Y utilized in preparing its report, and without this information, it is not clear that witness depositions would provide Plaintiffs with the substantial equivalent of the materials. Thus, Plaintiffs' motion to compel the E&Y materials is granted.

### 3. Waiver

Before leaving this topic, the court will briefly address Plaintiffs' additional argument that Household has waived any applicable privilege by voluntarily revealing the subject matter – though not the specific details – of the Compliance Engagement to the Attorneys General. The court declines to find such a broad waiver. Indeed, "a client does not waive his attorney-client privilege merely by disclosing a subject which he has discussed with his attorney." *United States v.*

*O'Malley*, 786 F.2d 786, 794 (7th Cir. 1986) (internal quotations omitted). *See also Avery Dennison Corp. v. UCB Films PLC*, No. 95 C 6351, 1998 WL 703647, at *4 (N.D. Ill. Sept. 30, 1998).

Nor will the court find waiver based on Household's inadvertent production of certain E&Y documents to Plaintiffs during discovery. Courts must balance five factors to determine whether waiver has occurred under such circumstances: (1) the reasonableness of the precautions taken to protect the document; (2) the time taken to rectify the error; (3) the scope of discovery; (4) the extent of the disclosure; and (5) the overriding issue of fairness. *Urban Outfitters, Inc. v. DPIC Companies, Inc.*, 203 F.R.D. 376, 380 (N.D. Ill. 2001). The court is aware that Defendants' inadvertent productions in this case have complicated discovery and prompted numerous motions. Nevertheless, as the court recently noted, "Defendants have produced some four million pages of documents in this case . . . . It was not unexpected that Defendants and their agents would inadvertently produce some privileged materials and, indeed, the parties' agreed protective order outlines a procedure for returning such materials." *Lawrence E. Jaffe Pension Plan*, 237 F.R.D. at 183.

Plaintiffs argue that Defendants waited too long, until June 29, 2006, to assert the privilege. (Pl. E&Y Mot., at 9.) The court agrees that Defendants have been somewhat careless in their document production. For example, Defendants affirmatively produced some of the E&Y documents, but they claim that "[i]t was not until Defendants learned of the subpoena issued to E&Y that Defendants' counsel had occasion to inquire into the potentially privileged nature of the Compliance Engagement and to review its production for potentially privileged documents relating to that engagement." (Def. E&Y Resp., at 16.) Given the volume of documents at issue in this case, however, the court declines to find that Defendants waived the privilege. *See, e.g., Abbott Labs. v. Andrx Pharmaceuticals, Inc.*, No. 05 C 1490, 2006 WL 2092377, at *4 (N.D. Ill. July 25, 2006) (citing *Beneficial Franchise Co. v. Bank One, N.A.*, 205 F.R.D. 212, 216 (N.D. Ill. 2001)) ("[W]aivers of the attorney-client privilege are to be narrowly construed.")

18

Plaintiffs finally urge the court to find waiver based on Defendants' failure to provide a privilege log for the disputed documents for some three months between June 29 and October 16, 2006. (Pl. E&Y Mot., at 9 (citing *Burlington Northern & Santa Fe Ry. Co. v. United States Dist. Court*, 408 F.3d 1142 (9th Cir. 2005).) In *Burlington*, the Ninth Circuit upheld the lower court's finding of waiver where a privilege log "not only was not filed during the Rule 34 time limit [30 days], but was filed *five months* later," and there were no mitigating considerations. *Id.* at 1149. The court rejected, however, a *per se* waiver rule in favor of "using the 30-day period as a default guideline" in making a "case-by-case determination." *Id.* Significantly, Defendants have now provided privilege logs covering all documents in question as of September 8 and October 25, 2006. (Def. E&Y Resp., at 17; Exs. 12 and 13 to Buckley Decl.) Given that more than four million pages of documents are at issue in this case, the court declines to find waiver based on the delay in submitting a privilege log. *Cf. Universal City Dev. Partners, Ltd. v. Ride & Show Eng'g, Inc.*, 230 F.R.D. 688, 695-96 (M.D. Fla. 2005) (privilege waived due to three and a half month delay in providing a privilege log where case involved "review and production of 13,000 pages of documents.")

In sum, the E&Y documents are protected by the attorney-client and work product privileges, but they are subject to the fiduciary exception and to Plaintiffs' showing of substantial need and undue hardship. Plaintiffs' motion to compel is therefore granted.

## B. Wilmer, Cutler & Pickering

As with the E&Y documents, Plaintiffs argue that the WilmerHale documents are not protected by any privilege, and that Defendants have waived any such privilege in any event. The court considers these arguments below.

### 1.    Attorney-Client Privilege

Plaintiffs claim that the attorney-client privilege does not protect the WilmerHale documents from disclosure because the law firm's investigation "was a fact-finding mission and did not contemplate or involve the rendering of legal advice." (Pl. WCP Mot., at 3 (citing *Osterneck v. E.T. Barwick Indus., Inc.*, 82 F.R.D. 81 (N.D. Ga. 1979).) In *Osterneck*, the SEC commenced an action against defendant E.T. Barwick Industries, Inc. and certain of its officers and directors alleging that it issued materially false and misleading financial statements in violation of federal securities laws. 82 F.R.D. at 82. The litigation was terminated by a Consent and Undertaking agreement that provided, among other things, that Barwick's Board of Directors would appoint a Special Review Committee ("SRC") "to investigate and report to the full Board of Directors on the matters alleged in the [SEC's] Complaint." *Id.* at 82-83. The SRC, in turn, would appoint an individual to act as Special Counsel to the SRC. The SRC ultimately prepared and submitted its report to the Board of Directors. *Id.* at 83. Thereafter, the plaintiffs issued subpoenas for deposition testimony and documents relating to the SRC's report. Defendants asserted the attorney-client privilege, but the court held that the SRC did not provide any legal advice to the Board of Directors. Rather, the SRC "investigate[d] and report[ed]" factual information, including reviewing the practices complained of in the SEC Complaint, interviewing witnesses, compiling documents, and evaluating data. *Id.* at 83, 85-86.

Plaintiffs argue that the Restructuring Report, similarly, was designed to address only factual questions, such as (1) How did HMS actually restructure delinquent loans during 2002?; (2) What did public disclosures and company policies say about HMS's restructuring of delinquent loans during the same period?; and (3) What were the differences, if any, between HMS's practices and either its policies or the Company's public disclosures? (Pl. WCP Mot., at 4; Ex. 2 to Pl. Mot.,

at 4.) Nowhere in that Report, Plaintiffs argue, did WilmerHale provide any legal analysis or recommendations that could be subject to the attorney-client privilege. (Id.; Pl. WCP Reply, at 3–4.)

The mere fact that WilmerHale's report included some factual findings does not establish that the entire report falls outside the scope of the attorney-client privilege. As Defendants note, "fact-gathering is an essential element in an attorney's formation of legal conclusions." (Def. WCP Resp., at 7.) See also Upjohn Co. v. United States, 449 U.S. 383, 390-91 (1981) ("The first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant.") The court has reviewed the Restructuring Report and finds that WilmerHale was retained to provide legal analysis and advice. It is true that unlike the simultaneously-prepared Bankruptcy Report, which "summarizes the relevant facts we have uncovered regarding Ms. Markell's allegations, assesses the pertinent law, [and] considers the potential exposure to HMS (and its parent HI) with respect to possible claims that might be asserted against it by mortgage customers who filed for bankruptcy," the Restructuring Report "sought to address three separate but related factual questions." (Compare Ex. 1 to Pl. WCP Mot., at 1 with Ex. 2 to WCP Mot., at 4.) Within the Restructuring Report, however, WilmerHale considered both the quantitative and qualitative materiality of variances from disclosed restructuring policies, and provided legal advice as to whether Household should take corrective action. (Ex. 2 to Pl. WCP Mot., at 7, 11.) Cf. Osterneck, 82 F.R.D. at 85 (no privilege where attorneys "were employed not for their legal acumen but for their skill as investigators.")

Plaintiffs make much of the fact that a Report to the Board of Directors on 2003 Audit Committee Activities stated that the Committee retained WilmerHale to investigate "the allegations made by Ms. Markell, in order to comply with the requirements of Section 10A of the Securities Act of 1934." (Ex. A to Brooks Decl.) See also 15 U.S.C. § 78j-1. Section 10A requires that "[i]f, in the course of conducting an audit . . . [auditors] become[] aware of information indicating that an illegal act . . . may have occurred, the firm shall . . . determine whether it is likely that an illegal act

21

has occurred." 15 U.S.C. § 78j-1(b)(1). This provision "expanded independent accountants' watchdog duties," such that KPMG was required to ascertain whether Household had engaged in any illegal acts that would directly and materially affect the Company's financial statements. *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 611 (S.D. Tex. 2002). Nothing prohibited KPMG, however, from requesting legal assistance in meeting its obligations under § 78j-1(b).

Plaintiffs also suggest that communications between WilmerHale and individual Household employees, including Per Eckholdt, are not privileged because only the Audit Committee constitutes the law firm's "client." (Pl. WCP Mot., at 4-5.) Under this theory, no attorney-client relationship exists between Household employees and WilmerHale, so "any interview-related documents, such as summaries, memoranda, or notes, and any documents prepared at the request of [WilmerHale] (such as Mr. Eckholdt's Exhibit 13 and similar documents), are discoverable and should be produced immediately." (*Id.* at 5.) The court disagrees that the attorney-client relationship is so narrowly construed in the corporate context. The recent case of *SEC v. Brady*, No. 3:05-CV-1416-M, 2006 U.S. Dist. LEXIS 74979 (N.D. Tex. Oct. 16, 2006) is instructive in this regard.

In *Brady*, a corporation's audit committee hired the law firm of Baker Botts to conduct an internal investigation and give legal advice concerning potential securities claims against the corporation. *Id.* at *5. As part of its investigation, Baker Botts attorneys reviewed some 40,000 pages of documents and conducted 70 interviews with current and former company employees. Baker Botts then submitted a lengthy report detailing the results of its investigation. *Id.* at *6. The SEC ultimately filed suit against the company's former president and CEO, Gregory A. Brady. During the course of discovery, Brady moved to compel production of documents relating to the Baker Botts investigation. *Id.* at *10-11. Baker Botts objected on the grounds of privilege, and the court sustained the objection. The court viewed the employee interviews as "confidential

communications between the corporate client and its counsel," and found the law firm's report to be "the equivalent of a confidential communication between an attorney and his client." *Id.* at *23.

In this case, similarly, Household's Audit Committee retained WilmerHale to provide legal analysis and advice regarding threatened litigation. WilmerHale's client was the entire corporation, and not just the Audit Committee. Plaintiffs disagree, noting that the Engagement Letter confirms that WilmerHale's "client in this matter will be the [Audit] Committee in its role as the audit committee of the Company's board of directors." (Ex. A to Wrathall Decl., ¶ 1.) In addition, the Engagement Letter contains a "conflicts" section advising that the firm is "representing, and will continue to represent, the Company with respect to a number of other matters including advice related to areas that may be within the scope of our work for the Committee." (*Id.* ¶ 3.) That same conflicts section, however, also states that "[t]he Committee and the Company agree that we may continue to represent, and may undertake in the future to represent, existing or new clients in any matter that is not substantially related to our work for the Committee and the Company . . . ." (*Id.*) The letter further provides that "our representation of *the Committee* will terminate upon our sending *the Company* our final statement for services rendered in this matter." (*Id.* ¶ 4) (emphasis added.) The court concludes that all communications and documents relating to the WilmerHale investigation are privileged.[3]

## 2.    Work Product Privilege

The WilmerHale documents and communications are also protected by the work product privilege. Household's Audit Committee retained WilmerHale because of the prospect of litigation;

---

[3]        Plaintiffs assert, in a footnote with no explanation, that the attorney-client privilege is nonetheless inapplicable under the *Garner* exception. (Pl. WCP Mot., at 4 n.5.) The court disagrees. Unlike E&Y, discussed above, the law firm of WilmerHale was retained to provide direct legal advice and analysis. In addition, Plaintiffs have a copy of the Restructuring Report and are free to prioritize a WilmerHale witness as one of their 55 deponents. In light of the fact that Plaintiffs have not filed a derivative action; have interests that are clearly personal; and seek to recover for, and have charged Household with, injuries sustained by the investing public, not the corporation, the court declines to apply the *Garner* exception to the WilmerHale communications.

i.e., Markell's threatened lawsuit and the SEC's formal investigation. *See National Jockey Club*, 2006 WL 733549, at *1; *Lawrence E. Jaffe Pension Plan*, 237 F.R.D. at 181. In addition, as explained earlier, WilmerHale provided Household with legal advice and analysis. The fact that Household was also being represented by other counsel in those actions does not alter the court's assessment. Nor does Household's use of the Restructuring Report to assist in consummating a merger with HSBC Holdings plc. The court remains satisfied that the report was prepared in anticipation of litigation. As for Plaintiffs' remaining arguments, the court has already rejected the assertions that the work product doctrine does not extend to dual-purpose documents and/or applies only to documents created for use against the party seeking their production. (Pl. WCP Mot., at 6 n.6; Pl. WCP Reply, at 6 n.7.) *See Lawrence E. Jaffe Pension Plan*, 237 F.R.D. at 181-82. The court will not revisit either argument here.

Plaintiffs claim that they should receive the requested information in any event because they have a substantial need for the materials and will not be able to obtain their substantial equivalent without undue hardship. (Pl. WCP Mot., at 6.) As a preliminary matter, it is not clear to the court that Plaintiffs seek only fact, as opposed to opinion work product under this exception. In any event, with respect to fact work product, Plaintiffs argue that the Restructuring Report and its underlying evidentiary bases "go to the heart of this case" and "establish the falsity of Household's public disclosures respecting its restructure policies and statistics; scienter in that Household knew its public disclosures to be false; and materiality because Household's reage statistics were key indicators of the value of the Company's assets . . . and were crucial to the Company's ability to sell large blocks of its loans (securitizations) to fund its business model." (*Id.* at 6-7.) According to Plaintiffs, they need the Restructuring Report materials "to cross-examine Household's reliance on any of these materials at trial." (*Id.* at 7.) To the extent Defendants do not intend to introduce the Restructuring Report at trial, however, Plaintiffs have no substantial need for the information for cross-examination purposes. (Def. WCP Resp., at 15.)

24

Nor have Plaintiffs demonstrated that they cannot obtain the equivalent information without undue hardship. Plaintiffs insist that they cannot recreate the WilmerHale investigation because they are only allowed to take 55 depositions and, thus, cannot depose all of the individuals WilmerHale interviewed. (Pl. WCP Mot., at 7.) Plaintiffs also lament that witnesses may have forgotten crucial facts and Household may have deleted relevant email messages. (Id. at 7-8.) Plaintiffs fail to explain, nor does the court see, why they need to depose every WilmerHale interviewee in order to test the law firm's conclusions, especially where Defendants do not intend to make those conclusions part of their defense. (Def. WCP Resp., at 16.) Moreover, Plaintiffs have deposed, or have scheduled depositions of nine current or former HMS employees who can testify about the Markell allegations and the conclusions stated in the Restructuring Report. (Id.) Notably, Plaintiffs have the underlying data KPMG used to test the accuracy of the Restructuring Report, and the Report itself. Under these circumstances, Plaintiffs have not demonstrated undue hardship for purposes of overcoming the work product privilege. See Eagle Compressors, 206 F.R.D. at 478 (quoting Trustmark Ins. Co., 2000 WL 1898518, at *3) (the burden of overcoming the privilege for fact work product "is difficult to meet and is satisfied 'only in rare situations, such as those involving witness unavailability.'")

### 3. Waiver

Plaintiffs insist that even assuming the WilmerHale materials are privileged, Defendants have waived the privilege by producing the requested information, or portions of it, to the Class, KPMG, and the SEC.

#### a. Production to Plaintiffs

Plaintiffs first note that after Per Eckholdt's deposition, Defendants affirmatively waived the privilege with respect to Exhibit 13, an internal email transmitting a tabular arrangement of factual data that had been requested by WilmerHale. The fact that Defendants withdrew the privilege as

25

to a strictly factual and non-privileged document, however, does not waive the privilege as to all WilmerHale materials. *Cf. In re Bank One Sec. Litig., First Chicago Shareholder Claims*, 209 F.R.D. 418, 423 (N.D. Ill. 2002) (noting that waiver of attorney-client and work product privileges occurs where party discloses actual attorney *work product* to an adversary). For similar reasons, Defendants' production of two other factual documents is insufficient to waive the privilege. The first is an internal email forwarding an email addressed to an attorney, which "merely identifies and attaches a tabular array of nonprivileged pre-existing factual information." (Def. WCP Resp., at 10; Ex. 11 to Pl. WCP Mot.) The second is an internal Household presentation that includes a reference to "estimates" having been prepared at WilmerHale's request, but does not include or describe those estimates. (*Id.*; Ex. 12 to Pl. WCP Mot.)

The court is also unpersuaded that a waiver occurred based on testimony Louis E. Levy, former chair of Household's Audit Committee, purportedly gave at his deposition. According to Plaintiffs, Mr. Levy testified "as to the substance of discussions he had with [WilmerHale]." (Pl. WCP Mot., at 9.) The cited transcript pages, however, confirm that Mr. Levy was discussing the substance of the SEC investigation, and not WilmerHale's investigation. (Ex. 4 to Pl. Mot., Levy Dep., at 188.)

Finally, the court declines to find waiver based on Defendants' error in producing the March 17, 2003 draft Restructuring Report to Plaintiffs during the course of discovery. Two other copies of the same draft report are included on Defendants' privilege logs, indicating that Defendants did not intend to produce the document, and Defendants have since recalled the document pursuant to the Protective Order. (Def. WCP Resp., at 10-11.) Given the volume of documents at issue in this case, the court declines to find that Defendants waived the privilege. *See Abbott Labs.*, 2006 WL 2092377, at *4 ("[W]aivers of the attorney-client privilege are to be narrowly construed.")

As for Plaintiffs' concern that Defendants are attempting to use favorable portions of the WilmerHale materials as a sword while simultaneously withholding unfavorable portions under the

work product shield, the court notes that Defendants do not intend to use the Restructuring Report, or any of the underlying privileged documents, in its defense of this case.

### b. Production to KPMG

Plaintiffs also seek a finding of waiver based on the fact that Household produced the Restructuring Report and related documents to its outside auditor, KPMG. (Pl. WCP Mot., at 11.) The court has already addressed and rejected Plaintiffs' arguments regarding disclosure to an auditor. See Lawrence E. Jaffe Pension Plan, 237 F.R.D. at 183 ("[T]he fact that an independent auditor must remain independent from the company it audits does not establish that the auditor also has an adversarial relationship with the client as contemplated by the work product doctrine. Disclosing documents to an auditor does not substantially increase the opportunity for potential adversaries to obtain the information.") The court will not revisit this ruling here.

### c. Production to the SEC

Plaintiffs finally seek waiver of the privilege based on Household's production to the SEC of "documents summarizing the Restructuring Report." (Pl. WCP Mot., at 11.) Defendants argue that they only provided the SEC with documents "which transmit pre-existing factual material that did not become privileged merely by virtue of having been provided to WilmerHale." (Def. WCP Resp., at 11-12.) Defendants also emphasize that Household expressly withheld any privileged materials pursuant to a privilege log and agreed to the SEC's request for access to the Restructuring Report only on condition that the SEC enter into a written confidentiality agreement. (Id. at 4, 11-12; Exs. G and H to Beer Decl.) That July 16, 2003 confidentiality agreement specifically stated that "neither the Committee nor Household intend to waive the protections of the attorney work product doctrine, attorney-client privilege, or any other privilege applicable as to third parties." (Ex. H to Beer Decl.)

Plaintiffs argue that Defendants cannot produce privileged material to a governmental agency for their own benefit and then still assert the privilege here. In other words, Plaintiffs ask the court to reject the "selective" or "limited" waiver theory, which provides that a party may disclose documents to a government agency without waiving the privilege as to any other party. As discussed below, the circuit courts are split as to the viability and application of this theory. Some have found that selective waiver is always permissible; some have found that selective waiver is never permissible; and others have found that selective waiver is permissible when the government has signed a confidentiality agreement. The court finds this last approach most persuasive in this case.

### 1.    Courts Allowing Selective Waiver

The Eighth Circuit has adopted the theory of selective waiver in the context of the attorney-client privilege. In *Diversified Indus., Inc. v. Meredith*, 572 F.2d 596 (8th Cir. 1977), a company voluntarily produced privileged material to the SEC pursuant to an agency subpoena. In a subsequent lawsuit, the company denied that it had waived the attorney-client privilege by virtue of that production. The Eighth Circuit agreed, finding that the SEC disclosure constituted only a limited waiver. The court explained that a contrary holding "may have the effect of thwarting the developing procedure of corporations to employ independent counsel to investigate and advise them in order to protect stockholders, potential stockholders and customers." *Id.* at 611.

### 2.    Courts Rejecting Selective Waiver

Many other courts have rejected the concept of selective waiver of the attorney-client privilege, finding that "[v]oluntary cooperation with government investigations may be a laudable activity, but it is hard to understand how such conduct improves the attorney-client relationship." *Permian Corp. v. United States*, 665 F.2d 1214, 1220-21 (D.C. Cir. 1981). These courts explain that "[t]he client cannot be permitted to pick and choose among his opponents, waiving the privilege

for some and resurrecting the claim of confidentiality to obstruct others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit." *Id.* at 1221. *See also United States v. Massachusetts Institute of Tech.*, 129 F.3d 681, 686 (1st Cir. 1997) ("Anyone who chooses to disclose a privileged document to a third party, or does so pursuant to a prior agreement or understanding, has an incentive to do so, whether for gain or to avoid disadvantage. It would be perfectly possible to carve out some of those disclosures and say that, although the disclosure itself is not necessary to foster attorney-client communications, neither does it forfeit the privilege. With rare exceptions, courts have been unwilling to start down this path – which has no logical terminus – and we join in this reluctance."); *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1425 (3d Cir. 1991) ("[S]elective waiver does not serve the purpose of encouraging full disclosure to one's attorney in order to obtain informed legal assistance; it merely encourages voluntary disclosure to government agencies, thereby extending the privilege beyond its intended purpose."); *In re Martin Marietta Corp.*, 856 F.2d 619, 623-24 (4th Cir. 1988) ("The Fourth Circuit has not embraced the concept of limited waiver of the attorney-client privilege.")

The Sixth Circuit has similarly joined the First, Third, Fourth, and D.C. Circuits in rejecting selective waiver. In *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289 (6th Cir. 2002), the Sixth Circuit determined that courts view selective waiver in one of three ways: (1) selective waiver is permissible; (2) selective waiver is not permissible in any situation; and (3) selective waiver is permissible where the Government agrees to a confidentiality order. *Id.* at 295. In rejecting any form of selective waiver, the court explained that the first approach "has little, if any, relation to fostering frank communication between a client and his or her attorney." *Id.* at 302. The court also found that any form of selective waiver, even that which stems from a confidentiality agreement, transforms the attorney-client privilege into "merely another brush on an attorney's palette, utilized and manipulated to gain tactical or strategic advantage." *Id.* The First, Third,

Fourth and Sixth Circuits also declined to find selective waiver in the context of work-product. *Westinghouse*, 951 F.2d at 1429; *Columbia/HCA Healthcare*, 293 F.3d at 306; *Martin Marietta*, 856 F.2d at 625-26 (company waived non-opinion work product privilege by making testimonial use of privileged matters in an effort to settle the government's criminal investigation); *Massachusetts Inst. of Tech.*, 129 F.3d at 687 ("[I]t would take better reason than we have to depart from the prevailing rule that disclosure to an adversary, real or potential, forfeits work product protection.")

Most recently, the Tenth Circuit declined to adopt the selective waiver doctrine where a company chose not to produce some 390,000 pages of privileged documents to the SEC and the Department of Justice ("DOJ"), but chose to produce 220,000 other pages of privileged documents pursuant to subpoena and written confidentiality agreements with each agency (the "waiver documents"). *In re Qwest Communications Int'l Inc.*, 450 F.3d 1179, 1181 (10th Cir. 2006). The confidentiality agreement with the SEC stated that the agency would not disclose the documents to third parties "except to the extent that the Staff determines that disclosure is otherwise required by law or would be in furtherance of the Commission's discharge of its duties and responsibilities." *Id.* The DOJ agreement contained similar language, but further provided that the DOJ could share the waiver documents with other state, local, and federal agencies, and could "make direct or derivative use of the [waiver documents] in any proceeding and its investigation." *Id.* In other agreements with the DOJ, the company also agreed that the agency could "make full use of any information it obtains under this agreement in any lawful manner in furtherance of its investigation, including, without limitation, analyses, interviews, grand jury proceedings, court proceedings, consultation with and support of other federal, state or local agencies, consultations with experts or potential experts, and the selection and/or retention of testifying experts." *Id.* at 1181-82.

In the course of a subsequent securities fraud case, the company argued that it should not be required to produce the waiver documents to the plaintiffs, but the Tenth Circuit disagreed. After conducting an extensive review and analysis of the current case law relating to selective

waiver, the court concluded that "[t]he record does not establish a need for a rule of selective waiver to assure cooperation with law enforcement, to further the purposes of the attorney-client privilege or work-product doctrine, or to avoid unfairness to the disclosing party." *Id.* at 1192. The court found that "[r]ather than a mere exception to the general rules of waiver, one could argue that Qwest seeks the substantial equivalent of an entirely new privilege, i.e., a government-investigation privilege." *Id.* The court was unwilling, on the record before it, to take such a giant leap in the common law development of privileges. *Id.*

The Seventh Circuit has not yet determined whether it endorses the concept of selective waiver, though courts in this district have not viewed it with particular favor. In *In re Bank One Sec. Litig.*, for example, the court found that the defendant had waived the work-product privilege with respect to documents produced to the Office of the Comptroller of the Currency ("OCC"). 209 F.R.D. at 424. The court acknowledged that the defendant had "complied with an OCC investigation in which documents were ordered to be produced," but held that "the voluntary nature of the disclosure is not dispositive as to whether the work-product privilege has been waived." *Id.* The court also rejected any reliance on a confidentiality agreement between the defendant and the OCC, finding that it "does not salvage the protection of the work-product doctrine due to the adversarial nature of this relationship." *Id. See also In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 407, 427 (N.D. Ill. 2006) (defendants waived any claim of privilege by producing "a raft of documents to the Department of Justice pursuant to subpoena.")

### 3.    Courts Allowing Selective Waiver with Confidentiality Agreement

As noted, the Seventh Circuit has not yet determined its position on selective waiver. It has, however, left the door open for this theory. In *Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122 (7th Cir. 1997), the government played certain tapes for corporate defense counsel to persuade the company to plead guilty. *Id.* at 1124. The plaintiffs in the ensuing civil litigation against the

31

company argued that the government had waived its law enforcement privilege by playing the tapes. *Id.* Without taking a formal position on the selective waiver issue, the Seventh Circuit noted that courts generally have rejected it, explaining that "courts feel, reasonably enough, that the possessor of the privileged information should have been more careful, as by obtaining an agreement by the person to whom they made the disclosure not to spread it further." *Id.* at 1127. The court found that the government had not deliberately waived its privilege but, rather, had made a mistake in failing to obtain "a promise that none of the lawyers or directors would show the notes to anyone else." *Id.* at 1126, 1127. The court therefore held that the government had not waived its law enforcement privilege in that case. *Id.* at 1127.

Other courts have affirmatively endorsed the theory of selective waiver where the parties have entered into confidentiality agreements. In *In re Steinhardt Partners, L.P.*, 9 F.3d 230 (2d Cir. 1993), for example, the Second Circuit declined to adopt a *per se* rule that all voluntary disclosures to the government waive work product protection. The court explained that any such rigid rule would fail to anticipate "situations in which the SEC and the disclosing party have entered into an explicit agreement that the SEC will maintain the confidentiality of the disclosed materials." *Id.* at 236. *See also In re Leslie Fay Companies, Inc. Sec. Litig.*, 161 F.R.D. 274, 284 (S.D.N.Y. 1995) (disclosures "made pursuant to confidentiality agreements intended to preserve any privilege applicable to the disclosed documents" satisfied the standard set forth in *Steinhardt*).

In *In re M & L Business Mach. Co.*, 161 B.R. 689 (D. Colo. 1993), a bank sought a protective order for attorney letters and memoranda that had been previously provided to the United States Attorney to assist in an investigation of one of the bank's clients, defendant M & L Business Machine Co. *Id.* at 691-92. The bank had cooperated with the U.S. Attorney's investigation "subject to the requirement that any information provided under the Letter Agreement be treated as privileged, subject to protection under FED. R. CRIM. P. 16(a)(2) and not be disseminated except as required under federal law or the rules of criminal procedure." *Id.* at 691.

In finding that the bank did not waive the attorney-client privilege, the court noted that the bank had taken "substantial steps" to ensure the confidentiality of the materials; and there was no evidence that the bank's cooperation in the investigation was for its personal benefit. *Id.* at 696. *See also United States v. Billmyer,* 57 F.3d 31, 37 (1st Cir. 1995) ("If there were ever an argument for limited waiver, it might well depend importantly on just what had been disclosed to the government and on what understandings. Without intending to preclude such an argument in a future case, we think that it is enough in this one to say that no such claim of limited waiver has been argued to us.")

A New York district court similarly endorsed this compromise position in *Teachers Ins. & Annuity Ass'n of America v. Shamrock Broadcasting Co.,* 521 F. Supp. 638 (S.D.N.Y. 1981). The court recognized a limited waiver where a party expressly reserved, at the time of disclosure, the right to assert the privilege in other proceedings. The court reasoned that "a contemporaneous reservation or stipulation would make it clear that . . . the disclosing party has made some effort to preserve the privacy of the privileged communication, rather than having engaged in abuse of the privilege by first making a knowing decision to waive the rule's protection and then seeking to retract that decision in connection with subsequent litigation." *Id.* at 646.

### 4.     Application to this Case

This court cannot say with any certainty whether the Seventh Circuit would apply selective waiver in this context, and the court declines to adopt a *per se* rule regarding waiver with respect to government disclosures. In this case, Household voluntarily disclosed privileged documents to the SEC. Notably, on or about July 3, 2003, Household recalled from the SEC several privileged documents that had been inadvertently produced. (Ex. N to Brooks Decl.) On July 16, 2003, however, Household agreed to produce the documents "[i]n light of the interest of the Staff of the

33

U.S. Securities and Exchange Commission . . . in determining whether there have been any violations of the federal securities laws . . . ." (Ex. H to Beer Decl.)

That said, Household insisted on a confidentiality agreement to protect the information. The court agrees with those cases finding that selective waiver may be appropriate where the disclosing party took steps to preserve its privilege. The agreement in this case expressly stated that "neither the Committee nor Household intend to waive the protections of the attorney work product doctrine, attorney-client privilege, or any other privilege applicable as to third parties." (Ex. H to Beer Decl., at 1.) Plaintiffs make much of the fact that the agreement also allows the SEC to disclose the confidential information "to the extent that the Staff determines that disclosure is otherwise required by law or would be in furtherance of the Commission's discharge of its duties and responsibilities." (Id. at 2.) Plaintiffs note that the Qwest Communications court found that identical confidentiality language did not preclude waiver because it "gave the [SEC and DOJ] broad discretion to use the Waiver Documents as they saw fit." 450 F.3d at 1181, 1194. The language in the DOJ's confidentiality agreement, however, was much broader than the language at issue here. In addition, unlike in Qwest, there is no evidence that "any restrictions on [the documents'] use were loose in practice." Id. at 1194. Thus, the court finds the agreement sufficient for purposes of applying selective waiver of the WilmerHale documents in this case. Household has not waived the work-product privilege by its voluntary production to the SEC of otherwise-privileged documents, and Plaintiffs' motion to compel is denied.[4]

---

[4]    The court notes that the Advisory Committee on Evidence Rules has proposed the following amendment to FED. R. EVID. 502:

> Selective waiver. – In a federal or state proceeding, a disclosure of a communication or information covered by the attorney-client privilege or work product protection – when made to a federal public office or agency in the exercise of its regulatory, investigative, or enforcement authority – does not operate as a waiver of the privilege or protection in favor of non-governmental persons or entities.

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion to Compel Documents Pertaining to Household's Consultations with Ernst & Young LLP [Doc. 708] is granted, but their Motion to Compel Further Responses to the Class' Questions for Per Eckholdt Concerning Exhibit 13 and the Production of Documents Underlying Wilmer, Cutler & Pickering Reports [Doc. 712] is denied.

ENTER:

Dated: December 6, 2006

*Nan R. Nolan*

NAN R. NOLAN
United States Magistrate Judge