# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 5893 | **DATE** | 3/23/2009 |
| **CASE TITLE** | Jaffe vs. Household et al. | | |

**DOCKET ENTRY TEXT**

Minute entry dated 3/23/09 [1526] is amended as follows to include pages 1-3: For the reasons provided in this Minute Order, the Court denies defendants' *Daubert* motion to exclude the testimony of Daniel Fischel pursuant to Federal Rule of Evidence ("Rule") 702 [doc. no. 1361].

■[ For further details see text below.]  Docketing to mail notices.

## STATEMENT

Under Rule 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993), a court must conduct a three-step inquiry: "[1] the witness must be qualified as an expert by knowledge, skill, experience, training, or education; [2] the expert's reasoning or methodology underlying the testimony must be scientifically reliable; and [3] the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue." *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007) (citations and quotation omitted).

Defendants argue that Daniel Fischel's testimony is inadmissible because his causation analysis is not useful to the fact finder in that he did not evaluate any causal connection, assumed his conclusion thereby making his opinion regarding causation useless to the fact finder and merely concluded that there is economic evidence "consistent with" plaintiffs' allegations but did not rule out non-fraud explanations. The Court disagrees.

Fischel's report, rebuttal report and documents underlying those reports establish that Fischel analyzed in detail the causal relationship between defendants' conduct and investors' losses. Fischel utilizes a well-established methodology in analyzing loss causation in securities fraud cases: an event study. *See Carpe v. Aquila, Inc.*, No. 02-0388-CV, 2005 WL 1138833, at *4 (W.D. Mo. Mar. 23, 2005) ("Failure to conduct an event study comparing the stock's price to the market as a whole or a selected index of similar businesses is enough to cause an expert's opinion to be excluded."); *see also In re Imperial Credit Indus. Sec. Litig.*, 252 F. Supp. 2d 1005, 1014-16 (C.D. Cal. 2003) (barring expert report that did not include an event study and stating that "[a] proper measure of damages in the securities context . . . requires elimination of that portion of the price decline or price difference which is unrelated to the alleged wrong."), *aff'd sub nom. Mortensen v. Snavely*, 145 Fed. Appx. 218 (9th Cir. 2005); *In re Executive Telecard, Ltd. Sec. Litig.*, 979 F. Supp. 1021, 1025 (S.D.N.Y. 1997) (excluding expert testimony because "[t]he reliability of the Expert

**STATEMENT**

Witness' proposed testimony is called into question by his failure to indicate . . . whether he conducted an 'event study' to determine whether [defendant's] stock price was affected by company specific factors exclusive of the challenged fraud").

To the extent that defendants take issue with Fischel's analysis, they are, in essence, questioning the validity of the use of an event study to establish materiality and causation. However, an event study is "[t]he gold standard, which is accepted by both courts and economists . . . ." Marge S. Thorsen et al., *Rediscovering the Economics of Loss Causation*, 6 J. Bus. & Sec. L. 93, 99 (2006).

> An event study is an examination of the association between news about a company (good, bad, or neutral) and stock price movements. The researcher is examining whether the association between news and share price movements is strong enough to support an inference of, among other things, causation. If price movements are found that are unexplained by the "market model" and are statistically significant, either individually or collectively, a causal connection between the event in question and price movements is established. The study will separate out the effects of company-specific news on the stock price from the effects of market or industry forces on the price, thereby identifying the "true" price and the inflationary component thereof. Typically, event studies work backward from what is ultimately determined to be a fair price, after dissipation of inflation, to determine how much inflation was contained in the price due to fraud during the relevant time frame all the way back to the beginning.

*Id.* "Event study analysis is a ubiquitous tool in assessing claims of loss causation as well as the 'materiality' of misstatements or fraudulently omitted information." Allen Farrell & Atanu Saha, *The Loss Causation Requirement for Rule 10b-5 Causes of Action: The Implications of* Dura Pharmaceuticals, Inc. v. Broudo, 63 Bus. Law. 163, 166 (2007). "Use of an event study or similar analysis is necessary more accurately to isolate the influences of information specific to [the issuer] which defendants allegedly have distorted." *In re Oracle Sec. Litig.*, 829 F. Supp. 1176, 1181 (N.D. Cal. 1993); *see* Sanjai Bhagat & Roberta Romano, *Event Studies and the Law: Part II: Empirical Studies of Corporate Law*, 4 Am. Law & Econ. Rev. 380, 400 (Fall 2002) ("It is therefore safe to conclude that, with regard to securities litigation, the methodology's appropriateness for valuation issues is a settled part of the landscape . . . .").

Typically, defendants, rather than plaintiffs, in securities fraud litigation rely on the event study approach because it may underestimate the amount of inflation in certain circumstances, e.g., when there is leakage of true information. *See* Sanjai Bhagat & Roberta Romano, *Event Studies and the Law: Part II: Empirical Studies of Corporate Law*, 4 Am. Law & Econ. Rev. 380, 400 (Fall 2002) ("[T]he event study technique will understate the damages . . . because part of the impact of the information has been incorporated into the stock price before the announcement date."). It is interesting to note that in the instant case, however, plaintiffs rely on the event study approach and defendants rely on the comparable index approach. *See* Paul Grier, *Establishing Upper and Lower Limits for Settlement Negotiations in Rule 10b-5 Class Action Litigation*, in Securities Litigation 1993 at 445 (PLI Corp. Litigation and Administrative Practice Series No. 479, 1993) ("[T]he event study approach underestimates damages because it assumes that the event effects the security price only on specific class period days while the comparable index approach assumes that the event can effect the security price on all of the class period days.").

Anomalies aside, Fischel offers the jury two ways to determine whether defendants' conduct caused investors' loss, both of which utilize the event study method: quantification using specific disclosures and quantification using leakage.[1] Fischel's methodologies involve precisely the kind of analysis that finds

**STATEMENT**

extensive support in economic, legal and financial articles. *See, e.g.*, G.N. Pettengill & J.M. Clark, *Estimating Expected Returns in an Event Study Framework: Evidence from the Dartboard Column*, 40 Quarterly Journal of Business & Economics (2001), at 19; A.C. MacKinlay, *Event Studies in Economics and Finance*, 35 J. Econ. Literature (March 1997), at 13-39; Mark L. Mitchell & Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission*, 49 Bus. Law. 545, 545-90 (1994); Bradford Cornell & R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. Rev. 883, 899 (1990).

     Fischel's event study (as do all event studies) employs a regression analysis, which measures stock price movements upon disclosure of new information, rather than the omission of information. *See* Daniel P. Lefler & Allan W. Kleidon, *Just How Much Damage Did Those Misrepresentations Actually Cause and to Whom?: Damages Measurement in "Fraud on the Market" Securities Class Actions*, in Securities Litigation & Enforcement Institute 2005, at 285, 289 (PLI Corp. Law & Practice, Course Handbook Series No. 6746, 2005) (". . . [U]nder *Dura*, the principle of loss causation limits recovery to the price reaction that actually occurred at the time of the disclosure (or disclosures) that actually occurred."). Fischel's regression analysis calculates the amount of artificial inflation resulting from an alleged omission on any day during the class period. It estimates the effect of the specific corrective disclosures and information leakage that caused dissipation of the artificial inflation that existed from the time of the first actionable nondisclosure and subtracts from the equation general market movements in order to determine the true effect of the information disclosed.

     In sum, the Court holds that Fischel's testimony is admissible because he evaluated the causal connection between defendants' conduct and investors' loss via a reliable methodology that accounts for non-fraud explanations. Accordingly, Fischel's testimony will assist the trier of fact to understand the evidence and determine facts in issue. The Court thus denies defendants' motion to exclude Fischel's testimony.

---

1. To the extent that defendants rely on *In re Williams Securities Litigation* for the proposition that Fischel's quantification based on leakage is inadmissible, the Court finds the case inapposite. 496 F. Supp. 2d 1195, 1272 (N.D. Okla. 2007). In that case, the court barred the loss causation expert's testimony because he "performed no regression analysis, or even an analysis of statistical significance, to differentiate fraud-related effects from forces unrelated to the fraud." *Id.* In the instant case, however, Fischel performed a regression analysis and employed a statistical significance measure in his event study.