UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LAWRENCE E. JAFFE PENSION PLAN, ON BEHALF OF ITSELF AND ALL OTHERS SIMILARLY SITUATED,<br><br>                          Plaintiffs,<br><br>     *- against -*<br><br>HOUSEHOLD INTERNATIONAL, INC., ET AL.,<br><br>                          Defendants. | Lead Case No. 02-C-5893<br>(Consolidated)<br>CLASS ACTION<br>Judge Ronald A. Guzmán |

## **DEFENDANTS' MOTION FOR NEW TRIAL PURSUANT TO RULE 59**

Defendants Household International, Inc., William F. Aldinger, David A. Schoenholz and Gary Gilmer (collectively, "Defendants"), by and through their attorneys, hereby move for an order granting Defendants a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure,[1] on the grounds set forth herein.

Defendants are filing, concurrently with this Motion, a Motion for Judgment as a Matter of Law Pursuant to Rule 50(b), which is incorporated herein by reference. The evidence

---

[1] No judgment can be (or has been) entered in this bifurcated proceeding until both liability and damages have been fully resolved. The time limitations for post-judgment motions do not begin to run until a separate document setting forth the judgment in compliance with Rule 58 has been entered. *Dunn v. Truck World, Inc.*, 929 F.2d 311, 313 (7th Cir. 1991). Defendants do not waive and expressly reserve the right to file additional post-trial motions, if necessary, as late as after the conclusion of the remainder of this bifurcated proceeding. However, pursuant to the Court's instructions on May 7, 2009, Defendants file this Motion to address the initial class-wide verdicts, with a supporting memorandum to follow not later than July 6, 2009.

at trial warrants entry of judgment for Defendants on the grounds set out in that motion. However, if the Court disagrees, then those same grounds call for a new trial because any verdict for Plaintiffs is unsupported by the record and contrary to the clear weight of the evidence.[2] Furthermore, a new trial is also required by erroneous evidentiary rulings and jury instructions, inconsistencies in the jury's verdicts, and the cumulative effect of such errors leading to a verdict against the clear weight of the evidence, set out below:

    1.    The jury's purported finding of inflation based solely on the legally untenable "leakage theory" proposed by Plaintiffs is unsupportable because it admittedly includes as inflation stock price movements that were "not at all fraud related." (Tr. 2959:24 - 2960:17.) This type of "leakage" model has been repeatedly rejected for failure to comply with the requirements of *Dura Pharmaceuticals* v. *Broudo*, 544 U.S. 336 (2005), most recently by the Tenth Circuit Court of Appeals. *See In re Williams Securities Litigation*, 558 F.3d 1130, 1135 (10th Cir. 2009). Although Defendants dispute that the jury made any determination of "damages", no jury could determine damages in terms of inflation per share per day based on this discredited "leakage" theory. The jury's finding of inflation was also improper because the jury applied the "leakage" model in a manner that is inconsistent with the theory and the assumptions upon which it was conceived.

---

[2] Federal courts may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). These grounds include, but are not limited to, claims that: "(1) the verdict is against the clear weight of the evidence; (2) the damages are excessive; or (3) the trial was unfair to the moving party." *Hot Wax, Inc.* v. *S/S Car Care*, 1999 WL 966094, at *1 (N.D. Ill. Oct. 14, 1999) (Hart, J.) (citing *Allison* v. *Ticor Title Ins. Co.*, 979 F.3d 1187, 1196 (7th Cir. 1992)); *see also McNabola* v. *Chicago Transit Authority*, 10 F.3d 501, 516 (7th Cir. 1993).

2.  Judicial error with respect to jury instructions deprived Defendants of a fair trial, including but not limited to the following prejudicial errors:

(a) Providing a confusing loss causation instruction that failed to instruct the jury that Plaintiffs had to prove the causative link between the allegedly fraudulent statement (the up-leg) and the claimed loss (the down-leg) entirely *during* the Relevant Period. *See Tricontinental Industries, Ltd.* v. *PricewaterhouseCoopers, LLP*, 475 F.3d 824, 843 (7th Cir. 2007).

(b) Instructing the jury to make a determination of "damages" which was confusing and inaccurate because the jury was to determine only inflation, not damages, and defining the measure of "actual damages" in a manner that incorrectly stated the law post-*Dura*.

(c) Failing to instruct the jury that a finding of scienter requires "a mental state embracing intent to deceive, manipulate, or defraud" and instead instructing the jury that a finding of scienter depends on what a defendant "knew or should have known," thus impermissibly weakening the standard for finding scienter on the basis of recklessness.

(d) Providing the jury an additional "Proof of Knowledge or Intent" instruction that placed undue emphasis on the individual Defendants' credibility and was redundant, cumulative, unnecessary and confusing in light of the separate scienter instruction.

(e) Improperly instructing the jury that it could find liability if "the defendant made, *approved, or furnished information to be included in* a false statement" even if such a defendant did not make the statement, which misstated the law and rendered superfluous the elements of Section 20(a) liability.

(f) Improperly instructing the jury that a defendant has a duty to disclose information if its omission would render a "prior statement" misleading, which is an incorrect statement of the law.

(g) Refusing to provide an instruction on "puffery" either separately or as part of the "materiality" instruction, notwithstanding the Court's statement that "there is no bright line that separates actionable statements from puffery." (Docket 1502). This refusal hindered the jury's ability to determine whether certain statements were inactionable promotional phrases, predictions of growth or optimistic statements.

(h) Improperly instructing the jury regarding spoliation after ruling that a finding of spoliation was not warranted, and failing to specify that any adverse inference requires a finding that a defendant had a duty to preserve the allegedly destroyed evidence and that the requisite finding of bad faith depends on a determination that evidence was destroyed for the purpose of concealing information from the Plaintiffs in this action.

(i) Refusing to give Defendants' requested instruction on "Representation of Witnesses", which counsel for Plaintiffs exploited by asking every witness about legal representation by defense counsel and then arguing that counsel for Defendants had "circled the wagons" -- a thinly-veiled insinuation that common representation was part of a scheme to provide false testimony.

(j) Refusing to give Defendants' "Expert Testimony Does Not Prove Facts Relied Upon" instruction, which allowed the jury to conclude that the information conveyed by Plaintiffs' experts as a basis for their "opinions" could be considered as fact. Plaintiffs' experts' testimony largely consisted of reading into the record documents not

separately authenticated (and often inadmissible to prove the truth of their contents) and purporting to explain their meaning.

(k) Refusing to give Defendants' "Disbelieving Testimony Not Sufficient Basis for Contrary Conclusion" instruction on the incorrect grounds that there was evidence in the record on every issue in the case (there was not), which was exploited by counsel for Plaintiffs in summation.

3. Judicial error with respect to the verdict form deprived Defendants of a fair trial, including but not limited to the following prejudicial errors:

(a) The form allowed consideration of the discredited "leakage" model as a basis for a finding of inflation.

(b) The failure to require particularized findings as to the 10b-5 elements for each statement permitted the jury to leap to a decision based on emotion rather than on the basis of the evidence. Even if the jury wanted to decide on the basis of the evidence, omitting the elements deprived the jury of guidance as to factual determinations that were necessary prerequisites to their verdicts, leading to jury confusion and depriving the Court (and appellate courts) of information that would be useful in interpreting and reconciling the jury's inconsistent verdicts. The verdict form also took the determination of scienter away from the jury by suggesting that scienter had already been decided and providing the jury only two permitted choices: "knowingly" or "recklessly".

(c) The grouping of multiple separate statements into one actionable disclosure defect simply because they were contained in the same press release, 10-K or 10-Q permitted a finding of liability without the jury's having found all the 10b-5 elements as to any one statement. Similarly, forcing the jury rather than Plaintiffs to identify which

of Plaintiffs' three theories applied to each statement was a recipe for confusion which led to irreconcilably inconsistent verdicts.

(d) The form provided no guidance if the jury rejected one or more of Professor Fischel's corrective disclosure dates.

(e) The refusal to include Arthur Andersen in the verdict form's "percentage of responsibility" calculation undeniably prejudiced Defendants and contravened the PSLRA because the vast majority of statements found by the jury to give rise to liability were found to be "reckless" violations and thus subject to allocation. The Court relied on an incorrect statement of the law (that the PSLRA does not permit liability to be allocated to a settling party who was a "knowing" violator) in striking Andersen from the form, notwithstanding Plaintiffs' binding judicial admissions that Andersen participated in the alleged fraud and made false statements with scienter and the fact that the only putative evidence of scienter at trial as to the restatement (Defendants submit there was none) was equally applicable to Andersen. Moreover, the PSLRA entitles Defendants to a reduction in the *greater* amount of (i) the percentage of responsibility of Andersen or (ii) the amount paid to Plaintiffs by Andersen. The Court's actions deprived Defendants of the statutory benefit of the former and improperly limited the available credit to the amount of Andersen's paltry settlement payment.

4. The combination of judicial errors in the jury charge and verdict form and the failure of Plaintiffs to meet their burden of proof as to multiple elements led the jury to return irreconcilably inconsistent verdicts that are unsupported by the factual record and against the clear weight of the evidence. Where, as here, "no rational jury could have brought back the verdicts that were returned," a new trial is required. *Deloughey v. City of Chicago*, 422 F.3d 611,

617 (7th Cir. 2005); *Turyna v. Martam Const. Co., Inc*., 83 F.3d 178 (7th Cir. 1996). The glaring deficiencies that render the jury's verdicts internally inconsistent and inconsistent with any purported general findings of liability include the following:

>  (a) The jury's finding that 23 of the 40 challenged statements were not actionable securities fraud renders any finding of inflation based on Plaintiffs' legally untenable "leakage" theory unsupportable as a matter of law. Because statements regarding each of Plaintiffs' three theories interspersed throughout the beginning, middle, and end of the relevant class and leakage periods were found not actionable, the "leakage" model (which was based on an all-or-none proposition as to liability beginning on a date to be chosen by the jury) is inapplicable. For example, in the Inflation Table, the jury found that the full amount of inflation arose on March 23, 2001, but the only statement found to be false on that date related solely to Plaintiffs' "predatory lending" theory -- not to either of the other two theories of fraud, which purportedly contributed to the levels of inflation proposed in Plaintiffs' "leakage" chart. These and related inconsistencies render the verdicts internally unsupportable, render meaningless any inflation amounts established on this basis, and at the very least mandate a new trial as to the amount of inflation.
>
>  (b) The jury found that the amount of inflation increased on days where there was no alleged false statement or where the jury explicitly rejected Plaintiffs' contention that a statement was false.[3]

---

3    For example, the Inflation Table indicates an increase in inflation from $21.54 on 9/21/01 to $23.94 on 9/28/01 despite the fact that the jury found no false statement during that time; inflation increased again on 10/15/01 from $23.59 to $23.94 despite the absence of any alleged false statement on that day; and inflation increased from $14.84 on 7/1/02 to $15.76 on 7/3/02 despite the fact that the jury found the alleged false statement on 7/2/02 was not actionable (and Professor

Footnote continued on next page.

(c)　　Applying Plaintiffs' "leakage" table, the jury also found that inflation declined on certain days before November 15, 2001, the date Professor Fischel testified that the inflation began to "leak out" of the stock price. Thus, any award of "damages" is inconsistent with the factual record and contrary to (and thus unsupported by) Professor Fischel's own testimony.[4]

(d)　　The jury found that none of the challenged statements up to and including the January 17, 2001 press release was fraudulent, but then found that the 2000 10-K filed on March 28, 2001 was actionable under each of Plaintiffs' three theories as to all four Defendants. However, the non-fraudulent January 17, 2001 and fraudulent March 28, 2001 statements were essentially the same: both announced earnings and net income, applauded growth, profitability and improved credit quality, and set out chargeoff and delinquency statistics. There is no evidence in the record that anything happened during that two-month period (neither generally, nor as to any theory or any Defendant) to suddenly give rise to scienter, materiality, or falsity.

(e)　　More specifically, as for Plaintiffs' restatement claim, the verdicts are wholly inconsistent and irreconcilable. The credit card accounting remained the same from before the Relevant Period, through the first statement at issue (the second quarter

---

Footnote continued from previous page.

Fischel in his event study identified no news that was revealed to the market on 7/2/02).

[4]　For example, the jury found that inflation decreased from $23.94 on September 10, 2001 to $22.61 on September 17, 2001, and similarly found that inflation declined from $23.94 to $23.59 on October 12, 2001. But Professor Fischel testified that November 15, 2001 was "the first date . . . that investors began to learn the truth about Household's lending practices" under both of his conflicting inflation models. (Tr. 4308:23-4309:7, 4314:8-14, 4324:15-20)

-8-

1999 10-Q filed on August 16, 1999) up until August of 2002 (the restatement). Yet the jury found each of the challenged financial statements non-actionable from 1999 through January 2001, and only found liability beginning as of March 28, 2001, a finding that could not have been reached unless Plaintiffs had introduced evidence to suggest that Defendants learned the accounting treatment was "false" between January and March, 2001. In fact, the only evidence that Plaintiffs introduced on the issue of Defendants' knowledge of the "falsity" of the earnings reports was Plaintiffs' Exhibit 712, an OCC Report of Examination sent in 1998.

(f)     The failure to require particularized findings as to 10b-5 elements for each Defendant and each statement led the jury to find primary liability on the part of various individuals for statements made by others throughout the period, notwithstanding the fact that no primary liability can attach to a non-speaking actor. *See Stoneridge Investment Partners, LLC v. Scientific-Atlanta*, 128 S.Ct. 761 (2008). For example, the jury impermissibly found Mr. Gilmer liable for multiple statements he had absolutely no involvement in making, and found Mr. Aldinger primarily liable for a statement he did not make -- Mr. Gilmer's March 23, 2001 statement regarding predatory lending.

(g)     In addition, the jury found that Mr. Aldinger acted "knowingly" as to Mr. Gilmer's March 23, 2001 statement, while finding that Mr. Gilmer himself was only reckless with regard to the same statement. A finding that Mr. Aldinger knowingly made a false statement (that he did not make) while the actual speaker (who had direct responsibility for the business unit whose practices were addressed in the statement) was at most reckless is not supported by the evidence, is internally inconsistent, and entitles Mr. Aldinger to a new trial.

-9-

(h) Furthermore, the jury found that Mr. Aldinger and the Company acted knowingly with respect to the March 23, 2001 statement -- the *only* knowing violation found by the jury -- but that all later actionable statements (including the one made on March 28, 2001) were made at most recklessly. Either Mr. Aldinger and everyone else at the Company with applicable knowledge forgot that the Company was "predatory" over those five days, or the verdicts demonstrate a glaring and impermissible internal inconsistency entitling Defendants to a new trial.

(i) The jury was hopelessly confused by the requirement that it choose which of Plaintiffs' three theories applied to each of the alleged false statements. This confusion was manifestly evident with respect to the second quarter 2002 10-Q, filed on August 14, 2002, which the jury found to be misleading not only as to predatory lending and reaging, but also as to the restatement. However, that 10-Q announced the restatement and contained the newly revised accounting treatment for the applicable contracts -- the parties have agreed that August 14, 2002 was *the* "corrective" disclosure date for the restatement (if any). Thus, the jury's verdicts must mean either that it ignored the evidence, failed to properly apply the law, or determined that the restatement "fraud" continued after August 14, 2002 and was never corrected within the Relevant Period (entitling Defendants to judgment as a matter of law on loss causation). If this inconsistency does not entitle Defendants to judgment as a matter of law on this issue it entitles them to a new trial.

(j) The jury impermissibly found that Mr. Gilmer was liable for false statements relating to the restatement despite the fact that those statements related to a different business unit of the Company (that Mr. Gilmer had no involvement with or responsi-

bility for) and the jury found Mr. Gilmer was not a control person as to Household, Mr. Aldinger, or Mr. Schoenholz.

  5. Judicial error with respect to *Daubert* motions filed by the parties deprived Defendants of a fair trial, including but not limited to the following prejudicial errors:

  (a) The denial of Defendants' *Daubert* motion regarding Plaintiffs' expert Catherine Ghiglieri allowed in evidence double (and triple) hearsay, unadjudicated complaints and regulatory "findings" as truth without sufficient limiting instructions, thus allowing Plaintiffs to introduce the vast majority of inadmissible facts in support of their "predatory lending" theory solely through the backdoor testimony of a non-percipient witness.

  (b) The denial of Defendants' *Daubert* motion regarding Professor Fischel impermissibly allowed into evidence Plaintiffs' defective loss causation analysis, including the legally untenable "leakage" model relied upon by Plaintiffs (and the jury) as evidence of inflation.

  (c) The denial of Defendants' *Daubert* motion regarding Plaintiffs' accounting expert Harris Devor impermissibly allowed his opinion that over 30 percent of Household's revenues were attributable to predatory lending (*e.g.*, Plaintiffs' Demonstrative Exhibit 40).

  (d) The denial of Defendants' *Daubert* motion regarding the unretained and unwilling "expert" testimony of Charles Cross allowed unsupported hearsay evidence (including unsworn statements and information received from unidentified regulators in other states) to be presented to the jury, which was relied upon by Ms. Ghiglieri as "fact" evidence and presented to the jury as proven fact in Plaintiffs' summation.

(e) The granting (in part) of Plaintiffs' *Daubert* motions regarding Defendants experts Robert Litan, John Bley and Roman Weil precluded certain testimony, notwithstanding Plaintiffs' experts' testimony as to similar general subjects.

(f) The exclusion of Mr. Bley's testimony on multiple issues because he had "no basis" for testifying as to certain conclusions or because his opinions were either "unsupported arguments" or "common-sense concepts" was prejudicial error, compounded by Ms. Ghiglieri's testimony as to similar concepts simply by reading into the record documents not separately authenticated or explained by a competent witness.

6. Judicial error with respect to evidentiary and *in limine* rulings deprived Defendants of a fair trial, including the following prejudicial errors:

(a) Allowing unadjudicated allegations and double and triple hearsay in state and federal examination reports to come in for their truth.

(b) Allowing Plaintiffs to proceed as to numerous alleged false statements that were not identified in discovery, but only belatedly identified on the eve of trial. These newly disclosed statements became the focal point of Plaintiffs' case: *e.g.,* announcements of net income and earnings per share; 10-Q and 10-K statements on 2+ delinquency and credit quality, the Goldman Sachs presentation on December 4, 2001, and statements at the April 9, 2002 Financial Relations Conference (which Plaintiffs had theretofore identified as corrective disclosures, as opposed to fraudulent statements).

(c) Allowing Plaintiffs to proceed as to numerous alleged false statements that were non-actionable puffery or too vague to be actionable, and allowing Plaintiffs to proceed on their "predatory lending" theory as to statements that gave rise to no duty to disclose.

(d) The preclusion of any and all testimony about Household's legal department and Defendants' understanding of the general role that department played in the Company's system of internal controls as punishment for Household's successful assertion of the attorney-client privilege during discovery, which was upheld by the Court.

(e) Prohibiting Defendants from referring to the fact that KPMG auditors gave Household a clean bill of health after conducting a full audit and review because Household successfully asserted work product privilege for certain letters from Household's General Counsel regarding the adequacy of Household's litigation reserves, which were never at issue in this case.

(f) Allowing Plaintiffs' accounting expert Harris Devor to testify using Plaintiffs' Demonstrative Exhibits 109, 90 and 91, implying to the jury that GAAP standards governed liability in a 10b-5 case, which corrective instructions could not cure.

(g) Improperly allowing the opinion testimony contained in various documents produced by third-party Wells Fargo for the truth of the matters asserted therein, prejudicially used by Plaintiffs as evidence of a potential multi-billion dollar (yet never realized) impact due to alleged improper accounting practices.

(h) Impermissibly allowing the October 11, 2002 Attorneys General Settlement (and related documents including Plaintiffs' Exhibit 516, the framework for settlement discussions) to be admitted for all purposes, leading to the prejudicial argument by Plaintiffs' counsel in summation that the settlement itself constituted evidence of materiality.

(i)  Impermissibly allowing Plaintiffs' Exhibit 681, a document related to settlement negotiations, in evidence for all purposes, which Plaintiffs' counsel then argued in summation demonstrated a $3.2 billion impact of "predatory lending" practices.

(j)  Improperly admitting for all purposes Plaintiffs' Exhibit 550, correspondence between Household attorneys and the Attorneys General Working Group that was on its face part of settlement negotiations and marked "Confidential For Settlement Purposes Only".

(k)  Prohibiting Defendants from introducing evidence relating to Arthur Andersen's reaffirmation after the restatement of the validity of Household's prior accounting treatment.

WHEREFORE, Defendants respectfully request that this Court grant a new trial pursuant to Fed. R. Civ. P. 59.

Dated: May 21, 2009

        Respectfully submitted,

        Cahill Gordon & Reindel LLP

        By:     /s/ Thomas J. Kavaler
            Thomas J. Kavaler
              Bar No. 1269927
            Howard G. Sloane
              Bar No. 1197391
            Patricia Farren
              Bar No. 1198498
            Susan Buckley
              Bar No. 1198696
            Landis C. Best
            David R. Owen

80 Pine Street
New York, New York 10005
(212) 701-3000

        - and-

EIMER STAHL KLEVORN & SOLBERG LLP
224 South Michigan Avenue
Chicago, Illinois 60604
(312) 660-7600

*Attorneys for Defendants Household International, Inc., William F. Aldinger, David A. Schoenholz and Gary Gilmer*