# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF ILLINOIS

# EASTERN DIVISION

| | | |
|---|---|---|
| LAWRENCE E. JAFFE PENSION PLAN, On Behalf of Itself and All Others Similarly Situated, | ) ) ) | Lead Case No. 02-C-5893 (Consolidated) |
| | ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | |
| vs. | ) ) | Judge Ronald A. Guzman Magistrate Judge Nan R. Nolan |
| HOUSEHOLD INTERNATIONAL, INC., et al., | ) ) ) | |
| Defendants. | ) ) ) | |
| | ) | |

## <u>PLAINTIFFS' POST-VERDICT SUBMISSION</u>

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................1

II.   NOTICE TO CLASS ..........................................................................................3

III.  DEFENDANTS ARE NOT ENTITLED TO DISCOVERY OR OTHER
      PROCEEDINGS ON RELIANCE .......................................................................4

      A.    Defendants Cannot Rebut the Presumption of Reliance...........................4

      B.    Defendants' "Truth-on-the-Market" Defense to the Presumption of
            Reliance Was Litigated – and Rejected by the Jury .................................6

      C.    Defendants Admitted that No Individual Investors Purchased with Actual
            Knowledge of Household's Fraud .........................................................12

      D.    There Is No Right to a Jury Trial on the Reliance Issue .......................15

IV.   CALCULATION OF CLASS MEMBERS' CLAIMS .......................................15

      A.    The Calculation of Damages Is a Mechanical Function that Is
            Appropriately Handled by the Claims Administrator............................15

      B.    Defendants Are Not Entitled to Offsets of "Inflationary Gains" from Other
            Transactions ........................................................................................18

      C.    FIFO Is the Appropriate Method for "Matching"..................................24

V.    THE COURT SHOULD AWARD PREJUDGMENT INTEREST .................27

VI.   THE COURT SHOULD ENTER JUDGMENT................................................31

# TABLE OF AUTHORITIES

**Page**

## CASES

*American Nat'l Fire Ins. Co. v. Yellow Freight Sys.*,
   325 F.3d 924 (7th Cir. 2003) ...................................................................................28, 30

*AremisSoft Corp. Sec. Litig.*,
   210 F.R.D. 109 (D.N.J. 2002)..........................................................................................25

*Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.*,
   315 F. Supp. 2d 666 (E.D. Pa. 2004) ...................................................................19, 22, 23

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)............................................................................................... *passim*

*Blackie v. Barrack*,
   524 F.2d 891 (9th Cir. 1975) .............................................................................................2

*Buchanan v. United States*,
   82 F.3d 706 (7th Cir. 1996) ............................................................................................31

*Burke v. Ruttenberg*,
   102 F. Supp. 2d 1280 (N.D. Ala. 2000)...........................................................................23

*Cement Div. v. City of Milwaukee*,
   950 F. Supp. 904 (E.D. Wis. 1996)
   (*aff'd*, 1999 A.M.C. 606 (7th Cir. 1998)) ........................................................................29

*Chill v. Green Tree Fin. Corp.*,
   181 F.R.D. 398 (D. Minn. 1998).....................................................................................25

*Cromer Fin. Ltd. v. Berger*,
   No. 00 CIV. 2284 (DLC), 2002 WL 32150479
   (S.D.N.Y. Feb. 14, 2002) ..................................................................................................5

*Davis v. Merrill Lynch, Pierce, Fenner & Smith*,
   906 F.2d 1206 (8th Cir. 1990) .........................................................................................23

*Eckstein v. Balcor Film Investors*,
   58 F.3d 1162 (7th Cir. 1995) .............................................................................................4

*First Nat'l Bank of Chicago v. Standard Bank and Trust*,
   172 F.3d 472 (7th Cir. 1999) ...........................................................................................29

*Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*,
   874 F.2d 431 (7th Cir. 1989) ...............................................................................27, 28, 29

**Page**

*Harrison v. Dean Witter Reynolds, Inc.*,
    No. 86 C 8003, 1995 WL 127792
    (N.D. Ill. Mar. 22, 1995) ...................................................................................28, 30

*Hutchison v. Amateur Elec. Supply, Inc.*,
    42 F.3d 1037 (7th Cir. 1994) .....................................................................................28

*In re Ask Sec. Litig.*,
    No. C-85-20207(A)-WAI, 1992 WL 278386
    (N.D. Cal. Aug. 18, 1992)............................................................................................15

*In re Blech Sec. Litig.*,
    No. 94 Civ. 7696 (RWS), 2003 U.S. Dist. LEXIS 4650
    (S.D.N.Y. Mar. 26, 2003) ...........................................................................................23

*In re Cardinal Health, Inc. Sec. Litig.*,
    226 F.R.D. 298 (S.D. Ohio 2005) ..............................................................................25

*In re Cendant Corp. Sec. Litig.*,
    109 F. Supp. 2d 235 (D.N.J. 2000) ............................................................................25

*In re Cendant Corp. Litig.*,
    264 F.3d 201 (3d Cir. 2001).......................................................................................25

*In re Cendant Corp. Sec. Litig.*,
    454 F.3d 235 (3d Cir. 2006).......................................................................................25

*In re CIGNA Corp. Sec. Litig.*,
    459 F. Supp. 2d 338 (E.D. Pa. 2006) .............................................................19, 23, 26

*In re Clinton Oil Co. Sec. Litig.*,
    M.D.L. No. 137, 1977 U.S. Dist. LEXIS 16787
    (D. Kan. Mar. 22, 1977)..............................................................................................20

*In re Comdisco Sec. Litig.*,
    No. 01 C 2110, 2004 U.S. Dist. LEXIS 7230
    (N.D. Ill. Apr. 26, 2004) .............................................................................................26

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    284 F. Supp. 2d 511 (S.D. Tex. 2003.) .................................................................18, 27

*In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*,
    831 F. Supp. 1354 (N.D. Ill. 1993) ............................................................................30

**Page**

*In re Oil Spill by The Amoco Cadiz*,
　　954 F.2d 1279 (7th Cir. 1992) ........................................................30

*In re Organogenesis Sec. Litig.*,
　　241 F.R.D. 397 (D. Mass. 2007).....................................................26

*In re Oxford Health Plans, Inc. Sec. Litig.*,
　　244 F. Supp. 2d 247 (S.D.N.Y. 2003)..............................................5

*In re Ribozyme Pharms. Sec. Litig.*,
　　192 F.R.D. 656 (D. Colo. 2000) .....................................................26

*In re Schering-Plough Corp. Sec. Litig.*,
　　No. 01-0829, 2003 U.S. Dist. LEXIS 26297
　　(D.N.J. Oct. 9, 2003)...................................................19, 23, 24, 25

*In re Sepracor Inc. Sec. Litig.*,
　　233 F.R.D. 52 (D. Mass. 2005)..................................................22, 23

*In re Veeco Instruments, Inc. Sec. Litig.*,
　　233 F.R.D. 330 (S.D.N.Y. 2005) ....................................................25

*Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Ironworkers' Local
Union 75 v. Madison Indus., Inc.*,
　　733 F.2d 656 (9th Cir. 1984) .........................................................31

*Johnson v. Dana Corp.*,
　　236 F.R.D. 349 (N.D. Ohio 2006) ..................................................26

*Kaiser Aluminum & Chem. Corp. v. Bonjorno*,
　　494 U.S. 827 (1990).......................................................................22

*Kane v. Shearson Lehman Hutton, Inc.*,
　　916 F.2d 643 (11th Cir. 1990) ...................................................21, 22

*Kane v. Shearson Loeb Rhoades, Inc.*,
　　No. 86-551-CIV-MARCUS, 1989 U.S. Dist. LEXIS 19022
　　(S.D. Fla. May 3, 1989) .................................................................21

*Katz v. Comdisco, Inc.*,
　　117 F.R.D. 403 (N.D. Ill. 1987).....................................................15

*Kaufman v. Motorola, Inc.*,
　　No. 95 C 1069, 2000 U.S. Dist. LEXIS 14627
　　(N.D. Ill. Sept. 19, 2000) ...............................................................18

**Page**

*Knapp v. Gomez*,
  No. 87-0067 H(M) (S.D. Cal. June 1993).....................................................2, 6

*Laborers Local 1298 Pension Fund v. Campbell Soup Co.*,
  Civ. A. No. 00-152 (JEI), 2000 U.S. Dist. LEXIS 5481
  (D.N.J. Apr. 24, 2000) .................................................................................25

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
  501 U.S. 350 (1991)...................................................................................23

*Lampi Corp. v. American Power Products, Inc.*,
  No. 93 C 1225, 2004 WL 1656547
  (N.D. Ill. July 22, 2004)..........................................................................29, 30

*Lincoln Nat'l Life Ins. Co. v. Silver*,
  966 F. Supp. 587 (N.D. Ill. 1995)
  (*aff'd*, 114 F.3d 1191 (7th Cir. 1997).....................................................27, 28

*Mendenhall v. Barber-Greene Co.*,
  No. 80 C 6747, 1990 WL 156519
  (N.D. Ill Oct. 5, 1990)..................................................................................30

*Michaels v. Michaels*,
  767 F.2d 1185 (7th Cir. 1985) .................................................................27, 28

*Myron v. Chicoine*,
  678 F.2d 727 (7th Cir. 1982) ...................................................................27, 28

*Nesbit v. McNeil*,
  896 F.2d 380 (9th Cir. 1990) ........................................................................23

*Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys.*,
  No. C 01-20418 JW, 2004 U.S. Dist. LEXIS 27008
  (N.D. Cal. May 27, 2004) ....................................................................18, 23, 24

*Randall v. Loftsgaarden*,
  478 U.S. 647 (1986)................................................................................ *passim*

*Rivera v. Benefit Trust Life, Ins. Co.*,
  921 F.2d 692 (7th Cir. 1991) ........................................................................27

*RK Co. v. Harvard Scientific Corp.*,
  No. 99 C 4261, 2007 WL 4150317
  (N.D. Ill. Nov. 16, 2007)...............................................................................29

Page

*Rothfarb v. Hambrecht,*
    No. C-82-1065 WHO, 1986 U.S. Dist. LEXIS 30385
    (N.D. Cal. Jan. 15, 1986) ..................................................................................25

*Royal Ahold N.V. Sec. & ERISA Litig.,*
    No. 03-MD-01539, 2006 U.S. Dist. LEXIS 1928
    (D. Md. Jan. 9, 2006) .......................................................................................25

*Sanders v. John Nuveen & Co., Inc.,*
    524 F.2d 1064 (7th Cir. 1975) ..........................................................................28

*Storage Tech. Corp. Sec. Litig.,*
    No. 84-F-1981, 1990 U.S. Dist. LEXIS 18462
    (D. Colo. Sept. 28, 1990) .................................................................................25

*Thompson v. Shaw Group, Inc.,*
    No. 04-1685, 2004 U.S. Dist LEXIS 25641
    (E.D. La. Dec. 15, 2004) ..................................................................................25

*U.S. Securities and Exchange Comm'n v. Kirch,*
    263 F. Supp. 2d 1144 (N.D. Ill. 2003) ............................................................29

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §77l(a)(2) .........................................................................................................20
    §78j(b) ........................................................................................................ *passim*
    §78t(a) ..........................................................................................................1, 30
    §78u-4(b)(4) .....................................................................................................22
    §78u-4(e)(1) .....................................................................................................17

Federal Rules of Civil Procedure
    Rule 23 ...............................................................................................................6
    Rule 26(a)(1)(A)(iii) ........................................................................................26
    Rule 58(b) .........................................................................................................31

17 C.F.R.
    §240.10b-5 .................................................................................................. *passim*
    §243.100 ...........................................................................................................13

## SECONDARY AUTHORITIES

Herbert B. Newberg, et al.,
    *Newberg on Class Actions,* §22.65 ...................................................................3

Pursuant to the Court's order, plaintiffs submit this brief regarding post-verdict issues. If the Court requires oral argument on these issues, plaintiffs respectfully request that the hearing ***not*** take place the week of June 1-5, 2009.

## I.    INTRODUCTION

On May 7, 2009, the jury in this case rendered a verdict. The jury found that defendants Household International, Inc., William Aldinger, David Schoenholz and Gary Gilmer violated §10(b), Rule 10b-5 and §20(a) of the Securities and Exchange Act of 1934 ("1934 Act") with respect to statements made from March 23, 2001 to October 11, 2002. The jury determined the inflation per share from March 23, 2001 to October 11, 2002.

The post-verdict proceedings should be limited. The Court should approve a notice to be sent to class members advising them of the verdict, and their right to file a claim for recovery. (*See* Section II., *infra*). The only remaining issue is determining the formula for calculating class members' claims, and calculating damages. Contrary to defendants' contention, a lengthy proceeding regarding reliance is not necessary.

In order to rebut the presumption of reliance, defendants must show that in purchasing Household shares, class members did not rely on the integrity of Household's stock price. The Supreme Court of the United States in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) identified three methods by which a defendant could rebut the presumption: (1) a "show[ing] that 'market makers' were privy to the truth . . . thus that the market price [was] not [] affected by [defendants'] misrepresentations" (*id.* at 248); (2) a showing that the truth had "credibly entered the market and dissipated the effects of the misstatements" (*id.* at 249); or (3) "[a]ny showing that severs the link

between the alleged misrepresentation and [] price [] paid by the plaintiff" (*id.* at 248).[1]  The first

method is clearly not applicable in this case.  The second method has already been litigated at trial

on a class-wide basis (*see* Section III.B., *infra*) and rejected by the jury.  The third method would

require defendants to prove by a preponderance of the evidence that a class member bought

Household stock or would have bought Household stock with actual knowledge that its price had

been artificially inflated by defendants' false and misleading statements.  *Basic*, 485 U.S. at 247-49.

There is no right by defendants to unlimited discovery on this issue from class members and

"[t]he district judge may reasonably control discovery" and "procedures can be found and used

which will provide fairness to the defendants and a genuine resolution of disputed issues while

obviating the danger" of destroying the efficacy of the class action.  *See Blackie v. Barrack*, 524 F.2d

891, 906-07 n.22 (9th Cir. 1975).  The evidence at trial was undisputed – defendants did ***not*** provide

any material nonpublic information to any investors (including those who purchased during the now

Relevant Period).  (*See* Section III.C., *infra*).  Since no claimants had any adverse nonpublic

information, the defendants cannot rebut the presumption of reliance by showing class members

bought the stock with knowledge of the fraud.  Therefore, defendants do not need discovery of

absent class members.  To protect defendants' interests, the Court could inquire, in the proof of

claim form, whether class members would have purchased Household's stock knowing that it was

artificially inflated by defendants' knowing and reckless false and misleading statements.  Such a

question was included in the claim form after verdict in the case of *Knapp v. Gomez*, No. 87-0067

H(M) (S.D. Cal. June 1993) (attached hereto as Exhibit 1).

Defendants will likely argue that they should be entitled to further discovery of the three lead

plaintiffs and other class members.  However, the real question is discovery of what?  There is, quite

---

[1]    Emphasis has been added and internal quotations and citations omitted unless otherwise noted.

simply, no discovery that could be reasonably calculated to lead to the discovery of admissible evidence. It is difficult to imagine a circumstance in which a class member would have purchased Household stock with actual knowledge of defendants' fraud.

In reality, the only remaining issue in this litigation is to award damages to each class member. The determination of damages sustained by individual class members in securities class action suits is often a mechanical task involving the administration of a formula. Herbert B. Newberg, et al., *Newberg on Class Actions*, §22.65 (4th ed.). The jury has rendered a per share damages award for each day of the Relevant Period. Defendants will undoubtedly request that the Court consider certain "offsets" to the jury's per share findings. However, as set forth in Section IV. below, the damages formula should focus only on Household stock purchases during the Relevant Period as determined by the jury (March 23, 2001 – October 11, 2002).

## II.    NOTICE TO CLASS

Plaintiffs attach a form of notice and claim form to be sent to all class members (*see* Exs. 2-4). The proposed notice will inform class members of the jury's verdict, and the process for filing a claim form. Included in the notice will be the formula the Court decides to apply to determine damages for class members. The notice will include the inflation table from the verdict form. The notice also can include the reliance question of whether investors would have still purchased Household stock with knowledge of the fraud. Plaintiffs also propose to notify class members of the verdict by publication through various news media. Plaintiffs also propose to have a dedicated website to give class members access to relevant information (*i.e.*, pleadings, notice, verdict form).

- 3 -

## III.　DEFENDANTS ARE NOT ENTITLED TO DISCOVERY OR OTHER PROCEEDINGS ON RELIANCE

### A.　Defendants Cannot Rebut the Presumption of Reliance

In this case, plaintiffs are entitled to a presumption of reliance based on the "fraud on the market" doctrine established by the Supreme Court in *Basic*, 485 U.S. 224. In *Basic*, the Court explained the fraud on the market doctrine as follows:

> An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action.

*Id.* at 247.

The Supreme Court's decision in *Basic* recognized the reality of the modern securities markets involving the trading of hundreds of millions of shares on a daily basis and that most ordinary investors do not read corporate reports or press releases.[2] In so ruling, the Court promoted the use of class actions to redress §10(b) violations. If the Court had required positive proof of individualized reliance from each plaintiff, individual issues may have predominated over the common ones, thereby precluding the pursuit of class actions in this context. The fraud on the market doctrine provides "'a practical resolution to the problem of balancing the substantive requirement of proof of reliance in securities cases against the procedural requisites of [Federal Rule of Civil Procedure] 23.'" *Basic*, 485 U.S. at 242 (alteration in original).

---

[2]　Following *Basic*, the Seventh Circuit has explained that the reliance required for a Rule 10b-5 action is not reliance as used in the lay sense of the term:

> "[R]eliance" is a synthetic term. It refers not to the investor's state of mind but to the effect produced by a material misstatement or omission. Reliance is the confluence of materiality and causation. The fraud on the market doctrine is the best example; a material misstatement affects the security's price, which injures investors who did not know of the misstatement.

*Eckstein v. Balcor Film Investors*, 58 F.3d 1162, 1170 (7th Cir. 1995).

In *Basic*, the court stated that the presumption of reliance could be rebutted in three ways: (1) a "show[ing] that 'market makers' were privy to the truth . . . and thus that the market price [was] not [] affected by [defendants'] misrepresentations" (485 U.S. at 248); (2) a showing that the truth had "credibly entered the market and dissipated the effects of the misstatements" (*id*. at 249); or (3) "[a]ny showing that severs the link between the alleged misrepresentation and [] price [] paid by the plaintiff" (*id.* at 248). The first method is inapplicable to the facts of this case. The second method has already been litigated at a trial on a class-wide basis and rejected by the jury. *See* Section III.B., *infra*. The third method would require defendants to prove that a class member bought Household stock or would have bought Household stock with actual knowledge that its price had been artificially inflated by defendants' false and misleading statements. *Basic*, 485 U.S. at 248. There is no basis to believe that any class member purchased Household stock with actual knowledge that its price had been artificially inflated by defendants' fraud.

As the court held in *In re Oxford Health Plans, Inc. Sec. Litig.*, 244 F. Supp. 2d 247, 249 (S.D.N.Y. 2003), "there can be no disputed issue of reliance as to absent class members":

> The shares of Oxford were publicly traded at all relevant times, and this case is being tried on the theory of "fraud on the market." Therefore, with possible theoretical exceptions not believed to exist in the case, there can be no disputed issue of reliance as to absent class members: "It has been held that 'it is hard to imagine that there ever is a buyer or seller who does not rely on market integrity. Who would knowingly roll the dice in a crooked crap game?'"

*Id.* (quoting *Basic*, 485 U.S. at 246-47); *see also Cromer Fin. Ltd. v. Berger*, No. 00 CIV. 2284 (DLC), 2002 WL 32150479, at *2 (S.D.N.Y. Feb. 14, 2002) ("[T]here shall be no bifurcation of the trial of the Cromer action. Consequently, there shall not be separate trials to address issues of the individual reliance of absent class members.").

Here, as in *Oxford*, there is no disputed issue of individual reliance as to absent class members. As set forth in Section III.C. below, the undisputed evidence at trial established that defendants did not provide any material nonpublic information to any investors who purchased stock

during the Relevant Period.  Thus, defendants cannot show that any class member bought Household stock with actual knowledge that its price had been artificially inflated by defendants' false and misleading statements.  For this reason, no discovery could be reasonably calculated to lead to the discovery of admissible evidence on this issue.

The claims procedure utilized by the court in *Knapp v. Gomez*, No. 87-0067 H(M) (S.D. Cal. June 1993) adequately addresses any "theoretical exception" to the presumption of reliance.  In *Knapp*, the court inquired in a proof of claim form whether any claimant had known at the time of his purchase that the subject stock was inflated by the defendants' misstatements.  *See* Ex. 1.  This procedure enables the court to disallow a claim in the unlikely event that an investor purchased Household stock with knowledge that the price was inflated by defendants' fraud.

Finally, defendants' amorphous request for unspecified discovery and thousands of mini-trials on the reliance of absent class members would frustrate the purpose of the class action, which is to consolidate numerous common claims and efficiently adjudicate a controversy with a single trial.  *See* Fed. R. Civ. P. 23.  Defendants stipulated to class certification in this case.  This Court should not indulge defendants' efforts to delay indefinitely the resolution of this action and re-litigate the element of reliance in the absence of any conceivable evidentiary or legal basis.

### B.    Defendants' "Truth-on-the-Market" Defense to the Presumption of Reliance Was Litigated – and Rejected by the Jury

The presumption of reliance may be rebutted by demonstrating that the truth "credibly entered the market and dissipated the effects of the misstatements."  *See generally Basic*, 485 U.S. at 248-49 (discussing means by which fraud on the market presumption may be rebutted).  Here, defendants spent significant time and effort at trial attempting to prove just that – that the truth regarding Household's fraud was known by the market during the Relevant Period.  Indeed, one of the three key "themes" constantly revisited by defendants during trial was that investors and the market "knew" about Household's predatory lending practices and credit quality manipulation.  Trial

Tr. at 1710:19-25 ("And you've begun to hear in the last couple of days about something which will turn out to be a very important issue in this case, and that is what the investors knew."); *id*. at 1711:1-1713:10 ("The investors, the plaintiffs, the people who bought the stock of Household during the time period we're talking about, bought it with knowledge of everything that was on the market, everything that was in public."); *id*. at 4535:15-20 ("[The market] knew that.  It was fully disclosed. . . .  They knew that.  You've seen that.  We've shown you that throughout the case.  All of that was disclosed."); *id*. at 4586:12-4590:17 (arguing that investors knew about Household's reaging practices because they were disclosed in Household's securitization prospectuses).  In returning a verdict for plaintiffs, however, the jury soundly rejected defendants' truth-on-the-market defense.  Because this issue was fully litigated at trial, defendants should not be permitted a second bite at rebutting the presumption of reliance.

Defendants spent a significant amount of time attempting to prove to the jury that investors bought Household stock "with knowledge of everything that was on the market, everything that was in public" regarding Household's predatory lending practices.  *Id*. at 1713:6-10; 1711:4-20 (arguing that investors "knew" about the debate in the market on the subject of predatory lending, "knew" what Household's products were, "knew" that Household's employees violated Company policy and "knew" that state and federal regulators "were on to that.").  During the nearly two day examination of defendant Gilmer, defense counsel questioned Gilmer about each predatory lending practice identified by plaintiffs' expert in an attempt to convince the jury that the market "knew" about the deceptive lending practices in place and employed by Household on a nationwide scale.[3]

---

[3]     During trial, defendants also unsuccessfully attempted to prove that the market was aware of Household's strategy to "grow" the Company at any cost.  Trial Tr. at 3183:24-3185:10.

For example, Gilmer testified about Household's use of prepayment penalties, claiming that analysts and the market were well aware of Household's practice of charging prepayment penalties. *Id*. at 1264:21-23 (testimony by Gilmer that there was a discussion in the marketplace about Household's use of prepayment penalties); *see also id.* at 1266:20-1269:2 (discussing press coverage of Household's use of origination points); *id*. at 1268:25-1269:3 ("A: It is true that the things that we have been discussing were well publicized. Q: No secret. A: None whatsoever."); *id*. at 1308:6-10 (testifying that the "world knew" that Household loans had prepayment penalties).

Defendants also adduced evidence that investors "knew" about the Company's policy of originating loans of up to 100% LTV, that borrowers often came away from the transaction with a second mortgage and that the Company used an incentive-based compensation program. *Id*. at 1287:11-1288:3 (Household never "hid" the fact that it often placed a second mortgage on top of first mortgages); Defendants' Trial Exhibit ("Defs' Ex.") 91 (analyst report discussing Household's growth strategy of writing the largest home equity loan it prudently could write); Trial Tr. at 1292:7-15 (discussing that the market was aware of Household's use of high LTV loans); *id*. at 1298:24-1299:5 (all shareholders had access to information about Household's use of high LTV loans); *id*. at 3185:2-3193:21 (Aldinger's discussion of a Legg Mason analyst report that analyzed Household's use of high LTV loans and other Household lending practices); *id*. at 1385:8-1387:20 (testimony by Gilmer that the market was aware that Household utilized incentive compensation methods with its employees); Defs' Ex. 230 (discussing Goldman Sachs analyst report that defendants claim made the market aware of Household's incentive compensation programs).[4]

---

[4]    *See also* Trial Tr. at 1199:2-1200:7 (discussing market's knowledge of Household's primary customer base and fact that Household's sub-prime customers created greater risk than prime customers); *id*. at 1202:21-25 ("Q: Household kept no secret from its shareholders that it dealt with people of – who presented a greater credit risk and compensated for that by charging them higher rates, higher fees and higher points,

Through Gilmer's testimony, defendants also attempted to prove that investors were aware of customer complaints filed against Household and of increasing regulatory scrutiny of Household's practices during the Relevant Period. Trial Tr. at 1283:9-17 (discussing analyst report recommending "sell" due to ACORN lawsuit and questioning Household's lending practices); Defs' Ex. 534 (analyst report discussing lawsuit filed by ACORN); Trial Tr. at 1284-1286:21 (information about the ACORN lawsuit was "out in the marketplace" and "available to the shareholders."); *id*. at 1341:17-1345:7 (testimony by Gilmer that Household's lending practices were criticized routinely in the press); Defs' Ex. 624 (news article questioning predatory lending); Trial Tr. at 1391:10-1394:15 (testifying that there was discussion "in the press and in the marketplace about Household's customer complaints."); Defs' Ex. 613 (newspaper article discussing ACORN complaints); Trial Tr. at 1403:22-1406:3 (testifying that investors knew that Household faced headline risk); Defs' Ex. 338 (*American Banker* article discussing Household's predatory lending-related headline risk); Defs' Ex. 222 (Salomon Smith Barney analyst report discussing Household's predatory lending-related headline risk); Trial Tr. at 1410:5-1412:7 (testimony by Gilmer that there was an awareness in the marketplace that Household was facing a "more onerous regulatory environment."). Despite their efforts, defendants failed to convince the jury that investors were made fully aware of the nature and extent of Household's predatory lending practices.

In addition to their failed attempt to prove that investors knew the truth about Household's lending practices, defendants also made numerous attempts to convince the jury that Household's practices related to the reaging of delinquent accounts were publicly available and therefore known by the market. *Id*. at 2138:21-2139:9 (testimony by Schoenholz that Household's re-aging practices

---

isn't that true? A: That was well known."); Trial Tr. at 1318:25-1319:22 (testimony by Gilmer that investors and the market were aware of Household's emphasis on growth).

were the subject of discussion and comment by analysts during the Relevant Period); *id.* at 2126:9-22 ("Q: Was re-aging something new to Household during the relevant time period, '99 to 2002? A: Absolutely not."). Defendants emphasized that these policies had not only been disclosed for a number of years in securitization documents, but were also disclosed in Household's 2001 Form 10-K and were described in detail at Household's April 9, 2002 Financial Relations Conference ("FRC").

Throughout trial, defendants presented evidence and argued that Household's one-payment reage and automatic reage policies were disclosed to the public in securitization documents. Trial Tr. at 2133:16-23. According to defendants, much like Form 10-Ks and Form 10-Qs, securitization documents are publicly filed with the U.S. Securities and Exchange Commission and, as such, are available to everyone. *Id.* at 3100:12-14 (testimony by Aldinger that it was his "understanding that a document filed with the SEC is available to everybody"); *id.* at 3159:23-24 ("It's hard to conceal anything that you've filed with the SEC. It's a public record after that.").

For example, Aldinger testified that while there was no disclosure in the 2001 Form 10-K of Household's one-payment practice, this practice was disclosed in a November 12, 1999 securitization prospectus. *Id.* at 3156:17-3158:9; Defs' Ex. 880 at HHT0017968 (providing that "[t]he master servicer may in its discretion . . . (3) treat a home equity loan as current if the borrower has made one scheduled payment to cure the delinquency status of the home equity loan"). Aldinger also explained that while Household did not disclose its automatic reage practice in the 2001 Form 10-K, the practice was disclosed in a securitization document filed with the SEC on August 3, 2001. Trial Tr. at 3158:13-3159:24; Defs' Ex. 695 at HHT0002335 (providing that "[d]elinquent accounts may be restructured (deemed current) every six months. Accounts are automatically restructured if the customer has made the equivalent of one payment equal to at least 95% of a full standard payment. Once restructured, the account is deemed current; however, the credit limit is zero.").

- 10 -

Aldinger further testified that discussions about Household's reaging practices were routinely incorporated into securitization prospectuses going back at least as far as November 24, 1998. Trial Tr. at 3248:21-3250:24; Defs' Ex. 741.

Defendants also argued that the market was aware of Household's reaging practices because analysts would review the information contained in the securitization prospectuses and report their conclusions to investors. For example, defendants put significant emphasis on a Legg Mason analyst report, which reiterated Household's one-payment and automatic reage policies as set forth in Household's securitization prospectuses. Trial Tr. at 3251:24-3254:23 (arguing that Household had been disclosing its re-aging policies for quite some time); Defs' Ex. 525. As Aldinger himself explained, "professional investors – and individual investors, in fact – rely on [analyst] reports," such as the Legg Mason report, in making their investment decisions. Trial Tr. at 3085:8-15.

Through defendant Schoenholz's testimony, defendants also tried to prove that Household's reage policies were disclosed to the market by way of a "two-pronged disclosure approach" in early 2002. *Id*. at 2137:5-18; 2152:16-2153:4. According to Schoenholz, the first prong of this disclosure consisted of the 2001 Form 10-K that was filed with the SEC and signed by both Aldinger and Schoenholz on March 12, 2002. *Id*. at 1921:18-21; 2137:5-16; Defs' Ex. 852 at HHT0015798 ("Our policies . . . permit reset of the contractual delinquency status of an account to current, subject to certain limits, if a predetermined number of consecutive payments has been received and there is evidence that the reason for the delinquency has been cured."). Aldinger testified that Household was the first company to go beyond merely disclosing the policies in securitization documents and "in a broad way put this information in the marketplace." Trial Tr. at 2133:16-23, 3248:4-20.

Defendants also presented testimony about the second prong of Household's two-prong approach, which, according to Schoenholz, involved disclosures made at the April 9, 2002 FRC. *Id*. at 2137:5-18. In an attempt to convince the jury that the market knew about Household's practices,

defendants argued that Household's reage policies were explained to the investment community at the FRC with "more detail than any other company in America" had previously provided. *Id*. at 373:25-374:5; 2147:13-22; 3265:22-3266:2. For example, defendant Schoenholz testified that he gave a presentation at the FRC in which he intended "to give investors an understanding of the business philosophy and the business purpose behind re-structure." *Id*. at 2143:16-2144:1; Plaintiffs' Trial Ex. 725 (describing Household's restructure process and presenting amounts corresponding to the total reaged portfolio). As with Household's predatory lending practices, the jury rejected defendants' claim that the market was aware of the Company's reaging practices and their impact on the Company's credit quality.

As the foregoing demonstrates, defendants put forth significant effort at trial to show the truth related to Household's predatory lending and reaging practices was available and known by investors. While this effort ultimately failed when it was rejected by the jury, the issue was fully litigated and should not be tried anew.

### C.    Defendants Admitted that No Individual Investors Purchased with Actual Knowledge of Household's Fraud

The presumption of reliance may also be rebutted by demonstrating that an individual plaintiff traded despite his knowing that the statements at issue were false. *See generally Basic*, 485 U.S. at 248-49 (discussing means by which fraud on the market presumption of reliance may be rebutted). Thus, here, defendants have the burden of proving that individual investors purchased despite knowing that Household's statements about its lending practices, 2+ delinquency statistics and credit card accounting practices were false, *i.e.*, with actual knowledge of defendants' fraud. Yet the record is completely devoid of evidence to support defendants' contention that individual plaintiffs purchased with actual knowledge of Household's fraud. Indeed, the evidence supports the opposite – that Household took great steps to ensure that no individual investor inadvertently or intentionally became privy to nonpublic material information. Moreover, Regulation FD, the

Securities and Exchange Commission Rule adopted during the Relevant Period, prohibited defendants from selectively disclosing material nonpublic information to individual investors. *See* 17 C.F.R. 243.100. Because the evidence at trial demonstrated that no class member could have purchased Household common stock with actual knowledge of defendants' fraud, defendants' efforts to rebut the presumption of reliance on this ground fails.

Effective October 23, 2000, Regulation FD prohibited the individual defendants, as well as Household spokespersons such as Craig Streem and Megan Hayden-Hakes or others, from selectively disclosing material nonpublic information to investors. 17 C.F.R. 243.100; *see also* Trial Tr. at 3098:8-3099:8 (testimony by defendant Aldinger discussing applicability of Regulation FD to Household's investor conferences). Indeed, during trial, Household's Vice President of Investor Relations, Craig Streem, testified that a "fundamental part of [his] job" was to attend analyst meetings along with defendant Aldinger and on some occasions, defendant Schoenholz, to ensure compliance with Regulation FD. Trial Tr. at 1649:15-1650:14. Streem testified that institutional investors, such as Goldman Sachs and Morgan Stanley, were regular attendees at Household's investor conferences. *Id*. One of Streem's primary responsibilities at the investor conferences was to "listen closely" to what defendants Aldinger and Schoenholz told investors, to ensure that "we would never intentionally make a disclosure that was – material information that was not available to the public at large." *Id*. at 1657:14-1658:6; *see also id.* at 1661:3-14 (testifying that he was prohibited from discussing Household's business during certain "window periods" in order to protect Streem from inadvertently disclosing material information). Indeed, as Streem testified:

> [O]ne of my critical functions would be to make sure that – first of all, that I accompanied my executives to any meeting of that sort because they didn't have the same degree of expertise that I did in disclosure. And then second of all, just to monitor and make sure that no inappropriate disclosures were made.

*Id*. at 1658:6-11.

- 13 -

Defendant Gilmer also testified that he was careful to follow the rules in place regarding when he "could and when [he] could not" answer questions from analysts:

> Q:  In other words, you are not allowed to give inside information to one of these people; is that correct?
>
> A:  That is correct.
>
> *      *      *
>
> Q:  In other words, you tried to make sure that you weren't giving somebody a piece of information that was secret or not disclosed to the general public?
>
> A:  What I tried to do at all times is to make sure that we were following the rules that were applicable to the subject matter and at the time.  We were obviously very picky about that, as we had to be.

Trial Tr. at 989:22-991:8 ("And, generally, I think the rule was, everybody needed to know.  If it was something of significance, they needed to know about it at the same time."); *id*. at 1305:11-1307:25 (explaining Household's Financial Relations Conference and testifying that he never told the attendees at the conference anything different than the information disseminated to the market as a whole); *id*. at 3098:8-3099:8 (testimony by defendant Aldinger discussing applicability to Regulation FD to Household's investor conferences).

Streem and Gilmer's testimony makes clear that Household and the individual defendants were careful to follow the applicable SEC rules to ensure that no individual investors intentionally or accidentally became privy to material nonpublic information regarding Household's business.  Any claim by defendants that certain individual investors somehow managed to obtain material, nonpublic information about Household's lending practices in violation of Regulation FD should be rejected.  In light of defendants' testimony and the other evidence presented at trial, it is absurd for defendants to now suggest that individual class members purchased with actual knowledge of the falsity of defendants' statements.

**D.      There Is No Right to a Jury Trial on the Reliance Issue**

Defendants have previously argued they have a Seventh Amendment right to a jury trial on individual issues of reliance.  In presenting their position on bifurcation, counsel for defendants made two references to defendants' "Seventh Amendment" right to a jury trial on the individual issue of reliance.  *See* March 12, 2009 Pretrial Tr. at 21:12-23 ("It's our entitlement under the . . . Seventh Amendment to try [the] issue [of reliance]."); *id*. at 25:14-23 ("We have a Seventh Amendment right to try [the presumption of reliance].").

Defendants did not point to any legal authority binding on this Court to support the right to a jury trial to rebut the only remaining issue – whether the presumption of reliance can be rebutted by showing class members would have still purchased Household stock if they knew about the fraud.  There is scant case law on this issue since very few cases are ever in the same procedural posture as this case.  In *In re Ask Sec. Litig.*, No. C-85-20207(A)-WAI, 1992 WL 278386 (N.D. Cal. Aug. 18, 1992), the court at the pretrial phase held that the court could consider rebuttal evidence post-verdict by means of the claims mechanism process to protect defendants' rebuttal rights.  As part of the claims process, the issue can be resolved by adding a question in the claim form to be completed by all class members.  The three class representatives are in the same position as all absent class members.  There is no right (or need) to have a jury trial to answer this limited question of all class members.

**IV.      CALCULATION OF CLASS MEMBERS' CLAIMS**

**A.      The Calculation of Damages Is a Mechanical Function that Is Appropriately Handled by the Claims Administrator**

Courts apply the "'out-of-pocket' measure of damages in § 10(b) cases involving fraud by a seller of securities."  *Randall v. Loftsgaarden*, 478 U.S. 647, 662 (1986); *see also Katz v. Comdisco, Inc.*, 117 F.R.D. 403, 408 (N.D. Ill. 1987) ([T]he "out-of-pocket rule [is] the standard measure of damages in securities fraud litigation.")  As set forth in Table B to the verdict form, the jury has

already determined per share inflation for each day Household's stock was affected by defendants'

fraud – March 23, 2001 through October 11, 2002 (the "Damages Period"). Therefore, the measure

of each claimant's out-of-pocket damages, is either: (a) the artificial inflation at the time of purchase

for shares purchased but not sold during the Damages Period; or (b) the artificial inflation at the time

of purchase less the artificial inflation at the time of sale for shares both purchased and sold during

the Damages Period. Consistent with this formula, recoverable damages should be calculated as

follows:

> For Household common stock that was purchased from March 23, 2001 through
> October 11, 2002, and:
>
> (a) sold prior to November 15, 2001, the recovery is zero;
>
> (b) sold from November 15, 2001 through October 10, 2002, the recovery per share
> is the difference between: (i) the artificial inflation on the date of purchase, less (ii)
> the artificial inflation on the date of sale; and
>
> (c) retained at the end of October 10, 2002, the recovery per share is the artificial
> inflation on the date of purchase.
>
> As discussed in the accompanying Declaration of Bjorn I. Steinholt, CFA ("Steinholt Decl.")

(Ex. 5 hereto), this out-of-pocket measure is properly subject to certain limitations. Accordingly, the

following offsets should be applied to damages calculated under the above formula:

> (a) recoverable damages will be limited by the mathematical formula provided in the
> 90-Day Bounce Back Rule, running from October 11, 2002, the day defendants'
> fraud was fully revealed and the first day the jury found Household's stock was not
> affected by the fraud;
>
> (b) for Household common stock that was purchased from November 15, 2001
> through October 11, 2002, and subsequently sold prior to October 11, 2002, the
> offset per share, if any, is the difference between: (i) the artificial inflation on the
> date of sale, less (ii) the artificial inflation on the date of purchase; and
>
> (c) the minimum inflation will be zero.
>
> The PSLRA's 90-Day Bounce Back Rule provides that damages "shall not exceed the

difference between the purchase . . . price paid . . . by the plaintiff for the subject security and the

mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." 15 U.S.C. §78u-4(e)(1).  The 90-Day Bounce Back Rule is not a separate or alternative means of calculating damages, but rather a limitation on damages to be applied ***after*** a plaintiff's damages are determined.  In this case, the 90-day period properly begins on October 11, 2002, the date on which the jury found defendants' fraud no longer affected Household's stock, and the artificial inflation in the stock was zero.

Consequently, recoverable damages in this case will be limited by the 90-Day Bounce Back Rule as follows:

(a)  For Household Shares Sold Prior to October 11, 2002:

No limitation of recoverable damages as shares were sold prior to the Bounce Back Period.

(b)  For Household Shares Sold From October 11, 2002 through January 8, 2003 (Sold During 90-Day Bounce Back Period – 21D(e)(2)):

Recoverable damages are limited to the purchase price per share less the average closing price from October 11, 2002 through the day of the sale.

(c)  For Household Shares Retained at the end of January 8, 2003 (Retained at the end of the 90-Day Bounce Back Period – 21D(e)(1)):

Recoverable damages are limited to the purchase price per share less the 90-day average closing price from October 11, 2002 through January 8, 2003 of $27.05 per share.

Steinholt Decl., ¶12 (Ex. 5 hereto).

During the trial, defendants argued that if the jury adopted Professor Fischel's Leakage Model of measuring inflation, the PSLRA's 90-Day Bounce Back would have to be calculated from every day during the Damages Period.  Defendants have not cited to a single case – and plaintiffs are aware of no case – supporting this novel contention nor have they specified how this plan would work mechanically.  The result of defendants' plan would be to calculate the 90-Day Bounce Back

over a timeframe where the stock was still impacted by the fraud. Calculating a cap using fraudulently inflated market prices would run directly counter to the purpose of the rule, which is to limit damages to "those losses caused by the fraud and not by other market conditions." PSLRA Committee Reports, Act §101 [¶405], *Limitation on damages*.

Defendants' proposal would result in improperly crediting them with stock increases directly caused by their fraud. For example, if the bounce back were run from the first partial corrective disclosure on November 15, 2001, not only would it be calculated using a fraudulently inflated price, it would include increases based on defendants' false and misleading statements. The bounce back was intended to adjust for overreactions in the share price following full disclosure of the truth, not reward defendants for their ongoing fraud. The period should run from October 11, 2002.

The straightforward, mechanical determination of each plaintiff's out-of-pocket damages can be performed by the independent claims administrator, Gilardi & Co., following receipt of trading information from the plaintiffs.[5] *See Kaufman v. Motorola, Inc*., No. 95 C 1069, 2000 U.S. Dist. LEXIS 14627, at *6 (N.D. Ill. Sept. 19, 2000) ("[A]n adequate remedy may be fashioned by having the jury determine a per share damage loss and requiring the filing of claims by each shareholder who claims that he, she or it has been damaged.")

### B. Defendants Are Not Entitled to Offsets of "Inflationary Gains" from Other Transactions

In addition to the appropriate offsets discussed above, defendants have indicated they intend to seek additional offsets based on supposed "benefits" derived from defendants' fraud. *See, e.g.*, Affidavit of Mukesh Bajaj, dated November 13, 2007. The offsets defendants seek are not from

---

[5]    Gilardi & Co. handled the Class Notice and is experienced in reviewing trading information and calculating class members damages pursuant to a plan of allocation. Gilardi has performed this task in hundreds of cases, including *Enron*, *Cisco*, *Quest*, among others.

securities that were purchased during the Damages Period, but instead from separate transactions in Household common stock purchased *prior to* the Damages Period. As discussed, however, the proper measure of damages is plaintiffs' out-of-pocket loss on securities purchased at prices artificially inflated by defendants' false and misleading statements, *i.e.*, Household common stock bought during the Damages Period. Nothing in the securities laws requires recoverable losses on these discreet transactions to be offset against gains, inflationary or otherwise, from separate transactions on which plaintiffs make no claim for damages.[6] *Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.*, 315 F. Supp. 2d 666, 680-81 (E.D. Pa. 2004) ("The language of Section 10(b) and Rule 10b-5 is more consistent with a transaction-based methodology than a cumulative one.")

Defendants' attempt to evade liability for their fraud by deducting from injured investors' damages "inflationary gains" from other securities transactions should be summarily rejected. Because plaintiffs' claims are based on losses that resulted from *purchases* of Household shares *during* the Damages Period, "gains made with respect to the *sale* of shares purchased *before* the [Damage] Period are irrelevant." *In re Schering-Plough Corp. Sec. Litig.*, No. 01-0829, 2003 U.S. Dist. LEXIS 26297, at *26 (D.N.J. Oct. 9, 2003) (emphases in original); *see also In re CIGNA Corp. Sec. Litig.*, 459 F. Supp. 2d 338, 354 (E.D. Pa. 2006) ("Defendants' theory uses sales of stock purchased prior to the damage period, which is *highly questionable*."). It is long settled that such gains are not properly netted against securities fraud damages:

---

[6]    Under defendants' theory, the separate transactions need not have been profitable to be offset against a defrauded plaintiffs' losses. For example, defendants construe an investor who purchased Household shares prior to the Damages Period on March 19, 2001 for $59.90 per share, and then sold these shares on March 27, 2001 for a slightly lower price of $59.85 per share as having an "inflationary gain" of $23.94/share despite actually losing money on the transaction.

> Net profits and losses realized on sales of stock acquired in a single purchase
> transaction should be offset, but profit/loss margins on sales of shares obtained in
> separate and independent purchase transactions should not be offset for the purpose
> of reaching a net figure.

*In re Clinton Oil Co. Sec. Litig.*, M.D.L. No. 137, 1977 U.S. Dist. LEXIS 16787, at *5 (D. Kan.

Mar. 22, 1977).

Defendants argue that the offsets are necessary to avoid a windfall to plaintiffs. However, as

noted above, plaintiffs have already included an offset directly tied to the "benefit" any class

member received as a result of purchasing and selling Household stock between November 14, 2001

and October 11, 2002. This is the only "netting" transaction that is appropriate. Plaintiffs also do

not include any gains or losses for completed transactions during the Damages Period prior to

November 14, 2001. Defendants' proposal to include pre-Damages Period transactions sold during

the Damages Period is contrary to the limitation set forth in plaintiffs' plan that no transactions prior

to November 14, 2001 are counted as profits or losses. Any further offset, such as that proposed by

defendants concerning "separate, unrelated transactions" is inappropriate and "would be an

unwarranted windfall to the wrongdoers." *Id*. Such a result would run contrary to the Supreme

Court's guidance in *Randall*, 478 U.S. 647, that "'[it] is more appropriate to give the defrauded party

the benefit even of windfalls than to let the fraudulent party keep them.'" *Id.* at 663 (alteration in

original).

In *Randall*, a securities fraud action arising under §10(b) of the 1934 Act and §12(a)(2) of the

Securities Act of 1933, the Supreme Court rejected the contention that the securities laws prohibit

defrauded investors from being put in a better financial position than they would have realized

without the fraud. *Randall*, 478 U.S. at 662-64. The Court declined to offset damages arising from

plaintiffs' investment in a tax shelter with tax benefits received from the investment, emphasizing

that it has "never interpreted §28(a) as imposing a rigid requirement that every recovery on an

express or implied right of action under the 1934 Act must be limited to the net economic harm

suffered by the plaintiff." *Randall*, 478 U.S. at 663.  The Court held that the "mere fact" that a judgment combined with other circumstances "may place a §10(b) plaintiff in a better position than he would have been in absent the fraud, does not establish that the flexible limits of §28(a) have been exceeded." *Id.*  It also should be noted that there is no evidence in this case that including pre-Damages Period purchases and Damages Period sales would put a class member in a better position absent the fraud.

The Supreme Court noted that "the 1934 Act was not confined solely to compensating defrauded investors" but also intended by Congress "to deter fraud and manipulative practices in the securities markets, and to ensure full disclosure of information material to investment decisions." *Id.* at 664.  Accordingly, the deterrent purpose underlying the 1934 Act prohibits the reduction defendants demand:  "This deterrent purpose is ill served by a too rigid insistence on limiting plaintiffs to recovery of their 'net economic loss.'" *Id.*  If fully culpable defendants could eliminate their liability on the basis of gains from unrelated transactions, the resulting diminution in responsibility of wrongdoers "would seriously impair the deterrent value of private rights of action." *Id.*  The deterrent effect of the securities laws would be severely impaired by defendants argument in this case, for defendants ask this Court to let them avoid full liability, although the jury found them 100% responsible for perpetrating the fraud that was proven.

In *Kane v. Shearson Loeb Rhoades, Inc.*, No. 86-551-CIV-MARCUS, 1989 U.S. Dist. LEXIS 19022, at *15, *23 (S.D. Fla. May 3, 1989) (*aff'd, Kane v. Shearson Lehman Hutton, Inc.*, 916 F.2d 643 (11th Cir. 1990), the court relied on *Randall* and rejected offsets similar to those proposed here, holding that "[s]uch an aggregation method for the calculation of out of pocket damages in a securities action undermines one of the principal goals of both federal and state securities laws: deterring fraud." *Id.* at *23.  The court concluded that the proper damage methodology "should have been to treat each transaction separately, rather than to have aggregated

them." *Id.* at *15.  The Eleventh Circuit affirmed this ruling, holding that "there is no support to be found under federal or Florida law for the 'netting' theory" advanced by the defendants.  *Kane v. Shearson Lehman Hutton, Inc.*, 916 F. 2d 643, 646 (11th Cir. 1990).  Citing *Randall*, the Eleventh Circuit continued: "What is found, under both federal and Florida law, is the intent to have securities antifraud provisions enforced stringently to deter fraud."  *Id.* (citing *Randall*, 478 U.S. at 663).

More recently, in *Argent*, the court adopted the "transaction-based" methodology for calculating out-of-pocket inflationary loss which "allows claims for unprofitable transactions . . . without offsetting the recoverable loss with gains from profitable transactions." 315 F. Supp. 2d at 680.  As the *Argent* court held, the language of §10(b) and Rule 10b-5 is more consistent with the "transaction-based" methodology than a "cumulative" methodology which aggregates all profitable and unprofitable transactions:

> The language of Section 10(b) and Rule 10b-5 is more consistent with a transaction-based methodology than a cumulative one.  Both provisions make it illegal for someone to make materially misleading statements "in connection with the purchase or sale of any security."  15 U.S.C. §78j(b) (2004); 17 C.F.R. §240.10b-5 (2004).  By using the singular nouns "purchase" or "sale," Congress and the SEC focus on each transaction individually.  Neither the statute nor the Rule authorize any sort of aggregation of purchases or sales that could sanction the cumulative approach.

*Id.*[7]

Several other recent decisions have rejected the argument defendants advance.  In *In re Sepracor Inc. Sec. Litig.*, 233 F.R.D. 52 (D. Mass. 2005), the court adopted the reasoning of *Argent* and held: "I find a transaction-based methodology, which allows claims for unprofitable transactions

---

[7]     The Private Securities Litigation Reform Act makes no mention of offsets for separate transactions: "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this title . . . caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. §78u-4(b)(4).  As the statute is silent about offsetting gains against losses, principles of statutory construction also preclude the interpretation defendants advance here.  *See Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835 (1990) ("Absent a clearly expressed legislative intention to the contrary, [the statutory] language must ordinarily be regarded as conclusive.").

without offsetting that recoverable loss with gains from profitable transactions, to be more consistent with the provisions of the statute and rule." *Id.* at 54 (citing *Argent*, 315 F. Supp. 2d at 680). Similarly, the court in *Schering-Plough* explicitly rejected both the analysis and rationale advanced by defendants here as "somewhat perplexing" in light of the fact that the profits defendants sought to use for offsetting damages were not derived from the damaged shares. 2003 U.S. Dist. LEXIS 26297, at *27. And, in *CIGNA*, the court characterized the use of "stock purchased prior to the damage period" to offset losses as "***highly questionable***." 459 F. Supp. 2d at 354 (also rejecting the argument that *Dura* requires "netting" approach: "there is nothing in Dura Pharmaceuticals that explicitly holds that . . . [an] investor's other trading in the company's stock is relevant to a claim for damages based on [other] isolated transactions.")[8]

Consistent with these decisions and the Supreme Court's direction in *Randall*, recoverable losses arising from defendants' securities fraud should not be offset against gains from separate profitable transactions unrelated to the damaged shares. The formula applied by the claims administrator to calculate recoverable damages should not include Household common stock

---

[8]    Numerous other courts have refused to permit a wrongdoer to avoid fully compensating victims of its fraud by offsetting a plaintiff's gains against his proven losses. *Nesbit v. McNeil*, 896 F.2d 380, 386 (9th Cir. 1990) (abrogated on other grounds, *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991)) (affirming lower court's refusal to permit offset of trading gains against losses on plaintiffs' investments in "churning" case, and stating that denying defendants an offset for portfolio gains "serves to forward the deterrent policies which underlie the federal securities laws"); *Davis v. Merrill Lynch, Pierce, Fenner & Smith*, 906 F.2d 1206, 1218 (8th Cir. 1990) (rejecting argument that because churned account realized a "cumulative net profit," no actual damages were sustained, and refusing to allow offset for profits in calculating damages); *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys.*, No. C 01-20418 JW, 2004 U.S. Dist. LEXIS 27008, at *10 (N.D. Cal. May 27, 2004) (rejecting as "premature and unpersuasive at the class certification stage" argument that certain plaintiffs were not appropriate class representatives because they made money during the Class Period and were "net sellers"); *In re Blech Sec. Litig.*, No. 94 Civ. 7696 (RWS), 2003 U.S. Dist. LEXIS 4650, at *72 (S.D.N.Y. Mar. 26, 2003) (in calculating damages, "[d]efendants are not entitled to an offset, factoring in any gains made by" in and out traders who sold their shares prior to the end of the class period); *Burke v. Ruttenberg*, 102 F. Supp. 2d 1280, 1302 n.32 (N.D. Ala. 2000) (plaintiff's "alleged gains during the early period of his trading cannot be offset against his purported losses").

purchased before the Damages Period. The only "netting" transactions should be for gains during the period of November 14, 2001 through October 11, 2002. Plaintiffs' suggested method endorses some form of netting but only for shares purchased during the Damages Period.

### C.    FIFO Is the Appropriate Method for "Matching"

In determining each plaintiff's damages, it will be necessary in some cases to apply a formula to match shares bought on a particular date to shares sold. Matching becomes necessary when the plaintiff held shares entering the Damages Period, sold shares during the Damages Period, and the specific shares sold cannot be determined from the trading records. In this case, the first-in, first-out ("FIFO") method is the appropriate method for matching shares. The FIFO method offsets sales during the class period with a plaintiff's pre-class period stock holdings by matching, in chronological order, the first shares sold during the class period with the shares held at the beginning of the Damages Period, if any, and then the first shares purchased during the Damages Period. This method of matching is consistent with the transactional approach discussed above, and will avoid inappropriate reductions to defendants' liability based on sales of shares purchased before the Damages Period.

FIFO has been approved by numerous courts for use in securities fraud actions. For example, in *Cisco*, the court certified a 10(b) class over defendants' objection that the proposed class representative was a "net seller" who did not have losses under LIFO ("last in, first out"). 2004 U.S. Dist. LEXIS 27008, at *10-*11. The court held that FIFO "has been established as a legitimate method for computing losses or gains from stock purchases or sales." *Id.* (also noting that "under the FIFO accounting method, the notion of 'net seller' would appear to be largely irrelevant.") Similarly, in *Schering-Plough*, the court granted plaintiffs' motion for class certification despite the State of Florida's status as a so-called "net-seller":

> Using the tracing method of First In First Out ('FIFO'), FSBA sustained a $25 million loss in connection with its purchases of Schering-Plough stock during the

> Class Period. Defendants' argument that the FIFO calculation is irrelevant . . . is somewhat perplexing. FSBA's Section 10(b) claim is based on losses that resulted from **purchases** of Schering-Plough stock made **during** the Class Period. Any capital gains made with respect to the **sale** of shares purchased **before** the Class Period are irrelevant.

2003 U.S. Dist. LEXIS 26297, at *25-*27 (emphases in original); *see also Chill v. Green Tree Fin. Corp.*, 181 F.R.D. 398, 410-11 (D. Minn. 1998) (rejecting a challenge to a potential lead plaintiff advanced on the ground that his trading activity, in the absence of FIFO, appeared to reflect financial gains); *Laborers Local 1298 Pension Fund v. Campbell Soup Co.*, Civ. A. No. 00-152 (JEI), 2000 U.S. Dist. LEXIS 5481 (D.N.J. Apr. 24, 2000); *In re Veeco Instruments, Inc. Sec. Litig.*, 233 F.R.D. 330 (S.D.N.Y. 2005); *In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298 (S.D. Ohio 2005).

FIFO also has been applied in numerous plans of allocation in securities fraud cases to calculate the claimants' recovery rights. *See In re Cendant Corp. Sec. Litig.*, 454 F.3d 235, 245-47 (3d Cir. 2006) (explaining that the plan of allocation applied FIFO); *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235, 272 (D.N.J. 2000) (*aff'd, In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001)) (approving the plan of allocation); *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 127 (D.N.J. 2002) (approving plan of allocation which applied FIFO); *In re Storage Tech. Corp. Sec. Litig.*, No. 84-F-1981, 1990 U.S. Dist. LEXIS 18462 (D. Colo. Sept. 28, 1990) (approving plan of distribution which applied FIFO); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, No. 03-MD-01539, 2006 U.S. Dist. LEXIS 1928, at *43-*44 (D. Md. Jan. 9, 2006) (granting preliminary approval of a plan of allocation which applied FIFO); *Rothfarb v. Hambrecht*, No. C-82-1065 WHO, 1986 U.S. Dist. LEXIS 30385, at *4 (N.D. Cal. Jan. 15, 1986) (approving plan of allocation which applied FIFO).[9] Consistent with this authority, the SEC recently used FIFO in its plan of allocation of $800

---

[9]    FIFO also is the method that the IRS uses for calculation of tax gains and losses. *Thompson v. Shaw Group, Inc.*, No. 04-1685, 2004 U.S. Dist LEXIS 25641, at *14 n.5 (E.D. La. Dec. 15, 2004) ("Many federal appeal courts and commentators regard FIFO, which the Internal Revenue Service ("IRS") consistently uses,

million to investors injured by American International Group's ("AIG") securities fraud.  Ex. 6 at 7 (attached hereto).  As is standard in plans of allocations, the SEC's plan does not provide for offsetting profits from non-actionable shares purchased prior to or during the class period.  This case should be no different.

In pre-trial briefing, defendants argued LIFO was appropriate in this case, citing three district court decisions declining to use FIFO in the lead plaintiff context.  *See* Dkt. No. 1186[10] at 5-6 (citing *In re Organogenesis Sec. Litig.*, 241 F.R.D. 397 (D. Mass. 2007), *Johnson v. Dana Corp.*, 236 F.R.D. 349, 353 (N.D. Ohio 2006), *In re Comdisco Sec. Litig.*, No. 01 C 2110, 2004 U.S. Dist. LEXIS 7230 (N.D. Ill. Apr. 26, 2004).  However, the rationale of these cases – that LIFO must be applied to avoid a plaintiff windfall – fails for the same reasons as defendants' netting argument fails, including that "'[it] is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them.'"  *Randall*, 478 U.S. at 663.  Notably, none of the cases relied on by defendants even mentions the Supreme Court's decision in *Randall v. Loftsgaarden*.[11]  In order to appropriately apportion damages and avoid a windfall to defendants guilty of securities fraud, FIFO should be applied by the claims administrator in cases where it is necessary to match shares.

---

as a firmly established methodology for calculating loss for tax purposes in the context of securities investments.").

[10]      Dkt. No. 1186 is defendants' Reply Memorandum of Law in Further Support of Defendants' Motion to Compel Plaintiffs to Supplement Their Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1)(A)(iii), filed February 25, 2008.

[11]      These cases are also distinguishable in that the calculation of largest financial interest to in the context of the choice of a lead plaintiff is not synonymous with damages. *See, e.g.*, *In re Ribozyme Pharms. Sec. Litig.*, 192 F.R.D. 656, 659-60 (D. Colo. 2000) ("[T]he determination of financial interest does not equate to damages.  Damages is a term of art and a technical matter to be established by experts.  The lead plaintiff provision in the PSLRA does not use the term 'damages' but instead, 'largest financial interest.' . . . I hold, therefore, that 'damages' under the PSLRA is not the proper test to determine largest financial interest."); *CIGNA*, 459 F. Supp. 2d at 352.

## V.    THE COURT SHOULD AWARD PREJUDGMENT INTEREST

This Court has discretion to award prejudgment interest to plaintiffs. "Prejudgment interest is a form of compensation and the decision to award prejudgment interest rests in the sound discretion of the district court." *Michaels v. Michaels*, 767 F.2d 1185, 1204 (7th Cir. 1985). *See also Myron v. Chicoine*, 678 F.2d 727, 733-34 (7th Cir. 1982). "[Prejudgment interest] is a matter within the Court's sound discretion." *Lincoln Nat'l Life Ins. Co. v. Silver*, 966 F. Supp. 587, 620-21 (N.D. Ill. 1995) (*aff'd*, 114 F.3d 1191 (7th Cir. 1997). "An award of pre-judgment interest is discretionary with the court." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 614 (S.D. Tex. 2003.)

The rationale behind awarding prejudgment interest is to compensate the plaintiffs for being deprived of the monetary value of their loss. "If a defendant has deprived the plaintiff of a specific sum of money, he has also deprived the plaintiff of the interest which the money would have earned in the absence of defendant's breach of duty; unless the plaintiff is paid interest for the entire time that he is deprived of the use of his money, he will not receive full compensation." *Myron*, 678 F.2d at 734. "This rationale is persuasive in cases involving investments because by entering into such a transaction, the investor has manifested his intention to utilize the funds for the production of income." *Id.*

The Seventh Circuit has consistently held in favor of awarding prejudgment interest to plaintiffs: "The time has come, we think, to generalize, and to announce a rule that prejudgment interest should be presumptively available to victims of federal law violations. Without it, compensation of the plaintiff is incomplete and the defendant has an incentive to delay." *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989). "The growing recognition of the time value of money has led this court to rule that 'prejudgment interest should be *presumptively* available to victims of federal law violations.'" *Rivera v. Benefit Trust Life, Ins. Co.*,

921 F.2d 692, 696 (7th Cir. 1991) (emphasis in original) (citing to *Gorenstein*).  Courts in the Seventh Circuit have held that any discretion to deny prejudgment interest is extremely limited (*see Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1046 (7th Cir. 1994), and *Harrison v. Dean Witter Reynolds, Inc.*, No. 86 C 8003, 1995 WL 127792 (N.D. Ill. Mar. 22, 1995)); nevertheless, the decision to award prejudgment interest "involves a balancing of the equities between the parties under the circumstances of the particular case." *Myron*, 678 F.2d at 734.  *See also Michaels*, 767 F.2d at 1204, and *Lincoln Nat'l Fire*, 966 F. Supp. at 620-21.

In the handful of cases, where a court declined to impose prejudgment interest in whole or in part, the courts focused on whether the plaintiffs caused undue delay in prosecuting the case, whether the defendants were relatively innocent, and whether the award was compensatory or punitive in nature.  *Sanders v. John Nuveen & Co., Inc.*, 524 F.2d 1064, 1075 (7th Cir. 1975) (vacated and remanded on other grounds); *American Nat'l Fire Ins. Co. v. Yellow Freight Sys.*, 325 F.3d 924, 938 (7th Cir. 2003).  In the present case, plaintiffs have not caused undue delay in the proceedings.  Furthermore, the verdict rendered by the jury on May 7, 2009, found defendants Household International, Inc. and William Aldinger acted knowingly in violation of SEC Rule 10b-5 and David Schoenholz and Gary Gilmer acted recklessly in violation of SEC Rule 10b-5.  Therefore, this is not a case of mere negligence or "relatively innocent" defendants.  Finally, the rationale that prejudgment interest is appropriate to compensate the plaintiffs "is persuasive in cases involving investments because by entering into such a transaction, the investor has manifested his intention to utilize the funds for the production of income." *Myron*, 678 F.2d at 734.  The plaintiffs in this case were wrongfully deprived of their investment funds and therefore, plaintiffs were also deprived of interest or other investment earnings on those funds.  For these reasons, the facts of this case support an award of prejudgment interest to plaintiffs.

The amount of prejudgment interest to be awarded to plaintiffs is appropriately left to the discretion of the district court; however, courts in the Seventh Circuit have consistently held that an interest rate equal to the prime rate is appropriate: "[W]e suggest that district judges use the prime rate for fixing prejudgment interest where there is no statutory interest rate.  That is a readily ascertainable figure which provides a reasonable although rough estimate of the interest rate necessary to compensate plaintiffs not only for the loss of the use of their money but also for the risk of default." *Gorenstein*, 874 F.2d at 436.  In a securities fraud case, this Court in *RK Co. v. Harvard Scientific Corp.*, No. 99 C 4261, 2007 WL 4150317 (N.D. Ill. Nov. 16, 2007), explained that "typically, the rate at which prejudgment interest is calculated is based upon the prime rate."  *Id*. at *3 (citing to *First Nat'l Bank of Chicago v. Standard Bank and Trust*, 172 F.3d 472, 480 (7th Cir. 1999)).  "Our practice has been to use the prime rate as the benchmark for prejudgment interest unless either there is a statutorily defined rate or the district court engages in 'refined rate setting' directed at determining a more accurate market rate for interest.  We hold today that to . . . award something other than the prime rate is an abuse of discretion, unless the district court engages in . . . a refined calculation." *First Nat'l Bank*, 172 F.3d at 480; *see also Cement Div. v. City of Milwaukee*, 950 F. Supp. 904, 909 (E.D. Wis. 1996) (*aff'd*, 1999 A.M.C. 606 (7th Cir. 1998)) ("[T]he Seventh Circuit has decided that . . . the prime rate . . . should be used because it is most nearly reflective of the market rate.").  This Court recognized in a securities fraud case prosecuted by the SEC that "Seventh Circuit law consistently teaches that the norm in federal question cases (and certainly the permissible rule in a district court's discretion) is to award such prejudgment interest -- and indeed preferably to award it at the compounded prime rate (else a wrongdoer will have gained an unwarranted profit from the use of the ill-gotten gains in the interim)."  *U.S. Securities and Exchange Comm'n v. Kirch*, 263 F. Supp. 2d 1144, 1152 (N.D. Ill. 2003).  "[P]rejudgment interest should be awarded on the total damages at the prime rates charged **monthly** by banks." *Lampi Corp.*

*v. American Power Products, Inc.*, No. 93 C 1225, 2004 WL 1656547, at *8 (N.D. Ill. July 22, 2004). Based on the above, plaintiffs request that prejudgment interest should be awarded at the average monthly prime rate. *See* Steinholt Decl., ¶17 (Ex. 5 hereto).

As a general rule, the decision as to whether to award compound or simple prejudgment interest is left to the discretion of the trial court; however, courts in the Seventh Circuit have consistently awarded compound prejudgment interest. "Compound prejudgment interest is the norm in federal litigation." *In re Oil Spill by The Amoco Cadiz*, 954 F.2d 1279, 1332 (7th Cir. 1992); *American Nat'l Fire*, 325 F.3d 924. "We do believe, that at least in a federal question case, a district court must explain why it believes it appropriate to deviate from the norm of compound interest, the measure that most completely fulfills the purpose of prejudgment interest of ensuring 'complete compensation.'" *American Nat'l Fire*, 325 F.3d at 938.

The issue of how often to compound is also left to the discretion of the district court. This Court in *Harrison*, in granting prejudgment interest in a case based on control person liability under §20(a) of the Securities Exchange Act of 1934, recognized that "[a]s for how often to compound, annually, monthly, daily, etc., there appears to be support in the law for each approach. This Court will adopt the approach taken by Judge Easterbrook, sitting by designation in a patent case, and will calculate the interest due by applying the average prime rate compounded monthly." *Harrison*, 1995 WL 127792, at *14 (citing to *In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 831 F. Supp. 1354, 1395 (N.D. Ill. 1993). Similarly, this Court in *Lampi*, which involved patent infringement, determined that "prejudgment interest should be awarded on the total damages at the prime rates charged monthly by banks, with the interest compounded monthly." *Lampi*, 2004 WL 1656547, at *8. ("Interest should be compounded monthly in order fully to compensate for delay." *Mendenhall v. Barber-Greene Co.*, No. 80 C 6747, 1990 WL 156519, at *3 (N.D. Ill Oct. 5, 1990)).

Plaintiffs respectfully propose that the prejudgment interest be compounded monthly at the average monthly prime rate accruing from October 11, 2002.

## VI.    THE COURT SHOULD ENTER JUDGMENT

Given the jury's verdict on May 7, 2009, plaintiffs intend to file a motion for entry of judgment against defendants' Household International, Inc., William Aldinger, David Schoenholz and Gary Gilmer.  Pursuant to Federal Rule of Civil Procedure 58(b), judgment should be entered when the jury returns a general verdict.  The Seventh Circuit explained that a judgment is final when it specifies "either the amount of money due the plaintiff or a formula by which that amount of money could be computed in mechanical fashion."  *Buchanan v. United States*, 82 F.3d 706, 707 (7th Cir. 1996).  Here, the jury has already determined per share inflation for each day that Household's stock was affected by defendants' fraud (March 23, 2001 through October 11, 2002).  As set forth in Section IV.A., *supra*, the amount of money due the plaintiffs can be calculated by the claims administrator using a straightforward, mechanical formula.  Thus, entry of final judgment is appropriate in this case.

For the purposes of developing an appropriate claims procedure and plan of allocation, this Court should retain jurisdiction over the claims procedure as well as the nature and amount of the distribution to be made to members of the Class who file valid claims.  This Court should also retain jurisdiction over any award to the class representatives and their counsel of attorneys' fees and costs in this action.  *See, e.g.*, *Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Ironworkers' Local Union 75 v. Madison Indus., Inc.*, 733 F.2d 656, 658-59 (9th Cir. 1984) (judgment on merits is final where court reserves question of fees for later consideration).

DATED:  May 28, 2009

Respectfully submitted,

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
PATRICK J. COUGHLIN (111070)
MICHAEL J. DOWD (135628)
SPENCER A. BURKHOLZ (147029)
DANIEL S. DROSMAN (200643)
MAUREEN E. MUELLER (253431)


                    /s/ Michael J. Dowd
_____
                 MICHAEL J. DOWD

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
AZRA Z. MEHDI (90785467)
D. CAMERON BAKER (154432)
LUKE O. BROOKS (90785469)
JASON C. DAVIS (253370)
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiffs

MILLER LAW LLC
MARVIN A. MILLER
LORI A. FANNING
115 S. LaSalle Street, Suite 2910
Chicago, IL  60603
Telephone:  312/332-3400
312/676-2676 (fax)

Liaison Counsel

LAW OFFICES OF LAWRENCE G.
  SOICHER
LAWRENCE G. SOICHER
110 East 59th Street, 25th Floor
New York, NY  10022
Telephone:  212/883-8000
212/355-6900 (fax)

Attorneys for Plaintiff

S:\CasesSD\Household Intl\Trial\BRF00059423 Post-Verdict Submission.doc

<u>DECLARATION OF SERVICE BY ELECTRONIC MAIL AND BY U.S. MAIL</u>

I, the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, a citizen of the United States and employed in the City and County of San Francisco, State of California, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 100 Pine Street, 26th Floor, San Francisco, California 94111.

2.     That on May 28, 2009, declarant served by electronic mail and by U.S. Mail to the parties PLAINTIFFS' POST-VERDICT SUBMISSION.

The parties' email addresses are as follows:

| | |
|---|---|
| TKavaler@cahill.com<br>PSloane@cahill.com<br>PFarren@cahill.com<br>LBest@cahill.com<br>DOwen@cahill.com | NEimer@EimerStahl.com<br>ADeutsch@EimerStahl.com<br>MMiller@MillerLawLLC.com<br>LFanning@MillerLawLLC.com |

and by U.S. Mail to:

Lawrence G. Soicher, Esq.                   David R. Scott, Esq.
Law Offices of Lawrence G. Soicher       Scott & Scott LLC
110 East 59th Street, 25th Floor            108 Norwich Avenue
New York, NY 10022                          Colchester, CT  06415

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 28th day of May, 2009, at San Francisco, California.

_____
/s/ Marcy Medeiros
MARCY MEDEIROS