# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF ILLINOIS

### EASTERN DIVISION

```
------------------------------------------------------------x
```
LAWRENCE E. JAFFE PENSION PLAN, ON
BEHALF OF ITSELF AND ALL OTHERS SIMILARLY
SITUATED,

                    Plaintiffs,

         - against -

HOUSEHOLD INTERNATIONAL, INC., ET AL.,

                   Defendants.
```
------------------------------------------------------------x
```

Lead Case No. 02-C-5893
(Consolidated)

CLASS ACTION

Judge Ronald A. Guzmán

## DEFENDANTS' RECOMMENDATIONS
## <u>FOR PHASE TWO PROCEEDINGS, IF NEEDED</u>

CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York  10005
(212) 701-3000

       -and-

EIMER STAHL KLEVORN & SOLBERG LLP
224 South Michigan Ave.
Suite 1100
Chicago, Illinois  60604
(312) 660-7600
*Attorneys for Defendants Household*
*International, Inc., William F. Aldinger,*
*David A. Schoenholz and Gary Gilmer*

*TABLE OF CONTENTS*

**Page**

INTRODUCTION ........................................................................................................1

FACTUAL BACKGROUND ........................................................................................3

ARGUMENT

      A.    Phase Two Should Be Deferred Pending Resolution of Defendants'
            Pending Post-Trial Motions ..............................................................5

      B.    The Presumption of Reliance Is Rebuttable and Defendants Are
            Entitled to Related Discovery..........................................................7

      C.    Phase Two Must Include Resolution of Threshold Damages Issues......................9

      D.    Defendants Have a Right to a Jury Trial........................................15

DEFENDANTS' PHASE II PROPOSAL .................................................................17

      a)    Notice and Basic Information Requests to Class Members................................17

      b)    Discovery of Individual Class Members...........................................18

      c)    Judicial Resolution of Threshold Measure of Damages Issues...........................19

      d)    Trial.................................................................................20

CONCLUSION ..........................................................................................................21

### *TABLE OF AUTHORITIES*

| <u>Cases</u> | <u>Page</u> |
|---|---|
| *Arenson* v. *Broadcom Corp.*, No. SA CV 02-301GLT, 2004 WL 3253646 (C.D. Cal. Dec. 6, 2004) ................................. | 11-12 |
| *In re Bally Manufacturing Securities Corp. Litigation*, 141 F.R.D. 262 (N.D. Ill. 1992) ......................................... | 9 |
| *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988)...................................... | 7, 8 |
| *Beacon Theatres, Inc.* v. *Westover*, 359 U.S. 500 (1959).................................. | 15-16 |
| *Biben* v. *Card*, 789 F. Supp. 1001 (W.D. Mo. 1992)......................................... | 9 |
| *Blackie* v. *Barrack*, 524 F.2d 891 (9th Cir. 1975) ................................ | 8 |
| *Blyden* v. *Mancusi*, 186 F.3d 252 (2d Cir. 1999) ................................ | 15 |
| *In re Boston Scientific Corp. ERISA Litigation*, 254 F.R.D. 24 (D. Mass. 2008) ........................................... | 12 |
| *In re Comdisco Securities Litigation*, 150 F. Supp. 2d 943 (N.D. Ill. 2001) ............................................ | 10-11 |
| *In re Comdisco Securities Litigation*, No. 01 C 2110, 2004 WL 905938 (N.D. Ill. Apr. 26, 2004)....................................... | 12 |
| *Curtis* v. *Loether*, 415 U.S. 189 (1974) ............................................ | 15 |
| *Dairy Queen, Inc.* v. *Wood*, 369 U.S. 469 (1962) ................................ | 15, 20 |
| *Dura Pharmaceuticals, Inc.* v. *Broudo*, 544 U.S. 336 (2005) ............................ | 12 |
| *Edward J. Bartolo Corp.* v. *Coopers & Lybrand*, 928 F. Supp. 557 (W.D. Pa. 1996)......................................... | 2, 5 |
| *Ellenburg* v. *JA Solar Holdings Co. Ltd.*, Nos. 08 Civ. 10475, 08 Civ. 11366, 2009 WL 1033362 (S.D.N.Y. April 17, 2009) ................................ | 12 |
| *In re eSpeed, Inc. Securities Litigation*, 232 F.R.D. 95 (S.D.N.Y. 2005)............ | 11 |
| *Ganesh, L.L.C.* v. *Computer Learning Centers, Inc.*, 183 F.R.D. 487 (E.D. Va. 1998)......................................... | 8-9 |

**Page**

| **Cases** | **Page** |
|---|---|
| *Grace* v. *City of Detroit*, 145 F.R.D. 413 (E.D. Mich. 1992) ............................ | 17-18 |
| *Hill* v. *Tribune Co*., No. 05 C 2602, 2005 WL 3299144 (N.D. Ill. Oct. 13, 2005) ...................................................................................... | 11 |
| *Hussein* v. *Oshkosh Motor Truck Co*., 816 F.2d 348 (7th Cir. 1987)................. | 15-16, 20 |
| *Jaroslawicz* v. *Engelhard Corp*., 724 F. Supp. 294 (D.N.J. 1989)...................... | 8, 9, 16 |
| *Johnson* v. *Dana Corp.*, 236 F.R.D. 349 (N.D. Ohio 2006) ............................... | 11, 12-13 |
| *Moskowitz* v. *Lopp*, 128 F.R.D. 624 (E.D. Pa. 1989) ......................................... | 9 |
| *Mottoros* v. *Abrams*, 524 F. Supp. 254 (N.D. Ill. 1981) .................................... | 8 |
| *Nelson* v. *Adams USA, Inc*., 529 U.S. 460 (2000) ............................................... | 16 |
| *In re NPS Pharmaceuticals, Inc. Securities Litigation*, No. 2:06-cv-00570-PGC-PMW, 2006 U.S. Dist. LEXIS 87231 (D. Utah Nov. 17, 2006) .................................................................................... | 13 |
| *In re Organogenesis Securities Litigation*, 241 F.R.D. 397 (D. Mass 2007) ...................................................................................... | 13 |
| *In re PNC Financial Services Group, Inc.*, 440 F. Supp. 2d 421, 436 (W.D. PA. 2006) ................................................................... | 14-15 |
| *Ross* v. *Bernhard*, 396 U.S. 531 (1970).............................................................. | 15 |
| *Schneider* v. *County of San Diego*, 28 F.3d 89 (9th Cir. 1994) ......................... | 16 |
| *In re Scott Paper Co. Securities Litigation*, 142 F.R.D. 611 (E.D. Pa. 1992) ...................................................................................... | 9 |
| *Zlotnick* v. *TIE Communications*, 836 F.2d 818 (3d Cir. 1988)......................... | 8 |
| | |
| **Constitutional Provisions** | |
| U.S. Const. amend. VII ............................................................................... | 15, 15n, 20 |
| | |

**Page**

| **Cases** | **Page** |
|---|---|
| **Statutes** | |
| Private Securities Litigation Reform Act of 1995<br>    § 21D(e)(1), 15 U.S.C. § 78u-4(e)(1)-(2) (2006)........................................... | 13-14, 14n |
| **Treatises** | |
| 3 Herbert Newberg, Newberg on Class Actions (2d ed. 1985) ......................... | 18 |
| **Other Authorities** | |
| Daniel R. Fischel et al., The Use of Trading Models to Estimate Aggre-<br>    gate Damages in Securities Fraud Litigation:  An Update, 10 National<br>    Center for the Public Interest, Briefly 1, 19-20 (Mar. 2006), available<br>    at www.aei.org1docLib/20070809_Aggregate_Damages.pdf ...................... | 2n |

Defendants Household International, Inc., William F. Aldinger, David A. Schoenholz and Gary Gilmer (collectively, "Defendants"), by and through their attorneys, hereby submit the following proposal for identifying and resolving open issues in any second phase ("Phase II") of this bifurcated action.[1]

## INTRODUCTION

Phase I addressed liability issues common to all class members, subject to the Court's reservation of core legal issues whose outcome may moot the need for proceedings on issues of individual reliance and damages. Examples include the utter lack of scienter evidence as to the restatement-related claims, Plaintiffs' failure to prove loss causation (as evidenced, inter alia, by their experts' admissions that the truth of the alleged reaging-related fraud was not revealed until several months after the end of the Class Period and the fact that the Household's stock price increased when the restatement was announced and increased again upon the announcement of the attorneys general settlement), and the statute of repose implications of Plaintiffs' inflation models, both of which demonstrate that any inflation in the price of Household stock preexisted the start of the Class Period. *See generally* Defendants' Motion for Judgment as a Matter of Law Pursuant to Rule 50(b) (Dkt. 1618). The Court's guidance on another legal issue—the viability of Plaintiffs' "leakage model" of inflation, generally and as applied by the jury—is also essential to determining whether there will be a Phase II and if so, how to measure individual damages in view of the jury's departure from the leakage model presented at trial. Moreover, an alternative decision to require a new Phase I trial would defer and might eliminate the need for Phase II proceedings. *See generally* Defendants' Motion for New Trial Pursuant to Rule 59 (Dkt. 1619). For these reasons, Phase II cannot reasonably proceed until this Court has

---

[1] Defendants are prepared to address any related questions the Court may have at the Court's convenience, and also plan to respond promptly (within one week) to Plaintiffs' Phase II proposal, which is due to be filed simultaneously with this submission.

ruled on the post-verdict motions that were filed on May 21, 2009. Thereafter, if a second phase should be needed, it must be designed so that individual issues involving reliance and damages can be identified, understood and developed through a standard questionnaire process (of approximately 45 days in duration), followed as needed by selective and efficient discovery (6-8 weeks), judicial rulings on certain threshold damages issues, and a jury trial on any contested issues of material fact.

In fashioning the Phase II program, this Court is proceeding in largely uncharted territory because PSLRA class actions are rarely tried to a jury verdict and even when they are, subsequent proceedings are sometimes avoided by post-verdict rulings in defendants' favor. *See*, *e.g.*, *Edward J. Bartolo Corp.* v. *Coopers & Lybrand*, 928 F. Supp. 557, 560 (W.D. Pa. 1996). Nevertheless, as discussed in this Memorandum, the guiding principles that should apply here are not open to serious debate. They include: (1) that Defendants' due process rights, jury trial rights and entitlement to discovery on contested individual issues were not eliminated or truncated by the certification of a class for purposes of trying common issues; (2) that nothing in the jury verdict on class-wide issues estops Defendants from attempting to rebut the presumption of reliance that was assumed for purposes of trying class-wide issues; and (3) in attempting to quantify damages, there is no reasonable substitute for consideration of class members' actual trading history. As Plaintiffs' damages expert Daniel Fischel has demonstrated, calculating damages on a formulaic, trading model basis tends to overstate actual damages by up to several hundred percent.[2]

---

[2]     *See* Daniel R. Fischel *et al.*, *The Use of Trading Models to Estimate Aggregate Damages in Securities Fraud Litigation: An Update*, 10 National Center for the Public Interest, *Briefly* 1, 19-20 (Mar. 2006), *available at* www.aei.org1docLib/20070809_Aggregate_Damages.pdf (demonstrating that as a result of estimation errors, "neither the [proportional trading model] nor the [multi-trader model] reliably estimates aggregate claimed losses and that both models can substantially overestimate actual claimed losses in any specific case").

It follows that Plaintiffs' suggestion during the PTO process — to the effect that class members should simply fill out claim forms and confirm in conclusory fashion that they relied on the integrity of the market — cannot seriously be entertained.[3] This does not mean that Defendants intend to seek discovery of every absent class member irrespective of size. Rather, Defendants propose to collect essential basic information through a standardized set of questions, which may suffice as to many claims, but will also help to identify individual class members whose claims warrant the further investigation and evidentiary development, particularly where a substantial claim justifies the expense of discovery and trial on individual issues. This process would be focused by the concentration of the largest claimants within a small number of large institutional investors. As Mr. Aldinger testified without contradiction at trial, some 15 investors collectively accounted for 65-70% of Household holdings during the period in question. (Phase I Trial Tr. 3086:20-3087:2). Defendants have no incentive to waste time and money on examining small shareholders with no unique characteristics, and if Phase II should proceed at all (meaning that Defendants' dispositive legal defenses had been rejected), Defendants will have a strong incentive to wrap up Phase II as quickly and efficiently as possible in order to pursue appropriate relief.

## FACTUAL BACKGROUND

During Phase I, Defendants served discovery requests on Lead Plaintiffs and certain of their investment advisors. Plaintiffs opposed such discovery on the ground that it involved individualized issues and should more properly be addressed in a second phase, once li-

---

[3]     Plaintiffs argued that any individual issues raised by Defendants could be resolved if "each class member could be asked on the claim form to answer the only relevant question – 'would you still have purchased Household stock during the Class Period if you knew that defendants had made materially false statements which artificially inflated the price that you paid for that stock at the time?' Only if the class member answers 'yes,' will defendants be able to rebut the presumption of reliance." (Dkt. 1545, 1546, March 13, 2009, Final Pretrial Order, submitted Jan. 30, 2009, Part 5(a) at 5).

ability (if any) was established regarding common issues. In three rulings, the Court deferred Defendants' attempts to take merits discovery of Lead Plaintiffs, including on the essential element of reliance.

In 2005, when Defendants sought discovery from Lead Plaintiff PACE and its investment advisors, Magistrate Judge Nolan noted that "Lead Plaintiffs recognize that discovery related to PACE's investment decisions may be relevant but contend that discovery should initially be limited to class-wide liability issues" (M.J. Nolan's April 18, 2005 Order, Dkt. 225 at 7, n.5), and on that basis granted Plaintiffs' motion to quash, holding that such discovery should be postponed "without prejudice to reassertion, if necessary, after a determination of class-wide liability." (*Id.* at 11). Magistrate Judge Nolan concluded that "the most efficient and expeditious manner of managing this litigation [was] to delay discovery into individualized issues until after class-wide liability has been determined." (*Id.* at 9). She decided that "bifurcating discovery regarding class liability issues and discovery regarding individualized reliance issues [was] the most orderly, efficient, and economical way to proceed." (*Id.*).

Defendants renewed their requests for such discovery in 2006. Plaintiffs successfully opposed this request based upon the same argument: that such discovery should be postponed until after the class-wide trial of common issues. *See* Dkt. 762, M.J. Nolan's November 13, 2006 Order (denying Defendants' motion to depose named plaintiffs and their financial advisors prior to any determination on class-wide issues) and Dkt. 935, Judge Guzman's January 29, 2007 Order (adopting ruling in full). Thus discovery on individual reliance and damages was postponed. When Defendants raised the issue of Phase II discovery with the Court at a status conference in 2008, the Court acknowledged that class actions are "generally two tiered trials" and the parties were instructed to incorporate their respective positions in the final pretrial order ("PTO"). (June 30, 2008 Tr. at 17:18-21)

Contradicting the position they successfully advanced in persuading the Court to postpone discovery until after the Phase I trial, Plaintiffs later urged the Court to dispense with discovery and Phase II proceedings altogether.  In their PTO submission, Plaintiffs argued that "[t]his case should not be bifurcated. The jury will be asked to render a verdict on all class-wide issues, including reliance, liability and the damages per share for each day of the Class Period.  If there is a verdict in favor of plaintiffs, a claims process will take place and individual class members' damages will be calculated."  (Dkt. 1545, 1546, March 13, 2009 Final Pretrial Order, submitted Jan. 30, 2009, Part 5(a) at 5).

During the pretrial conference, the Court determined that issues related to Phase II discovery regarding individualized reliance and damages would not be resolved during the class-wide trial and noted that the contours of Phase II had yet to be determined.  (Pre-Trial Tr. 33:17-22).  Following receipt of the verdict on class-wide issues, the Court requested recommendations from the parties "as to how they feel we should proceed on phase two."  (May 7, 2009, Tr. 4812:7-9).  This submission responds to that request.  In addition, Defendants filed a Motion For Judgment as a Matter Of Law Pursuant to Rule 50(b) and a Motion for a New Trial Pursuant to Rule 59 on May 21, 2009.  These motions will be fully briefed by August 20, 2009.

## ARGUMENT

### A.    Phase Two Should Be Deferred Pending Resolution of Defendants' Pending Post-Trial Motions

Defendants have raised serious questions regarding the legal inadequacy of Plaintiffs' class-wide showing and related flaws in the Phase I verdict.  Because Phase II proceedings will be impacted and possibly rendered moot by the outcome of Defendants' pending motions under Rules 50 and 59, those motions should be resolved before the start of Phase II proceedings. *See Edward J. Bartolo Corp.* v. *Coopers & Lybrand*, 928 F. Supp. at 560 (Phase II unnecessary because outstanding post-trial motions were decided in the defendant's favor).  Proceeding with

Phase II without first resolving these outstanding motions may unnecessarily waste judicial resources and impose undue burden on absent class members.

This is particularly evident with respect to the Leakage Model upon which the jury's finding of inflation relied. In response to Question No. 4 on the Verdict Form, the jury determined that Professor Fischel's Leakage Model (Plaintiffs' Exhibit 1395) "reasonably estimates plaintiffs' damages" (in the language of the Verdict Form to which Defendants objected). However, both before and after this issue went to the jury, Defendants asserted numerous objections based on the invalidity and inadmissibility of the Leakage Model, particularly given Professor Fischel's admission that certain charted activity had nothing to do with fraud. For example, in their Motion for Judgment as a Matter of Law, Defendants demonstrated that this type of Leakage Model has been rejected by numerous courts as inconsistent with Supreme Court rulings, and should have been excluded here as a matter of law. *See* Dkt. 1618 at 2. That motion also showed that the jury had applied the Model in a manner that is inconsistent with its underlying theory and assumptions. *Id.* at 2-3. Defendants' Motion for a New Trial highlighted fatal discrepancies in the jury's attempted application of the Leakage Model — for example, by irrationally finding decreases in inflation on days before any alleged corrective disclosures, and increases in inflation on days when no fraudulent statement was alleged. *Id.* at 7-8. Such flaws compounded the error of giving the jury the option of applying the Leakage Model; they should be addressed before the start of any other proceedings because it is not possible to premise a rational award of damages on such skewed and unsustainable findings of inflation.

Other dispositive issues must likewise be resolved before any Phase II can begin. For example, if Defendants are awarded judgment on Plaintiffs' restatement-related fraud theory because Plaintiffs proved no scienter, and/or on Plaintiffs' reaging-related fraud theory because Plaintiffs proved no loss causation, there would be no rational way to ascertain the impact (if any) of any remaining findings of fraud, because Professor Fischel impermissibly conflated all

such theories into an all-or nothing inflation model.  Similarly, if the Court applies the statute of repose to dismiss all claims (based on Professor Fischel's finding and Plaintiffs' judicial admission that inflation was already in the price of Household stock when the Class Period began), there would be no need for a Phase II.  Defendants' post-verdict motions raise numerous other potentially dispositive issues that will impact the scope of or need for Phase II.

### B.  The Presumption of Reliance Is Rebuttable and Defendants Are Entitled to Related Discovery

The Supreme Court has made clear that the presumption of reliance in a fraud-on-the-market action is rebuttable, and that any plaintiff who trades without relying on the integrity of the market is not entitled to the benefit of that presumption.  *See Basic Inc.* v. *Levinson*, 485 U.S. 224, 249-50 (1988).[4]  In *Basic*, the Supreme Court gave three examples of ways for defendants to rebut the presumption: (1) by rebutting proof of the elements giving rise to the presumption, (2) by showing that the misrepresentations did not lead to a distortion of a stock's market price, or (3) by demonstrating that an individual plaintiff traded or would have traded despite his knowing the statement was false.  *Id.* at 248.  Thus, facts indicating that individual plaintiffs purchased despite knowledge of the falsity of representations, or would have purchased anyway had

---

[4]     At the pretrial conference, the Court and counsel for Plaintiffs recognized that the presumption of reliance is rebuttable on an individual basis:

> THE COURT:  But we have agreement on the general proposition that one of the ways to rebut the inference is -- or the presumption -- is to present evidence of the acts, state of mind of individual investors?
>
> MR. BURKHOLZ:  That is in a second phase.  The thing is there aren't many cases analyzing what you do in a second phase to rebut that presumption. . . .
>
> THE COURT:  That's why I'm asking you.  Do you agree that that is one of the ways to rebut the fraud-on-the-market presumption?
>
> MR. BURKHOLZ:  Well, I think that there is a reference in Basic to that. . . .  (PTC Tr. 23:24-24:14)

they known about the representations' falsity, can sever the causal connection between the misrepresentation and that plaintiff's injury. *See Blackie* v. *Barrack*, 524 F.2d 891, 906 (9th Cir. 1975). "For example, a plaintiff who believed that [the defendant's] statements were false . . . but sold his shares nevertheless because of other unrelated concerns . . . could not be said to have relied on the integrity of a price he knew had been manipulated." *Basic*, 485 U.S. at 249; *see also Mottoros* v. *Abrams*, 524 F. Supp. 254, 259 (N.D. Ill. 1981) (Grady, J.) (presumption could be rebutted where investor relied upon matters extraneous to the market). An investor's "subjective and accurate belief" regarding a defendant's misrepresentations also severs the tie between loss and reliance. *Jaroslawicz* v. *Engelhard Corp.*, 724 F. Supp. 294, 300 (D.N.J. 1989) ("[T]he Court [in *Basic*] noted that a plaintiff's subjective and accurate belief regarding defendant's statements could destroy his chance of proving market-based reliance").

In *Jaroslawicz*, the court recognized that *Basic* "described several examples of proof that would rebut the presumption," and also acknowledged that "fraud-on-the-market reliance may be rebutted by individualized proof that focuses on a claimant's idiosyncratic investment choices." *Id.* at 300. The court held that because the fraud-on-the-market presumption was rebuttable, under *Basic*:

> [The court] must allow defendants to rebut the claimed reliance of each and every class member. Otherwise proof of Jaroslawicz's own "non-rebuttable" reliance will become conclusive as to all other class members. This result would let a "scheme of investor's insurance" into securities law through the back door.

*Id.* at 301 (quoting *Basic*, 485 U.S. at 252).

Courts have also recognized that a defendant may be able to rebut the presumption of reliance with regard to certain categories of traders such as option traders, short-sellers, day traders, value-indifferent arbitragers, and owners of automatically reinvested stock. *See*, *e.g.*, *Zlotnick* v. *TIE Communications*, 836 F.2d 818, 822-23 (3d Cir. 1988) (short-seller cannot benefit from fraud on the market presumption of reliance); *Ganesh, L.L.C.* v. *Computer Learning Centers, Inc.*, 183 F.R.D. 487, 491 (E.D. Va. 1998) (short-sellers "cannot logically use a fraud on

the market theory to obviate the need for positive proof of individual reliance"); *In re Bally Manufacturing Securities Corp. Litigation*, 141 F.R.D. 262, 269 n.6 (N.D. Ill. 1992) (Aspen, J.) (quoting *Moskowitz* v. *Lopp*, 128 F.R.D. 624, 631 (E.D. Pa. 1989)) (proof that options traders did not rely on price in their decision-making could defeat fraud-on-the-market presumption, as could certain traders who were in short positions; the court withheld judgment as to the inclusion in the class of option traders and holders of puts and calls); *In re Scott Paper Co. Securities Litigation*, 142 F.R.D. 611, 617 (E.D. Pa. 1992) (suggesting that the defendants could rebut the presumption of reliance as to the plaintiff's purchases through a dividend reinvestment plan).

Defendants' plan is to seek discovery of certain class members whose questionnaire answers or trading records demonstrate the kinds of investment choices that may be inconsistent with the presumption of reliance and/or who may assert substantial claims that warrant further analysis. *See Biben* v. *Card*, 789 F. Supp. 1001, 1003 (W.D. Mo. 1992) (agreeing with *Jaroslawicz* that in considering damages, "it would be either redundant or judicially inefficient to permit an aggregate award that assumed reliance when the defendant would later be allowed to rebut reliance as to each class member"). Examples of such claimants include Wells Fargo, which not only elected to retain but actually *increased* its large holdings in Household stock after supposedly uncovering alleged reaging fraud, and Lead Plaintiff Glickenhaus, which apparently purchased most of its Household stock after the date that Professor Fischel contends the market started to learn of alleged fraud. Plaintiffs' suggestion of posing a single rhetorical question about reliance in a simple claims form is no substitute for the proof required to support a reasoned analysis of a class member's trading strategies that appear to be inconsistent with a finding of individual reliance.

## C.    Phase Two Must Include Resolution of Threshold Damages Issues

A class member's claims for damages will depend on evidence of its particular trades, holdings and other relevant facts, subject to certain procedures and protocols that will dic-

tate the relevant calculation.  For example, a class member's claimed losses must be netted against gains from inflation, and the PSLRA's 90-day "look-back" provision will place a cap on damages according to its terms.  For this reason, Plaintiffs' vision of a single one-size fits all claims form is not a realistic or sufficient method for dealing with Phase II.  It may be a necessary starting point, but as this context is not the allocation of a fixed settlement fund, but rather the quantification and possible contest of individual damages claims, the Court may be called upon to resolve threshold damages disputes that may emerge in the course of Phase II.  A sample of some expected issues and relevant precedent appears below.

There is no dispute among the parties that netting of gains is appropriate.  Plaintiffs' Statement on Damages contemplates this process:  "Lead plaintiffs intend to use a netting approach for Class members who profited from some trades of Household's common stock acquired during the Class Period [July 30, 1999 - October 11, 2002] and sold after November 14, 2001, but suffered losses from other trades of Household's common stock during this same period."[5]  However, in order to net investor gains against claimed losses, there must be a method for "matching" stock sales with stock purchases.  Courts that have addressed the netting issue have followed a LIFO (last-in, first-out) protocol for matching purchases and sales.  *See In re Comdisco Securities Litigation*, 150 F. Supp. 2d 943, 945-46 (N.D. Ill. 2001) (Shadur, J.) (rejecting plaintiff's "attempted FIFO construct in favor of a calculation [LIFO] that properly nets out purchases and sales *during* the class period and determines gains or losses in those terms"); *Hill v. Tribune Co.*, No. 05 C 2602, 2005 WL 3299144, at *2 (N.D. Ill. Oct. 13, 2005) (Hart, J.)

---

[5]    Lead Plaintiffs' Supplemental Statement Regarding Damages Pursuant to the Court's October 17, 2007 Order, at 2 (Oct. 24, 2007).  (Declaration of Thomas J. Kavaler dated May 28, 2009, ("Kavaler Decl.") Ex. A).

("The current majority view . . . is that securities fraud losses should be calculated using LIFO. LIFO is also often used in determining the largest financial interest for purposes of the PSLRA lead plaintiff presumption.") (citation omitted); *Johnson* v. *Dana Corp.*, 236 F.R.D. 349, 353 (N.D. Ohio 2006) (choosing LIFO over FIFO); *In re eSpeed, Inc. Securities Litigation*, 232 F.R.D. 95, 101 (S.D.N.Y. 2005) ("more recently, courts have preferred LIFO and have generally rejected FIFO as an appropriate means of calculating losses in securities fraud cases") (citation and internal quotations marks omitted).

Despite their recognition of the need to net gains against claimed losses, Plaintiffs' damages statement asserts that some class member gains can be overlooked in the netting process. According to Plaintiffs, a claimant's inflation-related gains need not be considered if the gains were realized on shares acquired prior to the Class Period.[6] However, the weight of the authority expressly rejects Plaintiffs' "partial" netting position, holding that *all* inflationary gains must be netted. *See, e.g.*, *Arenson* v. *Broadcom Corp.*, No. SA CV 02-301GLT, 2004 WL 3253646 (C.D. Cal. Dec. 6, 2004) ("The authority is clear: where a plaintiff engages in multiple purchases and sales during the period in which the stock is inflated, the proper damages methodology is to take all the inflation losses resulting from all purchases at the inflated price and ***reduce this amount by all the inflation gain resulting from all sales at the inflated price***.") (emphasis added); *In re Comdisco Securities Litigation*, No. 01 C 2110, 2004 WL 905938, at *2-*3 (N.D. Ill. Apr. 26, 2004) (Shadur, J.) (finding no gain or loss if an investor with a pre-fraud stake

---

[6]    Plaintiffs stated that they "have not proposed the netting of shares purchased before the Class Period, and do not believe it is appropriate to do so. Indeed, lead plaintiffs' October 24, 2007 statement clearly limits any 'netting' to shares purchased during the Class Period and sold after the first disclosure on November 14, 2001." Lead Plaintiffs' Further Supplement to their Prior Statements Regarding Damages at 2 (Feb. 1, 2008). (Kavaler Decl. Ex. B).

in a company buys and sells the same number of shares during the class period); *Ellenburg* v. *JA Solar Holdings Co. Ltd.*, Nos. 08 Civ. 10475, 08 Civ. 11366, 2009 WL 1033362, at *3-*4 (S.D.N.Y. April 17, 2009) (net gain from pre-class period purchases must be offset against claimed losses for purposes of calculating plaintiff with greatest financial interest); *In re Boston Scientific Corp. ERISA Litigation*, 254 F.R.D. 24, 31-32 (D. Mass. 2008) (under *Dura Pharmaceuticals, Inc.* v. *Broudo*, 544 U.S. 336 (2005), the plaintiffs had suffered no injury because the inflation-related losses were more than offset by gains from units purchased before the class period).

Lacking any case law to support partial netting, Plaintiffs offer only the irrelevant observation that in "securities fraud cases, plaintiffs recover damages for shares they purchased *during the Class Period* based on the extent to which artificial inflation in the stock at the time of purchase has been diminished by the time of sale or the end of the Class Period."[7]  This argument has no legal support.  *See, e.g., Johnson* v. *Dana Corp.*, 236 F.R.D. 349, 353 (N.D. Ohio 2006):

> [Plaintiffs'] contention that because courts do not award damages for losses with respect to pre-existing shares, courts should likewise not subtract profits from the sale of those shares when calculating damages.  That argument is unconvincing. . . .
>
> If a firm overstates its earnings, artificially propping up its share price, and then corrects the problem causing that share price to fall, the drop in value itself is not a product of the overstatement-only the timing of the drop in value is.  Put simply, the value of those pre-existing shares would have fallen even if the firm did not misstate its earnings-the drop in value would just have occurred sooner.  Consequently, [plaintiffs'] analogy is not well taken.

---

[7] Lead Plaintiffs' Further Supplement to their Prior Statements Regarding Damages, at fn.3 (Feb. 1, 2008) (emphasis in original).  (Kavaler Decl. Ex. B).

Ignoring gains from shares sold during the Class Period but purchased before the Class Period for netting purposes would provide a further windfall to claimants who actually benefited from the share price inflation during the Class Period. For example, if a class member bought 100 shares of Household common stock the day before the Class Period started and sold those shares on the first day artificial inflation was introduced into the stock price on March 23, 2001, that class member would have experienced an inflation-based gain of $2,394. If that same class member subsequently bought 10 shares of stock on March 24, 2001 and sold those shares on May 31, 2002 the class member would experience an inflation-based loss of $76.80. Under the theory promulgated by Plaintiffs, that claimant would be able to recover the $76.80 despite receiving an aggregate gain of $2,317.20 due to the artificial inflation. Other courts have rejected the method Plaintiffs propose here precisely because "plaintiffs with significant pre-existing holdings of defendants' securities can profit substantially from defendant's misconduct and then turn around and show a loss for purposes of litigation." *Johnson* v. *Dana Corp.*, 236 F.R.D. at 353; *see also In re Organogenesis Securities Litigation*, 241 F.R.D. 397 (D. Mass. 2007) (rejecting plaintiffs' argument that shares held prior to class period should be ignored for netting purposes); *In re NPS Pharmaceuticals, Inc. Securities Litigation*, No. 2:06 -cv-00570-PGC-PMW, 2006 U.S. Dist. LEXIS 87231, at*7-*8 (D. Utah Nov. 17, 2006) (same).

In addition to the netting limitation, the PSLRA places a cap on recoverable damages which limits a plaintiff's recovery to the difference between the price paid for a security and "the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." Private Securities Litigation Reform Act of 1995, §21D(e)(1), 15 U.S.C. § 78u-4(e)(1) (2006).[8]  In order to apply the limitation on damages mandated by the

---

[8]    In addition, for class members who engaged in additional transactions during the "look-back" period, the PSLRA provides an additional cap on damages based on the shorter period between the beginning of the 90-day look-back period and the date of the applicable transaction:

Footnote continued on next page.

"look-back" (or "bounce-back") section of the PSLRA, the Court must determine a method for establishing the appropriate 90-day post-corrective disclosure period. Because Plaintiffs' various claims of fraud as incorporated in their "leakage" theory do not present a single corrective disclosure, but instead offer hundreds of allegedly "corrective" disclosures, the PSLRA cap on damages must be applied accordingly. This Court previously recognized that under the Leakage Model used by the jury, every day from November 15, 2001 to October 11, 2002 would be a relevant disclosure date for purposes of calculating the look-back period under the PSLRA, stating that "every date would be a date that fulfills the functions of the statute, and I'm not going to reargue that." (April 29, 2009 Tr. at 4351). The Court also noted that:

> [T]he [leakage] model would appear to be, I think correctly, it would appear to be a by definition disclosure day by day.
>
> MR. BURKHOLZ: That's correct. That's the essence of leakage.

(April 24, 2009, Tr. at 3901:14-18). An appropriate method for selecting the 90-day period must take into account each of the corrective disclosure dates during the "leakage" period. This method would require calculating the average stock price for *each* of the 90-day periods following each corrective disclosure date and then averaging those to calculate an average of the averages in order to apply the language of the PSLRA appropriately. *C.f. In re PNC Financial Services Group, Inc.*, 440 F. Supp. 2d 421, 436 (W.D. PA. 2006) (approving settlement where plaintiffs' expert identified more than one corrective disclosure, and noting that a potential jury de-

---

Footnote continued from previous page.

"[I]f the plaintiff sells or repurchases the subject security prior to the expiration of the 90-day period described in paragraph (1), the plaintiff's damages shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the security and the mean trading price of the security during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending on the date on which the plaintiff sells or repurchases the security." 15 U.S.C. § 78u-4(e)(2).

termination with regard to an earlier corrective disclosure would implicate the PSLRA 90-day look-back provision and cap any damages according to the statutory formula).

### D.    Defendants Have a Right to a Jury Trial

Once class members have submitted individual claims for damages, any material factual dispute that remains after discovery should be resolved by a jury trial. Defendants are entitled to a jury determination on damages and reliance issues under the Seventh Amendment of the U.S. Constitution.[9] The Seventh Amendment right to a jury trial applies to actions enforcing statutory rights and requires a jury if a statute creates legal rights and remedies enforceable in an action for damages in ordinary courts of law. *See Curtis* v. *Loether*, 415 U.S. 189, 193-94 (1974); *see also Blyden* v. *Mancusi*, 186 F.3d 252, 268 (2d Cir. 1999) ("In all cases . . . the Seventh Amendment right to trial by jury must be observed."); *Beacon Theatres, Inc.* v. *Westover*, 359 U.S. 500, 510 (1959) (right to jury trial "cannot be dispensed with, except by the assent of the parties entitled to it; nor can it be impaired by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action, or during its pendency").

Once the right to a jury trial attaches to a claim, it extends to all factual issues necessary to the resolution of that claim. *See Beacon Theatres*, 359 U.S. at 510-11 (1959); *Ross* v. *Bernhard*, 396 U.S. 531, 537-38 (1970) (Seventh Amendment preserves right to a jury trial for all claims in a shareholder derivative action); *Dairy Queen, Inc.* v. *Wood*, 369 U.S. 469, 479 (1962) (reversing for failure to grant demand for a jury trial on factual issues); *Hussein* v. *Oshkosh Motor Truck Co.*, 816 F.2d 348, 354 (7th Cir. 1987) (citing *Beacon Theatres* for proposition that district court is obligated to submit all factual issues underlying a claim to the jury). In this

---

[9]    The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII.

case, as in *Jaroslawicz*, issues relating to individualized reliance and damages are separate from the class-wide trial, and any disputes regarding these elements must be determined before that claimant may recover. *See* 724 F. Supp. at 302 (stating that "'class-wide' and 'individual' rebuttals of reliance are separable events"). Because individual reliance and damages are elements upon which Plaintiffs must prevail in order to recover, Defendants are entitled to have a jury determine any factual disputes related to these issues.

Furthermore, Defendants will be entitled to exercise their Due Process rights to present evidence relating to any individualized reliance issues. Allowing the opportunity to offer a proper defense is not only necessary but is mandated by Defendants' right to have the "actual opportunity to defend that due process affords every party against whom a claim is stated." *Nelson* v. *Adams USA, Inc.*, 529 U.S. 460, 471 (2000) (overruling Federal Circuit's decision for failure to allow a party to present a defense); *see also Schneider* v. *County of San Diego*, 28 F.3d 89, 92 (9th Cir. 1994), *as amended* (stating that due process requires "notice and an opportunity to be heard at a meaningful time and in a meaningful manner") (citation and internal quotation marks omitted).

This Court recognized that Defendants have a constitutional right to challenge the presumption of reliance, but it expressed concern that Defendants' rights must be balanced against losing the efficiency of a class action by propounding discovery on all class members. (Pre-Trial Tr. 34:5-14). However, it is not Defendants' intention to pursue discovery against every absent class member, as and noted, the large concentrations of Household stock in the hands of a relatively few large Class Period shareholders will permit considerable streamlining. Defendants' Phase II proposal, which is set forth below, offers a reasonable balance between Defendants' rights and the goal of avoiding the imposition of undue burden on class members and the Court.

-16-

## DEFENDANTS' PHASE II PROPOSAL

Defendants propose the following general sequence and framework if Phase II proceedings should be required following the Court's resolution of the post-verdict motions filed in Phase I:

### (a)    Notice and Basic Information Requests to Class Members

The first step should be the transmittal to each class member of a Court-approved Notice and Preliminary Claims Questionnaire (the "Notice") in a form substantially similar to that annexed to this submission as Appendix A.  This communication would explain the nature and status of the case and the purpose of Phase II proceedings, and require basic information about the class member's trading activity with respect to the common stock of Household International Inc. during the relevant period.  In addition to soliciting information sufficient to identify the class member and confirm its beneficial ownership of Household stock during the relevant period and non-exclusion from the class, the Notice should ask for sworn information about the date and dollar value of purchases or sales of Household common stock during the relevant period, and include a short list of primarily "yes"/"no" questions to determine whether the class member's trading activities during the relevant period fell into one or more categories (*e.g.*, short selling or value-indifferent arbitrage) that courts have considered inconsistent with entitlement to a fraud on the marketplace presumption.  (*See generally* Point B, *supra*.)  (A "yes" answer would not automatically disqualify a class member from claiming damages, but rather, may suggest a need for investigation through written discovery and/or depositions, especially in the case of high dollar-value claims.)  Finally, the Notice should specify that answers must be provided under oath and that a class member's failure to provide the requested information on or before the Court-ordered deadline -- Defendants propose 45 days from transmittal of the Notice -- would disqualify that class member from pursuing a claim for damages.  *See Grace* v. *City of Detroit*, 145 F.R.D. 413, 418 (E.D. Mich. 1992) (noting "'absent class members must be alert for the possibility that they must respond to a proof of claim notice in order to prove their actual damages

-17-

and to participate in any recovery'") (quoting 3 Herbert Newberg *Newberg on Class Actions* § 16.04, at 283, 2d ed. 1985).

      In circumstances where Defendants are already aware of significant questions regarding a given class member's entitlement to relief, they should be allowed to initiate discovery of that class member without awaiting the completion of the Preliminary Claim Questionnaire submission process. By way of example, although Plaintiffs made much at trial of Wells Fargo's alleged opportunity to "look under the hood" and evaluate detailed non-public information about Household's operations and credit quality during the Class Period, it is a matter of public record that Wells Fargo thereafter maintained a significant stake and later *increased* its holdings of Household common stock, notwithstanding its supposed discovery of what Plaintiffs characterized as massive fraud in Household's reporting of delinquent accounts. This suggests that Wells Fargo's decisions were not based on reliance on an efficient market, or on its own specific knowledge as alleged by Plaintiffs during the Phase I trial. (*See generally* Point B, *supra*.) To use their time efficiently during any Phase II, discovery on such issues should not have to await the completion of the Preliminary Claim Questionnaire process.[10]

### (b) Discovery of Individual Class Members

      Following a short period of time to analyze class members' completed questionnaires and related trading records, Defendants propose that they be permitted to conduct written discovery and/or take depositions of class members with significant claims whose responses suggest a need for inquiries regarding quantification of damages or eligibility for a presumption of reliance -- the type of discovery that was postponed by the Court at Plaintiffs' request in Phase

---

[10]    Lead Plaintiff Glickenhaus & Co. is another candidate for further inquiry because it purchased the great majority of its holdings more than 27 months into the Class Period, *after* the dates when Professor Fischel contended that the truth began to be revealed to the market. This fact pattern raises obvious questions about Glickenhaus's entitlement to a presumption of reliance.

I.  As an example of the first category, discovery regarding a substantial class member's transactions may be required for purposes of calculating the 90-day "look-back" period applicable to subsequent transactions, or for the purpose of "matching" where the proof of claim indicates discrepancies between transactions within the actionable period and amounts reported at the beginning or end of the actionable period.  As it relates to issues of individual reliance, selective discovery may be required to determine whether a class member that answered "yes" to certain question(s) about trading patterns, or displayed certain trading patterns based upon their preliminary claims information, is disqualified from relying on a presumption of reliance.

It is not possible to predict at the outset how many depositions or other discovery requests may be required in such categories, but by proceeding with different claimants concurrently (and assuming good faith compliance by the selected class members and their counsel) Defendants estimate that this process would take approximately 6-8 weeks, counting the 30-day lead time that they assume claimants would require to comply with discovery demands.  Any burden on an individual class member with a substantial claim would not be unreasonable in this context, especially given the narrow scope of the contemplated discovery.

Depending on the facts that emerge from class members' initial responses or through subsequent discovery, there may also be a need for expert analysis and presentation of opposing expert opinions on such subjects as the best means of matching purchases to sales, netting out benefits of selling at inflated prices, the reasons why a particular trading pattern belies individual reliance on the integrity of the market, etc.  Here too, however, the scope would be narrow, and because many questions as to proper quantification of damages are legal issues for resolution by the Court, there is no reason to believe that consideration of any expert input would cause undue burden or delay — particularly in relation to the possible magnitude of class members' aggregate demands.

### (c)      Judicial Resolution of Threshold Measure of Damages Issues

-19-

Questions regarding the correct protocols to be applied to the measurement of damages, such as selection of LIFO vs. FIFO analysis for matching transactions, the consequences of "in and out" trading patterns and the application of the PSLRA's 90-day look back requirement, are generally considered legal issues for determination by the Court. (*See generally* Point C, *supra.*)  Any differences on such issues that may emerge during Phase II can be presented to the Court for resolution on a schedule to suit the Court's convenience.

###     (d)     Trial

Defendants are entitled under the Seventh Amendment to a trial by jury to resolve any contested factual issues regarding issues of individual reliance and damages.  *Dairy Queen, Inc.* v. *Wood*, 369 U.S. at 479 (reversing for failure to grant demand for a jury trial on factual issues); *Hussein* v. *Oshkosh Motor Truck Co.*, 816 F.2d at 354 (district court is obligated to submit all factual issues underlying a claim to the jury).  (*See generally* Point D, *supra.*)  As with Phase II discovery, however, Defendants have no interest in trying such issues as to small claims that present no unique circumstances.  Conversely, because the stakes are likely to be high on both sides with respect to any claims of the major institutions that owned the vast majority of Household stock during the relevant period, there should be no impediment to allowing one or more jury trials as needed to resolve material factual disputes on individual issues raised by such claims.  Depending upon the number and size of such triable disputes, it may make sense to sever individual claims for purposes of conducting speedy and manageable trials.  However, logistics of that sort are better left for consideration at or near the close of Phase II fact discovery, when the scope of unresolved issues and identity of interested parties is known.

**CONCLUSION**

Defendants respectfully request that this Court accept the foregoing recommendations as to the timing, scope and administration of any Phase II proceedings.

Dated:  May 28, 2009

Respectfully submitted,

Cahill Gordon & Reindel LLP

By:     /s/  Thomas J. Kavaler                                 
         Thomas J. Kavaler
          Bar No. 1269927
         Howard G. Sloane
          Bar No. 1197391
         Patricia Farren
          Bar No. 1198498
         Susan Buckley
          Bar No. 1198696
         Landis C. Best
         David R. Owen
80 Pine Street
New York, New York  10005
(212) 701-3000
         - and-
EIMER STAHL KLEVORN & SOLBERG LLP
224 South Michigan Avenue
Chicago, Illinois  60604
(312) 660-7600
*Attorneys for Defendants Household*
*International, Inc., William F. Aldinger,*
*David A. Schoenholz and Gary Gilmer*

# Appendix A

**DRAFT**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LAWRENCE E. JAFFE, Pension Plan and all behalf of all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) | No. 02 C 5893 (RAG) (NRN) |
| v. | ) ) | CLASS ACTION |
| HOUSEHOLD INTERNATIONAL, INC., et. al. | ) ) | |
| Defendants. | ) | |

**NOTICE AND PRELIMINARY CLAIM QUESTIONNAIRE**

**IF YOU PURCHASED COMMON STOCK OF HOUSEHOLD INTERNATIONAL, INC. ("HOUSEHOLD") DURING THE PERIOD JULY 30, 1999 THROUGH OCTOBER 11, 2002, INCLUSIVE, YOU MAY BE ELIGIBLE TO RECEIVE AN AWARD OF DAMAGES, IF ANY ARE AWARDED IN THIS CLASS ACTION, PROVIDED THAT YOU PROVIDE REQUESTED INFORMATION AND RELATED TRADING RECORDS NO LATER THAN [DATE] AND THEREAFTER MAKE SUCH ADDITIONAL DISCLOSURE AS MAY BE REQUIRED**

## I.  OVERVIEW

1.      The purpose of this Notice and Preliminary Claim Questionnaire ("Notice") is to provide members of the class (the "Class") in *Lawrence E. Jaffe, et al.* v. *Household International, Inc., et al.*, 02 C 5893 (the "Litigation") with an update of recent developments in the Litigation and to request certain information under oath from members of the Class as a condition of participating in any recovery that may eventually be awarded to plaintiffs in the Litigation.

2.      A federal court authorized this Notice.  This is not a solicitation from a lawyer.

3.      NOTE THAT FAILURE TO PROVIDE THE REQUESTED INFORMATION AND SUPPORTING RECORDS BY THE DEADLINE OF [DATE 45 DAYS FROM TRANSMITTAL] WILL DISQUALIFY YOU FROM RECOVERING ANY DAMAGES THAT MAY EVENTUALLY BE AWARDED IN THIS LITIGATION, AS WILL YOUR FAILURE TO MAKE SUCH ADDITIONAL DISCLOSURE AS MAY BE REQUIRED.

4.      Providing the requested information will not automatically entitle you to an award of damages, but it is a necessary step in determining what amount of damages, if any, should be awarded to each eligible member of the Class.

5.      You may be asked for additional information as this next phase of the Litigation proceeds, including in the form of sworn testimony, responses to written questions, and/or submission of additional documents.  In that event, you will be given advance notice of such requests and the opportunity to assert any appropriate objections for consideration by the Court.

## II.  SUMMARY OF THE LITIGATION AND RECENT DEVELOPMENTS

1.      The Lead Plaintiffs in the Litigation brought this lawsuit against Household, William F. Aldinger, David A. Schoenholz, and Gary Gilmer ("Defendants").  The basis for the Litigation is an allegation that one or more of the Defendants falsely inflated the value of Household securities by disseminating information that was materially false and misleading.  The Litigation was brought as a class action and the Court originally certified a Class of certain persons who purchased Household securities between October 23, 1997 and October 11, 2002, inclusive.

2.      On February 28, 2006, the Court ruled that claims based on alleged misrepresentations or omissions that occurred before July 30, 1999 were not actionable based on the applicable statute of repose.

3.      Between March 30, 2009 and May 7, 2009, the fraud allegations covering the period July 30, 1999 through October 11, 2002 were tried to a ten-person jury in federal court in Chicago, Illinois.  The trial covered only issues common to all members of the Class and did not cover issues unique to individual members of the Class.  Individual issues will be addressed in the separate proceedings described below.

4.      On May 7, 2009 the jury returned a verdict finding that Defendants were not liable for fraud based on any statements or omissions made prior to March 23, 2009, and that Defendants were liable for fraud for certain statements made between March 23, 2001 and August 14, 2002.

5.      In order to determine whether individual members of the Class would be eligible for damages if the jury's verdict is sustained, the court has ordered that this Notice be sent to all members of the Class to request information required for this next phase of the Litigation.

## III.   GENERAL INSTRUCTIONS

1.      You are a member of the Class if you purchased Household International, Inc. common stock between July 30, 1999 and October 11, 2002, inclusive (the "Class Period"). The following persons are excluded from the Class:  (1) persons who previously filed a valid and timely request to be excluded from the Class; and (2) the Defendants in the Litigation and members of their immediate families, any person, firm, trust, corporation, officer, director or other individual or entity in which any defendant has a controlling interest or which is related to or affiliated with any Defendant in the Litigation, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

2.      If you are not a member of the Class you are not entitled to an award of any damages in the Litigation and you have no obligation to respond to this Notice.

3.      If you are a member of the Class, you **may** be entitled to recover money damages as a result of the jury verdict returned on May 7, 2009 ("Damages").  To be eligible to recover any Damages that may be awarded, you must complete, sign under oath, and submit the attached Preliminary Claim Questionnaire no later than [date]. If you do not comply with this requirement or if you later withdraw your Preliminary Claim Questionnaire, you will not be eligible to recover any Damages in the Litigation.

4.      Timely submission of a properly completed Preliminary Claim Questionnaire does not assure that you will be able to recover Damages in Phase II of the Litigation.  Defendants are entitled to obtain certain further information from you related to your claim.  Defendants may request that you produce additional documents, answer interrogatories or undergo an examination by deposition, and are entitled to a trial by jury on certain issues to evaluate the validity of your claim for Damages.

5.      If there are any disputed issues of material fact related to your claim, it is possible that a jury trial will be required to resolve such issues.

6.      The entire Class, including you, currently is represented by attorneys from the law firm of Coughlin, Stoia, Geller, Rudman & Robbins LLP.  If you choose, you may retain your own attorney(s) to advise you about pursuing any claim to Damages in this phase of the Litigation.  If you choose to retain your own attorney(s) instead of or in addition to the Coughlin law firm, you must identify such attorney(s) in the space provided below in Part I of this Form.

7.      YOU MUST MAIL YOUR COMPLETED, SIGNED AND NOTARIZED RESPONSE TO THE PRELIMINARY CLAIM QUESTIONAIRE POSTMARKED ON OR BEFORE [**DATE**], ADDRESSED AS FOLLOWS:

> Jaffe v. Household International, Inc.
> Claims Administrator
> [c/o Claims Administration Company]
> [Street Address]
> [City, State Zip-Code]

## IV.   CLAIMANT IDENTIFICATION

1..      **Use Part I** of this form, entitled "Claimant Identification," to identify each purchaser of Household International, Inc. common stock which forms the basis of this claim.

2.      All joint purchasers must sign this Preliminary Claim Questionnaire.  Executors, administrators, guardians, conservators and trustees must complete and sign this Preliminary Claim Questionnaire on behalf of per-

sons represented by them and their authority must accompany this claim and their titles or capacities must be stated. The Social Security (or taxpayer identification) number and telephone number of the owner may be used as verification on this Preliminary Claim Questionnaire. Failure to provide the foregoing information will result in rejection of your Preliminary Claim Questionnaire and you will not be able to recover Damages as a result of the Litigation.

## V.    SCHEDULE OF TRANSACTIONS

1.    **Use Part II** of this form, entitled "Schedule of Transactions in Household International, Inc. Common Stock," to supply all required details of your transaction(s) in Household International, Inc. common stock. If you need more space or additional schedules, attach separate sheets giving all of the required information in substantially the same form. Sign and print or type your name on each additional sheet.

2.    On the schedules, provide all of the requested information with respect to *all* of your purchases and *all* of your sales of Household International, Inc. common stock which took place at any time during the Class Period (July 30, 1999 through October 11, 2002, inclusive), whether such transactions resulted in a profit or a loss. Failure to report *all* such transactions may disqualify you from recovering any Damages in the Litigation.

3.    List each transaction in the Class Period separately and in chronological order, by trade date, beginning with the earliest. You must accurately provide the month, day and year of each transaction you list.

4.    Broker confirmations or other documentation of your transactions in Household International, Inc. common stock must be attached to your Preliminary Claim Questionnaire.

## VI.    TRADING QUESTIONNAIRE

1.    **Use Part III** of this form, entitled "Trading Questionnaire," to supply all requested information about certain aspects of your purchase and sale of Household International, Inc. common stock during the Class Period. Answer *every* question in Part III and indicate your answer by marking the YES or NO option.

2.    For each question in Part III to which you answer YES, attach a separate sheet to your Preliminary Claim Questionnaire identifying the purchases and/or sales of Household International, Inc. common stock during the Class Period to which your answer applies. Provide that information in substantially the same form as you used in Part II or this form.

### DO NOT TELEPHONE THE COURT REGARDING THIS NOTICE

To obtain further information you may call [Coughlin number] or write to [name and address of Coughlin person or claim administration person]

DATED: _____, 2009                                    BY ORDER OF THE COURT
                                                               UNITED STATES DISTRICT COURT
                                                               NORTHERN DISTRICT OF ILLINOIS

## PRELIMINARY CLAIM QUESTIONNAIRE

### PART I
### Claimant Identification

**[Standard claimant identification chart to be inserted, including identification of counsel]**

**PART II**
**Schedule of Transactions in Household International, Inc. Common Stock**

1.     Identify the number of shares of common stock of Household International, Inc. that you owned as of the close of trading on July 29, 1999:  _____.

2.     List each purchase of shares of Household International, Inc. common stock between July 30, 1999 and October 11, 2002, inclusive.

        [chart to be inserted, including trade date, number of shares, total purchase price, and whether proof of claim enclosed]

3.     Identify by number listed above all purchases in which you covered a "short sale".

4.     List each sale of shares of Household International, Inc. common stock between July 30, 1999 and October 11, 2002, inclusive.

        [chart to be inserted, including trade date, number of shares, total sale price, and whether proof of claim enclosed]

5.     Identify the number of shares of common stock of Household International, Inc. that you owned as of the close of trading on October 11, 2002:  _____.

YOU MUST ATTACH BROKER CONFIRMATIONS OR OTHER DOCUMENTATION OF YOUR TRANSACTIONS IN HOUSEHOLD INTERNATIONAL, INC. COMMON STOCK TO THIS RESPONSE. FAILURE TO PROVIDE THIS DOCUMENTATION MAY DISQUALIFY YOU FROM RECOVERING ANY DAMAGES IN THE LITIGATION.

**PART III**
**Trading Questionnaire**

       1.      Between July 30, 1999 and October 11, 2002, inclusive, did you transact in any securities issued by Household International, Inc. other than common stock , or in derivative contracts, such as put options or call options, for which the common stock of Household International, Inc. was the underlying asset ? If yes, identify the type of derivative securities and provide the requested details below.

       [chart to be inserted, including type of instrument, type of trade, trade date, number of shares, total purchase/sale price]

       2      Did you purchase or sell any share listed in the above Schedule of Transactions to comply with your obligations under an options contract?

       3.      Did you purchase or sell any share listed in the above Schedule of Transactions to hedge another position?

       4.      Did you purchase or sell any share listed in the above Schedule of Transactions as part of an index tracking strategy?

       5.      Did you purchase any share listed in the above Schedule of Transactions through an automatic dividend reinvestment program?

       6.      Did you purchase or sell any share listed in the above Schedule of Transactions pursuant to a proprietary trading model?

I (We) declare under penalty of perjury under the laws of the United States of America that all of the foregoing information supplied on this Preliminary Claim Questionnaire by the undersigned is true and correct.

_____
 (Signature)

_____
 (Type or print your name here)

_____
(Capacity of person(s) signing, *e.g.*,
Purchaser, Executor or Administrator)

Sworn to before me this ___ day of _____, 2009.

_____
           Notary