# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF ILLINOIS

# EASTERN DIVISION

|  |  |
|---|---|
| _____ ) | |
| LAWRENCE E. JAFFE PENSION PLAN, ON BEHALF OF ITSELF AND ALL OTHERS SIMILARLY SITUATED, ) ) ) | Lead Case No. 02-C-5893 (Consolidated) |
| Plaintiffs, ) ) | CLASS ACTION |
| - *against* - ) ) | Judge Ronald A. Guzmán |
| HOUSEHOLD INTERNATIONAL, INC., ET AL., ) ) | |
| Defendants. ) | |
| _____ ) | |

**APPENDIX OF TRANSCRIPT EXCERPTS IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50(b) AND DEFENDANTS' MOTION FOR NEW TRIAL PURSUANT TO RULE 59**

**VOLUME 1 OF 2**

CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York  10005
(212) 701-3000

EIMER STAHL KLEVORN & SOLBERG LLP
224 South Michigan Ave.
Suite 1100
Chicago, Illinois 60604
(312) 660-7600

*Attorneys for Defendants*
*Household International, Inc., William F.*
*Aldinger, David A. Schoenholz and Gary*
*Gilmer*

# TRANSCRIPT EXCERPTS

**Description**                                                                      **Tab**

**Depositions Displayed During Trial**
Excerpts from the Deposition of Charles Cross, April 8, 2008                             1
Excerpts from the Deposition of Todd May, May 1, 2007....................................     2


**Pretrial Transcripts**
Excerpts from the Transcript of Pre-Trial Conference March 12, 2009
    (Pre-Trial Tr. 1-127)..................................................................     3
Excerpts from the Transcript of Pre-Trial Conference March 18, 2009
    (Pre-Trial Tr. 449-550) ..........................................................     4
Excerpts from the Transcript of Pre-Trial Conference March 20, 2009
    (Pre-Trial Tr. 642-793) ..........................................................     5
Excerpts from the Transcript of Pre-Trial Conference March 26, 2009
    (Pre-Trial Tr. 794-906) ..........................................................     6


**Trial Transcripts**
Excerpts from the Transcript of Trial March 30, 2009 (Tr. 1-252) .....................     7
Excerpts from the Transcript of Trial March 31, 2009 (Tr. 253-468) .................     8
Excerpts from the Transcript of Trial April 1, 2009 (Tr. 469-646) .....................     9
Excerpts from the Transcript of Trial April 2, 2009 (Tr. 647-880) .....................    10
Excerpts from the Transcript of Trial April 6, 2009 (Tr. 881-1103)....................    11
Excerpts from the Transcript of Trial April 7, 2009 (Tr. 1104-1322)..................    12
Excerpts from the Transcript of Trial April 8, 2009 (Tr. 1323-1566)..................    13
Excerpts from the Transcript of Trial April 9, 2009 (Tr. 1567-1716) .................    14
Excerpts from the Transcript of Trial April 13, 2009 (Tr. 1717-1958) ...............    15
Excerpts from the Transcript of Trial April 14, 2009 (Tr. 1959-2219) ...............    16
Excerpts from the Transcript of Trial April 15, 2009 (Tr. 2220-2476) ...............    17
Excerpts from the Transcript of Trial April 16, 2009 (Tr. 2477-2695) ...............    18
Excerpts from the Transcript of Jury Instructions Conference April 17, 2009
    (Tr. 2696-2801) ....................................................................    19
Excerpts from the Transcript of Trial April 20, 2009 (Tr. 2802-3012)................    20
Excerpts from the Transcript of Trial April 21, 2009 (Tr. 3013-3281)................    21
Excerpts from the Transcript of Trial April 22, 2009 (Tr. 3282-3564)................    22
Excerpts from the Transcript of Trial April 23, 2009 (Tr. 3565-3823)................    23
Excerpts from the Transcript of Jury Instructions Conference April 24, 2009
    (Tr. 3824-3965) ....................................................................    24
Excerpts from the Transcript of Jury Instructions Conference April 27, 2009
    (Tr. 3966-4073) ....................................................................    25
Excerpts from the Transcript of Trial April 28, 2009 (Tr. 4074-4303)................    26
Excerpts from the Transcript of Trial April 29, 2009 (Tr. 4304-4426)................    27

Excerpts from the Transcript of Trial April 30, 2009 (Tr. 4427-4671)................    28
Excerpts from the Transcript of Jury Instructions Conference May 1, 2009
    (Tr. 4672-4700) ................................................................................    29
Excerpts from the Transcript of Jury Charge/Deliberation May 4, 2009
    (Tr. 4701-4742) ................................................................................    30
Excerpts from the Transcript of Verdict May 7, 2009 (Tr. 4769-4813)...............    31

# TAB 1

Charles Cross
Confidential

4/9/2008

## Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

LAWRENCE E. JAFFE PENSION   )
PLAN, on Behalf of Itself and   )
All Others Similarly Situated,)
                             )
        Plaintiffs,     )
                             )
    vs.            ) Lead Case No. 02-C-5893
                             )
HOUSEHOLD INTERNATIONAL,   )
INC., et al.,         )
                             )
        Defendants.     )

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
OF
CHARLES CROSS
CONFIDENTIAL

9:02 A.M.
APRIL 9, 2008
1515 COMMERCE STREET
TACOMA, WASHINGTON

REPORTED BY: JULIE R. HEAD, CRR, RPR, CCR No. 3119

## Page 2

```
 1          A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFFS:
 4      CAMERON BAKER, ESQ.
 5      LUKE O. BROOKS, ESQ.
 6      Coughlin Stoia Geller Rudman Robbins LLP
 7      100 Pine Street, Suite 2600
 8      San Francisco, California 94111
 9      Phone: 415.288.4545  Fax: 415.288.4534
10      E-mail: cbaker@csgrr.com
11      E-mail: LukeB@csgrr.com
12
13   FOR THE DEFENDANTS:
14      HOWARD (PETER) G. SLOANE, ESQ.
15      LAUREN PERLGUT, ESQ.
16      JASON M. HALL, ESQ.
17      LARA R. CORCHADO, ESQ.
18      Cahill Gordon & Reindel LLP
19      80 Pine Street
20      New York, New York 10005
21      Phone: 212.701.3000  Fax: 212.269.5420
22      E-mail: psloane@cahill.com
23      E-mail: lperlgut@cahill.com
24      E-mail: jhall@cahill.com
25      E-mail: lcorchado@cahill.com
```

## Page 3

```
 1   FOR THE WITNESS:
 2      ELIZABETH P. MARTIN, ESQ.
 3      Gordon Thomas Honeywell Malanca Peterson &
 4      Daheim LLP
 5      Wells Fargo Plaza
 6      1201 Pacific Avenue, Suite 2100
 7      Tacoma, Washington 98402
 8      Phone: 253.620.6500
 9      Fax: 253.620.6565
10      E-mail: emartin@gth-law.com
11
12
13   ALSO PRESENT:
14      JOHN L. BLEY, ESQ.
15      Foster Pepper PLLC
16      1111 Third Avenue, Suite 3400
17      Seattle, Washington 98101
18      Phone: 206.447.4400
19      Fax: 206.447.9700
20      E-mail: bleyj@foster.com
21
22
23      TANIA GRANT, Videographer
24
25
```

## Page 4

```
 1              I N D E X
 2
 3   EXAMINATION BY:                    PAGE
 4      MR. SLOANE              9, 190
 5      MR. BAKER              105, 198
 6
 7   EXHIBITS FOR IDENTIFICATION        PAGE
 8   Exhibit 1  Transcript of 12/19/02 Volume I    19
 9              Deposition of Charles L. Cross III, HHS
10              02498419 - 02498474
11   Exhibit 2  Transcript of 2/4/03 Volume II    19
12              Deposition of Charles L. Cross III, HHS
13              02498501 - 02498569
14   Exhibit 3  Washington Department of Financial   23
15              Institutions Expanded Report of
16              Examination for Household Finance
17              Corporation III as of April 30, 2002,
18              HHS 02498625 - 02498697
19   Exhibit 4  7/1/02 Letter to Chuck Cross, Re:   33
20              Expanded Report of Financial
21              Examination for Household Finance
22              Corporation III - Confidential
23              Response, Plus Attachment, HHS 02484858
24              - 02484940
25
```

Pages 1 to 4

Charles Cross
Confidential

4/9/2008

## Page 69

1    Would you look at page 399 of Exhibit 2, and
2  lines ten to 11, and, in connection with a question, you
3  gave the answer: "I think the report doesn't attempt to
4  make any statistical analysis," end of quote.
5    Did you give that answer and was it accurate
6  at the time?
7    A.   I gave that answer.  That's kind of a goofy
8  answer.
9    Q.   Was it accurate at the time?
10   A.   I think -- I was being truthful.
11   Q.   That's all I want to know.
12   A.   I was being truthful at the time.
13   Q.   Would you agree with me that the 19 complaints
14  that you looked at was a woefully inadequate population
15  to draw from?
16   A.   That sounds like something I would have said.
17   Q.   Let's look at it so I'm not misquoting you or
18  mischaracterizing it.
19    If you look at page 398 of Exhibit 2, and you
20  were asked the following question, line 22:
21    "Do you have any opinion whether a sample of
22  19 complaints out of a population of thousands and
23  thousands of complaints would be statistically
24  significant?"
25    Answer:  "I would say, without having any

## Page 70

1  remote claimed expertise in this area, that anybody who
2  was a statistician or knew anything about statistics
3  would tell you that that was a woefully inadequate
4  population to draw from."
5    Did you give that answer and was it accurate
6  at the time?
7    A.   Yes, and yes.  And, remember -- The reason I
8  remembered this is because you said -- you quoted this
9  to me just a little while ago, before we -- earlier on
10  in my deposition, so --
11   Q.   Yes.
12    Would you agree with me, notwithstanding the
13  number of complaints that -- Well, let me
14  withdraw the question.  This is not your testimony,
15  here, but I'm asking you a little different question.
16    Would you agree with me that 19 complaints out
17  of a total of the number of loans that you looked at or
18  that -- I'm sorry -- that were made by Household in the
19  time period that you reviewed was a woefully inadequate
20  statistical sample?
21    MR. BAKER:  Objection as to form.
22    A.   If you're -- If you're trying to say that
23  it -- that it --
24    Q.   (BY MR. SLOANE:)  I'm not -- Let me -- Let me
25  interrupt you.

## Page 71

1    I'm not trying to say anything.  I'm asking
2  you a question, and that's all you have to do, is answer
3  the question to the best of your knowledge.
4    You want to read it back?  I didn't mean to
5  interrupt you, but --
6    You seem to suggest that I was trying to put
7  words in your mouth.  I'm not.  I just want to know your
8  answer.
9    (Record read as follows:
10    Q.  "Would you agree with me that 19
11    complaints out of a total of the number
12    of loans that you looked at or that were
13    made by Household in the time period
14    that you reviewed was a woefully
15    inadequate statistical sample?")
16    MR. BAKER:  Same objection.
17   A.   I'm not sure how you're using statistical
18  sample.  And I notice that I used it -- I think
19  previously -- or they asked me the question about it,
20  but -- And a --
21   Q.   (BY MR. SLOANE:)  Why don't you answer it in
22  your own words.
23   A.   Okay.
24   Q.   Maybe we can get there easier.
25   A.   All right.  In a classic sense of doing

## Page 72

1  statistical analysis, yes, I think -- as I said, here,
2  anybody who does stats would say, "Well, you can't use
3  19 out of a giant population to say this is
4  statistically representative of something," but I don't
5  think I ever did say that, so, I would say yes to you,
6  and I apparently said yes back then, so -- Yeah.  Yes.
7    Q.   Okay.
8    In the work that you did in connection with
9  this report, did you make any effort to determine the
10  number of complaints in reference to the total amount of
11  loans in any particular year?
12   A.   I knew the number of complaints in each year
13  and I knew the number of loans in each year.  I don't
14  think I needed to make any -- and I knew that, so, I'm
15  not sure I needed to make an attempt to do it.
16    MR. SLOANE:  Reask the question -- Let me have
17  the question reread and maybe you've answered it or
18  maybe you've not.  Let's see.
19   A.   Okay.
20    (Record read as follows:
21    Q. "In the work that you did in
22    connection with this report, did you
23    make any effort to determine the number
24    of complaints in reference to the total
25    amount of loans in any particular

Pages 69 to 72

## Page 73

1     year?")

2     A.   I did do that.  I'm not sure it was any

3  effort, but I -- I did do that.

4     Q.   (BY MR. SLOANE:)  And what did you conclude in

5  the report in that regard?

6     A.   I -- I don't remember.

7     Q.   Okay.  Well, let me harken back -- Withdrawn.

8        Do you understand -- Did you understand the

9  concept, in the work you did, of a denominator and

10  determining a denominator in trying to establish a

11  company-wide -- whether something was a company practice

12  or company-wide practice?

13     MR. BAKER:  Objection as to form.

14     A.   I know what a denominator is.  I don't know

15  there's any formulator that says a specific denominator

16  has to be derived in order to come up with a

17  company-wide practice.

18        And, again, you haven't shown me, yet, where I

19  used the term company-wide practice.  You've only shown

20  me where I was responding to somebody that was using

21  that term with me.  So, I'm not sure I would have dealt

22  with that.

23     Q.   (BY MR. SLOANE:)  Okay.

24        Let me have the question, again, and I'll ask

25  you if -- if you can answer my question.

## Page 74

1     (Record read as follows:

2     Q.  "Did you understand the concept in

3        the work you did of a denominator and

4        determining a denominator in trying to

5        establish a company-wide -- whether

6        something was a company practice or

7        company-wide practice?")

8     MR. BAKER:  Same objection.

9     A.   Could -- Could you rephrase that for me?

10     Q.   (BY MR. SLOANE:)  Sure.

11     A.   I don't mean to be obstinate, here.  I'm

12  just --

13     Q.   No, you're not being obstinate, at all.  That

14  question -- That's exactly what I asked you to do before

15  we started.

16        In -- In connection with your work, did you

17  make any effort to quantify how many complaints --

18  whether the number of complaints, in any particular

19  practice -- practice that you identified was

20  statistically significant in terms of the overall

21  loans -- number of loans that were made by Household in

22  any particular time period?

23     A.   Yes and no.

24     Q.   Okay.

25     A.   Or no -- No and yes.  I could try to explain a

## Page 75

1  little bit.

2     Q.   Sure.  Please do.

3     A.   Again, there's is -- there is nothing about

4  this report that we --

5     Q.   That's Cross Exhibit 3.

6     A.   -- that we would argue is a statistical

7  analysis.  So, you're using that term with me.  I don't

8  know if I ever claimed, in this report, that it was a

9  statistical analysis, but my guess is I wouldn't have.

10        So, in a -- if we were to hire a

11  statistician -- which wouldn't be me -- if we were to

12  hire a statistician to do some analysis, they would --

13  they would probably come back with some numbers that

14  show that the number of complaints I was looking at in

15  this report were very, very, very, very small in

16  relation to the population of complaints, but we

17  don't -- the regulatory world, we don't live in a

18  vacuum.  We measure things like are the complaints with

19  this company greater than with a peer company and are

20  they increasing at a greater rate, are they more

21  egregious than other types of complaints, these types of

22  things.

23        In that sense, they may not be a classic

24  statistical indicator for us, but they are,

25  nevertheless, important in us forming our decisions.

## Page 76

1        And, I don't know, if -- if I can give you

2  a -- just the off-the-top-of-my-head strange analogy.  I

3  could walk down this street out front, here, a thousand

4  times, in front of that Tully's Coffee shop and, one

5  day, I could decide to go in and shoot somebody and take

6  money out of the till.  That's one out of a thousand

7  times, but I think that somebody would consider that to

8  be something that would need to be dealt with.

9        And that's what we're -- In this report, when

10  we're dealing with 19 complaints, that's -- that's what

11  we're saying, is these 19 complaints were egregious acts

12  against consumers.  And we never tried to argue that

13  they make up a huge percentage of -- of the total loans

14  in the company.  What we say is we find these practices

15  within these complaints -- we find them to be egregious.

16  We communicate with -- with many of the states across

17  the country.  We find that they have similar complaints

18  in their files, that their examination findings are

19  similar to the things that we're finding in our

20  examination.  And, therefore, we feel comfortable in

21  saying that, when we look at the company, we -- we do

22  not like the practices we're seeing here.  That's what

23  that report does.

24     Q.   Now, you mentioned communications with other

25  examiners.

## Page 85

1  controlled by Household, contained within a certain
2  environment or picture that they had -- had painted, and
3  I know that -- that to the extent that an agency not
4  being a person can lose sort of patience with that
5  process, we had reached a point where we had -- where we
6  had lost patience with it. We were no longer interested
7  in -- in having the dialogue that they kept insisting
8  that they wanted to have.
9       Q.   (BY MR. SLOANE:) Would you look at page 246
10  of Exhibit 2, lines 15 to 25.
11            Question: "So, as of the time that you sent
12  out this expanded report, you had made your findings and
13  opinions and you were not interested in revisiting them,
14  were you?"
15            There's an objection.
16            The Witness: "Personally, no, I wasn't too
17  interested in that because I had done my job and was
18  ready to move to the next stage. As far as what the
19  director was interested, I would have to leave that to
20  him to answer."
21            Did you give that testimony and was it
22  accurate at the time?
23       A.   Yes and yes.
24       Q.   Let me direct your attention to Exhibit 2,
25  page 371. It actually starts -- Let's start at page

## Page 86

1  371. You can read as much as you want. I'm focused on
2  lines ten to 13. And the question was asked: "In other
3  words, your report is just dealing with problems and
4  negative issues, not the positive side of the business?"
5            Answer: "Absolutely."
6            Did you give that testimony at that time and
7  was it accurate?
8       A.   Yes.
9       Q.   Yes to both?
10       A.   Yes to both.
11       Q.   Okay.
12            Off the record.
13            (A discussion was held off the record.)
14       Q.   (BY MR. SLOANE:) Is it accurate to say that,
15  of the 19 reports -- 19 complaints and loans listed in
16  your report, there wasn't a single instance, in
17  connection with those loans, in which you took
18  Household's word over that of the borrower as to what
19  had occurred?
20       A.   Boy, hum. I don't recall, but that -- It
21  would be uncommon for me to take a hundred percent of
22  what the borrowers' said and nothing of what Household
23  said, but, generally, as -- as the complaints supported
24  the violations or harms we were noting, I believed the
25  consumers more than I believed Household in those

## Page 87

1  complaints.
2       Q.   And if you had credited, in any respect,
3  Household's word over the word of the borrowers, that
4  would be in the report; isn't that right?
5       A.   Not necessarily, no.
6       Q.   Well, would you look at page 391, line 21 of
7  Exhibit 2.
8       A.   Line number?
9       Q.   Line number 21.
10       A.   Thank you.
11       Q.   391. I'm going to go from 391, 21, to 392, 2.
12  The question was asked: "Can you recall any instance in
13  discussing the 19 loans that are at issue in this report
14  that's Exhibit C where you took Household's word over
15  the word of the borrower as to what facts occurred?"
16            Answer: "I don't remember. I also have to
17  let the report speak for itself. If I did do that, it's
18  probably in there."
19            Did you give that testimony and was it
20  accurate?
21       A.   I gave the testimony. There's two huge
22  qualifiers in there: I don't remember and probably.
23  But, to the best of my ability, I was giving a truthful
24  answer at that time.
25       Q.   Okay. And let me continue on a little bit to

## Page 88

1  short-circuit this and see if, again, this is something
2  that you testified to and you believe was accurate.
3            It continues on line -- on page 392 of
4  Exhibit 2.
5            The Witness: "No, maybe from your" -- dash,
6  dash -- "I understand you have a different perspective
7  than from my perspective" --
8            And here's the part I wanted to ask you about:
9  "I don't know how that's -- it wouldn't have been
10  relevant to me. This is not a report about good things
11  Household did or the things that Household and us were
12  in agreement on. It's the things" -- dash, dash --
13  "it's about the harmful things Household did and the
14  things" that were -- "that we were in disagreement on."
15            Did you give that testimony and was it
16  accurate at the time?
17       A.   Yes and yes.
18       Q.   Would you look at page 393, lines two to 13.
19  The question was asked: "And are you telling me that,
20  with respect to those 19 complaints and that analysis,
21  you would have excluded any of the information that was
22  favorable to Household just as you did in the more
23  general discussion about Household?"
24            There's an objection.
25            The witness says, "Yeah, likely. Unless it

## Page 89

1  was relevant to the argument of the point I was trying
2  to make, there would be no point to put it in."
3           Question: "What was the argument of the point
4  you were trying to make?"
5           Answer: "That these consumers were harmed."
6           Did you give that testimony and was it
7  accurate at the time?
8      A.  Yes and yes.
9           MR. SLOANE:  Okay.  I'm told we have about
10  five minutes left on the tape, so, why don't we change
11  it now, and I guess it would be a good idea to take a
12  short break just because of that, if that's all right.
13     A.  Sure.
14          THE VIDEOGRAPHER:  We are now going off the
15  record in the continuing deposition of Charles Cross.
16  This is the end of tape one.  The time is now 11:06 a.m.
17          [Off the record at 11:06 a.m.]
18          [Back on the record at 11:23 a.m.]
19          THE VIDEOGRAPHER:  We are now back on the
20  record in the continuing deposition of Charles Cross.
21  This is the beginning of tape two.  The time is now
22  11:23 a.m.
23     Q.  (BY MR. SLOANE:)  Mr. Cross, let me ask you
24  this question:  Is it correct to say that the purpose of
25  your report, which is Exhibit 3, was not to come to the

## Page 90

1  fairest overall appraisal of all of Household's
2  practices as to all of its borrowers in the state of
3  Washington?
4      A.  Yes.
5      Q.  That was not the purpose of this report?
6      A.  That was not the purpose of the report.
7      Q.  Okay.  Did you think, in connection with the
8  work you did for Household, that it was relevant for you
9  to know about what Household's actual policies were
10  about how it communicate -- communicated information to
11  its customers, question mark?
12          MR. BAKER:  Objection.  Vague.  Objection as
13  to form.
14          MR. SLOANE:  Could I have the question reread?
15  He may be right, but it's probably wrong.
16          [Record read as follows:
17          Q. "Did you think, in connection with
18          the work you did for Household, that it
19          was relevant for you to know about what
20          Household's actual policies were about
21          how it communicate -- communicated
22          information to its customers, question
23          mark?"]
24          MR. SLOANE:  It's okay.
25     A.  I would say yes, I think it's relevant.  Now

## Page 91

1  relevant, it might be another question, but you didn't
2  ask that, so --
3      Q.  (BY MR. SLOANE:)  And is it also fair to say
4  that -- that in connection with your work, that it was
5  not a significant part of your examination to review any
6  of the Household policies or training manuals or
7  bulletins about practices that it should or should not
8  engage in?
9      A.  I -- I don't believe so, in the writing of
10  this report.  I believe, subsequent to this report,
11  we -- using that term loosely -- spent more time in that
12  area.
13     Q.  Okay.  At the time that you did this report
14  and investigation, was it your view that a company
15  should be held responsible for the acts of a single
16  individual employee?
17     A.  Yes.
18     Q.  And would, as you -- as you -- If you want to
19  expand on that, go ahead.  I don't want to interrupt
20  you.
21     A.  Depends -- The acts being done within the
22  company.  They're not responsible for the guy owning a
23  home and, you know, kicking the dog or something.
24     Q.  Yeah, I understand.
25          And would that -- those acts, in your

## Page 92

1  understanding, by that individual, be, in your view, a
2  company practice?
3      A.  Very well could be, yes.
4      Q.  Okay.  Now, in connection with the
5  investigative work that you did of Household and -- You
6  didn't operate under any presumption that borrowers had
7  a responsibility to review the terms of any documents
8  they signed; is that correct?
9      A.  I think that is incorrect, if I -- if I
10  understand your question.
11     Q.  Well, for the purposes of your regulatory
12  jurisdiction, you don't operate under any presumption
13  that borrowers have a responsibility to review the terms
14  of the documents they sign; is that fair?
15     A.  There's a -- There's a -- somewhat of a
16  complex answer to that.
17          I did not have jurisdiction over borrowers or
18  borrowers' actions.  We -- In the agency's normal course
19  of reviewing, investigating, resolving complaints, there
20  was a lot of discussion about the level to which
21  borrowers had a responsibility to go to -- to -- to
22  determine if the transaction was appropriate for them,
23  and so forth.  So, there was a lot of -- a lot of
24  agency, a lot of division, a lot of unit discussion
25  about that.  And all of that would have been -- Everything --

## Page 105

1    Q.    (BY MR. SLOANE:)  Mr. Cross, I don't have
2    any -- any questions -- further questions for you at
3    this time.  Thank you.
4        A.    You're welcome.
5        MR. BAKER:  Let's mark this next in order.
6    It's number seven.
7        MS. MARTIN:  6.
8        MR. BAKER:  Sorry, 6.
9        MR. SLOANE:  It's a bad start.
10       MR. BAKER:  Trying to trick me.
11           (Cross Exhibit 6 was marked for
12           identification.)
13           (A discussion was held off the record.)
14                    EXAMINATION
15   BY MR. BAKER:
16       Q.    Okay.  Mr. Cross, if you could turn to the
17   page to -- second page of this document.
18           And, earlier today, you were testifying about
19   some testimony that Mr. Bley had given, the Federal
20   Reserve Board, I believe, in 2000.  You recall that
21   testimony?
22       A.    Yes.
23       Q.    Okay.  And is the second page on -- is that a
24   copy of the testimony that Mr. Bley gave?
25       A.    It appears to be.

## Page 106

1        Q.    And did you author portions or all of this
2    testimony?
3        A.    Let me -- Let me read it.
4            (A discussion was held off the record.)
5        MR. BAKER:  First page is a cover letter.
6        A.    It's a cover letter.  You don't have that.
7        MR. SLOANE:  Oh, just have the testimony.
8            (A discussion was held off the record.)
9        MS. MARTIN:  Is the testimony actually through
10   page four?
11       MR. BAKER:  Yeah, page four and then there are
12   some attachments.
13       MS. MARTIN:  Oh, attachments.  Okay.  I was
14   confused.  Thank you.
15       A.    Could I give you more than a simple yes or no?
16       Q.    (BY MR. BAKER:)  Sure.
17       A.    Okay.  Much of the content of this I would
18   have provided to John -- when I'm reading this now, and
19   I realized that, when you talked to me on the phone
20   previously, I didn't have a copy of this in front of me.
21   Clearly, the attachment that -- that, I think, went
22   along with it --
23       Q.    Um-hum.
24       A.    -- is my authorship, and much of the content
25   of this would have been information I provided to John.

## Page 107

1    I'm reading this, now, and this -- the paragraphs, here,
2    are more in John's voice than my voice.
3        Q.    If I could direct your attention to page two.
4        A.    Of --
5        Q.    I'm sorry, page number two of the testimony.
6        A.    Got it.
7        Q.    You see, in the third paragraph, there's a
8    reference, "I have attached as Exhibit A a memorandum
9    authored by the department's chief mortgage
10   investigator, Mr. Chuck Cross, which describes the
11   deceptive practices we have observed in Washington"?
12       A.    Yes.
13       Q.    Okay.  And that's the memo that you were
14   referring to as the attachment that you had authored?
15       A.    Right.  That's the thicker part of this
16   document, actually.
17       Q.    Okay.
18           If I could direct your attention to the next
19   paragraph that says, "It is important to note that
20   predatory lending is not a new problem.  State
21   regulators have been dealing with this very same issue
22   under a different name for years," period.  "What was
23   once called mortgage fraud is now called predatory
24   lending," period.  "Under either name, our mission to
25   investigate violations and enforce the law has remained

## Page 108

1    the same."  Do you see that?
2        A.    Yes.
3        Q.    Do you concur with that?
4        A.    Yes.
5        MR. SLOANE:  Does he concur with it today?
6        Q.    (BY MR. BAKER:)  Did you always concur with
7    that?
8        A.    Yes.  Missions do change a little bit over
9    time, but I -- I think, generally, it's a pretty
10   accurate statement.
11       Q.    Okay.
12           Was the term predatory lending used within the
13   department during the time period that Mr. Sloane was
14   asking about, 1999 to 2002?
15       A.    Yes.
16       Q.    Okay.  Did you have any discussions with
17   Mr. Bley about predatory lending during that time
18   period?
19       A.    Sure.
20           Again, I didn't very often brief John because
21   I didn't report directly to him.  My boss reported to
22   him.  And, actually, during part of this time, my boss'
23   boss reported to him.  But -- But my relationship with
24   John goes -- goes way back, and, so, we would discuss
25   predatory lending.

Charles Cross
Confidential

4/9/2008

## Page 113

1    So -- And, also, we were beginning to
2 understand more and more about predatory lending
3 practices. We had the FAMCO case under our belt, now.
4 We understood more about what was going on, and the
5 deception that could actually occur with consumers,
6 where, a lot of times, consumers didn't even really have
7 a clue what happened, what went on.
8    So, we're having these conversations and it
9 was determined that -- that it made sense to do an
10 investigation or an exam -- expanded examination report
11 to -- and focus on the complaint side of the world as it
12 related to Household and try to -- try to understand
13 what was really going on with the practice of the
14 company, see if what we were hearing from the complaints
15 made sense or what -- what the routine exams was telling
16 us made sense. That's -- That's how it got started.
17    Q.    Okay.
18         Well, I'm going to ask you some more questions
19 about that after lunch, but let me just follow up a few
20 more questions.
21         Did you give a declaration in the Luna case
22 with respect to this particular DFI report?
23         Let's mark this next in order.
24    A.    I see one there, so, I'm going to say yes.
25    Q.    That's -- That's a good guess.

## Page 114

1         (Cross Exhibit 8 was marked for
2         identification.)
3         MS. MARTIN:  This is Exhibit 8; is that right?
4    Q.    (BY MR. BAKER:)  Is this a copy of your
5 signature on the bottom of page two?
6    A.    That's my signature.
7    Q.    Okay. And, before signing this, did you
8 review it to make sure it was correct?
9    A.    Yes, I -- Yeah, I definitely would have
10 reviewed it and made sure it was correct.
11    Q.    Okay.
12         And this -- This particular document that's
13 referred to in paragraph three is a copy, apparently,
14 that was a -- of the expanded report that was obtained
15 from the Bellingham Herald website, but the same
16 conclusions that are referenced in paragraph three,
17 here, apply also to Cross Exhibit 3? Same experience?
18    A.    Yes, yes.
19    Q.    Okay. It's the same report, in other words?
20    A.    It's the same report.
21         And this -- I think I -- as I remember, I
22 happily did this because it provided me some cover. I
23 think I was being accused of having released this report
24 that Household wanted to protect it and I didn't, so --
25    Q.    Mr. Sloane was asking you a number of

## Page 115

1 questions about the deposition testimony that you gave
2 that's reflected in Cross Exhibit 1 and Cross Exhibit 2,
3 and I just want to follow up on some of those questions.
4         He was asking you about specific snippets of
5 testimony. Is it true that, to the best of your
6 knowledge -- I should say -- Let me start again.
7         To the best of your knowledge, did you give
8 truthful and accurate testimony in response to the
9 questions that were posed to you in those two
10 depositions?
11    A.    Yes.
12    Q.    Okay. Since then, have you learned anything
13 that would have led you to believe that the testimony
14 you gave was not accurate?
15    A.    Without reading all that testimony, that is --
16 that is hard to say.
17         There is -- I'd like to think -- probably not
18 true, but I'd like to think I'm a little bit smarter, a
19 little -- know a little bit more today than I knew back
20 then. But I would say that everything that I said at
21 that time was truthful. Whether, now, you would ask me
22 some -- you know, some piece out of there that maybe I
23 would know more about today or not -- I can't say for
24 sure. But that was -- was an accurate, truthful
25 testimony at the time it was taken. And the facts were

## Page 116

1 very current at that point in time, too. I have to say
2 that, as well.
3    Q.    Okay.
4         Now, let's mark a couple more before,
5 hopefully, we break for lunch.
6         Let's mark this next number.
7         (Cross Exhibit 9 was marked for
8         identification.)
9         (A discussion was held off the record.)
10         MS. MARTIN:  Your copy is -- is there, yeah.
11    Q.    (BY MR. BAKER:)  This is just the question I'm
12 going to ask you again. Ignoring the handwriting on
13 this, earlier you were testifying -- testifying about a
14 March 4th, 2002 report examination based on what was --
15 based for calendar year 2001. To the best of your
16 knowledge, is this a copy of -- of that report, plus the
17 cover letter from Mr. Burgert?
18    A.    It sure looks like it.
19    Q.    Okay. And, at this point in time, March of
20 2004, would Mr. Burgert have been reporting to you?
21 Sorry, 2002.
22    A.    Oh.
23         MR. SLOANE:  You need it?
24    A.    I -- Hum, I -- Yes, I think so. Ed was my
25 boss at one time, but then he got demoted. I -- I

**Charles Cross**
**Confidential**

## Page 133

1  And you're discussing concerns resulting from borrower
2  confusion over biweekly and bimonthly programs.  You see
3  that in sort of the second full paragraph there?
4      A.   Yeah.
5      Q.   Are you familiar with the term effective rate
6  or equivalent rate as used with respect to a biweekly
7  payment program?
8      A.   Yes.
9      Q.   And did you identify a pattern of deceptive
10  practices at Household that used those terms?
11      A.   I -- I believe so, yes.
12      Q.   Okay.
13           And could you explain to -- to me what that
14  process was or what the deceptive practice was?
15      MR. SLOANE:  Object to the form of the
16  question.  You said a pattern at Household.
17      MR. BAKER:  I did.
18      A.   I was afraid you were going to ask me that,
19  because, as I remember, this is a fairly complex area of
20  the exam.  But I will try to the best of my
21  recollection.
22      Q.   (BY MR. BAKER:)  Actually, you know what,
23  maybe I'll just see if I can help you out, here.  You --
24  Let's see.
25           Here, let's mark this next in order.

## Page 134

1      (Cross Exhibit 10 was marked for
2      identification.)
3      (A discussion was held off the record.)
4      MR. SLOANE:  Is this about a specific customer
5  that was referenced in the report, Cam?
6      MR. BAKER:  I believe they are in this report,
7  actually --
8      THE REPORTER:  I'm sorry?
9      MR. BAKER:  I believe they are.  I believe
10  they are.
11      MR. SLOANE:  On that basis, go ahead.
12      Q.   (BY MR. BAKER:)  And, Mr. Cross, you see this
13  is a letter to you from Household?
14      A.   Yes.
15      Q.   Okay.  And it relates to a specific complaint
16  from the -- the Johnstons.  Do you see that?
17      A.   Yes.
18      Q.   Okay.  And you would have reviewed this and
19  considered this in evaluating the complaint -- the
20  merits of the claim; is that right?
21      A.   In relation to this -- yeah, Julian and Terry
22  Johnston complaint, yes.
23      Q.   And is it fair to say it was part of your
24  regular business practices, during the time period we're
25  talking about, to evaluate complaints received from

## Page 135

1  borrowers?
2      MR. SLOANE:  Object to the question.  Way
3  beyond the scope of the exam -- direct examination.
4      A.   I think the answer is yes.
5      Q.   (BY MR. BAKER:)  Okay.
6      A.   It -- I supervised this area and I had people
7  handling -- We received about a thousand complaints a
8  year, so, did I look at every complaint?  At one time, I
9  was the only guy looking at complaints, but you get into
10  this period of time and it took bigger cases like FAMCO
11  and Household for me to become involved in the
12  complaints.
13      Q.   Okay.
14      A.   But I approved every -- Every complaint
15  finding that ever went out went out under my approval,
16  but a lot of it was under sort of policy and procedure:
17  You do this in this situation.
18      Q.   Okay.  And if I direct your attention to the
19  second page of this document.  There's a paragraph
20  starting, "Third".  If you could read that to yourself.
21      A.   Un-hum.
22           I've read it.
23      Q.   Okay.  And does that refresh your recollection
24  as to what the -- the biweekly effective rate deceptive
25  practice was?

## Page 136

1      A.   A little bit.  He -- Schneider, here, is
2  referring to the equivalent rate.  I think we talked a
3  lot about the effective rate -- I can't remember, now,
4  whether those terms are interchangeable or had some
5  subtle nuances that were different among them.
6           And, in general -- And there were a couple of
7  variations or maybe more variations than the whole
8  biweekly or bimonthly program.  In general, what -- what
9  we found was that when borrowers had a biweekly or
10  bimonthly payment plan, they would communicate to us
11  that -- that their rate was approximately half of what
12  we could see on the note was showing as their rate, and,
13  as we discussed this with them -- and, then, also would
14  look at the materials and the responses from the
15  company -- it became apparent to us that -- that this
16  whole -- there was a sales pitch that went with getting
17  the biweekly program, and that sales pitch was clearly
18  leading borrowers to believe that their rate was half of
19  what it really was.
20           Now, there's -- there's a whole ton of
21  discussion that ensued, that I'm sure went on for months
22  and months, about the meaning of effective, meaning of
23  equivalent, who meant what by what.
24           In the end, our finding was that this is what
25  borrowers carried away from -- from -- from the sales

Pages 133 to 136

Charles Cross
Confidential                                    4/9/2008

## Page 137

1  pitch. These guys were the professionals selling this
2  loan program and -- in our -- In our regulatory world,
3  under the concept by which we issued the company a
4  license, they have an obligation not to mislead people,
5  and we found that borrowers were entering the
6  transaction believing that their rate was half of what
7  it really was.
8      Q.  Okay. And did you determine that that was a
9  deceptive practice?
10     A.  Absolutely.
11     Q.  Okay. In the report, here, it says -- I'm
12 reading from the -- looks like the second-to-last line
13 of this paragraph. It says, "The department has
14 identified the practice in other branches in Washington
15 and has even received reports from regulators in other
16 states concerning the practice." Do you see that?
17     A.  What document are you on?
18     Q.  I'm sorry, I'm on your Exhibit 3.
19     A.  Okay. Page 46, still.
20     Q.  Page 46. Yeah. The paragraph we're looking
21 at, this kind of inset.
22     A.  That begins with --
23     Q.  The Department.
24     A.  The prime -- or --
25     Q.  Yeah, borrowers have been informed.

## Page 138

1      A.  Okay.
2      Q.  Okay.
3      A.  And then what -- You're looking at the last
4  sentence that begins with department?
5      Q.  Yeah. Well, no, the second-to-last
6  sentence --
7      A.  Got it.
8      Q.  -- that says, "However the department has
9  identified"?
10     A.  Yes, okay.
11     Q.  Okay.
12     A.  Okay.
13     Q.  And other practices -- sorry, "the practice to
14 other branches in Washington and has even received
15 reports from regulators in other states concerning the
16 practice." Do you see that?
17     A.  I do, yes.
18     Q.  Okay. Do you recall how many other states
19 reported this practice? And if I could direct you to
20 page 89 of your deposition --
21     A.  Okay.
22     Q.  -- and your answer there.
23     A.  I'm going to say, off the top of my head,
24 probable Minnesota and Georgia, but -- Okay. I'm on
25 page 89.

## Page 139

1      Q.  Page 89, and question from Mr. Parlette:
2  "Let's put back together. I believe you said the
3  effective or equivalent interest rates sales program was
4  found in several other states?"
5          Answer:  "I was told that."
6          Question from Mr. Parlette:  "Okay." Do you
7  know how many other states" -- sorry, "Do you know how
8  many states?
9          Objection from Mr. Dunne.
10         Answer:  "No, I don't know how many, but I
11 know that I was told that by at least 15 to 20 states."
12     A.  And I don't know how far back we have to go to
13 get this into appropriate context, but, first, this was
14 contemporaneous in time with -- with the events, so, I
15 stand by what was said there.
16         What I'm wondering, now, if we went back and
17 looked at the earlier context, if the 15 and -- 15 to 20
18 was not relevant to the multistate, then -- in other
19 words, not -- the 15 -- 15 to 20 may not have been
20 before this report was drafted.
21     Q.  Okay.
22     A.  Yet, the report was drafted, and -- and a lot
23 of discussions ensued after the report was drafted, and
24 that's when the 15 to 20 may have said, "Hey, us, too."
25 But -- I'd have to read a bunch of this to figure that

## Page 140

1  out, I think.
2      Q.  Okay. So, you're not sure when you -- when
3  the timing of these 15 to 20 other states telling you
4  when that occurred?
5      A.  Right.
6      Q.  It could have occurred before this report or
7  could have occurred subsequent?
8      A.  Right.
9      Q.  Okay. But you're saying, to your knowledge,
10 this practice occurred between 15 and 20 other states?
11         MR. SLOANE:  Objection to form of the
12 question.
13     Q.  (BY MR. BAKER:)  In addition to Washington?
14         MR. SLOANE:  That's not what he said. He said
15 he had been told something. He didn't know whether it
16 occurred. How would he know?
17     Q.  (BY MR. BAKER:)  You can answer the question.
18     A.  I would say I was told. I did not -- I don't
19 know that I -- that I personally investigated materials
20 from other states; although, it's quite possible that --
21 We came together on several occasions and discussed
22 things and -- and looked at stuff, so, but -- but it is
23 most accurate to say that I was told that by 15 to 20
24 states.
25     Q.  Okay. Earlier in this deposition, you

Pages 137 to 140

## Page 145

1    years later, that New York was the only state that did
2    not have that issue. And this actually came to light
3    during the case. And the reason was New York had a
4    specific law saying you could not have prepayment
5    penalties, so, New York came into the case saying,
6    "Well, we don't see that in our state." It's because
7    prepayment penalties were completely disallowed, so
8    there's no reason to try to deceive somebody or
9    misrepresent that a prepayment penalty existed.
10           But all the other states, that was a very big
11   point that was discussed over and over and over.
12       Q.    And was there consensus within the group that
13   Household was engaged in deceptive practices with
14   respect to their prepayment penalties?
15           MR. SLOANE:  Objection to the form of
16   question. What do you mean by the group?
17           MR. BAKER:  The group that you're talking
18   about now.
19           MR. SLOANE:  I'm lost on what group.
20           MR. BAKER:  He's talking --
21       Q.    (BY MR. BAKER:)  You're talking about, if I
22   understand, there's a group of you -- some are attorneys
23   general, some are -- you are regulators -- who are
24   talking about these practices, and I'm wondering if you
25   reached a consensus that Household is engaged in

## Page 146

1    deceptive practices with respect to prepayment penalties
2    in all the states that you are representing.
3           MR. SLOANE:  Objection. Mischaracterizes his
4    testimony, but it's way beyond the scope of the direct
5    examination.
6        A.    The group grew to about 40 states, I believe,
7    with time, and, yes, we had -- I remember two physical
8    meetings we were all in the same room. The first
9    meeting, I think there were about 25 states, and then
10   the next meeting grew to about 40 states, and we very
11   much -- with the exception of New York, who wanted to
12   stay away from the prepayment penalty issue, because
13   they didn't have prepayment penalties in their state,
14   every other state was saying, "This is a major issue in
15   our state and it's an issue we have to have resolution
16   of in this case."
17       Q.    (BY MR. BAKER:)  One of the other things that
18   you talk about in your report that we haven't touched
19   upon has to do with the GFEs in the -- quote, unquote --
20   buydown or discount points. Do you recall that?
21       A.    Yes.
22       Q.    Okay. What can you tell me about that
23   particular practice?
24       A.    There were -- There were two -- I believe
25   there were two deceptions that I cited revolving around

## Page 147

1    the discount points, in this case. One was whether the
2    discount points were what I would call bona fide -- did
3    they actually have an effect of buying the rate down --
4    and the second was the disclosure on the Good Faith
5    Estimate of a range of discount points, which typically
6    began at zero and went up somewhere -- anywhere from
7    maybe six, seven thousand up to maybe, like, ten or 11
8    thousand. It was -- It would just be showing, in the
9    Good Faith Estimate, zero to this larger number.
10           But, in the cases I reviewed, consistently,
11   the borrowers paid at the very top of that number. Yet,
12   the borrowers were telling us that the loan originator
13   said they would be at the bottom. They would get
14   essentially a -- a very low-cost or no-cost loan. So --
15   Deception -- To reverse those, deception, first, around
16   what was disclosed to the borrower, making the borrower
17   believe that it could be as low as zero, and it
18   virtually never was, in -- in our investigation, and
19   then, once discount points were actually paid, they
20   didn't seem to have any affect in moving the rate down
21   any, which would be your natural assumption, is that --
22   and based on some documentation produced by Household,
23   some tables that showed that there was an inverse
24   relationship between points and rate. You would assume
25   that, but that was not what we found.

## Page 148

1        Q.    Okay. Was that also the subject of
2    discussions within the -- you mind if I call it the AG
3    group?
4        A.    That's fine. Yes.
5        Q.    Yeah, was it?
6           MR. SLOANE:  Objection. Well, beyond the
7    scope of my examination.
8        Q.    (BY MR. BAKER:)  And was there a consensus
9    reached within that group that Household was engaged in
10   deceptive practices throughout those states?
11           MR. SLOANE:  Objection.
12       Q.    (BY MR. BAKER:)  With respect to the discount
13   points and the GFE disclosures?
14           MR. SLOANE:  Cam, you keep spending time on
15   this. It's well beyond the scope of my examination.
16   It's not even close. What is --
17           MR. BAKER:  Peter, you know that's the most
18   ridiculous objection. Why don't you read the rule, the
19   Federal Rules of Civil Procedure. And I'm entitled to
20   ask any question. There's no limitation on the scope of
21   an examination at the deposition. Not only that --
22           MR. SLOANE:  Excuse me. Fact discovery is
23   over. It's been over for months. Has nothing to do
24   with the Federal Rules of -- of --
25           MR. BAKER:  Civil Procedure.

Pages 145 to 148

Charles Cross
Confidential
4/9/2008

## Page 149

```
1          MR. SLOANE:  -- Civil Procedure.  Has to do
2    with the rules set forth by the magistrate judge in this
3    case.  This is not your fact deposition.
4          MR. SLOANE:  We've noticed the deposition.
5          Q.  (BY MR. BAKER)  But, anyway, do you recall
6    the question?
7          MR. SLOANE:  Is that -- Is that pursuant --
8    Just so I understand your position, your questions are
9    now being asked pursuant to your noticed deposition?
10         MR. BAKER:  They could be or they could be
11   asked in response.
12         MR. SLOANE:  I want a position on it.
13         MR. BAKER:  I'm both.  I'm taking both.
14         MR. SLOANE:  You're saying it's proper, A,
15   and, B, it's within the scope of your notice; is that
16   what you're saying?
17         MR. BAKER:  I'm saying both.
18         MR. SLOANE:  Okay.
19         MR. BAKER:  And I don't want to waste any more
20   time on this.
21         MR. SLOANE:  Excuse me, I -- I made my point.
22   I just want to know what yours was.
23         A.  I think my answer's yes.
24         MR. BAKER:  Okay.
25         A.  But you might want to be precise in the
```

## Page 150

```
1    question.
2          MR. SLOANE:  He doesn't want to be precise.
3          MR. BAKER:  I do.
4          Q.  (BY MR. BAKER:)  I want to make sure -- The
5    question I want to know is:  Was there a consensus
6    reached, within the AG group, that Household was engaged
7    in deceptive practices with respect to the disclosures
8    of -- on GFEs and the -- quote, unquote -- buydown
9    discount points that you discussed?
10         MR. SLOANE:  Same -- Sorry, same objection.
11         A.  My recollection is that it was 100 percent,
12   so, we -- Yes, a consensus.
13         Q.  (BY MR. BAKER:)  Okay.  Now, in your
14   deposition, on page 132, which is Cross Exhibit 1,
15   there's a reference -- if you go to page, again, 132.
16         A.  I'll have to catch up with you here.
17         Q.  That's okay.
18         A.  I'm sorry --
19         Q.  Page 132.
20         A.  Got the wrong -- Got the wrong exhibit, sorry.
21   132.  Okay.  What line?
22         Q.  So, on page 132, if I could direct your
23   attention to the question and answer starting on lines
24   13.  And there's a -- The answer was:  "Household
25   maintained for, I don't know, two, two and a half years,
```

## Page 151

```
1    that they had a safe harbor under RESPA that allowed
2    them to disclose the range of discount points in the
3    Good Faith Estimate in the fashion in which they
4    disclosed those points," period.  You see that?
5          A.  Um-hum.
6          Q.  And it says that this issue has kind of been
7    going back and forth with them since late 1999.
8          A.  Yes.
9          Q.  Okay.  Who, at Household, was maintaining
10   that?  Who told you that they had a safe harbor?
11         A.  I don't remember.  I -- It would be --
12         Q.  Mr. Schneider?
13         A.  Mr. Schneider.
14             We had a lot of correspondence revolving
15   around the complaints where I think we were raising this
16   concern, but -- there -- there's a -- there was a woman
17   with Household who was something like assistant general
18   counsel, and I can't remember her name, now, and I think
19   we had a lot of arguments with her about this topic.
20         Q.  Okay.
21             And according to your -- It goes on.  You said
22   that you asked HUD for an opinion letter?
23         A.  Yes.
24         Q.  Okay.  And let me just show you a document.
25             (A discussion was held off the record.)
```

## Page 152

```
1          MR. SLOANE:  Would you give us the date of the
2    document?
3          MR. BAKER:  It looks like it's -- it doesn't
4    actually have a -- it's like July 5th, 2002.
5          MR. SLOANE:  That's the date.
6          Q.  (BY MR. BAKER:)  And I just want to know, is
7    this a copy of the letter that you received back from
8    HUD?
9          MS. MARTIN:  I need one.
10         A.  Yes.
11         MS. MARTIN:  Sorry, thank you.
12         MR. BAKER:  Okay.  And this is Cross
13   Exhibit 11?
14             (Cross Exhibit 11 was marked for
15             identification.)
16         Q.  (BY MR. BAKER:)  Did you ever show this
17   letter -- Sorry, did you ever show this letter to
18   Household?
19         A.  Yes.
20         MR. SLOANE:  Objection.  Beyond the scope.
21         A.  Yes, I did.
22         Q.  (BY MR. BAKER:)  And what was their response?
23         A.  It's one of my favorite points in history.  I
24   remember handing this in -- it was in our first -- first
25   large meeting of -- of negotiated settlements and we
```

Pages 149 to 152

Page 165

1   relationship with him -- great guy -- and he would visit
2   Mark at least once a month -- you know, just monitoring
3   -- "How's the company doing," you know, "We're your
4   licensee. We want to make sure we still have a
5   relationship with you." And Mark was starting to become
6   more and more direct with Tom in their meetings, saying,
7   "You guys are" -- "Your company's kind of veering off
8   the regulatory path, here," and -- and -- and this
9   would -- I'm -- I'm pretty sure, without knowing any
10  better, but we could trace this fax and we're back and
11  ultimately find out that it probably was an executive --
12  executive area of -- of DFI, and this is probably the
13  fax machine out of their area, to Tom, showing Tom
14  support of what Mark was talking to him about" -- you
15  know, "We're having these problems. These complaints
16  are arising," and so forth. But I'm speculating on
17  that.
18      Q.   Now, in your -- the DFI report that we were
19  talking about, Exhibit 3, it's a discussion of 19 -- 19
20  complaints; is that right?
21      A.   Yes.
22      Q.   Okay. How are those 19 chosen?
23      A.   Date, for one. The -- The elements of the
24  transaction, the appearance of possible violations, the
25  story that the consumers were telling us about what

Page 166

1   transpired.
2       Q.   Did you believe that those complaints were
3   representative of other complaints that you had received
4   from Household that aren't referenced in this specific
5   report?
6       A.   I don't --
7            MR. SLOANE:  Did you actually mean to ask the
8   question that way?
9            MR. BAKER:  Yeah.
10      Q.   (BY MR. BAKER:)  So, what I'm saying is -- Let
11  me go back and we'll start again.
12           MR. SLOANE:  No, you didn't.
13      Q.   (BY MR. BAKER:)  So, you got 19 complaints
14  that are discussed in Exhibit 3, right?
15      A.   Um-hum.
16      Q.   Those weren't all the complaints that you --
17  that DFI had received from Household, right?
18      A.   Right.
19      Q.   Okay.
20           MR. SLOANE:  Object to the form of the
21  question. There's --
22           MR. BAKER:  Oh, sorry.
23           MR. SLOANE:  You keep using the phrase from
24  Household. If you read your question a little more
25  carefully, you'd see that I was trying to help you.

Page 167

1       Q.   (BY MR. BAKER:)  All right. About Household,
2   right?
3       A.   (The witness nods his head.)
4       Q.   Okay. Do you believe that the 19 complaints
5   that you analyzed in Exhibit 3 are representative of
6   other complaints received about Household?
7            MR. SLOANE:  Are you asking him did he believe
8   at the time or as sitting here today, because --
9            MR. BAKER:  Did he believe at the time.
10      A.   I don't know. I -- I -- I don't know if they
11  represented other complaints. I do know, at the time,
12  and to this day, I believe that they represented other
13  loans, but whether they represented other complaints --
14      Q.   (BY MR. BAKER:)  Okay.
15      A.   -- I can't answer.
16      Q.   Let's -- Can I direct your attention to page
17  60 of your report -- sorry, of Exhibit 1, which is your
18  deposition.
19           Directing you to starting on 60, line 21,
20  through 61, line -- page 61, line three. Question was:
21  "Did you review other clients other than the 19?"
22           Answer:  "Yes."
23           Question:  "And did you believe that those 19
24  complaints were representative or typical of the ones
25  you received?"

Page 168

1            Objection from Mr. Dunne.
2            Answer:  "They were representative of many of
3   the complaints we had received at earlier times and were
4   very, very similar to complaints we received subsequent
5   to the date of the report," period.
6            You see that?
7       A.   Yes, I do.
8       Q.   And is that accurate testimony, to the best of
9   your knowledge?
10      A.   I'm sure that was accurate testimony.
11      Q.   Okay. Now, the report itself only deals with
12  complaints received with respect to complaints from HFC
13  borrowers and not Beneficial borrowers; is that correct?
14      A.   There were no Beneficial borrower complaints
15  in this report.
16      Q.   All right. Did you ever come to an opinion
17  that there was similar patterns of deceptive practices
18  taking place in the Beneficial offices?
19      A.   We believed that.
20      Q.   And when you say we, do you mean DFI?
21      A.   DFI, yes.
22      Q.   Okay.
23      A.   And -- Well, DFI and, eventually, other
24  people, and they evolved in the multistate.
25      Q.   And what was the basis for your belief?

## Page 169

1     A.    For one thing, the -- the -- the sales
2  practices, the -- the way loans appeared to be
3  originated, as I remember, were very similar between the
4  organizations.  I believe that even some of the
5  locations were the same locations, Beneficial and BFC
6  being in the same location at times, kind of maybe
7  sharing employees.  But we also had complaints against
8  Beneficial.  I think we had almost as many complaints
9  against Beneficial as we did against Household, and we
10  would have looked at those complaints and, ultimately,
11  their -- I mean, I remember needing to do a report on
12  Beneficial similar to what I did on Household.  It just
13  never -- We -- We went off on this whole other tangent
14  and it didn't go there.
15     Q.    Did you start that report?
16     A.    Boy, I might have.  I can't remember.  I might
17  have.
18     Q.    Okay.
19           In your first deposition, on -- in
20  December 19, 2002, you provided, as an exhibit, a list
21  of the then open complaints.  Do you recall that?
22     A.    Yeah.
23     Q.    Okay.
24     A.    Yeah.
25           MR. BAKER:  Let's mark this next in order.

## Page 170

1           MS. MARTIN:  14.
2           MR. BAKER:  14.
3     A.    I think I remember there maybe being some --
4  some confusion about the dates in this document.  I --
5           MS. MARTIN:  There's no question pending.
6     A.    Sorry.
7           MS. MARTIN:  Oh, it's okay.
8           (Cross Exhibit 14 was marked for
9           identification.)
10           (A discussion was held off the record.)
11     Q.    (BY MR. BAKER)  Okay.  And I'll just
12  represent, it does have a sticker on the bottom of this
13  page one that lists it as Exhibit A, the date:
14  December 13th, Witness:  Cross.  You see that?  It's on
15  the first page.
16     A.    Yes.
17     Q.    At the bottom.
18           So, the question I was going to ask you -- if
19  I could direct your attention to Bates number ending in
20  93.
21     A.    I'm there.
22     Q.    Okay.  And there's an original file number
23  2891.  I'm looking at the first --
24     A.    Yes.
25     Q.    -- 2891, then it has -- under Examiner, it has

## Page 171

1  listed Examiner.  What does that mean?
2     A.    It means that this file had been moved from
3  processor -- entry person -- to an examiner to review.
4     Q.    Are you familiar with a Danielle Mortenson?
5     A.    Yes.
6     Q.    What was her role at the DFI at this time?
7     A.    She was that person who did the input into the
8  system for us.  She was later replaced -- just see a
9  name here -- I think Wilma Nepsund replaced Danielle at
10  some point in time.
11     Q.    Okay.  So, she was sort of more the intake
12  person?
13     A.    Yes.
14     Q.    Okay.  And then continuing on this one chart,
15  2891, there's a number of days column and it has 337
16  days.
17     A.    Yes.
18     Q.    What does that refer to?
19     A.    The number of -- It should be the number of
20  days counted from the day the complaint was stamped as
21  received at DFI.
22     Q.    So, that's how long the complaint had been
23  pending?
24     A.    Yes.
25     Q.    Okay.  And, so, and that means that, as an

## Page 172

1  open complaint, it's been opened for almost a year and
2  not resolved?
3     A.    Yes.
4     Q.    Okay.
5           Let me just mark one more document and then
6  we'll take a break, if you want -- for --
7           MR. SLOANE:  Almost done?
8           MR. BAKER:  I'm almost done, actually.
9           Mark this next in order.
10           MS. MARTIN:  This will be 15.
11           MR. BAKER:  15.
12           (Cross Exhibit 15 was marked for
13           identification.)
14     Q.    (BY MR. BAKER)  I'm going to ask you to
15  ignore the first couple of pages of this document and go
16  to the second-to-last page, which is Bates number ending
17  in 78.
18     A.    Okay.
19     Q.    It references -- It's in the agenda for a
20  meeting that was held between the State of Washington
21  and Household officials on May 23rd, 2002.  Do you see
22  that?
23     A.    Yes.
24     Q.    And I believe, at this meeting, Robin Allcock
25  and Tom Detelich were there, and I believe also yourself

## Page 177

1    Q.    We're here on -- We're here on -- on May 23rd,
2    2002.  There's a discussion.  Someone from your side
3    mentions, "By the way, there's a multistate interest."
4    Was there any discussion between you and Household about
5    the next step to resolve the multistate interest in this
6    issue?
7    A.    I believe -- I believe we --
8          MR. SLOANE:  Objection.  Same objection.
9          Sorry, Chuck.
10   A.    I believe we hypothesized about that, but we,
11   of course, could not make any statements for what other
12   states would do.  But I -- But we hy -- we hypothesized
13   about the potential outcome if -- if things had to go,
14   you know, to a more aggressive level.
15   Q.    (BY MR. BAKER:)  Was there any discussion at
16   this meeting, to your knowledge, about a potential
17   settlement between AGs and the multistate group and
18   Household?
19   A.    I don't remember.
20   Q.    Okay.
21         Why don't we take a short break.
22         MR. SLOANE:  Yeah.
23         THE VIDEOGRAPHER:  We are now going off the
24   record in the continuing deposition of Charles Cross.
25   This is the end of tape two.  Time is now 2:28 p.m.

## Page 178

1          (Off the record at 2:28 p.m.)
2          (Back on the record at 2:41 p.m.)
3          THE VIDEOGRAPHER:  We are now back on the
4    record in the continuing deposition of Charles Cross.
5    This is the beginning of disk three.  The time is now
6    2:41 p.m.
7    Q.    (BY MR. BAKER:)  Earlier, you testified that
8    you, Mr. Galletin, Mr. Polidori were reviewing documents
9    in the context of the AG settlement discussions -- I
10   believe that's correct; is that right?
11   A.    Yes.
12         MR. SLOANE:  Objection.  Objection.  Well,
13   beyond the scope.
14   A.    Yes, and even more data than documents.
15   Q.    (BY MR. BAKER:)  Okay.
16   A.    The AGs began to spend a lot of time with
17   documents.  We spent a lot of time with data.
18   Q.    Did you ever personally review any complaints
19   received from consumers in other states about
20   Household's practices?
21         MR. SLOANE:  Objection.  Well beyond the
22   scope.
23   A.    I don't remember.
24   Q.    (BY MR. BAKER:)  Okay.  Were the documents and
25   materials you received with respect to Household's

## Page 179

1    practice in other states consistent with what -- with
2    the findings that you made in Exhibit 3?
3          MR. SLOANE:  Same objection.
4    A.    Much -- Much of what the other states found
5    and produced in our, you know, exchange of materials,
6    and so forth, was consistent with what we found in
7    Washington.
8    Q.    (BY MR. BAKER:)  Okay.
9          And, in terms of the AG, you're familiar with
10   the fact that there was actually a settlement between
11   Household and the multistate group; is that right?
12         MR. SLOANE:  Same objection:  Well beyond the
13   scope.
14   A.    Yes.
15   Q.    (BY MR. BAKER:)  Okay.  When, to your
16   knowledge, did that agreement come into fruition?
17         MR. SLOANE:  Same objection.  Also object to
18   the form of the question.
19   A.    On my birthday, October 2nd, 2002.
20   Q.    (BY MR. BAKER:)  Okay.  Why didn't DFI get to
21   the point of filing charges based on the apparent
22   violations found in your DFI report that's Exhibit 3?
23   A.    Two reasons.  The -- Well, maybe three
24   reasons.
25         When we started down the multistate path, we

## Page 180

1    were at least committing ourselves, in intent and
2    theory, to try to -- to try to stick with that, being in
3    solidarity with other states and bring a large
4    resolution for the entire country.
5          You have to remember, there were only --
6    There weren't 50 states that were -- that were
7    carrying this thing.  There were a handful of states
8    carrying the 50 states -- and that's how the multistate
9    work.  You sort of take turns carrying the load.  So --
10   And there were a lot of states that ended up in the
11   settlement and they just sort of signed on at the end
12   and they just rode on our coattails right on out through
13   the settlement, and said, "Whatever they say, we --
14   that's good for us."
15         So, we had this -- this allegiance to other
16   states holding that -- that together.  Although,
17   Washington was always extremely aggressive, so was
18   Minnesota, New York, some other states, extremely
19   aggressive in saying -- threatening, at various points
20   in time, to pull out and actually file charges.  So, we
21   always retained that right and authority to file
22   charges, but we had a commitment to the multistate.  We
23   thought we had a good chance of getting as much for
24   Washington consumers out of the multistate as we could
25   if we went on our own.

Pages 177 to 180

## Page 181

1    So, there was incentive. So, we could get
2  something for everybody plus us, equivalent to what we
3  probably could get if we went on our own. And then
4  there's the whole resource issue -- I mean, in reality,
5  it would have been five years of -- of our agency's
6  life, very ugly -- you know, this stuff would have gone
7  on for -- for five years and it would have been a huge
8  resource drain and that's -- that's much of the reason
9  why you settle.
10    Q.   Okay. A lot of -- of -- Household produced a
11  lot of documents to show that they were in compliance
12  with the various federal and state laws, including loan
13  documents signed by borrowers.
14    MR. SLOANE:  You talking about in connection
15  with his report?
16    MR. BAKER:  Yeah.
17    MR. SLOANE:  In other words --
18    MR. BAKER:  We considered that.
19    Q.   (BY MR. BAKER:)  You considered that as part
20  of -- and -- and found that, despite that, that there
21  was deceptive practices taking place; is that right?
22    A.   Yes.
23    Q.   Okay. Why didn't you find -- Why didn't you
24  rely upon the loan documents that Household was
25  producing to determine that there was, in fact,

## Page 182

1  compliance?
2    A.   In the early days, I think we did. In the
3  very early days of complaints coming in -- and if I
4  could roll the clock back, I would -- but, in the early
5  days, the company's arguments had been somewhat
6  convincing for us, and I think that we -- we had a
7  little bit of trouble coming to grips with what the
8  consumers were telling us. It didn't -- It didn't make
9  sense, early on, that this would be happening, that --
10  that a -- such a big company, such a well-structured,
11  well-organized, well-funded company, would be doing
12  these things to consumers. It didn't -- didn't make a
13  lot of sense. But, over a period of time, we -- we --
14  we changed our belief on that.
15    So, in the early days, there were documents
16  that were coming in. Company would -- would send us the
17  disclosures from their files, or whatever, and we'd look
18  at them and say, "Ah, well, consumer must have," you
19  know, "ignored them," or, "Maybe a consumer isn't
20  telling the full story," or whatever, and we would -- we
21  would largely discount the consumer and -- and close out
22  the complaint.
23    We reached a tipping point where we just, for
24  lack of a better description, sort of stood around,
25  looking at each other, saying, you know, at some point,

## Page 183

1  you know, we're having trouble believing this any
2  longer, the answers we were getting. And, so, there
3  became -- There was a point in time -- late 2001, early
4  2002 -- where we felt we were getting a lot of
5  disinformation from the company, a lot of -- We were --
6  We were extremely unhappy with the response we were
7  getting from the company. We stopped trusting the
8  response. And we started more and more believing what
9  we saw from the consumers, what the consumers were
10  telling us.
11    Documentation is one part of a case, and
12  regulators do have a tendency to sort of get blinders
13  on, saying, "Well, it's in the file. It must be true.
14  Hey, it came out of a computer. It's there. Somebody
15  must have gotten it." But you hear enough stories about
16  consumers saying, "I never saw it," or, "That's not how
17  it was explained to me," and so forth, and you start to
18  change your mind over time.
19    That's how all these predatory lending cases
20  come about. If you -- you take almost any predatory
21  lending case, that I can think of, and you go back to
22  the start of time, the regulators were not saying, you
23  know, consumers were harmed, here. It always kind of
24  starts off with not really believing that what people
25  are saying is it, and then you -- it grabs traction with

## Page 184

1  time and your -- your mind has changed.
2    And it was no different with this case, so --
3    So, we reached a point where -- where the
4  relationship seemed to be so disingenuous that -- it was
5  almost like stuff was being fabricated to convince us,
6  and we didn't believe it any longer.
7    Q.   Did your experience with FAMCO have anything
8  to do with it? In other words where -- where the paper
9  files looked clean, but, in fact, there were deceptive
10  practices taking place?
11    A.   FAMCO had nothing to do with our impression of
12  Household. Household was completely responsible for our
13  impression of Household. FAMCO educated us to learn how
14  to look beyond what was being said and FAMCO -- The
15  earlier complaints I was talking about where we didn't
16  maybe believe the consumers as much as we should have,
17  that was -- that was -- those complaints go back to the
18  early days of FAMCO, before we started to learn more
19  about how deception could take place, misrepresentation
20  could take place, how people could be trained to lie
21  with the truth, and all of these -- these sales
22  practices that we hadn't -- I came out of the banking
23  world. That kind of stuff didn't really take place in
24  the banking world. And, so, I had to be educated.
25    So, FAMCO educated me, educated the

Pages 181 to 184

# TAB 2

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
    No. 02 C 5893
    (No. 07 C 80028 - N.D. of CA)

LAWRENCE E. JAFFE PENSION PLAN,
on behalf of Itself and All
Others Similarly Situated,

    Plaintiffs,

vs.

HOUSEHOLD INTERNATIONAL, INC.,
et al,
    Defendants.

. . . . . . . . . . . . . . . . . .

    30(b)(6) VIDEOTAPED DEPOSITION OF

    WELLS FARGO REPRESENTATIVE TODD MAY

    (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

    PURSUANT TO PROTECTIVE ORDER)

. . . . . . . . . . . . . . . . . .

DATE TAKEN: 05/01/07    BY: CINDY M. TRATTLES

## Page 2

```
 1  APPEARANCES:
 2
 3  LERACH COUGHLIN STOIA GELLAR
    RUDMAN & ROBBINS, LLP
    Suite 2600
 4  100 Pine Street
    San Francisco, California  94111
 5  Phone: 415.288.4545
    Fax:   415.288.4534
 6  Email: jdavis@lerachlaw.com
 7  By: Mr. Jason Cassidy Davis and
        Mr. Luke Brooks
 8      For the Plaintiffs
 9
10  CAHILL GORDON & REINDEL LLP
    80 Pine Street
11  New York, New York  10005
    Phone: 212.701.3000
12  Fax:   212.269.5420
    Email: lbest@cahill.com
13
    By: Ms. Landis C. Best and
14      Mr. Paul F. Millen
        For the Defendants
15
16
    LORD BISSELL & BROOK
17  111 South Wacker Drive
    Chicago, Illinois  60606-4410
18  Phone: 312.443.0235
    Fax:   312.896.6235
19  Email: jkloecker@lordbissell.com
20  By: Mr. John F. Kloecker
        For the Deponent
21
22
    Also Present:  Attorney Susan E. Flint of Wells
23                 Fargo and Videographer Pat Curto
24
25
```

## Page 3

```
 1  I N D E X
 2  Examination by Mr. Davis, Page 10
 3  Examination by Ms. Best, Page 210
 4
    INDEX OF EXHIBITS
 5
    Exhibit
 6  Name       Description               Page #
 7  Wells Fargo 1  Wells Fargo's 30(b)(6) Subpoena  12
 8  Wells Fargo 2  Mr. Schoenholz' 03-28-03 Memo
        to Mr. Atkins - HHS 03473155         48
 9
    Wells Fargo 3  04-02 Notes to Project Blazer
10      Board Presentation - WF 006082       50
11  Wells Fargo 4  Mr. Atkins' 4-01-02 Fax to Mr.
        Schoenholz - HHS 03473147 - 49       51
12
    Wells Fargo 5  04-02 Letter to Board of
13      Directors - WF 006080 - 81           51
14  Wells Fargo 6  Blazer 04-23-02 Board of
        Directors - WF 006004 - 006039       58
15
    Wells Fargo 7  Mr. May's 04-11-02 Email
16      WF 009256 - WF 009288                58
17  Wells Fargo 8  Project Blazer Timelines -
        Options 1 & 2 - WF 007768 - 70       66
18
    Wells Fargo 9  Household International Board of
19      Directors 05-02 WF 006000 - 03       69
20  Wells Fargo 10 Mr. Klug's 05-03-02 Email
        WF 009965 - WF 009969                81
21
    Wells Fargo 11 Team Notification Procedures
22      WF 007754 - WF 007755                89
23  Wells Fargo 12 Preliminary Due Diligence
        Employee List WF 007761 - 007764 90
24
    Wells Fargo 13 A Monday, May 6 Timeline
25      WF 007765 - WF 007767                91
```

## Page 4

```
 1  INDEX OF EXHIBITS (continued)
 2  Exhibit
    Name       Description               Page #
 3
    Wells Fargo 14 Project Whiskey Due Diligence
 4      Guidelines - HHS 03473995         93
 5  Wells Fargo 15 Project Whiskey Working Group
        List - HHS 03472696 - 03472697    93
 6
    Wells Fargo 16 Mr. Klug's 05-03-02 Memo
 7      HHS 03472680 - HHS 03472691       95
 8  Wells Fargo 17 Executive Review/High Level Due
        Diligence - WF 001320             96
 9
    Wells Fargo 18 Project Blazer Business Line
10      Manager Due Diligence Program
        WF 001460 - WF 001467             98
11
    Wells Fargo 19 05-10-02 Email and Attachments
12      WF 00161 - WF 00213              101
13  Wells Fargo 20 Mr. Schoenholz' 06-13-02 Letter
        to Mr. Atkins - WF 002041        104
14
    Wells Fargo 21 March '02 Emails
15      HHS 02914861 - HHS 02914861      105
16  Wells Fargo 22 07-17-02 Email - HHS-ED 487956  110
17  Wells Fargo 23 10-28-02 Inter-Office Memo
        WF 00214 - WF 00215              110
18
    Wells Fargo 24 Project Blazer - Initial Review
19      WF 000781 - WF 000785            111
20  Wells Fargo 25 Emails of March '02 - WF 001531 124
21  Wells Fargo 26 Potential Allowance for Loan
        Loss Adjustment - WF 000416      128
22
    Wells Fargo 27 Project Blazer 04-19 Update
23      WF 003087 - WF 003089            129
24  Wells Fargo 28 04-26-02 Email - WF 009327 to
        WF 009331                        135
25
```

Pages 1 to 4

Page 121

1          MR. KLOECKER:  To the extent you

2    understand you can answer.

3  A  I don't know.

4  Q  (By Mr. Davis) That's fair enough.  Do you know

5    what "not FFIEC OK", means with respect to Private

6    Label?

7  A  My recollection is that it meant that they were not

8    FFIEC compliant for this product.

9  Q  And the next phrase reads, "Estimated impact

10    $250MM, based on 60% of $460MM accruing >90 DPD

11    loans reported by Blazer", do you know what that

12    sentence means?

13  A  My belief of what it means is that the cost was

14    estimated at 250 million to make this product FFIEC

15    compliant.

16  Q  Okay.  The next product down it says Personal

17    Unsecured.  Do you know what that means?

18  A  It is again a specific business product of

19    Household.

20  Q  And, again, it says, "Not FFIEC OK".  Do you know

21    what that means?

22  A  It would just mean that it's not FFIEC compliant.

23  Q  Okay.  And then it says, "Combination of recency

24    and contractual rules".  Do you know what that

25    references?

Page 122

1  A  No.

2  Q  Do you know what the underlined 500 million figure

3    refers to?

4  A  Not specifically.

5  Q  Do you have a general understanding?

6  A  My belief is that it is an estimated cost to make

7    this portfolio FFIEC compliant.

8  Q  The last sentence in that cell reads, "Significant

9    range of risk depending on exact composition of

10    portfolio and adherence to reage policy."  Do you

11    know what that means?

12  A  Yes.

13  Q  And what does it mean?

14  A  It means that there can be significant variability

15    in this estimate.

16  Q  I'd like to ask you to flip the page if I may to

17    785.  The heading reads Information Required Prior

18    to Executive Review.  Could you just scan that list

19    for a moment, please.

20  A  Okay.

21  Q  Okay.  Do you know whether --.  Did you have a role

22    in obtaining any of this information from

23    Household?

24  A  I don't know if specifically this information.

25  Q  Do you know whether Wells Fargo obtained any of the

Page 123

1    information referenced here from Household?

2  A  I don't know what specific information we received.

3  Q  Okay.  Did you receive -- strike that.  Did Wells

4    Fargo follow FFIEC rules?

5          MR. KLOECKER:  Object to the lack of

6    foundation.  To the extent you understand you can

7    answer.

8          MS. BEST:  Objection as well.

9  A  You're going to have to define it.

10  Q  (By Mr. Davis) Okay.  Define what?

11  A  Did we follow it.

12  Q  Oh, okay.  So I'd like to focus your attention back

13    on Exhibit 24, which we're still on.  And I'd like

14    to take you to the first paragraph.  And it says,

15    "Blazer delinquency and loss rates reflect a

16    finance company/subprime customer base and are

17    generally consistent with results in Wells Fargo

18    Financial."

19          The first question I have is:  Was Wells

20    Fargo Financial subject to FFIEC regulations?

21  A  At this time?

22  Q  Correct.

23          MR. KLOECKER:  Let me just throw in an

24    objection here.  I think when you talk about Wells

25    Fargo, overall there's a lot of different

Page 124

1    operations and legal compliance is a --.  I think

2    you're asking for a legal conclusion.  To the

3    extent you understand the standards for particular

4    operations and can testify about that, you can

5    answer.

6  A  My belief is they were not operating under FFIEC

7    compliant standards at the time.

8  Q  (By Mr. Davis) I'd like to focus your attention on

9    a new exhibit which is marked Exhibit 25, Bates

10    stamped WF 001531.  And --.  Well, could you just

11    take a moment to review the document, please.

12          Do you recognize this?

13  A  No.

14  Q  If you focus on the bottom E-mail, the original

15    message, there's a From line and it says May, Todd

16    and there's some brackets.  Is that your E-mail

17    address?

18  A  Yes.

19  Q  Okay.  Does that mean that you sent this E-mail?

20  A  Most likely, yes.

21  Q  Okay.  Do you remember why you sent this E-mail?

22  A  Not specifically.

23  Q  Okay.  The court reporter just handed you a

24    document marked Exhibit 26.  I'd like you to just

25    set that to one side for a moment, please.

Pages 121 to 124

# TAB 3

1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3    LAWRENCE E. JAFFE PENSION PLAN,  )
      on behalf of itself and all      )
 4    others similarly situated,       )
                                       )
 5                Plaintiff,           )
                                       )
 6      vs.                            )  No. 02 C 5893
                                       )
 7    HOUSEHOLD INTERNATIONAL, INC.,   )
      et al.,                          )  Chicago, Illinois
 8                                     )  March 12, 2009
                  Defendants.          )  1:30 p.m.
 9
                              VOLUME 1
10          TRANSCRIPT OF PROCEEDINGS - PRETRIAL CONFERENCE
                 BEFORE THE HONORABLE RONALD A. GUZMAN
11

12    APPEARANCES:

13    For the Plaintiff:       COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
14                             BY:  MR. SPENCER A. BURKHOLZ
                                    MR. MICHAEL J. DOWD
15                                  MR. DANIEL S. DROSMAN
                                    MS. MAUREEN E. MUELLER
16                             655 West Broadway
                               Suite 1900
17                             San Diego, California  92101
                               (619) 231-1058
18
                               COUGHLIN STOIA GELLER RUDMAN &
19                             ROBBINS LLP
                               BY:  MR. DAVID CAMERON BAKER
20                                  MR. LUKE O. BROOKS
                                    MR. JASON C. DAVIS
21                                  MS. AZRA Z. MEHDI
                               100 Pine Street
22                             Suite 2600
                               San Francisco, California  94111
23                             (415) 288-4545

24

25
```

1    your Honor.

2         I guess the one issue is this issue of reliance and

3    classwide reliance.  And the -- they have one -- they have an

4    opportunity to rebut that presumption through the

5    truth-on-the-market defense.  And that's something that they

6    should put on in this trial, and they intend to put on in this

7    trial.  They sought some of the plaintiffs' discovery; and

8    your Honor's January 29, 2007, order made clear that they did

9    not need plaintiffs' discovery in order to rebut the

10   presumption reliance on the issue of the truth-on-the-market.

11   So that -- we envision that being litigated in this case.  So

12   that's a reliance element that needs to be litigated on a

13   classwide basis.

14        With respect to the second phase, we envision -- if

15   we're successful with a verdict, liability verdict, a per

16   share damages calculation by this jury, we would envision

17   expert input into a formula on how you calculate damages for

18   the class members in this case.  Whether you use LIFO, FIFO,

19   whether you have in-and-out traders, how you would calculate

20   the damages, that formula, that would go into a notice that

21   would go to class members that would then fill out the claim

22   forms.

23        And then the real issue is what do we do after that.

24   Do we have what they've wanted, which is full-blown discovery

25   on all of the class members in order to rebut that presumption

160

 1    motion for summary judgment, Judge, well, we don't think

 2    that's relevant; we're not going that route.  We're sort of

 3    doing this miasma kind of fraud, that if you fail to tell

 4    people that you were a bad actor, that's the fraud.

 5            So -- but whether or not that was appropriate, we

 6    could discuss separately.  But for purposes of Professor

 7    Fischel, their loss causation expert, the guy that a jury

 8    would look to to say here's the fraudulent statement -- on

 9    this fraudulent statement, the stock -- the inflation went up

10    this way.  When that statement was shown to be false, it came

11    down this way.  He just worked on the down leg for some

12    reason.  But he did say, your Honor, that he found no new

13    artificial inflation, no introduction of artificial inflation

14    into the price of Household stock from the very first day of

15    the class period, where he assumed that there was some already

16    in place -- and, as you know, your Honor, we have statute of

17    repose problems with that.  From the very first day of the

18    class period for two-and-a-quarter years, until November 15,

19    2002 -- no, I'm sorry, 2001, that same artificial inflation

20    that he was assuming came in the door at the start of the

21    class period stayed exactly in place, didn't go up, didn't go

22    down, stayed exactly as is.  That could not be further in --

23    that could not be further from the real stock --

24            THE COURT:  If their expert fails to show that there

25    was inflation in price, you win.  But right now that's not

TAB 4

449

```
 1                   IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all    )
 4   others similarly situated,      )
                                     )
 5              Plaintiff,           )
                                     )
 6      vs.                          )  No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )  Chicago, Illinois
 8                                   )  March 18, 2009
                Defendants.          )  11:15 a.m.
 9
                           VOLUME 5
10        TRANSCRIPT OF PROCEEDINGS - PRETRIAL CONFERENCE
             BEFORE THE HONORABLE RONALD A. GUZMAN
11

12   APPEARANCES:

13   For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
14                             BY:  MR. SPENCER A. BURKHOLZ
                                    MR. MICHAEL J. DOWD
15                                  MR. DANIEL S. DROSMAN
                                    MS. MAUREEN E. MUELLER
16                             655 West Broadway
                               Suite 1900
17                             San Diego, California   92101
                               (619) 231-1058
18
                               COUGHLIN STOIA GELLER RUDMAN &
19                             ROBBINS LLP
                               BY:  MR. DAVID CAMERON BAKER
20                                  MR. LUKE O. BROOKS
                                    MR. JASON C. DAVIS
21                                  MS. AZRA Z. MEHDI
                               100 Pine Street
22                             Suite 2600
                               San Francisco, California   94111
23                             (415) 288-4545

24

25
```

486

1    "Scienter requires an extreme departure from the standards of
2    ordinary care."
3              THE COURT:  Do you agree with that?
4              MR. BURKHOLZ:  Not necessarily, I don't.
5              I'm just looking at the Ernst quote that they cited
6    in their opposition to our scienter and it doesn't exactly say
7    that.  It says, "The term 'scienter' refers to a mental state
8    -- "
9              THE COURT:  I'm sorry.  A little louder, please.
10             MR. BURKHOLZ:  Yes.
11             The term -- the case -- that they cite -- at least
12    the quote they cite from Ernst -- is, "The term 'scienter'
13    refers to a mental state embracing intent to deceive,
14    manipulate or defraud."
15             MS. BEER:  Ernst is -- this is at Page 193 of Ernst &
16    Ernst vs. Hochfelder, which is 425 U.S. 185:  "In this
17    opinion, the term 'scienter' refers to a mental state
18    embracing intent to deceive, manipulate or defraud.  In
19    certain areas of the law, recklessness is considered to be a
20    form of intentional conduct for purposes of imposing liability
21    for some act."
22             So, it's not an issue of not needing to prove intent.
23    It's a question of how intent is proved.
24             And the Court of Appeals for the Seventh Circuit
25    answered that question in Higginbotham vs. Baxter

# TAB 5

642

```
  1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
  2                          EASTERN DIVISION

  3    LAWRENCE E. JAFFE PENSION PLAN, )
       on behalf of itself and all     )
  4    others similarly situated,       )
                                        )
  5                Plaintiff,           )
                                        )
  6      vs.                            )  No. 02 C 5893
                                        )
  7    HOUSEHOLD INTERNATIONAL, INC.,   )
       et al.,                          )  Chicago, Illinois
  8                                     )  March 20, 2009
                   Defendants.          )  8:30 a.m.
  9
                              VOLUME 7
 10         TRANSCRIPT OF PROCEEDINGS - PRETRIAL CONFERENCE
                BEFORE THE HONORABLE RONALD A. GUZMAN
 11

 12    APPEARANCES:

 13    For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                                 ROBBINS LLP
 14                              BY:  MR. SPENCER A. BURKHOLZ
                                      MR. MICHAEL J. DOWD
 15                                   MR. DANIEL S. DROSMAN
                                      MS. MAUREEN E. MUELLER
 16                              655 West Broadway
                                 Suite 1900
 17                              San Diego, California  92101
                                 (619) 231-1058
 18
                                 COUGHLIN STOIA GELLER RUDMAN &
 19                              ROBBINS LLP
                                 BY:  MR. DAVID CAMERON BAKER
 20                                   MR. LUKE O. BROOKS
                                      MR. JASON C. DAVIS
 21                                   MS. AZRA Z. MEHDI
                                 100 Pine Street
 22                              Suite 2600
                                 San Francisco, California  94111
 23                              (415) 288-4545

 24

 25
```

719

```
 1          Different from each other or in addition to?

 2          MS. SMITH:  In addition to.

 3          THE COURT:  Okay.

 4          Which one has the additional cover?

 5          MS. SMITH:  550 has the additional cover e-mails,

 6   your Honor.

 7          THE COURT:  Is that 16 or 17?

 8          MR. DROSMAN:  Your Honor, if you'd like, I can hand

 9   you up Exhibit 550.

10          THE COURT:  You don't need to.  You guys can do this.

11          I want to know if there's any difference between the

12   document that I excluded, which is D17, and this document.

13          MR. DROSMAN:  Yes.  The answer is "Yes."

14          THE COURT:  What is the difference?

15          MR. DROSMAN:  The difference is the first -- the

16   first -- four pages of this document, Exhibit 550, were not

17   contained on the document that you excluded.

18          So, to the extent that the remaining pages of Exhibit

19   550 are contained, we can take those off.

20          THE COURT:  Okay.  That will be the ruling.

21          MR. DROSMAN:  This is -- Exhibit 596, your Honor, is

22   -- the next one.

23          THE COURT:  What's the objection?

24          MS. SMITH:  The objection is, your Honor, that in

25   light of your ruling on the spoliation motion, this document
```

TAB 6

794

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all    )
 4   others similarly situated,      )
                                     )
 5              Plaintiff,           )
                                     )
 6      vs.                          )  No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )  Chicago, Illinois
 8                                   )  March 26, 2009
                Defendants.          )  9:30 a.m.
 9
                          VOLUME 8
10       TRANSCRIPT OF PROCEEDINGS - PRETRIAL CONFERENCE
            BEFORE THE HONORABLE RONALD A. GUZMAN
11

12   APPEARANCES:

13   For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
14                             BY:  MR. SPENCER A. BURKHOLZ
                                    MR. MICHAEL J. DOWD
15                                  MR. DANIEL S. DROSMAN
                                    MS. MAUREEN E. MUELLER
16                             655 West Broadway
                               Suite 1900
17                             San Diego, California   92101
                               (619) 231-1058
18
                               COUGHLIN STOIA GELLER RUDMAN &
19                             ROBBINS LLP
                               BY:  MR. DAVID CAMERON BAKER
20                                  MR. LUKE O. BROOKS
                                    MR. JASON C. DAVIS
21                                  MS. AZRA Z. MEHDI
                               100 Pine Street
22                             Suite 2600
                               San Francisco, California   94111
23                             (415) 288-4545

24

25
```

843

 1    which would be used likely with Dr. Litan if he testifies, the

 2    underlying disclosures that are referenced here with the big

 3    green check marks, I believe plaintiffs are aware, are

 4    discussed at great length in Dr. Litan's report and in the

 5    exhibits to his report.

 6         MR. DOWD:  With that representation, we'll evaluate

 7    it and double check, if it's going to be used only with Litan

 8    and the source to his report.

 9         I think our next -- we have the same concern with

10    Exhibits 541-01 through 04.  I'm just not sure if these are

11    used with a particular witness or --

12         MS. COHN:  These would also be used with Dr. Litan.

13         MR. DOWD:  With that, we'll just save it for cross,

14    your Honor.

15         MR. BURKHOLZ:  Next objection we have is to 541 --

16    545-01 through 05.

17         THE COURT:  I'm sorry.  These are 5- --

18         MR. BURKHOLZ:  545-01.

19         THE COURT:  545.  Okay.

20         MR. BURKHOLZ:  Our basic objection is this is a

21    hypothetical that is not in Dr. Bajaj's report.  He does have

22    a different hypothetical involving an oil well and disclosure

23    of news regarding fire that he describes twice in his report.

24    But this is something new that's come from the defendants.

25         MR. HALL:  Your Honor, I understand Mr. Burkholz'

844

1   point to be that the experts should be constrained essentially
2   to the words that are in their report and not simply the
3   concepts that are in their report.  And we can agree to that.
4   And with the Court's permission, we'll reevaluate our
5   demonstratives in that context.
6           THE COURT:  It sounded wonderful, but I'm not sure
7   what it meant.
8           MR. HALL:  Your Honor, the point being, in light of
9   your Honor's earlier instructions that the experts, under Rule
10  26, will be limited to what they actually say in their reports
11  construed narrowly instead of construed broadly is my point.
12          THE COURT:  Well, I don't know about that point.  But
13  with respect to experts who have been hired to give opinions,
14  who have written reports and have been deposed, the use of
15  previously undisclosed hypotheticals to make their points at
16  trial is -- unless there are some unusual circumstances -- not
17  going to be allowed.
18          MR. HALL:  Yes, your Honor.
19          THE COURT:  Okay.
20          MR. HALL:  We can withdraw this exhibit, your Honor.
21  I believe we can probably productively, in light of that
22  guidance, your Honor, meet and confer with the plaintiffs and
23  eliminate several issues.
24          MR. BURKHOLZ:  Okay.
25          THE COURT:  Okay.

TAB 7

Jury Selection

160

1          PROSPECTIVE JUROR EGAN:  Correct.

2          MR. KAVALER:  A bank?

3          PROSPECTIVE JUROR EGAN:  Correct.

4          MR. KAVALER:  Sir?

02:24:56  5          PROSPECTIVE JUROR GALVAN:  No mortgage.

6          PROSPECTIVE JUROR VELIZ:  I have a mortgage,

7   refinanced once for better rates.  Don't know -- my wife

8   handled all that.  She just said, "Pay the bill."

9          (Laughter.)

02:25:07  10         MR. KAVALER:  I know that speech.  I've heard that

11  speech.

12         I noticed something interesting.  All of you except

13  one said "banks."  One of you said "finance company."

14         Do you all know the difference between a bank and

02:25:22  15  finance company?

16         (Some prospective jurors nodded and some shook their

17  heads.)

18         MR. KAVALER:  I see some Yes'es and some No's.

19         We all know what a bank is.  A bank takes deposits.

02:25:32  20  Tellers -- when I was a kid, banks had tellers.  Now they have

21  machines.  People deposit their money in a bank; and, then,

22  the bank lends their money to, for example, people buying

23  homes.

24         Does anyone know what a finance company is -- what

02:25:44  25  the difference is?

Jury Selection

161

             1          (No response.)

             2          MR. KAVALER:  Sir, you're a banker.

             3          PROSPECTIVE JUROR GALVAN:  It's not a bank.

             4          MR. KAVALER:  It's not a bank.  There you go.

02:25:53     5          A finance company does not take deposits.  Did you

             6   realize will that?  A finance company is a company that

             7   borrows money in the market wholesale, if you will, and rents

             8   it out to customers retail.  And it makes its money on the

             9   differential between the rate at which it borrows the money

02:26:14    10   and it sells the money -- rents it to the customers.

            11          Is that clear to everybody?

            12          (Prospective jurors nodding.)

            13          MR. KAVALER:  Okay.

            14          Household was never a bank.  Household International,

02:26:24    15   the big parent company, owned a couple of banks -- a small

            16   portion of the business.  Basically, the business Mr. Gilmer

            17   ran was a finance company -- a consumer loan business.

            18          Is everybody comfortable with that?  Do you

            19   understand the difference?

02:26:37    20          (Prospective jurors nodding.)

            21          MR. KAVALER:  So, when you think of bank as this case

            22   unfolds, I want to you remember it's all fine and good to

            23   think of banks, but you're not thinking of Household.

            24          Household is a different kind of company governed by

02:26:54    25   different rules.

TAB 8

253

```
 1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3    LAWRENCE E. JAFFE PENSION PLAN, )
      on behalf of itself and all     )
 4    others similarly situated,      )
                                      )
 5                Plaintiff,          )
                                      )
 6      vs.                           )   No. 02 C 5893
                                      )
 7    HOUSEHOLD INTERNATIONAL, INC.,  )
      et al.,                         )   Chicago, Illinois
 8                                    )   March 31, 2009
                  Defendants.         )   9:00 a.m.
 9
                            VOLUME 2
10              TRANSCRIPT OF PROCEEDINGS - TRIAL
         BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12    APPEARANCES:

13    For the Plaintiff:          COUGHLIN STOIA GELLER RUDMAN &
                                  ROBBINS LLP
14                                BY:  MR. SPENCER A. BURKHOLZ
                                       MR. MICHAEL J. DOWD
15                                     MR. DANIEL S. DROSMAN
                                       MS. MAUREEN E. MUELLER
16                                655 West Broadway
                                  Suite 1900
17                                San Diego, California  92101
                                  (619) 231-1058
18
                                  COUGHLIN STOIA GELLER RUDMAN &
19                                ROBBINS LLP
                                  BY:  MR. DAVID CAMERON BAKER
20                                     MR. LUKE O. BROOKS
                                       MS. AZRA Z. MEHDI
21                                100 Pine Street
                                  Suite 2600
22                                San Francisco, California  94111
                                  (415) 288-4545
23

24

25
```

Ghiglieri - direct

378

1    Q.  Did you also graduate from Georgia State University Law

2    School?

3    A.  I did.

4    Q.  And that was in June of 1991?

02:08:08  5    A.  Yes.

6    Q.  When did you attend the University of -- or the Georgia

7    State University Law School?

8    A.  I attended it in Atlanta for four years at night.

9    Q.  And why did you attend at night?

02:08:20 10    A.  Because I was working full-time.  I had a senior position

11    at the Comptroller of the Currency, which is the OCC.

12    Q.  Are you also licensed to practice law in Georgia?

13    A.  I am.

14    Q.  And you're licensed to practice law in Washington, D.C.,

02:08:35 15    as well?

16    A.  Yes.

17    Q.  And both those licenses are inactive currently; is that

18    right?

19    A.  That's correct.

02:08:39 20    Q.  Now, let's talk a little bit about your experience.

21         You've spent -- you spent -- 25 years as a state and

22    federal regulator in the banking industry; is that correct?

23    A.  That's correct.

24    Q.  And you began your tenure as a Regulator at the OCC; is

02:08:57 25    that right?

Ghiglieri - direct

379

1    A.   Yes.

2    Q.   What does the "OCC" stand for?

3    A.   It's the "Comptroller of the Currency," which is the

4    regulator of national banks in the country.

02:09:03   5    Q.   And you worked for the OCC from 1974 to 1992; is that

6    right?

7    A.   Yes.

8    Q.   From 1974 to 1982, you worked as a National Bank Examiner

9    in Chicago, Illinois; is that right?

02:09:17  10    A.   That's right.

11    Q.   And tell me what you were responsible for doing while you

12    were the National Bank Examiner in it Chicago?

13    A.   Well, actually, I was based in Joliet, Illinois; and, as a

14    field examiner, I would go from bank to bank and examine their

02:09:32  15    books and records, making sure they were complying with the

16    law and checking on the quality of their assets, to make sure

17    they were solvent.

18         And I did that for approximately seven years.

19    Q.   Okay.

02:09:45  20         And what was your jurisdiction during that time?

21    What states were you responsible for?

22    A.   I was based in Joliet and I examined banks in the

23    Chicagoland area and, also, the upper peninsula of Michigan;

24    and, then, they would call us in to do the big banks in

02:10:00  25    Detroit and Kalamazoo.

Ghiglieri - direct

380

1    Q.   Okay.

2         Were you responsible for a team of examiners at that

3    point?

4    A.   After I got commissioned as a National Bank Examiner, I

02:10:08  5    was.

6    Q.   Now, did you determine compliance with national banking

7    laws in that position?

8    A.   Yes.

9    Q.   And did you also teach courses at the OCC schools in the

02:10:19 10    areas in investment securities during that time?

11    A.   Yes.  And, also, white collar crime.

12    Q.   Now, let's fast forward to 1982.

13         You mentioned that your position changed at that

14    time; is that right?

02:10:29 15    A.   Yes.

16    Q.   You were still with the OCC in 1982?

17    A.   Yes.

18         And I went to Washington.

19    Q.   And, at that point, you became a Special Projects Examiner

02:10:37 20    in Washington, D.C., with the OCC?

21    A.   Yes.

22    Q.   And you worked in that position from 1982 to 1985; is that

23    correct?

24    A.   Yes.

02:10:45 25    Q.   What did you do as a Special Projects Examiner in

Ghiglieri - direct

381

```
           1   Washington?

           2   A.  And, actually, it was 1982 to 1984.

           3        As a Special Projects Examiner, I was responsible for

           4   a certain area of the country and I supervised the failing

02:10:59   5   banks.

           6        And, so, I would monitor them; and, when it was time

           7   to close them, I would actually go out and close it on behalf

           8   of the Comptroller of the Currency.

           9   Q.  Did you also formulate a book called the "Administrative

02:11:12  10   Action Book" during that time?

          11   A.  Yes.

          12        During that time, we started to see a rise in the

          13   number of problem banks.  And the person that was in charge of

          14   our division said, "We have to have consistency in the

02:11:24  15   enforcement actions that we're taking against banks."

          16        And, so, he gave me the responsibility of pulling

          17   together a sample enforcement articles, so that everyone in

          18   the United States would have some consistency when they were

          19   formulating enforcement actions.

02:11:37  20   Q.  And was that administrative action book, was it actually

          21   published and distributed to people in the field?

          22   A.  Not in the field, but in the offices.  And the legal staff

          23   would actually use this to draft up the enforcement actions.

          24        And it's still being used in an updated version, of

02:11:55  25   course, today.
```

Ghiglieri - direct

382

1    Q.  Now, you mentioned that you left your position as Special

2    Projects Examiner in 1984; is that right?

3    A.  Yes.

4    Q.  And, at that point, you stayed with the OCC; is that

02:12:06  5    correct?

6    A.  Yes.

7        I was promoted to be the Executive Assistant to the

8    top policy maker, the Senior Deputy Controller For Bank

9    Supervision.

02:12:15  10    Q.  And where was that position?

11    A.  In Washington, D.C., also.

12    Q.  Okay.

13        And did you act as the Senior Policy Adviser to the

14    Senior Deputy Comptroller at that time?

02:12:24  15    A.  Yes.

16    Q.  What did that involve?

17    A.  I advised him on all policymaking issues regarding bank

18    supervision policy; and, I also coordinated all of the senior

19    level policy issues with the FDIC and the Federal Reserve and

02:12:40  20    the Conference of State Bank Supervisors and the foreign

21    governments, as well, through the Basel Committee.

22    Q.  Was there an emphasis on enforcement matters at that time?

23    A.  Yes.  And I would review every document that he would

24    sign, including numerous enforcement actions.

02:12:58  25    Q.  What does that mean, "an enforcement action"?

Ghiglieri - direct

383

1    A.   An enforcement action is what regulators have the

2    authority to take when they find practices that they want to

3    change in the banks; and, the state regulators and the federal

4    regulators have the same sort of enforcement authority.

02:13:14  5          They can take a cease-and-desist action and say, "You

6    have to stop doing what you're doing," or they can take a

7    lesser action.

8          It's always in writing, so that's why we wanted the

9    Administrative Action Book, so they could pull sample articles

02:13:29  10   from that for those enforcement actions.

11   Q.   Now, you left your Executive Assistant to the Senior

12   Deputy Comptroller in 1986; is that right?

13   A.   Yes.

14   Q.   And you remained with the OCC still; is that correct?

02:13:39  15   A.   I did.

16   Q.   What was your next position?

17   A.   I was promoted to the Director For Bank Supervision and we

18   had six districts at the OCC at the time, and there were six

19   Directors For Bank Supervision and I was the Director For Bank

02:13:52  20   Supervision in the Southeastern District in Atlanta.

21   Q.   And what jurisdiction did that cover?

22   A.   We had nine states in our district and my responsibilities

23   were over all the large banks -- the ones that were over a

24   billion dollars -- and, then, another portfolio was all the

02:14:08  25   problem banks.

Ghiglieri - direct

384

1  Q.  And, then, in 1988, you left that position and you

2  remained with the OCC still; is that correct?

3  A.  Yes.

4  Q.  And you moved on to act as the Atlanta Field Office

02:14:19  5  Director; is that right?

6  A.  That's right.

7      My boss came to me and said, "Would you mind taking a

8  lateral and be the Atlanta Field Office Director because we're

9  going to shut down our Richmond office and we're going to

02:14:30  10  consolidate them, and this is going to be the largest one that

11  we have in the country?"

12      And since I already started law school, this was a

13  perfect opportunity for me to finish law school and do

14  something different.

02:14:41  15  Q.  What were your responsibilities when you acted as the

16  Atlanta Field Officer?

17  A.  The Atlanta Field Office Director was responsible for all

18  the community banks in a five-state area and all the

19  examiners.  So, I would hire the examiners.  I would train

02:14:59  20  them.  I would supervise them, along with this portfolio of

21  banks.

22  Q.  Now, in 1992, you left the office of the Comptroller of

23  the Currency; is that correct?

24  A.  That's correct.

02:15:09  25  Q.  And you took a position as the Texas State Banking

Ghiglieri - direct

385

1    Commissioner; is that right?

2    A.  Yes.

3    Q.  And, in that position, did you supervise over 56 billion

4    dollars in banking assets?

02:15:20  5    A.  Yes.

6    Q.  And is the Texas state banking -- is that the third

7    largest state banking system in the country?

8    A.  At the time, it was the third largest behind New York and

9    California, in terms of assets -- in terms of size of banks,

02:15:35  10   dollar-wise.  But it was only the second largest behind

11   Illinois, in terms of numbers of banks, because both of those

12   states came late to intrastate branching.

13   Q.  Were you appointed to that position or how did you obtain

14   that position?

02:15:49  15   A.  I was asked to apply for the position.

16        They were looking for a banking commissioner and I

17   went over and interviewed and they hired me.  And I reported

18   to an oversight board, which was gubernatorial appointee.

19        So, I was not appointed by the governor, but I worked

02:16:06  20   for an oversight board that was appointed.

21   Q.  Did you manage employees when you were the Texas State

22   Banking Commissioner?

23   A.  Yes, I did.

24   Q.  How many employees did you oversee?

02:16:16  25   A.  I had -- I think I had -- 150 employees; and, then, I also

Ghiglieri - direct

386

1    managed, from an administrative standpoint, the activities of

2    the other two sister agencies:  The Savings and Loan

3    Department and the Consumer Credit Department.

4    Q.  Did you also manage a $12 million budget as the Texas

02:16:35  5    State Banking Commissioner?

6    A.  Yes.

7    Q.  As the Texas State Banking Commissioner, were you involved

8    in the statutory modernization of certain statutes or laws

9    that existed at that time?

02:16:45 10    A.  Yes.  The Banking Code was from 1943; and, when I got

11    there, I thought, "You know, the first thing I need to do is

12    see if we can't update these laws -- these banking laws -- to

13    bring them into the modern era."

14        And, so, I formed a committee and we worked for two

02:17:02 15    years and we were able to get our banking laws updated.

16    Q.  Did you also coordinate supervisory efforts for problem

17    institutions?

18    A.  Yes.

19    Q.  Tell me about that.

02:17:12 20    A.  Well, all of the banks in the state of Texas -- in the

21    United States, we have a dual banking system.  And, so, if you

22    want a bank, you can either go to the federal government,

23    which is the Comptroller of the Currency, or you can go to

24    your State Banking Commissioner, which there's one in every

02:17:28 25    state.

Ghiglieri - direct

387

```
          1         And, so, anybody that had a state bank, I was
          2    responsible for overseeing.  And, of course, if they got into
          3    trouble, then I was responsible for trying to rehabilitate
          4    them or taking an enforcement action or whatever needed to be
02:17:44  5    done.
          6    Q.  Did you serve at the same time as Executive Director of
          7    the Texas Finance Commission?
          8    A.  Yes.
          9    Q.  What did that involve?
02:17:51 10    A.  It, basically, what it involved -- for the Finance
         11    Commission, which was the oversight board, there was the
         12    Banking Department, and I was the Commissioner of the Banking
         13    Department; there was a Savings and Loan Department; and, the
         14    Consumer Credit Department.
02:18:04 15         And just from an administrative standpoint, I would
         16    sort of manage the meetings.
         17         They had public meetings and various studies that
         18    they had to do.  So, I would do the -- manage that work on an
         19    administrative basis.
02:18:19 20    Q.  During all this time, were you also the Secretary and
         21    Treasurer of the Conference of State Bank Supervisors?
         22    A.  Yes.
         23    Q.  And what did that -- what did the Conference of State Bank
         24    Supervisors consist of?
02:18:31 25    A.  I was the Secretary/Treasurer during one of the years I
```

Ghiglieri - direct

388

1   was Banking Commissioner for seven-plus years.  And the

2   Conference of State Bank Supervisors is the national

3   organization of all the banking commissioners.  And some of

4   the Commissioners have different titles, like "Director" or

02:18:48  5   whatever.

6          But, basically, there's one from every state in the

7   four territories and we had an organization that would monitor

8   laws across the country.  We would go and testify before

9   Congress on various issues that affected the state banking

02:19:07  10   systems.

11   Q.  Now, in 1999, you left your position as the Texas State

12   Banking Commissioner; is that right?

13   A.  That's right.

14   Q.  And you founded your own company; is that correct?

02:19:18  15   A.  Yes, I did.

16   Q.  What's the name of your company?

17   A.  It's Ghiglieri & Company.

18   Q.  Tell us what Ghiglieri & Company does?

19   A.  Well, I do basically three things.  I do a lot of bank

02:19:29  20   consulting.  And I do, for example, if they run afoul of the

21   regulators, and the regulators are asking them to do certain

22   things, I will go in and do a management study or a strategic

23   planning session or something for them.

24          I also do expert witness work, such as I'm doing here

02:19:45  25   today.

Ghiglieri - direct

393

1    portfolio, since that's the largest asset.

2         And the past due percentages are very important, to

3    see what the quality of the loan portfolio is.

4         So, the regulators don't want the lenders to be

02:24:51  5    masking that number to them.  And, so, that's one of the

6    things that I would look at when I was a field examiner.

7    Q.  Let's now turn to the opinions you actually reached in

8    this case.

9         Did you reach any conclusion about whether Household

02:25:05  10   engaged in predatory lending practices during the 1999 to 2002

11   time frame?

12   A.  I did reach an opinion.

13   Q.  And tell us what that is.

14   A.  My opinion is, after looking at everything, that Household

02:25:18  15   engaged in company-wide systemic predatory lending.

16   Q.  Now, did you also reach any opinion or conclusion as to

17   whether Household hid the quality of its loans during the 1999

18   to 2002 time frame?

19   A.  I did reach an opinion.

02:25:35  20   Q.  And please tell the jury what that opinion is.

21   A.  My opinion, after looking at everything that I looked at,

22   is that Household utilized re-aging practices to mask their

23   delinquencies.

24   Q.  Let's -- before we talk in more detail about how you

02:25:51  25   arrived at those opinions and what you found that supported

Ghiglieri - direct

403

<pre>
            1        And, then, I would formulate how many loans I wanted

            2   to look at and whatever else I wanted to look at on their

            3   balance sheet.  So, I would look at the books, the records,

            4   internal memos, board minutes, things like that.

02:37:33    5   Q.  What procedure did you use to arrive at your conclusions

            6   in this case?

            7   A.  I used a similar procedure.  Some of the documents were

            8   different, but I looked at the loan-type documents that were

            9   available.  I looked at complaints.  I looked at the

02:37:52   10   Household's responses to the complaints.  I looked at

           11   examination reports -- the ones that were available.  I looked

           12   at the company's responses to those examinations.

           13        And, then, I also was able to have access to the

           14   deposition testimony, which is where the employees of

02:38:10   15   Household were questioned.  And I had the ability to read

           16   their -- the answers that they had.

           17   Q.  Did you prepare a demonstrative exhibit to assist you in

           18   explaining the procedure or process that you used in this case

           19   to develop your opinions?

02:38:27   20   A.  I did.

           21   Q.  I'll show you what has been marked as plaintiffs'

           22   demonstrative Exhibit 34 for identification.

           23        What does this exhibit show?

           24   A.  This exhibit shows the different materials that I looked

02:38:56   25   at:  Loan documents, internal e-mails and memos and reports.
</pre>

Ghiglieri - direct

1    tell the jury what that term means?

2    A.  Well, "predatory lending" is sort of an umbrella term

3    that's come into vogue in the last ten years or so, to

4    encompass a variety of practices that are either deceptive to

02:43:19   5    the customer or unfair -- contain unfair terms.

6              In the olden days, we used to call it mortgage fraud;

7    but, these days they call it predatory lending.  And a lot of

8    the practices that we looked at in the '70s -- for example,

9    insurance packing, compliance with Reg Z, things like that --

02:43:39  10    a lot of these practices are brought under this umbrella of

11    predatory lending.

12    Q.  Now, when you performed your analysis in this case, did

13    you review any documents to sort of survey the definition of

14    "predatory lending" that existed in the 1999 to 2002 time

02:43:54  15    frame?

16    A.  I did.

17    Q.  What documents did you survey to sort of see what material

18    was available at that point?

19    A.  Well -- and this is something that I always do when I'm

02:44:06  20    serving as an expert -- I want to know what the regulatory

21    landscape was like at the time.

22              And, so, in this time frame, I looked at any

23    issuances from the Comptroller of the Currency.  I looked at

24    any issuances from the Office of Thrift Supervision, because

02:44:21  25    both of them regulated Household.  I looked at anything that

433

1    settlement is not admitted to show that Household was at fault

2    or that Household engaged in any wrongdoing in the matter that

3    was settled.  Again, the evidence is admitted only for the

4    limited purpose of showing whether the settlement affected the

03:42:19  5    price of Household stock and should be considered and may be

6    considered only for that purpose.

7          I guess I want to make sure that I have this correct

8    from the attorneys.  The instruction regarding the information

9    assumed by the various expert opinions, do you want that

03:43:17  10    instruction given at this point as well?

11          MR. HALL:  Yes, your Honor.

12          THE COURT:  All right.  I believe I have the language

13    that you folks agreed to.  If it is, it's acceptable to me and

14    I will deliver it to the jury.  If I misspeak, let me know and

03:43:36  15    we will make the appropriate correction.

16          During the course of testimony by expert witnesses

17    who you may hear, you may hear evidence regarding the category

18    of documents I have already told you about.  Evidence

19    regarding publicity, notice, price, and things of that nature

03:44:21  20    will be explained to you during the course of the expert's

21    testimony.

22          The underlying information that you receive in this

23    manner must not be considered by you for the purpose of

24    determining -- must not be considered by you as evidence of

03:44:42  25    the truth of the information but rather is being admitted for

Ghiglieri - direct

434

           1    the limited purpose of showing you -- or assisting you to

           2    evaluate the expert witness' opinion and how sound that

           3    opinion is.

           4         The underlying opinion must not be used by you for

03:45:03   5    any other purpose than to evaluate the opinion of the expert

           6    witness.

           7         You may proceed.

           8         MR. DROSMAN:  Thank you, your Honor.

           9    BY MR. DROSMAN:

03:45:15  10    Q.  Ms. Ghiglieri, before the break I asked you whether you

          11    prepared a demonstrative exhibit to assist you in explaining

          12    your conclusion that Household engaged in a variety of

          13    predatory practices during the 1999-to-2002 time frame.

          14         Did you prepare such an exhibit?

03:45:33  15    A.  I did.

          16    Q.  Would that assist you in explaining your testimony?

          17    A.  Yes, it would.

          18    Q.  At this time I will show you what has been marked as

          19    Plaintiffs' Demonstrative Exhibit 29 for identification.

03:45:45  20         What are the entries on Plaintiffs' Exhibit 29?

          21    A.  These are the various predatory lending practices that I

          22    found when I was reviewing all of the documents.

          23    Q.  Let's take the first predatory lending practice listed,

          24    the effective or equivalent rate.

03:46:06  25         Can you tell the jury what that is?

Ghiglieri - direct

453

1        Down one more paragraph it says, "The Penalty Trap."

2        "One of Kahr's favorite strategies was to trap

3   customers with penalty fees for late payments or going over

4   credit limits.  That had the virtue not only of providing

04:13:55  5   direct fee income but also of permitting Providian to raise

6   interest rates as high as 24 percent annually."

7        So there were similarities between what I saw at

8   Household on his suggestions and what he had suggested to

9   Providian.

04:14:16  10   Q.  I will show you what has been marked as Plaintiffs'

11   Exhibit 347 for identification.

12     (Document tendered.)

13   BY MR. DROSMAN:

14   Q.  Ms. Ghiglieri, do you recognize Plaintiffs' Exhibit 347?

04:14:47  15   A.  I do.

16   Q.  What is it?

17   A.  This is one of the documents that I used to formulate my

18   opinions that Household engaged in widespread and systemic

19   predatory lending.

04:14:58  20   Q.  What is the document?

21   A.  This is a document that Paul Creatura -- it has a little

22   note to Gary Gilmer, and this is a summary of a meeting that

23   was held with Andrew Kahr on December 18th, 1998.

24        MR. DROSMAN:  Your Honor, at this time plaintiffs

04:15:23  25   offer Exhibit 347 into evidence.  I believe there has been no

# TAB 9

```
 1                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3    LAWRENCE E. JAFFE PENSION PLAN, )
      on behalf of itself and all     )
 4    others similarly situated,      )
                                      )
 5                 Plaintiff,         )
                                      )
 6        vs.                         )  No. 02 C 5893
                                      )
 7    HOUSEHOLD INTERNATIONAL, INC.,  )
      et al.,                         )  Chicago, Illinois
 8                                    )  April 1, 2009
                   Defendants.        )  9:55 a.m.
 9
                             VOLUME 3
10                TRANSCRIPT OF PROCEEDINGS - TRIAL
            BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12    APPEARANCES:

13    For the Plaintiff:           COUGHLIN STOIA GELLER RUDMAN &
                                   ROBBINS LLP
14                                 BY:  MR. LAWRENCE A. ABEL
                                        MR. SPENCER A. BURKHOLZ
15                                      MR. MICHAEL J. DOWD
                                        MR. DANIEL S. DROSMAN
16                                      MS. MAUREEN E. MUELLER
                                   655 West Broadway
17                                 Suite 1900
                                   San Diego, California  92101
18                                 (619) 231-1058

19                                 COUGHLIN STOIA GELLER RUDMAN &
                                   ROBBINS LLP
20                                 BY:  MR. DAVID CAMERON BAKER
                                        MR. LUKE O. BROOKS
21                                      MR. JASON C. DAVIS
                                        MS. AZRA Z. MEHDI
22                                 100 Pine Street
                                   Suite 2600
23                                 San Francisco, California  94111
                                   (415) 288-4545
24

25
```

Ghiglieri - direct

493

1  A.  I reviewed a document called First Mortgage Sales.  And it

2  had a couple different iterations over the time period that I

3  looked at it.  And in there, it trained the employees how to

4  derive that effective rate that concealed the true annual

11:22:04  5  percentage rate from the customer.

6       And then I also looked at a document regarding

7  insurance sales.  And in there, it taught the employees how to

8  assume that the customer wanted the insurance, called the

9  assumptive close.  And it taught them how to just

11:22:22  10  automatically put that insurance on the loan documents.

11  Q.  Did you review any training by a man named Lew Walter?

12  A.  Yes, I did.

13  Q.  And who is Lew Walter?

14  A.  He was a training officer in the northwestern division of

11:22:39  15  Household.

16  Q.  Now, let's take a look at Exhibit 379, which I placed

17  before you and defense counsel.

18       Do you recognize that document?

19  A.  I do.

11:22:50  20  Q.  What is it?

21  A.  This is a document -- it's a multipage document.  There's

22  a fax cover on top.  And it's from Rob O'Han to Tom Detelich.

23  It's dated May 20, 2002.  And there is an e-mail attachment to

24  it on the second page, and there's some other pages here too.

11:23:14  25  Q.  Why do you recognize Plaintiffs' Exhibit 379?

Ghiglieri - direct

494

1    A.   This is one of the documents that I've looked at in

2    formulating my opinions.

3         MR. DROSMAN:   Plaintiff's offer Exhibit 379 into

4    evidence.

11:23:25  5         MR. KAVALER:   Your Honor, I believe this is a limited

6    purpose document.

7         THE COURT:   It will be admitted.   The jury has

8    already been instructed on the limited purpose evidence.

9         MR. DROSMAN:   Thank you, your Honor.

11:23:33 10   BY MR. DROSMAN:

11   Q.   Let's talk about Plaintiffs' Exhibit 379.   You mentioned

12   that this was a fax from Rob O'Han to Tom Detelich.   Who is

13   Rob O'Han?

14   A.   Rob O'Han was one of the district general managers at

11:23:51 15   Household, I believe was his title.

16   Q.   Was he a sales officer?

17   A.   Yes.   The sales staff reported up through him.

18   Q.   And what about Tom Detelich?

19   A.   Tom Detelich was a senior officer at Household.   I can't

11:24:05 20   remember his exact title.

21   Q.   And he was an officer in the consumer lending business

22   unit; is that right?

23   A.   I believe so.

24   Q.   A managing director in that unit?

11:24:14 25   A.   Yes.

Ghiglieri - direct

495

1    Q.   Could you take a look at the second page of the document,

2    page ending 075.

3           Is there anything on that page that appears to be an

4    e-mail that supports your opinions in this case?

11:24:28  5    A.   Yes.

6    Q.   And can you tell me what that is?

7    A.   Yes.  This is an e-mail regarding a discussion about

8    how -- what they're doing in Florida.  It says Florida review

9    is the subject.  And it was written from someone in human

11:24:44 10    resources to Scott Schneider, and it was forwarded to Rob

11    O'Han.

12           And if you look at the -- it says, Here is the

13    summary of the timeline of the issues, July 1999.  And that's

14    hard to read, but I'll see if I can read it for you.

11:25:02 15           It says, Lew Walter rolled out the First Mortgage

16    Sales workshop to all HFC sales divisions, with the exception

17    of southwest, July 1999 to August 1999.  The southeast

18    division was rolled out approximately July 1999.  The workshop

19    workbook or -- I think there's a word missing there.  I think

11:25:27 20    it should say contained -- a worksheet on the biweekly plan

21    versus the 30-year program, equivalent rate.  The equivalent

22    rate would be described as the rate that would be needed if

23    they were to pay the same amount of interest over a 30-year

24    term at a bank compared to our proposed loan.  The form was

11:25:44 25    designed as a tool for the AEs -- and that's account

Ghiglieri - direct

496

1    executives -- to work up the numbers so that they could do

2    comparisons.  The worksheet was not to be distributed to the

3    customers.

4    Q.  So this shows that the equivalent rate training was rolled

11:26:02  5    out in July of 1999; is that right?

6    A.  Yes.  It was part of that First Mortgage Sales document

7    that I looked at.

8    Q.  And why is that significant to your opinions in this case?

9    A.  Well, because Household always said in its responses to

11:26:15  10   the regulators and its public discussions in the press that

11   this particular practice among others were the result of a

12   rogue employee or a rogue branch.  And that wasn't true.  This

13   was what the employees were trained to do nationwide.  And I

14   saw evidence of it all over the country in many locations.

11:26:40  15   And, here, they're talking about it in Florida.

16   Q.  Now, when you say rogue employee, you're talking about

17   some bad apple at Household; is that what you mean?

18   A.  Well, that's what I assume Household meant by saying rogue

19   employee or rogue branch.  It only happened over there.

11:26:56  20   Q.  And if you turn to page ending 077, there appears to be

21   another e-mail with a catalog of some customer complaints.

22            Can you tell me whether that's significant to your

23   opinion?

24   A.  Yes, it is.

11:27:19  25   Q.  And what's significant about page ending 077 to your

Ghiglieri - direct

497

1    opinion?

2    A.   Well, this is a -- let's see if we can --

3    Q.   You can just testify to it.

4    A.   Okay.   This is an articulation of several complaints.

11:27:36  5    On -- the customer was complaining that -- one, for example,

6    was a customer named Edwards.   And it says, Customer claims

7    HFC promised a fix rate of 7.38 for an 18-year mortgage.   The

8    contract states 30 years for 13.7 APR.

9         And several more like that.

11:27:59  10        A customer named Osmel, customer says -- said sales

11    office told him the rate would be 6.4 for 16 years, but

12    instead the contract shows a rate of 10.554 for 30 years.

13        So this is just an example of how -- and it's up

14    there now -- the effective rate was being given to the

11:28:19  15    customer instead of the annual percentage rate, which is the

16    APR, which is the only rate that's supposed to be given to the

17    customer.

18    Q.   And why is that significant to your opinion?

19    A.   Well, especially in the location, this was in the

11:28:32  20    southeast, in Florida and South Carolina -- and, again,

21    Household would say, well, it's only one branch or it's only

22    one employee.   But what I saw from the complaints, this was

23    taking place in a lot of places.   And it was the same -- the

24    same scheme.   They would say they told me this for a shorter

11:28:54  25    period of years when, in fact, the contract rate was higher

Ghiglieri - direct

498

1    for 30 years.  So it was the effective rate training that the

2    employees received in the Lew Walter training First Mortgage

3    Sales.

4    Q.  If you turn to page ending 080.

11:29:13  5        Can you tell us what this is?

6    A.  This is actually -- this is actually a document that

7    some -- even though it says that they weren't supposed to get

8    it, that some customers did receive the effective rate in

9    writing.  And that's pretty hard to read, but it says, The

11:29:38 10   above-referenced account 15-year contractual agreement is

11   17.99 percent.  Upon entering the EZ Pay Plus Program -- and

12   that's where you paid twice -- half of your mortgage payment

13   every other week; that's what Household called it, the EZ Pay

14   Plus Program -- the account will only incur a 10.15 percent

11:30:01 15   effective rate for the duration of the payment period, which

16   will be 11.2 years.

17        So here they're giving the effective rate actually in

18   writing, and this -- there are several of these that I've

19   seen.

11:30:14 20   Q.  So what is the contract -- can you determine what the

21   contract rate is from this document?

22   A.  It says that the contract rate was 17.99 percent.  This is

23   on a 15-year amortization.

24   Q.  And what did Household list the effective rate at?

11:30:30 25   A.  10.15 for 11.2 years.

Ghiglieri - direct

499

1   Q.  Now, if, in fact, this customer -- I believe it's

2   Mr. Ortega -- paid his loan off over a shorter period of year

3   than 15 years, would his rate actually decline?

4   A.  No.  Your rate never goes down.  Paying more quickly than

11:30:50  5   the amortization schedule does not affect your interest rate.

6   Your interest rate is your interest rate.  If I take a loan

7   out and two months later I pay it off, I still have the same

8   APR; but I didn't pay as much interest as I would have if I

9   had it over 30 years.

11:31:06 10      So this is just a way of deceiving the customer into

11  thinking that Household had more competitive rates because

12  their rates were higher than their competitors.

13  Q.  If you could turn to page ending 085.

14      And can you tell me what this document is?

11:31:26 15  A.  This is a letter sent by an account executive to this

16  borrower who was questioning why the loan balance hasn't gone

17  down.  And what he's saying to her is what the effective rate

18  training was.  If you pay half of your $945 payment -- so that

19  is the second to the last sentence there.  If you could

11:32:06 20  highlight that and then the last sentence.  See if you can

21  read that a little better.

22      By simply sending half of your $945 payment every two

23  weeks, your mortgage will be paid off in 18 years; and you

24  will be paying a comparable 6.5 APR.

11:32:27 25      Sometimes they use effective rate.  Sometimes they

Ghiglieri - direct

500

1    use comparable rate.  It's the same thing.

2        You will actually save 99,965 throughout the loan by

3    simply paying 472.50 every two weeks.

4    Q.  So you mentioned that sometimes they call the equivalent

11:32:43  5    rate a comparable rate?

6    A.  Yes, equivalent, comparable, effective.  Those were

7    different terms that I saw for this same program, to deceive

8    the customers into thinking they were getting a lower rate

9    when, in fact, they were being charged a higher rate.

11:32:59 10    Q.  And how is this text that you've just read significant to

11    your opinion in this case?

12    A.  Well, here you have someone actually putting it in

13    writing.  And at one point, Household went through and took

14    everything out of the files that had to do with effective

11:33:15 15    rate.  So it's hard to find a document like this because of

16    the document destruction that they did.  But this is where a

17    customer actually got in writing what the effective rate was.

18    Q.  Could you turn to page ending 090.

19        This appears to be an e-mail from a person named

11:33:39 20    Ronald Davis at Household; is that right?

21    A.  Yes.

22    Q.  And the subject is Ortega; is that correct?

23    A.  Yes.

24    Q.  Does the first paragraph there have any significance to

11:33:48 25    your opinion?

Ghiglieri - direct

501

1     A.  Let's see.  Yes.  Highlight the first -- okay.

2          It says, We gave this customer a written statement,

3     which I will fax to you, that clearly stated that their

4     effective interest rate would be 10.15 if they paid the EZ

11:34:08  5     way -- and that's the EZ Pay Plus.  This letter was sent prior

6     to us destroying all sales material other than HFC-approved

7     material.  Our branches had previously approved tax charts as

8     well as real estate master booklets that encouraged them to

9     use effective rates, which is where this letter derived from.

11:34:29  10     Q.  Now, if you take a look at the second to last sentence on

11     this page.

12          Does that have any significance to your opinion?

13     A.  Yes.  This says, No corrective action was given, as this

14     was enforced from HFC training materials that existed at the

11:34:45  15     time.

16     Q.  Why is that significant?

17     A.  Well, it's significant because the training was authorized

18     by the headquarters.  And the -- Lew Walter went to all the

19     districts except the southwest, which had some separate

11:35:02  20     training.  But all of the ideas were the same; and, that is,

21     come up with this effective rate to show that the Household

22     rates were competitive, when they were not.

23     Q.  And then the indication that no corrective action was

24     given, what do you understand that to mean?

11:35:16  25     A.  That the employee was not disciplined is how I interpret

Ghiglieri - direct

502

1    this because it was an authorized activity or it was something

2    that was condoned by Household.

3    Q.  And go ahead and turn if you would to page ending 092.

4         This appears to be a letter regarding Antonio Ortega

11:35:40 5    or to -- from Antonio Ortega.  I'm sorry.  Do you recognize

6    this letter?

7    A.  I do.

8    Q.  And is this significant to your opinion?

9    A.  Yes.  This is -- again, this is a complaint.  This is a

11:35:53 10   good example of a complaint where Mr. Ortega from Florida

11   filed a complaint with the state comptroller's office.  And

12   that's where the banking commissioner resides.  The state

13   comptroller actually has the title instead of banking

14   commissioner.

11:36:11 15        So he complained to the Florida, basically,

16   Department of Financial Institutions, that -- and I think --

17   my copy is very hard to read, but I think if you look at the

18   second or third -- yes.  I'm sorry.  It says, if you can read

19   that, She went back and -- first, he went in for a debt

11:36:38 20   consolidation loan and was told he could get one for 18

21   percent.  But the account executive, it says here, She went

22   back and checked and came back and told me if you can make

23   payments every two weeks, we can get you a loan for 10.15

24   percent, but remember you must pay every two weeks or it will

11:36:57 25   revert back to 18 percent.

Ghiglieri - direct

503

1    Q.   Why is that significant to your opinion?

2    A.   Because, once again, the annual percentage rate must have

3    been 18 percent.  And what they were trying to do was deceive

4    the customer into thinking if you make your payment every

11:37:15  5    other week -- half of your payment every other week, your

6    effective rate will be 10.15 percent, when that's not true.

7    It was never going to be anything other than 18 percent.

8    Q.   Now, we've talked about some training that Lew Walter

9    provided in this case.  Why don't I show you Plaintiffs'

11:37:43 10    Exhibit 899 for identification.

11       (Tendered.)

12              THE COURT:  I'm sorry.  What number was that?

13              MR. DROSMAN:  899, your Honor.

14              THE COURT:  Thank you.

11:38:08 15    BY MR. DROSMAN:

16    Q.   Ms. Ghiglieri, do you recognize Plaintiffs' Exhibit 899?

17    A.   I do.

18    Q.   What is it?

19    A.   This is a training material called First Mortgage Sales.

11:38:16 20    And this one says HFC northeastern division.  They had

21    different ones, and it would have a different division; but

22    this one says northeastern division.

23    Q.   And why do you recognize this?

24    A.   I reviewed these training manuals in formulating my

11:38:32 25    opinions.

Ghiglieri - direct

508

1    been an increasing number of complaints in this area, and all

2    the customer remembers is that they thought they were getting

3    a lower rate.  This is one of the many issues he is addressing

4    in Washington.

11:44:20  5        So I found it unbelievable that -- and Mr. Schneider

6    was in charge of policy and compliance, I think was his

7    title -- unbelievable that he would say, well, you can tell

8    them that you're going to get this effective rate, but you

9    just can't give it to them in writing.  I mean, that's still

11:44:37 10   deceiving the customer.

11   Q.  And this e-mail is dated May 25, 2001; is that correct?

12   A.  Yes.

13   Q.  And the training that we saw earlier from Lew Walter on

14   the effective rate, what was the date of that training?

11:44:53 15   A.  That was in mid 1999.  So two years later, they're still

16   having this issue of the effective rate, equivalent rate,

17   comparable rate.

18   Q.  Was there any other -- we talked about the Lew Walter

19   training and so forth.  Was there any other training materials

11:45:11 20   that you considered in reaching your conclusions in this case?

21   A.  Well, I looked at the other documents like this that were

22   from around the country or that's what they were entitled.

23   And I also looked at insurance training that they received.

24   Q.  Did you look at any training videos in reaching your

11:45:26 25   conclusions in this case?

Ghiglieri - direct

509

1  A.  Yes.  And I also looked -- I viewed a training video that

2  was prepared by the manager of the southwestern division.  His

3  name was Dennis Hueman.  And he prepared a video that

4  contained many of the same elements as this selling first

11:45:45  5  mortgages document -- training document that I looked at that

6  was developed by Lew Walter.

7      MR. DROSMAN:  I'm showing the witness a DVD that has

8  been marked as Plaintiffs' Exhibit 1383 for identification.

9    (Tendered.)

11:46:11  10  BY MR. DROSMAN:

11  Q.  Now, have you had an opportunity to review the contents of

12  Plaintiffs' Exhibit 1383, this DVD?

13  A.  Yes, I watched this DVD.

14  Q.  And after you watched the DVD, were you able to determine

11:46:31  15  who created it?

16  A.  Yes, Dennis -- well, and also I read his deposition and he

17  has stated -- he testified that he created this as a sales

18  tool for his staff.

19  Q.  And so what is Plaintiffs' Exhibit 1383?

11:46:45  20  A.  This is a video training on various ways of selling

21  Household's mortgages.  And it was developed in 2001, which is

22  almost two years after the training that Lew Walter developed

23  here on First Mortgage Sales.

24  Q.  And did you consider this DVD in reaching the conclusions

11:47:13  25  in your case -- in this case?

Ghiglieri - direct

510

1    A.  I did.

2          MR. DROSMAN:  At this time, plaintiffs offer 1383

3    into evidence.

4          THE COURT:  It will be admitted.

11:47:22  5          MR. KAVALER:  May I have voir dire?

6          THE COURT:  Sure.

7          MR. DROSMAN:  There's no objection to this, your

8    Honor.

9          THE COURT:  Was there an objection?

11:47:31  10          MR. KAVALER:  I just wanted to know if she viewed the

11    entire DVD.

12          THE COURT:  Was that objection stated in the pretrial

13    order?

14          MR. KAVALER:  No, your Honor.

11:47:39  15          THE COURT:  Okay.  Objection is overruled.

16          MR. KAVALER:  Thank you, your Honor.

17    BY MR. DROSMAN:

18    Q.  Approximately how long is this training video?

19    A.  I think it's about an hour.  It's been a while since I

11:47:49  20    looked at it.

21    Q.  And do you know to whom this video was distributed, 1383?

22    A.  It was distributed to the branch -- I believe it was

23    distributed to the branch -- branches in the southwest.

24    Q.  Are there parts of the video that you'd like to show the

11:48:08  25    jury to assist you in explaining your conclusions in this

Ghiglieri - direct

513

```
          1    it is.  And, you know, they had to do something in order to
          2    make their rates more competitive.  As Mr. Hueman said, we
          3    charge 8 -- 11 percent; our competitors charge 8 percent.
          4    They're never going to be able to book a loan with that unless
12:04:17  5    they do something to deceive the customer into thinking that
          6    they could get a lower rate.
          7    Q.  Have you prepared one last short clip you'd like to show
          8    the jury?
          9    A.  Yes.  This is only a three-minute clip.  And it's where
12:04:29 10    Mr. Hueman compares the customers to a fish and reeling them
         11    in.
         12    Q.  Why don't we take a look at that.
         13      (Whereupon said tape was played in open court.)
         14    BY MR. DROSMAN:
12:08:13 15    Q.  So this guy, Dennis Hueman, he was in charge of the entire
         16    southwest division of Household?
         17    A.  Yes.
         18    Q.  Training all the people who worked in the various branches
         19    in the entire southwest; is that right?
12:08:24 20    A.  Yes.
         21    Q.  And why is this significant, what we just watched, to your
         22    opinion?
         23    A.  Well, I think it's significant for a couple of reasons.
         24    One is, it had the same sort of effective rate training -- and
12:08:35 25    he was doing it verbally -- that was developed two years
```

Ghiglieri - direct

514

```
         1    prior.  So for those two years, this is what was being done in

         2    Household.  And he decided that he needed to have some sort of

         3    a training mechanism to train his staff in to better deceiving

         4    the customers into thinking that they were going to have a

12:08:54 5    better rate, so he developed this video.  So it -- it just

         6    showed me that the training was pervasive in Household and

         7    wasn't just the work of a rogue employee or a rogue branch.

         8    Q.  Did you prepare a demonstrative to assist you in

         9    explaining the geographic breadth of this effective rate

12:09:16 10   training?

        11    A.  Yes.

        12    Q.  Why don't I show you what we'll mark as Plaintiffs'

        13    Demonstrative Exhibit 28.

        14         Can you tell us what this exhibit shows?

12:09:23 15   A.  Yes.  That's Mr. Walter there.  He rolled out his

        16    training -- and that's what's highlighted there.  Lew Walter

        17    rolled out the First Mortgage Sales workshop to all HFC sales

        18    divisions, with the exception of the southwest, in July and

        19    August of 1999.  And then the video we just saw was

12:09:39 20   Mr. Hueman, who is in the southwest -- the left-lower corner

        21    of the United States there that we just saw on the tape --

        22    speaking to his employees about how to put this in place in

        23    the branches.

        24    Q.  So there were six sales divisions at Household; is that

12:09:58 25   right?
```

Ghiglieri - direct

515

1    A.   Yes.

2    Q.   And does this demonstrative show that Mr. Walter rolled

3    out his effective rate training to five of the six?

4    A.   Yes.

12:10:06  5    Q.   And then the sixth, was that covered by Mr. Hueman's

6    training?

7    A.   Yes.  But the training had to already be there somehow

8    because the concepts were the same as what Mr. Walter rolled

9    out.

12:10:20 10         MR. DROSMAN:  Your Honor, is this a good time for a

11   lunch break or would you like to go later?

12         THE COURT:  How much longer do you have to go?

13         MR. DROSMAN:  I can start on a new topic.

14         THE COURT:  And the new topic will take how long?

12:10:34 15         MR. DROSMAN:  As long as you like.  I can stop at any

16   point.

17         THE COURT:  If you continue through, how much longer

18   do you have with this witness?  That's all I'm asking.

19         MR. DROSMAN:  Oh, she'll be on after lunch as well,

12:10:44 20   for probably the remainder of the day.

21         THE COURT:  Okay.  Then we'll break for lunch at this

22   point.  No use waiting.

23         We'll break for lunch, ladies and gentlemen.  We'll

24   resume the testimony at 1:15.  Have a good lunch.  We'll see

12:10:56 25   you then.

Ghiglieri - direct

533

1    up with?

2    A.  Yes.

3    Q.  Did the states agree with Andrew Kahr's idea to ignore

4    state law and impose these prepayment penalties?

01:39:17  5    A.  No.  Many states did not agree with that.

6              And this is a listing of some of the states that

7    either, at one time or another, this e-mail says has strongly

8    questioned our ability to do this.

9              And the e-mail above it says, "Has Virginia

01:39:35 10    complained, also?"

11             So, there were a number of states that said, "We do

12    not agree with that."

13    Q.  I'll show you -- before I show you the next document, I'd

14    like to sort of change gears and talk about the predatory

01:39:52 15    lending practice that you talked about earlier -- the failure

16    to properly disclose.

17             Did you review additional documents relating to

18    "failure to properly disclose"?

19    A.  Yes.

01:40:02 20    Q.  Let me show you what's been marked as Plaintiffs' Exhibit

21    964 for identification.

22        (Document tendered.)

23    BY MR. DROSMAN:

24    Q.  Do you recognize Plaintiffs' Exhibit 964?

01:40:29 25    A.  I do.

Ghiglieri - direct

534

1    Q.   What is it?

2    A.   This is an Examination Information Correspondence from the

3    state of New Jersey to Household.

4    Q.   And what's the date of it?

01:40:42  5    A.   April 23rd, 2002.

6    Q.   And to whom is it addressed?

7    A.   It's addressed to "Tom Schneider, Policy and Compliance."

8    Q.   And is that somebody who works at Household?

9    A.   Yes.

01:40:52  10           He was in charge of coordinating information with the

11   regulators, as I understand it.

12   Q.   And why do you recognize this document?

13   A.   This is one of the documents that I looked at in

14   formulating my opinions.

01:41:06  15           MR. DROSMAN:   Plaintiffs offer Exhibit 964 into

16   evidence.

17           THE COURT:   It will be admitted.

18      (Plaintiff' Exhibit 964 received in evidence.)

19   BY MR. DROSMAN:

01:41:15  20   Q.   Now, you mentioned that this is from the State of New

21   Jersey to Household's Director of Policy, Compliance and

22   Support.

23           What's significant about this document to your

24   opinions?

01:41:25  25   A.   This document talks about various concerns that the State

Ghiglieri - direct

535

          1    of New Jersey had with Household's practices.

          2    Q.  Okay.

          3          And, specifically, if I could direct your attention

          4    to the page ending "805."

01:41:47  5          Actually, "804," if you'd look at that page.

          6          If you look at that page, it appears to be another

          7    letter to Tom Schneider, the Director of Policy and Compliance

          8    of Household, mfrom the State of New Jersey; is that right?

          9    A.  Yes.

01:41:59 10          And I'd like to point out something in the first

         11    paragraph, too of that.

         12          The last sentence says, "These findings are furnished

         13    to the licensee for your confidential information and

         14    consideration and the understanding that it's not to be made

01:42:16 15    public."

         16          And I talked about that yesterday -- that these

         17    examination reports are confidential -- and that the licensees

         18    are not supposed to make them public.

         19    Q.  And this is a -- is this a -- Report of Examination?

01:42:27 20    A.  Yes.

         21          This document it says, "Official Examination."

         22    Q.  Okay.

         23          And if you turn to the next page of the report, Page

         24    805.

01:42:39 25          Is there anything of significance to your opinion on

Ghiglieri - direct

536

1   that page?

2   A.  Yes.  They're talking about the criticisms that they have

3   regarding Household.

4   Q.  And, specifically, the first criticism?

01:42:52   5   A.  Yes.  This is regarding AMTPA and the prepayment

6   penalties.  And it says, "Prepayment penalties equivalent to

7   six months interest at the contract rate on the original

8   amount of the loan are being charged on closed-end, Pay Right

9   Reward first and second mortgage loans that are paid off in

01:43:06  10   advance.

11          "This is predicated upon Household's position that

12   these loans are variable rate loans covered by the preemptive

13   authority of the Alternative Mortgage Transactions Parity

14   Act."

01:43:17  15   Q.  So, this is that same Act that would allow Household to

16   ignore state law that prohibits prepayment penalties and

17   impose them, anyway?

18   A.  Yes.

19          If they comply with the federal law, they can ignore

01:43:31  20   state law to the contrary and impose certain fees and

21   prepayment penalties.

22   Q.  What about the State of New Jersey?  Did they believe that

23   Household could ignore state law under their Andrew Kahr

24   product?

01:43:43  25   A.  No.  They were saying that they don't believe that it

Ghiglieri - direct

537

1    qualifies under AMTPA.

2    Q.  What about No. 5 -- the criticism No. 5 -- there?  Is that

3    significant to your opinion?

4    A.  Yes.

01:43:53   5        And I talked about the wide range of closing costs

6    that Household would give to the applicants on a good-faith

7    estimate that's required by RESPA.  And this says, "Points

8    charged to borrowers at closing exceeded the amount reflected

9    on the good-faith estimate in 55 percent of the cases

01:44:14   10   reviewed."

11       And, so, not only did they give them a wide range,

12   but they, in 55 percent of the cases that New Jersey

13   reviewed -- the State of New Jersey -- they exceeded it.

14   Q.  Okay.

01:44:24   15       So, they'd give them a range of zero to $8,000, for

16   example, on their good-faith estimate and, then, they would

17   impose fees or points that were higher than $8,000?

18   A.  That's right, in 55 percent of the ones that they

19   reviewed.

01:44:36   20   Q.  Why don't I show you what has been marked as Plaintiffs'

21   Exhibit 324 for identification.

22       (Document tendered.)

23   BY MR. DROSMAN:

24   Q.  Do you recognize Exhibit 324?

01:45:09   25   A.  I do.

Ghiglieri - direct

538

1    Q.  What is it?

2    A.  This is correspondence and examination information being

3    transmitted to Household from the State of Minnesota.

4    Q.  Why do you recognize this document?

01:45:21 5    A.  This is a document that I considered in formulating my

6    opinions.

7    Q.  And was this an Examination --

8    A.  Yes.

9    Q.  -- Report?

01:45:29 10         What was the date of it?

11   A.  It was actually a compliance examination.

12         And the date -- let's see.

13         The date of the cover letter -- let's see if there's

14   a date of the examination here.

01:45:41 15         The date of the cover letter was September 23rd,

16   2002; and, the examination, the close of business March 31st,

17   2002.

18   Q.  And to whom was it sent?

19   A.  To the Board of Directors of Household.

01:45:57 20   Q.  And to whose attention at Household was it sent?

21   A.  Mr. Schneider.

22   Q.  That's the Tom Schneider we spoke of before?

23   A.  Yes.

24   Q.  The Director of Policy and Compliance?

01:46:05 25   A.  Yes.

Ghiglieri - direct

539

```
          1          MR. DROSMAN:  Plaintiffs move Exhibit --

          2   BY MR. DROSMAN:

          3   Q.  Let me ask you:  Did you consider this document in

          4   formulating your opinions in this case?

01:46:14  5   A.  I did.

          6          MR. DROSMAN:  Plaintiffs move Exhibit 324 into

          7   evidence.

          8          THE COURT:  It will be admitted.

          9          (Plaintiffs' Exhibit No. 324 received in evidence.)

         10   BY MR. DROSMAN:

         11   Q.  Now, if you could turn to the page ending "007."

         12          Is there any significance of the information on Page

         13   007 to the opinions you rendered in this case?

         14   A.  Yes.

01:46:42 15          If you -- these are all violations of Minnesota

         16   statute regarding the good-faith estimate.

         17   Q.  Specifically, if you look at the heading, "Good-Faith

         18   Estimate" in the middle of the page, and there appears to be a

         19   range underneath it of zero to $7,650.

01:47:06 20          Do you see that?

         21   A.  Yes.

         22   Q.  Is that significant to your opinion?

         23   A.  Yes.  This is -- this is -- typical of what Household was

         24   doing.  They were giving a wide range of closing costs.  So,

01:47:17 25   in this case, this customer, Mr. Cain, received a range of
```

Ghiglieri - direct

540

1      from zero to 7,650.  And they were actually charged, if you

2      look at the next column over -- if you could highlight that,

3      so maybe they could see it -- it's 9,591.90.

4              And Minnesota actually calculated the percent above

01:47:41  5   the range of 25.38 percent.  So, it was about 25 percent

6      higher that they were charged than the range.

7   Q.  If you could turn to the next page, the page ending "078."

8              Is there anything significant about the information

9      on that page to your opinion?

01:48:02 10  A.  Yes.

11             I mean, these good-faith estimate ranges -- and

12     there's many pages of them, where they're showing for each

13     customer the good-faith estimate range and, then, what they

14     actually got charged -- and the first one is a high

01:48:20 15  percentage, but it's a low dollar amount.  But it's a hundred

16     dollars to three hundred dollars is the range.

17             And, then, they were actually charged $531, and it

18     was 77 percent above the range.

19             There are some other ones in here that are large

01:48:36 20  dollar amounts, that they were charged over the range.

21             If you look to the fourth one down, for example,

22     Mr. Merzwski -- or something -- the range was from zero to

23     11,250, and they were actually charged 12,945.

24             And there's just page after page of that in this

01:49:02 25  Report of Examination.

Ghiglieri - direct

541

1    Q.  What about the next page, Page 079?

2    A.  079, the same thing.

3         The first one, Mr. Gray, was charged -- the range was

4    disclosed on the good-faith estimate, of from zero to 4912;

01:49:20  5    and, he was actually charged 9,349, which is a 90 percent

6    above the range.

7         And, remember, the range of closing costs must be

8    given to the applicant three days after the completed

9    application is accepted by the lender.  They're supposed to

01:49:37 10    give this good-faith estimate, so that the borrower has three

11    days to consider whether they want to do the loan.

12    Q.  Now, this document that they're provided is called a

13    "Good-Faith Estimate," correct?

14    A.  Yes.

01:49:45 15    Q.  Sometimes it's abbreviated as "GFE"?

16    A.  "GFE."

17    Q.  Is it your opinion that when you give somebody a range of

18    zero to $11,000, that that's a good-faith estimate of their

19    closing costs?

01:49:57 20    A.  No.

21         In fact, if, on a large percentage basis, during a

22    compliance exam that I would do as a bank examiner, if I would

23    see that the good-faith estimate was always either at the very

24    top of the range or above the range, then that would tell me

01:50:12 25    that there wasn't good faith in giving this estimate.

Ghiglieri - direct

542

1    Q.   I'm going to show you what has been marked as Plaintiffs'

2    Exhibit 333 for identification.

3        (Document tendered.)

4    BY MR. DROSMAN:

01:50:44  5    Q.   Do you recognize Plaintiffs' Exhibit 333 for

6    identification?

7    A.   I do.

8    Q.   And what is this document?

9    A.   This is Examination Report issued by the Commonwealth of

01:50:55 10    Virginia.

11    Q.   What's the date on it?

12    A.   And the date is March 11th, 2002.

13    Q.   And to whom did Virginia send a Report of Examination?

14    A.   Mr. Schneider, the head of Policy and Compliance.

01:51:09 15    Q.   That's at Household -- Mr. Schneider at Household?

16    A.   Yes.

17    Q.   Why do you recognize this document?

18    A.   This is one of the documents that I reviewed in

19    formulating my opinions.

01:51:18 20        MR. DROSMAN:   Plaintiffs move 333 into evidence, your

21    Honor.

22        THE COURT:   It will be admitted.

23        (Plaintiffs' Exhibit No. 333 received in evidence.)

24    BY MR. DROSMAN:

01:51:25 25    Q.   Now, on the first page of this document, the second to the

Ghiglieri - direct

543

1  last paragraph, does that have any significance to your

2  opinion?

3  A.  The second to the last paragraph?  It talks about citing

4  previous examination violations as a previous examination.

01:51:51  5  Q.  And it indicates that the violations cited in this report

6  are similar to violations cited in previous examinations?

7  A.  That's right.

8  Q.  Okay.

9     Is that significant to your opinion?

01:52:00  10  A.  Well, repeated violations are frowned upon by the

11  regulators.

12     When the regulators identify violations of law, they

13  expect that the institution will take corrective action; and,

14  if they don't, they will consider taking enforcement

01:52:14  15  authority.  And we talked about that yesterday -- doing a

16  cease and desist order, for example; fining them; making them

17  do refunds or even changing management.

18  Q.  Why is it significant, then, that apparently this is

19  similar to other violations for which the Commonwealth of

01:52:31  20  Virginia has already told Household about?

21  A.  Because they expect compliance and they don't expect to

22  see repeat violations of law.

23  Q.  And if you turn to the page ending "741," there's a number

24  of different loan customers listed on that page.

01:52:54  25     Starting with customer Ambrister, is that significant

Ghiglieri - direct

544

1    to your opinion at all?

2    A.  Yes.

3         On this one, it says, "Licensee failed to disclose

4    points charged to borrower on the good-faith estimate

01:53:06  5    disclosure."

6         So, this is where they didn't disclose them at all.

7    And, as I said yesterday, there were many failure-to-disclose

8    issues.  I only talked about the range of good-faith estimate

9    closing costs and prepayment penalties, but there were

01:53:21 10    instances that I noted where they didn't disclose the good-

11    faith estimate at all.

12    Q.  What about the next customer, customer Ayers?

13    A.  And on this one it says, "Licensee failed to disclose a

14    reasonable estimate of the points charged."  This is the range

01:53:36 15    issue.

16         The points charged were 6,930 -- I'm sorry, 6,393;

17    and, the points disclosed, the range was -- or in this one it

18    wasn't actually a range.  They actually disclosed one dollar

19    amount and they disclosed 3,522.

01:53:52 20    Q.  So, they told this customer Ayers that they were going to

21    charge $3500 in points, and how much did they actually charge?

22    A.  6,393.

23    Q.  What about the other customers on that page, Barbour and

24    Blaney?

01:54:07 25    A.  Well, Mr. Barbour didn't receive the good-faith estimate

Ghiglieri - direct

545

1    at all; and, then, Mr. Blaney, the same thing.  He was

2    disclosed 2,380 and he was charged 4,139.

3    Q.  If you turn to the next page, the page ending "742."

4         Can you tell us the significance of the information

01:54:25  5    on that page to your opinions?

6    A.  Yes.  Two of the loan files that they looked at did not

7    have any disclosure, and that was the fourth one down and the

8    sixth one down.  And, then, the rest of them were given a

9    specific dollar amount and charged higher than that dollar

01:54:45 10    amount, with the exception of the third one.

11         And they were given a range of four to five thousand

12    and charged 10,519.

13    Q.  I'll show you what has been marked as Plaintiffs' Exhibit

14    956 for identification.

15         (Document tendered.)

16    BY MR. DROSMAN:

17    Q.  Do you recognize Plaintiffs' Exhibit 956?

18    A.  I do.

19    Q.  What is it?

01:55:32 20    A.  This is the Kansas Examination Report.

21    Q.  And is there a fax cover sheet on top of the Kansas --

22    A.  Yes.

23    Q.  And what does that show?

24         To whom was it sent?

01:55:48 25    A.  The fax cover sheet is from Carla Madura to Robin Allcock.

Ghiglieri - direct

546

1    The date, July 25th, 2002.

2    Q.  And are these both Household employees?

3    A.  Yes.

4    Q.  Why do you recognize Plaintiffs' Exhibit 956?

01:56:02  5    A.  This is one of the documents that I reviewed in

6    formulating my opinions.

7    Q.  And what is the date of this particular examination on

8    Page 184?

9    A.  Yeah.

01:56:22  10       The examination date is April 29th, 2002.

11   Q.  And, then, if you turn to the page ending "192"; and, if

12   you'd look at the last sentence of the first paragraph -- I'm

13   sorry, the second paragraph -- and tell us whether that's of

14   any significance to your opinion?

01:56:45  15       The last sentence of the --

16   A.  Yes.

17   Q.  -- second paragraph.

18   A.  It says -- excuse me -- "HUD," which is the Housing and

19   Urban Development -- "believes that a pattern or practice of

01:57:02  20   quoting GFE" -- good-faith estimate -- "amounts that are lower

21   than the corresponding amounts later shown on the settlement

22   statements, may serve as evidence that the disclosures were

23   not made in good faith."

24   Q.  So, still on the page ending "192," tell me what that

01:57:19  25   means.

Ghiglieri - direct

547

1  A.  On the sentence that I just read?

2  Q.  Yeah.  Tell me why that's significant.

3  A.  Yeah.

4         And just what I said previously.  When you see a

01:57:29  5  pattern where the lender is disclosing the closing costs in a

6  range; and, if all the -- especially when the range is from

7  zero to a high number, when the closing costs are always at

8  the top end of the range or exceeding the range, then you have

9  to conclude that it's not good faith in giving the estimate of

01:57:49  10  the closing costs.

11        And that's what HUD concluded here.  HUD believes

12  that a pattern or practice of quoting GFE amounts that are

13  lower than the corresponding amounts later shown on the

14  settlement statements may serve as evidence that the

01:58:05  15  disclosures were not made in good faith.

16  Q.  Is the next sentence of this Examination Report of any

17  significance to your opinion?

18  A.  Yes.

19        And, so, in Kansas, when they were looking at loan

01:58:17  20  files, if -- you can highlight the group of loans below it,

21  also.

22        It says, "The following loans have good-faith

23  estimates with origination fees that were consistently lower

24  than those actually charged on the settlement statement."

01:58:34  25  Q.  And what is -- what do those groups of loans show?

Ghiglieri - direct

548

          1    A.   And the next sentence is, "Estimates that are consistently

          2    lower may serve as proof that the estimates are not made in

          3    good faith."

          4              And, so, these are a list of the loans that they

01:58:48  5    articulated in the Examination Report.

          6              So, for example, the first one is Mr. Barbieri.  His

          7    good-faith estimate was 12,700, and he was actually charged

          8    13,194.

          9              And, so, there's three ways that the regulators will

01:59:09 10    cite violations of the good-faith estimate:  Failure to give

         11    it at all; the instance that we show here, where you give it

         12    at a certain number, but you charge more than that; or, where

         13    you give it in a range, and the range is either too wide or

         14    you charge more than the range.

01:59:27 15              So, there are various iterations of why they cite

         16    violations of the good-faith estimate.

         17              MR. DROSMAN:  Plaintiffs move Exhibit 956 into

         18    evidence.

         19              THE COURT:  It will be admitted.

         20         (Plaintiffs' Exhibit No. 956 received in evidence.)

         21    BY MR. DROSMAN:

         22    Q.   I'd like to show you Plaintiffs' Exhibit 269 for

         23    identification.

         24              Before we do that -- now, we've talked about some of

01:59:49 25    the predatory lending practices in which Household engaged.

Ghiglieri - direct

565

1   objectives and you're asking them to check themselves.

2       So, you're saying, "We want you to grow the loans.

3   We're going to compensate you for growing the loans.  We're

4   going to train you how to grow the loans in these predatory

02:20:27 5   ways.  And, at the same token, we want you to check for

6   compliance with the laws and policies of the company," and

7   they conflict.  And it increases risk to the company.

8   Q.  Now, in addition to the documents that we've already

9   reviewed, have you seen any customer complaints that suggest

02:20:44 10  that defendants were aware of the predatory lending practices

11  during the 1999 to 2002 time frame?

12  A.  Yes.  I reviewed a number of complaints.

13  Q.  Let's look at a couple.

14      I'll show you a document that has been marked as

02:20:58 15  Plaintiffs' Exhibit 276 for identification.

16      (Document tendered.)

17  BY MR. DROSMAN:

18  Q.  Do you recognize Plaintiffs' Exhibit 276?

19  A.  I do.

02:21:30 20  Q.  And what is it?

21  A.  This is a complaint filed by José Nanez to the Arizona

22  Attorney General's office.  And this is a document that I

23  looked at in formulating my opinions.

24  Q.  What's the date of the complaint?

02:21:41 25  A.  February 20th, 2002, it was signed.

Ghiglieri - direct

566

1              MR. DROSMAN:  Your Honor, plaintiffs move Exhibit 276

2       into evidence.

3              MR. KAVALER:  I believe this is one of those limited

4       documents, your Honor.

02:21:56   5              THE COURT:  It will be admitted.

6              MR. DROSMAN:  Thank you, your Honor.

7          (Plaintiffs' Exhibit No. 276 received in evidence.)

8       BY MR. DROSMAN:

9       Q.  Now, can you tell us what this is -- what this shows?

02:22:06  10    A.  This is a typical complaint.  When someone has a complaint

11      against a regulated entity and they call the regulator -- and

12      I used to have staff in Atlanta that would take all the

13      complaints for National Bank in the southeast -- the first

14      thing that you tell them do is, "Put it in writing."

02:22:24  15             And the purpose for that is because not only does a

16      regulator want to be able to look at it -- the person in the

17      office -- but they'll send it to the examiner for the scope of

18      the next examination.  But, also, they want to send it to the

19      regulated entity, so that they can get their side of the

02:22:41  20    story.

21             And, so, this is a typical complaint form that

22      regulators use across the country.  We used it at the OCC and

23      in Texas -- something similar -- and it lays out what their

24      complaint was regarding their particular loan.

02:22:58  25    Q.  When you say that you'd also want to send it to the

Ghiglieri - direct

567

    1   regulated entity, what's that?

    2   A.  Well, the regulator's not going to just take this

    3   complaint and say, "Everything in here is true."  They want to

    4   get the regulated entity's side of the story; and, then,

02:23:13    5   they'll take the two and figure out if a violation has

    6   occurred or not.

    7   Q.  What is the regulated entity?

    8   A.  Well, in this case, it's Household.

    9        In the case when I was in Atlanta, it would be the

02:23:23   10   National banks in the nine southeastern states.

   11   Q.  So, whatever --

   12   A.  Whatever your jurisdiction is.

   13   Q.  So, whatever lender a person's complaining about would

   14   also get a copy of this complaint; is that right?

02:23:34   15   A.  Yes, with a specific request from the regulator to say,

   16   "Please respond to this complaint.  Tell us what your side of

   17   the story is."

   18   Q.  This particular complaint is filed by a man named José

   19   Nanez; is that right?

02:23:49   20   A.  Yes.

   21   Q.  And let's take a look at the first entry he has -- or the

   22   first number on his complaint.

   23   A.  This person lives in Phoenix, Arizona, and he's Hispanic,

   24   he says, and his primary language is Spanish.  And his

02:24:08   25   daughter was serving as interpreter.

Ghiglieri - direct

568

1          And he says, "Our home was purchased in February,

2     1997, and financed with a 30-year home loan at a 7 percent

3     fixed interest rate."

4     Q.  And No. 2, what's his --

02:24:25  5     A.  And, then, he received a solicitation from Household with

6     a $5,000 check, which they later cashed; and, then, they

7     called Household about refinancing.

8     Q.  And what does No. 3 indicate?

9     A.  No. 3 indicates that they went to talk to Household and:

02:24:43  10    "Beulah Jordan, a Household sales representative, told us that

11    Household had a special loan program under which we could

12    consolidate all our bills into one loan; get the cash we

13    wanted; and, save a lot of money in paying off our bills.

14    Jordan gave us a quote for Household's biweekly payment (or EZ

02:25:00  15    Payment Plus) plan.

16          "Under this plan, Jordan said that if we made

17    payments every two weeks, our loan would be paid out like a

18    7.58 percent 30-year loan, only we would get to pay it off

19    much sooner than 30 years.

02:25:14  20          "She also told us that we could get single premium

21    credit insurance in order to get the loan."

22    Q.  Is there a --

23    A.  I'm sorry, I misspoke.

24          She said, "We had to get single premium credit

02:25:28  25    insurance in order to get the loan."

Ghiglieri - direct

569

1    Q.  Now, is there anything significant about that complaint to

2    your opinions in this case?

3    A.  Well, what I found interesting about this complaint was,

4    first of all, non-English speakers, if you remember the OCCs

02:25:46  5    issuance, it talked about sometimes you have non-English

6    speakers, and that's a particular class that can be taken

7    advantage of.

8         And here we have the Hispanic non-English speaker,

9    the daughter serving as an interpreter.  So, that kind of

02:26:03  10    perks your ears up for possible predatory lending.

11         And, then, of course, again, we've got the biweekly

12    payment plan with the EZ Pay.  This is in Phoenix, Arizona.

13         You know, we've seen these in different places around

14    the country.  And, you know, the effective rate presentation,

02:26:20  15    again.

16    Q.  Why do you think that this is the effective rate

17    presentation?

18    A.  Because they're talking about, "If you pay off your loan

19    every two weeks, it will pay out like a 7.58 percent 30-year

02:26:32  20    loan, only you pay it off much sooner."

21         The one thing that's missing here from the

22    presentation is how many years sooner is it paid off?  18?

23    17?  Whatever.

24         And, then, they talk about single premium credit

02:26:44  25    insurance, which is a particularly predatory product because,

Ghiglieri - direct

1   remember, it tacks on to your 30-year loan, but it goes away

2   in five years.  And, so, that's been prohibited by a lot of

3   states.

4   Q.  So, they were told that they would have this 7.58 percent

02:27:04 5   interest rate with their loan?

6   A.  Yes.

7   Q.  Turn to the next page, the page ending "765".

8   A.  The first sentence says, "Respondents did not tell us

9   their biweekly payment quote did not include transaction fees,

02:27:21 10   property taxes or homeowners insurance on their home."

11       That's something I saw in a lot of the complaints --

12   and we haven't really talked about that -- but when you're

13   making a comparison of apples to apples, you want to make sure

14   that your mortgage payment, in fact, is the same -- contains

02:27:33 15   the same -- things as your current mortgage payment.

16       And this was a complaint that a lot of consumers had,

17   was that Household would not include their taxes and

18   insurance, and that's what their current one included.

19       So, when they were saying, "We'll give you a smaller

02:27:50 20   payment," that wasn't true.

21       And, then, the second sentence says, "Respondents

22   also did not explain that our loan included substantial loan

23   origination fees, substantial upfront insurance premiums and

24   an actual interest rate of 11.79 percent, a prepayment penalty

02:28:08 25   if we tried to pay off our loan before five years."

Ghiglieri - direct

571

1    Q.  So, what predatory practices were employed by Household

2    with respect to this person, José Nanez?

3    A.  Well, they have the effective rate presentation given to

4    them.  They had single premium insurance being required -- and

02:28:25  5    that's particularly predatory.  They had failure to disclose

6    the -- that the insurance and taxes were not in the new

7    payment, as were on the old, so they could compare.  And they

8    didn't -- failure to disclose the prepayment penalty.

9    Q.  And what does the last sentence of this complaint say?

02:28:46  10    A.  The last sentence says, "We believe the respondents

11    targeted us for predatory loans due to our national origin:

12    Hispanic.  As a result of their predatory lending, respondents

13    have stripped away part of our loam equity and we are in

14    danger of losing our home."

02:29:00  15        So, that's the equity stripping, again, that we

16    talked about.

17    Q.  Why don't I show you what's been marked as Plaintiffs'

18    Exhibit 1096 for identification.

19        (Document tendered.)

02:29:30  20    BY MR. DROSMAN:

21    Q.  Do you recognize Plaintiffs' Exhibit 1096?

22    A.  I do.

23    Q.  What is it?

24    A.  This is a complaint from Amy Adams in New Cumberland,

02:29:39  25    Pennsylvania.  It's dated September 10th, 2002, and it's

Ghiglieri - direct

572

1    addressed to Household.

2    Q.  And why do you recognize 1096?

3    A.  This is one of the documents that I looked at in

4    formulating my opinions.

02:29:51 5           MR. DROSMAN:  Plaintiffs offer Plaintiffs' Exhibit

6    1096 into evidence.

7           MR. KAVALER:  Your Honor, this is another one of

8    those limited documents.

9           THE COURT:  Okay.

02:29:59 10          It will be admitted.

11          MR. DROSMAN:  Thank you, your Honor.

12          THE COURT:  The jury has been instructed on the

13   documents.

14          MR. KAVALER:  Thank you, your Honor.

15      (Plaintiffs' Exhibit No. 1096 received in evidence.)

16   BY MR. DROSMAN:

17   Q.  Let's take a look at the first page of the document.  You

18   said that this document was sent to Household.

19          What was the date it was sent to Household?

02:30:15 20   A.  September 10th, 2002.

21   Q.  If you look at the second paragraph of the letter, what --

22   A.  Now, this is a complaint that's not on the complaint form,

23   that -- she actually wrote this letter herself.

24   Q.  And if you look at the last page of the letter -- the page

02:30:34 25   ending "448" -- why don't we look at the page ending "448" of

Ghiglieri - direct

573

1      the letter?  It's the third page in.

2              Can you tell me:  Did she it to anybody in particular

3      at Household?

4      A.  Yes.  She sent it to Mr. Aldinger, Mr. Gilmer,

02:30:52  5    Mr. Schoenholz and Mr. Streem.

6      Q.  She cc'd all those people?

7      A.  Yes.

8      Q.  Why don't we take a look again at the first page of 1096,

9      the second paragraph, and tell us if that's of any

02:31:09  10   significance to your opinion.

11     A.  Yes.

12             This is a case where she questioned the prepayment

13     penalty at the time of the closing.  And she says, "The

14     salesman who was handling our refinance very nonchalantly

02:31:23  15   glossed over this issue and communicated to my husband and me

16     that this would typically be about a $3,000 fee, given our 6

17     percent interest rate, which really turned out to be 9.49

18     percent -- more on this later -- and that these fees can be

19     waived for job-related relocations.  As we are now facing

02:31:39  20   selling our house due to relocation, I have since found this

21     not to be the case."

22     Q.  What does that mean?

23     A.  Well, this is the failure to disclose what's going on with

24     the prepayment penalty.

02:31:51  25           Here's someone that sees the prepayment penalty,

Ghiglieri - direct

574

1    asked about it and they say, "We can waive it."  And this

2    was -- I saw this in other complaints -- this very action.

3    Q.  Why don't we take a look at the next page, the page ending

4    "447."

02:32:10  5          And if you look at the first non-indented paragraph,

6    it begins, "To add insult to injury," can you tell us if

7    there's any significance of that information to your opinion?

8    A.  Yes.

9          And this says, "To add insult to injury, the salesman

02:32:26  10   who sold us this deal capitalized on the fact that we were

11   receiving a 6 percent interest rate by participating in the

12   biweekly EZ Pay Program.

13         "When I questioned the 9.49 percent rate listed on

14   our contract at the signing, I was told that was the rate for

02:32:40  15   people not participating in the biweekly payment program.

16   When I asked where the 6 percent interest rate was quoted in

17   the agreement, I was told it was assumed in the EZ Pay

18   Program, so that was why I wouldn't find it in the contract."

19         So, this is the whole effective rate presentation,

02:32:58  20   where the customers were being deceived into thinking it was

21   lower rate than they were actually getting.

22         Here was a customer questioning, you know:  "Why is

23   this different than my contract rate," and the employee's

24   telling them from Pennsylvania that, "Don't worry.  That's for

02:33:16  25   people that aren't participating in this biweekly payment

Ghiglieri - direct

1      program."

2      Q.  Then it looks like there's a series of bullet points on

3      that page and, then, another paragraph underneath that.

4           Can you take a look at that?

02:33:27  5   A.  Yes.

6      Q.  It begins --

7      A.  "I am responsible -- "

8      Q.  "I am a responsible consumer."

9      A.  "I'm a responsible consumer with good credit who was duped

02:33:38 10   through your slick sales techniques into refinancing a 7

11     percent FHA mortgage to your 9.49 percent unconventional loan,

12     losing $12,000 equity I had built up in my home and now I am

13     facing being further penalized for selling my home to support

14     a job move."

02:33:57 15   Q.  What significance is that to your opinion?

16     A.  So, she had a 7 percent mortgage.  She was told that she

17     could get a 6 percent interest rate through the biweekly

18     payment program; and, in fact, it turns out to be 9.49

19     percent.  And that's a typical --

02:34:14 20   Q.  She went from a 7 percent loan to a 9-point-something

21     percent loan?

22     A.  Yes, 9.49 percent.

23     Q.  And why does she say she did that?

24          Why would anybody go from a lower rate loan to a

02:34:25 25   higher rate loan?

Ghiglieri - direct

576

 1   A.  You wouldn't do it.

 2          Plus, she had an FHA mortgage and now she has an

 3   unconventional.  And the FHA would be more attractive.

 4          So -- well, you wouldn't do it.  You wouldn't

02:34:37  5   willingly pay more money on your loan.  I mean, for, what?

 6   What would be the point of that?

 7   Q.  Does this support your opinion that this woman, Ms. Adams,

 8   was deceived by Household?

 9   A.  Yes.

02:34:48 10   Q.  What predatory lending practices do you see reflected in

11   this complaint?

12   A.  Well, the non-disclosure or the -- discussing that the

13   prepayment penalty would be waived, that's one.  And, then,

14   the effective rate presentation would be two.  Equity

02:35:03 15   stripping would be three.

16   Q.  And did Ms. Adams attach anything to this complaint that

17   she sent to Mr. Aldinger and Mr. Gilmer and Mr. Schoenholz?

18   A.  Yes.

19          She attached a newspaper article -- actually, a

02:35:17 20   magazine article -- from Forbes entitled, "Home Wrecker" and

21   it's dated September 2nd, 2002.

22   Q.  Have you reviewed this article?

23   A.  Yes.

24          I actually reviewed this article separate from this

02:35:33 25   complaint because I was taking the -- I was canvassing

Ghiglieri - direct

577

1   everything that was out there regarding predatory lending

2   during the 1999/2002 time frame.  And I came across this

3   myself.

4         But she goes through and highlights some things in

02:35:44  5   here that are similar to what I found in looking at this file.

6   Q.  And the first thing that she highlights in the "Home

7   Wrecker" article in Forbes Magazine, what's that?

8   A.  Well, she's talking about a William Meyers, a borrower,

9   paid off his credit card debt by refinancing his loan with

02:36:07  10   Household.

11         "He says his new lender, Household International,

12   charged him 11 percent interest, not the 7.2 percent interest

13   as promised.  Then it added 14,400 in fees and insurance to

14   his $80,100 loan, and stuck him with a $15,000 second mortgage

02:36:23  15   at 20 percent.  He didn't notice it until the first bill," a

16   lot of the issues we've been talking about yesterday and

17   today.

18   Q.  What about, in particular, in Ms. Adams' complaint?  Is

19   there any similarities between Ms. Adams' complaint and this

02:36:37  20   information in Forbes Magazine; specifically, with the 11

21   percent interest --

22   A.  Yeah.

23   Q.  -- promised?

24   A.  Right.

02:36:44  25   Q.  I'm sorry, the 7.25 percent interest promised, when it's

Ghiglieri - direct

578

1    really an 11 percent interest rate?

2    A.  Yes.

3         This was the effective rate presentation, where

4    they're trying to make their rates look more competitive.

02:36:56  5    And, so, they're saying, "If you pay half of your mortgage

6    every other week, your rate's going to be 7.2," but really it

7    was 11 percent.

8    Q.  Let's look at the next spot.  I think it's the fourth

9    paragraph in the article that Ms. Meyers highlighted,

02:37:11 10    apparently to show similarities.

11         Can you tell us what that says?

12    A.  It's the one up above that.

13    Q.  The fourth paragraph down?

14    A.  Yeah.

02:37:19 15         There you go.

16         Now, this is what happened -- this is what she claims

17    happened -- to her.  "Household is under fire for myriad

18    tactics.  In addition to the bait-and-switch on interest

19    rates, it charges high prepayment penalties and service fees.

02:37:36 20    It lures clients with proposals showing monthly savings that,

21    at times, fail to materialize."

22         So, she's talking about the high -- or this article

23    is talking about the high -- prepayment penalties; and, then,

24    the effective rate presentation, which she talks about, too.

02:37:54 25    Q.  The next spot in the article -- the Forbes article -- that

Ghiglieri - direct

579

```
              1    Ms. Adams highlighted, can you tell us about that?

              2    A.  Actually, the last part of that sentence also is things

              3    that we were talking about today, too, if you'd go back to

              4    that.

02:38:08      5         And it says, "And it structures mortgages to include

              6    last-minute second loans that make it difficult for borrowers

              7    to defect and get refinancing elsewhere.  Household agents

              8    call it 'Closing the Back Door.'"

              9         So, that's -- we've been talking about closing the

02:38:21     10    back door here.

             11    Q.  Did you call it "Blocking the Back Door"?

             12    A.  "Blocking the Back Door," yes.

             13    Q.  Is there a difference between "Blocking the Back Door" and

             14    "Closing the Back Door"?

02:38:29     15    A.  No, it's the same thing.

             16    Q.  Take a look at the next paragraph that Ms. Adams

             17    highlighted.

             18    A.  In this -- this -- is something else that we've been

             19    talking about:  "But Household's questionable practices seem

02:38:40     20    to be in far wider use than that.  For one thing, Meyers lives

             21    in Dayton, Ohio, not Bellingham, Washington."

             22         And this refers to the paragraph above which says,

             23    "Household says such complaints represent a minuscule fraction

             24    of its 100 billion in outstanding loans."

02:38:59     25         It also says, "Gripes about the interest-rate-trick
```

Ghiglieri - direct

580

1    that fooled Meyers are largely confined to its office in

2    Bellingham, Washington."

3    Q.  So, that's the few-bad-apple argument?

4    A.  The rogue branch, rogue employee.

02:39:10  5         If you go down, then -- going back to what's

6    highlighted here -- "The Household pitch was so effective, it

7    even lured customers with good credit, including Meyers.

8    Customers and some ex-employees tell of the same interest rate

9    trick in a dozen states."

02:39:24 10         So, Ms. Adams has good credit and, so, she's

11   highlighting this because it says, "Even some people with good

12   credit are being lured by this."

13   Q.  The next sentence, I think, is a quote from a regulator in

14   Minnesota.  What does he have to say about the few-bad-apple

02:39:44 15   argument that Household made?

16   A.  The Commissioner in Minnesota -- the Commerce Commissioner

17   -- says, "Household encourages -- or at least tolerates --

18   these abuses.  It's not just an occasional rogue loan officer

19   or rogue office.  It has to do with corporate culture."

02:40:05 20   Q.  Is that consistent with or different from the conclusions

21   you drew in this case?

22   A.  No, it's consistent.

23   Q.  Okay.

24         Let's look at the next page, the page ending "450."

02:40:18 25         And, then, it looks like Ms. Adams has highlighted

Ghiglieri - direct

581

1    some more paragraphs from the Forbes article on that page.

2    Let's talk about the first one.

3    A.   Okay.

4         This one says, "Household also began EZ Pay Plus, a

02:40:32  5    program under which many borrowers, like Meyers, were lured

6    with lower interest rates, but were really charged higher

7    ones.  EZ Pay Plus also quotes Karina Galindo, a Teacher's

8    Assistant in Phoenix.

9         "In April, 2000, Household offered to replace her

02:40:49 10   $67,300 mortgage -- a Chase Manhattan Bank loan at 8.5

11   percent -- with a bigger, but seemingly cheaper one:  $86,300

12   at an effective rate of 7.6 percent, enough to pay off the old

13   mortgage, and a $12,200 personal loan she was paying off at

14   15.7 percent.  At least this is how she read a worksheet from

02:41:11 15   a Household loan officer.

16        "Galindo signed up.  Four days later, she says she

17   got nervous and reviewed the 80-page agreement, signed and

18   initialed in two dozen places, and spotted the real interest

19   rate:  12.2 percent.

02:41:25 20        "How did it happen?  Galindo says her agent, José

21   Avila, handed her the worksheet entitled 'Biweekly Payment

22   Quote" with this sentence at the bottom:  'If I can put

23   together a loan that pays out like a 7.579 percent a year

24   loan, but has a total term of 18.63 years, would you be

02:41:45 25   interested?"

Ghiglieri - direct

582

1    Q.  Let me stop you there.

2         That language that you just read, do you recognize

3    that language?

4    A.  That's from the Dennis Hueman video.

02:41:55 5    Q.  Okay.

6         And what is this article talking about?  What's the

7    passage you just read?

8    A.  This is the effective rate presentation on how Household,

9    in trying to make their mortgages look for competitive, would

02:42:09 10    do this effective rate presentation and lure these people in,

11    thinking they were going to get a lower interest rate.  Then

12    they find out that they have, in fact, a higher interest rate.

13         And here, you know, there's more interest and fees

14    and premiums tacked on.  So, it strips out your equity; it

02:42:25 15    keeps you there because no one else will refinance you, so

16    that the back door is blocked.

17         So, this paragraph goes to a lot of the things that

18    we've been talking about today.

19    Q.  Now, in your evaluation of Household's lending practices,

02:42:40 20    did you also review Reports of Examinations written by state

21    and federal regulators?

22    A.  I did.

23    Q.  Why did you review Reports of Examinations by regulators?

24    A.  Well, I wanted to see what the regulators thought.  I

02:42:55 25    looked at the documentation and I wanted to see if they -- if

Ghiglieri - direct

583

1   their findings supported my opinions.

2   Q.  Which regulators issued Reports of Examination that you

3   reviewed?

4   A.  I reviewed the OTS reports for the Federal Thrift that

02:43:11  5   Household had -- Household Bank FSB -- and, then, I reviewed

6   the State Examination Reports from the finance company.

7           And I also reviewed -- FDIC did a separate exam and,

8   then, I think they did a joint one with the OTS.

9           So, I reviewed any of the examination reports that

02:43:35  10   were available.

11   Q.  And how many State Examination Reports did you review

12   approximately?

13   A.  I would say maybe 30.

14           I'm not sure.  I know at one point I reviewed some

02:43:46  15   and, then, had to send some back.  So, I'm not exactly sure

16   how many.  Maybe 30.

17   Q.  And from what different states did these Examination

18   Reports come?

19   A.  New Jersey, Virginia, Kansas, Washington, Minnesota -- all

02:44:03  20   over the country.

21   Q.  Other states you haven't mentioned?

22   A.  Yes, uh-huh.

23   Q.  Why don't I show you what's been marked as Plaintiffs'

24   Exhibit 1205 for identification.

25           (Document tendered.)

Ghiglieri - direct

584

1    BY MR. DROSMAN:

2    Q.  Do you recognize Plaintiffs' Exhibit 1205?

3    A.  I do.

4    Q.  And what is 1205?

02:44:47  5    A.  This is the Special Compliance Examination that was

6    performed by the Office of Thrift Supervision, which is the

7    regulator of the Federal Thrift, dated January 16th, 2003.

8    Q.  And did this examination also examine the finance company

9    at Household?

02:45:06  10   A.  Yes.

11   Q.  So, it examined both the Thrift and the Finance Company?

12   A.  That's right.

13   Q.  And why do you recognize this document?

14   A.  This was one of the documents that I reviewed in

02:45:16  15   formulating my opinions.

16   Q.  And who authored the document?

17   A.  The Office of Thrift Supervision.

18        MR. DROSMAN:  Plaintiffs offer Exhibit 1205 into

19   evidence.

02:45:27  20       THE COURT:  It will be admitted.

21       (Plaintiffs' Exhibit 1205 received in evidence.)

22   BY MR. DROSMAN:

23   Q.  So, why don't we take a look at the first page.  It

24   indicates that the subject concerns both the bank and the

02:45:39  25   finance company; is that right?

Ghiglieri - direct

585

1    A.   Yes.

2         If you look at the bottom, it says, "Household Bank,

3    FSB," that's the Federal Thrift, and, then, "Household Finance

4    Corporation."

02:45:47  5         This is a Special Compliance Exam and the federal

6    regulators have the authority to go beyond the entity that

7    they regulate, if it's affiliated with the regulate -- the

8    entity that they regulate.

9         And the OTS decided to do that in this case because

02:46:03 10  of concerns that they had.

11   Q.   So, even though they wouldn't ordinarily regulate the

12   finance company, they decided to do a special examination of

13   Household Finance Company in this case?

14   A.   That's right.

02:46:14 15        And we used to do that at the OCC if we were worried

16   about an affiliate.  We would go on and examine that

17   affiliate.

18   Q.   Go ahead, if you would, and turn to the page ending "063."

19        It looks like the heading on that page is, "Special

02:46:31 20  Compliance Examination."

21        And, then, the date is June 3rd, 2002?

22   A.   Yes.

23   Q.   Does the first sentence of that document have any

24   significance to your opinion?

02:46:41 25  A.   "A Special Compliance Examination of Household Bank FSB

Ghiglieri - direct

586

1    commenced on June 3rd, 2002"?  That sentence?

2    Q.  Right.

3            Does this tell you when the actual examination took

4    place?

02:46:54  5    A.  Yes.

6    Q.  When was that?

7    A.  June 3rd, 2002.

8    Q.  So, in the middle of 2002, they performed this

9    examination?

02:47:01  10   A.  Yes.

11   Q.  And when did they issue their report, then?

12           Does the first page indicate January 16th, 2003?

13   A.  Yes, January 16th, 2003.

14   Q.  Okay.

02:47:20  15           If you could go down to the bottom of the page ending

16   "063," where it talks about the "overall findings for the

17   exam," and look at the first arrow there.

18   A.  Yes.

19           And, first, the second sentence of the first

02:47:33  20   paragraph at the top of the page says, "The focus of this

21   Special Examination was a variety of predatory lending and

22   insurance sales issues."

23           And, so, they're articulating what the scope of their

24   Special Compliance Examination was.

02:47:49  25   Q.  And what was the scope?

Ghiglieri - direct

587

1    A.   The scope is:  "The focus of this Special Examination was

2    a variety of predatory lending and insurance sales issues."

3    Q.   Okay.

4         If you take a look, then, at the bottom of that first

02:48:02  5    page, under, "Overall Examination Summary and Findings."

6    A.   Okay.

7         So, the first one is:  "There is evidence of

8    insurance packing.  HFC" -- and "HB" is Household Bank.  So,

9    that's the Federal Thrift.

02:48:16  10        "HFC/HB sold insurance products, personal property,

11   disability, life and involuntary unemployment to a very high

12   percentage of borrowers for both real estate and non-real

13   estate-secured lending.  There -- " I think that's the wrong

14   word.  It should be "T-h-e-i-r."

02:48:36  15        But, anyway, "There most egregious issue is sales of

16   personal property insurance for, essentially, unsecured

17   non-real estate loans."

18   Q.   Does that text that you just read have any significance to

19   your opinions in this case?

02:48:47  20   A.   Well, yes.

21        My conclusion is that Household engaged in insurance

22   packing.  And this is what the OTS is saying, also.

23   Q.   Okay.

24        If you'd turn to the page ending "065."

02:49:02  25        It looks like the second arrow on that page indicates

Ghiglieri - direct

588

1    that, "Some of the most significant concerns"; is that right?

2    A.  (No response.)

3    Q.  The second arrow on Page --

4    A.  Yes.

02:49:14  5    Q.  -- 065?

6    A.  And, then, they're articulated here.

7    Q.  So, let's talk about some of the most significant concerns

8    that the federal regulator -- in this case, the Office of

9    Thrift Supervision -- found.

02:49:28  10    A.  Okay -- excuse me.

11         So, the first box -- they have little boxes on this

12    side -- "Many cases of multiple -- " the first box there

13    (indicating) -- "Many cases of multiple and frequent

14    refinancing/debt consolidations in short time frames."

02:49:46  15         So, this would be loan flipping.

16    Q.  What's the next box or bullet that they have indicated?

17    A.  "Routine payment of high levels of loan fees associated

18    with frequent refinancings.

19         "In many instances, refinances offered marginal

02:50:02  20    benefit."

21         That would be to the borrower.  This is another issue

22    about loan flipping and charging the high level of loan fees.

23    Q.  This talks about -- the next one -- the next bullet on

24    that page -- what is that?

02:50:16  25    A.  This is on insurance.  It says, "Aggressive sales

Ghiglieri - direct

589

1    practices, with frequent sales of single payment credit life

2    insurance."

3            And, remember, that was the one that got tacked onto

4    your loan for 30 years, but it ran out after five years, in

02:50:31  5    terms of the term of it.  And you were still paying for the

6    next 25.

7            It says, "Also, frequent sales of personal property

8    insurance, involuntary unemployment insurance and disability

9    insurance.  Loans commonly rolled into new or additional loans

02:50:44 10    with credit insurance routinely included.  The credit life

11    insurance was typically for a maximum of five years, with a

12    single payment fee collected up front."

13            And, of course, tacked on the loan and amortized over

14    the 30 years.

02:50:58 15    Q.  And these are all OTS' significant concerns; is that

16    right?

17    A.  Yes.

18    Q.  What's the next significant concern that the OTS had?

19    A.  The next one is:  "High Loan to Value Lending.  Household

02:51:07 20    offered loans well in excess of a hundred percent of the

21    underlying collateral."

22            And that's, of course, equity stripping, where the

23    value of your house is a hundred thousand and they would lend

24    up to a hundred percent of the value of your house.

02:51:23 25            So, you would have no equity when you walked out of

Ghiglieri - direct

590

1    there.

2    Q.  And is that a predatory lending practice?

3    A.  Yes.

4    Q.  Is that also known as equity stripping?

02:51:33  5    A.  Equity stripping.

6    Q.  What's the next significant concern that the OTS had?

7    A.  The next one is:  "Cases of significantly declining home

8    equity due to increasing consumer debt."

9         And that's, basically, equity stripping, again.

02:51:47 10    Q.  Tell us what that means.

11    A.  It means that if you are consolidating your loans or if

12    you go to Household and you refinance your loan and they add

13    on points and fees and premiums to your loan, and you walk out

14    of there with a hundred percent loan to value, you've,

02:52:05 15    essentially, stripped away any equity that you had in your

16    house.

17    Q.  Turn to the next page -- the page ending "066" -- and look

18    at -- there's a "Significant Concern" in the box at the top of

19    the page?

02:52:17 20    A.  "Use of Household's EZ Pay Plus electronic payment product

21    through Fort Knox National Bank as a means of misinforming

22    applicants about the realities/benefits of increased biweekly

23    payments."

24         This is the effective rate presentation.

02:52:38 25    Q.  And that was a significant concern of the OTS?

Ghiglieri - direct

591

1  A.  Yes.

2  Q.  If you'd turn to the page ending "091," it looks like that

3  page indicates, "Examination Summary and Findings"; and, then,

4  there's some summary of the findings that were provided to

02:52:57  5  HFC, the finance company.

6       Can you look at the first arrow on Page 091 and tell

7  me whether that's significant to your opinion?

8  A.  It says, "There is evidence of insurance packing.  This is

9  based on loan file reviews, as well as analysis of data

02:53:14  10  relating to insurance sales.  HFC sold insurance products,

11  personal property, disability, life and involuntary

12  unemployment at its HFC/Beneficial offices to a very high

13  percentage of eligible borrowers for both real estate and

14  non-real estate secured lending.  There is a major concern

02:53:33  15  with the practice of selling personal property insurance on

16  what are, essentially, unsecured loans."

17  Q.  Why is that significant to your opinion?

18  A.  It just -- it supports my opinion that they engaged in

19  insurance packing.

02:53:47  20  Q.  If you turn to the page ending "093," on the third arrow

21  on that page, if you can tell me whether that's significant to

22  your opinion?

23  A.  Yes.  This concerns the good-faith estimate issues that

24  we've been talking about.

02:54:04  25       "A review of various loan files found that good-faith

Ghiglieri - direct

592

1    estimates often disclosed a very wide range of costs when

2    estimating the potential charges to the borrower.  The use of

3    such wide ranges easily led to confusion for the applicants.

4    The examiners believe that the regular use of wide ranges for

02:54:21  5    loan cost estimates is an unfair and deceptive practice.  A

6    recent policy change at Household should correct this

7    situation."

8    Q.  Okay.

9        And why is that significant to your opinion?

02:54:32  10   A.  Because this supports my opinions that Household used the

11   wide range to mislead the borrowers and, then, charged them at

12   the high end of the range or above the range.

13   Q.  If you'd turn to the page ending "095," it looks like, in

14   this case, the federal regulators are listing a number of

02:54:59  15   different civil complaints and state investigations, and

16   they're set forth in the arrows?

17   A.  Yes.

18   Q.  Do those -- are those relevant to your opinions?

19   A.  Yes.  And these are many of the same things that we've

02:55:10  20   been talking about here.

21   Q.  Let's look at the first arrow.

22   A.  "Many cases of multiple and frequent refinancings, debt

23   consolidations in short time frames."

24       That's loan flipping.

02:55:21  25   Q.  And what are all these things?

Ghiglieri - direct

593

1    A.   These are concerns that various civil complaints and state

2    regulators -- they're summarizing what their concerns are.

3    Q.   So, the OTS has looked at the various complaints in the

4    state investigations and they're sort of summarizing what they

02:55:39   5    found?

6    A.   Yes.

7    Q.   And what's the next thing they summarize?

8    A.   "Routine payment of high levels of loan fees associated

9    with frequent refinancings."

02:55:47   10   Q.   What is that?

11   A.   And that's where you pack on points and fees and insurance

12   premiums every time you flip the loan.

13        So, it's what we've been talking about today:   Equity

14   stripping and loan flipping, insurance packing.

02:56:04   15   Q.   So, the frequent refinancings, that's the loan flipping

16   that you've been speaking --

17   A.   Loan flipping, yes.

18   Q.   What's the next arrow on the page?

19   A.   "Borrowers paying a high price for frequent refinancings.

02:56:16   20   In many instances, refinances offered marginal or

21   insignificant benefit."

22        And that's the loan flipping; and, every time you

23   flip it, adding on -- or every time Household would flip the

24   loan, they would add on -- insurance, points and high fees.

02:56:29   25   Q.   And was that -- did that benefit the borrower -- these

Ghiglieri - direct

594

1    frequent refinancings?

2    A.   No.

3    Q.   What's the next arrow?

4    A.   "Aggressive Sales Practices."

02:56:41  5    Q.   And the next one?

6    A.   "Loans commonly rolled into new or additional loans and

7    credit insurance routinely included with the loan product."

8              So, this would be insurance packing every time the

9    loan was flipped.

02:56:52 10    Q.   And the next concern that the federal regulators found

11    when they were looking at all the different state

12    investigations, what's that?

13    A.   This is:  "Frequent sales of single payment credit life

14    insurance.  Also, frequent sales of personal property

02:57:07 15    insurance, unemployment insurance and disability insurance."

16              So, this is the egregious practice of selling that

17    single payment credit life insurance, which many states have

18    outlawed; and, then, insurance packing.

19    Q.   And the next arrow?

02:57:21 20    A.   "The credit life insurance was typically for a maximum of

21    five years, with a single payment collected upfront."

22              That's what they said before of what they found; and,

23    of course, that's the egregious part of this product.

24    Q.   The next summarized concern from all the state

02:57:36 25    investigations, what is that?

Ghiglieri - direct

595

1  A.  "High Loan to Value Lending.  Household offered loans well

2  in excess of a hundred percent of the underlying collateral."

3      Of course, we talked about that -- stripping away the

4  equity.  Even -- they even offered one that went above a

02:57:51  5  hundred percent.

6  Q.  And, then, the next summarized concern from all the state

7  investigations?

8  A.  "Cases of declining home equity because of increasing

9  consumer debt."

02:58:05  10      That's equity stripping.

11  Q.  What is that?

12  A.  Pulling out the equity because of adding on high points in

13  insurance premiums and other closing costs.

14  Q.  And, then, if you look at -- we'll skip a few of them.

02:58:23  15      If you look at the bottom arrow -- I know there's

16  many -- what is that bottom arrow:

17  A.  This is that good-faith estimate issue:  "Use of wide

18  ranges on good-faith estimate disclosures."

19      This practice was determined to be an unfair and

02:58:37  20  deceptive practice.

21  Q.  And the "GFE" in that sentence refers to, what?

22  A.  "Good-faith estimate."

23  Q.  And the state investigations found that --

24  A.  That's what they concluded, yes.

02:58:45  25  Q.  If you could turn to the page ending "120."

Ghiglieri - direct

596

             1          And it looks like there's a heading, No. 5:

             2    "Examiner Review of Real Estate Secured Lending:  High Loan

             3    Fees."

             4          Can you tell me what the last paragraph on that page

02:59:07     5    -- "120" -- shows?

             6    A.  I'm sorry, I'm on the wrong place.  Let me get it.

             7    Q.  "120."

             8    A.  Can you tell me what -- where -- you're directing me?

             9    I --

02:59:22    10    Q.  Sure.  If you'd look at the page ending "120"?

            11    A.  Okay.

            12    Q.  And, then, there's a heading on that page:  "Examiner

            13    Review of Real Estate Secured Lending"?

            14    A.  Oh, okay.

02:59:31    15    Q.  "High Loan Fees."

            16    A.  Yes.

            17    Q.  Is the last paragraph on that page of any significance to

            18    your opinion?

            19    A.  The last paragraph says, "The distinguishable pattern from

02:59:48    20    this sample is the high number of loans, 15 of 21 -- or 71.4

            21    percent -- with origination fees of 7 percent or more.  Loan

            22    fees of 7 percent are considered extremely high and are

            23    indicative of a high fee structure."

            24    Q.  Can you tell us what because that means?

03:00:05    25    A.  Yes.

Ghiglieri - direct

597

1          Now, we talked about Household charging discount

2    points, and that would normally be a negotiation between the

3    borrower and the lender, and the borrower may decide to pay

4    one discount point to lower the discount rate, say, 25 basis

03:00:24 5    points.

6          Household would charge -- the majority of their loans

7    were charged at the high end of what state law would allow.

8    Usually, either 5 percent or 7 to 7-and-a-half percent.  And

9    what the regulators are saying here -- the OTS is saying

03:00:39 10   here -- is that they consider loan fees of 7 percent to be

11   extremely high and indicative of a high fee structure.

12          So, just to put it in perspective.

13   Q.  So, if you had loan fees of 7 percent on a $100,000 loan,

14   what would your fee be?

03:00:56 15   A.  $7,000.

16          So, a discount point is one percent of the loan

17   balance.

18   Q.  And the regulators considered that to be, in their words,

19   extremely high?

03:01:06 20   A.  Extremely high.

21   Q.  If you turn to the next page, the page ending "121," take

22   a look at the top -- the heading at the top.

23          No. 6 is:  "Deceptive Acts."  Do you see that?

24   A.  Yes.

03:01:20 25   Q.  And, then, if you look down into that paragraph under

Ghiglieri - direct

598

1    "Deceptive Acts," the second paragraph -- the second sentence

2    of that paragraph -- is that of any significance to your

3    opinion?

4    A.   The second sentence says, "However, examiners believe that

03:01:38  5    HFC has engaged in unfair and deceptive acts, as described in

6    Section 3, relating to insurance sales."

7    Q.   What about the next sentence?

8    A.   "Also, although not a technical RESPA violation, the

9    examiners believe that the wide ranges for good-faith

03:01:54 10    estimates was also a deceptive act."

11    Q.   Is this significant -- this information significant -- to

12    your opinions in this case?

13    A.   Yes.

14    Q.   How?

03:02:01 15    A.   It supports my opinions that not only were they engaged in

16    insurance packing; but, also, that they -- the range, the wide

17    range that they -- gave borrowers, and, then, charged either

18    at the high end of the range or in excess of the range --

19    which would be a violation of RESPA -- supports my opinions.

03:02:22 20    Q.   I'll show you what has been marked as Plaintiffs' Exhibit

21    1333 for identification.

22        (Document tendered.)

23    BY MR. DROSMAN:

24    Q.   Do you recognize Plaintiffs' Exhibit 1333?

03:02:57 25    A.   I do.

Ghiglieri - direct

599

1    Q.  What is it?

2    A.  This is a letter from the Washington Department of

3    Financial Institutions to Household dated May 17th, 2002.

4    Q.  Why do you recognize it?

03:03:07  5    A.  This is one of the documents that I looked at in

6    formulating my opinions.

7           MR. DROSMAN:  Plaintiffs move Exhibit 1333 into

8    evidence.

9           THE COURT:  It will be admitted.

10    (Plaintiffs' Exhibit No. 1333 received in evidence.)

11    BY MR. DROSMAN:

12    Q.  Let's take a look at this document.

13          To whom was the letter addressed?

14    A.  To Tom Schneider.

03:03:27 15    Q.  And what's the subject of the letter?

16    A.  "Expanded Report of Examination."

17    Q.  And who is Mr. Schneider?

18    A.  He is in charge of Policy and Compliance for Household.

19    Q.  What is Policy and Compliance?

03:03:38 20    A.  My understanding was that he -- his area coordinated

21    Household's activities with the regulators.

22          And, then, it also at one point he would look at some

23    of the complaints from the Better Business Bureau and the AG's

24    office and things like that.

03:03:55 25    Q.  And, then, if you look at the second paragraph of the

Ghiglieri - direct

600

1    letter, is that significant to your opinion?

2    A.  Yes.

3    Q.  Tell me why.

4    A.  It says, "This report identifies significant patterns and

03:04:11  5    practices that the Department finds unacceptable.  The report

6    also carries serious allegations of wrongdoing with Washington

7    consumers.

8         "Contrary to Household's prior explanations, the

9    Department has found that the patterns, practices and alleged

03:04:25 10   harmful acts are not isolated to an individual office in

11   Washington.

12        "Further, the patterns and practices discussed in the

13   report appear to occur from Household offices across the

14   country."

03:04:38 15   Q.  This paragraph that you just read, is this relevant to

16   your conclusion that this wasn't one or two bad apples at

17   Household?

18   A.  Yes.  It supports my opinion that Household engaged in

19   predatory lending practices company-wide, nation-wide, and it

03:04:55 20   was a systemic practice -- a systemic issue.

21   Q.  Now, the subject here is:  "Expanded Report of

22   Investigation" -- or "Examination," I apologize.

23        And the letter indicates that there's an enclosure.

24        Did you review the expanded Report of Examination

03:05:11 25   from the Department of Financial Institutions at Washington?

601

```
          1    A.   Yes.

          2    Q.   I'll show you what has been marked as Plaintiffs' Exhibit

          3    290 for identification.

          4         (Document tendered.)

03:05:32  5         THE COURT:  I think that probably at this point,

          6    before we get into the new exhibit, it might be a good time to

          7    take our afternoon break.  We're five minutes past 3:00

          8    o'clock.  So, we'll do that at this time.

          9         We will take a 20-minute break, ladies and gentlemen,

03:05:43 10    and resume at 25 after.

         11         (Jury out.)

         12         THE COURT:  Before we break, I think it's a good time

         13    to ask if the attorneys have any suggestions with respect to

         14    the outstanding timing issues with the jurors, and the one

03:06:37 15    question regarding training logs, et cetera.

         16         MR. DOWD:  I think, your Honor, it sounded like the

         17    Court was inclined to break a little early today, anyway.  But

         18    if we're going to break earlier for the jurors, then I think

         19    it would make sense to start earlier.

03:06:57 20         And I think one time, when you were speaking to the

         21    jury this morning, you said, "We're going to start at 10:30."

         22    I think you just misspoke.

         23         THE COURT:  I misspoke.  It should have been "10:00

         24    o'clock," if I said that.

03:07:06 25         MR. DOWD:  I understood that.  I just think we should
```

Ghiglieri - direct

608

|  | 1 | based upon that, you must make your determination. |
|  | 2 | Proceed. |
|  | 3 | MR. DROSMAN:  Thank you, your Honor. |
|  | 4 | BY MR. DROSMAN: |
| 03:37:27 | 5 | Q.  When we broke, I had provided you with Plaintiffs' Exhibit |
|  | 6 | 290 for identification. |
|  | 7 | Do you recognize Plaintiffs' Exhibit 290? |
|  | 8 | A.  I do. |
|  | 9 | Q.  And what is this? |
| 03:37:37 | 10 | A.  This is the Washington Department of Financial |
|  | 11 | Institutions expanded report of examination, dated as of April |
|  | 12 | 30, 2002. |
|  | 13 | Q.  We saw a cover letter a moment ago, Plaintiffs' Exhibit |
|  | 14 | 1333.  Is this the report of -- expanded report of examination |
| 03:38:00 | 15 | that the cover letter, 1333, referred to? |
|  | 16 | A.  Yes. |
|  | 17 | Q.  And why do you recognize Plaintiffs' Exhibit 290? |
|  | 18 | A.  This was a document that I considered in formulating my |
|  | 19 | opinion. |
| 03:38:14 | 20 | MR. DROSMAN:  Plaintiffs offer Exhibit 290 into |
|  | 21 | evidence. |
|  | 22 | MR. KAVALER:  This is another one of those limited |
|  | 23 | documents, your Honor. |
|  | 24 | MR. DROSMAN:  Actually it isn't, your Honor.  There's |
| 03:38:22 | 25 | no objection to this document, your Honor. |

Ghiglieri - direct

609

1       MR. KAVALER:  I believe it's covered by limiting

2    instruction No. 2, your Honor.

3       THE COURT:  Let's take a look.

4       MR. DROSMAN:  Withdrawn, your Honor.  There's another

03:38:43  5    exhibit that's identical to this to which there was no

6    objection.  So that's my mistake.  This one, however, has a

7    limiting instruction.

8       THE COURT:  Very well.  The jury has been instructed

9    on the limited use of evidence as to certain documents.  The

03:38:55 10    document will be admitted with that instruction.

11    BY MR. DROSMAN:

12    Q.  Now, let's look at the first page of Exhibit 290.

13         What is an expanded report of investigation?

14    A.  Well, in this case, instead of just doing a regular

03:39:14 15    examination, they expanded it to take into consideration

16    certain things that they were interested in looking at.

17    Q.  And what was the date that they conducted this

18    examination?

19    A.  It says it's dated April 30, 2002.

03:39:29 20    Q.  And if you turn to -- we'll take a look inside the

21    expanded report of examination.  If you take a look at the

22    page ending 668, the first paragraph on that page.

23         Is that significant to your opinions in this case?

24    A.  Yes.  Is it the first -- my copy doesn't show -- the first

03:40:01 25    full paragraph starts with, While the misrepresentation.

Ghiglieri - direct

610

1    Q.  Yes, the first partial paragraph.

2    A.  Okay.

3    Q.  Is that significant to your opinion in this case?

4    A.  Yes.

03:40:16  5    Q.  Can you tell us why?

6    A.  Well, it says -- let's see if we can --

7    Q.  The sentence there begins, After reviewing the complaints.

8    A.  Yeah, I was just looking at the previous sentence here.

9        After reviewing the complaints, HFC's responses to

03:40:39  10    the complaints and documents relative to the complaints, the

11    Department believes that HFC representatives have employed

12    sales tactics intended to mislead, misdirect or confuse the

13    borrower.  As discussed below, this belief is supported by the

14    Department's own test originations of loans at three different

03:40:56  15    HFC branches in Washington.

16    Q.  What about the first sentence that you read, why is that

17    supportive of your opinion in this case?

18    A.  After reviewing the complaints, because the -- my opinions

19    go to misleading, misdirecting or confusing the borrower; and

03:41:17  20    so this would support my opinions.

21    Q.  And did the Washington Department of Financial

22    Institutions come to that same conclusion?

23    A.  Yes.

24    Q.  What about the second sentence that you read?

03:41:27  25    A.  Well, the second sentence is very unusual.  The Department

Ghiglieri - direct

611

1   in Washington State actually went out and did mystery

2   shopping, if you know what that is, where you go into the

3   store to see if -- you know, how the sales staff treats you

4   and report back to the company.  They were getting so many

03:41:47  5   complaints, they decided to go out and do some mystery

6   shopping themselves.  But when you do this as an examiner, you

7   actually apply for a loan.  And it actually makes your credit

8   rating go down.  So this is a very extreme step to take as a

9   regulator.  We did it at the OCC a handful of times in the 18

03:42:05  10   years I was there.

11        And so this is what they did.  That's what this

12   sentence means, As discussed below, this belief is supported

13   by the Department's own test originations of loans at three

14   different HFC branches in Washington.

03:42:19  15        So they went a really extra step in actually applying

16   for loans at three different branches to see what their sales

17   techniques were going to be.

18   Q.  And what did they conclude when they went and engaged in

19   this mystery shopping?

03:42:32  20   A.  Well, in some respects, the disclosures that were supposed

21   to be given to them were not given to them.  Or in another

22   respect, somebody put their arm over the disclosures.  But

23   they found many of the same practices that we've discussed

24   here in the last couple of days.

03:42:49  25   Q.  Did they conclude when they engaged in this mystery

Ghiglieri - direct

612

1    shopping that the Household/HFC sales representatives engaged

2    in sales tactics intended to mislead, misdirect or confuse the

3    borrower?

4    A.  Yes.

03:43:03  5    Q.  If you take a look down at the heading number two,

6    confusion over rates, points and fees.

7    A.  Yes.

8    Q.  Does that have any bearing on your opinion in this case?

9    A.  It does.  And it says, Consumers complain that they were

03:43:18 10    somehow confused or misled about the rates, points or fees

11    offered by HFC.  Some consumers apparently believed that their

12    rate would either be lower than what it was or that somehow

13    the effective rate would be lower due to the payment

14    structure.  Other consumers were alarmed at the amount of fees

03:43:35 15    they were required to pay in the transaction, indicating that

16    they must have somehow been confused about the fees they would

17    pay.

18    Q.  So why is that supportive of your opinion?

19    A.  Well, because this whole effective rate scheme was

03:43:52 20    developed to make -- so that Household could compare their

21    otherwise high interest rate loan with a competitor's lower

22    interest rate loan.  And we've seen examples of effective rate

23    presentations being made around the country.  So it further

24    supports my opinions that Household engaged in systemic

03:44:13 25    predatory practices.

Ghiglieri - direct

613

1  Q.  Did it bear on your opinion that the predatory practice

2  specifically in this case, the use of effective rate or

3  equivalent rate, was widespread?

4  A.  Yes.

03:44:25  5  Q.  And how does it support -- in what way does it support

6  your opinion?

7  A.  Well, they went -- they actually went and did tests

8  themselves to see if what the complaints that they were

9  receiving about this effective rate presentation were true.

03:44:40  10  And they've concluded that, in fact, that the way that

11  Household was structuring their rates were intended to

12  mislead, misdirect and confuse the borrower or deceptive sales

13  practices, which is part of the definition of predatory -- or

14  covers -- the predatory lending term covers deceptive sales

03:45:04  15  practices.

16  Q.  If you look at the next paragraph, third sentence in, it

17  begins, A subpattern of this pattern of confusion.

18  A.  Yes.

19  Q.  Does that have any bearing on your conclusions in this

03:45:16  20  case?

21  A.  It does.  It says, A subpattern of this pattern of

22  confusion has been identified by the Department in HFC's

23  misuse of the good faith estimate and what appears to be

24  intentional confusion about discount points charged on certain

03:45:30  25  loans.  This subpattern of confusion has been identified by

Ghiglieri - direct

614

1    the Department in over half of the recent complaints and is

2    discussed in greater depth below.

3    Q.  How does that bear on your opinion in this case?

4    A.  Well, my opinion is that they used the good faith estimate

03:45:45  5    to confuse the borrower by showing a wide range of closing

6    costs when, in fact, they were going to be charged at the

7    higher rate or possibly greater than the range.  And this

8    supports my opinion.

9    Q.  If you could turn to page ending 670.  And I guess the

03:46:03  10    first -- the second full paragraph on that page.  It begins,

11    The Department has also identified three additional concerns.

12         Does that have any significance to your opinions in

13    this case?

14    A.  Yes.

03:46:18  15    Q.  Why?

16    A.  This says that, The Department has identified three

17    additional concerns resulting from borrower confusion over the

18    biweekly and bimonthly program.  One, borrowers have been told

19    that by accepting the biweekly payment program, they can

03:46:32  20    effectively reduce the interest rate on their loan from

21    approximately 14 percent down to 7 percent.  The Department

22    has encountered reference to this 14 to 7 percent statement a

23    number of times and addressed the problem directly with HFC

24    management in mid 2001.  HFC informed the Department that the

03:46:50  25    practice was isolated to a single branch in Washington and

Ghiglieri - direct

615

1    that the matter was not a corporate practice.  However, the

2    Department has identified the practice to other branches in

3    Washington and has received reports from other regulators in

4    other states concerning the practice.  Contrary to HFC's

03:47:06  5    claims, the Department does not believe the practice is

6    isolated.

7    Q.  How is that relevant or significant to your opinions in

8    this case?

9    A.  They're concluding that this effective rate presentation

03:47:18  10   is cropping up in other than just the Bellingham, Washington,

11   office, which is what HF- -- Household would always say that's

12   the rogue office, Bellingham, Washington; and that they're

13   hearing from regulators around the country that this is

14   cropping up there too.  And that supports my opinion that

03:47:35  15   Household engaged in systemic and companywide predatory

16   lending practices.

17   Q.  If you turn to the page ending 671.  It's a continuation

18   of identify patterns that the Department of Financial

19   Institutions in Washington has observed.  If you look at

03:47:55  20   number five on that page.  It's the second paragraph there.

21   It's entitled prepayment penalty.

22   A.  Yes.

23   Q.  The first sentence of that paragraph, does that support

24   your opinion in this case?

03:48:06  25   A.  Yes.  It says, Consumers complained that they were unaware

Ghiglieri - direct

616

1    of a prepayment penalty or that they were told they did not

2    have a prepayment penalty.  However, their loans did contain a

3    prepayment penalty.

4    Q.  And if you take a look at the next page, page ending 672.

03:48:26   5    The heading number six indicates an insurance packing.  Do you

6    see that?

7    A.  Yes.

8    Q.  Did the Washington DFI or Department of Financial

9    Institutions also find indications of insurance packing?

03:48:40   10   A.  Yes.

11   Q.  And if you take a look down at seven, upselling loans.

12   A.  Yes.

13   Q.  The first sentence under seven, upselling loans, does that

14   support your opinion in this case?

03:48:53   15   A.  It does.  And this is basically the loan splitting.  The

16   Department found that HFC attempts to provide both a first and

17   a second mortgage to borrowers regardless of the borrower's

18   desire or need for two loans.

19          And that's the loan splitting that we talked about.

03:49:10   20   Q.  I'll show you what has been marked as Plaintiffs' Exhibit

21   445 for identification.

22   (Tendered.)

23   BY MR. DROSMAN:

24   Q.  Do you recognize Plaintiffs' Exhibit 445?

03:49:38   25   A.  I do.

Ghiglieri - direct

617

1    Q.  What is it?

2    A.  This is a memo.  It's been -- it's an attachment to an

3    e-mail from Stephen Hicks to a variety of people at Household.

4    And the subject is Meeting with Michigan regulators.  And it's

03:49:58  5    dated June 18, 2002.

6    Q.  Why do you recognize this document?

7    A.  This was a document that I looked at in formulating my

8    opinions.

9            MR. DROSMAN:  Plaintiffs offer Exhibit 455 in

03:50:14 10    evidence.

11            THE COURT:  It will be admitted.

12    BY MR. DROSMAN:

13    Q.  And, specifically, this particular document, this was sent

14    by Stephen Hicks, it indicates?

03:50:24 15    A.  Yes.

16    Q.  And if you look at the page ending 592, it appears to be a

17    memo that Mr. Hicks sent?

18    A.  Yes.

19    Q.  Who is Mr. Hicks?

03:50:34 20    A.  He was an official at Household.

21    Q.  And was he in the policy and compliance department?

22    A.  I believe so.

23    Q.  And that's the department that interfaces with the

24    regulators?

03:50:44 25    A.  Yes, Mr. Schneider's department.

Ghiglieri - direct

618

1   Q.  And the subject indicates Meeting with Michigan

2   regulators?

3   A.  Yes.

4   Q.  On what date was the meeting with the Michigan regulators?

03:50:53   5   A.  June 7, 2002, it says.

6   Q.  And if you look at the second to last sentence of the

7   first paragraph, were there two significant issues for the

8   Michigan regulators?

9   A.  Yes.  They talked about the good faith estimate and proper

03:51:10   10   disclosure, and they talked about prepayment penalties.

11   Q.  The first significant issue for the Michigan regulators

12   reads GFE and proper disclosure there?

13   A.  Yes.

14   Q.  Can you tell us whether that's significant to your

03:51:25   15   opinion?

16   A.  It's similar findings to what I saw in other states.  And

17   it says, The examiners -- and this is Michigan regulators now.

18   The examiners reviewed approximately 60 loan files and

19   identified six where the GFE was missing, fees were not

03:51:41   20   disclosed or the difference in fees disclosed versus the

21   HUD-1 -- which is the good faith estimate -- or which is

22   the -- the HUD-1 is your closing document -- was significant.

23   So let me read that again.

24       The examiners reviewed 60 loan files and identified

03:51:56   25   six where the GFE -- which is the good faith estimate given

Ghiglieri - direct

619

         1    three days after the completed application -- was missing,

         2    fees were not disclosed or the difference in the fees

         3    disclosed versus the HUD-1 -- which is the closing document --

         4    was significant.

03:52:11 5    Q.  What does the next sentence say?

         6    A.  With a 10 percent error rate, they indicated that they

         7    would require corrective action.

         8    Q.  And why is this significant to your opinion?

         9    A.  Because this is the type of activity that I saw in other

03:52:26 10   states to draw the conclusion that Household engaged in

        11    systemic and companywide predatory lending practices.

        12    Q.  And in this case, specifically, with failure to disclose

        13    and the good faith estimate?

        14    A.  Yes.

03:52:40 15   Q.  Can you look at the last full paragraph on that page.  It

        16    begins, This repeat examination issue.

        17    A.  This repeat examination issue was also noted in their

        18    March 2000 examination.  The examiners expressed concern over

        19    our lack of action in getting this issue resolved.

03:52:57 20   Q.  Is that significant to your opinion in this case?

        21    A.  Yes.  Examiners expect -- and regulators expect if they

        22    find something, that it's going to be corrected at the next

        23    examination.  And here, this is a repeat examination, which

        24    can lead to an enforcement action, anywhere from a cease and

03:53:16 25   desist order, requiring refunds, civil money penalties or even

Ghiglieri - direct

620

        1   change in management.

        2   Q.  So a year earlier, they found the same things, is that

        3   essentially what these people are saying?

        4   A.  Yes.

03:53:31  5   Q.  If you could turn to the next page, page ending 593.  One

        6   of the concerns that the Michigan regulators expressed -- it's

        7   the third one on the page -- is credit insurance

        8   cancellations?

        9   A.  Yes.  It says, The examiners indicated that they are

03:53:44 10   alarmed with significant numbers of cancellations of mortgage

      11   insurance.  They indicated that the cancellation rate

      12   suggested our sales practices may be inappropriate.  They

      13   indicated that the rate was much higher than any of their

      14   other regulated lenders.  They estimated that our cancellation

03:53:59 15   rate was 50 percent within the first three months of the loan.

      16   They asked us to look into it.

      17   Q.  How is that significant?

      18   A.  If you remember, the free look that the Household sales

      19   staff was trained to do -- so, in other words, if -- assume

03:54:16 20   that the customer wants the insurance, the insurance would be

      21   put on the loan documents.  When the borrower would look at it

      22   and say, well, what is that?  Is that credit insurance?  I

      23   don't want that; they were trained to say, don't worry, you

      24   can keep it for 30 days and then cancel it.

03:54:34 25        So what as a regulator you're trained to do is you

Ghiglieri - direct

621

1    look at the penetration ratios to see if insurance is

2    required; and, that is, how many loans that were booked in a

3    given time frame had insurance.  Or you look to see if there's

4    an excessive number of cancellations.  And that's what they

03:54:52 5    did in Michigan.  They noticed that there's an excessive

6    number of cancellations, and that could be indicative that

7    there's insurance packing going on and these people are

8    canceling it.

9    Q.  And then the next item there, prepayment penalties?

03:55:06 10    A.  Prepayment penalties.  It says here, The examiners

11    indicated that based on a review of our complaints, we need to

12    better disclose to our customers the terms of the loan.  They

13    indicated that there seems to be a lot of confusion among our

14    customers regarding terms.  They indicate that several

03:55:21 15    complaints mention that our branch personnel make many

16    inappropriate comments when questioned about prepayment

17    penalties.  For example, it was noted that our branch

18    personnel say, Don't worry about the penalty.

19         And I've seen that in other places where they say

03:55:36 20    don't worry, it will be waived.  And we saw that in one of the

21    complaints from Ms. Adams, that she was told it would be

22    waived for a job relocation.

23    Q.  And Ms. Adams was from Pennsylvania, right?

24    A.  I believe so.

03:55:49 25    Q.  And this is the Michigan regulators?

Ghiglieri - direct

622

| | | |
|---|---|---|
| | 1 | A.  This is Michigan. |
| | 2 | Q.  Identifying the same practice -- |
| | 3 | A.  Yes. |
| | 4 | Q.  -- that Ms. Adams complained about? |
| 03:55:55 | 5 | A.  That's right. |
| | 6 | Q.  I'll show you what has been marked as Plaintiffs' Exhibit |
| | 7 | 19 for identification. |
| | 8 | (Tendered.) |
| | 9 | BY MR. DROSMAN: |
| 03:56:24 | 10 | Q.  Do you recognize Plaintiffs' Exhibit 19? |
| | 11 | A.  Yes. |
| | 12 | Q.  And what is it? |
| | 13 | A.  This is an FDIC/OTS concurrent examination report. |
| | 14 | Q.  What's the date of it? |
| 03:56:35 | 15 | A.  August 27, 2001. |
| | 16 | Q.  Why do you recognize it? |
| | 17 | A.  This is one of the documents that I looked at in |
| | 18 | formulating my opinions. |
| | 19 | MR. DROSMAN:  Your Honor, plaintiffs offer Exhibit 19 |
| 03:56:47 | 20 | into evidence. |
| | 21 | THE COURT:  It will be admitted. |
| | 22 | BY MR. DROSMAN: |
| | 23 | Q.  Let's take a look at the first page. |
| | 24 | What does the FDIC stand for? |
| 03:56:56 | 25 | A.  The FDIC is the Federal Deposit Insurance Corporation. |

Ghiglieri - direct

623

```
           1    And they are the federal agency that insures the deposits of

           2    depository institutions in the United States.

           3    Q.  And then if you look below -- apparently that's their

           4    seal?

03:57:16   5    A.  Yes.

           6    Q.  If you look below the seal, it says FDIC review concurrent

           7    with OTS exam?

           8    A.  That's right.

           9    Q.  What does that mean?

03:57:22  10    A.  That means that the FDIC has backup regulatory authority

          11    for any entity that they are insuring the deposits.  In this

          12    case Household's bank, FSB stands for Federal Savings Bank.

          13    And so the FDIC went in concurrently with the OTS to do a

          14    joint examination.

03:57:42  15    Q.  And concurrently means at the same time?

          16    A.  At the same time.

          17    Q.  If you turn to page ending 689.  There looks like there

          18    have been some portions of this document which have been

          19    redacted or deleted.  But if you look at the bottom portion of

03:58:00  20    the document, the first two sentences there, is that

          21    significant to your opinion?

          22    A.  Yes.  It says, The thrift appears to be involved in -- to

          23    some extent in predatory lending.  Further, a consumer

          24    advocacy group has named Household organization the 2001

03:58:19  25    predatory shark lender of the year.
```

Ghiglieri - direct

624

1    Q.  And then if you go ahead and turn to page ending 699.  And

2    there's a small section of text on that page.  I think the

3    rest has been deleted or redacted.

4         Can you tell me whether that's significant to your

03:58:38  5    opinion?

6    A.  The OTS and the FDIC examiners believe that insurance

7    sales practices are predatory.  Community affairs specialist

8    Glenn Brewer is currently reviewing practices and will be

9    preparing a memo.  The penetration rate of insurance sales of

03:58:54  10    property, credit, life, unemployment and disability insurance

11    are all considered high, as illustrated in the table below.

12    Q.  And unfortunately we don't have that table.  But what does

13    the OTS refer to in that sentence?

14    A.  That's the Office of Thrift Supervision.  That's the

03:59:10  15    primary federal regulator of the Federal Savings Bank.

16    Q.  I'll show you what has been marked as Plaintiffs' Exhibit

17    550 for identification.

18       (Tendered.)

19    BY MR. DROSMAN:

03:59:43  20    Q.  Do you recognize Exhibit 550?

21    A.  I do.

22    Q.  What is it?

23    A.  It is a document attached to an e-mail.  The e-mail is

24    dated August 15, 2002.  It's from David Huey, which is -- he's

04:00:08  25    at the Washington State AG's office, to Kathleen Curtin and

Ghiglieri - direct

625

1    others.  And it's -- the subject is multistate working group

2    reply to HFC.

3    Q.  Why do you recognize this document?

4    A.  This is one of the documents I reviewed in formulating my

04:00:26  5    opinions.

6            MR. DROSMAN:  Plaintiffs offer Exhibit 550 into

7    evidence.

8            THE COURT:  It will be admitted.

9    BY MR. DROSMAN:

04:00:34  10   Q.  Let's take a look at the first page.  You said that it was

11   from David Huey from the Washington State AG.  What does AG

12   stand for?

13   A.  Attorney general.

14   Q.  And it looks like on the right there to Mr. Huey's name,

04:00:47  15   there's a cc to a number of other people.  Do you see that?

16   A.  Yes.

17   Q.  Who are those other people?

18   A.  I think those are all of the other members of the

19   multistate working group, it looks like to me.

04:01:03  20   Q.  Are those others attorneys general?

21   A.  Yes.

22   Q.  And you mentioned a multistate working group.  Can you

23   tell us what that is?

24   A.  Well, in the case -- in this case, the attorneys general

04:01:18  25   from various states got together because they were all

Ghiglieri - direct

626

1    receiving this -- similar complaints regarding Household.  And

2    they got together to discuss what they needed to do.  And so

3    this is part of that discussion with Household on the

4    complaints and the regulatory issues that they were seeing in

04:01:38  5    various states.

6    Q.  So the right-hand column there lists the names and e-mail

7    addresses of different attorneys generals from states all

8    across the United States?

9    A.  Yes.

04:01:50 10    Q.  Iowa is there; is that right?

11    A.  Iowa, New York, Michigan, Ohio, New Mexico, California,

12    Florida, Minnesota, Michigan.

13    Q.  And then if you take a look, it appears that the e-mail

14    attaches a memo, is that correct, on page ending 756?

04:02:24 15    A.  Yes.

16    Q.  And this memo was addressed to Kathleen Curtin; is that

17    right?

18    A.  Yes.

19    Q.  Who is Kathleen Curtin?

04:02:32 20    A.  She was the lawyer for -- general counsel for the consumer

21    finance section of Household.  It says HFC/Beneficial.

22    Q.  So she's the vice president and general counsel of HFC?

23    A.  Yes.

24    Q.  And what was the date of the memo?

04:02:52 25    A.  The date is -- August 15 is the e-mail.  And the memo is

Ghiglieri - direct

627

|          |    |                                                            |
|----------|----|------------------------------------------------------------|
|          | 1  | August 14 --                                               |
|          | 2  | Q.  And --                                                 |
|          | 3  | A.  -- 2002.                                               |
|          | 4  | Q.  And who is writing this particular memo?               |
| 04:03:06 | 5  | A.  And the memo is being written by David Huey on behalf of |
|          | 6  | the multistate working group.                              |
|          | 7  | Q.  And David Huey was the assistant attorney general from the |
|          | 8  | State of Washington?                                       |
|          | 9  | A.  Right, from Washington State.                          |
| 04:03:20 | 10 | Q.  And he was sort of the representative of all the different |
|          | 11 | attorneys generals across the United States?              |
|          | 12 | A.  Right.                                                 |
|          | 13 | Q.  And if you take a look at the second -- third paragraph on |
|          | 14 | that page, it's the third sentence in, can you tell us whether |
| 04:03:38 | 15 | that has any significance to your opinions in this case?  |
|          | 16 | A.  It says, Household's hope that the states would reconsider |
|          | 17 | their position that some of Household's practices are      |
|          | 18 | problematic is understandable.  However, we believe that your |
|          | 19 | company may have underestimated our understanding of how its |
| 04:03:55 | 20 | practices are actually implemented where it counts, at the |
|          | 21 | interface with your customers.                            |
|          | 22 | The explanations and rationales Household articulated     |
|          | 23 | on July 9 and in the July 17 letter have not given us any |
|          | 24 | reason to reconsider our position that the practices we   |
| 04:04:11 | 25 | earlier identified present serious problems under a variety of |

Ghiglieri - direct

628

1    consumer protection and regulatory laws.

2            Further, the responses provided no information which

3    has led us to change our position that those identified

4    practices warrant changes in the future and relief for

04:04:27  5    Household's customers who suffered from them in the past.

6    Q.  Is that significant to your opinion in this case?

7    A.  Yes.

8    Q.  Why?

9    A.  Because my opinions are that Household engaged in systemic

04:04:41 10    and companywide predatory lending.  And that's what they were

11    saying, it's more pervasive than Household wants to admit.

12    Q.  If you could turn to the page ending 757 and take a look

13    at the fourth paragraph on that page.

14    A.  And it begins with what?  I want --

04:05:08 15    Q.  We had hoped for the -- that the July 17 letter would have

16    been more responsive.

17    A.  We had hoped that the July 17 letter would have been more

18    responsive to the proposed framework for settlement rather

19    than purely defensive.  Indeed, the letter seems to indicate a

04:05:23 20    continued denial concerning what we have found to be

21    nationwide common practices.  While Household might like to

22    maintain the belief that these are isolated instances with

23    rogue offices and loan officers, the coast-to-coast usage of

24    common forms and sales techniques belie any such position.

04:05:41 25    Q.  Tell us why that's significant to your opinion.

Ghiglieri - direct

629

1    A.  And it supports my position -- my opinions that Household

2    engaged in companywide and systemic predatory lending; that

3    the excuse that it's a rogue officer or a rogue branch in

4    Bellingham, Washington, for example, doesn't hold water when

04:06:02 5    you look at the sum total of the documentation.

6    Q.  So this is essentially the multistate AGs, the attorneys

7    generals from all across the United States, rejecting

8    Household's explanation that it was just a few bad apples?

9    A.  Yes.

04:06:17 10    Q.  Then if you could turn to the next page, page ending 758,

11    and look at the first paragraph there.  It's a partial

12    paragraph.  It begins, These figures are, to put it mildly,

13    large.

14          Can you tell us whether the rest of that paragraph

04:06:33 15    supports your opinion in this case?

16    A.  Yes.  We note that several of the most insidiously

17    deceptive sales practices, which attracted regulatory

18    attention to Household practices at the outset, relate to

19    products and practices initiated by Household in 1999.

04:06:48 20    Industry figures indicate that since 1999, Household's

21    originations have nearly doubled.  Almost assuredly the

22    misleading sales practices the states have identified have

23    contributed to that growth.  Ultimately the value of

24    restitution and reformation must be viewed against that

04:07:12 25    backdrop.

Ghiglieri - direct

630

1    Q.  Why does this particular information support your opinion

2    in this case?

3    A.  Well, because my opinions outline that when Gary Gilmer

4    came to Household in 1998, the focus turned to growth; and

04:07:31  5    that for 1999, there was an obsession about growth.  And they

6    hired Andrew Kahr.  They developed these predatory products

7    and services, which they implemented.  And they did grow.  As

8    it shows here, Household's originations nearly doubled.  And

9    the conclusion of the regulators supports my conclusion that

04:07:56  10   they engaged in predatory lending practices and that they were

11   systemic and companywide.

12   Q.  This growth that you said, that they doubled their loan

13   originations, right?  What are loan originations?

14   A.  Those are new loans that they booked.  And we talked about

04:08:10  15   how the employees were being compensated for booking more

16   loans and for booking more dollars.  And that's what they're

17   talking about.  The number of new loans, the dollar amount of

18   new loans that they booked doubled and -- since 1999.  And the

19   date of this was August of 2002.

04:08:27  20   Q.  And what does the Washington State attorneys generals

21   attribute that huge doubling of loan originations to?

22   A.  To these deceptive sales practices that have -- that they

23   implemented and that they were using.

24   Q.  And is that consistent with your opinion in this case?

04:08:45  25   A.  Yes.

Ghiglieri - direct

639

         1          MR. KAVALER:  Objection, your Honor.

         2          THE COURT:  Sustained.

         3  BY MR. DROSMAN:

         4  Q.  What's your understanding as to how major issues and

04:19:37 5  obstacles relates to predatory lending on that page?

         6  A.  They were listing the major issues and obstacles to their

         7  loan growth and their profitability.  And so they have several

         8  listed here, and one of them is predatory lending.

         9  Q.  So they highlighted that as a major issue and obstacle to

04:19:58 10 loan growth?

        11  A.  Or to their operating plan, what their goals were for

        12  2001.

        13  Q.  Let's talk a little bit about ways in which you went about

        14  reaching your conclusions in this case.

04:20:19 15          Did you ever look at, for example, the total number

        16  of Household's loans, on the one hand, and then the number of

        17  complaints on the other and try to calculate some sort of

        18  complaint-to-open-loan ratio or percentage?

        19  A.  No.

04:20:35 20 Q.  Why not?

        21  A.  Because that ratio is meaningless.  Regulators look at

        22  complaints on a complaint-by-complaint basis because it's very

        23  difficult for people to file a complaint.  It takes a lot of

        24  energy.  They have to put something in writing.  They have to

04:20:52 25 get all their documentation together.  And so when someone

Ghiglieri - direct

640

1       complains, the regulators take it seriously.  Even if there's

2       a handful of complaints, the regulators take them seriously.

3              They look at each complaint.  They get the response

4       from the lender, in this case Household.  And they come to

04:21:12  5   some conclusion whether laws had been violated or deceptive

6       practices have been foisted on the borrower, whatever the

7       issue might be.  And so the -- the complaint framework and the

8       complaint-based review of a lender does not lend itself to a

9       ratio analysis of complaints to open loans.  It's -- that's

04:21:41 10   not meaningful.

11      Q.  Now, when you were -- you were a lender for 25 -- I mean

12      you were a regulator for 25 years; is that right?

13      A.  Yes.

14      Q.  And first you were a regulator with the OCC, the federal

04:21:52 15   government; is that right?

16      A.  That's right, the regulator of national banks.

17      Q.  And then a regulator for the Texas State Banking

18      Commission; is that right?

19      A.  Right.  I was the Texas banking commissioner.

04:22:02 20   Q.  You headed that department?

21      A.  Yes.

22      Q.  Did you ever calculate this ratio of complaints to open

23      loans during your 25 years of regulatory experience?

24      A.  No.

04:22:12 25   Q.  Did you ever have anybody underneath you say calculate

# TAB 10

647

```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all    )
 4   others similarly situated,      )
                                     )
 5             Plaintiff,            )
                                     )
 6     vs.                           )   No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )   Chicago, Illinois
 8                                   )   April 2, 2009
               Defendants.           )   9:45 a.m.
 9
                              VOLUME 4
10             TRANSCRIPT OF PROCEEDINGS - TRIAL
          BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:       COUGHLIN STOIA GELLER RUDMAN &
                              ROBBINS LLP
14                            BY:  MR. LAWRENCE A. ABEL
                                   MR. SPENCER A. BURKHOLZ
15                                 MR. MICHAEL J. DOWD
                                   MR. DANIEL S. DROSMAN
16                                 MS. MAUREEN E. MUELLER
                              655 West Broadway
17                            Suite 1900
                              San Diego, California  92101
18                            (619) 231-1058

19                            COUGHLIN STOIA GELLER RUDMAN &
                              ROBBINS LLP
20                            BY:  MR. DAVID CAMERON BAKER
                                   MR. LUKE O. BROOKS
21                                 MR. JASON C. DAVIS
                                   MS. AZRA Z. MEHDI
22                            100 Pine Street
                              Suite 2600
23                            San Francisco, California  94111
                              (415) 288-4545
24

25
```

Ghiglieri - direct

653

1   open loans.

2           Do you recall that?

3   A.  I do.

4   Q.  And you talked about the fact that you looked at the

09:55:30  5   seriousness of the allegations, the geographic dispersion or

6   spread of those allegations.

7           Did you look at anything else when assessing

8   complaints, customer complaints?

9   A.  Well, in the Household case or just as a regulator?

09:55:45  10  Q.  As a regulator.

11  A.  As a regulator, I would look at the nature of the

12  complaint, what type of a complaint was it, what were the

13  allegations in terms of violations of law; and, of course,

14  then how widespread was it in the particular lender, how

09:56:00  15  serious was it, what was the response of the company.  So you

16  try and take everything into consideration.

17  Q.  Did you also look at the trend of complaints, whether they

18  were increasing or decreasing over time?

19  A.  Yes.

09:56:12  20  Q.  And why did you do that?

21  A.  Well, because if -- whenever a complaint would come in, we

22  would always send it to the regulated entity.  In the case --

23  in my case, that would be national banks or state banks.  And

24  we would ask, you know, how -- what do you think about this

09:56:29  25  complaint; and if it's valid, how are you going to resolve it.

Ghiglieri - direct

654

1       And so you would expect if it was a legitimate issue, for it

2       to be corrected.  So if we continued to see complaints of the

3       same nature, you know, then we might send an examiner out to

4       do a special investigation, for example.  Or we would

09:56:49  5     definitely send the complaints to the examiners in case they

6       wanted to expand the scope of their examination.

7       Q.  And in this particular case, when you were examining the

8       documents to arrive at your conclusions, did you look at all

9       three of these issues with respect to the complaints that

09:57:07 10     customers made about Household?

11      A.  Yes.

12      Q.  Are there other reasons that a ratio of complaints to open

13      loans wouldn't provide you with useful information?

14      A.  Well, it doesn't lend itself to a ratio analysis, such as

09:57:27 15     looking at how many loans in a loan portfolio are past due,

16      because people who have been taken advantage of often don't

17      know they've been taken advantage of so they don't know to

18      complain.  And a lot of people that are mad about something,

19      for example, I've been taken advantage of, won't go to the

09:57:44 20     effort to write it down and send it in.  And that's what we've

21      known over the course of time.  So it's just not something

22      that lends itself to a ratio analysis.

23              You have to take every complaint seriously.  You have

24      to analyze every complaint.  And you have to get the

09:58:00 25     explanation from the lender to find out why are we getting

Ghiglieri - direct

665

1   conclusions in this case?

2   A.  Yes, I did.

3   Q.  And did Household's denials of predatory lending, did that

4   alter or change your view that Household engaged in widespread

10:12:10  5   systemic predatory lending practices?

6   A.  Well, I looked at the documents prior to formulating my

7   opinions.  I took all of the information into consideration in

8   formulating my opinions.  And the more documents that I looked

9   at, the less persuasive that argument became in my mind.  And

10:12:31 10   I concluded at the end of looking at all the information that

11   Household engaged in widespread and systemic and companywide

12   predatory lending, notwithstanding their claims that it was --

13   you know, that they didn't or that it was a rogue employee or

14   a rogue branch.

10:12:49 15   Q.  Why didn't the Household's denials that they engaged in

16   predatory lending, why didn't that change your view that they

17   did, in fact, engage in widespread, systemic predatory lending

18   practices?

19   A.  Well, there were several reasons why that didn't change my

10:13:07 20   view.  The first one is because, as these complaints started

21   to escalate, I didn't see from Household any attempt at trying

22   to identify the root causes of these complaints.  I would see

23   an issuance here or an e-mail there that would say we don't

24   engage in predatory lending or everyone else in the industry

10:13:29 25   engages in it but us.

Ghiglieri - direct

680

1   A.  So as re-agings go up, as loans are re-aged, which is

2   taken out of the two-plus bucket and put back in current, the

3   number of two-plus delinquencies goes down.  So this is taking

4   loans from the two-plus bucket and putting them over into the

10:33:30  5   current bucket.  So there's an inverse relationship between

6   re-aging and delinquent -- two-plus delinquencies.

7   Q.  What if two-plus delinquencies go up instead of down, what

8   is the effect on re-aging?

9   A.  Well, if they -- if Household stopped re-aging, for

10:33:48  10   example, or diminished the amount of their re-aging, the

11   re-aging would go down and the delinquencies would go up

12   because then the -- there was no way to make those loans

13   current.  So here re-aging is going down and the two-plus

14   numbers are going up, so it's a direct inverse relationship.

10:34:05  15   Q.  And is re-aging of loans significant to a regulator?

16   A.  Yes.  When I was a field examiner, this is one of the

17   things that we looked at in particular to determine if a

18   lender was masking their delinquencies.  We would look at a

19   variety of tactics that they could use, for example, rewriting

10:34:27  20   the loan, forbearance, a variety of things.  And we would look

21   to see how prevalent that was in the loan portfolio because

22   the more they were doing that, the more it would lead us to

23   conclude that they were masking delinquencies.

24   Q.  Now, during your reviews as an expert in this case, did

10:34:47  25   you determine whether Household used re-aging to manipulate

Ghiglieri - direct

681

          1    its two-plus delinquency number?

          2    A.  Yes, that was one of my conclusions, was that Household

          3    used various re-aging tactics and practices to mask their

          4    delinquencies.

10:35:02  5    Q.  I'll show you what has been marked as Plaintiffs' Exhibit

          6    1387 for identification.

          7    (Tendered.)

          8    BY MR. DROSMAN:

          9    Q.  Do you recognize Plaintiffs' Exhibit 1387?

10:35:34  10   A.  I do.

          11   Q.  What is it?

          12   A.  This is an e-mail from Elaine Markell to Rich Peters and

          13   others at Household -- she was at Household -- regarding the

          14   Re-aging Fitch Servicer Presentation Slides, dated November

10:35:48  15   12, 2002.

          16   Q.  Why do you recognize this document?

          17   A.  This was one of the documents that I looked at in

          18   formulating my opinions on the re-aging issues.

          19        MR. DROSMAN:  Plaintiffs move Exhibit 1387 into

10:36:02  20   evidence.

          21        THE COURT:  It will be admitted.

          22   BY MR. DROSMAN:

          23   Q.  Why don't we start at the bottom e-mail, I guess, the

          24   first in the string.  And can you tell us, first, who Elaine

10:36:12  25   Markell is in this e-mail?

Ghiglieri - direct

682

1   A.  Elaine Markell is a woman who worked in the mortgage

2   services division, which was kind of the sister division of

3   consumer lending.

4   Q.  And was she the vice president of default services in that

10:36:29 5   mortgage services business unit?

6   A.  Yes.

7   Q.  And it looks like she's sending an e-mail to Rich Peters.

8   Was he the vice president of credit risk for Household

9   mortgage services?

10:36:40 10   A.  Yes.

11   Q.  What's significant to you about this e-mail that

12   Ms. Markell is sending?

13   A.  Well, if the -- if you could highlight this -- the

14   paragraph here.  It says, Rich, you need to change the slides

10:36:56 15   for the presentation.

16          And this is for the presentation to Fitch.

17          First of all, what you have on the slides does not

18   represent the policies in place since September 27 when I was

19   directed to add back EZ pay restructures and restructures on

10:37:13 20   bankruptcies 13.

21          That means Chapter 13 bankruptcies.

22          The bankruptcy 13 restructures were done upon receipt

23   of the plan without the payment of funds.  In addition to

24   that, restructures were done on any Chapter 13 where one

10:37:29 25   payment was made in the past 60 days.  Since there was no

Ghiglieri - direct

683

1    other reason for the implementation of these restructure

2    policies other than to make the predetermined delinquency

3    number, you must take the bullet point out that restructures

4    are not done to defer loss recognition since it clearly does.

10:37:47  5    Presenting the true facts about restructures to Fitch is

6    equally as important as stating the true and unadjusted

7    delinquency which we have discussed before.

8    Q.  One of the sentences you read there said, Since there's no

9    other reason for the implementation of these restructure

10:38:06  10    policies other than to make the predetermined delinquency

11    number.

12        What's the difference between restructuring and

13    re-aging?

14    A.  Household used them interchangeably.

10:38:15  15    Q.  So why is that significant to you, that Ms. Markell

16    thought that there was no other reason for the implementation

17    of these re-aging or restructuring policies other than to make

18    the predetermined delinquency number?

19    A.  Because Household was trying to hit a delinquency target.

10:38:31  20    Because at this point in time, in November 2002, they were

21    reporting certain delinquency numbers and certain of their

22    policies.  And Fitch is a reporting agency that was coming in

23    to give them a more fuller investigation.

24    Q.  Does this suggest or support your opinion that Household

10:38:56  25    was using re-aging to manipulate its two-plus delinquency

Ghiglieri - direct

684

1    number?

2    A.  Yes.

3    Q.  How does it do that?

4    A.  Well, because she's saying here there's no other reason

10:39:03 5    for us to be doing these restructures with Chapter 13

6    bankruptcy accounts and doing all these shenanigans if it

7    wasn't to make a certain number.

8    Q.  And the delinquency number in this case, is that the

9    two-plus delinquency number?

10:39:20 10    A.  Yes.

11    Q.  I'll show you what has been marked as Plaintiffs' Exhibit

12    77 for identification.

13        (Tendered.)

14    BY MR. DROSMAN:

10:39:49 15    Q.  Do you recognize Exhibit 77?

16    A.  I do.

17    Q.  What is it?

18    A.  This is an e-mail string regarding the re-aging, on how

19    many loans had been re-aged one time versus multiple times,

10:40:01 20    with a chart attached showing that very thing.

21    Q.  What's the date of the e-mail?

22    A.  The date is September 11, 2002.

23    Q.  And why do you recognize this document?

24    A.  This is one of the documents that I looked at to analyze

10:40:19 25    and formulate my opinions regarding re-aging.

Ghiglieri - direct

685

1          MR. DROSMAN:  Plaintiffs offer Exhibit 77 into

2     evidence.

3          THE COURT:  It's admitted.

4     BY MR. DROSMAN:

10:40:30  5     Q.  Why don't we take a look -- you said it's two pages, an

6     e-mail with an attachment.  Why don't we look at the e-mail.

7          Can you tell us the significance of the e-mail to

8     your opinion?

9     A.  Yes.  The bottom says, For your information.

10:40:44 10     Mr. Schoenholz asked for a ratio -- and that should say of --

11     domestic multiple re-ages as a percentage of total re-age.

12     The question came to me via Gary -- which I assume is

13     Gilmer -- and we provided Mr. Schoenholz with the ratio of

14     47.9 percent over the phone.

10:41:02 15          And then if you look at the second page and look at

16     the bottom line.  If you could highlight the very bottom line,

17     you can see -- let's see if -- okay.  This line right here

18     shows total re-age loans of $15 billion of a total portfolio

19     of $98 billion.

10:41:35 20     Q.  What does that mean?

21     A.  Or 47.9 percent of these loans have been re-aged multiple

22     times.  So of the re-age section -- let me start all over

23     again.

24          Of the loans that Household had that had been

10:41:56 25     re-aged, 47.9 percent of them had been re-aged more than one

Ghiglieri - direct

686

1    time.

2    Q.  So let's start -- starting in this $98 billion number,

3    this signifies all of the loans that Household had at that

4    time?

10:42:09  5    A.  Yes.

6    Q.  And then what does this $15.9 billion number signify?

7    A.  And that signifies how many had been re-aged.  And that

8    would have been 16 percent of their whole portfolio had been

9    re-aged.

10:42:23 10    Q.  And then this 47.9 percent number, what does that mean?

11    A.  Of the 15 billion, 47.9 percent had been re-aged, almost

12    half of the 15 billion had been re-aged multiple times.

13    Q.  And what does that mean, re-aged multiple times?

14    A.  Well, it's really -- when you re-age something, you know,

10:42:44 15    you're taking it out of the delinquency and you're putting it

16    into the current bucket.  And then they're not paying again,

17    and then you re-age it again and you re-age it again.  And so

18    you are, in effect, masking your past due because there's no

19    way for the customer -- the customer is not paying.  You're

10:43:02 20    just re-aging it to take it out of the delinquency bucket.

21    And that's what Household was doing.

22    Q.  So re-aging multiple times means you've re-aged a loan

23    once already, you're re-aging it again, perhaps again and

24    again --

10:43:14 25    A.  Right.

Ghiglieri - direct

687

1    Q.  -- just to take it out of the delinquent bucket repeatedly

2    and put it back in the current?

3    A.  Right.  And the time frame is, it's in the two-plus bucket

4    and you re-age so it goes back to current.  So it takes a

10:43:26  5    number of months.  It takes two months to get it back in the

6    two-plus bucket.  Then you re-age it and it goes into the

7    current.  Then it takes a couple of months to get back there.

8    So once they re-age, they have a little bit of time before

9    they have to deal with it again.

10:43:41  10    Q.  And who is asking for this information, this ratio of how

11    many loans had been re-aged multiple times?

12    A.  It says Mr. Schoenholz is asking for it.

13    Q.  And that's David Schoenholz, the CFO of the company?

14    A.  Yes.

10:43:58  15    Q.  I'll show you what has been marked as Plaintiffs' Exhibit

16    654 for identification.

17      (Tendered.)

18    BY MR. DROSMAN:

19    Q.  Do you recognize Plaintiffs' Exhibit 654?

10:44:28  20    A.  I do.

21    Q.  And what is this?

22    A.  This is an e-mail from Dave Stockdale to various managers

23    or senior -- senior managers at Household.  And the subject is

24    retail services re-age policy.  And the date is September 4,

10:44:51  25    2001.

Ghiglieri - direct

688

1    Q.  And why do you recognize this document?

2    A.  This is one of the documents I looked at in formulating my

3    opinions.

4           MR. DROSMAN:  Plaintiffs offer Exhibit 654 into

10:45:03  5    evidence.

6           THE COURT:  It's admitted.

7    BY MR. DROSMAN:

8    Q.  Why don't we take a look at this.  The bottom e-mail

9    appears to be from Dave Stockdale; is that right?

10:45:15  10    A.  It looks like it's from Dave Stockdale to Paul

11    "Markawitz."

12    Q.  Paul Makowski?

13    A.  I'm sorry.  I'm mispronouncing his name.  Makowski, yes.

14    Q.  Mr. Makowski was the chief credit officer; is that

10:45:30  15    correct?

16    A.  Yes.

17    Q.  If you take a look at the second paragraph of the e-mail,

18    does that have any significance to your opinion?

19    A.  Yes.  This is what I was talking about.  This says, For

10:45:41  20    maximum benefit to year-end, retail sales should perform the

21    re-age between the customer cycle date and the month-end with

22    a sweep at month-end.  This will ensure that all September

23    re-ages will be unable to reach two-plus by year-end.

24           In other words, they're going to take all of them at

10:45:57  25    a certain time because then it would prevent them from

Ghiglieri - direct

689

1    progressing back to the two-plus number by year-end when they

2    have to report it on their 10-K.

3    Q.  So is this significant to your opinion that Household

4    manipulated its two-plus delinquency number through the use of

10:46:13  5    re-aging?

6    A.  Yes.

7    Q.  Why?

8    A.  Well, because they're discussing how they're going to

9    manipulate their delinquency number by using the re-age

10:46:21  10   practice at a certain -- and they're even planning when

11   they're going to use it so that these loans won't then become

12   delinquent and show up again in the two-plus bucket at

13   year-end.

14   Q.  Then the last sentence there says, This will ensure that

10:46:36  15   all September re-ages will be unable to reach two-plus at

16   year-end.

17   A.  Yes.

18   Q.  Do you see that?

19       What do you understand that to mean?

10:46:44  20   A.  Well, they were timing the re-ages so that they could

21   prevent the ones in this particular category from becoming

22   delinquent again, such that it reaches that two-plus bucket at

23   year-end so they don't have to disclose it as delinquent.

24   Q.  They have to disclose all the delinquent loans at the

10:47:03  25   year-end in their form 10-K, their annual report?

Ghiglieri - direct

690

1     A.  Yes.

2     Q.  And so what's your conclusion about why -- what this means

3     here?

4     A.  So they're timing these re-ages so that this group of

10:47:12  5     loans will not show up as two-plus delinquent at year-end.

6     Q.  And they do that by re-aging those loans?

7     A.  Yes, at a certain time.  They're timing it because they

8     know that the progression will be that it will go to 30 days

9     past due, then 60 days past due, in which case it's going to

10:47:29 10     end up in the two-plus bucket.  So they're timing it so that

11     doesn't happen until January so they don't have to disclose

12     it.

13     Q.  I'll show you what has been marked as Plaintiffs' Exhibit

14     454 for identification.

10:47:47 15     (Tendered.)

16     BY MR. DROSMAN:

17     Q.  Before we actually get to 454, there was one issue on that

18     last exhibit that we were talking about that I wanted to

19     discuss with you.

10:48:01 20          If we can put back up 654, the first page.

21          And this is the example of the timing of the re-ages

22     so that they wouldn't be delinquent at year-end.  If you look

23     at the top e-mail, it looks like it was forwarded by

24     Mr. Makowski?

10:48:21 25     A.  Yes.

Ghiglieri - direct

691

1    Q.  And was it forwarded to Mr. Schoenholz?

2    A.  Yes.  He was cc'd on it.

3    Q.  Perhaps we can zoom in on that so we can see whether it

4    was forwarded to Mr. Schoenholz.

10:48:35 5        So you said Mr. Schoenholz received a copy of this

6    e-mail?

7    A.  Yes.

8    Q.  Why don't we turn now to Plaintiffs' Exhibit 454 for

9    identification.

10:48:52 10       Do you recognize Plaintiffs' Exhibit 454?

11   A.  I do.

12   Q.  What is it?

13   A.  This is a document.  It's an e-mail string.  And it's got

14   some handwritten notes and then a chart attached to it.

10:49:08 15  Q.  And the e-mail string that you talked about, who is the

16   e-mail from?

17   A.  Well, there are several e-mails, but some of them are from

18   Gary Gilmer.

19   Q.  And what are the dates?

10:49:22 20  A.  The date of the bottom e-mail is February 22, 2000.

21   Q.  And what's the subject of the e-mail?

22   A.  And the subject is "cut."

23   Q.  Why do you recognize Plaintiffs' Exhibit 454?

24   A.  This was one of the documents that I looked at in

10:49:39 25  formulating my opinions.

Ghiglieri - direct

1          MR. DROSMAN:  Plaintiffs offer Exhibit 454 into

2   evidence.

3          THE COURT:  It will be admitted.

4   BY MR. DROSMAN:

10:49:50  5   Q.  Let's take a look at the bottom e-mail on page ending 417

6   that you said is entitled "cut."

7          That's from Dick Schaffer; is that right?

8   A.  Yes, and he's sending this to Gary Gilmer.

9   Q.  And that's the defendant in this case?

10:50:06 10  A.  Yes.

11  Q.  And Dick Schaffer is the managing director of operations

12  for the consumer lending division; is that correct?

13  A.  Yes.

14  Q.  Can you tell me what's significant about the text of that

10:50:18 15  e-mail?

16  A.  Well, he's saying here, I just revisited the two-plus

17  forecast with each of my guys.  Bottom line looks like a $25

18  million cut without the magic, parentheses, grace period, and

19  75,000 with it.  We are a little afraid of the 29-day month so

10:50:32 20  we aren't being overly aggressive with this forecast.   It

21  looks pretty solid.

22  Q.  Let's just focus on the first two sentences of that

23  e-mail.  Bottom line looks like a $25 million cut without the

24  magic, parens, grace period, and $75 million with it.

10:50:57 25          Is he talking about the two-plus delinquency number

Ghiglieri - direct

693

1    in this case?

2    A.  Yes.

3    Q.  And is he talking about a cut to the two-plus delinquency

4    number?

10:51:04  5    A.  Yes.

6    Q.  So what do you understand this to mean here?

7    A.  Well, what Household did is they would give their

8    borrowers 15 days after the date that the payment was due as a

9    grace period to make their payment.  And so, unlike other

10:51:19 10   lenders who just report delinquencies straight up, what they

11   would do is, say, for example, a loan was 74 days past due,

12   they would deduct 15 days from that and that would bring it

13   back down to 59 days and so they wouldn't report that as a

14   two-plus number, a loan that's in the two-plus bucket.

10:51:40 15          So they would use grace periods as a way to mask past

16   due by deducting 15 days from how many ever days the loans

17   were past due in the two-plus bucket and bringing them back

18   into the current bucket.

19          And so what he's saying here is that without the

10:51:56 20   magic of the grace period, they would not be -- it would look

21   like their delinquencies would be cut 25 million; but with

22   using this grace period tactic, they would be able to cut

23   two-plus numbers 75 million.

24   Q.  So they could cut $50 million from their two-plus numbers

10:52:17 25   by using the magic of the grace period; is that right?

Ghiglieri - direct

694

1     A.  Yes, yes.

2     Q.  And does this -- is this significant to your opinion that

3     Household used re-aging practices like the grace period to

4     manipulate its two-plus numbers?

10:52:31  5     A.  Yes.  I mean, there's no reason to do that unless you were

6     manipulating your delinquencies.

7     Q.  Who is receiving this particular e-mail?

8     A.  Mr. Schaffer was sending it to Gary Gilmer.

9     Q.  I'll show you what has been marked as Plaintiffs' Exhibit

10:52:53 10     262 for identification.

11        (Tendered.)

12     BY MR. DROSMAN:

13     Q.  Do you recognize Plaintiffs' Exhibit 262?

14     A.  I do.

10:53:17 15     Q.  And what is Plaintiffs' Exhibit 262?

16     A.  This is a series of e-mails that describes the cut in

17     delinquencies using this tactic for the grace periods, of

18     deducting the 15 days and pushing it back into the current

19     bucket.  And they're quantifying it from a dollar perspective

10:53:39 20     each month.  There's a series of them.

21     Q.  And who is the recipient of these e-mails?

22     A.  Let's see here.  It looks like Douglas Friedrich.

23     Q.  And he's the managing director, the head honcho, of

24     mortgage services at Household; is that right?

10:54:00 25     A.  Yes.

Ghiglieri - direct

695

1    Q.  And why do you recognize Plaintiffs' Exhibit 262?

2    A.  This is one of the documents that I reviewed in

3    formulating my opinions.

4        MR. DROSMAN:  Plaintiffs offer Exhibit 262 into

10:54:12  5    evidence.

6        THE COURT:  Admitted.

7    BY MR. DROSMAN:

8    Q.  Why don't we take a look at the first page of this series

9    of e-mails.

10:54:19  10        What's the title of the e-mail?

11   A.  So the title of the e-mail is two-plus reconciliation.

12   Q.  And what does this particular e-mail show?

13   A.  It shows that the adjustment for the 15-day grace period

14   was $19 million in this case for this month, the month of --

10:54:42  15   it would be the prior month, so January 2001.

16   Q.  So that the re-aged number was actually 431, is that

17   right, according to Sarah's figure?

18   A.  Yes.

19   Q.  And then they're deducting or lowering that re-age number

10:54:56  20   by 19.7 million; is that right?

21   A.  Actually the number is the two-plus number and so then

22   they're taking out the 15-day grace period.  So they're

23   adjusting the two-plus number.

24   Q.  And what are the parens around the 19.7 million?

10:55:11  25   A.  That means they're taking it out.  It's negative.

Ghiglieri - direct

696

1    Q.   The final two-plus delinquency number that they come up

2    with after taking out the grace period is what?

3    A.   418 million.

4    Q.   And you said that this e-mail was sent on 2/6/01, so it

10:55:24   5    would be for the month of January, right?

6    A.   Right.

7    Q.   Let's look at the next page, page ending 842.

8         And this e-mail was sent on March 7, 2001; is that

9    right?

10:55:40  10    A.   Yes.

11    Q.   Again, sent to Doug Friedrich, the head of Household's

12    mortgage services unit; is that right?

13    A.   Right.

14    Q.   And what's this showing here?

10:55:48  15    A.   And this is the two-plus reconciliation again.  So it

16    shows that the two-plus numbers for the grace period

17    adjustment were being reduced by 16 million.

18    Q.   Again, lowering the two-plus numbers by 16.1 million

19    for --

10:56:04  20    A.   Right, for that month.

21    Q.   For that month.

22         What about the next page?

23    A.   This is similar.  These are all these same sort of

24    reconciliations.  So here the grace period adjustment is

10:56:17  25    17,483,000.  So two-plus numbers are being reduced by this

Ghiglieri - direct

697

1      grace period adjustment.

2      Q.  And what's the date of this e-mail?

3      A.  August 7, 2001.  So this would be for July.

4      Q.  And do the rest of the e-mails show the same thing?

10:56:36  5      A.  Yes.

6      Q.  Does this -- is this significant to your opinion that

7      Household used re-aging tactics like the use of the grace

8      period to manipulate its two-plus delinquency numbers?

9      A.  Yes.

10:56:48 10      Q.  Why?

11      A.  Well, because there's no reason to make this kind of

12      adjustment.  Other lenders just do a straight-up deal.  Here,

13      what they were doing is using their grace period to move loans

14      from the two-plus bucket back to current.  And the pass --

10:57:03 15      these sorts of delinquency numbers are very important to

16      regulators and others because it shows the condition of the

17      loan portfolio.

18      Q.  Is this grace period right here, is this the same grace

19      period we heard referred to earlier in an earlier e-mail as

10:57:21 20      the magic?

21      A.  Yes.

22      Q.  Now, is there a relationship between predatory lending on

23      the one hand -- we talked quite a bit about that yesterday --

24      and the use of practices like re-aging to hide the true

10:57:34 25      quality of Household's loans on the other?

Ghiglieri - direct

698

1    A.  Yes, there is a relationship.

2    Q.  Did you prepare a demonstrative to assist you in

3    explaining the relationship between predatory lending

4    practices on the one hand and hiding the quality of

10:57:46  5    Household's loans on the other?

6    A.  I did.

7    Q.  I'll show you what has been marked as Plaintiffs'

8    Demonstrative Exhibit 31 for identification.

9        Can you tell us what this exhibit shows?

10:58:05 10    A.  Yes.  Household starts out making a predatory loan.  And

11    remember, they're packing on fees and insurance premiums and

12    stripping away the equity.  And what happens is, the borrower

13    cannot pay the loan.  It's too large for the borrower to pay.

14        So Household has one of two choices.  They can either

10:58:26 15    re-age it so that it's not showing up on their two-plus

16    bucket.  Or they can refinance it or rewrite it down below,

17    which is flipping it, adding more insurance, adding more fees

18    to it.

19        And then --

10:58:39 20    Q.  Let me just pause there.  To refinance it or rewrite it,

21    does that take it out of the two-plus bucket as well?

22    A.  Right.  And it brings it back to current.  So they can

23    either re-age it using some sort of tactic that we've already

24    talked about or they can actually rewrite it and make a new

10:58:56 25    loan and start over.

Ghiglieri - direct

699

1    Q.   Okay.

2    A.   And then, no matter what, the borrower still can't pay

3    because the loan is so packed full of products, premiums and

4    fees and can't go anywhere else because the equity has been

10:59:11  5    stripped and the loan to value is too high so they're stuck.

6    And Household then has one of two choices.   They can either

7    rewrite it on the top, which is flip it again and add more

8    fees and premiums, insurance premiums to it, or they can

9    re-age it using one of the tactics, like the grace period or

10:59:30 10    one of their other tactics.

11    Q.   So if they rewrite it right here, does that -- again, that

12    takes it out of the delinquent bucket; now all of a sudden

13    they have a brand new loan so it's current again?

14    A.   Yes.   So whether they re-age it or they rewrite it, that's

10:59:47 15    going to bring it to the current bucket.   But rewriting it

16    allows them to pack on more fees and insurance premiums.   So

17    they can do -- they can either re-age it or rewrite it.

18    Q.   And you talked -- is there a predatory lending practice

19    that this implicates right here?

11:00:02 20    A.   Yes.   I mean, it implicates all sorts of predatory lending

21    practices, loan flipping because they're re-aging it multiple

22    times, insurance packing, equity stripping.   If they rewrite

23    it into two loans, that would be loan splitting.   You know,

24    originally they're reeling them in with the effective rate, as

11:00:22 25    Dennis Hueman would say, and blocking the back door with the

Ghiglieri - cross

700

1    prepayment penalty so that -- and because they've stripped out

2    the equity, there's nowhere for them to go to refinance.

3    Q.  So what's the last step?

4    A.  So the borrower still can't pay, and the cycle starts over

11:00:39  5    again and go on one of two paths.  So there's a correlation

6    between predatory lending practices and the need for Household

7    to re-age and mask their delinquencies.

8    Q.  Thank you, Ms. Ghiglieri.

9          MR. DROSMAN:  I have no further questions at this

11:00:57 10    time.

11          THE COURT:  You may cross-examine.

12          MR. KAVALER:  Thank you.

13                    CROSS-EXAMINATION

14    BY MR. KAVALER:

11:01:22 15    Q.  Good morning, Ms. Ghiglieri.

16          As you know, I'm Tom Kavaler, and I represent the

17    defendants.  And we've met before, correct?

18    A.  Yes.

19    Q.  Okay.  I'm going to ask you a few questions today about

11:02:07 20    the same subject matter you've been talking about for the past

21    couple of days.  And my time is sort of limited, so I'm going

22    to try and ask you questions that can be answered yes or no.

23    If I do that, will you answer them yes or no?

24    A.  If I can answer them with a yes or a no.

11:02:20 25    Q.  Perfect.  Thank you.

Ghiglieri - cross

704

1    Q.  Do you know what percentage of the assets or the revenue

2    were accounted for by those three banks?

3    A.  I didn't calculate that, nor did I see that in the

4    documents.

11:05:39  5    Q.  Was it a small percentage?

6    A.  I don't know.

7    Q.  What percentage was accounted for by the finance company?

8    A.  I didn't see any of those percentages in the documents.

9    Q.  And you had never been a securities regulator; is that

11:05:54  10    correct?

11    A.  That's correct.

12    Q.  And you're offering no opinions here today regarding

13    movements in the price of Household stock, correct?

14    A.  That's correct.

11:06:02  15    Q.  And you're offering no opinions here about the impact of

16    any public statements on the group of investors that are

17    bringing this action against Household; is that correct?

18    A.  Yes.

19    Q.  Now, you told us yesterday -- or I think the day before,

11:06:19  20    Tuesday, I think -- about 40 Bankers Boxes.  You remember

21    counsel pointing to this box here and identified that as a

22    Bankers Box?

23    A.  Yes.

24    Q.  All right.  And that's the universe of documents that you

11:06:31  25    reviewed other than the depositions you talked about?

Ghiglieri - cross

705

1   A.  Well, if you recall, we had this conversation before.  I

2   reviewed a lot of documents in hard copy.  And then there were

3   approximately 75 depositions, some of which I printed out and

4   some of which I didn't, and then the exhibits to those

11:06:49  5   depositions.  So I reviewed a large number of documents that I

6   didn't print out, if -- if that's what you're asking me, how

7   many documents I looked at.

8   Q.  Let's focus on the 40 Bankers Boxes.  Approximately how

9   many documents does that comprise?

11:07:08  10   A.  I have no idea.

11   Q.  Okay.  Do you know roughly how many sheets of paper come

12   in a Bankers Box?

13   A.  No.

14   Q.  About 2,000?

11:07:17  15   A.  I have no idea.

16   Q.  No idea.  Okay.

17       Do you know that Household, the defendants in this

18   case, produced to investors' counsel approximately five

19   million documents?

11:07:26  20   A.  I don't know how many they produced.

21   Q.  Did you select the contents of those 40 boxes from a

22   larger universe of millions and millions of documents?

23   A.  Well, the plaintiffs' lawyers sent me some documents.  I

24   requested some documents.  And I had access to a database that

11:07:44  25   had depositions and exhibits.  So some of -- some of each I

Ghiglieri - cross

706

1     would say.

2     Q.  Putting aside the depositions and exhibits, you didn't

3     personally see the five million document universe and cull it

4     down to those 40 boxes, did you?

11:07:59  5     A.  I didn't personally see it.

6     Q.  Right.  Investors' counsel gave you the 40 boxes, right?

7     A.  No.  I asked for some documents that I knew, based on my

8     experience of regulating lenders, that Household would have;

9     and then they sent me some.  So it was a combination of me

11:08:18  10     asking for some documents and them sending me some documents.

11     Q.  But the end result was 40 boxes?

12     A.  Well, approximately, plus all -- everything that I had

13     access to online.

14     Q.  All right.  It certainly was not five million documents?

11:08:33  15     A.  I'm sure I didn't look at five million documents.

16     Q.  Okay.  And you're giving us here your opinions about

17     things that you've read in that universe of documents,

18     correct?

19     A.  Yes.

11:08:51  20     Q.  You're not testifying to any facts, that is, you don't

21     know actually what occurred?  You only know what you gleaned

22     from the documents you reviewed, right?

23     A.  That's correct.

24     Q.  Mr. Schoenholz would be able to tell us what he did,

11:09:06  25     Mr. Aldinger would be able to tell us what he did and

Ghiglieri - cross

707

1    Mr. Gilmer would be able to tell us what he did, correct?

2    A.  Yes.

3    Q.  And you'd be able to express opinions on that?

4    A.  Well, it's the same thing that I did as a regulator.  You

11:09:19  5    know, I would look at certain things and formulate opinions.

6    That's what I did here.  I'm not a fact witness.  I'm an

7    expert witness.

8    Q.  That's my point.

9    A.  Okay.  I agree with that.

11:09:28 10    Q.  And you understand that we've also hired an expert, and

11    our expert is going to have a different opinion?

12    A.  I'm sure.

13    Q.  Now, a few minutes ago, you told us about -- you were

14    talking about re-aging; and you said -- you were talking about

11:10:08 15    the two-plus number, and you said Household reported this

16    information in its 10-K.  Do you recall that?

17    A.  Yes.

18    Q.  The 10-K is the annual report?

19    A.  Yes.

11:10:16 20    Q.  That's filed with the SEC?

21    A.  Yes.

22    Q.  And that's publicly available to anyone who wants to read

23    it?

24    A.  Yes.

11:10:24 25    Q.  Does the SEC have a Web site where people can access those

Ghiglieri - cross

708

1    documents?

2    A.  Yes.

3    Q.  Did you read Household's annual reports filed with the

4    Securities and Exchange Commission?

11:10:33 5    A.  I looked at some of the charts where they disclosed their

6    past due, but I didn't read the full documents.  That was

7    outside of really what I was asked to opine on.

8    Q.  So you just accessed a part of them?

9    A.  I just looked at them, the delinquency charts.

11:10:49 10    Q.  But you could have accessed all of them?

11    A.  Sure.

12    Q.  And so can anyone?

13    A.  So can anyone.

14    Q.  That's public information?

11:10:56 15    A.  Yes.

16    Q.  And you are not here -- and you haven't focused on

17    anything having to do with the disclosures that Household made

18    in those public reports or elsewhere, correct?

19    A.  Yes.

11:11:26 20    Q.  Now, you used some words several times in your testimony.

21    I'd like to explore with you what you meant by them.

22            You said certain things were systemic.  Do you recall

23    that?

24    A.  I do.

11:11:40 25    Q.  Tell me what you meant, please, by systemic.

Ghiglieri - cross

709

1    A.  Companywide.

2    Q.  Okay.  And you used the word companywide also.  So those

3    both mean the same thing?

4    A.  Yes.

11:11:49  5    Q.  And you said widespread.  What does that mean?

6    A.  Companywide, pervasive.

7    Q.  And --

8    A.  They all mean the same thing.

9    Q.  I'm sorry.  I didn't mean to interrupt you.  Are you

11:11:55  10    finished?

11    A.  I guess.

12    Q.  Okay.  So all three of those words mean the same thing?

13    A.  Yes.

14    Q.  Okay.  Can you define those three words without using

11:12:06  15    those three words?  In other words, what does systemic or

16    companywide or widespread mean?  Does it mean it's everywhere?

17    Does it mean there's a lot of it?  What does it mean?

18         MR. DROSMAN:  Objection, compound.

19         THE COURT:  Overruled as to that.

11:12:22  20    BY THE WITNESS:

21    A.  Well, I -- what I was trying to portray by those words was

22    that the practices that I found that were predatory, for

23    example, were occurring in more than just one location by more

24    than just one employee.  They were occurring around the

11:12:45  25    country.

Ghiglieri - cross

710

BY MR. KAVALER:

Q.  Okay.  And yesterday -- or Tuesday I guess -- we looked at

Demonstrative Exhibit 29.  Let's see if we can put that up

again.

11:12:57      MR. KAVALER:  Your Honor, can we have the switch,

please.

THE COURT:  Where do you want it directed, counsel?

MR. KAVALER:  If I knew more about technology, I

would know.  I want these gentlemen to be able to put up on

11:13:14  the screen something.

THE COURT:  Technology is tough.

MR. KAVALER:  Thank you, your Honor.  You're dealing

with Mr. Low Tech here.

BY MR. KAVALER:

11:13:23  Q.  Now, do you recall this chart that was prepared by either

yourself or counsel?

A.  Yes.

Q.  Okay.  And these are some of the practices that you talked

about on Tuesday, maybe over into Wednesday?

11:13:35  A.  Yes.

Q.  And let's start with the effective/equivalent rate.  Do

you know how many complaints there were altogether about

effective/equivalent rate during the period 1999 to 2002?

A.  I don't know how many complaints there were and -- on the

11:14:15  effective rate?

Ghiglieri - cross

711

1    Q.   Yes.

2    A.   I don't know how many complaints they had on effective

3    rate in total.

4    Q.   Do you know what percentage of their loans generated

11:14:25  5    complaints about effective rate?

6    A.   I didn't see a percentage, but I do know that Household

7    calculated refunds of $1.2 billion for the effective rate

8    presentation that they made.  So I'm assuming it was a large

9    number of loans and must have been a pretty substantial

11:14:47 10    percentage.

11    Q.   But you can't tell me what that percentage is?

12    A.   No.

13    Q.   You know that Household had, during the relevant time, in

14    Mr. Gilmer's business unit about 3.2 million accounts?

11:15:01 15    A.   I don't know if that's true or not.

16    Q.   You don't know that.

17         Okay.  You know that that's set forth in Household's

18    10-K for the year 2001?

19    A.   It could be.  I looked at the -- some of the past due

11:15:17 20    charts.  I didn't analyze the 10-Ks.

21    Q.   Do you have any reason to question the number that

22    Household put in its 10-K describing how many accounts they

23    had?

24    A.   I don't have any reason to question it.

11:15:27 25    Q.   Okay.

Ghiglieri - cross

712

1          MR. KAVALER:  Can we see Exhibit 852.

2    BY MR. KAVALER:

3    Q.  This -- you recognize this as Household's 10-K for 2001?

4    A.  That's what it says.

11:15:48  5    Q.  Okay.

6          Can we pull up where it shows the number of loans.

7          You see there, it's talking about this business has

8    approximately 1,400 branches located in 46 states, 3.2 million

9    open customer accounts, 39.5 billion in managed receivables

11:16:26 10    and 13,000 employees.

11          Do you see that?

12    A.  I see that.

13    Q.  Do you understand that to be describing the business unit

14    that Mr. Gilmer ran?

11:16:35 15    A.  Yeah.  I mean, that's what it says.

16    Q.  Okay.  You have no reason to doubt that?

17    A.  No.

18    Q.  All right.  So half of 1 percent of 3.2 million accounts

19    would be 16,000 accounts?

11:16:56 20    A.  If you say so.

21    Q.  I'm reluctant to say so because the other thing I'm not

22    good at is math.  But I've been told that.  I think that's

23    right.

24          Did you see 16,000 effective rate or equivalent rate

11:17:10 25    complaints?

Ghiglieri - cross

713

1    A.  I didn't see 16,000.  I looked at over a hundred

2    complaints, and they had various complaints.  That's what I

3    looked at.

4    Q.  Did you ever manage a large public company?

11:17:28   5    A.  No.

6    Q.  Did you ever work at a large public company?

7    A.  No.

8    Q.  Are you aware that large public companies have a tendency

9    to measure almost everything that can be measured?

11:17:42  10         MR. DROSMAN:  Objection.

11         THE COURT:  Sustained.

12    BY MR. KAVALER:

13    Q.  Did you notice when you were looking at Household's

14    documents that Household had a tendency to measure many things

11:17:55  15    and express things in terms of percentages?

16    A.  Well, I saw a lot of percentages in the documents I looked

17    at.

18    Q.  Have you ever heard the phrase in your experience as a

19    regulator "you can't manage what you can't measure"?

11:18:20  20    A.  I don't know if I've ever heard that before or not.

21    Q.  Okay.  So you can't tell me how many effective rate

22    complaints there were and you can't tell me what percentage of

23    Household's open accounts were; is that correct?

24    A.  Well, Household can't either.  I mean, because not all the

11:18:42  25    complaints were tracked.  So I for sure can't, and I question

Ghiglieri - cross

714

1       whether Household can.

2       Q.  That was my question, whether you could.

3       A.  I don't know how I could have because they weren't all

4       tracked.  I didn't see a document showing all of them.

11:18:58  5   Q.  Short answer is you can't tell me either how many they are

6       or what percentage of the open loans they represent; is that

7       right?

8       A.  I would only be able to tell you if I saw a document like

9       that.

11:19:09  10  Q.  So, therefore, you can't tell me?

11      A.  Well, I didn't see anything to be able to tell you that,

12      no.

13      Q.  And you can't tell me whether they were more than one-half

14      of 1 percent of the open loans, can you?

11:19:23  15  A.  I didn't -- I don't have a basis to tell you because I

16      didn't see anything like that.

17      Q.  That means you can't tell me, correct?

18      A.  Well, I can't tell you what I haven't seen.

19      Q.  I agree with that.

11:19:37  20          Now, you said a couple of times in the last couple of

21      days that Household had to come up with a way of describing

22      its rates, its effective rates, because its rates were higher

23      than the rates of competitors.  Do you recall that?

24      A.  Yes.

11:20:01  25  Q.  What competitors were you comparing Household to?

Ghiglieri - cross

715

1    A.  Well, I was looking at, for example, the Dennis Hueman

2    video where he's talking about competitor rates being higher.

3    And I saw some other documents discussing Household's rates

4    versus competitors.  So I didn't really analyze whether it

11:20:18  5    would have been a bank or a finance company or anything like

6    that.  I'm just looking at what was in the documents from

7    Household employees.

8    Q.  The competitor Mr. Hueman talked about was Billy Bob's

9    Loan Company, right?

11:20:31 10    A.  Yes.

11    Q.  Did you think there really is a company called Billy Bob's

12    Loan Company or did you think he was just using that as an

13    example?

14    A.  Well, there would be no way to tell -- there would be no

11:20:40 15    reason to tell a consumer that their rate was lower than it

16    really was if their rates weren't -- if their rates were

17    competitive because they could just be straight up with them.

18    Q.  That's your opinion, right?

19    A.  Yes.

11:20:53 20    Q.  I'm trying to find out if you know any facts.  Do you know

21    which competitors charged what rates?

22    A.  I didn't do a survey of the time period and Household's

23    rates.

24    Q.  Therefore, the answer to my question is, no, you don't,

11:21:10 25    correct?

Ghiglieri - cross

1    A.  Unless I saw something in one of the documents.  I can't

2    recall sitting here.  I may have looked at something.  But

3    just sitting here, I can't think of --

4    Q.  You mentioned a moment ago in your answer -- you mentioned

11:21:22 5    the word banks.  You understand that finance companies and

6    banks are different?

7    A.  Well, they have to comply with the same lending laws, but

8    they are different with how they fund their operations.  I

9    agree with that.

11:21:34 10    Q.  Banks have deposits; finance companies do not?

11    A.  That's right.

12    Q.  And that affects their cost of funds?

13    A.  Right.

14    Q.  So finance companies generally charge rates different than

11:21:43 15    banks?

16    A.  Their cost of funds are generally higher and so they

17    generally charge more, yes.

18    Q.  So, therefore, for you to say that Household charged

19    higher rates than banks would be nothing more than to say

11:21:55 20    Household is a finance company and a bank is a bank, right?

21    A.  Well, that would be one of the reasons, yes.

22    Q.  So putting aside banks, do you have a list for me of

23    finance companies who had lower rates than Household?

24    A.  I think I just said that I didn't do a survey of who

11:22:11 25    charged what rate.

Ghiglieri - cross

717

|  |    |                                                                      |
|--|----|----------------------------------------------------------------------|
|  | 1  | Q.   Okay.   So every time you told us throughout your testimony      |
|  | 2  | that Household had to use effective rate techniques because          |
|  | 3  | its rates were higher than someone else, if I ask you who the        |
|  | 4  | someone else is, you don't know?                                     |
| 11:22:27 | 5 | A.   Well, I remember reading in Andrew Kahr's information      |
|  | 6  | where he talked about how they needed to show Household's            |
|  | 7  | rates being more competitive.   And so I concluded that their        |
|  | 8  | rates were higher than their competitors.   But I didn't do an       |
|  | 9  | analysis of the time frame.   I didn't go back in time and try       |
| 11:22:47 | 10 | and figure out who was charging what rate.                     |
|  | 11 | Q.   So your basis was something Andrew Kahr said?                   |
|  | 12 | A.   I -- well, Andrew Kahr, the Dennis Hueman video and other       |
|  | 13 | documents that I saw.                                                |
|  | 14 | Q.   Let's take them one at time.                                    |
| 11:22:59 | 15 |       The Dennis Hueman video, you mean the portions that      |
|  | 16 | this jury saw?                                                       |
|  | 17 | A.   Yes.                                                            |
|  | 18 | Q.   Where he referred to Billy Bob's Loan Company?                  |
|  | 19 | A.   Well, he was using an example; but he was teaching his          |
| 11:23:09 | 20 | sales staff to sell the loans when they otherwise wouldn't be  |
|  | 21 | able to because their rates were higher.                             |
|  | 22 | Q.   I'm trying to find out higher than whose.                       |
|  | 23 | A.   Well, I don't have their competitors' names for you or the      |
|  | 24 | interest rates.                                                      |
| 11:23:25 | 25 | Q.   You think Mr. Gilmer knows what his competitors' rates    |

Ghiglieri - cross

718

1    were?

2    A.  Hopefully.

3    Q.  Okay.  You said Mr. Kahr -- you got some information from

4    Mr. Kahr.  Was he ever an officer of Household?

11:23:37  5    A.  No, he was a consultant.

6    Q.  Was he an employee of Household?

7    A.  He was a consultant.

8    Q.  A consultant is someone that you pay money to to get an

9    opinion from, sort of like an expert witness, right?

11:23:47 10   A.  Or you get help in figuring out how to grow your loan

11   portfolio, I mean, different suggestions.

12   Q.  Did Mr. Kahr provide -- did you see somewhere in

13   Mr. Kahr's materials a list of the competitors of Household

14   who charged lower rates that you've talked about for the last

11:24:03 15  three days?

16   A.  I don't recall that, seeing that in his information.

17   Q.  You didn't conduct a survey of any other competitors?  You

18   didn't do any analysis?  You don't have a chart to show us

19   that says this competitor charged this and Household charged

11:24:28 20  that?  Nothing like that?

21   A.  No.

22       MR. KAVALER:  Let's see the list again.

23   BY MR. KAVALER:

24   Q.  The next thing up there is insurance packing.

11:24:43 25      Can you tell me how many claims of insurance packing

Ghiglieri - cross

719

1    there were throughout all of Household?

2    A.  Well, Household -- the internal documents from Household

3    showed approximately $160 million in refunds, and so I'm

4    assuming that that was quite a large number.

11:25:05  5    Q.  Well, my question was:  Can you tell me either as a number

6    or a percentage how many claims there were of insurance

7    packing during the time period you examined?

8    A.  Not precisely.

9    Q.  Do you think there was 16,000?

11:25:21  10    A.  I don't know.  I didn't see a number.  I only saw what the

11    estimate of the refunds based on insurance packing would be.

12    Q.  If Household says that its calculations showed the number

13    was less than half of 1 percent, do you have any basis to

14    suggest they're incorrect?

11:25:41  15    A.  No.

16    Q.  You testified that it's your opinion that when a customer

17    got to a loan closing, the insurance would already be added

18    on.  Do you remember that?

19    A.  Yes.

11:25:51  20    Q.  Did you ever attend even one loan closing at Household?

21    A.  No.

22    Q.  Do you know if Mr. Gilmer ever attended any house closings

23    at Household -- or loan closings?  Let me start again.

24         Do you know if Mr. Gilmer ever attended any loan

11:26:09  25    closings at Household during his career?

Ghiglieri - cross

1    you'll tell me you didn't look at them?

2    A.  Right.

3    Q.  So you just went to the SEC filing and looked for what you

4    were looking for?

11:28:40  5    A.  I was just looking at their past due charts.

6    Q.  Right.  You weren't looking to see generally what one

7    could learn about Household by looking at the SEC filings?

8    A.  No, I didn't read the SEC filings.  That was beyond what I

9    was asked to do.

11:28:55 10   Q.  Beyond what you were asked to do.  You were asked to come

11   here and talk to this jury about a very specific subject, and

12   you didn't look at anything beyond that?

13   A.  I looked at the documents in the case regarding predatory

14   lending and re-aging, but I didn't analyze the SEC filings,

11:29:10 15   no.

16   Q.  But you are a member of the Georgia bar and the D.C. bar,

17   I think you said, inactive?

18   A.  Uh-huh.

19   Q.  You understand that this case is a securities fraud case,

11:29:19 20   don't you?

21   A.  Yes.

22   Q.  You understand it's about the disclosure that Household

23   made to the investors, correct?

24   A.  Yes.

11:29:25 25   Q.  And you understand the issue in the case is whether that

Ghiglieri - cross

1    disclosure was complete or not complete, true or false,

2    correct?

3    A.  Yes.

4    Q.  You looked at nothing having to do with that disclosure,

11:29:35  5    correct?

6    A.  No, because they have another expert looking at that.

7    Q.  Who is that?

8    A.  I don't know.

9    Q.  I see.

11:29:42 10    A.  It's not me.

11    Q.  Okay.

12    A.  I was looking at the predatory lending and the re-aging.

13    Q.  So you have nothing to contribute to this jury on those

14    subjects, nothing about disclosure, nothing about the public

11:29:54 15    filings of the company, nothing about what the analysts said,

16    correct?

17    A.  Yes.

18    Q.  Okay.  But you did read newspapers you said?

19    A.  No, I didn't say newspapers.  There were a couple of

11:30:11 20    articles in Forbes and -- well, I take that back.  The San

21    Francisco Chronicle, yes.

22    Q.  So you read some newspapers?

23    A.  Yes.

24    Q.  Did you see an article in the St. Louis Post-Dispatch

11:30:25 25    about Household?

Ghiglieri - cross

724

1    A.  I don't remember that.

2    Q.  Let me show it to you and see if that refreshes your

3    recollection.

4          Can we have Exhibit 397.

11:30:38  5          THE COURT:  Is this the plaintiffs' or defendants'

6    exhibit?

7          MR. KAVALER:  This is defendants', your Honor.

8    BY MR. KAVALER:

9    Q.  This is an article on August 25, 2000, in the St. Louis

11:30:50  10   Dispatch, talking about, Protestors say Household, one of the

11   nation's largest consumer lenders, through its subsidiary

12   Household Financial Corp. and Beneficial, sells borrowers

13   single premium insurance policies without their knowledge.

14          Do you see that?

11:31:06  15   A.  I see what you're pointing to.

16   Q.  And that's your point?

17   A.  Well, yes.

18   Q.  Okay.

19   A.  It's insurance packing.

11:31:13  20   Q.  Right.  And then it says, This policy pays off the

21   borrower's loan in case of death, but industry experts view

22   the policy as overpriced because many borrowers would be

23   better served by buying life insurance that would cover the

24   cost of the loan.

11:31:26  25          Do you see that?

Ghiglieri - cross

725

1   A.  Yes.

2   Q.  You agree with that, don't you?

3   A.  I do.

4   Q.  And you know that this subject, the wisdom of selling

11:31:34  5   single premium credit life insurance in conjunction with

6   loans, was a controversial subject which was covered in the

7   press during these years, correct?

8   A.  I don't know how widespread it was being covered in the

9   press.  I haven't researched that issue.

11:31:50 10  Q.  You know that there was controversy about this subject?

11  A.  In the regulatory community there was.

12  Q.  And there were differing views amongst the regulators on

13  the one hand and the various lenders on the other hand,

14  correct?

11:32:01 15  A.  Well, I know that the regulators thought it was predatory

16  in nature and overpriced.

17  Q.  Right.  And you know that Household was far from the only

18  company that sold this product, right?

19  A.  I don't have any basis to be able to say how many

11:32:18 20  companies sold it.

21  Q.  Are you aware of any other companies selling this product?

22  A.  Well, I know that some of the banks sold it initially

23  before the regulators clamped down on them; but I don't have a

24  basis to be able to say how many companies sold it.

11:32:32 25  Q.  The banks used this product and then they stopped,

Ghiglieri - cross

726

1   correct?

2   A.  Yes.

3   Q.  Household used this product and it stopped, correct?

4   A.  Yes.

11:32:42  5   Q.  You know that Household voluntarily stopped selling single

6   premium credit life insurance at a point in 2001, don't you?

7   A.  Yes.

8   Q.  So there was a point in time when this was a product that

9   was commonly used by people, including Household; then there

11:32:56 10   was a point in time when this was a product that was less

11   commonly used; and one of the company's that stopped using it

12   was Household, correct?

13   A.  I don't know if that's a correct characterization, but it

14   was a product that people stopped using.

11:33:10 15   Q.  And before they stopped using it, they must have been

16   using it, correct?

17   A.  But I don't know how widespread.  I mean, that's what I'm

18   saying.  I have no basis to be able --

19   Q.  So this is another one of those areas where you don't know

11:33:23 20   the numbers; you just have an impression; but the impression

21   is, at a point in time, people, including Household, sold this

22   product; and at a later point in time, people, including

23   Household, stopped selling this product, correct?

24   A.  What was the first part of your question?

11:33:37 25   Q.  You have a sense -- you can't quantify for me, but

Ghiglieri - cross

727

              1    nevertheless you have a sense that there was a point in

              2    history where various lenders sold this product; and then

              3    there was a later point in history where various lenders

              4    stopped selling this product, correct?

11:33:53      5    A.  Yes.

              6    Q.  And when people were selling this product, Household sold

              7    it; and at a later point when people weren't selling this

              8    product, Household stopped selling it, correct?

              9    A.  I mean, I don't have the basis for saying yes to that.  I

11:34:08     10    don't know at what point Household stopped selling it versus

             11    everyone else stopping selling it.

             12    Q.  Okay.  You have a basis for saying no to that?

             13    A.  No, I don't have a basis for being able to put Household's

             14    decision to stop selling it in context with everyone else.

11:34:23     15    Q.  Fair enough.  Fair enough.  On that we'll have to ask

             16    somebody who actually knows, right?  Mr. Gilmer, for instance?

             17    A.  You'll have to ask somebody other than me, whoever you

             18    want.

             19    Q.  Okay.  Now, from the period of mid 1999 through 2001, were

11:34:47     20    there states that prohibited the sale of single premium credit

             21    insurance?

             22    A.  Yes.

             23    Q.  How many?

             24    A.  Well, I know there were many, but I don't know the exact

11:35:03     25    number.

Ghiglieri - cross

735

1    it's a five-year prepayment penalty, then it would be

2    considered illegal under the Deceptive Trade Practices Act.

3    So anything that's legal, either under the statute or under

4    the Deceptive Trade Practices Act, would not be predatory.  So

11:43:31  5    I think I'm consistent on that.

6    Q.  Okay.  And while we're talking on the subject of credit

7    insurance, the question of whether or not Household disclosed

8    to its shareholders that it sold credit insurance, that's

9    outside the scope of what you were asked to look at; isn't

11:43:48  10    that correct?

11    A.  Yes.

12    Q.  All right.

13         Go back to the chart, please.

14         The next item there on your demonstrative is failure

11:44:03  15    to properly disclose.  Do you see that?

16    A.  I do.

17    Q.  This was also something that you found to be widespread

18    and systemic and companywide?

19    A.  Yes.

11:44:15  20    Q.  Okay.  How many instances of this did you find in your

21    review of the 40 Bankers Boxes?

22    A.  Well, I didn't count them specifically.

23    Q.  Well, whether you counted them specifically, do you think

24    there were 16,000 of them?

11:44:29  25    A.  16,000?  I'm sure I didn't find 16,000.

Ghiglieri - cross

736

1     Q.   15,000?

2     A.   I didn't count them.  I have --

3     Q.   Are you under the impression you found 15,000?

4     A.   I have no way of giving you a specific number.  I found

11:44:41  5     them in a number of states.  I looked at the regulatory

6     material, which also told me that the regulators agreed with

7     my opinion that it was systemic because they were coming from

8     a variety of states.

9     Q.   But you didn't find examples of this problem that impacted

11:45:01  10    anywhere near even one-half of 1 percent of Household's 3.2

11    million outstanding consumer loans, correct?

12    A.   Well, this is like the complaint ratio analysis.  If I

13    found deception in 50 instances across the country as a

14    regulator, that would concern me; and I would conclude that

11:45:24  15    it's a widespread practice if it's happening in a

16    geographically dispersed area.  But I didn't sit down and

17    figure out a ratio percentage because I don't find that to be

18    persuasive.

19    Q.   I listened to what you said about ratios.  That's why I'm

11:45:42  20    not asking you about percentages.  I appreciate what you said.

21          What I'm asking you about, however, is raw numbers.

22    You didn't find anything remotely approaching 16,000 instances

23    of failure to properly disclose, did you?

24    A.   I didn't count them, but I'm sure I didn't find 16,000.

11:45:57  25    Q.   Right.  I listened pretty carefully to your testimony, and

Ghiglieri - cross

745

1    Q.   And you're not offering any testimony on whether or not

2    the fact that Household used prepayment penalties was or was

3    not disclosed to Household's investors, correct?

4    A.   Yes.

11:56:52  5    Q.   Do you have any knowledge on that subject?

6    A.   No.

7    Q.   Okay.  The next subject up there is excessive points and

8    fees.  And, again, this is something you found to be

9    widespread, systemic and companywide?

11:57:19 10    A.   Yes.

11    Q.   How many instances of this problem did you see in the

12    various documents you looked at?

13    A.   I didn't count the number of instances for any of these

14    activities.  So my answer is the same.  I didn't count the

11:57:37 15    number of times that Household charged excessive fees.

16    Q.   But whatever number it was, it was nothing remotely

17    approaching 16,000 times, correct?

18    A.   I didn't count them, so I don't know what the number would

19    be, plus I only looked at a subset of, you know, the total

11:57:56 20    loans obviously.  I didn't look at every loan they made over

21    that course of time.

22    Q.   But you looked at everything you wanted to look at, right?

23    A.   Yes, I looked at everything I felt like I needed to look

24    at.

11:58:06 25    Q.   And you looked at everything you felt you needed to look

Ghiglieri - cross

746

1    at to come here and give this jury your opinion, correct?

2    A.   Yes.

3    Q.   And having done that -- and let me back up.

4         I certainly didn't put any restrictions on what you

11:58:19  5    could look at, did I?

6    A.   No.

7    Q.   Okay.  Having done that, you're unable to say that the

8    rate or the number -- I apologize.  I take your point about

9    ratios -- the number of instances of excessive points and fees

11:58:34 10   is anywhere remotely close to one-half of 1 percent of the

11   volume of Household's loans outstanding, correct?

12   A.   I didn't count them, so I have no way of being able to

13   answer that question.

14   Q.   Yes, you do.  You can say, no, I can't say it's anywhere

11:58:50 15   near one-half of 1 percent, correct?

16        MR. DROSMAN:  Objection, your Honor, argumentative.

17        THE COURT:  Sustained.

18        MR. KAVALER:  Okay.

19   BY MR. KAVALER:

11:59:02 20   Q.   Now, you testified on this subject that Household charged

21   points within what the state would allow, correct?

22   A.   I think I -- I think my testimony was not exactly that.

23   Q.   Let me read you your testimony.  This is from Page 441,

24   Lines 9 to 13 of this trial transcript from two days ago.

11:59:22 25        One is they would -- it was their goal to charge 7 to

Ghiglieri - cross

764

1    Household; and there was a dialogue, right?

2    A.  Well, that's an interesting way to describe it, a

3    dialogue.

4    Q.  Well, did you see any documents reflecting Household's

01:42:27  5    dialogue with the State of California on this subject?

6    A.  I did.

7    Q.  And did you see that Mr. Detelich and Mr. Schneider met

8    with representatives of the California Department of

9    Corporations to discuss the AMTPA prepayment penalty late fee

01:42:43  10    preemption situation, and someone came and reported that the

11    meeting went very well and that the response from the

12    Department of Corporations was guardedly positive for the

13    prepayment penalty provision and the State of California did

14    not object to the preemption?  Did you see that document?

01:43:00  15    A.  Well, I think what that document said was that they were

16    going to look into it further.  I don't think that document

17    that you're reading from, if it's the same one I remember,

18    said that they blessed it.

19        My impression after reading that document was, they

01:43:13  20    went in and talked about it.  California said -- and I used to

21    do this as a regulator too -- well, I can't think of anything

22    at the moment, but let me do some further research; you send

23    me some additional material.  And I don't have a letter or

24    anything from California that blessed it.

01:43:30  25    Q.  All right.  Let's look at that document.  It's Defendants'

Ghiglieri - cross

765

1    Exhibit 219.

2             MR. KAVALER:  May I approach the witness, your Honor?

3             THE COURT:  Yes.

4    (Tendered.)

01:43:41  5    BY MR. KAVALER:

6    Q.  Is this the document you were thinking of?

7    A.  Yes, it is.

8    Q.  Okay.  And there's a memo at the bottom, an e-mail from

9    Patrick Zenzola, government relations, California.  And he

01:44:04 10   sends it to a bunch of people, including Mr. Detelich,

11   Ms. Allcock, Mr. Schneider, Ms. Curtain and other people.

12             Do you see that?

13   A.  Yes.

14   Q.  And the first paragraph says, Tom Detelich, Tom Schneider

01:44:17 15   and I met with representatives of the California Department of

16   Corporations on Monday to discuss the AMTPA prepayment

17   penalty/late fee preemption.  The meeting went very well.  The

18   response from the DOC was guardedly positive for the

19   prepayment penalty preemption.  They did not object to the

01:44:39 20   preemption.

21             Do you see that?

22   A.  I do.

23   Q.  Okay.  And this is Household having a dialogue with the

24   State of California about this situation, correct?

01:44:47 25   A.  Yes.  But the remainder of the sentences go to what I was

Ghiglieri - cross

766

1    talking about, which is they went into California; they said

2    this is what we want to do; California said we don't see

3    anything at the moment, but we want you to send us additional

4    information.

01:45:05  5        I did not see a follow-up from this discussion where

6    California blessed it.  In fact, I think California

7    participated in the settlement regarding prepayment

8    penalties -- well, I guess that was a couple of years later.

9    Q.  But this document reflects Household executives meeting

01:45:25 10   with California and openly and freely discussing the

11   situation, putting forth their position, listening to

12   California's position and being responsive, correct?

13   A.  Yes.  And, I mean, that's what this says.  This is what I

14   would expect to have seen in every state because normally when

01:45:44 15   you're going to do something that may violate state law, you

16   go to the regulators first and you get them to bless it.  And

17   I didn't see that in all the states, and I didn't see what the

18   final outcome was of this.

19   Q.  "I didn't see" is another way of saying I have no

01:46:00 20   information to give this jury on that subject, right?

21   A.  Say that again.

22   Q.  Sure.  When you say I didn't see something, that means I

23   have no substantive testimony to give this jury on that

24   subject?  I'm not here to say you did it right; I'm not here

01:46:12 25   to say you did it wrong; I just don't know?

Ghiglieri - cross

1    A.  Well, I thought you asked me if I saw where they met with

2    California and they blessed them doing this particular thing.

3    Q.  I don't believe I used the word "blessed."

4    A.  And I said, no, I didn't see that.

01:46:28  5    Q.  If that's what you heard, I apologize for any confusion I

6    might have caused.  I don't think I used the word "blessed."

7    I asked about a dialogue.

8         They were having a dialogue with California, correct?

9    A.  Yes, if you want to couch it like that, a dialogue.

01:46:43  10    Q.  And you weren't at that meeting?

11    A.  No, I wasn't.

12    Q.  Mr. Detelich and Mr. Schneider were at that meeting?

13    A.  That's what it says here.

14    Q.  Right.

01:46:55  15    A.  I have no way of knowing.

16    Q.  But you have no reason to doubt it?

17    A.  I mean, I have no -- no knowledge whatsoever if they were

18    there or not.

19    Q.  Okay.  Let's go to loan flipping.  I think that's the next

01:47:07  20    one.

21         You said loan flipping is simply continuous

22    refinances, correct?

23    A.  Yes.

24    Q.  And you said each time Household would refinance a loan,

01:47:22  25    they would flip a loan?

Ghiglieri - cross

1    A.  I don't know if I said each time.  Are you reading from my

2    testimony?

3    Q.  I'm reading from your testimony in this courtroom on March

4    31, at Page 444, Line 24 to Page 445, Line 1.  Quote:  Each

01:47:43  5    time Household would refinance a loan, they would flip a loan.

6         Is that what you meant to say?

7    A.  Well, I guess what I meant to say was, in doing loan

8    flipping, they would refinance a loan and add more fees and

9    products.  I'm sure that in all the loans that they made, we

01:48:04  10   could find one or two or how many ever where they refinanced

11   that it wasn't considered loan flipping.  But a lot of the

12   documents that I've looked at had loans refinanced more than

13   one time, where they would add the points all over again and

14   they would add the insurance premiums all over again.  And

01:48:25  15   that's what I was referring to there.

16   Q.  So your position is not it's each time, but it's a very

17   high level of incidence?

18   A.  Where they were doing loan flipping.

19   Q.  That's what I'm trying to find out.  What you testified

01:48:37  20   is, each time Household would refinance a loan, they would

21   flip a loan.

22        Let's start with refinance.  A refinance means a

23   customer has a loan.  He comes back to the same lender, and he

24   comes out with a new loan with new terms; and he pays whatever

01:48:50  25   costs are associated with that, correct?

Ghiglieri - cross

769

1    A.  Right.

2    Q.  That's a common practice, isn't it?

3    A.  Yes.

4    Q.  Is --

01:48:55  5    A.  It's not a common practice to charge points all over again

6    or it's not a common practice to add insurance all over again

7    or every time or as many times as you can.  That's the

8    difference between just doing a refinance and actually doing a

9    predatory loan flipping.  That was sort of the distinction I

01:49:14 10    was just trying to make to you just now.

11    Q.  So you have no quarrel with a plain vanilla refinance,

12    right?

13    A.  Right.

14    Q.  What percentage of Household loans are you now saying --

01:49:23 15    what percentage of Household refinances are you now saying

16    constitute flipping?

17    A.  I don't know the number, but I do know that when they

18    looked at it internally for refunding for loan flipping, it

19    came out to -- I think it was $60 million.  So it was a large

01:49:39 20    number of loans that they flipped.

21    Q.  But yesterday it sounded like you were saying it was a

22    hundred percent; today it sounds like you're off the hundred.

23    I'm trying to find out where you are now.

24    A.  I don't know what the exact number is.  But based on

01:49:52 25    internal documents at Household with how much they calculated

Ghiglieri - cross

770

1    that they were going to have to refund for loan flipping,

2    which totaled $60 million, I'm assuming that it's a large

3    number.  Now, what the exact number is, I don't know.  I did

4    not calculate the specific number of loan flippings or equity

01:50:12  5    strippings or anything like that.  I didn't feel that was

6    necessary for me to reach conclusions regarding whether they

7    did or did not do predatory lending.

8    Q.  But certainly if what anyone took from your testimony

9    yesterday that -- when you said each time Household would

01:50:26 10    refinance a loan, you're clearly saying today you didn't mean

11    each time?

12    A.  Well, I think I was talking in context of loan flipping.

13    And so if you take sentences in isolation, it's easy to, you

14    know, decide what you're going to say about it.  But what I

01:50:44 15    think I was referring to in this section was loan flipping.

16    And where they were loan flipping, each time they did a

17    refinance, they would add those points and fees.

18    Q.  So taking sentences in isolation doesn't give you a fair

19    view of what was actually said; is that your point?

01:51:02 20    A.  No.  I'm just saying you have to take it in context of

21    what you're saying.  And that's what I tried to do in this

22    case, where I tried to look at as many documents as I could.

23    Of course, I didn't look at every single one.  I understand

24    that.  But I tried to look at quite a few so I could draw some

01:51:17 25    conclusions.

Ghiglieri - cross

1    Q.   Taking it in context, as you just said, would be like

2    looking at the entire company to make a judgment about what

3    kind of company it was as opposed to looking at things that

4    exist up and in one-half or less of 1 percent of the company's

01:51:32  5    operations; would you agree with that?

6    A.   Well, you're focused on the percent or the number of

7    complaints or the number of loans or whatever you're saying.

8    I took a broader view of that, and I looked at the type of

9    lending practices they engaged in.  I looked at what their

01:51:49  10   training was.  I looked at what their -- how were their

11   employees compensated.  I looked at the internal audit.  I

12   looked at their compliance function.  I looked at complaints.

13   I looked at the investigations and the examinations by the

14   regulators.

01:52:04  15       So I looked at and used the methodology that I would

16   use as a bank regulator.  When we would go in to examine First

17   National Bank of Chicago, for example, it was impossible for

18   us to look at every single solitary loan that they had.  So we

19   had to make some judgments as far as how many loans we were

01:52:25  20   going to look at, how many, you know, depository accounts we

21   were going to look at so that we could check compliance with

22   the laws.  And where we found problems, we would expand that.

23   And so it -- it -- it -- that sort of an analysis doesn't lend

24   itself to calculating the exact number of loans in each of

01:52:50  25   those categories.  I looked at a much broader spectrum of

Ghiglieri - cross

772

1    things for the company.

2    Q.  I think the next thing on your list was blocking the back

3    door.  And the last thing on your list.  Okay.  We're making

4    progress.

01:53:10  5         And you said that if Household makes a loan and the

6    customer only stays for a short time, they're not going to be

7    as profitable as if the customer would stay and pay, correct?

8    A.  Are you reading from my testimony?

9    Q.  I am reading from the trial transcript on March 31 at Page

01:53:31 10   464, Line 21 to 465, Line 1.  The question was:

11        Question:  Why is that significant to your opinion?

12        You said, Answer:  Well, because Household is in the

13   business of making loans.  And if they make a loan and the

14   customer only stays for a short time, you know, they are not

01:53:46 15  going to be as profitable as they would be if the customer

16   would stay and pay.  I left out the "you know?"

17   A.  Thank you for doing that.  So -- and your question is?

18   Q.  The question is:  Do you recall that testimony?

19   A.  Yes.

01:53:59 20  Q.  Okay.  When you talk about the profitability of customers,

21   you're talking about the profitability to the owners of the

22   company, which is the investors, correct?

23   A.  When I made that statement, I was focused on the amount of

24   income that Household was going to generate.  And ultimately

01:54:25 25  when you talk about the company, you talk about its investors,

Ghiglieri - cross

773

1    I suppose.  That's not generally what I focus on.  But, yes.

2    But here I was just trying to discuss the income stream of the

3    company.

4    Q.  You say that's not generally what you focus on.  You've

01:54:43   5    never been the CEO of a public company, have you?

6    A.  Not the CEO.

7    Q.  You don't know what Mr. Aldinger focused on during the

8    years he was CEO of Household?

9    A.  Well, I know Household focused on growth in the 1999, you

01:54:59  10    know, to 2000 time frame.  But, of course, every company has

11    to focus on profitability, whether you're publicly traded or

12    not, because otherwise you would go out of business.

13    Q.  There you go.

14         And so that's what you were saying here, that --

01:55:17  15    let's talk -- a profitable loan is better for the company,

16    better for the shareholders, better for everybody than an

17    unprofitable loan, correct?

18    A.  Yes.  And from my standpoint, a sound loan is better for

19    the company than an unsound loan or a good loan is better than

01:55:35  20    a bad loan because if it's a bad loan, you don't get paid.

21    Q.  And you mentioned the word income.  In addition to income,

22    the company has to focus on costs, right?

23    A.  You mean just generally their costs or --

24    Q.  Sure.

01:55:52  25    A.  Sure.

Ghiglieri - cross

774

1    Q.   And profit is the difference between income and costs?

2    A.   Income less expenses, right.

3    Q.   Okay.  And do you understand that when a loan is priced,

4    the company takes into account certain costs, including the

01:56:10  5    cost of getting that money it's going to lend -- if it's not a

6    bank, it doesn't have deposits -- and it makes certain

7    assumptions as to how long the loan will last?

8    A.   Yes.

9    Q.   Okay.  And let's assume they've -- they've assumed a

01:56:25  10    length of five years, and the customer pays off after one

11    year.  The company will not make the profit it assumed it

12    would make on that loan, correct?

13    A.   Yes.

14    Q.   Okay.  So to protect the profit for the company's

01:56:37  15    shareholders, the company has two choices.  They can raise the

16    prices to all borrowers thereby increasing income and then one

17    borrower or another will pay off early and so be it and the

18    company will still make enough profits for its shareholders

19    because everybody pays more; or they could try to focus the

01:56:58  20    incremental cost on the fellow who pays off early, correct?

21    A.   I just have never seen something like that.  I've seen

22    other frameworks, but I'm not familiar with that.

23    Q.   You're not familiar with what I'm describing?

24    A.   Well, I understand what you're trying to say; but the

01:57:20  25    specifics of what you're saying, I haven't --

Ghiglieri - cross

1    Q.  Okay.

2    A.  -- ever heard a lender say that we are focusing on people;

3    we're going to charge someone more if they pay off early.

4    I've never heard that before.

01:57:34  5    Q.  Do you know what that's called in the lending trade?

6    A.  I don't know.

7    Q.  Prepayment penalty.  Have you ever heard that?

8    A.  I've heard the term prepayment penalty.

9    Q.  Isn't what I just told you, the business case for a

01:57:49  10    prepayment penalty is to focus the cost of an early

11    termination of a loan on the person who causes that loss in

12    revenue without focusing the cost on all the other borrowers

13    who are not causing any loss in anticipated revenue?

14    A.  I guess you could explain it like that.  I've never heard

01:58:07  15    a lender say that before.  But, I mean, I guess you can couch

16    it like that.

17    Q.  And you understand that the market niche of a finance

18    company, Household and others, starts off with people

19    who major banks like Wells Fargo don't choose to lend to

01:58:37  20    because they don't have the credit criteria that that bank is

21    looking for?

22    A.  Right.

23    Q.  Okay.  Now, in looking at these various documents, did you

24    come across a document where Mr. Gilmer put out his list of

01:59:06  25    predatory practices, which might be similar to, might be

Ghiglieri - cross

1  different than this?

2          I'm sorry.  Are you okay?

3  A.  I'm okay.

4  Q.  You need a break or something?

01:59:17  5  A.  No.  I can keep going.  I just might cough a little.

6  Q.  Did you come across a list of Mr. Gilmer's assembly of

7  practices he thought were predatory?

8  A.  I saw several memos from him where he discussed predatory

9  lending practices.  I'm not sure I know what you're referring

01:59:37 10  to.

11  Q.  Let me show you Defendants' 29 -- I'm sorry, 209.

12          I'll ask you if this is one of the memos of

13  Mr. Gilmer's that you recall seeing?

14  A.  I do.

02:00:00 15  Q.  Okay.  Let's go through it together.  It's dated May 1,

16  2000.  And it was sent to all Household employees, correct?

17  A.  Yes.

18  Q.  And the subject is predatory lending.  Mr. Gilmer writes,

19  Predatory lending is a very high-profile subject in the

02:00:13 20  financial services industry today; and, unfortunately, there

21  is some good reason for that.  Clearly, some companies,

22  although few in number, have committed outrageous acts that

23  appear to have been driven by greed.  As I mentioned in an

24  earlier note to you, our aim and, frankly, our commitment is

02:00:34 25  to drive these unscrupulous players from our business.  You

Ghiglieri - cross

1   may rest assured that we are doing all we can, including

2   forming coalitions and working with our friends in the state

3   and federal legislative branches, to curb their activity.  You

4   will be hearing more about these efforts in the coming weeks.

02:00:53  5       Do you see that?

6   A.  I do.

7   Q.  Okay.  And then he goes on.  He's got another paragraph

8   there.  I'll skip it in the interest of moving along.  And

9   then he says in the third paragraph, As you may know, there

02:01:04  10  are a few activities that are often mentioned in reports on

11  predatory lending.

12       And then he goes on to say, Below I have listed these

13  activities along with a brief description of each, as well as

14  our internal policies that relate to each one.  I thought you

02:01:20  15  might find the stark differences in these policies and

16  processes interesting.

17       And the first bullet point he has is stripping.  Do

18  you see that?

19  A.  I do.

02:01:29  20  Q.  He says, Stripping:  The practice of making RE -- that's

21  real estate?

22  A.  Yes.

23  Q.  Okay.  Thank you.  Practice of making real estate loans to

24  customers where the lender, using a variety of unscrupulous

02:01:41  25  tactics, hopes to ultimately foreclose on property, sell it

Ghiglieri - cross

1    and pocket the equity.  HFC -- that's Household Finance

2    Corporation?

3    A.  Yes.

4    Q.  HFC/Beneficial policy:  We do not permit hard equity

02:01:57   5    loans.

6                Do you see that?

7    A.  I do.

8    Q.  He's writing this to all Household employees in May of

9    2000, correct?

02:02:04  10    A.  Yes.

11    Q.  He says, In every case, we review our customers'

12    circumstances and conclude that the customer has the intent

13    and the ability to repay the debt.  Further, every effort is

14    made to avoid foreclosure, to include renegotiations of terms,

02:02:23  15    payment extensions, et cetera.  Finally, in those few

16    circumstances when foreclosure becomes our only alternative,

17    we always refund any and all excess funds, parenthesis, any

18    money from the sale of the property in excess of the amount

19    necessary to clear the debt, close parenthesis, back to the

02:02:45  20    borrower.

21                Do you see that?

22    A.  I do.

23    Q.  He is stating Household's policy on this subject to all

24    employees?

02:02:52  25    A.  That's what he's saying, yes.

Ghiglieri - cross

1    Q.  I agree.

2           Next bullet point, packing.

3    A.  I don't necessarily agree with it, but that's what it says

4    here.

02:03:00  5    Q.  That was my question.  He is stating Household's policy to

6    all employees as of May 2000, correct?

7    A.  Well, he's stating what he's stating.  What I have said in

8    my prior testimony and in the reports is that I don't think

9    that they don't do equity stripping.

02:03:21 10    Q.  Nevertheless, this is Mr. Gilmer writing to every single

11    employee in the company telling them what the company's policy

12    is, correct?

13    A.  Well, he's saying what he's saying in this memo.

14    Q.  The next bullet point says, Packing:  The practice of

02:03:39 15    requiring a customer to accept credit -- I'm sorry -- to

16    accept credit-related insurance as a condition for obtaining a

17    loan or hiding the fact that insurance is a part of the

18    transaction.

19           And underneath that, he says, HFC/Beneficial policy:

02:03:55 20    Under no circumstances will we ever require customers to buy

21    credit insurance from us as a condition for obtaining a loan.

22    Beyond that, our customers receive a 30-day free look, during

23    which time they may cancel their insurance and obtain a full

24    refund.  Beyond that, a customer may cancel insurance at any

02:04:17 25    time and receive a refund of all unearned premiums.

Ghiglieri - cross

1          Again, this is Mr. Gilmer in May of 2000 saying this

2     to all Household employees, correct?

3     A.  Well, that's what it says here.

4     Q.  Flipping, next bullet.  The practice of rapidly renewing

02:04:36  5     RE secured loans, each time collecting points, parenthesis,

6     sometimes 20 or more, close parenthesis, on the full amount

7     financed for the purpose of gouging customers.

8          HFC/Beneficial policy:  Rapid refinancing of RE loans

9     for this purpose is forbidden.  Further, the maximum number of

02:04:58  10     points allowed under any circumstance is seven and a half.

11     Beyond that, for loans refinanced within a year, our policy

12     prohibits charging any points whatsoever on the refinanced

13     amount.

14          Do you see that?

02:05:14  15     A.  I do.

16     Q.  That's Mr. Gilmer telling every single Household employee

17     in May of 2000 that that's our policy, that's the company's

18     policy, correct?

19     A.  Well, this is what he's writing to them, yes.

02:05:26  20     Q.  Okay.  And then he says, As you can see from this summary,

21     we stand far apart from the unscrupulous lenders that we've

22     all read about in the press.  In fact, HFC/Beneficial is often

23     cited as, quote, the standard, close quote, for high ethics

24     and fair customer dealings by our regulators and legislators.

02:05:50  25     I know that you share my pride in our position and will

Ghiglieri - cross

781

1    support our efforts to maintain our standing in the years

2    ahead.

3            And that's also what he wrote to every single

4    employee of the company on May 1, 2000, correct?

02:06:03  5    A.  That's what the memo stated, yes.

6    Q.  That's my question.

7            Now, here's my next question:  Did you ever see a

8    memo from Mr. Gilmer to all the employees saying please ignore

9    my memo of 5/1/00 and do something completely different; I

02:06:21 10    just sent that memo out so that I have it available to point

11    to if someone said to me you're a predatory lender?  Did you

12    see a memo like that?

13    A.  No.

14    Q.  And Household had approximately 14,000 employees in this

02:06:36 15    particular business and 32,000 overall during these years?

16    A.  I don't know the exact number.  I know you pointed it out

17    in the 10-K.  If you say so.

18    Q.  You have no reason to question what's in the 10-K?

19    A.  No.

02:06:51 20    Q.  Did you ever see something that suggests to you Mr. Gilmer

21    had a conference call with these 14,000 employees and said

22    don't pay any attention to my memo?

23    A.  I didn't see anything that indicated he had a conference

24    call with them.

02:07:03 25    Q.  Did you see anything that indicated Mr. Gilmer went around

Ghiglieri - cross

782

| | | |
|---|---|---|
| | 1 | the country meeting with these 14,000 people saying don't pay |
| | 2 | attention to this memo? |
| | 3 | A.  I didn't see anything like that. |
| | 4 | Q.  And I think I heard you say a minute ago, this is one of |
| 02:07:17 | 5 | numerous memos that you saw from Mr. Gilmer to all the |
| | 6 | employees to the same general effect, correct? |
| | 7 | A.  Well, I didn't say numerous; but I know there was at least |
| | 8 | three that I saw, one per year approximately during that time |
| | 9 | frame that I was looking at these documents. |
| 02:07:35 | 10 | Q.  All right.  We might get to look at some more, but I'll |
| | 11 | pass for the time being. |
| | 12 | A.  I'm sorry? |
| | 13 | Q.  I said we might get to look at some more, but for the |
| | 14 | moment, I'll pass on to something else. |
| 02:07:48 | 15 |         I apologize.  I take that back.  Let me show you -- |
| | 16 | let me ask you, you said you saw one of these a year.  Did you |
| | 17 | see one entitled "ethical behavior" issued by Mr. Gilmer on or |
| | 18 | about October 3, 2001? |
| | 19 | A.  I'll have to look at the memo -- |
| 02:08:19 | 20 | Q.  Absolutely. |
| | 21 | A.  -- to tell you if I saw it or not. |
| | 22 | Q.  Absolutely. |
| | 23 |         MR. KAVALER:  Your Honor, may I approach. |
| | 24 |         Let the record reflect I'm handing the witness a copy |
| 02:08:30 | 25 | of Defendants' 165. |

Ghiglieri - cross

1      (Tendered.)

2    BY MR. KAVALER:

3    Q.  And this is, again, to all consumer lending employees.

4    That's Mr. Gilmer's business group, correct?

02:08:41 5    A.  I'm sorry?  May I have a moment to look at this?

6    Q.  Sure.  Take all the time you need to read this document.

7      (Brief pause.)

8    BY THE WITNESS:

9    A.  I'm not -- I don't think I saw this memo.

02:09:13 10   BY MR. KAVALER:

11   Q.  Let me see if I can refresh your recollection.  Focus on

12   the bottom paragraph because there's some distinctive words in

13   there you might recall.

14   A.  Okay.

02:09:22 15   Q.  He says, Let me say, I take pride in the fact that 99.9

16   percent of our people uphold and support our company

17   standards.  As I have communicated before, I also take pride

18   in the fact we maintain a zero tolerance for inappropriate and

19   unethical behavior and demonstrate that with swift action.

02:09:42 20   The introduction of the employee integrity tip line is simply

21   an additional tool you can use to help us maintain our great

22   company name.

23        Do those words refresh your recollection that you saw

24   this memo?

02:09:54 25   A.  I don't think I did.  But I know that he sent out a few

Ghiglieri - cross

784

1   that were similar to this.

2   Q.  Right.  And the phrase "zero tolerance" was one that he

3   used quite frequently?

4   A.  I don't remember that.

02:10:04 5   Q.  Okay.  And you understand the phrase "demonstrate with

6   swift action" means people who violate his policies will be

7   punished?

8   A.  Well, that would be a good explanation of it, I think.

9   Q.  And, in fact, from your review of the documents, you know

02:10:19 10   that people who violated Household's policies were, in fact,

11   punished?

12   A.  I didn't hear the last part of your question.  Were what?

13   Q.  I'm sorry.  You know from your review of the documents

14   that people who violated Household's policies in this area

02:10:35 15   were, in fact, punished by Household?

16   A.  I did see a few of those documents.

17   Q.  All right.  Including some people being fired?

18   A.  I saw one or two of those, I think.

19   Q.  Including instances where the account executive who made a

02:10:52 20   bad loan was fired and sometimes the branch manager who

21   supervised that account executive was also fired?

22   A.  I can't remember their positions, but I did see a handful

23   of those types of documents.

24   Q.  And that was for violating Household's policies as

02:11:07 25   articulated by Mr. Gilmer and others?

Ghiglieri - cross

1    A.  Yes.

2    Q.  Okay.  Now, you talked yesterday about a person named

3    Andrew Kahr -- I'm sorry -- the day before yesterday, I think

4    it was.  Anyway, in the last couple of days, you told us about

02:12:00  5    Andrew Kahr, correct?

6    A.  Yes.

7    Q.  And you told us he was a founder of a company called

8    Providian, correct?

9    A.  Yes.

02:12:06 10    Q.  He was not a founder of Household?

11    A.  No, not that I know of.

12    Q.  Well, you know Household is 125 years old, don't you?

13    A.  Is it 125 years old?  I don't know if I knew that.

14    Q.  Assuming that's true, then you don't think he was a

02:12:19 15    founder of Household?

16    A.  I'm not sure how old he is really.

17    Q.  Okay.  And Providian is not a company related to

18    Household?

19    A.  No.

02:12:29 20    Q.  All right.  So he was the founder of some other company.

21    And he was -- I think I might have asked you this.  If I did,

22    I apologize.  I'm getting senile in my old age.  He was not a

23    senior executive of Household?

24    A.  He was a consultant for Household.

02:12:42 25    Q.  Not an employee?

Ghiglieri - cross

786

1    A.  No.

2    Q.  So if you were drawing a table of organization -- do you

3    know what a table of organization is?

4    A.  Yes.

02:12:49   5    Q.  If you were drawing a table of organization for Household,

6    where would you put him on it?

7    A.  Well, you could put him on a dotted line to Mr. Gilmer or

8    something like that.  Sometimes you see consultants on there

9    or not at all.

02:13:01  10    Q.  Not at all or a dotted line.  What does a dotted line

11    usually mean?

12    A.  Well, that they're either not an employee or they are

13    reporting sort of outside the framework.

14    Q.  And on this table of organization of Household as you

02:13:14  15    understand it, where would you put Mr. Aldinger?

16    A.  Above Mr. Gilmer.

17    Q.  At the top?

18    A.  Yes.

19    Q.  You certainly wouldn't put Mr. Kahr at the same level as

02:13:34  20    Mr. Aldinger, would you?

21    A.  Well, I mean, you asked me where you would put him on an

22    org chart.  And I would think it would only make sense if he's

23    not an employee to put him on a dotted line reporting to

24    Mr. Aldinger or Mr. Gilmer because I think he was actually

02:13:51  25    hired to promote the growth for the finance --

Ghiglieri - cross

787

```
            1   Q.  For giving advice?

            2   A.  Consumer finance.

            3           Yes.

            4   Q.  By giving advice, not by running the company?

02:13:57    5   A.  No, no.  And that's not what I'm saying.

            6   Q.  Now, you read to the jury from Plaintiffs' Exhibit 1388,

            7   which is in evidence, which is an article about Mr. Kahr's

            8   company, Providian, in the San Francisco Chronicle.

            9           Do you remember that?

02:14:18   10   A.  Yes.

           11   Q.  That's the article that's up there on the screen now.

           12           And this article says various negative things about

           13   Mr. Kahr, correct?

           14   A.  Yes.

02:14:29   15   Q.  And the point of that was to say that when Household

           16   engaged Mr. Kahr, they should have been aware of these things?

           17           MR. DROSMAN:  Objection, calls for speculation.

           18           THE COURT:  Overruled.

           19   BY THE WITNESS:

02:14:50   20   A.  So -- can you ask me the question again?

           21   BY MR. KAVALER:

           22   Q.  Sure.  The point of your reading from this article was to

           23   suggest that when Household engaged Mr. Kahr as a consultant,

           24   they should have been aware of its contents?

02:15:02   25   A.  Are you saying the contents of the article?
```

Ghiglieri - cross

788

1    Q.  Sure.

2    A.  Well, the article was dated in 2002, which was sort of

3    towards the end of when Mr. Kahr was helping them.

4    Q.  It was four years after you testified that they engaged

02:15:17  5    him as a consultant, right?

6    A.  They engaged him at the end -- or, well, three, three and

7    a half.  They engaged him at the end of 1998.

8    Q.  The article is dated May 5, 2002, correct?

9    A.  I can't see the date, but, yes, 2002.

02:15:30 10    Q.  Okay.

11    A.  Yes.

12    Q.  So Mr. Aldinger couldn't possibly have read this article

13    before Household engaged Mr. Kahr, correct?

14    A.  Well, it hadn't been written yet.

02:15:39 15    Q.  The answer is correct?

16    A.  Yes.

17    Q.  And Mr. Schoenholz couldn't have read this article before

18    Household engaged Mr. Kahr?

19    A.  Right.

02:15:45 20    Q.  And Mr. Gilmer couldn't have read this article before

21    Household engaged Mr. Kahr?

22    A.  Right.

23    Q.  And you have no reason to believe Mr. Aldinger,

24    Mr. Schoenholz or Mr. Gilmer ever read this article, correct?

02:15:55 25    A.  I have no idea if they read it or not.

Ghiglieri - cross

789

1   Q.  You don't know whether they read it or not.  For all you

2   know, the first time they ever saw it was yesterday on the

3   screen?

4   A.  Well, unless they were following Mr. Kahr because right

02:16:08  5   after this, there were some internal memos saying that they

6   wanted to start -- they blocked Mr. Kahr's e-mail; and they

7   deleted all of the e-mails internally regarding Mr. Kahr.  And

8   then -- I don't know if it was Mr. Aldinger, one of the senior

9   officials, said we better get rid of all the memos too.  So I

02:16:29 10  think someone at Household read this because right after that,

11  they did a document destruction regarding Andrew Kahr.

12  Q.  The answer to my question is you don't know if any of them

13  ever saw this memo earlier than yesterday, do you?

14  A.  I don't.

02:16:49 15  Q.  Do you know how Mr. Kahr came to Household's attention?

16  A.  As I'm sitting here, I don't.  I may have looking at the

17  documents three years ago.  But I just don't know sitting

18  here.

19  Q.  I think you just told me you read a bunch of Mr. Kahr's

02:17:07 20  memos, correct?

21  A.  Yes.

22  Q.  We'll look at a couple in a minute.

23        Do you know what Mr. Kahr was famous for before he

24  came to consult at Household?

02:17:16 25  A.  Predatory lending practices at Providian.

Ghiglieri - cross

790

1    Q.  Well, that would have been well known after this article

2    in May of 2005.  Do you know what he was known for before

3    1998?

4    A.  Well, his relationship with Providian.  I don't know about

02:17:32    5    before that.

6    Q.  Did you ever hear of a company called Merrill Lynch?

7    A.  Yes.

8    Q.  Did you ever hear of a product called a cash management

9    account?

02:17:40  10    A.  Oh, I think that's described in here or in one of the

11    articles, yes.

12    Q.  Do you know what a cash management account is?

13    A.  Yes, I do.

14    Q.  And today they're very prevalent in the finance industry.

02:17:51  15    It's the linkage of a credit card and a brokerage account.

16    The credit card might be a debit account.  You can use it as a

17    checking account.  It's very common, correct?

18    A.  Yes.

19    Q.  You're not as old as I am so you won't remember when it

02:18:02  20    first came out, but it was a big stir in the financial

21    industry when Merrill Lynch rolled out the first one, wasn't

22    it?

23    A.  I'm too young to remember that.

24        (Laughter.)

02:18:11  25    BY MR. KAVALER:

Ghiglieri - cross

791

1    Q.  But you've heard of it?

2    A.  I heard a tale at my father's knees.

3    Q.  People older than you told you this?

4    A.  Yes.

02:18:18  5    Q.  And people who are in the finance business sometimes say

6    it was a revolutionary moment in the finance industry; you've

7    heard that?

8    A.  I haven't heard that, but --

9    Q.  And you've heard that the person who is credited with

02:18:29 10    having invented this product, this revolutionary product, at

11    Merrill Lynch is Andrew Kahr?

12    A.  I have no knowledge about that except for what I read in

13    that article about that he developed that product.

14    Q.  You were very kind enough to share with us the other

02:18:42 15    knowledge you got from that article yesterday, so you think

16    the article is reliable, don't you?

17    A.  Yes.

18    Q.  So if the article says something about Merrill Lynch and

19    the CMA, that rings a bell?  You've heard that before?

02:18:54 20    A.  Yes.

21    Q.  Would you describe Mr. Kahr as an innovator based on his

22    invention of the cash management product at Merrill Lynch?

23    A.  You know, you could describe him as that.

24    Q.  Do you think senior managers of a company might think it's

02:19:08 25    a good idea to bring someone in to give them innovative

Ghiglieri - cross

1    thoughts which they can bat around?

2    A.  Sure.

3    Q.  Would you expect that a responsible company would

4    nevertheless put a fence around that guy because he's not an

02:19:20  5    employee or an officer and make sure that the guys who are

6    employees and officers watch him and make sure he doesn't come

7    up with any silly ideas?

8    A.  Sure.

9    Q.  You know that that's exactly what Household did, don't

02:19:31 10    you?

11         Household surrounded Mr. Kahr with all of their

12    senior management; and they said to him, you generate ideas

13    and we'll decide if they're right for Household because they

14    need to be consistent with our culture and good for our

02:19:45 15    customers and good for our employees and good for our

16    investors.  And what happened was, in all these e-mails you

17    read, Mr. Kahr constantly fought with senior management

18    because he thought they wouldn't let him do what he wanted to

19    do and they thought he was crazy.

02:20:02 20         Isn't that what happened?

21    A.  I didn't see anything that said "I think Mr. Kahr is

22    crazy," so I have no knowledge of those last statements that

23    you made.

24    Q.  Okay.  Let's see what you did see.

02:20:15 25    A.  Okay.

Ghiglieri - cross

793

1    Q.  Let's start with Plaintiffs' Exhibit 1007, which counsel

2    for the investors put up on the screen during the opening

3    statements.

4         MR. KAVALER:  Your Honor, may I approach?

02:20:44  5         THE COURT:  Yes.

6    (Tendered.)

7    BY MR. KAVALER:

8    Q.  This is a memo dated March 12, 2001, to files from

9    Mr. Schoenholz.  I know -- I don't believe you were here for

02:20:59  10   the opening statements, but you've seen this memo before,

11   correct?

12   A.  Let me take a minute to look at it.

13   Q.  Please, please.

14   A.  And see if I've seen it.

02:21:05  15   (Brief pause.)

16        THE COURT:  While she's doing that, why don't we take

17   just a couple of minutes to do a little switch here.  We can

18   stay right where we are, folks.  It will just take a minute.

19   (Brief pause.)

02:24:16  20        THE COURT:  You may resume.

21        MR. KAVALER:  Thank you, your Honor.

22   BY MR. KAVALER:

23   Q.  Have you had enough time to read this document?

24   A.  I did.

02:24:22  25   Q.  Okay.

Ghiglieri - cross

794

1    And counsel for the shareholders read some portions

2    of it to the jury during his opening.  He didn't read this

3    portion.  Let me read it to you.  It's in the bottom of the

4    second paragraph.  It begins with the word "However."

02:24:33  5    "However, Andrew Kahr also made proposals that have

6    not passed review by the Office of General Counsel and/or have

7    not been viewed favorably by the senior business executives.

8    Consequently, these proposals have never been implemented."

9    Do you see that?

02:24:49 10    A.  I see it.

11    Q.  You saw, in reviewing these various memos of Mr. Kahr's,

12    that there was an ongoing tension between Mr. Kahr and other

13    senior executives about a lot of his proposals, didn't you?

14    A.  You know, I didn't focus on that.  I was just focusing on

02:25:06 15    what the proposals were.

16    Q.  Right.

17    A.  So --

18    Q.  I think another document that you showed us yesterday --

19    and I'll come to it in a minute -- said that Mr. Kahr

02:25:16 20    originally made 60 proposals and it was whittled down to ten?

21    A.  I think that's right.

22    Q.  And of the ten, I think you told us two were implemented?

23    A.  I think more than two were implemented.

24    There were two on a listing of some, but I believe

02:25:31 25    there were more than two implemented.

Ghiglieri - cross

795

1    Q.  We'll get to that.

2         But the point is:  He was an idea generator who threw

3    out 60 ideas.  At least 50 of them died, correct?

4    A.  Yes.

02:25:40  5    Q.  Some of them died as a result of some ugly memos back and

6    forth between Mr. Kahr and senior executives of Household who

7    said, in essence, "Not here you don't"; isn't that right?

8    A.  I don't know.  I didn't see all those types of memos.

9    Q.  Well, you saw -- how many Kahr memos did you see?

02:26:00  10   A.  I probably saw maybe five or so.

11   Q.  Let's see which ones you saw.

12        Let me show you Plaintiffs' Exhibit 533.  I believe

13   this is one of the documents we looked at yesterday or the day

14   before yesterday, correct?

15   A.  (No response.)

16   Q.  Correct?

17        MR. KAVALER:  May I approach the witness, your Honor?

18        THE COURT:  You may.

19        MR. KAVALER:  Thank you.

20        (Document tendered.)

21   BY THE WITNESS:

22   A.  Thank you.

23   BY MR. KAVALER:

24   Q.  So, this is a document investors' counsel showed to you

02:26:39  25   and you testified about a couple days ago?

Ghiglieri - cross

796

             1   A.   Yes.

             2   Q.   Do you remember that?

             3   A.   Yes.

             4   Q.   Okay.

02:26:47     5        And it's to Joe Vozar, with copies to Paul Creatura,

             6   Gary Gilmer, Martha Pampel, Kay Curtin, Dave Schoenholz, Ken

             7   Robin and Susan Jewell.

             8        Do you know who Ken Robin is?

             9   A.   I know who almost all these people are, but I can't

02:27:04    10   remember all their titles.

            11   Q.   Let me see if I -- sorry.

            12   A.   But you can tell me.

            13   Q.   I'll try to refresh your recollection.

            14   A.   Okay.

02:27:09    15   Q.   Mr. Robin was the General Counsel of the company?

            16   A.   Yes.

            17   Q.   Susan Jewell was the Deputy General Counsel of the

            18   company?

            19   A.   I'm not familiar with her.

02:27:18    20   Q.   Okay.

            21        When I say "the company," I mean Household

            22   International, the parent, the public company.

            23        Kay Curtin was the General Counsel of Household

            24   Finance?

02:27:25    25   A.   Yes.

Ghiglieri - cross

1  Q.  Do you recall that?

2  A.  Yes.

3  Q.  Martha Pampel was a lawyer on Kay Curtin's staff --

4  A.  Yes.

02:27:32  5  Q.  -- I believe.

6           She might have been on Mr. Robin's staff.

7           In any event, she was in the Law Department.

8           All right.

9           And if you look down into the third paragraph, about

02:27:41  10  the third line beginning with "Since" -- there it

11  is (indicating) -- he says, "Since I have been working

12  personally with the HFC -- " that's Household Finance -- "and

13  HI -- " that's Household International, correct?

14  A.  Yes.

02:27:59  15  Q.  " -- lawyers on this, please let me handle any requests

16  from you and HFC for legal approval of specific actions and

17  forms relating to this project for the time being.

18           "Please do not" -- underscored -- "put such requests

19  into any routine legal approval process.

02:28:16  20  "I met with the lawyers on Friday and thanked them

21  for their efforts, which have made this breakthrough

22  possible."

23           Do you see that?

24  A.  I do.

02:28:22  25  Q.  And, then, in the next paragraph, three lines from the

Ghiglieri - cross

1    Q.  And there are many other regulators who don't share those

2    opinions, correct?

3    A.  I'm not sure I understand.  That didn't think they engaged

4    in predatory lending?

02:40:07  5    Q.  Correct.

6    A.  There were a few states that issued reports that didn't

7    show those types of violations.  And I don't know how

8    expansive their -- the scope of their -- examination.

9         But, ultimately, all 50 states came to an agreement

02:40:25 10    with Household and fined them $484 million for these predatory

11    lending practices.

12         So, ultimately, all of the states ended up signing

13    onto that.

14    Q.  You reviewed a number of state regulatory exams of

02:40:40 15    Household, which were complimentary of Household, which you

16    didn't mention in your direct testimony, correct?

17    A.  Not a number.  I know there were a few that I reviewed,

18    that had violations of other types of things, but not of

19    predatory -- you know, the types of practices.

02:40:56 20         I didn't do a complete review of everything that

21    Household might have violated in that time period.  I focused

22    on whether or not they engaged in predatory lending.

23         So, the examination reports had much other

24    information in there, requiring corrective action, that went

02:41:15 25    to other things besides predatory lending.

Ghiglieri - cross

811

1  A.  I mean, I don't know -- I don't have it in front of me to

2  be able to say --

3  Q.  Okay.

4      Let's see if we can put it up on the board.

02:46:16  5  A.  -- to see what it is.

6      MR. KAVALER:  Tab 43.

7      (Brief pause.)

8  BY MR. KAVALER:

9  Q.  This is an excerpt of the deposition of Mr. Cross.

02:46:39 10      Do you recall reading the deposition of Mr. Cross?

11  A.  I do.

12      Is he referring to -- are you saying that he's

13  referring to -- 290?

14  Q.  He's referring to the Expanded Report of Examination.

02:46:52 15      Do you recall at his deposition he was asked about

16  this report?

17  A.  I read it a while ago, but I thought they looked at more

18  than 19 in this expanded report.

19  Q.  Okay.

02:47:05 20      Let's --

21      MR. DROSMAN:  Your Honor, are they offering the depo

22  into evidence?  I'm not sure --

23      MR. KAVALER:  No, your Honor.

24      The witness said her recollection would be refreshed

02:47:15 25  if I showed her Mr. Cross' testimony.

Ghiglieri - cross

812

1          I'm asking whether this refreshes her recollection

2     about what he testified about.

3          THE COURT:  The way to do that is to show it to the

4     witness --

02:47:22  5          MR. KAVALER:  Okay.

6          THE COURT:  -- not to publish it to the courtroom or

7     the jury.

8          So, please remove that.

9          MR. KAVALER:  I'll do that.

02:47:28 10          Take that down, please.

11       (Brief pause.)

12          MR. KAVALER:  Thank you.

13          May I approach the witness, your Honor?

14          THE COURT:  Yes.

15    BY MR. KAVALER:

16    Q.  I'm handing you Pages 397 through 400 of Mr. Cross'

17    deposition; and, I'm directing your attention, ma'am, to the

18    bottom of 398, where I put the red tick through the top of

19    "3999."  It's a total of nine lines.

02:48:19 20          My question is:  Does that refresh your recollection

21    that that's the testimony that Mr. Cross gave?

22       (Document tendered.)

23    BY THE WITNESS:

24    A.  So, your question to me is:  Is this his testimony?

02:48:46 25    BY MR. KAVALER:

Ghiglieri - cross

813

1   Q.  No, my question is:  Does that refresh your recollection

2   that you read Mr. Cross' testimony, where he said that the 19

3   complaints, out of a population of thousands that he looked at

4   to form his conclusions in this report, were a woefully

02:49:02  5   inadequate population to draw from?

6   A.  I see what he says here, but I don't see how it connects

7   to this report.

8        He -- because what you asked him before that is what

9   he majored in in college.  So, I'm not sure about the

02:49:21  10   connection there.

11        I see what he says about a statistical significance

12   or --

13   Q.  All right.

14   A.  That he's not a statistician.  So, I don't know.

02:49:34  15   Q.  Let's look at 2090, which is the report that counsel for

16   the investors showed you a couple days ago and you testified

17   about, which is now in evidence.

18   A.  Okay.

19   Q.  All right.

02:49:41  20        Do you have that up there?

21        MR. DROSMAN:  I think it's 290, your Honor.

22        MR. KAVALER:  Sorry.

23   BY THE WITNESS:

24   A.  290?

02:49:47  25   BY MR. KAVALER:

Ghiglieri - cross

814

1  Q.  290.  I apologize.

2          All right.  We'll go to Page -- the production number

3  at the bottom "HHS," ending in "667."

4          THE COURT:  Let me just make sure I have this.  This

02:50:01  5  is Plaintiffs' Exhibit 290?

6          MR. KAVALER:  290, your Honor.

7          THE COURT:  In evidence?

8          MR. KAVALER:  In evidence.

9          THE COURT:  Proceed.

02:50:08 10          MR. KAVALER:  Two days ago.

11  BY MR. KAVALER:

12  Q.  And we're at the page ending in "667," and the production

13  numbers are in the lower right-hand corner.

14          Do you see that?

02:50:18 15  A.  (No response.)

16  Q.  And where it says, "Identify patterns and recent complaint

17  history," it says:  "The complaints filed with the Department

18  reflect transactions originated in several branch locations

19  from varying locales in Washington.  While most of the

02:50:33 20  complaints show similar patterns of consumer abuse, the

21  Bellingham branch stands out with over 30 percent of the

22  complaints, (6 of 19), discussed in detail in this report."

23          Do you see that?

24  A.  I do.

02:50:48 25  Q.  Okay.

Ghiglieri - cross

1       And, then, Mr. Cross, the author of this report, was

2   asked in his deposition about those 19 complaints.  And he

3   said that that was a "woefully inadequate population to draw

4   from."

02:50:58  5       Do you see that in his testimony?

6   A.  I see that in his testimony.

7   Q.  Okay.

8       And my question is:  You recall reading his

9   deposition testimony, correct?

02:51:05  10  A.  Yes.

11  Q.  And do you recall testifying extensively about the

12  Washington Report a couple days ago, correct?

13  A.  Yes.

14  Q.  Okay.

02:51:15  15       And you understood, when you testified about that

16  report, that it was based on a sample of 19 complaints, which

17  Mr. Cross said that it was a woefully inadequate population to

18  draw from, correct?

19  A.  I see that that's what he testified; but, based on the

02:51:31  20  number of complaints, they did this expanded investigation and

21  they did the mystery shopping.

22       So, you know, I don't know what the context is

23  exactly of how -- you know -- what these questions were, but I

24  know they thought something was significant, to go to this

02:51:49  25  much trouble -- to do this investigation.

Ghiglieri - cross

816

1    Q.  Okay.

2         Let's look at Minnesota.  You testified about some

3    complaints in Minnesota two days ago?

4    A.  Yes.

02:52:03  5    Shall I get that?

6    Q.  I'm working on it.  Give me a second.

7    (Brief pause.)

8    BY MR. KAVALER:

9    Q.  Let me show you what's been marked as Defendants' 296.

02:52:36  10   MR. KAVALER:  May I approach, your Honor?

11        THE COURT:  You may.

12   BY THE WITNESS:

13   A.  Is that not this one (indicating)?

14   BY MR. KAVALER:

02:52:44  15   Q.  Is this one of the documents that you reviewed?

16   A.  Yes.

17   Q.  Okay.

18        And this is a letter to Mr. Jordan Ash, the Loan

19   Counselling Director of Acorn Housing Corporation, from

02:53:11  20   Mr. Kevin M. Murphy, the Deputy Commissioner of the Minnesota

21   Department of Commerce, correct?

22   A.  Yes.

23   Q.  Okay.

24        And Mr. -- Deputy Commissioner -- Murphy is writing

02:53:24  25   to Mr. Ash about certain complaints against Household.

Ghiglieri - cross

817

1          Do you see that?

2    A.  Yes.

3    Q.  And he says -- he lists the complaints by name and he says

4    -- "I have personally reviewed all of the complaints and the

02:53:39  5    response documentation provided by Household Beneficial.  To

6    date, we find no evidence of law by Household Beneficial with

7    respect to these complaints."

8          Do you see that language?

9    A.  I see that language.

02:53:50  10   Q.  Okay.

11         And he says there are two more complaints as to which

12   he doesn't yet have documentation, correct?

13   A.  Where are you reading from?

14   Q.  I think I'm reading from the wrong place.

02:54:15  15    (Brief pause.)

16   BY MR. KAVALER:

17   Q.  I'm reading from the bottom of the first page, but I

18   withdraw the question.

19   A.  Okay.

02:54:30  20   Okay.

21         So, at least in Minnesota, on this occasion, although

22   there were complaints, Commissioner Murphy found that in the

23   case of five of them, there was no evidence of any violations

24   of law by Household/Beneficial, correct?

02:54:43  25   A.  Right.

Ghiglieri - cross

818

1        And that predates by a year and a little bit the

2    examination that we looked at yesterday.

3    Q.   Right.

4        But it follows by two or three years the time when

02:54:52  5    you said two days ago everything began to change when Gary

6    Gilmer decided to focus on growth, correct?

7    A.   Well, if you remember Mr. Cross' testimony in his

8    deposition, he said, "You know, in the beginning we believed

9    Household when they said it was either a rogue employee or a

02:55:11  10   rogue branch," or whatever; and, it took us a while to put

11   together that they were, in fact, engaging in predatory

12   lending.

13       And, then, he started talking to other regulators

14   around the country and they were all having the same sorts of

02:55:26  15   issues.

16       So, some of this information predates when they

17   finally put it all together and figured out what was going on.

18   Q.   Okay.

19       But, in any event, this is an instance of a state

02:55:40  20   regulator investigating a complaint and coming to the

21   conclusion that, notwithstanding the customer complained,

22   there was no merit to the complaint, correct?

23   A.   Yes.

24   Q.   And that happens sometimes, doesn't it?

02:55:51  25   A.   Sure.

Ghiglieri - cross

830

1    Q.  Did you see, in the records that you looked at,

2    Household's response to Mr. Ortega's complaint?

3    A.  I may have.  I don't remember.

4    Q.  Let me show you that document and see if that refreshes

03:31:51  5    your recollection.

6              MR. KAVALER:  Your Honor, could we mark this for

7    identification as Defendant Exhibit 1079?

8         (Document tendered.)

9         (Brief pause.)

10   BY MR. KAVALER:

11   Q.  Ready?

12   A.  Uh-huh.

13   Q.  Does that refresh your recollection that you saw

14   Household's response to Mr. Ortega's complaint setting forth

03:33:45  15   its position and describing what it had done to remedy his

16   complaint?

17   A.  Yes.

18   Q.  Okay.

19             MR. KAVALER:  Your Honor, I offer Defendants' 1079.

03:33:59  20             THE COURT:  Any objection?

21             MR. DROSMAN:  No objection, your Honor.

22             THE COURT:  It will be admitted without objection.

23             MR. KAVALER:  All right.

24        (Defendants' Exhibit 1079 received in evidence.)

25   BY MR. KAVALER:

Ghiglieri - cross

831

1    Q.   Let's look at 1079 together.

2         It's a letter from Household signed by Tom Schneider,

3    who you identified earlier, I believe, as the Director of

4    Policy and Compliance Support, correct?

03:34:19  5    A.   Yes.

6    Q.   And it's addressed to the:  "Office of the Comptroller of

7    the Department of Banking and Finance of the state of

8    Florida."

9         And the reference is to Antonio Ortega, correct?

03:34:30  10   A.   Yes.

11   Q.   And Mr. Schneider writes and he says, "Dear Ms. Dawes,

12   thank you for the opportunity to respond to Mr. Ortega's

13   concerns in his correspondence.  Mr. Ortega has stated that he

14   did not receive the interest rate that he was promised.  In

03:34:49  15   the letter provided to Mr. Ortega by our branch office, the

16   Branch Sales Manager was not quoting the interest rate, but an

17   'equivalent rate' based on the effect of having the loan paid

18   biweekly instead of monthly."

19        And, then, he says, "It is not our policy to quote an

03:35:12  20   equivalent interest rate associated with a biweekly payment

21   program.

22        "We believe Mr. Ortega was quoted the equivalent

23   interest rate for potential interest savings over the life of

24   his loan when payments are made on a biweekly schedule.

03:35:30  25        "As stated previously, this type of communication is

Ghiglieri - cross

832

```
             1   not condoned nor approved.  As a result, we have referred the

             2   documentation enclosed in Mr. Ortega's complaint to senior

             3   management for review and immediate action."

             4        And, then, he continues in a new paragraph.  He says,

03:35:50     5   "Due to any misunderstandings that may have occurred and, as a

             6   good-faith gesture, Mr. Ortega received a refund check in the

             7   amount of $1,134.19 on June 29, 2001.  The amount of the check

             8   represented the cost of the origination fee that was assessed

             9   to his account.

03:36:16    10        "In addition, we have reduced the contract rate of

            11   interest on Mr. Ortega's account to 10.15 percent effective as

            12   of March 30, 2001."

            13        And this letter is being written on October 18, 2001,

            14   correct?

03:36:34    15   A.  Yes.

            16   Q.  All right.

            17        "Due to the reduced rate of interest, Mr. Ortega's

            18   principal balance was reduced by an additional $1,188.92 for

            19   the period of March 30, 2001, through 10-15-2001."

03:36:54    20        And Mr. Schneider concludes, "We deeply regret the

            21   circumstances surrounding this situation.  Please convey our

            22   sincere apologies to Mr. Ortega."

            23        Do you see that?

            24   A.  I do.

03:37:04    25   Q.  Okay.
```

Ghiglieri - cross

833

1        So, in this case, which you mentioned to us

2   yesterday, you told us about Mr. Ortega's complaint; and, now,

3   we see Household's response, correct?

4   A.   Yes.

03:37:12  5   Q.   Okay.

6            Household is apologizing, correct?

7   A.   Yes.

8   Q.   It is acknowledging that one of its employees made a

9   mistake, correct?

03:37:20 10   A.   Yes.

11   Q.   It is asserting that the mistake was contrary to

12   Household's policy, correct?

13   A.   That's what it says here.

14   Q.   That's what it says.

03:37:31 15            It is saying that the matter will be referred to

16   senior management for review and immediate action; and, the

17   clear complication is against the employee, correct?

18   A.   I don't know what the implication is there.

19   Q.   Okay.

03:37:42 20            And, finally, it reports that they have made a

21   financial restitution to Mr. Ortega in three separate ways.

22            They sent him a refund check in the amount of

23   $1,134.19, which represents the cost of his origination fee,

24   correct?

03:38:01 25   A.   That's what it says here.

Ghiglieri - cross

834

1   Q.  Well, when you say "That's what it says," do you think

2   they didn't send him the check?

3   A.  All I'm -- I agree with you, that's what it says here.

4   Q.  All right.

03:38:12  5          And, then, they also say they reduced the contract

6   rate of interest to a lower rate of interest.

7          Do you see that?

8   A.  I see it.

9   Q.  Okay.

03:38:20  10          And, thirdly, as a result of that, they've reduced

11  his principal balance by another $1888.92.

12          Do you see that?

13  A.  I see that.

14  Q.  As a regulator, if you came in and you saw Mr. Ortega's

03:38:35  15  complaint letter and Household's response letter, would you be

16  satisfied that Household had responded to the Ortega

17  complaint?

18  A.  Taken in isolation, yes.

19  Q.  Okay.

03:38:46  20          Now, the next thing you told us about yesterday was a

21  complaint -- another complaint -- by Mr. Nanez.

22          Am I pronouncing that correctly; do you think?

23  A.  That's how I pronounce it.

24  Q.  That's where I got it from.

03:39:03  25          And you remember that testimony?

Ghiglieri - cross

835

1   A.  I do.

2   Q.  Okay.

3        And, in the course of reviewing the files that you

4   reviewed, did you come across the underlying documents related

03:39:14   5   to Mr. Nanez's complaint?

6   A.  I reviewed some documents.  I'm not sure which ones you're

7   talking about.

8   Q.  Let me show you a couple and see if it refreshes your

9   recollection.

03:39:26  10        Let's start with a document which I will mark as

11   Defendants' 1080 for identification.

12        (Document tendered.)

13   BY MR. KAVALER:

14   Q.  Is this one of the documents you looked at?

03:39:55  15   A.  It might have been.  I've seen this type of document

16   before.

17   Q.  Okay.

18        And this document has Mr. Nanez's name on it --

19   Ms. Nanez and Mr. Nanez?

03:40:08  20   A.  Yes.

21   Q.  All right.

22        And it says on the top --

23        MR. KAVALER:  I'm sorry, your Honor, I offer

24   Defendants' 1080 in evidence.

03:40:17  25        MR. DROSMAN:  This isn't on the exhibit list, your

Ghiglieri - cross

1    Honor.

2              MR. KAVALER:  That's why it's 1080, your Honor.

3              THE COURT:  Yes, I guess it's not.

4              Is there an objection?

03:40:30  5    MR. DROSMAN:  It's hearsay, your Honor.

6              THE COURT:  What's it being offered to prove?

7              MR. KAVALER:  Your Honor, it's offered -- she says

8    she reviewed it.  It's offered in response to the testimony

9    she gave yesterday, to show the response that Household made

03:40:41 10   to the very complaint that she testified about yesterday.

11             THE COURT:  Overruled.

12             MR. KAVALER:  Thank you, your Honor.

13             (Defendants' Exhibit 1080 received in evidence.)

14   BY MR. KAVALER:

03:40:54 15   Q.  Now, you see on the top --

16             MR. KAVALER:  Withdrawn.

17   BY MR. KAVALER:

18   Q.  If I recall your testimony correctly yesterday, your point

19   was that Mr. Nanez -- or Ms. Nanez -- said she had to take

03:41:13 20   single premium credit insurance in order to get a loan; is

21   that correct?

22   A.  I'd have to look at that complaint, again, to see exactly

23   what it says on the complaint.

24   Q.  Okay.

03:41:20 25             Let me try it this way.  I can show you your

Ghiglieri - cross

1   testimony yesterday.

2          MR. KAVALER:  I am having difficulty with the

3   transcript.

4   BY MR. KAVALER:

03:42:29  5   Q.  Let me do it this way:  This document, 1080, is headed

6   "Optional Credit Insurance Disclosure."

7          Do you see that?

8   A.  I see that.

9   Q.  And first thing it says after the name of the creditor,

03:42:37 10   the name of the borrowers and some boxes with some amounts in

11   it, is a sentence that begins in capital letters, "No credit

12   insurance is required to obtain this loan."

13          Do you see that?

14   A.  I do.

03:42:46 15   Q.  All right.

16          And this is the document signed by the borrowers --

17   the Nanezes -- on the next page, correct?

18   A.  Yes.

19   Q.  So, they received a written disclosure from Household

03:42:58 20   which says on the top, it's an "Optional Credit Insurance

21   Agreement" and says in the beginning of the text in capital

22   letters, "No credit insurance is required to obtain this

23   loan."

24          Do you see that?

03:43:10 25   A.  I see it.

Ghiglieri - cross

838

1    Q.   Okay.

2         And that would alert them to the fact this credit

3    insurance is both optional and not required to obtain the

4    loan, correct?

03:43:18  5    A.   If they spoke English.  They're Spanish speakers.

6    Q.   Do you know that for a fact or you just assuming that?

7    A.   Well, I'm reading it from the complaints.  I pulled the

8    complaint out.

9    Q.   Okay.

03:43:30 10    A.   "We are Hispanic and our primary language is Spanish."

11    Q.   Okay.

12         And your point is:  This document is in English?

13    A.   It is in English.

14    Q.   Okay.

03:43:38 15         So, as a regulator, what would you like to see?

16         Would you like to see Household provided them with a

17    disclosure in Spanish?

18    A.   Well, there are a couple things.

19         One, if you are lending money to someone that doesn't

03:43:55 20    speak English, at least I know -- from the bank's

21    standpoint -- they've got forms.  All of their documents are

22    in all the different languages of the clients that they serve.

23         The second thing is Household always claimed that

24    their insurance was optional; but, if you remember, I talked

03:44:12 25    about the penetration ratios.

Ghiglieri - cross

839

1       When you look at how many loans were made and how

2  many insurance policies were written on those loans, if it

3  gets above 50 percent, the regulators think that credit

4  insurance is actually required.

03:44:29  5       In this complaint, it actually says that:  "The

6  Household's representative told us that we had to get single

7  premium credit insurance."

8       So, it conflicts with the language in this document,

9  which, if they spoke English, they would have been able to

03:44:47  10  read and maybe ask a question about.

11       But, notwithstanding that, this is symptomatic of

12  insurance packing that was complained of in various states

13  around the country.

14  Q.  All right.

03:44:59  15       So, part of the problem is the document is in English

16  and you believe they spoke Spanish?

17  A.  Well, they said they spoke Spanish.  I'm just looking at

18  their complaint.

19       I don't know them personally.

03:45:10  20  Q.  Understood.

21       So, let's look at the other document in the loan

22  file, which is the Loan Payment and Security Agreement.

23       We'll mark this as Defendants' 1081 for

24  identification.

25       (Document tendered.)

Ghiglieri - cross

840

1    BY MR. KAVALER:

2    Q.  Did you see that document, as well, when you were looking

3    at the documents relating to the claim of Mr. and Mrs. Nanez?

4    A.  I'm not sure.  I have seen documents that look like this.

03:45:50  5    I don't know if I saw this particular one.

6    Q.  Let me see if I can refresh your recollection.

7        It has Mr. Nanez's name and Ms. Nanez's name on the

8    first page?

9    A.  That doesn't help.

03:46:02  10    I've seen documents like this, but I can't tell you

11    for sure if I saw this particular document.

12    Q.  Okay.

13        It's called a "Loan Payment and Security Agreement"?

14    A.  That's what it says at the top, yes.

03:46:10  15    Q.  Now, on the last page, next to the Nanez's signatures, it

16    has a paragraph in Spanish.

17        Do you see that?

18    A.  Yes.

19    Q.  Do you happen to read Spanish?

03:46:22  20    A.  No, I don't.

21    Q.  Do you see the paragraph right above it?  It translates it

22    in English.

23    A.  Okay.

24    Q.  Okay.

03:46:26  25    The English says, "Notice the borrowers may request

Ghiglieri - cross

841

1    the Truth in Lending Disclosures be provided in the Spanish

2    language before signing any loan documents."

3          And the Spanish, I won't even try, but it says -- the

4    first word is "Aviso," which I think means something very

03:46:45  5    similar to "Notice."

6          My guess is the language in Spanish and English is

7    the same.

8          Does that sound reasonable to you?

9    A.  Sure.

03:46:52 10   Q.  Okay.

11         Does that refresh you recollection that when you

12   looked at the Nanez loan file, you saw that the Nanezes were

13   provided with a disclosure document which contained a notice

14   in Spanish that they were entitled to request that all of

03:47:05 15   their documentation be provided in Spanish, if they wanted?

16   A.  I can't read Spanish, but the English translation says,

17   "Truth in Lending Disclosures."

18         So, this optional credit insurance, I don't know if

19   that's part of the "Truth in Lending Disclosure."

03:47:23 20   Q.  Okay.

21   A.  But it does have something here in Spanish that says that

22   they have the opportunity to get their Truth in Lending

23   Disclosures.  That would be Regulation z.

24   Q.  In Spanish?

03:47:54 25   A.  It is in Spanish, yes; but, it doesn't have anything to do

Ghiglieri - cross

842

1    with this document that you showed me that's in English,

2    regarding optional credit insurance.

3    Q.  Right.

4         Let me be clear.  There's a statement in Spanish that

03:47:55  5    says, "You can get the disclosures in Spanish," right?

6    A.  It says, "Truth in Lending Disclosures."  That's different

7    than disclosures.

8    Q.  Okay.

9         And you saw documents like this in the course of your

03:48:04  10    investigation?

11    A.  Yes.

12         MR. KAVALER:  I offer Defendants' 1081, your Honor.

13         MR. DROSMAN:  No objection, your Honor.

14         THE COURT:  Admitted without objection.

15    (Defendants' Exhibit 1081 received in evidence.)

16    BY MR. KAVALER:

17    Q.  So, it says on the front, "Loan Repayment and Security

18    Agreement"?

19         MR. KAVALER:  And go to the last page.

20    BY MR. KAVALER:

21    Q.  And you see the box in the upper left (indicating) --

22    that's what we're talking about.

23         It says in English, "Notice:  The borrowers may

24    request that the Truth in Lending Disclosures be provided in

03:48:37  25    the Spanish language before signing any loan documents."

Ghiglieri - cross

843

1      And then it has a sentence that appears to say the

2  same thing in Spanish, to the extent that either one of us can

3  tell since neither one of us reads Spanish.

4      Now, the third customer complaint you talked about

03:49:08  5  yesterday was a letter from a woman named Adams.

6      Do you recall that?

7  A.  Yes.

8  Q.  And in the course of reviewing the files, did you happen

9  to see -- do you recall seeing -- the response of Household, a

03:49:21  10  letter back to Mrs. Adams?

11  A.  I may have.  I'm not sure.

12  Q.  All right.

13      Let me see if I can refresh your recollection.

14      Do you recall seeing a six-page, single-spaced letter

03:49:51  15  to Mrs. Adams from Steven Hicks, the Director of Compliance

16  Risk Management, addressing every element of her claim,

17  explaining what happened, what transpired, how the situation

18  arose, what Household's response was going to be, what

19  Household's position is, what Household's policy is?

03:50:11  20      MR. DROSMAN:  Your Honor, if he's going to lay a

21  foundation, I just ask that he ask the foundational questions

22  and not discuss the contents of the document.

23      MR. KAVALER:  Sure.

24  BY MR. KAVALER:

03:50:20  25  Q.  Do you recall a letter like that?

Ghiglieri - cross

844

<pre>
          1   A.  I just don't remember if I saw it or not.  You'll have to

          2   show it to me.

          3   Q.  Absolutely.

          4        Let me show it to you and see if it refreshes your

03:50:27  5   recollection.

          6        I'm handing you Defendants' 1082 for identification.

          7        (Document tendered.)

          8   BY THE WITNESS:

          9   A.  I don't -- this doesn't look familiar to me.

         10   BY MR. KAVALER:

         11   Q.  Would you expect Household to have written a response to

         12   Mrs. Adams?

         13   A.  Do I expect them to?

         14   Q.  Would you have expected them to respond --

03:51:08 15   A.  Sure.

         16   Q.  -- to the letter?

         17   A.  Sure.

         18   Q.  Did you look for a response when you reviewed the Adams

         19   complaint letter?

03:51:13 20   A.  Well, I had a lot of complaints and I looked at the -- I

         21   looked at what documents were produced surrounding those

         22   complaints.

         23        So, if I didn't have a response, I may not have

         24   specifically asked the plaintiffs' lawyers for one because I

03:51:30 25   had quite a few responses.
</pre>

Ghiglieri - cross

845

1 I know that they responded -- or they responded back

2 -- to the regulators -- Household did.

3 Q.  Did you know Household regularly responded back to the

4 regulators and you asked the plaintiffs' counsel for letters

03:51:42 5 responsive to the complaints you were going to testify about?

6 A.  Well, I had so many documents and so many complaints, I

7 didn't, you know, like, specifically, say, "Okay, I've got a

8 complaint here.  Where's Household's response?"

9 I just took them all together and started looking

03:51:58 10 through them.

11 I may have seen this.  I just -- I just -- don't

12 remember, as I'm sitting here, that I saw it.

13 Q.  But, as a general matter, your intent was to get

14 Household's response to the --

03:52:06 15 A.  Yes.

16 Q.  -- complaint letters, if there was one?

17 A.  Yes.

18 Q.  All right.

19 And certainly if it was one of the ones you were

03:52:10 20 going to testify about at trial?

21 A.  Well, I looked at the complaints three years ago.  So, I

22 didn't know if this case was going to trial or not.

23 I wasn't thinking that far ahead.

24 Q.  But in preparing to come here and testify, you knew which

03:52:25 25 complaints you were going to testify about?

Ghiglieri - cross

846

A.  I pulled a few out, yes.

Q.  And when you pulled out the Adams' complaint, did you pull

out the response to the Adams' complaint?

A.  No, I -- I -- didn't pull out the response.  So, I don't

03:52:39  know if I actually have it or not.

It doesn't look familiar, but that's not to say I

didn't see it.

Q.  You might have seen it?

A.  I might have seen it.

03:52:46  MR. KAVALER:  Your Honor, I offer 1082.

MR. DROSMAN:  It's hearsay, your Honor.

Objection.

THE COURT:  What's it being offered to prove?

MR. KAVALER:  Your Honor, it's being offered to --

03:52:54  under 106 -- for the doctrine of completeness, in response to

the testimony she gave yesterday where she put the Adams'

complaint letter into evidence.

This is the response to the Adams' complaint letter.

It's for the proposition that Household responded.

03:53:12  THE COURT:  Well, the doctrine of completeness is how

you get it in, but I know what know what you're offering it to

prove.

MR. KAVALER:  Your Honor, very simply.  She told us

all the things that Mrs. Adams complained about.  I want to

03:53:26  show that Household promptly and completely responded in

Ghiglieri - cross

847

1    writing to each and everything Mrs. Adams said.

2        THE COURT:  If you're offering it to establish the

3    foundation or lack of foundation for her opinion or opinions,

4    I'll admit it.

03:53:45 5    Is that what you're offering it for?

6        MR. KAVALER:  Yes, your Honor.  I think it goes

7    beyond that; but, it certainly --

8        THE COURT:  Overruled.

9        MR. KAVALER:  -- goes to her opinion.

03:53:51 10    THE COURT:  The objection is overruled.

11        MR. KAVALER:  Thank you, your Honor.

12    (Defendants' Exhibit 1082 received in evidence.)

13    BY MR. KAVALER:

14    Q.  All right, Ms. Ghiglieri, if you look at this letter --

03:54:00 15    Exhibit 1082 in evidence -- it's a letter from Mr. Hicks, the

16    Director of Compliance Risk Management, to Ms. Amy M. Adams in

17    New Cumberland, Pennsylvania, dated September 27, 2002,

18    correct?

19    A.  Yes.

03:54:12 20    Q.  And Mr. Hicks says, "We are responding to your letter of

21    September 10, 2002, and your subsequent e-mails.  We have

22    investigated the allegations stated in the complaint and our

23    responses are indicated below."

24        And, then, his first heading is, "Prepayment

03:54:32 25    penalty;" and, in the second paragraph, he says, "The

Ghiglieri - cross

848

1    prepayment penalty was fully, conspicuously and accurately

2    described in your Loan Repayment and Security Agreement ('Loan

3    Agreement') under the paragraph titled, 'Prepayment Penalty.'"

4         And, then, he quotes from the language of the

03:54:54  5    agreement.

6         Do you see that?

7    A.   I do.

8    Q.   And, then, he says, "To clarify the above, please refer to

9    Page 1 of your rate" (attached).  The date of your loan was

03:55:06 10    2-20-02, and this was stated on Page 1 of the Loan Agreement

11    in the box titled, 'Date of Loan.'  The contract rate is 9.490

12    percent, and this is stated on Page 1 of the Loan Agreement in

13    the box titled 'Contract Rate Per Year.'"

14         And skipping down to the end of that paragraph, he

03:55:28 15    says, "Your signature on the Loan Agreement signifies s your

16    acceptance of the terms contained therein, including the

17    prepayment penalty."

18         And, then, he says in the next paragraph, "In

19    addition, because your loan was secured by your property, we

03:55:44 20    are required by law to give you three business days to review

21    your loan documents and determine whether the loan meets your

22    needs, whether you agree to the terms and conditions and

23    whether you want to keep or cancel the loan.

24         "Please refer to the document titled 'Notice of Right

03:56:02 25    to Cancel' attached."

Ghiglieri - cross

849

1        And, then, he continues:  "Your loan closed on

2    2-20-02.  You had until midnight on 2-23-02 to decide whether

3    to rescind the loan.

4        "The second page of the notice, signed by both you

03:56:19  5    and your husband, not only confirms that you had those three

6    days, but confirms that we allowed you two additional days.

7    Your loan did not fund until 2-25-02, which means we gave you

8    five days to consider your loan.

9        "Unlike other lenders, we do not immediately fund a

03:56:40 10    loan after three days, but wait until the customers actually

11    confirm they want the loan.  We believe that five days was

12    ample time to consider the pricing, terms and conditions of

13    your loan."

14        Do you see that?

03:56:55 15    A.  I do.

16    Q.  In the next paragraph, he says, "Please refer to the

17    Customer Satisfaction Survey attached.  On this form, we

18    clearly asked the question:  'Do you understand the terms and

19    conditions of your prepayment penalty?'  On this survey, you

03:57:12 20    checked the 'Yes' box, confirming that you understood the

21    prepayment penalty.  You checked 'Yes' to confirm that we

22    listened to your concerns and responded appropriately to your

23    questions.  You checked 'Yes' that we gave you a good

24    explanation of your loan terms, features and benefits.  You

03:57:38 25    also checked -- "

Ghiglieri - cross

1          MR. DROSMAN:  Your Honor, objection.

2          Is there a question?  That's what I object to.  He

3    said he was putting it in to test the foundation of the

4    witness' opinions.  I just see him reading the document.

03:57:47  5          THE COURT:  Is there a question?

6          MR. KAVALER:  Yes, your Honor.

7          When I get finished reading parts of the letter to

8    her, I'm going to ask her whether, in her view, Household

9    responded satisfactorily to the question -- to the complaint

03:57:59 10   -- of Amy Adams.

11         THE COURT:  Proceed.

12         MR. KAVALER:  Thank you, your Honor.

13   BY MR. KAVALER:

14   Q.  I'm sorry, I think this is where I was.

03:58:07 15        " -- you checked 'Yes" that we gave you a good

16   explanation of your loan terms, features and benefits.  You

17   also checked 'Yes' to the question of whether the loan product

18   provided met your financial needs.

19         "In addition, you also wrote a comment on the survey

03:58:22 20   indicating that you were able to 'advance the payoff of both

21   your mortgage'" -- I'm sorry -- "'advance the payoff of both

22   our mortgage as well as our credit card bills.'

23         "You also viewed our customer orientation video at

24   loan close.  To ensure that our branch personnel are providing

03:58:44 25   complete and accurate information to our customers, we have

Ghiglieri - cross

851

1  produced a video, which is provided to every customer prior to

2  closing their loan.

3        "The customer viewed this customer orientation video

4  prior to loan closing.  The video further explains the process

03:59:01  5  and begins by stating that an application has been taken and

6  approved.  The video also explains the following:"

7        Bullet:  "The customer was provided with a good-faith

8  estimate of the costs of the loan."

9        Bullet:  "The customer should have received other

03:59:18  10  documents three days prior to closing."

11        Bullet:  "The loan documents will be presented to the

12  customer include -- " " -- the loan documents that will be

13  presented to the customer include -- " indented bullet --

14  "Truth In Lending Disclosure, which disclosed the APR -- "

03:59:35  15  that's the "Annual Percentage Rate," is it?

16  A.  Yes.

17  Q.  " -- payments, amount financed, costs and loan rate."

18        Indented bullet:  "Mortgage or Deed of Trust."

19        Indented bullet:  "HUD 1 Settlement Statement

03:59:49  20  disclosing details of the transaction."

21        "HUD" stands for "Housing and Urban Development"?

22  A.  Yes.

23  Q.  It's a government form?

24  A.  Yes.

03:59:56  25  Q.  Sub-bullet:  "Loan Agreement, which includes details

Ghiglieri - cross

852

1    regarding the prepayment penalty, late charges, interest rate,

2    points and fees, monthly payment amount, payoff date and

3    optional insurance chosen."

4         Final sub-bullet: "At the end of this section, the

04:00:15 5    customer is encouraged to stop and ask questions of the

6    account executive if anything is unclear."

7         And it continues.

8         Now, I don't want to spend a lot of time reading the

9    entire letter.

04:00:27 10        He goes through the entire process that was followed

11    at the closing.  He says, "You were encouraged to ask

12    questions.  You signed an acknowledgment that you viewed the

13    video."

14        He encloses a copy of the signature pages where she

04:00:38 15    says, "We saw the video."

16        He says, "We produced this video so that to be sure

17    that our customers are fully aware of the process and are told

18    where, in various documents, they can find these terms."

19        He talks about the result of his investigation:

04:00:55 20    "Didn't find any evidence that the terms or pricing of your

21    loan, including the prepayment penalty, were not fully

22    disclosed to both you and your husband."

23        He says, "It's our position you were advised of the

24    loan, you understood the loan, there was no deception

04:01:09 25    regarding the sale of the loan."

Ghiglieri - cross

853

1      He then goes on in another heading called, "Refinance

2      -- "

3            THE COURT:  At some point, you have to ask a

4      question.

04:01:17  5            MR. KAVALER:  Your Honor --

6            THE COURT:  This is a good time.

7            MR. KAVALER:  Okay.

8      BY MR. KAVALER:

9      Q.  He lays out all these reasons why he thinks she got full

04:01:24  10  disclosure.

11            Do you feel that Household acted properly, as a

12     regulator, in responding in writing in a seven-page --

13     six-page -- single-spaced letter to this lady's complaint,

14     addressing each and every element of the transaction as it

04:01:40  15  went down, and enclosing for her various documents that she

16     was shown and then she signed?

17     A.  Do I feel it was appropriate?

18     Q.  Yes.

19     A.  No, I don't.

04:01:49  20  Q.  Okay.

21            He also talks about the ways in which the loan

22     benefitted her.

23            If you go to Page 5 under the heading called,

24     "Interest Rate of 7 Percent," he says, "You stated in your

04:02:04  25  letter you were duped into refinancing a 7 percent FHA

Ghiglieri - cross

854

1    mortgage to 9.49 percent unconventional loan.  We have

2    performed a thorough investigation of this allegation and we

3    discovered the following:  Through closing our loan, you

4    achieved the following:"

04:02:21 5          Bullet:  "You paid off Wells Fargo $95,557.67 and

6    Capital One $4,982."

7          Bullet:  "You received cash of $250.40."

8          Bullet:  --

9          MR. DROSMAN:  He's just testifying.  I object, again.

04:02:43 10          THE COURT:  You have to break up your references to

11    the document with questions.  Otherwise, it does become

12    rather --

13          MR. KAVALER:  Very good, your Honor.

14          THE COURT:  -- a narration of the document.

04:02:55 15          MR. KAVALER:  I will break it into smaller pieces.

16    BY MR. KAVALER:

17    Q.  Is he reciting there the ways in which this loan

18    benefitted this customer financially?

19    A.  And that's what I think he's attempting to do, yes.

04:03:03 20    Q.  Okay.

21          He continues, does he not, "Your monthly payments

22    prior to the loan totalled $2,453.  Your payments, after our

23    loan, and including $119 for taxes and insurance (no longer

24    escrowed close), totalled $2,392.  This saved you $61 per

04:03:24 25    month."

Ghiglieri - cross

855

1        Is he pointing out to the customer how she is better

2   off on a monthly basis with the new loan than with the old

3   loans?

4   A.  I think that's what he's attempting to do.

04:03:37 5   Q.  Okay.

6        He says, "Your debt-to-income ratio which measures

7   gross monthly income against monthly credit payments decreased

8   from 43.08 percent to 42.01 percent.  This is a positive

9   improvement."

04:03:53 10       Is he, to use your words, attempting to point out to

11   her how -- another way in which this loan benefitted her?

12   A.  Yes, that's what he's attempting to do.

13   Q.  And, finally, in the final bullet, he says, "Your

14   disposable income, which is money left over, after credit

04:04:08 15   payments are made, was $1,676 before our loan and $1,737 after

16   our loan, which is also a positive improvement."

17       Is he, once again, attempting to point out to her how

18   this loan benefitted her?

19   A.  It looks like that's what he's trying to do.

04:04:31 20   Q.  And in the next paragraph, he addresses how Household

21   figured out what interest rate she qualified for.

22       Do you see that?

23   A.  I see the paragraph, yes.

24   Q.  And he explains to her that, "Household typically extends

04:04:50 25   offers of credit to borrowers who, for one reason or another,

Ghiglieri - cross

856

            1    may not otherwise qualify to obtain credit under lower rate

            2    lending programs."

            3              Is that what you understand to be Household's primary

            4    business model?

04:05:03    5    A.  Extending credit to subprime --

            6    Q.  Yes.

            7    A.  -- borrowers?  Yes.

            8    Q.  And, then, he says, "The cost of extending this credit is

            9    traditionally higher as the likelihood of a customer becoming

04:05:19   10    delinquent is much greater, resulting in increased risk and

           11    collection costs to the lender in the event of default."

           12              Do you understand that that accurately describes

           13    Household's business model, as well?

           14    A.  Yes.

04:05:32   15    Q.  Finally, he says, "Based on your creditworthiness, you

           16    qualified for an interest rate of 11.12 percent.  However, our

           17    District General Manager granted a rate exception to 9.49

           18    percent to accommodate your needs."

           19              Do you see that?

04:05:52   20    A.  I see that.

           21    Q.  Now, if you go back to the prior page -- the bottom of

           22    Page 4 -- there's a heading called, "Loan Pricing," and

           23    without reading it, he goes through the concept of a FICO

           24    score.

04:06:04   25              You know what a FICO score is, don't you?

Ghiglieri - cross

857

1    A.  I do.

2    Q.  And it says, "A FICO score measures a customer's credit

3    risk in relation to the rest of the national population," does

4    it?

04:06:14  5    A.  Well, it's a credit-scoring mechanism developed by Fair

6    Isaac.  And it's based on the predictor -- it's a predictor of

7    the repayment capacity of an individual.

8         And, so, I don't know if that's an accurate statement

9    or not -- that it compares it to the rest of the national

04:06:34 10    population; but, I do know how they calculate the FICO score.

11    Q.  And higher is better?

12    A.  Higher is better.

13    Q.  And 850 is perfect?

14    A.  Yes.

04:06:43 15    Q.  Okay.

16         And he tells her in this letter that, "850 is a

17    perfect FICO score."  And he says at the time of the loan, her

18    husband had a FICO score of 638.  He tells her what percentile

19    that puts him in; and, he tells her what the risk of

04:06:58 20    delinquency is for that percentile.

21         Do you see all of that?

22    A.  I do.

23    Q.  Okay.

24         And, then, he says on the top of Page 5, "The Credit

04:07:07 25    Bureau Reports for you and Mr. Adams show that, combined, you

Ghiglieri - cross

858

1    had 22 delinquencies in the past 30 days and three

2    delinquencies of past-60 days of your accounts; you had 14

3    inquiries on your Credit Bureau Report, suggesting you were

4    aggressively seeking credit."

04:07:22    5         Do you see that?

6    A.   I see it.

7    Q.   And, then, he says that using Household's internal scoring

8    models, that's how they came up with the rate.

9         Do you see that?

04:07:30    10   A.   I do.

11   Q.   Okay.

12        And, then, finally on the last page -- Page 6 of the

13   letter -- he says in a paragraph called "Summary," "Mrs.

14   Adams, when our District Sales Manager spoke with you on

04:07:43    15   September 17, 2002, she advised you that if you provided us

16   with a copy of your sold contract, we would be willing to

17   waive one-half of the prepayment penalty.  You were to contact

18   us on September 20, 2002, regarding the contract.  To date, we

19   have still not received a copy of the sold contract."

04:08:02    20        In other words, he's offering her a further

21   accommodation, notwithstanding everything he has previously

22   said in his letter about why he believes the transaction was

23   appropriate, correct?

24   A.   That's what he's saying there.

04:08:13    25   Q.   And, then, he says under that -- in the next to the last

Ghiglieri - cross

859

1    paragraph -- "We regret to hear you are dissatisfied with your

2    loan.  Beneficial prides itself on its commitment to customer

3    service and is always willing to work toward an agreeable

4    solution to a customer's concerns.  The offer to waive

04:08:31  5    one-half of the prepayment penalty still stands provided you

6    sell the house and produce a valid sales contract.

7            "However, the offer is not valid in the event you

8    refinance this loan with another lender."

9            And what he's saying there is that notwithstanding

04:08:48  10    that there was a deadline for her to take up this offer of a

11    further waiver of one-half of the penalty, and the deadline

12    passed without her having provided the required documentation,

13    he's extending that offer still further, correct?

14    A.   Yes.

04:09:03  15    Q.   Okay.

16            Now, this letter is written 17 days after Ms. Adams'

17    complaint letter?

18    A.   Correct.  Yes.

19    Q.   It explains in great detail how the transaction occurred;

04:09:22  20    how the loan was priced; why he concludes that she was treated

21    fairly; it attaches documentation supporting everything he

22    says; it tells her an offer was made to resolve her grievance.

23    He extends a further offer.

24            As a regulator, looking at these two documents -- the

04:09:39  25    complaint and the response in a file -- would you feel

Ghiglieri - cross

860

1    Household had responded suitably and appropriately to this

2    complaint?

3    A.  Well, there's a couple of things that they didn't respond

4    to, even though this is really lengthy and I didn't really --

04:09:55  5    I don't recall reading this.

6         But based on everything that you've said, the one

7    thing that they didn't respond to is the fact that the account

8    executive that was closing the loan indicated that the fee

9    could be waived for job-related relocation.

04:10:13 10        And did Mr. Hicks write this?

11        This really went into great detail -- yes, Mr. Hicks,

12    he went into a large detail -- about how she had notice.

13        You know, in other words, it was written here, it was

14    written there, it was written there.

04:10:27 15        Well, she asked the account executive, according to

16    her complaint, and he said, "Don't worry about it.  For

17    job-related relocations, we'll waive the penalty."

18        So, she was -- she must have been satisfied with that

19    and went ahead with the transaction; is now facing a job

04:10:43 20    relocation; and, Household's coming back to her and saying,

21    "You had plenty of notice.  It was written here, here, here

22    and here."

23        But they don't discuss the issue that I saw in a

24    number of complaints around the country; and, that is, "Don't

04:10:58 25    worry, we'll waive it."  Or "There isn't one."  There was

Ghiglieri - cross

861

1   always something that was different than what was written in

2   the document.

3            The issue about the creditworthiness of this borrower

4   is a little confusing to me because her -- the loan that she

04:11:11   5   did have was at 7 percent.  And a 7 percent rate is really a

6   good rate on an FHA loan.  And that tells me that she had --

7   was probably a prime credit.

8            They're indicating in this letter she was a subprime

9   credit.  So, I just don't -- I'm not sure how to harmonize

04:11:34  10   that.

11            But I don't -- you know, she still is explaining some

12   predatory practices that were noticed around the country --

13   the other one is -- the high closing costs:  The 7.25 percent

14   closing costs.

04:11:51  15            So, you know, this complaint contains similar

16   complaints that people had around the country and Household

17   did respond very extensively here; and, if I was a regulator

18   -- and, like Chuck Cross says at first, you know, you believe

19   what Household says and take it at face value; and, then, the

04:12:17  20   more complaints you look at, the more, you know, you don't

21   know what kind of a story they're telling.

22            So, the date of this was September 27th, 2002.  That

23   was right before the big multi-state settlement -- $484

24   million -- that they paid for these very kinds of practices.

04:12:34  25            So, you know, that's my response to that complaint

Ghiglieri - cross

862

1   and the response to the complaint.

2   Q.  You don't know when she took out this FHA 7 percent loan;

3   you don't know how many years ago it was; you don't know what

4   changes there in her credit rating in the interim,

04:12:51  5   correct?

6   A.  I don't know if it's in the complaint when she took it

7   out.

8        Let me see if it is.

9        I don't -- I don't -- see it, just on a quick read.

04:13:04  10       But the discussion in Mr. Hicks' letter about whether

11  she's better off, was she better off paying 7.25 percent of

12  the loan balance so she could refinance with Household from a

13  7 percent FHA loan to a 9.49 percent contract rate?

14       That doesn't sound like she was benefitted.

04:13:29  15       I don't know if his calculations are accurate or not.

16  There's no way for me to know; but, just on a global basis, it

17  doesn't look like she benefitted.

18       So, I think there's some things in his letter that,

19  as a regulator, I would want to look into further.

04:13:44  20  Q.  So, even when Mr. Hicks writes a six-page single-spaced

21  letter responding to the complaint, detailing all of the

22  things he details in here, in your opinion, that's not enough?

23  A.  It's not the volume of response that a regulator looks at.

24  It's what are they responding to.

04:14:01  25       And she starts out by saying, "I moved my loan,

Ghiglieri - cross

863

1      thinking that this prepayment penalty would be waived for a

2      job relocation.  Now I'm facing a job relocation and I'm being

3      told it's not."

4            And, then, he goes into almost "doth protest too

04:14:21  5    much."  You know, almost two full pages of, "It was here," "It

6      was there," "It was everywhere," which I'm sure she knew.

7            But the account executive, according to her, had told

8      her and her husband that it would be waived.  And that's

9      something that I saw in complaints -- in other complaints --

04:14:40  10   in different parts of the country.

11     Q.  You don't know if that's true, though, do you?

12     A.  I don't know if it's true, but -- and that's the problem

13     with complaints is, you know, you want to listen to both sides

14     of the story.  But as Chuck Cross said, from the Department of

04:14:54  15   Washington, at first they relied on Household.  They had a

16     relationship with Household.  They gave them the benefit of

17     the doubt.

18           But as more and more complaints cropped up around the

19     State of Washington and, then, when he talked to other

04:15:06  20   regulators around the country, they realized that Household,

21     you know, what they were saying just wasn't true:  This isn't

22     just an isolated incident.  It's something that they were

23     taught to do and something that they were doing.

24     Q.  And, in this instance, you have absolutely no knowledge

04:15:23  25   anything Mr. Hicks said is untrue, correct?

Ghiglieri - cross

864

1    A.  Well, I pointed out a few things that I would question if

2    I was a regulator.

3    Q.  Right.

4    A.  And, especially, if I knew about more complaints of a

04:15:34  5    similar nature.

6    Q.  But you don't know, for example, whether the account

7    executive did or did not say anything to these people at the

8    closing.

9        They did, however, sign multiple acknowledgements

04:15:44  10    that they watched the video; they got the disclosures; he

11    encloses all those things.

12        The paper record is impeccable and you're saying,

13    "but the possibility exists, on facts I don't know, that

14    enables me to give an opinion to this jury that maybe,

04:15:59  15    notwithstanding this extensive paper record, this extensive

16    letter, this responsive document, nevertheless, I still, at

17    the end of the week, will not acknowledge that this was a

18    superb job by Mr. Hicks in responding to this lady's

19    complaint," correct?

04:16:14  20    A.  Well, he made a huge effort in responding to her.  I just

21    don't agree that the quality of the response was good.

22        This was just one month before Household paid $484

23    million to settle claims of predatory lending.  And, so,

24    there's no doubt in the regulators' mind that they were

04:16:37  25    pervasive problems, many of which I've pointed out are in this

Ghiglieri - cross

865

1    complaint:  The high closing costs; saying that the prepayment

2    penalty would be waived; being harmed by the fact that they

3    thought they were going to get a lower effective rate than

4    they got.

04:16:53  5        So, I understand that this is a long response, but I

6    think the quality of it is not sufficient to address some of

7    the predatory lending practices that appear in this complaint.

8    Q.  And you mentioned Household's settlement with the

9    regulators.

04:17:09 10        Did you know that the market cap of Household's stock

11   went up, in response to that settlement, by $3.3 billion the

12   next two days?  Did you know that?

13   A.  I have no knowledge of that.

14   Q.  I didn't think so.

04:17:22 15        MR. KAVALER:  Your Honor, this would be a good time

16   to break.

17        THE COURT:  I think we are going to have stop at this

18   point.  We are going to stop at 4:15.

19        As I already indicated to you, we have some matters I

04:17:31 20  need to address and I want to be able to let all the jurors go

21   by the time we indicated.

22        Ladies and gentlemen, we're going to break and quit

23   for the day.  We'll resume tomorrow at 9:45 in the a.m.

24        As always -- oh, gosh, tomorrow's Friday, isn't it?

04:17:52 25        (Laughter.)