TAB 11

881

```
 1                   IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all     )
 4   others similarly situated,      )
                                     )
 5             Plaintiff,            )
                                     )
 6      vs.                          )  No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )  Chicago, Illinois
 8                                   )  April 6, 2009
               Defendants.          )  9:45 a.m.
 9                            VOLUME 5
10               TRANSCRIPT OF PROCEEDINGS - TRIAL
        BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
14                             BY:  MR. LAWRENCE A. ABEL
                                    MR. SPENCER A. BURKHOLZ
15                                  MR. MICHAEL J. DOWD
                                    MR. DANIEL S. DROSMAN
16                                  MS. MAUREEN E. MUELLER
                               655 West Broadway
17                             Suite 1900
                               San Diego, California  92101
18                             (619) 231-1058

19                             COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
20                             BY:  MR. DAVID CAMERON BAKER
                                    MR. LUKE O. BROOKS
21                                  MR. JASON C. DAVIS
                                    MS. AZRA Z. MEHDI
22                             100 Pine Street
                               Suite 2600
23                             San Francisco, California  94111
                               (415) 288-4545
24

25
```

896

1    the Court's pretrial ruling. He had a similar opinion.

2    THE COURT: Okay. Well, I reviewed to the best -- as

3    best I could the transcript over the weekend. I must say, I

4    wasn't as conscientious and effective as either of you. But

10:03:25  5    several things struck me.

6    First, I also did a review of my pretrial rulings.

7    And neither side has touched on this, but I think that there

8    are really two rulings that apply to this situation, the one

9    that has been mentioned already regarding the use of the

10:03:43  10    settlement and the terms and so on; and another one, which in

11    some ways was more of a direct ruling on what we have before

12    us, which was the admissibility of the underlying evidence

13    that experts relied upon for purposes of evaluating the

14    expert's opinion. And we even instructed the jury on that.

10:04:06  15    We said we're going to allow that evidence in. We're going to

16    instruct the jury that they're to use it only for purposes of

17    evaluating the expert's opinion.

18    And it seems to me that what we have here is a

19    situation that kind of slid between the cracks of those two

10:04:21  20    opinions. We have one opinion saying we're not going to go

21    into the terms of the settlement for purposes of showing

22    liability. We have another opinion that says experts can go

23    into matters that are otherwise inadmissible, and the jury can

24    use that information for the purpose of judging the expert's

10:04:40  25    opinion.

1          What I think nobody addressed -- well, I know nobody

2     addressed prior to trial is what happens if one of the things

3     that the expert relies upon is the very settlement and the

4     terms and conditions of that settlement in reaching her

10:04:54  5     opinion or conclusion about the issue of liability, the

6     existence of predatory lending, which is what has happened

7     here.  This expert obviously relied upon not only the reports

8     but the actual fact of the settlement, that all of these

9     states participated in the settlement, as a basis for

10:05:16 10     corroborating her opinions regarding the pervasive and

11     extensive nature of the various predatory practices that she

12     opines Household was engaged in.  Nobody addressed that issue

13     prior to trial specifically.  And, thus, we have this

14     happening.

10:05:37 15          It's pretty clear to me from the pretrial exhibits

16     and motions that it ought to have been clear to both sides

17     that this expert was relying upon that settlement in reaching

18     some of her conclusions.

19          Now, to the point of the questions and answers here,

10:05:59 20     to me what drives this ruling is exactly what Mr. Kavaler here

21     pointed out.  It is that, early on in the cross-examination,

22     it was clear that this witness was going to rely upon the

23     terms of that settlement in answering questions about whether

24     other investigators agreed with her, the number or extensive

10:06:26 25     nature of the alleged wrongdoings by Household.  But at no

898

1  point, even after it was clear to me and it ought to have been

2  clear to everybody, if not from the pretrial discovery,

3  certainly from her answers on the stand that she was going to

4  be relying on these things, was an objection made.  At no

10:06:45  5  point was there a request for a clarification from the Court

6  on its ruling.  At no point was there a request that the Court

7  admonish the witness.  At no point, until the very last

8  question, which resulted not only in an answer by the witness

9  but a rejoinder by counsel really in his responsive question

10:07:08  10  where he pointed out the $3 billion increase in Household's

11  stock after they announced this settlement, a fact not in

12  evidence, which he assumed in his question and forced the

13  witness to admit she didn't know about.

14        Now, you can't allow a series of answers that

10:07:33  15  apparently violate what you believe is the appropriate

16  interpretation of the Court's rulings to go on and on and on,

17  continue to ask questions, make no objections and sort of keep

18  in your hip pocket the fact that you may be objecting to these

19  things later on if the cross-examination doesn't turn out the

10:07:51  20  way you want it to.  You can't reserve an objection.  You have

21  to voice it at the time that the inappropriate answer comes

22  out.

23        By his own count, we have about six inappropriate

24  answers here, none of which were objected to, not a single

10:08:08  25  one, not until after the testimony was done for the day and

899

        1    the witness stepped down did counsel make any comment to the

        2    Court.  And at that point, his only comment was that he wished

        3    to voir dire the witness, not that he objected to her answers.

        4            Clearly if there was an objection here, it was

10:08:27    5    waived.  Now, I'm not so sure there was an objection because,

        6    as I said, the Court has not addressed -- because nobody has

        7    presented to it squarely -- the question of to what extent

        8    this witness, if she testifies that she relied upon this

        9    settlement and the terms of it in reaching her opinion, can

10:08:44 10    testify to those terms.  Nobody has asked us to issue a ruling

       11    on that, and we haven't.  By now, of course, it's too late.

       12    She has done that.

       13            I find that all of the answers she gave, with the

       14    possible exception of the last one, were directly responsive

10:09:03 15    to the questions.  If you ask a witness to quantify the number

       16    of particular types of complaints in order to undermine her

       17    opinion that this particular type of wrongdoing was pervasive,

       18    she's going to give you the answer that she has.  And the

       19    answer this witness had -- and it's clear from her report --

10:09:27 20    was that she had depended upon the amount of money that

       21    Household set aside to repair the injuries that are alleged to

       22    have taken place from that particular type of misconduct; in

       23    other words, the settlement and the various aspects of the

       24    settlement.  Those answers were all responsive to the

10:09:50 25    questions.

1          What I think was not necessarily responsive, and I'm

2    ruling now that the witness will be instructed, is for her to

3    mention the amount of the settlement.  That was not necessary.

4    The number of states, sure.  The money or dollar amount I

10:10:11  5    don't think is particularly necessary.  Can't blame the

6    witness for saying it.  It obviously constituted a part of her

7    reasoning in coming to her conclusions.  But I'm instructing

8    you to instruct her that she is not to do that unless she's

9    specifically asked a question directly asking her to mention

10:10:33 10    the amount of the settlement or the size of the settlement in

11    answering any other questions.

12          That's the Court's ruling.  And I'll try to put

13    something in writing afterwards to the extent that I have

14    time.

10:10:47 15          I don't feel there's any need for a voir dire.  I

16    feel you do need to instruct your witness that she's not to go

17    into the amount of the settlement.  If she's asked questions

18    directly relating to how she estimated the degree of the

19    problems that she opined Household had, the extent to which

10:11:10 20    they were pervasive and so on, then she can answer in terms

21    of, to the extent that it's true and that she relied upon it,

22    her analysis of the amount of money they set aside to address

23    the issue.

24          Can we bring the jury out now?

10:11:30 25          MR. KAVALER:  Your Honor, may that instruction to

Ghiglieri - cross

911

1    Q.  Okay.

2    A.  Yes, I have it.

3    Q.  That's not the only Virginia report you reviewed in

4    formulating your opinions in this case, is it?

10:26:04  5    A.  I reviewed many, many examination reports.  I couldn't

6    tell you exactly how many I reviewed from Virginia.

7    Q.  Let me show you another Virginia report and see if this

8    refreshes your recollection.  This is Plaintiffs' Exhibit 335.

9      (Tendered.)

10:26:35  10   BY MR. KAVALER:

11   Q.  Does that refresh your recollection that you reviewed this

12   document as well?

13   A.  I'd have to look at it a little bit more to see.

14   Q.  Sure.

10:26:42  15   A.  I don't know if --

16   Q.  My question -- take all the time you need to look at it,

17   Ms. Ghiglieri.  My question will be whether that's one of the

18   documents that you reviewed in formulating your opinion.

19   A.  Okay.

10:27:02  20     (Brief pause.)

21   BY THE WITNESS:

22   A.  I'm just not sure if I reviewed it, but -- I can't say

23   with certainty that I reviewed it.  I'm assuming that I did,

24   but I just -- it doesn't ring a bell.

10:27:50  25   BY MR. KAVALER:

Ghiglieri - cross

                1    Q.  You see it has a plaintiffs' exhibit tag on it?

                2    A.  Yes.

                3    Q.  You understand that means it's a document the plaintiffs

                4    have identified as one they intend to use as evidence in this

10:27:59        5    case?

                6    A.  Then I must have looked at it.

                7    Q.  Okay.  Let's look at some of the things you must have

                8    looked at together.

                9    A.  Okay.

10:28:10       10    Q.  You know that the 11 violations found in this report

               11    constituted only 1 percent of the 1,450 loans reviewed in this

               12    exam, don't you?

               13    A.  Are you reading from somewhere?

               14    Q.  Well, at the moment I'm asking you a question.

10:28:27       15        Do you know that?

               16    A.  I don't know without looking at this report a little bit

               17    more.

               18    Q.  Okay.  Let's look at the page ending with the Bates number

               19    at the bottom in 028.  And if you look at the third full

10:28:47       20    paragraph, it says, During the period covered by this

               21    examination, 8/1 to 5/31/01, HRC originated and funded 7,794

               22    loans on Virginia property.  1,000 closed loan files,

               23    parenthesis, 13 percent, close parenthesis; 350 paid loan

               24    files, 28 percent; and 100 rejected loan files, 13 percent.

10:29:25       25    And four licensed branch offices in Virginia were reviewed to

Ghiglieri - cross

913

1    determine compliance with all state and federal rules,

2    regulations and laws.  A total of 11 violations, 1 percent,

3    were found during this examination and are cited on pages 4 to

4    4a.

10:29:44    5         Do you see that?

6    A.  I do see it.

7    Q.  Does that refresh your recollection that in this

8    examination, Virginia found 11 violations that constituted 1

9    percent of the loans they examined?

10:29:56    10    A.  I mean, I see that.  It doesn't refresh my recollection,

11    but I see that they say that.

12    Q.  You have no quarrel with the Virginia examiner, do you?

13    A.  No.

14    Q.  Okay.  And you know that this exam found that Household's

10:30:08    15    advertising did not contain false, misleading or deceptive

16    statements or representations, don't you?

17    A.  Are you reading from somewhere?

18    Q.  I'm asking you a question.

19    A.  I don't know the -- I did not memorize the contents of all

10:30:23    20    the examination reports, so I would have to look in here to

21    see if what you're saying is correct.

22    Q.  Okay.  Look at page ending in 034.  Down at the bottom,

23    it's got a heading called Advertising and a citation to a

24    section of the code of Virginia laws -- the Code of Virginia

10:30:47    25    rather.

Ghiglieri - cross

914

```
          1            Do you see that?

          2    A.  I do.

          3    Q.  And it says:  16, Does the licensee's advertising, A,

          4    contain false, misleading or deceptive statements or

10:30:56  5    representations?  And the answer is, None found.

          6            Do you see that?

          7    A.  I do.

          8    Q.  You have no quarrel with that finding by the Virginia

          9    examiner, do you?

10:31:06 10    A.  No.  I mean, if that's what they found, that's what they

         11    found.

         12    Q.  And you know that in this same exam, Virginia found that

         13    prepayment penalties were levied in accordance with Virginia

         14    law, don't you?

10:31:19 15    A.  You can show me where it is.  I don't remember the --

         16    Q.  Sure.

         17    A.  -- the specifics of this examination report.

         18    Q.  Okay.  No problem.  Turn to page ending with 036.  And

         19    look at item 28.

10:31:37 20            It says:  28, Are mortgage loans written with a

         21    prepayment penalty provision, question mark.  Are prepayment

         22    penalties levied in accordance with Section 66.1-330.83 -- .83

         23    and 6.1-330.85 of the Code of Virginia?  And underneath that

         24    it says, Yes.

10:32:04 25            Do you see that?
```

Ghiglieri - cross

1   A.  I do.

2   Q.  You have no quarrel with the examiner on that point, do

3   you?

4   A.  No.

10:32:10  5   Q.  And you know that this exam found no evidence that

6   Household misrepresented any material loan terms, correct?

7   A.  No.  You'd have to point it out to me.

8   Q.  Okay.  Turn to the very next page, ending with 037.  Do

9   you see the heading that says Virginia Administrative Code?

10:32:32  10   A.  I do.

11   Q.  Number 31, Was any evidence uncovered indicating the

12   licensee intentionally misrepresented the qualification

13   requirements for a mortgage or misrepresented any material

14   loan terms?  And below that it says, None found.

10:32:50  15        Do you see that?

16   A.  I do.

17   Q.  Do you have any reason to quarrel with the examiner about

18   that?

19   A.  I don't.

10:32:56  20   Q.  You looked at exams from other states; did you not?

21   A.  I did.

22   Q.  One of the states you looked at exams from -- you looked

23   at exams from Arizona in formulating your opinion that you

24   gave in this case; did you not?

10:33:07  25   A.  I did.

Ghiglieri - cross

916

1      Q.  All right.  Let's look at an Arizona exam.

2           MR. KAVALER:  Your Honor, if I forgot to do so -- I'm

3      sure I did -- I'll move Plaintiffs' 335 into evidence.

4           THE COURT:  It will be admitted.

10:33:26  5      MR. KAVALER:  Thank you, your Honor.

6      BY MR. KAVALER:

7      Q.  Let me show you what has been marked as Defendants' 454.

8        (Tendered.)

9      BY MR. KAVALER:

10:33:49 10  Q.  Do you want to take a minute to look that over?

11          And, specifically, if you look at -- starting at page

12     ending in 899, I think you'll see a report from the State

13     Banking Department.

14       (Brief pause.)

10:34:38 15  BY MR. KAVALER:

16     Q.  Is this document one of the documents that you looked at

17     in formulating your opinion that you gave in this case?

18     A.  I looked at a lot of examination reports, like I said.  I

19     just -- I can't confirm whether I looked at this one.  I'm

10:35:05 20  assuming that I did, but I don't know for sure unless I check

21     the Bates numbers.

22     Q.  All right.  Well, let's see if we can refresh your

23     recollection.

24          Do you recall that in this exam, the examiner found

10:35:20 25  that Household did not display, broadcast or televise any

Ghiglieri - cross

 1    false or misleading statements or representations with regard

 2    to rates, terms or conditions for loans?

 3    A.  Are you reading from somewhere?

 4    Q.  At the moment, I'm asking you a question.

10:35:39  5    A.  And the question is what?

 6    Q.  Do you recall that the examiner found that Household did

 7    not display, broadcast or televise any false or misleading

 8    statements or representations with regard to the rates, terms

 9    or conditions of loans?

10:35:54 10    A.  I don't have any way of knowing that because I don't

11    recall seeing this document.  But I'm happy to look at

12    whatever page you're reading from.

13    Q.  Sure.  Look at page 1916, please, page ending with Bates

14    1916.  And there's a chart on that page with a bunch of

10:36:16 15    numbered questions and then three columns afterwards, yes, no,

16    and NA.

17         Do you see that?

18    A.  Let's see.  1916 is the page you're on?

19    Q.  1916.

10:36:27 20    A.  Okay.  Which number is it?

21    Q.  Look at number seven, which reads, quote, Does the

22    licensee advertise, display, distribute, broadcast or televise

23    any false or misleading or deceptive statements or

24    representation with regard to the rates, terms or conditions

10:36:45 25    for loans?  And a tick mark appears -- an X appears in the

Ghiglieri - cross

1   "no" column.

2          Do you see that?

3   A.  I do.

4   Q.  Do you have any reason to disagree with the examiner on

10:36:55  5   that?

6   A.  I don't.

7   Q.  Do you know that the examiner also found that Household

8   had not charged a consumer for any costs, fees, charges or

9   premiums not allowed?

10:37:05 10  A.  I don't.  I mean, I don't remember that.

11  Q.  Okay.  Turn two pages further on to the page ending in

12  1918 and look at box 24.  Quote, Has the licensee charged a

13  consumer for any costs, fees, charges or premiums not allowed,

14  close quote.  And there's an X in the box headed "no."

10:37:31 15         Do you see that?

16  A.  I do.

17  Q.  Do you have any reason to disagree with the examiner on

18  that finding?

19  A.  I don't.

10:37:37 20  Q.  Do you know that the examiner found that insurance

21  appeared to be at the option of the consumer?

22  A.  I don't have a separate recollection of that.

23  Q.  Okay.  Turn to page 1922 and look at box number nine,

24  which reads, quote, Does the insurance appear to be at the

10:38:02 25  option of the consumer, close quote.  And the examiner put an

Ghiglieri - cross

1    X in the box labeled "yes."

2         Do you see that?

3    A.  I do.

4    Q.  Do you have any reason to quarrel with the examiner's

10:38:13  5    finding on that subject?

6    A.  I don't.

7    Q.  Okay.  Let's go back to page 1912.

8         You see the first heading on that page is, Violations

9    of law noted in previous examination.  And underneath that, it

10:38:50  10   says, Violations from the last examination have been

11   corrected.

12        Do you see that?

13   A.  I do.

14   Q.  Do you have any reason to quarrel with that conclusion by

10:38:57  15   the Arizona examiner?

16   A.  I don't.

17   Q.  Underneath that it says, Summary of violations.  And

18   underneath that, it says, None noted in this examination.

19        Do you have any reason to quarrel with that finding

10:39:07  20   by the Arizona examiner?

21   A.  I don't.

22   Q.  Down at the bottom under examiner comments/conclusions and

23   recommendations, do you see where it says, Based on the

24   findings of this examination, the licensee's overall

10:39:23  25   compliance with the applicable laws and rules is satisfactory.

Ghiglieri - cross

1          Do you have any reason to quarrel with that

2     conclusion by the Arizona examiner?

3     A.  I don't.

4     Q.  Now, you spoke a bit about the Lew Walter training and the

10:39:42  5     Dennis Hueman video.  Do you recall that?

6     A.  Yes.

7     Q.  And you played some excerpts from the Dennis Hueman

8     videotape.  Do you recall that?

9     A.  I do.

10:39:53 10    Q.  Did you yourself select those particular excerpts?

11    A.  I did.

12    Q.  And how long is the videotape in total?

13    A.  It's approximately one hour.

14    Q.  And what appears on the rest of the videotape that you

10:40:04 15    didn't select to play?

16    A.  Various role playing things and just him describing

17    different things to his staff.

18    Q.  Now, you know that that was not an authorized Household

19    training tape, don't you?

10:40:19 20    A.  I know it was -- well, I know what they did in response to

21    it, yes.

22    Q.  You know that that tape did not emanate from Household's

23    training department, correct?

24    A.  Yes, I do.

10:40:30 25    Q.  Mr. Hueman made that tape himself, correct?

Ghiglieri - cross

921

|  | 1 | A.  Yes. |
|--|---|----------|
|  | 2 | Q.  And you mentioned that you know what happened afterwards. |
|  | 3 | Do you know that as soon as other folks at Household found out |
|  | 4 | that tape existed, they seized all copies of it and impounded |
| 10:40:46 | 5 | it, correct? |
|  | 6 | A.  Yes. |
|  | 7 | Q.  And that's why you testified very carefully that the |
|  | 8 | videotape was, quote, distributed, close quote, to branches, |
|  | 9 | not that it was watched in any branches, right? |
| 10:40:57 | 10 | A.  Well, I wasn't thinking of that distinction; but I don't |
|  | 11 | know if it was watched in any branches or not. |
|  | 12 | Q.  Let me put it the other way, Ms. Ghiglieri.  You have |
|  | 13 | absolutely no evidence whatsoever -- nothing you've seen |
|  | 14 | suggests that that videotape was used to train one single |
| 10:41:13 | 15 | employee at Household; isn't that right? |
|  | 16 | A.  Well, I don't know what occurred after the video was made |
|  | 17 | except that it was distributed.  And I do know that what was |
|  | 18 | on that, the concepts that were on that tape, were similar to |
|  | 19 | the Lew Walter training with the effective rate training, |
| 10:41:34 | 20 | which was developed two years prior to that. |
|  | 21 | Q.  My question, Ms. Ghiglieri, was very simple.  You have no |
|  | 22 | evidence whatsoever that the Hueman videotape was used to |
|  | 23 | train even one employee at Household; is that right? |
|  | 24 | A.  I don't know -- I don't know who saw the tape after it was |
| 10:41:53 | 25 | distributed. |

Ghiglieri - cross

1    Q.  You don't have any evidence that anyone ever saw that tape

2    other than you, the people in this courtroom yesterday,

3    correct?

4    A.  I think I just said I don't know who saw the tape after it

10:42:08  5    was distributed.

6    Q.  In other words, you can't identify for this jury one

7    individual who ever saw that tape, correct?

8    A.  I just don't have the information on exactly who saw the

9    tape.  I --

10   Q.  So the answer --

11   A.  -- just don't know.

12   Q.  I'm sorry.  Were you finished?

13   A.  I don't know.

14   Q.  The answer to my question is correct, isn't it?

10:42:29 15   A.  I don't know who saw the tape after it was distributed.

16   Q.  So if this jury thought your testimony was for the

17   proposition that someone watched this tape, what you're saying

18   is that was a misunderstanding; you never meant to say that,

19   correct?

10:42:45 20   A.  Well, why I wanted to show the tape was because the

21   concepts were similar throughout Household in terms of the

22   effective rate training.  And they had been -- the staff in

23   various parts of the country had been trained two years prior.

24   Dennis Hueman testified that he did the tape as a training

10:43:08 25   vehicle.  And a lot of the language that he used on the tape

Ghiglieri - cross

1    was similar to what they were trained to do two years prior

2    and was similar to what a lot of the language in the

3    complaints were; if I can do this for you, would you be

4    interested.

10:43:24  5   Q.  Notwithstanding that, Ms. Ghiglieri, you have no evidence

6    that even one single employee at Household was ever trained by

7    being shown the Hueman videotape; isn't that so?

8    A.  Well, they -- they were already doing these -- they had

9    already been trained to do these things.  And he was doing

10:43:49 10  this training video, from what he says, just so he would have

11   another tool.

12   Q.  Nevertheless, you have no evidence that even one Household

13   employee was ever trained by seeing the Hueman videotape;

14   isn't that correct?

10:44:07 15  A.  I think I already testified that I don't know who saw the

16   tape, but my impression is that this was training that had

17   already occurred two years before.

18   Q.  Nevertheless, whatever that means, you have no evidence

19   that even one Household employee was ever trained by watching

10:44:30 20  the Hueman videotape; isn't that correct?

21   A.  I don't know who was trained.  That's as good as I can

22   answer that question.

23   Q.  So if you were asked to identify even one Household

24   employee who was trained using the Hueman videotape, you would

10:44:46 25  not be able to give me a name, correct?

Ghiglieri - cross

926

1    did, and he said he thought that he -- he did, but he wasn't

2    sure.

3    Q.  All right.  Now, you talked about the Lew Walter training.

4    And you remember that plaintiffs introduced Exhibit 379 in

10:47:51  5    connection with the Lew Walter training?

6    A.  I have to see what that is.

7    Q.  Sure.  Do you want me to hand you a copy?

8    A.  Sure.

9    Q.  Absolutely.

10:48:04  10    (Tendered.)

11    BY THE WITNESS:

12    A.  Thank you.

13    BY MR. KAVALER:

14    Q.  Let's look at the second page of this document.  I think

10:48:40  15    you have to rotate it sideways to look at it.

16        And you read the jury the sentence here that starts

17    with the bullet point saying July 1999, correct?

18    A.  Yes.

19    Q.  Okay.  And you didn't read to the jury the next bullet

10:49:02  20    point labeled 9/99, correct?

21    A.  You're asking me if I --

22    Q.  I'm asking, do you recall whether you read the jury the

23    second bullet point, the one that appears right under the one

24    you said you did read, headed 9/99?

10:49:22  25    A.  I think I read the first -- from the first bullet point.

Ghiglieri - cross

927

1    Q.  Okay.  Let's read from the second bullet point.  It says

2    9/99.  The original workbook was rewritten and rolled out

3    nationally to HFC/Bene, B-e-n-e -- that means Household

4    Finance Corporation and Beneficial, does it?

10:49:42  5    A.  I'm assuming.

6    Q.  Okay.  In September of 1999.  The leaders and participant

7    guides were made available at that time for use in all future

8    workshops.  This rewritten workbook did not include the

9    equivalent rate worksheet.

10:50:02  10            Do you see that?

11    A.  I do.

12    Q.  That's the bullet point you did not read, correct?

13    A.  I did not read that.

14    Q.  Okay.  So this is saying that the materials were reissued

10:50:13  15    in September '99 without the equivalent rate worksheet,

16    correct?

17    A.  That's what it says.

18    Q.  Okay.  Now, you offered some opinions about re-aging; is

19    that correct?

10:50:27  20    A.  I did.

21    Q.  And if a loan is not re-aged, then it leads to charge-off

22    and foreclosure; is that right?  Assuming it's not being paid.

23    A.  I didn't hear the last part of what you said.  I'm sorry.

24    Q.  Let me rephrase it.

10:50:44  25            If the customer is not paying on the loan and it is

Ghiglieri - cross

928

           1    not re-aged, then what happens eventually is the loan is

           2    charged off and the property is foreclosed upon, correct?

           3    A.  And you're assuming that they're not making any more

           4    payments?

10:51:00   5    Q.  Correct.

           6    A.  That would be the natural progression.

           7    Q.  Okay.

           8    A.  If someone doesn't pay, the loan would be foreclosed on

           9    and any deficiency would be charged off.

10:51:12  10    Q.  And you know that Household's policy was to avoid

          11    foreclosure whenever possible, correct?

          12    A.  Yes, I do know that that was their policy.

          13    Q.  And you're not a CPA, are you?

          14    A.  No, I'm not.

10:51:26  15    Q.  Did you perform any analysis or studies of Household's

          16    recidivism statistics?

          17    A.  Did I perform any studies?

          18    Q.  That's the question.

          19    A.  No, I did not.

10:51:40  20    Q.  Do you know what percentage of re-aged loans were still

          21    current a year after the re-age?

          22    A.  I saw some statistics regarding that.  I didn't commit

          23    them to memory, but I know that there -- there were many --

          24    there were loans that were re-aged numerous times that became

10:52:03  25    past due again.

Ghiglieri - cross

929

1  Q.  And there were others that were re-aged and were current a

2  year later, correct?

3  A.  Well, probably some of them.  I don't know -- in

4  comparison to the ones that were past due again, I think it

10:52:16  5  was a low percentage, if my memory serves me correct.

6  Q.  But that's a statistic that Household tracked?

7  A.  The documents that I looked at, it looked like they

8  were -- they didn't track them on a regular basis; that they

9  were just looking at them for a particular purpose.

10:52:42 10  Q.  You didn't perform any cash flow analysis on the amount of

11  income generated from accounts that had been re-aged, did you?

12  A.  No, I didn't perform that.

13  Q.  And you understand that when an account is re-aged, the

14  hope is that it continues to make payments to Household,

10:52:56 15  correct?

16  A.  Yes.

17  Q.  And if it continues to make payments, there will be cash

18  flow; if it doesn't continue to make payments, if it's written

19  off, there won't be cash flow, correct?

10:53:06 20  A.  Yes.

21  Q.  And you agree that re-aging has a positive effect on cash

22  flow if the loans don't become past due again?

23  A.  It can have a positive effect, yes.

24  Q.  Did you look at any statistics or data on the availability

10:53:20 25  of re-ages as a factor in a customer's decision to choose

Ghiglieri - cross

1    Household as its lender in the first place?

2    A.  Ask me that again.

3    Q.  Did you look at any statistics or data which speak to the

4    question of whether the availability of re-ages, that is, the

10:53:36   5    fact that Household will re-age your loan if you get in

6    trouble whereas a bank will not, is a factor in a customer's

7    decision to choose to borrow from Household in the first place

8    as opposed to borrowing from a bank?

9    A.  I don't remember seeing anything about that.

10:53:53  10    Q.  In forming your opinions regarding re-age, you didn't

11    consider the effect of re-age on persuading a customer to make

12    a payment, did you?

13    A.  Say that again.

14    Q.  Sure.  In formulating your opinions that you testified to

10:54:10  15    about re-age, you didn't consider whether a customer might be

16    persuaded to make an incremental payment, an additional

17    payment, because Household is prepared to restructure or

18    re-age the loan?

19    A.  So this is from the customer's standpoint are you asking

10:54:33  20    me this?

21    Q.  Well, sure.  You understand, do you not, Ms. Ghiglieri,

22    that the impact of re-aging is on the customer?  It's the

23    customer who has missed a payment and it's the customer whom

24    Household is working with to see if the customer can get back

10:54:45  25    on to some kind of a payment schedule.  You understand that,

Ghiglieri - cross

931

1    don't you?

2    A.  Well, Household was using re-aging -- various re-aging

3    tactics to mask delinquencies.  That was my opinion.  And I

4    looked at the re-aging activities from Household's standpoint,

10:55:03  5    not from the customer's standpoint.

6    Q.  Right.

7    A.  I wanted to see if they were using various tactics to mask

8    delinquencies.  That was one of the things that I was asked to

9    review.  So how happy or not happy the customer was about this

10:55:21 10    re-aging did not factor into my opinions.  I was looking at it

11    from Household's standpoint.

12    Q.  And you make an interesting point.  Everything you said is

13    your opinion, correct?

14    A.  I rendered my opinions, that's right.

10:55:33 15    Q.  And you don't know any facts other than what you've read

16    in these documents, right?  You didn't work at Household?  You

17    didn't interview -- we had this conversation the other day.

18    You're just rendering opinions on those 40 boxes of documents,

19    right?

10:55:44 20    A.  Well, it would be a conflict for me to serve as an expert

21    in this case if I had worked at Household.  So, no, I never

22    worked at Household.  I rendered objective opinions in this

23    case.

24    Q.  But that's my point.  They're opinions.  You're not

10:55:58 25    testifying as a fact witness?

Ghiglieri - cross

1    whom were you asked to review whatever you were asked to

2    review?

3    A.   And in what context are you saying that now?

4    Q.   In the same answer -- in the same lengthy answer you gave

10:58:31  5    a few minutes ago, you said, That was my opinion; I didn't

6    look at it from the customer's perspective.  And then you

7    said, It's not what I was asked to review.  Do you recall

8    that?

9    A.   Yes.  I was asked to review whether Household engaged in

10:58:44 10   predatory lending and whether -- what was the implication of

11   their re-aging activities.

12   Q.   Who asked you that?

13   A.   The plaintiffs' lawyers.

14   Q.   And they did not ask you to look at re-aging from the

10:58:56 15   perspective of a customer, correct?

16   A.   Right.

17   Q.   So you didn't look at any statistics or data on the effect

18   of re-aging on customer satisfaction, correct?

19   A.   No.

10:59:13 20   Q.   You know that re-aging was a recognized practice in the

21   consumer finance industry, don't you?

22   A.   I know that other lenders did re-aging, yes.

23   Q.   You know that other lenders did re-aging besides

24   Household, correct?

10:59:28 25   A.   Yes.

Ghiglieri - cross

935

1    Q.  You know that Household did re-aging before 1998, correct?

2    A.  I'm assuming so.  When I examined banks, banks were doing

3    re-aging in the early '70s; so it's not a new concept.

4    Q.  It's not a new concept.  It's not something Mr. Gilmer

10:59:47  5    invented in 1998, correct?

6    A.  No.  And my criticism isn't of the re-aging.  It's how

7    they did re-aging to mask past due.  And that's what we used

8    to examine banks for also, whether or not these various

9    tactics were being used to mask past due.

11:00:04  10    Q.  All right.  And when loans deteriorate in quality, lenders

11    are required to increase their reserves for loan losses,

12    aren't they?

13    A.  Yes.

14    Q.  And the company's reserves tell people about the loans it

11:00:18  15    might or might not be able to collect in the future, correct?

16    A.  Yes.

17    Q.  And those reserves tell people the credit quality of the

18    company's loan portfolio, correct?

19    A.  That's one statistic, among others, including past --

11:00:31  20    including delinquency statistics.

21    Q.  Did you examine how Household calculated its reserves?

22    A.  I didn't look at the reserves.

23    Q.  So you're not here to offer any testimony at all about

24    reserves?

11:00:41  25    A.  No.

Ghiglieri - cross

1    Q.  Do you know what an audit of a financial statement is?

2    A.  Yes.

3    Q.  Did you audit Household's financial statements with regard

4    to reserves?

11:00:51    5    A.  You mean in my prior life or as an expert?

6    Q.  In connection with the testimony you're giving here today.

7    A.  No.

8    Q.  Do you know whether Household was ever required to add to

9    the existing reserves because the reserves, as calculated by

11:01:18    10   Household's methodology, proved to be inadequate?

11   A.  I don't know the answer to that.

12   Q.  You testified that you recently had an article published

13   in the American Banker.  Do you recall that?

14   A.  I do.

11:01:35    15   Q.  Do you recall the article well or do you need me to hand

16   you a copy of it?

17   A.  Hand me a copy and then I can answer whatever you ask me.

18      (Tendered.)

19   BY THE WITNESS:

11:01:53    20   A.  Thank you.

21          MR. KAVALER:  We'll call this Defendants' Exhibit

22   1083 for identification, your Honor.

23   BY MR. KAVALER:

24   Q.  Is that the article?

11:02:11    25   A.  Yes.

Gilmer - direct

968

1    as an account executive in South Carolina; is that right?

2    A.  It was called a branch representative at the time, but it

3    was a similar position.

4    Q.  A sales job?

11:44:42  5    A.  That's correct, sales and collections in those days.

6    Q.  And after that, you became a branch manager at HFC; is

7    that correct, sir?

8    A.  That is indeed correct.

9    Q.  Is it fair to say that over the next 25 years after you

11:44:54 10    were promoted to branch manager, you received a series of

11    promotions at Household?

12    A.  Indeed I did.  I think my family and I relocated 15 times

13    associated with those, so there were quite a few.

14    Q.  And eventually, sir, in 1995, you were named managing

11:45:12 15    director and CEO of HFC Bank in the United Kingdom; is that

16    right?

17    A.  That is correct.

18    Q.  And HFC Bank in the United Kingdom, did it have branches

19    that sold loans?

11:45:25 20    A.  It did indeed.

21    Q.  Approximately how many branches did it have?

22    A.  Wow, that's going back a while.  I don't remember, but it

23    would be in the triple digits.

24    Q.  When you say triple digits, you mean more than a hundred?

11:45:36 25    A.  More than a hundred, right.

Gilmer - direct

969

1    Q.  And did there come a time, sir, in the end of 1997 or

2    early 1998 that you returned to the United States?

3    A.  That is correct.

4    Q.  And at that time, you took a position as the head of the

11:45:48  5    consumer lending department at Household; is that correct?

6    A.  That is correct.

7    Q.  Could you briefly describe for me what your duties were in

8    that position when you came back in 1997, 1998?

9    A.  I can indeed.  I was responsible for the HFC branch

11:46:00 10    network, which was about 14 or 1,500 -- strike.  Let me back

11    up because I was adding Beneficial in that.

12         When I first returned to the United States, it was

13    just HFC and about 500 branches, as I recall.  So I was

14    responsible for all of that.

11:46:19 15         In addition, I was responsible for the operating

16    centers.  In our operating centers, you know, we did work that

17    you might imagine.  Those were collection calls, underwriting.

18    By that I mean loan decisions were made in that area of the

19    operation.  Customer service and that sort of thing.  So upon

11:46:42 20    my arrival in 1998, that was sort of the way the business was

21    set up.  And in round numbers, there were probably -- I won't

22    get this exactly right, but there were several thousand

23    employees.  I would guess probably 8,000 employees or so in

24    total at that time.

11:46:57 25    Q.  And you're saying 8,000 people in consumer lending that

Gilmer - direct

970

1     reported ultimately to you?

2     A.    That is correct.  And that did not include, Mr. Dowd, a

3     goodly number of employees at home office, support-level kinds

4     of people, quality assurance kinds of people, training, human

11:47:14  5     resources.  A goodly number of employees working there as

6     well.

7     Q.    And during 1998, Household acquired Beneficial; is that

8     correct, sir?

9     A.    That is -- that is true.

11:47:24 10     Q.    That was in addition --

11     A.    I believe --

12     Q.    I'm sorry, sir.

13     A.    No, I just -- I was going to say I think that was around

14     June or July of 1998.

11:47:32 15     Q.    By this time, you were already running consumer lending at

16     Household?

17     A.    That's true.

18     Q.    And when you acquired Beneficial, you added about another

19     thousand branches; is that fair to say?

11:47:42 20     A.    That's right.  So that when we finished the

21     consolidation -- because some branches were consolidated and

22     put together -- we had about 1,400 or 1,500 or so branches.  I

23     believe it was in 46 states.  And we had six operating centers

24     to support those branches across the United States.  And

11:48:04 25     probably 15,000 or so employees.

Gilmer - direct

1   Q.  And, sir, was consumer lending also called United States

2   consumer finance?

3   A.  Yes, it was.

4   Q.  And those two words were used interchangeably?

11:48:17  5   A.  Yes, they were.

6   Q.  And did you report directly to Mr. Aldinger during this

7   time from 1998 to 2002?

8   A.  I did.

9   Q.  And there was nobody between you and he?  He was your

11:48:27 10   boss?

11   A.  That is correct.

12   Q.  Now, is it fair to say, sir, that during -- towards the

13   end of 1998, you believed Household's stock was undervalued;

14   is that correct?

11:48:40 15   A.  I'm sure -- I'm sure I did.  I don't remember the exact

16   dates, but yes.

17   Q.  And you believe --

18   A.  That's a fair --

19   Q.  I'm sorry.

11:48:47 20   A.  That's a fair assessment.

21   Q.  And is it fair to say, sir, that you believed that

22   Household's stock was undervalued at that time because you

23   believed that the market would not believe that Household

24   could grow; is that correct?

11:49:00 25   A.  In part that is true.  I believe that our franchise was

# TAB 12

1104

```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all    )
 4   others similarly situated,     )
                                    )
 5             Plaintiff,           )
                                    )
 6      vs.                         )  No. 02 C 5893
                                    )
 7   HOUSEHOLD INTERNATIONAL, INC., )
     et al.,                        )  Chicago, Illinois
 8                                  )  April 7, 2009
               Defendants.          )  9:45 a.m.
 9
                              VOLUME 6
10              TRANSCRIPT OF PROCEEDINGS - TRIAL
          BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:      COUGHLIN STOIA GELLER RUDMAN &
                             ROBBINS LLP
14                           BY:  MR. LAWRENCE A. ABEL
                                  MR. SPENCER A. BURKHOLZ
15                                MR. MICHAEL J. DOWD
                                  MR. DANIEL S. DROSMAN
16                                MS. MAUREEN E. MUELLER
                             655 West Broadway
17                           Suite 1900
                             San Diego, California  92101
18                           (619) 231-1058

19                           COUGHLIN STOIA GELLER RUDMAN &
                             ROBBINS LLP
20                           BY:  MR. DAVID CAMERON BAKER
                                  MR. LUKE O. BROOKS
21                                MR. JASON C. DAVIS
                                  MS. AZRA Z. MEHDI
22                           100 Pine Street
                             Suite 2600
23                           San Francisco, California  94111
                             (415) 288-4545
24

25
```

Gilmer ~ cross

            1    A.  Well, I think practically every public company, maybe
            2    every public company, but most, if not all, who have their
            3    stock listed publicly -- that's what I mean by a public
            4    company -- have analysts who examine their records and books,
01:33:34    5    and they're called different things, I believe these analysts
            6    are called different things, and they publish their findings.
            7          So they'll come in, sometimes they'll talk to
            8    management, sometimes they'll look at documents, combination
            9    of different things, and they will publish their opinions
01:33:51   10    about what they're doing and how they're doing it.  Those
           11    publications come out periodically, several times a year.  And
           12    it is not uncommon that you'll have more than one analyst
           13    looking at the same company at the same time.
           14    Q.  And what is an investor relations report with regard to
01:34:12   15    these analysts' reports?
           16    A.  I'm sorry?
           17    Q.  What -- you told me you looked at something called an
           18    investor relations report.  Was that a Household document?
           19    A.  No, that was not a Household document.  That document was
01:34:23   20    put together by whatever company would be looking and
           21    examining the -- the company in that case, this case I'm
           22    talking about Household.  They would -- they would publish in
           23    their opinion all sorts of information, information about the
           24    kind of customers, about the distribution network, the kinds
01:34:43   25    of management techniques that were employed, the results of

Gilmer - cross

1197

1    the companies, all sorts of information there.

2    Q.  Let me ask you this, Mr. Gilmer:  During the years that

3    you ran the Consumer Finance Division, did someone make

4    available to you on a regular basis press clippings and news

01:34:58  5    stories about your business?

6    A.  That is accurate, yes.

7    Q.  Did you read them all?

8    A.  I probably didn't read them all.  There were -- there were

9    bucket loads of those reports, but I read a fair number.

01:35:09 10    Q.  All right.  Let me show you Defendants' Exhibit 522.  Copy

11    for counsel.  Copy to you, Mr. Gilmer.

12    A.  Thank you.

13    Q.  Is this one of the analyst reports that you were talking

14    about during the period that we're talking about here when you

01:35:30 15    were head of consumer finance at Household -- this is dated

16    December 3, 2001 -- speaking about Household?

17    A.  Yes, it is.

18         MR. KAVALER:  I offer this, your Honor.

19         MR. DOWD:  Your Honor, this document's to be received

01:35:42 20    with a limiting instruction.

21         MR. KAVALER:  That's correct, your Honor.

22         THE COURT:  Very well.  It will be admitted with a

23    limiting instruction.

24    (Defendants' Exhibit 522 received in evidence with a

01:35:55 25    limiting instruction.)

Gilmer - cross

1          MR. KAVALER:  Thank you, your Honor.

2      BY MR. KAVALER:

3      Q.  Now, Mr. Gilmer, this is put out by a firm called Legg

4      Mason?

01:35:59  5      A.  That's right.

6      Q.  Is Legg Mason an analyst firm?

7      A.  Yes, it is.

8      Q.  Okay.  Look at the second bullet point on the first page.

9      And this is dated December 3, 2001, is it?

01:36:10  10     A.  December 3rd, right.

11     Q.  Some of the article -- I'm sorry.  It's talking about in

12     the first bullet point Barron's and Business Week Online

13     apparently put out articles about Household, is that right?

14     A.  That's right.

01:36:23  15     Q.  And those articles, according to the first bullet point,

16     questioned the quality of the company's accountings --

17     accounting, earnings and asset quality, do you see that?

18     A.  That's correct.

19     Q.  And then Legg Mason says, "Some of the article deals with

01:36:34  20     issues that we would consider known or immaterial,

21     particularly given HI's" -- do you understand HI to be

22     Household?

23     A.  Household International, correct.

24     Q.  -- "non-prime customer base."  Is that what you were

01:36:45  25     talking about a minute ago?

Gilmer - cross

1199

1    A.   Yes, it was.

2    Q.   Does this reflect that this analyst knew who Household's

3    customers were?

4    A.   It does indeed.

01:36:52  5    Q.   "Household" -- continuing to read:  "Household has always

6    said that its customers make 11 payments a year.  If they

7    could make 12, they would not be HI's customers but would be

8    at a bank or the agencies, and not paying the rates and points

9    that HI charges for its higher risk clientele."

01:37:09 10         Do you see that?

11   A.   I do.

12   Q.   Does this reflect an understanding by the analyst who's

13   writing this report about the very testimony you just gave,

14   that Household customers are a higher risk and more likely to

01:37:18 15   miss a payment than bank customers?

16         MR. DOWD:  Objection.  Compound and speculation.

17         MR. KAVALER:  I'll break it down.

18   BY MR. KAVALER:

19   Q.   What is your understanding of what the analyst is saying

01:37:26 20   in this sentence in contrast to what you understand to be the

21   facts about Household?

22   A.   He is saying exactly what I testified earlier.  He has a

23   good description of our customer here.  He says that indeed

24   our market exists because we're different from a bank and our

01:37:42 25   customers pay higher rates, and they do so because they can't

Gilmer - cross

1     make 12 payments a year.

2     Q.  And the last thing he says -- withdrawn.

3          And is that accurate, Mr. Gilmer?  Do your customers

4     pay higher rates and points because of the higher risks they

01:37:58  5  present?

6     A.  That is correct.

7     Q.  So those facts were well known to the marketplace.

8     A.  In this publication and many others like it.

9     Q.  And this publication is circulated to investors?

01:38:10 10  A.  Yes, indeed, including a very well respected equity

11    research company, Legg Mason.

12    Q.  Including Household's shareholders?

13    A.  That is correct.

14    Q.  Let's look at another one.  Let me hand you Defendants'

01:38:31 15  Exhibit 600.  Hand one to counsel as well.

16         That's a newspaper article containing a story about

17    Household, is it, Mr. Gilmer?

18    A.  Yes, indeed.

19    Q.  All right.  If you'd turn to page -- there's a story in

01:38:55 20  the lower right-hand column of the first page which continues

21    on the next two pages, and then on the page with Bates number

22    H702 in the first column it continues further and there's a

23    reference to Craig Streem.  Do you see that?

24    A.  Yes.

01:39:10 25  Q.  Do you know who Craig Streem was?

Gilmer - cross

1    A.  Yes, I do.

2    Q.  Who was he?

3    A.  He was in charge of investor relations.

4    Q.  For what company?

01:39:16  5    A.  Sorry, for Household International.

6         MR. KAVALER:  Your Honor, I offer Defendants' 600.  I

7    believe this also is subject to the same instruction.

8         MR. DOWD:  That's correct, your Honor.

9         THE COURT:  It will be admitted subject to the

01:39:26 10   instruction.

11        (Defendants' Exhibit 600 received in evidence with a

12         limiting instruction.)

13   BY MR. KAVALER:

14   Q.  Mr. Gilmer, this is an article in the Sacramento Bee.

01:39:32 15  That's a newspaper in general circulation, is that correct?

16   A.  That is correct.

17   Q.  And in the lower right-hand corner, there's an article

18   labeled, "Predatory Lending Targeted."

19        Do you see that?

01:39:46 20  A.  That's right.

21   Q.  If you look under the top left under the Sacramento Bee

22   header, there's a date.  It says May 29, 2001.  Do you see

23   that?

24   A.  I do.

01:39:57 25  Q.  Now, turn to the next two pages, there's a big heading on

Gilmer - cross

1202

1   both of those pages, "Predatory Lending Targeted."  Do you see

2   that?  Looks like one is a cleaner print of another.

3   A.  I do.

4   Q.  Okay.  Turn to the page after that on the right-hand page?

01:40:09 5   A.  Which page am I on?

6   Q.  I'm sorry.  This is Bates number 702.

7   A.  I'm there.

8   Q.  And it says, "Craig Streem, a spokesman for Household,

9   declined to comment in detail on Alexander's case but said the

01:40:23 10   Chicago-based company did not take advantage of her.  'I don't

11   deny that we charge customers with poor credit higher interest

12   rates,' Streem said, 'but that's one cost of doing business,

13   given the risks.'"

14        Do you see that?

01:40:37 15   A.  I do.

16   Q.  Do you agree with Mr. Streem?

17   A.  I do.

18   Q.  And is the Sacramento Bee a paper in general circulation

19   in California to your knowledge?

01:40:45 20   A.  That's correct.

21   Q.  Household kept no secret from its shareholders that it

22   dealt with people of -- who presented a greater credit risk

23   and compensated for that by charging them higher rates, higher

24   fees and higher points, isn't that true?

01:41:00 25   A.  That was well known.

Gilmer - cross

1203

1    Q.   Now, Mr. Gilmer, you told us something about the

2    organization of the consumer lending group that you headed.

3         Did we prepare a demonstrative which would help you

4    walk through this and explain it, demonstrate it to the jury?

01:41:16  5    A.   Yes.

6              MR. KAVALER:   Your Honor, may we put up the

7    demonstrative?

8              THE COURT:   Yes.

9              MR. KAVALER:   Put up -- there we go.

10   BY MR. KAVALER:

11   Q.   Mr. Gilmer, where do you sit on this structure, as it

12   were?

13   A.   I -- I sit at the top of the pyramid.

14   Q.   Okay.  And who is that right under you?

01:41:39 15   A.   Her name is Lisa Sodeika.

16   Q.   And what is her title?

17   A.   She was a special assistant assigned to me.

18   Q.   Now, Mr. Dowd asked you a question earlier today and used

19   the word assistant, and you said the person you were talking

01:41:53 20   about was your secretary.

21        What's the difference between that person and

22   Ms. Sodeika?

23   A.   The secretary does clerical work, at least mine did

24   primarily, and a special assistant like Sodeika is not

01:42:06 25   involved in clerical work at all.  Her job, her responsibility

Gilmer - cross

1265

         1          MR. KAVALER:  Your Honor, it's five minutes to 3:00.

         2    I'm perfectly happy to plow ahead, and I'm perfectly happy to

         3    take a break.  Whatever your pleasure is.

         4          THE COURT:  Is there anything that can't go for five

02:57:22  5    minutes and then be interrupted?

         6          MR. KAVALER:  I could finish this next point in five

         7    minutes.

         8          THE COURT:  Go ahead.

         9          MR. KAVALER:  Okay.  Thank you, your Honor.

02:57:29 10    BY MR. KAVALER:

        11    Q.  Mr. Gilmer, on the subject of excessive points and fees,

        12    what was Household's policy with regard to charging --

        13    withdrawn.

        14          Do you know what the phrase origination points means?

02:57:40 15    A.  Yes, I do.

        16    Q.  Do you know what the phrase discount points means?

        17    A.  I do.

        18    Q.  Are they the same or different?

        19    A.  They're different.

02:57:45 20    Q.  Explain.

        21    A.  Origination points are part of the point -- part of the

        22    pricing of a loan up front.  It's not -- generally not

        23    negotiable.  It's included in the contract rate and does not

        24    affect the contract rate.

02:58:00 25    Q.  What are discount points?

Gilmer - cross

1266

1    A.  Discount points are different.  Discount points enable a

2    customer, should they desire, to pay a point, which is 1

3    percent of the amount in discussion, in exchange for a lower

4    rate.

02:58:16  5         So you could go in and talk about a, pick a number,

6    10 percent rate, and you could determine that you might want a

7    lower rate as a borrower.  You might want a lower rate.  At

8    Household, we offered the opportunity for that.  You could

9    lower your rate by purchasing what we would call discount

02:58:35 10   points.  You'd pay some money up front, and your rate would be

11   lowered.

12   Q.  Let's go back to origination points.

13        As to origination points, did you have a view as to

14   whether you wanted to get more or less in the way of

02:58:47 15   origination points?

16   A.  Well, more in origination points means a higher rate and

17   more profitable.

18   Q.  For whose benefit?

19   A.  For the benefit of the shareholder.

02:58:57 20   Q.  Okay.  Was this a subject of some ongoing controversy

21   during the years that you were the head of consumer lending at

22   Household?

23   A.  Indeed, it was.

24   Q.  And did the press cover this controversy during the years

02:59:08 25   that you were head of consumer lending at Household?

Gilmer - cross

1267

1     A.   Indeed, they did in depth.

2     Q.   Let me show you what's been marked as Defendants'

3     Exhibit 630.  Copy for counsel, copy for you, Mr. Gilmer.

4          This is an article in the San Mateo Times.  Is this

02:59:32   5     one of the kinds of articles that were circulated by

6     Mr. Streem that you read during the time period that we're

7     talking about here?

8     A.   Yes, it was.

9     Q.   And this is from December 29, 2001?

02:59:42   10    A.   That is correct.

11         MR. KAVALER:  I offer Defendants' 630, your Honor.

12         MR. DOWD:  I believe that comes with a limiting

13    instruction.

14         MR. KAVALER:  That's correct, your Honor.

02:59:49   15         THE COURT:  It does.  It will be admitted with a

16    limiting instruction.

17         (Defendants' Exhibit 630 received in evidence with a

18         limiting instruction.)

19    BY MR. KAVALER:

02:59:54   20    Q.   Mr. Gilmer, please turn to page 3 of this article.  And

21    you see the second full paragraph on that page reads as

22    follows:

23         "Borrowers who would qualify for lower interest prime

24    mortgages are sometimes funneled into higher interest loans.

03:00:16   25    Donner said Household Finance, a company making 10 percent of

Gilmer - cross

1    all subprime loans, regularly makes loans to borrowers with

2    good credit at 12 percent for first and 24 percent for second

3    mortgages. 'That's a rate higher than a credit card,' Donner

4    said. 'For the privilege, borrowers are charged

03:00:39 5    7.5" percent -- I'm sorry -- "7.5 points."

6         Do you see that, Mr. Gilmer?

7    A.  I do.

8    Q.  Is this an article in a newspaper of general circulation

9    talking about the fact that Household charged 7.5 percent in

03:00:48 10   points?

11   A.  Yes, sir, it is.

12   Q.  All right.  And the sentence continues, or the paragraph

13   continues:  "To get out of the loan, you have to pay 5 or

14   6 percent of the loan out in prepayment penalties."

03:00:59 15        Do you see that?

16   A.  I do.

17   Q.  Is that a discussion in a newspaper of general circulation

18   about Household's use of prepayment penalties?

19   A.  Yes, sir.  It's one of many.

03:01:09 20   Q.  One of the many.  Was it well known to the public that

21   Household charged origination points as high as 7.5 percent

22   and that Household charged prepayment penalties as high as 5

23   or 6 percent to people who wanted to get out of Household

24   loans?

03:01:22 25   A.  It is true that the things that we have been discussing

Gilmer - cross

1269

      1   were well publicized.

      2   Q.  No secret.

      3   A.  None whatsoever.

      4          MR. KAVALER:  Your Honor, I believe this would be a

03:01:34  5   good time to break, since the next topic is longer.

      6          THE COURT:  Very well.

      7          Take our afternoon break, ladies and gentlemen.

      8   We'll resume in 20 minutes.

      9   (Jury exits courtroom.)

03:02:11 10          THE COURT:  Anything we need to take up?

     11          MR. KAVALER:  Nothing, your Honor.

     12          MR. DOWD:  No.

     13          THE COURT:  I'd like to ask a question.

     14          So approximately how many exhibits are there out

03:02:25 15   there that have neither been agreed to by the parties or ruled

     16   upon by me?

     17          I'm just trying to understand what the --

     18          MR. DOWD:  Your Honor, if I can respond.  My guess is

     19   it's not going to happen often.  I mean I think we had -- we

03:02:48 20   probably should have brought this one to the attention because

     21   they asked about it.  We spoke about it or exchanged e-mails.

     22   I didn't know whether that meant they were -- just decided not

     23   to use it or not, but that one was one that we hadn't

     24   resolved.

03:03:01 25         And then there's the issue with some of the audit

Gilmer - cross

1270

1    documents where we have an understanding that if they lay a

2    foundation with the witness, then, you know, so be it, which I

3    think we told the Court at the time.  I remember the Court

4    saying, well, that's always the way it is with a business

03:03:14  5    record.

6          But I think for the most part, I haven't seen -- I

7    don't think there's going to be many outstanding issues.

8          MR. KAVALER:  I can simply say, your Honor, and the

9    witnesses are prepared --

03:03:26 10          THE COURT:  I just want to have an idea.  I didn't

11    think this was going to be a major time-consuming factor in

12    the case, and if that's going to change, I just needed to

13    know.  That's all.

14          MR. KAVALER:  Your Honor, I generically agree with

03:03:42 15    Mr. Dowd.  I don't think it's going to be a significant

16    time-consuming factor.  There are a couple of exhibits here

17    and there that raise the issue.

18          I also, while we're doing generic housekeeping

19    things, your Honor, I've adopted the policy of moving

03:03:53 20    exhibits, but I continue to understand I don't have to do

21    that.  My understanding was under the local rule, if it's

22    identified in a pretrial order and it was not removed in the

23    objection process, it's in evidence; but I understand your

24    Honor's individual rules are that it has to be mentioned

03:04:08 25    during the proceedings in order to go to the jury.

Gilmer - cross

1    the position Household management took?

2    A.  Yes, that is correct.

3    Q.  And it continues, "investors should recall what happened

4    to Providian as well as another large consumer finance

03:41:18  5    company, The Associates, in 2000.  In other words, we are more

6    likely in the early stages of a pile-on effect that could

7    result in financial penalties, changes in sales tactics, and

8    lending practices, ultimately impacting both growth and

9    profitability."

03:41:34  10           Do you see that?

11   A.  I do.

12   Q.  And that is Ventana Capital telling its readers, this is a

13   bad development for the price of Household stock, correct?

14   A.  That's exactly what he is doing here.

03:41:44  15   Q.  You don't agree with him, do you?

16   A.  No.

17   Q.  Nevertheless, this was out in the marketplace?

18   A.  Right.

19   Q.  Available to the shareholders?  Was it available to the

03:41:54  20   shareholders, Mr. Gilmer?

21   A.  Yes, indeed it was.

22   Q.  Continuing.  "We personally believe" -- that's Ventana

23   Canyon's {sic} opinion, right?

24   A.  Right.

03:42:02  25   Q.  "We personally believe that some of Household's tactics

Gilmer - cross

1287

1   are predatory in nature, including the placement of second

2   mortgages on top of first mortgages in order to prevent

3   prepayment of the loan."

4            Do you see that sentence, Mr. Gilmer?

03:42:13  5   A.  I do.

6   Q.  Do you agree with that, that's predatory?

7   A.  Absolutely not.

8   Q.  Nevertheless, Ventana Capital is airing this statement in

9   public, right?

03:42:21 10   A.  They are.

11   Q.  Where did they get the information from that Household

12   sometimes places second mortgages on top of first mortgages?

13   A.  Well, that was publicly disclosed information.  We never

14   hid that.  That was part of our business proposition.

03:42:36 15   Q.  So you disclosed that you do it and Ventana Canyon --

16   Ventana Capital said, because you do it, you are a predatory

17   lender and people should sell your stock?

18   A.  That was their opinion.

19   Q.  Continuing.  "In fact, Household has openly discussed this

03:42:53 20   business practice with the investment community."

21            Is that a true statement, Mr. Gilmer?

22   A.  That is a true statement.

23   Q.  Do you mean to tell me that Household discussed with the

24   investment community the fact that it puts one mortgage on top

03:43:04 25   of another?

Gilmer - cross

         1    A.   We did.

         2    Q.   No secret?

         3    A.   None whatsoever.

         4    Q.   Then he says, "We have attached the ACORN suit for

03:43:13  5    leisurely reading."

         6             Do you see that?

         7    A.   I do.

         8    Q.   He says, "Specifically, we would recommend reviewing the

         9    section entitled 'Defendants' Wrongful Conduct' beginning at

03:43:22 10    Page 5."

        11             Do you see that?

        12    A.   I do.

        13    Q.   And this is dated February 8, 2002, correct?

        14    A.   That is right.

03:43:27 15    Q.   So everything I just read you was in the public domain on

        16    February 8th, 2002?

        17    A.   That's right.

        18    Q.   Let's go back and look at the chart.

        19             What's the next one?  Equity stripping.

03:43:40 20             Do you know what high LTV loans are?

        21    A.   I do.

        22    Q.   What is a high LTV loan?

        23    A.   It is a loan whose amount exceeds or nearly exceeds,

        24    depending on what your definition is, the value of the house

03:43:59 25    that is used as collateral.

Gilmer - cross

1289

1    Q.   Did Household make high LTV loans?

2    A.   We did.

3    Q.   Did other lenders make high LTV loans?

4    A.   They did.

03:44:08  5    Q.   Why would Household make a high LTV loan -- withdrawn.

6         What business purpose does it serve for the customer

7    to take a high LTV loan?

8    A.   They get their financial need met.  In other words, if

9    they need more money than can be -- than the value of their

03:44:26 10   home, they can find a lender who will lend them more than the

11   value of their home and they can buy a car, they can put the

12   child in college.  I mean, whatever their financial need may

13   have been, it would have been met.

14   Q.   Tell us what happens at the closing of a high LTV loan.

03:44:46 15   In other words, give us an example where the house is worth so

16   much, the loan is so much, make it 125 percent of the value.

17   Tell us, at the closing, where the money goes.

18        MR. DOWD:  Objection, your Honor.  Sounds like expert

19   testimony of some sort.

03:44:58 20        THE COURT:  I am sorry?

21        MR. DOWD:  Objection.  It sounds like some sort of

22   expert testimony; lack of foundation.

23        MR. KAVALER:  It's the antithesis of this, your

24   Honor.  The foundation is the 32 years this man worked in this

03:45:07 25   business making these kinds of loans.

Gilmer - cross

1    knowledge.

2              THE COURT:  Sustained.

3    BY MR. KAVALER:

4    Q.  Mr. Gilmer, were you involved in supervising the rendition

03:45:55   5    by Household of services to customers in selling high LTV

6    loans?

7    A.  Yes.

8    Q.  How did you intend a high LTV loan to work?

9    A.  All right.  An example would be where a customer would

03:46:07  10    come into the office and need $125,000, as an example, to buy

11    a house or pay off a house, buy a car, as I mentioned earlier,

12    put their child in college.  In other words, the totality of

13    the monies that they needed -- let me back up.

14              And the house that they were using for collateral was

03:46:34  15    worth $100,000.  So they needed 125,000.  The house was worth

16    100,000.

17              So we would make a loan for $125,000, which would

18    meet all the needs of the -- by that, I mean buy the house --

19    it could be buy the house and buy the car, put the kid in

03:46:54  20    school.

21              So that's called a high LTV loan.

22              Now, that's what it is.  That's how it works.  That's

23    how it's explained to the customer.  It meets the customer's

24    needs.

03:47:05  25    Q.  And in that instance, Mr. Gilmer, would the customer get

Gilmer - cross

1292

1    the benefit of the entire $125,000?

2    A.   Indeed.

3    Q.   So at the closing, the customer would get $125,000, either

4    to buy the house or pay off a prior loan, and the rest of it

03:47:24  5    in a check?

6    A.   That's correct.

7    Q.   Did Household utilize high LTV loans as an excuse to tack

8    on fees and insurance?

9    A.   Absolutely not.

03:47:37  10   Q.   Was there a discussion in the marketplace of the wisdom of

11   this practice?

12   A.   Yes, sir.

13   Q.   Is this also something that the analysts commented on from

14   time to time?

03:48:00  15   A.   They did.

16   Q.   Let me show you Defendants' 91.

17        (Document tendered.)

18            MR. KAVALER:   Copy to counsel.

19        (Document tendered.)

03:48:11  20   BY THE WITNESS:

21   A.   Thank you.

22   BY MR. KAVALER:

23   Q.   Mr. Gilmer, is this a Legg Mason analyst report about

24   Household dated March 16th, 2000?

03:48:18  25   A.   It is.

Gilmer - cross

1293

1          MR. KAVALER:  I offer Defendants' 91, your Honor.

2          MR. DOWD:  This is another exhibit with a limiting

3     instruction, your Honor.

4          MR. KAVALER:  Correct, your Honor.  Same limitation.

03:48:26  5          THE COURT:  It will be admitted.

6      (Said exhibit was received in evidence.)

7     BY MR. KAVALER:

8     Q.  Mr. Gilmer, is this another report by one of the analysts

9     who covered Household during the time period that you were the

03:48:34 10    head of consumer lending?

11    A.  That is correct.

12    Q.  All right.  Go down to the third paragraph, which starts

13    off, "Whole lot of lending going on."

14          Do you see that?

03:48:44 15    A.  I do.

16    Q.  It says, "A key part of Household's growth strategy has

17    been to write the largest home equity loan it prudently can."

18          Is that true?

19    A.  That's correct.

03:48:53 20    Q.  Did Household disclose to the marketplace that that was a

21    key part of its growth strategy?

22    A.  Obviously.  And this is a good example of that in

23    evidence.

24    Q.  Now, Mr. Gilmer, is that the same growth strategy that

03:49:05 25    Mr. Dowd began your examination with yesterday when he asked

Gilmer - cross

1294

1    you about you implementing a growth strategy or "the pencil in

2    the eyeball" e-mail?

3    A.  I assume that's what he meant.

4    Q.  And the fact that Household was engaged in a growth

03:49:20  5    strategy was no secret from the marketplace, was it?

6    A.  None whatsoever.

7    Q.  Did you participate in telling the marketplace that

8    Household was engaged in growth strategy?

9    A.  Many times.

03:49:28 10    Q.  Is this an analyst report talking about Household's

11    implementation of its growth strategy?

12    A.  It is.

13    Q.  Let me continue.  "The company had found itself vulnerable

14    to lenders that would target a Household customer with a

03:49:47 15    75 percent loan-to-value (LTV) home equity loan and write a

16    new larger loan at 85 percent."

17         What does that refer to, Mr. Gilmer?

18    A.  In years past we had different types of products

19    available.  Some were more limited in size and loan-to-value

03:50:06 20    limits than others.

21         So what he is saying here is, our previous strategy

22    of having a limit of 75 percent LTV -- meaning a customer

23    comes in with a $100,000 house, the biggest loan we could make

24    under that policy was 75,000.

03:50:24 25         What he is saying here is that our competitors would

Gilmer - cross

1    come in and take one of our customers by saying, we will make

2    you a loan to 85 percent, or 85,000.  We can make you a bigger

3    loan than Household.  He is describing that here.

4    Q.  And you would lose that customer?

03:50:40  5    A.  We would lose that customer.

6    Q.  Is that good or bad for the shareholders?

7    A.  That's terrible for the shareholders.

8    Q.  Was that something you wanted to put a stop to?

9    A.  I did indeed.

03:50:48  10    Q.  And did you design products and services to put a stop to

11    that?

12    A.  We did.

13    Q.  Was one of them high LTV loans?

14    A.  That is correct.

03:50:57  15    Q.  The article continues.  "HI's strategy is to preempt such

16    a move without increasing overall risk inherent in a loan with

17    a greater advance, higher LTV, and lower equity cushion."

18         Please explain those terms to us, Mr. Gilmer.

19         What is your strategy and what do those words mean?

03:51:18  20         The words I am talking about, Mr. Gilmer, are

21    "greater advance" -- "higher LTV" you have already defined --

22    "lower equity cushion."

23    A.  Okay.  In other words, equity cushion is the amount of, I

24    can't think of a better word than "cushion" that a lender

03:51:34  25    would enjoy or have the benefit of if a customer decided not

Gilmer - cross

1296

1    to pay.

2         So if you only made -- if you made loans, for

3    example, to 75 percent, you would have a considerable cushion.

4    That means you would have a 25 percent cushion beyond which to

03:51:49  5    protect your balance in the event you ever had to foreclose.

6         That cushion would drop if you went to 95 percent.

7    That cushion would drop to 5 percent.

8         So it was a calculation depending -- that depended on

9    the size of the customer's loan balance versus the value of

03:52:06 10    the house.

11   Q.  Then he continues.  He says, "Offensively" -- or I should

12   say "they."

13        Legg Mason continues.  "Offensively, Household's

14   strategy results in a larger loan which should drive a higher

03:52:18 15   closing rate and a tighter and longer customer relationship."

16        Was that your goal, Mr. Gilmer?

17   A.  That is correct.  It was.

18   Q.  So Legg Mason correctly understood your goal and your

19   policy?

03:52:28 20   A.  They did.

21   Q.  Then it says, "Defensively, prepayment risk is reduced as

22   the higher LTV and smaller equity cushion leave little room

23   for another lender to steal HI's customer away and make a

24   larger loan -- unless the lender is willing to advance even

03:52:46 25   more -- generally requiring a 100 percent plus LTV loan and/or

Gilmer - cross

1    reduce the interest rate."

2         Do you see that?

3    A.   That is correct.

4    Q.   Was that a correct assessment of your strategy?

03:52:57  5    A.   That is.

6    Q.   And did it work?

7    A.   It did indeed.

8    Q.   Now, is this what you understood -- withdrawn?

9         You have heard the phrase "closing the back door"?

03:53:14 10    A.   Yes, I have.

11    Q.   Is this what that refers to?

12    A.   I have never used that phrase.  But I believe, as it was

13    explained the other day, that would be a part of this.

14    Q.   What is the goal of strategies like this?  Is it to keep

03:53:31 15    the customer?

16    A.   It's twofold.

17         It is to, number one, have a product available that

18    meets the customer's needs.  If the 75 percent, the smaller

19    loan, doesn't meet your customer's needs, you have to think

03:53:46 20    about a way to do that.  That means you have to adjust your

21    product.  So obviously that's number one.

22         Number two, having met the customer's need, it is

23    much less likely that the customer is going to go someplace

24    else and take out a loan with one of your competitors.  So

03:54:05 25    it's a win-win.  The customer wins, the shareholder wins.  And

Gilmer - cross

1298

1    that's the way it works.

2    Q.  And the last sentence is, "Higher" -- the last sentence

3    I'm going to read you, rather, is, "Higher LTV loans are

4    inherently more risky, all else being equal, and as expected,

03:54:23 5    HI underwrites and prices for this risk."

6         Do you see that?

7    A.  Yes.

8    Q.  What does that mean?

9    A.  That means that, of course if you make a loan that is

03:54:32 10   equal to or exceeds the value of someone's house, as the

11   lender, you take on more risk.

12        As I mentioned earlier, in the event that the

13   customer doesn't pay, then obviously you have a problem

14   because you have a house that, when you sell it, you may well

03:54:49 15   not get all of your money back.

16        So how do you handle that?  You handle it by charging

17   a higher price for the higher risk.  That's what he is talking

18   about here in this sentence.

19   Q.  Mr. Gilmer, whatever one might think about the wisdom, the

03:55:08 20   business wisdom, or the social utility of the strategy we are

21   talking about here, it wasn't a secret, was it?

22   A.  Not at all.  It's clearly outlined here in this report, as

23   a matter of fact.

24   Q.  And shareholders can buy or sell the stock as they see

03:55:25 25   fit?

Gilmer - cross

1   A.  They can indeed.

2   Q.  And they all have access to this information?

3   A.  They do.

4   Q.  Some will buy, some will sell?

03:55:32  5   A.  Correct.

6   Q.  The next item on the chart is "Prepayment Penalties."

7       You have already told us what a prepayment penalty

8   is.

9       I believe this morning you were talking about AMTPA,

03:55:47  10  and Mr. Dowd cut you off.

11      Do you recall the question and the answer about

12  AMTPA?

13  A.  I don't recall the question.  I do recall that I was about

14  to explain -- I don't remember exactly what the question was,

03:56:01  15  but I do recall I was about to explain what AMTPA was and how

16  we used it.

17  Q.  Explain what AMTPA was and how you used it.

18  A.  AMTPA was a law passed by Congress, the United States

19  Congress, in about 1982.  The reason they passed that law was

03:56:14  20  to increase the availability of credit back at that time.  The

21  early '80s were a very difficult economic time.  Credit was

22  not readily available across the country, and it was uneven in

23  places.

24      So they passed a law that said, there are rules and

03:56:34  25  regulations that will apply and will overrule state laws and

Gilmer - cross

1314

1   A.  No.

2   Q.  Was he ever an employee of Household?

3   A.  No.

4   Q.  Did he speak for Household?

04:14:55  5   A.  No.

6   Q.  Did he have the ability to implement policy at Household?

7   A.  Absolutely not.

8   Q.  Did he suggest a number of ideas to Household when you

9   were head of consumer lending?

04:15:06  10   A.  He did.

11   Q.  We saw a document yesterday that suggested that he

12   suggested 60 ideas, of which 50 were rejected out of hand, ten

13   were looked at further, and a couple were pursued even

14   further.

04:15:17  15         Do you remember that?

16   A.  I do.

17   Q.  Did those ideas go through the same vetting process you

18   just described for ideas submitted by customers, ideas

19   submitted by employees, or ideas generated by you?

04:15:29  20   A.  They were subjected to the same rigorous process.

21   Q.  At the end of the day, if one of Mr. Kahr's ideas had been

22   adopted, who would be responsible for the end results?

23   A.  I would.

24   Q.  If consumer lending adopted a product, that product was

04:15:41  25   your responsibility?

Gilmer - cross

1   A.  It was.

2   Q.  Without regard to who came up with the idea?

3   A.  That's true.

4   Q.  What kind of discussions -- withdrawn.

04:15:54  5        Were there discussions in the marketplace about

6   Household's ongoing efforts to grow its business?

7   A.  Yes, there were.

8   Q.  Let me show you Defendants' 78.

9        (Document tendered.)

04:16:13 10        MR. KAVALER:  Let the record reflect I gave a copy to

11  counsel.

12  BY MR. KAVALER:

13  Q.  Mr. Gilmer, is this a memorandum circulated to various

14  people at Household on April 14th, 1998?

04:16:50 15 A.  Yes, it is.

16  Q.  Okay.  And turn to the second page.

17        Do you see the name Celeste Murphy?

18  A.  I do.

19  Q.  Do you know who Celeste Murphy was?

04:16:59 20 A.  I do.

21  Q.  Who was Celeste Murphy?

22  A.  She worked in the investor relations group.

23  Q.  And is this transmitting a first-call research report from

24  William Blair & Company?  And then a couple pages later, a

04:17:14 25 research report, an equity research report, from Bear, Stearns

Gilmer - cross

1316

```
         1   & Company?

         2   A.  Yes, sir, it is.

         3           MR. KAVALER:  I offer Defendants' 78, your Honor.

         4           MR. DOWD:  This is another document with a limiting

04:17:27 5   instruction, your Honor.

         6           MR. KAVALER:  I agree, your Honor.

         7           THE COURT:  It will be admitted with a limiting

         8   instruction.

         9   (Said exhibit was received in evidence.)

04:17:33 10  BY MR. KAVALER:

         11  Q.  Mr. Gilmer, if you turn to the Bear, Stearns analyst

         12  report, which begins at the page beginning 697, it says,

         13  "Household International buy."

         14          Do you see that?

04:17:48 15  A.  Hang on one second.

         16  Q.  Page ending 697.  It's about the middle of the document.

         17  A.  Okay.

         18  Q.  The page numbers I am referring to are down in the lower

         19  right-hand corner.

04:17:55 20  A.  697.  I am on 697, middle of the document.  "While

         21  there" --

         22  Q.  No, no.  The black heading.  Bear, Stearns research,

         23  equity research --

         24  A.  All the way at the top.  I do see that.

04:18:06 25  Q.  "Household International buy."  Then it says, "Annual
```

Gilmer - cross

1317

```
        1   conference for investors.  Asset and earnings growth on track
        2   for 1998."
        3           Do you see that?
        4   A.  I am sure I will in just a second here.  Toward the end of
04:18:18 5   the day my eyes are not quite what they were.
        6   Q.  Look in the middle of the page.
        7   A.  Middle of the page.
        8   Q.  Down -- come down about two inches from the top.
        9   A.  Okay.
04:18:32 10  Q.  Do you see the heading there?
        11  A.  "Annual Conference for Investors."  I am sorry.  I do.
        12  It's in the dark print.
        13  Q.  It's in the dark print.
        14  A.  I see it.
04:18:40 15  Q.  Okay.  This was an annual conference that Household held?
        16  A.  Right.
        17  Q.  Do you see it says underneath that, "Household held its
        18  annual meeting for commercial bankers, and this year included
        19  equity investors/analysts as well."  Correct?
04:18:54 20  A.  I see it.
        21  Q.  "Equity investors" is another word for shareholders?
        22  A.  That's right.
        23  Q.  Okay.  Turn two pages, to the page ending 699.  Look at
        24  the top of that page.
04:19:01 25  A.  Right.
```

Gilmer - cross

1318

1   Q.  It says, "Gary Gilmer, who is now the senior executive in

2   charge of HFC, presented a review of the business."

3         That's you?

4   A.  That's me.

04:19:09  5   Q.  This is right after you took over the business?

6   A.  That's correct.

7   Q.  "HFC continues to seek to generate loan growth by

8   (1) increasing its new originations and reducing profits" --

9   "and (2) reducing profits.  In addition to growth, there is

04:19:22 10   also a focus on maintaining credit quality."

11         Did you say those things, Mr. Gilmer?

12   A.  I did.

13   Q.  "To increase growth, the company plans to target its

14   marketing efforts and refine its compensation system to

04:19:34 15   encourage the origination of more real estate-secured loans."

16         Did you say that, Mr. Gilmer?

17   A.  Yes, I do.

18   Q.  There also -- there has been -- let me start again.

19         "There has also been an increased emphasis on selling

04:19:46 20   real estate-secured loans to existing unsecured customers

21   (private label and personal unsecured) in an effort to

22   increase the proportion of real estate-secured lending."

23         Do you see that?

24   A.  Right.

04:19:57 25   Q.  Mr. Gilmer, did you disclose to the investing public as

Gilmer - cross

1319

1    early as the middle of -- early part of 1998 precisely the

2    emphasis on growth?

3    A.  I did indeed.

4    Q.  That Mr. Dowd asked you about yesterday at the beginning

04:20:15  5    of your examination?

6    A.  Yes, sir.

7    Q.  Did you keep secret from the marketplace the fact that

8    your policy as the head of consumer lending at Household

9    International would be to press for growth?

04:20:28  10   A.  There were no secrets.

11   Q.  Mr. Gilmer, was this research piece available to anybody

12   in the marketplace who wanted to see it?

13   A.  It would have been.

14   Q.  So when all of the talk about -- other than "the pencil in

04:20:43  15   the eye" -- about growth was had yesterday, that was something

16   known to all the investors in Household back in early 1998,

17   correct?

18   A.  I was determined to make sure that they knew it.

19   Q.  You were proud of it?

04:20:57  20   A.  I was very proud of it.

21   Q.  You thought it was a great thing?

22   A.  It was a great thing.

23        MR. KAVALER:  Your Honor, this would be a good place

24   to break for the day because the next topic I am going to

04:21:07  25   begin can't possibly be finished in the next couple of

Gilmer - cross

1    minutes.  Or I will be happy to start.  I thought you wanted

2    to break at 4:20.

3              THE COURT:  We will break for the day.

4              MR. KAVALER:  Very good, your Honor.  Thank you.

04:21:22  5         THE COURT:  Ladies and gentlemen, that's the

6    testimony for today.  We will resume tomorrow at the same

7    time.

8              As always, please do not discuss the case with

9    anyone.  Do not allow anyone to discuss it with you.

04:21:35 10         Have a good evening.  We will see you tomorrow.

11         (Jury out at 4:21 p.m.)

12              THE COURT:  You may step down.

13              Anything we need to take up before we adjourn?

14              MR. KAVALER:  Your Honor, I just saw the look on your

04:22:05 15   face just now.  I apologize if I misunderstood.  I thought you

16    wanted to break at 4:20 because a couple of the jurors wanted

17    to leave at 4:20.  I would be delighted to go until 4:30.

18              THE COURT:  No.  You are absolutely correct.  I am

19    just looking at the pace, and it's not real great.

04:22:21 20         Now, I guess it's maybe time -- since we have

21    essentially a new composition to the jury, maybe it's time to

22    approach the jurors that we have left with the idea of

23    spending a little more time in court, making our days a little

24    bit longer.  So possibly tomorrow morning it would be a good

04:22:43 25   idea to do that.

TAB 13

1323

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all    )
 4   others similarly situated,     )
                                    )
 5            Plaintiff,            )
                                    )
 6      vs.                         )  No. 02 C 5893
                                    )
 7   HOUSEHOLD INTERNATIONAL, INC., )
     et al.,                        )  Chicago, Illinois
 8                                  )  April 8, 2009
              Defendants.           )  9:45 a.m.
 9                         VOLUME 7
10              TRANSCRIPT OF PROCEEDINGS - TRIAL
        BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:      COUGHLIN STOIA GELLER RUDMAN &
                             ROBBINS LLP
14                           BY:  MR. LAWRENCE A. ABEL
                                  MR. SPENCER A. BURKHOLZ
15                                MR. MICHAEL J. DOWD
                                  MR. DANIEL S. DROSMAN
16                                MS. MAUREEN E. MUELLER
                             655 West Broadway
17                           Suite 1900
                             San Diego, California  92101
18                           (619) 231-1058

19                           COUGHLIN STOIA GELLER RUDMAN &
                             ROBBINS LLP
20                           BY:  MR. DAVID CAMERON BAKER
                                  MR. LUKE O. BROOKS
21                                MR. JASON C. DAVIS
                                  MS. AZRA Z. MEHDI
22                           100 Pine Street
                             Suite 2600
23                           San Francisco, California  94111
                             (415) 288-4545
24

25
```

Gilmer - cross

1    A.  That's right.

2    Q.  And the first time they fixed it, it didn't work?

3    A.  Yes, that's right, it certainly didn't.  We made a fix.

4    We had the accounting and people who would be responsible for

10:14:23  5    determining which calculations should be employed work with

6    the systems people.  They put in a fix they thought would make

7    this right.  Apparently there was a glitch in the system.

8    And, you know, when you think things can go -- can't go from

9    bad to worse, it did because we didn't catch them all.  We

10:14:43  10    caught some of them or some percentage of them, but we didn't

11    catch all of them.

12    Q.  The last line on the first page of that press release,

13    down at the bottom, the last paragraph reads, Household's

14    corrective actions resulted in a June 19, 2001, press release

10:14:57  15    issued by the Department of Corporations commending Household

16    for its commitment to fully refund their customers.

17            Do you see that?

18    A.  I do.

19    Q.  Is that accurate?

10:15:07  20    A.  It is.

21    Q.  Did you make every effort you could to resolve this

22    problem with California?

23    A.  Yes, sir.

24    Q.  Now, counsel for the investors showed you Plaintiffs'

10:15:22  25    Exhibit 1307, which is now in evidence.  Let me see if I have

Gilmer - cross

1349

1    another copy of that, save everybody the trouble of finding

2    theirs.

3         Here's one for counsel and here's one for you,

4    Mr. Gilmer.

5    (Tendered.)

6    BY MR. KAVALER:

7    Q.  It's the same document you were looking at yesterday,

8    isn't it?

9    A.  Yes, sir, it appears to be.

10:15:53 10    Q.  Now, Mr. Gilmer, this is a story that appeared in

11    something called Origination News on March 23, 2001?

12    A.  That's right.

13    Q.  Okay.  And investors' counsel read you some portions of it

14    yesterday.  I'd like to read you some other portions.

10:16:10 15        Let's start with the third full paragraph down.  This

16    is a news story.  And it says, Unlike many companies in the

17    mortgage industry, Household said it actively supported the

18    creation of the Homeowners Equity Protection Act back in 1993

19    and 1994.

10:16:27 20        Is that an accurate statement?

21    A.  That is.

22    Q.  What was the Homeowners Equity Protection Act?

23    A.  It was a set of rules designed to protect consumers in

24    mortgage transactions that affected their homes.

10:16:42 25    Q.  Did Household support that act?

Gilmer - cross

1350

1   A.  Yes, indeed.

2   Q.  How did Household support that act?

3   A.  Well, as -- the same way we would any other public issue.

4   We came out in favor of it.  We contributed to it, in the

10:16:54 5   sense that we made suggestions on how to make it better.  And

6   we went public in all the media saying we're in favor of this.

7        By the way, we weren't particularly popular when we

8   did that because most of the subprime industry -- at least a

9   substantial part it -- said, hey, you know, we don't -- we

10:17:09 10   don't want to do that.  And -- but, you know, we took the

11   position that it was good for our customers.  It would be good

12   for our industry.  If that was the case, it would be good for

13   our company.

14   Q.  And that was federal legislation?

10:17:21 15   A.  That's right.

16   Q.  Now, counsel for the investors asked you yesterday about

17   some Illinois statute, something about making statewide --

18   something that was part of a Chicago ordinance.

19        Do you remember that?

10:17:29 20   A.  That's correct, I do remember that.

21   Q.  Did Household have a preference for comprehensive national

22   legislation or state-by-state regulation?

23   A.  We had a preference for national legislation.

24   Q.  Why?

10:17:40 25   A.  Because, as I mentioned earlier, we operated in 45 states.

Gilmer - cross

1351

1    Each of the 45 states had their own separate rules, required

2    their own separate documents.  And it was a nightmare to try

3    and keep up with all of those things.  And no matter what your

4    systems, if you have, you know, thousands of rules in 45

10:18:00  5    states to try and comply with, the opportunity for error was

6    clear and obvious.  So what we wanted to do was move away from

7    that and ask, look, just give us a set of rules, one set of

8    rules that we can use, one set of documents that we could use

9    and -- whatever that is; and we will stick with that.  So that

10:18:20  10    was our -- and it was obviously good for us because it saved a

11    lot of money at the end of the day.

12    Q.  Let's go to the next sentence here.  That's the one

13    counsel read to you.  It quotes you, Mr. Gilmer.  It says,

14    Gary Gilmer, president and chief executive of Household's

10:18:37  15    subsidiaries HFC and Beneficial, said the company's position

16    on predatory lending is perfectly clear.  Quote, Unethical

17    lending practices of any kind are abhorrent to our company,

18    our employees and most importantly our customers.

19         Do you see that?

10:18:54  20    A.  I do.

21    Q.  Mr. Gilmer, was that statement true when you made it?

22    A.  Absolutely.

23    Q.  Why do you say that, sir?

24    A.  Well, because it was my long-stated, long-held and, in

10:19:05  25    fact, currently-held view that there is just no place in any

Gilmer - cross

1352

1    business -- and certainly not in a business where you have the

2    trust of your customers, where that's important -- so

3    important, in fact, it involves their homes -- where you could

4    have a -- tolerate a circumstance where there's any less than

10:19:26  5    absolute honesty and integrity.  Just couldn't have it.

6         So it's another example, in addition to the ones that

7    we talked about earlier, where I took the opportunity to say

8    that publicly.

9    Q.  Mr. Gilmer, was that statement false when you made it?

10:19:39 10    A.  Absolutely not.

11    Q.  Did you think it was false when you made it?

12    A.  No.

13    Q.  Did you have any doubt in your mind about the truth of

14    that statement when you made it?

10:19:49 15    A.  None whatsoever.

16    Q.  Did you think you were being reckless in making that

17    statement?

18    A.  No, I didn't think I was reckless.  I thought it was

19    absolutely factual.

10:19:59 20    Q.  Did you have any discomfort at all in making that

21    statement publicly?

22    A.  I had none then and I have none today.

23    Q.  Did you understand, sir, that investors -- current and

24    potential future investors -- might read that statement and

10:20:12 25    rely on it as an accurate statement of facts?

Gilmer - cross

1353

1    A.    Sure.

2    Q.    Did you believe it to be an accurate statement of facts?

3    A.    I did indeed.

4    Q.    Did you intend to mislead or deceive anybody when you made

10:20:21    5    that statement?

6    A.    No.

7    Q.    Do you think you misled or deceived anybody when you made

8    that statement?

9    A.    No, sir.

10:20:26   10    Q.    Now, Mr. Gilmer, you've been sitting in this courtroom

11    since this trial began, right?

12    A.    I have indeed.

13    Q.    And you've heard various testimony about various things,

14    about various regulators and various examinations around the

10:20:39   15    country?

16    A.    I have.

17    Q.    How can you give the testimony you just gave in light of

18    those facts?

19          You said earlier you were responsible for everything

10:20:47   20    that happens in consumer lending.  And you've heard all this

21    testimony, whatever it is, whatever it means; and you say the

22    statement that you just made here, unethical lending practices

23    of any type are abhorrent to our company, our employees and

24    most importantly our customers.  How can you swear that with

10:21:05   25    what you've heard here?

Gilmer - cross

1354

1    A.    I don't believe it is in conflict whatsoever because while

2    it is true that among the millions of accounts and thousands

3    and thousands of employees that we have had and have at

4    Household and Beneficial, not every one every day did the

10:21:26  5    right thing.  They're not any different from -- I'd say the

6    people in this courtroom.

7              But it is absolutely true that day in and day out,

8    these were good people.  And they did the right thing every

9    day.  They came in and did the right thing.  I'm talking about

10:21:46 10    the 99 point something percent.  Pick a number you like.  Say

11    I'm way off and it's 95 percent.  And I wouldn't tar 15,000

12    people with a label of predatory lending on the basis of a few

13    bad apples.  What -- what kind of a leader would I be if I

14    refused to stand up for the tens of thousands of people that

10:22:21 15    gave it their best every day and say, okay, well, they were --

16    they're all bad people because somebody made a mistake or

17    somebody didn't care or somebody in the organization didn't

18    follow the rules?

19              So I was proud to stand up and make that statement.

10:22:37 20    It was accurate.  I believed in it, and I believe in the good

21    side of people; and I believe in the good side of our people.

22    I trained those people.  I hired those people.  I set the

23    example for those people, and they did the right thing.

24              Yeah, you know, we saw some examples of some people

10:22:53 25    who didn't do the right thing, Mr. Kavaler.  That didn't have

Gilmer - cross

1355

1   anything to do with the vast majority of them who did and who

2   do the right thing every day.  So I stand by that.  Yes, there

3   were reports -- I've seen them; we talked about them; what

4   about this page; what about that example.  They were real

10:23:11  5   examples.  No question about that.

6        And I know it had been said earlier on this stand

7   that percentages don't matter, that -- I don't calculate

8   ratios.  I heard that time after time.  It doesn't make any

9   difference.  Well, I tell you, it does make a difference.  I

10:23:30 10  don't live in a fantasy world.  I live in a world where there

11  are real people doing real work with real customers and

12  looking after real shareholders.  So I can't, as a manager of

13  a 15,000 person operation, stand up and say, well, we made a

14  mistake so we're all bad people.  We're all crooks.  That's

10:23:50 15  not a real world.  That's -- that doesn't work.  I mean, that

16  works, I guess, if you don't have to deal with people and

17  problems and regulators and shareholders.  Maybe that works.

18  But I tell you what, when you step out into the real world,

19  Mr. Kavaler, and you're dealing with real people, you can't

10:24:06 20  take the view that you make one mistake and you're dead.  That

21  doesn't work.

22  Q.  Mr. Gilmer, have you just described what your state of

23  mind was back then -- everything you testified to now, is that

24  what you were thinking back on March 23, 2001?

10:24:20 25  A.  Indeed it was.

Gilmer - cross

1    Q.   The article in Origination News continues.  It looks like

2    it's still quoting you.  Next paragraph, We are encouraged

3    that the Federal Reserve Board has taken a deliberate and

4    inclusive review of the issue and has set the benchmark for

10:24:50  5    guidelines that ensure our customers are protected from

6    unscrupulous lenders, while at the same time do not have their

7    access to credit restricted.

8         Does that reflect your thinking at the time,

9    Mr. Gilmer?

10:25:02 10    A.   Yes, sir, it does.

11    Q.   And it says, Household -- this is now the article not

12    quoting you, simply the journalist reporting -- the entity

13    reporting in its own words.  Household has a long-standing

14    history, the company noted, of working with legislators and

10:25:16 15    regulators in the pursuit of responsible lending.

16         Is that true, Mr. Gilmer --

17    A.   That is right.

18    Q.   -- that the company has that history?

19    A.   It does indeed.

10:25:26 20    Q.   Mr. Gilmer, did you ever lie to the public, to the

21    investors, to the press, to the analyst community about the

22    business or the affairs of Household in any way?

23    A.   Not one time.

24    Q.   Did you ever instruct anyone else to do so?

10:25:44 25    A.   No, sir.

Gilmer - cross

1357

1    Q.   Did anyone ever instruct you to do so?

2    A.   No, sir.

3    Q.   Did you ever conceal any information from the public, the

4    investment community, the press or anyone else about the

10:25:54  5    affairs of Household that you deemed material or important?

6    A.   No, sir.

7    Q.   Did you tell anyone else to do that?

8    A.   No, sir.

9    Q.   Did you ever instruct any of Household's public relations

10:26:05 10    spokespeople to lie to the press?

11    A.   Not one time ever.

12    Q.   Did you ever instruct any of Household's public relations

13    spokespeople to conceal anything from the press or the

14    investment community or the investors or the public or the

10:26:17 15    government or anyone?

16    A.   No, sir.

17    Q.   Mr. Gilmer, did you ever conceal the existence of a

18    pervasive, nationwide, widespread predatory lending scheme?

19    A.   No, sir.

10:26:30 20    Q.   Did you believe that such a scheme existed at Household?

21    A.   Absolutely not.

22    Q.   Did you ever conceal or urge anyone else to conceal that

23    Household used restructuring to hide the true credit quality

24    of Household's loans?

10:26:47 25    A.   Never.

Gilmer - cross

1358

1    Q.  Did Household do that?

2    A.  No.

3    Q.  Did you think Household did that?

4    A.  No.

10:26:53  5    Q.  Did you have any suspicion that Household was doing that?

6    A.  No, sir.

7    Q.  Now, Mr. Gilmer, we heard some brief reference in the

8    opening statement to something about an accounting

9    restatement, having to do with the credit card business.

10:27:11  10         Did the credit card business report to you?

11   A.  No, sir.

12   Q.  Did you have anything to do with that restatement?

13   A.  No, sir.

14   Q.  Mr. Gilmer, during the time we're talking about here, did

10:27:22  15   you personally own any stock in Household?

16   A.  Yes, sir, I did.

17   Q.  And where did you obtain that stock?  Tell me all the

18   different ways in which you obtained Household stock during

19   the years 1998 through 2002.

10:27:38  20   A.  Well, it didn't start in 1998.  It started in 1972.  We

21   bought -- Marilyn and I bought our first five shares in 1972.

22   And every year after that, we bought shares.  We took our own

23   money and we bought shares.

24         In addition to that, there were times when Household,

10:27:57  25   as a part of our compensation program, would give us shares,

Gilmer - cross

1359

1       even back in the old days.  There were times when, if you, as

2       an employee, would buy a share of stock, the company would

3       give you a share of stock.

4               On every occasion where those opportunities arose,

10:28:20  5     we -- we took advantage of the opportunity to increase our

6       ownership in this company.

7       Q.  Why?

8       A.  Because it was my life.  I mean, I had -- everything I

9       did, all of my thoughts were invested in this company.  And I

10:28:36 10     believed in this company.  And while there were tremendous

11      opportunities, I guess, and a wide variety of opportunities in

12      the marketplace to buy stock in other companies, I didn't do

13      that.  I didn't know about other companies like I knew about

14      Household.  I didn't know about the products and the services.

10:28:54 15     I didn't know about the training programs.  I didn't know

16      about the people.  I didn't know about the customers.  But I

17      understood all of those things about the company that I worked

18      for.  And I felt that the best opportunity for me and for my

19      family was to invest in what we believed in and what we

10:29:11 20     understood.

21      Q.  Sir --

22      A.  And so that's what we did.

23      Q.  I apologize.

24              You used the phrase Marilyn and I used our own money.

10:29:19 25     What did you mean by that?

Gilmer - cross

1360

1    A.  Well, we didn't have very much of it; but what we had and

2    where there was the opportunity, we used money that I was paid

3    in salary or -- and she worked at part-time jobs from time to

4    time.  As a mother, she never really worked full-time, but --

10:29:38    5    so if we'd have extra money, we'd buy stock with it.  And we'd

6    hang on to that stock.

7    Q.  Is that stock that you went into the marketplace and

8    bought just like any customer, any public customer could?

9    A.  Yes, sir.

10:29:50    10    Q.  Public investor rather?

11    A.  That is correct.

12    Q.  And what did you pay for that stock when you bought it?

13    A.  Whatever it was selling for at the time.

14    Q.  Mr. Dowd asked you a bunch of questions about $11 and $55

10:30:00    15    and all that stuff, which I didn't quite follow.  Those are

16    instances where you went into the market and you bought the

17    stock at whatever it was trading for that day on the New York

18    Stock Exchange, just like any public investor?

19    A.  Just like anybody in this room would do.

10:30:15    20    Q.  And during the period, Mr. Dowd -- I'm sorry, Mr. Gilmer,

21    from July 30, 1999, through October 11, 2002, did your

22    holdings in Household increase, decrease or stay flat?

23    A.  They increased.

24    Q.  Have we prepared a demonstrative that shows your holdings

10:30:41    25    during that time period?

Gilmer - cross

1361

         1   A.  Yes, we have.

         2        MR. KAVALER:  Can we see Defendants' Demonstrative, I

         3   guess, 189-06.

         4   BY MR. KAVALER:

10:30:49 5   Q.  Mr. Gilmer, what does this demonstrative show?

         6   A.  Is this not working?

         7   Q.  You're asking the wrong person.

         8     (Brief pause.)

         9   BY MR. KAVALER:

10:31:20 10  Q.  Okay.  What does this demonstrative show, Mr. Gilmer?

        11   A.  It shows that in 1999 at -- July 30, 1999, we had

        12   accumulated about something north, I guess, of 400,000 shares.

        13   We continued to accumulate shares, so that at October the

        14   11th, 2002, we were up to about 900,000 shares.

10:31:53 15  Q.  So your position more than doubled during the period?

        16   A.  Yes, it did.

        17   Q.  Mr. Gilmer, do you understand how stock options work?

        18   A.  Yes, sir, I do.

        19   Q.  Did you exercise any stock options during this period?

10:32:07 20  A.  I did at one point in time and maybe at a couple of points

        21   in time.  As you can see, it looks like there's a slight

        22   decrease in ownership in 2001.  That may have been -- I don't

        23   remember all the details.  It may have been a time when I

        24   exercised some stock options.

10:32:25 25  Q.  Without going into a lengthy explanation of how stock

Gilmer - cross

1362

1    options work, does that involve getting some -- exercising an

2    option, getting some stock, selling some stock to pay the

3    taxes and keeping the net amount of stock?

4    A.   It can be, yes, indeed.

10:32:38  5    Q.   Did you ever sell any stock during this period for any

6    other purpose?

7    A.   Yes, yes.

8    Q.   When did you do that?

9    A.   I remember an occasion where we sold a little bit when

10:32:46 10    we -- when we started to retire and we were going to build our

11    retirement home.  I needed some money to build a retirement

12    home, so I sold a little bit of stock so that we could do

13    that.

14    Q.   What percentage of your and Marilyn's net worth was always

10:33:02 15    tied up in Household stock?

16    A.   Practically all of it.

17    Q.   Now, Mr. Gilmer, would you have done what you just

18    described, that is, purchased Household stock with your own

19    money and Marilyn's own money and continue to increase your

10:33:21 20    position during the years 1999 through 2002 if you knew that

21    the price of the stock was inflated by lies that were being

22    told to the marketplace by yourself, Mr. Aldinger,

23    Mr. Schoenholz or the company?

24    A.   Well, of course not.

10:33:44 25    Q.   And you understand that the theory of this case -- the

Gilmer - cross

1363

1    plaintiffs' theory is that the three of you and the company

2    defrauded the market by telling lies that artificially pushed

3    up the price of the stock?

4    A.  Sadly, I'm aware of that.

10:33:56  5    Q.  Did you do that, Mr. Gilmer?

6    A.  No.

7    Q.  If you had done that, would you have been among the people

8    victimized by that?

9    A.  Indeed I would, since everything I -- Marilyn and I

10:34:09 10    have -- had was invested in Household stock.

11    Q.  So do you understand the plaintiffs' theory to be that you

12    deceived yourself?

13    A.  You know, I thought about that a lot.

14          MR. DOWD:  Objection.

15    BY THE WITNESS:

16    A.  I don't --

17          MR. DOWD:  Objection, your Honor, argumentative.

18          THE COURT:  Sustained.

19          MR. KAVALER:  Okay.

10:34:27 20    BY MR. KAVALER:

21    Q.  Mr. Gilmer, investors' counsel showed you some documents

22    relating to compensation yesterday.  One of them is

23    Plaintiffs' Exhibit 776.  I'll put a copy of that in front of

24    you again.  It's already in evidence, but for convenience,

10:34:45 25    here's a copy for counsel and a copy for you.

Gilmer - cross

1364

1    (Tendered.)

2    BY MR. KAVALER:

3    Q.  This is the same document we looked at yesterday, isn't

4    it, Mr. Gilmer?

10:34:53  5    A.  Yes, sir.

6    Q.  We'll just take a minute to look at a page that we didn't

7    look at yesterday.  Turn to the second page of the document

8    bearing Bates number 472.

9    A.  Okay.

10:35:06 10    Q.  Is that captioned Household's Executive Compensation

11    Philosophy?

12    A.  It is.

13    Q.  And it says as follows:  Household International's goal is

14    to link compensation directly to performance and to

10:35:21 15    shareholder return.

16         As an executive covered by this policy, Mr. Gilmer,

17    did you understand that to be the case?

18    A.  It was very clear to me.

19    Q.  Continuing, We have designed our compensation so that base

10:35:31 20    salaries are lower than our peers with substantially higher

21    upside on bonus and long-term compensation if we deliver

22    superior shareholder returns.

23         Did you understand that to be Household's

24    compensation philosophy for senior executives?

10:35:48 25    A.  Yes, sir.

Gilmer - cross

1365

1    Q.  Did that motivate you to work hard for the shareholders?

2    A.  Indeed it did.

3    Q.  Was it to your personal financial benefit to do a good job

4    for the shareholders?

10:35:59  5    A.  It was.

6    Q.  Next sentence, Consequently our total compensation will be

7    lower than our peer group in years with weak performance and

8    at the top with other high-performing financial companies when

9    performance is superior.

10:36:14  10         Did you understand that, Mr. Gilmer?

11   A.  Yes, I did.

12   Q.  Did that influence your conduct of business?

13   A.  It made me work as hard as I could every day.

14   Q.  Did it make your goal to enhance performance?

15   A.  I'm sorry, sir?

16   Q.  Did it make it -- did it make your goal to be to enhance

17   performance of the price of the company's stock?

18   A.  It certainly did.

19   Q.  And when the company's stock went up, it benefitted all

10:36:33  20   the shareholders, the plaintiffs and you, correct?

21   A.  That's correct.

22   Q.  Then it says, Performance is primarily measured by EPS

23   growth and total shareholder return.

24         What is EPS growth, Mr. Gilmer?

10:36:45  25   A.  That is earnings per share.

Gilmer - cross

1366

1   Q.  And then it said -- and what is total shareholder return?

2   A.  It's the -- total shareholder return is everything -- all

3   things considered.  It's the income of the company.  It's the

4   growth.  It's everything.

10:37:03  5   Q.  And the final sentence reads, Household is a pay for

6   performance company.

7         Do you see that?

8   A.  That's correct.

9   Q.  What does that phrase mean?

10:37:08 10  A.  It's very clear, and it was very clear to all of us.  If

11   you do a good job, you work hard, you will make more money.

12   If you don't, well, you won't.

13   Q.  Now, Mr. Gilmer, in this document yesterday, shareholders'

14   counsel directed your attention to page ending in 478, I

10:37:26 15  think.

16         Would you turn to that page?

17   A.  I'm there.

18   Q.  And the page is headed Household International Top Five

19   Executives.  Are there SEC, United States Securities and

10:37:39 20  Exchange Commission rules that require the pay of the top five

21   executives to be publicly disclosed every year?

22   A.  That is correct.

23   Q.  Was your pay publicly disclosed every year?

24   A.  Yes, it was.

10:37:48 25  Q.  Was Mr. Aldinger's?

Gilmer - cross

1       must -- and the word must is in solid capital letters,

2       correct?

3       A.   It is.

4       Q.   -- provide our customer with tangible benefits according

11:00:58   5       to company policy.

6            Do you see that?

7       A.   I do.

8       Q.   Was there something called a net tangible benefit rule?

9       A.   Yes, there is.

11:01:05  10       Q.   Who came up with that?

11       A.   I did.

12       Q.   What was it?

13       A.   It was a list of requirements that had to be met to ensure

14       that every customer benefitted from a loan transaction before

11:01:13  15       that loan could be granted.

16       Q.   Next paragraph says, In the event it is determined by

17       management that a loan was made to a customer and no tangible

18       benefit exists, a penalty will occur.

19            Do you see that?

11:01:24  20       A.   I do.

21       Q.   This penalty will involve suspension and/or cancellation

22       of part or all of your subsequent incentive -- it says

23       inventive.  I think it means incentive.  Do you think that?

24       A.   I believe that's right, yes.

11:01:38  25       Q.   So we need some corrective action for whoever typed this.

Gilmer - cross

      1       Subsequent incentive payments.  In addition,

      2  corrective action may apply, up to and including termination

      3  of employment.

      4       Was that the policy, Mr. Gilmer?

11:01:49  5  A.  That was clearly the policy.

      6  Q.  And was this disseminated to all sales employees?

      7  A.  It was.

      8  Q.  And, Mr. Gilmer, was there public discussion in the

      9  marketplace about the fact that Household utilized incentive

11:02:02 10  compensation methods with its employees?

    11  A.  Yes, sir.

    12  Q.  Let me show you Defendants' Exhibit 230.

    13      A copy for counsel.  A copy for you, Mr. Gilmer.

    14   (Tendered.)

11:02:20 15  BY MR. KAVALER:

    16  Q.  This is a Goldman Sachs investment research department

    17  specialty financial services publication dated July 19, 2000,

    18  company, Household International.

    19      Did you see this document?

11:02:32 20  A.  Yes, sir.

    21  Q.  Sometime in July of 2000?

    22  A.  That would be right.

    23      MR. KAVALER:  I offer Defendants' 230 in evidence,

    24  your Honor.

11:02:38 25      MR. DOWD:  Again, your Honor, it's received with a

Gilmer - cross

1    limiting instruction.

2            MR. KAVALER:  And I agree.

3            THE COURT:  It will be so received.

4    BY MR. KAVALER:

11:02:45  5    Q.  Mr. Gilmer, is this another one of these analysts' reports

6    about the company?

7    A.  It is.

8    Q.  Generally available to all investors?

9    A.  Certainly is.

11:02:52  10    Q.  No secrets in here, right?

11    A.  None whatsoever.  This is a published document.

12    Q.  Look at the last bullet point on the first page, Marketing

13    and investment spending accelerating.  And, again, this is

14    July of 2000, right?

11:03:06  15    A.  Right.

16    Q.  Quote, Masking even stronger fundamental growth, marketing

17    expense, infrastructure technology and discretionary incentive

18    compensation are all trending significantly higher, furthering

19    the view that Household is reinvesting significant earnings

11:03:23  20    power in extending its growth and franchise investments,

21    parenthesis, adding over $120 million in operating expenses in

22    2Q, close parenthesis.

23            Do you see that, Mr. Gilmer?

24    A.  I do.

11:03:34  25    Q.  What does 2Q mean?

Gilmer - cross

1387

1    A.  Second quarter.

2    Q.  Household continues to deploy resources into four areas

3    which ultimately improve leveragibility and earnings momentum.

4        Do you see that?

11:03:47 5    A.  I do.

6    Q.  Now, Mr. Gilmer, do you see the words "discretionary

7    incentive compensation" in the second line?

8    A.  Give me one second.

9        Yes, I do.

11:03:57 10    Q.  It's underlined in red.

11    A.  Absolutely.

12    Q.  Okay.  What did you understand that to refer to?

13    A.  Well, that's exactly what we've been talking about.  It

14    was -- it was to reallocate and refocus our salaries and other

11:04:11 15    forms of communication to areas that we felt would be better

16    aligned for the success of our business, to pay people for

17    their good results because we believed at the end of the day,

18    that would be the right thing for our employees, to pay those

19    that got the job done, and the right thing for our

11:04:31 20    shareholders.

21    Q.  Now, Mr. Gilmer, let me turn to a different subject

22    briefly.

23        You were asked yesterday by investors' counsel about

24    complaints.  Do you remember that?

11:04:39 25    A.  I do.

Gilmer - cross

1388

1  Q.  And you testified Household received complaints?

2  A.  I did.

3  Q.  Did Household track those complaints?

4  A.  Yes, we did.

11:04:46  5  Q.  How did you do that?

6  A.  We had a myriad of ways to do that.  We did it in a

7  decentralized fashion, in a centralized fashion.  Our most

8  used technique was to establish a tracking system in our

9  operating center, put it under the control of the policy and

11:05:05 10  compliance department, to have those people gather those

11  complaints, to analyze those complaints and to take whatever

12  action might be appropriate.

13  Q.  And why did you track them?

14  A.  Well, we needed to know what was going on.  Complaints --

11:05:19 15  complaints can be a good thing.  While you don't want

16  complaints, obviously, because they suggest you're doing

17  something that you shouldn't be doing or making mistakes, it's

18  also an opportunity to learn.  It's an opportunity to learn

19  what actually is happening, what mistakes are you making.  And

11:05:36 20  it gives you an opportunity to fix it.  It gives you an

21  opportunity to make it better.  And it gives you an

22  opportunity to solidify a relationship with a customer.

23       Example, if you take a customer who has complained

24  and gets their complaint resolved, you really have -- you

11:05:52 25  really have done a good job of cementing that relationship.

Gilmer - cross

1389

1    So there are a lot of good things to be learned from

2    complaints, and we tracked them carefully for that reason.

3    Q.  Mr. Gilmer, you also said in your answer just a minute ago

4    that you responded to these complaints, you investigated them

11:06:07  5    and resolved them and learned from them, correct?

6    A.  That is correct.

7    Q.  Let me show you an exhibit that investors' counsel showed

8    you yesterday, Plaintiffs' Exhibit 242.

9        Here's a copy for counsel and a copy for you,

11:06:18 10    Mr. Gilmer.

11        Do you remember this document from yesterday?

12    (Tendered.)

13    BY THE WITNESS:

14    A.  Yes, sir, I do.

11:06:24 15    BY MR. KAVALER:

16    Q.  Now, investors' counsel spent some time with you on the

17    first few pages.  I would like to go a little deeper into the

18    document.  Turn to the page ending 656.

19    A.  All right, sir, I'm there.

11:06:39 20    Q.  Okay.  And that's a memo from Carla Madura to Robin

21    Allcock and Tom Schneider?

22    A.  That's right, it is.

23    Q.  That's the one that talks about an alarming increase of 83

24    percent over February?

11:06:53 25    A.  That is correct, it does.

Gilmer - cross

1    Q.  And the next paragraph says, As a result of this increase,

2    we will be issuing a separate communication to the sales field

3    identifying the top issues, as well as possible ways to

4    address them at the branch level.

11:07:09  5           Do you see that?

6    A.  I do.

7    Q.  Addressing the issues at the initial point of contact

8    should reduce the number of complaints elevated to the

9    regulatory or legal level.

11:07:18  10          Do you see that?

11   A.  I do.

12   Q.  First of all, does that reflect people who worked for you

13   in the consumer lending division trying to address this

14   problem?

11:07:25  15  A.  It does.

16   Q.  And what is the significance of what's being said there?

17   What does it mean to address issues at the initial point of

18   contact to reduce the number of complaints elevated to the

19   regulatory or legal level?

11:07:36  20  A.  What Carla Madura is saying here is that these complaints

21   that she's talking about are generated at the point of

22   contact.  In other words, when you -- generated in this case

23   at the branch level.  So, naturally, the opportunity to fix

24   that is at the branch level.  And so what she is saying here

11:07:59  25  is, look, we're going to have -- we're going to figure out

Gilmer - cross

1391

1    exactly what these complaints are, put them in categories and

2    we're going to send them out to the branch so that you, you

3    know, branch manager and branch staff, can deal with it and

4    get it resolved and make sure the customers are happy because

11:08:17  5    if we don't, obviously it will get escalated.  And instead of

6    having a good happy customer who is going to be with us for a

7    long time, we'll have an angry customer who won't be with us,

8    and we'll have a regulator involved, and none of that is good

9    for our company.

11:08:33  10   Q.  Now, Mr. Gilmer, was there discussion in the press and in

11   the marketplace about Household's customer complaints?

12   A.  Indeed there were.

13   Q.  I'll show you Defendants' Exhibit 613.

14        Copy for counsel.  Copy for you.

11:08:47  15        It's a newspaper article from something called the

16   Albuquerque Journal, dated September 12, 2001.

17   (Tendered.)

18   BY MR. KAVALER:

19   Q.  Did you see that article at or about the time it appeared?

11:09:05  20   A.  Yes.

21        MR. KAVALER:  I offer Defendants' 613 into evidence,

22   your Honor.

23        THE COURT:  It will be admitted.

24   BY MR. KAVALER:

11:09:12  25   Q.  Mr. Gilmer, turn to the third page of this exhibit.  It

Gilmer - cross

       1   says, PERA urged to drop finance firm investment.

       2         Do you see that?

       3   A.  Yes, I do.

       4   Q.  Look at the second paragraph.  PERA, a public pension fund

11:09:28  5   for state, county and municipal workers, holds more than $15

       6   million worth of stock and bonds from Household International,

       7   the parent company of Household Finance and one of the nations

       8   largest lenders to people with bad credit.

       9         Do you see that?

11:09:43 10   A.  I do.

    11   Q.  Is that a description of Household's business?

    12   A.  It is.

    13   Q.  And then it says, Citing predatory lending practices by

    14   Household Finance, such as mail solicitations and undisclosed

11:09:55 15   fees and penalties, members of ACORN, the Association of

    16   Community Organizations for Reform Now, urged PERA to sell off

    17   its investments in Household Finance.

    18         Do you see that?

    19   A.  I do.

11:10:07 20   Q.  Senator Dede Feldman, Democrat, Albuquerque, said she has

    21   received complaints about Household Finance from residents in

    22   her district and she urged PERA directors to listen carefully

    23   to consumer complaints by members of ACORN, a advocate for

    24   low-income borrowers.  Quote, When you decide what kinds of

11:10:26 25   stocks you will be purchasing, Senator Feldman said, I think

Gilmer - cross

1393

1    it would be well to reconsider the potential for lawsuits

2    against Household Finance.

3         Do you see that?

4    A.  I do.

11:10:35  5    Q.  Was this part of the ongoing public debate about

6    Household?

7    A.  It was one of many, many, many.

8    Q.  And you understand that PERA public pension fund is a

9    shareholder of Household at this point in time?

11:10:46  10    A.  I do.

11    Q.  And this is during the period of time that we're talking

12    about here, September 12, 2001?

13    A.  That's correct.

14    Q.  And a state senator in New Mexico is saying PERA, the

11:10:57  15    pension fund that owned stock in Household, should sell that

16    stock?

17    A.  That appears to be her advice.

18    Q.  And you're quoted in this article; are you not,

19    Mr. Gilmer?

11:11:07  20    A.  I am.

21    Q.  And you say -- it says here, Responding to Feldman's

22    concerns in a letter, Household International president and

23    chief executive officer, Gary Gilmer, wrote August 31, quote,

24    I can tell you that in none of these complaints did we find

11:11:19  25    nor did our regulator find that we violated state or federal

Gilmer - cross

1    law, close quote.

2             Do you see that?

3    A.  Yes, I do.

4    Q.  And in the next column, one paragraph up from the bottom,

11:11:27  5    it says, Gilmer stated that state regulators this year have

6    forwarded 15 complaints from Household Finance customers who

7    number 33,000 throughout New Mexico.

8             Do you see that?

9    A.  I do.

11:11:39 10    Q.  The 15 complaints you were referring to were in New

11    Mexico?

12    A.  That's correct.

13    Q.  Mr. Gilmer, is this an example of the public discussion

14    about Household receiving customer complaints?

11:11:49 15    A.  It is.

16    Q.  And indeed here it's coupled with advice from an elected

17    official to the state pension fund to sell your stock?

18    A.  That is true.

19    Q.  Was there something called a best practices initiative?

11:12:07 20    A.  Yes, there was.

21    Q.  And when was that put in place?

22    A.  In the 2001 time frame.

23    Q.  Was that a year or more before this lawsuit was brought?

24    A.  I'm sorry?

11:12:18 25    Q.  Was that a year or more before this lawsuit was brought?

Gilmer - cross

1395

1    A.  It would be.

2    Q.  Let's look at Defendants' Exhibit 38.

3           A copy for counsel.  A copy for you, Mr. Gilmer.

4      (Tendered.)

5    BY MR. KAVALER:

6    Q.  Is this another one of your e-mails to all Household

7    employees, this one dated 7/24/01?

8    A.  It is.

9    Q.  13 months before this lawsuit was filed?

11:12:42 10    A.  That's correct.

11           MR. KAVALER:  I offer Defendants' 38 in evidence,

12    your Honor.

13           THE COURT:  It will be admitted.

14    BY MR. KAVALER:

11:12:50 15    Q.  Mr. Gilmer, look at the third paragraph.  I'm pleased to

16    recap these best practice initiatives.

17           Do you see that?

18    A.  Yes.

19    Q.  And then you list customer rescue program, better rates

11:13:06 20    for best customers, reduced prepayment duration, more

21    stringent tangible benefits test, improved insurance product.

22           Do you see that?

23    A.  I do.

24    Q.  What was the purpose of the best practices initiative?

11:13:17 25    A.  My plan, my goal here was to, once again, set Household

Gilmer - cross

1406

  1 publication in the industry?

  2 A. It certainly is.

  3 Q. Let's look at one more disclosure. This is Exhibit 222.

  4   Copy for counsel. Copy for you, Mr. Gilmer.

11:25:29 5 (Tendered.)

  6 BY MR. KAVALER:

  7 Q. This is a Salomon Smith Barney document dated October 29,

  8 2001.

  9   Did you see this one, Mr. Gilmer?

11:25:41 10 A. I did.

  11   MR. KAVALER: Your Honor, I offer Defendants' 222 in

  12 evidence.

  13   MR. DOWD: Again, with the limiting instruction.

  14   MR. KAVALER: Absolutely.

11:25:49 15   THE COURT: It will be admitted with the limiting

  16 instruction.

  17 BY MR. KAVALER:

  18 Q. Look at the fourth bullet point, Mr. Gilmer.

  19 A. Yes, sir, I'm there.

11:26:02 20 Q. Okay. Headline risk, in quotes, may continue. We expect

  21 that consumer advocacy groups will continue to get attention

  22 criticizing, parenthesis, justly or unjustly, close

  23 parenthesis, the practices of subprime lenders. At best, we

  24 believe these efforts may have the effect of distracting

11:26:24 25 management attention and resources. At worst, current

Gilmer - cross

1407

         1    business practices may be altered, e.g., discontinuation of

         2    single premium credit life insurance, and adverse investor

         3    reactions to stocks with perceived political risk could impede

         4    the valuation that shares are awarded in the market.

11:26:46 5         Do you see that, Mr. Gilmer?

         6    A.  I do.

         7    Q.  Let's work our way through that.  First of all, this is

         8    dated October 29, 2001; is it not?

         9    A.  That's right.

11:26:53 10   Q.  Before this lawsuit was filed?

        11    A.  That's correct.

        12    Q.  Okay.  Consumer advocacy groups, those are the folks you

        13    spoke about yesterday?

        14    A.  That's right.

11:27:01 15   Q.  Will continue to get attention criticizing, justly or

        16    unjustly.  You thought the criticism was just or unjust?

        17    A.  Unjust.

        18    Q.  Other people thought it was just or unjust?

        19    A.  There were differing opinions.

11:27:11 20   Q.  The practice of subprime lenders, it wasn't limited to

        21    Household?

        22    A.  That's absolutely correct.

        23    Q.  At best, we believe these efforts may have the effect of

        24    distracting management.  Did you testify earlier today you

11:27:23 25   were spending a lot of time on this?

Gilmer - cross

1408

1    A.  I did.

2    Q.  Did you complain about that to Mr. Aldinger?

3    A.  Yes, I did.

4    Q.  Did you tell him it was time taken away from running your

11:27:32    5    business?

6    A.  I certainly did.

7    Q.  At worst, current business practices may be altered, e.g.,

8    discontinuation of single premium credit life insurance.  Did

9    Household discontinue selling single premium credit life

11:27:45   10    insurance, Mr. Gilmer?

11    A.  We did.

12    Q.  At worst -- I'm sorry.  I'm beyond that.

13         And adverse investor reactions to stocks.  Did that

14    occur, Mr. Gilmer?

11:27:59   15    A.  Indeed.

16    Q.  Mr. Gilmer, this Salomon Smith Barney document, dated

17    October 29, 2001, was available to all investors?

18    A.  It certainly was.

19    Q.  No secret?

11:28:08   20    A.  None whatsoever.

21    Q.  The fact that Household was exposed to headline risk was

22    being discussed publicly?

23    A.  Yes, that is correct.

24    Q.  Mr. Gilmer, you were telling us yesterday -- withdrawn.

11:28:27   25         You said a minute ago you kept Mr. Aldinger apprised

Gilmer - cross

1409

1    of these events and others.  Do you recall telling

2    Mr. Aldinger about a specific instance that reflects in your

3    mind the changing environment that occurred when some of your

4    folks attended a meeting with some regulators here in

11:28:54  5    Illinois?

6    A.  Yes, sir, I do.

7    Q.  And tell us about that conversation.

8              MR. DOWD:  Objection, your Honor, hearsay.

9    BY MR. KAVALER:

11:28:59 10    Q.  Tell us about the conversation you had with Mr. Aldinger.

11             THE COURT:  What's it being offered to show?

12             MR. KAVALER:  State of mind of both Mr. Gilmer and

13    Mr. Aldinger, your Honor.

14             THE COURT:  What state of mind?

11:29:23 15             MR. KAVALER:  Mr. Gilmer and Mr. Aldinger's state of

16    mind, which goes to -- do you want me to approach at sidebar

17    or do you want me to tell you here?

18             THE COURT:  Go ahead.  Goes to what?

19             MR. KAVALER:  Goes to their perception of the

11:29:35 20    fundamental invalidity of many of these claims and many of the

21    assertions being made.

22             THE COURT:  I'll sustain the objection to that.

23             MR. KAVALER:  Okay.

24    BY MR. KAVALER:

11:29:53 25    Q.  Let me show you one more of these documents, Mr. Gilmer.

1   This is Defendants' Exhibit 498.

2         A copy for counsel.  And a copy for you, Mr. Gilmer.

3   (Tendered.)

4   BY MR. KAVALER:

11:30:08 5   Q.  This is a Legg Mason report on Household International,

6   and it's dated April 6, 2000.

7         Did you see this document, Mr. Gilmer?

8   A.  I did.

9         MR. KAVALER:  Your Honor, I offer Defendants' Exhibit

11:30:22 10   498 in evidence.

11         MR. DOWD:  Same, with the limiting instruction, your

12   Honor.

13         MR. KAVALER:  Agreed, your Honor.

14         THE COURT:  Admitted with the limiting instruction.

11:30:36 15   BY MR. KAVALER:

16   Q.  Mr. Gilmer, you told us yesterday about the more onerous

17   regulatory environment that Household was facing?

18   A.  That's right.

19   Q.  Turn to the second page of this document, dated April 6,

11:30:56 20   2000.  That would be more than two years before this lawsuit

21   was filed?

22   A.  That's right.

23   Q.  In the middle of the paragraph under the heading, Some

24   macro concerns, about five or six lines down, it says, In

11:31:10 25   addition, while the usual and potentially correct answer to

Gilmer - cross

1411

1    the question, what is the impact on HI from the more onerous

2    regulatory environment, parenthesis, aimed at eliminating

3    predatory lending -- predatory pricing rather, close

4    parenthesis, that is developing is, parenthesis, quite

11:31:33   5    accurately, close parenthesis, that results in a more rational

6    operating environment with fewer players, close quote, some

7    states are pursuing strict predatory lending laws that may

8    limit risk-based pricing ceilings and constrain growth and/or

9    profitability.

11:31:51  10            Do you see that?

11    A.  I do.

12    Q.  Does this reflect that there was awareness in the investor

13    community of the fact that Household was facing more onerous

14    regulatory environment?

11:32:01  15    A.  It's very clear on that point.

16    Q.  And that the consequences of that might be the enactment

17    of strict predatory lending laws that might limit risk-based

18    pricing ceilings and constrain growth and/or profitability?

19    A.  That's right.

11:32:14  20    Q.  This was being publicly disclosed and discussed in the

21    investment community?

22    A.  It was.

23    Q.  They continue, Nonetheless, we do believe that HI's

24    centralized underwriting and compliance structure eliminates

11:32:26  25    many of the risks and potential problems associated with

Gilmer - cross

1412

1     aggressive lending tactics.

2               Do you see that?

3     A.  I do.

4     Q.  So the very subjects we're talking about here in this

11:32:35  5     courtroom were being discussed by Legg Mason in public back in

6     April of 2000?

7     A.  That's correct.

8     Q.  Mr. Gilmer, you were shown yesterday by investors' counsel

9     a document which is in evidence as 510.

11:33:14  10              Let me give you a copy for your convenience.  And a

11     copy for counsel.

12       (Tendered.)

13     BY MR. KAVALER:

14     Q.  Do you recall being asked questions about this document?

11:33:24  15     A.  I do.

16     Q.  And this document has to do with the Florida attorneys

17     general -- attorney general -- Florida attorney general's

18     subpoena.  Do you remember that?

19     A.  I do.

11:33:36  20     Q.  Okay.  And did Household hold an investors' call moderated

21     by Craig Streem on July 17, 2002, attended by various analysts

22     and other people?

23     A.  It did.

24     Q.  Let me show you Defendants' Exhibit 74.

11:34:02  25              A copy for counsel.  A copy for you, Mr. Gilmer.

Gilmer - cross

1413

1    (Tendered.)

2    BY MR. KAVALER:

3    Q.  Is this a transcript of that investors' call moderated by

4    Craig Streem on July 17, 2002?

11:34:20  5        MR. DOWD:  Objection, your Honor.  I object as

6    hearsay to this document.  I think the witness has testified

7    he was out of active management by this point.

8            THE COURT:  I couldn't hear you.

9            MR. DOWD:  I think the witness has testified he was

11:34:30 10  out of active management by this point.  So it's a lack of

11   foundation as well.

12           MR. KAVALER:  I'll ask a question.

13   BY MR. KAVALER:

14   Q.  Mr. Gilmer, even after you were out of active management,

11:34:38 15  did you have some ongoing involvement in the affairs of the

16   company?

17   A.  Yes, I did.

18   Q.  Were you aware of things that were going on, such as

19   investor calls?

11:34:48 20  A.  I was.

21   Q.  Do you recall if you participated in this particular call?

22   A.  I don't think I did.

23   Q.  Did you receive a copy of the transcript?

24   A.  I'm not sure that I did.

11:34:56 25  Q.  Did you continue to receive the publication that was

Gilmer - redirect

1416

1           Do you see that?

2      A.  I do.

3      Q.  Is that what you mean by headline risk?

4      A.  That's exactly what I mean.

11:37:28  5   Q.  And it says, This could have a significant adverse effect

6      on the institution.

7           Do you agree with that, Mr. Gilmer?

8      A.  I do.

9      Q.  Mr. Gilmer, you sat in this courtroom and you listened to

11:37:43 10   the opening statements, did you?

11      A.  I did.

12      Q.  And you sat here and you listened to the testimony of

13      Ms. Ghiglieri, the expert witness, did you?

14      A.  I did, sir.

11:37:51 15   Q.  Mr. Gilmer, as you sat here and listened to Mr. Dowd and

16      Ms. Ghiglieri describe a company, did you recognize the

17      company they were describing as the company you worked for for

18      32 years?

19           MR. DOWD:  Objection, your Honor, asked and answered.

11:38:07 20           THE COURT:  The objection will be sustained.

21           MR. KAVALER:  Your Honor, I have no further questions

22      for this witness at the present time.

23           THE COURT:  Redirect.

24           MR. DOWD:  Thank you, your Honor.

11:38:20 25                    REDIRECT EXAMINATION

Gilmer - redirect

1417

1    BY MR. DOWD:

2    Q.  Good morning, Mr. Gilmer.

3    A.  Good morning.

4    Q.  You looked at a document earlier, Mr. Kavaler was showing

11:38:45  5   you, about EPS; that you had a target of $4.05 in that year

6    and then you hit $4.08; is that right?

7    A.  That is correct.

8    Q.  That restatement about the credit cards, did the EPS

9    number go down after that restatement, do you know?

11:39:02  10  A.  I had no involvement in that.  I don't know what it

11   affected.

12   Q.  You didn't have any idea that the -- as a result of that

13   credit card restatement, that the company's net income went

14   down and its EPS went down when they had to restate it?

11:39:17  15  A.  No, that's not what I said.  I said I was not involved in

16   it, and I don't know what years it affected, nor how it was

17   allocated.  So I don't know if it affected -- to answer your

18   question, earnings would go down if you restated and reported

19   lower earnings.  Of course, that would be true.  I don't know

11:39:37  20  which years were affected, nor how much they were affected.

21   And I don't know if it was included in the numbers we looked

22   at, the 4.05, already or not.

23   Q.  Okay.  Mr. Gilmer, you had a chart prepared about how your

24   stock went from like 400,000 shares, I think you said, to like

11:39:55  25  900,000 shares?

Gilmer - redirect

1418

1    A.  Yes.

2    Q.  Okay.  And I'm just a little confused because you file

3    forms with the SEC, right, Form 4s, as a reporting officer of

4    the company?

11:40:05  5    A.  I'm sure we do.

6    Q.  And I didn't see you going into your pocket and buying

7    500,000 shares during that time.  Did I miss something, sir?

8    A.  Yes, you missed something.

9    Q.  Okay.  Well, let me ask you this:  Your 900,000, does that

11:40:19  10   include your stock options?

11   A.  It includes all of my interest, as is required, I believe,

12   by law to be reported.  And so it would include everything.

13   Q.  So the 900,000 on the chart, sir, just so we're clear on

14   that, that includes the stock options you were granted during

11:40:35  15   the relevant time period, '99, 2000 and 2001, right?

16   A.  That would absolutely be correct, sure.

17   Q.  Oh, okay.  So the 900,000 wasn't just stock, the common

18   stock that you owned; it includes a right to buy common stock

19   that was granted by the board of directors, right?

11:40:54  20   A.  It included the following:  It included all --

21   Q.  Sir, just answer my question.  Did it include the stock

22   options?

23   A.  I've already said twice, I believe, that it included the

24   stock options.

11:41:05  25   Q.  Okay.  So let's take a look at those stock options because

Hayden-Hakes - direct

1491

1           MR. KAVALER:  If we have seen it, we have no

2      objection.  I am told we have seen it.

3           THE COURT:  All right.  They may be --

4           MR. KAVALER:  Is this for the next witness?

02:29:08  5           MR. BURKHOLZ:  It is.

6           MR. KAVALER:  I am sorry.  We have seen this.  Yes,

7      your Honor.

8           THE COURT:  They may be passed out.

9           Ladies and gentlemen, you are receiving copies of the

02:29:15 10      exhibits that are about to be used.  Not only will they be

11      shown on the screen, if they are shown on the screen, but you

12      will have the actual exhibits with you.  It's just for the

13      purpose of convenience.  It's nothing special about these

14      exhibits over any others.

02:29:28 15           Do we know who the next witness is?

16           MR. BURKHOLZ:  Yes, your Honor.  Megan Hayden-Hakes.

17           THE COURT:  Step right up there, ma'am.

18           Remain standing and raise your right hand, please.

19           MEGAN HAYDEN-HAKES, PLAINTIFFS' WITNESS, SWORN

02:30:53 20                          DIRECT EXAMINATION

21      BY MR. BURKHOLZ:

22      Q.  Good afternoon.

23      A.  Hi.

24      Q.  Can you please state your name for the record.

02:30:56 25      A.  Megan Hayden-Hakes.

Hayden-Hakes - direct

1492

1     Q.   We have never met before, correct?

2     A.   Correct.

3     Q.   You graduated from college in 1997, correct?

4     A.   Yes.

02:31:05  5     Q.   And your first job was in public relations at Edelman &

6     Company?

7     A.   Yes.

8     Q.   And your job included writing press releases and media

9     research, correct?

02:31:14 10     A.   Among other things, yes.

11     Q.   What were the other things you did?

12     A.   Worked with reporters based on stories about my clients.

13     Q.   And then you moved to Denver in 1998 to work for another

14     PR firm, correct?

02:31:29 15     A.   Correct.

16     Q.   And then you moved back to Chicago and worked for

17     Edelman & Company, correct?

18     A.   Yes.

19     Q.   And Household was a client of Edelman at that time in

02:31:38 20     1999; isn't that correct?

21     A.   Correct.

22     Q.   In July 2001, you took the job at Household as director of

23     corporate communications; isn't that correct?

24     A.   Correct.

02:31:46 25     Q.   And reported to a Mr. Craig Streem; is that correct?

Hayden-Hakes - direct

1493

1    A.  Yes.

2    Q.  And his job was director of investor relations at that

3    time?

4    A.  Vice president of investor relations, I believe.

02:31:57 5    Q.  And he also had another part of his job title at that

6    time, director of communications?

7    A.  You are asking me about Craig's job title?

8    Q.  Yes.

9    A.  Yeah.  Whether that was his formal title or not, I can't

02:32:09 10    tell you, but it was part of his responsibilities.

11    Q.  Okay.  And part of his responsibilities was talking to

12    analysts, correct?

13    A.  Yes.

14    Q.  And part of your responsibility was to talk to the media,

02:32:18 15    correct?

16    A.  Yes.

17    Q.  And you worked at Household from July 2001 until October

18    2002, correct?

19    A.  Yes.

02:32:28 20    Q.  And is it fair to say that both yourself and Mr. Streem

21    spoke to the media on behalf of Household during that time?

22    A.  Yes.

23    Q.  Now, as part of your job duties, you reviewed articles

24    that discussed Household; isn't that correct?

02:32:42 25    A.  Can you restate that?  I am sorry.

Hayden-Hakes - direct

1528

1    what do I tell the investing public out there?  What should I

2    tell the media regarding this situation?  That would have been

3    your practice, right?

4    A.  Well, I don't talk to the -- part of my job had nothing to

03:39:41  5    do with talking to investors.

6    Q.  Right, but you know that investors rely on statements made

7    to the public or that are issued through media articles.  You

8    understood that at the time, didn't you?

9    A.  Sure, among many other audiences.

03:39:52  10   Q.  Okay.  And you're not telling me you didn't talk to

11   Mr. Aldinger during this time to say what are we going to tell

12   the media regarding this situation?  Our stock's going down;

13   the situation in Bellingham, we're acknowledging it; and the

14   analysts are wondering whether this is a nationwide problem

03:40:07  15   that's going to affect our earnings.  You're not telling me

16   you didn't talk to him about this, are you?

17   A.  I'm not telling you whether I did or didn't.  Again, I

18   want to be very truthful here.  I can't tell you specifically

19   a conversation I had in a very limited time period.

03:40:17  20            I had many conversations with many different people

21   over the months that I worked at Household.

22   Q.  What about Mr. Aldinger, did you talk to him regarding how

23   to talk to the media?

24   A.  Many times.

03:40:27  25   Q.  Right.  And during this time period, that would have been

Hayden-Hakes - direct

1529

1    your practice, right, to talk to him about what to say to the

2    media regarding this situation?

3    A.   I'd have to speculate to tell you whether I did or didn't

4    talk to him in this very specific period of time.

03:40:39   5         I mean had I had many conversations with Mr. Aldinger

6    over the period of time that I worked at Household?  Yes.

7    Q.   Right.

8         And this was an important time, wasn't it?  I mean

9    you had a situation where the effective rate was being

03:40:50  10   acknowledged to be used by the company in Washington state in

11   one branch they're telling the public.  I mean you would have

12   talked to him about this situation at that time.  That would

13   have been your practice, right?

14   A.   Again, I mean I would -- I would assume so, but I can't

03:41:04  15   confirm for you whether I did or didn't.

16   Q.   You just don't have a recollection, right?

17   A.   I have no recollection.

18   Q.   But that would have been your practice, right?

19   A.   Ideally that would be my practice.

03:41:27  20   Q.   Let me show the witness what we've marked as Plaintiffs'

21   1447 for identification.  Copy for counsel.

22        MR. BURKHOLZ:  This is an article in the July 2nd

23   Oregonian entitled "High-Cost Home Loans Rise."  Your Honor,

24   I'd offer it for -- into evidence.

03:41:53  25        MR. KAVALER:  Same limiting instruction, your Honor,

Hayden-Hakes - direct

1530

1     another newspaper article.

2          THE COURT:  It will be admitted with a limiting

3     instruction.

4          (Plaintiffs' Exhibit 1447 received in evidence with a

5          limiting instruction.)

6     BY MR. BURKHOLZ:

7     Q.  Feel free to read the article.  I'm going to focus your

8     attention on the second half of the article which deals with

9     Household.

03:42:08 10    A.  Do you want me to read the whole article?

11    Q.  Feel free to, but I'm just going to -- I'm going to point

12    you to the second page, so if you can turn to that page.

13    A.  Okay.

14    Q.  Why don't you read that, that first half of that page to

03:42:19 15    yourself.

16    A.  The first half of page 2.

17    Q.  Yes.

18    A.  I've read the first half.

19    Q.  Okay.  Let's look at the third paragraph.  It reads, "Jim

03:43:29 20    Krueger, who retired June 21st as consumer and mortgage

21    lending program manager in the state's Division of Finance and

22    Corporate Securities, says he saw a pattern in Household loans

23    in which the company would write two separate loans -- one a

24    refinance loan, and the second an equity-backed line of credit

03:43:48 25    that apparently consolidates the home buyer's consumer debt."

Hayden-Hakes - direct

1531

1          Then further on, the next paragraph, it says,

2    "Krueger said he found that in a majority of cases that the

3    combined debt exceeded the value of the home and that the

4    loans contained prepayment penalties.  He says he knows of no

03:44:07  5    other companies that impose prepayment penalties on line of

6    credit loans."

7          Do you see that?

8    A.  I do.

9    Q.  Then it continues to say -- read, "Household International

03:44:17 10    officials deny any pattern of wrongdoing and say the company

11    is open to changes in its lending practices if they are

12    harmful to consumers.  'We've made mistakes,' said Megan

13    Hayden, spokeswoman for the Prospects Heights, Illinois

14    company.  'Is there a companywide pattern of abuse?

03:44:37 15    Absolutely not.'"

16          Do you see that?

17    A.  I do.

18    Q.  And that was an accurate quote that you made at that time,

19    correct?

03:44:43 20    A.  To the -- I have no reason to believe it wasn't.

21    Q.  So we looked at the American Banker article.  You told

22    that reporter that the predatory lending was limited to the

23    Bellingham, Washington branch.

24          Now we have an article in the Oregonian News and

03:45:05 25    you're quoted as saying, "Is there a companywide pattern of

Hayden-Hakes - direct

1532

1    abuse?  Absolutely not," regarding complaints in Oregon, but

2    at that time you don't even -- you don't really know the

3    extent of the predatory lending practices at Household, do

4    you?

03:45:17   5          You don't know whether or not they're companywide,

6    isn't that correct?

7    A.  I didn't believe they were companywide.  I mean based on

8    interactions with people who were running the business,

9    that's -- that was what I believed to be true.

03:45:30  10  Q.  Right, and they told you that, and that's why you went and

11   told the press that, correct?

12   A.  Correct.

13   Q.  Okay.  Let me show you what we've marked as Plaintiffs'

14   1439.  Copy for counsel.

03:46:05  15         This is an article in the Origination News,

16   September 2002.  Do you see where you're quoted about halfway

17   down in the article?

18   A.  I do.

19          MR. BURKHOLZ:  Your Honor, I'd move this exhibit into

03:46:33  20  evidence.

21          MR. KAVALER:  Same limiting instruction, your Honor,

22   please.

23          THE COURT:  It will be admitted with a limiting

24   instruction.

25   (Plaintiffs' Exhibit 1439 received in evidence with a

Hayden-Hakes - direct

1533

1       limiting instruction.)

2    BY MR. BURKHOLZ:

3    Q.  The first paragraph reads, "ACORN at press time had filed

4    another class-action lawsuit against Household International,

03:46:48  5    this time in Massachusetts, alleging the subprime mortgage

6    lender is ignoring state laws and regulations and making

7    high-cost mortgages."

8            Then a little further down, fourth paragraph, there's

9    a quote attributed to you, "'We clearly follow all state and

03:47:03 10    federal laws and regulations,' Household spokeswoman Megan

11    Hayden said."  Do you see that?

12    A.  I do.

13    Q.  And that was an accurate quote at the time, correct?

14    A.  I believe so.

03:47:15 15    Q.  Okay.  Let me show you another document, Exhibit 1448.

16    Copy for counsel.

17            This is a September 2nd, 2002, publication by the

18    National Mortgage News headlined "State Regulator Slams

19    Household Practices."

03:47:52 20            And do you see where you're quoted about

21    three-quarters of the way down the article?

22    A.  Yes.

23            MR. BURKHOLZ:  Your Honor, I'd move this exhibit into

24    evidence.

03:48:03 25            MR. KAVALER:  Same limiting instruction, please, your

Hayden-Hakes - direct

1534

1  Honor.

2        THE COURT:  Same ruling.

3  (Plaintiffs' Exhibit 1448 received in evidence with a

4  limiting instruction.)

03:48:08 5  BY MR. BURKHOLZ:

6  Q.  The first paragraph reads, "After investigating Household

7  International for more than a year in issuing a scathing

8  report on its lending practices, state regulators in

9  Washington are seriously considering bringing an enforcement

03:48:27 10  action against the subprime lending giant."

11        Do you see that?

12  A.  Yes.

13  Q.  And then further down, where it says, "A Household

14  spokeswoman."  Do you see that?

03:48:38 15        It says, "A Household spokeswoman said she's not

16  aware of any pending enforcement actions or settlement talks."

17        Do you see that?

18  A.  Yes.

19  Q.  And then right below that it says, "'We readily accept

03:48:49 20  that there have been mistakes made in Washington and we -- we

21  working very hard with DFI and certainly with the Attorney

22  General's office,' spokeswoman Megan Hayden said."

23        Do you see that?

24  A.  I do.

03:49:02 25  Q.  And the quote, the quote that's attributed to you, you

Hayden-Hakes - direct

1535

1    don't disagree that was something you said at the time,

2    correct?

3    A.  I have no reason to believe I didn't.

4    Q.  Okay.  And then the reference above that to "A Household

03:49:14  5    spokeswoman said she's not aware of any pending enforcement

6    actions or settlement talks."  That was referring to you,

7    correct?

8    A.  I'm assuming so.

9    Q.  I mean there were no other Household spokeswomen at the

03:49:24  10    time, correct?

11    A.  No, there were.  I mean there were -- I wasn't the only

12    person who talked to the media.

13    Q.  Who else was talking to the media on behalf -- that was a

14    woman on behalf of Household at this time?

03:49:36  15    A.  It could have been a variety of people.  Lisa Sodeika

16    spoke with the media.  There was a woman who worked with me

17    who could have possibly spoken with the media.

18         I mean my name is the one in the story, but I'm not

19    the only woman who spoke to the media.

03:49:50  20    Q.  Okay, but you spoke to this reporter at the time, correct?

21    A.  I'm assuming so because my name is in the article.  I

22    don't remember the specific conversation.

23    Q.  Okay.  You have no reason to doubt that the reference to a

24    Household spokeswoman isn't referring to you, do you?

03:50:03  25    A.  It's more than likely me.

Hayden-Hakes - direct

1536

1    Q.  Now, you do recall in August of 2002 that the company

2    restated its financial statements for prior periods.  You

3    recall that, right?

4    A.  Whether that was August 2002, I don't remember

03:50:33  5    specifically; but I do remember that the company did issue a

6    restatement.

7    Q.  Right.

8          And at the same time, as circumstances have it, at

9    the same time, Forbes and the New York Times were writing

03:50:45 10    articles regarding Household's lending practices, isn't that

11    correct?

12    A.  I believe that all happened around the same period of

13    time.

14    Q.  In fact, those two stories from the New York Times and

03:51:05 15    Forbes Magazine, they were coming out right at the same time

16    that Household was announcing its restatement, right?

17    A.  At the exact same time?  I don't recall.

18    Q.  Around the same week.

19    A.  Around the same period of time, yeah, I believe that was

03:51:18 20    the case.

21    Q.  Right.  And you're -- and at that time, you wanted

22    Household's management to talk to those writers of those

23    stories.

24          I mean you knew they were coming out, right, the

03:51:28 25    stories from Forbes?

TAB 14

1567

```
 1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                             EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all     )
 4   others similarly situated,      )
                                     )
 5              Plaintiff,           )
                                     )
 6      vs.                          )  No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )  Chicago, Illinois
 8                                   )  April 9, 2009
                Defendants.          )  9:55 a.m.
 9                            VOLUME 8
10               TRANSCRIPT OF PROCEEDINGS - TRIAL
           BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
14                             BY:  MR. LAWRENCE A. ABEL
                                    MR. SPENCER A. BURKHOLZ
15                                  MR. MICHAEL J. DOWD
                                    MR. DANIEL S. DROSMAN
16                                  MS. MAUREEN E. MUELLER
                               655 West Broadway
17                             Suite 1900
                               San Diego, California  92101
18                             (619) 231-1058

19                             COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
20                             BY:  MR. DAVID CAMERON BAKER
                                    MR. LUKE O. BROOKS
21                                  MR. JASON C. DAVIS
                                    MS. AZRA Z. MEHDI
22                             100 Pine Street
                               Suite 2600
23                             San Francisco, California  94111
                               (415) 288-4545
24

25
```

Streem - direct

1626

1    (Witness sworn.)

2        THE COURT:  Be seated.

3        You want those documents up there?

4        MR. BURKHOLZ:  I don't.

5        CRAIG ALAN STREEM, PLAINTIFFS' WITNESS, SWORN

6                DIRECT EXAMINATION

7    BY MR. BURKHOLZ:

8    Q.  Sir, can you state your name for the record.

9    A.  Yes, Craig Alan Streem.

01:28:25 10    Q.  And you had your deposition taken in this case, correct?

11    A.  Yes.

12    Q.  And you were represented by the lawyers for the defendants

13    at that deposition, correct?

14    A.  Yes.

01:28:33 15    Q.  And you're represented here today by the same law firm,

16    aren't you?

17    A.  Yes.

18    Q.  Now, you worked at Household from 1996 to 2003; isn't that

19    correct?

01:28:41 20    A.  Yes.

21    Q.  And what were your job duties during the time period -- or

22    job titles during the time period of 1999 to 2002?

23    A.  I can't remember specifically when -- the dates when

24    transitions occurred.  But at one point, I was vice president

01:28:59 25    of investor relations.  And then subsequent to that, I was

Streem - direct

1627

1    vice president, investor relations -- or corporate relations

2    and communications, excuse me.

3    Q.  And you got that additional job title sometime in the

4    spring of 2001; is that correct?

01:29:11  5    A.  I don't recall exactly when that happened.

6    Q.  Was it around the time that Ms. Megan Hayden-Hakes came on

7    board --

8    A.  Yes.

9    Q.  -- at the company?

01:29:19  10        And she took over -- or she took on the task of being

11   one of the corporate spokespersons for the company?

12   A.  Yes.

13   Q.  But you continued to talk to the media still, correct?

14   A.  Yes.

01:29:28  15   Q.  In fact, you spoke to Business Week at the end of 2001.

16   Do you remember that?

17   A.  I remember speaking to a reporter from Business Week, but

18   I could not tell you exactly when that was.

19   Q.  Now, as the VP of investor relations, you reported

01:29:45  20   directly to Mr. Schoenholz, the CFO, correct?

21   A.  Yes.

22   Q.  And you also reported to Mr. Aldinger, didn't you?

23   A.  At another point I did, yes.

24   Q.  Do you recall when that was?

01:29:56  25   A.  I don't recall the transition date, no.

Streem - direct

1628

```
            1   Q.  Let's take a look at Plaintiffs' 824, which we'll mark for

            2   identification.

            3   (Tendered.)

            4       MR. BURKHOLZ:  A copy for counsel.

01:30:22    5       MR. KAVALER:  Thank you.

            6   BY MR. BURKHOLZ:

            7   Q.  Do you recognize the document?

            8   A.  Yes, I do.

            9   Q.  It's a memo that you sent to senior management on or about

01:30:45   10   November 1, 2000, correct?

           11   A.  Yes.

           12   Q.  And it was sent to Mr. Aldinger, Mr. Gilmer,

           13   Mr. Schoenholz and others, correct?

           14   A.  Yes.

01:30:53   15       MR. BURKHOLZ:  Your Honor, I move 824 into evidence.

           16       MR. KAVALER:  Your Honor, this is a document subject

           17   to the limiting instruction No. 1.  It's a newspaper article.

           18       MR. BURKHOLZ:  That's correct.

           19       THE COURT:  It will be admitted with the limiting

01:31:04   20   instruction No. 1.

           21   BY MR. BURKHOLZ:

           22   Q.  Let's take a look at --

           23       THE COURT:  I'm sorry.  Let me just make a correction

           24   there.

01:31:11   25       I think the newspaper article limiting instruction is
```

TAB 15

1717

```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all    )
 4   others similarly situated,      )
                                     )
 5            Plaintiff,             )
                                     )
 6       vs.                         )  No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )  Chicago, Illinois
 8                                   )  April 13, 2009
              Defendants.            )  9:00 a.m.
 9                          VOLUME 9
10             TRANSCRIPT OF PROCEEDINGS - TRIAL
         BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:       COUGHLIN STOIA GELLER RUDMAN &
                              ROBBINS LLP
14                            BY:  MR. LAWRENCE A. ABEL
                                   MR. SPENCER A. BURKHOLZ
15                                 MR. MICHAEL J. DOWD
                                   MR. DANIEL S. DROSMAN
16                                 MS. MAUREEN E. MUELLER
                              655 West Broadway
17                            Suite 1900
                              San Diego, California  92101
18                            (619) 231-1058

19                            COUGHLIN STOIA GELLER RUDMAN &
                              ROBBINS LLP
20                            BY:  MR. DAVID CAMERON BAKER
                                   MR. LUKE O. BROOKS
21                                 MR. JASON C. DAVIS
                                   MS. AZRA Z. MEHDI
22                            100 Pine Street
                              Suite 2600
23                            San Francisco, California  94111
                              (415) 288-4545
24

25
```

1723

1    counsel may want to examine this witness differently or not

2    and the next witness differently or not.

3         THE COURT:  Do you think it's going to impact this

4    witness?

09:11:40 5         MR. KAVALER:  It might.  I don't know what he intends

6    to ask him.

7         THE COURT:  Let me ask him.

8         MR. BURKHOLZ:  I don't think so.  I don't know what

9    Mr. Kavaler is talking about.

09:11:49 10         MR. KAVALER:  Very simply, your Honor -- I don't mean

11   to be obscure.  In one order you excluded the attorney

12   general's settlement, the $484 million and the settlement

13   documents themselves.  And that is order number --

14        THE COURT:  Right.

09:11:59 15         MR. KAVALER:  -- 1516.  The other order, the 1528 as

16   to Mr. Devor, you said the documents on which Devor relies,

17   Household's estimate of the refunds it might have to make in

18   connection with the multistate investigation and the

19   multistate agreement itself, settlement agreement itself, are

09:12:15 20  sufficient to support his opinion.  I believe that creates the

21   exact same issue as to Ghiglieri, and we will deal with it as

22   it arises.

23        My view is I also am familiar with your Honor's point

24   about once the door is open, the door is open.  If Mr. Devor

09:12:29 25  is going to address that, we will respond.  All I'm saying is,

Detelich - direct

1773

1 practices.  While Household might like to maintain the belief

2 that these are isolated instances with, quote, rogue, end

3 quote, offices and loan officers, the coast-to-coast usage of

4 common forms and sales techniques belie any such position.

10:22:35 5          You see that, right?

6 A.  I see that.

7 Q.  And you read that at the time, right, sir?

8 A.  I would have, yes.

9 Q.  Then further on, on to the next page, regarding

10:22:43 10 restitution, Mr. Huey wrote, These figures are, to put it

11 mildly, large.  Yet, we note that several of the most

12 insidiously deceptive sales practices which attracted

13 regulatory attention to Household practices at the outset

14 relate to products and practices initiated by Household in

10:23:01 15 1999.

16          You see that, right, sir?

17 A.  I do.

18 Q.  Industry figures indicate that since 1999, Household's

19 originations have nearly doubled.  Almost assuredly, the

10:23:10 20 misleading sales practices the states have identified have

21 contributed to that growth.  Ultimately, the value of

22 restitution and reformation must be viewed against that

23 backdrop.

24          You see that, right, sir?

10:23:21 25 A.  I do.

Detelich - cross

1840

1    they would -- included in the "To"s were the Regional General

2    Managers, Division General Managers, Policy Compliance, Human

3    Resource, our sustainability person I described earlier who is

4    -- essentially manages the government relations function.

01:28:49  5         So, most of the senior team inside of the consumer

6    lending business, inside of the branch business and, then, the

7    supporting functions around the business.

8    Q.  And if we skip down further in the document, I think you

9    begin by setting forth some goals of the meeting; is that

01:29:07  10   right?

11   A.  That's right.

12   Q.  "Among our goals for this meeting, we will gain an

13   understanding of the current legislative and regulatory

14   climate, examine areas where we have the greatest risk of

01:29:18  15   non-compliance with company policies" -- and, then, we skip

16   down to, "How we ensure we offer -- " "how we ensure that our

17   sales practices, including verbal and written presentations,

18   never stray from our approved practices."

19         Why was that topic on the agenda, Mr. Detelich?

01:29:38  20   A.  If you don't mind, I'll point out you skipped the last

21   bullet point under the objectives, which I think is very

22   important:  "Discuss and agree to best practices to ensure 100

23   percent compliance with all of our policies and procedures."

24   I just want to make sure that was clear.

01:29:55  25         And, again, this was a time when there was, you know,

Detelich - cross

1841

1    significant discussion and the environment was focused on this

2    concept, undefined as it was at that time, of predatory

3    lending and the difference between non-prime lending,

4    predatory lending, which practices fit into which categories.

01:30:15    5    And our belief was bringing our team together, making

6    sure we understood the distinction, which policies and

7    practices we had to examine -- even if they were within our

8    existing policies -- examine them, and be sure that we had the

9    best practices in the industry; and, if not, what changes did

01:30:34    10    we have to make?

11    Q.  Mr. Detelich, did you ever believe that Household was a

12    predatory lender?

13    A.  No.

14    Q.  Why not?

01:30:41    15    A.  I never believed that.

16    Q.  Why not?

17    A.  Everything we did during this time, before that time and

18    since that time as an organization was focused on benefitting

19    the customers.  If you look at our practices, the things that

01:30:56    20    we did around net tangible benefits tests, our practices

21    around insisting on income documentation on every single loan.

22    No stated income, no adjustable rate mortgages, none of these

23    loans that just aren't good for customers.  Our loans were the

24    right loans for the right customers.  That was the way we

01:31:14    25    believed this business should be run.  We believed it then,

Detelich - cross

1842

1    believe it today.

2    Q.  Now, why was this topic on the bottom we just came to, "to

3    ensure that our sales practices never stray from our approved

4    practices," why was that on the agenda?

01:31:34  5    A.  We had evidence in the period of time, roughly four

6    months, maybe five months -- not entirely clear, but somewhere

7    in that relatively compressed time frame -- of an increase in

8    customer complaints about a sales practice that revolved

9    around this effective rate issue and, through our compliance

01:32:02  10   and quality efforts, had discovered documents or sales

11   documents that were unapproved.

12        So, that was happening in the weeks that preceded

13   this summit.  And we felt it was important that we gathered

14   together to discuss exactly how that was happening.

01:32:21  15   Q.  And when you discovered these unauthorized forms,

16   Mr. Detelich, did you do any investigation to find out whether

17   any other customers had been affected by these unauthorized

18   forms?

19   A.  We did that a number of times, yes.

01:32:36  20   Q.  What did you do?

21   A.  One example was in the Bellingham, Washington, market

22   where we had good evidence that one branch in particular was

23   using an effective rate presentation in their sales practices.

24   And in that branch, we contacted every single customer for

01:32:55  25   every loan made over a period of time.  And I don't recall the

Detelich - redirect

1855

1    A.  I believe that was in late '97, used in early '98.

2        MR. BURKHOLZ:  Why don't you bring up Exhibit 550.

3    BY MR. BURKHOLZ:

4    Q.  You have it.

01:48:15  5    A.  My 550?

6        (Brief pause.)

7    BY THE WITNESS:

8    A.  Bear with me.

9        (Brief pause.)

10   BY THE WITNESS:

11   A.  I have 550.

12   BY MR. BURKHOLZ:

13   Q.  Okay.

14       And you see Mr. Huey's e-mail to Ms. Curtin, which is

01:49:01  15   forwarded to you?

16   A.  Let me just re-acquaint myself with this, again.

17       I do.

18   Q.  Okay.

19       And you see the list of Attorney Generals that are on

01:49:11  20   the e-mail, the multi-state working group.  If you turn to the

21   second page, you see that the State of Arizona is listed as a

22   member of the multi-state working group at this time in the

23   summer of 2002?

24   A.  I don't yet -- oh, I see, yes, Sandra Kane, yes, I do.

01:49:31  25   Q.  Right.

Schoenholz - direct

1878

1     And, then, what did your title change to at that

2  time?

3  A.  I became the Chief Operating Officer.

4  Q.  Okay.

02:21:26  5     And, in the middle of 2002, were you also given some

6  role as the Chief Operating Officer as being put in charge of

7  Consumer Lending?

8  A.  Tom Detelich, beginning in August of 2002, then, reported

9  to me, correct.

02:21:48 10  Q.  Okay.

11     So, in other words, Mr. Detelich ran Consumer

12  Lending, but reported to you in that role as the COO; is that

13  right?

14  A.  That's correct.

02:21:57 15  Q.  And that, I take it, was after Mr. Gilmer's retirement?

16  A.  Correct.

17  Q.  Now, let me take you to this period when you were the

18  Chief Financial Officer; and, in particular, between 1999 and

19  the summer of 2002.

02:22:10 20     All right, sir?

21  A.  Okay.

22  Q.  Let me ask you:  Were you responsible as the Chief

23  Financial Officer of Household for the company's external

24  financial reporting?

02:22:19 25  A.  Correct.

Schoenholz - direct

1879

1    Q.  Okay.

2         And when we say "financial reporting," did that

3    include the filing of 10-Ks and 10-Qs with the SEC, for

4    example?

02:22:29  5    A.  That was in my scope of responsibility.

6    Q.  As the CFO?

7    A.  As CFO.

8    Q.  Did you also have administrative oversight for the

9    Internal Audit Department?

02:22:44  10   A.  I think throughout that entire period I did, although

11   maybe in 2002 that shifted over to Mr. Aldinger.

12   Q.  Okay.

13        And I take it you also had some role, as the CFO,

14   with respect to the company's treasury practices; is that

02:23:02  15   right?

16   A.  The treasurer reported to me and I worked with him on

17   those treasury functions.

18   Q.  Okay.

19        And the treasurer, during that time period, was Edgar

02:23:11  20   Ancona; is that correct?

21   A.  Yes.

22   Q.  And, sir, in addition to these other responsibilities as

23   the CFO, did you also have some oversight over your investor

24   relations activities at the company?

02:23:27  25   A.  For most of that time, I believe Craig Streem reported to

Schoenholz - direct

1880

1   me.  Subsequently, he then reported to Mr. Aldinger.

2   Q.  Okay.

3        And Mr. Streem testified here last week; is that

4   correct?

02:23:41  5   A.  Correct.

6   Q.  So, at certain times during that period Mr. Streem, you

7   were his boss?

8   A.  Correct.

9   Q.  Sir, I'd like to show you a series of documents today.

02:24:03  10        MR. DOWD:  I hand what's been marked as Plaintiffs'

11   176 to counsel.  I'll also hand you a copy of Plaintiffs' 176.

12        (Document tendered to counsel and the witness.)

13   BY MR. DOWD:

14   Q.  I ask you to take a look at that, if you would, please,

02:24:15  15   sir.

16        (Brief pause.)

17   BY MR. DOWD:

18   Q.  Sir, I'll ask you, generally, you have seen Plaintiffs'

19   Exhibit 176 before; have you not, sir?

02:25:16  20   A.  I believe so.

21   Q.  Okay.

22        And that is a document entitled, "Household

23   International Quality of Accounting Policies Applied and

24   Financial Reporting," dated November 13, 2000; is that right,

02:25:29  25   sir?

Schoenholz - direct

1890

1   Two-Month and Over Contractual Delinquency Ratios."

2            Do you see that chart?

3   A.  I do.

4   Q.  All right.

02:39:26  5            And, sir, this chart was what you reported regarding

6   what you referred to internally and externally as your

7   two-plus numbers; is that right?

8   A.  Correct.

9   Q.  Okay.

02:39:36 10            When you said "two-plus numbers" -- that phrase --

11   what did that mean at Household?

12   A.  Two or more months delinquent.

13   Q.  Okay.

14            So, in other words, what you did, for example, in

02:39:48 15   this chart is you would take your whole loan portfolio, is

16   that right, and you would take a look at that and figure out

17   what percentage of the people -- or of the loan dollars --

18   were more than two months delinquent; is that right?

19   A.  By product.

02:40:07 20   Q.  By product?

21   A.  In total and by product.

22   Q.  Okay.

23            So, in other words, you got "Total" down there a

24   couple times; and, then, you also have it broken down, for

02:40:14 25   example, one category is "Real Estate Secured;" is that right?

Schoenholz - direct

1891

1    A.  Correct.

2    Q.  Sir, in this particular 10-K for the year December 31,

3    2000, did you say anything in this one about the percentage of

4    this portfolio -- this -- your two-plus numbers -- that had

02:40:39 5    been re-aged before this number was arrived at during

6    December -- at December 31st, 2000?

7    A.  Not in the 2000 10-K.

8    Q.  Okay.

9         So, in other words, when you reported these two-plus

02:40:51 10   numbers, they didn't include loans that had been re-aged

11   during the year 2000; is that right?

12   A.  Say that, again.

13   Q.  Sure.

14        When you reported this number at the end of 2000, it

02:41:01 15   didn't include loans that had been re-aged and were current

16   because of that re-age; is that correct?

17   A.  That's correct.

18   Q.  Sir, in the December 31st, 2000, 10-K, in reporting the

19   company's net income at any time, did you say anything about

02:41:35 20   what amount of that income was generated by loans made, where

21   account executives had quoted customers an effective rate?

22   A.  Say that, again, please.

23   Q.  Sure.

24        In your 10-K for the year ended December 31, 2000 --

02:41:49 25   Defendants' Exhibit 851 -- did you say anything in reporting

Schoenholz - direct

1    net income about what amount of that income was generated by

2    loans made, where account executives quoted a customer an

3    effective rate?

4    A.  I'm sure not.

02:42:02 5    Q.  You said, what?

6    A.  No.

7    Q.  Okay.

8            And in reporting net income in the Defendants'

9    Exhibit 851, did you say anything about what amount of that

02:42:13 10   income was generated by loans made where account executives

11   gave a good-faith estimate with ranges from zero to in excess

12   of $6,000?

13   A.  No.

14   Q.  In reporting that net income in Defendants' Exhibit 851,

02:42:26 15   did you say anything about what amount of that income was

16   generated by loans made, when Household made two loans

17   contemporaneously with the second loan at a higher interest

18   rate?

19   A.  No.

02:42:36 20   Q.  In reporting net income, did you say anything about what

21   amount of that income was generated by account executives who

22   misled borrowers about points and fees?

23   A.  Well, I personally don't think account executives misled

24   borrowers.  So, we certainly wouldn't have disclosed that.

02:42:54 25   Q.  Okay.

Schoenholz - direct

1893

1        And you were there when the account executives were

2    talking to all your loan customers?

3    A.  I was not.

4    Q.  And, later, the State Attorney Generals disagreed with you

02:43:03  5    about whether account executives had misled people; is that

6    right, sir?

7    A.  Certainly, that discussion with Attorney Generals.

8    Q.  And you understand that there were regulators during the

9    period between 1999 and 2002 who found that your account

02:43:17  10   executives had misled borrowers; is that correct?

11   A.  Would say that, again, please?

12   Q.  Sure.

13       You understand that between 1999 and 2002, there were

14   state regulators who also found that your AEs had misled

02:43:29  15   borrowers about loan terms?

16   A.  That was certainly their -- their -- opinion.

17   Q.  Okay.

18       In reporting net income, did you say anything about

19   account executives who misled borrowers about insurance

02:43:40  20   products?

21   A.  I would say the same thing I said before.  I don't think

22   our account executives misled borrowers.  So, we would not

23   have disclosed that.

24   Q.  And, again, you weren't there, right, sir?

02:43:53  25   A.  Correct.

Schoenholz - direct

1894

1     Q.   Okay.

2          And, again, there were Attorney Generals who

3     disagreed with you about that; is that correct, sir?

4     A.   That's correct.

02:43:58 5   Q.   And there were regulators who found that your account

6     executives had misled borrowers about insurance products; is

7     that right?

8     A.   What do you mean by "found"?

9          I know that was certainly their opinion.

02:44:11 10  Q.   Okay.

11         Well, when I say "found," when I'm talking about a

12    regulator, if they put together an exam report and sent it to

13    you, that's how I use the term.

14    A.   Okay.

02:44:20 15  Q.   All right, sir?

16         Sir, I'd like to show you what's been marked as

17    Defendants' 854.

18         Sorry, Mr. Schoenholz, there's a lot of Ks and Qs

19    over there (indicating) and some of them are pretty thick.

02:44:52 20  So, I've got to dig through the boxes.

21         (Document tendered to counsel and the witness.)

22         MR. DOWD:   A copy to counsel.

23    BY MR. DOWD:

24    Q.   And, sir, I show you what's been marked as Defendants'

02:45:14 25  Exhibit 854.

Schoenholz - direct

1900

1   A.  Yes.

2   Q.  Okay.

3       And, sir, I'd ask you to turn to the page that ends

4   with the Bates range 8217, if you would.

02:51:46  5   And, sir, about the -- I think it's the third and

6   fourth entries down on that page --

7       MR. DOWD:  Well, first, your Honor, I'm sorry, I'd

8   offer Plaintiffs' Exhibit 736.

9       THE COURT:  It will be admitted.

10   (Plaintiffs' Exhibit No. 736 received in evidence.)

11   BY MR. DOWD:

12   Q.  And looking at the page that ends with the Bates range

13   217, sir, the sort of third and fourth bullet points down

14   there contain your two-plus information written out; is that

02:52:13  15   correct?

16   A.  Yes.

17   Q.  And that's information you would have signed off on prior

18   to the time this document was filed with the SEC; is that

19   right?

02:52:21  20   A.  Yes.

21   Q.  Okay.

22       And, then, you also provided your two-plus

23   information in a table format on the page that ends with the

24   Bates range 224; is that correct, sir?

02:52:34  25   A.  Yes.

Schoenholz - direct

1901

1    Q.  Okay.

2        And, sir, in reporting your two-plus statistics, did

3    you say anything in the September 30, 1999, 10-Q about the

4    percentage of the portfolio that had been re-aged before this

02:52:55 5    number was arrived at?

6    A.  No.

7    Q.  Did you say anything about the percentage of the portfolio

8    that had been re-aged multiple times before that number was

9    arrived at?

02:53:03 10    A.  No.

11    Q.  In reporting net income in the September 30th, 1999, 10-K,

12    you didn't disclose anything about whether there was income

13    derived from account executives who had misled or

14    misrepresented terms of contracts to customers, did you?

02:53:24 15    A.  My response would be the same as we did before.  I didn't

16    think account executives misled that.  So, we would have

17    reported that.

18    Q.  Okay.

19        And, again, you weren't there because you --

02:53:35 20    A.  Right.

21    Q.  -- didn't attend the closings, did you?

22    A.  That's correct.

23    Q.  And you don't know what your salespeople were saying on

24    the phone, do you, because you weren't there?

02:53:41 25    A.  That's correct.

Schoenholz - direct

1902

1    Q.  You do know that both regulators and State Attorney

2    Generals indicated that your AEs were misleading customers,

3    though; is that right?

4    A.  I do know that.

02:53:54  5    Q.  Sir, I'll place in front of you what's been marked as

6    Plaintiffs' Exhibit 1462.  I'd ask you to take a look at that,

7    if you would?

8             MR. DOWD:  And a copy to counsel.

9        (Document tendered to counsel and the witness.)

10   BY MR. DOWD:

11   Q.  And, sir, is that -- Plaintiffs' Exhibit 1462, do you

12   recognize that to be a copy of the Household International

13   10-K for the period ending December 31, 1999?

14   A.  That's what it says.

02:54:38  15   Q.  Okay.

16            MR. DOWD:  Your Honor, at this time, I'd offer

17   Plaintiffs' Exhibit 1462.

18            THE COURT:  It will be admitted.

19            MR. DOWD:  Okay.

20       (Plaintiffs' Exhibit No. 1462 received in evidence.)

21   BY MR. DOWD:

22   Q.  Sir, I'd ask you to turn to the page -- and I think now

23   it's actually easier to use the actual page numbers, if we

24   can.

02:54:55  25            At the is very bottom of Exhibit Plaintiffs' 1462,

Schoenholz - direct

1922

1    Q.  Sir, do you recognize Defendants' 852 to be the 10-K for

2    the year-ended December 31, 2001?

3    A.  Yes.

4    Q.  And it's for Household International; is that right, sir?

03:39:48  5    A.  Yes.

6    Q.  Okay.  And you signed off on this document as well; is

7    that correct, sir?

8    A.  Yes.

9    Q.  And, again, by signing off on it, you were telling the

03:40:03 10    outside world it was true in all material respects; is that

11    right?

12    A.  Correct.

13    Q.  And I'd ask you to turn, sir, to the page that ends with

14    the Bates range 847.  It's pretty far back in the document.

15    (Brief pause.)

16    BY MR. DOWD:

17    Q.  Sir, do you have the page that ends with 847 in front of

18    you?

19    A.  I do.

03:40:43 20    Q.  And there's a section there that says, Management's report

21    to the shareholders of Household International; is that

22    correct?

23    A.  Yes.

24          MR. DOWD:  Your Honor, I'd offer 852.

03:41:01 25          THE COURT:  It will be admitted.

Schoenholz - direct

1923

1   BY MR. DOWD:

2   Q.  Sir, looking at that page that ends with the Bates range

3   847, in this section, this report to the shareholders, it says

4   that Household International's management is responsible for

03:41:17  5   the preparation, integrity and fair presentation of its

6   published financial statements; is that right?

7   A.  Yes.

8   Q.  Okay.  And that's you, right, sir, when it talks about

9   Household's management there?

03:41:29  10  A.  I would certainly be one of Household's management that's

11  referred to here, absolutely.

12  Q.  In other words, in addition to yourself, Mr. Aldinger also

13  signed this 10-K; is that right?

14  A.  Correct.

03:41:41  15  Q.  And you affirmed that the consolidated financial

16  statements have been prepared in accordance with Generally

17  Accepted Accounting Principles and, as such, include amounts

18  based on judgments and estimates made by management.

19  Management also prepared other information included in the

03:42:00  20  annual report and is responsible for its accuracy and

21  consistency with the financial statements; is that right?

22  A.  Correct.

23  Q.  Then, sir, turning to the next page that ends with 848,

24  this report to shareholders continues at the top of the page;

03:42:22  25  is that right?

Schoenholz - direct

1924

1    A.  Yes.

2    Q.  And it shows that this report itself, within the 10-K, is

3    signed off by both yourself and Mr. Aldinger; is that right?

4    A.  Yes.

03:42:32  5    Q.  And you said in this report that among your

6    responsibilities is included -- or that one of the

7    responsibilities is included in the statement of policy on

8    ethical standards which provides that the company will fully

9    comply with laws, rules and regulations of every community in

03:42:49 10    which it operates and adhere to the highest ethical standards.

11         That's what you told people, right, sir?

12    A.  Yes.

13    Q.  Okay.  Sir, let me ask you, by the summer of 2002, you had

14    state regulators telling you that you hadn't complied with

03:43:07 15    their laws; isn't that right, sir?

16    A.  That was their position.

17    Q.  You had people from attorney general's offices in a

18    multistate working group telling you that you hadn't complied

19    with the laws in their states; isn't that right, sir?

03:43:17 20    A.  In what time frame?

21    Q.  In the summer of 2002.

22    A.  Correct.

23    Q.  But you understood they were talking about your practices

24    during 2001 as well, didn't you, sir?

03:43:24 25    A.  In the summer of 2002 that they were talking about

Schoenholz - direct

1925

1    practices in 2001?

2    Q.  Yes.  That had gone on since 2001 into 2002; isn't that

3    right?

4    A.  I wasn't involved in any of the discussions with the AGs.

03:43:41  5    But --

6    Q.  Did you have an understanding --

7         MR. SLOANE:  Excuse me, your Honor.  I think the

8    document that's up on the screen is not the same version as in

9    evidence.  You've got a redacted version.

03:43:51 10         MR. DOWD:  Okay.

11         THE COURT:  You want to compare versions?  What --

12         MR. DOWD:  No, it's fine, your Honor.  Maybe they put

13    up the wrong one.  We'll just put up the right one.  Sorry.

14    BY THE WITNESS:

03:44:02 15    A.  Repeat the question.

16         THE COURT:  I'm sorry.  What are you doing?  What are

17    you going to do now with the document?

18         MR. DOWD:  They just pulled up the wrong one.  There

19    was an issue with redaction that we had talked about the other

03:44:10 20    day with the defendants.  They put up the wrong one, so

21    they'll put up the unredacted.

22         THE COURT:  Have them put up the one they're going to

23    put up and tell me if you have any objection to it on your

24    screen.

03:44:30 25    (Brief pause.)