# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF ILLINOIS

### EASTERN DIVISION

---

|  |  |
|---|---|
| ) | |
| LAWRENCE E. JAFFE PENSION PLAN, ON BEHALF OF ITSELF AND ALL OTHERS SIMILARLY SITUATED, ) | Lead Case No. 02-C-5893 (Consolidated) |
| Plaintiffs, ) | CLASS ACTION |
| - against - ) | Judge Ronald A. Guzmán |
| HOUSEHOLD INTERNATIONAL, INC., ET AL., ) | |
| Defendants. ) | |

---

**APPENDIX OF TRANSCRIPT EXCERPTS IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50(b) AND DEFENDANTS' MOTION FOR NEW TRIAL PURSUANT TO RULE 59**

**VOLUME 2 OF 2**

CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York  10005
(212) 701-3000

EIMER STAHL KLEVORN & SOLBERG LLP
224 South Michigan Ave.
Suite 1100
Chicago, Illinois 60604
(312) 660-7600

*Attorneys for Defendants*
*Household International, Inc., William F. Aldinger, David A. Schoenholz and Gary Gilmer*

**TRANSCRIPT EXCERPTS**

| __Description__ | __Tab__ |
|---|---|

**Depositions Displayed During Trial**

Excerpts from the Deposition of Charles Cross, April 8, 2008 — 1

Excerpts from the Deposition of Todd May, May 1, 2007................................... 2

**Pretrial Transcripts**

Excerpts from the Transcript of Pre-Trial Conference March 12, 2009
(Pre-Trial Tr. 1-127)........................................................................... 3

Excerpts from the Transcript of Pre-Trial Conference March 18, 2009
(Pre-Trial Tr. 449-550) ...................................................................... 4

Excerpts from the Transcript of Pre-Trial Conference March 20, 2009
(Pre-Trial Tr. 642-793) ...................................................................... 5

Excerpts from the Transcript of Pre-Trial Conference March 26, 2009
(Pre-Trial Tr. 794-906) ...................................................................... 6

**Trial Transcripts**

Excerpts from the Transcript of Trial March 30, 2009 (Tr. 1-252) ...................... 7

Excerpts from the Transcript of Trial March 31, 2009 (Tr. 253-468) ................. 8

Excerpts from the Transcript of Trial April 1, 2009 (Tr. 469-646) .................... 9

Excerpts from the Transcript of Trial April 2, 2009 (Tr. 647-880) ..................... 10

Excerpts from the Transcript of Trial April 6, 2009 (Tr. 881-1103).................... 11

Excerpts from the Transcript of Trial April 7, 2009 (Tr. 1104-1322)................... 12

Excerpts from the Transcript of Trial April 8, 2009 (Tr. 1323-1566).................. 13

Excerpts from the Transcript of Trial April 9, 2009 (Tr. 1567-1716) ................. 14

Excerpts from the Transcript of Trial April 13, 2009 (Tr. 1717-1958) ............... 15

Excerpts from the Transcript of Trial April 14, 2009 (Tr. 1959-2219) ............... 16

Excerpts from the Transcript of Trial April 15, 2009 (Tr. 2220-2476) ............... 17

Excerpts from the Transcript of Trial April 16, 2009 (Tr. 2477-2695) ............... 18

Excerpts from the Transcript of Jury Instructions Conference April 17, 2009
(Tr. 2696-2801) ................................................................................. 19

Excerpts from the Transcript of Trial April 20, 2009 (Tr. 2802-3012).............. 20

Excerpts from the Transcript of Trial April 21, 2009 (Tr. 3013-3281)................ 21

Excerpts from the Transcript of Trial April 22, 2009 (Tr. 3282-3564)................ 22

Excerpts from the Transcript of Trial April 23, 2009 (Tr. 3565-3823)................ 23

Excerpts from the Transcript of Jury Instructions Conference April 24, 2009
(Tr. 3824-3965) ................................................................................. 24

Excerpts from the Transcript of Jury Instructions Conference April 27, 2009
(Tr. 3966-4073) ................................................................................. 25

Excerpts from the Transcript of Trial April 28, 2009 (Tr. 4074-4303)................ 26

Excerpts from the Transcript of Trial April 29, 2009 (Tr. 4304-4426)................ 27

Excerpts from the Transcript of Trial April 30, 2009 (Tr. 4427-4671)................. 28

Excerpts from the Transcript of Jury Instructions Conference May 1, 2009
(Tr. 4672-4700) ............................................................................................... 29

Excerpts from the Transcript of Jury Charge/Deliberation May 4, 2009
(Tr. 4701-4742) ............................................................................................... 30

Excerpts from the Transcript of Verdict May 7, 2009 (Tr. 4769-4813)............... 31

TAB 16

1959

```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all     )
 4   others similarly situated,      )
                                     )
 5               Plaintiff,          )
                                     )
 6      vs.                          )  No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )  Chicago, Illinois
 8                                   )  April 14, 2009
                 Defendants.         )  8:45 a.m.
 9
                              VOLUME 10
10               TRANSCRIPT OF PROCEEDINGS - TRIAL
            BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:          COUGHLIN STOIA GELLER RUDMAN &
                                 ROBBINS LLP
14                               BY:  MR. LAWRENCE A. ABEL
                                      MR. SPENCER A. BURKHOLZ
15                                    MR. MICHAEL J. DOWD
                                      MR. DANIEL S. DROSMAN
16                                    MS. MAUREEN E. MUELLER
                                 655 West Broadway
17                               Suite 1900
                                 San Diego, California  92101
18                               (619) 231-1058

19                               COUGHLIN STOIA GELLER RUDMAN &
                                 ROBBINS LLP
20                               BY:  MR. DAVID CAMERON BAKER
                                      MR. LUKE O. BROOKS
21                                    MR. JASON C. DAVIS
                                      MS. AZRA Z. MEHDI
22                               100 Pine Street
                                 Suite 2600
23                               San Francisco, California  94111
                                 (415) 288-4545
24

25
```

Schoenholz - direct

1997

1  Q.  The numbers that Mr. Makowski said were wrong, among

2  others, were, for example, this number about re-aged once in

3  the last 12 months; is that right?

4  A.  That's correct.

09:43:44  5  Q.  And, for example, he says that 9.4 should really have said

6  6.2; is that right?

7  A.  That's what that says.

8  Q.  Okay.  And then he goes on to say that the multiple

9  re-aged number that he told people back in April was 4.3 was

09:44:03  10  actually 7.5 percent; is that right?

11  A.  That's correct.

12  Q.  And then, for example, just looking at the numbers, the

13  4.3 that changed to 7.5 -- that should have been 7.5 -- we're

14  talking about somewhere around $3 billion in additional

09:44:28  15  multiple re-aged loans; is that right?

16  A.  That's correct.

17  Q.  In other words, he said it was 4 billion -- or you said in

18  April 2002, 4 billion 28 million; is that right?

19  A.  That's correct.

09:44:39  20  Q.  And Mr. Makowski said, no, that's wrong.  The number

21  should be 7.025 billion, right?

22  A.  Correct.

23  Q.  Okay.  Now, sir, the bottom line numbers stayed the same

24  because that's just talking about total in the portfolio

09:44:59  25  that's re-aged, right?

Schoenholz - direct

1998

1    A.   That's correct.

2    Q.   In other words, the loans that had been re-aged more than

3    once, you had about 3 billion more than you told people in

4    April of 2002; is that right?

09:45:08   5    A.   That was the error, correct.

6    Q.   Okay.  And so you presented the multiple re-age numbers so

7    that people could look at them in April 2002, but the numbers

8    that you presented were wrong?

9    A.   They were wrong.

09:45:21  10    Q.   Okay.

11         MR. DOWD:  Thank you, Luke.

12    BY MR. DOWD:

13    Q.   Now, sir, you also presented information about certain

14    recidivism statistics by product line; is that right?

09:45:45  15    A.   Correct.

16    Q.   Okay.  And if you could take a look at page 567.  And

17    we're back in Plaintiffs' Exhibit 135 again.

18         Do you have that page in front of you?

19    A.   I do.

09:46:11  20    Q.   Okay.  And it's up on the screen there, right?  We're

21    looking at the same page, Recidivism Statistics by Product,

22    right?

23    A.   Correct.

24    Q.   This, again, was a chart that you used at this April 2002

09:46:24  25    presentation; is that correct, sir?

Schoenholz - direct

2004

1    BY MR. DOWD:

2    Q.  Okay.  You agree with me here though that the recidivism

3    figures are listed as -- for real estate secured -- 53.9

4    percent, right?

09:54:32 5    A.  That's what they're listed as.

6    Q.  For auto finance, they're listed as 48.2 percent; is that

7    right?

8    A.  Yes, sir.

9    Q.  Yes?

09:54:44 10   A.  Yes.

11   Q.  For MasterCard/Visa, 64.3 percent; is that right?

12   A.  Yes.

13   Q.  And for private label, 69 and a half percent; is that

14   right?

09:54:54 15   A.  Yes.

16   Q.  And then it goes on to include 78 percent for personal

17   non-credit card and 75 percent for personal homeowner loans;

18   is that right?

19   A.  That's right.

09:55:04 20   Q.  Okay.  So it seems that Mr. Pantelis has much higher

21   recidivism rates than the ones you reported in April 2002;

22   does he not?

23   A.  Mr. Pantelis is the one who generated the numbers we

24   disclosed in April 2002.  And so I'm not -- again, I'm not

09:55:23 25   sure the context of this e-mail and how directly comparable it

Schoenholz - direct

2005

1   is to the analysis that Pantelis did for the FRC.

2   Q.  Okay.

3   A.  Clearly 53 is higher than 13.

4   Q.  Okay.  But you agree with me, sir, that when you presented

09:55:39  5   those figures in April 2002 at the FRC, you didn't include

6   people who had been re-aged in the last 12 months as

7   recidivists, right?

8   A.  I didn't know that at the time, and I didn't say anything

9   about that.

09:55:53  10   Q.  Okay.  But you didn't include those, did you?

11   A.  The definition of recidivism at the FRC did not include

12   subsequent re-ages.

13   Q.  And Mr. Pantelis in this document says, If we restate our

14   recidivism figures with classification of subsequently re-aged

09:56:15  15   accounts as recidivists; that's what he's figuring out here,

16   right?

17   A.  That's what it says.

18   Q.  He's saying, if we put back in as recidivists people who

19   did it again, guys that got re-aged another time, these are

09:56:27  20   the numbers?

21   A.  That's what -- that's what this says.

22   Q.  Okay.  Let's look at one more if we could.  I'll show you

23   Plaintiffs' 79.

24   (Tendered.)

09:57:13  25   (Brief pause.)

Schoenholz - direct

2050

1   A.   That's what this -- this says 1.847.   And it would have

2   been lower than originally reported.

3   Q.   Okay.   And same thing for the year 2000; is that correct?

4   A.   Correct.

11:23:00  5   Q.   And the same thing for the year 1999; is that correct?

6   A.   That's right.

7   Q.   Okay.   And, in fact, sir, if you take a look at the page

8   that ends with the Bates range 34, do you see that?

9            At the very bottom there, there's a chart; is that

11:23:26 10   right?

11   A.   I do see that.

12   Q.   And it shows that between 1994 -- for the years 1994 to

13   1998 in your restated 10~K, you reduced income, reported

14   income, by $155 million for those years; is that right?

11:23:41 15   A.   For '94 to '98 did you say?

16   Q.   Yes.   I'm just looking at that chart there.

17   A.   That's what it says.

18   Q.   For example, in 1999, you lowered your net income in this

19   document, your reported income, by $58 million; is that right?

11:23:54 20   A.   That's what it says.

21   Q.   Okay.   And in 2000, you reduced your reported income in

22   this document by 70 million; is that right?

23   A.   Yes, sir.

24   Q.   And for the year 2001, you reduced it by 75.9 million; is

11:24:07 25   that right?

Schoenholz - direct

2051

1    A.  That's correct.

2    Q.  So the numbers were lower by those amounts in this new

3    10-K, this amended 10-K, than they were in the original

4    documents; is that right?

11:24:16  5    A.  That's correct.

6    Q.  I'd ask you to turn to the very next page that ends with

7    the Bates range 035.

8         At the very top, there's another chart.  And it

9    appears to show, sir, your -- how your earnings per share

11:24:33  10   numbers were affected by this restatement; is that correct?

11   A.  That's what it says.

12   Q.  Okay.  And so, for example, looking at the diluted

13   earnings per share, in 2001, when you originally issued your

14   10-K in March of 2002, you told people that their earnings per

11:24:51  15   share was $4.08, right?

16   A.  That's correct.

17   Q.  And now you were telling them, well, we got it wrong; it's

18   $3.91; is that right?

19   A.  I'm not sure I'd characterize it quite the way you did,

11:25:07  20   but it would certainly say it's 3.91.

21   Q.  In other words, originally we told you $4.08; now we're

22   telling you $3.91; is that right?

23   A.  I would agree with that.

24   Q.  In 2000, you told people, in probably March of 2001 when

11:25:21  25   you issued your 10-K, you told people the EPS was $3.55; is

Schoenholz - cross

2118

1   Q.  Did you understand that the investors -- future investors,

2   present investors -- might read and rely on those statements?

3   A.  Of course.

4   Q.  Did you think you misled or deceived anyone?

01:54:10  5   A.  No.

6   Q.  Mr. Schoenholz?

7   A.  Absolutely not.

8   Q.  Did you ever lie to the public, to the investors about the

9   affairs and the business of Household?

01:54:25 10   A.  I never lied to anybody.

11   Q.  Did you ever instruct anyone to do so?

12   A.  Never.

13   Q.  Anyone ever instruct you to do so?

14   A.  No.

01:54:34 15   Q.  Mr. Gilmer, Mr. Aldinger -- anyone -- did they ever tell

16   you to do that?

17   A.  Never.

18   Q.  Did you ever conceal any information from the public or

19   the investment community about the affairs of Household that

01:54:48 20   you deemed material --

21   A.  No.

22   Q.  -- to those affairs?

23   A.  No.

24   Q.  Did you ever tell anyone else to do that?

01:54:55 25   A.  I did not.

Schoenholz - cross

2119

1    Q.  Now, you've heard some testimony sitting back here from

2    Public Relations people, Megan and others?

3         Did you ever tell any of the Public Relations people

4    to conceal anything or to hide anything from the investment

01:55:13  5    community or the investors?

6    A.  Absolutely not.

7    Q.  Mr. Dowd showed you some articles or an article -- one

8    article -- from a newspaper about some allegations of lending

9    practices.

01:55:31 10         Did you ever conceal the existence of a pervasive

11    nationwide, widespread predatory lending scheme, sir?

12    A.  I never did.

13    Q.  Did you believe -- did you believe -- that such a scheme

14    existed?

01:55:45 15    A.  Absolutely not.

16    Q.  Now, we've talked about re-age.  Did you ever conceal or

17    urge anyone to conceal that Household used re-age or

18    restructuring to hide the true credit quality of Household's

19    loans?

01:56:07 20    A.  I never did that.

21    Q.  Did Household do that, sir?

22    A.  Absolutely not.

23    Q.  Did you ever think or did you ever believe they did that?

24    A.  No.

01:56:16 25    Q.  Now, we've heard some stuff about internal and external

Schoenholz - cross

2129

1    that loan ultimately charged off, you could improve the net

2    present value of that loan.

3         And I think from an investor point of view, too --

4    particularly, in this kind of business -- if you were taking

02:10:43  5    and cementing in longer-term customer relationships, that's

6    obviously good for the investors over time.

7         The one other point I would make, though, is there is

8    kind of this -- or could be an assumption that you were doing

9    re-aging to defer credit losses.  But that's just not the

02:11:05  10   case.  I mean, because you reserved for those accounts.

11        So, if an account was re-aged, it would have a

12   reserve against it and it would have a higher reserve against

13   it than if it had not been re-aged, such that from a financial

14   point of view and from the earnings that investors would see,

02:11:24  15   that was irrelevant.

16        The earnings were properly stated because the

17   reserves were properly stated.

18   Q.  How do you know they were properly stated?

19   A.  Well, we had a lot of detailed procedures.  We had a lot

02:11:37  20   of people looking at it.  We had a lot of people -- we did

21   reserves with statistical models adding a judgmental

22   component.  We had the Credit Risk people then compare those

23   models to their projections of future credit losses.  And,

24   then, finally, we had the external auditors audit them.  And I

02:12:00  25   can tell you in this time frame -- by "time frame" I mean the

Schoenholz - cross

2130

1      class period in particularly --

2      Q.  '99 to 2002?

3      A.  '99 to 2002, and particularly as it related to '99, 2000

4      and 2001.  We had Andersen audit the reserves; and, then, as

02:12:21  5    we talked about earlier -- that there was this restatement and

6      KPMG came in, and KPMG re-audited all the reserves and they

7      thought they were fine.

8           And not only did KPMG re-audit the reserves, KPMG

9      brought in their own Credit Risk specialists to re-audit what

02:12:40 10    the auditors audited.

11          So, throughout this time period, there was a lot of

12     scrutiny on the credit loss reserves.  Everyone concluded they

13     were right.

14          And I guess the final point is that even with

02:12:53 15    hindsight, we never had a blow-up.  We never had a credit

16     surprise.

17     Q.  What does that mean?

18     A.  Well, as I said earlier, you know some losses aren't --

19     you aren't -- going to collect all these things, but you don't

02:13:05 20    know which ones and how much.  So, you have to make an

21     estimate.

22          But if you didn't make a correct estimate

23     consistently, eventually the fact that you had been

24     underestimated these things would catch up with you; and, at

02:13:19 25    some future period, you'd have to have some kind of charge

Schoenholz - cross

2133

1     Household, to put that in context.

2     Q.  Now, was re-aging an accounting policy or an operational

3     policy?

4     A.  It was absolutely an operation policy.  It was delegated

02:16:18  5     to the Business Units.  It was set by the detail -- the

6     Business Unit Collection people and the Business Unit Credit

7     risk people.

8     Q.  It's been a while for everybody.

9          How many Business Units did Household have?

02:16:35 10     A.  I think seven major ones.

11     Q.  Okay.

12          And, so, were the Business Units -- is what you're

13     saying the Business Units were responsible for the operational

14     policies of re-aging?  Is that your statement?

02:16:59 15     A.  Absolutely.

16     Q.  Now, you mentioned about disclosure about the re-aging

17     policies.  Would you give us a little background about when

18     and how that came about?

19     A.  I think I would start that discussion with -- in the

02:17:26 20     context of the 2001 10-K.

21          We had never previously disclosed in our 10-K filings

22     the existence of re-age policies, although I believe that we

23     had some types of disclosures in our asset-backed filings.

24          But when we were looking at the 2001 10-K, we were

02:17:58 25     aware that there were questions among the financial press --

Schoenholz - cross

2153

1    was trying to pull together the numbers to put in this -- I

2    think you called it a two-pronged disclosure -- the 10-K and

3    the FRC?

4    A.   Absolutely.

02:46:02  5         I mean, we had actually talked about trying to

6    include these numbers in the 10-K three weeks earlier in March

7    and we couldn't because we couldn't get the numbers pulled

8    together.

9         But this was the first time that the Corporate Credit

02:46:15 10   Risk group, working in connection with the Business Units,

11   gathered all the Business Unit data and consolidated it.

12   Q.   When you say "we couldn't," was that because there was

13   separate Business Units that had all this data and the data

14   was different; or, what was the reason?

02:46:31 15   A.   I mean, the re-aging was an operating policy.  It was

16   delegated to the Business Units.  They tracked it.  We didn't

17   ask them to report it to corporate.  I didn't get monthly

18   reports talking about it.

19        And, so, when we decided we wanted to take a

02:46:47 20   consolidated view of it, the guys had to get together and

21   figure out how to gather the data in consistent formats and

22   consistent terminology and how to consolidate it; and, when we

23   talked about the error that happened, I think that's why we

24   had the error.

02:47:04 25   Q.   Well, let's talk about that error.

Schoenholz - cross

2155

1   A.   Right.  That was the document.

2          And we talked about sub-certifications.

3   BY MR. SLOANE:

4   Q.   Yes.

02:48:36   5   A.   That's what this is.

6          And, so, this would have been received --

7          MR. SLOANE:  Brian, let's put this back up now,

8   please.

9       (Brief pause.)

10   BY MR. SLOANE:

11   Q.   Go ahead, please.  I'm sorry.

12   A.   It's not dated, but this would have been received in that

13   time frame of either July or August.

14   Q.   July or August of what year?

02:48:56   15   A.   2002.  Excuse me.

16          And in it, because we had people when they reviewed

17   the 10-K document or the 10-Q document, they had to certify

18   that they were not aware of any errors or any misstatements or

19   anything else.

02:49:13   20          And, so, Mr. Makowski, I think -- because he knew

21   that the FR -- that the FRC presentation, this document --

22   Q.   "This document" being -- for the record, being --

23   Plaintiffs' Exhibit 725?

24   A.   I don't know what --

02:49:32   25   Q.   It's the one with your handwriting on it?

Schoenholz - cross

2156

1    A.   It's -- correct, that one (indicating).

2    Q.   Okay.

3    A.   That he knew that that had been filed with the SEC -- not

4    with my handwriting on it, of course, but the clean copy -- I

02:49:44  5    think he felt that he needed to certify the fact that there

6    was an error on this -- in this document.

7    Q.   Who made the error?

8    A.   A guy named Dan Pantelis.

9    Q.   Did he admit to making the error?

02:49:58 10    A.   Oh, yeah.  Dan --

11             MR. DOWD:  Objection.

12             Hearsay, your Honor.

13             MR. SLOANE:  It's a little late, Judge.

14             MR. DOWD:  It's not, your Honor.

02:50:10 15             THE COURT:  Well, overruled.  It's late.  It's

16    overruled.

17             Proceed.

18    BY MR. SLOANE:

19    Q.   Now --

02:50:22 20    A.   Your question -- what was your question?

21    Q.   Well, I asked you a question:  Did he admit to making the

22    error?  You said "Yes."

23             Let me move on to another issue.

24             Can you just explain to the jury what was the error

02:50:35 25    that Mr. Makowski is explaining had been made by Mr. Pantelis

Schoenholz - cross

2157

1    or by Mr. Makowski's group in this document, which is

2    Plaintiffs' Exhibit 188?

3    A.  I'm not sure exactly how it arose, but what you can see is

4    that if you look at the "As Prepared" and "As Corrected" --

02:50:58  5    Q.  Why don't you --

6        MR. SLOANE:  Brian, maybe you can follow along and --

7        (Brief pause.)

8    BY THE WITNESS:

9    A.  If you look at those two columns and you go down to the

02:51:06 10    row that says, "Re-Aged Multiple Times," what we told

11    people -- what we disclosed based on what we thought was

12    correct at the time, at the April 9th Financial Relations

13    Conference -- was that 4.3 percent of the portfolio was

14    re-aged more than one time.  That's what we told people.

02:51:32 15        Conversely, what that would have meant is that 83

16    percent of the people had never been re-aged.

17        You know, if you look, that's the difference

18    between -- by the fact that it's 16.9 percent for the total.

19    So, if you do the arithmetic, what that means is we told

02:51:56 20    people that about 95 or 96 percent of the people had never

21    been re-aged or had been re-aged one time.  That's what we

22    told people on April 9th.

23        What we found out, then, was that that was wrong;

24    that the people who had been re-aged more than once was

02:52:21 25    seven-and-a-half percent.

Schoenholz - cross

2158

```
              1        So, said another way, that would have meant instead
              2   of 90 -- 96 -- percent of the people who had never been
              3   re-aged or re-aged once, it was only 90- -- about 93 --
              4   percent.
02:52:40      5   Q.  Mr. Pantelis made a mistake, right?
              6   A.  Yeah.  He made a mistake.
              7   Q.  Go on.
              8   A.  That's really what it is.  I mean --
              9   Q.  Did the 16.9 percent change?
02:52:53     10   A.  That was --
             11   Q.  Total re-age?
             12   A.  That was all the same.
             13        The two-plus delinquency was all the same; the
             14   charge-offs were the same; our reserves were the same; our
02:53:08     15   reserve ratios were the same; and, so, we concluded that that
             16   was not -- I mean, it was unfortunate.  We certainly didn't
             17   want it to happen.  But it was an unintentional error on his
             18   part and we concluded it wasn't -- wasn't -- material.
             19   Q.  You concluded it wasn't material.  Is that a conclusion
02:53:29     20   you reached after the error was discovered?
             21   A.  Correct.
             22   Q.  And that was discussed internally?
             23   A.  We got everybody together -- this came to my attention
             24   probably -- I don't remember exactly, but within weeks.  I
02:53:46     25   knew about this long before Makowski did it in his
```

Schoenholz - cross

2159

1    certification.  And we got all the right people together to

2    talk about it.  And that was our conclusion -- is that it was

3    an error.

4    Q.  When you said you knew about it before the his

02:54:00 5    certification, did you know about it before you told the

6    investor community?

7    A.  Absolutely not.

8    Q.  You're sure about that?

9    A.  I'm positive about that.  I'm positive -- I can't remember

02:54:09 10    the exact date that Pantelis and Makowski came into my office,

11    but it was two to three weeks after we did this presentation

12    and they came in and said they had bad news.

13    Q.  Bad news?

14    A.  Yeah.

02:54:28 15        They wanted -- they realized they had made a clerical

16    error and needed to tell me about it.

17    Q.  What was your reaction?

18    A.  I was not pleased; but, you know, it was what it was.  And

19    once I concluded that it was an error, I got the right people

02:54:46 20    involved to figure out what to do about it.

21    Q.  Now, you mentioned -- or actually, Mr. Dowd had a

22    transcript of a -- I guess it's Plaintiffs' Exhibit 183.

23        Can you find that in front of you?  It's a big

24    thick --

02:55:09 25    A.  What was it?

Schoenholz - cross

2165

1          MR. SLOANE:  May I proceed, your Honor?

2          THE COURT:  -- proceed.

3    BY MR. SLOANE:

4    Q.  Mr. Schoenholz, we talked a little bit about reserves, and

03:23:54  5    I'd like you to explain what the process was of setting

6    reserves.  I think you mentioned something about statistical

7    reserves.  Why don't you explain that.

8    A.  The business units each would calculate a statistical

9    estimate of their loss reserve requirements using a consistent

03:24:20 10   methodology but unique to their product.  And what they did is

11   they tried to track, or they didn't try, what they did do is

12   they tracked how loans would move among delinquency buckets on

13   the way to ultimately being charged off.

14   Q.  What's that mean, moved between delinquency buckets?

03:24:46 15   A.  So you might look at an account that's current in month

16   one, and the next month you'd see, well, what happened to it?

17   Did it stay current?  Did it go to one month delinquent?

18          The next month you could say, well, what happened to

19   that account?  Did it go to three months delinquent?  Did it

03:25:01 20   stay at two months delinquent?  Did it go back to current?

21          And you would get we called them roll rates.  Some

22   people called it migration analysis; but in essence, it was a

23   detailed calculation of -- of your portfolio's potential loss

24   experience based on delinquency status and charge-off

03:25:30 25   experience, and each of the business units would do that kind

Schoenholz - cross

2166

1    of model.

2         They would then send them to the corporate office.

3    The corporate office would look at those and then arrive at

4    judgmental reserves.

03:25:46  5    Q.  Let's stick with the statistical reserves first.

6    A.  Okay.

7    Q.  So the statistical reserves were done by the business

8    units, is that correct?

9    A.  Yes.

03:25:56 10    Q.  And was -- if an account was re-aged, we heard all this

11    discussion about re-aged, if it was re-aged, was that

12    reflected in the statistical reserves?

13    A.  Yes.

14    Q.  How?

03:26:10 15    A.  Well, however the -- if an account that was re-aged

16    performed worse over time, it would move through the buckets

17    more quickly, and so it would end up carrying a higher reserve

18    requirement.

19    Q.  So if it moved from 30 days delinquent to 60 days

03:26:36 20    delinquent, would that somehow affect the statistical

21    reserves?

22    A.  Sure.  And -- and if it -- I don't know how really else to

23    explain it, but I mean you had huge numbers of accounts.  And

24    so when you looked at how those accounts performed over time

03:26:59 25    and how they migrated from bucket to bucket, delinquency

Schoenholz - cross

2167

1    bucket, delinquency status to delinquency status, you would

2    come up with a reserve requirement for those types of

3    reserves.

4            We had refined a methodology to actually break down

03:27:21  5    statistical requirements among -- for those accounts that had

6    been re-aged, which would carry a higher reserve component

7    because they were the weaker accounts, for accounts that

8    declared bankruptcy, and then for accounts that had never been

9    re-aged or gone bankrupt.

03:27:38 10    Q.  So you started -- these are the statistical reserves.

11           Now, was there -- were there also another component

12    of the reserve-setting process?

13    A.  The second component was called judgmental reserves.

14    Q.  What's that mean?

03:27:53 15    A.  Well, the statistical models were a historical average, so

16    you needed to take into account things that might not be

17    reflected in that historical average.

18           So, for instance, if the economy was getting worse,

19    you'd want to have more judgmental reserves.  If you thought

03:28:11 20    housing values were getting worse, you'd want to have more.

21    You looked at unemployment.  You looked at the mix of products

22    in the portfolio.

23           So if unsecured products were growing more quickly

24    than real estate secured and they had higher loss rates, you

03:28:28 25    might want to have more judgmental reserves for that.

Schoenholz - cross

2172

1    A.  Then you would have to take another expense to make up the

2    shortfall between the 100 and the 200.

3    Q.  So you'd have to add to your reserves then or take an

4    expense for the miscalculation or the missed expectation?

03:34:38  5    A.  Yes, sir.

6    Q.  Did that ever happen?

7    A.  Never.

8    Q.  Now, let me ask you, you mentioned something called FFIEC

9    in your direct-examination, and I know that we've heard some

03:35:01 10    testimony about this.  You were in the back of the room

11    before.

12         Without getting into what FFIEC stands for, did it

13    apply to household?

14    A.  It applied to our credit card bank, but not to the other

03:35:14 15    parts of the company.

16    Q.  What percentage, if you know, of Household's total

17    receivables did FFIEC apply to?

18    A.  My guess is -- I don't remember exactly, but it was

19    relatively small.

03:35:41 20    Q.  Relatively small.

21         So what was the concern about FFIEC and the FFIEC

22    rules that we have heard so much testimony about as you've

23    been sitting in the back of the courtroom, what was your

24    concern about FFIEC as it might apply to Household?

03:36:09 25    A.  Well, FFIEC were rules set by banking regulators to apply

Schoenholz - cross

2173

1     to banks, and they set standards on things such as re-age and

2     charge-off.

3     Q.  Was Household International a bank?

4     A.  It was not a bank.

03:36:34   5         And the concern was if you applied these standards

6     which were meant to apply to a bank's customer base and you

7     applied them to a consumer finance customer base, you would

8     actually increase the amounts of ultimate credit losses within

9     the finance company.

03:36:58  10   Q.  What would it do to your business model in terms of your

11    dealings with your customers?

12    A.  It would really throw the whole model upside down.  I mean

13    the reason you had a consumer finance company customer was

14    that they really didn't normally qualify to go to a bank.  So

03:37:16  15   it would make no sense to take that customer and now say,

16    well, now I'm going to treat you like a bank customer.

17    Q.  Mr. Dowd and I asked you about a restatement that occurred

18    in connection with certain credit card agreements.

19         Would you describe the circumstances surrounding the

03:37:49  20   restatement?

21    A.  In -- I think it was in the spring of 2002, the audit

22    committee of the board decided to replace Arthur Andersen and

23    to hire KPMG.  KPMG was, therefore, engaged, and they had to

24    re-audit, issue their opinion, on 1991 -- 1999, 2000 and

03:38:24  25   2001 -- the financial statements in those 10-K documents.

Schoenholz - cross

2174

1    Q.  Before KPMG got involved, was Arthur Andersen involved?

2    A.  Arthur Andersen had done the original audit work of those

3    financial statements and had valid audit opinions that were

4    out -- that were in effect for 1999, 2000 and 2001.

03:38:45  5    Q.  What's a valid audit opinion?

6    A.  Well, in terms of financial statements included in the

7    10-K, you have to have an auditor's report that is current,

8    and there were rules about what current meant; but you had to

9    have a set of audited financial statements on file with the

03:39:05  10   SEC in order to conduct transactions in the securities

11   markets, trading stock or, for us, going in to borrow money

12   which we would then lend to customers.

13          So you had to have a valid set of audited financial

14   statements on file with the SEC to conduct your business.

03:39:28  15   Q.  Now, Mr. Dowd showed you a bunch of 10-Ks for various

16   years, 2000, 2001 and 2002.  As best you understood it, did

17   those include opinions from your outside auditors?

18   A.  Yes.

19   Q.  Is that something that you drew comfort from --

03:39:47  20   A.  Yes.

21   Q.  -- in certifying the documents after the Sarbanes-Oxley

22   rules came into effect?

23   A.  Well, and even before Sarbanes-Oxley came into effect.

24   The fact that I had to sign the documents.

03:40:00  25   Q.  Now, we saw on the board, if you put up that demonstrative

Schoenholz - cross

2175

1    exhibit, Brian, DX 180 -- I'm sorry -- it's the one about the

2    process.

3            That's it.

4            This refers to the external auditors, does it not?

03:40:21  5    If you look down the lower left-hand corner?

6    A.  Yes, sir.

7    Q.  And it also includes reference to the external auditors in

8    the top, in the 10-K draft, is that right?

9    A.  It does.

03:40:33 10    Q.  And that was Arthur Andersen first and then KPMG?

11    A.  Correct.

12    Q.  Now, I interrupted you.  Arthur Andersen, you were telling

13    us about Arthur Andersen, and then you said KPMG came in, so

14    continue, please.

03:40:50 15    A.  Okay.  So the audit committee decided to replace Arthur

16    Andersen and hire KPMG.  KPMG had to audit 1999, 2000 and

17    2001, even though they had previously been audited by Arthur

18    Andersen.  And they did that in the summer, late spring and

19    summer of 2002.

03:41:12 20            KPMG's audit conclusions that they concurred with

21    everything, including loss reserves and disclosures on

22    re-aging, on the company's account credit policies, but they

23    did not, KPMG did not agree with the accounting on three

24    contracts that Household had regarding marketing credit cards.

03:41:46 25            And without going into a lot of detail, the issue was

Schoenholz - cross

2176

1    kind of basically the same on all three.  It was Household

2    spent money to market credit cards or paid money to these

3    partners to market credit cards and, therefore, got a benefit

4    from that over a period of time, and what was the period of

03:42:11  5    time to record that expense?  Because you wouldn't record it

6    all day one.  You would record it over some period of time.

7    And there were no specific accounting, hard-line accounting

8    rules about that.  So you had to use management judgment.

9         When Household first established those contracts, one

03:42:31 10    of which went back I think to '93, I think it was '92 or '93,

11    we had consulted with Arthur Andersen at that time who were

12    our auditors to get their opinion --

13         MR. DOWD:  Objection, lack of foundation and hearsay.

14         THE COURT:  Sustained.

03:42:51 15    BY MR. SLOANE:

16    Q.  Let me show you a document.  Perhaps this will expedite

17    this.  Can you put in front of you Plaintiffs' Exhibit 231.

18         I think you should have that right in front of you,

19    Mr. Schoenholz, in that maybe top of the pile.

03:43:16 20    A.  231?

21    Q.  Yeah, it's the 10-K/A.  Do you see that?

22    A.  Not yet.

23    Q.  Let me just see if I can put it up on the screen and

24    perhaps that will help.

03:44:14 25    A.  Okay.

Schoenholz - cross

2177

1          MR. SLOANE:  If you could, Brian, put up page 5079,

2    and highlight -- it's page 62 of the document.  Highlight the

3    last paragraph at the bottom.  Maybe you can blow that up,

4    Brian.

5    BY MR. SLOANE:

6    Q.  Now, this says, "Household International has restated its

7    consolidated financial statements for the years ended

8    December 31, 1999, 2000 and 2001.  This Form 10-K/A and the

9    exhibits included herewith include all adjustments relating to

03:45:02 10   the statement -- restatement for all such prior periods.  The

11   restatement relates to MasterCard and Visa co-branding and

12   Affinity credit card relationships and a marketing agreement

13   with a third-party credit card marketing company.  All were

14   part of our credit card services segment.  In consultation

03:45:25 15   with our prior auditors, Arthur Andersen, LLP, we treated

16   payments made in accordance with these agreements that were

17   entered into between 1992 and 1999 as prepaid assets and

18   amortized them in accordance with the underlying economics of

19   the agreements.  Our current auditors, KPMG, LLP, have advised

03:45:54 20   us that in their view, these payments should have either been

21   charged against earnings at the time they were made or

22   amortized over a shorter period of time."

23          Do you see that?

24   A.  I do.

03:46:07 25   Q.  And does this accurately reflect what happened; that is,

Schoenholz - cross

2178

1     that Arthur Andersen, as set forth in this document, had

2     consulted with the company and had agreed with the accounting

3     at that time?

4     A.  Yes.

03:46:24  5     Q.  And KPMG came in and it disagreed, is that what this says?

6     A.  That's what that says.

7     Q.  Now, there was also a different view, was there not?

8     There was some view that the OTS had about this, is that

9     right?

03:46:38 10     A.  The OCC --

11     Q.  OCC, I'm sorry.

12     A.  -- yes, had a view on one of the -- one of the items.

13     Q.  And had they changed their view over time?

14          MR. DOWD:  Objection, hearsay.

03:46:56 15     BY MR. SLOANE:

16     Q.  What was your understanding of their view?

17     A.  They originally agreed with the accounting as Household

18     did it and subsequently went back and questioned their prior

19     opinion and were in the process of finalizing their opinion

03:47:17 20     when this matter arose.

21     Q.  Was it correct to say, sir, that you first followed the

22     views of Arthur Andersen?

23     A.  That's correct.

24     Q.  And then KPMG came in, you followed their views.

03:47:33 25     A.  That's correct.

Schoenholz - redirect

2179

1          MR. SLOANE:  Nothing further, your Honor.

2          THE COURT:  Redirect?

3          MR. DOWD:  Thank you, your Honor.

4                    REDIRECT EXAMINATION

03:47:45  5   BY MR. DOWD:

6     Q.  Mr. Schoenholz, just so I understand, the financial

7   statements that got restated, sir, that you just talked about

8   with Mr. Sloane, they were Household's financial statements,

9   right?

03:47:57 10   A.  That's correct.

11    Q.  They weren't Andersen's financial statements, were they?

12    A.  They were the financial statements of the company.

13    Q.  They were your responsibility, right?

14    A.  That's correct.

03:48:05 15   Q.  Now, sir, you testified that these re-agings were done for

16   the customers, I think, on cross, is that right?

17    A.  I think I testified they were done and benefited customers

18   and benefited investors.

19    Q.  Okay.  Sir, I'll ask you to look back at Plaintiffs'

03:48:26 20  Exhibit 654, which you looked at, I believe, yesterday or

21   today.  Plaintiffs' 654.

22          MR. DOWD:  Can we have the switch, your Honor?

23          THE COURT:  Indeed.

24   BY MR. DOWD:

03:48:43 25   Q.  Again, sir, this was an e-mail from Mr. Makowski in

Schoenholz - redirect

2184

                   1    day when we ended this quarter, 4 percent of our loans were

                   2    two-plus, right?

                   3    A.   It was a reported statistic.

                   4    Q.   Yeah.  It wasn't a future prediction.  It was a number

    03:53:17      5    saying this is where it is right now in terms of people that

                   6    are two-plus delinquent, right?

                   7    A.   That's a statistic.

                   8    Q.   Right.  It was current data, isn't that right, sir?

                   9    A.   Correct.

    03:53:27     10    Q.   It wasn't a future prediction, was it?

                  11    A.   It's a statistic as of a point in time.

                  12    Q.   Right.

                  13          Now, sir, you talked about this April 9, 2002

                  14    investor conference, right?  And we looked at these boards

    03:53:52     15    earlier today about some of the information that he gave to

                  16    these 400 people in this room who followed Household, is that

                  17    right, sir?

                  18    A.   We did.

                  19    Q.   Okay.  And you said, oh, we gave them the wrong numbers,

    03:54:03     20    but I did it by mistake, is that right?

                  21    A.   That's what I said.

                  22    Q.   Okay.  And you understood, sir, that, in fact, the number

                  23    you gave for multiple re-ages was 4.3, and the actual number

                  24    was 7.5, isn't that right?

    03:54:17     25    A.   Not when I gave the presentation.

Schoenholz - redirect

2185

1    Q.  No, but you later learned, within weeks, you said, is that

2    right, sir?

3    A.  That's what I said.

4    Q.  Within weeks, you learned that the loans that had been

03:54:27  5    re-aged multiple times wasn't 4.3 percent.  It was

6    7.5 percent, right?

7    A.  Correct.

8    Q.  Okay.  You left out about $3 billion in loans, isn't that

9    right?

03:54:37  10    A.  That's what that says.

11    Q.  Okay.  And that's what you learned from Mr. Makowski and

12    Mr. Pantelis, is that right, sir?

13    A.  Correct.

14    Q.  Okay.  So after giving those information, all that

03:54:49  15    information to the investors on April 9, 2002, as soon as you

16    found that out, within two weeks, you issued a big press

17    release and corrected those numbers, right?

18    A.  I told you we concluded they weren't material and we

19    didn't correct them.

03:55:03  20    Q.  Okay.  So just so I understand, no press release went out

21    saying, oh, boy, the numbers we gave you about multiple

22    re-ages were wrong.

23         No press release like that went out, did it, sir?

24    A.  That's correct.

03:55:14  25    Q.  You didn't tell anybody about that mistake, did you, sir?

Schoenholz - redirect

2186

1    A.  We didn't tell people about that mistake.

2    Q.  Okay.  Was that the last time you gave those numbers

3    between then and October 11, 2002?

4    A.  I don't recall.

03:55:29  5    Q.  Sir, did anyone ever tell you during 2002 that re-aging

6    was being used to inappropriately mask the true two-plus

7    delinquency numbers?

8    A.  Say that again, please?

9    Q.  Did anyone ever tell you during the year 2002 that

03:55:48 10    re-aging was being used to mask the true two-plus delinquency

11    number?

12    A.  I'm not sure.  Possibly in one case.

13    Q.  Okay.  Who told you that?

14    A.  I -- I'm not sure, but there was a discussion regarding

03:56:12 15    mortgage services, and I'd referred earlier to this woman

16    Elaine Markell.  And I think that was her view, and I'm not

17    sure if she expressed that view to me or not.  I know she'd

18    expressed that view to other people.

19    Q.  Okay.  But you learned of it in 2002, didn't you?

03:56:29 20    A.  I think I learned of that some -- at some point in time, I

21    think I heard that comment.

22    Q.  Okay.  Sir, Mortgage Services was the second largest of

23    Household's business units in 2001 and 2002, was it not?

24    A.  I'm not sure.

03:56:47 25    Q.  Okay.  You had about 39 billion in loans in Consumer

Schoenholz - recross

2187

1    Lending, and you had somewhere around 18 billion in loans in

2    Mortgage Services, isn't that right?

3    A.  I don't remember, and I'm not sure what credit -- off the

4    top of my head, I can't think of what Credit Card Services

03:57:00  5    had.

6    Q.  It was bigger than Auto, right, sir?

7    A.  Clearly bigger than Auto.

8    Q.  It was bigger than Retail Services, wasn't it?

9    A.  It was.

03:57:07  10    Q.  Now, sir, you said that you didn't conceal anything from

11    investors, is that right?

12    A.  That's what I said.

13    Q.  But you ordered the destruction of documents, isn't that

14    right, sir?

03:57:17  15    A.  I ordered the destruction of Andrew Kahr documents.

16            MR. DOWD:  No further questions.

17            THE COURT:  Recross?

18            MR. SLOANE:  Yes, your Honor.

19                      RECROSS EXAMINATION

03:57:35  20    BY MR. SLOANE:

21    Q.  Mr. Dowd asked you about this error, and your

22    determination was, I think your testimony was it wasn't

23    material.  Why was that?

24    A.  Well, the first point was the total re-ages were correct.

03:57:55  25    The 16.9 percent number on that chart, that was correct.

Schoenholz - further redirect

2188

1          Delinquency was correct.

2          Charge-offs were correct.

3          Reserves were correct.

4          What wasn't correct was that split within the re-aged

03:58:17  5  category, and although we can say $3 billion is a lot of

6  money -- I don't disagree with that -- the receivable

7  portfolio was $100 billion, and it was 3 percent difference.

8          MR. SLOANE:  Nothing further, your Honor.

9          MR. DOWD:  Your Honor, just one question.

03:58:33 10          THE COURT:  Sure.

11          FURTHER REDIRECT EXAMINATION

12  BY MR. DOWD:

13  Q.  Sir, you understood that an account that had been re-aged

14  multiple times performed worse than an account that had never

03:58:41 15  been re-aged before and had performed worse than an account

16  that had been re-aged just once, isn't that right?

17  A.  I believe that's true.

18  Q.  So those $3 billion in loans were going to perform worse

19  than other loans, isn't that right?

03:58:54 20  A.  Our credit loss reserves would have been taking that into

21  account and would have -- so there would not have been an

22  effect on that for the investors.

23  Q.  Okay, sir, but you didn't tell anybody about that, did

24  you?

03:59:04 25  A.  I think I've already testified I didn't.

TAB 17

2220

```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                             EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all    )
 4   others similarly situated,      )
                                     )
 5                  Plaintiff,       )
                                     )
 6      vs.                          )  No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )  Chicago, Illinois
 8                                   )  April 15, 2009
                    Defendants.      )  8:55 a.m.
 9
                               VOLUME 11
10                   TRANSCRIPT OF PROCEEDINGS - TRIAL
             BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:         COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
14                              BY:  MR. LAWRENCE A. ABEL
                                     MR. SPENCER A. BURKHOLZ
15                                   MR. MICHAEL J. DOWD
                                     MR. DANIEL S. DROSMAN
16                                   MS. MAUREEN E. MUELLER
                                655 West Broadway
17                              Suite 1900
                                San Diego, California  92101
18                              (619) 231-1058

19                              COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
20                              BY:  MR. DAVID CAMERON BAKER
                                     MR. LUKE O. BROOKS
21                                   MR. JASON C. DAVIS
                                     MS. AZRA Z. MEHDI
22                              100 Pine Street
                                Suite 2600
23                              San Francisco, California  94111
                                (415) 288-4545
24

25
```

Rybak - direct

2325

1    Household in which it was very critical of various Household

2    practices, didn't you, sir?

3    A.  I'm not sure what the Washington DFI report is.

4    Q.  You never saw that report, sir?

11:41:09  5    A.  Not to the best of my recollection.

6    Q.  Now, between 1999 and the time period we're talking about

7    in 2002, sir, you're aware of evidence that Household had

8    misled investors and analysts, weren't you?

9    A.  I'm not sure if it would be misled.

11:41:40 10    Q.  You're aware in which -- there were situations in which

11   Household misled investors and analysts about its re-aging

12   policies.  You're aware of that, right?

13   A.  I improperly -- I improperly stated what our restructure

14   policy was to mis -- to investors, yes.

11:41:58 15    Q.  You did?

16   A.  Yes.

17   Q.  When did you do that?

18   A.  I wrote a note.  In early '02, I asked what the re-age

19   policy was for real estate.  I stated that it was two

11:42:14 20    months -- I'm sorry -- two payments within 12 months, and

21   there were some exceptions that I had forgotten about.  And I

22   basically disclosed that to senior management early in April.

23   Q.  Right.  But I thought you said that you made the statement

24   to investors and analysts that --

11:42:35 25    A.  I had been --

Rybak - direct

2326

1      Q.  Let me finish.

2              -- that you made the statement that was

3      misrepresented to investors and analysts?

4      A.  Well, when senior management asked me what the policy was

11:42:46  5      in real estate, I stated it would be two payments -- two

6      payments within two months, once every 12 months, and it was

7      proven to be inaccurate.

8      Q.  When did you make this statement to management?

9      A.  That it was inaccurate?

11:43:04 10      Q.  Yes.

11      A.  In April.

12      Q.  April of what year?

13      A.  2002.

14      Q.  Okay.  Let's take a look at the e-mail I think you're

11:43:13 15      referring to.  It's Plaintiffs' Exhibit 1100.  It's already in

16      evidence.

17        (Tendered.)

18      BY MR. BURKHOLZ:

19      Q.  Let's highlight the first paragraph, please.

11:43:49 20              This is an e-mail you wrote on April 4, 2002, right,

21      sir?

22      A.  Yes.

23      Q.  And you wrote it to Gary Gilmer and Joe Vozar, right?

24      A.  And Dave Little.

11:43:59 25      Q.  Dave Little.

Rybak - direct

2327

1          You wrote, As you know, we have stated that in real

2     estate, our restructure policy is once every 12 months with

3     two payments received.  This statement has been made

4     externally to investors, as well as buy- and sell-side

11:44:25  5     analysts.

6          That's what you wrote on April 4, 2002, right, sir?

7     A.  Yes.

8     Q.  You go on to say, As you are aware, we would restructure

9     real estate more often than once every 12 months if we secured

11:44:39 10     an EZ Pay arrangement with the customer.

11          Do you see that?

12     A.  Yes.

13     Q.  And then it says, This situation has been corrected.  We

14     determined that Beneficial legacy accounts -- and Beneficial

11:44:52 15     was the company that Household acquired in 1998, right?

16     A.  Yes.

17     Q.  And Household, in your consumer lending division, would

18     re-age and restructure those accounts during 1999 and 2002,

19     correct, sir?

11:45:07 20     A.  In that period, yes.

21     Q.  Okay.  So you wrote, We determined that Beneficial legacy

22     accounts were restructured once every nine months with one

23     payment.  This has been the policy for some time.  However, I

24     did not remember it.  Any issues relating -- arising from this

11:45:24 25     are my responsibility.

Rybak - direct

2328

1           And you're referring to the Beneficial legacy now,

2     right?

3     A.  Yes.

4     Q.  Okay.  And then you -- at the bottom, you write, I will

11:45:42   5     cover this off with corporate, right?

6     A.  Yes.

7     Q.  And by that you meant you were going to discuss the fact

8     that these two statements that had been made externally to

9     investors and had been found to be inaccurate, you were going

11:46:01  10     to discuss that situation with Mr. Makowski, the controller,

11     and Mr. Schoenholz, right?

12     A.  I'm not sure.  I believe I discussed it with Mr. Makowski.

13     Q.  Right.  And he was the controller for Household

14     International, right?

11:46:22  15     A.  No.

16     Q.  He was the controller for Household, correct?

17     A.  Mr. Makowski?  No.

18     Q.  What was his position?

19     A.  He was director of credit risk for Household.

11:46:31  20     Q.  Okay.  And the five divisions of Household would

21     communicate with him, right, regarding issues that came up?

22     A.  Yes.

23     Q.  And he worked for Mr. Schoenholz, right?

24     A.  Yes.

11:46:50  25     Q.  And you would agree with me that Mr. Schoenholz had input

Rybak - direct

2329

1    into restructure policies at Household, right?

2    A.  Yes, he did.

3    Q.  Okay.  Are you aware whether Household issued a press

4    release or public statement to investors or analysts to

11:47:14  5    correct the inaccuracy as identified in your e-mail?

6    A.  Not to the best of my knowledge.

7    Q.  When you wrote inaccurate on two accounts, that the

8    inaccurate statement had been made externally to investors,

9    you meant all investors, right, individual investors,

11:47:39 10    institutional investors?

11    A.  I'm not sure about individual investors.

12    Q.  Well, don't individual investors have a right to know all

13    information that's out there?

14    A.  I'm not sure what is disclosed to investors or what the

11:47:55 15    policies are in terms of what needs to be disclosed to

16    investors.

17    Q.  I understand you don't have that knowledge, but you

18    understand that Household puts out public statements that both

19    institutional and individual investors rely on, don't you?

11:48:08 20    A.  I know that they do send out statements.  They send out

21    10-Ks, annual reports.

22    Q.  10-Qs, right?

23    A.  10-Qs.

24    Q.  Statements that the senior executives make during

11:48:19 25    presentations to analysts and investors are available to

Rybak - cross

2334

1    Q.   In trying to come up with statistics about the effect of

2    restructuring, what were you trying to do?

3    A.   We were trying to look at the components of how that

4    account paid in the future, how many of them would remain

11:54:28  5    current, how many would roll to write-off.  We would look at

6    the cash sometimes.  There were different analyses that were

7    done.

8    Q.   Was one of the analyses profitability to the investors?

9    A.   It -- we -- we computed the components of profitability,

11:54:44  10   how much cash was collected, et cetera.

11   Q.   Now, did you -- are you aware of whether consumer lending

12   changed restructure policies a couple of times in -- more than

13   a couple of times in 2002?

14   A.   There were some changes that were proposed and there were

11:55:11  15   some changes that were done.  Most of the changes in 2002 I

16   thought were somewhat minor, but there were some changes made.

17   Q.   Just so we understand what you think, what do you think

18   the purpose was of the restructure policies at Household?

19   A.   Well, what we were trying to do was to maximize how much

11:55:35  20   cash we would collect.  In real estate, for example, you

21   wanted to make sure that you would put the customer in a

22   situation where if he had intent to pay he could keep paying

23   on that loan.

24           And we would -- for example, if -- today's April 15.

11:55:58  25   If the customer hadn't made a payment in January through

Rybak - cross

2335

1    April, he would have been due four payments.  The collector

2    would call.  Oftentimes, even if there was an intent to pay,

3    he could not make up all four payments that were in arrears so

4    he -- you know, if he had a $1,500 payment, he could be $6,000

11:56:18  5    in arrears if he was talking to a collector today.

6          The collector would ask for that money.  But in most

7    cases, they couldn't pay the four standard payments.  Also, on

8    May 1st, he would have another payment due; and on June 1st,

9    again, he'd have another payment due.

11:56:34  10          What the collector would ask or tell the customer was

11   if you made two payments in the next two months, we would

12   consider you to be up to date.  That $6,000 that you're past

13   due on you're still going to owe, but we're just not going to

14   ask you for it now.  We'll just collect it as you make

11:56:54  15   payments and the loan draws down.

16          That would keep the customer -- it would be a

17   powerful offer, I think -- and it proved out to be -- to get

18   people to pay again.  If you didn't make the offer, some

19   percentage of those customers would basically give up and

11:57:13  20   not -- and go down the path of foreclosure because there's no

21   way they could start making payments again and pay the amount

22   that was in arrears.

23   Q.  So is it fair to say that part of the reason for

24   restructuring was to help the customers?

11:57:30  25   A.  You were trying to determine who had the ability to pay

Rybak - cross

2336

1    and who had intent.  And by asking for the payments and

2    getting them, you could figure out which customers had intent

3    and it helped them out.

4         The credit bureau would show the balance was up to

11:57:47 5    date.  They'd be able to stay in the house, and we'd be

6    getting cash payments.  We would be getting standard payments

7    from that point on.  So, yeah, it helped.

8    Q.  Did -- did -- you mentioned collecting cash.  Were

9    restructure policies also designed, as you understood it, to

11:58:04 10    benefit the investors?

11         MR. BURKHOLZ:  Objection.  He's leading again.

12         THE COURT:  Sustained.  Reask the question.

13    BY MR. SLOANE:

14    Q.  Did you understand that restructuring had another purpose

11:58:15 15    in addition to helping the customers?

16    A.  Well, restructures -- you want the customers to resume

17    payment; and to the extent that restructures permitted that to

18    happen, it was good for investors.

19    Q.  Did you ever conceal or urge anyone to conceal that

11:58:48 20    Household used restructuring to hide the true credit quality

21    of Household's loans?

22    A.  No.

23    Q.  Are you aware of anybody else doing that?

24    A.  I'm -- no one that I know of ever concealed anything about

11:59:04 25    restructures.

Rybak - cross

2356

1           Now, let me just stop with that first one.  That was

2      an error that was made by you or people working under you?

3           MR. BURKHOLZ:  Objection.  Leading.

4      BY MR. SLOANE:

01:29:35  5  Q.  Do you know who made the error?

6      A.  Yes, I --

7           MR. BURKHOLZ:  Objection.  Leading.

8           THE COURT:  Overruled.

9      BY THE WITNESS:

01:29:40 10  A.  Yes, I know who made the error.  We discussed having an EZ

11     Pay -- we put a policy in that you could do an EZ Pay

12     arrangement, require a payment and, then, basically

13     restructure the account.  The problem was that when they

14     implemented the policy, they misunderstood it.  And what they

01:30:04 15  did was they didn't look at -- we -- the policy was you would

16     restructure once every 12 months.  In error, they started

17     restructuring accounts that were -- it was less than 12 months

18     since the last restructure.

19     BY MR. SLOANE:

01:30:20 20  Q.  When you say "they," who are you talking about?

21     A.  The unit managers in Collections.  And that's why Little's

22     on the list.  When I found out about this error, I called Dave

23     Little.  He agreed that they had an error, started

24     restructuring.  We called all of the unit managers; corrected

01:30:40 25  them in terms of what was supposed to be done; and, then, they

Rybak - cross

2357

1    changed the policy immediately.

2    Q.  I don't --

3    A.  They changed the implementation immediately.

4    Q.  I don't think we've heard the phrase "unit managers."  Who

01:30:51  5  were they?  Maybe there's some other -- another name?

6    A.  Well, in Collections, you have a front end, you have a

7    midrange and you have a back end.  So, you have what they call

8    the unit managers would be running each of those groups.  So,

9    "all supervisors" would be a better way.

01:31:07  10         The various supervisors of the group were on a

11   conference call when we discussed this, and we made sure that

12   they understood what the process was.

13   Q.  Did this have anything to do with -- this error have

14   anything to do with -- the computers at all?

01:31:20  15  A.  Well, the people who programmed the automated transactions

16   basically coded it incorrectly.  They didn't keep the

17   12-month -- they didn't exclude accounts that were on -- where

18   they were less than 12 months since the last restructures out

19   of that EZ rate -- EZ Pay restructure.

01:31:42  20  Q.  Mistake?

21   A.  Mistake.

22   Q.  Let me go to the second item in this.  And it says, "We

23   determined that Beneficial legacy accounts were restructured

24   once every nine months with one payment," and, then, you go

01:32:07  25  on.  I believe counsel started to ask you about that and -- in

Rybak - cross

2358

1    any event, would you explain that to the jury?  What was that

2    all about?

3    A.    Okay.  When we -- we acquired Beneficial in 1998.  Their

4    book of real estate business was -- the customers had a higher

01:32:28    5    probability of default than the rest of HFC.  And, so, what we

6    did was -- in '98, what we said was -- instead of requiring

7    two payments every 12 months, what we said was that we would

8    follow this policy where they would be restructured once every

9    nine months with a single payment.

01:32:49    10    The rule was if Household underwrote that account --

11    remember, this is '98.  The rule was that if we underwrote

12    that customer and gave him a new loan -- paid off the old one,

13    just refinanced the mortgage, gave him a new one -- that we

14    would follow our policies in HFC, which is two payments once

01:33:08    15    every 12 months would be -- an account could be restructured.

16    But under the legacy, we said if we never underwrote

17    the loan -- we just bought these loans; if we never underwrote

18    the loan -- that we would follow the policy that -- policy of

19    one payment every nine months.

01:33:24    20    That portfolio had gotten fairly small by this time

21    in 2002.  I believe -- I know a billion dollars sounds like a

22    lot, but it was in the area of a billion to a billion-and-a-

23    half dollars.

24    We had $45 billion in real estate.  And I had

01:33:41    25    completely forgotten about this, about the legacy.  So, I was

Rybak - cross

2359

1   telling everybody that we used a two-month restructure.  So,

2   that's why I said I had an error.  And any issues arising was

3   my responsibility.  I had simply forgotten about it.

4          It was a small part of the portfolio, again, you

01:33:58  5   know.  And not that a billion-and-a-half -- billion,

6   billion-and-a-half -- isn't large; but, compared to the whole

7   book, it was small.

8          And, so, I had misstated that policy to senior

9   management.

01:34:13  10  Q.  And you said it was a small part of the book.  Do you have

11  any idea of what percent of Household International's total

12  portfolio that involved -- that mistake?

13  A.  It was less than two percent.

14  Q.  Do you have any understanding of the concept of

01:34:38  15  materiality at all, Mr. Rybak?

16  A.  I understand the concept, yes.

17  Q.  And did you think that was a material mistake?

18  A.  I did not think --

19          MR. BURKHOLZ:  Objection.  Foundation.

20  BY THE WITNESS:

21  A.  -- it was material, but --

22          THE COURT:  Objection, what?

23          MR. BURKHOLZ:  Foundation.

24          THE COURT:  Sustained.

25  BY MR. SLOANE:

Rybak - cross

2360

1   Q.  Did you understand what "material" meant in or about this

2   time period?

3   A.  I understood what "material" meant, yes.

4   Q.  Did you have any view about whether this mistake was

01:35:05   5   material?

6   A.  I didn't think it was material.  I just didn't think it

7   was -- we were being accurate.  And I wanted to make sure that

8   people understood about those two situations.

9   Q.  Another mistake?

01:35:18  10   A.  Unfortunately.

11   Q.  Even people who go to the University of Chicago business

12   school make mistakes?

13   A.  Yes.

14   Q.  Now, counsel for the investors also asked you about a

01:35:42  15   document, 1103?

16   A.  Yes.

17   Q.  Do you have that in front of you --

18   A.  Yes, I do.

19   Q.  -- or can you see it on the screen?

01:35:57  20       Now, this talks about -- there are a bunch of e-mails

21   at the back, and I think counsel for the investors focused on

22   this e-mail from you.

23       Do you see that, the top one?

24   A.  Yes, I do.

01:36:11  25   Q.  And, again, I think you were asked a bunch of questions,

Devor - direct

2400

1        THE WITNESS:  Sorry.

2        THE COURT:  Wait, sir.  There's an objection.

3        What's the objection, again?

4        MS. BUCKLEY:  Beyond the class period, your Honor.

02:28:02 5      MR. DOWD:  It would relate to events during the class

6    period, your Honor.

7        THE COURT:  I will sustain the objection.

8    BY MR. DOWD:

9    Q.  Sir, your opinion, if you could, limit it to the 13 Qs and

02:28:16 10   Ks that were filed in connection with the end of these periods

11   originally.  All right?

12   A.  That is correct.

13   Q.  Okay.

14       And do these 10-Qs and 10-Ks, do they report

02:28:29 15   information about Household's income, for example?

16   A.  They do.

17   Q.  Do they report information about revenues?

18   A.  They do.

19   Q.  And do they report information about earnings per share?

02:28:41 20   A.  They also do, sure.

21   Q.  And, sir, do these -- this type of information, where in

22   the 10-Q or 10-K is it presented?

23       What's that document called?

24   A.  Well, "Financial Statements," in essence.  The company --

02:28:59 25   10-Qs and 10-Ks include the financial statements of the

Devor - direct

2401

1  company, which consists maybe of three, four, five pages.  It

2  can certainly vary.

3         And, then, over and beyond the financial statements,

4  there's a whole section called the "Footnotes" to the

02:29:16  5  financial statements, which are actually part of the financial

6  statements, which is a long narrative that explains the

7  financial statements.

8         And, beyond that, there's a whole other section of

9  the 10-K that also discusses the financial information, called

02:29:30 10  "Management's Discussion and Analysis," also known as "MD&A."

11  Q.  What type of information is provided in the footnotes and

12  MD&A?

13  A.  Well, basically, the footnotes and MD&A -- the narrative

14  part of the document -- basically is there to explain the

02:29:52 15  financial statements.  They sort of give the story behind the

16  numbers, in essence:  How the numbers were prepared; what

17  procedures, policies the company followed to arrive at these

18  numbers; and, they're very important to an understanding of

19  how the financial statements came to be what they are.

02:30:13 20  Q.  And have you prepared a demonstrative exhibit to explain

21  the concept of the disclosures in these footnotes and MD&As?

22  A.  I have.

23  Q.  Okay.

24         MR. DOWD:  I'd ask to bring up Plaintiffs'

02:30:27 25  Demonstrative Exhibit 101.

Devor - direct

2402

1          (Brief pause.)

2     BY MR. DOWD:

3     Q.   Sir, you can you see Plaintiffs' Exhibit 101 there?

4     A.   I can.

02:30:44  5     Q.   And is that the demonstrative you've prepared?

6     A.   It is.

7     Q.   Okay.

8          And can you tell us what this demonstrative shows?

9     A.   Well, in the background of the demonstrative, you'll see

02:30:57  10    what looks like a bunch of numbers and captions.

11         That's one of Household's financial statements.  It's

12    the Statement of Income, also commonly referred to as a

13    "Profit and Loss Statement."

14         And, then, what's in front of that -- if you actually

02:31:17  15    go to the bottom of the financial statements, you'll see a

16    little red box right there (indicating) that's been blown up.

17    And what that says is, "The accompanying notes are an integral

18    part of these consolidated financial statements."

19         So, that refers the reader or the user of the

02:31:36  20    financial statements to this narrative -- the footnotes --

21    that I explained before, so that one can understand what the

22    numbers mean.

23         And, as you can see, it indicates that it's actually

24    part of the financial statements.  The footnotes and financial

02:31:51  25    statements are considered one item.

Devor - direct

2403

1  Q.  Okay.

2       And, sir, have you also prepared --

3  A.  I'm sorry, right below it is an example of that, taken out

4  of Household's -- one small example.

02:32:02  5  Q.  In other words, that's a part of the footnotes that's

6  blown up there?

7  A.  Right.

8  Q.  Okay.

9       And that goes on, I take it, for pages and pages?

02:32:09 10  A.  Pages and pages.

11  Q.  Okay.

12       And, sir, have you also prepared a demonstrative to

13  assist you in explaining this testimony about the MD&A -- the

14  Management Discussion and Analysis?

02:32:20 15  A.  I have.

16  Q.  Okay.

17       MR. DOWD:  And could we please bring up Plaintiffs'

18  Demonstrative 102.

19       (Brief pause.)

20  BY MR. DOWD:

21  Q.  And, sir, what is depicted in Plaintiffs' Demonstrative

22  Exhibit 102?

23  A.  Well, again, in the background is the same income

24  statement -- the same financial statement -- that was on the

02:33:07 25  prior slide; and, in the foreground of the demonstrative is a

Devor - direct

2404

            1    section out of this other section of the 10-K called the

            2    "Management's Discussion and Analysis."  And it provides

            3    certain analysis of the numbers required by the SEC.

            4            And this is an example right out of, I think, the 201

02:33:32    5    10-K of Household.

            6    Q.  And that's been received in evidence as Defendants' 852.

            7            Now, sir, are there rules?  I mean, you said

            8    something about SEC rules.  Are there rules about what's

            9    supposed to be in these financial disclosures -- this MD&A and

02:33:48   10    the footnotes?

           11    A.  Yes, there are rules.

           12    Q.  Okay.

           13            And have you prepared another demonstrative to assist

           14    you in explaining that concept?

02:33:55   15    A.  I have.

           16    Q.  Okay.

           17            MR. DOWD:  And could we please have up Plaintiffs'

           18    Demonstrative Exhibit 109.

           19        (Brief pause.)

           20    BY MR. DOWD:

           21    Q.  And, sir, what is shown on Plaintiffs' Demonstrative

           22    Exhibit 109?

           23    A.  Really, the two sets of rules that would govern how a

           24    public company would, in fact, report.

02:34:25   25            So, the first one -- the upper left-hand corner -- is

Devor - direct

2405

1    something known as "Generally Accepted Accounting Principles."

2    That's one set of rules.

3        And, basically, any set of financial statements --

4    public companies, small company, whatever -- unless it's

02:34:42  5    indicated otherwise, has to be in accordance with generally

6    accepted accounting principles, which is also known by its

7    acronym, usually -- at least by accountants -- as GAAP,

8    G-A-A-P.

9    Q.  So, in other words, anybody who is doing financial

02:35:01 10    statements has to make sure that those financial statements

11    are presented under these GAAP rules; is that fair?

12    A.  That's correct.

13    Q.  Okay.

14        And can you tell us about any other requirements that

02:35:13 15    public companies face in connection with preparing their

16    financial statements?

17    A.  Sure.

18        Well, public companies -- first of all, public

19    companies -- also have to follow GAAP.  But, over and beyond

02:35:24 20    that, the SEC has certain requirements over and beyond GAAP,

21    such that public companies have to follow GAAP and maybe some

22    other requirements.

23        And, in fact, engrained in the SEC regulations is a

24    statement that says, in essence -- I'm not quoting, but -- any

02:35:45 25    financial statements not presented in accordance with GAAP are

Devor - direct

2406

1    considered to be false and misleading.  Something like that.

2    Q.  Now, sir, who is responsible for preparing the financial

3    statements at a company like Household?

4    A.  The company, specifically; and, more specifically than

02:36:05  5    that, the senior management of the company is ultimately

6    responsible.

7    Q.  Okay.

8         And have you prepared a demonstrative to show us that

9    concept, as well?

02:36:15  10   A.  I have.

11   Q.  Okay.

12        And could we please pull up Plaintiffs' Demonstrative

13   Exhibit 110.

14        (Brief pause.)

15   BY MR. DOWD:

16   Q.  And, sir, do you recognize Plaintiffs' Exhibit 110?

17   A.  I do.

18   Q.  And what does that show us?

19   A.  Well, this is, also, I believe, right out of Household's

02:36:38  20   10-K, although I don't remember precisely what year.  I

21   believe it's the '01 10-K, also.

22        And it's a -- the paragraph on the top is blown up;

23   it's actually a -- letter to the shareholders that goes, at

24   that point in time went in, the 10-Ks.  And I'll just read it.

02:37:00  25        "Household International's management is responsible

Devor - direct

2407

1      for the preparation, integrity and fair presentation of its

2      published financial statements."

3              So, it's saying management's responsible for the

4      financial statements.

02:37:15  5              And, then, the second line is, "The consolidated

6      financial statements have been prepared in accordance with

7      GAAP."

8              That's that thing I mentioned before.

9      Q.  Okay.

02:37:25 10             And, then, sir, is this something that gets signed

11     off by the officers of the company?

12     A.  It does.

13     Q.  And have you included an example of that, as well, within

14     Plaintiffs' Demonstrative 110?

02:37:37 15    A.  Yes.

16             Again, blown up the bottom part of that sheet in the

17     background, and it's signed by the CEO, Mr. Aldinger in this

18     case and Mr. Schoenholz, who is the CFO.  So, they're the ones

19     that they're referring to above where it says, "Management has

02:37:57 20    responsibilities."

21     Q.  All right.

22             And now, sir, let's go back to your three opinions,

23     if we could.

24             MR. DOWD:  And I'd ask that we pull up, again,

02:38:05 25    Plaintiffs' Demonstrative 107.

Devor - direct

2408

                1        (Brief pause.)

                2    BY MR. DOWD:

                3    Q.  And, sir, your first opinion in this case related to

                4    Household's failure to disclose certain information; is that

02:38:18        5    right?

                6    A.  Yes.

                7    Q.  Okay.

                8        And what is that first opinion?

                9    A.  Well, that Household failed to disclose certain

02:38:26       10    information that was required about improper lending

               11    practices, if the company had engaged in such.

               12    Q.  Okay.

               13        And, sir, are you a -- you know, you're an expert in

               14    accounting, I take it.  Do you consider yourself to be an

02:38:43       15    expert in the area of predatory lending or improper lending

               16    practices?

               17    A.  I believe I know what it is, but the answer is no, I'm

               18    not.  I'm an accountant.

               19    Q.  Okay.

02:38:53       20        And were you asked to make certain assumptions in

               21    connection with your opinion regarding predatory lending?

               22    A.  I was.

               23    Q.  Okay.

               24        And tell us about that.

02:39:01       25    A.  I was asked to assume that the -- that the -- company

Devor - direct

2409

1   engaged in improper lending practices; and, therefore, what

2   were the reporting responsibilities of the company, as a

3   result of that.

4   Q.  And were you also asked to make a determination of amounts

02:39:25 5   attributable to predatory lending practices between 1999 and

6   2002?

7   A.  I was.

8   Q.  Okay.

9       Let me first ask you:  What was your conclusion

02:39:35 10  regarding Household's disclosures regarding predatory lending?

11  A.  That they were, in some cases, non-existent and certainly

12  inadequate.

13  Q.  Okay.

14      And let me ask you:  Did you also make an effort to

02:39:51 15  quantify the amount of revenue that Household had recorded,

16  that was attributable to loan splitting, misrepresenting loan

17  fees and points, misrepresenting interest rates, insurance

18  packing and imposing prepayment penalties during the relevant

19  time frame?

02:40:07 20      MS. BUCKLEY:  Objection, your Honor.

21      THE COURT:  The basis?

22      MS. BUCKLEY:  The subject of your MIL on revenue

23  recognition.

24      THE COURT:  Overruled.

25  BY MR. DOWD:

Devor - direct

2410

1   Q.  You can answer.

2   A.  Okay.

3       I just have to remember the question.

4   Q.  Do you want me to --

02:40:25  5   A.  No, I got it.

6       The answer is:  Yes, I did.

7   Q.  Okay.

8       And what was the amount that you came up with?

9   A.  Approximately $3.2 billion.

02:40:37 10  Q.  Okay.

11      And, generally, how did you arrive at that $3.2

12  billion number?

13  A.  I used computations that were done by the company.

14  Q.  Okay.

02:40:46 15      And did you look at that 3.2 billion for -- was that

16  for the period from 1999 through the second quarter of 2002?

17  A.  It was.

18  Q.  Okay.

19      And approximately what percentage of Household's

02:41:11 20  revenues were attributable to improper lending practices

21  between the beginning of 1999 and the second quarter of 2002?

22      MS. BUCKLEY:  The same objection, your Honor.

23      THE COURT:  Overruled.

24      MS. BUCKLEY:  I'd request a sidebar.

02:41:28 25      THE COURT:  Sure.

Devor - direct

2413

1   attributable to predatory lending?"

2           "You're implying that the failure to put in the 10-K

3   was due to predatory lending."

4           Again, I quote from your Honor.

02:44:40 5          That's the objection I'm raising.

6           THE COURT:  Okay.

7           MR. DOWD:  Your Honor, and --

8           THE COURT:  Well, my ruling at this point is this --

9   and maybe I didn't state it clearly yesterday:  The question

02:44:50 10  cannot imply or ask for an opinion that would lead the jury to

11  believe that the amount of total revenues reported was somehow

12  false or misleading because it included predatory lending

13  revenues.

14          The comparison between predatory lending revenue and

02:45:09 15  overall revenue can be made for purposes of establishing an

16  issue that's already been aired almost ad nauseam here; and,

17  that is, to what degree did the predatory lending practices

18  pervade?

19          MR. DOWD:  Thank you, your Honor.

02:45:22 20         MS. BUCKLEY:  Thank you, your Honor.

21      (Proceedings had in open court:)

22          MR. DOWD:  May I resume, your Honor?

23          THE COURT:  Yes.

24  BY MR. DOWD:

02:45:49 25  Q.  Mr. Devor, did you look at that 3.2 billion that you

Devor - direct

2414

1    quantified, that was attributable to improper lending

2    practices, and compare it to the amount of revenue between

3    1999 -- June 30th, 1999 -- and June 30th, 2002?

4    A.  I did.

02:46:10  5    Q.  Okay.

6         And can you tell us approximately what percentage of

7    revenue was attributable to these practices during that time

8    period?

9    A.  I believe it ranged from, depending on what period we're

02:46:25 10    talking about, somewhere between five-and-a-half percent to

11    eight percent.

12    Q.  And did you also look at the 3.2 billion, as it compared

13    to net income, during that same time period?

14    A.  I did.

02:46:40 15    Q.  And did you prepare a demonstrative depicting that?

16    A.  I did.

17    Q.  Okay.

18         I'll show you what's been marked as Plaintiffs'

19    Demonstrative 40.  And I'd ask you to look at that, if you

02:46:51 20    would.

21         And can you explain to me what you were trying to

22    determine straight with Plaintiffs' Demonstrative 40?

23    A.  Just the impact of the amounts attributable to the alleged

24    improper lending practices, as a percentage of net income that

02:47:23 25    the company actually reported.

Devor - direct

2415

```
            1   Q.  Okay.

            2         And, so, for example, in 1999, what was the

            3   percentage that you determined, based on the documents that

            4   you looked at?

02:47:33    5   A.  As you can see, it's 28 percent, roughly.

            6   Q.  Okay.

            7         And, then, for the year 2000, 32 percent; is that

            8   right?

            9   A.  That's correct.

02:47:43   10   Q.  Okay.

           11         And for the year 2001, 36 percent?

           12   A.  That's correct.

           13   Q.  And, finally, for the year 2002 -- the first two

           14   quarters -- 32.8 percent?

02:47:55   15   A.  That's correct.

           16   Q.  And, again, these amounts shown in that middle column

           17   there (indicating) -- the -- attributable to the lending

           18   practices -- are dollars of net income during these periods

           19   attributable to loan splitting, misrepresenting loan fees and

02:48:14   20   points, misrepresenting the interest rate, insurance packing

           21   and imposing prepayment penalties; is that right, sir?

           22   A.  That's right.

           23   Q.  Okay.

           24         In addition to looking at internal calculations of

02:48:25   25   the amounts attributable to certain lending practices, did you
```

Devor - direct

2416

1    perform a secondary analysis, as well?

2    A.  I did.

3    Q.  And was that based on amounts that Household agreed to

4    make restitution of, to consumers through their states?

02:48:40  5    A.  That's correct.

6    Q.  Okay.

7        And did that confirm your opinion as to whether these

8    amounts attributable to improper lending practices were

9    material?

02:48:50 10    A.  It did.

11    Q.  Okay.

12        And do you have an opinion about materiality of those

13    amounts?

14    A.  Yes.  I believe they were material.

02:48:59 15    Q.  Was Household management required to disclose what it was

16    doing with respect to predatory lending, assuming they engaged

17    in it?

18    A.  Absolutely, both under GAAP and SEC rules.

19    Q.  And why is that?

02:49:21 20    A.  I mean, in general -- I mean, I've prepared some slides

21    for that; but, in general, it's required by the accounting

22    rules to disclose information that is useful to investors and

23    any other users of the financial statements -- lenders,

24    whatever -- and the SEC has similar rules around disclosure.

02:49:49 25        In essence, it really -- a reader cannot have a full

Devor - direct

2417

1    understanding of the numbers unless they understand what's in

2    the numbers.  And -- plus, users use financial statements

3    generally to really gauge the prospects for the future of a

4    company.

02:50:09  5         So, when a company reports historical financial

6    statements, they're generally used by the public or the

7    users -- whoever they are -- to gauge the prospects going

8    forward of this company.

9         And this would be important information for someone

02:50:24 10    to know, I guess, because it could very well cease at some

11    point in time.

12   Q.  Okay.

13        And you said you prepared some demonstratives to

14   explain this concept, as well; is that right, sir?

02:50:35 15   A.  I have, yes.

16   Q.  Okay.

17        I'd ask to bring up Plaintiffs' Demonstrative Exhibit

18   90.

19        (Brief pause.)

20   BY MR. DOWD:

21   Q.  And can you explain to us what is Plaintiffs'

22   Demonstrative Exhibit 90?

23   A.  This is -- remember the two sets of rules that I was

24   talking about before, GAAP -- which everybody's got to

02:51:04 25   follow -- and SEC rules, which over and beyond GAAP public

Devor - direct

2418

1   companies have to file.  This is GAAP.

2       You might even recognize the cover of the book that

3   was on the other slide.

4       But -- so, that's what this is.  This is something

02:51:20  5   called "Financial Accounting Concepts No. 5," and part of what

6   is constituted as GAAP.

7   Q.  And how is FAC Con 5 relevant to your opinions here today?

8   A.  Well, if you read some of this, it says, "Information

9   disclosed in notes -- " remember the footnotes to the

02:51:43  10  financial statements, which technically is part of the

11  financial statements -- "amplifies or explains information

12  recognized in the financial statements."

13      So, you need these notes to be able to understand

14  better what is in the financial statements.

02:51:58  15      And the next line goes on, "That sort of information

16  is essential to understanding the information recognized in

17  financials," which is really what I just said.

18      And these footnotes, once again, are -- these

19  disclosures and footnotes are -- considered integral,

02:52:17  20  important to the understanding of the financial statements.

21  Q.  Okay.

22      And is that the only thing that GAAP says about this

23  disclosure concept in this context?

24  A.  No.

02:52:30  25  Q.  All right.

Devor - direct

2419

1     MR. DOWD:  Could we please pull up Plaintiffs'

2  Demonstrative Exhibit 91?

3     (Brief pause.)

4  BY MR. DOWD:

02:52:40  5  Q.  Is that another demonstrative that you prepared to assist

6  you in explaining your testimony?

7  A.  It is.

8  Q.  Okay.

9     And what is this FAS Con 1 that you have up here

02:52:51 10  (indicating)?

11  A.  FAS Con 1 is just another part of GAAP.  And it's

12  contained in that book there on the left.  And the thing

13  that's significant to me about this is, obviously, "Financial

14  reporting should provide information about an enterprise's

02:53:09 15  financial performance during a period.  Investors and

16  creditors often use information about the past to help in

17  assessing the prospects of an enterprise."

18     And I just really talked about why this information

19  that we were talking about before -- about improper lending --

02:53:29 20  would need to be disclosed because it would be important to

21  assess the prospects of this company going forward, to know

22  that there might be a piece of revenue that, for instance,

23  might disappear some day if they are not able to do it

24  anymore.

02:53:46 25  Q.  And, in your opinion, did Household follow these

Devor - direct

2420

1    accounting rules that you've just mentioned?

2    A.  I don't believe so.

3        And, by the way, this isn't -- there are other

4    references to footnotes being "accurate" and "reliable" and

02:54:01  5    "complete," which are not even on this slide; but, there are

6    numerous references to that sort of thing in the accounting

7    literature.

8    Q.  All right.

9        Sir, do the SEC rules say anything about disclosure?

02:54:14 10    A.  Yes.  They are more concerned about the Management's

11    Discussion and Analysis section, although, as I said before,

12    this is all incorporated into the SEC rules because first and

13    foremost you have to follow GAAP.  So, the SEC rules are over

14    and beyond that.

02:54:30 15        But the SEC also has rules about disclosure of this

16    sort of thing in the MD&A section -- the Management's

17    Discussion and Analysis.

18    Q.  Okay.

19        And have you prepared two demonstratives to assist

02:54:42 20    new explaining that concept?

21    A.  I have.

22        MR. DOWD:  I'd ask that we pull up Plaintiffs'

23    Demonstrative Exhibit 94.

24        (Brief pause.)

25    BY MR. DOWD:

Devor - direct

2421

1  Q.  And can you tell us, sir, how is Plaintiffs' Demonstrative

2  Exhibit 94 significant to your opinion?

3  A.  Sure.

4       This is from Regulation S-K.

02:55:01  5       "S-K" is the -- amongst other things, indicates the

6  requirements by the SEC of what goes in Management's

7  Discussion and Analysis and how to present these things.

8  Q.  And why is that significant to your opinion?

9  A.  Well, it's the section also of the 10-K where the company,

02:55:22  10  I believe, should have disclosed this, assuming that these

11  things were improper; and, the thing of significance in this,

12  if you look at it, I mean, it goes --

13       THE COURT:  Especially when you're looking away from

14  the jury, which is fine, you've got to speak even louder.

02:55:34  15       THE WITNESS:  Okay.

16       I apologize, your Honor.

17       I apologize to the jury, too.

18       THE COURT:  Just take a deep breath and let it out.

19       (Laughter.)

20  BY THE WITNESS:

21  A.  What's significant to me about this is -- and the reason I

22  put the slide together is -- and I'll read it, "Describe any

23  other significant components of revenues -- " it also says and

24  expenses -- or "our core expenses" -- "that the registrant's

02:56:02  25  judgment," the registrant in this case, that's Household --

Devor - direct

2422

1  "should be described in order to understand the registrant's

2  results of operations."

3          So, again, components of revenue -- if there is this

4  piece of revenue and it's significant -- relating to improper

02:56:21  5  lending, Regulation S-K would say, "You've got to say that in

6  your MD&A."

7          That's it why this is significant to me.

8          MR. DOWD:  Could we pull up Plaintiffs' Demonstrative

9  Exhibit 95?

10      (Brief pause.)

11  BY MR. DOWD:

12  Q.  And, sir, this is, again, Regulation S-K; is that correct?

13  A.  It is.

14  Q.  Can you explain the significance of this portion of the

02:56:43  15  regulation?

16  A.  Sure.

17          Again, in the context of improper lending, "Describe

18  any known trends or uncertainties that have had or that the

19  registrant reasonably expects will have a material, favorable

02:57:01  20  or unfavorable impact on net sales or revenues -- " and it

21  goes on -- "or income from continuing operations."

22          And, again, this is if there are items included in

23  the financial statements, for instance, that could likely not

24  continue; and, therefore, when users look at the financial

02:57:24  25  statements, they don't know that, "Oh, going forward they're

Devor - direct

2423

1    not going to have this piece."  And I would think that's

2    certainly a possibility when you're talking about improper

3    lending.

4        As a result of that, that's exactly what S-K requires

02:57:42  5    in the Management Discussion and Analysis section.  So, that's

6    another thing.

7        So people can, again, gauge the prospects of a

8    company going forward, which is really the main purpose of

9    presenting financial statements to begin with.

02:57:57  10   Q.  Okay.

11       And do you believe that Household complied with these

12   GAAP and, then, SEC regulations with regard to predatory

13   lending practices?

14   A.  I do not.

02:58:06  15   Q.  And why is that?

16   A.  Well, they really failed to disclose the items in the

17   nature of the disclosures that are required in -- you know, in

18   -- their 10-Ks or 10-Qs during the period.

19   Q.  Now, sir, you had three opinions, I believe.

02:58:31  20       MR. DOWD:  Could we go back to Plaintiffs'

21   Demonstrative Exhibit 107.

22       (Brief pause.)

23   BY THE WITNESS:

24   A.  If I just, maybe on the last answer, I want to be clear;

02:58:37  25   and, that is, that there were significant amounts of revenue

Devor - direct

2451

1    A.  Yes.

2        So it's significant to me because -- well, first of

3    all, notice -- within this report, there's -- it indicates

4    that the company does one payment -- it may even indicate

03:53:48  5    zero -- no, I'm sorry.

6        In this -- in this document, it indicates that the

7    company does automatic restructures.  So now go back to the

8    second part of that disclosure that I talked about that's in

9    the 10-K; that is, the company has evidence that the reason

03:54:07  10    for the delinquency in the first place has been cured.

11        But this document indicates they re-age

12    automatically, which would obviously mean they haven't talked

13    to the customer and -- in most cases and have not been able to

14    get evidence or even try to get evidence that the reason for

03:54:23  15    the delinquency has been cured.

16    Q.  And is there any significance to the date of this

17    benchmarking study?

18    A.  Yes.  I just point out that this -- and, of course, this

19    is the final copy, but this is dated March 12th, 2002, and

03:54:39  20    that, again, is prior to the company actually filing its 10-K

21    for '01, which I believe was filed the next day.

22    Q.  Okay.  And did there come a time that the company changed

23    its disclosure regarding its re-aging practices?

24    A.  The company ultimately did change the disclosure with

03:55:04  25    respect to this -- these issues, the re-aging issues.

Devor - direct

2452

1    Q.   Okay.  And can you tell us about that.

2    A.   Sure.

3         At some point, almost a year after the filing of this

4    10-K, this was March of '02, I believe in March of '03, they

03:55:23  5    issued an amended 10-K, a restated 10-K, which is really

6    correcting this one, and they came out with a new disclosure

7    that I guess I prepared a couple slides to show.

8    Q.   Okay.  And, sir, let's take a look, if we could, at

9    Plaintiffs' Demonstrative Exhibit 123.

03:56:05  10   A.   Okay.

11   Q.   And is that a copy of a demonstrative that you prepared?

12   A.   It is.  One of them.

13   Q.   Can you explain the significance of this demonstrative

14   exhibit?

03:56:13  15   A.   Yeah.  Well, on the left-hand side I've taken those

16   excerpts that we just went over, which I said were false and

17   misleading, I believe, and I've put them out separately on the

18   left-hand side in two different cells in a spreadsheet.

19        And the first one, again, you'll remember was that

03:56:33  20   the company re-ages when two things happen:  Number one,

21   they've gotten consecutive payments; and, number two, the

22   second thing, when they have evidence that the reason for the

23   delinquency has been cured.

24        And as I noted before in March a year later, they

03:56:50  25   actually restate this 10-K and amend it.  And this is their

Devor - direct

2453

1    new disclosure, and I'll read it to you:  "We are amending our

2    disclosures of our restructure policies to include the

3    following disclosures," and then first they say, "In numerous

4    instances, Household accepts one or zero payments prior to

03:57:12  5    resetting the delinquency status."

6         So, of course, you look at that and you compare that

7    to what they actually disclosed originally, and it's the exact

8    opposite really.

9    Q.  Okay.  And that's -- and that -- we're not talking about a

03:57:30  10    new 10-K for the year 2000 or 2003.  They basically just took

11    their old 10-K that they'd issued in March 2002 and now in

12    March 2003 issued a new one with the same date on it, right?

13    A.  That's correct.  And it's actually the 2001 10-K that got

14    issued in March of '02 but which they correct in March of '03.

03:57:54  15    Q.  Okay.  And is there anything else significant about the

16    changes between the 10-K they issued in March of 2002 and the

17    one they issued in March of 2003 correcting that disclosure?

18    A.  Right.  The answer is yes.

19         And if you go to the next block down on the

03:58:12  20    right-hand side, they also said in this restated or amended

21    10-K/A, which stands for amendment, by the way:  "In the case

22    of automatic restructures, no prior contact is required

23    with" -- excuse me -- "with the customer to determine if the

24    cause of the delinquency has been cured."

03:58:34  25         Again, I look at that and say that's almost the

Devor - direct

2454

1    opposite of -- it is the opposite of what they said in their

2    original 10-K.

3    Q.   Okay.   Is there anything else significant about the

4    corrections that they made in March of 2003?

03:58:47  5    A.   Right.   If you look at the bottom left-hand side,

6    basically the company had only talked about, you know, I guess

7    they had mentioned -- they hadn't mentioned all the

8    concealment techniques that we've discussed in their original

9    10-K; but if you go to the amended 10-K, the restated one,

03:59:09 10    they actually list all of these I believe for the first time,

11    at least with respect in the financial statement footnotes as

12    well as in MD&A, the use of, you know, these seven other

13    methods that they used to take these out of two-plus.

14          And you'll note that many of these are the same ones

03:59:32 15    that I discussed in my little slide show before -- re-aging,

16    forbearance, extended payment to me, as I understand it, is

17    very similar if not the same as Skip-A-Pay, rewrites, et

18    cetera.   So --

19    Q.   And why would this matter?   Why did they need to make this

03:59:52 20    new -- or let me begin again.

21          Why does this matter?   Let me just ask you that.

22    A.   Well, it matters, first of all, because the company on the

23    left-hand side was, first of all, disclosing to someone who's

24    going to use the loan quality statistics, the two-plus

04:00:09 25    statistics, a very stringent policy and saying, hey, look, we

TAB 18

Devor - direct

2489

1   explain what's in the numbers.

2   Q.  Okay.  And, sir, is the blowup basically just a blowup of

3   the language that's in Plaintiffs' 231?

4   A.  Yes.

09:42:10 5   Q.  And could you walk us through a brief description of the

6   restatement and how -- what the company said about it.

7   A.  Well, with the slide up there for one more second at

8   least.  The 386, I believe, was the impact on net income for

9   all the periods restated.  And the company restated, I

09:42:31 10   believe, back to 1994.  So they restated the earnings from '94

11   to the first or second quarter of 2002.

12       The restatement related to -- just briefly, to the

13   company's contracts that it had entered into relating to

14   credit card arrangements with four entities, General Motors,

09:42:55 15   the AFL-CIO, something called UP, a company called UP, as well

16   as a marketing company called Kessler.

17       And it basically in its most basic form related to,

18   for the most part, expenses that were, for the most part, not

19   being written off over a shorter -- short enough period of

09:43:22 20   time which, of course, had the impact of overstating income

21   and in one case actually booking revenue that should not have

22   been booked.

23       So in a nutshell, that's what it was.  All four of

24   them -- all four contracts, the accounting for it, overstated

09:43:40 25   net income for all those periods.

2477

1                    IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
2                            EASTERN DIVISION

3    LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all     )
4    others similarly situated,      )
                                     )
5                 Plaintiff,         )
                                     )
6       vs.                          )  No. 02 C 5893
                                     )
7    HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )  Chicago, Illinois
8                                    )  April 16, 2009
                  Defendants.        )  9:18 a.m.
9
                              VOLUME 12
10              TRANSCRIPT OF PROCEEDINGS - TRIAL
         BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:         COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
14                              BY:  MR. LAWRENCE A. ABEL
                                     MR. SPENCER A. BURKHOLZ
15                                   MR. MICHAEL J. DOWD
                                     MR. DANIEL S. DROSMAN
16                                   MS. MAUREEN E. MUELLER
                                655 West Broadway
17                              Suite 1900
                                San Diego, California  92101
18                              (619) 231-1058

19                              COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
20                              BY:  MR. DAVID CAMERON BAKER
                                     MR. LUKE O. BROOKS
21                                   MR. JASON C. DAVIS
                                     MS. AZRA Z. MEHDI
22                              100 Pine Street
                                Suite 2600
23                              San Francisco, California  94111
                                (415) 288-4545
24

25

Devor - direct

2490

1    Q.   Okay.  Now, sir, you said that for that entire period, I

2    think you said '94 through sometime in 2002, they restated 386

3    million of net income; is that right?

4    A.   That's correct.

09:43:55  5    Q.   Okay.  And have you also prepared a demonstrative to show

6    what the effect was on the relevant time periods that we're

7    talking about from 1999 through 2002?

8    A.   Yes, which of course was my focus.  I have.

9    Q.   Okay.  And I'd ask to pull up what's been marked as

09:44:17 10    Plaintiffs' Demonstrative 128.

11         All right.  Can you walk us through what's been

12    marked as Plaintiff's Demonstrative 128?

13    A.   Yes.  The -- I mean, this demonstrative is just put

14    together to show what the company's reported historical net

09:44:42 15    income was for '99 through '02.

16         And the restated net income is what it was changed to

17    in that 10-K/A that we -- you know, that we referred to

18    before -- that I referred to before.  And the difference

19    between those two columns is the impact on net income, and

09:45:06 20    we've expressed it as -- or I've expressed it as percentage of

21    reported net income.  And you can see it goes from -- you

22    know, from 1 percent at the end to as high as 6 percent in

23    different periods.

24    Q.   All right.  Sir, I hate to do this, but just so it's in

09:45:27 25    the record, in other words, for year-end 1999, the company in

Devor - cross

2504

1            Do you recall that?

2     A.   I don't remember the precise question, but it was

3     something like that, yes.

4     Q.   Well, we'll ask it again.  Have you been qualified as an

10:03:11  5     expert in federal courts?

6     A.   Sure, I've testified in federal courts.

7     Q.   And have you been disqualified in federal courts?

8     A.   To testify at a trial?  Not that I recall.

9     Q.   Not that you recall?

10:03:23 10     A.   At a trial?  No.

11     Q.   Has your opinion ever been rejected in federal courts?

12     A.   Never for reliability.  It may have been for relevance,

13     but never for reliability.

14     Q.   Do you recall submitting an opinion in a case called in re

10:04:02 15     Acceptance Insurance Companies, Inc., Securities Litigation,

16     Mr. Devor?

17     A.   I recall writing an affidavit on a narrow issue that was

18     used to determine, I believe, in support of a motion for

19     summary judgment as I recall.

10:04:19 20     Q.   You understand an affidavit is testimony, don't you,

21     Mr. Devor?

22     A.   I'm not a lawyer.  I -- I -- it's not oral testimony.  But

23     it is what it is.

24     Q.   It's sworn testimony under oath; is it not?

10:04:32 25     A.   I believe when I write that affidavit I swear that it's

Devor - cross

2505

1    the truth.  In my opinion, it's the whole truth.  I think I

2    do.  I say that on the affidavit, absolutely.

3    Q.  You have to sign it in front of a notary, don't you,

4    Mr. Devor?

10:04:43  5    A.  I believe that that goes to state rules, and it doesn't

6    necessarily -- I don't know that you have to sign it in front

7    of a notary.  I certainly have to sign it.  But, nonetheless,

8    I've never issued an affidavit that I would -- was not a

9    hundred percent comfortable with.

10:04:59 10   Q.  All right.  And you know that in the in re Acceptance

11   Insurance Companies Securities Litigation, that the Court

12   rejected your opinion there, correct?

13   A.  The Court deemed my opinion to be irrelevant because the

14   Court could not -- could not find the analysis within the

10:05:18 15   affidavit.  Again, no oral testimony.  So I think the Court

16   decided that my opinion was not helpful or relevant to the

17   decisions needed to be made and therefore would not be

18   considered because the analysis was not apparent in the

19   affidavit.  Again, I never testified in that case.

10:05:36 20   Q.  Mr. Devor, you seem to be having some problem with the

21   fact that an affidavit is testimony; is that right?

22   A.  Well, I'm distinguishing in my mind between oral

23   testimony, which I never gave in that to explain the

24   affidavit, and the affidavit.

10:05:51 25   Q.  The affidavit being written testimony, correct?

Devor - cross

2506

1   A.   That's --

2          MR. DOWD:  Objection, your Honor.  It's

3   argumentative.

4   BY MS. BUCKLEY:

10:05:59  5   Q.   Relevance wasn't the ground on which your affidavit was

6   rejected, was it?

7   A.   Absolutely.  The Court said, I believe, in there because

8   the analysis is not present -- which, by the way, I

9   respectfully disagree with; it was there.  But with all due

10:06:16 10  respect, I believe the decision was because the opinion in --

11  because the affidavit does not make clear what the analysis

12  was.  It doesn't have problems with the analysis.  It just

13  said because the affidavit doesn't make clear what Mr. Devor's

14  analysis was, in essence, then the affidavit will not be

10:06:37 15  helpful to us and therefore is not relevant.  It does not go

16  to reliability or anything else.

17  Q.   Would it refresh your recollection, Mr. Devor, if the

18  Court said, quote, Devor does not explain how he reached his

19  ultimate opinions, nor does he describe the analytical

10:06:54 20  processes he went through to reach his opinions, unquote.

21  Would that refresh your recollection that your affidavit was

22  not rejected on grounds of relevance?

23          MR. DOWD:  Your Honor, perhaps if we're going to

24  refresh the witness' recollection, we should show him a copy

10:07:07 25  of the document so he can look at the other parts.  Otherwise,

Devor - cross

1    it's an improper question and not refreshing recollection.

2            MS. BUCKLEY:  I think I'm permitted to read him the

3    document first, your Honor.

4            MR. DOWD:  You're permitted to say is there anything

10:07:25  5    that would refresh your recollection and if it's the opinion,

6    you give it to him.

7            MS. BUCKLEY:  He already testified as to what he

8    thought the opinion said and why his opinion was rejected and

9    he's wrong.

10:07:35  10           MR. DOWD:  That's absolutely untrue.  Your Honor, I

11    move to strike that.  What he said is absolutely right.

12           THE COURT:  The objection is sustained.  There's no

13    basis for reading a document into evidence at this point.  My

14    recollection of the testimony was that the witness never

10:07:52  15    indicated that he did not recall or remember or that he needed

16    to have his recollection refreshed.  The objection is

17    sustained.

18    BY MS. BUCKLEY:

19    Q.  Mr. Devor, did you also submit testimony in a case called

10:08:07  20    in re IKON Office Solutions, Inc., Securities Litigation?

21    A.  Deposition testimony I did.

22    Q.  You recall that?

23    A.  It was a long time ago, but I recall it vaguely.

24    Q.  And you recall that your opinion was rejected in that case

10:08:26  25    because you relied on, quote, unreliable assumptions?

Devor - cross

2508

```
        1    A.  No.

        2    Q.  You don't?

        3    A.  My opinion was rejected -- my ability to testify?  I'm not

        4    sure I understand what you're saying.

10:08:37 5    Q.  I'm asking you --

        6    A.  No, I don't remember that.

        7    Q.  You don't remember.

        8            MS. BUCKLEY:  May I approach the witness, your Honor?

        9            THE COURT:  You may.

10:09:09 10   (Tendered.)

       11    BY MS. BUCKLEY:

       12    Q.  This is the problem with having two pairs of glasses,

       13    Mr. Devor.  You never have the right one when you need it.

       14            I think I gave you the wrong one.

10:09:28 15   (Tendered.)

       16    BY MS. BUCKLEY:

       17    Q.  Do you want to turn to page 21 of the printout, Mr. Devor,

       18    right-hand column, halfway down.

       19            And the earlier reference to your opinion is on page

10:09:52 20   20 of the printout, right-hand column, halfway down.

       21    A.  I'm sorry.  20 or 21?

       22    Q.  Both.  It starts on page 20, halfway down.

       23    A.  Dealing with Professor Carmichael and Devor?

       24    Q.  Right.

10:10:09 25   A.  Okay.  So I'm sorry.  Is there a question?
```

Devor - cross

2509

1   Q.   And then there's another reference to your report on page

2   21 halfway down.

3   A.   Yes.

4   Q.   Does this refresh your recollection that your opinion was

10:10:21   5   rejected because it relied on unreliable assumptions?

6   A.   First of all, I'm not sure what you mean by my opinion was

7   rejected.   I wasn't precluded from testifying.   I mean, this

8   was not a -- that's not what this is.   I mean, in general, you

9   know, what happened, I believe, as I understand it, is this

10:10:45   10   was a case that dealt with reserves and whether a company's

11   policy equated to those GAAP rules that I put on the screen

12   yesterday.

13           And there was testimony in the record that indicated

14   the company believed that the whole purpose of these rules

10:11:05   15   was, in fact, to generate financial statements that were in

16   accordance with GAAP.   And that was one of the basis of my

17   opinions.

18           For whatever reason, with all due respect to I

19   believe Judge Katz, when he read this, for some reason he

10:11:25   20   ignored that.   He did not -- he didn't mention why.   He just

21   said that Devor's opinion that the company's policy equates to

22   GAAP is -- whatever he says -- unsupportable or not -- I think

23   he says not supported by the facts or whatever.   But he

24   doesn't mention the whole thing that I based my opinion on.

10:11:49   25           So I -- you know, and, again, there was no hearing so

Devor - cross

2510

1    I didn't get to explain but, your Honor, here's -- here's the

2    testimony that I was relying on. So I have no idea what was

3    in Judge Katz's mind. I don't know if he -- again, with all

4    due respect, whether he forgot it, didn't know it, or for some

10:12:08    5    reason chose to ignore it because of some other reason. And

6    I'll never know.

7        All's I know is that the basis for my opinion was

8    something that he never even mentioned, so I don't know what

9    he was thinking. He never shared it with me.

10:12:22 10    Q.  Except for the part that he said that your conclusion was

11    based on similarly unreliable assumptions; isn't that right?

12    A.  Well, point me to wherever that says. I don't know.

13    Q.  That's on page 21, Mr. Devor.

14    A.  The similarly is referring to what he also said about

10:12:40 15    Professor Carmichael at the time.

16    Q.  Yes. Apparently, you --

17    A.  And --

18    Q.  -- were both on unreliable assumptions --

19    A.  Yeah, but he doesn't explain why. I mean -- and he

10:12:48 20    ignores in the whole discussion the exact testimony that, in

21    fact -- he talks about other things, but he ignores the

22    testimony that my opinion was based on and, unfortunately, I

23    have no idea why he did that. Again, maybe he was unaware of

24    it. I don't know. He didn't ask me before he wrote this.

10:13:07 25    Q.  So you disagree with the Court there?

Devor - cross

2511

1      A.   I respectfully disagree.

2      Q.   Okay.  You're not an expert in predatory lending, are you,

3      Mr. Devor?

4      A.   I'm not an expert.  I'm an accountant.

10:13:23  5   Q.   You're not an expert in lending laws or regulations, are

6      you?

7      A.   I'm not.  I'm an accountant, an auditor.

8      Q.   You're not an expert in the business of a consumer finance

9      company, are you?

10:13:33  10   A.   I don't believe so.  But I've, you know, certainly over

11      the years had several cases that have involved those and

12      lending activities.  So I've certainly learned a lot, but I

13      would not call myself an expert.

14      Q.   So not an expert in the business of a consumer finance

10:13:52  15   company, correct?

16      A.   Yeah, I guess.

17      Q.   Okay.  And you're not an expert in banking, are you?

18      A.   I am not an expert in banking.

19      Q.   And you're not an expert in how to re-age, are you?

10:14:02  20   A.   How to re-age?

21      Q.   How to re-age.

22      A.   Mechanically taking it from one category to the next I

23      don't believe needs any expertise, so maybe you need to

24      explain that a little more.  Maybe I don't understand your

10:14:18  25   question.

Devor - cross

2516

1         Do you consider the KPMG auditors who worked on the

2    Household account and whose papers you reviewed in connection

3    with this case experts in accounting?

4    A.   I -- the answer is no different than the Arthur Andersen.

10:19:55  5    Q.   Okay.  Now, you've given three opinions -- opinions on

6    three various topics in this case; is that fair, Mr. Devor?

7    A.   That's fair.

8    Q.   And yesterday you discussed your opinions on predatory

9    lending, right?

10:20:15 10    A.   Yes.

11    Q.   And you also discussed yesterday and a little bit this

12    morning your opinions on the re-aging/restructuring issue,

13    correct?

14    A.   That's correct.

10:20:24 15    Q.   And the last thing you discussed, the third issue, was

16    your opinion on the restatement for the credit card contracts,

17    correct?

18    A.   That's correct.

19    Q.   Okay.  We're going to go backwards if you don't mind since

10:20:38 20    it's fresh in the jury's memory about the restatement this

21    morning and turn to the topic of the credit card contracts

22    that resulted in the restatement in, I believe you said,

23    August of 2002.  Correct?

24    A.   Okay.

10:20:56 25    Q.   Now, you told us earlier today that you did an independent

Devor - cross

2517

1     analysis of these three contracts -- let me stop myself there,

2     Mr. Devor.

3           Do you consider them three contracts or four?

4     A.   We view them as four separate entities, I guess, simply

10:21:16  5   because although similar, there are differences in the

6     transactions.  So we looked at them as four.  It really

7     doesn't matter how you look at them, whether you call them

8     three or four.  We looked at them as four.

9     Q.   Okay.  The first one is a contract concerning General

10:21:33 10   Motors' credit card, correct?

11    A.   That's correct.

12    Q.   And that's a sort of a single, independent one, right?

13    A.   I'm sorry.  Could you say that again?

14    Q.   Let's just outline what the four are so we can all be on

10:21:44 15   the same page.

16          We have the General Motors agreement?

17    A.   Yes.

18    Q.   We have the AFL-CIO agreement?

19    A.   That's correct.

10:21:49 20   Q.   The Union Privilege card agreement?

21    A.   Yes.

22    Q.   Sometimes they are discussed sort of together in a clump?

23    A.   Yes.

24    Q.   And finally, the Kessler agreement; is that right?

10:21:58 25   A.   That's correct.

Devor - cross

2518

1    Q.   All right.   Concerning the General Motors agreement,

2    Mr. Devor, what was your view as to how the General Motors

3    agreement should have been accounted for?

4    A.   Well, during the class period, during the relevant time

10:22:14  5    period, subsequent to the beginning of the contract, there

6    were significant changes to the original contract.  And as a

7    result of that, they, in essence -- because of those

8    significant changes, they, in essence, changed the nature of

9    the first contract such that the contract going forward needed

10:22:41 10   to be accounted for by virtue of an opinion out there

11   called -- under GAAP called 931, ETIF 93-1, which basically

12   said that upfront fees that are being paid need to be expensed

13   in one year, assuming that the credit card fee charged by --

14   to the customer is relatively immaterial or insignificant I

10:23:08 15   believe it uses.

16         So as a result of the significant changes that occur

17   from, I believe, '94 on, that because of the issuance of 93-1,

18   the -- the accounting for the contracts, that contract, needed

19   to be in compliance with 93-1.

10:23:36 20         The company originally took the stance -- and whether

21   I agree with it or not, it's really not the issue of the

22   restatement, but the company took the stance that 93-1 didn't

23   apply because the original contract with GM was entered into

24   prior to the issuance and effectiveness of 93-1.  Whether I

10:23:59 25   agree with that or not doesn't matter.

Devor - cross

2519

1          The reason it gets restated is that subsequent to

2     93-1 and subsequent to all of this, there are significant

3     amendments to the contract; that even if it was appropriate to

4     grandfather this contract in under that accounting, no longer

10:24:23  5     is it the same contract and you need to follow the new

6     Generally Accepted Accounting Principles.

7          So, therefore, the company restates as a result of

8     that and, in essence, takes these expenses over one year as

9     opposed to I believe the company was writing them off over the

10:24:43  10    life of the contract or some period of time greater than one

11    year.

12    Q.   Okay.  So it's your view that because this contract was

13    modified at some point, that a different accounting treatment

14    was required than what Household had chosen; is that right?

10:24:59  15    A.   The -- the changes starting in '94 and forward -- there

16    were changes after '94 -- in essence were so significant that

17    the contract needed to be accounted for under the new

18    accounting literature because it was no longer grandfathered.

19    Q.   That's your opinion, correct?

10:25:20  20    A.   It was not just my opinion.  It was also KPMG's opinion.

21    And I point out, it was also the company's opinion because the

22    company restated.

23    Q.   What was --

24    A.   You can't restate unless --

10:25:30  25    Q.   There's no question pending, Mr. Devor.

Devor - cross

2520

1  A.  Well, I wasn't finished with my last answer.

2  Q.  Go ahead.

3  A.  You cannot restate financial statements unless you think

4  they're materially wrong.

10:25:39  5  Q.  We're talking about the GM contract right now, Mr. Devor.

6  What was --

7  A.  That was part of the restatement.

8  Q.  I understand that.  What was Household's view as to how

9  the GM contract was affected by the changes that you viewed to

10:25:54  10  be significantly modified?

11      MR. DOWD:  Objection, vague as to time.

12  BY MS. BUCKLEY:

13  Q.  After 1994?

14  A.  I believe -- well, ultimately they believed it was wrong

10:26:04  15  because they restated.  But, you know, I don't recall exactly

16  what their -- you know, in each year what their -- what their

17  reaction was but -- but, again, this contract was

18  significantly changed year -- not every year, but there were

19  significant changes in the period '94 until the time of the

10:26:29  20  restatement to the contract, both in length of time, both in

21  fees being charged.

22      And, you know, to that extent, under the accounting

23  literature, it should have been viewed as a new contract and,

24  therefore, the accounting under 93-1, which was out there

10:26:50  25  since '93, should have been applied.

Devor - cross

2521

1    Q.   That's your opinion, correct?

2    A.   It is my opinion, KPMG's opinion --

3         MS. BUCKLEY:  Move to strike, your Honor.

4    BY THE WITNESS:

10:27:00  5    A.   And it's also the company's opinion.

6         THE COURT:  You can just answer her question

7    directly.

8         THE WITNESS:  Okay.

9    BY MS. BUCKLEY:

10:27:07  10    Q.   When Household originally accounted -- chose an accounting

11   treatment for this contract -- strike that.

12        Arthur Andersen disagrees with your opinion, correct?

13   A.   I think Mr. Mizialko actually in his testimony and some of

14   the things I've read, I don't know that he disagrees.  I

10:27:29  15   thought he actually -- I think at some point, he may have

16   agreed with that.

17   Q.   Are you under the impression Mr. Mizialko works for Arthur

18   Andersen now?

19   A.   No, but I believe he did work for Mr. -- for Arthur

10:27:42  20   Andersen.

21   Q.   Do you now understand that Arthur Andersen disagree --

22   Arthur Andersen's opinion issued at Household when the

23   contract was initially entered into is not consistent with

24   yours?  That's just what I'm trying to find out.  You disagree

10:27:59  25   with Arthur Andersen, correct?

Devor - cross

2522

1    A.  Arthur Andersen allowed that accounting, so I would say

2    the -- you know, from an auditor's standpoint, they agreed to

3    issue a clean opinion.  Whether they agreed with me or didn't

4    agree with me, I guess sort of goes to state of mind.  I don't

10:28:18  5    know what they thought.

6    Q.  So Household has one view of how the contract should be

7    treated and Arthur Andersen agreed with it, correct?

8    A.  That's not necessarily what the documents I've looked at

9    indicate.

10:28:33  10    Q.  You don't know whether Arthur Andersen agreed with

11    Household's accounting treatment for the original contract; is

12    that right?

13    A.  There's testimony and things that indicate the way this

14    was accounted for, that Arthur Andersen was not comfortable

10:28:44  15    with the accounting.

16    Q.  You're sure about that, Mr. Devor?

17    A.  I'm absolutely sure, especially where they're talking

18    about bifurcating the upfront payment and where Arthur

19    Andersen says there's no way that you can do that.

10:28:58  20    Q.  That's your testimony?

21    A.  I believe I read in memos that Arthur Andersen, you know,

22    actually went to the -- the board, the emerging issues task

23    force that put together this GAAP and asked them about would

24    you accept if the bifur- -- if they actually took the upfront

10:29:21  25    payment and bifurcated, divided it into two parts, and I

Devor - cross

2535

1    believe, to review it for impairment to see whether the asset,

2    in fact, was impaired in future reporting periods.  I think

3    that's the -- I don't think.  I believe that was the position

4    of the company.

11:08:15  5    Q.  And do you agree or disagree with that, Mr. Devor?

6    A.  I disagree, in that, I believe the asset should have been

7    amortized in a ratable systematic method over the life of the

8    contract because that's the period under which they -- the

9    asset was going to be realized.  And that way a proper

11:08:40  10   matching of expense and revenues generated under the contract

11   would have occurred.  And I believe that's exactly what GAAP

12   would require, and that's very old GAAP too.

13   Q.  And do you recall what Arthur Andersen's view was?

14   A.  I believe from -- I mean, I don't specifically recall.

11:09:01  15   But, I believe, Arthur Andersen, you know, ultimately did not

16   take exception to the company's reporting.  But I don't know

17   whether they concurred totally or not.  I just don't remember.

18   Q.  You're just not sure where Arthur Andersen stood?

19   A.  Well, again, it goes, in essence, to their state of mind.

11:09:22  20   So I don't -- I don't -- I don't know whether Arthur Andersen

21   concurred or not.  Again, the company -- it's the company's

22   accounting.  Ultimately Arthur Andersen issued a clean

23   opinion.  So it wasn't -- at least this individual contract

24   was not enough to keep Arthur Andersen from issuing a clean

11:09:42  25   opinion.

Devor - cross

2536

1    Q.  And you know that at some point, the OCC weighed in on

2    these issues, correct?

3    A.  I believe we just looked at it.

4    Q.  We're not there yet, Mr. Devor.  This is the ombudsman's

11:09:52  5    letter.  I'm getting there.

6    A.  Okay.

7    Q.  You know that the OCC weighed in on this issue, do you?

8    A.  Yeah.  And without looking at the document, I seem to

9    recall they recommended that maybe they go to the SEC, I

11:10:02 10    believe.  That's my recollection.

11    Q.  All right.  Let's see if we can refresh your recollection.

12    This is the letter from the OCC ombudsman, the step after the

13    OCC, correct, Mr. Devor?

14    A.  I believe so.

11:10:13 15    Q.  All right.  Let's take a look at the second part under

16    AFL-CIO.

17           Go down to the second paragraph.  The OCC and the

18    bank agree on the guiding standards under Generally Accepted

19    Accounting Principles, FASB Statement of Financial Accounting

11:10:33 20    Concepts No. 5, which require that expenses be allocated in a

21    systematic and rational manner to the period in which the

22    related assets are expected to provide benefits.

23           Do you see that, Mr. Devor?

24    A.  I do.

11:10:46 25    Q.  And then it goes on to say, The OCC concluded that a

Devor - cross

2537

1    systematic and rational approach is one that recognizes

2    periodic expense in relationship to the average revolving

3    receivable balances in the corresponding period.  Based on the

4    bank projections, the OCC determined that an amortization rate

11:11:04   5    of between 1.1 and 1.3 percent of average revolving balances

6    would provide this level relationship.

7            And then it goes on.

8            If you skip down to the next paragraph "when

9    considering."  When -- it reads, When considering the criteria

11:11:25  10    of systematic and rational, the bank applied a concept that

11    mirrored the economics of an arm's length contract between two

12    independent parties.

13           And then it goes on to describe the bank, namely here

14    the Household bank's position.

11:11:40  15           And finally we get to the resolution of the -- or the

16    comments by the ombudsman on the point, which is in the

17    paragraph beginning "the accounting standards."

18           Do you see that?

19    A.  Yes.

11:11:52  20    Q.  The accounting standards and principles relevant to this

21    transaction are not specific.  Therefore, when considering the

22    bank's and OCC's methods, I believe that there exists a

23    legitimate difference of opinion regarding a systematic and

24    rational approach to accounting for this very complex

11:12:08  25    transaction.

Devor - cross

2538

1        Do you agree with that sentence, Mr. Devor?

2    A.  Let me just reread it one more time.

3    Q.  Okay.

4    (Brief pause.)

11:12:18  5  BY THE WITNESS:

6    A.  I believe that there is GAAP, which is just discussed

7    above by this -- by this ombudsman, that relates and is very

8    much on point.  So I believe actually that -- I don't

9    necessarily agree.  The systematic and rational expensing of

11:12:52 10  this asset is covered very clearly by FASB Con. 5.  Remember,

11   this company was not amortizing this asset at all.

12   BY MS. BUCKLEY:

13   Q.  So you're disagreeing with the OCC ombudsman; am I right?

14   A.  I mean, my testimony is exactly as I just stated.  You

11:13:11 15  know, I didn't meet with the ombudsman, so I don't know what

16   he was considering.

17        But I will tell you that just above, if you look at

18   the second paragraph, they are very explicit in saying FASB

19   Statement of Financial Accounting Concept No. 5 requires that

11:13:28 20  expenses be allocated in a systematic, rational manner to the

21   period in which the related assets are expected to provide

22   benefits.  This asset wasn't being amortized at all.

23   Q.  So you don't think it was systematic and rational?

24   A.  Leaving an asset on the balance sheet, no, I do not.

11:13:46 25  Q.  And the OCC ombudsman thought it was, correct?

Devor - cross

2539

1    A.  Well, wait a minute.  I'm not sure it says that.  Let me

2    read it again.  I don't think they're saying that it is

3    systematic.

4            They're saying they believe there's a legitimate

11:14:02  5    difference of opinion regarding what a systematic and rational

6    approach to accounting this is.  I don't agree with that.

7    Q.  You don't agree that there's even a -- I want to quote him

8    correctly -- a legitimate difference of opinion?

9    A.  I think, you know, if they were amortizing this asset over

11:14:22  10   four years instead of two years or seven years instead of five

11   years, I would say there might be a difference of opinion.

12   But they weren't amortizing this asset at all.  They were

13   leaving this asset on the balance sheet and they weren't

14   amortizing it at all.  You know, that, to me, is not

11:14:42  15   necessarily a difference of opinion.  I don't agree with that.

16   Q.  You don't agree with the ombudsman?

17   A.  I don't, in my humble opinion.

18   Q.  Do you consider him an expert in accounting?

19   A.  Never met the man before.

11:14:53  20   Q.  Wouldn't know if the OCC's ombudsman is an expert in

21   accounting?

22   A.  We're talking about Mr. Golden specifically?  I don't

23   know.

24   Q.  All right.  Let's go on, Mr. Devor, the same paragraph,

11:15:16  25   beginning, The accounting standards and principles relevant to

Devor - cross

2540

1    this transaction are not specific.

2            And then we just talked about the next sentence,

3    right, Mr. Devor?

4    A.  Right, we did.

11:15:28  5    Q.  All right.  And it goes on, I clearly respect that there

6    could be different judgments made and different conclusions

7    reached on the asset valuations.

8            Do you agree with the ombudsman on that point?

9    A.  That he respects it?  I don't understand.  He says it

11:15:45 10    respects it.

11    Q.  That there could be different conclusions reached on the

12    asset valuations.

13    A.  I agree with it except that the asset valuation isn't the

14    issue.  The issue is, this is a prepaid amount that has to be

11:16:05 15    systematically allocated to expense over the period of

16    benefit.  It can't just remain there, no matter what it's

17    worth.

18    Q.  Okay.

19    A.  That's -- that's the issue.  I mean, agree that there can

11:16:19 20    be differences amongst people as to what the value of an asset

21    is; but that's not the issue.  I believe it misses the issue.

22    Q.  And then he goes on, the ombudsman, Mr. Devor, to say, I

23    have no reason to believe that the bank's method, particularly

24    considering the time element, was not systematic and rational.

11:16:38 25            Do you see that?

Devor - cross

2541

1    A.   I do.

2    Q.   Do you see it?

3    A.   I do.

4    Q.   Do you agree with it?

11:16:44  5   A.   Not with respect to this piece.  It was not amortized.

6    Q.   All right.  Fair enough.

7         And he goes on to say, Therefore, I believe that the

8    most appropriate resolution of this difference of opinion

9    rests with the SEC accounting division.

11:17:00  10       Do you see that?

11   A.   I do see that, yes.

12   Q.   By the way, Mr. Devor, do you think the accountants in the

13   SEC accounting division are experts?

14   A.   I would not answer that any way different than when you

11:17:16  15   asked me if the people at Andersen or KPMG are experts.  I

16   mean, everybody has individual talents.  I've met some of the

17   most brightest people in the world from Andersen and KPMG, and

18   I've met people who I would not consider so bright from

19   Andersen and KPMG.

11:17:34  20   Q.   Okay.

21   A.   And the same goes, by the way, with the SEC.

22   Q.   Okay.  Let's move on to the Kessler agreement, if you

23   would.  Can you tell me who the parties were -- who the

24   parties were who were involved in the Kessler transaction?

11:17:53  25   A.   I've just got to switch gears here from AFL-CIO to

Devor - cross

2567

1       deposition testimony where I talked about it.  And,

2       furthermore, as I said before, it's not part of my ultimate

3       opinions other than what I just indicated to you, which is, I

4       believe, contained in my report.

11:52:36    5           MS. BUCKLEY:  Can we play Devor deposition 283, Line

6       6 to 13, please.

7           (Whereupon said tape was played in open court.)

8       BY MS. BUCKLEY:

9       Q.  Way beyond the scope of my engagement, right?

11:53:03   10   A.  To compute whether or not the reserves were inadequate.

11      But my -- that answer is exactly what I just said.

12      Q.  Well, we'll let the jury decide that, Mr. Devor.

13      A.  Okay.

14      Q.  Your first opinion, which you offered yesterday, was on

11:53:18   15   the issue of predatory lending.

16              Do you remember that?

17      A.  Yes.

18      Q.  And yesterday Mr. Dowd asked you to address two issues

19      relating to predatory lending.

11:53:31   20              Do you remember that?

21      A.  I have no idea what the two issues are you're referring

22      to.

23      Q.  Okay.  We'll help you out.

24              Do you remember Mr. Dowd asking you about your first

11:54:07   25   opinion in the case, relating to Household's failure to

Devor - cross

2569

1    certain information that was required about improper lending

2    practices, if the company engaged in such; is that right?

3    A.   That's correct.  And I think I explained that to say I was

4    asked to assume that the company had; and, therefore, what are

11:55:58  5    the accounting and reporting considerations as a result of

6    that.  That's correct.

7    Q.   All right.  And you would admit, Mr. Devor, that you're no

8    expert in predatory lending, right?

9    A.   I'm an accounting expert, right.

11:56:13 10   Q.   No expert in predatory lending?

11   A.   I'm not an expert in predatory lending.

12   Q.   How about improper lending?

13   A.   Well, accountants use the word improper in a way -- I

14   mean, I think I understand, based on my knowledge in this

11:56:28 15   case, what would be improper to an accountant.  I'm an

16   accountant.

17   Q.   Are you an expert in improper lending?

18   A.   You didn't ask me that.  I think your question was a

19   little different the first time.  I'm not -- I was asked to

11:56:44 20   assume in this case that improper lending took place.  Based

21   on that, I'm opining on the accounting disclosure

22   ramifications of that.  That's what I am.  I am not an expert

23   in predatory lending, but I can tell you how one would account

24   for it or disclose it if a company was found to have done

11:57:06 25   something improper or illegal to earn that revenue.

Devor - cross

2570

1    Q.  I understand that, Mr. Devor.  My question is:  Are you an

2    expert in improper -- in what is improper lending?

3    A.  The accounting literature, to me, would indicate that

4    that's when a company -- something is improper when -- when an

11:57:28  5    entity is not entitled to the benefits that come from that

6    activity, in this case, lending.  So I think I do know what

7    that means, yes.

8    Q.  You know what it means?

9    A.  I think I just described it, yes.

11:57:40 10    Q.  Okay.  But are you drawing some distinction between

11    improper and predatory, Mr. Devor?

12    A.  I'm not an expert in predatory lending.  I've certainly

13    read testimony as to what predatory lending is.  And I

14    understand the five or six issues that are at issue in this

11:57:58 15    case with respect to predatory lending, but I'm not an expert

16    in that.

17    Q.  Okay.  And you're not offering any expert opinion that

18    Household actually engaged in improper lending practices, are

19    you?

11:58:13 20    A.  I'm not giving expert opinion on that, no.

21    Q.  That's the only kind of opinion you're allowed to give,

22    Mr. Devor.

23        You didn't go out and conduct any studies to

24    determine if Household engaged in any improper lending, did

11:58:28 25    you?

2577

1      (Proceedings heard in open court:)

2           THE COURT:  I would like to raise an issue that, it

3      seems to me, we should probably address sooner rather than

4      later.

01:09:08  5           I think it was during -- I think it was during the

6      testimony of David Schoenholz that he was asked a series of

7      questions about what information regarding -- I will use the

8      term as a catchall -- predatory lending practices was included

9      in the 10-K disclosures.

01:09:39 10           And the day after that series of questions and

11      answers, the issue was raised by defense counsel -- and I

12      can't remember which counsel it was.

13           MR. SLOANE:  It was me, your Honor.

14           THE COURT:  Okay.  You're the guilty party, then, I

15      guess.

16           -- regarding the propriety of those questions.  I

17      think the objection was phrased in terms of the ruling we had

18      made with respect to this expert's testimony, if I am not

19      mistaken, regarding the revenue -- implications of the

01:10:14 20      statement of -- our ruling indicating that it could not be

21      argued that merely because information regarding the alleged

22      predatory lending practices wasn't included in the 10-K that

23      it could not be argued that the revenue information was

24      therefore false or misleading.

01:10:41 25           And unless I am mistaken -- and I am pretty sure I am

2578

1    not -- the consensus was that we didn't have to address the

2    issue at that time, that we could wait until this Friday, I

3    believe, during the jury instruction conference to address the

4    issue.

01:11:01    5        MR. SLOANE:  I think that's right, your Honor.

6        THE COURT:  Well, it seems to me the issue is now

7    here, and it's not yet Friday.

8        I mean, unless I am mistaken, and this witness has

9    testified that the disclosures regarding revenue were required

01:11:21   10   to be accompanied by explanations regarding the predatory

11   lending practices in order not to be misleading, which I think

12   is the same way as saying in order not to be false.

13       There hasn't been an objection to any of those

14   questions, either on his -- so far in his testimony.  But as I

01:11:47   15   read the testimony -- and I started to go back over it again

16   last night; it makes for a fun ride on the train -- it

17   occurred to me that we really have the same issue before us

18   that you had raised, which was not resolved.  It was reserved

19   until Friday.

01:12:08   20       And the question is, do we want to reserve that issue

21   until Friday, or do we need to resolve it now, given that we

22   are now on cross-examination of this witness, and I assume the

23   cross-examination is going to go over, because it was part of

24   his direct testimony, his assertions that the GAAP and the SEC

01:12:33   25   rules require disclosure of those practices in relation to the

2579

1    statement of revenues, which I think was pretty clearly the

2    testimony that was given.

3         MR. SLOANE:  Your Honor, let me just say one thing.

4         I think the context in which it was raised when

01:12:58  5    Mr. Dowd and I were arguing about Mr. Schoenholz's testimony

6    was some questions Mr. Dowd had asked.  And I think the

7    request -- the application at that time was threefold.

8         One was to not have the questions asked in that way

9    again, which I think Mr. Dowd said he wasn't going to ask them

01:13:15  10   that way or something like that.  Perhaps I am misstating it.

11        And the other was a curative instruction.  And your

12   Honor said, consistent with your prior rulings, since I didn't

13   object at the time, no curative instruction then, but then we

14   would take it up on Friday in the context of the bigger issue.

01:13:30  15   I think that was the way it developed at that point.

16        I am not disagreeing with anything your Honor is

17   saying about whether it's right --

18        THE COURT:  Assuming that's so, why was there no

19   objection to the testimony given by this witness?

01:13:45  20   MS. BUCKLEY:  Your Honor, it was my understanding --

21   and perhaps it was my usual lack of clarity -- that that was

22   precisely what we discussed in the sidebar before he began.

23        And then, again -- and maybe your Honor and I are not

24   on the same page as to what the issue is.

01:14:02  25   THE COURT:  I think the ruling at the sidebar was

2580

1    that -- was with regard to his ability to contrast -- or to

2    determine the magnitude of the revenues resulting from the

3    alleged predatory lending practices by comparing that number

4    to the amount of total revenues disclosed in the 10-K.

01:14:31  5            And my ruling then was, as it was previously, that he

6    can do that.  That goes to the question of the pervasiveness

7    and the -- if you will, the materiality of the alleged

8    wrongful predatory lending practices, but that he would not be

9    allowed to, either by the questions or by argument of any

01:15:01 10    sort, imply that the mere statement of the revenues, without

11    explanation, made the statement of revenues false or

12    misleading.  I mean, that's what I ruled before the trial

13    started, and that's what I said at the conference.

14            It occurs to me that late in the day yesterday those

01:15:19 15    were the very questions that were asked.

16            MR. DOWD:  I don't think so, your Honor.  I suspect

17    the reason there is no objections is because -- I mean, I

18    think you have to take a step back.

19            This witness, his original opinion that the Court

01:15:34 20    ruled on in the Daubert motions, one of his opinions was that

21    this revenue, this income, should never have been booked in

22    the first instance.

23            Now, the Court has made a determination that, under a

24    legal standard, the Court believes that's incorrect.  If you

01:15:49 25    ask Mr. Devor, I know what he would say.  He would say you

2581

1   have to have -- you know, you have to earn the revenue.  And

2   if it's illegal, you can't earn it.  So under GAAP, it should

3   never have been booked in the first instance.

4          That said, the Court said, legally I don't accept

01:16:05  5   that.  And I have never asked him a question about that.  I

6   mean, I have never said, should that revenue or net income be

7   booked in the first instance?  He hasn't testified to that,

8   and I assume that's why there is no objections because we are

9   going along then.

01:16:18  10          But one of the witness' other opinions from the

11   get-go in this case, that the defendants didn't challenge on

12   Daubert, was the issue of, if you are engaged in practices

13   that are generating revenue, whether you could book it or not,

14   if you know that in the future those revenues could be stopped

01:16:37  15   because they are illegal or improper or whatever word we want

16   to use, then you have to disclose that.  It's a disclosure

17   obligation.  That's in his report.  The defendants didn't

18   challenge it.

19          It's different from, can he say that number is wrong?

01:16:49  20   I never asked him that because the Court says he can't say it.

21   If I ask Mr. Devor, I know what he would say.  He would say,

22   yeah, that number is wrong.  In the 10-Ks and 10-Qs, you can't

23   book that.

24          So we have stayed completely away from that.

01:17:03  25          The issue is an issue of disclosure in terms of going

2582

1    forward because investors are going to consider the future

2    growth.  And if you know that there is this risk that these

3    practices are improper or illegal, that that could be lost in

4    the future, it's going to affect the growth rate.

01:17:18  5         So I think that's why there has been no objection.  I

6    mean, we are doing exactly what the Court said in the opinion,

7    which is that he can't say that number is wrong.  I mean, and

8    he hasn't said that.  And I don't think he has come close to

9    saying that in his testimony.

01:17:33 10         And the witness and I have talked about that.  He has

11   obviously read the in limine ruling as well.  He may disagree

12   from a GAAP perspective, but you are the person who decides

13   the law, so we stayed completely away from that.

14         So I think we have done what we are supposed to do.

01:17:48 15         THE COURT:  Okay.

16         MS. BUCKLEY:  Your Honor, it was my understanding

17   that to the extent that Mr. Devor tried to link the

18   quantification to the falsity of a 10-K or a 10-Q, he was not

19   permitted to do that.  He was not permitted to imply that the

01:18:15 20  number or the size of the number had any impact on the true

21   financial statements of the 10-Ks and the 10-Qs.  That's what

22   I had thought where we were and why I sought clarification

23   yesterday.

24         And I thought I understood your Honor's distinction

01:18:36 25  that if he wanted to quantify what he claims the amount the

1     company got -- I won't use loaded words -- from the allegedly

2     predatory lending practices --

3                THE COURT:  Right.

4                MS. BUCKLEY:  -- that he was allowed to do that.

01:18:56  5           I think the second time I objected yesterday it was

6     when they put a demonstrative up on the screen which had the

7     quantification amounts juxtaposed against the 10-Ks, which I

8     at least had thought was not where your Honor's head was.  And

9     we did have a sidebar on that, and we proceeded.

01:19:20  10          That, if it is of any use to the Court, is what I

11    understood the Court's ruling to be and abided by it

12    throughout the rest of the examination.

13               MR. DOWD:  I think, your Honor -- and I apologize to

14    Ms. Buckley.  I am sure she is right.  I don't remember an

01:19:37  15   objection to that.  I remember an objection to the third

16    opinion slot.

17               But the demonstrative I used was a demonstrative that

18    the Court ruled on in limine and said I could use.

19               THE COURT:  I don't think that was the objection that

01:19:48  20   was made to it in the ruling in limine, was it?

21               MR. DOWD:  Yeah.  No.  They -- I mean, they tried to

22    tie it into this opinion, and we went through the language the

23    Court had about attributable and said I could use that one.

24               Now, I will tell you, your Honor, I had three more.

01:20:02  25   And because of the Court's comments the other day, I just went

2584

```
          1   with the one to try to keep it as simple as I could.

          2        THE COURT:  I don't have any problem with the

          3   testimony comparing or quantifying the amount of revenue that

          4   was gained from the -- his opinion as to the amount of revenue

01:20:20  5   that was gained from the alleged predatory lending acts.  We

          6   ruled that that could be done, and I think it's perfectly

          7   proper.  It's an accounting issue.  He can view the records,

          8   view the books and see how they quantify this.  I don't have a

          9   problem with that.

01:20:36 10        I do have a problem with it slipping into the

         11   argument that because information as to predatory lending

         12   wasn't included in the 10-K, specifically wasn't a footnote or

         13   an amplification of the revenue statement, that the revenue

         14   statement is misleading.

01:20:56 15        That's the problem with me.  And we seem to be

         16   sliding into that, which would be the back end of our original

         17   ruling really.

         18        MR. DOWD:  Well, with all due respect, your Honor,

         19   that's in his report.  There is no question about it.  I mean,

01:21:09 20   that was one of his opinions.  And they didn't even move on

         21   that on Daubert.

         22        The issue that I thought the Court had was, he cannot

         23   say the numbers are false.  But he should be able to testify

         24   that under GAAP and SEC rules, that if you think there is --

01:21:25 25   the future trends are not going to be the same.  I think under
```

2585

1    the SEC it's future trends; and under GAAP, you know, it's, is

2    it going to affect the enterprise? or something like that -- I

3    would have to ask Mr. Devor for the exact language -- then

4    that has to be disclosed.

01:21:40   5        Like we said -- I mean, as the witness has testified

6    a number of times, he was asked to assume it was predatory

7    lending.  He didn't make that analysis.  But if there was,

8    then the company should have disclosed that.

9        And I think he is not saying they should have

01:21:55  10   disclosed it because of the past.  He is saying they should

11   have disclosed it so shareholders consider it for the future.

12       And he certainly never said that those numbers were

13   wrong.  He believes that, as an accountant, but he hasn't said

14   it because there is a ruling on it, and it's a different issue

01:22:10  15   under the law in accounting.

16       THE COURT:  Well, I suspect we are at the point where

17   we are going to be discussing it on Friday.  I just -- I

18   wanted to bring it up.  I think, depending on the ruling, we

19   may have to give a curative instruction.  I don't know.  We

01:22:28  20   may have to give a clarifying instruction as to the purpose

21   for the testimony.  But I suspect it's something that we will

22   have to take up.  It's something we are going to have to take

23   up on Friday, and you should all be prepared to do so.

24       MR. DOWD:  Thank you, your Honor.

01:22:44  25       MS. BUCKLEY:  Yes, your Honor.

Devor - cross

2586

```
          1        THE COURT:  Let's bring them out.

          2    (Jury in at 1:23 p.m.)

          3        THE COURT:  Proceed.

          4        MS. BUCKLEY:  Thank you, your Honor.

          5    HARRIS L. DEVOR, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

          6              CROSS-EXAMINATION - Resumed

          7    BY MS. BUCKLEY:

          8    Q.  Excuse me, Mr. Devor.  I need to back up just a tad and go

          9    back to the first issue we were discussing today and just ask

01:24:16 10    a couple of follow-up questions.

         11        And that was your opinion concerning Household's

         12    restatement as a result of the credit card agreements that you

         13    and I spent a lot of time discussing.

         14        Are you back there with me?

01:24:29 15    A.  I am.

         16    Q.  You would agree, wouldn't you, Mr. Devor, that the fact

         17    that a company restates doesn't mean that fraud took place,

         18    correct?

         19    A.  It doesn't, but certainly many of the cases I have been

01:24:46 20    involved in, fraud did take place.  But it doesn't necessarily

         21    mean that.

         22        A restatement is a correction.  It doesn't mean that

         23    it was intended to be wrong.  But, again, in a lot of cases I

         24    have been involved in, it has been.

01:25:00 25    Q.  Okay.  Your experience aside, you will agree that a
```

Devor - cross

2587

1    restatement per se doesn't imply the existence of fraud?

2    A.   It does not.  That's correct.

3    Q.   You mentioned in the course of our discussion about the

4    restatement several times that Arthur Andersen had issued a

01:25:23  5    clean opinion on Household's financials.

6         Do you remember that?

7    A.   I do.

8    Q.   Could you describe for the jury what a clean opinion is.

9    A.   It's an opinion written by the auditors that relates to

01:25:35 10    the financial statements saying that the financial statements,

11    taken as a whole, all the financial statements and all the

12    accounts that are presented thereon, fairly state the

13    company's financial position and results of operations for

14    whatever periods they are.

01:25:52 15    Q.   So if Arthur Andersen issued a clean opinion for --

16    withdrawn.

17         You understand that Arthur Andersen issued a clean

18    opinion, as you would define it, for 1999, correct?

19    A.   Yes.

01:26:04 20    Q.   And the same for 2000?

21    A.   I believe Arthur Andersen's opinions during the period

22    were all clean, unqualified.

23         MS. BUCKLEY:  No further questions, your Honor.

24         THE COURT:  Redirect.

01:26:19 25    MR. DOWD:  Thank you, your Honor.

Devor - redirect

2588

1                    REDIRECT EXAMINATION

2    BY MR. DOWD:

3    Q.  Mr. Devor, just a few quick things.

4         When you were talking about the restatement before,

01:26:25  5    you mentioned a guy named Cliff Mizialko; is that right?

6    A.  Yes.

7    Q.  Okay.  And I couldn't tell.  I thought you said at one

8    point he worked for Andersen and at one point he worked for

9    Household.  Could you just clear that up for me?

01:26:39  10   A.  Back in the early '90s, Mr. Mizialko -- and this is, of

11   course, based on depositions and things I have read -- worked

12   for Arthur Andersen.  He was the company's outside accountant,

13   auditor.

14        And at some point, also in the mid-'90s, I believe,

01:26:56  15   or late '90s, maybe even a little later than that, took a

16   position with Household in the company.

17   Q.  Sir, I just have -- do you have Defendants' Exhibit 315 in

18   front of you there?

19   A.  What's it look like?

01:27:12  20   Q.  It's the letter from OCC.

21   A.  Sure.  Hang on.

22   Q.  We can probably pull it up on the screen.  That might be

23   easier.

24             MR. DOWD:  Your Honor, could we have the switch?

01:27:26  25             THE COURT:  Yes.

Fischel - direct

2602

1    A.   No.   Even institutional purchases frequently are on behalf

2    of individual investors who entrust their money to

3    professional money managers who then purchase stock, but

4    purchases are on behalf of the individuals.

01:45:28  5    Q.   Would an example be a mutual fund at Fidelity?

6    A.   A mutual fund would be a perfect example.

7    Q.   Now, what's your understanding of plaintiffs' allegations

8    in this case?

9    A.   My understanding is that plaintiffs claim that Household

01:45:43  10   made inaccurate disclosures concerning its lending practices,

11   its predatory lending; as well as the way that it treated its

12   loans, the so-called reaging issue; and another accounting

13   issue relating to the proper accounting for its credit card

14   unit, which ultimately led to a restatement.

01:46:13  15        My understanding is that the plaintiffs claim that

16   Household's disclosures were not accurate in all three of

17   those areas.

18   Q.   Now, did you make any assumptions as to whether or not the

19   defendants made false statements or disclosures during the

01:46:28  20   relevant period?

21   A.   Yes, I did.   I assumed that the defendants did make false

22   statements during the relevant period in order to perform my

23   quantifications.

24   Q.   Is that a common assumption to make in estimating

01:46:42  25   inflation and damages in one of these cases?

Fischel - direct

2603

1  A.  Yes.  I would say it's a necessary assumption to make

2  that's always made because the job of determining whether or

3  not statements are false or misleading, that's an issue for

4  the Court and the jury.  That's not an economic question.

01:46:58  5       So any economist who has the role of quantifying the

6  effect of inaccurate disclosures or misstatements has to begin

7  with an assumption that the Court and/or the jury would

8  conclude that there is something to quantify; namely, the

9  statements were misleading.

01:47:15  10  Q.  Now, given that assumption, what did you do in this case?

11  A.  What I did was, obviously, first familiarize myself with

12  the background of the case, looking at the allegations, the

13  pleadings, the responses, a set of legal issues that formed

14  the background of the case.

01:47:39  15       And then I looked at a massive amount of information,

16  documents about Household disclosures, analyst commentary

17  about those disclosures.

18       I also looked very carefully at Household's stock

19  price movements during the relevant period, the stock --

01:48:03  20  comparable stock price performance of competitors of

21  Household, various indexes that Household identified as the

22  way its performance should be judged against.

23       I performed a statistical analysis of stock price

24  movements relating the information that became known to

01:48:26  25  investors during the class period to Household's stock price.

Fischel - direct

2604

1    And I measured the amount of inflation on every day during the

2    relevant period using two different methods, which is a way to

3    calculate the amount of loss that any individual investor

4    suffered during the relevant period, depending on what day

01:48:49  5    they purchased and what day they sold.

6    Q.  Based on the analysis that you described, did you form any

7    opinions in this case?

8    A.  Yes.  I formed the opinion that Household's disclosure

9    defects, its inaccurate disclosures, caused there to be

01:49:08 10    significant inflation in Household stock price for much of the

11    relevant period.  And as a result, again depending on when

12    investors purchased and when they sold, investors in Household

13    stock suffered very significant losses as a result of

14    Household's defective disclosures.

01:49:32 15    Q.  You mentioned the term stock price inflation.  What did

16    you mean by that?

17    A.  What I meant by that is that the stock price on any given

18    day for any company reflects the information that is known

19    about that company.  And if there is a situation where a

01:49:52 20    company is not disclosing accurate information about itself,

21    the stock price will reflect not only the accurate information

22    about the company but also the inaccurate, or the false

23    information, about the company.

24            And what inflation is, is a measure of how much the

01:50:11 25    stock price has been affected by the false information that's

Fischel - direct

2605

1    been disclosed by a particular company.

2    Q.  Can a misrepresentation and an omission both cause the

3    stock price to be inflated?

4    A.  Yes.  You can have -- there are two classic situations

01:50:30  5    where inflation can exist.

6         One situation is where a company makes a false

7    statement and the stock price rises to a level that's higher

8    than it would have been in the absence of the false statement.

9    That would be a classic misrepresentation situation.

01:50:48 10         There is also an equally equivalent way that

11    inflation can occur if a company discloses information but

12    fails to disclose something negative about itself that it

13    knows about but investors in the marketplace do not know

14    about.  In that situation the stock is inflated because the

15    stock is prevented from falling to a lower level, which is the

16    level that the stock would have fallen to had the company

17    disclosed the additional negative information that it failed

18    to disclose.  That's a traditional omission type of situation

19    causing inflation.

20    Q.  In your opinion, how could the wrongdoing that the

21    plaintiffs allege in this case have caused inflation in

22    Household stock?

23    A.  Well, first of all, I would say, in any situation where a

24    company does not accurately reflect its financial condition

25    and its growth prospects, that potentially could be very

Fischel - direct

2609

1  significant growth strategy to try and grow their earnings, to

2  try and grow their revenue, to try and grow their size.  That

3  was really the key component of one of their key -- of their

4  business plan.

02:04:24 5          "In order to convince investors that this growth plan

6  was a reason that they should pay more and more for Household

7  stock, it was necessary to communicate that Household could

8  not only report increasing revenues and increasing earnings

9  but that these increasing revenues and earnings would continue

02:04:38 10  into the future.

11          "And if it were the case, as the plaintiffs allege in

12  this case and as many analysts and commentators concluded,

13  that those revenues could not be sustained in the long-term

14  because they were the function of improper lending practices,

02:04:53 15  which would cause Household to get into a lot of trouble,

16  ultimately force it to change its business practices, lower

17  its growth targets, making it a less-profitable company than

18  what investors believed at the beginning of the relevant

19  period, that certainly could lead to inflation."

02:05:10 20          MR. KAVALER:  Your Honor, I counted the word "growth"

21  or some derivative of it eight to ten times in that paragraph.

22  And I counted the word "sustainability" or the concept of

23  sustainability several times.  Those are precisely the themes

24  on which plaintiffs opened to the jury in this case.  They are

02:05:25 25  not, however, the themes of Professor Fischel's expert report

Fischel - direct

2610

1    in Paragraph 10.

2         Moreover, your Honor, and very importantly, you will

3    recall a lengthy discussion during the pretrial process,

4    ironically between Mr. Burkholz and myself, when they tried to

02:05:40  5    change the start date of the class period from what was then

6    referred to as July 30 to August 16. We had a long discussion

7    about that. The whole issue which drove that conversation and

8    which drives this objection is, in his deposition we pressed

9    Professor Fischel very hard on what caused the inflation. He

02:05:57 10    wouldn't say.

11         He has testified at length in his deposition, he

12    can't speak to the cause. He has testified and he said in his

13    report, he can't speak to the cause. His empirical data

14    doesn't speak to the cause. And now suddenly we have a

02:06:13 15    cause-based explanation for the inflation, which happens by

16    coincidence to be the theory of plaintiffs' opening statement,

17    which is not disclosed in the report and, therefore, was not

18    the subject of cross.

19         And in fact the cross, as your Honor knows from our

02:06:23 20    prior discussions about this issue, focused extensively on his

21    inability to give a reason.

22         And we also had a lengthy argument in front of your

23    Honor about the fact that when the plaintiffs were asked when

24    the inflation arose and what caused it in front of the

02:06:37 25    magistrate judge, they took the position -- they tactically

Fischel - direct

2611

1    decided they wouldn't say.  And the magistrate judge said,

2    then, you are bound by that answer and defendants can make of

3    that answer what they will.

4         And this is Professor Fischel trying to extricate the

02:06:49  5    plaintiffs from that problem of their own making, contrary to

6    the rulings of this Court.

7         MR. BURKHOLZ:  He is not trying to extricate us from

8    any problem.

9         These are questions Mr. Kavaler can ask on

10    cross-examination.

11         In his report he refers exactly, in Paragraph 20, to

12    the reduction in the growth rates that the analysts were

13    making in the summer of 2002, which he testified about, that

14    caused the stock price to go down.

02:07:12  15         And he specifically says in his report that he has

16    concluded that the economic evidence is consistent with

17    plaintiffs' claim that the alleged wrongdoing caused investors

18    in Household's common stock to incur losses, at Paragraph 11.

19         So the questions that Mr. Kavaler wants to raise, he

02:07:29  20    can raise them on cross-examination.

21         But this opinion was referenced in his report and

22    it's proper.

23         MR. KAVALER:  Your Honor, Paragraph 20 talks about,

24    as counsel says, events of July 2002.  What this witness is

02:07:40  25    now talking about is the beginning of the period, 1998 and

Fischel - direct

2612

1    '99.  That's completely different.

2         THE COURT:  Why do you say that?

3         MR. KAVALER:  He says "caused," your Honor.  The

4    whole point is caused.

02:07:50  5         In 2002 we have the inflation coming out of the

6    stock.

7         There are two different issues in this case, your

8    Honor:  Where did the inflation come from; how did it come in?

9    And how did it come out?

02:07:58 10         He is talking about "come out."

11         They have given us a notebook today of all the

12   exhibits.  There are lots of exhibits on "come out."  I

13   understand that.  I am prepared to deal with that on my

14   examination.  That's fair game.

02:08:07 15         On "come in," we spent a lot of time asking him.  We

16   made two motions to your Honor, the eight-page motion and the

17   summary judgment motion, based upon the absence of any

18   evidence of "come in."

19         I won't rehearse all of that, but we all know we are

02:08:22 20   waiting eagerly to hear what he has to say about "come in."  I

21   would assume that what he says about "come in" is cabined by

22   what he said about "come in" in his expert report, otherwise

23   the whole system is totally unworkable and wholly unfair.

24         THE COURT:  You said he didn't say anything about it.

02:08:35 25         MR. KAVALER:  That's my point.  Having elected to say

Fischel - direct

2613

1       nothing about where it comes from in his expert report, he

2       can't now have a theory as to where it comes from or what

3       causes it.

4               THE COURT:  Okay.

02:08:45  5             MR. KAVALER:  In his deposition, your Honor -- we

6       asked him repeatedly; you know us -- he was agnostic on where

7       it comes from.  He said, I don't know.  My regression analysis

8       can't answer that question.

9               And the plaintiffs chimed in helpfully in front of

02:08:58 10     magistrate and says, and he doesn't have to know.

11              Now he knows?

12              MR. BURKHOLZ:  It's not true, your Honor.  Actually,

13      in his rebuttal report -- actually, it's in his original

14      report.  I am sorry.

02:09:19 15             At the end -- first of all, causation is measured by

16      stock price inflation coming out with the disclosures at the

17      end of the class period.  That's how you measure inflation.

18              But the issue Mr. Kavaler is raising -- I can't find

19      it right now, your Honor, but it was specifically addressed in

02:09:49 20     one of his reports, this issue of preclass-period inflation

21      and inflation during the class period.  I mean, that's an

22      issue he can just raise on cross-examination.

23              But the issue of causation clearly is something that

24      was in his report.  And he measures it.  He discusses the

02:10:06 25     statements that the plaintiffs allege.  And as long as we

Fischel - direct

2614

1    prove that there are false statements, he alleges that

2    inflation begins whenever the first false statement happens in

3    the class period, or in the relevant period.

4           MR. KAVALER:  Your Honor, two things of cosmic

02:10:21  5    importance to understand what Mr. Burkholz just said.

6           First, if I understood him correctly, he says he is

7    going to address where the inflation came out, and he is going

8    to say, see, it must have been there.

9           The Seventh Circuit in the Ray case says, as I know

02:10:35 10    your Honor knows, the plaintiffs must show inflation coming in

11    and inflation going out in the class period or be nonsuited if

12    it goes to their case.  Not in those words, but that's what it

13    says.  There is no question about that.

14           I believe he is not going to say where it came from.

02:10:48 15           MR. BURKHOLZ:  That's not true.

16           MR. KAVALER:  Secondly, your Honor, I am reading from

17    his rebuttal report at Page 27.  He says, "Therefore, no

18    regression analysis can be used to identify the day on which

19    the stock price became inflated in this case."

02:11:01 20           That's -- it seems to me, there's going to be at the

21    end of his testimony a failure of proof when it comes in.

22           What he is doing now I think is obvious.

23           But, your Honor, the question he was asked repeatedly

24    is:  In your opinion, how could the wrongdoing the plaintiffs

02:11:13 25    allege in this case have caused the inflation in Household

Fischel - direct

2619

1     Street analysts."

2          And then just the beginning of the next paragraph,

3     and then I will stop reading.

4          "Household also began EZ Pay Plus, a program under

02:18:45 5     which many borrowers, like Myers" -- a particular individual

6     described in the story -- "were lured with lower interest

7     rates but were really charged higher ones."

8          And the article continues in the same vein.

9          But the basic point of the article is exactly what I

02:19:02 10    said before about how plaintiffs' allegations could produce

11    inflation if the spectacular growth was a function of

12    predatory lending and aggressive accounting and if that growth

13    was not sustainable over the long-term because customers would

14    complain, lawsuits would arise, regulators would complain, and

02:19:27 15    Household would ultimately be forced, as it actually was in

16    the real world, to change its practices, to abandon some of

17    the practices that fueled the growth causing it to lower its

18    growth rates.  That caused the stock price to decline.

19         And if that information had been known at the

02:19:43 20    beginning of the relevant period, beginning the end of July of

21    1999, Household's stock price would have fallen at an earlier

22    point in time because the inflation that existed in its stock

23    throughout the relevant period until the end, when the truth

24    started coming out, would have caused the price to fall.

02:20:04 25  Q.  As part of your analysis, did you also analyze Household's

Fischel - direct

2620

1    stock price performance during the relevant period?

2    A.  Yes.  In a number of different ways, I did.

3    Q.  And what did you conclude?

4    A.  I concluded that during the implementation of the

02:20:21  5    Household growth strategy, particularly beginning in the end

6    of 1999, 2000, and much of 2001, Household stock performed

7    extremely well.

8        And then, when the criticism started to mount, when

9    Household's denials about its lending practices and aggressive

02:20:44  10   accounting began to be more and more questioned, when people

11   started to disbelieve what Household was saying in terms of

12   analysts and other market professionals, the stock price

13   started to fall.

14       So it went from somewhere in the 40s to almost 70.

02:21:01  15  And then in the latter part of the period, when the truth

16   started to come out, the stock fell to somewhere in the

17   high -- low 20s and then the higher 20s.

18   Q.  And did you also analyze the information that was being

19   communicated to investors during this relevant period?

02:21:18  20  A.  Yes.  Again, very carefully on a day-by-day basis.

21   Q.  And did you perform any statistical tests to analyze the

22   relationship between the information communicated to investors

23   at Household and its stock price during this time period?

24   A.  I did.

02:21:31  25  Q.  And what did you do?

Fischel - direct

2621

1    A.   I performed what is generally referred to as an event

2    study, which is a type of what -- a statistical technique

3    known as a regression analysis.

4    Q.   Let me hand you what we have marked as Plaintiffs' 1391.

02:21:52  5    (Document tendered.)

6    BY MR. BURKHOLZ:

7    Q.   Is Exhibit 1391 your event study?

8    A.   Yes.

9         MR. BURKHOLZ:  Your Honor, there is no objection to

02:22:13  10   this document.  I move it into evidence.

11        THE COURT:  It will be admitted.

12   (Said exhibit was received in evidence.)

13   BY MR. BURKHOLZ:

14   Q.   I would like you to explain the event study to the jury.

02:22:24  15        And let's focus on one of the dates that you looked

16   at, August 14th, 2002.

17        What is the significance of that date, if you recall?

18   A.   That's the date that Household issued its restatement.

19   Q.   Okay.  Why don't you walk us through what you did in the

02:22:47  20   event study with respect to that date and explain to the jury

21   the different headings here.

22   A.   Okay.  Let me start by just very briefly explaining what

23   an event study is so that the context is clear.

24        One of the things that we know about the stock prices

02:23:07  25   for any company is that the stock price can be affected by

Fischel - direct

2622

1    basically three things.

2            It can be affected by movements in the overall stock

3    market.  It could be movements in the industry that the

4    company is a part of, developments in the industry.  And it

02:23:26  5    could also be affected by things that are unique to the

6    particular company that are not shared with other companies in

7    the industry or not shared with the overall market.

8            And what the regression analysis does that's

9    reproduced in the event study is, it analyzes on any given day

02:23:50 10    how much of a company's stock price movement is explained by

11    the market in the industry as opposed to how much is specific

12    to the particular company.

13            And it's very important always, in understanding

14    stock price movements, to understand the relationship between

02:24:12 15    the company on the one hand and the overall market and the

16    industry.

17            So just for example, unfortunately, in roughly the

18    past year -- although it's gotten a little better -- the stock

19    market has basically fallen in half from 14,000 roughly to

02:24:34 20    below 7,000.  Now it's a little bit above 8,000.

21            So if you didn't know that and I told you that during

22    this period you had a stock that lost 5 percent of its value,

23    you might think that that wasn't so good because you lost

24    money.  But I guarantee that most people who buy stocks would

02:25:00 25    be delighted if they only lost 5 percent of their value in the

Fischel - direct

2623

1   last year because the overall stock market lost 50 percent of

2   its value.

3       Similarly, in the last month, the stock market has

4   gone up significantly, by 25 percent approximately.  And if I

02:25:18  5   told you during that period you had a stock that made

6   5 percent, you might think that you made money.  But then if I

7   tell you that the overall market went up by 25 percent, you

8   wouldn't think that was such a good investment.

9       And the purpose of the event study is to not look

02:25:34  10  just at whether a stock price goes up or down but rather to

11  understand how it performed relative to the overall market and

12  relative to the overall industry that it's a part of, because

13  unless you know that, it's impossible to know how a stock

14  really did.

02:25:53  15      And that's what an event study does.  It does that by

16  a fairly complicated statistical method.  But the basic idea

17  is pretty simply.  It's what I just described.

18      With that background, maybe we can just highlight the

19  top --

02:26:08  20  Q.  Can I ask you a question before we get to that?

21  A.  Sure.  Of course.

22  Q.  Is an event study a common technique that's used to

23  estimate damages?

24  A.  Yes, I believe it is the standard methodology that's used

02:26:17  25  in virtually every case that I am aware of to estimate both

Fischel - direct

2625

1    S&P 500 went up by a little over 4 percent that day,

2    4.01 percent.

3            And the next column, the S&P financials index, which

4    is the index that Household itself compared itself to, that

02:28:21  5    went up by 3.74 percent.

6            So in the same way that I just described about the

7    stock market going down in the past year by 50 percent, going

8    up in the last month by 25 percent, you can't just look at

9    that .77 percent increase in a vacuum.  You have to compare it

02:28:41  10    to how the overall market did and how the industry did.

11            And you see the overall market did -- let's see --

12    more than five times better than Household did on that day.

13    And the industry, looks like it did also about five times

14    better than Household on that day.

02:29:02  15            So if we go to the next column, the predicted return,

16    this is the -- where the statistical analysis gives you the

17    ability to say with some precision, given what happened in the

18    overall market and given what happened in the overall

19    industry, knowing how much they went up that day, how much

02:29:29  20    would you predict -- given Household's relationship with the

21    market and the industry -- Household would have gone up on

22    that day, August 14th?

23            And if we go to the -- it's 3.26 percent.

24            And if we go to the next column, residual return,

02:29:50  25    2.49 percent -- that's simply the difference between

Fischel - direct

2626

1    3.26 percent -- what you would predict. You would predict

2    that Household would go up by a lot. Instead it went up by

3    just a little. That's just like my example of the stock

4    market going up by 25 percent in the last month but a

02:30:11  5    particular stock going up by only 5 percent. 5 percent sounds

6    good, but it's not as good as what you would expect,

7    25 percent.

8              And the same thing is true for Household.

9              So applying that statistical method, you see that the

02:30:29 10    residual return for Household on that day is actually

11    negative, negative by a fairly large amount because Household

12    so far underperformed the market and the industry which have a

13    big influence on its performance.

14              And the next column, the residual price change, that

02:30:56 15    is just -- that's simply a multiplication of this

16    minus 2.49 percent times what Household's closing price was

17    the previous day, $37.80.

18              So when you look at Household stock price

19    analytically, precisely, scientifically, you see that

02:31:21 20    Household stock price, measured against the market and the

21    industry of which it's a part, actually declined by 94 cents

22    as opposed to the initial appearance that it looks like the

23    price went up on that day.

24              And then, if you go to the last two columns, the

02:31:46 25    T statistic and whether the T statistic is greater than 1.65,

Fischel - direct

2627

1    that is simply a measure of whether the negative performance

2    of Household on that day is sufficiently large to be

3    considered significant using this particular regression

4    analysis and event study.

02:32:10    5          Any time there is three stars on a particular date,

6    the conclusion is that, based on this particular event study,

7    this particular regression analysis, Household stock price

8    underperformed by a statistically significant amount on this

9    particular day.

02:32:30   10          And that's how an event study works, basically.

11    Q.  What was the -- what is the relationship between this

12    event study and your quantification of inflation?

13    A.  I used two methods of quantification.  An event study is

14    basically used in both of them.

02:32:48   15          But with respect to the first method, what I did was,

16    I selected those disclosures which I considered to be

17    fraud-related during the relevant period where there was a

18    statistically significant price movement, where I was also

19    reasonably confident that the fraud-related disclosure on a

02:33:13   20    particular day was responsible for a particular statistically

21    significant price movement.

22    Q.  And how many dates did you find during this period?

23    A.  Using under my first method, 14 dates.

24    Q.  What was the first date that you found one of these

02:33:31   25    events -- one of the dates that you are testifying about?

Fischel - direct

2628

1  A.  November 15th, 2001.

2  Q.  Why were these 14 dates selected?

3  A.  They were selected because I wanted to isolate the

4  fraud-related disclosures that were important to investors.

02:33:55  5  So I had to make a series of judgments based on the event

6  study in order to do that.  I had to isolate disclosures.  I

7  had to determine whether those disclosures occurred at a time

8  when there was a statistically significant stock price

9  movement.  And I had to be reasonably confident that the

02:34:18  10  fraud-related disclosure was responsible for the price

11  movement.

12  Q.  And have you prepared a demonstrative that summarizes the

13  relationship between your analysis of the 14 dates and

14  inflation?

02:34:28  15  A.  I have.

16        MR. BURKHOLZ:  Can we bring up Plaintiffs'

17  Demonstrative 150.

18  BY MR. BURKHOLZ:

19  Q.  Now, before we look at -- is this the demonstrative that

02:34:44  20  you prepared?

21  A.  Yes.

22  Q.  Before looking at these 14 dates, was there another set of

23  dates that you could have picked?

24  A.  Yes.  I believe this particular analysis focuses on

02:34:59  25  14 dates.  I have seen an analysis by Household that

Fischel - direct

2629

1    identifies 166 dates.

2    Q.  If you included those dates in your quantification, would

3    the inflation be higher or lower?

4    A.  It would be almost double the number that I calculated

02:35:16  5    here.  We will get to it, but the $7.97 number.

6        If I included all the defendants' dates, that number

7    would increase by another $7, so it would be virtually $15,

8    which would make the harm and the losses to investors much

9    greater than what I myself calculated under this first method.

02:35:39  10   Q.  So selecting the 14 dates was conservative, in your view?

11   A.  Absolutely.  Relative to the choice of dates of the

12   defendants.

13   Q.  Let's look at the 14 dates.

14       Why is November 15th, 2001, the first date on this

02:35:51  15   exhibit?

16   A.  Because that is the date that the California Department of

17   Corporations filed suit against Household alleging that

18   Household had engaged in systematic unfair predatory lending

19   practices.

02:36:10  20   Q.  Did you prepare a demonstrative related to that date?

21   A.  I did.

22       MR. BURKHOLZ:  Can we bring up Plaintiffs'

23   Demonstrative 137.

24   BY THE WITNESS:

02:36:31  25   A.  I don't think -- this is not the right document.

Fischel - direct

2630

1           That's the right document.

2    BY MR. BURKHOLZ:

3    Q.  I want to hand you what we have marked as

4    Plaintiffs' 1305, Plaintiffs' 1405, and Plaintiffs' 1452.

02:36:44  5       (Documents tendered.)

6    BY MR. BURKHOLZ:

7    Q.  Plaintiffs' 1305 is a California Department of

8    Corporations press release.

9           Plaintiffs' 1405 is a Bloomberg article regarding a

02:36:52 10   lawsuit on November 14th, 2001.

11          And Plaintiffs' 1452 is a Household press release of

12   November 15th, 2001.

13          Did you take excerpts from those three exhibits and

14   include them on your demonstrative?

02:37:05 15   A.  I did.

16          MR. BURKHOLZ:  Your Honor, I move these three

17   exhibits into evidence subject to the limiting instruction.

18          THE COURT:  They will be admitted subject to the

19   limiting instruction.

02:37:18 20      (Said exhibits were received in evidence.)

21   BY MR. BURKHOLZ:

22   Q.  Can you describe the demonstrative that you prepared.

23   A.  Yes.  This is an exhibit which describes the events on

24   November 15th, 2001, the California Department of Corporations

02:37:39 25   lawsuit.

Fischel - direct

2631

1          And it also, on the third line, says "residual price

2    change, negative $1.86," meaning that this is the first of my

3    14 dates where there was a fraud-related disclosure which had

4    a significant effect on Household stock price.

02:38:00   5          And I think it's fairly self-explanatory, but just so

6    we are all clear, the press release of the California

7    Department of Corporations stated that, "After the close of

8    trading on November 14th, 2001, the California Department of

9    Corporations issued a press release announcing that it had

02:38:24  10    sued Household for imposing 'excessive and improper fees,

11    penalties, interest, and charges in violation of state

12    consumer protection laws.'"

13          And then I also included Household's response.

14          "Household International responded that it is

02:38:42  15    'currently reviewing the specifics of the lawsuit but

16    vehemently denies any assertion that it has willfully violated

17    the lending laws that regulate its business.'"

18          But you can see from the price reaction, the negative

19    price reaction, the negative significant price reaction, that

02:39:00  20    this is the beginning of the time when Household, that had

21    been denying its involvement in predatory lending throughout,

22    when market participants begin to doubt Household's denials

23    because of the accumulation of accusations and firsthand

24    accounts by customers who had complained about their dealings

02:39:24  25    with Household.

Fischel - direct

2632

1    Q.  And did analysts comment on this lawsuit?

2    A.  Yes, quite extensively.

3    Q.  Let me show you Plaintiffs' Exhibit 1407.  It's a

4    November 15th, 2001, Salomon Smith Barney analyst report.

02:39:36  5    (Document tendered.)

6         MR. BURKHOLZ:  I would like to move that into

7    evidence, your Honor.  I don't believe there is an objection.

8    Again subject to the limiting instruction.

9         THE COURT:  It will be admitted subject to the

02:39:44 10   limiting instruction.

11   (Said exhibit was received in evidence.)

12   BY MR. BURKHOLZ:

13   Q.  What is the significance of this report to your opinion?

14   A.  Well, if we highlight under "summary" just the first

02:39:55 15   bullet point -- remember what I wanted to do was isolate

16   events and then be reasonably confident that the events are

17   the cause of the stock price movement; in this case, a stock

18   price decline.

19        Here you have the analyst saying exactly that: that

02:40:17 20   Household shares sold off almost 4 percent intraday on news

21   that the California Department of Corporations has filed an

22   $8.5 million lawsuit against Household for lending law

23   violations (predatory lending).

24        Then, on the next page -- this is quite important in

02:40:39 25   light of subsequent developments.  In the third paragraph, the

Fischel - direct

2633

1    paragraph beginning "Clearly." The second sentence, if we

2    could highlight that.

3         The analyst says, "The greater potential risk" -- in

4    other words, greater than the fact that they are being sued

02:41:00  5    for $8.5 million -- "in our view is that this lawsuit turns

6    into a larger development," which is exactly what occurred.

7         Then, the last sentence of the paragraph, if we could

8    highlight that.

9         "Thus, to the extent there were further findings from

02:41:19 10    another audit or another regulatory body was interested in

11    pursuing the matter, there could be further chapters in the

12    story."

13        And again, that's exactly what occurred.

14   Q.  Let me show you another analyst report, Exhibit 1408, a

02:41:37 15    Deutsche Bank Alex. Brown report, dated on the same day,

16    November 15th, 2001.

17        (Document tendered.)

18        MR. BURKHOLZ:  I would ask that to be admitted into

19    evidence, your Honor, subject to the limiting instruction.

20   BY THE WITNESS:

21   A.  Again --

22        THE COURT:  Excuse me.

23        THE WITNESS:  I am sorry, your Honor.

24        THE COURT:  That's all right.

02:42:01 25        It will be admitted subject to the limiting

Fischel - direct

2634

1    instruction the jurors have.

2    (Said exhibit was received in evidence.)

3    THE WITNESS:  I apologize, your Honor.

4    THE COURT:  Go ahead.

02:42:08  5  BY MR. BURKHOLZ:

6    Q.  Now, what is the significance of this analyst report to

7    your opinion?

8    A.  This analyst report, again, talks about the significance

9    of the lawsuit.  And, again, this analyst begins to suspect

02:42:21 10  that there is going to be problems with the long-term growth

11   strategy that might develop as a result of the lawsuit.

12       So if we look at the middle of the page on Page 94,

13   conclusion, if we can just highlight 1, 2, 3.  The analyst

14   talks about what the possible effect of the lawsuit might be.

02:42:53 15      It talks about how much more in refunds might

16   Household owe to consumers who are victims of predatory

17   lending.

18       Will the accusations escalate within or beyond the

19   state?  Again, that's exactly what occurred.

02:43:09 20      And three, will there be any operational constraints?

21   Meaning the business strategy that Household pursued to drive

22   its growth, whether they are going to be -- whether there were

23   going to be constraints on that strategy as more and more

24   complaints occurred, more and more lawsuits were filed, more

02:43:27 25  and more regulators were concerned and upset, whether

Fischel - direct

2635

1    Household was going to have to abandon the identical practices

2    which fueled its growth strategy in the first place.

3    Q.   Now, the article refers to the department filing the suit

4    on November 9th, 2001.  And this analyst report is on

02:43:43  5    November 15th, 2001.

6          What's the significance of that?

7    A.   Well, they are both relevant dates, but if you look at the

8    stock price reaction, the stock price reaction occurred on

9    November 15th.  That was also the day that Household issued a

02:44:01  10    press release denying the allegations as opposed to saying it

11    was working something out or some alternative form of

12    disclosure.

13          And November 15th was the date that the analyst, as

14    we just looked at, isolated as the date that Household stock

02:44:20  15    price fell because of the filing of this lawsuit, coupled with

16    Household's denial on November 15th.

17    Q.   Did the value of Household stock decline by the

18    $8.5 million that the California Department of Corporations

19    was seeking?

02:44:37  20    A.   No.  It declined by much, much more than that because

21    analysts concluded and investors concluded, with the benefit

22    of hindsight, correctly that it was much more than the

23    $8.5 million that was at stake.  It was Household's ability to

24    continue with the business practices that it was engaged in,

02:44:57  25    whether Household was going to be able to avoid more regulator

2636

1    scrutiny, more lawsuits, more complaints by consumers.

2         These are the things that analysts said might happen,

3    and those are the things that in fact did happen later on in

4    the relevant period.

02:45:12  5  Q.  Did you prepare a demonstrative for the second date that

6    you selected, December 3rd, 2001?

7    A.  I did.

8         MR. BURKHOLZ:  Can we bring up Demonstrative 138.

9    BY MR. BURKHOLZ:

02:45:27 10  Q.  Are there analyst reports and articles referred to in this

11   demonstrative?

12   A.  Yes.

13   Q.  Let me hand you what we have marked as Plaintiffs'

14   Exhibit 1409, a Dow Jones capital markets report of

02:45:42 15  December 1st, attaching the Barron's article; Plaintiffs'

16   Exhibit 1421, Bernstein Research report of December 4, 2001;

17   and Exhibit 1420, which is a Legg Mason December 3rd, 2001,

18   analyst report.

19     (Documents tendered.)

02:46:04 20  BY MR. BURKHOLZ:

21   Q.  Are those the documents that you are referring to in this

22   demonstrative?

23   A.  Yes, sir, they are.

24        MR. BURKHOLZ:  Your Honor, we move these three

02:46:09 25  exhibits into evidence subject to the limiting instruction.

Fischel - direct

2660

1     ultimately be.

2          So as a result, if you go back to the top of the

3     demonstrative, the analyst talks about how concerns about

4     these investigations, about the effect of the Washington

03:37:11  5     report caused the analysts to lower their price target for

6     Household from $57 to $36, which is a really major negative

7     shift because of the concern about what the ultimate effect is

8     going to be of all these investigations and lawsuits and

9     regulatory pressure on Household to change its predatory

03:37:38 10     lending practices.

11     Q.  And when you talked about the concern, are you talking

12     about how much money Household will have to pay for any

13     settlement as well as how much money they're going to make in

14     the future?  Is that what the analysts are looking at?

03:37:48 15     A.  I think there's some concern about how much money

16     Household will have to pay, but much more important than what

17     Household will have to pay is what the effect will be of

18     abandoning its predatory lending on its profitability and its

19     growth prospects for the future.

03:38:03 20          That's really what the analysts were more focused on,

21     although obviously the amount is also relevant.  But what's

22     more relevant is Household's business strategy, the

23     relationship between predatory lending and aggressive

24     accounting in that business strategy, and whether pressure

03:38:21 25     from investigations, lawsuits, et cetera, will force Household

Fischel - direct

2661

1  to abandon certain business practices and accounting

2  practices, reducing its profitability, reducing its growth,

3  causing its stock price to fall, which is why the analysts

4  lowered the price target from $57 to $36.

03:38:39  5  Q.  And analysts and investors look at the growth rate of a

6  company in order to estimate how to value that company, what

7  the stock price should be?

8  A.  Yes.  How a company is expected to perform in the future,

9  that's really what determines what a stock price is today.

03:38:53 10  Q.  Okay.  Have you prepared a demonstrative for our next

11  date, October 4th, 2002?

12  A.  I have.

13        MR. BURKHOLZ:  Okay, can we bring up 148, please?

14  BY MR. BURKHOLZ:

03:39:08 15  Q.  And is that the demonstrative you've prepared for

16  October 4th, 2002?

17  A.  Yes.

18  Q.  And you cite to a Wall Street Journal article of October

19  4th, 2002, correct?

03:39:17 20  A.  Correct.

21  Q.  Let me give you what's been marked as Plaintiffs' 1375,

22  which is the Wall Street Journal article of October 4th, 2002.

23        MR. BURKHOLZ:  Ask that that be marked into

24  evidence -- moved into evidence, your Honor, subject to the

03:39:31 25  limiting instruction.

Fischel - direct

2664

1    significantly in response to these particular disclosures on

2    October 10th and October 11th, correcting for movements in the

3    market and the industry as a whole, and the reason for that is

4    that there had been so much leakage, so much concern about

03:42:17  5    what the settlement might be, whether the settlement would

6    occur, how much Household would decline in profitability as a

7    result of the resolution of the lawsuits and reform of their

8    business practices that the stock price had fallen to a really

9    low level relative to where it had been before.  It was now in

03:42:42 10    the low 20s versus relatively close to 70 that it had been

11    earlier.

12          And when Household stated, looking at the bottom of

13    the demonstrative, that the effect of the series of business

14    practice reforms would only be 10 cents per share in 2003, 20

03:43:04 15    cents per share in 2004 and 30 cents per share in 2005, that

16    was much less than what many analysts were expecting.  They

17    were expecting the impact on Household's profitability to be

18    greater.  So this was relatively good news as compared with

19    what people were expecting.

03:43:24 20          And then subsequent to this, a number of analysts and

21    commentators said that these numbers were still too high.  But

22    as of this particular date, this was perceived as good news by

23    the market because even though Household was saying that it

24    was going to be less profitable in the future, that it wasn't

03:43:42 25    going to be able to grow at the same rate, the reductions in

Fischel - direct

2665

1    profitability and growth were less than some people were

2    forecasting, although, as I said, later these numbers were

3    criticized as well.

4    Q.   You were referring to the Bernstein article that we looked

03:43:54  5    at that was cutting their estimates, that this wasn't as

6    bad as what Bernstein said?

7    A.   Correct, correct.

8    Q.   So that's why the stock went up?

9    A.   Yeah, not just Bernstein, but a lot of other analysts as

03:44:04 10    well.

11    Q.   So this increase in the stock price, how did that impact

12    your quantification?

13    A.   I took it into account.  I gave Household full credit for

14    it; and as a result, it reduced my calculation of inflation

03:44:16 15    during the relevant period.

16    Q.   Let's talk about your quantification and go back to your

17    14 dates.  If we can bring up Plaintiffs' Demonstrative 150

18    again.

19         We've just looked at most of these dates.  I think

03:44:34 20    the only one we didn't look at was the February 27th, 2002.

21    Can you explain that to the jury?

22    A.   Yes.  That's a date when Household indicated or disclosed

23    that it was implementing a series of sales practice reforms to

24    try and deal with some of the complaints that it was

03:45:01 25    receiving, and that was perceived positively by the market,

Fischel - direct

2666

1    which is why there's a plus $1.64 entry there.

2              And, again, I took that, I gave Household credit for

3    that, took it into account in my calculation of inflation.

4    Q.  And can you explain the chart, how you got to the

03:45:19  5    calculation of taking the increases and decreases into

6    account?

7    A.  Yes.  I looked at what the event study showed with respect

8    to all 14 dates, every single one that I identified.  And if

9    you look at the last column, the entries in red --

03:45:36 10              MR. BURKHOLZ:  Highlight that whole last thing?

11    Thank you.

12              Sorry to interrupt.

13    BY THE WITNESS:

14    A.  No problem.

03:45:40 15              The entries in red are negative price movements

16    controlling for market and industry conditions.  The entries

17    in black are positive price movements controlling for market

18    and industry conditions.

19              The negative -- the negatives total 16 -- negative

03:46:04 20    $16.33.  The positives total $8.37.  I netted the positives

21    against the negatives for a total of $7.97.

22    BY MR. BURKHOLZ:

23    Q.  So including the positive price increases was conservative

24    in your view?

03:46:19 25    A.  Yes.  Obviously, if I only looked at the negative ones,

Fischel - direct

2667

1    the inflation would be higher.  The harm to investors would be

2    greater.

3    Q.  Did you prepare a demonstrative that shows the artificial

4    inflation that you calculated based on the 14 dates?

03:46:32  5    A.  I did.

6                MR. BURKHOLZ:  Can we bring up 151, please?

7    BY MR. BURKHOLZ:

8    Q.  Okay.  Is this a demonstrative that you picked -- that you

9    prepared that shows the quantification -- quantifies the

03:46:50  10   inflation in Household's stock price for this particular

11   model?

12   A.  Graphically, that's correct.

13   Q.  Okay.  And I noticed at the very end, it's a little

14   difficult to see, but the blue line goes over the red line.

03:47:05  15             Can you explain what's happening in the last month of

16   the class period -- of the relevant period?

17   A.  Yeah.  And just for context, the red line is the price.

18   That's what the actual price was of Household on every day

19   during the relevant period.

03:47:21  20             The blue line, that's referred to as the "true

21   value."  That is what my calculations indicate the price of

22   Household would have been had there been no inflation in the

23   stock price as a result of the fraud-related disclosures, as a

24   result of the 14 fraud-related disclosures.

03:47:47  25             And you see for the entire period until the very end,

Fischel - direct

2668

1   the price, the red line, is above the blue line, and the

2   shading in between represents that difference.  And what that

3   means is that investors on every day while the red line is

4   greater than the blue line are paying too high a price for

03:48:13  5   Household's stock because the price is inflated by these

6   fraud-related disclosures or non-disclosures.

7         At the very -- I'm sorry.

8   Q.  No, continue.  Go ahead.

9   A.  Yeah, I was going to say at the very end, the blue line

03:48:26  10  goes above the red line.  The true value line, the

11  non-inflated price, goes above the actual price, and the

12  reason for that is what I just described, that there was so

13  much negative information about Household disclosed to the

14  market, so much adverse publicity, so much expectation that

03:48:49  15  Household's growth strategy was going to be derailed in a

16  fundamental way that the price actually fell to a level below

17  what my calculations indicate the price should have been under

18  this method had Household been making accurate disclosures

19  during the entire relevant period.

03:49:10  20         So at the very end, the investors who purchased at

21  the red line during those days when the blue line is above the

22  red line, based on my calculation, they were in effect getting

23  a bargain.  They suffered no loss because they were buying

24  when people thought the truth was worse than it actually

03:49:34  25  appeared to be, at least as of October 10th and 11th, though

Fischel - direct

2671

1    Q.  Would there be inflation on that date if there was no

2    finding that the August 16th, 1999 10-Q was false or

3    misleading?

4    A.  No, no, that the -- well, it would depend, I guess, on

03:53:16  5    whether it was an earlier disclosure that was found to be

6    false and misleading.  It's hard to separate one from the

7    other.

8         But so long as there is a disclosure that Household

9    made that was false and misleading because it did not provide

03:53:31  10   accurate information about its predatory lending practices,

11   its re-aging policies, its credit card accounting, the ability

12   to sustain its growth strategy in the future, the inflation

13   would be this particular amount based on my calculations.

14   Q.  Okay.  Now, in your opinion, the $7.97 of inflation that

03:54:01  15   you calculated, does that capture, in your opinion, the amount

16   of inflation that was in Household's stock price?

17   A.  No.

18   Q.  And why not?

19   A.  Because what I did was I focused on individual

03:54:15  20   disclosures, but that's in some sense not a completely

21   realistic analysis because it's not as if there was only 14

22   disclosures during the relevant period.

23        There was a cascade of negative information that came

24   out about Household, particularly after negative --

03:54:36  25   particularly after November 15th, 2001, when market

Fischel - direct

2672

1    participants, investors, analysts became to increasingly doubt

2    Household's denials and started to really question whether or

3    not Household's disclosures were accurate, whether its

4    accounting was accurate, whether its lending practices were

03:54:59  5    consistent with governing regulations.

6         There was, as we get a little bit later in the

7    period, tremendous amount of leakage of information about the

8    Washington Department of Financial Institutions report, about

9    the possibility of a settlement, about the need for Household

03:55:21  10   to reform its sales practices and the possible effect that

11   would have on Household's profitability, and I believe that

12   cascade of negative information had an effect, a negative

13   effect, on Household's stock price in addition to the effect

14   of the 14 disclosures that I originally quantified that we

03:55:44  15   just went through.

16   Q.  Do you have the Bellingham Herald article, that

17   Exhibit 1429?

18   A.  Probably better if you give me another copy of it because

19   I have so many documents.  I could search for it, but if you

03:55:57  20   have another copy, that would be better.

21        What's the date of it?

22   Q.  I have a copy.

23   A.  Thank you.

24        I have it.

03:56:30  25   Q.  Okay.  Is this an example of the type of leakage that you

Fischel - direct

2680

1    all dividends are reinvested) of Household to Standard &

2    Poor's Composite Financial Stock Price Index and Standard &

3    Poor's 500 Composite Stock Price Index.  Our common stock is

4    included in both of these indices.  The chart assumes $100 was

04:08:44  5    invested in Household common stock on December 31, 1996 and

6    that all dividends are reinvested.  We are required to publish

7    the five-year return chart so you could compare our

8    performance to other stocks."

9            So Household demonstrated in this document what they

04:09:03 10    considered the relevant comparison was.  I used the exact same

11    comparison that Household itself stated was the right

12    comparison to use.

13    Q.  And did you prepare an exhibit that shows the amount of

14    artificial inflation, taking into account the leakage that

04:09:17 15    you've discussed?

16    A.  I did.

17    Q.  Before we get to that, did you prepare a demonstrative

18    that shows the inflation taking into account the leakage?

19    A.  Yes, I -- yes, I did.

04:09:55 20            MR. BURKHOLZ:  Okay.  Let's bring up 154, the next

21    demonstrative, 154.

22    BY MR. BURKHOLZ:

23    Q.  And what does this show?

24    A.  This is analogous to the document that we've already

04:10:07 25    looked at, the graph focusing on the 14 specific disclosures.

Fischel - direct

2681

1    But here instead of 14 specific disclosures, this method again

2    uses an event study, uses a regression analysis and attempts

3    to calculate the amount of inflation on every day during the

4    relevant period, again, taking into account the effect of the

04:10:34 5    market and the industry on Household's stock prices on every

6    day.

7         You can see that the difference between the red line,

8    the price, and the blue line is wider.  The blue line, the

9    true value line, the uninflated price, that's wider than in my

04:10:54 10    first method focusing on 14 disclosures, and the reason is

11    obvious, that you have so many more negative disclosures that

12    are leaking out that are not captured in my 14 specific

13    disclosures.

14         The result of that is that a greater percentage, a

04:11:11 15    greater proportion of Household's decline in price is

16    attributable to fraud-related disclosures and the correction

17    of fraud-related information in this exhibit than the previous

18    exhibit; but you can see again at the very end, the blue line

19    goes above the red line.

04:11:29 20         So even in this exhibit, I want to be careful that

21    investors who suffered no loss because they purchased at

22    particularly low prices are not entitled to recover because

23    they haven't suffered any harm.

24    Q.  And that's the investors in the last 30, approximately

04:11:48 25    30 days of the relevant period?

Fischel - direct

2682

1    A.  Correct.  When the leakage resulted in a much lower stock

2    price than what ultimately occurred on October 10th and 11th.

3    Q.  And you prepared an exhibit that shows the amount of

4    inflation on every day during the relevant period for your

04:12:04  5    leakage model, right?

6    A.  Correct.

7    Q.  Let me show you Exhibit 1395.

8    A.  Thank you.

9    Q.  And is that your quantification of the inflation under

04:12:15  10   your leakage model?

11   A.  Yes.  If you can put it on the screen maybe.

12   Q.  Did you prepare this document?

13   A.  I did.

14         MR. BURKHOLZ:  Your Honor, I don't believe there's an

04:12:24  15   objection to 1395 if we can move it into evidence.

16         THE COURT:  It will be admitted.

17    (Plaintiffs' Exhibit 1395 received in evidence.)

18   BY MR. BURKHOLZ:

19   Q.  Can you explain what this exhibit is?

04:12:35  20   A.  This exhibit, again, is analogous to the previous exhibit

21   which focused on the 14 specific disclosures; but this exhibit

22   takes leakage into account and, once again, has a calculation

23   of the stock price on every day, what the true value is, which

24   is what my calculation is of the uninflated price, what the

04:13:00  25   price should have been had there been no fraudulent

Fischel - direct

2683

1    disclosures or omissions in the various Household statements

2    and disclosures during the relevant period.  That's the second

3    column, true value.

4            And the artificial inflation is the number in the

04:13:20    5    last column.  And, again, you'll see that it's different from

6    7.97 at the beginning because this calculation doesn't just

7    focus on 14 disclosures.  It focuses on all the negative

8    disclosures that came out, particularly after November 15th

9    when the market started to, in a much more systematic way,

04:13:44    10    disbelieve Household's denials that it was engaging in

11    predatory lending and that it was engaging in improperly

12    aggressive accounting.

13    Q.  Like your specific disclosure model, does this

14    quantification use statistical methods to account for the

04:14:00    15    market and industry influences on Household's stock prices?

16    A.  Yes, it does.

17    Q.  And did you also analyze whether company-specific factors

18    unrelated to the alleged fraud can explain Household's stock

19    price decline during this latter part of the relevant period?

04:14:16    20    A.  Yes, I did.  I looked at that carefully.

21            I noticed that there were a lot of disclosures that

22    had some fraud-related information in it and some other

23    disclose -- and part of the disclosure did not have -- dealt

24    with something other that was fraud related.

04:14:37    25            There were some -- some of those disclosures that had

2684

1    a positive effect, some had a negative effect; but overall it

2    was impossible to conclude that the difference between the

3    true value line and the actual price would have been any

4    different had there been no disclosures about

04:15:02  5    non-fraud-related information during this particular period.

6    Some positive, some negative.  They cancel each other out.

7    Q.  Okay.  Now, reaching your opinion about inflation, did you

8    consider whether investors during the relevant period were

9    fully informed about Household's accounting and lending

04:15:17 10    practices?

11    A.  I did.

12    Q.  And what did you find?

13    A.  I found that they were not fully informed for a number of

14    different reasons.

04:15:25 15    Q.  And what were the reasons?

16    A.  Well, first, the disclosures coming out criticizing

17    Household's practices didn't come from Household; and if a

18    company is disclosing information about itself, it's one thing

19    for third parties to comment, but it's another thing for the

04:15:46 20    information to come directly from the company itself.

21         Since the company was not disclosing what the

22    analysts and the critics were saying, market participants did

23    not have full information.

24    Q.  Okay.  So you had your analysts' reaction or commentary,

04:16:03 25    some of -- the Barron's article and the analysts' reports, the

TAB 19

2696

1                  IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
2                           EASTERN DIVISION

3    LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all     )
4    others similarly situated,      )
                                     )
5                 Plaintiff,          )
                                     )
6       vs.                          ) No. 02 C 5893
                                     )
7    HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         ) Chicago, Illinois
8                                    ) April 17, 2009
                  Defendants.        ) 1:25 o'clock p.m.
9
                            VOLUME 13
10               TRANSCRIPT OF TRIAL PROCEEDINGS
            BEFORE THE HONORABLE RONALD A. GUZMAN
11

12   APPEARANCES:

13   For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
14                             BY:  MR. SPENCER A. BURKHOLZ
                                    MR. MICHAEL J. DOWD
15                                  MR. DANIEL S. DROSMAN
                                    MS. MAUREEN E. MUELLER
16                             655 West Broadway
                               Suite 1900
17                             San Diego, California  92101
                               (619) 231-1058
18
                               COUGHLIN STOIA GELLER RUDMAN &
19                             ROBBINS LLP
                               BY:  MR. DAVID CAMERON BAKER
20                                  MR. LUKE O. BROOKS
                                    MR. JASON C. DAVIS
21                                  MS. AZRA Z. MEHDI
                               100 Pine Street
22                             Suite 2600
                               San Francisco, California  94111
23                             (415) 288-4545

24

25

2704

1    securities fraud; and, the mere fact that an expert gave such

2    an opinion doesn't address the question they have to decide.

3            THE COURT:  Okay.

4            MR. KAVALER:  We can, obviously, talk about the

01:32:54  5    language at a later point.

6            THE COURT:  Okay.

7            MR. KAVALER:  I'm not suggesting that was the

8    language.

9            Thank you, your Honor.

01:33:04 10            MR. DOWD:  Your Honor, it's interesting because I

11    think what's been happening just happened, again.  If -- I

12    suspect what Mr. Kavaler was just arguing was about whether

13    the restatement, you know, standing alone, could be evidence

14    of scienter.

01:33:20 15            And that has nothing to do with the questions the

16    Court's asking about.  Nothing to do with the questions about

17    Mr. Devor -- at least as I understand your questions.  They're

18    two completely different issues.

19            So, I'd like to address it and I'm somewhat reluctant

01:33:35 20    to do it because they never object to anything we bring in,

21    and I know the Court raises the issue; but, once again, you

22    raised the issue and they talk about something completely

23    different.

24            And I think --

01:33:45 25            THE COURT:  Well --

2705

```
          1        MR. DOWD:  -- the issue that I think the Court is

          2   struggling with -- and if I'm wrong, tell me, your Honor.

          3        THE COURT:  Go ahead.

          4        MR. DOWD:  -- is you're saying, "Under this line of

01:33:54  5   cases," Sofamor Danek, Marsh McClellan, Galati -- whatever

          6   they are, I think there's three of them -- I can't say that

          7   the financial statements -- the Qs and the Ks -- were false

          8   because that revenue was illegal.

          9        That's what I you understood the Court's order to be

01:34:13 10   this entire time.

         11        THE COURT:  That is the Court's order, correct.

         12        MR. DOWD:  And what you're troubled about is:  Are

         13   the disclosure issues related to predatory lending somehow a

         14   back door around that?

01:34:24 15        THE COURT:  Correct.

         16        MR. DOWD:  And that's my understanding of what you

         17   are asking us about.

         18        So, what the restatement has to do with that, I'm not

         19   sure.

01:34:30 20        THE COURT:  And the reason I'm asking that is because

         21   of the wording in your expert's testimony.

         22        I mean, if I remember it correctly -- and I thought

         23   about it a lot -- his chain of logic was, "Well, you know,

         24   you've got this financial statement that's required in the

01:34:48 25   10-Ks and the 10-Qs.  And we've got the GAAP -- or the
```

2706

1    accounting principles -- over here; and, those accounting

2    principles say that you have to put in there whatever is

3    necessary in the footnotes and in the analysis section to make

4    your accounting statement meaningful.  And in order to do

01:35:12  5    that, GAAP requires you to put in all of this stuff about

6    predatory lending that they left out."

7         And if that's the case, it would seem to me that in

8    every case in which nothing more than the net earnings,

9    earnings per share, et cetera, nothing more than the bare

01:35:35 10    bones financial statement that's put into a 10-K or a 10-Q,

11    you're going to have a requirement, by virtue of GAAP now,

12    that any sort of illegal conduct or predatory lending

13    practices in this case be included.

14         So, it appears to me to be an end run around the

01:35:57 15    Court's ruling -- that the mere statement of the revenues in

16    the 10-K does not trigger a finding or possibility that the

17    statement was misleading or false.

18         MR. DOWD:  Right.

19         And I understand that.  You know, I'm a little

01:36:15 20    reluctant to deal with the end run because that's been the

21    opinion all along.  And no one's ever objected to that part of

22    the opinion ever.  Even this morning or this afternoon, no one

23    objected to it, again.

24         And, so, I mean, my issue is just the Court raises

01:36:33 25    it.  And it's a huge issue, your Honor.  I'm not kidding you.

2707

1    I mean, the Qs and the Ks it, if his disclosure opinions

2    aren't allowed in on that issue, I mean, it's a huge issue.

3    It's like them bringing a motion for summary judgment that the

4    Court raised sua sponte, and they still haven't raised even

01:36:48  5    this afternoon.

6         But putting all that aside, what the expert says is

7    it's illegal to book that revenue.  He never testified to that

8    in this trial.  We were very careful to not testify to that

9    because that's exactly what the Court's in limine ruling said

01:37:07 10    he's not allowed to do.  So, that testimony never came in.

11         What is important, your Honor, is the testimony that

12    says that if you fail to disclose and, indeed, they made

13    contemporaneous statements, as well, in their press releases,

14    but if you fail to disclose and make contemporaneous

01:37:28 15    statements about the growth, and don't disclose that that

16    growth is being generated by these predatory practices, if you

17    don't disclose that, those financial statements and the press

18    releases to the extent there are false statements are both

19    false by omissions and by false statements.  Because investors

01:37:48 20    look at those statements -- the financials, the press

21    releases -- to determine the future growth of the company.

22    And that is one of the main issues.

23         Now, where it becomes important, your Honor, is

24    Professor Fischel yesterday, as he testified, says, "What

01:38:06 25    drove this stock down?"

2712

1          MR. DOWD:  No. 5 in yours?

2          THE COURT:  No. 5 in mine, right.

3          MR. DOWD:  Sorry, your Honor.  I was looking at the

4    one that was the exhibit.

01:43:59  5          So, now, here they are announcing their 2000 year-end

6    results in a press release.  And they say, "Revenues -- " and

7    I am in the second paragraph -- "Revenues were particularly

8    strong.  Our record earnings reflect an outstanding year in

9    our consumer finance business, a dramatic turnaround in our

01:44:13 10   MasterCard/Visa business and strong results in all of our

11   other businesses.  We are particularly pleased with excellent

12   receivable growth in '99, particularly in our branches, while

13   fully realizing all the acquisition synergies in the

14   Beneficial merger."

01:44:30 15          So, they're talking now about what's generated their

16   growth.  What's generated those numbers.  And then you see the

17   very next statement is the 10-K.

18          So, I mean, it's clear, in our view, that that's a

19   false statement when you deal with the predatory lending

01:44:45 20   practices -- what they said in the January of 2000.

21          THE COURT:  Your argument is that because they made

22   what you believe to be misleading statements in the press,

23   they then became obligated to make full disclosure in the

24   10-Ks and the 10-Qs?

01:45:11 25          MR. DOWD:  Yeah.

1          I think -- I mean, how do you then file your 10-Q and

2    10-K two months later and you're allowed to put that statement

3    out there and not correct the lies that you told two months

4    before?

01:45:21  5          THE COURT:  I don't think so.

6          I mean, I disagree with that.  To me, the case law is

7    pretty clear that the omission has to be relative to the

8    statement.  And I think that a 10-K, two months after a press

9    release, is not the same statement.

01:45:35 10          MR. DOWD:  Well, I mean, I would beg to differ with

11   the Court as to just on the Qs and Ks to begin with.  I mean,

12   we disagree there.

13          THE COURT:  Okay.

14          MR. DOWD:  I think they have to say that they engage

01:45:44 15  in these predatory lending practices.

16          THE COURT:  I don't find -- if you can find me a case

17   that says that there is a general duty to disclose improper or

18   even illegal business practices in a 10-K, I would be happy to

19   see it.

01:46:01 20          MR. DOWD:  All right.

21          THE COURT:  But I haven't seen one.  And I've looked

22   at most of the cases you folks have cited in your prior

23   submissions.

24          MR. DOWD:  Well, I would ask the Court -- and I have

01:46:11 25  to look at it to see if it's precisely the Qs and the Ks, but

2714

1    I don't know if the Court's looked at the Providian case?

2             THE COURT:  What's does it say?

3             MR. DOWD:  It's very similar to our case, as we know

4    from Mr. Kahr and his memos.  And it says, "The complaint --

01:46:27  5    "it's a motion to dismiss stage -- "The complaint specifically

6    alleges that because of the illegal or fraudulent sales

7    practices, the statements misstated or inflated Providian's

8    financial results."

9             Then it goes on to say it describes -- the complaint

01:46:41  10   describes -- each of the allegedly illegal or fraudulent

11   practices in detail, gives reasons for describing the

12   practices as illegal or fraudulent, and explains how the

13   practices would inflate incoming revenue.

14            And, then, it goes on to talk about the GAAP

01:46:55  15   violations.  And the Court says, "The plaintiffs aren't

16   alleging that Providian did not actually increase the number

17   of its credit cards.  Instead, plaintiffs are alleging that

18   the reason why such counts increased was that the company was

19   engaged in undisclosed fraudulent and unlawful practices."

01:47:13  20   The same sort of distinction that I think I'm trying to make

21   here and I thought the Court had made in its order.

22            Then it says -- it goes on to say -- "Assuming the

23   truth of plaintiff's allegations, it is plain that the

24   complaint alleges misstatement of the cause of Providian's

01:47:28  25   success.  It alleges material omission more plainly than it

2715

1    alleges straight-forward material misrepresentation.  It's

2    alleged Providian billed customers for add-on products they

3    did not order."  It goes on to describe the other practices.

4          And it says, "The SEC alleges that these practices

01:47:49 5    artificially inflated Providian's revenue, profits and

6    customer base."

7          And it goes on to say, "However, the statements

8    attributed Providian's good fortunes to its customer-focused

9    approach.  Indeed, this assertion puts the topic of the cause

01:48:03 10   of Providian's success in play.  Having put the issue in play,

11   Providian is obligated to disclose information concerning the

12   source of its success since reasonable investors would find

13   that such information would significantly alter the mix of

14   available information."

01:48:18 15         It goes on to say, "Were Providian engaged in a

16   series of illegal or fraudulent business practices, and were

17   those practices responsible for inflating revenue, profit and

18   customer base, such information would clearly alter the mix of

19   information available to the public as to the source of their

01:48:36 20   success and the viability of full realization of the reported

21   profits."

22         THE COURT:  I don't have a problem with that case.  I

23   don't think it goes to the issue I'm talking about.

24         I mean, I'm not talking that this is not material

01:48:46 25   information.  I think it's clearly material.  But you show me

2716

1    where in the 10-K statements or the 10-Q statements that you

2    cite in this 40 -- I think we're down to, what 43 statements

3    now?

4            MR. DOWD:  I believe so.

01:48:58  5            THE COURT:  -- where you have representations as to

6    the basis for the success of the revenues, such as that case

7    just talked about.

8            I find only two.  I find there is -- I'll tell you

9    which two, actually.

01:49:23 10            I think the March 28th, 2001, 10-K is one where you

11    can allege, you can offer evidence and you can argue to the

12    jury that failure to include in that 10-K evidence of its

13    predatory lending practices is a material omission.  Because

14    they talk about, "We have a process which we believe gives us

01:50:04 15    a reasonable basis for predicting the credit quality of new

16    accounts.  This process is based on our experience with

17    numerous marketing, credit and risk management tests."

18            They're talking about the process they used to

19    determine the creditworthiness of their accounts.  And if

01:50:26 20    they're going to assert that they have a good process in doing

21    that, then I think they've got to tell you, "Oh, by the way,

22    there's this other aspect of our creditworthiness management

23    principles, which is that we're packing and we're lying and

24    we're cheating."

01:50:40 25            So, I think you can do that.  I think there's one

2717

1    other in here -- I'm trying to remember where I found it --

2    where there's similar language.

3         Oh, yeah, there's the direct statement, actually,

4    regarding predatory lending practices in the -- I can't find

01:51:17  5    it now.  I thought there was one other one.

6         Here it is, yeah:  The March 13th, 2002, 10-K:

7    "Management has long recognized its responsibility for

8    conducting the company's affairs in a manner which is

9    responsive to the interest of employees, shareholders,

01:51:41  10    investors and society, in general."

11         Well, when you open that door, you better include all

12    of the evidence that relates to it.

13         But I do not see -- and I'd be happy for you to show

14    me -- in any of the other 10-K or 10-Q Asserted False

01:51:59  15    Statements anything other than language like, "Household's

16    10-Q for Quarter Ending 6-30-99, Household Reported Net Income

17    of $326.9 million."

18         That is not an assertion which, it seems -- I mean,

19    that's a historical statement of what they earned, period.

01:52:16  20    And it doesn't go to the issue of going forward.  And it

21    doesn't require them to disclose the material aspects of their

22    going-forward predictions.

23         MR. DOWD:  Your Honor, but you're basically -- when

24    you say that -- you're throwing out all of the SEC and GAAP

01:52:33  25    requirements.  Those financial statements have to be in

accordance with GAAP.

THE COURT: I mean, I disagree.

The only cases that I've seen regarding GAAP and the assertion of GAAP requirements in the 10-Ks and the 10-Qs relate to how you're to report what you have to report.

01:52:53

But the GAAP requirements do not indicate what the duty to report is. The duty to report doesn't come from GAAP. The duty to report comes from case law and statutory law in some occasions. Insider trading, you've got a duty to disclose.

01:53:14

And the cases that I have seen regarding duty to disclose are very clear.

Well, all but, I think, one -- which is an old case going back, I don't know, how far -- make it clear there's no general duty to disclose in the 10-K or the 10-Q improper conduct.

01:53:28

MR. DOWD: Well, we have -- your Honor, we have -- the expert testified about SEC regulations and GAAP; that you have to explain significant trends that could affect future --

01:53:44

THE COURT: And that tells you how you are to disclose what you have a duty to disclose. It doesn't establish the duty -- it doesn't establish the duty -- to disclose that.

MR. DOWD: I understand what you are saying, your Honor, but they're speaking -- they're speaking -- every

01:53:58

2757

1    plaintiffs having purchased stock, which we cannot introduce

2    to the jury at this stage of the litigation.

3         There would be no need for a bifurcated trial if we

4    were to do that. It would all come in together.

02:52:35    5         I mean, that's my rationale for the instruction that

6    the Court has here, which doesn't require the jury to find

7    that the plaintiffs purchased stock. It simply requires them

8    to find, essentially, inflation; that is, that a substantial

9    cause of the plaintiffs' loss is shown if a statement or

02:53:06    10   omission of a material fact causes Household's stock price to

11   be higher than it would be if the statement had not been made

12   or concealed, or the fact" -- "or the concealed fact had been

13   disclosed; and, two, that the market's discovery of the truth

14   causes Household's stock price to decrease."

02:53:29    15        At this stage, that's all that has to be shown.

16   That's that half of the definition of "loss causation" that

17   has to be shown at this stage of the trial.

18        The other half -- which is, that the plaintiffs

19   purchased stock price during that window, comes in the damages

02:53:45    20   phase, if, indeed, there is one.

21        Now, if you have a different view, I'll give you a

22   chance to state it, but I get the feeling you hadn't thought

23   this through.

24        MS. BEER:  I understand that wording, and I don't

02:54:02    25   know that there's a question about the wording just read.

2758

```
          1          When this instruction was discussed during the
          2     pretrial conference, we agreed to omit one of the elements.
          3     And that specific element is "an economic loss."  And we
          4     omitted that from the list of elements because it was subsumed
02:54:30  5     in the description of "loss causation."
          6          And what I'm trying to think through now is whether
          7     the direction that we're going puts all evidence of economic
          8     loss to the second phase and whether that is something that we
          9     can do when economic loss is one of the essential parts of the
02:54:56 10     claim.
         11          THE COURT:  Well, no, it doesn't.  It doesn't.
         12     "Economic loss" has, essentially, two parts.  The part is that
         13     there be an inflation; and, then, a deflation when the truth
         14     comes out.  And the other part is that you be caught in that
02:55:10 15     wave -- that you be one of the people who purchased during the
         16     inflation; and, then, you then lost value during the
         17     deflation.
         18          The first part we prove now.  The second part we
         19     prove at damages.
02:55:23 20          Economic loss is not going to be shown in either this
         21     phase or the next phase.  It's got to be both together.  And
         22     the portion of economic loss that we can prove here is the
         23     inflation and deflation of the price, based upon the
         24     statements or omissions.  Okay?
02:55:40 25          At any rate, that's my ruling now.  If you have
```

2759

1     another argument that you want to make -- something that I

2     haven't considered, that you think requires the language

3     regarding "purchase of a stock by plaintiffs" -- I'll be happy

4     to consider it.

02:55:54  5          MS. BEER:  I have one slightly different question.

6     Does that ruling involve using from the Court's Proposed --

7     for discussion -- Instruction the phrase, "The defendants'

8     statement or omission" -- using "defendants" in the plural?

9          The concern I have is using it as a plural term, as

02:56:17 10    though all of the defendants are speaking in unison.

11         THE COURT:  Well, what portion of the instruction are

12    you referring to, because what I have here on "loss causation"

13    doesn't mention the defendants at all?

14         MS. BEER:  Okay.

02:56:40 15    Then that's -- the paragraph that begins in the red

16    line version that the defendant submitted:  "First, plaintiffs

17    must prove."

18         THE COURT:  A --

19         MS. BEER:  That's really my question.  I wanted to

02:56:59 20    make sure we were reading from the same page.

21         THE COURT:  Tell me specifically what you're

22    referring to.  I'll look at it.

23         MS. BEER:  I was referring to the paragraph that

24    has -- that's numbered "4" in parentheses in the Court's

02:57:15 25    instruction.

2760

|   |   |   |
|---|---|---|
| | 1 | THE COURT:  Which instruction? |
| | 2 | MR. BURKHOLZ:  Oh, it's No -- I think she's referring |
| | 3 | to No. -- 22.  Court's No. 22. |
| | 4 | THE COURT:  Oh, 22.  Okay. |
| 02:57:23 | 5 | So, we're -- |
| | 6 | MR. BURKHOLZ:  I think she's referring to the fourth |
| | 7 | element -- or the fourth number -- and the reference to |
| | 8 | "defendants" as being plural there. |
| | 9 | Is that correct? |
| 02:57:29 | 10 | MS. BEER:  But if the wording that you were -- that |
| | 11 | the Court was reading was from the Defendants' Proposed 25, |
| | 12 | that language is not included in our proposed paragraph. |
| | 13 | THE COURT:  You've lost me. |
| | 14 | MS. BEER:  Whichever one we're looking at, your |
| 02:57:58 | 15 | Honor, we don't want to use "Defendants'" -- "s" apostrophe, |
| | 16 | in the plural -- because each defendant needs to be -- |
| | 17 | THE COURT:  I don't think I have that, do I?  I think |
| | 18 | all of my "Defendants" are "t" apostrophe "s" -- |
| | 19 | MS. BEER:  Okay. |
| 02:58:12 | 20 | THE COURT:  -- hopefully. |
| | 21 | You know, when do I that, I get this picture in my |
| | 22 | mind of my Seventh Grade grammar teacher. |
| | 23 | Boy, she was mean, but she was right.  I guess it |
| | 24 | does actually make a difference. |
| 02:58:35 | 25 | All right.  So, next, we have the defendants are |

TAB 20

2802

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3  LAWRENCE E. JAFFE PENSION PLAN, )
    on behalf of itself and all    )
 4  others similarly situated,     )
                                   )
 5              Plaintiff,         )
                                   )
 6     vs.                         )  No. 02 C 5893
                                   )
 7  HOUSEHOLD INTERNATIONAL, INC., )
    et al.,                        )  Chicago, Illinois
 8                                 )  April 20, 2009
                Defendants.        )  9:00 a.m.
 9
                         VOLUME 14
10            TRANSCRIPT OF PROCEEDINGS - TRIAL
        BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12  APPEARANCES:

13  For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                              ROBBINS LLP
14                            BY:  MR. LAWRENCE A. ABEL
                                   MR. SPENCER A. BURKHOLZ
15                                 MR. MICHAEL J. DOWD
                                   MR. DANIEL S. DROSMAN
16                                 MS. MAUREEN E. MUELLER
                              655 West Broadway
17                            Suite 1900
                              San Diego, California  92101
18                            (619) 231-1058

19                            COUGHLIN STOIA GELLER RUDMAN &
                              ROBBINS LLP
20                            BY:  MR. DAVID CAMERON BAKER
                                   MR. LUKE O. BROOKS
21                                 MR. JASON C. DAVIS
                                   MS. AZRA Z. MEHDI
22                            100 Pine Street
                              Suite 2600
23                            San Francisco, California  94111
                              (415) 288-4545
24

25
```

Fischel - direct

2845

1    December 3.  And this, again, is a situation where independent

2    third parties are trying to assess whether management's denial

3    is believable or, alternatively, whether the critics are right

4    that there's something fundamentally wrong with Household's

11:28:42  5    predatory lending practices as well as its accounting

6    treatment.

7            And what this particular analyst concludes, as I

8    think is obvious from the language, is that looking at

9    everything, looking at the disclosures in the financial

11:28:56 10    statements, the disclosures in the securitization

11    prospectuses, Household's defense of its re-aging practices,

12    the analyst is simply not convinced that investors are getting

13    an accurate picture of Household's true financial situation

14    and is raising all these doubts and all these questions that

11:29:16 15    remain unanswered, which the CFRA report that you just showed

16    me a minute ago, a little bit later reaches a more definitive

17    conclusion that Household's treatment of its re-aging

18    practices is affirmatively misleading for investors.

19    Q.  And the market reacted negatively to Household's stock

11:29:34 20    when this analyst raised these concerns?

21    A.  Correct.

22    Q.  Now, I wanted to ask you a few questions about your

23    compensation and then finish up with one more topic.

24            How many professionals at Compass Lexecon worked with

11:29:49 25    you on this matter?

Fischel - direct

2846

1    A.  Altogether, you know, I'd estimate maybe 20.

2    Q.  And approximately how many hours did you and your team

3    work on this matter?

4    A.  Well, as of the last go, I think I worked altogether a

11:30:03 5    little over 200 hours.  And I think with respect to the whole

6    team, it would be thousands and thousands of hours for sure.

7    Q.  And what were the approximate range of hourly rates for

8    the members of your team?

9    A.  You know, my guess, they'd range from about $200 an hour

11:30:21 10    to my rate, which is a thousand dollars an hour.

11    Q.  And did you produce expert reports in this case?

12    A.  Multiple expert reports.

13    Q.  And did you respond to the defendants' experts' reports?

14    A.  Yes, the defendants' expert reports I think totaled over

11:30:34 15    7,000 pages and obviously took a lot of work to respond to

16    them.

17    Q.  Okay.  I want to show you what we marked as Plaintiffs'

18    Exhibit 1473.

19    (Tendered.)

11:30:50 20    MR. BURKHOLZ:  A copy for counsel.

21    Your Honor, this is a list of the statements that

22    plaintiffs allege are false or misleading that the other --

23    the defendants have stipulated are the statements in the case

24    or -- and the press releases will be admitted in through

11:31:07 25    Mr. Aldinger.  We'd like to admit this into evidence at this

Fischel - direct

2847

1    time.

2              MR. KAVALER:  Your Honor, could we have a moment?

3        (Brief pause.)

4              MR. KAVALER:  Your Honor, could we have a sidebar?

11:31:32   5          THE COURT:  Sure.  What's the exhibit number again?

6              MR. BURKHOLZ:  It's 1473.

7        (Proceedings heard at sidebar:)

8              THE COURT:  Okay.

9              MR. KAVALER:  Your Honor, this is the same document

11:32:01  10   that's been the subject of the most recent conversation at the

11   jury trial -- charge conference last Friday, and this presents

12   the same issues that were raised there about what the jury is

13   being told about this compilation.  And we do not agree this

14   compilation should be shown to the jury.

11:32:17  15          We have discussed at various times the limited

16   agreement that we had made as to who these statements were

17   issued by, who some of these statements were made by.  We

18   don't agree to the format.  We don't agree to the

19   presentation.  We think the document is misleading in this

11:32:30  20   format as we said before.  And you're constantly being told we

21   stipulated to this.  That's not accurate.  What we stipulated

22   to was an attachment to a document that --

23              THE COURT:  Wait.  I get your point.  Now you're

24   offering this for what?

11:32:43  25          MR. BURKHOLZ:  We want to put it into evidence before

Fischel - direct

2848

1    we close our case.  We can do it with, Mr. Aldinger.

2              THE COURT:  What's it being offered for, is what I

3    want to know.  What are you trying to prove with this thing?

4              MR. BURKHOLZ:  We're going to talk about one of the

11:32:52  5    statements in there.  I don't need to use the document with

6    him.

7              THE COURT:  Then don't use it for now.

8         (Proceedings heard in open court:)

9    BY MR. BURKHOLZ:

11:33:28  10    Q.  You testified Thursday that, I formed the opinion that

11    Household's disclosure defects, its inaccurate disclosures

12    caused there to be significant inflation in Household stock

13    price for much of the relevant period.

14              That is your opinion?

11:33:43  15    A.  Correct.

16    Q.  When you refer to disclosure defects causing inflation in

17    Household's stock, does that refer to statements plaintiffs

18    allege were false or misleading that were Household's public

19    statements to the media, press releases, 10-Qs and 10-Ks?

11:33:54  20    A.  Yes, both misleading statements and things that were left

21    out that would have been necessary to provide a more correct

22    picture of Household's financial situation.

23    Q.  Okay.  Let's look at two of the statements Household

24    issued that plaintiffs allege were false or misleading.  Let's

11:34:11  25    focus on your leakage model.

Fischel - direct

2849

1           Can we bring up Exhibit 1395 that's been admitted

2       into evidence, and if we can highlight August 16, 1999.

3           Do you have Exhibit 1395?

4       A.  I can see it -- I do have it, but I can see it on the

11:34:38  5       screen.

6       Q.  I think it's tab 28 of your binder.

7       A.  Okay.  I have it now.

8       Q.  Okay.  And this is your daily quantification of inflation

9       under your leakage model?

11:34:49  10      A.  Correct.

11      Q.  Okay.  Now, you assume, do you not, that plaintiffs can

12      prove that Household's statement on August 16, 1999, was false

13      or misleading?

14      A.  Correct.  All of my opinions are based on that assumption.

11:35:04  15      The issue of falsity is really one for the Court and the jury

16      to decide.  It's not for me to decide.

17      Q.  And that's a common assumption in your field in estimating

18      damages?

19      A.  A necessary assumption because economists don't decide

11:35:19  20      truth or falsity.  That's for the Court and the jury.

21      Q.  Can you explain how you determined the inflation of $16.48

22      on August 16, 1999, as it relates to Household's 10-Q that was

23      issued on that day?

24      A.  Yes.  What -- the way the methodology works is that there

11:35:44  25      is an ending date on October 10 and 11 of 2002; and based on

Fischel - direct

2850

1        that ending date, what the model -- what the methodology

2        attempts to do is attempts to predict what Household's price

3        would have been on any given day, which is the true value

4        line -- the true value column rather, relative to the stock

11:36:17    5   price, which is the first column, based on a statistical model

6        of how Household's stock should behave in light of its

7        statistical relationship between the overall market and the --

8        the industry, the S&P Financials Index.

9                Remember, those are the two indexes that Household

11:36:42   10   itself said its performance should be judged against.  There's

11       a slightly different treatment before and after November 15,

12       2001, because remember that's the first date that I identified

13       that the market really started to become skeptical of

14       Household's denials.

11:37:04   15            But the basic idea is this statistical model trying

16       to adjust the actual stock price for how the stock price would

17       have behaved had there been no false and misleading

18       statements, had there been no continual leakage of negative

19       information, particularly after November 15, 2001.

11:37:24   20   Q.  And if there is no false or misleading statement before

21       August 16, 1999, does that mean that there's zero inflation in

22       the stock?

23       A.  No.  So long as there is a false and misleading statement

24       on this particular date, inflation would begin on this date

11:37:40   25   going forward.  But, again, I want to be careful because if

Fischel - direct

2851

1    there's no false and misleading statement before this date,

2    then any purchasers before this date wouldn't suffer any harm

3    and wouldn't be entitled to any recovery.

4         There would be no difference between the stock price

11:37:58    5    and the true value the way there is on my exhibit because I

6    assumed the false and misleading statements began on July 30,

7    1999.  But if it's more accurate, as I said in my report,

8    actually to start on August 16, then anybody who purchased

9    between July 30 and August 16, those columns in the exhibit,

11:38:22   10    would basically disappear and inflation would begin on August

11    16.

12    Q.  Okay.  Let's assume the Court and the jury doesn't find

13    the August 16, 1999, statement to be false or misleading.  And

14    then let's look at the next public statement on the next page

11:38:37   15    of October 19, 1999.

16         If we can highlight that.

17         Is Household's stock now inflated by the next

18    statement, October 19, 1999, assuming the prior statement is

19    not false or misleading?

11:38:54   20    A.  It's really the exact same point.  Under what my analysis

21    does is it provides a method of quantifying the amount of

22    inflation on any given day and subsequent days, provided that

23    the jury finds that as of that date a false and misleading

24    statement has been made.

11:39:14   25         So if the jury were to conclude that there were no

Fischel - direct

2852

1    statements that were made before October 19, 1999, that were

2    false and misleading, then for all practical purpose, my

3    exhibit should be read as beginning on that date.  And there

4    would be, again, for all dates before that no difference

11:39:35  5    between the stock price and the true value line, no artificial

6    inflation; any purchasers in any period before October 19,

7    1999, would not suffer any harm.

8    Q.  And do each subsequent statement -- public statement by

9    Household cause inflation to remain in a stock?

11:39:53 10    A.  Yes, absolutely.  And any increases or decreases depending

11    on misrepresentations, which occurred at the time of December

12    5 when there was the response to the Barron's article, another

13    misrepresentation with the best practices initiative in

14    February, those would be misrepresentations which affect the

11:40:20 15    amount of inflation.

16         There would be more inflation coming in to the stock

17    on those days.  But basically, as of the first false and

18    misleading statement, there would be inflation on every single

19    day after that until the false and misleading information was

11:40:36 20    corrected.

21    Q.  And does the -- as the truth comes out in late 2001 into

22    2002, what happens to the inflation in the stock until the end

23    of the relevant period?

24    A.  For the most part, it declines.  Because what's happening

11:40:49 25    is as more and more -- there are more and more criticisms of

Fischel - direct

2854

1    the truth leaked out from November 2001 to October 2002?

2    A.   Correct, from November 15, 2001, to October 11 of 2002.   I

3    should also say of these -- I think there's almost 70 firms in

4    the S&P Financials Index.   These are indexes which is a

5    composite of firms.

6         But if you look at the firms individually, Household

7    was the fourth worst-performing firm out of 70 firms during

8    this particular period.  So they dramatically underperformed

9    relative to the indexes that Household itself deemed to be

11:43:02 10    comparable.  But if you look at the individual firms that

11   compose the index, Household is the fourth worst as compared

12   to the full 70 firm set.

13   Q.   Now, your specific disclosure model estimates inflation of

14   only about $7.97 during this period, correct?

11:43:23 15    A.   As the maximum amount, correct.

16   Q.   And your opinion is that that understates the inflation in

17   Household's stock due to Household's public statements?

18   A.   Yes, because it doesn't take into account the leakage that

19   we've been discussing and I've been describing.

11:43:36 20    Q.   And your leakage model estimates daily inflation ranging

21   from $13 to approximately $23 for each day of the relevant

22   period?

23   A.   Yes.  And actually, let me just explain why there's a cap

24   of $23.  Because what I did was I calculated the total

11:43:53 25    underperformance of Household on -- relative to these indexes

Fischel - direct

2855

1    based on my statistical model and that number was, I think,

2    $23.94 or something like that.

3         So I made that the maximum possible inflation on any

4    given day.  So even when my model would predict or would

11:44:18  5    indicate inflation of more than $23.94, I made $23.94 the cap

6    because that's the amount that Household underperformed the

7    S&P Financials Index and the S&P 500 Index.

8    Q.  So compared to the stock price decline of $32, you

9    attribute anywhere from 13 to $23 due to disclosures related

11:44:45 10    to the fraud?

11    A.  13 to $23 based on leakage and $7.97 as the maximum under

12    the specific disclosure models.

13    Q.  And it's your opinion that the leakage model is a better

14    estimate of the inflation in Household's stock price during

11:44:56 15    the relevant period due to the alleged false statements and

16    omissions?

17    A.  Correct, because it takes into account the economic

18    reality in this case where negative information came out

19    slowly over time precisely because Household did not admit the

11:45:12 20    predatory lending practices that it was involved in or the

21    improper accounting as a result of re-aging, and the

22    restatement of the truth only became known gradually as a

23    result of real world events and commentary by third parties.

24         MR. BURKHOLZ:  Nothing further at this time, your

11:45:29 25    Honor.

Fischel - cross

2856

1          THE COURT:  Cross-examine.

2          MR. KAVALER:  Thank you, your Honor.

3                       CROSS-EXAMINATION

4   BY MR KAVALER:

11:46:39  5   Q.  Good morning, Professor Fischel.

6   A.  Good morning.

7   Q.  My name is Tom Kavaler.  I represent the defendants.

8   A.  We met before actually.

9   Q.  Briefly, I think.

11:46:48  10          And I'm going to ask you some questions today.  I'm

11  going to try to -- try to understand what you said on direct

12  and explore how it applies to some other aspects of the case

13  that I'm interested in.  I would appreciate it if you would

14  answer the questions I ask you and just those questions.

11:47:04  15          Can you do that?

16  A.  I will do my best, sir.

17  Q.  Excellent.

18          Now, you have an extensive background in this area in

19  connection with disclosures and their impact on stock price,

11:47:16  20  don't you?

21  A.  I do.

22  Q.  You are widely regarded as if not the preeminent, one of

23  the preeminent experts in this field; are you not?

24  A.  That's very kind of you to say.  I hope that's the case,

11:47:28  25  but I accept your gracious compliment.

Fischel - cross

2857

1    Q.  And your work has been cited by the Supreme Court,

2    correct?

3    A.  It has.

4    Q.  And, in fact, when we were looking for an expert, we

11:47:39 5    contacted you to see if you were available, but you had

6    already been hired by these folks, correct?

7    A.  You were nice enough to contact me to try and hire me in

8    this case, but I was already retained, yes.

9    Q.  And you've conducted a substantial number of event studies

11:47:55 10    in connection with various cases over the years?

11    A.  I have.

12    Q.  An event study is a well-established methodology for

13    analyzing loss causation in securities fraud cases?

14    A.  Correct.

11:48:05 15    Q.  In fact, an event study is widely regarded as the gold

16    standard by both courts and economists for evaluating the

17    economic aspects of a case like this?

18    A.  In connection with -- in combination with other economic

19    evidence, I would say that's correct.

11:48:22 20    Q.  And you conducted an event study in this case?

21    A.  We did.

22    Q.  And, in fact, the results are one of the documents marked

23    in evidence?

24    A.  Correct.

11:48:29 25    Q.  And you used your event study to analyze and detail the

Fischel - cross

2860

1   A.  That's fine.

2   Q.  Shorthand.  All right.

3       And your role here is to explain your opinion and to

4   help us understand how you measured this effect, whereas

11:52:02  5   counsel's role is proving that the statements are false and

6   otherwise come within your opinion, correct?

7   A.  Well, I can certainly comment on my role.  I'm not -- I

8   don't want to be presumptuous and comment on his role.

9   Q.  Let me rephrase the question.

11:52:16  10      Your role is not to prove whether any particular

11  statement is false or not?

12  A.  Correct.  I've tried to make that very clear.

13  Q.  I'm agreeing with you.

14      You're here to talk about the measure of the effect?

11:52:29  15  A.  Correct.

16  Q.  Okay.  And you have not attended this trial for the last

17  three weeks, correct?

18  A.  I have not.

19  Q.  Have you read the transcripts?

11:52:46  20  A.  I would say some part of the transcript that seemed

21  relevant for purposes of my analysis, but I haven't attempted

22  to either attend the trial or follow the transcript in a

23  systematic way.

24  Q.  And you haven't looked at all the exhibits that have been

11:53:04  25  introduced into evidence?

Fischel - cross

2861

1    A.  I have not.  There is a set of exhibits that I have looked

2    at which seem to me to relate to the subject areas of my

3    testimony, but I haven't made any attempt to make a

4    comprehensive review of all the exhibits.

11:53:23  5    Q.  Okay.  And you agree, do you not, Professor, that in an

6    efficient market, stock prices react quickly to new

7    information?

8    A.  Generally speaking, I do.

9    Q.  And you agree, do you not, that upon the publication of

11:53:39  10   new information, the market immediately reacts, adjusts and

11   incorporates the new information into the price of the stock?

12   A.  If it's publicly available and disseminated in a way that

13   market participants and professional investors have access to

14   it, I do agree.

11:53:58  15   Q.  And, for example, in this case you've mentioned and

16   pointed to a number of analyst reports.  Those are the kind of

17   things that are disseminated quickly through the market,

18   correct?

19   A.  Generally speaking, that's correct.

11:54:08  20   Q.  And do you have an idea during the relevant period how

21   many different analyst reports there were that were issued

22   about Household?

23   A.  I'm sure there were a lot, but I haven't made any attempt

24   to calculate exactly how many.

11:54:21  25   Q.  When you say a lot, hundreds?

Fischel - cross

2862

1    A.   I wouldn't want to guess.  I know I looked myself at a lot

2    so I'm sure there were a lot.

3    Q.   And the way that works, when those analyst reports are

4    disseminated, interested investment professionals have access

11:54:40  5   to them right away and read them right away?

6    A.   Correct.  They have access to them.  Whether someone reads

7    them or not varies from case to case.

8    Q.   Understood.

9             And the market price of shares on a well-developed

11:54:54 10  market reflects all publicly-available information and hence

11   any material misrepresentations; isn't that right?

12   A.   That's right.

13   Q.   And it's only new information that is relevant to this

14   exercise; isn't that correct?

11:55:12 15  A.   I'm not sure what you mean by "this exercise."  But

16   generally speaking, if information is already known and fully

17   reflected in stock prices, then stock prices will only adjust

18   to information that's not previously known, that's correct.

19   Q.   And you agree, don't you, sir, that the premise of the

11:55:36 20  fraud-on-the-market theory is that the market -- investors

21   rely on market prices and that assumes that the market price

22   reflects all publicly-available information quickly and

23   without bias?

24   A.   I do.

11:55:57 25  Q.   Now, on your direct, you identified the term stock price

Fischel - cross

2863

1    inflation and you said, quote, What I meant by that is that

2    the stock price on any given day for any company reflects the

3    information that is known about that company.  And if there's

4    a situation where a company is not disclosing accurate

11:56:17   5    information about itself, the stock price will reflect not

6    only the accurate information about the company but also the

7    inaccurate or the false information about the company.

8            Did I get that right?

9    A.  I think it is a correct statement.  I don't remember if

11:56:32  10    that's exactly what I said, but if you're reading from the

11    transcript --

12    Q.  I'm reading from Page 2604 of the transcript.

13    A.  If you're going to read from the transcript, do you mind

14    if I have a copy of it so I can follow along with you?

11:56:44  15    Q.  Sure.

16            MR. KAVALER:  Do we have a copy of the transcript?

17            Can we have the switch, your Honor?  Can you put up

18    Page 2604 and cause it to be on Professor Fischel's screen as

19    well.

11:57:00  20    BY THE WITNESS:

21    A.  Is it possible, sir, just to get a copy of it because

22    sometimes there's things said before or after that might also

23    be relevant.

24    BY MR. KAVALER:

11:57:07  25    Q.  I understand the point.  Apparently, we don't have a hard

Fischel - cross

2864

1    copy right now.  We'll try to get one later in the day, but I

2    will call your attention to the very next sentence, so I take

3    your point entirely.

4           2604, Lines 15 through 23 is what we were just

11:57:30  5    reading.  Right after that you said, "And what inflation is is

6    a measure of how much the stock price has been affected by the

7    false information that's been disclosed by a particular

8    company."

9           Correct?

11:57:40 10   A.  Correct.

11   Q.  And is -- when you use those words there, all I want to

12   ask you is, is that the same thing that you said to me earlier

13   a few minutes ago which I said I had written down as measure

14   of effect?  Is that what we're talking about?

11:57:58 15   A.  Correct.

16   Q.  So that's the definition of measure of effect.

17           And the exercise that you went through with counsel

18   Thursday and today, using your sophisticated means of analysis

19   and your expertise and your judgment, you are able to help the

11:58:18 20   jury see inflation going into and coming out of the stock?

21   A.  That's what I'm trying to do, correct.

22   Q.  And you agree, don't you, sir, that in this case, what you

23   are trying to determine is both whether the defendants'

24   alleged misrepresentations artificially inflated the price of

11:58:39 25   the stock and whether the value of the stock declined once the

Fischel - cross

2865

1     market learned of that deception; isn't that right?

2     A.   That's correct.

3     Q.   Okay.  So there's two separate things.  For purposes of

4     shorthand, I'll refer to them as inflation coming into the

11:58:52  5     stock and inflation going out of the stock.  Will that be

6     okay?

7     A.   That's fine, sir.

8     Q.   Okay.  Into and out of.

9          All right.  And Thursday afternoon you explained to

11:59:04 10     us primarily, if I understood you correctly, with a couple of

11     exceptions, how inflation came out of the stock in the period

12     between November 15, 2001, and October 11, 2002.  Did I

13     understand that correctly?

14     A.   Certainly my analysis after November 15, 2001, through the

11:59:28 15     end of the -- through the end of the relevant period on

16     October 10 and 11 was a focus primarily on inflation coming

17     out of the stock.  But if you look on a day-by-day basis under

18     both my methods, there's some periods when inflation is also

19     entering the stock because of misrepresentations.

11:59:47 20          But generally speaking, that is a period when

21     inflation is declining because of the new negative information

22     about Household's practices coming into the marketplace, but

23     it's not the case that there's a continuous decline through

24     that whole period.

12:00:05 25     Q.   Absolutely.  I don't want to either mislead you or suggest

Fischel - cross

2866

1    that I didn't understand that.  Let me be sure we're precisely

2    on the same page.

3         In that time period starting November 15, 2001,

4    basically the inflation is coming out, but there are a couple

12:00:22  5    of days where new inflation comes in and the amount of

6    inflation increases; but over the time period net/net, it's

7    decreasing, correct?

8    A.   Net/net, that's correct; but on a daily basis, you need to

9    look at the particular --

12:00:35 10  Q.   And we're going to do that in a minute, sir.  I just

11   wanted to be sure I understood.

12        So by November 15, 2001, the inflation was in there.

13   And then subject to the couple of days where it goes up, from

14   there to October 21, it's essentially coming out?

12:00:53 15  A.   Again, I don't want to accept essentially coming out.  But

16   under my analysis, inflation exists from the first time the

17   jury concludes that there is a false or misleading statement

18   either as a result of a misrepresentation or as a result of a

19   failure to disclose something about Household's lending

12:01:14 20  practices or accounting that should have been disclosed, and

21   then it continues throughout the relevant period.

22        The first under -- particularly under my first method

23   focusing on specific disclosures, the first time where

24   inflation decreases is on November 15, 2001, because of the

12:01:37 25  CDC lawsuit.  And after that, it fluctuates on a day-by-day

Fischel - cross

2867

1    basis; but for the most part, I'm agreeing with you that it

2    declines until October 10 and 11.

3    Q.  And I'm agreeing with you, sir.  I'm just trying to find

4    shorthand phrases so we don't spend the entire day speaking to

12:01:54  5    each other in these lengthy sentences and wasting people's

6    time.

7           Would you prefer if I said inflation decreases

8    instead of coming out?

9    A.  I really don't want to quibble.  I think the point is

12:02:04  10   clear.  Overall it decreases if you look at the beginning

11   point and the endpoint.  But on a daily basis, it's not

12   necessarily correct.

13   Q.  Understood.  I think we're on the same page.  Okay.

14          THE COURT:  Let -- since you both understand each

12:02:21  15   other at this point, it may be a good time to stop for lunch.

16          MR. KAVALER:  Maybe the high point of the day, your

17   Honor.

18          THE COURT:  We will take an hour for lunch, ladies

19   and gentlemen.  Return at 1:00 o'clock, please.

12:02:37  20   (Jury out.)

21          THE COURT:  You may step down, sir.

22          We're recessed until 1:00 o'clock.

23          MR. KAVALER:  Thank you, your Honor.

24   (Trial adjourned until April 20, 2009, at 1:00 p.m.)

25

Fischel - cross

2874

1       And that was after Mr. Aldinger spoke at the Goldman

2   Sachs conference?

3   A.   Correct.

4   Q.   Okay.

01:10:53   5       And, so, we know at least on that day we can find

6   inflation coming into the stock.  And let's see if we can look

7   together at how that works.

8       Turn in this exhibit, if you would, to Page 13.

9       MR. KAVALER:   And can we highlight the entry for

01:11:12   10   December 5, 2001.

11   BY MR. KAVALER:

12   Q.   And this shows us actual inflation in that column is

13   $6.05, correct?

14   A.   That's right.

01:11:29   15   Q.   Okay.

16       And on December 6th, the inflation is also $6.05?

17   A.   Correct.

18   Q.   And on December 7, same thing:  $6.05?

19   A.   Correct.

01:11:38   20   Q.   But on December 4, the day before, it was $4.20, correct?

21   A.   Correct.

22   Q.   So, that's where you got the number that was on the

23   demonstrative you showed us during your direct testimony of a

24   dollar eighty-five.  A dollar eighty-five is the difference

01:11:53   25   between 4.20 and 6.05?

Fischel - cross

2875

1    A.   That's right.

2    Q.   So, the way we did that is we saw the inflation increase

3    from 4.20 to 6.05?

4    A.   Correct.

01:12:03    5    Q.   So, Mr. Aldinger's statement to Goldman Sachs at the

6    Goldman Sachs conference, in the language you and I agreed to

7    use this morning about measure effect, had an effect, correct?

8    A.   Correct.

9    Q.   And the effect was to create artificial inflation in the

01:12:17   10    amount of a dollar eighty-five?

11    A.   Correct.

12    Q.   Okay.

13         Now, let me show you Plaintiffs' Demonstrative 139.

14    And that was your analysis of this day.

01:12:42   15         The residual price change of 1.85 is the very thing

16    you and I just talked about?

17    A.   Correct.

18    Q.   And the text on there discusses the event that caused that

19    effect.   That's Mr. Aldinger's speech at Goldman Sachs?

01:12:56   20    A.   That's right.

21    Q.   Okay.

22         And now let's look at Exhibit 1391 in evidence.

23         MR. KAVALER:   And, again, your Honor, may I publish

24    this to the jury, as well, so they can follow on their own

01:13:21   25    copy?

Fischel - cross

2881

1          (Document tendered.)

2              THE WITNESS:  Thank you.  Appreciate it.

3              MR. KAVALER:  Here's a copy of 1391, as well.

4              THE WITNESS:  Got it.

01:18:44  5          (Document tendered.)

6              MR. KAVALER:  Figured since I wasn't moving them into

7      evidence, I'd save the trip.

8      BY MR. KAVALER:

9      Q.  Okay.  So, we're on Page 13 of 1397.  We're looking at the

01:18:51 10    entry for December 12, 2001.  We see that the artificial

11     inflation is $3.66, correct?

12     A.  Correct.

13     Q.  And the day before, the artificial inflation on December

14     11 was $6.05, correct?

01:19:04 15    A.  That's right.

16     Q.  And the difference between those two, if my math serves,

17     is the $2.85 we're talking about?

18     A.  That's right.

19     Q.  $2.39, which appears on Plaintiffs' Demonstrative 140?

01:19:15 20    A.  Correct.

21     Q.  Okay.  Good.

22              And now if you'll look at your event study, which is

23     Plaintiffs' 1391 in evidence, and turn to Page 31 and you'll

24     see the entry there for December 12, 2001.  And that shows a

01:19:38 25    statistically-significant price decrease that resulted in

Fischel - cross

2882

1    inflation on December 12, correct?

2    A.  Correct.

3    Q.  And that's as a result of the Legg Mason report, correct?

4    A.  Correct.

01:19:49  5    Q.  And if we go to Plaintiffs' Demonstrative 140, we see,

6    again, the same format.  Up in the box, you've got the dollar

7    amount of the residual price change; and, in the text, you

8    explain what it is Legg Mason is saying?

9    A.  Correct.

01:20:06  10    Q.  All right.

11        So, in this one example, we see the inflation coming

12    in on December 5, and we see it coming out on December 12,

13    correct?

14    A.  We see inflation increasing on December 5th and decreasing

01:20:28  15    on December 12th, that's correct.

16    Q.  And the amount of the decrease is larger than the amount

17    of the increase?

18    A.  Correct.

19    Q.  So, all of the inflation that increased on December 5 came

01:20:39  20    out in the decrease a week later?

21    A.  I guess you could call it that, but --

22    Q.  I'll tell you why I think that.

23    A.  Please, go ahead.

24    Q.  Sure.

01:20:50  25        MR. BURKHOLZ:  Your Honor, he's interrupting the

Fischel - cross

2883

1    witness.

2            MR. KAVALER:  I'm sorry.

3    BY MR. KAVALER:

4    Q.  It came in because of whatever Mr. Aldinger said at

01:21:00  5    Goldman Sachs?

6    A.  Well, when you say "came in," there's pre-existing

7    inflation.  So, it increased as a result of the statements

8    made on December 5th.  And, then, because there was a partial

9    corrective disclosure on December 12th, that decreased the

01:21:19 10    amount of inflation.

11            I think that's the proper relationship.

12    Q.  I appreciate your correcting my terminology.  I'll try to

13    stick to "increased" and "decreased."

14            And the amount of the decrease was greater than the

01:21:31 15    amount of the increase?

16    A.  Based on those two dates, that's correct.

17    Q.  Right.

18            So, for example, Professor, if we were to assume --

19    just like the plaintiff asked you to make an assumption, I'm

01:21:46 20    asking you to make an assumption -- that's all this case were

21    about; the only statement by Mr. Aldinger or by Household in

22    this case were that one; he made it on the 4th; the market

23    reacted on the 5th; there was what you described as a partial

24    corrective disclosure on the 12th; the decrease was larger

01:22:08 25    than the increase, you would say the inflation that -- the

Fischel - cross

1    increased inflation that -- occurred had been dissipated --

2    at least dissipated -- because the decrease was smaller -- and

3    we're finished, right?

4    A.  Decrease is larger, not smaller.

01:22:24  5    Q.  I apologize.

6         You understood my point?

7    A.  Well, in your hypothetical, if that were the whole case, I

8    would say that assuming the -- again, the -- hypothetical jury

9    found the statement on December 5th to be false and

01:22:38 10    misleading, then all purchasers of Household stock between

11    December 5th and December 12th suffered harm because they

12    purchased at a price that was greater than the true value;

13    and, then, the price and the true value equaled each other,

14    again, on December 12th.

01:22:58 15         So, in your hypothetical, any investors before

16    December 12th wouldn't suffer any harm and any investors after

17    December 12th wouldn't suffer any harm, but investors between

18    December 5th and December 12th would suffer harm.

19    Q.  I'd be happy to take the gift you just gave me, but I

01:23:14 20    think you misspoke when you said any investors before December

21    12 wouldn't suffer harm and any investors after December 12th

22    wouldn't suffer any harm.  You meant before the 5th and after

23    the 12th?

24    A.  I did.  If I misspoke, I appreciate the correction.

01:23:25 25    Q.  And when you said Mr. Aldinger's statement on the 5th, you

Fischel - cross

2885

1    meant his statement on the 4th, which is when he spoke to

2    Goldman Sachs after the market closed, right?

3    A.   Yeah.   I was thinking in terms of trading days.

4    Q.   Right.   That was exactly my point.

01:23:36  5          He spoke, you know, after the market closed, so it's

6    reflected in the following day's trading?

7    A.   That's my recollection.

8    Q.   Perfect.   Okay.

9          Let's see if we can do that same exercise, Professor,

01:23:56 10   with some other dates.

11   A.   Okay.

12   Q.   Hopefully, now that we know how to do it, at least I can

13   do it more efficiently.

14         Let's look at some of the other dates that the

01:24:03 15   plaintiffs have either shown this jury or I understand are

16   going to show this jury or they may show this jury.

17         They've shown this jury the 10-K -- I'm sorry, the

18   10-Q -- that Household filed on August 16, 1999.

19   A.   Okay.

01:24:20 20   Q.   Okay.   Let's see what happened on August 16, '99.   Let's

21   do the same methodology we just used.   Let's start by looking

22   at Plaintiffs' 1397.   And we'll look on Page 1 for August 16,

23   1999.

24         And that shows us that the artificial inflation that

01:24:40 25   day was 7.97, correct?

Fischel - cross

2888

1    August 16th.  And that is why there was no change in inflation

2    between August 15th, August 16th, August 17th.

3         If, on the other hand -- and this is what I tried to

4    explain in terms of how the exhibit should be interpreted, if

01:27:08  5    -- the jury were to conclude that there was no misleading

6    disclosure on July 30th or failure to disclose accurately on

7    July 30th, but the first misleading disclosure was the second

8    quarter result announcement on August 16th, then the right way

9    to read the exhibit would be that the amount of artificial

01:27:32 10    inflation from July 30th to August 15th is zero; and, then, it

11    goes from zero to 7.97 on August 16th.

12         So, when inflation increases or decreases is a

13    function of what the jury concludes as to when the first

14    misleading disclosure that Household makes is.  And the proper

01:27:54 15    number of inflation is zero on every day until the day that

16    the jury concludes, if they so conclude, that Household made a

17    misleading disclosure.

18    Q.  But I'm looking at 1397 in the column headed "Artificial

19    Inflation."  I don't see any zeros, right?

01:28:12 20    A.  There's no zeros because of the assumption that -- I hope

21    I explained clearly, but if not, I'll try and explain it,

22    again.

23    Q.  That's okay.

24    A.  -- that the first time inflation entered Household's stock

01:28:25 25    price was July 30th.  But that's a jury determination.  It's

Fischel - cross

2889

1    not a determination for me to make.

2           So, any date later than that, if the jury concludes

3    that's the first date of a misleading disclosure, the right

4    way to read the exhibit is to substitute zero for 7.97 until

01:28:45  5  the date -- the first date -- that the jury concludes there

6    was a misleading disclosure.

7    Q.  For purposes of this question, I'll agree with you.  Let's

8    assume it starts on July 30, 1999, okay?

9    A.  Okay.

01:28:57 10  Q.  So, then, we agree that if it starts on July 30, 1999,

11   whatever Household said on August 16 had no effect?

12   A.  That's correct --

13   Q.  Okay.

14   A.  -- based on that assumption.

01:29:11 15  Q.  A witness named Mr. Devor was here last week and he showed

16   us this chart (indicating).  I don't know if you can see that.

17   It's just the cover sheets of a series of 10-Ks and -Qs.  And

18   this is the one I just asked you about, the June 30, 1999 --

19   A.  Okay.

01:29:30 20  Q.  -- Q, which was filed on August 16, 1999.

21          So, based on what we just talked about, I'm going to

22   cross that off my list.  I will not come back to it, again,

23   and I will not put it on that list over there (indicating).

24   Okay?

01:29:49 25  A.  Okay.

Fischel - cross

2890

1   Q.  Okay.

2          If you look at your event study for this day --

3   that's Exhibit 1391, and it's on Page 1 -- did you find a

4   statistically-significant price increase that resulted in

01:30:22  5   inflation on August 16, 1999?

6   A.  No, sir, I did not.

7   Q.  Okay.

8          I should have asked you that before I put my X up

9   there.  I apologize.  I'll get the hang of this.

01:30:35  10          All right.  Let's look at the next one.

11          Plaintiffs may show you a press release that -- I'm

12   sorry, plaintiffs may show the jury a press release -- that

13   Household issued on October 19, 1999.  I'm going in

14   chronological order.  How much did you find that inflation

01:30:53  15   increased or decreased on that date when that press release

16   was issued?

17          And to do that, we're going to look, again, at

18   Plaintiffs' 1397.  We're going to turn to Page 2, look at the

19   entry for October 19.  And to save time, I will observe --

01:31:10  20   tell me if I'm right -- this whole page also has actual

21   inflation steady at 7.97 throughout, correct?

22   A.  Correct.

23          And, again, I just want to make sure we're talking

24   about my -- the first method.

01:31:20  25   Q.  The first method.

Fischel - cross

2891

1    A.   Okay.

2    Q.   Absolutely.

3    A.   Because the second method is different.

4    Q.   Understood.

01:31:24  5         Your first method, 7.97 throughout the page, right?

6    A.   Correct.

7    Q.   So, therefore -- can I cut to the chase and eliminate all

8    the interim steps, therefore -- you agree that the filing by

9    Household -- the issuance by Household -- of the press release

01:31:38 10   on October 19, 1999, had no effect on the amount of inflation?

11   A.   I would not agree with that for the reasons that I stated

12   before.

13        It would have no effect on the amount of inflation if

14   the jury were to conclude that Household made a false and

01:31:57 15   misleading disclosure prior to this date.  If that were the

16   case, then there would be no change.  But if the jury were

17   conclude that this was the first date where Household made a

18   false and misleading disclosure, again, then the proper way to

19   read the exhibit would be every day prior to this date would

01:32:15 20   have zero inflation and $7.97 of inflation would have entered

21   Household's stock price on this date.

22   Q.   What I'm trying to avoid is me asking you the exact same

23   questions for every document and you giving me the exact same

24   answers.  I'm accepting, for purposes of this series of

01:32:31 25   questions, what you said earlier, that your starting

Fischel - cross

2892

1    assumption was the first false statement was July 30.

2    A.    Fine.  It's just that I have to answer your question

3    accurately as you ask it.

4    Q.    I appreciate that.

01:32:46    5         But on those assumptions, just as we established with

6    regard to the June 30 10-Q, so you would agree, would you not,

7    that the -- let me ask you before I do that -- let's look at

8    1391.

9         And we're looking for October 19, which is on Page 3.

01:33:06    10   October 19, 1999.

11        Do you see that?

12   A.    I do.

13   Q.    Did you find any statistically-significant price increase

14   that resulted in inflation on October 19, 1999?

01:33:19    15   A.    No, I did not.

16   Q.    Okay.

17        So, based on those two answers, I'm going to cross

18   off this one (indicating), and I'm not going to list it on

19   that board following the methodology we're using?

01:33:32    20   A.    Sir, what you decide to cross off or what you do with your

21   boards, I'm not going to give you any advice on that.

22   Q.    Fair enough.

23        But we agreed that we would list over there on the

24   white board any disclosure that caused an increase in

01:33:45    25   inflation.  Remember that?

Fischel - cross

2893

1   A.   Again, I'm not sure what decision rule you're using with

2   respect to what you're writing down, what you're crossing off,

3   what you're leaving alone.  You know, that's however you

4   decide to do it.

01:34:02  5   Q.   I'm sure the jury remembers what we said to each other.

6   I'm going to cross off this one and not come back to it,

7   again.

8            Let's go to the next one.

9            Plaintiffs have shown this jury the December 31st,

01:34:27 10   1999, 10-K that Household filed on March 28, 2000.  Let's look

11   at first Exhibit No. 1397 for March 28, 2000.  And that's on

12   Page 4.

13            And, again, we'll highlight it on the board there.

14            And to save time, you agree that the number in the

01:34:53 15   "Artificial Inflation" column on this page is $7.97 throughout

16   the page?

17   A.   I do, sir.

18   Q.   Okay.

19            Then let's go to your event study, which is

01:35:03 20   Plaintiffs' Exhibit 1391, and we'll find the same date, which

21   is 3-28-2000.

22            And that will be on Page 8.

23   A.   Okay, I have it.

24   Q.   Did you find any statistically-significant price increase

01:35:28 25   that resulted in inflation on March 28th, 2000?

Fischel - cross

2894

1    A.  No, sir, I did not.

2    Q.  All right.  I won't bother you about this one.

3         MR. KAVALER:  Don't have it?  Plaintiffs'

4    Demonstrative 99.

01:35:44  5         Sorry.  99, 10-K.

6    BY MR. KAVALER:

7    Q.  Plaintiffs have shown this jury the March 31, 2000, 10-K

8    that Household filed on May 10, 2000.  Let's do the same

9    exercise.  Let's look at your chart, which is 1397 in

01:36:22  10   evidence.  Let's look at 5-10-2000, which is on Page 5.

11        Again, try to save time.  Same result:  No increase

12   in artificial inflation?

13   A.  Correct.

14   Q.  And now let's look at your event study, which is

01:36:39  15   Plaintiffs' 1391 for the same date.  It's on Page 10.  Did you

16   find a statistically-significant price increase that resulted

17   in inflation on May 10, 2000?

18   A.  No, sir, I did not.

19   Q.  Okay.

01:36:58  20        So, once again --

21        MR. KAVALER:  I think I'm crossing the wrong thing

22   off.  I'll fix it later.  I'm confusing myself here.

23   BY MR. KAVALER:

24   Q.  Plaintiffs have shown this jury the June 30 10-K -- 10-Q,

01:37:25  25   rather -- that Household filed on August 11, 2000.  Let's look

Fischel - cross

2895

1    at August 11, 2000, in the first document, which is 1397.

2    It's on Page 6.

3            Once again, no increase in artificial inflation,

4    correct?

01:37:41  5    A.  Correct.

6    Q.  And let's look at it in your event study on Page 14.

7            Did you find any statistically-significant price

8    increase that resulted in inflation on August 11, 2000?

9    A.  No, sir, I did not.

01:38:03 10    Q.  All right.

11           Plaintiffs have shown this jury a newspaper article

12    in the St. Louis Post-Dispatch on November 1, 2000, and that

13    one says something about, "Craig Streem says HFC never

14    pressures people to buy credit life insurance."

01:38:33 15           Let's do the same exercise.  Look at Plaintiffs'

16    Exhibit 1397 for November 1, 2000, at Page 7.

17    A.  I see it.

18    Q.  Okay.

19           No increase in artificial inflation in connection

01:38:49 20    with that event, either, right?

21    A.  That's correct.

22    Q.  All right.

23           Now, let's look at your event study, which is

24    Plaintiffs' Exhibit 1391.  I'm going to go to Page 17.  And

01:39:04 25    you see the entry there for 11-1-2000?

Fischel - cross

2896

1    A.  I do, sir.

2    Q.  Did you find any statistically-significant price increase

3    that resulted in inflation on 11-1-2000?

4    A.  No, sir, I did not.

01:39:17   5    Q.  Okay.

6          MR. KAVALER:  Plaintiffs' Demonstrative No. 12,

7    please.

8    BY MR. KAVALER:

9    Q.  Plaintiffs have shown this jury the Origination News

01:39:28  10    article that appeared on March 23, 2001, which says something

11    about Gary Gilmer saying the company's position on predatory

12    lending is perfectly clear.

13          I think we have the language up here.  It's the

14    second one.  This one here (indicating), down at the bottom.

01:39:50  15    A.  I see it, sir.

16    Q.  Okay.  Thank you.

17          Let's look at your Plaintiffs' Exhibit 1397.  We'll

18    go to Page 9.  We'll look at 3-23-01.  And let's look at

19    3-28-01.  It's possible there might be a mistake in the

01:40:19  20    dating, possibly not; but, either way, there's no change in

21    the artificial inflation in that column?

22    A.  That's correct, sir.

23    Q.  Okay.

24          And, then, let's go to your event study.  And I guess

01:40:33  25    we'll have to -- this is Exhibit No. 1391.  It is the right

Fischel - cross

2897

1    date.

2         And we'll look at Page 21.  Did you find a

3    statistically-significant price increase that resulted in

4    inflation in connection with either March 23 or March 28,

01:41:01 5    2001?

6    A.  Let me just check something because -- it looks like March

7    23rd is a statistically-significant price increase.

8    Q.  And the 28th is not?

9    A.  Correct.

01:41:22 10   Q.  Okay.

11         This is plaintiffs' board.  So, we'll see how we

12   resolve that.

13         Let me ask you this -- well, let me come back to

14   that.  So, we'll leave this one open for the moment.

01:41:39 15        The plaintiffs have shown this jury the December 31,

16   2000, 10-K that Household filed on March 28th, '01.  That's

17   one of the dates we just looked at and, in Exhibit 1397, we

18   found no change in artificial inflation, correct?

19   A.  That's correct.

01:41:53 20   Q.  And on your event study, which is Exhibit 1391, we found

21   no statistically-significant price increase that resulted in

22   inflation on March 28, correct?

23   A.  That changed the amount of inflation, correct.

24   Q.  Okay.

01:42:12 25        So, that's the December 31 10-K.  Plaintiffs have

Fischel - cross

1    shown this jury the Star Tribune article that appeared on July

2    27, 2001 --

3              MR. KAVALER:   This is Plaintiff's Demonstrative 13.

4    BY MR. KAVALER:

01:42:42  5    Q.  -- in which they say Household spokeswoman Megan Hayden

6    said the terms of loans are disclosed to all customers?

7              MR. KAVALER:   You can put it right in front.  Put it

8    up -- sorry.  Should have known you'd know what to do.

9    BY MR. KAVALER:

01:43:01 10    Q.  So, we're looking at July 27, '01.  It's this one over

11    here (indicating).

12              It's Megan Hayden saying, "The terms of loans are

13    disclosed to all customers as required by state and federal

14    laws -- " and something has been left out on this board -- "so

01:43:25 15    I take exception to any characterization that we engaged in

16    predatory lending practices."

17              By the way, Professor, you understand these are

18    plaintiffs' boards, we just blew them up?

19    A.  I don't have -- I don't have -- any understanding, one way

01:43:36 20    or the other.

21    Q.  Do you see in the lower right-hand corner it says

22    "PDEM013"?

23    A.  Actually, I can't really read it from here, but I'm sure

24    that's what it -- there's no need to show it to me.  I'm sure

01:43:47 25    that's what it says.

Fischel - cross

2899

01:43:53

1    Q.  I was going to bring it over to you.

2    A.  No, I'm happy to --

3    Q.  And you know that means "plaintiffs' demonstrative"?

4    A.  That's fine.

5    Q.  So, I'm not the one who left whatever's left out of there,

6    but I'm not suggesting anything follows from it.

7         Okay.  Let's look at that date in Exhibit 1397.  It's

8    on Page 11.  And, again, we have an entire page where

9    artificial inflation is 7.97, correct?

01:44:13 10  A.  That's right.

11   Q.  So, no change here, either?

12   A.  Correct.

13   Q.  All right.

14        Let's now look in your event study.  This is at

01:44:20 15  Page -- this is Exhibit 1391.  And we go to Page 26, it's the

16   second entry down.

17        Did you find any statistically-significant price

18   increase that resulted in inflation on July 27, 2001?

19   A.  No, sir, I did not.

01:44:54 20  Q.  Let me see if I can shorten this.  In fact, you didn't

21   find any statistically-significant price increases that

22   resulted in inflation from July 30, 1999, through November 15,

23   2001; is that right?

24   A.  Under the first method, that's correct.

01:45:25 25  Q.  The first method.  Absolutely.

Fischel - cross

2900

1    A.  Correct.

2    Q.  Right?

3         Okay.

4         MR. KAVALER:  Let's put up everything we have that

01:45:33  5    the plaintiffs were kind enough to furnish us that occurred

6    before November 15, 2001.

7         (Brief pause.)

8         MR. KAVALER:  January 19, 2000; April 19, 2000;

9    August 11, 2000; October 18, 2000; January 17, 2001.

01:47:23  10        MR. BURKHOLZ:  Your Honor, is there a question

11   pending or is this demonstrative --

12        MR. KAVALER:  These are all following from the last

13   question, your Honor.  He told me everything remains the same

14   through a certain date.  I'm simply trying to expedite matters

01:47:35  15   so we don't waste all afternoon.  This is the same process I

16   went through each of the other exhibits.  I'd be happy to do

17   it piecemeal.  It will just take forever.

18        THE COURT:  Do you have an objection?

19        MR. BURKHOLZ:  Is there a question pending?

01:47:47  20   THE COURT:  Do you have an objection?

21        MR. BURKHOLZ:  No.  It's fine, your Honor.

22        THE COURT:  Okay.

23        MR. KAVALER:  Thank you.

24        THE COURT:  Proceed.

01:47:55  25   MR. KAVALER:  July 18, 2001.

Fischel - cross

1    BY MR. KAVALER:

2    Q.  Now, Professor, I may not have a board for every

3    statement, but if the statement falls within the same time

4    frame as my last question, you'd give me the same answer?

01:48:17 5    A.  If you're just asking me the mechanical question as to

6    whether there's a change in the amount of inflation or whether

7    there's a statistically-significant price increase --

8    Q.  Those are my only questions.

9    A.  If those are your only questions, as opposed to explaining

01:48:32 10   why the numbers are what they are, then I agree with you.

11   Q.  All right.

12        Now let's look at some days after November 15.

13   A.  Okay.

14   Q.  We're not going to be able to expedite.  We're going to

01:48:43 15   have to go day by day.

16   A.  Okay.

17   Q.  Okay.  Plaintiffs may show this jury a December 4 -- I

18   think we did that already.  We did Goldman Sachs.  It's that

19   one (indicating).

01:48:55 20       MR. KAVALER:  Plaintiffs' Demonstrative 23, please.

21   BY MR. KAVALER:

22   Q.  Plaintiffs may show this jury a press release that

23   Household issued on January 16, 2002.  It looks like this

24   (indicating).  It's Mr. Aldinger in the photograph here and

01:49:18 25   talks about receivable and revenue growth exceeded our

Fischel - cross

2902

1    expectations, et cetera.

2              Let's look at January 16, 2002, in your exhibit,

3    Plaintiffs' Exhibit 1397.  And that will be on Page 14.

4              And you see that the inflation on January 15 is 3.66.

01:49:45  5    On January 16, it's 3.66.  On January 17, it's 3.66.

6              So, although we no longer have a full page of 7.97,

7    we still have the same phenomenon.  The artificial inflation

8    did not increase upon the issuance of this press release,

9    correct?

01:50:00 10    A.  That's correct.

11    Q.  Okay.

12              And now let's go to your event study, which is

13    Plaintiffs' Exhibit 1391.  And let's find the same date, which

14    is January 16, 2002, which will be on Page 32.  And tell me

01:50:19 15    whether you found a statistically-significant price increase

16    that resulted in inflation on January 16, 2002.

17    A.  No, sir, I did not.

18    Q.  Plaintiffs have shown this jury the Copley News Service

19    article --

01:50:42 20              MR. KAVALER:  This is Plaintiffs' Demonstrative 13,

21    please.

22    BY MR. KAVALER:

23    Q.  Plaintiffs have shown this jury the Copley News Service

24    article which appeared on February 6th, 2002.  I have it over

01:50:56 25    here (indicating):  "We do the right thing for our borrowers.

Fischel - cross

2903

1      We make good loans. They're not only legal loans, but are

2      beneficial for our customers."

3              Do you see that?

4      A.  I do, sir.

01:51:05  5    Q.  Okay.

6              Let's look at our old friend Plaintiffs' 1397 for

7      that date, February 6. I think we're on the same page, Page

8      14.

9              And you see the inflation there is -- it's a 3.66

01:51:19 10    number in a whole column of 3.66 numbers. Not the entire

11     page, but a bunch of them, right?

12     A.  Correct.

13     Q.  Again, inflation did not increase upon the release of this

14     press release, right?

01:51:29 15    A.  That's right.

16             Again, we're talking only about the first method.

17     Q.  Only the first model.

18     A.  That's right.

19     Q.  Absolutely. I promise you when I switch to the second

01:51:35 20    model, I'll tell you. I have it in my notes.

21     A.  Okay.

22     Q.  First model. I agree with you.

23             Now, let's look at your event study, Plaintiffs'

24     1391, for the same date, which is February 6, '02, which will

01:51:50 25    be Page 33.

Fischel - cross

2904

1        Did you find any statistically-significant price

2    increase that resulted in inflation from any disclosure on

3    February 6th, 2002?

4    A.   Statistically it's giving price decrease, but not

01:52:09  5    increase.

6    Q.   But not increase?

7    A.   Correct.

8    Q.   That's exactly my point.  I'm asking about an increase.

9    Not an increase?

01:52:14 10    A.   Okay.  Not an increase.

11    Q.   In other words, whatever Ms. Hayden-Hakes said, it did not

12    artificially -- it did not increase the amount of artificial

13    inflation?

14    A.   That's correct.  Decreased it.

01:52:33 15        MR. KAVALER:  Plaintiffs' Demonstrative 14.

16    BY MR. KAVALER:

17    Q.   Plaintiffs have shown this jury the National Mortgage News

18    article which appeared on February 18, 2002.  And that's --

19    what it says there is -- "Our first take on the allegations of

01:52:48 20    predatory lending raised in the ACORN action is that it is not

21    a significant issue, not indicative of any widespread problem

22    and certainly not a concern that it will spread elsewhere?"

23        It's attributed to David Schoenholz.  Do you see

24    that?

01:53:01 25    A.   Can I just -- in my previous answer, when I said it

Fischel - cross

2905

1    decreased it in this first method, and no effect, I want to

2    correct my previous answer.

3    Q.  Okay.

4         I'll be clear with you.  You be clear with me.

01:53:13  5    Again, I'm not trying to trick you.

6    A.  You have been clear --

7    Q.  The first method.

8    A.  You have been clear --

9    Q.  The first method.

01:53:18  10   A.  -- I misspoke.  I wanted to correct it.

11   Q.  Okay.  And I appreciate that.

12        And, just, the point is previously you said it

13   decreased it.  Now, you're saying it was flat.  My question

14   was:  It didn't increase it, correct?

01:53:27  15   A.  Correct.

16   Q.  All right.

17        So, from my point of view, both your answers are the

18   same.  You've now made it more accurate, but it's still not an

19   increase --

01:53:35  20   A.  Okay.

21   Q.  -- correct?

22   A.  Correct, yes.

23   Q.  Thank you.

24        Okay.  Let's look at this date (indicating).  We'll

01:53:43  25   go to Plaintiffs' 1397.  The date is February 18, 2002.  We

Fischel - cross

1    are on Page 14.  And we see there is no "February 18, 2002,"

2    probably because it's a weekend.  There's a "February 15" and

3    "February 19."

4            Do you see that?

01:53:58  5    A.  Yes, sir, I do.

6    Q.  Where should I go, the 19th?

7    A.  If it came out on the weekend, you should go to the 19th.

8    Q.  It doesn't matter because it's 3.66 for days and days

9    before, and days and days after, correct?

01:54:08 10    A.  Correct.

11    Q.  So, again, this didn't cause any increase in artificial

12    inflation, correct?

13    A.  That's right.

14    Q.  Now, let's go to 1391, your Event Study, and let's see if

01:54:19 15    we can find the same date.

16            This is February 18 (indicating) and it looks like

17    it's February 19, and it's on Page 34.

18            Do you see that?

19    A.  I do, sir.

01:54:30 20    Q.  Okay.

21            Am I on the right date?

22    A.  You are.

23    Q.  All right.

24            And did you find any statistically-significant price

01:54:36 25    increase under your first method that resulted in inflation on

Fischel - cross

2907

1    February 18, 2002?

2    A.  No, sir, I did not.

3    Q.  Plaintiffs have shown this jury the December 31, 2001,

4    10-K filed by Household on March 13, 2002.

5         MR. KAVALER:  Did we do this already?

6         (Brief pause.)

7         MR. KAVALER:  We did not.  Okay.

8    BY MR. KAVALER:

9    Q.  Let's look at Plaintiffs' 1397.  We'll look at it for

01:55:11 10    March 13, 2002.

11        And you see that artificial inflation is 5.30 there

12   (indicating), and 5.30 for several days before and 5.30 for

13   several days thereafter, right?

14   A.  I see that, sir.

01:55:23 15   Q.  Once again, no increase in artificial inflation upon the

16   filing of the December 31 10-K, correct?

17   A.  Correct.

18   Q.  And let's look at your Event Study, which is Exhibit 1391.

19        Let's go to March 13, 2002, which looks like it's on

01:55:41 20   Page 35.

21        Did you find any statistically-significant price

22   increase that resulted in inflation on March 13, 2002?

23   A.  No, sir, I did not.

24   Q.  Plaintiffs have shown this jury statements made at the

01:56:09 25   Household Financial Relations Conference that took place on

Fischel - cross

2908

1    April 9, 2002.

2              Let's look at your Exhibit 1397.

3              I think we're on Page 15.

4              No increase in artificial inflation on April 9 or

01:56:32  5    April 10 or April 11 of 2002, correct?

6    A.   Correct.

7    Q.   Let's look at your Event Study, Plaintiffs' 1391, for the

8    same date, which will be on Page 36.

9              Did you find any statistically-significant price

01:56:49 10    increase that resulted in inflation on April 9, 2002?

11   A.   No, sir, I did not.

12   Q.   Okay.

13             So, we don't have a board for that; but, if we did,

14   we'd cross it off.

01:56:59 15             Plaintiffs may show this jury a press release issued

16   by Household on April 17, 2002.

17             Let's look at Plaintiffs' Exhibit 1397 for April 17.

18             Again, no increase in artificial inflation that day

19   or any of the days within five or ten thereafter, right?

01:57:19 20   A.   Let me look at it on there.

21   Q.   Absolutely.  Please, please.

22   A.   No change in inflation on those dates.

23   Q.   Okay.

24             I'm just giving you a window so as to make it easier

01:57:29 25   for you to hone in.

Fischel - cross

2909

1          Let's look at your Event Study, which is Exhibit --

2    Plaintiffs' -- 1391, for the same day, which will be on Page

3    37, I think.

4          Give me a second here.

5      (Brief pause.)

6    BY MR. KAVALER:

7    Q.  Correct.  37?

8          Now, I'm not sure I understand the entry here.  It

9    says, "4-21," and, then, there's nothing.

10         Am I on the wrong date?

11         Hang on.

12     (Brief pause.)

13   BY MR. KAVALER:

14   Q.  I'm on the wrong date.  I apologize.

01:58:04 15         4-17.  Okay.  4-17.

16         Did you find any statistically-significant price

17   increase that resulted in inflation on April 17, 2002?

18   A.  No, sir, I did not.

19   Q.  All right.

01:58:14 20         And that's this press release here (indicating), with

21   a picture of Mr. Aldinger, talking about, "A credit quality

22   performance was well within our expectations," et cetera.

23         Plaintiffs have shown this jury the Bellingham Herald

24   article that appeared on April 21, 2002.  This is Plaintiffs'

01:58:36 25   Demonstrative No. 14, the second item, and that's this one

Fischel - cross

2910

1    here in the middle (indicating).

2         "Megan Hayden-Hakes:  It is absolutely against our

3    policy in any way to quote a rate that is different than a

4    true rate."

01:58:55   5         I can't underscore that enough -- that quote.

6         Let's look at Plaintiffs' Exhibit 1397 for April 21,

7    2002, Page 15.

8         Again, no change in the artificial inflation

9    associated with that event, right?

01:59:08  10    A.   I believe that's correct, but it's not highlighted yet.

11    Q.   Oh, sorry.

12    A.   So, I just want to verify it.

13         Correct.

14    Q.   And, again, you have the document in front of you.  Any

01:59:18  15    time you'd rather look at your own document than the

16    highlighting, whatever makes you --

17    A.   I'd just, rather than flip pages, since you have it on the

18    screen.

19    Q.   I'm happy to do it.  Whatever works for you.

01:59:25  20         Let's go to your Event Study, which is Plaintiffs'

21    1391.

22         Let's go to Page 37.

23         Here I need to ask you a preliminary question.

24    There's an entry for 4-21, which consists of a date, but the

01:59:40  25    other columns aren't filled in.  And, then, there's an entry

Fischel - cross

2911

1    for 4-22, which has the columns filled in.

2            The prior entry is 4-19.  I'm guessing that's a

3    weekend; and, for some reason, it printed an interim date?

4    A.  It looks like a weekend.  It's possible that there was

01:59:55  5    some disclosure of some type during the weekend that the Event

6    Study picked up -- that mentioned Household.

7            The column -- the Comment column -- is intended to

8    pick up every -- there's a headline of every document that

9    mentions Household, the company, in an article, even if the

02:00:15 10    article has to do with something completely different from

11    Household.

12            But if it mentions Household in the Wall Street

13    Journal or Dow Jones Newswire, it's picked up in the Comment

14    column.  So, there probably was a story over the weekend, if I

02:00:29 15    had to guess at what happened.

16    Q.  All right.

17            But, in any event, did you find any statistically-

18    significant price increase that resulted in inflation on April

19    21?

02:00:37 20    A.  No, sir.

21    Q.  Plaintiffs have shown this jury a Chicago Tribune article

22    that appeared on May 3, 2002, in which they say Household

23    said, "Household denied that it misleads customers.  ACORN

24    continues to launch baseless accusations and lawsuits rather

02:01:04 25    than work to enact real solutions to help eliminate predatory

Fischel - cross

2912

1   lending from the marketplace, the lender's statement said."

2           Let's look at your Exhibit 1391 from May 3, 2002.

3   And that's on Page 15.

4           And, again, Professor Fischel, there's no change in

02:01:30  5   artificial inflation associated with that date, either, right?

6   A.   That's correct, sir.

7   Q.   And, now, we will look at your Event Study, which is

8   Plaintiffs' 1391.  We'll turn to Page 39.

9           You didn't find any statistically-significant price

02:01:57 10   increase that resulted in inflation on May 3, did you?

11          I might be on the wrong page.  I apologize.  It's 38.

12   38, May 3.

13          You didn't find any statistically-significant price

14   increase that resulted in inflation on May 3, 2002, did you?

02:02:19 15   A.   No, sir, I did not.

16   Q.   Okay.

17          Let's go to Plaintiffs' Demonstrative 99.

18      (Brief pause.)

19          MR. KAVALER:  Oh, it's right in front of me.

02:02:34 20          I apologize to you.

21   BY MR. KAVALER:

22   Q.   Plaintiffs have shown this jury the March 31, 2002 10-Q

23   filed by Household on May 10, 2002.

24          Let's look at May 10, 2002, in Exhibit 1397.  It's on

02:02:46 25   Page 15.

Fischel - cross

1          And, once again, no increase in artificial inflation

2     that day, right?

3     A.   That's correct, sir.

4     Q.   And, now, let's look at your Event Study, which is

02:03:00  5     Plaintiffs' 1391 for May 10, 2002.

6          Did you find any statistically-significant price

7     increase that resulted in inflation on May 10, 2002?

8     A.   No, sir, I did not.

9     Q.   Okay.

02:03:19 10         So, this was the March 31 10-Q.

11         MR. KAVALER:   Plaintiffs' Demonstrative 14, please.

12         (Brief pause.)

13         MR. KAVALER:   It's right in front of me, again.

14   BY MR. KAVALER:

02:03:44 15   Q.   Plaintiffs have shown this jury an article that appeared

16   in the record on May 10 -- the same date -- in which they say

17   Household said, "Our position is that accusations regarding

18   predatory lending are baseless;" and, then, it says here on

19   their board (indicating):   "The loans are legal; they're

02:03:59 20   compliant with state and federal laws and our own policies;

21   and, in each instance, they have benefits for each customer."

22         That's the same day we just did.  Do we have to do

23   the exercise, again, or can we just assume you'd give me the

24   same answers?

02:04:10 25   A.   If it's the same date, I'm happy to give you the same

Fischel - cross

2914

1    answers.

2    Q.  Okay.

3          MR. KAVALER:  Plaintiffs' Demonstrative Board 15,

4    please.

5          (Brief pause.)

6    BY MR. KAVALER:

7    Q.  Plaintiffs may show this jury an Associated Press online

8    article that appeared on May 14, 2002.  The first one up

9    there, it says, "All of Household's lending policies are in

02:04:39 10   accord with federal and state regulations and requirements."

11          Let's look at that date.  Go to Plaintiffs' 1397.

12          We're on Page 15.  The date is May 14th.

13          No change in artificial inflation on May 14, 2002,

14   either, right?

02:04:59 15   A.  That's correct, sir.

16   Q.  And, now, let's go to your Event Study, Plaintiffs' 1391.

17   It will be Page 38.

18          Did you find any statistically-significant price

19   increase that resulted in inflation on May 14, 2002?

02:05:18 20   A.  No, sir, I did not.

21   Q.  Board -- Plaintiffs' Demonstrative 15, the same board.

22          Plaintiffs have shown this jury an American Banker

23   article that appeared on May 31, 2002, which quotes Megan

24   Hayden-Hakes here (indicating) saying, "Household took full

02:06:17 25   and prompt responsibility and is satisfied that the situation

Fischel - cross

2915

1    was localized to the Bellingham branch."

2              Let's look at your exhibit, Plaintiffs' 1397, for May

3    31, '02, which is Page 16.

4              No change in inflation there, correct?

02:06:38  5    A.  That's right.

6    Q.  Let's look at your Event Study, which is Plaintiffs' 1391

7    for May 31, '02, which is at Page 39, I believe.

8              Yes, Page 39.

9              Did you find a statistically-significant price

02:06:58  10   increase that resulted in inflation on May 31, 2002?

11   A.  No, sir, I did not.

12        (Brief pause.)

13   BY MR. KAVALER:

14   Q.  Let's go to the very next one, right underneath it.

02:07:19  15             Plaintiffs have shown this jury an article that

16   appeared in the Oregonian on July 2, 2002, which says, "We've

17   made mistakes, said Megan Hayden-Hakes, Spokeswoman for the

18   Prospect Heights, Illinois, company.  Is there a company-wide

19   pattern of abuse?  Absolutely not."

02:07:41  20             Let's look at your Exhibit 1397 for this date, July

21   2, 2002.  It's on Page 16.

22             No increase in artificial inflation that day,

23   correct?

24   A.  Correct.

02:07:55  25   Q.  And let's look at your Event Study, which is Plaintiffs'

Fischel - cross

2916

1    1391, at Page 40 for July 2, 2002.

2        Did you find any statistically-significant price

3    increase that resulted in inflation on that day?

4    A.  No, sir, I did not.

02:08:15  5    Q.  Plaintiffs' Demonstrative 25, please.  This is a press

6    release that Household issued on November 17 -- sorry.

7        This is a press release that Household issued on July

8    17, 2002.  Plaintiffs have this picture of Mr. Aldinger up

9    here (indicating) and it says, "Our results this quarter were

02:08:55  10   ruled fueled by ongoing strong demand for our loan products.

11   Growth this quarter was strong, while we have maintained our

12   conservative underwriting criteria."

13       Let's look at that date.

14       Turn first, if you would, sir, to your Exhibit 1397

02:09:09  15   at Page 16.

16       No change in artificial inflation on that day,

17   correct?

18   A.  I see that, sir.

19   Q.  Okay.

02:09:17  20       And, now, we'll look at your Event Study, Plaintiffs'

21   1391, at Page 40.

22       Did you find any statistically-significant price

23   increase that resulted in inflation on July 17, 2002?

24   A.  No, sir, I did not.

02:09:38  25   Q.  Plaintiffs may show this jury a press release that

Fischel - cross

2917

1    Household issued; and, they already have shown this jury the

2    June 30, 2002, 10-Q that Household filed.  Both of those took

3    place on August 14, 2002.

4         Let's look at August 14, 2002, in Plaintiffs' Exhibit

02:10:22  5    1397.  It would be on Page 17.

6         Now, on August 14 -- let's start on August 13.

7         What is the artificial inflation on the 13th, 3.10?

8    A.   Correct.

9    Q.   What is it on August 14?

02:10:51 10    A.   $2.16.

11    Q.   Okay.

12         So, this is not one of those situations like we've

13    been looking at, where it's the same number for line after

14    line after line.  The number changes on the day we're looking

02:11:00 15    at?

16    A.   Right, because October 14th is one of my 14 specific

17    disclosure dates.  So, it's the date of the restatement.

18    Q.   But, in any event, it goes down?

19    A.   Correct.

02:11:10 20    Q.   I think you said October 14th.  This is August 14th.

21    A.   I'm sorry, August 14th, 2002.

22    Q.   It goes down, it doesn't go up?

23    A.   Correct.

24    Q.   All right.

02:11:20 25         And let's look in your Event Study, Plaintiffs' 1391,

Fischel - cross

2918

1    for the same date, which is August 14. It's on Page 42.

2         Did you find a statistically-significant price

3    increase that resulted in inflation on August 14, 2002?

4    A.  No, sir, I did not.

02:11:38 5    Q.  This is -- plaintiffs have shown this jury the Origination

6    news article that appeared on August 23, 2002, down at the

7    bottom here (indicating). It quotes Megan Hayden-Hakes

8    saying, "We clearly follow all state and federal laws and

9    regulations."

02:12:11 10        Let's look at your Exhibit 1397 for August 23, 2002.

11   It's on Page 17.

12        No change in artificial inflation there?

13   A.  Correct.

14   Q.  Let's look at your Event Study, which is Plaintiffs' 1391

02:12:35 15   for the same date, August 23, 2002, which is at Page 45.

16        Did you find any statistically-significant price

17   increase that resulted from inflation on August 23, 2002?

18   A.  No, sir, I did not.

19   Q.  Plaintiffs have shown this jury the National Mortgage News

02:13:14 20   article that appeared on September 2, 2002, in which they say,

21   "A Household spokeswoman said that she is not aware of any

22   pending enforcement actions or settlement talks."

23        Let's look at 1397 for September 2. That would be on

24   Page 17.

02:13:33 25        And, again, this is one of those where there is no

Fischel - cross

2919

1   September 2, but there is a September 3.

2          And you see the inflation is -- is that a negative

3   number there, minus 209?

4   A.  Yes, that's a negative number.

02:13:47  5   Q.  And the day before is a minus number -- a minus 88?

6   A.  Correct.

7   Q.  All right.

8          So, is this -- I'm not good with two negative

9   numbers.  Is that inflation increasing or decreasing?

02:14:00  10  A.  That is inflation decreasing.

11  Q.  Okay.

12         And let's look at your 1391, for the same date that's

13  your Event Study.  And this is September 2 or September 3.

14  It's on Page 46.

02:14:26  15         Did you find a statistically-significant price

16  increase that resulted in inflation on September 2 or, in this

17  case, on September 3, 2002?

18  A.  No, sir, I did not.

19  Q.  Okay.

02:14:41  20         We're done with that.

21         Now, you told me something earlier about when the

22  inflation first came into the stock.  Let's go back to 139 and

23  start on Page 1.

24  A.  Okay.

02:15:19  25  Q.  Okay?

Fischel - cross

2927

1    find one of these thousands of documents that are in this

2    courtroom -- pick it up and say, "Okay, I got it.  This is the

3    false statement (indicating)."

4         And, then, I can look at the date and it will say to

02:23:58  5    me, "Household made it on X date;" and, then, I can look at

6    your chart and see the inflation increasing and I can say,

7    "There it is.  Professor Fischel just told me a couple minutes

8    ago that he agrees with me that plaintiffs need to show

9    inflation coming into the price of the stock in the relevant

02:24:14 10   period."

11        So, that means they have to show it on some date.  It

12   means it comes from some document.

13        Now, I'm trying to find out, sir, if you can help

14   me -- maybe you can't -- is there a document that I can look

02:24:27 15   at, which was issued by Household on a date which, when we

16   take that date and run it through this exercise we've been

17   doing here for the last 45 minutes with these two documents --

18   1397 and 1391 -- is going to give me the opposite answer.

19        For example, we have this date here (indicating).

02:24:44 20   This is one of those days, December 5, 2001.  That's a day

21   where Mr. Aldinger made a statement; and, according to your

22   testimony -- your expertise -- that added inflation to the

23   price of Household stock, correct?

24   A.  Correct, based on the assumption that the statement was

02:24:59 25   false.

Fischel - cross

2928

1    Q.  Yes.

2        Absolutely.  I fully understand that you're not

3    saying that one word Mr. Aldinger said at Goldman Sachs was

4    false; and, you're also not saying it was true.  You have no

02:25:10  5    view on that, right?

6    A.  That's right.

7    Q.  Okay.

8        But you do say that when Mr. Aldinger spoke at

9    Goldman Sachs on this date (indicating), inflation increased?

02:25:23 10    A.  Correct.

11    Q.  Give me another date in this case where, based on your

12    research, Household made a statement like Mr. Aldinger's at

13    Goldman Sachs -- that I can touch and feel, read to the jury,

14    examine Mr. Aldinger about -- that increased inflation in the

02:25:37 15    stock?

16    A.  February 27th.

17        And the reason is, just like December 5th, if the

18    jury were to conclude that Household's statements about its

19    re-aging practices, how they were perfectly appropriate at all

02:25:53 20    points in time; that they accurately reflected Household's

21    financial condition; that they were done only for the purpose

22    of benefitting the consumer; if the jury were conclude that

23    those statements were false, going back to the beginning of

24    the relevant period as early as possibly July 30th, 1999, or

02:26:12 25    any later date, then Household's statements to the contrary on

Fischel - cross

2929

1    December 5th of 2001 and February 27th of 2002, would be false

2    and misleading statements, which would increase the amount of

3    inflation.

4         But the inflation would date back to the first time

02:26:33  5    Household made a statement about its re-aging practices --

6    defending them; saying the accounting was correct; saying

7    nobody was misled; saying that they accurately reflected the

8    quality of Household's assets, its delinquencies -- the first

9    time Household made a statement to that effect, if it later

02:26:54  10   turned out to be false or if it was false at the time that it

11   was made, then these statements on December 5th and February

12   27th were, themselves, false because they reiterated

13   Household's defense of its re-aging practices.  And that's why

14   inflation increased on those dates.

02:27:10  15   Q.   Increased.

16        But I'm trying to find out what was the base level.

17        As I read your chart, 1397, for two-and-a-quarter

18   years during this class period -- during the relevant

19   period -- starting on July 30, '99, and going all the way up

02:27:27  20   to October 15, I think you said, of -- November 15 of -- 2001,

21   it's always $7.97, correct?

22   A.   Under the first quantification method.  And the reason is

23   that when you quantify the valuation effects, the stock price

24   consequences of the 14 specific disclosures that I identified,

02:27:49  25   that were fraud-related disclosures that had a statistically-

Fischel - cross

2930

1    significant effect on Household's stock price, those 14

2    disclosures, netting out the positives and the negatives, had

3    a cumulative effect of $7.97.

4            And what that means is that the best estimate of what

02:28:11  5    the effect on Household's stock price would have been the

6    first time there was a false and misleading statement, instead

7    of talking about its growth strategy; how its growth strategy

8    was going to continue in the future; how its lending practices

9    were appropriate at all points in time; how it wasn't going to

02:28:30 10    get into trouble with consumers and regulators; how its

11    accounting was proper; didn't disguise its re-aging practices;

12    how its credit card accounting was proper and didn't result

13    ultimately in a restatement, all those corrected disclosures

14    are sum to $7.97.

02:28:49 15            So, the best estimate of what Household's price would

16    have been on the first date when they made a false and

17    misleading statement, according to the jury -- if the jury

18    were to so conclude -- the price of Household stock would fall

19    by $7.97 relative to what it was in the real world when

02:29:13 20    investors bought and sold.  And that's why the inflation

21    number is $7.97.

22    Q.  So, it's all hindsight.  Until something happens on

23    December 5, 2001, you can't go back to July 30, '99, and tell

24    us what's going on; is that right?

02:29:26 25    A.  Correct.  Precisely because Household did not disclose

Fischel - cross

2931

1    accurate information.

2           The only way that you can judge the value of the

3    information is look at what the market reaction was when the

4    markets learned that the growth model wasn't going to be able

02:29:41  5    to be sustained; that lending practices were attacked as

6    predatory in lawsuits; consumer groups; regulators, et cetera;

7    that the accounting was deemed to be inaccurate; and,

8    Household had to restate its disclosures about its accounting;

9    independent groups, like CFRA, as well as many analysts

02:30:02  10   concluded that Household's accounting was false and

11   misleading.

12          When there was a restatement of its credit card

13   accounting on August 14th, only at that time did the market --

14   at those times did the market -- learn about what the value

02:30:16  15   was of the new information -- the corrective information --

16   that came out at the end of the period, that investors in

17   Household stock at the beginning of the relevant period did

18   not know.

19          So, in that sense, it's corrected in hindsight; but,

02:30:31  20   the only reason it's in hindsight is because Household didn't

21   disclose what ultimately came out later.  In fact, they kept

22   denying it.  And it was only when analysts and other market

23   participants didn't believe the denials any more that the

24   value of that information became known to market participants.

02:30:48  25   And the value of that information, based on my calculation

Fischel - cross

2936

1          (Document tendered.)

2             MR. KAVALER:  Now, let's do 154.

3             Copies, please.

4          (Brief pause.)

02:35:15  5             MR. KAVALER:  Let the record reflect I'm handing the

6      witness 154.

7             THE WITNESS:  Thank you.

8             MR. KAVALER:  And a copy for counsel.

9          (Document tendered.)

10      BY MR. KAVALER:

11      Q.  The same series of questions, Professor Fischel.

12             Once again, the horizontal axis shows at the extreme

13      left-hand end July 30, 1999, correct?

14      A.  Correct, sir.

02:35:36 15      Q.  And you go up that axis, you see a blue line (indicating),

16      which is the true value; a red line (indicating), which is

17      price; and, a pink -- it looks blue up there (indicating) --

18      whatever color it is, the area between the lines is shaded in?

19      A.  Yeah.

02:35:54 20             That corresponds precisely to the table that we were

21      just looking at on the amount of inflation.  So -- well, since

22      we haven't talked about this yet, if you just put the other

23      one up on the screen for a second?

24      Q.  Okay.  Sure.

02:36:23 25             Go back to 151.

Fischel - cross

2937

1          (Brief pause.)

2     BY THE WITNESS:

3     A.  So, what the -- the red line is the actual price, and you

4     can see what it was relative to -- the level of the price

02:36:24  5     relative to -- the vertical axis on price.

6               And the blue line is the true value.

7               So, what this predicts is that the price fluctuates

8     every day; but, the true value, based on my calculations, is

9     $7.97 lower than the actual price until November 15th of 2001;

02:36:53  10    and, then, it gets more or less than -- the inflations

11    increases or decreases based on the specific disclosure.

12    BY MR. KAVALER:

13    Q.  I hear you.  None of that is my question.

14             I want to go back to -- I put up 151 because you

02:37:03  15    wanted me to.  I want to go to 154 for a minute.

16    A.  I apologize.

17             Okay.  Thank you.

18    Q.  154, my only question is:  You prepared this chart?

19    A.  I did.

02:37:11  20    Q.  Okay.

21             On this chart, as on the other one, the blue line,

22    the red line and the shaded-in space all butt right up against

23    July 30, 1999, correct?

24    A.  Correct, for the reasons I've stated.

02:37:24  25             MR. KAVALER:  Your Honor, I offer Plaintiffs'

Fischel -

2938

1    Demonstrative 154 in evidence, pursuant to Rule 801(d)(2).

2            THE COURT:  Let's take our afternoon break now.

3    We'll take 15 minutes; we'll discuss this; and, then, we'll

4    bring the jury back out and continue.

02:38:38  5            (Jury out.)

6            THE COURT:  So, you're offering these two

7    demonstrative exhibits as?

8            MR. KAVALER:  As an admission by a party opponent,

9    your Honor.

02:38:43 10            THE COURT:  Okay.

11            A response?

12            MR. BURKHOLZ:  First of all, your Honor, I don't

13    think it's an admission against a party opponent.  This is an

14    expert retained by the plaintiff.

02:38:53 15            But, in any case, the plaintiffs will not be

16    submitting any false statements before August 16th, 1999.

17            I mean, Mr. Kavaler can use this demonstrative in any

18    way he wants to, but we don't think it's a party admission.

19            THE COURT:  Okay.

02:39:10 20            Why don't you think it's a party admission?

21            MR. BURKHOLZ:  Because it's -- he's -- he's an expert

22    retained by the plaintiffs, but it's not a statement being

23    made by the plaintiff.

24            THE COURT:  Your response?

02:39:25 25            MR. KAVALER:  Your Honor, 801(d)(2) says, "Admission

Fischel - cross

2958

1    quoted in a dollar amount without this adjustment that you've

2    shown on all these charts for what it really should be, right?

3    A.  Well, respectfully, sir, I'm not sure what you mean by

4    what it really should be.  That's really a mischaracterization

03:27:38  5    of what I said.

6    Q.  Fair enough.  Turn to Plaintiffs' Demonstrative 137, where

7    you've got a residual price change of minus $1.86.

8         Do you see that?

9         MR. BURKHOLZ:  Could you show him where it is?

03:27:51  10        MR. KAVALER:  Sure.

11   BY MR. KAVALER:

12   Q.  It's tab three, which just happens to be the first one

13   in --

14   A.  I'm looking at it on the screen.

03:27:54  15   Q.  If I were looking at the price of the stock, closing price

16   on the New York Stock Exchange, on November 15, 2001, I

17   wouldn't see minus $1.86, would I?

18   A.  You would not, for the reasons that I explained at length.

19   Q.  And if I were watching Bloomberg News, I wouldn't see

03:28:12  20   minus $1.86, would I?

21   A.  Probably not.

22   Q.  And if I were reading the Wall Street Journal in the

23   morning or the New York Times or the Chicago Tribune, I

24   wouldn't see minus $1.86?

03:28:22  25   A.  I suspect you would not.

Fischel - cross

2959

1    Q.   And if I were looking at my brokerage statement if I owned

2    Household stock, I wouldn't see minus $1.86?

3    A.   No.   But in all those documents, you might see discussion

4    of how the stock price movement compared with the overall

03:28:39  5    market and movements of other firms in the industry.   That's a

6    very common measure that Household itself used in its proxy

7    statements that's, in effect, required by SEC regulations.

8    Q.   I'm making --

9    A.   So this is just a quantification of what investors look at

03:28:57 10    all the time.

11    Q.   I'm making a very small point, sir.   Stocks are quoted in

12    a price which is the price usually that they close on the New

13    York Stock Exchange, right?

14    A.   Correct.   But there's also frequently comparisons of stock

03:29:12 15    prices and prices of the overall -- movement to the overall

16    market, movements in the industry.   That's what Household

17    itself disclosed in its proxy statement.   This is just a

18    quantification of that relationship.

19    Q.   You've been very patient all afternoon while we talked

03:29:28 20    about your first model.   I want to turn to your second model.

21    A.   Okay.

22    Q.   This is the model with the leakage, right?

23    A.   Okay.

24    Q.   Okay.   And you agree there are a bunch of stock price

03:29:39 25    movements that were significant under your aggression analysis

Fischel - cross

2960

1    that were not attributable to fraud-related disclosures, don't

2    you?

3    A.   There were probably some, both positive and negative, but

4    a lot of the significant movements were combined disclosures

03:29:57  5    of -- they had some fraud-related aspect and then they had

6    some other aspect in addition to the fraud-related aspect.

7    Q.   And were there some, any, that had no fraud-related

8    aspect?

9    A.   It's a matter of judgment as to whether something has a

03:30:13 10    fraud-related aspect or not.  I would say there were a few,

11    but there were also, I would say, a significant number of the

12    statistically significant movements that had this combined

13    aspect.

14         But just to be clear, under the leakage model,

03:30:31 15    whether they did -- whether they were purely fraud related,

16    combined fraud related or not at all fraud related, they were

17    all included in the leakage model.

18    Q.   I understand.  But my point is there was some of all

19    three?

03:30:46 20    A.   You probably could -- that would probably be a fair

21    statement.

22    Q.   Okay.  Now, this is not on either model.  This is a

23    general question.

24    A.   Okay.

03:30:56 25    Q.   You assumed that the defendants did make false statements

Fischel - cross

2961

1   during the relevant period, didn't you?

2   A.   That's correct.

3   Q.   Okay.  Can you do this:  Assume the opposite.  Assume the

4   defendants did not make any false statements during the

03:31:10 5   relevant period.

6   A.   Okay.

7   Q.   Okay.  The stock price still declined in the real world,

8   didn't it?

9   A.   The stock price declined in the real world, that's

03:31:23 10   correct.

11   Q.   Why?

12   A.   I think the stock price declined for a variety of

13   different factors.  I touched on this in my testimony.  There

14   was a -- a big part of the stock price decline that's --

03:31:40 15   according to both of my calculations that's attributable to

16   some combination of market industry and non-fraud-related

17   effects.  And also some percentage of the stock price decline

18   that's attributed -- attributable -- excuse me -- to the

19   market learning correct information about Household's

03:32:05 20   predatory lending practices, its re-aging policies and the

21   effect of the restatement.

22   Q.   And giving the last part of that answer, you were still

23   holding to the assumption I asked you to make that there's no

24   fraud?

03:32:19 25   A.   I'm sorry.  Well, if there's no fraud, then obviously

Fischel - cross

2962

1     fraud played no role in the decline in Household's stock

2     price.

3     Q.  Let me try it again.  I want to be clear.

4          I'm asking you to assume there is no fraud.

03:32:32  5     Nevertheless, in the real world, there's no question, the

6     price of Household's stock went down?

7     A.  No.  But let me ask you a clarifying question, sir,

8     because your question, at least to me, is a little bit

9     confusing.

03:32:43  10         Are you assuming that the stock price would have been

11     the same in the real world, in addition to there being no

12     fraud?  Because I would say if there's no fraud, the stock

13     price likely would have been different.

14     Q.  Okay.  This is where I always got in trouble in law school

03:32:59  15     because I don't know how to assume things that are different

16     than the real world very well.

17          I'm assuming there was never any fraud.

18     A.  Never any fraud in the stock price is identical to the way

19     it was in the real world.

03:33:08  20     Q.  Sure.  It went down?  It went down significantly?

21     A.  Okay.

22     Q.  Okay.  Why?

23     A.  Well, here's the problem:  You're asking me a

24     hypothetical, to make assumptions in a hypothetical; and

03:33:20  25     you're asking me in the real world what happened in the

Fischel - redirect

2963

1    hypothetical.  And there's sort of a contradiction in terms in

2    the question.

3    Q.  All right.  I take your point.  Let me try it this way:

4    What we know for a fact is the stock price went down, correct?

03:33:34  5    A.  Correct.

6    Q.  What you've done here yesterday and today is give us your

7    opinion as to why?

8    A.  Based on the assumption that I've explained numerous

9    times, correct.

03:33:44 10    Q.  Exactly.  And the assumption was -- the assumption -- you

11    assumed because these gentlemen here asked you to -- that

12    there was fraud?

13    A.  Correct, because if there's no misstatements, then there's

14    no case, so there's nothing to quantify.

03:34:00 15    Q.  Thank you, Professor Fischel.  I couldn't have said it

16    better myself.

17         MR. KAVALER:  No further questions, your Honor.

18         THE COURT:  You may redirect.

19              REDIRECT EXAMINATION

03:34:12 20    BY MR. BURKHOLZ:

21    Q.  Let me ask you a simple question.  Counsel showed you all

22    these public statements that Household made.  Do you need to

23    find a statistically significant price increase on the dates

24    of these public statements in order for there to be inflation

03:34:38 25    in Household's stock under your specific disclosure model?

Fischel - redirect

2964

1    A.   No.   That's really the whole point, that the reason why

2    there's no statistically significant price increase in

3    response to all those disclosures where there's big red Xs is

4    because in each one of those disclosures, Household was

03:34:57   5    reaffirming its growth strategy.   It was denying any

6    wrongdoing.   It was defending its accounting.

7         When it started later to say that there were

8    problems, it was either because of a computer glitch or

9    localized to a particular employee or a group of employees.

03:35:18   10   Because Household made all those statements and reiterated the

11   same statements from the beginning until later in the class

12   period, of course, the market didn't react because Household

13   is saying the same thing over and over and over again.

14        It was only when the truth began to come out when

03:35:40   15   market participants began to disbelieve the denials, when the

16   complaints from regulators started to pile up, the lawsuits

17   started to pile up, the complaints from customers started to

18   pile up, Household had to restate its accounting, had to

19   restate and provide a correct disclosure of its re-aging

03:35:59   20   practices and the effect of those re-aging practices, when

21   there was leakage of the very damaging Washington department

22   of financial insurance report, rumors of the effect of the

23   settlement and the combined effect of what that would mean for

24   Household's growth strategy, it was only then when you started

03:36:21   25   to see statistically significant price reactions because the

Fischel - redirect

1   market was learning the truth.

2          In fact, the market became so negative, as I

3   indicated, that the price went below what my true value line

4   indicated, demonstrating that investors who bought at the end

03:36:43 5   basically bought at a bargain price and, at least under both

6   of my quantifications, are not entitled to any compensation.

7   Q.  Is it a common method to focus on the disclosures later in

8   the relevant period to quantify the inflation due to the

9   statements Household made earlier in the relevant period?

03:37:01 10  A.  It's completely standard because if what you're trying to

11  do is measure the value of the truth and the truth is not

12  provided early in the period, the only way to analyze the

13  effect of the truth is to see what the effect on investors and

14  market prices is when the truth comes out.  And by doing that,

03:37:23 15  you're able to make a judgment, as I did, about what the,

16  quote, true value of the stock would have been at the

17  beginning had the truth been told the entire time.

18  Q.  Now, counsel showed you the beginning of the relevant

19  period, July 30, 1999, and then the first statement on August

03:37:43 20  16, 1999, the 10-Q.

21          Do you remember that?

22  A.  I do.

23  Q.  And do you have an understanding that the beginning of the

24  relevant period, July 30, 1999, is due to a Court decision in

03:37:54 25  this case?

Fischel - redirect

2966

1    A.    That's my understanding.

2    Q.    Okay.    And if the first false statement that plaintiffs

3    allege in this case is on August 16, 1999, how would you

4    calculate inflation on that date?

03:38:06 5    A.    I would calculate inflation the same way as of August 16,

6    but there would be no inflation from July 30 to August 15.    So

7    as I indicated, where I have an entry for artificial inflation

8    from July 30 to August 15, the correct way to interpret the

9    exhibit is just to replace the inflation number with a zero

03:38:28 10   for every day until August 16.    And beginning on August 16, it

11   would then be $7.97 under the first method.

12   Q.    And your assumption that plaintiffs will be able to prove

13   the various statements are false and misleading during the

14   relevant period is a common assumption that you make in your

03:38:58 15   field?

16   A.    Again, it's a necessary assumption because the

17   responsibility of determining whether a statement is false or

18   not, that's not for an expert witness, for any expert witness.

19   It's not for an economist.    It's really a function for the

03:39:12 20   jury to decide.

21        MR. BURKHOLZ:    Can we bring up Plaintiffs' Exhibit

22   1391.    Can we have the switch, your Honor.

23        If we can turn to the third page.

24        If we can highlight the last date on the bottom,

03:39:36 25   November 12, 1999.

Fischel - recross

2973

1  investors who purchased prior to July 30, 1999, have a claim

2  that they are pursuing in this case.  For that reason, by

3  definition, since there's no claim of harm, there is no harm;

4  and there's no inflation.  And that's why the exhibit begins

03:48:21  5  on, my understanding as a result of a Court ruling of the

6  first day of the relevant period, which is July 30, 1999.

7  There are statements made on July 22, statements made on

8  August 16, statements made on October 19.  They're all kinds

9  of days when different statements are made.  You've got lots

03:48:43  10  of them with your colorful red Xs over there.

11          But the point isn't when statements are made.  The

12  point is when inflation begins.  And inflation begins on the

13  first false and misleading statement, which is a decision, as

14  I've said numerous times, only the jury can make.

03:49:02  15  Q.  I thought I understood you to say to Mr. Burkholz a minute

16  ago -- and I think you just said it again -- the relevant

17  period used to go back further, didn't it?

18  A.  I'm not sure what you're referring to of what I said to

19  Mr. Burkholz.

03:49:15  20  Q.  There was a point where the relevant period started long

21  before July 30, 1999, correct?

22  A.  You mean in some prior time in this case before a ruling

23  by the Court?

24  Q.  Correct.  When you first looked at this project.

03:49:34  25  A.  I can't remember what the situation was when I first was

Fischel - recross

2974

1    involved.  I am aware that as a result of a series of Court

2    rulings, the first day of the relevant period has been

3    established at July 30, 1999.  And there were competing claims

4    by the plaintiffs and defendants which resulted in that

03:49:57  5    judicial ruling.  And that's the basis for my starting with

6    July 30.

7    Q.  And you mentioned something about July 22, 1999, just now,

8    did you?

9    A.  I did.

03:50:07  10    Q.  Did Household make a statement on July 22?

11    A.  It did.

12    Q.  Was that statement false?

13    A.  If the statement on August 16 was false, then the

14    statement on July 22 was also false.

03:50:26  15    Q.  Because they're the same statement?

16    A.  Same statement, correct.

17    Q.  Okay.  So if the same statement -- withdrawn.

18         And you said this jury can decide the August 16

19    statement was false?  It's up to them, right?

03:50:41  20    A.  Correct.

21    Q.  And the July 22 statement is the same statement as the

22    August 16 statement you say?

23    A.  Same statement; but as a result of rulings by the Court,

24    it's not part of the case.

03:50:51  25    Q.  Nevertheless, it's the -- in the real world, it's the same

Fischel - recross

2975

1    statement?  Household said the same thing twice?

2    A.   In the real world, it's the same statement.  But the real

3    world of this case, the August 16 statement counts and the

4    July 22 statement does not count because of the rulings by the

03:51:09   5    Court --

6    Q.   What I'm trying --

7    A.   -- as I understand them.

8    Q.   What I'm trying to understand is Household said X on July

9    22.   Then they said X again on August 16.  Somehow when they

03:51:23  10    say it on August 16, it causes inflation.  But when they say

11    the same thing on July 22, it doesn't cause inflation.  Is

12    that your testimony?

13    A.   Correct.  Household may have made all kinds of false

14    statements over any number of years that may have been false,

03:51:40  15    they may or may not have been false; but even if they were

16    false, they're not part of this case, they're not part of my

17    quantification because pursuant to my understanding of the

18    rulings of the Court, only dates after July 30, 1999, count.

19         So it doesn't really matter what false statements or

03:52:01  20    what true statements or what the effect on stock prices was in

21    any period prior to July 30, 1999, because it's not part of

22    the case.  And because it's not part of the case, I didn't

23    perform any quantification about what's not relevant in the

24    case.

03:52:17  25    Q.   Is it possible that the exact same statement that

Fischel - recross

2976

1    Household made on August 16 when Household made it on July 22

2    caused the inflation in the price of the stock, and that's the

3    same inflation that continues at $7.97 from July 2 -- July 22

4    right through July 30, right through August 16, and for the

03:52:42  5    next two and a quarter years until November 14, 2001?

6    A.   Yes, it's definitely possible that if the first false

7    statement in the relevant period is August 16, that inflation

8    would begin on that date.

9    Q.   No, no.  You didn't understand the question.  It wasn't

03:52:59  10   clear.

11        What if the first false statement is on July 22; it's

12   the exact same statement as August 16.  Could it have caused

13   the inflation on July 22, nothing else happens, Household

14   doesn't make any other statements till August 16, inflation

03:53:12  15   cruises along at $7.97, just like you have on this chart here,

16   1397; it cruises along from July 22, 1999; it goes right

17   through July 30; it goes right through August 16.  And

18   according to your chart, it stays right there at 7.97 all the

19   way out here until November 14, 2001, two and a quarter years

03:53:36  20   later.  Is that possible?

21   A.   No, it's not possible.  I disagree with your

22   characterization of the inflation starts and cruises along,

23   whatever that means.

24   Q.   Stays the same.

03:53:45  25   A.   Well, it doesn't stay the same because there can't be any