# TAB 21

3013

```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN,  )
     on behalf of itself and all      )
 4   others similarly situated,       )
                                       )
 5               Plaintiff,            )
                                       )
 6      vs.                            )   No. 02 C 5893
                                       )
 7   HOUSEHOLD INTERNATIONAL, INC.,    )
     et al.,                           )   Chicago, Illinois
 8                                     )   April 21, 2009
                 Defendants.           )   9:00 a.m.
 9
                              VOLUME 15
10                  TRANSCRIPT OF PROCEEDINGS - TRIAL
             BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:          COUGHLIN STOIA GELLER RUDMAN &
                                 ROBBINS LLP
14                               BY:  MR. LAWRENCE A. ABEL
                                      MR. SPENCER A. BURKHOLZ
15                                    MR. MICHAEL J. DOWD
                                      MR. DANIEL S. DROSMAN
16                                    MS. MAUREEN E. MUELLER
                                 655 West Broadway
17                               Suite 1900
                                 San Diego, California  92101
18                               (619) 231-1058

19                               COUGHLIN STOIA GELLER RUDMAN &
                                 ROBBINS LLP
20                               BY:  MR. DAVID CAMERON BAKER
                                      MR. LUKE O. BROOKS
21                                    MR. JASON C. DAVIS
                                      MS. AZRA Z. MEHDI
22                               100 Pine Street
                                 Suite 2600
23                               San Francisco, California  94111
                                 (415) 288-4545
24

25
```

Aldinger - cross

3081

1    statistics?"  Right?

2    A.  That was my impression, yes.

3    Q.  And you agreed with him?

4    A.  I did.

10:59:19  5    Q.  Let's go to the page ending 893 in this document, which is

6    now in evidence?

7           And you see there's two tables on this page.  The top

8    one says, "Credit Quality," et cetera.  The bottom one --

9           MR. KAVALER:  Can we pull up the bottom one there,

10:59:42 10    Brian?

11           (Brief pause.)

12    BY MR. KAVALER:

13    Q.  -- that says, "Re-Age Statistics," doesn't it?

14    A.  I guess I should have read the whole document.

10:59:50 15    Q.  Uh-huh.

16           And, then, with regard to all these documents,

17    Mr. Drosman asked you if you disclosed or the company

18    disclosed that account executives were misrepresenting

19    interest rates, misrepresenting effective rates, disclosing

11:00:18 20    GFEs from zero to $6,000, misleading customers about points

21    and fees and misleading customers into buying insurance.

22           Do you remember that series of questions?

23    A.  Yes, I do.

24    Q.  Those aren't facts, are they, Mr. Aldinger?  Those are Mr.

11:00:35 25    Drosman's assumptions?

Aldinger - cross

3082

1          MR. DROSMAN:  Objection, your Honor.

2      BY THE WITNESS:

3      A.   Those are allegations.

4          THE COURT:  Sustained as to the form of the question.

11:00:41  5          MR. KAVALER:  I'll a rephrase, your Honor.

6      BY MR. KAVALER:

7      Q.   Were you aware, Mr. Aldinger, that any significant number

8      of employees were engaged in any of those practices?

9      A.   No.

11:00:50  10  Q.   Did you believe any significant number of employees were

11      engaged in those practices?

12      A.   I did not.

13      Q.   Did you believe it was the practice of the company to

14      misrepresent interest rates?

11:01:01  15  A.   I did not.

16      Q.   Did you believe it was the practice of the company to

17      employ an effective rate presentation?

18      A.   No, I did not.

19      Q.   Did you believe it was the practice of the company to

11:01:11  20  mislead people regarding points and fees?

21      A.   No, I did not.

22      Q.   Did you believe it was the practice of the company to

23      mislead people into buying insurance?

24      A.   I did not.

11:01:20  25  Q.   Now, Mr. Drosman asked you some questions which involved

Aldinger - cross

1    the word "material" in it.  Do you recall that?

2    A.  I do.

3    Q.  And what do you understand "material" to mean?

4    A.  Well, it's an accounting term and it means it should be

11:01:34  5    very significant.

6    Q.  Significant.

7         Did you have any understanding about any of these

8    activities I just listed, assuming they were going on at all,

9    whether they were going on to any material extent?

11:01:44  10   A.  No.  We never thought they were anywhere near systemic or

11   material.

12        I think in earlier discussions in the last few weeks

13   we've talked about how it related to one of our five major

14   businesses, not all of them; and, it represented less than

11:01:59  15   one-tenth of one percent.  And that was the -- that was

16   questions raised, not proved.

17   Q.  Now --

18   A.  So, we didn't think it was systemic or material.

19   Q.  You mentioned -- you started to mention something and,

11:02:13  20   then, Mr. Drosman asked you to stop speaking.  And he said I

21   could bring it out.  So, I'll take his invitation.

22        You said something about other companies didn't say

23   this sort of things in their press releases, either.

24        Did the fact that other companies didn't disclose the

11:02:27  25   kind of things Mr. Drosman is talking about form part of your

Aldinger - cross

3084

1    view as to whether something is material or not?

2    A.  Well, I think we look at what -- what -- has been required

3    over time.  I'm not an accountant, first of all, I should say.

4    So, I don't know how to define everything that goes in there.

11:02:43  5         But I think we did look to what history had shown

6    what we put in our documents and what the rest of the

7    competitive group would put in their documents, as benchmarks;

8    and, we looked for guidance from the accountants -- the public

9    accountants.

11:02:58 10   Q.  Mr. Drosman asked you briefly about a presentation you

11   made at Goldman Sachs?

12   A.  Yes.

13   Q.  Let's see if we can put that in context, Mr. Aldinger.

14         Let's start with this (indicating).

11:03:14 15        MR. KAVALER:  Can we have -- well, no.

16   BY MR. KAVALER:

17   Q.  Was it any part of your duties, from time to time, to meet

18   with and communicate with the major shareholders of the

19   company?

11:03:25 20   A.  It was a very significant part of my role.  I spent about

21   30 percent of my time as an outside person working with

22   investors, working with analysts, working with rating

23   agencies, working with the Board beyond my day-to-day

24   responsibilities.

11:03:42 25        So, a big part of my time was spent working with

Aldinger - cross

3154

1          I'm handing to counsel Defendants' 837 and 840.  I'm

2     handing you, Mr. Aldinger, 837 and 840, Defendants' 837 and

3     840.

4       (Tendered.)

5     BY MR. KAVALER:

6     Q.  And I ask you, are these also securitization documents

7     filed with the SEC?

8     A.  Yes, they are.

9          MR. KAVALER:  I offer Defendants' 837 and 840, your

01:40:14 10   Honor.

11          THE COURT:  Admitted without objection.

12          MR. KAVALER:  Now, I'm handing you Defendants' 839

13     and 859.  A copy for counsel.

14       (Tendered.)

15     BY MR. KAVALER:

16     Q.  And I'll ask you the same question, Mr. Aldinger.  Are

17     these securitization documents filed with the SEC?

18     A.  Yes, they are.

19          MR. KAVALER:  I offer 8 -- Defendants' 839 and 859 in

01:40:42 20   evidence, your Honor.

21          THE COURT:  Admitted.

22          MR. KAVALER:  I'm now handing counsel Defendants' 838

23     and Defendants' 841.  And I'm handing copies to you,

24     Mr. Aldinger.

25       (Tendered.)

Aldinger - cross

1    BY MR. KAVALER:

2    Q.  I'll ask you, are these all securitization documents filed

3    with the SEC?

4    A.  Yes, they are.

01:41:20  5         MR. KAVALER:  Your Honor, I offer Defendants' 841 and

6    838.

7         THE COURT:  Admitted.

8         MR. KAVALER:  I'm handing counsel a copy of

9    Defendants' 697.  I'm handing you a copy, Mr. Aldinger.

10    (Tendered.)

11   BY MR. KAVALER:

12   Q.  Is that also a securitization document filed with the SEC?

13   A.  Yes, it is.

14        MR. KAVALER:  I offer Defendants' 697, your Honor.

01:41:54 15        THE COURT:  Admitted.

16        MR. KAVALER:  And I'm handing counsel Defendants' 695

17   and Defendants' 880, and I'm handing copies of both of those

18   to Mr. Aldinger.

19    (Tendered.)

01:42:21 20  BY MR. KAVALER:

21   Q.  And I ask you, sir, are those copies of securitization

22   documents filed with the SEC?

23   A.  Yes, they are.

24        MR. KAVALER:  Your Honor, I offer Defendants' 880 and

01:42:30 25  Defendants' 695.

Aldinger - cross

1          THE COURT:  Admitted.

2          MR. KAVALER:  Last two.  Now I'm handing counsel a

3     copy of Defendants' 741 and Defendants' 881.  And I'm handing

4     these to you, Mr. Aldinger.

5       (Tendered.)

6     BY MR. KAVALER:

7     Q.  I ask you whether these are also securitization documents

8     filed with the SEC?

9     A.  Yes, they are.

01:43:18 10          MR. KAVALER:  I offer Defendants' 881 and Defendants'

11     743, your Honor.

12          THE COURT:  Admitted.

13     BY MR. KAVALER:

14     Q.  Okay.  Mr. Aldinger, you were here when Mr. Schoenholz

01:44:00 15     testified?

16     A.  Yes, I was.

17     Q.  And do you remember when counsel asked him about the 2001

18     10-K and he said -- this is at Page 1928 of the transcript --

19     Question:  Okay.  Did you tell anybody in this 10-K, did you

01:44:25 20     tell your investors or Wall Street or anybody that used your

21     financial statements that you would actually re-age loans on

22     one payment?

23          And Mr. Schoenholz said:  Not when this 10-K was

24     filed?

01:44:36 25          Do you remember that?

Aldinger - cross

3157

1    A.  Yes, I do.

2    Q.  All right.  And did you understand the point of that

3    exchange to be there was no disclosure in the 2001 10-K of the

4    one-payment practice?

01:44:47  5    A.  That's what I understood.

6    Q.  But it was in a 1999 securitization prospectus that you

7    have in front of you?

8    A.  Yes.

9    Q.  Let's look at that and let's see if we can do this

01:44:59 10    expeditiously.  Turn to Exhibit 880, which I believe you have

11    there.

12    A.  Are we going to --

13    Q.  It's one of the ones I just gave you.

14    A.  Okay.  I'm going to look at it on the board.

01:45:09 15    Q.  Even better.  Then we go to the page ending in 968.

16         And can we highlight the language there that says --

17    paragraph -- in the middle of the page beginning, The master

18    servicer.

19         Do you see that paragraph?  There you go.

01:45:35 20         At the bottom of the screen, Brian.  That's it.

21         And halfway down there it says, The master servicer

22    may in its discretion, and it says one, two, and three.  I

23    want to focus your attention on three.  It says, Treat a home

24    equity loan as current if the borrower has made one scheduled

01:45:54 25    payment to cure the delinquency status of the home equity

Aldinger - cross

3158

1    loan.

2          Do you see that?

3    A.  Yes, I do.

4    Q.  This was a disclosure by Household to the world as of the

01:46:04  5    time it filed this prospectus that it engaged in one-payment

6    re-age?

7    A.  That's correct.

8    Q.  And this was a 1999 prospectus?

9    A.  That's what I understand, yes.

01:46:14  10   Q.  And Mr. Schoenholz was being questioned about the 2001

11   10-K, correct?

12   A.  That's correct.

13   Q.  Okay.  Mr. Schoenholz was also questioned about the

14   same -- well, the subsequent 10-K, the 2002 10-Q and the

01:46:32  15   questioning there had to do with automatic re-age.

16          Do you remember that?

17   A.  Yes, I do.

18   Q.  And, again, he said it was not in the 2002 10-K?

19   A.  That's my recollection.

01:46:44  20   Q.  Okay.  Let's look at 695.  Is that one of the exhibits you

21   have up there?

22   A.  It is.

23   Q.  Defendants' 695.  And let's go to page 335.

24          335, Brian.

01:47:09  25          And two paragraphs up from the bottom beginning with

Aldinger - cross

3159

```
            1    the words, Delinquent accounts.  Right there.

            2            Delinquent accounts may be restructured (deemed

            3    current) every six months.  Accounts are automatically

            4    restructured if the customer has made the equivalent of one

01:47:32    5    payment equal to at least 95 percent of a full standard

            6    payment.  Once restructured, the account is deemed current;

            7    however, the credit limit is zero.

            8            Do you see that?

            9    A.  I do.

01:47:43   10    Q.  Is that disclosure by Household in a document filed with

           11    the SEC on August 3, 2001, according to its cover sheet?

           12    A.  Yes, it was.

           13    Q.  And that relates to automatic re-age?

           14    A.  Yes, it does.

01:48:00   15    Q.  And that's before the 2002 10-K was filed?

           16    A.  That's correct.

           17    Q.  All right.  So, Mr. Aldinger, if the company was trying to

           18    conceal these practices, by leaving them out of the 2001 or

           19    2002 10-K a couple of years after -- in one case two years

01:48:21   20    after, in one case one year after -- it had disclosed them to

           21    the world in filings with the SEC, how were you going to

           22    conceal them?

           23    A.  It's hard to conceal anything that you've filed with the

           24    SEC.  It's a public record after that.

01:48:35   25    Q.  And we know that Mr. Ryan, at least among the analysts,
```

Aldinger - cross

3161

1    growth that couldn't last, ladies and gentlemen.  They knew

2    that.  Our clients did not.

3         Mr. Aldinger, did Household have an annual meeting

4    every year?

01:50:55  5    A.  Yes, we did.

6    Q.  And in connection with an annual meeting, are written

7    materials sent out to all the shareholders in advance?

8    A.  Yes, usually a few months in advance.

9    Q.  And what's that document called?

01:51:08  10    A.  It's the proxy.

11    Q.  A proxy statement?

12    A.  Yes.

13    Q.  And is that document also filed with the SEC?

14    A.  Yes, it is.

01:51:15  15    Q.  All right.  And did Household have an annual meeting in

16    2001?

17    A.  Yes, we did.

18    Q.  Do you happen to remember where?

19    A.  I believe it was at one of our centers.

01:51:28  20    Q.  What's a center?

21    A.  Well, we have different centers for either collections or

22    sales or -- across the country.

23    Q.  Is it possible for shareholders to submit proposals to the

24    company which get circulated in this proxy statement and voted

01:51:46  25    on by all the other shareholders?

Aldinger - cross

3162

1    A.   Yes, it is, if they submit it early enough, a couple of

2    months before we complete the proxy, yes.

3    Q.   Do they submit it in writing?

4    A.   They do.

01:51:55  5    Q.   And do you recall whether a shareholder or a group of

6    shareholders submitted a proposal to be considered at the

7    annual meeting in 2001 having to do with the subject of

8    predatory lending?

9    A.   Yes, I do.

01:52:08 10    Q.   We have a video with -- withdrawn.

11         And at the meeting, are the shareholders allowed to

12    get up and speak in favor of their proposal?

13    A.   Yes, they are.

14    Q.   And then all the other shareholders vote?

01:52:19 15    A.   That's correct.

16    Q.   We have a video of part of the 2001 annual meeting which

17    we'd like to play.

18         MR. KAVALER:  This is Plaintiffs' Exhibit 51, your

19    Honor.

01:52:35 20         THE COURT:  Has it been admitted?

21         MR. KAVALER:  It's plaintiffs' exhibit and it's

22    unobjected to, your Honor.

23         THE COURT:  You wish to offer it before we play it?

24         MR. KAVALER:  I apologize, your Honor.  Yes, I wish

01:52:46 25    to offer it and I would like to publish it.

Aldinger - cross

3163

       1            THE COURT:  Any objection?

       2            MR. DROSMAN:  No, your Honor.

       3            THE COURT:  It's admitted in evidence.  It may be

       4     published.

01:52:52  5     BY MR. KAVALER:

       6     Q.  Mr. Aldinger, I want you to watch this; and when it comes

       7     on, I'm going to ask you who the players are.

       8            Who's that?

       9     A.  That's me.

01:52:58 10     Q.  And what was your role at this annual meeting?

      11     A.  I was the CEO and I was in charge of conducting the

      12     meeting.

      13            MR. KAVALER:  Let's play a little bit, Brian.  Let's

      14     see if we see anyone else.

      15      (Whereupon said tape was played in open court.)

      16            MR. KAVALER:  Brian, please.

      17     BY MR. KAVALER:

      18     Q.  Do you know who Ms. Goodrich is?

      19     A.  She's a shareholder who presented a proposal at the

01:53:19 20     meeting.

      21     Q.  Thank you.

      22            MR. KAVALER:  Please continue playing, Brian.

      23      (Whereupon said tape was played in open court.)

      24     BY MR. KAVALER:

01:56:43 25     Q.  Now, Mr. Aldinger, she spoke those words at an annual

Aldinger - cross

3164

1    meeting in May of 2001?

2    A.   That's correct.

3    Q.   That's about a year and a half before the time counsel

4    referred to in his opening in October of 2002 when he said

01:57:02  5    these things first became known to his clients, the

6    shareholders?

7    A.   That's correct.

8    Q.   Did you hear her mention many of the same things that this

9    whole discussion has been about the last several weeks here?

01:57:12  10    A.   I did.

11    Q.   And did the shareholders know everything that she said

12    back in May of '02?

13    A.   The shareholders did.

14         MR. DROSMAN:  Objection, speculation.

01:57:23  15         THE COURT:  I'll sustain that.

16         MR. KAVALER:  I'll rephrase.

17    BY MR. KAVALER:

18    Q.   Did she say this at a meeting open to all shareholders?

19    A.   She did.

01:57:27  20    Q.   How many shareholders usually attend such meetings?

21    A.   It varies; a hundred, 150.

22    Q.   Is the resolution -- withdrawn.

23         Was the -- withdrawn again.

24         And when she had submitted -- withdrawn a third time.

01:57:41  25    I'm sorry.

Aldinger - cross

1      Would she have submitted this resolution in writing

2  to the company for inclusion in the proxy materials?

3  A.  Yes, she would.

4  Q.  That would have been even earlier than May?

01:57:51  5  A.  That's correct.  Probably April -- March -- I'm sorry,

6  March most likely.

7  Q.  Let me show you Defendants' 360.  A copy for counsel.

8     (Tendered.)

9  BY MR. KAVALER:

01:58:05 10  Q.  Is that a copy of the proxy statement in connection with

11  the March -- I'm sorry, the 2001 annual meeting?

12  A.  Yes, it is.

13      MR. KAVALER:  Your Honor, I offer Defendants' 360 in

14  evidence.

01:58:22 15      THE COURT:  It will be admitted.

16      MR. KAVALER:  And, ladies and gentlemen of the jury,

17  that's tab two in your binder.

18  BY MR. KAVALER:

19  Q.  Now, Mr. Aldinger, turn, if you will, to page ending in

01:58:33 20  124 in that document.

21  A.  124.

22  Q.  And the first sentence in the upper left-hand corner

23  reads, This proxy statement and the accompanying proxy card

24  are being mailed to Household stockholders in connection with

01:58:53 25  the solicitation of proxies by the board of directors for the

Aldinger - cross

3166

1    2001 annual meeting of stockholders.  This proxy allows you to

2    vote at our May 8, 2001, annual meeting of stockholders

3    without attending the meeting.  The proxy material is being

4    mailed to stockholders on or about March 29, 2001.

01:59:14 5           Do you see that?

6    A.  Yes, I do.

7    Q.  So any written submission Ms. Goodrich made had to have

8    been received by Household before March 29?

9    A.  Yes.

01:59:23 10   Q.  And this was mailed -- this proxy solicitation,

11   Defendants' 360, was mailed to every single shareholder?

12   A.  That's correct.

13   Q.  Is that required by federal law?

14   A.  Yes, it is.

01:59:31 15   Q.  And then it gets filed with the SEC?

16   A.  Yes.

17   Q.  Where anyone who wants can access it?

18   A.  That's correct.

19   Q.  All right.  Turn to page ending in 144 in that document.

01:59:43 20           And you'll see in the left-hand column it says, Item

21   two, stockholder proposal.  And underneath that beginning with

22   "whereas" it sets forth Ms. Goodrich's proposal?

23   A.  Yes.

24   Q.  And that's what she wants the shareholders to vote for by

02:00:10 25   soliciting their proxies?

Aldinger - cross

3167

1    A.   That's right.

2    Q.   And in the right-hand column it says, Management

3    statement.

4         Do you see that?

02:00:15 5    A.   Yes.

6    Q.   And the board of directors recommended voting against this

7    proposal?

8    A.   That's correct.

9    Q.   And she gave her reasons in writing and management gave

02:00:23 10   its reasons in writing, correct?

11   A.   Yes.

12   Q.   And then the shareholders voted; is that right,

13   Mr. Aldinger?

14   A.   Yes, they did.

02:00:32 15   Q.   And this is in 19 -- I'm sorry -- in 2001.  The meeting is

16   in May of 2001, so it's right in the middle of the time period

17   we're talking about between '99 and '02?

18   A.   That's right.

19   Q.   And the shareholders who voted on that proposal were the

02:00:49 20   shareholders who are the members of the class in this case?

21   A.   Yes, that's right.

22   Q.   And the proposal was to tie management's compensation more

23   closely to specific efforts management undertook to rein in

24   what Ms. Goodrich thought was an excessive focus on predatory

02:01:11 25   lending?

Aldinger - cross

3168

1   A.  That's correct.

2   Q.  Did Ms. Goodrich's proposal win or lose in a vote by the

3  shareholders, Mr. Aldinger?

4   A.  It lost.

02:01:18  5   Q.  By what vote did it lose?

6   A.  I believe it was 90 percent against.

7   Q.  90 percent of the shareholders voted against a proposal in

8  2001 to instruct the board to adopt a compensation plan that

9  would reward management for taking a stronger anti-predatory

02:01:38  10  lending stance?

11   A.  That's correct.

12   Q.  Let me show you Defendants' 17, Mr. Aldinger.

13   (Tendered.)

14  BY MR. KAVALER:

02:02:07  15   Q.  And I'll ask you whether these are the minutes of the 2001

16  annual meeting of shareholders, the same meeting at which we

17  just listened to Ms. Goodrich advance her proposal?

18   A.  Yes, they are.

19        MR. KAVALER:  I offer Defendants' 17, your Honor.

02:02:35  20        THE COURT:  Admitted.

21  BY MR. KAVALER:

22   Q.  Turn to page ending at 391, Mr. Aldinger.

23        Do you see the third paragraph there, The chairman

24  next announced the results of the voting.  That's you, isn't

02:02:51  25  it?

Aldinger - cross

3169

1    A.   That's correct.

2    Q.   By reporting that over 90 percent of shares voting voted

3    for the election of directors, against the shareholder

4    proposal and for the appointment of Arthur Andersen as the

02:03:03  5    corporation's independent public accountant for the year 2001.

6         Do you see that?

7    A.   I do.

8    Q.   Let's take those three votes separately.   The shareholders

9    elect directors every year?

02:03:15  10   A.   Yes, they do.

11   Q.   Do they elect you, sir?

12   A.   They do.

13   Q.   Do they elect you after seeing this proxy statement that

14   we looked at a minute ago?

02:03:24  15   A.   Yes, they do.

16   Q.   Let's go back to the proxy statement for a minute.   And

17   that's Exhibit 360.

18        And let's look at page 11, Compensation philosophy

19   and goals.   And in this document, sent to all the shareholders

02:04:08  20   and filed with the SEC, that paragraph says, Our corporate

21   goal is to link compensation to financial performance.   We

22   designed our compensation programs so that base salaries are

23   generally competitive with our comparator group(22 companies,

24   all in the S & P Financials) with substantially higher

02:04:33  25   earnings potential on bonus and long-term compensation if we

Aldinger - cross

3172

1   A.  Correct.

2   Q.  And they voted for the appointment of Andersen as the

3   company's auditors?

4   A.  Yes.

02:06:22  5   Q.  Look at the next page, 392.

6       This tells how many votes every person received.

7       Do you see that?

8   A.  Yes.

9   Q.  You got 417 thousand 137, 528 votes?

02:06:37 10   A.  I think it was million.

11   Q.  I'm sorry?

12   A.  417 million.

13   Q.  Numbers are not my thing, Mr. Aldinger.  I stand

14   corrected, 417 million votes.

02:06:47 15       And withheld is votes that were not given to you?

16   A.  That's correct.

17   Q.  And that was about 2 million?

18   A.  Right.

19       MR. DROSMAN:  Objection, your Honor, leading.

02:06:55 20       MR. KAVALER:  I'll rephrase.

21   BY MR. KAVALER:

22   Q.  Did you get all the votes, Mr. Aldinger?

23   A.  I did not.

24   Q.  How many did you not get?

02:06:59 25   A.  2,082,098.

Aldinger - cross

1   Q.  And below that it tells us about the vote on

2   Ms. Goodrich's proposal, correct?

3          MR. DROSMAN:  Objection, your Honor, leading.

4   BY MR. KAVALER:

02:07:08  5   Q.  What appears immediately below that on the page,

6   Mr. Aldinger?

7   A.  The results of the vote on the shareholder proposal.

8   Q.  And what were the results?

9   A.  For, about 18 million; against, 350 million -- and I'm

02:07:22 10   rounding here -- and abstain, about 6.6 million.

11   Q.  Okay.  And the following year, Mr. Aldinger -- the same

12   sort of thing happens every year; there was a proxy statement?

13   A.  Yes, it does.

14   Q.  It was mailed out?

02:07:44 15   A.  In the March time frame, yes.

16   Q.  Okay.  Let's look at Defendants' 99.  A copy for counsel.

17          A copy for you, Mr. Aldinger.

18   (Tendered.)

19   BY MR. KAVALER:

02:07:58 20   Q.  Is this the proxy statement for the 2002 annual meeting?

21   A.  Yes, it is.

22   Q.  Was Ms. Goodrich's proposal submitted to the shareholders

23   again?

24   A.  Yes, it was.

02:08:11 25   Q.  Let's look at page --

Aldinger - cross

3174

1          MR. KAVALER:  I'm sorry, your Honor.  I offer

2     Defendants' 99 in evidence.

3          THE COURT:  Admitted.

4          MR. KAVALER:  Thank you, your Honor.

02:08:20  5  BY MR. KAVALER:

6     Q.  Let's look at page ending in 277.  You'll see on the

7     left-hand side there, it says Stockholder Proposal.  And you

8     see in the right-hand column, it's got a bunch of -- starting

9     in the left-hand column and carrying over into the right,

02:08:44 10    there are a bunch of whereases.

11    A.  Yes.

12    Q.  And then go to page 278 and it says Management Statement.

13         Do you see that?

14    A.  Yes.

02:08:53 15    Q.  It's essentially the same proposal again?

16    A.  Yes, it is.

17    Q.  By the same shareholder?

18    A.  Yes.

19    Q.  Opposed by management again?

02:09:00 20    A.  Yes.

21    Q.  Notice given to all shareholders?

22         MR. DROSMAN:  Objection, leading.

23         THE COURT:  Sustained.

24    BY MR. KAVALER:

02:09:07 25    Q.  To whom was notice given?

Aldinger - cross

3175

1   A.  All shareholders.

2   Q.  Who does that include?

3   A.  It includes all the people represented by the plaintiffs

4   here.

02:09:14  5   Q.  And was it brought up for a vote at the annual meeting?

6   A.  Yes, it was.

7   Q.  Was it defeated?

8   A.  Yes, it was.

9   Q.  By what vote?

02:09:24 10   A.  I believe about 65 percent.

11   Q.  All right.  Let's look at Defendants' 309.  A copy for

12   counsel.

13       A copy for you, Mr. Aldinger.

14   (Tendered.)

02:09:41 15   BY MR. KAVALER:

16   Q.  Is this document the minutes of the 2002 annual meeting?

17   A.  Yes, it is.

18       MR. KAVALER:  Your Honor, I offer 309 in evidence,

19   Defendants' 309.

02:09:52 20       THE COURT:  Admitted.

21       MR. KAVALER:  And I should have said this, your

22   Honor.  Defendants' 99, the proxy for this year, is tab three

23   in the jury's binder, your Honor.

24   BY MR. KAVALER:

02:10:14 25   Q.  All right.  And let's look at 309 now in evidence.  Turn

Aldinger - cross

3176

1      to the second page, 915.

2              Do you see that?

3              Page ending in 915, Brian. Or 916.

4              There you go. No, back a page.

02:10:50  5              Okay. Focus on the paragraph in the middle of the

6      page, The chairman next announced the results of the voting by

7      reporting that the requisite majorities of shares voting voted

8      for the election of the directors, against the shareholder

9      proposal and for the appointment of KPMG LLP as the

02:11:09 10    corporation's independent public accountant for the year 2002.

11             Do you see that?

12     A.  I do.

13     Q.  Tell me what that means the shareholders did.

14     A.  Well, they reelected the directors, they voted against the

02:11:20 15    shareholder proposal, and they reelected -- or elected for the

16     first time KPMG as the auditor.

17     Q.  Different accounting firm?

18     A.  Different accounting firm.

19     Q.  Changing accounting firms requires a shareholder vote?

02:11:31 20    A.  Yes, it does.

21     Q.  Were you reelected this year as well?

22     A.  Yes, I was.

23     Q.  After the shareholders again received a proxy statement

24     containing information about your compensation?

02:11:41 25    A.  Yes.

Aldinger - cross

1    board; and he was also head of the audit committee.

2    Q.   Is there any conflict because Mr. Levy is a retired KPMG

3    partner and he's the head of your audit committee, is there

4    any conflict with hiring KPMG?

5    A.   We didn't think so because he had been retired for a

6    number of years.

7    Q.   Okay.

8    A.   And we suggested it.  He did not.  So we felt better about

9    that.

10   Q.   Now, we saw the proxy statement.  The shareholders voted

11   to retain Andersen -- KPMG?

12   A.   Yes, they did.

13   Q.   And KPMG came in and began work?

14   A.   Yes.

15   Q.   What did they do?

16   A.   They went in and basically looked at our financial

17   statements all the way back to 1994.  So they looked at

18   basically a period '94 through the second quarter of '02.  So

19   quite a long period of time.

20   Q.   You understand that that's normal when a new auditor comes

21   in?

22   A.   Yes.  We expected that would happen and understood it

23   would happen.  And it was very expensive.  It cost millions of

24   dollars and took a long time, several months.

25   Q.   But you personally, Mr. Aldinger, knew that they would do

Aldinger - cross

3216

1    that when they --

2    A.   Yes, I did.

3    Q.   Were you concerned that in bringing in a new auditor, they

4    might discover whatever misdeeds you had been doing and

5    misdeeds that Andersen had been covering up for years?

6    A.   No, I was not.

7    Q.   Why not?

8    A.   Because I think we do the right thing.  I know we do the

9    right thing.  And we had relied as well on Andersen

10   throughout.

11   Q.   And KPMG came in and conducted this audit going back to

12   1994?

13   A.   That's correct.

14   Q.   With what results?

15   A.   Well, it resulted in a dispute between Arthur Andersen,

16   who had audited us for decades, and KPMG on the four credit

17   card contracts that you have heard about over the last few

18   days.  And the basic dispute was that Arthur Andersen had

19   reviewed -- had their highest technical people review and had

20   supported basically amortizing expenses for those credit cards

21   over three or four years.

22        KPMG came back and, in my view, a little bit like a

23   Monday morning quarterback and said many years after, well, we

24   think you ought to charge that off in one year, not three or

25   four years.  And so the result would be that in all of those

Aldinger - cross

1    given years, you would have not expensed enough.

2           So the company had a dilemma of, we've got one

3    accountant telling us it's okay, one accountant telling us

4    it's not okay.  Lou Levy, the head of audit, certainly Dave

5    and myself, we didn't really agree with KPMG.  But the problem

6    is that in the end, we couldn't go back, fire KPMG and put

7    Arthur Andersen back in place.  And we had to make a decision.

8    And if KPMG was going to sign our statements, we had to

9    essentially agree to their view of the world.

10   Q.  Was it important to you that KPMG sign your statements?

11   A.  It was, because of the liquidity issue I mentioned before.

12   Essentially we issue paper every day in the marketplace and

13   frequently are issuing notes and longer-term bonds.  And you

14   can't do that without certified financial statements.

15          So while everybody can say it's your accounting,

16   that's true.  And we do actually have to be the people who

17   sign the accounts.  In the end, it's with consultation with

18   your auditors and with advice from the outside auditors.  And

19   here we had a dispute.

20          So my view is, fire them and go back to Arthur

21   Andersen.  Couldn't do that.  Couldn't bring in a new firm and

22   wait four more months.  And in the end, we decided that for

23   shareholders, we couldn't risk becoming illiquid while we

24   debated this issue out.  So we agreed to effectively restate.

25   Q.  So in the years that Andersen was your auditor, did you

Aldinger - cross

3218

1   take Andersen's advice?

2   A.  We did.

3   Q.  And in the years that KPMG was your auditor, did you take

4   KPMG's advice?

5   A.  We did.

6   Q.  Did you understand exactly what the difference was between

7   Andersen and KPMG?

8   A.  I did.

9   Q.  All right.  What business unit did this problem arise in?

10          MR. KAVALER:  You want me to quit, your Honor?

11          THE COURT:  Well, go ahead and finish.

12          MR. KAVALER:  I'll finish this topic momentarily.

13  BY MR. KAVALER:

14  Q.  What business unit did this problem arise in?

15  A.  This was in the Visa/MasterCard business.

16  Q.  Let's put up Plaintiffs' Demonstrative 37.  Can we do

17  that?

18          You see this chart that the plaintiffs prepared,

19  Mr. Aldinger?

20  A.  I do.

21  Q.  The unit in the middle there, consumer lending, that's

22  Mr. Gilmer's unit?

23  A.  That's Mr. Gilmer's unit, yes.

24  Q.  Where do I look to find the unit where the problem that

25  gave rise to the restatement occurred?

Aldinger - cross

3219

1    A.  I would look to the very far right, credit card services,

2    where we had 17-plus billion dollars of loans.

3    Q.  And Mr. Gilmer had nothing to do with that unit?

4    A.  He had nothing to do with that unit.

5    Q.  Did he have anything to do with the decisions to restate?

6    A.  He did not.

7         MR. KAVALER:  Your Honor, this would be a good time

8    to break.

9         THE COURT:  Very well.  Let's take our afternoon

10   break, ladies and gentlemen.  15 minutes.

11   (Jury out.)

12        THE COURT:  You may step down, sir.

13        Okay.  We're on break.

14   (Recess taken.)

03:20:38 15        THE COURT:  Ready for the jury?

16        MR. KAVALER:  Yes, your Honor.

17        THE COURT:  Very well.

18   (Jury enters courtroom.)

19        THE CLERK:  Please be seated.

03:21:44 20        THE COURT:  You may resume.

21        MR. KAVALER:  Thank you, your Honor.

22   BY MR. KAVALER:

23   Q.  Mr. Aldinger, just before we broke, I asked you a

24   question.  I wasn't sure I heard your answer, or if I did, I

03:22:00 25   might have misheard it.

Aldinger - cross

3220

1          My question was did you understand all the details of

2   this argument between Arthur Andersen and KPMG?

3   A.  I think I'm fluent with the argument, but I'm not an

4   accountant to be in a position to decide who's the ultimate

03:22:19  5   right answer.

6   Q.  Did you rely on the accountants, the outside accountants,

7   for this?

8   A.  I did.

9   Q.  Now, when you announced -- when the company announced the

03:22:30  10   restatement, was there a reaction in the market reflected in

11   the price of the company's stock?

12   A.  Yes, there was.

13   Q.  And what happened to the stock?

14   A.  It went up.

03:22:40  15   Q.  Do we have a demonstrative that shows that process?

16   A.  I believe we do.

17   Q.  Can we look at DDX 230-02?

18          What does this demonstrative show us, Mr. Aldinger?

19   First of all, what is the date 8-13, 2002?

03:22:57  20   A.  That's the day before the announcement.

21   Q.  What is 8-14-02?

22   A.  That's the date of the announcement.

23   Q.  What's 8-15-02?

24   A.  The day after the announcement.

03:23:05  25   Q.  And what does this show the stock market -- the price of

Aldinger - cross

3235

1    have a weak environment, credit usually gets worse, people

2    lose jobs, can't pay their -- their loans, and that's expected

3    in that period.

4         So for those three reasons, we were being hit pretty

03:39:33  5    hard.

6    Q.  Let's look at Defendant's Exhibit 558.  Copy for counsel,

7    copy for you, Mr. Aldinger.  This is from Salomon Smith Barney

8    August 14, also about Household International.

9         Is that another analyst report about your company,

03:39:46 10    sir?

11    A.  Yes, it is.

12         MR. KAVALER:  Your Honor, I offer Defendants' 558

13    subject -- excuse me, your Honor -- subject to the same

14    limiting instruction.

03:39:54 15         THE COURT:  It's admitted.

16    (Defendants' Exhibit 558 received in evidence subject to a

17    limiting instruction.)

18         MR. KAVALER:  Ladies and gentlemen of the jury,

19    that's at tab 9 in your binders.

03:40:01 20    BY MR. KAVALER:

21    Q.  This is also dated August 14, 2002, Mr. Aldinger, correct?

22    A.  Yes, it is.

23    Q.  Turn to page 2, ending in 444.

24         Look at the paragraph under the three bullets.  It

03:40:20 25    says, "It appears to us that Household's previous accounting

Aldinger - cross

3236

1    treatment was consistent with the rules at the time they were

2    enacted, given that they were blessed repeatedly over the

3    years by Household's previous auditor, Andersen."

4            Do you agree with that, Mr. Aldinger?

03:40:34 5    A.  Yes, I do.

6    Q.  "In one case, the company even received such a blessing

7    from the senior technical person at Andersen that wrote the

8    conclusion on the new accounting policy that suggested that

9    the accounting practice would be grandfathered in under the

03:40:47 10   old then-existing rules."

11           Do you agree with that, Mr. Aldinger?

12   A.  I do.

13   Q.  "While Household could have been more conservative by

14   adopting the new accounting policies even though it didn't

03:40:57 15   have to, we believe a reasonable case can be made for the

16   course of action it took."

17           Do you agree with that?

18   A.  I do.

19   Q.  Okay.  Let's go to Exhibit Number 565.  Copy for counsel,

03:41:28 20   copy for you, Mr. Aldinger.  This is also dated August 15, the

21   next day, Household International by U.S. Bancorp Piper

22   Jaffray.

23           Is that another analyst report on your company?

24   A.  Yes, it is.

03:41:42 25           MR. KAVALER:  Your Honor, I offer 565 subject to the

TAB 22

3282

1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
2                            EASTERN DIVISION

3    LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all     )
4    others similarly situated,      )
                                     )
5              Plaintiff,            )
                                     )
6       vs.                          )    No. 02 C 5893
                                     )
7    HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )    Chicago, Illinois
8                                    )    April 22, 2009
               Defendants.          )    9:10 a.m.
9
                              VOLUME 16
10                  TRANSCRIPT OF PROCEEDINGS - TRIAL
            BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:          COUGHLIN STOIA GELLER RUDMAN &
                                 ROBBINS LLP
14                               BY:  MR. LAWRENCE A. ABEL
                                      MR. SPENCER A. BURKHOLZ
15                                    MR. MICHAEL J. DOWD
                                      MR. DANIEL S. DROSMAN
16                                    MS. MAUREEN E. MUELLER
                                 655 West Broadway
17                               Suite 1900
                                 San Diego, California  92101
18                               (619) 231-1058

19                               COUGHLIN STOIA GELLER RUDMAN &
                                 ROBBINS LLP
20                               BY:  MR. DAVID CAMERON BAKER
                                      MR. LUKE O. BROOKS
21                                    MR. JASON C. DAVIS
                                      MS. AZRA Z. MEHDI
22                               100 Pine Street
                                 Suite 2600
23                               San Francisco, California  94111
                                 (415) 288-4545
24

25

Aldinger - cross

3288

1    elaborate process that each business unit had its own team,

2    worked up to the corporate team, and then eventually to the

3    final work product which was approved by the outside

4    accountants.

09:17:05   5    Q.  You mentioned each of these five separate businesses.  Can

6    you give us some idea of the order of magnitude of the size

7    that each of these five separate businesses would be if it was

8    a freestanding company, if it wasn't part of Household?

9    A.  Now, each of these five businesses, were they separate and

09:17:21  10    public, would have been a Fortune 500 company on its own.

11    Q.  And --

12    A.  So effectively we had five Fortune 500 companies that we

13    were accounting for here.

14    Q.  What does it mean to be a Fortune 500 company?

09:17:32  15    A.  It means you're one of the 500 largest companies in

16    America.  So each of these on their own, if they were outside

17    of our company, would have been one of the 500 largest

18    companies in America.

19    Q.  And where did Household itself with all these companies in

09:17:45  20    it rank on that list?

21    A.  I think from an earnings perspective in this class period,

22    we would have been in the top hundred or so companies in the

23    United States.

24    Q.  Now, that's how you control things on the financial side.

09:17:58  25         How did you control things or cause people to be in

Aldinger - cross

3333

1    A.  Yes, I did.

2    Q.  What did you say to them?

3    A.  I said that unless we could get a global settlement of 48

4    AGs, we wouldn't do any settlement.

10:14:22  5    Q.  Was there a time when you had to authorize certain

6    activities to cause additional attorneys general to join the

7    team that was opposing Household?

8    A.  Yes.

9    Q.  What did you authorize?

10:14:32  10    A.  What I authorized was our government relations team to go

11    out with some outside lawyers and we also hired a number of

12    former attorneys general to come out and work with us and

13    approach the other attorneys general around the country and

14    ask them to join in this --

10:14:48  15          MR. DROSMAN:  Objection, hearsay.

16    BY MR. KAVALER:

17    Q.  Are these the instructions you gave?

18    A.  These are the instructions I gave.

19          THE COURT:  Overruled.

10:14:56  20    BY MR. KAVALER:

21    Q.  Please continue, Mr. Aldinger.

22    A.  And so we asked them to go out and approach the attorneys

23    general and try to sign up effectively 48 of the AGs.  And

24    ultimately, in order to get broader participation, we actually

10:15:15  25    had to go out and we offered to pay each of the attorneys

Aldinger - cross

3386

1                But, then, we come here with what is probably the

2        last of the defense -- defendants -- to testify; and, the last

3        15, 20, 30 minutes of his testimony is spent describing the

4        process, the analysis, the motivations for agreeing to the

11:39:37  5        settlement.  All the things that we had ruled could not be

6        gone into by the plaintiffs are now brought out by the defense

7        before the jury.

8                And if, indeed, the sole reason for filing that

9        motion in limine was to get the Court to rule that this

11:39:58 10        information was not admissible, was to gain a tactical

11        advantage so that the plaintiffs couldn't bring it out, but

12        the defense would be the first to bring it out in its

13        examination of the witnesses, I feel my time has been poorly

14        utilized.

11:40:10 15                MR. KAVALER:  Your Honor, let me assure you that was

16        not our purpose.  Our feeling is exactly the opposite.  We

17        feel we have not gotten the benefit of our victory because

18        it's been undermined, eroded and chipped away at by the

19        plaintiffs.

11:40:21 20                For example, they've shown Plaintiffs' 550 to a

21        number of witnesses.  This is a document concerning settlement

22        discussions.

23                They've asked each of their witnesses -- each of

24        their expert witnesses -- to comment about the -- we've had

11:40:30 25        this conversation previously on the record, your Honor.  I'm

Aldinger - cross

3388

1    detriment; and, when we tried to raise that with your Honor,

2    your Honor said what I read before.

3           And we specifically told the Court, prior to the

4    testimony of Mr. Detelich, that this very scenario would

11:41:49  5    arise.

6           And, your Honor, you recall I said to you, "I don't

7    want to be told later by them, you know, that I didn't know

8    this was coming."

9           And you said, "Well, now that you've said that, they

11:41:56  10   can't say it."

11          And, now, in effect, I'm being told it, albeit not by

12   them.

13          I mean, I just, your Honor, feel that our perspective

14   is we are responding to a door opening by the other side,

11:42:06  15   particularly by the repeated use of 550, which we had no

16   choice about.

17          We certainly would have preferred, your Honor -- this

18   was anything but tactical; we would have preferred -- that

19   this entire subject remain as your Honor ruled, but we felt

11:42:17  20   your Honor's rulings have been undermined and eroded, and we

21   were left with no choice.

22          THE COURT:  Okay.

23          Well, I've made my point.  I think the record is

24   pretty clear on this.  My rulings were very narrow and strict

11:42:30  25   with respect to the use of that information.  And they have

Aldinger - redirect

3441

1    A.  Not there.

2    Q.  You didn't tell investors that you actually re-aged

3    automatically, did you?

4    A.  It doesn't say that.

01:35:55 5    Q.  Okay.  You know that this was materially false and

6    misleading, don't you?

7    A.  I understand it was incorrect at the time.

8    Q.  My question is, sir, you understand that this is

9    materially false and misleading, correct?

01:36:09 10    A.  You could say that.

11    Q.  No, sir.  I'm asking you a question.

12        Do you understand that this is materially false and

13    misleading?

14    A.  I'll accept that characterization.

01:36:21 15    Q.  Is that a yes, sir?

16    A.  Yes.

17    Q.  Let's take a look at a document that's Exhibit 1267 for

18    identification, Plaintiffs'.

19        You know what this is, right, sir?

01:36:54 20    A.  Yes, I do.

21        MR. DROSMAN:  This is Plaintiffs' Exhibit 1267.  We

22    move it into evidence if it's not already in.

23        It's in evidence, your Honor.  I apologize.

24    BY MR. DROSMAN:

01:37:09 25    Q.  This is your 10-K/A, right?

Aldinger - redirect

3442

1    A.   That's correct.

2    Q.   And the 10-K stands for 10-K, and the A stands for

3    amended, right?

4    A.   That's correct.

01:37:17  5    Q.   This is a 10-K that you filed in March of 2003, right?

6    A.   That's correct.

7    Q.   Okay.  And it contains some different information about

8    your re-aging, doesn't it?

9    A.   Yes, it does.

01:37:29 10    Q.   It contains the correct information, doesn't it?

11    A.   It contains revised and correct information.

12    Q.   Okay.  And you waited a year, right, because this is

13    March 19th, 2003, is that right?

14    A.   It is.

01:37:41 15    Q.   So you waited a year to tell investors the truth about

16    your re-aging, is that right, sir?

17    A.   That's when we filed the return.  I guess that would be

18    right.

19    Q.   Okay.  Because the nitty-gritty, apparently your team

01:37:54 20    didn't pick that up for a year, right?

21    A.   We filed it when we filed it.  I can't add any more than

22    that.

23    Q.   You signed this document, too, right, sir?

24    A.   Yes, I did.

01:38:04 25    Q.   Go, if you would, turn to page ending 552.

Aldinger - redirect

3456

```
         1   A.  Okay.

         2   Q.  Why don't I show you what we'll mark as Exhibit 516 for

         3   identification.

         4        Exhibit 516 is an e-mail string, right, sir?

01:54:17 5   A.  It is.

         6   Q.  And the subject is discussion framework, correct?

         7   A.  I don't see that.

         8   Q.  If you look to the right on the subject line of every

         9   e-mail?

01:54:31 10  A.  Discussion framework, got it.

         11  Q.  And the date of the bottom e-mail is 6-29, 2002, correct?

         12       I'm sorry, 6-28, 2002.  It's to the left of the

         13  subject.

         14  A.  I see 6-29, 2002.

01:54:53 15       MR. DROSMAN:  Okay.  Plaintiffs move Exhibit 516 into

         16  evidence.

         17       MR. KAVALER:  Your Honor, we renew our objection for

         18  the record, subject to the motion in limine.

         19       MR. DROSMAN:  I can ask some additional foundation

01:55:19 20  questions, your Honor.

         21       THE COURT:  Yes.

         22  BY MR. DROSMAN:

         23  Q.  Okay.  And you understand that this particular e-mail was

         24  sent from a person named David Huey, right?

01:55:29 25  A.  That's what that says.
```

Aldinger - redirect

3457

1    Q.    And you know who David Huey is, right?

2    A.    Well, I see here who David Huey is.

3    Q.    He was the representative for all the multi-state attorney

4    generals, right?

01:55:42  5    A.    He would have been one of them.

6    Q.    Okay.  And it was sent to a person at Household, correct?

7    A.    That's right.

8    Q.    A woman named Kay Curtin, is that correct?

9    A.    Yes.

01:55:53 10    Q.    Okay.  And then it was forwarded by Ms. Curtin, correct?

11    A.    Right.

12    Q.    And it was forwarded to a whole host of people at

13    Household, right?

14              A JUROR:  Judge --

01:56:01 15              THE COURT:  Can't hear?

16              A JUROR:  Excuse me.  I have to use the restroom.

17              THE COURT:  Well, it's a good time to take a break, I

18    think.  We'll take a break for 15 minutes, folks.

19              THE COURT:  Why don't you folks file out, and we'll

01:56:27 20    have someone waiting for you in the back.

21    (Jury exits courtroom.)

22              THE COURT:  Let me know when you're ready.

23              You may step down if you wish.

24              Why don't you, before we take 15 minutes, which you

01:57:09 25    might as well take along with the jury, tell me what this

Aldinger - redirect

3459

1    negotiations and ultimate settlement have been put into play

2    by this witness's prior testimony as to each and every one of

3    those things, and since the representation is that this goes

4    to rebut that testimony and that this document relates

01:59:00  5    directly to those issues, it is and will be allowed into

6    evidence, assuming the proper foundation is established.

7              Okay, 15 minutes, folks.

8        (Recess from 1:59 to 2:10 p.m.)

9              THE COURT:  Folks ready?

02:10:44 10              MR. KAVALER:  Ready, your Honor.

11              THE COURT:  All right.  Bring the jury.

12              MR. DROSMAN:  Ready, your Honor.

13              MR. KAVALER:  Sorry about being late getting back

14    here.  Didn't know you were here.  Fooled us.

02:10:59 15              THE COURT:  Once again.

16              MR. KAVALER:  Once again.

17        (Jury enters courtroom.)

18              THE CLERK:  Please be seated.

19              THE COURT:  You may resume.

02:12:39 20    BY MR. DROSMAN:

21    Q.  When we broke, Mr. Aldinger, we were talking about

22    Exhibit 516.  Do you have that before you?

23    A.  I do.

24    Q.  Okay.  And I had asked you whether Ms. Curtin had sent it

02:12:51 25    to a host of people at -- this particular e-mail to a host of

Aldinger - redirect

3460

1    people at Household, right?

2    A.  Yes.

3    Q.  And, in fact, she sent it to Gary Gilmer, right?

4    A.  That's correct.

02:13:01  5    Q.  She sent it to James Kauffman, correct?

6    A.  Correct.

7    Q.  Lisa Sodeika, is that right?

8    A.  Yes.

9    Q.  And Megan Hayden-Hakes, is that correct?

02:13:12 10    A.  I'm not seeing --

11    Q.  She's, I think, right after Ms. Sodeika -- I'm sorry --

12    right before Ms. Sodeika.

13    A.  Yes.  I see that.

14    Q.  And that was on 6-29, 2002, is that right?

02:13:27 15    A.  That's right.

16         MR. DROSMAN:  Plaintiffs offer Exhibit 516 into

17    evidence.

18         MR. KAVALER:  Objection.  Lack of foundation.  No

19    connection to this witness.

02:13:39 20         THE COURT:  Overruled.

21    (Plaintiffs' Exhibit 516 received in evidence.)

22    BY MR. DROSMAN:

23    Q.  Okay.  Sir, you mentioned on your direct-examination that

24    you talked to folks about the settlement, right?

02:13:51 25    A.  That's right.

Aldinger - redirect

3461

1    Q.  About the negotiations that preceded the settlement,

2    right?

3    A.  That's right.

4    Q.  You kept yourself in the loop, didn't you?

02:13:58  5    A.  I kept myself in the loop.

6    Q.  You were concerned about this issue, weren't you?

7    A.  Yes.

8    Q.  You spoke to Mr. Kauffman about it, right?

9    A.  I don't remember if it was Mr. Kauffman or not, but --

02:14:10  10    Q.  You had a whole team of people that you told us you gave

11    instructions to this morning, right?

12    A.  We did, yes.

13    Q.  And Mr. Kauffman was one of them, right?

14    A.  Well, he would have been one of them.  I'm not sure he was

02:14:19  15    the lead one, but --

16    Q.  Okay.  Now, if you would, turn to page 308, and you see

17    that there was an attachment to this e-mail, right?

18    A.  I do.

19    Q.  And the attachment contains the heading Framework For the

02:14:34  20    Discussion of Issues Concerning Lending Practices of Household

21    International, Inc.

22         Do you see that?

23    A.  Yes, I do.

24    Q.  And then it says, "A number of states, through their

02:14:45  25    attorney general's offices and through their financial

Aldinger - redirect

3463

1   Q.   And, "C, to provide other appropriate relief to the

2   states," right?

3   A.   Yes.

4   Q.   And then there's a heading right below that that says

02:16:03   5   Patterns and Practices.

6        Do you see that?

7   A.   I see that.

8   Q.   And that reads, "The following list sets forth the

9   significant patterns and practices the states have identified.

02:16:12   10   While all of these practices do not occur with every loan, the

11   practices are national in scope and not confined to a single

12   state or branch office."

13        Do you see that?

14   A.   I see that.

02:16:21   15   Q.   So you understood at least that the attorney generals were

16   saying or attorneys general were saying that, when they said

17   it was national in scope, that it was widespread, right?

18   A.   Well, that's posturing.  I'm not sure that because they

19   say it I agree with that or understand that.

02:16:36   20   Q.   Well, you understood that's what they told Household,

21   correct, sir?

22   A.   That's what it says.

23   Q.   Okay.  You understood this, right?

24   A.   Well, I didn't see this before.

02:16:44   25   Q.   So you never saw this, right?

Aldinger - redirect

3464

1  A.  No.

2  Q.  Nitty-gritty?

3  A.  Not nitty-gritty.  I just never saw it.  It was

4  preliminary and obviously wasn't to a level where they wanted

02:16:52  5  to involve me.

6  Q.  And then it continues on -- oh, when they talk about not

7  confined to a single state or branch office, you understood

8  they were saying that Household's predatory lending practices

9  were not isolated, right?

02:17:06  10  A.  Well, those are your words.  I don't agree that we had

11  predatory lending practices.

12  Q.  Well, what they said is the significant patterns and

13  practices that they had identified.  You understood that those

14  were not isolated, right?

02:17:19  15  A.  That's what that says.  I don't see anything about

16  predatory lending on there.

17  Q.  Well, let's -- fair point.  Let's take a look at what

18  patterns and practices they identified, shall we?

19        So the first one has a heading 1, do you see that?

02:17:34  20  A.  I do.

21  Q.  It says, "Splitting loans into a closed-end home equity

22  and a spurious open-end loan."

23        Do you see that?

24  A.  I see that.

02:17:44  25  Q.  You've heard of loan splitting?

Aldinger - redirect

3465

1    A.   I have.

2    Q.   You understood that's what the attorney generals said that

3    Household engaged in, right?

4    A.   I'm not sure I see that, but -- I'm not sure I interpret

02:17:57  5    it the same way, but they're saying split loans.

6    Q.   Right.  You don't interpret this as loan splitting?

7    A.   Well, no, we had -- we had multiple loans, so I'll accept

8    what it says.

9    Q.   Right.

02:18:11  10        I'm asking you if you understand that the attorney

11    generals were saying that you engaged in loan splitting.  Did

12    you understand that?

13    A.   That's what they were saying there, and I'm not sure

14    whether that's accurate or posturing, but that's what they

02:18:20  15    were saying there.  I agree with that.

16    Q.   And when they say "spurious open-end loan," you understand

17    what that means, right?

18    A.   I'm not sure how I interpret that.

19    Q.   You don't know what spurious open-end loan means?

02:18:39  20    A.   I've not heard the term used that way.

21    Q.   Do you know what spurious means?

22    A.   No, I'm not sure I do.

23    Q.   Okay.  What it means, sir, is they were saying your

24    open-ended loan was false, wasn't it?

02:18:49  25        MR. KAVALER:  Objection, your Honor, form.

Aldinger - redirect

3466

1          THE COURT:  Sustained as to form.

2     BY MR. DROSMAN:

3     Q.  You understand that spurious open-ended loan means a

4     false, an unnecessary open-ended loan, right?

02:18:59  5     A.  That's what that says.

6     Q.  Okay.  And that's what the attorney generals were -- the

7     attorneys general were telling you, right?

8     A.  Yes.  That's what they --

9          MR. KAVALER:  Objection to the form, your Honor.

02:19:08 10     Asking him to interpret the document, that's fine.

11     BY THE WITNESS:

12     A.  -- that's what they're saying there.

13          MR. KAVALER:  The witness testified he never saw the

14     document before.

02:19:16 15          THE COURT:  I'm sorry, so what's the objection?

16          MR. KAVALER:  The objection is he keeps changing the

17     task.  It's one thing to ask him to read the document and say

18     what he thinks it means.  When he says in the past tense, he's

19     implying that the witness saw the document, and the witness

02:19:27 20     has testified without contradiction he never saw the document.

21          THE COURT:  If you'll object at the point in time

22     that the improper question is asked, I will make a ruling on

23     it.

24          MR. KAVALER:  I thought that was the improper

02:19:38 25     question.

Aldinger - redirect

3467

|  |  |
|---|---|
| 1 | THE COURT:  Which was? |
| 2 | MR. KAVALER:  Which was -- |
| 3 | THE COURT:  What was the question? |
| 4 | MR. DROSMAN:  I'll just withdraw the question, your |
| 02:19:51  5 | Honor, and ask another one. |
| 6 | THE COURT:  Okay, the question's withdrawn. |
| 7 | MR. KAVALER:  That will work. |
| 8 | BY MR. DROSMAN: |
| 9 | Q.  Okay.  Sir, you understood that the attorney generals -- |
| 02:19:58  10 | the attorneys general were telling Household that Household |
| 11 | engaged in loan splitting, right? |
| 12 | MR. KAVALER:  Objection, your Honor.  There's the |
| 13 | "understood" right there. |
| 14 | THE COURT:  Your objection is to -- |
| 02:20:09  15 | MR. KAVALER:  My objection is by understood, he's |
| 16 | implying the witness saw the document at the time, and the |
| 17 | uncontradicted testimony is the witness did not see the |
| 18 | document.  If he says understand, it speaks to the present |
| 19 | context -- |
| 02:20:20  20 | THE COURT:  I'll sustain the objection as to form. |
| 21 | MR. KAVALER:  Thank you, your Honor. |
| 22 | BY MR. DROSMAN: |
| 23 | Q.  Okay.  You didn't see this document because this is |
| 24 | nitty-gritty, right, sir? |
| 02:20:25  25 | A.  It's not because it's nitty-gritty.  They brought me |

Aldinger - redirect

3468

1    things when they were in more final form and they needed an

2    input or a decision from me, so I did not see this document.

3    Q.  You don't have any doubt that Mr. Gilmer saw the document,

4    do you?

02:20:37  5    A.  No, I don't.

6    Q.  And you don't have any doubt that Ms. Hayden-Hakes saw the

7    document, do you?

8    A.  They were copied.  I believe they saw it.

9    Q.  Okay.  So you understand as you sit here today, sir, that

02:20:46  10   the attorneys general were telling Household that they engaged

11   in nationwide and systemic loan splitting, don't you?

12   A.  That's what that says there.

13   Q.  Okay.  The next heading there -- oh, before we get to

14   that, let's look at the last sentence under loan splitting.

02:21:02  15        It says, "Household misleads consumers into believing

16   that these credit lines will fully amortize if the minimum

17   monthly payments are made when, in fact, a large balloon

18   payment will be required to pay off the loan at the end of the

19   term."

02:21:18  20        Do you see that?

21   A.  I see that.

22   Q.  So you understand that the attorneys general were -- was

23   telling Household that they mislead consumers?

24   A.  That's what that says.

02:21:27  25   Q.  Okay.  Let's look at No. 2, misrepresenting the loan fees.

Aldinger - redirect

3469

1          Do you see that?

2    A.  I do.

3    Q.  And that reads, "Household misrepresents to consumers the

4    fees and transaction costs associated with the loan and the

02:21:40  5    purpose of these fees and costs, including, for example," the

6    first bullet point there is "Household's discloses as

7    'discount fees' charges that are not bona fide discount fees;

8    that is, they're not used to 'buy down' the interest rate, nor

9    are consumers informed that paying a discount fee should

02:22:02  10    result in a reduced interest rate."

11          Do you see that?

12    A.  I see that.

13    Q.  So you understand that that was what the attorney generals

14    were telling Household back in June of 2002, is that right?

02:22:13  15    A.  That's what they were saying.  Not clear that we agreed

16    with that.

17    Q.  The next bullet point says, "Household discloses these

18    fees in the good-faith estimate using a wide dollar range for

19    the proposed loan that is misleading especially when the fees

02:22:29  20    is consistently"-- "it consistently imposes vary within a much

21    narrower range (approximately 7.25 points for loans and 5

22    points for lines of credit.)"

23          Do you see that?

24    A.  I do.

02:22:41  25    Q.  And then let's look at the No. 3.  No. 3 says,

Aldinger - redirect

1    "Misrepresenting rate of interest and amount of monthly

2    payments to consumers."

3              Do you see that?

4    A.   I see that.

02:22:51  5    Q.   And then it continues, "Household misrepresents the rate

6    of interest and monthly payments required on the Household

7    loan."

8              Do you see that?

9    A.   I do.

02:23:00  10   Q.   And if you skip a couple sentences, there's another

11   example of this practice.

12             Do you see that?

13   A.   I do.

14   Q.   Okay, and it continues, "Another example of this practice

02:23:12  15   is the promotion of the biweekly payment program.  Household

16   misleads consumers by comparing the total interest the

17   consumer will pay over a 30-year term of monthly payments

18   against the total interest a consumer would pay in making

19   biweekly payments."

02:23:29  20             Do you see that?

21   A.   I see what it says.

22   Q.   You understand that the attorneys general were -- was

23   telling Household that they engaged in widespread and systemic

24   use of the effective rate presentation, right?

02:23:39  25   A.   That was a position there which I think we've said before

Aldinger - redirect

3471

1    we didn't agree with.

2    Q.  That wasn't my question, sir, whether you agreed or

3    disagreed.  Apparently, you paid them 484 million, right?

4    A.  We did.

02:23:51  5    Q.  Okay.  My question wasn't whether you agreed or disagreed.

6    I asked you whether the attorneys general were -- was telling

7    Household that they engaged -- that they used the effective

8    rate presentation to mislead consumers?

9    A.  That's what that says.

02:24:04 10    Q.  And then it continues, "Household deceptively asserts that

11    the effective interest rate is lower under the biweekly

12    program because the loan is paid off sooner."

13         Do you see that?

14    A.  I see that.

02:24:16 15    Q.  No. 4.  Engaging in equity-based lending.

16         Do you see that?

17    A.  Yes.

18    Q.  You know what loan flipping is, right, sir?

19    A.  Yes, I do.

02:24:25 20    Q.  And you understand that the attorneys general was telling

21    Household that they engaged in systematic and widespread loan

22    flipping?

23    A.  I see what that says.

24    Q.  That wasn't my question, sir.

02:24:37 25    A.  Yes.

Aldinger - redirect

3472

1    Q.   Did you understand that the attorneys general was telling

2    Household that it engaged in systematic and widespread loan

3    flipping?

4    A.   I see that it says it engaged in flipping there.   I see

02:24:52  5    that.

6    Q.   Okay.   It says, "Household engages in the practice of

7    frequently refinancing or flipping one Household loan with

8    another, imposing additional costs and fees with no or little

9    net tangible benefit to the consumer."

02:25:06 10         Do you see that?

11   A.   Yes.

12   Q.   And then the next heading, No. 5, is packing single

13   premium credit insurance.

14         Do you see that?

02:25:13 15   A.   I see it.

16   Q.   And it says, "Household charges consumers for single

17   premium credit insurance where the consumer has not requested

18   it and is unaware of the sale until receipt of the monthly

19   statement."

02:25:24 20         Do you see that?

21   A.   I see it.

22   Q.   So you understood that the attorneys general -- you

23   understand that the attorneys general was telling Household

24   that it engaged in widespread and systemic insurance packing,

02:25:36 25   isn't that right, sir?

Aldinger - redirect

3473

1    A.  Well, I don't know that I'd use the word widespread and

2    systemic packing.  I don't see that there.

3    Q.  Well, sir, we just looked at a section on the first page.

4    Why don't you flip over.

02:25:52   5        Do you see at the second sentence of this document,

6    where it says, "These investigations have revealed that

7    Household engages in widespread lending patterns and practices

8    that violate both state and federal law."

9        Do you see that?

02:26:08  10   A.  I see that.

11   Q.  And then under Patterns and Practices, it says, "The

12   following list sets forth the significant patterns and

13   practices the states have identified.  While all of these

14   practices do not occur with every loan, the practices are

02:26:24  15   national in scope and are not confined to a single state or

16   branch office."

17        Do you see that?

18   A.  Yes, I do.

19   Q.  So you understand, don't you, that the attorneys general

02:26:32  20   was telling Household that it engaged in widespread and

21   systemic insurance packing, don't you, sir?

22   A.  That's the view in this letter, and I think we've been

23   over the last few weeks fairly clearly that the number --

24        MR. DROSMAN:  Judge, motion to strike.

02:26:48  25        THE COURT:  I'll overrule the objection.

Aldinger - redirect

3474

1    BY THE WITNESS:

2    A.  -- that the number of total complaints numbered every one

3    we could put together in the thousands in a business with 3

4    million customers and a company with 48 million customers, so

02:27:03  5    we do have a disagreement.

6         There's posturing in any negotiation, and that's the

7    way I interpret this, a lot of this here today.  It's

8    posturing.

9    BY MR. DROSMAN:

02:27:10  10   Q.  So the complaints, the consumer complaints for effective

11   rate, insurance packing, equity stripping, loan flipping,

12   those were all nits and gnats to you, sir?

13   A.  They weren't nits and gnats.  Every one of them is

14   important, but I will not sit here and have you portray that

02:27:27  15   as a systemic problem when it's less than 1/10 of 1 percent of

16   all loans made in Gary Gilmer's business, and it's -- I don't

17   even know how to calculate it for 48 million customers.

18        So that's posturing, that's their position.  We have

19   a view as well, and I'm just not going to sit here and adopt

02:27:45  20   everything you read here and assume it's fact.

21        That's their view.  I'll accept that.  That's their

22   view.  That's their negotiating posture.  That's what it is.

23   Q.  Let's see what they said about single premium credit

24   insurance, okay?

02:27:57  25   A.  Fine.

Aldinger - redirect

3475

1   Q.  Why don't we look at No. 5.  It says, "Household charges

2   consumers for single premium credit insurance where the

3   consumer has not requested it and is unaware of the sale until

4   receipt of the monthly statement."

02:28:09  5          Do you see that?

6   A.  I see that.

7   Q.  Let's look at No. 6, imposing prepayment penalties.  Do

8   you see that heading?

9   A.  I do.

02:28:17  10  Q.  It says, "Household does not adequately disclose the

11  imposition of prepayment penalties on non-HOEPA loans and

12  violates HOEPA by imposing prepayment penalties on high-cost

13  loans.  Household also imposes prepayment penalties on

14  open-end credit."

02:28:35  15         Do you see that?

16  A.  I see that.

17  Q.  The next one is Failure to Provide Required Disclosures.

18         Do you see that?

19  A.  I see that.

02:28:44  20  Q.  And the attorneys general felt that Household was not

21  providing consumers with certain required disclosures under

22  federal or state law, right, sir?

23  A.  That's what that says.

24  Q.  And then if you turn the page to the page ending 311, do

02:29:00  25  you see that?

Aldinger - redirect

3476

```
           1        At the top of page ending 311, 3-1-1, there's a
           2   heading Proposed Remedies.  Do you see that?
           3   A.  I see that.
           4   Q.  Okay.  And the attorneys general were proposing some
02:29:25   5   remedies to Household, right, in the context of these
           6   settlement negotiations?
           7   A.  That's what that says.
           8   Q.  Okay.  And you understood, because you were involved in
           9   these negotiations, that they'd proposed some remedies, right?
02:29:37  10   A.  I did.
          11   Q.  I'll show you what has been marked as Plaintiffs'
          12   Exhibit 681 for identification.
          13        Plaintiffs' Exhibit 681 consists of a document
          14   containing some calculations, right?
02:30:14  15   A.  Right.
          16   Q.  And if you look at the top, it says AG costs.  Do you see
          17   that?
          18   A.  I do.
          19   Q.  And then if you look at the bottom, the path -- I'm sorry,
02:30:22  20   the footer, there's a date.  Do you see that, right next to
          21   the page number?
          22   A.  6-27-06 at the bottom?
          23   Q.  At the bottom right-hand corner of the page, there's a
          24   page number.
02:30:32  25   A.  Oh, 7-15, yeah.
```

Aldinger - redirect

3477

1    Q.   There's a date there July 15th, 2002, right?

2    A.   That's right.

3    Q.   And you understand that that was the date that this

4    document was printed, correct?

02:30:42   5    A.   I would assume so.

6    Q.   Then you see the Bates number at the bottom, HHS 03070933.

7    Do you see that?

8    A.   I do.

9    Q.   And you understand that this came from Household's files,

02:30:52   10   correct?

11   A.   Yes, I do.

12   Q.   Okay.  And then if you look -- plaintiffs move 681 into

13   evidence.

14        MR. KAVALER:   Objection, your Honor, MIL, and no

02:31:02   15   foundation.

16        THE COURT:   I'll sustain the objection.  There's no

17   testimony as to what this document is.

18   BY MR. DROSMAN:

19   Q.   Okay.  Sir, you mentioned that you dealt with a team of

02:31:31   20   people who were in charge of negotiating with the attorneys

21   general, right?

22   A.   I said I had a team of people that were negotiating with

23   the attorneys general, that's right.

24   Q.   Right.  And you communicated with them, right?

02:31:41   25   A.   I communicated particularly with one person.

Aldinger - redirect

1   Q.   You gave them instructions, correct?

2   A.   I did.

3   Q.   And then they communicated information back to you, right?

4   A.   That's correct.

02:31:48  5   Q.   And you knew one of the issues that the attorneys general

6   was dealing with was a calculation of how much Household

7   needed to redress all of the harm that it had caused to

8   consumers, right?

9   A.   I don't recall that.  I recall they had their own views on

02:32:04  10  what it would be valued at, but I don't recall us giving them

11  an estimate.

12  Q.   Well, you do understand that you paid $484 million.

13  A.   Oh, absolutely, I do.

14  Q.   And you understand what that $484 million went to, right?

02:32:17  15  A.   To our customers.

16  Q.   Right.  You understand that that was restitution, right?

17  A.   I'm not sure I'd characterize it as purely restitution

18  because, as I understand it under the terms of the agreement,

19  it was paid out to every customer in the state whether they

02:32:32  20  had an issue or not based upon how the attorneys general

21  elected to do it.

22          So all we knew is it was going to go to our

23  customers, which we were happy about, with no cost along the

24  way because the attorneys general don't take a cut.  So we

02:32:46  25  were -- that's what I understood, but I didn't believe --

Aldinger - redirect

3479

1    Q.  Right, you didn't understand --

2            MR. KAVALER:  Excuse me, your Honor.  He interrupted

3    the witness.

4            THE COURT:  I think he's answered the question.  I'll

02:32:55  5    overrule that objection.

6    BY MR. DROSMAN:

7    Q.  The reason you understood it was going to go to all your

8    customers instead of the ones who had filed complaints is

9    because the ones that filed complaints weren't the only ones

02:33:04 10    harmed, right, sir?

11    A.  I don't think that's correct.  The reason it was going to

12    go to everybody was just because they were going to give

13    everybody something.  They didn't have to file a claim, they

14    didn't have to have a specific product, as I understood it, or

02:33:16 15    they had their own allocation to do it.

16            So from our perspective, it was going to customers,

17    that was good; but it was not related to any complaint levels,

18    no.

19    Q.  You know who Carin Rodemoyer is, right, sir?

02:33:27 20    A.  No, I don't.

21    Q.  You never heard the name before?

22    A.  Never heard the name.

23    Q.  Okay.  You understood that people were negotiating with

24    the attorneys general, right?

02:33:33 25    A.  Yes, I did.

Aldinger - redirect

3480

1   Q.  Okay.  And Household was telling the attorneys general

2   we'll pay X, and the attorneys general was saying we'll accept

3   Y, right?  You understood that those were the basic --

4   A.  Well, that's the way negotiations go.

02:33:44  5   Q.  Okay.  And so in the context of that negotiation,

6   Household derived some figures as to what it owed people,

7   right?

8               MR. KAVALER:  Objection to the form, your Honor.

9               THE WITNESS:  I'm not sure that's true at all.

02:33:54  10               THE COURT:  Excuse me?

11               MR. KAVALER:  Objection to the form, your Honor.

12               THE COURT:  What particular objection?

13               MR. KAVALER:  Owed.

14               THE COURT:  Overruled.

02:34:02  15               The witness can answer.

16   BY THE WITNESS:

17   A.  I don't think any -- any payment that we put together,

18   including the 484 million, tied to any number that I could

19   relate to damages or number of customers harmed or anything.

02:34:15  20   It was a number we agreed to to get this behind us in a global

21   settlement.

22               So I certainly had no view that it meant X for

23   something and Y for something else.

24   BY MR. DROSMAN:

02:34:28  25   Q.  Take a look at the first page of the document, upper

Aldinger - redirect

3481

1    left-hand corner.  Do you see the E:?

2    A.   I see AG costs, side loans is what I'm looking at.

3    Q.   Okay.  Then do you see the E:, right below that?

4    A.   Yeah.

02:34:42  5    Q.   And there's a back slash, right?

6    A.   Yeah.

7    Q.   You understand what a path and a file name is, right?

8    Sir, have you ever heard that term before?

9    A.   No.  I'm not sure I understand what you're saying.

02:34:54  10    Q.   You understand that when documents are saved on the hard

11    drive at Household, they're given a path and file name, right?

12    A.   Oh, no, I didn't know that, but -- I didn't know that.

13    Q.   You worked at Household for eight years?

14    A.   I did.

02:35:05  15    Q.   You've never seen a path and file name from Household?

16    A.   I certainly never focused on it, no.

17    Q.   Okay.  Well, look at this path and file name, it says

18    DEPT, department, right?

19    A.   Yes.

02:35:16  20         MR. KAVALER:  Object to him reading from a document

21    that's not in evidence, particularly in light of the fact that

22    the witness is unable to say that he has any idea what a path

23    and file name is.

24         THE COURT:  That's overruled.  These are preliminary

02:35:25  25    questions being asked to attempt to lay a foundation.  As long

Aldinger - redirect

3482

1    as the portions being read are relevant to that and not to the

2    substance, I'll overrule the objection.

3    BY MR. DROSMAN:

4    Q.  Then it says HFCBUSIN, business.  Do you see that?

02:35:41  5    A.  I do.

6    Q.  You understood that this came from the computer system of

7    HFC, correct?

8    A.  That's what it looks like.

9    Q.  Okay.  And then it says C-A-R-I-N, Carin, right?

02:35:53  10   A.  Right.

11   Q.  Back slash again, Special Request, correct?

12   A.  Yeah.

13   Q.  Back slash again, AG Costs, right?

14   A.  That's what it says.

02:36:01  15   Q.  Okay.  And so you don't have any doubt that this came from

16   the computer system of one of your many employees at

17   Household, do you?

18   A.  I don't think so, no.

19   Q.  You don't think it did come --

02:36:11  20   A.  No, no, I don't have any objection to that.  It looks like

21   it did.

22   Q.  Okay.

23   A.  That's what I think.

24        MR. DROSMAN:  Plaintiffs offer Exhibit 681 into

02:36:19  25   evidence.

Aldinger - redirect

3483

1           MR. KAVALER:  Objection, your Honor.  That's not a

2      foundation.

3           THE COURT:  What's missing?  What's missing?

4           MR. KAVALER:  Some indication that he has some idea

02:36:27  5    what this is.

6           THE COURT:  Overruled.

7           I think the testimony so far has established that the

8      document is what it purports to be; therefore, that's

9      sufficient for admissibility.  The rest goes to weight,

02:36:38 10    credibility, and questions may be asked.

11      (Plaintiffs' Exhibit 681 received in evidence.)

12   BY MR. DROSMAN:

13   Q.  Do you see on the first one, the top is AG costs, right?

14   A.  Yes.

02:36:48 15   Q.  The first one is side loans.  Do you see that?

16   A.  Right.

17   Q.  Okay.  Let's look at the calculation for total refund at

18      the bottom.

19           What's the total refund for side loans?

02:36:59 20   A.  It says 150.

21   Q.  Total refund, sir, at the very bottom?

22   A.  217.

23   Q.  And you understand that's millions, right?

24   A.  That's correct.

02:37:07 25   Q.  So 217 million calculated for refunds for side loans,

Aldinger - redirect

3484

1   right?

2   A.  I don't -- I don't know anything about this calculation,

3   have never seen this calculation, and, you know, it doesn't

4   have any relevance to the decision I made when we settled this

02:37:22  5   thing.

6        So we can go through it if you like, and let's go

7   through every page, but it doesn't have any calculation I

8   know.

9   Q.  Okay.  Look at AG costs, next page.  Page ending 934.

02:37:38  10       Points, do you see that?

11  A.  I do.

12  Q.  What's the total refund there?

13  A.  A billion 187.

14  Q.  Next page, AG costs interest rate, total calculation

02:37:50  15  there?

16  A.  A billion 253.

17  Q.  That's for the amount refunded, right?  That's what it

18  says.

19  A.  That's what it says.

02:37:58  20  Q.  Okay.  AG costs equity-based lending.  What's the total

21  refund there?

22  A.  66 million.

23  Q.  AG costs single premium credit insurance, next page.

24  A.  460 million I read.

02:38:16  25  Q.  That's -- it says premiums refunded, is that right?

Aldinger - redirect

3485

```
          1   A.  That's what it says.

          2   Q.  Okay.  Next page, AG costs PPP.  Do you see that?

          3   A.  Yes.

          4   Q.  You know what PPP stands for, right?

02:38:29  5   A.  Prepayment penalties.

          6   Q.  Okay.  So how much was calculated for total amount

          7   refunded for prepayment penalties?

          8   A.  161 million.

          9   Q.  Okay.  And you understand, sir, that all of the numbers

02:38:41 10   that we just read for the total amount refunded, that adds up

         11   to over $3 billion?

         12   A.  Well, that's what it looks like.

         13   Q.  I'm just asking you a simple math question.

         14   A.  That's what it looks like, yeah.

02:38:50 15   Q.  Okay.

         16   A.  Done by a junior person whose assumptions I don't know a

         17   thing about and didn't make any settlement based on.

         18   Q.  Sir, I don't have a question pending.

         19       Sir, yesterday when you were testifying about your

02:39:29 20   option sales, do you remember that testimony?

         21   A.  Yes.

         22   Q.  And you talked about how you sold some options during the

         23   class period.  Do you remember that?

         24   A.  I do.

02:39:35 25   Q.  And I looked at your testimony, and you said you sold a
```

TAB 23

3565

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all     )
 4   others similarly situated,      )
                                     )
 5            Plaintiff,             )
                                     )
 6     vs.                           )  No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )  Chicago, Illinois
 8                                   )  April 23, 2009
               Defendants.           )  9:00 a.m.
 9
                            VOLUME 17
10             TRANSCRIPT OF PROCEEDINGS - TRIAL
         BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
14                             BY:  MR. LAWRENCE A. ABEL
                                    MR. SPENCER A. BURKHOLZ
15                                  MR. MICHAEL J. DOWD
                                    MR. DANIEL S. DROSMAN
16                                  MS. MAUREEN E. MUELLER
                               655 West Broadway
17                             Suite 1900
                               San Diego, California  92101
18                             (619) 231-1058

19                             COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
20                             BY:  MR. DAVID CAMERON BAKER
                                    MR. LUKE O. BROOKS
21                                  MR. JASON C. DAVIS
                                    MS. AZRA Z. MEHDI
22                             100 Pine Street
                               Suite 2600
23                             San Francisco, California  94111
                               (415) 288-4545
24

25
```

Bley - direct

3670

1    Q.  All right.  And you mentioned that Household came under

2    your regulatory purview when you were at Washington State.

3    Was Household the only company you regulated or did you

4    regulate many companies?

11:42:16  5    A.  Either as deputy supervisor or supervisor, of course,

6    there would have been companies licensed under the consumer

7    services side and, of course, many banks that were chartered

8    by the State of Washington and insured by the FDIC.

9    Q.  And does your experience in regulating Household back then

11:42:40 10    form any part of the basis for your opinion in this case?

11    A.  Yes, it does.

12    Q.  What was your view of Household at the time when you

13    regulated Household?

14    A.  I had tremendous respect for Household because they were

11:42:51 15    helping me fulfill my statutory mission, which was to

16    facilitate credit to low- and moderate-income folks.  They

17    were a leader.  They helped facilitate prudent public policy

18    in this area and were -- it was an organization I could rely

19    on in help assisting in that process.

11:43:18 20    Q.  You know a gentleman by the name of Chuck Cross?

21    A.  Yes, I do.

22    Q.  Who -- how long have you known Mr. Cross?

23    A.  I've known Mr. Cross for just about as long as I was a

24    regulator.  So that would -- including current time, probably

11:43:33 25    15 years.

Bley - direct

3671

1   Q.   And was he at the Department of Financial Institutions

2   when you were there?

3   A.   Indeed he was.

4   Q.   Did he -- he was a subordinate of yours?

11:43:41  5   A.   He would have been -- I would have been either his boss'

6   boss' boss or his boss' boss.

7   Q.   Did you attend the taking of his deposition in this matter

8   which resulted in a video, some part of which we saw here a

9   week or two ago?

11:44:00  10   A.   I did.

11   Q.   And do you recall that he testified that he thinks you're

12   a very honest person?

13   A.   I recall that.

14   Q.   And you think he's a very honest person?

11:44:09  15   A.   Yes, I do.

16   Q.   Okay.  Do you think it presents any kind of a conflict of

17   interest for you to testify here today because you regulated

18   Household?

19   A.   No, sir.  It makes me an expert.

11:44:23  20   Q.   You never worked for Household, did you?

21   A.   No, sir.

22   Q.   You never got paid by Household except in connection with

23   this matter, right?

24   A.   No, sir.

11:44:32  25   Q.   Is it a practice among regulators, Mr. Bley, for the

Bley - direct

3672

1    regulator, when they conduct an examination, to send a bill to

2    the regulated entity for the cost of the examination?

3    A.   Those are all statutory.   And the legislature's public

4    policy in that area is that they want the regulated entities

11:44:58  5    to pay for the cost of their regulation.

6    Q.   So the company that's being regulated paying the state for

7    the cost of -- the state incurs in conducting the regulation

8    is a normal thing?

9    A.   It's a normal thing.

11:45:16 10   Q.   Now, since you've left government service, Mr. Bley, have

11   you given expert advice to any persons or entities?

12   A.   Expert advice in general?   Yes, to hundreds of companies.

13   Q.   Give me an example of the sort of engagements you've had

14   without specifying the specific entity or anything.

11:45:36 15   A.   There are a number of companies that are under regulatory

16   scrutiny.   There's advice that we need to provide to those

17   institutions to help them become compliant, meet regulatory

18   expectations.

19          On the other side of that, it could also be

11:45:53 20   circumstances where the company is correct; and we're

21   advocating the company side to the regulators and providing

22   them with more information, hopefully to change their posture.

23   That's in the area of what we would call in the industry now,

24   either as a management consultant or as a lawyer, sir,

11:46:13 25   regulatory intervention.   It's working with clients in that

Bley - direct

3673

1    regard.

2    Q.  Have you ever testified in a court as you are today as an

3    expert witness before?

4    A.  No, sir, this is my first time.

11:46:28  5    Q.  Have you formed some opinions in this case?

6    A.  I have formed some opinions in this case.

7    Q.  Can you summarize for us those opinions?

8    A.  As an expert in the area, as a review officer, I have

9    concluded that Household's financial services products were

11:46:51  10   legal.

11        I have also included -- concluded that the culture at

12   Household was a compliance culture; that the senior officers

13   had firm expectations of their subordinates to operate this --

14   their company, Household, and to sell products to customers in

11:47:23  15   an ethical and legal way.  Not only were the policies

16   consistent with that expectation, but the other part of the

17   analysis was senior management walking the talk.  Can I find

18   evidence, informal evidence, where they are walking the talk,

19   that the policies are being implemented.  My review of the

11:47:52  20   evidence is that senior management was, in fact, walking the

21   talk.

22        My third conclusion -- or excuse me -- the other --

23   the other part of that conclusion is whether or not

24   Household's training policies were consistent with the -- the

11:48:18  25   training methods -- excuse me -- were consistent with their

Bley - cross

3804

1           Now, let's look at the second page, the page ending

2      "757."

3           Do you see that?

4      A.  Yes.

04:12:03 5      Q.  It reads, "We had hoped that the July -- " this is -- I'm

6      sorry, I'm reading in the fourth paragraph down.

7           It's actually the third full paragraph down.  It

8      begins, "We had hoped."

9           Do you see that?

04:12:15 10     A.  Yes.

11     Q.  "We had hoped that the July 17 letter would have been more

12     responsive to the proposed framework for settlement, rather

13     than purely defensive.  Indeed, the letter seems to indicate a

14     continued denial concerning what we have found to be

04:12:30 15     nationwide common practices.

16          "While Household might like to maintain the belief

17     that these are isolated instances with 'rogue offices and loan

18     officers,' the coast-to-coast usage of common forms and sales

19     techniques belie any such position."

04:12:48 20          Do you see that, sir?

21     A.  I see that.

22     Q.  Okay.

23          And you reviewed this document in coming to your

24     conclusions in this case, right, sir?

04:12:53 25     A.  Yes, I did.

3811

1    ladies and gentlemen.

2         As usual, we will have the attorneys give six-minute

3    summations -- their six-minute summations of the testimony

4    during the week.

04:19:27  5         I want to remind you that these summations, as all

6    others by the attorneys, are not evidence in the case.  They

7    constitute merely the attorneys' attempts to summarize the

8    evidence and to describe for you the reasonable inferences and

9    conclusions that they feel you should draw from the evidence.

04:19:46 10         If, what the attorneys describe either as evidence or

11   as their conclusions conflict with anything you have seen or

12   heard, you are to disregard what they say and rely upon your

13   own recollections of the evidence.

14         In addition, I want to read to you an instruction

04:20:09 15   regarding some previous testimony at this point in time.

16         During his testimony, among other things, Mr. Devor,

17   the expert attorney -- the expert witness for the plaintiffs

18   -- gave his opinion that Household had a duty to disclose any

19   predatory lending practices in certain 10-Q and 10-K filings

04:20:33 20   that they had with the SEC.

21         Whether such a duty to disclose existed as to any

22   particular 10-Q or 10-K filing is for you to decide on the

23   basis of the evidence and the instructions that I will give

24   you at the end of the trial.

04:20:53 25         Accordingly, I instruct you to disregard that portion

3812

1    and only that portion of Mr. Devor's testimony.

2         I recognize plaintiff.

3         MR. DOWD:  Thank you, your Honor.

4         Ladies and gentlemen, I was going to talk to you

04:21:12  5    about a couple of things; but, before I start, I just wanted

6    to say, you know, I sit here and I listen to testimony, where

7    somebody says, you know, "Gary Gilmer, he walked the walk, he

8    walked the walk," you know, because he sent out some e-mails

9    that said "everybody be good"?

04:21:28 10    What happened when he had the chance to walk the

11    walk, when Dennis Hueman's video got found out?

12         Now, you know what he did?  He didn't walk the walk

13    one bit, did he?  He just talked the talk.

14         But Dennis Hueman kept his job, didn't he?  And,

04:21:43 15    then, they sit here and say, "The tone at the top was great."

16         Think about those kind of things, ladies and

17    gentlemen.  That's evidence.  That's evidence.  He could have

18    walked the walk and he didn't.  All he ever did was talk the

19    talk.  And that's the kind of thing you've got to think about.

04:21:59 20    But what I wanted to talk to you about today was two

21    of the witnesses you saw this week.  We called Professor Dan

22    Fischel to the stand to testify, basically, about damages.

23         You know, when you're doing somebody's

24    qualifications, as the attorney put putting the expert on, you

04:22:14 25    want people to understand that the guy's qualified; that he's

TAB 24

3824

```
 1                   IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                             EASTERN DIVISION

 3    LAWRENCE E. JAFFE PENSION PLAN, )
      on behalf of itself and all     )
 4    others similarly situated,      )
                                      )
 5              Plaintiff,            )
                                      )
 6       vs.                          )  No. 02 C 5893
                                      )
 7    HOUSEHOLD INTERNATIONAL, INC.,  )
      et al.,                         )  Chicago, Illinois
 8                                    )  April 24, 2009
         Defendants.                  )  11:00 o'clock a.m.
 9                           VOLUME 18
10                  TRANSCRIPT OF TRIAL PROCEEDINGS
              BEFORE THE HONORABLE RONALD A. GUZMAN
11

12    APPEARANCES:

13    For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
14                              BY:  MR. SPENCER A. BURKHOLZ
                                     MR. MICHAEL J. DOWD
15                                   MR. DANIEL S. DROSMAN
                                     MS. MAUREEN E. MUELLER
16                              655 West Broadway
                                Suite 1900
17                              San Diego, California  92101
                                (619) 231-1058
18
                                COUGHLIN STOIA GELLER RUDMAN &
19                              ROBBINS LLP
                                BY:  MR. DAVID CAMERON BAKER
20                                   MR. LUKE O. BROOKS
                                     MR. JASON C. DAVIS
21                                   MS. AZRA Z. MEHDI
                                100 Pine Street
22                              Suite 2600
                                San Francisco, California  94111
23                              (415) 288-4545

24

25
```

3853

1    where?

2         MR. BURKHOLZ:  It's on Page 60- -- I think it starts

3    on Page 63 of their red-lined version -- 63 of their red-line

4    version.  The language that they have proposed is on the

11:41:18  5    bottom of 64, running into 65 of their red-line version they

6    propose.

7         THE COURT:  So, what about their language do you

8    oppose?

9         MR. BURKHOLZ:  The -- I guess the -- what's missing

11:43:48 10   is the "or furnishing information or language for inclusion"

11   in the statement, which would go on the top of Page 65 after

12   "In making a false statement or omission of material fact."

13        MS. BEER:  We object, your Honor, to the addition of

14   that language as being unsupported by controlling law in the

11:44:22 15   Seventh Circuit and not supported by the factual record of

16   this case.

17        THE COURT:  Then what do we tell the jury about scope

18   of employment?  Do you think they know what that is?

19        Does the defense have a definition for "scope of

11:45:15 20   employment" language?

21        MS. BEER:  We did not include a definition of the

22   language on the assumption that it is relatively common

23   terminology that --

24        THE COURT:  Well, among lawyers, I'm sure it is; but,

11:45:45 25   I don't know too many lay people who walk around talking about

3862

1    the scienter issue, it appears that the language that you have

2    in 64 and 65 is -- starting on the last paragraph on Page 64

3    and going on to Page 65 -- there's not a great deal of

4    disagreement with that; is that correct?

12:01:07  5         MR. BURKHOLZ:  That's correct.  It's just the

6    "furnishing information or language for inclusion in the

7    statement" that's missing, that's, you know, from the Tellabs

8    case.

9         But, otherwise, the rest of it's fine, except for, of

12:01:19 10   course, the last paragraph of the instruction.  And we

11   probably could add in the definition of "scope of employment"

12   after the -- that -- sentence that discusses it.

13        MS. BEER:  Yeah, we've come full circle, but I just

14   want to reiterate our objection to adding the "furnishing

12:01:51 15  information" language into the instruction.

16        THE COURT:  Yes, it's on the record.

17        And I think we have to give an instruction on the

18   scope of employment.  I don't think you can leave that to the

19   jury, unless the parties want to stipulate that there's no

12:02:20 20  issue as to scope of employment in this case.

21        I, frankly, think this is a case where there's no

22   issue as to scope of employment.  I don't think anybody that

23   has been named here can reasonably be argued not to fit within

24   the definition of "doing something that he was assigned to do"

12:02:40 25  or that "might reasonably be said to have been contemplated as

3878

1   making this issue less clear to the jury -- this is a separate

2   issue.  I'm certain Mr. Dowd and I will both be addressing it

3   specifically, your Honor.  We might even have some

4   demonstratives to go with it, you never know.  Mr. Dowd has

12:31:10  5   lots of demonstratives.  The jury is going to look to these

6   instructions for clear guidance on this subject.

7       We might even, your Honor, have another expert who is

8   going to address this subject before the case is over.

9       So, I think this is an area -- and it is, as Ms. Beer

12:31:23  10   said, the hardest conceptually for the jury to wrap their

11   minds around.  You said last week, your Honor, juries decide

12   questions of truth and falsity every day.  If truth and

13   falsity --

14       THE COURT:  I said that?

12:31:35  15   MR. KAVALER:  I believe you did, your Honor.

16       THE COURT:  I think that's a true statement.

17   (Laughter.)

18       MR. KAVALER:  I don't disagree with that.

19       But I think if that's at one end of the continuum of

12:31:44  20   things jurors do every day, loss causation has got to be at

21   the other end of the continuum.  Even lawyers don't deal with

22   it every day.  The only person who deals with it every day is

23   Professor Fischel.

24       But it's a very hard concept, your Honor.  We have a

12:31:58  25   lot of trouble wrapping our minds around.  Anything you can do

3879

1    to make clear to the jury what it is we're asking them to

2    decide here is important.  And I think on behalf of --

3          THE COURT:  Well, you and I both agree there.  We're

4    in agreement there.  We're just not in agreement as to how to

12:32:10  5    make it clear to them.  Okay?

6          I can't disagree with much of anything you said --

7    that it's an issue, as are probably another, you know, 20

8    other issues in this case, that are crucial and without which

9    the plaintiff loses every single time, that they have to

12:32:31  10    establish.

11          I'm perfectly confident that the instructions we're

12    giving them appropriately define loss causation.  We tell

13    them -- I mean, we tell them -- what a false or misleading

14    statement is, and it's only a statement made during the

12:33:03  15    relevant time period.

16          Then we tell them that, "The statement was a

17    substantial cause of plaintiffs' economic loss."

18          And, then, we tell them that, "A statement is a

19    substantial cause if it causes the stock price to be higher

12:33:38  20    than it would have been had the fact not been concealed or

21    disclosed; and, upon discovery, it causes the stock price to

22    decrease."

23          That's loss causation.

24          Restating a portion of the elements instruction is

12:34:05  25    not necessary and, in my opinion, will not make it clearer to

3880

1     the jury.  It will just simply cause them to go back over

2     something they must already have decided before they even get

3     to this portion of the instructions.

4          If they find that there was no such statement,

12:34:26  5     they're not going to be worried about damages.  And we tell

6     them that until and unless they find liability -- which means

7     they find a false or misleading statement within the relevant

8     time period -- they need not and should not and cannot

9     consider damages.  That's part of the instruction.

12:34:43 10          So, I just disagree with you as to the manner by

11    which we go about making this as clear to the jury as we can.

12          MR. KAVALER:  Your Honor, let me just say one last

13    thing and I'll sit down.

14          We specifically are asking you to charge the exact

12:34:56 15    language of the Seventh Circuit in Ray, where the Circuit said

16    "Under that theory -- " talking about the Supreme Court's

17    decision in Dura, the Supreme Court's theory -- it says,

18    "Under -- " I'm quoting now from the Seventh Circuit -- "Under

19    that theory, plaintiffs must show both that the defendants'

12:35:23 20    alleged misrepresentations artificially inflated the price of

21    the stock and that the value of the stock declined once the

22    market learned of the deception."

23          My point, your Honor, is if you can --

24          THE COURT:  But, Mr. Kavaler, that is exactly the

12:35:36 25    language in the Court's instruction.  You've just read it.

3881

1     "Must show:  One, that it caused Household's stock price to be

2     higher than it would be if the statement had not been made or

3     the concealed fact had been be disclosed."

4           We've gone further.  We defined inflation.  Rather

12:35:55  5     than using the conclusory term "inflation," we tell them,

6     "This is what inflation is:  It's causing the stock price to

7     be higher."  And, then, we tell them what happens when the

8     market discovers the truth.

9           MR. KAVALER:  Your Honor, if you believe they're the

12:36:08  10    same, then I'm asking you to use the actual language of the

11    Seventh Circuit rather than paraphrasing.  And if --

12          THE COURT:  But the language you have here is not the

13    actual language of the Seventh Circuit that you just read to

14    me.  It includes stuff that's not in what you just read to me

12:36:21  15    and it doesn't include everything that you just read to me.

16          MR. KAVALER:  But in light of our conversation this

17    morning, your Honor, what I'm asking you to do now is use the

18    exact language of the Seventh Circuit, without prejudice to

19    the instructions we submitted.

12:36:32  20          If your Honor is rejecting those, then our next

21    request is to use the exact language of the Seventh Circuit

22    that I just read to you, which I'll be happy to hand up.

23          THE COURT:  I think that language, of course, is

24    binding and controlling on me; but, the language and specific

12:36:48  25    words that are an appellate court uses in explaining the law

3888

1    defendant, then you should not consider the question of

2    inflation."

3         THE COURT:  Of inflation?  Okay.  Plaintiff?

4         MR. BURKHOLZ:  We think it should stay the way it is.

01:53:28 5   The inflation is part of damages, and so this jury is going to

6    find the inflation per share, and then there's going to be

7    some kind of second proceeding.  We differ on what that's

8    going to be, but that inflation per share will go into a

9    calculation of damages for each class member.

01:53:48 10       THE COURT:  Okay.  I don't think it makes much

11   difference whether we say damages or not.  Clearly, inflation

12   is an element in the calculation of damages, so why that

13   element should be separated out from others and not referred

14   to as damages, I'm not sure.

01:54:08 15       And, it just seems to me, it would cause us to have

16   to rewrite a whole bunch of language without adding any

17   particular clarity.  So I don't have a problem with continuing

18   to use the phrase damages.  I think even in the plaintiffs'

19   proposed instruction -- or Defendants' Proposed Instruction

01:54:32 20  Number 33, it's utilized, you know, quite effectively.

21        The defendants talk about, for example, the amount of

22   daily damages per share, and I prefer that language frankly

23   over the term inflation, which is another term that we'll then

24   have to define in the instructions for the jury.

01:54:55 25       Is there a more substantive objection?

3912

1    that I have here, does it measure inflation?

2            MS. BEER:  It measures, your Honor, the --

3            THE COURT:  Let him answer.

4            MR. OWEN:  I think it does measure inflation.

02:47:48  5            THE COURT:  Okay.  So then what you're saying is that

6    we should call it measure of inflation instead of actual

7    damages, is that right?

8            MR. OWEN:  I think that would be accurate, yes, your

9    Honor.

02:47:57 10           THE COURT:  Okay.  I don't care what we call it.  As

11   long as it's the appropriate calculation, I don't care what we

12   call it.

13           I think the one cogent point that's come out of this

14   is that we do have to have a determination of the date upon

02:48:17 15   which the revelation took place so that we can measure the cap

16   on any subsequent losses that are proven in the second phase.

17   That I think we need to do.

18           MR. OWEN:  Okay.

19           MS. BEER:  Your Honor, if I might add one thing.

02:48:30 20           I think one of the problems that we're dealing with

21   in calling this damages is that in order to determine damages,

22   you have to know not only the amount of inflation on the day

23   someone bought the shares but the amount of inflation on the

24   day that they sold the shares.

02:48:46 25           THE COURT:  Yeah, you do, which is why we can't

3935

1    statement which he said is up to the plaintiffs to prove is a

2    misstatement vel non.  But his point is that if they prove it

3    on one date, August 16, they have, therefore, proved it on the

4    other date, July 22.  He didn't calculate the amount of

03:57:57  5    inflation earlier than July 30.

6         But based on his testimony, it is certainly, at a

7    minimum, a question the jury needs to resolve, what is the

8    significance of that being the same dates -- the same

9    disclosure.  And for that reason, your Honor, you have to tell

03:58:11 10    them that July 30 is a cutoff.

11         THE COURT:  Haven't I already done that?  Doesn't

12    every instruction I put in here contain a reference to the

13    relevant period, which we defined for them as being July 30?

14         MR. KAVALER:  I understand your Honor's analysis.

03:58:26 15    I'm simply pointing out, this is another example where this is

16    a particular discrete issue on a subject that is beyond the

17    ken of humanity, normal people, jurors, lawyers who are not

18    litigators and 99.9 percent of litigators what we are talking

19    about right now.  It's certainly beyond my ken, your Honor.

03:58:45 20         The only person who understands this is Professor

21    Fischel.  And I respectfully submit, notwithstanding his

22    understanding, notwithstanding his expertise, he gave it up.

23         THE COURT:  Can we talk about how this instruction

24    helps address that point?  Because I don't see that it does.

03:59:00 25         MR. BURKHOLZ:  It doesn't.  And, by the way --

3936

1              THE COURT:  This is an instruction that tells the

2         jury to apply the statute of repose, which I've already

3         applied.  And we told the jury, because I've applied that

4         statute the way I have, that any statement that they consider

03:59:16  5    must be within the relevant time period, which excludes the

6         statute of repose.  Therefore, if they find, as this proposed

7         instruction seems to argue, that Professor Fischel's testimony

8         requires them to base their determination of liability on

9         statements made prior to that statute of repose period that

03:59:46 10    I've set -- deadline that I've set, then you're going to win.

11        But why do I -- why would I give them this instruction?

12             MR. KAVALER:  So that I can win.

13             THE COURT:  But it's already there.

14             MR. KAVALER:  Your Honor --

03:59:56 15        THE COURT:  I've already given it to them.  Although

16        I would like to help you win, I've already given them the

17        instruction.  And I don't see that it helps any whatsoever.

18             MR. KAVALER:  I have to observe the irony of that

19        one.

04:00:09 20        But, Judge, what I'm saying is, when you and I say it

21        to each other, we understand each other.  The question is,

22        does the jury really understand this or do they need some help

23        here.  What they need to understand is precisely what your

24        Honor just said.  I'm not quarreling with what you said.  I'm

04:00:25 25    just saying you need to give it to the jury in a way that they

3937

1    can understand how to apply it.

2         You have said the statute of repose bars any claim

3    before July 30. Understood. Agreed. No quarrel. You've

4    also said if the jury finds that the claim -- the statement

04:00:41 5    was made before July 30, they will reject it. Well, not

6    unless someone tells them that's what they're supposed to do,

7    not unless someone tells them that if they find the claim --

8    in other words, I'll point out to them what Professor Fischel

9    said. That will be my job. And Professor Fischel said what

04:00:57 10   he said. That was his job. And counsel conducted such

11   redirect as they wanted. That was their job. But I

12   respectfully submit it's your job to tell them what it all

13   means. And what it means is what you just said to me. I

14   don't disagree with what you say it means, your Honor. I just

04:01:12 15   think you need to say it to them.

16        THE COURT: Okay. I think I've done it, so I'll deny

17   this instruction.

18        MR. KAVALER: Again, your Honor, this is a

19   particularly important instruction. So we specifically

04:01:24 20   formally except your ruling, not that we don't except other

21   rulings. But we take exception to this one because we think

22   that this -- we believe this should have been resolved before

23   trial as a matter of law. We believe it should be resolved at

24   the close of the plaintiffs' case as a matter of law. We

04:01:39 25   believe it should not go to the jury. We believe if it goes

TAB 25

3966

1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
2                           EASTERN DIVISION

3   LAWRENCE E. JAFFE PENSION PLAN, )
    on behalf of itself and all    )
4   others similarly situated,     )
                                   )
5              Plaintiff,          )
                                   )
6      vs.                         )  No. 02 C 5893
                                   )
7   HOUSEHOLD INTERNATIONAL, INC., )
    et al.,                        )  Chicago, Illinois
8                                  )  April 27, 2009
               Defendants.         )  1:25 p.m.
9
                              VOLUME 19
10                  TRANSCRIPT OF PROCEEDINGS - TRIAL
          BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12  APPEARANCES:

13  For the Plaintiff:         COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
14                             BY:  MR. LAWRENCE A. ABEL
                                    MR. SPENCER A. BURKHOLZ
15                                  MR. MICHAEL J. DOWD
                                    MR. DANIEL S. DROSMAN
16                                  MS. MAUREEN E. MUELLER
                               655 West Broadway
17                             Suite 1900
                               San Diego, California  92101
18                             (619) 231-1058

19                             COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
20                             BY:  MR. DAVID CAMERON BAKER
                                    MR. LUKE O. BROOKS
21                                  MR. JASON C. DAVIS
                                    MS. AZRA Z. MEHDI
22                             100 Pine Street
                               Suite 2600
23                             San Francisco, California  94111
                               (415) 288-4545
24

25

4005

1    indicate that if someone authorizes or provides information to

2    be used in a false statement for that purpose, that that

3    person is liable.

4            It would be, indeed, I think ironic if all corporate

02:35:23  5    officers could shield themselves completely from 10b-5

6    liability by simply hiring innocent spokespersons, press

7    relations people, intentionally giving them false information

8    and then telling them to provide that information to the

9    public.  It just doesn't make any sense to me.

02:35:57 10            MS. BEER:  In that scenario, your Honor, those

11   individuals would not be shielded from liability because a

12   20(a) claim would lie.

13            THE COURT:  Not necessarily.

14            MR. DROSMAN:  Moreover, your Honor, StoneRidge has no

02:36:10 15   applicability to this case.  StoneRidge dealt with a

16   third-party, I believe, supplier.  It had nothing to do with

17   people inside the company providing or furnishing information.

18            MS. BEER:  It was a ruling as to the necessity of a

19   direct statement.  It was not limited to the third-party

02:36:27 20   scenario.  And there is no authority of which we are aware for

21   imposing 10b-5 liability on a person who does not make a

22   misrepresentation.

23            THE COURT:  Okay.  This is the same argument we had

24   before, and I think the defendants have made a pretty clear

02:36:45 25   record.  There's no need to go over it all again.

4007

1    included verdict form, and a few minutes later we'll be

2    explaining to them the included verdict form.  If that did not

3    take place, I guess this would be confusing; but given that, I

4    don't think it's -- I don't think it is.

02:38:46  5        Next is the Court's 24, previously 23, false or

6    misleading.

7        MR. BURKHOLZ:  I believe this was the language we

8    agreed upon last week that I tried to incorporate from the

9    Court's ruling into the instruction.

02:39:08  10       MS. BEER:  Your Honor, we have an alternative version

11   of this instruction that I'd like to hand up.  We spent a good

12   deal of time discussing it.  And -- and I think our discussion

13   was not really a linear discussion.  We split off into other

14   things, and I'm not sure that the record of the conference

02:39:24  15  last week provides a very clear indication of just what the

16   decisions were as to this instruction.  So I'd like to propose

17   the defendants' alternative instruction, if I may.

18       THE COURT:  Sure.

19   (Tendered.)

02:39:40  20       THE COURT:  Thank you.

21       MS. BEER:  That's a copy for Mr. Burkholz.

22       This attempts to clarify the language that we were

23   discussing on Friday, and as well to -- to incorporate a

24   clearer description of when a duty to disclose arises and

02:40:29  25  incorporate -- the last three pages of this should be --

4008

1   should be removed.  I'm sorry.  They shouldn't be on there.

2   If I could exchange that, something got mixed up in the

3   copying, your Honor.

4       (Tendered.)

02:41:08  5       THE COURT:  You want this back?  Is that what you're

6   saying?  These are your private notes?

7       MS. BEER:  I can take it back, your Honor.  It just

8   mixed up something in the copying machine that wasn't part of

9   this instruction.  And I'll exchange with Mr. Burkholz the

02:41:29 10   copy with the research being done on something else.  If I

11   could have that copy back, please?

12       (Tendered.)

13       MS. BEER:  This also incorporates, your Honor, the

14   instruction that was given on the record during the trial

02:41:50 15   regarding Mr. Devor's testimony.

16       (Brief pause.)

17       THE COURT:  I think I'm missing my original version

18   of this.  Let me -- I think that would have been my 23, I

19   think.

02:44:38 20       MS. BEER:  I have another copy if you'd like, your

21   Honor.

22       Would you like a copy, your Honor?

23       THE COURT:  I would like the one I marked up frankly.

24   It's got my notes and what I said.

02:45:10 25       Let me take ten minutes, and then hopefully I'll be

4014

1    all the 10-K has is a statement of revenue, and it later turns

2    out that they had engaged in predatory lending practices.

3        Would the 10-K statement be misleading without any

4    explanation, given that context?

03:24:50  5        MS. BEER:  The statement about the 10-K?

6        THE COURT:  The statement in the 10-K of the revenues

7    earned for that year.

8        MS. BEER:  No, your Honor, I don't believe it would

9    be.

03:25:03 10        THE COURT:  Financial statement says we earned

11    $50 million this year.

12        MS. BEER:  I don't believe you can import information

13    from a separate statement into a 10-K.  You can look at the

14    language that is used in the 10-K and determine if that

03:25:16 15    language is misleading because something was omitted.

16        MR. BROOKS:  We disagree, your Honor.  We think that

17    statements that are made, especially when they're relating to

18    omissions, need to be looked at in context.

19        I think that's one of the main arguments that

03:25:36 20    defendants have advanced in this case actually when they're

21    talking about truth on the market and other things, but I

22    think that the issue here is whether the statement that gives

23    rise to the duty has to be the same as the statement that is

24    the false statement, and the plaintiffs' position is that that

03:25:53 25    is not the case.

4015

1    If there's a statement that gives rise to a duty to

2 disclose and absent disclosure the subsequent statement or the

3 different statement in the same document is false and

4 misleading because of that failure to disclose, we think that

03:26:07 5 that's actionable, Judge, and that's why this is an

6 appropriate instruction.

7    THE COURT:  Well, I mean I think that's the Court's

8 position, that if the breadth of the context is such that the

9 statements are essentially intertwined, then it could lead to

03:26:31 10 a duty to disclose in the 10-K financial statement itself.

11 Whether that's -- or to what extent that's been attained in

12 this case is still a circuit question, but I think that as I

13 tried to make clear with my example, I'm not sure I did, but

14 if the CEO of a corporation says we're going to disclose

03:26:57 15 everything there is to disclose about our predatory lending

16 practices in our financial statement that we're filing, in our

17 10-K financial statement that we're filing tomorrow, and they

18 file the statement and all it says is we earned $50 million, I

19 think that statement is misleading because it omits

03:27:17 20 information that, you know, you would expect it to have, given

21 the prior statement by the CEO, that it was going to contain

22 it.

23    That's one I think -- that's one clear sort of

24 best-case example of when that could become an obligation

03:27:49 25 under the law as I see it.  I think clearly the first part of

4016

1   this statement, that the statement of revenue in a 10-K or

2   10-Q that accurately states the earnings does not by itself

3   give rise to a duty to disclose specific lending practices, is

4   correct.  It is the law.

03:28:09  5        But I think that the statement after that, which is

6   that it's for the jury to determine based on the totality of

7   the evidence whether any given statement is leading or

8   misleading is also the law, and it's what we tell them earlier

9   on.  It doesn't really matter whose proposed instruction we

03:28:30 10  take on false or misleading.  We tell them that in determining

11  whether a statement is false or misleading, you must consider

12  the statement in light of the circumstances that existed at

13  the time that it was made.

14        MS. BEER:  It's our position, your Honor, that that's

03:28:54 15  a sufficient instruction and that the parties can argue what

16  they want from -- from that instruction, and to put the

17  Court's imprimatur on a particular scenario imposing a duty to

18  disclose based on a statement made in one document, a duty to

19  disclose in a separate document is an instruction that we do

03:29:14 20  object to and don't believe should be given.  The hypothetical

21  scenario that was described, your Honor, is not a scenario

22  that exists in this case.

23        THE COURT:  Absolutely correct.

24        MS. BEER:  It's one which you could possibly argue

03:29:27 25  that the two statements are actually merged because of the way

4017

1    in which you described the statements that were made.  That's

2    not the situation that we have in this case.  That's not the

3    connection between documents that we have the plaintiffs

4    arguing in this case, and we do -- we object to the giving of

03:29:46  5    the second part of this instruction.  The first sentence we

6    have no problem with.

7         THE COURT:  Well, I want to make sure that I

8    understand what you're saying because I'm not sure I do.

9         So what you're objecting to is the Court telling the

03:30:07  10   jury that whether the 10-K or the 10-Q statement of earnings

11   is misleading is for the jury to decide based on the totality

12   of the evidence?

13        MS. BEER:  No, your Honor.  If the sentence read as

14   you just read it, we would not object to it.

03:30:35  15        The specific reference to looking to a separate

16   document to find the duty to disclose in a 10-K or 10-Q is the

17   portion of the sentence that we find unsupported and

18   objectionable.

19        THE COURT:  But you would not then object to the

03:30:51  20   plaintiffs arguing that the prior statements, given the light

21   of all the circumstances in this case, gave rise to a duty to

22   disclose more in the 10-K than was disclosed, and you arguing

23   that there were no such facts in this case sufficient to give

24   rise to such a duty, is that your position?  Because that's

03:31:17  25   what I thought I heard you say.

4021

1    disclose a fact if a prior statement he or it made about the

2    same subject would be misleading if the fact is not

3    disclosed"?

4              MS. BEER:  If the statement in the prior statement is

03:36:12  5    rendered misleading by the omission, then the duty to disclose

6    in that prior statement exists, yes.

7              THE COURT:  The duty to disclose in the subsequent

8    statement, would result in a duty to disclose in the

9    subsequent statement?

03:36:28  10          So, for example, to use what I'm thinking you're

11    saying to see if I have it right, if Mr. Aldinger got up and

12    said, "We don't engage in predatory lending practices, and to

13    the extent that we do, it's going to be included in our 10-K

14    financial statement," and he issues a 10-K financial statement

03:36:52  15    that includes no information on it whatsoever.

16          That statement, you're saying, could be evidence of

17    the fact that his prior statement, that they don't engage in

18    predatory lending practices, was misleading?

19              MS. BEER:  The prior statement is the statement that

03:37:08  20    you would look to to determine whether a misleading statement

21    had been made.  The statement you would look to to determine

22    if information had been omitted would be the prior statement.

23    That's -- that prior statement does not create any obligation

24    to disclose further information in the 10-K.

03:37:25  25              THE COURT:  Okay.  And you, I take it, disagree with

4022

1   that?

2           MR. BROOKS:  We do, your Honor.  We don't think that

3   the statement giving rise to the duty has to be the exact

4   statement in the same document or -- and we also think that

03:37:44 5   there can be a statement -- there are many different

6   circumstances under which a statement can give rise to a duty

7   or something other than a statement maybe could give rise to a

8   duty, and that's why this instruction is proper, Judge,

9   because it gives the jury the chance to weigh the facts and

03:37:59 10  decide whether there was a duty to disclose and whether they

11  did, in fact, disclose.

12          THE COURT:  Okay.  Well, I -- I agree with that.  I

13  think that the only way to honor the instruction which is

14  clear throughout, that the jury is to determine whether a

03:38:19 15  statement is misleading based upon all of the circumstances

16  that existed at the time it was made is to give that

17  instruction.

18          I don't think we can give an instruction that, by

19  implication or otherwise, deprives the jury of the right to

03:38:36 20  consider all of the circumstances surrounding the making of

21  the statement.

22          MS. BEER:  Reiterate defendants' objection to the

23  instruction as unnecessary and incorrect.

24          THE COURT:  Okay.  So let me make sure I have -- the

03:39:01 25  Defendants' Jury Instruction Number 26 is denied.  This is the

4023

1    one you just submitted today, correct?

2          MS. BEER:  Yes, your Honor.

3          THE COURT:  26?  Was there a prior 26?

4          MS. BEER:  Yes.

03:39:13  5    THE COURT:  So this supersedes it?

6          MS. BEER:  The 26 that was submitted today was

7    revised in an attempt to take into account the discussion that

8    we had on Friday with the Court.

9          THE COURT:  Okay.  This will be denied.

03:39:39  10   MS. BEER:  Can we provide a copy to the court

11   reporter to get it into the record of today's conference, a

12   record of what was submitted and requested by the defendants

13   and denied?  Or would you like me to read the three pages into

14   the record?

03:39:54  15   THE COURT:  Neither.  Why don't you just file it.

16   Then it will be part of the record.

17         MS. BEER:  Thank you, your Honor.

18         We take exception to the Court's denial of the

19   Defendants' Requested Jury Instruction Number 26.

03:40:12  20   THE COURT:  Okay.  The Court will give the Court's

21   Instruction 24, previously 23, as amended in the submission by

22   the plaintiffs.

23         MS. BEER:  Again, your Honor, for the record, we

24   object to this instruction.  In particular, to the first

03:40:34  25   sentence of the third paragraph, "An omission is misleading

4028

1    this proposed instruction was discussed last Friday and

2    rejected by the Court, but it's back into this instruction

3    again, along with other issues that we discussed and spent a

4    lot of time going through and coming up with the instruction

03:48:33 5    that the plaintiffs modified according to the Court's

6    instruction.

7        MS. BEER:  I don't believe we actually quite made it

8    to the last paragraph.

9        MR. BURKHOLZ:  The last paragraph refers to the

03:48:43 10    good-faith issue that was in your proposed -- defendants'

11    proposed instruction, was rejected by the Court after a

12    discussion between the parties and the Court.

13        MS. BEER:  The other element that seems to have

14    gotten lost from the instruction is the actual definition of

03:49:26 15    scienter.  The definition from the Supreme Court that the

16    mental state requires an intent to deceive, manipulate or

17    defraud somehow was dropped from the instruction, and we

18    believe it's appropriate to restore the correct definition of

19    the mental state.  And then to establish -- then to discuss

03:49:48 20    the two ways in which that mental state can be demonstrated by

21    knowledge of falsity or reckless disregard for a substantial

22    risk of falsity.

23        The definition of recklessness dropped out or was

24    substantially suppressed to a much later stage in the

03:50:26 25    instruction and cut back to a statement that does not give

4034

1    begins, "Plaintiffs can recover only actual damages, which is

2    the difference between the price plaintiffs paid for each

3    share of Household stock and the price each share would have

4    cost if no false or misleading statement or omission of

04:01:14  5    material fact had occurred."

6         Many of the possible alternative phrasings that we

7    discussed on Friday were rejected because they used the

8    terminology inflation, and I suggest that we should revisit

9    that determination because, in fact, the jury has heard

04:01:34  10    nothing but inflation in discussing this issue.

11         MR. DROSMAN:  Your Honor --

12         THE COURT:  Well, I think my concern was, you know,

13    what are we going to have to do with the rest of the

14    instructions if we use inflation in this instruction, and I'm

04:01:47  15    still not sure I know what the answer to that is.

16         MR. DROSMAN:  Your Honor, I read this and it's the

17    classic formulation of the out-of-pocket measure of damages

18    which is the measure of damages in a securities fraud case.

19    Dura said nothing about the out-of-pocket --

04:02:02  20         THE COURT:  I'm not concerned with this being in

21    violation of Dura.  I think clearly it's not.  I think we're

22    talking about different phases in the determination of

23    damages.

24         I think technically counsel may be correct in that,

04:02:17  25    you know, calling this damages may not be technically accurate

4035

1    in legal parlance.  I don't know that that's important

2    frankly.  I mean we could call it, you know, the recipe for

3    pizza, and it wouldn't make any difference if the calculation

4    we're telling the jury they have to make is the correct

04:02:38   5    calculation, and I think that that part is correct.

6        I do worry about, you know, making it -- I don't want

7    it to be confusing to the jury, and if using the term

8    inflation in here somehow would help the jury tie this in to

9    the testimony of both experts, maybe we can do that.  I'm

04:02:59  10    not -- I'm not opposed to that.

11        Let's see, so maybe we can --

12        MR. DROSMAN:  Your Honor, I don't think we feel

13    strongly.  I'm just not sure -- it's a characterization of

14    what the out-of-pocket measure of damages is, and I'm not sure

04:03:18  15    that it's necessary, but we don't feel strongly one way or the

16    other.

17        THE COURT:  Well, I don't think it is necessary; but

18    I think if -- what we're telling them here is I think what

19    your expert testified to essentially, which is what I think

04:03:34  20    what the law is.  It's a calculation he made.  I think that's

21    what the law tells us the calculation should be; but if, while

22    he was describing this, he was using the word inflation, then

23    it may be easier for the jury to understand why this is here,

24    what they're doing and what testimony to relate it to if we

04:03:50  25    also use the word inflation.  I had no idea it was 200 and --

4063

1    or misleading as to which particular issue.

2        MS. BEER:  And that could be very helpful.  I also,

3    as I think you know, we designed a form that does definitely

4    use landscape format and has the jury go through each

04:49:11  5    statement only once to determine whether -- whether each of

6    the elements of a 10b-5 claim has been met as to that

7    particular statement.

8        THE COURT:  Okay.  Well --

9        MS. BEER:  And we still do believe that that's an

04:49:23  10   essential component of this process, that to use any kind of

11   verdict form that takes the jury straight to a question of

12   violation, yes, no, is improper in this case; that the jury

13   needs to be kept in mind of what the elements of the violation

14   are that they are to consider with each instruction.

04:49:44  15       With that in mind and not knowing what the plaintiffs

16   were planning to do, we got no response on that over the

17   weekend, we have an alternative, which is a somewhat -- we are

18   not withdrawing our request that the verdict form that we

19   proposed be used, and we think it is -- it is the proper way

04:50:05  20   to instruct the jury.

21       It asks the jury to go through the deliberations

22   here.  It's a complicated form.  It's complicated because

23   there are so many statements, so many theories, so many

24   defendants; but it can't get any less complicated and still

04:50:20  25   protect the individual defendants' right to a separate

TAB 26

4074

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3  LAWRENCE E. JAFFE PENSION PLAN, )
    on behalf of itself and all    )
 4  others similarly situated,     )
                                   )
 5              Plaintiff,         )
                                   )
 6     vs.                         )  No. 02 C 5893
                                   )
 7  HOUSEHOLD INTERNATIONAL, INC., )
    et al.,                        )  Chicago, Illinois
 8                                 )  April 28, 2009
                Defendants.        )  9:10 a.m.
 9                      VOLUME 20
10            TRANSCRIPT OF PROCEEDINGS - TRIAL
       BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12  APPEARANCES:

13  For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                              ROBBINS LLP
14                            BY:  MR. LAWRENCE A. ABEL
                                   MR. SPENCER A. BURKHOLZ
15                                 MR. MICHAEL J. DOWD
                                   MR. DANIEL S. DROSMAN
16                                 MS. MAUREEN E. MUELLER
                              655 West Broadway
17                            Suite 1900
                              San Diego, California  92101
18                            (619) 231-1058

19                            COUGHLIN STOIA GELLER RUDMAN &
                              ROBBINS LLP
20                            BY:  MR. DAVID CAMERON BAKER
                                   MR. LUKE O. BROOKS
21                                 MR. JASON C. DAVIS
                                   MS. AZRA Z. MEHDI
22                            100 Pine Street
                              Suite 2600
23                            San Francisco, California  94111
                              (415) 288-4545
24

25
```

Bajaj - direct

4200

1    BY MR. KAVALER:

2    Q.  Do you view the information disclosed in the May 31

3    article to be identical to the information contained in the

4    July 26th article?

01:52:10  5    A.  Yes, I do.

6    Q.  What is the significance of the fact that you found an

7    article dated May 31, which contains the same article as

8    the -- same information as the -- article dated July 26, which

9    Professor Fischel counts as his sixth disclosure date?

01:52:26  10    A.  Once again, Professor Fischel made the mistake of counting

11    old information as news and a corrective disclosure.

12    Q.  Did you prepare a demonstrative that illustrates this

13    point?

14    A.  Yes.

01:52:39  15        MR. KAVALER:  Can we have 559-14, please.

16    BY MR. KAVALER:

17    Q.  What does this show us, Professor?

18    A.  On the right is the Bellingham Herald article that

19    Professor Fischel cited as a corrective disclosure.  On the

01:52:55  20    left is the American Banker article we just reviewed dated May

21    31, 2002, some two months earlier which had the same

22    information.

23    Q.  Based on your testimony, Professor, is it possible for

24    Professor Fischel to have correctly included as his sixth

01:53:11  25    disclosure date July 26th, 2002?

Bajaj - direct

4201

```
            1   A.  No.  He made a mistake.

            2   Q.  I'll cross this one off.

            3        Okay with you?

            4   A.  Yes.

01:53:24    5   Q.  Okay.

            6        Let's go to the next date, Day 7.  This is --

            7   Professor Fischel's entry reads, "8-14-02 Financial

            8   Restatement."

            9        You know what that's about?

01:53:39   10   A.  Yes.

           11   Q.  And he picked this one for his seventh disclosure date

           12   because he said it revealed information to the market causing

           13   inflation to be removed from Household's stock price?

           14   A.  That is correct.

01:53:50   15   Q.  Did you analyze this disclosure date, as well?

           16   A.  Yes, I did.

           17   Q.  Did you determine whether the restatement significantly

           18   affected Household's stock price?

           19   A.  Yes, I did determine.

01:54:00   20   Q.  What did you conclude?

           21   A.  This event is a little complicated.

           22   Q.  Unlike the rest of your testimony.

           23        (Laughter.)

           24   BY THE WITNESS:

01:54:13   25   A.  Household announced a restatement of its earnings due to
```

Bajaj - direct

4202

1      some credit card-related amortization items on August 14,

2      2002, and the stock, indeed, opened significantly lower.

3      Throughout the day, there was analyst commentary indicating

4      that this was a technical accounting matter that affected

01:54:49  5      different -- that reflected difference of opinion between

6      Household's old auditor and Household's new auditor; did not

7      indicate any malfeasance on part of Household; that the

8      amounts involved were small relative to Household's balance

9      sheet and income; and, in any case, this did not involve any

01:55:16 10      cash implications.

11          And a fundamental principle of finance is that in an

12      efficient market, accounting changes that do not involve cash

13      flow differences, the market looks through, does not react to.

14          And as this commentary hit the market during the day

01:55:38 15      on August 14th and continued after the closing hours on August

16      14th and into August 15th, Household's stock price continued

17      to recover.  On August 14th, it closed up from where it opened

18      or relative to previous day's close by 29 cents.  So, it

19      hadn't declined by the end of the day on August 14th.  And

01:56:03 20      August 15th, it went up and, if I recall correctly,

21      significantly so, according to Professor Fischel's event

22      study.

23          In any case, when you add August 14th and August

24      15th, the period over which market absorbed this news, the

01:56:21 25      market did not react negatively to this news at all, and it

Bajaj - direct

4203

1    was not significant by anybody's event study.

2    Q.   Do you have a demonstrative that illustrates what you just

3    said, Professor?

4    A.   Yes, I do.

01:56:35  5         MR. KAVALER:   Can we see 559-16, please.

6    BY MR. KAVALER:

7    Q.   What are we looking at here, Professor?

8    A.   Professor Fischel focuses on Household's stock price

9    reaction on August 14th, which he says is significantly

01:56:51  10   negative, even though in absolute terms, Household's stock

11   price increased that day.

12         But what I indicate is when you look at the two-day

13   period of August 14th and August 15th -- and I believe I

14   recall Professor Fischel testifying here on the stand that

01:57:10  15   this was a controversial day, where there was a lot of analyst

16   commentary.   When you look at the totality of analyst

17   commentary and the market understanding what this complicated

18   accounting issue was, over those two dates, even in Professor

19   Fischel's own event study, nothing happened.   There was no

01:57:28  20   significant decline in Household's stock price after adjusting

21   for market and the industry.

22   Q.   Now, Professor, in the last few examples, you've always

23   pointed to things being virtually immediately absorbed by the

24   market, and here you're telling us it took two separate days

01:57:42  25   for the market to fully understand this.   How do you reconcile

Fischel - direct

4282

1    of disclosures of headline risk, it has nothing to do with

2    Household stock prices during the relevant period.  One of

3    their exhibits, which they didn't show, which I think maybe we

4    can show, which demonstrates that point very powerfully.

04:14:24  5         And third, another thing that Dr. Bajaj failed to

6    mention -- my friend, Dr. Bajaj -- is that a number of

7    analysts thought Household was benefiting by headline risk,

8    not harmed but benefited.  And we can go through that.  I have

9    some evidence of that.  And the reason is that Household was a

04:14:47 10    strong, well-capitalized company.

11         A number of analysts thought that if there was going

12    to be a regulatory crackdown because of abuses, the regulatory

13    crackdown would affect the smaller fringe firms so that firms

14    like Household would be in a better position competitively,

04:15:11 15    because a lot of their rivals -- the smaller, less

16    well-financed firms -- would be driven out of business.

17         So I guess I have those three different opinions.

18    Q.  Okay.  Let me show you what we have marked as

19    Plaintiffs' 140.

04:15:24 20    (Document tendered.)

21    BY MR. BURKHOLZ:

22    Q.  This is an April 10th, 2002, Legg Mason report.

23         MR. BURKHOLZ:  I would move this into evidence, your

24    Honor, subject to the limiting instruction.

04:15:42 25         THE COURT:  Number again, please?

Fischel - direct

4283

1          MR. BURKHOLZ:  It is 140.

2          THE COURT:  It's admitted subject to the limiting

3     instruction.

4     (Said exhibit was received in evidence.)

04:15:55  5     BY MR. BURKHOLZ:

6     Q.  If we can, turn to the third page at the bottom.  If we

7     can highlight the paragraph, "Lastly."

8          I think it's Tab 5 in your binder.

9     A.  This is an important --

04:16:21 10     Q.  Let's get the context of this report.

11          So this is a Legg Mason report coming out April 10th,

12     2002, the day after the FRC conference in which Mr. Schoenholz

13     and Mr. Aldinger spoke, right?

14     A.  Correct.

04:16:37 15     Q.  And Legg Mason -- this is the same analyst who was

16     commenting -- had all the questions about the securitization

17     and 10-K documents December 11th, right?

18     A.  Correct.

19     Q.  And what's the significance of the paragraph that we have

04:16:50 20     highlighted, to your opinion?

21     A.  Well, this really goes to the issue of how market

22     participants became increasingly skeptical of Household's

23     denials and its defenses of its accounting and lending

24     practices.

04:17:14 25          In fact, again to put this in context, I believe the

Fischel - direct

4284

1    last thing that Dr. Bajaj said was that the disclosure on

2    April 9th that Household made, when the stock price went up,

3    that proved, in his opinion, that there was some fundamental

4    inconsistency between that stock price increase and

04:17:40  5    plaintiffs' theory of the case.

6        In fact, in my opinion, it's precisely the reverse

7    because what happened was, market participants looked at what

8    Household said on April 9th; they thought it was false and

9    misleading -- as I will get to this quote in a minute -- and,

04:18:01  10    in fact, Household ultimately had to correct, had to restate,

11    its disclosures about the reaging issue because they were

12    found to be false and misleading.

13        So with respect to this particular paragraph, which

14    really supports the point that I just made, the analyst

04:18:22  15    states, "Lastly, and perhaps most importantly, we also believe

16    that these policies" -- these are the reaging policies that

17    were just described the day before by Household -- "overstate

18    reported earnings per share and support a relatively lower

19    price-earnings multiple for Household.  While Household

04:18:50  20    reported solid earnings per share and asset quality in 2001,

21    we now know that the asset quality was artificially improved

22    by the significant increase in the reaged portfolio.

23        "To put it another way, Household appeared to

24    significantly outperform its fellow subprime lenders which

04:19:09  25    struggled with rising losses and delinquencies last year.  It

Fischel - direct

4285

1    now appears this was more accounting-related rather than

2    driven by fundamentals, and we think Household should trade at

3    a discount as a result."

4         So when Dr. Bajaj said the market learned the truth

04:19:25  5    for the first time about Household's reaging policies the day

6    before, again, if you want to use the word the "truth," the

7    truth is precisely the reverse.  What market participants

8    concluded, and Household ultimately had to admit, that the

9    very statement which Dr. Bajaj said gave investors the truth

04:19:48 10    was itself false and misleading and ultimately had to be

11    corrected when Household had to correct its 2001 10-K.

12         MR. KAVALER:  Your Honor, sidebar?

13         THE COURT:  Sure.

14    (The following proceedings were had at sidebar:)

04:20:25 15         MR. KAVALER:  Your Honor, this is sounding to me

16    suspiciously like another instance where an expert is going to

17    try and sneak up on a document you specifically prohibited,

18    and that's the SEC consent decree.

19         MR. BURKHOLZ:  That's not going to happen.  I can

04:20:39 20    guarantee it.

21         MR. KAVALER:  He said Household was required to say

22    it was untrue.  It sounded to me like that's where he is

23    going.

24         I want to be absolutely certain that this time we

04:20:48 25    have a clear record.

Fischel - direct

4286

1          I am objecting in advance.  I am asking that counsel

2     be instructed to make sure the witness --

3          THE COURT:  Wait a minute.  Let me find out what's

4     going on first.

04:20:55  5          MR. BURKHOLZ:  All he talked about was the 2001 10-K

6     that was restated.  That's all he said.

7          THE COURT:  So when he said they had to restate it,

8     he was talking about the 10-K?

9          MR. BURKHOLZ:  Yes.  That's already been testified.

04:21:05 10     He is not going to talk about any SEC consent.

11          THE COURT:  That's already in evidence?

12          MR. KAVALER:  I have no problem with that.  I thought

13     he was heading to the C and D.  I want to be absolutely

14     crystal clear.  If that happens, I have a major problem,

04:21:15 15     because that's a document you ruled out.

16          We made specific tactical decisions in our case

17     because of your rulings.  We did not call witnesses we might

18     have called.  There is no way they can open their own door

19     here, your Honor.

04:21:27 20          And if that is attempted or effected, it's going to

21     have serious consequences.

22          MR. BURKHOLZ:  It's not going to happen, your Honor.

23          THE COURT:  Okay.

24     (End of sidebar proceedings.)

25     BY MR. BURKHOLZ:

TAB 27

4304

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all     )
 4   others similarly situated,      )
                                     )
 5               Plaintiff,          )
                                     )
 6      vs.                          )  No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )  Chicago, Illinois
 8               Defendants.         )  April 29, 2009
                                     )  9:12 a.m.
 9
                              VOLUME 21
10              TRANSCRIPT OF PROCEEDINGS - TRIAL
          BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
14                             BY:  MR. LAWRENCE A. ABEL
                                    MR. SPENCER A. BURKHOLZ
15                                  MR. MICHAEL J. DOWD
                                    MR. DANIEL S. DROSMAN
16                                  MS. MAUREEN E. MUELLER
                               655 West Broadway
17                             Suite 1900
                               San Diego, California  92101
18                             (619) 231-1058

19                             COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
20                             BY:  MR. DAVID CAMERON BAKER
                                    MR. LUKE O. BROOKS
21                                  MR. JASON C. DAVIS
                                    MS. AZRA Z. MEHDI
22                             100 Pine Street
                               Suite 2600
23                             San Francisco, California  94111
                               (415) 288-4545
24

25
```

4332

1   somebody --

2          THE COURT:  That's only if there's evidence from

3   which they can conclude that Arthur Andersen's conduct was

4   reckless.  And the only evidence -- well, first, there is no

12:54:21 5   evidence in the record right now.  None.  There's just no

6   evidence with respect to Arthur Andersen, that I can come

7   across, that leads to that conclusion.

8          You're arguing that the plaintiffs' pleadings should

9   be taken as part of the record in this case; and, that they

12:54:37 10   are binding -- conclusively binding -- as to what they pled

11   against Arthur Andersen.

12          MR. KAVALER:  As against the plaintiff.

13          THE COURT:  And the only -- well, you can't give it

14   to the jury and say, "You can only consider an issue if it's

12:54:51 15   favorable to us.  Otherwise, you have to take it as being

16   unfavorable to the plaintiff."

17          I mean, it either goes to the jury or it doesn't.

18          MR. KAVALER:  No, your Honor, you missed my point.

19   I'm not asserting the plaintiffs' submissions are binding on

12:55:07 20   Andersen.

21          I'm not asserting that the plaintiffs' admissions

22   bind Andersen or establish liability against Andersen.  They

23   prevent the plaintiffs from opposing -- as they're doing --

24   our asserting --

12:55:20 25          THE COURT:  Well, if they don't establish liability

4361

01:32:58

1          The other issue that we have with the questions on

2     the form that the plaintiffs have proffered is that we believe

3     the jury should be given more guidance on the elements of a

4     10b-5 claim; that they should not be permitted to simply walk

5     into the jury room and say, "Violation:  Yes or No"; that they

6     should get more guidance on applying the elements, as they

7     must, to each particular statement that is alleged to be false

8     or misleading.

9          So, we have incorporated that suggestion into another

01:33:17   10   variation, which would, again, require the verdict -- the jury

11    to go through the form, the list of statements once, for all

12    four defendants.

13         May I offer that form?

14         THE COURT:  I'm not going to do that.  I mean, you

01:33:30   15   can offer that, but I'm not going to do that.  We give them an

16    instruction; we tell them what the elements are; we define

17    each element; and, we tell them that to find a violation they

18    have to find that the plaintiff proved each such element by a

19    preponderance of the evidence.  And if it the plaintiff did

01:33:47   20   not, then they haven't established a violation.

21         I'm not going to repeat the elements of the offense

22    in the verdict form, again.  I understand why you would want

23    to do that, but it's not necessary.

24         If the jury is not going to follow the Court's

01:34:14   25   instructions, then we're all in trouble here, folks.  But I

4362

1        think we know the law is pretty clear; and, I have no doubt

2        with respect to this jury -- that has been as attentive

3        through a prolonged and difficult trial as I have ever seen a

4        jury -- that they will follow the Court's instructions and

01:34:28  5        they will not find that Statement One has been violated by

6        Household and disregard the elements instruction we gave them

7        on all of the 10b-5 statements.  I'm not going to do that.

8              I think that it's entirely possible that the verdict

9        form could be reshaped so as to make it easier for jurors to

01:34:55 10        follow Statement One through all of the defendants, rather

11        than all of the statements through each defendant, which this

12        form makes it easier for them to do.

13              And if you want to take a crack at doing that, I'll

14        be happy to consider it.  Otherwise, I'm simply going to tell

01:35:12 15        the jury, when I show them the verdict form, that they have an

16        option.  They can go through all 40 statements with respect to

17        defendant Household; and, then, go back to the next defendant,

18        Mr. Aldinger, and go through all 40 statements; or, they can

19        take one statement, Statement No. One, and analyze it with

01:35:29 20        respect to the defendant Household; and, then, go on to Page 6

21        and analyze it with respect -- or Page 8, whatever it is --

22        with respect to defendant Aldinger, and so on and so on.

23              Either way will work.  I think the way you have

24        suggested would make it easier for the jury -- and I'd be

01:35:50 25        happy to consider it -- but I'm not going to make a change as

4363

1    to include the elements in the verdict form.  I'm just not

2    going to do that.

3           MS. BEER:  Your Honor, the question on the

4    plaintiffs' verdict form as to whether a particular defendant

01:36:07  5    violated Section 10(b), Rule 10b-5, without a separate

6    question as to whether this statement gives rise to whether

7    the element of loss causation has been established as to a

8    particular statement, introduces an ambiguity, because a

9    violation of 10(b) and 10b-5 does not, in itself, include a

01:36:31 10    finding of loss causation.

11           THE COURT:  Well --

12           MS. BEER:  Loss causation is an element of the cause

13    of action.

14           THE COURT:  Sure.

01:36:36 15           But if you wanted that, you should have included that

16    in your argument when we were discussing what elements ought

17    to be included in the elements instruction on a 10b-5

18    violation.  And that was never discussed by anyone and it's

19    too late to bring it up now.

01:36:48 20           MS. BEER:  Your Honor --

21           THE COURT:  And you can't discuss it now in the

22    context of adding that to a verdict form rather than the

23    elements instruction.

24           MS. BEER:  No, I'm sorry I'm not making myself clear.

01:36:58 25           The elements instruction sets forth the elements of a

4365

```
       1        MS. BEER:  I will just reiterate the defendants'
       2  objection to the use of a verdict form that does not require
       3  the jury to make a finding as to the specific elements of a
       4  10b-5 cause of action, as to each specific statement.
01:39:02  5        THE COURT:  Well, I agree with you and I would not do
       6  that; but, this clearly does, indeed, require them to find
       7  that the plaintiffs have prevailed, and the 10b-5 elements
       8  instruction tells them that in order to prevail, they must
       9  find that plaintiffs have proved by a preponderance of the
01:39:17 10  evidence each of the four elements included in that
      11  instruction.
      12        MS. BEER:  I believe it's our view that the verdict
      13  form should repeat -- either repeat the elements or include a
      14  specific reference to the elements instruction.  And this does
01:39:37 15  neither; and, therefore, our objection, I'm afraid, has not
      16  been alleviated.
      17        THE COURT:  Okay.  Your points are noted for the
      18  record.
      19        Anything else with respect to this portion of the
01:40:08 20  verdict form?
      21        (No response.)
      22        THE COURT:  I think it remains the same through each
      23  of the defendants.
      24        MS. BEER:  Your Honor, would it be appropriate to
01:40:28 25  list the individual defendants before "defendant Household"
```

4366

1    simply because of the findings as to defendant Household is

2    dependent upon the findings as to the individual defendants?

3              MR. BROOKS:  That's not the case, your Honor --

4    sorry.

01:40:45  5              THE COURT:  Excuse me?

6              MR. BROOKS:  It's not the case, Judge.  I think in

7    the jury instruction discussions we've discussed Household can

8    be liable even if the individual defendants aren't.

9              THE COURT:  I don't think it makes any great

01:40:57 10    difference, rather than -- I don't think it makes any great

11    difference.

12              Then after the last defendant, the instruction

13    form -- the verdict form -- reads, "If you answered 'No' for

14    all of the statements in Questions 1, 4, 7, 10 and 13, you

01:41:29 15    have finished with the verdict form."

16              I think you just need to add in there that they

17    should turn to the last page, sign and date the form and let

18    the Court know that they have finished.

19              MR. DROSMAN:  Your Honor, I should probably add a

01:41:46 20    date entry on the last form.  I think there's just signature.

21              THE COURT:  On the verdict form?  Yeah.

22              MR. DROSMAN:  I'll add a date.

23              THE COURT:  Okay.

24              "If you answered 'Yes' for any statement, please

01:42:13 25    proceed to Question No. 16."

4367

1              Question No. 16 starts out, "Write the amount of loss

2   per share, if any, that any defendant or former defendant's

3   conduct -- " I guess we can leave out "or former

4   defendants" -- " -- any defendant's conduct caused plaintiffs

01:42:52  5   to suffer on each of the dates set forth in Table B.

6              "If no loss was caused on any date, write 'None'."

7              I suppose we could put in there, "Write 'None' or

8   'Zero.'"

9              We'll get this back with a bunch of zeros, then

01:43:21 10   there's a problem.  So, write "None" or "Zero."

11             Is there any objection to that portion of the verdict

12   form?

13             MS. BEER:  Yes, your Honor.

14             THE COURT:  Proceed.

01:43:29 15   MS. BEER:  There are two points here.  One is that we

16   believe before the jury is directed to Table B, they should

17   record their decision as to which of the two models they are

18   using.

19             THE COURT:  How about that?

01:43:46 20   MR. DROSMAN:  Well, your Honor, I think the jury is

21   free to put something that's -- any damage amount that's --

22   reasonable in the Table B.

23             THE COURT:  Yeah, but they only have two ways to

24   figure out what's a reasonable damage amount:  Either of the

01:43:59 25   two theories Professor Fischel gave them.  Anything else is

4368

1    outside the evidence presented in the case.  It would be

2    creating their own theory of liability.

3         MR. DROSMAN:  Well, if that's the case, then what

4    we're doing, again, is we're posing Question No. 17 and asking

01:44:14  5    them the same question twice.  Because we're going to know

6    immediately what model they chose because it's either going to

7    conform to the artificial inflation numbers in the leakage

8    model or in the specific disclosures model.

9         THE COURT:  You know what my fear is with the way

01:44:27 10    this is -- and it's something I was going to bring up when we

11    got to the next two questions, but I think it comes in

12    logically with the issue counsel has raised -- that the way

13    this is stated here, you'll have two tables come back all

14    filled out.  You'll have amounts from both the specific

01:44:54 15    disclosure model and the leakage model.

16         MR. BROOKS:  The only reason these questions are

17    parsed out like this, Judge, is because Question 17 was going

18    to go to the specific disclosures.  I think that we can modify

19    the questions and --

01:45:11 20         THE COURT:  I think it would be best starting with

21    what counsel has suggested, to ask them to make a specific

22    finding as to which model they find most accurately reflects

23    the damages, if any; and, then, specifically instruct them

24    that they're to use one model and one model only.

01:45:32 25         MR. BROOKS:  And we would suggest, Judge, that we

4408

1    entirety of the record on that date.

2         That instruction was in lieu of the Instruction 24

3    before me now?

4         MS. BEER:  Yes, your Honor.

03:12:31 5    THE COURT:  Okay.  Then obviously it's been denied.

6         Next is 24A.

7         MS. BEER:  Again, defendants object to the giving of

8    this instruction.  We're aware of no cases in this circuit on

9    which a duty to disclose has been found on the basis of prior

03:13:19 10   statements other than the line of cases that deal with a duty

11   to correct, which is not a factual scenario that is applicable

12   to this proposed instruction.

13        THE COURT:  No, I think it applies to the two 10-K,

14   10-Q statements that we've identified as containing language

03:13:55 15   which would require a disclosure, so I think as to those two

16   it applies.

17        There's no change from what it was last time we

18   discussed it, correct?

19        MR. DROSMAN:  Correct, your Honor.  We inserted what

03:14:08 20   you gave us.

21        THE COURT:  Okay.  Then it will be given.

22        Number 25, I think there was some language changed

23   there.  We changed the language "a person or organization

24   assumed to be of", we changed that to "presumed to have."

03:14:48 25   MR. DROSMAN:  Right.

4418

1    the respondeat superior instruction, your Honor, I think we

2    have no objection.  For that language to be included in the

3    scienter instruction in a way that alters the scienter

4    instruction, we continue to object.

03:37:58 5    THE COURT:  Well, what I'm proposing is that the

6    scienter instruction remain as paragraph 1 and that the

7    corporation then be addressed in paragraph 2, and that we

8    address the corporation not only as to scienter but also as to

9    actual acts in paragraph 2 by pointing out that the

03:38:27 10    corporation can only act through its employees; that if any

11    employee, acting within the scope and in furtherance of the

12    corporation's goals, violates 10b-5, then the corporation

13    violates 10b-5.  And then we define scope of employment.

14    Does that alter anything?

03:38:55 15    MS. BEER:  I think what we're losing is the scienter

16    instruction.

17    THE COURT:  As to what?

18    MS. BEER:  We do not have that the plaintiffs must

19    demonstrate that defendant acted with an intent to deceive,

03:39:06 20    manipulate or defraud as the Supreme Court requires is the

21    definition of scienter.

22    We removed that from the instruction on the elements

23    of 10b-5 on the assumption that the more specific, more

24    detailed instruction on the scienter element would include the

03:39:23 25    information that was removed in order to abbreviate the

4419

1    elements instruction, but now it's not here either.

2         THE COURT:  Okay.  Okay.  So let's do this.  Why

3    don't you both prepare an instruction and submit it as soon as

4    you can.  You can do it by e-mail, and I'll pick one and give

03:39:42  5    it.

6         MR. DROSMAN:  Okay, your Honor.

7         THE COURT:  I think that there is a need to go back

8    and start on I guess you could say square one, whatever, with

9    this.  I think that there may be assumptions in this latest

03:40:06 10    iteration that we've lost sight of.

11         So let's -- you each prepare what you believe to be

12    an appropriate instruction on scienter as to the defendants

13    and also as to the respondeat liability of the corporation in

14    all respects.

03:40:37 15         MS. BEER:  Is that intended to be an instruction that

16    replaces both -- try to get the numbering right here -- Number

17    26, scienter, and Number 29, respondeat superior?

18         THE COURT:  Yeah, yeah.  You could break it up into

19    two instructions.  You can break it up into two instructions

03:41:03 20    if you want, but I want a submission that fulfills both of

21    those instructions.

22         MS. BEER:  Very clear, your Honor.  Thank you.

23         THE COURT:  Now, my recollection is that I think the

24    only thing we took out of that scienter instruction was the

03:41:44 25    acting in furtherance of the corporation's goals because we

TAB 28

4427

```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all    )
 4   others similarly situated,      )
                                     )
 5              Plaintiff,           )
                                     )
 6      vs.                          )  No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )  Chicago, Illinois
 8                                   )  April 30, 2009
                Defendants.          )  8:41 a.m.
 9
                              VOLUME 22
10                 TRANSCRIPT OF PROCEEDINGS - TRIAL
            BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
14                             BY:  MR. LAWRENCE A. ABEL
                                    MR. SPENCER A. BURKHOLZ
15                                  MR. MICHAEL J. DOWD
                                    MR. DANIEL S. DROSMAN
16                                  MS. MAUREEN E. MUELLER
                               655 West Broadway
17                             Suite 1900
                               San Diego, California  92101
18                             (619) 231-1058

19                             COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
20                             BY:  MR. DAVID CAMERON BAKER
                                    MR. LUKE O. BROOKS
21                                  MR. JASON C. DAVIS
                                    MS. AZRA Z. MEHDI
22                             100 Pine Street
                               Suite 2600
23                             San Francisco, California  94111
                               (415) 288-4545
24

25
```

Dowd - closing

4471

1    attorney generals were all over them.  They know that these

2    people had found, yeah, you did engage in a nationwide pattern

3    of abuse.  It's not just me saying it.  It's not just

4    Mr. Burkholz or Mr. Drosman saying it.  The AGs were telling

10:03:01    5    them, ladies and gentlemen.  The regulators were telling them.

6    They knew when they made this statement that it was false.

7    They all knew.  And, again, if you say Ms. Hakes seemed like a

8    nice lady and maybe she didn't know, doesn't get them off the

9    hook.  When Hakes speaks, Household speaks.  It's that simple.

10:03:17    10    Now, let's talk a little bit more about some of the

11    evidence of predatory lending.  I'll try to go through this

12    quickly because I think you've heard an awful lot about it.

13    Ms. Ghiglieri testified.  She testified that

14    Household engaged in widespread predatory lending practices.

15    She was a witness that was on the stand the longest in this

16    case.  I think altogether she was up there for nine, ten hours

17    between direct and cross.

18    And she walked you through all those predatory

19    practices that the company engaged in, didn't she?  So what

10:03:44    20    did the defendants say?  They bring in Mr. Bley, and they say,

21    well, gee, you know Cathy Ghiglieri, she was a bank regulator.

22    She was a bank regulator and we're a thrift company, you know,

23    so her testimony should be discounted somehow.

24    Think about that, ladies and gentlemen.  I'm sure

10:04:02    25    where you're from it's just like where I'm from, okay.  If

Dowd - closing

4472

1    it's deceptive and unlawful, it's deceptive and unlawful

2    everywhere, isn't it?  I mean, there's no confusion about

3    that.  She told us the same rules about stuff like that apply.

4    You can't just say we're a thrift company so it's okay to lie.

10:04:21    5    That's just a phony story to begin with.

6          And then ask yourself this:  If she didn't know what

7    she was talking about, how come the defendants called her when

8    they were looking for an expert?  They weren't worried about

9    her being a bank regulator then, were they?  No, not at all.

10:04:38   10    That's just to try to throw you off the scent, like many of

11    the things that you've heard in this case.

12          Let's take a look at those practices and we'll try to

13    do it quickly.  Let's take a look at the practices that

14    Ms. Ghiglieri referred to.  She talked about effective and

10:04:55   15    equivalent rate.  We'll talk about that as we go through this.

16    She talked about insurance packing.  She talked about failure

17    to properly disclose things to customers.  She talked about

18    excessive points and fees, loan splitting, prepayment

19    penalties, loan flipping, and finally equity stripping and

10:05:07   20    closing the back door, which kind of ties together.

21          She walked you through all that stuff.  She showed

22    you regulator reports that talked about it.  It wasn't just

23    her.  She was basing it on the evidence she saw in their

24    files, what they knew, what they were told.  That's what she

10:05:20   25    based it on, their e-mails, their internal documents.  So,

Dowd - closing

4478

1     these practices to drive that phony growth, don't they?

2          So what else do we see, ladies and gentlemen?  We see

3     the regulators.  The regulator reports, we put a list up here

4     for them and you'll see that when you get back in there and

10:11:38  5     look at the exhibits.  The regulators kept warning Household

6     about it.

7          We did a lot of them with Mr. Gilmer, you know, where

8     we showed him regulator reports, a lot with Ms. Ghiglieri.

9     They were showed all these documents.  They were being told

10:11:48 10     they were improper.  Okay?  They didn't care.  Because all

11     they cared about was growth in the stock price, phony growth

12     generated by the predatory practices.

13          And you heard Mr. Cross.  We played him on a

14     videotaped deposition, the Washington regulator.  Remember

10:12:01 15     that guy?  And he even told you at one point during his

16     testimony, he said something like, well, customers come in and

17     complain.  You know, at first you go to the company and they

18     say, oh, that's hogwash.  And he goes, you're kind of inclined

19     to believe them because it's like a big company and then

10:12:14 20     you've got some customer complaining.  But then it just kept

21     being the same stuff.  People were telling the same stories.

22          And then what happened?  Washington was finding these

23     things and so were people in other parts of the country, so

24     were other regulators and attorneys general, and it built.  It

10:12:29 25     built from 12 states telling them you're engaging in predatory

Dowd - closing

4479

1    practices to 15 to over 20 to over 25 to ultimately where they

2    ended up with all of them.  So, ladies and gentlemen, take a

3    look at those regulator reports as you go through these

4    issues.

10:12:42  5        Let's talk a little bit more about predatory lending.

6    I want you to know that, you know, we had the -- Household was

7    investigated by the attorney generals.  They found widespread

8    and pervasive predatory practices.  They ended up settling for

9    484 million.

10:12:59 10        You know, ladies and gentlemen, that 484, that's just

11   to show you that this was a material issue.  I mean, this

12   wasn't some joke.  I mean, 484, as Mr. Ancona put it, was a

13   risk to the company, 500 million.  So you understand that this

14   was material.  This was important.  All right?

10:13:14 15        Let's take a look at Plaintiffs' -- I think it's 516.

16   And this is just an example.  This is a memo that came from

17   Mr. Huey.  He was the guy in the Washington AG's office who

18   was talking on behalf of these other AGs.  I think at this

19   point there were 13 or 15 states that were dealing with

10:13:31 20   Household.

21        And he sends it to Ms. Curtin.  She forwards it on to

22   others at the company.  Let's take a look at what he was

23   telling these people.

24        This is June of 2002, ladies and gentlemen.  And he

10:13:47 25   tells them a number of states through their AG's offices,

Dowd - closing

4480

1    through their financial regulatory agencies, have been

2    investigating Household residential mortgage practices. These

3    investigations have revealed Household engages in widespread

4    lending patterns and practices that violate both state and

10:14:02  5    federal law.

6            Then he goes through them, ladies and gentlemen. He

7    talks about these significant patterns and practices. He says

8    they're national in scope, not confined to a single branch

9    office. Then he walks through them one after another.

10:14:16 10    Splitting loans, that's those side loans, ladies and

11    gentlemen. He talks about misrepresenting the loan fees. He

12    talks about this discount fee issue, the discount fees.

13            Then he goes on to talk at the top of the second page

14    about the good faith estimate being too great. I mean, when

10:14:33 15    you're telling people zero to $7,000, it ain't right. That's

16    what he's telling them.

17            Then he talks about misrepresenting the rate of

18    interest. There he's talking about effective rate and issues

19    like that. He talks about flipping in the next one,

10:14:46 20    equity-based lending, flipping. He talks about packing

21    insurance, single premium credit insurance. Then he goes on

22    to talk about imposing prepayment penalties.

23            You need to look at these documents, ladies and

24    gentlemen. But when you look at them, think, it ain't just us

10:15:01 25    saying it. These are attorney generals from 12 to 15 states

Dowd - closing

4481

1    telling these guys, we've done investigations and this is

2    what's going on out there.  It ain't just us.

3         Let's take a look -- look a little bit further.  We

4    talk about materiality.  Well, ladies and gentlemen, you know,

10:15:17  5    we know the 484.  Mr. Devor testified in this case -- he was

6    our expert in accounting -- and he said that he's seen

7    internal company documents where they estimate the refunds at

8    3.2 billion.  That's what he said, okay, for these practices.

9    We know the number ended up lower than that ultimately when

10:15:36 10    they settled, but he talked about loan splitting,

11    misrepresenting fees, misrepresenting interest, insurance

12    packing and prepayment penalties.

13         So we know, ladies and gentlemen, we know that this

14    was a material issue, that this was far widespread, that we

10:15:51 15    weren't talking about 47 complaints.  And how did he come up

16    with that?  Well, we didn't show the documents to Mr. Devor,

17    but they came in later in the evidence.  All right.

18         And if we can pull up plaintiffs' demonstratives,

19    you'll see.  There's a Plaintiffs' Exhibit 681 that came into

10:16:09 20    evidence, ladies and gentlemen.  681 was an estimate of AG

21    costs, and it was a document prepared July 2002.  That's what

22    the string says on it at the bottom.

23         And that document estimates -- contains estimates of

24    AG costs, Household figuring out how much they were going to

10:16:33 25    owe on these things.  Okay.  It talks about side loans.  You

Dowd - closing

4482

1    can see it in the upper left-hand corner, side loans.  Points.

2    Interest rates.  Equity-based lending.  Single premium credit

3    insurance.  Prepayment penalties.

4         And they list the numbers out there in millions.  217

10:16:53  5    million for side loans.  Over a billion for points.  Over 1.2

6    billion for interest rate.  Over 66 million for this

7    equity-based lending.  Over -- I believe it's 460 million for

8    the single premium credit insurance.  And prepayment

9    penalties, 161 million.

10:17:12 10         So you say, okay, well, this is just a piece of paper

11    in their files, right?  No.  Mr. Devor told you he relied on

12    it.  But where does it come from?  How do you tie it to this

13    stuff?

14         Ladies and gentlemen, when you get back there, you

10:17:24 15    take that Exhibit 681 and you compare it to Exhibit 516, the

16    one that came from the attorney generals.  And you'll see, as

17    we go to the next exhibit, they tracked right down.  The AGs

18    list out all those practices we just talked about in that

19    exhibit, splitting loans, misrepresenting loan fees,

10:17:44 20    misrepresenting rate of interest, engaging in equity-based

21    lending, packing single premium credit insurance, imposing

22    prepayment penalties.

23         And it's obvious that they're figuring out what the

24    costs are as to how much they think they are on the hook for

10:17:58 25    that.  But the evidence is uncontroverted for Mr. Devor.  He

Dowd - closing

4483

1    told you it was 3.2 billion.  You didn't hear anybody say

2    anything else.  They didn't call an accountant to tell you

3    anything else.

4              So let's keep talking, ladies and gentlemen.  We'll

10:18:12  5    spend a couple of minutes now talking about, I believe, the

6    effective rate.  Let's talk about the effective rate.  You

7    heard Mr. O'Han.  He testified that Walter and Hueman, they

8    provided nationwide effective rate training.

9              I want to talk to you about it, because these guys

10:18:26 10    keep talking about the tone at the top, right?  They sent out

11    those memos that say don't do anything bad.  Okay.  Let's talk

12    about the tone at the top we really saw at this company.

13             Let's bring up Plaintiffs' Demonstrative 174.  So

14    let's take a look at effective rate.  This shows you that

10:18:44 15    starting back in 1998, Aldinger brings Gilmer back from the

16    United Kingdom to focus on growth.  Then right after that,

17    they go out and they get Andrew Kahr.  Andrew Kahr is going to

18    come in, the opportunistic growth consultant.

19             And so they come up with their initiatives, right?

10:19:02 20    And what is one of the initiatives that Mr. Kahr and

21    Mr. Gilmer come up with?  It's to offer biweekly payment loans

22    to reduce the effective rate, the APR, the annual percentage

23    rate, effective rate.

24             Let's take a look at Plaintiffs' Exhibit 347.  This

10:19:19 25    document was received in evidence during the course of the

Dowd - closing

4497

1    minutes -- where they say Schoenholz and the guys from the

2    audit committee met with the government regulators the day

3    before to talk about the benchmarking study.  There's no

4    question that when they signed that 10-K on March 12, they

10:36:07    5    knew what was in there.  They knew what was in this study.

6    Okay?

7            What was in this study, ladies and gentlemen?  When

8    you flip through it, do you know what you're going to see?  We

9    restructure automatically.  They call them extensions,

10:36:20   10    re-ages, restructures.  We do it automatically.  We do it on

11    one payment.  We don't require two payments.  We don't require

12    consecutive.  That's what was in this document.

13            You flip through it, ladies and gentlemen, and you

14    tell me if Mr. Aldinger and Mr. Schoenholz can sit there with

10:36:33   15    a straight face and tell you they didn't know.  But you know

16    what, ladies and gentlemen?  You know.  You know that they

17    knew.

18            Let's just take a look at Plaintiffs' 649 for a

19    second, January 2002.  Again, Plaintiffs' 649.  And this is an

10:36:51   20    e-mail that Mr. Schoenholz received, ladies and gentlemen.  He

21    got it in January of 2002.  Mr. Makowski, the chief credit

22    officer, reports directly to him, Subject, our re-age policy.

23    One of the policies that creates headline risk is the

24    one-payment re-age.

10:37:10   25            Come on, ladies and gentlemen.  Mr. Schoenholz is

Dowd - closing

4498

1    seriously going to sit on this witness stand and tell you that

2    when he signed that 10-K he didn't know they were doing one

3    payment re-ages?  This isn't the only document that says this.

4    There's a ton of them that say it, ladies and gentlemen.

10:37:23  5    These guys absolutely knew, but people were asking questions

6    and they decided to lie.  That's what happened here.  The

7    evidence was there for it.  Mr. Aldinger admitted it was a

8    materially false and misleading statement.

9        Your Honor, did you want to take a break?

10:37:38  10    THE COURT:  This is a good time to take a break.

11    We'll take a 15-minute break, ladies and gentlemen.

12    (Jury out.)

13    THE COURT:  Recess for 15 minutes.

14    (Recess taken.)

10:53:33  15    THE COURT:  Ready?

16    MR. DOWD:  Yes, your Honor.

17    THE COURT:  Okay.  Bring them out.

18    (Jury in.)

19    THE COURT:  Counsel, you may resume.

10:55:12  20    MR. DOWD:  Yes, your Honor.  All set.

21    BY MR. DOWD:

22    Ladies and gentlemen, when we left off we were

23    talking about that March, 2002, 10-K, the one with consecutive

24    payments and the reasons for the delinquencies been cured,

10:55:32  25    right?  That is this is the one Aldinger said on the witness

Dowd - closing

4499

1    stand was materially false and misleading.

2         So, what happened with this?  Well, eventually,

3    ladies and gentlemen, as you know, they had to amend that

4    10-K.  A whole year later -- March 2003, long after some of my

10:55:49  5    clients bought stock in between March, 2002, and October,

6    2002 -- they put out a new 10-K.  Okay?  It's Plaintiffs'

7    1267.  You take a look.

8         Now they say what they should have been saying all

9    along.  They go back and in their 10-K that goes out, it says

10:56:07 10    that they re-age; and, they say, "In numerous instances,

11    Household accepts one or zero payments prior to resetting the

12    delinquency status."

13         They knew that, ladies and gentlemen.  They knew that

14    in March, 2002.  They knew it all along.

10:56:21 15         It goes on to say, "In many instances, we

16    restructured delinquent accounts automatically."

17         It goes on to say they don't have to require prior

18    contact with the customer.  It's automatic.

19         Nobody's checking with somebody to see if they had a

10:56:36 20    bump in the road.  Nothing like that.  Automatic.  Okay?

21         And, so, when they came clean, they came clean a year

22    later.

23         I don't know why they waited a whole year to tell

24    people the truth, but they did.  Okay?  That's why

10:56:49 25    Mr. Aldinger had to tell you it was a false and misleading

Dowd - closing

4500

1    statement in March of 2002.

2         It got corrected in March of 2003, didn't it?

3         Now, let's just take a real quick look at Plaintiffs'

4    Demonstrative 123.  That was that chart that we showed you a

10:57:05  5    bunch of times.  I think you saw it during Mr. Schoenholz's

6    testimony, Mr. Devor's and others.  Okay?

7         Originally, they said you needed the consecutive

8    payments before they could re-age somebody.  Then they come

9    clean.  They say one or zero payments in many instances, not

10:57:19 10    consecutive, right?

11        Second, the reason -- the evidence that the reason --

12    for the delinquency "has been cured."  That's what they said

13    in March, 2002.

14        March, 2003, "Case automatic restructures.  No prior

10:57:33 15    contact is required."  And they knew that.

16        You saw Schoenholz getting the e-mail about the one

17    payment.  You saw that KPMG study.  And you're going to see

18    other evidence as you look through the exhibits.  There was no

19    doubt they knew they were doing one-payment restructures all

10:57:45 20    along.  They knew they were changing the policies all along.

21        And then they go on to describe some of the account

22    management techniques, as well.  That was the March, 2002,

23    10-K, and that's why that's materially false and misleading,

24    as Mr. Aldinger admitted.

10:57:59 25        Now, let's talk April, 2002.  Remember there was this

Dowd - closing

4501

1    Financial Relations Conference or something they called it,

2    FRC.  Mr. Schoenholz said, "Yeah, we wanted to get the word

3    out there to more people.  We wanted to tell people about our

4    re-aging; we wanted to set the record straight, give people

10:58:13  5    more information, because we know they knew investors were

6    nervous about this.  Okay?

7          And he said there were 400 people there -- all these

8    Wall Street analysts, investors.  And then they were beaming

9    it nationwide to other people that wanted to watch it, as

10:58:26  10    well.

11          Mr. Schoenholz got up that day, ladies and gentlemen,

12    and he made false statement after false statement after false

13    statement.  Okay?

14          First, he talked about the fact that their policies

10:58:39  15    on re-aging were consistently applied.  You know they weren't.

16    That was a lie when he said that, ladies and gentlemen.  He

17    knew they weren't.

18          Even Mr. Gilmer said, "Re-Aging policies, yeah,

19    Schoenholz has to be involved in changes to re-aging

10:58:53  20    policies."  He knew they weren't consistently applied.  And

21    you're going to see it in the documents as you look through

22    them.  They changed those policies.

23          We talked about a couple of them over here

24    (indicating) that shows they changed the policies.

10:59:03  25          And Ms. Markell told you they changed them daily,

# TAB 29

4672

```
 1                   IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all     )
 4   others similarly situated,      )
                                     )
 5                 Plaintiff,        )
                                     )
 6       vs.                         )  No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )  Chicago, Illinois
 8                                   )  May 1, 2009
                   Defendants.       )  1:20 p.m.
 9
                              VOLUME 23
10       TRANSCRIPT OF PROCEEDINGS - JURY INSTRUCTIONS CONFERENCE
                 BEFORE THE HONORABLE RONALD A. GUZMAN
11

12   APPEARANCES:

13   For the Plaintiff:          COUGHLIN STOIA GELLER RUDMAN &
                                 ROBBINS LLP
14                               BY:  MR. LAWRENCE A. ABEL
                                      MR. SPENCER A. BURKHOLZ
15                                    MR. MICHAEL J. DOWD
                                      MR. DANIEL S. DROSMAN
16                                    MS. MAUREEN E. MUELLER
                                 655 West Broadway
17                               Suite 1900
                                 San Diego, California  92101
18                               (619) 231-1058

19                               COUGHLIN STOIA GELLER RUDMAN &
                                 ROBBINS LLP
20                               BY:  MR. DAVID CAMERON BAKER
                                      MR. LUKE O. BROOKS
21                                    MR. JASON C. DAVIS
                                      MS. AZRA Z. MEHDI
22                               100 Pine Street
                                 Suite 2600
23                               San Francisco, California  94111
                                 (415) 288-4545
24

25
```

4679

1   calculate an element of damages.

2          MR. KAVALER:  Your Honor, they're going to calculate

3   inflation.

4          THE COURT:  You can call it an inflation element of

01:33:23  5   damages or you can just call it damages for the sake of this

6   jury.  They don't know the difference, and it won't make any

7   difference to them.  The calculation they're being asked to

8   make will serve our purposes in the next round.

9          MR. KAVALER:  It may serve some purpose, your Honor.

01:33:34  10  It will not serve the purpose of either accuracy of the law or

11  fairness.  Those are my concerns.

12         THE COURT:  Well, I don't think --

13         MR. KAVALER:  I believe it's unfair, and I believe

14  it's inaccurate.  I believe it's error.  And I respectfully

01:33:45  15  ask you to reconsider.  And if the only argument against it is

16  retyping a portion of the charge, you know, we'll do what we

17  can to alleviate the burden.  We're not trying to make work

18  for you.

19         THE COURT:  I understand.  It's not merely a question

01:33:58  20  of retyping a few words, as you know.  Everything has a

21  trickle effect in these instructions.  Everything.  We would

22  have to review the entire set of instructions.  And we'd have

23  to consider whether the language you're asking us to use

24  comports with the language that was used during the course of

01:34:13  25  the trial.  And I'm not sure that it does.  I think the term

4682

1          MS. BEER:  And if I may, there's also one other

2     objection that we have previously made that I want to be sure

3     that we are aware of today and reflected in the record.

4          To the extent the verdict form requires a

01:37:35  5     determination of the elements of a 10b-5 claim on the numbered

6     items 1 through 40 that are included on Table A, defendants do

7     object to the combination of separate statements drawn from

8     the same document as though they are one -- one statement.  We

9     feel that will be confusing to the jury and does not require

01:38:00 10     that the elements be assessed separately as to each separate

11     alleged false statement.

12          THE COURT:  I guess that's a new one.

13          MR. BURKHOLZ:  That's been made about five times,

14     your Honor.

01:38:22 15          THE COURT:  Has it?  All right.

16          Let's see.  Okay.  I have unfortunately only one copy

17     per side for three other -- three of the instructions.  I can

18     give these out to you.  Give a copy to opposing counsel.  I

19     have to do it this way or I'll get them mixed up.

01:39:30 20     (Tendered.)

21          MR. BURKHOLZ:  Got it.

22          THE COURT:  One more.  Sorry.  The longest one.

23     (Tendered.)

24          THE COURT:  Before we get started on those, I'd like

01:40:05 25     to -- I think it's instruction No. 3 which talks about

4685

```
        1          But I'll take your objections if there are any new

        2    objections.  You don't have to voice any old objections that

        3    you've already made.  They're part of the record.  They're not

        4    being erased by any failure to object yet again today.

01:44:42  5          MR. BURKHOLZ:  We're fine with it, Judge.

        6          THE COURT:  But if there's something about the new

        7    language that's here or the language that's been omitted that

        8    results in a new basis for objecting.

        9      (Brief pause.)

01:45:07 10          MS. BEER:  Your Honor, we previously objected to the

       11    language in the fourth paragraph.  That formerly referred to a

       12    prior statement.  It's now been changed to, But if -- But each

       13    defendant has a duty to disclose a fact if a prior or

       14    contemporaneous statement he or it made on the same subject

01:45:29 15    would be misleading.

       16          Just so there's no confusion, because that language

       17    has changed, we do object to the -- we do object to that

       18    language and believe that a duty to disclose is not derived by

       19    reference to a prior statement that may give rise to a duty to

01:45:48 20    correct in certain circumstances not presented in this case.

       21    But a duty to disclose does not properly arise from a prior

       22    statement.

       23          THE COURT:  Okay.  Anything else?

       24      (Brief pause.)

01:46:37 25          MS. BEER:  We have no additional objections, your
```

4687

1          If defendants William Aldinger, David Schoenholz or

2     Gary Gilmer made a statement knowing that it was false or

3     misleading or with reckless disregard for a substantial risk

4     that it was false or misleading, that defendant acted with the

01:48:28  5     required state of mind, would be the appropriate sequence for

6     the -- for the instruction to follow.

7          THE COURT:  But you've already made that objection.

8     Is there anything new?

9          MS. BEER:  The instruction does not define scienter.

01:48:52 10     As I have noted during our last conference, your Honor, we

11     removed the definition of scienter from the -- from the

12     instruction on the elements of 10b-5.  We removed it on the

13     understanding that it would be included in a separate

14     instruction that would focus on the state of mind.  And we now

01:49:12 15     have no definition of scienter in the elements instruction.

16     And we also have no definition of scienter in this

17     instruction.

18          We do need for this instruction to explain that

19     scienter means, as defined by the Supreme Court, an intent to

01:49:29 20     deceive, manipulate or defraud.

21          MR. BURKHOLZ:  Your Honor, I think that's about the

22     fifth time we've heard that argument and objection.  And I

23     think the second paragraph covers the definition.

24          MS. BEER:  That language is given in the preliminary

01:49:44 25     instructions, your Honor.  We removed it from the end of trial

TAB 30

4701

```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3    LAWRENCE E. JAFFE PENSION PLAN, )
      on behalf of itself and all    )
 4    others similarly situated,      )
                                      )
 5              Plaintiff,            )
                                      )
 6      vs.                           )  No. 02 C 5893
                                      )
 7    HOUSEHOLD INTERNATIONAL, INC.,  )
      et al.,                         )  Chicago, Illinois
 8                                    )  May 4, 2009
                Defendants.           )  9:00 a.m.
 9
                              VOLUME 24
10                 TRANSCRIPT OF PROCEEDINGS - TRIAL
           BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12    APPEARANCES:

13    For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
14                              BY:  MR. LAWRENCE A. ABEL
                                     MR. SPENCER A. BURKHOLZ
15                                   MR. MICHAEL J. DOWD
                                     MR. DANIEL S. DROSMAN
16                                   MS. MAUREEN E. MUELLER
                                655 West Broadway
17                              Suite 1900
                                San Diego, California  92101
18                              (619) 231-1058

19                              COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
20                              BY:  MR. DAVID CAMERON BAKER
                                     MR. LUKE O. BROOKS
21                                   MR. JASON C. DAVIS
                                     MS. AZRA Z. MEHDI
22                              100 Pine Street
                                Suite 2600
23                              San Francisco, California  94111
                                (415) 288-4545
24

25
```

4713

1    words, for the purpose of hiding adverse information.

2         You have heard witnesses give opinions about matters

3    requiring special knowledge or skill.  You should judge this

4    testimony in the same way that you judge the testimony of any

09:33:37  5    other witness.  The fact that such a person has given an

6    opinion does not mean that you are required to accept it.

7    Give the testimony whatever weight you think it deserves,

8    considering the reasons given for the opinion, the witness'

9    qualifications, and all of the other evidence in the case.

09:34:01 10         Certain demonstrative exhibits have been shown to

11   you.  Those exhibits are used for convenience and to help

12   explain the facts of the case.  They are not themselves

13   evidence or proof of any facts.

14         You must give separate consideration to each claim

09:34:26 15   and each party in this case.

16         When I say a particular party must prove something by

17   "a preponderance of the evidence" or when I use the expression

18   "if you find" or "if you decide," this is what I mean:  When

19   you have considered all the evidence in the case, you must be

09:34:49 20   persuaded that it is more probably true than not true.

21         Plaintiffs contend that defendants Household, William

22   Aldinger, David Schoenholz and Gary Gilmer violated Section

23   10(b) of the Securities Exchange Act and the Securities

24   Exchange Commission or SEC's Rule 10b-5.  From now on, I will

09:35:19 25   use 10b-5 to refer to both the section and the rule.

4714

1          To prevail on their 10b-5 claim against any

2     defendant, plaintiffs must prove each of the following

3     elements by a preponderance of the evidence as to that

4     defendant:

09:35:38  5          One, the defendant made, approved or furnished

6     information to be included in a false statement of fact or

7     omitted a fact that was necessary, in light of the

8     circumstances, to prevent a statement that was made from being

9     false or misleading during the relevant time period between

09:36:01 10     July 30, 1999, and October 11, 2002;

11          Two, the false statement or omission was material;

12          Three, the defendant acted with a particular state of

13     mind; and

14          Four, the defendant's statement or omission was a

09:36:24 15     substantial factor in causing plaintiffs' economic loss.

16          If you find that the plaintiffs have proved each of

17     the above elements as to any defendant, your verdict should be

18     for the plaintiffs and against that defendant.  If you find

19     that the plaintiffs have not proved each of the above elements

09:36:47 20     as to any defendant, your verdict should be for that defendant

21     and against the plaintiffs.

22          To meet the first element of their 10b-5 claim

23     against any defendant, plaintiffs must prove that during the

24     relevant time period, the defendant made a false or misleading

09:37:07 25     statement of fact or omitted a fact that was necessary to

4715

1    prevent a statement that was being made from being misleading.

2         Table A to the verdict form that you will be given

3    sets forth the statements that plaintiffs claim are false and

4    misleading.

09:37:24  5         In determining whether a statement of fact is false

6    or misleading, you must consider the statement in light of the

7    circumstances that existed at the time it was made.

8         An omission violates 10b-5 only if the defendant has

9    a duty to disclose the omitted fact.  The defendants do not

09:37:45 10   have a duty to disclose every fact they possess about

11   Household or any fact that is in the public domain.  But each

12   defendant has a duty to disclose a fact if a prior or

13   contemporaneous statement he or it made about the same subject

14   would be misleading if the fact is not disclosed.  If a

09:38:09 15   defendant does not have a duty to disclose a fact but chooses

16   to make a statement about it, the statement must be truthful

17   and not misleading.

18        Defendant Household is required to file with the SEC

19   an annual report, called a 10-K, and quarterly reports, called

09:38:33 20   10-Qs, for the first three quarters of each year.  These

21   reports include financial statements and other disclosures.

22   Financial statements present a company's financial position at

23   one point in time, or its operating results and cash flows for

24   a specified period.  Household has no duty to update its 10-Q

09:38:56 25   reports on any cycle other than quarterly.

4717

1    In determining whether a statement or omission is

2    material, you must consider it in light of the circumstances

3    that existed at the time the statement was made or the fact

4    was omitted.

09:41:00   5    To meet the third element of their 10b-5 claim

6    against any defendant, plaintiffs must prove that the

7    defendant acted with a specific state of mind.  Defendants

8    William Aldinger, David Schoenholz, Gary Gilmer acted with the

9    required state of mind in making a statement of material fact

09:41:25 10    if he made the statement knowing that it was false or

11    misleading or with reckless disregard for a substantial risk

12    that it was false or misleading.

13    Defendants William Aldinger, David Schoenholz or Gary

14    Gilmer acted with the required state of mind in failing to

09:41:46 15    disclose a material fact if he knew that the omission would

16    make another statement he made on the same subject misleading

17    or he recklessly disregarded a substantial risk that the

18    omission would make another statement he made on the same

19    subject misleading.

09:42:05 20    A defendant's conduct is reckless if it is an extreme

21    departure from the standards of ordinary care and he knows

22    that it presents a risk of misleading investors or the risk is

23    so obvious that he had to have been aware of it.

24    A finding that any defendant acted with the required

09:42:29 25    state of mind depends on what he knew or should have known

4718

1    when he made a particular statement or omission.

2         Defendant Household, which can only act through its

3    employees, had the required state of mind with respect to a

4    false statement or omission if defendants William Aldinger,

09:42:51  5    David Schoenholz, Gary Gilmer or any other Household employee

6    made the statement or omission with the required state of mind

7    while acting within the scope of his or her employment.

8         The fact that Household restated certain financial

9    statements does not, by itself, prove that any defendant acted

09:43:14 10    knowingly or recklessly with respect to the information in the

11    original financial statements.  However, you may consider it

12    along with any other evidence to determine whether any

13    defendant acted knowingly or recklessly.

14         The intent of a person or the knowledge that a person

09:43:39 15    possesses at any given time may not ordinarily be proved

16    directly because there is no way of directly scrutinizing the

17    workings of the human mind.  In determining the issue of what

18    a person knew or what a person intended at a particular time,

19    you may consider any statements made or acts done by that

09:44:02 20    person and all other facts and circumstances received in

21    evidence which may aid in your determination of that person's

22    knowledge or intent.

23         You may infer, but you are certainly not required to

24    infer, that a person intends the natural and probable

09:44:20 25    consequences of acts knowingly done or knowingly omitted.  It

4719

1    is entirely up to you, however, to decide what facts to find

2    from the evidence received during this trial.

3        To meet the last element of their 10b-5 claim against

4    any defendant as to any false or misleading statement or

09:44:43    5    omission of material fact, plaintiffs must prove that the

6    defendant's particular statement or omission was a substantial

7    cause of the economic loss plaintiffs suffered.  Plaintiffs do

8    not have to prove that any statement or omission was the sole

9    cause of plaintiffs' loss.

09:45:05    10        A statement or omission of material fact is a

11    substantial cause of plaintiffs' loss if, one, it causes

12    Household's stock price to be higher than it would be if the

13    statement had not been made or the concealed fact had been

14    disclosed; and, two, the market's discovery of the truth about

09:45:30    15    that statement or omission causes Household's stock price to

16    decrease.  The truth may be revealed to the market through a

17    single disclosure or a series of disclosures made by any

18    person or entity.

19        Household is liable for any violation of 10b-5 that

09:45:55    20    you find defendants William Aldinger, David Schoenholz, Gary

21    Gilmer or any other Household employee committed while acting

22    within the scope of his or her employment and trying to

23    further Household's goals.  A Household officer or employee

24    acts within the scope of his or her employment when

09:46:19    25    transacting business Household assigned to him or her or doing

4720

1  anything that can reasonably be considered to be a part of his

2  or her employment.

3          If you find that plaintiffs have not proved all of

4  the elements of their 10b-5 claim against any defendant, then

09:46:44  5  you should not consider the question of damages.

6          If you find that plaintiffs have proved all of the

7  elements of their 10b-5 claim against any defendant, then you

8  must determine the amount of per-share damages, if any, to

9  which plaintiffs are entitled.  Plaintiffs can recover only

09:47:07  10  actual damages, which is the difference between the price

11  plaintiffs paid for each share of Household stock and the

12  price each share would have cost if no false or misleading

13  statement or omission of material fact had occurred, in other

14  words, the measure of inflation in the stock price.  This is

09:47:32  15  the only damages calculation you will be asked to make in this

16  case.  Any damages you award must have a reasonable basis in

17  the evidence.  Damages need not be proved with mathematical

18  certainty but there must be enough evidence for you to make a

19  reasonable estimate of the damages.

09:47:56  20          Under Section 20(a) of the Securities Exchange Act, a

21  defendant may be liable for what is called a "secondary

22  violation," even if he did not violate Rule 10b-5, if he had

23  the authority to control another defendant who violated 10b-5.

24  Plaintiffs claim that each of the individual defendants,

09:48:20  25  William Aldinger, David Schoenholz and Gary Gilmer, is liable

4721

1    for a secondary violation under Section 20(a).

2          To prove that any defendant is liable for a secondary

3    violation, plaintiffs have the burden of proving both of the

4    following elements:

09:48:41  5          One, that another defendant, called a "primary

6    violator," violated 10b-5 in the manner I have previously

7    explained; and

8          Two, that the defendant was a "controlling person"

9    with respect to the primary violator.

09:48:59  10          If you determine that no defendant has violated

11    10b-5, you do not have to consider whether any defendant was a

12    controlling person.

13          If you find that any defendant was a primary

14    violator, however, you must then determine whether any of the

09:49:17  15    other defendants was a controlling person as to that primary

16    violator.

17          To establish that William Aldinger, David Schoenholz

18    or Gary Gilmer was a "controlling person," plaintiffs must

19    prove that:

09:49:32  20          One, the defendant actually exercised general control

21    over the operations of the primary violator; and

22          Two, the defendant had the power or ability, even if

23    that power was not exercised, to control the specific

24    transaction or activity upon which the primary violation was

09:49:53  25    based, in this case, making the specific false statement or

4722

1    omission of material fact.

2            Both of these elements must be established as to each

3    individual defendant.  The parties have stipulated that both

4    William Aldinger and David Schoenholz actually exercised

09:50:13 5    general control over the operations of Household, so no proof

6    is required on that element as to those two defendants, in

7    their relation to Household.

8            Upon retiring to the jury room, you must select a

9    presiding juror.  The presiding juror will preside over your

09:50:36 10    deliberations and will be your representative here in court.

11            A verdict form has been prepared for you, and we will

12    go through that verdict form.

13            A copy of the very first page of the verdict form is

14    on the screen now, ladies and gentlemen.

09:51:04 15            The verdict form you receive will include two tables,

16    Tables A and B, and will require you to answer a series of

17    questions about the issues in this case.

18            You are, of course, free to answer those questions in

19    whatever order you prefer.

09:51:26 20            For example, as to statement number one, in the case

21    of defendant Household, you might first look to Table A to

22    identify what statement number one is.  Table A, you recall,

23    is a list of all of the false statements plaintiffs claim

24    defendants made.  You would then answer question number one.

09:52:01 25            If your answer to question number one is no, then the

4723

1    plaintiffs have not established that Household is liable with

2    regard to this statement and you need not consider and need

3    not go on to answer questions two or three as to this false

4    statement in regards to defendant Household.

09:52:27  5          You would then drop down to the next defendant,

6    Gilmer, and answer the same questions as to him.

7          And then Schoenholz.

8          And then Aldinger.

9          As to any defendant for which you answer yes to

09:52:47 10   question number one, you must then answer questions two and

11    three.

12          Question number one, of course, asks if the

13    plaintiffs have prevailed on their 10(b)/Rule 10b-5 claim with

14    regard to any of the statements set forth in Table A.

09:53:16 15          Question number two requires you to identify the

16    issue or issues that the statement misrepresented.  You may

17    check more than one issue for any one statement.

18          Question three then requires you to indicate whether

19    you find that the defendant -- that the statement was made

09:53:38 20   recklessly or knowingly as to each issue.

21          After you have answered these three questions for

22    each defendant as to statement number one, you will then move

23    down to statement number two and answer the same three

24    questions.  And you will do so for each of the alleged 40

09:54:11 25   statements.

4724

1          When you have done that, you will find yourselves at

2     page 41 of the verdict form.

3          At the top of the page, you see, there will be

4     described two options for you.  If you answered no to question

09:54:50  5     number one, the question regarding liability, as to each

6     defendant for all of the 40 alleged false or misleading

7     statements, then you have finished with the verdict form.

8     You'll turn to the last page, sign and date the verdict form

9     and inform the Court that you have finished.

09:55:10 10          On the other hand, if you answered yes to question

11    number one as to any defendant for any of the 40 alleged false

12    or misleading statements, you must then proceed to answer

13    question number four.

14          Question number four involves a computation of

09:55:30 15    damages.

16          In order to determine what damages, if any,

17    plaintiffs have proved they suffered, the verdict form

18    requires you to decide if either of the damages models

19    plaintiffs has proposed allows you to reasonably estimate

09:55:52 20    plaintiffs' damages.  If not, then you check the line for the

21    first option.  You have finished your task and must turn to

22    the last page of the verdict form, sign and date it and inform

23    the Court that you have finished.

24          But if you find that one of the two proposed models

09:56:20 25    does allow you to reasonably estimate plaintiffs' damages,

4725

           1    then you must indicate which one.  You may choose only one.

           2    Then you must turn to Table B, which is part of the verdict

           3    form, and fill in the amount of loss per share that you find

           4    each of the dates -- for each of the dates on Table B.

09:56:53   5              After you have done that, you will then turn to

           6    question five.

           7              Here, you have two choices.  If you checked

           8    "knowingly" as to question number three for all 40 alleged

           9    false or misleading statements, you will then proceed directly

09:57:31  10    to question number six and need not answer question number

          11    five.

          12              However, if you checked "recklessly" as to question

          13    number three for any of the 40 alleged false or misleading

          14    statements, you must then determine what percentage of

09:57:51  15    responsibility, if any, for any loss plaintiffs suffered is

          16    due to the conduct of defendants Household, Aldinger,

          17    Schoenholz and Gilmer.  You will do this by filling in the

          18    percentage for each defendant, the percentage of

          19    responsibility that you find each of the defendants bears in

09:58:19  20    relation to the damage caused.

          21              The total must equal 100 percent.

          22              Then you will proceed to question number six.

          23              Questions six, seven and eight require you to

          24    determine if plaintiffs have proved that either of the three

09:58:50  25    individual defendants was a controlling person.

4726

1          You simply check the appropriate box, yes or no, next

2     to each of the defendants.

3          After you have finished questions six, seven and

4     eight, you will verify your findings by signing and dating the

09:59:08  5     last page of the verdict form and inform the Court that you

6     have finished your task.

7          When you have reached your unanimous agreement on the

8     verdict, your presiding juror will sign and date the

9     appropriate form along with the rest of you and you will

09:59:43 10     notify the Court that you are done.

11          I do not anticipate that you will need to communicate

12     with me.  If you do, however, the only proper way is in

13     writing.  The writing must be signed by the presiding juror,

14     or, if he or she is unwilling to do so, by some other member

10:00:04 15     of the jury.  The writing should be given to the marshal who

16     will give it to me.  I will respond either in writing or by

17     having you return to the courtroom so that I can respond

18     orally.

19          If you do communicate with me, you should not

10:00:19 20     indicate in your note what your numerical division is, if any,

21     at any time.

22          Finally, ladies and gentlemen, your verdict must

23     represent the considered judgment of each juror.  Your verdict

24     for or against any party must be unanimous.

10:00:49 25          You should make every reasonable effort to reach a

# TAB 31

05-07-09 Volume 26 (2).txt

4769

```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3    LAWRENCE E. JAFFE PENSION PLAN, )
      on behalf of itself and all     )
 4    others similarly situated,      )
                                      )
 5              Plaintiff,            )
                                      )
 6       vs.                          )  No. 02 C 5893
                                      )
 7    HOUSEHOLD INTERNATIONAL, INC.,  )
      et al.,                         )  Chicago, Illinois
 8                                    )  May 7, 2009
                Defendants.           )  10:30 a.m.
 9
                             VOLUME 26
10              TRANSCRIPT OF PROCEEDINGS - TRIAL
          BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12    APPEARANCES:

13    For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
14                              BY:  MR. LAWRENCE A. ABEL
                                     MR. SPENCER A. BURKHOLZ
15                                   MR. MICHAEL J. DOWD
                                     MR. DANIEL S. DROSMAN
16                                   MS. MAUREEN E. MUELLER
                                655 West Broadway
17                              Suite 1900
                                San Diego, California  92101
18                              (619) 231-1058

19                              COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
20                              BY:  MR. DAVID CAMERON BAKER
                                     MR. LUKE O. BROOKS
21                                   MR. JASON C. DAVIS
                                     MS. AZRA Z. MEHDI
22                              100 Pine Street
                                Suite 2600
23                              San Francisco, California  94111
                                (415) 288-4545

24

25
```

4770

```
 1    APPEARANCES:  (Continued)

 2    For the Plaintiff:        MILLER LAW LLC
                                BY:  MR. MARVIN ALAN MILLER
```

05-07-09 Volume 26 (2).txt

3                                    115 South LaSalle Street
                                     Suite 2910
4                                    Chicago, Illinois  60603
                                     (312) 332-3400
5
      For the Defendants:           EIMER STAHL KLEVORN & SOLBERG LLP
6                                    BY:  MR. ADAM B. DEUTSCH
                                     224 South Michigan Avenue
7                                    Suite 1100
                                     Chicago, Illinois  60604
8                                    (312) 660-7600

9                                    CAHILL, GORDON & REINDEL LLP
                                     BY:  MS. SUSAN BUCKLEY
10                                        MS. PATRICIA FARREN
                                          MR. THOMAS J. KAVALER
11                                        MR. DAVID R. OWEN
                                          MR. HOWARD G. SLOANE
12                                        MS. JANET A. BEER
                                          MR. JASON M. HALL
13                                        MR. JOSHUA M. NEWVILLE
                                          MS. LAUREN PERLGUT
14                                        MS. KIM A. SMITH
                                          MR. MICHAEL J. WERNKE
15                                   80 Pine Street
                                     New York, New York  10005
16                                   (212) 701-3000

17

18

19

20

21

22    Court Reporter:               NANCY C. LaBELLA, CSR, RMR, CRR
                                     Official Court Reporter
23                                   219 South Dearborn Street
                                     Room 1222
24                                   Chicago, Illinois  60604
                                     (312) 435-6890
25                                   Nancy_LaBella@ilnd.uscourts.gov


                                                               4771


1             THE CLERK:  02 C 5893, Jaffe v. Household.

2             THE COURT:  We have a note from the jury.  9:40 --

3     9:50.  It reads as follows:  Lawsuit date parameters, colon,

4     can the beginning date in determining any guilt have a

10:29:37 5    beginning date subsequent to July 30, 1999?

6             If so, does each and every statement within the

7     period require the unanimous, quote, yes, unquote, vote of the
                              Page 2

05-07-09 Volume 26 (2).txt

8      jurors to render a valid verdict by this jury?

9            I'll read it again.

10:30:02 10         Lawsuit date parameters:  Can the beginning date in

11     determining any guilt have a beginning date subsequent to July

12     30, 1999?

13            If so, does each and every statement within --

14     statement is in quotation marks -- within the period require

10:30:27 15   the unanimous, quote, yes, end quote, vote of the jurors to

16     render a valid verdict by this jury?

17            Plaintiff?

18            MR. DOWD:  I think it's yes and yes, your Honor.

19            MR. KAVALER:  We agree, your Honor.

10:30:58 20         MR. DOWD:  Could I have a moment?

21     (Brief pause.)

22            MR. DOWD:  Yes and yes.  We're still there.

23            MR. KAVALER:  As are we, your Honor.

24            THE COURT:  Okay.  So they have to vote yes on each

10:31:19 25   of the alleged false statements for a valid verdict?

4772

1            MR. DOWD:  I think that's a slightly different

2      question.

3            THE COURT:  If so, does each and every statement

4      within the period require the unanimous, quote, yes, unquote,

10:31:36 5    vote of the jurors to render a valid verdict by this jury?

6            MR. DOWD:  You're reading that a different way from

7      me, your Honor.  I thought they meant do they have to decide

8      each statement unanimously.

9            THE COURT:  Write it down the way I read it.

10:31:51 10         If so, comma, does each -- the word each is

11     underlined -- and every -- the word every is underlined --

Page 3

05-07-09 Volume 26 (2).txt

12          MR. KAVALER:  But they don't have to be unanimous.
13   They could be hung on some.  In other words --
14          THE COURT:  They could be hung on some, sure.
11:23:54 15          MR. KAVALER:  -- they could be unanimous on some
16   statements and hung on others.
17          THE COURT:  But in order for a verdict to be valid,
18   it has to be unanimous, whether the verdict is yes or no.  To
19   tell them that it doesn't have to be unanimous, it's just a
11:24:04 20  way -- I mean, it's not a verdict if it's not unanimous.  It's
21   hung.  It's a hung jury on that --
22          MR. KAVALER:  That would be correct, your Honor.  It
23   would be a hung jury as to that statement.
24          THE COURT:  Okay.  All right.  Anything else?
11:24:21 25          I have a question for the plaintiffs.  Now, your

                                                        4780

1    objection to the second sentence in the Court's proposed
2    response to the first question is based on what?
3           MR. DOWD:  Your Honor, I just didn't think it was --
4    that part was necessary to be responsive to the question.  It
11:24:43 5   sort of ties into another element.  That's all.  I just
6    thought -- our response was, as to your first question, the
7    answer is yes, the beginning date can have a date subsequent
8    to July 30, 1999, which I think is simpler and directly
9    answers the question without tying it into other issues that
11:25:01 10  they've already been instructed on.  That's all.
11     (Brief pause.)
12          THE COURT:  Okay.
13          MR. KAVALER:  Your Honor, if I might?
14          With regard to your statement that they have to be
11:26:57 15  unanimous on a no, I think that's inconsistent with the burden
16   of proof.  I think they have to -- they certainly have to be
                    Page 10

05-07-09 Volume 26 (2).txt

17    unanimous on a yes.  I'm not sure they have to be unanimous on

18    a no.  I take your point that it's not a verdict without a no

19    being unanimous, but it would be a result which would follow

11:27:18 20    from the evidence and the charge; that is, if they're unable

21    to agree unanimously on a yes, that is failure of proof.  We

22    certainly want to preserve the position that if that's what

23    happens, if you get a verdict back with some yeses and some

24    inconclusive votes, we're going to renew our motion to dismiss

11:27:35 25    because they haven't met their burden, among other grounds.

4781

1    We certainly are not going to agree to a shifting of the

2    burden.  And we certainly are not going to agree that there's

3    some burden on the jury to find a unanimous no.  A failure to

4    find a unanimous yes is a defense win.  That means the

11:27:52 5    plaintiffs failed to carry their burden of proof.  I don't

6    think you can tell them that.  That's why we took "no" out of

7    the first sentence.  But it seems to me that -- and that's why

8    we took the second sentence out entirely.  But if you're going

9    to put something like the second sentence back in, you can't

11:28:07 10    shift the burden of proof or you can't -- let me say it

11    differently.  You can't relieve the plaintiffs of the burden

12    of proof.

13        MR. DOWD:  Your Honor, just a response for the

14    record.  Under that theory, there would never be a hung jury;

11:28:18 15    so I don't understand it.

16        THE COURT:  Well, I think, in view of the comments of

17    the parties, that the instruction I'm prepared to give the

18    jury is this:  With regards to the first question, the

19    instruction I will give them is as follows:  The answer to

11:28:41 20    that question -- well, let me read the question so that we're

Page 11

05-07-09 Volume 26 (2).txt
21   clear.  I will read the question, which is:  Can the beginning

22   date in determining any guilt have a beginning date subsequent

23   to July 30, 1999?

24          The answer to that question is yes.  You need only

11:29:01 25   find that a false statement was made on or after July 30,

4782

1   1999, which caused Household's stock price to become inflated.

2          I think the question clearly relates to only one

3   aspect and, that is, the date, beginning date.  And the

4   response clearly now relates to only one aspect, and, that is,

11:29:24 5   the beginning date of the false statements.  So I'm satisfied

6   with that answer, that it's clear as to what it refers to.  It

7   does not in any way indicate that the other elements of

8   liability, since it strikes the word liability from it, can be

9   ignored.

11:29:44 10          And I'm also -- I also believe, contrary to the

11   plaintiffs' proposal, that we need to make clear to the jury

12   what we're talking about here, which is the beginning date of

13   the false statements.

14          The second part, I'll read the question:  If so, does

11:30:04 15   each and every statement within the period require the

16   unanimous yes vote of jurors to render a valid verdict by this

17   jury?

18          The answer to that question is as follows:  A vote of

19   yes or no as to any statement must be unanimous.  However, you

11:30:46 20   need not vote yes as to each of the alleged false or

21   misleading statements in order for your verdict to be valid.

22   You may vote yes as to some and no as to others and your

23   verdict will still be valid.

24          I will mark the submissions by the plaintiffs and the

11:31:07 25   defendants as exhibits, and they'll become part of the record.

Page 12

05-07-09 Volume 26 (2).txt

```
             3          THE COURT:  Next.

             4          JUROR KAMINSKI:  Joe Kaminski.

03:00:06     5          THE COURT:  Sir, did you hear the verdicts as

             6   published by the Court?

             7          JUROR KAMINSKI:  Yes.

             8          THE COURT:  And do these verdicts constitute your

             9   individual verdicts in all respects?

03:00:13    10          JUROR KAMINSKI:  Yes.

            11          THE COURT:  Sir.

            12          JUROR DAVIS:  Charles Davis.

            13          THE COURT:  Sir, did you hear the verdicts as

            14   published by the Court?

03:00:20    15          JUROR DAVIS:  Yes.

            16          THE COURT:  And do these verdicts constitute your

            17   individual verdicts in all respects?

            18          JUROR DAVIS:  Yes.

            19          JUROR HODGES:  Renee Hodges.

03:00:29    20          THE COURT:  Ma'am, did you hear the verdicts as

            21   published in open court?

            22          JUROR HODGES:  Yes.

            23          THE COURT:  And do these verdicts constitute your

            24   individual verdicts in all respects?

03:00:36    25          JUROR HODGES:  Yes.
```

4806

```
             1          JUROR STUBBS:  Gail Stubbs.

             2          THE COURT:  Ma'am, did you hear the verdicts as

             3   published by the Court?

             4          JUROR STUBBS:  Yes.

03:00:45     5          THE COURT:  And do these verdicts constitute your

             6   individual verdicts in all respects?
```

Page 32

05-07-09 Volume 26 (2).txt
```
           7          JUROR STUBBS:  Yes.

           8          JUROR BERARD:  James Berard.

           9          THE COURT:  Sir, did you hear the verdicts as
03:00:55  10   published by the Court?

          11          JUROR BERARD:  Yes.

          12          THE COURT:  And do these verdicts constitute your

          13   individual verdicts in all respects?

          14          JUROR BERARD:  Yes.

03:01:03  15          JUROR HUNT:  David Hunt.

          16          THE COURT:  Sir, did you hear the verdicts as

          17   published by the Court?

          18          JUROR HUNT:  Yes.

          19          THE COURT:  And do these verdicts constitute your

03:01:11  20   individual verdicts in all respects?

          21          JUROR HUNT:  Yes.

          22          THE COURT:  Very well.

          23          Any other motions before I release the jury?

          24          MR. DOWD:  None from the plaintiffs, your Honor.

03:01:22  25          MR. KAVALER:  Yes, your Honor.  We believe the
```

                                                                4807

```
           1   verdict is fatally inconsistent in a number of ways, which

           2   we're prepared to detail to the Court.  I'm not sure if you

           3   need the jury to be present.  Obviously it's up to you.

           4          Primarily it's the interspersal of the yeses and nos
03:01:36   5   when juxtaposed again Professor Fischel's leakage model,

           6   whatever the -- whatever our position on the leakage model ab

           7   initio might have been, it certainly doesn't work that way.

           8   And certainly a verdict which contains both yeses and nos but

           9   nevertheless adopts Professor Fischel's leakage damage model

03:01:55  10   is fatally flawed and internally inconsistent.

          11          THE COURT:  Okay.
```
                                  Page 33

05-07-09 Volume 26 (2).txt

12          MR. KAVALER:  We have other things we'll say at the

13     appropriate time, but that is something which I thought should

14     be mentioned before the jury retires.

03:02:07 15          THE COURT:  All right.  Does the plaintiff have

16     anything to say?

17          MR. DOWD:  No, your Honor.  We think the verdicts are

18     consistent.

19          THE COURT:  Very well.

03:02:12 20          Ladies and gentlemen, that constitutes your jury

21     service in this case.  And I might add, quite a long, diligent

22     and some might even say heroic service it has been.  I want to

23     personally thank you for your patience, your attentiveness and

24     your persistence as jurors in this case.  I don't need to tell

03:02:44 25     you, it has been a difficult case.  It has been a long case.

4808

1     It has been a complicated case.  But it has been an important

2     case.  And as such, I thank you for having taken the time out

3     of your lives at what I know is considerable cost both

4     personal and pecuniary to many of you to do this.

03:03:09 5          I also tell you that you should consider yourselves

6     to some -- in some respect fortunate to have had the

7     opportunity to take part in what is a fundamental aspect of

8     our democratic way of life.  You have served your country

9     today without having to join the military, pay anything extra

03:03:39 10     in taxes or volunteer for community service.  And we very much

11     appreciate it, and you should be proud of it.

12          We'll be back for any of you who wish to stick around

13     to talk to you if you want to -- have any questions for me, if

14     there's anything you want to ask, anything you want me to

03:03:57 15     explain.  But you need not stick around.

Page 34