# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF ILLINOIS

# EASTERN DIVISION

| | |
|---|---|
| LAWRENCE E. JAFFE PENSION PLAN, ON BEHALF OF ITSELF AND ALL OTHERS SIMILARLY SITUATED, <br><br> Plaintiffs, <br><br> *- against -* <br><br> HOUSEHOLD INTERNATIONAL, INC., ET AL., <br><br> Defendants. | Lead Case No. 02-C-5893 (Consolidated) <br><br> CLASS ACTION <br><br> Judge Ronald A. Guzmán |

## CONSOLIDATED MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTIONS FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50(b) OR, IN THE ALTERNATIVE, FOR A NEW TRIAL PURSUANT TO RULE 59

CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York 10005
(212) 701-3000

EIMER STAHL KLEVORN & SOLBERG LLP
224 South Michigan Ave.
Suite 1100
Chicago, Illinois 60604
(312) 660-7600

*Attorneys for Defendants*
*Household International, Inc.,*
*William F. Aldinger, David A. Schoenholz*
*and Gary Gilmer*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES...................................................................................vii

INTRODUCTION .................................................................................................1

LEGAL STANDARDS GOVERNING THESE MOTIONS .......................................2

ARGUMENT

I.  PLAINTIFFS' FAILURE TO PROVE LOSS CAUSATION ENTITLES
    DEFENDANTS TO JUDGMENT AS A MATTER OF LAW.........................4

    A.  Plaintiffs' "Leakage Model" Is Legally Defective ...............................5

        1.  Fischel's Admitted Attribution of Inflation to Factors Unrelated
            to the Alleged Fraud Invalidates His Leakage Model...............6

        2.  The Leakage Model Did Not Prove a Causal Nexus Between the
            Alleged Fraud and Any Price Decline.......................................8

        3.  Plaintiffs Presented No Proof That Any of the 17 Statements at
            Issue Introduced Inflation into Household's Stock Price .........10

        4.  Plaintiffs' *Ad Hoc* "Solution" To These Defects – Urging the Jury
            to Determine Its Own Inflation Quantification and Thus Create Its
            Own Theory of Liability – Produced Verdicts Devoid of Record
            Support ...................................................................................11

        5.  The Leakage Model Resulted in Irrational Verdicts Attributing
            All Inflation Regarding Three Separate Theories of Fraud to a
            Single Statement Related to Only One Theory..........................12

    B.  *A Fortiori*, the Verdicts Were Against the Weight of the Evidence
        on the Essential Element of Loss Causation .....................................12

II.  PLAINTIFFS' RULE 10B-5 CLAIMS ARE TIME-BARRED .....................12

III. PLAINTIFFS FAILED TO PROVE THAT ANY OF THE 17
     STATEMENTS WAS MATERIAL ............................................................14

IV.  PLAINTIFFS FAILED TO PROVE THAT HOUSEHOLD'S
     RESTATEMENT RESULTED FROM FRAUDULENT ACCOUNTING ...........14

    A.  Neither a GAAP Violation nor a Restatement, Without More,
        Proves Securities Fraud.....................................................................15

**Page**

B.    Good Faith Reliance on External Auditors Precludes a Finding of Scienter..................................................................................................16

C.    Disagreement Among Qualified Auditors Regarding Proper Accounting Treatment Precludes a Finding of Scienter .....................................16

D.    The Increase in the Price of Household Stock upon the Announcement of the Restatement Precludes a Finding of Loss Causation........................................................................................17

V.    PLAINTIFFS' "PREDATORY LENDING" THEORY WAS UNTENABLE AS A MATTER OF LAW....................................................................17

A.    Household's Recognition of Actual Revenues and Growth from Consumer Lending Activities Is Not Actionable as Securities Fraud ..................................................................................................18

B.    The March 23, 2001 Statement Regarding Unethical Lending Practices Was Immaterial Puffery ........................................................19

C.    Household Had No Duty to Disclose Facts Already Known to the Market ....................................................................................................19

D.    The Jury's Verdicts Regarding Alleged "Predatory Lending" Fraud Contradicted the Clear Weight of the Evidence ........................................20

VI.    PLAINTIFFS FAILED TO PROVE THEIR THEORY OF "CREDIT QUALITY CONCEALMENT"......................................................................22

A.    Plaintiffs Failed to Prove That Reported 2+ Numbers Were False .....................22

B.    Assertions That Management Should Have Taken Charge-Offs Earlier Cannot Give Rise to Rule 10b-5 Liability ...............................................23

C.    Detailed Disclosures Regarding Reserves and Probable Loan Losses Negate Any Inference of Scienter and Render Plaintiffs' Claims Immaterial ...............................................................................24

D.    Reage Disclosure Discrepancies Cited by Plaintiffs Reflected Only Immaterial Mistakes..................................................................25

E.    Errors in the 2001 10-K and the FRC Presentation Were Not Exposed During the Relevant Period.....................................................26

F.    The Jury's Verdicts as to Alleged "Credit Quality Concealment" Were Against the Weight of the Evidence ........................................26

Page

VII. PLAINTIFFS PROVED NO ACTIONABLE MISSTATEMENT OR OMISSION BY DEFENDANT GARY GILMER .......................................27

VIII. PLAINTIFFS PROVED NO SECTION 20(a) LIABILITY AS TO ANY INDIVIDUAL DEFENDANT ...........................................................28

IX. THE JURY'S VERDICTS ARE IRRECONCILABLY INCONSISTENT...................29

    A.    The Jury's Findings of Stock Price Inflation Were Inconsistent with Its Findings of Liability.................................................29

    B.    The Jury Irrationally Treated Disclosures Derived from Identical Credit Card Accounting Methodology Differently on Different Dates ....................................................................................30

    C.    The Jury Inexplicably Found Credit Card Accounting Fraud in the Announcement of the Restatement that Allegedly *Corrected* Such Fraud............................................................................31

    D.    The Jury Irrationally Found Both Liability and Non-Liability Based on the Disclosure of Identical Information on Different Dates Two Months Apart .......................................................31

    E.    The Jury's Finding of "Knowing" Liability as to the "Reckless" March 2001 *Origination News* Article Cannot Be Reconciled with Its Inconsistent Findings as to Prior and Subsequent Statements on the Same Subject..........................................31

X. ADMITTING UNRELIABLE EXPERT TESTIMONY WITH NO ADEQUATE LIMITING INSTRUCTIONS DEPRIVED DEFENDANTS OF A FAIR TRIAL ..............................................................32

    A.    The Governing Authorities Required Rejection of Subjective Opinions Based on Unverifiable (or Nonexistent) Methodology.........................34

    B.    Ghiglieri's Subjective and Unreliable Testimony Should Have Been Excluded...............................................................35

    C.    Cross's Biased and Statistically Inadequate Conclusions Should Have Been Excluded..................................................39

    D.    Devor's Opinion as to Revenues Allegedly Derived from "Improper" Practices Should Have Been Excluded ...........................................40

    E.    Devor's Substitution of GAAP Standards for Rule 10b-5 Disclosure Requirements Caused Prejudice That Corrective Instructions Could Not Cure ..................................................42

F.    The Prejudice That Followed from the Court's Erroneous
*Daubert* Rulings Was Exacerbated by the Lack of Suitable
Limiting Instructions ................................................................ 43

XI.   IMPROPER JUDICIAL RULINGS AND PLAINTIFFS'
CIRCUMVENTION OF PROPER EXCLUSION ORDERS RESULTED
IN AN UNFAIR TRIAL ............................................................... 45

A.    Plaintiffs Built Their Predatory Lending Case on Prejudicial and
Inadmissible Hearsay ............................................................... 45

B.    Plaintiffs Deliberately and Repeatedly Violated the Court's
Exclusion of Settlement Evidence Pursuant to Rule 408 ..................... 45

C.    Plaintiffs Based Their Case on Alleged False Statements That
Were Immaterial Puffery or Otherwise Too Vague to Be
Actionable ............................................................................. 49

D.    Allowing Fischel to Give Testimony That Had Not Been
Disclosed in His Expert Report Was an Abuse of Discretion ................. 50

XII.  PREJUDICIAL ERRORS IN THE JURY INSTRUCTIONS AND
VERDICT FORM REQUIRE A NEW TRIAL ..................................... 52

A.    Errors in the Jury Instructions Require a New Trial .......................... 53

1.    Instructing the Jury That It Could Find Liability If "the Defendant
Made, Approved, or Furnished Information to be Included in a
False Statement" Misstated the Law ...................................... 53

2.    Instructing the Jury That a Defendant Has a Duty to Disclose
Information If Its Omission Would Render a "Prior Statement"
Misleading Was an Incorrect Statement of the Law .................... 54

3.    Failing to Instruct the Jury That Scienter Embraces "Intent to
Deceive, Manipulate, or Defraud," Coupled with an Instruction
That Scienter Depends on What a Defendant "Knew or Should
Have Known," Impermissibly Weakened the Scienter Standard ..... 55

4.    The Court Misstated the Law in Response to the Jury's Confusion
About the Requirements for Proof of Loss Causation .................. 57

5.    Instructing the Jury to Make a Determination of "Damages" Was
Confusing and Inaccurate, and the Court's Definition of "Actual
Damages" Incorrectly Stated the Law under *Dura* .................... 58

6.    Refusing to Instruct That "Expert Testimony Does Not Prove
Facts Relied Upon" Allowed the Jury to Conclude That

Page

Information Presented as a Basis for Experts' "Opinions" Could
Be Treated as Fact ................................................................................. 59

B.    Judicial Errors with Respect to the Verdict Form Irreparably
Harmed Defendants, Requiring a New Trial ........................................ 60

1.    The Verdict Form's Failure to Require Particularized Findings
with Regard to the Rule 10b-5 Elements Was Harmful Error ............... 60

2.    Grouping Multiple Separate Statements on a Given Date into a
Single Entry Nullified the Requirement That Plaintiffs Prove
Each Rule 10b-5 Element with Respect to Each Alleged
Fraudulent Statement .............................................................................. 61

3.    The Verdict Form Impermissibly Removed the Determination of
Scienter from the Jury ............................................................................ 62

4.    Refusing to Include Arthur Andersen in the Allocation of
Responsibility Contravened the PSLRA and Prejudiced
Defendants .............................................................................................. 62

CONCLUSION ................................................................................................. 65

# TABLE OF AUTHORITIES

**Page**

**Cases**

*ABM Marking, Inc.* v. *Zanasi Fratelli, S.R.L.*, 353 F.3d 541 (7th Cir. 2003) ...................................................................................... 3, 29

*In re Acceptance Ins. Cos. Sec. Litig.*, 352 F. Supp. 2d 940 (D. Neb. 2004) ...................................................................................... 40n

*Adams Labs., Inc.* v. *Jacobs Eng'g Co.*,761 F.2d 1218 (7th Cir. 1985) ............... 3

*In re Affiliated Computer Servs. Derivative Litig.*, 540 F. Supp. 2d 695 (N.D. Tex. 2007)..................................................................... 55

*In re Air Crash Disaster at Sioux City, Iowa, on July 19, 1989*, 1991 WL 279005 (N.D. Ill. Dec. 26, 1991) ............................................. 45

*In re Allscripts, Inc. Sec. Litig.*, 2001 WL 743411 (N.D. Ill. June 29, 2001) ...................................................................................... 16n, 25

*In re American Bus. Fin. Servs. Inc. Sec. Litig.*, 413 F. Supp. 2d 378 (E.D. Pa. 2005) ........................................................................... 19n

*Anderson* v. *Abbott Labs*, 140 F. Supp. 2d 894 (N.D. Ill. 2001), *aff'd sub nom., Gallagher* v. *Abbott Labs.*, 269 F.3d 806 (7th Cir. 2001 ................. 19n, 22, 50n

*In re Apollo Group, Inc. Sec. Litig.*, No. CV 04-2147-PHX-JAT (D. Ariz.) (verdict forms) ...................................................................... 62

*In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576 (S.D.N.Y. 2006)..................................................................... 19n, 24

*In re Bally Total Fitness Sec. Litig.*, 2006 WL 3714708 (N.D. Ill. July 12, 2006).................................................................................. 16n

*BASF Corp.* v. *Old World Trading Co.*, 1992 WL 232078 (N.D. Ill. Sept. 8, 1992).............................................................................. 36

*Bastian* v. *Petren Resources Corp.*, 892 F.2d 680 (7th Cir. 1990)........................ 19

*Bintz* v. *Bertrand*, 403 F.3d 859 (7th Cir. 2005) .................................................. 3

*Brown* v. *M&M/Mars*, 883 F.2d 505 (7th Cir. 1989) .......................................... 56n

*Brown* v. *Primerica Life Ins. Co.*, 2006 WL 1155878 (N.D. Ill. Apr. 29, 2006)................................................................................. 34

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) ...................................................................................... 14

**Page**

*Caviness* v. *DeRand Res. Corp.*, 983 F.2d 1295 (4th Cir. 1993) .......................... 55

*Chain* v. *Lake Forest Partners, LLC*, 2008 WL 4831707 (N.D. Ill. Nov. 3, 2008) .................................................................... 64

*Chapman* v. *Maytag Corp.*, 297 F.3d 682 (7th Cir. 2002)........................... 34

*In re Clarent Corp. Sec. Litig.*, Docket No. 01-CV-3361 (N.D. Cal. 2005) (verdict form) .................................................. 62

*In re Comshare Sec. Litig.*, 183 F.3d 542 (6th Cir. 1999) .................................... 16n

*Danis* v. *USN Communications, Inc.*, 121 F. Supp. 2d 1183 (N.D. Ill. 2000) ................................................................ 17

*Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ................ 8n, 34, 39

*Davis* v. *Rowe*, 1993 WL 34867 (N.D. Ill. Feb. 10, 1993) .............................. 48

*Dawson* v. *New York Life Ins. Co.*, 135 F.3d 1158 (7th Cir. 1998)..................... 53, 56, 57, 58, 59

*Deloughey* v. *City of Chicago*, 422 F.3d 611 (7th Cir. 2005) .............................. 29

*Deltak, Inc.* v. *Advanced Sys. Inc.*, 574 F. Supp. 400 (N.D. Ill. 1983) ................. 34, 38

*Dhillon* v. *Crown Controls Corp.*, 269 F.3d 865 (7th Cir. 2001)........................ 34

*Dicker* v. *Allstate Life Ins. Co.*, 1997 WL 182290 (N.D. Ill. Apr. 9, 1997) .................................................................... 5n

*DiLeo* v. *Ernst & Young*, 901 F.2d 624 (7th Cir. 1990) ....................................... 23

*In re Ditech Networks, Inc. Derivative Litig.*, 2007 WL 2070300 (N.D. Cal. July 16, 2007) .................................................... 14n

*Doe* v. *Smith*, 470 F.3d 331 (7th Cir. 2006)......................................................... 3

*Dolphin & Bradbury, Inc.* v. *SEC*, 512 F.3d 634 (D.C. Cir. 2008)...................... 56n

*Donohoe* v. *Consol. Operating & Prod. Corp.*, 30 F.3d 907 (7th Cir. 1994) .................................................................... 28

*Dranchak* v. *Akzo America, Inc.*, 1995 WL 470245 (N.D. Ill. Aug. 7, 1995), *aff'd*, 88 F.3d 457 (7th Cir. 1996) ........................................ 3

*Drebing* v. *Provo Group, Inc.*, 519 F. Supp. 2d 811 (N.D. Ill. 2007) .................. 36n

*Dunn* v. *Truck World, Inc.*, 929 F.2d 311 (7th Cir. 1991) .................................... 1n

**Page**

*Dura Pharmaceuticals, Inc.* v. *Broudo*, 544 U.S. 336 (2005).............................. 4, 5, 6, 7n, 8, 30, 57-59

*Durkin* v. *Equifax Check Serv., Inc.*, 406 F.3d 410 (7th Cir. 2005) ..................... 38

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009)................................................................... 19n

*Elcock* v. *KMart Corp.*, 233 F.3d 734 (3d Cir. 2000)......................................... 41

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 236 F.R.D. 313 (S.D. Tex. 2006*), rev'd on other grounds, Regents of Univ. of California* v. *Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372 (5th Cir. 2007) *cert. denied, sub nom., Regents of Univ. of California* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 128 S. Ct. 1120 (2008) ............................................................................................. 63

*Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185 (1976)........................................... 16, 16n, 56

*Estate of Kluener* v. *C.I.R.*, 154 F.3d 630 (6th Cir. 1998) ................................... 59

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 2009 WL 2169197 (2nd Cir. July 22, 2009) ....................................................................................... 6, 8, 8n, 9, 9n-10n

*In re Ford Motor Company*, 381 F.3d 563 (6th Cir. 2004)................................... 19n, 27

*Frain* v. *Andy Frain, Inc.*, 660 F. Supp. 97 (N.D. Ill. 1987) ............................... 29

*Frymire-Brinati* v. *KPMG Peat Marwick*, 2 F.3d 183 (7th Cir. 1993)................. 3, 53

*Fuesting* v. *Zimmer, Inc.*, 421 F.3d 528 (7th Cir. 2005)..................................... 34-35

*Galati* v. *Commerce Bancorp, Inc.*, 220 Fed. Appx. 97 (3d Cir. 2007) ............... 19n, 41, 49

*Galati* v. *Commerce Bancorp, Inc.*, 2005 WL 3797764 (D.N.J. Nov. 7, 2005) ............................................................................................................. 50n

*Gallagher* v. *Abbott Labs*, 269 F.3d 806 (7th Cir. 2001) ................................... 28

*Geffon* v. *Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001)......................................... 56n

*General Foam Fabricators, Inc.* v. *Tenneco Chemicals, Inc.*, 695 F.2d 281 (7th Cir. 1982)..................................................................................... 3

*Gong* v. *Hirsch*, 913 F.2d 1269 (7th Cir. 1990) ................................................. 59

*Grant* v. *Chemrex, Inc.*, 1997 WL 223071 (N.D. Ill. Apr. 28, 1997)................... 59

*Grassi* v. *Information Resources, Inc.*, 63 F.3d 596 (7th Cir. 1995)..................... 23

**Page**

*Grimes* v. *Navigant Consulting, Inc.*, 185 F. Supp. 2d 906 (N.D. Ill. 2002) .................................................................................... 14, 29

*Guise* v. *BWM Mortgage, LLC*, 377 F.3d 795 (7th Cir. 2004)............................ 64

*In re H&R Block Sec. Litig.*, 527 F. Supp. 2d 922 (W.D. Mo. 2007).................... 16

*Harper* v. *Albert*, 400 F.3d 1052 (7th Cir. 2005)...................................................... 3

*Higginbotham* v. *Baxter Int'l, Inc.*, 495 F.3d 753 (7th Cir. 2007) ........................ 19, 22, 56

*Honaker* v. *Smith*, 256 F.3d 477 (7th Cir. 2001)...................................................... 2

*Hossack* v. *Floor Covering Assoc. of Joliet, Inc.*, 492 F.3d 853 (7th Cir. 2007)................................................................................................ 2-3

*Huey* v. *United Parcel Service, Inc.*, 165 F.3d 1084 (7th Cir. 1999) ................... 34, 36, 39

*In re Impax Labs., Inc. Sec. Litig.*, 2007 WL 5076983 (N.D. Cal. Jan. 3, 2007)................................................................................................ 17

*Irvine* v. *Murad Skin Research Labs. Inc.*, 194 F.3d 313 (1st Cir. 1999)............. 41

*In re James Wilson Assocs.*, 965 F.2d 160 (7th Cir. 1992) .................................. 15n, 21, 38, 44, 59

*In re JDS Uniphase Corp. Sec. Litig.*, No. C-02-1486 (N.D. Cal.) (verdict form)................................................................................................ 62

*Joseph* v. *Brierton*, 739 F.2d 1244 (7th Cir. 1984)............................................... 43

*In re JP Morgan Chase & Co. Sec. Litig*, 2007 WL 4531794 (N.D. Ill. 2007) ................................................................................................ 27-28

*Kaufman* v. *Motorola, Inc.*, 2000 WL 1506892 (N.D. Ill. Sept. 21, 2000) ................................................................................................ 17

*Keller* v. *U.S.*, 58 F.3d 1194 (7th Cir. 1995)........................................................... 64

*Knollenberg* v. *Harmonic, Inc.*, 152 Fed. Appx. 674 (9th Cir. 2005) ................... 56n

*Kritikos* v. *Palmer Johnson, Inc.*, 821 F.2d 418 (7th Cir. 1987).......................... 41

*Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137 (1999) ........................................... 34, 39-40

*Kushner* v. *Beverly Enterprises, Inc.*, 317 F.3d 820 (8th Cir. 2003)....................... 28

*In re Lake States Commodities, Inc.*, 271 B.R. 575 (Bankr. N.D. Ill. 2002) ................................................................................................ 44n

*Lang* v. *Kohl's Food Stores, Inc.*, 217 F.3d 919 (7th Cir. 2000).......................... 36

**Page**

*LaPerriere* v. *Vesta Ins. Group, Inc.*, 526 F.3d 715 (11th Cir. 2008) .................. 28

*Lattanzio* v. *Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007)...................... 55

*Loeffel Steel Products, Inc.* v. *Delta Brands, Inc.*, 387 F. Supp. 2d 795 (N.D. Ill. 2005) ............................................... 34, 35n, 36, 44n

*Lovelace* v. *Software Spectrum, Inc.*, 78 F.3d 1015 (5th Cir. 1996)....................... 16n

*Makor Issues & Rights, Ltd.* v. *Tellabs, Inc.*, 437 F.3d 588 (7th Cir. 2006), *vacated and remanded on other grounds*, 551 U.S. 308 (2007) ................................................. 19, 49

*Malone* v. *ReliaStar Life Ins. Co.*, 558 F.3d 683 (7th Cir. 2009) ......................... 60

*Manning* v. *Buchan*, 357 F. Supp. 2d 1036 (N.D. Ill. 2004)................................ 38

*In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452 (S.D.N.Y. 2006) ............................................... 19n, 41

*Mathews* v. *Centex Telemanagement, Inc.*, 1994 WL 269734 (N.D. Cal. June 8, 1994) ............................................. 16

*In re Midway Games, Inc., Sec. Litig.*, 332 F. Supp. 2d 1152 (N.D. Ill. 2004) ................................................. 49

*Mike's Train House, Inc.* v. *Lionel, LLC*, 472 F.3d 398 (6th Cir. 2006).............. 38

*In re Miller Indus., Inc. Sec. Litig.*, 120 F. Supp. 2d 1371 (N.D. Ga. 2000) ................................................ 17

*Muzzey* v. *Kerr-McGee Chemical Corp.*, 921 F. Supp. 511 (N.D. Ill. 1996) ................................................. 40

*Nachtsheim* v. *Beech Aircraft Corp.*, 847 F.2d 1261 (7th Cir. 1988)................... 38n, 45

*Naeem* v. *McKesson Drug Co.*, 444 F.3d 593 (7th Cir. 2006) ............................. 35, 36

*In re Navarre Corp. Sec. Litig.*, 299 F.3d 735 (8th Cir. 2002)............................ 16n

*Navarro* v. *Fuji Heavy Industries, Ltd.*, 117 F.3d 1027 (7th Cir. 1997)............... 34

*In re Neopharm, Inc., Sec. Litig.*, 2007 WL 625533 (N.D. Ill. Feb. 23, 2007) ................................................ 50

*In re Northfield Labs., Inc. Sec. Litig.*, 527 F. Supp. 2d 769 (N.D. Ill. 2007) ................................................ 8

*In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050 (N.D. Cal. June 19, 2009) ............................................... 9n

**Page**

*Oran* v. *Stafford*, 226 F.3d 275 (3d. Cir. 2000)..................................... 14, 29, 55

*Panter* v. *Marshall Field & Co.*, 646 F.2d 271 (7th Cir. 1981).............................. 3

*In re Parmalat Sec. Litig.*, 477 F. Supp. 2d 637 (S.D.N.Y. 2007) ........................ 38

*Powell* v. *Idacorp, Inc.*, 2007 WL 1498881 (D. Idaho May 21, 2007) ............... 10n

*Pro Bono Investments Inc.* v. *Gerry*, 2005 WL 2429787 (S.D.N.Y. Sept. 30, 2005)..................................................... 14n

*Pugh* v. *Tribune Co.*, 521 F.3d 686 (7th Cir. 2008) ............................................. 28, 54

*Ray* v. *Citigroup Global Markets, Inc.*, 482 F.3d 991 (7th Cir. 2007) ................. 4, 5, 8, 10, 12, 26, 29, 57, 59

*Redback Networks, Inc. Sec. Litig.*, 2007 WL 963958 (N.D. Cal. Mar. 30, 2007)..................................................... 10n

*Robin* v. *Arthur Young & Co.*, 915 F.2d 1120 (7th Cir. 1990)........................... 56, 56n

*Roth* v. *OfficeMax, Inc.*, 527 F. Supp. 2d 791 (N.D. Ill. 2007) ........................... 16

*Rowe* v. *Maremont Corp.*, 850 F.2d 1226 (7th Cir. 1988)................................... 56

*Salas* v. *Carpenter*, 980 F.2d 299 (5th Cir. 1992) ............................................. 36n

*Sanders* v. *John Nuveen & Co.*, 554 F.2d 790 (7th Cir. 1977) ............................ 56-57

*Santa Fe Indus., Inc.* v. *Green*, 430 U.S. 462 (1997) ........................................... 23

*Schlifke* v. *Seafirst Corp.*, 866 F.2d 935 (7th Cir. 1989) ...................................... 26

*Searls* v. *Glasser*, 64 F.3d 1061 (7th Cir. 1995)................................................. 19, 19n, 49, 56, 56n

*Sears, Roebuck and Co.* v. *Savoy Reinsurance Co.*, 1991 WL 247583 (N.D. Ill. Nov. 8, 1991)..................................................... 44n

*SEC* v. *Jakubowski*, 150 F.3d 675 (7th Cir. 1998) ............................................... 56

*Silverman* v. *Motorola, Inc.*, 2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) ..................................................... 49, 50

*Smith* v. *Ford Motor Co.*, 215 F.3d 713 (7th Cir. 2000)...................................... 34

*In re Sofamor Danek Group, Inc.*, 123 F.3d 394 (6th Cir. 1997)......................... 19n, 22, 41, 50n

| | Page |
|---|---|
| *Soo Line R.R. Co.* v. *St. Louis Sw. Ry. Co.*, 125 F.3d 481 (7th Cir. 1997) | 64 |
| *Stark Trading* v. *Falconbridge Ltd.*, 552 F.3d 568 (7th Cir. 2009) | 1 |
| *Stavroff* v. *Meyo*, 1997 WL 720475 (6th Cir. Nov. 12, 1997 ) | 16, 16n |
| *Stavros* v. *Exelon Corp.*, 266 F. Supp. 2d 833 (N.D. Ill. 2003) | 19n |
| *Stoneridge Investment Partners, LLC* v. *Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008) | 53-54 |
| *Stransky* v. *Cummins Engine Co.*, 51 F.3d 1329 (7th Cir. 1995) | 19n, 49, 55 |
| *Sundstrand Corp.* v. *Sun Chem. Corp.*, 553 F.2d 1033 (7th Cir. 1977) | 56, 57 |
| *In re System Software Assocs., Inc. Sec. Litig.*, 2000 WL 283099 (N.D. Ill. Mar. 8, 2000) | 16n |
| *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) | 56 |
| *Tricontinental Industries, Ltd.* v. *PricewaterhouseCoopers, LLP*, 475 F.3d 824 (7th Cir. 2007) | 4, 5-6, 8, 8n, 9, 12, 29, 58 |
| *Turyna* v. *Martam Construction Co.*, 83 F.3d 178 (7th Cir. 1996) | 3, 29 |
| *U.S.* v. *Brown*, 7 F.3d 648 (7th Cir. 1993) | 34 |
| *U.S.* v. *Ferguson*, 584 F. Supp. 2d 447 (D. Conn. 2008) | 6, 6n |
| *U.S.* v. *Ladish Malting Co.*, 135 F.3d 484 (7th Cir. 1998) | 56n |
| *U.S.* v. *L.E. Myers Co.*, 562 F.3d 845 (7th Cir. 2009) | 56n |
| *U.S.* v. *Lindsay*, 157 F.3d 532 (7th Cir. 1998) | 42 |
| *U.S.* v. *Mikos*, 2003 WL 22922197 (N.D. Ill. Dec. 9, 2003) | 35-36 |
| *U.S.* v. *Moore*, 521 F.3d 681 (7th Cir. 2008) | 11n, 34, 35 |
| *U.S.* v. *Santos*, 201 F.3d 953 (7th Cir. 2000) | 3 |
| *U.S.* v. *Tran Trong Cuong*, 18 F.3d 1132 (4th Cir. 1994) | 38 |
| *Virginia Bankshares, Inc.* v. *Sandberg*, 501 U.S. 1083 (1991) | 28 |
| *West* v. *Media Gen. Operations, Inc.*, 120 Fed. Appx. 601 (6th Cir. 2005) | 61 |
| *Wilk* v. *American Medical Ass'n*, 719 F.2d 207 (7th Cir. 1983) | 60, 62 |

**Page**

*In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195 (N.D. Okla. 2007) ..................... 6

*In re Williams Securities Litigation — WCG Subclass*, 558 F.3d 1130
     (10th Cir. 2009) ............................................................... 6, 9

*Winchester Packaging, Inc.* v. *Mobil Chemical Co.*, 14 F.3d 316 (7th
     Cir. 1994) .................................................................... 41

*In re WorldCom, Inc. Sec. Litig.*, 2005 WL 335201 (S.D.N.Y. Feb. 14,
     2005) ........................................................................ 64

*Zenith Electronics Corp.* v. *WHTV Broadcasting Corp.*, 395 F.3d 416
     (7th Cir. 2005) .............................................................. 34

**Law Reviews**

Bradford Cornell and R. Gregory Morgan, *Using Finance Theory to
     Measure Damages in Fraud on the Market Cases*, 37 UCLA L. Rev.
     883 (1990) ................................................................... 7n-8n

Judge Amy J. St. Eve and Bryce C. Pilz, *The Fault Allocation
     Provisions of the Private Securities Litigation Reform Act of 1995 –
     A Roadmap for Litigants and Courts*, 3 N.Y.U. J. L. & Bus. 187
     (2006) ....................................................................... 63

**Regulations**

SEC Regulations

Rule 10b-5, 17 C.F.R. § 240.106-5 (2009) ......................................... passim

**Rules**

Fed. R. Civ. P.

26(a)(2)(B)(i) .................................................................... 51
26(e)(1) ......................................................................... 11n
50(b) ............................................................................ 1, 2, 65
51(d)(2) ......................................................................... 53
58 ............................................................................... 1n
59 ............................................................................... 1, 2, 3, 65

Fed. R. Evid.

403 .............................................................................. 48, 48n
408 .............................................................................. 33, 40, 42,
                                                                                   48, 48n
702 .............................................................................. 11, 11n, 34,
                                                                                   39
703 .............................................................................. 45, 48
802 .............................................................................. 48n
901 .............................................................................. 48n

**Page**

## Statutes

Private Securities Litigation Reform Act

| | |
|---|---|
| 15 U.S.C. § 78u-4(f)(2) ........................................................................... | 28 |
| 15 U.S.C. § 78u-4(f)(3)(A) (2006) ........................................................... | 63 |
| 15 U.S.C. § 78u-4(f)(3)(A)(iii) (2006) ..................................................... | 62 |
| 15 U.S.C. § 78u-4(f)(7)(B) (2006) ........................................................... | 64 |
| 15 U.S.C. § 78u-5(c)(1)(B) ...................................................................... | 19n |

Securities Exchange Act of 1934

| | |
|---|---|
| 15 U.S.C. § 78j(b)  (§ 10(b)) ...................................... ............................ | 23, 28, 29, 54, 56, 60, 62, 63, 65 |
| 15 U.S.C. § 78t(a) (§ 20(a)) .......................................... ............................ | 28, 54, 65 |
| 15 U.S.C. § 78bb(a) ................................................................................. | 7n, 17 |

## Treatises

| | |
|---|---|
| 29 Charles A. Wright & Victor J. Gold, *Federal Practice and Procedure* §6273 (1997) ...................................................... | 45 |

## Other Authorities

| | |
|---|---|
| American Bar Ass'n, *Model Jury Instructions Securities Litigation* (1996) ...................................................................................... | 57n |
| Fed. R. Evid. 702 advisory committee's note (2000) ............................. | 39 |
| Fed. R. Evid. 703 advisory committee's note (2000) ............................. | 38n, 45 |
| Fed. R. Evid. 704 advisory committee's note (1972) ............................. | 36n-37n |
| *Manual of Model Civil Jury Instructions – Ninth Circuit* (2007) ........................... | 57n |
| *Pattern Jury Instructions (Civil Cases)  – Fifth Circuit* (2006) ............................ | 57n |
| *Pattern Jury Instructions (Civil Cases)  – Eleventh Circuit* (2005) ...................... | 57n |

Defendants Household International, Inc., William F. Aldinger, David A. Schoenholz and Gary Gilmer (collectively, "Defendants") respectfully submit this Consolidated Memorandum in support of their motions for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure or, in the alternative, for a new trial pursuant to Rule 59.[1]

## INTRODUCTION

"In a typical Rule 10b-5 case, the plaintiff buys stock at a price he claims was inflated by misrepresentations by the corporation's management and sells his stock at a loss when the truth comes out and the price plummets." *Stark Trading* v. *Falconbridge Ltd.*, 552 F.3d 568, 571 (7th Cir. 2009). Here, in contrast, Plaintiffs advanced only amorphous and conflated descriptions of what they claimed was fraudulent and why; they refused to explain when and how the artificial inflation they were required to prove incepted; and they introduced a loss causation model that showed a negative correlation between alleged Relevant Period fraud and alleged inflation. Notwithstanding the Court's admonition that the jurors would not be allowed to "create their own theory of liability" (Tr. 4367:20-4368:2),[2] that is *exactly* what they did.

The verdicts left many essential questions wide open, and the answers are nowhere in the trial record because Plaintiffs relied on appeals to prejudice rather than presenting sufficient evidence and adequate explanations of the key elements of their claims. For example:

- How could there be a finding of materiality or loss causation as to any of the 17 statements found to be fraudulent when ***Plaintiffs' expert admitted that all inflation existed at the start of the Relevant Period*** and that Relevant Period statements merely "reaffirmed" preexisting information with no new impact?

- How could there be a finding of materiality or loss causation as to any of the 17 statements when ***Plaintiffs' expert offered no proof that any of those statements introduced artificial inflation*** into the price of Household stock?

- How could there be a finding that the March 23, 2001 statement introduced $23.94 in artificial inflation when ***the record is completely devoid of any such evidence*** and the Court had correctly ruled that the jury was not allowed to make it up?

---

[1] The time limitations for making post-judgment motions do not begin to run until a separate document setting forth the judgment in compliance with Rule 58 has been entered. *Dunn* v. *Truck World, Inc.*, 929 F.2d 311, 313 (7th Cir. 1991). Defendants expressly reserve the right to file additional post-trial motions, if necessary to address issues arising in any second phase of this litigation, as late as after the conclusion of the remainder of this bifurcated proceeding.

[2] Transcript passages cited in this Memorandum as "Tr.," "PTC Tr." or "Cross Tr." are collected in the accompanying Appendix of Transcript Excerpts.

- How could there be a finding of loss causation as to alleged reaging or credit card accounting-related fraud when the jury attributed 100% of all inflation (albeit *without a record basis*) to a single statement about predatory lending?

- What *proof* of scienter supported findings of fraudulent credit card accounting beginning only in March 2001, some seven years after Household's adoption of an allegedly improper accounting method for credit card-related contracts?

- What *proof* supported a finding of fraudulent credit card accounting on August 14, 2002, the very date on which Plaintiffs alleged that the restatement *exposed* that same fraud?

- If August 14, 2002 was not a corrective disclosure date, when (if ever) during the Relevant Period was the alleged credit card accounting fraud disclosed, causing a loss to any plaintiff?  Because *Plaintiffs proved no such corrective disclosure*, how could there be a finding of liability on their credit card accounting fraud claims?

- How could the jury rationally have found loss causation during the Relevant Period as to alleged reaging-related fraud based on Household's 2001 Form 10K, given Plaintiffs' contention and showing that *the alleged fraud was not disclosed until March 2003*?

The answers to these and numerous other dispositive questions cannot be found in the trial record because Plaintiffs conflated their three discrete theories of fraud by lumping together different types of alleged fraud in the 40 challenged "statements" and by failing to disaggregate the three theories in their leakage model of inflation.  Having admitted that none of the challenged statements proximately caused any loss, their expert invited the jury to "find" inflation evidence *dehors* the record, which it proceeded to do.  Recognizing these and other fatal deficiencies requires no weighing of the evidence or testing of credibility.  Parts I through VIII of this Memorandum establish independently sufficient grounds on which the Court should enter judgment as a matter of law in Defendants' favor pursuant to Rule 50(b) or, in the alternative, award Defendants a new trial pursuant to Rule 59 because the verdicts are against the weight of the evidence.  In addition, Parts IX through XII demonstrate irreconcilable inconsistencies and numerous judicial errors which, individually and cumulatively, require a new trial.[3]

## LEGAL STANDARDS GOVERNING THESE MOTIONS

The issue under Rule 50(b) is "whether the evidence in support of the verdict is substantial; the party opposing the motion must have put forward more than a 'mere scintilla' of evidence to support that jury verdict." *Honaker* v. *Smith*, 256 F.3d 477, 484 (7th Cir. 2001); *accord*

---

[3]    Because the jury found that Plaintiffs failed to meet their burden of proof as to 23 of the 40 statements at issue, Defendants move for a new trial only as to the 17 statements on which the jury found in Plaintiffs' favor.  As to the other 23 statements, judgment should be entered in Defendants' favor.

*Hossack* v. *Floor Covering Assoc. of Joliet, Inc.*, 492 F.3d 853, 859 (7th Cir. 2007).  In examining the sufficiency of a plaintiff's showing, the court should review the totality of the trial record without weighing the evidence or making credibility determinations. *Harper* v. *Albert*, 400 F.3d 1052, 1067 (7th Cir. 2005).  Evidence must be viewed in the light most favorable to the non-movant, but in determining whether there is "a sufficient probative basis upon which a jury could reasonably reach a verdict without 'speculation over legally unfounded claims,'" the court may not ignore "uncontradicted, unimpeached evidence supporting defendant's position." *Panter* v. *Marshall Field & Co.*, 646 F.2d 271, 281-82 (7th Cir. 1981) (citations omitted).

Under Rule 59, "[t]he test to be applied in determining whether a motion for a new trial should be granted is whether 'the verdict is against the weight of the evidence, that the damages are excessive, or that for other reasons, the trial was not fair to the party moving.'" *General Foam Fabricators, Inc.* v. *Tenneco Chemicals, Inc.*, 695 F.2d 281, 288 (7th Cir. 1982) (citation omitted).  A new trial should be granted "when a jury returns a factually inconsistent general verdict" that is "against the manifest weight of the evidence." *ABM Marking, Inc.* v. *Zanasi Fratelli, S.R.L.*, 353 F.3d 541, 543, 545 (7th Cir. 2003) (citations and internal quotation marks omitted); *accord Turyna* v. *Martam Construction Co.*, 83 F.3d 178, 179, 182 (7th Cir. 1996) (remanding for a new trial where verdict was internally inconsistent and verdict form was "hopelessly confused"); *Dranchak* v. *Akzo America, Inc.*, 1995 WL 470245, at *14 (N.D. Ill. Aug. 7, 1995) (granting new trial in the alternative because the verdict was so inconsistent with the weight of evidence that "the jury must have resorted to speculation"), *aff'd*, 88 F.3d 457 (7th Cir. 1996).

In addition, erroneous evidentiary rulings require a new trial if they had a substantial and injurious influence on the jury's determinations. *Doe* v. *Smith*, 470 F.3d 331, 348 (7th Cir. 2006); *Bintz* v. *Bertrand*, 403 F.3d 859, 869 (7th Cir. 2005).  Even where an individual trial error may be viewed as harmless standing alone, a new trial is required where the cumulative effect of multiple errors is a fundamentally unfair trial for the moving party.  *Frymire-Brinati* v. *KPMG Peat Marwick*, 2 F.3d 183, 188 (7th Cir. 1993) (reversing and remanding for new trial because while "[o]ne or two" of the trial errors "might have been excused as harmless," taken together "they presented the jury such a skewed picture that the verdict is unreliable"); *accord U.S.* v. *Santos*, 201 F.3d 953, 962-65 (7th Cir. 2000); *Adams Labs., Inc.* v. *Jacobs Eng'g Co.*, 761 F.2d 1218, 1227 (7th Cir. 1985).

**ARGUMENT**

**I.    PLAINTIFFS' FAILURE TO PROVE LOSS CAUSATION ENTITLES DEFENDANTS TO JUDGMENT AS A MATTER OF LAW**

Plaintiffs have failed to articulate – or prove at trial – a legally viable theory of loss causation. Their burden under *Dura Pharmaceuticals* v. *Broudo*, 544 U.S. 336 (2005) ("*Dura*"), was to prove "a causal connection between the material misrepresentation and the loss," *Tricontinental Industries, Ltd.* v. *PricewaterhouseCoopers, LLP*, 475 F.3d 824, 843 (7th Cir. 2007), citing *Dura* (internal quotation marks omitted), which required proof "*both* that the defendants' alleged misrepresentations artificially inflated the price of the stock *and* that the value of the stock declined once the market learned of the deception." *Ray* v. *Citigroup Global Markets, Inc.*, 482 F.3d 991, 995 (7th Cir. 2007) (emphasis added). Yet the so-called "leakage model" of inflation adopted by the jury was incapable of meeting these requirements because, as Plaintiffs' expert Daniel Fischel conceded, it included as inflation stock price movements that were "not at all fraud related." (Tr. 2959:22-2960:17) Without more, this admitted failure to rule out non-fraud reasons for the decline in Household's stock price is fatal under *Dura* and its progeny. This incurable defect tainted every aspect of Plaintiffs' loss causation showing. For example, like its companion "specific disclosures model," Plaintiffs' leakage model assumed that the alleged inflation already existed on the first day of the Relevant Period, and Fischel offered no proof that any of the 17 Relevant Period statements the jury found to be fraudulent caused any new inflation. To the contrary, he admitted (and the jury found) that the vast majority of them did not. (PX 1395) This failure of proof, in turn, precluded proof of the required nexus between the 17 statements and the decline in Household's stock price.[4]

Fischel compounded these defects by inviting the jury to substitute its own loss causation analysis if it rejected the model's underlying assumption that all 40 Relevant Period statements were fraudulent. The jury did so, with predictably irrational results, finding that the total sum of inflation attributable to Plaintiffs' three separate theories of fraud entered the stock price simultaneously as a result of a single statement pertaining to only one of the three theories – and on a

---

[4]    Defendants' loss causation argument is more fully explicated in their earlier submissions on this subject. The Court is respectfully referred to Defendants' memoranda of law in support of their motion for summary judgment, relevant *Daubert* motions, and motions for judgment pursuant to Rule 50(a). (Dkt. 1235, 1249, 1364, 1488, 1569, 1597) Because the jury did not apply the specific disclosures model, its validity need not be addressed further here, although Defendants do not waive their position, set forth in their prior briefing, as to the legal insufficiency of that model.

single day as to which Fischel found no new inflation.  There was no record evidence to support this erratic result, and no evidence connecting Household's stock price decline to the exposure of this or any other fraud.  In consequence, all Defendants are entitled to judgment as a matter of law (or, in the alternative, a new trial) on all claims.

## A.  Plaintiffs' "Leakage Model" Is Legally Defective

Although Fischel testified that he used an "event study" as a basis for both of his inflation models (Tr. 2627:11-21), the purported inflation calculations in the two models are irreconcilably inconsistent.[5]  The jury declined to apply Fischel's specific disclosures model (PX 1397), deciding instead to apply an unsupported and truncated version of his leakage model (PX 1395), which even as he presented it departed significantly from accepted economic practice and adherence to loss causation standards.  By design, the leakage model identified no discrete dates on which artificial inflation allegedly incepted in the price of Household stock or on which the market allegedly learned the "truth" about any fraud.  Rather, the model assumed without demonstrating that inflation was present in the price of Household's stock at the beginning of the Relevant Period and that this inflation dissipated as the market gradually learned the truth of the alleged fraud over a 330-day period through the "continual leakage" of unspecified negative information. (Tr. 2849:21-2850:19)

Because the leakage model assumed that residual stock price declines were solely the result of gradual dissipation of artificial inflation of indefinite origin, it necessarily failed to isolate and remove declines attributable to non-fraud "firm-specific facts, conditions, or other events" as required by controlling Supreme Court authority. *Dura*, 544 U.S. at 342-43.[6]  Further, the leakage model did not even begin to satisfy Plaintiffs' burden of proving that any of the 17 statements as to which the jury found liability actually introduced inflation into the stock price. *See Ray*, 482 F.3d at 995.  For that reason, and because the leakage model did not correlate Household's stock price decline to any fraud-related "corrective disclosure[s]," Plaintiffs did not dem-

---

[5]    As Defendants demonstrated in their *Daubert* motion memoranda (Dkt. 1364, 1488), the event study underlying both of Fischel's inflation models (PX 1391) was itself deeply flawed because it applied an unreliable "one-tail" test. (Kavaler Dec. Ex. 3 at 53:5-23).  Use of a result-oriented one-tail test has been repeatedly rejected by courts in this Circuit as unreliable. *E.g.*, *Dicker* v. *Allstate Life Ins. Co.*, 1997 WL 182290, at *40 (N.D. Ill. Apr. 9, 1997).  Fischel's reliance on this inherently biased mode of analysis rendered his regression analyses inadmissible.

[6]    Nor does the leakage model offer any mechanism to distinguish between purported inflation from the 17 statements at issue and purported inflation from the 23 statements the jury found not fraudulent.

onstrate the required connection between particular instances of alleged fraud and Plaintiffs' investment losses. *Tricontinental*, 475 F.3d at 843.  These are all fatal defects that precluded a rational finding of loss causation. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 2009 WL 2169197 (2nd Cir. July 22, 2009) (rejecting leakage model that failed to establish the essential connection between fraud and loss); *In re Williams Sec. Litig.*, 558 F.3d 1130, 1135 (10th Cir. 2009) (same).

### 1.   Fischel's Admitted Attribution of Inflation to Factors Unrelated to the Alleged Fraud Invalidates His Leakage Model

In keeping with *Dura*'s mandate that a plaintiff must prove its losses were caused by the revelation to the market of misstatements, to the exclusion of other factors, 544 U.S. at 342-43, courts have squarely rejected loss causation models that fail to rule out causative factors other than fraud.  For example, in *Williams* the court rejected a leakage model identical to Fischel's:

> *Dura* leaves no room for doubt that even where a securities fraud plaintiff proceeds on a "leakage" theory of corrective disclosure, he must still establish that the lower price reflects the fraud-related inflation and not "changed economic circumstances, changed investor expectations, new-industry specific facts, conditions or other events, which taken separately or together account for some or all of that lower price."

*In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1266-67 (N.D. Okla. 2007) (internal citation omitted), *aff'd*, 558 F.3d 1130 (10th Cir. 2009).  The court explained that a leakage model (like Fischel's) that attributes all residual returns not explained by general market forces to inflation "collides directly with loss causation doctrine" because such a model "does not even purport . . . to have removed the effects of '[n]onfraud company-specific information.'" *Id.* (citation omitted).  In affirming, the Tenth Circuit cited the leakage model's inability to distinguish between fraud and the "'tangle of other factors' that affect a company's stock price" as an explanation for a price decline. 558 F.3d at 1139 (citing *Dura*).

The Second Circuit recently rejected a similar "leakage theory" based on the same failings and noted that a plaintiff must "disaggregate those losses caused by [the *Dura* non-fraud factors] from disclosures of the truth behind the alleged misstatements." *Flag Telecom*, 2009 WL 2169197 at *6, *9-10.  Similarly, the court in *U.S.* v. *Ferguson*, 584 F. Supp. 2d 447 (D. Conn. 2008), rejected a "leakage event study" because, as here, the "leakage study attributes all non-market and non-industry related decline in [the company's] stock price to the . . . fraud without accounting for other factors that may have contributed to that decline."[7] *Id.* at 453.

---

[7]    The *Ferguson* court was skeptical of a lengthy 30-day event window. 584 F. Supp. 2d at 453. Professor Bradford Cornell identified the same problem with Fischel's even more extended 330-day

*Footnote continued on next page.*

Fischel's admissions at trial confirm that his leakage model likewise fails to eliminate non-fraud, firm-specific explanations for stock price declines:

> Q.  Okay.  And you agree there are a bunch of stock price movements under your [re]gression analysis that were not attributable to fraud-related disclosures, don't you?
>
> A.  There were probably some both positive and negative . . . and then they had some other aspect in addition to the fraud-related aspect.
>
> **Q.  *And were there some, any, that had no-fraud related aspect?***
>
> A.  It's a matter of judgment as to whether something has a fraud-related aspect or not. . . .  But just to be clear, under the leakage model, whether they did – ***whether they were purely fraud related, combined fraud related or not at all fraud related, they were all included in the leakage model.***

(Tr. 2959:24-2960:17 (emphasis added))  On direct examination, Fischel admitted that his leakage model makes it "impossible to conclude" whether exclusion of non-fraud, firm-specific information would have altered his quantification. (Tr. 2683:17-2684:6)[8]

Even the economist whose article was the supposed inspiration for Fischel's leakage model has repudiated it for not being a proper showing of loss causation – precisely because the model fails to exclude non-fraud causes for supposed inflation:

> Prof. Fischel's leakage model assumes, without demonstrating, that all the news items that affect Household's stock price are related to the fraud.  In my opinion as an economist, that assertion does not provide adequate evidence, indeed it really provides no evidence, that the stock price decline was caused by leakage of fraud related information rather than disclosure of other firm specific news. . . . Although Prof. Fischel's model could take account of market and industry factors, assuming it is properly specified, it does not take account of firm specific factors. ***Therefore, any estimate of inflation produced by this model cannot be relied upon.***

(Kavaler Dec. Ex. 4 at 5) (emphasis added)[9]

---

*Footnote continued from previous page.*

"leakage" window. Kavaler Dec. Ex. 4 at 5-6.  As the Supreme Court stated in *Dura*, "the longer the time between purchase and sale, . . . the more likely that other factors caused the loss." 544 U.S. at 343.

[8]    Even if Plaintiffs had proved, as Fischel speculated, that all non-fraud, firm-specific disclosures over the entire 330-day period "cancel each other out" (Tr. 2684:6), it would still be improper to include them in his analysis.  For example, Fischel's event study included a 10-day period between July 5 and July 15, 2002, during which there was no identified news, fraud-related or otherwise, yet the leakage model indicates a $2.52 decrease of inflation during that period. (PX 1391 at 40, 1395 at 16)  A class member who purchased stock at the beginning of that 10-day period and sold it at the end would in theory be able to recover under the leakage model, despite the fact the model identified no fraud-related movement during this period.  Asserting that some fraud-related movement elsewhere in the Relevant Period "cancelled out" this decline does not cure the legal insufficiency of this outcome, and would violate the rule that under the securities laws a plaintiff is entitled only to "actual damages" caused by fraud. 15 U.S.C. § 78bb(a).

[9]    Professor Bradford Cornell is co-author with R. Gregory Morgan of *Using Finance Theory to*
*Footnote continued on next page.*

## 2. The Leakage Model Did Not Prove a Causal Nexus Between the Alleged Fraud and Any Price Decline

Following *Dura*, the Court of Appeals reiterated that a plaintiff must demonstrate a causal link between an allegedly fraudulent statement and any alleged losses. *Tricontinental*, 475 F.3d at 843. In *Tricontinental*, the plaintiff alleged that the defendant had made material misrepresentations in a 1997 audit statement. In an attempt to connect the alleged fraud with an apparently unrelated later market decline, the plaintiff argued that the 1997 statement was part of an "on-going scheme" that was revealed when the falsity of the 1998 and 1999 audit statements was made known. *Id.* at 842. In affirming dismissal, the Court of Appeals held that the plaintiff's position could not be reconciled with *Dura*'s emphasis on establishing "a causal connection between the material misrepresentation and the loss, not simply that the misrepresentation touches upon a later economic loss." *Id.* at 843 (quoting *Dura*, 544 U.S. at 342-43) (citations and internal quotation marks omitted); *accord Ray*, 482 F.3d at 995 (affirming summary judgment for the defendant where the company's competitors suffered similar losses and the alleged corrective disclosure was made after the stock price had already collapsed); *In re Northfield Labs., Inc. Sec. Litig.*, 527 F. Supp. 2d 769, 789 (N.D. Ill. 2007).

Because Fischel's leakage model failed to identify any corrective events whatsoever, by definition it cannot and did not link any allegedly corrective event with any earlier alleged misstatement. Rejecting a similar "leakage theory" on precisely these grounds, the Second Circuit explained in *Flag Telecom*:

> Plaintiffs further fail to connect the decline in the price of Flag stock to any corrective disclosures . . . . While the event study links the decline in value of Flag common stock to various events, Plaintiffs have not presented sufficient evidence on which the lower court could conclude that any of the events revealed the truth about the subject of any of Defendants' alleged misstatements.

2009 WL 2169197 at *10.[10]

---

*Footnote continued from previous page.*

*Measure Damages in Fraud on the Market Cases*, 37 UCLA L. Rev. 883 (1990). That Fischel was able to cite only a single article as purported support for his "leakage model" itself raised serious questions about the validity of his approach. *See Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594 (1993) ("*Daubert*").

[10] While noting that a series of partial corrective disclosures could, in theory, expose a single misrepresentation, 2009 WL 2169197, at *9 n.5, the *Flag Telecom* court clarified that an expert's naked assumption (with no substantiating evidence) that there was a non-specific growing awareness, with no particular connection to a fraudulent statement or omission, or even to any particular type of fraud, cannot suffice. *Id.* at *9-*10; *Tricontinental*, 475 F.3d at 843.

In keeping with *Dura* and its progeny, Plaintiffs were required to identify specific events that removed inflation from Household's stock price, thus causing the alleged loss, with respect to each of the misrepresentations at issue. *Tricontinental*, 475 F.3d at 843 (citing *Dura* and explaining that a plaintiff must "specify each misleading statement . . . and that there must be a causal connection between the material misrepresentation and the loss") (citation and internal quotation marks omitted). Merely stating in conclusory fashion that inflation caused by all three types of fraud "leaked" out gradually, without reference to *any* specific disclosures or underlying fraudulent statements, cannot satisfy *Dura*. *Williams*, 558 F.3d at 1138 ("[Plaintiff must] establish that his losses were attributable to *some form of revelation to the market* of the wrongfully concealed information") (emphasis in original, citation omitted); *Flag Telecom*, 2009 WL 2169197, at *9 ("Plaintiffs have failed to demonstrate that any of the information that 'leaked' into the market prior to [the end of the class period] revealed the truth with respect to the specific misrepresentations alleged.").[11]

Indeed, in describing his now-moot specific disclosures model (PX 1397), Fischel acknowledged the economic necessity of identifying the particular corrective disclosures to which an alleged fraud must be linked. (Tr. 2628:2-11 ("*I had to* isolate disclosures. *I had to* determine whether those disclosures occurred at a time when there was a statistically significant stock price movement. And *I had to* be reasonably confident that the fraud-related disclosure was responsible for the price movement.") (emphasis added)) Yet, as Fischel admitted, the leakage model satisfies none of these requirements: the leakage model *fails* to isolate disclosures, *fails* to align them to stock price movement, and *fails* to rule out non-fraud explanations for such movement. Instead, according to Fischel, the leakage model "attempts to calculate the amount of inflation on every day during the relevant period" on the (unproven) premise that unspecified information "leaked" out, gradually revealing the alleged fraud. (Tr. 2680:17-2681:4)[12] In other words, he

---

[11] *Accord In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050, at *12-*17, *19 (N.D. Cal. June 19, 2009) (granting summary judgment on loss causation where the identified corrective disclosure did not provide new information to the market relating to the facts allegedly concealed).

[12] There is impermissible overlap between the period of time during which the jury found that statements caused inflation to come in and Fischel's "leakage" period, during which he says it went out. Fischel testified that the "truth" about Household's practices "leaked" out over an 11-month period beginning on November 15, 2001. (Tr. 2619:19-24, 2671:18-2672:15) Yet almost half of the 17 statements at issue were made during that period. Therefore, according to Plaintiffs and Fischel, investors were somehow simultaneously deceived and told the truth. As the Second Circuit explained in *Flag Telecom*: "Plaintiffs cannot have it both ways. They cannot allege that Defendants made certain misstatements . . .
*Footnote continued on next page.*

inferred circularly that there were corrective disclosures from the very fact that the stock price went down (or that it went down more than did some broad index), thus bootstrapping rather than establishing that revelation(s) of a particular fraud substantially caused a stock price decline.

Assuming, rather than proving, the existence and gradual revelation of alleged fraud, irrespective of timing or type, conveniently allowed Plaintiffs to skirt their patent inability to connect alleged instances of fraud, disclosures and market declines. For example, for their "credit quality concealment" fraud theory, Plaintiffs relied heavily on allegedly false statements in Household's 2001 10-K (DX 852) about how and how frequently Household reaged delinquent accounts. Yet neither of Fischel's models showed that this alleged false statement introduced inflation when it was made (and the jury found no new inflation on that day), and both Fischel and Plaintiffs' accounting witness Harris Devor testified that the alleged reaging misstatements in Household's 2001 10-K (filed in March 2002) were not corrected until Household filed an amended 2001 10-K in March 2003 – five months *after* the end of the Relevant Period. (Tr. 2451:22 -2453:14 (Devor); Tr. 4285:7-11 (Fischel)) Plaintiffs' own trial evidence rendered impossible any proof of loss causation, and it would be plain error to allow an inchoate "leakage model" to take the place of legally sufficient proof.

### 3. Plaintiffs Presented No Proof That Any of the 17 Statements at Issue Introduced Inflation into Household's Stock Price

To prove loss causation, Plaintiffs were required to prove that Defendants' alleged misrepresentations artificially inflated the price of Household's stock. *Ray*, 482 F.3d at 995; Tr. 2758:12-24, 4719:10-16. However, Fischel did not demonstrate that any of the 17 statements the jury found to be fraudulent introduced any inflation into Household's stock price under his leakage analysis (PX 1395), and the leakage model established no correlation between any of the 17 alleged misstatements at issue and any inflationary movement in Household's stock price. Instead, the model actually calculated *no change or a decrease in inflation* following 14 of the 17 statements at issue. For example, although the jury found that a March 28, 2001 statement was fraudulent, Fischel's leakage regression reflects no corresponding increase in inflation on that date. (PX 1395 at 9) The same is true for the April 18, May 9, July 18, August 10, Octo-

---

*Footnote continued from previous page.*

and simultaneously argue that the misstatement itself constituted a corrective disclosure." 2009 WL 2169197, at *9; *see also Redback Networks, Inc. Sec. Litig.*, 2007 WL 963958 (N.D. Cal. Mar. 30, 2007); *Powell* v. *Idacorp, Inc.*, 2007 WL 1498881 (D. Idaho May 21, 2007).

ber 17 and November 14, 2001 statements; the January 16, March 13, April 9, May 10 and July 17, 2002 statements; and the two August 14, 2002 statements. (PX 1395)  Kavaler Dec. Ex. 13 provides a graphic representation of data from PX 1395 relating to those dates.  Plaintiffs' failure to adduce any testimony connecting any alleged false statement with any increase in inflation constitutes an utter failure of proof on a required element. [13]

### 4. Plaintiffs' *Ad Hoc* "Solution" To These Defects – Urging the Jury to Determine Its Own Inflation Quantification and Thus Create Its Own Theory of Liability – Produced Verdicts Devoid of Record Support

During the charge conference, Plaintiffs' counsel proposed that the jury be allowed to assign "any damage amount that's – reasonable" in the verdict form's inflation table.  The Court properly rejected this proposal, stating that the jurors "only have two ways to figure out what's a reasonable damage amount:  Either of the two theories Fischel gave them. *Anything else is outside the evidence presented in the case.  It would be creating their own theory of liability*." (Tr. 4367:20-4368:2 (emphasis added)).  Yet that is exactly what the jury did.  The jury chose to disregard Fischel's leakage quantification and "replace the inflation number with a zero for every day" before the date of the first statement the jury found to be false. (Dkt. 1611)  Fischel's invitation to disregard the results of his regression (Tr. 2966:9-10) is tantamount to an admission that his leakage analysis does not meet the standard for reliability set by Rule 702 and the principles underlying *Daubert*. [14]  Although Fischel testified that he and a team of 20 professionals spent "thousands and thousands of hours" preparing his reports and testimony (Tr. 2846:2-12), nowhere in his expert reports did he explain that a lay jury could correct his results on the fly by selectively adopting only parts of the leakage model.

With no record evidence or economic expertise to guide it, the jury "calculated" that $23.94 in artificial inflation entered Household's stock price on March 23, 2001, from a base of zero inflation the day before.  But Fischel had estimated an inflation increase on that day of at

---

[13]  Equally contradictory, the leakage quantification indicates inflationary increases on hundreds of dates upon which no fraudulent statements were found, which thus could *not* have been fraud-related; *e.g.*, although Plaintiffs did not allege and the jury did not find any fraudulent statement on Feb. 27, 2002, the leakage regression indicates an inflationary increase on that date. (PX 1395 at 14; Tr. 2928:11-16)

[14]  This untested alternative ignores the requirement, embodied in Rule 702, that expert testimony must be based on sufficient facts or data, must be the product of reliable principles and methods, and those principles and methods must be applied reliably to the facts of the case. *U.S.* v. *Moore*, 521 F.3d 681, 683-84 (7th Cir. 2008).  And, because this theory is absent from Fischel's expert reports, it could not properly have been presented to, and considered by, the jury. Fed. R. Civ. P. 26(e)(1).

most $0.67 (PX 1395 at 9), which itself was attributed to a modeling artifact, not fraud. (*See* n. 15, *infra*.)  There is not a scintilla of evidence in the trial record to support the jury's *ad hoc* finding that artificial inflation under the leakage model sprang from nothing on March 22, 2001 to nearly $24 the next day.  By accepting Fischel's invitation to craft its own inflation model, inconsistent with the Court's instruction on the law, the jury reached a result that was devoid of record support and at odds with governing legal requirements.

> **5.    The Leakage Model Resulted in Irrational Verdicts Attributing All Inflation Regarding Three Separate Theories of Fraud to a Single Statement Related to Only One Theory**

To construct his leakage analysis, Fischel purported to track decreases in assumed artificial inflation backwards during the "leakage" period, capping the maximum value of artificial inflation at $23.94. Kavaler Dec. Ex. 1 at ¶¶ 41-42.  He assumed that this inflation was attributable to all three of Plaintiffs' theories of fraud:  predatory lending, reaging, and credit card accounting. (Tr. 2855:13-23 ("[N]egative information came out slowly over time precisely because Household did not admit the predatory lending practices that it was involved in or the improper accounting as a result of re-aging, and the restatement."))  However, the jury found that the *entire* $23.94 of inflation arose on March 23, 2001 from a statement denouncing unethical lending practices. (Dkt. 1611 at 83)  Even if that vague statement were actionable as securities fraud (and Part XI.C, *infra*, demonstrates that it is not), because the statement related to only one of Plaintiffs' theories of fraud (predatory lending) it is impossible to reconcile the $23.94 of predatory lending-related inflation that the jury found with the $23.94 of amorphous "leakage" that Fischel attributed to all three theories of fraud.  This logical (and evidentiary) gap directly violates *Dura* and its progeny. *Tricontinental*, 475 F.3d at 843; *Ray*, 482 F.3d at 995.

> **B.    *A Fortiori*, the Verdicts Were Against the Weight of the Evidence on the Essential Element of Loss Causation**

In view of the dispositive failings in Plaintiffs' showing of loss causation (as reinforced by the jury's finding of *no* increase in inflation for almost all of the days and legal theories for which they purported to find liability), the verdict is necessarily against the weight of evidence and, in the alternative, requires a new trial.

## II.    PLAINTIFFS' RULE 10B-5 CLAIMS ARE TIME-BARRED

Plaintiffs' failure to connect the decline in Household's stock price to any fraudulent statement or omission made *during the Relevant Period* entitles Defendants to judgment under

the statute of repose. The timing of the introduction of inflation is critical because Plaintiffs may not recover for any losses based on fraudulent statements or omissions that occurred prior to July 30, 1999. (Dkt. 434) Fischel's leakage model explicitly demonstrated that the alleged artificial inflation in Household's stock was *already in existence on the first day of the Relevant Period*. (PX 1395 at 1; Tr. 2936:11-2937: 24) Plaintiffs adduced no evidence to the contrary, and Fischel's event study found no statistically significant price increase that resulted in inflation on July 30, 1999 (PX 1391) – meaning that inflation (if it existed at all) became embedded prior to July 30, 1999, just as Plaintiffs had alleged and judicially admitted in their complaint. (Dkt. 54 at ¶¶ 3, 192-234)[15]

Furthermore, Plaintiffs made (and are now bound by) a deliberate strategic decision *not* to attempt to prove when and how (and therefore whether) alleged artificial inflation entered the stock price. They successfully resisted discovery, and they represented to the Court that "Household's stock price was artificially inflated on July 30, 1999 by Household's failure to disclose material adverse facts in connection with its July 22, 1999 statement announcing its second quarter results" and that the inflation may have started at least as early as October 1997, if not earlier. (Kavaler Dec. Ex. 7 at 3 (Dkt. 1174))[16] Fischel himself reinforced Plaintiffs' admissions by explaining that the reason there was no new inflation for the first two and a quarter years of the Relevant Period was that Household's statements during that period merely reaffirmed its previous statements. (Tr. 2963:21-2964:13, 2974:10-16)[17]

With no evidentiary basis to contradict Plaintiffs' and Fischel's admissions in this regard, the jury could not reasonably have found the much later advent of inflation that is reflected in its

---

[15] Although the inflation quantification in the leakage model fluctuates from day to day between July 30, 1999 and November 15, 2001, Fischel's report confirmed that those changes were not caused by fraudulent statements but rather were simply due to a modeling artifact. (*See* Kavaler Dec. Ex. 1 at ¶ 41.) Under Fischel's model, the changes were caused by the use of a modified constant percentage method for calculating inflation (subject to a $23.94 cap, *see* Kavaler Dec. Ex. 1 at ¶ 42). Thus, the purported inflation on November 15, 2001 was the same inflation that existed on July 30, 1999.

[16] In response to Defendants' discovery motion seeking disclosure of "when (*i.e.*, the specific date or dates) the 'artificial inflation' . . . was first introduced into Household's stock price (Dkt. 1178, 1179 at 10), Plaintiffs said: "The fact that Household's stock was inflated on July 22, 1999 or July 30, 1999 has no bearing on whether plaintiffs' claims are actionable . . . ." "Plaintiffs' case will not involve showing any pre-Class Period inflation as that information has no bearing on plaintiffs' methodology for calculating damages." (Dkt. 1182 at 3, 7)

[17] Fischel testified that the first allegedly false statement, a statement in Household's 10-Q filed on August 16, 1999, merely reiterated a statement made in Household's July 22, 1999 press release (during the period of repose) – because they were the "same statement." (Tr. 2974:10-16)

verdicts. The only possible inference from these admissions is that the alleged inflation, if it existed at all, was caused by some action or event that occurred during the period of repose. (Tr. 2963:21-2964:13, 2974:10-16)[18]

## III.    PLAINTIFFS FAILED TO PROVE THAT ANY OF THE 17 STATEMENTS WAS MATERIAL

"[I]n an efficient market 'the concept of materiality translates into information that alters the price of the firm's stock'." *Oran* v. *Stafford*, 226 F.3d 275, 282 (3d. Cir. 2000). "[I]f a company's disclosure of information has no effect on stock prices, 'it follows that the information disclosed . . . was immaterial as a matter of law.'" *Id.* (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997) (Alito, J.)); *Grimes* v. *Navigant Consulting, Inc.*, 185 F. Supp. 2d 906, 912-13 (N.D. Ill. 2002). Fischel agreed that the market immediately reacts to and incorporates new information into the stock price. (Tr. 2861:9-14, 2862:8-12) Yet Plaintiffs utterly failed to demonstrate that any fraudulent statement had an impact on Household's stock price. (Part I.A, *supra*) Fischel admitted outright that none of the contested statements impacted the stock price because they merely "reaffirmed" prior reassurances or denials and thus added nothing new to the mix of information available to the market – *"the market didn't react because Household is saying the same thing over and over and over again."* (Tr. 2963:21-2965:6) This dispositive admission precluded a rational finding that any of the alleged false or misleading statements was material,[19] and also rendered the verdicts against the weight of evidence.

## IV.    PLAINTIFFS FAILED TO PROVE THAT HOUSEHOLD'S RESTATEMENT RESULTED FROM FRAUDULENT ACCOUNTING

On August 14, 2002 Household announced that it was restating income reported in its year-end 1999, 2000 and 2001 and first-quarter 2002 financial statements due to a change in ac-

---

[18]    Because a plaintiff must prove that a non-time-barred statement or omission introduced artificial inflation into a defendant's stock price, there is no "continuing violation" exception to the statute of repose. *E.g.*, *In re Ditech Networks, Inc. Derivative Litig.*, 2007 WL 2070300, at *8 (N.D. Cal. July 16, 2007); *Pro Bono Investments, Inc.* v. *Gerry*, 2005 WL 2429787, at *8 (S.D.N.Y. Sept. 30, 2005).

[19]    A glaring example of this disconnect is the jury's finding that Defendants were *not* liable for any statements up to and including the January 17, 2001 press release, but *were* liable for identical statements in the March 28, 2001 10-K. (Dkt. 1611, Nos. 13, 15; Part IX.D, *infra*) Both presented the same substantive information with respect to Plaintiffs' reaging and credit card-related restatement theories – the same revenue, earnings per share, credit quality, reserves, delinquency and chargeoff information as of year-end 2000. The only reasonable conclusion, consistent with Fischel's own testimony, is that the market had already absorbed those facts when they were previously disclosed through *non-actionable* statements on January 17, 2001, thus precluding a finding of materiality as to the March 28, 2001 statement.

counting treatment for certain service contracts executed by a single business unit responsible for issuing credit cards. (Tr. 2177:6-2178:4)  At trial, Plaintiffs did not prove that anyone involved in the determination or approval of Household's original accounting treatment for these credit card-related contracts did so with an intent to deceive investors, and their loss causation expert confirmed that the announcement of the restatement did not impact Household's stock price.

The jury's finding that Defendants had not proved the essential elements as to any of Household's reports of earnings from 1999 through and including January 2001 confirms Plaintiffs' failure to prove scienter regarding Household's accounting for credit card-related contracts. Because the method of accounting for the contracts and the resulting net income and earnings per share figures were identically presented in the January 17, 2001 Press Release, as to which the jury found no liability (Dkt. 1611 Table A, No. 13), and the supposedly "fraudulent" March 28, 2001 10-K (Dkt. 1611 Table A, No. 15), the only element that could theoretically have changed during that brief interval was scienter.  Yet Plaintiffs adduced no proof or explanation as to how scienter regarding the accounting could have suddenly materialized between January and March 2001.[20]  With no plausible evidence of scienter, Plaintiffs are left with only the fact of the restatement itself as purported but legally insufficient evidence of fraud.

A.    Neither a GAAP Violation nor a Restatement, Without More, Proves Securities Fraud

The trial evidence showed only that for many years before the start of the Relevant Period Household relied on the accounting treatment approved by its outside auditor Arthur Andersen ("Andersen") for certain novel credit card servicing contracts; that years later the Company's new outside auditor KPMG disagreed with its predecessor; and that Household deferred to its

---

[20]    Although Plaintiffs alluded at trial to a *1998* report of regulatory examination that merely asked whether certain credit card-related accounting was in compliance with FASB (PX 712), that document was sent to Household more than two years before the date of the first statement the jury found to be fraudulent – and the jury expressly found that the press releases, 10-Qs and 10-Ks issued during the two-year interval were not fraudulent.  Because the method of accounting for the contracts was unchanged and the net income resulting from the credit card-related contracts was presented in the same fashion from well before the Relevant Period through August 2002, the jury necessarily rejected any inference of scienter from this pre-Relevant Period document.

Plaintiffs also cited the unsubstantiated "expert" testimony of Harris Devor that Arthur Andersen was "not comfortable with the accounting" for one of the credit card-related contracts. (Dkt. 1581 at 17)  Plaintiffs failed to provide any evidentiary support for Devor's speculation, which is not competent evidence, and did not establish any facts or provide any factual information about Defendants' state of mind. *James Wilson Assocs.*, 965 F.2d 160, 172-73 (7th Cir. 1992).  In any event, Devor confirmed that, after reviewing the relevant information, Andersen agreed to issue a clean opinion allowing the accounting treatment. (Tr. 2521:21-2522:5)

new auditor's judgment and restated the affected earnings accordingly.  Period. (Tr. 2173:17-2178:25)  As a matter of law, a restatement is insufficient to prove a claim of securities fraud. *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185, 193, 199 (1976); *Roth* v. *OfficeMax, Inc.*, 527 F. Supp. 2d 791, 797 (N.D. Ill. 2007).[21]  Devor agreed that a "restatement per se doesn't imply the existence of fraud." (Tr. 2586:16-2587:2)[22]  Yet Plaintiffs adduced zero evidence that the original accounting treatment was adopted or applied with any intent to deceive or defraud investors.

**B.      Good Faith Reliance on External Auditors Precludes a Finding of Scienter**

The only fact witnesses through whom Plaintiffs elicited testimony about the restatement were Aldinger and Schoenholz, both of whom confirmed that Household had relied on its external auditors to evaluate and advise it on the proper accounting treatment for the subject contracts. (Tr. 2174:12-2178:6 (Schoenholz), Tr. 3216:11-3218:5, 3219:23-3220:8 (Aldinger))  As Devor confirmed, Andersen gave Household a clean opinion in every relevant year until its successor KPMG recommended a different accounting treatment for the contracts. (Tr. 2173:19-2176:18, 2587:3-22)  This uncontested evidence precludes a finding of scienter. *Stavroff*, 1997 WL 720475, at *6; *Mathews* v. *Centex Telemanagement, Inc.*, 1994 WL 269734, at *7 (N.D. Cal. June 8, 1994).  Household's retention of KPMG to re-audit all of its Relevant Period results (Tr. 2173:19-2176:8) itself negates a finding of scienter.  *See In re H&R Block Sec. Litig.*, 527 F. Supp. 2d 922, 930 (W.D. Mo. 2007).

**C.      Disagreement Among Qualified Auditors Regarding Proper Accounting Treatment Precludes a Finding of Scienter**

Household's successive independent outside auditors did not agree on the appropriate accounting treatment. (Tr. 2175:20-24)  Forced to choose, Household chose to rely on the advice of its current auditors and restate its earnings upon KPMG's advice. (Tr. 2178:24-25)  The Office

---

[21]  *Accord In re Bally Total Fitness Sec. Litig.*, 2006 WL 3714708, at *7 (N.D. Ill. July 12, 2006) ("The Seventh Circuit has observed that even a very large restatement is not itself evidence of scienter."); *In re System Software Assocs., Inc. Sec. Litig.*, 2000 WL 283099, at *13 (N.D. Ill. Mar. 8, 2000); *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 745 (8th Cir. 2002); *Lovelace* v. *Software Spectrum, Inc.*, 78 F.3d 1015, 1020-21 (5th Cir. 1996); *see also In re Allscripts, Inc. Sec. Litig.*, 2001 WL 743411, at *11 (N.D. Ill. June 29, 2001); *In re Comshare Sec. Litig.*, 183 F.3d 542, 553-54 (6th Cir. 1999); *Stavroff* v. *Meyo*, 1997 WL 720475, at *6 (6th Cir. Nov. 12, 1997).

[22]  Even Plaintiffs conceded in seeking judicial approval of their settlement with Andersen that "merely establishing GAAP violations is not sufficient and Lead Plaintiffs would need to show that Andersen . . . engaged . . . in intentional or willful conduct designed to deceive or defraud investors." (Dkt. 456 at 8 (citing *Hochfelder*, 425 U.S. at 199))

of the Comptroller of the Currency ("OCC"), the OCC Ombudsman and Plaintiffs' accounting expert all had differing views. (Tr. 2536:25-2539:17 & DX 315 (The OCC Ombudsman opined, "I believe there exists a legitimate difference of opinion regarding a systematic and rational approach to accounting for this very complex transaction.")) Such disagreement among experts negates a finding of scienter. *Danis* v. *USN Communications, Inc.*, 121 F. Supp. 2d 1183, 1195 (N.D. Ill. 2000). Plaintiffs have shown "nothing more than that equally competent and reasonable accountants" disagreed on a novel and complex accounting issue, resulting in a restatement. *In re Miller Indus., Inc. Sec. Litig.*, 120 F. Supp. 2d 1371, 1382-83 (N.D. Ga. 2000).

> **D.    The Increase in the Price of Household Stock upon the Announcement of the Restatement Precludes a Finding of Loss Causation**

The restatement was announced on August 14, 2002. The stock closed up $0.29 that day and up another $1.51 the next day. (PX 1395; Tr. 4201:17-4203:1) It is black-letter law that a plaintiff's recovery in a private securities action must be based on actual losses, not speculation about how much larger a price increase might have been in the absence of alleged fraud. 15 U.S.C. § 78bb(a); *Kaufman* v. *Motorola, Inc.*, 2000 WL 1506892, at *2 (N.D. Ill. Sept. 21, 2000). Because Household's stock price increased the day that and the day after the restatement was announced, that announcement could not have been the cause of any economic loss. *In re Impax Labs., Inc. Sec. Litig.*, 2007 WL 5076983, at *6 (N.D. Cal. Jan. 3, 2007).

Furthermore, the jury inexplicably found that the second quarter 2002 10-Q, filed on August 14, 2002 using the new accounting treatment, was *itself* false or misleading as to the restatement issue. (Dkt. 1611, No. 38) As there was no evidence of any corrective disclosure regarding the restatement *after* August 14, 2002, the jury's irrational finding suggests that it determined that the alleged accounting fraud was never corrected during the Relevant Period, rendering Plaintiffs' claims insupportable for failure to demonstrate loss causation. (Part I.A, *supra*)

## V.    PLAINTIFFS' "PREDATORY LENDING" THEORY WAS UNTENABLE AS A MATTER OF LAW

The jury found liability under Plaintiffs' "predatory lending" theory as to 10 of the 17 statements at issue. Nine of those statements were drawn from 10-Ks or press releases announcing earnings results, but Household's recognition of actual revenues and growth from consumer lending activities is not actionable as securities fraud. The tenth statement – that "[u]nethical lending practices of any type are abhorrent to our company, our employees and most importantly our customers" – is not actionable because it is immaterial puffery.

A.   **Household's Recognition of Actual Revenues and Growth from Consumer Lending Activities Is Not Actionable as Securities Fraud**

Plaintiffs sought to prove that Defendants failed to disclose in Household's press releases, 10-Ks and 10-Qs that Household could not sustain that portion of its income derived from loans impacted by effective rate sales presentations, sales of single-premium credit insurance, second loans with higher interest rates, or allegedly misleading points and fees, contract terms or GFEs. (*E.g.*, Tr. 1891:18-1892:24, 1893:18-23, 1901:11-17)  But these filings and related press releases announcing "record results" were accurate descriptions of indisputably real income from Household's consumer lending operations (there being no evidence that Household misstated the reported revenues).

The Court recognized that Plaintiffs could not proceed on a theory that Household's financial statements were false by virtue of recognizing revenues obtained from alleged "predatory" practices (Dkt. 1528), and held that Plaintiffs could not proceed on their predatory lending theory as to Household's 10-Qs and 1999 10-K. (Dkt. 1602)  As the Court stated, "the statement of revenue in a 10-K or 10-Q that accurately states the earnings does not by itself give rise to a duty to disclose specific lending practices." (Tr. 4016:1-4; *accord* Tr. 2705:22-2706:17)  The Court applied the same principle in barring certain of Devor's opinion testimony. (Dkt. 1528)

The earnings reports and press releases at issue reported earnings and net income; applauded growth, profitability and improved credit quality; and set out chargeoff and delinquency statistics. (Dkt. 1611 Table A, Nos. 16, 18, 21, 24, 29, 36, 37)  None placed Household's lending practices at issue or gave rise to a duty to disclose allegedly predatory loan origination practices. The challenged statement in Household's 2000 10-K (*id.*, No. 15) – "We have a process which we believe gives us a reasonable basis for predicting the credit quality of new accounts" (Tr. 2716:5-24) – did not create a duty to disclose alleged predatory lending.  It had nothing to do with loan origination practices, but instead addressed the level of Household's contractual delinquency and "2+" numbers and thus related only to Plaintiffs' reaging theory.  The statement in the 2001 10-K (Dkt. 1611 Table A, No. 27) that purportedly put alleged predatory practices at issue noted that management had "long recognized its responsibility for conducting the company's affairs in a manner which is responsive to the interest of employees, shareholders, investors and society in general." (Tr. 2717:3-10)  Besides being literally true, this sort of vague cor-

porate puffery does not give rise to securities fraud.[23] Plaintiffs' argument that a failure to disclose the alleged non-sustainability of growth renders revenue and earnings statements misleading has been repeatedly rejected.[24] Defendants are thus entitled to judgment as to Plaintiffs' predatory lending theory with respect to the 2000 and 2001 10-Ks and press releases as to which the jury found liability. (Dkt. 1611, Nos. 15, 16, 18, 21, 24, 27, 29, 36, 37)

### B.    The March 23, 2001 Statement Regarding Unethical Lending Practices Was Immaterial Puffery

The only other statement as to which the jury found liability under Plaintiffs' "predatory lending" theory was a quote attributed to Gilmer in an industry publication that Household's "position on predatory lending is perfectly clear.  Unethical lending practices of any type are abhorrent to our company, our employees and most importantly our customers." (Dkt. 1611 Table A, No. 14; Tr. 1351:12-1353:9)  This "soft" statement of opinion is inactionable as a matter of law as "[i]ts lack of specificity precludes it from being deemed material; it contains no useful information upon which a reasonable investor would base a decision to invest." *Searls*, 64 F.3d at 1066; *accord Makor Issues & Rights, Ltd.* v. *Tellabs, Inc.*, 437 F.3d 588, 596 (7th Cir. 2006), *vacated and remanded on other grounds*, 551 U.S. 308 (2007), and cases cited in n.24, *infra*.

### C.    Household Had No Duty to Disclose Facts Already Known to the Market

Plaintiffs cannot recover for losses caused by alleged concealment of "information that is already in the public domain." *Higginbotham* v. *Baxter Int'l, Inc.*, 495 F.3d 753, 759 (7th Cir. 2007); *accord Bastian* v. *Petren Resources Corp.*, 892 F.2d 680, 686 (7th Cir. 1990).  As a matter of law, Defendants had no duty to disclose additional aspects of Household's business model

---

[23]    *E.g.*, *ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009); *In re Ford Motor Co.*, 381 F.3d 563, 571 (6th Cir. 2004); *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 475 (S.D.N.Y. 2006); *In re American Bus. Fin. Servs. Inc. Sec. Litig.*, 413 F. Supp. 2d 378, 400 (E.D. Pa. 2005).

[24]    *E.g.*, *Searls* v. *Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995); *Stransky* v. *Cummins Engine Co., Inc.*, 51 F.3d 1329, 1332 (7th Cir. 1995); *Anderson* v. *Abbott Labs.*, 140 F. Supp. 2d 894, 904-07, 909 (N.D. Ill.), *aff'd sub nom. Gallagher* v. *Abbott Labs.*, 269 F.3d 806 (7th Cir. 2001); *Galati* v. *Commerce Bancorp, Inc.*, 220 Fed. Appx. 97 at 101-02 (3d Cir. 2007); *In re Sofamor Danek Group*, 123 F.3d 394, 401-02 (6th Cir. 1997); *Marsh*, 501 F. Supp. 2d 452, 471 (S.D.N.Y. 2006); *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 587 (S.D.N.Y. 2006).  Furthermore, this theory would entail characterizing the statements as misleading forward-looking statements, for which the required state of mind is "actual knowledge" of their false or misleading nature. 15 U.S.C. § 78u-5(c)(1)(B); *Stavros* v. *Exelon Corp.*, 266 F. Supp. 2d 833, 847 (N.D. Ill. 2003).  No liability could attach as a matter of law because the jury found Defendants acted at most "recklessly," not "knowingly," as to the statements at issue. (Dkt. 1611, Nos. 16, 18, 21, 24, 29, 36, 37)

and practices because the trial record shows without contradiction that Household disclosed to the market, and market participants were fully aware of, all material information regarding Household's business operations and attendant risks, including practices alleged to be indicia of "predatory lending."[25]

The trial record also reflects without contradiction that Household fully disclosed and the market well understood the emerging regulatory, legislative, political and litigation risks to which Household was subject throughout the Relevant Period, and that the "headline" risks associated with its subprime lending model were growing steadily during that recessionary time.  For example, it is undisputed that well before November 2001 the market knew that ACORN and other putative consumer advocacy groups were protesting against Household's lending practices and analysts warned that increased political and regulatory scrutiny might impact its business model.[26]  Moreover, in March 2001 and 2002 proposals were sent to all Household shareholders for consideration at the upcoming annual meeting, describing increasing public scrutiny of "predatory lending" practices in the subprime industry, detailing nationally reported protests over the Company's lending policies and practices, and requesting that the Board tie management compensation "to successfully addressing the public's concern about predatory lending practices." (DX 360; Tr. 3162:5-3168:1; DX 99; Tr. 3173:20-3174:20)  The shareholders rejected both proposals. (Tr. 3168:2-3168:11, 3174:25-3175:10)  These events indisputably reflect market awareness of the fully disclosed and steadily increasing investment risks (and related decreasing stock price) occasioned by growing scrutiny and disfavor of Household's lending practices.

> ### D.   The Jury's Verdicts Regarding Alleged "Predatory Lending" Fraud Contradicted the Clear Weight of the Evidence

Plaintiffs relied almost entirely on unsupported, statistically insignificant allegations and unreliable expert opinions to suggest that Household was engaged in systemic predatory lending

---

[25]   Trial exhibits and testimony exemplifying Household's disclosure and market awareness of alleged "predatory lending" indicia are listed in Kavaler Dec. Ex. 14. (*E.g.*, DX 78, 91, 222, 230, 397, 511, 522, 534, 600, 630, 695 at HHT 0002335, 880 at HHT 0017936, HHT 0017940, HHT 0017968; PX 69, 824, 1439, 1440, 1447, 1448; Tr. 723:24-725:3, 1197:10-1200:13, 1201:14-1202:25, 1266:24-1269:3, 1286:25-1288:3, 1292:23-1298:23, 1315:8-1319:22, 1385:8-1387:20, 1406:3-1408:23, 1529:20-1531:8, 1533:15-1535:25, 3155:21-3156:1, 3157:6-3158:9, 3158:20-3159:24.)

[26]   Trial exhibits and testimony exemplifying market awareness of growing "headline risks" associated with Household's subprime lending model during the Relevant Period are listed in Kavaler Dec. Ex. 15. (*E.g.*, DX 222, 397, 498, 600, 613, 850 at HHT0015416-17, 851 at HHT0015512-13, 852 at HHT 0015661-63; PX 824, 1451; Tr. 1201:11-1202:20, 1391:15-1394:18, 1406:3-1408:23, 1410:5-1412:7.)

and that Defendants intentionally concealed this conduct from the public. Plaintiffs' admissible fact evidence was not sufficient to support either conclusion or to overcome Defendants' uncontradicted showing that Household's senior management actively promoted responsible lending practices and reasonably believed that more than 99% of Household's loans were compliant with state and federal laws, and that Household publicly disclosed most or all of the practices Plaintiffs criticized as predatory and attendant investment risks.

The insufficient linchpin of Plaintiffs' "predatory lending" theory was the naked opinion of their expert Catherine Ghiglieri that Household "engaged in systemic and companywide predatory lending practices." (Tr. 615:15-16) Although Ghiglieri recited various untested and mostly inadmissible complaints, unadjudicated allegations, preliminary regulatory views, settlement negotiations and agreements and, above all, the biased and overblown conclusions of reluctant "expert" Charles Cross (Parts X.B-X.C, *infra*), she admittedly took no steps to test her conclusion that the anecdotes she cited were valid or pervasive. Defendants, in contrast, presented competent, undisputed proof that the aggregate number of unresolved complaints of all sorts and from any sources never exceeded the immaterial level of *less than one-half of one percent of Household's outstanding loans*. (Tr. 712:6-713:3, 719:5-15, 735:20-736:24, 745:11-21 (Ghiglieri), 1255:6-1257:11 (Gilmer); DX 143) Even the three internal reports Ghiglieri relied upon show a low rate of complaints: PX 242, 245 and 794 reported in the aggregate only 679 complaints, *a mere .00141%* of Household's customer base of 48 million. (Tr. 3474:10-22) The verdicts, in line with Ghiglieri's unsubstantiated opinion that consumer abuses were "systemic," "pervasive," and "widespread," were against the clear weight of the consistent empirical record.

Plaintiffs tried to compensate for Ghiglieri's admitted lack of empirical support by having accountant Harris Devor pronounce that a substantial percentage of Household's earnings were "attributable" to "improper lending practices." Plaintiffs and Devor made no attempt to prove this sweeping conclusion but rather simply assumed that inadmissible settlement payments and unsubstantiated settlement-related calculations were a valid measure of allegedly illicit earnings. An expert's reliance on inadmissible evidence is not competent proof of any fact and does not relieve a plaintiff of the burden of proving the facts underlying its expert's *ipse dixit* through admissible evidence. *James Wilson Assocs.*, 965 F.2d at 172-73. (Part X.F, *infra*)

In addition to the deficiencies in their proof of falsity and materiality, Plaintiffs also failed to prove scienter by a preponderance of the evidence. To support the opinion that senior

management deliberately concealed lending abuses, Ghiglieri relied heavily on management's alleged awareness of anecdotal criticisms of Household's lending and account operations practices in unadjudicated lawsuits and routine regulatory examination reports, allegations from consumer advocate groups such as ACORN, and newspaper articles.  However, none of this was sufficient to support an inference of scienter. *Higginbotham*, 495 F.3d at 758.  An inference of scienter was actively belied by uncontested proof that Household openly disclosed its growth strategy, lending practices (including those that Plaintiffs characterized as "predatory"), and investment risks associated with growing political, regulatory and consumerist attacks on its practices. (Part V.C, *supra*)  Plaintiffs' expert's negative characterization of Household's business was never substantiated as a matter of fact, so its attendant inference of scienter is likewise devoid of proof.  The verdicts were against the weight of admissible evidence and require a new trial.

## VI.    PLAINTIFFS FAILED TO PROVE THEIR THEORY OF "CREDIT QUALITY CONCEALMENT"

Plaintiffs' "credit quality concealment" theory focused on three arguments:  (1) that Household's 2+ delinquency numbers reported in its 10-Ks, 10-Qs and press releases were false because Household used reaging to defer charging off loans; (2) that Household's 2001 10-K (DX 852), filed in March 2002 and amended only *after* the Relevant Period (DX 847), failed to disclose automatic and one-payment restructures; and (3) that there were discrepancies in certain reaging statistics for a handful of items presented to investors during the April 9, 2002 Financial Relations Conference ("FRC").

### A.    Plaintiffs Failed to Prove That Reported 2+ Numbers Were False

Although Plaintiffs expended enormous effort to create an impression that Household defrauded investors by reporting 2+ delinquency numbers that did not properly reflect the risk of bad loans or that omitted underlying operational details that no other lending company routinely disclosed, their assertion that Household's reported 2+ numbers were "false" is wholly unsupported by the record.  Plaintiffs introduced no evidence that the numbers were inaccurate or ever restated, and Defendants proved without contradiction that at all relevant times Household's loan loss reserves were (a) fully disclosed and (b) adequate to cover all actual losses.  Because Household's reported 2+ delinquency and charge-off numbers were accurate descriptions of financial results, as a matter of law they cannot be the basis for Rule 10b-5 liability. *Sofamor Danek*, 123 F.3d at 401 & n.3; *Anderson*, 140 F. Supp. 2d at 909.

**B.    Assertions That Management Should Have Taken Charge-Offs Earlier
Cannot Give Rise to Rule 10b-5 Liability**

Plaintiffs sought to attribute fraud to Household's accurate 2+ delinquency data through
the unsupported opinions of Ghiglieri and Devor that Household reaged loans in order to defer
charge-offs and restore delinquent loans to current status.  But disagreements with a company's
managerial decisions, or even proof of mismanagement, are not sufficient predicates for a find-
ing of fraud. *Santa Fe Indus., Inc.* v. *Green*, 430 U.S. 462, 479 (1977) ("Congress by § 10(b) did
not seek to regulate transactions which constitute no more than internal corporate mismanage-
ment.").  As the Court of Appeals has said of charge-off decisions in particular, "Plaintiffs essen-
tially claim that [defendant] should have written off its bad investment[s] sooner – but this is not
fraud." *Grassi* v. *Information Resources, Inc.*, 63 F.3d 596, 600 (7th Cir. 1995).

In the normal course, the managers of each of Household's business units chose whether
to take a potential charge-off immediately (thus incurring foreclosure costs and precluding any
possibility of restoring the payment stream) or to restructure a loan in exchange for an immediate
partial payment while maintaining reserves for potential nonpayment based on the payment and
reaging history of loans in the unit's portfolio. (Tr. 2133:2-7, 2153:12-24, 2165:4-2167:9,
2334:17-2336:18)  At bottom, Plaintiffs' experts disagreed with the volume or frequency of reag-
ing or the underlying criteria, and with the resultant timing of chargeoffs.  This is not the stuff of
securities fraud.

The Court of Appeals in *DiLeo* v. *Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990), re-
jected a similar claim that the failure to anticipate credit losses could form the basis for Rule
10b-5 liability:

> If all that is involved is a dispute about the timing of the writeoff, based on estimates
> of the probability that a particular debtor will pay, we do not have fraud; we may not
> even have negligence.  Recklessness or fraud in making loans is not the same as fraud
> in discovering and revealing that the portfolio has turned sour.

Here, Plaintiffs cannot even claim that much, because at all relevant times Household's
credit loss reserves were adequate to cover losses on the portion of loans expected to fail.[27]
(Tr. 2128:25-2130:16 (Schoenholz); Tr. 3114:13-3115:1 (Aldinger))

---

[27] Devor expressed no opinion as to the adequacy of Household's reserves. (Tr. 2567:9-11)
Ghiglieri agreed that "when loans deteriorate in quality, lenders are required to increase their reserves for
loan losses . . . " and that "reserves tell people about the loans it might or might not be able to collect in
the future . . . ." (Tr. 935:10-20)

### C. Detailed Disclosures Regarding Reserves and Probable Loan Losses Negate Any Inference of Scienter and Render Plaintiffs' Claims Immaterial

In the same sections of the same public reports that disclosed the challenged delinquency data, Household made extensive, detailed disclosures about the probability of loan defaults and the attendant development and posting of reserves. The jury could not rationally have found that Household withheld or "fudged" details of routine business operations in order to disguise the magnitude of the risk of loan defaults in the same documents in which it provided candid and detailed projections of that very risk. *E.g.*, *Axis*, 456 F. Supp. 2d at 588 ("[T]he company's disclosures must be 'read as a whole. . . .'") (citation omitted) Plaintiffs' pejorative but ultimately baseless "credit quality concealment" theory proved insubstantial as a matter of law both because Plaintiffs failed to prove scienter and because Defendants had no duty to elaborate on immaterial operational details.

Consider, for example, Household's 2001 10-K (DX 852), containing supposedly false 2+ delinquency statistics and a single sentence in which management tried to sum up reaging policies in what turned out to be an overly generalized nutshell. (Dkt. 1611 Table A, No. 27) These excerpts are sandwiched between extensive, never-challenged disclosures about probable loan losses and the development of appropriate (and, as the record shows, always adequate) record-level loss reserves, which were set forth with express reference to historical account performance and reaging and charge-off policies, among other factors. (DX 852 at HHT 0015789-90, 795, 799, 808-12, 820; *accord* DX 851 at HHT 0015606-10, 616-19, 628; Kavaler Dec. Ex. 16)[28] Such candid disclosures – the antithesis of "credit quality concealment" – dispel any possible inference of fraud. There is no record evidence to suggest that reserves (the industry's well-accepted bellwether of probable losses) were ever insufficient, as they surely would have been in a company that reaged loans solely to conceal indications of probable losses.

---

[28] *E.g.*, under the heading "Critical Accounting Policies," Household explained that it reserved for credit losses in an amount sufficient to maintain credit loss reserves at a level considered adequate to cover probable losses. (DX 852 at HHT 0015789) It stated that probable losses considered charge-off and customer account management policies, contractual delinquency, historical loss experience and management's judgment of portfolio risk factors, such as economic conditions, bankruptcy trends, etc. *Id.* Household also announced that it had increased owned loss reserves to an all-time high of $2.7 billion, in view of such factors as "continued uncertainty over the impact of the weakening economy on charge-off and delinquency trends" (*id.* at HHT 0015790), explained that the reserves increase was "based on an estimate of inherent losses in our loan portfolio," and disclosed that the provision for credit losses increased from $2.1 billion in 2000 to $2.9 billion in 2001 (*id.* at HHT 0015795).

For this reason, Plaintiffs' undue reliance on policy changes, disclosure discrepancies and operational target-setting in Household's individual business units was completely beside the point or, in a word, immaterial. *Allscripts*, 2001 WL 743411, at *8, *9 (alleged failure to disclose problems with a company's product not actionable where 10-K disclosures notified investors of the very risks the plaintiffs claimed were concealed). Like the defendants in *Allscripts*, Household "confronted squarely in its Form 10-K the risks of its endeavor" and had "no companion duty to report every glitch that arises," *id.* at *9, or to "'bury the shareholders in an avalanche of trivial information – a result that is hardly conducive to informed decision-making,'" *id.* at *6 (citation omitted). Allowing an irrational verdict of "credit quality concealment" to stand on this record would elevate sleight-of-hand advocacy over substance.

### D. Reage Disclosure Discrepancies Cited by Plaintiffs Reflected Only Immaterial Mistakes

The only trial evidence of discrepancies in reported reage statistics related to a handful of line items in the dozens of pages of disclosures that were presented to investors as part of the April 9, 2002 FRC. (PX 135; Dkt. 1611 Table A, No. 28) Plaintiffs presented evidence of only three alleged "errors" in those statistics, and each was patently immaterial as a matter of law, rendering the jury's verdict as to the FRC unsupported by the record at trial.

First, Plaintiffs focused on a discrepancy in the figures specifying the percentage of loans that had been reaged either once or multiple times. Although the total percentage of reaged accounts (16.9 percent) was indisputably reported correctly (Tr. 1997:23-1998:1, 2187:21-2188:7), the subset of loans that had been reaged multiple times was incorrectly reported as 4.3 percent rather than 7.5 percent – an immaterial discrepancy that applied to only 3 percent of the portfolio. (Tr. 2156:24-2158:11-18) Schoenholz was not aware of the mistake when he made the presentation (Tr. 2184:13-25), and it was uncontroverted that when it was discovered *after* the FRC (Tr. 2159:4-12), the Company concluded that the error was not material, thus belying any inference of scienter. (Tr. 2158:5-2159:3, 2185:14-19)[29] As to the omission of two minor exceptions to the restructure policy for real estate loans, Walt Rybak testified without contradiction that he

---

[29]   Plaintiffs also quibbled with recidivism data reported at the FRC because the figures did not include accounts that were "current" one year after reage but had been reaged during the intervening period. This argument ignores the plain language of the disclosure, which does not purport to include such accounts. (PX 135 at HHS 01883567 ("Recidivism reflects accounts that are 2+ delinquent or charged off one year after reage.")) Whether Household's management decisions in this regard were prudent or not, there is no rational basis to equate them with fraud.

had made an honest mistake implicating an immaterial subset of his business unit's reaged ac-
counts and, indeed, that the small number of affected accounts was why he forgot to mention
them in an internal summary of reaging policies. (Tr. 2356:5-2359:13, 2360:1-10)  An internal
reporting error, affecting a tiny and declining portfolio in only one of the Company's five major
business units (Tr. 3288:5-13), is patently immaterial and shows no indicia of an intent to de-
fraud.  Plaintiffs adduced no evidence to the contrary.

      The fact that an individual knew a certain fact does not prove scienter; Plaintiffs must
demonstrate that a Defendant knew that an undisclosed fact *was material to investors,* which
Plaintiffs did not even attempt to prove here. *Schlifke* v. *Seafirst Corp.*, 866 F.2d 935, 946 (7th
Cir. 1989).  No rational jury could have found materiality or scienter under these facts.

### E.  Errors in the 2001 10-K and the FRC Presentation Were Not Exposed During the Relevant Period

      The jury found liability for alleged reaging-based fraud in Household's 2001 10-K (DX
852) and the April 9, 2002 FRC presentation (PX 132), the centerpieces of Plaintiffs' "reaging"
theory. (Dkt. 1611)  Defendants are entitled to judgment because Plaintiffs failed to demonstrate
any Relevant Period corrective disclosure.  Indeed, Plaintiffs expressly argued, and their expert
witnesses admitted, that the alleged fraud in these statements was not exposed until March
2003 – five months *after* the end of the Relevant Period.  Both Fischel and Devor conceded that
the alleged misstatements in the 2001 10-K, filed in March 2002, were not corrected until
Household filed an amended 2001 10-K in March 2003. (Tr. 2451:22-2453:7 (Devor);
Tr. 4285:7-11 (Fischel))  Plaintiffs' counsel recognized in his summation that "the truth" about
reaging was not revealed until March 2003 ("It got corrected in March of 2003, didn't it?").
(Tr. 4499:2-4500:15)  The undisputed evidence also showed that the discrepancies in the FRC
presentation were not corrected during the Relevant Period. (Tr. 2156:4-2159:3, 2185:14-2186:1,
2325:6-2329:6)  These admissions require judgment as a matter of law for Defendants with re-
gard to the alleged "reaging" fraud in the 2001 10-K and at the April 2002 FRC. *Ray*, 482 F.3d at
995-96 (7th Cir. 2007) (affirming summary judgment as "inevitable" where the alleged correc-
tive disclosure was not made until after the stock price had already collapsed).

### F.  The Jury's Verdicts as to Alleged "Credit Quality Concealment" Were Against the Weight of the Evidence

      The jury heard uncontroverted testimony that the purpose and effect of reaging was to
enhance the Company's ability to collect outstanding amounts on loans (Tr. 2105:11-19,

2334:17-2335:22, 2336:14-18); that Household candidly and accurately disclosed and fully re-
served for "credit quality risk" (Part VI.C, *supra*); and that any discrepancies in reporting under-
lying delinquency numbers were inadvertent and immaterial (Part VI.D, *supra*).  Plaintiffs failed
to prove loss causation under this theory and admitted that the supposed fraud was not exposed
until well after the end of the Relevant Period (Part VI.E, *supra*).  Without even considering the
legal precept that disagreement as to the timing of charge-offs is not the stuff of securities fraud
(Part VI.B, *supra*), the jury's findings of liability for supposed reaging-related fraud were against
the weight of evidence and require a new trial.

## VII.    PLAINTIFFS PROVED NO ACTIONABLE MISSTATEMENT OR OMISSION BY DEFENDANT GARY GILMER

Gary Gilmer served as President and Chief Executive Officer of Household's Consumer
Lending business unit. (Tr. 969:4-6, 969:25-970:6)  He had no responsibility for drafting, ap-
proving, signing or issuing Household's allegedly fraudulent 10-Ks and 10-Qs (*see* Tr. 1878:22-
1879:5, 1923:2-14, 1924:2-4), nor did he supervise or control anyone who did (*see* Tr. 969:25-
970:6, 971:6-8); no evidence to the contrary was introduced at trial.

It is also undisputed that neither Gilmer nor his business unit had any responsibility for,
or any involvement in, the accounting treatment for credit card contracts that was the subject of
Household's August 14, 2002 restatement. (Tr. 1358:7-13, 1417:8-22, 3218:24-3219:6)  As a
matter of law, Gilmer cannot be liable for statements relating to Plaintiffs' restatement theory
because he had no involvement with those statements and, as the jury found, he was not a control
person as to any other Defendant. (Dkt. 1611 at 43)  The record is also devoid of evidence that
Gilmer had any involvement in any allegedly fraudulent statements attributed to Aldinger or
Schoenholz.

All that remains is a single statement on March 23, 2001 disfavoring predatory lending,
which is attributed to Gilmer. (Tr. 1349:10-1353:9; PX 1307; Dkt 1611 Table A, No. 14)  As
demonstrated in Part V.B, *supra*, this "soft" statement of opinion is mere sales puffery and is in-
actionable as a matter of law.  Furthermore, the jury rejected Plaintiffs' contention that Gilmer
made the statement with actual knowledge, rendering the statement inactionable as a matter of
law given the absence of any proof that Gilmer did not subjectively hold this opinion. *E.g., In re
JP Morgan Chase & Co. Sec. Litig.*, 2007 WL 4531794, at *10 (N.D. Ill. Dec. 18, 2007) ("State-
ments of opinion or belief are actionable only if they are both objective[ly] and subjectively

false.");  *Ford Motor Co.*, 381 F.3d at 572; *Kushner* v. *Beverly Enterprises, Inc.*, 317 F.3d 820, 831 (8th Cir. 2003); *Gallagher* v. *Abbott Labs.*, 269 F.3d at 811; *Virginia Bankshares, Inc.* v. *Sandberg*, 501 U.S. 1083, 1095 (1991) ("soft" statements are actionable "solely as a misstatement of the psychological fact of the speaker's belief").

Gilmer's statement of opinion was thoroughly consistent not only with the miniscule proportion of problem loans (Part V.D, *supra*) but also with his numerous contemporaneous instructions to the employees in the consumer lending business unit. (DX 209, 166)  These unrebutted circumstances precluded any rational finding of scienter and necessitate the entry of judgment as a matter of law in Gilmer's favor on all claims.

## VIII.   PLAINTIFFS PROVED NO SECTION 20(a) LIABILITY AS TO ANY INDIVIDUAL DEFENDANT

Plaintiffs' Section 20(a) claims as to all Individual Defendants must fail because, as shown above, Plaintiffs failed to offer sufficient proof for a finding of primary liability under Section 10(b), a requisite element of a Section 20(a) claim. *Pugh* v. *Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008).

Furthermore, the jury impermissibly found that Schoenholz was a control person as to Aldinger. (Dkt. 1611 at 43)  "Control person" liability requires proof that the defendant "*actually* exercised general control over the operations of the wrongdoer" and "had the power or ability – even if not exercised – to control the specific transaction or activity" at issue. *Donohoe* v. *Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911-12 (7th Cir. 1994) (emphasis in original).  Plaintiffs presented no evidence that Schoenholz had the power to control, or actually exercised control over, Aldinger.  Because Schoenholz, as CFO, reported directly *to* Aldinger, the CEO, no reasonable jury could have found that he controlled Aldinger.

Finally, because the jury determined that Schoenholz was not a "knowing" violator individually as to any statement, he is entitled to a ruling limiting his liability as a matter of law to the jury's proportionate liability finding. (Dkt. 1611 at 42, limiting his percentage of responsibility to 15%)  Although Section 20(a) generally provides for joint and several liability for control persons, the PSLRA's proportionate liability provisions, 15 U.S.C. §78u-4(f)(2), override Section 20(a), and a control person is not jointly and severally liable unless the factfinder determines that the control person knowingly committed the violation. *LaPerriere* v. *Vesta Ins. Group, Inc.*, 526 F.3d 715, 727-28 (11th Cir. 2008).

## IX.    THE JURY'S VERDICTS ARE IRRECONCILABLY INCONSISTENT

"When a jury returns a factually inconsistent general verdict, the verdict cannot stand." *Turyna*, 83 F.3d at 181; *accord Deloughey* v. *City of Chicago*, 422 F.3d 611, 617 (7th Cir. 2005); *ABM Marking, Inc.*, 353 F.3d at 543-44; *Frain* v. *Andy Frain, Inc.*, 660 F. Supp. 97, 100 (N.D. Ill. 1987). Allowing a verdict procured by jury confusion to stand is a "miscarriage of justice." *Frain*, 660 F. Supp. at 103.

"General verdicts simply ask the jury to answer the question 'who won.'" *Turyna*, 83 F.3d at 181. The verdict form submitted to the jury in this case did precisely that. Question 1 asked: "Have plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements forth in Table A?" (Dkt. 1611; Tr. 4722:22-4723:14, 4723:12-14) Each time the jury answered that question, it returned a separate general verdict on one of the 40 alleged false or misleading statements and as to one of the Defendants. Those general verdicts are incurably inconsistent *inter se* in numerous respects.[30] Separately or in the aggregate, the aberrations in the verdicts reflect a level of confusion and misguided thinking that renders the verdicts irrational and, at a minimum, requires a new trial.

### A.    The Jury's Findings of Stock Price Inflation Were Inconsistent with Its Findings of Liability

The jury's findings on loss causation are illogical, contradictory, and – like Plaintiffs' trial presentation – devoid of any coherent link between stock price inflation and alleged fraud. *See Ray*, 482 F.3d at 995; *Tricontinental*, 475 F.3d at 843; Tr. 4719:10-18. Specifically, the jury found *no increase* in inflation and sometimes even a *decrease* in inflation (as indicated in Verdict Form Table B) on the dates of numerous statements for which it reportedly had found liability (as indicated in its answers to Verdict Form Question 1). (Dkt. 1611) These findings cannot logically coexist because a fraudulent statement is not material and cannot be deemed a source of loss causation if, as the jury expressly found, it had no impact on the value of the subject security. *Ray,* 482 F.3d at 995; *Oran*, 226 F.3d at 282; *Grimes*, 185 F. Supp. 2d at 913. The jury's express finding that *none* of the following 14 statements caused new inflation invalidates its finding that Defendants were liable for fraud on the basis of these statements:

---

[30]    Defendants objected to inconsistencies in the verdict before the jury was excused. (Tr. 4806:25-4807:10 ("We believe the verdict is fatally inconsistent in a number of ways, which we're prepared to detail to the Court."))

| Statement | Date of Statement | Inflation Found on Day Before | Inflation Found on Day of Statement | Change Found |
|---|---|---|---|---|
| 15 | 3/28/01 | 23.94 | 23.94 | 0 |
| 16 | 4/18/01 | 23.94 | 23.94 | 0 |
| 17 | 5/9/01 | 23.94 | 23.94 | 0 |
| 18 | 7/18/01 | 23.94 | 23.94 | 0 |
| 20 | 8/10/01 | 23.94 | 23.94 | 0 |
| 21 | 10/17/01 | 23.94 | 23.94 | 0 |
| 22 | 11/14/01 | 23.94 | 23.94 | 0 |
| 24 | 1/16/02 | 20.28 | 19.87 | -0.41 |
| 27 | 3/13/02 | 23.37 | 22.86 | -0.51 |
| 28 | 4/9/02 | 23.24 | 23.16 | -0.08 |
| 32 | 5/10/02 | 21.26 | 19.64 | -1.62 |
| 36 | 7/17/02 | 15.01 | 11.59 | -3.42 |
| 37 | 8/14/02 | 7.06 | 6.39 | -0.67 |
| 38 | 8/14/02 | 7.06 | 6.39 | -0.67 |

(Dkt. 1611 Table B)

Moreover, the jury found that inflation *increased* on numerous days during the Relevant Period even though it found no fraudulent statement on those days and, in most cases, none was even alleged. (Dkt. 1611 Table B (finding that inflation was introduced on the following days, unrelated to any finding of fraud:  Nov. 1, 6, 19 and 21, 2001; Dec. 13, 17, 18 and 27, 2001; Jan. 15 and 31, 2002; Feb. 8 and 27, 2002; Aug. 22, 2002; Sept. 18, 19, and 20, 2002; Oct. 10, 2002))  These findings likewise defy logic and governing legal standards and have the effect of measuring damages based on stock price movements unrelated to fraud, contrary to the rule of *Dura*, 544 U.S. at 342-43.  As discussed in Part I.A, *supra*, these irreconcilable inconsistencies entitle Defendants to judgment as a matter of law; at a minimum, they mandate a new trial.

**B.    The Jury Irrationally Treated Disclosures Derived from Identical Credit Card Accounting Methodology Differently on Different Dates**

Plaintiffs contended that Household's August 14, 2002 restatement revealed accounting fraud in Household's previously reported financial results for certain credit card operations, and that *each* of the 10-K and 10-Q Reports that Household filed during the Relevant Period and *each* related press release therefore violated Rule 10b-5.  It was undisputed that the prior accounting methodology was adopted in 1994, well before the start of the Relevant Period, and used until the restatement was announced. (*E.g.*, Tr. 2050:12-2051:1, 2489:2-2490:4, 2516:19-2520:25, 3215:16-19)  Yet although the jury found that *none* of the relevant portions of Household's financial statements from July 30, 1999 through January 2001 was fraudulent (Dkt. 1611,

Nos. 1-10, 12-13), it inexplicably found liability for alleged credit card accounting fraud in the same types of statements in the Company's 2000 10-K (filed March 28, 2001) and each successive earnings report (*id.*, Nos. 15-18, 20-22, 24, 27, 29, 32, 36, 38) – even though the underlying accounting methodology had remained unchanged and even though the jury found that none of the "fraudulent" statements caused artificial inflation.

### C. The Jury Inexplicably Found Credit Card Accounting Fraud in the Announcement of the Restatement that Allegedly *Corrected* Such Fraud

Plaintiffs alleged that the 10-Q Household filed on August 14, 2002 (DX 874) contained the "corrective disclosure" of Household's previous, allegedly fraudulent method of accounting for credit card marketing contracts. (Tr. 2931:12-18)  The jury irrationally found that statements taken from this 10-Q, which announced the restatement of earnings and the adoption of a revised accounting treatment, contained the very accounting fraud that Plaintiffs attributed to the prior accounting methodology and that the report allegedly exposed. (Dkt. 1611, No. 38)

### D. The Jury Irrationally Found Both Liability and Non-Liability Based on the Disclosure of Identical Information on Different Dates Two Months Apart

The jury found that Defendants were liable for statements in Household's 2000 10-K, issued on March 28, 2001 (Dkt. 1611, No. 15), even though it found no liability for the disclosure of the identical information in a press release on January 17, 2001. (Dkt. 1611, No. 13)  Both reported on Household's annual and fourth-quarter results for the year 2000, and they presented identical information relating to net income and delinquencies.  Plaintiffs introduced no evidence that would support the conclusion that any essential Rule 10b-5 element – falsity, materiality, scienter or loss causation – that was missing on January 17, 2001 thereafter materialized prior to March 28, 2001.  Indeed, because the information had already been disclosed on January 17 (without giving rise to liability), its impact (if any) on the efficient market that Plaintiffs posit was necessarily complete at that time, such that the repetition several weeks later of the then-stale information could not have been deemed material. (Tr. 2861:5-14, 2862:13-18)  Defendants are entitled to judgment as a matter of law as to the March 28, 2001 statement; in the alternative, the confusion and irreconcilable inconsistencies require a new trial.

### E. The Jury's Finding of "Knowing" Liability as to the "Reckless" March 2001 *Origination News* Article Cannot Be Reconciled with Its Inconsistent Findings as to Prior and Subsequent Statements on the Same Subject

In its only finding of knowing fraud, the jury found that Aldinger and Household each knowingly deceived investors when *Gilmer* stated on March 23, 2001 that Household disfavored

"predatory lending" (Dkt. 1611, No. 14). Yet the jury also found that Gilmer, the only speaker, had acted only recklessly and that all subsequent statements for which Defendants were liable under Plaintiffs' "predatory lending" theory (even statements issued just five days later in the 10-K filed on March 28, 2001) were made only recklessly. It is simply not rational for the jury to have found that Aldinger and Household "knew" on March 23 that the Company was "predatory," but forgot that knowledge during the next five days.[31]

## X.    ADMITTING UNRELIABLE EXPERT TESTIMONY WITH NO ADEQUATE LIMITING INSTRUCTIONS DEPRIVED DEFENDANTS OF A FAIR TRIAL

Plaintiffs' theory of predatory lending-based fraud relied heavily on inflammatory counterfactual impressions that Household operated its lending business improperly and concealed the supposed fact that its lending revenues could not be sustained. This amorphous approach was enabled by a series of evidentiary rulings that allowed Plaintiffs to introduce incompetent and unsubstantiated accusations of wrongdoing through expert witnesses who presented settlements as proof of liability, treated unadjudicated and statistically insignificant complaints as proof of "pervasive" predatory lending, and adopted admittedly biased third-party findings and other unproven multiple hearsay as fact. The resulting prejudice was compounded by the Court's refusal suitably to instruct the jury that the experts' pronouncements were opinion, not fact, and that much of the material they transmitted to the jury (the lion's share of Plaintiffs' case) was not received for its truth.

The nearly three-day appearance of Plaintiffs' keynote witness, Catherine Ghiglieri, epitomized all of these prejudicial defects. With her unearned trappings of authority as a consumer lending expert, and admittedly without the benefit of any testing, authentication, or awareness of the facts, Ghiglieri painted a lurid – but never substantiated – image of a company whose core business model was to employ abusive sales practices to extend unfavorable loans and then recycle those loans endlessly while concealing from investors the true level of risk. Ghiglieri never explained how this cartoon villain remained profitable or why, if employees were systematically taught to abuse borrowers, the total of all known or suspected problem loans consistently amounted to less than one-half of one percent of outstanding loans. The admission of the "expert" testimony of former regulator Charles Cross compounded the prejudice of substitut-

---

[31] Also irreconcilable are the jury's findings that Aldinger and Household acted knowingly with regard to the March 23, 2001 statement while the person who made the statement, Gilmer, acted recklessly.

ing expert advocacy for admissible fact evidence.  The denial of Defendants' *Daubert* motion to exclude Cross's testimony was especially egregious in view of the witness's candid admission that his views were based on "woefully inadequate" data and that his purpose was to advocate for consumers, not to reach an unbiased assessment of Household's practices.

Accounting expert Harris Devor exacerbated these problems by introducing inadmissible settlement-related calculations and agreements as supposed proof that approximately one-third of Household's income during the Relevant Period was derived from "improper" lending practices, and advising the jury that GAAP and SEC regulations required Household to disclose that "information" in its public earnings reports.  Devor opined, with zero record support, that Household itself had calculated its returns from predatory lending to be $3.2 billion.  Devor's use of otherwise inadmissible settlement-related documents as his sole measure of supposedly illicit returns necessarily entailed treating them as proof of wrongdoing, in utter derogation of the policies underlying Rule 408, substantive law, the *factual* record, and the Court's proper ruling (before it was improvidently withdrawn) that settlement details were not admissible to prove wrongdoing.

For all of these reasons, Ghiglieri, Cross and Devor should not have been allowed to testify but, once they were accepted over Defendants' objections, the jury should have been firmly and repeatedly instructed that their assumptions were not to be taken as fact and that Plaintiffs retained the burden of proving as a matter of fact that all of the predicates of their experts' conclusions were valid.  It is no answer that Defendants had the right, within tight time constraints, to cross examine the experts about the bases of their opinions, because the experts were admittedly ignorant of relevant information.  *Plaintiffs* had the burden of substantiating their experts' pronouncements as a matter of fact and, because they did *not* undertake to do so as to most of their experts' rhetoric, the risk of a verdict based on inadmissible speculation was heightened to an unacceptable degree. [32]

---

[32]  The Court also erred in denying Defendants' motion to exclude Fischel's testimony and holding that Fischel's leakage model is "a reliable methodology that accounts for non-fraud explanations." (Dkt. 1527 at 3)  Even Fischel acknowledged that the leakage model included stock price movements that were completely unrelated to fraud (Tr. 2959:24-2960:21) and that he had based his leakage analysis on the assumption that statements Plaintiffs alleged were false or misleading actually were so (Tr. 2602:18-23). Moreover, Plaintiffs could not demonstrate that the "leakage" model was generally accepted within the economics community, as the co-author of the sole article Fischel relied upon has expressly disclaimed Fischel's invocation of his work. (Kavaler Dec. Ex. 4, at 5)

### A.    The Governing Authorities Required Rejection of Subjective Opinions Based on Unverifiable (or Nonexistent) Methodology

The goal of Rule 702 and the strict analysis required under *Daubert*, 509 U.S. at 589-95, is to ensure that proffered expert evidence is reliable, *i.e.*, that it is well grounded in the methods, principles, and procedures of science, and relevant, *i.e.*, that it fits an issue in the case and will aid the jury in understanding the evidence or determining a fact in issue.  Because the testimony of an expert witness exerts a powerful influence on a lay jury, which may tend to give it undue weight, *U.S.* v. *Brown*, 7 F.3d 648, 655 (7th Cir. 1993), the district court bears a heavy responsibility to act as a vigilant "gatekeeper" at each and every step to ensure that such testimony is both relevant and reliable. *Kumho Tire Co*. v. *Carmichael*, 526 U.S. 137, 147-49 (1999) (interpreting *Daubert*); *Dhillon* v. *Crown Controls Corp*., 269 F.3d 865, 869 (7th Cir. 2001).  "The opportunity for vigorous cross examination and the presentation of contrary evidence – the traditional and appropriate means of attacking shaky but admissible evidence – is not a basis for allowing otherwise inadmissible testimony to be admitted." *Loeffel Steel Products, Inc.* v. *Delta Brands, Inc.*, 387 F. Supp. 2d 795, 800 (N.D. Ill. 2005) (internal citation omitted).

In fulfilling its essential gatekeeper role, the court must assess both reliability and relevance. *Smith* v. *Ford Motor Co*., 215 F.3d 713, 718 (7th Cir. 2000)); *accord Chapman* v. *Maytag Corp*., 297 F.3d 682, 686-87 (7th Cir. 2002).  "Good credentials may be a necessary condition for expert testimony but are not a sufficient condition." *Moore*, 521 F.3d at 685.  A cornerstone of the *Daubert* analysis is the determination that the proposed expert has arrived at his or her conclusions through an analytical process that is verifiable, *i.e.*, a process that could be replicated, and the results verified, by another expert working with the same underlying information.

The courts in this Circuit have drawn a stern line on the need for verifiability, heeding *Daubert*'s admonition to shun "subjective belief or unsupported speculation" masquerading as expert opinion. *Daubert*, 509 U.S. at 590. *E.g., Zenith Elec. Corp*. v. *WH-TV Broadcasting Corp*., 395 F.3d 416, 419 (7th Cir. 2005); *Huey* v. *United Parcel Service, Inc*., 165 F.3d 1084, 1086 (7th Cir. 1999); *Navarro* v. *Fuji Heavy Indus., Ltd*., 117 F.3d 1027, 1031 (7th Cir. 1997); *Brown* v. *Primerica Life Ins. Co*., 2006 WL 1155878, *2 (N.D. Ill. Apr. 29, 2006); *Deltak, Inc.* v. *Advanced Sys., Inc*., 574 F. Supp. 400, 405-06 (N.D. Ill. 1983).  In evaluating the reliability of proposed expert testimony, the court must do more than merely conclude that the expert has applied sound methodology; the court must explain the basis of that belief. *Fuesting* v. *Zimmer, Inc.*, 421 F.3d 528, 535 (7th Cir. 2005) (the court must "assess the reliability of the *methodology*

the expert employed in arriving at his opinion") (emphasis in original); *Naeem* v. *McKesson Drug Co.*, 444 F.3d 593, 608 (7th Cir. 2006); *Moore*, 521 F.3d at 685.

**B.     Ghiglieri's Subjective and Unreliable Testimony Should Have Been Excluded**

Without any recognized analytical framework and with utter disregard for the need to show statistical significance of the untested anecdotes she adopted at face value, Ghiglieri repeatedly announced to the jury that "Household [had] engaged in company-wide, systemic predatory lending" throughout the Relevant Period. (Tr. 393:13-15, 453:14-19, 600:15-20, 612:18-25, 615:7-16, 619:8-11, 628:6-11, 630:1-11, 665:3-14)  Ghiglieri admitted that, to reach this conclusion, she did no more than review selected portions of the discovery record through the prism of her "experience" as a one-time bank examiner and regulator. (Tr. 403:5-16, 704:19-707:7)[33]  She admittedly performed no form of quantification or statistical analysis and sought out no data necessary to do so. (Tr. 704:1-8, 928:15-929:12)[34]  Nor did she evaluate Household in the context of its peers, interview customers, regulators or anyone knowledgeable about the validity or scope of complaints regarding alleged customer abuses, or look beyond the limited selection of materials provided by Plaintiffs' counsel. (Tr. 706:16-23)[35]  In short, whatever the limited value of Ghiglieri's opinion on the small number of anecdotes she examined, she admittedly brought to bear no expertise whatever on her core conclusion that alleged customer abuses were "systemic" and "pervasive" – the linchpin of Plaintiffs' nondisclosure theory.

Ghiglieri freely admitted that she had undertaken no effort to quantify instances of alleged customer abuse to determine whether they were representative of Household's overall business – the logical and legally required *sine qua non* of any attempt to portray a practice as systemic or pervasive. *See U.S.* v. *Mikos*, 2003 WL 22922197, at *4 (N.D. Ill. Dec. 9, 2003)

---

[33]   In 7 years as Texas Banking Commissioner and 18 years at the Office of the Comptroller of Currency, Ghiglieri never regulated a consumer lending company (*see* Tr. 378:20-388:13, 653:4-654:10), yet she freely offered conclusions as to consumer lending industry norms.  For example, she told the jury that Household needed to trick customers because it charged higher rates than its peers, though she admittedly had no knowledge of, and made no attempt to discover, the customary rates and practices of Household's peer companies. (Tr. 714:25-715:7, 716:22-25, 717:1-13, 718:17-21, 725:17-24, 727:6-11)

[34]   Even her ultimate conclusion – that "predatory" practices were companywide, widespread, and systemic – was circular and information-free.  When asked to substantiate her conclusion, Ghiglieri tried to explain each term by reference to the others (Tr. 708:22-709:8), without ever providing any quantification or replicable analysis or verifiable factual support that might substantiate her conclusion.

[35]   That Defendants explored those facts on cross-examination does not vitiate the point that this witness never should have been allowed to testify in light of these uncontested facts. *Loeffel Steel Products*, 387 F. Supp. 2d at 800.

(Guzmán, J.) (an extremely small sample cannot be used reliably to extrapolate general princi-
ples); *BASF Corp.* v. *Old World Trading Co., Inc.*, 1992 WL 232078, at *4 (N.D. Ill. Sept. 8,
1992) (anecdotal evidence with no proof of statistical significance held irrelevant).  To the con-
trary, Ghiglieri testified that she had no idea how many Household customers were affected by
the practices she claimed to be predatory or what percentage of Household's total number of
loans or total loan volume may have been affected by any of those practices. (Tr. 745:16-21 ("I
didn't count them, so I don't know what the number would be, plus I only looked at a subset of,
you know, the total loans obviously."); Tr. 710:21-711:3; 711:13-15; 713:21-714:18; 719:5-11;
745:7-21; 746:7-13; 930:3-931:5; 934:17-19)  She testified that the relative proportion of prob-
lem loans to loans that yielded no complaints or problems was a matter of indifference to her
(Tr. 639:13-640:10), even though the very crux of her expert testimony was to assess House-
hold's denials of systemic "predatory lending."

    In view of these admissions of her utter lack of analysis, Ghiglieri should not have been
allowed to offer an expert opinion that abuses at Household were rampant, nationwide, and sys-
temic.  The courts in this Circuit have not hesitated to rule out that kind of conclusory *ipse dixit*.
"Talking off the cuff – deploying neither data nor analysis – is not an acceptable methodology."
*Lang* v. *Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000); *accord Naeem*, 444 F.3d at
608 & n.7; *Huey*, 165 F.3d at 1086; *Loeffel Steel Products*, 387 F. Supp. 2d at 808-09.[36]

---

[36] Ghiglieri's result-oriented testimony regarding Household's reaging practices, about which she
knew even less, also failed *Daubert*'s reliability prong for lack of any recognizable or replicable method-
ology.  Ghiglieri opined that "Household used various re-aging tactics and practices to mask their [*sic*]
delinquencies." (Tr. 680:24-681:4)  To reach this conclusion, she applied no recognizable or replicable
analytical methodology.  She admitted that she did not perform any analysis of Household's recidivism
statistics (Tr. 928:15-19), she had no concrete knowledge of what percentage of reaged accounts were
current one year after the reage (Tr. 928:20-929:5), she did not perform a cash flow analysis to evaluate
the income from reaged accounts (Tr. 929:10-12), and she did not evaluate reaging as a factor in influen-
cing customer behavior (Tr. 929:24-931:5).  Instead of providing analytical support for her conclusions,
Ghiglieri merely read aloud the text of a string of internal e-mails and then announced, *ipse dixit*, that
Household had fraudulently manipulated its delinquency numbers. (Tr. 681:5-700:7)  She reached her
conclusion that reaging was used to mask past due amounts, an inherently number-centric opinion, with-
out ever looking at relevant data, performing any mathematical analysis, or reviewing the Company's fi-
nancial statements. (Tr. 935:10-936:11, Tr. 688:4-690:12 & PX 654)  *See* n. 35, *supra*.

    Ghiglieri's opinion that Household used reaging and other account management techniques to mask
or manipulate delinquencies and charge-offs – permitted over Defendants' objection – also inappropri-
ately usurped the role of the jury. (Tr. 393:20-23, 680:24-681:4, 685:1-686:21 & PX 77, 689:3-690:12 &
PX 654)  The opinion goes to whether Defendants *consciously* used Household's reage practices to hide
information, but this determination as to state of mind is solely the province of the jury and a region upon
which an expert cannot tread. *Salas* v. *Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992); *Drebing* v. *Provo
Group, Inc.*, 519 F. Supp. 2d 811, 816 n. 5 (N.D. Ill. 2007); Rule 704 advisory committee's notes (1972)
*Footnote continued on next page.*

Ghiglieri also extrapolated broadly from small samples of individual customer complaints, without testing their validity or typicality or even examining Household's responses (Tr. 736:9-18, 842:21-865:14 & DX 1082) before reaching her unequivocal conclusions and applying them to Household's entire business.[37] Her persistent failure to verify her assumptions is significant because, despite admittedly lacking any empirical support for her conclusion that "predatory lending" was pervasive at Household, Ghiglieri argued that the Company should have been aware of widespread problems because some unspecified number of customers had submitted complaints. (Tr. 565:8-582:18 & PX 276, 1096)

Ghiglieri also relied on a small, unverified and biased set of anecdotes to argue unreliably that the Company routinely trained its salespeople across the country to engage in predatory practices. (Tr. 496:8-15, 513:21-514:7) Her sole support for this central conclusion was the existence of an "effective rate comparison" example in a short-lived training program that was discontinued a mere two months after it was issued (only a few weeks into the Relevant Period), and replaced with a version that made no reference to "effective rate comparisons" (Tr. 493:11-496:19 & PX 379; Tr. 926:3-927:17 & PX 379) and an unauthorized and immediately confiscated amateur training video (Tr. 508:24-510:1 & PX 1383; Tr. 920:18-921:6).[38] By extrapolating from these two patently inadequate examples without reviewing or testifying about a single *authorized* training manual or program, Ghiglieri irresponsibly mischaracterized the supposed training and discipline protocol for the Company's entire staff of 30,000 employees.

Ghiglieri's extensive reliance on untested and unreliable third-party reports, such as selected regulatory examination reports, was another defect that compelled exclusion. Virtually all of those reports were based on unadjudicated customer allegations of the sort the Court held to be inadmissible for the truth of their contents when offered on a stand-alone basis. (Dkt. 1516 at 7-8) Although Plaintiffs produced no independent factual evidence of the underlying circumstances, validity, reliability or ultimate disposition of the observations in such reports, and al-

_Footnote continued from previous page._
(rule does not admit opinions "which would merely tell the jury what result to reach").

[37] For example, she concluded from a single complaint that Household's loan documents did not disclose the terms and conditions of loans to Spanish-speaking borrowers (Tr. 569:1-15), without even checking the loan file, which showed, as she admitted, that the relevant loan documents had been made available to the complainant in both English and Spanish (Tr. 834:20-843:3 & DX 1080, 1081).

[38] Ghiglieri conceded on cross-examination that she had no reason to believe that a single Household employee ever watched the unauthorized training video. (Tr. 921:7-923:22)

though Ghiglieri admitted that she did not interview or verify any of the absent sources on which she relied, Plaintiffs had her read selected passages of negative reports into the record (ignoring exculpatory reports and passages), following which she testified, with no supporting detail or analysis, that the reports proved her thesis.[39]  The most dramatic example of Ghiglieri's reliance on third-party reports with no indicia of reliability was her wholesale parroting of the views of Charles Cross, a former employee of the Washington Department of Financial Institutions ("DFI"), who in turn had adopted the alleged conclusions of unidentified informants from un-specified other states.[40]  An expert's reliance on such unverifiable second- and third-hand exper-tise is not acceptable under *Daubert*. *E.g.*, *Mike's Train House, Inc.* v. *Lionel, L.L.C.*, 472 F.3d 398, 409 (6th Cir. 2006); *U.S.* v. *Tran Trong Cuong*, 18 F.3d 1132, 1143 (4th Cir. 1994); *In re Parmalat Sec. Litig.*, 477 F. Supp. 2d 637, 641 (S.D.N.Y 2007).[41]

At base, because she performed no expert analysis and employed no recognizable meth-odology to reach or verify her conclusory opinions, the only role Ghiglieri played at trial was to tell the jury, from the limited stock of information she reviewed, what to think about the merits of Plaintiffs' claims.  This is not proper expert testimony, and it should not have been allowed. *E.g., Durkin* v. *Equifax Check Serv., Inc.*, 406 F.3d 410, 420-22 (7th Cir. 2005);  *James Wilson Assocs.*, 965 F.2d at 173; *Manning* v. *Buchan*, 357 F. Supp. 2d 1036, 1045 (N.D. Ill. 2004); *Del-tak*, 574 F. Supp. at 405-06 ("a case study in the misuse of the expert witness" where the plain-tiff's expert "was little more than a mouthpiece or amplifier through which [the plaintiff's] coun-sel addressed argument to the trier of fact").

---

[39]   Tr. 533:20-537:19 & PX 964; Tr. 537:20-541:25 & PX 324; Tr. 542:1-545:12 & PX 333; Tr. 545:13-548:16 & PX 956; Tr. 583:23-598:19 & PX 1205; Tr. 598:20-600:20 & PX 1333; Tr. 600:24-601:3; 608:5-616:19 & PX 290; Tr. 616:24-622:5 & PX 445; Tr. 622:9-624:15 & PX 19; Tr. 624:20-629:25 & PX 550.

[40]   *Compare* Cross Tr. 107:22-24 *with* Tr. 407:6-7; *compare* Cross Tr. 182:23-183:10 *with* Tr. 818:3-17; *compare* Cross Tr. 113:4-7 *with* Tr. 654:16-18; *compare* Cross Tr. 75:10-18 *with* Tr. 640:3-10.  As discussed below, Cross openly admitted that he was not aiming for fairness or balance when he set out to assemble complaints against Household; that he did not verify the accuracy of the complaints he reported; that his goal was to compile evidence adverse to Household; and that the 19 complaints from a single state on which he reported were "woefully inadequate" to support his conclusion that Household was en-gaged in predatory lending nationwide. (Cross Tr. 69:13-70:10)

[41]   When the Court overruled Defendants' objection to the wholesale adoption of these unauthenti-cated and unexamined reports (Dkt. 1516 at 4), it gave no indication that it had conducted the required balancing analysis, weighing the potential prejudice of this evidence against its marginal probative value. *See Nachtsheim* v. *Beech Aircraft Corp.*, 847 F.2d 1261, 1270 (7th Cir. 1988); Rule 703 advisory com-mittee's notes (2000).

### C.  Cross's Biased and Statistically Inadequate Conclusions Should Have Been Excluded

On May 15, 2002 Cross's employer, the Washington DFI, issued an Expanded Report of Examination for Household Finance Corporation as of April 30, 2002 (the "DFI Report") (PX 290).  The DFI Report is an evaluation of unadjudicated complaints from 19 customers in Washington (out of a base of 31,292 loans) that in Cross's opinion reflected violations of particular state or federal regulations. (DX 298 at 4; Cross Tr. 49:23-50:02)  Cross concluded in the DFI Report that these alleged violations and remarks made by unnamed regulators from other states demonstrated that Household was engaged in a nationwide scheme of deceptive sales practices.[42]

The "method" Cross used to reach his conclusion involved unsupported extrapolation from 19 unadjudicated customer complaints.  Cross admitted outright that this was a "woefully inadequate population to draw from." (Cross Tr. 69:13-70:10)  His "methodology," such as it is, does not begin to satisfy *Daubert* criteria.  It is not subject to verification in any objective sense, but "is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability."  Rule 702 advisory committee's note (2000); *accord Daubert*, 509 U.S. at 592-93.  Expert or not, Cross's *ipse dixit* is not enough. *Huey*, 165 F.3d at 1086-87.  Cross drew conclusions about Household's operations nationwide solely on the basis of remarks he heard about alleged problems in unidentified other state(s) (relegated to a single line on page 3 of the DFI Report, in which Cross did not identify the other state regulators or how many complaints they had received or verified).  This is simply hearsay, not a viable expert methodology.[43]

Moreover, Cross's opinions were intentionally biased.  He testified that the DFI Report was "just dealing with problems and negative issues, not the positive side of the business" (Cross Tr. 85:24-86:10) and that the purpose of the report was not to reach a fair evaluation of Household's practices, but to assemble support for his argument that "these consumers were harmed" (Cross Tr. 88:18-89:08, 89:23-90:06).  A primary purpose of the *Daubert* inquiry is to exclude expert opinions that are tainted by bias for one side and thus insufficiently reliable. *Kumho*, 526

---

[42]  Cross Tr. 133:9-11, 135:23-137:10, 145:21-148:4, 150:4-9, 150:11-12, 167:16-169:14, 178:24-179:7 & PX 290 at 43-49.  In a portion of his deposition that was not presented to the jury, Cross explicitly stated that if he had been asked to testify as an expert in this case, he would have refused. (Kavaler Decl. Ex. 6 at 102:13-21)  Nonetheless, Plaintiffs designated him as an expert witness and portions of his videotaped deposition were played to the jury.

[43]  *See* n. 35, *supra*.

U.S. at 152. By his own admission, Cross's objective in drafting the DFI Report was to find violations and to be an advocate for consumers, not fairly and reliably to assess Household's performance as a lender. Without question, his resulting conclusions should have been excluded under *Daubert*. *Muzzey* v. *Kerr-McGee Chemical Corp.*, 921 F. Supp. 511, 520 (N.D. Ill. 1996).

### D.    Devor's Opinion as to Revenues Allegedly Derived from "Improper" Practices Should Have Been Excluded

Plaintiffs' accounting expert Harris Devor reinforced and built upon the prejudice engendered by the unreliable testimony of Ghiglieri and Cross by telling the jury that a full third of Household's annual income was "attributable" to "improper lending practices." (Tr. 2414:12-2415:22 & Kavaler Dec. Ex. 12) Devor's conclusion was not the product of any expertise whatsoever, and it rested on a critical assumption that has no support in the record.[44] Devor is admittedly not an expert on predatory lending, improper lending, or lending laws or regulations. (Tr. 2408:12-18, 2511:2-7, 2569:7-11)[45] Nonetheless, he testified that he had performed a "secondary analysis" on the portion of Household's earnings allegedly "attributable" to predatory lending. (Tr. 2415:24-2416:14) Not only did that purported "analysis" plainly exceed the scope of Devor's qualifications as an accountant, it also entailed no expertise. Without taking any steps to measure revenues or income that Household derived in a given year from alleged "improprieties" (Tr. 2409:14-19, 2410:6-13), Devor merely compared Household's annual reported earnings to two different numbers that were not, and under the principles informing Rule 408 could not properly be deemed to be, a measure of earnings from "improper practices." The first number was the payment Household agreed to in October 2002 to resolve an investigation by several state attorneys general. The second number, $3.2 billion, was the sum of the dollar amounts contained in an untitled and unidentified document produced by Defendants that Plaintiffs speculated was a quantification of Household's potential exposure from the collective opening demands of negotiators for the attorneys general.[46] The trial record contains literally no evidence that Plaintiffs' speculation was correct.

---

[44]    Other courts have found Devor's expert testimony to be unreliable. (Tr. 2504:14-2511:1 (Devor)); *e.g.*, *In re Acceptance Ins. Cos. Sec. Litig.*, 352 F. Supp. 2d 940, 948 (D. Neb. 2004).

[45]    *See* n. 35, *supra*.

[46]    The document (PX 681) was introduced during Plaintiffs' direct examination of Aldinger, who testified that he did not recognize the document. Despite the absence of any foundation, the document was admitted over Defendants' objection. (Tr. 3480:1-3485:17)

It is well-settled that the fact of a settlement, its dollar value, the substance of settlement negotiations, and even back-of-the-envelope calculations of an adversary's demands cannot properly be introduced as evidence of liability or of the validity of such demands. *E.g.*, *Winchester Packaging, Inc.* v. *Mobil Chemical Co.*, 14 F.3d 316, 320 (7th Cir. 1994); *Kritikos* v. *Palmer Johnson, Inc.*, 821 F.2d 418, 423 (7th Cir. 1987).  Yet Devor's opinion rested on nothing but the amounts shown on inadmissible settlement documents, and Plaintiffs never proved that those amounts were a proper measure of supposed net proceeds from "improper lending practices." Devor's speculation therefore does not satisfy the *Daubert* criteria of reliability and replicability. His testimony rests entirely on a critical assumption that is not supported by the record and is therefore an inadequate foundation for his opinion. *Elcock* v. *KMart Corp.,* 233 F.3d 734, 755-56 (3d Cir. 2000); *Irvine* v. *Murad Skin Research Labs. Inc*., 194 F.3d 313, 320-21 (1st Cir. 1999).

Devor's purported attribution of earnings to "improper" practices should have been disallowed on the additional ground that it improperly suggested to the jury that Household had defrauded investors by failing to disclose that a sizeable portion of its earnings was illicit.  It is well-settled, and this Court properly ruled (Dkt. 1528), that a finding of securities fraud may not rest on the accurate disclosure of income actually received, even if the sources of income might be deemed improper. *Galati*, 220 Fed. Appx. at 100-02;  *Sofamor Danek*, 123 F.3d at 401 & n.3; *Marsh*, 501 F. Supp. 2d at 470.  The Court excluded Devor's proposed testimony that Household had impermissibly reported earnings from "predatory lending," and it recognized the need to issue a curative instruction after Devor cited GAAP to imply that Household had violated disclosure obligations more stringent than Rule 10b-5 requires. (Tr. 3811:14-3812:1)  (The inadequacy of the Court's curative instruction is discussed in Part X.E, *infra*.)  The value of these prudent measures was vitiated, however, by allowing Devor to advance the same inadmissible point under the guise of opining on materiality.  That Defendants were prejudiced is evident from the jury's otherwise inexplicable dependence on Household's earnings reports as fraudulent statements under Plaintiffs' "predatory lending" theory of fraud. (*e.g.*, Dkt. 1611 Table A, Nos. 15, 16, 18, 21, 24, 27, 29, 36)

Plaintiffs' supposed "need" to show materiality should not have outweighed the inevitable prejudice from Devor's unreliable and unsupported opinion as to purported earnings from "improper lending practices."  Because Plaintiffs could not have established that this evidence was admissible, their bootstrapping argument that they needed it (PTC Tr. 807:16-808:17)

should not have been accepted as a basis for allowing its introduction. "'[N]ecessity' is not the standard for admissibility" under the Federal Rules. *U.S.* v. *Lindsay*, 157 F.3d 532, 535 (7th Cir. 1998). That Plaintiffs might otherwise have been unable to adduce sufficient admissible evidence to meet their burden of proof at this trial was not a justification for bending the standards of Rule 408; if it were, the Federal Rules of Evidence would serve no purpose.

### E. Devor's Substitution of GAAP Standards for Rule 10b-5 Disclosure Requirements Caused Prejudice That Corrective Instructions Could Not Cure

Devor testified that the SEC considers financial statements not presented in accordance with GAAP to be false and misleading (Tr. 2400:14-2407:20) and that Household had violated GAAP and other accounting protocols by failing to disclose its supposed "predatory lending" practices (Tr. 2416:15-2423:18), thus equating a GAAP violation with a finding of fraud under Rule 10b-5.[47] The Court raised this error *sua sponte* following a sidebar in which defense counsel complained that Devor's "attribution of earnings to improper lending" was a thinly disguised equivalent of the excluded "revenue recognition model." (Tr. 2577:2-2585:25, 2705:12-2706:17) Ultimately, the Court issued the following curative instruction:

> I want to read to you an instruction regarding some previous testimony at this point in time. During his testimony, among other things, Mr. Devor, the [ ] expert witness for the plaintiffs, gave his opinion that Household had a duty to disclose any predatory lending practices in certain 10-Q and 10-K filings that they had with the SEC. Whether such a duty to disclose existed as to any particular 10-Q or 10-K filing is for you to decide on the basis of the evidence and the instructions that I will give you at the end of the trial. Accordingly, I instruct you to disregard that portion and only that portion of Mr. Devor's testimony.

(Tr. 3811:14-3812:1) However, the Court refused to give a final jury instruction that would have reiterated the curative instruction and provided much-needed clarification. (Dkt. 1585 at 4-5; Tr. 4007:10-18, 4008:13-15, 4022:24-4023:2; 4023:10-19)

This sequence of events injected prejudicial error that the Court's instruction was insufficient to avoid. First, the Court failed to show the parties the "curative" instruction prior to giving it to the jury, which would have allowed counsel to object to its ambiguity and propose essential corrections before it was read to the jury. Second, the instruction itself was inadequate: In telling the jury seven days after the fact to "disregard *that portion* . . . of Devor's testimony," the

---

[47] In its ruling on Defendants' *Daubert* motion, the Court had specifically cautioned that Devor could not opine that Household's financial statements falsely reported its revenues because they included earnings from predatory lending. (Dkt. 1528 at 2)

instruction was ambiguous and confusing as to what specific portion the jury was to ignore and assumed that the jurors, without any guidance, would be able not only to identify the inappropriate testimony but also to substitute their own views as to when a duty to disclose may arise. Even passing that the existence of such a duty is a legal question on which the jury should not have been invited to speculate, the instruction at least implies that the jury was free to accept Devor's legally erroneous equation of GAAP and Rule 10b-5 criteria. The rejection of Defendants' proposed clarifying instruction (Dkt. 1585 at 4-5) made matters worse by depriving the jury of (1) any explanation of what was wrong about Devor's articulation (or indeed any indication that it *was* wrong), and (2) guidance as to the correct parameters of a duty to disclose under Rule 10b-5. The jury found "predatory lending"-related fraud in every one of Household's earnings reports after March 23, 2001 for which the verdict form presented that option, strongly suggesting that Devor's misinformation took root despite the Court's attempt to contain the damage.

In analogous circumstances, the Court of Appeals found a curative instruction inadequate in *Joseph* v. *Brierton*, 739 F.2d 1244, 1248 (7th Cir. 1984), noting that, although it is normally inclined to defer to the trial court's judgment in such matters:

> [W]e must reverse if we disagree strongly with the district judge's evaluation, especially where, as happened here, the judge expressed concern with the impact of the remarks on the jury and therefore gave a curative instruction – but a curative instruction that we are convinced could not have cured.

**F.     The Prejudice That Followed from the Court's Erroneous *Daubert* Rulings Was Exacerbated by the Lack of Suitable Limiting Instructions**

Expert opinion typically is introduced to explain or put a gloss on competent factual record evidence adduced on a particular subject during trial. Here, however, Plaintiffs impermissibly used expert opinion as a surrogate for meeting their burden of proving fraud through admissible factual evidence. Under their "predatory lending" theory, for example, Plaintiffs never proved that improper lending practices were widespread or even material; they merely had their experts say so, based on inadmissible hearsay and no empirical analysis whatever.[48] (Parts X.B

---

[48]   Ghiglieri read the text of customer complaints into the record (*e.g.*, Tr. 496:20-500:17; Tr. 500:19-503:7; Tr. 565:14-571:16 & PX 276; Tr. 571:17-577:5 & PX 1096), then testified that based on practices described in those complaints she concluded that Household was engaged in predatory practices (Tr. 571:17-582:18; PX 1096). Although the complaints were inadmissible hearsay, Ghiglieri's opinions were based on the unverified assumption that they accurately represented what had occurred. Those facts were never proven by Plaintiffs but, without suitable limiting instructions, the jury was permitted to assume, to Defendants' prejudice, that the complaints were accurate or representative accounts.

through X.D, *supra*)  Contrary to what the jury must have perceived, these opinions and their

unreliable bases were not admitted for their truth.  As the Court of Appeals has explained,

> [I]n explaining his opinion an expert witness normally is allowed to explain the facts underlying it, even if they would not be independently admissible.  But the judge must make sure that the expert isn't being used as a vehicle for circumventing the rules of evidence.  The fact that inadmissible evidence is the (permissible) premise of the expert's opinion does not make that evidence admissible for other purposes, purposes independent of the opinion.  *If for example the expert witness (call him A) bases his opinion in part on a fact (call it X) that the party's lawyer told him, the lawyer cannot in closing argument tell the jury, "See, we proved X through our expert witness A."*

*James Wilson Assocs.*, 965 F.2d at 172-73 (emphasis added, internal citations omitted).[49]  Yet

throughout the trial, Plaintiffs persistently relied on inadmissible or limited-purpose evidence

introduced through their experts, and in closing they summarized that "evidence" as supposed

proof of liability.  For example, Plaintiffs' counsel said in his summation:  "And she [Ghiglieri]

*walked you through all those predatory practices that the company engaged in*, didn't she?"

(Tr. 4471:18-19) (emphasis added)  Plaintiffs' counsel further argued:  "[A]nd he [Devor] said

that he's seen internal company documents where they estimate the refunds at 3.2 billion. . . .  So

*we know, ladies and gentlemen, we know that this was a material issue*, that this was far wide-

spread . . . ." (Tr. 4481:6-14) (emphasis added)[50]

    Although the Court told the jury once at the start of the five-week trial that inadmissible

or limited-purpose evidence presented by the experts would be introduced to explain the basis of

the experts' opinions (Tr. 433:16-434:6), this generic limitation did not go nearly far enough in

the particular circumstances of this case.  As Defendants urged during trial, the jury should have

been instructed and reminded at appropriate junctures and in the final charge that neither an expert's

opinion nor any summary of evidence that was a basis of that opinion establishes the truth

of those facts for purposes of satisfying Plaintiffs' burden of proof.  Given Plaintiffs' almost exclusive

reliance on expert testimony, coupled with the risk that lay juries will vest experts with

undue credibility, the failure to give adequate limiting instructions was unduly prejudicial to Defendants

and therefore requires a new trial.

---

[49]  *Accord Loeffel Steel Products*, 387 F. Supp. 2d at 808-09; *In re Lake States Commodities, Inc.*, 271 B.R. 575, 585-86 (Bankr. N.D. Ill. 2002); *Sears, Roebuck and Co.* v. *Savoy Reinsurance Co., Ltd.*, 1991 WL 247583, at *5 (N.D. Ill. Nov. 8, 1991).

[50]  Plaintiffs employed the same subterfuge in their opposition to Defendants' Rule 50(a) motion, where they repeatedly cited expert opinion testimony to support their contention that they had met their *factual* burden of proof. (*E.g.*, Dkt. 1581 at 47 (arguing that Defendants' rates were not competitive based on Ghiglieri's unsubstantiated testimony to that effect))

## XI.  IMPROPER JUDICIAL RULINGS AND PLAINTIFFS' CIRCUMVENTION OF PROPER EXCLUSION ORDERS RESULTED IN AN UNFAIR TRIAL

### A.  Plaintiffs Built Their Predatory Lending Case on Prejudicial and Inadmissible Hearsay

Plaintiffs used their expert witnesses as vehicles to read into the record a substantial body of multiple hearsay of a markedly prejudicial nature.  Before trial, the Court ruled that customer complaints and pleadings in other litigations were not to be introduced for the truth of the underlying allegations, but only for the limited purpose of explaining an expert's rationale or demonstrating Defendants' knowledge. (Dkt. 1516)  Plaintiffs honored this limitation only in the breach, repeatedly introducing hearsay documents for their truth – unadjudicated customer complaints (individually and in regulatory reports), untested allegations in other civil cases, and the conclusory preliminary opinions of unidentified regulators or field examiners.  Plaintiffs' experts presented the substance of these hearsay documents as fact, accepted them as true, and principally on that basis opined that Household was a systemic predatory lender.  Plaintiffs then cited this inadmissible evidence for its truth in their closing (*e.g.*, Tr. 4478:17-24 ("People were telling the same stories. . . .  Washington was finding these things and so were people in other parts of the country . . . .")).

Rule 703 permits inadmissible evidence to be disclosed to the jury only if the court determines that the probative value in assisting the jury to weigh the expert's opinion substantially outweighs the risk of prejudice from the jury's potential misuse of the information for *substantive* purposes. Rule 703 advisory committee's notes (2000) (balancing test establishes presumption *against* disclosure); *Nachtsheim*, 847 F.2d at 1270; *In re Air Crash Disaster*, 1991 WL 279005, at *8 (N.D. Ill. Dec. 26, 1991); 29 Charles A. Wright & Victor J. Gold, *Federal Practice & Procedure*, § 6273, at 312 (1997) ("Rule 703 does not authorize admitting hearsay on the pretense that it is the basis for expert opinion when, in fact, the expert adds nothing to the out-of-court statements other than transmitting them to the jury.").

### B.  Plaintiffs Deliberately and Repeatedly Violated the Court's Exclusion of Settlement Evidence Pursuant to Rule 408

Prior to trial Defendants moved *in limine* to bar Plaintiffs from introducing evidence of Household's settlement with a group of state attorneys general ("the Settlement"). (Dkt. 1349-2 at 47-54)  The Court's ruling was clear and correct:  The risk of unfair prejudice was too great to permit Plaintiffs to present evidence of the settlement negotiations and the resulting Settlement.

(Dkt. 1516 ("March 17 Order"))  The Court limited Plaintiffs' use of the Settlement to testimony relevant to the alleged inadequacy of Household's disclosures or the effect on Household's stock price, specifically, the "date, time, means and nature of the *disclosure* . . . without requiring the introduction of any actual settlement documents or any documents or testimony concerning allegations that were settled or the settlement terms or negotiations." (*Id*. at 6 (emphasis added)) However, Plaintiffs repeatedly chipped away at the protection granted by the March 17 Order by introducing Settlement-related testimony and exhibits with the overt implication that they proved that Household had engaged in widespread predatory lending.

Devor's improper use of the amount of the Settlement payment and related calculations was discussed in Part X.D, *supra*.  For purposes of this separate ground for relief, it is significant that Devor necessarily assumed that the Settlement proved liability and the related calculations quantified "improper" earnings.  He also used inadmissible Settlement-related documents to leap to the conclusion that $3.2 billion of Household's revenue purportedly "was attributed to loan splitting, misrepresenting loan fees and points, misrepresenting interest rates, insurance packing and imposing prepayment penalties." (Tr. 2409:13-2410:9; then-excluded PX 681)  In direct contravention of the Court's order, Devor told the jury that "the amounts that Household agreed to make restitution . . . to consumers through their states" were material. (Tr. 2415:24-2416:5)

Ghiglieri likewise flouted the March 17 Order by gratuitously injecting information about the Settlement and its dollar value in responses to questions unrelated to that subject.  Obviously primed to do so, she repeatedly volunteered the fact and amount of the Settlement and opined that predatory practices had to have been pervasive because the Settlement involved a large dollar amount. (Tr. 864:6-865:13)[51]  Until the Court admonished Plaintiffs, Ghiglieri continued to reiterate the Settlement amount to "support" her conclusion that predatory practices were systemic. (Tr. 806:1-13, 859:24-862:1, 864:6-865:13)  Ghiglieri breached the March 17 Order time after time under the spurious guise that she had "relied" on the excluded prejudicial documents

---

[51]    Asked whether the Company's response to an individual customer's complaint was adequate (Tr. 859:24-862:1); whether she had reviewed any regulators' opinions that differed from hers (Tr. 806:1-13); and whether the Company had practices in place to educate customers and disclose procedures (Tr. 864:6-865:13), Ghiglieri each time responded with the non sequitur that Household settled with the states for $484 million.  The Court, based on Plaintiffs' argument, rationalized that Defendants had fair warning that Ghiglieri would testify about the Settlement because she had relied upon it in her report. (Tr. 896:2-900:24)  But as the report was written in August 2007 and the Court's ruling precluding such evidence at trial came in March 2009, Defendants had no reason to expect Ghiglieri to violate the Court's order.

she described.[52]  Like Devor's allusions to the Settlement, these breaches presented a Hobson's choice:  Defendants could move to strike each unresponsive, violative answer and seek a curative instruction (and thus indelibly highlight the "elephant in the room") or undertake a detailed cross-examination to show that Ghiglieri's conclusions about the Settlement were unfounded (and thus open the door to this inadmissible subject).  Given the highly prejudicial shortcomings of each choice, Defendants elected to ask a single question that fell squarely within the one exception the March 17 Order allowed – the performance of Household's stock upon disclosure of the Settlement. (Tr. 865:8-13)

By the time Defendants cross-examined former CEO Aldinger, Plaintiffs had repeatedly elicited from their experts improper and inflammatory testimony about the Settlement, including the attorneys general's allegations and conclusory rhetoric; a document Plaintiffs claimed (with no factual basis) was Household's calculation of financial exposure; the terms of the Settlement; the final amount of the Settlement payment; and a good deal of expert editorializing that treated the fact and dollar value of the Settlement as if they were proof of pervasive wrongdoing. (Tr. 859:19-862:1 (Ghiglieri); Tr. 2415:24-2416:14 (Devor); Tr. 2660:11-2661:4 (Fischel))  Faced with the risk that the jury would accept Plaintiffs' unsubstantiated distortions, Defendants' only realistic option at that point was to have Aldinger explain the economic reasons for the Settlement.[53]  This suitably tailored defense cannot fairly be treated as a waiver either of the March 17 Order or of Defendants' continuing objection to Plaintiffs' violations. (*E.g.*, Tr. 3388:13-21)

Nevertheless, the Court erroneously found that Defendants' measured response to Plaintiffs' repeated deliberate disclosures of the Settlement "opened the door" completely and allowed Plaintiffs to exploit prejudicial documents that had been properly excluded by the March 17, 2009 Order, including a "Framework for the Discussion . . ." (PX 516), which laid out the task force's most extreme accusations (Tr. 3456:2-3457:11, 3459:21-3476:10, 4479:15-4481:15), and a document (PX 681) that purportedly estimated Household's worst-case exposure (Tr. 3476:11-

---

[52]  *E.g.*, Tr. 711:4-10, 718:25-719:4, 769:14-20, 806:1-25 (all based on then-excluded PX 681); 628:12-629:25 (reading from erroneously admitted PX 550.  Note 55, *infra*, reviews the circumstances that led to the erroneous ruling admitting PX 550.

[53]  The Court mistakenly concluded that Defendants had nefariously planned this sequence of events *ab initio*. (Tr. 3386:8-14)  *Contra*, Tr. 1723:23-25 ("My view is I also am familiar with your Honor's point about once the door is open, the door is open.  If  Devor is going to address that, we will respond.") (Defendants' counsel, addressing the Court); Kavaler Dec. Exs. 9 & 10 (Defendants' agreement to withdraw an objection was conditioned on the understanding that withdrawal would *not* "open the door").

4481:19-4483:3).  Plaintiffs openly admitted that their purpose was to "establish what [the attorneys general] were alleging" and "what [payment] they sought to obtain from Household," violating the spirit of Rule 408 and flouting the purpose of Rule 403.[54]  Combined with the unfair prejudice already occasioned by Plaintiffs' persistent leaking of inadmissible Settlement details, the Court's drastic and seemingly punitive reaction to Defendants' limited defensive showing deprived Defendants of a fair trial.

In any event, the decision to admit these documents should have been informed by a balancing test under Rule 403 and/or 703 to determine whether the danger of unfair prejudice outweighed any marginal probative value. *Davis* v. *Rowe*, 1993 WL 34867, at *5 (N.D. Ill. Feb. 10, 1993).  In that respect, nothing had changed from the time the Court properly held in its original ruling on point that "[w]hether Household settled claims based on its lending practices may very well lead to the unfair and prejudicial inference that Household failed to disclose material facts regarding its lending practices." (Dkt. 1516 at 5)  Because the admission of inflammatory hearsay allowed the jury to reach its verdict based on Plaintiffs' appeal to prejudice rather than a reasoned analysis of admissible evidence, Defendants are entitled to a new trial.[55]

---

[54]  Plaintiffs also used PX 681 to argue that Devor was correct when he testified as a matter of fact that Household had earned $3.2 billion from improper lending practices. (Tr. 4481:6-14)  The document showed no such thing, but Plaintiffs' irrational extrapolation illustrates why inconclusive notes made at the outset of negotiations and having no correlation with the Settlement itself were properly excluded and should not have been released as a judicial reprisal for Plaintiffs' having interposed a limited defense to Plaintiffs' improper insinuations.  Defendants chose not to cross-examine Devor on his outlandish $3.2 billion estimate precisely to avoid opening the door to a Settlement-based explanation.  The Court's subsequent admission of PX 681 after Devor had been excused is another factor requiring a new trial.

[55]  Even if the Court had not rescinded its exclusion of Settlement-related materials, Defendants would have been prejudiced by the erroneous admission of an inflammatory letter addressed to Household by Washington Assistant Attorney General David Huey, on behalf of the multi-state working group (the "Huey letter," PX 550), which plainly discloses matters at the core of the Settlement negotiations.

Defendants voluntarily submitted with their *in limine* motions an extensive Appendix that identified for the Court's convenience documents culled from Plaintiffs' enormous list of proposed trial exhibits that typified Defendants' motions. (Dkt. 1344.1 at 1-16)  Defendants made no representation that the Appendix was all-inclusive and, indeed, expressly stated that the listing was "[w]ithout limitation." (Dkt. 1349-2 at 1)  The Huey letter was the subject of express objections that Defendants submitted to the Court as part of the pre-trial order process.  The [Proposed] Final Pre-trial Order itemized Defendants' objections to Plaintiffs' 1600+ proposed trial exhibits.  Defendants objected to the Huey letter on the basis of Rules 403, 408, 802 and 901. (Kavaler Dec. Ex. 11)  The Huey letter was not one of the documents included in the Appendix in connection with Defendant's *in limine* motions, filed the same day, although substantially similar documents were scheduled, including at least one document that contained many of the same pages.  It has never been disputed that the Huey letter falls squarely within the ambit of the March 17 Order, which expressly excluded evidence of Settlement negotiations to "reduce[ ] the risk of unfair prejudice to defendants and promote[] the spirit of Rule 408." (Dkt. 1516 at 6)  The document was

*Footnote continued on next page.*

### C.    Plaintiffs Based Their Case on Alleged False Statements That Were Immaterial Puffery or Otherwise Too Vague to Be Actionable

Before trial Defendants moved *in limine* to preclude Plaintiffs from advancing as a basis for any Defendant's liability at trial certain inactionably vague statements. (Dkt. 1317, 1319) The Court ruled that statements drawn from Household's July 18, 2001, January 16, 2002 and April 17, 2002 press releases "contain some puffery, but it is entwined with verifiable assertions of fact, which are actionable despite the puffery." (Dkt. 1502 at 2)[56]  This erroneous ruling permitted the jury to find Defendants liable for statements that are immaterial as a matter of law because the lack of specificity of each vague statement "precludes it from being deemed material; it contains no useful information upon which a reasonable investor would base a decision to invest." *Searls*, 64 F.3d at 1066; *Stransky*, 51 F.3d at 1332.

These challenged portions of Nos. 18, 24 and 29 (Dkt. 1611 Table A) are precisely the type of "'loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker'" that courts have held them immaterial as a matter of law. *In re Midway Games, Inc., Sec. Litig.*, 332 F. Supp. 2d 1152, 1164 (N.D. Ill. 2004) (citation omitted); *accord Makor Issues & Rights*, 437 F.3d at 597; *Galati*, 220 Fed. Appx. at 101-02; *Silverman* v. *Motorola, Inc.*, 2008 WL 4360648, at *9 (N.D. Ill. Sept. 23, 2008).

---

*Footnote continued from previous page.*

part of the ongoing negotiations between Household and the attorneys general – indeed, it is headed "CONFIDENTIAL FOR SETTLEMENT DISCUSSION PURPOSES ONLY" – and it contains the same unadjudicated inflammatory allegations as other documents that the Court excluded because of the risk of unfair prejudice.

Elevating form over substance, however, the Court undermined its own prior ruling by overruling Defendants' objections to PX 550, solely because Defendants had not included this version of the document in the Appendix. (PTC Tr. 719:10-20)  Portions of the Huey letter were excluded, but only because they duplicated a document that *had* been included in the Appendix, and the Court authorized Plaintiffs to use the remainder of the letter without restriction. *Id.*  Plaintiffs then exploited PX 550 aggressively, to Defendants' prejudice, permitting their expert witnesses to present it to the jury as evidence of the truth of Plaintiffs' predatory lending allegations:  Ghiglieri parroted Huey's accusations. (Part X.B, *supra*)  When cross-examining Defendants' expert John Bley, Plaintiffs used the letter as a hook to read Huey's unproven allegations to the jury yet again. (Tr. 3804:11-19)  And Plaintiffs used the letter in direct and redirect examination of Tom Detelich, questioning him about the Settlement and about the attorneys general's allegation that Household had engaged in "insidiously deceptive sales practices." (Tr. 1773:9-17, 1855:2)

Admitting PX 550 was plain error, not only because the document itself should have been excluded pursuant to Rules 408 and 403, but also because its admission helped to unravel the Court's prior correct ruling excluding Settlement-related evidence.  Focusing on a clerical discrepancy at the expense of substantive harm turned a principled inquiry into a game of "gotcha."

[56]    Because the challenged statements were included in items 18, 24 and 29 on the verdict form (Dkt. 1611 Table A), they are referred to herein as Nos. 18, 24 and 29.  In the Court's ruling on Defendants' motion in limine (Dkt. 1502), Nos. 18, 24 and 29 were referred to as 21, 30 and 35, respectively.

The Court's ruling that Nos. 18, 24 and 29 were actionable cannot be reconciled with its simultaneous ruling that Plaintiffs could *not* base their fraud claims on other substantially identical statements.  For instance, the Court inexplicably ruled that the statements "[o]ur record performance reflects strong sales and marketing results in all of our businesses coupled with our continued focus on risk management and operational efficiency" (PX 884) and "[r]eceivable and revenue growth were strong, and credit performance was within our expectations" (PX 978) were inactionable puffery but that statements such as "[w]e enjoyed strong receivable and revenue growth compared to a year ago, with all of our businesses performing well" (No. 18), "[r]eceivable and revenue growth exceeded our expectations while credit indicators weakened only modestly in a tough economic environment" (No. 24) or "[w]e remain committed to maintaining a strong balance sheet and maximum financial flexibility" (No. 29) were not.[57]  (Dkt. 1502 at 2)

In ruling that Plaintiffs could proceed on the basis of Statement Nos. 18, 24 and 29 because they contained both actionable facts and puffery, the Court erred by failing to separate the two categories to ensure that the jury did not impermissibly base its verdict on the inactionable portions. *In re Neopharm, Inc. Sec. Litig.*, 2007 WL 625533, at *13 (N.D. Ill. Feb. 23, 2007); *Silverman*, 2008 WL 4360648, at *10.[58]  The failure to excise those portions of the statements that contain puffery was not harmless error because liability was predicated on these statements, and there is no way to determine whether the jury's verdict was based upon the inactionable vague portions of the statements.

### D.    Allowing Fischel to Give Testimony That Had Not Been Disclosed in His Expert Report Was an Abuse of Discretion

Before trial, Plaintiffs' expert Fischel committed to his position – adopted by Plaintiffs – that no artificial inflation entered Household's stock price from the start of the Relevant Period until November 15, 2001.  However, at trial, over Defendants' objection, he speculated at length – based on theories never mentioned in discovery – about the supposed advent and causes of inflation during the Relevant Period, and he invited the jurors to jettison his painstaking,

---

[57]    The inexplicable and irreconcilable similarities between Statement Nos. 18, 24 and 29 and substantially identical statements that the Court excluded are illustrated in Kavaler Dec. Ex. 17.

[58]    To the extent that the Court found portions of Nos. 18, 24 and 29 relating to Household's revenue to be actionable, the ruling is erroneous on that basis as well. *Anderson*, 140 F. Supp. 2d at 909, *Galati v. Commerce Bancorp, Inc.*, 2005 WL 3797764, at * 7 (D.N.J. Nov. 7, 2005);  *Sofamor Danek*, 123 F.3d at 401 & n.3.

months-long empirical analyses and substitute their own (necessarily unfounded) findings as to the date of creation and the amount of any inflation.

In his expert report provided pursuant to Rule 26(a)(2)(B)(i), Fischel indicated that *no* artificial inflation entered Household's stock price on any of the days on which Plaintiffs alleged that false statements were made. (Kavaler Dec. Ex. 1 at ¶¶ 41, 42 & Exhibits 53, 56)  Plaintiffs adopted this position by reference in their interrogatory answers (Kavaler Dec. Ex. 5 at 24, and Fischel reiterated this position at his deposition (Kavaler Dec. Ex. 3 at 122:19-123:19).  Moreover, Plaintiffs successfully resisted Defendants' vigorous efforts to discover their position on how and when artificial inflation first entered the price of Household stock. (Dkt. 1159)

Contrary to his repeated pre-trial statements that he had *not* identified inflationary increases in Household's stock price, at trial Fischel expounded an entirely new, detailed theory of loss causation, which was entirely absent from his expert reports and deposition testimony:

> Q.  In your opinion, how could the wrongdoing that the plaintiffs allege in this case have caused inflation in Household stock?
>
> A.  . . .  Household, during the relevant period, was embarking on a very significant growth strategy to try and grow their earnings, to try and grow their revenue, to try and grow their size.  That was really the key component – or one of the key components of their business plan.  In order to convince investors that this growth plan was a reason that they should pay more and more for Household stock, it was necessary to communicate to investors that Household could not only report increasing revenues, increasing earnings, but that these increasing revenues and earnings would continue into the future.  And if it were the case, as the plaintiffs allege in this case and as many analysts and commentators concluded, that those revenues could not be sustained in the long-term because they were the function of improper lending practices, which would cause Household to get into a lot of trouble, ultimately force it to change its business practices, lower its growth targets, making it a less-profitable company than what investors believed at the beginning of the relevant period, that could certainly lead to inflation.

(Tr. 2605:20-2606:23)  (The same theory had been expounded in Plaintiff's opening.)  Counsel for Defendants objected immediately that this theory had not been disclosed in Fischel's report and was, in fact, at odds with his prior testimony that he could not speak to the cause of inflation. (Tr. 2610:11-2611:6)  The Court overruled this objection with little explanation, and allowed Plaintiffs to put before the jury unsubstantiated causation evidence that Plaintiffs had strategically withheld from Defendants during discovery, and that was completely inconsistent with Fischel's findings as disclosed and examined during expert discovery.

The error was compounded by Fischel's suggestion to the lay jurors – also unveiled for the first time at trial – that they disregard his empirical findings and select for themselves the

starting point and dollar value of artificial inflation. In his reports and at his deposition, Fischel had testified that his entire analysis and inflation quantification hinged on the assumption that Household's stock price became artificially inflated *prior to the start of the Relevant Period*. (Kavaler Dec Ex. 3 at 84:3-7; *id.* Ex. 2 at ¶ 36; *id.* Ex. 8 at 15:14-18, 18:13-17) It was unfairly prejudicial to permit Fischel to assert at trial the newly minted (and unsupported) opinion that the jury could reject his inflation quantifications – admitted on the ground that they resulted from his expertise and would aid the jury – and instead insert zeros anywhere they wanted.

The resulting prejudice to Defendants is manifest: With no record support whatever, and contrary to Plaintiffs' only evidence on point, the jury found that the level of artificial inflation went from zero to nearly $24 on March 23, 2001. The insufficiency of evidence supporting this finding requires the entry of judgment for Defendants (Part I.A, *supra*); in the alternative, Fischel's *ad hoc* detour from the substance of his reports and deposition testimony entitles Defendants to a new trial.

## XII. PREJUDICIAL ERRORS IN THE JURY INSTRUCTIONS AND VERDICT FORM REQUIRE A NEW TRIAL

In addition to the foregoing grounds, numerous errors in the jury instructions and verdict form individually and collectively produced unreliable verdicts. A common thread in all these errors is the absence of the reasonable specificity that was essential to preventing jury confusion in this complicated and amorphous case. Plaintiffs asserted an unusually large number of allegedly fraudulent "statements", each of which allegedly reflected up to three discrete and unrelated theories of fraud. Each alleged instance of fraud in each of the 40 "statements" required discrete findings as to falsity, materiality, scienter and loss causation as to each of the four Defendants over an unusually protracted temporal window. Under these circumstances, it is not surprising that the jury returned verdicts that, in many respects, literally make no sense.

In an effort to avoid this insupportable outcome, Defendants proposed the adoption of instructions and a verdict form (Dkt. 1546 Exs. I-3, J-3) that would have separated out by type the alleged instances of fraud within a particular "statement" and that would have required the jury to record its findings as to the distinct elements of a Rule 10b-5 claim for each alleged misstatement or omission. Disaggregating by theory the instances of fraud within a given "statement" and imposing the discipline of an element-by-element review would have provided the jury with

a simpler, unambiguous roadmap and ultimately could have provided intelligible verdicts to the parties and any reviewing court.  The Court did not adopt this orderly procedure.

In addition to this fatal lack of clarity, substantive errors in the jury instructions and verdict form, such as diluting or misstating the requirements for proving securities fraud, require the grant of a new trial.  Even if each of the individual errors discussed below could be excused as harmless when standing alone (and they could not), the cumulative effect of the multiple errors was a trial that was fundamentally unfair to Defendants.  Here, as in *Frymire-Brinati*, 2 F.3d at 188, multiple errors, considered in the aggregate, "presented the jury such a skewed picture that the verdict is unreliable" and a new trial is required.

### A.    Errors in the Jury Instructions Require a New Trial

"An incorrect instruction calls for a new trial even if the jury could have based its verdict on a different, properly instructed theory." *Dawson* v. *New York Life Ins. Co.*, 135 F.3d 1158, 1165 (7th Cir. 1998).  Each of the plain errors discussed below was clear and obvious and affected Defendants' substantial rights, influencing the outcome of the proceedings to Defendants' prejudice. Fed. R. Civ. P. 51(d)(2).

### 1.    Instructing the Jury That It Could Find Liability If "the Defendant Made, Approved, or Furnished Information to be Included in a False Statement" Misstated the Law

The Court incorrectly instructed the jury that in order to prevail on a Rule 10b-5 claim against any Defendant, Plaintiffs must prove by a preponderance of the evidence that:

> The defendant made, ***approved, or furnished information to be included in*** a false statement of fact or omitted a fact that was necessary, in light of the circumstances, to prevent a statement that was made from being false or misleading during the relevant time period between July 30, 1999, and October 11, 2002 . . . .

(Tr. 4714:1-10; Dkt. 1614 at 25 (emphasis added))[59]  Instructing the jury that a Defendant can be held liable merely for having "approved or furnished information to be included in a false statement of fact" impermissibly expanded the scope of Rule 10b-5, which states:  "It shall be unlawful for any person, directly or indirectly . . . [t]o ***make*** any untrue statement of a material fact . . . ." 17 C.F.R. § 240.10b-5 (emphasis added).  In *Stoneridge Investment Partners, LLC* v. *Scientific-Atlanta, Inc.*, 552 U.S. 148, 128 S. Ct. 761 (2008), the Supreme Court expressly re-

---

[59] Defendants objected on the record to the inclusion of "approved or furnished information" in the jury instruction. (Tr. 3853:9-16, 3862:13-15)  The contested language does not appear in either Defendants' *or Plaintiffs'* pre-trial submissions, nor in the circuit court pattern instructions the parties cited as authorities. (Dkt. 1546-4, at 11, 13; Dkt. 1545-7, at 28)

jected the theory of scheme liability under Rule 10b-5, holding that a secondary actor's "decep-
tive acts, which were not disclosed to the investing public" are inactionable, because they are
"too remote to satisfy the requirement of reliance." *Id*. at 770. Citing *Stoneridge*, the Court of
Appeals explained in *Pugh*, 521 F.3d at 697, that "an indirect chain to the contents of false public
statements is too remote to establish primary liability" and held that a party that did not prepare
or disseminate the company's financial statements could not be found liable under § 10(b).

   In addition to contravening *Stoneridge*, this instruction rendered gratuitous the elements
of Section 20(a) liability, which governs whether an alleged "approval" of a false statement of
fact or omission is actionable. 15 U.S.C. §§ 78t. In requiring a finding that the control person
defendant exercised control over the primary violator's general operations, Section 20(a) implic-
itly recognizes that not every "approval" of an allegedly false statement gives rise to primary li-
ability, contrary to the mistaken implication of the subject jury instruction.

   The Court's erroneous instruction was harmful because it allowed the jury to find Gilmer
liable for all of the statements found to be false in Household's 10-Ks, 10-Qs, and related press
releases during and after March 2001 (Dkt. 1611, Nos. 15-18, 20-22, 24, 27, 29, 32, 36-38), even
though he did not sign or issue them. The instruction also permitted the jury to find Gilmer and
Schoenholz liable for a statement made only by Aldinger during a Goldman Sachs presentation
(*id.*, No. 23), and produced the untenable finding that both Gilmer and Aldinger were liable for
statements made at the Financial Relations Conference on April 9, 2002 only by Schoenholz.
(*id.*, No. 28) This error may also account for the erratic finding that Aldinger was not only liable
for a statement attributed to Gilmer alone, but that he knowingly committed fraud as to that
statement, *versus* the recklessness the jury attributed to Gilmer. (*id.*, No. 14) Even if some other
error or confusion accounted for these illogical findings, as the Court of Appeals instructed in
*Dawson*, a new trial is required if the jury could have based its verdict on the erroneous instruc-
tion, as is manifestly the case here.

   **2.    Instructing the Jury That a Defendant Has a Duty to Disclose
           Information If Its Omission Would Render a "Prior Statement"
           Misleading Was an Incorrect Statement of the Law**

In its instructions on the element of misrepresentation or omission, the Court stated:

   An omission violates 10b-5 only if the defendant has a duty to disclose the omitted
   fact. The defendants do not have a duty to disclose every fact they possess about
   Household or any fact that is in the public domain. ***But each defendant has a duty to
   disclose a fact if a prior or contemporaneous statement he or it made about the same
   subject would be misleading if the fact is not disclosed.*** If a defendant does not have

a duty to disclose a fact but chooses to make a statement about it, the statement must
be truthful and not misleading.

(Tr. 4715:8-17; Dkt. 1614 at 26 (emphasis added))

The requirement of concurrent disclosure of all material facts necessary to prevent a
given statement from being misleading applies only to the statement in question and does not
impose a duty to correct allegedly fraudulent prior statements whenever a new statement is
made. *Oran*, 226 F.3d at 286; *Stransky*, 51 F.3d at 1331. Plaintiffs' extreme position to the con-
trary has no legal support and is a corruption of the uncontested proposition that "a duty to cor-
rect 'applies when a company makes a historical statement that, at the time made, the company
believed to be true. . . .'" (Dkt. 1564 at 10-11 (citation omitted); Tr. 4408:7-12, 4685:16-22) Ex-
panding this concept to create a perpetual duty to correct prior statements allegedly false when
made would also render the statute of repose meaningless, as "all knowing misstatements made
before the class period, which remain uncorrected, would be actionable within the class period
on an omission theory." *Lattanzio* v. *Deloitte & Touche LLP*, 476 F.3d 147, 154 (2d Cir. 2007)
(internal quotation marks omitted). Courts have consistently rejected attempted revivals of time-
barred violations. *Id.*; *Caviness* v. *DeRand Res. Corp.*, 983 F.2d 1295, 1301-02 (4th Cir. 1993);
*In re Affiliated Computer Servs. Derivative Litig.*, 540 F. Supp. 2d 695, 701 (N.D. Tex. 2007).

### 3. Failing to Instruct the Jury That Scienter Embraces "Intent to Deceive, Manipulate, or Defraud," Coupled with an Instruction That Scienter Depends on What a Defendant "Knew or Should Have Known," Impermissibly Weakened the Scienter Standard

In charging the jury on the issue of the requisite state of mind giving rise to Rule 10b-5
liability, the Court stated:

Defendants William Aldinger, David Schoenholz, Gary Gilmer acted with the required
state of mind in making a statement of material fact if he made the statement knowing
that it was false or misleading or with reckless disregard for a substantial risk that it
was false or misleading. . . .

A defendant's conduct is reckless if it is an extreme departure from the standards of
ordinary care and he knows that it presents a risk of misleading investors or the risk is
so obvious that he had to have been aware of it.

***A finding that any defendant acted with the required state of mind depends on what
he knew or should have known when he made a particular statement or omission.***

(Tr. 4717:7-4718:1; Dkt. 1614 at 29 (emphasis added)) This charge improperly minimized
Plaintiffs' burden of proof on scienter by failing to instruct, as Defendants had repeatedly re-
quested (*e.g.*, PTC Tr. 486:16-23; Tr. 4028:13-22, 4418:2-4419:1, 4687:9-20; Dkt. 1585 at 6),
that "'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud."

*Ernst & Ernst* v. *Hochfelder*, 425 U.S. at 193 n.12; *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499, 2507 n.3 (2007). The phrase "intent to deceive, manipulate, or defraud" is critical to a proper understanding of the state of mind the jury must find to impose Rule 10b-5 liability. *Higginbotham*, 495 F.3d at 756. The Court of Appeals has consistently acknowledged the centrality of *Hochfelder*'s "intent to deceive" language, *e.g.*, *SEC* v. *Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998); *Robin* v. *Arthur Young & Co.*, 915 F.2d 1120, 1126 (7th Cir. 1990); *Rowe* v. *Maremont Corp.*, 850 F.2d 1226, 1238 (7th Cir. 1988).

Failure to instruct the jury that "plaintiffs must demonstrate that the defendant acted with an intent to deceive, manipulate or defraud" requires reversal because "the tendered instruction was correct; the instruction the Court gave misinformed the jury; and the misinformation prejudiced the objecting party." *Dawson*, 135 F.3d at 1167 (internal citations omitted). The rejected language was correct because it was a verbatim quote from *Hochfelder* – the seminal Supreme Court case on scienter. Moreover, the Court's less rigorous formulation erroneously informed the jury that "[a] finding that any defendant acted with the required state of mind depends on what he knew *or should have known* when he made a particular statement or omission." (Tr. 4717:24-4718:1; Dkt. 1614 at 29 (emphasis added)) This instruction impermissibly reduced the scienter standard to one of simple negligence, notwithstanding the well-settled rule that "a merely negligent breach of a duty defendant owes plaintiff is not sufficient" to ground liability under § 10(b) or Rule 10b-5. *Sundstrand Corp.* v. *Sun Chem. Corp.*, 553 F.2d 1033, 1043-44 (7th Cir. 1977).[60]

Despite Defendants' urging that the jury be given the Court of Appeals' complete definition of recklessness (Dkt. 1585 at 6-8), the Court refused to instruct that mere negligence does not constitute recklessness, and instead explicitly permitted the jury to impose liability for conduct that was considerably less than the "functional equivalent" of willful fraud. *Searls*, 64 F.3d at 1066. By blurring the distinction between recklessness and negligence, the Court disregarded the Court of Appeals' caution that "the definition of 'reckless behavior' should not be a liberal

---

[60]  *Accord Robin*, 915 F.2d at 1127; *Searls*, 64 F.3d at 1066; *Dolphin & Bradbury, Inc.* v. *SEC*, 512 F.3d 634, 639 (D.C. Cir. 2008); *Knollenberg* v. *Harmonic, Inc.*, 152 Fed. Appx. 674, 678 (9th Cir. 2005); *Geffon* v. *Micrion Corp.*, 249 F.3d 29, 36, 36 n.8 (1st Cir. 2001). The Court of Appeals has reached the same conclusion in contexts other than securities law. *E.g.*, *U.S.* v. *L.E. Myers Co.*, 562 F.3d 845, 855 (7th Cir. 2009) (OSHA violation); *U.S.* v. *Ladish Malting Co.*, 135 F.3d 484, 486-88 (7th Cir. 1998) (OSHA violation); *Brown* v. *M&M/Mars*, 883 F.2d 505, 512 (7th Cir. 1989) (ADEA violation).

one lest any discernible distinction between 'scienter' and 'negligence' be obliterated for these purposes." *Sanders* v. *John Nuveen & Co., Inc.,* 554 F.2d 790, 793 (7th Cir. 1977); *accord Sundstrand,* 553 F.2d at 1045 & n. 20.  Even *Plaintiffs'* proposed instruction, unlike the Court's erroneous charge, required proof of a Defendant's awareness of the possibility of deception. (Dkt. 1545-7 at p. 34)  The Court's much looser "should have known" standard is legally unsupportable and at odds with every published Circuit Court pattern jury instruction,[61] and allowed the jury to determine scienter without adequate guidance, all to the prejudice of Defendants.

Because the falsity of certain statements was not contested at trial, permitting the jury to find scienter through mere "should have known" negligence – as opposed to knowledge or properly defined recklessness – was by definition prejudicial. *See Dawson,* 135 F.3d at 1165.

### 4.   The Court Misstated the Law in Response to the Jury's Confusion About the Requirements for Proof of Loss Causation

After days of deliberation, the jury submitted the following question:  "Lawsuit date parameters: can the beginning date in determining any guilt have a beginning date subsequent to July 30, 1999?  If so, does each and every statement within the period require the unanimous 'yes' vote of the jurors to render a valid verdict by this jury?" (Tr. 4771:2-8; Dkt. 1613)  The jury's confusion was a predictable result of Plaintiffs' failure to prove the fundamental requirements of loss causation, including when and how inflation allegedly entered the price of Household's stock. *Ray,* 482 F.3d at 995.

The Court's response exacerbated this problem by providing a truncated and therefore erroneous description of Plaintiffs' burden of proof.  The Court rejected Defendants' proposed response to the jury's second question (Dkt. 1613; Tr. 4774:18-4775:2, 12-14, 4776:12-4777:9), and instead instructed the jury, over Defendants' objection:  "You need ***only*** find that a false statement was made on or after July 30, 1999, which caused Household's stock price to become inflated." (Tr. 4781:24-4782:1 (emphasis added); Dkt. 1613)  By directing the jury to focus exclusively on the introduction of inflation, the instruction effectively erased the other elements essential for a finding of Rule 10b-5 liability; the jury could reasonably have understood this instruction to supersede all prior instructions.  Additionally, this instruction mirrors the standard

---

[61]   *Pattern Jury Instructions (Civil Cases) – Fifth Circuit,* § 7.1 at 78; *Manual of Model Civil Jury Instructions – Ninth Circuit* § 18.3, at 489 (2007); *Pattern Jury Instructions (Civil Cases) – Eleventh Circuit* § 4.2, at 262; *see also* American Bar Association, *Model Jury Instructions – Securities Litigation* § 4.02[4].

that the Supreme Court expressly *rejected* when it ruled in *Dura* that "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss." 544 U.S. at 342 (repudiating argument that loss causation could be established by proof that "the price *on the date of purchase* was inflated because of the misrepresentation") (internal quotation marks omitted, emphasis in original). The Court's shorthand answer to the jury's question relieved the jury of its duty to determine when and how the alleged fraud in each statement was revealed, and to ensure, as required by *Dura*, 544 U.S. at 343-45, that any decline in inflation was proximately connected to the fraud that caused it. *Tricontinental*, 475 F.3d at 843. Under *Dawson*, this incorrect instruction "calls for a new trial even if the jury could have based its verdict on a different, properly instructed theory." 135 F.3d at 1165.

### 5. Instructing the Jury to Make a Determination of "Damages" Was Confusing and Inaccurate, and the Court's Definition of "Actual Damages" Incorrectly Stated the Law under *Dura*

The Court unnecessarily charged the jury on the determination of damages, in relevant part as follows:

> If you find that plaintiffs have proved all of the elements of their 10b-5 claim against any defendant, then *you must determine the amount of per share damages*, if any, to which plaintiffs are entitled. Plaintiffs can recover only *actual damages*, which is the difference between the price plaintiffs paid for each share of Household stock and the price each share would have cost if no false or misleading statement or omission of material fact had occurred, *in other words, the measure of inflation in the stock price.* This is the only *damages calculation* you will be asked to make in this case. Any *damages you award* must have a *reasonable basis in the evidence*.

(Tr. 4720:6-17; Dkt. 1614 at 34 (emphasis added)) As an initial matter, the trial concluded only the first phase of this bifurcated case. Individualized reliance and damages issues will be determined, if necessary, at a subsequent stage. (Dkt. 225, 762, 935; PTC Tr. 20:14-22) In this context, instructing the jury that if it found for Plaintiffs it "must determine the amount of per-share damages" to which Plaintiffs are entitled was confusing and simply incorrect.

The instruction injected plain error by equating the concepts of inflation and damages, even though the Court recognized that the concepts were not equivalent. (Tr. 4034:24-4035:5) Contrary to the Court's view that it made no difference which term it used (Tr. 3888:10-18, 3912:10-12, 4679:4-7), the distinction between "inflation" and "damages" is not merely semantic; it was of cosmic substantive importance to the ruling in *Dura*. As the Supreme Court explained "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss. For one thing, as a matter of pure logic, at the moment the transaction takes

place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value." 544 U.S. at 342; *accord Ray,* 482 F.3d at 995. Thus, far from equating the concepts of stock price inflation and damages, the law requires that any calculation of "actual damages" must include not only a determination of fraud-induced inflation at the time of the stock's purchase, but also a determination of the amount of congruent deflation resulting from disclosure of that fraud prior to a particular plaintiff's sale of the stock, a necessarily individual determination reserved for the second phase of this bifurcated trial.

By conflating the concepts of "inflation" and "damages" and, in the process, adopting language pertaining to the measurement of damages rather than the standard for proving an essential element of Plaintiffs' claims, the Court effectively reduced Plaintiffs' burden of proving loss causation by a preponderance of evidence. In keeping with its inapposite "damages" theme, the Court told the jury: "Any damages you award must have a ***reasonable basis in the evidence***." (Tr. 4720:16-17; Dkt. 1614 at 34 (emphasis added)) A "reasonable basis in the evidence" is clearly not commensurate with proof by a "preponderance of the evidence." *Estate of Kluener* v. *C.I.R.*, 154 F.3d 630, 637 (6th Cir. 1998). In confusing the burden of proof on loss causation with a less stringent standard for calculating damages, the Court allowed the jury to find for Plaintiffs without finding that Plaintiffs had proved an essential element of their Rule 10b-5 claim by a preponderance of the evidence, as required by law. The possibility that the jury based its verdict on incorrect law requires a new trial. *Dawson*, 135 F.3d at 1165.

### 6. Refusing to Instruct That "Expert Testimony Does Not Prove Facts Relied Upon" Allowed the Jury to Conclude That Information Presented as a Basis for Experts' "Opinions" Could Be Treated as Fact

The Court improperly refused to instruct that expert testimony does not prove facts introduced solely to explain the expert's position, a concept tendered in Defendants' Proposed Jury Instruction No. 3.24 (Dkt. 1546-3 at 79), in accordance with the Court of Appeals' clear guidance that an expert's reliance on otherwise inadmissible evidence neither renders that evidence admissible for other purposes nor proves any fact by a preponderance of evidence. *James Wilson Assocs.*, 965 F.2d at 172-173; *Gong* v. *Hirsch*, 913 F.2d 1269, 1272-73 (7th Cir. 1990); *Grant* v. *Chemrex, Inc.*, 1997 WL 223071, at *8 (N.D. Ill. Apr. 28, 1997).[62]

---

[62]    As discussed in Part X.F, *supra*, the Court's single limiting instruction was an inadequate safeguard against severe prejudice.

**B.    Judicial Errors with Respect to the Verdict Form Irreparably Harmed Defendants, Requiring a New Trial**

The prejudice occasioned by the erroneous jury instructions was compounded by the Court's defective verdict form. *See Wilk* v. *American Medical Ass'n*, 719 F.2d 207, 218, 223 (7th Cir. 1983) (reversing, where verdict form included a general question on liability, because the jury charge "failed to convey" the correct legal standard).

**1.    The Verdict Form's Failure to Require Particularized Findings with Regard to the Rule 10b-5 Elements Was Harmful Error**

Question 1 on the verdict form asked, as to each of the 40 alleged fraudulent statements (each supposedly reflecting up to three discrete types of fraud) and as to each Defendant:  "Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A?" (Dkt. 1611)  Nowhere in the verdict form was the jury instructed to indicate whether it found each statement (or any of the separate and discrete subparts of each statement) to be false or misleading, material, made with scienter, and a substantial cause of Plaintiffs' loss. Given the complexities and inherent vagueness of Plaintiffs' claims, this general question invited confusion, imprecise analysis and the inevitable risk of jurors' overlooking essential elements – problems that were exacerbated by Plaintiffs' bundling of discrete theories of fraud into each statement, with each theory represented by separate passages drawn from the same document. Defendants therefore opposed the verdict form on the ground that it should have provided either check-off spaces for each essential element (Dkt. 1546-6 (19-27); Dkt. 1546-7 (1-58); Dkt. 1607) or at least a reference back to the criteria to be considered before marking a simple 'yes' or 'no.' (Tr. 4063:9-14, 4361:1-12, 4365:1-4)  The Court declined to include specific elements on the verdict form. (Tr. 4362:23-4363:2)

Requiring the jury to answer a general verdict question on liability as to 40 different statements with numerous subparts without making explicit findings on the elements of each claim compounded the errors in the Court's jury instructions. *Wilk*, 719 F.2d at 217; *Malone* v. *ReliaStar Life Ins. Co.*, 558 F.3d 683, 688 (7th Cir. 2009).  The combination of a verdict form that omitted any reference to the elements of Plaintiffs' Rule 10b-5 claims and jury instructions that were erroneous as to key elements of securities fraud deprived the jury of guidance as to the many necessary factual determinations that should have informed its verdict.

Moreover, the verdict form was at best ambiguous with regard to the essential loss causa-tion element.  Although it did include a "none of the above" option in the loss causation inquiry,

that question was to be answered only *after* the jury had found for Plaintiffs on their Rule 10b-5 claims as to a particular statement, in which case (because a finding of liability required proof of loss causation) "none of the above" would presumptively have been unavailable. Although that ambiguity would have been avoided (and legal standards more reliably satisfied) by having the jury expressly address the predicate loss causation element (as well as the other predicate elements) *before* turning to the ultimate question of liability, the form instructed exactly the opposite and thus produced unintelligible findings of liability coupled with zero or negative inflation, and findings of inflation on days when no fraud was even alleged. (Part IX.A, *supra*)

### 2. Grouping Multiple Separate Statements on a Given Date into a Single Entry Nullified the Requirement That Plaintiffs Prove Each Rule 10b-5 Element with Respect to Each Alleged Fraudulent Statement

Question 1 on the verdict form directed the jury to Table A, which listed 40 allegedly false "statements" upon which Plaintiffs based their securities fraud claims, and asked the jury to decide if Plaintiffs had prevailed on their Rule 10b-5 claims with regard to each "statement" and with regard to each Defendant. (Dkt. 1611)  While each of the numbered entries in Table A purported to quote a discrete statement, many consisted of multiple separate statements on different subjects that were simply lumped together because they had been made in the same press release or public filing. (*E.g.*, Dkt. 1611 Table A, No. 16 (including both that Household "reported that earnings per share rose 17 percent . . ." *and* under the heading "Credit Quality and Loss Reserves" that at March 31, "the managed delinquency ratio (60+ days) was 4.25 percent . . .")) Such aggregation, permitted over Defendants' objection (Tr. 4682:4-11), effectively reduced Plaintiffs' burden of proof by permitting the jury to find liability as to a given "statement" without having to find that Plaintiffs had proved each of the Rule 10b-5 elements as to each separate category of fraud in a given document, in contravention of the law and to Defendants' considerable prejudice. *West* v. *Media Gen. Operations, Inc.*, 120 Fed. Appx. 601, 620 (6th Cir. 2005).

Because of this improper aggregation, the jury might have concluded, for example, that a reported earnings statement made in a press release was false and material but was not made with scienter, while simultaneously finding that a separate statement regarding credit quality statistics, made in the same press release, was false, made with scienter, but not material. The result: a verdict for Plaintiffs without the jury's having found all the requisite elements with regard to *any* misstatement or omission. The jury instructions likewise failed to specify the necessity of finding all elements for each separate alleged fraud, increasing the likelihood that grouping unrelated

excerpts from a single document led the jury to find liability without finding each Rule 10b-5 element with regard to each excerpt alleged to be false. This deprived Defendants of a fair trial.

### 3.  The Verdict Form Impermissibly Removed the Determination of Scienter from the Jury

Like the other Rule 10b-5 elements, scienter was not specifically addressed in the verdict form's global question on liability. The form's only reference to scienter, in Question 3 (Dkt. 1611), permitted the jury to choose only between "knowingly" or "recklessly," thus suggesting that "none of the above" was not an option – notwithstanding the PSLRA's mandate that the Court instruct the jury to answer, for each party alleged to have caused loss, "*whether* such person knowingly committed a violation of the securities laws." 15 U.S.C. § 78u-4(f)(3)(A)(iii) (emphasis added). The only rational construction of this statutory requirement is that a separate scienter question is required if requested (as it was here) and that a "none of the above" option must be made available to the jury. That would ensure, as the PSLRA requires, that the jury has considered and come to a conclusion regarding scienter for each alleged fraudulent statement. Indeed, in the verdict forms in several previous securities fraud cases, courts have required the jury to answer either **"yes" or "no"** as to whether a defendant had acted with the required intent, reflecting the commonsense interpretation of the PSLRA. *E.g.*, *In re JDS Uniphase Corp. Sec. Litig.*, No. C-02-1486 (N.D. Cal.) (verdict form); *In re Apollo Group, Inc. Sec. Litig.*, No. CV 04-2147-PHX-JAT (D. Ariz.) (verdict forms); *In re Clarent Corp. Sec. Litig.*, Docket No. 01-CV-3361 (N.D. Cal. 2005) (verdict form). In conjunction with jury instructions that misstated the law on scienter, the failure to require a specific finding on this essential element "seriously affected" the jury's understanding of the scienter requirement, entitling Defendants to a new trial. *Wilk*, 719 F.2d at 218-19.

### 4.  Refusing to Include Arthur Andersen in the Allocation of Responsibility Contravened the PSLRA and Prejudiced Defendants

Plaintiffs' [Corrected] Amended Complaint ("AC") (Dkt. 54) devoted more than 10 pages to a description of how Household's former auditor Arthur Andersen allegedly participated in Defendants' alleged fraud, including allegations that Andersen made false statements with scienter in violation of Section 10(b) and Rule 10b-5. On April 6, 2006 the Court approved Plaintiffs' settlement with Andersen (Dkt. 485), which settled all claims asserted against Andersen in exchange for a payment of $1.5 million. On April 29, 2009 the Court granted Plaintiffs' motion to strike any reference to Andersen from the verdict form question as to allocation of responsibil-

ity. (Dkt. 1601)  Both grounds cited by the Court were erroneous and deprived Schoenholz and Gilmer (who were not found liable for any "knowing" violation of §10(b)) of the statutory reduction in liability that would have resulted from an allocation of responsibility to Andersen.

The Court's conclusion that liability could be allocated only among knowing violators was incorrect.  Under the PSLRA, *all* persons claimed by either party to have caused or contributed to the plaintiffs' loss *must* appear on the verdict form, regardless of that person's state of mind.  When determining responsibility in order to facilitate proportionate liability:

> [T]he court *shall* instruct the jury to answer special interrogatories . . . with respect to each covered person and *each of the other persons claimed by any of the parties to have caused or contributed to the loss incurred by the plaintiff, including persons who have entered into settlements with the plaintiff or plaintiffs*, concerning: (i) whether such person violated the securities laws; (ii) the percentage of responsibility of such person, measured as a percentage of the total fault of all persons who caused or contributed to the loss incurred by the plaintiff; and (iii) whether such person knowingly committed a violation of the securities laws.

15 U.S.C. §78u-4(f)(3)(A) (emphasis added).  The purpose of the statute is to reduce the exposure of any remaining defendants who acted *without* actual knowledge.  Pursuant to the plain language of the PSLRA, the jury should have been allowed to answer the three interrogatories listed in §78u-4(f)(3)(A) with regard to each settling and non-settling defendant in sequential order.  *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 236 F.R.D. 313 (S.D. Tex. 2006), *rev'd on other grounds*, *Regents of Univ. of California* v. *Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372 (5th Cir. 2007), *cert. denied*, *sub nom.*, *Regents of Univ. of California* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 128 S. Ct. 1120 (2008); *see* Hon. Amy J. St. Eve and Bryce C. Pilz, *The Fault Allocation Provisions of the Private Securities Litigation Reform Act of 1995 – A Roadmap for Litigants and Courts*, 3 N.Y.U. J. L. & Bus. 187, 212-24 (2006).  Taken in sequence, consideration of whether a defendant acted knowingly comes only *after* the allocation of responsibility is determined.  By adopting Plaintiffs' erroneous position that apportionment of responsibility is limited only to "reckless" violators, the Court contravened the plain language of the PSLRA.

Moreover, the Court's conclusion that there was no evidence in the record upon which the jury could conclude that Andersen had recklessly violated the securities laws (Dkt. 1601 at 2; Tr. 4332:2-7) overlooks the fact that any evidence that arguably goes to Defendants' scienter regarding Household's restatement of earnings was equally applicable to Andersen.  As demonstrated in Part IV above, Plaintiffs failed to prove scienter in connection with the alleged ac-

counting fraud that supposedly necessitated Household's restatement because the only purported evidence of scienter was the restatement itself. If the Court should nevertheless rule that this purported "evidence" of scienter is sufficient to support a finding of Defendants' liability under Plaintiffs' restatement theory, then it must be deemed sufficient as to Andersen as well.

Trial testimony established without contradiction that Andersen and Household were inextricably intertwined in the preparation of the challenged financial statements and using the allegedly fraudulent method of accounting for credit card contracts. (Tr. 2173:17-25, 2174:1-4, 2174:25-2176:12, 2521:21-2522:5) As Schoenholz testified, Andersen "had done the original audit work of those financial statements and had valid audit opinions [ ] that were in effect for 1999, 2000 and 2001." (Tr. 2174:1-4) Aldinger agreed that "Household's previous accounting treatment was . . . blessed repeatedly over the years by . . . Andersen" and that "[i]n one case, the company even received such a 'blessing' from the senior technical person at Andersen. . . ." (Tr. 3235:12-3236:12 & DX 558) If such evidence can support a jury finding that Defendants acted with scienter in connection with the alleged accounting fraud (which Defendants say it cannot), the same evidence is equally applicable to support a Rule 10b-5 violation by Andersen.

Plaintiffs are judicially estopped from arguing that responsibility may not be apportioned to Andersen. Because of the well-settled rule that a party is bound by what it states in its pleadings, Plaintiffs' complaint operates as a judicial admission that if any fraud was committed, Andersen played a part in it. As this Court has stated:

> Judicial admissions are defined as 'formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them. They may not be controverted at trial or on appeal.' Judicial admissions ultimately remove a fact from being contested.

*Chain* v. *Lake Forest Partners, LLC*, 2008 WL 4831707, at *2 (N.D. Ill. Nov. 3, 2008) (Guzmán, J.) (internal citation omitted); *accord Soo Line R.R. Co.* v. *St. Louis Sw. Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997); *Guise* v. *BWM Mortgage, LLC*, 377 F.3d 795, 800-01 (7th Cir. 2004); *Keller* v. *U.S.*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995). Plaintiffs are thus estopped from contesting the factual statements alleged in their complaint with regard to Andersen's involvement in the alleged fraud. (AC ¶¶ 171, 172, 173, 176, 182, 186, 190)

The denial of Defendants' request to include Andersen in the jury's allocation of responsibility prejudiced Defendants by stripping them of their statutory right to have any final judgment reduced by the greater of the amount of Andersen's settlement or its percentage of respon-

sibility. 15 U.S.C. §78u-4(f)(7)(B); *In re WorldCom, Inc. Sec. Litig.*, 2005 WL 335201, at *12-13 (S.D.N.Y. Feb. 14, 2005).  Without a new trial in which a jury can determine Andersen's percentage of responsibility, any damages phase of this bifurcated trial could not proceed fairly.

## CONCLUSION

For the foregoing reasons, the Court should resolve all claims in Defendants' favor and grant Defendants' Motion for Judgment as a Matter of Law Pursuant to Rule 50(b) because Plaintiffs failed to introduce sufficient evidence for a reasonable jury to find that Defendants committed violations of Section 10(b), Rule 10b-5 or Section 20(a).  In the alternative, because the jury's verdict was irreconcilably inconsistent, numerous judicial errors individually and cumulatively deprived Defendants of a fair trial, and a verdict for Plaintiffs was against the weight of the evidence, the Court should grant Defendants' Motion for New Trial Pursuant to Rule 59.

Dated:  August 3, 2009                          Respectfully submitted,

                                       CAHILL GORDON & REINDEL LLP


                                       By:      /s/ Thomas J. Kavaler
                                                Thomas J. Kavaler
                                                  Bar No. 1269927
                                                Howard G. Sloane
                                                  Bar No. 1197391
                                                Patricia Farren
                                                  Bar No. 1198498
                                                Susan Buckley
                                                  Bar No. 1198696
                                                Landis C. Best
                                                David R. Owen

                                       80 Pine Street
                                       New York, New York  10005
                                       (212) 701-3000

                                                -and-

                                       EIMER STAHL KLEVORN & SOLBERG LLP
                                       224 South Michigan Ave.
                                       Suite 1100
                                       Chicago, Illinois  60604
                                       (312) 660-7600

                                       *Attorneys for Defendants Household*
                                       *International, Inc., William F. Aldinger, David A.*
                                       *Schoenholz, and Gary Gilmer*