# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF ILLINOIS

# EASTERN DIVISION

| | |
|---|---|
| LAWRENCE E. JAFFE PENSION PLAN, On Behalf of Itself and All Others Similarly Situated,<br><br>　　　　　　　Plaintiff,<br><br>　　vs.<br><br>HOUSEHOLD INTERNATIONAL, INC., et al.,<br><br>　　　　　　　Defendants. | Lead Case No. 02-C-5893 (Consolidated)<br><br><u>CLASS ACTION</u><br><br>Judge Ronald A. Guzman<br>Magistrate Judge Nan R. Nolan |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50(b) OR, IN THE ALTERNATIVE, FOR A NEW TRIAL PURSUANT TO RULE 59

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   LEGAL STANDARDS GOVERNING DEFENDANTS' MOTIONS ..............................2

      A.   The Standard for Defendants' Rule 50(b) Motion ...................................2

      B.   The Standard for Defendants' Rule 59 Motion for New Trial................................2

III.  PLAINTIFFS HAVE PROVEN LOSS CAUSATION ......................................................3

      A.   Fischel's Quantification of Inflation Under the Leakage Model Was
           Appropriate and Did Not Include Non-Fraud Declines...........................7

      B.   The Leakage Model Showed a Causal Nexus Between the Fraud and Price
           Decline ...................................................................................10

      C.   Professor Fischel Identified How Household's Stock Was Inflated Due to
           Defendants' 17 False Statements ...........................................................10

      D.   Professor Fischel Did Not Provide a "New" Leakage Model at Trial or
           Improperly Instruct the Jury to "Partially" Implement His Model .......................12

      E.   The Leakage Model Did Not Result in Irrational Verdicts...................................12

IV.   DEFENDANTS' TIME-BAR ARGUMENT IS WITHOUT MERIT .............................12

V.    PLAINTIFFS PROVED MATERIALITY FOR THE FALSE STATEMENTS .............13

VI.   DEFENDANTS CANNOT SHOW THE ABSENCE OF LEGALLY
      SUFFICIENT EVIDENCE ESTABLISHING LIABILITY FOR THE
      RESTATEMENT...................................................................................................13

VII.  PREDATORY LENDING...................................................................................18

      A.   The Court Did Not Commit Error by Finding Defendants' Failure to
           Disclose Household's Predatory Practices Were Actionable ................................18

      B.   The Market Was Not Aware of Household's Widespread Predatory
           Practices ...................................................................................20

      C.   There Is More than Sufficient Evidence to Support the Jury's Verdict as to
           Defendants' Predatory Lending Fraud.................................................................22

VIII. THE EVIDENCE PRESENTED AT TRIAL SUPPORTS THE JURY'S
      VERDICT AS TO HOUSEHOLD'S CREDIT QUALITY CONCEALMENT ...............24

Page

    A.    Defendants Made Materially False and Misleading Statements About Household's Reaging Practices at the 4/9/02 Financial Relations Conference ........................................................................................................... 27

    B.    Plaintiffs Proved Loss Causation for the "Reaging" Statements ........................... 29

    C.    There Is More than Sufficient Evidence to Support the Jury's Verdict as to Defendants' Credit Quality Concealment Fraud ..................................................... 29

IX.    PLAINTIFFS ESTABLISHED THAT DEFENDANT GILMER MADE ACTIONABLE MISSTATEMENTS OR OMISSIONS ................................................... 30

X.    DEFENDANTS CANNOT SHOW THE ABSENCE OF LEGALLY SUFFICIENT EVIDENCE ESTABLISHING §20(a) LIABILITY ................................. 31

XI.    DEFENDANTS' ARGUMENTS REGARDING AN INCONSISTENT VERDICT ARE WITHOUT MERIT ................................................................................ 33

    A.    Defendants Have Waived Any Objection to the Alleged Inconsistent Verdicts ................................................................................................................. 33

    B.    The Jury's Finding of Stock Price Inflation Was Consistent with a Finding of Liability ............................................................................................................. 34

    C.    The Liability Verdicts Are Fully Consistent ........................................................ 34

XII.    THE COURT PROPERLY RULED ON EXPERT TESTIMONY ................................. 36

    A.    The Court's Gatekeeping Function Under FRE 702 Focuses on the Expert's Methodology ........................................................................................... 36

    B.    The Court Properly Admitted the Testimony of Plaintiffs' Expert Catherine Ghiglieri Pursuant to *Daubert* and FRE Rule 702 ............................... 36

    C.    The Court Properly Admitted the Testimony of Charles Cross Pursuant to *Daubert* and FRE 702 ........................................................................................ 38

    D.    Devor's Opinion as to Revenues Derived from Predatory Lending Was Properly Admitted ................................................................................................. 39

    E.    Any Alleged Prejudice Arising From Devor's Testimony Was Cured by the Court's Subsequent Instructions to the Jury .................................................. 41

    F.    The Court Properly Instructed the Jury Regarding Consideration of Expert Testimony ................................................................................................. 42

Page

XIII.    THE COURT'S JUDICIAL RULINGS DO NOT ENTITLE DEFENDANTS TO
         A NEW TRIAL...................................................................................................44

         A.    Defendants Have Not Met the Burden of Proving that Plaintiffs' Reliance
               on Customer Complaints and Complaints in Other Litigation Deprived
               Them of a Fair Trial.................................................................................44

         B.    Defendants Opened the Door to the Admission of Settlement-Related
               Evidence...................................................................................................45

         C.    Defendants' False and Misleading Statements Are Not Puffery ...........................48

         D.    Fischel Did Not Offer Any Opinions that Were Not Included in His Report........49

XIV.     THE COURT'S JURY INSTRUCTIONS AND VERDICT FORM WERE
         PROPER ...........................................................................................................50

         A.    The Court's Jury Instructions Do Not Entitle Defendants to a New Trial.............50

               1.    The Court Properly Instructed the Jury Regarding the Making of a
                     False Statement ..........................................................................50

               2.    There Was No Error in the Court's Instruction Regarding
                     Defendants' Duty to Disclose .......................................................53

               3.    The Court's Scienter Instruction Was Proper ............................................55

               4.    The Court Did Not Misstate the Law in Response to the Jury's
                     Question About Loss Causation.....................................................57

               5.    The Court's Instruction on Damages Was Proper ....................................57

         B.    The Court's Jury Verdict Form Was Correct.........................................................58

               1.    The Court's Use of a General Verdict Form for Plaintiffs' 10b-5
                     Claims Was Appropriate................................................................58

               2.    The Court Did Not Err by Organizing Defendants' False
                     Statements by Document ..............................................................60

               3.    The Verdict Form Reflects the Jury's Finding that Defendants
                     Acted with Scienter......................................................................60

               4.    The Court Properly Excluded Arthur Andersen from the Verdict
                     Form............................................................................................61

**Page**

XV.    CONCLUSION................................................................................................................64

# TABLE OF AUTHORITIES

Page

## CASES

*ABM Marking, Inc. v. Zanasi Fratelli, S.R.L.*,
　353 F.3d 541 (7th Cir. 2003) ........................................................................3

*American Network Leasing Corp. v. Peachtree Bancard Corp.*,
　No. 93-C-3109, 1996 U.S. Dist. LEXIS 11253
　(N.D. Ill. Aug. 2, 1996)..............................................................................64

*Arias v. Allegretti*,
　No. 05-C-5940, 2008 U.S. Dist. LEXIS 4352
　(N.D. Ill. Jan. 22, 2008) .............................................................................37

*Banks v. Yokemick*,
　214 F. Supp. 2d 401 (S.D.N.Y. 2002)................................................62, 63, 64

*Barrie v. Intervoice-Brite, Inc.*,
　409 F.3d 653 (5th Cir. 2005) ................................................................30, 52

*Basic Inc. v. Levinson*,
　485 U.S. 224 (1988)............................................................................13, 28

*Blanchard v. EdgeMark Fin. Corp.*,
　No. 94-C-1890, 1999 WL 59994
　(N.D. Ill. Feb. 3, 1999)...............................................................................60

*Boyd v. Ill. State Police*,
　384 F. 3d 888 (7th Cir. 2004) ....................................................................53

*Bularz v. Prudential Ins. Co.*,
　93 F.3d 372 (7th Cir. 1996) .......................................................................58

*Bullock v. Sheahan*,
　519 F. Supp. 2d 760 (N.D. Ill. 2007) ..........................................................36

*Carter v. Chi. Transit Authority*,
　No. 99-C-7738, 2001 U.S. Dist. LEXIS 14052
　(N.D. Ill. Sept. 6, 2001) .......................................................................53, 59

*Caviness v. DeRand Res. Corp.*,
　983 F.2d 1295 (4th Cir. 1993) ...................................................................54

*Chu v. Sabratek Corp.*,
　100 F. Supp. 2d 815 (N.D. Ill. 2000) ....................................................14, 24

**Page**

*CIVIX-DDI, LLC v. Cellco P'ship*,
    387 F. Supp. 2d 869 (N.D. Ill. 2005) ...............................................................9

*Cruz v. Town of Cicero*,
    275 F.3d 579 (7th Cir. 2001) ...............................................................58, 59

*Dabertin v. HCR Manor Care, Inc.*,
    68 F. Supp. 2d 998 (N.D. Ill. 1999) ...............................................................63

*Davis v. USN Communs., Inc.*,
    73 F. Supp. 2d 923 (N.D. Ill. 1999) ...............................................................5

*Diarama Trading Co. v. J. Walter Thompson U.S.A.*,
    No. 01-CIV.-2950 (DAB), 2005 U.S. Dist. LEXIS 19496
    (S.D.N.Y. Sept. 6, 2005) ...............................................................63

*DiLeo v. Ernst & Young*,
    901 F.2d 624 (7th Cir. 1990) ...............................................................26

*Drago v. Aetna Plywood, Inc.*,
    No. 96 C 2398, 1998 U.S. Dist. LEXIS 12249
    (N.D. Cal. July 31, 1998) ...............................................................38

*Drebing v. Provo Group, Inc.*,
    519 F. Supp. 2d 811 (N.D. Ill. 2007) ...............................................................37

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ............................................................... *passim*

*Elcock v. K-Mart Corp.*,
    233 F.3d 734 (3d Cir. 2000) ...............................................................40, 41

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976) ...............................................................55

*Estate of Kluener v. C.I.R*,
    154 F.3d 630 (6th Cir. 1998) ...............................................................57, 58

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
    270 F.3d 645 (8th Cir. 2001) ...............................................................56

*Fogarazzo v. Lehman Bros., Inc.*,
    No. 03 Civ. 5194, 2004 WL 1151542
    (S.D.N.Y. May 21, 2004) ...............................................................5

**Page**

*Fort Howard Paper Co. v. Standard Havens, Inc.*,
    901 F.2d 1373 (7th Cir. 1990) ...................................................................2

*Fox v. Hayes*,
    No. 04 C 7309, 2008 U.S. Dist. LEXIS 75801
    (N.D. Ill. Sept. 25, 2008) ...........................................................................33

*Frymire-Brinati v. KPMG Peat Marwick*,
    2 F.3d 183 (7th Cir. 1993) .........................................................................58

*Gallagher v. Abbot Laboratories*,
    269 F.3d 806 (7th Cir. 2001) .....................................................................31

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)................................................................20, 22

*Gile v. United Airlines, Inc.*,
    213 F.3d 365 (7th Cir. 2000) .......................................................................2

*Gilford Partners L.P. v. Sensormatic Electronics Corp.*,
    No. 96 C 4072, 1997 WL 757495
    (N.D. Ill. Nov. 24, 1997).............................................................................14

*Gooden v. Neal*,
    17 F.3d 925 (7th Cir. 1994) ..................................................................19, 32

*Griffin v. Foley*,
    542 F.3d 209 (7th Cir. 2008) .....................................................................48

*Hardnick v. United States*,
    No. 07-C-1330, 2009 U.S. Dist. LEXIS 53739
    (N.D. Ill. June 25, 2009) ............................................................................42

*Harrison v. Dean Witter Reynolds, Inc.*,
    974 F.2d 873 (7th Cir. 1992) .....................................................................32

*Harvey v. Office of Banks and Real Estate*,
    377 F.3d 698 (7th Cir. 2004) .....................................................................34

*In re Acceptance Ins. Co. Sec. Litig.*,
    352 F. Supp. 2d 940 (D. Neb. 2004).........................................................39

*In re Affiliated Computer Servs. Deri. Litig.*,
    540 F. Supp. 2d 695 (N.D. Tex. 2007) ......................................................54

Page

*In re Allscripts, Inc. Sec. Litig.*,
No. 00 C 6796, 2001 WL 743411
(N.D. Ill. June 29, 2001) ..................................................................................27

*In re Anicom Sec. Litig.*,
No. 00 C4391, 2001 U.S. Dist. LEXIS 6607
(N.D. Ill. May 18, 2001) ...................................................................................14

*In re Cabletron Systems, Inc.*,
311 F.3d 11 (1st Cir. 2002) ...............................................................................14

*In re Cendant Corp. Litig.*,
264 F.3d 201 (3rd Cir. 2001) ............................................................................11

*In re Comshare Inc. Sec. Litig.*,
183 F.3d 542 (6th Cir. 1999) ............................................................................14

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) .......................................................19, 21

*In re Discovery Zone Sec. Litig.*,
943 F. Supp. 924 (N.D. Ill. 1996) ....................................................................14

*In re Enron Corp. Secs., Derivative & ERISA Litig.*,
No. H-01-3624, 2003 U.S. Dist. LEXIS 1668
(S.D. Tex. Jan. 28, 2003) ......................................................................16, 20, 24

*In re Enron Corp. Secs. Derivative & ERISA Litig.*,
236 F.R.D. 313 (S.D. Tex. 2006) ................................................................61, 62

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
No. 07-4017-cv-L, 2009 U.S. App. LEXIS 16080
(2d Cir. July 22, 2009) ...............................................................................5, 10

*In re Ford Motor Co. Sec.Litig.*,
381 F.3d 563 (6th Cir. 2004) ............................................................................31

*In re Initial Public Offering Secs. Litig.*,
241 F. Supp. 2d 281 (S.D.N.Y. 2003).............................................................60

*In re James Wilson Assoc.*,
965 F.2d 160 (7th Cir. 1992) ............................................................................43

**Page**

*In re JP Morgan Chase & Co. Sec. Litig.*,
    2007 U.S. Dist. LEXIS 93877
    (N.D. Ill. Dec. 18, 2007) ...................................................................16, 24, 31

*In re Lake States Commodities, Inc.*,
    271 B.R. 575 (Bankr. N.D. Ill. 2002) ...........................................................43

*In re Metawave Commc'ns Corp. Sec. Litig.*,
    298 F. Supp. 2d 1056 (W.D. Wash. 2003) ...................................................16

*In re MicroStrategy, Inc. Sec. Litig.*,
    115 F. Supp. 2d 620 (E.D. Va. 2000) ...........................................................14

*In re Motorola Sec. Litig.*,
    505 F. Supp. 2d 501 (N.D. Ill. 2007) .............................................................5

*In re MTBE Product Liability Litig.*,
    379 F. Supp. 2d 348 (S.D.N.Y. 2005)...........................................................63

*In re NTL Sec. Litig.*,
    No. 02 Civ. 3013, 2006 WL 330113
    (S.D.N.Y. Feb. 14, 2006) ...............................................................................5

*In re Par Pharm., Inc. Sec. Litig.*,
    733 F. Supp. 668 (S.D.N.Y. 1990) ...............................................................20

*In re Parmalat Sec. Litig.*,
    477 F. Supp. 2d 637 (S.D.N.Y. 2007)...........................................................37

*In re Providian Fin. Corp. Sec. Litig.*,
    152 F. Supp. 2d 814 (E.D. Pa. 2001) .......................................................18, 20

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2nd Cir. 2001)...........................................................................56

*In re Sotheby's Holdings, Inc. Sec. Litig.*, 00 CIV. 1041 (DLC),
    2000 U.S. Dist. LEXIS 12504
    (S.D.N.Y. Aug. 31, 2000) .............................................................................20

*In re Van Der Moolen Holding N.V. Sec. Litig.*,
    405 F. Supp. 2d 388 (S.D.N.Y. 2005)...........................................................20

*In re Wellcare Mgmt. Group Sec. Litig.*,
    964 F. Supp. 632 (N.D.N.Y. 1997)................................................................16

**Page**

*In re Williams Sec. Litig.-WCG Subclass*,
    558 F.3d 1130 (10th Cir. 2009) ........................................................5, 9

*In re Worldcom, Inc. Sec. Litig.*,
    388 F. Supp. 2d 319 (S.D.N.Y. 2005)............................................5, 9

*Indiana Bell Tel. Co. v. Ward*,
    No. 02-0170-C-H/K, 2005 U.S. Dist. LEXIS 12939
    (S.D. Ind. June 24, 2005) .....................................................................33

*Irvine v. Murad Skin Research Labs Inc.*,
    194 F.3d 313 (1st Cir. 1999)................................................................41

*Jackson v. Bunge Corp.*,
    40 F.3d 239 (7th Cir. 1994) ...................................................................3

*Jones v. Lincoln Elec. Co.*,
    188 F.3d 709 (7th Cir. 1999) ...............................................................44

*Joseph v. Brierton*,
    739 F.2d 1244 (7th Cir. 1984) .............................................................42

*Kansas v. Marsh*,
    548 U.S. 163 (2006)..............................................................................34

*Keller v. United States*,
    58 F.3d 1194 (7th Cir. 1995) ...............................................................64

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999)..............................................................................36

*Kushner v. Beverly Enters., Inc.*,
    No. 4:98CV646, 2001 U.S. Dist. LEXIS 24979
    (E.D. Ark. Oct. 18, 2001),
    *aff'd*, 317 F.3d 820 (8th Cir. 2003)....................................................31

*Laperriere v. Vesta Ins. Group, Inc.*,
    526 F.3d 715 (11th Cir. 2008) .............................................................32

*Latino v. Kaizer*,
    58 F.3d 310 (7th Cir. 1995) ...................................................................3

*Lattanzio v. Deloitte & Touche LLP*,
    476 F.3d 147 (2d Cir. 2007).................................................................54

**Page**

*Lerch v. Angell*,
   No. 06-C-454, 2007 U.S. Dist. LEXIS 69333
   (E.D. Wis. Sept. 17, 2007) ...........................................................................63

*Loeffel Steel Products, Inc. v. Delta Brands, Inc.*,
   387 F. Supp. 2d 795 (N.D. Ill. 2005) ............................................................43

*Love v. Lerch*,
   No. 88 C 8006, 1993 U.S. Dist. LEXIS 185
   (N.D. Ill. Jan. 12, 1993) ...............................................................................44

*Mack v. Great Dane Trailers*,
   308 F.3d 776 (7th Cir. 2002) ........................................................................16

*Maresca v. Mancall*,
   No. 04-3103, 135 Fed. App'x 529, 2005 U.S. App. LEXIS 11493
   (3d Cir. June 16, 2005) .................................................................................63

*McCloud v. Goodyear Dunlop Tires N. Am., Ltd.*,
   No. 04-cv-1118, 2008 U.S. Dist. LEXIS 43265
   (C.D. Ill. June 2, 2008) ....................................................................36, 42, 48

*McEwan v. Digitron Sys.*,
   160 F.R.D. 631 (D. Utah 1994) .....................................................................11

*McKinnon v. Berwyn*,
   750 F.2d 1383 (7th Cir. 1984) ......................................................................35

*Mesman v. Crane Pro Services*,
   512 F.3d 353 (7th Cir. 2008) ........................................................................55

*Mid-West Underground Storage, Inc. v. Porter*,
   717 F.2d 493 (10th Cir. 1983) ......................................................................16

*Mike's Train House, Inc. v. Lionel, L.L.C.*,
   472 F.3d 398 (6th Cir. 2006) ........................................................................37

*Miksis v. Howard*,
   106 F.3d 754 (7th Cir. 1997) ........................................................................36

*Miley v. Oppenheimer & Co.*,
   637 F.2d 318 (5th Cir. 1981) ..................................................................58, 59

*Nathenson v. Zonagen Inc.*,
   267 F.3d 400 (5th Cir. 2001) ........................................................................11

**Page**

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v.*
    *America West Holding Corp.*, 320 F.3d 920 (9th Cir. 2003)..............................................22

*Ong v. Sears, Roebuck & Co.*,
    No. 03-C-4142, 2005 U.S. Dist. LEXIS 20391
    (N.D. Ill. Sept. 14, 2005) ...............................................56

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000)...............................................18

*Oto v. Metropolitan Life Ins. Co.*,
    224 F.3d 601 (7th Cir. 2000) ...............................................36, 48

*Partington v. Broyhill Furniture Indus., Inc.*,
    999 F.2d 269 (7th Cir. 1993) ...............................................16

*Petersen v. Gibson*,
    No. 97-C-4123, 2002 U.S. Dist. LEXIS 133
    (N.D. Ill. Jan. 7, 2002) ...............................................35

*PR Diamonds, Inc. v. Chandler*,
    364 F.3d 671 (6th Cir. 2004) ...............................................56

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996) ...............................................14

*Pugh v. Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008) ...............................................51

*Ray v. Citigroup Global Mkts.*,
    482 F.3d 991 (7th Cir. 2007) ...............................................4

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000)...............................................2, 23

*Retsky Family Ltd. Partners v. Pricewaterhouse LLP*,
    No. 97-7694, 1998 WL 774678
    (N.D. Ill. Oct. 21, 1998)...............................................5

*Richman v. Sheahan*,
    415 F. Supp. 2d 929 (N.D. Ill. 2006) ...............................................39

*Robin v. Arthur Young & Co.*,
    915 F.2d 1120 (7th Cir. 1990) ...............................................55

**Page**

*Rowe v. Maremont Corp.,*
850 F.2d 1226 (7th Cir. 1988) .................................................................28, 55

*Sadowski v. Bombardier, Ltd.,*
539 F.2d 615 (7th Cir. 1976) .........................................................................58

*Salgado by Salgado v. General Motors,*
150 F.3d 735 (7th Cir. 1998) .........................................................................49

*Schleicher v. Wendt,*
529 F. Supp. 2d 959 (S.D. Ind. 2007) ...........................................................24

*Schobert v. Ill. Dept. of Transp.,*
304 F.3d 725 (7th Cir. 2002) .........................................................................32

*Searls v. Glasser,*
64 F.3d 1061 (7th Cir. 1995) .........................................................................55

*Sears, Roebuck and Co. v. Savoy Reinsurance Co., Ltd.,*
No. 90-C-1202, 1991 WL 247583
(N.D. Ill. Nov. 8, 1991)..................................................................................43

*SEC v. Caserta,*
75 F. Supp. 2d 79 (E.D.N.Y. 1999) ...............................................................17

*SEC v. Goldfield Deep Mines Co.,*
758 F.2d 459 (9th Cir. 1985) .........................................................................17

*SEC v. Jakubowski,*
150 F.3d 675 (7th Cir. 1998) .........................................................................55

*SEC v. Michel,*
521 F. Supp. 2d 795 (N.D. Ill. 2007) .............................................................23

*SEC v. Murphy,*
626 F.2d 633 (9th Cir. 1980) .........................................................................13

*SEC v. Systems Software Assocs., Inc.,*
145 F. Supp. 2d 954 (N.D. Ill. 2001) .............................................................14

*Sierra Club Lone Star Chapter v. Cedar Point Oil Co.,*
73 F.3d 546 (5th Cir. 1996) ...........................................................................49

*Silverman v. Motorola, Inc.,*
No. 97 C 4507, 2008 WL 4360648
(N.D. Ill. Sept. 23, 2008) ...............................................................................48

**Page**

*Smith v. Biomet, Inc.*,
    384 F. Supp. 2d 1241 (N.D. Ind. 2005) ...........................................................59

*Smith v. Ford Motor Co.*,
    215 F.3d 713 (7th Cir. 2000) ...................................................................36, 37

*Spina v. Forest Pres. Dist.*,
    207 F. Supp. 2d 764 (N.D. Ill. 2002) ...............................................................44

*Steiner v. MedQuist Inc.*,
    No. 04-5487 (JBS), 2006 U.S. Dist. LEXIS 71952
    (D.N.J. Sept. 29, 2006) .........................................................................18, 20

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148, 128 S. Ct. 761 (2008)....................................................50, 51, 52

*Stransky v. Cummins Engine Co.*,
    51 F.3d 1329 (7th Cir. 1995) ...................................................................28, 54

*Strauss v. Stratojac Corp.*,
    810 F.2d 679 (7th Cir. 1987) .............................................................12, 33, 35

*Sundstrand Corp. v. Sun Chem. Corp.*,
    553 F.2d 1033 (7th Cir. 1977) .......................................................................55

*Swack v. Credit Suisse First Boston*,
    383 F. Supp. 2d 223 (D. Mass. 2004) ................................................................5

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308, 127 S. Ct. 2499 (2007)....................................................... *passim*

*TIG Ins. Co. v. Giffin, Winning, Cohen & Bodewes, P.C.*,
    No. 00 C 2737, 2002 WL 31870528
    (N.D. Ill. Dec. 20, 2002) ..............................................................................63

*Traharne v. Wayne Scott Fetzer Co.*,
    156 F. Supp. 2d 717 (N.D. Ill. 2001) ...............................................................36

*Trs. of E. Cent. Ill. Pipe Trades Health & Welfare Fund v.*
    *Airport Plumbing & Heating Inc.*,
    No. 04-1059, 2006 U.S. Dist. LEXIS 787
    (C.D. Ill. Jan. 5, 2006) .................................................................................39

*TSC Indus. v. Northway, Inc.*,
    326 U.S. 438 (1976)..............................................................................13, 28

**Page**

*Turyna v. Martam Construction Co.*,
    83 F.3d 178 (7th Cir. 1996) ........................................................................33

*U.S. v. Wynn*,
    845 F.2d 1439 (7th Cir. 1988) ...............................................................18, 46

*United States v. Anifowoshe*,
    307 F.3d 643 (7th Cir. 2002) .................................................................45, 47

*United States v. Battista*,
    646 F.2d 237 (6th Cir. 1981) .......................................................................24

*United States v. Erickson*,
    601 F.2d 296 (7th Cir. 1979) .......................................................................17

*United States v. Lee*,
    558 F.3d 638 (7th Cir. 2009) .......................................................................43

*United States v. Powell*,
    469 U.S. 57 (1984).......................................................................................16

*United States v. Tran Trong Cuong*,
    18 F.3d 1132 (4th Cir. 1994) .......................................................................37

*Wakeen Doll Co., Inc. v. Ashton Drake Galleries*,
    272 F.3d 441 (7th Cir. 2001) ................................................................ *passim*

*Will v. Comprehensive Accounting Corp.*,
    776 F.2d 665 (7th Cir. 1985) .......................................................................33

*Wilson v. Groaning*,
    25 F.3d 581 (7th Cir. 1994) .........................................................................42

*Wilson v. Williams*,
    182 F.3d 562 (7th Cir. 1999) .......................................................................36

*Wilson v. Williams*,
    83 F.3d 870 (7th Cir. 1996) .............................................................3, 5, 9, 10

*Zimmerman v. Chicago Board of Trade*,
    360 F.3d 612 (7th Cir. 2004) ...............................................................2, 20, 23

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §78j(b)............................................................................................... *passim*

Page

§78t(a) ............................................................................................................. 31-33, 50, 51
§78u-4(f)(3)(A) ............................................................................................................33

Federal Rules of Civil Procedure
Rule 26 ..........................................................................................................9, 18, 49
Rule 49 ..................................................................................................................59
Rule 49(b) ............................................................................................................33
Rule 50 ..................................................................................................................2
Rule 50(a) ..............................................................................................12, 19, 24, 32
Rule 50(b) ........................................................................................................2, 16
Rule 59 ............................................................................................................2, 48
Rule 59(a) ..............................................................................................................2

Federal Rules of Evidence
Rule 103(a) ..........................................................................................................36
Rule 403 ..............................................................................................................47
Rule 408 ..............................................................................................................45
Rule 702 ....................................................................................................36, 38, 42
Rule 703 ....................................................................................................36, 39, 40
Rule 803(8) ..........................................................................................................44

17 C.F.R.
§240.10b-5 ....................................................................................................... *passim*

## SECONDARY AUTHORITIES

40 *Quarterly Journal of Business & Economics* (2001) ................................................7

Bradford Cornell & R. Gregory Morgan,
*Using Finance Theory to Measure Damages
in Fraud on the Market Cases* (1990)
37 UCLA L. Rev. 883 ..................................................................................................4, 7

C. Wright & A. Miller,
*Federal Practice and Procedure* (1995)
§2524 ..................................................................................................................2

Charles Alan Wright, Arthur R. Miller,
*Moore's Federal Practice & Procedure*
§49.03(1) ........................................................................................................58, 59

Madge S. Thorsen, *et al*.,
*Rediscovering the Economics of Loss Causation* (April 2006)
6 J. of Bus. & Sec. L. 93 ................................................................................................6

**Page**

*Restatement (Second) of Torts*
  §548A cmt.b (1977). ................................................................................................5

Sanjai Bhagat and Roberta Romano,
  *Event Studies and the Law: Part II: Empirical*
   *Studies of Corporate Law*,
  4 Am. L. and Econ. Rev. 380 (2001) ....................................................................6

Seventh Circuit Pattern Instruction No. 1.09.  *Federal Civil Jury Instructions of the*
  *Seventh Circuit* ....................................................................................................43

## I.     INTRODUCTION

After nine days of pre-trial hearings and 24 days of trial, the jury returned a verdict finding defendants liable for securities fraud and determined the per-share damages on a daily basis throughout the Relevant Period, 7/30/99-10/11/02 ("RP").  During the trial, defendants and their counsel made a series of tactical decisions that backfired and made strategic decisions not to object to certain evidence and testimony.  Now, having lost, defendants seek a second bite at the apple. Unfortunately for defendants, trial is not a preseason game, where they can try different approaches, see how it goes, and adapt for the regular season.  They lost fair and square, and the issues they raise on these motions utterly fail to reach the standards required to obtain a new trial or judgment as a matter of law.

Defendants assert that Professor Fischel's testimony, which was apparently adopted by the jury, is based on a legally defective model.  However, it was defendants' counsel who vouched for Professor Fischel at trial – telling the jurors that Fischel was "The Man" of securities damages and that he "wrote the book" on these issues.  Defendants can hardly claim at this stage that the jurors should have rejected that testimony.  Defendants made a strategic decision to make love, not war as to Fischel, and it backfired.

Defendants claim that there was insufficient evidence for the jurors to return a verdict for the plaintiffs on the restatement issues.  As set forth below, there was plenty of evidence adduced by plaintiffs in support of this claim.  It was defendants who made the odd choice to not call their accounting expert, the audit partners from Arthur Andersen or KPMG, or even the internal Household accountants to give their side of the story.  Their strategic decision left the jurors with little choice, but to render a decision for plaintiffs.

Defendants won a motion *in limine* to exclude certain evidence regarding their settlement with the Attorneys General.  Inexplicably, defendants thereafter opened the door to the admission of that evidence.  Their decision blew up in their faces, and now they attempt to distort the record and blame plaintiffs and the Court for their silly stratagem.

Defendants attempt to manufacture errors in the verdict, verdict form, jury instructions and certain evidentiary rulings, ignoring the stringent legal requirements that they must meet to obtain a new trial or judgment as a matter of law based on their factually and legally unsound arguments. Defendants also try to rehash and renew their failed arguments regarding the statute of repose, puffery and the Court's pre-trial *Daubert* rulings.  Again, defendants are flat-out wrong in their analyses.

- 1 -

As set forth below, defendants are not entitled to a new trial or judgment as a matter of law. Defendants' curious decisions at times almost made it seem as if they knew that a jury of their peers would find that they were liable and that they preferred to try their case in the Seventh Circuit Court of Appeals. Since their motions are meritless, plaintiffs respectfully ask that this Court deny the motions in their entirety and send defendants packing toward their inevitable appeal.

## II.     LEGAL STANDARDS GOVERNING DEFENDANTS' MOTIONS

### A.      The Standard for Defendants' Rule 50(b) Motion

The Seventh Circuit has explained that a party seeking to overturn a jury verdict "assumes a Herculean burden." *Gile v. United Airlines, Inc.*, 213 F.3d 365, 372 (7th Cir. 2000). The motion "should be granted cautiously and sparingly" because it "deprives the party opposing the motion of a determination of the facts by a jury." 9A C. Wright & A. Miller, *Federal Practice and Procedure*, §2524, at 252 (1995). "Judgment as a matter of law is proper only where there is no legally sufficient basis for a reasonable jury to find for the nonmoving party." *Zimmerman v. Chicago Board of Trade*, 360 F.3d 612, 623 (7th Cir. 2004); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000). "[T]he court is required to view the evidence in the light most favorable to the nonmoving party, and must draw all reasonable inferences in that party's favor." *Zimmerman*, 360 F.3d at 623 (citing, *inter alia*, *Reeves*, 530 U.S. at 150-51). "We may not weigh the evidence or pass on the credibility of witnesses, nor may we substitute our view of the contested evidence for the jury's." *Zimmerman*, 360 F.3d at 623 (citing, *inter alia*, *Reeves*, 530 U.S. at 150).

By this standard, defendants' Rule 50 motion is without merit.

### B.      The Standard for Defendants' Rule 59 Motion for New Trial

Under Rule 59(a), defendants bear the burden of demonstrating their entitlement to a new trial. "'Rule 59(a) is not merely intended to secure a forum for the relitigation of old matters or to afford the parties the opportunity to present the case under new theories; instead, the motion is a device properly used to correct manifest errors of law or fact or to present newly discovered evidence.'" *Fort Howard Paper Co. v. Standard Havens, Inc.*, 901 F.2d 1373, 1380 n.4 (7th Cir. 1990).[1]

A new trial should be granted "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our

---

[1]      Here, as elsewhere, unless otherwise noted, citations are omitted and emphasis is added.

conscience." *Latino v. Kaizer*, 58 F.3d 310, 315 (7th Cir. 1995); *see also ABM Marking, Inc. v. Zanasi Fratelli, S.R.L.*, 353 F.3d 541, 545 (7th Cir. 2003). Thus, the Court will not set aside a jury verdict as long as a reasonable basis exists in the record to support the verdict. *Jackson v. Bunge Corp.*, 40 F.3d 239, 244 (7th Cir. 1994).

In determining whether a jury instruction can be fairly characterized as a "miscarriage of justice" sufficient to warrant a new trial, the Seventh Circuit has provided the following guidance:

> In this review we avoid fastidiousness and inquire only whether the correct message was conveyed to the jury reasonably well. We will reverse only if it appears that "the jury was misled . . . [and its] understanding of the issue was seriously affected to the prejudice of the complaining party."

*Wilson v. Williams*, 83 F.3d 870, 874 (7th Cir. 1996).

In this trial, far from being a miscarriage of justice, the jury rationally concluded from all the evidence that defendants were liable for certain alleged false statements. This is not a situation where the jury rendered a factually inconsistent verdict. Here, the jury's answers on the verdict form are completely consistent. Moreover, the jury was correctly instructed on the law on every issue.

## III.    PLAINTIFFS HAVE PROVEN LOSS CAUSATION

Defendants argue that plaintiffs have failed to prove loss causation. Yet, plaintiffs showed loss causation by establishing a causal connection between defendants' false statements and the loss suffered. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005). *See also* Dkt. 1527 (Fischel *Daubert* Order). Professor Fischel used an event study and regression analysis to analyze the disclosures of Household's fraud and to quantify the inflation in Household's stock price during the RP, due to defendants' misrepresentations and omissions. *Daubert* Order at 1-2; Trial Transcript ("Tr.") 2680:17-2681:6. Professor Fischel properly assumed that inflation would exist on the first day the jury found a false statement (3/23/01) (Tr. 2921:10-2922:9; 2870:24-2871:2), and the 16 subsequent false statements maintained that inflation until partial disclosures of the truth dissipated the inflation. Throughout their motion, defendants improperly claim that inflation is measured by Household's stock price reaction on the date of the false statement when in fact inflation is measured by the stock price reaction when the truth is disclosed. Tr. 2965:7-17; 2849:21-2850:19. In quantifying inflation, Professor Fischel used two models. Professor Fischel's "Specific Disclosures" model only included 14 fraud related disclosures that were "statistically significant," which amounted to up to $7.97 of inflation per share for each day of the RP. However, Professor Fischel opined that this approach did not capture ***other*** relevant disclosures of the fraud – a "cascade of negative information that came

out about Household" according to Fischel. Tr. 2671:14-2672:15; 2675:21-2676:8. The specific disclosures model underestimated inflation per share since Household vastly underperformed the market and its peer group during the disclosure period of 11/15/01-10/11/02 – declining 53% while its peers declined approximately 20%. Tr. 2677:11-2678:10. Market participants attributed this underperformance to the truth slowly leaking out about Household's predatory lending, reaging criticisms, and Household's restatement of its prior financial results and ***not*** to any non-fraud company specific reason or any other non-fraud related reasons. Tr. 2671:19-2672:15; *see also* Fischel Report, ¶¶28, 39-40.[2] Defendants failed to adduce any evidence that Household's stock price declines were due to a non-fraud company specific reason. In fact, a Household internal e-mail (Plaintiffs' Ex. ("PX")[3] 1156) attributed a $20 decline in Household's stock price during 5/02-8/02 to gradual leakage of the Washington DFI report (PX 290). Professor Fischel testified that a leakage model was a more appropriate means to properly quantify inflation since, despite defendants' denials, there was clear evidence of continuous leakage of the truth from 11/15/01-10/11/02. Tr. 2855:13-23. In fact, the leakage theory is appropriate to address situations "in which fraud was revealed slowly over time, including one in which 'a slow flow of increasingly negative news fueled a rising tide of doubts and rumors' with the result that 'only a few dramatic announcements were associated with [statistically significant declines]'" and using residual price changes in those cases "'only on disclosure days will understate damages.'" Fischel Report, ¶38 (quoting Bradford Cornell & R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. Rev. 883, 905-06 (1990)); *see* Tr. 4273:7-10 (leakage theory accepted in the field).

The use of a leakage theory to establish loss causation does not run afoul of *Dura* or Seventh Circuit precedent. As the *Ray* court indicated, *Dura* did not change the standard for pleading or proving loss causation in the Seventh Circuit: that is, the defendants' alleged misrepresentation artificially inflated the stock price and the value of the stock declined once the market learned of the deception. *Ray v. Citigroup Global Mkts.*, 482 F.3d 991, 995 (7th Cir. 2007). Although "[l]oss causation is easiest to show when a corrective disclosure reveals the fraud to the public as the price subsequently drops . . . . *Dura* did not suggest that this was the only or even the preferred method of showing loss causation, though; it acknowledged that the relevant truth can 'leak out,' *Dura*, 544

---

[2]     Attached to Dkt. 1416-2.

[3]     For the Court's convenience, all trial exhibits and trial transcript references are attached in separate appendices, filed herewith.

U.S. at 342, which would argue against a strict rule requiring revelation by a single disclosure." *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1137 (10th Cir. 2009). The Tenth Circuit in *Williams* found that the leakage theory *per se* did not run afoul of *Dura* so long as there was evidence of leakage and "some mechanism for [disclosing] how the truth was revealed." *Id.* at 1138 (citing *In re Worldcom, Inc. Sec. Litig.*, 388 F. Supp. 319, 346-47 (S.D.N.Y. 2005)). In *Flag*, the Second Circuit agreed that a "leakage theory" was viable post-*Dura* but simply found no evidence of leakage. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 07-4017-cv-L, 2009 U.S. App. LEXIS 16080, at \*31-\*32 n.5 (2d Cir. July 22, 2009). These decisions are not surprising since *Dura* held that one way to prove loss causation is to show the "relevant truth" about the "financial condition of a corporation" previously misrepresented or concealed became "generally known" and corrected the stock price. *Dura*, 544 U.S. at 342-44 (quoting *Restatement (Second) of Torts* §548A cmt.b (1977)).

A number of other trial courts pre- and post-*Dura* have accepted the leakage theory for loss causation. *See In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 543 (N.D. Ill. 2007); *Davis v. USN Communs., Inc.*, 73 F. Supp. 2d 923, 943 (N.D. Ill. 1999) ("the market responded to and 'corrected' the price of USN stock over the better part of a year as bits and pieces of negative information became available"); *Retsky Family Ltd. Partners v. Pricewaterhouse LLP*, No. 97-7694, 1998 WL 774678 (N.D. Ill. Oct. 21, 1998); *Swack v. Credit Suisse First Boston*, 383 F. Supp. 2d 223 (D. Mass. 2004) (market learned the truth gradually); *Fogarazzo v. Lehman Bros., Inc.*, No. 03 Civ. 5194, 2004 WL 1151542, at \*11-\*13 (S.D.N.Y. May 21, 2004) ("plaintiffs have alleged a number of events that operated, essentially, as disclosures of market corrections"); *In re NTL Sec. Litig.*, No. 02 Civ. 3013, 2006 WL 330113, at \*1 (S.D.N.Y. Feb. 14, 2006) ("[t]he Court finds that the class complaint adequately alleges that certain negative information . . . leaked out during the class period").

Contrary to *Williams* or *Flag*, plaintiffs' expert did not "assume" leakage. Rather, there was clear and undisputed evidence of leakage in this case that caused the stock price decline. For example, although the defendants previously denied any systemic predatory lending issues and sought and obtained a court order sealing its publication, news of the Washington DFI Report finding that Household was engaged in systemic nationwide predatory lending practices leaked into the market along with other information about Household's predatory lending practices in the summer of 2002. Tr. 2671:14-2674:15; PX 1429. Even defendants' expert Bajaj conceded that there was leakage of the contents of the Washington DFI Report. Tr. 4267:19-25; Bajaj Report at

57.[4]  In fact, defendants internally blamed the continuous leakage of the Washington DFI report as the reason for Household's $20 stock price decline between 5/02-8/02.  *See* PX 1156.

There was also evidence that information leaked to the market that Household would have to pay a huge fine and restitution of up to $500 million to a number of states Attorneys General and discontinue its predatory lending practices, which would reduce future earnings growth.  Analysts reduced their estimates of Household's future earnings growth as this and other information continued to leak into the market which contributed to Household's stock price decline.  Tr. 2671:14-2674:15.  Evidence of leakage was included in Household internal documents, PX 1486 (timeline) and investor relations reports (PXs 820; 198; and 199), that discussed Household's stock price declines due to analyst and media reports questioning Household's predatory lending practices in light of rumors about the Washington DFI report, Household's reaging practices, and the restatement.  Another example was the *American Banker* article dated May 31, 2002 (PX 1446), which discussed Wall Street analysts analyzing Household's denials of widespread predatory lending and it being limited to Bellingham, Washington, and stating that it could be a big problem if it were widespread.  Tr. 2839:2-2840:17.  In addition, a 4/10/02 Legg Mason report stated that Household's reaging policies discussed in the 2001 10-K and 4/9/02 FRC "overstate reported EPS [earnings per share]."  PX 140 at HHS01942923.  Furthermore, two CFRA analyst reports issued in the summer of 2002 also concluded that Household's prior disclosures on reaging were highly misleading.  PX 515, Fischel Report Exs. 41, 42; Tr. 2840:18-2841:11; 2845:7-18; 2842:15-2843:2.

In his testimony, defendants' expert Bajaj did not criticize any particular aspect of Fischel's adoption of the Cornell and Morgan leakage approach, or provide any alternative quantification of leakage.  Rather, Bajaj offered an unsupported and conclusory opinion that the leakage model is "not a recognized method."  Tr. 4150:4-10.  Yet, the Cornell & Morgan approach is accepted in the field.  *See* Sanjai Bhagat and Roberta Romano, *Event Studies and the Law: Part II: Empirical Studies of Corporate Law*, 4 Am. L. and Econ. Rev. 380, at 14-15 (2001) ("[i]t is therefore safe to conclude that with regard to securities litigation, the methodology's appropriateness for valuation issues is a settled part of the landscape"); *see also* Madge S. Thorsen, *et al.*, *Rediscovering the Economics of Loss Causation*, 6 J. of Bus. & Sec. L. 93 at 12 n.49 (April 2006) (citing Cornell & Morgan at 905-06 and other articles supporting leakage and Cornell & Morgan approach); *see also* Dkt. 1527 at 2-3.

---

[4]        Attached to Dkt. 1416-6-7.

A.    **Fischel's Quantification of Inflation Under the Leakage Model Was Appropriate and Did Not Include Non-Fraud Declines**

Professor Fischel's quantification of inflation under the leakage model was proper under *Dura's* mandate because he excluded non-fraud declines. Professor Fischel identified corrective disclosures from 11/14/01-10/11/02 that revealed the truth through the use of an event study. Dkt. 1527; Tr. 2627:11-2628:11; 2671:14-2672:15; 2680:17-2681:6. Fischel then used a regression analysis to remove any industry or market declines in Household's stock price. Tr. 2681:1-6; 2682:3-2683:16. Contrary to defendants' arguments, Fischel ruled out any obvious non-fraud reasons for the declines. Tr. 2683:4-12; *see also* Fischel Rebuttal Report, ¶¶20-24.[5] Fischel's leakage model used the approach laid out by Cornell & Morgan and quantified daily inflation of $12.92 to $23.94, which was far less than Household's actual stock price decline during this period. PX 1395; Tr. 2682:3-2683:12; *see also* Fischel Report, ¶¶40-42. Defendants criticize Fischel's use of a 330-day observation window (11/15/01-10/11/02), yet Fischel's leakage approach is supported by Cornell & Morgan.[6] The specific mechanics of Fischel's leakage quantification were never seriously challenged by defendants.[7]

---

[5]    Attached to Dkt. 1416-3.

[6]    As laid out in Fischel's Report, ¶¶40-42: "Cornell and Morgan explain that one way to reduce the likely understatement in a case where fraud was revealed slowly over time is to extend the observation window (*i.e.*, the period over which a price reaction to an event is measured) surrounding the disclosure date and measure residual returns over time." Cornell and Morgan note that "[t]he length of the window depends on the facts of each specific case." 37 UCLA L. Rev. at 906. They explain that, "[t]he window begins far enough in advance of the disclosure for the analyst to be reasonably confident that no significant information leakage has occurred . . . [and] ends at a date when the analyst feels confident that most of the information is publicly available. The authors state that for a case in which there is a continuous leakage of information, it may be necessary to expand the observation window to cover the entire class period."

[7]    As Fischel stated: "[t]he next step is to use actual stock returns and predicted returns to construct a time series of daily stock price returns ("Constructed Returns") during the Class Period: for each day during the observation window, the Constructed Return equals the predicted return, for all other days, the Constructed Return equals the actual return." Fischel Report, ¶41. Because a bias can occur for long observation windows in the standard market model that underlies our event study, we used predicted returns calculated using the capital asset pricing model ("CAPM") for the event study approach. *See, e.g.*, G.N. Pettengill & J.M. Clark, "Estimating Expected Returns in an Event Study Framework: Evidence from the Dartboard Column," 40 *Quarterly Journal of Business & Economics* (2001), 19 and Exhibit 55 . . . The next step is to calculate a 'true value line,' *i.e.*, a daily series of the stock's estimated true value. This line was generated by setting its value equal to Household's stock price on October 11, 2002 (the last day of the Class Period) and working backwards in time according to the following formula: $\text{Value}_{t-1} = (\text{Value}_t + \text{Dividend}_t) / (1 + \text{Constructed Return}_t)$. I then computed daily artificial inflation as the difference between the Company's stock price and the true value line. If the resulting inflation on any day was greater than the cumulative residual price decline during the observation window of $23.94, I limited the inflation to $23.94

Defendants argue that the "leakage theory" adopted by the jury is legally untenable because Fischel failed to remove the effects of non-fraud company specific information. Defs' Brf. at 6 (Dkt. 1650). However, the amount of net inflation quantified by Professor Fischel does *not* reflect any material non-fraud company specific declines. Professor Fischel analyzed *all* of the disclosures during the 11/15/01-10/11/02 period, and the *few* non-fraud related *increases or declines* he found did not impact his quantification of inflation under the leakage model:

> Q.      Like your specific disclosure model, does this quantification use statistical methods to account for the market and industry influences on Household's stock prices?
> A.      Yes, it does.
> Q.      And did you also analyze whether company-specific factors unrelated to the alleged fraud can explain Household's stock price decline during this latter part of the relevant period?
> A.      Yes, I did. I looked at that carefully. I noticed that there were a lot of disclosures that had some fraud-related information in it and some other disclose – and part of the disclosure did not have – dealt with something other that was fraud related.
> There were some – some of those disclosures that had a positive effect, some had a negative effect; but *overall it was impossible to conclude that the difference between the true value line and the actual price would have been any different had there been no disclosures about non-fraud-related information during this particular period. Some positive, some negative. They cancel each other out*.
> Tr. 2683:13-2684:6.

Professor Fischel's testimony on direct examination was clear – there were "a few" non-fraud related increases *and* decreases (*see* Tr. 2960:10-11), but they cancelled each other out and had no impact on the quantification of inflation. Tr. 2683:25-2684:6. Despite questioning Professor Fischel extensively, defendants' counsel never asked Fischel what the "few" non-fraud related increases and decreases were or challenged his conclusion that they cancelled each other out. Since they "cancel each other" (Tr. 2684:6) these few positive and negative disclosure dates had no impact on the quantification of inflation. Defendants also did not put forth any evidence (through their expert Bajaj or otherwise) that any non-fraud company-specific declines were included in the quantification of leakage. The fact that Fischel limited the quantification to the cumulative residual price decline of $23.94 reflects the fact that no industry or market declines were included. The declines included in

---

and adjusted the true value line accordingly." Fischel Report, ¶¶41-42. Defendants' argument about Fischel's use of a "one-tail" test is without merit since Fischel used the one-tail test for the specific disclosures model, but not the leakage model. Yet, there is ample support for using either a one-tailed or a two-tailed test in the economic literature. *See* Fischel Report, ¶33.

the quantification were all fraud-related.[8]

Defendants point to a late-filed affidavit submitted by Professor Cornell in connection with defendants' *Daubert* motion that criticizes Professor Fischel's leakage model. The Cornell affidavit was not in evidence at trial. Cornell was not a designated expert in the case subject to a Rule 26 report and deposition. As such his affidavit should not even be considered by the Court. *CIVIX-DDI, LLC v. Cellco P'ship*, 387 F. Supp. 2d 869, 884 (N.D. Ill. 2005) (striking untimely expert declaration). In any event, Professor Cornell does not repudiate his article or criticize Fischel for adopting his approach. In fact, Professor Cornell acknowledges that the leakage model is an accepted method but claims (without support) that Fischel has included non-fraud company specific declines in his final net quantification of inflation. However, Professor Cornell, Professor Bajaj and the defendants do not point to any non-fraud Household specific decline, or point to any of the $12.92 to $23.94 of daily inflation as including one of these declines. Fischel also used a "cap" of $23.94 to limit the amount of inflation to the difference between Household's decline and the decline of its peers. Cornell did not criticize Fischel for this modification.

Defendants cite to the *Williams* case as support for the exclusion of a leakage model. The Tenth Circuit in *Williams* upheld the district court's exclusion of plaintiffs' expert testimony as unreliable but did not adopt a *per se* rule that a leakage theory is not viable. In fact, the *Williams* Court held that *Dura* acknowledged that the relevant truth can "leak out, *Dura*, 544 U.S. at 342," and the leakage theory "does not automatically run afoul of *Dura*." 558 F.3d at 1138. To satisfy *Dura*, under a leakage theory, the plaintiff must show how the truth was revealed. *Id.* (citing *In re WorldCom*, 388 F. Supp. 2d at 342). Plaintiffs' expert in *Williams* never identified **any** corrective disclosures that alerted the market to the fraud but instead claimed "tiny" disclosures on **every** day of the class period including days prior to the first corrective disclosure. *Id.* In fact, the disclosures identified by the *Williams* expert were "generally applicable to the telecommunications industry as a whole." *Id.* The expert in *Williams* also did not identify any evidence of leakage but rather "assumed" leakage. *Id.* at 1135. The expert in *Williams* also did not perform a regression analysis to account for any industry or peer related declines and instead attributed the entire stock market decline in *Williams* stock (98%) to leakage despite the fact that this decline "correlated with the overall decline in the telecommunications industry as a whole." *Id.* at 1135. *See also* Dkt. 1527 at 3

---

[8]    Defendants argue that since daily inflation declined between 7/5/02-7/15/02 when there was no identifiable news, the leakage model is faulty. Defs' Brf. at 7 n.8. Yet inflation declines during this period because of leakage which dissipates inflation.

n.1 (Guzman 3/23/09 Order).  In contrast to the expert in *Williams*, Professor Fischel clearly showed how the truth was revealed, found undisputed evidence of leakage, accounted for and removed any industry or peer related declines, and did not include any non-fraud declines in his net quantification of inflation.

**B.    The Leakage Model Showed a Causal Nexus Between the Fraud and Price Decline**

As set forth above, the leakage model is appropriate to establish loss causation.  However, defendants cite *Flag* to claim a leakage model is insufficient to establish loss causation.  Yet, defendants admit that the court in *Flag* acknowledged the viability of the leakage theory to establish loss causation.  *See Flag*, 2009 U.S. App. LEXIS 16080, at *31 n.5.  The court in *Flag* rejected the expert's leakage theory because it presented ***no*** evidence of leakage, and only identified defendants' own statements as corrective disclosures.  *Id.* at *32-*33.  Here, both parties' experts agreed there was evidence of leakage, and Professor Fischel not only identified 14 specific disclosures of the fraud that were statistically significant, but identified other third-party disclosures (*i.e.*, analyst reports/media articles) discussing Household's predatory lending and reaging practices that were corrective disclosures that caused the stock price decline.

Defendants point to the fact that some of the 17 false statements were made during the Disclosure Period (11/14/01-10/11/02) as a reason to reject the leakage theory.  These statements were made during a time of ***partial*** disclosures of the truth by other sources (analysts, media).  Unlike *Flag*, Fischel points to many corrective disclosures other than defendants' own misstatements.

**C.    Professor Fischel Identified How Household's Stock Was Inflated Due to Defendants' 17 False Statements**

Defendants argue that plaintiffs did not show how defendants' 17 false statements inflated Household's stock price because it did not increase in a "statistically significant" manner when the false statement was made or the amount of inflation did not increase with each of the 17 false statements.  Defendants once again create a requirement where none exists.

In fact, both experts testified that Household's stock price could be inflated by misrepresentations or omissions, even if Household's stock price did not increase after the alleged misrepresentation or omission was made.  *See* Fischel (Tr. 2963:21-2964:6); Bajaj (Tr. 4244:2-6).  As Professor Fischel explained, there does not need to be a "statistically significant" price increase after a statement is made in order for that statement to cause inflation in the stock if that statement is

in fact false or misleading or omits a material fact. Tr. 2963:21-2964:6.[9] And defendants' expert, Bajaj agreed. Tr. 4244:2-6.

Professor Fischel testified that Household's stock price was inflated when the jury determined the first false or misleading statement. *See* Tr. 2848:10-22; 2850:20-2852:7; 2866:15-21; 2870:24-2871:2; 2921:10-2922:9; 2924:8-13; 2925:9-18; 2965:7-17; 4289:9-4292:2. Inflation from defendants' 17 false statements is not measured by looking at Household's stock price reaction on each of those dates. Inflation caused by those 17 statements is quantified by the residual stock price declines associated with the later disclosures of the truth. Tr. 4289:9-4292:2; 2921:10-2922:9; 2849:21-2850:19. If the full amount of inflation (in this case the $23.94 cap) is already in Household's stock price from the first false statement (3/23/01), subsequent false statements do not increase inflation but rather cause inflation to remain in the stock. Tr. 2852:8-15. Defendants argue that increases and decreases in daily inflation under the leakage model are contradictory since the amount of daily inflation increases even though there is no fraudulent statement. Yet, defendants admit that the variation in daily inflation throughout the RP is due to Professor Fischel using a modified constant percentage method similar to Cornell & Morgan's leakage model method which is common in the field. In fact, defendants never challenged the use of this method in their *Daubert* motion, nor did Professor Cornell criticize use of this method. Unlike the constant dollar approach (used in the specific disclosure model) which takes the absolute amount of the dollar decline due to disclosures of the truth, the constant percentage method takes the relative percentage decline.

Fischel testified that unlike the "constant dollar" approach of the specific disclosures model ($7.97 of inflation on each day prior to 11/15/01), inflation under the leakage model varied for each day of the RP before the first partial disclosure on 11/15/01 and similarly on each day after 11/15/01 until the end of the RP (unless "capped"), which was due to the use of the constant percentage method and later leakage of the truth. Tr. 2887:22-2888:2; 2890:17-2891:4; 2899:20-25; 2903:13-18; 2968:2-5. Despite raising the distinction numerous times in his testimony, defendants never objected to or challenged Professor Fischel about the use of the constant percentage methodology.

---

[9]    Professor Fischel's testimony is in accord with case law that a company's stock does **not** have to increase for the stock to become inflated due to a false statement or omission. *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001); *In re Cendant Corp. Litig.*, 264 F.3d 201, 239 n.21 (3rd Cir. 2001); *McEwan v. Digitron Sys.*, 160 F.R.D. 631, 640 (D. Utah 1994).

**D.      Professor Fischel Did Not Provide a "New" Leakage Model at Trial or Improperly Instruct the Jury to "Partially" Implement His Model**

Defendants argue that the jury impermissibly introduced its own theory of damages by disregarding the inflation quantification table of PX 1395. Defs' Brf. at 11. As explained a number of times by Professor Fischel, the inflation was dependent on when the jury first found a false statement or omission because absent this, there is no inflation. Tr. 2850:20-2851:3. Professor Fischel explained how to implement his quantification chart (PX 1395) by replacing the daily inflation numbers with "zeros" on the verdict form until the first date the jury found a false statement or omission. This actually resulted in a "consistent" verdict since the jury found in favor of defendants on all statements before 3/23/01 and wrote "0" in the verdict form. On that first day of inflation, the jury adopted Fischel's table and found Household's stock price was inflated by $23.94 on that day. The jury properly followed Fischel's leakage model quantification.

**E.      The Leakage Model Did Not Result in Irrational Verdicts**

Defendants argue that the leakage model resulted in irrational verdicts because the $23.94 of inflation on 3/23/01 was attributable to all three of plaintiffs' theories of fraud but the statement on that date only related to predatory lending. First, defendants failed to object to the jury's verdict on this basis and to request the Court to order the jury to return to deliberate and rectify the supposed conflict. As such, this argument is waived. *Strauss v. Stratojac Corp.*, 810 F.2d 679 (7th Cir. 1987). Second, the jury properly filled out the verdict form. Defendants did not put forth any alternative inflation amount for that date. Third, the jury properly considered the fraud as one integrated fraud with the sole purpose of inflating Household's stock – and all of the elements of the fraud were met for the first time in connection with the 3/23/01 statement. Neither *Dura* nor any other relevant authority requires the parsing exercise requested by defendants but not even attempted by defendants' own expert. Finally, even if defendants' argument had any merit, it would only impact three days (3/23/01 and 3/26-27/01) since Household made another false statement on 3/28/01 (Household's 2001 10-K), which clearly related to all three theories and caused inflation of $23.94.

**IV.    DEFENDANTS' TIME-BAR ARGUMENT IS WITHOUT MERIT**

Defendants argue that the inflation caused by the first false statement on 3/23/01 is somehow due to inflation that existed on 7/30/99 from a time-barred statement. Defendants previously raised this issue in their motions for summary judgment and relief under Rule 50(a) and plaintiffs incorporate their respective oppositions. Defendants also raised this issue with the jury who rejected

it.  As Professor Fischel testified, there was no inflation on any date prior to 3/23/01 because the jury did not find any false statement prior to that date.  Tr. 2870:24-2871:2.  Professor Fischel testified that inflation would exist once the jury found a false statement during the RP.  The inflation on 3/23/01 was due to the statement issued by defendants on that date, and the amount of inflation was determined by analyzing the disclosures from 11/14/01-10/11/02 and quantifying the inflation through a regression analysis.

## V.    PLAINTIFFS PROVED MATERIALITY FOR THE FALSE STATEMENTS

Under *Basic*, a fact is material if there is a "substantial likelihood" that a reasonable investor would consider it important, with it having significantly altered the "total mix" of information made available.  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus. v. Northway, Inc.*, 326 U.S. 438, 449 (1976)).  Information regarding a company's financial condition is material.  *SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980).  A rational trier of fact could find that the omissions and misstatements in Household's financial statements and press releases were material to a reasonable investor.  Yet, defendants claim that plaintiffs have not shown materiality for the 17 false statements since Household's stock price did not move upon the issuance of the statements.  Defendants' analysis is wrong.  The information defendants failed to disclose was clearly material since it caused Household's stock price to decline when the market became aware of it.  Fischel's testimony highlighted by defendants simply states the fact that Household's stock price remained inflated due to continued misrepresentations and does not mean that the undisclosed adverse information was not material – especially when its later disclosure caused the stock price decline.

## VI.    DEFENDANTS CANNOT SHOW THE ABSENCE OF LEGALLY SUFFICIENT EVIDENCE ESTABLISHING LIABILITY FOR THE RESTATEMENT

Defendants contend that they are entitled to judgment as a matter of law with respect to plaintiffs' Rule 10b-5 claims arising from the restatement.  Defs' Brf. at 14-17.  Specifically, defendants claim that there was no legally sufficient basis for a reasonable jury to find that defendants acted with scienter when they issued false financials that they were ultimately required to restate.  Defendants' arguments ignore the facts and the law.

Plaintiffs introduced legally sufficient evidence demonstrating fraud with respect to the 8/14/02 restatement.  Contrary to defendants' conclusory assertions, this evidence is more than simply the fact that Household restated.  Plaintiffs presented evidence regarding the magnitude and seriousness of the restated accounting (Household overstated its net income by $386 million or as

much as 6.5%), its impact on defendants' compensation (without the restated net income, defendants would not have met their bonus targets), and the red flags received by management (including an Office of the Comptroller of the Currency ("OCC") report questioning Household's accounting for three of the four contracts subject to the restatement). PXs 231; 712; 759. This evidence provides a solid basis for any reasonable jury to conclude defendants acted with scienter under the totality of the circumstances. *See Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499, 2509 (2007); *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 815, 825 (N.D. Ill. 2000).

A GAAP violation is presumptively a material misstatement. *E.g.*, *SEC v. Systems Software Assocs., Inc.*, 145 F. Supp. 2d 954, 958 (N.D. Ill. 2001) ("[a] financial statement that . . . does not conform to the requirements of GAAP is presumptively a false or misleading statement of material fact under Rule 10b-5"); *Gilford Partners L.P. v. Sensormatic Electronics Corp.*, No. 96 C 4072, 1997 WL 757495, at *17 n.16 (N.D. Ill. Nov. 24, 1997) ("a company's violation of GAAP may often indicate a violation of Section 10(b)"). By restating, therefore, Household admitted that its financial statements were materially false.

The restatement also supports an inference of scienter. *See In re Cabletron Systems, Inc.*, 311 F.3d 11, 39 (1st Cir. 2002) ("'Accounting shenanigans' are among the characteristic types of circumstances which may demonstrate scienter for securities fraud."); *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996) (violations of GAAP and company's revenue policy are circumstantial evidence of scienter); *In re Anicom Sec. Litig.*, No. 00 C4391, 2001 U.S. Dist. LEXIS 6607, at *16 (N.D. Ill. May 18, 2001) (allegations of GAAP violations, including the need for restatement, "raise a strong inference that the defendants knew or recklessly disregarded that [the company] was disseminating incorrect information"); *In re Discovery Zone Sec. Litig.*, 943 F. Supp. 924, 937 (N.D. Ill. 1996) ("[T]he alleged GAAP violations alone support an inference of fraudulent intent.").[10]

---

[10]     Defendants argue that "a restatement is insufficient to prove a claim of securities fraud." *See* Defs' Brf. at 16. "This general rule states the sensible and otherwise unremarkable proposition that the inferences that may be drawn for or against scienter from the mere fact that a company misapplied GAAP and accordingly had to restate its financials are in equipoise, and, therefore that such allegations by themselves cannot give rise to a 'strong inference' of scienter." *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 635 (E.D. Va. 2000). But this rule does not "stand for the proposition that scienter cannot be inferred ***at all*** from such allegations and that the allegations are therefore ***irrelevant*** to the issue of scienter." *Id.* (emphasis in original). Furthermore, defendants' argument ignores the fact that the "strong inference" standard set forth in the PSLRA is a pleading standard that does not apply to proof of scienter at trial. *See, e.g.*, *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 548-49 (6th Cir. 1999) ("As courts have observed, the PSLRA did not change the scienter that a plaintiff must prove to prevail in a securities fraud case but instead changed what a plaintiff must plead in his complaint in order to survive a motion to dismiss.").

Plaintiffs' accounting expert's testimony was right on point. Harris Devor defined the concept of an accounting error, and then explained that restatement is the appropriate response to material accounting errors. Tr. 2493:21-2494:19. Devor identified the accounting errors that required restatement of the financials. *Id.* at 2487:21-2489:25. Devor explained that the total amount of the restatement was $386 million, of which $230 million impacted the RP financials. *Id.* at 2490:5-2493:20. Using this manipulation, defendants overstated reported net income during the RP by as much as 6.5%. *Id.* at 2491:4-2493:20. Devor testified that it is ultimately the company's decision to restate its financials. *Id.* at 2495:1-9. Finally, after analyzing the documents and materials produced in the litigation, Devor concluded that Household's accounting was not reasonable. In discussing the AFL-CIO contract accounting, Devor pointed out that "FASB Statement of Financial Accounting Concept No. 5 requires that expenses be allocated in a systematic, rational manner to the period in which the related assets are expected to provide benefits. This asset wasn't being amortized at all." *Id.* at 2538:17-22. In this situation, the evidence establishes that there was no grounds for a legitimate difference of opinion. *Id.* at 2539:9-15.

Plaintiffs introduced other circumstantial evidence at trial of defendants' scienter relating to the restated financials. For example, in 1998, the OCC questioned Household's accounting for three of the four contracts, the GM, AFL-CIO and UP contracts. PX 712. The OCC specifically warned:

> Management should determine if these cash vs. accrual timing and recognition differences are in keeping with FASB Statement of Concepts #3 concerning accrual accounting and expenses. The unique and complex terms of the UP and GM programs result in numerous deferred expenses and income. In several cases, the timing and recognition of certain fees (expenses) differ materially from actual cash payments.

*Id.* at HHS03117481. The OCC also pointed out "assumptions that need close review" including the "recapture of the $40 million advance payment to the AFL-CIO." *Id.* at HHS03117482. Aldinger admitted that Household received this document from the OCC in 1998. Tr. 3057:2-4.[11]

In addition, the individual defendants would not have met their bonus targets for 2000 without the misreported net income that they ultimately restated. *See* PXs 231 and 759; Tr. 2051-52. "[T]he Seventh Circuit has established motive as a 'useful indicator,' and should not be taken

---

[11]    Household's accounting for these contracts was raised every year with the Audit Committee. PXs 176; 694. For example, the 11/13/00 Quality of Accounting presentation to the Audit Committee expressly discussed the GM, AFL-CIO and UP accounting and the Kessler contracts. PX 176 at HHS02018103-4. The Audit Committee presentation in 2001 also referenced the accounting for these three contracts. PX 694. Defendant Schoenholz testified that he reviewed these presentations. Tr. 1882:7-9.

lightly." *In re JPMorgan Chase & Co. Sec. Litig.*, MDL No. 1783-C.A., No. 06 C 4674, 2007 U.S. Dist. LEXIS 93877, at *24 (N.D. Ill. Dec. 18, 2007).[12]   Bonus compensation for the defendants during this period was up to five times their base salary.  PX 772 at HHS03173760.  Household's Compensation Committee set target Earnings Per Share ("EPS") goals that Household's executives were required to meet to obtain a bonus.  *E.g.*, PX 759.  For example, in fiscal year 2000, the EPS target was $3.50.  Household reported EPS of $3.55 for fiscal year 2000, beating the target by $.05.  As a result, Aldinger received a $4 million bonus, and Gilmer and Schoenholz each received a $2 million bonus.  *Id*.  But after defendants restated their accounting for the contracts, the company reported EPS for 2000 of just $3.40 – $.15 less than the EPS target for that year.  *See* Tr. 2052:9-2055:11.  Thus, if defendants had correctly accounted for the credit card contracts, the Company would have missed its EPS targets and defendants would have missed their bonus targets.

Under the totality of the circumstances test, Schoenholz's 3/12/01 memorandum ordering the destruction of Andrew Kahr's memoranda – the same type of memoranda that Schoenholz explained had "exacerbated" Providian's legal difficulties – provides further evidence of scienter.  *See* PX 1007; Tr. 2091:16-19 ("Q. Okay.  So, in other words, you wanted to get this Kahr evidence out of your files, right?"  "A. We wanted to destroy it.").  "If, being sensitive to the possibility of a suit, a company then destroys the very files that would be expected to contain the evidence most relevant to such a suit, the inference arises that it has purged incriminating evidence."  *See Partington v. Broyhill Furniture Indus., Inc.*, 999 F.2d 269, 272 (7th Cir. 1993).  Plainly, this evidence of scienter is sufficient to support the jury's verdict.[13]

Defendants claim their good faith reliance on their external auditors, Arthur Andersen,

---

[12]        *See In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1071 (W.D. Wash. 2003) ("Scienter can be established even if there were no sales of stock by officers during the class period, if there were other motives for fraud such as receiving benefits tied to the company's financial performance."); *In re Wellcare Mgmt. Group Sec. Litig.*, 964 F. Supp. 632, 639 (N.D.N.Y. 1997) ("[T]he Court will not disregard, as irrelevant, allegations that incentive compensation was affected by the alleged fraudulent conduct.").

[13]        For this reason, defendants' claim that "Plaintiffs adduced no proof or explanation as to how scienter regarding the accounting could have suddenly materialized between January and March 2001" simply ignores the evidence.  *See* Defs' Brf. at 15.  Furthermore, any attempt to explain why the jury found defendants liable for statements made in or after 3/01 – but not before that date – "would be based on either pure speculation or would require inquiries into the jury's deliberations that courts generally will not undertake."  *United States v. Powell*, 469 U.S. 57, 66 (1984); *see Mid-West Underground Storage, Inc. v. Porter*, 717 F.2d 493, 501 (10th Cir. 1983) ("It is well settled that a verdict will not be upset on the basis of speculation as to the manner in which the jurors arrived at it.").  At trial, plaintiffs satisfied the only relevant inquiry on a Rule 50(b) motion: plaintiffs presented sufficient evidence to support the statements for which defendants were held liable.  *See Mack v. Great Dane Trailers*, 308 F.3d 776, 780 (7th Cir. 2002).

precludes a finding of liability. Defendants are wrong. There was ample evidence at trial that it was Household's management's duty to file accurate financial statements. *See, e.g.*, Tr. 2179:6-14; 2523:22-25; 2495:2-3. This responsibility cannot be delegated to a company's auditors. *United States v. Erickson*, 601 F.2d 296, 305 (7th Cir. 1979) ("Although certified by accountants as prepared in accordance with generally accepted accounting principles, the financial statements are nevertheless the representations of management."). For this reason, it is simply incorrect that Andersen's clean audit opinions "precludes a finding of scienter." *Id.* ("If a company officer knows that the financial statements are false or misleading and yet proceeds to file them, the willingness of an accountant to give an unqualified opinion with respect to them does not negative the existence of the requisite intent or establish good faith reliance . . . .").

Nor is there "uncontested evidence" that defendants relied in good faith on the advice of their external auditors, as defendants erroneously insist. *See* Defs' Brf. at 16. To the contrary, Devor testified that "Arthur Andersen was not comfortable with the accounting" for certain credit card contracts and told Household's management, "no, you can't do that." Tr. 2522:10-2523:9. Similarly, Devor testified that Andersen provided no advice as to whether to recognize income with respect to the Kessler contracts: "It doesn't look like [Andersen] looked at the revenue recognition issue that ultimately resulted in the company restating." Tr. 2544:14-16. Defendants who claim good faith based upon reliance on a professional must show they (1) made a complete disclosure to the professional; (2) requested the professional's advice as to the legality of the contemplated action; (3) received advice that it was legal; and (4) relied in good faith on that advice. *See SEC v. Goldfield Deep Mines Co.*, 758 F.2d 459, 467 (9th Cir. 1985); s*ee also SEC v. Caserta*, 75 F. Supp. 2d 79, 94-95 (E.D.N.Y. 1999) (collecting cases). Because the evidence shows defendants failed to make full disclosure to Andersen ***and*** Andersen advised Household that it was "not comfortable" with the accounting, defendants cannot rely on Andersen to negate scienter.

Finally, Fischel showed a causal connection between Household's 8/14/02 disclosure of its restatement and loss. Although Household's stock price increased $.29 that day, it suffered a "residual" decline of $.94 compared to movements in the market and Household's peer group and analysts questioned Household's prior earnings from its credit card business that was being restated. *See* PXs 1391; 1413. The residual decline of 2.49% was properly included in the quantification of inflation. Thus, the jury's conclusion that defendants are liable under Rule 10b-5 with respect to the restatement is supported by legally sufficient evidence.

## VII. PREDATORY LENDING

### A. The Court Did Not Commit Error by Finding Defendants' Failure to Disclose Household's Predatory Practices Were Actionable

Defendants contend that they had no duty to disclose the existence and nature of their predatory lending practices. Defs' Brf. at 18-19. However, defendants' duty to disclose was triggered by statements they made in conjunction with Household's earnings announcements. Certain press releases and 10-Ks put the Company's ethics and the source of the Company's record growth squarely "into play" and gave rise to actionable securities fraud violations. *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 824-25 (E.D. Pa. 2001) (statements that "attribute Providian's good fortunes to its 'customer focused approach' . . . . put[] the topic of the cause of Providian's success in play" and require Providian "to disclose information concerning the source of its success"); *Steiner v. MedQuist Inc.*, No. 04-5487 (JBS), 2006 U.S. Dist. LEXIS 71952, at *48 (D.N.J. Sept. 29, 2006) (§10(b) liability arises when defendants "know that statements putting the source of the company's revenue at issue are false or misleading, even though the financials themselves are otherwise accurate"); *Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000) ("'By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully.'").

At the 4/17/09 Jury Instruction hearing, the Court agreed that plaintiffs had identified language in Household's 2000 and 2001 10-K's and press releases sufficient to trigger defendants' duty to disclose Household's deceptive lending practices.[14]  *See* Tr. 2716:10-2717:12. Both Household's 2000 and 2001 10-K's contain the following identical language:

> Management has long recognized its responsibility for conducting the company's affairs in a manner which is responsive to the interest of the employees, shareholders, investors and society in general. ***This responsibility is included in the statement of policy on ethical standards which provides that the company will fully comply with laws, rules and regulations of every community in which it operates and adhere to the highest ethical standards***. Officers, employees and agents of the company are

---

[14]  Defendants did not object, citing tactical reasons. Tr. 2733:21-2734:10. Defendants previously failed to timely object when Devor testified that defendants' RP 10-Ks and 10-Qs were false because the filings omitted and/or failed to disclose Household's predatory lending practices, an opinion contained in Devor's Rule 26 report and not challenged by defendants in their *Daubert* motion. Tr. 2416:7-2422:6. Defendants' failure to raise the issue in their *Daubert* motion, object to Devor's testimony and state their position during the 4/17 hearing constitutes a waiver. *U.S. v. Wynn*, 845 F.2d 1439, 1443 (7th Cir. 1988) (courts are even more reluctant to find harmful error where failure to object was tactical decision).

> expected and directed to manage the business of the company with complete honesty,
> candor and integrity.

See Defendants' Exhibits ("DX") 851; 852.[15]   These statements, made in conjunction with the
Company's earnings announcements, gave rise to a duty to disclose Household's predatory practices.
As this Court stated, "when you open that door, you better include all of the evidence that relates to
it." Tr. 2717:6-12.

Defendants contend these statements were puffery.[16]  However, the Court's two prior rulings
to the contrary were correct.  See Dkt. 1502 at 2 (holding Statement No. 15 not puffery); Tr.
2723:13-25 ("I find them to be not puffery, but actual statements which could trigger the
requirement for full disclosure.").  These statements are assertions of fact intended to falsely convey
Household's compliance with applicable law and commitment to ethical lending standards.  Makor
Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 596 (7th Cir. 2006), rev'd on other grounds, 551
U.S. 308 (2007).  Given the circumstances, moreover, there is no question that an investor would
consider Household's deceptive lending practices an important fact in deciding whether to buy or
sell its securities.  See In re Countrywide Fin. Corp. Sec. Litig., 588 F. Supp. 2d 1132, 1144 (C.D.
Cal. 2008) (finding the statement "high quality" actionable because Countrywide's "essential
operations were so at odds with the company's public statements").

The Court correctly held that defendants' assurance (again made in both the 2000 and 2001
10-Ks) that Household had "a process which we believe gives us a reasonable basis for predicting
the credit quality of new accounts" (DXs 851; 852) triggered a duty to disclose the predatory lending
practices. Tr. 2716:10-24.  In response, defendants assert only that these statements have no relation
to loan originations.[17]  Yet, the statements refer to "new accounts" and thus clearly relate to loan
originations.  Furthermore, plaintiffs proved at trial that the rampant predatory lending led to a
declining credit quality portfolio.  See, e.g., Tr. 698:10-18; 700:3-7; 773:13-20; 964:2-13.
Household's failure to disclose the predatory practices thus contributed to the false impression that
Household's credit quality exceeded its peers, and Household's assertion that its process for

---

[15]    Although this portion of the 3/28/2001 10-K (Stmt. No. 15) is not listed as a separate false statement
on the Verdict Form, the 10-K is in evidence and this statement, in connection with the statements listed on
the Verdict Form, gave rise to an actionable duty to disclose Household's predatory practices. Tr. 2723:13-25
(holding exact same statement made one year later "trigger[ed] the requirement for full disclosure.").

[16]    Defendants never raised this "puffery" argument in their Rule 50(a) motion.  See 50(a) motion at 22-
24.  The argument is thus waived.  Gooden v. Neal, 17 F.3d 925, 927 (7th Cir. 1994).

[17]    Once again, defendants waived this argument by failing to object on these grounds at trial or in their
50(a) motion.  Gooden, 17 F.3d at 927.

predicting credit losses was reasonable gave rise to a duty to disclose the predatory lending practices. Tr. 2716:10-24.

The Court also correctly held that Household's press releases announcing periodic financial results gave rise to a duty to disclose.  Tr. 2710:16-17.  Without analysis, defendants incorrectly contend the Court erred.  In their press releases, defendants announced record earnings to investors, attributed those record results to "strong growth," "quality earnings," and "strong demand for [its] loan products," and bragged to investors that Household's "business model generates superior results."  PX 504 (Stmt. No. 16); PX 503 (Stmt. No. 18); PX 978 (Stmt. No. 21); PX 706 (Stmt. No. 24); PX 635 (Stmt. No. 29); PX 788 (Stmt. No. 36); PX 227 (Stmt. No. 37).  When defendants made statements about Household's net income and growth and the reasons for the Company's superior results, they had a duty to "speak truthfully and to make such additional disclosures as [were] necessary to avoid rendering the statements made misleading."  *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 675 (S.D.N.Y. 1990); *In re Van Der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005).[18]

### B.    The Market Was Not Aware of Household's Widespread Predatory Practices

Defendants assert that notwithstanding their misrepresentations, the market and investors were aware of the truth.  However, the jury soundly rejected defendants' truth-on-the-market defense.  Defendants' attempt to re-litigate the issue, substituting their view for the jury's, should be rejected.  *Zimmerman*, 360 F.3d at 623.

A defendant can only prevail on a truth-on-the-market defense if the truth was "conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements."  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000).  The disclosures cited by defendants do not establish even that the concealed information was publicly available, much less "conveyed to the public" with the required level of "intensity and credibility" to overcome defendants' contemporaneous denials.  *Id.* Additionally, the economic evidence demonstrates that market awareness of defendants' fraud did not begin until 11/15/01 and gradually increased through the end of the RP.  As discussed below, each of these points is fatal to defendants' motion.

---

[18]    *See also Providian*, 152 F. Supp. 2d 814; *Steiner*, 2006 U.S. Dist. LEXIS 71952, at *53; *In re Sotheby's Holdings, Inc. Sec. Litig.*, 00 CIV. 1041 (DLC), 2000 U.S. Dist. LEXIS 12504, at *13 (S.D.N.Y. Aug. 31, 2000).

The supposed disclosures relied on by defendants did not reveal the specific predatory lending practices at issue in this case, *i.e.*, misrepresentation of rates and fees, insurance packing, prepayment penalties violative of state law and the misrepresentations on the good-faith estimate. *See* Kavaler Decl., Ex. 14 (Dkt. 1651-2). In arguing otherwise, defendants resort to misdirection. For example, plaintiffs did not contend that "charg[ing] prepayment penalties" standing alone constituted predatory lending. Rather, it was Household's practice of charging prepayment penalties in violation of state law and without customer knowledge that constituted predatory lending. Disclosure of the former does not alter the fact that the market was not aware of the latter. Similarly, defendants' fraud did not arise from failure to disclose that "Household sold single premium credit life insurance" (*id.*), charged higher rates and fees than prime lenders (*id.*), or "offer[ed] EZ-Pay" on loans (*id.*), but rather from, *inter alia*, concealing that Household improperly and illegally packed insurance, misled customers about the rates and fees charged and used the effective rate sales pitch to misrepresent the interest rate. Defendants could set up and knock down 100 more straw men, but it would not change the fact that the Company's widespread predatory practices were concealed from investors.[19]

The purported disclosures of "headline risk" fare no better. The analyst reports and newspapers cited by defendants focus on third party allegations, principally made by ACORN, that Household was engaging in "industry-wide" predatory lending practices. However, these disclosures, even when considered collectively, do not expose any of defendants' specific predatory sales practices, such as the effective rate presentation, the improper disclosure on the GFE, prepayment penalties in violation of state law, and insurance packing. Nor do they reveal that Household's growth was the product of billions of dollars generated by improper practices.

As Professor Fischel explained, moreover, third party disclosures are "not the same thing as Household itself telling investors about its own practices." Tr. 2838:8-9. This is particularly important because, during this period, Household specifically denied engaging in predatory lending. *See Countrywide*, 588 F. Supp. 2d at 1159-60. In fact, these denials are included in the very same newspaper articles cited by defendants as revealing the truth. *See, e.g.*, PXs 824; 1451.

---

[19]    When asked about those practices, defendants specifically denied they occurred. *E.g.*, Tr. 3043:22-3044:16; 3046:17-3047:12; 1891:18-1892:6; 1892:8-13; 1892:14-19; 1892:20-24; 1893:18-23. Defendants' assertion that the market knew the truth cannot be reconciled with their position that no widespread predatory lending occurred. The time for "pleading in the alternative" has long passed, and the evidentiary record supports neither assertion.

Defendants' reliance on shareholder proposals fails for the same reasons. The proposals do not disclose the specific practices Household employed, or the massive improper revenue generated by those practices. Defendants continued to deny any predatory practices and management recommended rejection of the proposals. At bottom, none of the disclosures defendants cite conveyed the truth to the market with the force and credibility necessary to establish a truth-on-the-market defense, especially to the overwhelming degree necessary to take the determination from a jury that has already decided to the contrary. DX 99.

The economic evidence further undercuts defendants' truth-on-the-market claim. This evidence shows that it was not until 11/14/01, when one of Household's regulators, the California Department of Corporations, filed a lawsuit against Household that the market began to react to these third party disclosures. If defendants were correct that the truth was on the market as to the fraud alleged prior to 11/14/01, there would have been no negative market reaction to the later, post-11/14/01 disclosures. However, Fischel's testimony established, and the jury concluded, that after 11/14/01 and continuing through the end of the RP, the market reacted negatively to the leakage of that truth into the market. *See* §III.A., *supra*. Fischel's testimony constitutes strong economic evidence that the market did not know about the concealed facts. This fact is fatal to defendants' claim that the market knew about Household's fraud. *See Ganino*, 228 F.3d at 167-68; *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003).

### C.    There Is More than Sufficient Evidence to Support the Jury's Verdict as to Defendants' Predatory Lending Fraud

The evidence at trial unquestionably supports the jury's verdict that defendants fraudulently concealed Household's predatory lending activities. Defendants contend otherwise, focusing the bulk of their attack on the opinions of plaintiffs' expert Catherine Ghiglieri. However, as discussed in detail in §XII.B., *infra*, defendants mischaracterize Ghiglieri's testimony and its impact. Ghiglieri's expert opinion that Household engaged in "systemic and companywide predatory lending practices" (Tr. 615:15-16 (Ghiglieri)) was enough by itself to support the jury's conclusion. In their motion, defendants conveniently ignore not only this fact, but the overwhelming evidence establishing defendants' widespread predatory lending fraud. As plaintiffs proved, this fraud

involved misrepresenting interest rates,[20] charging prepayment penalties in violation of state law and hiding prepayment penalties in the loan terms,[21] insurance packing,[22] improper use of discount points,[23] loan flipping[24] and loan splitting.[25]  As the multi-state group of Attorneys General stated, "the coast-to-coast usage of common forms and sales techniques belie[s]" defendants' contention that the Company's "insidiously deceptive sales practices" were not widespread.  PX 550.  To the contrary, numerous state investigations "revealed that Household engage[d] in widespread lending patterns and practices that violate[d] both state and federal law."  PX 516.  "The practices [were] national in scope and not confined to a single state or branch office."  *Id.*

In response to this mountain of evidence, defendants raise in their motion the same feeble arguments presented to and rejected by the jury – that the number of internally tracked customer complaints was small and that defendants denied engaging in predatory lending.  Defs' Brf. at 21.  This argument is an improper attempt by defendants to "substitute [their] view of the contested evidence for the jury's" and should be summarily rejected.  *Zimmerman*, 360 F.3d at 623 (citing, *inter alia*, *Reeves*, 530 U.S. at 150).  Indeed, defendants' myopic recitation of plaintiffs' evidence hardly warrants response, let alone a new trial.  When viewed in the light most favorable to plaintiffs, the evidence presented at trial clearly supports the jury's verdict.

Defendants' argument that the jury's finding of scienter is unsupported by the weight of the evidence is equally baseless.  Defs' Brf. at 22.  The same contentions defendants now make were soundly rejected by the jury.  *See SEC v. Michel*, 521 F. Supp. 2d 795, 828 (N.D. Ill. 2007).  The foregoing evidence itself is enough to support the jury's scienter finding.  But, plaintiffs proved more.

Plaintiffs proved defendants had motive to commit fraud.  This evidence includes defendants' incentive compensation, which was heavily weighted in favor of incentives tied to the Company's

---

[20]    *See, e.g.*, PXs 348; 461; 1383; Tr. 2812:14-2830:22; 496:8-15; PXs 899; 903; 379; 901; 926; 379; 799; 290; Cross Depo. Tr. 139:1-20; PXs 900; 794; 828; 681.

[21]    PXs 508; 965; 329; 585; 348; 533; 461; 447; 835; 681.

[22]    PXs 967; 1204; 1205; 19; 290; 516; 1103; Tr. 437:2-6; PX 916 at HHS03421387; PX 898; Tr. 527:9-528:14; Cross Depo. Tr. 130:8-131:6; PX 1095; Tr. 1778:13-1779:12; 493:6-10; PX 898; Tr. 437:11-24; 1016:22-24; PX 481 at HHS02911737; PX 269; Tr. 526:13-25; 557:3-10; PX 681.

[23]    PX 285; Tr. 439:3-5; Cross Depo. Tr. 150:22-151:8; PXs 290; 956; 445; 324; 964; 333; 516; Cross Depo. Tr. 150:4-12; PXs 1205; 681.

[24]    PXs 562; 1103;1589; 516; 681.

[25]    PXs 901; 290; 516; 681.

EPS,[26] and defendants' plan to sell the Company (and their stock) while the price was still inflated, which would have netted defendants more that $100 million in termination payments and millions more due to early acceleration of options.[27]  Plaintiffs also proved that Aldinger and Gilmer sold stock while Household's price was artificially inflated,[28] netting $19 million and $3 million respectively from stock sales during this RP.  This evidence of personal motive is an important consideration in determining scienter.  *See JPMorgan*, 2007 U.S. Dist. LEXIS 93877, at *24.  Plaintiffs also proved that defendants hired Kahr and paid him to develop growth initiatives that ultimately became some of defendants' most widespread and insidious practices.[29]  Finally, plaintiffs proved defendants destroyed documents to cover up their fraud.[30]  *United States v. Battista*, 646 F.2d 237, 244 (6th Cir. 1981) (document destruction probative of scienter); *In re Enron Corp. Secs.*, *Derivative & ERISA Litig.*, No. H-01-3624, 2003 U.S. Dist. LEXIS 1668, at *61 (S.D. Tex. Jan. 28, 2003).  These indicia of scienter, combined with defendants' awareness and/or reckless disregard of the Company's predatory practices, support the jury's determination on scienter.  *Tellabs*, 437 F.3d at 603; *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 971 (S.D. Ind. 2007); *Chu*, 100 F. Supp. 2d at 822-23.

## VIII.  THE EVIDENCE PRESENTED AT TRIAL SUPPORTS THE JURY'S VERDICT AS TO HOUSEHOLD'S CREDIT QUALITY CONCEALMENT

Defendants contend they are entitled to judgment as a matter of law or, in the alternative, a new trial due to plaintiffs' failure to prove their "theory of credit quality concealment." Defs' Brf. at 22.  First, defendants claim plaintiffs failed to prove that Household's reported 2+ numbers were false.  Next, defendants argue that decisions by management concerning whether to reage accounts or take a charge-off "is not the stuff of securities fraud."  Finally, defendants attempt (again) to make their rejected reserves argument stick, arguing that detailed disclosures regarding Household's reserves and probable loan losses negates an inference of scienter.  Defs' Brf. at 22-24.  Each of defendants' arguments should be rejected and their motion denied.[31]

---

[26]    *E.g.*, PXs 772; 774; 759.

[27]    *E.g.*, 1371; Tr. 2061:23-2063:13.

[28]    *E.g.*, Tr. 3486:9-11; DXs 774; 775; Tr. 1429:24-1430:2; DXs 758; 759; 763.

[29]    *E.g.*, PXs 458; 267; 347; Tr. 985:21-986:11.

[30]    *E.g.*, Tr. 669:7-11; PXs 596; 796; Tr. 2089:12-2092:12; 2096:5-2098:24; PX 1026.

[31]    Defendants raised nearly identical arguments in their Motion for Judgment as a Matter of Law Pursuant to Rule 50(a).  *See* Dkt. 1569-2 at 23-27.  Accordingly, plaintiffs incorporate by reference their Memorandum of Law in Opposition to Defendants' Motion for Judgment as a Matter of Law Pursuant to Rule 50(a).  *See* Dkt. 1581 at 22-30.

From the inception of this case, plaintiffs have alleged defendants used improper reaging and other credit quality manipulation practices to conceal the true level of delinquencies and mask the credit quality of Household's loan portfolio. Plaintiffs also alleged that Household failed to disclose – and later affirmatively misrepresented – Household's aggressive and improper restructuring policies that contributed to Household's understated reported delinquency and charge-off statistics. As a result of Household's undisclosed credit quality manipulation practices, the 2+ statistics and charge-off numbers reported in the Company's 10-Ks, 10-Qs, and quarterly press releases along with statements made at the 4/9/02 Financial Relations Conference and disclosures in Household's 2001 10-K, were false and misleading when made. This is exactly what plaintiffs proved at trial.

Defendants' assertion that plaintiffs failed to prove the falsity of Household's 2+ numbers is simply another attempt to distort plaintiffs' case. Contrary to defendants' claim, plaintiffs were not required to prove that Household's 2+ numbers were false in the literal sense, *i.e.*, "inaccurate or ever restated" as defendants claim, but could prevail at trial if they proved that defendants made false *or* misleading statements of fact, or omitted a fact that was necessary to prevent a statement that was made from being *misleading*. *See, e.g.*, Tr. 4713:21-4716:11 (instructing the jury on the elements of plaintiffs' Rule 10b-5 claim).

The evidence presented at trial demonstrated defendants' use of reaging and credit quality manipulation practices to artificially reduce the level of reported 2+ delinquent accounts. *See* Tr. 680:24-681:4; 689:10-13; PXs 313; 618; 102; 710; 1351. The jury also heard expert testimony that Household's reported 2+ statistics and charge-off figures were misleading due to Household's failure to disclose its aggressive and constantly changing reaging and credit quality manipulation practices.[32] *See* Tr. 2443:17-2445:5; 2444:8-2445:3; PXs 654; 726.

Defendants next argue that "assertions that management should have taken charge-offs earlier cannot give rise to Rule 10b-5 liability." Defs' Brf. at 23. This too is a red herring. Plaintiffs never challenged or criticized the act of reaging itself. Plaintiffs did, however, challenge defendants' use of reaging and other credit quality concealment practices to manipulate Household's reported 2+ delinquency numbers and the nonexistent disclosures regarding those practices.

Defendants' characterization of Household's deliberate reaging practices as "managerial decisions," or "mismanagement" should be rejected. The evidence at trial demonstrated defendants'

---

[32]    Household's failure to disclose the Company's reaging practices cannot be disputed. *See, e.g.*, Tr. 1883:8-1887:19; 1888:4-1891:17; 3043:7-3044:16; 3046:3-3047:12.

deliberate manipulation of Household's delinquent accounts in order to report artificially low 2+ statistics to investors. Household accomplished its credit quality manipulation by reaging delinquent accounts – in some cases, over and over again. Household also modified its reaging criteria and implemented one-time skip-a-pays in order to "make" its targeted 2+ numbers at month end. Investors and analysts reviewing Household's reported 2+ statistics, a key metric considered in evaluating the quality of Household's loans, were completely unaware of defendants' aggressive reaging policies and other credit quality manipulation practices. Tr. 1883:8-1887:19; 1888:4-1891:17.[33]

Finally, defendants claim that the development of adequate loss reserves and detailed disclosures regarding Household's probable loan losses negates any intentional credit quality concealment. Defs' Brf. at 24. Defendants spent a significant amount of time during trial trying to convince the jury of the importance of Household's loan loss reserves and the adequacy of the Company's reserves during the relevant period. Tr. 4581:17-4584:11; 4590:19-4591:2; 2122:25-2124:18; 2165:4-2172:7; 3112:12-3116:10; 3118:19-20; 3244:2-18; 2125:2-2126:8; 2129:11-2132:2; 2138:21-2139:3; 2141:7-14.

The jury also heard evidence from plaintiffs contradicting defendants' loss reserve argument. Plaintiffs demonstrated that Household's 2+ statistic was a key metric that both Wall Street and investors considered in evaluating the quality of Household's loans and the value of its stock. *See, e.g.*, PX 461; Tr. 3024:17-19; 3026:4-3028:11; 1897:12-18; 1898:5-10. Plaintiffs also presented evidence distinguishing Household's reserves, which are merely an estimate based on a future prediction, from Household's 2+ statistics, which are actual numbers reported based on current data. Tr. 2183:7-2184:11. Thus, despite defendants' attempt to make this case about reserves, the jury ultimately rejected their argument.

Using Household's 2001 10-K as an example, defendants also claim that obscure disclosures concerning Household's probable loan losses dispels any intentional credit quality concealment. Defendants' assertion that Household's reaging disclosures were an "overly generalized nutshell" is particularly disingenuous given that Household's CEO ***admitted*** on the stand that the disclosures in

---

[33]     Defendants' reliance on *DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir. 1990), is inapposite. *DiLeo* involved an appeal from the district court's dismissal of plaintiffs' securities fraud action, in which plaintiffs alleged that defendants violated the securities laws by certifying fraudulent financial statements for Continental Illinois Bank ("Continental"). *Id*. at 626. Specifically, plaintiffs claimed that Continental failed to increase its reserves fast enough. *Id*. Unlike *DiLeo*, plaintiffs' allegations were not focused on reserves.

the 2001 10-K were materially false and misleading. Tr. 3437:22-3441:16. After Aldinger's admission, it is of little surprise that the jury found Household's loan loss reserve disclosures unrelated to Household's misleading 2+ delinquency statistics and reaging disclosures.[34]

Moreover, defendants' contention that the reserves were adequate ignores uncontroverted expert testimony that the reserves were based on unreliable methods and "there were significant indications in the record that [the reserves were] also understated." Tr. 2564:12-2565:5. Devor left no doubt that in his expert opinion Household's reserves were not adequate: "So when you ask me if I would agree that it was fine, of course, I wouldn't agree that it's fine." *Id.* Viewed in the light most favorable to plaintiffs, Devor's testimony removes the lynchpin of defendants' argument – that Household's reserves were undisputedly adequate. Indeed, other than the self-serving testimony of Aldinger and Schoenholz, defendants presented no testimony to support their claim that the reserves were adequate.

### A. Defendants Made Materially False and Misleading Statements About Household's Reaging Practices at the 4/9/02 Financial Relations Conference

At the 4/9/02 Financial Relations Conference ("FRC"), defendants presented false and misleading information about the percentage of Household's loan portfolio that had been reaged multiple times. The difference between the figures presented at the FRC and the true percentage of loans reaged more than once amounted to approximately $3 billion in loans. PXs 175; 79; 1100; Tr. 1996:1-1998:4; 2184:22-2185:7. Defendants tried to downplay the $3 billion discrepancy as an innocent mistake or merely a "clerical error."[35] Tr. 2158:1-6; 2159:15-16. At the FRC, defendants also presented false and misleading information about recidivism statistics broken down by product line. Tr. 1998:13-2010:9; PXs 79; 188. For example, defendants told attendees at the FRC that Household's recidivism rate for real estate secured was only 13.1% when, in reality, the recidivism rate was 53.9%. *Id.* Again, defendants tried to explain away the differences as a simple "mistake."

---

[34]    *In re Allscripts, Inc. Sec. Litig.*, No. 00 C 6796, 2001 WL 743411 (N.D. Ill. June 29, 2001), does not support defendants' case. There, the court found that defendants had sufficiently disclosed in its public filings all risks associated with the company's new product. *Id.* at *6. The court further concluded that "any reasonable investor" would have easily spotted the company's "numerous frank disclosures." *Id.* Here, however, Household's disclosures respecting the Company's reaging practices were insufficient, and as Aldinger admitted, materially false and misleading.

[35]    Defendants attempt to minimize the significance of the multiple reage discrepancy by arguing that the error only applied to "3 percent of the portfolio." Defs' Brf. at 25. Yet defendants' "error" amounted to approximately $3 billion in loans. Defendants pretended that this $3 billion difference was immaterial – the jury disagreed.

The jury, however, rejected defendants' claims of "mistake," finding that the statements made at the FRC violated §10(b) and Rule 10b-5. *See* Dkt. 1611 (verdict form). The evidence was more than sufficient to support the jury's verdict.

During trial, plaintiffs presented evidence demonstrating that in late 2001 and early 2002, the markets became increasingly skeptical about Household's reaging practices. For example, a 12/01 *Barrons* article questioned whether the reaging practices were being used to defer or mask charge-offs. Tr. 3390:7-3391:3. Following the *Barrons* article, reaging became a particularly "important" issue for Aldinger and Schoenholz; both defendants admitted that they were aware that investors wanted and needed more information about Household's reaging practices. Tr. 3391:5-25; 3396:17-3397:19; 1897:12-18; 1898:5-10. Thus, by the time of the FRC, Household's reaging practices were already at the forefront of both defendants' and investors' minds. Any claim that the materiality of Household's reaging practices was not known to defendants prior to the FRC must be rejected.

Defendants also relegate to a footnote the false and misleading recidivism statistics presented at the FRC. Defendants' recidivism disclosures were designed to mislead investors by falsely understating the percentage of accounts reaged once that subsequently went 2+ delinquent or were charged-off a year later. Tr. 1998:13-1999:15. In other words, defendants deliberately gave investors the impression that after an account had been reaged once, the borrower was over the "bump in the road" and would likely not go 2+ delinquent or require additional reages again. However, defendants failed to disclose that the low recidivism statistics presented at the FRC *excluded* those accounts that had been reaged again in the last 12 months. Once defendants reclassified all subsequently re-aged accounts as recidivists, the percentage of recidivist accounts doubled or in some cases tripled. Tr. 1998:13-2010:9 (recidivism rate for real estate secured jumped from 13.1% to 53.9%). Defendants then concealed the corrected recidivism statistics from investors by failing to disclose the inaccuracies in the statistics presented at the FRC. *See* Tr. 2001:5-15. There is more than sufficient evidence in the record to support the jury's verdict.

Moreover, a false statement or omission is material if a substantial likelihood exists that a *reasonable investor* would find the omitted or misstated fact significant in deciding whether to buy or sell a security. *Basic*, 485 U.S. 224; *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1233 (7th Cir. 1988). A determination of materiality "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are *peculiarly ones for the trier of fact*." *TSC Indus.*, 426 U.S. at 450; *see also Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1333 (7th Cir. 1995). Thus, defendants' claim

that the false reaging and recidivism statistics presented at the FRC were "patently immaterial as a matter of law" fails.  The jury in this case, not defendants, properly determined that the $3 billion discrepancy in the number of loans reaged multiple times and the false recidivism statistics presented at the FRC were material to investors.[36]

### B.    Plaintiffs Proved Loss Causation for the "Reaging" Statements

Defendants argue that plaintiffs did not prove loss causation with respect to their "reaging" theory of fraud.  Defs' Brf. at 26.  Defendants point to Household's 2001 10-K issued in 3/02 (Statement No. 27), which was not restated until 3/03 and misrepresentations made at the 4/9/02 FRC (Statement No. 28).  First, plaintiffs' reaging theory was not limited to those public statements.  Other statements found false by the jury – Household press releases (Statement Nos. 16, 18, 21, 24, 36), financial statements (2000 10-K and 10-Qs) (Statement Nos. 15, 17, 20, 22, 32, 38) and statements at the Goldman Sach's conference (Statement No. 23) contained false information regarding reaging that inflated Household's stock price.  Household's false 2001 10-K and 4/9/02 FRC maintained the prior inflation in Household's stock price from its first false statement and these other statements about reaging false statements.  Also, disclosures relating to reaging practices occurred between 11/15/01-10/11/02.  Specific disclosures that criticized Household's reaging practices include the 12/1/01 *Barron's* article (PX 1409); the 12/11/01 Legg Mason report (PX 1410); the 4/10/02 Legg Mason report (PX 140); the CFRA report in the summer of 2002 (PX 515); and the 9/22/02 CIBC report (PX 1435); and other leakage of information regarding Household's practices.  The disclosures made ***after*** the 2001 10-K and FRC clearly provided information that called into question the accuracy of those public statements regarding reaging.  The CFRA reports themselves criticized Household's reaging statistics disclosed at the 4/9/02 FRC.  The fact that Household did not admit its 2001 10-K was false until 3/03 or admit it lied at the 4/9/02 FRC does not mean market participants had not already questioned the veracity of Household's public statements regarding its reaging practices.

### C.    There Is More than Sufficient Evidence to Support the Jury's Verdict as to Defendants' Credit Quality Concealment Fraud

Defendants' argument that the "uncontroverted testimony" proved that the purpose of reaging

---

[36]    Defendants make much of Rybak's testimony that he made an "honest mistake" in misrepresenting Household's real estate restructure policy. Defs' Brf. at 25-26. Though Rybak testified to his belief that the mistake was not material, he later admitted that he had no expertise on materiality with respect to the federal securities laws. Tr. 2371:16-19.

was to "enhance the Company's ability to collect outstanding amounts on loans" is belied by the record. Defs' Brf. at 26. The jury heard a significant amount of evidence concerning the true intent behind defendants' reaging practices – that reaging was used to artificially reduce Household's reported 2+ delinquency statistics and charge-offs to mask the credit quality of Household's loan portfolio.[37] The evidence presented at trial clearly supports the jury's verdict as to defendants' intentional credit quality concealment. That the jury was not persuaded by defendants' evidence does not entitle defendants to judgment as a matter of law, or a new trial.

## IX.   PLAINTIFFS ESTABLISHED THAT DEFENDANT GILMER MADE ACTIONABLE MISSTATEMENTS OR OMISSIONS

Defendants contend that Gilmer is not liable for statements in the Form 10-K's and Form 10-Q's because he had "no responsibility for drafting [or] approving" those documents. Defs' Brf. at 27. This is flat out wrong. Not only did Gilmer himself make false and misleading statements, *see* PX 1307; Dkt. 1611, Table A, No. 14, he provided information for and approved the contents of the SEC filings. *See Tellabs*, 513 F.3d at 708. Aldinger and Schoenholz testified that the business unit managers had input into these filings and reviewed them prior to issuance. Tr. 3427:16-22; 2106:21-2107:22; 2109:18-20; 2110:15-23; *see also* DDX 802-01. Gilmer was the head of Consumer Lending – Household's largest division. Likewise, Gilmer is liable for sitting idly by while Schoenholz made false statements at the FRC. *Barrie v. Intervoice-Brite, Inc.*, 409 F.3d 653, 656 (5th Cir. 2005) ("[A] high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements, and hope to escape liability for those statements.").

As a fallback, defendants claim Gilmer cannot be liable for statements relating to the credit card misstatements because he had "no involvement" in that accounting. Again, defendants misread the record. Gilmer did not testify that he lacked knowledge about the fraudulent accounting and how it improperly inflated earnings, only that he was not involved in the restatement itself and did not know its details. *See* Tr. 1358:7-13; 1417:8-22. Significantly, Gilmer "retired" prior to 8/14/02, when the restatement occurred, and thus, his carefully worded denial of "involvement" in the restatement does not establish a lack of knowledge about the fraudulent accounting that led to the restatement. Tr. 1143:10-22. In addition, the jury could reasonably infer scienter based on Gilmer's

---

[37]     *See, e.g.*, Tr. 680:24-681:4; 689:10-13; 678:23-679:3; 693:6-694:8; 695:12-697:1; 2429:23-2436:21; 2190:22-2191:10; 2199:20-2201:14; PXs 654; 313; 1387; 1338; 1351; 1048.

key position,[38] the 1998 OCC Report criticizing this accounting (PX 712),[39] the magnitude of the misstatement and its significance in achieving his bonus, and his personal involvement in the other two aspects of defendants' fraudulent scheme (reaging and predatory lending). *See Makor*, 513 F.3d at 709-10.

Defendants argue that Gilmer's 3/23/01 statement is an inactionable statement of opinion. However, that statement is one of fact, not opinion.[40] *See* Dkt. 1611, Table A, No. 14 (when asked if Household engaged in predatory practices, Gilmer stated, "[u]nethical lending practices of any type are abhorrent to our company, our employees and most importantly our customers"). Indeed, on the stand, Gilmer conceded as much. Tr. 1352:23-1353:3 (he believed it "an accurate statement of facts"). Based on the above and the arguments set forth in Part XIII.C. and VII.A., *supra*, Gilmer's 3/23/01 public statement is plainly not inactionable puffery.

## X.    DEFENDANTS CANNOT SHOW THE ABSENCE OF LEGALLY SUFFICIENT EVIDENCE ESTABLISHING §20(a) LIABILITY

Defendants ask this Court to overturn the jury's finding of liability for §20(a) because they claim that plaintiffs failed to offer sufficient proof of primary liability under §10(b). But the jury found each of the four defendants liable under §10(b) and, as shown herein, defendants have failed to show the absence of legally sufficient evidence establishing primary liability. As a result, defendants' argument challenging the jury's verdict on §20(a) must also fail.

Equally meritless, defendants assert that the jury's finding that Schoenholz is a control person as to defendant Aldinger must be dismissed because "Plaintiffs presented no evidence that Schoenholz had the power to control, or actually exercised control, over Aldinger." Defs' Brf. at 28.

---

[38]    Gilmer was an executive officer of Household until his "retirement" in the summer of 2002. DX 850 at HHT0015419; DX 851 at HHT0015515; DX 852 at HHT0015666. He was appointed Vice-Chairman, Consumer Lending in 2002. DX 852 at HHT015666. Gilmer's role extended to corporate-wide initiatives and other business units, including participation in the senior management meeting re the corporation's reaging policies. Tr. 2032:1-21; 2034:21-24; PXs 512; 1117. Additionally, Schoenholz consulted him as to matters involving Mortgage Services and other business units. *See* PXs 360; 1117.

[39]    Gilmer testified that he sat on the board of Household Bank, f.s.b., and received reports of examination relating to that entity. Tr. 1116:18-21; 1117:19-20; *see also* PX 19 at FDIC-0685 (showing Household Bank (SB), N.A. was subsidiary to Household Bank, fsb).

[40]    Defendants' cases are distinguishable. *Cf. In re JP Morgan Chase & Co. Sec. Litig.*, 2007 U.S. Dist. LEXIS 93877, at *31 (N.D. Ill. Dec. 18, 2007) (fairness opinion); *Gallagher v. Abbot Laboratories*, 269 F.3d 806, 811 (7th Cir. 2001) (predictive statement as to future growth); *In re Ford Motor Co. Sec.Litig.*, 381 F.3d 563, 571 (6th Cir. 2004) ("very, very proud" and "extremely satisfied"); *Kushner v. Beverly Enters., Inc.*, No. 4:98CV646, 2001 U.S. Dist. LEXIS 24979, at *15 (E.D. Ark. Oct. 18, 2001) (company "believes" it is in compliance), *aff'd*, 317 F.3d 820 (8th Cir. 2003).

Specifically, defendants contend that Schoenholz could not control Aldinger because Schoenholz "reported directly *to* Aldinger." *Id.* (emphasis in original). Not surprisingly, defendants' argument is devoid of legal support. The Seventh Circuit set forth the following test to establish control person liability:

> Plaintiff must establish, first, that the defendant lender actually participated in (i.e. *exercised* control over) the operations of the corporation *in general*; then he must prove that the defendant possessed the power to control the specific transaction or activity upon which the primary violation is predicated, but he *need not prove that this later power to control was exercised*.

*Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 877 (7th Cir. 1992) (emphasis in original); *see* Dkt. 1614 at 36 (jury instruction at trial for control person liability mirrored the test set forth in *Harrison*).

First, defendants stipulated that defendant Schoenholz actually exercised control over the operations of Household. *See* Dkt. 1614 at 36. Second, there was sufficient evidence presented at trial that defendant Schoenholz "had the power or ability, even if that power was not exercised, to control the specific transaction or activity upon which the primary violation was based – in this case, making the specific false statement or omission of material fact." *Id.* Nor do defendants cite any supporting authority for their contention that Schoenholz cannot be liable for §20(a) as to Aldinger. If, on the other hand, defendants' point is that Schoenholz's liability as a controlling person does not fit the facts of this case and should not have been included in the verdict form, defendants have waived this issue by failing to object at trial and by failing to include it in their Rule 50(a) motion during trial. *See Schobert v. Ill. Dept. of Transp.*, 304 F.3d 725, 729-30 (7th Cir. 2002); *Gooden*, *supra*, 17 F.3d at 927 ("a contention rooted in the facts of a case may not be raised for the first time after trial").

Finally, relying on a single out-of-circuit case, defendants assert that the proportionate liability provisions of §10(b) somehow trump the joint and several liability provisions of §20(a). Defs' Brf. at 28. Defendants' argument misses the mark. Analyzing the joint and several liability provision of §20(a), the court in *Laperriere v. Vesta Ins. Group, Inc.*, 526 F.3d 715, 729 (11th Cir. 2008) explained: "We ought to avoid any interpretation of the statute that would treat controlling persons more harshly than the primary violator . . . ." Putting aside the fact that Schoenholz himself was found to be a primary violator, the jury found that defendant Schoenholz controlled Household, which was also a primary violator. *See* Dkt. 1611 at 43. Because the jury found that the primary violator (Household) acted knowingly, and is thus indisputably jointly and severally liable, joint and

- 32 -

several liability also attaches to the controlling person (Schoenholz).  *See* 15 U.S.C. §78t(a) ("Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder *shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable*, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.").

## XI.   DEFENDANTS' ARGUMENTS REGARDING AN INCONSISTENT VERDICT ARE WITHOUT MERIT

### A.    Defendants Have Waived Any Objection to the Alleged Inconsistent Verdicts

The Court presented the jury with a general verdict with interrogatories subject to Fed. R. Civ. P. 49(b).  *See Turyna v. Martam Construction Co.*, 83 F.3d 178, 182 (7th Cir. 1996); *Indiana Bell Tel. Co. v. Ward*, No. 02-0170-C-H/K, 2005 U.S. Dist. LEXIS 12939, at *28 n.4 (S.D. Ind. June 24, 2005); *see also* 15 U.S.C.A. §78u-4(f)(3)(A) (requiring use of three interrogatories).  Defendants waived their inconsistent verdict arguments because they did not, as required by Rule 49(b), object to discharge of the jury.  *Strauss*, *supra*, 810 F.2d at 683.

In *Strauss*, the Seventh Circuit found, pursuant to Rule 49(b), waiver of objections to alleged inconsistencies where the party "raised no objection to the discharge of the jury."  810 F.2d at 683. Likewise, the Seventh Circuit held "a request to have the jury resume its deliberations is the only appropriate response to special verdicts that are inconsistent with general verdicts, *see* Rule 49(b), and that if a party does not act in time he waives any later challenge."  *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 678 n.6 (7th Cir. 1985).  Without these steps, there is "no reason why [a party] should be permitted to try [its] luck with a second jury."  *Strauss*, 810 F.2d at 683.

Defendants assert in a footnote that they "objected" to the alleged jury inconsistencies.  *See* Defs' Brf. at 29 n.30; Tr. 4806:25-4807:10.  This is insufficient.  Defendants were required to object to discharge of the jury.  *Strauss*, 810 F.2d at 683.  Defendants' admitted awareness of the alleged inconsistencies prior to discharge of the jury makes their failure to object to the jury's discharge inexcusable and distinguishes this case from *Turyna*, on which defendants rely.[41]

---

[41]      In any event, Judge Darrah found waiver as to alleged inconsistencies between general verdicts based on the party's failure to object to discharge of the jury.  *Fox v. Hayes*, No. 04 C 7309, 2008 U.S. Dist. LEXIS 75801, at *30-*31 (N.D. Ill. Sept. 25, 2008).

**B.    The Jury's Finding of Stock Price Inflation Was Consistent with a Finding of Liability**

Defendants' claim that the jury's daily inflation findings were inconsistent with its findings of liability because there was no increase in inflation on some of the 17 false statement dates and sometimes a decrease of inflation. However, since the jury found total inflation of $23.94 on the first false statement (3/23/01), which was the "cap" per Fischel's model, by necessity there would be no further increase in inflation on subsequent false statement dates. The decrease in inflation on false statement dates in 2002 was due to the inflation coming out of Household's stock from partial disclosures of the fraud. Also, as set forth above, inflation increased on other dates during the RP when no statement was made due to the constant percentage formula. The jury's adoption of Fischel's leakage quantification (PX 1395) was consistent with their findings of liability.

**C.    The Liability Verdicts Are Fully Consistent**

First, defendants argue that the verdict finding liability for the restatement is inconsistent because Household had been improperly accounting for certain credit card operations since 1996, and "the jury found that ***none*** of the relevant portions of Household's financial statements from July 30, 1999 through January 2001 was fraudulent." Defs' Brf. at 30 (emphasis in original). Defendants' argument misstates the facts and misapprehends the law.

Contrary to defendants' assertions, the jury never made a finding exonerating Household of fraud for the period 7/99-1/01. Rather, the jury found that plaintiffs had failed to prove all elements of §10(b) – including scienter – by a preponderance of the evidence as to statements made during that period. *Kansas v. Marsh*, 548 U.S. 163, 194 (2006). As the evidence of defendants' scienter continued to mount throughout the RP, *see supra*, §IV., the jury rationally concluded that plaintiffs had proven the element of scienter or fraudulent intent by a preponderance of the evidence as of 3/23/01. There is nothing even remotely inconsistent or irrational about this conclusion. As the Seventh Circuit has explained, "[w]hen a plaintiff offers specific evidence from which the jury may reasonably infer that the proffered reasons are not truthful, the case turns on the credibility of the witnesses." *Harvey v. Office of Banks and Real Estate*, 377 F.3d 698, 712 (7th Cir. 2004). It is not the Court's province to "second-guess a jury on credibility issues." *Id.*

Second, defendants argue that the "jury inexplicably found credit card accounting fraud in the announcement of the restatement that allegedly corrected such fraud." *See* Defs' Brf. at 31. This argument should be given short shrift. Despite this alleged inconsistency, defendants never objected to the inclusion of a box on the verdict form for "restatement" next to the 8/14/02 statement. As a

result, defendants have now waived this argument.  *McKinnon v. Berwyn*, 750 F.2d 1383, 1387 (7th Cir. 1984) (where parties requested verdict form asking jury to assess damages individually, they "will not be heard to complain" about inconsistency in holding only employer liable); *Petersen v. Gibson*, No. 97-C-4123, 2002 U.S. Dist. LEXIS 133, at *5 (N.D. Ill. Jan. 7, 2002) (alleged error in verdict form waived where movant never objected to form before the jury retired to deliberate).  Not only did defendants fail to object before the jury began its deliberations, they also failed to object to the discharge of the jury.  This is also grounds for waiver.  *Strauss*, 810 F.2d at 683.

Third, defendants contend that that the jury found that Defendants were liable for statements in Household's 2000 10-K, issued on 3/28/01, even though it found no liability for the disclosure of identical information in a press release on 1/17/01.  Defs' Brf. at 31.  Defendants' argument is based on a faulty premise.  The disclosures on 1/17/01 and 3/28/01 were hardly "identical," as defendants insist.  After all, Household's 2000 10-K, issued on 3/28/01, was almost 150 pages in length whereas its 1/17/01 press release was just 8 pages long.  *Compare* DX 851 *with* PX 491.  Plaintiffs' accounting expert, Devor, explained the significance of the footnotes to the financial statements, which are found only in the Form 10-K.  *See* Tr. 2400:14-2404:5.  Furthermore, plaintiffs introduced evidence showing that on 3/12/01 (after Household issued its 1/17/01 press release and before it issued its 3/28 10-K), defendant Schoenholz issued a memoranda ordering the destruction of Andrew Kahr's devastating memoranda.  PX 1007.  Because the disclosures on 1/17/01 were clearly not "identical" to those on 3/28/01 and because there was additional evidence of defendants' scienter during this period, the jury's determination that defendants were liable for the March disclosure and not for the January disclosure is rational and consistent.

Finally, defendants contend that the jury acted inconsistently when it concluded that Aldinger and Household acted knowingly in making the 3/23/01 statement "while the person who made the statement, Gilmer, acted recklessly."  Defs' Brf. at 32 n.31.  Similarly, defendants complain that the jury's finding that Aldinger "knowingly" made the 3/23/01 statement regarding predatory lending is inconsistent with its conclusion that Aldinger "recklessly" made a false and misleading statement regarding predatory lending on 3/28/01.  Once again, defendants have waived these arguments by failing to object either to the verdict form or to the discharge of the jury.  *Strauss*, 810 F.2d at 683-84; *McKinnon*, 750 F.2d at 1387; *Petersen*, 2002 U.S. Dist. LEXIS 133, at *5.  Nor are the jury's conclusions inconsistent.  The jury could rationally conclude that defendant Gilmer was reckless in disregarding a substantial risk that his representations were false while Household and Aldinger knew that the representations were false.  Likewise, the jury's conclusion that Aldinger knew that the

3/23 statement was false and misleading while he disregarded a substantial risk that the 3/28 statement was false and misleading is entirely consistent.

## XII.  THE COURT PROPERLY RULED ON EXPERT TESTIMONY

### A.  The Court's Gatekeeping Function Under FRE 702 Focuses on the Expert's Methodology

As the Seventh Circuit has stated, this Court plays a limited gatekeeping function with respect to expert testimony: "we emphasize that the court's gatekeeping function focuses on an examination of the expert's methodology.  The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact . . . ."  *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000); *see also Traharne v. Wayne Scott Fetzer Co.*, 156 F. Supp. 2d 717, 723 (N.D. Ill. 2001) (Guzman, J.).  "'The rejection of expert testimony is the exception rather than the rule, and the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'  Cross examination and the presentation of contrary evidence are the 'traditional and appropriate means' of attacking expert testimony."  *Bullock v. Sheahan*, 519 F. Supp. 2d 760, 762 (N.D. Ill. 2007).  In exercising the gatekeeping function, the Court has "broad discretion."  *Miksis v. Howard*, 106 F.3d 754, 762 (7th Cir. 1997).  As discussed below, the Court fulfilled its gatekeeping function.

### B.  The Court Properly Admitted the Testimony of Plaintiffs' Expert Catherine Ghiglieri Pursuant to *Daubert* and FRE Rule 702

A motion for a new trial is not "a vehicle to relitigate old matters."  *McCloud v. Goodyear Dunlop Tires N. Am., Ltd.*, No. 04-cv-1118, 2008 U.S. Dist. LEXIS 43265, at *10 (C.D. Ill. June 2, 2008); *see also Oto v. Metropolitan Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000).  For this reason, the Court should reject defendants' arguments regarding Ghiglieri's testimony, which are mostly recycled from their *Daubert* motion without significant alteration.[42]

In any event, the Court properly admitted her testimony as her methodology was reliable.  3/17/09 Minute Order (Ghiglieri Order), Dkt. 1515.  It is undisputed that she performed the traditional analysis performed by regulators across the country.  *Id.* at 2; *see also Kumho Tire Co.,*

---

[42]    Defendants raise three new arguments, which are barred under FRE 103(a) because they failed to object to the testimony at issue during trial.  *Wilson v. Williams*, 182 F.3d 562, 567 (7th Cir. 1999).  As a result, the Court should deny defendants' challenges to (1) testimony regarding reaging (Defs' Brf. at 36 n.36), (2) testimony based on regulatory reports pursuant to FRE 703 (*id.* at 38 n.41), and (3) testimony regarding defendants' uncompetitive rates (*id.* at 35 n.33).

*Ltd. v. Carmichael*, 526 U.S. 137, 151 (1999); *Drebing v. Provo Group, Inc.*, 519 F. Supp. 2d 811, 817 (N.D. Ill. 2007). Further, as defendants' own expert conceded, this methodology often utilized "only . . . the materials reviewed by Ghiglieri." Ghiglieri Order at 2. To be sure, the focus of defendants' arguments here is not her methodology, but the factual underpinnings of her opinions. In its Order, the Court correctly noted: "If that is true, defendants have fertile ground for cross-examination, but it is not a basis for excluding Ghiglieri's testimony." *Id.*; *see Smith*, *supra*, 215 F.3d at 718; *Arias v. Allegretti*, No. 05-C-5940, 2008 U.S. Dist. LEXIS 4352, at *10 n.1 (N.D. Ill. Jan. 22, 2008).

Further, Ghiglieri's opinions had overwhelming factual support. During her direct, she discussed exhibits in the record regarding training,[43] insurance penetration targets (PX 898), branch office compensation (PX 269), inadequate internal controls (PX 717), Andrew Kahr's "growth initiatives,"[44] customer complaints[45] and regulatory reports from around the country.[46] And in her cross-examination, defendants elicited testimony regarding defendants' own internal refund estimates.[47] Ghiglieri had ample support for her opinions regarding defendants' widespread predatory lending practices.[48]

---

[43]     PXs 379; 898; 899; 900; 1383; *see also* Tr. 1462:2-12. These exhibits demonstrated not a "short-lived [effective rate] training program," *see* Defs' Brf. at 37, but a two-year nationwide effective rate training program.

[44]     PXs 347; 348; 533; 835.

[45]     PXs 276; 379; 1096. Defendants erroneously claim Ghiglieri used the Nanez complaint to opine Household generally did not disclose the terms of its loans to Spanish-speakers. Defs' Brf. at 37 n.37. Ghiglieri did not offer that opinion. *See* Tr. 569:1-15.

[46]     PXs 19; 290; 324; 333; 445; 550; 956; 965; 1013; 1205; 1333. Defendants challenge Ghiglieri's use of these reports because they were "unverifiable second- and third-hand expertise." Defs' Brf. at 38. However, "regulators ordinarily consult with, and rely on the findings of, their peers." *Cross* Order at 2 (Dkt. 1514). The cases defendants cite are inapposite, addressing an expert's use of a report prepared by a second, non-testifying expert in the same or related litigation. *See, e.g.*, *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 408 (6th Cir. 2006) (prior report prepared by expert in Korean litigation); *United States v. Tran Trong Cuong*, 18 F.3d 1132, 1143 (4th Cir. 1994) (prior report prepared at the request of the prosecution); *In re Parmalat Sec. Litig.*, 477 F. Supp. 2d 637, 641 (S.D.N.Y. 2007) (prior report prepared by expert for Italian criminal prosecution). The regulatory reports were pre-existing reports prepared by public officers pursuant to their duties, not litigation. *See* Tr. 262:11-263:1.

[47]     Tr. 711:4-10 (effective rate presentation); *id.* at 718:25-719:4 (insurance packing); *id.* at 769:14-20 (loan flipping). It is disingenuous for defendants to claim that Ghiglieri undertook no effort to quantify customer harm. Defs' Brf. at 35. As they "well knew," her report "has a section about how much Household calculated the refunds at, their estimates of those types of practices." Tr. 895:14-20; *see also id.* at 897:1-898:4.

[48]     In addition, there was evidence of Household's non-competitive interest rates. In a part of the Hueman videotape (PX 1383) shown to the jury, Hueman candidly noted Household's rates were higher than Household's competitors. PX 1383; *see* Tr. 717:14-21.

Ghiglieri also presented compelling testimony undercutting defendants' factual arguments, including (1) an explanation why regulators do ***not*** perform a complaint ratio analysis, but instead consider each complaint (Tr. 639:15-641:2; 654:24-655:2); and (2) that due to poor tracking of complaints, defendants themselves "did not have an idea of the magnitude of the complaints on any given issue." *Id.* at 659:7-22; *see also* PX 1148.

In sum, the Court properly exercised its gatekeeping function given the reliability of Ghiglieri's methodology. In any event, defendants' erroneous factual arguments go to the weight, not admissibility, of her testimony.

### C.    The Court Properly Admitted the Testimony of Charles Cross Pursuant to *Daubert* and FRE 702

Defendants contend the Court committed prejudicial error by admitting the video deposition testimony of Charles Cross. Defs' Brf. at 39-40. Defendants' current motion merely recycles the same arguments the Court already rejected in denying defendants' pre-trial *Daubert* challenge. *See* 3/17/09 Order. These arguments are no more persuasive the second time around. For example, defendants' primary contention – that Cross' opinions were derived solely from review of 19 complaints – is factually inaccurate. As the Court correctly noted, "Cross testified . . . that his conclusions were based not only on the investigation he conducted in Washington but on documents and information he received from regulators in thirty-nine other states." 3/17/09 Order (Dkt. 1514) at 2 (citing Cross Depo. Tr. 145-146); *see also* Cross Depo. Tr. 120:13-121:23; 138:8-140:24; 142:7-21; 150:4-150:12; 178:24-179:7; Cross Luna Depo Tr. 479:17-480:17; 486:2-21; 488:8-20. Additionally, in forming his opinions, Cross reviewed and analyzed internal documents produced by Household (Cross Depo Tr. 118:12-15; 119:1-7; 142:7-21; 178:24-179:7); solicited and evaluated responses from Household regarding the various issues raised (PX 290 at 4; Cross Depo Tr. 135:23-137:10; 182:2-184:6); evaluated Household's products and policies (PX 290 at 63, 65-66; Cross Depo Tr. 129:19-131:19; 145; Cross Luna Depo Tr. 149-150); interviewed witnesses (Cross Depo Tr. 117:22-117:25; 131:7-19); engaged in "mystery shopping" (Cross Depo Tr. 118:4-11); and assessed the impact of Household's compensation scheme on lending practices (PX 290 at 63, 66; Cross Depo Tr. 160:4-161:13). The Court's conclusion that Cross employed a sound methodology was correct.[49]

---

[49]    Defendants' factually inaccurate challenge should be rejected for the additional reason that it goes to the weight of Cross' opinions, not their admissibility. *Drago v. Aetna Plywood, Inc.*, No. 96 C 2398, 1998

Defendants' hearsay challenge is equally baseless.  As the Court held, Cross' testimony established that "regulators ordinarily consult with, and rely on the findings of, their peers." 3/17/09 Order at 2.  Thus, reliance on this information was proper.  FRE 703.

Defendants' bias argument also fails.  In conducting his examination, Cross reviewed and considered documents produced by Household, evaluated management's responses and viewed the complaints in a neutral manner.  Cross Depo Tr. 118:12-15; 119:1-7; 125:15-19; 135:23-137:10. Ultimately, however, Household's credibility eroded to a point where "it was almost like stuff was being fabricated to convince us, and we didn't believe it any longer."  Cross Depo Tr. 182:2-184:6. These facts do not establish bias.  In any event, as the Court correctly held, "Cross' alleged bias, which defendants explored on cross-examination, goes to the weight of his testimony not its admissibility." 3/17/09 Order at 2; *accord Richman v. Sheahan*, 415 F. Supp. 2d 929, 943 (N.D. Ill. 2006).  Cross' testimony was properly admitted.

### D.    Devor's Opinion as to Revenues Derived from Predatory Lending Was Properly Admitted

Defendants contend that Devor's opinion regarding the amount of revenue attributable to improper lending practices should not have been received.  Defs' Brf. at 40.  Defendants proffer two bases for their argument: (1) defendants contend that the opinion was not within the scope of Devor's expertise;[50] and (2), defendants argue that the opinion was based on evidence that was otherwise inadmissible.  *Id*.[51]  Defendants raised both issues in their *Daubert* motion as to Devor and lost.

Undoubtedly, Devor, as an accountant, was qualified to determine defendants' revenues during the RP and perform calculations to determine what percentage of that revenue on an annual or

---

U.S. Dist. LEXIS 12249, at *11 (N.D. Cal. July 31, 1998) (challenges to aspects of methodology and certain of the findings go to weight not admissibility); *see also Trs. of E. Cent. Ill. Pipe Trades Health & Welfare Fund v. Airport Plumbing & Heating Inc.*, No. 04-1059, 2006 U.S. Dist. LEXIS 787, at *8-*9 (C.D. Ill. Jan. 5, 2006) (same).

[50]    Defendants falsely claim that other courts have found Devor's testimony unreliable.  In *In re Acceptance Ins. Co. Sec. Litig.*, 352 F. Supp. 2d 940, 948 (D. Neb. 2004), the  Court excluded an affidavit submitted by Devor in support of plaintiffs' opposition to a summary judgment motion.  That affidavit was stricken because it did not assist the trier of fact, not because Devor's opinions were found to be unreliable. *Id*.

[51]    Defendants also claim Devor's testimony improperly suggested to the jury that Household defrauded investors by failing to disclose the Company's predatory practices.  This argument is addressed in detail at §XII.E.

quarterly basis was derived from improper lending. As this Court held in ruling on the *Daubert* motion:

> He [Devor] can also give his opinion about ***how much of the revenue Household reported for 1999*** through the second quarter of 2002 ***was attributable to predatory lending practices***. Defendants can explore on cross-examination the extent to which the documents on which Devor relies – Household's estimate of the refunds it might have to make in connection with the multi-state investigation and the multi-state investigation settlement agreement – ***are sufficient to support his opinion***. Dkt. 1528 at 2.

During trial, the issue arose again, and the Court specifically noted that Devor's opinion was based on his accounting expertise:

> THE COURT: I don't have any problem with the testimony comparing or quantifying the amount of revenue that was gained from the – his opinion as to the amount of revenue that was gained from the alleged predatory lending acts. We ruled that could be done, and I think it's perfectly proper. It's an accounting issue. He can view the records, view the books and see how they quantify this. I don't have a problem with that. Tr. 2584:2-9.

The Court was correct. Devor, an experienced CPA, was perfectly capable of rendering such an opinion. Tr. 2380-2388.

Similarly, Devor's reliance on the refund amounts paid by Household to settle with the Attorneys General and the $3.2 billion in refunds calculated by Carin Rodemoyer (PX 681) to support his opinion was perfectly proper. As a starting point, experts may rely on hearsay and otherwise inadmissible evidence in formulating their opinions. FRE 703. More importantly, the settlement amount was admitted for both damages purposes and to demonstrate the materiality of defendants' improper lending practices. As such, Devor was entitled to base his opinion on the undisputed number. Further, PX 681 was also ultimately received at trial – once defendants, who successfully convinced the Court to exclude details regarding the settlement – inexplicably opened the door on the issue during Aldinger's cross-examination. Tr. 3330:22-3349:7.

Defendants' claim that Devor's reliance on PX 681 constitutes complete speculation is nonsense. Clearly, defendants did their best to hide the significance of PX 681. *See* Dkt. 1358-1 at 18. However, there was never a real dispute about the purpose of PX 681. Rodemoyer's calculation, when placed next to PX 516, demonstrates she was calculating refunds for each of the predatory lending practices identified by the AGs.

In short, Devor's reliance on the settlement amount and PX 681 to support his opinion is a far cry from the circumstances confronted by the courts in *Elcock v. K-Mart Corp.*, 233 F.3d 734, 755-

56 (3d Cir. 2000), and *Irvine v. Murad Skin Research Labs Inc.*, 194 F.3d 313, 320-21 (1st Cir. 1999). In *Elcock* and *Irvine*, the assumptions underlying the expert's testimony were flatly contradicted by the evidence. In stark contrast, Devor's testimony was based on uncontradicted evidence.

Finally, the Court specifically held that defendants could test Devor's opinions regarding the revenue attributable to predatory lending on cross-examination. Dkt. 1528 at 2. However, defendants never even attempted to prove Devor wrong.

### E.     Any Alleged Prejudice Arising From Devor's Testimony Was Cured by the Court's Subsequent Instructions to the Jury

During trial, Devor testified without objection that, in his opinion, defendants' failure to disclose its predatory lending practices pursuant to GAAP made the Company's 10-Ks and 10-Qs false and misleading. Tr. 2416:7-2422:6. The Court subsequently *sua sponte* expressed concern with this testimony. Tr. 2578:6-2579:2. After receiving submissions on the issue from both parties, the Court read to the jury the following curative instruction:

> During his testimony, among other things, Mr. Devor, the expert attorney – the expert witness for the plaintiffs – gave his opinion that Household had a duty to disclose any predatory lending practices in certain 10-Q and 10-K filings that they had with the SEC. Whether such duty to disclose existed as to any particular 10-Q or 10-K filing is for you to decide on the basis of the evidence and the instructions that I will give you at the end of the trial. Accordingly, I instruct you to disregard that portion and only that portion of Mr. Devor's testimony.

Tr. 3811:14-3812:1. The Court properly handled this matter.[52]

First, although defendants complain now about an alleged ambiguity, they made no contemporaneous objection on that basis. *See* Tr. 4007:10-18; 4008:13-15; 4022:24-4023:19. Moreover, the instruction was not ambiguous – it specifically identified the problematic testimony ("his opinion that Household had a duty to disclose any predatory lending practices") and directed the jury to disregard ***that*** testimony. Indeed, defendants "incorporated" the same language into their own proposed instruction. *Id.* at 4008:13-15; *see* Dkt. 1585 at 5.

Second, the Court subsequently instructed the jury on defendants' duty to disclose. In fact, the Court's final instruction on this issue was substantially equivalent to defendants' proposed jury instruction, with one minor exception. *Compare* Jury Instructions at 26-27 with Dkt. 1585 at 4-5.

---

[52]     Defendants complain that the Court did not show them the curative instruction prior to issuance. However, given the parties' submissions, there was no requirement for the Court to do so.

That exception, a reminder to disregard Devor's prior testimony, was unnecessary because the jury was presumed to follow the Court's prior curative instruction to disregard that testimony. *Wilson v. Groaning*, 25 F.3d 581, 587 (7th Cir. 1994).

Finally, defendants did not object. As the Court noted, "here's the problem: I think that the defendants have failed to raise the issue at the appropriate times during the course of the trial." Tr. 2720:16-18. Thus, defendants cannot complain about the Court's failure to immediately issue a curative instruction, because they timely failed to call the purported "improper" testimony to the Court's attention. In any event, more than two weeks lapsed from the time Devor testified until the jury began deliberations, during which time any alleged prejudice to defendants diminished significantly. *See, e.g.*, *McCloud*, 2008 U.S. Dist. LEXIS 43265, at *28-*29.

In sum, defendants' complaints about the Court's curative instruction are meritless.[53]

## F.    The Court Properly Instructed the Jury Regarding Consideration of Expert Testimony

Defendants argue that this Court failed to instruct the jury properly with respect to consideration of expert testimony. This is patently false – this Court's jury instructions, which were either stipulated or pattern instructions, protected defendants from any possible undue prejudice arising from the testimony of plaintiffs' experts.

Defendants contend that an expert's opinion does not count "for purposes of satisfying Plaintiffs' burden of proof." Defs' Brf. at 44. However, FRE 702 expressly allows the jury to consider expert testimony in determining whether a party has met its burden. *See also*, *e.g.*, *Hardnick v. United States*, No. 07-C-1330, 2009 U.S. Dist. LEXIS 53739, at *19-*20 (N.D. Ill. June 25, 2009). The cases cited by defendants support not their contention, but only the narrow proposition that an expert's opinion based on inadmissible evidence does not prove the truth of that

---

[53]    Defendants' reliance on *Joseph v. Brierton*, 739 F.2d 1244 (7th Cir. 1984), is misguided. In that case, plaintiffs were precluded from mentioning that defendants would be indemnified by the State of Illinois if they lost. *Id*. at 1246. Notwithstanding this, defense counsel's closing focused on the potential financial impact of a judgment, falsely suggesting that a large judgment would ruin defendants. *Id*. In response, the court merely instructed the jury not to concern themselves with the defendants' ability to pay. *Id*. The jury returned a verdict for defendants. *Id*. On appeal, the Seventh Circuit found that the court's curative instruction was inadequate because when "the misconduct giving rise [to the curative instruction] is as serious as it was in this case stronger medicine may be needed." *Id*. at 1247. In no way can Devor's testimony concerning Household's duty of disclosure under GAAP be compared to the highly prejudicial and patently false closing argument in *Joseph*. Thus, no "stronger medicine" was required here.

evidence.[54]

And the Court's instructions did not allow the jury to consider inadmissible evidence cited by an expert for any purpose other than evaluating the expert's testimony.[55]  These instructions were given not once as defendants assert but three times (pretrial,[56] in-trial[57] and post-closing[58]) and were either stipulated to by the parties (Tr. 419:23-427:4), or substantively identical to Seventh Circuit Pattern Instruction No. 1.09.  *Federal Civil Jury Instructions of the Seventh Circuit*, Instruction No. 1.09.  These instructions removed any risk that the jury would consider evidence cited by the expert for improper purposes.  *See id.*, Committee Comments to Instruction 1.09 (citing cases).

It is presumed that the jury will follow the Court's limiting instructions: "Absent any showing that the jury could not follow the court's limiting instruction, we presume that the jury limited its consideration in accordance with the court's instruction." *United States v. Lee*, 558 F.3d 638, 649 (7th Cir. 2009).  There is no showing that the jury could not follow these instructions.

In sum, defendants have no basis to contend that this Court's admission of the testimony of Ghiglieri, Cross or Devor, whether individually or collectively, warrants a new trial.[59]  All of the challenged testimony was properly admitted and the Court carefully instructed the jury on how to consider evidence admitted solely for the purpose of evaluating that testimony.

---

[54]    *See In re James Wilson Assoc.*, 965 F.2d 160, 172-73 (7th Cir. 1992); *Loeffel Steel Products, Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 795, 808-09 (N.D. Ill. 2005); *In re Lake States Commodities, Inc.*, 271 B.R. 575, 585-86 (Bankr. N.D. Ill. 2002); *Sears, Roebuck and Co. v. Savoy Reinsurance Co., Ltd.*, No. 90-C-1202, 1991 WL 247583, at *5 (N.D. Ill. Nov. 8, 1991).

[55]    The Court also instructed the jury on how to evaluate expert testimony.  That instruction, which is Seventh Circuit Pattern Instruction No. 1.21, addressed and removed the possibility that the jury might give experts undue credibility.  *See Federal Civil Jury Instructions of the Seventh Circuit*, Committee Comments to Instruction No. 1.21 (citing cases).

[56]    "During the course of the trial, I may instruct you that certain evidence is being admitted for a limited purpose only.  When I do so, you must consider this evidence only for that limited purpose."  Preliminary Instructions at 5; Tr. 238:15-18.

[57]    "During the course of testimony by expert witnesses who you may hear, you may hear evidence regarding the category of documents I have already told you about. . . .  The underlying information that you receive in this manner must not be considered by you for the purpose of determining – must not be considered by you as evidence of the truth of the information but rather is being admitted for the limited purpose of showing you – or assisting you to evaluate the expert witness' opinion and how sound that opinion is."  Tr. 429:15-434:6.

[58]    "Some evidence was admitted for the limited purpose of assisting you to evaluate an expert witness' opinion.  Such evidence must not be used by you for any other purpose."  Instructions at 6; Tr. 4709:5-7.

[59]    Defendants cite two portions of plaintiffs' closing argument as probative of their prejudice.  These statements were not objected to and are not objectionable, being summaries of the experts' prior testimony.  *See* Tr. 4432:10-14 (statement of Court re purposes of closing argument).

- 43 -

### XIII.  THE COURT'S JUDICIAL RULINGS DO NOT ENTITLE DEFENDANTS TO A NEW TRIAL

#### A.    Defendants Have Not Met the Burden of Proving that Plaintiffs' Reliance on Customer Complaints and Complaints in Other Litigation Deprived Them of a Fair Trial

Prior to trial, defendants moved *in limine* to exclude evidence of or reference to customer complaints and complaints filed in other civil cases, arguing that the complaints contained inadmissible hearsay.  *See* Dkt. 1349-2.  The Court denied defendants' motion, holding the complaints were relevant for the nonhearsay purpose of proving defendants' knowledge of the lending practices and to rebut defendants' argument that Household's predatory lending practices were geographically isolated and the result of a few rogue employees.  Dkt. 1516 at 5, 8.  The Court also instructed defendants to draft an appropriate limiting instruction for the jury concerning the purpose for which the evidence should be considered.  *Id.* at 5.

Defendants contend plaintiffs repeatedly introduced customer complaints and complaints filed in other civil litigation for their truth and that "Plaintiffs' experts presented the substance of these hearsay documents as fact."[60]  Defs' Brf. at 45.  Defendants fail to identify where in the record, if at all, they objected to the alleged improper use of the examination reports.  *See, e.g.*, *Spina*, 207 F. Supp. 2d at 771; *Love v. Lerch*, No. 88 C 8006, 1993 U.S. Dist. LEXIS 185, at *23 (N.D. Ill. Jan. 12, 1993).

Moreover, the Court instructed the jury regarding the limited purpose of both the complaints and testimony of plaintiffs' expert witnesses.  Tr. 433:16-434:6 (instructing jury that testimony by expert witnesses regarding limited purpose evidence is not to be "considered by you as evidence of the truth of the information but rather is being admitted for the limited purpose of showing you – or assisting you to evaluate the expert witness' opinion and how sound that opinion is").  Not only did defendants help draft the limiting instruction, at no time did defendants object to the instruction as given.  Nor have defendants demonstrated that the jury disregarded the instruction and considered the complaints for something other than their limited purpose.  *Jones*, 188 F.3d at 732 (noting presumption that a jury will follow the court's cautionary instructions).

---

[60]    Defendants also argue plaintiffs relied on hearsay evidence contained in state and federal reports of examination.  The Court properly rejected defendants' hearsay argument, ruling that the reports of examination were admissible under FRE 803(8).  *See* Tr. 260:8-264:13.

### B.    Defendants Opened the Door to the Admission of Settlement-Related Evidence

Defendants moved *in limine* to preclude any reference to Household's settlements in civil lawsuits and regulatory agency actions, including the $484 million settlement with the State AGs. Dkt. 1349-2.  In granting in part defendants' motion, the Court held that admission of the AG investigatory findings and civil complaints to prove defendants' knowledge of a reckless course of conduct, rather than the civil and regulatory settlements, "reduces the risk of unfair prejudice to defendants and promotes the spirit of Rule 408."  *See* Dkt. 1516 at 6.  The Court further held that plaintiffs were entitled to prove loss causation through the use of public disclosures about the settlement, using only that "information sufficient to identify the date, time, means and nature of the disclosure."  *Id.*  The Court recognized that such information "can be introduced into evidence without requiring the introduction of any actual settlement documents or any documents or testimony concerning allegations that were settled or the settlement terms or negotiations."[61]  *Id.*

Following the Court's *in limine* ruling, defendants continued their efforts to limit plaintiffs' use of settlement-related evidence at trial.  For example, defendants asked the Court to limit the $484 million settlement's use in the trial to Devor's calculations or proof of loss causation.  Pretrial Conf. Tr. 824:11-21.  The Court responded as follows:

> I don't know that I can do that.  I don't know what's going to happen during the trial. I mean, ***you may bring it up***.  I don't know.  ***Or you may open the door***.  Or there may be some other legitimate function for it. . . . I'm not prepared to make an advisory ruling as to anything.

*Id.* at 824:22-825:3.  The Court's admonitions made explicitly clear that settlement evidence would come in if defendants otherwise opened the door.

Notwithstanding this fact, it was defendants themselves who first elicited testimony concerning the State AG settlement.  *See* Dkt. 1551 at 6 ("in direct examination [Ghiglieri] was not

---

[61]    Defendants also claim they were prejudiced by the "erroneous admission" of PX 550, a letter from the Washington State Assistant AG to Household that discussed the multi-state AG investigation into Household's predatory lending practices.  Defs' Brf. at 48 n.55.  But defendants did not include PX 550 in the appendix of documents they sought to exclude in their motions *in limine*.  On 3/17/09, the Court granted in part and denied in part defendants' motions *in limine*.  *See generally* Dkt. 1516.  The Court deemed "any argument based on the motion waived" as to any exhibits not included in the appendix, "because the exhibit . . . . should have been included in the appendix for the Court's consideration."  Dkt. 1516 at 1.  Because defendants had failed to identify PX 550 as a document that they sought to exclude, the Court admitted it. *United States v. Anifowoshe*, 307 F.3d 643, 649 (7th Cir. 2002) (giving "great deference" to trial court's decision to admit or exclude evidence).  Furthermore, defendants never demonstrated that PX 550 was inadmissible.

asked and did not testify regarding the settlement itself or the terms of the settlement"). Indeed, Ghiglieri was not "primed" to "flout" the Court's order and did not testify about the fact or amount of the settlement until defendants brought evidence of the settlement out on cross-examination. *See, e.g.*, Dkt. 1551 at 7 (holding defendants waived any objections to Ghiglieri's testimony by failing to object or move to strike at the time).

Defendants now attempt to explain away their failure to object or move to strike Ghiglieri's testimony, complaining that any curative instruction would have highlighted the "elephant in the room" and that detailed cross-examination could have opened the door to more inadmissible evidence. Defs' Brf. at 47. Defendants' "Hobson's choice" argument rings hollow in light of defense counsel's admission during trial that he made a "tactical decision" not to object to Ghiglieri's testimony. A mistaken tactical decision does not result in a new trial. *United States v. Wynn*, 845 F.2d 1439, 1443 (7th Cir. 1988) (noting reluctance to find plain error "where a defendant fails to object to the admission of evidence at trial because of a tactical decision").

Moreover, by the time Devor testified, the jury had already heard testimony concerning the fact and amount of the $484 million State AG settlement. Thus, any claim that Devor violated the Court's 3/17/09 Order should be rejected. Defendants also improperly suggest that Devor violated the Court's Order by using settlement-related documents to opine on the amount of revenue attributable to Household's predatory lending practice. Prior to trial, the Court ruled Devor could rely on otherwise inadmissible documents, such as PX 681, to quantify the amount of revenue attributable to the Company's lending practices. *See* Pretrial Conf. Tr. 800:24-808:11 (overruling defendants' objection to Pltfs' Demonstrative Ex. No. 40). Defendants subsequently raised the same issue again in a sidebar with the Court before Devor testified. At that time, defendants made yet another attempt to limit Devor's expert testimony. Tr. 2374:7-2377:12. The Court ruled Devor could "testify as to the bases for his opinions, including the figures that he took into account. He can testify as to the origin of those figures." Tr. 2376:23-25. Contrary to defendants' assertion, Devor's testimony was entirely proper and did not contravene the Court's Order.

If the door was not fully open by the time Aldinger testified, it was blown off its hinges afterwards. Defense counsel examined Aldinger in detail concerning the motivation behind Household's decision to settle with the State AGs, the events leading up to the settlement and Aldinger's involvement in the settlement. Tr. 3330:22-3349:7. Immediately after this testimony, plaintiffs' counsel requested permission to use two previously excluded settlement-related exhibits. Tr. 3353:8-3373:15; *see also* PXs 681; 516. Defendants first tried to claim that they had "done

nothing to open the door." The Court disagreed. Tr. 3385:1-3386:14 ("My ruling with respect to the Attorney Generals' settlement is that that door has been opened."). Defendants then made the same argument they raise now, claiming plaintiffs "undermined, eroded and chipped away" at the Court's 3/17/09 Order. The Court responded:

> I think the record is pretty clear on this. My rulings are very narrow and strict with respect to the use of that information. ***And they have been adhered to***. Only the experts have testified to [the settlement] and only then in order to indicate their support for their opinions. And the record will clearly also reflect that the very first time ***any*** of this came into the record was on ***your*** cross-examination of Ms. Ghiglieri. And I've already made a long and extensive ruling on how that happened and how it could have been avoided, had you not pressed and pressed and pressed her on that point. Tr. 3388:23-3389:9.

Defendants' efforts to distort the record must be rejected. Defendants first elicited details of the settlement during ***defendants***' cross-examination of Ghiglieri (to which defendants did not move to strike) and then ***defendants*** extensively cross-examined Aldinger about the settlement. The Court had the discretion to allow plaintiffs to use previously inadmissible settlement-related evidence in order to rebut Aldinger's testimony after defendants opened the door to such evidence. *See* Tr. 3372:9-3373:5 ("Look, your client just testified for about 20 minutes as to the negotiations that went on in reaching the settlement agreement . . . [t]hey now have a right to rebut that. They have a right to bring out evidence to rebut what your client said about how the negotiations went down and what his motivation was for . . . reaching that settlement."); *Anifowoshe*, 307 F.3d at 649 ("[t]he district court is within its discretion in allowing testimony if the objecting party has already opened the door for such testimony"). Any alleged prejudice defendants have suffered is the result of their own doing and does not entitle them to a new trial.

Finally, defendants accuse the Court of failing to conduct a balancing test under Rule 403 because "nothing had changed" from the Court's initial ruling barring the use of certain settlement-related evidence. Defs' Brf. at 48. Before trial, the Court held that "[w]hether Household settled claims based on its lending practices may very well lead to the unfair and prejudicial inference that Household failed to disclose material facts regarding its lending practices." Dkt. 1516 at 5. During cross-examination, however, Aldinger testified that Household settled with the State AGs solely for business purposes, not because he believed Household had done anything wrong. Tr. 3330:22-3349:7; 3372:13-3373:5. At that point, everything changed. Once defendants opened the door by examining Aldinger on the motivation behind Household's settlement, plaintiffs had a right to rebut his testimony; "[plaintiffs had] a right to bring out evidence to rebut what [Aldinger] said about how

the negotiations went down and what his motivation was for the – for reaching that settlement." Tr. 3373:1-5; 3371:20-23 ("You can't bring [evidence of the settlement] out and then say, 'Oh, because of [the Court's] prior ruling, they cannot now rebut the evidence you brought forth.'"); *Griffin v. Foley*, 542 F.3d 209, 219 (7th Cir. 2008) (concluding it was proper for the district court to allow previously inadmissible evidence in to rebut testimony when the complaining party opened the door to the evidence during cross-examination). The Court's decision was entirely proper.

## C.      Defendants' False and Misleading Statements Are Not Puffery

Prior to trial, defendants sought to exclude 11 statements and/or portions of statements they claimed contained "non-actionable" puffery, such as statements about Household's "growth and profitability" and "strong" performance. Dkt. 1319 at 4. The Court denied defendants' motion in part, finding that some of the challenged statements contained inactionable puffery, while others were "entwined with verifiable assertions of fact, which are actionable despite the puffery." Dkt. 1502 at 2. The jury found defendants liable with respect to three of the statements challenged by defendants. *See* Dkt. 1611 (Table A to verdict form, statements Nos. 18, 24 and 29).

Without identifying new facts or changed law, defendants now rehash the same arguments advanced in their motion *in limine*, claiming that the challenged portions of statement Nos. 18, 24 and 29 are puffery. *Compare* Defs' Brf. at 49 *with* Dkt. 1319 at 3-6. However, it is well-established that "Rule 59 is not a vehicle for rearguing previously rejected motions." *Oto v. Metropolitan Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000); *McCloud*, 2008 U.S. Dist. LEXIS 43265, at *10 (refusing to rehash defendants' old arguments, noting that a "motion for a judgment as a matter of law nor a motion for a new trial can be used as a vehicle to relitigate old matters" and criticizing defendants for "rerais[ing] every major issue[] previously addressed by the Court"). Because that is exactly what defendants are attempting here, their motion should be denied.

The Court committed no error in ruling that the challenged portions of statements Nos. 18, 24 and 29 contained "verifiable assertions of fact." Dkt. 1502 at 2. As the Seventh Circuit has recognized, "the crux of materiality is whether, ***in context***, an investor would reasonably rely on the defendant's statement as reflecting a consequential fact about the company." *Makor Issues & Rights*, 437 F.3d at 596; *Silverman v. Motorola, Inc.*, No. 97 C 4507, 2008 WL 4360648, at *10 (N.D. Ill. Sept. 23, 2008) (pointing out that among the alleged puffery "lies certain specific statements of present fact that could be considered material"); Dkt. 1502 at 2 ("there is no bright line that separates actionable statements from puffery"). Finally, defendants' unsupported assertion that the jury may have based its verdict on the "inactionably vague portions of the statements" should be

- 48 -

rejected. The Court properly instructed the jury concerning the element of materiality and the jury is presumed to have followed the Court's instructions. *See* Tr. 4716:16-25.

### D. Fischel Did Not Offer Any Opinions that Were Not Included in His Report

The Court did not err in allowing Fischel's testimony. Fischel's opinions at trial were all disclosed in his two expert reports and one supplemental declaration. Rule 26 expert reports must be "detailed and complete" and not "sketchy, vague or preliminary in nature." Fed. R. Civ. P. 26 Advisory Committee Notes, 1993 Amendment; *Sierra Club Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 571 (5th Cir. 1996); *Salgado by Salgado v. General Motors*, 150 F.3d 735, 741 n.6 (7th Cir. 1998). Fischel provided three expert reports totaling 58 pages, plus exhibits, which set forth all of the opinions offered at trial and responded in detail to every criticism set forth by Bajaj. In short, defendants were not "surprised" by any opinion offered by Fischel at trial.

Defendants argue that Fischel "committed" in his report that no artificial inflation entered into Household's stock price from 7/30/99-11/15/01. Defendants made this argument in their *Daubert* motion and it was rejected for the same reason – Fischel clearly opined that inflation entered Household's stock during this period due to defendants' false statements or omissions. Fischel Rebuttal Report, ¶¶37-38. Fischel admitted that there were no statistically significant price increases on the dates of the false statements but they were not necessary for Household's stock to be inflated. Tr. 2963:21-2964:6. And Bajaj agreed. Tr. 4244:2-6.

Fischel's trial testimony cited by defendants was not a "new" opinion on loss causation, as defendants suggest. Fischel testified that inflation was caused by Household's false statements about its financial condition (increasing revenues and earnings) and growth prospects. Tr. 2605:20-2606:23. This testimony clearly relates to his opinions in his expert report about Household's alleged false statements and the inflation in Household's stock price. *See* Fischel Report, ¶10 (discussing materially false financial statements, predatory lending, reaging and restatement allegations cited in plaintiffs' complaint). The Court properly overruled defendants' objection to this testimony.

Defendants' argument that Fischel offered a new opinion at trial about inflation is also without merit. Fischel consistently testified that he assumed a false statement caused Household's stock to be inflated on 7/30/99 or a later date but that it was the jury's job to determine liability. If the jury found a false statement at a later date, inflation would exist on that date.

## XIV.   THE COURT'S JURY INSTRUCTIONS AND VERDICT FORM WERE PROPER

### A.   The Court's Jury Instructions Do Not Entitle Defendants to a New Trial

Defendants are entitled to a new trial on the basis of an incorrect jury instruction *only* if they suffered prejudice, *i.e.*, if, "considering the instructions as a whole, along with all of the evidence and arguments, the jury was misinformed about the applicable law." *Wakeen Doll Co., Inc. v. Ashton Drake Galleries*, 272 F.3d 441, 452 (7th Cir. 2001) ("To win a new trial based on an erroneous jury instruction [defendants] must show that: 1) the instructions did not adequately state Seventh Circuit law and 2) [they] were prejudiced by the error because the jury was likely confused or misled."). None of the instructions defendants now challenge incorrectly stated the applicable law or misled the jury, nor have defendants demonstrated that they have suffered the type of prejudice sufficient to warrant a new trial.

#### 1.   The Court Properly Instructed the Jury Regarding the Making of a False Statement

At the close of evidence, the Court instructed the jury regarding the elements of plaintiffs' Rule 10b-5 claim. With respect to the first element, the Court's instruction stated as follows:

> [T]he defendant made, approved, or furnished information to be included in a false statement of fact or omitted a fact that was necessary, in light of the circumstances, to prevent a statement that was made from being false or misleading during the relevant time period between July 30, 1999 and October 11, 2002. Tr. 4714:1-10.

Defendants now claim they are entitled to a new trial because the Court's instruction "impermissibly expanded the scope of Rule 10b-5." Defendants first point out that the language of Rule 10b-5 explicitly provides that "it shall be unlawful for any person" to "*make* any untrue statement of a material fact." Defs' Brf. at 53. Defendants next contend that the Court's instruction improperly contravened the Supreme Court's decision in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 128 S. Ct. 761 (2008) and "rendered gratuitous" the elements of liability under §20(a). Finally, defendants claim prejudice. Each argument is without merit.

Consistent with the language of Rule 10b-5, the Court instructed the jury that plaintiffs must prove that the defendant *made* a false or misleading statement of fact. Tr. 4714:22-4715:1. At the close of evidence, the Court essentially instructed the jury twice regarding the elements of plaintiffs' Rule 10b-5 claim. First, the Court briefly summarized the four elements plaintiffs were required to prove to prevail. Tr. 4714:1-15 (describing briefly the four elements of plaintiffs' Rule 10b-5 claim). The Court then instructed the jury in detail regarding each separate element. With respect to

the first element, the Court stated the plaintiffs must prove that "the defendant made, approved or furnished information to be included in a false statement of fact or omitted a fact that was necessary in light of the circumstances, to prevent a statement that was made from being false or misleading." Tr. 4714:5-9.

The Court's instruction did not "impermissibly expand the scope of Rule 10b-5" and was taken directly from controlling Seventh Circuit authority. Here, plaintiffs alleged that the Company, in addition to the individual defendants, was liable for violations of §10(b) and Rule 10b-5. In *Makor*, 513 F.3d at 708, the Seventh Circuit recognized that a corporation is liable for statements made by employees acting with apparent authority to make them. The Seventh Circuit then observed that the corporate scienter inquiry "requires look[ing] to the state of mind of the individual corporate official or officials who make or issue the statement (*or order or approve it or its making or issuance, or who furnish information or language for inclusion therein*, or the like)." *Id.*; *see also Pugh v. Tribune Co.*, 521 F.3d 686, 697 (7th Cir. 2008) (same).

Though *Tellabs* and *Pugh* both address the issue of corporate scienter, this Court recognized the overlap between corporate scienter and the act of making a statement. Tr. 2797:17-20; 3850:3-4; 3858:2-6 (noting that "the language that the Seventh Circuit used in its scienter discussion also applied to the making of a statement"). Thus, the Court's instruction properly included the "approved or furnished" language set forth in *Tellabs* and *Pugh*. Tr. 3841:15-22 ("[*Tellabs*] appears to be the most recent instruction that we can glean from the Seventh Circuit . . . it appears to be the best language we have right now to interpret the Seventh Circuit's thinking on this precise issue."). Because the Court's instruction was consistent with and accurately stated Seventh Circuit authority, defendants are not entitled to a new trial.

Defendants next argue that the Court's instruction contravened *Stoneridge Inv. Partners*, 552 U.S. 148, 128 S. Ct. 761 (2008). Their reliance on *Stoneridge* is completely misguided.[62] In *Stoneridge*, the Supreme Court addressed the issue of when, if ever, investors may recover under §10(b) from a **secondary actor** "that neither makes a public misstatement nor violates a duty to

---

[62]    Defendants also claim that the Court's instruction "rendered gratuitous" the elements of §20(a) liability. Defendants made the same argument during a jury instruction hearing, which the Court properly rejected. Tr. 3855:22-3857:13 ("We're talking about the individual defendants as the individuals who provided information to those who are not defendants . . . I don't see how, given that situation, we're somehow eradicating 'controlling authority' liability."). The "approved or furnished" language contained in the Court's instruction relates to corporate scienter and is entirely unrelated to and did not alter the elements of §20(a).

disclose but does participate in a scheme to violate §10(b)." *Id.* at 767. The secondary actors in *Stoneridge* were suppliers, and later customers, of the company that issued the financial statements and securities in question, but had no role in preparing or disseminating the financial statements at issue. *Id.* In affirming the Eighth Circuit's judgment, the Supreme Court held that the implied right of action under §10(b) "does not reach the customer/supplier companies because the investors did not rely upon their statements or representations." *Id*. at 766.

Unlike in *Stoneridge*, the defendants in this case are the quintessential primary actors – the Company, its CEO, CFO and the head of the Company's largest business unit. Each of the individual defendants helped prepare and disseminate the Company's financial statements; defendants cannot seriously contend otherwise. Aldinger admitted that he was "accountable" because he signed the Company's Form 10-K. Tr. 3439:5-11 ("I signed the document, so I'm accountable for what's in it."). Schoenholz also admitted responsibility for the contents of Household's public filings. Tr. 2111:25-2112:2. And Aldinger testified that Gilmer was responsible for the consumer lending disclosures contained in Household's Form 10-K. Tr. 3427:16-22 ("[E]ach of the[] businesses has its own CEO, a CFO, Chief Financial Officer, a chief credit officer, a head of collections, and all of those people, including the controllers and accounting support, work on putting our packages together."). Clearly, this case is not one involving secondary actors. Accordingly, there is nothing about the Court's instruction that improperly contravened *Stoneridge*.

Finally, defendants resort to pure speculation, claiming that the Court's instruction allowed the jury to find Gilmer and Aldinger liable for statements they did not make. However, defendants' speculation does not rise to the level of "prejudice" necessary to justify a new trial. As discussed at §IX., *supra*, the jury heard evidence regarding Gilmer's involvement in the preparation of Household's financial statements, along with testimony about Gilmer and Aldinger's attendance at the FRC. *See, e.g.*, PX 135; *Barrie*, 409 F.3d at 656. Defendants also hypothesize that the Court's instruction "may" have accounted for the "erratic" finding that Aldinger knowingly committed fraud as to a statement made by Gilmer. Defs' Brf. at 54. As discussed, this conclusion is perfectly consistent and rational. §XI.C., *supra*. Furthermore, the Court's instruction correctly stated the proper legal standard under Seventh Circuit law. Even assuming, *arguendo*, the Court's instruction was erroneous, defendants have not met the burden of demonstrating that the Court's error resulted in prejudice. In the absence of such showing, defendants' motion should be denied.

### 2. There Was No Error in the Court's Instruction Regarding Defendants' Duty to Disclose

Defendants seek a new trial based on their flawed argument that the Court improperly instructed the jury regarding defendants' duty to disclose information if the omission of that information would render a prior or contemporaneous statement about the same topic misleading, if those facts are not disclosed. Defendants' argument ignores the basic premise that the Court's instruction regarding defendants' duty to disclose information must be considered in conjunction with the entire charge to the jury, along with all of the evidence and arguments by counsel. *Boyd*, 384 F.3d at 894; *Carter*, 2001 U.S. Dist. LEXIS 14052, at *21. Defendants have taken one sentence from the jury charge completely out of context. Further, defendants have failed to demonstrate any prejudice that resulted from the alleged error. *Wakeen*, 272 F.3d at 452. Since defendants have made no showing that the jury was likely confused or misled as a result of this instruction, their motion must be denied.

In essence, defendants argue that they are entitled to a new trial based on the Court's inclusion of the word "prior" in the instruction regarding false statements and omissions. However, defendants take the sentence out of context. In fact, the Court, as a primary matter, instructed the jury that plaintiffs must prove:

> the defendant made . . . a false statement of fact or ***omitted a fact that was necessary, in light of the circumstances, to prevent a statement that was made from being false or misleading during the relevant time period*** . . . . Tr. 4714:5-9.

Thereafter, the Court again admonished that the omission must relate to a statement that was made, telling the jury:

> To meet the first element of their 10b-5 claim against any defendant, plaintiffs must prove that during the relevant time period the defendant made a false or misleading statement of fact or omitted a fact that was necessary to prevent a statement that was being made from being misleading.
>
> Table A to the verdict form that you will be given, sets forth the statements that plaintiffs claim are false and misleading.
>
> ***In determining whether a statement of fact is false or misleading, you must consider the statement in light of the circumstances that existed at the time it was made***. Tr. 4714:22-4715:7.

Finally, the Court, in an effort to protect the defendants, instructed the jury that defendants could not be liable simply for failing to disclose a fact in the absence of a duty to disclose it, stating:

> An omission violates 10b-5 only if the defendant has a duty to disclose the

omitted fact.  The defendants do not have a duty to disclose every fact they possess about Household or any fact that is in the public domain.  ***But each defendant has a duty to disclose a fact if a prior or contemporaneous statement he or it made about the same subject would be misleading if the fact is not disclosed***.  If a defendant does not have a duty to disclose a fact but chooses to make a statement about it, the statement must be truthful and not misleading.  Tr. 4715:8-17.

Taken as a whole, the instruction is absolutely consistent with Seventh Circuit jurisprudence. The Court explained that defendants have no general duty of disclosure, unless they choose to speak about a particular subject, in which case the statement must be truthful and not misleading. *Stransky*, 51 F.3d at 1331.  In using the word "prior," the Court properly admonished the jury that once a defendant had made a statement about a particular subject, that defendant was under an ongoing duty to disclose the omitted fact that was necessary to prevent the prior, or any contemporaneous, statements made about the same subject from being misleading.[63]  The Court's instruction, taken as a whole, is appropriate.[64]

Defendants' fears about the statute of repose are completely unfounded.  The Court advised the jury that defendants could only be liable for statements or omissions during the relevant period. In light of this admonition, the cases cited by defendants are inapplicable.  *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 154 (2d Cir. 2007) (holding that a duty to correct arises when a defendant learns that its prior statement is false, but granting defendants' motion to dismiss because RP statements, after the duty arose, did not cause plaintiffs' loss); *Caviness v. DeRand Res. Corp.*, 983 F.2d 1295, 1301 (4th Cir. 1993) (standing simply for the proposition that a "theory of integration . . . may not be applied to a claim under §12(2) to alter the three-year statute of repose of §13" of the Securities Act of 1933); *In re Affiliated Computer Servs. Deri. Litig.*, 540 F. Supp. 2d 695, 701 (N.D. Tex. 2007) (dismissing claims based on statute of repose).

In addition, defendants have not demonstrated any prejudice from the instruction.

---

[63]     Clearly, a defendant has an ongoing duty to correct historical statements that, at the time made, defendant believed to be true, but which are subsequently discovered to be false.  *Stransky*, 51 F.3d at 1331. In light of that maxim, defendants here cannot seriously argue that a defendant who makes a false statement with contemporaneous scienter as to falsity, is not under a similar ongoing duty to correct it.

[64]     Defendants made a similar argument at the hearing discussing the Court's proposed jury instruction on the duty to disclose.  There, defendants argued that the duty to disclose should be judged solely from the face of the statement, "whether the statement itself is misleading and whether it is misleading because of specific information that has been omitted from that statement."  Tr. 4018:1-5; 4019:1-4022:17.  The Court rejected defendants' interpretation of the duty of disclose, concluding that the "jury is to determine whether a statement is misleading based upon all of the circumstances that existed at the time it was made."  Tr. 4022:12-17.

Defendants attempt to argue prejudice by raising (again) the specter that somehow the jury may have been confused into imposing liability for statements protected by the statute of repose. Defendants' argument is completely contradicted by the record. The jury's verdict confirms that they only found liability for particular, identified statements. Defendants cannot seriously argue jury confusion when the jury found that defendants were not liable on statements 1-13, 19, 25-26, 30-31, 33-35, 39-40. The verdict, standing in isolation, demonstrates that the jury independently considered each false statement.

### 3.    The Court's Scienter Instruction Was Proper

To obtain a new trial based on the Court's scienter instruction, defendants must show (1) a legally erroneous instruction and (2) prejudice arising from the alleged error. *Wakeen*, 272 F.3d at 452. However, they cannot prevail because the Court's instruction was correct. Moreover, there was no possible prejudice since the correct legal principles were stated in the verdict form and the parties' arguments.

The Court's scienter instruction directed the jury to find scienter as to a statement if the defendant acted "knowing that it was false or misleading or with reckless disregard for a substantial risk that it was false or misleading." Scienter Jury Instruction, Dkt. 1614 at 29. It then specifically defined reckless conduct to be "an extreme departure from the standards of ordinary care and [the defendant] knows that it presents a risk of misleading investors or the risk is so obvious that he had to have been aware of it." *Id.* This instruction undeniably set out the applicable law.[65] *See Makor Issues & Rights*, 513 F.3d at 704 (including "popular definition of recklessness").

Nevertheless, in an effort to manufacture error, defendants seize upon the following sentence: "A finding that any defendant acted with the required state of mind depends on what he knew or

---

[65]    In contrast, it would have been legal error to adopt defendants' proposed scienter instruction, which required the jury to find "an intent to deceive, manipulate, or defraud." Defendants argue that their language must be correct since it comes from the Supreme Court's decision in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976). However, after that case was decided, the Seventh Circuit, like every other circuit, concluded that scienter can also be shown "using the 'reckless' alternative," an issue left open in *Ernst*. *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1039-40 (7th Cir. 1977); *see also Rowe*, 850 F.2d at 1238; *SEC v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998) ("*Sundstrand* [] holds that reckless disregard of the truth counts as intent for this purpose."); *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995) ("intent to mislead or at least with recklessness so severe that it is the functional equivalent of intent"); *Robin v. Arthur Young & Co.*, 915 F.2d 1120, 1126 (7th Cir. 1990) ("the requirement of wrongful intent is satisfied by a showing of reckless conduct"). The Court's rejection of defendants' proposed language, therefore, was proper as that language is overly narrow and inconsistent with the "reckless" prong of scienter. *See Mesman v. Crane Pro Services*, 512 F.3d 353, 356-57 (7th Cir. 2008) (refusal to give "garbled" instruction not error).

should have known when he made a particular statement or omission." Defs' Brf. at 55-56. This sentence properly limits the jury's scienter deliberations to information defendant knew or had available to him *at the time*, *i.e.*, no fraud by hindsight. *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir. 2001); *see also Makor Issues & Rights, Ltd.*, 437 F.3d at 603 (citing *Green Tree*). Courts use the phrase "should have known" to describe this temporal aspect of scienter. *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2nd Cir. 2001); *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 684 (6th Cir. 2004); *Ong v. Sears, Roebuck & Co.*, No. 03-C-4142, 2005 U.S. Dist. LEXIS 20391, at *55-*56 (N.D. Ill. Sept. 14, 2005). Not surprisingly, defendants cite no case law demonstrating that inclusion of this sentence was legally erroneous.

Instead, defendants contend that the sentence weakened the standard for recklessness to a negligence standard. Defs' Brf. at 56. This cannot be reconciled with the jury instruction as a whole nor the sentence itself. As noted above, the instruction commences with language requiring defendants' conduct to be either "knowing" or "reckless," with the latter defined in a way to preclude liability for mere negligence. *See supra*. The sentence cited by defendants does not alter the plain meaning of these portions of the instruction nor does it suggest there could be scienter as to a statement that a defendant "should have known" was false.

Additionally, under Seventh Circuit authority, the Court should not order a new trial based on an erroneous jury instruction where the correct legal standard was set forth in the verdict form or the parties' oral arguments. *Wakeen*, 272 F.3d at 454. Question No. 3 of the Court's verdict form required the jury to determine whether the defendant acted "knowingly" or "recklessly." There was no improper "negligence" option in the verdict form. Similarly, the parties' closing arguments highlighted that mere negligence was insufficient. Plaintiffs' counsel stated plainly: "We have to show that the defendants acted knowingly or recklessly." Tr. 4450:7-8. Defendants' counsel distinguished between intentional acts and mistakes: "if it wasn't intentional, if it was just a mistake, it doesn't matter, either." Tr. 4540:1-4; *see also id.* at 4540:13-18; 4540:25-4541:11; 4546:16-19; 4549:5-18; 4588:3; 4597:1-4598:19; 4599:10-11; 4600:20-22; 4601:10-19; *id.* at 2691:2-2692:22 (interim summation).

In sum, there is no way the jury could have been confused into believing that a simple mistake (negligence) was enough. On the contrary, the Court's scienter instruction, whether considered alone or with the verdict form and the parties' arguments, required the jury to find that the defendants acted knowingly or with reckless disregard, the correct legal standard.

### 4.    The Court Did Not Misstate the Law in Response to the Jury's Question About Loss Causation

The Court's response to the jury's question about the starting date for liability was proper. The jury's question was related to whether a finding of liability can start during the RP and if it needs to be unanimous. Tr. 4771:2-16. The Court's response was not exclusive to the loss causation instruction given as defendants suggest. The Court's response was narrowly tailored to the question raised about whether liability can start on a date subsequent to 7/30/99 and not to any other elements of liability. Tr. 4781:16-4782:9. The defendants clearly benefitted from this clarification since the jury found no liability until 3/23/01. Instead of suffering prejudice, defendants benefitted from the Court's clarification.

### 5.    The Court's Instruction on Damages Was Proper

Defendants claim that the jury instruction on damages was error since it referred to damages when the jury was to determine inflation, and defined the measure of "actual damages" in an incorrect manner. The instruction was not error since the jury understood it was to determine inflation per share, if any, for every day of the RP. Daily inflation per share is only one component of actual damages for each class member. At defendants' request, the Court changed its original instruction to include language "in other words, the measure of inflation in the stock price." Tr. 4042:6-9; 4043:18-19. This clarification made it clear that the jury was deciding inflation per share on a daily basis which took into account the loss causation element per *Dura*. Defendants' other objection was their concern that the jury thought it was deciding the amount of damages for each investor. Tr. 4048:12-16. The Court took that objection into account and added language "this is the only damages calculation you will be asked to make in this case." Tr. 4048:21-25. Defendants were satisfied with the instruction. Tr. 4049:3-6. In sum, the defendants agreed to the modified instruction as given. The Court's instruction did not reduce plaintiffs' burden of proving loss causation by a preponderance of the evidence. The jury was informed in a number of instructions that the plaintiff had to prove each element by a preponderance of the evidence. The Court's inclusion of the language "any damages you award must have a reasonable basis in the evidence" was proper.[66]   Tr. 4720:16-17.

---

[66]     Defendants' reliance on *Estate of Kluener v. C.I.R*, 154 F.3d 630, 632 (6th Cir. 1998) is misplaced. That case involved an appeal from the IRS' notice of deficiency and penalty for substantial understatement of taxes arising from the sale of horses. *Id*. The taxpayers contested the IRS penalty on the ground that "substantial authority" supported the tax treatment of the horse sale. In addressing what constitutes

## B.    The Court's Jury Verdict Form Was Correct

In seeking a new trial based on the verdict form, defendants bear a heavy burden. District courts have "considerable discretion in determining the nature and scope of the issues to be submitted to the jury." *Sadowski v. Bombardier, Ltd.*, 539 F.2d 615, 621 (7th Cir. 1976) (denying motion for new trial based on Court's submission of general verdict form). "Whether or not to grant a party's request to submit special interrogatories (either on all issues or on a subset of issues like damages) is committed to the sound discretion of the district court." *Cruz v. Town of Cicero*, 275 F.3d 579, 591 (7th Cir. 2001) (citing *Bularz v. Prudential Ins. Co.*, 93 F.3d 372, 377 (7th Cir. 1996)). "As with other discretionary acts, this should not be reviewable, except, perhaps, for gross abuse, which can rarely be shown." *Miley v. Oppenheimer & Co.*, 637 F.2d 318, 333-34 (5th Cir. 1981) (quoting 5A Moore's Federal Practice §49.03(1)). Defendants failed to establish error, let alone "gross abuse."[67] Their motion for a new trial should be denied.

### 1.    The Court's Use of a General Verdict Form for Plaintiffs' 10b-5 Claims Was Appropriate

Defendants contend they are entitled to a new trial because the Court did not separately list each element of plaintiffs' Rule 10b-5 claims on the verdict form. Defs' Brf. at 60-61. However, the Court's decision to provide the jury with a general verdict form with special interrogatories was entirely proper and consistent with controlling authority. Moreover, even if erroneous, defendants were not prejudiced by the alleged error. There is no evidence the jury did not understand plaintiffs' obligation to prevail on each element of their claims.

By responding "yes" to Question No. 1, the jury recorded its finding that plaintiffs proved falsity, materiality, scienter and loss causation by a preponderance of the evidence. Nothing more is required. Contrary to defendants' suggestion, "*[n]o party is entitled to a special verdict on each of the multi-faceted, multitudinous issues essential to the resolution of a given case*." *Oppenheimer*,

---

"substantial authority," the Sixth Circuit noted that "substantial means something less than a preponderance, but more than a mere reasonable basis." *Id*. at 637. Thus, *Kluener* in no way supports defendants' proposition that a "reasonable basis in the evidence is not commensurate with proof by a preponderance of the evidence." Defs' Brf. at 59.

[67]    The rulings in this case (none of which were in error) are completely distinguishable from the trial court's rulings in *Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183 (7th Cir. 1993). There, the court's rulings were so one-sided that they presented a "skewed picture" to the jury sufficient to set aside the verdict. *Id*. at 188. Here, the Court's rulings were balanced and favored neither party. While defendants claim that many of the Court's rulings prejudiced defendants, as discussed herein, most of the alleged "prejudice" was the result of defendants' own tactical decisions and errors; this is not cause for setting aside the verdict.

637 F.2d at 333-34 (citing 5A Charles Alan Wright, Arthur R. Miller, *Moore's Federal Practice & Procedure* §49.03(1)).  As the Seventh Circuit held in *Cruz*, "Fed. R. Civ. P. 49 gives the district court the discretion to submit a general verdict, and it did not abuse its discretion by doing so in this case."  *Id.*, 275 F.3d at 591 (rejecting bid for a new trial based on denial of request for special interrogatories on the question of damages).  Instead, "[a] general verdict form where the jury simply makes a finding as to liability on each claim, and additional damage findings if applicable, suffices." *Smith v. Biomet, Inc.*, 384 F. Supp. 2d 1241, 1261 (N.D. Ind. 2005).  Thus, the Court's rejection of defendants' lengthy and confusing proposed verdict form was well within its sound discretion.  *Id.*

Defendants' contention that the verdict form created confusion and deprived the jury of "guidance as to the many factual determinations that should have informed its verdict" is incorrect. Defs' Brf. at 60.  The jury was properly instructed on each element of plaintiffs' Rule 10b-5 claims, and instructed that if it found plaintiffs failed to prove ***any element***, it must find for the defendants. Tr. 4714:16-21; Jury Instructions at 25.  The jury also was given multiple written sets of the jury instructions to consult during deliberations.  Tr. 4706:4-6.  Nothing more is required.  *Oppenheimer*, 637 F.2d at 334 ("Having provided a fully and correctly informed jury, Judge Mahon was under no duty to go further.").

In their closing argument, moreover, defendants made it abundantly clear that failure to prevail on any single element would result in a loss for plaintiffs, re-stating the point at least six different times:

> The point I want to emphasize is the investors have the burden of proving every element on this chart.  If they prove one, it's not good enough.  If they prove two, it's not good enough.  If they prove three, it's not good enough.  They have to prove all four.

> Any failure to prove any element, they lose.

Tr. 4546:6-11; 4546:13-20; 4551:2-11; 4600:16-22; 4631:14-22; 4632:2-4; 4632:9-4633:5.  The jury clearly understood defendants' argument and the Court's instruction that for each statement, plaintiffs had to prevail on every element to win.  Thus, any potential confusion was cured by "the instructions, the evidence and the argument the jury hear[d]." *Carter*, 2001 U.S. Dist. LEXIS 14052, at *21; *see also Wakeen*, 272 F.3d at 452.

Defendants' suggestion that the verdict form is ambiguous because the "loss causation inquiry" came after the determination of liability cannot be reconciled with the verdict form itself. Defs' Brf. at 60-61.  The jury was first asked to decide the issue of loss causation (Question No. 1)

and for statements where it found liability, including loss causation, to determine the appropriate damages model (Question No. 4). Thus, the lynchpin of defendants' argument – that Question No. 4 is the "loss causation inquiry" – is incorrect. Defs' Brf. at 60. In fact, defendants argued the exact opposite to the jury: "Loss causation is an element of a 10b-5 claim. It's part of the claim. It's not damages. It's part of the claim. No loss causation, no claim. . . . ***You don't have to go to question number two or question number three if you're checking no***." Tr. 4632:9-4633:5. Defendants' mischaracterization of the verdict form does not entitle them to a new trial.

### 2.    The Court Did Not Err by Organizing Defendants' False Statements by Document

Defendants seek a new trial, arguing the verdict form grouped false statements from the same document. Defs' Brf. at 61-62. However, in securities fraud cases, false statements and omissions are properly viewed and analyzed in context. *Makor*, 437 F.3d at 596; *Blanchard v. EdgeMark Fin. Corp.*, No. 94-C-1890, 1999 WL 59994, at *6 (N.D. Ill. Feb. 3, 1999). For documents like SEC filings and press releases "the relevant inquiry is whether all of the misrepresentations, in the context of the [document], deceived the reasonable investor about the 'nature of the securit[y].'" *In re Initial Public Offering Secs. Litig.*, 241 F. Supp. 2d 281, 379-80 (S.D.N.Y. 2003). Thus, far from error, presenting the statements grouped by document provided proper context for the jury's evaluation.

As with their other attacks, defendants fail to establish any prejudice from the Court's alleged error, contending only that the formulation of the verdict form "might have" caused the jury to render its verdict without finding all the required elements. Defs' Brf. at 61. This unsupported conjecture is not grounds for a new trial. *Wakeen*, 272 F.3d at 454 ("speculation that the jury might have decided the case differently if given the proper instruction is insufficient to establish prejudice"). For each violation found, moreover, the verdict form directed the jury to identify each specific fraud theory and the mental state of each defendant as to each theory. *See* Verdict Form Question Nos. 2 & 3. For each document with multiple false statements quoted, the jury explicitly found plaintiffs satisfied their burden as to ***all*** theories. Any ambiguity on this point was clarified by defendants' own argument. Tr. 4551:2-11 ("Everything I just said applies to each of these claims. It applies to predatory lending, restatement, re-age.").

### 3.    The Verdict Form Reflects the Jury's Finding that Defendants Acted with Scienter

Defendants next contend that the verdict form took the determination of scienter from the jury by including the separate question of whether each defendant found to have violated the

securities laws did so "knowingly" or "recklessly." They argue that inclusion of this question suggested that the jury had no option but to find scienter. Defs' Brf. at 62. Yet, the verdict form specifically states the determination of recklessness or knowledge was to be made only ***after*** a 10(b) violation was found. *See* Verdict Form, Question No. 3 ("For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly. . ."). As scienter already had been decided by the time the jury reached this question, the only remaining question was whether that violation was knowing or reckless. The jury clearly understood this as they only answered Question No. 3 for those statements where they found a violation of 10b-5. *Compare*, *e.g.*, Statement No. 1 *with* Statement No. 14. Defendants have demonstrated no error and no prejudice, and their attempt to manufacture an error should be denied.

### 4.    The Court Properly Excluded Arthur Andersen from the Verdict Form

At trial, defendants failed to adduce any evidence that Arthur Andersen ("Andersen") committed a violation of the securities laws. On 4/29/09, the Court granted plaintiffs' motion to strike references to Andersen from the verdict form. *See* Order Granting Plaintiffs' Motion to Strike References to Arthur Andersen from the Verdict Form, Dkt. 1601. The Court correctly found that no "evidence introduced by either party, could reasonably support the conclusion that Andersen recklessly violated the securities laws." *Id*. at 2. Defendants now seek to re-litigate the Court's decision.

Defendants do not dispute that the party seeking to designate "a non-party as potentially wholly or partially at fault . . . bear[s] the burden of proof demonstrating that the non-party violated the federal securities statutes." *In re Enron Corp. Secs. Derivative & ERISA Litig.*, 236 F.R.D. 313, 319 (S.D. Tex. 2006). Notwithstanding their position that there was no scienter by any person as to the restatement (Defs' Brf., §IV.), defendants argue that if the verdict against defendants is upheld, then Andersen necessarily committed securities fraud, *i.e.*, if one acted with scienter, both did. Defendants also contend that plaintiffs' Complaint allegations against Andersen constitute judicial admissions that Andersen violated the securities laws. Both arguments fail.

Defendants' first argument rests on the faulty premise that the "only purported evidence of scienter was the restatement itself." Defs' Brf. at 64. As discussed in §VI., *supra*, plaintiffs introduced proof of scienter against the defendants that had nothing to do with Andersen. For example, it is undisputed that defendants' fraudulent accounting enabled defendants to exceed earnings targets, contributing to increased bonuses. PXs 772; 774; 779; Tr. 2051-52. Defendants

also used record earnings, bolstered by the accounting fraud, to dress up the Company for a sale to Wells Fargo that would have resulted in massive payouts for each individual defendant. PXs 1371; 1038. This motive evidence does not apply to Andersen. In fact, no evidence of Andersen's motive to commit fraud was adduced at trial. In 1998, the OCC warned defendants that their accounting for the GM, AFL-CIO and UP contracts could be improper. PX 712. The OCC specifically directed defendants to reassess their accounting for expenses on those contracts, the very items Household would later restate. *Id.* There is no evidence Andersen received this report, or was otherwise warned by government agencies that this accounting was incorrect.

Contrary to defendants' contention, moreover, Andersen was not "inextricably intertwined" with Household in preparing the false financial statements. Defs' Brf. at 64. To support this argument, defendants rely entirely on Schoenholz and Aldinger's testimony. *Id.* But, they both testified the false financials were management's responsibility, not Andersen's. Tr. 2179:6-14 (Schoenholz); Tr. 3050:21-24 (Aldinger). Devor, the only accounting expert to appear at trial, testified that "Auditors don't approve a company's accounting . . . The accounting is the responsibility of the company and management." Tr. 2523:19-25. On this Kessler contract, Andersen did not even review the revenue recognition issue that led to the restatement. Tr. 2544:14-16. Indeed, defendants took no steps during the trial to prove that Andersen violated the securities laws. Although defendants listed two Andersen audit partners on their "will call" witness list, they declined to call them at trial. They also decided not to call their accounting expert. In fact, defendants did not call a single witness to testify about the accounting fraud, let alone establish Andersen's liability. Under these facts, Andersen was properly precluded from the verdict form. *Enron*, 236 F.R.D. at 319.

Recognizing there is no evidence of Andersen's guilt in the record, defendants contend that plaintiffs' Complaint constitutes a judicial admission, requiring Andersen's inclusion on the verdict form. Defs' Brf. at 62-65. However, as the Court's 4/29 Order correctly notes, plaintiffs cannot make judicial admissions as to Andersen's state of mind. 4/29 Order; Dkt. 1601; *Banks v. Yokemick*, 214 F. Supp. 2d 401, 406 (S.D.N.Y. 2002) (holding "[g]eneral attributions of mental state" made in pleading do not constitute binding judicial admission). State of mind allegations are "not subject to verification without an extensive evidentiary inquiry" and are "qualitatively different from the objective facts that are typically recognized as conceded or stipulated judicial admissions." *Id.*

Further to the point, plaintiffs' allegations regarding Andersen's culpability and mental state do not constitute judicial admissions. Such allegations were based on information controlled by

Household and Andersen. *Banks*, 214 F. Supp. 2d at 406 ("judicial admissions generally pertain to binding assertions of ***fact***, matters that a party unequivocally declares to be true because that party is uniquely positioned to know so and concede," as opposed to facts uniquely known or controlled by an adverse party); *In re MTBE Product Liability Litig.*, 379 F. Supp. 2d 348, 371 (S.D.N.Y. 2005) (holding that "plaintiffs' statements of impossibility are not judicial admissions because they pertain to facts peculiarly in the knowledge and control of defendants"); *Diarama Trading Co. v. J. Walter Thompson U.S.A.*, No. 01-CIV.-2950 (DAB), 2005 U.S. Dist. LEXIS 19496, at *29-*30 (S.D.N.Y. Sept. 6, 2005) (complaint allegation regarding privity of defendants did not constitute judicial admission where made on "information and belief" because facts not under control of plaintiff). Also these allegations are legal conclusions, *e.g.*, that Andersen violated the securities laws, and do not qualify as judicial admissions. *Lerch v. Angell*, No. 06-C-454, 2007 U.S. Dist. LEXIS 69333, at *16 (E.D. Wis. Sept. 17, 2007) (admission in answer that defendants acted "in violation of plaintiffs' civil rights" was non-binding legal conclusion); *Dabertin v. HCR Manor Care, Inc.*, 68 F. Supp. 2d 998, 1000 (N.D. Ill. 1999) (legal conclusion not judicial admission).

Furthermore, the Complaint was never published to the jury and is not a part of the trial record. Thus the jury had no basis to conclude Andersen violated the securities laws, let alone apportion a percentage of liability to Andersen. *Maresca v. Mancall*, No. 04-3103, 135 Fed. App'x 529, 2005 U.S. App. LEXIS 11493, at *5 (3d Cir. June 16, 2005) (noting that plaintiff's expert's report was never admitted into the trial record and "thus could not be considered by the jury"). Including Andersen on the verdict form based on the Complaint allegations would have improperly invited the jury to ignore the Court's instruction that its "first duty is to decide the facts from the evidence in the case" and "the evidence consists of the testimony of the witnesses, the exhibits admitted in evidence and stipulations." Tr. 4706:10-12; 4707:6-8; Jury Instructions at 1, 3.

Even if the Complaint allegations could constitute a judicial admission, "'[a] trial judge has discretion whether to accept a judicial admission.'" *TIG Ins. Co. v. Giffin, Winning, Cohen & Bodewes, P.C.*, No. 00 C 2737, 2002 WL 31870528, at *5 (N.D. Ill. Dec. 20, 2002). Under the facts and circumstances of this case, where defendants took a contrary position in front of the jury, did not seek to introduce evidence of Andersen's culpability during the trial, did not seek to introduce the Complaint and did not assert the "admission" until after the close of evidence, the Court did not

abuse its discretion by declining to treat the Complaint allegations as a judicial admission.[68]

Even if the Court were to treat the Complaint as a judicial admission, defendants would still lose because their own admissions prevent them from asserting Andersen violated the securities laws. In their Answer, defendants denied each of the allegations they now seek rely on to establish Andersen's culpability. Household Defendants' Answer, ¶¶171, 172, 173, 176, 182, 186, 190 (Dkt. 156, filed 7/2/04). They denied that Andersen "help[ed] Household perpetrate the massive accounting fraud alleged herein." *Id.*, ¶172. They denied that Andersen made false representations regarding Andersen's audit and Household's financials. *Id.*, ¶¶173, 190. And they denied that Andersen deliberately ignored the falsity of Household's financial statements, *i.e.*, that Andersen acted with scienter. *Id.*, ¶190. Thus, if the Court accepts defendants' argument, defendants themselves are bound by their Answer denying that Andersen committed securities fraud and Andersen's preclusion from the verdict form was appropriate. *American Network Leasing Corp. v. Peachtree Bancard Corp.*, No. 93-C-3109, 1996 U.S. Dist. LEXIS 11253, at *14-*15 (N.D. Ill. Aug. 2, 1996) (question of fact existed where party seeking to assert judicial admission from opponent complaint denied the allegation in its own answer).

As defendants' judicial admission argument is fatally flawed, the Court need not reach the question of whether liability can be apportioned if Andersen acted knowingly. Defs' Brf. at 62-63. The record is devoid of any evidence that Andersen committed securities fraud and exclusion from the verdict form was appropriate.

## XV.    CONCLUSION

For the foregoing reasons, defendants' motion for judgment as a matter of law or, in the alternative, for a new trial should be denied in its entirety.

---

[68]    Treating the Complaint as a judicial admission would not serve the purpose of the rule, which is to "narrow the scope of discovery to disputed matters and thus reduce trial time." *Banks*, 214 F. Supp. 2d at 405-06. As the Seventh Circuit held in *Keller*, "[t]he significance of a judicial admission is precisely that it has the effect of withdrawing a fact from contention." *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995). Yet, plaintiffs' allegations, placed into contention rather than removed, disputed issues for trial and thus do not meet that definition.

DATED: September 3, 2009          Respectfully submitted,

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
PATRICK J. COUGHLIN (111070)
MICHAEL J. DOWD (135628)
SPENCER A. BURKHOLZ (147029)
DANIEL S. DROSMAN (200643)
MAUREEN E. MUELLER (253431)


        /s/ Michael J. Dowd
         MICHAEL J. DOWD

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
AZRA Z. MEHDI (90785467)
D. CAMERON BAKER (154432)
LUKE O. BROOKS (90785469)
JASON C. DAVIS (253370)
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiffs

MILLER LAW LLC
MARVIN A. MILLER
LORI A. FANNING
115 S. LaSalle Street, Suite 2910
Chicago, IL  60603
Telephone:  312/332-3400
312/676-2676 (fax)

Liaison Counsel

LAW OFFICES OF LAWRENCE G.
    SOICHER
LAWRENCE G. SOICHER
110 East 59th Street, 25th Floor
New York, NY  10022
Telephone:  212/883-8000
212/355-6900 (fax)

Attorneys for Plaintiff

S:\CasesSD\Household Intl\BRF00061272_PV-Opp.doc

<u>DECLARATION OF SERVICE BY ELECTRONIC MAIL AND BY U.S. MAIL</u>

I, the undersigned, declare:

1.       That declarant is and was, at all times herein mentioned, a citizen of the United States and employed in the City and County of San Diego, State of California, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.       That on September 3, 2009, declarant served by electronic mail and by U.S. Mail to the parties PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50(b) OR, IN THE ALTERNATIVE, FOR A NEW TRIAL PURSUANT TO RULE 59.

The parties' email addresses are as follows:

| | |
|---|---|
| TKavaler@cahill.com<br>PSloane@cahill.com<br>PFarren@cahill.com<br>LBest@cahill.com<br>DOwen@cahill.com | NEimer@EimerStahl.com<br>ADeutsch@EimerStahl.com<br>MMiller@MillerLawLLC.com<br>LFanning@MillerLawLLC.com |

and by U.S. Mail to:

Lawrence G. Soicher, Esq.              David R. Scott, Esq.
Law Offices of Lawrence G. Soicher     Scott & Scott LLC
110 East 59th Street, 25th Floor       108 Norwich Avenue
New York, NY 10022                     Colchester, CT  06415

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 3rd day of September, 2009, at San Diego, California.

_____
                /s/ Teresa Holindrake
                TERESA HOLINDRAKE