# EXHIBIT 1

Case 1:02-cv-05893    Document 1657-2    Filed 09/03/2009    Page 1 of 16

Cross, Charles (Confidential)  4/9/2008  9:02:00 AM

## Page 1

```
 1      UNITED STATES DISTRICT COURT
 2   NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION
 3   _____
 4   LAWRENCE E. JAFFE PENSION   )
     PLAN, on Behalf of Itself and )
 5   All Others Similarly Situated,)
                                   )
 6         Plaintiffs,       )
                             )
 7         vs.          ) Lead Case No. 02-C-5893
                             )
 8   HOUSEHOLD INTERNATIONAL,   )
     INC., et al.,        )
 9                       )
           Defendants.    )
10   _____
11     VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
12                       OF
13               CHARLES CROSS
14               CONFIDENTIAL
15   _____
16              9:02 A.M.
17            APRIL 9, 2008
18         1515 COMMERCE STREET
19          TACOMA, WASHINGTON
20
21
22
23
24   REPORTED BY: JULIE R. HEAD, CRR, RPR, CCR No. 3119
25
```

## Page 2

```
 1          A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFFS:
 4      CAMERON BAKER, ESQ.
 5      LUKE O. BROOKS, ESQ.
 6      Coughlin Stoia Geller Rudman Robbins LLP
 7      100 Pine Street, Suite 2600
 8      San Francisco, California 94111
 9      Phone: 415.288.4545  Fax: 415.288.4534
10      E-mail: cbaker@csgrr.com
11      E-mail: LukeB@csgrr.com
12
13   FOR THE DEFENDANTS:
14      HOWARD (PETER) G. SLOANE, ESQ.
15      LAUREN PERLGUT, ESQ.
16      JASON M. HALL, ESQ.
17      LARA R. CORCHADO, ESQ.
18      Cahill Gordon & Reindel LLP
19      80 Pine Street
20      New York, New York 10005
21      Phone: 212.701.3000  Fax: 212.269.5420
22      E-mail: psloane@cahill.com
23      E-mail: lperlgut@cahill.com
24      E-mail: jhall@cahill.com
25      E-mail: lcorchado@cahill.com
```

## Page 3

```
 1   FOR THE WITNESS:
 2      ELIZABETH P. MARTIN, ESQ.
 3      Gordon Thomas Honeywell Malanca Peterson &
 4      Daheim LLP
 5      Wells Fargo Plaza
 6      1201 Pacific Avenue, Suite 2100
 7      Tacoma, Washington 98402
 8      Phone: 253.620.6500
 9      Fax: 253.620.6565
10      E-mail: emartin@gth-law.com
11
12
13   ALSO PRESENT:
14      JOHN L. BLEY, ESQ.
15      Foster Pepper PLLC
16      1111 Third Avenue, Suite 3400
17      Seattle, Washington 98101
18      Phone: 206.447.4400
19      Fax: 206.447.9700
20      E-mail: bleyj@foster.com
21
22
23      TANIA GRANT, Videographer
24
25
```

## Page 4

```
 1             I N D E X
 2
 3   EXAMINATION BY:                PAGE
 4      MR. SLOANE               9, 190
 5      MR. BAKER                105, 198
 6
 7   EXHIBITS FOR IDENTIFICATION           PAGE
 8   Exhibit 1  Transcript of 12/19/02 Volume I      19
 9      Deposition of Charles L. Cross III, HHS
10      02498419 - 02498474
11   Exhibit 2  Transcript of 2/4/03 Volume II       19
12      Deposition of Charles L. Cross III, HHS
13      02498501 - 02498569
14   Exhibit 3  Washington Department of Financial   23
15      Institutions Expanded Report of
16      Examination for Household Finance
17      Corporation III as of April 30, 2002,
18      HHS 02498625 - 02498697
19   Exhibit 4  7/1/02 Letter to Chuck Cross, Re:    33
20      Expanded Report of Financial
21      Examination for Household Finance
22      Corporation III - Confidential
23      Response, Plus Attachment, HHS 02484858
24      - 02484940
25
```

13

1  with the banking department --
2  Q. Okay.
3  A. -- which was then merged with other agencies
4  or subagencies to form DFI in 1993.
5  Q. Now, I'm -- I really want to understand the
6  structure of the DFI for purposes of -- of setting the
7  scene, here. You correct me if I'm wrong.
8      At -- At some point prior to, say, 2000, or
9  1999, there was a -- a person who headed the DFI who was
10 Mr. Bley, who is sitting here today; is that correct?
11 A. Correct.
12 Q. And, below Mr. Bley, there were something like
13 four divisions of DFI?
14 A. Yes.
15 Q. And one of the divisions was consumer
16 something -- consumer services?
17 A. And I -- I want to say, at some point in time,
18 I think it became five divisions. The admin division,
19 which is accounting and personnel, so forth, moved up
20 and became a division on its own.
21 Q. He told me that, but I forgot.
22 A. Okay.
23 Q. Okay. So, there was, at some point, five
24 divisions, but one of the divisions, for my purposes,
25 today, was the Consumer Services Division; is that

14

1  right?
2  A. I assume so, yes.
3  Q. When you say you assume so --
4  A. You said for your purposes, but --
5  Q. Yeah, you really are good.
6      For purposes of my examination today, am I
7  correct in calling it the Consumer Services Division?
8  A. Or the Division of Consumer Services.
9  Q. Okay. If I screw up and call it consumer
10 services, you'll understand.
11 A. Yes.
12 Q. And that was headed by someone named Mark
13 Thompson during the period, say, '99 through 2003; is
14 that correct?
15 A. Yes. I'm trying to think if -- Towards the
16 end, Mark became the acting director, but he was still
17 over -- he was still at consumer services at that time,
18 so, yes, that would be accurate from -- I believe Mark
19 became division director in 2004. Originally, it was
20 somebody named Anne Pulitano in -- I'm sorry, 1994 --
21 1993 was somebody else. Mark came in about 1994 and
22 stayed division director until June of 2003.
23 Q. Okay. For purposes of the court reporter,
24 since I don't know the spelling of Pulitano, could you
25 spell that for her?

15

1  A. P-U-L-I-T-A-N-O. I'm not sure. John probably
2  knows the spelling.
3  Q. I should have thought of that.
4      John will get the spelling for you on the
5  break.
6      Now, am I correct that the -- the Consumer
7  Services Division was headed by Mr. Thompson and his --
8  he was essentially an assistant director of DFI, but
9  they called him a director for -- for purposes of
10 simplicity; is that right?
11 A. Yeah.
12 Q. And, under Mr. Thompson, there was, as I
13 understand it -- correct me if I'm wrong -- there were a
14 number of people who reported to him, one of which was
15 yourself as the enforcement chief?
16 A. Correct.
17 Q. And were there two or three other program
18 people who reported to -- directly to Mr. Thompson, on
19 your level, if you will?
20 A. Yeah. And it depends on what periods of time
21 you're talking about. The -- The division grew almost
22 exponentially over time, so -- but I think, during the
23 periods of time of which you're concerned with, there
24 were essentially two program managers -- one over
25 licensing and then I was the other program manager with

16

1  the title of enforcement chief.
2  Q. Okay. Now, how many people reported to you?
3  How many -- I don't know what you call them --
4  investigators, auditors, whatever they were.
5  A. Again, it depends on which periods of time
6  you're talking about, but --
7  Q. Let's say '99 to 2002 -- through 2002.
8  A. Well, that would have been a period of time in
9  which things were changing. But anywhere from 15 to 30,
10 depending on, you know, what point -- I took on greater
11 roles over time.
12 Q. Let me be specific. At the time that you were
13 doing the investigation of Household, how many
14 investigators reported to you?
15 A. Again, that was a fairly long case and spans a
16 period of time in which I -- I got more jurisdiction on
17 more people, but -- let's just say 15 for --
18 Q. Okay.
19 A. -- or so.
20 Q. That's -- That's helpful.
21     Now, there was also, as I understand it, an
22 elected attorney general named Christine -- Christine
23 Regoire?
24 A. Gregoire.
25 Q. Is that right? Gregoire. It's

117

1 think, at this point in time, he reported to me and not
2 the other way around.
3    Q.  (BY MR. BAKER:)  Okay.  And did you consider
4 the findings made in Mr. -- sorry, in the 2001 report of
5 examination as part of the background for the findings
6 that -- and conclusions you reached in your own expand
7 report, Exhibit 3?
8    A.  I believe some of this was used in that
9 examination report.  How much it formed a foundation for
10 my findings, hum, I'm not -- not quite as sure about
11 this.  This is -- Obviously, you look at the difference,
12 one's pretty thin, the other's pretty thick, so -- But
13 there was some of this that was relevant to that
14 expanded examination report.
15    Q.  And Household provided a response to this
16 report, and I can give it to you.  It's March 31, 2002
17 response.
18        Did you have that information as background
19 when you were preparing the expand report, Exhibit 3?
20    A.  I had all of -- everything that had -- had
21 gone before was at my disposal, so, yes.
22    Q.  And, in preparing Exhibit 3, you testified
23 that you interviewed some of the consumers; is that
24 correct?
25    A.  That's correct.

118

1    Q.  Did you --
2    MR. SLOANE:  Object to the form of the
3 question.  The word was a few.
4    Q.  (BY MR. BAKER:)  Did you also -- you and some
5 of your colleagues -- engage in what I understand to be
6 called mystery shopping?
7    A.  Yeah, we applied for loans at Household, yes.
8    Q.  Okay.  And did your experience help you reach
9 any -- any of the conclusions that are set forth in
10 Exhibit 3?
11    A.  Yes.  There were -- There was -- Yes.
12    Q.  Okay.  Did you also subpoena documents from
13 Household in February of 2002?
14    A.  I don't know the date, but I know that we --
15 we subpoenaed them.
16    Q.  Okay.
17    A.  Sounds about right.
18    Q.  Yeah.  And did you consider those documents
19 that were received in response to the subpoena in
20 reaching the conclusions that are set forth in
21 Exhibit 3?
22    MR. SLOANE:  Object to the form of the
23 question.
24    A.  I think the -- I'm sorry, could you ask me the
25 question again?

119

1    Q.  (BY MR. BAKER:)  Okay.  And did you consider
2 any documents received from Household in response to the
3 subpoena in reaching the conclusions that are set forth
4 in Exhibit 3?
5    MR. SLOANE:  Object to the form of the
6 question.
7    A.  Yes.
8    Q.  (BY MR. BAKER:)  Okay.  And can you tell me
9 what you recall of the conclusions that are set forth in
10 Exhibit 3?  Giving you a broad, open-ended question
11 Mr. Sloane wanted me to.
12    MR. SLOANE:  I object to that.  I -- First of
13 all, I don't -- I think it's well beyond the scope of my
14 examination.  Second of all, the report is the report.
15 Is there some purpose in having him try to remember, off
16 the top of his head, what the conclusions were?  What's
17 the purpose of this?
18    Q.  (BY MR. BAKER:)  You can answer the question.
19    A.  What's the question?
20    Q.  What were the conclusions that you reached in
21 that report?
22    A.  In very brief summary or you want me to go
23 through and find the conclusions and --
24    Q.  Can -- Can you give me a brief summary or --
25 or is it -- Are they -- Well --

120

1    A.  Sure.
2    Q.  Let's -- Let's put it -- Take it step by step.
3        Are all the conclusions set forth in that
4 report?
5    A.  No.
6    Q.  Okay.
7    A.  But -- But all the conclusions relevant to
8 this report are set --
9    Q.  Okay.
10    A.  -- forth in this report.
11    Q.  Okay.
12        Let me ask you some different questions, then.
13        You're familiar that -- with the fact that
14 subsequent to -- or about the time of the issuance of
15 this report, the Washington State Attorney General was
16 conducting her own investigation into Household?
17    MR. SLOANE:  I object to this question.  I
18 object to any questions that go beyond the scope of my
19 direct examination.  I asked no questions about that.
20 It's not remotely cross examination in the sense that
21 anyone understands it to be.
22    Q.  (BY MR. BAKER:)  You can answer the question.
23    A.  I was involved in their investigation, so,
24 yes, I was aware of it.
25    Q.  Okay.  And, in the course of that

121

1   investigation, did you learn additional information
2   about Household's practices within the state of
3   Washington?
4       A.   Yes.
5           MR. SLOANE:  Object to -- Object, again.
6   We're way beyond the scope of my examination.
7           MR. BAKER:  We can have -- We can have a
8   running objection.
9           MR. SLOANE:  No, I'll make the objection each
10  time.
11          MR. BAKER:  Okay.
12          MR. SLOANE:  I won't -- I won't make speaking
13  objections, but I will make objections each time to make
14  sure the court is aware that the objections were made.
15          MR. BAKER:  Okay.
16      Q.  (BY MR. BAKER:)  And did the information that
17  you learned as a result of participating in the AG
18  investigation reinforce the conclusions that you reached
19  as a result of your own investigation reflected in
20  Exhibit 3?
21          MR. SLOANE:  Object.  Way beyond the scope of
22  my examination.
23      A.   Yes.
24      Q.  (BY MR. BAKER:)  And did the attorney general
25  conduct interviews of former employees of Household, to

122

1   your knowledge?
2           MR. SLOANE:  Objection.  Beyond the scope.
3       A.   Yes.
4       Q.  (BY MR. BAKER:)  Okay.  Did you participate in
5   any of those discussions?
6       A.   Quite possible.  They primarily used Jan
7   Simonds, who is an investigator working for Dave Huey,
8   to interview consumers, but I think it's quite possible
9   that, at times, Dave and I were both present when a
10  consumer was being interviewed.
11          MR. SLOANE:  Same objection.
12      A.   I don't have a clear recollection of that.
13          MS. MARTIN:  I'm not -- I'm also not clear
14  that you answered the question that he asked.  I think
15  that --
16          MR. SLOANE:  That's okay.  It's the same
17  objection.
18          MS. MARTIN:  All right.
19          MR. SLOANE:  Beyond the scope of my
20  examination.
21      Q.  (BY MR. BAKER:)  Okay.  You testified that --
22  during this time period, that you were in discussions
23  with other state examiners -- and I mean examiners from
24  other states; is that correct?
25      A.   Yes, I believe so, yes.

123

1       Q.   Okay.  One of the ones, according to your
2   deposition -- and I think if I could -- it's on
3   Exhibit 1.  Take you to Exhibit 1, page 33 to 34.
4   Towards the bottom.  Mr. Parlette asks you:  "What other
5   states were you in contact with?"
6           Answer:  "Minnesota, Georgia, Idaho, Oregon.
7   Those were the main ones.  There was some infrequent
8   contact with Michigan, California, Illinois."
9           Do you see that?
10      A.   Yes.
11      Q.   Who were you in contact with from the state of
12  Illinois, if you can recall?
13      A.   Boy, they -- Everybody switched out their -- I
14  want to say Dea Brennan.  They had an entire turnover in
15  that -- in that agency.  I don't know the people there
16  any longer.  I think -- I think Dea would have still
17  been around in those days.
18      Q.   Was it -- Was it counterpart from what was
19  then known as Illinois Department of Financial
20  Institutions?
21      A.   I think I would have talked to some of
22  those -- to either Dea or some of her staff, but I spent
23  a lot of time with Tom James from the Illinois Attorney
24  General office.
25      Q.   Are you familiar with a man named Phil Stein?

124

1   Does that name ring a bell?
2       A.   Yeah.
3       Q.   From Illinois DFI?
4       A.   Yeah, I know the name.
5           Sorry.
6       Q.   Okay.
7           Why don't we take a lunch break now.
8           MS. MARTIN:  Okay.
9           THE VIDEOGRAPHER:  We are now going off the
10  record in the continuing deposition of Charles Cross.
11  The time is now 12:20 p.m.
12          (Deposition recessed at 12:20 p.m. to be
13          reconvened at 1:30 p.m.)

125

1  THE VIDEOGRAPHER: We are now back on the
2  record in the continuing deposition of Charles Cross.
3  The time is now 1:27 p.m.
4      AFTERNOON SESSION
5      1:27 P.M.
6      --oOo--
7      EXAMINATION RESUMED
8  BY MR. BAKER:
9  Q. Okay. Mr. Cross, I just want to ask you some
10 more questions about your report.
11     Now, in the preparation of your report, did
12 you approach the issue with a neutral view as to the
13 merits of these complaints?
14 A. In the preparation of the report?
15 Q. No, just -- Sorry, in evaluating these
16 complaints, did you take, initially, a neutral view?
17 A. Yes. The -- The reason I was qualifying is by
18 the time I was actually writing this report, it was no
19 longer a neutral position.
20 Q. Okay. And, earlier, I had asked you what was
21 the purpose of the report. If I could direct your
22 attention to page 28 of Exhibit 1, which is your
23 deposition, lines 17 through 23. And the question on
24 line 17 was: "When did you decide to do this expanded
25 report of examination?" The answer is: "I believe it

126

1  was in, I want to say, December of 2001 is when the
2  director and myself agreed that we needed to further
3  document our findings." Okay.
4      And, by document the findings, you mean the
5  findings that you were having with individual
6  complaints?
7  A. Yes. And, also, I believe the complaints were
8  the driver, but, beyond that, we were starting to
9  develop -- for lack of a better words -- theories about
10 the business practices of Household that were -- that
11 didn't comport with what we would expect from our
12 licensee, so the complaints were the driver, but it was
13 beyond the complaints.
14 Q. Okay. And as you further investigated and
15 looked at, for instance, Household's internal documents,
16 do those corroborate your theories?
17 A. Yes.
18 Q. Okay. And what specific theories were you
19 operating under at this point in time?
20     MR. SLOANE: What point in time?
21     MR. BAKER: In December of 2001.
22 A. I have to say, from -- would be the general --
23 generally, the theories that ended up in the report,
24 which were deception, misrepresentation, confusion,
25 up-selling borrowers unnecessarily. Those types of

127

1  things. But -- As a move towards, you know, producing
2  the actual report, those became more -- more defined --
3  became clearer and -- and more -- more precise, I guess,
4  in the report.
5  Q. (BY MR. BAKER:) What types of deception did
6  you find that were being engaged in by Household?
7      MR. SLOANE: Object to the form. Object to
8  the form of the question, and, also, I think it goes
9  beyond the scope of my examination, but -- Are you
10 asking him beyond the report or just the report?
11     MR. BAKER: Just in general. Just a general
12 question.
13     MR. SLOANE: Well, I object to that as beyond
14 the scope. If you're asking about the report, then
15 that's within the scope of my examination.
16 A. I can do this one or of two ways. I can give
17 a very incomplete recollection or I can flip through the
18 report and tell you what the report says.
19 Q. (BY MR. BAKER:) All right. Well, the
20 report -- the report, on page 43, starts talking about
21 some of the things that you found, so, if you want to
22 look at that and that will help you identify some of the
23 issues.
24     MR. SLOANE: I want to just caution the
25 witness, if what he's doing is reading from the report,

128

1  we all know what it says. If you're asking him does it
2  refresh his recollection, that's another question. If
3  you're asking him just to read it, I think that's a
4  complete waste of all of our time.
5  A. There -- There are these identified patterns
6  of practice that are sort of fleshed out by the
7  complaint history, starting, here, on page 43. One of
8  them is misrepresentations of failed promises, next one
9  is confusion over rates, points, and fees. So, that's
10 pretty consistent with what I said, generally, about the
11 sort of deception, misrepresentation, confusion kind of
12 thing.
13     These were all -- I -- I did a -- a bunch of
14 cases during my time with DFI and, just because of the
15 timing of things, not -- not really necessarily because
16 of anything else, but just because I happened to work
17 for an agency that -- that pushed the envelope on some
18 things -- we were out in front of a lot of people and --
19 on some of this kind of stuff, and I was becoming very
20 immersed in it, even ahead of a bunch of -- of other
21 states, and these are all -- These are what I would
22 identify as predatory practices that, at times, similar
23 to things I would see in other cases and -- and it
24 revolves around this general idea that -- that people
25 are being sold something that isn't what they think that

129

1  they're getting and -- and it very likely may not be in
2  their best interest to get that product, but it's very
3  much in the company's best interests to sell that
4  product. That's sort of the big picture of it.
5      Specifically, you get down to things like the
6  prepayment penalties, the way the payments were sold,
7  the amount of loans being sold. This case had a -- had
8  a specific area of insurance packing that concerned us,
9  which I don't remember finding insurance packing in any
10 company subsequent to this, but -- but, leading up to
11 this time, there were companies that -- that have been
12 doing some insurance packing, but I -- I think the
13 associates case that predated this one sort of scared
14 most people out of the business of insurance packing.
15     But, during this period of time, that was
16 still an area going on that -- that we had concerns
17 with, so -- You know, without reading the report, like
18 he said, those are the sort of general -- general areas.
19     Q.  (BY MR. BAKER:)  In -- In making a
20 determination that Household was engaged in insurance
21 packing, did you consider the insurance penetration
22 rates?
23     A.  Yes. That was a -- That was a -- That was a
24 common thing that we did. In fact, that's -- I'm pretty
25 sure that's an area that -- that I had the other

130

1  examiners develop for me, because they were the experts
2  in identifying insurance penetration for the office,
3  and -- and I think I had some of them prepare the
4  insurance penetration data for me that I used.
5      Q.  There's a section on page 48, Section 6.
6      A.  Oh, okay. Give me just a moment. I'll try to
7  refresh myself with this.
8      I remember some of this. There -- The
9  insurance penetration was something that -- that was
10 done -- An analysis of insurance penetration was
11 something that was done with -- with most, if not all,
12 of the consumer loan company exams. And I don't want to
13 confuse you by consumer loans. That's the type of
14 license Household held even though what we were looking
15 at was primarily mortgage activity, it was a -- what was
16 called a consumer loan license, and companies that were
17 examined under that statute, it was pretty routine to
18 look at -- at insurance penetration to determine if --
19 if -- if we believed that the company was packing or
20 getting insurance into the transaction, either through
21 an overly convincing sales pitch or out-and-out
22 misrepresentation or deception to the consumer.
23     And this, I'm looking here, it was -- I
24 remember it being very high in some of the branches. It
25 says 92 to a hundred percent here. I mean, that's --

131

1  that's incredible. I mean, any time that we drift
2  above, maybe, like 60 percent, we would -- I mean,
3  alarms with red flags would start going off -- you know,
4  we need to really look at this area -- where, here,
5  we're -- you know, some cases almost every loan had --
6  had -- had insurance. That's just extremely uncommon.
7      When you talk to consumers about this
8  insurance, it's very seldom that a consumer ever sits
9  down and says, yeah, I -- I really wanted that and I
10 took it for a specific reason. Every now and then. In
11 this -- I have a recollection of a consumer, in this
12 case, that I believe did tell me he wanted the
13 insurance, but when I got into it further, I found out
14 he was too old to actually even use the insurance that
15 was sold to him. I think he could only be 65 or 70 and
16 he was already 72, yet, he had been sold this very
17 costly insurance that he thought he had that he could
18 never even actually use. So, we had a bunch of concerns
19 about this.
20     Q.  One of the things that's noted, here, is the
21 second-to-last sentence says, "the department believes
22 that some of this penetration may have been achieved
23 through actual forgery of borrower signatures on
24 insurance acceptance documents." Do you see this
25 sentence?

132

1      A.  Yes.
2      Q.  Why did the department have that belief?
3      A.  There was at least one consumer --
4          MR. SLOANE:  Object to the form of the
5  question. You said the department had that belief.
6          MR. BAKER:  Yeah, that's what it says.
7          MR. SLOANE:  Object to the characterization of
8  the department having any belief.
9      A.  When -- Although it's -- may not be the best
10 use of grammar, but -- and the agency examiners didn't
11 take ownership of the report, if you will. We didn't
12 say, "I believe this." It was the -- We spoke for the
13 department beliefs, and that's why it says, "department
14 believes," but if -- if you -- you know, if you drilled
15 back down, it would be me making these findings and
16 believing -- in conjunction with my -- my associates
17 there that are looking at this data with me, and so
18 forth.
19     But I remember there being a -- at least one
20 consumer, and could have been more, who claimed that in
21 no way was that their signature on the -- on the
22 documents, so -- That's where this came from.
23     Q.  (BY MR. BAKER:)  Okay. One of the factors
24 that you discussed -- discussed in this report, if I
25 could direct your attention to page 46, the prior page.

133

 1  And you're discussing concerns resulting from borrower
 2  confusion over biweekly and bimonthly programs. You see
 3  that in sort of the second full paragraph there?
 4     A.  Yeah.
 5     Q.  Are you familiar with the term effective rate
 6  or equivalent rate as used with respect to a biweekly
 7  payment program?
 8     A.  Yes.
 9     Q.  And did you identify a pattern of deceptive
10  practices at Household that used those terms?
11     A.  I -- I believe so, yes.
12     Q.  Okay.
13        And could you explain to -- to me what that
14  process was or what the deceptive practice was?
15        MR. SLOANE:  Object to the form of the
16  question. You said a pattern at Household.
17        MR. BAKER:  I did.
18     A.  I was afraid you were going to ask me that,
19  because, as I remember, this is a fairly complex area of
20  the exam. But I will try to the best of my
21  recollection.
22     Q.  (BY MR. BAKER:)  Actually, you know what,
23  maybe I'll just see if I can help you out, here. You --
24  Let's see.
25        Here, let's mark this next in order.

134

 1        (Cross Exhibit 10 was marked for
 2        identification.)
 3        (A discussion was held off the record.)
 4        MR. SLOANE:  Is this about a specific customer
 5  that was referenced in the report, Cam?
 6        MR. BAKER:  I believe they are in this report,
 7  actually --
 8        THE REPORTER:  I'm sorry?
 9        MR. BAKER:  I believe they are. I believe
10  they are.
11        MR. SLOANE:  On that basis, go ahead.
12     Q.  (BY MR. BAKER:)  And, Mr. Cross, you see this
13  is a letter to you from Household?
14     A.  Yes.
15     Q.  Okay. And it relates to a specific complaint
16  from the -- the Johnstons. Do you see that?
17     A.  Yes.
18     Q.  Okay. And you would have reviewed this and
19  considered this in evaluating the complaint -- the
20  merits of the claim; is that right?
21     A.  In relation to this -- yeah, Julian and Terry
22  Johnston complaint, yes.
23     Q.  And is it fair to say it was part of your
24  regular business practices, during the time period we're
25  talking about, to evaluate complaints received from

135

 1  borrowers?
 2        MR. SLOANE:  Object to the question. Way
 3  beyond the scope of the exam -- direct examination.
 4     A.  I think the answer is yes.
 5     Q.  (BY MR. BAKER:)  Okay.
 6     A.  It -- I supervised this area and I had people
 7  handling -- We received about a thousand complaints a
 8  year, so, did I look at every complaint? At one time, I
 9  was the only guy looking at complaints, but you get into
10  this period of time and it took bigger cases like FAMCO
11  and Household for me to become involved in the
12  complaints.
13     Q.  Okay.
14     A.  But I approved every -- Every complaint
15  finding that ever went out went out under my approval,
16  but a lot of it was under sort of policy and procedure:
17  You do this in this situation.
18     Q.  Okay. And if I direct your attention to the
19  second page of this document. There's a paragraph
20  starting, "Third". If you could read that to yourself.
21     A.  Um-hum.
22        I've read it.
23     Q.  Okay. And does that refresh your recollection
24  as to what the -- the biweekly effective rate deceptive
25  practice was?

136

 1     A.  A little bit. He -- Schneider, here, is
 2  referring to the equivalent rate. I think we talked a
 3  lot about the effective rate -- I can't remember, now,
 4  whether those terms are interchangeable or had some
 5  subtle nuances that were different among them.
 6        And, in general -- And there were a couple of
 7  variations or maybe more variations than the whole
 8  biweekly or bimonthly program. In general, what -- what
 9  we found was that when borrowers had a biweekly or
10  bimonthly payment plan, they would communicate to us
11  that -- that their rate was approximately half of what
12  we could see on the note was showing as their rate, and,
13  as we discussed this with them -- and, then, also would
14  look at the materials and the responses from the
15  company -- it became apparent to us that -- that this
16  whole -- there was a sales pitch that went with getting
17  the biweekly program, and that sales pitch was clearly
18  leading borrowers to believe that their rate was half of
19  what it really was.
20        Now, there's -- there's a whole ton of
21  discussion that ensued, that I'm sure went on for months
22  and months, about the meaning of effective, meaning of
23  equivalent, who meant what by what.
24        In the end, our finding was that this is what
25  borrowers carried away from -- from -- from the sales

137

1  pitch. These guys were the professionals selling this
2  loan program and -- in our -- In our regulatory world,
3  under the concept by which we issued the company a
4  license, they have an obligation not to mislead people,
5  and we found that borrowers were entering the
6  transaction believing that their rate was half of what
7  it really was.
8      Q. Okay. And did you determine that that was a
9  deceptive practice?
10     A. Absolutely.
11     Q. Okay. In the report, here, it says -- I'm
12 reading from the -- looks like the second-to-last line
13 of this paragraph. It says, "The department has
14 identified the practice in other branches in Washington
15 and has even received reports from regulators in other
16 states concerning the practice." Do you see that?
17     A. What document are you on?
18     Q. I'm sorry, I'm on your Exhibit 3.
19     A. Okay. Page 46, still.
20     Q. Page 46. Yeah. The paragraph we're looking
21 at, this kind of inset.
22     A. That begins with --
23     Q. The Department.
24     A. The prime -- or --
25     Q. Yeah, borrowers have been informed.

138

1      A. Okay.
2      Q. Okay.
3      A. And then what -- You're looking at the last
4  sentence that begins with department?
5      Q. Yeah. Well, no, the second-to-last
6  sentence --
7      A. Got it.
8      Q. -- that says, "However the department has
9  identified"?
10     A. Yes, okay.
11     Q. Okay.
12     A. Okay.
13     Q. And other practices -- sorry, "the practice to
14 other branches in Washington and has even received
15 reports from regulators in other states concerning the
16 practice." Do you see that?
17     A. I do, yes.
18     Q. Okay. Do you recall how many other states
19 reported this practice? And if I could direct you to
20 page 89 of your deposition --
21     A. Okay.
22     Q. -- and your answer there.
23     A. I'm going to say, off the top of my head,
24 probable Minnesota and Georgia, but -- Okay. I'm on
25 page 89.

139

1      Q. Page 89, and question From Mr. Parlette:
2  "Let's put back together. I believe you said the
3  effective or equivalent interest rates sales program was
4  found in several other states?"
5          Answer: "I was told that."
6          Question from Mr. Parlette: "Okay." Do you
7  know how many other states" -- sorry, "Do you know how
8  many states?"
9          Objection from Mr. Dunne.
10         Answer: "No, I don't know how many, but I
11 know that I was told that by at least 15 to 20 states."
12     A. And I don't know how far back we have to go to
13 get this into appropriate context, but, first, this was
14 contemporaneous in time with -- with the events, so, I
15 stand by what was said there.
16         What I'm wondering, now, if we went back and
17 looked at the earlier context, if the 15 and -- 15 to 20
18 was not relevant to the multistate, then -- in other
19 words, not -- the 15 -- 15 to 20 may not have been
20 before this report was drafted.
21     Q. Okay.
22     A. Yet, the report was drafted, and -- and a lot
23 of discussions ensued after the report was drafted, and
24 that's when the 15 to 20 may have said, "Hey, us, too."
25 But -- I'd have to read a bunch of this to figure that

140

1  out, I think.
2      Q. Okay. So, you're not sure when you -- when
3  the timing of these 15 to 20 other states telling you
4  when that occurred?
5      A. Right.
6      Q. It could have occurred before this report or
7  could have occurred subsequent?
8      A. Right.
9      Q. Okay. But you're saying, to your knowledge,
10 this practice occurred between 15 and 20 other states?
11         MR. SLOANE: Objection to form of the
12 question.
13     Q. (BY MR. BAKER:) In addition to Washington?
14         MR. SLOANE: That's not what he said. He said
15 he had been told something. He didn't know whether it
16 occurred. How would he know?
17     Q. (BY MR. BAKER:) You can answer the question.
18     A. I would say I was told. I did not -- I don't
19 know that I -- that I personally investigated materials
20 from other states; although, it's quite possible that --
21 We came together on several occasions and discussed
22 things and -- and looked at stuff, so, but -- but it is
23 most accurate to say that I was told that by 15 to 20
24 states.
25     Q. Okay. Earlier in this deposition, you

141

1  referred to some meetings that were held with other
2  state regulatory agencies in Washington in January and
3  February of 2002. Maybe January, March of 2002. Do you
4  recall those meetings?
5      A.  Vaguely.
6      Q.  Okay. And were the findings that are -- that
7  you were looking at at the complaints discussed with
8  other regulatory agencies at that time?
9      MR. SLOANE: Object to the question. Way
10  beyond the scope of my direct examination.
11      A.  Yes.
12      Q.  (BY MR. BAKER:) Okay. And were those other
13  regulatory agencies finding similar patterns of
14  misconduct by Household?
15      MR. SLOANE: Object to the form of the
16  question. Well beyond the scope of my examination or
17  the proper scope of -- of a fact witness.
18      A.  I don't know if all of them were, but some of
19  them were finding this. And their -- In the earlier
20  periods of time, some states were very interested and
21  began to look more completely later, so, Washington did
22  some triggering of other states to look into things that
23  maybe they hadn't looked into before. So, I can't tell
24  you exactly at what moment in time they would have
25  necessarily seen certain things.

142

1      Q.  (BY MR. BAKER:) Are you familiar with a man
2  named Dan Gallatin?
3      A.  Yes.
4      Q.  Okay. And did Mr. Gallatin work at the
5  Minnesota Department of Commerce?
6      A.  He did.
7      Q.  And did he exchange information with you about
8  what he was finding in the state of Minnesota?
9      MR. SLOANE: Object to the question, again.
10  Well beyond the scope of the direct examination.
11      A.  There were three examiners -- me, Dan
12  Gallatin, Tony Polidori -- representing three different
13  states who provided all of the technical support to what
14  became the big multistate case. So, Dan and -- and Tony
15  and -- and me, we all -- we all worked together very
16  closely. We analyzed a lot of documentation from -- We
17  were the guys that were charged with analyzing all the
18  documentation that was coming in from all of the states
19  into this multistate. So, yeah, we spent a lot of time
20  exchanging information, exchanging documents, looking at
21  spreadsheets, that kind of thing.
22      Q.  (BY MR. BAKER:) And where is Mr. Polidori
23  from?
24      A.  Idaho.
25      Q.  Idaho, okay.

143

1      In your deposition, you referenced a Ben Bruce
2  from New York.
3      A.  Yes, he would be with -- with New York
4  Attorney General. He was an assistant attorney general.
5      Q.  I see.
6      And there was an Ann Gaultney referenced from
7  Michigan.
8      A.  She was Mark Thompson's equivalent in the
9  State of Michigan. She would be the equivalent -- I
10  don't know if the title is the same, but basically an
11  assistant commissioner, I think, in Michigan. We call
12  them directors here, but --
13      Q.  Was she also involved in the technical side of
14  evaluating the scope of misconduct by Household?
15      A.  A little bit. She was a little bit above that
16  level. I think she might have loaned some of her people
17  to us, some point in time. She definitely -- And
18  definitely had the ability to discuss at those levels.
19  I can't remember her necessarily getting her hands so
20  dirty with the numbers.
21      Q.  Okay. Was Michigan one of the states that was
22  reporting finding effective rate presentations in their
23  state?
24      MR. SLOANE: Objection. Way beyond the scope
25  of the direct examination.

144

1      A.  I can't remember.
2      Q.  (BY MR. BAKER:) Okay. If your prior
3  deposition said that she was, would that be consistent?
4      A.  Then I would say she was.
5      Q.  She was, okay.
6      A.  Or they were, sorry.
7      Q.  All right. And the same thing would be true
8  with Mr. Bruce?
9      A.  Yes. Keeping in mind that -- that Ben was not
10  a regulator. He was an assistant attorney general.
11      Q.  Okay. Okay.
12      You testified earlier about deceptive
13  practices with respect to prepayment penalty by
14  Household. There's a reference in this report. Can you
15  tell me what you recall about the -- the prepayment
16  penalty deceptions?
17      A.  Some of it.
18      Q.  Yes.
19      A.  Okay. As I would interview borrowers, they
20  would tell me they didn't know that they had a
21  prepayment penalty and they were, at times, confused
22  about the fact that they had a prepayment penalty.
23  And -- And that was definitely a discussion among the
24  different states.
25      In fact, I'm pretty confident, here, now,

145

1  years later, that New York was the only state that did
2  not have that issue. And this actually came to light
3  during the case. And the reason was New York had a
4  specific law saying you could not have prepayment
5  penalties, so, New York came into the case saying,
6  "Well, we don't see that in our state." It's because
7  prepayment penalties were completely disallowed, so
8  there's no reason to try to deceive somebody or
9  misrepresent that a prepayment penalty existed.
10      But all the other states, that was a very big
11  point that was discussed over and over and over.
12      Q. And was there consensus within the group that
13  Household was engaged in deceptive practices with
14  respect to their prepayment penalties?
15      MR. SLOANE: Objection to the form of
16  question. What do you mean by the group?
17      MR. BAKER: The group that you're talking
18  about now.
19      MR. SLOANE: I'm lost on what group.
20      MR. BAKER: He's talking --
21      Q. (BY MR. BAKER:) You're talking about, if I
22  understand, there's a group of you -- some are attorneys
23  general, some are -- you are regulators -- who are
24  talking about these practices, and I'm wondering if you
25  reached a consensus that Household is engaged in

146

1  deceptive practices with respect to prepayment penalties
2  in all the states that you are representing.
3      MR. SLOANE: Objection. Mischaracterizes his
4  testimony, but it's way beyond the scope of the direct
5  examination.
6      A. The group grew to about 40 states, I believe,
7  with time, and, yes, we had -- I remember two physical
8  meetings we were all in the same room. The first
9  meeting, I think there were about 25 states, and then
10  the next meeting grew to about 40 states, and we very
11  much -- with the exception of New York, who wanted to
12  stay away from the prepayment penalty issue, because
13  they didn't have prepayment penalties in their state,
14  every other state was saying, "This is a major issue in
15  our state and it's an issue we have to have resolution
16  of in this case."
17      Q. (BY MR. BAKER:) One of the other things that
18  you talk about in your report that we haven't touched
19  upon has to do with the GFEs in the -- quote, unquote --
20  buydown or discount points. Do you recall that?
21      A. Yes.
22      Q. Okay. What can you tell me about that
23  particular practice?
24      A. There were -- There were two -- I believe
25  there were two deceptions that I cited revolving around

147

1  the discount points, in this case. One was whether the
2  discount points were what I would call bona fide -- did
3  they actually have an effect of buying the rate down --
4  and the second was the disclosure on the Good Faith
5  Estimate of a range of discount points, which typically
6  began at zero and went up somewhere -- anywhere from
7  maybe six, seven thousand up to maybe, like, ten or 11
8  thousand. It was -- It would just be showing, in the
9  Good Faith Estimate, zero to this larger number.
10      But, in the cases I reviewed, consistently,
11  the borrowers paid at the very top of that number. Yet,
12  the borrowers were telling us that the loan originator
13  said they would be at the bottom. They would get
14  essentially a -- a very low-cost or no-cost loan. So --
15  Deception -- To reverse those, deception, first, around
16  what was disclosed to the borrower, making the borrower
17  believe that it could be as low as zero, and it
18  virtually never was, in -- in our investigation, and
19  then, once discount points were actually paid, they
20  didn't seem to have any affect in moving the rate down
21  any, which would be your natural assumption, is that --
22  and based on some documentation produced by Household,
23  some tables that showed that there was an inverse
24  relationship between points and rate. You would assume
25  that, but that was not what we found.

148

1      Q. Okay. Was that also the subject of
2  discussions within the -- you mind if I call it the AG
3  group?
4      A. That's fine. Yes.
5      Q. Yeah, was it?
6      MR. SLOANE: Objection. Well, beyond the
7  scope of my examination.
8      Q. (BY MR. BAKER:) And was there a consensus
9  reached within that group that Household was engaged in
10  deceptive practices throughout those states?
11      MR. SLOANE: Objection.
12      Q. (BY MR. BAKER:) With respect to the discount
13  points and the GFE disclosures?
14      MR. SLOANE: Cam, you keep spending time on
15  this. It's well beyond the scope of my examination.
16  It's not even close. What is --
17      MR. BAKER: Peter, you know that's the most
18  ridiculous objection. Why don't you read the rule, the
19  Federal Rules of Civil Procedure. And I'm entitled to
20  ask any question. There's no limitation on the scope of
21  an examination at the deposition. Not only that --
22      MR. SLOANE: Excuse me. Fact discovery is
23  over. It's been over for months. Has nothing to do
24  with the Federal Rules of -- of --
25      MR. BAKER: Civil Procedure.

149

1  MR. SLOANE: -- Civil Procedure. Has to do
2  with the rules set forth by the magistrate judge in this
3  case. This is not your fact deposition.
4  MR. BAKER: We've noticed the deposition.
5  Q. (BY MR. BAKER:) But, anyway, do you recall
6  the question?
7  MR. SLOANE: Is that -- Is that pursuant --
8  Just so I understand your position, your questions are
9  now being asked pursuant to your noticed deposition?
10  MR. BAKER: They could be or they could be
11  asked in response.
12  MR. SLOANE: I want a position on it.
13  MR. BAKER: I'm both. I'm taking both.
14  MR. SLOANE: You're saying it's proper, A,
15  and, B, it's within the scope of your notice; is that
16  what you're saying?
17  MR. BAKER: I'm saying both.
18  MR. SLOANE: Okay.
19  MR. BAKER: And I don't want to waste any more
20  time on this.
21  MR. SLOANE: Excuse me, I -- I made my point.
22  I just want to know what yours was.
23  A. I think my answer's yes.
24  MR. BAKER: Okay.
25  A. But you might want to be precise in the

150

1  question.
2  MR. SLOANE: He doesn't want to be precise.
3  MR. BAKER: I do.
4  Q. (BY MR. BAKER:) I want to make sure -- The
5  question I want to know is: Was there a consensus
6  reached, within the AG group, that Household was engaged
7  in deceptive practices with respect to the disclosures
8  of -- on GFEs and the -- quote, unquote -- buydown
9  discount points that you discussed?
10  MR. SLOANE: Same -- Sorry, same objection.
11  A. My recollection is that it was 100 percent,
12  so, we -- Yes, a consensus.
13  Q. (BY MR. BAKER:) Okay. Now, in your
14  deposition, on page 132, which is Cross Exhibit 1,
15  there's a reference -- if you go to page, again, 132.
16  A. I'll have to catch up with you here.
17  Q. That's okay.
18  A. I'm sorry --
19  Q. Page 132.
20  A. Got the wrong -- Got the wrong exhibit, sorry.
21  132. Okay. What line?
22  Q. So, on page 132, if I could direct your
23  attention to the question and answer starting on lines
24  13. And there's a -- The answer was: "Household
25  maintained for, I don't know, two, two and a half years,

151

1  that they had a safe harbor under RESPA that allowed
2  them to disclose the range of discount points in the
3  Good Faith Estimate in the fashion in which they
4  disclosed those points," period. You see that?
5  A. Um-hum.
6  Q. And it says that this issue has kind of been
7  going back and forth with them since late 1999.
8  A. Yes.
9  Q. Okay. Who, at Household, was maintaining
10  that? Who told you that they had a safe harbor?
11  A. I don't remember. I -- It would be --
12  Q. Mr. Schneider?
13  A. Mr. Schneider.
14  We had a lot of correspondence revolving
15  around the complaints where I think we were raising this
16  concern, but -- there -- there's a -- there was a woman
17  with Household who was something like assistant general
18  counsel, and I can't remember her name, now, and I think
19  we had a lot of arguments with her about this topic.
20  Q. Okay.
21  And according to your -- It goes on. You said
22  that you asked HUD for an opinion letter?
23  A. Yes.
24  Q. Okay. And let me just show you a document.
25  (A discussion was held off the record.)

152

1  MR. SLOANE: Would you give us the date of the
2  document?
3  MR. BAKER: It looks like it's -- it doesn't
4  actually have a -- it's like July 5th, 2002.
5  MR. SLOANE: That's the date.
6  Q. (BY MR. BAKER:) And I just want to know, is
7  this a copy of the letter that you received back from
8  HUD?
9  MS. MARTIN: I need one.
10  A. Yes.
11  MS. MARTIN: Sorry, thank you.
12  MR. BAKER: Okay. And this is Cross
13  Exhibit 11?
14  (Cross Exhibit 11 was marked for
15  identification.)
16  Q. (BY MR. BAKER:) Did you ever show this
17  letter -- Sorry, did you ever show this letter to
18  Household?
19  A. Yes.
20  MR. SLOANE: Objection. Beyond the scope.
21  A. Yes, I did.
22  Q. (BY MR. BAKER:) And what was their response?
23  A. It's one of my favorite points in history. I
24  remember handing this in -- it was in our first -- first
25  large meeting of -- of negotiated settlements and we

157

1    MR. SLOANE: Objection. Way beyond the scope.
2    A. Most of it was -- was information we extracted
3    from Household, their own data.
4    Q. (BY MR. BAKER:) Okay. And, to the best of
5    your knowledge, were your ac -- were your statements of
6    the harms caused by the specific practices reasonable?
7    MR. SLOANE: Objection. Way beyond the scope.
8    A. As I remember it, our estimates were generally
9    higher than the assistant AGs would pull us down to.
10   Q. (BY MR. BAKER:) Okay. So, the numbers that
11   we'll see reflected in this particular document -- for
12   example, point you to page four. On the top of it, it
13   says, "The states" proposed that -- "proposed that the
14   remedy for loan splitting is to refund or credit fees
15   and points on the second loan. From the information
16   supplied, the aggregate value of that is estimated to
17   be" -- looks like $27,652,547.
18   MR. SLOANE: Objection. Beyond the scope.
19   Q. (BY MR. BAKER:) Do you see that?
20   A. Yes.
21   Q. So, you're saying that your estimate, in all
22   likelihood, to the best of your recollection, would have
23   been higher than this amount here?
24   A. I can't say on this specific one. This is the
25   piggy-backs, I think.

158

1    Q. Yeah.
2    A. I can't say on -- on this specific one that
3    that's -- The one that really stands out in my mind is
4    we felt that the discount points amounted to as much as
5    $1.2 million -- $1.2 billion in -- at harm to consumers,
6    yet the AGs consistently argued with us, you know, we
7    got to move down -- we can't -- we can't use that
8    number. We got to move down from that number. I think,
9    at one point, we were -- were saying 800 million to
10   1.2 billion. So, that was the number I really remember.
11   It's the largest dollar amount in the case that -- that
12   we were trying to hold -- the regulators were trying to
13   hold the upper end on.
14   Q. Do you know if that $1.2 billion discount
15   points was ever communicated to Household?
16   MR. SLOANE: Objection. Beyond the scope.
17   A. Yeah, it was discussed.
18   Q. (BY MR. BAKER:) Okay. Approximately what
19   date?
20   A. July to August of -- probably July of 2002.
21   Q. Do you want to add some more?
22   A. Communicated, there was a lot of screaming
23   going on. You know, at times, as we discussed numbers,
24   you know, very forcefully, you know, dollar amounts
25   would be yelled back and forth across the table. So, I

159

1    don't know if we ever drafted a document that contained
2    1.2 billion, but I know that, on more than one occasion,
3    I -- I would become flabbergasted at the amounts that we
4    were arguing over, and then I would point out, very
5    strongly, we're talking about much bigger dollar
6    amounts, here, than, you know, what you're willing to
7    talk about.
8    Q. Okay. Did you find any practice or pattern
9    where Household would maximize the amount of a loan that
10   was given to the -- Sorry. See if I could do this --
11   that would maximize the loan amount that was given to
12   the borrower?
13   MR. SLOANE: Are you talking about in
14   connection with his preparation of his report?
15   MR. BAKER: I'm going back -- I'm going back
16   to your report.
17   MR. SLOANE: Okay.
18   A. I believe I referred to that as up-selling.
19   Q. (BY MR. BAKER:) Okay.
20   A. And, yeah, it was one of the -- one of the
21   practices that caused us concern.
22   Q. Okay. Just one other question, going back to
23   Exhibit 12. Were the numbers that you were talking
24   about -- were those discussed prior to the submission of
25   this document to Household?

160

1    A. Yes.
2    MR. SLOANE: Objection. Again, beyond the
3    scope.
4    Q. (BY MR. BAKER:) All right. As part of your
5    preparation of this report, did you consider the impacts
6    of Household's branch compensation record?
7    MS. MARTIN: I'm sorry, when you mean -- when
8    you say this report, do you mean --
9    MR. BAKER: I'm sorry, Exhibit 3.
10   MS. MARTIN: Okay. Thank you.
11   A. I know that we gave a lot of attention to
12   branch -- or employee compensation. The timing of that
13   I'm not absolutely certain on, whether I was aware of
14   compensation or specific compensation plans prior to
15   drafting the report or if it was subsequent to drafting
16   the report.
17   Q. (BY MR. BAKER:) Okay. Well, if I could
18   direct your attention to page 111 of your report.
19   A. My report or the deposition?
20   Q. Sorry, the deposition. Getting me confused.
21   MS. MARTIN: Sorry, it's all my fault, here.
22   MR. BAKER: I don't think so.
23   Yeah, Cross Exhibit 1.
24   Q. (BY MR. BAKER:) Question is on line five and
25   the answer starts on line nine.

161

1  And your answer was: "Well, I know that the
2  compensation for originating or closing loans with
3  insurance was a significant amount to the loan officer's
4  commission, so it would just have to be my opinion that
5  heavy compensation claims can lead towards the" -- dash
6  -- "obviously it would be an incentive for" any --
7  "somebody" -- dash -- "could be an incentive for
8  somebody to do something they wouldn't do if that
9  incentive wasn't there." Is that your testimony?
10  A.  That's a statement I made at that time.
11  Q.  And, to the best of your knowledge, it's an
12  accurate statement?
13  A.  Yep.
14  MR. SLOANE: You didn't read the whole answer,
15  of course, which says, "Whether I can say" that -- "that
16  some loan officer, you know, followed the incentive,"
17  but I am sure the witness can read the whole sentence.
18  Q.  (BY MR. BAKER:) Did you find, based on your
19  review of complaints in the state of Washington, that
20  Household was engaging in a practice of equity
21  stripping?
22  A.  Yes. Although equity stripping wasn't --
23  wasn't --
24  Q.  Wasn't a term you used?
25  A.  That's more of an AG term than a -- than a

162

1  regulator term. But -- But, yeah, definitely eating up
2  the borrower's equity, the equity in their property,
3  through up-selling loan and layering on fees,
4  definitely. That eats up equity. Equity stripping as a
5  specific legal -- that's -- There's a legal definition
6  of that in the state of Washington and there's a whole
7  law revolving around that that wasn't under our
8  jurisdiction. It was under the AG's jurisdiction. So,
9  I had tendency, I think, to stay away from that specific
10  term, equity stripping, but the AGs talked about it a
11  lot.
12  MR. BAKER: Let's mark one more document,
13  here.
14  (Cross Exhibit 13 was marked for
15  identification.)
16  (A discussion was held off the record.)
17  Q.  (BY MR. BAKER:) We're going to have to work
18  our way around it. This document has a lot of
19  handwriting on it, but I'm not going to represent it's
20  yours. But if you turn in a couple pages, you'll see
21  there's a memo to you from Patrick Hardman.
22  A.  Yes.
23  Q.  And it's dated May 17th, 2001.
24  A.  Yes.
25  Q.  And, thereafter, there is various pages of

163

1  this, and it appears that Mr. Hardman has summarized
2  complaints that are -- that were then pending relating
3  to Household. Do you see that?
4  A.  Yes.
5  Q.  Okay. And was it part of Mr. Hardman's
6  responsibilities, as a financial examiner, to prepare
7  memorandums like this for you?
8  A.  Yes, we hold -- we held weekly meetings of
9  the -- of the enforcement staff and -- and I remember
10  assigning to Patrick the job of starting to report to me
11  on -- on -- on the complaint volume and activity with
12  Household and Beneficial, so that I could start to get
13  my mind around what was going on with the company.
14  My -- My staff had -- My staff had been
15  complaining for quite some time that not only had the
16  complaints been increasing, but their interaction with
17  the company had -- had become more and more adversarial.
18  So, we -- So, I can remember asking Patrick, you know,
19  Start -- "start monitoring this for me," and this would
20  be one of the reports that we would have done that.
21  Q.  Do you know why this particular document was
22  shared with Household?
23  A.  I didn't -- I don't know that I knew that it
24  was.
25  Q.  Okay.

164

1  A.  They -- Maybe it was through -- I can't
2  remember if there was discovery in this case or not. I
3  don't know if I shared -- I don't think I shared it with
4  them.
5  Q.  This one has some -- some fax lines -- it
6  looks like it was shared, faxed back and forth in May of
7  2001, which is near the date of this document.
8  A.  Let me just kind of look at these fax headers
9  for a second.
10  Hum. I can sort of see a number that -- that
11  could have been a DFI fax number: 360-705, maybe 4154.
12  Q.  Right.
13  A.  I don't know that that was a DFI fax number.
14  Could have been an AG's fax number. I don't know.
15  Q.  It's sent to Tom Echols.
16  A.  Wow, you know what? Yeah, I bet you --
17  hypothesizing, here -- that Mark Thompson sent this to
18  Tom Echols. Tom and Mark had a very close relationship.
19  Q.  Okay.
20  A.  And, I don't know, some of this is starting to
21  gel for me a little bit. Mark and Tom were talking a
22  whole lot. This is back in 2001 still.
23  Q.  Um-hum.
24  A.  And Tom was the -- the representative for
25  Household in Washington State. We had an excellent

177

1   Q.  We're here on -- We're here on -- on May 23rd,
2   2002.  There's a discussion.  Someone from your side
3   mentions, "By the way, there's a multistate interest."
4   Was there any discussion between you and Household about
5   the next step to resolve the multistate interest in this
6   issue?
7   A.  I believe -- I believe we --
8   MR. SLOANE:  Objection.  Same objection.
9   Sorry, Chuck.
10  A.  I believe we hypothesized about that, but we,
11  of course, could not make any statements for what other
12  states would do.  But I -- But we hy -- we hypothesized
13  about the potential outcome if -- if things had to go,
14  you know, to a more aggressive level.
15  Q.  (BY MR. BAKER:)  Was there any discussion at
16  this meeting, to your knowledge, about a potential
17  settlement between AGs and the multistate group and
18  Household?
19  A.  I don't remember.
20  Q.  Okay.
21  Why don't we take a short break.
22  MR. SLOANE:  Yeah.
23  THE VIDEOGRAPHER:  We are now going off the
24  record in the continuing deposition of Charles Cross.
25  This is the end of tape two.  Time is now 2:28 p.m.

178

1   (Off the record at 2:28 p.m.)
2   (Back on the record at 2:41 p.m.)
3   THE VIDEOGRAPHER:  We are now back on the
4   record in the continuing deposition of Charles Cross.
5   This is the beginning of disk three.  The time is now
6   2:41 p.m.
7   Q.  (BY MR. BAKER:)  Earlier, you testified that
8   you, Mr. Gallatin, Mr. Polidori were reviewing documents
9   in the context of the AG settlement discussions -- I
10  believe that's correct; is that right?
11  A.  Yes.
12  MR. SLOANE:  Objection.  Objection.  Well,
13  beyond the scope.
14  A.  Yes, and even more data than documents.
15  Q.  (BY MR. BAKER:)  Okay.
16  A.  The AGs began to spend a lot of time with
17  documents.  We spent a lot of time with data.
18  Q.  Did you ever personally review any complaints
19  received from consumers in other states about
20  Household's practices?
21  MR. SLOANE:  Objection.  Well beyond the
22  scope.
23  A.  I don't remember.
24  Q.  (BY MR. BAKER:)  Okay.  Were the documents and
25  materials you received with respect to Household's

179

1   practice in other states consistent with what -- with
2   the findings that you made in Exhibit 3?
3   MR. SLOANE:  Same objection.
4   A.  Much -- Much of what the other states found
5   and produced in our, you know, exchange of materials,
6   and so forth, was consistent with what we found in
7   Washington.
8   Q.  (BY MR. BAKER:)  Okay.
9   And, in terms of the AG, you're familiar with
10  the fact that there was actually a settlement between
11  Household and the multistate group; is that right?
12  MR. SLOANE:  Same objection:  Well beyond the
13  scope.
14  A.  Yes.
15  Q.  (BY MR. BAKER:)  Okay.  When, to your
16  knowledge, did that agreement come into fruition?
17  MR. SLOANE:  Same objection.  Also object to
18  the form of the question.
19  A.  On my birthday, October 2nd, 2002.
20  Q.  (BY MR. BAKER:)  Okay.  Why didn't DFI get to
21  the point of filing charges based on the apparent
22  violations found in your DFI report that's Exhibit 3?
23  A.  Two reasons.  The -- Well, maybe three
24  reasons.
25  When we started down the multistate path, we

180

1   were at least committing ourselves, in intent and
2   theory, to try to -- to try to stick with that, being in
3   solidarity with other states and bring a large
4   resolution for the entire country.
5   You have to remember, there were only --
6   There -- There weren't 50 states that were -- that were
7   carrying this thing.  There were a handful of states
8   carrying the 50 states -- and that's how the multistates
9   work.  You sort of take turns carrying the load.  So --
10  And there were a lot of states that ended up in the
11  settlement and they just sort of signed on at the end
12  and they just rode on our coattails right on out through
13  the settlement, and said, "Whatever they say, we --
14  that's good for us."
15  So, we had this -- this allegiance to other
16  states holding that -- that together.  Although,
17  Washington was always extremely aggressive, so was
18  Minnesota, New York, some other states, extremely
19  aggressive in saying -- threatening, at various points
20  in time, to pull out and actually file charges.  So, we
21  always retained that right and authority to file
22  charges, but we had a commitment to the multistate.  We
23  thought we had a good chance of getting as much for
24  Washington consumers out of the multistate as we could
25  if we went on our own.

181

1  So, there was incentive. So, we could get
2  something for everybody plus us, equivalent to what we
3  probably could get if we went on our own. And then
4  there's the whole resource issue -- I mean, in reality,
5  it would have been five years of -- of our agency's
6  life, very ugly -- you know, this stuff would have gone
7  on for -- for five years and it would have been a huge
8  resource drain and that's -- that's much of the reason
9  why you settle.
10  Q. Okay. A lot of -- of -- Household produced a
11  lot of documents to show that they were in compliance
12  with the various federal and state laws, including loan
13  documents signed by borrowers.
14  MR. SLOANE: You talking about in connection
15  with his report?
16  MR. BAKER: Yeah.
17  MR. SLOANE: In other words --
18  MR. BAKER: He considered that.
19  Q. (BY MR. BAKER:) You considered that as part
20  of -- and -- and found that, despite that, that there
21  was deceptive practices taking place; is that right?
22  A. Yes.
23  Q. Okay. Why didn't you find -- Why didn't you
24  rely upon the loan documents that Household was
25  producing to determine that there was, in fact,

182

1  compliance?
2  A. In the early days, I think we did. In the
3  very early days of complaints coming in -- and if I
4  could roll the clock back, I would -- but, in the early
5  days, the company's arguments had been somewhat
6  convincing for us, and I think that we -- we had a
7  little bit of trouble coming to grips with what the
8  consumers were telling us. It didn't -- It didn't make
9  sense, early on, that this would be happening, that --
10  that a -- such a big company, such a well-structured,
11  well-organized, well-funded company, would be doing
12  these things to consumers. It didn't -- didn't make a
13  lot of sense. But, over a period of time, we -- we --
14  we changed our belief on that.
15  So, in the early days, there were documents
16  that were coming in. Company would -- would send us the
17  disclosures from their files, or whatever, and we'd look
18  at them and say, "Ah, well, consumer must have," you
19  know, "ignored them," or, "Maybe a consumer isn't
20  telling the full story," or whatever, and we would -- we
21  would largely discount the consumer and -- and close out
22  the complaint.
23  We reached a tipping point where we just, for
24  lack of a better description, sort of stood around,
25  looking at each other, saying, you know, at some point,

183

1  you know, we're having trouble believing this any
2  longer, the answers we were getting. And, so, there
3  became -- There was a point in time -- late 2001, early
4  2002 -- where we felt we were getting a lot of
5  disinformation from the company, a lot of -- We were --
6  We were extremely unhappy with the response we were
7  getting from the company. We stopped trusting the
8  response. And we started more and more believing what
9  we saw from the consumers, what the consumers were
10  telling us.
11  Documentation is one part of a case, and
12  regulators do have a tendency to sort of get blinders
13  on, saying, "Well, it's in the file. It must be true.
14  Hey, it came out of a computer. It's there. Somebody
15  must have gotten it." But you hear enough stories about
16  consumers saying, "I never saw it," or, "That's not how
17  it was explained to me," and so forth, and you start to
18  change your mind over time.
19  That's how all these predatory lending cases
20  come about. If you -- you take almost any predatory
21  lending case, that I can think of, and you go back to
22  the start of time, the regulators were not saying, you
23  know, consumers were harmed, here. It always kind of
24  starts off with not really believing that what people
25  are saying is it, and then you -- it grabs traction with

184

1  time and your -- your mind has changed.
2  And it was no different with this case, so --
3  So, we reached a point where -- where the
4  relationship seemed to be so disingenuous that -- it was
5  almost like stuff was being fabricated to convince us,
6  and we didn't believe it any longer.
7  Q. Did your experience with FAMCO have anything
8  to do with it? In other words where -- where the paper
9  files looked clean, but, in fact, there were deceptive
10  practices taking place?
11  A. FAMCO had nothing to do with our impression of
12  Household. Household was completely responsible for our
13  impression of Household. FAMCO educated us to learn how
14  to look beyond what was being said and FAMCO -- The
15  earlier complaints I was talking about where we didn't
16  maybe believe the consumers as much as we should have,
17  that was -- that was -- those complaints go back to the
18  early days of FAMCO, before we started to learn more
19  about how deception could take place, misrepresentation
20  could take place, how people could be trained to lie
21  with the truth, and all of these -- these sales
22  practices that we hadn't -- I came out of the banking
23  world. That kind of stuff didn't really take place in
24  the banking world. And, so, I had to be educated.
25  So, FAMCO educated me, educated the