# EXHIBIT 2

Page 1

```
 1                UNITED STATES DISTRICT COURT
 2            FOR THE WESTERN DISTRICT OF WASHINGTON

 3                                    )
    JOSEPH LUNA and JEANIE LUNA,      )
 4  husband and wife; CARL BENNETT    )
    and BRENDA BENNETT, husband and   )
 5  wife; DAVID J. MURPHY and         )
    GENEVEVE L. MURPHY, husband and   )
 6  wife; NEIL NELSON and ELSIE L.    )
    NELSON, husband and wife; BRYAN   )
 7  THOMSON and JEANNETTE THOMSON,    )
    husband and wife; and DANIEL      )
 8  JAMES and MAZIE JAMES, husband and)
    wife, on behalf of themselves and )
 9  all others similarly situated,    )
                                      )
10            Plaintiffs,             )
                                      )
11            vs.                     ) NO. C02-1635
                                      )
12  HOUSEHOLD FINANCE CORPORATION,    )
    III, a foreign corporation doing  )
13  business in the State of          )
    Washington; and HOUSEHOLD REALTY  )
14  CORPORATION, a foreign corporation)
    doing business in the State of    )
15  Washington; BENEFICIAL MORTGAGE   )
    CORPORATION, a Delaware           )
16  corporation, and other related    )
    entities and subsidiaries,        )
                                      )
17                                    )
              Defendants.             )
18  _____

19     DEPOSITION UPON ORAL EXAMINATION OF CHARLES L. CROSS III
               (VOLUME ONE - Pages 1-220)
20  _____

21
22
23                  December 19, 2002
24                  Olympia, Washington
25
```

Dixie Cattell & Associates (360) 352-2506



EXHIBIT 1
Cross
DATE: 4/9/08
J.R. Head, CCR, CRR, CSR, RPR

CONFIDENTIAL

HHS 02498419

PARLETTE (CROSS)

Page 146

1    to them faster so they could get a better handle on it and
2    get the stuff. I'm just talking this summer, this last
3    summer.
4        Prior to that, our system was pretty much up and
5    working, and within about five days after receiving a
6    complaint, we launched off to my company.
7  Q  Okay. On my page 52, which must be your page 57, you have a
8    section entitled Clear, Conspicuous, and Segregated
9    Disclosures.
10  A  58 for me.
11  Q  And you can take a minute to review after I ask the
12    question. What was your issue in this section?
13        MR. DUNNE: Objection to form.
14  A  Regulation Z is specific about the issue of clear,
15    conspicuous, and segregated disclosures. That's what I'm
16    discussing here. There were documents I found in loan files
17    in one of the identifiers, the Luna file, where information
18    that should be segregated to the Truth in Lending disclosure
19    statement found its way on to other documents. And my
20    finding was that's a violation of Regulation Z under the
21    Truth in Lending Act.
22  Q  (By Mr. Parlette) Specifically what found its way on to
23    other documents?
24  A  The amount financed. Let's see. Let me read this. Yeah.
25    I believe the amount financed was shown on the E-Z Pay

Page 147

1    document.
2  Q  And it should not have been?
3  A  No. There's specific items in the Truth in Lending
4    disclosure statement that are to be segregated and kept
5    apart from any other information not at issue in the Truth
6    in Lending disclosure statement. These are even bounded by
7    boxes in the Truth in Lending disclosure. You're not
8    supposed to pull these things off and use them in other
9    representative ways.
10  Q  And they had done that with the Lunas?
11  A  Yes.
12  Q  Do you recall what forms they used the Truth in Lending --
13  A  It was an amortization form that I found off and on
14    connected with this E-Z Pay Plus. Looked like it had been
15    run out of somebody's dot matrix printer, but it would
16    capture specific information that would maybe or maybe not
17    be relevant to the loan that the person ended up with, but
18    it would be included in there and then these amortization
19    tables run. Let's see.
20        And looks like there was rates and APR's on that form
21    that were not - didn't appear to be relevant to the
22    borrower's situation. But the borrower is telling us those
23    documents were used to convince them that they were
24    getting a 6.99 percent loan.
25        The company responded to me, and there's a quote in

Page 148

1    here where they state, "In explaining the potential saving,
2    amortization schedules were employed to show the comparison
3    by illustrating the difference in a potential savings of an
4    18-year loan at 12.69 percent over a 30-year loan at 6.99
5    percent. This was done for demonstration purposes only and
6    was not intended to apply or establish that the interest
7    rate on the loan Mr. and Mrs. Luna were considering
8    purchasing was 6.99 percent." My point in this section is,
9    regardless of that, Truth in Lending says you can't do that
10    kind of thing for the very reason that it could mislead
11    somebody into thinking something is different than what the
12    transaction really is.
13  Q  Okay. On the next page you make the statement that
14    House - quote, Household has provided various responses to
15    the Department ranging from statements that the borrowers
16    were mistaken to claims that the practice is isolated to a
17    branch in Washington. The Department believes these
18    responses to be disingenuous, however. What do you mean
19    by - why did you make that statement, that you believed them
20    to be disingenuous?
21  A  You said it was on the next page?
22        MR. DUNNE: I don't see it either.
23        MS. RATH: On mine it's on the top of the page
24    after the next page.
25        MR. DUNNE: I think every one of us has it on a

Page 149

1    different page.
2  Q  (By Mr. Parlette) It's about - what you were reading from
3    earlier, Mr. Cross, it's about five paragraphs down. Starts
4    with - the paragraph starts, "In the documents reviewed by
5    the Department."
6  A  Okay. I looked at that paragraph, didn't see what you just
7    read.
8  Q  It's at the bottom of that paragraph, the last two
9    sentences.
10  A  I see. Okay. Let me read this paragraph. And your
11    question was, why did I state that we believed it to be
12    disingenuous --
13  Q  Yes.
14  A  -- the statement to be disingenuous? Because too many
15    borrowers - so many borrowers - in our belief, so many
16    borrowers can't be mistaken. We do give companies the
17    benefit of the doubt. You know, an occasional borrower
18    tells us they believe something doesn't sound quite right.
19    The company responds with no, that's not really how it was.
20    You know, they must have misheard or they're mistaken or
21    whatever. We'll oftentimes give companies the benefit of
22    the doubt. We did that very thing with Household for a
23    significant period of time. We trusted this company for a
24    long time. We used to have a very good relationship with
25    this company.

38 (Pages 146 to 149)

CONFIDENTIAL

HHS 02498456

PARLETTE (CROSS)

Page 150

1   So I have to say that as of today, with hindsight over
2   the last couple of years, there were borrowers put through
3   more because the Department believed Household first and the
4   borrower second until finally the weight of the complaints
5   and our investigative work just sort of finally pushed us
6   over and made us wake up, if you will, and that's - that's
7   what we're arriving at here. We're saying, look, the
8   company has been telling us over and over borrowers are
9   mistaken or we have rogue loan officers, but just the weight
10  of - the sheer weight, volume coming from not only this
11  state but other states telling the same story over and over
12  caused us to finally say we don't believe that argument
13  anymore. That's a disingenuous argument.
14  Q   Okay. You make - in the next paragraph you refer to the
15      Bley complaint.
16  A   Yes.
17  Q   Apparently that must have come out of the Bellingham office.
18      Is that true?
19  A   I could tell you.
20  Q   Excuse me. I said Bellingham. I meant Spokane.
21  A   Yes. Spokane. There was a moment in time when I had all
22      this memorized, but it's long since passed.
23  Q   You say that in this report that the 7 percent equivalent
24      interest rate scenario had occurred in several branches in
25      Washington and in multiple locations in the country. Was

Page 151

1   the Spokane branch one of the places where this was showing
2   up?
3       MR. DUNNE: Objection: overbroad, vague and
4   ambiguous, and leading, lack of foundation.
5   A   I led you to believe that here. Let's see if that's really
6   the truth. Yes. Borrowers claimed the Bleys complained
7   of confusion about their interest rate.
8   Q   (By Mr. Parlette) At the bottom of that paragraph you
9   state, quote, the Department believes that the equivalent
10  interest rate sham proffered by HFC representatives is known
11  and likely fostered by the corporation itself or, at the
12  least, by corporate officers overseeing large segments of
13  the country. This belief appears to be supported by HFC
14  headquarter's knowledge of the disclosures and sales
15  practices when responding to complaints, end quote. Who do
16  you believe at Household knew about this equivalent interest
17  rate you call sham?
18      MR. DUNNE: Objection: calls for speculation and
19  lack of foundation.
20  A   At a minimum, Tom Schneider, who at least, at one point in
21  time, was director of compliance. He used the term
22  effective and/or equivalent interest rate in his responses
23  to us. It could very well be where I first even came across
24  those terms was from Mr. Schneider in his responses to our
25  complaints. But he used this terminology on several

Page 152

1   occasions with us, so he clearly knew what was going on. He
2   just argued each time there was nothing wrong with it.
3   Q   (By Mr. Parlette) And his job description again?
4   A   Director of compliance is how his letters were signed during
5   a period of time.
6   Q   Top of the company?
7       MR. DUNNE: Objection: lack of foundation.
8   A   I have no idea.
9       MR. DUNNE: Vague and ambiguous.
10  Q   (By Mr. Parlette) Not director of compliance in the state
11  of Washington?
12  A   No. He was in Illinois. I don't know what director means
13  at Household.
14  Q   When do you believe he knew?
15      MR. DUNNE: Objection: calls for speculation, lack
16  of foundation.
17  A   I recall he was putting us in his letters back in 2000.
18  Q   (By Mr. Parlette) And your earlier testimony, and I don't
19  want to be mischaracterizing it in any way, but I asked you
20  a question about what happened after this July 6th, '01,
21  memo from Mr. O'Han, and you indicated you found two
22  instances where similar interest rate confusion had occurred
23  in - by reviewing the complaint forms filed here subsequent
24  to this date.
25      MR. DUNNE: Objection: mischaracterizes the

Page 153

1   testimony. The summary is vague and ambiguous.
2   A   I want to clarify that I said I believe that's what you were
3   getting at, but you never really asked me that. If you're
4   asking me that now --
5   Q   (By Mr. Parlette) I'm asking you that now.
6   A   Yes. I found two in here that were subsequent to that date.
7   Q   Which two did you find, if you can recall?
8   A   Luna was one. And you should have asked me this when we
9   were on it.
10  Q   That's all right. I don't want to take your time now and
11  have you all go through.
12      MR. DUNNE: I would like him to answer the
13  question, please.
14  A   Start over.
15  Q   (By Mr. Parlette) You found it?
16  A   No. I only see Luna now.
17  Q   Okay.
18  A   I don't know if I either saw a date prior to July of '01
19  before or if my eyes are just getting - probably find it
20  30 minutes after you walk out of here.
21  Q   What was the date of the Luna complaint?
22  A   November 2001.
23  Q   Okay.
24  A   Actually that was the complaint date anyway.
25      MR. DUNNE: What page are you looking at, please?

39 (Pages 150 to 153)

CONFIDENTIAL

HHS 02498457

CHARLES L. CROSS (VOLUME II)    Multi-Page™

Page 477

1 Q Okay. So the findings and analysis that you put into
2   the report regarding what you found to be patterns of
3   Household behavior, that was based on the information
4   that you received related to that kind of action?
5     MR. DUNNE: Objection, there were no findings
6   that are apparent findings.
7     THE WITNESS: No, I don't think the report --
8   it refers to apparent violations. I don't think it
9   refers to apparent findings. We're pretty careful
10  about that.
11    MR. PIERSON: Well, whether they're called
12  apparent findings or findings, the answer is the same?
13    THE WITNESS: Yeah, and --
14    MR. DUNNE: Can I object? I don't know what that
15  means. I think that's a critical question, vague and
16  ambiguous.
17    THE WITNESS: I only put in the report what I
18  believe to be true. So I don't know if that's what
19  you're asking.
20 Q (By Mr. Pierson) Well, I guess the question is whether
21  you considered the universe of information that you
22  received related to the areas covered by your report?
23 A Yes, I considered everything that I received.
24 Q Okay.
25 A It doesn't mean I didn't consider it and discount it

Page 478

1   or not give it --
2 Q And would you have --
3 A -- credit.
4 Q And would you have identified the seven patterns of
5   Household practices stated in your report if you had
6   concluded that the evidence presented to you didn't
7   support that?
8 A No.
9 Q Okay. And did you make any attempt to skew your
10  report so that it would not accurately reflect the
11  evidence that you'd received or the information you'd
12  received?
13 A No.
14 Q In your and the Department's experience, when you
15  receive complaints, does that often indicate that
16  there's a problem that's more widespread than the
17  actual number of complaints you receive?
18    MR. DUNNE: Objection, calls for speculation.
19    THE WITNESS: I can speculate on that because
20  I've been doing this since 1993, yes.
21 Q (By Mr. Pierson) Well, let me just stop you there
22  because I want to make sure we're on the same page
23  with speculation. You talked about that earlier when
24  you went over to the dictionary, and that made you
25  comfortable as I recall when you used the word

Page 479

1   speculation; is that right?
2 A Yes, I'll be using that term more often.
3 Q Well, explain to me why that is based on what you say
4   in the dictionary over here in the office?
5 A Well, because what we do is examine and that was one
6   of the very first words to define speculate. And I'm
7   sorry. I don't think that has anything to do with
8   answering your question.
9 Q Well, let me ask you this: After looking at the
10  dictionary and feeling comfortable with using that
11  word, do you consider speculation to mean something
12  other than forming conclusions based on a factual
13  investigation?
14 A No, that's how I would use it.
15 Q Okay. That's what you mean?
16 A Yes.
17 Q Okay. Then let's go back to the question about
18  whether or not in your and the Department's experience
19  receiving complaints sometimes or often indicates a
20  problem more widespread than the sheer number of
21  complaints.
22    MR. DUNNE: Objection, calls for speculation.
23    THE WITNESS: The answer is, yes, emphatically
24  yes. It is one of the chief indicators we use to make
25  a determination whether to move forward with greater

Page 480

1   scrutiny on a company.
2 Q (By Mr. Pierson) And what is your experience with
3   that?
4 A That complaints are -- what we refer to as tip of the
5   iceberg. The complaints are always the tip of the
6   iceberg in any case I've ever worked. I've never
7   worked a complaint -- I mean, I've never worked a case
8   where there were just a few complaints. Every time we
9   start the case because there's a few complaints, and
10  it's one of those where there's smoke, there's fire
11  thing, and we find that those people who take the time
12  and the energy to complain are a very small percentage
13  of consumers.
14 Q And is that what you believe to be the case here?
15 A Yes. And after spending six months with regulators
16  and the AG's from 49 other states, that's what they
17  all indicated they believed as well.
18 Q You testified that at some point Household higher-ups
19  indicated to you that there had been some practices
20  they weren't happy about in the Bellingham office. Do
21  you remember that?
22 A They -- when they began coming and talking to us in
23  late spring/early summer of 2002, that was what --
24  that was the song they kept singing. In fact, they
25  delivered that message so much that I remember a point

Marlis DeJongh & Associates    Page 477 - Page 480
(206) 583-8711

CONFIDENTIAL    HHS 02498566

**CHARLES L. CROSS (VOLUME II)**        Multi-Page™

1 people I felt were being largely dishonest.
2 Q (By Mr. Pierson) Mr. Dunne asked you if borrowers
3 sometimes get accurate and truthful information, but
4 are still confused. Do you remember that?
5 A Yes.
6 Q Based on your review of the facts in this case, is
7 that what you concluded happened here?
8 A No. In fact, there were some specific examples that
9 really jumped out. Georgia Smart, I've gone back to
10 her several discussions that here is a woman who is
11 very intelligent and who went out of her way to make
12 sure she understood this transaction, and she still
13 got something other than what she bargained for.
14 Q Other examples too?
15 A Yeah, yeah, there were other people who indicated that
16 they felt they had done what -- what people had told
17 them to do or what they believed was the best thing to
18 do to make sure they were getting what they thought
19 they were getting. And there were people who said,
20 you know, told them I didn't want a prepayment penalty
21 or, you know, I clarified what it was that I was
22 getting.
23 Q Okay. Mr. Dunne asked you some questions about the
24 terms, quote, equivalent, or, quote, effective
25 interest rate. Do you remember that question?

1 A Yes.
2 Q Did it appear to you based on the information you
3 obtained in connection with your investigation that
4 those terms had been used by Household in a way that
5 was common to a number of borrowers?
6    MR. DUNNE: Objection, vague, ambiguous and lack
7 of foundation.
8    THE WITNESS: We heard it fairly frequently in
9 conjunction with the Household transactions and the
10 Household borrowers, not just in this state, but in
11 other states, enough to make, not just myself, but,
12 you know, ultimately, it wasn't just me. It's a whole
13 bunch of assistant AG's and regulators having to be as
14 convinced as I was convinced in each of their
15 jurisdictions. And so, yes, within this state, David
16 Hughey and I both felt that we'd seen equivalent or
17 effective interest rate enough times to believe that
18 it was some part of this company, and then it was just
19 supported from state to state to state by our
20 counterparts in other states. So we were -- we were
21 pretty confident that we had that figured out.
22 Q (By Mr. Pierson) And that that was being used in an
23 inappropriate way in a way common to numerous
24 borrowers?
25    MR. DUNNE: Same objection, lack of foundation.

1    THE WITNESS: We believed it was used to seek
2 borrowers.
3 Q (By Mr. Pierson) That was based on your investigation?
4 A My, the AG's discussions with other regulators.
5 Q And when you say being used in a way to deceive
6 borrowers, you mean, in a way common to numerous
7 borrowers?
8    MR. DUNNE: Same objection, lack of foundation,
9 vague and ambiguous.
10    THE WITNESS: We discounted the argument that
11 this only happened in this one branch up in Northwest
12 Washington. So common to various borrowers, yeah.
13 Across the country there was enough commonality of
14 this effective equivalent interest rate scenario sales
15 pitch that we believed it was a company practice.
16 Q (By Mr. Pierson) Okay. Mr. Dunne asked you a question
17 or two about borrowers' responsibility. Does the
18 Department of Financial Institutions consider lenders
19 responsible for not using unfair or deceptive
20 practices?
21 A They're prohibited from doing such.
22 Q And is there any reason to think that Washington
23 courts have a different view than the Department on
24 that one?
25 A No. When I say we diverge, frequently diverge,

1 there's specific issues that we disagree on. It
2 doesn't stop us from taking away somebody's license or
3 fining them just because some court said it was okay.
4 That's what I was referring to.
5    MR. PIERSON: Okay. That's all I have. Thanks.
6    E X A M I N A T I O N
7 BY MR. DUNNE:
8 Q Let me quickly follow-up. You just said that you
9 heard it fairly frequently that somebody in the
10 company used effective or equivalent interest rate
11 presentations. Do you consider two to four times in
12 the complaints that were reviewed in connection with
13 the report fairly frequently?
14 A I didn't say exactly what you just said. But what I
15 consider two to four times being fairly frequently,
16 no. What I said that, I said, we, and I said the AG's
17 office and me and regulators and other AG's from
18 across the country. So I think there's a significant
19 amount of evidence that it was used fairly
20 frequently. I'll tell you I --
21 Q Let me -- okay. I don't want to keep you late. This
22 won't take long. And so that other information is
23 what we would generally call as lawyers hearsay. So
24 you're talking about hearsay information from a chain
25 of communications communicated orally from individuals

CONFIDENTIAL                                    HHS 02498568