EXHIBIT 3

Case Clip(s) Detailed Report
Monday, April 20, 2009, 5:39:41 PM

## Household

---

 **Cross, Charles**                                    1 CLIP  (RUNNING 01:11:03.667)



Cross trial#3

| -1230-0001214-002 | 121 SEGMENTS (RUNNING 01:11:03.667) |
|---|---|

### 1. PAGE 12:14 TO 13:04 (RUNNING 00:00:54.360)

```
       14        Q.   (BY MR. SLOANE:)  Okay.  Let me just do
       15   some -- some preliminary stuff so that we kind of get
       16   this out of the way.
       17            Without going into a lot of detail, my
       18   understanding is -- and correct me if I'm wrong -- that
       19   you were with the Washington -- State of Washington DFI
       20   for a period of time and, for purposes of what we're
       21   interested in, here, you returned to the DFI sometime in
       22   1993; is that correct?
       23        A.   Well, to be accurate, it didn't become DFI
       24   until, I believe, October of 1993, so, when I was with
       25   the agency -- if we use that term -- previously, it was
   00013:01   with the banking department --
       02        Q.   Okay.
       03        A.   -- which was then merged with other agencies
       04   or subagencies to form DFI in 1993.
```

### 2. PAGE 15:06 TO 15:16 (RUNNING 00:00:30.479)

```
       06            Now, am I correct that the -- the Consumer
       07   Services Division was headed by Mr. Thompson and his --
       08   he was essentially an assistant director of DFI, but
       09   they called him a director for -- for purposes of
       10   simplicity; is that right?
       11        A.   Yeah.
       12        Q.   And, under Mr. Thompson, there was, as I
       13   understand it -- correct me if I'm wrong -- there were a
       14   number of people who reported to him, one of which was
       15   yourself as the enforcement chief?
       16        A.   Correct.
```

### 3. PAGE 16:12 TO 16:19 (RUNNING 00:00:21.262)

```
       12        Q.   Let me be specific.  At the time that you were
       13   doing the investigation of Household, how many
       14   investigators reported to you?
       15        A.   Again, that was a fairly long case and spans a
       16   period of time in which I -- I got more jurisdiction on
       17   more people, but -- let's just say 15 for --
       18        Q.   Okay.
       19        A.   -- or so.
```

### 4. PAGE 22:21 TO 23:01 (RUNNING 00:00:35.635)

```
       21        Q.   Okay.  Now, let me -- Let's move to the actual
       22   report and focus on that for a few minutes.  So, let's
       23   mark as Cross 3 the Washington State Department of
       24   Financial Institutions' expanded report of examination
       25   for Household Corporation 1, 2, 3 -- Roman III as of
   00023:01   April 30, 2000.
```

### 5. PAGE 26:19 TO 26:22 (RUNNING 00:00:18.423)

```
       19        Q.   Now, am I correct that this report, this
       20   April 30 report, was delivered to or sent to Household
       21   on or about May 15th of '02?
       22        A.   Sounds about right.
```

CONFIDENTIAL

## Household

---

### 6. PAGE 27:07 TO 27:19 (RUNNING 00:00:48.190)

```
07          As I understand it -- correct me if I'm
08   wrong -- there is a scheduled examination of certain
09   entities under your jurisdiction, at that time, every
10   two years; is that right?
11          A.   I think the law changed subsequently, but I
12   think, during that period of time, it was a 24-month
13   exam period.
14          Q.   Okay.  And what was your involvement in the
15   April 30, 2002 routine examination?  I'm sorry, the --
16   the March 2002 routine examination.
17          A.   My involvement would have been to -- to review
18   that report and -- that would have been the extent of my
19   involvement.
```

### 7. PAGE 28:13 TO 28:22 (RUNNING 00:00:29.914)

```
13          Q.   Okay.  Now, in connection with this report --
14   Let's go to Cross 3, the report -- am I correct that you
15   had more direct involvement in doing the work that
16   resulted in the report?
17          A.   Yes.  It -- In this report --
18          Q.   This, for the record, is Cross Exhibit 3, just
19   so we know.
20          A.   Virtually a hundred percent of this was my
21   work, my examination work, investigation work, and my
22   authoring.
```

### 8. PAGE 29:02 TO 29:06 (RUNNING 00:00:19.512)

```
02          Q.   Okay.  Now, is it correct that the report that
03   is Cross 3 was based on complaints that had been made or
04   you found over a 22-month period, from May 2000 to
05   February 2002?
06          A.   Largely.
```

### 9. PAGE 74:16 TO 76:23 (RUNNING 00:03:05.310)

```
16          In -- In connection with your work, did you
17   make any effort to quantify how many complaints --
18   whether the number of complaints, in any particular
19   practice -- practice that you identified was
20   statistically significant in terms of the overall
21   loans -- number of loans that were made by Household in
22   any particular time period?
23          A.   Yes and no.
24          Q.   Okay.
25          A.   Or no -- No and yes.  I could try to explain a
00075:01  little bit.
02          Q.   Sure.  Please do.
03          A.   Again, there's is -- there is nothing about
04   this report that we --
05          Q.   That's Cross Exhibit 3.
06          A.   -- that we would argue is a statistical
07   analysis.  So, you're using that term with me.  I don't
08   know if I ever claimed, in this report, that it was a
09   statistical analysis, but my guess is I wouldn't have.
10          So, in a -- if we were to hire a
11   statistician -- which wouldn't be me -- if we were to
12   hire a statistician to do some analysis, they would --
13   they would probably come back with some numbers that
14   show that the number of complaints I was looking at in
15   this report were very, very, very, very small in
16   relation to the population of complaints, but we
17   don't -- the regulatory world, we don't live in a
18   vacuum.  We measure things like are the complaints with
19   this company greater than with a peer company and are
```

CONFIDENTIAL

**Household**

```
           20   they increasing at a greater rate, are they more
           21   egregious than other types of complaints, these types of
           22   things.
           23           In that sense, they may not be a classic
           24   statistical indicator for us, but they are,
           25   nevertheless, important in us forming our decisions.
   00076:01           And, I don't know, if -- if I can give you
           02   a -- just the off-the-top-of-my-head strange analogy.  I
           03   could walk down this street out front, here, a thousand
           04   times, in front of that Tully's Coffee shop and, one
           05   day, I could decide to go in and shoot somebody and take
           06   money out of the till.  That's one out of a thousand
           07   times, but I think that somebody would consider that to
           08   be something that would need to be dealt with.
           09           And that's what we're -- In this report, when
           10   we're dealing with 19 complaints, that's -- that's what
           11   we're saying, is these 19 complaints were egregious acts
           12   against consumers.  And we never tried to argue that
           13   they make up a huge percentage of -- of the total loans
           14   in the company.  What we say is we find these practices
           15   within these complaints -- we find them to be egregious.
           16   We communicate with -- with many of the states across
           17   the country.  We find that they have similar complaints
           18   in their files, that their examination findings are
           19   similar to the things that we're finding in our
           20   examination.  And, therefore, we feel comfortable in
           21   saying that, when we look at the company, we -- we do
           22   not like the practices we're seeing here.  That's what
           23   that report does.
```

**10. PAGE 84:16 TO 84:19 (RUNNING 00:00:12.233)**

```
           16           Q.   (BY MR. SLOANE:)  So, as of that time, the
           17   time that you sent out this expanded report, you had
           18   made your findings and opinions and you were not
           19   interested in revisiting them, were you?
```

**11. PAGE 84:21 TO 85:08 (RUNNING 00:00:43.045)**

```
           21           A.   Hard to say, now.  From speaking from
           22   recollection, I know that the agency, including me, was
           23   not interested in having the conversation or dialogue
           24   that Household kept insisting they -- that they wanted
           25   to have with -- with us, which was very much a dialogue
   00085:01   controlled by Household, contained within a certain
           02   environment or picture that they had -- had painted, and
           03   I know that -- that to the extent that an agency not
           04   being a person can lose sort of patience with that
           05   process, we had reached a point where we had -- where we
           06   had lost patience with it.  We were no longer interested
           07   in -- in having the dialogue that they kept insisting
           08   that they wanted to have.
```

**12. PAGE 91:03 TO 91:12 (RUNNING 00:00:45.340)**

```
           03           Q.   (BY MR. SLOANE:)  And is it also fair to say
           04   that -- that in connection with your work, that it was
           05   not a significant part of your examination to review any
           06   of the Household policies or training manuals or
           07   bulletins about practices that it should or should not
           08   engage in?
           09           A.   I -- I don't believe so, in the writing of
           10   this report.  I believe, subsequent to this report,
           11   we -- using that term loosely -- spent more time in that
           12   area.
```

## Household

**13. PAGE 97:25 TO 98:11 (RUNNING 00:00:40.750)**

```
        25         Q.   Okay.  And you mentioned some conversations
00098:01   with Mr. Baker.  How many times -- How many times have
        02   you talked to any lawyer representing the plaintiffs in
        03   this case?
        04         A.   Boy, I wouldn't know that.  I think
        05   Mr. Baker's the -- the only attorney I know, for sure,
        06   who represents the plaintiffs -- I don't even really
        07   know who the plaintiffs are, but -- I'm fairly
        08   comfortable saying -- at least as far as I know,
        09   Mr. Baker is the only attorney I was speaking with with
        10   the knowledge that -- that the attorney represented the
        11   plaintiffs.
```

**14. PAGE 99:23 TO 100:08 (RUNNING 00:00:41.285)**

```
        23         Q.   Do you recall the general -- generally, what
        24   was discussed, other than what you've already said?
        25         A.   Pretty much what I already said:  That he was
00100:01   interested in my deposition with -- with Bob Parlette;
        02   he had even actually reminded me that I had done this
        03   deposition, because it had slipped my mind; and, at one
        04   point, one of the conversations, we talked about whether
        05   Exhibit 3 would have actually been a -- I think a
        06   formally issued report of the department or whether it
        07   was still in draft form, and we talked about that a
        08   little bit.
```

**15. PAGE 100:14 TO 101:14 (RUNNING 00:01:25.700)**

```
        14         Q.   Sure.  And in connection with the -- what the
        15   subject matter that you just referred to about the
        16   report, is there anything you recall telling him in
        17   particular about that?
        18         A.   Yeah, I was -- I -- I think I laughed and said
        19   that -- I think I might have asked him, "Does it have my
        20   signature on it?"  And he said, "Yes."  And it's got my
        21   signature on it, it was -- it was a formally entered
        22   report of the agency, and I remember issuing that
        23   report.  I remember Household asking me not to and a
        24   whole bunch of arguments around whether it should be or
        25   not.  But it was definitely an entered report by the
00101:01   agency.
        02         There was some discussion about the term
        03   apparent violations, and I explained to Mr. Baker that,
        04   basically, if -- if -- if the term apparent violations
        05   in this report is somehow going to make it a non-formal
        06   report or -- or a draft report, then I think just about
        07   any report we ever did would fall into that category,
        08   including all of the reports out of our division of
        09   banks.  I mean, for 15 years, now, everything would be
        10   draft, because we use that term, apparent violations, as
        11   does the FDIC, federal regulatory agency, so -- That's
        12   where I brought it from.  I was with the FDIC before I
        13   came to Washington State.  It's an accepted term that's
        14   used throughout examination reports.
```

**16. PAGE 105:05 TO 105:08 (RUNNING 00:00:06.754)**

```
        05         MR. BAKER:  Let's mark this next in order.
        06   It's number seven.
        07         MS. MARTIN:  6.
        08         MR. BAKER:  Sorry, 6.
```

**17. PAGE 105:16 TO 106:02 (RUNNING 00:00:35.777)**

```
        16         Q.   Okay.  Mr. Cross, if you could turn to the
        17   page to -- second page of this document.
```

## Household

```
        18          And, earlier today, you were testifying about
        19  some testimony that Mr. Bley had given, the Federal
        20  Reserve Board, I believe, in 2000.  You recall that
        21  testimony?
        22      A.   Yes.
        23      Q.   Okay.  And is the second page on -- is that a
        24  copy of the testimony that Mr. Bley gave?
        25      A.   It appears to be.
00106:01      Q.   And did you author portions or all of this
        02  testimony?
```

**18. PAGE 106:15 TO 106:15 (RUNNING 00:00:02.000)**

```
        15      A.   Could I give you more than a simple yes or no?
```

**19. PAGE 106:16 TO 109:11 (RUNNING 00:02:57.616)**

```
        16      Q.   (BY MR. BAKER:)  Sure.
        17      A.   Okay.  Much of the content of this I would
        18  have provided to John -- when I'm reading this now, and
        19  I realized that, when you talked to me on the phone
        20  previously, I didn't have a copy of this in front of me.
        21  Clearly, the attachment that -- that, I think, went
        22  along with it --
        23      Q.   Um-hum.
        24      A.   -- is my authorship, and much of the content
        25  of this would have been information I provided to John.
00107:01  I'm reading this, now, and this -- the paragraphs, here,
        02  are more in John's voice than my voice.
        03      Q.   If I could direct your attention to page two.
        04      A.   Of --
        05      Q.   I'm sorry, page number two of the testimony.
        06      A.   Got it.
        07      Q.   You see, in the third paragraph, there's a
        08  reference, "I have attached as Exhibit A a memorandum
        09  authored by the department's chief mortgage
        10  investigator, Mr. Chuck Cross, which describes the
        11  deceptive practices we have observed in Washington"?
        12      A.   Yes.
        13      Q.   Okay.  And that's the memo that you were
        14  referring to as the attachment that you had authored?
        15      A.   Right.  That's the thicker part of this
        16  document, actually.
        17      Q.   Okay.
        18          If I could direct your attention to the next
        19  paragraph that says, "It is important to note that
        20  predatory lending is not a new problem.  State
        21  regulators have been dealing with this very same issue
        22  under a different name for years," period.  "What was
        23  once called mortgage fraud is now called predatory
        24  lending," period.  "Under either name, our mission to
        25  investigate violations and enforce the law has remained
00108:01  the same."  Do you see that?
        02      A.   Yes.
        03      Q.   Do you concur with that?
        04      A.   Yes.
        05          MR. SLOANE:  Does he concur with it today?
        06      Q.   (BY MR. BAKER:)  Did you always concur with
        07  that?
        08      A.   Yes.  Missions do change a little bit over
        09  time, but I -- I think, generally, it's a pretty
        10  accurate statement.
        11      Q.   Okay.
        12          Was the term predatory lending used within the
        13  department during the time period that Mr. Sloane was
        14  asking about, 1999 to 2002?
        15      A.   Yes.
```

## Household

```
16        Q.   Okay.   Did you have any discussions with
17   Mr. Bley about predatory lending during that time
18   period?
19        A.   Sure.
20             Again, I didn't very often brief John because
21   I didn't report directly to him.  My boss reported to
22   him.  And, actually, during part of this time, my boss'
23   boss reported to him.  But -- But my relationship with
24   John goes -- goes way back, and, so, we would discuss
25   predatory lending.
00109:01        There -- There was another case that was
02   called a FAMCO case that was -- that predated this, and
03   John and I talked much more about that case than we did
04   about this case, and that was -- that was sort of our --
05   our first really big venture into the world of predatory
06   lending.  We'd done minor cases leading up to that, but
07   that was the first really big one.
08        Q.   Okay.  Earlier, Mr. Sloane asked you about
09   whether the term predatory lending had a rigid
10   definition.  Was it your understanding that that term
11   had a commonly understood meaning?
```

**20. PAGE 109:15 TO 110:07 (RUNNING 00:00:46.118)**

```
15        A.   I think -- To this day, it doesn't -- nobody
16   has -- has defined predatory lending.  Every -- Many
17   people have defined it.  I mean, I even defined it
18   myself.  But many people have defined it.  There's no
19   one universal accepted definition of predatory lending;
20   although, I have to say, in more recent years, the
21   federal agencies have tried to establish some
22   definitions of predatory lending, which I don't
23   completely agree with, and not everybody agrees with.
24   So, we don't have a uniform accepted term for predatory
25   lending.
00110:01        That being said, you could put five or a
02   thousand regulators in the same room, you could throw
03   out some examples, and we'd say that was predatory
04   lending, that wasn't predatory lending, that was, that
05   was.  So, you know it when you see it.  Do we have --
06   Can we open up the dictionary and find a definition?
07   No.
```

**21. PAGE 110:08 TO 111:01 (RUNNING 00:00:55.240)**

```
08        Q.   (BY MR. BAKER:)  Earlier, you had been asked a
09   question as to whether the director of the DFI itself
10   had approved Cross Exhibit 3, the report.  Mr. Thompson,
11   at this time, was -- was your boss; is that correct?
12        A.   That is correct.
13             Well, again, I get promoted somewhere right in
14   there.  So, Whittier Johnson might have been my boss at
15   the time this report was entered.  But, that being said,
16   I really reported directly to Mark Thompson.  I had --
17   Because I was enforcement chief, I sort of bypassed
18   that -- that spot on the org chart.
19        Q.   Okay.  At this point in time of -- in
20   April 2002, was Mr. Thompson aware of the -- the
21   findings and conclusions reached in Cross Exhibit 3?
22        A.   Intimately aware and familiar with them, yes.
23        Q.   And did he authorize your submission of that
24   filings -- promulgation of that report to Household at
25   the time?
00111:01        A.   Absolutely.
```

**22. PAGE 111:15 TO 113:16 (RUNNING 00:03:07.816)**

```
15             What was the purpose of the expanded report,
```

## Household

```
16   which we've been calling Exhibit 3?
17        A.   The first one qualifies that the purpose is
18   probably contained within the report itself, and then
19   I'll speak from recollection, as -- as to the purpose.
20        We had, for a period of -- I want to say six
21   years -- completed three examinations of Household and
22   Beneficial in conjunction with Household and, in that
23   period of time, the examination reports had,
24   repeatedly -- you know, for at least, I think, three
25   exam reports -- come in thin and -- I don't want to say
00112:01  not complementary to the company, but not with a lot of
02   findings within them.
03        Now, that was the examinations unit conducting
04   those exams.   I was over the enforcement unit at that
05   time; although, sometime during this period of time,
06   I -- I came over both of them.
07        But, in the enforcement unit, we handled the
08   complaints coming in, dealt with all the investigations
09   and enforcement actions.   The -- The findings of the
10   exam side reports were not jiving with what we were
11   seeing in the complaints over this -- this same period
12   of time.   So, the division began raising questions about
13   this:   What -- Why are we seeing this in the complaint
14   side -- or the -- or the enforcement side and we're not
15   seeing this in the examination side?   What's -- What's
16   going on?
17        So, these discussions were ongoing and they
18   involved very much the -- the division director, Mark
19   Thompson, about, you know, why weren't they -- why
20   weren't the exams picking up on this stuff?   What --
21   What was -- What was going wrong?   Are they -- Are they
22   getting too comfortable, you know, going to this -- to
23   these routine exams and not seeing what's going on?   Why
24   isn't it jiving with what the consumers were telling us?
25   So forth.
00113:01        So -- And, also, we were beginning to
02   understand more and more about predatory lending
03   practices.   We had the FAMCO case under our belt, now.
04   We understood more about what was going on, and the
05   deception that could actually occur with consumers,
06   where, a lot of times, consumers didn't even really have
07   a clue what happened, what went on.
08        So, we're having these conversations and it
09   was determined that -- that it made sense to do an
10   investigation or an exam -- expanded examination report
11   to -- and focus on the complaint side of the world as it
12   related to Household and try to -- try to understand
13   what was really going on with the practice of the
14   company, see if what we were hearing from the complaints
15   made sense or what -- what the routine exams was telling
16   us made sense.   That's -- That's how it got started.
```

### 23. PAGE 117:22 TO 117:25 (RUNNING 00:00:07.488)

```
22        Q.   And, in preparing Exhibit 3, you testified
23   that you interviewed some of the consumers; is that
24   correct?
25        A.   That's correct.
```

### 24. PAGE 118:04 TO 118:17 (RUNNING 00:00:35.716)

```
04        Q.   (BY MR. BAKER:)   Did you also -- you and some
05   of your colleagues -- engage in what I understand to be
06   called mystery shopping?
07        A.   Yeah, we applied for loans at Household, yes.
08        Q.   Okay.   And did your experience help you reach
09   any -- any of the conclusions that are set forth in
```

Case Clip(s) Detailed Report
Monday, April 20, 2009, 5:39:41 PM

## Household

```
10   Exhibit 3?
11        A.   Yes.   There were -- There was -- Yes.
12        Q.   Okay.   Did you also subpoena documents from
13   Household in February of 2002?
14        A.   I don't know the date, but I know that we --
15   we subpoenaed them.
16        Q.   Okay.
17        A.   Sounds about right.
```

**25. PAGE 119:01 TO 119:04 (RUNNING 00:00:08.058)**

```
00119:01        Q.   (BY MR. BAKER:)   Okay.   And did you consider
      02   any documents received from Household in response to the
      03   subpoena in reaching the conclusions that are set forth
      04   in Exhibit 3?
```

**26. PAGE 119:07 TO 119:07 (RUNNING 00:00:01.179)**

```
07        A.   Yes.
```

**27. PAGE 120:13 TO 120:16 (RUNNING 00:00:10.753)**

```
13             You're familiar that -- with the fact that
14   subsequent to -- or about the time of the issuance of
15   this report, the Washington State Attorney General was
16   conducting her own investigation into Household?
```

**28. PAGE 120:23 TO 121:04 (RUNNING 00:00:12.331)**

```
23        A.   I was involved in their investigation, so,
24   yes, I was aware of it.
25        Q.   Okay.   And, in the course of that
00121:01   investigation, did you learn additional information
      02   about Household's practices within the state of
      03   Washington?
      04        A.   Yes.
```

**29. PAGE 121:16 TO 121:20 (RUNNING 00:00:10.557)**

```
16        Q.   (BY MR. BAKER:)   And did the information that
17   you learned as a result of participating in the AG
18   investigation reinforce the conclusions that you reached
19   as a result of your own investigation reflected in
20   Exhibit 3?
```

**30. PAGE 121:23 TO 121:23 (RUNNING 00:00:00.532)**

```
23        A.   Yes.
```

**31. PAGE 121:24 TO 122:01 (RUNNING 00:00:08.810)**

```
24        Q.   (BY MR. BAKER:)   And did the attorney general
25   conduct interviews of former employees of Household, to
00122:01   your knowledge?
```

**32. PAGE 122:03 TO 122:03 (RUNNING 00:00:00.862)**

```
03        A.   Yes.
```

**33. PAGE 122:04 TO 122:05 (RUNNING 00:00:02.998)**

```
04        Q.   (BY MR. BAKER:)   Okay.   Did you participate in
05   any of those discussions?
```

**34. PAGE 122:06 TO 122:10 (RUNNING 00:00:24.400)**

```
06        A.   Quite possible.   They primarily used Jan
07   Simonds, who is an investigator working for Dave Huey,
08   to interview consumers, but I think it's quite possible
09   that, at times, Dave and I were both present when a
10   consumer was being interviewed.
```

CONFIDENTIAL

## Household

---

**35. PAGE 122:12 TO 122:12 (RUNNING 00:00:02.203)**

```
12        A.   I don't have a clear recollection of that.
```

**36. PAGE 122:21 TO 122:25 (RUNNING 00:00:12.221)**

```
21        Q.   (BY MR. BAKER:)  Okay.  You testified that --
22   during this time period, that you were in discussions
23   with other state examiners -- and I mean examiners from
24   other states; is that correct?
25        A.   Yes, I believe so, yes.
```

**37. PAGE 123:01 TO 123:03 (RUNNING 00:00:15.310)**

```
00123:01        Q.   Okay.  One of the ones, according to your
02   deposition -- and I think if I could -- it's on
03   Exhibit 1.  Take you to Exhibit 1, page 33 to 34.
```

**38. PAGE 123:04 TO 123:10 (RUNNING 00:00:20.041)**

```
04   Towards the bottom.  Mr. Parlette asks you:  "What other
05   states were you in contact with?"
06             Answer:  "Minnesota, Georgia, Idaho, Oregon.
07   Those were the main ones.  There was some infrequent
08   contact with Michigan, California, Illinois."
09             Do you see that?
10        A.   Yes.
```

**39. PAGE 125:09 TO 126:19 (RUNNING 00:01:54.662)**

```
09        Q.   Okay.  Mr. Cross, I just want to ask you some
10   more questions about your report.
11             Now, in the preparation of your report, did
12   you approach the issue with a neutral view as to the
13   merits of these complaints?
14        A.   In the preparation of the report?
15        Q.   No, just -- Sorry, in evaluating these
16   complaints, did you take, initially, a neutral view?
17        A.   Yes.  The -- The reason I was qualifying is by
18   the time I was actually writing this report, it was no
19   longer a neutral position.
20        Q.   Okay.  And, earlier, I had asked you what was
21   the purpose of the report.  If I could direct your
22   attention to page 28 of Exhibit 1, which is your
23   deposition, lines 17 through 23.  And the question on
24   line 17 was:  "When did you decide to do this expanded
25   report of examination?"  The answer is:  "I believe it
00126:01   was in, I want to say, December of 2001 is when the
02   director and myself agreed that we needed to further
03   document our findings."  Okay.
04             And, by document the findings, you mean the
05   findings that you were having with individual
06   complaints?
07        A.   Yes.  And, also, I believe the complaints were
08   the driver, but, beyond that, we were starting to
09   develop -- for lack of a better words -- theories about
10   the business practices of Household that were -- that
11   didn't comport with what we would expect from our
12   licensee, so the complaints were the driver, but it was
13   beyond the complaints.
14        Q.   Okay.  And as you further investigated and
15   looked at, for instance, Household's internal documents,
16   do those corroborate your theories?
17        A.   Yes.
18        Q.   Okay.  And what specific theories were you
19   operating under at this point in time?
```

## Household

---

**40. PAGE 126:22 TO 127:04 (RUNNING 00:00:37.563)**

```
      22        A.   I have to say, from -- would be the general --
      23   generally, the theories that ended up in the report,
      24   which were deception, misrepresentation, confusion,
      25   up-selling borrowers unnecessarily.  Those types of
00127:01   things.  But -- As a move towards, you know, producing
      02   the actual report, those became more -- more defined --
      03   became clearer and -- and more -- more precise, I guess,
      04   in the report.
```

**41. PAGE 127:05 TO 127:06 (RUNNING 00:00:06.286)**

```
      05        Q.   (BY MR. BAKER:)  What types of deception did
      06   you find that were being engaged in by Household?
```

**42. PAGE 127:16 TO 127:18 (RUNNING 00:00:09.005)**

```
      16        A.   I can do this one or of two ways.  I can give
      17   a very incomplete recollection or I can flip through the
      18   report and tell you what the report says.
```

**43. PAGE 127:19 TO 127:23 (RUNNING 00:00:10.114)**

```
      19        Q.   (BY MR. BAKER:)  All right.  Well, the
      20   report -- the report, on page 43, starts talking about
      21   some of the things that you found, so, if you want to
      22   look at that and that will help you identify some of the
      23   issues.
```

**44. PAGE 128:05 TO 129:18 (RUNNING 00:02:12.906)**

```
      05        A.   There -- There are these identified patterns
      06   of practice that are sort of fleshed out by the
      07   complaint history, starting, here, on page 43.  One of
      08   them is misrepresentations of failed promises, next one
      09   is confusion over rates, points, and fees.  So, that's
      10   pretty consistent with what I said, generally, about the
      11   sort of deception, misrepresentation, confusion kind of
      12   thing.
      13        These were all -- I -- I did a -- a bunch of
      14   cases during my time with DFI and, just because of the
      15   timing of things, not -- not really necessarily because
      16   of anything else, but just because I happened to work
      17   for an agency that -- that pushed the envelope on some
      18   things -- we were out in front of a lot of people and --
      19   on some of this kind of stuff, and I was becoming very
      20   immersed in it, even ahead of a bunch of -- of other
      21   states, and these are all -- These are what I would
      22   identify as predatory practices that, at times, similar
      23   to things I would see in other cases and -- and it
      24   revolves around this general idea that -- that people
      25   are being sold something that isn't what they think that
00129:01   they're getting and -- and it very likely may not be in
      02   their best interest to get that product, but it's very
      03   much in the company's best interests to sell that
      04   product.  That's sort of the big picture of it.
      05        Specifically, you get down to things like the
      06   prepayment penalties, the way the payments were sold,
      07   the amount of loans being sold.  This case had a -- had
      08   a specific area of insurance packing that concerned us,
      09   which I don't remember finding insurance packing in any
      10   company subsequent to this, but -- but, leading up to
      11   this time, there were companies that -- that have been
      12   doing some insurance packing, but I -- I think the
      13   associates case that predated this one sort of scared
      14   most people out of the business of insurance packing.
      15        But, during this period of time, that was
      16   still an area going on that -- that we had concerns
```

## Household

```
      17    with, so -- You know, without reading the report, like
      18    he said, those are the sort of general -- general areas.
```

**45. PAGE 129:19 TO 130:05 (RUNNING 00:00:35.259)**

```
      19        Q.   (BY MR. BAKER:)  In -- In making a
      20    determination that Household was engaged in insurance
      21    packing, did you consider the insurance penetration
      22    rates?
      23        A.   Yes.  That was a -- That was a -- That was a
      24    common thing that we did.  In fact, that's -- I'm pretty
      25    sure that's an area that -- that I had the other
00130:01    examiners develop for me, because they were the experts
      02    in identifying insurance penetration for the office,
      03    and -- and I think I had some of them prepare the
      04    insurance penetration data for me that I used.
      05        Q.   There's a section on page 48, Section 6.
```

**46. PAGE 130:06 TO 130:07 (RUNNING 00:00:03.325)**

```
      06        A.   Oh, okay.  Give me just a moment.  I'll try to
      07    refresh myself with this.
```

**47. PAGE 130:08 TO 131:19 (RUNNING 00:01:49.713)**

```
      08             I remember some of this.  There -- The
      09    insurance penetration was something that -- that was
      10    done -- An analysis of insurance penetration was
      11    something that was done with -- with most, if not all,
      12    of the consumer loan company exams.  And I don't want to
      13    confuse you by consumer loans.  That's the type of
      14    license Household held even though what we were looking
      15    at was primarily mortgage activity, it was a -- what was
      16    called a consumer loan license, and companies that were
      17    examined under that statute, it was pretty routine to
      18    look at -- at insurance penetration to determine if --
      19    if -- if we believed that the company was packing or
      20    getting insurance into the transaction, either through
      21    an overly convincing sales pitch or out-and-out
      22    misrepresentation or deception to the consumer.
      23             And this, I'm looking here, it was -- I
      24    remember it being very high in some of the branches.  It
      25    says 92 to a hundred percent here.  I mean, that's --
00131:01    that's incredible.  I mean, any time that we drift
      02    above, maybe, like 60 percent, we would -- I mean,
      03    alarms with red flags would start going off -- you know,
      04    we need to really look at this area -- where, here,
      05    we're -- you know, some cases almost every loan had --
      06    had -- had insurance.  That's just extremely uncommon.
      07             When you talk to consumers about this
      08    insurance, it's very seldom that a consumer ever sits
      09    down and says, yeah, I -- I really wanted that and I
      10    took it for a specific reason.  Every now and then.  In
      11    this -- I have a recollection of a consumer, in this
      12    case, that I believe did tell me he wanted the
      13    insurance, but when I got into it further, I found out
      14    he was too old to actually even use the insurance that
      15    was sold to him.  I think he could only be 65 or 70 and
      16    he was already 72, yet, he had been sold this very
      17    costly insurance that he thought he had that he could
      18    never even actually use.  So, we had a bunch of concerns
      19    about this.
```

**48. PAGE 132:23 TO 133:04 (RUNNING 00:00:22.503)**

```
      23        Q.   (BY MR. BAKER:)  Okay.  One of the factors
      24    that you discussed -- discussed in this report, if I
      25    could direct your attention to page 46, the prior page.
```

## Household

---

```
00133:01  And you're discussing concerns resulting from borrower
     02  confusion over biweekly and bimonthly programs.  You see
     03  that in sort of the second full paragraph there?
     04       A.   Yeah.
```

**49. PAGE 133:05 TO 133:11 (RUNNING 00:00:18.265)**

```
     05       Q.   Are you familiar with the term effective rate
     06  or equivalent rate as used with respect to a biweekly
     07  payment program?
     08       A.   Yes.
     09       Q.   And did you identify a pattern of deceptive
     10  practices at Household that used those terms?
     11       A.   I -- I believe so, yes.
```

**50. PAGE 133:25 TO 133:25 (RUNNING 00:00:04.257)**

```
     25            Here, let's mark this next in order.
```

**51. PAGE 134:12 TO 134:22 (RUNNING 00:00:21.344)**

```
     12       Q.   (BY MR. BAKER:)  And, Mr. Cross, you see this
     13  is a letter to you from Household?
     14       A.   Yes.
     15       Q.   Okay.  And it relates to a specific complaint
     16  from the -- the Johnstons.  Do you see that?
     17       A.   Yes.
     18       Q.   Okay.  And you would have reviewed this and
     19  considered this in evaluating the complaint -- the
     20  merits of the claim; is that right?
     21       A.   In relation to this -- yeah, Julian and Terry
     22  Johnston complaint, yes.
```

**52. PAGE 134:23 TO 135:01 (RUNNING 00:00:11.723)**

```
     23       Q.   And is it fair to say it was part of your
     24  regular business practices, during the time period we're
     25  talking about, to evaluate complaints received from
00135:01  borrowers?
```

**53. PAGE 135:04 TO 135:17 (RUNNING 00:00:32.871)**

```
     04       A.   I think the answer is yes.
     05       Q.   (BY MR. BAKER:)  Okay.
     06       A.   It -- I supervised this area and I had people
     07  handling -- We received about a thousand complaints a
     08  year, so, did I look at every complaint?  At one time, I
     09  was the only guy looking at complaints, but you get into
     10  this period of time and it took bigger cases like FAMCO
     11  and Household for me to become involved in the
     12  complaints.
     13       Q.   Okay.
     14       A.   But I approved every -- Every complaint
     15  finding that ever went out went out under my approval,
     16  but a lot of it was under sort of policy and procedure:
     17  You do this in this situation.
```

**54. PAGE 135:18 TO 135:21 (RUNNING 00:00:16.001)**

```
     18       Q.   Okay.  And if I direct your attention to the
     19  second page of this document.  There's a paragraph
     20  starting, "Third".  If you could read that to yourself.
     21       A.   Um-hum.
```

**55. PAGE 135:22 TO 137:10 (RUNNING 00:01:57.968)**

```
     22            I've read it.
     23       Q.   Okay.  And does that refresh your recollection
     24  as to what the -- the biweekly effective rate deceptive
     25  practice was?
```

Case Clip(s) Detailed Report
Monday, April 20, 2009, 5:39:41 PM

## Household

```
00136:01         A.   A little bit.  He -- Schneider, here, is
      02   referring to the equivalent rate.  I think we talked a
      03   lot about the effective rate -- I can't remember, now,
      04   whether those terms are interchangeable or had some
      05   subtle nuances that were different among them.
      06         And, in general -- And there were a couple of
      07   variations or maybe more variations than the whole
      08   biweekly or bimonthly program.  In general, what -- what
      09   we found was that when borrowers had a biweekly or
      10   bimonthly payment plan, they would communicate to us
      11   that -- that their rate was approximately half of what
      12   we could see on the note was showing as their rate, and,
      13   as we discussed this with them -- and, then, also would
      14   look at the materials and the responses from the
      15   company -- it became apparent to us that -- that this
      16   whole -- there was a sales pitch that went with getting
      17   the biweekly program, and that sales pitch was clearly
      18   leading borrowers to believe that their rate was half of
      19   what it really was.
      20         Now, there's -- there's a whole ton of
      21   discussion that ensued, that I'm sure went on for months
      22   and months, about the meaning of effective, meaning of
      23   equivalent, who meant what by what.
      24         In the end, our finding was that this is what
      25   borrowers carried away from -- from -- from the sales
00137:01   pitch.  These guys were the professionals selling this
      02   loan program and -- in our -- In our regulatory world,
      03   under the concept by which we issued the company a
      04   license, they have an obligation not to mislead people,
      05   and we found that borrowers were entering the
      06   transaction believing that their rate was half of what
      07   it really was.
      08         Q.   Okay.  And did you determine that that was a
      09   deceptive practice?
      10         A.   Absolutely.
```

**56. PAGE 137:11 TO 138:24 (RUNNING 00:01:10.732)**

```
      11         Q.   Okay.  In the report, here, it says -- I'm
      12   reading from the -- looks like the second-to-last line
      13   of this paragraph.  It says, "The department has
      14   identified the practice in other branches in Washington
      15   and has even received reports from regulators in other
      16   states concerning the practice."  Do you see that?
      17         A.   What document are you on?
      18         Q.   I'm sorry, I'm on your Exhibit 3.
      19         A.   Okay.  Page 46, still.
      20         Q.   Page 46.  Yeah.  The paragraph we're looking
      21   at, this kind of inset.
      22         A.   That begins with --
      23         Q.   The Department.
      24         A.   The prime -- or --
      25         Q.   Yeah, borrowers have been informed.
00138:01         A.   Okay.
      02         Q.   Okay.
      03         A.   And then what -- You're looking at the last
      04   sentence that begins with department?
      05         Q.   Yeah.  Well, no, the second-to-last
      06   sentence --
      07         A.   Got it.
      08         Q.   -- that says, "However the department has
      09   identified"?
      10         A.   Yes, okay.
      11         Q.   Okay.
      12         A.   Okay.
      13         Q.   And other practices -- sorry, "the practice to
      14   other branches in Washington and has even received
```

## Household

```
15   reports from regulators in other states concerning the
16   practice."  Do you see that?
17        A.   I do, yes.
18        Q.   Okay.  Do you recall how many other states
19   reported this practice?  And if I could direct you to
20   page 89 of your deposition --
21        A.   Okay.
22        Q.   -- and your answer there.
23        A.   I'm going to say, off the top of my head,
24   probable Minnesota and Georgia, but -- Okay.  I'm on
```

### 57. PAGE 138:24 TO 140:08 (RUNNING 00:01:34.872)

```
        24   probable Minnesota and Georgia, but -- Okay.  I'm on
        25   page 89.
00139:01        Q.   Page 89, and question From Mr. Parlette:
        02   "Let's put back together.  I believe you said the
        03   effective or equivalent interest rates sales program was
        04   found in several other states?"
        05             Answer:  "I was told that."
        06             Question from Mr. Parlette:  "Okay."  Do you
        07   know how many other states" -- sorry, "Do you know how
        08   many states?"
        09             Objection from Mr. Dunne.
        10             Answer:  "No, I don't know how many, but I
        11   know that I was told that by at least 15 to 20 states."
        12        A.   And I don't know how far back we have to go to
        13   get this into appropriate context, but, first, this was
        14   contemporaneous in time with -- with the events, so, I
        15   stand by what was said there.
        16             What I'm wondering, now, if we went back and
        17   looked at the earlier context, if the 15 and -- 15 to 20
        18   was not relevant to the multistate, then -- in other
        19   words, not -- the 15 -- 15 to 20 may not have been
        20   before this report was drafted.
        21        Q.   Okay.
        22        A.   Yet, the report was drafted, and -- and a lot
        23   of discussions ensued after the report was drafted, and
        24   that's when the 15 to 20 may have said, "Hey, us, too."
        25   But -- I'd have to read a bunch of this to figure that
00140:01   out, I think.
        02        Q.   Okay.  So, you're not sure when you -- when
        03   the timing of these 15 to 20 other states telling you
        04   when that occurred?
        05        A.   Right.
        06        Q.   It could have occurred before this report or
        07   could have occurred subsequent?
        08        A.   Right.
```

### 58. PAGE 140:09 TO 140:10 (RUNNING 00:00:04.621)

```
        09        Q.   Okay.  But you're saying, to your knowledge,
        10   this practice occurred between 15 and 20 other states?
```

### 59. PAGE 140:18 TO 140:24 (RUNNING 00:00:26.201)

```
        18        A.   I would say I was told.  I did not -- I don't
        19   know that I -- that I personally investigated materials
        20   from other states; although, it's quite possible that --
        21   We came together on several occasions and discussed
        22   things and -- and looked at stuff, so, but -- but it is
        23   most accurate to say that I was told that by 15 to 20
        24   states.
```

### 60. PAGE 142:01 TO 142:08 (RUNNING 00:00:13.807)

```
00142:01        Q.   (BY MR. BAKER:)  Are you familiar with a man
        02   named Dan Gallatin?
```

## Household

```
03      A.   Yes.
04      Q.   Okay.  And did Mr. Gallatin work at the
05 Minnesota Department of Commerce?
06      A.   He did.
07      Q.   And did he exchange information with you about
08 what he was finding in the state of Minnesota?
```

**61. PAGE 142:11 TO 142:21 (RUNNING 00:00:35.833)**

```
11      A.   There were three examiners -- me, Dan
12 Gallatin, Tony Polidori -- representing three different
13 states who provided all of the technical support to what
14 became the big multistate case.  So, Dan and -- and Tony
15 and -- and me, we all -- we all worked together very
16 closely.  We analyzed a lot of documentation from -- We
17 were the guys that were charged with analyzing all the
18 documentation that was coming in from all of the states
19 into this multistate.  So, yeah, we spent a lot of time
20 exchanging information, exchanging documents, looking at
21 spreadsheets, that kind of thing.
```

**62. PAGE 142:22 TO 143:20 (RUNNING 00:00:53.459)**

```
22      Q.   (BY MR. BAKER:)  And where is Mr. Polidori
23 from?
24      A.   Idaho.
25      Q.   Idaho, okay.
00143:01            In your deposition, you referenced a Ben Bruce
02 from New York.
03      A.   Yes, he would be with -- with New York
04 Attorney General.  He was an assistant attorney general.
05      Q.   I see.
06            And there was an Ann Gaultney referenced from
07 Michigan.
08      A.   She was Mark Thompson's equivalent in the
09 State of Michigan.  She would be the equivalent -- I
10 don't know if the title is the same, but basically an
11 assistant commissioner, I think, in Michigan.  We call
12 them directors here, but --
13      Q.   Was she also involved in the technical side of
14 evaluating the scope of misconduct by Household?
15      A.   A little bit.  She was a little bit above that
16 level.  I think she might have loaned some of her people
17 to us, some point in time.  She definitely -- And
18 definitely had the ability to discuss at those levels.
19 I can't remember her necessarily getting her hands so
20 dirty with the numbers.
```

**63. PAGE 143:21 TO 143:23 (RUNNING 00:00:05.821)**

```
21      Q.   Okay.  Was Michigan one of the states that was
22 reporting finding effective rate presentations in their
23 state?
```

**64. PAGE 144:01 TO 144:10 (RUNNING 00:00:25.634)**

```
00144:01      A.   I can't remember.
02      Q.   (BY MR. BAKER:)  Okay.  If your prior
03 deposition said that she was, would that be consistent?
04      A.   Then I would say she was.
05      Q.   She was, okay.
06      A.   Or they were, sorry.
07      Q.   All right.  And the same thing would be true
08 with Mr. Bruce?
09      A.   Yes.  Keeping in mind that -- that Ben was not
10 a regulator.  He was an assistant attorney general.
```

## Household

**65. PAGE 144:12 TO 145:11 (RUNNING 00:01:12.239)**

```
          12              You testified earlier about deceptive
          13    practices with respect to prepayment penalty by
          14    Household.  There's a reference in this report.  Can you
          15    tell me what you recall about the -- the prepayment
          16    penalty deceptions?
          17        A.   Some of it.
          18        Q.   Yes.
          19        A.   Okay.  As I would interview borrowers, they
          20    would tell me they didn't know that they had a
          21    prepayment penalty and they were, at times, confused
          22    about the fact that they had a prepayment penalty.
          23    And -- And that was definitely a discussion among the
          24    different states.
          25              In fact, I'm pretty confident, here, now,
00145:01    years later, that New York was the only state that did
          02    not have that issue.  And this actually came to light
          03    during the case.  And the reason was New York had a
          04    specific law saying you could not have prepayment
          05    penalties, so, New York came into the case saying,
          06    "Well, we don't see that in our state."  It's because
          07    prepayment penalties were completely disallowed, so
          08    there's no reason to try to deceive somebody or
          09    misrepresent that a prepayment penalty existed.
          10              But all the other states, that was a very big
          11    point that was discussed over and over and over.
```

**66. PAGE 145:21 TO 146:02 (RUNNING 00:00:15.408)**

```
          21        Q.   (BY MR. BAKER:)  You're talking about, if I
          22    understand, there's a group of you -- some are attorneys
          23    general, some are -- you are regulators -- who are
          24    talking about these practices, and I'm wondering if you
          25    reached a consensus that Household is engaged in
00146:01    deceptive practices with respect to prepayment penalties
          02    in all the states that you are representing.
```

**67. PAGE 146:06 TO 146:16 (RUNNING 00:00:28.385)**

```
          06        A.   The group grew to about 40 states, I believe,
          07    with time, and, yes, we had -- I remember two physical
          08    meetings we were all in the same room.  The first
          09    meeting, I think there were about 25 states, and then
          10    the next meeting grew to about 40 states, and we very
          11    much -- with the exception of New York, who wanted to
          12    stay away from the prepayment penalty issue, because
          13    they didn't have prepayment penalties in their state,
          14    every other state was saying, "This is a major issue in
          15    our state and it's an issue we have to have resolution
          16    of in this case."
```

**68. PAGE 146:17 TO 147:25 (RUNNING 00:01:42.063)**

```
          17        Q.   (BY MR. BAKER:)  One of the other things that
          18    you talk about in your report that we haven't touched
          19    upon has to do with the GFEs in the -- quote, unquote --
          20    buydown or discount points.  Do you recall that?
          21        A.   Yes.
          22        Q.   Okay.  What can you tell me about that
          23    particular practice?
          24        A.   There were -- There were two -- I believe
          25    there were two deceptions that I cited revolving around
00147:01    the discount points, in this case.  One was whether the
          02    discount points were what I would call bona fide -- did
          03    they actually have an effect of buying the rate down --
          04    and the second was the disclosure on the Good Faith
          05    Estimate of a range of discount points, which typically
```

## Household

```
06    began at zero and went up somewhere -- anywhere from
07    maybe six, seven thousand up to maybe, like, ten or 11
08    thousand.  It was -- It would just be showing, in the
09    Good Faith Estimate, zero to this larger number.
10              But, in the cases I reviewed, consistently,
11    the borrowers paid at the very top of that number.  Yet,
12    the borrowers were telling us that the loan originator
13    said they would be at the bottom.  They would get
14    essentially a -- a very low-cost or no-cost loan.  So --
15    Deception -- To reverse those, deception, first, around
16    what was disclosed to the borrower, making the borrower
17    believe that it could be as low as zero, and it
18    virtually never was, in -- in our investigation, and
19    then, once discount points were actually paid, they
20    didn't seem to have any affect in moving the rate down
21    any, which would be your natural assumption, is that --
22    and based on some documentation produced by Household,
23    some tables that showed that there was an inverse
24    relationship between points and rate.  You would assume
25    that, but that was not what we found.
```

### 69. PAGE 148:01 TO 148:04 (RUNNING 00:00:07.438)

```
00148:01         Q.  Okay.  Was that also the subject of
02    discussions within the -- you mind if I call it the AG
03    group?
04         A.  That's fine.  Yes.
```

### 70. PAGE 150:04 TO 150:09 (RUNNING 00:00:14.112)

```
04         Q.  (BY MR. BAKER:)  I want to make sure -- The
05    question I want to know is:  Was there a consensus
06    reached, within the AG group, that Household was engaged
07    in deceptive practices with respect to the disclosures
08    of -- on GFEs and the -- quote, unquote -- buydown
09    discount points that you discussed?
```

### 71. PAGE 150:11 TO 150:12 (RUNNING 00:00:05.617)

```
11         A.  My recollection is that it was 100 percent,
12    so, we -- Yes, a consensus.
```

### 72. PAGE 150:22 TO 150:24 (RUNNING 00:00:08.642)

```
22         Q.  So, on page 132, if I could direct your
23    attention to the question and answer starting on lines
24    13.  And there's a -- The answer was:  "Household
```

### 73. PAGE 150:24 TO 151:24 (RUNNING 00:01:05.401)

```
24    13.  And there's a -- The answer was:  "Household
25    maintained for, I don't know, two, two and a half years,
00151:01    that they had a safe harbor under RESPA that allowed
02    them to disclose the range of discount points in the
03    Good Faith Estimate in the fashion in which they
04    disclosed those points," period.  You see that?
05         A.  Um-hum.
06         Q.  And it says that this issue has kind of been
07    going back and forth with them since late 1999.
08         A.  Yes.
09         Q.  Okay.  Who, at Household, was maintaining
10    that?  Who told you that they had a safe harbor?
11         A.  I don't remember.  I -- It would be --
12         Q.  Mr. Schneider?
13         A.  Mr. Schneider.
14              We had a lot of correspondence revolving
15    around the complaints where I think we were raising this
16    concern, but -- there -- there's a -- there was a woman
17    with Household who was something like assistant general
```

## Household

```
18  counsel, and I can't remember her name, now, and I think
19  we had a lot of arguments with her about this topic.
20      Q.   Okay.
21           And according to your -- It goes on.  You said
22  that you asked HUD for an opinion letter?
23      A.   Yes.
24      Q.   Okay.  And let me just show you a document.
```

**74. PAGE 152:06 TO 152:08 (RUNNING 00:00:05.102)**

```
06      Q.   (BY MR. BAKER:)  And I just want to know, is
07  this a copy of the letter that you received back from
08  HUD?
```

**75. PAGE 152:10 TO 152:10 (RUNNING 00:00:01.370)**

```
10      A.   Yes.
```

**76. PAGE 152:12 TO 152:13 (RUNNING 00:00:03.160)**

```
12           MR. BAKER:  Okay.  And this is Cross
13  Exhibit 11?
```

**77. PAGE 152:16 TO 152:19 (RUNNING 00:00:04.440)**

```
16      Q.   (BY MR. BAKER:)  Did you ever show this
17  letter -- Sorry, did you ever show this letter to
18  Household?
19      A.   Yes.
```

**78. PAGE 152:21 TO 152:21 (RUNNING 00:00:00.957)**

```
21      A.   Yes, I did.
```

**79. PAGE 159:08 TO 159:12 (RUNNING 00:00:17.115)**

```
08      Q.   Okay.  Did you find any practice or pattern
09  where Household would maximize the amount of a loan that
10  was given to the -- Sorry.  See if I could do this --
11  that would maximize the loan amount that was given to
12  the borrower?
```

**80. PAGE 159:18 TO 159:21 (RUNNING 00:00:08.458)**

```
18      A.   I believe I referred to that as up-selling.
19      Q.   (BY MR. BAKER:)  Okay.
20      A.   And, yeah, it was one of the -- one of the
21  practices that caused us concern.
```

**81. PAGE 160:04 TO 160:10 (RUNNING 00:00:11.012)**

```
04      Q.   (BY MR. BAKER:)  All right.  As part of your
05  preparation of this report, did you consider the impacts
06  of Household's branch compensation record?
07           MS. MARTIN:  I'm sorry, when you mean -- when
08  you say this report, do you mean --
09           MR. BAKER:  I'm sorry, Exhibit 3.
10           MS. MARTIN:  Okay.  Thank you.
```

**82. PAGE 160:11 TO 160:16 (RUNNING 00:00:23.386)**

```
11      A.   I know that we gave a lot of attention to
12  branch -- or employee compensation.  The timing of that
13  I'm not absolutely certain on, whether I was aware of
14  compensation or specific compensation plans prior to
15  drafting the report or if it was subsequent to drafting
16  the report.
```

**83. PAGE 160:17 TO 160:18 (RUNNING 00:00:03.955)**

```
17      Q.   (BY MR. BAKER:)  Okay.  Well, if I could
18  direct your attention to page 111 of your report.
```

## Household

---

**84. PAGE 160:24 TO 161:13 (RUNNING 00:00:37.849)**

```
         24        Q.   (BY MR. BAKER:)  Question is on line five and
         25   the answer starts on line nine.
  00161:01             And your answer was:  "Well, I know that the
         02   compensation for originating or closing loans with
         03   insurance was a significant amount to the loan officer's
         04   commission, so it would just have to be my opinion that
         05   heavy compensation claims can lead towards the" -- dash
         06   -- "obviously it would be an incentive for" any --
         07   "somebody" -- dash -- "could be an incentive for
         08   somebody to do something they wouldn't do if that
         09   incentive wasn't there."  Is that your testimony?
         10        A.   That's a statement I made at that time.
         11        Q.   And, to the best of your knowledge, it's an
         12   accurate statement?
         13        A.   Yep.
```

**85. PAGE 161:18 TO 162:11 (RUNNING 00:00:47.676)**

```
         18        Q.   (BY MR. BAKER:)  Did you find, based on your
         19   review of complaints in the state of Washington, that
         20   Household was engaging in a practice of equity
         21   stripping?
         22        A.   Yes.  Although equity stripping wasn't --
         23   wasn't --
         24        Q.   Wasn't a term you used?
         25        A.   That's more of an AG term than a -- than a
  00162:01   regulator term.  But -- But, yeah, definitely eating up
         02   the borrower's equity, the equity in their property,
         03   through up-selling loan and layering on fees,
         04   definitely.  That eats up equity.  Equity stripping as a
         05   specific legal -- that's -- There's a legal definition
         06   of that in the state of Washington and there's a whole
         07   law revolving around that that wasn't under our
         08   jurisdiction.  It was under the AG's jurisdiction.  So,
         09   I had tendency, I think, to stay away from that specific
         10   term, equity stripping, but the AGs talked about it a
         11   lot.
```

**86. PAGE 162:12 TO 162:13 (RUNNING 00:00:03.488)**

```
         12             MR. BAKER:  Let's mark one more document,
         13   here.
```

**87. PAGE 162:17 TO 163:04 (RUNNING 00:00:30.358)**

```
         17        Q.   (BY MR. BAKER:)  We're going to have to work
         18   our way around it.  This document has a lot of
         19   handwriting on it, but I'm not going to represent it's
         20   yours.  But if you turn in a couple pages, you'll see
         21   there's a memo to you from Patrick Hardman.
         22        A.   Yes.
         23        Q.   And it's dated May 17th, 2001.
         24        A.   Yes.
         25        Q.   And, thereafter, there is various pages of
  00163:01   this, and it appears that Mr. Hardman has summarized
         02   complaints that are -- that were then pending relating
         03   to Household.  Do you see that?
         04        A.   Yes.
```

**88. PAGE 163:05 TO 163:20 (RUNNING 00:00:50.696)**

```
         05        Q.   Okay.  And was it part of Mr. Hardman's
         06   responsibilities, as a financial examiner, to prepare
         07   memorandums like this for you?
         08        A.   Yes, we hold -- we held weekly meetings of
         09   the -- of the enforcement staff and -- and I remember
         10   assigning to Patrick the job of starting to report to me
```

CONFIDENTIAL

## Household

```
11   on -- on -- on the complaint volume and activity with
12   Household and Beneficial, so that I could start to get
13   my mind around what was going on with the company.
14            My -- My staff had -- My staff had been
15   complaining for quite some time that not only had the
16   complaints been increasing, but their interaction with
17   the company had -- had become more and more adversarial.
18   So, we -- So, I can remember asking Patrick, you know,
19   Start -- "start monitoring this for me," and this would
20   be one of the reports that we would have done that.
```

**89. PAGE 166:13 TO 166:18 (RUNNING 00:00:07.984)**

```
13        Q.   (BY MR. BAKER:)  So, you got 19 complaints
14   that are discussed in Exhibit 3, right?
15        A.   Um-hum.
16        Q.   Those weren't all the complaints that you --
17   that DFI had received from Household, right?
18        A.   Right.
```

**90. PAGE 167:16 TO 167:18 (RUNNING 00:00:06.063)**

```
16        Q.   Let's -- Can I direct your attention to page
17   60 of your report -- sorry, of Exhibit 1, which is your
18   deposition.
```

**91. PAGE 167:19 TO 168:10 (RUNNING 00:00:36.366)**

```
19            Directing you to starting on 60, line 21,
20   through 61, line -- page 61, line three.  Question was:
21   "Did you review other clients other than the 19?"
22            Answer:  "Yes."
23            Question:  "And did you believe that those 19
24   complaints were representative or typical of the ones
25   you received?"
00168:01            Objection from Mr. Dunne.
02            Answer:  "They were representative of many of
03   the complaints we had received at earlier times and were
04   very, very similar to complaints we received subsequent
05   to the date of the report," period.
06            You see that?
07        A.   Yes, I do.
08        Q.   And is that accurate testimony, to the best of
09   your knowledge?
10        A.   I'm sure that was accurate testimony.
```

**92. PAGE 168:11 TO 169:14 (RUNNING 00:01:46.595)**

```
11        Q.   Okay.  Now, the report itself only deals with
12   complaints received with respect to complaints from HFC
13   borrowers and not Beneficial borrowers; is that correct?
14        A.   There were no Beneficial borrower complaints
15   in this report.
16        Q.   All right.  Did you ever come to an opinion
17   that there were similar patterns of deceptive practices
18   taking place in the Beneficial offices?
19        A.   We believed that.
20        Q.   And when you say we, do you mean DFI?
21        A.   DFI, yes.
22        Q.   Okay.
23        A.   And -- Well, DFI and, eventually, other
24   people, and they evolved in the multistate.
25        Q.   And what was the basis for your belief?
00169:01        A.   For one thing, the -- the -- the sales
02   practices, the -- the way loans appeared to be
03   originated, as I remember, were very similar between the
04   organizations.  I believe that even some of the
05   locations were the same locations, Beneficial and HFC
```

## Household

```
06   being in the same location at times, kind of maybe
07   sharing employees.  But we also had complaints against
08   Beneficial.  I think we had almost as many complaints
09   against Beneficial as we did against Household, and we
10   would have looked at those complaints and, ultimately,
11   their -- I mean, I remember needing to do a report on
12   Beneficial similar to what I did on Household.  It just
13   never -- We -- We went off on this whole other tangent
14   and it didn't go there.
```

### 93. PAGE 172:11 TO 172:11 (RUNNING 00:00:04.000)

```
11              MR. BAKER:  15.
```

### 94. PAGE 172:14 TO 173:01 (RUNNING 00:00:35.760)

```
14       Q.   (BY MR. BAKER:)  I'm going to ask you to
15   ignore the first couple of pages of this document and go
16   to the second-to-last page, which is Bates number ending
17   in 78.
18       A.   Okay.
19       Q.   It references -- It's in the agenda for a
20   meeting that was held between the State of Washington
21   and Household officials on May 23rd, 2002.  Do you see
22   that?
23       A.   Yes.
24       Q.   And I believe, at this meeting, Robin Allcock
25   and Tom Detelich were there, and I believe also yourself
00173:01   and Mr. Huey were there.
```

### 95. PAGE 173:03 TO 175:11 (RUNNING 00:02:15.655)

```
03              MR. BAKER:  Yeah.
04       Q.   (BY MR. BAKER:)  Is that your recollection?
05       A.   Yes, and that -- that attorney from the
06   company, I can't -- can't remember her name, but it
07   could be Kay Curtin.  I just saw this name.
08       Q.   Kay Curtin, yes, okay, okay.
09            Did you have any role in the preparation of
10   this agenda?
11       A.   Yes.
12       Q.   Okay.  Did you prepare it?
13       A.   Mostly.  I think this might have finally come
14   out of Mark Thompson's computer.  I remember being in
15   his office, helping him with some finishing touches on
16   this.
17       Q.   Now, item one of this, under the
18   Misrepresentation of Discount or Loan Origination Fee --
19   Do you see that?
20       A.   Yes.
21       Q.   Okay.  There's a bullet point, it says,
22   "Reparation to borrowers deceived about fees."
23       A.   Um-hum.
24       Q.   That's kind obscured a little bit by the
25   underlining.
00174:01       A.   Yes.
02       Q.   Do you recall if there was any discussion, at
03   this point in time, about the amount of reparation that
04   should be made?  And I'm talking about May -- May 23rd,
05   2002.
06       A.   Discussion.  Yes.  Whether I had identified a
07   specific dollar amount at that time or not, I don't
08   remember, but I was very insistent that all discount
09   points should probably go back to consumers, unless they
10   could prove, consumer by consumer, that they didn't
11   deceive the consumers, and I wanted all discount points
12   to go back to consumers.
13       Q.   Okay.  Did you share that thought with
```

## Household

```
       14   Household at that time?
       15        A.   We argued about that, yes.
       16        Q.   Okay.  Did you mention anything about the
       17   next -- it's an effective interest rate?  Do you see
       18   that?  There's the next heading there?
       19        A.   Yes.
       20        Q.   And, again, it also has a reparation to
       21   borrowers deceived about the interest rate to be
       22   charged.  Do you see that?
       23        A.   Yes.
       24        Q.   Did you have any discussion with them about
       25   the amount of -- and, by them, I mean Household -- about
00175:01   the amount of reparation that should be given back to
       02   borrowers based on this particular point?
       03        A.   I don't remember if -- if any dollar amount
       04   was discussed on that.
       05        Q.   Okay.  How about a discussion about the next
       06   item point, which is reparation for -- for prepayment
       07   penalties?
       08        A.   Again, the discussion would have been all
       09   that -- in every instance, word appeared that borrowers
       10   were misled about prepayment penalties, which I was
       11   arguing, at that time, was a practice, so --
```

### 96. PAGE 175:25 TO 176:04 (RUNNING 00:00:10.213)

```
       25             So, they came in to talk about that, but, at
00176:01   the same time, as the agenda notes, you mentioned to
       02   them there's multistate interest, and that's on page
       03   two.
       04        A.   Yes.
```

### 97. PAGE 176:05 TO 176:07 (RUNNING 00:00:05.803)

```
       05        Q.   Okay.  And was there a discussion between you
       06   and Household about the multistate interest at this
       07   point in time?
```

### 98. PAGE 176:10 TO 176:10 (RUNNING 00:00:02.205)

```
       10        A.   We would have discussed that.
```

### 99. PAGE 177:01 TO 177:07 (RUNNING 00:00:18.972)

```
00177:01        Q.   We're here on -- We're here on -- on May 23rd,
       02   2002.  There's a discussion.  Someone from your side
       03   mentions, "By the way, there's a multistate interest."
       04   Was there any discussion between you and Household about
       05   the next step to resolve the multistate interest in this
       06   issue?
       07        A.   I believe -- I believe we --
```

### 100. PAGE 177:10 TO 177:14 (RUNNING 00:00:17.390)

```
       10        A.   I believe we hypothesized about that, but we,
       11   of course, could not make any statements for what other
       12   states would do.  But I -- But we hy -- we hypothesized
       13   about the potential outcome if -- if things had to go,
       14   you know, to a more aggressive level.
```

### 101. PAGE 178:24 TO 179:02 (RUNNING 00:00:09.051)

```
       24        Q.   (BY MR. BAKER:)  Okay.  Were the documents and
       25   materials you received with respect to Household's
00179:01   practice in other states consistent with what -- with
       02   the findings that you made in Exhibit 3?
```

### 102. PAGE 179:04 TO 179:07 (RUNNING 00:00:16.339)

```
       04        A.   Much -- Much of what the other states found
```

Case Clip(s) Detailed Report
Monday, April 20, 2009, 5:39:41 PM

## Household

05 and produced in our, you know, exchange of materials,
06 and so forth, was consistent with what we found in
07 Washington.

**103. PAGE 179:09 TO 179:11 (RUNNING 00:00:07.302)**

09        And, in terms of the AG, you're familiar with
10 the fact that there was actually a settlement between
11 Household and the multistate group; is that right?

**104. PAGE 179:14 TO 179:14 (RUNNING 00:00:01.183)**

14        A.   Yes.

**105. PAGE 179:15 TO 179:16 (RUNNING 00:00:04.548)**

15        Q.   (BY MR. BAKER:)  Okay.  When, to your
16 knowledge, did that agreement come into fruition?

**106. PAGE 179:19 TO 179:19 (RUNNING 00:00:03.085)**

19        A.   On my birthday, October 2nd, 2002.

**107. PAGE 179:20 TO 181:09 (RUNNING 00:02:15.781)**

20        Q.   (BY MR. BAKER:)  Okay.  Why didn't DFI get to
21 the point of filing charges based on the apparent
22 violations found in your DFI report that's Exhibit 3?
23        A.   Two reasons.  The -- Well, maybe three
24 reasons.
25        When we started down the multistate path, we
00180:01 were at least committing ourselves, in intent and
02 theory, to try to -- to try to stick with that, being in
03 solidarity with other states and bring a large
04 resolution for the entire country.
05        You have to remember, there were only --
06 There -- There weren't 50 states that were -- that were
07 carrying this thing.  There were a handful of states
08 carrying the 50 states -- and that's how the multistates
09 work.  You sort of take turns carrying the load.  So --
10 And there were a lot of states that ended up in the
11 settlement and they just sort of signed on at the end
12 and they just rode on our coattails right on out through
13 the settlement, and said, "Whatever they say, we --
14 that's good for us."
15        So, we had this -- this allegiance to other
16 states holding that -- that together.  Although,
17 Washington was always extremely aggressive, so was
18 Minnesota, New York, some other states, extremely
19 aggressive in saying -- threatening, at various points
20 in time, to pull out and actually file charges.  So, we
21 always retained that right and authority to file
22 charges, but we had a commitment to the multistate.  We
23 thought we had a good chance of getting as much for
24 Washington consumers out of the multistate as we could
25 if we went on our own.
00181:01        So, there was incentive.  So, we could get
02 something for everybody plus us, equivalent to what we
03 probably could get if we went on our own.  And then
04 there's the whole resource issue -- I mean, in reality,
05 it would have been five years of -- of our agency's
06 life, very ugly -- you know, this stuff would have gone
07 on for -- for five years and it would have been a huge
08 resource drain and that's -- that's much of the reason
09 why you settle.

**108. PAGE 181:10 TO 181:13 (RUNNING 00:00:15.489)**

10        Q.   Okay.  A lot of -- of -- Household produced a

CONFIDENTIAL

## Household

```
11   lot of documents to show that they were in compliance
12   with the various federal and state laws, including loan
13   documents signed by borrowers.
```

**109.  PAGE 181:19 TO 185:02  (RUNNING 00:04:22.195)**

```
19        Q.     (BY MR. BAKER:)  You considered that as part
20   of -- and -- and found that, despite that, that there
21   was deceptive practices taking place; is that right?
22        A.     Yes.
23        Q.     Okay.  Why didn't you find -- Why didn't you
24   rely upon the loan documents that Household was
25   producing to determine that there was, in fact,
00182:01   compliance?
02        A.     In the early days, I think we did.  In the
03   very early days of complaints coming in -- and if I
04   could roll the clock back, I would -- but, in the early
05   days, the company's arguments had been somewhat
06   convincing for us, and I think that we -- we had a
07   little bit of trouble coming to grips with what the
08   consumers were telling us.  It didn't -- It didn't make
09   sense, early on, that this would be happening, that --
10   that a -- such a big company, such a well-structured,
11   well-organized, well-funded company, would be doing
12   these things to consumers.  It didn't -- didn't make a
13   lot of sense.  But, over a period of time, we -- we --
14   we changed our belief on that.
15        So, in the early days, there were documents
16   that were coming in.  Company would -- would send us the
17   disclosures from their files, or whatever, and we'd look
18   at them and say, "Ah, well, consumer must have," you
19   know, "ignored them," or, "Maybe a consumer isn't
20   telling the full story," or whatever, and we would -- we
21   would largely discount the consumer and -- and close out
22   the complaint.
23        We reached a tipping point where we just, for
24   lack of a better description, sort of stood around,
25   looking at each other, saying, you know, at some point,
00183:01   you know, we're having trouble believing this any
02   longer, the answers we were getting.  And, so, there
03   became -- There was a point in time -- late 2001, early
04   2002 -- where we felt we were getting a lot of
05   disinformation from the company, a lot of -- We were --
06   We were extremely unhappy with the response we were
07   getting from the company.  We stopped trusting the
08   response.  And we started more and more believing what
09   we saw from the consumers, what the consumers were
10   telling us.
11        Documentation is one part of a case, and
12   regulators do have a tendency to sort of get blinders
13   on, saying, "Well, it's in the file.  It must be true.
14   Hey, it came out of a computer.  It's there.  Somebody
15   must have gotten it."  But you hear enough stories about
16   consumers saying, "I never saw it," or, "That's not how
17   it was explained to me," and so forth, and you start to
18   change your mind over time.
19        That's how all these predatory lending cases
20   come about.  If you -- you take almost any predatory
21   lending case, that I can think of, and you go back to
22   the start of time, the regulators were not saying, you
23   know, consumers were harmed, here.  It always kind of
24   starts off with not really believing that what people
25   are saying is it, and then you -- it grabs traction with
00184:01   time and your -- your mind has changed.
02        And it was no different with this case, so --
03        So, we reached a point where -- where the
04   relationship seemed to be so disingenuous that -- it was
```

## Household

```
        05   almost like stuff was being fabricated to convince us,
        06   and we didn't believe it any longer.
        07        Q.   Did your experience with FAMCO have anything
        08   to do with it?  In other words where -- where the paper
        09   files looked clean, but, in fact, there were deceptive
        10   practices taking place?
        11        A.   FAMCO had nothing to do with our impression of
        12   Household.  Household was completely responsible for our
        13   impression of Household.  FAMCO educated us to learn how
        14   to look beyond what was being said and FAMCO -- The
        15   earlier complaints I was talking about where we didn't
        16   maybe believe the consumers as much as we should have,
        17   that was -- that was -- those complaints go back to the
        18   early days of FAMCO, before we started to learn more
        19   about how deception could take place, misrepresentation
        20   could take place, how people could be trained to lie
        21   with the truth, and all of these -- these sales
        22   practices that we hadn't -- I came out of the banking
        23   world.  That kind of stuff didn't really take place in
        24   the banking world.  And, so, I had to be educated.
        25             So, FAMCO educated me, educated the
00185:01   department, and in no way formed any impression about
        02   Household.
```

### 110. PAGE 185:11 TO 185:18 (RUNNING 00:00:15.007)

```
        11        Q.   Okay.  That's all I was trying to -- And --
        12   And, earlier today, Mr. Sloane was asking you some
        13   questions about hypothetical predatory lending practices
        14   or improper practices, you know, about based on one
        15   office or one employee.  Do you remember those
        16   questions?
        17        A.   Yes.
        18        Q.   The patterns --
```

### 111. PAGE 185:22 TO 185:24 (RUNNING 00:00:06.373)

```
        22        Q.   (BY MR. BAKER:)  Going back to the findings of
        23   patterns that you made in Exhibit 3.  Those are not
        24   based on one office; is that correct?
```

### 112. PAGE 186:05 TO 186:09 (RUNNING 00:00:13.519)

```
        05        A.   I can't say that there wasn't a single place
        06   in the file where something only happened in one branch,
        07   but, no, we looked at -- I would say a half-dozen
        08   branches were considered very seriously in that -- in
        09   that exam.
```

### 113. PAGE 189:11 TO 189:12 (RUNNING 00:00:04.427)

```
        11             And let's mark this next in order as Exhibit
        12   18.
```

### 114. PAGE 189:16 TO 190:08 (RUNNING 00:00:44.308)

```
        16        Q.   (BY MR. BAKER:)  Okay.  And, Mr. Cross, do you
        17   see Exhibit 18?
        18        A.   Yes.
        19        Q.   And the cover -- the first page is a letter
        20   from Ms. Allcock to yourself; do you see that?
        21        A.   Yes.
        22        Q.   Okay.  And attached to it is a list -- exhibit
        23   list of -- sorry, it's exhibit -- sorry, Exhibit A, but
        24   it's a list of documents that were produced in response
        25   to the subpoena that you requested.
00190:01        A.   Yes.
        02        Q.   Okay.  And did you review all these documents
        03   as part of your preparation of Exhibit 3?
```

## Household

```
04        A.    Yes.  I can't say I sat down and watched these
05   videotapes.  Although I -- You didn't ask me.
06        Q.    But you had them available for your
07   consideration if you thought it was appropriate?
08        A.    Yes.
```

**115.  PAGE 190:09 TO 190:16  (RUNNING 00:00:24.651)**

```
09        Q.    Okay.  Now, was the preparation of reports of
10   examination, at this point in time, one of your regular
11   duties at DFI?
12        A.    It was my all-consuming duty as -- Everything
13   else kind of got put on hold for a couple of months.
14        Q.    And was Exhibit 3 a report prepared pursuant
15   to Washington law?
16        A.    Yes.
```

**116.  PAGE 193:04 TO 195:22  (RUNNING 00:03:47.150)**

```
04        Q.    Okay.  All right.  Let me rephrase that.
05              In what -- what way did you believe you were
06   pushing the envelope in the kinds of investigations,
07   using your word, that the -- that the -- your department
08   was doing?
09        A.    There were a variety of things we did that
10   were being done before any other state, much of which
11   long since was adopted by other states, but, I mean --
12   We were the leading state in FAMCO, Household,
13   AmeriQuest.  I mean, those are the three biggies in this
14   world, this -- this world of mortgage regulation.  We
15   were using subpoenas before most of the other states.
16   The way we were processing complaints and conducting
17   complaint resolutions were very progressive compared to
18   other states and, you know, we began using -- instead of
19   simple request letters on complaints, we -- we began
20   using directives and pleadings formats.  No other state
21   had thought to do that and we -- we went from a --
22   probably a 40-percent successful response rate to almost
23   a hundred-percent successful response rate.  I mean,
24   literally, overnight, by -- by changing some of those --
25   those methods.
00194:01          So -- We were -- Much credit to John and Mark
02   Thompson.  We thought outside the -- the box from --
03   from a lot of regulators.
04        Q.    And is it, in your -- Were you thinking
05   outside the box, to use your phrase, in terms of the
06   kinds of practices that you were investigating?
07        A.    We were finding outside the box.  I'm not sure
08   we were -- in -- Always -- Regardless of how progressive
09   a regulator is, we're always way behind the industry.
10   We're always playing catch-up.  So, the kind of stuff
11   that we've seen from these days to present time -- I
12   mean, these days, we -- we see this -- we see the
13   practices that take place in companies and sort of it --
14   it's -- it's commonplace.  In those days, we were
15   just -- we were seeing it for the first time.  It was
16   very new, and we were having to be very aggressive in
17   our insistence that we didn't just accept the surface or
18   the -- the pat answers that a company was giving us back
19   and closing out a case and going on.
20              We started to -- As Mr. Baker questioned,
21   because of FAMCO and some other cases, we started to
22   drill deeper, become more insistent.  We became -- We
23   were very aggressive regulators.  I remember Mr. Bley
24   sometimes fondly referring to me as his Pit Bull at the
25   end of the chain.  I mean, we were -- we were extremely
00195:01   aggressive.
```

## Household

```
02          Now, it's pretty normal.  States like
03  Massachusetts, New York, Florida, these states are
04  extremely -- extremely aggressive, but they weren't so
05  much in those days, because everybody came out of
06  that -- that banking regulator world, and this was a new
07  world to us.  This -- This was a difference between
08  businessmen and criminals.  I mean -- I'm not saying --
09  I'm not saying anything about Household being criminal,
10  but the whole world -- we came into this mortgage world.
11  We began doing fraud cases.  We never did fraud cases in
12  the banking side of the world.  It was -- It was -- It
13  was new, it was different.  You had to think
14  progressively or you just weren't going to make any
15  cases and, so, that's what I meant by that.
16          Q.  You used the phrase finding outside the box.
17  What did you mean by that?
18          A.  Well, I was just trying to sort of not have
19  you give me that -- you know, use that phrase in this --
20  this context.  I mean, the fact that we thought outside
21  of the box in our -- in our investigative or examination
22  work --
```

**117. PAGE 195:23 TO 196:09 (RUNNING 00:00:35.470)**

```
23          What I was trying to say was that -- that the
24  Household practices revealed themselves to us.  We
25  didn't make -- I think -- I was -- I was getting the
00196:01  sense that you were implying that we made up these new
02  ways of them doing business, and we'll call it this or
03  call it that.  And what I meant to say was, no, we
04  weren't thinking outside the box and coming up with
05  these -- these scams and so forth.  We were saying,
06  "Wow, look at this," and we would study it, realize
07  that's a scam.  This is a misrepresentation.  And we
08  would start to label and identify these things.  But we
09  didn't create them.  We discovered them.
```

**118. PAGE 198:25 TO 199:10 (RUNNING 00:00:26.628)**

```
25          Q.  Just a couple follow-up questions based on
00199:01  what Mr. Sloane asked you.
02          He asked you a question about borrowers using
03  the terminology effective rate or equivalent rate.  You
04  remember those questions?
05          A.  Yes.
06          Q.  Were there a larger number of borrowers
07  complaining that the interest rate they received was
08  substantially more or twice the interest rate that they
09  had been told by Household employees?
10          A.  Yes.
```

**119. PAGE 199:13 TO 199:18 (RUNNING 00:00:13.304)**

```
13          Q.  (BY MR. BAKER:)  Okay.  Then, you asked
14  about -- he asked you some questions about borrowers
15  receiving written documentation about a representation
16  about an effective or equivalent rate; do you remember
17  that question?
18          A.  Yes.
```

**120. PAGE 200:03 TO 200:05 (RUNNING 00:00:08.958)**

```
03          Were there other borrowers who told you they
04  had received an oral representation of a lower interest
05  rate based on a biweekly loan program?
```

**121. PAGE 200:08 TO 200:08 (RUNNING 00:00:02.603)**

```
08          A.  I believe so.
```