EXHIBIT 1

794

```
1          IN THE UNITED STATES DISTRICT COURT
2          FOR THE NORTHERN DISTRICT OF ILLINOIS
                    EASTERN DIVISION
3  LAWRENCE E. JAFFE PENSION PLAN, )
   on behalf of itself and all      )
4  others similarly situated,       )
5          Plaintiff,               )
                                    )
6     vs.                           )  No. 02 C 5893
                                    )  Chicago, Illinois
7  HOUSEHOLD INTERNATIONAL, INC., )
   et al.,                          )  March 26, 2009
8          Defendants.              )  9:30 a.m.
9                    VOLUME 8
10   TRANSCRIPT OF PROCEEDINGS - PRETRIAL CONFERE
        BEFORE THE HONORABLE RONALD A. GUZMAN
11
12  APPEARANCES:
13  For the Plaintiff:    COUGHLIN STOIA GELLER RUDMAN &
                          ROBBINS LLP
14                   BY: MR. SPENCER A. BURKHOLZ
                         MR. MICHAEL J. DOWD
15                       MR. DANIEL S. DROSMAN
                         MS. MAUREEN E. MUELLER
16                   655 West Broadway
                     Suite 1900
17                   San Diego, California  92101
                     (619) 231-1058
18
                     COUGHLIN STOIA GELLER RUDMAN &
19                   ROBBINS LLP
                 BY: MR. DAVID CAMERON BAKER
20                   MR. LUKE O. BROOKS
                     MR. JASON C. DAVIS
21                   MS. AZRA Z. MEHDI
                     100 Pine Street
22                   Suite 2600
                     San Francisco, California  94111
23                   (415) 288-4545
24
25
```

795

```
1  APPEARANCES:  (Continued)
2  For the Plaintiff:    MILLER LAW LLC
                     BY: MR. MARVIN ALAN MILLER
3                    115 South LaSalle Street
                     Suite 2910
4                    Chicago, Illinois  60603
                     (312) 332-3400
5
6  For the Defendants:   CAHILL, GORDON & REINDEL LLP
                     BY: MR. THOMAS J. KAVALER
7                        MS. PATRICIA FARREN
                         MR. DAVID R. OWEN
8                        MS. JANET A. BEER
                         MR. JASON M. HALL
9                        MR. JOSHUA M. NEWVILLE
                         MS. KIM A. SMITH
10                       MS. SUSAN BUCKLEY
                         MS. YAFIT COHN
11                       MR. MICHAEL WERNKE
                     80 Pine Street
12                   New York, New York  10005
                     (212) 701-3000
13
14
15
16
17
18
19
20
21
22
23  Court Reporter:       NANCY C. LaBELLA, CSR, RMR, CRR
                      Official Court Reporter
24                    219 South Dearborn Street
                      Room 1222
25                    Chicago, Illinois  60604
                      (312) 435-6890
                      Nancy_LaBella@ilnd.uscourts.gov
```

796

```
1          THE CLERK:  02 C 5893, Jaffe v. Household
2  International, Incorporated.
3          THE COURT:  Good morning, everyone.
4       I think last time we were together, we were talking
5  about addressing demonstrative exhibits sometime soon, doing
6  some scheduling for the jury selection and I believe there was
7  a -- what was benignly described as a housekeeping matter
8  regarding some witnesses.  How do you wish to proceed?
9          MR. KAVALER:  Your Honor, I have a housekeeping
10  matter prior to the housekeeping matter.  I recognize this is
11  unusual, given the rules, but could I orally move the
12  admission pro hac vice of Ms. Yafit Cohn of the New York bar
13  who will be with us today to participate in the
14  demonstratives.  Counsel for plaintiffs has no objection.  We
15  will file the requisite paperwork nunc pro tunc later today or
16  perhaps tomorrow.  We just didn't get a chance to get that
17  done.  She's the only person on our team here today who is not
18  admitted pro hac or a regular member of the bar and/or the
19  trial bar of this court.
20          THE COURT:  Sure.  Do you have any objection?
21          MR. DOWD:  None, your Honor.
22          THE COURT:  Okay.
23          MR. KAVALER:  Thank you, your Honor.  Appreciate it.
24  Mr. Dowd.
25          THE COURT:  Still don't know how you want to proceed.
```

797

```
1          MR. DOWD:  Your Honor, I think -- this is where we
2  are.  We exchanged demonstrative exhibits late yesterday
3  afternoon.  The parties have objections to plaintiffs'
4  demonstrative exhibits.  We were working our way through
5  defendants' demonstrative exhibits earlier this morning trying
6  to resolve objections if it were possible.  I think we can
7  probably start with plaintiffs' if the Court -- if it would
8  please the Court.
9          MR. KAVALER:  Then, your Honor, we see on your
10  calendar that you have other matters at 10:30.  We were
11  hopeful that when you break, we can go out and resolve the
12  remaining issues between ourselves or at least as much as
13  we're able to.  And when we come back, proceed.
14          THE COURT:  Very well.  Let's proceed that way then.
15  What do you have?
16          MR. DOWD:  Your Honor, these are the demonstratives
17  that we turned over to defendants last night.  If I may
18  approach.
19       (Tendered.)
20          THE COURT:  So this book is plaintiffs'
21  demonstratives exhibits?
22          MR. DOWD:  Yes, they're numbered in the bottom
23  right-hand corner.
24          THE COURT:  Indeed they are, from 1 to 154, I take
25  it.
```

798

1      Okay.  Objections to these?
2      MR. HALL:  Yes, your Honor.  I think we can probably
3  do them in batches to some extent.
4      Jason Hall for defendants.
5      Our objections, starting with No. 1 and I think it
6  goes through No. 25, are that the exhibits themselves, the
7  demonstratives themselves, are headed with a title that says
8  Household's false and misleading statements or something to
9  that effect.  And defendants' position is that that title is
10  unnecessarily prejudicial, and it should properly be
11  Household's alleged false and misleading statements.
12      MR. DOWD:  Your Honor, I think that the jury is going
13  to hear that plaintiffs are accusing the defendants of false
14  and misleading statements.  And that's exactly what we're
15  going to set out to prove in the trial.  Certainly we chose to
16  phrase false and misleading statements because that's what
17  they're going to hear in the jury instructions.  We could have
18  said lies defendants told during the class period.  We could
19  have said fraudulent things that defendant said during the
20  class period.  And we thought we chose a word that was fairly
21  neutral but still at least allow the jury to connect what we
22  were trying to prove with the jury instructions they were
23  going to hear.
24      THE COURT:  Will the word "alleged" cure it for you?
25      MR. HALL:  Yes, your Honor.

799

1      THE COURT:  Add the word "alleged."  That's in front
2  of the word false, not in front of "Household."
3      (Laughter.)
4      THE COURT:  What else?
5      MR. DOWD:  I think defendants' next objection is
6  Exhibit 31 apparently, your Honor.  Oh, they withdrew that.
7  Sorry, your Honor.
8      MR. HALL:  That's correct, your Honor.  The next one,
9  your Honor, is No. 38, which is an organizational chart that
10  folds out.
11      Defendants' only objection on this document is that
12  at the top, it lists an outside consultant that Household
13  worked with, named Andrew Kahr.  And your Honor may recall
14  that Mr. Kahr was the subject of one of defendants' motions in
15  limine, which your Honor denied.  But the plaintiffs have
16  suggested here in this chart that Mr. Kahr was an employee of
17  Household like these other people and also that he was at the
18  top of the company; and defendants contend that that's
19  misleading.
20      MR. DOWD:  Your Honor, I think that Mr. Kahr, as the
21  Court is aware, plays a role in this case.  I think he has to
22  be somewhere near the top of the chart because the evidence in
23  this case will show that Mr. Kahr and Mr. Aldinger and
24  Mr. Aldinger and Mr. Schoenholz, the two guys running the
25  company.  And so I think it only fair for Mr. Kahr to be up

800

1  where they are.  He's the one that they consulted with.
2      THE COURT:  How is the chart going to be used?
3      MR. DOWD:  I believe, your Honor, this chart -- it
4  may be used in opening statements, just to give the jurors
5  some feel for where these different people are.  And it may
6  also be used, I assume, in closing statement just -- closing
7  arguments just to remind the jury of the different witnesses
8  who appeared and testified.
9      THE COURT:  Okay.  I don't see what's objectionable
10  here.  If counsel wants to say in his opening statements that
11  Mr. Kahr was really at the top of the corporate structure
12  because he ran the whole show in terms of his proposals, and
13  he wants to then argue that he proved that at the end of the
14  trial, he can do that.  This chart is nothing more than an
15  extension of his argument.  This is what he's going to argue
16  the evidence will show.  If he does it that way, it's
17  appropriate.
18      If he attempts somehow to imply that this is an
19  organizational chart that comes from Household International
20  or that is accepted by Household International, then you have
21  a problem.  But if he's going to use it the way he described,
22  I don't see a problem.
23      MR. HALL:  Understood, your Honor.  Thank you.
24      Your Honor, turning to plaintiffs' demonstrative
25  No. 40, this is a document and -- this is a document, your

801

1  Honor, that relies -- and plaintiffs intend to use apparently
2  with their expert, their accounting expert, Mr. Devor.  The
3  underlying documents here, your Honor, that support these
4  numbers have both been excluded from evidence under Rule 408
5  pursuant to one of defendants' motions in limine related to
6  the settlement.  Defendants don't believe it's appropriate for
7  Mr. Devor then to --
8      THE COURT:  I'm sorry.  What numbers are you
9  referring to?
10      MR. HALL:  Your Honor, in the middle of the table on
11  this exhibit, there are numbers that say amount attributable
12  to improper lending practices.  Those numbers their expert
13  drew from two documents essentially, both of which have been
14  excluded from evidence.
15      THE COURT:  What documents are those?
16      MR. HALL:  Your Honor, it's essentially the
17  settlement agreement itself, the $484 million, and a document
18  that had previously been used in this case that was created by
19  Carin Rodemoyer, who was an employee of the consumer lending
20  business.  And I can get your Honor the exhibit numbers in a
21  moment.
22      MR. DOWD:  Your Honor, I think this is a fairly
23  straightforward issue.  The defendants filed a Daubert motion
24  on Harris Devor, our accounting expert.  And the Court issued
25  a two-page opinion on the 23rd of March.  And what the

802

1 Court -- initially the Court had said that we couldn't use
2 what's been called in this case Rodemoyer 17. I believe if
3 the Court wants to look, it's actually Plaintiffs' Exhibit
4 681. It was a calculation. And I have a copy if the Court
5 wants or Mr. Hall needs it as well.
6 (Tendered.)
7 MR. DOWD: And essentially, your Honor, Mr. Devor in
8 rendering his opinion -- and I have no dispute with counsel
9 that the Court said we couldn't offer Rodemoyer 17, which is
10 the Plaintiffs' Exhibit 681 that the Court is looking at. It
11 was an internal calculation of potential refunds from improper
12 lending practices that Ms. Rodemoyer prepared in the summer of
13 2002.
14 As to Mr. Devor, he took Rodemoyer 17 and he took the
15 bottom line number, the 484 million of the settlement, and
16 what he said was, there are two ways that one could look to
17 see how much money Household generated from improper lendin
18 practices. He says one way is look at the 484, the dollar
19 amount of the settlement. That's one number you could put on
20 it. He says the second number you could put on it is the
21 internal calculations that the company did, which were
22 performed by Ms. Rodemoyer. Defendants addressed both of
23 those issues in their Daubert motion.
24 Ultimately, your Honor, in your opinion, you said
25 that Mr. Devor could testify, could give his opinion about how

803

1 much of the revenue Household reported for 1999 through the
2 second quarter of 2002 was attributable to predatory lending
3 practices. And these are the documents -- this is the
4 evidence that Mr. Devor relied on to give that opinion.
5 The Court goes on to say in the opinion, Defendants
6 can explore on cross-examination the extent to which the
7 documents on which Devor relies -- Household's estimate of the
8 refunds it might have to make -- that's Rodemoyer 17 or
9 Plaintiffs' Exhibit 681 -- or the multistate investigation
10 settlement agreement -- which is the 484 -- are sufficient to
11 support his opinion.
12 Here's my understanding of what the Court was telling
13 me I could do: That doesn't allow me to go back and say the
14 Court's earlier opinion that I can't put in Plaintiffs'
15 Exhibit 681 is now overruled by the subsequent opinion. I
16 will not offer Rodemoyer 17. What I'm going to have to do is
17 ask Mr. Devor, Have you tried to quantify how much money was
18 derived from these predatory lending practices? Yes, I have.
19 And, sir, what is your opinion as to how much revenue was
20 derived from predatory lending practices based on the
21 documents you reviewed? He's got two choices. He can say 484
22 for the jury; he can say the -- I think it adds up to 3.2
23 billion, your Honor.
24 And at that point, the second part of the Court's
25 order kicks it. It's up to the defendants then to figure out

804

1 how they want to cross him, how they want to do it, whether
2 they want to use the document itself, whether they want to use
3 Ms. Rodemoyer's deposition testimony, where, to a certain
4 extent, she says, well, I think I was doing this or whatever
5 that testimony may be that helps them. We think it helps us.
6 Certainly they think it helps them. That's my understanding
7 of what the Court is allowing us to do.
8 MR. HALL: Your Honor, to the extent Mr. Devor has an
9 opinion about the amount of revenue that was attributable to
10 these practices that's independent of documents the Court has
11 excluded, defendants wouldn't seek to argue that he shouldn't
12 be permitted to do that. But where here, these demonstrative
13 exhibits are clearly indicating an effort of Mr. Devor to
14 stand up and say I've relied now on the amount of the
15 settlement, which the Court has explicitly held is out of this
16 case, and the amount of this quantification that was part of
17 the settlement negotiation process, which this Court has
18 explicitly held is out of the case. Defendants think it's
19 inappropriate to put up a demonstrative exhibit which
20 essentially holds those numbers up for their truth.
21 MR. DOWD: Your Honor, I think in response to that,
22 first of all, we don't think the Court has said the amount of
23 the settlement is out. I mean, clearly it's going to be
24 integral to the damages issues in this case. And Mr. Burkholz
25 will address that when we get to it I take it.

805

1 Second, I mean, you look at 681, your Honor, and I'm
2 not -- I don't want to reargue the old motions. I just don't
3 think that's appropriate. However, this is what he based his
4 opinion on. I mean, this is what his opinion was based on.
5 So I assume that the Court understood that because the
6 defendants probably spent 20 pages explaining it in their
7 Daubert motion. So he's allowed to give his opinion. His
8 opinion is based on those two things. That's the evidence
9 that Household produced that would allow someone to quantify
10 the amount attributable to predatory lending practices.
11 THE COURT: This is the problem we face with all of
12 the exhibits and all of the information regarding the various
13 settlements, the negotiations for settlements, the proposals
14 to settle, the results of the settlements, et cetera. The
15 rule against allowing these things into evidence as such is
16 based upon the desire to promote settlement. Period.
17 But the law is also clear that if it's not being
18 offered to prove liability or acceptance of liability or the
19 types of things that will cause a litigant to not want to
20 engage in settlement conferences because they're afraid that
21 that will harm them further on down the line, if the evidence
22 is being offered to prove other things, then it's admissible.
23 To the extent possible, I am trying to keep out any
24 gratuitous presentation of the settlements, the amount of the
25 settlements and negotiations. And I think my rulings reflect

806

1 that.
2         On the other hand, when experts rely upon this
3 information and when the information becomes the best and
4 maybe the only way to show damages in this case with respect
5 to certain alleged improper acts, we have a countervailing
6 interest. And to the extent that the information is used for
7 that purpose, it's going to come in. To the extent that
8 experts relied upon it -- properly relied upon it, used it in
9 their calculations, it's going to be -- it's going to be
10 coming in.
11        And the damages issue in this case really is a large
12 factor to take into account in determining how much of this
13 evidence comes before the jury. I've said that before. It's
14 the only way to prove damages.
15        MR. HALL: May I respond briefly to that, your Honor?
16        THE COURT: Sure.
17        MR. HALL: I think that there are two issues. One is
18 the issue that Mr. Dowd alluded to, including whether and to
19 what extent plaintiffs' damages expert, their loss causation
20 expert, Professor Fischel, will be allowed to rely on the
21 terms of the settlement. And that's an issue that's not
22 presented by this demonstrative.
23        Another issue is whether their accounting expert, who
24 is here on the liability side of the case to prove falsity and
25 the other elements of their 10(b) claim, is going to be

807

1 allowed to rely on these. In one instance, the settlement
2 amount relates arguably to the damages in this case, which is
3 the movement of the stock price. In the other instance, it
4 relates only to showing the truth essentially of what was
5 alleged in the settlement allegations.
6         THE COURT: I'm not really sure I follow how you
7 reach that conclusion.
8         MR. HALL: Well, your Honor, Mr. Devor, who opines on
9 this issue in his report, isn't opining as to damages in the
10 securities case. He's opining as to -- you know, to what
11 extent essentially did Household benefit from the practices
12 that the plaintiffs say were misrepresented, not that they
13 were wrong. That's not what this case is about. This case is
14 about whether certain practices weren't disclosed then to the
15 market.
16        MR. DOWD: And, your Honor, you know, we have to
17 demonstrate materiality. We have to demonstrate some sort of
18 quantification so that defendants can't stand up and say
19 predatory lending could have been two cents, could have been
20 three cents, could have been five bucks, could have been two
21 billion, but plaintiffs couldn't tell you. And that's all
22 they're trying to do, is to not allow us, with documents that
23 there's -- the only objection to them is 408, that an expert
24 relied on to show that quantification; and they are just
25 trying to drive a truck through 408.

808

1         Your Honor, I mean, with all due respect, I mean,
2 what 681 has to do with 408 is beyond me, this exhibit. And
3 I'll live with that ruling, your Honor. The Court makes
4 rulings. We adapt and overcome. I mean, that's part of our
5 job as lawyers. But to try to wipe it out completely when the
6 Court then issues a ruling directly dealing with plaintiffs'
7 accounting expert and says we can do it is just unfair.
8         THE COURT: Well, I think the ruling has already been
9 made here. I've indicated that he can testify to these
10 things; and that includes, of course, the material that is
11 explained in the motions that he relied upon in doing so.
12        MR. DOWD: Thank you, your Honor.
13        THE COURT: That's the way the baby gets sliced this
14 time. Okay.
15        MR. DOWD: I believe defendants' next objections were
16 on 42 and 43.
17        MR. HALL: Yes. Could we have a moment, your Honor?
18 (Brief pause.)
19        MR. DOWD: We actually have reached an agreement on
20 42 and 43, your Honor. We're just going to combine the year
21 '99.
22        THE COURT: Okay.
23        MR. HALL: Your Honor, I'm going to let my colleague,
24 Mike Wernke, speak to these.
25        THE COURT: As long as you're doing some shuffling

809

1 around, I believe there's a case we're ready to call on the
2 call. We'll recall this.
3 (Brief recess.)
4         THE CLERK: Recall, 02 C 5893, Jaffe v. Household
5 International, Incorporated.
6         THE COURT: Okay. So 42 and 43 have been agreed to?
7         MR. DOWD: Yes, your Honor.
8         MR. HALL: Your Honor, I think the next one in order
9 that we have an objection to is No. 49, plaintiffs'
10 demonstrative 49.
11        Your Honor, the issue here is simple. The
12 plaintiffs' demonstrative states that income was overstated by
13 $133 million, but it's unclear as to the time period at issue
14 here. And, in fact, the restatement that's at issue extends
15 over a number of years. And the implication here, we think,
16 is that the income was overstated by $133 million in some
17 undetermined period of time. It could have been one quarter
18 or one year.
19        MR. DOWD: Your Honor, this is a classic example of a
20 demonstrative we're going to use with a witness. The number
21 is 133 million. He's going to explain what it is over
22 different periods of time. I don't think it's an attempt to
23 mislead anyone. He's going to explain exactly what the
24 restatement amounts are.
25        In other words, they're not saying the number is

822

1  53.
2      MR. DOWD:  Yes.  They had an old version that has
3  been corrected.
4      MR. HALL:  Your Honor, we're just going to confirm
5  that the numbers that appear on Exhibit 53 and the other
6  demonstrative exhibits like No. 53 match up with Mr. Devor's
7  report.  And to the extent that they match up, we'll withdraw
8  our objections.
9      THE COURT:  Okay.
10     MR. HALL:  Next, your Honor, that defendants object
11  to is No. 86.
12     Actually, your Honor, this one we can withdraw our
13  objection.  I think both sides now have an understanding,
14  based on the Court's instruction, that the titles would come
15  off of the demonstrative exhibits.  And with that
16  understanding, we can withdraw our objection to the rest of
17  the content here.
18     THE COURT:  Okay.
19     MR. HALL:  The next, No. 92, your Honor, is
20  essentially the same issue.  This one they've got the SEC seal
21  on the top.  And I just want to make sure we all understand
22  that that SEC seal likewise will be removed.
23     THE COURT:  Yes.
24     MR. DOWD:  And I assume that applies to the
25  defendants' exhibits too.  Their demonstratives also contain

823

1  the SEC seal.
2      THE COURT:  And you want that out?
3      MR. DOWD:  Yes.  If it comes out on mine, it should
4  come out on theirs.  Otherwise I'm fine with it.
5      THE COURT:  No captions and no seals.
6      MR. HALL:  All right.
7      THE COURT:  That goes for the presidential seal as
8  well.  You cannot have the presidential seal on any of your
9  exhibits.
10     (Laughter.)
11     MR. HALL:  And No. 116, your Honor, I believe is the
12  same issue.  You know, again, we just want to confirm that
13  both sides agree that the experts are going to be limited to
14  the contents of their reports.  And with that understanding --
15  and assuming these numbers match up to Mr. Devor's report --
16  we'll withdraw this objection.
17     THE COURT:  Okay.
18     MR. HALL:  All right.  Our next objection, your
19  Honor, is on No. 125.  Here, again, this essentially has moved
20  now out of the heading and down into the body of the
21  demonstrative, the same words we agreed shouldn't be in the
22  title.  And so our objection then now is to saying words false
23  and misleading in the body of the slide.
24     MR. DOWD:  Your Honor, my understanding is I take off
25  reported charge-off statistics were false and misleading.  I

824

1  think the other stuff is actually in the --
2      MR. HALL:  With that understanding, we can withdraw
3  our objection to No. 125.
4      THE COURT:  Okay.
5      MR. HALL:  And with the same understanding, we'll
6  withdraw on 126 and 127.
7      On No. 128, I believe we're going to get a modified
8  version from the plaintiffs that will consolidate 1999 into
9  one number, which will match up with their expert's report.
10     MR. DOWD:  That's correct, your Honor.
11     MR. HALL:  And, your Honor, the last -- we withdraw
12  our objections on the rest of these, except No. 149.  Here,
13  your Honor, this is a slide presumably that plaintiffs intend
14  to use with Professor Fischel which mentions the $484 million
15  settlement explicitly.  We had talked about that earlier.  And
16  I believe the Court clarified that to the extent the
17  plaintiffs need to use that number with one of their experts,
18  including Mr. Devor or Mr. Fischel, that the amount of the
19  settlement is going to be allowed to be presented to the jury.
20  We just want to clarify that that will be the limit of the
21  $484 million settlement's use in the trial.
22     THE COURT:  I don't know that I can do that.  I don't
23  know what's going to happen during the trial.  I mean, you may
24  bring it up.  I don't know.  Or you may open the door.  Or
25  there may be some other legitimate function for it.

825

1      MR. HALL:  Okay, your Honor.
2      THE COURT:  I'm not prepared to make an advisory
3  ruling as to anything.
4      MR. HALL:  I understand, your Honor.  I guess all I'm
5  saying is to the extent that the Court's previous order was
6  limited -- and this falls within that order -- and it's used
7  here to establish plaintiffs' loss causation argument or to
8  advance plaintiffs' loss causation argument, we'll withdraw
9  the objection on this slide.
10     MR. BURKHOLZ:  Thank you.
11     THE COURT:  That's why it's there, right?  That's
12  what you're going to use it for?
13     MR. BURKHOLZ:  Yes.
14     THE COURT:  Okay.
15     MR. HALL:  Your Honor, that's the last of the
16  defendants' objections on plaintiffs' demonstrative exhibits.
17     THE COURT:  Thank you.  We go the other way now.
18     MR. HALL:  Yes, your Honor.
19     Your Honor, if I may approach, I'll hand you up a
20  copy of the defendants' demonstratives.  There's an electronic
21  form on a DVD.  If you'd like, we could have someone put them
22  up on the screen.
23     THE COURT:  Are they all in here?
24     MR. HALL:  No, your Honor.  Some of them are
25  animations so they don't --

EXHIBIT 2

165

1      PROSPECTIVE JUROR BERARD: No.
2      MR. KAVALER: Are you satisfied with your union
3  pension fund?
4      PROSPECTIVE JUROR BERARD: Very much so.
5      MR. KAVALER: Okay. Very good. Excellent.
6  Sir?
7      PROSPECTIVE JUROR HUNT: I had the same kinds of --
8  I'm involved in a union in our work, but we don't have a
9  pension through our work -- through our union.
10     MR. KAVALER: You have the same experience, training
11 younger members of the union?
12     PROSPECTIVE JUROR HUNT: Correct.
13     MR. KAVALER: Teaching their jobs?
14     PROSPECTIVE JUROR HUNT: Correct.
15     But we don't have any pension through our union.
16     MR. KAVALER: How long have you been doing that?
17     PROSPECTIVE JUROR HUNT: Ten years.
18     MR. KAVALER: I saw your hand up?
19     PROSPECTIVE JUROR ARCHBOLD: Staff training in
20 orientation for new staff for new students coming in.
21     MR. KAVALER: Okay. All right.
22     And how many of you supervise other people in your
23 job?
24     (Hands raised.)
25     MR. KAVALER: The same three people.

166

1      Tell me how many people you supervise?
2      PROSPECTIVE JUROR ARCHBOLD: 56.
3      MR. KAVALER: 56.
4      And are they always a hundred percent on message?
5  Ever have any problems with them?
6      PROSPECTIVE JUROR ARCHBOLD: Oh, no.
7      MR. KAVALER: Sometimes you give them training and
8  someone doesn't get it?
9      PROSPECTIVE JUROR ARCHBOLD: Correct.
10     MR. KAVALER: What do you do, follow up?
11     PROSPECTIVE JUROR ARCHBOLD: Follow up. Follow w
12 our Human Resource Department, follow their set protocol.
13     MR. KAVALER: And sometimes they still don't get it?
14     PROSPECTIVE JUROR ARCHBOLD: Correct.
15     MR. KAVALER: What do you do, then?
16     PROSPECTIVE JUROR ARCHBOLD: Well, it's a layered
17 response to how you handle it.
18     MR. KAVALER: There's a process?
19     PROSPECTIVE JUROR ARCHBOLD: There's a process.
20     MR. KAVALER: Okay.
21     But when that happens, it's not because you're not
22 training them, is it?
23     PROSPECTIVE JUROR ARCHBOLD: I hope not.
24     MR. KAVALER: All right.
25     If someone asked you if you were doing a good job,

167

1  you'd say, "Yes, I am"?
2      PROSPECTIVE JUROR ARCHBOLD: Yes.
3      MR. KAVALER: Even if one of them wasn't with the
4  program?
5      PROSPECTIVE JUROR ARCHBOLD: Correct.
6      MR. KAVALER: Over here (indicating), a couple hands
7  in the front row. I will work my way across.
8      PROSPECTIVE JUROR BERARD: From one to three hund
9      MR. KAVALER: Three hundred? Very impressive.
10     Let me ask you the same questions. Do all three
11 hundred people invariably do everything you are teaching them
12 perfect?
13     PROSPECTIVE JUROR BERARD: Oh, no.
14     MR. KAVALER: How many would you say don't get the
15 message?
16     PROSPECTIVE JUROR BERARD: The first time out or --
17     MR. KAVALER: Over time.
18     PROSPECTIVE JUROR BERARD: Most of them will get it
19 over time.
20     MR. KAVALER: What would you say your success rate
21 is? 80 percent? 90 percent?
22     PROSPECTIVE JUROR BERARD: Maybe 85.
23     MR. KAVALER:
24     Do you consider that pretty good?
25     PROSPECTIVE JUROR BERARD: Yeah.

168

1      MR. KAVALER: Me, too. That's impressive.
2      PROSPECTIVE JUROR BERARD: It's the way you go abo
3  it.
4      MR. KAVALER: 85 is impressive. 95 would be more
5  impressive.
6      PROSPECTIVE JUROR BERARD: Well, it's almost
7  impossible, though.
8      MR. KAVALER: Almost impossible.
9      It's certainly a goal to be sought.
10     PROSPECTIVE JUROR BERARD: Yes.
11     You want a hundred percent, if you could get it, but
12 you have to be realistic sometimes.
13     MR. KAVALER: That's right, you try for a hundred.
14     PROSPECTIVE JUROR BERARD: Yep.
15     MR. KAVALER: You are happy at 95 and you're content
16 at 85.
17     PROSPECTIVE JUROR BERARD: Yep.
18     MR. KAVALER: It doesn't mean you're doing a bad job.
19     PROSPECTIVE JUROR BERARD: No.
20     MR. KAVALER: You, too?
21     PROSPECTIVE JUROR HUNT: One to six.
22     MR. KAVALER: Six people.
23     The same question. When you train these six people,
24 when you give them some guidance how to do their job, do all
25 six of them get it a hundred percent right all the time?

237

1  must also accept those facts as proved without the
2  presentation of evidence.
3         You should use common sense in weighing the evidence
4  and considering the evidence in light of your own observations
5  in life.
6         In our lives we often look at one fact and conclude
7  from it that another fact exists.  In law we call this an
8  inference.  A jury is allowed to make reasonable inferences.
9  Any inference you make must be reasonable and must be based on
10 the evidence in the case.
11        You have also already heard the phrases "direct
12 evidence" and "circumstantial evidence."  Direct evidence is
13 proof that does not require an inference, such as the
14 testimony of someone who claims to have personal knowledge of
15 a fact.  Circumstantial evidence is proof of a fact or a
16 series of facts that tends to show that some other fact is
17 true.
18        As an example, direct evidence that it is raining is
19 the testimony from a witness who says, I was outside a minute
20 ago and I saw it raining.  Circumstantial evidence that it is
21 raining might be the observation of someone entering a room
22 carrying a wet umbrella.  One calls for an inference.  The
23 other does not.
24        The law makes no distinction between the weight to be
25 given to either direct or circumstantial evidence.  When the

238

1  time comes to deliberate on your verdict, you should consider
2  all the evidence, including the circumstantial evidence.
3         Now, what is not evidence.  The following things are
4  not evidence, and you must not consider them as evidence in
5  deciding the facts of this case:
6         The attorneys' opening statements, their interim
7  statements at the end of each week and their closing arguments
8  are not evidence; the questions and objections of the
9  attorneys are not evidence; any rulings I make on those
10 objections, any testimony that I instruct you to disregard,
11 and anything you may see or hear when the court is not in
12 session, even if what you see or hear is done or said by one
13 of the parties or by one of the witnesses or by one of the
14 attorneys.
15        During the course of the trial, I may instruct you
16 that certain evidence is being admitted for a limited purpose
17 only.  When I do so, you must consider that evidence only for
18 that limited purpose and no other.
19        It will be your task, ladies and gentlemen, to decide
20 whether the testimony of each of the witnesses is truthful and
21 accurate in part, in whole or not at all.  You also have to
22 decide what weight, if any, you give to the testimony of each
23 witness.
24        From time to time during the trial, I may be called
25 upon to make rulings of law on objections or motions by the

239

1  lawyers.
2         When I sustain an objection, I am excluding that
3  evidence from this trial for a good reason.  When you hear me
4  say that I have overruled an objection, that means that I am
5  permitting that evidence to be admitted and may be considered
6  by you.
7         You should not infer or conclude from any ruling or
8  other comment I may make that I have any opinions about how
9  you should decide this case.  I do not.  And if I sustain an
10 objection and a question then goes unanswered by a witness,
11 you should not guess or speculate what the answer might have
12 been.  And you should not draw any inferences or conclusions
13 from the question itself or from any ruling that I may make.
14        At times during the trial -- and you have already
15 seen an example of this -- it may be necessary for me to talk
16 with the lawyers here at the bench outside of your hearing or
17 by calling a recess.  We meet because often during the trial,
18 something comes up that doesn't involve your function as a
19 jury.  During the bench conferences or sidebars, you must
20 remain seated in the jury box.
21        I will do everything in my power to keep the number
22 and length of these conferences to a minimum.  However, in
23 every trial, there are some sidebar conferences.  Please keep
24 in mind the importance of the matters you are here to
25 determine and be patient while we resolve these issues.

240

1         You will be provided with paper and pens for taking
2  notes.  You are not required to take notes.  If you feel that
3  taking notes will distract you from paying attention to the
4  testimony and the witnesses, do not take any notes.
5         Any notes that you take during this trial are only
6  aids to your memory.  The notes are not evidence.
7         If you do not take notes, you should rely on your
8  independent recollection of the evidence and not be unduly
9  influenced by those who have taken notes.  Notes are not
10 entitled to any greater weight than the recollections or
11 impressions of each juror about the testimony.
12        If you do decide to take notes, mark your notepad
13 with your name.  When you leave the courthouse during the
14 trial, your notes will be left in the jury room.  When you
15 leave at night, your notes will be secured and not read by
16 anyone.  At the end of the trial, your notes will be
17 destroyed; and no one will be allowed to read the notes before
18 they are destroyed.
19        You must not read the notes taken by your fellow
20 jurors for the same reason that you are not to discuss the
21 case until after all of the evidence has been presented.
22        You should pay close attention to the testimony as it
23 is given.  At the end of the trial, you will have to make your
24 determination based on what you recall of what the testimony
25 was.  You will have a copy of all the exhibits that are

257

1    MS. FARREN: Okay. Thank you, your Honor.
2    THE COURT: So then unless there's a better
3  suggestion, the Court will not read this statement to the
4  jury. And we will simply either give it to them to take back
5  with them during their deliberations or determine some other
6  method by which we may want to publish the contents.
7    I look at some of these facts, and it occurs to me
8  that during the course of the trial, you all may decide by
9  agreement that some of them just simply aren't necessary. But
10  it's up to you.
11    So we have our choice now. We can either take up the
12  limiting instructions that are proposed or we can take up the
13  issue of the juror.
14    MR. BURKHOLZ: Why don't we take the more painful
15  one, the limiting instructions. Try to work our way through
16  this.
17    THE COURT: You think that's more painful, huh?
18    MR. BURKHOLZ: I do.
19    We have a disagreement about this limiting
20  instruction regarding various categories of evidence.
21  Basically the first one is the analysts' reports, investor
22  relation reports, presentations by Household executives at
23  conferences, rating agency reports, newspaper, magazine
24  articles.
25    We think the jury should simply be told that the --

258

1  these documents are not admitted to show that they were true.
2  And leave it at that. There are many other purposes that they
3  can come in for, and we want to limit it to that.
4    If we would just look at the first one, the analysts'
5  reports, they could come in to show the effect on the price of
6  Household stock. They could come in to show the notice to
7  defendants of what the analysts were saying. And we don't
8  want to have to limit it in this particular document. We'd
9  rather see, as the evidence comes in, if the Court can modify
10  the instruction to show what purpose it's coming in for.
11    MS. FARREN: Well, your Honor, we followed and rely
12  on pattern instruction 1.09. Committee report suggests -- and
13  obviously it makes sense to avoid confusing the jury -- that
14  you don't just state what it's not admitted for. You explain
15  what it is admitted for, otherwise the jury would be in the
16  dark, I should think, about what they're to do with it.
17    THE COURT: Well, I think there's a problem with just
18  telling the jury you can't consider these for what is likely
19  for them to be the most obvious use for this information
20  without giving them some explanation. Now, it may be that
21  there is more than one other use, and that this instruction
22  should include those other possibilities and indicate, to the
23  extent that they find the evidence is effective as to those
24  issues, they can consider it as to those. But I don't think
25  it would be very effective to simply tell them, here's what

259

1  the reports say, but we're not offering them to prove to you
2  what the reports say. We're offering them to prove to you
3  something else. We're not going to tell you what it is.
4    MR. BURKHOLZ: If that's the case, we can offer to
5  the Court what we think the different purposes are at this
6  time or later.
7    THE COURT: How soon are we going to be dealing with
8  this?
9    MS. FARREN: Forgive me, your Honor. I didn't hear
10  you.
11    THE COURT: How soon are we going to be dealing with
12  this?
13    MR. BURKHOLZ: Probably this week at some point.
14    MS. FARREN: I should think, your Honor, that the
15  limiting instruction should be read before plaintiffs' first
16  witness, Ms. Ghiglieri, because the essence of her testimony,
17  based on her report, will be an amalgam of civil complaints
18  that your Honor has admitted only for the truth -- forgive me,
19  only for notice. Customer complaints, the same thing.
20    And we have a bit of a dispute, your Honor, about the
21  meaning of your Honor's omnibus ruling on the proper use of
22  federal and state exam reports. So that would be another
23  issue that would, of course, leap out in Ms. Ghiglieri's
24  testimony because she places heavy reliance or at least cites
25  heavily to state exam reports. We had understood your Honor

260

1  to --
2    THE COURT: I think the issue is do we do it now or
3  later. It seems to me that we can afford to at least wait
4  until most likely the lunch break. During that time, if you
5  can get together what you believe are the other possible uses
6  for each of the categories of these exhibits.
7    MR. BURKHOLZ: We'll do that.
8    THE COURT: I'm looking at limiting instruction --
9  proposed limiting instruction No. 2. The first is an
10  instruction with respect to the federal government and other
11  investigatory reports. Do you want to address that at this
12  point?
13    MR. BURKHOLZ: We could, your Honor. Mr. Brooks is
14  going to handle that particular part.
15    MR. BROOKS: We don't believe any limiting
16  instruction is proper, your Honor. Defendants moved in their
17  motion in limine on these exam reports under 403 to exclude
18  the reports. The Court ruled that those reports come in. The
19  Court remarked that defendants' arguments went to the weight
20  rather than the admissibility of the regulatory documents.
21  And defendants didn't move on any hearsay grounds, Judge, to
22  exclude the reports. They didn't do it. They didn't do it,
23  your Honor, because they fall squarely within 803(8).
24    And so, Judge, there's no limiting instruction -- the
25  Court didn't -- in its order didn't indicate that there would

261

1  be a limiting instruction like it did for complaints.  For
2  example, on page five of the omnibus order, the Court said
3  defendants may propose a limiting instruction.  With respect
4  to the state and federal regulatory exams, that's not there.
5      So, Judge, we think these exam reports come in for
6  all purposes.  They haven't moved to exclude on hearsay.  The
7  Court's ruling was not based on any hearsay determination.
8  And so the limiting instruction that they've proposed is
9  entirely improper.
10     THE COURT:  Response.
11     MS. FARREN:  Your Honor, I don't want to tell the
12  Court what was on its mind, but Mr. Brooks is mistaken that we
13  did not move on the basis of hearsay and Rule 408 and other
14  bases because these exam reports are rife with the type of
15  evidence that your Honor has ruled is admissible only for the
16  limited purpose of notice.
17     And we have examples, your Honor, where, for example,
18  the OTS has a report that does nothing but recap the
19  allegations in certain civil complaints, appear to take them
20  as true and also recite settlements and other types of
21  evidence, including customer complaints that your Honor has
22  held should be admitted only for the purpose of notice.
23     We understood that to be the basis of your Honor's
24  ruling in part B of the omnibus ruling; that the regulatory
25  documents are probative of scienter.  It will aid in

262

1  determining the scienter notice.
2      And then on page eight, your Honor, in -- on page
3  eight in -- the Court says -- forgive me -- seven.  Once
4  again, plaintiffs may rely on the federal and state regulatory
5  examinations and complaints in other litigation which targeted
6  the inadequacies of Household policies to establish notice and
7  scienter.
8      Then when your Honor was talking about individual
9  customer complaints, it harked back to point B and adopted its
10  rationale, which we understood, your Honor, to be notice only.
11     THE COURT:  Okay.  Well, the ruling that I made was
12  based essentially on Federal Rule of Evidence 803(8) relating
13  to public records and reports.  And that rule states pretty
14  clearly that records, reports, statements or data compilations
15  in any form of public offices or agencies setting forth, A,
16  the activities of the office or agency or -- and here's the
17  matter that seems to apply -- B, matters observed pursuant to
18  duty imposed by law, as to which matters there was a duty to
19  report.
20     And it goes on to make exclusions in criminal cases,
21  police officers and so on, which don't apply here.
22     I think that ruling applies to these investigatory
23  reports from these agencies.  It was their duty to make
24  observations, report those observations and to make findings
25  and report those findings; and they've done that.  And to the

263

1  extent they've done that, the reports come in.
2      MS. FARREN:  Thank you, your Honor.  But that doesn't
3  deal with respect to the Rule 408 and the double and triple
4  hearsay aspects of these reports to the extent that your Honor
5  has ruled that those -- that type of information that some of
6  the agencies merely recite comes in only for notice.  I think
7  we need some --
8      THE COURT:  I think the duty to observe language does
9  actually deal with that.  It says that if they report
10  something they have a duty to observe, then that report is not
11  hearsay.  They had a duty to observe these things, these
12  complaints and all these other things; and they're reporting
13  them as part of the investigative report.  And that reporting
14  of them is not hearsay.
15     MS. FARREN:  Your Honor, I'm agreeing with that.  But
16  I'm trying to turn the Court's attention, if I may, to the
17  double hearsay and triple hearsay problems with that.
18     When, for example, the OTS says, all the complaints
19  that your Honor has found should come in only for notice, this
20  or that group of customers alleged X, Y, Z, if the jury is not
21  somehow swayed into the fact that that's not necessarily true,
22  that is to say, the truth of the allegations of whatever
23  customer is being cited haven't been adjudicated, aren't
24  necessarily true, the fact that a state or a federal
25  regulatory agency may say something about it may give it undue

264

1  weight in the eyes of the jury and really eradicate your
2  Honor's ruling on --
3      THE COURT:  I think what you're talking about is
4  called cross-examination, and that's what you do.  You
5  cross-examine, and you point out that these complaints are --
6  have not been adjudicated.  There's been no trial.  That's
7  what you do when experts and others take into account reports
8  and other matters that, although may not be admissible
9  themselves, come into evidence.  That's what you do when
10  investigative reports include facts which under this exception
11  come into evidence; you attack the weight to be given to those
12  findings and those observations by cross-examining the people
13  who introduce them.  That's the ruling on that.
14     MS. FARREN:  Thank you, your Honor.
15     MR. BROOKS:  Thank you, your Honor.
16     THE COURT:  I think there are others here; are there
17  not?  Complaints that were filed publicly against Household
18  and certain other lawsuits during the class period.  Do you
19  have an objection to the limiting instruction on that?
20     MR. BURKHOLZ:  I think that one is fine, your Honor.
21     THE COURT:  I agree.  Third, plaintiffs will offer
22  evidence about complaints made by certain individual customers
23  of Household.
24     MR. BURKHOLZ:  That one is fine too.
25     THE COURT:  Fourth, plaintiffs will offer evidence

Ghiglieri - direct

417

1  A.  That -- what that -- says is:  "Flipping.  Frequent and
2  multiple refinancings, usually of mortgage loans, requiring
3  additional fees which strip equity from the borrower."
4  Q.  Then the final bullet point looks like:  "Collection of
5  up-front single-premium credit insurance"?
6  A.  Right.  And they're describing:  "Life, disability or
7  unemployment, when the consumer does not receive a tangible --
8  net tangible -- financial benefit."
9  Q.  Were there any other regulatory materials you surveyed
10  when looking at what practices constituted predatory lending
11  practices during the 1999 to 2002 time frame?
12  A.  Yes.  I had a number of them that I describe in my report;
13  and, I had an appendix with some more.  So, there was quite a
14  few.
15  Q.  And what sorts of materials did you consider?
16  A.  Issuances by the different regulators was one.  I looked
17  at information that was out in the financial press.  And
18  testimony before Congress.
19      There was quite a bit of testimony during this time
20  regarding predatory lending practices of various kinds.
21  Q.  Did you prepare a demonstrative exhibit to assist you in
22  explaining to the jury the meaning of "predatory lending"?
23  A.  I did.
24  Q.  I show you what has been marked as Plaintiffs' Exhibit 35
25  for identification.

Ghiglieri - direct

418

1      Can you tell us what this is -- what this exhibit
2  shows?
3  A.  Yes.
4      I think this characterizes the umbrella term
5  "predatory lending" and it covers deceptive sales practices,
6  which includes misrepresentation of the loan terms; and, it
7  also includes unfair loan terms to the borrower; things that
8  would be of no benefit to the borrower or make it beyond their
9  ability to repay.
10      So, this is basically a description of the umbrella
11  term "predatory lending."
12  Q.  Now, you testified that you concluded that Household
13  engaged in widespread, systemic predatory lending practices
14  during the 1999 to 2002 time frame.
15      Did you prepare a demonstrative to assist the jury in
16  understanding the predatory practices that Household engaged
17  in during that time frame?
18  A.  I did.
19  Q.  I'm showing --
20      THE COURT:  Would this be a good time to take our
21  break?  It's almost 3:00 o'clock and it looks like you're
22  moving into something else.
23      MR. DROSMAN:  Absolutely, your Honor.
24      THE COURT:  Ladies and gentlemen, we'll take our
25  afternoon break now.  We'll break for 20 minutes and resume

Ghiglieri - direct

419

1  the testimony after that.
2      (Jury out.)
3      THE COURT:  You may step down, ma'am.
4      THE WITNESS:  Thank you.
5      THE COURT:  Anything we should take up before we
6  break?
7      MR. DROSMAN:  Nothing for plaintiffs, your Honor.
8      MR. MILLER:  Can we cool it down in the courtroom,
9  Judge?
10      THE COURT:  Sure.  Not a problem.
11      MR. DROSMAN:  Now that you mention it, I would
12  appreciate that.
13      THE COURT:  We'll call GSA and let you know.
14      MR. HALL:  Your Honor?
15      THE COURT:  Yes.
16      MR. HALL:  We had agreed on some limiting
17  instructions before.  I think some of them may be applicable
18  to the rest of this witness' testimony.
19      I don't know whether you want to cover those now.
20      THE COURT:  Yes, that seems almost as important as
21  cooling things down.  Why don't we go over that now.
22      (Laughter.)
23      MR. BURKHOLZ:  I'll make it quick, your Honor.  I
24  think we've reached agreement on all the language.
25      THE COURT:  Okay.

420

1      MR. BURKHOLZ:  I think we have a Joint Instruction
2  No. 1, which has those five categories, starting with the
3  "Analyst Reports."
4      THE COURT:  Give me 30 seconds.  Let me go back and
5  retrieve that.
6      I guess I left it on my desk, not thinking we were
7  going to deal with it.  Give me a second.  I will be right
8  back.
9      (Brief pause.)
10      THE COURT:  Go ahead.
11      MR. BURKHOLZ:  So we had on Joint Instruction No. 1
12  five different categories of evidence.  We have language that
13  would go to -- it's agreed upon -- would go at the end --
14  let's look at the first one, the analyst reports.  At the end
15  of that paragraph where it says, "The analyst report was
16  publicly available and for no other purpose," after "publicly
17  available," we would add the following language:  "Whether
18  they affected the price of Household stock or that defendants
19  were on notice of the contents."
20      THE COURT:  I'm sorry.  Give that to me again.
21      MR. BURKHOLZ:  "Whether they affected the price of
22  Household stock or that defendants were on notice of the
23  contents."
24      THE COURT:  Of?
25      MR. BURKHOLZ:  "Of the contents."

421

1    THE COURT:  You are going to have to give it to me
2  one more time.
3    "Whether they affected the price of Household" --
4    MR. BURKHOLZ:  "Household stock or that defendants
5  were on notice of the contents."
6    MR. HALL:  Your Honor, I think there is a grammatical
7  issue.  At the beginning of that same line it says, "Show that
8  the contents of the analyst reports was," and it should say
9  "were" there.
10    THE COURT:  It says "contents," so I guess so.
11    "This evidence is admitted only to show that the
12  contents of the analyst reports were available, whether they
13  affected the price of Household stock or that defendants were
14  on notice of the contents."
15    Is that correct?
16    MR. BURKHOLZ:  That's correct.
17    MR. HALL:  With the word "publicly" before
18  "available," your Honor.  The word "publicly" before the word
19  "available."
20    THE COURT:  "The contents of the analyst reports was
21  publicly available."
22    MR. HALL:  Yes, your Honor.
23    THE COURT:  That's what I have here.  I just didn't
24  read it.
25    Okay.  Next?

422

1    MR. BURKHOLZ:  We would propose that language would
2  go in the same location for the second -- the next paragraph,
3  the investor relations reports, at the end of that paragraph
4  after "publicly available" and before "and for no other
5  purpose."  We would add that same language.
6    THE COURT:  So do you want the language "and for no
7  other purpose" to come, then, at the end of the additional
8  material?
9    MR. BURKHOLZ:  Correct.
10    THE COURT:  Same language at the end of the second
11  paragraph or the second --
12    MR. BURKHOLZ:  Correct.
13    MR. HALL:  Correct.
14    THE COURT:  -- document designation.
15    Then we move on to the third.
16    MR. BURKHOLZ:  The third one just has one change.  We
17  would not have in the second piece of what we are adding in,
18  that the defendants were on notice of the contents.  They are
19  making misstatements.  Clearly they were on notice of those
20  contents.  So it would just be whether they affected the price
21  of Household stock.
22    THE COURT:  Okay.
23    MR. BURKHOLZ:  And then the next page, the fourth and
24  fifth categories would have the agreed upon language, the two
25  additional conditions.

423

1    THE COURT:  The same language as one and two?
2    MR. BURKHOLZ:  Yes.
3    THE COURT:  Okay.  Fifth?
4    MR. HALL:  Your Honor, the next and last issue, I
5  believe, is on Limiting Instruction No. 4, which relates to --
6    THE COURT:  Is the same language for the fourth and
7  the fifth?
8    MR. BURKHOLZ:  Yes.
9    MR. HALL:  Yes, your Honor.
10    THE COURT:  Okay.  Okay.
11    MR. HALL:  And the next, your Honor, is Limiting
12  Instruction No. 4, which --
13    THE COURT:  What happened to two?
14    MR. HALL:  I believe we addressed that earlier, your
15  Honor.
16    THE COURT:  I'm sorry.
17    MR. HALL:  We addressed that one earlier.  I don't
18  believe there are any changes to that one.
19    MR. BURKHOLZ:  Right.  That's the one that had the
20  exam reports, the second one.
21    THE COURT:  Okay.  Go ahead.
22    MR. HALL:  Turning to Limiting Instruction No. 4,
23  and this deals with limited purpose evidence that's the basis
24  of expert testimony.  We agreed on some language.  So it's
25  kind of a redraft of what's here.  I can just read it slowly.

424

1    THE COURT:  Let me make sure I have got this
2  straight, then.
3    The language you just went over was for Limiting
4  Instruction number?
5    MR. HALL:  No. 1.
6    THE COURT:  No. 1?
7    MR. HALL:  Yes.
8    THE COURT:  And for Limiting Instruction No. 2?
9    MR. BURKHOLZ:  We agreed upon that this morning.
10    THE COURT:  I don't recall that.  What did you agree
11  on this morning?
12    MR. BURKHOLZ:  That was the one where we struck the
13  second paragraph regarding the examination reports, and the
14  remainder of it, we were fine with the language.
15    THE COURT:  Give it to me exactly because I don't
16  have a note of that here, for some reason.  We are okay with
17  4.  We are okay with 3 and 2.  And 1 was not okay.  And I
18  don't have any --
19    MR. BURKHOLZ:  That was stricken from the document,
20  the language regarding examination reports.  So the
21  instruction would just start off with the complaints.
22    THE COURT:  With the second?
23    MR. BURKHOLZ:  The second.  Exactly.
24    THE COURT:  So that's stricken altogether.
25    MR. BURKHOLZ:  Just that the second paragraph of the

425

1  instruction, the, "First, plaintiffs will offer certain
2  documents created by state and" --
3       THE COURT: A little bit louder.  I just can't hear
4  you.
5       MR. HALL: It's the paragraph that begins with the
6  word "First," your Honor, that paragraph is stricken.
7       THE COURT: Right.
8       "First, plaintiffs will offer certain documents
9  created by state or federal agencies."  That was what was
10  objected to, and that's been stricken now.  We have agreed to
11  that.
12      MR. BURKHOLZ: The rest of it is fine.
13      THE COURT: The rest of it stays the way it was.
14  Okay.
15      Now you want to go to your proposed No. 4?
16      MR. HALL: Correct.
17      THE COURT: Okay.
18      MR. HALL: And here, your Honor, we have new language
19  that we have agreed upon.  The easiest way for me to read
20  that now?
21      THE COURT: I can't think of any other way.
22  I have lost your feed.
23      I don't know.  Are you folks getting the court
24  reporter's feed out there?
25      MS. FARREN: Yes, your Honor.

426

1       THE COURT: You are.  Well, it's just me then, for
2  some reason.
3       MR. HALL: I will read this out, your Honor.  If it's
4  convenient, we can just rewrite it neatly and hand it up.
5       THE COURT: Okay.
6       MR. HALL: This is Limiting Instruction No. 4.  The
7  instruction will read, "Recall that certain evidence is
8  admitted for the limited purpose of showing that the contents
9  were publicly available, or whether they affected the price of
10  Household stock, or that defendants were on notice of the
11  contents.
12      "You may also consider such evidence for the limited
13  purpose of assisting you to evaluate the witness' opinion."
14  This will refer to an expert witness.
15      "The underlying information must not be used by you
16  for any substantive purpose for which the evidence is not
17  admitted.
18      "I will let you know when and if the evidence is to
19  be considered for a limited purpose."
20      THE COURT: Okay.  If you took a poll among those 12
21  jurors, how many different definitions do you think you would
22  get for the word or the phrase "substantive purpose"?
23      MR. BURKHOLZ: Twelve.
24      MR. HALL: Your Honor, I think we could resolve that
25  issue by just saying -- well, you could just say, "and for no

427

1  other purpose," as we did with the other instructions at the
2  end of that long --
3       MR. BURKHOLZ: That's fine.
4       THE COURT: Sounds good to me.
5       Now, when do you want these delivered?
6       MR. HALL: Your Honor, I think it would be
7  appropriate to deliver them before the remainder of
8  Ms. Ghiglieri's testimony.  I think she may -- I expect she
9  may cross over into some areas where she is relying on
10  underlying material that's admitted for a limited purpose.
11      MR. KAVALER: Your Honor, this is the issue I
12  addressed earlier today.
13      THE COURT: Yes, it is.
14      MR. KAVALER: I would like it done every single time
15  she does it, but my guess is she is going to do it at some
16  point continuously on a staccato basis.  I don't believe it's
17  reasonable to ask you to do it every time, but I want to
18  protect the record.
19      THE COURT: I don't have a problem with giving it
20  now.
21      You don't have any objection, do you?
22      MR. BURKHOLZ: No.  We can give it once.
23      THE COURT: If we are going to do it, then it seems
24  that we really ought to give one instruction, just
25  incorporating all these different types of documents rather

428

1  than four instructions, each one beginning with, "You will
2  recall."  So it's going to take a little massaging of the
3  language.
4       I will see what I can do.
5       MR. KAVALER: Thank you, your Honor.
6       THE COURT: We probably still have about five minutes
7  left on our break.
8       (A brief recess was taken at 3:16 p.m. until 3:33 p.m.)
9       THE COURT: So I think we will bring the jury out.
10  The first thing we will do is give them this instruction; is
11  that correct?  That's what we agreed on?
12      MR. KAVALER: That would be fine, your Honor.
13      THE COURT: Very well.
14      MR. DROSMAN: Your Honor, before you bring out the
15  jury, just a couple of issues.
16      First, I think this monitor can be turned on, but it
17  isn't on right now.  Is there any way we can get that on?
18      THE COURT: Yes.  You push a button.
19      (Laughter.)
20      MR. DROSMAN: I thought that you controlled it.  I am
21  sorry.
22      And then, the second issue, your Honor, is that we
23  prepared some binders with the exhibits that I am using in
24  evidence today, your Honor, for the jury.  If we have your
25  permission, I would like to provide a binder for each juror

429

1  with the exhibits that we are going to be using.  It's a
2  little difficult to see things on the screen.  This way they
3  will have their own documents in front of them.
4       MR. KAVALER:  We haven't seen it, your Honor.
5       THE COURT:  You haven't seen it?
6       MR. KAVALER:  I don't believe so.
7       THE COURT:  Then you can't use it.
8       MR. DROSMAN:  Okay.
9       THE COURT:  Show it to them first.
10      Anything else?
11      MR. DROSMAN:  That's it, your Honor.
12      THE COURT:  All right.  Let's bring them out.
13   (Jury in at 3:34 p.m.)
14      THE COURT:  Welcome back, ladies and gentlemen.
15      Before we recommence the testimony, you will recall
16  that I have informed you that there may be times during the
17  course of the trial when evidence would be admitted for a
18  limited purpose only and that I would so advise you, and that
19  when I advise you in that manner, you are to consider that
20  particular evidence only for that purpose and for no other
21  purpose.
22      The attorneys tell me we are quickly coming into
23  territory which will encompass several types of evidence that
24  will be offered only for a limited purpose.  So let me give
25  you a specific instruction now on that.

430

1       Please bear with me.
2       It is likely that a number of documents known as
3  analyst reports, which I think you have already heard
4  something about, will be offered in evidence.  Analyst reports
5  are written by market analysts employed by investment banks or
6  brokerage firms who comment on Household's business, its
7  securities, and the economy in general.
8       These reports are not admitted to show that what the
9  analyst said was true but only to show that the contents of
10  the analyst reports were publicly available, whether they
11  affected the price of Household stock, or to show that the
12  defendants were on notice of the contents and for no other
13  purposes.
14      There is more.
15      There are also certain documents entitled "Investor
16  Relations Reports" that may be offered into evidence.
17  Household's investor relations reports were prepared by
18  Household employees for internal use within the company.  The
19  investor relations reports typically include quotations or
20  excerpts from selected analyst reports.
21      To the extent that the investor relations reports
22  quote from, attach, or paraphrase statements made by the
23  analysts, you may consider those portions of the investor
24  relations reports only for the limited purpose of showing that
25  the contents of the analyst reports were publicly available or

431

1  whether they affected the price of Household stock or to show
2  that the defendants were on notice of the contents and for
3  only those purposes.
4       There is a third category of documents as well.
5       Evidence will be offered about certain presentations
6  that Household executives made to analysts and to investors
7  either in person or in conference phone calls.
8       This evidence is admitted for the limited purpose of
9  showing that the contents of the presentations made by the
10  Household executives was publicly available, that they
11  affected the price of Household stock -- or that they affected
12  the price of Household stock and for no other purpose.
13      You may also -- we may also receive in evidence
14  reports prepared by rating agencies that relate to Household's
15  financial condition.  These reports also are not admitted to
16  show that the rating -- what the rating agency said was true.
17  Rather, this evidence is admitted only to show that the
18  contents of the rating agency's reports was publicly available
19  or whether they affected the price of Household stock or that
20  the defendants were on notice of the contents of these reports
21  and for no other reasons.
22      A fifth type of document is newspaper and magazine
23  articles which may be offered for the limited purpose of
24  showing that the contents of the articles were publicly
25  available and for no other purpose.  They are not being

432

1  admitted to show that the contents of the newspaper or
2  magazine articles were actually true.
3       You may also be exposed to evidence about complaints
4  that were filed publicly against Household in certain other
5  lawsuits during the relevant time period.  This evidence, like
6  the others, is not admitted to show that the allegations
7  asserted in the complaints against Household in those other
8  lawsuits were actually true.  Rather, these documents -- that
9  is, the complaints that were filed -- and any testimony about
10  them are admitted only for the limited purpose of showing that
11  the existence and nature of the prior lawsuits were known to
12  one or more of the defendants, showing that this information
13  was publicly available, or whether the complaints affected the
14  price of the Household stock and for no other purpose.
15      You may also be exposed to complaints made by certain
16  individual persons, customers of Household.  This evidence --
17  that is, the complaints by individual customers of
18  Household -- is also not admitted to show that the customers'
19  complaints were true.  This evidence is admitted only for the
20  limited purpose of showing that the existence and nature of
21  the complaints were known to one or more of the defendants and
22  for no other purpose.
23      There may also be evidence presented about
24  settlements that Household entered into to resolve legal
25  proceedings during the relevant period.  Evidence about a

433

1  settlement is not admitted to show that Household was at fault
2  or that Household engaged in any wrongdoing in the matter that
3  was settled.  Again, the evidence is admitted only for the
4  limited purpose of showing whether the settlement affected the
5  price of Household stock and should be considered and may be
6  considered only for that purpose.
7      I guess I want to make sure that I have this correct
8  from the attorneys.  The instruction regarding the information
9  assumed by the various expert opinions, do you want that
10 instruction given at this point as well?
11     MR. HALL:  Yes, your Honor.
12     THE COURT:  All right.  I believe I have the language
13 that you folks agreed to.  If it is, it's acceptable to me and
14 I will deliver it to the jury.  If I misspeak, let me know and
15 we will make the appropriate correction.
16     During the course of testimony by expert witnesses
17 who you may hear, you may hear evidence regarding the category
18 of documents I have already told you about.  Evidence
19 regarding publicity, notice, price, and things of that nature
20 will be explained to you during the course of the expert's
21 testimony.
22     The underlying information that you receive in this
23 manner must not be considered by you for the purpose of
24 determining -- must not be considered by you as evidence of
25 the truth of the information but rather is being admitted for

Ghiglieri - direct

434

1  the limited purpose of showing you -- or assisting you to
2  evaluate the expert witness' opinion and how sound that
3  opinion is.
4      The underlying opinion must not be used by you for
5  any other purpose than to evaluate the opinion of the expert
6  witness.
7      You may proceed.
8      MR. DROSMAN:  Thank you, your Honor.
9  BY MR. DROSMAN:
10 Q.  Ms. Ghiglieri, before the break I asked you whether you
11 prepared a demonstrative exhibit to assist you in explaining
12 your conclusion that Household engaged in a variety of
13 predatory practices during the 1999-to-2002 time frame.
14     Did you prepare such an exhibit?
15 A.  I did.
16 Q.  Would that assist you in explaining your testimony?
17 A.  Yes, it would.
18 Q.  At this time I will show you what has been marked as
19 Plaintiffs' Demonstrative Exhibit 29 for identification.
20     What are the entries on Plaintiffs' Exhibit 29?
21 A.  These are the various predatory lending practices that I
22 found when I was reviewing all of the documents.
23 Q.  Let's take the first predatory lending practice listed,
24 the effective or equivalent rate.
25     Can you tell the jury what that is?

Ghiglieri - direct

435

1  A.  Yes.  Household's rates were higher than its competitors.
2  So in order for it to be able to make loans, they came up with
3  a way of describing their rates as effective rates.
4      Basically what they would do is tell the customer,
5  you can pay your mortgage payment -- half of your mortgage
6  payment every two weeks instead of your whole mortgage
7  payment once a month.  And in that way, you will pay it off
8  faster.  And that's true because you make 13 payments instead
9  of 12 payments if you make a half of a payment every other
10 week.
11     But what they would do is, they would then calculate
12 what they called an effective rate and compare it to someone
13 that's making their payment once a month for 30 years.  And
14 they would say, because you are paying less interest, you are
15 paying a lower interest rate, which is not true.
16     If I took out a 30-year mortgage and I refinanced it
17 somewhere else after two years, the amount of interest I would
18 pay to the first lender would be less than if I would have
19 stayed there for 30 years and paid it.  But my interest rate
20 didn't change.
21     So Household used what they called this effective
22 rate.  Sometimes they would call it equivalent rate.
23 Sometimes they would call it comparative rate.  But they would
24 couch this, their higher rate, in terms of this biweekly
25 payment plan and say, you know, your effect rate is lower.  So

Ghiglieri - direct

436

1  this is an example.
2      Someone would come in, apply for a loan or refinance
3  their current loan.  Household would do this effective rate
4  calculation based on the biweekly payment plan.  And they
5  would say, well, you currently have an 8 percent rate.  But if
6  you come and refinance with us, the effective rate would be
7  7 percent.  And the customer would say, oh, that's great; I am
8  going to refinance.  But really what would happen is, the
9  interest rate would still be you, know, 12 and a half or
10 13 percent.
11     So Household used this predatory lending practice to
12 get people to come in and borrow from them, even though their
13 rates were not competitive.  If they would have said, if you
14 pay your loan every two weeks on the current loan, the rate
15 would be 4 percent, you know, as compared to our 7 percent.
16     So the reason why Regulation Z is in place, as I said
17 this morning or earlier -- I am sorry -- this afternoon is
18 lenders are required to only use the annual percentage rate so
19 that customers can compare from lender to lender what the
20 rates are so they can compare apples to apples.  Regulation Z
21 is violated when you come up with all these different sorts of
22 rates to give to the customer.  So that was the effective
23 equivalent rate scam that Household was running during this
24 1999-to-2002 time frame.
25 Q.  Now, we have touched on the second practice, insurance

Ghiglieri - direct

437

1  packing. But can you tell us what that is?
2  A. Yes. Insurance packing is when you add insurance premiums
3  for credit life, accident and health, unemployment, whatever
4  kind of insurance, on to the loan without the borrower's
5  knowledge. That's a typical insurance packing definition.
6      Household did some of that.
7      They also would tell the customers that the insurance
8  was required. Sometimes they wouldn't tell them at all. And
9  if the customer would come to the loan closing -- let me back
10  up a minute.
11     What Household trained their employees to do was to
12  assume that the customer wanted all of these insurance
13  products. So when the customer got to the loan closing, the
14  insurance would already be added on. If the customer would
15  notice it, they would say many times, oh, we have to run all
16  your loan documents; this is going to take a long time.
17     If the customers, you know, asked about it and really
18  said, we don't want it, we don't want it; they would say,
19  don't worry about it. You can cancel after 30 days.
20     They would get their premium back -- a portion of
21  their premium back, but the premium would still be on their
22  loan. And they would be making not only payments over
23  30 years because of the insurance, they would also be paying
24  interest on that insurance premium.
25     So this is considered a predatory lending practice.

Ghiglieri - direct

438

1  And it's particularly egregious when the type of insurance is
2  single premium credit insurance. And that is where you make a
3  premium payment up-front. You pay it off, of course, as you
4  pay your mortgage off over 30 years, but the insurance only
5  lasts for five years. So you no longer have insurance, and
6  still after the fifth year, you are paying for this. So
7  regulators in a lot of states have prohibited this. That is a
8  particularly egregious predatory lending practice.
9  Q. Did you see instances in which Household packed single
10  credit premium insurance on?
11  A. Yes.
12  Q. What about the next practice, failure to properly
13  disclose? Can you tell us what that is?
14  A. Failure to properly disclose is in two major categories.
15  There were a lot of problems with disclosure, but I will
16  confine it to these two categories.
17     One is the good faith estimate. And for anyone that
18  has gone to close on a home, you will know that when you make
19  an application to close, three days after the application
20  is accepted you are supposed to receive a good faith estimate
21  of the closing costs. And that's under the Real Estate
22  Settlement Procedures Act, which is known as RESPA.
23     The good faith estimate that Household would give,
24  when they would give it -- sometimes they didn't give it;
25  sometimes it was late -- but when they would give the good

Ghiglieri - direct

439

1  faith estimate, it was a wide range. They would say, your
2  closing costs are going to be between zero dollars and $8,000.
3      The majority of the time on the documents that I
4  looked at, Household charged at the high end of the range or
5  in excess of the range. The lenders are never supposed to
6  charge in excess of what they have on the closing costs
7  without redisclosing. But in many cases, Household would
8  charge in excess of that range.
9      Household's practice was to charge at the high end of
10  the range. And if you look at the regulatory literature, when
11  you give a range and almost all the time when you charge at
12  the high end of the range, it's considered deceptive if you
13  are giving too wide of a range to a borrower. So that's one
14  of the problems with failure to properly disclose. And it's
15  considered a predatory lending practice.
16     The other example of failure to disclose was the
17  prepayment penalty. A prepayment penalty is when you go to
18  pay off your mortgage either through refinance or from other
19  means and you are charged a penalty for paying it off. Some
20  states have prohibited this, but some states have not.
21     And when Gary Gilmer took over Household in 1999 --
22  1998, starting in 1999 they increased the amount of the
23  prepayment penalty from three years to five years. What that
24  meant was, if you came in to pay off your loan inside of five
25  years, you were charged six months' worth of interest as a

Ghiglieri - direct

440

1  penalty.
2      And this prepayment penalty disclosure was buried in
3  the fine print in the middle of the loan documents. You know,
4  you always have a big stack of loan documents to sign. Many
5  times the customers didn't know about this prepayment penalty.
6      If they would see the prepayment penalty and ask
7  about it, they would be told, don't worry about it; it will be
8  waived. And then, of course, as I saw in some of the
9  complaints, people would have to move for their job or
10  whatever and come into Household and they would say, sorry,
11  it's not waived.
12     So those are two examples of failure to disclose: the
13  good faith estimate being in too wide of a range and the
14  prepayment penalty not being clearly disclosed.
15  Q. The next practice is excessive fees and points.
16     Can you tell us what that is and how it existed at
17  Household?
18  A. Yes. Excessive fees and points. A point is 1 percent of
19  the loan balance. And what discount points are normally used
20  for is to buy down the rate. So if your lender has a program,
21  for example, where if you pay 1 or 2 points, you can buy down
22  the rate by, you know, like a half a percent or something,
23  that's a decision that the borrower and the lender -- that the
24  borrower makes in negotiation with the lender.
25     As an examiner, when I am looking at a lender's books

493

1  A.  I reviewed a document called First Mortgage Sales.  And it
2  had a couple different iterations over the time period that I
3  looked at it.  And in there, it trained the employees how to
4  derive that effective rate that concealed the true annual
5  percentage rate from the customer.
6      And then I also looked at a document regarding
7  insurance sales.  And in there, it taught the employees how to
8  assume that the customer wanted the insurance, called the
9  assumptive close.  And it taught them how to just
10  automatically put that insurance on the loan documents.
11  Q.  Did you review any training by a man named Lew Walter?
12  A.  Yes, I did.
13  Q.  And who is Lew Walter?
14  A.  He was a training officer in the northwestern division of
15  Household.
16  Q.  Now, let's take a look at Exhibit 379, which I placed
17  before you and defense counsel.
18      Do you recognize that document?
19  A.  I do.
20  Q.  What is it?
21  A.  This is a document -- it's a multipage document.  There's
22  a fax cover on top.  And it's from Rob O'Han to Tom Detelich.
23  It's dated May 20, 2002.  And there is an e-mail attachment to
24  it on the second page, and there's some other pages here too.
25  Q.  Why do you recognize Plaintiffs' Exhibit 379?

494

1  A.  This is one of the documents that I've looked at in
2  formulating my opinions.
3      MR. DROSMAN:  Plaintiff's offer Exhibit 379 into
4  evidence.
5      MR. KAVALER:  Your Honor, I believe this is a limited
6  purpose document.
7      THE COURT:  It will be admitted.  The jury has
8  already been instructed on the limited purpose evidence.
9      MR. DROSMAN:  Thank you, your Honor.
10  BY MR. DROSMAN:
11  Q.  Let's talk about Plaintiffs' Exhibit 379.  You mentioned
12  that this was a fax from Rob O'Han to Tom Detelich.  Who is
13  Rob O'Han?
14  A.  Rob O'Han was one of the district general managers at
15  Household, I believe was his title.
16  Q.  Was he a sales officer?
17  A.  Yes.  The sales staff reported up through him.
18  Q.  And what about Tom Detelich?
19  A.  Tom Detelich was a senior officer at Household.  I can't
20  remember his exact title.
21  Q.  And he was an officer in the consumer lending business
22  unit; is that right?
23  A.  I believe so.
24  Q.  A managing director in that unit?
25  A.  Yes.

495

1  Q.  Could you take a look at the second page of the document,
2  page ending 075.
3      Is there anything on that page that appears to be an
4  e-mail that supports your opinions in this case?
5  A.  Yes.
6  Q.  And can you tell me what that is?
7  A.  Yes.  This is an e-mail regarding a discussion about
8  how -- what they're doing in Florida.  It says Florida review
9  is the subject.  And it was written from someone in human
10  resources to Scott Schneider, and it was forwarded to Rob
11  O'Han.
12      And if you look at the -- it says, Here is the
13  summary of the timeline of the issues, July 1999.  And that's
14  hard to read, but I'll see if I can read it for you.
15      It says, Lew Walter rolled out the First Mortgage
16  Sales workshop to all HFC sales divisions, with the exception
17  of southwest, July 1999 to August 1999.  The southeast
18  division was rolled approximately July 1999.  The workshop
19  workbook or -- I think there's a word missing there.  I think
20  it should say contained -- a worksheet on the biweekly plan
21  versus the 30-year program, equivalent rate.  The equivalent
22  rate would be described as the rate that would be needed if
23  they were to pay the same amount of interest over a 30-year
24  term at a bank compared to our proposed loan.  The form was
25  designed as a tool for the AEs -- and that's account

496

1  executives -- to work up the numbers so that they could do
2  comparisons.  The worksheet was not to be distributed to the
3  customers.
4  Q.  So this shows that the equivalent rate training was rolled
5  out in July of 1999; is that right?
6  A.  Yes.  It was part of that First Mortgage Sales document
7  that I looked at.
8  Q.  And why is that significant to your opinions in this case?
9  A.  Well, because Household always said in its responses to
10  the regulators and its public discussions in the press that
11  this particular practice among others were the result of a
12  rogue employee or a rogue branch.  And that wasn't true.  This
13  was what the employees were trained to do nationwide.  And I
14  saw evidence of it all over the country in many locations.
15  And, here, they're talking about it in Florida.
16  Q.  Now, when you say rogue employee, you're talking about
17  some bad apple at Household; is that what you mean?
18  A.  Well, that's what I assume Household meant by saying rogue
19  employee or rogue branch.  It only happened over there.
20  Q.  And if you turn to page ending 077, there appears to be
21  another e-mail with a catalog of some customer complaints.
22      Can you tell me whether that's significant to your
23  opinion?
24  A.  Yes, it is.
25  Q.  And what's significant about page ending 077 to your

525

1   Q. And a "DSM" is a "Division Sales Manager"?
2   A. I think it's called "District Sales Manager."
3   Q. And Rob O'Han was a senior executive in the Sales
4   Department at Consumer Lending?
5   A. Yes.
6       I can't remember his exact title. "District General
7   Manager," or something like that.
8   Q. I'll show you what has been marked as Plaintiffs' Exhibit
9   898 for identification.
10      (Document tendered.)
11  BY MR. DROSMAN:
12  Q. Do you recognize Plaintiffs' Exhibit 898?
13  A. I do.
14  Q. What is it?
15  A. This is the Insurance Training Manual that I referred to
16  earlier, that I looked at in formulating my opinions.
17  Q. And is it a -- does it contain a cover memo?
18  A. Yes, it contains a cover memo.
19  Q. What is the date of the cover memo?
20  A. The cover memo date is May 12th, 2000.
21  Q. And to whom is the cover memo addressed?
22  A. "All HFC Branch Sales Managers."
23  Q. What's the subject?
24  A. "Insurance Service Staff Meeting."
25      MR. DROSMAN: Your Honor, Plaintiffs offer Exhibit

526

1   898 into evidence.
2       THE COURT: It will be admitted.
3       (Plaintiffs' Exhibit No. 898 received in evidence.)
4   BY MR. DROSMAN:
5   Q. Now, we spoke about the effective rate. Let's turn to
6   insurance, which we've also touched on.
7       Is this document significant to your opinions
8   regarding -- or your conclusion -- that Household engaged in
9   insurance packing?
10  A. Yes.
11  Q. Okay.
12      Let's take a look at the first page of the document.
13      Is there anything significant about that document or
14  that page that's significant to your opinion?
15  A. Yes, a couple of things.
16      In the first paragraph, the last sentence, it says,
17  "In addition, the company benefits from a profitability and
18  growth standpoint; and, of course, you benefit from an
19  incentive compensation standpoint."
20  Q. Why is that significant?
21  A. This is significant because part of the compensation
22  program at HFC -- or, I'm sorry, at Household -- rewarded
23  employees for packing on as much insurance as possible. And
24  they're articulating that in the front of this training
25  manual.

527

1   Q. What about the second to the last paragraph on this page?
2   A. Right.
3       The second to the last paragraph says, "To assist you
4   in achieving these goals -- " oh, are you talking about -- oh,
5   the second to last. Sorry.
6       Anyway, this was -- this particular document was --
7   so that they could conduct training in their individual
8   locations.
9       The second to the last paragraph that's highlighted
10  up there says, "I look forward to you achieving 100
11  percent-plus of your -- " and I don't know what that means
12  "NWP" -- "goals in both credit and non-credit products, and to
13  a 75 percent customer acceptance rate in all branches."
14  Q. And do you know what a "75 percent customer acceptance
15  rate" refers to?
16  A. Yes. That was what, in regulatory parlance, we talk about
17  as penetration ratios. And what they wanted was 75 percent of
18  any loan that was made to have this insurance product added
19  onto it. And we call that as -- in the regulatory field --
20  "penetration ratio."
21  Q. And they were seeking a 75 percent penetration --
22  A. Yes.
23  Q. -- ratio?
24  A. Yes.
25      And, from a regulatory perspective, that's very, very

528

1   high.
2       Whenever you -- and I used to go into banks and
3   examine for this very thing, to see if Regulation Z was being
4   complied with. Because if insurance is required, they have
5   to disclose it in a separate location than if it's not
6   required.
7       And, so, what we would look at is if the bank would
8   say, "Oh, no, we don't require it," we would look at
9   penetration ratios to determine if, in fact, they do require
10  it, but they're just saying that.
11      And anything above 50 percent -- that was sort of our
12  rule of thumb -- was considered very high and could be
13  indications of insurance packing, and that insurance was
14  required.
15  Q. Let me direct your attention to the page ending "493."
16      And if you could take a look at that page and let me
17  know if there's anything on this page that appears to be part
18  of a training manual for insurance that is significant to your
19  opinion?
20  A. Yes.
21      Are they pulling it up?
22  Q. Yes. Just go ahead and testify.
23  A. In the second paragraph, it says -- they're talking about
24  selling insurance: "A good way to do this is by using the
25  assumptive close," and I've talked about that a couple times

557

1  bottom of the page there?
2  A. Right, "Insurance."
3     I found this component to be particularly interesting
4  because not only did it reward the individual salesperson for
5  packing on insurance of a variety of kinds -- credit life,
6  single premium credit, accident and health; you know,
7  whatever -- but there was a portion of the incentive went into
8  a pool for all branch employees.
9     So, it helped produce peer pressure for the branch
10  for everyone to do this particular practice. So, this
11  component I found particularly interesting.
12  Q. What is this? Were they offered additional compensation
13  for the more insurance they sold?
14  A. Yes.
15     And the branch was, too, if they met certain goals.
16     Remember the penetration ratio that they wanted in
17  that other document was 75 percent. So, they wanted 75
18  percent of all the loans that they made to have some sort of
19  insurance packed on there.
20  Q. Now, did you prepare a demonstrative exhibit to assist you
21  in explaining how Household's compensation practices
22  encouraged predatory lending practices?
23  A. Yes.
24  Q. I'm showing you what has been marked as Plaintiffs'
25  Demonstrative Exhibit 32 for identification.

558

1     Can you tell us what this exhibit shows?
2  A. What this exhibit shows is the various incentives on the
3  left. We talked about "New Money Volume," "Loan Account
4  Gain" -- I should use my clicker here -- "Margin and
5  Insurance."
6     And these are the predatory lending practices that
7  they encouraged. So, let's just take them one at a time or --
8  is that okay?
9  Q. Sure. That's fine.
10     Why don't we take the first one, "New Money
11  Incentive." Tell us what practices that encouraged?
12  A. Okay. "New Money Incentive," so here we have -- remember,
13  this is an incentive based on how much new money is booked.
14     And, so, what it encouraged was loan flipping because
15  each time they did these rapid refinances or continual
16  refinances, they would add on points, they would add on
17  insurance premiums and they would add on fees.
18     So, it encouraged loan flipping; it encouraged equity
19  stripping, because every time they added on points and fees
20  and insurance premiums, of course, it stripped off the equity;
21  it encouraged insurance packing, because insurance was part of
22  the new money; and, it encouraged putting maximum points on,
23  because that was also part of the new money.
24     The second one is "Loan" -- is "Volume" -- "Loan
25  Volume Incentive." And these are the number of loans,

559

1  remember. And, so, that encouraged loan flipping and loan
2  splitting. Because for each new loan that they booked, they
3  got a certain number of points.
4     If they split it into two, they got more points. And
5  when they split it into certain kinds of loans, they got even
6  more points. And that kind of changed over the course of
7  time.
8     The third one -- "Loan Account Gain" -- that
9  encouraged -- remember, now, this is the attrition. This is
10  -- if the overall book of business goes down, you don't get
11  your incentives. So, they were trying to prevent attrition,
12  trying to prevent anybody from paying off their loan too fast.
13     And this encouraged loan flipping because every time
14  that, you know, the loan needed to be refinanced or whatever,
15  it kept the loan balances going up with the extra products and
16  points and everything being added on.
17     Of course, equity stripping, because when all that
18  was added on, it stripped away equity; and, insurance packing,
19  because that added to the loan balances.
20     So, "Loan Account Gain" encouraged those types of
21  predatory lending practices.
22     For "Margin Incentive," we talked about that.
23  Everyone -- every applicant -- that came to Household had a
24  benchmark rate that was calculated based on the
25  creditworthiness of the borrower.

560

1     And the sales executives were incentivized by
2  increasing that as much as possible. So, at the highest rate
3  possible, adding on as many points as possible.
4     And, then, the last one:  "Insurance Packing" --
5  "Insurance Incentive." Not only were the individuals
6  rewarded, but they could be rewarded based on sort of the peer
7  pressure of the branch, and that encouraged insurance packing.
8  Q. All right.
9     As a regulator now, let's talk about -- we talked a
10  little bit about the Quality Assurance and Control Department
11  at Household?
12  A. Yes.
13  Q. Often abbreviated as the "QAC" Department.
14     Are you familiar with Quality and Assurance Control
15  Departments at various lenders that you've examined over the
16  years?
17  A. Yes.
18  Q. And what are the purpose of these QAC Departments,
19  generally?
20  A. Well, generally, the purpose is to make sure that the
21  lender is complying with various laws; and, you would need
22  someone to go and look at the loan files to determine that.
23     And, then, the second thing would be to make sure
24  that they're complying with Household's policies or the
25  company's policies.

569

1  Q. Now, is there anything significant about that complaint to
2  your opinions in this case?
3  A. Well, what I found interesting about this complaint was,
4  first of all, non-English speakers, if you remember the OCCs
5  issuance, it talked about sometimes you have non-English
6  speakers, and that's a particular class that can be taken
7  advantage of.
8     And here we have the Hispanic non-English speaker,
9  the daughter serving as an interpreter.  So, that kind of
10  perks your ears up for possible predatory lending.
11    And, then, of course, again, we've got the biweekly
12  payment plan with the EZ Pay.  This is in Phoenix, Arizona.
13    You know, we've seen these in different places around
14  the country.  And, you know, the effective rate presentation,
15  again.
16  Q. Why do you think that this is the effective rate
17  presentation?
18  A. Because they're talking about, "If you pay off your loan
19  every two weeks, it will pay out like a 7.58 percent 30-year
20  loan, only you pay it off much sooner."
21    The one thing that's missing here from the
22  presentation is how many years sooner is it paid off?  18?
23  17?  Whatever.
24    And, then, they talk about single premium credit
25  insurance, which is a particularly predatory product because,

570

1  remember, it tacks on to your 30-year loan, but it goes away
2  in five years.  And, so, that's been prohibited by a lot of
3  states.
4  Q. So, they were told that they would have this 7.58 percent
5  interest rate with their loan?
6  A. Yes.
7  Q. Turn to the next page, the page ending "765."
8  A. The first sentence says, "Respondents did not tell us
9  their biweekly payment quote did not include transaction fees,
10  property taxes or homeowners insurance on their home."
11    That's something I saw in a lot of the complaints --
12  and we haven't really talked about that -- but when you're
13  making a comparison of apples to apples, you want to make sure
14  that your mortgage payment, in fact, is the same -- contains
15  the same -- things as your current mortgage payment.
16    And this was a complaint that a lot of consumers had,
17  was that Household would not include their taxes and
18  insurance, and that's what their current one included.
19    So, when they were saying, "We'll give you a smaller
20  payment," that wasn't true.
21    And, then, the second sentence says, "Respondents
22  also did not explain that our loan included substantial loan
23  origination fees, substantial upfront insurance premiums and
24  an actual interest rate of 11.79 percent, a prepayment penalty
25  if we tried to pay off our loan before five years."

571

1  Q. So, what predatory practices were employed by Household
2  with respect to this person, José Nanez?
3  A. Well, they have the effective rate presentation given to
4  them.  They had single premium insurance being required -- and
5  that's particularly predatory.  They had failure to disclose
6  the -- that the insurance and taxes were not in the new
7  payment, as were on the old, so they could compare.  And they
8  didn't -- failure to disclose the prepayment penalty.
9  Q. And what does the last sentence of this complaint say?
10  A. The last sentence says, "We believe the respondents
11  targeted us for predatory loans due to our national origin:
12  Hispanic.  As a result of their predatory lending, respondents
13  have stripped away part of our loam equity and we are in
14  danger of losing our home."
15    So, that's the equity stripping, again, that we
16  talked about.
17  Q. Why don't I show you what's been marked as Plaintiffs'
18  Exhibit 1096 for identification.
19    (Document tendered.)
20  BY MR. DROSMAN:
21  Q. Do you recognize Plaintiffs' Exhibit 1096?
22  A. I do.
23  Q. What is it?
24  A. This is a complaint from Amy Adams in New Cumberland,
25  Pennsylvania.  It's dated September 10th, 2002, and it's

572

1  addressed to Household.
2  Q. And why do you recognize 1096?
3  A. This is one of the documents that I looked at in
4  formulating my opinions.
5     MR. DROSMAN:  Plaintiffs offer Plaintiffs' Exhibit
6  1096 into evidence.
7     MR. KAVALER:  Your Honor, this is another one of
8  those limited documents.
9     THE COURT:  Okay.
10    It will be admitted.
11    MR. DROSMAN:  Thank you, your Honor.
12    THE COURT:  The jury has been instructed on the
13  documents.
14    MR. KAVALER:  Thank you, your Honor.
15    (Plaintiffs' Exhibit No. 1096 received in evidence.)
16  BY MR. DROSMAN:
17  Q. Let's take a look at the first page of the document.  You
18  said this document was sent to Household.
19    What was the date it was sent to Household?
20  A. September 10th, 2002.
21  Q. If you look at the second paragraph of the letter, what --
22  Q. Now, this is a complaint that's not on the complaint form,
23  that -- she actually wrote this letter herself.
24  Q. And if you look at the last page of the letter -- the page
25  ending "448" -- why don't we look at the page ending "448" of

613

1  Q. Did it bear on your opinion that the predatory practice
2  specifically in this case, the use of effective rate or
3  equivalent rate, was widespread?
4  A. Yes.
5  Q. And how does it support -- in what ways does it support
6  your opinion?
7  A. Well, they went -- they actually went and did tests
8  themselves to see if what the complaints that they were
9  receiving about this effective rate presentation were true.
10  And they've concluded that, in fact, that the way that
11  Household was structuring their rates were intended to
12  mislead, misdirect and confuse the borrower or deceptive sales
13  practices, which is part of the definition of predatory -- or
14  covers -- the predatory lending term covers deceptive sales
15  practices.
16  Q. If you look at the next paragraph, third sentence in, it
17  begins, A subpattern of this pattern of confusion.
18  A. Yes.
19  Q. Does that have any bearing on your conclusions in this
20  case?
21  A. It does. It says, A subpattern of this pattern of
22  confusion has been identified by the Department in HFC's
23  misuse of the good faith estimate and what appears to be
24  intentional confusion about discount points charged on certain
25  loans. This subpattern of confusion has been identified by

614

1  the Department in over half of the recent complaints and is
2  discussed in greater depth below.
3  Q. How does that bear on your opinion in this case?
4  A. Well, my opinion is that they used the good faith estimate
5  to confuse the borrower by showing a wide range of closing
6  costs when, in fact, they were going to be charged at the
7  higher rate or possibly greater than the range. And this
8  supports my opinion.
9  Q. If you could turn to page ending 670. And I guess the
10  first -- the second full paragraph on that page. It begins,
11  The Department has also identified three additional concerns.
12      Does that have any significance to your opinions in
13  this case?
14  A. Yes.
15  Q. Why?
16  A. This says that, The Department has identified three
17  additional concerns resulting from borrower confusion over the
18  biweekly and bimonthly program. One, borrowers have been told
19  that by accepting the biweekly payment program, they can
20  effectively reduce the interest rate on their loan from
21  approximately 14 percent down to 7 percent. The Department
22  has encountered reference to this 14 to 7 percent statement a
23  number of times and addressed the problem directly with HFC
24  management in mid 2001. HFC informed the Department that the
25  practice was isolated to a single branch in Washington and

615

1  that the matter was not a corporate practice. However, the
2  Department has identified the practice to other branches in
3  Washington and has received reports from other regulators in
4  other states concerning the practice. Contrary to HFC's
5  claims, the Department does not believe the practice is
6  isolated.
7  Q. How is that relevant or significant to your opinions in
8  this case?
9  A. They're concluding that this effective rate presentation
10  is cropping up in other than just the Bellingham, Washington,
11  office, which is what HF- -- Household would always say that's
12  the rogue office, Bellingham, Washington; and that they're
13  hearing from regulators around the country that this is
14  cropping up there too. And that supports my opinion that
15  Household engaged in systemic and companywide predatory
16  lending practices.
17  Q. If you turn to the page ending 671. It's a continuation
18  of identify patterns that the Department of Financial
19  Institutions in Washington has observed. If you look at
20  number five on that page. It's the second paragraph there.
21  It's entitled prepayment penalty.
22  A. Yes.
23  Q. The first sentence of that paragraph, does that support
24  your opinion in this case?
25  A. Yes. It says, Consumers complained that they were unaware

616

1  of a prepayment penalty or that they were told they did not
2  have a prepayment penalty. However, their loans did contain a
3  prepayment penalty.
4  Q. And if you take a look at the next page, page ending 672.
5  The heading number six indicates an insurance packing. Do you
6  see that?
7  A. Yes.
8  Q. Did the Washington DFI or Department of Financial
9  Institutions also find indications of insurance packing?
10  A. Yes.
11  Q. And if you take a look down at seven, upselling loans.
12  A. Yes.
13  Q. The first sentence under seven, upselling loans, does that
14  support your opinion in this case?
15  A. It does. And this is basically the loan splitting. The
16  Department found that HFC attempts to provide both a first and
17  a second mortgage to borrowers regardless of the borrower's
18  desire or need for two loans.
19      And that's the loan splitting that we talked about.
20  Q. I'll show you what has been marked as Plaintiffs' Exhibit
21  445 for identification.
22      (Tendered.)
23  BY MR. DROSMAN:
24  Q. Do you recognize Plaintiffs' Exhibit 445?
25  A. I do.

637

1 Q. So volume, you belive, refers to volume of loans?
2 A. Loan volume, yes.
3 Q. The greater the volume, the more loans you're selling?
4 A. The greater the volume, the more loans will be on your
5 books. The more loans on your books, the more money you make
6 Q. And they're looking at the impact of disclosures on how
7 many loans they can sell?
8 A. Yes.
9 Q. What do you understand disclosures to mean in that
10 context?
11 A. Disclosure of the existence of a prepayment penalty,
12 instead of being buried in really fine print somewhere;
13 disclosure of the actual closing costs, instead of the wide
14 range of the good faith estimate; disclosure of the actual
15 annual percentage rate, rather than the effective rate. Those
16 types of disclosures. And the impact that they would have on
17 loan volume, which would be negative if they were actually
18 disclosed.
19 Q. Explain that to me. What's the relationship between
20 disclosure and selling more loans or loan volume?
21 A. Well, if you -- if you're a lender that has high rates and
22 you properly disclose your high rates and borrowers can
23 otherwise find another lender that's going to give them a
24 lower rate, it has a negative effect on volume. You can't
25 book as many loans because people aren't going to agree to it.

638

1     Or if you properly disclose that you have a
2 prepayment penalty, that if you pay your loan within the first
3 five years, it's going to be six months' worth of interest as
4 a penalty and the borrower can go down the street and get
5 some -- a loan that doesn't have a prepayment penalty, where
6 are they going to go?
7     Same with the closing costs. If you disclose what
8 you actually think the closing costs are going to be, which is
9 what the regulation requires, rather than a wide range when
10 you know you're going to charge at the top or above the range,
11 people are not going to agree to take a loan out with you.
12     And so there's an inverse relationship, if you're
13 that kind of a lender, to proper disclosure and how many loans
14 you'll be able to book.
15 Q. And then if you take a look at page ending 391, in the
16 same document. This is, again, from Mr. Schoenholz to
17 Mr. Aldinger.
18     Does this information have any significance to you?
19 A. Well, it just tells me that they were talking at the board
20 level, at the very highest level of Household, about predatory
21 lending in 2001.
22 Q. And what did they view -- the heading up there says major
23 issues and obstacles. What did they view predatory lending
24 as?
25 A. I'm assuming they viewed it as --

639

1     MR. KAVALER: Objection, your Honor.
2     THE COURT: Sustained.
3 BY MR. DROSMAN:
4 Q. What's your understanding as to how major issues and
5 obstacles relates to predatory lending on that page?
6 A. They were listing the major issues and obstacles to their
7 loan growth and their profitability. And so they have several
8 listed here, and one of them is predatory lending.
9 Q. So they highlighted that as a major issue and obstacle to
10 loan growth?
11 A. Or to their operating plan, what their goals were for
12 2001.
13 Q. Let's talk a little bit about ways in which you went about
14 reaching your conclusions in this case.
15     Did you ever look at, for example, the total number
16 of Household's loans, on the one hand, and then the number of
17 complaints on the other and try to calculate some sort of
18 complaint-to-open-loan ratio or percentage?
19 A. No.
20 Q. Why not?
21 A. Because that ratio is meaningless. Regulators look at
22 complaints on a complaint-by-complaint basis because it's very
23 difficult for people to file a complaint. It takes a lot of
24 energy. They have to put something in writing. They have to
25 get all their documentation together. And so when someone

640

1 complains, the regulators take it seriously. Even if there's
2 a handful of complaints, the regulators take them seriously.
3     They look at each complaint. They get the response
4 from the lender, in this case Household. And they come to
5 some conclusion whether laws had been violated or deceptive
6 practices have been foisted on the borrower, whatever the
7 issue might be. And so the -- the complaint framework and the
8 complaint-based review of a lender does not lend itself to a
9 ratio analysis of complaints to open loans. It's -- that's
10 not meaningful.
11 Q. Now, when you were -- you were a lender for 25 -- I mean
12 you were a regulator for 25 years; is that right?
13 A. Yes.
14 Q. And first you were a regulator with the OCC, the federal
15 government; is that right?
16 A. That's right, the regulator of national banks.
17 Q. And then a regulator for the Texas State Banking
18 Commission; is that right?
19 A. Right. I was the Texas banking commissioner.
20 Q. You headed that department?
21 A. Yes.
22 Q. Did you ever calculate this ratio of complaints to open
23 loans during your 25 years of regulatory experience?
24 A. No.
25 Q. Did you ever have anybody underneath you say calculate

641

1  this ratio?
2  A.  No.
3  Q.  When you were a regulator for 25 years, did you ever see
4  this ratio being calculated?
5  A.  No, because it's not meaningful.  It's not a meaningful
6  ratio to calculate.
7  Q.  What did you look at as a regulator?
8  A.  Well, what you would do -- and we had some very large
9  banks that we regulated, you know, like Sun Trust.  When I was
10  a field examiner, we regulated Continental, Illinois National
11  Bank, First National Bank of Chicago.  We regulated Exchange
12  National Bank.  And, of course, they would have more
13  complaints than the smaller banks just in terms of number.
14  But it doesn't mean that we would look at the smaller banks or
15  the larger banks any differently.
16      We would look at the nature of the complaints.  We
17  would look at geographic dispersion, especially for a bank --
18  when I was in Atlanta, for example -- that operated in
19  multiple states to see how widespread the practice was.  We
20  would look at the -- not only the nature and the geographic
21  dispersion, but just how common it was, how many complaints we
22  were getting in a particular area.  And then we would give the
23  information to the examiners so that they could widen their
24  scope in that particular area.
25      So it's something that's taken very seriously and is

642

1  looked on a complaint-by-complaint basis.
2  Q.  And when you said you would look at the nature of the
3  complaints, you would look at whether they were very serious
4  complaints or not so serious complaints?
5  A.  Yes.  You would look at -- I mean, just using Household as
6  a example, you know, I thought I was going to get a low
7  interest rate loan, but really I have a high interest loan.
8  And so you would look at how many of those complaints are you
9  getting, where are they coming from, what law does that
10  violate, you know, and how serious do you view that.  People
11  being deceived is viewed more seriously than a typo in a loan
12  document, for example.  So, you know, we would weigh how
13  serious it was, of course, taking into consideration the
14  response from the lender.
15  Q.  So not all complaints are viewed equally, correct?
16  A.  That's right.
17  Q.  And when you say geographic dispersion, you look at --
18  what do you mean by that, geographic dispersion?
19  A.  Like, for example, we didn't have branch banking in
20  Illinois when I was a field examiner.  But when I was in
21  Atlanta at the OCC, we had banks operating in five states.  So
22  we would look to see if it was isolated to a particular state
23  because state laws vary, you know, depending on what the issue
24  was; or was it a companywide issue that we had to deal with at
25  the headquarters office.  So just how widely dispersed are the

643

1  complaints and are the issues.
2      THE COURT:  Let me interrupt you here.  We're five
3  minutes from 4:30, and I want to have just a minute or two to
4  talk to the jury.  So you may step down at this point, ma'am.
5      Folks, I've talked this over with the attorneys and I
6  have calculated and recalculated the number of hours in a day
7  and the amount of work we have to get done.  And it does not
8  appear to me that we can quit before 4:30 on a regular basis
9  unless we can start before 10:00 o'clock.  If all of you are
10  in agreement that we can start before 10:00 o'clock, we can
11  quit a little bit earlier; otherwise in order to get this case
12  finished within the time period that we quoted to you in the
13  notice we sent out, we have to go to at least 4:30 every day;
14  and that's pushing the limit.
15      So let me put the question to you:  Is there anyone
16  who would be adverse to coming in and starting at, say, 9:45
17  instead of 10:00 o'clock?
18      Are you all in agreement with that?  Give me a show
19  of hands if you cannot do that.
20      So we'll try it one more time just to make sure.
21      Anybody that cannot do that?
22      All right.  Then let's start tomorrow at -- we'll try
23  it tomorrow and see if everyone can get here on time and we
24  can actually get started.  At 9:45, we will commence with the
25  evidence and we will quit at -- I think you folks wanted to

-

644

1  quit at 4:20 rather than 4:30.  That will give you time to
2  catch that earlier train and get home before the sun goes
3  down.  We will do it that way.
4      I remind you again, do not discuss the case with
5  anyone.  I do not allow anyone to discuss it with you.  Do not
6  read, listen to or view any news stories about this case.
7      Have a good evening and we'll see you tomorrow.
8      (Jury out.)
9      THE COURT:  Okay.  First, do the attorneys have any
10  issues?
11      MR. DOWD:  No, your Honor.
12      MR. KAVALER:  Your Honor, as far as the first
13  Thursday of the last day of the first week, I assume we're
14  going to have our six minutes apiece for interim summations
15  and I assume they'll be at the end of the day.
16      THE COURT:  To be honest with you, it occurred to me
17  that we've had so little testimony, we're not even through
18  with one witness, that it would be best to forgo that this
19  week, use the time to get the testimony in and begin next week
20  with that practice where you actually have some substance to
21  talk about.  Right now you would be, I guess, both trying to
22  summarize the as yet unfinished testimony of one witness.  It
23  doesn't appear to me to be a valuable use of time.
24      So the answer is no, we're not going to do it this
25  week.  We haven't gotten enough evidence in, I think, to make

EXHIBIT 3

651

1    agree to them or you file with me separate motions indicating
2    that you want me to change the instructions I've already
3    given.  The idea is not to confuse the jury.  It's to try to
4    help them and clarify the tasks for them.  And what we're
5    doing here is confusing me, and I know it's going to confuse
6    them.
7        MR. KAVALER:  Your Honor, this is the instruction
8    that we agreed upon.  You asked me yesterday --
9        THE COURT:  Get all of the instructions together, all
10   of the instructions on all of the issues regarding all of the
11   documents that you agreed to; and I will once more charge the
12   jury.  But I will do it all at one time and all with agreed
13   language that's going to be in writing.  If you can't agree,
14   just file separate motions before me, and I will determine
15   whether there needs to be a different charge than was already
16   given.
17       MR. KAVALER:  Very good, your Honor.
18       THE COURT:  Okay.  I have an issue for you.  I
19   received a note from a juror:  Dear Judge Guzman.  After much
20   thought and numbers crunching, it appears that if I continue
21   to serve, I will not be able to make my mortgage.  My wife and
22   I have been trying to figure where we could cut back to make
23   up the shortfall.  I knew that it was going to be tough.
24   Because I work a rotating shift, I would lose the income I
25   normally make on Saturday and Sunday as my job would want to

Ghiglieri - direct
652

1    put me on a straight shift, left paren, no Saturday, Sunday,
2    right paren.  I regret that I'm making this request of you,
3    but I must.
4        Your thoughts.
5        MR. DOWD:  It's a tough one, your Honor.  Maybe I
6    could talk to Mr. Kavaler over the break and see if there's
7    something that we could agree on.
8        MR. KAVALER:  I'm certainly happy to talk to
9    Mr. Dowd.
10       THE COURT:  All right.  We'll postpone the issue
11   until the break.
12       Carole, let's bring the jury out, please.
13   (Jury in.)
14       THE COURT:  Good morning, ladies and gentlemen.
15   Welcome back.  We're ready to proceed.
16       Counsel.
17       MR. DROSMAN:  Thank you, your Honor.
18   CATHERINE GHIGLIERI, PLAINTIFFS' WITNESS, PREVIOUSL
19          DIRECT EXAMINATION (Resumed)
20   BY MR. DROSMAN:
21   Q.  Good morning, Ms. Ghiglieri.
22   A.  Good morning.
23   Q.  When we broke for the day yesterday, we were talking about
24   why you didn't think it made sense -- you had never seen
25   anybody calculate a ratio or a percentage of complaints to

Ghiglieri - direct
653

1    open loans.
2        Do you recall that?
3    A.  I do.
4    Q.  And you talked about the fact that you looked at the
5    seriousness of the allegations, the geographic dispersion or
6    spread of those allegations.
7        Did you look at anything else when assessing
8    complaints, customer complaints?
9    A.  Well, in the Household case or just as a regulator?
10   Q.  As a regulator.
11   A.  As a regulator, I would look at the nature of the
12   complaint, what type of a complaint was it, what were the
13   allegations in terms of violations of law; and, of course,
14   then how widespread was it in the particular lender, how
15   serious was it, what was the response of the company.  So you
16   try and take everything into consideration.
17   Q.  Did you also look at the trend of complaints, whether they
18   were increasing or decreasing over time?
19   A.  Yes.
20   Q.  And why did you do that?
21   A.  Well, because if -- whenever a complaint would come in, we
22   would always send it to the regulated entity.  In the case --
23   in my case, that would be national banks or state banks.  And
24   we would ask, you know, how -- what do you think about this
25   complaint; and if it's valid, how are you going to resolve it.

Ghiglieri - direct
654

1    And so you would expect if it was a legitimate issue, for it
2    to be corrected.  So if we continued to see complaints of the
3    same nature, you know, then we might send an examiner out to
4    do a special investigation, for example.  Or we would
5    definitely send the complaints to the examiners in case they
6    wanted to expand the scope of their examination.
7    Q.  And in this particular case, when you were examining the
8    documents to arrive at your conclusions, did you look at all
9    three of these issues with respect to the complaints that
10   customers made about Household?
11   A.  Yes.
12   Q.  Are there other reasons that a ratio of complaints to open
13   loans wouldn't provide you with useful information?
14   A.  Well, it doesn't lend itself to a ratio analysis, such as
15   looking at how many loans in a loan portfolio are past due,
16   because people who have been taken advantage of often don't
17   know they've been taken advantage of so they don't know to
18   complain.  And a lot of people that are mad about something,
19   for example, I've been taken advantage of, won't go to the
20   effort to write it down and send it in.  And that's what we've
21   known over the course of time.  So it's just not something
22   that lends itself to a ratio analysis.
23       You have to take every complaint seriously.  You have
24   to analyze every complaint.  And you have to get the
25   explanation from the lender to find out why are we getting

Ghiglieri - direct

655

1  these complaints as a regulator, why -- do they continue to
2  come, why are they escalating or whatever.
3  Q.  So if a person were deceived by Household, say, by the
4  effective rate scheme or insurance was packed on, and they
5  never realized they were deceived, would you expect that
6  person to complain?
7  A.  No, because --
8        MR. KAVALER:  Objection, your Honor.
9        THE COURT:  Basis of the objection?
10       MR. KAVALER:  Requires a state of mind of customers,
11 other people who might or might not -- do or do not -- it's
12 hard to understand what expertise she has that enables her to
13 do this.
14       THE COURT:  Sustained.
15 BY MR. DROSMAN:
16 Q.  Why is it that -- based on your expert experience, would
17 you expect or -- a person who had been deceived, did you see
18 those people and they never recognized that they had been
19 deceived when you were an expert, did you see those people
20 file complaints?
21       MR. KAVALER:  Objection, your Honor.
22       THE COURT:  Sustained.
23 BY MR. DROSMAN:
24 Q.  Let's talk about Household in particular.  Were all the
25 complaints that customers filed at Household, were those all

Ghiglieri - direct

656

1  logged?
2  A.  No.  The complaints that were filed with the field, the
3  branch sales staff, were not logged into the system for a long
4  time, I should say.  I think they tried to log some of those
5  in later on at the end of 2002.  But in the beginning of the
6  time period that I was looking at, 1999 to mid 2002, anything
7  that was filed -- any complaint that was filed with the
8  branches was not logged.  It was only the ones that weren't
9  resolved at the branches that made it into the general log
10 system.
11       And I might add, there were some issues about people
12 not logging even those in.  There were a lot of e-mails back
13 and forth with some senior management officials saying, you
14 know, we've noticed that in this particular area, the
15 complaints aren't being logged.  And that went on throughout
16 almost the whole time period I was looking at.
17 Q.  I'll show you what we'll mark as Plaintiffs' Exhibit 1148
18 for identification.
19       (Tendered.)
20 BY MR. DROSMAN:
21 Q.  Do you recognize Plaintiffs' Exhibit 1148?
22 A.  I do.
23 Q.  And what is this document?
24 A.  This is a document that discusses the logging of
25 complaints.  And it's an e-mail string.  The last e-mail is

Ghiglieri - direct

657

1  dated August 28, 2002.
2  Q.  And who sent this e-mail string, the bottom one?
3  A.  The bottom one is sent from Stephen Hicks of Household to
4  Tom Detelich, Robin Allcock, James Kauffman and others.
5  Q.  Why do you recognize Plaintiffs' Exhibit 1148?
6  A.  This is one of the e-mails that I saw that talked about
7  their inability to be able to get all of the complaints
8  logged.
9        MR. DROSMAN:  Plaintiffs offer Exhibit 1148 into
10 evidence.
11       THE COURT:  It will be admitted.
12 BY MR. DROSMAN:
13 Q.  Let's go ahead and take a look at Plaintiffs' Exhibit
14 1148.
15       And you spoke about the e-mail from Mr. Hicks.  Who
16 is Mr. Hicks?
17 A.  He's an official at Household.
18 Q.  The director of policy and compliance there?
19 A.  Yes.
20 Q.  And it was his job to interface with the regulators?
21 A.  Yes.
22 Q.  And then is -- the first paragraph there in the e-mail
23 that Mr. Hicks sent, it's entitled complaints.  Do you see
24 that?
25 A.  I do.

Ghiglieri - direct

658

1  Q.  Is there any significance to that paragraph to your
2  opinion?
3  A.  Yes.  This is what I was talking about.  It says, I spoke
4  at length with the clerk and the manager of the rapid response
5  team regarding unlogged complaints.  The clerk admitted that
6  she might not have communicated the complete context of her
7  conversation with Mike Pinto.  She indicates that on several
8  occasions, Mike has forwarded complaints to her which he has
9  worked but not resolved.  In those instances, she has asked
10 him if he had logged them into the database and he has
11 indicated no.  She and others in the department speculated on
12 the number of unlogged complaints he might be holding and
13 whether the ones he resolved were ever logged in.  It was also
14 speculation as to the reasons why he might not log them in.  I
15 apologize for this confusion.
16 Q.  What's the date of this e-mail?
17 A.  August 28, 2002.
18 Q.  Why is this significant to your opinion?
19 A.  Because this is at about the end of the time frame that I
20 looked at.  And this is one of the criticisms in my report,
21 was that Household didn't know the sum total of the complaints
22 that they had on any given topic because they weren't being
23 logged.  The ones that were in the branches were not being
24 logged if they were resolved at the branches.  And so there
25 was no way for Household really to understand what the

Ghiglieri - direct

659

1  magnitude of the complaints were.
2  Q. And if you take a look at the next page, page ending 201.
3  And the first paragraph, fourth sentence begins Jada Howard,
4  manager of the RRT.
5      Do you see that?
6  A. Yes, I do.
7  Q. Can you tell me whether that's significant to your opinion
8  in this case?
9  A. It is because it says Ms. Howard, manager of the RRT --
10  which is rapid response team -- indicates that Mike is not the
11  only DMG -- which is the district general manager -- who does
12  not log in complaints when they are received.  She indicates
13  that on many occasions, she receives complaints from other
14  district general managers that have been worked but not
15  resolved which have not been logged into the complaint
16  tracking database.
17  Q. Is there significance to that?
18  A. Yes.  Household continued to tell the regulators in the
19  documents that I looked at that this was an isolated instance,
20  whatever the complaint was.  It was a rogue employee.  It was
21  a rogue branch.  And this demonstrates that they did not have
22  an idea of the magnitude of the complaints on any given issue.
23  Q. Now, yesterday we spoke about compensation, various
24  components of the compensation plan that you said encouraged
25  certain predatory lending practices.  Do you recall that

Ghiglieri - direct

660

1  discussion?
2  A. Yes.
3  Q. And did you prepare a demonstrative that showed the
4  percentage of compensation in which an employee could expect
5  to receive through incentive compensation?
6  A. I did.
7  Q. I'll show you what has been marked as Plaintiffs'
8  Demonstrative Exhibit 33 for identification.
9      What does this exhibit show?
10  A. What this is, it shows that the sales staff received 60
11  percent base salary and then 40 percent incentive.  And so the
12  base salary, they would get regardless.  The incentive portion
13  of this, they would receive based on the insurance incentive,
14  the margin incentive, the loan account incentive, the loan
15  volume incentive and the loan dollar -- I can't remember what
16  the first one was -- incentive.  And so during the 1992 -- I'm
17  going to try this to see if I can get it to work.  During the
18  1992 --
19  Q. Do you mean 1999?
20  A. I'm sorry.  1999 to 2002 time frame, the average incentive
21  award was between $1,000 and $2,500 per month.  And that's
22  significant because on the left-hand side, you'll see the base
23  salary for account executives, and this was the frontline
24  sales staff, was only $2,000 a month.  So they could either
25  increase their salary or compensation by between 50 percent

Ghiglieri - direct

661

1  and 150 percent depending on if they met these targets.  So
2  they could receive a significant amount of compensation for
3  engaging in those predatory lending practices that we talked
4  about.
5  Q. And was one of the ways that they could more than double
6  their base monthly salary by packing insurance on?
7  A. Right, and meeting the insurance incentive.
8  Q. Now, we also spoke about the difference between an
9  examination and an investigation.  And we looked at some
10  reports of examinations yesterday.
11      Did you also see instances in which states instituted
12  investigations of Household?
13  A. Yes.
14  Q. Did you prepare a demonstrative to show a timeline of the
15  investigations that states engaged in?
16  A. I did.
17  Q. I'll show you what has been marked as Plaintiffs'
18  Demonstrative Exhibit 30 for identification.
19      And these are fairly small bubbles.  Can you tell us
20  what this demonstrative shows?
21  A. Yes.  Let me just read -- I'll read from the -- let's see
22  if I can get this to work.
23      I'll read from the top left-hand box because they're
24  very difficult to read.  That one says May -- oh, good.  May
25  21, 2001, Washington State provides Household with a summary

Ghiglieri - direct

662

1  of complaint investigation.
2      So this -- they did a special investigation because
3  of the number of complaints that they received regarding these
4  predatory lending practices.  And this is where they provided
5  Household with the summary information.
6      The next one is September 25, 2001.  And that is
7  coming from Minnesota where they issued a subpoena for records
8  regarding these practices.
9  Q. Can you tell me what that means, issues a subpoena for
10  records?
11  A. It's not often done by a regulator because normally they
12  can get information from the regulated entity.  But in this
13  case, Minnesota felt like they weren't getting what they
14  needed, and so they issued a subpoena requiring Household to
15  give them certain information.
16  Q. And a subpoena commands or compels Household to turn over
17  documents?
18  A. Yes.
19      The next one is November 14, 2001.  And the State of
20  California sues Household for various practices that they
21  deemed were predatory and in violation of their laws.
22      The next one, December 4, 2001.  Minnesota is now
23  providing Household with a summary of its investigation, and
24  that would include the documents that they looked at under the
25  subpoena.

Ghiglieri - direct

667

1  out of whole cloth because they wouldn't know to say these
2  words.  And the similarity of complaints in various parts of
3  the country told me that this was a widespread issue.
4        And as I looked at the training and as I looked at
5  the compensation, how they were being compensated and how m
6  money they could make, it offset any of Household's policy
7  that says we're ethical, we believe in ethical lending.  It
8  offset any of the e-mails that I saw that said we don't engage
9  in predatory lending or this is a rogue officer.
10 Q.  Did you consider Household's response that it did not
11 engage in insurance packing, for example, because the
12 insurance penetration rates were incorrectly calculated?
13 A.  Well, they would say that they don't require insurance.
14 And they would say we don't require insurance, see, look at
15 our policies that say we don't require insurance or look at
16 this document that we're having the consumer sign that says we
17 don't require insurance.
18       But what regulators do when they go in to look at a
19 lender is they look at the penetration ratios.  There was one
20 piece of correspondence that I saw where Household was trying
21 to persuade the regulator to use ineligible borrowers as part
22 of the calculation.  And what that is, is a person who doesn't
23 qualify for insurance.  And so if you're calculating a
24 penetration ratio, you can't use ineligible borrowers because
25 that gives you an unrealistic penetration ratio.

Ghiglieri - direct

668

1        So there were a lot of things.  And I just kind of
2  attribute that to maybe a little spin.  But there were a lot
3  of things that regulators do to make sure that what the
4  lenders are telling them is valid.  And in the case of
5  insurance packing, the regulators will look at the penetration
6  ratios.
7  Q.  Did you consider Household's response that the range of
8  fees and points in a good faith estimate were actually
9  reasonable?
10 A.  Did I -- say --
11 Q.  Consider Household's explanation that the range of fees
12 and points that they provided in the good faith estimate were
13 actually reasonable?
14 A.  No.  I mean, it's unreasonable because, as the Housing and
15 Urban Development agency opined, when you see borrowers bein
16 charged at the high end of the range or even in excess of the
17 range, which is a violation of RESPA, it gives you the
18 impression that there's not good faith there with how they're
19 disclosing to the borrower what their closing costs are going
20 to be.  So that explanation, that closing costs in that wide
21 of a range from zero to, you know, $8,500 was reasonable, was
22 not persuasive.
23 Q.  Did you consider Household's response that it launched a
24 full investigation of complaints regarding effective rate?
25 A.  I did consider that.

Ghiglieri - direct

669

1  Q.  And did that explanation change your view that Household
2  engaged in widespread, systemic predatory lending practices?
3  A.  No, for several reasons.  If you recall, complaints are
4  not logged at the branches.  That's one problem.  So all the
5  effective rate complaints, they would have no way of knowing
6  what the magnitude of that is.
7        Also, in May of 2001, they went on a document
8  destruction binge where they said, if there's anything in the
9  file regarding effective rate, we want it to be destroyed.  So
10 there was no way for them to know how many borrowers' files
11 had had that effective rate presentation taken out.
12       And I had one other point, but I lost it.
13 Q.  Did you see instances, for example, where Household went
14 out and tried to reach out to all of the people who had been
15 scammed by the effective rate?
16 A.  Well, there was no way for them to know that because they
17 didn't do a full investigation of looking at the compensation,
18 looking at the training.  The documents in this particular
19 area were purged.  And there was just no way for them to know
20 who had been affected.
21       From the documents that I saw, the branches in
22 handling the complaints -- there was no central office
23 compliance review person that would actually reach out to the
24 customers.  So there was never a confirmation that these folks
25 were being taken advantage of on the effective rate.  They

Ghiglieri - direct

670

1  were relying on the branch folks for that.  And --
2  Q.  You said that the documents were purged.  What do you mear
3  by that?
4  A.  There were some documents that I looked at, some e-mails
5  that went out and said if we have anything regarding effective
6  rates, we want to get that out of the files.  And there were
7  some documents to indicate that it wasn't just the blank forms
8  that were destroyed, but actual information in the loan files
9  if there was an effective rate presentation.  That's why if
10 they went back and looked at who was taken advantage of
11 regarding the effective rate, there was -- would be no way for
12 them to know the universe of those people.
13       The other thing is they did look at -- in mid 2002
14 when they were dealing with the states attorneys general, they
15 did look at the effective rate.  And they came up with I
16 believe it was 46 complaints out of -- you know, I don't know
17 how many they were looking at.  But this was late in the game,
18 and all these other things had taken place; so there was no
19 way that that study was effective in my opinion.
20 Q.  The study you're talking about, these are people who had
21 complained about the effective rate?
22 A.  Yes.
23 Q.  Were people who had been scammed by the effective rate bu
24 didn't realize they had been scammed, were they included in
25 that study?

Ghiglieri - direct

675

1  then we would also look at charged-off loans.  And those would
2  be loans that would have not paid for so long that the lender
3  just doesn't think they're ever going to get paid, and so
4  they're actually taken off the books; so those would be called
5  charged-off loans.
6  Q.  What is a delinquent loan?
7  A.  A delinquent loan is a loan that has not paid in
8  accordance with its terms.  And Household used a term that
9  other lenders use and it's called a two-plus delinquencies,
10  and that's a loan that hasn't been paid for two months or 60
11  days.
12  Q.  And that's the two-plus delinquency number that you're
13  referring to --
14  A.  Yes.
15  Q.  -- at Household?
16      Did Household report the amount or the number of
17  two-plus delinquent loans or the percentage of two-plus
18  delinquent loans?
19  A.  Yes.
20  Q.  What does it mean for a loan to be two-plus delinquent?
21  A.  It means that the borrower hasn't paid for two months or
22  60 days.
23  Q.  What if the borrower hasn't paid for three months or 90
24  days, would the loan be two-plus delinquent then?
25  A.  Right.  It means two months delinquent or more basically.

Ghiglieri - direct

676

1  Q.  So did Household report this as a percentage, this
2  two-plus delinquency number?
3  A.  Yes.
4  Q.  And if Household reported that its two-plus delinquency
5  percentage was, for example, 4.5 percent, what did that mean?
6  A.  That meant that 4 percent of the loans in the portfolio
7  were greater than 60 days past due or two months past due.
8  Q.  What is the significance of a lender reporting its
9  two-plus delinquency number statistic?
10  A.  This is -- this is a vital statistic that lenders report
11  because it's a predictor of future financial health and also
12  gives you an indication of the current condition of the
13  lender.
14  Q.  And you mentioned the charge-off as another indicator of
15  loan quality?
16  A.  Yes.
17  Q.  What is that?
18  A.  That's where the loan becomes so far past due that the
19  lender says we're just not going to get paid on this loan, so
20  they'll actually take it off the books.  They'll charge it off
21  the books.
22  Q.  Did you prepare a demonstrative exhibit to assist you in
23  explaining how loans go from being current to being two-plus
24  delinquent to being charged off?
25  A.  I did.

Ghiglieri - direct

677

1  Q.  I'll show you what's been marked as Plaintiffs'
2  Demonstrative Exhibit 36 for identification.
3      Can you tell us what this exhibit shows?
4  A.  Right.  So if you look at the current bucket here -- we'll
5  just call these buckets.  That's what Household called them.
6  And you have all the current loans here.  As a regulator, this
7  is where you hope all their loans are, but realistically you
8  know they're going to have some that aren't going to pay.
9      So when a person doesn't pay two months' worth of
10  payments, it goes into the second bucket, which is the
11  two-plus bucket.  And that's missing payments for 60 days or
12  two months.
13      And then as time goes on and they keep missing more
14  and more payments, at some point, it will fall into the
15  charge-off bucket when the lender has no expectation of
16  further collection.
17  Q.  Is there a relationship between two-plus delinquency
18  numbers and loan quality?
19  A.  Yes.  There's a direct correlation between the two-plus
20  numbers and loan quality.  The higher the two-plus number, the
21  worse the loan quality.  So the more delinquencies that a
22  lender has, the worse their loan quality.
23  Q.  Now, did Household report these two-plus delinquency
24  numbers in its form 10-K annual report?
25  A.  Yes.

Ghiglieri - direct

678

1  Q.  Can you explain for the jury what it means to re-age a
2  loan?
3  A.  Re-aging a loan means you do something to the loan to take
4  it from being delinquent to putting it back on a current
5  basis.  It could be a variety of things.  If a person has
6  gotten sick and now they're back to work, you have a
7  discussion with them as a lender and you say, okay, well, why
8  don't we sort of start fresh.  And there's a variety of ways
9  to do it.  But you can start fresh, and they can start paying
10  again after not paying for a certain time; and that would be
11  re-age.  There would be a memo in the file discussing why the
12  loan was re-aged, and it would be something done on a
13  case-by-case basis.
14  Q.  Was there -- did Household re-age loans?
15  A.  Yes.  Household re-aged loans in a variety of ways and
16  didn't have individual discussions.  Some of them were -- they
17  would re-age whole portfolios automatically.  They engaged in
18  a variety of things.
19  Q.  When you said they would re-age whole portfolios
20  automatically, did they engage in this sort of call to the
21  borrower and ask them whether they're back on their feet and
22  maybe we can give you a break; was that how Household did it?
23  A.  No.  They would engage in a variety of practices where
24  they would automatically re-age.  They would send the
25  borrowers an offer that said we'll let you skip the next

Ghiglieri - direct

679

1  payment.  If we don't hear from you, we'll take that as a yes.
2  And then, you know, it allowed them to re-age whole
3  portfolios.
4  Q.  Did Household engage in automatic re-aging?
5  A.  Yes.
6  Q.  What is automatic re-aging?
7  A.  Automatic re-aging is -- what Household did is if a loan
8  met a certain criteria, they would re-age the whole entire
9  portfolio; and the borrowers wouldn't even know they had been
10  re-aged.
11  Q.  So the borrower might be 60, 90 days delinquent; and all
12  of a sudden, they were current?
13  A.  Yes.
14  Q.  And Household just did that automatically?
15  A.  Yes.
16  Q.  Now, is there a relationship between re-aging loans and
17  two-plus delinquencies?
18  A.  Yes.  There's a direct correlation between the two.
19  Q.  Did you prepare a demonstrative to show you the
20  relationship between two-plus delinquency and re-aging loans?
21  A.  I did.
22  Q.  I'll show you what's been marked as Plaintiffs'
23  Demonstrative Exhibits 26 and 27 for identification.
24       26 and 27.
25       Can you tell us what this demonstrative shows?

Ghiglieri - direct

680

1  A.  So as re-agings go up, as loans are re-aged, which is
2  taken out of the two-plus bucket and put back in current, the
3  number of two-plus delinquencies goes down.  So this is taking
4  loans from the two-plus bucket and putting them over into the
5  current bucket.  So there's an inverse relationship between
6  re-aging and delinquent -- two-plus delinquencies.
7  Q.  What if two-plus delinquencies go up instead of down, what
8  is the effect on re-aging?
9  A.  Well, if they -- if Household stopped re-aging, for
10  example, or diminished the amount of their re-aging, the
11  re-aging would go down and the delinquencies would go up
12  because then the -- there was no way to make those loans
13  current.  So here re-aging is going down and the two-plus
14  numbers are going up, so it's a direct inverse relationship.
15  Q.  And is re-aging of loans significant to a regulator?
16  A.  Yes.  When I was a field examiner, this is one of the
17  things that we looked at in particular to determine if a
18  lender was masking their delinquencies.  We would look at a
19  variety of tactics that they could use, for example, rewriting
20  the loan, forbearance, a variety of things.  And we would look
21  to see how prevalent that was in the loan portfolio because
22  the more they were doing that, the more it would lead us to
23  conclude that they were masking delinquencies.
24  Q.  Now, during your reviews as an expert in this case, did
25  you determine whether Household used re-aging to manipulate

Ghiglieri - direct

681

1  its two-plus delinquency number?
2  A.  Yes, that was one of my conclusions, was that Household
3  used various re-aging tactics and practices to mask their
4  delinquencies.
5  Q.  I'll show you what has been marked as Plaintiffs' Exhibit
6  1387 for identification.
7      (Tendered.)
8  BY MR. DROSMAN:
9  Q.  Do you recognize Plaintiffs' Exhibit 1387?
10  A.  I do.
11  Q.  What is it?
12  A.  This is an e-mail from Elaine Markell to Rich Peters and
13  others at Household -- she was at Household -- regarding the
14  Re-aging Fitch Servicer Presentation Slides, dated November
15  12, 2002.
16  Q.  Why do you recognize this document?
17  A.  This was one of the documents that I looked at in
18  formulating my opinions on the re-aging issues.
19      MR. DROSMAN:  Plaintiffs move Exhibit 1387 into
20  evidence.
21      THE COURT:  It will be admitted.
22  BY MR. DROSMAN:
23  Q.  Why don't we start at the bottom e-mail, I guess, the
24  first in the string.  And can you tell us, first, who Elaine
25  Markell is in this e-mail?

Ghiglieri - direct

682

1  A.  Elaine Markell is a woman who worked in the mortgage
2  services division, which was kind of the sister division of
3  consumer lending.
4  Q.  And was she the vice president of default services in that
5  mortgage services business unit?
6  A.  Yes.
7  Q.  And it looks like she's sending an e-mail to Rich Peters.
8  Was he the vice president of credit risk for Household
9  mortgage services?
10  A.  Yes.
11  Q.  What's significant to you about this e-mail that
12  Ms. Markell is sending?
13  A.  Well, if the -- if you could highlight this -- the
14  paragraph here.  It says, Rich, you need to change the slides
15  for the presentation.
16      And this is for the presentation to Fitch.
17      First of all, what you have on the slides does not
18  represent the policies in place since September 27 when I was
19  directed to add back EZ pay restructures and restructures on
20  bankruptcies 13.
21      That means Chapter 13 bankruptcies.
22      The bankruptcy 13 restructures were done upon receipt
23  of the plan without the payment of funds.  In addition to
24  that, restructures were done on any Chapter 13 where one
25  payment was made in the past 60 days.  Since there was no

Ghiglieri - direct
687

1    Q. -- just to take it out of the delinquent bucket repeatedly
2    and put it back in the current?
3    A. Right. And the time frame is, it's in the two-plus bucket
4    and you re-age so it goes back to current. So it takes a
5    number of months. It takes two months to get it back in the
6    two-plus bucket. Then you re-age it and it goes into the
7    current. Then it takes a couple of months to get back there.
8    So once they re-age, they have a little bit of time before
9    they have to deal with it again.
10   Q. And who is asking for this information, this ratio of how
11   many loans had been re-aged multiple times?
12   A. It says Mr. Schoenholz is asking for it.
13   Q. And that's David Schoenholz, the CFO of the company?
14   A. Yes.
15   Q. I'll show you what has been marked as Plaintiffs' Exhibit
16   654 for identification.
17      (Tendered.)
18   BY MR. DROSMAN:
19   Q. Do you recognize Plaintiffs' Exhibit 654?
20   A. I do.
21   Q. And what is this?
22   A. This is an e-mail from Dave Stockdale to various managers
23   or senior -- senior managers at Household. And the subject is
24   retail services re-age policy. And the date is September 4,
25   2001.

Ghiglieri - direct
688

1    Q. And why do you recognize this document?
2    A. This is one of the documents I looked at in formulating my
3    opinions.
4       MR. DROSMAN: Plaintiffs offer Exhibit 654 into
5    evidence.
6       THE COURT: It's admitted.
7    BY MR. DROSMAN:
8    Q. Why don't we take a look at this. The bottom e-mail
9    appears to be from Dave Stockdale; is that right?
10   A. It looks like it's from Dave Stockdale to Paul
11   "Markawitz."
12   Q. Paul Makowski?
13   A. I'm sorry. I'm mispronouncing his name. Makowski, yes.
14   Q. Mr. Makowski was the chief credit officer; is that
15   correct?
16   A. Yes.
17   Q. If you take a look at the second paragraph of the e-mail,
18   does that have any significance to your opinion?
19   A. Yes. This is what I was talking about. This says, For
20   maximum benefit to year-end, retail sales should perform the
21   re-age between the customer cycle date and the month-end with
22   a sweep at month-end. This will ensure that all September
23   re-ages will be unable to reach two-plus by year-end.
24      In other words, they're going to take all of them at
25   a certain time because then it would prevent them from

Ghiglieri - direct
689

1    progressing back to the two-plus number by year-end when they
2    have to report it on their 10-K.
3    Q. So is this significant to your opinion that Household
4    manipulated its two-plus delinquency number through the use of
5    re-aging?
6    A. Yes.
7    Q. Why?
8    A. Well, because they're discussing how they're going to
9    manipulate their delinquency number by using the re-age
10   practice at a certain -- and they're even planning when
11   they're going to use it so that these loans won't then become
12   delinquent and show up again in the two-plus bucket at
13   year-end.
14   Q. Then the last sentence there says, This will ensure that
15   all September re-ages will be unable to reach two-plus at
16   year-end.
17   A. Yes.
18   Q. Do you see that?
19      What do you understand that to mean?
20   A. Well, they were timing the re-ages so that they could
21   prevent the ones in this particular category from becoming
22   delinquent again, such that it reaches that two-plus bucket at
23   year-end so they don't have to disclose it as delinquent.
24   Q. They have to disclose all the delinquent loans at the
25   year-end in their form 10-K, their annual report?

Ghiglieri - direct
690

1    A. Yes.
2    Q. And so what's your conclusion about why -- what this means
3    here?
4    A. So they're timing these re-ages so that this group of
5    loans will not show up as two-plus delinquent at year-end.
6    Q. And they do that by re-aging those loans?
7    A. Yes, at a certain time. They're timing it because they
8    know that the progression will be that it will go to 30 days
9    past due, then 60 days past due, in which case it's going to
10   end up in the two-plus bucket. So they're timing it so that
11   doesn't happen until January so they don't have to disclose
12   it.
13   Q. I'll show you what has been marked as Plaintiffs' Exhibit
14   454 for identification.
15      (Tendered.)
16   BY MR. DROSMAN:
17   Q. Before we actually get to 454, there was one issue on that
18   last exhibit that we were talking about that I wanted to
19   discuss with you.
20      If we can put back up 654, the first page.
21      And this is the example of the timing of the re-ages
22   so that they wouldn't be delinquent at year-end. If you look
23   at the top e-mail, it looks like it was forwarded by
24   Mr. Makowski?
25   A. Yes.

Ghiglieri - direct
691

1   Q.  And was it forwarded to Mr. Schoenholz?
2   A.  Yes.  He was cc'd on it.
3   Q.  Perhaps we can zoom in on that so we can see whether it
4   was forwarded to Mr. Schoenholz.
5        So you said Mr. Schoenholz received a copy of this
6   e-mail?
7   A.  Yes.
8   Q.  Why don't we turn now to Plaintiffs' Exhibit 454 for
9   identification.
10       Do you recognize Plaintiffs' Exhibit 454?
11  A.  I do.
12  Q.  What is it?
13  A.  This is a document.  It's an e-mail string.  And it's got
14  some handwritten notes and then a chart attached to it.
15  Q.  And the e-mail string that you talked about, who is the
16  e-mail from?
17  A.  Well, there are several e-mails, but some of them are from
18  Gary Gilmer.
19  Q.  And what are the dates?
20  A.  The date of the bottom e-mail is February 22, 2000.
21  Q.  And what's the subject of the e-mail?
22  A.  And the subject is "cut."
23  Q.  Why do you recognize Plaintiffs' Exhibit 454?
24  A.  This was one of the documents that I looked at in
25  formulating my opinions.

Ghiglieri - direct
692

1        MR. DROSMAN:  Plaintiffs offer Exhibit 454 into
2   evidence.
3        THE COURT:  It will be admitted.
4   BY MR. DROSMAN:
5   Q.  Let's take a look at the bottom e-mail on page ending 417
6   that you said is entitled "cut."
7        That's from Dick Schaffer; is that right?
8   A.  Yes, and he's sending this to Gary Gilmer.
9   Q.  And that's the defendant in this case?
10  A.  Yes.
11  Q.  And Dick Schaffer is the managing director of operations
12  for the consumer lending division; is that correct?
13  A.  Yes.
14  Q.  Can you tell me what's significant about the text of that
15  e-mail?
16  A.  Well, he's saying here, I just revisited the two-plus
17  forecast with each of my guys.  Bottom line looks like a $25
18  million cut without the magic, parentheses, grace period, and
19  75,000 with it.  We are a little afraid of the 29-day month so
20  we aren't being overly aggressive with this forecast.  It
21  looks pretty solid.
22  Q.  Let's just focus on the first two sentences of that
23  e-mail.  Bottom line looks like a $25 million cut without the
24  magic, parens, grace period, and $75 million with it.
25       Is he talking about the two-plus delinquency number

Ghiglieri - direct
693

1   in this case?
2   A.  Yes.
3   Q.  And is he talking about a cut to the two-plus delinquency
4   number?
5   A.  Yes.
6   Q.  So what do you understand this to mean here?
7   A.  Well, what Household did is they would give their
8   borrowers 15 days after the date that the payment was due as a
9   grace period to make their payment.  And so, unlike other
10  lenders who just report delinquencies straight up, what they
11  would do is, say, for example, a loan was 74 days past due,
12  they would deduct 15 days from that and that would bring it
13  back down to 59 days and so they wouldn't report that as a
14  two-plus number, a loan that's in the two-plus bucket.
15       So they would use grace periods as a way to mask past
16  due by deducting 15 days from how many ever days the loans
17  were past due in the two-plus bucket and bringing them back
18  into the current bucket.
19       And so what he's saying here is that without the
20  magic of the grace period, they would not be -- it would look
21  like their delinquencies would be cut 25 million; but with
22  using this grace period tactic, they would be able to cut
23  two-plus numbers 75 million.
24  Q.  So they could cut $50 million from their two-plus numbers
25  by using the magic of the grace period; is that right?

Ghiglieri - direct
694

1   A.  Yes, yes.
2   Q.  And does this -- is this significant to your opinion that
3   Household used re-aging practices like the grace period to
4   manipulate its two-plus numbers?
5   A.  Yes.  I mean, there's no reason to do that unless you were
6   manipulating your delinquencies.
7   Q.  Who is receiving this particular e-mail?
8   A.  Mr. Schaffer was sending to Gary Gilmer.
9   Q.  I'll show you what has been marked as Plaintiffs' Exhibit
10  262 for identification.
11       (Tendered.)
12  BY MR. DROSMAN:
13  Q.  Do you recognize Plaintiffs' Exhibit 262?
14  A.  I do.
15  Q.  And what is Plaintiffs' Exhibit 262?
16  A.  This is a series of e-mails that describes the cut in
17  delinquencies using this tactic for the grace periods, of
18  deducting the 15 days and pushing it back into the current
19  bucket.  And they're quantifying it from a dollar perspective
20  each month.  There's a series of them.
21  Q.  And who is the recipient of these e-mails?
22  A.  Let's see here.  It looks like Douglas Friedrich.
23  Q.  And he's the managing director, the head honcho, of
24  mortgage services at Household; is that right?
25  A.  Yes.

Ghiglieri - direct

695

1  Q. And why do you recognize Plaintiffs' Exhibit 262?
2  A. This is one of the documents that I reviewed in
3  formulating my opinions.
4       MR. DROSMAN: Plaintiffs offer Exhibit 262 into
5  evidence.
6       THE COURT: Admitted.
7  BY MR. DROSMAN:
8  Q. Why don't we take a look at the first page of this series
9  of e-mails.
10      What's the title of the e-mail?
11 A. So the title of the e-mail is two-plus reconciliation.
12 Q. And what does this particular e-mail show?
13 A. It shows that the adjustment for the 15-day grace period
14 was $19 million in this case for this month, the month of --
15 it would be the prior month, so January 2001.
16 Q. So that the re-aged number was actually 431, is that
17 right, according to Sarah's figure?
18 A. Yes.
19 Q. And then they're deducting or lowering that re-age number
20 by 19.7 million; is that right?
21 A. Actually the number is the two-plus number and so then
22 they're taking out the 15-day grace period. So they're
23 adjusting the two-plus number.
24 Q. And what are the parens around the 19.7 million?
25 A. That means they're taking it out. It's negative.

Ghiglieri - direct

696

1  Q. The final two-plus delinquency number that they come up
2  with after taking out the grace period is what?
3  A. 418 million.
4  Q. And you said that this e-mail was sent on 2/6/01, so it
5  would be for the month of January, right?
6  A. Right.
7  Q. Let's look at the next page, page ending 842.
8       And this e-mail was sent on March 7, 2001; is that
9  right?
10 A. Yes.
11 Q. Again, sent to Doug Friedrich, the head of Household's
12 mortgage services unit; is that right?
13 A. Right.
14 Q. And what's this showing here?
15 A. And this is the two-plus reconciliation again. So it
16 shows that the two-plus numbers for the grace period
17 adjustment were being reduced by 16 million.
18 Q. Again, lowering the two-plus numbers by 16.1 million
19 for --
20 A. Right, for that month.
21 Q. For that month.
22      What about the next page?
23 A. This is similar. These are all these same sort of
24 reconciliations. So here the grace period adjustment is
25 17,483,000. So two-plus numbers are being reduced by this

Ghiglieri - direct

697

1  grace period adjustment.
2  Q. And what's the date of this e-mail?
3  A. August 7, 2001. So this would be for July.
4  Q. And do the rest of the e-mails show the same thing?
5  A. Yes.
6  Q. Does this -- is this significant to your opinion that
7  Household used re-aging tactics like the use of the grace
8  period to manipulate its two-plus delinquency numbers?
9  A. Yes.
10 Q. Why?
11 A. Well, because there's no reason to make this kind of
12 adjustment. Other lenders just do a straight-up deal. Here,
13 what they were doing is using their grace period to move loans
14 from the two-plus bucket back to current. And the pass --
15 these sorts of delinquency numbers are very important to
16 regulators and others because it shows the condition of the
17 loan portfolio.
18 Q. Is this grace period right here, is this the same grace
19 period we heard referred to earlier in an earlier e-mail as
20 the magic?
21 A. Yes.
22 Q. Now, is there a relationship between predatory lending on
23 the one hand -- we talked quite a bit about that yesterday --
24 and the use of practices like re-aging to hide the true
25 quality of Household's loans on the other?

Ghiglieri - direct

698

1  A. Yes, there is a relationship.
2  Q. Did you prepare a demonstrative to assist you in
3  explaining the relationship between predatory lending
4  practices on the one hand and hiding the quality of
5  Household's loans on the other?
6  A. I did.
7  Q. I'll show you what has been marked as Plaintiffs'
8  Demonstrative Exhibit 31 for identification.
9       Can you tell us what this exhibit shows?
10 A. Yes. Household starts out making a predatory loan. And
11 remember, they're packing on fees and insurance premiums and
12 stripping away the equity. And what happens is, the borrower
13 cannot pay the loan. It's too large for the borrower to pay.
14      So Household has one of two choices. They can either
15 re-age it so that it's not showing up on their two-plus
16 bucket. Or they can refinance it or rewrite it down below,
17 which is flipping it, adding more insurance, adding more fees
18 to it.
19      And then --
20 Q. Let me just pause there. To refinance it or rewrite it,
21 does that take it out of the two-plus bucket as well?
22 A. Right. And it brings it back to current. So they can
23 either re-age it using some sort of tactic that we've already
24 talked about or they can actually rewrite it and make a new
25 loan and start over.

Ghiglieri - direct

699

1  Q. Okay.
2  A. And then, no matter what, the borrower still can't pay
3  because the loan is so packed full of products, premiums and
4  fees and can't go anywhere else because the equity has been
5  stripped and the loan to value is too high so they're stuck.
6  And Household then has one of two choices.  They can either
7  rewrite it on the top, which is flip it again and add more
8  fees and premiums, insurance premiums to it, or they can
9  re-age it using one of the tactics, like the grace period or
10  one of their other tactics.
11  Q. So if they rewrite it right here, does that -- again, that
12  takes it out of the delinquent bucket; now all of a sudden
13  they have a brand new loan so it's current again?
14  A. Yes.  So whether they re-age it or they rewrite it, that's
15  going to bring it to the current bucket.  But rewriting it
16  allows them to pack on more fees and insurance premiums.  So
17  they can do -- they can either re-age it or rewrite it.
18  Q. And you talked -- is there a predatory lending practice
19  that this implicates right here?
20  A. Yes.  I mean, it implicates all sorts of predatory lending
21  practices, loan flipping because they're re-aging it multiple
22  times, insurance packing, equity stripping.  If they rewrite
23  it into two loans, that would be loan splitting.  You know,
24  originally they're reeling them in with the effective rate, as
25  Dennis Hueman would say, and blocking the back door with the

700

1  prepayment penalty so that -- and because they've stripped out
2  the equity, there's nowhere for them to go to refinance.
3  Q. So what's the last step?
4  A. So the borrower still can't pay, and the cycle starts over
5  again and go on one of two paths.  So there's a correlation
6  between predatory lending practices and the need for Household
7  to re-age and mask their delinquencies.
8  Q. Thank you, Ms. Ghiglieri.
9      MR. DROSMAN:  I have no further questions at this
10  time.
11      THE COURT:  You may cross-examine.
12      MR. KAVALER:  Thank you.
13          CROSS-EXAMINATION
14  BY MR. KAVALER:
15  Q. Good morning, Ms. Ghiglieri.
16      As you know, I'm Tom Kavaler, and I represent the
17  defendants.  And we've met before, correct?
18  A. Yes.
19  Q. Okay.  I'm going to ask you a few questions today about
20  the same subject matter you've been talking about for the past
21  couple of days.  And my time is sort of limited, so I'm going
22  to try and ask you questions that can be answered yes or no.
23  If I do that, will you answer them yes or no?
24  A. If I can answer them with a yes or a no.
25  Q. Perfect.  Thank you.

701

1      Now, it's correct that you never worked at Household
2  International?
3  A. Correct.
4  Q. And, in fact, you've never worked at any company in the
5  private sector, only in the government?
6  A. Incorrect.
7  Q. Okay.  Where did you work in the private sector?
8  A. Well, I launched Rate Genius, which is a company that
9  refinances automobile loans.  And I also worked at our family
10  bank when I was in high school and college.
11  Q. Okay.  And you were never a customer of Household
12  International?
13  A. That's correct.
14  Q. And when you were the head of the Texas Department of
15  Banking, you didn't personally regulate Household; someone
16  else did that, correct?
17  A. A sister agency regulated it, the Consumer Credit
18  Commissioner.
19  Q. Right.  And am I correct that you never met Bill Aldinger
20  or Gary Gilmer or Dave Schoenholz personally?
21  A. That's correct.
22  Q. And you never met Tom Detelich or Lisa Sodeika either?
23  A. That's correct.
24  Q. You never met or spoke with anyone else whom you
25  understood to be an employee of Household at the time you were

702

1  speaking to them?
2  A. I'm sorry.  I couldn't hear what you were saying.
3  Q. I apologize.  Let me try it a little louder.
4      You never met or spoke with anyone else whom you
5  understood to be an employee of Household at the time you were
6  speaking to them?
7  A. That's correct.
8  Q. And you never interviewed any former Household employees,
9  correct?
10  A. That's correct.
11  Q. And you never interviewed any present Household employees
12  correct?
13  A. That's correct.
14  Q. Do you know John Bley, who used to be the commissioner of
15  the Washington State Department of Financial Institutions?
16  A. Yes, I do.
17  Q. You've seen him sitting here in the back of the courtroom
18  the last couple of days listening to you?
19  A. Yes.
20  Q. And you know that when he was the director of the
21  Department of Financial Institutions in Washington, he did
22  regulate Household, correct?
23  A. Yes.
24  Q. And you mentioned Mr. Cross a couple of times.  He worked
25  for that same Washington agency?

711

1   Q. Yes.
2   A. I don't know how many complaints they had on effective
3   rate in total.
4   Q. Do you know what percentage of their loans generated
5   complaints about effective rate?
6   A. I didn't see a percentage, but I do know that Household
7   calculated refunds of $1.2 billion for the effective rate
8   presentation that they made. So I'm assuming it was a large
9   number of loans and must have been a pretty substantial
10  percentage.
11  Q. But you can't tell me what that percentage is?
12  A. No.
13  Q. You know that Household had, during the relevant time, in
14  Mr. Gilmer's business unit about 3.2 million accounts?
15  A. I don't know if that's true or not.
16  Q. You don't know that.
17      Okay. You know that that's set forth in Household's
18  10-K for the year 2001?
19  A. It could be. I looked at the -- some of the past due
20  charts. I didn't analyze the 10-Ks.
21  Q. Do you have any reason to question the number that
22  Household put in its 10-K describing how many accounts they
23  had?
24  A. I don't have any reason to question it.
25  Q. Okay.

712

1       MR. KAVALER: Can we see Exhibit 852.
2   BY MR. KAVALER:
3   Q. This -- you recognize this as Household's 10-K for 2001?
4   A. That's what it says.
5   Q. Okay.
6       Can we pull up where it shows the number of loans.
7       You see there, it's talking about this business has
8   approximately 1,400 branches located in 46 states, 3.2 million
9   open customer accounts, 39.5 billion in managed receivables
10  and 13,000 employees.
11      Do you see that?
12  A. I see that.
13  Q. Do you understand that to be describing the business unit
14  that Mr. Gilmer ran?
15  A. Yeah. I mean, that's what it says.
16  Q. Okay. You have no reason to doubt that?
17  A. No.
18  Q. All right. So half of 1 percent of 3.2 million accounts
19  would be 16,000 accounts?
20  A. If you say so.
21  Q. I'm reluctant to say so because the other thing I'm not
22  good at is math. But I've been told that. I think that's
23  right.
24      Did you see 16,000 effective rate or equivalent rate
25  complaints?

713

1   A. I didn't see 16,000. I looked at over a hundred
2   complaints, and they had various complaints. That's what I
3   looked at.
4   Q. Did you ever manage a large public company?
5   A. No.
6   Q. Did you ever work at a large public company?
7   A. No.
8   Q. Are you aware that large public companies have a tendency
9   to measure almost everything that can be measured?
10      MR. DROSMAN: Objection.
11      THE COURT: Sustained.
12  BY MR. KAVALER:
13  Q. Did you notice when you were looking at Household's
14  documents that Household had a tendency to measure many thin
15  and express things in terms of percentages?
16  A. Well, I saw a lot of percentages in the documents I looked
17  at.
18  Q. Have you ever heard the phrase in your experience as a
19  regulator "you can't manage what you can't measure"?
20  A. I don't know if I've ever heard that before or not.
21  Q. Okay. So you can't tell me how many effective rate
22  complaints there were and you can't tell me what percentage of
23  Household's open accounts were; is that correct?
24  A. Well, Household can't either. I mean, because not all the
25  complaints were tracked. So I for sure can't, and I question

714

1   whether Household can.
2   Q. That was my question, whether you could.
3   A. I don't know how I could have because they weren't all
4   tracked. I didn't see a document showing all of them.
5   Q. Short answer is you can't tell me either how many they are
6   or what percentage of the open loans they represent; is that
7   right?
8   A. I would only be able to tell you if I saw a document like
9   that.
10  Q. So, therefore, you can't tell me?
11  A. Well, I didn't see anything to be able to tell you that,
12  no.
13  Q. And you can't tell me whether they were more than one-half
14  of 1 percent of the open loans, can you?
15  A. I didn't -- I don't have a basis to tell you because I
16  didn't see anything like that.
17  Q. That means you can't tell me, correct?
18  A. Well, I can't tell you what I haven't seen.
19  Q. I agree with that.
20      Now, you said a couple of times in the last couple of
21  days that Household had to come up with a way of describing
22  its rates, its effective rates, because its rates were higher
23  than the rates of competitors. Do you recall that?
24  A. Yes.
25  Q. What competitors were you comparing Household to?

715

1  A. Well, I was looking at, for example, the Dennis Hueman
2  video where he's talking about competitor rates being higher.
3  And I saw some other documents discussing Household's rates
4  versus competitors. So I didn't really analyze whether it
5  would have been a bank or a finance company or anything like
6  that. I'm just looking at what was in the documents from
7  Household employees.
8  Q. The competitor Mr. Hueman talked about was Billy Bob's
9  Loan Company, right?
10  A. Yes.
11  Q. Did you think there really is a company called Billy Bob's
12  Loan Company or did you think he was just using that as an
13  example?
14  A. Well, there would be no way to tell -- there would be no
15  reason to tell a consumer that their rate was lower than it
16  really was if their rates weren't -- if their rates were
17  competitive because they could just be straight up with them.
18  Q. That's your opinion, right?
19  A. Yes.
20  Q. I'm trying to find out if you know any facts. Do you know
21  which competitors charged what rates?
22  A. I didn't do a survey of the time period and Household's
23  rates.
24  Q. Therefore, the answer to my question is, no, you don't,
25  correct?

716

1  A. Unless I saw something in one of the documents. I can't
2  recall sitting here. I may have looked at something. But
3  just sitting here, I can't think of --
4  Q. You mentioned a moment ago in your answer -- you mentione
5  the word banks. You understand that finance companies and
6  banks are different?
7  A. Well, they have to comply with the same lending laws, but
8  they are different with how they fund their operations. I
9  agree with that.
10  Q. Banks have deposits; finance companies do not?
11  A. That's right.
12  Q. And that affects their cost of funds?
13  A. Right.
14  Q. So finance companies generally charge rates different than
15  banks?
16  A. Their cost of funds are generally higher and so they
17  generally charge more, yes.
18  Q. So, therefore, for you to say that Household charged
19  higher rates than banks would be nothing more than to say
20  Household is a finance company and a bank is a bank, right?
21  A. Well, that would be one of the reasons, yes.
22  Q. So putting aside banks, do you have a list for me of
23  finance companies who had lower rates than Household?
24  A. I think I just said that I didn't do a survey of who
25  charged what rate.

717

1  Q. Okay. So every time you told us throughout your testimony
2  that Household had to use effective rate techniques because
3  its rates were higher than someone else, if I ask you who the
4  someone else is, you don't know?
5  A. Well, I remember reading in Andrew Kahr's information
6  where he talked about how they needed to show Household's
7  rates being more competitive. And so I concluded that their
8  rates were higher than their competitors. But I didn't do an
9  analysis of the time. I didn't go back in time and try
10  and figure out who was charging what rate.
11  Q. So your basis was something Andrew Kahr said?
12  A. I -- well, Andrew Kahr, the Dennis Hueman video and other
13  documents that I saw.
14  Q. Let's take them one at time.
15      The Dennis Hueman video, you mean the portions that
16  this jury saw?
17  A. Yes.
18  Q. Where he referred to Billy Bob's Loan Company?
19  A. Well, he was using an example; but he was teaching his
20  sales staff to sell the loans when they otherwise wouldn't be
21  able to because their rates were higher.
22  Q. I'm trying to find out higher than whose.
23  A. Well, I don't have their competitors' names for you or the
24  interest rates.
25  Q. You think Mr. Gilmer knows what his competitors' rates

718

1  were?
2  A. Hopefully.
3  Q. Okay. You said Mr. Kahr -- you got some information from
4  Mr. Kahr. Was he ever an officer of Household?
5  A. No, he was a consultant.
6  Q. Was he an employee of Household?
7  A. He was a consultant.
8  Q. A consultant is someone that you pay money to to get an
9  opinion from, sort of like an expert witness, right?
10  A. Or you get help in figuring out how to grow your loan
11  portfolio, I mean, different suggestions.
12  Q. Did Mr. Kahr provide -- did you see somewhere in
13  Mr. Kahr's materials a list of the competitors of Household
14  who charged lower rates that you've talked about for the last
15  three days?
16  A. I don't recall that, seeing that in his information.
17  Q. You didn't conduct a survey of any other competitors? You
18  didn't do any analysis? You don't have a chart to show us
19  that says this competitor charged this and Household charged
20  that? Nothing like that?
21  A. No.
22      MR. KAVALER: Let's see the list again.
23  BY MR. KAVALER:
24  Q. The next thing up there is insurance packing.
25      Can you tell me how many claims of insurance packing

719

1 there were throughout all of Household?
2 A. Well, Household -- the internal documents from Household
3 showed approximately $160 million in refunds, and so I'm
4 assuming that that was quite a large number.
5 Q. Well, my question was: Can you tell me either as a number
6 or a percentage how many claims there were of insurance
7 packing during the time period you examined?
8 A. Not precisely.
9 Q. Do you think there was 16,000?
10 A. I don't know. I didn't see a number. I only saw what the
11 estimate of the refunds based on insurance packing would be.
12 Q. If Household says that its calculations showed the number
13 was less than half of 1 percent, do you have any basis to
14 suggest they're incorrect?
15 A. No.
16 Q. You testified that it's your opinion that when a customer
17 got to a loan closing, the insurance would already be added
18 on. Do you remember that?
19 A. Yes.
20 Q. Did you ever attend even one loan closing at Household?
21 A. No.
22 Q. Do you know if Mr. Gilmer ever attended any house closings
23 at Household -- or loan closings? Let me start again.
24      Do you know if Mr. Gilmer ever attended any loan
25 closings at Household during his career?

720

1 A. I don't know.
2 Q. Now, you testified that you consider single premium credit
3 insurance to be a predatory product, correct?
4 A. Yes.
5 Q. And you testified that -- you told this jury yesterday or
6 Tuesday, I guess, that you looked at what was in the financial
7 press during this time as well, correct?
8 A. I did.
9 Q. So you know that the securities analysts specifically
10 approved of Household's credit insurance sales which added to
11 Household's profitability for the investors, don't you?
12 A. Can you ask me that again?
13 Q. Sure. From your reading of the financial press, you saw
14 articles which indicated that the security -- let me start
15 even further back.
16      You know what a securities analyst is?
17 A. Yes.
18 Q. Those are people who review the filings of a company and
19 comment on them for the financial community, correct?
20 A. Yes.
21 Q. And their reports are read by various investors; they're
22 reprinted in newspapers and things of that nature, correct?
23 A. Well, I didn't read any analysts' reports.
24 Q. You read press stories?
25 A. Just press stories, financial -- I mean, regulatory

721

1 issuances and things like that.
2 Q. You didn't read anything about the market reaction to what
3 Household was doing?
4 A. No.
5 Q. You didn't see any commentary by the analysts reported in
6 the press specifically focusing on insurance sales, saying
7 this is good for the investors because it adds to the
8 profitability of the company for the benefit of the investors?
9 A. I didn't read any analysts' information.
10 Q. And you didn't see that covered in the press?
11 A. No.
12 Q. And that wasn't included in the 40 boxes of materials you
13 looked at?
14 A. No.
15 Q. And investors' counsel didn't tell you they had all those
16 materials?
17 A. Well, I did the survey on my own, so I didn't pull down
18 any analysts' reports.
19 Q. Okay. And you know that Household disclosed to investors
20 that it offered credit insurance and, therefore, the
21 marketplace knew that this was a product offered by Household,
22 correct?
23 A. I didn't look at the SEC filings other than to just look
24 at the past due charts, so I don't know what they disclosed.
25 Q. I see. So if I show you SEC filings that disclose that,

722

1 you'll tell me you didn't look at them?
2 A. Right.
3 Q. So you just went to the SEC filing and looked for what you
4 were looking for?
5 A. I was just looking at their past due charts.
6 Q. Right. You weren't looking to see generally what one
7 could learn about Household by looking at the SEC filings?
8 A. No, I didn't read the SEC filings. That was beyond what I
9 was asked to do.
10 Q. Beyond what you were asked to do. You were asked to come
11 here and talk to this jury about a very specific subject, and
12 you didn't look at anything beyond that?
13 A. I looked at the documents in the case regarding predatory
14 lending and re-aging, but I didn't analyze the SEC filings,
15 no.
16 Q. But you are a member of the Georgia bar and the D.C. bar,
17 I think you said, inactive?
18 A. Uh-huh.
19 Q. You understand that this case is a securities fraud case,
20 don't you?
21 A. Yes.
22 Q. You understand it's about the disclosure that Household
23 made to the investors, correct?
24 A. Yes.
25 Q. And you understand the issue in the case is whether that

767

1  A.  Well, I thought you asked me if I saw where they met with
2  California and they blessed them doing this particular thing.
3  Q.  I don't believe I used the word "blessed."
4  A.  And I said, no, I didn't see that.
5  Q.  If that's what you heard, I apologize for any confusion I
6  might have caused.  I don't think I used the word "blessed."
7  I asked about a dialogue.
8       They were having a dialogue with California, correct?
9  A.  Yes, if you want to couch it like that, a dialogue.
10 Q.  And you weren't at that meeting?
11 A.  No, I wasn't.
12 Q.  Mr. Detelich and Mr. Schneider were at that meeting?
13 A.  That's what it says here.
14 Q.  Right.
15 A.  I have no way of knowing.
16 Q.  But you have no reason to doubt it?
17 A.  I mean, I have no -- no knowledge whatsoever if they were
18 there or not.
19 Q.  Okay.  Let's go to loan flipping.  I think that's the next
20 one.
21      You said loan flipping is simply continuous
22 refinances, correct?
23 A.  Yes.
24 Q.  And you said each time Household would refinance a loan,
25 they would flip a loan?

769

1  A.  Right.
2  Q.  That's a common practice, isn't it?
3  A.  Yes.
4  Q.  Is --
5  A.  It's not a common practice to charge points all over again
6  or it's not a common practice to add insurance all over again
7  or every time or as many times as you can.  That's the
8  difference between just doing a refinance and actually doing a
9  predatory loan flipping.  That was sort of the distinction I
10 was just trying to make to you just now.
11 Q.  So you have no quarrel with a plain vanilla refinance,
12 right?
13 A.  Right.
14 Q.  What percentage of Household loans are you now saying --
15 what percentage of Household refinances are you now saying
16 constitute flipping?
17 A.  I don't know the number, but I do know that when they
18 looked at it internally for refunding for loan flipping, it
19 came out to -- I think it was $60 million.  So it was a large
20 number of loans that they flipped.
21 Q.  But yesterday it sounded like you were saying it was a
22 hundred percent; today it sounds like you're off the hundred.
23 I'm trying to find out where you are now.
24 A.  I don't know what the exact number is.  But based on
25 internal documents at Household with how much they calculated

768

1  A.  I don't know if I said each time.  Are you reading from my
2  testimony?
3  Q.  I'm reading from your testimony in this courtroom on March
4  31, at Page 444, Line 24 to Page 445, Line 1.  Quote:  Each
5  time Household would refinance a loan, they would flip a loan.
6       Is that what you meant to say?
7  A.  Well, I guess what I meant to say was, in doing loan
8  flipping, they would refinance a loan and add more fees and
9  products.  I'm sure that in all the loans that they made, we
10 could find one or two or how many ever where they refinanced
11 that it wasn't considered loan flipping.  But a lot of the
12 documents that I've looked at had loans refinanced more than
13 one time, where they would add the points all over again and
14 they would add the insurance premiums all over again.  And
15 that's what I was referring to there.
16 Q.  So your position is not it's each time, but it's a very
17 high level of incidence?
18 A.  Where they were doing loan flipping.
19 Q.  That's what I'm trying to find out.  What you testified
20 is, each time Household would refinance a loan, they would
21 flip a loan.
22      Let's start with refinance.  A refinance means a
23 customer has a loan.  He comes back to the same lender, and he
24 comes out with a new loan with new terms; and he pays whatever
25 costs are associated with that, correct?

770

1  that they were going to have to refund for loan flipping,
2  which totaled $60 million, I'm assuming that it's a large
3  number.  Now, what the exact number is, I don't know.  I did
4  not calculate the specific number of loan flippings or equity
5  strippings or anything like that.  I didn't feel that was
6  necessary for me to reach conclusions regarding whether they
7  did or did not do predatory lending.
8  Q.  But certainly if anyone took from your testimony
9  yesterday that -- when you said each time Household would
10 refinance a loan, you're clearly saying today you didn't mean
11 each time?
12 A.  Well, I think I was talking in context of loan flipping.
13 And so if you take sentences in isolation, it's easy to, you
14 know, decide what you're going to say about it.  But what I
15 think I was referring to in this section was loan flipping.
16 And where they were loan flipping, each time they did a
17 refinance, they would add those points and fees.
18 Q.  So taking sentences in isolation doesn't give you a fair
19 view of what was actually said; is that your point?
20 A.  No.  I'm just saying you have to take it in context of
21 what you're saying.  And that's what I tried to do in this
22 case, where I tried to look at as many documents as I could.
23 Of course, I didn't look at every single one.  I understand
24 that.  But I tried to look at quite a few so I could draw some
25 conclusions.

771

1  Q. Taking it in context, as you just said, would be like
2  looking at the entire company to make a judgment about what
3  kind of company it was as opposed to looking at things that
4  exist up and in one-half or less of 1 percent of the company's
5  operations; would you agree with that?
6  A. Well, you're focused on the percent or the number of
7  complaints or the number of loans or whatever you're saying.
8  I took a broader view of that, and I looked at the type of
9  lending practices they engaged in. I looked at what their
10  training was. I looked at what their -- how were their
11  employees compensated. I looked at the internal audit. I
12  looked at their compliance function. I looked at complaints.
13  I looked at the investigations and the examinations by the
14  regulators.
15      So I looked at and used the methodology that I would
16  use as a bank regulator. When we would go in to examine First
17  National Bank of Chicago, for example, it was impossible for
18  us to look at every single solitary loan that they had. So we
19  had to make some judgments as far as how many loans we were
20  going to look at, how many, you know, depository accounts we
21  were going to look at so that we could check compliance with
22  the laws. And where we found problems, we would expand that.
23  And so it -- it -- it -- that sort of an analysis doesn't lend
24  itself to calculating the exact number of loans in each of
25  those categories. I looked at a much broader spectrum of

772

1  things for the company.
2  Q. I think the next thing on your list was blocking the back
3  door. And the last thing on your list. Okay. We're making
4  progress.
5      And you said that if Household makes a loan and the
6  customer only stays for a short time, they're not going to be
7  as profitable as if the customer would stay and pay, correct?
8  A. Are you reading from my testimony?
9  Q. I am reading from the trial transcript on March 31 at Page
10  464, Line 21 to 465, Line 1. The question was:
11      Question: Why is that significant to your opinion?
12      You said, Answer: Well, because Household is in the
13  business of making loans. And if they make a loan and the
14  customer only stays for a short time, you know, they are not
15  going to be as profitable as they would be if the customer
16  would stay and pay. I left out the "you know?"
17  A. Thank you for doing that. So -- and your question is?
18  Q. The question is: Do you recall that testimony?
19  A. Yes.
20  Q. Okay. When you talk about the profitability of customers,
21  you're talking about the profitability to the owners of the
22  company, which is the investors, correct?
23  A. When I made that statement, I was focused on the amount of
24  income that Household was going to generate. And ultimately
25  when you talk about the company, you talk about its investors,

773

1  I suppose. That's not generally what I focus on. But, yes.
2  But here I was just trying to discuss the income stream of the
3  company.
4  Q. You say that's not generally what you focus on. You've
5  never been the CEO of a public company, have you?
6  A. Not the CEO.
7  Q. You don't know what Mr. Aldinger focused on during the
8  years he was CEO of Household?
9  A. Well, I know Household focused on growth in the 1999, you
10  know, to 2000 time frame. But, of course, every company has
11  to focus on profitability, whether you're publicly traded or
12  not, because otherwise you would go out of business.
13  Q. There you go.
14      And so that's what you were saying here, that --
15  let's talk -- a profitable loan is better for the company,
16  better for the shareholders, better for everybody than an
17  unprofitable loan, correct?
18  A. Yes. And from my standpoint, a sound loan is better for
19  the company than an unsound loan or a good loan is better than
20  a bad loan because if it's a bad loan, you don't get paid.
21  Q. And you mentioned the word income. In addition to income,
22  the company has to focus on costs, right?
23  A. You mean just generally their costs or --
24  Q. Sure.
25  A. Sure.

774

1  Q. And profit is the difference between income and costs?
2  A. Income less expenses, right.
3  Q. Okay. And do you understand that when a loan is priced,
4  the company takes into account certain costs, including the
5  cost of getting that money it's going to lend -- if it's not a
6  bank, it doesn't have deposits -- and it makes certain
7  assumptions as to how long the loan will last?
8  A. Yes.
9  Q. Okay. And let's assume they've -- they've assumed a
10  length of five years, and the customer pays off after one
11  year. The company will not make the profit it assumed it
12  would make on that loan, correct?
13  A. Yes.
14  Q. Okay. So to protect the profit for the company's
15  shareholders, the company has two choices. They can raise the
16  prices to all borrowers thereby increasing income and then one
17  borrower or another will pay off early and so be it and the
18  company will still make enough profits for its shareholders
19  because everybody pays more; or they could try to focus the
20  incremental cost on the fellow who pays off early, correct?
21  A. I just have never seen something like that. I've seen
22  other frameworks, but I'm not familiar with that.
23  Q. You're not familiar with what I'm describing?
24  A. Well, I understand what you're trying to say; but the
25  specifics of what you're saying, I haven't --

799

1  the middle -- you know, what?  Let me just read the whole
2  paragraph.
3      "I'm sure you can come up with additional and better
4  alternatives.  Out of this wealth of possibilities, I would
5  like us to choose for now one standard approach to
6  qualification, applicable to all our present fixed-rate,
7  fixed- term mortgage production, a specific program with which
8  Legal -- " that's the Law Department, right?
9  A.  Yes.
10  Q.  " -- will be comfortable."
11      Do you see that?
12  A.  I see it.
13  Q.  All right.
14      And, then, down on the bottom of that page, the
15  paragraph one up from the bottom, he says, "Whatever approach
16  we end up (soon!) recommending, in order to make essentially
17  all our mortgages 'alternative,' our idea we'll have to pass
18  muster with Legal's -- " I'm sorry -- "Legal, Systems, Sales
19  and Gary."
20      Do you see that?
21  A.  Yes.
22  Q.  He's talking about the Law Department, the Systems
23  Department, the Sales Department and Gary Gilmer, correct?
24  A.  I'm assuming that's what he means.
25  Q.  Okay.

800

1      And, then, on the page ending in production numbers
2  "891," two pages from the back, right above the words "late
3  fees" there, let's look at the sentence above that.
4      He says, "Let's check with the lawyers to assure that
5  we make any such provision workable and effective."
6      Do you see that?
7  A.  Yes.
8      Excuse me.
9  Q.  Do you need a drink or something?  Are you all right?
10  A.  I'm fine.
11  Q.  Okay.
12      You also testified, I believe, about a memo from
13  Randy Raup, which is in evidence as Plaintiffs' Exhibit 349.
14      MR. KAVALER:  Your Honor, may I approach?
15      THE COURT:  Yes.
16      (Document tendered.)
17  BY THE WITNESS:
18  A.  Thanks.
19      MR. KAVALER:  Thank you, your Honor.
20  BY MR. KAVALER:
21  Q.  And you testified about this document a couple of days
22  ago.  Do you remember that?
23  A.  Yes.
24  Q.  And in the middle of the first page under "13. Collection
25  Counselling," it says, "Gary Gilmer and Ken Robin will

801

1  determine appropriate next steps."
2      Do you see that?
3  A.  I do.
4  Q.  That's the same Ken Robin who was the General Counsel of
5  the parent company, correct?
6  A.  Yes.
7  Q.  And, then, underneath it says, "Overall, Gary Gilmer and
8  Dave Schoenholz will continue to co-head the Andrew Kahr
9  initiative areas within USCF."
10      Do you see that?
11  A.  I do.
12  Q.  Now, it's the latter sentence that counsel for the
13  investors read to you -- and you read back to him -- two days
14  ago at this podium.  The sentence I read is directly above it,
15  right?
16  A.  Yes.
17  Q.  So, you understood that this meant -- in this memorandum
18  that was shown to you by counsel for the investors -- that
19  Mr. Gilmer, the head of the Business Unit, and Mr. Robin, the
20  General Counsel of the entire company, would be involved in
21  determining what would happen next?
22  A.  Well, how I read this memo is the sentence that says,
23  "Gary Gilmer and Ken Robin will determine appropriate next
24  step," goes to collection counselling, which wasn't really
25  something that I touched on in my reports.

802

1      "But, overall, Gary Gilmer and Dave Schoenholz will
2  continue to co-head the Andrew Kahr initiative areas within
3  Consumer Finance," I understood to mean that they were
4  spearheading the initiatives that were developed in
5  conjunction with Andrew Kahr.
6  Q.  All right.
7      But you certainly understood that Mr. Robin had some
8  role in this process, correct?
9  A.  Yes.  For the collection counselling I see his name there,
10  yes.
11  Q.  Okay.
12      Let's look at one more memorandum from Mr. Kahr.
13      Let's not.
14      Let's move on.  You testified that Household was
15  focused on growth and didn't care if loans didn't comply with
16  the law.
17      Do you recall that?
18  A.  I know I've said before that Household was focused on
19  growth, at the expense of compliance.
20  Q.  What you said at trial transcript Page 448, Lines 6
21  through 12, was this:  "Because the corporate culture in the
22  1999 to 2002 time frame was really focused on growth, at the
23  expense of other things -- like compliance -- and this
24  document shows that."
25      Counsel for the investors said:

803

1    "Q.  When you say it was focused on growth at the
2  expense of compliance, what do you mean by that?"
3      Answer by you:
4      "A.  They were focused on growth and they didn't care
5  if loans didn't comply with the law or whatever."
6      Do you recall that?
7  A.  Yes.
8  Q.  Okay.
9      Now, the memo we looked at a couple minutes ago from
10  Gary Gilmer, where he says, "We maintain zero tolerance for
11  inappropriate and unethical behavior, and demonstrate that
12  with swift action -- " and you and I talked about "swift
13  action" means terminating people -- would be inconsistent that
14  view, wouldn't it?
15  A.  Well, I didn't agree with that memo on a variety of -- for
16  a variety of -- reasons, which I go into in my report and
17  which I discussed at my deposition.
18      If they were so concerned about ethical behavior, why
19  would they have developed all these predatory lending
20  practices; and, then, compensated their employees and trained
21  them how to sell them; and, then, compensated their employees
22  for selling them?
23      So, all of the memos in the world don't mean anything
24  if you don't then go through and check for compliance with
25  them.

804

1      And, so, I know he wrote them, but it doesn't mean
2  anything, and especially from a regulatory standpoint.  That's
3  one of the things that the regulators do, is they check to
4  make sure that what the policies are, are actually being
5  complied with.  And, at Household, they were not.
6  Q.  You said, "I don't agree with that memo."
7      You agree he wrote it, correct?
8  A.  Oh, yes.
9      I saw several memos from Mr. Gilmer where he said,
10  "We don't engage in predatory lending.  We, you know, have
11  ethical behavior."  But that just wasn't the case.  They
12  engaged in predatory lending practices.  They developed
13  predatory lending practices.  They trained their employees how
14  to sell them.  And they compensated their employees, based on
15  engaging in these predatory lending practices.
16      So, like the Attorneys General said, there's a
17  disconnect between what Household says its policies are and
18  what's happening on the ground.
19      And I found that to be true.
20  Q.  So, what you're saying is, in your opinion, the company
21  did not perform, as Mr. Gilmer said in these memos it should?
22  A.  That's my opinion.
23  Q.  You're familiar with the phrase "Tone At the Top"?
24  A.  I am.
25  Q.  Mr. Gilmer was setting the tone at the top; he was sending

805

1  a message to all employees, "This is what I want you to do,"
2  correct?
3  A.  Well, "Tone At the Top" is a term that came into being
4  with Sarbanes-Oxley, and it has to do with corporate
5  governance.  And in the Bank Directors College classes that I
6  hold for the bank directors, this is something that we teach
7  them:  How important "Tone At the Top" is.
8      And that means that they have a corporate culture
9  that requires ethical behavior, and they have a code of
10  conduct; and, then, they check to make sure that the way that
11  their employees are behaving is in compliance with that.
12      And that's what Household didn't do here.  They
13  didn't focus on compliance during this 1999 to 2002 time
14  frame, to make sure that what Mr. Gilmer was saying was, in
15  fact, happening.
16      And, really, how could they have because the products
17  that they were offering consumers, the way that they were
18  training their employees and the way they were compensating
19  their employees, how could they expect anything else other
20  than predatory lending to be conducted?
21  Q.  Those are your opinions?
22  A.  Yes.
23  Q.  And you believe the regulators, who you referred to in
24  your direct testimony, share those opinions?
25  A.  Many of them shared my opinions, yes.

806

1  Q.  And there are many other regulators who don't share those
2  opinions, correct?
3  A.  I'm not sure I understand.  That didn't think they engaged
4  in predatory lending?
5  Q.  Correct.
6  A.  There were a few states that issued reports that didn't
7  show those types of violations.  And I don't know how
8  expansive their -- the scope of their -- examination.
9      But, ultimately, all 50 states came to an agreement
10  with Household and fined them $484 million for these predatory
11  lending practices.
12      So, ultimately, all of the states ended up signing
13  onto that.
14  Q.  You reviewed a number of state regulatory exams of
15  Household, which were complimentary of Household, which you
16  didn't mention in your direct testimony, correct?
17  A.  Not a number.  I know there were a few that I reviewed,
18  that had violations of other types of things, but not of
19  predatory -- you know, the types of practices.
20      I didn't do a complete review of everything that
21  Household might have violated in that time period.  I focused
22  on whether or not they engaged in predatory lending.
23      So, the examination reports had much other
24  information in there, requiring corrective action, that went
25  to other things besides predatory lending.

807

1     But I do know that a few states had things other than
2  predatory lending in them.
3  Q.  And a few states had very complimentary things to stay
4  about Household?
5  A.  Well, in some of the time frames that -- early on before
6  the complaints got high and some of these other things
7  happened, where all the states got together to do an
8  investigation, you can find things in the examination reports,
9  you know, that were not negative.  That's true.
10  Q.  More than not negative, they were complimentary?
11  A.  Well, I mean, however you want to phrase it.  It would
12  depend on the subject.
13     I don't think they said, "You're not engaged in
14  predatory lending."  I don't recall seeing that:
15  Congratulations, you're not engaged in predatory lending."
16  Q.  All right.
17     You talked about the -- let's look at some of the
18  state reports.
19     You didn't actually conduct any state regulatory
20  reviews of Household for any state, did you?
21     You were not the reviewing authority in any of these
22  states?
23  A.  For -- you mean during the time frame?
24  Q.  In other words, what you did is you -- what you did in
25  your direct testimony is you -- commented on regulatory

808

1  reports prepared by states, which you didn't participate in?
2  A.  Well, no.  I -- I -- couldn't have because I wasn't
3  employed by those organizations.
4     I looked at the materials that were turned over.
5  Q.  The answer is:  I'm right, you didn't participate in
6  those --
7  A.  Right, no, I did not participate in the original
8  examinations.  That's correct.
9  Q.  Okay.
10     One of the states you talked about is the Washington
11  State DFI report.  Do you remember that?
12  A.  Yes.
13  Q.  And we looked at a letter.  I think it's Plaintiffs' 1333.
14     We're getting a copy of that, but it was a letter
15  from Mr. Cross transmitting a copy of the Washington State
16  Report.
17     Do you recall that?
18  A.  I know I looked at several things from Washington State.
19  I'd have to see what you're talking about.
20  Q.  Okay.  Give me a second.  We'll find it.
21     MR. KAVALER:  Plaintiffs' 1333.
22     (Brief pause.)
23  BY MR. KAVALER:
24  Q.  We'll find it in a minute.
25  A.  Okay.

809

1  Q.  In any event, you know who Mr. Cross is?
2  A.  I do.
3  Q.  Okay.
4     And he's the author of the report that you talked
5  about the day before yesterday?
6  A.  There were several Washington reports.
7  Q.  The Washington Extended Report.  Do you remember that one
8  A.  Yes.
9  Q.  Okay.
10     And that's the one where he reviewed 19 customer
11  accounts.
12     Do you remember that?
13  A.  I'd have to look at the report to see exactly what you're
14  referring to.
15  Q.  Okay.
16     Here it is right here (indicating).
17     MR. KAVALER:  Your Honor, may I approach?
18  BY THE WITNESS:
19  A.  Show me what he just -- oh, I'm sorry.
20  BY MR. KAVALER:
21  Q.  It's 290.
22  A.  Do you want me to get it?
23  Q.  Yes.  That would be fine.
24     Absolutely.  Thank you?
25     It's 290 and his cover letter is Plaintiffs' 1333.

810

1     They're both in evidence and you were discussing both
2  of them here a couple days ago.
3     (Brief pause.)
4  BY MR. KAVALER:
5  Q.  You're not doing any better than I was.  Let me give you
6  one.
7  A.  290?
8  Q.  290.
9  A.  And 1333.
10     Okay.
11  Q.  Okay.
12     That's the Chuck Cross I'm talking about.
13  A.  Okay.
14  Q.  All right.
15     And do you recall that, with regard to this report,
16  Mr. Cross -- the author of that report -- gave some testimony
17  in a deposition, which you read, where he said his review of
18  these 19 complaints -- 19 customer complaints -- that formed
19  the basis for this report was woefully inadequate to reach any
20  statistically-valid conclusions about Household's business.
21     Do you remember that?
22  A.  Where are you reading from?
23  Q.  I'm reading from his deposition testimony, which I believe
24  you've seen.
25     I'll be happy to get you a copy of that.

835

1   A. I do.
2   Q. Okay.
3       And, in the course of reviewing the files that you
4   reviewed, did you come across the underlying documents related
5   to Mr. Nanez's complaint?
6   A. I reviewed some documents. I'm not sure which ones you're
7   talking about.
8   Q. Let me show you a couple and see if it refreshes your
9   recollection.
10      Let's start with a document which I will mark as
11  Defendants' 1080 for identification.
12      (Document tendered.)
13  BY MR. KAVALER:
14  Q. Is this one of the documents you looked at?
15  A. It might have been. I've seen this type of document
16  before.
17  Q. Okay.
18      And this document has Mr. Nanez's name on it --
19  Ms. Nanez and Mr. Nanez?
20  A. Yes.
21  Q. All right.
22      And it says on the top --
23      MR. KAVALER: I'm sorry, your Honor, I offer
24  Defendants' 1080 in evidence.
25      MR. DROSMAN: This isn't on the exhibit list, your

836

1   Honor.
2       MR. KAVALER: That's why it's 1080, your Honor.
3       THE COURT: Yes, I guess it's not.
4       Is there an objection?
5       MR. DROSMAN: It's hearsay, your Honor.
6       THE COURT: What's it being offered to prove?
7       MR. KAVALER: Your Honor, it's offered -- she says
8   she reviewed it. It's offered in response to the testimony
9   she gave yesterday, to show the response that Household made
10  to the very complaint that she testified about yesterday.
11      THE COURT: Overruled.
12      MR. KAVALER: Thank you, your Honor.
13      (Defendants' Exhibit 1080 received in evidence.)
14  BY MR. KAVALER:
15  Q. Now, you see on the top --
16      MR. KAVALER: Withdrawn.
17  BY MR. KAVALER:
18  Q. If I recall your testimony correctly yesterday, your point
19  was that Mr. Nanez -- or Ms. Nanez -- said she had to take
20  single premium credit insurance in order to get a loan; is
21  that correct?
22  A. I'd have to look at that complaint, again, to see exactly
23  what it says on the complaint.
24  Q. Okay.
25      Let me try it this way. I can show you your

837

1   testimony yesterday.
2       MR. KAVALER: I am having difficulty with the
3   transcript.
4   BY MR. KAVALER:
5   Q. Let me do it this way: This document, 1080, is headed
6   "Optional Credit Insurance Disclosure."
7       Do you see that?
8   A. I see that.
9   Q. And first thing it says after the name of the creditor,
10  the name of the borrowers and some boxes with some amounts in
11  it, is a sentence that begins in capital letters, "No credit
12  insurance is required to obtain this loan."
13      Do you see that?
14  A. I do.
15  Q. All right.
16      And this is the document signed by the borrowers --
17  the Nanezes -- on the next page, correct?
18  A. Yes.
19  Q. So, they received a written disclosure from Household
20  which says on the top, it's an "Optional Credit Insurance
21  Agreement" and says in the beginning of the text in capital
22  letters, "No credit insurance is required to obtain this
23  loan."
24      Do you see that?
25  A. I see it.

838

1   Q. Okay.
2       And that would alert them to the fact this credit
3   insurance is both optional and not required to obtain the
4   loan, correct?
5   A. If they spoke English. They're Spanish speakers.
6   Q. Do you know that for a fact or you just assuming that?
7   A. Well, I'm reading it from the complaints. I pulled the
8   complaint out.
9   Q. Okay.
10  A. "We are Hispanic and our primary language is Spanish."
11  Q. Okay.
12      And your point is: This document is in English?
13  A. It is in English.
14  Q. Okay.
15      So, as a regulator, what would you like to see?
16      Would you like to see Household provided them with a
17  disclosure in Spanish?
18  A. Well, there are a couple things.
19      One, if you are lending money to someone that doesn't
20  speak English, at least I know -- from the bank's
21  standpoint -- they've got forms. All of their documents are
22  in all the different languages of the clients that they serve.
23      The second thing is Household always claimed that
24  their insurance was optional; but, if you remember, I talked
25  about the penetration ratios.

839

1    When you look at how many loans were made and how
2  many insurance policies were written on those loans, if it
3  gets above 50 percent, the regulators think that credit
4  insurance is actually required.
5    In this complaint, it actually says that:  "The
6  Household's representative told us that we had to get single
7  premium credit insurance."
8    So, it conflicts with the language in this document,
9  which, if they spoke English, they would have been able to
10  read and maybe ask a question about.
11    But, notwithstanding that, this is symptomatic of
12  insurance packing that was complained of in various states
13  around the country.
14  Q.  All right.
15    So, part of the problem is the document is in English
16  and you believe they spoke Spanish?
17  A.  Well, they said they spoke Spanish.  I'm just looking at
18  their complaint.
19    I don't know them personally.
20  Q.  Understood.
21    So, let's look at the other document in the loan
22  file, which is the Loan Payment and Security Agreement.
23    We'll mark this as Defendants' 1081 for
24  identification.
25    (Document tendered.)

840

1  BY MR. KAVALER:
2  Q.  Did you see that document, as well, when you were looking
3  at the documents relating to the claim of Mr. and Mrs. Nanez?
4  A.  I'm not sure.  I have seen documents that look like this.
5  I don't know if I saw this particular one.
6  Q.  Let me see if I can refresh your recollection.
7    It has Mr. Nanez's name and Ms. Nanez's name on the
8  first page?
9  A.  That doesn't help.
10    I've seen documents like this, but I can't tell you
11  for sure if I saw this particular document.
12  Q.  Okay.
13    It's called a "Loan Payment and Security Agreement"?
14  A.  That's what it says at the top, yes.
15  Q.  Now, on the last page, next to the Nanez's signatures, it
16  has a paragraph in Spanish.
17    Do you see that?
18  A.  Yes.
19  Q.  Do you happen to read Spanish?
20  A.  No, I don't.
21  Q.  Do you see the paragraph right above it?  It translates it
22  in English.
23  A.  Okay.
24  Q.  Okay.
25    The English says, "Notice the borrowers may request

841

1  the Truth in Lending Disclosures be provided in the Spanish
2  language before signing any loan documents."
3    And the Spanish, I won't even try, but it says -- the
4  first word is "Aviso," which I think means something very
5  similar to "Notice."
6    My guess is the language in Spanish and English is
7  the same.
8    Does that sound reasonable to you?
9  A.  Sure.
10  Q.  Okay.
11    Does that refresh you recollection that when you
12  looked at the Nanez loan file, you saw that the Nanezes were
13  provided with a disclosure document which contained a notice
14  in Spanish that they were entitled to request that all of
15  their documentation be provided in Spanish, if they wanted?
16  A.  I can't read Spanish, but the English translation says,
17  "Truth in Lending Disclosures."
18    So, this optional credit insurance, I don't know if
19  that's part of the "Truth in Lending Disclosure."
20  Q.  Okay.
21  A.  But it does have something here in Spanish that says that
22  they have the opportunity to get their Truth in Lending
23  Disclosures.  That would be Regulation z.
24  Q.  In Spanish?
25  A.  It is in Spanish, yes; but, it doesn't have anything to do

842

1  with this document that you showed me that's in English,
2  regarding optional credit insurance.
3  Q.  Right.
4    Let me be clear.  There's a statement in Spanish that
5  says, "You can get the disclosures in Spanish," right?
6  A.  It says, "Truth in Lending Disclosures."  That's different
7  than disclosures.
8  Q.  Okay.
9    And you saw documents like this in the course of your
10  investigation?
11  A.  Yes.
12    MR. KAVALER:  I offer Defendants' 1081, your Honor.
13    MR. DROSMAN:  No objection, your Honor.
14    THE COURT:  Admitted without objection.
15    (Defendants' Exhibit 1081 received in evidence.)
16  BY MR. KAVALER:
17  Q.  So, it says on the front, "Loan Repayment and Security
18  Agreement"?
19    MR. KAVALER:  And go to the last page.
20  BY MR. KAVALER:
21  Q.  And you see the box in the upper left (indicating) --
22  that's what we're talking about.
23    It says in English, "Notice:  The borrowers may
24  request that the Truth in Lending Disclosures be provided in
25  the Spanish language before signing any loan documents."

EXHIBIT 4

893

1  pervasive, they started to disbelieve Household, which is
2  exactly what she was saying.  Very hard for me to look at
3  their response, their detailed response, and not, by this
4  point in time, two weeks before they reached this settlement
5  when they know they're under this scrutiny, to say that that's
6  a fair response to the complaint.  Asked as a regulator, you
7  get the answer of what the regulators did.
8       Finally, the third time it came up, your Honor --
9  first of all, by then it's out; and it's become an issue
10  that's being talked about.  He asked her, Don't you think the
11  guy did a superb job.  After getting the wrong answer for
12  himself moments before on the regulator question, two pages
13  later, at Page 864 to 865, she says she doesn't agree.  There
14  were pervasive problems.  The regulators were on them at this
15  point.  It's two weeks before the $484 million settlement.
16      And I think, your Honor, there is no question that
17  all of her answers were responsive to his questions.  He
18  opened the door.  And then he compounded his error by then not
19  moving to strike, not objecting, which he described Thursday
20  afternoon after we finished as a tactical decision on his
21  part.  Well, your Honor, when you make a tactical decision
22  like that, you waive your objection.
23      And, your Honor, it's not as if defense counsel
24  wasn't warned.  I mean, there is no question that the $484
25  million settlement is coming in in certain parts of this case,

894

1  without question.  There are no fewer than five press
2  releases, three on defendants' exhibit list, two on ours, that
3  the parties have vetted that are coming into evidence in this
4  case.  So the jury is going to hear about it.  There is no
5  question about that.  Those documents are already -- have been
6  marked.  There are no objections to them at this point.
7       And I go back to day seven of our pretrial hearings,
8  your Honor, at Pages 658 to 661 where the Court basically
9  said, I don't think anybody is seriously contending that the
10  fact there was a settlement is not going to come in
11  evidence, are you?  I mean, how does the market know unless
12  there's an announcement?
13      You went on to say, Sure, but one of the facts for
14  sure is going to be that there was a settlement.  And
15  Mr. Newville answered, Yes, your Honor.
16      We got back to it when we were talking about
17  Mr. Devor's opinion on the restitution issue.  And he went
18  on -- Mr. Hall asked a question.  He withdraw an objection to
19  one of our demonstratives.  And he said, We had talked about
20  it earlier.  I believe the Court clarified, to the extent that
21  the plaintiffs need to use that number -- referring to the
22  484 -- with one of their experts, including Devor or Fischel,
23  that the amount of the settlement is going to be allowed to be
24  presented to the jury.  We just want to clarify that that
25  would be the limit of the 484 million settlement use in trial.

895

1       And the Court said, I don't know that I can do that.
2  I don't know what's going to happen during the trial.  I mean,
3  you may bring it up.  I don't know.  You may open the door or
4  there may be some other legitimate function for it.  I'm not
5  prepared to make an advisory ruling as to anything.
6       And so they were forewarned, forearmed.  And yet
7  instead, they ask questions where they drove the expert
8  witness specifically into answering with the 484.  Not all the
9  states, maybe many, but not all the states were against them?
10  Well, all 50 settled with them so -- for predatory lending
11  practices.  That's a responsive answer.
12      And before I take my seat, your Honor, I would just
13  like to clarify that on Thursday afternoon when we finished,
14  Mr. Kavaler asked a series of questions about do you know the
15  number of loans that were affected by these different
16  practices.  And as he well knew from reading Ms. Ghiglieri's
17  report, she has a section about how much Household calculated
18  the refunds at, their estimates of those types of practices.
19  That's the way she had to answer that question.  He knew that.
20  She answered it that way.  And we intend to go into that this
21  morning because it's a fair response to their question of the
22  number of loans.  Well, the number of loans, all I can tell
23  you is you calculated 1.2 billion.  And she should be allowed
24  to say that, your Honor.  I don't think there's any question
25  that it's clear that Mr. Devor is allowed to say that based on

896

1  the Court's pretrial ruling.  He had a similar opinion.
2       THE COURT:  Okay.  Well, I reviewed to the best -- as
3  best I could the transcript over the weekend.  I must say, I
4  wasn't as conscientious and effective as either of you.  But
5  several things struck me.
6       First, I also did a review of my pretrial rulings.
7  And neither side has touched on this, but I think that there
8  are really two rulings that apply to this situation, the one
9  that has been mentioned already regarding the use of the
10  settlement and the terms and so on; and another one, which in
11  some ways was more of a direct ruling on what we have before
12  us, which was the admissibility of the underlying evidence
13  that experts relied upon for purposes of evaluating the
14  expert's opinion.  And we even instructed the jury on that.
15  We said we're going to allow that evidence in.  We're going to
16  instruct the jury that they're to use it only for purposes of
17  evaluating the expert's opinion.
18      And it seems to me that what we have here is a
19  situation that kind of slid between the cracks of those two
20  opinions.  We have one opinion saying we're not going to go
21  into the terms of the settlement for purposes of showing
22  liability.  We have another opinion that says experts can go
23  into matters that are otherwise inadmissible, and the jury can
24  use that information for the purpose of judging the expert's
25  opinion.

897

1    What I think nobody addressed -- well, I know nobody
2  addressed prior to trial is what happens if one of the things
3  that the expert relies upon is the very settlement and the
4  terms and conditions of that settlement in reaching her
5  opinion or conclusion about the issue of liability, the
6  existence of predatory lending, which is what has happened
7  here.  This expert obviously relied upon not only the reports
8  but the actual fact of the settlement, that all of these
9  states participated in the settlement, as a basis for
10  corroborating her opinions regarding the pervasive and
11  extensive nature of the various predatory practices that she
12  opines Household was engaged in.  Nobody addressed that issue
13  prior to trial specifically.  And, thus, we have this
14  happening.
15    It's pretty clear to me from the pretrial exhibits
16  and motions that it ought to have been clear to both sides
17  that this expert was relying upon that settlement in reaching
18  some of her conclusions.
19    Now, to the point of the questions and answers here,
20  to me what drives this ruling is exactly what Mr. Kavaler here
21  pointed out.  It is that, early on in the cross-examination,
22  it was clear that this witness was going to rely upon the
23  terms of that settlement in answering questions about whether
24  other investigators agreed with her, the number or extensive
25  nature of the alleged wrongdoings by Household.  But at no

898

1  point, even after it was clear to me and it ought to have been
2  clear to everybody, if not from the pretrial discovery,
3  certainly from her answers on the stand that she was going to
4  be relying on these things, was an objection made.  At no
5  point was there a request for a clarification from the Court
6  on its ruling.  At no point was there a request that the Court
7  admonish the witness.  At no point, until the very last
8  question, which resulted not only in an answer by the witness
9  but a rejoinder by counsel really in his responsive question
10  where he pointed out the $3 billion increase in Household's
11  stock after they announced this settlement, a fact not in
12  evidence, which he assumed in his question and forced the
13  witness to admit she didn't know about.
14    Now, you can't allow a series of answers that
15  apparently violate what you believe is the appropriate
16  interpretation of the Court's rulings to go on and on and on,
17  continue to ask questions, make no objections and sort of keep
18  in your hip pocket the fact that you may be objecting to these
19  things later on if the cross-examination doesn't turn out the
20  way you want it to.  You can't reserve an objection.  You have
21  to voice it at the time that the inappropriate answer comes
22  out.
23    By his own count, we have about six inappropriate
24  answers here, none of which were objected to, not a single
25  one, not until after the testimony was done for the day and

899

1  the witness stepped down did counsel make any comment to the
2  Court.  And at that point, his only comment was that he wished
3  to voir dire the witness, not that he objected to her answers.
4    Clearly if there was an objection here, it was
5  waived.  Now, I'm not sure there was an objection because,
6  as I said, the Court has not addressed -- because nobody has
7  presented to it squarely -- the question of to what extent
8  this witness, if she testifies that she relied upon this
9  settlement and the terms of it in reaching her opinion, can
10  testify to those terms.  Nobody has asked us to issue a ruling
11  on that, and we haven't.  By now, of course, it's too late.
12  She has done that.
13    I find that all of the answers she gave, with the
14  possible exception of the last one, were directly responsive
15  to the questions.  If you ask a witness to quantify the number
16  of particular types of complaints in order to undermine her
17  opinion that this particular type of wrongdoing was pervasive,
18  she's going to give you the answer that she has.  And the
19  answer this witness had -- and it's clear from her report --
20  was that she had depended upon the amount of money that
21  Household set aside to repair the injuries that are alleged to
22  have taken place from that particular type of misconduct; in
23  other words, the settlement and the various aspects of the
24  settlement.  Those answers were all responsive to the
25  questions.

900

1    What I think was not necessarily responsive, and I'm
2  ruling now that the witness will be instructed, is her to
3  mention the amount of the settlement.  That was not necessary.
4  The number of states, sure.  The money or dollar amount I
5  don't think is particularly necessary.  Can't blame the
6  witness for saying it.  It obviously constituted a part of her
7  reasoning in coming to her conclusions.  But I'm instructing
8  you to instruct her that she is not to do that unless she's
9  specifically asked a question directly asking her to mention
10  the amount of the settlement or the size of the settlement in
11  answering any other questions.
12    That's the Court's ruling.  And I'll try to put
13  something in writing afterwards to the extent that I have
14  time.
15    I don't feel there's any need for a voir dire.  I
16  feel you do need to instruct your witness that she's not to go
17  into the amount of the settlement.  If she's asked questions
18  directly relating to how she estimated the degree of the
19  problems that she opined Household had, the extent to which
20  they were pervasive and so on, then she can answer in terms
21  of, to the extent that it's true and that she relied upon it,
22  her analysis of the amount of money they set aside to address
23  the issue.
24    Can we bring the jury out now?
25    MR. KAVALER:  Your Honor, may that instruction to

Ghiglieri - redirect

961

1  said, in essence, we don't engage in predatory lending.  Do
2  you recall that?
3  A. I do.
4  Q. And did these memos change your conclusion as to whether
5  Household engaged in widespread, systemic predatory lending
6  practices during the 1999-to-2002 time frame?
7       MR. KAVALER: Objection, your Honor, replicates the
8  direct.
9       THE COURT: I'll sustain the objection.  You're going
10  to have to ask specific questions or move on.  We can't just
11  regurgitate.
12  BY MR. DROSMAN:
13  Q. Okay.  I'll show you Plaintiffs' Exhibit 550 in evidence.
14  (Tendered.)
15  BY MR. DROSMAN:
16  Q. Ms. Ghiglieri, you recall Plaintiffs' Exhibit 550?
17  A. I do.
18  Q. And this was a document that you considered in formulating
19  your opinions, correct?
20  A. Yes.
21  Q. And this is a letter from the multistate attorney
22  generals; is that right?
23  A. That's right.
24  Q. And that's -- it's addressed to Household?
25  A. Yes.

Ghiglieri - redirect

962

1  Q. And it's dated August 15, 2002; is that right?
2  A. August 14, the letter?
3  Q. Is it dated August 15 -- you're right, August 14, 2002.
4  A. Yes.
5  Q. And then if you could look at the page ending 756, and the
6  third paragraph down.  It's the third -- begins the third
7  sentence in, The explanations and rationales.  It reads, The
8  explanations and rationales Household articulated on July 9
9  and in the July 17 letter have not given us any reason to
10  reconsider our position that the practices we earlier
11  identified present serious problems under a variety of
12  consumer protection and regulatory laws.  Further, the
13  responses provided no information which has led us to change
14  our position that those identified practices warrant changes
15  in the future and relief for Household's customers who
16  suffered from them in the past.
17       Do you see that?
18  A. I do.
19       MR. KAVALER: Objection, your Honor.  This, again, is
20  rehashing exactly what we went over in the direct.
21       MR. DROSMAN: This is her chance to explain why Gary
22  Gilmer's letters -- self-serving memoranda are not persuasive.
23       MR. KAVALER: Your Honor, I move to strike the
24  comment about self-serving.  That's counsel's unsworn
25  testimony.

Ghiglieri - redirect

963

1       And, secondly, that's precisely the point he made in
2  the direct for precisely the same reason.  We're going over it
3  again to bolster the prior testimony.  I didn't think that was
4  the purpose of redirect.  In that case, I'll recross her and
5  we'll go through it forever.
6       THE COURT: I'd rather not go on forever, clearly.
7       The objection will be sustained.  If you have new
8  material to bring out, you may do so.  The same material may
9  not be gone over again.
10  BY MR. DROSMAN:
11  Q. You mentioned today that it would be a conflict for you to
12  testify as an expert if you had worked previously at
13  Household.  Do you recall that?
14  A. Yes.
15  Q. Why do you believe that it would be a conflict for you to
16  testify as an expert if you worked at Household?
17  A. Because if I take an expert witness case, the first thing
18  I do is see if I have a conflict.  If it concerns a past place
19  that I worked, I wouldn't be able to take the case.
20       So, for example, if it has to do with the Department
21  of Banking in Texas during the time frame when I was there, I
22  would be opining on the decisions that I made; and that would
23  not be objective opinions by an objective person.
24  Q. You mentioned today that re-aging may have a positive
25  effect on the cash flow of the business, correct?

Ghiglieri - redirect

964

1  A. Yes.
2  Q. Does that have any significance to your opinion that
3  Household engaged in re-aging practices to mask its two-plus
4  delinquency numbers?
5  A. Well, the positive effect is only if the person keeps
6  paying.  But if you recall, we discussed that last week, that
7  the way that these loans were structured made it very
8  difficult for the people to pay because the balances kept
9  going up with all the fees and insurance premiums being packed
10  on.  And so then, they would become delinquent.  Household
11  would re-age them, pack on some more things.  They wouldn't be
12  able to pay again.  Household would re-age them.  So it had a
13  negative effect on cash flow, not positive.
14       MR. KAVALER: Your Honor, I move to strike everything
15  after the phrase as you recall, we discussed last week.  It's
16  precisely that; what we discussed last week.
17       MR. DROSMAN: Your Honor, I ask that he not make
18  speaking objections.
19       THE COURT: Make a legal objection.
20       The objection is overruled.  The answer may stand.
21       MR. DROSMAN: Thank you.
22  BY MR. DROSMAN:
23  Q. Finally, you were contacted by lawyers for the defendants
24  after you were retained in this case by plaintiffs, correct?
25  A. Yes.

985

1  Q. Mr. Gilmer, I take it that you recognize Exhibit 458. You
2  have seen it several times in the last few days during the
3  trial; is that right, sir?
4  A. Yes, I do.
5  Q. Sir, is that a copy of an e-mail that you prepared and
6  sent on or about December 22nd, 1998?
7  A. That is correct.
8  Q. And you sent it to people at Household in consumer lending
9  that reported to you; is that correct?
10  A. That's true.
11  Q. And the title of your e-mail was "Growth in 1999," sir; is
12  that right?
13  A. That's correct.
14  Q. And you say, "I think we have talked about this enough
15  that everyone understands just how important it is to us next
16  year and beyond." Is that right?
17  A. That's exactly right.
18  Q. When you said that, you were referring to growth; is that
19  correct, sir?
20  A. That is correct.
21  Q. You go on to say that you met with senior management on
22  Thursday, December 18th for seven hours; is that right, sir?
23  A. That's what it says, yes.
24  Q. When you are talking about senior management, do you mean
25  Mr. Aldinger?

986

1  A. Unfortunately, it's been ten years ago, so I can't recall
2  who was there. But senior management could have been a part
3  of this team that's listed here. It could have been others in
4  the organization. I don't know if I meant Mr. Aldinger, but
5  it might well have been.
6  Q. How about Mr. Schoenholz? Was he at the meeting? Do you
7  remember?
8  A. No, I don't recall.
9  Q. Have you ever used the phrase "senior manager" to refer to
10  Mr. Aldinger and Mr. Schoenholz?
11  A. Yes, indeed.
12  Q. And you said the meeting went on for seven hours. Is that
13  correct, sir?
14  A. That's what it says.
15  Q. And it was devoted almost entirely to growth; is that
16  right?
17  A. That's exactly right.
18  Q. Do you recall, sir, was an Andrew Kahr present at the
19  meeting on December 18th?
20  A. No. Remember, I said I don't remember the meeting.
21  Q. So you don't recall whether he was there one way or the
22  other, I take it?
23  A. No. That's correct.
24  Q. And you say that "We stink at growth." Is that right?
25  A. Well, I am sure it's on here, and we probably did stink at

987

1  growth.
2  Q. Mr. Gilmer, I think this is true, but just to help you out
3  a little bit, from time to time they highlight the documents
4  up here. You got a monitor so I can prompt you to the
5  specific spot. All right, sir?
6  A. Very good.
7  Q. You go on to talk about this concept of growth; is that
8  correct?
9  A. That is correct.
10  Q. In fact, you prepared a chart that showed how Household
11  stock was valued compared to what you called their peers; is
12  that right?
13  A. I did indeed.
14  Q. And in this chart -- I mean, it's got "Household" at the
15  top, "Providian" at the bottom. But actually you were showing
16  your people that Household was dead last in terms of earnings
17  multiple; is that correct?
18  A. That's exactly what this chart shows.
19  Q. So you felt that -- in this chart, when you prepared it,
20  you felt that Household stock was undervalued compared to
21  these other companies; is that right?
22  A. That's a fair conclusion.
23  Q. And you go on to say, "As you know, a company's stock is
24  simply a reflection of the market's confidence in its ability
25  to consistently generate future earnings growth."

988

1      Do you see that?
2  A. Yes, I do.
3  Q. And I take it you believed that at the time. That's why
4  you wrote it?
5  A. Indeed, that would be correct.
6  Q. Sir, there, when you are talking about the market's
7  confidence, you are talking about Wall Street; is that right?
8  A. That would be at least a part of it, yes.
9  Q. And you talk about that confidence is in its ability to
10  consistently generate future earnings growth.
11      Let me ask you, sir, did you mean by that, that when
12  people are valuing a stock, one of the things that they look
13  at is how that company is going to grow in the future; is that
14  right?
15  A. That would be a critical component of their evaluation, I
16  would think, yes.
17  Q. And you say that "This market does not have much faith in
18  our ability to deliver that growth." Is that right?
19  A. As reflected by the chart.
20  Q. And you go on to say that you have spoken to half the
21  analysts on Wall Street in the last ten days.
22      Do you see that?
23  A. Yes, I do.
24  Q. I guess you say, "spoken to what seems like half the
25  analysts on Wall Street." Is that fair?

1013

1 A. I do.
2 Q. And what you meant by that is that a significant part of
3 the borrowers who were paying off loans early lived in states
4 or owned property in states that didn't allow prepayment
5 penalties; is that right?
6 A. That does appear to be correct, yes.
7 Q. So you say, "Given that the Parity Act allows us" -- as
8 you understood it -- "to overcome that problem, we need to get
9 that implemented right away."
10     Is that right?
11 A. Let me explain what the Parity Act was as I understood it,
12 to be clear.
13 Q. Well, you can just answer my question, sir.
14     Is that what you wrote at the time:  "Given that the
15 Parity Act allows us, as I understand it, to overcome that
16 problem, we need to get that implemented right away"?
17 A. If you would like for me to testify that you have
18 correctly read that sentence, the answer is correct.  You
19 have.
20 Q. That's my question, sir.
21 A. Okay.
22 Q. And Ms. Allcock replied that same day to you,
23 January 13th, 1999; is that correct, sir?
24 A. That is correct.
25 Q. And in her response she said that they will put that issue

1014

1 on the top of the list; is that correct?
2 A. Right.  Right, she does say that.
3 Q. Sir, I would like to show you what's been marked as
4 Plaintiffs' Exhibit 463.
5     (Document tendered.)
6 BY MR. DOWD:
7 Q. I will ask you to take a look at that, if you would.
8     MR. DOWD:  Copy for counsel.
9     (Document tendered.)
10     MR. DOWD:  Your Honor, I would offer 463 at this
11 time.
12     THE COURT:  It will be admitted.
13     (Said exhibit was received in evidence.)
14 BY MR. DOWD:
15 Q. Have you had a chance to look at 463?
16 A. I am ready.
17 Q. Is that a copy of an e-mail that you prepared and sent to
18 Household officers and employees on or about October 13th,
19 1999?
20 A. It appears to be so, yes.
21 Q. And among others, you sent it to Mr. Detelich, Mr. Vozar;
22 is that correct?
23 A. Joe Vozar and Tom Detelich.  That's correct.
24 Q. You also sent it to a Dennis Hueman; is that correct, sir?
25 I'm looking about halfway down the second column there.

1015

1 A. That is correct.
2 Q. And the title of your e-mail is "MAC follow-up."  Is that
3 correct?
4 A. That is correct.
5 Q. What did "MAC" stand for?
6 A. Management Advisory Committee.
7 Q. And that was like a term of art, those initials.  MAC just
8 meant Management Advisory Committee?
9 A. That's correct.
10 Q. What was the Management Advisory Committee at this point
11 in time at consumer lending, sir?
12 A. I don't recall.  I don't recall who was on it.  It was a
13 group of people -- you mean what was its function?
14 Q. Yes, sir.
15 A. Its function was to meet and discuss issues of the day for
16 our company.  My recollection is that it met at least
17 annually.  It may have even met quarterly.  Again, get around
18 the table, talk about things that are going on in the company
19 or we need to apply a focus and come up with some ideas and
20 flesh those out and move forward from there.
21 Q. And you say that the purpose of your note -- I take it you
22 mean your e-mail -- is to update the people receiving it on
23 "the considerable progress we have made on the suggestions
24 generated at the MAC meeting in June."
25     Is that right, sir?

1016

1 A. Right.
2 Q. Looking down about the fourth entry that you make here on
3 the first page of Exhibit 463, it states, "Create an insurance
4 penetration report on house mail."
5     Do you see that?
6 A. It does.
7 Q. What's an insurance penetration report?  What did that
8 phrase mean, sir?
9 A. An insurance penetration report would be a report that
10 would tell management what it needed to know about its results
11 for insurance sales.  And specifically -- I guess you could
12 look at it from several different angles, but primarily it
13 would answer the question, how well are we doing at selling
14 this product, either in premium -- by premium volume of some
15 sort or perhaps by the numbers of customers that would accept
16 the product?  It could be any combination of those.  But
17 fundamentally, that's what it was for.
18 Q. Do you recall, sir, whether the insurance penetration
19 report included percentages of customers that were accepting
20 insurance?
21 A. It probably would have.  I would expect it to, sure.
22 Q. And that was something that you tracked at Household in
23 this era?
24 A. Absolutely.  Yes, we would.
25 Q. Sir, the next entry says, "Spread live check' drops over a

Gilmer - direct

1116

1 MR. DOWD:  And I'd offer 1204, your Honor.
2 THE COURT:  It will be admitted.
3 (Brief pause.)
4 BY THE WITNESS:
5 A. Okay.  I haven't read all the pages, but I've got the gist
6 of it, I think.
7 BY MR. DOWD:
8 Q. If you need a second when we get to a page, let me know.
9 All right, sir?
10 A. Okay.
11 Q. Is a that a copy of a report of examination prepared by
12 the Office of Thrift Supervision for an examination that
13 started on or about August 27, 2001, and ended on or about
14 March 26, 2002?
15 A. That, I believe, is correct.
16 Q. And it's for Household Bank FSB; is that right, sir?
17 A. That is correct.
18 Q. And during the period beginning August 27, 2001, until
19 sometime early 2002, you were on the board of Household Bank;
20 is that right?
21 A. That's right.
22 Q. Sir, I'd ask you to turn to the second page of Exhibit
23 1204 if you would.
24 A. Okay.
25 Q. And it's the one that ends with the Bates range 40.  Is

Gilmer - direct

1117

1 that a copy of a letter from the Office of -- or OTS, the
2 Department of the Treasury, dated April 12, 2002, to the board
3 of directors of Household Bank?
4 A. That is correct.
5 Q. Sir, I'd ask you to go to the page that ends with the
6 Bates range 44 if you would, a bunch of zeroes and then a 44.
7 A. Okay.
8 Q. You have that in front of you?
9 A. I do.
10 Q. And the beginning of that page, it says, Examination
11 Conclusions and Comments Continued; is that right?  At the top
12 of the page there?
13 A. That is correct.
14 Q. And OTS states in that section, A potential predatory
15 lending practice existed in the requirement for personal
16 property insurance on loans in the Texas agency offices; is
17 that right?
18 A. That's right.
19 Q. Did you receive a copy of this report at the time?
20 A. I probably did.  It seems that a whole page is missing or
21 at least a substantial part of the page from which you just
22 read is missing.
23 Q. I --
24 A. Is that right or wrong?
25 Q. I think that there were -- as I understand it, the OTS

Gilmer - direct

1118

1 produced documents and gave us what was relevant pursuant to
2 subpoena.
3 A. I have no idea.  I just point out that all of the material
4 leading up to this sentence you're reading is missing.
5 Q. I understand that, sir.
6 A. Okay.
7 Q. There's nothing I can do about that.  You understand that,
8 right?
9 A. You understand when you read a sentence at the end of a
10 paragraph where it appears that the whole page in front of it
11 is missing, it's difficult for me to understand what your --
12 what the context is in which you're reading it.  But that's
13 the only point I'm making.
14 Q. Right.  I get these from the OTS.  But you would have got
15 it with the entire page there when you were at Household,
16 right, sir?
17 A. Would you forgive me if I didn't memorize this page from
18 eight years ago?
19 Q. Absolutely.
20 A. Okay.  Thank you.
21 Q. I'm just pointing out why.  You seem to be asking me a
22 question.  I don't want you to --
23 A. I am.
24 Q. -- misunderstand, like I somehow cut this page off.  I
25 didn't, sir.

Gilmer - direct

1119

1 A. I'm sure you wouldn't do that.
2 Q. We go on, sir, to page -- Bates range that ends with
3 numbers 56.  I'd ask you to take a look at that if you would.
4 A. Okay.
5 Q. And there's a section there entitled Predatory Lending and
6 Services.
7 Do you see that?
8 A. I do indeed.
9 Q. And the OTS states, A consumer lending policy requires
10 insurance on personal property used as collateral for loans
11 originated by former Beneficial Finance agency offices in
12 Texas.
13 Do you see that?
14 A. I do.
15 Q. And if you go down a little further on the page, it says,
16 Based on our loan review, insurance premiums can be up to 9
17 percent of loan proceeds.  The premium is an upfront fee and
18 included in the total loan proceeds.
19 Do you see that, sir?
20 A. I do.
21 Q. It goes on to say, Although most homeowners and renters
22 would have existing insurance coverage, over 95 percent of the
23 borrowers obtained insurance through the agency offices.
24 Do you see that, sir?
25 A. I do indeed.

-

Gilmer - direct

1140

1 about the existence of prepayment penalties.
2     Do you see that, sir?
3 A. I do.
4 Q. Do you see that on the next page, they talk about
5 insurance packing and fraudulent sale of insurance?
6     Do you see that?
7 A. I do.
8 Q. They go on to say, HFC's practice is to hard sell
9 insurance products. These practices break down into four
10 categories. One, aggressive sales tactics; two, inclusion of
11 insurance without customer knowledge; three, making borrowers
12 believe insurance is a requirement.
13     Do you see those entries?
14 A. I do.
15 Q. And you understood that was the State of Washington's
16 position back here in May of 2002, and they were telling you
17 about that position; is that right?
18 A. I understood it to be based on the 19 accounts that they
19 looked at, yes.
20 Q. You didn't understand it to be based on more than just 19
21 customer complaints, sir?
22 A. That is -- that is not -- my understanding -- correct me,
23 I'm sure, if I'm wrong -- but the basis of their examination
24 was 19 accounts. Is that wrong?
25 Q. Yeah, I believe they looked at a lot more than that, sir.

-

Gilmer - direct

1141

1 But when we got to that report from the State of Washington,
2 you told me that you couldn't ever remember reading it before?
3 A. Yes, I don't remember reading it before. Is that in
4 conflict with my recollection that it was 19 accounts? I
5 don't know that it says 19 accounts in there. My
6 recollection, from talking with the people in my organization,
7 was that it were very limited number of accounts that they
8 reviewed. And my -- it might have been 20. Maybe it was 18.
9 But the number was 18, 19, or 20. I think it was 19. And
10 that is my testimony. It is not different from my prior
11 testimony. And that's what it is.
12 Q. Okay. You didn't understand that they had also sent in
13 people essentially undercover?
14 A. Oh, yes. I think they had three -- I think they visited
15 three branches, as I recall.
16 Q. So in addition to the 19 customers, there was this
17 undercover issue; is that right?
18 A. I think that is right. Now, please forgive me again. I
19 don't remember what the issues were with the three visits.
20 Again, going back many years. But, I mean, you know, the
21 difficulty that I have is when we put a report up here that
22 doesn't have any -- any numbers, no statistics. It just says
23 this happened. It just says that happened. I did read the --
24 as I said, I read the first three pages of that report. It
25 said that we had 300 employees in Washington, I believe. We

-

Gilmer - direct

1142

1 had I don't know how many billions of dollars, how many -- I
2 think there were 400,000 loans outstanding. That's on the
3 report that you handed me a few minutes ago. Then you handed
4 me this and say, well, this happened and that happened with no
5 context. What am I supposed to say?
6 Q. Sir --
7 A. All I can give you is the truth.
8 Q. Right. But you told me it was based on 19 customer
9 complaints. Now you're telling me, oh, okay, now I remember
10 in addition to the 19 customer complaints, they sent in people
11 undercover three times; is that right?
12 A. That's exactly right.
13 Q. Did you understand that they were also talking to attorney
14 generals and regulators from across the country about the
15 practices?
16 A. I understood based on this and what you gave me and some
17 recollection of the time. And when you say across the
18 country, the United States has 50 states. That's a
19 groundbreaking announcement. There were some attorneys
20 general, as noted there, that did not agree with what we were
21 doing. That's pretty clear in what you just handed me. I
22 also know that there were many attorneys general that didn't
23 have a problem with what we were doing.
24 Q. Sir, let me stop you there. After you left the company in
25 August of 2002, Household continued to deal with these

-

Gilmer - direct

1143

1 attorneys generals from across the country; isn't that right?
2 A. Well, that would be difficult for me to testify to
3 something that happened after I left the company. Would you
4 like me to speculate?
5 Q. I'm not asking you to speculate, sir. I'm asking --
6 A. You --
7 Q. -- if you know from your personal knowledge.
8     What was your official resignation date?
9 A. I didn't resign. I retired after 32 years, counselor.
10 Q. Okay. And when was the last day that you officially
11 resigned?
12 A. I didn't resign.
13 Q. Retire, sir.
14 A. Thank you. There's a big difference in resigning [sic]
15 after 32 years and resigning. So I didn't resign. I retired.
16 My retirement was -- was phased over several months beginning
17 in about June of 2002, and I started to step back from
18 day-to-day operations. And I spent most of my time away from
19 the office beginning sort of July time frame. And by the end
20 of December, I was completely -- officially retired. I didn't
21 have any -- any active management duties really from the June
22 time frame. Maybe that helps you.
23 Q. Okay. So you're not aware of what took place between
24 these attorneys generals and Household between the time of,
25 say, June and October 11, 2002?

1216

1 payment, the money would be there and the customers --
2 another great product, I thought, by the way. It helped the
3 customers.
4 Q. Also beneficial to the customer? Also beneficial to the
5 customer?
6 A. Very much so, especially to our customers.
7 Q. What about the company? Was it good for the company?
8 A. Again, for the same reason that I just talked about with
9 the biweekly payment plan. It was convenient for the
10 customer. The customer -- I think I described our customers
11 earlier as having spotty credit. Some of that was their
12 neglect, not remembering, not taking it as seriously as
13 perhaps they should. This took away that -- that doubt or
14 that opportunity for just piling on to their previously bad
15 credit pattern.
16      So it instilled a little discipline in their lives as
17 far as their credit was concerned. So it was very helpful to
18 them; and as I mentioned on the credit quality side for us,
19 meaning the collection centers, when the customers pay more
20 regularly, you don't need as many collectors, and so we saved
21 a lot of money.
22 Q. That's an interesting point, Mr. Gilmer. What's a
23 collector?
24 A. A collector is -- they call them adjusters in some
25 companies, account executives in other companies. It's a

1217

1 person who calls a customer when the customer misses a payme
2 to remind the customer that the payment is due and to talk to
3 the customer about making arrangements to get that payment in.
4 Q. And what's a collection center?
5 A. A collection center is a place where these collection
6 collectors are housed. We had five or six collection centers
7 at different times across the United States.
8 Q. And are collection centers and collectors costs to the
9 company?
10 A. Yes, and they're very expensive to maintain.
11 Q. Is there, therefore, a business incentive to minimize the
12 number of collectors or collection centers?
13 A. Yes. Yes, there were.
14 Q. Did having people voluntarily sign up for EZ Pay have any
15 impact on the number of collectors you needed to have?
16 A. Yes. Yes, it did.
17 Q. I think we'll come back to collectors in a minute.
18      And, Mr. Gilmer, was EZ Pay always a customer option,
19 a customer choice?
20 A. Yes, it was.
21 Q. Now, Mr. Gilmer, during this trial, you watched -- you sat
22 here and you saw the excerpts from the Hueman video that were
23 played here in the courtroom?
24 A. Yes, sir, I did.
25 Q. Have you ever seen that video before or any part of that

1218

1 video before in your life?
2 A. No, sir, not before last week.
3 Q. When you say last week, you mean here in this room?
4 A. Here in the courtroom, right.
5 Q. What was your reaction when you saw that video?
6 A. Disbelief. It was a despicable piece of material that was
7 homemade by an executive who had no authority to do that, and
8 I thought it violated the fundamentals of our company, and I
9 thought it was a terrible reflection on our entire
10 organization that somebody would -- would do something like
11 that that could reflect on all of the fellow employees.
12 Q. Now, Mr. Gilmer, is that the only time that you were
13 outraged when you discovered that some employee had done
14 something contrary to your policies?
15 A. No, sir. It wouldn't be the only time I would have been
16 outraged; but I think if I had to rank outrage, that would
17 probably take the top billing.
18 Q. Did you ever express your outrage about something
19 employees were doing to Mr. Detelich, for example?
20 A. Mr. Detelich was frequently the recipient of my opinions
21 about things that I didn't like in the company.
22 Q. Let me ask you this, Mr. Gilmer: Is the common
23 experience of people around you that they are the recipients
24 of your opinions?
25 A. Yes, sir.

1219

1 Q. Whether they want them or not?
2 A. They didn't have to ask.
3 Q. Would you describe -- how would you describe your
4 personality in a business setting?
5 A. Blunt. Hopefully fair. Let me add fair, but certainly
6 blunt.
7 Q. Certainly blunt. Nobody doubts where you stand.
8 A. I don't think so.
9 Q. Let me show you Defendants' 37. Copy for counsel. Look
10 at the second page.
11      Is that your handwriting on this document?
12 A. Yes, sir, it is.
13 Q. Is that a note you wrote to Mr. Detelich?
14 A. Yes, sir, it is.
15      MR. KAVALER: I offer 37, your Honor, Defendants' 37.
16      THE COURT: It will be admitted.
17 (Defendants' Exhibit 37 received in evidence.)
18 BY MR. KAVALER:
19 Q. Mr. Gilmer, let's turn to the second page of this document
20 bearing Bates range 8110. Is that your handwriting on the
21 right?
22 A. Yes, sir, it is.
23 Q. Read it to the jury, please.
24 A. It says, "Tom, this is an outrage." And then --
25 Q. That's your signature underneath it?

1244

1   time of residence, income, debts and property values.  Also,
2   there were five loans where the AE did not follow underwriter
3   instructions and waived payoffs.  Sandy Stewart was terminated
4   for dishonesty, and all incentives have been withheld."
5        Do you see that?
6   A.  Yes, I do.
7   Q.  What does "all incentives have been withheld" mean?
8   A.  It means any pending pay, compensation, that she had
9   coming was revoked.
10  Q.  The next one says, "Bellevue, NE, Midwest Division.
11  During a QAC audit of insurance sales, there was evidence of
12  the sale of insurance after the customers had requested no
13  insurance on the loans.  QAC is doing further review to
14  determine employee involvement.  Employee interviews will be
15  done on former and present employees.  BSM Will DeRosear is
16  being placed on CA" -- what is CA?
17  A.  Corrective action.
18  Q.  -- "for his failure to handle audit insurance sales and
19  cancelations in his branch."
20       What does this mean, Mr. Gilmer?  Was someone
21  misbehaving with regard to insurance?
22  A.  It certainly appears so, yes.
23  Q.  Was remedial action taken?
24  A.  Indeed it was.
25  Q.  Go down two, three to Santa Maria, California, Southwest

1245

1   Division.
2        You know what, Mr. Gilmer, let me just move it along.
3   Are these just examples of people who were terminated or
4   otherwise sanctioned for violating various company rules?
5   A.  Yes, sir.
6   Q.  These are just the reports from two months from two
7   different divisions -- one division, right?
8   A.  That's correct, region.
9   Q.  Let me go back to the Code of Conduct we were looking at,
10  Defendants' 148, down at the bottom we looked at it says, "I
11  understand that failure to observe and follow the above may
12  result in the termination of my employment."
13       Was that Household's policy?
14  A.  Yes.
15  Q.  Okay.  Mr. Gilmer, these are all events that you have
16  personal knowledge of.
17  A.  Yes.
18  Q.  Did Household have a video that it showed to people in
19  connection with a closing?
20  A.  Yes, sir, we did.
21  Q.  Whose idea was that, Mr. Gilmer?
22  A.  That was my idea.
23  Q.  Why did you come up with this video?
24  A.  Well, I -- I wanted to make absolutely sure as best I
25  could that every loan was handled the way it should be

1246

1   handled.  By that I mean all the policies and all the
2   procedures and all the requirements, all the disclosures and
3   so forth were given and explained properly.
4        And short of my being able to be there myself
5   personally and understanding that no matter how many rules and
6   regulations we may have, we're dealing with thousands of
7   people, there's going to be somebody out there who wouldn't
8   play by the rules.  So I came up with the idea, look, if I
9   can't be in every loan closing, the next best thing to do
10  would be to put a video together, using professional actors,
11  and ask the borrower to view that video before they left our
12  branch.
13       Now, in that video -- I thought about all the things
14  that could go wrong.  You know, did they understand, for
15  example, insurance?  Did they understand, for example,
16  prepayment penalties?  Did they understand other loan terms,
17  such as contract rates?  All the things that we've heard about
18  over the last few days.
19       And so I asked the human resources department to
20  develop a video so that we could have one final -- on top of
21  everything else, we could have one final, unalterable, always
22  consistent -- a video always says the same thing, you can play
23  it a thousand times, it says the same thing -- that these
24  customers could watch so that there could be absolutely no
25  confusion, at least in my mind, or at least it could come as

1247

1   close as possible to my actually being in the room personally,
2   and I -- it was a very expensive endeavor to do that, as you
3   can imagine, mailed out thousands of these things, but I
4   thought it was worth it, and so I did it.
5   Q.  Mr. Gilmer, how long is this video?
6   A.  It's several minutes long.
7   Q.  And have we prepared a short extract that's much shorter
8   to play?
9   A.  That's right.
10       MR. KAVALER:  Your Honor, may we play the video?
11  It's Defendants' Exhibit 183.
12       MR. DOWD:  Object as hearsay, your Honor, and lack of
13  foundation as to the timing of it.
14       MR. KAVALER:  I can address the timing of it.  It's
15  certainly not hearsay, your Honor.
16       THE COURT:  Well, was there an objection at the
17  pretrial conference?
18       MR. DOWD:  Yes, your Honor.
19       THE COURT:  I don't have it.
20       MR. KAVALER:  Want me to add the timing to the
21  foundation, your Honor?
22       May I ask him one more question?
23       THE COURT:  Sure.
24  BY MR. KAVALER:
25  Q.  Mr. Gilmer, was this video played during the time we're

Gilmer - cross

1351

1 Each of the 45 states had their own separate rules, required
2 their own separate documents.  And it was a nightmare to try
3 and keep up with all of those things.  And no matter what your
4 systems, if you have, you know, thousands of rules in 45
5 states to try and comply with, the opportunity for error was
6 clear and obvious.  So what we wanted to do was move away from
7 that and ask, look, just give us a set of rules, one set of
8 rules that we can use, one set of documents that we could use
9 and -- whatever that is; and we will stick with that.  So that
10 was our -- and it was obviously good for us because it saved a
11 lot of money at the end of the day.
12 Q.  Let's go to the next sentence here.  That's the one
13 counsel read to you.  It quotes you, Mr. Gilmer.  It says,
14 Gary Gilmer, president and chief executive of Household's
15 subsidiaries HFC and Beneficial, said the company's position
16 on predatory lending is perfectly clear.  Quote, Unethical
17 lending practices of any kind are abhorrent to our company,
18 our employees and most importantly our customers.
19     Do you see that?
20 A.  I do.
21 Q.  Mr. Gilmer, was that statement true when you made it?
22 A.  Absolutely.
23 Q.  Why do you say that, sir?
24 A.  Well, because it was my long-stated, long-held and, in
25 fact, currently-held view that there is just no place in any

Gilmer - cross

1352

1 business -- and certainly not in a business where you have the
2 trust of your customers, where that's important -- so
3 important, in fact, it involves their homes -- where you could
4 have a -- tolerate a circumstance where there's any less than
5 absolute honesty and integrity.  Just couldn't have it.
6     So it's another example, in addition to the ones that
7 we talked about earlier, where I took the opportunity to say
8 that publicly.
9 Q.  Mr. Gilmer, was that statement false when you made it?
10 A.  Absolutely not.
11 Q.  Did you think it was false when you made it?
12 A.  No.
13 Q.  Did you have any doubt in your mind about the truth of
14 that statement when you made it?
15 A.  None whatsoever.
16 Q.  Did you think you were being reckless in making that
17 statement?
18 A.  No, I didn't think I was reckless.  I thought it was
19 absolutely factual.
20 Q.  Did you have any discomfort at all in making that
21 statement publicly?
22 A.  I had none then and I have none today.
23 Q.  Did you understand, sir, that investors -- current and
24 potential future investors -- might read that statement and
25 rely on it as an accurate statement of facts?

Gilmer - cross

1353

1 A.  Sure.
2 Q.  Did you believe it to be an accurate statement of facts?
3 A.  I did indeed.
4 Q.  Did you intend to mislead or deceive anybody when you made
5 that statement?
6 A.  No.
7 Q.  Do you think you misled or deceived anybody when you made
8 that statement?
9 A.  No, sir.
10 Q.  Now, Mr. Gilmer, you've been sitting in this courtroom
11 since this trial began, right?
12 A.  I have indeed.
13 Q.  And you've heard various testimony about various things,
14 about various regulators and various examinations around the
15 country?
16 A.  I have.
17 Q.  How can you give the testimony you just gave in light of
18 those facts?
19     You said earlier you were responsible for everything
20 that happens in consumer lending.  And you've heard all this
21 testimony, whatever it is, whatever it means; and you say the
22 statement that you just made here, unethical lending practices
23 of any type are abhorrent to our company, our employees and
24 most importantly our customers.  How can you swear that with
25 what you've heard here?

Gilmer - cross

1354

1 A.  I don't believe it is in conflict whatsoever because while
2 it is true that among the millions of accounts and thousands
3 and thousands of employees that we have had and have at
4 Household and Beneficial, not every one every day did the
5 right thing.  They're not any different from -- I'd say the
6 people in this courtroom.
7     But it is absolutely true that day in and day out,
8 these were good people.  And they did the right thing every
9 day.  They came in and did the right thing.  I'm talking about
10 the 99 point something percent.  Pick a number you like.  Say
11 I'm way off and it's 95 percent.  And I wouldn't tar 15,000
12 people with a label of predatory lending on the basis of a few
13 bad apples.  What -- what kind of a leader would I be if I
14 refused to stand up for the tens of thousands of people that
15 gave it their best every day and say, okay, well, they were --
16 they're all bad people because somebody made a mistake or
17 somebody didn't care or somebody in the organization didn't
18 follow the rules?
19     So I was proud to stand up and make that statement.
20 It was accurate.  I believed in it, and I believe in the good
21 side of people; and I believe in the good side of our people.
22 I trained those people.  I hired those people.  I set the
23 example for those people, and they did the right thing.
24     Yeah, you know, we saw some examples of some people
25 who didn't do the right thing, Mr. Kavaler.  That didn't have

Gilmer - cross

1355

1  anything to do with the vast majority of them who did and who
2  do the right thing every day.  So I stand by that.  Yes, there
3  were reports -- I've seen them; we talked about them; what
4  about this page; what about that example.  They were real
5  examples.  No question about that.
6       And I know it had been said earlier on this stand
7  that percentages don't matter, that -- I don't calculate
8  ratios.  I heard that time after time.  It doesn't make any
9  difference.  Well, I tell you, it does make a difference.  I
10  don't live in a fantasy world.  I live in a world where there
11  are real people doing real work with real customers and
12  looking after real shareholders.  So I can't, as a manager of
13  a 15,000 person operation, stand up and say, well, we made a
14  mistake so we're all bad people.  We're all crooks.  That's
15  not a real world.  That's -- that doesn't work.  I mean, that
16  works, I guess, if you don't have to deal with people and
17  problems and regulators and shareholders.  Maybe that works.
18  But I tell you what, when you step out into the real world,
19  Mr. Kavaler, and you're dealing with real people, you can't
20  take the view that you make one mistake and you're dead.  That
21  doesn't work.
22  Q.  Mr. Gilmer, have you just described what your state of
23  mind was back then -- everything you testified to now, is that
24  what you were thinking back on March 23, 2001?
25  A.  Indeed it was.

Gilmer - cross

1356

1  Q.  The article in Origination News continues.  It looks like
2  it's still quoting you.  Next paragraph, We are encouraged
3  that the Federal Reserve Board has taken a deliberate and
4  inclusive review of the issue and has set the benchmark for
5  guidelines that ensure our customers are protected from
6  unscrupulous lenders, while at the same time do not have their
7  access to credit restricted.
8       Does that reflect your thinking at the time,
9  Mr. Gilmer?
10  A.  Yes, sir, it does.
11  Q.  And it says, Household -- this is now the article not
12  quoting you, simply the journalist reporting -- the entity
13  reporting in its own words.  Household has a long-standing
14  history, the company noted, of working with legislators and
15  regulators in the pursuit of responsible lending.
16       Is that true, Mr. Gilmer --
17  A.  That is right.
18  Q.  -- that the company has that history?
19  A.  It does indeed.
20  Q.  Mr. Gilmer, did you ever lie to the public, to the
21  investors, to the press, to the analyst community about the
22  business or the affairs of Household in any way?
23  A.  Not one time.
24  Q.  Did you ever instruct anyone else to do so?
25  A.  No, sir.

Gilmer - cross

1357

1  Q.  Did anyone ever instruct you to do so?
2  A.  No, sir.
3  Q.  Did you ever conceal any information from the public, the
4  investment community, the press or anyone else about the
5  affairs of Household that you deemed material or important?
6  A.  No, sir.
7  Q.  Did you tell anyone else to do that?
8  A.  No, sir.
9  Q.  Did you ever instruct any of Household's public relations
10  spokespeople to lie to the press?
11  A.  Not one time ever.
12  Q.  Did you ever instruct any of Household's public relations
13  spokespeople to conceal anything from the press or the
14  investment community or the investors or the public or the
15  government or anyone?
16  A.  No, sir.
17  Q.  Mr. Gilmer, did you ever conceal the existence of a
18  pervasive, nationwide, widespread predatory lending scheme?
19  A.  No, sir.
20  Q.  Did you believe that such a scheme existed at Household?
21  A.  Absolutely not.
22  Q.  Did you ever conceal or urge anyone else to conceal that
23  Household used restructuring to hide the true credit quality
24  of Household's loans?
25  A.  Never.

Gilmer - cross

1358

1  Q.  Did Household do that?
2  A.  No.
3  Q.  Did you think Household did that?
4  A.  No.
5  Q.  Did you have any suspicion that Household was doing that?
6  A.  No, sir.
7  Q.  Now, Mr. Gilmer, we heard some brief reference in the
8  opening statement to something about an accounting
9  restatement, having to do with the credit card business.
10       Did the credit card business report to you?
11  A.  No, sir.
12  Q.  Did you have anything to do with that restatement?
13  A.  No, sir.
14  Q.  Mr. Gilmer, during the time we're talking about here, did
15  you personally own any stock in Household?
16  A.  Yes, sir, I did.
17  Q.  And where did you obtain that stock?  Tell me all the
18  different ways in which you obtained Household stock during
19  the years 1998 through 2002.
20  A.  Well, it didn't start in 1998.  It started in 1972.  We
21  bought -- Marilyn and I bought our first five shares in 1972.
22  And every year after that, we bought shares.  We took our own
23  money and we bought shares.
24       In addition to that, there were times when Household,
25  as a part of our compensation program, would give us shares,

-

1417

Gilmer - cross

1415

1 (Tendered.)

2 BY MR. KAVALER:

3 Q. Which is a report of the FDIC.

4    Do you remember that?

5 A. I do.

6 Q. And investors' counsel read to you from this document,

7 asked you some questions about it. Let me turn to page 689 in

8 the lower right-hand corner.

9 A. Okay.

10 Q. And you see there it says in the third line or the second

11 line -- I'm sorry. Let me back up.

12    The thrift appears to be involved to some extent in

13 predatory lending. Further, a consumer advocacy group has

14 named the Household organization as 2001 predatory shark

15 lender of the year.

16    Do you see that?

17 A. I do.

18 Q. Who was that consumer advocacy group, do you know?

19 A. That would be ACORN.

20 Q. Class action and other large lawsuits have been filed

21 against the organization.

22    And then the Federal Deposit Insurance Corporation

23 says, Regardless of the validity of these accusations, the

24 organization has a very high level of reputational risk due to

25 its lending activities.

1416

1    Do you see that?

2 A. I do.

3 Q. Is that what you mean by headline risk?

4 A. That's exactly what I mean.

5 Q. And it says, This could have a significant adverse effect

6 on the institution.

7    Do you agree with that, Mr. Gilmer?

8 A. I do.

9 Q. Mr. Gilmer, you sat in this courtroom and you listened to

10 the opening statements, did you?

11 A. I did.

12 Q. And you sat here and you listened to the testimony of

13 Ms. Ghiglieri, the expert witness, did you?

14 A. I did, sir.

15 Q. Mr. Gilmer, as you sat here and listened to Mr. Dowd and

16 Ms. Ghiglieri describe a company, did you recognize the

17 company they were describing as the company you worked for for

18 32 years?

19    MR. DOWD: Objection, your Honor, asked and answered.

20    THE COURT: The objection will be sustained.

21    MR. KAVALER: Your Honor, I have no further questions

22 for this witness at the present time.

23    THE COURT: Redirect.

24    MR. DOWD: Thank you, your Honor.

25       REDIRECT EXAMINATION

1 BY MR. DOWD:

2 Q. Good morning, Mr. Gilmer.

3 A. Good morning.

4 Q. You looked at a document earlier, Mr. Kavaler was showing

5 you, about EPS; that you had a target of $4.05 in that year

6 and then you hit $4.08; is that right?

7 A. That is correct.

8 Q. That restatement about the credit cards, did the EPS

9 number go down after that restatement, do you know?

10 A. I had no involvement in that. I don't know what it

11 affected.

12 Q. You didn't have any idea that the -- as a result of that

13 credit card restatement, that the company's net income went

14 down and its EPS went down when they had to restate it?

15 A. No, that's not what I said. I said I was not involved in

16 it, and I don't know what years it affected, nor how it was

17 allocated. So I don't know if it affected -- to answer your

18 question, earnings would go down if you restated and reported

19 lower earnings. Of course, that would be true. I don't know

20 which years were affected, nor how much they were affected.

21 And I don't know if it was included in the numbers we looked

22 at, the 4.05, already or not.

23 Q. Okay. Mr. Gilmer, you had a chart prepared about how your

24 stock went from like 400,000 shares, I think you said, to like

25 900,000 shares?

1418

1 A. Yes.

2 Q. Okay. And I'm just a little confused because you file

3 forms with the SEC, right, Form 4s, as a reporting officer of

4 the company?

5 A. I'm sure we do.

6 Q. And I didn't see you going into your pocket and buying

7 500,000 shares during that time. Did I miss something, sir?

8 A. Yes, you missed something.

9 Q. Okay. Well, let me ask you this: Your 900,000, does that

10 include your stock options?

11 A. It includes all of my interest, as is required, I believe,

12 by law to be reported. And so it would include everything.

13 Q. So the 900,000 on the chart, sir, just so we're clear on

14 that, that includes the stock options you were granted during

15 the relevant time period, '99, 2000 and 2001, right?

16 A. That would absolutely be correct, sure.

17 Q. Oh, okay. So the 900,000 wasn't just stock, the common

18 stock that you owned; it includes a right to buy common stock

19 that was granted by the board of directors, right?

20 A. It included the following: It included all --

21 Q. Sir, just answer my question. Did it include the stock

22 options?

23 A. I've already said twice, I believe, that it included the

24 stock options.

25 Q. Okay. So let's take a look at those stock options because

1427

1  13; is that right?
2  A.  That's what I've been trying to tell you, Mr. Dowd.
3  That's the way a stock option works.
4  Q.  Right.  No, I understand that.  It's just that your
5  counsel asked you today something about me asking about you
6  exercising that 11 bucks.  I just want to make sure we
7  understand that's exactly what you did during the relevant
8  time period, right, sir?
9       MR. KAVALER:  Objection to the form, your Honor.
10      THE COURT:  I'll sustain the objection as to the form
11  of the question.
12  BY MR. DOWD:
13  Q.  Mr. Gilmer, let me show you one more.  I'll show you
14  what's been marked as Defendants' Exhibit 763.
15   (Tendered.)
16  BY MR. DOWD:
17  Q.  And is that again, sir, a Form 4 that you filed with the
18  SEC?
19  A.  Yes, sir, it is.
20  Q.  Okay.  And that's your signature there on the second page?
21  A.  It is.
22  Q.  Okay.  And you were required to file these forms with the
23  SEC?  This one too, right?
24  A.  As I've said, I believe it is a requirement, yes.
25  Q.  And, sir, on July 18, 2001, you exercised some more

1428

1  options at 17 -- for 17,500 shares and, again, for 7,500
2  shares; is that right, sir?
3  A.  That is correct.
4  Q.  And you were paying $13.62 for the 17,500 shares and then
5  $19.87 for the 7,500 shares; is that right, sir?
6  A.  That -- that is the strike price on the -- on the stock
7  options that I exercised.
8  Q.  That's what you paid, right?
9  A.  That's the way a stock option works, yes.
10  Q.  And when you sold those shares that same day, you got
11  $68.84, $69 and $69; is that right, sir?
12  A.  That's right.  That's how much the stock had gone up since
13  I was granted the options.  And so that's what I was able to
14  sell them for in the open market on that day, that's true.
15  Q.  In other words, that's what my clients paid when they
16  bought them on that day, right?
17  A.  Which is exactly the same I would have paid if I had been
18  in the open market on that day.
19  Q.  Right.  But you weren't in the open market; you were
20  exercising options, right, sir?
21  A.  On that particular day.  I had been in the open market
22  since 1972.
23  Q.  I'm not asking about what you did in 1972, sir.  I'm
24  asking you what you did on July 18, 2001.
25  A.  That document actually -- accurately describes what I did

1429

1  on -- what day did you say?  July --
2  Q.  18, 2001.
3  A.  I believe it was July 19, 2001, but I won't quibble over a
4  day.
5  Q.  I think it says the 18th, but I won't quibble over a day
6  either.
7  A.  I'm just looking at the signature.
8  Q.  Sir, I'm going to show you what I believe we have marked
9  as Plaintiffs' Demonstrative Exhibit -- bear with me for a
10  second.  I believe it's 150 -- 155.
11       I'll show a copy to counsel.
12   (Tendered.)
13  BY MR. DOWD:
14  Q.  Sir, Plaintiffs' Demonstrative 155 -- we can bring that up
15  a little clearer.
16       Sir, we listed out the Form 4s that you filed with
17  the SEC during the relevant period, the three we just looked
18  at.  Okay?
19  A.  Right.
20  Q.  They show the date that you bought stock, it shows the
21  date that you sold stock, it shows the prices that you paid or
22  the prices that you sold at.  Is that right, sir?
23  A.  That is correct.
24  Q.  Okay.  It looks to me like you made $3 million --
25  $3,065,000 just on your sales during the class period; is that

1430

1  right, sir?
2  A.  I surely did.
3  Q.  Mr. Gilmer, sometime yesterday you said something about
4  how there were no secrets at Household; is that right?
5  A.  That's correct.
6  Q.  Let me just ask you a question about that.  I mean, I
7  guess we use words like secret.  We use words like
8  confidential.  I just want to double check some things so I
9  understand it.
10       Yesterday you looked at Plaintiffs' Exhibit 967.  It
11  was that letter from the OTS dated April 26, 2001.  And I have
12  an extra copy.
13       MR. DOWD:  I apologize, Mr. Kavaler, I didn't bring
14  an extra copy of the ones that were received.  If you need a
15  moment to get it, let me know.
16  BY MR. DOWD:
17  Q.  Now, this Exhibit 967, Plaintiffs' 967, that was a letter
18  from the OTS to the board of directors at Household Bank,
19  right?
20  A.  That is.
21  Q.  Okay.  Now, let me just ask you, this was confidential,
22  right?
23  A.  It has "confidential" stamped at the bottom of it.
24  Q.  Well, I mean, you understand that the OTS didn't just
25  willy-nilly hand these out to everybody, right?

1443

1    GARY GILMER, SR., PLAINTIFFS' WITNESS, PREVIOUSLY S
2         REDIRECT EXAMINATION - Resumed
3    BY MR. DOWD:
4    Q. Mr. Gilmer, yesterday I believe your attorney showed you a
5    Defendants' Exhibit 37. I would ask you to take a look at
6    that, if you would.
7       (Document tendered.)
8    BY MR. DOWD:
9    Q. If you recall, sir, Defendants' Exhibit 37 was a fax where
10   you wrote the words "this is an outrage" on there.
11      Do you remember that?
12   A. Yes, I do.
13   Q. And you have it in front of you, sir?
14   A. I do.
15   Q. And you wrote that because you saw examples of your sales
16   force using an effective rate presentation; is that correct?
17   A. That appeared to be the case, yes.
18   Q. And you received this notification around April 8th of
19   2002. Is that fair?
20   A. I am sure there is a date on it, sir.
21   Q. I am looking at the front page of the cover sheet. It
22   says "4-8." Then there's some fax numbers on the bottom that
23   say April 8th, '02?
24   A. Okay.
25   Q. I take it you received it in that time frame, sir?

1444

1    A. I am sure that I would have.
2    Q. Sir, were you outraged because you considered the
3    effective rate presentation being used by your sales force to
4    be a deceptive practice?
5    A. Yes. Yes, I was outraged by that.
6    Q. So you do believe that the effective sales presentation is
7    a deceptive practice?
8    A. Depending on how it was used, it could be. And as I
9    indicated here, I was outraged at the whole concept.
10   Q. Sir, I would like to show you what we will have marked as
11   Plaintiffs' 1470. And I will put that on here for now.
12      Plaintiffs' 1470, sir.
13      (Document tendered.)
14   BY THE WITNESS:
15   A. Thank you.
16      MR. DOWD: And I would offer Plaintiffs' 1470 at this
17   time, your Honor.
18      THE COURT: It will be admitted.
19      (Said exhibit was received in evidence.)
20   BY MR. DOWD:
21   Q. Now, sir, Plaintiffs' 1470 is a series of e-mails dated
22   April 4th, 2002; is that right?
23   A. That is correct.
24   Q. I would refer you to the bottom e-mail on the first page
25   of the exhibit. I would ask you to take a look at that, if

1445

1    you would.
2    A. I am sorry. Are you talking about the one from Robin
3    Allcock?
4    Q. No. At the very bottom, there is an e-mail there from a
5    Megan Hayden to yourself, Mr. Detelich, and others.
6       Do you see that?
7    A. Yes, sir, I do.
8    Q. I take it you would have received that around April 4th of
9    2002?
10   A. Probably, yes.
11   Q. And in the text of her e-mail, which is on the second page
12   of Exhibit 1470, sir, Ms. Hayden discusses a call that she got
13   from a reporter in Washington State about a class action
14   lawsuit that had been filed; is that correct?
15   A. Could I take just one second?
16   Q. Sure. Go ahead.
17   A. I will try to be brief.
18      (Brief pause.)
19   BY THE WITNESS:
20   A. Okay. I am sorry.
21   BY MR. DOWD:
22   Q. And you agree with me, sir, that this discusses a phone
23   conversation that Ms. Hayden had with a reporter from the
24   Bellingham Herald; is that right?
25   A. That's what she says, right.

1446

1    Q. And he had called her about a class action lawsuit that
2    had been filed in Washington State around that time; is that
3    right?
4    A. That appears to be the case, yes.
5    Q. And one of the things that the reporter asked her about,
6    according to her e-mail, is that the lawsuit claims that "We
7    are misrepresenting the benefits of the EZ Pay product and are
8    quoting effective rates (he used that term) in order to coerce
9    customers into believing they are getting a better deal than
10   the one we were truly giving them."
11      Do you see that, sir?
12   A. I do.
13   Q. So you understood that there was a lawsuit that had
14   accused your people of using the effective rate presentation
15   as of April 4th, 2002; is that right, sir?
16   A. Apparently that must have been widely known. And I must
17   have known about it, having read this document.
18   Q. You knew about it, right?
19   A. Right. I must have at the time. I don't remember
20   exactly, but I must have at the time.
21   Q. Now, counsel asked you some questions about when this
22   lawsuit was filed in August of '02. I remember some of those,
23   sir.
24      But let me ask you, when you wrote "this is an
25   outrage" on April 8th, '02, you knew about this other lawsuit

1447

1 all about effective rates on April 4th, right?
2 A. Okay. Say that again, please, Counsel.
3 Q. What I am asking you is, you got an e-mail on April 4th,
4 2002, about a reporter in Washington calling up asking about a
5 lawsuit that alleged some effective rate misrepresentation,
6 right?
7 A. I believe that's what this says.
8 Q. Okay. And then, at least four days later, when you got
9 this e-mail or this fax about people quoting effective rates,
10 that's when you wrote "this is an outrage," right, sir?
11 A. That appears to be the case, yes.
12 Q. Okay. So you knew -- when you wrote "this is an outrage,"
13 you knew that there was a reporter snooping around, asking
14 questions about misrepresentation of effective rates, right?
15 A. I assume, based on the dates of these two documents, but I
16 wouldn't draw any conclusion from that because I don't -- I
17 mean, I didn't connect one to the other, that I recall.
18 Q. Do you remember on April 4th, 2002, and April 8th, 2002,
19 whether you were connecting those two things or not, sir?
20 A. Of course not.
21 Q. Okay. Thank you.
22     Now, during my direct examination, sir, I showed you
23 a report.
24     MR. DOWD: And I will refer counsel to
25 Plaintiffs' 794.

1448

1     I will grab you an extra copy of it in case those got
2 wet up there.
3 BY MR. DOWD:
4 Q. Plaintiffs' 794 was a memo from Carla Madura dated
5 May 25th, 2001. Do you see that, sir?
6 A. I do.
7 Q. And you got a copy of this one, too, didn't you, sir?
8 A. Hang on one second and I can confirm that.
9     (Brief pause.)
10 BY THE WITNESS:
11 A. I am sorry. I took far too long.
12     I did.
13 BY MR. DOWD:
14 Q. Sir, what Ms. Madura told you in that one was that there
15 were seven complaints of the ones she was reporting on that
16 made it to the level of an Attorney General, a Better Business
17 Bureau, or a regulator where people were claiming that
18 effective rate presentations were given to them; is that
19 right, sir?
20 A. Could I read that, please?
21 Q. Sure. We looked at it yesterday, but go ahead.
22 A. Just let me refresh my memory.
23     (Brief pause.)
24 BY THE WITNESS:
25 A. That's exactly what it says in the third paragraph, 7 of

1449

1 27 complaints were about a rate issue.
2 BY MR. DOWD:
3 Q. And I take it this was just as outrageous, sir, back in
4 May of 2001, that people were using this effective rate
5 presentation, right?
6 A. No.
7 Q. Oh, it wasn't?
8 A. No. Here is why. I believe that all of these complaints
9 on the document that we just reviewed came from a single
10 branch in Washington. Now, that didn't make it any less an
11 issue. But in this case, I had a branch, one single branch,
12 that accounted for 18 customer complaints. That tells me that
13 we have got a serious problem in this branch.
14     Now, this document says that I have seven complaints
15 across the United States, I believe. So I would view every
16 one of these -- 18 and 7, that would be 25. I would view
17 every one of these complaints -- even though that I don't know
18 that they were valid, I would view every one of these
19 complaints as a very serious matter. But I would look at it
20 differently if I had 18 complaints in one branch and if I had
21 seven complaints in the United States.
22 Q. Okay. I just want to get this straight.
23     So to you it was worse if you had 18 complaints
24 isolated to a single branch than if you had seven complaints
25 that made it all the way to an Attorney General, the Better

1450

1 Business Bureau, or a regulator all across the United States.
2 That was less of a concern to you.
3     Is that your testimony?
4 A. I believe that's what I said.
5     Look, talking about seven out of three-and-a-half
6 million or 18 out of one branch, I mean, there is a huge
7 difference.
8 Q. Sir, I will show you what has been marked as Plaintiffs'
9 Exhibit 798 and ask you to take a look at that, if you would.
10     (Document tendered.)
11     MR. DOWD: Copy for counsel.
12     (Document tendered.)
13     MR. DOWD: Your Honor, at this time I would offer
14 798.
15     THE COURT: It will be admitted.
16     (Said exhibit was received in evidence.)
17     (Brief pause.)
18 BY THE WITNESS:
19 A. All right, sir.
20 BY MR. DOWD:
21 Q. Sir, you agree with me that Plaintiffs' 798 is an e-mail
22 from Ned Hennigan to Tom Detelich and others at HFC; is that
23 correct?
24 A. That appears to be the case, right.
25 Q. And I will just note, sir, you didn't get a copy of this

1455

1 is.
2      So to say that there were a gazillion effective rate
3 complaints that came into the branch that some AE buried
4 because he was able to fix it, that's not possible.
5 Q. Oh, it's not possible, Mr. Gilmer. It's not possible that
6 an AE, who already tricked a customer into this effective rate
7 deceptive practice, couldn't then explain it away to the
8 customer again a month, two months, three months later.
9 That's not possible, sir?
10 A. I guess you could paint a situation where you could have
11 an AE who would be so callous as to violate policy and so
12 slick as to talk a customer into believing that they weren't
13 tricked the first time and that they didn't do anything about
14 it to fix it and then convince the customer not to complain to
15 anybody else because he couldn't fix it. I guess that would
16 be possible theoretically.
17 Q. Sir, yesterday we looked at -- or I think you have seen
18 during the course of the trial Plaintiffs' Exhibit 379; is
19 that right, sir?
20      I will show it to you. It was about this Ortega
21 complaint. Do you remember hearing about that?
22      (Document tendered.)
23 BY THE WITNESS:
24 A. I may well. If you could give me just a second here.
25 BY MR. DOWD:

1456

1 Q. Sure, sir.
2      (Brief pause.)
3 BY THE WITNESS:
4 A. If you would allow me to go back if I need to, it's going
5 to take forever to read this thing.
6 BY MR. DOWD:
7 Q. Sure. That's fair enough.
8      I would ask you to turn to the page that ends with
9 the Bates range 090, if you would.
10 A. Okay. I am on 090.
11 Q. And, again, sir, this is an e-mail that we have seen
12 earlier during the trial.
13      You have been here the whole time, right?
14 A. I have been here the whole time.
15 Q. And this was an e-mail where the Ortegas said that they
16 had been quoted an effective rate, an effective interest rate,
17 that was lower than the rate that was actually on their loan
18 documents.
19      Do you remember hearing about that?
20 A. Give me one second, then. Okay? You have given me
21 several of these reports.
22      (Brief pause.)
23 BY THE WITNESS:
24 A. Okay. I have read the e-mail.
25 BY MR. DOWD:

1457

1 Q. At the very bottom of that e-mail, it notes that, No
2 corrective action was given as this was enforced from HFC
3 training materials that existed at the time.
4      Do you see that, sir?
5 A. That is correct.
6 Q. And, sir, can I ask you, did you ever disclose to the
7 market that there were HFC training materials that taught
8 sales reps or account executives to use an effective rate
9 presentation?
10 A. Well, since I personally prohibited it, I certainly would
11 not have misled the market into thinking that I, as I have
12 said so many times, and my management team, as you have read
13 so many times, did not approve of this practice.
14      Now, it is fair to say what you just outlined here.
15 And that is, this says that there was some training program.
16 And I suspect it was the one that was out -- you remember the
17 one that we talked about the other day that was in existence
18 for two months somebody caught it and pulled it out. I
19 expect it was that one, but I don't know, as I have never seen
20 this before.
21      That is all I can say.
22 Q. Sir, yesterday you talked about the pay right rewards
23 program. Do you remember that?
24 A. I do.
25 Q. And I think you said that it was one of your best products

1458

1 ever; is that right?
2 A. That is correct.
3 Q. Sir, you had your deposition taken in this case on
4 January 12th, 2007; is that right?
5 A. It's been a couple years ago, right.
6 Q. I would like to show what you said about pay right rewards
7 at that time.
8      MR. DOWD: And that's, for opposing counsel, at
9 Pages 567 to 568 of the deposition.
10      (Videotape played in open court.)
11 BY MR. DOWD:
12 Q. Sir, do you agree with me that was the testimony you gave
13 back on January 12th, 2007, about the pay right rewards
14 program?
15 A. I certainly do. And I think I explained that in my
16 earlier testimony to you, that I had spent days and weeks
17 since I testified in that deposition going over all the
18 materials that I had been shown here and all the materials
19 that I had been shown during the time that I was preparing for
20 this with my attorneys. And I can tell you, I am much better
21 prepared, having gone over the documents today, than I was the
22 day I walked in and faced 5 million documents that I had seen
23 seven years earlier or five years earlier or whatever it was.
24      So I don't want you to get the wrong impression here.
25 Q. I understand that, sir. But you understood you were

1459

1 having your deposition taken in the case, right?  You had
2 notice of that.  Didn't you, sir?
3 A. Of course I had notice of that.
4 Q. And you understood that was an important deposition that
5 people were going to be relying on your testimony, didn't you?
6 A. And I apologize that I was unable to remember specifics of
7 a product that we launched several years earlier that was
8 buried amongst 5 million pages.
9     A very different time, a very different circumstance.
10 And I can tell you right now, the pay right reward product,
11 I've gone over it in detail.  We had documents up here today
12 and yesterday talking about how effective it was.  It was a
13 great product, and I am very proud of it.
14 Q. And that's what you said yesterday.  It was one of your
15 best products ever.
16     But you agree with me, in January 2007, you couldn't
17 remember anything about it, could you?
18 A. I agree with you that I didn't remember anything about it.
19 That's exactly right.  That's exactly right.
20 Q. Now, yesterday I think you talked about Dennis Hueman's
21 video; is that right?  Do you recall that testimony?
22 A. Right.
23 Q. And I believe yesterday you said that it was despicable;
24 is that right, sir?
25 A. The word I used -- I think I said it louder than that.  I

1460

1 said "despicable."
2 Q. And do you believe that Mr. Hueman was on that video
3 talking about things that were deceptive practices?
4 A. It was very clear to me that Mr. Hueman was on that video,
5 as I think everybody saw, talking about practices that I
6 thought were just outrageous.  And I mentioned, I believe --
7 of course today, it was a circumstance where you he let us all
8 down, all of our colleagues, our customers, and everybody.
9 Q. And, sir, let me ask you this:  Do you know that over a
10 year after you found that videotape -- or Mr. Detelich found
11 that videotape, do you know that Dennis Hueman was still being
12 asked to do training sessions on sales practices for
13 Household?
14 A. No.  In fact, let me be clear, if I wasn't clear.
15     I saw that video for the first time in this
16 courtroom.  I guess it was last week when you played it
17 repeatedly.  And I found it despicable.  I will tell you.  If
18 I had seen that video two years ago or five years ago or
19 whenever it was, I would have fired Mr. Hueman.  I would have
20 fired him.
21     And I think it's generally, almost always, in fact,
22 inappropriate for a person in the line of -- in the chain of
23 command to go around people and remove them directly.  But I
24 will have to say, I would have done that.
25 Q. Sir, just so we are clear, then, you understood that

1461

1 Mr. Detelich and Mr. O'Han, they saw that video at the time.
2     Do you know that?
3 A. Yeah.  They probably did.
4     Let me just make one other point.
5 Q. I am just asking you that question.
6 A. I don't know that they saw it in its entirety.  But I
7 think they certainly had it and they saw enough of it to know
8 what it meant.  I will say that.
9     Now, I only saw a few snippets of it.  I don't know
10 what was in the other 57 minutes, but maybe it was all great
11 stuff.  I don't know.  But I don't need to see the rest of it.
12 What I saw was enough for me.
13 Q. Sir, you understand -- or do you understand that Mr. O'Han
14 still had Mr. Hueman training people a year and a half later
15 on sales, in August of 2002?
16 A. I am assuming you wouldn't tell me that if it weren't
17 true.
18 Q. I will show you something if you want to see it.
19 A. No.  That's what I said.  I assume -- I would also --
20 number one, I am surprised at that.
21     Number two, I would expect that Mr. Hueman had been
22 retrained -- I am speculating about the whole thing,
23 obviously.
24 Q. Okay.  Well, don't speculate for me, Mr. Gilmer.  Just
25 tell me what you know.

1462

1 A. Okay.
2 Q. Did you understand -- when you watched this snippet of
3 this videotape, did you understand that at the very beginning,
4 the part that you saw when we were watching the opening
5 statements, he said that he was "Teaching our AEs and our SAEs
6 and, hopefully, some BSMs, too, on some sales techniques,
7 things that I do as I visit around the branches and as I
8 gather your people together."
9     Did you hear him say that?
10 A. I heard that just as you heard that, Mr. Dowd.  And I
11 cringed in my seat.  Absolutely.  You and I are in lockstep on
12 that.
13     That is exactly the kind of thing that happens in a
14 large organization like ours if there is even the smallest
15 lapse.  And that's why I was continually sending out the memos
16 that you were kind enough to put up and hammering this home
17 and making these videos myself.
18     I mean, even with all of that, from time to time we
19 would have a bad apple slip through.  It's embarrassing.
20 Q. In this situation you had a bad apple who was a DGM,
21 right, a division general manager?
22     He was responsible for parts of Texas, Arizona, New
23 Mexico, and Southern California, right?
24 A. I don't know the exact states that he was responsible for,
25 but he was responsible probably for 50 branches, a lot of

1471

1  A. No.
2  Q. Oh, all right, sir.
3  A. It is not. Do you want me to explain it?
4  Q. Yeah, you can explain it.
5  A. Okay. Well, this net benefits test had a series of net
6  benefit options. And to ensure that our customers received a
7  net benefit, you had to qualify for at least one of these
8  options.
9       We had -- you see the numbers here, 34 of the 36 had
10  new money; 13 of the 36 -- and some of these have more than
11  one, obviously -- had second mortgage payoffs. And on and on
12  and on.
13       So that was exactly what I said. The net benefits
14  test works.
15  Q. So the other 64 you think all met the net benefits test?
16  A. That is my understanding of this, yes.
17  Q. Let's take a look at one more of these, just to clarify
18  it.
19       MR. DOWD: Counsel.
20  (Document tendered.)
21  BY MR. DOWD:
22  Q. Sir, I will show you what has been marked as
23  Plaintiffs' 559 and ask you to take a look at that.
24  (Document tendered.)
25       MR. DOWD: I would offer 559 at this time, your

1472

1  Honor.
2       THE COURT: It will be admitted.
3  (Said exhibit was received in evidence.)
4  (Brief pause.)
5  BY THE WITNESS:
6  A. All right, sir. I have read it.
7  BY MR. DOWD:
8  Q. Sir, this is a document entitled "Review of Benefits Test
9  Booked Loans from November and December of 2001," right?
10  A. That is correct.
11  Q. I just want to understand how this test works.
12       Let's take a look at the very first entry there.
13  A. Okay.
14  Q. There is a loan that the date approved is November 21st,
15  2001. Do you see that, sir?
16  A. I do, yes.
17  Q. And then there is an account number and the loan amount.
18  Do you see that?
19  A. I do.
20  Q. And the loan amount was $269,000; is that right?
21  A. Yes, sir. That is correct.
22  Q. And this customer originally -- if you look at the third
23  column from the right, their rate on the first mortgage was
24  7.5 percent; is that right?
25  A. Okay. That is correct.

1473

1  Q. And their contract rate and APR under the loan you were
2  writing was 12.15 percent and 11 percent; is that right?
3  A. If you give me one second. Which column are you in?
4       That's right.
5  Q. Last one.
6  A. That's right. I see it.
7  Q. So, in other words, they went from a 7.5 percent mortgage
8  to a mortgage with a rate of 11 or 12.15 under the APR; is
9  that right?
10  A. Hang on one second.
11  (Brief pause.)
12  BY THE WITNESS:
13  A. That appears to be correct.
14  BY MR. DOWD:
15  Q. And then, one of the benefits that's listed to the
16  customer is new money. And it says they got what looks like
17  about $31,000; is that right?
18  A. That's exactly right.
19  Q. And to get that $31,000, they paid points of $14,157; is
20  that right?
21  A. In points, I am not sure what kind of points they were.
22  They might well have been buy-down points. But there were --
23  it does say there were $14,000 worth of appraisal fees, title
24  fees and points of some sort, yes.
25  Q. Okay. So, in other words, this customer went from a

1474

1  7-and-a-half percent loan to an 11 percent loan. They paid
2  $14,000 to get that loan to get $31,000 in cash back; is that
3  right?
4  A. That is part of the story, yes.
5  Q. Okay. Now, would that meet your benefits test criteria?
6  A. Yes, it would.
7  Q. Thank you, sir.
8       Now --
9  A. You wouldn't want me to talk any more about this, I am
10  sure, would you?
11  Q. No, I just want to understand it.
12  A. Well, if you want to understand it, I can talk a little
13  bit more about it.
14  Q. That's all right, sir. I am sure you will get your
15  chance. You do a lot of talking.
16       Now, sir, yesterday you talked about AMTPA. I think
17  today you talked about the Parity Act, right?
18  A. As you said, I talk a lot. So I probably did.
19  Q. And you explained yesterday how AMTPA was a law passed I
20  Congress in about 1982, and it talked about -- you talked
21  about the '80s were a very difficult time. And you said that
22  this was a law that permitted you to charge prepayment
23  penalties, right?
24  A. Yes. I reviewed the AMTPA law a couple weeks ago. And
25  that's my clear recollection, yes.

1475

1 Q. Sir, you had your deposition taken in this case on
2 January 11th, 2007, right?
3 A. I did, yes.
4 Q. So let me see what you said when you answered questions
5 and answers about that at that time.
6       MR. KAVALER: Page reference?
7       MR. DOWD: I believe it's 147.
8    (Videotape played in open court.)
9 BY MR. DOWD:
10 Q. You agree with me, sir, that was the testimony you gave on
11 January 11, 2007, about AMTPA or the Parity Act, right?
12 A. I agreed with you before. It's two years ago, and that's
13 exactly what I said two years ago.
14       What you related to earlier was exactly what I said
15 yesterday.
16       And after weeks of cramming, I feel comfortable with
17 what I said yesterday. I believe that is the correct
18 definition of the Parity Act. And all of the testimony that I
19 gave yesterday I believe is correct.
20 Q. You just couldn't remember any of that back in January of
21 2007; is that correct?
22 A. As I said in my testimony there, I didn't remember the
23 particulars of the Parity Act. As you can see, it's a
24 complicated, technical, legal process.
25       I will have to say I couldn't remember things that

1476

1 happened years and years ago on the day all of that paper was
2 dumped on my desk. But I studied it in preparation for your
3 question, and I think I have got it.
4 Q. So you were unprepared for your deposition. Is that what
5 you are telling me?
6 A. Did I say that, sir?
7 Q. I am just asking.
8       You seem to know a lot more about AMTPA today than
9 you did back then, two years ago.
10 A. I know a lot more about all of this stuff -- excuse my
11 term -- today than I did two or three years ago.
12       The last several months I have devoted my every
13 waking minute and every document that I could get my hands on
14 to get familiar with it. You bet I am a lot more familiar
15 with it. Sure.
16 Q. Sir, but again, you were under oath that day, right, when
17 you gave your deposition?
18 A. Not that I would have to be. I was under oath, but I
19 don't need to be under oath to tell the truth.
20 Q. But you were?
21 A. Let me say it again. I thought I said it.
22       I was under oath. I am under oath now. I would tell
23 the truth without regard to whether I am under oath. I don't
24 know what world other people live in, what their standards
25 are, but I tell the truth.

1477

1 Q. Thanks, sir.
2       Now, I think yesterday you also said that -- and I
3 just want to make sure I got this right -- that Household's
4 customers, borrowers, you didn't expect them to make
5 12 payments a year. You kind of expected them to make like
6 11 payments a year.
7       Did I get that right?
8 A. That's a very broad definition. We expect them to make
9 all of their payments over time. But when they come to
10 Household, it is because they haven't made 12 payments a year.
11 It would be unfair for us to expect that they would
12 forevermore make 12 payments a year.
13       So that's the -- that's why we had a business.
14 That's why we have a business.
15 Q. Why you had a business.
16 A. Well, I mean, I have been retired since 2002. Is that
17 what you mean?
18 Q. Yes.
19 A. Right. So I should say "had a business," right.
20 Q. Then, I just want to get one other thing just clear in my
21 mind.
22       I think you also said that the average loan at
23 Household lasted about five years; is that right?
24 A. The average real estate loan at Household -- I think the
25 last document that I saw was about 42 months.

1478

1 Q. Forty-two months. So that's, what, three and a half
2 years?
3 A. You are right. It is three and a half years. Maybe it's
4 52 months. I don't remember. It was years. It was several
5 years, not several months.
6 Q. Right. Somewhere between three and a half and five years?
7 A. I think that's correct.
8 Q. Now, was that something -- I think you said everybody kind
9 of understood that, right?
10 A. Everybody understood --
11 Q. The people at Household, they kind of understood that, the
12 average loan term, how long somebody would last?
13 A. I don't know that -- I am trying to remember if there was
14 a standard published report that went out to the field that
15 said that or not. I don't think there was a standard report
16 that did, but maybe there was.
17 Q. Sir, yesterday -- I think you just touched on it
18 briefly -- you talked about restructuring of loans. And you
19 talked about sort of a bump in the road that a customer might
20 hit where they might miss some payments. Right, sir?
21 A. That is correct, where a customer would miss a payment.
22 Q. And you talked about how the customer would come in and
23 you would talk about it, right?
24 A. That was one of the processes that we would use for that.
25       There were a number of programs and processes over

Detelich - direct

1777

1  taken because this Washington report had been leaked to the
2  press at various times?
3  A. I don't know that we actually ever followed this line of
4  argument.
5  Q. So you don't know whether or not he followed the directive
6  and got the information?
7  A. He may have gotten the information. I don't know that it
8  was ever a valid argument.
9  Q. Have you ever seen a document that shows his analysis?
10  A. I don't have any recollection of it, so I'm guessing --
11  Q. And you never saw a document preparing for your testimony
12  here today that showed it, did you?
13  A. No, I did not. Yeah, certainly not.
14      MR. BURKHOLZ: Your Honor, I'm ready to go on to
15  another subject. If you want to take our 15-minute break.
16  I'm willing to go on.
17      THE COURT: We'll break now. We'll take our first
18  break, ladies and gentlemen. 15 minutes, as you requested.
19  (Jury out.)
20      THE COURT: You may step down, sir.
21  Anything you want to take up?
22      MR. BURKHOLZ: Nothing, your Honor.
23      THE COURT: Defense?
24      MR. KAVALER: Nothing, your Honor. Thank you.
25      THE COURT: We'll take our 15-minute break.

Detelich - direct

1778

1  (Recess taken.)
2      THE COURT: Okay. Are we ready for the jury?
3  Let's bring them out. They're ready for us.
4  (Jury in.)
5      THE COURT: Counsel, you may proceed.
6      MR. BURKHOLZ: Thank you, your Honor.
7  BY MR. BURKHOLZ:
8  Q. Sir, when we were talking about insurance goals for the
9  company, it was your testimony that the goals for '99 and 2000
10  were 45 to 55 percent?
11  A. I think my testimony was that was what we generally built
12  into the compensation plan, yes.
13  Q. Let me show you what we've marked as Exhibit 1095.
14  (Tendered.)
15      MR. BURKHOLZ: A copy for counsel.
16  (Brief pause.)
17  BY MR. BURKHOLZ:
18  Q. You've read the document?
19  A. I have.
20  Q. And it's entitled 2000 Goals, correct?
21  A. That's right.
22      MR. BURKHOLZ: Your Honor, this is a documents that's
23  not objected to. I move it into evidence.
24      THE COURT: It will be admitted.
25  BY MR. BURKHOLZ:

Detelich - direct

1779

1  Q. Tell me what it says under AE for insurance penetration.
2  What's the percentage is it?
3  A. It says 75.
4  Q. Tell me what it says under branch for insurance
5  penetration. What does it say?
6  A. This document says 75.
7  Q. Tell me what it says under the district for insurance
8  penetration.
9  A. It says 75.
10  Q. And tell me what it says under division for insurance
11  penetration.
12  A. 75.
13  Q. Thank you. You can put that to the side.
14      Let's talk about Dennis Hueman. He was the
15  southwestern division general manager in 2001, correct?
16  A. That would be correct, yes.
17  Q. So he was one of 16 DGMs covering Household branches
18  around the country, right?
19  A. I think it was 16 or 18, somewhere in there, depending on
20  the time frame.
21  Q. Fair to say that he was one of the top 25 of the
22  executives in the consumer lending division?
23  A. I don't know if I would characterize it that way, but he
24  was one of the 16 to 18 division general managers.
25  Q. Okay. He was one of the top 50 executives in consumer

Detelich - direct

1780

1  lending at that time?
2  A. I don't mean to nitpick here, but I don't know what you
3  mean by "top."
4  Q. In your hierarchy, in the pyramid in --
5  A. On the organizational chart?
6  Q. Yes. Top 50?
7  A. He may have been maybe in top 50.
8  Q. Certainly top hundred, right?
9  A. On an organizational chart, he would have been positioned
10  in the top hundred, yes.
11  Q. Household had 30,000 employees at this time, right,
12  approximately?
13  A. Sounds about right, yes.
14  Q. How many did you have in consumer lending approximately?
15  A. 12,000.
16  Q. Now, Mr. Hueman's territory covered six states, Texas,
17  South Carolina -- Southern California, Texas and four
18  others at the time, right?
19  A. Sounds about correct. Again, I know he was in California
20  at that time.
21  Q. And California was one of Household's biggest areas for
22  its business, wasn't it?
23  A. It's one of the largest states.
24  Q. I mean, for Household's volume of loans, it was in
25  California in a big way during this time in 2001, wasn't it?

Schoenholz - direct

1881

1   A.  Correct.
2       MR. DOWD:  Your Honor, at this time I'd offer
3   Plaintiffs' 176.
4       THE COURT:  It will be admitted.
5       (Plaintiffs' Exhibit No. 176 received in evidence.)
6   BY MR. DOWD:
7   Q.  And, Mr. Schoenholz, plaintiffs' Exhibit 176 -- this
8   Quality of Accounting Policies document -- that was a document
9   that was prepared by Mr. McDonald; is that right?
10  A.  I believe so.
11  Q.  And Mr. McDonald was the Controller of Household during
12  this time period; is that right?
13  A.  Right.
14  Q.  Okay.
15      And in the organization there's the Controller; and,
16  then, he would report to you as the Chief Financial Officer;
17  is that right?
18  A.  Correct.
19  Q.  Okay.
20      And this was a document that was prepared for
21  discussions between Household's Audit Committee of the Board
22  of Directors and its outside auditors; is that correct?
23  A.  Correct.
24  Q.  Okay.
25      And it was -- you were required to prepare such a

Schoenholz - direct

1882

1   document for these discussions pursuant to certain accounting
2   professional standards; is that right?
3   A.  Correct.
4   Q.  And I take it this document was prepared in or about
5   November, 2000; is that right, sir?
6   A.  I would think so.
7   Q.  And I take it you would have reviewed it before it was
8   sent by Mr. McDonald on to the Audit Committee; is that right?
9   A.  I would think so.
10  Q.  Okay.
11      And I'd ask you to turn to the page that ends with
12  the Bates range 8102, if you would -- 8102.
13      You see those numbers in the bottom right-hand
14  corner, right?
15  A.  I do.  8- --
16  Q.  -102.
17  A.  Okay.
18  Q.  And there's a section there that states, "Below is a
19  summary of the significant accounting policies which are
20  applied in our financial reporting and will be disclosed in
21  Household's 2000 Annual Report."
22      Do you see that?
23  A.  I do.
24  Q.  Then there's a section that includes the significant
25  accounting policies; is that right, sir?

Schoenholz - direct

1883

1   A.  Yes.
2   Q.  Okay.
3       I'd ask you to flip a couple pages back to the page
4   that ends with the Bates range 8107, if you would.
5   A.  (Witness complies with request.)
6   Q.  Do you have that in front of you, sir?
7   A.  I do.
8   Q.  One of those significant accounting policies identified in
9   this document was entitled, "Provision and Credit Loss
10  Reserves"; is that right?
11  A.  Correct.
12  Q.  And one of the issues that's discussed in this section is,
13  essentially, delinquency; is that correct, sir?
14  A.  It really talks about re-aging receivables.
15  Q.  Okay.
16      And, so, when you -- you said re-aging of
17  receivables; is that right?
18  A.  Correct.
19  Q.  Okay.
20      And when you say "re-aging of receivables," is it
21  also fair to call that "re-aging of loans"?
22  A.  Yes.
23  Q.  Okay.
24      And the first sentence there says, "Our credit
25  policies also provide for reset of the contractual delinquency

Schoenholz - direct

1884

1   status of an account to current, subject to certain limits.
2   If either a predetermined number of consecutive payments had
3   been received, a certain behavior score is attained or the
4   delinquency reason has been cured, based on product."
5       Do you see that?
6   A.  I do.
7   Q.  And that's talking about this re-aging policy; is that
8   right?
9   A.  Yes.
10  Q.  And it goes on to say a little further down, "We track
11  performance of accounts after they are re-aged, to ensure that
12  re-age customers perform and make payments and that re-age
13  policies are not used simply to defer charge-off."
14      Do you see that?
15  A.  I do.
16  Q.  Okay.
17      So, this was one of the significant accounting
18  policies identified by Mr. McDonald in this document that he
19  sent to the company's Audit Committee; is that right?
20  A.  That's correct.
21  Q.  Now, if I'm reading Plaintiffs' Exhibit 176 correctly,
22  sir, it had said that, "These were significant accounting
23  policies which will be disclosed in Household's 2000 annual
24  report," right?
25  A.  That's what it says, I believe.

Schoenholz - direct
1885

1  Q. Okay.
2      Sir, I'll show you what's been marked as defendants'
3  Exhibit 851. I'd ask you to take a look at that, if you
4  would.
5      MR. DOWD: A copy for counsel.
6      (Document tendered to counsel and the witness.)
7  BY MR. DOWD:
8  Q. Have you seen defendants' Exhibit 851 before, sir?
9  A. Do you want me to go through the entire -- I mean, it says
10  it's a 10-K for 2000.
11  Q. Right.
12      I mean, this is Household International's Form 10-K
13  for the period ended 12-31-2000; is that right, sir?
14  A. I would assume so.
15  Q. Okay.
16      And this document -- this 10-K -- would have been
17  filed by Household with the SEC in or about March of 2001; is
18  that correct?
19  A. Right.
20  Q. And you would have signed off on it as the CFO of the
21  company; is that right?
22  A. That's correct.
23  Q. And if we look at the page that's marked with the Bates
24  range 15520, if we could.
25      Do you see that page?

Schoenholz - direct
1886

1  A. I do.
2  Q. And it actually contains your electronic signature as the
3  Group Executive Chief Financial Officer, also the Principal
4  Financial and Accounting Officer; is that right, sir?
5  A. Correct.
6  Q. Okay.
7      Sorry, you just have to answer out loud because he's
8  typing everything down.
9      And, sir, did that mean -- when you signed off on
10  this -- you were taking the position that this document was
11  accurate in all material respects; is that right?
12  A. True.
13  Q. I mean, that was your understanding, correct?
14  A. That was my understanding.
15  Q. All right.
16      Sir, let me ask you a question. We had that
17  significant accounting policy about your re-aging practices
18  that Mr. McDonald had identified in Plaintiffs' 176; and,
19  tried as I might, I couldn't find where that was in this
20  document.
21      Am I wrong?
22  A. I don't know if it's in here or not. Do you want me to
23  look, too?
24  Q. I don't want you to take all day, but, sir, you know you
25  didn't disclose anything about your re-aging policies in this

Schoenholz - direct
1887

1  document in 2000; is that right?
2  A. I don't recall one way or the other.
3  Q. Okay.
4      Where would you expect to find such a disclosure
5  about your re-aging policies in this document?
6  A. I think either in the Accounting Policy area or there's
7  also my recollection in the documents, there's a Credit
8  Administration section.
9  Q. Okay.
10      Why don't you take a look at those two sections and
11  see if you can find that language that Mr. McDonald said was a
12  significant accounting policy?
13      MR. DOWD: Your Honor, at this time, I would also
14  offer Defendants' Exhibit 851.
15      THE COURT: It will be admitted.
16      (Defendants' Exhibit No. 851 received in evidence.)
17      (Brief pause.)
18  BY THE WITNESS:
19  A. I don't see it.
20  BY MR. DOWD:
21  Q. Okay.
22      You don't see the information that Mr. McDonald had
23  listed as a significant accounting policy; is that right?
24  A. Correct.
25  Q. Sir, I'd ask you to turn to the page that ends with the

Schoenholz - direct
1888

1  Bates range 523, if you would, still staying within
2  Defendants' Exhibit 851.
3  A. (Witness complies with request.)
4  Q. Sir, this part of the 10-K is the part where Household
5  reports its net income; is that correct, sir?
6      (Brief pause.)
7  BY MR. DOWD:
8  Q. If you want, sir, there's a screen in front of you and it
9  kind of highlights some of those sections.
10  A. I believe this page is the Parent-Company-Only financial
11  statement.
12  Q. Okay.
13      And it shows a net income there of about 1.7 billion;
14  is that right?
15  A. That's correct.
16  Q. Okay.
17      And you always reported net income in your 10-Ks and
18  your 10-Qs; is that right, sir?
19  A. Correct.
20  Q. Nothing unusual about that. That's one of the basic
21  metrics that people would look at; is that correct?
22  A. Right.
23  Q. All right.
24      Sir, I'd ask you to turn to the page that ends with
25  the Bates range 588, if you would.

Schoenholz - direct

1889

1    And, sir, that page sets forth the earnings per share
2    for Household during the year 2000; is that correct?
3    A. Correct.
4    Q. Okay.
5        So, in other words, there you show in 2000 diluted
6    EPS of $3.55; is that right?
7    A. Correct.
8    Q. And EPS is derived by, basically, taking the net income
9    and dividing it by the number of shares that are outstanding;
10   is that right?
11   A. And I believe you have to deduct preferred stock --
12   preferred dividends.
13   Q. Okay.
14       When you're in the diluted side, right?
15   A. Correct.
16   Q. Sir, I'd ask you to turn to the page that ends with the
17   Bates range 609, if you would, still staying within
18   Defendants' 851.
19       (Brief pause.)
20   BY MR. DOWD:
21   Q. Okay.
22       Do you have that page in front of you?
23   A. I do.
24   Q. Okay.
25       And this page shows an entry called, "Consumer

Schoenholz - direct

1890

1    Two-Month and Over Contractual Delinquency Ratios."
2        Do you see that chart?
3    A. I do.
4    Q. All right.
5        And, sir, this chart was what you reported regarding
6    what you referred to internally and externally as your
7    two-plus numbers; is that right?
8    A. Correct.
9    Q. Okay.
10       When you said "two-plus numbers" -- that phrase --
11   what did that mean at Household?
12   A. Two or more months delinquent.
13   Q. Okay.
14       So, in other words, what you did, for example, in
15   this chart is you would take your whole loan portfolio, is
16   that right, and you would take a look at that and figure out
17   what percentage of the people -- or of the loan dollars --
18   were more than two months delinquent; is that right?
19   A. By product.
20   Q. By product?
21   A. In total and by product.
22   Q. Okay.
23       So, in other words, you got "Total" down there a
24   couple times; and, then, you also have it broken down, for
25   example, one category is "Real Estate Secured;" is that right?

Schoenholz - direct

1891

1    A. Correct.
2    Q. Sir, in this particular 10-K for the year December 31,
3    2000, did you say anything in this one about the percentage of
4    this portfolio -- this -- your two-plus numbers -- that had
5    been re-aged before this number was arrived at during
6    December -- at December 31st, 2000?
7    A. Not in the 2000 10-K.
8    Q. Okay.
9        So, in other words, when you reported these two-plus
10   numbers, they didn't include loans that had been re-aged
11   during the year 2000; is that right?
12   A. Say that, again.
13   Q. Sure.
14       When you reported this number at the end of 2000, it
15   didn't include loans that had been re-aged and were current
16   because of that re-age; is that correct?
17   A. That's correct.
18   Q. Sir, in the December 31st, 2000, 10-K, in reporting the
19   company's net income at any time, did you say anything about
20   what amount of that income was generated by loans made, where
21   account executives had quoted customers an effective rate?
22   A. Say that, again, please.
23   Q. Sure.
24       In your 10-K for the year ended December 31, 2000 --
25   Defendants' Exhibit 851 -- did you say anything in reporting

Schoenholz - direct

1892

1    net income about what amount of that income was generated by
2    loans made, where account executives quoted a customer an
3    effective rate?
4    A. I'm sure not.
5    Q. You said, what?
6    A. No.
7    Q. Okay.
8        And in reporting net income in the Defendants'
9    Exhibit 851, did you say anything about what amount of that
10   income was generated by loans made where account executives
11   gave a good-faith estimate with ranges from zero to in excess
12   of $6,000?
13   A. No.
14   Q. In reporting that net income in Defendants' Exhibit 851,
15   did you say anything about what amount of that income was
16   generated by loans made, when Household made two loans
17   contemporaneously with the second loan at a higher interest
18   rate?
19   A. No.
20   Q. In reporting net income, did you say anything about what
21   amount of that income was generated by account executives who
22   misled borrowers about points and fees?
23   A. Well, I personally don't think account executives misled
24   borrowers. So, we certainly wouldn't have disclosed that.
25   Q. Okay.

Schoenholz - direct

1893

1 And you were there when the account executives were
2 talking to all your loan customers?
3 A. I was not.
4 Q. And, later, the State Attorney Generals disagreed with you
5 about whether account executives had misled people; is that
6 right, sir?
7 A. Certainly, that discussion with Attorney Generals.
8 Q. And you understand that there were regulators during the
9 period between 1999 and 2002 who found that your account
10 executives had misled borrowers; is that correct?
11 A. Would say that, again, please?
12 Q. Sure.
13 You understand that between 1999 and 2002, there were
14 state regulators who also found that your AEs had misled
15 borrowers about loan terms?
16 A. That was certainly their -- their -- opinion.
17 Q. Okay.
18 In reporting net income, did you say anything about
19 account executives who misled borrowers about insurance
20 products?
21 A. I would say the same thing I said before. I don't think
22 our account executives misled borrowers. So, we would not
23 have disclosed that.
24 Q. And, again, you weren't there, right, sir?
25 A. Correct.

Schoenholz - direct

1894

1 Q. Okay.
2 And, again, there were Attorney Generals who
3 disagreed with you about that; is that correct, sir?
4 A. That's correct.
5 Q. And there were regulators who found that your account
6 executives had misled borrowers about insurance products; is
7 that right?
8 A. What do you mean by "found"?
9 I know that was certainly their opinion.
10 Q. Okay.
11 Well, when I say "found," when I'm talking about a
12 regulator, if they put together an exam report and sent it to
13 you, that's how I use the term.
14 A. Okay.
15 Q. All right, sir?
16 Sir, I'd like to show you what's been marked as
17 Defendants' 854.
18 Sorry, Mr. Schoenholz, there's a lot of Ks and Qs
19 over here (indicating) and some of them are pretty thick.
20 So, I've got to dig through the boxes.
21 (Document tendered to counsel and the witness.)
22 MR. DOWD: A copy to counsel.
23 BY MR. DOWD:
24 Q. And, sir, I show you what's been marked as Defendants'
25 Exhibit 854.

Schoenholz - direct

1895

1 Is that a copy of the Household 10-Q for the period
2 ended June 30th, 1999?
3 A. That's what it purports to be, yes.
4 Q. Okay.
5 And it appears to be the 10-Q, right, sir?
6 A. It appears to be the 10-Q.
7 Q. Okay.
8 And this 10-Q was filed with the SEC on or about
9 August 16th, 1999; is that right?
10 A. Yes.
11 Q. Okay.
12 And, sir, again, turning to the page that ends with
13 the Bates range 905, you signed this 10-Q on behalf of
14 Household; is that right?
15 MR. DOWD: Your Honor, at this time I offer 854 --
16 Defendants' 854.
17 THE COURT: Has there been an answer to your
18 question?
19 MR. DOWD: No, your Honor. I was waiting for the
20 witness. I was trying to do an in-between. Sorry.
21 THE COURT: Wait for the answer.
22 BY THE WITNESS:
23 A. Your question?
24 BY MR. DOWD:
25 Q. Yes, sir.

Schoenholz - direct

1896

1 You signed this 10-Q, Defendants' 854, on behalf of
2 Household; is that right?
3 A. I did.
4 MR. DOWD: And now I'd move the admission of 854,
5 your Honor.
6 THE COURT: It will be admitted.
7 (Defendants' Exhibit No. 854 received in evidence.)
8 BY MR. DOWD:
9 Q. Sir, I'd ask you to turn to the page that ends with the
10 Bates range 884.
11 Do you have that page in front of you, sir?
12 A. I do.
13 Q. And, again, just like in a 10-K, in the 10-Qs, this one --
14 Defendant' 854 -- for the period ended June 30th, '99,
15 Household reported its net income; is that right?
16 A. Yes.
17 Q. Okay.
18 And, sir, I'd ask you to turn to the page that ends
19 with the Bates range 897, if you would. Still within
20 Defendants' 854.
21 (Brief pause.)
22 BY MR. DOWD:
23 Q. Do you have that page in front of you?
24 A. I do.
25 Q. In this 10-Q, you also disclosed at Page 897 information

Schoenholz - direct

1897

1  about your two-plus statistics; is that right, sir?
2  A. Yes.
3  Q. Okay.
4      And that's the paragraph that begins, "Own Consumer
5  Two Month and Over Contractual Delinquency."
6      Do you see that?
7  A. I do.
8  Q. All right.
9      And, then, you provided a table regarding your
10  two-plus numbers at Page 902 of this document; is that right?
11  A. Yes.
12  Q. Okay.
13      And, sir, one of the reasons that you reported your
14  two-plus statistics -- this information about the percentage
15  of your portfolio that was more than two months delinquent --
16  was because that was an important metric that both Wall Street
17  and investors looked at; isn't that correct?
18  A. Yes.
19  Q. Okay.
20      In other words, you were a loan company and the
21  quality of loans would be something that would be of interest
22  or be significant to readers of your financial statements; is
23  that right?
24  A. What I'm hesitating about is I think, taken by themselves,
25  it wouldn't be of great interest.  I think it would be

Schoenholz - direct

1898

1  interest in the context also of the loss reserves of the
2  company -- to get a full picture of the credit position of the
3  company.
4  Q. Right.
5      My question to you, though, was:  One of the reasons
6  that you put the two-plus statistics in your Qs and your Ks
7  was because that's something investors would want to look at
8  in considering the quality of your loan portfolio; is that
9  correct?
10  A. Correct.
11  Q. And, sir, in arriving at the re-age -- or, I'm sorry, at
12  the two-plus numbers in Defendants' Exhibit 854 -- in this
13  10-Q, did Household say anything about the percentage of the
14  portfolio that had been re-aged before this number -- this
15  two-plus number -- had been arrived at?
16  A. I'm sure not.
17  Q. Okay.
18      Did Household say anything about the percentage of
19  this portfolio that had been re-aged multiple times before
20  this number was arrived at?
21  A. No.
22  Q. Sir, I'll show you what's been marked as Plaintiffs'
23  Exhibit 736.  I'd ask you to take a look at that, if you
24  would.
25      (Document tendered to counsel and the witness.)

Schoenholz - direct

1899

1  BY MR. DOWD:
2  Q. Sir, do you recognize Plaintiffs' Exhibit 736 to be the
3  Household International 10-Q for the period ending September
4  30th, 1999?
5  A. It purports to be.
6  Q. Okay.
7      And you have no reason to doubt that it is, right,
8  sir?
9  A. I don't.
10  Q. And looking at the page that ends with the Bates range
11  229, you signed off on this 10-Q for the period ended
12  September 30, 1999, as the Executive Vice-President and Chief
13  Financial Officer at Household; is that right?
14  A. Correct.
15  Q. And you were affirming that it was accurate in all
16  material respects; is that correct, sir?
17  A. Correct.
18  Q. And, sir, again, you would have reported net income
19  information in this document; is that correct?
20  A. Yes.
21  Q. And you would have reported earnings per share information
22  in this document; is that correct?
23  A. Yes.
24  Q. And, in addition to that, you would have reported your
25  two-month -- two-plus -- statistics; is that right?

Schoenholz - direct

1900

1  A. Yes.
2  Q. Okay.
3      And, sir, I'd ask you to turn to the page that ends
4  with the Bates range 8217, if you would.
5      And, sir, about the -- I think it's the third and
6  fourth entries down on that page --
7      MR. DOWD:  Well, first, your Honor, I'm sorry, I'd
8  offer Plaintiffs' Exhibit 736.
9      THE COURT:  It will be admitted.
10      (Plaintiffs' Exhibit No. 736 received in evidence.)
11  BY MR. DOWD:
12  Q. And looking at the page that ends with the Bates range
13  217, sir, the sort of third and fourth bullet points down
14  there contain your two-plus information written out; is that
15  correct?
16  A. Yes.
17  Q. And that's information you would have signed off on prior
18  to the time this document was filed with the SEC; is that
19  right?
20  A. Yes.
21  Q. Okay.
22      And, then, you also provided your two-plus
23  information in a table format on the page that ends with the
24  Bates range 224; is that correct, sir?
25  A. Yes.

# EXHIBIT 5

1995

1  Q. And he goes on to say, The statistics are wrong because
2  the row labeled re-aged once in the last 12 months is, in
3  fact, the total of all accounts that received only one re-age
4  in the last 12 months; however, some have had multiple re-ages
5  over their entire life.
6      Do you see that?
7  A. Yes.
8  Q. And then he goes on to say, Therefore, the other incorrect
9  row is that labeled re-aged multiple times.
10      Do you see that?
11  A. I do.
12  Q. Did Mr. Makowski -- did you see Mr. Makowski's
13  certification in the summer of 2002?
14  A. I did. But I knew about -- this error that it refers to,
15  the guy -- the person who made the error was somebody who
16  worked for Makowski. And he and Makowski came up to me, oh,
17  within a few weeks after the Financial Relations Conference
18  after they figured out that they had made a clerical error and
19  made me aware of it.
20  Q. Okay. And so, sir, the numbers that you gave at the FRC
21  were wrong, right, about the multiple re-age issue?
22  A. The multiple re-age entry. So back on your chart where it
23  said December '01, 4.3 percent.
24  Q. Right.
25  A. That -- that 4.3 percent was wrong.

1996

1  Q. Okay. And Mr. Makowski, in this certification, what we've
2  marked as Plaintiffs' 188, he lists out what the numbers were
3  as prepared and used at the FRC presentation; is that correct?
4  A. That's correct.
5  Q. And then he listed out what they should have been as
6  corrected; is that correct?
7  A. That's correct.
8  Q. Okay. I just want to take a look at a few of these
9  numbers if we could.
10      We had sort of a chart blown up so we can keep
11  Mr. Makowski's certification on a board.
12      MR. DOWD: Could I move in Plaintiffs' 188, your
13  Honor? I apologize.
14      THE COURT: It will be admitted.
15      MR. DOWD: Your Honor, we'll use Mr. Brooks as a
16  human easel if we can for a minute.
17      THE COURT: An interesting use.
18  BY MR. DOWD:
19  Q. Mr. Schoenholz, if I could, the numbers that
20  Mr. Makowski --
21      MR. SLOANE: Excuse me, your Honor.
22      THE COURT: Go ahead, counsel, move over there so you
23  can see it.
24      MR. SLOANE: Thank you, your Honor.
25  BY MR. DOWD:

1997

1  Q. The numbers that Mr. Makowski said were wrong, among
2  others, were, for example, this number about re-aged once in
3  the last 12 months; is that right?
4  A. That's correct.
5  Q. And, for example, he says that 9.4 should really have said
6  6.2; is that right?
7  A. That's what that says.
8  Q. Okay. And then he goes on to say that the multiple
9  re-aged number that he told people back in April was 4.3 was
10  actually 7.5 percent; is that right?
11  A. That's correct.
12  Q. And then, for example, just looking at the numbers, the
13  4.3 that changed to 7.5 -- that should have been 7.5 -- we're
14  talking about somewhere around $3 billion in additional
15  multiple re-aged loans; is that right?
16  A. That's correct.
17  Q. In other words, he said it was 4 billion -- or you said in
18  April 2002, 4 billion 28 million; is that right?
19  A. That's correct.
20  Q. And Mr. Makowski said, no, that's wrong. The number
21  should be 7.025 billion, right?
22  A. Correct.
23  Q. Okay. Now, sir, the bottom line numbers stayed the same
24  because that's just talking about total in the portfolio
25  that's re-aged, right?

1998

1  A. That's correct.
2  Q. In other words, the loans that had been re-aged more than
3  once, you had about 3 billion more than you told people in
4  April of 2002; is that right?
5  A. That was the error, correct.
6  Q. Okay. And so you presented the multiple re-age numbers so
7  that people could look at them in April 2002, but the numbers
8  that you presented were wrong?
9  A. They were wrong.
10  Q. Okay.
11      MR. DOWD: Thank you, Luke.
12  BY MR. DOWD:
13  Q. Now, sir, you also presented information about certain
14  recidivism statistics by product line; is that right?
15  A. Correct.
16  Q. Okay. And if you could take a look at page 567. And
17  we're back in Plaintiffs' Exhibit 135 again.
18      Do you have that page in front of you?
19  A. I do.
20  Q. Okay. And it's up on the screen there, right? We're
21  looking at the same page, Recidivism Statistics by Product,
22  right?
23  A. Correct.
24  Q. This, again, was a chart that you used at this April 2002
25  presentation; is that correct, sir?

1999

1  A. That's right.
2  Q. And you say -- what you were explaining here is once an
3  account had been re-aged, you were trying to show the people
4  at this presentation how many of them were current 12 months
5  after that re-age; is that right?
6  A. No, that's not right.
7  Q. Okay. You were actually showing them how many had gone
8  two-plus or charge-off a year later; is that right?
9  A. That's correct.
10  Q. Okay. Sorry, sir. I misspoke.
11      So, in other words, what you were telling people here
12  is, of loans that had been re-aged, where you had reset a
13  customer, they had been late and you had reset them, re-aged
14  them, right?
15  A. Yes.
16  Q. Okay. And you're telling them, okay, of those loans that
17  we re-aged, for example, in real estate secured, at the end of
18  December 2001, only 13.1 percent of those had been charged off
19  or gone two-plus; is that right?
20  A. What I'm hesitating about is I don't remember what the
21  time period was when the loans were re-aged.
22  Q. So doesn't it say at the bottom, sir, Recidivisms reflect
23  accounts that are two-plus delinquent or charge-off one year
24  after re-age; is that right?
25  A. Correct.

2000

1  Q. Okay. And you were telling people, of these loans we
2  re-aged, only 13.1 percent of them went bad; isn't that right?
3  A. That's what that says.
4  Q. Okay. And you, in fact, told people at that Financial
5  Relations Conference that 87 percent or 86.9 percent remained
6  good; isn't that right?
7  A. I don't know what words I said, but I would have said they
8  had not gone two-plus or charged off.
9  Q. Okay. Well, let's -- if you want, we can take a look at
10  the transcript of that conference, page 183 -- or Plaintiffs'
11  Exhibit 183. And I'd refer you to the Bates that ends 306.
12      Okay. And in that second paragraph, you told people,
13  the way to read this chart is, let's take real estate as an
14  example, 12 months later, 13 percent of the people went bad.
15  They either charged off or were two-plus delinquent; is that right?
16  Conversely, 87 percent of them remained good; is that right?
17  A. That's what it says.
18  Q. And then you walked through each of those product lines,
19  if we go back to Plaintiffs' 135. In other words, in addition
20  to real estate secured, you gave them recidivism numbers for
21  auto finance, MasterCard/Visa, private label and personal
22  non-credit card; is that right?
23  A. Yes.
24  Q. Now, sir, let me ask you: When you presented these
25  numbers, did you tell those people at those conference that

2001

1  you considered a loan to be good, to be in that 87 percent
2  that remained good, if you had re-aged it again in those last
3  12 months?
4  A. I didn't know that at the time we made this presentation.
5  Q. Okay. So let me just get this straight. I just want to
6  understand. You told people 12 months later, 13 percent went
7  bad, went either two-plus or charged off. 87 percent of those
8  loans remained good after they had been re-aged, right?
9  A. That's what this says.
10  Q. Okay. What you didn't tell those people that day was,
11  hey, in that 87 percent that remains good a year later, we
12  include people who went delinquent again during that year and
13  then we re-aged them to bring them current again; is that
14  right?
15  A. I don't think that's true.
16  Q. Sir, are you telling me you told people that?
17  A. What I'm saying is in the example you've just used, my
18  recollection is that for real estate secured, the criteria is
19  you could only be re-aged once every 12 months. So for your
20  example, I don't think it's possible for an account to have
21  been subsequently re-aged. If you picked a different example,
22  I think your example would be correct.
23  Q. So you think I'm right for auto finance, MasterCard/Visa,
24  private label and personal non-credit card?
25  A. I think that's true.

2002

1  Q. Okay. And, sir, isn't it true that when you're talking
2  about these loans that had been re-aged as of December 31,
3  2000 -- December 31, 2000, for example, re-aged in the -- when
4  you said re-aged in the last 12 months, they could have been
5  re-aged more than a year ago, so they could have been re-aged
6  again, couldn't they?
7  A. Say that again.
8  Q. Sure. What I'm telling you is, you're telling me if they
9  got re-aged -- they couldn't be re-aged for 12 months, so they
10  couldn't have been recidivists again, is that right, for real
11  estate?
12  A. I think that's true.
13  Q. Let's take a look at what some of your people said. I'll
14  show you what's been marked as Plaintiffs' Exhibit 75.
15   (Tendered.)
16  BY MR. DOWD:
17  Q. Sir, Plaintiffs' Exhibit 75 is an e-mail from a Daniel
18  Pantelis to Steve McDonald with cc's to Mr. Makowski, among
19  others, dated June 11, 2002; is that right?
20  A. That's correct.
21  Q. Okay. And --
22      MR. DOWD: Your Honor, at this time I offer
23  Plaintiffs' 75.
24      THE COURT: It will be admitted.
25  BY MR. DOWD:

2003

1  Q. Okay. And, sir, again, Mr. McDonald was the controller
2  and Mr. Makowski was in charge of credit risk, right?
3  A. That's correct.
4  Q. And Mr. Pantelis was in credit risk and reported to
5  Mr. Makowski; is that right?
6  A. That's correct.
7  Q. And Mr. Pantelis says, Per your request, we have restated
8  our recidivism figures with classification of subsequently
9  re-aged accounts as recidivists.
10     Do you see that?
11  A. I do see that.
12  Q. Okay. And what he was saying there is, now we're going to
13  include as people who are recidivists, people who did it
14  again, people that actually got re-aged; isn't that right?
15  A. If you could bear with me for one second.
16  Q. Sure.
17  (Brief pause.)
18  BY THE WITNESS:
19  A. I'm not -- I've not seen this e-mail or -- yeah, e-mail.
20  And the reason I'm hesitating is I'm not sure if this applies
21  to Household International in total or if it applies to the
22  bank. Because under the chart, it talks about "as discussed
23  with the OTS." So I'm not sure of the context in which
24  McDonald asked the question or Pantelis is responding to the
25  question.

2004

1  BY MR. DOWD:
2  Q. Okay. You agree with me here though that the recidivism
3  figures are listed as -- for real estate secured -- 53.9
4  percent, right?
5  A. That's what they're listed as.
6  Q. For auto finance, they're listed as 48.2 percent; is that
7  right?
8  A. Yes, sir.
9  Q. Yes?
10  A. Yes.
11  Q. For MasterCard/Visa, 64.3 percent; is that right?
12  A. Yes.
13  Q. And for private label, 69 and a half percent; is that
14  right?
15  A. Yes.
16  Q. And then it goes on to include 78 percent for personal
17  non-credit card and 75 percent for personal homeowner loans;
18  is that right?
19  A. That's right.
20  Q. Okay. So it seems that Mr. Pantelis has much higher
21  recidivism rates than the ones you reported in April 2002;
22  does he not?
23  A. Mr. Pantelis is the one who generated the numbers we
24  disclosed in April 2002. And so I'm not -- again, I'm not
25  sure the context of this e-mail and how directly comparable it

2005

1  is to the analysis that Pantelis did for the FRC.
2  Q. Okay.
3  A. Clearly 53 is higher than 13.
4  Q. Okay. But you agree with me, sir, that when you presented
5  those figures in April 2002 at the FRC, you didn't include
6  people who had been re-aged in the last 12 months as
7  recidivists, right?
8  A. I didn't know that at the time, and I didn't say anything
9  about that.
10  Q. Okay. But you didn't include those, did you?
11  A. The definition of recidivism at the FRC did not include
12  subsequent re-ages.
13  Q. And Mr. Pantelis in this document says, If we restate our
14  recidivism figures with classification of subsequently re-aged
15  accounts as recidivists; that's what he's figuring out here,
16  right?
17  A. That's what it says.
18  Q. He's saying, if we put back in as recidivists people who
19  did it again, guys that got re-aged another time, these are
20  the numbers?
21  A. That's what -- that's what this says.
22  Q. Okay. Let's look at one more if we could. I'll show you
23  Plaintiffs' 79.
24  (Tendered.)
25  (Brief pause.)

2006

1  BY MR. DOWD:
2  Q. Sir, have you had a chance to look at Plaintiffs' 79?
3  A. I have.
4  Q. And it appears to be an e-mail. It says to Daniel
5  Pantelis, subject, DAS request OTS recidivists; is that right?
6  A. That's what it says.
7  Q. It says, Dan, based on what you said over the phone, I put
8  together what DAS wants; is that right?
9  A. That's what it says.
10  MR. DOWD: I offer Plaintiffs' Exhibit 79, your
11  Honor.
12  THE COURT: It will be admitted.
13  BY MR. DOWD:
14  Q. And looking at this e-mail, it has a note at the bottom
15  that says version 6-11-02.
16  Do you see that?
17  A. Correct.
18  Q. Okay. And on the second page of the exhibit, there are
19  two charts. One of them says at the top, Recidivism after 12
20  months, reporting two-plus and charge-off dollars.
21  Do you see that?
22  That's the chart on the top half of the page?
23  A. Right.
24  Q. Okay. And then on the bottom half of the page, there's an
25  entry that says, Recidivism after 12 months, reporting

2007

1  two-plus and charge-off dollars.  And then it says, Added back
2  subsequently re-aged accounts to delinquency status.
3       Do you see that?
4  A.  I do see that.
5  Q.  Okay.  Do you recall asking Mr. Pantelis to gather this
6  information?
7  A.  What -- I don't remember specifically asking him to do
8  that.  What I do generally remember is kind of in this time
9  frame, the OTS had raised questions about recidivism and how
10  they looked at it and their definition.  And I assume this is
11  what that refers to.
12  Q.  Okay.  And, again, when he says -- when they say DAS,
13  that's David A. Schoenholz, isn't it?
14  A.  Yeah, I'm sure that's me.
15  Q.  Sir, I'm looking at these numbers in the top half where he
16  talks about recidivism after 12 months; and for auto, credit
17  card, retail services and real estate total, they look pretty
18  similar to the numbers that you gave in April 2002, don't
19  they?
20  A.  Correct.
21  Q.  Okay.  And, for example, I guess we have another blow-up
22  of that one page.
23       Ask Mr. Brooks to hold that up again.
24       So, for example, this was the chart that you used on
25  April 9, 2002, right, sir?

2008

1  A.  Can you hold that up a little higher?
2       Yes.  Thank you.
3  Q.  And you said for real estate secured, 13.1 percent were
4  people who had gone bad; is that right?
5  A.  Yes, sir.
6  Q.  Okay.  And that's the same number for real estate total
7  listed in Exhibit 79, isn't that right, Plaintiffs' 79, 13.1
8  percent?
9  A.  Yes.
10  Q.  Okay.  Then retail services, is that the same as private
11  label, sir?
12  A.  Yes.
13  Q.  Okay.  And you told people back in April, 35.5 percent had
14  gone bad; and that's the same number listed on Plaintiffs' 79;
15  is that right?
16  A.  Correct.
17  Q.  Okay.  And then on the auto finance, it says -- you told
18  people 36.9 percent; is that right?
19  A.  Yes.
20  Q.  And that's the same number reflected in Plaintiffs' 79,
21  the document from June of 2002; is that right?
22  A.  Yes.
23  Q.  I think the only one I skipped was -- it was
24  MasterCard/Visa, 41.5 percent is what you said back in April
25  of 2002; is that right?

2009

1  A.  Correct.
2  Q.  And for -- looking at Exhibit 79, Plaintiffs' 79, the
3  document from June '02, it's also 41.5 percent; is that
4  correct, sir?
5  A.  Correct.
6  Q.  Okay.  But then below those numbers that appear to be
7  consistent with what you said in April of 2002, on Plaintiffs'
8  79, this document reports back in what those numbers would
9  look like if you included subsequently re-aged accounts; is
10  that right?
11  A.  So you're not looking where it talks about defining it as
12  cash collected or principal reduction?
13  Q.  At the bottom -- no, I'm looking at the second entry where
14  it says recidivism after 12 months, reporting two-plus and
15  charge-off, except this time adding back subsequently re-aged
16  accounts to delinquency status.
17       Do you see that?
18  A.  I do.
19  Q.  And here, on Plaintiffs' 79, the number for auto, for
20  example, goes from 36.9 to 48.2; is that right?
21  A.  That's what this document says.
22  Q.  Okay.  The number for real estate goes to 53.9 percent; is
23  that right?
24  A.  That's what the document says.
25  Q.  The number for card goes from 41 and a half to 64.3; is

2010

1  that right?
2  A.  Correct.
3  Q.  And the number for private label or retail services goes
4  from 35.5 to 69.5; is that right?
5  A.  That's what this analysis shows.
6  Q.  So, in other words, when you add back in people that got
7  re-aged a second time, the recidivism rates go up, don't they,
8  sir?
9  A.  That's what this says.
10  Q.  Bear with me for a moment, Mr. Schoenholz.
11    (Brief pause.)
12  BY MR. DOWD:
13  Q.  Sir, I'd like to show you what's been marked as
14  Plaintiffs' Exhibit 654.
15    (Tendered.)
16       MR. DOWD:  And it's been received in evidence, your
17  Honor.
18  BY MR. DOWD:
19  Q.  Sir, do you recognize Plaintiffs' Exhibit 654 as a series
20  of e-mails dated between August 30, 2001, and September the
21  4th, 2001?
22  A.  I recognize this as a document that Ms. Ghiglieri
23  introduced as relevant to her testimony, yes.
24  Q.  Okay.  So you've seen it before in the last few days?
25  A.  Yeah.  I don't remember it outside of that context.

2031

1    MR. DOWD:  A copy for counsel.
2  BY MR. DOWD:
3  Q.  Sir, do you recognize Plaintiffs' Exhibit 512 as a copy of
4  a cover memo with an attached e-mail that you received from
5  Mr. Aldinger on or about June 27, 2002?
6  A.  Could I just take a quick minute, please?
7  Q.  Sure.
8    MR. DOWD:  Your Honor, I'd offer Plaintiffs' 512 at
9  this time.
10    THE COURT:  Admitted.
11  (Brief pause.)
12  BY MR. DOWD:
13  Q.  You've had a chance to look at Plaintiffs' 512, sir?
14  A.  Yes, sir.
15  Q.  And that's a copy of a cover memo from Mr. Aldinger to
16  yourself that you received on or about June 27, 2002; is that
17  right?
18  A.  Appears to be.
19  Q.  Okay.  And Mr. Aldinger's cover memo says, Dave, let's
20  discuss; is that right?
21  A.  Correct.
22  Q.  And attached to his e-mail -- or attached to his cover
23  memo is an e-mail from Mr. Makowski that was dated June 21,
24  2002; is that right?
25  A.  Correct.

2032

1  Q.  And among others, both yourself and Mr. Aldinger were cc'd
2  on Mr. Makowski's June 21 e-mail, right?
3  A.  Yes, sir.
4  Q.  Okay.  There's a bunch of handwriting on the right-hand
5  side of the page.  Do you recognize that handwriting?
6  A.  It's Mr. Aldinger's.
7  Q.  So, in other words, he sent you the e-mail after he had
8  kind of written a bunch of stuff on there; is that right?
9  A.  It appears to be.
10  Q.  The subject of Mr. Makowski's e-mail is Revised - New
11  Re-aging Policy; is that right?
12  A.  Correct.
13  Q.  And he goes on in the text of the e-mail to say, At the
14  senior management meeting this week, new policies for re-aging
15  delinquent accounts were approved; is that right?
16  A.  That's what it says.
17  Q.  What was your understanding of what Mr. Makowski referred
18  to when he talked about the senior management meeting?
19  A.  We had -- Mr. Aldinger periodically would have an off-site
20  meeting with his senior team to go through kind of topics that
21  weren't just the day-to-day topics.
22  Q.  Okay.  And I take it you would have attended the senior
23  management meetings?
24  A.  Yes, sir.
25  Q.  Okay.  And Mr. Makowski lists these new policy changes for

2033

1  re-aging delinquent accounts, right?
2  A.  That's what he does.
3  Q.  Okay.  And, for example, on the left-hand side, one of the
4  policies relates to real estate secured; is that right?
5  A.  Correct.
6  Q.  And then it says BUs.  I assume that's business units,
7  right?
8  A.  Yes.
9  Q.  And it says MS.  That would be mortgage services.  CL, for
10  example, consumer lending, right?
11  A.  Correct.
12  Q.  And then he lists these new policies as requiring two
13  payments and a minimum of 12 months since prior re-age, for
14  example, for real estate secured; is that right?
15  A.  That's correct.
16  Q.  And then he goes on to say, Our immediate next steps are
17  to affirm any impacts on financial projections and identify
18  any outstanding transition issues by July 1, 2002; is that
19  right?
20  A.  Correct.
21  Q.  And he says, Detailed policies need to be finalized and
22  approved by July 15; is that right?
23  A.  That's what he says.
24  Q.  And he goes on to say, The new policy changes will be
25  announced in July, with implementation to take effect August

2034

1  1; is that right?
2  A.  That's what he says.
3  Q.  Okay.  And can you read Mr. Aldinger's handwriting?
4  A.  Pretty tough.
5  Q.  Okay.  I take it you would -- got used to reading it
6  during your time at the company though, right?
7  A.  Well, you know, that's why, if you notice, the bulk was
8  typed.  His secretary could translate it and would type it up
9  for people.
10  Q.  It looks like under number two there, he writes, Do we
11  have a better understand of the financial impact; is that
12  right?
13  A.  I guess.
14  Q.  That's what it looks like to you too?
15  A.  Do we have a better understand of the something impact.
16  Q.  Okay.
17  A.  It could be financial.  I don't know what it is actually.
18  Q.  Okay.  And these were questions directed at yourself, I
19  take it?
20  A.  I think this is what he would have wanted to discuss.
21  Q.  And so there was a management meeting where you talked
22  about changing your re-age policies in the summer of 2002; is
23  that right?
24  A.  It was in June, I believe.
25  Q.  Okay.  And was the intention at that time with regard to

2051

1   A. That's correct.
2   Q. So the numbers were lower by those amounts in this new
3   10-K, this amended 10-K, than they were in the original
4   documents; is that right?
5   A. That's correct.
6   Q. I'd ask you to turn to the very next page that ends with
7   the Bates range 035.
8       At the very top, there's another chart. And it
9   appears to show, sir, your -- how your earnings per share
10  numbers were affected by this restatement; is that correct?
11  A. That's what it says.
12  Q. Okay. And so, for example, looking at the diluted
13  earnings per share, in 2001, when you originally issued your
14  10-K in March of 2002, you told people that their earnings per
15  share was $4.08, right?
16  A. That's correct.
17  Q. And now you were telling them, well, we got it wrong; it's
18  $3.91; is that right?
19  A. I'm not sure I'd characterize it quite the way you did,
20  but it would certainly say it's 3.91.
21  Q. In other words, originally we told you $4.08; now we're
22  telling you $3.91; is that right?
23  A. I would agree with that.
24  Q. In 2000, you told people, in probably March of 2001 when
25  you issued your 10-K, you told people the EPS was $3.55; is

2052

1   that right?
2   A. Yes, sir.
3   Q. And when you restated it, it was $3.40 per share; is that
4   right?
5   A. That's right.
6   Q. And in 1999, you originally told people $3.07; and when
7   you restated it, you told them $2.95; is that right?
8   A. That's right.
9   Q. Sir, I'd like to show you what's been marked as
10  Plaintiffs' Exhibit 759. Ask you to take a quick look at
11  that. I'm going to direct your attention to certain
12  particular pages.
13      (Tendered.)
14  BY MR. DOWD:
15  Q. And that's a document related to a compensation committee
16  meeting on January 29, 2001; is that correct?
17  A. That's what it says.
18  Q. Sir, I'd ask you to turn to the page that ends with the
19  Bates range 33 if you would.
20      Do you have that in front of you?
21  A. I do.
22  Q. And, sir, the --
23      MR. DOWD:  Your Honor, I'd offer Plaintiffs' 759.
24      THE COURT:  It will be admitted.
25  BY MR. DOWD:

2053

1   Q. Okay. Sir, turning to the page that ends with the Bates
2   range 33 -- I think you said you were already there -- there's
3   a memo from you to Colin Kelly, dated January 16, 2001; is
4   that right?
5   A. That's correct.
6   Q. And the subject is 2000 Goals; is that correct?
7   A. Correct.
8   Q. And you list below it, a number of goals that were to be
9   considered by the compensation committee in awarding bonuses;
10  is that right?
11  A. That's correct.
12  Q. For example, there, sir, the first goal was increase
13  Household International EPS to $3.50; is that right?
14  A. That's correct.
15  Q. And you say earnings per share for 2000 was $3.55, and
16  that's five cents higher than the goal; is that right?
17  A. That's what it says.
18  Q. Now, when you restated a year and a half later, you
19  reduced your $3.55 EPS to $3.40; is that right?
20      You can take a look back or I can show it to you.
21  A. If that's what you said.
22  Q. I'm referring to Exhibit 231.
23  A. If that's what said before, that's fine.
24  Q. So if you had reported the numbers that you -- in 2000,
25  beginning in 2001, that you later reported in August of 2002,

2054

1   this goal wouldn't have been met, right, if you're at 3.40?
2   A. The reason I'm hesitating is I think if -- if we had known
3   in 2000 that we were to follow the accounting that we then
4   adopted in 2002, the goal would have been set consistently
5   with that new kind of accounting. So I don't know if it would
6   have been 3.50. But mechanically, if the goal was 3.50 and
7   stayed unchanged and you reported 3.40, that's less than 3.50.
8   Q. Okay. And so, for example, that goal wouldn't have been
9   achieved?
10  A. If the goal had not been adjusted to be consistent with
11  the new accounting, that would have been in place.
12  Q. Okay. Sir, I'll ask you to take a quick look, again
13  staying in Plaintiffs' Exhibit 759, and -- let's go to the
14  page that ends with the Bates range 52 if you could.
15      Sir, do you have that in front of you?
16  A. I do.
17  Q. And that reports certain information about your
18  compensation, as well as recommendations for bonuses for the
19  year 2000; is that correct?
20  A. That's what it says.
21  Q. Okay. And it's true, sir, that at the end of the year
22  2000, you were making a salary of $500,000 a year; is that
23  right?
24  A. Yes.
25  Q. Okay. And you made that same salary in the next year,

2055

1   2001; is that correct?
2   A. Yes.
3   Q. And, sir, you got a bonus in 1999 of $1.5 million; is that
4   right?
5   A. Yes.
6   Q. And do you recall, sir, there's a recommended bonus here
7   of $2 million for the year 2000; and, in fact, that was the
8   bonus you received in 2000; is that correct?
9   A. Yes.
10  Q. Okay. And then in the next year, 2001, you received a
11  bonus of $2.5 million; is that correct, sir?
12  A. I did.
13  Q. And in addition to those, you were also granted stock
14  options in 1999, 2000 and 2001 by the company; is that
15  correct?
16  A. Yes.
17  Q. Sir, in the spring of 2002, Household and Wells Fargo
18  entered into merger discussions; is that correct?
19  A. There were preliminary discussions between the two
20  companies. And it progressed to the point where there was
21  some due diligence that was done.
22  Q. Okay. So, in other words, you met with people from Wells
23  Fargo to talk about a potential merger; is that right?
24  A. Yes.
25  Q. And after those meetings, late in the spring of 2002, the

2056

1   companies undertook what's called due diligence; is that
2   right?
3   A. That's correct.
4   Q. And due diligence, when you say that, in other words,
5   Wells Fargo would have access to the internal books and
6   records of Household; is that right?
7   A. That's right.
8   Q. Okay. And is that also true vice versa, did Household
9   have access to Wells Fargo's books?
10  A. I believe we did -- I believe we did due diligence on
11  them, but I don't remember the extent of it.
12  Q. Okay. And certainly, Wells Fargo was talking about
13  acquiring Household, right?
14  A. That's correct.
15  Q. So you know they did due diligence on Household, right?
16  A. That's correct.
17  Q. Okay. And, in fact, you know that people that worked for
18  you, for example, gathered internal records and documents to
19  share with the Wells Fargo due diligence team; is that right?
20  A. I do know that.
21  Q. Okay. And the purpose of due diligence, sir, is for a
22  company to look at these internal books and records so that
23  they can basically look under the hood, right?
24  A. I think to look under the hood and also to figure out how
25  the companies would come together, and so how would you mana

2057

1   the two companies if they were to combine. So it's more than
2   just looking under the hood.
3   Q. Okay. And -- but you agree with me that when Wells Fargo
4   did this due diligence, they had access to Household books and
5   records that were not available to the general public, right?
6   A. I think that's true.
7   Q. Okay. And, in fact, like these -- this -- these deals are
8   done sort of on the hush-hush because you don't want people
9   outside the two companies to find out about it, to the extent
10  that you can prevent it, right?
11  A. That's correct.
12  Q. In other words, like you had a code name for Wells Fargo;
13  you called them Whiskey, right?
14  A. That's correct.
15  Q. So, in other words, if somebody left like a file laying
16  around somewhere and it said Whiskey due diligence, they
17  wouldn't know that you were thinking about a merger with Wells
18  Fargo; right?
19  A. That would be the theory.
20  Q. Okay. And, sir, in there -- were you aware that Wells
21  Fargo referred to the merger and Household as Blazer?
22  A. I don't think I was.
23  Q. Okay. All right. But you know you called them Whiskey in
24  your internal stuff?
25  A. I do know that.

2058

1   Q. And, sir, you had at this time -- in the spring of 2002,
2   you had an employment contract with Household; is that right?
3   A. I did.
4   Q. And if the two companies had merged, if Wells Fargo and
5   Household had merged, and it affected your position at
6   Household, you'd be entitled to certain additional
7   compensation, right?
8   A. That's correct.
9   Q. So, in other words, if the merger happened, it could
10  trigger these additional payments that you would be entitled
11  to under your employment agreement, right?
12  A. That's correct.
13  Q. And, sir, do you recall under that employment agreement,
14  you would have received somewhere in the neighborhood of 30 to
15  $35 million if Wells Fargo and Household had merged; is that
16  right?
17  A. I don't think so. That does not ring a bell to me.
18  Q. Okay. I'll show you what's been marked as Plaintiffs'
19  1038. I'd ask you to take a look at that if you would.
20  (Tendered.)
21  (Brief pause.)
22  BY MR. DOWD:
23  Q. Sir, that's a copy of an e-mail from a Susan Casey at
24  Household to a Michael Carlson at Household, subject Revised
25  Tier One and Two Spreadsheets.

2059

1      Do you see that?
2    A.  That's what it says.
3    Q.  It's dated April 26, 2002; is that right?
4    A.  Correct.
5         MR. DOWD:  I'd offer Plaintiffs' 1038, your Honor.
6         THE COURT:  It's admitted.
7    BY MR. DOWD:
8    Q.  And in this document, Ms. Casey says, Here's the current
9    versions of the spreadsheets we worked on today for cash
10   distributions and parachute calculations.
11        Do you see that?
12   A.  Correct.
13   Q.  Have you ever heard the phrase "golden parachute"?
14   A.  I have.
15   Q.  And what does that mean?
16   A.  I think that generally means -- or my understanding of
17   what it means is that in a change of control situation, it
18   would be a payment made to the people who -- or to the
19   executives who were not part of the surviving entity.
20   Q.  So, in other words, the executives who were left out of
21   the new company after the merger would be entitled under
22   employment agreements to a parachute, in other words,
23   something to give them a safe landing; is that right?
24   A.  They would be entitled to compensation, however their
25   contract was worded.

2060

1    Q.  Okay.  And I'd ask you to turn to the second page of
2    Exhibit 1038.
3         At the top of the page, there's an entry, Highly-paid
4    U.S. employees, tier one, approximate cash distributions
5    assuming a May 31, 2002, termination.
6         Do you see that?
7    A.  That's what it says.
8    Q.  And there's an entry there for you, Dave
9    Schoenholz; is that right?
10   A.  There is.
11   Q.  And it's got, for example, your salary down there,
12   500,000; is that right?
13   A.  Correct.
14   Q.  And it's got your 2001 bonus, that 2.5 million; is that
15   right?
16   A.  Correct.
17   Q.  And then it lists a total number of $34,823,769 in the
18   right-hand column; is that right?
19   A.  I see that.
20   Q.  And did you have an understanding in May -- at the end of
21   April 2002 that there were internal calculations being done on
22   how much you would receive if you left the corporation May 31,
23   2002, as a result of a merger?
24   A.  I don't remember -- I'm not surprised that there were
25   calculations being done.  I don't remember specifically if I

2061

1    knew that they were being done.
2    Q.  Okay.  Sir, I'll show you what's been marked as
3    Plaintiffs' Exhibit 1371.  I'd ask you to take a look at that
4    if you would.
5         (Tendered.)
6         MR. DOWD:  For the record, your Honor, that's an
7    e-mail from a Paula Roe to Todd May, dated April 22, 2002,
8    regarding Project Blazer.  And I'd offer Plaintiffs' 1371 at
9    this time.
10        THE COURT:  It will be admitted.
11        (Brief pause.)
12   BY MR. DOWD:
13   Q.  Sir, have you had a brief chance to look at Plaintiffs'
14   1371?
15   A.  Yes.
16   Q.  Have you seen that document before?
17   A.  I have not.
18   Q.  Okay.  And, sir, were you familiar with a gentleman named
19   Todd May that worked on the due diligence for Wells Fargo?
20   A.  I was not.
21   Q.  You don't recall meeting with him at any time?
22   A.  I don't.
23   Q.  Okay.  In this e-mail, it says, Todd, an extremely rough
24   estimate of the liability under the contracts.
25        Do you see that?

2062

1    A.  Yes.
2    Q.  And under your name, it says Schoenholz, 9.0, then 27.0.
3         Do you see that?
4    A.  I do.
5    Q.  On the second page of the exhibit, there's another e-mail
6    from Paula Roe to Todd May and others, dated April 22, 2002.
7         Do you see that?
8    A.  Yes.
9    Q.  It's the one entitled Project Blazer.
10        Do you see that?
11   A.  I do.
12   Q.  And she writes, John/Todd, I've reviewed the materials
13   forwarded to me and have the following comments.  And it goes
14   on to say, Employment contracts are very rich.  They were
15   rewritten March 1, 2002.  Unclear to me why they were amended.
16        Do you see that?
17   A.  I do.
18   Q.  Do you know whether employment contracts for yourself or
19   any of the other executives at Household were rewritten on
20   March 1, 2002?
21   A.  I don't remember.  I know they were amended at some point
22   in time, but I don't remember when.
23   Q.  Could it have been in March of 2002?
24   A.  It could have been.
25   Q.  And I think you've already said the employment contracts,

2063

1　at least your employment contract, did have provisions related
2　to what you would receive if you were terminated or if there
3　was a change in control; is that right?
4　A. It did.
5　Q. And it goes on to say, However, in the case of a change of
6　control where an executive position is adversely impacted, the
7　payment is 300 percent.
8　　Do you see that?
9　A. I do.
10　Q. Do you recall whether under your employment contract, you
11　received three times what you were entitled to receive
12　annually if there was a change in control?
13　A. I believe that's the way it always was.
14　Q. Sir, I'll show you what's been marked as Plaintiffs'
15　Exhibit 1359. I'd ask you to take a look at that if you
16　would.
17　　(Tendered.)
18　　MR. DOWD:  And a copy for counsel.  For the record,
19　your Honor, it's entitled Confidential, Household
20　International, Inc., Board of Directors, May XX, 2002.  And
21　I'd offer Plaintiffs' 1359 at this time.
22　　THE COURT:  It will be admitted.
23　BY MR. DOWD:
24　Q. Sir, have you had a chance to briefly review that?
25　A. I have.

2064

1　Q. And can I ask you, have you reviewed this document?
2　A. I've never seen this document.
3　Q. Okay.  I'd ask you to turn to the third page of
4　Plaintiffs' Exhibit 1359 if you would.  And there's an entry
5　there that says Recent Events.
6　　Do you see that?
7　A. It does.
8　Q. It says, Reached agreement on an exchange rate on May 1st.
9　　Do you see that?
10　A. It does say that.
11　Q. Do you know what an exchange rate means in the context of
12　a merger?
13　A. I do.
14　Q. What does that mean?
15　A. If you're going to have a stock-for-stock deal, it would
16　be how many shares of stock one company would exchange for th
17　shares of another company.
18　Q. Okay.  And that number has to be arrived at so that a
19　merger can be consummated; is that right?
20　A. If it's a stock-for-stock deal, yes.
21　Q. Okay.  And do you know, did you reach an agreement with
22　Wells Fargo on an exchange rate on or about May 1, 2002?
23　A. I don't think so.
24　Q. I'd ask you to turn to the last page of Exhibit 1359.
25　　And there's a document there called Deal Comparison.

2065

1　　Do you see that?
2　A. I do.
3　Q. And it talks about, Structure on May 1st when exchange was
4　fixed.
5　　Do you see that?
6　A. I do.
7　Q. Does that refresh your recollection at all as to whether
8　exchange rates were reached between Household and Wells Farg
9　on May 1 of 2002?
10　A. It doesn't.  I'm not -- I'm not sure that this is
11　referring to -- I've never seen this document.
12　Q. All right.
13　A. But -- I've never seen this document, so I don't know.  I
14　don't believe there was ever any exchange ratios -- exchange
15　rates agreed to, that the conversations ever got to that level
16　of detail.
17　Q. But you did know that due diligence took place?
18　A. I do know that.
19　Q. And that Wells Fargo came in and looked at your books and
20　records, right?
21　A. I do know that.
22　Q. Sir, I'll show you what's been marked as Plaintiffs'
23　Exhibit 1351.  I'd ask you to take a look at that if you
24　would.
25　　(Tendered.)

2066

1　　MR. DOWD:  A copy for counsel.
2　　For the record, your Honor, it's entitled Consumer
3　Finance.  At the bottom it says, Highly Confidential.  On the
4　top of the second page, it says WFF Due Diligence, Blazer
5　Executive Summary by the Business Team, May 9, 2002.  And I'd
6　offer Plaintiffs' 1351 at this time.
7　　THE COURT:  It will be admitted.
8　BY MR. DOWD:
9　Q. Sir, have you had a chance to briefly review what's been
10　received as Plaintiffs' 1351?
11　A. I have.
12　Q. Okay.  And on the top of the second page of the exhibit,
13　sir, you agree with me it says WFF Due Diligence, Blazer
14　Executive Summary by the Business Team, May 9, 2002; is that
15　right?
16　A. That's what it says.
17　Q. Okay.  This was during the time period, May 9, 2002, that
18　Wells Fargo was doing due diligence?
19　A. I would assume so.
20　Q. Okay.  Sir, looking at that second page of the exhibit,
21　the one that ends with the Bates range 220, there's an entry
22　there in the third paragraph that says, Unfortunately, our
23　investigation revealed some major systemic issues in Blazer's
24　policies and procedures.
25　　Do you see that?

2087

1  right?
2  A.  That's what this says.
3  Q.  And that's what you wrote in March of 2001, right?
4  A.  That's correct.
5  Q.  Okay.
6       And you went on to say, "This has caused me to
7  reflect on Andrew's work product with a fresh view," right?
8  A.  Correct.
9  Q.  Okay.
10      And what you meant by that is Providian had gotten
11  sued; their situation was much worse; and, you started to
12  think about it, in terms of how it could affect you, right?
13  A.  I think that that was probably a triggering or a
14  triggering issue that led me to write this, although the more
15  I dealt with Mr. Kahr, the more uncomfortable I became with
16  Mr. Kahr.
17  Q.  The more uncomfortable?
18  A.  Uncomfortable.
19  Q.  Okay.
20      And, sir, you talked -- you go on to talk in the memo
21  about how "some of his ideas have been adopted by one or
22  another of the businesses to help them grow their businesses
23  and better serve our customers"; is that right?
24  A.  That's correct.
25  Q.  So, you understood some of Mr. Car Kahr's initiatives had

2088

1  been adopted at this point in time; did you not?
2  A.  Some of his initiatives were adopted after people
3  internally vetted them and signed off on them, correct.
4  Q.  Okay.
5       Some of his initiatives were adopted, right?
6  A.  That's correct.
7  Q.  And you go on to say in the last paragraph on the first
8  page there, "In efforts to innovate, Andrew has, at times,
9  suggested approaches that were inappropriate and/or would not
10  best serve our customer"; is that right?
11  A.  That's correct.
12  Q.  And you believed that in March of 2001; is that right?
13  A.  Correct.
14  Q.  And you said, "He is a very prolific writer of memoranda";
15  is that correct, sir?
16  A.  I did say that.
17  Q.  Okay.
18      And you meant he wrote a lot of memos, right?
19  A.  I meant that.
20  Q.  And you went on to say, "Moreover, Andrew's writing style
21  can be acerbic, intemperate and inflammatory when presenting
22  ideas of possible approaches"; is that right?
23  A.  That's what I wrote.
24  Q.  Okay.
25      And you went on to say that, "There exists in our

2089

1  files a large quantity of Andrew Kahr memoranda, some of which
2  contain ideas and comments about our products, customers and
3  employees, expressed in language which is offensive and is
4  inconsistent with our statement of business principles, our
5  individual ethical standards and the way we conduct our
6  business"; is that right, sir?
7  A.  That's what I wrote and that's what I believed.
8  Q.  Okay.
9       And, sir, you knew he was a very prolific writer of
10  memoranda, right?  We've established that?
11  A.  Yes.
12  Q.  And you understood, at the time that you wrote this memo,
13  that his memoranda that he had written at Providian had
14  exacerbated their situation, right?
15  A.  Yes.
16  Q.  So, you knew his memos Household put Providian in far more
17  legal difficulty than they would have otherwise been, right?
18  A.  I don't know how to characterize "far more difficulty,"
19  but I certainly would have known they weren't helpful.
20  Q.  Okay.
21      Well, you said they "exacerbated" the situation,
22  right?
23  A.  That's what I said.
24  Q.  Okay.
25      And, so, now you write this memo and you're thinking

2090

1  about the fact that you have Kahr memoranda in your files,
2  too, right?
3  A.  That is part of this memo.
4  Q.  And, so, you go on to talk about how you've spoken to
5  Andrew about this and he has toned down his rhetoric, right?
6  A.  That's what it says.
7  Q.  And, again, you had meetings from time to time with
8  Mr. Kahr between the end of '98 and 2001, right?
9  A.  Excuse me?
10  Q.  You had meetings with Mr. Kahr between '98 and 2001,
11  right?
12  A.  I did.
13  Q.  And you go on to say that, "In order to avoid this
14  misinterpretation of history," do you see that?
15  A.  I do.
16  Q.  You say, "I'm instructing that all copies of all Andrew
17  Kahr memoranda, both paper and electronic versions, be
18  collected by the Office of General Counsel and thereafter
19  destroyed," right, sir?
20  A.  That's what I said.
21  Q.  Okay.
22      And, so, what you said was, "Destroy the Kahr memos";
23  is that right?
24  A.  What I said was the Office of General Counsel should
25  collect them and destroy them.

2091

1   Q. Okay.
2       So, in other words, you were worried about somebody
3   seeing these Kahr memoranda, the same type of memos that had
4   gotten Providian in trouble and getting you in trouble; isn't
5   that right, sir?
6   A. I think what I say is that I was concerned that --
7   Mr. Kahr -- it came -- I came to believe that Mr. Kahr did not
8   represent the values that we had in his attitudes and his
9   actions and his words.  His memoranda were inconsistent with
10  that.
11      And I was concerned that operating people could take
12  and find these memoranda somewhere and come to the conclusio
13  that this is what Household management endorsed.  And I
14  thought that was a risk we should not take, which is why I
15  asked them to be destroyed.
16  Q. Okay.
17      So, in other words, you wanted to get this Kahr
18  evidence out of your files, right?
19  A. We wanted to destroy it.
20  Q. Sir, did Mr. Kahr propose any initiatives that you thought
21  were unethical?
22  A. I guess I would answer it this way:  There's nothing we
23  implemented after discussion with Mr. Kahr that was unethical
24  clearly.
25  Q. What I'm asking you is:  Did he propose any initiatives

2092

1   that you thought were unethical?
2   A. I would -- I would -- say that things that -- Andrew
3   bounced all sorts of ideas all over the place.  I think there
4   were things where he didn't respect the customers and I think
5   there were things -- I guess I would come back and say I don't
6   think there's anything that we implemented or that we
7   discussed implementing as a result of Mr. Kahr was unethical.
8   Q. But, just to make sure, you destroyed all the memos,
9   right, sir?
10  A. Say that, again, please.
11  Q. Just to make sure, you destroyed all the memos, right?
12  A. I wanted the memos destroyed.
13  Q. Sir, I'll show you what's been marked as Plaintiffs'
14  Exhibit 1006 and ask you to take a look at that, if you would.
15      MR. DOWD: I hand a copy to counsel.
16      (Document tendered to counsel and the witness.)
17  BY MR. DOWD:
18  Q. Sir, this document is entitled, "Household International
19  General Ledger Purged Detail"; is that correct?
20  A. That's what it says.
21  Q. And, sir, taking a look at this --
22      MR. DOWD:  Well, first of all, your Honor, I'd offer
23  Plaintiffs' 1006.
24      THE COURT:  It will be admitted.
25      (Plaintiffs' Exhibit No. 1006 received in evidence.)

2093

1   BY MR. DOWD:
2   Q. Sir, do you recognize this document to be a record of the
3   payments to Andrew Kahr by Household International?
4   A. I don't.
5   Q. Do you recall, sir, that eleven days after you wrote your
6   May -- March -- 2001, memo, that you gave Andrew Kahr a check
7   for $120,000?
8   A. I don't remember that.
9   Q. Okay.
10      I'd ask you to take a look at the page that ends with
11  the Bates range 594, if you would.
12      And do you see an entry there, sir, of a payment on
13  March 23rd, 2001, for $120,000?
14  A. I see it looks like there's an entry.  I don't know who
15  it's to.
16  Q. Okay.
17      Well, sir, your lawyers have told us that these are
18  the payments to Mr. Kahr.
19      Has anybody talked to you about that?
20  A. No.
21  Q. So, do you know whether or not you paid Andrew Kahr
22  $120,000 just eleven days after you wrote your memo about
23  destroying his memoranda?
24  A. I don't know that.
25  Q. Did you know that you kept paying him until July of 2002,

2094

1   sir?
2   A. If that's what this represents.  The last item on the page
3   says July of '02.
4   Q. And there's a payment on July 15th for $60,000; is that
5   right?
6   A. That's what it says.
7   Q. And a payment on July 30th, 2002, for $120,000; is that
8   right, sir?
9   A. That's what it says.
10  Q. Sir, I'd like to show you what's been marked as
11  Plaintiffs' Exhibit 1388.  And that's in evidence.
12      (Document tendered to counsel and the witness.)
13  BY MR. DOWD:
14  Q. Sir, is that a copy of an article dated May 5th, 2002,
15  regarding Providian?
16  A. Yes.
17  Q. And there's an article that, basically, talks about Andrew
18  Kahr and Providian; is that fair?
19  A. That's what it says.
20  Q. Okay.
21      For example, it says in the second paragraph there,
22  "In lending to the kinds of high-risk customers Providian
23  specialized in, Kahr wrote the 'Problem is to squeeze out
24  enough revenue and get customers to sit still for the
25  squeeze.'"

2095

1      Right?
2   A. That's what it says.
3   Q. Okay.
4      And, sir, you were aware of articles like this about
5   Andrew Kahr and Providian in May of 2002, weren't you?
6   A. I don't remember if I saw this memo or not.
7   Q. Okay.
8   A. I probably would have, but I can't testify to that.
9   Q. Okay.
10     You were certainly keeping track of Providian's legal
11  difficulties back in March of 2001; is that right?
12  A. I was aware of them.
13  Q. Okay.
14     And I take it you kept yourself apprised of
15  Providian's problems, especially with regard to Mr. Kahr, over
16  the next year; isn't that fair?
17  A. I don't know if that's fair or not.
18     I mean, when I wrote the memo, I was aware of
19  Providian's difficulties.  I don't remember one way or the
20  other if I read this newspaper article; and, I don't have any
21  recollection that I tracked what Providian was doing between
22  March of '01 and May of '02.
23  Q. Okay.
24     And this article, 1388, is May, 2002, right?
25  A. That's what it says.

2096

1   Q. I'll show you what's been marked as Plaintiffs' Exhibit
2   1026.  I'd ask you to take a look at that, if you would.
3      (Document tendered to counsel and the witness.)
4   BY MR. DOWD:
5   Q. Mr. Schoenholz, do you recognize Plaintiffs' Exhibit 1026
6   to be a series of e-mails dated between June 24th, 2002, and
7   June 28th, 2002?
8   A. That's what it says.
9   Q. Okay.
10     MR. DOWD:  Your Honor, I'd offer Plaintiffs' 1026.
11     THE COURT:  Admitted.
12     (Plaintiffs' Exhibit No. 1026 received in evidence.)
13  BY MR. DOWD:
14  Q. And, sir, the e-mail at the bottom of the page here is an
15  e-mail from Ken Harvey, and the subject is "Kahr Memos"; is
16  that right?
17  A. That's correct.
18  Q. And Ken Harvey works for Household; is that right?
19  A. Correct.
20  Q. Or he did at the time?
21  A. Right.
22  Q. And he goes on to say that -- he sends the e-mail to
23  yourself, Mr. Aldinger and Mr. Robin; is that right?
24  A. That's correct.
25  Q. And the title is "Kahr Memos," correct?

2097

1   A. That's correct.
2   Q. And he goes on to say that, "We will be deleting 620
3   e-mails from over 90 employee mailboxes shortly."
4      Do you see that?
5   A. That's what it says.
6   Q. And he says, "We'll also block all incoming memos from
7   that e-mail account."
8      Do you see that?
9   A. That's what it says.
10  Q. And did that mean incoming e-mails from Mr. Kahr?
11  A. I would assume so.
12  Q. That's what you understood at the time, I take it, sir?
13  A. I don't remember this specific piece of paper, but that's
14  how I would read it.
15  Q. Okay.
16     And, then, you responded to Mr. Harvey's e-mail,
17  right?
18  A. I forwarded it to Mr. Robin.
19  Q. Okay.
20     And you said, "I think you should send out a note on
21  disposing of all memos," right?
22  A. That's what it says.
23  Q. Okay.
24     And this was the second time that you had ordered the
25  destruction of Andrew Kahr materials; is that right, sir?

2098

1   A. The bottom part of Mr. Harvey's e-mail says, "We've
2   created a database and will work with Ken Robin on the
3   disposition."
4      And I think what I'm telling is agreeing with that,
5   that, yes, we should dispose of these memos.
6      I don't think this is any inconsistent with the memo
7   that I had written earlier.
8   Q. Right.
9      In March, 2001, you said, "Destroy the Kahr memos,"
10  right?
11  A. Correct.
12  Q. And in June of 2002, you said, "Destroy the Kahr memos and
13  e-mails," right?
14  A. Correct.
15     MR. DOWD:  No further questions at this time, your
16  Honor.
17     THE COURT:  Cross-examine.
18     MR. SLOANE:  Yes, your Honor.
19     (Brief pause.)
20     MR. SLOANE:  May I proceed, your Honor?
21     THE COURT:  You may proceed.
22     MR. SLOANE:  Thank you.
23        CROSS-EXAMINATION
24  BY MR. SLOANE:
25  Q. Let me stick with Andrew Kahr, Mr. Schoenholz, for a

Schoenholz - cross
2103

1 think, through all that time, our Information Technology Group
2 reported to me. And I also had Investor Relations reported to
3 me, as well as kind of the administrative responsibility for
4 the internal audit function.
5 Q. Did you view your responsibilities as being to the
6 plaintiffs' investors in this case?
7 A. Oh, of course.
8 Q. Did you also view your responsibilities as including
9 responsibilities to the borrowers -- to the people that
10 Household lent money to?
11 A. I mean, indirectly, as an officer of the company, I wanted
12 to make sure that we did what was the right thing for the
13 customers. Because if you didn't do the right thing for the
14 customers, you couldn't do the right thing for the
15 shareholders.
16    But I was not a front-end direct interface with the
17 customers, given my responsibilities.
18 Q. Let me show you a document.
19    MR. SLOANE: May I approach, your Honor?
20    THE COURT: Yes.
21 BY MR. SLOANE:
22 Q. It's been previously marked as Plaintiffs' Exhibit 1115.
23    (Document tendered to counsel and the witness.)
24 BY MR. SLOANE:
25 Q. Would you tell the Court and the jury what that document

Schoenholz - cross
2104

1 is?
2 A. Say, again, please?
3 Q. Tell the Court and the jury, please, what that is.
4 A. This is an e-mail -- well, it's two e-mails. The first
5 e-mail is November 19th of '01. And it's from me to Paul
6 Makowski. And it says, "We should look at the economic and
7 net present value analysis behind all of our re-age policy
8 -- "
9 Q. Before you read it, Mr. Schoenholz, let me just offer it
10 into evidence.
11    MR. SLOANE: Your Honor, I offer Plaintiffs' Exhibit
12 1115 into evidence. I don't believe there's an objection to
13 this.
14    THE COURT: It will be admitted.
15    (Plaintiffs' Exhibit No. 1115 received in evidence.)
16    MR. SLOANE: Can we publish that on the board,
17 please?
18    (Brief pause.)
19 BY MR. SLOANE:
20 Q. Now, you started to explain it. Please go ahead.
21 A. Well, in this time frame, I was asking Mr. Makowski to get
22 more involved with looking at our re-age policies, which has
23 traditionally been delegated and were the responsibilities of
24 the various business units.
25    And what I'm telling him to do is look at the

Schoenholz - cross
2105

1 economic and net present value analysis behind our re-age
2 policies, and that our criteria is that we wanted to do the
3 right thing for the customer and make a good economic
4 decision.
5    The re-age policies really benefitted both the
6 customers and benefitted the investors.
7 Q. So, your concern was, with what you wrote here -- "I want
8 to make sure we're doing the right thing for the customer and
9 making a good economic decision" -- is that right?
10 A. Of course.
11 Q. And when you said making -- or when you said -- "making a
12 good economic decision," what did you mean?
13 A. Well, I mean, we were responsible for increasing the
14 return to the shareholders. And if you did restructures or
15 re-ages correctly, you would increase cash flow; you would
16 reduce the ultimate credits losses the company would have; you
17 could reduce your cost of collections; you could improve
18 customer relationships, which would benefit investors over the
19 long-term.
20    And, so, we wanted to do the right thing for the
21 customer, but only in a way that made -- was also a right
22 business decision for the investors.
23 Q. The investors being the plaintiffs in this case; is that
24 right?
25 A. That's correct.

Schoenholz - cross
2106

1 Q. Now, counsel asked you about a big stack of documents that
2 are piled up here (indicating) on the table -- various 10-Ks
3 and 10-Qs and other public filings. Do you recall that?
4 A. I do.
5 Q. Now, would you explain to the jury and to the Court the
6 process by which --
7    MR. SLOANE: Let me withdraw that.
8 BY MR. SLOANE:
9 Q. Did you write those documents?
10 A. I did not.
11 Q. Would you explain to the Court and to the jury what was
12 the process by which those documents were created?
13 A. Let me start with the 10-K document because that's a more
14 comprehensive document.
15 Q. Let me interrupt you one second.
16    MR. SLOANE: Your Honor, we have a demonstrative
17 exhibit, 802-01. May we publish that on the board, please?
18    I don't believe there's any objection to it.
19    THE COURT: If there's no objection, yes.
20 BY MR. SLOANE:
21 Q. Perhaps this can serve as an aid to the jury and to you,
22 Mr. Schoenholz.
23    So, why don't you walk us through this document, if
24 you would.
25 A. Okay.

Schoenholz - cross

2107

1    Well, in this time frame, what it means is that the
2  10-K draft would have been initially prepared, generated by
3  the Corporate Controller's group with input from Investor
4  Relations, from the Treasury Department, from the Credit Risk
5  Department, clearly on the types of disclosures we've been
6  talking about would be drafted by the Credit Risk people; and,
7  also, would include initial input from the external auditors.
8    It would then be reviewed, after it was actually
9  drafted, by other people in the Corporate Controller's group.
10  I think that says "Internal Audit."
11    A draft would then go to Mr. McDonald, who was the
12  Chief Accounting Officer.
13  Q.  Mr. McDonald is the person that Mr. Dowd asked you about
14  in connection with certain of the exhibits you saw this
15  morning?
16  A.  Yes, sir.
17    He would then review the draft thoroughly, provide
18  his input, his comments, his direction, at which time he would
19  then circulate a 10-K document to all of those people listed:
20  Basically, senior business unit, operating managers, as well
21  as financial managers and functional heads within the
22  corporate office.
23    They were charged with reviewing the 10-K,
24  particularly as it related to disclosures that they had
25  specific informed knowledge on.  They provided their input

Schoenholz - cross

2108

1  back to what we had was called a Disclosure Committee.  And
2  that Disclosure Committee consisted -- my recollection is it
3  consisted -- of McDonald; the treasurer; representatives of
4  the legal group that were, like, the SEC experts; as well as
5  some people -- a couple business unit financial people -- I
6  believe.
7    They would take it, digest it, come up with a draft
8  that they were happy with.  There would be then kind of a
9  summary meeting with Aldinger, myself, McDonald, and that says
10  Schwartz, who was kind of the SEC counsel in this time frame,
11  to talk about any issues, anything that we needed to revolve
12  at a higher level.
13    KPMG, the auditors, would then review that draft.
14  Although they had provided input at the very beginning part of
15  the process, but they would review it and, in essence, sign
16  off on that as part of their audit processes.  That would
17  include reviewing the MD&A and all those types of disclosures,
18  as well.
19    I would then get a draft and I'd review it very
20  carefully; generally, kind of in the late December time frame
21  and, then, probably updated in the late January time frame.
22    It would go to Mr. Aldinger.  Mr. Aldinger would take
23  and review it and provide whatever comments he had.  Then we
24  provided a draft of the 10-K to the Audit Committee generally
25  at the end of January for a meeting when the auditors would

Schoenholz - cross

2109

1  present the results of their audit.
2    Mr. McDonald would take and talk about the financial
3  statements.
4    Prior to the meeting with the Audit Committee, we had
5  a separate advanced meeting -- this is pre-Audit Committee
6  meeting -- with Mr. Levy, who was the Chairman of the of Audit
7  Committee.
8    Mr. Levy was a retired senior technical partner with
9  KPMG and was a very -- truly an expert in this area of
10  financial reporting and disclosures.
11    He wanted to have a -- he wanted to have a -- private
12  advanced meeting with myself, McDonald, the internal auditors,
13  the external auditors.  And then he would meet privately just
14  with the internal auditors and privately just with the
15  external auditors, would get his input and then present it to
16  the Audit Committee and then get their input.
17  Q.  Let me be sure I understand this.
18    Did all of the 10-Ks and 10-Qs, after July 30, 2002,
19  go through this same process?
20  A.  That's correct.
21  Q.  Now, what was the process -- what's the significance of
22  the July 30, 2002, date, in your mind?
23  A.  That was when Sarbanes-Oxley came in.
24  Q.  What does that mean?
25  A.  Sarbanes-Oxley was legislation introduced on creating a

Schoenholz - cross

2110

1  requirement for the Senior Chief Executive Officer and
2  principal Financial Officer.  So, in essence, certify
3  financial statements that were filed with the SEC.
4    And in response to that requirement to have that
5  certification, we created a sub-certification process that, in
6  essence, that had everybody in the business -- and there were,
7  I don't know, 40 or 50 people -- had to certify, in essence,
8  to Mr. Aldinger and myself the same things that we would have
9  to certify to the outside world.
10    That's why July -- that's the significance of July
11  30.
12  Q.  So, that was after July 30th, after this law got passed;
13  is that right?
14  A.  Right.
15  Q.  What was the process like before this law got passed?
16  A.  It was, essentially, the same process.  The difference
17  would be there wasn't a formal certification process and we
18  didn't have a formal disclosure committee.  So, it was more
19  like McDonald -- it would be the same where he would send it
20  out to the different business units and the functional heads,
21  but he would get the input back himself and working with his
22  department, giving it to KPMG; and, then, really are the rest
23  of the process was the same.
24  Q.  Now, when you signed these documents -- these 10-Ks or
25  10-Qs that Mr. Dowd showed you -- did you draw any comfort or

Schoenholz - cross

2111

1  reliance on this process?
2  A. Of course.
3      I mean, I couldn't be aware of every detail or
4  everything. So, I clearly reformed -- relied -- on kind of
5  the informed -- the judgments of informed -- professionals;
6  whether those were people internally or externally, I would
7  have relied and taken comfort from the fact that the external
8  auditors reviewed and signed off on things.
9      Now, that doesn't -- we earlier talked about were
10 they the responsibility of management. Clearly, but --
11 Q. Let me stop you.
12     How many people would have been involved in reviewing
13 this document before it got to you -- internal, external? Can
14 you give us an order of magnitude?
15 A. Literally dozens -- multiple dozens -- of people.
16 Q. Now, did this apply both before and after July 30, 2002;
17 that is, literally dozens ands of people would have been
18 involved --
19 A. Yes.
20 Q. -- in the review of it?
21 A. Yes.
22 Q. And those -- that review -- would have gave you comfort as
23 to the accuracy of what was in there?
24 A. Absolutely.
25 Q. Now, you were responsible for what was in there because

Schoenholz - cross

2112

1  you signed it; isn't that right?
2  A. That's correct.
3  Q. Now, Mr. Dowd showed you a document I'd like to put on the
4  screen. It's Plaintiffs' Exhibit 1076 -- I'm sorry, it's 176.
5      MR. SLOANE: 176.
6      (Brief pause.)
7  BY MR. SLOANE:
8  Q. Now, this was a document, I think you testified, was
9  something that was prepared -- when Mr. Dowd asked you -- I
10 think you said by Mr. McDonald?
11 A. It was a combination of Mr. McDonald and the outside
12 auditors.
13 Q. Okay.
14     And Mr. McDonald --
15     MR. SLOANE: Going back to that chart, again, for a
16 second, Brian.
17     (Brief pause.)
18 BY MR. SLOANE:
19 Q. -- Mr. McDonald, again, was one of the people who reviewed
20 the final version of these public disclosures before they were
21 issued to the public; isn't that right?
22 A. Without question.
23 Q. And that's him right there in the middle (indicating)?
24     MR. SLOANE: Brian, if you can highlight "Steve
25 McDonald" right there (indicating) at the top. It's over

Schoenholz - cross

2113

1  there in the middle.
2      Thank you.
3  BY MR. SLOANE:
4  Q. Now, Mr. Dowd showed you a couple of the pages -- one of
5  the pages I don't think he showed you, but let me show you.
6  It's Page 802018102.
7      Can you find that document?
8      I can give you another copy, but it's Plaintiffs'
9  Exhibit 176. It's a November 13th, 2000, "Quality of
10 Accounting Policies Applied in Financial Reporting"?
11     You can look actually on your screen there,
12 Mr. Schoenholz, if it's easier.
13 A. Unfortunately, with my bifocals, I can't read that.
14 Q. Okay.
15     Let me hand you another copy of it.
16     MR. SLOANE: May I approach, your Honor?
17     THE COURT: Yes.
18 BY MR. SLOANE:
19 Q. Just ignore the highlighting of the front page. I'm not
20 asking you about that.
21 A. Okay.
22     (Document tendered.)
23 BY MR. SLOANE:
24 Q. If you would turn to Page 8102.
25     Now, Mr. Dowd asked you about the top. It says,

Schoenholz - cross

2114

1  "Below is a summary of the significant accounting policies
2  which are applied in our financial reporting and will be
3  disclosed in Household's 2000 Annual Report."
4      Do you see that?
5  A. I do.
6  Q. And it refers to accounting -- "significant accounting
7  policies" -- right?
8  A. (No response.)
9  Q. That first sentence.
10 A. Yes.
11 Q. And, then, later, the next sentence says, "For each of
12 these policies, a Comment section is included to discuss
13 specific items relating to the items covered by such policies,
14 peer group comparisons and the level of judgment involved in
15 carrying out those policies."
16     Do you see that?
17 A. I do.
18 Q. Now, would you turn to Page 8107.
19     I'm sorry, go to 8106 first.
20 A. Yes.
21 Q. Now, do you see there is -- at the top it says, "Provision
22 and Credit Loss Reserves"?
23 A. Yes.
24 Q. And, then, it says "Comments."
25     Do you see that, right under it?

Schoenholz - cross

2119

1  Q. Now, you've heard some testimony sitting back here from
2  Public Relations people, Megan and others?
3      Did you ever tell any of the Public Relations people
4  to conceal anything or to hide anything from the investment
5  community or the investors?
6  A. Absolutely not.
7  Q. Mr. Dowd showed you some articles or an article -- one
8  article -- from a newspaper about some allegations of lending
9  practices.
10     Did you ever conceal the existence of a pervasive
11  nationwide, widespread predatory lending scheme, sir?
12  A. I never did.
13  Q. Did you believe -- did you believe -- that such a scheme
14  existed?
15  A. Absolutely not.
16  Q. Now, we've talked about re-age.  Did you ever conceal or
17  urge anyone to conceal that Household used re-age or
18  restructuring to hide the true credit quality of Household's
19  loans?
20  A. I never did that.
21  Q. Did Household do that, sir?
22  A. Absolutely not.
23  Q. Did you ever think or did you ever believe they did that?
24  A. No.
25  Q. Now, we've heard some stuff about internal and external

Schoenholz - cross

2120

1  auditors.
2      Could you explain to the Court and the jury what did
3  the Internal Audit Group at Household do?
4  A. Well, their focus was more on internal controls and
5  internal processes, whether those processes or controls were
6  in the corporate office or within the business units.
7      The internal auditors also audited within the branch
8  network and audited control processes and internal controls
9  within the branch network.
10  Q. Who did the Internal Audit function report to?
11  A. Well, it always reported solid line into the Chairman of
12  the Audit Committee, to ensure that it was independent and
13  properly funded and so forth.
14  Q. Let me interrupt you for a second, if I may.
15      There was a Board of Directors of Household; is that
16  right?
17  A. Correct.
18  Q. How many employees of Household sat on the Board of
19  Directors?
20  A. One.
21  Q. And who was that?
22  A. Mr. Aldinger.
23  Q. How many directors were there during the relevant time
24  period; if you remember?
25  A. I think it was probably in the 12-to-14-type range.

Schoenholz - cross

2121

1  Q. You weren't a director?
2  A. I was not a director.
3  Q. So, the 12 to 14, there was one company representative; is
4  that your testimony?
5  A. That's my testimony.
6  Q. And tell me how did the Audit Committee happen?
7  A. Well, large public companies have Audit Committees
8  consisting only of independent directors.
9      Today, there are rules that the Audit Committee
10  members have to have certain financial expertise and
11  credentials; and, that the Chairman of the Audit Committee had
12  to have even more financial -- even more experience in areas
13  of financial -- accounting, financial management and so forth.
14  Q. Who was the Chairman of the Audit Committee of Household?
15  A. In this time period, it was Louis Levy.
16  Q. Who was he?
17      What was his background?
18  A. Lou was the retired -- he was -- he grew up -- or worked
19  his career at KPMG.  He was the retired senior-most technical
20  partner within KPMG.  So, he set up -- he oversaw all of
21  KPMG's accounting/auditing/technical practices.
22  Q. Now, tell me about -- or tell the jury about -- the
23  external auditors -- the independent auditors.
24      How did they happen?
25  A. Well --

Schoenholz - cross

2122

1      MR. DOWD:  Objection, your Honor.  It's vague and
2  ambiguous.
3      MR. SLOANE:  Well, I'll agree with that.
4      (Laughter.)
5  BY MR. SLOANE:
6  Q. How did the independent auditors come to be independent
7  auditors for Household?
8  A. Well, the Audit Committee of the Board was responsible for
9  reviewing the credentials and the qualifications of the
10  external auditors.
11      I think the way the process technically works is they
12  then recommended to the full Board that those auditors be
13  appointed; and, then, the full Board recommended that those
14  auditors be appointed.  And that had to be subject to a
15  shareholder vote annually, which was done in connection with
16  the annual meeting.
17  Q. So, the investors had to approve every year who the
18  independent auditors were; is that right?
19  A. That's true.
20  Q. Now, let's turn to re-age for a few minutes because it was
21  a topic, I believe, Mr. Dowd spent a fair amount of time on.
22      Would you explain how re-age relates to reserves?
23      How does the re-age process and that process relate
24  to reserves?
25  A. Well, let me -- let me say first what reserves are.

Schoenholz - cross

2123

1  Q.  Okay.
2  A.  If you're a lending company and you make a bunch of loans,
3  you know that not all of those loans will be collected.  Some
4  customers just won't pay you back.
5      So, what you have -- but the problem with that is you
6  don't know which ones and you don't know that they won't pay
7  you back for several years.  So, you have to make an estimate.
8  And you have to make an estimate before you have all that
9  knowledge.
10     So, what you do is you have various procedures and
11 techniques to make those estimates; and, then, you would set
12 aside a certain amount of money at the end of a period with a
13 charge against your profits.  And that money would be set
14 aside to cover those losses in the future when those loans
15 prove to be uncollectible.
16     Now, in setting those reserves, you had to take and
17 consider all of the operating policies associated with the
18 loan portfolio.
19     So, how you underwrote loans -- you know, in other
20 words, how you qualified them to get on the books -- was
21 important.  How you collected loans would be important.
22     Re-aging, to the extent that it was an operating
23 policy, would factor into that.
24     The reserves were calculated based on a detailed
25 statistical calculation done within each of the business

Schoenholz - cross

2124

1  units.
2      Those statistical calculations were reviewed and
3  consolidated at the corporate level.  And, then, there was
4  another layer of reserves added to that called "Judgmental
5  Reserves."
6      Those "Judgmental Reserves" were intended to cover
7  things that would not have been captured in the statistical
8  model, such as recent changes in the environment; you know,
9  the economic situation; housing prices.  It would include
10 things such as rapid growth of the portfolio.  It would
11 include things like the portfolio mix, so if you had a
12 different mix of receivable coming into the portfolio.
13     It would take into effect the account re-aging
14 practices that might not be reflected in the statistical
15 models.
16     And it also -- those "Judgmental Reserves" also --
17 were set with an eye toward certain reserve ratios --
18 aggregate reserve ratios.
19 Q.  Now, you heard Mr. Dowd.  You were sitting here when he
20 made his opening and he said that -- and I'm paraphrasing; I'm
21 sure he'll correct me if I got it wrong -- that re-aging and a
22 bunch of other techniques like rewrites, forbearance and grace
23 periods, were used by Household to conceal the quality of its
24 loans.
25     Do you believe that to be true, sir?

Schoenholz - cross

2125

1  A.  Absolutely not.
2  Q.  Now, you've said, I believe in response to a question from
3  Mr. Dowd earlier today, that -- he asked you about something
4  called two-plus delinquencies.  And you said -- and I'm
5  quoting, I wrote it down -- "Delinquency is not meaningful in
6  and of itself.  It has to be looked at in the context of loss
7  reserves?"
8      What did you mean by that?
9  A.  Well, investors value stocks based on estimates of future
10 earnings.  And those future earnings will be impacted by the
11 adequacy of credit loss reserves.
12     Now, in looking at those credit loss reserves,
13 delinquency would be a relevant statistic, as would
14 charge-off, as would reserve levels or portfolio mix.
15     So, I wasn't trying to say delinquency was not
16 relevant; but, in and of itself, these stocks aren't priced on
17 a price-to-delinquency ratio.  They're priced on a price-to-
18 earnings ratio.  And the only way that that gets into that
19 equation is through the concept of:  Are their loss reserves
20 adequate, given the underlying credit quality of your
21 portfolio?
22     I'd make one other point, though.  I do think
23 delinquency, in and of itself, can be relevant to operators of
24 the company.  Because, there, you're not really worried about
25 accounting for it.  You're worried about managing it and

Schoenholz - cross

2126

1  running the business.
2      And delinquency would be something that you would
3  want to reduce or minimize, in order to reduce loans rolling
4  to charge-off or rolling to foreclosure.
5      It's something you'd want to manage, as relates to
6  managing your costs of collections; and, it would also relate
7  to, you know, how do you take and maintain those customer
8  relationships over time?
9  Q.  Was re-aging something new to Household during the
10 relevant time period, '99 to 2002?
11 A.  Absolutely not.
12 Q.  It had been going on a long time?
13 A.  I think it had been going on a long time; and, I think it
14 is a practice that is widespread in the financial services
15 industry and within the banking industry.
16     I mean, there's been a lot of talk about Household
17 versus a bank; but, clearly within the bank regulations
18 specifically allow for re-aging and restructures under
19 their -- under their -- guidelines.
20 Q.  Something that investors would be aware of -- familiar
21 with?
22 A.  It certainly should be.
23 Q.  Now, what was the goal of re-aging --
24     MR. SLOANE:  And let me put back on the screen, if
25 you would, Brian, 1115.

Schoenholz - cross

2127

1    (Brief pause.)
2    BY MR. SLOANE:
3    Q.  -- as you understood it?
4    A.  Well, I said before, I think re-aging benefitted both
5    customers and investors.
6         As it related to customers, if an account -- if
7    somebody got themselves in trouble and fell behind and our
8    customer base was such that, you know, you could make one
9    payment or maybe two payments at a time, but if you started to
10   get behind, you couldn't come up with enough money to make
11   three or four payments.
12        So, if a customer got himself or herself in a
13   difficult situation, they would start to slide though
14   delinquency, start to slide to foreclosure, and re-aging would
15   help prevent that.  So, that was one benefit to the customer.
16        Another benefit is that the company wouldn't charge
17   them late fees.  So, in essence, even if you were delinquent,
18   it wasn't like the company was trying to rack up late fees
19   each month on the customer.
20        The third benefit to the customer was that they
21   didn't get reported late to the Credit Bureau.  So, it was a
22   way of helping the customer manage their credit scores or
23   their credit files, which would be important to them, as well.
24   Q.  And is that what you meant on 1115 when you said, "I want
25   to make sure we're doing the right thing for the customer and

Schoenholz - cross

2128

1    making a good economic decision"?
2    A.  That's absolutely right; and, particularly, for the type
3    of customer that you've heard about within Consumer Lending.
4         You know, there's been testimony about 11 out of 12
5    payments and all that kind of stuff.  And I think most of
6    Household's customers made 12 out of 12 payments, but some di
7    not.
8         And, so, that re-age process was an inherent part of
9    that value proposition to those customers -- that you
10   originated a certain type of customer at the front end,
11   recognizing they might need that flexibility in the collection
12   process.
13        So, it would be foolish to originate that kind of
14   customer and, then, not afford them that flexibility in the
15   collection process.  That wouldn't make any sense at all.
16        But the other part of the re-age issue is really it's
17   good for investors.
18        By re-aging properly, you reduce the ultimate loss,
19   in terms of charge-offs.  You don't let the person get so far
20   down the scale they can't recover.  It helps you kind of
21   manage your collection work force, so that you can take and
22   put your collection dollars on the customers that are most
23   difficult; and, for the customers that are less difficult, you
24   can deal with it in a more cost-efficient factor.
25        A re-age improves cash flow out of loans.  Even if

Schoenholz - cross

2129

1    that loan ultimately charged off, you could improve the net
2    present value of that loan.
3         And I think from an investor point of view, too --
4    particularly, in this kind of business -- if you were taking
5    and cementing in longer-term customer relationships, that's
6    obviously good for the investors over time.
7         The one other point I would make, though, is there is
8    kind of this -- or could be an assumption that you were doing
9    re-aging to defer credit losses.  But that's just not the
10   case.  I mean, because you reserved for those accounts.
11        So, if an account was re-aged, it would have a
12   reserve against it and it would have a higher reserve against
13   it than if it had not been re-aged, such that from a financial
14   point of view and from the earnings that investors would see,
15   that was irrelevant.
16        The earnings were properly stated because the
17   reserves were properly stated.
18   Q.  How do you know they were properly stated?
19   A.  Well, we had a lot of detailed procedures.  We had a lot
20   of people looking at it.  We had a lot of people -- we did
21   reserves with statistical models adding a judgmental
22   component.  We had the Credit Risk people then compare those
23   models to their projections of future credit losses.  And,
24   then, finally, we had the external auditors audit them.  And I
25   can tell you in this time frame -- by "time frame" I mean the

Schoenholz - cross

2130

1    class period in particularly --
2    Q.  '99 to 2002?
3    A.  '99 to 2002, and particularly as it related to '99, 2000
4    and 2001.  We had Andersen audit the reserves; and, then, as
5    we talked about earlier -- that there was this restatement and
6    KPMG came in, and KPMG re-audited all the reserves and they
7    thought they were fine.
8         And not only did KPMG re-audit the reserves, KPMG
9    brought in their own Credit Risk specialists to re-audit what
10   the auditors audited.
11        So, throughout this time period, there was a lot of
12   scrutiny on the credit loss reserves.  Everyone concluded they
13   were right.
14        And I guess the final point is that even with
15   hindsight, we never had a blow-up.  We never had a credit
16   surprise.
17   Q.  What does that mean?
18   A.  Well, as I said earlier, you know some losses aren't --
19   you aren't -- going to collect all these things, but you don't
20   know which ones and how much.  So, you have to make an
21   estimate.
22        But if you didn't make a correct estimate
23   consistently, eventually the fact that you had been
24   underestimated these things would catch up with you; and, at
25   some future period, you'd have to have some kind of charge

Schoenholz - cross

2131

1  against your profits related to the fact that you had
2  under-reserved in prior years.  And we never had that.
3  Q.  Mr. Dowd referred to -- we'll get back to in a few
4  minutes -- this restatement.
5      Did that have anything to do with the credit blow-up
6  -- or whatever the phrase you used was?
7  A.  Absolutely not.
8      MR. DOWD:  Objection, your Honor.  It's unclear which
9  restatement --
10     THE COURT:  Hold on a second, sir.
11     I'm sorry, your objection, again?
12     MR. DOWD:  Yes, your Honor.
13     Which restatement?
14     It's vague and ambiguous.
15     THE COURT:  Why don't you specify what particular
16 document you're referring to, please.
17 BY MR. SLOANE:
18 Q.  Mr. Schoenholz, Mr. Dowd asked you some questions about a
19 restatement involving credit card contracts.
20     Do you recall that testimony?
21 A.  I do.
22 Q.  And did that have anything to do with a credit blow-up or
23 whatever you referred to before?
24 A.  The restatement that investors' counsel asked me about had
25 nothing to do with credit loss reserves, re-aging,

Schoenholz - cross

2132

1  delinquency, charge-off or anything, in terms of credit
2  account management.
3  Q.  Now, Mr. Brooks was kind enough to show that board up here
4  to the jury before and it had a percentage of loans that were
5  re-aged at Household.
6      Do you know what percentage of Household's total loan
7  portfolio was re-aged?
8  A.  We disclosed, as of the end of 2001, it was just under 17
9  percent, was never re-aged -- or excuse me was re-aged, which
10 means 83 percent was never re-aged.
11 Q.  Say that, again.
12     I'm sorry, I got lost in the numbers.
13 A.  What we disclosed on that one chart was that I think it
14 was 16.9 percent -- 17 percent -- had been re-aged.  That
15 means 83 percent of our customers had never been re-aged.
16 Q.  Now, was this re-aging that we're talking about, was that
17 an accounting policy?
18 A.  I'd just like to add one other point, if I could.
19 Q.  Feel free.
20 A.  That chart also showed it was a split between those that
21 had been re-aged once or re-aged more than once.  And we
22 talked about the error and so forth.
23     Even after the error, what that said was that the
24 percentage of the portfolio that had never been re-aged or had
25 been re-aged once, was about 93 percent of the receivables of

Schoenholz - cross

2133

1  Household, to put that in context.
2  Q.  Now, was re-aging an accounting policy or an operational
3  policy?
4  A.  It was absolutely an operation policy.  It was delegated
5  to the Business Units.  It was set by the detail -- the
6  Business Unit Collection people and the Business Unit Credit
7  risk people.
8  Q.  It's been a while for everybody.
9      How many Business Units did Household have?
10 A.  I think seven major ones.
11 Q.  Okay.
12     And, so, were the Business Units -- is what you're
13 saying the Business Units were responsible for the operational
14 policies of re-aging?  Is that your statement?
15 A.  Absolutely.
16 Q.  Now, you mentioned about disclosure about the re-aging
17 policies.  Would you give us a little background about when
18 and how that came about?
19 A.  I think I would start that discussion with -- in the
20 context of the 2001 10-K.
21     We had never previously disclosed in our 10-K filings
22 the existence of re-age policies, although I believe that we
23 had some types of disclosures in our asset-backed filings.
24     But when we were looking at the 2001 10-K, we were
25 aware that there were questions among the financial press --

Schoenholz - cross

2134

1  analysts, investors, and so forth -- about, I think, the core
2  question, quite honestly, was:  In a recession, were
3  Household's credit loss reserves going to be adequate, given
4  the underlying credit quality portfolio; or, would there be
5  one of these surprises coming later?  Which there never was.
6      But there was -- we were aware that there was -- this
7  general question about account management practices and the
8  underlying credit quality in the portfolio.
9      We had also received, as comments from the Corporate
10 Finance Division of the SEC, as did about 200 other companies.
11 So, this was not unique to Household.  This was a broad, broad
12 directive sent out, advising companies in future filings to be
13 more granular about what they disclosed about their business.
14 Q.  What does that mean, "be more granular"?
15 A.  To provide more details about operating policies-types of
16 things.
17     So, Mr. McDonald approached me and said he thought we
18 should include a disclosure on re-aging policies in the 2001
19 10-K.
20 Q.  Prior to that time -- let me just interrupt you.
21     Had there been disclosure of the re-age policies in
22 the prior 10-Ks, as you understood it?
23 A.  I don't believe we did.
24 Q.  And was it common, based upon your knowledge, for
25 companies -- businesses similar to Household -- to disclose

Schoenholz - cross

2135

1  re-age policies at that time?
2        MR. DOWD:  Objection.  Lack of foundation.
3  BY MR. SLOANE:
4  Q.  Do you know --
5        THE COURT:  The objection is sustained.  Lay a
6  foundation.
7  BY MR. SLOANE:
8  Q.  Do you know, Mr. Schoenholz, whether other companies in
9  that time period disclosed re-age policies?
10  A.  One of the conclusions -- we had talked --
11        MR. DOWD:  Objection, your Honor.  Lack of
12  foundation.
13        Lack of foundation.  Still, what company?
14        THE COURT:  Sustained.
15        MR. DOWD:  Sorry, your Honor.
16        THE COURT:  Sustained.
17  BY MR. SLOANE:
18  Q.  Are you aware of other companies that existed in the
19  financial services business or the business that Household was
20  in at or about this time period:  '99 to 2002?
21  A.  Am I aware of other companies?
22  Q.  Yes.
23  A.  Yes.
24  Q.  Could you tell us some of the names?
25  A.  Well, initially, you had finance companies that acted

Schoenholz - cross

2136

1  independently, which were Associates, AFCO, Beneficial.
2  Trans-America was a subsidiary of Trans-America Financial.
3  American General, you had a subsidiary.  Bank One had a
4  finance company.  Wells Fargo had a finance company.
5  Q.  Now, were you aware of, sir, in this time period -- '99 to
6  2002 -- of what disclosure those companies that you've
7  identified made with respect to their re-age policies?
8  A.  I believe they did not disclose re-age policies.
9  Q.  Okay.
10        Now, you started to tell us about this period 2001
11  10-K, and I interrupted you and asked you whether --
12  A.  Right.
13  Q.  -- you had disclosed that before.
14        So, why don't you continue.
15  A.  So, Mr. McDonald approached me in January of 2001 and said
16  he thought we should include something on re-aging in the 2001
17  10-K.
18        I initially was reluctant to do it.  But, then --
19  because I didn't think -- first of all, I thought it was an
20  operating policy, and we didn't disclose other operating
21  policies like how many collectors we used or what day of the
22  month they called or what our underwriting criteria were.
23  Q.  Why not?
24  A.  Because it wasn't relevant.
25        I mean, it was a level of detail that was not

Schoenholz - cross

2137

1  material for an investor to understand the company taken as a
2  whole.  So, I didn't think it was a particularly material
3  disclosure; and, I think the facts that investors didn't view
4  the detail of that proved out to be correct.
5        But what we did decide to do was to have a
6  two-pronged disclosure approach in that in the 10-K we would
7  have a general disclosure, and it would consist of an
8  acknowledgment that we reset contractual delinquency to
9  current, based on account management practices; that it would
10  have criteria; and, as I've indicated before, I don't think we
11  worded that as well as we should have.  But it was a payment
12  criteria and, then, a criteria about evidence of the reason
13  for delinquency being resolved.
14        And, then, the third thing we disclosed is that these
15  things -- practices -- vary by business.  So, that's what we
16  put in the 10-K.
17        At the same time we knew they were going to have this
18  Financial Relations Conference that we talked about.
19  Q.  All right.  We'll get to the Financial Relations
20  Conference in a second.
21        Anything else you want to add to the history how all
22  that happened?  How all the re-aging started to get into the
23  public reports of Household?
24  A.  No, that was really the thought process for putting it
25  into the 10-K.

Schoenholz - cross

2138

1  Q.  And was re-aging something that was a secret to the
2  investors, the plaintiffs in this case?
3        MR. DOWD:  Objection.  It calls for speculation.
4  Lack of foundation.
5  BY MR. SLOANE:
6  Q.  Was it --
7        MR. SLOANE:  I'm sorry, your Honor.
8        THE COURT:  Sustained.
9        MR. SLOANE:  I'll rephrase it.
10  BY MR. SLOANE:
11  Q.  Was that something that was commented on -- re-aging and
12  the practices of various companies generally -- during the
13  time period 2001-2002?
14        MR. DOWD:  Objection.  Vague and ambiguous, your
15  Honor.
16        THE COURT:  Overruled.
17  BY THE WITNESS:
18  A.  Can you repeat the question?
19  BY MR. SLOANE:
20  Q.  Yeah.
21        Was it something that was the subject of discussion
22  and comment by analysts and others during the time period
23  2001-2002?
24  A.  Well, as I've testified earlier, I think the general
25  question that investors had about Household in that time

Household                              Unsigned                              Page - - -

Schoenholz - cross

2139

1  period was:  Were the reserves for credit losses going to be
2  adequate, given the underlying credit quality of the portfolio
3  and given the downturn in the economy?
4       There was some discussion raised about accounting
5  policies, based on an analyst's article, an analyst report in
6  the fall of 2001; and, then, there was an article in Barron's
7  which raised some questions about account management practices
8  generally.
9       So, there was some interest in that.
10  Q.  Now, I think you used the phrase in Mr. Dowd's examination
11  of you "test and learn."  What did that mean?
12  A.  Well, we tried to continue to improve our management
13  practices across the board; and, you wanted to do it in a
14  thoughtful, controlled fashion.  So, you didn't want to just
15  say, "Well, we'll try this.  Roll the dice.  If it works out,
16  great, fine.  If not, we'll try something else."
17       So, what did you is you set up tests and you would
18  test one assumption versus another assumption.  And that was
19  done in Underwriting.
20       So, if we wanted to have this type of product for
21  this type of credit score, it was done in collection
22  strategies.
23       Is it better to call a delinquent customer on Day
24  Five versus Day Seven?
25       You know, is it better to call him at 4:00 in the

Schoenholz - cross

2140

1  afternoon versus 6:00 in the after- -- 6:00 in the evening?
2       And it was done in some of the re-aging things, too.
3  Is it better to do it at a four-month interval or a six-month
4  interval?
5       So, throughout the company, we were trying to improve
6  our processes, but to do it in a controlled fashion.
7  Q.  And I think you saw a document earlier, Mr. Dowd showed
8  you about something that happened in Brandon, in the -- in one
9  of the Business Units.
10       What was that all about?
11  A.  That was in March of 2002, that the operating
12  management -- and it was -- the business was Mortgage
13  Services.  So, that's not the same business as Consumer
14  Lending.  And the business wanted to adopt the policy that
15  relied less on restructure or re-aging accounts.  And they
16  hired a new collections manager, a name -- a woman named --
17  Elaine Merkel, who came in and didn't -- either didn't --
18  follow instructions, couldn't follow instructions, I don't
19  know.
20       But the planned approach of trying to have a test-
21  and-learn evolution of that portfolio just did not work well.
22  And, so, the results of that first effort were reversed; and,
23  then, they began a series over several months of trying to
24  adopt -- trying to test different strategies, to optimize
25  collections and optimize re-ages.

Schoenholz - cross

2141

1       MR. SLOANE:  Your Honor, would this be a convenient
2  time to take the afternoon break?
3       THE COURT:  No, let's keep going.
4       MR. SLOANE:  Okay.
5       THE COURT:  It's better we keep going.
6  BY MR. SLOANE:
7  Q.  You mentioned that investors didn't want to know the
8  details.  What did you mean by that?
9  A.  Well, I think what investors -- I go back to -- the
10  question is:  They wanted to know were your reserves adequate.
11  I think what else investors wanted to know was:  What was the
12  business purpose of re-aging?  Because it wasn't entirely
13  clear what this was.  And, so, people wanted to understand the
14  business purpose and the philosophy behind it.
15       And, then, I think what people wanted to know was:
16  Well, how much is there of this?  How prevalent is it?
17       And, so, the detail of a policy -- whether it was one
18  payment, two payment, whatever -- however you described that,
19  the numbers that we disclosed were correct.  The two-plus
20  numbers were what they were.  The stock of restructured
21  accounts were what they were.  Charge-offs were what they
22  were.
23       And, so, when we -- at this Financial Relations
24  Conference, we included an Appendix which had in there that
25  there were re-aged policies for some products that had one

Schoenholz - cross

2142

1  payment.
2       You know, my feeling was if that was going to be a
3  sensitive material disclosure to investors, you'd have had an
4  outroar.  All of a sudden they'd say, "Well, wait a minute.
5  We just found out they did one payment."
6       Well, it was a yawn.  People -- the investor response
7  to that in the analyst reports is generally very positive.  I
8  don't remember seeing any reports saying, "Gee, this is a bad
9  thing because it's only one payment."
10       And, so, what it led me to conclude or reaffirm my
11  belief is what investors wanted to understand was:  Were your
12  reserves adequate; what was the business purpose of
13  restructuring; how did it fit into your operating model; and,
14  how much was it?
15  Q.  Now, you mentioned you Financial Relations Conference.
16  There was some discussion about that earlier with Mr. Dowd.
17       Let me show you a document that's been previously
18  marked as Plaintiffs' Exhibit 725.
19       (Document tendered to counsel and the witness.)
20  BY MR. SLOANE:
21  Q.  Would you tell us what that document is, sir?
22  A.  This is a copy of a presentation that I made at the
23  Financial Relations Conference on April 9th, 2002, and it
24  looks like it has my handwritten notes on it.
25       MR. SLOANE:  Your Honor, we offer Plaintiffs' Exhibit

Schoenholz - cross

2155

1    A.  Right.  That was the document.
2          And we talked about sub-certifications.
3    BY MR. SLOANE:
4    Q.  Yes.
5    A.  That's what this is.
6          And, so, this would have been received --
7          MR. SLOANE:  Brian, let's put this back up now,
8    please.
9          (Brief pause.)
10   BY MR. SLOANE:
11   Q.  Go ahead, please.  I'm sorry.
12   A.  It's not dated, but this would have been received in that
13   time frame of either July or August.
14   Q.  July or August of what year?
15   A.  2002.  Excuse me.
16         And in it, because we had people when they reviewed
17   the 10-K document or the 10-Q document, they had to certify
18   that they were not aware of any errors or any misstatements or
19   anything else.
20         And, so, Mr. Makowski, I think -- because he knew
21   that the FR -- that the FRC presentation, this document --
22   Q.  "This document" being -- for the record, being --
23   Plaintiffs' Exhibit 725?
24   A.  I don't know what --
25   Q.  It's the one with your handwriting on it?

Schoenholz - cross

2156

1    A.  It's -- correct, that one (indicating).
2    Q.  Okay.
3    A.  That he knew that that had been filed with the SEC -- not
4    with my handwriting on it, of course, but the clean copy -- I
5    think he felt that he needed to certify the fact that there
6    was an error on this -- in this document.
7    Q.  Who made the error?
8    A.  A guy named Dan Pantelis.
9    Q.  Did he admit to making the error?
10   A.  Oh, yeah.  Dan --
11         MR. DOWD:  Objection.
12         Hearsay, your Honor.
13         MR. SLOANE:  It's a little late, Judge.
14         MR. DOWD:  It's not, your Honor.
15         THE COURT:  Well, overruled.  It's late.  It's
16   overruled.
17         Proceed.
18   BY MR. SLOANE:
19   Q.  Now --
20   A.  Your question -- what was your question?
21   Q.  Well, I asked you a question:  Did he admit to making the
22   error?  You said "Yes."
23         Let me move on to another issue.
24         Can you just explain to the jury what was the error
25   that Mr. Makowski is explaining had been made by Mr. Pantelis

Schoenholz - cross

2157

1    or by Mr. Makowski's group in this document, which is
2    Plaintiffs' Exhibit 188?
3    A.  I'm not sure exactly how it arose, but what you can see is
4    that if you look at the "As Prepared" and "As Corrected" --
5    Q.  Why don't you --
6          MR. SLOANE:  Brian, maybe you can follow along and --
7          (Brief pause.)
8    BY THE WITNESS:
9    A.  If you look at those two columns and you go down to the
10   row that says, "Re-Aged Multiple Times," what we told
11   people -- what we disclosed based on what we thought was
12   correct at the time, at the April 9th Financial Relations
13   Conference -- was that 4.3 percent of the portfolio was
14   re-aged more than one time.  That's what we told people.
15         Conversely, what that would have meant is that 83
16   percent of the people had never been re-aged.
17         You know, if you look, that's the difference
18   between -- by the fact that it's 16.9 percent for the total.
19   So, if you do the arithmetic, what that means is we told
20   people that about 95 or 96 percent of the people had never
21   been re-aged or been re-aged one time.  That's what we
22   told people on April 9th.
23         What we found out, then, was that that was wrong;
24   that the people who had been re-aged more than once was
25   seven-and-a-half percent.

Schoenholz - cross

2158

1          So, said another way, that would have meant instead
2    of 90 -- 96 -- percent of the people who had never been
3    re-aged or re-aged once, it was only 90- -- about 93 --
4    percent.
5    Q.  Mr. Pantelis made a mistake, right?
6    A.  Yeah.  He made a mistake.
7    Q.  Go on.
8    A.  That's really what it is.  I mean --
9    Q.  Did the 16.9 percent change?
10   A.  That was --
11   Q.  Total re-age?
12   A.  That was all the same.
13         The two-plus delinquency was all the same; the
14   charge-offs were the same; our reserves were the same; our
15   reserve ratios were the same; and, so, we concluded that that
16   was not -- I mean, it was unfortunate.  We certainly didn't
17   want it to happen.  But it was an unintentional error on his
18   part and we concluded it wasn't -- wasn't -- material.
19   Q.  You concluded it wasn't material.  Is that a conclusion
20   you reached after the error was discovered?
21   A.  Correct.
22   Q.  And that was discussed internally?
23   A.  We got everybody together -- this came to my attention
24   probably -- I don't remember exactly, but within weeks.  I
25   knew about this long before Makowski did it in his

Schoenholz - cross

2159

1  certification.  And we got all the right people together to
2  talk about it.  And that was our conclusion -- is that it was
3  an error.
4  Q.  When you said you knew about it before the his
5  certification, did you know about it before you told the
6  investor community?
7  A.  Absolutely not.
8  Q.  You're sure about that?
9  A.  I'm positive about that.  I'm positive -- I can't remember
10  the exact date that Pantelis and Makowski came into my office,
11  but it was two to three weeks after we did this presentation
12  and they came in and said they had bad news.
13  Q.  Bad news?
14  A.  Yeah.
15       They wanted -- they realized they had made a clerical
16  error and needed to tell me about it.
17  Q.  What was your reaction?
18  A.  I was not pleased; but, you know, it was what it was.  And
19  once I concluded that it was an error, I got the right people
20  involved to figure out what to do about it.
21  Q.  Now, you mentioned -- or actually, Mr. Dowd had a
22  transcript of a -- I guess it's Plaintiffs' Exhibit 183.
23       Can you find that in front of you?  It's a big
24  thick --
25  A.  What was it?

Schoenholz - cross

2160

1  Q.  183.
2  A.  I got it.
3  Q.  Okay.
4       Now, I think it was described earlier as a transcript
5  of your conversations or your points that you made at the
6  Financial Relations Conference; is that right?
7  A.  That's what -- yes.
8  Q.  And it was transcribed by somebody; is that right?
9  A.  Correct.
10  Q.  Now, would you look at Page 301 of this?
11       It's 02028301.
12  A.  Okay.
13  Q.  Now, if you look down at the bottom, the last paragraph --
14       MR. SLOANE:  If you could highlight that, Brian.
15       (Brief pause.)
16  BY MR. SLOANE:
17  Q.  This says that, "There's some internal benefits in that it
18  allows you to work at higher risk accounts.  And I think a key
19  point is that it has been done consistently, and they vary by
20  product, as we'll see."
21       Did you use the phrase "done consistently"?
22  A.  If this is a transcript, I would have said that.
23  Q.  And what did you mean by that?
24  A.  Well, I knew that these were operating policies.  And, so,
25  that they could be subject to -- let me back up.

Schoenholz - cross

2161

1       These operating policies had lots of different
2  criteria.  So, there would be a number of payment criteria.
3  There would be a time between re-ages.
4       So, if you had re-aged somebody, how many months you
5  had to wait.
6       There would be a credit score criteria in some cases.
7  So, if you were a higher credit score, it would be easier to
8  be re-aged than if you were a lower credit score.
9       There were also some exceptions to these policies.
10       So, for instance, I learned that if you had a
11  bankruptcy filing, that that could -- an approved bankruptcy
12  plan could take the place of a payment.  But -- so, you knew
13  you were going to have modifications of those criteria.
14       In my mind, though, from -- what we're talking about
15  here is really financial types of disclosures and consistency.
16  The criteria in my mind was:  Is it the same basic approach?
17  Is it --
18  Q.  Is what the same basic approach?
19  A.  How you would have applied your re-aging practices or
20  policies.
21  Q.  Okay.
22  A.  So, did you apply them in the same basic approach?  Was
23  your philosophy about re-aging and how it fit into your
24  collection strategies the same basic approach?  And, then,
25  thirdly, was the degree of reliance on it, essentially,

Schoenholz - cross

2162

1  consistent?
2       So, I mean, if you had never done this before ever,
3  and all of a sudden you did 30 percent of the portfolio, that
4  wouldn't be consistent under those criteria.  And, in my mind,
5  it was done consistently.
6       Now, the other point I would make, these comments tie
7  into a chart in this exhibit, Exhibit --
8  Q.  725?
9  A.  -- 725.
10       And that document was prepared by Corporate Credit
11  Risk people and Business Unit Credit Risk people.  And they
12  opined that those practices had been consistently applied.
13  Q.  When you say "opined," what does that mean?
14  A.  I shouldn't say "opined."  That's not the correct -- the
15  way they drafted, it they drafted it that they were
16  consistently applied.
17       So, it was their opinion, from a Credit Risk point of
18  view, that they had been consistently applied.
19  Q.  Now, if you turn to Page 303 of this presentation --
20       MR. SLOANE:  And, Brian, if you'd highlight the
21  fourth paragraph down.
22       (Brief pause.)
23       MR. SLOANE:  It's actually the next one, Brian.  I
24  must have counted wrong.
25       (Brief pause.)

Schoenholz - cross

2163

BY MR. SLOANE:
1
2    Q.   Now, this talks about -- we're not going to go through
3    those, but there are certain criteria.
4         "We also have a kind of statistical test-and-learn
5    environment to see what's the best way to navigate through
6    that Decision Tree."
7         What did you mean by that?
8    A.   Well, that's really -- the "Decision Tree" is the document
9    that we looked at before.
10   Q.   I'm focusing, I'm sorry, on the "test and learn."
11   A.   Well, what -- I think what -- I had testified was as we
12   went -- as you had that mental framework, you would come up
13   with tests where you would take a sample of accounts in a
14   certain period of time and you would treat them in a certain
15   way, and you would compare that to another sample of accounts
16   which you would treat in a different way.
17        And, by that, you were trying to learn what was the
18   best way to make those decisions; when would you restructure;
19   when wouldn't you restructure; and, how might you fine tune
20   those criteria.
21        THE COURT:  I think this is probably a good place to
22   break.
23        We'll break for the afternoon, take 15 minutes and,
24   then, resume testimony after that, ladies and gentlemen.
25        (Jury out.)

Schoenholz - cross

2164

1        THE COURT:  You may step down, sir.
2    Anything we need to take up?
3        MR. SLOANE:  Nothing, your Honor.
4        THE COURT:  Okay.
5    (Brief recess.)
6        THE COURT:  Are we ready?
7        MR. SLOANE:  Your Honor, is it all right if I put
8    this up here?
9        THE COURT:  I don't know.  What is it?
10       MR. SLOANE:  It's an empty chart that I'm going to
11   write on.
12   I can put it anywhere else.
13       THE COURT:  No, I'm trying to figure out.  I don't
14   particularly need to see it unless there's an objection, in
15   which case then I won't be able to see it.
16       I guess that's better for me.  I have no problem with
17   it.  Do you have a problem with it?
18       MR. DOWD:  No, your Honor.
19       THE COURT:  Okay.  Let's bring the jury out.
20       MR. SLOANE:  Hold it.
21       MR. DOWD:  That's another option.
22   (Laughter.)
23   (Jury enters courtroom.)
24       THE CLERK:  Please be seated.
25       THE COURT:  Counsel --

Schoenholz - cross

2165

1        MR. SLOANE:  May I proceed, your Honor?
2        THE COURT:  -- proceed.
3    BY MR. SLOANE:
4    Q.   Mr. Schoenholz, we talked a little bit about reserves, and
5    I'd like you to explain what the process was of setting
6    reserves.  I think you mentioned something about statistical
7    reserves.  Why don't you explain that.
8    A.   The business units each would calculate a statistical
9    estimate of their loss reserve requirements using a consistent
10   methodology but unique to their product.  And what they did is
11   they tried to track, or they didn't try, what they did do is
12   they tracked how loans would move among delinquency buckets
13   the way to ultimately being charged off.
14   Q.   What's that mean, moved between delinquency buckets?
15   A.   So you might look at an account that's current in month
16   one, and the next month you'd see, well, what happened to it?
17   Did it stay current?  Did it go to one month delinquent?
18        The next month you could say, well, what happened to
19   that account?  Did it go to three months delinquent?  Did it
20   stay at two months delinquent?  Did it go back to current?
21        And you could get we called them roll rates.  Some
22   people called it migration analysis; but in essence, it was a
23   detailed calculation of -- of your portfolio's potential loss
24   experience based on delinquency status and charge-off
25   experience, and each of the business units would do that kind

Schoenholz - cross

2166

1    of model.
2        They would then send them to the corporate office.
3    The corporate office would look at those and then arrive at
4    judgmental reserves.
5    Q.   Let's stick with the statistical reserves first.
6    A.   Okay.
7    Q.   So the statistical reserves were done by the business
8    units, is that correct?
9    A.   Yes.
10   Q.   And was -- if an account was re-aged, we heard all this
11   discussion about re-aged, if it was re-aged, was that
12   reflected in the statistical reserves?
13   A.   Yes.
14   Q.   How?
15   A.   Well, however the -- if an account that was re-aged
16   performed worse over time, it would move through the buckets
17   more quickly, and so it would end up carrying a higher reserve
18   requirement.
19   Q.   So if it moved from 30 days delinquent to 60 days
20   delinquent, would that somehow affect the statistical
21   reserves?
22   A.   Sure.  And -- and if it -- I don't know how really else to
23   explain it, but I mean you had huge numbers of accounts.  And
24   so when you looked at how those accounts performed over time
25   and how they migrated from bucket to bucket, delinquency

Schoenholz - cross
2167

1  bucket, delinquency status to delinquency status, you would
2  come up with a reserve requirement for those types of
3  reserves.
4      We had refined a methodology to actually break down
5  statistical requirements among -- for those accounts that had
6  been re-aged, which would carry a higher reserve component
7  because they were the weaker accounts, for accounts that
8  declared bankruptcy, and then for accounts that had never been
9  re-aged or gone bankrupt.
10 Q.  So you started -- these are the statistical reserves.
11     Now, was there -- were there also another component
12 of the reserve-setting process?
13 A.  The second component was called judgmental reserves.
14 Q.  What's that mean?
15 A.  Well, the statistical models were a historical average, so
16 you needed to take into account things that might not be
17 reflected in that historical average.
18     So, for instance, if the economy was getting worse,
19 you'd want to have more judgmental reserves.  If you thought
20 housing values were getting worse, you'd want to have more.
21 You looked at unemployment.  You looked at the mix of products
22 in the portfolio.
23     So if unsecured products were growing more quickly
24 than real estate secured and they had higher loss rates, you
25 might want to have more judgmental reserves for that.

Schoenholz - cross
2168

1      If you had significant changes or if you had changes
2  in your account management practices, you might have more
3  judgmental reserves.  And so it was an attempt to go through,
4  in a fairly thoughtful fashion, to look at items that would
5  give rise to reserve requirements that were not reflected in
6  the statistical calculation.
7  Q.  Was it just plugging in numbers, or was there some science
8  to this?
9  A.  Well, it wasn't -- the accounting rules don't have you
10 quantify each element of judgmental reserves, but there was a
11 thought process went through by the controller's group, by the
12 corporate risk people, that they discussed with me of what led
13 to those judgments on -- led to those estimates of judgmental
14 reserves.
15     The other piece of that is that we did look at high
16 level reserve metrics.
17 Q.  What's that mean?
18 A.  We looked at reserves to receivables, we looked at
19 reserves to charge-offs, and we looked at reserves to
20 non-performing loans, and you would take and come up with kind
21 of a sanity check of saying was the totality of the reserves,
22 did that make sense.
23 Q.  Did you set these reserves on your own?
24 A.  I did not.
25 Q.  Did you review them?

Schoenholz - cross
2169

1  A.  I reviewed the -- I never reviewed the detailed models,
2  but I would review the conclusions with the controller, the
3  chief credit officer, and sometimes I would have discussions
4  with the business unit financial people about reserving.
5  Q.  Why didn't you do the work yourself?
6  A.  Well, there's a lot of work involved.  I had -- I mean, it
7  was better for them to do the work.  They could do it more
8  thoughtfully, they had more detailed knowledge, and then they
9  would discuss it with me, and I would review it.
10 Q.  Were there meetings to discuss what the reserves should
11 be, internal meetings?
12 A.  We met quarterly with that group to talk about that.
13 Q.  Now, were the reserves also reviewed with the audit
14 committee?
15 A.  Yes, they were.
16 Q.  And, again, the audit committee was a committee of the
17 board?
18 A.  A committee of the board chaired by the person who was the
19 senior technical person at KPMG.
20 Q.  Did -- were the reserves discussed with the independent
21 auditors?
22 A.  Oh, absolutely.
23 Q.  Were they discussed with -- your first, the independent
24 auditors during the relevant time period were first Arthur
25 Andersen, is that right?

Schoenholz - cross
2170

1  A.  Correct.
2  Q.  And what was Arthur Andersen's view of the reserves?
3  A.  Their view --
4          MR. DOWD:  Objection, hearsay.
5  BY THE WITNESS:
6  A.  -- was always --
7          MR. DOWD:  Objection, hearsay.
8          THE COURT:  Sustained.
9  BY MR. SLOANE:
10 Q.  Did you have an understanding of whether there was
11 agreement with the reserves established by the company?
12 A.  Yes.
13 Q.  And was that something that also gave you comfort about
14 the adequacy of the reserves?
15 A.  Yes.
16 Q.  And your understanding of the adequacy of the reserves,
17 was that informed by the views of your internal auditors as
18 well?
19          MR. DOWD:  Objection, hearsay.
20          THE COURT:  No, he can answer that question yes or
21 no.
22 BY THE WITNESS:
23 A.  Yes.
24 BY MR. SLOANE:
25 Q.  And was it informed by the views of your external

Schoenholz - cross
2171
1 auditors; yes or no?
2        MR. DOWD:  Objection, hearsay.
3        THE COURT:  Overruled.
4 BY THE WITNESS:
5 A. Yes.
6 BY MR. SLOANE:
7 Q. Now, let me try to understand the reserves or ask you
8 about the reserves on a very basic level.
9        Suppose you have a thousand dollars or had a thousand
10 dollars of earnings.
11        All right, for the Court's record, I've written on
12 the board a thousand dollars of earnings.
13        Do you see that?
14 A. I do.
15 Q. And suppose you had a credit reserve of $100.  Do you see
16 that?
17 A. I do.
18 Q. And what does that mean?
19 A. That means you would have set aside $100 to cover future
20 credit losses, to absorb future credit losses.
21 Q. Now, what if you had $200, twice as many, of bad loans,
22 loans that weren't repaid?  What would that mean?
23 A. When did you know you had 200 bad?
24 Q. Let's assume you knew it after you had set the credit
25 reserve of 100?

Schoenholz - cross
2172
1 A. Then you would have to take another expense to make up the
2 shortfall between the 100 and the 200.
3 Q. So you'd have to add to your reserves then or take an
4 expense for the miscalculation or the missed expectation?
5 A. Yes, sir.
6 Q. Did that ever happen?
7 A. Never.
8 Q. Now, let me ask you, you mentioned something called FFIEC
9 in your direct-examination, and I know that we've heard some
10 testimony about this.  You were in the back of the room
11 before.
12        Without getting into what FFIEC stands for, did it
13 apply to household?
14 A. It applied to our credit card bank, but not to the other
15 parts of the company.
16 Q. What percentage, if you know, of Household's total
17 receivables did FFIEC apply to?
18 A. My guess is -- I don't remember exactly, but it was
19 relatively small.
20 Q. Relatively small.
21        So what was the concern about FFIEC and the FFIEC
22 rules that we have heard so much testimony about as you've
23 been sitting in the back of the courtroom, what was your
24 concern about FFIEC as it might apply to Household?
25 A. Well, FFIEC were rules set by banking regulators to apply

Schoenholz - cross
2173
1 to banks, and they set standards on things such as re-age and
2 charge-off.
3 Q. Was Household International a bank?
4 A. It was not a bank.
5        And the concern was if you applied these standards
6 which were meant to apply to a bank's customer base and you
7 applied them to a consumer finance customer base, you would
8 actually increase the amounts of ultimate credit losses within
9 the finance company.
10 Q. What would it do to your business model in terms of your
11 dealings with your customers?
12 A. It would really throw the whole model upside down.  I mean
13 the reason you had a consumer finance company customer was
14 that they really didn't normally qualify to go to a bank.  So
15 it would make no sense to take that customer and now say,
16 well, now I'm going to treat you like a bank customer.
17 Q. Mr. Dowd and I asked you about a restatement that occurred
18 in connection with certain credit card agreements.
19        Would you describe the circumstances surrounding the
20 restatement?
21 A. In -- I think it was in the spring of 2002, the audit
22 committee of the board decided to replace Arthur Andersen and
23 to hire KPMG.  KPMG was, therefore, engaged, and they had to
24 re-audit, issue their opinion, on 1991 -- 1999, 2000 and
25 2001 -- the financial statements in those 10-K documents.

Schoenholz - cross
2174
1 Q. Before KPMG got involved, was Arthur Andersen involved?
2 A. Arthur Andersen had done the original audit work of those
3 financial statements and had valid audit opinions that were
4 out -- that were in effect for 1999, 2000 and 2001.
5 Q. What's a valid audit opinion?
6 A. Well, in terms of financial statements included in the
7 10-K, you have to have an auditor's report that is current,
8 and there were rules about what current meant; but you had to
9 have a set of audited financial statements on file with the
10 SEC in order to conduct transactions in the securities
11 markets, trading stock or, for us, going in to borrow money
12 which we would then lend to customers.
13        So you had to have a valid set of audited financial
14 statements on file with the SEC to conduct your business.
15 Q. Now, Mr. Dowd showed you a bunch of 10-Ks for various
16 years, 2000, 2001 and 2002.  As best you understood it, did
17 those include opinions from your outside auditors?
18 A. Yes.
19 Q. Is that something that you drew comfort from --
20 A. Yes.
21 Q. -- in certifying the documents after the Sarbanes-Oxley
22 rules came into effect?
23 A. Well, and even before Sarbanes-Oxley came into effect.
24 The fact that I had to sign the documents.
25 Q. Now, we saw on the board, if you put up that demonstrative

Schoenholz - cross

2175

1  exhibit, Brian, DX 180 -- I'm sorry -- it's the one about the
2  process.
3        That's it.
4        This refers to the external auditors, does it not?
5  If you look down the lower left-hand corner?
6  A. Yes, sir.
7  Q. And it also includes reference to the external auditors in
8  the top, in the 10-K draft, is that right?
9  A. It does.
10  Q. And that was Arthur Andersen first and then KPMG?
11  A. Correct.
12  Q. Now, I interrupted you. Arthur Andersen, you were telling
13  us about Arthur Andersen, and then you said KPMG came in, so
14  continue, please.
15  A. Okay. So the audit committee decided to replace Arthur
16  Andersen and hire KPMG. KPMG had to audit 1999, 2000 and
17  2001, even though they had previously been audited by Arthur
18  Andersen. And they did that in the summer, late spring and
19  summer of 2002.
20        KPMG's audit conclusions that they concurred with
21  everything, including loss reserves and disclosures on
22  re-aging, on the company's account credit policies, but they
23  did not, KPMG did not agree with the accounting on three
24  contracts that Household had regarding marketing credit cards.
25        And without going into a lot of detail, the issue was

Schoenholz - cross

2176

1  kind of basically the same on all three. It was Household
2  spent money to market credit cards or paid money to these
3  partners to market credit cards and, therefore, got a benefit
4  from that over a period of time, and what was the period of
5  time to record that expense? Because you wouldn't record it
6  all day one. You would record it over some period of time.
7  And there were no specific accounting, hard-line accounting
8  rules about that. So you had to use management judgment.
9        When Household first established those contracts, one
10  of which went back I think to '93, I think it was '92 or '93,
11  we had consulted with Arthur Andersen at that time who were
12  our auditors to get their opinion --
13        MR. DOWD: Objection, lack of foundation and hearsay.
14        THE COURT: Sustained.
15  BY MR. SLOANE:
16  Q. Let me show you a document. Perhaps this will expedite
17  this. Can you put in front of you Plaintiffs' Exhibit 231.
18        I think you should have that right in front of you,
19  Mr. Schoenholz, in that maybe top of the pile.
20  A. 231?
21  Q. Yeah, it's the 10-K/A. Do you see that?
22  A. Not yet.
23  Q. Let me just see if I can put it up on the screen and
24  perhaps that will help.
25  A. Okay.

Schoenholz - cross

2177

1        MR. SLOANE: If you could, Brian, put up page 5079,
2  and highlight -- it's page 62 of the document. Highlight the
3  last paragraph at the bottom. Maybe you can blow that up,
4  Brian.
5  BY MR. SLOANE:
6  Q. Now, this says, "Household International has restated its
7  consolidated financial statements for the years ended
8  December 31, 1999, 2000 and 2001. This Form 10-K/A and the
9  exhibits included herewith include all adjustments relating to
10  the statement -- restatement for all such prior periods. The
11  restatement relates to MasterCard and Visa co-branding and
12  Affinity credit card relationships and a marketing agreement
13  with a third-party credit card marketing company. All were
14  part of our credit card services segment. In consultation
15  with our prior auditors, Arthur Andersen, LLP, we treated
16  payments made in accordance with these agreements that were
17  entered into between 1992 and 1999 as prepaid assets and
18  amortized them in accordance with the underlying economics of
19  the agreements. Our current auditors, KPMG, LLP, have advised
20  us that in their view, these payments should have either been
21  charged against earnings at the time they were made or
22  amortized over a shorter period of time."
23        Do you see that?
24  A. I do.
25  Q. And does this accurately reflect what happened; that is,

Schoenholz - cross

2178

1  that Arthur Andersen, as set forth in this document, had
2  consulted with the company and had agreed with the accounting
3  at that time?
4  A. Yes.
5  Q. And KPMG came in and it disagreed, is that what this says?
6  A. That's what that says.
7  Q. Now, there was also a different view, was there not?
8  There was some view that the OTS had about this, is that
9  right?
10  A. The OCC --
11  Q. OCC, I'm sorry.
12  A. -- yes, had a view on one of the -- one of the items.
13  Q. And had they changed their view over time?
14        MR. DOWD: Objection, hearsay.
15  BY MR. SLOANE:
16  Q. What was your understanding of their view?
17  A. They originally agreed with the accounting as Household
18  did it and subsequently went back and questioned their prior
19  opinion and were in the process of finalizing their opinion
20  when this matter arose.
21  Q. Was it correct to say, sir, that you first followed the
22  views of Arthur Andersen?
23  A. That's correct.
24  Q. And then KPMG came in, you followed their views.
25  A. That's correct.

Schoenholz - redirect

2179

1    MR. SLOANE:  Nothing further, your Honor.
2    THE COURT:  Redirect?
3    MR. DOWD:  Thank you, your Honor.
4         REDIRECT EXAMINATION
5    BY MR. DOWD:
6    Q.  Mr. Schoenholz, just so I understand, the financial
7    statements that got restated, sir, that you just talked about
8    with Mr. Sloane, they were Household's financial statements,
9    right?
10   A.  That's correct.
11   Q.  They weren't Andersen's financial statements, were they?
12   A.  They were the financial statements of the company.
13   Q.  They were your responsibility, right?
14   A.  That's correct.
15   Q.  Now, sir, you testified that these re-agings were done for
16   the customers, I think, on cross, is that right?
17   A.  I testified they were done and benefited customers
18   and benefited investors.
19   Q.  Okay.  Sir, I'll ask you to look back at Plaintiffs'
20   Exhibit 654, which you looked at, I believe, yesterday or
21   today.  Plaintiffs' 654.
22        MR. DOWD:  Can we have the switch, your Honor?
23        THE COURT:  Indeed.
24   BY MR. DOWD:
25   Q.  Again, sir, this was an e-mail from Mr. Makowski in

Schoenholz - redirect

2180

1    September 2001, right?
2    A.  That's correct.
3    Q.  And if you look in the second full paragraph there, it
4    says "for maximum benefit."  Do you see that, sir?
5    A.  It does.
6    Q.  It says, "For maximum benefit to year end, retail services
7    should perform the re-age between the customer cycle date and
8    month end with a sweep at month end.  This will ensure that
9    all September re-ages will be unable to reach two-plus at year
10   end."
11        Do you see that, sir?
12   A.  I do.
13   Q.  So Mr. Makowski, or I guess it was Mr. Stockdale in this
14   e-mail is saying you should re-age everything in September so
15   it doesn't go two-plus by the end of the year, isn't that
16   right?
17   A.  I'm not sure what Mr. Stockdale meant.
18   Q.  Okay.  You just know what he wrote right there, right?
19   A.  I know what he wrote.
20   Q.  Okay.  He didn't say anything about doing this for the
21   customer, did he, sir?
22   A.  Well, the whole change was in context of the customer,
23   making the policy more customer friendly.
24   Q.  Sir, he said to sweep them all in the month of September,
25   didn't he?

Schoenholz - redirect

2181

1    A.  He's talking about a change of policy.
2    Q.  He's talking about doing all the re-ages between the
3    customer cycle date and month end so that all the September
4    re-ages will be unable to reach two-plus at year end.  Isn't
5    that what he says?
6    A.  That's what that paragraph says.  My only comment to you
7    is that he prefaces it, saying the reason they're doing the
8    re-age policy is to modify their policy which would have made
9    it more customer friendly.
10   Q.  Yeah.  He was trying to make sure that two-plus number
11   didn't get larger by the end of the year.  He was trying to
12   reduce the two-plus number by the end of the year, wasn't he?
13   A.  I have no idea.
14   Q.  Okay.  That's what he wrote though, isn't it, sir?
15   A.  I don't know -- I can't opine what he meant when he wrote
16   those words.
17   Q.  Okay.  But you got that, that e-mail.
18   A.  I was copied on Makowski's approval of Stockdale's e-mail.
19   That's correct.
20   Q.  Okay.  And you didn't write back and say, gosh, no, we did
21   these for the customers.  We shouldn't sweep everything in the
22   month of September, did you, sir?
23   A.  I don't think I responded to this.  I don't think I
24   remembered this.
25   Q.  Okay.  Sir, your counsel keeps showing a chart with a list

Schoenholz - redirect

2182

1    of banks and brokerage houses and keeps saying they're the
2    investors, right?
3    A.  I've seen the chart.
4    Q.  Okay.  You've seen the chart, so you must be familiar with
5    who are the people who bought stock between July 30th, 1999
6    and October 11, 2002, right?
7    A.  Say again, please?
8    Q.  You must be familiar with who the investors were who
9    bought stock between July 30, '99 and October 11, 2002, right?
10   A.  I don't know everyone who bought stock.
11   Q.  Okay.  You don't, and you don't know that because there
12   were thousands of individuals who bought stock during that
13   time.  Isn't that right, sir?
14   A.  I don't know who bought stock during that time.
15   Q.  You know individuals bought stock during that time, didn't
16   you, sir?
17   A.  Oh, clearly some individuals bought stock.
18   Q.  Yeah, thousands of individuals bought stock, didn't they?
19   A.  I can't quantify it for you.
20   Q.  More than a thousand, sir?
21   A.  I don't know.
22   Q.  Okay.  But you're pretty sure that there were some banks
23   that bought stock.  You're happy to testify about that, am I
24   right, sir?
25   A.  I'm sure banks bought our stock.

Schoenholz - redirect

2183

1  Q. Yeah. And you're sure that individuals bought that stock,
2  too, right, sir?
3  A. I'm sure individuals --
4  Q. And you're sure that pension funds bought that stock,
5  right, sir?
6  A. I would think so.
7  Q. Now, sir, you talked about these reserves, right? You
8  talked about that a little bit on your cross.
9      And a reserve is an estimate, is it not, sir? It's a
10  prediction of how many loans you expected to go two-plus or
11  charge-off in the future, is that right?
12  A. It would not be related to loans that would go two-plus.
13  It would be related to loans that would go charge-off.
14  Q. Okay. So in other words, it's a prediction based on
15  judgmental analysis of historical data of what you think will
16  get charged off in the future, is that right?
17  A. That's fair.
18  Q. Okay. And it depends on, like, how the economy is doing,
19  stuff is like that, right?
20  A. That could be a factor.
21  Q. Okay. Sir, the two-plus numbers that you reported in
22  every one of these 10-Qs and 10-Ks, they were a hard number,
23  weren't they, sir?
24  A. What do you mean by a hard number?
25  Q. By a hard number, I mean you were telling people on this

Schoenholz - redirect

2184

1  day when we ended this quarter, 4 percent of our loans were
2  two-plus, right?
3  A. It was a reported statistic.
4  Q. Yeah. It wasn't a future prediction. It was a number
5  saying this is where it is right now in terms of people that
6  are two-plus delinquent, right?
7  A. That's a statistic.
8  Q. Right. It was current data, isn't that right, sir?
9  A. Correct.
10  Q. It wasn't a future prediction, was it?
11  A. It's a statistic as of a point in time.
12  Q. Right.
13      Now, sir, you talked about this April 9, 2002
14  investor conference, right? And we looked at these boards
15  earlier today about some of the information that he gave to
16  these 400 people in this room who followed Household, is that
17  right, sir?
18  A. We did.
19  Q. Okay. And you said, oh, we gave them the wrong numbers,
20  but I did it by mistake, is that right?
21  A. That's what I said.
22  Q. Okay. And you understood, sir, that, in fact, the number
23  you gave for multiple re-ages was 4.3, and the actual number
24  was 7.5, isn't that right?
25  A. Not when I gave the presentation.

Schoenholz - redirect

2185

1  Q. No, but you later learned, within weeks, you said, is that
2  right, sir?
3  A. That's what I said.
4  Q. Within weeks, you learned that the loans that had been
5  re-aged multiple times wasn't 4.3 percent. It was
6  7.5 percent, right?
7  A. Correct.
8  Q. Okay. You left out about $3 billion in loans, isn't that
9  right?
10  A. That's what that says.
11  Q. Okay. And that's what you learned from Mr. Makowski and
12  Mr. Pantelis, is that right, sir?
13  A. Correct.
14  Q. Okay. So after giving those information, all that
15  information to the investors on April 9, 2002, as soon as you
16  found that out, within two weeks, you issued a big press
17  release and corrected those numbers, right?
18  A. I told you we concluded they weren't material and we
19  didn't correct them.
20  Q. Okay. So just so I understand, no press release went out
21  saying, oh, boy, the numbers we gave you about multiple
22  re-ages were wrong.
23      No press release like that went out, did it, sir?
24  A. That's correct.
25  Q. You didn't tell anybody about that mistake, did you, sir?

Schoenholz - redirect

2186

1  A. We didn't tell people about that mistake.
2  Q. Okay. Was that the last time you gave those numbers
3  between then and October 11, 2002?
4  A. I don't recall.
5  Q. Sir, did anyone ever tell you during 2002 that re-aging
6  was being used to inappropriately mask the true two-plus
7  delinquency numbers?
8  A. Say that again, please?
9  Q. Did anyone ever tell you during the year 2002 that
10  re-aging was being used to mask the true two-plus delinquency
11  number?
12  A. I'm not sure. Possibly in one case.
13  Q. Okay. Who told you that?
14  A. I -- I'm not sure, but there was a discussion regarding
15  mortgage services, and I'd referred earlier to this woman
16  Elaine Markell. And I think that was her view, and I'm not
17  sure if she expressed that view to me or not. I know she'd
18  expressed that view to other people.
19  Q. Okay. But you learned of it in 2002, didn't you?
20  A. I think I learned of that some -- at some point in time, I
21  think I heard that comment.
22  Q. Okay. Sir, Mortgage Services was the second largest of
23  Household's business units in 2001 and 2002, was it not?
24  A. I'm not sure.
25  Q. Okay. You had about 39 billion in loans in Consumer

-                                                                          -

Schoenholz - recross

2187

1  Lending, and you had somewhere around 18 billion in loans in
2  Mortgage Services, isn't that right?
3  A. I don't remember, and I'm not sure what credit -- off the
4  top of my head, I can't think of what Credit Card Services
5  had.
6  Q. It was bigger than Auto, right, sir?
7  A. Clearly bigger than Auto.
8  Q. It was bigger than Retail Services, wasn't it?
9  A. It was.
10  Q. Now, sir, you said that you didn't conceal anything from
11  investors, is that right?
12  A. That's what I said.
13  Q. But you ordered the destruction of documents, isn't that
14  right, sir?
15  A. I ordered the destruction of Andrew Kahr documents.
16        MR. DOWD: No further questions.
17        THE COURT: Recross?
18        MR. SLOANE: Yes, your Honor.
19        RECROSS EXAMINATION
20  BY MR. SLOANE:
21  Q. Mr. Dowd asked you about this error, and your
22  determination was, I think your testimony was it wasn't
23  material. Why was that?
24  A. Well, the first point was the total re-ages were correct.
25  The 16.9 percent number on that chart, that was correct.

Schoenholz - further redirect

2188

1        Delinquency was correct.
2        Charge-offs were correct.
3        Reserves were correct.
4        What wasn't correct was that split within the re-aged
5  category, and although we can say $3 billion is a lot of
6  money -- I don't disagree with that -- the receivable
7  portfolio was $100 billion, and it was 3 percent difference.
8        MR. SLOANE: Nothing further, your Honor.
9        MR. DOWD: Your Honor, just one question.
10        THE COURT: Sure.
11        FURTHER REDIRECT EXAMINATION
12  BY MR. DOWD:
13  Q. Sir, you understood that an account that had been re-aged
14  multiple times performed worse than an account that had never
15  been re-aged before and had performed worse than an account
16  that had been re-aged just once, isn't that right?
17  A. I believe that's true.
18  Q. So those $3 billion in loans were going to perform worse
19  than other loans, isn't that right?
20  A. Our credit loss reserves would have been taking that into
21  account and would have -- so there would not have been an
22  effect on that for the investors.
23  Q. Okay, sir, but you didn't tell anybody about that, did
24  you?
25  A. I think I've already testified I didn't.

Markell - direct

2189

1        MR. DOWD: Nothing further, your Honor.
2        THE COURT: Anything else?
3        MR. SLOANE: Nothing, your Honor.
4        THE COURT: You may step down, sir.
5        Call your next witness.
6        MR. DROSMAN: Plaintiffs call Elaine Markell.
7        THE COURT: Excuse me a second. Will you folks
8  release these documents that you left here so that this lady
9  has a place to stand and sit?
10        Thank you.
11        Step right up there, ma'am. Remain standing and
12  raise your right hand.
13  (Witness sworn.)
14        THE COURT: Be seated.
15        HELEN ELAINE MARKELL, PLAINTIFFS' WITNESS, DULY SW
16        DIRECT EXAMINATION
17  BY MR. DROSMAN:
18  Q. Good afternoon, Ms. Markell. Could you please state your
19  name and spell your last name for the record.
20  A. Helen Elaine Markell, M-A-R-K-E-L-L.
21  Q. Ms. Markell, have you ever worked for Household?
22  A. Yes.
23  Q. When?
24  A. From February of 2002 'til November 2002.
25  Q. What was your title at Household?

Markell - direct

2190

1  A. I was the vice president over Default Services.
2  Q. And you left Household in November of 2002, is that right?
3  A. That's correct.
4  Q. Why did you leave Household?
5  A. I went on an administrative leave of absence, paid leave
6  of absence.
7  Q. And why is that?
8  A. Well, some issues had come up regarding some of the
9  policies and procedures that they were doing, and I had been
10  asked to do things that I thought were improper, and some of
11  my functions and responsibilities had been taken away from me.
12        So I contacted an attorney in California to find out
13  what my rights would be, and he contacted Household. And then
14  it was determined that I would go on a paid leave of absence
15  until it was resolved.
16  Q. What issues came up that you thought were improper?
17  A. The primary reason -- the primary issues were the calling
18  of bankrupt accounts. Another one was the method in which
19  they re-aged delinquent loans in the two-plus buckets, and
20  the -- adjusting the delinquency ratios for purposes of a
21  Fitch review that was coming up.
22  Q. And you mentioned that one of the things you thought was
23  improper that Household was doing was using re-aging to affect
24  the two-plus delinquency number, is that right?
25  A. That's correct.

Markell - direct

2191

1  Q.  What do you mean by that?
2  A.  Well, re-aging the accounts to meet a certain delinquency
3  number that had been projected at some time before the month
4  end, and what they would do would be to roll the accounts to a
5  more current status, and that would move it out of the
6  two-plus bucket and into a more current status so it wouldn't
7  reflect as a delinquent loan.
8      And that would be without the benefit sometimes of
9  talking to the borrower, determining the reason for
10  delinquency, or collecting any cash payments.
11  Q.  Why did you believe that was improper?
12  A.  Because I felt that it was falsifying and minimizing the
13  delinquency numbers.
14  Q.  Now, before you worked at Household -- we'll talk more
15  about that in a moment, but before you worked at Household,
16  had you worked for any other mortgage lending companies?
17  A.  Yes.  I had about 25 years of experience in mortgage
18  servicing.
19  Q.  Let's go to the first mortgage lending position that you
20  held.  What was that?
21  A.  I was -- I actually was in collections at United First
22  Mortgage as my first job in mortgage servicing.
23  Q.  And what was your next job?
24  A.  From there, I went to a -- Crocker Mortgage for a short
25  period of time.

Markell - direct

2192

1  Q.  Okay.  How long were you at Crocker?
2  A.  About nine months.
3  Q.  And what was your next job?
4  A.  I was a servicing manager at a company called Real Estate
5  Consultants.
6  Q.  Why did you leave Crocker?
7  A.  I got recruited for a management position at the other
8  company.
9  Q.  Okay.  And how long were you at this next company?
10  A.  Approximately three years.
11  Q.  Okay.  And what was your next job?
12  A.  I -- my husband had been transferred to Miami, Florida, so
13  I got a job at Washington Federal Savings in Miami Beach, and
14  I was a collections manager there.
15  Q.  And how long were you at Washington Savings and Loan?
16  A.  Two years.
17  Q.  What was your next job?
18  A.  I -- my husband again got transferred to Gaithersburg,
19  Maryland, and I went to work for Standard Federal Savings and
20  Loan where I was the manager of collections, foreclosures and
21  eventually customer service and acquisitions.
22  Q.  How long were you there?
23  A.  Three years.
24  Q.  And why did you leave?
25  A.  My husband again got transferred to Southern California,

Markell - direct

2193

1  and so I actually got hired back at United First Mortgage in a
2  management position this time; and at that point, they had
3  been purchased by Merrill Lynch, so it was now Merrill Lynch
4  Mortgage, but I was hired back to manage collections and
5  foreclosures.
6  Q.  How long were you there?
7  A.  I was there for about three years, I think.
8  Q.  And why did you leave?
9  A.  I -- I went to work at Wells Fargo.
10  Q.  Okay.  And what was your position at Wells Fargo?
11  A.  At Wells Fargo, I was generally servicing, managing
12  general servicing areas; and during that time, I was promoted
13  to vice president over servicing.
14  Q.  And how long did you stay at Wells Fargo?
15  A.  Almost six years.
16  Q.  And what was your next job?
17  A.  I went to Norwest Mortgage as the servicing manager and
18  vice president over mortgage servicing at Norwest.
19  Q.  Why did you leave Wells Fargo?
20  A.  I got recruited to the position at Norwest Mortgage.
21  Q.  And how long did you stay at Norwest?
22  A.  Two years.
23  Q.  What was your next job?
24  A.  I went to work at Prudential Home Mortgage, and, again, I
25  was over default services and loss mitigation.

Markell - direct

2194

1  Q.  And why did you leave Norwest?
2  A.  I was recruited to -- to a higher position.
3  Q.  And how long did you stay at Prudential?
4  A.  Two years.
5  Q.  What was your next job after that?
6  A.  Prudential sold its mortgage servicing operations, so I
7  was contacted by Countrywide Home Loans in California, and
8  they asked me to come out for an interview, and I was hired
9  there.
10  Q.  How long did you work at Countrywide?
11  A.  Two years.
12  Q.  And what was your next job after that?
13  A.  I went to Ameriquest Mortgage as executive vice president
14  over mortgage loan servicing.
15  Q.  And why did you leave Countrywide for Ameriquest?
16  A.  I was recruited.
17  Q.  Was it a better job?
18  A.  Yes, it was a better job.
19  Q.  Now, did Ameriquest have any subprime loans that it worked
20  with?
21  A.  Ameriquest was 100 percent subprime loans.
22  Q.  And how long were you at Ameriquest?
23  A.  Three-and-a-half years.
24  Q.  And what was your next job after Ameriquest?
25  A.  Household.

-

Markell - direct
2195

1  Q.  And why did you leave Ameriquest?
2  A.  I had been recruited in 2001 to take the position at
3  Household, and that -- that position was filled by somebody
4  else.  And I had kept in contact with Doug Friedrich, as well
5  as the recruiter that had contacted me about that position.
6  And a year later I was interviewed again for a different
7  position, over default services, and I elected to take that
8  job and move to Household.
9  Q.  Now, you said you were contacted in 2001 by Household, is
10  that right?
11  A.  That's correct.
12  Q.  And you interviewed with Household at that time?
13  A.  That's correct.
14  Q.  What was the job for which you were interviewing at
15  Household in 2001?
16  A.  COO.
17  Q.  And that's COO of the Mortgage Services business unit?
18  A.  Mortgage Services in Florida, yes.
19  Q.  Who did you interview with when you interviewed for that
20  job?
21  A.  I interviewed with Doug Friedrich, Mike Woodward, Dave
22  Schoenholz, and there was one other person and today I don't
23  recall who that was.
24  Q.  And you mentioned Dave Schoenholz was one of the people
25  who interviewed you, is that right?

-

Markell - direct
2196

1  A.  That's correct.
2  Q.  And you also mentioned a person named Doug Friedrich
3  interviewed you, is that correct?
4  A.  That's correct.
5  Q.  And was he the managing director of the entire Mortgage
6  Services business unit?
7  A.  Yes, he was.
8  Q.  Okay.  So what happened with this COO position that you
9  were interviewing for?
10  A.  It was filled by Greg Gibson.
11  Q.  And then you interviewed again with Household?
12  A.  Yes.  About -- you know, like I said, I kept in contact
13  with Mr. Friedrich and the recruiter that had initially
14  contacted me.
15      And then I was asked to come back and re-interview
16  for the position of default services, which I did, and I
17  ultimately accepted that position.
18  Q.  Okay.  So when did you actually begin working at Household
19  then as vice president of default services?
20  A.  Early in February 2002.
21  Q.  And as vice president of default services, what were your
22  job responsibilities?
23  A.  I was the -- managing collections, foreclosures,
24  bankruptcies and loss mitigation.
25  Q.  And where were you physically located?

-

Markell - direct
2197

1  A.  Brandon, Florida.
2  Q.  Now, Household, their corporate headquarters are in
3  Prospect Heights, Illinois, right?
4  A.  That's correct.
5  Q.  Why were you in Brandon, Florida?
6  A.  That's where the mortgage servicing center was.
7  Q.  What about the COO of the entire Mortgage Services
8  business unit, Greg Gibson.  Where was he located?
9  A.  He was in Brandon, Florida, as well.
10  Q.  And how many people reported to you in your position as
11  vice president of default servicing?
12  A.  Approximately 300.
13  Q.  Were those direct reports or indirect reports?
14  A.  Indirect reports.
15  Q.  Okay.  What about directly?  How many directly reported to
16  you?
17  A.  Five or six direct reports.
18  Q.  And then you supervised about 300 people in that position?
19  A.  Yes.
20  Q.  All right.  Now, did you -- did you meet every month with
21  Doug Friedrich, the managing director of Household Mortgage
22  Services, while you were the vice president?
23  A.  Yes.  Doug Friedrich had a monthly management meeting.
24  Greg Gibson would attend, and then I was also invited to
25  attend those meetings on a monthly basis until about August

-

Markell - direct
2198

1  of 2002.
2  Q.  Did you also meet periodically with the CFO of the entire
3  company, David Schoenholz?
4  A.  I met with him on about three occasions, I think.
5  Q.  Okay.  Now, let's turn to a discussion of sort of
6  delinquency in general and that concept in general.
7      What is a delinquent loan?
8  A.  A delinquent loan would be a loan whose payment had not
9  been paid in the month that it was due.
10  Q.  Now, what is a two-plus delinquent loan?
11  A.  A loan that was due for at least two or more payments.
12  Q.  Have you ever heard of the term re-age before?
13  A.  I have, yes.
14  Q.  Okay.  What does it mean to re-age a loan?
15  A.  They -- re-aging an account would be to -- to roll the due
16  date on the computer system to a more current status.
17  Q.  So, for example, take it out of the two-plus bucket and
18  make it current?
19  A.  Yeah.
20  Q.  That would be re-aging?
21  A.  That's correct.
22  Q.  What about the term restructure?  Have you ever heard that
23  before?
24  A.  That would be the same as re-aging.
25  Q.  So those terms were used interchangeably at Household, is

Markell - direct
2199

1  that right?
2  A.  That's correct.
3  Q.  Okay.  Now, if you re-age more loans, all other things
4  being equal, what happens to the two-plus delinquencies
5  statistic?
6  A.  Well, the -- re-aging the accounts would bring down the
7  two-plus delinquencies, so it would be a favorable -- a
8  favorable result on the two-plus.
9  Q.  While you were at Household during 2002, did Household
10 Mortgage Services re-age its loans?
11 A.  Yes, it did.
12 Q.  Okay.  Were you personally involved in re-aging loans at
13 Household Mortgage Services?
14 A.  My staff was, yes.
15 Q.  And you oversaw that process?
16 A.  Yeah, that's correct.
17 Q.  Now, is there anything inherently wrong with re-aging a
18 loan?
19 A.  No.
20 Q.  Did you believe that there was something wrong with the
21 way that Household Mortgage Services re-aged its loans?
22 A.  Yes, I did.
23 Q.  What was that?
24 A.  Well, they re-aged the loans primarily to manage the
25 delinquency number that was forecast rather than -- rather

Markell - direct
2200

1  than collecting cash to bring the accounts current.
2  Q.  What do you mean when you say that they re-aged the loans
3  primarily to affect the forecast two-plus delinquency number?
4  A.  They would re-age enough loans to favorably impact the
5  two-plus delinquency to get to the resulted number that they
6  had projected for month end.
7  Q.  So they had a target number for month end, and they would
8  make sure to re-age just enough loans to get to that target?
9  A.  That's correct.
10 Q.  Okay.  Now, was there a greater focus on re-aging loans
11 during certain periods of time?
12 A.  Yes.  The -- the -- it was extremely critical at quarter
13 end.
14 Q.  What -- what do you mean by quarter end?  There are four
15 quarters.
16 A.  At the end of March -- yeah, there's four quarters of the
17 year, so the March month-end figures would be important.  The
18 June month-end figures would be important, September, et
19 cetera.
20 Q.  And you said that re-aging received a special focus at
21 quarter end?
22 A.  Yes.
23 Q.  What do you mean by that?
24 A.  Well, they wanted a more favorable result at quarter end
25 because I believe those numbers are published.

Markell - direct
2201

1  Q.  And so what happened at Household at quarter end?
2  A.  They would -- they would put extreme emphasis on meeting
3  the delinquency number that was projected for that quarter
4  end.
5  Q.  And how would that be accomplished?
6  A.  Well, they did a lot of re-aging.
7  Q.  Right at quarter end there?
8  A.  Right at quarter end.
9  Q.  And you witnessed that?
10 A.  Yes, I did.
11 Q.  Were there -- you mentioned two-plus delinquency targets
12 that Household Mortgage Services was supposed to meet.  Were
13 there such things?
14 A.  Yes.
15 Q.  Okay.  Now, was there a time during 2002 that you re-aged
16 loan accounts at Household Mortgage Services solely to meet
17 the two-plus delinquency target that had been set?
18 A.  Yes.
19 Q.  Tell me about that.  When was that?
20 A.  It was in September for the September month-end number,
21 and starting very close to the end of the month, they --
22 Household began restructuring loans without contacting the
23 borrower, meaning that they would run reports of certain
24 loans, in this case they were bankruptcy 13 loans, and these
25 people had just filed for bankruptcy 13.  They ran the report,

Markell - direct
2202

1  and all of those loans were -- were restructured.
2  Q.  So, for example, they'd say give me a report of all of our
3  loan customers who just filed for bankruptcy, and we want to
4  re-age those loans to current?
5      MR. SLOANE:  Objection, your Honor.  He's leading the
6  witness.
7      THE COURT:  Sustained.
8  BY MR. DROSMAN:
9  Q.  Okay.  Can you elaborate on what you mean by "they ran
10 reports"?
11 A.  Yes.  The -- they did say take all the loans that just
12 filed for bankruptcy, Chapter 13, run a report.  They gave
13 those to my staff, and my staff made the restructure
14 adjustments to the due dates.
15      They also ran reports of any bankruptcy Chapter 13
16 loan that had made one payment in the last 60 days, and they
17 restructured all of those loans as well.
18 Q.  Did they call these bankrupt customers before they
19 restructured them?
20 A.  No, they did not.
21 Q.  Did Household Mortgage Services use certain standards to
22 decide which loans it should re-age and which loans it
23 shouldn't re-age?
24 A.  From time to time, there were policies that were put in
25 writing, but almost from the very beginning of my employment

# EXHIBIT 6

Rybak - redirect

2368

1  your Honor.  I don't believe there's an objection.
2       THE COURT:  It will be admitted.
3       MR. BURKHOLZ:  Thank you.
4       (Plaintiff's Exhibit No. 102 received in evidence.)
5       MR. BURKHOLZ:  Can we highlight the part on the
6  bottom under "Discussion Items."
7  BY MR. BURKHOLZ:
8  Q.  It says, "EZ Pay.  The issue was raised regarding EZ Pay
9  and restructures.  A strategic decision was made for the 2000
10  year to use restructures much more aggressively than before."
11       Do you see that?
12  A.  Yes.
13  Q.  "In general, the number of accounts restructured in
14  January and February of 2000 were two to three times greater
15  than in December, 1999."
16       Do you see that?
17  A.  Yes.
18  Q.  And, then, it says, "The resulting two-plus percentage for
19  January, 2000, and February, 2000, was positively impacted."
20       You see that, right?
21  A.  Yes.
22  Q.  By "positively impacted," that means the percentage of
23  accounts that were delinquent went down, right?
24  A.  That's correct.
25  Q.  Is there any reference at all in this discussion item to

Rybak - redirect

2369

1  doing the restructuring for customers?  Do you see that at
2  all?
3  A.  No.
4  Q.  Do you see any reference to taking the economy into
5  account in this paragraph here as a reason to do restructures?
6  A.  No.
7  Q.  Now, let's turn to -- do you have Exhibit 1100 in front of
8  you?
9       MR. BURKHOLZ:  Can we bring that doc up on the
10  screen?
11  BY THE WITNESS:
12  A.  Yes.
13       MR. BURKHOLZ:  Let's highlight the first part.
14  BY MR. BURKHOLZ:
15  Q.  It says, "As you know, we have stated in real estate our
16  restructure policy is once every 12 months with two payments
17  received"?
18  A.  Yes.
19  Q.  Do you see that?
20       The "we" you were referring to was Household,
21  correct?
22  A.  Yes.
23  Q.  Okay.
24       And you understood --
25       MR. BURKHOLZ:  Strike that.

Rybak - redirect

2370

1  BY MR. BURKHOLZ:
2  Q.  So, your testimony is that this was just a mistake, these
3  two statements that were made regarding the restructure policy
4  to investors and buy and sell side analysts, right?  Two
5  mistakes, right?
6  A.  Yes.
7  Q.  Two separate mistakes, right?
8  A.  Yes.
9  Q.  And what happened?  You woke up on April 3rd or April 4th
10  and you realized, "We made two mistakes here"?  Is that what
11  happened?
12  A.  No.
13  Q.  The date of the memorandum is April 4th, 2002, right?
14  A.  Yes.
15  Q.  And in the months leading up to the date of this
16  memorandum, you're aware, aren't you, that Barron's and
17  Business Week started raising issues regarding Household's
18  re-aging and charge-off policies?
19  A.  I was aware of the Barron's article.
20  Q.  Okay.
21       Not aware of the Business Week article?
22  A.  I don't recall.
23  Q.  And you remember that -- you do recall that the Barron's
24  article was very critical and raising questions about
25  Household's re-aging and charge-off policies, right?

Rybak - recross

2371

1  A.  Yes.
2  Q.  You were aware, also, weren't you, that there were
3  analysts at this time starting to question Household's
4  re-aging and charge-off policies, right?
5  A.  Yes.
6  Q.  And you read some of those analyst reports, didn't you?
7  A.  Yes.
8  Q.  And you're not aware of Household issuing a press release
9  that day or the day after saying, "We made a mistake,
10  investors and analysts.  We misled you regarding our
11  restructure policy in real estate.  We made two mistakes"?
12       You didn't issue that kind of press release, did you?
13  A.  I didn't issue any press release.
14  Q.  And Household didn't, did they?
15  A.  Not to the best of my knowledge, no.
16  Q.  And regarding materiality, you're not an expert on
17  materiality with respect to the federal securities laws, are
18  you?
19  A.  No.
20       MR. BURKHOLZ:  No further questions, your Honor.
21       MR. SLOANE:  A few questions, your Honor.
22            RECROSS EXAMINATION
23  BY MR. SLOANE:
24  Q.  Would you look at what counsel's just shown you,
25  Plaintiffs' Exhibit 102?

Rybak - recross
2372

1     MR. SLOANE:  Put that back up on the screen.
2     Your Honor, I think we need to switch.
3     THE COURT:  I'm sorry.
4     MR. SLOANE:  My fault.
5  BY MR. SLOANE:
6     Q.  And if you go to the last page, it says, "Follow-Ups."
7  You look at the second item, it says, "Accounting will report
8  on their review of Risk's loss model."
9     What was the loss model?
10    A.  We had a model of -- to the best of my recollection, this
11 is for Household Mortgage Services.  We had models which would
12 predict what the losses were based on the value of the home,
13 the lien position, probability of default and loss severities.
14    So, we were trying to forecast out what the losses
15 would be.
16    Q.  And this is another one of those statistical methods used
17 at Household International to try to determine losses or
18 write-offs; is that right?
19    A.  Yes, it was.
20    Q.  Now, I think counsel asked you something about
21 restructures reducing two-plus.  If you know, why did
22 restructures, in your view, reduce two-plus delinquencies?
23    A.  Where there were -- well, if an account was six days or
24 past due, that account would no longer be delinquent.  But
25 most of our restructures were on accounts that were 30 days

Rybak - recross
2373

1  past due.  And one thing that it did was that it would reduce
2  the number of accounts that were in the collection queues.
3     And, basically, what we wanted was to have the
4  collectors work the accounts that were, indeed, going to roll
5  to charge-off.  And one of the reasons -- you know, if you run
6  restructures and you bring the accounts current because they
7  demonstrated payments, they're making payments, then you
8  should not keep those accounts in the queues to collect
9  past-due balances.
10    And, so, the fact that you could more efficiently
11 work the accounts that were not making payments also reduced
12 two-plus.
13    Q.  What do you mean "work the accounts"?
14    A.  Well, you had a -- at any point in time, you only had a
15 fixed number of collectors.  And, so, they could only work so
16 many accounts per collector.  And when you -- when you -- when
17 you -- re-aged an account because he made payments and you
18 took him out of the queue, he had fewer accounts to work and
19 he could focus on the people who were not making payments.
20    MR. SLOANE:  Nothing further, your Honor.
21    MR. BURKHOLZ:  No questions, your Honor.
22    THE COURT:  You may step down.
23    (Witness excused.)
24    MR. DOWD:  At this time, the plaintiffs would call
25 Harris Devor.

2374

1     MS. BUCKLEY:  Your Honor, we had some threshold
2  issues about this witness.
3     THE COURT:  Okay.  That is correct.
4     Let's try to address those at a sidebar, see if that
5  works.
6     (Proceedings had at sidebar:)
7     THE COURT:  Refresh my recollection.
8     MS. BUCKLEY:  Yes, your Honor.  This witness referred
9  to the Attorney General settlement, settlement figure.
10    THE COURT:  It's an expert witness, right?
11    MR. DOWD:  Yes.
12    MS. BUCKLEY:  Yes.
13    And in your opinion concerning Ms. Ghiglieri and our
14 request to voir dire her, you noted that there was a potential
15 tension between two of your rulings.  First, that the Attorney
16 General settlement and negotiations were not to be referred to
17 except in the context of damages and loss causation; and,
18 then, here, again, with this witness who bases some of his
19 opinion on those things.
20    THE COURT:  Okay.
21    MS. BUCKLEY:  He is a liability witness.
22    THE COURT:  Let me stop you here.
23    MS. BUCKLEY:  Yes.
24    THE COURT:  What's he going to say about the
25 settlement?

2375

1     MR. DOWD:  Your Honor, he's going to offer -- he has
2  two quantifications.  You know, he's allowed to testify to
3  what was attributable to the illegal practices.  The Court had
4  said that in the opinion.
5     First he's going to testify that he's seen internal
6  calculations that put the number at $3.2 billion, about 2
7  billion of --
8     THE COURT:  Does he have to say that they are as a
9  result of the settlement?
10    MR. DOWD:  Oh, no.  That's the first part.
11    THE COURT:  Okay.
12    MR. DOWD:  Then I'm just going to ask him, your
13 Honor, "Did you perform a secondary analysis?"
14    And I'm going to ask him, "What is that?"
15    And if you want, I can try to lay the two of them out
16 -- I was going to have him say, "Was the secondary analysis
17 based on restitution that Household paid through the Attorney
18 Generals to consumers?"
19    Is that okay with you guys?
20    I mean, I think that -- was trying to not use the
21 word "settlement," not use "484."
22    And, then, I was just going to ask him if it
23 confirmed his earlier opinion.
24    MS. BUCKLEY:  Your Honor, as I said, this is not a
25 damages expert.  He's a liability person.  But let me address

2376

1  the first point.
2       The $3.2 billion figure that counsel refers to comes
3  from a document your Honor specifically excluded from evidence
4  because of the Attorney General negotiation point.  So, the
5  $3.2 billion number is no more acceptable under the analysis
6  of the Federal Rules of Evidence, at least in our view, than
7  the $484 million number.
8       So, that document, called Rodemoyer 17, has been
9  excluded by your Honor on grounds that it's a settlement
10  document.  It was prepared in the context of settlement
11  negotiations.  So, I don't understand the legal distinction
12  counsel is making between those two figures.
13       MR. DOWD:  Your Honor, because you said that's
14  exactly what I could do in the opinion.  It's right there
15  (indicating).  He can give his opinion about how much of the
16  revenue reported for '99 through the second quarter was
17  attributable to predatory lending practices.
18       MS. BUCKLEY:  It doesn't say he can talk about the
19  settlement.
20       MR. DOWD:  Defendants can explore on cross the extent
21  to which the document --
22       THE COURT:  Okay.
23       The ruling is he can testify as to the bases for his
24  opinions, including the figures that he took into account.  He
25  can testify as to the origin of those figures.

2377

1       I don't see any need for him to testify as to -- to
2  use the word "settlement" --
3       MR. DOWD:  No, he won't.
4       THE COURT:  -- or "settlement negotiations."  The
5  fact that there was an amount paid is going to come out as
6  part of the damages.  So, nothing new is going to be added
7  there.
8       But to the extent that his testimony goes beyond my
9  ruling on the use of the settlement itself, I'm going to allow
10  it; and, if at any point in time you feel that that's
11  happened, you can ask the Court to instruct the jury with the
12  appropriate instruction and I will do that.
13       MR. DOWD:  And I will try to lead him a little bit
14  through that part, your Honor, just to keep it safer.
15       THE COURT:  That's the idea.
16       MS. BUCKLEY:  I had one other smaller issue, your
17  Honor.
18       This witness testified in his deposition -- and I
19  have -- only counsel knows whether he'll try to testify, again
20  -- that an Attorney General settlement negotiations should
21  have been disclosed in three public filings that Household
22  filed in August of 2002.  We will be objecting to that.
23       THE COURT:  When you say "public filings," you're
24  talking about the --
25       MS. BUCKLEY:  10-Ks and 10-Qs.

Devor - direct

2378

1       THE COURT:  Okay.
2       MS. BUCKLEY:  The 10-Ks and 10-Qs that this man is
3  attacking are not listed on Plaintiffs' False Statements in
4  This Case and, therefore --
5       THE COURT:  Is he going to testify to that?
6       MR. DOWD:  About the loss contingency on the
7  negotiations, no, I'm not going to bring that out.
8       In other words, you're talking about the August
9  '02 --
10       MS. BUCKLEY:  Yeah.
11       MR. DOWD:  -- where they should have said that there
12  was a -- they should have disclosed the negotiations?
13       THE COURT:  Right.
14       MS. BUCKLEY:  Right.
15       MR. DOWD:  No, I'm not going to ask about that.
16       MS. BUCKLEY:  Great.
17       THE COURT:  Okay.
18       MS. BUCKLEY:  Thank you all.
19       (Proceedings had in open court:)
20       MR. DOWD:  Plaintiffs call Harris Devor.
21       HARRIS DEVOR, PLAINTIFF'S WITNESS, SWORN
22               DIRECT EXAMINATION
23  BY MR. DOWD:
24  Q.  Good afternoon, sir.
25  A.  Good afternoon.

Devor - direct

2379

1  Q.  Could you state your name for the record, please, and
2  spell your last name?
3  A.  Sure.  Harris L. Devor, D-e-v-o-r.
4  Q.  And have you been retained by the plaintiffs to reach an
5  expert opinion in this case?
6  A.  I have.
7  Q.  Did you reach a conclusion as to whether Household failed
8  to disclose required information about its improper or illegal
9  lending practices in violation of SEC regulations and
10  accounting rules?
11  A.  I did.
12  Q.  Did you reach a conclusion as to whether Household used
13  re-aging and other loan quality concealment techniques to
14  manipulate its delinquency statistics?
15  A.  I did.
16  Q.  Did you reach a conclusion as to whether Household
17  improperly recorded revenue and expenses in connection with
18  certain agreements with General Motors, the AFL-CIO, Union
19  Privilege and a marketing company called Kessler?
20  A.  I did.
21  Q.  All right.
22       Before you explain your conclusions, I'd like to
23  begin with your qualifications, if I could.  All right, sir?
24  A.  Okay.
25  Q.  And let's start with your educational background.  Where

Devor - direct
2380
1  did you attend college?
2  A. I went to Temple University.
3  Q. And did you graduate from Temple?
4  A. I did.
5  Q. And did you receive a degree?
6  A. I did.
7  Q. And what was your degree in?
8  A. Bachelor's of Business Administration with a Major in
9  Accounting.
10  Q. And where did you go to work after graduating from Temple
11  University?
12  A. I joined Pricewaterhouse.
13  Q. And what was the business of Pricewaterhouse at that time?
14  A. Pricewaterhouse is an accounting firm then and now,
15  although now it's known as PricewaterhouseCoopers. It's a CPA
16  firm, an accounting firm.
17  Q. Okay.
18      And when you talk about an accounting firm, what type
19  of business, what type of work did you do at Pricewaterhouse?
20  A. I was an auditor. That was my specialty.
21  Q. And what is an auditor, sir?
22  A. An auditor is a person who basically goes into companies,
23  looks at what the companies have reported in the way usually
24  of financial information to the public, or to whomever they're
25  reporting to; and, then, goes into the company and determines

Devor - direct
2381
1  whether or not their records, the transactions, the events at
2  the company really are represented fairly in what the company
3  reported to the outside. That's what an auditor does.
4      THE COURT: I'm going to ask you to step back from
5  that microphone a little bit.
6      THE WITNESS: Okay, sure.
7      THE COURT: Every witness is different, but I think
8  you need to have it a little bit further away from you.
9      THE WITNESS: Okay.
10      MR. DOWD: You're the first witness that's had to
11  push it back.
12      (Laughter.)
13  BY MR. DOWD:
14  Q. What was your entry-level position with Pricewaterhouse?
15  A. I was a staff accountant.
16  Q. Did you receive any promotions during the time you were at
17  Pricewaterhouse?
18  A. Sure. I did.
19  Q. And tell us about that.
20  A. I was promoted to Senior Accountant, which was the next
21  level after Staff Accountant. I was, at some point later on,
22  promoted to Manager, which at the time, I believe, was the
23  last step before Partner. I reached the level of Manager
24  before I left.
25  Q. Okay.

Devor - direct
2382
1      And what year did you leave Pricewaterhouse?
2  A. I left in 1981.
3  Q. And how long were you there total?
4  A. So, I was there eight years.
5  Q. And at some point during that time, did you become a
6  certified public accountant?
7  A. I did.
8  Q. And can you just tell us briefly what is a CPA, a
9  certified public accountant?
10  A. Well, I became a certified public accountant in 1975,
11  which was two years after I joined the firm. And back then,
12  you couldn't become a certified public accountant or even sit
13  for the exam until you practiced for two years.
14      A certified public accountant is one who takes a
15  rigorous exam, some almost three days -- at least when I took
16  it, it was almost three days -- long in length, covering a
17  variety of accounting-related, auditing-related subjects. And
18  once you passed the exam, you are then licensed to operate as
19  a CPA.
20  Q. Okay.
21      And are you still a CPA today?
22  A. I am.
23  Q. And as a CPA, are there any continuing education
24  obligations that you have? Do you have to take courses every
25  year or anything like that?

Devor - direct
2383
1  A. Yes. In order to renew your license -- you have to renew
2  it -- in my state at least, anyway -- every two years. And
3  you renew it, in part, by taking 80 hours of continuing
4  education credits relating to accounting subjects every two
5  years or roughly 40 a year. It doesn't have to be 40 a year,
6  but it has to be 80 in two years.
7  Q. And, sir, you left Pricewaterhouse, you said, in about
8  1981. Did you at that time join a firm called Laventhal
9  Howarth?
10  A. Yes. I actually was given an offer I couldn't refuse.
11  Laventhal was a very large firm -- also an international
12  accounting firm, like Pricewaterhouse -- headquartered in
13  Philadelphia. Philadelphia was a major practice to that firm.
14  And I was, in essence, given an offer I couldn't refuse. I
15  left.
16  Q. Okay.
17      And how long did you stay with Laventhal?
18  A. I stayed at Laventhal nine years.
19  Q. Okay.
20      And what was your entry-level position at Laventhal?
21  A. I joined at the same level I left Pricewaterhouse at,
22  which was Audit Manager. And, again, that was the step prior
23  to being a partner.
24  Q. Okay.
25      And at some point did you become a partner at

Devor - direct
2384

1 Laventhal?
2 A. I did, in 1984.
3 Q. And can you tell me, just explain to us briefly, what type
4 of audit work -- what type of industries did you audit during
5 the time that you were an auditor, both at Pricewaterhouse and
6 Laventhal?
7 A. Well, they sort of ran the gamut, actually. Everything
8 you can possibly think of. Both -- at both places, they were
9 publicly-held companies. Pricewaterhouse, probably they were
10 larger clients. They were worldwide, international.
11 Laventhal, although still publicly held, they were a little
12 bit smaller. Also, just about every industry you can think
13 of: Wholesaling, manufacturing, retailing, not-for-profits,
14 some finance entities. Different ones.
15 Q. And in performing audit work, do you rely on the
16 management's representations?
17 A. To some extent. I mean, it can't be the primary source of
18 your opinion -- basis for your opinion. It can't be. But,
19 certainly, during the course of an audit, you're -- you do
20 rely on management representations, sure, to some extent.
21 Q. And when I say "management," I mean management of the
22 company you're auditing.
23 A. Sure.
24 Q. And you left Laventhal in 1990; is that right?
25 A. I and everybody who worked at Laventhal left in 1990, yes.

Devor - direct
2385

1 Q. Okay.
2    It closed down?
3 A. Closed down.
4 Q. Okay.
5    And where did you go to work after that?
6 A. Well, at that point, I had a chance -- I had a choice. I
7 could -- I actually was given an offer to go back to
8 Pricewaterhouse, but I decided for the first time in my life I
9 wanted to work in a small firm where I just had more control
10 of what I was doing, as opposed to working in a large
11 organization.
12 Q. Okay.
13    And where did you go at that time?
14 A. I joined a firm -- smaller firm -- in Philadelphia by the
15 name -- at the time, the name of the firm was Shechtman Marks,
16 and after I joined it, it became Shechtman Marks Devor.
17 Q. And what's the business of Shechtman Marks Devor? What
18 kind of work do you do?
19 A. Also a CPA firm, an accounting firm; and, you know, do
20 very similar work that I did at Laventhal and Pricewaterhouse
21 in terms of being an auditor, amongst other things.
22 Q. Okay.
23    And, approximately, how many times have you been
24 retained as an expert witness or consultant in connection with
25 litigation matters?

Devor - direct
2386

1 A. Well, when you say "and consultant," I would say probably
2 too numerous to mention. In terms of actually ultimately
3 opining, given that the cases sometimes settle before they go
4 to trial or whatever, I would say -- I don't know -- 30, 40,
5 50. Something like that.
6 Q. Okay.
7    And on those occasions, have you been retained to
8 render opinions about accounting and financial reporting
9 issues?
10 A. Yes. I mean, in some of the largest cases that I'm sure
11 many people in this room have heard of over the last ten
12 years. Large cases that involve financial statements that are
13 allegedly misreported. One that I recall being in Chicago on
14 was something called Waste Management about ten years ago,
15 which at the time was a fairly large one.
16    But, yes, that's the kind of work I do.
17 Q. Have you been hired by both plaintiffs and defendants in
18 connection with expert witness work?
19 A. Yes, but certainly much more by plaintiffs than
20 defendants.
21 Q. Okay.
22    And have you been retained by any government agencies
23 over the years to provide consulting and auditing, accounting
24 and financial disclosure?
25 A. I have. I've been retained by the Department of Justice

Devor - direct
2387

1 in a case in Pennsylvania against a large company which I'm
2 sure everybody has heard of called Rite-Aid. That was a
3 criminal trial, and I testified at trial.
4    I've also been retained by various state Attorneys
5 General around the country in certain cases relating to other
6 damage issues or accounting and auditing issues.
7 Q. Have you been qualified as an expert witness in the
8 federal courts?
9 A. Yes, of course.
10 Q. Okay.
11    Have you been qualified to testify as an expert
12 witness in any state courts?
13 A. Of course, yes.
14 Q. Have you ever taught courses in accounting or auditing?
15 A. I have.
16 Q. Tell us about that.
17 A. I taught in Temple's graduate program -- MBA program -- at
18 night for a semester or two. I've taught various courses
19 within the firms that I've worked at, both Pricewaterhouse,
20 Laventhal and, of course, my firm -- my current firm. And
21 I've also taught professionally -- well, in a professional
22 manner. As I said before, CPAs have to get certain credits
23 during the year and they run courses, and I've been asked to
24 teach on a bunch of those occasions to other professionals,
25 other CPAs, about certain subjects.

Devor - direct

2388

1  Q.  And, sir, in your professional career, either as an
2  auditor or in connection with your litigation work, have you
3  had any experience with the banking or lending industries?
4  A.  Sure.
5  Q.  Okay.
6       And tell us a little bit about that.
7  A.  Well, I've audited a couple banks.  I've -- I audited a
8  finance company.  And much of the litigation work I've done
9  over the last year-and-a-half has related to lenders, subprime
10  lenders, a couple of whom have very similar issues to this
11  case regarding loan quality deception, which I guess we'll
12  talk about later, but those kinds of things.
13       And many of the banks that are now the subject of the
14  banking crisis over the last six months to a year, that
15  everybody's read about from Wall Street, I've been retained in
16  at least five or six of those very large bank cases, all
17  alleging misreporting of financial information.
18  Q.  And, sir, let me ask you, when did you start working on
19  this case?
20  A.  It's a long time ago, but I would say about four years
21  ago.
22  Q.  Okay.
23       And do you work on it alone at Shechtman Marks Devor?
24  A.  I don't, no.  I have a team.
25  Q.  Okay.

Devor - direct

2389

1       And what type of work have you and your team done?
2  A.  Well, just to explain that, I mean, you cannot do an
3  engagement like this on your own.  I mean, the size of this
4  engagement, as well as some of the other ones I've worked,
5  necessitates having a team of people to obviously assist you.
6       And I apologize, but I lost your question.
7  Q.  Sure.
8       I just wanted to know what type of work you and your
9  team have done since you started in 2005, I guess.
10  A.  Okay.
11       Well, we have reviewed boxes and boxes of documents,
12  perhaps in excess of 150.
13       I believe, in addition to that, all the documents in
14  this case remain available to us on the computer in a data
15  system.  And we were able to access that system.  So, we've
16  run searches for terms on that system, to be able to pull out
17  documents that may be relevant to the issues we're looking at.
18       We have read, I don't know, I would say somewhere
19  around 50 or so depositions, as well as the exhibits to the
20  depositions.
21       We have looked at some SEC transcripts.  We have
22  looked at the auditor work papers of both the original auditor
23  of Household, which was Arthur Andersen, as well as the
24  successor auditor of Household, which was KPMG.
25       And I'm sure I've left something out, but that's a

Devor - direct

2390

1  pretty good start.
2  Q.  Okay.
3       Can you tell me approximately how many hours you and
4  your staff have worked on this case?
5  A.  I believe it's somewhere around 6,000.
6  Q.  And I take it you don't do this for free?
7  A.  Well, I -- my firm doesn't do it for free.  I -- I -- I'm
8  just a salaried employee; but, the firm, obviously, has not
9  done it for free, no.  They've billed my time, as well as my
10  team's time, as we have gone through the engagement.
11  Q.  Okay.
12       And how much do you charge per hour for your work?
13  A.  My billing rate is $550 an hour.
14       It wasn't for the whole four-year period; but, at
15  this point, it's 550.
16  Q.  Okay.
17       And what was your assignment, as you understood it?
18  What were you asked to do by plaintiffs?
19  A.  Well, in a nutshell, we were asked to review the 10-Ks and
20  10-Qs that were issued by Household during the relevant time
21  period in this case, and determine whether or not the
22  disclosures that were -- the financial statements and the
23  disclosures that were -- included therein were, in fact,
24  fairly stated.
25  Q.  Okay.

Devor - direct

2391

1       And you testified earlier that you had reached
2  certain conclusions with regard to Household's financial
3  statements and disclosures included in the 10-Qs and the
4  10-Ks; is that right?
5  A.  That is correct.
6  Q.  Okay.
7       And have you prepared -- or had a demonstrative
8  exhibit prepared -- to assist you in explaining your
9  conclusion to the jury?
10  A.  I have.
11  Q.  Okay.
12       MR. DOWD:  I'd ask that we pull up what's been marked
13  as Plaintiffs' Demonstrative Exhibit 107.
14       MS. BUCKLEY:  Objection, your Honor.
15       THE COURT:  The basis?
16       MS. BUCKLEY:  The third bullet point is the subject
17  of your order of earlier this week.
18       MR. DOWD:  I think that's a different issue.
19       MS. BUCKLEY:  Withdrawn, your Honor.  Sorry.
20       THE COURT:  I'm sorry, you're withdrawing your
21  objection?
22       MS. BUCKLEY:  I am, your Honor.
23       THE COURT:  Okay.
24       MR. DOWD:  Do we have Plaintiffs' Demonstrative 106?
25       Oh, your Honor, we need to switch.  Sorry.

Devor - direct

2400

1     THE WITNESS:  Sorry.
2     THE COURT:  Wait, sir.  There's an objection.
3     What's the objection, again?
4     MS. BUCKLEY:  Beyond the class period, your Honor.
5     MR. DOWD:  It would relate to events during the class
6   period, your Honor.
7     THE COURT:  I will sustain the objection.
8   BY MR. DOWD:
9   Q.  Sir, your opinion, if you could, limit it to the 13 Qs and
10  Ks that were filed in connection with the end of these periods
11  originally.  All right?
12  A.  That is correct.
13  Q.  Okay.
14      And do these 10-Qs and 10-Ks, do they report
15  information about Household's income, for example?
16  A.  They do.
17  Q.  Do they report information about revenues?
18  A.  They do.
19  Q.  And do they report information about earnings per share?
20  A.  They also do, sure.
21  Q.  And, sir, do these -- this type of information, where in
22  the 10-Q or 10-K is it presented?
23      What's that document called?
24  A.  Well, "Financial Statements," in essence.  The company --
25  10-Qs and 10-Ks include the financial statements of the

Devor - direct

2401

1   company, which consists maybe of three, four, five pages.  It
2   can certainly vary.
3       And, then, over and beyond the financial statements,
4   there's a whole section called the "Footnotes" to the
5   financial statements, which are actually part of the financial
6   statements, which is a long narrative that explains the
7   financial statements.
8       And, beyond that, there's a whole other section of
9   the 10-K that also discusses the financial information, called
10  "Management's Discussion and Analysis," also known as "MD&A.
11  Q.  What type of information is provided in the footnotes and
12  MD&A?
13  A.  Well, basically, the footnotes and MD&A -- the narrative
14  part of the document -- basically is there to explain the
15  financial statements.  They sort of give the story behind the
16  numbers, in essence:  How the numbers were prepared; what
17  procedures, policies the company followed to arrive at these
18  numbers; and, they're very important to an understanding of
19  how the financial statements came to be what they are.
20  Q.  And have you prepared a demonstrative exhibit to explain
21  the concept of the disclosures in these footnotes and MD&As?
22  A.  I have.
23  Q.  Okay.
24      MR. DOWD:  I'd ask to bring up Plaintiffs'
25  Demonstrative Exhibit 101.

Devor - direct

2402

1   (Brief pause.)
2   BY MR. DOWD:
3   Q.  Sir, you can you see Plaintiffs' Exhibit 101 there?
4   A.  I can.
5   Q.  And is that the demonstrative you've prepared?
6   A.  It is.
7   Q.  Okay.
8       And can you tell us what this demonstrative shows?
9   A.  Well, in the background of the demonstrative, you'll see
10  what looks like a bunch of numbers and captions.
11      That's one of Household's financial statements.  It's
12  the Statement of Income, also commonly referred to as a
13  "Profit and Loss Statement."
14      And, then, what's in front of that -- if you actually
15  go to the bottom of the financial statements, you'll see a
16  little red box right there (indicating) that's been blown up.
17  And what that says is, "The accompanying notes are an integral
18  part of these consolidated financial statements."
19      So, that refers the reader or the user of the
20  financial statements to this narrative -- the footnotes --
21  that I explained before, so that one can understand what the
22  numbers mean.
23      And, as you can see, it indicates that it's actually
24  part of the financial statements.  The footnotes and financial
25  statements are considered one item.

Devor - direct

2403

1   Q.  Okay.
2       And, sir, have you also prepared --
3   A.  I'm sorry, right below it is an example of that, taken out
4   of Household's -- one small example.
5   Q.  In other words, that's a part of the footnotes that's
6   blown up there?
7   A.  Right.
8   Q.  Okay.
9       And that goes on, I take it, for pages and pages?
10  A.  Pages and pages.
11  Q.  Okay.
12      And, sir, have you also prepared a demonstrative to
13  assist you in explaining this testimony about the MD&A -- the
14  Management Discussion and Analysis?
15  A.  I have.
16  Q.  Okay.
17      MR. DOWD:  And could we please bring up Plaintiffs'
18  Demonstrative 102.
19      (Brief pause.)
20  BY MR. DOWD:
21  Q.  And, sir, what is depicted in Plaintiffs' Demonstrative
22  Exhibit 102?
23  A.  Well, again, in the background is the same income
24  statement -- the same financial statement -- that was on the
25  prior slide; and, in the foreground of the demonstrative is a

Devor - direct
2404

1  section out of this other section of the 10-K called the
2  "Management's Discussion and Analysis." And it provides
3  certain analysis of the numbers required by the SEC.
4      And this is an example right out of, I think, the 201
5  10-K of Household.
6  Q.  And that's been received in evidence as Defendants' 852.
7      Now, sir, are there rules? I mean, you said
8  something about SEC rules. Are there rules about what's
9  supposed to be in these financial disclosures -- this MD&A and
10 the footnotes?
11 A.  Yes, there are rules.
12 Q.  Okay.
13     And have you prepared another demonstrative to assist
14 you in explaining that concept?
15 A.  I have.
16 Q.  Okay.
17     MR. DOWD:  And could we please have up Plaintiffs'
18 Demonstrative Exhibit 109.
19     (Brief pause.)
20 BY MR. DOWD:
21 Q.  And, sir, what is shown on Plaintiffs' Demonstrative
22 Exhibit 109?
23 A.  Really, the two sets of rules that would govern how a
24 public company would, in fact, report.
25     So, the first one -- the upper left-hand corner -- is

Devor - direct
2405

1  something known as "Generally Accepted Accounting Principles."
2  That's one set of rules.
3      And, basically, any set of financial statements --
4  public companies, small company, whatever -- unless it's
5  indicated otherwise, has to be in accordance with generally
6  accepted accounting principles, which is also known by its
7  acronym, usually -- at least by accountants -- as GAAP,
8  G-A-A-P.
9  Q.  So, in other words, anybody who is doing financial
10 statements has to make sure that those financial statements
11 are presented under these GAAP rules; is that fair?
12 A.  That's correct.
13 Q.  Okay.
14     And can you tell us about any other requirements that
15 public companies face in connection with preparing their
16 financial statements?
17 A.  Sure.
18     Well, public companies -- first of all, public
19 companies -- also have to follow GAAP. But, over and beyond
20 that, the SEC has certain requirements over and beyond GAAP,
21 such that public companies have to follow GAAP and maybe som
22 other requirements.
23     And, in fact, engrained in the SEC regulations is a
24 statement that says, in essence -- I'm not quoting, but -- any
25 financial statements not presented in accordance with GAAP are

Devor - direct
2406

1  considered to be false and misleading. Something like that.
2  Q.  Now, sir, who is responsible for preparing the financial
3  statements at a company like Household?
4  A.  The company, specifically; and, more specifically than
5  that, the senior management of the company is ultimately
6  responsible.
7  Q.  Okay.
8      And have you prepared a demonstrative to show us that
9  concept, as well?
10 A.  I have.
11 Q.  Okay.
12     And could we please pull up Plaintiffs' Demonstrative
13 Exhibit 110.
14     (Brief pause.)
15 BY MR. DOWD:
16 Q.  And, sir, do you recognize Plaintiffs' Exhibit 110?
17 A.  I do.
18 Q.  And what does that show us?
19 A.  Well, this is, also, I believe, right out of Household's
20 10-K, although I don't remember precisely what year. I
21 believe it's the '01 10-K, also.
22     And it's a -- the paragraph on the top is blown up;
23 it's actually a -- letter to the shareholders that goes, at
24 that point in time went in, the 10-Ks. And I'll just read it.
25     "Household International's management is responsible

Devor - direct
2407

1  for the preparation, integrity and fair presentation of its
2  published financial statements."
3      So, it's saying management's responsible for the
4  financial statements.
5      And, then, the second line is, "The consolidated
6  financial statements have been prepared in accordance with
7  GAAP."
8      That's that thing I mentioned before.
9  Q.  Okay.
10     And, then, sir, is this something that gets signed
11 off by the officers of the company?
12 A.  It does.
13 Q.  And have you included an example of that, as well, within
14 Plaintiffs' Demonstrative 110?
15 A.  Yes.
16     Again, blown up the bottom part of that sheet in the
17 background, and it's signed by the CEO, Mr. Aldinger, in this
18 case and Mr. Schoenholz, who is the CFO. So, they're the ones
19 that they're referring to above where it says, "Management has
20 responsibilities."
21 Q.  All right.
22     And now, sir, let's go back to your three opinions,
23 if we could.
24     MR. DOWD:  And I'd ask that we pull up, again,
25 Plaintiffs' Demonstrative 107.

Devor - direct

2416

1  perform a secondary analysis, as well?
2  A. I did.
3  Q. And was that based on amounts that Household agreed to
4  make restitution of, to consumers through their states?
5  A. That's correct.
6  Q. Okay.
7      And did that confirm your opinion as to whether these
8  amounts attributable to improper lending practices were
9  material?
10  A. It did.
11  Q. Okay.
12      And do you have an opinion about materiality of those
13  amounts?
14  A. Yes. I believe they were material.
15  Q. Was Household management required to disclose what it was
16  doing with respect to predatory lending, assuming they engaged
17  in it?
18  A. Absolutely, both under GAAP and SEC rules.
19  Q. And why is that?
20  A. I mean, in general -- I mean, I've prepared some slides
21  for that; but, in general, it's required by the accounting
22  rules to disclose information that is useful to investors and
23  any other users of the financial statements -- lenders,
24  whatever -- and the SEC has similar rules around disclosure.
25      In essence, it really -- a reader cannot have a full

Devor - direct

2417

1  understanding of the numbers unless they understand what's in
2  the numbers. And -- plus, users use financial statements
3  generally to really gauge the prospects for the future of a
4  company.
5      So, when a company reports historical financial
6  statements, they're generally used by the public or the
7  users -- whoever they are -- to gauge the prospects going
8  forward of this company.
9      And this would be important information for someone
10  to know, I guess, because it could very well cease at some
11  point in time.
12  Q. Okay.
13      And you said you prepared some demonstratives to
14  explain this concept, as well; is that right, sir?
15  A. I have, yes.
16  Q. Okay.
17      I'd ask to bring up Plaintiffs' Demonstrative Exhibit
18  90.
19      (Brief pause.)
20  BY MR. DOWD:
21  Q. And can you explain to us what is Plaintiffs'
22  Demonstrative Exhibit 90?
23  A. This is -- remember the two sets of rules that I was
24  talking about before, GAAP -- which everybody's got to
25  follow -- and SEC rules, which over and beyond GAAP public

Devor - direct

2418

1  companies have to file. This is GAAP.
2      You might even recognize the cover of the book that
3  was on the other slide.
4      But -- so, that's what this is. This is something
5  called "Financial Accounting Concepts No. 5," and part of what
6  is constituted as GAAP.
7  Q. And how is FAC Con 5 relevant to your opinions here today?
8  A. Well, if you read some of this, it says, "Information
9  disclosed in notes -- " remember the footnotes to the
10  financial statements, which technically is part of the
11  financial statements -- "amplifies or explains information
12  recognized in the financial statements."
13      So, you need these notes to be able to understand
14  better what is in the financial statements.
15      And the next line goes on, "That sort of information
16  is essential to understanding the information recognized in
17  financials," which is really what I just said.
18      And these footnotes, once again, are -- these
19  disclosures and footnotes are -- considered integral,
20  important to the understanding of the financial statements.
21  Q. Okay.
22      And is that the only thing that GAAP says about this
23  disclosure concept in this context?
24  A. No.
25  Q. All right.

Devor - direct

2419

1      MR. DOWD: Could we please pull up Plaintiffs'
2  Demonstrative Exhibit 91?
3      (Brief pause.)
4  BY MR. DOWD:
5  Q. Is that another demonstrative that you prepared to assist
6  you in explaining your testimony?
7  A. It is.
8  Q. Okay.
9      And what is this FAS Con 1 that you have up here
10  (indicating)?
11  A. FAS Con 1 is just another part of GAAP. And it's
12  contained in that book there on the left. And the thing
13  that's significant to me about this is, obviously, "Financial
14  reporting should provide information about an enterprise's
15  financial performance during a period. Investors and
16  creditors often use information about the past to help in
17  assessing the prospects of an enterprise."
18      And I just really talked about why this information
19  that we were talking about before -- about improper lending --
20  would need to be disclosed because it would be important to
21  assess the prospects of this company going forward, to know
22  that there might be a piece of revenue that, for instance,
23  might disappear some day if they are not able to do it
24  anymore.
25  Q. And, in your opinion, did Household follow these

Devor - direct

2420

1 accounting rules that you've just mentioned?
2 A. I don't believe so.
3     And, by the way, this isn't -- there are other
4 references to footnotes being "accurate" and "reliable" and
5 "complete," which are not even on this slide; but, there are
6 numerous references to that sort of thing in the accounting
7 literature.
8 Q. All right.
9     Sir, do the SEC rules say anything about disclosure?
10 A. Yes. They are more concerned about the Management's
11 Discussion and Analysis section, although, as I said before,
12 this is all incorporated into the SEC rules because first and
13 foremost you have to follow GAAP. So, the SEC rules are over
14 and beyond that.
15     But the SEC also has rules about disclosure of this
16 sort of thing in the MD&A section -- the Management's
17 Discussion and Analysis.
18 Q. Okay.
19     And have you prepared two demonstratives to assist
20 new explaining that concept?
21 A. I have.
22     MR. DOWD: I'd ask that we pull up Plaintiffs'
23 Demonstrative Exhibit 94.
24     (Brief pause.)
25 BY MR. DOWD:

Devor - direct

2421

1 Q. And can you tell us, sir, how is Plaintiffs' Demonstrative
2 Exhibit 94 significant to your opinion?
3 A. Sure.
4     This is from Regulation S-K.
5     "S-K" is the -- amongst other things, indicates the
6 requirements by the SEC of what goes in Management's
7 Discussion and Analysis and how to present these things.
8 Q. And why is that significant to your opinion?
9 A. Well, it's the section also of the 10-K where the company,
10 I believe, should have disclosed this, assuming that these
11 things were improper; and, the thing of significance in this,
12 if you look at it, I mean, it goes --
13     THE COURT: Especially when you're looking away from
14 the jury, which is fine, you've got to speak even louder.
15     THE WITNESS: Okay.
16     I apologize, your Honor.
17     I apologize to the jury, too.
18     THE COURT: Just take a deep breath and let it out.
19     (Laughter.)
20 BY THE WITNESS:
21 A. What's significant to me about this is -- and the reason I
22 put the slide together is -- and I'll read it, "Describe any
23 other significant components of revenues -- " it also says and
24 expenses -- or "our core expenses" -- "that the registrant's
25 judgment," the registrant in this case, that's Household --

Devor - direct

2422

1 "should be described in order to understand the registrant's
2 results of operations."
3     So, again, components of revenue -- if there is this
4 piece of revenue and it's significant -- relating to improper
5 lending, Regulation S-K would say, "You've got to say that in
6 your MD&A."
7     That's it why this is significant to me.
8     MR. DOWD: Could we pull up Plaintiffs' Demonstrative
9 Exhibit 95?
10     (Brief pause.)
11 BY MR. DOWD:
12 Q. And, sir, this is, again, Regulation S-K; is that correct?
13 A. It is.
14 Q. Can you explain the significance of this portion of the
15 regulation?
16 A. Sure.
17     Again, in the context of improper lending, "Describe
18 any known trends or uncertainties that have had or that the
19 registrant reasonably expects will have a material, favorable
20 or unfavorable impact on net sales or revenues -- " and it
21 goes on -- "or income from continuing operations."
22     And, again, this is if there are items included in
23 the financial statements, for instance, that could likely not
24 continue; and, therefore, when users look at the financial
25 statements, they don't know that, "Oh, going forward they're

Devor - direct

2423

1 not going to have this piece." And I would think that's
2 certainly a possibility when you're talking about improper
3 lending.
4     As a result of that, that's exactly what S-K requires
5 in the Management Discussion and Analysis section. So, that's
6 another thing.
7     So people can, again, gauge the prospects of a
8 company going forward, which is really the main purpose of
9 presenting financial statements to begin with.
10 Q. Okay.
11     And do you believe that Household complied with these
12 GAAP and, then, SEC regulations with regard to predatory
13 lending practices?
14 A. I do not.
15 Q. And why is that?
16 A. Well, they really failed to disclose the items in the
17 nature of the disclosures that are required in -- you know, in
18 -- their 10-Ks or 10-Qs during the period.
19 Q. Now, sir, you had three opinions, I believe.
20     MR. DOWD: Could we go back to Plaintiffs'
21 Demonstrative Exhibit 107.
22     (Brief pause.)
23 BY THE WITNESS:
24 A. If I just, maybe on the last answer, I want to be clear;
25 and, that is, that there were significant amounts of revenue

Devor - direct

2428

1  Q.  And, sir, what is contained in Plaintiffs' Demonstrative
2  Exhibit 39?
3  A.  Well, these are, I guess, six examples of the kinds of
4  practices that I've called "loan quality concealment
5  techniques" that the company used during the relevant period
6  of this case, that had the impact of moving things out of the
7  two-plus category; and, in effect, therefore, not reporting it
8  in the 10-Ks and 10-Qs.
9  Q.  And, just for the record, sir, what were those six types
10 of loan quality concealment techniques that you identified?
11 A.  Okay.  Re-ages and restructures; late stage re-ages;
12 forbearance; skip-a-pay; re-writes; and, grace periods.
13       MR. DOWD:  Do you want to stop there, your Honor?
14       THE COURT:  Yes.
15       Let's take our 15-minute break, ladies and gentlemen.
16    (Jury out.)
17       THE COURT:  You may step down, sir.
18       Okay.  We'll take a 15-minute break.
19       MR. DOWD:  Thank you, your Honor.
20       MR. KAVALER:  Your Honor, can I ask you a question?
21       THE COURT:  I'm sorry, go back on the record.
22       MR. KAVALER:  I just want to know if you had a time
23 chosen for Friday yet.
24       THE COURT:  No, I haven't.  Why don't you folks tell
25 me when you think you want to meet.

Devor - direct

2429

1       MR. KAVALER:  Are you available at all times?
2       THE COURT:  The morning there's going to be a call
3  for sure.
4       About what time, Carol?  Noon, probably?
5       THE CLERK:  Yes.
6       We have a sentencing at 10:30 and some statuses.  So,
7  that's a good hour usually.
8       THE COURT:  The sentencing will go until 11:30.
9  So, it will be probably around 12:30.
10      MR. KAVALER:  Is that what you want us to do?
11      Whatever you want, your Honor.
12      THE COURT:  Why don't we count on that now:  12:30.
13      MR. KAVALER:  Is that all right with you guys?
14      MR. DOWD:  Fine.
15      THE COURT:  Now, we're in recess.
16    (Brief recess.)
17      THE COURT:  Let's bring the jury out.
18    (Jury enters courtroom.)
19      THE CLERK:  Please be seated.
20      THE COURT:  Proceed.
21      MR. DOWD:  Thank you, your Honor.
22 BY MR. DOWD:
23 Q.  Mr. Devor, when we left off, you were talking about these
24 re-aging and other loan quality concealment techniques, is
25 that right?

Devor - direct

2430

1  A.  Yes.
2  Q.  Have you seen any evidence that would suggest to you that
3  these techniques were used extensively?
4  A.  Yes.
5  Q.  And can you tell us about that.
6  A.  Well, the -- first of all, there was a lot of company
7  documents that -- during the time period that indicate they
8  were.
9       MS. BUCKLEY:  Objection, your Honor.
10      THE COURT:  Basis?
11      MS. BUCKLEY:  The witness has conceded he's not an
12 expert in predatory lending.
13      THE COURT:  Overruled.
14 BY THE WITNESS:
15 A.  So that's one -- do I keep talking?
16 BY MR. DOWD:
17 Q.  Yes.  Go ahead.
18 A.  So that's one.
19      I think the company actually at some point used a
20 number like 17 billion in its proxy statement to also indicate
21 that at least for '01 they had used re-aging and other
22 techniques of close to $17 billion, so that's a pretty
23 significant number.
24 Q.  Okay.  And, sir, have you prepared an animation or a
25 series of demonstratives that will explain how these different

Devor - direct

2431

1  loan quality concealment techniques work for the jurors'
2  benefit?
3  A.  I have.
4       MR. DOWD:  All right.  And at this time, I'd ask to
5  pull up, they're actually marked between Plaintiffs'
6  Demonstrative 54 to 72, your Honor, counsel has a copy of the
7  CD they're on.
8  BY MR. DOWD:
9  Q.  And, sir, we start out here with -- can you explain to us
10 what this first demonstrative is?
11 A.  Sure.
12      I guess to understand how this works, the first thing
13 we ought to talk about is something called aging buckets.  And
14 basically what that is and for these examples I have, I use
15 four or five customers.  What happens is a company monitors
16 how current each loan and customer is so that if a customer,
17 for instance, has paid whatever loan payments are due, their
18 loan -- and they're current, then their loan is shown as
19 current.
20      If they've missed a payment, the loan would be shown
21 in the middle column, which is 31 to 60 days past due.
22      And then if they miss a second payment, they're more
23 than 60 days past due, and that would fall into the third
24 column.  It's a way for companies to basically manage their
25 business, to figure out, you know, how their loans are

Devor - direct

2432

1  performing and in this case also used to be able to report
2  two-plus statistics.
3  Q. Okay. And have you prepared the next slide to show us
4  what would happen in month one with these examples of
5  customers?
6  A. Right. And keep in mind in that prior slide, the last
7  column over, the more than 60 days is what we've been
8  referring to as the two-plus delinquencies, and that's that
9  number that was reported in that chart in the 10-K, but -- so
10  this is month one for my example.
11      We start off with five mythical customers and assume
12  that their loans are all $100, and let's also assume that at
13  first they're all current. They've all paid. You know, in
14  the beginning they're all -- you know, they're not past due at
15  this point in time.
16  Q. Okay, and in your example, what happens in month two?
17  A. So you go to month two, and let's assume that three
18  customers -- two customers actually pay, you know, so they
19  continue to be current. Their loans are classified as
20  current, and that's B and D.
21      But assume three customers, A, C and E, fall behind
22  and they are not. They don't pay their -- their payment, and,
23  therefore, they're now in the -- they move over to the second
24  bucket, the 31-to-60-day past-due column.
25  Q. Okay. And does your example continue with the third

Devor - direct

2433

1  month?
2  A. Yes. In month three, let's assume for the moment that one
3  customer, Customer E, actually pays and pays not only the
4  current amount but the amount that was past due, so that whole
5  loan gets pushed back into the current column because the
6  customer's current.
7      But let's also assume A and C are not current. They
8  again make a payment, so they move to the next category, which
9  is more than 60 days past due. So in this example, $200 is in
10  more than 60 days past due and 300 is in current.
11  Q. Okay. And more than 60 days past due, that's -- that's
12  two-plus, is that right?
13  A. Right. The company has referred to that as two-plus. And
14  the two, of course, means two months, and two-plus means
15  greater than two months or greater -- 61 days or over.
16  Q. And that would be reported then in the financial
17  disclosures that the company has, is that correct, sir?
18  A. That's correct. That is expressed in -- that number is
19  expressed in these charts we talked about.
20      Now, the company elects to report it as a percentage
21  of the portfolio, so you see percentages there, but in the
22  chart we just looked at, I'm expressing it just in gross
23  dollars, but you could easily compute a percentage of the
24  portfolio.
25  Q. Okay. And, sir, you -- you testified that you believe the

Devor - direct

2434

1  company manipulated this two-plus information through these
2  re-aging and loan concealment techniques, is that right?
3  A. That's -- that is correct.
4  Q. And did you prepare demonstratives that explain each of
5  these loan quality concealment techniques as you've called
6  them?
7  A. I did.
8  Q. Okay. And the first technique I believe you had was
9  re-ages and restructures, is that correct?
10  A. That is correct.
11  Q. Okay. And just explain to us quickly what is re-aging or
12  restructuring?
13  A. Well, re-aging and restructuring is taking an account that
14  is just about to fall into the two-plus category or is already
15  in the two-plus category and just re-aging it, reclassifying
16  it back to current, notwithstanding the fact that the
17  company -- that the customer hasn't paid anything.
18  Q. Okay.
19  A. So even though it is more than two months past due, it's
20  not reflected as that.
21  Q. And did you prepare a demonstrative to explain how that
22  works?
23  A. I did.
24  Q. All right. And this one is entitled Re-Ages and
25  Restructures, is that right?

Devor - direct

2435

1  A. It is.
2  Q. Okay. And could you walk us through how a re-age or a
3  restructure works with respect to a two-plus account?
4  A. Sure.
5      Assume for the moment that these accounts are either
6  just about to go -- the two accounts are just about to go into
7  the two-plus column, or they're already there, as this slide
8  indicates. What happens is the company comes along,
9  reclassifies them back to current, notwithstanding that
10  payment hasn't been received and that it's still greater than
11  60 days old, and moves it back to current. And obviously it
12  has the impact of reducing two-plus in that example by 200 and
13  now showing zero instead of 200.
14  Q. Okay. And then take it these re-aged loans wouldn't
15  show up in that percentage column of two-plus in the financial
16  statements during this period, is that right?
17  A. That is correct. They would also reduce the percentage of
18  loans shown as two-plus because they got moved to current.
19  Q. Okay. And I think the next concealment technique that you
20  identified was called late stage restructures, is that right?
21  A. That is correct.
22  Q. Okay. And have you prepared a demonstrative to explain
23  how that works?
24  A. I have.
25  Q. Okay. And why don't you go ahead and explain the late

Devor - direct

2436

1  stage re-age.
2  A.  Well, late stage re-ages are really not much different
3  than the re-age, restructure concept that I just explained
4  other than it's used to -- and Household used it actually to
5  describe something that's even greater than two months old.
6  So instead of being 60 days old or 61 days old, it might be
7  90 days old or 120 days old, 150 days old.
8      And, again then, once this late stage restructure or
9  re-age was done, the company takes it and just re-ages or
10  restructures it and reclassifies it back to the current column
11  so that it's not included in two-plus.  Keep in mind that the
12  two-plus column is not just the greater-than-60-day column,
13  but that also includes everything greater than 60, which means
14  90, 120, whatever.  The company combines those and reports
15  those as one statistic.
16  Q.  And, again then, once this late stage restructure or
17  re-age was done, these loans that we just saw move, they would
18  not show up in those two-plus statistics, is that right?
19  A.  That is correct.
20  Q.  And have you seen evidence that the company did perform
21  late stage re-ages or restructures?
22  A.  Yes.
23  Q.  Now, let's go back to your list, if we could.  The next --
24  the next loan quality concealment technique is called
25  forbearance, is that right?

Devor - direct

2437

1  A.  That's correct.
2  Q.  Okay.  And what is forbearance?  What does that mean?
3  A.  Forbearance is basically the company agreeing to sort of
4  lay off for a period of time on a customer that might be
5  delinquent until that -- and cease collection efforts during
6  some small period of time, a month or two months, whatever it
7  is, in order to give the customer a chance to, you know, sort
8  of work out whatever the problems are that have caused them to
9  become delinquent.
10  Q.  And have you prepared a demonstrative to demonstrate how
11  forbearance works?
12  A.  I have.
13  Q.  Okay.  And can you walk us through that.
14  A.  So, again, in this column, the accounts of in this case
15  Customer F and Customer I are shown in the far right column,
16  the two-plus column, and the company agrees to forbear
17  collection efforts.  And in this case what happens is they
18  just disappear.  They don't get re-aged going back to current,
19  but they are just adjusted out of the two-plus statistic
20  column which has the same impact on two-plus of, you know,
21  whether you re-age it or just eliminate it altogether.  So in
22  this case, it disappeared.  It just disappears.
23  Q.  So in other words, if the accounts were two-plus months
24  delinquent when this forbearance was done, they would still be
25  Qs and Ks as being two-plus?

Devor - direct

2438

1  A.  Right.  The company would actually adjust that out before
2  reporting the number in their 10-Ks and 10-Qs.
3  Q.  Okay.  And let's go back to your list.  I think the next
4  one that you had was called Skip-A-Pay, is that right?
5  A.  That's correct.
6  Q.  And have you prepared a demonstrative to explain how
7  Skip-A-Pay works?
8  A.  Yes, I have.
9  Q.  And is that it?
10  A.  That is it.
11  Q.  All right.  Could you walk us through that, please.
12  A.  Sure.
13      So let's assume that two accounts, Customer K and
14  Customer N, are sort of in the middle column, about to move
15  into the two-plus column.  And what happens is maybe they're
16  in day 59 or day 60 and what happens is the company says, hey,
17  you don't have to pay this payment.  You know, skip this
18  payment.  You know, pay next month, but you don't have to pay
19  this month.
20      And, of course, ultimately they have to pay it.  It
21  just gets added on, I believe, to the end of the loan.  It has
22  to get paid at some point.  The company's not forgiving the
23  loan; but, in essence, they're still more than 60 days past
24  due, and it never gets to the two-plus column because it just
25  sort of bounces off and comes back.

Devor - direct

2439

1  Q.  Okay.  And is that another way that the company was able
2  to artificially reduce its two-plus number in the Qs and Ks
3  during the relevant time period?
4  A.  Yes.
5  Q.  Okay.  And I believe the next loan quality concealment
6  technique that you had was called rewrites, is that correct,
7  sir?
8  A.  That's correct.
9  Q.  And have you prepared a demonstrative to explain how
10  rewrites worked generally?
11  A.  I have.
12  Q.  And can we take a look at that?  Is that the demonstrative
13  regarding rewrites?
14  A.  It is.
15  Q.  And can you explain how that works.
16  A.  Sure.
17      In this case, Customer U is in the two-plus category,
18  more than 60 days, and the company, in essence, cancels the
19  loan and rewrites a new loan.  And because now the old loan is
20  gone and the company would exclude that from the two-plus, and
21  since it's now a new loan, even though it's, in essence, the
22  same loan, the customer is now -- is now shown as current
23  because it's "a new loan."  And as a result of that, the
24  account is classified as current and, of course, is eliminated
25  from the two-plus column.

-

Devor - direct

2440

1  Q. So in other words, you take a guy that's 60 days plus late
2  on his loan, you then just give him a new loan, cancel the old
3  loan, and he disappears from the two-plus statistics, too.
4  A. That's correct.
5  Q. Okay. And I believe you had another category of what you
6  referred to as loan quality concealment techniques called
7  grace periods, is that right?
8  A. I did.
9  Q. And have you prepared a demonstrative to explain how the
10  grace periods worked?
11  A. Yes, I have.
12  Q. And is that it?
13  A. That is it.
14  Q. Okay. Can you walk us through how the grace period issue
15  worked.
16  A. Sure.
17       So the company would extend, as the account was
18  becoming close to 60 days old, the company would grant the
19  customer, say, an additional 15-day period to pay the bill.
20  And, again, there's nothing wrong with that, in essence. It
21  just has to be reported correctly.
22       And what would happen was -- so now as the account
23  gets over 60 days and 61 days, 62 days, whatever, because
24  they're still within this grace period, the company chose not
25  to include those items, at least in part during the period, in

-

Devor - direct

2441

1  the two-plus statistic column but included that in the
2  31-to-60-day column even though it might be being paid on,
3  say, day 74 or something, or even 75, but nonetheless it
4  would -- if it was paid at all, but it was -- but it was
5  included in the middle column as opposed to the far column.
6  Q. Okay. So in other words, it didn't show up as two-plus in
7  the Qs and Ks, is that right?
8  A. That's correct.
9  Q. Okay. You just went through a number of these loan
10  quality concealment techniques.
11       Have you seen evidence that each of these was used by
12  Household during the relevant time period?
13  A. I have.
14  Q. Okay. And have you prepared a slide that demonstrates how
15  all these different things work in conjunction in your
16  example?
17  A. I have.
18  Q. Okay. And can we take a look at that, please.
19  A. Sure.
20       So these are -- these are all the accounts that we've
21  really spoken about if you put them all up there, and if I can
22  just summarize. So the first one we talked about was
23  automatic re-age, where they just take it out of 60 days plus
24  and move it over to current, notwithstanding nobody's paid.
25       Forbearance, they've agreed to lay off, but the

-

Devor - direct

2442

1  account is still over 60 days, and it just disappears because
2  it's been eliminated from the two-plus column.
3       The next one we talked about was Skip-A-Pay. It's in
4  the middle column, and it's about to get to the final column
5  but doesn't quite get there because the company has offered
6  them a chance to skip the pay.
7       Late stage re-age is really, you know, similar to the
8  first category only a little bit older than 60 days, maybe
9  much older, and the account gets reclassified and just
10  disappears out of the more-than-60-day column over. And you
11  see, by the way, we started out, I think the first slide
12  before we went into the animation set, on the right-hand
13  column something like 1,100 hours or something, and it's
14  already down to 300 by virtue of this.
15       So the last one was rewrite. That's where they
16  basically canceled the old loan and rewrite a new one and
17  somehow it gets put back in -- the company puts it back into
18  current from the two-plus category, notwithstanding the fact
19  that, again, the customer hasn't paid.
20       And then I think the final one we talked about was
21  grace period and that's, remember, it's in the middle column,
22  but because of a 15-day grace period, they have the ability to
23  pay a little later; but, nonetheless, it's still more than
24  60 days past due, and as a result of that, it's not shown in
25  the two-plus column.

-

Devor - direct

2443

1       As you can see, the impact of all these in my example
2  was to reduce the whole thing to zero.
3  Q. Okay. And now, sir, you're not saying that Household
4  reported zero under the two-plus column in their Qs and Ks
5  during the relevant time period, are you?
6  A. No, of course not. That's just my example. No, it's just
7  for simplicity sake to try to explain it.
8       Of course, they didn't report zero. We saw the
9  chart. They actually reported some percentages.
10  Q. Okay. And I believe you said, though, that you've seen
11  evidence that the company had essentially re-aged and used
12  loan quality concealment techniques on approximately
13  $17 billion of their portfolio during the relevant time
14  period, is that right?
15  A. Yes. I believe the company disclosed that in a proxy
16  statement in '03, I believe.
17  Q. Okay. The use of these practices, these loan quality
18  concealment techniques, why do you believe they made
19  Household's financial statements during the relevant time
20  period, the 13 we talked about, why did they make those false
21  and misleading, in your mind?
22  A. Well, first of all, as you can see, the numbers are
23  misleading. They're false. I mean all these items that we
24  just talked about are excluded from the chart that's disclosed
25  to people in the 10-K.

Devor - direct

2444

1    So the first thing is that the accounts, you know,
2  the two-plus numbers are false, they're misleading, and
3  there's no disclosure with respect to how much they're being
4  used or how to come up with the right number in the two-plus
5  chart.
6  Q.  Okay.
7  A.  That's the first reason.
8    The second reason is that the company, during this
9  time period, changed how they were doing these different
10  things.  They would have a program where they would do a grace
11  period for a short time, and then they would stop during the
12  grace period.
13    They would do re-ages based on certain criteria, then
14  change the criteria.  And this had the impact of -- of
15  increasing and decreasing all of these items from period to
16  period which rendered the financial statistics that are being
17  disclosed in these things almost useless.  I mean a user
18  wouldn't know all this and wouldn't know -- you know, just
19  wouldn't know how to compare numbers.  They would almost be
20  like comparing apples and oranges.
21  Q.  Sir, let me ask you, in its 10-Ks and 10-Qs during the
22  relevant time period, did Household tell people what it was
23  doing with regard to these practices?
24  A.  Not really.  I mean -- they really did not.  I mean in
25  1999 certainly and 2000, there was basically nothing that

Devor - direct

2445

1  related to the extent this was being used, the
2  inconsistencies, how significant they were, so there was
3  nothing.
4    And in 2001, there was some disclosure, but it was --
5  it was also problematic, as I'm sure I'll explain.
6  Q.  Okay.  And when you talk about the 2001 disclosure, are
7  you talking about certain information that Household provided
8  in its 10-K for the period ended December 31st, 2001?
9  A.  I am.
10  Q.  Okay.  And that 10-K would have been filed with the SEC
11  sometime around March of 2002, is that right?
12  A.  That's correct.  A 10-K is required to be filed in the
13  first couple months of the new year -- of the next year.
14  Q.  And was that disclosure sufficient, in your mind, to
15  identify re-aging practices?
16  A.  It was not.
17  Q.  Okay.  And perhaps we could take a look at the disclosure
18  itself.  I'll show you what's been marked as Plaintiffs'
19  Demonstrative Exhibit 121.
20    And, sir, is Plaintiffs' Demonstrative Exhibit 121 a
21  demonstrative that you prepared taken from the company's 10-K,
22  original 10-K, for the period ended December 31st, 2001?
23  A.  It is.
24  Q.  Okay.  And I believe that's been received in evidence as
25  Defendants' Exhibit 852.

Devor - direct

2446

1    And can you tell us first what does the disclosure
2  say?
3  A.  And I point out this is the first time they actually make
4  this disclosure.  In '99 and 2000, there is -- this disclosure
5  does not exist.
6    Just if I can take you through this step-by-step, in
7  2001, they make this disclosure, and it says, "Our policies
8  for consumer receivables permit reset of the contractual
9  delinquency status of an account to current..."
10    Now, that's pretty much what we were just talking
11  about, so they're disclosing that they actually take stuff
12  that's in delinquent and move it over to current.
13    "... subject to certain limits.  If a" -- and now
14  they go into the circumstances under which they actually do
15  it.  Number one, "If a predetermined number of consecutive
16  payments has been received," so there's got to be --
17  consecutive means at least two, I guess, two or more payments
18  received in a row; and, number two, "there is evidence that
19  the reason for the delinquency," the reason that it got to
20  become two-plus, "has been cured."
21    So the company is saying that, hey, look, at times we
22  re-age, we reclassify, but we only do it two things occur:
23  Number one, we get at least two payments in a row, if not
24  more; and, number two, this also has to happen, whatever gave
25  rise to the delinquency, we have evidence that that's been

Devor - direct

2447

1  cured.
2  Q.  Okay.
3  A.  So that's a disclosure that the company makes in the 2001
4  10-K, which is somewhere in March of '02.
5  Q.  And, sir, in your opinion, why was that disclosure false?
6  A.  Well, it was false because it, in essence -- it's just
7  false.  I mean that statement is not true.
8  Q.  Okay.
9  A.  That statement is not true.
10  Q.  In what respect?
11  A.  It is not true basically in every respect, if I may.
12    If you -- number one, there were -- there were a
13  predetermined -- the company actually re-aged and reclassified
14  in circumstances where it only received one payment or
15  sometimes no payments, so that's certainly not what
16  consecutive payments means.
17    And, number two, the company utilized automatic
18  restructures; that is, they just had a system that
19  automatically re-age these things without customer contact.
20  I mean if, in fact, there is -- if they're automatically
21  re-aging, then it's hard to say, well, I've got evidence that
22  this customer and this customer have cured their delinquency
23  problems.  Whatever it was, the person was out of work or, you
24  know, or was ill or whatever it was, how could the company
25  have evidence of that if they're automatically re-aging these

# EXHIBIT 7

9

Devor - direct

2485

1 re-aging policies are aggressive. These issues appear to be
2 pervasive in the businesses we reviewed.
3      And then it goes on to some scenarios in the next
4 paragraph of what would happen if they converted Blazer's
5 policies to something more in line with acceptable industry
6 standards.
7      And if you go to -- if you go to that paragraph, The
8 impact of converting Blazer's policies to something more in
9 line with acceptable industry standards is hard to predict
10 with precision but is estimated as a one-time charge of $2
11 billion and an ongoing annual charge of $500 million, compared
12 to historical loss rates. Their re-aging and write-off
13 policies coupled with their rate of receivable growth,
14 approximately 14 percent in '01, mask the true run rate of
15 Blazer's losses.
16 Q. And why is that significant to you?
17 A. Well, it's significant because, again, it goes to what my
18 conclusions were; that is, when one looks at the disclosures
19 and the statistics that were, in fact, reported by Household,
20 that it -- those -- it's really been masked by these re-aging
21 techniques.
22 Q. Okay. Is there anything else in that paragraph that you
23 considered in reaching your conclusions?
24 A. Yes. I guess the last sentence, which is quite lengthy --
25 it's really the last part of the sentence, but I guess in

10

Devor - direct

2486

1 order to get the context, Blazer's financial maneuvering over
2 the past few years -- just the word maneuvering to me is
3 somewhat troubling -- past few years has resulted in a clear
4 disconnect between the field approach to management and the
5 policies created by the finance group which were espoused to
6 be a solution to the issues created by the Beneficial
7 acquisition.
8      And here's really what's key to me. But it is hard
9 to imagine that they are not also being employed to boost
10 earnings.
11 Q. And what does earnings mean?
12 A. Earnings is that thing on the income statement that shows
13 the net profit, how much the company earned during a period of
14 time. And that's probably the number that most users, be they
15 investors, banks, whatever, would look at to gauge the
16 performance of the company more than any other.
17 Q. Is there anything else about this document that you
18 considered significant in reaching your conclusions?
19 A. I believe the rest of the document just gets into more
20 details, and there's other e-mails attached, but I think
21 that's the highlights of at least what I found significant.
22 Q. Fair enough.
23      Now, sir, do you have an understanding as to what
24 happened to the proposed Household/Wells Fargo merger?
25 A. Yeah, my understanding is that after the due diligence

11

Devor - direct

2487

1 procedures -- my understanding, based on the testimony, is
2 that Wells Fargo decided not to continue with the acquisition.
3 Q. Now, sir, I think we've covered your first two conclusions
4 or opinions. You also had a third conclusion overall, and I'd
5 ask that we pull up Plaintiffs' Demonstrative 107.
6      And, sir, could you briefly walk us through your
7 third conclusion?
8 A. Yes. Household improperly recorded revenue and expenses
9 resulting in a restatement and, that is, originally issued
10 financial statements had to be restated or corrected.
11 Q. And, sir, I'll show you what's been received in evidence
12 as Plaintiffs' Exhibit 231.
13      (Tendered.)
14 BY MR. DOWD:
15 Q. Sir, is Plaintiffs' Exhibit 231 a copy of a restated 10-K
16 for the period ended December 31, 2001?
17 A. It is.
18 Q. Okay. Now, first I'll ask you, did you prepare a
19 demonstrative to assist you in describing this restatement?
20 A. I did.
21 Q. And when did this restatement take place?
22 A. I believe in August of '02, the company actually filed
23 this -- this restatement and restated a whole bunch of years
24 and -- including the first quarter, I believe.
25 Q. And so initially, sir, Household had issued those 10-Qs

12

Devor - direct

2488

1 and 10-Ks that we saw, the ones from -- for the period ended
2 June 30th, 1999, through the first quarter of 2002, right?
3 A. That's correct.
4 Q. Okay. And included within that was in March of 2002, the
5 company filed what we've looked at as Defendants' Exhibit 852,
6 which was the 10-K for the period ended December 31, 2001; is
7 that correct?
8 A. That's correct.
9 Q. And now in August, they come out and say we're going to do
10 this restatement; is that right?
11 A. That's correct.
12 Q. Okay. Let's pull up Plaintiffs' Demonstrative Exhibit
13 127.
14      Sir, can you explain to us what is shown in
15 Plaintiffs' Demonstrative Exhibit 127?
16 A. Yes. Well, this is the disclosure that was made within
17 the restated, the amended 10-K -- that's why it says 10-K/A --
18 in 2001 which again was filed for 2001, which was filed in
19 August of 2002 correcting the '01 one as well as other
20 periods.
21      And it's just a blowup, I think, of, you know, the
22 first couple of lines of the paragraph in the 10-K that the
23 company -- where the company described in their footnotes the
24 disclosure to the numbers, what happened with the numbers.
25 Again, remember, going back to yesterday, the footnotes

13

Devor - direct

2489

1  explain what's in the numbers.
2  Q. Okay. And, sir, is the blowup basically just a blowup of
3  the language that's in Plaintiffs' 231?
4  A. Yes.
5  Q. And could you walk us through a brief description of the
6  restatement and how -- what the company said about it.
7  A. Well, with the slide up there for one more second at
8  least. The 386, I believe, was the impact on net income for
9  all the periods restated. And the company restated, I
10  believe, back to 1994. So they restated the earnings from '94
11  to the first or second quarter of 2002.
12      The restatement related to -- just briefly, to the
13  company's contracts that it had entered into relating to
14  credit card arrangements with four entities, General Motors,
15  the AFL-CIO, something called UP, a company called UP, as well
16  as a marketing company called Kessler.
17      And it basically in its most basic form related to,
18  for the most part, expenses that were, for the most part, not
19  being written off over a shorter -- short enough period of
20  time which, of course, had the impact of overstating income
21  and in one case actually booking revenue that should not have
22  been booked.
23      So in a nutshell, that's what it was. All four of
24  them -- all four contracts, the accounting for it, overstated
25  net income for all those periods.

14

Devor - direct

2490

1  Q. Okay. Now, sir, you said that for that entire period, I
2  think you said '94 through sometime in 2002, they restated 386
3  million of net income; is that right?
4  A. That's correct.
5  Q. Okay. And have you also prepared a demonstrative to show
6  what the effect was on the relevant time periods that we're
7  talking about from 1999 through 2002?
8  A. Yes, which of course was my focus. I have.
9  Q. Okay. And I'd ask to pull up what's been marked as
10  Plaintiffs' Demonstrative 128.
11      All right. Can you walk us through what's been
12  marked as Plaintiff's Demonstrative 128?
13  A. Yes. The -- I mean, this demonstrative is just put
14  together to show what the company's reported historical net
15  income was for '99 through '02.
16      And the restated net income is what it was changed to
17  in that 10-K/A that we -- you know, that we referred to
18  before -- that I referred to before. And the difference
19  between those two columns is the impact on net income, and
20  we've expressed it as -- or I've expressed it as percentage of
21  reported net income. And you can see it goes from -- you
22  know, from 1 percent at the end to as high as 6 percent in
23  different periods.
24  Q. All right. Sir, I hate to do this, but just so it's in
25  the record, in other words, for year-end 1999, the company in

15

Devor - direct

2491

1  its 10-K reported 1 billion 486 million in net income; is that
2  correct?
3  A. That is correct.
4  Q. That's what they put in originally back at the end of '99
5  in their Q -- K that they would have filed in the beginning of
6  2000; is that right?
7  A. That is correct.
8  Q. Okay. And at this point in time in August of 2002, they
9  say, we have to change our accounting and the number that we
10  should have reported at that time was 1.428 million; is that
11  right?
12  A. That's correct.
13  Q. Okay. And then that -- what you did is just try to figure
14  out how much of it was overstated, and that's the difference
15  between the 1486 and the 1428 and that's 4.1 percent of their
16  net income; is that right?
17  A. That's correct.
18  Q. Okay. And then walking through these columns, sir, they
19  reported 372 million in the first quarter of 2000 and they
20  should have reported 351; is that right?
21  A. That's correct.
22  Q. And that's 6.1 percent overstated; is that right?
23  A. That's correct.
24  Q. Similarly, in the second quarter of 2000, they reported
25  383.9 million, and they should have reported 368.3 million; is

16

Devor - direct

2492

1  that right?
2  A. That's right.
3  Q. And that's an overstatement of 4.2 percent; is that
4  correct?
5  A. That's correct.
6  Q. The third quarter of 2000, they reported 451 million, they
7  should have reported 434; is that right?
8  A. That's correct.
9  Q. And that's an overstatement of 3.8 percent?
10  A. That's right.
11  Q. The same thing in the fourth quarter of 2000, 492 reported
12  versus 476 restated; is that right?
13  A. That's correct.
14  Q. And that's 3.5 percent, correct?
15  A. That's right.
16  Q. Okay. And then looking through the four quarters of 2001,
17  in the first quarter they reported 431 in net income; it
18  should have said 405, right?
19  A. That's right.
20  Q. And that's 6.5 percent; is that correct?
21  A. That's right.
22  Q. Q2, 2001, we have 439 versus 423.3, and that's an
23  overstatement of 3.7 percent; is that right?
24  A. That is right.
25  Q. Q3, 2001, 503 versus 485.6; is that correct?

17

Devor - direct

2493

1  A.  That's right.
2  Q.  And that's 3.8 percent?
3  A.  That's right.
4  Q.  Then Q4, 2001, we have 548.9, and they should have
5  reported and did report restated in August 2002, 533 million;
6  is that right?
7  A.  That's right.
8  Q.  And it's 2.9 percent; is that correct?
9  A.  That's correct.
10  Q.  First quarter 2002, they originally had reported in their
11  Q 511 in net income, and in their restatement they say the
12  number should have been 491; is that right?
13  A.  That's right.
14  Q.  And that's 4.1 percent; is that right?
15  A.  That's right.
16  Q.  Second quarter of 2002, 513 million versus 507 million; is
17  that right?
18  A.  That's right.
19  Q.  And that was 1.2 percent; is that right?
20  A.  That is right.
21  Q.  Can you just explain to us what exactly is a restatement?
22  A.  A restatement is when a company realizes there's something
23  wrong with financial statements that are on the street, so to
24  say, and there's something materially wrong.  And, of course,
25  under -- you know, to not mislead any users of those financial

18

Devor - direct

2494

1  statements anymore, they need to pull them back and put out
2  the new numbers.  That's what a misstatement is.
3         It's a -- a restatement, rather.  It has to be
4  material and it's an admission that it was wrong.  You can't
5  restate for a change in estimate later on.  I mean, if you do
6  change your estimate to a better estimate, that's something
7  that gets recorded currently, prospectively, as opposed to
8  going back.
9         Basically the only time you restate is for
10  companies -- is when you know your numbers are materially
11  wrong.  So it's an admission that the numbers were wrong and
12  materially wrong.
13  Q.  Is a restatement a common event?
14  A.  It is not a common event.  I mean, it occurs occasionally.
15  But as you can imagine, you know, the -- you can imagine how
16  troubling it is for a company to restate, I mean, to go to
17  whoever the users are and say, hey, you know those financial
18  statements I gave you, they're wrong, I need them back, I'll
19  give you new ones.  So it's not done very commonly.
20  Q.  When a company restates, whose decision is it to restate?
21  A.  It's, you know, I believe -- by the way, just to finish
22  that last question, I think back in 2000, there was some kind
23  of study as I recall.  And in 2000, something like 2 percent
24  or so of all public companies and all filings had actually
25  restated, which means 98 percent did not.  I'm sorry.

19

Devor - direct

2495

1  Q.  Okay.  And whose decision is it to restate ultimately?
2  A.  Well, it has to be the company's.  Remember, as we said
3  yesterday, these financial statements belong to the company.
4  They don't belong to the auditors.  They don't belong to
5  anybody else.  They're the company's.
6         And remember, the company's management signs off on
7  those financial statements; and if the company restates, it's
8  the company's -- it's the company's place to do it.  They're
9  the only ones that can restate.
10  Q.  Okay.  And, sir, did you perform an analysis, look at the
11  underlying documents and materials produced in this litigation
12  and independently conclude as to whether the company should
13  have restated?
14  A.  Yes.  You know, this was vetted extensively by KPMG in the
15  2002 time frame.  And I read everything they did.  I looked at
16  the documents they referred to that were in the record.  I
17  read deposition testimony.
18         I also looked at the original accounting, read memos
19  and read the testimony that related to the original decisions
20  to record these transactions.  I looked at Arthur Andersen,
21  who was the predecessor auditor at the time.  I looked at
22  their testimony and whatever documents we had.  I looked at
23  the contracts.  And, you know, I reached my own conclusion.
24  Q.  Okay.  And did you agree with the company's decision that
25  it needed to restate these financial statements?

20

Devor - direct

2496

1  A.  I did.
2  Q.  Now, sir, I'd just like to conclude briefly with a sort of
3  summary of your opinions.  And I'd ask that we pull up
4  Plaintiffs' 126.
5         Sir, do you have that there on the screen?
6  A.  I do.
7  Q.  So, sir, you -- your first conclusion that you testified
8  to, could you just remind us of that, that we talked about
9  yesterday briefly?
10  A.  Yes.  That is Household failed to disclose required
11  information about improper lending practices.  And, again,
12  this goes to the fact that the 10-Ks and 10-Qs were false and
13  misleading because the information in there did not contain
14  disclosures that were in accordance with those GAAP
15  requirements that I indicated in footnote disclosure, as well
16  as the SEC MD&A disclosure requirements, management's
17  discussion and analysis with respect to significantly -- a
18  significant amount of revenue -- the company earning a
19  significant amount of revenue relating to the improper lending
20  practices, assuming that they are considered -- I was asked to
21  assume that those lending practices were considered improper.
22  Q.  Okay.  And, sir, I'd like to go back to one demonstrative
23  that we looked at yesterday.  It's Plaintiffs' Demonstrative
24  40.  If we can pull that up briefly.
25         Sir, this was -- you explained it to the jury -- a

45

Devor - cross

2521

1  Q. That's your opinion, correct?
2  A. It is my opinion, KPMG's opinion --
3      MS. BUCKLEY:  Move to strike, your Honor.
4  BY THE WITNESS:
5  A. And it's also the company's opinion.
6      THE COURT:  You can just answer her question
7  directly.
8      THE WITNESS:  Okay.
9  BY MS. BUCKLEY:
10 Q. When Household originally accounted -- chose an accounting
11 treatment for this contract -- strike that.
12     Arthur Andersen disagrees with your opinion, correct?
13 A. I think Mr. Mizialko actually in his testimony and some of
14 the things I've read, I don't know that he disagrees.  I
15 thought he actually -- I think at some point, he may have
16 agreed with that.
17 Q. Are you under the impression Mr. Mizialko works for Arthur
18 Andersen now?
19 A. No, but I believe he did work for Mr. -- for Arthur
20 Andersen.
21 Q. Do you now understand that Arthur Andersen disagree --
22 Arthur Andersen's opinion issued at Household when the
23 contract was initially entered into is not consistent with
24 yours?  That's just what I'm trying to find out.  You disagree
25 with Arthur Andersen, correct?

46

Devor - cross

2522

1  A. Arthur Andersen allowed that accounting, so I would say
2  the -- you know, from an auditor's standpoint, they agreed to
3  issue a clean opinion.  Whether they agreed with me or and I
4  agree with me, I guess sort of goes to state of mind.  I don't
5  know what they thought.
6  Q. So Household was one view of how the contract should be
7  treated and Arthur Andersen agreed with it, correct?
8  A. That's not necessarily what the documents I've looked at
9  indicate.
10 Q. You don't know whether Arthur Andersen agreed with
11 Household's accounting treatment for the original contract; is
12 that right?
13 A. There's testimony and things that indicate the way this
14 was accounted for, that Arthur Andersen was not comfortable
15 with the accounting.
16 Q. You're sure about that, Mr. Devor?
17 A. I'm absolutely sure, especially where they're talking
18 about bifurcating the upfront payment and where Arthur
19 Andersen says there's no way that you can do that.
20 Q. That's your testimony?
21 A. I believe I read in memos that Arthur Andersen, you know,
22 actually went to the -- the board, the emerging issues task
23 force that put together this GAAP and asked them about would
24 you accept if the bifur-- if they actually took the upfront
25 payment and bifurcated, divided it into two parts, and I

47

Devor - cross

2523

1  believe the response was, no, you can't do that.  And that was
2  documented, I believe, in a company e-mail, but I think it
3  represented a discussion they had with Arthur Andersen.
4  Q. So what was Arthur Andersen's view -- how was Arthur
5  Andersen's view different from Household's?
6  A. You know, Arthur -- Arthur Andersen's view different from
7  Household's?  I believe, number one, they were uncomfortable
8  with the bifurcation.  Ultimately, they agreed to sign a clean
9  opinion.
10 Q. So ultimately, they agreed with Household?
11 A. Well, I -- they agreed.  I believe in my report I look
12 at -- I actually quote testimony or a document that indicates
13 they were trying to find a way for these guys to hang up on
14 their balance sheet this thing.  And they even talked about
15 different strategies so that they wouldn't have to do this.
16     So I don't know how independent or objective really
17 Arthur Andersen was back then.  I mean, there's evidence to me
18 that maybe they weren't so objective or independent.
19 Q. But you don't know sitting here today that Arthur Andersen
20 approved Household's accounting treatment for the GM contract;
21 is that what you're saying, yes or no?
22 A. Auditors don't approve a company's accounting.  They
23 either issue a clean opinion or they issue something other.
24 The accounting is the responsibility of the company and
25 management.

48

Devor - cross

2524

1  Q. Mr. Devor, sitting here today, is it your testimony that
2  Arthur Andersen did not concur with Household's original
3  accounting for the General Motors contract, yes or no?
4  A. I can only --
5  Q. Yes or no, Mr. Devor?
6  A. I can't answer that.
7      MS. BUCKLEY:  Your Honor, move to strike.
8      THE WITNESS:  I didn't even say anything.
9      THE COURT:  He's not required to answer yes or no.
10 If he can't answer yes or no, he can say so.
11 BY MS. BUCKLEY:
12 Q. You can't answer yes or no?
13 A. I cannot answer that they concurred.
14 Q. Let's turn to the AFL-CIO contract, Mr. Devor.
15 A. Sure.
16 Q. You'll agree that one of the key issues concerning the
17 AFL-CIO contract was whether the accounting provided for a
18 systematic and rational recognition of expense in premium
19 amortization over the life of the contract; is that right?
20 A. Amongst other things.
21 Q. And your view was that Household and Arthur Andersen's
22 approved accounting for the contract did not provide for
23 systematic and rational recognition; is that right?
24 A. I don't think I said anything about Arthur Andersen.  I
25 said the company's accounting was wrong.  That's what I said.

61

Devor - cross

2537

1 systematic and rational approach is one that recognizes
2 periodic expense in relationship to the average revolving
3 receivable balances in the corresponding period. Based on the
4 bank projections, the OCC determined that an amortization rate
5 of between 1.1 and 1.3 percent of average revolving balances
6 would provide this level relationship.
7      And then it goes on.
8      If you skip down to the next paragraph "when
9 considering." When -- it reads, When considering the criteria
10 of systematic and rational, the bank applied a concept that
11 mirrored the economics of an arm's length contract between two
12 independent parties.
13      And then it goes on to describe the bank, namely here
14 the Household bank's position.
15      And finally we get to the resolution of the -- or the
16 comments by the ombudsman on the point, which is in the
17 paragraph beginning "the accounting standards."
18      Do you see that?
19 A. Yes.
20 Q. The accounting standards and principles relevant to this
21 transaction are not specific. Therefore, when considering the
22 bank's and OCC's methods, I believe that there exists a
23 legitimate difference of opinion regarding a systematic and
24 rational approach to accounting for this very complex
25 transaction.

62

Devor - cross

2538

1      Do you agree with that sentence, Mr. Devor?
2 A. Let me just reread it one more time.
3 Q. Okay.
4      (Brief pause.)
5 BY THE WITNESS:
6 A. I believe that there is GAAP, which is just discussed
7 above by this -- by this ombudsman, that relates and is very
8 much on point. So I believe actually that -- I don't
9 necessarily agree. The systematic and rational expensing of
10 this asset is very clearly by FASB Con. 5. Remember,
11 this company was not amortizing this asset at all.
12 BY MS. BUCKLEY:
13 Q. So you're disagreeing with the OCC ombudsman; am I right?
14 A. I mean, my testimony is exactly as I stated. You
15 know, I didn't meet with the ombudsman, so I don't know what
16 he was considering.
17      But I will tell you that just above, if you look at
18 the second paragraph, they are very explicit in saying FASB
19 Statement of Financial Accounting Concept No. 5 requires that
20 expenses be allocated in a systematic, rational manner to the
21 period in which the related assets are expected to provide
22 benefits. This asset wasn't being amortized at all.
23 Q. So you don't think it was systematic and rational?
24 A. Leaving an asset on the balance sheet, no, I do not.
25 Q. And the OCC ombudsman thought it was, correct?

63

Devor - cross

2539

1 A. Well, wait a minute. I'm not sure it says that. Let me
2 read it again. I don't think they're saying that it is
3 systematic.
4      They're saying they believe there's a legitimate
5 difference of opinion regarding what a systematic and rational
6 approach to accounting this is. I don't agree with that.
7 Q. You don't agree that there's even a -- I want to quote him
8 correctly -- a legitimate difference of opinion?
9 A. I think, you know, if they were amortizing this asset over
10 four years instead of two years or seven years instead of five
11 years, I would say there might be a difference of opinion.
12 But they weren't amortizing this asset at all. They were
13 leaving this asset on the balance sheet and they weren't
14 amortizing it at all. You know, that, to me, is not
15 necessarily a difference of opinion. I don't agree with that.
16 Q. You don't agree with the ombudsman?
17 A. I don't, in my humble opinion.
18 Q. Do you consider him an expert in accounting?
19 A. Never met the man before.
20 Q. Wouldn't know if the OCC's ombudsman is an expert in
21 accounting?
22 A. We're talking about Mr. Golden specifically? I don't
23 know.
24 Q. All right. Let's go on, Mr. Devor, the same paragraph,
25 beginning, The accounting standards and principles relevant to

64

Devor - cross

2540

1 this transaction are not specific.
2      And then we just talked about the next sentence,
3 right, Mr. Devor?
4 A. Right, we did.
5 Q. All right. And it goes on, I clearly respect that there
6 could be different judgments made and different conclusions
7 reached on the asset valuations.
8      Do you agree with the ombudsman on that point?
9 A. That he respects it? I don't understand. He says it
10 respects it.
11 Q. That there could be different conclusions reached on the
12 asset valuations.
13 A. I agree with it except that the asset valuation isn't the
14 issue. The issue is, this is a prepaid amount that has to be
15 systematically allocated to expense over the period of
16 benefit. It can't just remain there, no matter what it's
17 worth.
18 Q. Okay.
19 A. That's -- that's the issue. I mean, agree that there can
20 be differences amongst people as to what the value of an asset
21 is; but that's not the issue. I believe it misses the issue.
22 Q. And then he goes on, the ombudsman, Mr. Devor, to say, I
23 have no reason to believe that the bank's method, particularly
24 considering the time element, was not systematic and rational.
25      Do you see that?

65

Devor - cross

2541

1   A. I do.
2   Q. Do you see it?
3   A. I do.
4   Q. Do you agree with it?
5   A. Not with respect to this piece. It was not amortized.
6   Q. All right. Fair enough.
7       And he goes on to say, Therefore, I believe that the
8   most appropriate resolution of this difference of opinion
9   rests with the SEC accounting division.
10       Do you see that?
11   A. I do see that, yes.
12   Q. By the way, Mr. Devor, do you think the accountants in the
13   SEC accounting division are experts?
14   A. I would not answer that any way different than when you
15   asked me if the people at Andersen or KPMG are experts. I
16   mean, everybody has individual talents. I've met some of the
17   most brightest people in the world from Andersen and KPMG, and
18   I've met people who I would not consider so bright from
19   Andersen and KPMG.
20   Q. Okay.
21   A. And the same goes, by the way, with the SEC.
22   Q. Okay. Let's move on to the Kessler agreement, if you
23   would. Can you tell me who the parties were -- who the
24   parties were who were involved in the Kessler transaction?
25   A. I've just got to switch gears here from AFL-CIO to

66

Devor - cross

2542

1   Kessler.
2       Kessler was -- I believe the parties, as I recall,
3   were Kessler and Household; and there may have been a third
4   party. There was. A separate company that I believe fell
5   under the Kessler umbrella. And my -- you know, so those were
6   the parties, to answer your question, as I recall.
7   Q. Do you know the names of the two Kessler entities?
8   A. Kessler one and Kessler two. I can't -- I just -- you
9   know, it's in my report. I don't remember the specific name
10   of the entity. They were both Kessler entities, as I recall.
11   Q. You call them, shorthand, Kessler one and Kessler two?
12   A. That's fine.
13   Q. I mean, that's fine with me. I'm just asking you if
14   you're comfortable with that?
15   A. It doesn't matter. Yeah.
16   Q. What were the obligations of Kessler one under the
17   contract?
18   A. Well, in general, the way the contract worked in --
19   Kessler was to do -- was -- in essence, there was some
20   marketing services that needed to be done. And, in essence,
21   Household -- one of the Kessler entities was, in essence,
22   helping to front some of those expenses by paying Household,
23   in essence, financing them.
24   Q. Which one?
25   A. I believe the second one.

67

Devor - cross

2543

1   Q. Okay.
2   A. It's set forth in my report. Overall it's not -- it's not
3   important as to which one did what.
4   Q. In your opinion?
5   A. That's correct.
6   Q. Go ahead.
7   A. But -- so what happened was, in essence, these payments --
8   because there was very little risk to Kessler of getting paid
9   back and, in essence, wasn't a sales transaction or a revenue
10   transaction to be recorded on -- on Household's books, but
11   instead was really a fronting of money by Kessler to Household
12   to cover some of these expenses early on; and then later on, a
13   payback with some return going back to Kessler. And in that
14   transaction, it was really, in essence, a financing
15   transaction. And that's what the company decided -- they
16   restated -- as well as KPMG concurred with it and so do I.
17   Q. Well, that wasn't the company's original accounting
18   treatment for the Kessler transaction, was it?
19   A. No, they recorded those payments that I just described as
20   revenue as opposed to just advances going back and forth.
21   Q. And Arthur Andersen's position was that Household's
22   accounting treatment was correct; is that right?
23   A. To be honest with you, I don't recall Andersen looking at
24   whether revenue recognition in the Kessler transaction was
25   appropriate. I believe they tested it for other issues,

68

Devor - cross

2544

1   whether the payments were appropriate and, you know, they
2   agreed to the agreement. That kind of thing. But I don't
3   think -- I think they were silent on the issue of whether the
4   revenue recognition by Kessler was actually appropriate. I
5   don't recall seeing anything where they actually touched on
6   that. I could be wrong -- and please refresh my memory with a
7   document -- but I don't believe they went to the revenue
8   recognition issue.
9   Q. So you're not entirely clear as to where AA was on this;
10   is that fair?
11   A. On "this"? What do you mean?
12   Q. Kessler.
13   A. It looks like it's an issue that Andersen missed or
14   just -- you know, flew by Andersen. It doesn't look like they
15   looked at the revenue recognition issue that ultimately
16   resulted in the company restating.
17   Q. You understand that Arthur Andersen looked at this
18   transaction at the time; do you not?
19   A. Vague recollection, yes.
20   Q. And you understand that Arthur Andersen approved
21   Household's accounting treatment for this contract at the
22   time, correct?
23   A. Again, I don't specifically recall that they did and
24   looked at the revenue recognition issue. I don't recall them
25   overtly doing that.

69

Devor - cross
2545

1  Q. Do you recall what KPMG's position was when they reviewed
2  this contract?
3  A. I believe KPMG's position ultimately was that --
4  consistent with what I said -- was that these payments going
5  back and forth are nothing really more than advances, upfront
6  advances, to help finance the costs that Household has to
7  incur on the contract. And then Household's payments back are
8  merely repayment, in essence, of those, with some rate of
9  return, as I recall.
10 Q. One more question on Kessler, Mr. Devor. You understand
11 that this was a contract to encourage the development of
12 credit card relationships; is that right?
13 A. I believe so, yes.
14 Q. Now -- and it was designed to market and service private
15 label credit cards, sort of like the GM card; isn't that
16 right?
17 A. I don't understand the question.
18 Q. And if the parties, namely Kessler and Household, decided
19 to pursue a credit card marketing agreement, do you know who
20 the risk of loss would land on if the effort was unsuccessful?
21 A. I don't understand the question.
22 Q. All right. Did you examine whether or not Kessler or
23 Household bore the risk of loss if a particular credit card
24 marketing project went bust?
25 A. What I recall was that based on the way the deal was

70

Devor - cross
2546

1  structured, Kessler had very little, in the overall
2  transaction, risk of loss. The payments back to Kessler were
3  based on a bare minimum of signups, I guess they were, for
4  credit cards. And it was, as I recall from my report,
5  something like -- the bare minimum was something like
6  one-third or something of what Household ended up every year
7  entering into. And as a result of that, there was very little
8  risk. I mean, the benchmark was set so low that Kessler had
9  almost no risk in the deal and was getting a return. So
10 appropriately, that's not a sale. That's a financing
11 transaction.
12 Q. In your opinion, right?
13 A. And the company's and KPMG's.
14 Q. No, sir. We've already established that Household's
15 initial treatment of the Kessler contract was different from
16 what you recommend; isn't that right?
17 A. The initial contract accounting was different but was
18 ultimately restated by the company, which is an admission that
19 it was wrong.
20 Q. In your opinion, correct?
21 A. And the company's when they restate.
22 Q. In your opinion, correct?
23 A. As I said, in my opinion and the company's and KPMG's.
24 Q. All of this is your opinion, isn't it, Mr. Devor?
25 A. If you're asking if I concur with that opinion, the answer

71

Devor - cross
2547

1  is yes.
2  Q. No, that wasn't my question.
3      All of what we're hearing from you yesterday and
4  today is your opinion, isn't it, Mr. Devor?
5  A. As opposed to what? I mean, I don't understand the
6  question.
7  Q. As opposed to facts, Mr. Devor.
8  A. I think my opinion is based on reviewing the facts.
9  Q. Okay. But --
10 A. That's what -- that's what experts do. They read
11 depositions of people who were there at the time. They look
12 at the accounting literature, in my case, and see what the
13 facts -- what the requirements are. They look at documents
14 that were put together at the time. And then they give their
15 opinions as to how that needs to be trans- -- how that
16 transaction needs to be accounted for, of course. Of course
17 it's my opinion. It's my best opinion.
18 Q. Thank you.
19     All right. Moving on to the issue of re-aging.
20 A. Okay.
21 Q. We've already established that you're not an expert in how
22 to re-age, right?
23 A. Again, if I understand how you're using that --
24 Q. Do you want me to play the clip again, Mr. Devor?
25 A. I mean, if you would like to, that's your call. But I

72

Devor - cross
2548

1  think I understand what you're asking. The answer is, what
2  accounts to re-age, to make the decision to re-age, if that's
3  what your question includes, which is the follow-up question I
4  gave on that tape, my answer is, I am not an expert in making
5  those decisions. I am an expert in accounting for the
6  ramifications of those decisions, I would say.
7  Q. All right. And you agree, Mr. Devor, do you not, that
8  re-aging is a common practice in the banking and lending
9  industries?
10 A. I have read in the record in this case, it certainly
11 references to -- that other banks do the -- they also re-age.
12 Maybe not to the same extent or using the same
13 inconsistencies, but my understanding is that they also
14 re-age, other companies re-age too.
15 Q. Banks re-age, don't they?
16 A. I believe they do. I've seen reference to that. I
17 haven't studied other banks, but my focus has been on
18 Household, but --
19 Q. And you understand that banks have different standards
20 that apply to them when they re-age, don't you?
21 A. They may very well have regulatory standards.
22 Q. That's my question. You do understand that they do have
23 different standards, don't you?
24 A. They may.
25 Q. Do you know one way or the other?

73

Devor - cross
2549

1  A.  Well, I know banks are regulated.  And I know there may be
2  standards that relate specifically to re-aging.
3  Q.  So they do?  Or you don't know?  Just tell me.
4  A.  Well, I am not -- wait a minute.  I am not -- first of
5  all, I'm not a regulatory expert.  Okay.  I'm an accounting
6  expert.  It certainly sounds reasonable that banks would
7  have -- that regulatory authority for banks would, in fact,
8  have rules and requirements regarding this.  So it's certainly
9  logical.  But if you're asking -- I mean, I'm an accounting
10  expert.  I don't know why you would ask me that question,
11  but --
12  Q.  So it's logical that banks might have different
13  regulations, but you don't know because you're an accounting
14  expert, correct?
15  A.  It's very logical.  I don't know for sure, but I would
16  think that they do.
17  Q.  Okay.  And you agree that re-aging is sometimes a very all
18  right practice, don't you?
19      You agree that re-aging is an all right practice,
20  don't you?
21  A.  I don't understand the question.  It's an all right
22  practice?  I don't know what that means.
23  Q.  Do you agree that re-aging is all right?  It's all right
24  to do it?
25  A.  It's okay to do it as long as it's not something that's

74

Devor - cross
2550

1  meant to mislead the public or to manage numbers that you're
2  trying to report to the public.
3      Also, my opinion doesn't go to whether re-aging is
4  good or bad or -- inherently.  My opinion goes to disclosing
5  how much and how inconsistent the re-aging was.  I don't have
6  an opinion on whether re-aging was good or bad.  I mean, there
7  may be very good business reasons, as we said yesterday, why
8  companies would re-age and give their customers a break and
9  give them time, you know, to get their -- to cure whatever
10  problem it is that has caused them to go delinquent.  But
11  that's not inconsistent with disclosing to the public when you
12  publish statistics, like two-plus statistics, to indicate to
13  the public what you did.
14  Q.  So you have no quarrel with re-aging as a practice
15  generally; is that right?
16  A.  I have a quarrel with how it was disclosed --
17  Q.  You have --
18  A.  -- and accounted for in that chart.
19  Q.  You have no quarrel with the practice of re-aging
20  generally, correct?
21  A.  I have -- I have a quarrel with the way -- I don't know
22  what you mean by generally.  What is -- I don't --
23  Q.  Do you have any quarrel with the practice of re-aging per
24  se, Mr. Devor?  Does that make it easier for you?
25  A.  I have a quarrel with not disclosing it or --

75

Devor - cross
2551

1  Q.  But you've testified to that three times.
2  A.  Or using that to manipulate delinquency statistics.  I
3  have a big problem with that.  I think it violates the
4  securities --
5      MS. BUCKLEY:  Motion to strike, your Honor.
6      THE COURT:  That will be stricken.  I think he's
7  answered the question as best he can answer.  Time to move on.
8      MS. BUCKLEY:  Okay, your Honor.
9  BY MS. BUCKLEY:
10  Q.  And you just said you understand that re-aging can have a
11  benefit to the customer, don't you?
12  A.  It hypothetically can.
13  Q.  Hypothetically?
14  A.  Sure.
15  Q.  You haven't seen in your travels through all the documents
16  in this case that re-aging can benefit a customer?
17  A.  Household made millions and millions of millions of
18  loans.  I'm sure some of the re-aging did benefit a customer.
19  And, again, I don't quarrel with the re-aging necessarily at
20  all.  I quarrel with the disclosure -- with the lack of
21  disclosure with respect to re-aging and ultimately a
22  disclosure that was made late that was, in fact, false and
23  misleading.
24  Q.  Yes.  Well, you've told us that, haven't you, Mr. Devor?
25  But that wasn't my question, was it?

76

Devor - cross
2552

1  A.  You asked me if I had a problem with re-aging.  You keep
2  asking me that.
3  Q.  Let's start over again.  Maybe you didn't hear me.
4      I asked you whether in your travels through the
5  documents you had ever come across evidence that re-aging
6  assisted customers, yes or no?
7  A.  I haven't seen a specific instance of that; but I am sure
8  in a company as big as Household, given how many re-ages were
9  done, that some of them actually helped customers or even were
10  intended to help customers.  I'm sure that's the case.  I
11  would be shocked if it wasn't the case, given how big
12  Household was.
13  Q.  Mr. Devor, you testified that you believed that you had
14  found evidence that Household used re-aging practices to
15  manipulate its delinquency numbers, right?  That's kind of the
16  gist of what you said yesterday, right?
17  A.  I believe the documents -- I believe -- I believe that
18  does accurately summarize.
19  Q.  Okay.  Are you -- and you are familiar with the KPMG
20  benchmarking study; are you not?
21  A.  I am.
22  Q.  And you put it in -- I think we discussed it yesterday,
23  didn't we?  Did you discuss it yesterday?
24  A.  I believe it came up briefly, yes.
25  Q.  Okay.  I'm going to hand you what I think is in evidence

85

Devor - cross
2561

1  correct?
2  A.  When you say I don't understand, I don't know specifically
3  what the requirements are.  I mean, I would understand what
4  they are, the substance of them.  But I don't know exactly
5  what they are in terms of they require these aspects of a
6  customer before you re-age.  You know, I don't know what those
7  require.
8  Q.  That's fair enough.  You just don't know what those
9  requirements are, right?
10  A.  That's correct.
11  Q.  And you know as to Household, they're not governed by any
12  such requirements, correct?
13  A.  That's correct.
14  Q.  All right.
15  A.  I believe though this was referring though for the most
16  part to the consumer lending business, but not the banking
17  part.  As I recall, these documents -- I thought they were for
18  the most part referring not to the banking business of
19  Household but to the consumer lending arm of --
20  Q.  Mr. Devor, Household isn't the bank.  Wells Fargo is the
21  bank.
22  A.  No, I understand that.
23  Q.  I don't understand what you just said.
24  A.  What I'm saying is Wells Fargo would have known in looking
25  at Household that the consumer lending policies that they had

86

Devor - cross
2562

1  wouldn't -- of course, they would not have to follow banking
2  standards; but this doesn't say that.  This -- this doesn't
3  say, hey, because of the banking requirements that we have,
4  our regulatory requirements, there's this latent bubble.  It
5  just talks about the fact that there's this bubble of latent
6  credit losses.  It doesn't attribute it to our accounting is
7  different because we're a bank and Household's different
8  because they're not.  You know, that does not -- and, in fact,
9  I think it went to GAAP when it said it's hard to imagine
10  they're not doing this stuff -- I'm paraphrasing the document
11  we had.  It's hard to imagine they're not doing this stuff for
12  reasons other than deferring losses and managing earnings,
13  something like that.  I can't remember exactly what it said.
14  We looked at it this morning.
15  Q.  But you understand that if Wells Fargo acquired Household,
16  that Household would have to comply with FFIEC because it was
17  being acquired by a bank, no?
18  A.  Yes, but -- I do understand that.
19  Q.  Okay.  Let's see document No. 1351, which was discussed by
20  Mr. Devor earlier today.  And let's go to Bates number 228.
21        There's a chart on the bottom that says, Ongoing
22  impact of complying with FFIEC as illustrated below.
23        Do you see that that, Mr. Devor?
24  A.  Yes, I do.
25  Q.  Do you understand what that chart means?

87

Devor - cross
2563

1  A.  Give me a second to study it.
2        (Brief pause.)
3  BY THE WITNESS:
4  A.  It's somehow charting, you know, the impact going forward
5  of complying with FFIEC requirements.
6  BY MS. BUCKLEY:
7  Q.  Okay.  You think it was important in commenting on the --
8  due diligence of Wells Fargo into Household for you
9  to -- strike that.
10        You think it was important to note, Mr. Devor, that
11  we had this FFIEC issue vis-a-vis Wells Fargo and Household?
12  A.  I wasn't referring before in these documents to the fact
13  that they needed this to meet regulatory requirements.  I
14  know, for instance, that Wells Fargo said that they needed to
15  take a $600 million hit in the consumer lending division,
16  which was not to comply with regulatory requirements.  That
17  was GAAP.
18  Q.  You don't understand that when -- if Household had been
19  acquired by Wells Fargo, that certain costs would have been
20  incurred for Household to be FFIEC compliant as Wells Fargo --
21  because Wells Fargo was a bank?
22        You don't understand that?
23  A.  I do understand that, but I guess what I'm trying to say
24  is a bad loan is a bad loan.  Under GAAP, you have to record
25  the charge also, not just for regulatory.

88

Devor - cross
2564

1  Q.  You don't think it was important when presenting the issue
2  of Wells Fargo acquisition that the -- your opinion also
3  include the notion that there was a different regulatory
4  environment?
5  A.  I was not commenting on the need to book anything that the
6  company had with respect to -- first of all, I wasn't talking
7  about reserves.  I was talking about the fact that their
8  re-aging was so significant and aggressive, which I think they
9  say.  And, secondly, I wasn't taking issue with the regulatory
10  requirements.  So why would I comment on it?  I wasn't at all
11  taking issue with that.
12  Q.  You just mentioned reserves, Mr. Devor.  You'll agree,
13  will you not, that Household's loan loss reserves were not
14  inadequate during this period, correct?
15  A.  I would not -- I would not agree with that statement.  I
16  would not agree with that statement at all.
17  Q.  You don't agree that Household's loan loss reserves were
18  not inadequate during the relevant period?
19  A.  I believe I concluded in my report that the method that
20  the company used to estimate its reserves, to come up with its
21  reserve number, was unreliable.  And, furthermore, there were
22  significant indications in the record that it was also
23  understated.  So when you asked me if I would agree that it
24  was fine, of course, I wouldn't agree that it's fine.
25  Q.  You have not offered an opinion in this case that

89

Devor - cross

2565

1   Household's loan loss reserves are inadequate, have you?
2   A.  I just gave my opinion.  The answer is no, I have not
3   given that opinion.  Instead I've said it's unreliable the way
4   they did, and there are indications that it is understated.  I
5   can't quantify it because I don't have enough information.
6   Q.  As a matter of fact, you told us, didn't you, Mr. Devor,
7   that the issue of Household's loan loss reserves was way
8   beyond the scope of your retention in this case, right?
9   A.  I -- if you're referring to deposition testimony, you
10  know, it was a year and a half ago.  I don't remember if I
11  said that or not.
12  Q.  Was --
13  A.  Again, the focus of my attention was on the reporting of
14  the two-plus delinquency numbers, the improper lending and the
15  revenue issues with respect to that and the restatement.
16  Those are my opinions.
17  Q.  I understand your opinions, Mr. Devor.  I'm asking if the
18  issue of the adequacy of Household's loan loss reserves was
19  way beyond the scope of your engagement in this case, yes or
20  no?
21  A.  I don't -- I mean, I would think you would not mislead the
22  Court by saying that I said that without me saying it.  So I'm
23  sure if I looked at my testimony, I may have said it.  But,
24  again, it doesn't --
25  Q.  Is it true or false, Mr. Devor?

90

Devor - cross

2566

1   A.  Well, it doesn't -- it doesn't enter into any of my
2   conclusions.  We looked at it.  And in my report, it is very
3   apparent that we looked at it.  And it was part of the scope
4   because we comment on it for pages and pages in my report.  I
5   commented on it.
6   Q.  Was the adequacy of Household's loan loss reserves way
7   beyond the scope of your report, yes or no, please?
8        MR. DOWD:  Objection, your Honor, asked and answered.
9        THE COURT:  Overruled.  You can answer that yes or
10  no.
11  BY THE WITNESS:
12  A.  The answer is, it wasn't beyond the scope because I didn't
13  look at it.  And I -- and I actually gave conclusions in my
14  report on it.  In the end, did it impact my decisions and
15  conclusions surrounding those three items that I indicated
16  were my conclusions?  The answer is, it didn't have any impact
17  on those.
18  BY MS. BUCKLEY:
19  Q.  Let's play --
20  A.  I --
21  Q.  I'm sorry.  I thought you were finished.
22  A.  So, I mean, obviously if you look at my report, my report
23  indicates that, of course, I looked at it.  You know, whether
24  it was within the scope or not, it ended up -- I ended up
25  looking at it, of course.  I opined -- I have a lot of

91

Devor - cross

2567

1   deposition testimony where I talked about it.  And,
2   furthermore, as I said before, it's not part of my ultimate
3   opinions other than what I just indicated to you, which is, I
4   believe, contained in my report.
5        MS. BUCKLEY:  Can we play Devor deposition 283, Line
6   6 to 13, please.
7   (Whereupon said tape was played in open court.)
8   BY MS. BUCKLEY:
9   Q.  Way beyond the scope of my engagement, right?
10  A.  To compute whether or not the reserves were inadequate.
11  But my -- that answer is exactly what I just said.
12  Q.  Well, we'll let the jury decide that, Mr. Devor.
13  A.  Okay.
14  Q.  Your first opinion, which you offered yesterday, was on
15  the issue of predatory lending.
16       Do you remember that?
17  A.  Yes.
18  Q.  And yesterday Mr. Dowd asked you to address two issues
19  relating to predatory lending.
20       Do you remember that?
21  A.  I have no idea what the two issues are you're referring
22  to.
23  Q.  Okay.  We'll help you out.
24       Do you remember Mr. Dowd asking you about your first
25  opinion in the case, relating to Household's failure to

92

Devor - cross

2568

1   disclose certain information?
2        Do you remember that?
3   A.  I remember questions as related to that issue, yes.
4   Q.  Okay.  And Mr. Dowd said -- asked you what your first
5   opinion was.  And you said that Household failed to disclose
6   certain information that was required about improper lending
7   practices, if the company had engaged in such; is that
8   correct?
9   A.  That's my general remembrance of what I said yesterday,
10  yeah.
11  Q.  Okay.  Let's see if we can put up on the screen the
12  passage of your testimony from yesterday.  It's Page 2408,
13  Lines 4 to 2409 --
14       MR. DOWD:  Objection, your Honor.  I believe this is
15  improper impeachment.  He just agreed with --
16       MS. BUCKLEY:  I thought he didn't remember.
17       THE COURT:  No, I'll overrule the objection.
18       MS. BUCKLEY:  Thank you, your Honor.
19  You want to make that bigger, Brian.
20  BY MS. BUCKLEY:
21  Q.  Focusing on Lines 9 to 11, Mr. Devor, do you see that?
22       Maybe you can highlight that, Brian.
23       This is what --
24  A.  Yes, I read it; and I remember saying it.
25  Q.  And your opinion is that Household failed to disclose

101

2577

1    (Proceedings heard in open court:)
2         THE COURT:  I would like to raise an issue that, it
3    seems to me, we should probably address sooner rather than
4    later.
5         I think it was during -- I think it was during the
6    testimony of David Schoenholz that he was asked a series of
7    questions about what information regarding -- I will use the
8    term as a catchall -- predatory lending practices was included
9    in the 10-K disclosures.
10        And the day after that series of questions and
11   answers, the issue was raised by defense counsel -- and I
12   can't remember which counsel it was.
13        MR. SLOANE:  It was me, your Honor.
14        THE COURT:  Okay.  You're the guilty party, then, I
15   guess.
16        -- regarding the propriety of those questions.  I
17   think the objection was phrased in terms of the ruling we had
18   made with respect to this expert's testimony, if I am not
19   mistaken, regarding the revenue -- implications of the
20   statement of -- our ruling indicating that it could not be
21   argued that merely because information regarding the alleged
22   predatory lending practices wasn't included in the 10-K that
23   it could not be argued that the revenue information was
24   therefore false or misleading.
25        And unless I am mistaken -- and I am pretty sure I am

102

2578

1    not -- the consensus was that we didn't have to address the
2    issue at that time, that we could wait until this Friday, I
3    believe, during the jury instruction conference to address the
4    issue.
5         MR. SLOANE:  I think that's right, your Honor.
6         THE COURT:  Well, it seems to me the issue is now
7    here, and it's not Friday.
8         I mean, unless I am mistaken, and this witness has
9    testified that the disclosures regarding revenue were required
10   to be accompanied by explanations regarding the predatory
11   lending practices in order not to be misleading, which I think
12   is the same way as saying in order not to be false.
13        There hasn't been an objection to any of those
14   questions, either on his -- so far in his testimony.  But as I
15   read the testimony -- and I started to go back over it again
16   last night; it makes for a fun ride on the train -- it
17   occurred to me that we really have the same issue before us
18   that you had raised, which was not resolved.  It was reserved
19   until Friday.
20        And the question is, do we want to reserve that issue
21   until Friday, or do we need to resolve it now, given that we
22   are now on cross-examination of this witness, and I assume the
23   cross-examination is going to go over, because it was part of
24   his direct testimony, his assertions that the GAAP and the SEC
25   rules require disclosure of those practices in relation to the

103

2579

1    statement of revenues, which I think was pretty clearly the
2    testimony that was given.
3         MR. SLOANE:  Your Honor, let me just say one thing.
4         I think the context in which it was raised when
5    Mr. Dowd and I were arguing about Mr. Schoenholz's testimony
6    was some questions Mr. Dowd had asked.  And I think the
7    request -- the application at that time was threefold.
8         One was to not have the questions asked in that way
9    again, which I think Mr. Dowd said he wasn't going to ask them
10   that way or something like that.  Perhaps I am misstating it.
11        And the other was a curative instruction.  And your
12   Honor said, consistent with your prior rulings, since I didn't
13   object at the time, no curative instruction then, but then we
14   would take it up on Friday in the context of the bigger issue.
15        I think that was the way it developed at that point.
16        I am not disagreeing with anything your Honor is
17   saying about whether it's right --
18        THE COURT:  Assuming that's so, why was there no
19   objection to the testimony given by this witness?
20        MS. BUCKLEY:  Your Honor, it was my understanding --
21   and perhaps it was my usual lack of clarity -- that that was
22   precisely what we discussed in the sidebar before he began.
23        And then, again -- and maybe your Honor and I are not
24   on the same page as to what the issue is.
25        THE COURT:  I think the ruling at the sidebar was

104

2580

1    that -- was with regard to his ability to contrast -- or to
2    determine the magnitude of the revenues resulting from the
3    alleged predatory lending practices by comparing that number
4    to the amount of total revenues disclosed in the 10-K.
5         And my ruling then was, as it was previously, that he
6    can do that.  That goes to the question of the pervasiveness
7    and the -- if you will, the materiality of the alleged
8    wrongful predatory lending practices, but that he would not be
9    allowed to, either by the questions or by argument of any
10   sort, imply that the mere statement of the revenues, without
11   explanation, made the statement of revenues false or
12   misleading.  I mean, that's what I ruled before the trial
13   started, and that's what I said at the conference.
14        It occurs to me that late in the day yesterday those
15   were the very questions that were asked.
16        MR. DOWD:  I don't think so, your Honor.  I suspect
17   the reason there is no objections is because -- I mean, I
18   think you have to take a step back.
19        This witness, his original opinion that the Court
20   ruled on in the Daubert motions, one of his opinions was that
21   this revenue, this income, should never have been booked in
22   the first instance.
23        Now, the Court has made a determination that, under a
24   legal standard, the Court believes that's incorrect.  If you
25   ask Mr. Devor, I know what he would say.  He would say you

2581

1  have to have -- you know, you have to earn the revenue.  And
2  if it's illegal, you can't earn it.  So under GAAP, it should
3  never have been booked in the first instance.
4      That said, the Court said, legally I don't accept
5  that.  And I have never asked him a question about that.  I
6  mean, I have never said, should that revenue or net income be
7  booked in the first instance?  He hasn't testified to that,
8  and I assume that's why there is no objections because we are
9  going along then.
10      But one of the witness' other opinions from the
11  get-go in this case, that the defendants didn't challenge on
12  Daubert, was the issue of, if you are engaged in practices
13  that are generating revenue, whether you could book it or not,
14  if you know that in the future those revenues could be stopped
15  because they are illegal or improper or whatever word we want
16  to use, then you have to report.  It's a disclosure
17  obligation.  That's in his report.  The defendants didn't
18  challenge it.
19      It's different, can he say that number is wrong?
20  I never asked him that because the Court says he can't say it.
21  If I ask Mr. Devor, I know what he would say.  He would say,
22  yeah, that number is wrong.  In the 10-Ks and 10-Qs, you can't
23  book that.
24      So we have stayed completely away from that.
25      The issue is an issue of disclosure in terms of going

2582

1  forward because investors are going to consider the future
2  growth.  And if you know that there is this risk that these
3  practices are improper or illegal, that that could be lost in
4  the future, it's going to affect the growth rate.
5      So I think that's why there has been no objection.  I
6  mean, we are doing exactly what the Court said in the opinion,
7  which is that he can't say that number is wrong.  I mean, and
8  he hasn't said that.  And I don't think he has come close to
9  saying that in his testimony.
10      And the witness and I have talked about that.  He has
11  obviously read the in limine ruling as well.  He may disagree
12  from a GAAP perspective, but you are the person who decides
13  the law, so we stayed completely away from that.
14      So I think we have done what we are supposed to do.
15      THE COURT:  Okay.
16      MS. BUCKLEY:  Your Honor, it was my understanding
17  that to the extent that Mr. Devor tried to link the
18  quantification to the falsity of a 10-K or a 10-Q, he was not
19  permitted to do that.  He was not permitted to imply that the
20  number or the size of the number had any impact on the true
21  financial statements of the 10-Ks and the 10-Qs.  That's what
22  I had thought where we were and why I sought clarification
23  yesterday.
24      And I thought I understood your Honor's distinction
25  that if he wanted to quantify what he claims the amount the

2583

1  company got -- I won't use loaded words -- from the allegedly
2  predatory lending practices --
3      THE COURT:  Right.
4      MS. BUCKLEY:  -- that he was allowed to do that.
5      I think the second time I objected yesterday it was
6  when they put a demonstrative up on the screen which had the
7  quantification amounts juxtaposed against the 10-Ks, which I
8  at least had thought was not where your Honor's head was.  And
9  we did have a sidebar on that, and we proceeded.
10      That, if it is of any use to the Court, is what I
11  understood the Court's ruling to be and abided by it
12  throughout the rest of the examination.
13      MR. DOWD:  I think, your Honor -- and I apologize to
14  Ms. Buckley.  I am sure she is right.  I don't remember an
15  objection to that.  I remember an objection to the third
16  opinion slot.
17      But the demonstrative I used was a demonstrative that
18  the Court ruled on in limine and said I could use.
19      THE COURT:  I don't think that was the objection that
20  was made to it in the ruling in limine, was it?
21      MR. DOWD:  Yeah.  No.  They -- I mean, they tried to
22  tie it into this opinion, and we went through the language the
23  Court had about attributable and said I could use that one.
24      Now, I will tell you, your Honor, I had three more.
25  And because of the Court's comments the other day, I just went

2584

1  with the one to try to keep it as simple as I could.
2      THE COURT:  I don't have any problem with the
3  testimony comparing or quantifying the amount of revenue that
4  was gained from the -- his opinion as to the amount of revenue
5  that was gained from the alleged predatory lending acts.  We
6  ruled that that could be done, and I think it's perfectly
7  proper.  It's an accounting issue.  He can view the records,
8  view the books and see how they quantify this.  I don't have a
9  problem with that.
10      I do have a problem with it slipping into the
11  argument that because information as to predatory lending
12  wasn't included in the 10-K, specifically wasn't a footnote or
13  an amplification of the revenue statement, that the revenue
14  statement is misleading.
15      That's the problem with me.  And we seem to be
16  sliding into that, which would be the back end of our original
17  ruling really.
18      MR. DOWD:  Well, with all due respect, your Honor,
19  that's in his report.  There is no question about it.  I mean,
20  that was one of his opinions.  And they didn't even move on
21  that on Daubert.
22      The issue that I thought the Court had was, he cannot
23  say the numbers are false.  But he should be able to testify
24  that under GAAP and SEC rules, that if you think there is --
25  the future trends are not going to be the same.  I think under

125

Fischel - direct

2601

1  Q. Have you ever testified as an expert in cases involving
2  allegations of securities fraud?
3  A. Yes, many times.
4  Q. And have you testified on behalf of plaintiffs and
5  defendants in those type of cases, the cases involving
6  allegations of securities fraud?
7  A. Yes, I have.
8  Q. And have you testified more times for the plaintiffs or
9  for the defendants?
10  A. Far more times for defendants.
11  Q. Let me start by asking you some basic background
12  information about this case.
13      What is your understanding of who the plaintiffs are
14  in this case?
15  A. My understanding of who the plaintiffs are is all
16  purchasers of Household stock from the period beginning
17  July 30th, 1999 through October 11th, 2002.
18  Q. And what is your understanding of who these purchasers
19  are?
20  A. A wide variety of different types of entities,
21  institutional investors, retirement funds, public pension
22  funds, money managers of various types, as well as many
23  individuals.
24  Q. And were these purchasers always buying stock on their own
25  behalf?

126

Fischel - direct

2602

1  A. No. Even institutional purchases frequently are on behalf
2  of individual investors who entrust their money to
3  professional money managers who then purchase stock, but
4  purchases are on behalf of the individuals.
5  Q. Would an example be a mutual fund at Fidelity?
6  A. A mutual fund would be a perfect example.
7  Q. Now, what's your understanding of plaintiffs' allegations
8  in this case?
9  A. My understanding is that plaintiffs claim that Household
10  made inaccurate disclosures concerning its lending practices,
11  its predatory lending; as well as the way that it treated its
12  loans, the so-called reaging issue; and another accounting
13  issue relating to the proper accounting for its credit card
14  unit, which ultimately led to a restatement.
15      My understanding is that the plaintiffs claim that
16  Household's disclosures were not accurate in all three of
17  those areas.
18  Q. Now, did you make any assumptions as to whether or not the
19  defendants made false statements or disclosures during the
20  relevant period?
21  A. Yes, I did. I assumed that the defendants did make false
22  statements during the relevant period in order to perform my
23  quantifications.
24  Q. Is that a common assumption to make in estimating
25  inflation and damages in one of these cases?

127

Fischel - direct

2603

1  A. Yes. I would say it's a necessary assumption to make
2  that's always made because the job of determining whether or
3  not statements are false or misleading, that's an issue for
4  the Court and the jury. That's not an economic question.
5      So any economist who has the role of quantifying the
6  effect of inaccurate disclosures or misstatements has to begin
7  with an assumption that the Court and/or the jury would
8  conclude that there is something to quantify; namely, the
9  statements were misleading.
10  Q. Now, given that assumption, what did you do in this case?
11  A. What I did was, obviously, first familiarize myself with
12  the background of the case, looking at the allegations, the
13  pleadings, the responses, a set of legal issues that formed
14  the background of the case.
15      And then I looked at a massive amount of information,
16  documents about Household disclosures, analyst commentary
17  about those disclosures.
18      I also looked very carefully at Household's stock
19  price movements during the relevant period, the stock --
20  comparable stock price performance of competitors of
21  Household, various indexes that Household identified as the
22  way its performance should be judged against.
23      I performed a statistical analysis of stock price
24  movements relating the information that became known to
25  investors during the class period to Household's stock price.

128

Fischel - direct

2604

1  And I measured the amount of inflation on every day during the
2  relevant period using two different methods, which is a way to
3  calculate the amount of loss that any individual investor
4  suffered during the relevant period, depending on what day
5  they purchased and what day they sold.
6  Q. Based on the analysis that you described, did you form any
7  opinions in this case?
8  A. Yes. I formed the opinion that Household's disclosure
9  defects, its inaccurate disclosures, caused there to be
10  significant inflation in Household stock price for much of the
11  relevant period. And as a result, again depending on when
12  investors purchased and when they sold, investors in Household
13  stock suffered very significant losses as a result of
14  Household's defective disclosures.
15  Q. You mentioned the term stock price inflation. What did
16  you mean by that?
17  A. What I meant by that is that the stock price on any given
18  day for any company reflects the information that is known
19  about that company. And if there is a situation where a
20  company is not disclosing accurate information about itself,
21  the stock price will reflect not only the accurate information
22  about the company but also the inaccurate, or the false
23  information, about the company.
24      And what inflation is, is a measure of how much the
25  stock price has been affected by the false information that's

129

Fischel - direct

2605

1  been disclosed by a particular company.
2  Q. Can a misrepresentation and an omission both cause the
3  stock price to be inflated?
4  A. Yes. You can have -- there are two classic situations
5  where inflation can exist.
6      One situation is where a company makes a false
7  statement and the stock price rises to a level that's higher
8  than it would have been in the absence of the false statement.
9  That would be a classic misrepresentation situation.
10     There is also an equally equivalent way that
11 inflation can occur if a company discloses information but
12 fails to disclose something negative about itself that it
13 knows about but investors in the marketplace do not know
14 about. In that situation the stock is inflated because the
15 stock is prevented from falling to a lower level, which is the
16 level that the stock would have fallen to had the company
17 disclosed the additional negative information that it failed
18 to disclose. That's a traditional omission type of situation
19 causing inflation.
20 Q. In your opinion, how could the wrongdoing that the
21 plaintiffs allege in this case have caused inflation in
22 Household stock?
23 A. Well, first of all, I would say, in any situation where a
24 company does not accurately reflect its financial condition
25 and its growth prospects, that potentially could be very

130

Fischel - direct

2606

1  important for investors. And in this case, it's really no
2  exception.
3      But more specifically, in this case Household, during
4  the relevant period, was embarking on a very significant
5  growth strategy to try and grow their earnings, to try and
6  grow their revenue, to try and grow their size. That was
7  really the key component -- or one of the key components of
8  their business plan.
9      In order to convince investors that this growth plan
10 was a reason that they should pay more and more for Household
11 stock, it was necessary to communicate to investors that
12 Household could not only report increasing revenues,
13 increasing earnings, but that these increasing revenues and
14 earnings would continue into the future.
15     And if it were the case, as the plaintiffs allege in
16 this case and as many analysts and commentators concluded,
17 that those revenues could not be sustained in the long-term
18 because they were the function of improper lending practices,
19 which would cause Household to get into a lot of trouble,
20 ultimately force it to change its business practices, lower
21 its growth targets, making it a less-profitable company than
22 what investors believed at the beginning of the relevant
23 period, that could certainly lead to inflation.
24     MR. KAVALER: Objection. Move to strike and ask for
25 a sidebar.

131

Fischel - direct

2607

1      THE COURT: Why don't we take a break and have the
2  jury go back to the jury room, and then we will have the
3  sidebar out here.
4      (Jury out.)
5      THE COURT: Okay, Mr. Kavaler. Your objection.
6      MR. KAVALER: Yes, your Honor.
7      Your Honor, I move to strike the answer. In his
8  answer the witness, echoing the opening statement of the
9  plaintiffs in this case, talked about growth. And he talked
10 about growth being the cause. He used the word "cause" and he
11 used the word "growth."
12     My specific objection is, the whole concept of growth
13 is not in his expert report. If you look at his expert
14 report, in Paragraph 10 he talks about what he says the
15 allegations of the complaint are. In other words, the format
16 of the expert report is exactly the same format --
17     THE COURT: Refresh my recollection since I didn't
18 have the feed here. What was the question he was answering?
19     MR. KAVALER: Your Honor, there were a series of
20 questions. The first one was --
21     MR. BURKHOLZ: Your Honor, I have the question.
22     THE COURT: Okay.
23     MR. BURKHOLZ: "In your opinion, how could the
24 wrongdoing that the plaintiffs allege in this case have caused
25 inflation in Household stock?"

132

Fischel - direct

2608

1      MR. KAVALER: And I have two objections, your Honor.
2  One is to the word "cause" and the other is as to the word
3  "growth."
4      The objection to "growth" is, in Paragraph 10 of his
5  expert report he says -- he says what he says. It's a lengthy
6  paragraph. I'd be happy to read it to you.
7      What he doesn't mention at all is growth. The notion
8  that growth is a key fact here comes from plaintiffs' opening
9  statement. It was not disclosed by Professor Fischel in his
10 report and, therefore, not pursued by us in the depositions.
11     Secondly --
12     THE COURT: His answer was that growth was a key
13 element how? What did he say?
14     MR. BURKHOLZ: "First of all, I would say, in any
15 situation where a company does not accurately reflect" --
16     THE COURT REPORTER: I'm sorry. I can't hear you.
17     THE COURT: A little bit louder.
18     THE COURT REPORTER: You have got a microphone the
19     MR. BURKHOLZ: "First of all, I would say, in any
20 situation where a company does not accurately reflect its
21 financial condition and its growth prospects, that potentially
22 could be very important for" -- I think, its investors. "And
23 in this case, it's relevant.
24     "But more specifically in this case, Household,
25 during the relevant period, was embarking on a very

149

Fischel - direct

2625

1  S&P 500 went up by a little over 4 percent that day,
2  4.01 percent.
3      And the next column, the S&P financials index, which
4  is the index that Household itself compared itself to, that
5  went up by 3.74 percent.
6      So in the same way that I just described about the
7  stock market going down in the past year by 50 percent, going
8  up in the last month by 25 percent, you can't just look at
9  that .77 percent increase in a vacuum. You have to compare it
10 to how the overall market did and how the industry did.
11     And you see the overall market did -- let's see --
12 more than five times better than Household did on that day.
13 And the industry, looks like it did also about five times
14 better than Household on that day.
15     So if we go to the next column, the predicted return,
16 this is the -- where the statistical analysis gives you the
17 ability to say with some precision, given what happened in the
18 overall market and given what happened in the overall
19 industry, knowing how well they went up that day, how much
20 would you predict -- given Household's relationship with the
21 market and the industry -- Household would have gone up on
22 that day, August 14th?
23     And if we go to the -- it's 3.26 percent.
24     And if we go to the next column, residual return,
25 2.49 percent -- that's simply the difference between

150

Fischel - direct

2626

1  3.26 percent -- what you would predict. You would predict
2  that Household would go up by a lot. Instead it went up by
3  just a little. That's just like my example of the stock
4  market going up by 25 percent in the last month but a
5  particular stock going up by only 5 percent. 5 percent sounds
6  good, but it's not as good as what you would expect,
7  25 percent.
8      And the same thing is true for Household.
9      So applying that statistical method, you see that the
10 residual return for Household on that day is actually
11 negative, negative by a fairly large amount because Household
12 so far underperformed the market and the industry which have a
13 big influence on its performance.
14     And the next column, the residual price change, that
15 is just -- that's simply a multiplication of this
16 minus 2.49 percent times what Household's closing price was
17 the previous day, $37.80.
18     So when you look at Household stock price
19 analytically, precisely, scientifically, you see that
20 Household stock price, measured against the market and the
21 industry of which it's a part, actually declined by 94 cents
22 as opposed to the initial appearance that it looks like the
23 price went up on that day.
24     And then, if you go to the last two columns, the
25 T statistic and whether the T statistic is greater than 1.65,

151

Fischel - direct

2627

1  that is simply a measure of whether the negative performance
2  of Household on that day is sufficiently large to be
3  considered significant using this particular regression
4  analysis and event study.
5      Any time there is three stars on a particular date,
6  the conclusion is that, based on this particular event study,
7  this particular regression analysis, Household stock price
8  underperformed by a statistically significant amount on this
9  particular day.
10     And that's how an event study works, basically.
11 Q. What was the -- what is the relationship between this
12 event study and your quantification of inflation?
13 A. I used two methods of quantification. An event study is
14 basically used in both of them.
15     But with respect to the first method, what I did was,
16 I selected those disclosures which I considered to be
17 fraud-related during the relevant period where there was a
18 statistically significant price movement, where I was also
19 reasonably confident that the fraud-related disclosure on a
20 particular day was responsible for a particular statistically
21 significant price movement.
22 Q. And how many dates did you find during this period?
23 A. Using under my first method, 14 dates.
24 Q. What was the first date that you found one of these
25 events -- one of the dates that you are testifying about?

152

Fischel - direct

2628

1  A. November 15th, 2001.
2  Q. Why were these 14 dates selected?
3  A. They were selected because I wanted to isolate the
4  fraud-related disclosures that were important to investors.
5  So I had to make a series of judgments based on the event
6  study in order to do that. I had to isolate disclosures. I
7  had to determine whether those disclosures occurred at a time
8  when there was a statistically significant stock price
9  movement. And I had to be reasonably confident that the
10 fraud-related disclosure was responsible for the price
11 movement.
12 Q. And have you prepared a demonstrative that summarizes the
13 relationship between your analysis of the 14 dates and
14 inflation?
15 A. I have.
16     MR. BURKHOLZ: Can we bring up Plaintiffs'
17 Demonstrative 150.
18 BY MR. BURKHOLZ:
19 Q. Now, before we look at -- is this the demonstrative that
20 you prepared?
21 A. Yes.
22 Q. Before looking at these 14 dates, was there another set of
23 dates that you could have picked?
24 A. Yes. I believe this particular analysis focuses on
25 14 dates. I have seen an analysis by Household that

193

Fischel - direct

2669

1  as I said, those disclosures were criticized later as well.
2  Q. So is it your opinion that the investors that bought stock
3  during the relevant period up until approximately the last
4  month suffered harm, but the investors in the last month did
5  not suffer?
6  A. Correct.
7       And I wanted to be careful in excluding investors who
8  suffered no harm in this particular calculation, which is why
9  I indicate that for a certain period, the blue line is above
10  the red line.
11  Q. Okay. And did you prepare an exhibit that displays the
12  actual amount of artificial inflation on every day during the
13  relevant period?
14  A. I did. Under this method and the second method that we
15  haven't gotten to yet.
16  Q. Let me show you what we've marked as Plaintiffs' 1397.
17  What is Plaintiffs' 1397?
18  A. This is an exhibit which basically takes this graph that
19  is currently on the screen and reports for every day what the
20  actual price was of Household in the real world and what the
21  amount of inflation was in Household's stock price on every
22  day during the relevant period with the amount of inflation
23  defined as the difference between the red line, the actual
24  price, and the blue line, the uninflated true value line. And
25  you can see it's positive for the entire period until the end

194

Fischel - direct

2670

1  when it turns negative.
2       MR. BURKHOLZ: I'd like to show the jury some of
3  these dates if we can. Your Honor, can we move in 1397? I
4  don't believe there's any objection.
5       THE COURT: 1397 is admitted.
6       (Plaintiffs' Exhibit 1397 received in evidence.)
7  BY MR. BURKHOLZ:
8  Q. So why don't we just highlight August 16th, 1999.
9  A. Okay.
10  Q. Can you just describe what -- what your demonstrative --
11  what your exhibit, I'm sorry, shows for that date?
12  A. All right. On August 16th, 1999, which is, I believe, the
13  date of Household's -- when it reported its second quarter
14  results in its 10-Q filing, the closing price that day was
15  $39.75.
16       My calculations indicate that that stock price was
17  inflated by $7.97, the effect of the 14 fraud-related
18  disclosures, so that the true value on that date, what
19  investors should have paid, was $31.78.
20  Q. Okay. Can we turn to the next page? I'm sorry, and focus
21  on October 19th, 1999.
22       Now, I think that's the date of another press release
23  by Household of its quarterly results. You have inflation of
24  7.97 on that date?
25  A. Correct.

195

Fischel - direct

2671

1  Q. Would there be inflation on that date if there was no
2  finding that the August 16th, 1999 10-Q was false or
3  misleading?
4  A. No, no, that the -- well, it would depend, I guess, on
5  whether it was an earlier disclosure that was found to be
6  false and misleading. It's hard to separate one from the
7  other.
8       But so long as there is a disclosure that Household
9  made that was false and misleading because it did not provide
10  accurate information about its predatory lending practices,
11  its re-aging policies, its credit card accounting, the ability
12  to sustain its growth strategy in the future, the inflation
13  would be this particular amount based on my calculations.
14  Q. Okay. Now, in your opinion, the $7.97 of inflation that
15  you calculated, does that capture, in your opinion, the amount
16  of inflation that was in Household's stock price?
17  A. No.
18  Q. And why not?
19  A. Because what I did was I focused on individual
20  disclosures, but that's in some sense not a completely
21  realistic analysis because it's not as if there was only 14
22  disclosures during the relevant period.
23       There was a cascade of negative information that came
24  out about Household, particularly after negative --
25  particularly after November 15th, 2001, when market

196

Fischel - direct

2672

1  participants, investors, analysts became to increasingly doubt
2  Household's denials and started to really question whether or
3  not Household's disclosures were accurate, whether its
4  accounting was accurate, whether its lending practices were
5  consistent with governing regulations.
6       There was, as we get a little bit later in the
7  period, tremendous amount of leakage of information about the
8  Washington Department of Financial Institutions report, about
9  the possibility of a settlement, about the need for Household
10  to reform its sales practices and the possible effect that
11  would have on Household's profitability, and I believe that
12  cascade of negative information had an effect, a negative
13  effect, on Household's stock price in addition to the effect
14  of the 14 disclosures that I originally quantified that we
15  just went through.
16  Q. Do you have the Bellingham Herald article, that
17  Exhibit 1429?
18  A. Probably better if you give me another copy of it because
19  I have so many documents. I could search for it, but if you
20  have another copy, that would be better.
21       What's the date of it?
22  Q. I have a copy.
23  A. Thank you.
24       I have it.
25  Q. Okay. Is this an example of the type of leakage that you

197

Fischel - direct

2673

1  were talking about?
2  A.  Yes.  In fact, the article discusses the very leakage that
3  I just described.
4  Q.  Okay.  And what in the article is significant to your
5  opinion regarding leakage?
6  A.  Well, if we just highlight the first half of the page on
7  the first page of the article.  The first paragraph talks
8  about the Washington report, the state investigative report on
9  Household.
10  It talks about how it's been suppressed by --
11  for three months as a result of a court order that Household
12  obtained; then describes, because the article's been now
13  leaked, a -- what the article refers to as a blistering
14  assessment of Household's loan practices in Washington and
15  elsewhere in the state.
16  And then it goes on to talk about what the report
17  accuses the company of, misrepresentations and dishonest
18  statements, failure to provide customers with accurate
19  disclosures, coaxing borrowers into signing without reading
20  the documents that they're signing, talking borrowers into
21  refinancing at disadvantageous interest rates based on
22  misleading them, adding costly insurance premiums.
23  But then the next paragraph is really what is
24  supportive of what I said a minute ago.  It talks about how
25  Household's attorneys went to court to obtain a restraining

198

Fischel - direct

2674

1  order blocking release of the report; but in recent weeks,
2  copies of the report have been leaked to every news
3  organization that has followed the HFC story, including the
4  New York Times, Forbes Magazine, American Banker Magazine,
5  the Bellingham Herald.
6  And the point is that my 14 specific disclosures
7  don't pick up all this leakage going on behind the scenes to
8  all of these news organizations about the consequences to
9  Household of this report.
10  And, again, the same is true with respect to rumors
11  about the settlement, about rumors about the effect of sales
12  practice reform on Household's profitability and its growth
13  strategy, and that's why I think that my first quantification
14  doesn't fully capture the inflation in Household's stock
15  price.
16  Q.  Okay.  Before we get a little further into leakage and
17  your leakage analysis, did you prepare a demonstrative that
18  compared how Household's stock price went down from your first
19  date, November 15, 2001, until the end of the relevant period,
20  October 11, 2002, to the inflation that you found, the $7.97?
21  A.  I did.
22  MR. BURKHOLZ:  Okay.  Can we look at -- bring up 152,
23  please.
24  BY MR. BURKHOLZ:
25  Q.  Is this a demonstrative that you prepared?

199

Fischel - direct

2675

1  A.  Yes.
2  Q.  And can you explain the demonstrative to the jury?
3  A.  Yes.  This is a comparison of Household's stock price
4  decline from November 15th, 2001, my first fraud-related
5  disclosure, the date of the California Department of
6  Corporations suit, to October 11th, 2002, when the settlement
7  and the reform of sales practices is announced, and the red
8  bar is the amount of the decline in Household's stock price.
9  $32.70 was the decline from I think it's, you know, somewhere
10  around 60 to somewhere in the 20s, but the exact amount of the
11  decline is $32.70.
12  And I compare that with the amount of inflation that
13  I calculated based on my 14 specific disclosures, which is the
14  blue bar, $7.97, and obviously $7.97 is a much smaller number
15  than $32.70.  So in my first method of the decline in price of
16  $32.70, only $7.97 of that $32.70 decline I attribute to
17  improper inflation, and the rest is attributable to other
18  factors under this first method.
19  So you can see the vast majority of the stock price
20  decline I do not count as inflation under my first method.
21  Q.  And it's your opinion that the $7.97 is -- doesn't fully
22  capture the inflation that was in Household's stock price
23  before this time period?
24  A.  Correct.  It captures the 14 specific disclosures, but it
25  doesn't capture the pervasive leakage of all of the

200

Fischel - direct

2676

1  accusations and the findings in the Washington report,
2  consumer groups, the possibility of more regulatory
3  investigations, the effect on Household's -- rumors about the
4  effect on Household's lower profitability as a result of
5  reform of its sales practices, any analysis of specific
6  disclosures in a situation where there's so much leakage, the
7  specific disclosures can't fully capture all of the decline
8  that's attributable to fraud-related information.
9  Q.  And did you prepare -- compare Household's stock price
10  decline during this period we're looking at to what it
11  identified as its peer group?
12  A.  I did.
13  MR. BURKHOLZ:  Okay.  And can we look at -- bring up
14  demonstrative 136, please?
15  Let's highlight that.
16  BY MR. BURKHOLZ:
17  Q.  Is this a demonstrative that you prepared?
18  A.  Yes.
19  Q.  Can you explain it to the jury?
20  A.  Yeah.
21  Again, this is very important because, as I indicated
22  earlier, you can't really analyze a stock price in the
23  abstract.  You have to know how it compares to how the market
24  did and how the industry that it's a part of did.
25  And what I did was I looked at Household's

201

Fischel - direct

2677

1    disclosures to see what benchmark Household itself identified
2    as the market index and the industry index that its
3    performance should be compared against.
4        And Household identified the Standard & Poor's
5    Financial Index and the Standard & Poor's 500 Index, a much
6    broader index of the overall market.
7        So during this period when Household declined by
8    $32.70, I wanted to compare how Household performed versus th
9    indexes that Household itself said it should be compared
10   against, and this is what this graph indicates.
11       First of all, the full red bar is Household's
12   performance during this period.  The $32.70 decline translate
13   into a decline of 53 percent in Household's stock price during
14   this period.
15       But, again, I wanted to see how that compared with
16   the market and the industry to be consistent with my overall
17   analysis that you can't ever analyze stock prices in
18   isolation, you have to compare them to the market in the
19   industry.
20       So if you look at the two lines going across, they
21   represent the performance of the S&P Financials Index and the
22   S&P 500 Index, which, again, I did not choose those.
23   Household itself chose them as the relevant benchmarks to
24   assess its performance against.
25       And you can see that the Household -- the S&P

202

Fischel - direct

2678

1    Financials Index declined by approximately 20 percent.  The
2    S&P 500 Index declined by approximately 25 percent, but
3    Household declined by more than twice that amount.  It
4    declined by 53 percent during this period, which, again, gave
5    me confidence that Household's decline was not just
6    attributable to normal market and industry fluctuations, but
7    was attributable to new negative information coming out about
8    Household that is easily understandable in light of the
9    cascade of negative information that was coming out during
10   this period.
11   Q.   And was the $7.97 inflation that you found -- what was the
12   relationship between that and what you were finding in this
13   analysis?
14   A.   The $7.97 number is smaller than the amount of the -- of
15   Household's decline that exceeded the decline of the indexes
16   that Household itself compared itself to.  So my analysis was
17   conservative again in that respect.
18   Q.   And I want to show you the proxy that Household filed, 14A
19   proxy.  It's Exhibit 1275 dated May 14, 2002.
20       Is this a document that you used in preparing this
21   demonstrative?
22   A.   Yes.  Again, I didn't want to perform any comparisons of
23   Household to indexes that Household didn't compare
24   itself to, so under the governing regulations of the
25   Securities and Exchange Commission, companies have to identify

203

Fischel - direct

2679

1    which stocks and which stock indexes their performance should
2    be compared against so investors can assess whether their
3    performance is good or bad, not just in isolation, but
4    relative to the companies or the indexes that they themselves
5    compare themselves to.
6        MR. BURKHOLZ:  Okay.  Let's look at 1275.  Before we
7    bring it up, your Honor, can we move this in.  It's Household
8    SEC filing, 1275.
9        THE COURT:  No objection, it will be admitted.
10   (Plaintiffs' Exhibit 1275 received in evidence.)
11       MR. BURKHOLZ:  Thank you.
12   BY MR. BURKHOLZ:
13   Q.   Let's turn -- it's on page 31 of the proxy filing, and we
14   can highlight that paragraph that starts "The above chart."
15   A.   Yeah, actually if you highlight the panel right above
16   that.
17   Q.   Okay.
18   A.   And this is -- Household is reporting its performance
19   relative to the S&P Financials Index and the S&P 500 Index,
20   exactly the indexes that my exhibit just compared Household's
21   to.  And, in fact, the reason why I chose those
22   indexes is because Household itself identified those indexes
23   as what its performance should be compared against.
24       And then after the panel, Household's disclosure
25   states that "The above chart compares total returns (assuming

204

Fischel - direct

2680

1    all dividends are reinvested) of Household to Standard &
2    Poor's Composite Financial Stock Price Index and Standard &
3    Poor's 500 Composite Stock Price Index.  Our common stock is
4    included in both of these indices.  The chart assumes $100 was
5    invested in Household common stock on December 31, 1996 and
6    that all dividends are reinvested.  We are required to publish
7    the five-year return chart so you could compare our
8    performance to other stocks."
9        So Household demonstrated in this document what they
10   considered the relevant comparison was.  I used the exact same
11   comparison that Household itself stated was the right
12   comparison to use.
13   Q.   And did you prepare an exhibit that shows the amount of
14   artificial inflation, taking into account the leakage that
15   you've discussed?
16   A.   I did.
17   Q.   Before we get to that, did you prepare a demonstrative
18   that shows the inflation taking into account the leakage?
19   A.   Yes, I -- yes, I did.
20       MR. BURKHOLZ:  Okay.  Let's bring up 154, the next
21   demonstrative, 154.
22   BY MR. BURKHOLZ:
23   Q.   And what does this show?
24   A.   This is analogous to the document that we've already
25   looked at, the graph focusing on the 14 specific disclosures.

205

Fischel - direct

2681

1  But here instead of 14 specific disclosures, this method again
2  uses an event study, uses a regression analysis and attempts
3  to calculate the amount of inflation on every day during the
4  relevant period, again, taking into account the effect of the
5  market and the industry on Household's stock prices on every
6  day.
7          You can see that the difference between the red line,
8  the price, and the blue line is wider.  The blue line, the
9  true value line, the uninflated price, that's wider than in my
10 first method focusing on 14 disclosures, and the reason is
11 obvious, that you have so many more negative disclosures that
12 are leaking out that are not captured in my 14 specific
13 disclosures.
14         The result of that is that a greater percentage, a
15 greater proportion of Household's decline in price is
16 attributable to fraud-related disclosures and the correction
17 of fraud-related information in this exhibit; but you can see
18 again at the very end, the blue line
19 goes above the red line.
20         So even in this exhibit, I want to be careful that
21 investors who suffered no loss because they purchased at
22 particularly low prices are not entitled to recover because
23 they haven't suffered any harm.
24 Q.  And that's the investors in the last 30, approximately
25 30 days of the relevant period?

206

Fischel - direct

2682

1  A.  Correct.  When the leakage resulted in a much lower stock
2  price than what ultimately occurred on October 10th and 11th.
3  Q.  And you prepared an exhibit that shows the amount of
4  inflation on every day during the relevant period for your
5  leakage model, right?
6  A.  Correct.
7  Q.  Let me show you Exhibit 1395.
8  A.  Thank you.
9  Q.  And is that your quantification of the inflation under
10 your leakage model?
11 A.  Yes.  If you can put it on the screen maybe.
12 Q.  Did you prepare this document?
13 A.  I did.
14         MR. BURKHOLZ:  Your Honor, I don't believe there's an
15 objection to 1395 if we can move it into evidence.
16         THE COURT:  It will be admitted.
17         (Plaintiffs' Exhibit 1395 received in evidence.)
18 BY MR. BURKHOLZ:
19 Q.  Can you explain what this exhibit is?
20 A.  This exhibit, again, is analogous to the previous exhibit
21 which focused on the 14 specific disclosures; but this exhibit
22 takes leakage into account and, once again, has a calculation
23 of the stock price on every day, what the true value is, which
24 is what my calculation is of the uninflated price, what the
25 price should have been had there been no fraudulent

207

Fischel - direct

2683

1  disclosures or omissions in the various Household statements
2  and disclosures during the relevant period.  That's the second
3  column, true value.
4          And the artificial inflation is the number in the
5  last column.  And, again, you'll see that it's different from
6  7.97 at the beginning because this calculation doesn't just
7  focus on 14 disclosures.  It focuses on all the negative
8  disclosures that came out, particularly after November 15th
9  when the market started to, in a much more systematic way,
10 disbelieve Household's denials that it was engaging in
11 predatory lending and that it was engaging in improperly
12 aggressive accounting.
13 Q.  Like your specific disclosure model, does this
14 quantification use statistical methods to account for the
15 market and industry influences on Household's stock prices?
16 A.  Yes, it does.
17 Q.  And did you also analyze whether company-specific factors
18 unrelated to the alleged fraud can explain Household's stock
19 price decline during this latter part of the relevant period?
20 A.  Yes, I did.  I looked at that carefully.
21         I noticed that there were a lot of disclosures that
22 had some fraud-related information in it and some other
23 disclose -- and part of the disclosure did not have -- dealt
24 with something other that was fraud related.
25         There were some -- some of those disclosures that had

208

Fischel - direct

2684

1  a positive effect, some had a negative effect; but overall it
2  was impossible to conclude that the difference between the
3  true value line and the actual price would have been any
4  different had there been no disclosures about
5  non-fraud-related information during this particular period.
6  Some positive, some negative.  They cancel each other out.
7  Q.  Okay.  Now, reaching your opinion about inflation, did you
8  consider whether investors during the relevant period were
9  fully informed about Household's accounting and lending
10 practices?
11 A.  I did.
12 Q.  And what did you find?
13 A.  I found that they were not fully informed for a number of
14 different reasons.
15 Q.  And what were the reasons?
16 A.  Well, first, the disclosures coming out criticizing
17 Household's practices didn't come from Household; and if a
18 company is disclosing information about itself, it's one thing
19 for third parties to comment, but it's another thing for the
20 information to come directly from the company itself.
21         Since the company was not disclosing what the
22 analysts and the critics were saying, market participants did
23 not have full information.
24 Q.  Okay.  So you had your analysts' reaction or commentary,
25 some of -- the Barron's article and the analysts' reports, the

213

Dowd - interim summation

2689

1    They knew that wasn't true.  Mr. Schoenholz got
2    e-mails that said they were using one payment.  There were
3    other documents that showed they were using one payment.  He
4    knew that wasn't true when he signed the 10-K.
5        And then the reason for the delinquency is cured when
6    you're doing some of them automatically, when you're not
7    contacting the customer.
8        Ladies and gentlemen, he admitted the statement was
9    false.  That's why they had to re-issue that 10-K a year later
10   and change all the language because it was false.
11       He admitted that he had this huge financial relations
12   conference on April 9th, 2002, 400 people there, broadcast all
13   over the United States to other people that were interested.
14   And what kind of numbers did he give them?  He gave them false
15   numbers, ladies and gentlemen.
16       He forgot to tell them about $3 billion in loans that
17   had been re-aged more than once.  3 billion.  Then he didn't
18   tell them -- he didn't tell them about the recidivism
19   statistics.  He didn't tell them how much of these re-aged
20   loans get re-aged again and again.  And he tells you, oh, gee,
21   I didn't know that.  Somebody made a mistake.
22       You're talking to 400 people all across the country
23   and you make a mistake?  This is no mistake, ladies and
24   gentlemen.  Just like it was no mistake when he said
25   consecutive payments and he knew it was one payment a month

214

Kavaler - interim summation

2690

1    before that.  It was no mistake.
2        And what happens in his story?  He has to say
3    eventually we found out about it, he says a couple weeks
4    later, because we got Mr. Makowski's certification where
5    Makowski said the numbers were wrong, okay?  So he has to
6    admit I found out.
7        So what did he do about it, ladies and gentlemen?
8    After he told 400 people all these numbers, does he issue a
9    press release?  Does he call these 400 people back and say,
10   you know what?  I gave you the wrong numbers.  I misled you.
11       No.  He says it didn't matter.  It didn't matter.  It
12   was immaterial, so I never told anybody anything again, and I
13   never put those numbers out there again.
14       That, ladies and gentlemen, was a false and
15   misleading statement, just like --
16       THE COURT:  30 seconds.
17       MR. DOWD:  Thank you, your Honor.
18       MR. KAVALER:  May I have the switch, your Honor?
19   May we have the switch?
20       Thank you, your Honor.
21       Good afternoon, ladies and gentlemen.  Nice to be
22   able to talk to you again.
23       Last week, I discussed with you Household investors
24   knew.  That was our theme last week.  Today I want to touch
25   briefly on the second of our themes.  I'll touch on the third

215

Kavaler - interim summation

2691

1    one next week.
2        Today's theme is there was no intent to deceive
3    anyone.  What counsel told you, what the evidence this week
4    showed is mistakes.  There were mistakes made.  Mr. Schoenhol:
5    was on the stand.  Counsel went after him for making a
6    mistake.
7        Actually, it turns out Mr. Pantelis made a mistake,
8    and then he went and told Mr. Schoenholz he'd made a mistake,
9    and Mr. Schoenholz admitted that, as a result, he realized he
10   had made a mistake, and he made it in front of a lot of
11   people.  There's no question about that, all right?
12       That's how mistakes work.  You make them by accident,
13   and sometimes you make them in front of a lot of people.
14   Sometimes I make them in the courtroom.  Things like that
15   happen.  There's no intent to make the mistake.  It's just a
16   mistake.
17       Well, then what happened next?  Mr. Schoenholz,
18   recognizing a mistake had been made, you heard what he said,
19   he called together all the right people.  Remember that
20   phrase?  And they discussed it, and they came to the
21   conclusion, ladies and gentlemen, that it was not material.
22       Yes, there's no question it was $3 billion.  That's a
23   lot of money by anybody's account.  But it was a $3 billion
24   mistake on a $100 billion number.  Ladies and gentlemen, in
25   this case, all the numbers are gigantic.  They are

216

Kavaler - interim summation

2692

1    mind-boggling.  But you always have to look at everything in
2    context.
3        A $3 billion mistake on a $100 million,
4    Mr. Schoenholz told you, is not material.  It's also not
5    material for another reason.
6        Remember there was a chart, and there were several
7    lines on the chart, and the mistake was in one of those lines,
8    all right?  The mistake was not in the bottom line.  When you
9    went back and looked at the mistake, it didn't change the
10   bottom line.
11       There was no change in re-age.  There was no change
12   in charge-off.  There was no change in delinquency.  The
13   bottom line was right.  It was one of the other lines.
14       In other words, at the end of the day, it didn't make
15   a material difference to the point Mr. Schoenholz was talking
16   about.  And you will hear in this case, you've already started
17   to hear, you don't disclose every single thing.  You disclose
18   things that make a difference, all right?
19       And what the plaintiffs need to show in this case is
20   that people lied on purpose.  That's fraud.  Not that they
21   made mistakes.  That's a mistake.  And that's what we heard
22   this week.
23       We also were introduced to the concept of
24   materiality.  Not every mistake is material; and if it's not
25   material, it's not a problem under the securities laws, all

EXHIBIT 8

2708

```
1    And he says, "What drove this stock down is the fact
2    that analysts and others -- " you know, the media -- financial
3    media -- "were reporting that the company couldn't sustain
4    that growth because there were predatory practices; they now
5    have to change those practices; and, the growth estimates have
6    to be reduced."
7        So, the false statements and the omissions relating
8    to the predatory lending tie precisely into the disclosures
9    that drive the stock price down.
10       THE COURT:  Well, the problem I have with that
11   argument is that I don't see in your designated false
12   statements regarding the 10-Qs and the 10-Ks any statement
13   regarding growth --
14       MR. DOWD:  Well, your Honor.
15       THE COURT:  -- that you've alleged is false.
16       MR. DOWD:  WELL, your Honor --
17       THE COURT:  In fact, give me a second.  Let me go get
18   the -- I didn't bring out that -- the rulings where I have
19   that.  Let me bring that out.  Just give me a second.
20       MR. DOWD:  Sure.
21       (Brief pause.)
22       THE COURT:  It took longer to find than I thought it
23   would, which is undoubtedly why I didn't bring it out in the
24   first place.
25       Okay.  Go ahead.
```

2709

```
1        MR. DOWD:  Yes, your Honor.
2        Well, I think there's two issues.  And I know the
3    Court just said the statements -- I'll get to that in a
4    second -- but in the Pretrial Order, there's also alleged
5    omissions.
6        And the omissions -- for example, "During the class
7    period, defendants failed to disclose to the market that
8    Household engaged in predatory lending practices and the
9    impact of those predatory lending practices on Household's
10   financial statements."
11       THE COURT:  Well, I mean, let's stick with the
12   concrete example of the 10-Ks and the 10-Qs, because my
13   understanding of an omission is that it only comes into play
14   relative to a statement made.  An omission is only misleading
15   as it attaches to the statement.  You make a statement.  You
16   fail to include facts that need to be included.  That's a
17   material omission, which may be a cause for liability.
18       So, we've got to start out with the predicate in the
19   10-Ks:  Where is the statement that this omission, with
20   respect to future growth, relates to?
21       MR. DOWD:  Okay.
22       THE COURT:  And I don't see it.
23       MR. DOWD:  I would say first, your Honor, as
24   Mr. Devor testified to, you have an obligation to provide
25   information about these numbers -- I mean, under both SEC
```

2710

```
1    rules and GAAP -- and that's what governs financial
2    statements.
3        THE COURT:  No, I don't -- I mean, if that's the
4    premise of your arguments, I disagree with it.  I mean, I
5    think all the case law that I've seen indicates there is no
6    independent duty --
7        MR. DOWD:  Well, we can --
8        THE COURT:  -- to disclose predatory lending
9    practices or even illegal practices.
10       MR. DOWD:  Well, I can address those cases in a
11   moment, and I'll walk the Court, you know, through the chart.
12       THE COURT:  Go ahead.
13       MR. DOWD:  At the same time that you have these Qs
14   and Ks being issued, you have the press release, your Honor,
15   that accompany them.
16       THE COURT:  I think that the press releases are fair
17   game for that argument.
18       MR. DOWD:  And -- all right.
19       THE COURT:  I think the law is pretty clear:  If they
20   undertake to make statements, that's precisely where this
21   material omissions issue comes in.
22       MR. DOWD:  Well --
23       THE COURT:  They make the statement.  They omit an
24   important fact.  They could be held liable.
25       MR. DOWD:  Right.
```

2711

```
1        THE COURT:  And many of the press statements where
2    they say, "We don't do this," or, "Our practices are clean;
3    our practices are legal; it was a rogue office," all of those
4    statements, it seems to me, are argument for, "They omitted a
5    material fact."
6        But that's not the testimony I'm concerned with.
7        MR. DOWD:  Well -- but I think, your Honor, let's
8    take an example.  If you look at False Statements 4 and 5, I
9    mean, there you have a press release -- all right? -- that
10   announces, basically, the year-end results.
11       THE COURT:  Well, number one, it was objected to and
12   sustained.  So, that's no longer a false statements that's at
13   issue here.
14       MR. DOWD:  The January 19th, 2000, Household press
15   release?  January 19th?
16       THE COURT:  No, we have different numberings, then.
17   No. 1 on my False Statements list was what you folks
18   gave me at the motion in limine hearing; and, that was their
19   July 22nd, 1999.
20       But you're talking about January, what?
21       MR. DOWD:  January 19th, the Household press release.
22       THE COURT:  Of what year?
23       MR. DOWD:  2000.
24       THE COURT:  I will try to find it.
25       Here it is.
```

4-17-09 Jury Instructions Hearing Transcript  4/17/2009  10:32:00 AM

2716

1  where in the 10-K statements or the 10-Q statements that you
2  cite in this 40 -- I think we're down to, what 43 statements
3  now?
4      MR. DOWD:  I believe so.
5      THE COURT:  -- where you have representations as to
6  the basis for the success of the revenues, such as that case
7  just talked about.
8      I find only two.  I find there is -- I'll tell you
9  which two, actually.
10      I think the March 28th, 2001, 10-K is one where you
11  can allege, you can offer evidence and you can argue to the
12  jury that failure to include in that 10-K evidence of its
13  predatory lending practices is a material omission.  Because
14  they talk about, "We have a process which we believe gives us
15  a reasonable basis for predicting the credit quality of new
16  accounts.  This process is based on our experience with
17  numerous marketing, credit and risk management tests."
18      They're talking about the process they use to
19  determine the creditworthiness of their accounts.  And if
20  they're going to assert that they have a good process in doing
21  that, then I think they've got to tell you, "Oh, by the way,
22  there's this other aspect of our creditworthiness management
23  principles, which is that we're packing and we're lying and
24  we're cheating."
25      So, I think you can do that.  I think there's one

2717

1  other in here -- I'm trying to remember where I found it --
2  where there's similar language.
3      Oh, yeah, there's the direct statement, actually,
4  regarding predatory lending practices in the -- I can't find
5  it now.  I thought there was one other one.
6      Here it is, yeah:  The March 13th, 2002, 10-K:
7  "Management has long recognized its responsibility for
8  conducting the company's affairs in a manner which is
9  responsive to the interest of employees, shareholders,
10  investors and society, in general."
11      Well, when you open that door, you better include all
12  of the evidence that relates to it.
13      But I do not see -- and I'd be happy for you to show
14  me -- in any of the other 10-K or 10-Q Asserted False
15  Statements anything other than language like, "Household's
16  10-Q for Quarter Ending 6-30-99, Household Reported Net Income
17  of $326.9 million."
18      That is not an assertion which, it seems -- I mean,
19  that's a historical statement of what they earned, period.
20  And it doesn't go to the issue of going forward.  And it
21  doesn't require them to disclose the material aspects of their
22  going-forward predictions.
23      MR. DOWD:  Your Honor, but you're basically -- when
24  you say that -- you're throwing out all of the SEC and GAAP
25  requirements.  Those financial statements have to be in

2718

1  accordance with GAAP.
2      THE COURT:  I mean, I disagree.
3      The only cases that I've seen regarding GAAP and the
4  assertion of GAAP requirements in the 10-Ks and the 10-Qs
5  relate to how you're to report what you have to report.
6      But the GAAP requirements do not indicate what the
7  duty to report is.  The duty to report doesn't come from GAAP.
8  The duty to report comes from case law and statutory law in
9  some occasions.  Insider trading, you've got a duty to
10  disclose.
11      And the cases that I have seen regarding duty to
12  disclose are very clear.
13      Well, all that I know -- which is an old case
14  going back, I don't know, how far -- make it clear there's no
15  general duty to disclose in the 10-K or the 10-Q improper
16  conduct.
17      MR. DOWD:  Well, we have -- your Honor, we have --
18  the expert testified about SEC regulations and GAAP; that you
19  have to explain significant trends that could affect future --
20      THE COURT:  And that tells you how you are to
21  disclose what you have a duty to disclose.  It doesn't
22  establish the duty -- it doesn't establish the duty -- to
23  disclose that.
24      MR. DOWD:  I understand what you are saying, your
25  Honor, but they're speaking -- they're speaking -- every

2719

1  quarter during the class period; and, every time they issue a
2  Q or a K, they issue a press release that describes how that
3  revenue is generated.  And I don't think you can distinguish
4  those two when you speak and say, "This is what our earnings
5  and income are going to be, and this is how we arrived at
6  them," because of synergies with Beneficial.  And the reality
7  is that you're engaging in improper practices.
8      You just spoke.  And you didn't tell the truth.
9      THE COURT:  Well --
10      MR. DOWD:  And I understand the Court saying -- at
11  least I understand it -- the press release is actionable, but
12  you are not sure about the Qs and Ks that accompanying it.
13      THE COURT:  Well, what I'm telling you is that I
14  don't believe that the press releases trigger an obligation to
15  disclose in the 10-Ks and the 10-Qs.  I think you have to talk
16  about the statement made in the 10-K or the 10-Q; and, if that
17  statement triggers an obligation to disclose, then you can
18  argue omission of material fact.
19      But if the statement is nothing more than, "The
20  revenue for this year was $5 trillion dollars," that doesn't
21  trigger an obligation.
22      MR. DOWD:  So, in other words, your Honor, I can
23  issue a press release and can say, "Our growth was driven by
24  these tremendous -- " you know, whatever -- whatever lie they
25  told in each one of these press releases.  And they say, "That

2720

1  is what generated our numbers in year-end 2000."
2      And, then, a month later, they issue a Q and K with
3  those same numbers in them and they don't say, "By the way, we
4  lied the last time" or "This is the basis for these numbers.
5  They include predatory practices," I don't see how that can
6  be.
7      THE COURT:  Well, I think that's the law.
8      I mean, if you find me a case that says otherwise,
9  that's fine, but the cases I've read -- I mean, geez, there
10  are just too many.
11      MR. DOWD:  Well, your Honor, could I have an
12  opportunity to do that, because --
13      THE COURT:  Sure.
14      MR. DOWD:  -- I do feel somewhat at a loss because
15  the defendants have never raised this issue, I don't believe.
16      THE COURT:  Well, here's the problem:  I think that
17  the defendants have failed to raise the issue at the
18  appropriate times during the course of the trial.
19      I think, in some respects, they may have raised some
20  portion of this issue belatedly, when they come back the next
21  day and ask for a ruling as to, you know, five hours of
22  testimony the prior day, when no objection was made that prior
23  day when the testimony was coming in.
24      I think with regard to your expert testimony, it's
25  the same.

2721

1      The problem is that we're going to get to the point
2  where we're going to have to instruct the jury on what the law
3  is.
4      So, the fact that the testimony comes in doesn't end
5  the issue.  We still have to determine what the appropriate
6  instructions are for the jury.
7      And that set of instructions can impact the entire
8  case, whatever verdict comes.
9      MR. DOWD:  No, I understand that, your Honor.
10      And could I submit something by Monday?
11      THE COURT:  You can.
12      I'll give you a couple cases to look at, which I
13  found -- and this is just a couple of them which I found --
14  rather --
15      MR. DOWD:  Sure.
16      THE COURT:  -- surprising, frankly, but telling.
17      Roeder -- R-o-e-d-e-r -- vs. Alpha Industries
18  Incorporated, 814 Federal Second 22, First Circuit, 1987 case.
19      Galati -- G-a-l-a-t-i -- vs. Commerce Bank Corp,
20  Incorporated, a 2007.  I think that's a Third Circuit.
21      MR. DOWD:  I have Galati, your Honor.
22      THE COURT:  Okay.
23      MR. DOWD:  I mean, Galati, the court says, "The
24  factual recitations that defendants made were not challenged
25  by the plaintiffs."  The other statements were mere puffery

2722

1  and says, "Defendants have alleged" -- "Plaintiffs have
2  alleged no statements that were rendered misleading by
3  defendant's scheme."
4      I think that is distinguishable, but I'll be happy to
5  address it in writing, if we can.
6      THE COURT:  Well, I mean, okay.  If you want to -- it
7  seems to me that they talk about statements made in their
8  filings to the SEC; statements like "The strong performance
9  was led by the Public Finance Division," "The unique commerce
10  business model."
11      You know, I'm not too sure I would find that to be
12  mere puffery because that's getting pretty specific.  But, I
13  mean, they're clearly addressing the very same types of things
14  we're talking about.
15      And wherever statements have been made like that --
16  in the 10-Ks and the 10-Qs that I've looked through here --
17  the two instances I found are the ones I gave to you, in which
18  those statements were made.  And I think in those situations,
19  those statements were not mere puffery.  They went directly to
20  the issues that we're concerned with.  And disclosure was
21  required -- or you can considering that disclosure was
22  required -- to the jury.
23      But, as to the other statements, where all you have
24  is -- in your list, all you have is -- the recitation of what
25  the net income was for the quarter, I don't think you can

2723

1  bootstrap the prior press statements and other statements into
2  that 10-Q and say that those trigger a requirement in the 10-Q
3  to make statements that wouldn't have been required.
4      MR. DOWD:  When I talked about puffery, your Honor,
5  that's what the Galati court, itself, said.
6      THE COURT:  I know.
7      MR. DOWD:  Oh, sorry.
8      THE COURT:  I've got it here in front of me, too.
9  That's what they said.  I'm telling you I'm not sure I would
10  have found that one statement to be puffery.  I think that,
11  given all the circumstances, I don't know that that statement
12  would have been puffery in this case.
13      But, at any rate, what I'm telling you is that where
14  you've made those statements -- where those statements have
15  been made here -- in the two occasions that I find them, I
16  find them to be not puffery, but actual statements which could
17  trigger the requirement for full disclosure.
18      And I think once you have that, then your expert's
19  testimony with regard to the use of the GAAP -- that is, how
20  they disclose what they have a duty to disclose -- becomes
21  applicable.
22      If they didn't disclose it the way the GAAP
23  principles would require them to, in a meaningful way, then --
24  and you can convince the jury of that -- then I think you've
25  got a cause of action there.

4-17-09 Jury Instructions Hearing Transcript  4/17/2009  10:32:00 AM

2732

1    MR. KAVALER:  -- what follows, in terms of loss
2  causation.
3    And I think it will be very interesting to see what
4  he says when he comes back on Monday because I -- well, we'll
5  see what happens.  We'll see what he says.
6    But I agree with your Honor, it's a threshold
7  question.  But that's exactly my point.  I have trouble
8  putting it in that pigeonhole and leaving it there because it
9  seeps into all the rest of this.
10    And the very question you and Mr. Dowd are discussing
11  comes out completely differently if you assume the company is
12  a predatory lender and if you assume the company is not a
13  predatory lender.
14    If you assume, as the defendants did -- and we
15  believe justifiably --
16    THE COURT:  Sure.
17    MR. KAVALER:  -- that it's not a predatory lender,
18  then there's no disclosure issue here at all.  Indeed, it's
19  Alice in Wonderland to say, "In publishing -- " as your Honor
20  said, what they put out quarterly is their routine, everyday,
21  run-of-the-mill, historical numbers:  "We earned a dollar."
22    It would never occur to them to say, "And in earning
23  this dollar, somebody" -- some individual account executive
24  somewhere -- "misbehaved."  I mean, it doesn't make any sense,
25  your Honor.

2733

1    THE COURT:  I think that I don't quarrel with
2  anything you said, if they can't establish the basic
3  predicates then.
4    But when we talk about how we're going to instruct
5  the jury, you know, we have to instruct them in terms of,
6  "What happens if you find these things."  At what point is
7  there liability?
8    They, then, are free to determine whether they found
9  those elements or not, but I think we have to give them the
10  appropriate instructions.
11    And, as it turns out -- luckily for your client --
12  it's my impression at this point -- it's my opinion -- that
13  with respect to all but two of the 10-K filings, that there
14  was no -- 10-K or 10-Q filings; that there was no --
15  explanation of predatory lending practices, assuming such
16  existed and assuming your clients knew about them, is not an
17  issue that's even going to get to the jury because I don't
18  believe there was a duty in regard to those 10-Ks -- the other
19  10-Ks -- and 10-Qs for them to disclose those facts, even if
20  it existed and even if they knew about it.
21    MR. KAVALER:  And, your Honor, just so you don't look
22  book at the transcript later and say, "Mr. Kavaler had a duty
23  to speak at this point," let me echo something Mr. Dowd said.
24    I'm very reluctant to say what I'm thinking right now
25  because we're in the middle of the plaintiffs' case.

2734

1    THE COURT REPORTER:  Slow down.
2    MR. KAVALER:  I'm sorry.
3    I'm very reluctant to say what I'm thinking, which
4  would only encourage you to think what you are thinking,
5  because we're still in the middle of the plaintiffs' case, and
6  we are letting them put on their case as they wish and we will
7  respond.
8    But there is a -- there are, we think, fatal defects
9  in this case, which we will point out to your Honor once
10  they've rested.
11    Rule 50 talks about when a party --
12    THE COURT:  You have been telling me that for a
13  while.  I know.
14    MR. KAVALER:  Your Honor, I believe we're there.  I
15  believe we're going to be there.  But I could be wrong.
16    But all I'm saying is I don't want you to read this
17  transcript later and say, "Well, why didn't you say that
18  then?"
19    I mean -- because it's not the right time to say
20  that, your Honor.  But I do agree it's a question of
21  instructing the jury.  I think, however -- much as I think
22  it's a great idea to have this conference today -- the
23  instructions conference -- some things will not be clear until
24  closer to the end of the plaintiffs' case, as to what the
25  instruction needs to be.

2735

1    THE COURT:  Indeed.  I agree.
2    MR. KAVALER:  It's a big frustration for us, your
3  Honor.
4    Let me just add one last thing.
5    I don't at all disagree with your Honor's observation
6  about the timing of objections.  I fully appreciate what
7  you've said.
8    Our view is we did raise certain things in the
9  motions in limine.  You addressed them and we accepted your
10  rulings for purposes of the trial.
11    Obviously, we don't agree.  And I'm sure the
12  plaintiffs don't agree with the ones they lost.  But we
13  understood you ruled.  We understand you're final at the trial
14  level.  And we've been conducting ourselves accordingly.
15    And we just find it sometimes tactically advantageous
16  to act the way we've been acting, but we certainly understand
17  your Honor's view of the consequences of doing that.
18    THE COURT:  Okay.
19    MR. KAVALER:  But we think, at the end of the day,
20  it's a legal question.
21    And, I mean, your Honor, just -- we seriously
22  considered not crossing any of these witnesses.  We considered
23  it.
24    THE COURT:  Now, you're breaking my heart.
25    (Laughter.)

4-17-09 Jury Instructions Hearing Transcript  4/17/2009  10:32:00 AM

2796

1      MR. DOWD: I disagree with that. That's a statement
2   by Household as well, absolutely. And if you have other
3   top-level officers who assisted in making that statement,
4   preparing it, and they know it's false, they're liable.
5   Whether somebody on the audit committee who signed it knew it
6   was false or Schoenholz knew it was false, I think they're
7   liable.
8      THE COURT: You mean the corporation is liable?
9      MR. DOWD: The corporation.
10     THE COURT: Do you agree with that?
11     MS. BEER: No, I don't. It sounds like Mr. Dowd
12  needs to look for some more cases.
13     THE COURT: I don't know. There's a certain --
14  there's a certain logic there, which is -- I think goes back
15  to what he said. He's essentially talking about passing
16  knowledge --
17     MS. BEER: But Mr. Makowski --
18     THE COURT: -- through individuals who didn't know
19  and out to the public and holding the corporation liable
20  because individuals who prepared rather than uttered the
21  statements did know.
22     MS. BEER: But I think it's not just the scienter --
23  not just as to the scienter that the corporation acts only
24  through individuals. It's the making of the statement as well
25  where they act only through individuals. And the individuals

2797

1   who are making the statement --
2      THE COURT: Well, I mean, I haven't researched that.
3   Haven't researched that. So if you have a case -- either of
4   you have a case that says one way or the other --
5      MR. BURKHOLZ: I think the Tellabs case is the case
6   that we cited, the Seventh Circuit case, in our authority
7   for -- and it has a good discussion of how to keep -- what the
8   corporate liability is and scienter for the corporation.
9      THE COURT: Okay. That speaks to -- actually speaks to
10  it?
11     MR. BURKHOLZ: It does. It's 513 F.3d 702.
12     THE COURT: I see what you've got here. Does it say
13  something other than a corporation may be held liable for
14  statements by employees who have apparent authority to make
15  them? Because if that's all it says, that's not going to do
16  it for me.
17     What you're talking about is what constitutes making
18  a statement, is it the end person who says it to the public or
19  does it include all the little whispering in his ear from
20  employees within the corporation?
21     MR. BURKHOLZ: I think it includes the other senior
22  executives.
23     THE COURT: Okay. I'll read it. If you have --
24  whatever you have on it, I will read.
25     I think that's as far as we get today, folks.

2798

1      That leaves us essentially I think with -- we have to
2   mop up 10b-5; but if we get past scienter, I think we're done
3   with the worst of it.
4      That's going to leave us with the controlling person
5   cause of action. I would be curious to know from the
6   plaintiffs' point of view what that adds to the case, but --
7      MR. BURKHOLZ: You can ask Mr. Dowd that.
8      THE COURT: I guess what I would be curious to know
9   is a set of facts under which this jury could find no
10  liability under 10b-5 but find liability under controlling
11  person, given the facts of this case and what it adds to your
12  case; but that's just curiosity. I'm not telling you I need
13  to know that, but -- so that leaves us with mopping up 10b-5,
14  which shouldn't take very long. Then we've got the
15  controlling person instructions, which should take forever.
16  And then we --
17     MR. KAVALER: Under your hypothetical, by definition,
18  there would be no controlling personal liability -- if the
19  jury found no underlying 10b-5 claim, there would be nothing
20  for the controlling person to control.
21     THE COURT: That doesn't quite answer my question.
22  My question is, what person or act is brought into the net by
23  adding the controlling person liability.
24     MR. KAVALER: I wasn't attempting to answer your
25  question. I was pointing out your hypothetical --

2799

1      THE COURT: My hypothetical was not good. I agree.
2   My question wasn't good.
3      But, at any rate -- and I think, you know, probably
4   one more session, maybe one and a half, we can get that done,
5   which would be -- we've got loss causation out there too as
6   part of damages. But those two things are really the only two
7   big ones left. So I suppose we're probably looking at doing
8   this again next Friday, I warn you all.
9      Okay. Thank you very much.
10     MR. KAVALER: Your Honor, I did have a mechanical
11  matter.
12     We have shown the plaintiffs earlier a jury notebook
13  we intend to hand out in connection with the cross of
14  Mr. Aldinger. They have no objection to the exhibits.
15     The only question is whether we can highlight or flag
16  in these multipage documents -- these are largely disclosure
17  documents -- the language we want to focus their attention on.
18  I thought it would be more convenient for the jury.
19  Mr. Burkholz objects.
20     MR. BURKHOLZ: Just that when I handed the jury my
21  binder of articles for Ms. Hayden-Hakes, I didn't highlight
22  them. Whatever the Court wants to do. It's --
23     MR. KAVALER: Well, his binder was this thick
24  (indicating) and contained a few two-page documents. This
25  contains 20- and 30- and 40-page documents. They'll be

O'Han - direct

2810

1  A. Robert O'Han.
2  Q. And we've never met before, have we, sir?
3  A. No.
4  Q. You work for Household currently; is that right?
5  A. Correct.
6  Q. HSBC?
7  A. HSBC.
8  Q. Okay. How long have you worked for the company?
9  A. 19 years. Almost 20.
10  Q. You were deposed in this case; is that right, sir?
11  A. Correct.
12  Q. Back in May of 2006?
13  A. I don't recall the exact date.
14  Q. And the defendants -- counsel for the defendants
15  represented you at that deposition, didn't they?
16  A. Yes.
17  Q. And they represent you here today, don't they, sir?
18  A. Yes.
19  Q. Now, I'd like to talk to you a little bit about your
20  background at the company. Specifically starting in the late
21  '90s, you became a division general manager in 1998; is that
22  right?
23  A. I was promoted to a job called regional director of sales
24  in 1996, late '96. And then that position, that title, was
25  basically transferred to -- just renamed division general

O'Han - direct

2811

1  manager I think in late '97, so very -- close enough.
2  Q. So as of '98-'99, you were a division general manager?
3  A. And 2000.
4  Q. Okay. And as a division general manager, how many
5  branches were you responsible for?
6  A. Approximately 80 to a hundred.
7  Q. And right below you on the hierarchy in that consumer
8  lending unit were the district sales managers, correct, sir?
9  A. Correct.
10  Q. And how many district sales managers did you have?
11  A. It varied. But approximately eight to ten.
12  Q. Eight to ten covering 80 to a hundred branches?
13  A. Right.
14  Q. And you were in the southeastern part of the country,
15  what's called the southeast division or the south central; is
16  that right, sir?
17  A. Yes.
18  Q. And where were your headquarters located then?
19  A. In Raleigh, North Carolina.
20  Q. Okay. And in January of 2001, you were promoted to
21  regional general manager, correct?
22  A. That's correct.
23  Q. Otherwise known as RGM?
24  A. Correct.
25  Q. Okay. And at that point, you were one of three regional

O'Han - direct

2812

1  general managers in the consumer lending business; is that
2  right?
3  A. That's correct.
4  Q. And you reported to Tom Detelich, correct?
5  A. What time period are you speaking of?
6  Q. January '01.
7  A. Yes, sir.
8  Q. And he was the managing director of consumer lending; is
9  that right?
10  A. That's correct.
11  Q. And did you report to Mr. Detelich all the way through the
12  end of 2002?
13  A. Yes.
14  Q. Now, I want to take you back around to the 1999 time
15  frame, okay?
16      You knew a man named Lew Walter, correct?
17  A. Yes.
18  Q. And Mr. Walter in that time frame was a trainer at
19  Household; is that right?
20  A. That's my recollection, yes.
21  Q. And you attended a training given by Mr. Walter in 1999,
22  didn't you?
23  A. That's my recollection, yes.
24  Q. That was about the fall of '99, right, sir?
25  A. Yeah.

O'Han - direct

2813

1  Q. Okay. And the training took place in the southeast
2  division where you were the DGM, correct?
3  A. Yes.
4  Q. Was that in your office in Raleigh, North Carolina?
5  A. I don't recall the location.
6  Q. The training that you saw Mr. Walter give was a training
7  on selling first mortgages, right?
8  A. That's right.
9  Q. And who attended that training, sir?
10  A. It would be district managers and some other support
11  staff.
12  Q. So you had about seven to ten district managers covering
13  80 to a hundred branches at that training; is that about
14  right?
15  A. That's about right, yeah.
16  Q. Okay. And one of the members of the support staff was the
17  human resources manager. Do you recall that?
18  A. I don't recall for certain, but it makes --
19  Q. It makes sense?
20  A. He may have been there; he may not have been there.
21  Q. It makes sense that the human resources manager would be
22  at a training like this, correct, sir?
23  A. Yes.
24  Q. And that's because the human resources department was
25  responsible in part for training at the company, right?

Trial Day 14  4/20/2009  5:54:00 AM

O'Han - direct

2814

1   A. Correct.
2   Q. And at the time that you attended this training, you
3   understood that Mr. Walter had given the training at other
4   divisions before he came to the southeast, correct?
5   A. That is my recollection.
6   Q. This was something that Mr. Walter was going around to the
7   various divisions and training on in the summer and fall of
8   1999; isn't that right?
9   A. That's my recollection.
10  Q. Okay. And when Mr. Walter gave the training, did you
11  raise any objections to the training, sir?
12  A. No.
13  Q. And did your human resources manager raise any objections?
14  A. No.
15  Q. I'd like to hand you a document, sir --
16      MR. BROOKS: May I approach, your Honor?
17      THE COURT: Yes.
18      MR. BROOKS: It's been marked as Plaintiffs' Exhibit
19  899. It's already in evidence.
20  (Tendered.)
21  BY MR. BROOKS:
22  Q. And this document is a May 21, 2002, fax from a Paul
23  Pichoske to you; is that correct, sir?
24  A. That's correct.
25  Q. And you received this fax back in May of 2002, didn't you,

O'Han - direct

2815

1   Mr. O'Han?
2   A. Do I recall receiving this?
3   Q. Well, you received it, right, sir?
4   A. It's addressed to me. I would assume, yes.
5   Q. And Mr. Pichoske worked for you, didn't he?
6      He was one of your division general managers?
7   A. I believe so. There was a time period where he was a
8   district. I'm not sure if he had been promoted to DGM at that
9   point in time or not. I believe so, though.
10  Q. Okay. And the subject of this fax is June/July 1999,
11  correct, sir?
12      MS. BUCKLEY: Objection, your Honor.
13      THE COURT: I'm sorry?
14      MS. BUCKLEY: Objection, your Honor.
15      THE COURT: What's the basis of the objection?
16      MS. BUCKLEY: The characterization of the document.
17      THE COURT: Reask your question.
18  BY MR. BROOKS:
19  Q. Do you see the re line there, sir?
20  A. Yes.
21  Q. Do you see that it says June/July 1999?
22  A. Yes.
23  Q. So that's the subject of this fax, right, sir?
24  A. That would make sense.
25  Q. I'd ask you to turn to the next page, Mr. O'Han, and flip

O'Han - direct

2816

1   through the booklet that's attached to the fax, if you would.
2      MR. BURKHOLZ: Your Honor, could we get the switch?
3   BY MR. BROOKS:
4   Q. Have you taken a look at it, sir?
5   A. Do you want me to go through the whole thing?
6   Q. No, just so you familiarize yourself with it. You've seen
7   this before, right, sir? This is the same booklet --
8   A. I believe so.
9   Q. This is the same booklet Mr. Walter handed out at the
10  training that you attended in the southeast, isn't it?
11  A. I don't know that for sure.
12  Q. It's very similar, isn't it?
13  A. Yes.
14  Q. Okay. And this one is entitled "First Mortgage Sales
15  HFC." And it says it's from the northeastern division. Do
16  you see that?
17  A. Yes, sir.
18  Q. And Mr. Pichoske was the DGM in the northeast division and
19  he was based out of Latham, New York, right, sir?
20  A. I would say that's right. Like I said, I was not positive
21  whether or not he had been promoted or not.
22  Q. So at some point --
23  A. But, yeah, I didn't see the Latham on there, so I believe
24  that would be right.
25  Q. So the Latham indicates to you that he had been promoted

O'Han - direct

2817

1   to DGM at that time?
2   A. I believe so.
3   Q. Okay. And there's a handwritten note here that says
4   June/July 1999. Do you see that on the page ending 470?
5   A. On that page right there?
6   Q. Correct, sir.
7   A. Yes.
8   Q. And that's your handwriting, isn't it?
9   A. Yeah, that's my handwriting.
10  Q. And June/July 1999, is that when Mr. Pichoske told you
11  that he had received this first mortgage sales training
12  booklet?
13      MS. BUCKLEY: Objection, hearsay.
14      THE COURT: I'm sorry. What?
15      MS. BUCKLEY: Objection, your Honor, hearsay.
16      MR. BROOKS: It's a party admission, your Honor.
17      THE COURT: Overruled.
18  BY THE WITNESS:
19  A. Could you ask the question again?
20  BY MR. BROOKS:
21  Q. June/July 1999, sir, that's when Mr. Pichoske told you he
22  had received this booklet, isn't it?
23  A. I would be assuming. I don't recall the conversation.
24  Q. Okay. That was right around the time that you had gotten
25  the same training in the southeast division, right, sir?

O'Han - direct
2818

1   A.  The fall of '99?
2   Q.  Yeah.
3   A.  Yes.
4   Q.  So just before that?
5   A.  This is before that, yes.
6   Q.  Okay.  Mr. O'Han, if I could ask you to turn to the page
7   ending 742.  And included in this training booklet is a
8   reference to a Tom Detelich HouseMail note dated January 4,
9   1999.
10       Do you see that?
11  A.  Could you ask the question again?  I'm sorry.
12  Q.  Included in this training booklet is reference to a Tom
13  Detelich HouseMail note dated January 4, 1999 --
14  A.  Yes.
15  Q.  -- do you see at the top there?
16  A.  Yes.
17  Q.  And there was some quotes from that e-mail.
18       Do you see that?
19  A.  Yes.
20  Q.  The first one reads, "New era for HFC.  HFC is committed
21  to growth primarily through real estate loans."
22       Do you see that?
23  A.  Yes.
24  Q.  Is that your understanding of the business plan at the
25  time?

O'Han - direct
2819

1   A.  I guess a vague recollection.
2   Q.  Okay.  Then if you skip a couple down, it reads,
3   "Marketing has been focused on finding new ways to support
4   your sales efforts in first mortgage and biweekly mortgage
5   lending."
6        Do you see that?
7   A.  Yes.
8   Q.  That was part of the growth plan too, wasn't it, sir?
9   A.  I would say yes.
10  Q.  Okay.  Then if you look at the bottom two entries there,
11  there's a big growth.  Starting there it says, "Growth was
12  mentioned 13 times in Mr. Detelich's HouseMail.  We plan to
13  give you the tools that will make you successful in selling
14  first mortgages."
15       Do you see that?
16  A.  Yes.
17  Q.  So it's fair to say, Mr. O'Han, that this booklet that
18  Mr. Walter was handing out and training on in 1999 was part of
19  the plan to grow the first mortgage sales of the company,
20  correct?
21  A.  Can you ask that question again?
22  Q.  It's fair to say, sir, that this booklet that Mr. Walter
23  was handing out in the summer and fall of 1999 was part of the
24  plan to grow the first mortgage sales; isn't that right?
25  A.  Yes.

O'Han - direct
2820

1   Q.  Now, if I could ask you, Mr. O'Han, to turn to the page
2   ending 772.  It's toward the back of this training manual.
3   A.  What was the number again?
4   Q.  772.
5   A.  Got it.
6   Q.  You're there?
7   A.  Yeah.
8   Q.  Okay.  The title of this worksheet is, "Biweekly versus 30
9   years."  You see that right at the top?
10  A.  Yes.
11  Q.  And it says, "Finding the 30-year equivalent of HFC's
12  biweekly program."
13       Do you see that, sir?
14  A.  Yes.
15  Q.  So this worksheet here shows the account executive or
16  branch sales manager how to calculate for the customers the
17  equivalent rate, right, sir?
18  A.  Let me just take a second.
19  Q.  Sure.
20    (Brief pause.)
21  BY THE WITNESS:
22  A.  It calculates the interest rate you'd have to get on a
23  30-year loan paid monthly to equal the total payback of our
24  loan, in this case, paid biweekly.  So it's comparing the
25  total payback of the interest.

O'Han - direct
2821

1   BY MR. BROOKS:
2   Q.  Okay.
3   A.  Is that --
4   Q.  And in this particular example, the equivalent rate is
5   7.33 percent, right?  See that at the very bottom?
6   A.  Yes.
7   Q.  Okay.  And, sir, if I could ask you to flip to the next
8   two pages.  These are the same worksheet.  They're just not
9   filled out, right?  On 773 and then on 774.  It says
10  "practice."
11       Do you see that?
12  A.  Yes.
13  Q.  Okay.  So these are the same; they're just not filled out
14  like the first one, right?
15  A.  Yes.
16  Q.  And one is blank and the other one says practice, right,
17  sir?
18  A.  Yes.
19  Q.  Okay.  So this is a copy of the training form for the
20  northeast division, correct?
21  A.  Can you ask that again?  I'm sorry.
22  Q.  This is a copy of the training that Mr. Walter did in the
23  northeast division, correct, sir?
24       MS. BUCKLEY:  Objection, foundation.
25       THE COURT:  Overruled.  You may answer.

O'Han - direct
2822

1  BY THE WITNESS:
2  A.  Can you ask the question again?
3  BY MR. BROOKS:
4  Q.  This is a copy of the training that Mr. Walter did in the
5  northeast division; isn't that right, sir?
6  A.  I don't know.
7  Q.  It's the same as the one you saw him give in the
8  southeast, correct?
9  A.  Similar.  I don't know.
10  Q.  These sheets, these three sheets we just looked at are the
11  same, aren't they, Mr. O'Han?
12  A.  They may be.  It's a long time ago.  You're asking for me
13  to -- you know, I just don't want to make a statement of fact
14  if I'm not positive here.
15  Q.  But you knew he had done trainings in divisions before
16  coming to yours, correct, sir?
17  A.  That's my recollection.
18  Q.  Okay.  Showing you what's been marked as Exhibit 901.
19       (Tendered.)
20  BY MR. BROOKS:
21  Q.  This document also has been admitted into evidence.
22       And, Mr. O'Han, this is a May 24, 2001, e-mail
23  forwarded to you by Mr. Pichoske.
24       Do you see that?
25  A.  Yes.

O'Han - direct
2823

1  Q.  And the e-mail that he's forwarding is from Philip Swetz
2  to Paul Pichoske, right?
3  A.  Yes.
4  Q.  And the subject of the e-mail is effective rate; is that
5  correct?
6  A.  Yes.
7  Q.  And, sir, I would just note that Mr. Pichoske here is a
8  DSM in the northeastern division at that point back in 2001,
9  right, sir?  Do you see that right next to his name?
10  A.  Yes.
11  Q.  So this is a year before Mr. Pichoske faxed you what is
12  Exhibit 899, the exhibit we just looked at; is that correct?
13  A.  It appears that way, yes.
14  Q.  Okay.  And in the top e-mail, Mr. Pichoske wrote, "Rob,
15  this is a scenario that my group has been using.  They have
16  been terming it equivalent rate which I thought was okay.
17  Should we discontinue this?"
18       Do you see that, sir?
19  A.  Yes.
20  Q.  So in 2001, Mr. Pichoske's group is using the equivalent
21  rate presentation; is that right?
22  A.  That's what it says.
23  Q.  Now, did Mr. Pichoske receive any corrective action?
24  A.  Not that I recall.
25  Q.  So when he told you in 2001 that a scenario that his group

O'Han - direct
2824

1  had been using, this equivalent rate scenario, he wasn't
2  disciplined in any way, was he?
3  A.  Not that I recall.
4  Q.  And, in fact, in 2002 or sometime after that, he was
5  promoted to district general manager, wasn't he, sir?
6  A.  Division general manager.
7  Q.  Division general manager?
8  A.  Correct.
9  Q.  And that's one bump up, right, sir?
10  A.  Correct.
11  Q.  Just under the RGM?
12  A.  Correct.
13  Q.  Okay.  I'd like to show you another document, Mr. O'Han.
14  Plaintiffs' Exhibit 903.
15       (Tendered.)
16  BY MR. BROOKS:
17  Q.  Sir, this is a fax from Mike Pinto to you dated May 22,
18  2001, correct?
19  A.  That's correct.
20  Q.  And you received this fax back in 2001?
21  A.  I would assume.
22       MR. BROOKS:  Your Honor, I'd move Exhibit 903 into
23  evidence.
24       THE COURT:  It will be admitted.
25  BY MR. BROOKS:

O'Han - direct
2825

1  Q.  Now, Mr. Pinto, he was the division general manager of the
2  mid-Atlantic region, right, Mr. O'Han?
3  A.  I believe so, yes.
4  Q.  And he was based out of Seven Fields, Pennsylvania?
5  A.  That's what it says.
6  Q.  And the subject of this fax is "1st mortgage."
7       Do you see that?
8  A.  Yes.
9  Q.  And Mr. Pinto, just like you, as a DGM had about 80 to a
10  hundred branches under his control; is that right?
11  A.  I would say the -- just put the range at 60 to a hundred
12  just because I'm not positive.
13  Q.  It varies from division to division?
14  A.  That's correct.
15  Q.  And that would be the same for Mr. Pichoske when he was a
16  DGM?
17  A.  Yes.
18  Q.  So 60 to a hundred that Mr. Pinto is responsible for.  And
19  as you can see if you flip to the next page and the page after
20  that, Mr. Pinto is sending to you from the mid-Atlantic region
21  the same forms that you received from Mr. Pichoske in the
22  northeast division, correct?
23  A.  It looks that way, yes.
24  Q.  Yeah.  It's got the biweekly versus 30 years?
25  A.  Yes.  I didn't compare every line.

O'Han - direct
2826

1  Q.  It's the same 7.33 percent?
2  A.  Yes.
3  Q.  The same 7.33 percent there?
4  A.  Correct.
5  Q.  And was Mr. Pinto disciplined in any way?
6  A.  No.
7  Q.  So at this point, sir, we've talked about you've seen the
8  Lew Walter presentation in the southeast and you've been faxed
9  these forms from the northeast and the mid-Atlantic divisions,
10  correct, sir?
11  A.  There's a time period in between there, but yes.
12  Q.  And you knew around May of 2001 that Mr. Walter had given
13  this training up in the northwest division because you were
14  getting a lot of complaints out of there, right, sir?
15  A.  That's my recollection.
16  Q.  I'd like to show you another exhibit, Mr. O'Han,
17  Plaintiffs' Exhibit 926.
18    (Tendered.)
19  BY MR. BROOKS:
20  Q.  Exhibit 926 is an e-mail from JoAnn Barnes to the witness,
21  Rob O'Han, and a couple of others, Krista Eads and Mandy
22  Bartels dated April 3, 2002.
23    Do you see that, Mr. O'Han?
24  A.  Yes.
25  Q.  And you received this e-mail back in April of 2002,

O'Han - direct
2827

1  correct?
2  A.  I would say so.
3  Q.  You have no reason to believe you didn't, do you, sir?
4  A.  No.
5    MR. BROOKS:  Plaintiffs move Exhibit 926 into
6  evidence.
7    THE COURT:  It will be admitted.
8  BY MR. BROOKS:
9  Q.  Ms. Barnes, who was sending you this e-mail at the time in
10  April of '02, was the district general -- the division general
11  manager in the HFC central division, correct, Mr. O'Han?
12  A.  That appears to be correct, yes.
13  Q.  So like the other division general managers, she was in
14  charge of 60 to a hundred branches; is that right, sir?
15  A.  Correct.
16  Q.  And the subject of this particular e-mail is customer
17  complaints.
18    Do you see that?
19  A.  Yes.
20  Q.  Flipping to the second page, sir, I would like to focus
21  your attention on the first paragraph there.  Okay?  And the
22  first sentence reads, "Majority of the complaints are
23  regarding the interest rate and all are around discussions of
24  effective rates with the biweekly payments."
25    Do you see that, sir?

O'Han - direct
2828

1  A.  Yes.
2  Q.  And Ms. Barnes is telling you this in April of 2002,
3  correct?
4  A.  Yes.
5  Q.  Ms. Barnes goes on to say, "As we are no longer actively
6  discussing effective rates and disclosing them on HOLPs, this
7  should subside."
8    Do you see that, sir?
9  A.  Yes.
10  Q.  And so the central division was also using the effective
11  rate presentation; isn't that right, Mr. O'Han?
12  A.  At some point in time, some folks in that division were.
13  That's what it says, yes.
14  Q.  The majority of the complaints they were getting were
15  regarding interest rates and were specifically regarding
16  discussions around effective rates, right, Mr. O'Han?
17  A.  That's what it says, yes.
18  Q.  So we've talked about the central division, the
19  mid-Atlantic, the northeast, the northwest and the southeast,
20  sir.  We haven't yet talked about the southwest division.  Who
21  is the division general manager there?
22  A.  A gentleman by the name of -- what time period are we
23  talking about?
24  Q.  The same time frame, '99 to 2002.  Let's talk summer of
25  '01 specifically.

O'Han - direct
2829

1  A.  Okay.  That's better.  That would be Dennis Hueman.
2  Q.  Dennis Hueman?
3  A.  Yeah.
4  Q.  And Mr. Hueman, like the rest, was responsible for 60 to a
5  hundred branches, correct?
6  A.  Correct.
7  Q.  And he reported directly to you?
8  A.  Correct.
9  Q.  And in 2001, you learned that Mr. Hueman had created a
10  training video; is that right?
11  A.  Correct.
12  Q.  That was in June of 2001?
13  A.  Summer of 2001.
14  Q.  And you first learned of the video when Mr. Detelich and
15  Mr. Gilmer, your bosses, called you on the phone; is that
16  right?
17  A.  That is my recollection, yes.
18  Q.  And they called you in 2001.  They were on the same call;
19  is that right, sir?
20  A.  That's how I recall it, yes.
21  Q.  And Mr. Gilmer and Mr. Detelich had seen the video and
22  they called to talk about it; isn't that right?
23  A.  That's correct.
24  Q.  So you talked to Mr. Gilmer and Mr. Detelich.  They told
25  you about what was on the video because you hadn't seen it at

O'Han - direct

2830

1  that time; is that right?
2  A. That's my recollection, yes.
3  Q. So you talked to them. They said they had seen it. They
4  said they were concerned; is that right?
5  A. Yes.
6  Q. And so Mr. Gilmer instructed you to fire Mr. Hueman on the
7  spot, right, Mr. O'Han?
8  A. No.
9  Q. He didn't?
10  A. No.
11  Q. I take it he didn't want to go around the chain of
12  command, so he let Mr. Detelich tell you to fire Mr. Hueman on
13  the spot; is that what happened?
14  A. No.
15  Q. Did you fire Mr. Hueman?
16  A. No.
17  Q. Even after you watched the video, you didn't fire him, did
18  you?
19  A. No.
20  Q. Mr. Hueman was never fired for this video, was he, sir?
21  A. No.
22      MR. BROOKS: No further questions, your Honor.
23      THE COURT: This may be a good time to break before
24  we start the cross. Why don't we take a 15-minute break,
25  ladies and gentlemen.

O'Han - cross

2831

1  (Jury out.)
2      THE COURT: You may step down, sir.
3  Anything we need to take up?
4      MR. BURKHOLZ: No, your Honor.
5      MR. KAVALER: No, your Honor.
6  (Recess taken.)
7      THE COURT: Bring out the jury? Yes? No? Leave
8  them back there?
9      MR. KAVALER: Yes, your Honor.
10  (Jury in.)
11      THE COURT: You may cross-examine.
12      MS. BUCKLEY: Thank you, your Honor.
13          CROSS-EXAMINATION
14  BY MS. BUCKLEY:
15  Q. Good morning, Mr. O'Han. I'd like to show you what's been
16  marked as Defendants' Exhibit 184.
17      MS. BUCKLEY: It's in evidence, your Honor.
18  May I approach?
19      THE COURT: Yes, you may.
20  (Tendered.)
21      MR. KAVALER: Can we have the switch, your Honor?
22      THE COURT: Indeed.
23  BY MS. BUCKLEY:
24  Q. Mr. O'Han, can you tell us what this document is?
25  A. It's a bulletin board message. It's one of the ways we

O'Han - cross

2832

1  communicate with all the employees within the company at that
2  point in time.
3  Q. And I take it you're the author of this bulletin board
4  message; is that right?
5  A. It's from me. The author would be the policy and
6  compliance department.
7  Q. And I see that it's dated May 24, 2001. Did you send this
8  bulletin board to all HFC sales offices and HFCPS management
9  on or about May 24, 2001?
10  A. That's my recollection.
11  Q. Why?
12  A. To clarify policy regarding the quoting of rates to
13  customers and also ensuring that branch offices -- indicating
14  that branch offices needed to utilize only authorized
15  materials, sales materials.
16  Q. Could you refer back to what you were asked about earlier
17  today, Mr. O'Han, Plaintiffs' Exhibit 901. Do you have that
18  handy?
19  A. I'm sorry. Say that again, please.
20  Q. Do you have Plaintiffs' 901, Exhibit 901, handy? You were
21  asked about it this morning, earlier this morning.
22  A. Yeah, I'm going to find it.
23  Q. Sure.
24  A. Yes, I do.
25  Q. And this was the e-mail from Paul Pichoske to you dated

O'Han - cross

2833

1  May 24, 2001?
2  A. Yes.
3  Q. Okay. At this time, were you trying to collect
4  information concerning this effective rate issue?
5  A. That is my recollection.
6  Q. Why?
7  A. We -- sometime in the first part of 2001, we had begun
8  receiving customer complaints regarding confusion over
9  interest rates. And we were trying to -- through -- through
10  the investigation of those, we wanted to understand what was
11  causing -- causing the influx of complaints.
12  Q. Did you -- do you know whether you responded to
13  Mr. Pichoske's e-mail of May 24, 2001? Do you recall?
14  A. I don't specifically recall.
15  Q. But that same day you sent out the bulletin board that
16  we've marked as Defendants' 184 in evidence; isn't that right?
17  A. That's correct.
18  Q. If you could pull out Plaintiffs' Exhibit 903 that you
19  were shown earlier today, Mr. O'Han.
20  A. I have it.
21  Q. You have that?
22  A. Yes, ma'am.
23  Q. Do you know the circumstances under which Mr. Pinto sent
24  you this document?
25  A. I would have a vague recollection.

O'Han - cross
2834

1 Q. What's your recollection?
2 A. Probably in response to the -- either the bulletin board
3 or some other type of discussion around the customer
4 complaints.
5 Q. But this was about the time that you were looking into
6 whether there were unauthorized sales material in branches,
7 wasn't it?
8     MR. BROOKS: Objection, leading.
9     THE COURT: Sustained.
10 BY MS. BUCKLEY:
11 Q. Was this the time you were looking into whether there was
12 unauthorized sales material in branches, Mr. O'Han?
13 A. I believe so, yes.
14 Q. If you could pull out the document that plaintiffs'
15 counsel showed you this morning, which is Plaintiffs' Exhibit
16 926.
17     Do you have that?
18 A. I have it.
19 Q. Okay. And this is dated April '02; is that correct?
20 A. That's correct.
21 Q. April 3, '02, to be exact.
22     Could we -- it's already there. Pull this up on the
23 screen.
24     If you could turn to page two, which was the page
25 that Mr. Brooks was asking you about, Mr. O'Han --

O'Han - cross
2835

1 A. Yes, ma'am.
2 Q. -- which kind of runs over from the bottom of page one.
3 There's a heading which says -- at the bottom of page one,
4 there's a heading "Term-specific issues." And then it lists
5 complaints. Do you see that? One complaint regarding PPP,
6 three complaints regarding monthly payment amount, six
7 complaints regarding rate, two attorney general, three reg,
8 two BBB, one complaint regarding fees on loan.
9     Do you see that?
10 A. Yes.
11 Q. Then right after that is the sentence Mr. Brooks pointed
12 you to which is, The majority of the complaints are regarding
13 the interest rate and all-around discussions of effective
14 rates with the biweekly payments. Then it goes on, As we are
15 no longer actively discussing effective rates and disclosing
16 them on HOLPs, this should subside. In the meantime, the best
17 course of action is to teach the BSMs how to handle these
18 types of issues at the branch level by working with the
19 DSM/DGM for resolution versus the customer feeling no option
20 but to go to an agency/state, slash, an abbreviation for
21 attorney general.
22     And then we see three of these loans are in the
23 process of being rewritten to satisfy the customer. One we
24 have submitted an offer to the customer and two we have adjust
25 the rates on the account to resolve.

O'Han - cross
2836

1     Do you see that?
2 A. Yes.
3 Q. So we're talking about a total of six complaints here; is
4 that right, Mr. O'Han?
5 A. It appears that way, yes.
6 Q. Mr. Brooks asked you a few questions about your
7 conversation with Mr. Gilmer and Mr. Detelich concerning
8 Dennis Hueman's videotape.
9     Do you recall that?
10 A. Yes.
11 Q. I wrote down very carefully what he asked you and I wanted
12 to ask you about it. He asked, And Mr. Gilmer and
13 Mr. Detelich had seen the video and they called to talk about
14 it; isn't that right? And you answered, That's correct.
15     I'd like to break down the question because there's
16 actually two in there, Mr. O'Han.
17     You recall that Mr. Gilmer and Mr. Detelich called
18 you to talk about the tape, don't you?
19 A. Yes.
20 Q. Do you know whether or not Mr. Gilmer or Mr. Detelich saw
21 the tape?
22     MR. BROOKS: Objection, asked and answered.
23     THE COURT: Objection again?
24     MR. BROOKS: Asked and answered, your Honor.
25     THE COURT: Overruled.

Fischel - direct
2837

1 BY THE WITNESS:
2 A. I know for -- my recollection is Tom Detelich definitely
3 saw it. I cannot say for sure if Gary had seen it or not.
4 BY MS. BUCKLEY:
5 Q. Okay.
6 A. He may have.
7 Q. Okay. You just don't know one way or the other?
8 A. As I sit here today, no.
9 Q. Okay.
10     MS. BUCKLEY: No further questions, your Honor.
11     THE COURT: Redirect.
12     MR. BROOKS: No more questions, your Honor.
13     THE COURT: You may step down, sir.
14     MR. BURKHOLZ: Your Honor, plaintiffs call Daniel
15 Fischel back to the stand.
16     THE COURT: You understand, sir, that you're still
17 under oath?
18     THE WITNESS: I do, your Honor.
19     DANIEL FISCHEL, PLAINTIFFS' WITNESS, PREVIOUSLY SW
20     DIRECT EXAMINATION (Resumed)
21 BY MR. BURKHOLZ:
22 Q. When we left off Thursday, we were discussing the
23 disclosures by third parties, like analysts and media, in late
24 2001 and 2002; do you recall that?
25 A. I do.

Fischer - direct

2838

1  Q. How does that relate to your opinion that investors were
2  not told the truth about Household?
3  A. Well, Household is really the party in the best position
4  to tell investors about its own practices. And to the extent
5  that there are disclosures coming out by third parties who are
6  increasingly critical, increasingly skeptical, increasingly
7  disbelieving of Household's denials, that provides some
8  information to investors, but it's not the same thing as
9  Household itself telling investors about its own practices.
10  Q. And did you see evidence of criticism by analysts
11  increasing in late 2001 and throughout 2002 and denials by
12  management becoming less accepted by investors and analysts?
13  A. Yes, that was very much the pattern. The history during
14  the entire relevant period of this case was accusations
15  followed by denials. And for the first part of the period,
16  investors really didn't know what to believe, and the denials
17  were given some credence.
18      But by the end of the period, analysts and
19  third-party commentators were openly skeptical of management's
20  denials because there was so much evidence accumulating to the
21  contrary.
22  Q. Let me show you what we've marked as Plaintiffs' Exhibit
23  1446. It's already in evidence.
24  (Tendered.)
25  BY MR. BURKHOLZ:

Fischer - direct

2839

1  Q. What is Exhibit 1446?
2  A. This is an American Banker article dated May 31, 2002.
3  Q. And is this a denial by Household management that relates
4  to your opinion?
5  A. Yes, very much so. And, again, it's an indication by the
6  analysts that they're not quite sure whether the denial is
7  credible or there aren't going to be a lot more bad things to
8  come.
9  Q. Okay. Let's turn to the second page of the document. If
10  we can highlight the part that begins with, Ms. Hayden said
11  Household took full and prompt responsibility.
12      What is the significance of that statement and the
13  statement underneath it?
14  A. Well, this was a statement by a Household representative
15  that Household acknowledged there was a complaint that
16  customers -- some customers were confused about the rates that
17  they were paying on their loan. But then she said that
18  Household was satisfied that this was basically a localized
19  situation, an isolated situation in one particular branch, but
20  again consistent with the pattern that I just described a
21  minute ago because this is very late in the period, very late
22  in the relevant period.
23      The author of the article then says, But Wall Street
24  analysts wonder if this is the tip of an expensive iceberg,
25  meaning that they didn't believe it was localized. They

Fischer - direct

2840

1  didn't believe it was isolated. They believed this was just
2  the beginning of a lot more bad information coming out about
3  Household's predatory lending practices and its aggressive
4  accounting which again is, in fact, exactly what happened.
5  Q. And does this article relate to your leakage opinion?
6  A. Yes, very much, that -- as I said, I have two methods for
7  quantifying the amount of inflation. The first method focused
8  on 14 specific disclosures, but I also explained that the 14
9  specific disclosures don't fully capture the negative
10  information that was increasingly coming out about Household
11  that wasn't present at the beginning of the relevant period
12  but became increasingly present towards the end of the period.
13      And this statement about Wall Street analysts
14  speculating about how big and bad this problem was going to be
15  and increasingly so as Household's denials became less and
16  less credible, that's precisely what underlies the leakage
17  theory.
18  Q. And did you review an analyst's report by CFRA issued in
19  the summer of 2002 that was critical of Household's re-aging
20  practices?
21  A. I did.
22  Q. And did that relate to your leakage model?
23  A. Yes. Really the same thing, that Household had defended
24  its treatment of its re-aging practices. There are a series
25  of disclosures by Household on that issue. But then when this

Fischer - direct

2841

1  CFRA report comes out -- it's an independent organization as I
2  understand it, and it concludes that basically all of
3  Household's disclosures on re-aging that it had defended were,
4  in fact, highly misleading.
5      And, again, that's another situation where Household
6  defended its practices, denied that there was a problem, and
7  then a third-party commentator comes along and says we've now
8  looked at this, we don't believe the denials, we think the
9  re-aging practices and the treatment of the re-aging practices
10  in Household's financial statements were misleading and did
11  not provide an accurate picture for investors.
12  Q. Let me show you what we've marked as Plaintiffs' Exhibit
13  515.
14  (Tendered.)
15      MR. BURKHOLZ: A copy for counsel.
16  BY MR. BURKHOLZ:
17  Q. Is Exhibit 515 an e-mail from Mr. Aldinger to Mr. Streem
18  attaching the CFRA report that you reviewed?
19  A. Yes.
20      MR. BURKHOLZ: Your Honor, we move Exhibit 515 into
21  evidence. I don't believe there's any objection.
22      MR. KAVALER: Just the limiting instruction.
23      MR. BURKHOLZ: Subject to the limiting instruction.
24      THE COURT: It will be admitted subject to the
25  limiting instruction.

Fischel - direct

2842

BY MR. BURKHOLZ:

Q. And if we can turn to the fourth page of the actual
document and highlight the top part where it says, Account
re-aging obscures true credit loss experience.

What is the significance of that part of the report
to your opinion?

A. This is really the conclusion that I just described; that
CFRA -- if we could highlight maybe the first sentence under
the -- yeah. That CFRA notes that Household's account
re-aging may obscure its credit quality picture and that
account re-aging increased in 2001 versus 2000.

So not only is the accounting misleading, but the
amount of the practice that's subject to the misleading
accounting is increasing over time.

Q. And is this CFRA report in the summer of 2002 similar to
the Legg Mason report that we looked at from December of 2001
that was critical to Household's re-aging practices?

A. Yes. There's a big difference between the information
available to investors at the beginning of the relevant period
in 1999 and what comes out by the end of the relevant period.
There are accusations throughout, but what occurs, the big
change, is that Household's denials become less and less
credible, less and less believed by analysts and investors
and, as a result, negative information about Household's
practices and the effect on its securities, its stock price,

Fischel - direct

2843

increases towards the end of the relevant period as you go
into 2001 and 2002.

Q. Okay. I'd like to go back to the Legg Mason December 11,
2001, report. If you have that in front of you. I think it's
tab nine of your binder.

If we can bring up the Plaintiffs' Demonstrative 140
again.

Plaintiffs' Demonstrative 140 is a demonstrative you
prepared, correct?

A. Correct.

Q. And these are the highlights from the Legg Mason report of
December 12, 2001, correct?

A. Correct.

Q. December 11, 2001.

A. Correct.

Q. And if you can take a look at the actual report, Exhibit
1410, I'd like to just highlight a few other parts of the
report.

1410 is already in evidence. If we can bring that
up.

Start on the second page under delinquencies. Do you
see the reference to a securitization document and then in the
third paragraph it says, Beyond the tortured wording?

Do you see that?

A. Yes.

Fischel - direct

2844

Q. And then a -- if we can go to the first page of the
report.

And if we can highlight where it says, Obviously a
big surprise to many, including us, was the 570-day charge-off
policy.

Do you see that?

A. I do.

Q. Okay. And then if we can highlight -- if we can turn to
the third page of the report, the top of that. If we can just
highlight where it says, Without this conventional disclosure,
we are left with many unanswered questions.

Do you see that at the top of the third page of the
report? We've highlighted it up on the screen.

A. Oh, I see. I had the wrong page. Yes, I see it.

Q. Okay. And then in the fourth paragraph of that page where
it says, Once again a few questions. Is it 300 days, ten
months, or 270 days, nine months, as stated in the annual
report.

Do you see that?

A. I do.

Q. And what is the significance of all these questions being
raised by the analysts with respect to a Household
securitization document?

A. Again, this is right after a defense by Household of -- by
Mr. Aldinger right after the Barron's article came out on

Fischel - direct

2845

December 3. And this, again, is a situation where independent
third parties are trying to assess whether management's denial
is believable or, alternatively, whether the critics are right
that there's something fundamentally wrong with Household's
predatory lending practices as well as its accounting
treatment.

And what this particular analyst concludes, as I
think is obvious from the language, is that looking at
everything, looking at the disclosures in the financial
statements, the disclosures in the securitization
prospectuses, Household's defense of its re-aging practices,
the analyst is simply not convinced that investors are getting
an accurate picture of Household's true financial situation
and is raising all these doubts and all these questions that
remain unanswered, which the CFRA report that you just showed
me a minute ago, a little bit later reaches a more definitive
conclusion that Household's treatment of its re-aging
practices is affirmatively misleading for investors.

Q. And the market reacted negatively to Household's stock
when this analyst raised these concerns?

A. Correct.

Q. Now, I wanted to ask you a few questions about your
compensation and then finish up with one more topic.

How many professionals at Compass Lexecon worked with
you on this matter?

Fischel - direct

2846

1   A. Altogether, you know, I'd estimate maybe 20.
2   Q. And approximately how many hours did you and your team
3   work on this matter?
4   A. Well, as of the last go, I think I worked altogether a
5   little over 200 hours. And I think with respect to the whole
6   team, it would be thousands and thousands of hours for sure.
7   Q. And what were the approximate range of hourly rates for
8   the members of your team?
9   A. You know, my guess, they'd range from about $200 an hour
10  to my rate, which is a thousand dollars an hour.
11  Q. And did you produce expert reports in this case?
12  A. Multiple expert reports.
13  Q. And did you respond to the defendants' experts' reports?
14  A. Yes, the defendants' expert reports I think totaled over
15  7,000 pages and obviously took a lot of work to respond to
16  them.
17  Q. Okay. I want to show you what we marked as Plaintiffs'
18  Exhibit 1473.
19      (Tendered.)
20      MR. BURKHOLZ: A copy for counsel.
21      Your Honor, this is a list of the statements that
22  plaintiffs allege are false or misleading that the other --
23  the defendants have stipulated are the statements in the case
24  or -- and the press releases will be admitted in through
25  Mr. Aldinger. We'd like to admit this into evidence at this

Fischel - direct

2847

1   time.
2       MR. KAVALER: Your Honor, could we have a moment?
3   (Brief pause.)
4       MR. KAVALER: Your Honor, could we have a sidebar?
5       THE COURT: Sure. What's the exhibit number again?
6       MR. BURKHOLZ: It's 1473.
7   (Proceedings heard at sidebar:)
8       THE COURT: Okay.
9       MR. KAVALER: Your Honor, this is the same document
10  that's been the subject of the most recent conversation at the
11  jury trial -- charge conference last Friday, and this presents
12  the same issues that were raised there about what the jury is
13  being told about this compilation. And we do not agree this
14  compilation should be shown to the jury.
15      We have discussed at various times the limited
16  agreement that we had made as to who these statements were
17  issued by, who some of these statements were made by. We
18  don't agree to the format. We don't agree to the
19  presentation. We think the document is misleading in this
20  format as we said before. And you're constantly being told we
21  stipulated to this. That's not accurate. What we stipulated
22  to was an attachment to a document that --
23      THE COURT: Wait. I get your point. Now you're
24  offering this for what?
25      MR. BURKHOLZ: We want to put it into evidence before

Fischel - direct

2848

1   we close our case. We can do it with, Mr. Aldinger.
2       THE COURT: What's it being offered for, is what I
3   want to know. What are you trying to prove with this thing?
4       MR. BURKHOLZ: We're going to talk about one of the
5   statements in there. I don't need to use the document with
6   him.
7       THE COURT: Then don't use it for now.
8   (Proceedings heard in open court:)
9   BY MR. BURKHOLZ:
10  Q. You testified Thursday that, I formed the opinion that
11  Household's disclosure defects, its inaccurate disclosures
12  caused there to be significant inflation in Household stock
13  price for much of the relevant period.
14      That is your opinion?
15  A. Correct.
16  Q. When you refer to disclosure defects causing inflation in
17  Household's stock, does that refer to statements plaintiffs
18  allege were false or misleading that were Household's public
19  statements to the media, press releases, 10-Qs and 10-Ks?
20  A. Yes, both misleading statements and things that were left
21  out that would have been necessary to provide a more correct
22  picture of Household's financial situation.
23  Q. Okay. Let's look at two of the statements Household
24  issued that plaintiffs allege were false or misleading. Let's
25  focus on your leakage model.

Fischel - direct

2849

1       Can we bring up Exhibit 1395 that's been admitted
2   into evidence, and if we can highlight August 16, 1999.
3       Do you have Exhibit 1395?
4   A. I can see it -- I do have it, but I can see it on the
5   screen.
6   Q. I think it's tab 28 of your binder.
7   A. Okay. I have it now.
8   Q. Okay. And this is your daily quantification of inflation
9   under your leakage model?
10  A. Correct.
11  Q. Okay. Now, you assume, do you not, that plaintiffs can
12  prove that Household's statement on August 16, 1999, was false
13  or misleading?
14  A. Correct. All of my opinions are based on that assumption.
15  The issue of falsity is really one for the Court and the jury
16  to decide. It's not for me to decide.
17  Q. And that's a common assumption in your field in estimating
18  damages?
19  A. A necessary assumption because economists don't decide
20  truth or falsity. That's for the Court and the jury.
21  Q. Can you explain how you determined the inflation of $16.48
22  on August 16, 1999, as it relates to Household's 10-Q that was
23  issued on that day?
24  A. Yes. What -- the way the methodology works is that there
25  is an ending date on October 10 and 11 of 2002; and based on

-                                                                                    -

Fischel - direct
2850

1  that ending date, what the model -- what the methodology
2  attempts to do is attempts to predict what Household's price
3  would have been on any given day, which is the true value
4  line -- the true value column rather, relative to the stock
5  price, which is the first column, based on a statistical model
6  of how Household's stock should behave in light of its
7  statistical relationship between the overall market and the --
8  the industry, the S&P Financials Index.
9        Remember, those are the two indexes that Household
10  itself said its performance should be judged against.  There's
11  a slightly different treatment before and after November 15,
12  2001, because remember that's the first date that I identified
13  that the market really started to become skeptical of
14  Household's denials.
15       But the basic idea is this statistical model trying
16  to adjust the actual stock price for how the stock price would
17  have behaved had there been no false and misleading
18  statements, had there been no continual leakage of negative
19  information, particularly after November 15, 2001.
20  Q.  And if there is no false or misleading statement before
21  August 16, 1999, does that mean that there's zero inflation in
22  the stock?
23  A.  No.  So long as there is a false and misleading statement
24  on this particular date, inflation would begin on this date
25  going forward.  But, again, I want to be careful because if

-                                                                                    -

Fischel - direct
2851

1  there's no false and misleading statement before this date,
2  then any purchasers before this date wouldn't suffer any harm
3  and wouldn't be entitled to any recovery.
4        There would be no difference between the stock price
5  and the true value the way there is on my exhibit because I
6  assumed the false and misleading statements began on July 30,
7  1999.  But if it's more accurate, as I said in my report,
8  actually to start on August 16, then anybody who purchased
9  between July 30 and August 16, those columns in the exhibit,
10  would basically disappear and inflation would begin on August
11  16.
12  Q.  Okay.  Let's assume the Court and the jury doesn't find
13  the August 16, 1999, statement to be false or misleading.  And
14  then let's look at the next public statement on the next page
15  of October 19, 1999.
16       If we can highlight that.
17       Is Household's stock now inflated by the next
18  statement, October 19, 1999, assuming the prior statement is
19  not false or misleading?
20  A.  It's really the exact same point.  Under what my analysis
21  does is it provides a method of quantifying the amount of
22  inflation on any given day and subsequent days, provided that
23  the jury finds that as of that date a false and misleading
24  statement has been made.
25       So if the jury were to conclude that there were no

-                                                                                    -

Fischel - direct
2852

1  statements that were made before October 19, 1999, that were
2  false and misleading, then for all practical purpose, my
3  exhibit should be read as beginning on that date.  And there
4  would be, again, for all dates before that no difference
5  between the stock price and the true value line, no artificial
6  inflation; any purchasers in any period before October 19,
7  1999, would not suffer any harm.
8  Q.  And do subsequent statement -- public statement by
9  Household cause inflation to remain in a stock?
10  A.  Yes, absolutely.  And any increases or decreases depending
11  on misrepresentations, which occurred at the time of December
12  5 when there was the response to the Barron's article, another
13  misrepresentation with the best practices initiative in
14  February, those would be misrepresentations which affect the
15  amount of inflation.
16       There would be more inflation coming in to the stock
17  on those days.  But basically, as of the first false and
18  misleading statement, there would be inflation on every single
19  day after that until the false and misleading information was
20  corrected.
21  Q.  And does the -- as the truth comes out in late 2001 into
22  2002, what happens to the inflation in the stock until the end
23  of the relevant period?
24  A.  For the most part, it declines.  Because what's happening
25  is as more and more -- there are more and more criticisms of

-                                                                                    -

Fischel - direct
2853

1  Household's practices, which become believable -- more and
2  more believable by investors, causing the stock price to
3  decline.
4        The effect of that is, in effect, to partially cure
5  the false information that's existed from the beginning so the
6  amount of inflation over time declines so that it's zero at
7  the end when the truth is revealed.
8  Q.  And does a company like Household need to admit its prior
9  statements were false in order for the truth to come out as
10  relates to those statements?
11  A.  Well, in an ideal world, yes.  But as a practical matter,
12  frequently what happens, as in this case, is that the denials
13  become less and less credible to the point that investors
14  learn the truth simply because the denials are not matched by
15  what occurs in reality in the real world.
16       And investors and analysts can see what happens in
17  the real world, and that can ultimately, in effect, constitute
18  the truth, although obviously it's better if the company
19  itself tells the truth.
20  Q.  And let's take a look at your demonstrative, Plaintiffs'
21  Demonstrative 136.  I think it's tab 24 of your binder.
22  A.  I have it.
23  Q.  And this is a demonstrative that you prepared, correct?
24  A.  It is.
25  Q.  And Household's stock declined from about $60 to $28 as

- 2856

Fischel - direct

2854

1 the truth leaked out from November 2001 to October 2002?
2 A. Correct, from November 15, 2001, to October 11 of 2002. I
3 should also say of these -- I think there's almost 70 firms in
4 the S&P Financials Index. These are indexes which is a
5 composite of firms.
6     But if you look at the firms individually, Household
7 was the fourth worst-performing firm out of 70 firms during
8 this particular period. So they dramatically underperformed
9 relative to the indexes that Household itself deemed to be
10 comparable. But if you look at the individual firms that
11 compose the index, Household is the fourth worst as compared
12 to the full 70 firm set.
13 Q. Now, your specific disclosure model estimates inflation of
14 only about $7.97 during this period, correct?
15 A. As the maximum amount, correct.
16 Q. And your opinion is that that understates the inflation in
17 Household's stock due to Household's public statements?
18 A. Yes, because it doesn't take into account the leakage that
19 we've been discussing and I've been describing.
20 Q. And your leakage model estimates daily inflation ranging
21 from $13 to approximately $23 for each day of the relevant
22 period?
23 A. Yes. And actually, let me just explain why there's a cap
24 of $23. Because what I did was I calculated the total
25 underperformance of Household on -- relative to these indexes

Fischel - direct

2855

1 based on my statistical model and that number was, I think,
2 $23.94 or something like that.
3     So I made that the maximum possible inflation on any
4 given day. So even when my model would predict or would
5 indicate inflation of more than $23.94, I made $23.94 the cap
6 because that's the amount that Household underperformed the
7 S&P Financials Index and the S&P 500 Index.
8 Q. So compared to the stock price decline of $32, you
9 attribute anywhere from 13 to $23 due to disclosures related
10 to the fraud?
11 A. 13 to $23 based on leakage and $7.97 as the maximum under
12 the specific disclosure models.
13 Q. And it's your opinion that the leakage model is a better
14 estimate of the inflation in Household's stock price during
15 the relevant period due to the alleged false statements and
16 omissions?
17 A. Correct, because it takes into account the economic
18 reality in this case where negative information came out
19 slowly over time precisely because Household did not admit the
20 predatory lending practices that it was involved in or the
21 improper accounting as a result of re-aging, and the
22 restatement of the truth only became known gradually as a
23 result of real world events and commentary by third parties.
24     MR. BURKHOLZ: Nothing further at this time, your
25 Honor.

1     THE COURT: Cross-examine.
2     MR. KAVALER: Thank you, your Honor.
3          CROSS-EXAMINATION
4 BY MR KAVALER:
5 Q. Good morning, Professor Fischel.
6 A. Good morning.
7 Q. My name is Tom Kavaler. I represent the defendants.
8 A. We met before actually.
9 Q. Briefly, I think.
10     And I'm going to ask you some questions today. I'm
11 going to try to -- try to understand what you said on direct
12 and explore how it applies to some other aspects of the case
13 that I'm interested in. I would appreciate it if you would
14 answer the questions I ask you and just those questions.
15     Can you do that?
16 A. I will do my best, sir.
17 Q. Excellent.
18     Now, you have an extensive background in this area in
19 connection with disclosures and their impact on stock price,
20 don't you?
21 A. I do.
22 Q. You are widely regarded as if not the preeminent, one of
23 the preeminent experts in this field; are you not?
24 A. That's very kind of you to say. I hope that's the case,
25 but I accept your gracious compliment.

- 2857

1 Q. And your work has been cited by the Supreme Court,
2 correct?
3 A. It has.
4 Q. And, in fact, when we were looking for an expert, we
5 contacted you to see if you were available, but you had
6 already been hired by these folks, correct?
7 A. You were nice enough to contact me to try and hire me in
8 this case, but I was already retained, yes.
9 Q. And you've conducted a substantial number of event studies
10 in connection with various cases over the years?
11 A. I have.
12 Q. An event study is a well-established methodology for
13 analyzing loss causation in securities fraud cases?
14 A. Correct.
15 Q. In fact, an event study is widely regarded as the gold
16 standard by both courts and economists for evaluating the
17 economic aspects of a case like this?
18 A. In connection with -- in combination with other economic
19 evidence, I would say that's correct.
20 Q. And you conducted an event study in this case?
21 A. We did.
22 Q. And, in fact, the results are one of the documents marked
23 in evidence?
24 A. Correct.
25 Q. And you used your event study to analyze and detail the

2866

```
1   that I didn't understand that.  Let me be sure we're precisely
2   on the same page.
3          In that time period starting November 15, 2001,
4   basically the inflation is coming out, but there are a couple
5   of days where new inflation comes in and the amount of
6   inflation increases; but over the time period net/net, it's
7   decreasing, correct?
8   A.  Net/net, that's correct; but on a daily basis, you need to
9   look at the particular --
10  Q.  And we're going to do that in a minute, sir.  I just
11  wanted to be sure I understood.
12         So by November 15, 2001, the inflation was in there.
13  And then subject to the couple of days where it goes up, from
14  there to October 21, it's essentially coming out?
15  A.  Again, I don't want to accept essentially coming out.  But
16  under my analysis, inflation exists from the first time the
17  jury concludes that there is a false or misleading statement
18  either as a result of a misrepresentation or as a result of a
19  failure to disclose something about Household's lending
20  practices or accounting that should have been disclosed, and
21  then it continues throughout the relevant period.
22         The first under -- particularly under my first method
23  focusing on specific disclosures, the first time where
24  inflation decreases is on November 15, 2001, because of the
25  CDC lawsuit.  And after that, it fluctuates on a day-by-day
```

2867

```
1   basis; but for the most part, I'm agreeing with you that it
2   declines until October 10 and 11.
3   Q.  And I'm agreeing with you, sir.  I'm just trying to find
4   shorthand phrases so we don't spend the entire day speaking to
5   each other in these lengthy sentences and wasting people's
6   time.
7          Would you prefer if I said inflation decreases
8   instead of coming out?
9   A.  I really don't want to quibble.  I think the point is
10  clear.  Overall it decreases if you look at the beginning
11  point and the endpoint.  But on a daily basis, it's not
12  necessarily correct.
13  Q.  Understood.  I think we're on the same page.  Okay.
14         THE COURT:  Let -- since you both understand each
15  other at this point, it may be a good time to stop for lunch.
16         MR. KAVALER:  Maybe the high point of the day, your
17  Honor.
18         THE COURT:  We will take an hour for lunch, ladies
19  and gentlemen.  Return at 1:00 o'clock, please.
20  (Jury out.)
21         THE COURT:  You may step down, sir.
22         We're recessed until 1:00 o'clock.
23         MR. KAVALER:  Thank you, your Honor.
24         (Trial adjourned until April 20, 2009, at 1:00 p.m.)
25
```

2868

```
1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
2                          EASTERN DIVISION
3   LAWRENCE E. JAFFE PENSION PLAN, )
    on behalf of itself and all    )
4   others similarly situated,      )
5              Plaintiff,           )
6      vs.                          ) No. 02 C 5893
7   HOUSEHOLD INTERNATIONAL, INC., )
    et al.,                         ) Chicago, Illinois
8              Defendants.          ) April 20, 2009
                                    ) 1:00 o'clock p.m.
9
10           TRANSCRIPT OF TRIAL PROCEEDINGS
        BEFORE THE HONORABLE RONALD A. GUZMAN
11
12  APPEARANCES:
13  For the Plaintiff:    COUGHLIN STOIA GELLER RUDMAN &
                          ROBBINS LLP
14                        BY: MR. SPENCER A. BURKHOLZ
                              MR. MICHAEL J. DOWD
15                            MR. DANIEL S. DROSMAN
                              MS. MAUREEN E. MUELLER
16                        655 West Broadway
                          Suite 1900
17                        San Diego, California  92101
                          (619) 231-1058
18
                          COUGHLIN STOIA GELLER RUDMAN &
19                        ROBBINS LLP
                          BY: MR. DAVID CAMERON BAKER
20                            MR. LUKE O. BROOKS
                              MR. JASON C. DAVIS
21                            MS. AZRA Z. MEHDI
                          100 Pine Street
22                        Suite 2600
                          San Francisco, California  94111
23                        (415) 288-4545
24
25
```

2869

```
1   APPEARANCES:  (Continued)
2   For the Plaintiff:    MILLER LAW LLC
                          BY: MR. MARVIN ALAN MILLER
3                         115 South LaSalle Street
                          Suite 2910
4                         Chicago, Illinois  60603
                          (312) 332-3400
5
6   For the Defendants:   CAHILL, GORDON & REINDEL LLP
                          BY: MR. THOMAS J. KAVALER
7                             MS. PATRICIA FARREN
                              MR. DAVID R. OWEN
8                             MS. JANET A. BEER
                              MR. JASON M. HALL
9                             MR. JOSHUA M. NEWVILLE
                              MS. KIM A. SMITH
10                            MS. SUSAN BUCKLEY
                              MS. YAFIT COHN
11                            MR. MICHAEL WERNKE
                          80 Pine Street
12                        New York, New York  10005
                          (212) 701-3000
13
14
15
16
17
18
19
20
21
22  Court Reporter:       NANCY C. LaBELLA, CSR, RMR, CRR
                          JOSEPH RICKHOFF
23                        Official Court Reporter
                          219 South Dearborn Street
24                        Room 1222
                          Chicago, Illinois  60604
25                        (312) 435-6890
                          Nancy_LaBella@ilnd.uscourts.gov
```

2870

1     THE CLERK:  02 C 5893, Jaffe vs. Household
2  International, Incorporated.
3     THE COURT:  Ready to resume?
4     MR. KAVALER:  Ready, your Honor.
5     THE COURT:  Bring out the jury, please.
6  (Jury in.)
7     THE COURT:  Welcome back, ladies and gentlemen.
8     Ready to resume?
9     MR. KAVALER:  Thank you.
10    DANIEL FISCHEL, PLAINTIFF'S WITNESS, PREVIOUSLY SW
11        CROSS-EXAMINATION - Resumed
12  BY MR. KAVALER:
13  Q.  All right, Professor Fischel.  Where I think we were was
14  we had talked about what you told us about last week.  Today
15  I'd like to spend a little time -- hopefully, very little --
16  trying to understand how the inflation came into the price of
17  the stock.
18    In other words, I want to see if we can observe
19  together where it came from, when it got there and what it was
20  the effect of, to use the word -- the reason, why I'm trying
21  to avoid the "caused" word?
22    I take it your sophisticated analysis can do that, as
23  well?
24  A.  Well, when the inflation comes into the stock, as I've
25  explained numerous times, is a function of what the jury

2871

1  concludes as to when the first leading -- first misleading
2  statement is.
3  Q.  That's the first time.  I'm going to talk about a later
4  period of time.  In the post-- I should have been clear.  In
5  the post-November 15 period.
6    You told us this morning there are days when it comes
7  in, days when it goes out?
8  A.  Correct.
9  Q.  That's what I want to talk about.
10    And I'm talking now specifically about your
11  quantification using specific disclosures.  In other words,
12  your first method.
13  A.  Okay.
14  Q.  Okay?
15  A.  Got it.
16  Q.  I'll tell you when we switch to the second method.
17  A.  All right.  That's fine.
18  Q.  Okay.
19    So, until I tell you that, we're talking about the
20  first method, all right?
21  A.  I understand.
22  Q.  Okay.
23    And in the quantification-using-specific-disclosures
24  model, what you attempted to do is based on the assumptions
25  you were asked to make by the plaintiffs about a false

2872

1  statement, you attempted to quantify the amount of inflation
2  that resulted and how that inflation varied over time as
3  different disclosures occurred which either increased or
4  decreased inflation during the relevant period, correct?
5  A.  Correct, although the quantification doesn't depend on any
6  assumption.
7  Q.  Okay.  I'll take out the assumption.
8    But that's what you're trying to find.  You're trying
9  to see how you can quantify the amount of inflation and how it
10  varied over time as different disclosures occurred which
11  either increased or decreased inflation?
12  A.  That's correct.
13  Q.  Okay.
14    And you prepared some charts which plaintiffs'
15  counsel moved into evidence, and one of them is Exhibit 1397
16  in evidence.
17    Do you have a copy of that up there or do you need
18  one?
19  A.  I do.  Just give me a second to find it.
20    MR. KAVALER:  Your Honor, may we publish this to the
21  jury?  It might be easier for them to follow along if they
22  have their own copy.
23    MR. BURKHOLZ:  It's fine.
24    THE WITNESS:  I have it, sir.
25    MR. KAVALER:  Okay.  In a moment, everyone will have

2873

1  it.
2    (Document tendered to the jury.)
3    MR. KAVALER:  Pass them out.
4    (Brief pause.)
5  BY MR. KAVALER:
6  Q.  And what this exhibit shows us, Professor, it presents the
7  quantification of total inflation on each day during the
8  relevant time period using your first method?
9  A.  That's correct.
10  Q.  And in this quantification using specific disclosures, you
11  only included those dates on which news --
12    MR. KAVALER:  Withdrawn.  That's not right.
13  BY MR. KAVALER:
14  Q.  This is every day from July 30 -- every -- that's not
15  right, either.
16    This is every trading day from July 30, 1999, through
17  October 11, 2002?
18  A.  Correct.
19  Q.  Okay.  Got it right on the third try.
20    Now, as you and I were discussing before lunch,
21  you've already shown us at least one example of inflation
22  going into the stock price; and, that was the December 5,
23  2001, event, correct?
24  A.  Correct.
25  Q.  Okay.

2886

1  A. Correct.
2  Q. And the artificial inflation the day before was 7.97,
3  correct?
4  A. That's right.
5  Q. And the artificial inflation the day after was 7.97?
6  A. Correct.
7  Q. In fact, to save time, the "Artificial Inflation" column
8  on this entire page is 7.97?
9  A. That's right.
10  Q. Okay.
11      So, that means, in the language we were just using --
12  we've just used -- the filing of the Household 10-K on August
13  16, 1999, had no effect on the amount of inflation in the
14  stock?
15  A. You know, you can't say that definitively. It depends.
16  Is this the -- what assumption am I making as to whether this
17  is the first false and misleading disclosure?
18  Q. I'll tell you what assumptions to make. Assume your chart
19  is accurate.
20  A. Okay.
21  Q. Assume I've read the numbers correctly.
22  A. Okay.
23  Q. And assume I'm trying to understand the process. So, I'm
24  looking at August 13, where I see the inflation is 7.97, okay?
25  A. Okay.

2887

1  Q. And, then, I'm looking at August 16 or August 17 because
2  we don't know what time of the day it was filed.
3  A. Right.
4  Q. And on both days I see "7.97."
5  A. Okay.
6  Q. So, the number hasn't changed?
7  A. All right. And let me explain why that is, sir.
8  Q. First, you agree with me?
9  A. No, obviously, the number hasn't changed.
10  Q. Okay.
11      And you prepared these numbers?
12  A. I did.
13  Q. I had nothing to do with it?
14  A. No, that's right, you had nothing to do with it.
15      But --
16  Q. All right.
17  A. -- the reason is that this document, as I hopefully
18  explained earlier, is based on the assumption that the first
19  time where there is a false and misleading disclosure or the
20  failure to make an accurate disclosure is on July 30th, 1999,
21  which is why the exhibit begins on July 30th, 1999.
22      Based on my first method, the specific disclosure
23  method -- not the second method, the specific disclosure
24  method -- nothing changes between the time of the first
25  misleading disclosure or failure to disclose on July 30th and

2888

1  August 16th. And that is why there was no change in inflation
2  between August 15th, August 16th, August 17th.
3      If, on the other hand -- and this is what I tried to
4  explain in terms of how the exhibit should be interpreted, if
5  -- the jury were to conclude that there was no misleading
6  disclosure on July 30th or failure to disclose accurately on
7  July 30th, but the first misleading disclosure was the second
8  quarter result announcement on August 16th, then the right way
9  to read the exhibit would be that the amount of artificial
10  inflation from July 30th to August 15th is zero; and, then, it
11  goes from zero to 7.97 on August 16th.
12      So, when inflation increases or decreases is a
13  function of what the jury concludes as to when the first
14  misleading disclosure that Household makes is. And the proper
15  number of inflation is zero on every day until the day that
16  the jury concludes, if they so conclude, that Household made a
17  misleading disclosure.
18  Q. But I'm looking at 1397 in the column headed "Artificial
19  Inflation." I don't see any zeros, right?
20  A. There's no zeros because of the assumption that -- I hope
21  I explained clearly, but if not, I'll try and explain it,
22  again.
23  Q. That's okay.
24  A. -- that the first time inflation entered Household's stock
25  price was July 30th. But that's a jury determination. It's

2889

1  not a determination for me to make.
2      So, any date later than that, if the jury concludes
3  that's the first date of a misleading disclosure, the right
4  way to read the exhibit is to substitute zero for 7.97 until
5  the date -- the first date -- that the jury concludes there
6  was a misleading disclosure.
7  Q. For purposes of this question, I'll agree with you. Let's
8  assume it starts on July 30, 1999, okay?
9  A. Okay.
10  Q. So, then, we agree that if it starts on July 30, 1999,
11  whatever Household said on August 16 had no effect?
12  A. That's correct --
13  Q. Okay.
14  A. -- based on that assumption.
15  Q. A witness named Mr. Devor was here last week and he showe
16  us this chart (indicating). I don't know if you can see that.
17  It's just the cover sheets of a series of 10-Ks and -Qs. And
18  this is the one I just asked you about, the June 30, 1999 --
19  A. Okay.
20  Q. -- Q, which was filed on August 16, 1999.
21      So, based on what we just talked about, I'm going to
22  cross that off my list. I will not come back to it, again,
23  and I will not put it on that list over there (indicating).
24  Okay?
25  A. Okay.

2890

1    Q. Okay.
2        If you look at your event study for this day --
3    that's Exhibit 1391, and it's on Page 1 -- did you find a
4    statistically-significant price increase that resulted in
5    inflation on August 16, 1999?
6    A. No, sir, I did not.
7    Q. Okay.
8        I should have asked you that before I put my X up
9    there. I apologize. I'll get the hang of this.
10       All right. Let's look at the next one.
11       Plaintiffs may show you a press release that -- I'm
12   sorry, plaintiffs may show the jury a press release -- that
13   Household issued on October 19, 1999. I'm going in
14   chronological order. How much did you find that inflation
15   increased or decreased on that date when that press release
16   was issued?
17       And to do that, we're going to look, again, at
18   Plaintiffs' 1397. We're going to turn to Page 2, look at the
19   entry for October 19. And to save time, I will observe --
20   tell me if I'm right -- this whole page also has actual
21   inflation steady at 7.97 throughout, correct?
22   A. Correct.
23       And, again, I just want to make sure we're talking
24   about my -- the first method.
25   Q. The first method.

2891

1    A. Okay.
2    Q. Absolutely.
3    A. Because the second method is different.
4    Q. Understood.
5        Your first method, 7.97 throughout the page, right?
6    A. Correct.
7    Q. So, therefore -- can I cut to the chase and eliminate all
8    the interim steps, therefore -- you agree that the filing by
9    Household -- the issuance by Household -- of the press release
10   on October 19, 1999, had no effect on the amount of inflation?
11   A. I would not agree with that for the reasons that I stated
12   before.
13       It would have no effect on the amount of inflation if
14   the jury were to conclude that Household made a false and
15   misleading disclosure prior to this date. If that were the
16   case, then there would be no change. But if the jury were
17   conclude that this was the first date where Household made a
18   false and misleading disclosure, again, then the proper way to
19   read the exhibit would be every day prior to this date would
20   have zero inflation and $7.97 of inflation would have entered
21   Household's stock price on this date.
22   Q. What I'm trying to avoid is me asking you the exact same
23   questions for every document and you giving me the exact same
24   answers. I'm accepting, for purposes of this series of
25   questions, what you said earlier, that your starting

2892

1    assumption was the first false statement was July 30.
2    A. Fine. It's just that I have to answer your question
3    accurately as you ask it.
4    Q. I appreciate that.
5        But on those assumptions, just as we established with
6    regard to the June 30 10-Q, so you would agree, would you not,
7    that the -- let me ask you before I do that -- let's look at
8    1391.
9        And we're looking for October 19, which is on Page 3.
10   October 19, 1999.
11       Do you see that?
12   A. I do.
13   Q. Did you find any statistically-significant price increase
14   that resulted in inflation on October 19, 1999?
15   A. No, I did not.
16   Q. Okay.
17       So, based on those two answers, I'm going to cross
18   off this one (indicating), and I'm not going to list it on
19   that board following the methodology we're using?
20   A. Sir, what you decide to cross off or what you do with your
21   boards, I'm not going to give you any advice on that.
22   Q. Fair enough.
23       But we agreed that we would list over there on the
24   white board any disclosure that caused an increase in
25   inflation. Remember that?

2893

1    A. Again, I'm not sure what decision rule you're using with
2    respect to what you're writing down, what you're crossing off,
3    what you're leaving alone. You know, that's however you
4    decide to do it.
5    Q. I'm sure the jury remembers what we said to each other.
6    I'm going to cross off this one and not come back to it,
7    again.
8        Let's go to the next one.
9        Plaintiffs have shown this jury the December 31st,
10   1999, 10-K that Household filed on March 28, 2000. Let's look
11   at first Exhibit No. 1397 for March 28, 2000. And that's on
12   Page 4.
13       And, again, we'll highlight it on the board there.
14       And to save time, you agree that the number in the
15   "Artificial Inflation" column on this page is $7.97 throughout
16   the page?
17   A. I do, sir.
18   Q. Okay.
19       Then let's go to your event study, which is
20   Plaintiffs' Exhibit 1391, and we'll find the same date, which
21   is 3-28-2000.
22       And that will be on Page 8.
23   A. Okay, I have it.
24   Q. Did you find any statistically-significant price increase
25   that resulted in inflation on March 28th, 2000?

2894

1  A. No, sir, I did not.
2  Q. All right. I won't bother you about this one.
3      MR. KAVALER: Don't have it? Plaintiffs'
4  Demonstrative 99.
5      Sorry. 99, 10-K.
6  BY MR. KAVALER:
7  Q. Plaintiffs have shown this jury the March 31, 2000, 10-K
8  that Household filed on May 10, 2000. Let's do the same
9  exercise. Let's look at your chart, which is 1397 in
10  evidence. Let's look at 5-10-2000, which is on Page 5.
11      Again, try to save time. Same result: No increase
12  in artificial inflation?
13  A. Correct.
14  Q. And now let's look at your event study, which is
15  Plaintiffs' 1391 for the same date. It's on Page 10. Did you
16  find a statistically-significant price increase that resulted
17  in inflation on May 10, 2000?
18  A. No, sir, I did not.
19  Q. Okay.
20      So, once again --
21      MR. KAVALER: I think I'm crossing the wrong thing
22  off. I'll fix it later. I'm confusing myself here.
23  BY MR. KAVALER:
24  Q. Plaintiffs have shown this jury the June 30 10-K -- 10-Q,
25  rather -- that Household filed on August 11, 2000. Let's look

2895

1  at August 11, 2000, in the first document, which is 1397.
2  It's on Page 6.
3      Once again, no increase in artificial inflation,
4  correct?
5  A. Correct.
6  Q. And let's look at it in your event study on Page 14.
7      Did you find any statistically-significant price
8  increase that resulted in inflation on August 11, 2000?
9  A. No, sir, I did not.
10  Q. All right.
11      Plaintiffs have shown this jury a newspaper article
12  in the St. Louis Post-Dispatch on November 1, 2000, and that
13  one says something about, "Craig Streem says HFC never
14  pressures people to buy credit life insurance."
15      Let's do the same exercise. Look at Plaintiffs'
16  Exhibit 1397 for November 1, 2000, at Page 7.
17  A. I see it.
18  Q. Okay.
19      No increase in artificial inflation in connection
20  with that event, either, right?
21  A. That's correct.
22  Q. All right.
23      Now, let's look at your event study, which is
24  Plaintiffs' Exhibit 1391. I'm going to go to Page 17. And
25  you see the entry there for 11-1-2000?

2896

1  A. I do, sir.
2  Q. Did you find any statistically-significant price increase
3  that resulted in inflation on 11-1-2000?
4  A. No, sir, I did not.
5  Q. Okay.
6      MR. KAVALER: Plaintiffs' Demonstrative No. 12,
7  please.
8  BY MR. KAVALER:
9  Q. Plaintiffs have shown this jury the Origination News
10  article that appeared on March 23, 2001, which says something
11  about Gary Gilmer saying the company's position on predatory
12  lending is perfectly clear.
13      I think we have the language up here. It's the
14  second one. This one here (indicating), down at the bottom.
15  A. I see it, sir.
16  Q. Okay. Thank you.
17      Let's look at your Plaintiffs' Exhibit 1397. We'll
18  go to Page 9. We'll look at 3-23-01. And let's look at
19  3-28-01. It's possible there might be a mistake in the
20  dating, possibly not; but, either way, there's no change in
21  the artificial inflation in that column?
22  A. That's correct, sir.
23  Q. Okay.
24      And, then, let's go to your event study. And I guess
25  we'll have to -- this is Exhibit No. 1391. It is the right

2897

1  date.
2      And we'll look at Page 21. Did you find a
3  statistically-significant price increase that resulted in
4  inflation in connection with either March 23 or March 28,
5  2001?
6  A. Let me just check something because -- it looks like March
7  23rd is a statistically-significant price increase.
8  Q. And the 28th is not?
9  A. Correct.
10  Q. Okay.
11      This is plaintiffs' board. So, we'll see how we
12  resolve that.
13      Let me ask you this -- well, let me come back to
14  that. So, we'll leave this one open for the moment.
15      The plaintiffs have shown this jury the December 31,
16  2000, 10-K that Household filed on March 28th, '01. That's
17  one of the dates we just looked at and, in Exhibit 1397, we
18  found no change in artificial inflation, correct?
19  A. That's correct.
20  Q. And on your event study, which is Exhibit 1391, we found
21  no statistically-significant price increase that resulted in
22  inflation on March 28, correct?
23  A. That changed the amount of inflation, correct.
24  Q. Okay.
25      So, that's the December 31 10-K. Plaintiffs have

2898

1  shown this jury the Star Tribune article that appeared on July
2  27, 2001 --
3          MR. KAVALER:  This is Plaintiff's Demonstrative 13.
4  BY MR. KAVALER:
5  Q.  -- in which they say Household spokeswoman Megan Hayden
6  said the terms of loans are disclosed to all customers?
7          MR. KAVALER:  You can put it right in front.  Put it
8  up -- sorry.  Should have known you'd know what to do.
9  BY MR. KAVALER:
10  Q.  So, we're looking at July 27, '01.  It's this one over
11  here (indicating).
12          It's Megan Hayden saying, "The terms of loans are
13  disclosed to all customers as required by state and federal
14  laws -- " and something has been left out on this board -- "so
15  I take exception to any characterization that we engaged in
16  predatory lending practices."
17          By the way, Professor, you understand these are
18  plaintiffs' boards, we just blew them up?
19  A.  I don't have -- I don't have -- any understanding, one way
20  or the other.
21  Q.  Do you see in the lower right-hand corner it says
22  "PDEM013"?
23  A.  Actually, I can't really read it from here, but I'm sure
24  that's what it -- there's no need to show it to me.  I'm sure
25  that's what it says.

2899

1  Q.  I was going to bring it over to you.
2  A.  No, I'm happy to --
3  Q.  And you know that means "plaintiffs' demonstrative"?
4  A.  That's fine.
5  Q.  So, I'm not the one who left whatever's left out of there,
6  but I'm not suggesting anything follows from it.
7          Okay.  Let's look at that date in Exhibit 1397.  It's
8  on Page 11.  And, again, we have an entire page where
9  artificial inflation is 7.97, correct?
10  A.  That's right.
11  Q.  So, no change here, either?
12  A.  Correct.
13  Q.  All right.
14          Let's now look in your event study.  This is at
15  Page -- this is Exhibit 1391.  And we go to Page 26, it's the
16  second entry down.
17          Did you find any statistically-significant price
18  increase that resulted in inflation on July 27, 2001?
19  A.  No, sir, I did not.
20  Q.  Let me see if I can shorten this.  In fact, you didn't
21  find any statistically-significant price increases that
22  resulted in inflation from July 30, 1999, through November 15,
23  2001; is that right?
24  A.  Under the first method, that's correct.
25  Q.  The first method.  Absolutely.

2900

1  A.  Correct.
2  Q.  Right?
3          Okay.
4          MR. KAVALER:  Let's put up everything we have that
5  the plaintiffs were kind enough to furnish us that occurred
6  before November 15, 2001.
7          (Brief pause.)
8          MR. KAVALER:  January 19, 2000; April 19, 2000;
9  August 11, 2000; October 18, 2000; January 17, 2001.
10          MR. BURKHOLZ:  Your Honor, is there a question
11  pending or is this demonstrative --
12          MR. KAVALER:  These are all following from the last
13  question, your Honor.  He told me everything remains the same
14  through a certain date.  I'm simply trying to expedite matters
15  so we don't waste all afternoon.  This is the same process I
16  went through each of the other exhibits.  I'd be happy to do
17  it piecemeal.  It will just take forever.
18          THE COURT:  Do you have an objection?
19          MR. BURKHOLZ:  Is there a question pending?
20          THE COURT:  Do you have an objection?
21          MR. BURKHOLZ:  No.  It's fine, your Honor.
22          THE COURT:  Okay.
23          MR. KAVALER:  Thank you.
24          THE COURT:  Proceed.
25          MR. KAVALER:  July 18, 2001.

2901

1  BY MR. KAVALER:
2  Q.  Now, Professor, I may not have a board for every
3  statement, but if the statement falls within the same time
4  frame as my last question, you'd give me the same answer?
5  A.  If you're just asking me the mechanical question as to
6  whether there's a change in the amount of inflation or whether
7  there's a statistically-significant price increase --
8  Q.  Those are my only questions.
9  A.  If those are your only questions, as opposed to explaining
10  why the numbers are what they are, then I agree with you.
11  Q.  All right.
12          Now let's look at some days after November 15.
13  A.  Okay.
14  Q.  We're not going to be able to expedite.  We're going to
15  have to go day by day.
16  A.  Okay.
17  Q.  Okay.  Plaintiffs may show this jury a December 4 -- I
18  think we did that already.  We did Goldman Sachs.  It's that
19  one (indicating).
20          MR. KAVALER:  Plaintiffs' Demonstrative 23, please.
21  BY MR. KAVALER:
22  Q.  Plaintiffs may show this jury a press release that
23  Household issued on January 16, 2002.  It looks like this
24  (indicating).  It's Mr. Aldinger in the photograph here and
25  talks about receivable and revenue growth exceeded our

2902

1  expectations, et cetera.
2      Let's look at January 16, 2002, in your exhibit,
3  Plaintiffs' Exhibit 1397.  And that will be on Page 14.
4      And you see that the inflation on January 15 is 3.66.
5  On January 16, it's 3.66.  On January 17, it's 3.66.
6      So, although we no longer have a full page of 7.97,
7  we still have the same phenomenon.  The artificial inflation
8  did not increase upon the issuance of this press release,
9  correct?
10 A.  That's correct.
11 Q.  Okay.
12     And now let's go to your event study, which is
13 Plaintiffs' Exhibit 1391.  And let's find the same date, which
14 is January 16, 2002, which will be on Page 32.  And tell me
15 whether you found a statistically-significant price increase
16 that resulted in inflation on January 16, 2002.
17 A.  No, sir, I did not.
18 Q.  Plaintiffs have shown this jury the Copley News Service
19 article --
20     MR. KAVALER:  This is Plaintiffs' Demonstrative 13,
21 please.
22 BY MR. KAVALER:
23 Q.  Plaintiffs have shown this jury the Copley News Service
24 article which appeared on February 6th, 2002.  I have it over
25 here (indicating):  "We do the right thing for our borrowers.

2903

1  We make good loans.  They're not only legal loans, but are
2  beneficial for our customers."
3      Do you see that?
4  A.  I do, sir.
5  Q.  Okay.
6      Let's look at our old friend Plaintiffs' 1397 for
7  that date, February 6.  I think we're on the same page, Page
8  14.
9      And you see the inflation there is -- it's a 3.66
10 number in a whole column of 3.66 numbers.  Not the entire
11 page, but a bunch of them, right?
12 A.  Correct.
13 Q.  Again, inflation did not increase upon the release of this
14 press release, right?
15 A.  That's right.
16     Again, we're talking only about the first method.
17 Q.  Only the first model.
18 A.  That's right.
19 Q.  Absolutely.  I promise you when I switch to the second
20 model, I'll tell you.  I have it in my notes.
21 A.  Okay.
22 Q.  First model.  I agree with you.
23     Now, let's look at our event study, Plaintiffs'
24 1391, for the same date, which is February 6, '02, which will
25 be Page 33.

2904

1      Did you find any statistically-significant price
2  increase that resulted in inflation from any disclosure on
3  February 6th, 2002?
4  A.  Statistically it's giving price decrease, but not
5  increase.
6  Q.  But not increase?
7  A.  Correct.
8  Q.  That's exactly my point.  I'm asking about an increase.
9  Not an increase?
10 A.  Okay.  Not an increase.
11 Q.  In other words, whatever Ms. Hayden-Hakes said, it did not
12 artificially -- it did not increase the amount of artificial
13 inflation?
14 A.  That's correct.  Decreased it.
15     MR. KAVALER:  Plaintiffs' Demonstrative 14.
16 BY MR. KAVALER:
17 Q.  Plaintiffs have shown this jury the National Mortgage News
18 article which appeared on February 18, 2002.  And that's --
19 what it says there is -- "Our first take on the allegations of
20 predatory lending raised in the ACORN action is that it is not
21 a significant issue, not indicative of any widespread problem
22 and certainly not a concern that it will spread elsewhere?"
23     It's attributed to David Schoenholz.  Do you see
24 that?
25 A.  Can I just -- in my previous answer, when I said it

2905

1  decreased it in this first method, and no effect, I want to
2  correct my previous answer.
3  Q.  Okay.
4      I'll be clear with you.  You be clear with me.
5  Again, I'm not trying to trick you.
6  A.  You have been clear --
7  Q.  The first method.
8  A.  You have been clear --
9  Q.  The first method.
10 A.  -- I misspoke.  I wanted to correct it.
11 Q.  Okay.  And I appreciate that.
12     And, just, the point is previously you said it
13 decreased it.  Now, you're saying it was flat.  My question
14 was:  It didn't increase it, correct?
15 A.  Correct.
16 Q.  All right.
17     So, from my point of view, both your answers are the
18 same.  You've now made it more accurate, but it's still not an
19 increase --
20 A.  Okay.
21 Q.  -- correct?
22 A.  Correct, yes.
23 Q.  Thank you.
24     Okay.  Let's look at this date (indicating).  We'll
25 go to Plaintiffs' 1397.  The date is February 18, 2002.  We

2918

1 for the same date, which is August 14. It's on Page 42.
2     Did you find a statistically-significant price
3 increase that resulted in inflation on August 14, 2002?
4 A. No, sir, I did not.
5 Q. This is -- plaintiffs have shown this jury the Origination
6 news article that appeared on August 23, 2002, down at the
7 bottom here (indicating). It quotes Megan Hayden-Hakes
8 saying, "We clearly follow all state and federal laws and
9 regulations."
10     Let's look at your Exhibit 1397 for August 23, 2002.
11 It's on Page 17.
12     No change in artificial inflation there?
13 A. Correct.
14 Q. Let's look at your Event Study, which is Plaintiffs' 1391
15 for the same date, August 23, 2002, which is at Page 45.
16     Did you find any statistically-significant price
17 increase that resulted from inflation on August 23, 2002?
18 A. No, sir, I did not.
19 Q. Plaintiffs have shown this jury the National Mortgage News
20 article that appeared on September 2, 2002, in which they say,
21 "A Household spokeswoman said that she is not aware of any
22 pending enforcement actions or settlement talks."
23     Let's look at 1397 for September 2. That would be on
24 Page 17.
25     And, again, this is one of those where there is no

2919

1 September 2, but there is a September 3.
2     And you see the inflation is -- is that a negative
3 number there, minus 209?
4 A. Yes, that's a negative number.
5 Q. And the day before is a minus number -- a minus 88?
6 A. Correct.
7 Q. All right.
8     So, is this -- I'm not good with two negative
9 numbers. Is that inflation increasing or decreasing?
10 A. That is inflation decreasing.
11 Q. Okay.
12     And let's look at your 1391, for the same date that's
13 your Event Study. And this is September 2 or September 3.
14 It's on Page 46.
15     Did you find a statistically-significant price
16 increase that resulted in inflation on September 2 or, in this
17 case, on September 3, 2002?
18 A. No, sir, I did not.
19 Q. Okay.
20     We're done with that.
21     Now, you told me something earlier about when the
22 inflation first came into the stock. Let's go back to 139 and
23 start on Page 1.
24 A. Okay.
25 Q. Okay?

2920

1 A. I have it.
2 Q. Okay.
3     This chart was prepared by you?
4 A. Correct.
5 Q. You were retained by the plaintiffs' counsel?
6 A. That's correct.
7 Q. They instructed you in whatever manner they instructed
8 you.
9     They gave you whatever assignment they gave you?
10 A. I wouldn't really say they gave me an assignment, other
11 than to analyze the economic evidence of the case, in light of
12 their allegations and all the other relevant facts and
13 circumstances.
14 Q. You and I never discussed this case until this afternoon?
15 A. That's correct.
16 Q. Okay.
17     So, I had nothing to do with what date you picked
18 here to start on?
19 A. That's fair.
20 Q. All right.
21     You picked it or they picked it -- someone picked it?
22 A. Well, the only thing that they picked, I would say, is the
23 choice of the relevant period.
24 Q. Okay.
25 A. Beginning on July 30th, 1999.

2921

1 Q. Okay.
2     And the first day you put on here is July 30, 1999.
3 A. Correct.
4 Q. And you performed your various analytical processes and
5 came up with artificial inflation of 7.97?
6 A. That's right.
7 Q. Okay.
8     So, according to your analysis, it was there on July
9 30th?
10 A. Well, I think I've explained this numerous times, sir. It
11 was there at the time that the jury concludes the first false
12 and misleading statement was made; the first time the jury
13 concludes that when Household was describing how it was
14 going -- it was committed to a growth strategy, it would
15 continued to grow; its lending and its accounting were proper.
16     The first time that they conclude that a statement of
17 that nature was false; the inflation, based on my calculation
18 of the effect of specific disclosures after November 15th,
19 based on this particular methodology; my calculation suggests
20 that the price would have fallen by $7.97, which is why the
21 inflation is listed at $7.97.
22     But the first date -- I want to emphasize, again --
23 is a function of what the jury concludes when the first false
24 statement occurred, if they conclude a false statement
25 occurred.

2922

1    And I put "July 30th" on my exhibit because it's the
2  first possible date.
3    But if the jury concludes it's not July 30th, it's
4  August 16th or October 19th -- or whatever date the jury
5  picks -- the exhibit can be used.  It's just that every date
6  prior to the first date that the jury picks as the first false
7  and misleading disclosure, there is no artificial inflation.
8  And artificial inflation begins on whatever the jury decides
9  the first date is of a false and misleading disclosure.
10  Q. I don't disagree with you, sir, that you've given that
11  answer before.  I'm trying to find out if there's any other
12  answer I can get.
13    Let me try this:  You said it was the first possible
14  date.  There couldn't have been inflation before then?
15  A. Not as I understand the relevant period in this case,
16  correct.
17  Q. Okay.
18    But what causes inflation is a false statement by the
19  company?
20  A. Not just a false statement.  A false statement that
21  investors have a right to recover on; and, as I understand the
22  allegations in this case currently, the first possible date
23  where that might be the case is July 30th, 1999.
24  Q. Well, was there any inflation on July 29th?
25  A. If there's no claim of any right to recover on July 29th,

2923

1  then I would say, by definition, there's no inflation on July
2  29th.
3  Q. So, who makes the claim to recover, the plaintiffs?
4  A. I think it's a combination of the plaintiffs, coupled with
5  rulings by the Judge -- the Court -- as to what's a
6  permissible claim that can go forward, that could be tried in
7  a trial like this.
8  Q. So, this is some legal concept?
9  A. It's a -- I said a -- combination of what the plaintiffs
10  claim and what the Court allows.
11    So, it's a combination of the allegations in the
12  particular case; the facts and circumstances of the case; and,
13  the rulings of the Court -- of the Judge -- which, of course,
14  control everything.
15  Q. So, it's not driven by one of these documents here
16  (indicating)?
17  A. Well, that's not right, either.  It's just the universe of
18  potential documents that could be false and misleading has to
19  be within the relevant period of the case.
20    And, as I understand it, the relevant period in this
21  case begins on July 30th, 1999.  Whether that's the first date
22  on whether there's a false and misleading disclosure or a duty
23  to correct a prior disclosure, again, that's really for the
24  jury to decide, as instructed by the Court.
25  Q. You just said the false and misleading statement has to be

2924

1  within the relevant period, correct?
2  A. Correct.
3  Q. And don't you agree that the defendants' alleged
4  misrepresentations have to have artificially inflated the
5  price of the stock also within the relevant period?
6  A. Yes.  In order for there to be a recovery, in order for
7  investors to be harmed, that must be true.  I agree.
8  Q. Then there wasn't any inflation before Household made a
9  false statement?
10  A. There cannot be any inflation before the jury concludes
11  that a statement that Household was false or a time when
12  Household had an obligation to correct misstatements that were
13  made in the past, correct.
14  Q. It sounds like we're saying slightly different things.
15    I said there can't be any false statement -- any
16  inflation before Household makes a false statement; and, you
17  said there can't be any inflation before the jury concludes
18  Household made a false statement.
19    So, now in the last two minutes you've told me the
20  reason we can't figure out where the inflation came from or
21  when because it's either something the plaintiffs did, that
22  causes it, or something that his Honor did that causes it, or
23  something the jury's going to do that causes it.
24    What I'm trying to find out is:  Is there anything
25  Household did that caused the inflation in the first place?

2925

1  A. Yes, there's no inflation unless Household makes a false
2  and misleading statement or has a duty to correct a false and
3  misleading -- or a statement that became false and misleading
4  as a result of new information.
5  Q. What date did Household first make the false and
6  misleading --
7    MR. KAVALER:  Withdrawn.
8  BY MR. KAVALER:
9  Q. What date did Household first make the false and
10  misleading statement that caused the inflation to go into the
11  stock?
12  A. I've tried to be very clear about this, sir.  That's a
13  determination for the jury to make.
14    I know the claim that the plaintiffs have made is
15  that the first relevant date is July 30th, 1999; but, the
16  decision of when a state- -- when the first statement that
17  Household made was false, that's a determination for the jury,
18  that I expressed no opinion on.
19  Q. Understood.
20    Professor, you know I have the highest respect for
21  you personally and professionally.  I mean no disrespect.
22    I take your last answer to have been, "I can't say"?
23  A. I can't -- you're correct.  I do not have an opinion as to
24  when the first false and misleading statement was.  That's a
25  determination for the jury.

2958

1  quoted in a dollar amount without this adjustment that you've
2  shown on all these charts for what it really should be, right?
3  A.  Well, respectfully, sir, I'm not sure what you mean by
4  what it really should be.  That's really a mischaracterization
5  of what I said.
6  Q.  Fair enough.  Turn to Plaintiffs' Demonstrative 137, where
7  you've got a residual price change of minus $1.86.
8     Do you see that?
9     MR. BURKHOLZ:  Could you show him where it is?
10    MR. KAVALER:  Sure.
11 BY MR. KAVALER:
12 Q.  It's tab three, which just happens to be the first one
13 in --
14 A.  I'm looking at it on the screen.
15 Q.  If I were looking at the price of the stock, closing price
16 on the New York Stock Exchange, on November 15, 2001, I
17 wouldn't see minus $1.86, would I?
18 A.  You would not, for the reasons that I explained at length.
19 Q.  And if I were watching Bloomberg News, I wouldn't see
20 minus $1.86, would I?
21 A.  Probably not.
22 Q.  And if I were reading the Wall Street Journal in the
23 morning or the New York Times or the Chicago Tribune, I
24 wouldn't see minus $1.86?
25 A.  I suspect you would not.

2959

1  Q.  And if I were looking at my brokerage statement if I owned
2  Household stock, I wouldn't see minus $1.86?
3  A.  No.  But in all those documents, you might see discussion
4  of how the stock price movement compared with the overall
5  market and movements of other firms in the industry.  That's a
6  very common measure that Household itself used in its proxy
7  statements that's, in effect, required by SEC regulations.
8  Q.  I'm making --
9  A.  So this is just a quantification of what investors look at
10 all the time.
11 Q.  I'm making a very small point, sir.  Stocks are quoted in
12 a price which is the price usually that they close on the New
13 York Stock Exchange, right?
14 A.  Correct.  But there's also frequently comparisons of stock
15 prices and prices of the overall -- movement to the overall
16 market, movements in the industry.  That's what Household
17 itself disclosed in its proxy statement.  This is just a
18 quantification of that relationship.
19 Q.  You've been very patient all afternoon while we talked
20 about your first model.  I want to turn to your second model.
21 A.  Okay.
22 Q.  This is the model with the leakage, right?
23 A.  Okay.
24 Q.  Okay.  And you agree there are a bunch of stock price
25 movements that were significant under your aggression analysis

2960

1  that were not attributable to fraud-related disclosures, don't
2  you?
3  A.  There were probably some, both positive and negative, but
4  a lot of the significant movements were combined disclosures
5  of -- they had some fraud-related aspect and then they had
6  some other aspect in addition to the fraud-related aspect.
7  Q.  And were there some, any, that had no fraud-related
8  aspect?
9  A.  It's a matter of judgment as to whether something has a
10 fraud-related aspect or not.  I would say there were a few,
11 but there were also, I would say, a significant number of the
12 statistically significant movements that had this combined
13 aspect.
14    But just to be clear, under the leakage model,
15 whether they did -- whether they were purely fraud related,
16 combined fraud related or not at all fraud related, they were
17 all included in the leakage model.
18 Q.  I understand.  But my point is there was some of all
19 three?
20 A.  You probably could -- that would probably be a fair
21 statement.
22 Q.  Okay.  Now, this is not on either model.  This is a
23 general question.
24 A.  Okay.
25 Q.  You assumed that the defendants did make false statements

2961

1  during the relevant period, didn't you?
2  A.  That's correct.
3  Q.  Okay.  Can you do this:  Assume the opposite.  Assume the
4  defendants did not make any false statements during the
5  relevant period.
6  A.  Okay.
7  Q.  Okay.  The stock price still declined in the real world,
8  didn't it?
9  A.  The stock price declined in the real world, that's
10 correct.
11 Q.  Why?
12 A.  I think the stock price declined for a variety of
13 different factors.  I touched on this in my testimony.  There
14 was a -- big part of the stock price decline that's --
15 according to both of my calculations that's attributable to
16 some combination of market industry and non-fraud-related
17 effects.  And also some percentage of the stock price decline
18 that's attributed -- attributable -- excuse me -- to the
19 market learning correct information about Household's
20 predatory lending practices, its re-aging policies and the
21 effect of the restatement.
22 Q.  And giving the last part of that answer, you were still
23 holding to the assumption I asked you to make that there's no
24 fraud?
25 A.  I'm sorry.  Well, if there's no fraud, then obviously

2962

1  fraud played no role in the decline in Household's stock
2  price.
3  Q. Let me try it again.  I want to be clear.
4      I'm asking you to assume there is no fraud.
5  Nevertheless, in the real world, there's no question, the
6  price of Household's stock went down?
7  A. No.  But let me ask you a clarifying question, sir,
8  because your question, at least to me, is a little bit
9  confusing.
10     Are you assuming that the stock price would have been
11 the same in the real world, in addition to there being no
12 fraud?  Because I would say if there's no fraud, the stock
13 price likely would have been different.
14 Q. Okay.  This is where I always got in trouble in law school
15 because I don't know how to assume things that are different
16 than the real world very well.
17     I'm assuming there was never any fraud.
18 A. Never any fraud in the stock price is identical to the way
19 it was in the real world.
20 Q. Sure.  It went down?  It went down significantly?
21 A. Okay.
22 Q. Okay.  Why?
23 A. Well, here's the problem:  You're asking me a
24 hypothetical, to make assumptions in a hypothetical; and
25 you're asking me in the real world what happened in the

Fischel - redirect

2963

1  hypothetical.  And there's sort of a contradiction in terms in
2  the question.
3  Q. All right.  I take your point.  Let me try it this way:
4  What we know for a fact is the stock price went down, correct?
5  A. Correct.
6  Q. What you've done here yesterday and today is give us your
7  opinion as to why?
8  A. Based on the assumption that I've explained numerous
9  times, correct.
10 Q. Exactly.  And the assumption was -- the assumption -- you
11 assumed because these gentlemen here asked you to -- that
12 there was fraud?
13 A. Correct, because if there's no misstatements, then there's
14 no case, so there's nothing to quantify.
15 Q. Thank you, Professor Fischel.  I couldn't have said it
16 better myself.
17     MR. KAVALER:  No further questions, your Honor.
18     THE COURT:  You may redirect.
19     REDIRECT EXAMINATION
20 BY MR. BURKHOLZ:
21 Q. Let me ask you a simple question.  Counsel showed you all
22 these public statements that Household made.  Do you need to
23 find a statistically significant price increase on the dates
24 of these public statements in order for there to be inflation
25 in Household's stock under your specific disclosure model?

Fischel - redirect

2964

1  A. No.  That's really the whole point, that the reason why
2  there's no statistically significant price increase in
3  response to all those disclosures where there's big red Xs is
4  because in each one of those disclosures, Household was
5  reaffirming its growth strategy.  It was denying any
6  wrongdoing.  It was defending its accounting.
7      When it started later to say that there were
8  problems, it was either because of a computer glitch or
9  localized to a particular employee or a group of employees.
10 Because Household made all those statements and reiterated the
11 same statements from the beginning until later in the class
12 period, of course, the market didn't react because Household
13 is saying the same thing over and over and over again.
14     It was only when the truth began to come out when
15 market participants began to disbelieve the denials, when the
16 complaints from regulators started to pile up, the lawsuits
17 started to pile up, the complaints from customers started to
18 pile up, Household had to restate its accounting, had to
19 restate and provide a correct disclosure of its re-aging
20 practices and the effect of those re-aging practices, when
21 there was leakage of the very damaging Washington department
22 of financial insurance report, rumors of the effect of the
23 settlement and the combined effect of what that would mean for
24 Household's growth strategy, it was only then when you started
25 to see statistically significant price reactions because the

Fischel - redirect

2965

1  market was learning the truth.
2      In fact, the market became so negative, as I
3  indicated, that the price went below what my true value line
4  indicated, demonstrating that investors who bought at the end
5  basically bought at a bargain price and, at least under both
6  of my quantifications, are not entitled to any compensation.
7  Q. Is it a common method to focus on the disclosures later in
8  the relevant period to quantify the inflation due to the
9  statements Household made earlier in the relevant period?
10 A. It's completely standard because if what you're trying to
11 do is measure the value of the truth and the truth is not
12 provided early in the period, the only way to analyze the
13 effect of the truth is to see what the effect on investors and
14 market prices is when the truth comes out.  And by doing that,
15 you're able to make a judgment, as I did, about what the,
16 quote, true value of the stock would have been at the
17 beginning had the truth been told the entire time.
18 Q. Now, counsel showed you the beginning of the relevant
19 period, July 30, 1999, and then the first statement on August
20 16, 1999, the 10-Q.
21     Do you remember that?
22 A. I do.
23 Q. And do you have an understanding that the beginning of the
24 relevant period, July 30, 1999, is due to a Court decision in
25 this case?

Fischel - redirect

2966

1  A.  That's my understanding.
2  Q.  Okay.  And if the first false statement that plaintiffs
3  allege in this case is on August 16, 1999, how would you
4  calculate inflation on that date?
5  A.  I would calculate inflation the same way as of August 16,
6  but there would be no inflation from July 30 to August 15.  So
7  as I indicated, where I have an entry for artificial inflation
8  from July 30 to August 15, the correct way to interpret the
9  exhibit is just to replace the inflation number with a zero
10  for every day until August 16.  And beginning on August 16, it
11  would then be $7.97 under the first method.
12  Q.  And your assumption that plaintiffs will be able to prove
13  the various statements are false and misleading during the
14  relevant period is a common assumption that you make in your
15  field?
16  A.  Again, it's a necessary assumption because the
17  responsibility of determining whether a statement is false or
18  not, that's not for an expert witness, for any expert witness.
19  It's not for an economist.  It's really a function for the
20  jury to decide.
21      MR. BURKHOLZ:  Can we bring up Plaintiffs' Exhibit
22  1391.  Can we have the switch, your Honor.
23      If we can turn to the third page.
24      If we can highlight the last date on the bottom,
25  November 12, 1999.

Fischel - redirect

2967

1  BY MR. BURKHOLZ:
2  Q.  That's the date of a public statement by Household.
3      Do you see the three bars on the right?
4  A.  I do.
5  Q.  What does that signify?
6  A.  That it's a statistically significant day.
7  Q.  And that was a statistically significant price increase on
8  that date, correct?
9  A.  Correct.
10  Q.  Why didn't you take, under your specific disclosure model,
11  the $7.97 and just add the dollar and two cent inflation on
12  that date?
13  A.  Because, as I indicated, to be one of my 14 specific
14  disclosures, three criteria had to be met.  There had to be an
15  event, there had to be a statistically significant stock price
16  reaction and I had to believe to a reasonable degree of
17  certainty that the event caused the stock price reaction.
18      So what I did with respect to dates like November 12
19  was that there was a statistically significant price increase.
20  I could have included that date to increase the amount of
21  inflation, but I didn't do it because I wasn't confident that
22  there was a fraud-related disclosure on that date that was
23  responsible for that price increase, which is why in my first
24  method of quantification I only had 14 dates, as opposed to
25  every date where there was a statistically significant price

Fischel - redirect

2968

1  movement.
2  Q.  And under your leakage model, the inflation varies
3  throughout the relevant period?
4  A.  Correct, from the first day to the last day.  It varies
5  every day.
6  Q.  And then counsel was quizzing you on some of the specific
7  disclosure dates.  I want you to go back to the September 23,
8  2002, date, which is tab 16 in your binder.
9  A.  Okay.  I have it.
10  Q.  And he asked you whether or not that date related to
11  predatory lending.  And I think you said it did.  But you
12  didn't look at the actual report.  Can you look at the second
13  page of the report?
14  A.  I have it.
15  Q.  Okay.  Do you see the first paragraph -- at the end of the
16  first paragraph on the second page, Moreover, skepticism
17  regarding the company's rapid portfolio growth, particularly
18  within the auto business, and mounting credit quality concerns
19  related to Household's loan workout and re-aging practices
20  have also been a drag on the stock.
21  A.  Correct, I see that.  The correct answer would have been
22  this disclosure related both to predatory lending practices as
23  well as a re-aging, not just to predatory lending.
24  Q.  And, finally, it's your opinion that the leakage model is
25  a better estimate of inflation from Household's false

Fischel - recross

2969

1  statements as alleged by the plaintiffs than your specific
2  disclosure model?
3  A.  Yes, because of all the evidence of the leakage of the
4  Washington department of financial insurance report, as well
5  as all the leakage of the settlements, the possible
6  settlements, and all the criticism of Household's predatory
7  lending practices, as well as its re-aging policies.
8      MR. BURKHOLZ:  Nothing further at this time, your
9  Honor.
10      THE COURT:  Recross.
11      MR. KAVALER:  Briefly, your Honor.
12  (Brief pause.)
13      THE WITNESS:  Be careful.
14      RECROSS EXAMINATION
15  BY MR. KAVALER:
16  Q.  Anything happens a lot of lawyers that will throw their
17  cards at my body.
18      Let me just pursue what you just told Mr. Burkholz.
19  He directed your attention to November 12, 1999.  Let's look
20  at Plaintiffs' Exhibit 1397, page two.  That's your list
21  there.
22  A.  13 -- which --
23  Q.  1397 is this one, the one with the columns.
24  A.  Okay.  Let me find it.  I've got 1395.
25  Q.  The one you and I were looking at all day.

EXHIBIT 9

Aldinger - direct

3021

1  Q. Okay.
2      And that was for the third quarter of 1999; is that
3  right?  Household's results?
4  A. I'm looking for it here, but I assume so.
5  Q. Do you have the hard copy in front of you, sir?
6  A. I do.
7      Oh, it says third quarter.  I see that.
8  Q. And you were quoted in this press release; is that right?
9  A. That's right.
10  Q. In the second paragraph of the press release, you're
11  quoted; is that correct?
12  A. That's correct.
13  Q. And you said, "Our quarter reflects excellent performance
14  in all our businesses, with the key drivers being accelerating
15  internal receivable and revenue growth," right?
16  A. Yes.
17  Q. Okay.
18      And this press release also contains financial
19  results; doesn't it, sir?
20  A. Yes, it does.
21  Q. In fact, there's a chart at the back of the press release
22  that sort of summarizes the financial results, correct?
23  A. There is one, yes.
24  Q. And your Chief Financial Officer, Mr. Schoenholz, would
25  have reviewed the press release before it was issued by

Aldinger - direct

3022

1  Household International, correct?
2  A. That's right.
3  Q. And we also talked about how the press release contains
4  Household International's two-plus delinquency statistics,
5  correct?
6  A. That's correct.
7  Q. And you told me that the reason that the two-plus
8  statistics are in the press release is because that was an
9  important metric or number for investors, correct?
10  A. That's correct.
11  Q. And if you turn to -- do you have a document we looked at,
12  as well, it's Exhibit 461?  It's a memo to you from Mr. Gilmer
13  dated January 18th, 1999.
14      Do you have that in front of you?
15  A. Yes, I do.
16  Q. Okay.
17      And this was a memo that Mr. Gilmer wrote to you
18  regarding the operating results at HFC, correct?
19  A. That's correct.
20  Q. A results memo, right?
21  A. Yes.  A monthly memo.
22  Q. And this wasn't the only monthly memo that you received
23  from Mr. Gilmer, was it?
24  A. No, he would routinely send me monthly memos.
25  Q. In fact, you received them in 2000, correct?

Aldinger - direct

3023

1  A. Yes.
2  Q. 2001, as well, right?
3  A. Yes.
4  Q. And if you'd turn to the page of that monthly memo that
5  Mr. Gilmer sent you ending 333.
6      And the heading on the top of that page -- are you
7  there yet?
8  A. I'm not there yet.
9  Q. Just let me know when you get there.
10  A. I will.
11      (Brief pause.)
12  BY THE WITNESS:
13  A. I'm there.
14  BY MR. DROSMAN:
15  Q. And you see the heading?  It's underlined in a larger font
16  at the top of the page?
17  A. I do.
18  Q. And it's entitled, "Key Performance Measures HFC Consumer
19  Credit Quality."
20      Do you see that?
21  A. Yes, I do.
22  Q. And, then, if you look, there's a box below that; and, at
23  the top of the box, there's a heading "Two-Plus
24  Delinquencies."
25      Do you see that?

Aldinger - direct

3024

1  A. Yes, I see that.
2  Q. And you understood the two-plus delinquency was a key
3  performance measure, don't you?
4  A. It was a measure, yeah.
5  Q. You don't understand it was a key performance measure?
6  A. Well, it's important, but I don't know that I'd call it
7  one of the key.  The key for me would be reserves and revenues
8  and expenses and things that hit the bottom line.
9  Q. You understood that Mr. Gilmer entitled it a key
10  performance measure, right?
11  A. Well, yes, he did, you're right.
12  Q. Okay.
13      And this was a memo that you received, right?
14  A. Absolutely.
15  Q. You read, correct?
16  A. Yeah.
17  Q. And you saw the two-plus delinquency, at least according
18  to Mr. Gilmer, was a key performance measure, right, sir?
19  A. Yes.
20  Q. And Mr. Gilmer performed -- reported this key performance
21  measure, the two-plus delinquency number, in the other growth
22  memos that you received, right?
23  A. I don't know.  I'd have to see that.
24  Q. Okay.
25      Why don't we take a look at some other memos that

Aldinger - direct
3025

1  Mr. Gilmer sent you. I'll show you what has been marked as
2  Plaintiffs' Exhibit 482 for identification. I'll provide a
3  copy to counsel.
4      (Document tendered to counsel and the witness.)
5  BY THE WITNESS:
6  A. Thank you.
7  BY MR. DROSMAN:
8  Q. Plaintiffs' Exhibit 482 is a memo to you, right, sir?
9  A. Yes, it is.
10  Q. And this is from Gary Gilmer, correct?
11  A. Correct.
12  Q. And it's dated August 14th, 2000, right, sir?
13  A. Correct.
14  Q. And it's entitled, "July Results," right?
15  A. Yes.
16      MR. DROSMAN: Plaintiffs offer Exhibit 482 into
17  evidence.
18      THE COURT: It's admitted.
19      (Plaintiffs' Exhibit No. 482 received in evidence.)
20  BY MR. DROSMAN:
21  Q. If you look at the first page of Mr. Gilmer's memo -- by
22  the way, you received this memo, right, sir?
23  A. Yes.
24  Q. You reviewed it when you received it, right?
25  A. Yes.

Aldinger - direct
3026

1  Q. Okay.
2      And there's some bullet points. Do you see those?
3  A. I do.
4  Q. And if you look at the bullet point -- the sixth bullet
5  point down, do you see that?
6  A. Yes.
7  Q. And it reads, "Two-plus delinquency was 13 million over
8  our forecast, but our delinquency percentage was right on
9  forecast due to higher than expected receivables."
10      Do you see that, sir?
11  A. I see that.
12  Q. So, you understood that Mr. Gilmer was reporting
13  delinquency numbers to you in July of 2000 -- or August of
14  2000, right, sir?
15  A. Yes.
16  Q. And if you go ahead and look at the page ending 780 --
17  A. Yes.
18  Q. -- there's a single heading on that page.
19      Do you see it, sir?
20  A. Yes.
21  Q. It's "Two-Plus Delinquency," right?
22  A. Correct.
23  Q. You reviewed that from August of 2000, right?
24  A. I would have skimmed it.
25  Q. You would have skimmed it?

Aldinger - direct
3027

1  A. Yeah.
2  Q. Okay.
3      And when you skimmed it, you would have seen that
4  there were various Skip-a-Pay programs aimed at lowering
5  delinquency, right, sir?
6  A. I see that, yes.
7  Q. Okay.
8      And you understood that Mr. Gilmer reported the
9  delinquency numbers to you in his results memo in 2001; don't
10  you, sir?
11  A. Are we back to the one over here?
12  Q. No. I'm just asking you a question.
13  A. Well -- I'm sorry, ask the question, again.
14  Q. Sure.
15      You understood that Mr. Gilmer reported the two-plus
16  delinquency number to you in the results memos in 2001, don't
17  you?
18  A. Oh, during 2001. Yes.
19  Q. Okay.
20  A. Okay.
21  Q. By the way, there's a series of headings on this page --
22  in this memo. Do you see them?
23  A. I do.
24  Q. Probably eight or nine of them, right, throughout this
25  memo?

Aldinger - direct
3028

1  A. You mean on other pages now, we're talking about?
2  Q. Right.
3      The memo is four or five pages long?
4  A. Yes.
5  Q. Probably eight or nine headings, right?
6  A. Yeah.
7  Q. One of them's two-plus delinquency, right, sir?
8  A. Yes.
9  Q. Is there a loss reserves heading on this page -- in this
10  memo?
11  A. No, I don't think there is.
12  Q. So, we've established that the two-plus delinquency number
13  was a key performance measure that Mr. Gilmer reported to you,
14  right, sir?
15  A. It's a key performance member -- number -- yeah.
16  Q. Let's take a look back at the press release that we were
17  discussing, the one dated October 19th, 1999.
18  A. I'm sorry, the first one?
19  Q. It's Plaintiffs' Exhibit 506.
20      Do you have it in front of you?
21  A. I've got three now. I'm reconciling.
22      I've got it.
23  Q. Okay.
24      And we talked about the two-plus delinquency
25  statistic that's reported in there, correct?

Aldinger - direct

3041

1  Q. I'll show you what's been marked as Plaintiffs' Exhibit
2  503 for identification.
3      (Document tendered to counsel and the witness.)
4  BY MR. DROSMAN:
5  Q. Plaintiffs' Exhibit 503 is a pres release issued by
6  Household International, right?
7  A. Yes.
8  Q. A press release you reviewed before it was issued,
9  correct?
10 A. Yes.
11 Q. It was issued on July 18th, 2001, right?
12 A. Yes.
13 Q. And it contains the second quarter 2001 results for
14 Household International, correct?
15 A. Yes.
16    MR. DROSMAN:  Plaintiffs offer Exhibit 503 into
17 evidence.
18    THE COURT:  It's admitted.
19    (Plaintiffs' Exhibit No. 503 received in evidence.)
20 BY MR. DROSMAN:
21 Q. I'll show you what's been marked as Plaintiffs' Exhibit
22 978 for identification.
23    (Document tendered to counsel and the witness.)
24 BY MR. DROSMAN:
25 Q. Plaintiffs' Exhibit 978 is a press release issued by

Aldinger - direct

3042

1  Household International, correct?
2  A. Correct.
3  Q. Issued on October 17th, 2001?
4  A. Correct.
5  Q. Containing the third quarter 2001 results for Household
6  International?
7  A. Yes.
8  Q. You know, we've got a court reporter who is taking
9  everything down.  So, it's important that you wait until I
10 finish my question before you answer.  Is that okay?
11 A. It is okay.
12 Q. Okay.
13    MR. DROSMAN:  Plaintiffs offer Exhibit 978 into
14 evidence.
15    THE COURT:  It's admitted.
16    (Plaintiffs' Exhibit No. 978 received in evidence.)
17 BY MR. DROSMAN:
18 Q. I'll show you what's been marked as Plaintiffs' Exhibit
19 706 for identification.
20    (Document tendered to counsel and the witness.)
21 BY MR. DROSMAN:
22 Q. Plaintiffs' Exhibit 706 is a press release issued by
23 Household International, correct?
24 A. Correct.
25 Q. And Exhibit 706 was issued by Household on January 16th,

Aldinger - direct

3043

1  2002, right?
2  A. Yes.
3  Q. And in this press release, Household provided investors
4  with fourth quarter and yearend 2001 financial results,
5  correct?
6  A. Yes.
7  Q. Now, let's take a look at the four -- you issued four
8  press releases reporting quarterly results during -- or for --
9  the year 2001, correct?
10 A. Yes.
11 Q. In those press releases, you included the two-plus
12 delinquency statistic in each one of them, didn't you?
13 A. Yes, we did.
14 Q. And when you reported this two-plus delinquency ratio, it
15 didn't include loans that had been re-aged and were current
16 because of that re-age, correct?
17 A. Correct.
18 Q. You didn't tell people in the press releases what
19 percentage of loans had been re-aged before arriving at the
20 two-plus statistic, did you?
21 A. No.
22 Q. You didn't tell people that Household misrepresented the
23 interest rate on the loans it gave to customers in the press
24 releases, did you?
25 A. No.

Aldinger - direct

3044

1  Q. You didn't tell people that Household's sales reps were
2  quoting customers an effective rate in these press releases,
3  did you?
4  A. No.
5  Q. You didn't tell people that sales reps from Household were
6  giving a good faith estimate to customers with ranges from
7  zero to more than $6,000 in these press releases, did you?
8  A. No.
9  Q. You didn't tell people that sales reps were misleading
10 borrowers about the amount of points and fees on their loans
11 in these press releases, did you?
12 A. No.
13 Q. And you didn't tell people in these press releases that
14 the sales reps misled borrowers into purchasing insurance, did
15 you?
16 A. No.
17 Q. I'll show you what's been marked as Plaintiffs' Exhibit
18 635 for identification.
19    MR. DROSMAN:  Copy for counsel.
20    (Document tendered to counsel and the witness.)
21 MR. DROSMAN:  Doctors.
22 Q. Plaintiffs' Exhibit 635 is a press release issued by
23 Household International, correct?
24 A. Yes.
25 Q. Issued on April 17th, 2002, right?

Aldinger - direct

3045

1 A. Yes.
2 Q. In which Household reported the first quarter 2002
3 financial results, correct?
4 A. Yes.
5     MR. DROSMAN: Plaintiffs move Exhibit 635 into
6 evidence.
7     THE COURT: Admitted.
8     (Plaintiffs Exhibit No. 635 received in evidence.)
9 BY MR. DROSMAN:
10 Q. I'll show you what's been marked as Plaintiffs' Exhibit
11 788 for identification.
12     MR. DROSMAN: Copy for counsel.
13     (Document tendered to counsel and the witness.)
14 BY MR. DROSMAN:
15 Q. Plaintiffs' Exhibit 788 is a press release that was issued
16 by Household International, correct?
17 A. Yes.
18 Q. Issued on July 17th, 2002, correct?
19 A. Yes.
20 Q. And it contained the second quarter 2002 results for
21 Household International; is that right?
22 A. Yes.
23     MR. DROSMAN: Plaintiffs offer Exhibit 788 into
24 evidence, your Honor.
25     THE COURT: Admitted.

Aldinger - direct

3046

1     (Plaintiffs' Exhibit No. 788 received in evidence.)
2 BY MR. DROSMAN:
3 Q. So, we've got now the first two quarters of 2002, press
4 releases for those, right?
5 A. That's correct.
6 Q. And in each of those press releases, Household reported
7 its two-plus delinquency statistic, correct?
8 A. Yes.
9 Q. And when you reported this two-plus delinquency ratio in
10 those press releases, it didn't include loans that had been
11 re-aged and were current because of that re-age, correct?
12 A. That's correct.
13 Q. You didn't tell people in those two press releases what
14 percentage of loans had been re-aged before arriving at the
15 two-plus statistic, did you?
16 A. No.
17 Q. You didn't tell people in those press releases that
18 Household misrepresented the interest rate on the loans it
19 gave to customers, did you?
20 A. No.
21 Q. You didn't tell people in those press releases that
22 Household sales reps were quoting customers an effective rate,
23 did you?
24 A. No.
25 Q. You didn't tell people in those press releases that

Aldinger - direct

3047

1 Household sales representatives were giving a good faith
2 estimate to customers with ranges from zero to more than
3 $6,000, did you?
4 A. No.
5 Q. You didn't tell people in those press releases that
6 Household sales reps were misleading borrowers about the
7 amount of points and fees on their loans, did you?
8 A. No.
9 Q. And you didn't tell people in those press releases that
10 Household sales reps were misleading borrowers into purchasing
11 insurance, did you?
12 A. No.
13 Q. Let me show you what's been marked as Plaintiffs' Exhibit
14 227 for identification.
15     (Document tendered to counsel and the witness.)
16 BY MR. DROSMAN:
17 Q. Plaintiffs' Exhibit 227 is a press release issued by
18 Household International, right?
19 A. Yes.
20 Q. Issued on August 14th, 2002?
21 A. That's right.
22 Q. And you reviewed this press release before it was issued,
23 correct, sir?
24 A. I did.
25     MR. DROSMAN: Plaintiffs move Exhibit 227 into

Aldinger - direct

3048

1 evidence.
2     THE COURT: Admitted.
3     (Plaintiffs' Exhibit No. 227 received in evidence.)
4 BY MR. DROSMAN:
5 Q. This press release isn't a press release reporting the
6 quarterly results for Household, though, is it?
7 A. No, it's not.
8 Q. This is a different kind of press release, correct?
9 A. That's correct.
10 Q. This is a press release in which Household reported that
11 it was restating its financials, correct?
12 A. That's correct.
13 Q. And, in fact, you're quoted in this press release
14 restating financials, correct?
15 A. Well, I'd like to look at that; but, yes, I believe so.
16     Is there a question?
17 Q. I asked you if you were quoted in the press release.
18 A. Yes.
19 Q. Okay.
20     And if you take a look at the third paragraph of the
21 press release, it reads, "Aldinger continued, 'Household has
22 undergone a thorough review of our financial statements and
23 related accounting policies in conjunction with our new
24 auditors, KPMG LLP. As part of this review, we have
25 determined to adopt certain revisions to the accounting

Aldinger - direct
3049

1 treatment of our Mastercard/Visa co-branding and affinity
2 credit card relationships, and a credit card marketing
3 agreement with a third party.'"
4     Do you see that?
5 A. I do.
6 Q. So, you were aware of this restatement when it was issued,
7 correct, sir?
8 A. Yes, I was.
9 Q. You knew about the circumstances, right?
10 A. I think they're described here.
11 Q. Well, you know what it involved, right?  The restatement?
12 A. Yes.
13 Q. And you knew that, for example, the AFL-CIO credit card
14 agreement was one of those affinity credit card relationships,
15 correct?
16 A. That's right.
17 Q. And you knew that General Motors' credit card was one of
18 the affinity credit card relationships that was being
19 restated, correct?
20 A. Yes.
21 Q. And you knew that the affinity credit card relationship
22 involved a restatement for the Union Privilege credit card
23 agreement, correct?
24 A. Those were the contracts involved in the restatement.
25 Q. So, AFL, GM and Union Privilege or UP, correct?

Aldinger - direct
3050

1 A. Correct.
2 Q. And, then, there was a third-party marketing agreement,
3 right?
4 A. That's correct.
5 Q. And you knew that was with Kessler, right?
6 A. Right.
7 Q. And, then, you continued, "We are restating earnings to
8 reflect the cumulative impact of the adjusted items over the
9 period in which the adjustments are applicable as determined
10 in consultation with our new auditors at KPMG.  The
11 restatement associated with these matters has the effect of
12 reducing second quarter earnings per share by one cent or
13 approximately one percent and EPS for the six months ended
14 June 30, 2002, by six cents or 2.8 percent, versus what was
15 reported in the company's earnings release of July 17, 2002."
16     Do you see that?
17 A. I do.
18 Q. And you understood that that was the case, right?
19 A. Yes.
20 Q. Okay.
21     Now, you understand that Household's management is
22 responsible for the accuracy of Household's financial
23 statements, correct?
24 A. I do.
25 Q. You understand that Household's management is also

Aldinger - direct
3051

1 responsible for determining whether to restate Household's
2 financial statements, right?
3 A. I'm not sure I agree with that simplistically.
4 Q. Well, let me ask you this:  Household's auditors --
5 A. It's an oversimplification.
6 Q. Household's auditors can't make the decision to restate
7 Household's financial statements, can they?
8 A. No.
9 Q. That decision is made by management, correct?
10 A. It is made by management.
11 Q. And you understand that a restatement occurs when a
12 company violates GAAP in its financial statements and, then,
13 must later correct those financial statements, right, sir?
14 A. I'm not sure I understand "violates GAAP."  I think what
15 we had here was a disagreement between two auditors on how
16 credit card expenses should be allocated.  And, so, I'm not
17 sure that we -- I -- understand "violated GAAP."
18 Q. So, your testimony -- I just want to make sure I
19 understand it -- is that when you restated your financials,
20 you hadn't violated GAAP?
21 A. I think our view was that we adopted the view of the
22 current auditors, which was different from the prior auditors.
23 And the auditors disagreed.
24 Q. That wasn't my question, whose view you adopted or didn't
25 adopt.

Aldinger - direct
3052

1 A. Yeah.
2 Q. My question was simply --
3 A. Yeah.
4 Q. -- when you restated your financials, you understood that
5 it was because you had violated GAAP and needed to adjust your
6 financials, correct?
7 A. I understood that there was a mistake based upon a
8 different view from a different accounting firm.  There was no
9 intent to violate anything.  I don't understand that at all.
10 Q. I didn't ask you whether you intended to violate GAAP or
11 didn't intend to violate GAAP, right?  You understand that?
12 A. Well, I didn't understand that.
13 Q. Okay.
14     I'm asking you whether a company restates when it
15 violates GAAP and needs to adjust its earnings.  That's what a
16 restatement is; isn't it, sir?
17 A. I'm not sure I define it that way, but -- it's a change
18 in your numbers based upon a different interpretation at a
19 different time.
20 Q. Let's take it this way:  Can you restate if you didn't
21 violate GAAP under any circumstances?
22 A. I don't know.  I'm not an accountant.  So, I'll stop
23 there.
24 Q. Let me just ask you, can you think of a single
25 circumstance in which you could restate if you didn't violate

Aldinger - direct
3053

1  GAAP?
2  A.  I just don't like the word "violate."  There's a
3  difference of opinion here that was totally -- different
4  opinion from two major accounting firms, two of the largest
5  accounting firms in the world, who -- and we adopted the view
6  of the firm that was our auditor at the current time and --
7  Q.  I didn't ask you about a difference of opinion, right?
8  A.  Well --
9  Q.  Did I ask you about a difference of opinion?
10  A.  I don't know where this is going.  The GAAP treatment
11  before was different from the GAAP treatment after, and I
12  guess that's where I'd end.
13  Q.  Okay.
14      And you understood that the reason Household restated
15  its financials is because it had violated GAAP?
16      I'm not asking you whether it intended to.  Just --
17  A.  I don't know that I'd use that term, "violated."  We had a
18  different GAAP treatment.
19  Q.  And you understand that in order to restate the
20  financials, the error must be material, correct?
21  A.  Yes.
22  Q.  You couldn't restate the financials if the error was
23  immaterial, correct?
24  A.  That's correct.
25  Q.  I'll show you what's been marked as Plaintiffs' Exhibit

Aldinger - direct
3054

1  712 for identification.
2      (Document tendered to counsel and the witness.)
3  BY MR. DROSMAN:
4  Q.  Plaintiffs' Exhibit 712 is a Report of Examination from
5  the Office of the Comptroller of the Currency, correct?
6  A.  Correct.
7  Q.  And it was sent to Household Bank; is that right?
8  A.  Yes.
9      MR. DROSMAN:  Plaintiffs offer Exhibit 712 into
10  evidence.
11      THE COURT:  Admitted.
12      (Plaintiffs' Exhibit No. 712 received in evidence.)
13  BY MR. DROSMAN:
14  Q.  If you look at the second page of this Report of
15  Examination, it says the Report of Examination is strictly
16  confidential.
17      Do you see that?  It's in all capitals at the top of
18  the page -- second page?
19  A.  Yes, I do.
20  Q.  You understood that this wasn't being issued to the
21  public, correct?
22  A.  That's correct.
23  Q.  And, then, if you look at the third page of the document,
24  page ending 454, it says the examination start date was
25  October 19th, 1998.

Aldinger - direct
3055

1      Do you see that?
2  A.  I see that.
3  Q.  Okay.
4      Now, turn to the fourth page, page ending 481.  And
5  there's two bullet points or arrows at the end of the bottom
6  of the page.
7      Do you see those?
8  A.  I do.
9  Q.  If you look at the second -- or the last bullet point, it
10  says that, "Management should determine if these cash versus
11  accrual timing and recognition differences are in keeping with
12  FASB Statement of Concepts No. 3 concerning accrual accountin
13  and expenses."
14      Do you see that?
15  A.  Yes.
16  Q.  And you understand that the FASB Statement of Concepts No
17  3 is part of the generally accepted accounting principles or
18  what we refer to as GAAP, right?
19  A.  I believe so.
20  Q.  Okay.
21      And, then, it continues:  "The unique and complex
22  terms of the UP and GM programs result in numerous deferred
23  expenses and income."
24      Do you see that?
25  A.  I do.

Aldinger - direct
3056

1  Q.  And the UP refers to Union Privilege, right?
2  A.  That's correct.
3  Q.  And the GM refers to General Motors, right?
4  A.  That's correct.
5  Q.  These were the -- these were two of the three credit card
6  affinity relationships that Household ended up restating --
7  A.  Yes.
8  Q.  -- several years later, correct?
9  A.  Actually, we didn't restate the credit card relationships.
10  We restated the expenses related to those --
11  Q.  Okay.
12  A.  -- whether they should be lumped in one place or spread
13  out over several years.  That was the issue.
14  Q.  Right.
15      And those --
16  A.  Yeah.
17  Q.  You restated the expenses related to the UP contract,
18  correct?
19  A.  That's correct.
20  Q.  And the GM contract, correct?
21  A.  That's correct.
22  Q.  And, then, it continues:  "In several cases, the timing
23  and recognition of certain fees (expenses) differ materially
24  from actual cash payments."
25      Correct?

Aldinger - direct
3057

1  A. That's what it says.
2  Q. And this was a document, like you told me, that had been
3  received by Household in 1998, correct?
4  A. That's correct.
5  Q. I'll show you what's been marked as Plaintiffs' Exhibit
6  1248 for identification.
7      (Document tendered to counsel and the witness.)
8  BY MR. DROSMAN:
9  Q. Mr. Aldinger, you recognize Plaintiffs' Exhibit 1248,
10  right?
11  A. Yes, I do.
12  Q. And this was a presentation that you made, wasn't it?
13  A. Yes, it was.
14  Q. On December 4th, 2001, correct?
15  A. That's what it says, yes.
16     MR. DROSMAN: Plaintiffs offer Exhibit 1248 into
17  evidence.
18     THE COURT: It's admitted.
19     (Plaintiffs' Exhibit No. 1248 received in evidence.)
20  BY MR. DROSMAN:
21  Q. You made this -- these are PowerPoint slides, right?
22  A. That's correct.
23  Q. And what you do is you'd show up at this Goldman Sachs
24  conference and you'd give a PowerPoint presentation to the
25  folks there, right?

Aldinger - direct
3058

1  A. That's right.
2  Q. These were big institutional investors and analysts,
3  right?
4  A. That's right.
5  Q. Okay.
6     And this was the presentation that you gave on
7  December 4th, 2001, right?
8  A. Certainly the front page of it. I haven't looked at the
9  rest, but I assume it is.
10  Q. You don't have any reason to believe that this is an
11  inaccurate representation of what you gave?
12  A. I would -- I don't. I don't have any reason to believe
13  that.
14  Q. Okay.
15     Go ahead, if you would, and turn to the -- there's
16  small print "PFG." Do you see that Bates number down at the
17  bottom right?
18  A. Yes, I do.
19  Q. Turn to the page ending 158, if you would.
20     And the top slide there --
21  A. I'm not there yet.
22  Q. Okay. Let me know when you arrive.
23     (Brief pause.)
24  BY THE WITNESS:
25  A. I'm there.

Aldinger - direct
3059

1  BY MR. DROSMAN:
2  Q. Okay.
3     The top slide there, you ask the question, "Have
4  Household's accounting policies impacted results?"  Right?
5  A. That's right.
6  Q. And, then, you proceeded to answer that question to all of
7  the investors and analysts present, correct?
8  A. That's right.
9  Q. And in the third bullet point, you wrote, "Chargeoff
10  policies are appropriate for our target market and result in
11  proper loss recognition," right?
12  A. That's right.
13  Q. And that's what you told folks, right?
14  A. Yes.
15  Q. And, then, you said, "All policies have been consistently
16  applied and realistically report results," right?
17  A. That's right.
18  Q. And when you said "policies" there, you were telling folks
19  about your accounting policies, weren't you?
20  A. Yes.
21  Q. I'll show you what's been marked as Plaintiffs' Exhibit
22  759 for identification.
23     (Document tendered to counsel and the witness.)
24  BY MR. DROSMAN:
25  Q. Plaintiffs' Exhibit 759 consists of a number of documents

Aldinger - direct
3060

1  related to the Compensation Committee at Household
2  International, correct?
3  A. I'd like to look.
4  Q. Why don't you turn to the third page of the document.
5  A. Is this to members of Board Compensation Committee? Wher
6  are you?
7  Q. Third page, page ending 028.
8  A. 28.
9  Q. Do you see that there's a Compensation Committee meeting
10  agenda set forth there?
11  A. Yes.
12  Q. You were on the Board of Directors, right, sir?
13  A. Yes.
14  Q. In fact, you were the Chairman of the Board of Directors;
15  is that right?
16  A. That's right.
17  Q. You've seen Compensation Committee meeting agendas befc
18  correct?
19  A. Yes, I have.
20  Q. Okay.
21     And this was one that was an agenda for January 29th,
22  2001, correct?
23  A. That's what it says.
24     MR. DROSMAN: Plaintiffs offer Exhibit 759 into
25  evidence.

3109

1  people independently made a decision on underwriting.
2      For us, it was a very valuable benefit.
3  Q. Sorry.
4      Let's go to Page 13.
5  A. Yeah.
6  Q. "Better Credit Skills."
7      Do you see that heading, Mr. Aldinger?
8  A. I do.
9  Q. Better credit skills than whom, sir?
10  A. Well, again, than the competition and peer groups we
11  looked at, other consumer finance companies.
12  Q. What does it mean when you said here, "Prepared for
13  slowdown over last two years"?
14  A. Well, each year we do a plan, and it's a best guess on
15  where the world is going to go; and, we had been seeing a
16  slowdown. We thought we were probably early and wrong. We
17  thought it was going to slow down faster than it did. But we
18  began to do things like more real estate loans and take
19  actions that related to the belief that things would get
20  worse.
21  Q. Now, the next -- the second -- bullet down says, "Doubled
22  Collectors." Do you see that?
23  A. Yes.
24  Q. Tell the jury what you told the Goldman Sachs conference
25  about that subject, please?

3110

1  A. Well, I can't remember the exact number, but we had
2  thousands of collectors. And when we double them, it's a big
3  investment.
4      But the investment is to get more people in place who
5  can work with our customers and do it earlier. And that --
6  it's a known way of lowering your chargeoff over time.
7  Q. There's been some suggestion in this case, Mr. Aldinger,
8  that Household's business model was to make loans to people
9  who couldn't pay them back; and, then, once they couldn't pay
10  them back, make them another loan they couldn't pay back; and,
11  then, shuffle them all around.
12      As I understood that testimony, the company never got
13  paid back; is that true?
14  A. I have to say I heard the same thing you did and didn't
15  agree with any of it.
16      You know, we made a lot of loans and we had some that
17  went bad, but it was never the intent that you'd ever want to
18  make a loan that goes bad. It can never be good for the
19  company to have a bad loan.
20  Q. And did the company collect most of its loans?
21  A. We collected most of our loans; and, as we have said --
22  Q. More than 50 percent?
23  A. A lot more than 50 percent.
24  Q. 60?
25  A. 90-plus percent or more -- high 90s, probably.

3111

1  Q. That's the name of the game, right? You lend money --
2  A. Absolutely.
3  Q. -- you charge interest, you collect?
4  A. Absolutely.
5  Q. And what you have --
6  A. And what you have to do is respond to the changing
7  environment, which we did.
8  Q. When you doubled the number of collectors, I think you
9  said there were thousands of collectors?
10  A. I believe so, yes.
11  Q. So, when you doubled them, there were twice as many
12  thousands?
13  A. Yes.
14      And I'm sorry, I can't remember the exact number we
15  had before and after. Remember, the company had 33,000
16  people. It was a pretty big company. But we did have
17  thousands of collectors.
18  Q. And what is the impact of doubling the number of
19  collectors, who collect loans from people who aren't paying on
20  the company's delinquency rate?
21  A. It lowers the delinquency rate dramatically.
22  Q. And it costs money to hire more collectors?
23  A. Yes, it does.
24  Q. Then why do you spend the money?
25  A. We spend the money because it's a good investment. We'd

3112

1  rather have fewer delinquent and fewer chargeoff.
2  Q. You're not looking to have chargeoffs?
3  A. I'm sorry?
4  Q. You're not looking to have chargeoffs?
5  A. Exactly.
6  Q. You spend money to prevent chargeoffs?
7  A. Absolutely.
8  Q. Turn to the next page, Page 14. This asks the question:
9  "Are Household reserves adequate?"
10      Do you see that?
11  A. I do.
12  Q. Tell us what a reserve is?
13      I think you started to say this this morning and
14  Mr. Drosman said he didn't want to hear it. Tell us now.
15  A. Yes. Reserves are the thing that I focused on most for
16  the company; and, basically, what we would do is put aside
17  reserves in each quarter to anticipate our losses. And that
18  affects the net income. The more reserves you put up, the
19  lower your profits are. They go down.
20      So, over time, we were very conservative and we made
21  the point at this conference that our reserves were at an
22  all-time high of $3.6 billion, and that we had grown our
23  reserves over the five-year period by $2.1 billion.
24      Our reserve ratios were also higher.
25  Q. I'm sorry, I didn't mean to interrupt.

3113

1    Go ahead.
2    A.   No, no, I think in the end the point I'd make is our
3    reserves were very strong.
4    Q.   I just want to be sure that I'm following you.
5        Give me an example using numbers.  You said the more
6    you put your reserves up, the lower your profits are.
7        Explain to me -- give me an example using just a
8    hundred dollars.  How does that work?
9    A.   Well, Dave Schoenholz would do this a lot better than me.
10   So, he's going to critique me, and I am getting worried about
11   that.
12   Q.   A lot better than I.
13   A.   Basically, what you have is over the course of the year,
14   you earn revenues and income; and, that comes down to your net
15   income.  And when you put a reserve to the side, it reduces
16   that net income that you report for shareholders.  It reduces
17   your EPS.
18       So, if you had a hundred dollars of net income and
19   you put ten dollars of reserves aside, that would become 90
20   dollars of net income.
21   Q.   And the reserves are held aside against what possibility?
22   A.   Well, against the possibility that things turn badly.
23   Q.   So, then --
24   A.   And losses go up.
25   Q.   Let's go into the future.

3114

1        Things turn badly and you have losses in some
2    subsequent period?
3    A.   Yes.
4    Q.   What do you do?  You go back and apply the reserves to the
5    losses?
6    A.   Well, in each quarter you're always adding reserves to
7    reflect what's going on, but you want to build a base that
8    protects against a worse scenario.
9    Q.   To avoid surprise?
10   A.   Correct.
11   Q.   Does the marketplace like surprise?
12   A.   No, the marketplace hates surprises.
13   Q.   Going back to Page 14 of this exhibit, I think you went
14   through the first two bullet points.  Maybe -- you may have
15   touched upon the third.
16       Let's look at the fourth:  "Build Reserves For Nine
17   Consecutive Quarters."
18       What were you referring to there?
19   A.   Well, the last nine consecutive quarters, we were
20   effectively adding reserves more than our chargeoffs were.
21       So, that's relatively conservative and good thing
22   to do.
23       And I guess I would make one other point here, which
24   is in the entire eight years that I was CEO of Household, we
25   never, ever had a one-time reserve addition because our

3115

1    reserves were inadequate.  So, that's what I focused on.
2    Q.   And the last sub-bullet on this page says, "Reserves Are
3    Now At 107 Percent of Chargeoff."  What does that mean?
4    A.   That means that we, effectively, have put aside -- we have
5    107 percent of what the actual losses were for the year.
6    Q.   Is that a conservative thing?
7    A.   It is.
8    Q.   Now, what I don't see anywhere on this page, Mr. Aldinger,
9    is any reference to two-plus.
10       Is the concept of two-plus included somewhere in this
11   page?
12   A.   Well, ultimately, two-plus gets incorporated into
13   reserves.  I mean, effectively, the way it works is that
14   whatever your two-plus number -- and, again, Dave would be a
15   lot better at this than me -- but there's a formula that they
16   put in, that they put reserves in, related to what your
17   two-plus are.
18       And, then, we add another bit of reserves for re-age;
19   and, then, we add a third kind of reserve called "Judgmental
20   Reserves," which looks at the whole economy and the world and
21   unemployment and what we think might impact the company goin
22   forward.
23       So, we have three kind of pieces that go into that
24   reserve calculation and, effectively, that's the way we look
25   at it.

3116

1        So, delinquency is clearly an element and one of them
2    that we account for; but, as a CEO, you know, that wasn't my
3    main measure that I looked at.  I looked at reserves.
4    Q.   Did I hear you say that part of the reserves is attributed
5    to re-aging?
6    A.   That's my understanding, yes.  Yes.
7    Q.   So, all this talk we've heard about re-aging throughout
8    this case is accounted for or addressed by a part of the
9    reserve?
10   A.   That's correct.
11   Q.   Let's turn to Page 17.
12       I think you said a few minutes ago, when we looked at
13   a chart that showed us Household's performance in a weak
14   economy, you said in a few pages, we'll see the contrast.
15   This one says, "Household's performance in strong economy."
16       Do you see that?
17   A.   Yes.
18   Q.   Okay.
19       Tell us what the bullet point margins narrowed means?
20   By that, I mean, what did you say at the Goldman Sachs
21   conference about that subject?
22   A.   Well, the point I was making is that you, effectively,
23   manage the company slightly different in a weak environment
24   than you do in a strong environment; and, that there are
25   likely different outcomes in those environments.

3117

1    So, in a strong environment, it's easier to grow.
2  People are fully employed, people are spending money, the
3  economy is good, it's easier to grow your loan portfolio.
4  Q. And, then, it says --
5  A. But what happens -- the next point -- is when, if the
6  economy is good, there are more people who want to make loans
7  because it's safer. And, so, what happens is more lenders are
8  trying to make loans, the margins go down. Pricing goes down.
9  The cost of loans goes down in a good economy. And that
10  lowers yours profit.
11    But the flip side is the next bullet, which is: "In
12  A Good Economy, Chargeoffs Improve," because more people are
13  working and the economy is better and they're able to pay
14  their debts.
15    So, in a good economy, you get good growth, you get
16  thinner pricing and lower losses.
17    The bad economy is just the reverse. Your growth
18  slows down, fewer people are able to qualify for a loan,
19  margins get higher -- because there's a scarcity of lenders --
20  and, finally, chargeoffs get worse because the economy is
21  worse.
22    So, those are the key factors in different
23  environments.
24  Q. What did you tell the people at the Goldman Sachs
25  conference about the next bullet point, "Reserves Increased

3118

1  $525 Million"?
2  A. Well, again, that was the comment for the year, I think,
3  net increase.
4  Q. And, again, is that a good thing to do?
5  A. It's a good thing to do.
6  Q. All right.
7    Turn to the next page, Page 18. And this is
8  Household's performance in a weak economy.
9    Is this in contrast to the prior slide?
10  A. Yes, that's the contrast. And what you see here is
11  whereas we grew 22 percent in the good economy, we only grew
12  12 percent in loans in a weak economy.
13  Q. But I see in the fourth bullet, once again, you increased
14  your reserves even in a bad economy, just not as much?
15  A. That's correct.
16  Q. Were you always -- were you trying to always increase your
17  reserves?
18  A. Yes. That -- that -- in my view, is a good thing.
19  Q. Again, the two-plus number is in the reserves somewhere?
20  A. Yes, it is.
21  Q. Let's turn to the Outlook for 2002 on Page 19.
22    Do you see that?
23  A. Yes.
24  Q. I notice, once again, it says, "Reserves Increasing."
25    Is that something you talked about at the Goldman

3119

1  Sachs conference?
2  A. Yes, I did.
3  Q. What did you say?
4  A. Well, I mean, essentially, I used this bullet point. I
5  said that, effectively, we would grow slower, we're going to
6  see a weak economy and we're going to continue to increase our
7  reserves over time, which made investors feel good.
8  Q. So, you were always increasing reserves in a good economy
9  or a bad economy?
10  A. Yes.
11  Q. And, respectively, you planned to increase reserves?
12  A. That's correct.
13  Q. Why is there always this focus on increasing reserves?
14  A. Why? It's just a conservative way to run the company.
15    Living -- growing up in the banking world, I learned
16  that reserves are good.
17  Q. Let's turn to Page 21.
18    The question you ask on this page is: "Have
19  Household's accounting policies impacted results?"
20    Was this one of the pages you said you added on that
21  Sunday, to respond to the Barron's article that you learned
22  about when Mr. Streem interrupted your dinner Saturday night?
23  A. Yes, it was.
24  Q. Tell us what this page -- tell us what you told the
25  Goldman Sachs conference about this page.

3120

1  A. I think we wanted to make two points. One was that the
2  changes occurred in 1996 and the article occurred in 2001.
3    So, if your accounting changes were really going to
4  help your company a whole lot, it certainly would have shown
5  up in the five years -- you know, that it had been done five
6  years ago -- this wasn't something we did a day before.
7    And the second point of the article was, "Well, and
8  the investors didn't know. You secretly changed your
9  accounting on the investors."
10    Well, if you go forward on the next slide, what we
11  were able to do was to pull up a statement I made in 1996 to a
12  big investor conference call, which said -- if we go to --  I
13  don't want to jump ahead. Do you have a --
14  Q. Well, I was asking you to walk me through Slide No. 21.
15    Have you finished telling us all the things you said
16  at the Goldman Sachs conference about this slide?
17  A. Yes.
18    I mean, I think they're self-explanatory.
19  Q. Okay.
20    Let's go to Slide 22. The heading this time is:
21  "Has Household 'Hidden' Changes in Accounting Policies?"
22    Who had accused Household of hiding its changes in
23  accounting policies?
24  A. Well, there was one analyst who, for years, was negative
25  on us, by the name of Bill Ryan. And the article in Barron's

3241

1  Q.  Okay.  Mr. Aldinger, in issuing the financial reports that
2  were later restated, in other words, the original reports for
3  all of those years in reliance on the advice of Arthur
4  Andersen, did you have any intent to defraud anybody?
5  A.  No.
6  Q.  Did you have any intent to misstate anything?
7  A.  Never.
8  Q.  Did you have any intent to do anything other than get the
9  numbers right?
10  A.  No.
11  Q.  Did you think you were getting the numbers right?
12  A.  I did think we were getting the numbers right.
13  Q.  Did you have a reasonable level of comfort that all the
14  people involved in this process were on board with you?
15  A.  Yes, I did.
16  Q.  Did anyone ever say to you this is wrong, we shouldn't be
17  saying this?
18  A.  No.
19  Q.  Let's talk a little bit about restructuring.
20       We've heard a lot about it's either called
21  restructuring or re-aging.
22       Are you okay?
23  A.  Yes.  I'm okay.
24  Q.  Can you tell us why Household engaged in the business
25  practice of restructuring loans in the first place?

3242

1  A.  Re-aging was a process that was -- was going on for
2  decades, 70 or 80 years since the beginning of the company,
3  well before I got there, and it really had two purposes.  One
4  was to fulfill our customer proposition; that is, to work with
5  customers, keep them in their houses longer.
6       Second was to maximize cash flow, and we believed
7  that re-aging did both of those things.
8  Q.  Tell us how -- address each of those things in order.
9  First start with the customers.  Tell us how re-aging helps
10  the customers.
11  A.  Well, re-aging in many cases allows the customers to stay
12  in their homes.  And, again, I'm not an expert on how we
13  re-age or what the techniques are, what the best approach is;
14  but generally speaking, it allows the customers to continue to
15  pay their loans when they wouldn't be able to do it if we
16  applied bank rules.
17  Q.  When you say bank rules, what are you referring to?
18  A.  Well, bank rules, something called FFIEC, they're much
19  more strict on what you can do in terms of re-aging and how
20  long you can let customers go without paying.
21  Q.  Did they apply to Household's Consumer Lending Unit?
22  A.  They did not.
23  Q.  Did they apply to Wells Fargo?
24  A.  They did.
25  Q.  And the second thing you said is re-aging helps to

3243

1  maximize cash flow.  Please explain what you meant by that,
2  sir.
3  A.  Well, it means we believe that by re-aging, ultimately we
4  get more money than if we didn't re-age.
5  Q.  Explain how that works.
6  A.  By -- by re-aging and allowing the customer to continue to
7  pay his bills as opposed to walking away, we get more money
8  than we would otherwise if he walked away.
9  Q.  My fault for not being clear.
10       What would the alternative be to re-aging?  If you
11  didn't re-age, what would you do?
12  A.  Well, for example, on a home if we didn't re-age, what
13  would happen is you'd have more foreclosures.  And from a
14  company -- certainly from a customer standpoint, that's
15  terrible; but from a company's standpoint, it's terrible
16  because you can only lose money on a foreclosure.  The way our
17  policy was if there was any gain, it went to the customer.
18  But in 90 percent of the times we have foreclosed or
19  99 percent of the times, you basically lost money because you
20  had the cost of selling it and you had the cost of maintaining
21  it.
22       And so we never wanted to own a home if we could, and
23  to the extent we could re-age, encourage the customer to stay
24  paying, that was a good thing.  Good for the customer, they
25  kept their house; good for us, we got more cash flow, and we

3244

1  didn't get the house back.
2  Q.  Now, again, Mr. Aldinger, you understand that the theory
3  of the people who are suing you is that Household used
4  restructuring policies to conceal its credit quality or
5  manipulate its earnings in some fashion.
6       Do you understand that's what they say?
7  A.  I understand that that's what they say.
8  Q.  Did Household do any such thing?
9  A.  No.  I don't -- I don't agree with that at all.
10  Q.  Are you sure?
11  A.  I'm sure.
12  Q.  How come?
13  A.  Because I have faith in the team that runs the business,
14  because we've seen that the cash flow is maximized by doing
15  re-aging.  We know that it certainly helps customers, and it
16  fulfills our goals; and, most importantly, because in the end
17  it's all about reserves, and we reserved for re-age, we
18  reserved enough to protect this company.
19  Q.  So if what investors' counsel is suggesting for the last
20  several weeks had been going on down at the level they like to
21  focus on, down at the low level --
22  A.  Right.
23  Q.  -- how would you have been able to see that up at the
24  level you were at?
25  A.  Well, I wouldn't see what happens day-to-day.  You know,

Aldinger - cross

3330

1   Q.  What did Household do to respond to this increased
2   headline risk?
3   A.  Well, we tried to be active with regulators.  We tried to
4   be active with investors to tell them our story.  But it was a
5   challenging time.
6   Q.  Did you add any employees?  Did you beef up any of your
7   departments?
8   A.  Well, we obviously -- after adding Jim Kauffman and his
9   team, we added a significant number of people to the
10  compliance effort.  We basically gave him an open budget.
11  Q.  What does an open budget mean?
12  A.  That means he could hire as many people as he wanted to,
13  no questions asked.  We said to him we want you to absolutely
14  have control of whatever you need.
15  Q.  Is that a normal thing in the company?
16  A.  No.  That's rare.
17  Q.  Why did you do that?
18  A.  Because I thought compliance was the really important
19  issue of the day.
20  Q.  Did you give any other departments any -- an open budget?
21  A.  Not that I recall.
22  Q.  Now, Mr. Aldinger, you've heard some testimony in this
23  case from various people about a settlement with the attorneys
24  general?
25  A.  Yes, I have.

Aldinger - cross

3331

1   Q.  Let's see if we can put that in context.  What led up to
2   that scenario?  Who were the attorneys general?  Let's start
3   with that.
4   A.  Well, each state has an attorneys general in it; and I
5   think as you've heard in earlier discussions, at some point
6   the State of Washington was very active in discussing their
7   issues with Household.  And there were two or three states,
8   Minnesota being one, which eventually grew to be a group of 12
9   to 15 attorneys general that began discussing with Household
10  the idea of trying to make some kind of a compromise or a
11  settlement with that group.
12  Q.  And did there come a time where you got involved in
13  directing Household's efforts in connection with that subject?
14  A.  Yes.
15  Q.  Why?
16  A.  Well, I thought it was the most important issue in front
17  of us.  Clearly, the concerns about regulatory issues were
18  dragging our stock price down, were hurting the morale of the
19  company, were distracting the executives, and so I thought at
20  some point it made sense, if we could, to reach a settlement
21  potentially with the AGs even though we may not have agreed
22  that we had done anything wrong.
23  Q.  When you first got involved, how many attorneys general
24  were gathered together opposing Household?
25  A.  I think it was between 12 and 15.  And at that point, I

Aldinger - cross

3332

1   authorized my team to go in and begin discussions with them.
2   Q.  Were you prepared to come to a resolution with these 12 to
3   15 attorneys general?
4   A.  As it later turned out, we decided not to do that.
5   Q.  Did you make that decision?
6   A.  I did.
7   Q.  What did you want to do instead?
8   A.  Instead I wanted to get a global settlement.  My view was
9   that settling with 12 to 15 of the most aggressive AGs didn't
10  make sense because investors would still have concerns.  There
11  still would be the potential for somebody else to come in and
12  litigate, and so we told the team that if we're going to have
13  any settlement, it had to be global with all of the AGs where
14  we did business, and we did business in roughly 48 states.
15  Q.  So the idea to expand from 12 or 13 to 48 was yours?
16  A.  That's correct.
17  Q.  Did you find that there were attorneys general who had no
18  interest in participating?
19  A.  Yes, I did.  When we first sent the team out to talk to
20  other attorneys general about joining the compromise and the
21  settlement, the reaction of many of the AGs was --
22      MR. DROSMAN:  Objection, hearsay.
23  BY MR. KAVALER:
24  Q.  Focus on what you said.  Did you give instructions to your
25  people with regard to bringing in other attorneys general?

Aldinger - cross

3333

1   A.  Yes, I did.
2   Q.  What did you say to them?
3   A.  I said that unless we could get a global settlement of 48
4   AGs, we wouldn't do any settlement.
5   Q.  Was there a time when you had to authorize certain
6   activities to cause additional attorneys general to join the
7   team that was opposing Household?
8   A.  Yes.
9   Q.  What did you authorize?
10  A.  What I authorized was our government relations team to go
11  out with some outside lawyers and we also hired a number of
12  former attorneys general to come out and work with us and
13  approach the other attorneys general around the country and
14  ask them to join in this --
15      MR. DROSMAN:  Objection, hearsay.
16  BY MR. KAVALER:
17  Q.  Are these the instructions you gave?
18  A.  These are the instructions I gave.
19      THE COURT:  Overruled.
20  BY MR. KAVALER:
21  Q.  Please continue, Mr. Aldinger.
22  A.  And so we asked them to go out and approach the attorneys
23  general and try to sign up effectively 48 of the AGs.  And
24  ultimately, in order to get broader participation, we actually
25  had to go out and we offered to pay each of the attorneys

Aldinger - cross

3334

1  generals' offices $200,000 per attorneys general per state to
2  join in this settlement negotiation.
3        So literally we went and ultimately spent $7 million
4  bringing in all the states.  About 35 states that did not
5  originally participate and did not originally want to
6  participate, we brought them in ourselves and actually had to
7  expend $7 million of our own money of what we called
8  administrative expenses to get them on board.
9        One of the ironic parts or the funny parts to this is
10  that at the end, we got calls from two other attorneys
11  general, one in South Dakota and one in Alaska, where we had
12  no customers, no business, no offices, and they said they
13  wanted to join too.
14        MR. DROSMAN:  Objection, hearsay.
15        THE COURT:  I'll sustain the objection.
16  BY MR. KAVALER:
17  Q.  Mr. Aldinger, is there a practice in the business of being
18  a regulated industry where the regulated company reimburses
19  the regulator for the cost of investigating the company?
20  A.  Yes, there is.
21  Q.  And is that the model that you were following here?
22  A.  Absolutely.
23  Q.  The $200,000 was a measure of the expense an attorney
24  general might incur in having to send his people to these
25  meetings?

Aldinger - cross

3335

1  A.  Absolutely.
2  Q.  Did there come a time when you achieved a critical mass of
3  attorneys general?
4  A.  Yes.
5  Q.  Once you had the critical mass, Mr. Aldinger, did you
6  authorize people to negotiate with the attorneys general?
7  A.  I did.
8  Q.  Were you kept apprised of the progress of the
9  negotiations?
10  A.  I was.
11  Q.  Did there come a time when the people who were reporting
12  to you about the negotiations reported that an offer was on
13  the table that seemed to be within the range of acceptable?
14  A.  Yes.
15        MR. DROSMAN:  Objection, leading and hearsay.
16        THE COURT:  I'll sustain the objection.
17  BY MR. KAVALER:
18  Q.  Did you come to understand, Mr. Aldinger, at some point
19  these negotiations had come to a head?
20  A.  Yes.
21  Q.  What, if any, actions did you take at that point?
22  A.  I essentially then talked with my board about the
23  possibility of a settlement once we had a number that we
24  thought made good business sense in terms of settling this
25  whole issue with all the AGs across the board.

Aldinger - cross

3336

1  Q.  Were you in favor of settling this issue with all the AGs
2  across the board?
3  A.  Well, I initially was not in favor of it and there were a
4  number of my board members who had reservations, but in --
5  because we felt we had done nothing wrong.  But in the end, I
6  think we had to make a practical business decision.
7        If we didn't settle, we could have potentially had
8  this drag out for years, keep our stock price down for years,
9  distract management.  And so our view was that if we could get
10  a reasonable settlement, put this all behind us, that our
11  stock price would rise.  And from a business standpoint, not a
12  legal standpoint, it was a good decision.
13  Q.  Do you recall when you had this conversation with your
14  board of directors?
15  A.  It was sometime in October, the day before we announced
16  our settlement.
17  Q.  The day before you announced.  Do you remember what day
18  you announced the settlement?
19  A.  It was in October, I think 11th or 12th.  I can't remember
20  the exact date today.
21  Q.  But your best recollection is the conversation with the
22  board was the day before?
23  A.  That's my best recollection, yes.
24  Q.  Did you have to have the board's approval to make this
25  settlement?

Aldinger - cross

3337

1  A.  I did.
2  Q.  So was it possible to make a settlement before you talked
3  to the board?
4  A.  No.
5  Q.  You didn't have that authority yourself?
6  A.  No, I didn't.
7  Q.  The people you had negotiating with the attorneys general
8  didn't have that authority?
9  A.  No, they had no authority.
10  Q.  Did the board authorize the settlement?
11  A.  They did.
12  Q.  What did you do then?
13  A.  We then went back and --
14  Q.  What did you do, sir?
15  A.  Well, I settled it.
16  Q.  Did you instruct the people negotiating with the attorneys
17  general?
18  A.  Yes, I did.
19  Q.  What instruction did you give them?
20  A.  To settle the -- to settle.
21  Q.  Did the company disclose the fact that it reached a
22  settlement with the attorneys general?
23  A.  It did.
24  Q.  Let's look at Exhibit 74 in evidence.
25        A copy to counsel.  A copy to you, Mr. Aldinger.

Aldinger - cross

3338

1  (Tendered.)
2  BY MR. KAVALER:
3  Q. This is a July 17, 2002, conference call transcript.
4     Do you see that?
5  A. Yes, I do.
6  Q. Is that several months before the settlement?
7  A. Yes, it is.
8  Q. Turn, if you would, to page ending in 489.
9     Do you see there's a question asked by Bob Napoli?
10  "Good morning and nice quarter." Do you see that?
11  A. I do.
12  Q. Do you know who Mr. Napoli is?
13  A. Yes, he was an analyst.
14  Q. And he says, Good morning and nice quarter. I wonder if
15  you could just expand a little bit more on two issues that are
16  on everybody's minds. Are there any other discussions going
17  on with the regulators? I mean, are they looking for any
18  other unusual types of information or spending and I wonder if
19  you can just talk about that a little bit more.
20     And then the second issue, you know, that frequently
21  comes up is that -- the predatory lending issue. I was
22  wondering if you could just talk about a little bit what's
23  going on with some of the lawsuits and the extent that you can
24  help us out on that. Thanks.
25     And then you begin to answer. And then down at the

Aldinger - cross

3339

1  bottom you begin to answer.
2     And on the top of the next page, 490, you say, What
3  is happening, I mean, with the ACORN suits and what is
4  happening with the AGs.
5     Do you see that?
6  A. No, I'm not in the right -- same place yet.
7  Q. Top of 48 -- 490. Top of the next page. Second line
8  down.
9  A. Yes.
10  Q. Okay. That was you talking?
11  A. That's right.
12  Q. And on the next page, 491, third paragraph down, that's
13  still you talking. And you say, Now let's talk about the
14  lawsuits. We think straight out the class action suits
15  brought by ACORN in particular are just baseless, and we don't
16  see any long-term impact there. We think they're wrong.
17     On the AGs, obviously again it's a very political
18  issue. There's been lots of talk. We will, like we do on
19  everything else, focus on resolving that issue over the next
20  six months or so. But I can't go into any details except to
21  say that I am confident that our best practices in our current
22  model ultimately will prevail and we'll do what we do because
23  we do not do predatory lending.
24     Do you see that?
25  A. I do.

Aldinger - cross

3340

1  Q. And this conversation was in July of '02?
2  A. That's correct.
3  Q. And you settled with the attorneys general in October of
4  '02?
5  A. That's correct.
6  Q. Within six months?
7  A. That's right.
8  Q. Exactly as you had said?
9  A. Yes.
10     MR. KAVALER: Ladies and gentlemen of the jury, that
11  transcript is at tab 20 of your binder.
12     And I was remiss in not telling you that the AG
13  Edwards document, Defendants' 891, was tab 19 in your binder.
14  So I apologize for that.
15  BY MR. KAVALER:
16  Q. Now, let's look at Exhibit 550.
17     A copy to counsel. A copy to you, Mr. Aldinger.
18  (Tendered.)
19  BY MR. KAVALER:
20  Q. Is this an analyst report prepared and issued by Morgan
21  Stanley about Household International on or about July 31,
22  2002, while you were CEO?
23  A. Yes, it is.
24     MR. KAVALER: Offer Defendants' 550 in evidence, your
25  Honor, with the usual limiting instruction.

Aldinger - cross

3341

1     THE COURT: It will be admitted.
2     MR. KAVALER: Ladies and gentlemen of the jury, this
3  document appears at tab 21 in your binder.
4  BY MR. KAVALER:
5  Q. Now, Mr. Aldinger, this is an analyst's report released on
6  July 31?
7  A. That's correct.
8  Q. About two and a half months before the settlement?
9  A. Yes.
10  Q. And this is by Mr. Kenneth A. Posner, whom you talked
11  about yesterday?
12  A. Yes.
13  Q. You thought his analyses were usually the most acute?
14  A. I did.
15  Q. Look at the first page. It's got some bold headings, and
16  the last one down -- the next to the last one down says,
17  Impact of predatory lending may be overblown. Do you see
18  that? He says, New lending practices could reduce the
19  company's consumer finance margins from 2.0 percent to 1.5 to
20  1.75 percent.
21     Do you see that?
22  A. I do.
23  Q. What is he referring to by new lending practices?
24  A. That was the best practices we would put in place. And,
25  also, there's some speculation that if we were to do a

Aldinger - cross
3342

1 settlement, there may be other practices to change.
2 Q. And then he continues, And we're factoring in $500 million
3 in legal damages/regulatory fines in our price target.
4     Do you see that?
5 A. I do.
6 Q. When you saw this, what did you think he was referring to
7 by the $500 million?
8 A. Well, what he was referring to is what we might settle for
9 with the AGs.
10 Q. Did you know on July 31 what that number might be that you
11 would settle with the AGs for?
12 A. No. We had no number at that point.
13 Q. When is the first time you knew what number you would be
14 able to settle with the AGs for?
15 A. Not until very close -- the day before the settlement.
16 Q. The conversation you described earlier?
17 A. That's correct.
18 Q. And for there to be a settlement, both the company and the
19 AGs had to agree?
20 A. That's correct.
21 Q. And the company could not agree until the board told you
22 it was all right?
23 A. That's correct.
24 Q. Turn to page ending in Bates range 405 in that same
25 document.

Aldinger - cross
3343

1     Lower right-hand corner, bold heading, Household has
2 already been targeted in a number of regulatory and legal
3 actions.
4     Do you see that?
5 A. I do.
6 Q. He wrote, Further, bad press doesn't help as it often
7 encourages more borrowers and activist groups to step forward
8 with complaints. Household has been the subject of a great
9 deal of bad press lately. To capture the likelihood of
10 additional legal damages and/or regulatory fines, we subtract
11 $1 per share from our target price, based on a probability of
12 75 percent applied to $500 million in damages. This estimate
13 represents an educated guess. We cannot anticipate the
14 outcome of ACORN's class action lawsuit, regulatory actions in
15 the State of Washington, or other potential legal and
16 regulatory issues.
17     Do you see that?
18 A. I do.
19 Q. When you saw that, Mr. Aldinger, did you know if the
20 probability of success of resolving a lawsuit or a dispute,
21 rather, the probability of resolving the matter with the AGs
22 was 75 percent?
23 A. No.
24 Q. Did you know whether $500 million was a high number, a low
25 number or an accurate number?

Aldinger - cross
3344

1 A. No.
2 Q. When is the first time you knew that the probability of
3 being able to resolve this with the attorney generals was a
4 hundred percent?
5 A. About a day before we settled it.
6 Q. When is the first time you knew what number you'd be able
7 to settle on with the attorneys general?
8 A. Again, it would have been about a day before.
9 Q. The day before what, sir?
10 A. The day before we officially settled it.
11 Q. Mr. Aldinger, have we prepared a demonstrative to show the
12 movement of the stock price on the day the settlement was
13 announced?
14 A. Yes, we have.
15 Q. Now, was there some talk in the marketplace about the
16 settlement even before it was formally announced?
17 A. There appeared to be some.
18 Q. Did any leaks come from the Household side?
19 A. They did not.
20 Q. Do you know where the leaks came from?
21 A. Not for certain.
22 Q. But in any event, you know there were leaks?
23 A. Yes.
24 Q. Can we look at DDX 230-03.
25     And, Mr. Aldinger, the left-hand axis reads,

Aldinger - cross
3345

1 Household stock price per share.
2     Do you see that?
3 A. Yes, I do.
4 Q. And what does this show us?
5 A. Well, this shows the stock price going up over a two-day
6 period.
7 Q. What do you understand those two days to be?
8 A. One was, I think, the day before we announced, but the
9 leak was out, and the second was after we announced.
10 Q. And by how much did the stock price go up over those two
11 days?
12 A. The value -- well, the stock price went from 28 -- $21 to
13 28.20, but the value of the company went up by over $3
14 billion, $3.2 billion.
15 Q. First of all, tell me what percentage increase that is
16 from 21 to 28.
17 A. Well, it's about a 30 percent increase plus, a third.
18 Q. And do you know whether that was a significant increase
19 for Household?
20 A. That may have been the biggest increase I ever saw in my
21 eight years as CEO in any two-day period.
22 Q. Secondly, you told us the value of Household increased by
23 in excess of $3 billion?
24 A. That's correct.
25 Q. Tell us how you got to that calculation.

Aldinger - cross
3346

1  A.  Well, we had 500 million shares, so basically it was north
2  of $3 billion.
3  Q.  It's the basically part that I'm not getting.  Do the math
4  for me.
5  A.  Well, if you've got 500 million shares and your stock goes
6  up by about $7, I was understating it.  It's about 3.5 billion
7  incremental value.
8  Q.  To all the shareholders?
9  A.  To all the shareholders.
10  Q.  Including you?
11  A.  Absolutely.
12  Q.  Including the plaintiffs?
13  A.  Yes.
14  Q.  And how much did Household -- withdrawn.
15       Is that the result you were anticipating and hoping
16  for?
17  A.  It is.
18  Q.  Is that the result you were working to achieve?
19  A.  Yes.
20  Q.  How much did Household pay the attorneys general to
21  achieve this increase in value for all the shareholders,
22  including yourself, and the plaintiffs of $3-1/2 billion?
23  A.  $484 million.
24  Q.  Were you satisfied that that was a good deal,
25  Mr. Aldinger?

Aldinger - cross
3347

1  A.  I was.
2  Q.  Still?
3  A.  I still am.
4  Q.  Let's talk about what that $484 million represented to
5  Household.  Have we prepared a demonstrative that shows us --
6  first, have we prepared a demonstrative that compares the two
7  numbers you just gave us, the approximately $3-1/2 billion
8  increase and the $484 million payment?
9  A.  I believe we have.
10  Q.  Can we see DDX 220-01.
11       What does this show us, Mr. Aldinger?
12  A.  It shows the cost at 484 million and the increase in
13  Household stock to $3.3 billion.
14  Q.  Is it to $3.3 billion or by 3.3 billion?
15  A.  By 3.3 billion.
16  Q.  Secondly, can you give us some idea -- withdrawn.
17       Can you put in perspective this $484 million for us,
18  Mr. Aldinger?  For example, can you tell us what Household's
19  gross revenues were in 2002?
20  A.  Yes.  I think our revenues were about $15 billion during
21  that period.
22  Q.  Okay.
23       THE COURT:  Is this a good time to stop?
24       MR. KAVALER:  Whatever you say, your Honor.
25       THE COURT:  I think we'll take our 15-minute break at

Aldinger - cross
3348

1  this time and then we'll continue.
2  (Jury out.)
3       THE COURT:  You may step down, sir.
4       THE WITNESS:  Thank you.
5       THE COURT:  Okay.  We're recessed for 15 minutes.
6       MR. KAVALER:  Thank you, your Honor.
7  (Recess taken.)
8       THE COURT:  Ready to resume.
9       MR. KAVALER:  Yes, your Honor.
10  (Jury in.)
11       MR. KAVALER:  Thank you, your Honor.
12  BY MR. KAVALER:
13  Q.  Mr. Aldinger, I can't remember if I asked you this
14  question or started to ask you this question.  So, let me ask
15  it, again, if I didn't finish it or, in any event.
16       You told me Household's gross revenues in 2002 were
17  about $15 billion.  I know I didn't ask it.  Can you do the
18  math -- compare Household's gross revenues of 15 billion to
19  the settlement price of 484 million?
20  A.  It would be about three percent, I think, of the revenues.
21  Q.  Three percent.  Is that the same as about 30 times as much
22  revenue?
23  A.  That's about right.
24  Q.  15 billion is 30 times as much?
25  A.  Yes.

Aldinger - cross
3349

1  Q.  Okay.
2       Do you know or can you calculate in your head
3  Household's gross revenues for the entire period?
4       We've been talking about 1999 to 2002?
5  A.  I don't know that I'd venture a guess on that.
6  Q.  But it was a lot more than 15 billion?
7  A.  A lot more than 15.
8  Q.  Let's talk briefly about Wells Fargo.
9       You saw the videotaped deposition of Mr. Todd May?
10  A.  I did.
11  Q.  Did you ever meet Mr. May in your life?
12  A.  No, I did not.
13  Q.  The negotiations between Wells Fargo and Household -- that
14  Mr. May was talking about -- did you participate in those?
15  A.  I did.
16  Q.  Who did you discuss -- who did you negotiate against?  Who
17  was your counter-party?
18  A.  Dick Kovacevich, the CEO of Wells Fargo.
19  Q.  You were the CEO of Household and he was the CEO of Well
20  Fargo?
21  A.  That's correct.
22  Q.  You spoke CEO to CEO?
23  A.  Yes, we did.
24  Q.  Mr. May was not in the room?
25  A.  That's right.

Aldinger - cross

3350

1  Q.  All right.
2      Was there ever an agreement upon a price for that
3  transaction?
4  A.  No.
5  Q.  Was there ever an agreement to do that transaction?
6  A.  No.
7  Q.  Who terminated the conversations between Household and
8  Wells Fargo?
9  A.  We did.
10  Q.  Who communicated that decision to Mr. Kovacevich?
11  A.  I did.
12  Q.  When you spoke to Mr. Kovacevich, was Mr. May in the room?
13  A.  He was not.
14  Q.  What did you say to Mr. Kovacevich as the reason for why
15  Household was terminating the negotiations?
16  A.  I said that we had taken too long in the negotiations and
17  we were getting worried about leaks.
18      We also had our annual meeting coming up and didn't
19  want to be in a position where somebody could ask a question
20  and we'd be in a very difficult spot if they asked us about an
21  ongoing transaction, because you never want to let that out.
22      So, I pulled the deal.
23  Q.  Do you have any knowledge whatsoever of how Mr. Kovacevich
24  reported your statement to him back to his people?
25  A.  I do not.

Aldinger - cross

3351

1  Q.  Mr. Aldinger, you've seen investors' counsel put up on the
2  board various press releases that quote you -- various
3  statements by you.  You saw a series of boards the other day
4  with your picture on them with some language.
5      In any of the statements that have been attributed to
6  you in this trial, did you knowingly make any false
7  statements?
8  A.  I did not.
9  Q.  When you made each of those statements, did you believe
10  them to be true?
11  A.  I did.
12  Q.  When you made each of those statements, did you believe
13  you had an adequate basis to know whether they were true or
14  not?
15  A.  I did.
16  Q.  Did you think they were true?
17  A.  I did.
18  Q.  As you sat here through the trial, has anything that has
19  happened cause you to question the accuracy of anything you
20  said in those statements?
21  A.  No.
22  Q.  When you signed the various 10-Ks and 10-Qs that have been
23  put in evidence in this case, did you knowingly make any false
24  statements?
25  A.  I did not.

Aldinger - cross

3352

1  Q.  Did you ever ask anyone else to make any false statements?
2  A.  I did not.
3  Q.  Did you ever direct any Household employee to lie to the
4  press, lie to a regulator, lie to an investor, lie to an
5  analyst or anyone else about the affairs of Household or
6  anything else?
7  A.  I did not.
8  Q.  Did you intentionally conceal from the public a widespread
9  pervasive predatory lending scheme at Household?
10  A.  Absolutely not.
11  Q.  Did you believe there was a widespread pervasive predatory
12  lending scheme at Household?
13  A.  I did not.
14  Q.  Did it ever occur to you that there was a widespread
15  pervasive predatory lending scheme at Household?
16  A.  No.
17  Q.  Did you believe that Household was engaged in various
18  credit concealment devices?
19  A.  I did not.
20  Q.  Did it ever occur to you anything like that might be going
21  on?
22  A.  No.
23  Q.  Did you ever knowingly intend -- excuse me.
24      Did you ever knowingly fail to say something that you
25  thought needed to be said, to cause some earlier statement you

Aldinger - cross

3353

1  had made to be corrected or amplified or rectified in some
2  fashion?
3  A.  No.
4      MR. KAVALER:  I have no further questions for this
5  witness at the present time, your Honor.
6      Thank you.
7      THE COURT:  Redirect?
8      MR. DROSMAN:  A brief sidebar, your Honor.
9      THE COURT:  Sure.
10      (Proceedings had at sidebar:)
11      MR. DROSMAN:  Your Honor, there's been an instance in
12  which defendants have opened the door, that I wanted to run by
13  you.
14      THE COURT:  A little bit louder.  They won't hear
15  you.
16      MR. DROSMAN:  There's been an instance in which
17  defendants have opened the door, and I wanted to run by you --
18  before I use the document -- that I plan on using an SEC Cease
19  and Desist Order with this witness and I'll tell you why.
20      It's an appropriate --
21      THE COURT:  Do you object?
22      MR. KAVALER:  I object, your Honor.
23      It was -- the matter was specifically briefed and
24  argued before your Honor in a motion in limine.  You ruled it
25  couldn't come in.  We've done nothing to open the door.  I

Aldinger - cross

3354

1　don't know what he's talking about.
2　　　THE COURT:  Well -- go ahead.
3　　　MR. DROSMAN:  Here's what you said in your order.
4　You said, "Evidence coming in of settlement negotiations has
5　been admitted for purposes of rebuttal, for purposes of
6　impeachment, to show knowledge and intent," and what this
7　witness did is he sat on the stand and he said, "We disclosed
8　the fact that we had one payment re-age.  We disclosed the
9　fact that we had automatic re-ages."  That was disclosed by
10　Household.  I have the quotes.
11　　　And, then, in -- the SEC said they failed to disclose
12　the one payment re-ages, they failed to disclose the automatic
13　re-ages.  It's a proper response to that testimony.
14　　　MR. KAVALER:  I don't believe the SEC said anything,
15　your Honor.  There was a settlement agreement with the SEC.
16　　　THE COURT:  No, he is saying the settlement agreement
17　said that.
18　　　MR. DROSMAN:  That's right.
19　　　MR. KAVALER:  It's a Rule 408 problem, your Honor.
20　　　What he said is Household disclosed it in its
21　securitization prospectuses.  Those are in the record.
22　There's no question that it's accurate.  I read to him from
23　the settlement -- from the securitization prospectuses -- and
24　he acknowledged what he said.
25　　　THE COURT:  What does it say in the settlement?

Aldinger - cross

3355

1　　　MR. DROSMAN:  Here's what the trial says.  It says --
2　this is the testimony:  "This was disclosure by Household to
3　you, to the world, as of the time it filed its prospectus,
4　that it engaged in one payment re-age."
5　　　And what they say -- what the SEC says -- is that
6　they were false and misleading because they didn't disclose
7　the fact that they would restructure a loan without receiving
8　any payments or one-payment.
9　　　MR. KAVALER:  Your Honor, they're talking about two
10　different documents.  The testimony was about the
11　securitization prospectuses.
12　　　The testimony counsel just read is a truism.  It is a
13　disclosure to the world.  It is a res gestae.  The document is
14　filed with the SEC.  It says what it says.
15　　　THE COURT:  That's not the point.  The point is it
16　may be perfectly true; but, if your client has previously said
17　that it's not true, he's entitled to impeach him with a
18　previous statement.
19　　　MR. KAVALER:  I'm not sure I understand where he said
20　it's not true, your Honor.  What he said on the stand --
21　　　THE COURT:  Well, in the SEC settlement, he is saying
22　that your client said that his company did not disclose these
23　things to the public.
24　　　Is that right?
25　　　MR. DROSMAN:  Yes, your Honor.

Aldinger - cross

3356

1　　　Your Honor, let me --
2　　　THE COURT:  Wait, wait.
3　　　MR. DROSMAN:  Your Honor, here's the point.  The
4　point is he knows full well that they entered into a Cease and
5　Desist Order.  They're using this as a sword.  They're sitting
6　up there saying it was disclosed to the world.
7　　　THE COURT:  Yeah, I know.  That's a general argument.
8　　　MR. DROSMAN:  No, but listen.  If it were, in fact,
9　disclosed to the SEC, how could the SEC have issued a Consent
10　Decree that it wasn't disclosed?
11　　　THE COURT:  They can issue whatever they want.
12　　　MR. DROSMAN:  But that's --
13　　　THE COURT:  The question --
14　　　MR. DROSMAN:  I mean, it's evidence that there
15　wasn't, and that's the appropriate response.
16　　　MR. KAVALER:  Your Honor, the SEC settlement involved
17　one particular filing.  It was not a global review of
18　everything the company disclosed.
19　　　The difference between this case and the SEC case is
20　the SEC was an enforcement action that focused on one
21　particular document.
22　　　THE COURT:  I'm not worried -- it's not cases we're
23　comparing.  We're comparing statements.
24　　　Did he say something in the SEC Consent Decree --
25　　　MR. KAVALER:  First of all, your Honor --

Aldinger - cross

3357

1　　　THE COURT:  -- that I have barred, that he
2　contradicted here?
3　　　MR. KAVALER:  First --
4　　　THE COURT:  If he did, they can use that statement to
5　impeach him.
6　　　MR. KAVALER:  He did not.
7　　　THE COURT:  I don't know if he did or not because I
8　don't have the SEC settlement agreement in front of me, and I
9　would have to look at it to see.
10　　　MR. DROSMAN:  I've got it right here.
11　　　THE COURT:  My other concern is that your client just
12　took the last 15 or 20 of minutes of his testimony, at least,
13　talking about the reasons for going into his settlement
14　agreement with the SEC --
15　　　MR. KAVALER:  With the Attorneys General, your Honor.
16　　　THE COURT:  With the Attorneys General.
17　　　-- directly telling the jury that the reason they did
18　that was not because he thought they had any liability, but
19　because he wanted to avoid the publicity that came from the
20　lawsuit.
21　　　Now, I have a ruling in here that you folks -- that I
22　must have spent four hours doing -- when you asked us to
23　specifically not allow any of the terms or any of the
24　settlement negotiations or any of the circumstances
25　surrounding them to come into evidence to show liability.

Aldinger - cross

3358

1    You've now used all of those things to try to show no
2  liability.  Why haven't you opened up the door to the entire
3  proceeding?
4        MR. DROSMAN:  It's blown off the hinges, your Honor,
5  is what it is.
6        MR. KAVALER:  May I respond, your Honor?
7        THE COURT:  Yeah.
8        MR. KAVALER:  I want to respond to two things.
9        First, as to the SEC, he was not a party to that
10  settlement.  The company was a party to the settlement.  And
11  the settlement specifically says it does not apply to any one
12  of the signatories.  It carves out people such as Mr.
13  Aldinger.
14        Secondly --
15        THE COURT:  It's not who is liable under the
16  settlement.  It's whose statement does the settlement
17  comprise?
18        He's here speaking for the company when he says, "We
19  disclosed" or "We didn't disclose."  He's not just speaking
20  for himself.  You asked him.  You asked him, specifically:
21  "So, it was not a secret to anyone?" a half dozen times.
22        If he signed the document or if his company has
23  signed a document that said it was a secret, then those are
24  contradictory statements.
25        MR. KAVALER:  Your Honor, this is a disclosure case.

Aldinger - cross

3359

1  It's a securities fraud case.  What is on the market is on the
2  market.  I don't understand how he can somehow be precluded
3  from observing what is on the market.
4        THE COURT:  He can't.  He can testify to it all he
5  wants.
6        But if he has previously made statements that
7  contradict that, then they can impeach him with those
8  statements.
9        MR. KAVALER:  If he had done so.
10        I don't believe he's done so.  I believe the SEC
11  Consent Decree specifically says, "Without admitting or
12  denying anything, the company enters into a settlement."
13        MR. DROSMAN:  That goes to the weight, your Honor.
14        MR. KAVALER:  As to the opening --
15        THE COURT:  We're talking about which --
16        MR. DROSMAN:  There's two different issues.
17        Here's the SEC Cease and Desist (indicating).  It's
18  the order instituting Cease and Desist proceedings, making
19  findings.
20        THE COURT:  I will have to read it to see.
21        MR. DROSMAN:  Okay.
22        THE COURT:  And the other point is --
23        MR. KAVALER:  Secondly, your Honor --
24        THE COURT:  -- as to his testimony regarding the AG
25  settlement was, you know, directly -- I mean, I sat up in my

Aldinger - cross

3360

1  seat when you did it; it was directly -- aimed at disputing
2  that by entering into a settlement, Household was admitting
3  any liability.  It was directly aimed at implying -- not
4  implying, but telling the jury -- that even though they
5  entered into the settlement, they did not do any of the things
6  that the settlement -- that the lawsuit -- accused them of
7  doing.
8        MR. KAVALER:  But, your Honor, this is precisely --
9  precisely -- the issue that's created by what Ms. Ghiglieri
10  did, by what the other witnesses did, by putting the $484
11  million number before the jury.
12        And when we discussed this at Page 1723, we discussed
13  the fact that, in view of -- I said, "In view of -- I'm also
14  familiar with your Honor's point about once the door is
15  opened, the door is opened.  If Mr. Devor is going to address
16  that, then will respond."
17        Mr. Devor addressed it.  Ms. Ghiglieri addressed it.
18  Everybody addressed it.  We were compelled to respond.
19        THE COURT:  Sure.  But they addressed it for purposes
20  of establishing what, if any, effect it had on the price of
21  the stock.
22        MR. DROSMAN:  Exactly.
23        THE COURT:  That's what we said they could do.
24        MR. KAVALER:  But that's exactly what he responded
25  to, your Honor.

Aldinger - cross

3361

1        THE COURT:  That's not what he testified to.
2        No, that's not what he testified to.
3        MR. KAVALER:  Your Honor --
4        THE COURT:  He testified for about 20 minutes saying
5  that even though they were innocent, that he went around
6  recruiting Attorneys Generals so that they could get into the
7  settlement, even though they didn't do anything wrong.
8        MR. KAVALER:  And, your Honor, we very carefully
9  reviewed the transcript.  That is covered at Page 1858 and
10  1859.
11        Ms. Buckley -- this is a sidebar with the Court.
12        "MS. BUCKLEY:  Many states participated at the
13  request of Household.
14        "THE COURT:  If you want to bring that out, I guess
15  you can."
16        THE COURT:  That's right.
17        MR. KAVALER:  That's exactly what he brought out --
18  that many states participated --
19        THE COURT:  Yeah, but you open the door when you do
20  it.  I mean --
21        MR. KAVALER:  Well, your Honor, I'm just saying --
22  your Honor, we were responding directly to your Honor's words
23  at Page 1858:  "If you think -- "  I'm continuing to read --
24  "If you think Arizona participated at the request of
25  Household, if you want to bring that out, I guess you can."

Aldinger - cross
3362

1    And, then, you continue: "But I think he has a right
2  to present whatever evidence he has to rebut what you've tried
3  to establish with the jury, and this is one such piece of
4  evidence.  The fact that Arizona sued and obtained a
5  settlement from Household and the issues around which that
6  settlement was obtained, the amounts I don't think are
7  particularly relevant."
8    "Mr. Burkholz:  Okay."
9    Your Honor, we reviewed the transcript very carefully
10 and I believe in both those instances I'm referring to, we are
11 completely --
12    THE COURT:  Is there some reason why you didn't bring
13 this up when we took the break?  We have the jury sitting out
14 there doing nothing.
15    MR. DROSMAN:  Yes -- no, I'm sorry about that.  I
16 wanted to let him finish his examination.
17    THE COURT:  Let's send the jury back.
18    MR. DROSMAN:  All right.
19    (Proceedings had in open court:)
20    THE COURT:  Folks, I'm going to ask you to step back
21 in the jury room while we finish this conference.
22    (Jury out.)
23    THE COURT:  As I see it, we have two issues before
24 us.  One is the effect of the testimony this witness has given
25 on the Court's prior rulings regarding the SEC Consent Decree

Aldinger - cross
3363

1  and the other is the same question regarding the Attorney
2  Generals' settlement.
3    MR. DROSMAN:  I mean, why don't we take the Attorney
4  Generals' settlement first.
5    THE COURT:  Okay.
6    MR. DROSMAN:  What we had up there was we had an
7  instance in which Mr. Kavaler chose to explore the
8  negotiations underlying the settlement -- the reasons that
9  they entered into the settlement.  Okay?
10    Now, what Mr. Kavaler would like is for our hands to
11 be tied behind our back and not be able to respond in kind
12 because there are documents that you've excluded, based on
13 that exact thing.
14    What you've said is the 484 million can come into
15 evidence to show the effect on the stock price.
16    If they chose to go into great details regarding the
17 negotiations and the reasons and why Mr. Aldinger did or did
18 not enter into the settlement, then we should be able to at
19 least respond with the documents that discuss the
20 negotiations; that discuss the reasons for the settlement.
21    They've used this as a sword.  And it was designed as
22 a shield.  It would be patently unfair for us not to be able
23 to use it.
24    THE COURT:  Okay.
25    A response?

Aldinger - cross
3364

1    MR. KAVALER:  Your Honor, this has been a recurring
2  theme throughout this case.  We've raised it previously.  Your
3  Honor has made rulings.  We have very carefully reviewed your
4  Honor's rulings.  We believe we're in complete compliance with
5  your Honor's rulings.
6    I refer specifically to two instances.  One is at
7  Page 1723 of the transcript.  I was speaking to your Honor and
8  we were talking about what Mr. Devor was going to address.
9  And you said -- I said -- "My view is -- "
10    THE COURT:  What exactly were we talking about?
11 Mr. Devor was going to address, what?
12    MR. KAVALER:  This is one of the times we raised in
13 anticipation.  The question -- let me back up.
14    We had -- the discussions we had about Mrs. Ghiglieri
15 mentioning the settlement amount.
16    Then we addressed, your Honor, before Mr. Devor
17 testified and we said we thought the problem would arise,
18 again.
19    And the particular portion I'm referring to is this.
20 I said, "My view is I'm also familiar with your Honor's point
21 about once the door is open, the door is open."
22    If Mr. Devor is going to address that, we will
23 respond.
24    And, then, it went directly during the testimony --
25 or on the eve of the testimony -- Ms. Buckley went to the

Aldinger - cross
3365

1  sidebar --
2    THE COURT:  Okay.
3    So, let me just -- hold on.
4    When you said that -- "If he's going to address
5  that" -- you meant, what?
6    MR. KAVALER:  Mr. Devor was going to talk about the
7  amount of the settlement.
8    THE COURT:  The amount of the settlement?
9    MR. KAVALER:  Your Honor, we -- what we were talking
10 about --
11    THE COURT:  Or more than that?
12    Because I ruled that the amount of the settlement,
13 you know, prior to the trial can come in for purposes of
14 showing the shift in price, if any, to the stock, to show
15 damages, to show loss causation.  That was the Court's ruling
16 before trial.
17    So, if I said that Mr. Devor can testify to that,
18 that's nothing different and hasn't changed the playing field
19 at all.
20    MR. KAVALER:  Your Honor, as we took the testimony of
21 Ms. Ghiglieri, Mr. Devor and Professor Fischel -- the three
22 experts -- we thought only Professor Fischel was going to
23 address this.
24    It turned out we were wrong about that.  We thought
25 we raised that problem.  We thought your Honor to be saying --

Aldinger - cross

3366

1  THE COURT: Well, the -- okay, now you're arguing a
2  slightly different issue, which is whether the experts could
3  testify regarding the settlement and what effect that had on
4  their opinions.
5  And I ruled in regard to that, that they could and
6  that we would give the Court -- at your request, we would give
7  the jury -- a limiting instruction. And we did, I think, on
8  some occasions when you requested it -- that the evidence that
9  was coming in was coming in solely so that the jury could
10  judge the basis and the probative weight of the expert's
11  opinion and not for the truth of what it contained.
12  MR. KAVALER: Yes, your Honor. And we discussed on
13  several occasions the fact that those two rulings appeared to
14  be in some tension.
15  THE COURT: Right.
16  MR. KAVALER: And we approached the Court before
17  Mr. Devor testified, to get clarification.
18  THE COURT: And that's how I resolved it. That's how
19  I resolved it. I said, "The tension's resolved this way:
20  They can testify as to the underlying bases. We'll give the
21  jury a limiting instruction and they will consider that by
22  approaching solely for the purpose of determining the
23  probative weight to give the expert's opinion."
24  MR. KAVALER: Your Honor, my understanding of what
25  transpired at Page 1723 is somewhat different --

Aldinger - cross

3367

1  THE COURT: Okay. Tell mow how.
2  MR. KAVALER: -- because I understood that you were
3  saying if the door is opened, the door is opened. And I was
4  the one trying to keep the door closed at that point.
5  THE COURT: Well, which door are we talking about?
6  Let's be specific.
7  MR. KAVALER: Well, your Honor, that's the question.
8  Let me just put on the record who we're talking
9  about at Page 1858, because I think it's a continuation of the
10  same thing.
11  Ms. Buckley approached --
12  THE COURT: Well, wait, wait.
13  Are we talking now about the same conversation or a
14  different one?
15  MR. KAVALER: It's a different conversation.
16  THE COURT: All right.
17  MR. KAVALER: But it also involves Mr. Devor.
18  THE COURT: All right.
19  MR. KAVALER: It's now a sidebar at 1858.
20  "MS. BUCKLEY: Many states participated at the
21  request of Household.
22  "THE COURT: If you want to bring that out, I guess
23  you can."
24  THE COURT: Sure, but what was -- you already showed
25  me that.

Aldinger - cross

3368

1  What was the context of that? I don't know what
2  we're talking about there. Many states are -- why was she
3  making that statement? Was there an objection to a specific
4  question or a specific piece of testimony?
5  If so, what was it?
6  MR. KAVALER: Your Honor, this was at a sidebar, I
7  believe, before Mr. Devor started to testify.
8  Let me just see a second.
9  Well, I know, your Honor. It has to do with
10  Mr. Burkholz said to your Honor -- the sidebar began with
11  these words at Page 1856:
12  "MR. BURKHOLZ: Your Honor, they opened the door on
13  this Consent Decree from the State of Arizona.
14  "It's not admissible pursuant to your motion in
15  limine."
16  THE COURT: What was he referring to when he said,
17  "They opened the door with respect to this Consent Decree"?
18  Because until I know that, I don't know what the ruling is.
19  MR. DOWD: Your Honor, if you'd like some help, what
20  happened, as I recall, was the defendants put in a
21  videotape --
22  MR. KAVALER: That's right.
23  MR. DOWD: -- which we had objected to, I believe,
24  where they had the Arizona Banking Commissioner testifying.
25  And they said, "Doesn't the bank -- Arizona Banking

Aldinger - cross

3369

1  Commissioner -- love you?"
2  And we said, "They opened the door to at least the
3  Arizona Consent Decree coming in."
4  MR. KAVALER: I agree with Mr. Dowd saying that was
5  the preface of it.
6  THE COURT: I recall that.
7  So, the Consent Decree was allowed into evidence in
8  that case. Whatever they brought out about that Consent
9  Decree, the Arizona Consent Decree was allowed into evidence:
10  One, because you sought to establish that the State of Arizona
11  loved your clients and had no problem with the way they did
12  business; and, because you did that, the Consent Decree, to
13  the extent that it was contradictory, was allowed in to
14  impeach and contradict the prior testimony that you,
15  yourselves, elicited.
16  All right. Now, we have the context --
17  MR. KAVALER: Your Honor --
18  THE COURT: -- for the quote that you were reading
19  there.
20  MR. KAVALER: Your Honor, the characterization you're
21  adopting is Mr. Dowd's characterization. We did not elicit
22  that video for the purpose of showing the Arizona Commissioner
23  loved us or any such thing. It was elicited specifically on
24  the testimony of Mr. Detelich as an example of training that
25  was conducted by Household and in counter-distinction to the

- -

Aldinger - cross
3370

1  homemade Hueman videotape --
2  THE COURT: Well, I recall that you made that
3  argument; and, at that point, I ruled that I disagreed with
4  you -- that I thought that part of the basis for bringing that
5  out was to show that the State of Arizona, given the questions
6  you asked and the implications from those questions, had no
7  problem with the way you folks were conducting business.
8  And, so, I allowed that particular piece of
9  information about the Arizona Consent -- the Arizona Consent
10  Decree -- to come into evidence to rebut that.
11  That's what I did.
12  MR. KAVALER: I'm not sure that's right, your Honor.
13  I think -- I'm told by Ms. Buckley -- and I, frankly, don't
14  recall -- that at the end of that whole exchange, the Consent
15  Decree did not come in.
16  But, obviously, we can look at the record. It is
17  what it is.
18  THE COURT: It may not have come in. I don't know.
19  But, then, what's the purpose of reading me the quote
20  where I say, "If you opened the door, you opened the door"?
21  MR. KAVALER: Because, your Honor, it was our clear
22  understanding -- again, I need to read you the five lines
23  of --
24  THE COURT: Go ahead.
25  MR. KAVALER: -- what transpired at 1858.

- -

Aldinger - cross
3371

1  THE COURT: Go ahead.
2  MR. KAVALER: (Reading):
3  "MS. BUCKLEY: Many states participated at the
4  request of Household.
5  "THE COURT -- "
6  THE COURT: And, at this point, she's arguing as to
7  why we should not allow evidence of the Arizona Consent Decree
8  to come in; is that correct?
9  MR. KAVALER: I think that's right.
10  THE COURT: All right.
11  Go on.
12  MR. KAVALER: It seems to be the context.
13  "THE COURT: If you want to bring that out, I guess
14  you can."
15  THE COURT: Which is true.
16  MR. KAVALER: That's precisely the point Mr. Aldinger
17  was addressing. 35 states participated because Household
18  agreed to reimburse their expenses for participating.
19  THE COURT: Well, sure.
20  I mean, if you want to bring that out, you can; but,
21  you can't bring it out and then say, "Oh, because of your
22  prior ruling, they cannot now rebut the evidence you brought
23  forth."
24  MR. KAVALER: Your Honor, I'm not saying that at all.
25  What transpired at sidebar --

- -

Aldinger - cross
3372

1  THE COURT: Then I don't know what we're arguing
2  about.
3  MR. KAVALER: Frankly, I don't, either, your Honor.
4  What transpired at the sidebar is when I
5  wanted to use the SEC Consent Decree. That was on one
6  subject. It segued into a different subject.
7  I can't understand the difference between the two.
8  Let me be clear.
9  THE COURT: Because they're somewhat related. I
10  mean, you have that quote there. So, it was clear that you
11  thought they were related, as well. You brought the quote
12  with you to the sidebar.
13  Look, your client just testified for about 20 minutes
14  as to the negotiations that went on in reaching the settlement
15  agreement with the different states' AGs, as to his
16  motivations for doing that -- why he did it -- and made it
17  clear, from his testimony, that the reason he did it was not
18  because he believed that your clients had done anything wrong,
19  but solely for business purposes.
20  And you even put up a chart to show what good
21  business sense it made -- separate and apart from issues of
22  liability or whether they did anything wrong or not; what good
23  business sense it made -- to spend a small amount of money in
24  a settlement agreement and gain the huge bump in the stock
25  prices that you gained.

- -

Aldinger - cross
3373

1  They now have a right to rebut that. They have a
2  right to bring out evidence to rebut what your client said
3  about how the negotiations went down and what his motivation
4  was for the -- for reaching that settlement. That's all this
5  is.
6  MR. KAVALER: And I have an observation and a
7  question, your Honor.
8  THE COURT: Sure.
9  MR. KAVALER: The observation is: And none of that
10  was objected to by Mr. Drosman on a timely manner.
11  THE COURT: No. And he's not objecting to it now.
12  He's just saying, "Voila, you opened the door."
13  MR. KAVALER: And, secondly, your Honor --
14  THE COURT: Well, he didn't say "Voila," but, I mean,
15  that's what he's doing.
16  MR. KAVALER: -- I don't see how that subject leads
17  in any way to the SEC Consent Decree, which has nothing to do
18  with the Attorney General settlement. It is a hundred percent
19  related to a different document, a different set of facts.
20  THE COURT: I may be mistaken, but I thought that the
21  argument was going to be a parallel argument to both, and
22  that's why I brought them both in together, after he began
23  with the SEC.
24  But maybe I'm mistaken, so let's hear now --
25  MR. KAVALER: They're wholly separate.

Aldinger - cross
3382

1 the punch line for five minutes here.
2        THE COURT:  Oh, okay.  It seemed more like ten, but
3 go ahead.
4        (Laughter.)
5        MR. KAVALER:  Well, it may wind up being 15, your
6 Honor, but we have to get to the bottom of this.  This is very
7 important.
8        This is not a global -- that's the very distinction
9 I'm drawing, your Honor.  I was telling you the disclosures on
10 the market are relevant to a private plaintiff.
11       In an SEC enforcement action, I passed that my
12 clients, plural, did not agree to this, Household agreed to
13 this.  I passed that this has a carveout for people, not
14 parties.  I passed it as a carveout for actions not involving
15 the SEC.  And I passed that it was entered into after the
16 class period.
17       Passing all of that, it is addressed to one
18 particular document.  It is addressed to the 2001 10-K filed
19 on March 13, 2002.
20       And this paragraph specifically tells you what
21 disclosures it's talking about because later in the same
22 paragraph, your Honor, it says, "Household reiterated this
23 disclosure in its Form 10-Q for the second quarter of 2002,
24 its Form 10-K(A) for fiscal year 2001, its Form 10-Q for the
25 third quarter.  Those are the disclosures.  It does not relate

Aldinger - cross
3383

1 to the securitization prospectuses.
2        THE COURT:  Okay.
3        MR. DROSMAN:  Your Honor, if I can --
4        THE COURT:  Your response?
5        MR. DROSMAN:  -- just say one thing.
6        Yeah, that's great.  That's fine.  If he wants to
7 tell the jury that the securitization prospectus have no
8 relation to the 10-K disclosures, I'll accept that.
9        THE COURT:  Well --
10       MR. DROSMAN:  But his point, your Honor, is just the
11 opposite.  His point is that when they disclosed it in these
12 securitization prospectuses, that there was no false statement
13 because it was already known to the world.
14       THE COURT:  Well, but that's -- now you're enlarging
15 the argument.  I mean, what we're talking about here is a
16 specific point of impeachment.  You can't impeach someone by a
17 prior statement that doesn't relate to the statement that he's
18 testified about on the stand.  Okay?
19       And this prior statement seems to relate only -- this
20 prior statement which says -- and I'm attributing it to
21 Household because they agreed to this order -- that,
22 "Household's disclosures regarding its restructure policies
23 failed to present an accurate description," relates to the
24 disclosures in Paragraph 7, apparently, which are the 10-Ks.
25       I don't -- in my opinion, a statement which says

Aldinger - cross
3384

1 that, "In a prospectus in 1999, we disclosed this to the
2 world," is not contradictory of a statement that says, "In our
3 10-Ks in 2002, we did not accurately disclose it to the
4 world."
5        Those are not the same things.  I think he has a
6 point.
7        It took him a while to get there, but I think he has
8 a point.
9        (Laughter.)
10       MR. KAVALER:  Your Honor, in fairness to me -- I
11 think I mentioned it at the sidebar, but I certainly didn't
12 make it clear -- I apologize for not being vigorous enough.
13 It's one of my well-known failures.
14       THE COURT:  I don't think it's a question of vigor,
15 but no apology necessary.
16       And it would appear to me, then, it's the same ruling
17 with respect to the automatic restructuring statement
18 contained in the Decree -- or in the Cease and Desist Order.
19 The same ruling.
20       These are not impeachment of the same statement.
21 They just don't relate to the same statement.
22       So, I'll -- my ruling will be, which I think you were
23 looking for before we went in, is that he has not opened the
24 door for this material from the Cease and Desist Order to come
25 in.

Aldinger - cross
3385

1        My ruling with respect to the Attorney Generals'
2 settlement is that that door has been opened; that the very
3 things we said could not be brought out by the plaintiff --
4 and the reason I -- this is clearly on my mind -- is that, you
5 know, we spent a long time ruling on this -- the multiple
6 motions in limine that were filed by both sides.
7        One of the major ones was to what extent could the
8 settlement with the various Attorney Generals of the different
9 states be brought into evidence.
10       And, you know, the defendants made it clear that they
11 did not want that settlement brought in for any reason other
12 than to show the change in price.
13       Now, during the course of -- and we ruled in their
14 favor on that.
15       During the course of the trial, that ruling was
16 modified to allow the experts -- okay? -- to bring in their
17 use of that settlement and how it affected their opinions.
18       And the jury was instructed that they were to
19 consider the information regarding that settlement -- the
20 settlements -- and what they contained and the amounts, and so
21 on, for purposes of determining how much weight and
22 credibility they wanted to give to the opinion reached by the
23 experts.
24       Now, so far so good.  And I feel that my time was
25 properly utilized prior to trial.

Household                           Unsigned                           Page - - -

Aldinger - cross
3386

1    But, then, we come here with what is probably the
2  last of the defense -- defendants -- to testify; and, the last
3  15, 20, 30 minutes of his testimony is spent describing the
4  process, the analysis, the motivations for agreeing to the
5  settlement.  All the things that we had ruled could not be
6  gone into by the plaintiffs are now brought out by the defense
7  before the jury.
8    And if, indeed, the sole reason for filing that
9  motion in limine was to get the Court to rule that this
10  information was not admissible, was to gain a tactical
11  advantage so that the plaintiffs couldn't bring it out, but
12  the defense would be the first to bring it out in its
13  examination of the witnesses, I feel my time has been poorly
14  utilized.
15    MR. KAVALER:  Your Honor, let me assure you that was
16  not our purpose.  Our feeling is exactly the opposite.  We
17  feel we haven't gotten the benefit of our victory because
18  it's been undermined, eroded and chipped away at by the
19  plaintiffs.
20    For example, they've shown Plaintiffs' 550 to a
21  number of witnesses.  This is a document concerning settlement
22  discussions.
23    They've asked each of their witnesses -- each of
24  their expert witnesses -- to comment about the -- we've had
25  this conversation previously on the record, your Honor.  I'm

Aldinger - cross
3387

1  not going to repeat my comments about Ms. Ghiglieri and
2  Mr. Devor.  I would have thought if the plaintiffs were
3  adhering to your Honor's ruling, it would have come in only
4  through only Professor Fischel and only in the way Professor
5  Fischel used it; but, apparently there was a tension between
6  two rulings.  And our view is the plaintiffs exploited that
7  tension.  And when we brought it to your Honor's attention,
8  your Honor said what you said on the record, which we read
9  very carefully; and, we felt we had no choice.  We had to
10  respond to Plaintiffs' 550.  We had to respond to the drum
11  beat throughout this trial about the settlement.  Because the
12  implication being used was the settlement was being used for
13  liability, not for measurement of stock price movement.  It
14  was being used -- crystal clear to us, your Honor -- to
15  suggest that we were wrongdoers and we've been caught by the
16  Attorneys General and we paid them a lot of money to make up
17  for our wrongdoing.
18    And, in fact, Mr. Cross appeared on the screen there
19  and he testified that the Attorneys Generals settled for the
20  exact same reason Mr. Aldinger testified; that is, to avoid
21  five years of litigation.
22    And I'm sure Mr. Cross' view is they should have gone
23  forward and been vindicated.  But we felt we were in an
24  untenable position, your Honor, where both of these rulings
25  were being manipulated, in our view, by the plaintiffs, to our

Aldinger - cross
3388

1  detriment; and, when we tried to raise that with your Honor,
2  your Honor said what I read before.
3    And we specifically told the Court, prior to the
4  testimony of Mr. Detelich, that this very scenario would
5  arise.
6    And, your Honor, you recall I said to you, "I don't
7  want to be told later by them, you know, that I didn't know
8  this was coming."
9    And you said, "Well, now that you've said that, they
10  can't say it."
11    And, now, in effect, I'm being told it, albeit not by
12  them.
13    I mean, I just, your Honor, feel that our perspective
14  is we are responding to a door opening by the other side,
15  particularly by the repeated use of 550, which we had no
16  choice about.
17    We certainly would have preferred, your Honor -- this
18  was anything but tactical; we would have preferred -- that
19  this entire subject remain as your Honor ruled, but we felt
20  your Honor's rulings have been undermined and eroded, and we
21  were left with no choice.
22    THE COURT:  Okay.
23    Well, I've made my point.  I think the record is
24  pretty clear on this.  My rulings were very narrow and strict
25  with respect to the use of that information.  And they have

Aldinger - cross
3389

1  been adhered to.  Only the experts have testified to it and
2  only then in order to indicate their support for their
3  opinions.
4    And the record will clearly also reflect that the
5  very first time any of this came into the record was on your
6  cross-examination of Ms. Ghiglieri.  And I've already made a
7  long and extensive ruling on how that happened and how it
8  could have been avoided, had you not pressed and pressed and
9  pressed her on that point.
10    MR. KAVALER:  Your Honor --
11    THE COURT:  And that -- well, at any rate, we'll let
12  that go.  That's done.  It's water over the dam.
13    I felt that it was imperative that I make it clear
14  that we spent an awful lot of time on these rulings; and, that
15  I don't want the parties to waltz through the trial ignoring
16  them, thereby making the time and effort that we spent,
17  essentially, a waste of time.
18    But that's that.  Let's go forward now and do what we
19  can before the lunch break.
20    MR. DROSMAN:  Thank you, your Honor.
21    THE COURT:  Let's bring the jury out.
22    MR. KAVALER:  Thank you, your Honor.
23    (Jury in.)
24    MR. MILLER:  Judge, can we have the switch, please?
25    THE COURT:  Yes.

3390

1    REDIRECT EXAMINATION
2    BY MR. DROSMAN:
3    Q.  Mr. Aldinger, let's start with the Barron's article that
4    you spoke about, both today and yesterday.
5        Do you recall that discussion?
6    A.  I do.
7    Q.  Okay.
8        And this was an article that you received on December
9    1st, 2001, correct, sir?
10   A.  That's my recollection.
11   Q.  Okay.
12       And the Barron's article, essentially, said that some
13   of Household's re-aging was either deferring or masking
14   chargeoffs, right?
15   A.  I recall -- I don't recall that specifically.  I'd like to
16   see it, if I could.
17   Q.  You don't recall that it said that some of Household's
18   re-aging was either deferring or masking chargeoffs?
19   A.  I don't remember the specifics of the article without
20   seeing them; and, after yesterday's experience, I'd like to
21   see it before I -- I -- agree to anything.
22   Q.  You were worried about investors' reaction to the Barron's
23   article, weren't you?
24   A.  Yes, I was.
25   Q.  You understood that from the investors' point of view,

3391

1    investors were nervous about re-aging; didn't you, sir?
2    A.  Investors never raised anything about re-aging before that
3    article.
4    Q.  Fair enough.
5        I just want to understand that your testimony under
6    oath today is that you did not understand that, from the
7    investors' point of view, investors were nervous about
8    re-aging after you read the Barron's article?
9        Is that your testimony, sir?
10   A.  That's not my testimony.
11   Q.  Okay.
12       Is your testimony, sir, that you understood that,
13   from the investors' point of view, investors were nervous
14   about re-aging?
15   A.  My testimony is that until the Barron's article, nobody
16   had ever raised a question about re-aging to me in the entire
17   seven years I had been CEO of the company.
18       Post-Barron's, people were nervous about it and
19   that's why we responded the way we did.
20   Q.  Okay.  Fair enough.
21       So, post-Barron's article -- after you read the
22   Barron's article -- you understood that, from the investors'
23   point of view, investors were nervous about re-aging, right?
24   A.  Absolutely.
25   Q.  Okay.

3392

1        And you wanted to give more people -- you wanted to
2    give people more data about re-aging, right?
3    A.  That's correct.
4    Q.  More information about re-aging, right?
5    A.  That's correct.
6    Q.  And more knowledge about re-aging, didn't you?
7    A.  That's correct.
8    Q.  That was -- that was -- really on your mind at the time;
9    wasn't it, sir?
10   A.  That's correct.
11   Q.  Okay.
12       And after you read the Barron's article, you
13   understood that investors wanted to see less re-aging; didn't
14   you, sir?
15   A.  They would have felt more comfortable, in terms of the
16   risk profile of the company, if there was less re-aging.  But
17   re-aging would be what it would be.
18   Q.  So, after you read the Barron's article, you understood
19   that investors wanted to see less re-aging, correct, sir?
20   A.  I would say investors would have preferred it.  But we --
21   we -- just don't change because investors would like it.  You
22   have to do what's right for the customer, right for the
23   company.
24       And, preferably, it would have been better if it went
25   down because they'd feel more comfortable.

3393

1    Q.  Okay.
2        I'll show you what we'll mark as Exhibit 1476 for
3    identification.
4        MR. DROSMAN:  A copy for counsel.
5        (Document tendered to counsel and the witness.)
6    BY MR. DROSMAN:
7    Q.  This is a deposition transcript, right?
8    A.  Yes, I believe it is.
9    Q.  It's your deposition, correct?
10   A.  Yes, it is.
11   Q.  Taken December 18th, 2003; is that right?
12   A.  Yes.
13   Q.  You were represented in that case; is that right?
14   A.  Yes, I was.
15   Q.  You were represented by a lawyer, right?
16   A.  Yes.
17   Q.  In fact, Mr. Kavaler represented you, didn't he?
18   A.  Yes, he did.
19   Q.  Mr. Sloane represented you in this case -- in that
20   deposition -- didn't he?
21   A.  Yes.
22   Q.  And that was for a different case than the one we're here
23   on today, isn't it?
24   A.  I'm sorry, I --
25   Q.  If you'll look at the top left-hand corner, you'll see the

3394

1  case caption.
2  A. Oh, I see that.
3      Yes.
4  Q. And you answered the questions truthfully at that
5  deposition; didn't you, sir?
6  A. I believe I did, yes.
7  Q. In fact, you were under oath to tell the truth, right?
8  A. Yes, I was.
9  Q. The same oath you're under today, correct?
10  A. Yes.
11  Q. And, then, if you turn to me -- to Page 37, just follow
12  along with me, if you would.
13      Let's look at 37, Line 25, to 38, Line 9.  Okay?
14  A. I'm not there yet.
15      Page 37, what lines?
16  Q. I'm sorry, 33, Line 15, to 33, Line 25.
17      So, Page 33.
18  A. 33?
19  Q. Yes.  I apologize.
20  A. It's okay.
21  Q. Do you see 33, Line 15?
22  A. I'm not there yet.
23  Q. Okay.
24  A. I'm going back.
25  Q. Just let me know when you arrive there?

3395

1  A. I will.
2      This is the HHS 33, right?
3  Q. I was using the page of the deposition.
4  A. Oh, I'm sorry.
5  Q. Yes.
6  A. Let me go to 33.
7  Q. Do you see how each of the deposition pages is numbered in
8  the top right-hand corner there?
9  A. I do.
10  Q. Okay.
11      So, I'm talking about Page 33 of the deposition --
12  A. Let me get there.
13  Q. -- Lines 15 through 25.
14  A. I'm there.
15  Q. So, just read with me, if you would.
16      Question:  "When you say people were worried about
17  it, what people?"
18      Answer:  "Our investors said, basically, that they
19  would like to see less re-aging over time because the
20  perception that we may be risky, as raised in the Barron's
21  article, was hurting the company and hurting the stock."
22      Question:  "So, when you refer to people, is it
23  people inside the company?"
24      Answer:  "No."
25      Question:  "You're referring to investors?"

3396

1      Answer:  "I'm referring to investors."
2      Did I read that correctly, sir?
3  A. I think you did.
4      MR. KAVALER:  Your Honor, objection.  Improper
5  impeachment.  No inconsistency between his testimony today and
6  his testimony then.  It's the exact same testimony.
7      THE WITNESS:  That's the way I read it.
8      MR. DROSMAN:  Your Honor, I asked the question --
9      THE COURT:  Wait just a second.
10      If you don't mind, I'll rule on the objections.
11      THE WITNESS:  Sorry about that.
12      THE COURT:  I agree.  I don't think that was
13  impeaching.
14      The jury will disregard it.
15      Ask your next question.
16  BY MR. DROSMAN:
17  Q. After you read the Barron's article, sir, you understood
18  that investors wanted to see less re-aging, correct?
19  A. They would feel better with less re-aging.
20  Q. Okay.
21      In fact, it's fair to say, isn't it, that the
22  re-aging issue raised in the Barron's article was an important
23  issue to you, isn't it?
24  A. Well, it became an important issue.  It wasn't before.
25  Q. Right.

3397

1      After you read the Barron's article, the re-aging
2  issue that was raised in the Barron's article was an important
3  issue to you, correct?
4  A. Yes, it was, because investors were asking about it and I
5  wanted to give them whatever they needed to know.
6  Q. Right.
7      More information, right?
8  A. Correct.
9  Q. More data, right?
10  A. That's right.
11  Q. All about re-aging, correct?
12  A. About everything they wanted to know.
13  Q. Right.
14      In this case, they wanted to know about re-aging,
15  right?
16  A. Yes.
17  Q. And you thought you needed to respond to the Barron's
18  article right away, right?
19  A. That's right.
20  Q. So, you went to the Goldman Sachs conference.  You talked
21  about that yesterday.
22      Do you recall that discussion?
23  A. I did.
24  Q. And you went there a couple days after the Barron's
25  article, right?

3426

1  presented this report, which you can see is quite lengthy,
2  they presented a smaller version for the board, don't recall
3  if this specifically was covered, and then gave all board
4  members a copy of it to take with them.
5      So I don't remember any of the details of this.  I
6  focused on the -- on the beginning, the executive summary, and
7  the key issues that I had to know from the company's
8  standpoint; did not get involved in the minutiae here, so I
9  can't say that I know any of that.
10 Q.  So on March 12th, when you received this report at
11 9:00 a.m. in the morning --
12 A.  Right.
13 Q.  -- you didn't read this, sir?  Is that your testimony?
14 A.  I'm saying every part of it.
15 Q.  Well, I'm asking you particularly about the passage we
16 just reviewed.
17 A.  No, I didn't -- I probably didn't read that, no.
18 Q.  You didn't read that, right?
19 A.  No.
20 Q.  Okay.  And your salary at this time was, what, $24 million
21 in overall compensation, is that right?
22 A.  I don't remember it exactly that way.
23     MR. KAVALER:  Objection, your Honor, form of the
24 question, his salary as opposed to overall compensation.
25     THE COURT:  I'll overrule it.  The witness can answer

3427

1  the question.
2  BY THE WITNESS:
3  A.  Whatever I was paid, I was paid.
4  BY MR. DROSMAN:
5  Q.  Okay.  And you didn't read this, is that right?
6  A.  No, I don't believe I did.
7  Q.  And you didn't read this despite the fact that you knew
8  that investors were nervous about re-aging, right?
9  A.  That's right.
10 Q.  And you didn't read it despite the fact that you wanted to
11 get more information out to investors, right?
12 A.  Well, I did want to get more information out to investors;
13 but, you know, if I looked at the nits and gnats of every one
14 of five major businesses and went five levels below, I'd never
15 get my job done.
16     My job is to look at things that impact the bottom
17 line of the company in a big way; but you need to put in
18 perspective that each of these businesses has its own CEO, a
19 CFO, Chief Financial Officer, a chief credit officer, a head
20 of collections, and all of those people, including the
21 controllers and accounting support, work on putting our
22 packages together.
23     Now, for me to know the specifics of what Auto does
24 versus what Credit Card does, it would be a very bad use of my
25 time, a very bad use of my time.

3428

1  Q.  Sir, you were the one, you were the one that called Eugene
2  O'Kelly, right?
3  A.  Yes, because -- exactly.
4  Q.  Sir, you can just answer my question.
5  A.  Yes.
6  Q.  Okay.  And you had asked him perform this benchmarking
7  study, didn't you?
8  A.  Absolutely.
9  Q.  Okay.  And then you got a copy of it, right?
10 A.  Yes.
11 Q.  But you couldn't be concerned with the, I think your
12 words, nits and gnats, is that it?
13 A.  I think -- I was concerned with the overall summary of the
14 report, and I left it to the rest of the management team to
15 deal with their specific areas, and I was comfortable that
16 what I got at the summary was quite good for me in what I
17 needed.
18 Q.  Okay.  So you didn't read this stuff about automatic
19 re-aging because it was nits and gnats, is that right, sir?
20 A.  That's correct.
21 Q.  Okay.  Let's look at some other nits and gnats, shall we?
22 A.  Well, it would be the same answer for the most part,
23 but --
24 Q.  Go ahead and turn to page ending 258.
25 A.  If you could put it up there, it would be great.

3429

1  Q.  And you see at the top left-hand corner, it says consumer
2  credit unsecured, right?
3  A.  Right.
4  Q.  You understand that we're talking now about different
5  types of loans, right?
6  A.  That's right.
7  Q.  Okay.  And then we've got Household's policy there, right?
8      Do you see that?
9  A.  Yes.
10 Q.  And then there's a box entitled restructuring, re-aging
11 extensions.
12     Do you see that?
13 A.  Yes.
14 Q.  Okay.  And then in the middle box where the two connect,
15 it says, "One payment in the last two months required to
16 restructure."
17     Do you see that?
18 A.  I do.
19 Q.  So you realized, right, on November -- on March 12th,
20 2002, at 9:00 a.m., that Household was restructuring loans on
21 one payment, right?
22 A.  Actually, I didn't.  My answer would be the same as I gave
23 you before.  I didn't compare the minute restructuring
24 policies of each business at that level.  We had people who
25 were responsible for that, and what I was concerned with is

3434

1    THE COURT:  If there's an objection, you have to
2  wait, and when I'm telling you to wait, you have to wait.
3    Now your objection, please.
4    MR. KAVALER:  Objection to the form of the question.
5  He transposed the witness's statement "I don't know that I'd
6  say that" into a "you don't know that they'd say that."
7    THE COURT:  Well, I'll overrule the objection at this
8  point in time, but just ask questions.
9    MR. DROSMAN:  Sure.
10    THE COURT:  You don't need to repeat the answers.
11    MR. DROSMAN:  That's fine, your Honor.
12 BY MR. DROSMAN:
13 Q.  You know that KPMG didn't validate any of the information
14 contained in here, right?
15 A.  That's my impression.
16 Q.  Okay.  Instead they accepted Household's representations,
17 right?
18 A.  I suppose.  I guess that's right.
19 Q.  Well, sir, I don't want you to guess.
20 A.  Well --
21 Q.  They accepted Household's representations, didn't they?
22 A.  I believe they did.
23 Q.  So you provided KPMG with information about the re-aging
24 practices, and they wrote it down, right?
25 A.  That's what it looks like.

3435

1 Q.  Turn to page ending 223.
2 A.  Are we going to put it up?
3 Q.  You see these are overall observations.  You remember you
4 reviewed this with Mr. Kavaler yesterday?
5 A.  Yes, I do.
6 Q.  You testified you took great comfort in these overall
7 observations.  Do you remember that?
8 A.  I do.
9 Q.  Okay.  So let's take a look at the second bullet point
10 down.  It says, "Except as described herein, Household
11 International policies are consistent with peer practices."
12    Do you see that?
13 A.  Yes.
14 Q.  So you must have read that, right?  You did read that,
15 didn't you?
16 A.  Yes, I did.
17 Q.  On March 12th, 2002, is that right?
18 A.  Yes, I did.
19 Q.  9:00 a.m.?
20 A.  At some point, yes.
21 Q.  At some point around that?
22 A.  Maybe 9:05.
23 Q.  And you must have read that and said, well, except as
24 described herein, what does that mean, right?
25 A.  Absolutely.

3436

1 Q.  Okay.  And then you looked at the information that we just
2 looked at to determine what wasn't consistent with Household's
3 peers, right?
4 A.  That's not my recollection.
5 Q.  You didn't do that, right?
6 A.  No, I think it's -- I think it's in the summary.
7 There's -- they answer their comment there, as I recall.  So I
8 think if we go later in this document, we'll have an answer to
9 that.
10 Q.  Where Household's policies were not consistent with its
11 peers?
12 A.  Yeah, I believe there's a short comment on that is my
13 recollection if we could find it.
14 Q.  So March 12th, 2002, was significant for a reason other
15 than the fact that KPMG provided you with this benchmarking
16 study, right?
17 A.  Well, it was a board meeting.
18 Q.  And there was a 10-K that you filed on that day?
19 A.  I didn't remember it was filed exactly on that day, but --
20 Q.  You provided your annual report to investors on that day,
21 didn't you, sir?
22 A.  I didn't remember that, but I'll accept that.
23 Q.  You signed that report, didn't you?
24 A.  Absolutely.
25 Q.  And you reviewed it before you signed it, didn't you?

3437

1 A.  I did.
2 Q.  You looked at every page, didn't you, sir?
3 A.  Well, I looked at every -- mostly, yes.
4 Q.  Were there some pages you skipped, sir?
5 A.  No, I looked at every page.
6 Q.  Okay.  Why don't I show you what's been marked as -- in
7 evidence as Defendants' Exhibit 852.
8 A.  Are we done with the other one?
9 Q.  For the time being.  You can put it aside.
10    You understand that this was the 10-K that Household
11 filed on March 12th, 2002, is that right?
12 A.  I do.
13 Q.  Okay.  And you signed it, you said?
14 A.  Yes, I did.
15 Q.  And if you'd turn with me, would you, to page ending 798.
16    Are you on page 798?
17 A.  I'm almost there.
18 Q.  Okay.
19 A.  I'm at 798.
20 Q.  You see the second paragraph of text, do you see that?
21 A.  I do.
22 Q.  And it reads, "Our policies for consumer receivables
23 permit reset of the contractual delinquency status of an
24 account to current, subject to certain limits, if a
25 predetermined number of consecutive payments has been receive

3438

1  and there is evidence that the reason for the delinquency has
2  been cured."
3      Do you see that?
4  A. I do.
5  Q. And there Household was setting forth its re-aging
6  policies, right?
7  A. That's one of them.
8  Q. I'm sorry?
9  A. Yeah, that's one of them, I assume.
10 Q. What do you mean that's one of them?
11 A. One of the statements in there. I assume there are more
12 than one statement in the whole document.
13 Q. That was the policy that Household told investors that you
14 used to re-age loans, right?
15 A. That's what it says.
16 Q. Okay. You needed two things, correct?
17 A. That's what it says.
18 Q. You needed consecutive payments, right?
19 A. That's what it says.
20 Q. And consecutive, you understand that means more than one,
21 don't you, sir?
22 A. I think I do.
23 Q. Okay. So at least two, right?
24 A. Right.
25 Q. Okay. And then you told investors that the reason for the

3439

1  delinquency has been cured. You wouldn't re-age a loan unless
2  that happened, right?
3  A. That's what it says.
4  Q. Well, that's what you told investors, right?
5  A. Well, I signed the document, so I'm accountable for what's
6  in it; but I have to say that in reading that, I didn't
7  micromanage what those little pieces said.
8      I relied on the input from the people who do this
9  every day and the process we put in place; but I'm accountable
10 because I signed it, but I can assure you that I didn't, you
11 know, I didn't focus on the detail of this.
12 Q. You didn't focus on the detail -- you didn't focus on the
13 detail of this re-aging, is that your testimony, sir?
14 A. That's correct, like I read -- what I focused on are the
15 large financial issues the most and the C and D we do to the
16 investment community, and I look at the rest and I read the
17 rest; but I certainly don't, you know, look at that in detail
18 and try to contrast it with something to see if it's right.
19 Q. Okay. So you weren't focused on the re-aging policies
20 when you put together the 10-K, right?
21 A. I wasn't focused on the details of that. I relied on our
22 team to do it. We have a full financial team. We have a full
23 back-up of people who do this, and it's looked at by our
24 outside auditors as well before I sign it. And so I relied on
25 the expertise of people who do this for a living, but I'm

3440

1  accountable because I signed it.
2  Q. This was the nitty-gritty, right, sir? Is that right?
3  A. Look at the size of the report. Do you expect me to know
4  every word of the report and memorize it?
5  Q. Well, for $24 million, sir, aren't you expected to know
6  what's in the report?
7  A. I know what's in the report generally, but I'm not -- I'm
8  not knowledgeable about these kinds of details to the nth
9  degree. I'm just not knowledgeable to this level.
10 Q. Right, because you just went out and commissioned a big
11 benchmarking study through KPMG, right?
12 A. And I got a response that was helpful to me and the board,
13 yes.
14 Q. Right, and you didn't read, according to your testimony,
15 some of the report that you received from KPMG?
16 A. That's correct, that's correct. I went with the
17 high-level view.
18 Q. Right. Some of the report that would have been directly
19 relevant to this particular 10-K, right, sir?
20 A. Yes.
21 Q. Okay. So you also said that you had to have evidence that
22 the reason for the delinquency had been cured, right?
23 A. That's what it says.
24 Q. And you didn't tell investors that you actually re-aged
25 with one payment, did you?

3441

1  A. Not there.
2  Q. You didn't tell investors that you actually re-aged
3  automatically, did you?
4  A. It doesn't say that.
5  Q. Okay. You know that this was materially false and
6  misleading, don't you?
7  A. I understand it was incorrect at the time.
8  Q. My question is, sir, you understand that this is
9  materially false and misleading, correct?
10 A. You could say that.
11 Q. No, sir. I'm asking you a question.
12      Do you understand that this is materially false and
13 misleading?
14 A. I'll accept that characterization.
15 Q. Is that a yes, sir?
16 A. Yes.
17 Q. Let's take a look at a document that's Exhibit 1267 for
18 identification, Plaintiffs'.
19      You know what this is, right, sir?
20 A. Yes, I do.
21      MR. DROSMAN: This is Plaintiffs' Exhibit 1267. We
22 move it into evidence if it's not already in.
23      It's in evidence, your Honor. I apologize.
24 BY MR. DROSMAN:
25 Q. This is your 10-K/A, right?

3486

1  couple of options, right?
2  A. I sold two options, I believe, two of my options.
3  Q. You said, sir, yesterday "I sold a couple of options,"
4  right?
5  A. Yes, I'll accept that.
6  Q. Okay. And, sir, when you sold a couple of options, you
7  made some money, right?
8  A. Yes.
9  Q. Okay. In fact, you made over 19 million during 1999
10  through 2002 by selling Household stock, right?
11  A. I thought that's what we covered yesterday, yes.
12  Q. Okay. You sold $28.1 million worth of Household stock
13  during the 1999-through-2002 period, right?
14  A. Based on options, yes.
15  Q. And you bought 8.7 million shares during the same period,
16  right?
17  A. I don't remember that, but --
18  Q. What's a million or there?
19  A. I don't remember. I don't -- I didn't look at that.
20  Q. That sounds familiar though, right?
21  A. It sounds right.
22  Q. Okay. So if you bought 8.7 and you sold 28.1, you netted
23  about 19 million, right? A little more?
24  A. I had to -- I think I had to pay for the ones I sold, so
25  that net may not be right, but 19 sounds fine with me. What's

3487

1  your point?
2  Q. That sounds like about what you made in option sales --
3  A. That sounds about right.
4  Q. -- through the 1999 through 2002 time frame, right?
5  A. That sounds about right. Actually it's the '94 through
6  2002 time frame because I never sold options before or after
7  during that time frame.
8  Q. So you waited until 1999 through 2002 to sell your stock,
9  right?
10  A. Well, some have to vest.
11  Q. Right, but I'm just asking you, you waited. You didn't
12  sell before. You waited until the 1999-through-2002 period to
13  sell, right?
14  A. That's when I sold, but I also kept a whole lot that I
15  could have sold.
16  Q. Let's talk about your tenure at Household, sir. You
17  mentioned that you were CEO for eight years, right?
18  A. That's correct.
19  Q. When did you leave Household?
20  A. I left in 2005, I believe.
21  Q. And when did you begin working at Household?
22  A. '94.
23  Q. '94. That sounds like 11 years to me.
24  A. Well, it wasn't Household at that point, so I was CEO for
25  eight years.

3488

1  Q. Okay. And so you never left Household, right?
2  A. Well, I left -- I was no longer CEO after that. It became
3  a division of another company, so --
4  Q. Okay. Let's just walk through your tenure as CEO from
5  1998 on, okay?
6  A. Fine.
7  Q. Sir, you brought Mr. Gilmer back from England in 1998 to
8  run HFC, right?
9  A. That's correct.
10  Q. And then you and Mr. Schoenholz hired Andrew Kahr at the
11  end of 1999 to work with Mr. Gilmer to accelerate growth,
12  right? No dispute there.
13  A. No dispute there.
14  Q. Okay. And then in July 1999, when our clients began
15  buying Household stock, it was selling for about 42 bucks a
16  share, right, sir?
17  A. I don't remember the price at the given point; but if you
18  show me something, I'll confirm it.
19  Q. Well, sir, you told me you had a ticker going on in -- all
20  around you, you were surrounded by the stock price, right?
21  A. Absolutely.
22  Q. So 42 bucks a share in the summer of 1999 sounds about
23  right?
24  A. Well, let's see, that's nine-and-a-half years ago, and to
25  know what it was the summer of '99 or in a given month or a

3489

1  given day, I'd have a heck of a memory.
2  Q. But it doesn't -- it doesn't sound like it's off by more
3  than $5, does it?
4  A. Probably not.
5  Q. $42 a share?
6  A. Probably not.
7  Q. Okay. Then two years later in July 2001, stock's selling
8  for about $69 a share, right?
9  A. That's right.
10  Q. So it's gone up from 42 to 69, right?
11  A. That's right.
12  Q. Okay. So it's gone up over $25 a share, right?
13  A. That's about right.
14  Q. And that's because you're adding value to the company,
15  right?
16  A. It's because the company's performing well.
17  Q. And it's because of you. You're running the ship, right?
18  A. Only as good as the people you have.
19  Q. Okay. And you're driving the growth?
20  A. Part of the team.
21  Q. Okay. And because you're adding shareholder value, it's
22  okay to sell your stock and take some of that value, right?
23  A. It was appropriate to diversify some of my holdings.
24  Q. Okay. So then the truth starts to come out in November
25  of 2001, and the stock begins to drop, right, sir?

EXHIBIT 10

3809

Bley - redirect

3809

1  from, there's language that says, "The recency factor under 6
2  indicates customer wants to pay debt with one payment;" and,
3  then, it says, "We need to be very careful of doing
4  rewrite-flipping."
5       Do you see that?
6  A. Yes.
7  Q. Do you recall Mr. Vozar's testimony in his deposition
8  about what that sentence means?
9  A. It's -- this is -- I see this as a document from senior
10 management.
11      MR. DROSMAN: Objection, your Honor. Lack of
12 foundation. Move to strike. Non-responsive.
13      MR. KAVALER: Well, your Honor, counsel asked him
14 about the same document, picked out a sentence an inch above
15 this one. Apparently, he was capable of answering counsel's
16 questions. And, now, suddenly, counsel objects to him reading
17 the next sentence.
18      MR. DROSMAN: I move to strike that objection.
19 I have no objection to him asking about it. He
20 clearly doesn't remember the testimony.
21      THE COURT: I'll sustain the objection -- that it's
22 not responsive to the question. It seems not to be responsive
23 to your question.
24      Re-ask it.
25      MR. KAVALER: I will ask a different question.

3810

3810

1       THE COURT: Sure.
2  BY MR. KAVALER:
3  Q. To the extent you recall looking at this document in
4  forming your opinion, what did you take away from the sentence
5  or the part of a sentence that says, "We need to be very
6  careful of doing rewrites -- flipping."
7       Was Mr. Vozar advocating flipping or is he against
8  flipping?
9  A. It means he's against flipping. He's --
10      MR. KAVALER: No further questions, your Honor.
11      THE COURT: Anything else?
12      MR. DROSMAN: Nothing further from plaintiffs.
13      THE COURT: You may step down, sir.
14 (Witness excused.)
15      THE COURT: The next witness?
16      MR. KAVALER: Your Honor, we have a video we can play
17 at this time, but I thought we would segue directly into
18 the -- I thought this would be an appropriate time to go to
19 the mini summations, your Honor.
20      We do have a video to play.
21      THE COURT: Oh, you're right. We only have about 12
22 minutes.
23      MR. KAVALER: That was my point, your Honor.
24      THE COURT: Very well.
25      That will conclude the testimony for this week,

3811

3811

1  ladies and gentlemen.
2       As usual, we will have the attorneys give six-minute
3  summations -- their six-minute summations of the testimony
4  during the week.
5       I want to remind you that these summations, as all
6  others by the attorneys, are not evidence in the case. They
7  constitute merely the attorneys' attempts to summarize the
8  evidence and to describe for you the reasonable inferences and
9  conclusions that they feel you should draw from the evidence.
10      If, what the attorneys describe either as evidence or
11 as their conclusions conflict with anything you have seen or
12 heard, you are to disregard what they say and rely upon your
13 own recollections of the evidence.
14      In addition, I want to read to you an instruction
15 regarding some previous testimony at this point in time.
16      During his testimony, among other things, Mr. Devor,
17 the expert attorney -- the expert witness for the plaintiffs
18 -- gave his opinion that Household had a duty to disclose any
19 predatory lending practices in certain 10-Q and 10-K filings
20 that they had with the SEC.
21      Whether such a duty to disclose existed as to any
22 particular 10-Q or 10-K filing is for you to decide on the
23 basis of the evidence and the instructions that I will give
24 you at the end of the trial.
25      Accordingly, I instruct you to disregard that portion

3812

3812

1  and only that portion of Mr. Devor's testimony.
2       I recognize plaintiff.
3       MR. DOWD: Thank you, your Honor.
4       Ladies and gentlemen, I was going to talk to you
5  about a couple of things; but, before I start, I just wanted
6  to say, you know, I sit here and I listen to testimony, where
7  somebody says, you know, "Gary Gilmer, he walked the walk, he
8  walked the walk," you know, because he sent out some e-mails
9  that said "everybody be good"?
10      What happened when he had the chance to walk the
11 walk, when Dennis Hueman's video got found out?
12      Now, you know what he did? He didn't walk the walk
13 one bit, did he? He just talked the talk.
14      But Dennis Hueman kept his job, didn't he? And,
15 then, they sit here and say, "The tone at the top was great."
16      Think about those kind of things, ladies and
17 gentlemen. That's evidence. They could have
18 walked the walk and he didn't. All he ever did was talk the
19 talk. And that's the kind of thing you've got to think about.
20      But what I wanted to talk to you about today was two
21 of the witnesses you saw this week. We called Professor Dan
22 Fischel to the stand to testify, basically, about damages.
23      You know, when you're doing somebody's
24 qualifications, as the attorney put putting the expert on, you
25 want people to understand that the guy's qualified; that he's

3840

1  that's not the way the language appears in Tellabs.
2      MR. BURKHOLZ:  I could modify that, your Honor, to
3  have the exact language from Tellabs.  I thought we were
4  pretty close.
5      I'm looking at it.  It says, "Corporate liability for
6  a violation of 10b-5 requires -- "
7      THE COURT:  Slow down and louder.
8      MR. BURKHOLZ:  Sorry about that.
9      I'll read it in, again.
10     "To establish corporate liability for a violation of
11 10b-5 requires 'looking to the state of mind of the individual
12 corporate official or officials who make or issue the
13 statement, or order or approve it or its making or issuance,
14 or who furnish information or language for inclusion therein
15 or the like.'"
16     That's it.
17     THE COURT:  I think that's pretty much what I said,
18 isn't it?
19     MR. BURKHOLZ:  It is.
20     THE COURT:  Is there a structure in there that I
21 don't -- that I'm missing?
22     Is there a structuring of that sentence that I'm
23 missing?
24     MS. BEER:  I'm sorry?
25     THE COURT:  What am I missing here?  You were arguing

3841

1  that --
2      MS. BEER:  Well, we're arguing, first of all, that
3  the sentence should not be included in the instruction at all.
4      THE COURT:  Okay.
5      And why is that?
6      MS. BEER:  Because there's been no -- there's no
7  court in this circuit that has imposed liability on the basis
8  of the scienter of individuals within the organization, who
9  were not also the persons who issued the statement.
10     THE COURT:  You mean no district courts?
11     MS. BEER:  There's no court.
12     THE COURT:  Okay.
13     MS. BEER:  The Tellabs case recites this language,
14 but it does not deal with this issue.
15     THE COURT:  Right.  But it appears to be the most
16 recent instruction that we can glean from Seventh Circuit
17 opinions on the precise issue that we're talking about now,
18 right?
19     You're telling me it's not a holding, but it appears
20 to be the best language we have right now to interpret the
21 Seventh Circuit's thinking on this precise issue.  Why
22 shouldn't we adopt it?
23     MS. BEER:  The language appears in the Tellabs case,
24 in a section in which the court is attempting to limit the
25 scope of the corporate scienter doctrine, not in a context in

3842

1  which they're attempting to expand it beyond those who are
2  individual defendants.
3      The case that the Court draws the language from --
4  the Southland Securities case in the Fifth Circuit -- quotes a
5  case from California -- the Apple Computer case -- in which
6  the court says, "It is not enough to establish fraud on the
7  part of a corporation that one corporate officer makes a false
8  statement."
9      THE COURT:  No, no, I missed that whole first part.
10 You have got to slow it down a bit for me.
11     MS. BEER:  The Southland case from the Fifth Circuit,
12 the Apple Computer Securities Litigation case from the
13 Northern District of California are the authorities that the
14 Tellabs case is relying on.  Those cases both refused to find
15 or permit cases to proceed on allegations that the scienter of
16 a corporation could be established on the basis of the
17 scienter of an employee or officer of the corporation, who was
18 not also the individual who had made the allegedly false
19 statement.
20     So, the same language that is appearing in Tellabs --
21 that is now being argued to open the doors more widely -- was
22 quoted in Tellabs in exactly the opposite direction and --
23     THE COURT:  Well --
24     MS. BEER:  -- was applied in the cases that are being
25 cited to limit liability to -- to limit the imputation of

3843

1  scienter to those persons who had also made the statements.
2      And if I could just clarify the timing point.
3      If we're going to be looking to the state of mind of
4  individuals, other than the individual defendants and the
5  corporate spokespersons, that state of mind needs to be
6  assessed at the time they provided the information.
7      THE COURT:  Of course.  When else?
8      But we --
9      MR. KAVALER:  Your Honor --
10     THE COURT:  -- haven't gotten to that issue yet.
11     I just don't understand how it is that, because the
12 language that establishes the scope of the corporation's
13 liability in regards to the acts of its employees, was applied
14 to a certain set of facts -- and, the result reached was that
15 there was no liability -- that that language is somehow not
16 valid to be applied to the set of facts that we have in this
17 case.
18     The language is the language.  Whether it resulted in
19 a no-liability finding, in Tellabs or any other case,
20 shouldn't determine whether we apply the language in this
21 case, should it?
22     Whether there's going to be a resulting liability or
23 lack of liability will depend on the facts in this case; and,
24 fortunately, that's a determination that the jury will make in
25 this case, not the Court, because we're at the stage where

3848

1    The chances that they're going to win this case on
2  this instruction and nothing else are about like that
3  (indicating); and, the door for an argument on appeal, that
4  they're opening up, is like this (indicating).
5        What's the risk benefit here?
6        But that's not my decision to make.  It's not my
7  decision to force on a case.  That's the decision for the
8  litigants to make.
9        And I could say the same thing about defendants, as
10  well, frankly, on many occasions.  But more so the plaintiffs
11  usually.
12        So, given that they're asserting this theory of
13  liability, it seems to me that -- I think that the Makor or
14  Makor case language tells us what the law is, or is likely to
15  be, as close as we can come in this circuit when it arrives up
16  there.  And I think that's the language that we should use in
17  instructing the jury.
18        I think we should tell them -- and how we put it in
19  here is a different matter.  I mean, I'm looking at a false or
20  misleading statement instruction, where we talk about, "The
21  plaintiff must prove that the defendant made a false or
22  misleading statement."  Not necessarily so.
23        I mean, "made," "issued," "ordered," "provided false
24  information to be included in," I think there's evidence as to
25  most of those.  And it seems to me that that's a place where

3849

1  we start incorporating this language.
2        Go ahead.
3        MR. BURKHOLZ:  Well, I don't know if we need to do
4  that.  I think the defendant is Household.  They make the
5  statements.  Their scienter is what we're struggling with --
6  the definition.
7        THE COURT:  That's one defendant.  But unless I'm
8  mistaken, there was a substantial amount -- or you asked a
9  substantial number -- of questions of -- oh, who was the lady
10  that --
11        MR. BURKHOLZ:  Ms. Hayden-Hakes.
12        THE COURT:  Yes, Ms. Hayden-Hakes.
13        -- about who told her to say this and did she have
14  knowledge or did she get the knowledge from somebody else, as
15  to the various public statements that she made.
16        Are those statements attributable to the defendant
17  that gave her the information to include in the statements?
18        MR. BURKHOLZ:  Well, the statements are attributable
19  to the company that she's making.
20        THE COURT:  Yes.
21        Are they attributable to the defendant who told her,
22  "Go out there and say that there's no predatory lending"?
23        Are you going to argue that in closing?  Is Mr. Dowd going to
24  argue that in closing?  Is he going to say, "He told her to
25  say those things"?

3850

1        MR. BURKHOLZ:  That goes to the scienter issue of the
2  company.
3        THE COURT:  It goes to the making of the statement
4  issue, as well.
5        MR. BURKHOLZ:  Well, that's the company's statement;
6  and, the scienter of the company, you look at the --
7        THE COURT:  So, you are not going to argue that when
8  Mr. Gilmer said to Ms. Hayden-Hakes, "Go out there and make
9  this statement," but when they got together and discussed it
10  and when they put together the statements that she was going
11  to issue to the press, that the statements she subsequently
12  made were statements also made by Mr. Gilmer, that he can be
13  held accountable for those?
14        You're not going to argue that?  You're just going to
15  argue that the corporation can be held liable?
16        MR. BURKHOLZ:  Right.  The individual defendants are
17  liable for the company's statements.
18        THE COURT:  Gee, there you go.  Okay.
19        So, you're going to argue just the company's liable;
20  and, then, you're going to, because the company is liable for
21  that statement, say that you're going to impute the company's
22  intent to Mr. Gilmer and to Mr. -- well, the other defendants?
23        MR. BURKHOLZ:  Aldinger and Schoenholz.
24        THE COURT:  Yes.
25        Is that your theory?

3851

1        MR. DOWD:  Your Honor, I think it depends which
2  statements we're talking about.
3        I mean, the issue I think --
4        THE COURT:  I'm asking but all them because I want to
5  know if I should instruct the jury as to all them.
6        MR. DOWD:  I understand, your Honor.
7        I think it's -- I mean, I think it's true that the
8  defendants, to the extent that they're involved in furnishing
9  the statements, they're liable for them.
10        THE COURT:  Well, the instruction we have right now,
11  you know, just says, "prove that the defendant made a false or
12  misleading statement of fact or omitted a fact that was
13  necessary"; and, if that's the case, then -- and if that's all
14  there is -- and I don't know that the statements made by any
15  of their subordinates, that were -- that they ordered or
16  issued or provided the information for, are statements that
17  they would be liable for.
18        MR. BURKHOLZ:  Well, but we have the -- I think it's
19  the -- respondeat superior statement that talks about the
20  company is --
21        THE COURT:  You're focusing on the corporation's
22  liability.  I'm focusing right now on the individual
23  defendants.  Okay?
24        What I don't want is for Mr. Dowd to get up and
25  argue, "You know, Mr. Gilmer told Ms. Hayden-Hakes to supply

3852

1  this information to the press."  She did it and that's a false
2  and material misleading statement by him.  And for the
3  defendants to get up and say, "Objection.  It's not what the
4  instructions say.  Objection, your Honor."  He shouldn't even
5  be allowed to argue that.
6      And for the jury, then, to go back with no guidance
7  on that -- because I have -- I mean, unless those questions
8  you were asking her about -- where she got the information and
9  who told her to make the statement and whether she had
10  independent knowledge of the truth or falsity of the statement
11  she was making -- were going nowhere, I assumed that you were
12  going to make that argument.
13      If you're not, that's fine.  I'd rather not instruct
14  the jury.
15      But if you are going to make that argument, then I
16  think we need to instruct the jury as to, essentially, the
17  language in the Makor case, that that's what we're talking
18  about.  We're talking about -- I think other cases have called
19  it -- "substantial participation."
20      And the corporation, it seems to me, is the same
21  language with respect to scienter.  If it fits within that
22  Makor language, how do we instruct on that?  There's a
23  different --
24      MR. DOWD:  I think --
25      THE COURT:  We find the defendants' instruction,

3853

1  where?
2      MR. BURKHOLZ:  It's on Page 60- -- I think it starts
3  on Page 63 of their red-lined version -- 63 of their red-line
4  version.  The language that they have proposed is on the
5  bottom of 64, running into 65 of their red-line version they
6  propose.
7      THE COURT:  So, what about their language do you
8  oppose?
9      MR. BURKHOLZ:  The -- I guess the -- what's missing
10  is the "or furnishing information or language for inclusion"
11  in the statement, which would go on the top of Page 65 after
12  "In making a false statement or omission of material fact."
13      MS. BEER:  We object, your Honor, to the addition of
14  that language as being unsupported by controlling law in the
15  Seventh Circuit and not supported by the factual record of
16  this case.
17      THE COURT:  Then what do we tell the jury about scope
18  of employment?  Do you think they know what that is?
19      Does the defense have a definition for "scope of
20  employment" language?
21      MS. BEER:  We did not include a definition of the
22  language on the assumption that it is relatively common
23  terminology that --
24      THE COURT:  Well, among lawyers, I'm sure it is; but,
25  I don't know too many lay people who walk around talking about

3854

1  scope of employment, do you?
2      Well, I mean, in my circles they don't, maybe in your
3  circles --
4      (Laughter.)
5      THE COURT:  -- I don't know.
6      Actually, I think I lost a page here:  "Was acting
7  within the scope of his or her employment."
8      Well, I guess I could suggest language from the
9  Illinois pattern jury instructions, which reads something
10  like, "An agent is acting within the scope of his authority if
11  he is engaged in the transaction of business, which has been
12  assigned to him by his principal; or, if he is doing anything
13  which may reasonably be said to have been contemplated as a
14  part of his employment.
15      "It is not necessary that an act or failure to act
16  must have been expressly authorized by his principal."
17      MR. BURKHOLZ:  That's fine with plaintiffs.
18      MS. BEER:  We have no problem with the language, your
19  Honor.
20      Where would this fit into the instruction?
21      THE COURT:  I don't know.  You folks are proposing
22  the instructions.  I guess it would fit in about where -- or
23  it may be a separate instruction to add after the instruction
24  on scienter.
25      MS. BEER:  It might make sense, then, your Honor, to

3855

1  pull all of the material, rather than doing a separate
2  instruction only on the scope of employment, to put -- pull --
3  all of the material on the imputation of an employee's state
4  of mind to the corporation, into that separate instruction.
5      THE COURT:  Yes, there's a lot of ways of doing it
6  for sure.  I have no preference, one way or the other.  I
7  think that first we need to go back and revisit the language
8  on the first element of the 10b-5 claim, to include language
9  in the Makor case, which makes perfect sense to me.
10      I mean, it just makes -- it's just logical that an
11  individual defendant's liability for violating the rules
12  against fraud in the sale of securities, should not depend on
13  whether he, himself, actually uttered the words that caused
14  the violation, but should also be assigned to him if he
15  provided the information for that purpose or ordered someone
16  else to do it or directed someone else to do it.
17      I can't -- it would be a really crab reading, I
18  think, of the statute, not to conclude that.
19      And, then, with respect to scienter --
20      MS. BEER:  Can we back up to that just for a moment,
21  your Honor?  I'm sorry to interrupt.
22      If that language is introduced, what's the point of a
23  20-A claim?  Maybe I'm missing something in this, but I don't
24  see the distinction between "imposing liability on an
25  individual defendant for statements he did not make" and

3856

1  "imposing liability on that individual defendant, as the
2  controlling person who caused someone else's statements."
3      THE COURT:  Well, I don't think it's quite the same
4  thing.  For example, "controlling person" depends on
5  establishing a primary liability.  So, if the theory is that,
6  for example, Mr. Gilmer is liable for what Ms. Hayden-Hakes
7  said, you would first have to establish that Ms. Hayden-Hakes
8  committed a liability -- was liable; committed a violation of
9  10b-5.  And if she did not have the requisite intent or
10  scienter, that fails.  It's a non-starter.  It doesn't even
11  get there.
12      So, whether he's her controlling person or not
13  doesn't bring liability on him.
14      I think "controlling person" is for a slightly
15  different situation.  I mean, it's for the situation where
16  Ms. Hakes actually had the Full Monty, if you will.  She made
17  the statement, she knew it was false, she had the intent, she
18  had everything.  And Mr. Gilmer was her controlling person.
19  This is exactly the opposite situation, really -- what we're
20  talking about.
21      We're talking about -- we're talking about -- sending
22  liability in a different direction in the situation that we're
23  involved in.
24      MS. BEER:  If we started off talking about the
25  individuals who provided information to the individual

3857

1  defendants --
2      THE COURT:  That's not what we're talking about.
3  We're talking about the individual defendants as the
4  individuals who provided information to those who are not
5  defendants.
6      Mr. Gilmer, who is a defendant, providing information
7  or instruction or instructing or ordering Ms. Hakes to tell a
8  lie; to commit a fraud under 10b-5 -- which, I think, is the
9  whole crux of the cross-examination that they were doing of
10  Ms. Hakes -- as to whether she knew the truth of what she was
11  saying as to where she got the information, who it came from.
12      I don't see how, given that situation, we're somehow
13  eradicating "controlling authority" liability.
14      MS. BEER:  We started off with attempting to analyze
15  the instructions in which the corporation can be found to have
16  a wrongful state of mind on the basis of the actions of
17  employees who did nothing but provide information to someone
18  else who made a statement.
19      THE COURT:  Okay.
20      MS. BEER:  Now, we're talking about providing --
21  finding liability on the part of an individual defendant
22  who -- for a statement that individual defendant did not make,
23  on the basis that that individual provided information to
24  someone else who did speak.
25      Am I following that correctly?  It seems we've

3858

1  shifted to something quite different.
2      THE COURT:  Well, we're talking about two things.
3  Along the way, it struck me -- as I was looking at the
4  scienter materials, based upon the conversation we had last
5  time -- that the language that the Seventh Circuit used in its
6  scienter discussion also applied to the making of a statement.
7      I mean, they talked about not only uttering the
8  statement, but providing information for it, and so on.
9      And, so, it appeared to me that it would be necessary
10  or appropriate to go back to our instruction on making a false
11  or misleading statement and include that language in it.
12      Ultimately, we're back at where we started out, which
13  is imputing the scienter to the corporation and how we should
14  instruct there.  And it shouldn't surprise anyone that some of
15  the same language applies to both questions.
16      So, it's not as if I started out saying one thing or
17  doing another.  It's that the language led me to consider
18  something else and I brought it up here.
19      MS. BEER:  I think it may be that a part of the
20  difficulty comes from attempting to break the cause of action
21  down into the elements.  Because the act that provides a basis
22  for liability includes both the making of a statement and the
23  wrongful state of mind; and, by atomizing those into separate
24  elements to be analyzed, we're separating -- we're maybe
25  separating -- them too far.

3859

1      And if we end up with a situation where one person
2  does the statement -- makes the statement -- and another
3  person has the state of mind, it's one thing to talk about
4  that going up to the corporation, and quite another thing to
5  say that someone who didn't make the statement can now have --
6  that liability can be imposed on someone who didn't make a
7  statement, without finding the elements of the cause of action
8  as to that individual.
9      THE COURT:  Well, I mean, the argument seems to me
10  you're making -- and now we are talking about the individual
11  liability -- is that if -- I hate to pick on him, but, again,
12  let's use Mr. Gilmer.
13      If Mr. Gilmer said to Ms. Hakes -- if Mr. Gilmer
14  believed in his heart of hearts and his mind that the company
15  was involved in predatory lending practices and he said to
16  Ms. Hakes, "Go out there and tell them we're not involved in
17  any such thing," that he would not be liable under 10b-5.
18      Is that your argument?
19      MS. BEER:  No, that's not my argument.
20      THE COURT:  Okay.
21      Well, that's all I'm saying is that by including the
22  language in our "false or misleading" instruction -- "ordered
23  approved or furnished information to be included in the
24  statement" -- the person can be liable, assuming that all the
25  other elements are met, as well, of course.

4006

1    Next is Court's 24, previously 23.
2    MS. BEER: Your Honor, there's a sentence that's been
3  omitted from the instruction on 10b-5 elements. There's a
4  reference, in the paragraph on Arthur Andersen, at the very
5  end of that paragraph a reference to a verdict form; but
6  there's no previous reference anywhere in the
7  instructions to a verdict form.
8    Defendants' previous version of this instruction
9  included the sentence, "When you retire to deliberate, you
10  will be provided with a verdict form on which you will record
11  your decision as to each defendant on each of the essential
12  elements."
13    I would request that that sentence be restored to the
14  instruction immediately after paragraph number -- the numbered
15  paragraph four, the fourth element, in order to, A, explain
16  that there will be a verdict form and to lay the predicate for
17  the reference to a verdict form at the end of the final
18  paragraph of this instruction.
19    THE COURT: Plaintiff.
20    MR. BURKHOLZ: I don't even see the language in their
21  proposed red line version that was just referenced by counsel.
22    I think if the Court wants to make any reference, it
23  could just say at the end "as explained on the verdict form
24  that will be provided to you with the instructions."
25    THE COURT: Just leave it the way it is. We say

4007

1  included verdict form, and a few minutes later we'll be
2  explaining to them the included verdict form. If that did not
3  take place, I guess this would be confusing; but given that, I
4  don't think it's -- I don't think it is.
5    Next is the Court's 24, previously 23, false or
6  misleading.
7    MR. BURKHOLZ: I believe this was the language we
8  agreed upon last week that I tried to incorporate from the
9  Court's ruling into the instruction.
10    MS. BEER: Your Honor, we have an alternative version
11  of this instruction that I'd like to hand up. We spent a good
12  deal of time discussing it. And -- and I think our discussion
13  was not really a linear discussion. We split off into other
14  things, and I'm not sure that the record of the conference
15  last week provides a very clear indication of just what the
16  decisions were as to this instruction. So I'd like to propose
17  the defendants' alternative instruction, if I may.
18    THE COURT: Sure.
19    (Tendered.)
20    THE COURT: Thank you.
21    MS. BEER: That's a copy for Mr. Burkholz.
22    This attempts to clarify the language that we were
23  discussing on Friday, and as well to -- to incorporate a
24  clearer description of when a duty to disclose arises and
25  incorporate -- the last three pages of this should be --

4008

1  should be removed. I'm sorry. They shouldn't be on there.
2  If I could exchange that, something got mixed up in the
3  copying, your Honor.
4    (Tendered.)
5    THE COURT: You want this back? Is that what you're
6  saying? These are your private notes?
7    MS. BEER: I can take it back, your Honor. It just
8  mixed up something in the copying machine that wasn't part of
9  this instruction. And I'll exchange with Mr. Burkholz the
10  copy with the research being done on something else. If I
11  could have that copy back, please?
12    (Tendered.)
13    MS. BEER: This also incorporates, your Honor, the
14  instruction that was given on the record during the trial
15  regarding Mr. Devor's testimony.
16    (Brief pause.)
17    THE COURT: I think I'm missing my original version
18  of this. Let me -- I think that would have been my 23, I
19  think.
20    MS. BEER: I have another copy if you'd like, your
21  Honor.
22    Would you like a copy, your Honor?
23    THE COURT: I would like the one I marked up frankly.
24  It's got my notes and what I said.
25    Let me take ten minutes, and then hopefully I'll be

4009

1  able to find that.
2    (Recess taken.)
3    THE COURT: Well, I was only partially successful in
4  finding my marked-up version.
5    So what's the plaintiffs' response to defendants'
6  proposed false or misleading statement instruction?
7    MR. BROOKS: Judge, we think the instruction that --
8    THE COURT: Look up, speak loudly.
9    MR. BROOKS: We think the instruction, your Honor,
10  that has been edited by plaintiffs and submitted is proper.
11    There's a lot in here in defendants' instruction
12  especially on the duty and reiterating the instruction that
13  the Court has already given once to the jury about Mr. Devor's
14  testimony is completely improper, both legally, you know, from
15  a duty standpoint and also improper in the way that it's
16  phrased for a jury instruction. Essentially they're telling
17  the jury what to find on duty, which, of course, is not
18  correct.
19    So we object wholesale, Judge, to this substitution
20  instruction and advance our edits that I believe are the
21  result of the discussion last week to instruction -- former
22  instruction 23 on false and misleading.
23    MS. BEER: The two instructions, your Honor, are
24  really not all that different; and I believe in a case that
25  principally relies on alleged omissions, it is important for

4010

1  the jury to receive clear instructions on when a duty to
2  disclose arises.
3      We've already had some confusion on that, and that's
4  the reason for the instruction concerning Mr. Devor's
5  testimony. That's the reason for repeating the instruction on
6  Mr. Devor's testimony in the final instructions that are given
7  to the jury to ensure that it's an instruction that they will
8  remember.
9      The edits that are incorporated in the version that
10  plaintiffs circulated last night include actually one sentence
11  that's completely backwards and the statement that an omission
12  is misleading only if the defendant has a duty to disclose the
13  omitted fact.
14      We've twisted and teased this language so much that
15  we've just gotten it completely backwards. The omission is
16  not misleading if there's a duty. There is a duty if the
17  statement with the omission is misleading.
18      Much of the rest of the instruction on the --
19  Household is required to file with the SEC, Household is
20  required to prepare its financial statements regarding GAAP,
21  the two instructions really don't differ very much on those,
22  if at all.
23      MR. BURKHOLZ: I'll just point out that defendants'
24  instruction also took out what the Court had worked up as a
25  sentence, but each defendant has a duty to disclose a fact if

4011

1  a prior statement he or it made about the same subject would
2  be misleading if the fact is not disclosed. The Court had
3  worked up that language, and that's even taken out of the
4  defendants' new submission.
5      MS. BEER: The sentence remains in the defendants'
6  instruction that if a defendant does not have a duty to
7  disclose a fact but chooses to make a statement about it, the
8  statement must be truthful and not misleading. I don't think
9  that's different.
10      MR. BURKHOLZ: Well, there's a sentence before that
11  that the Court had worked up that has now been taken out of
12  the defendants' proposed instruction.
13      MS. BEER: If the plaintiffs' intention in including
14  that sentence in the instruction is to start down the road of
15  suggesting to the jury that a duty arises because of a duty to
16  correct a prior statement, that's an entirely different
17  instruction. That's out of context with the initial
18  explanation of why a duty to disclose arises under 10(b) if
19  the omission of information creates a misleading statement.
20      THE COURT: I think I want to put this proposed
21  instruction in the mix at this point. I think it becomes
22  quite relevant, if you folks want to come up.
23      (Tendered.)
24      MR. BROOKS: Your Honor, are you thinking about
25  putting this somewhere in between the second to last and last

4012

1  paragraphs there of the instruction that we handed up?
2      THE COURT: Yes, or as its own separate instruction.
3      MR. BROOKS: I think the plaintiffs are fine with
4  that either way, Judge.
5      THE COURT: Defendants?
6      MS. BEER: I think one issue we have, your Honor, is
7  the potential ambiguity in the phrase "to prevent another
8  statement made in a 10-K, 10-Q or elsewhere, the duty to
9  disclose arises if the omitted information causes" -- you have
10  to look at the statement that was made to look at whether it
11  is rendered misleading by the omission of information and
12  opening the possibility that you can look for a duty to
13  disclose by finding a misleading statement in some other
14  document or even elsewhere in a 10-K, which is a huge documen
15  that covers a number of different subjects, introduces an
16  ambiguity that I think moves us away from the actual
17  definition of what gives rise to a duty to disclose.
18      THE COURT: Well, what should you be looking at? I
19  guess what I'm thinking of, the clearest example is if, say,
20  Mr. Aldinger got up the day before the release of the 10-K and
21  said, "And we don't conduct or engage in predatory lending
22  practices, and if you want to see the proof of that, take a
23  look at our 10-K that we're filing tomorrow."
24      And the 10-K has nothing but a statement of revenues
25  in its financial statement. Should it have more? Would the

4013

1  law require it to have more under those circumstances?
2      MS. BEER: In looking at the 10-K -- in looking to
3  determine whether the language in the 10-K is rendered
4  misleading by any omission, you look to the language in the
5  10-K.
6      THE COURT: So in that situation, what would your
7  answer be?
8      MS. BEER: My answer would be that to find a duty to
9  disclose on the basis of an omission, the analysis would be
10  directed to the statement actually made in the 10-K, whether
11  that statement is misleading because the information --
12  because any information -- because whether that statement is
13  rendered misleading by the omission of information, whether
14  someone reading that statement on its own will find
15  information in that statement that causes that person to be
16  misled --
17      THE COURT: But the question is do you have to read
18  it on its own, given the fact that you're to look at a
19  statement and consider all of the circumstances regarding it,
20  its issuance? If the circumstances before its issuance was
21  that -- let's make it even more stark.
22      Let's say Mr. Aldinger stood up holding the 10-K in
23  his hand and said, "We don't engage in predatory lending
24  practices and the proof of it is look at the disclosures we've
25  made in our 10-K, and here it is, folks. Check it out." And

4014

1  all the 10-K has is a statement of revenue, and it later turns
2  out that they had engaged in predatory lending practices.
3       Would the 10-K statement be misleading without any
4  explanation, given that context?
5       MS. BEER:  The statement about the 10-K?
6       THE COURT:  The statement in the 10-K of the revenues
7  earned for that year.
8       MS. BEER:  No, your Honor, I don't believe it would
9  be.
10      THE COURT:  Financial statement says we earned
11  $50 million this year.
12      MS. BEER:  I don't believe you can import information
13  from a separate statement into a 10-K.  You can look at the
14  language that is used in the 10-K and determine if that
15  language is misleading because something was omitted.
16      MR. BROOKS:  We disagree, your Honor.  We think that
17  statements that are made, especially when they're relating to
18  omissions, need to be looked at in context.
19      I think that's one of the main arguments that
20  defendants have advanced in this case actually when they're
21  talking about truth on the market and other things, but I
22  think that the issue here is whether the statement that gives
23  rise to the duty has to be the same as the statement that is
24  the false statement, and the plaintiffs' position is that that
25  is not the case.

4015

1       If there's a statement that gives rise to a duty to
2  disclose and absent disclosure the subsequent statement or the
3  different statement in the same document is false and
4  misleading because of that failure to disclose, we think that
5  that's actionable, Judge, and that's why this is an
6  appropriate instruction.
7       THE COURT:  Well, I mean I think that's the Court's
8  position, that if the breadth of the context is such that the
9  statements are essentially intertwined, then it could lead to
10  a duty to disclose in the 10-K financial statement itself.
11  Whether that's -- or to what extent that's been attained in
12  this case is still a circuit question, but I think that as I
13  tried to make clear with my example, I'm not sure I did, but
14  if the CEO of a corporation says we're going to disclose
15  everything there is to disclose about our predatory lending
16  practices in our financial statement that we're filing, in our
17  10-K financial statement that we're filing tomorrow, and they
18  file the statement and all it says is we earned $50 million, I
19  think that statement is misleading because it omits
20  information that, you know, you would expect it to have, given
21  the prior statement by the CEO, that it was going to contain
22  it.
23      That's one I think -- that's one clear sort of
24  best-case example of when that could become an obligation
25  under the law as I see it.  I think clearly the first part of

4016

1  this statement, that the statement of revenue in a 10-K or
2  10-Q that accurately states the earnings does not by itself
3  give rise to a duty to disclose specific lending practices, is
4  correct.  It is the law.
5       But I think that the statement after that, which is
6  that it's for the jury to determine based on the totality
7  of the evidence whether any given statement is leading or
8  misleading is also the law, and it's what we tell them earlier
9  on.  It doesn't really matter whose proposed instruction we
10  take on false or misleading.  We tell them that in determining
11  whether a statement is false or misleading, you must consider
12  the statement in light of the circumstances that existed at
13  the time that it was made.
14      MS. BEER:  It's our position, your Honor, that that's
15  a sufficient instruction and that the parties can argue what
16  they want from -- from that instruction, and to put the
17  Court's imprimatur on a particular scenario imposing a duty to
18  disclose based on a statement made in one document, a duty to
19  disclose in a separate document is an instruction that we do
20  object to and don't believe should be given.  The hypothetical
21  scenario that was described, your Honor, is not a scenario
22  that exists in this case.
23      THE COURT:  Absolutely correct.
24      MS. BEER:  It's one which you could possibly argue
25  that the two statements are actually merged because of the way

4017

1  in which you described the statements that were made.  That's
2  not the situation that we have in this case.  That's not the
3  connection between documents that we have the plaintiffs
4  arguing in this case, and we do -- we object to the giving of
5  the second part of this instruction.  The first sentence we
6  have no problem with.
7       THE COURT:  Well, I want to make sure that I
8  understand what you're saying because I'm not sure I do.
9       So what you're objecting to is the Court telling the
10  jury that whether the 10-K or the 10-Q statement of earnings
11  is misleading is for the jury to decide based on the totality
12  of the evidence?
13      MS. BEER:  No, your Honor.  If the sentence read as
14  you just read it, we would not object to it.
15      The specific reference to looking to a separate
16  document to find the duty to disclose in a 10-K or 10-Q is the
17  portion of the sentence that we find unsupported and
18  objectionable.
19      THE COURT:  But you would not then object to the
20  plaintiffs arguing that the prior statements, given the light
21  of all the circumstances in this case, gave rise to a duty to
22  disclose more in the 10-K than was disclosed, and you arguing
23  that there were no such facts in this case sufficient to give
24  rise to such a duty, is that your position?  Because that's
25  what I thought I heard you say.

4018

1    MS. BEER:  We believe, your Honor, that the duty to
2  disclose is judged from on the face of the statement, whether
3  the statement itself is misleading and whether it is
4  misleading because of specific information that has been
5  omitted from that statement.
6    THE COURT:  So your reading is that you must consider
7  the statement in light of the circumstances that existed at
8  the time that it was made, that the phrase "in light of the
9  circumstances that existed" means the content of the statement
10  itself?
11    MS. BEER:  The content of the statement, the
12  circumstances under which the statement was given, when it was
13  given, to whom it was given, what it was given in response to,
14  any number of factors like that, but not other statements made
15  in other documents.  Those other documents may themselves giv
16  rise to a claim that the statement is misleading.
17    THE COURT:  What about other statements in the same
18  document?
19    MS. BEER:  I don't think even in that circumstance
20  it's necessarily the case that a statement is going to give
21  rise to a duty to disclose on the basis that the statement was
22  rendered misleading.
23    THE COURT:  Well, I don't mean necessarily, but I
24  mean as a matter of law, can it be?  That's what we're
25  instructing the jury on.

4019

1    I'm trying to see where you draw the line, and I'm
2  just not -- I don't see the -- I can't think of any authority
3  for drawing the line there.  It seems to me that the
4  authority's pretty clear that when the facts are in dispute,
5  the jury decides what the facts are and then decides whether
6  those facts that relate to the circumstances under which the
7  statement was made make the statement misleading, either by
8  virtue of its affirmations or by virtue of its omissions.
9  That is, as I understand it, what the law is, and that's what
10  I think I'm saying here.
11    But you're telling me that you don't -- you believe
12  that all the circumstances that can be taken into account is
13  circumscribed to exclude other statements.
14    MS. BEER:  I'm saying that -- that the jury has the
15  obligation to examine a statement and determine if that
16  statement is misleading, whether it creates a misleading
17  impression because certain other information has been omitted
18  and that the circumstances that may be taken into account -- I
19  don't know that any of us could give a complete catalog of the
20  circumstances that would arise in various cases.
21    What I am saying is that it's not permitted to look
22  at one document to find an omission to derive a duty to
23  disclose in a different statement.
24    THE COURT:  Well, when you say statement, do you
25  mean -- I don't think it's not permitted to look at one

4020

1  document.  When you say one document, are you referring to the
2  10-K in this case?
3    MS. BEER:  We could in this case, yes.
4    THE COURT:  To find an omission to derive a duty to
5  disclose in a different statement.
6    Okay.  So in my example if Mr. Aldinger got up and
7  said, "We don't engage in predatory lending practices" or,
8  better yet, "We're going to tell you to what extent we engage
9  in predatory lending practices in our 10-K that we're filing
10  tomorrow.  Here it is, in the 10-K, or in the financial
11  statement of our 10-K."
12    And the 10-K financial statement says nothing other
13  than here are the revenues we earned, that under those
14  circumstances you could not take into account Mr. Aldinger's
15  prior statement in determining whether the 10-K statement of
16  revenues was misleading?  Because that's a prior statement,
17  it's not the same 10-K statement.  It's a prior statement
18  completely.
19    Can you take it into account in determining whether
20  that 10-K statement was misleading because of an omission?
21    MS. BEER:  The question in that circumstance is
22  whether the prior statement is misleading, not whether the
23  subsequent statement is misleading.
24    THE COURT:  So you would agree with the sentence in
25  our instruction that says "but each defendant has a duty to

4021

1  disclose a fact if a prior statement he or it made about the
2  same subject would be misleading if the fact is not
3  disclosed"?
4    MS. BEER:  If the statement in the prior statement is
5  rendered misleading by the omission, then the duty to disclose
6  in that prior statement exists, yes.
7    THE COURT:  The duty to disclose in the subsequent
8  statement, would result in a duty to disclose in the
9  subsequent statement?
10    So, for example, to use what I'm thinking you're
11  saying to see if I have it right, if Mr. Aldinger got up and
12  said, "We don't engage in predatory lending practices, and to
13  the extent that we do, it's going to be included in our 10-K
14  financial statement," and he issues a 10-K financial statement
15  that includes no information on it whatsoever.
16    That statement, you're saying, could be evidence of
17  the fact that his prior statement, that they don't engage in
18  predatory lending practices, was misleading?
19    MS. BEER:  The prior statement is the statement that
20  you would look to to determine whether a misleading statement
21  had been made.  The statement you would look to to determine
22  if information had been omitted would be the prior statement.
23  That's -- that prior statement does not create any obligation
24  to disclose further information in the 10-K.
25    THE COURT:  Okay.  And you, I take it, disagree with

4022

1   that?
2        MR. BROOKS: We do, your Honor. We don't think that
3   the statement giving rise to the duty has to be the exact
4   statement in the same document or -- and we also think that
5   there can be a statement -- there are many different
6   circumstances under which a statement can give rise to a duty
7   or something other than a statement maybe could give rise to a
8   duty, and that's why this instruction is proper, Judge,
9   because it gives the jury the chance to weigh the facts and
10  decide whether there was a duty to disclose and whether they
11  did, in fact, disclose.
12       THE COURT: Okay. Well, I -- I agree with that. I
13  think that the only way to honor the instruction which is
14  clear throughout, that the jury is to determine whether a
15  statement is misleading based upon all of the circumstances
16  that existed at the time it was made is to give that
17  instruction.
18       I don't think we can give an instruction that, by
19  implication or otherwise, deprives the jury of the right to
20  consider all of the circumstances surrounding the making of
21  the statement.
22       MS. BEER: Reiterate defendants' objection to the
23  instruction as unnecessary and incorrect.
24       THE COURT: Okay. So let me make sure I have -- the
25  Defendants' Jury Instruction Number 26 is denied. This is the

4023

1   one you just submitted today, correct?
2        MS. BEER: Yes, your Honor.
3        THE COURT: 26? Was there a prior 26?
4        MS. BEER: Yes.
5        THE COURT: So this supersedes it?
6        MS. BEER: The 26 that was submitted today was
7   revised in an attempt to take into account the discussion that
8   we had on Friday with the Court.
9        THE COURT: Okay. This will be denied.
10       MS. BEER: Can we provide a copy to the court
11  reporter to get it into the record of today's conference, a
12  record of what was submitted and requested by the defendants
13  and denied? Or would you like me to read the three pages into
14  the record?
15       THE COURT: Neither. Why don't you just file it.
16  Then it will be part of the record.
17       MS. BEER: Thank you, your Honor.
18       We take exception to the Court's denial of the
19  Defendants' Requested Jury Instruction Number 26.
20       THE COURT: Okay. The Court will give the Court's
21  Instruction 24, previously 23, as amended in the submission by
22  the plaintiffs.
23       MS. BEER: Again, your Honor, for the record, we
24  object to this instruction. In particular, to the first
25  sentence of the third paragraph, "An omission is misleading

4024

1   only if a defendant has a duty to disclose the omitted fact"
2   as being legally incorrect.
3        THE COURT: Then I think we'll call the instruction I
4   just have given to the parties and that we have discussed
5   Court's 24A, and that will be given over the objection
6   articulated by the defendants.
7        Next is the Court's 25, previously Court's 24,
8   material -- materiality.
9        MS. BEER: Your Honor, the language that has changed
10  at the beginning of paragraph 3 does not reflect the
11  discussion at the conference last Friday. The language we
12  ultimately ended up with during the conference was "A
13  reasonable investor is presumed to have ordinary intelligence
14  and is presumed to have information available in the public
15  domain."
16       THE COURT: Sounds better.
17       MR. BURKHOLZ: That's fine with us. Can you read
18  that again, please?
19       MS. BEER: "A reasonable investor is presumed to have
20  ordinary intelligence and is presumed to have information
21  available in the public domain."
22       THE COURT: You know, as I look at this, should that
23  be a presumption, or should that be an instruction to the
24  jury? That for purposes of this case, they will take it as
25  true, that a reasonable investor is a person of ordinary

4025

1   intelligence and has information available in the public
2   domain.
3        MR. BURKHOLZ: That's fine with us.
4        MS. BEER: Either way would be fine, your Honor. I
5   think it's included only to further explain the sentence in
6   the preceding paragraph that "A statement of fact or omission
7   is material if there's a substantial likelihood that a
8   reasonable investor would have considered it important."
9        THE COURT: Either way. If either side -- we can
10  just leave it the way it is. That's fine then.
11       MS. BEER: We have no objection, your Honor, to
12  leaving it as a presumption.
13       THE COURT: Okay. Let's leave it the way it is then
14  and change the language as given by the defendants.
15       MR. BURKHOLZ: We'll do that.
16       THE COURT: All right. The next is Court's
17  Instruction Number 26, previously numbered 25.
18       MS. BEER: We have an alternative version for this
19  instruction, your Honor. We went around a lot of circuitous
20  discussion, and I think --
21       THE COURT: And I thought I was being so focused.
22       MS. BEER: It may be that you were and we were not,
23  your Honor; but we ended up going in a lot of different
24  directions on this instruction, and I would like to propose --
25  to submit defendants' proposed alternative to the instruction

4038

1   is --
2       THE COURT: I mean I think I agree with what you
3   said, but that it seems to me to keep our options open, we
4   want a determination as to what the date is that the jury
5   finds that the disclosure occurred.
6       MR. BROOKS: Well, I think legally, Judge, the date
7   that the disclosure occurs is the date that the fraud no
8   longer affects the market price of the stock; and if they
9   accept either of Professor Fischel's models, that would be
10  October 11, 2002.
11      Additionally, Judge, if they accept the specific
12  disclosures, which is what we were talking about, they would
13  fill in 7.97 for the days leading up to the first disclosure,
14  and then after November 15th, which is the first time that
15  Professor Fischel finds inflation comes out of the stock, they
16  would drop that number to $6 and something cents a share.
17      It would be evident in the event the Court determines
18  that the disclosure should be measured from sometime during
19  the relevant time frame, which we don't think is correct, it
20  would be evident from that, Judge, that that's the first time
21  that inflation's removed and, therefore, the first
22  "corrective" disclosure during that time frame.
23      Essentially, Judge, to have the jury answer the
24  question was there a disclosure on this date is to have them
25  answer the question twice. They're answering it once when

4039

1   they fill out the artificial inflation table and again when
2   the question is posed separately, as we did in the verdict
3   form. And as you know from my letter accompanying that
4   verdict form, we objected, and this is part of the reason that
5   we object to including that information. I think it's
6   confusing, your Honor, for the jury. They don't have
7   information about -- I mean the terms aren't defined.
8       There's a lot of information that they don't have to
9   fill this out, and I think that we get what we need, again,
10  assuming that they go with the specific disclosures, we get
11  what we need by reading the drops in the artificial inflation
12  as time goes by. And there are some rises, too, Judge. And,
13  again, that goes back to the first point, make a determination
14  some rises during that time frame and what you'd be doing
15  would be capping damages based on those rises which are due to
16  the fraud, again, if they accept the specific disclosures
17  model.
18      THE COURT: Yeah.
19      MR. DROSMAN: And, your Honor, I just wanted to
20  add --
21      THE COURT: I see all of that, but, I mean, we still
22  come down to why shouldn't we have the jury, based on the
23  information in evidence presented, make a determination on
24  those issues now for possible use later? Why should we make
25  that determination as a matter of law at this point and let

4040

1   the jury come back without reaching those determinations,
2   which means that we're at a point of no return if it turns out
3   that the argument you've just made is not accepted by the 7th
4   Circuit.
5       MR. BROOKS: Well, I think there are two points, your
6   Honor. First is that this -- this diminution in the
7   artificial inflation is a point that can be used -- again,
8   accepting their argument -- is a point that could be used to
9   measure the correction from.
10      Secondly, Judge, this is an extra step that the jury
11  is going to have to take. This question is an extra step that
12  they're going to have to take that is not a necessary step.
13  It's not one of the elements of the claim, your Honor, and all
14  we're doing is adding more information and more things to hang
15  the jury up on that's not necessary in order to proceed to a
16  verdict or to a judgment against the plaintiffs by, you know,
17  by unanimous jury. It just gives them one more thing to hang
18  up on, and a thing that is not an entirely lucid concept, I
19  mean --
20      THE COURT: Yeah, well, unfortunately, it's in the
21  statute, isn't it?
22      MR. DROSMAN: Your Honor, I think that you are
23  providing them -- you are preserving --
24      THE COURT: I understand, I understand what your
25  argument is, and you know what? If you want to put it in

4041

1   writing, I'll consider it. My concern at this point in time
2   is to preserve -- at this point in time is, and I don't think
3   anybody, and that includes you frankly, has worked harder at
4   keeping this clear and simple for the jury than I have. At
5   times when I think all of the attorneys have kind of lost
6   track of that, but I also have a concern with keeping a record
7   here that can be useful.
8       We are making determinations on a lot of issues for
9   which there is no clear-cut precedent. So to the extent that
10  we can keep -- we can keep the findings of this jury -- we can
11  make the findings of this jury preserve these different
12  issues, that's my main concern.
13      But if you want to put in writing why you're
14  absolutely convinced that a separate finding on the statutory
15  language, however clumsy and difficult to apply the statutory
16  language may be, I'll be happy to consider it. But for right
17  now, I think I'm going to insist on a verdict form that
18  requires that finding as to disclosure dates.
19      And we haven't gone to the jury yet, so if you want
20  to provide something in writing and I read it and I'm
21  completely convinced that there's no way that it's necessary
22  to do that, it's a simple thing to take something out of a
23  verdict form. Much harder thing to put something in.
24      As far as this particular instruction is concerned, I
25  think we may be able to partially satisfy some of the concerns

4042

1  by maybe adding some language.  It seems to me that what's
2  happening in this case is that at this junction of the case in
3  this particular type of bifurcated process, the measure of
4  damages is essentially the measure of inflation, as far as
5  this jury's concerned.
6        So maybe we can do this:  Maybe we can simply add
7  after the word -- after the phrase "or omission of material
8  fact occurred" the words, "in other words, the measure of
9  inflation in the stock price."
10       MR. BURKHOLZ:  We'll add that in, your Honor.
11       THE COURT:  Excuse me?
12       MR. BURKHOLZ:  We'll add that in.
13       MR. OWEN:  Your Honor, we had some lengthy discussion
14  on this subject last time around.
15       THE COURT:  I vaguely remember it.
16       MR. OWEN:  I understand your Honor's point to be that
17  this instruction, as you conceive it, is not inconsistent with
18  Dura in the sense that we do not yet know what the actual
19  trading days will be and that any claimant will only recover
20  for a diminution in the inflation between the time they bought
21  the stock and the time they sold the stock and that their
22  claim will not be measured by the inflation that's in the
23  stock only at the time they bought.  Is that -- is that
24  correct?
25       THE COURT:  Well, I think I would like to say that

4043

1  they don't have damages unless they actually go through the
2  entire sequence of events.  They don't have damages the minute
3  they purchase the stock even though it's inflated at the time
4  they purchase it.  Damages don't occur until we have deflation
5  and all the elements are met.
6        MR. OWEN:  Okay.  Just to clarify for my own
7  understanding, hypothesizing an investor who bought when there
8  was $7.97 in inflation in the stock price who then sells
9  during a time when there is still $7.97 in inflation in the
10  stock price, that investor has suffered zero damages.
11       THE COURT:  I would think.  I would like to see him
12  tell me what damages he has suffered.  It would be
13  interesting.
14       MR. DROSMAN:  We don't dispute --
15       THE COURT:  I'm sure you could find a lawyer
16  someplace that would try to help him; but, yes, I agree with
17  you.
18       MR. OWEN:  Okay.  Subject to that understanding, I
19  think -- I think we're in agreement.
20       THE COURT:  Okay.  So we can add that language at the
21  end of the -- after the word "occurred" to bring in the
22  language of inflation, if you will, to help the jury relate
23  this instruction to the evidence they heard 233 times --
24       MR. KAVALER:  So far.
25       THE COURT:  -- so far.

4044

1        MS. BEER:  Your Honor, we had also discussed adding a
2  sentence to this instruction to alert this jury that they will
3  not be asked to determine the amount of damages for each
4  investor, only the amount of whatever we call it, inflation
5  per share.
6        MR. DROSMAN:  That's --
7        MS. BEER:  That, I think, would help to actually to
8  clarify what this instruction is being focused on.  Since
9  we're using the word damages, I think the automatic assumption
10  is that they're going to figure out how much everybody gets,
11  and they're not in any scenario.  Even if there were a finding
12  of liability, all they're going to be determining is the
13  amount of inflation.  They're not going to be determining, in
14  this phase of the proceeding, the damages for any individual
15  plaintiff, and we did discuss on Friday adding a sentence in
16  the second paragraph to that fact.
17       MR. DROSMAN:  Plaintiffs' position is that that's
18  completely superfluous.  I mean where would we stop?  We could
19  educate them on the entire claims process.  I mean it's
20  just -- this is information that is not necessary for the jury
21  to know or understand in order to return a verdict for either
22  side, and it's just surplusage.
23       MR. OWEN:  Your Honor, this issue speaks directly to
24  the ambiguity that we're concerned about, and we don't think
25  it's too complex.

4045

1        THE COURT:  Well, let me ask you this:  What is your
2  concern?  What do you think is going to happen or is likely to
3  happen if we don't put language like that in there?
4        MR. OWEN:  Well, what could happen, the principal
5  issue we're concerned with, as I was just discussing, is the
6  jury could read this and conclude that somebody who bought a
7  share at 7.97 inflation and then sold that share at 7.97 of
8  inflation was damaged in the amount of 7.97.  I think a
9  straightforward reading of this would or might lead to that
10  conclusion.
11       THE COURT:  Suppose they did.  What difference would
12  it make?
13       MR. OWEN:  They would have an incorrect perception of
14  what would flow from their decision.
15       THE COURT:  You understand we're not interested here
16  in their perceptions of a state of facts that will never be
17  brought before them and of an ultimate issue that they will
18  never consider, the actual damages in this case.
19       It doesn't matter whether they think that damages
20  were incurred the day the stock was purchased as opposed to
21  the day that the deflation occurred.  It doesn't matter what
22  this jury thinks.
23       The next jury, different matter altogether; but this
24  jury won't have to consider that concept, will they?
25       MR. OWEN:  Not in the sense of actually calculating

4046

1  the number, but I think there's certainly some value in having
2  the jury correctly apprehend what it is that they are
3  concluding with respect to any inflation figures they may
4  ultimately fill out in the verdict form.
5       THE COURT:  Let me tell you how I look at it.  The
6  value is in getting the jury to do the correct thing according
7  to the law in language that is as simple and clear as
8  possible.
9       If I thought that the explanation you're calling for
10  would help avoid confusion in the actual exercise, and I'm not
11  convinced that we don't need to say something, but I'm going
12  to have to be convinced it's going to help the jury avoid
13  confusion in doing what they have to do.
14       If that's not the case, then I don't want to put it
15  in.  If you can give me language that's somehow going to make
16  it easier for the jury to do this, you know, I mean I don't
17  mind telling the jury, look, what you're going to have to
18  decide in this case is just this, the difference between the
19  price the plaintiffs paid for each share and the price each
20  share would have cost if no false or misleading omission, the
21  fact it occurred, period, there's nothing else in the way of
22  damages, that's what you have to decide.
23       I don't mind telling them that, but you have to give
24  me some language that's going to make it easier for the jury
25  to understand.  My only concern here is that the jury is

4047

1  liable to come back with a question, okay, we figured out what
2  the difference is between the price it would have been and the
3  price it was due to inflation.  Now how many millions of
4  shares do we multiply it by?  I don't want that question.
5       You know, if I thought that was likely to be a
6  question because of jury's misconceptions of what this trial
7  is or what trials are, then I would include such language.
8       As I see it, given the instructions and the jury
9  verdicts, they don't really have that idea thrust in front of
10  them, so I don't think it's a problem, but -- and that's what
11  I want to address, giving them the precise legal concept of
12  what they're doing in the universe of what's to come in this
13  case.  I'm just happy to get them to do what they're supposed
14  to do with as simple and clear language as possible.  I don't
15  need to teach them correct legal concepts, I don't think,
16  unless they're directly applicable.
17       Now, you tell me, what language do you want me to put
18  in here that's going to help them actually do this
19  calculation, decide if the evidence supports it?
20       MR. OWEN:  Your Honor, it's the language that
21  Ms. Beer just mentioned.
22       THE COURT:  Which is what?
23       MR. OWEN:  Which indicates you will not be asked to
24  determine the amount of damages for each investor, only --
25       THE COURT:  The problem with that is that we're

4048

1  telling them up top here plaintiffs can recover only actual
2  damages, and we're telling them how to calculate it, and we're
3  telling them the damages they must award, okay, and then we're
4  going to tell them you're not supposed to calculate the
5  damages?
6       MS. BEER:  No, your Honor, I think that we -- we
7  would propose that that be the second sentence of the second
8  paragraph, right after they're told that they must determine
9  the amount of -- well --
10       THE COURT:  All right.  Then what else are you going
11  to say?  Go ahead.
12       MS. BEER:  That they must determine the amount of
13  damages, if any, to which plaintiffs are entitled, and which
14  our version was the amount of daily damages per share, and
15  then you will not be asked to determine the amount of damages
16  for each investor, period.
17       THE COURT:  Well, I guess I still have a problem with
18  that.  They're liable to look at that and say then what are we
19  doing when we do this calculation?  Do you see what I'm
20  saying?
21       I don't know, would the plaintiff object to at the
22  end -- say, at the end of the words, in other words, the
23  inflation in the stock price, if you were to add language to
24  the effect of "this is the only damages calculation you will
25  be asked to make in this case."

4049

1       MR. DROSMAN:  I don't think we object to that, your
2  Honor.
3       THE COURT:  Does that satisfy you?
4       MS. BEER:  That's fine.
5       THE COURT:  Is that a yes?
6       MR. OWEN:  Yes.
7       THE COURT:  Okay.  All right.
8       Okay.  Next is Court's Number 31, previously Court's
9  29, the Section 20(a) elements.
10       MS. BEER:  No objection from the defendants, your
11  Honor.
12       THE COURT:  Okay.  Next is Court's 32, previously
13  Court's 30, controlling person, two-part test.
14       MR. BURKHOLZ:  I incorporated defendants' language
15  into that instruction.
16       MS. BEER:  We have no objection, your Honor.
17       THE COURT:  Very well.
18       Court's Number 33, previously 31, selection of
19  presiding juror, verdict form.
20       MS. BEER:  I believe, your Honor, this is going to
21  depend a lot on what the verdict form is.
22       THE COURT:  Well, this language won't.  This is
23  language I'll use no matter what the verdict form is.  Whether
24  it's long, short, in Greek, it won't matter.  I'm going to
25  tell them, hey, we prepared a verdict form for you, here it

4050

1   is, take it to the jury room with you, and, you know, you've
2   got to sign it when you've reached a verdict.
3        So this particular language is what I'm talking
4   about.  Is there any objection to this?
5        MS. BEER:  Again, your Honor, depending on the
6   verdict form, there may be -- there may be a need for
7   additional instructions on how to use the verdict form, but I
8   don't know that we can decide that now.
9        THE COURT:  I think I've told you that there will be
10  additional language.  There definitely will be.  I will go
11  through the verdict form with them, and I will propose some
12  language, although it's not likely to be a verbatim transcript
13  of exactly what I'm going to say, but I will tell you in at
14  least outlined how I'm going to instruct them when I go
15  through the verdict form with them.
16       But that's not what you're being asked to approve or
17  disapprove here.  That's a separate thing.  What you're being
18  asked to approve or disapprove is just this language that's
19  before you.
20       MS. BEER:  We have no objection to this language.  We
21  do reserve on the question of what language is actually used
22  to explain the particular verdict form because we can't decide
23  that until we see what the verdict form is.
24       THE COURT:  Correct.
25       Court's Instruction 34, previously 32, communication

4051

1   with the Court.
2        MS. BEER:  No objection, your Honor.
3        THE COURT:  Court's Proposed Instruction 35,
4   previously Court's 33.
5        MS. BEER:  Defendants have no objection.
6        THE COURT:  Court's Proposed Instruction 36,
7   previously 34, juror notes.
8        MS. BEER:  And, again, defendants have no objection.
9        THE COURT:  Okay.
10       MR. BURKHOLZ:  Just one question, your Honor.  The
11  Court's 24A instruction.
12       THE COURT:  Yes.
13       MR. BURKHOLZ:  Should I give it a heading?  It's part
14  of the false and misleading element.
15       THE COURT:  You could just put the heading 24A on it
16  if you want.
17       MR. BURKHOLZ:  Okay.  I'll do that.
18       THE COURT:  When these instructions go back to the
19  jury, they're not going to have any headings.  They're going
20  to be just the text.  Pretty much like your demonstrative
21  exhibits.
22       MS. BEER:  That's not suggesting that the
23  demonstrative exhibits are going back to the jury, is it?
24       THE COURT:  No, it's not.
25       Okay.  I have before me Plaintiffs' Proposed Table A,

4052

1   Alleged False Or Misleading Statements, and here is my
2   concern.
3        I am far from convinced that with respect
4   specifically to the statement of net income that's included as
5   a false statement for every 10-K or 10-Q within the period
6   that there's sufficient evidence on the record to go to the
7   jury on each of those.  Plaintiffs have filed a motion for a
8   rule -- ruling as to a matter of law, and part of that is a
9   determination that I have to make as to whether there's
10  sufficient evidence for a reasonable juror to conclude in
11  plaintiffs' favor.
12       For example, statement number one, the first portion
13  of the alleged false statement is Household 10-Q for quarter
14  ending 6-30-99:  Household reported net income of $326,900,000
15  for the quarter ended June 30, 1999, and EPS of 67¢.
16       I think given the instructions that we have, the only
17  way that becomes a false statement is if the surrounding
18  circumstances are such that the omission of any information
19  regarding to predatory lending practices would make this
20  statement misleading, and that depends on the evidence you've
21  adduced surrounding the making of this statement.
22       I have, I think, identified two statements for you, I
23  think it's number 27 of your statements and number 15 of your
24  statements in which the 10-Q or 10-K financial statement
25  contains in and of itself language which is sufficient to take

4053

1   it to the jury on the question of whether disclosure of
2   predatory lending practices should have been included.
3        As to the rest of these, you folks are going to have
4   to give me one by one what information there is on the record
5   that would be sufficient to tie this particular 10-Q or 10-K
6   statement of reported net income and EPS to some prior
7   statement or circumstances that would require disclosure in
8   order to make this statement not misleading.
9        MR. BROOKS:  First, Judge, a clarification.  The EPS
10  and net income numbers also were false and misleading because
11  of the restatement, and so we've introduced evidence regarding
12  the restatement.  Obviously, these are the numbers that were
13  restated on August 14th, 2002.
14       THE COURT:  Yeah, the restatement, however, only
15  referred to -- I'm talking about being able to argue that
16  these were false and misleading with respect to the failure to
17  include information regarding predatory lending in that
18  manner.
19       MR. BROOKS:  I understand that, Judge.  I just wanted
20  to make clear in any event there's a reason to send back to
21  the jury --
22       THE COURT:  Yeah, I'm not talking about the
23  restatement of the credit card issues or the aging -- re-aging
24  issue, just predatory lending.
25       MR. BROOKS:  Well, your Honor, we've submitted a

4150

1  negatively and there is no news in his event study.  And he
2  adds it all up, and he calls it leakage-based quantification
3  of inflation.  That's not accepted methodologically at all.
4  Q.  Let me ask you about that.  So you're saying that this
5  method, the leakage method, is not a recognized method in the
6  field of economics for conducting an event study?
7  A.  Absolutely not.  It has nothing to do with what we are
8  here for, which is to find how much the stock price declined
9  because of market learning the truth about the purported
10  fraud.  It has no linkage with any of the purported fraud.
11  Q.  But Professor Fischel says that he relies on some
12  professor at UCLA, Professor Cornell, to support his approach.
13      Have you looked at Professor Cornell's work?
14  A.  I know his work well, and I know Professor Cornell well.
15  Q.  And does his work support Professor Fischel's method here?
16  A.  Absolutely not.
17  Q.  Let me ask you this:  If he doesn't identify any days when
18  anything special happened in his leakage model, special in the
19  sense that it was related to the alleged fraud, how does he
20  come up with inflation figures that he says are fraud related?
21  A.  Well, all he has measured is underperformance in
22  Household's stock price between November 15, 2001, and end of
23  the relevant period, based on his faulty regression model.
24  That has nothing to do with fraud per se.
25  Q.  Is that the same problem we were looking at over here on

4151

1  the white board; he's got his estimation period where he's
2  got the wrong high bar, I think you said it was, and now he's
3  comparing the price of the stock in a declining stock market
4  and that's giving him the result?
5  A.  Yes.
6  Q.  Okay.  And is this -- is this leakage model that Professor
7  Fischel used capable -- can you use it to distinguish stock
8  price movements that might be attributable to fraud from other
9  movements that have nothing to do with fraud?
10  A.  By construction it cannot separate such sources of
11  movement.
12  Q.  It's just going to measure decline?
13  A.  It's the kitchen sink.
14  Q.  All right.  Let's talk about his other model, the specific
15  disclosures model.  That, at least, is a model you recognize?
16  A.  The methodology is well-accepted.  I have differences with
17  Professor Fischel about how that methodology was implemented.
18  Q.  We'll get to how he implemented it in a minute.
19      Let's start with the basic methodology.  Please tell
20  us how that kind of a specific disclosure model is supposed to
21  work to measure inflation.
22  A.  Okay.  So let's go back to what you were talking about, a
23  typical pattern in these cases.  There's an up leg.  Inflation
24  comes in.  And there is a down leg when market learns the
25  truth and inflation goes up.

4152

1      Now, you can conduct economic analysis in one or both
2  of the following ways:  You can look at the plaintiffs'
3  allegations.  Lie number one was told on date number one.  And
4  you can quantify inflation on that date number one.  Whether
5  it is a misrepresentation or it's an omission, you can use
6  well-accepted statistical techniques and methods to say I now
7  know as an economist the company lied, stock price was
8  inflated by 50 cents a share on lie number one.
9      And you can quantify inflation by adding up all the
10  inflation that came into the stock price on all the dates that
11  lies were told.
12      In addition to this methodology, or depending on
13  facts and circumstances sometimes instead of this methodology,
14  you might say it's more reliable for me to measure how much
15  inflation came out of the stock when the market learned the
16  truth.  That's the approach Professor Fischel has adopted.
17  It's factually incorrect.  It's methodologically incorrect.
18  But in principle, there's nothing wrong per se in adopting
19  that approach.
20      But if you are quantifying inflation, as an economist
21  whose work is going to be the basis of award of damages,
22  you've got to link the amount of inflation you have quantified
23  to specific lies that are at issue in this case.
24      And as we discussed earlier, Professor Fischel, by
25  looking at certain disclosures after November 15, 2001, has

4153

1  concluded that as of November 14, 2001, there was $7.97 of
2  inflation.  But there is nothing in his work that can tell us
3  how much of that 7.97 is because of lie number one or lie
4  number 40 that plaintiffs allege in that case.
5      In fact, the oddness of the result is during July 30,
6  1999, to November 15, 2001, when 22 lies were told, according
7  to the plaintiffs, that inflation does not change one cent.
8  How could the inflation he determined be -- in any reliable
9  way be tied to the fraud plaintiffs allege has been committed
10  in this case?
11      That is the major shortcoming of Professor Fischel's
12  specific disclosure model at a conceptual level, rather than
13  methodological levels.
14  Q.  You told us a few minutes ago, Professor Bajaj, that the
15  information related to plaintiffs' claims was already known to
16  investors before, I think you were talking about November 15,
17  2001.  Does that apply to Professor Fischel's specific
18  disclosures model, the one we're talking about now?
19  A.  Yes, it does.
20  Q.  Why?
21  A.  Well, Professor Fischel, as I was saying, is a respected
22  scholar in use of economics for legal proceedings.  And I am a
23  fan of some of his writings in the area.  And in his own
24  writings, Professor Fischel has said that markets are
25  efficient.  He's assumed that Household traded in an efficient

Bajaj - cross

4242

1 Tell us what this shows us?
2 A. Well, it summarizes what we've been discussing, on April
3 9th, when Household -- according to the plaintiffs --
4 disclosed its re-aging policies at Financial Relations
5 Conference. The stock price went up.
6      On August 14th, when Household issued its
7 restatement, the stock price went up -- and August 10th and
8 11th, when Household settled with Attorneys General -- the
9 stock price went up.
10 Q. Professor Bajaj, is any of the economic evidence in this
11 case in any way consistent with fraud?
12 A. No.
13      MR. KAVALER: No further questions, your Honor.
14      THE COURT: I think it's a good time to take our
15 break for the afternoon.
16      Take a 15-minute break, ladies and gentlemen.
17 (Jury out.)
18 (Brief recess.)
19 (Proceedings heard in open court:)
20      THE COURT: Ready?
21      MR. BURKHOLZ: All set.
22 (Jury in at 3:13 p.m.)
23           CROSS-EXAMINATION
24 BY MR. BURKHOLZ:
25 Q. Sir, you criticized Professor Fischel on market efficiency

Bajaj - cross

4243

1 and the 14 dates that he selected saying that the information
2 was stale, yet you were never cited like Professor Fischel was
3 on market efficiency in the stock market by the U.S. Supreme
4 Court in the seminal case of Basic v. Levinson, were you, sir?
5      Have you ever been cited by the U.S. Supreme Court?
6 A. No, sir, I haven't.
7 Q. Thank you. It's a "yes" or "no."
8      Have you ever been cited by the U.S. Supreme Court
9 with respect to market efficiency?
10 A. No, sir.
11 Q. Now, Professor Fischel, plaintiffs' expert, who the
12 defendants' counsel refers to as "wrote the book," teaches
13 market efficiency and how you calculate inflation here at the
14 University of Chicago and Northwestern University and cited by
15 the U.S. Supreme Court.
16      He is wrong in all his opinions in this case; isn't
17 that true, sir? Isn't that your position, that he is wrong,
18 right?
19 A. That is the market evidence and that is my opinion.
20 Q. That is your opinion, right, sir? He is wrong on all of
21 his opinions, right? Yes or no?
22 A. Well, Counsel, as I --
23 Q. Is he right or wrong, sir? You can't answer that
24 question?
25 A. Well, I testified he is wrong.

Bajaj - cross

4244

1 Q. Right. Okay.
2      Now, you will agree with me, won't you, sir, that you
3 don't need a stock price increase on the day a company makes a
4 false statement in order for inflation to come into that
5 company's stock price? Do you agree with that?
6 A. Yes, I do.
7 Q. Thank you.
8      In fact, in the Computer Associates case, another
9 case in which you were an expert, you gave the opinion that
10 you don't have to measure a stock price increase in order to
11 estimate inflation, right?
12      You did that in that case, right?
13 A. Well, what I did in that case was estimate inflation on
14 the way in by looking at other companies --
15 Q. Sir, that wasn't my question, sir.
16      My question was, in that case you didn't measure the
17 stock price increase in order to estimate inflation, right?
18 You didn't do that, right?
19 A. Counsel, if I may answer?
20 Q. It's a "yes" or "no," sir. Did you do it?
21      I asked you the question at your deposition and you
22 answered it.
23 A. Well, I think a "yes" or "no" answer would be misleading,
24 so --
25 Q. I don't want you to mislead anybody here.

Bajaj - cross

4245

1      MR. BURKHOLZ: I will withdraw the question, your
2 Honor.
3 BY MR. BURKHOLZ:
4 Q. Now, you will agree with me, sir, that a company does not
5 need to admit it committed fraud for inflation to come out of
6 the stock price?
7 A. As a general proposition that could be true, yes.
8 Q. Okay.
9      In fact, there are a number of ways in which
10 inflation can come out of a company's stock price. It can
11 come out through a company admission. It can come out from
12 information from third parties, such as analysts or the media.
13 Isn't that correct, sir?
14 A. Not necessarily.
15 Q. Okay. Sir, your deposition was taken in this case, right?
16 A. Yes.
17 Q. And you gave an oath to tell the truth in the deposition,
18 right?
19 A. Of course I did.
20 Q. Okay. Let's look at your deposition at Page 43, Lines 5
21 through 21.
22    (Said videotape was played in open court.)
23 BY MR. BURKHOLZ:
24 Q. That was your testimony that day, right, sir?
25      MR. KAVALER: I'm going to move to strike. That's

Bajaj - cross

4266

1    You see that right, sir?
2    A. That's what it says.
3    Q. Okay. Now, the next paragraph it says, "In my view, this
4    is a very unsavory situation, a petulant CEO" -- and you know
5    what "petulant" means, right, sir? It means easily irritated
6    or annoyed?
7    A. Yes.
8    Q. -- "a petulant CEO who holds banking hostage to research
9    ratings."
10    Do you see that?
11    A. That's what it says.
12    Q. And you understood, sir, that Morgan Stanley, the firm
13    that Mr. Posner worked for, was one of many investment banking
14    firms that did business with Household?
15    A. I don't know that for a fact, but it doesn't surprise me.
16    Q. Mr. Aldinger was saying no more fees for the bankers if
17    the analysts don't support the stock.
18    Isn't that what he is saying there?
19    A. Well, I can't speak to this document. I have never seen
20    this. I have never considered this. I don't know the
21    context. I don't know what business Morgan Stanley did or
22    didn't do with Mr. Aldinger. This is way outside the scope of
23    anything I did.
24    Q. Well, just like the Barron's article that you looked at
25    and you considered, in the Barron's article they discuss an

Bajaj - cross

4267

1    analyst who's afraid to talk because his company has an
2    investment banking relationship with Household and they want
3    to get fees from Household for doing the banking.
4    Here we have the same situation with Mr. Posner.
5    And you considered that in forming your opinion,
6    didn't you, sir?
7    A. And you didn't want me to explain.
8    Q. No. You considered that in forming your opinion, didn't
9    you?
10    A. Yes, I did.
11    Q. Okay. Thank you.
12    Now, you reject Professor Fischel's leakage model in
13    this case, don't you?
14    A. Yes, I do.
15    Q. Okay. And Professor Fischel's opinion is that his leakage
16    model is the most appropriate way to estimate damages in this
17    case, right? That's your understanding of his opinion, right?
18    A. I heard him say that he preferred his leakage model, yes.
19    Q. Now, you, sir, in fact, in your expert report, Page 58,
20    referred to the fact that the Washington DFI report had leaked
21    out at four various times during the summer of 2002, right,
22    sir?
23    A. Where are you referring to in my expert report?
24    Q. Page 58.
25    A. I see that, yes.

Bajaj - cross

4268

1    Q. So there was evidence of leakage in this case on this
2    Washington DFI report which basically said Household was
3    committing predatory lending practices in Washington and
4    around the country. And you saw evidence of that leakage,
5    didn't you, sir? You put it in your report?
6    A. And as I testified this morning, there is a proper way to
7    analyze that leakage.
8    Q. Okay. So your quarrel with Professor Fischel is over the
9    way that he quantified the leakage, right? That's really your
10    qualm, right?
11    A. I have no quarrel with Professor Fischel. I like the man.
12    I am simply saying I have a difference of opinion with him on
13    how to analyze this evidence of leakage.
14    Q. Okay. Now let's talk about the October 10th and 11th
15    dates, okay?
16    Household gained about 3 billion in value on that day
17    because the stock went from $22 to about $28, right, sir?
18    About $6 a share, right?
19    A. I think it's about $7 a share, and it's about 3.3 billion,
20    but give or take, you are about right.
21    Q. Now, Household stock had lost somewhere between 16 and
22    $18 billion from November 15th, 2001, to October 10th, 2002,
23    right, sir? Somewhere in that area?
24    A. I didn't do the calculation, but I can take your
25    representation for it.

Bajaj - cross

4269

1    Q. But your opinion is that none of that stock price decline
2    was due to fraud, right?
3    A. I didn't see any economic evidence showing me that that
4    decline had anything to do with your fraud allegations.
5    Q. Okay.
6    Now, you will agree with me, won't you, sir, that if
7    the company lies and the stock is inflated, if it makes
8    additional statements that are lies, it keeps the stock
9    inflated, right?
10    A. I think your statement is way too general and overboard
11    for me to agree or disagree with it.
12    Q. Company lies in the 10-K, the stock is inflated on that
13    day. The company lies three months later in a press release,
14    the stock stays inflated.
15    You will agree with me on that, right?
16    A. No. I think your statement is way too generally worded
17    and way too imprecise for me to either agree or to disagree
18    with it.
19    Q. Now, you talked about testifying for the plaintiffs and
20    the defendants in these cases. But, sir, it's true, isn't it,
21    that in these kind of cases, the securities class action cases
22    on behalf of investors, that you testified for the defense all
23    the time, not for the plaintiffs, right?
24    Isn't that what you told me in your deposition?
25    A. What I said in my deposition was consistent with what I

- 

4270

1  said today, that I have been engaged by plaintiffs' counsel in
2  cases involving securities fraud allegations.
3      It is true that I have not been engaged to testify,
4  by counsel, in a securities class action case.
5      MR. BURKHOLZ:  Thank you.  No further questions at
6  this time, your Honor.
7      MR. KAVALER:  Your Honor, I have no further questions
8  of this witness at all.
9      MR. BURKHOLZ:  Your Honor -- go ahead.
10     THE COURT:  I am sorry?
11     MR. BURKHOLZ:  No further questions.
12     THE COURT:  And you have no further questions?
13     MR. KAVALER:  Right.
14     THE COURT:  So you both have no further questions?
15     MR. BURKHOLZ:  We don't.
16     (Laughter.)
17     THE COURT:  Sir, you may step down.
18     THE WITNESS:  Thank you, your Honor.
19     (Witness excused.)
20     THE COURT:  Call your next witness.
21     MR. KAVALER:  Your Honor, we have three exhibits we
22  need to move into evidence.  We asked plaintiffs about them
23  this morning, if they have any objection.  If they have no
24  objection, we will move those into evidence and then rest.
25     If they do have an objection, we will move them into

- 

4271

1  evidence and address the objection and then rest.
2      THE COURT:  Well, go ahead.
3      What are the exhibits?
4      Are there objections?
5      (Brief pause.)
6      MR. KAVALER:  Your Honor, we offer Defendants' 454
7  and Defendants' 397 without objection.
8      THE COURT:  Admitted without objection.
9      (Said exhibits were received in evidence.)
10     MR. KAVALER:  And as to 182, I understand that the
11  plaintiffs want me to make some redactions on it.  I think it
12  was just the cover page, but we will work that out with them.
13     Subject to working that out, we offer
14  Defendants' 182.
15     MR. DOWD:  It was the videotape, your Honor.  And the
16  Court allowed them to play parts and, I think, not the other
17  parts.  As long as the parts that were admitted go back to the
18  jury, we have no problem.
19     MR. KAVALER:  We will conform it to what we played,
20  your Honor.
21     THE COURT:  We will take it under advisement.
22     You can reserve your right with respect to that
23  exhibit in case you need to reopen your case.
24     MR. KAVALER:  Very good, your Honor.
25     In that case, defendants rest.

- 

Fischel - direct

4272

1      THE COURT:  Very well.
2      Plaintiffs?
3      MR. BURKHOLZ:  We have a motion, your Honor, to
4  submit to the Court, Rule 50(a).
5      THE COURT:  Why don't you -- I will reserve your
6  right to do that.  You can do that after we are done with the
7  evidence.
8      MR. BURKHOLZ:  Plaintiffs recall Professor Daniel
9  Fischel to the stand.
10     THE COURT:  Professor, I am going to reswear you,
11  please.
12     Raise your right hand.
13     DANIEL R. FISCHEL, PLAINTIFFS' REBUTTAL WITNESS, SV
14         DIRECT EXAMINATION
15  BY MR. BURKHOLZ:
16  Q.  Sir, you sat through Professor Bajaj's testimony, right?
17  A.  I did.
18  Q.  Lots of criticisms of your approach in this case?
19  A.  I heard many of them.
20  Q.  Did his testimony change any of your opinions in this
21  case?
22  A.  No.
23  Q.  Let's discuss -- now, you are recognized as an expert on
24  the use of regression analysis and event studies?
25  A.  Yes, sir.

- 

Fischel - direct

4273

1  Q.  And you used an event study in this case for both your
2  specific disclosures and your leakage model, didn't you?
3  A.   Correct.
4      I believe Professor Bajaj stated that my leakage
5  model was not based on an event study.  That's simply
6  incorrect.
7  Q.  And did you follow, in your leakage model, the approach
8  that's been accepted in your field that's laid out in the
9  Cornell and Morgan article?
10  A.  Yes, sir.
11  Q.  Now, your specific disclosure model, did you consider and
12  reject any nonfraud reasons that Household stock price dropped
13  on those dates?
14  A.  Yes.
15  Q.  And did you find that new information was disclosed on
16  each of those dates?
17  A.  Yes.  What I noticed, listening to Dr. Bajaj's testimony
18  where he continually stated that information that I said was
19  part of a corrective disclosure was disclosed previously, he
20  was very selective in what he pointed to in terms of what was
21  disclosed previously, and he left out critical information in
22  my disclosure dates in connection with his statement that each
23  and every -- all 14 happen to be stale or whatever the reason
24  was that was given for the red lines, like the red Xs that we
25  had last time.

Fischel - direct

4286

1    I am objecting in advance.  I am asking that counsel
2  be instructed to make sure the witness --
3        THE COURT:  Wait a minute.  Let me find out what's
4  going on first.
5        MR. BURKHOLZ:  All he talked about was the 2001 10-K
6  that was restated.  That's all he said.
7        THE COURT:  So when he said they had to restate it,
8  he was talking about the 10-K?
9        MR. BURKHOLZ:  Yes.  That's already been testified.
10  He is not going to talk about any SEC consent.
11        THE COURT:  That's already in evidence?
12        MR. KAVALER:  I have no problem with that.  I thought
13  he was heading to the C and D.  I want to be absolutely
14  crystal clear.  If that happens, I have a major problem,
15  because that's a document you ruled out.
16        We made specific tactical decisions in our case
17  because of your rulings.  We did not call witnesses we might
18  have called.  There is no way they can open their own door
19  here, your Honor.
20        And if that is attempted or effected, it's going to
21  have serious consequences.
22        MR. BURKHOLZ:  It's not going to happen, your Honor.
23        THE COURT:  Okay.
24    (End of sidebar proceedings.)
25  BY MR. BURKHOLZ:

Fischel - direct

4287

1  Q.  Professor Fischel, did you find parallels in these articles
2  attributing Household stock price decline in late 2001 to
3  October 2002 to predatory lending, reaging, and restatement?
4  A.  Yes.  Again, I heard Dr. Bajaj testify over and over and
5  over again that there was no relationship between Household
6  stock price movements and inflation or the plaintiffs'
7  allegations.
8        Again, to me, it's not a matter of a battle of
9  statistics.  It's a matter of which opinion more closely
10  approximates reality.
11  Q.  Let me show you Plaintiffs' Exhibit 1450.
12    (Document tendered.)
13        MR. BURKHOLZ:  Plaintiffs' Exhibit 1450 is an analyst
14  report issued by Deutsche Bank on September 12th, 2002,
15  offered into evidence subject to the limiting instruction,
16  your Honor.
17        THE COURT:  It will be admitted.
18    (Said exhibit was received in evidence.)
19  BY MR. BURKHOLZ:
20  Q.  If we can, turn to the second page of the document, the
21  top part of the document.
22        What is the significance of this analyst report to
23  your opinion regarding news coming out about predatory
24  lending, reaging, restatement issues in 2002?
25  A.  Well, again, Dr. Bajaj testified that Household's stock

Fischel - direct

4288

1  price had nothing to do with the allegations of predatory
2  lending, the regulatory investigations and complaints, the
3  lawsuits, consumer complaints.  It was all a function of what
4  happened with finance companies.
5        And I think I have shown, or certainly tried to show,
6  that if you look at the economic evidence with respect to
7  finance companies, there was dramatic underperformance of
8  Household.
9        But, again, it's not just an opinion of an expert.
10  It's supported by what observers were saying at the time.
11        Again, this first paragraph demonstrates that.  The
12  particular analyst talks about how "Household's stock has been
13  under pressure due to concern about accusations of unfair and
14  predatory lending practices, primarily consumer groups (ACORN
15  and AARP) and the State of Washington Department of Financial
16  Institutions."  And then talks about the possibility of
17  further developments along the same lines in the future.
18  Q.  I want to go back to your S&P financial group.
19        During the time period of your disclosure period,
20  November to October of '02 -- November of '01 to October of
21  '02, how did Household perform within that group?
22  A.  Much worse.
23  Q.  Did you look to see how they performed?
24  A.  Yes.  They were the fourth worst out of 70 firms.
25        By the way, that's also true if you take a look at

Fischel - direct

4289

1  the period that Dr. Bajaj selected -- again, not the correct
2  period, in my view, because it didn't start with
3  November 15th.  But even looking at his period, Household was
4  the fourth worst performing firm out of 70 firms --
5  approximately 70 firms in the S&P financials index, which was
6  the index that Household itself, as required by law, told
7  investors that it should be -- its performance should be
8  judged against.
9  Q.  Before we finish up today, I just want to go back to one
10  more topic, and that's the up-leg, as the defendants refer to
11  it, inflation coming into Household stock.
12        How does the false statements in this case cause
13  inflation to be in Household stock?
14  A.  The plaintiffs have alleged in this case that Household
15  failed to disclose that its growth strategy was based on an
16  unsustainable business model; that it was based on predatory
17  lending practices that would ultimately be the subject of
18  regulatory investigations, customer complaints, lawsuits,
19  proceedings by states' Attorney General, et cetera.  It also
20  alleged that Household's accounting was incorrect; that its
21  reaging policies masked delinquencies and defaults; and that
22  its accounting for its credit card revenues was incorrect as
23  demonstrated by the ultimate restatements.
24        When Dr. Bajaj gives his opinion over and over and
25  over again that there is no economic evidence that there is

Fischel - direct

4290

1  any relationship between those allegations and inflation in
2  Household stock, what he is saying is that had Household
3  disclosed from the beginning of the relevant period everything
4  that the plaintiffs allege that Household should have
5  disclosed, its stock price would have been identical on every
6  day during the class period.
7      In other words, if Household had disclosed, our
8  growth model is based on predatory lending practices, which
9  can't be sustained; if it disclosed that our accounting is
10  overly aggressive and masked delinquencies; if it had
11  disclosed that our accounting is ultimately going to be the
12  subject of a restatement, that would have had no effect on
13  investors at any point in time during the relevant period,
14  even though we know when that information came out after
15  November 15th, when Household's denials became less and less
16  credible, the stock price fell dramatically.
17      So the premise of, really, both of my analyses -- the
18  specific disclosure model and the leakage model -- is that
19  stock price decreased, that dramatic underperformance from
20  November 15th forward.
21      If the information that came out after November 15th,
22  if that information had been properly disclosed at the
23  beginning of the relevant period, Household's stock price
24  would have fallen the same way that Household's stock price in
25  fact fell when the correct, or truthful, information came out

Fischel - direct

4291

1  when Household's denials became less and less credible after
2  November 15th.
3      So the way inflation entered Household's stock prices
4  is very simple.
5      Dr. Bajaj had all kinds of complicated exhibits, but
6  the point is very, very simple.
7      If instead of the disclosures that Household in fact
8  made before they had to change their disclosures, admit that
9  some of their disclosures were false and misleading, if they
10  had said those things at the beginning, would the stock price
11  have been the same, or would it have fallen?
12      And what I tried to do was attempt to quantify, using
13  two different methods, how much Household's stock price would
14  have fallen had there been correct disclosures at all points
15  in time.
16      In other words, if the information that came out
17  gradually beginning on November 15th, 2001, if instead of
18  coming out at that time and with Household continually denying
19  the allegations, if Household had made truthful and accurate
20  disclosure at the beginning, its stock price wouldn't have
21  been in the 40s. It would have been lower because investors
22  would have realized the growth strategy is not sustainable,
23  the accounting is not reliable, there is questions about the
24  integrity of management and financial reporting. All those
25  things would have caused the stock price to be lower. That's

4292

1  what constitutes the inflation. That's what I tried to
2  quantify under my two different methods.
3      MR. BURKHOLZ: Is this a good time to break, your
4  Honor?
5      I can keep going.
6      THE COURT: No. It is. Very well.
7      Ladies and gentlemen, we will break for today. We
8  will -- as you can no doubt perceive, we are nearing the close
9  of the evidence in this case. So your patience and your
10  attention is, as always, appreciated. But know that we are
11  almost at the end.
12      We will resume tomorrow at the usual time.
13      Please don't discuss the case with anyone or allow
14  anyone to discuss it with you.
15      Have a good evening. We will see you tomorrow.
16  (Jury out at 4:31 p.m.)
17      THE COURT: You may step down.
18      THE WITNESS: Thank you, your Honor.
19      THE COURT: Tell me what our schedule is.
20      MR. BURKHOLZ: We have the 50(a) motion with respect
21  to --
22      THE COURT: Tell me what the schedule is with the
23  evidence. That's what I need to know.
24      MR. BURKHOLZ: Probably another 20 to 30 minutes.
25      THE COURT: With this witness?

4293

1      Any other witnesses?
2      MR. BURKHOLZ: No, your Honor.
3      THE COURT: All right. I assume you will have about
4  the same in cross?
5      MR. KAVALER: In terms of time or in terms of number
6  of witnesses, your Honor?
7      THE COURT: In terms of time with this witness first.
8      MR. KAVALER: Less. Based on what he has done so
9  far, less. With witnesses, fewer.
10      THE COURT: Any other witnesses after him in
11  surrebuttal?
12      MR. KAVALER: Zero. Again, your Honor, subject to
13  him saying -- hereafter would require some response.
14      THE COURT: Okay. All right. So we can count on
15  releasing this jury tomorrow probably right around lunchtime,
16  I would assume.
17      And I can have your -- when can I have your
18  submissions on the verdict forms?
19      MR. DROSMAN: I have that now, your Honor.
20      We will hand up a copy of the 50(a) motion at the
21  same time.
22      THE COURT: That's fine.
23      MR. DROSMAN: What I have got is, I have got a copy
24  of the 50(a) motion for the Court, a copy of the verdict form,
25  a clean copy of the revised jury instructions, and then a

# EXHIBIT 11

4431

1  issue of timing.  It was my hope that now that we're into
2  closing arguments we wouldn't have to consider timing issues
3  anymore, but alas, it is not so.
4      I told you yesterday that we would give you the
5  instructions on the law and you would retire to deliberate
6  today.  It appears, however, that the closing arguments are
7  going to take the better part of the day, unless, that is, you
8  folks are willing to give up all of your breaks and your
9  lunch.  And frankly, even if you are, I'm not.  So we're not
10  going to do that.
11      (Laughter.)
12      THE COURT:  So, the fact of the matter is that the
13  instructions on the law probably won't be finished today,
14  which means that you won't be instructed on the law not today
15  but on the next court date.  The question then remains for you
16  to debate during your break among yourselves whether you wish
17  to return tomorrow, which I'm sure I need not remind you is a
18  Friday, to receive the instructions on the law and begin your
19  deliberations, or do you wish to keep the same schedule you
20  have kept so far and, that is, return on Monday.  You can --
21      A JUROR:  I think we can answer that question now.
22  We'd like to keep the old schedule and come back Monday.
23      THE COURT:  Very well.  I was going to say, unless
24  everyone agrees, we won't break the old schedule.  So we will
25  return on Monday for the instructions on the law and you can

Dowd - closing
4432

1  retire to deliberate on that day.
2      Today will be devoted to closing arguments.  As I
3  previously have told you, ladies and gentlemen, the arguments
4  and statements that the attorneys make during their closings
5  are not to be considered by you either as evidence in the case
6  or as your instructions on the law.
7      And should your recollection of the evidence conflict
8  with that of any of the attorneys, you are to disregard what
9  the attorneys say and rely upon your own collective
10  recollection.  Nevertheless, the statements that the attorneys
11  make, the arguments that they will make to you are intended to
12  highlight the issues, the evidence as it applies to those
13  issues and the reasonable inferences that they believe you can
14  draw from the evidence that has been presented.  And as such,
15  closing arguments are an important part of the trial.
16  Therefore, please give these attorneys your close attention as
17  we recognize them for their closing arguments.
18      Mr. Dowd.
19      MR. DOWD:  Thank you, your Honor.
20      CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFFS
21      MR. DOWD:  Good morning, ladies and gentlemen.  It's
22  been a long road.  We've been here four and a half weeks, I
23  think, and I've been here longer than that.  And what I'd like
24  to talk to you about today is the fact that even though it's
25  been a long road, you saw some amazing things in this trial.

Dowd - closing
4433

1  You saw and heard amazing things from that witness stand.
2      Think about William Aldinger.  He was the CEO of one
3  of America's largest corporations, and he got on that witness
4  stand and he said to you, When we issued that 2001 10-K we
5  made materially false and misleading statements.  He admitted
6  that to you, ladies and gentlemen.
7      Think about that.  That's an amazing thing.  A CEO of
8  one of America's largest companies making an admission like
9  that here in this courtroom.  And yet, ladies and gentlemen,
10  as soon as he said it, he realized what he had said, didn't
11  he?  He started talking in his testimony about how he relied
12  on others.  There were business unit chiefs, there were other
13  people below him, there were accounting department people.
14  All these people gave him something.
15      Mr. Aldinger couldn't be bothered with the
16  nitty-gritty as he told you, the nits and gnats.  He was like
17  a guy falling off a cliff, ladies and gentlemen, that reaches
18  up and just tries to drag everybody else down with him at that
19  company.  But he's right.  He's right.  He did drag them down.
20  Because they were all responsible for these false and
21  misleading statements.  They all were.  They all knew they
22  were false and misleading.  They knew they were material.
23      But, ladies and gentlemen, why?  Why did he do this?
24  Why did he make $20 million a year and couldn't be bothered to
25  look at the nits and gnats, the nitty-gritty?  Well, think

Dowd - closing
4434

1  about what he was doing with his time, ladies and gentlemen.
2  He told you that he spent 30 percent of his time talking to
3  Wall Street analysts and people on Wall Street.  That's what
4  he told you.  30 percent of his time.
5      Think about it.  Shouldn't this guy have been
6  spending a hundred percent of his time thinking about what was
7  going on in those branch offices, thinking about the issues
8  that affected that company?  No.  He was talking to Wall
9  Street.
10      Why was he talking to Wall Street 30 percent of his
11  time, ladies and gentlemen?  Because he was trying to keep
12  that stock price up, wasn't he?  He was trying to convince
13  those people that they had real growth.  He was trying to
14  convince them that they had great loan quality.  That's what
15  he was trying to do.  That's why he was on that phone.  That's
16  why he was at those conferences.  He was trying to convince
17  Wall Street to keep that stock price up.
18      Why did he want that stock price up?  He wanted that
19  stock price up because he had himself an exit strategy, didn't
20  he?  He was going to sell that company.  He was going to sell
21  Household to Wells Fargo.  And yet, ladies and gentlemen, when
22  Wells Fargo got in there and they saw those aggressive
23  re-aging practices, when they saw a latent credit bubble, were
24  the words they used, guys sweeping everything under the rug
25  and making a big ol' pile underneath it, when they saw all

Dowd - closing

4447

1  15 attorney generals that are investigating Household.
2      And he writes a letter.  It goes to Ms. Curtin and
3  it's forwarded on to others at the company, including
4  Ms. Sodeika, who was here, Ms. Hayden-Hakes, Mr. Detelich.
5  And what does he say on the last page of this exhibit?  He
6  tells them, We note that several of the most insidiously
7  deceptive sales practices which attracted regulatory attention
8  to Household, practices at the outset, relate to products and
9  practices initiated by Household in 1999.
10      1999, that's when they started engaging in what he
11  calls insidiously deceptive sales practices.  Then he says,
12  Industry figures indicate that since 1999, Household's
13  originations have nearly doubled.  The number of loans they
14  made, the number of deceptive loans they made, the number of
15  predatory loans they made have doubled after these practices
16  got put in place in '99.  And he says, almost assuredly the
17  misleading sales practices the states have identified have
18  contributed to that growth.
19      It's not just us, ladies and gentlemen.  It's not
20  just us.  They were telling these guys, look, we investigated
21  it.  We see what happened here.  You put in these deceptive
22  practices.  The practices allowed you to double the number of
23  loans you were making.  That's what drove this growth.  And
24  that growth, that phony growth built on deceptive practices,
25  that growth increased the stock price, didn't it, ladies and

Dowd - closing

4448

1  gentlemen?  It's not just us.  That's what the attorney
2  generals told them, too.
3      So let's take a look a little bit at the other part
4  of this equation.  All through the relevant time period,
5  ladies and gentlemen -- and I'm sorry.  I know this is a
6  little tough to see.  I'll try to walk you through these
7  boxes.
8      All through the relevant period, they're talking,
9  aren't they?  Every quarter Household has got a Q.  Every year
10  they got a 10-K that comes out.  And every time they put one
11  of those things out, right before it, they put out a press
12  release that basically has the same information.  They just
13  keep talking, and they're telling people about their growth.
14  They're telling people about how great their loan quality is,
15  showing them those two-plus numbers that we know they forgot
16  to tell people about, all that re-aging that was going on.
17      That wasn't in those Qs and Ks, but they tell them
18  about that.  They put in the phony numbers from the credit
19  card accounting, don't they?  These are the statements that
20  they make.  Their conduct and their statements go hand in
21  hand, ladies and gentlemen.
22      As they put out these press releases, I mean, these
23  are the things, combined with their practices, that drive the
24  stock price up during this period.
25      Let's talk a little bit about false and misleading

Dowd - closing

4449

1  statements.  Let's talk a little bit about your job as jurors.
2  If we could, I would like to pull up Plaintiffs' Demonstrative
3  165.  And, ladies and gentlemen, the Court is going to
4  instruct you with the jury instructions.  At any time we're
5  talking about jury instructions, I'm just going to tell you
6  flat out, you listen to the Court, to Judge Guzman.  He's the
7  boss, not me.  So he gets it right.  I do my best, but you
8  listen to him.  He's the final word.  He's the only word.
9      So we look at the elements of 10b-5.  Right?  10b-5
10  is just that part of the securities laws that you're here to
11  decide.  And it says, Defendants made a false statement of
12  fact or omitted a fact that was necessary, in light of the
13  circumstances, to prevent a statement that was made from being
14  false and misleading.
15      So what are we talking about?  We're talking about
16  false statements.  We're talking about omissions.  Where they
17  said one thing and they forget to tell you the rest, that's an
18  omission, right?
19      And so what do we have to prove?  We have to prove a
20  false statement or omission.  We think we've proved that to
21  you, ladies and gentlemen.  We think we proved to you that all
22  these statements that we say are false are indeed false based
23  on what you heard from that witness stand.
24      What else do we have to show?  We have to show it's
25  material.  It's got to matter to an investor.  It's got to be

Dowd - closing

4450

1  something that they think is important in making a decision.
2  That's all.  That's what materiality is.  It's a simple
3  concept, right?  Everybody does it every day.  People tell you
4  something.  Some things are important, some things you care
5  about, and some things you don't.  That's materiality.
6      Let's get to state of mind, knowingly or reckless.
7  We have to show that the defendants acted knowingly or
8  recklessly.  That's one of the things we'll be talking about
9  as we continue today.
10      And then finally we've got to show that a substantial
11  factor -- those statements were a substantial factor in
12  causing the plaintiffs' economic loss.  That's why you had
13  Dr. Fischel here, to try to explain to you if there's a false
14  statement, this is what happens with the stock price.  We'll
15  come back to that as well.
16      I do want to talk to you about a couple of things
17  that relate to these jury instructions.  The first is, you're
18  going to see sometimes in the jury instructions something
19  about plaintiffs purchased stock.  All right.
20      Now, we didn't put a plaintiff on the witness stand
21  because it wasn't an issue in this case.  As this case is set
22  up, we don't have to put a plaintiff on the witness stand.  In
23  fact, we didn't have to show you that anybody purchased the
24  stock just because the way this case is set up.
25      So don't be confused by that.  That's not an issue.

4539

1    Apparently, it's not the case. I apologize. I won't
2  give you the transcript page numbers, but I have them.
3    Okay. In any event, it was a big number. There's no
4  question about it. $3 billion is a big number. But it wasn't
5  a material number. Why? Because it was 3 billion out of a
6  hundred billion. That's like three pennies out of a dollar.
7    Maybe I got that wrong. You know, I'm not good at
8  math. Maybe it's three mills out of a dollar. It's very
9  small.
10    At the end of the day, they discussed it -- all the
11  relevant people -- and they decided, "We're not required to
12  correct it because it's not material."
13    And Mr. Dowd talked to you about material. And Judge
14  Guzman will instruct you about material. And I agree with
15  Mr. Dowd, you have to listen to whatever the Judge tells you.
16  The rules are the rules. He's prepared his instructions very
17  carefully. They say exactly what he wants them to say. You
18  listen to them, not to me, not to Mr. Dowd. We're both going
19  to discuss what we think the application of those rules to the
20  facts might be, but he is the man who is going to tell you the
21  law. No question about that.
22    But I think what he's going to tell you is if it's
23  not material, it doesn't matter in a securities fraud case
24  because, as Mr. Dowd said in that chart he had up there, one
25  of the things it has to be is material.

4540

1    And the second thing he's going to tell you is there
2  has to be some degree of intent on Dave's part. The Judge
3  will describe what that is. But if it wasn't intentional, if
4  it was just a mistake, it doesn't matter, either.
5    And this is interesting. Mr. Dowd was talking a
6  minute ago about the restatement. He started to say
7  something -- halfway through his sentence -- and then he
8  stopped. I'll come to that when I talk about restatement.
9    But what he was going to say was, "And this speaks to
10  his -- " and then he stopped. The word he was going to use
11  was "intent." And he stopped. He said, "It speaks to
12  restatement."
13    Do you know why, ladies and gentlemen? Because
14  without proof of intent, a mistake doesn't count; without
15  proof of intent, there is no securities fraud claim. And
16  there's no intent in the restatement issue in this case
17  whatsoever. None. Mr. Dowd knows it. I know it. You know
18  it. None. Zero. That's the missing element.
19    So, he spent all that time talking about restatement,
20  telling you something I would have given up in a minute.
21    Remember when questioning Mr. Bley, Mr. Drosman went
22  through state after state after state after state; and, then,
23  he said to Mr. Bley, "15." And Bley said, "I would have given
24  you 15 ten minutes ago."
25    I give him restatement is false. I give him

4541

1  material. No question. That's what a restatement is. We got
2  it wrong. We're doing it over. But there's no intent to
3  defraud. There was no intent ten years earlier to put out
4  false numbers so that ten years later somebody could meet his
5  bonus target. That's what he's saying, in fact. That's what
6  he's telling you. There's no intent.
7    In other words, Dave didn't lie. He made a mistake.
8  If he didn't lie, if he had no intent, he didn't commit fraud.
9  If he didn't commit fraud, when we get down to the thing
10  Mr. Dowd ended on -- the checklist that we'll talk about
11  later -- you have to check "No."
12    You're going to find that you have to check "No" for
13  all of those because there's some problem with each and every
14  one of these cases -- claims.
15    Then there's Gary. Mr. Dowd ridiculed Gary for this;
16  but, it's true, Gary went to work for a local branch at HFC
17  when he was a young man in his local town. He started out in
18  the lowest rung of the ladder; and, he eventually worked
19  himself up to being head of Consumer Lending. That's a good
20  thing. That's not a bad thing. That's a great thing. It's
21  what we all want for our children. That's what America is
22  about. There's no barriers to success.
23    And that's a great success story, just like Bill
24  Aldinger's. Bill's father was a union dock worker in
25  Brooklyn, and Bill is the CEO of a company that touches one

4542

1  out of six Americans. Where else but in America could that
2  happen? That's a great story. That's what we want for our
3  children: Success like that.
4    And Bill and Dave and Gary are not the only Household
5  people you met here. In fact, if you think about it, it's
6  kind of interesting. All the live witnesses that you saw,
7  every single one -- other than the experts; Mr. Dowd and I
8  both hired experts, God knows; but, other than the experts --
9  all the live witnesses, the people who came and sat on that
10  stand -- were all once Household employees.
11    You met several people who worked for Household
12  during the relevant period. They all have one thing in
13  common. I think you know that. They tried their very best to
14  do a good job for the shareholders. You met Megan
15  Hayden-Hakes, Tom Schneider, Craig Streem, Steve Hicks, Tom
16  Detelich, Walt Rybak, Rob O'Han and Lisa Sodeika. And each of
17  them added to your understanding of who is Household.
18    Here's something interesting. Some of them you just
19  met here now in April of 1999, but some of them you met as
20  they were back ten years ago in the relevant period. Because,
21  by the magic of videotape, you were able to actually look over
22  their shoulders and watch Lisa Sodeika and Gary Gilmer doing
23  their job back in the day. And that wasn't a video that
24  somebody made for this jury. That was made ten years ago.
25  That was just Household videotaping its executives doing

4543

1    things because, as Lisa told you, they wanted to spread the
2    around the company.
3        You saw Gary Gilmer talking to the employees. He
4    didn't know you were going to be watching him. He was
5    speaking from the heart. He told them.
6        You saw Lisa Sodeika speaking to the employees. She
7    was speaking from the heart. She told them.
8        What did they say? "Go out there and do this company
9    proud. Do what you've been taught to do: Help the customer."
10       You saw those videos. That wasn't some staged
11   production. That was Household.
12       And Tom Detelich, he showed you another video -- an
13   authorized training video. You noticed it was very fancy,
14   high production values, professional actors, you know, good
15   lighting. It wasn't Mr. Hueman with somebody with a hand-held
16   video camera in his office making some herky, jerky homemade
17   tape that was unauthorized.
18       We'll come back to the Hueman tape.
19       But Tom Detelich showed you the real Household. And
20   you saw a video that Gary Gilmer thought -- it was
21   interesting. Did you see how many things in this case, that
22   was pro-consumer initiatives, were dreamt up by Gary Gilmer?
23       The closing video, do you remember that? That was
24   Gary's idea. He wanted every customer all around the country
25   to see the same video, just like on the airlines you all see

4544

1    the same "buckle-your-seat-belt" video, to make sure there's
2    uniformity, to make sure everybody gets the right word. That
3    was Gary's idea. You saw that video. That's Household.
4        These videos show you real people doing real jobs in
5    real time. They give you a much better picture of Household
6    than Catherine Ghiglieri could ever give you.
7        Mr. Dowd said she was the longest witness in the
8    case. She was. And you know why. You know why. If she had
9    answered a single -- the first question I asked her, "Will you
10   answer 'Yes' or 'No,' if you can?
11       "I'll try, Mr. Kavaler."
12       Not once -- not once -- in two days did she answer a
13   simple question with a "Yes" or "No." That's why she was the
14   longest witness in the case.
15       Now, as Mr. Dowd said -- and I agree with him on
16   this -- the Judge is going to instruct you on you burden of
17   proof. As Mr. Dowd said -- and I agree with him on this, too
18   -- the burden is on the plaintiffs.
19       If the investors are going to recover anything
20   against anybody on any claim, they have the burden of proving
21   that claim.
22       Mr. Dowd talked to you about a scale and tips a
23   little bit. That's his view. I'm going to ask you to
24   consider two things as you think about this concept of burden
25   of proof. And I agree with him, it's not beyond a reasonable

4545

1    doubt. It's not clear and convincing. It's a preponderance
2    of the evidence. The scale analogy is apt.
3        But if the scale is like this (indicating) -- it's
4    exactly equal -- if you can't figure it out, all ties go to
5    the defendant. I win because then he hasn't put any weight on
6    the scale. It starts off equal. If he doesn't move that
7    scale, he loses. That's how the system works.
8        In other words, if you look at the evidence and you
9    say, "Gee, maybe this is right. Maybe not. Mr. Dowd has a
10   point. Mr. Kavaler has a point. I can't tell." That's a
11   vote for the defendants.
12       It also means that the investors have to carry their
13   burden. They have to explain their case to you.
14       So, if a part of the case is unclear or if the
15   evidence is confusing, it's Mr. Dowd's job to straighten that
16   out. Because if he can't explain it to you, then how could he
17   have persuaded you by a preponderance of the evidence that
18   he's right and we're not?
19       So, if you wind up saying to yourself, "This claim
20   makes no sense to me," or "this part of the claim makes no
21   sense to me," that's also a reason to vote for the defendants.
22       It's not our burden to prove anything. My job here
23   today is not to persuade you I've proved anything. My job is
24   simply to show you the ways in which the investors haven't
25   carried their burden.

4546

1        Now, the Judge is going to tell you about the
2    elements of a claim of securities fraud. Mr. Dowd had a chart
3    up there. I don't really disagree with his chart. We have a
4    similar chart. We could have used his. But, again, the Judge
5    will tell you the law.
6        The point I want to emphasize is the investors have
7    the burden of proving every element on this chart. If they
8    prove one, it's not good enough. If they prove two, it's not
9    good enough. If they prove three, it's not good enough. They
10   have to prove all four.
11       Any failure to prove any element, they lose.
12       I know you've all heard the expression, "A chain is
13   only as strong as its weakest link," you know. And there are
14   several weak links in Wall Street's chain here. I'm going to
15   walk you through them for the next period of time.
16       If one link breaks, the investors can't prove their
17   case. And that's how -- the elements of securities fraud.
18   They have to prove falsity and materiality and an intent and a
19   causal connection. All four. If they prove three, it's not
20   securities fraud.
21       Let me walk you briefly through -- remember at the
22   beginning of the case, the Judge told you about the elements.
23   He's going to tell you more about them, but let me just put
24   this in context. And I'm going to use his words. I'm going
25   to quote him.

4547

1    The first thing he told you is, "The plaintiffs must
2    prove that during the relevant period, the defendants made a
3    false statement of fact or omitted a fact that was necessary,
4    in light of the circumstances, to prevent a statement that was
5    made from being misleading."
6    The part I want to focus there is "during the
7    relevant period." It's very important. You know, I asked a
8    lot of questions of Professor Fischel and Professor Bajaj.
9    One of them was, "This business about there's the same
10   statement on August 16 and July 22. Both professors said --
11   by the way, you'll see there's a lot of agreement between the
12   professors. It might not have sounded like it, but they agree
13   on the first principles. One is the market reacts instantly
14   to knowledge. The other is once you disclose something -- the
15   the second time you disclose it -- it doesn't make any
16   difference. Both of them agreed that Household made the same
17   statement -- whatever it is, true or false -- July 22nd,
18   August 16th.
19   July 30, which is the first day of the relevant
20   period, comes in the middle there. Well, if it's the same
21   statement, the only one that counts is the first one. That's
22   August 16. That's outside the relevant period.
23   So, that's what you need to focus on when you listen
24   to the judge's instructions. If he tells you that you have to
25   find a statement in the relevant period, and you conclude that

4548

1    the statement they're talking about -- the August 16th
2    statement -- Mr. Dowd talked about was first made on July
3    22nd -- that's outside the relevant period -- we're done.
4    That's it. They can't prevail.
5    So, a lot of these things are very, very subtle, but
6    very important, very important. And I'll try to point some of
7    that out to you.
8    The second thing the Judge said when he gave you the
9    preliminary instructions, was, "Plaintiffs must prove that the
10   false statement or the omitted fact was material."
11   You know, that's an issue; and, you know that a lot
12   of these things, materiality, is a function of what the
13   professors talked about, whether it moved the market or not.
14   If it didn't move the market it wasn't material.
15   Mr. Dowd said what a reasonable investor would want to know."
16   But if a reasonable investor -- the best proof, you
17   know, voting with your feet, as they say, is if the market
18   doesn't move. And Professor Fischel told you, "No change in
19   the inflation from Day One until November 15, '01. '99, '01,
20   two-and-a-quarter years, no movement.
21   What he's telling you is every single statement these
22   guys are talking about for two-and-a-quarter years was not
23   material. Because if it had been material, it would have
24   moved the market. It didn't move the market.
25   I am going to come back to that concept when I talk

4549

1    about loss causation, which is the last thing Mr. Dowd talked
2    about, but I'm speaking about materiality now. That was
3    powerful testimony by Professor Fischel that none of these
4    statements are material.
5    Okay. The third thing the Judge said is, "Plaintiffs
6    must prove that the defendant acted with a particular state of
7    mind." That's what we were talking about earlier. Dave made
8    a mistake. No question. I'm not avoiding it. Let me think
9    of a much more dramatic example.
10   Bill said that statement was false and misleading --
11   the 10-K was false and misleading.
12   Mr. Dowd loves that. He opened his remarks to that.
13   I knew he would. It's true. It doesn't address, however, the
14   question of intent. It does not speak to intent.
15   Sorry, the chart went away.
16   It's a separate line in the chart. One is false.
17   One is material. One is intent. Something can be false, said
18   by accident, not securities fraud.
19   Finally, he told you plaintiffs must prove a causal
20   connection between any material misrepresentation or omission
21   -- if you find one -- and an economic loss by the plaintiffs.
22   "To prove this --" now, this is the hardest part of
23   the case; this was what Mr. Dowd was talking about at the end;
24   this is what the professors were fighting about -- to prove
25   this, his Honor said, plaintiffs must prove both -- " and I

4550

1    emphasize enormously the word "both" -- either one alone, not
2    enough, both: A, that they purchased Household stock at a
3    price that was artificially inflated because of a -- because
4    of -- the misrepresentation or omission during the relevant
5    period." That's that August/July problem, again. I'll come
6    back to that. And -- and the "and" is the same thing as the
7    "both" -- you need both of them; and, B, that the subsequent
8    disclosure of the truth -- that is what Professor Fischel said
9    later on in the class period, the relevant period statements
10   were maid that revealed the truth that had been concealed.
11   And you know there was no truth that was concealed in
12   the first place. That's why he has no up leg. But we'll come
13   back to that.
14   "Subsequent disclosure of the truth during the
15   relevant period."
16   Now, Mr. Dowd talked to you at length about 201 10-K.
17   When I get around to it, we'll find out when the truth was
18   revealed about that; and, we'll find out whether it was
19   revealed in the relevant or not.
20   If it wasn't in the relevant period, that's a big
21   problem for Wall Street.
22   And, of course, ladies and gentlemen, you know this:
23   The relevant period is between July 30, 1999, and October 11,
24   2002. Those are the goal posts. When I talk about loss
25   causation, I'll draw you a little diagram, I'll put it up on

4-30-09 Trial Day 22  4/30/2009  3:39:00 PM

4551

1  the white board so we can see what's in and what's out.
2       Now, let me be clear.  Everything I just said applies
3  to each of these claims.  It applies to predatory lending,
4  restatement, re-age, et cetera.
5       In each of these cases, if you find one of these
6  elements not proven, your decision needs to be for the
7  defendants.  All right?
8       A way to think about it is this:  To win, Mr. Dowd
9  has to be right for every one of those claims all four times.
10  I only need to be right once.  That's the way the system
11  works.
12       Let me start with predatory lending.  We begin today
13  where we began this journey.
14       MR. KAVALER:  Your Honor, do you want me to break for
15  lunch at this time?
16       THE COURT:  You tell me when it's convenient.
17       MR. KAVALER:  Well, since I'm about to begin
18  predatory lending, this is a perfect time to stop.
19       THE COURT:  The perfect time to stop, then.
20       We'll break for lunch at this point, ladies and
21  gentlemen.  Return at 1:00 o'clock.
22       MR. KAVALER:  Thank you, your Honor.
23       (Jury out.)
24       THE COURT:  See you in an hour.
25       MR. KAVALER:  Your Honor, I apologize, I didn't

4552

1  realize we didn't have the capacity to give them a readback,
2  if they wanted.
3       THE COURT:  Well, every readback is a request and an
4  issue for the Court to determine, based upon what the parties
5  present and what the question is.  And I don't want to be
6  prejudged in front of the jury, so that they're led to expect
7  something that may not come.
8       MR. KAVALER:  I apologize.  I won't do it again.  I
9  didn't realize that was your policy.
10       THE COURT:  Okay.
11       MR. KAVALER:  But I do have page cites for everything
12  in there.
13       THE COURT:  I'm sure you do.
14       (Trial recessed until 1:00 p.m. of the same day.)
15
16
17
18
19
20
21
22
23
24
25

4553

1       IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2            EASTERN DIVISION
3  LAWRENCE E. JAFFE PENSION PLAN, )
   on behalf of itself and all    )
4  others similarly situated,      )
                                   )
5          Plaintiff,              )
                                   )
6     vs.                          ) No. 02 C 5893
                                   )
7  HOUSEHOLD INTERNATIONAL, INC.,  )
   et al.,                         ) Chicago, Illinois
8          Defendants.             ) April 30, 2009
                                   ) 1:10 p.m.
9
10       TRANSCRIPT OF PROCEEDINGS - TRIAL
       BEFORE THE HONORABLE RONALD A. GUZMAN, and a ju
11
12  APPEARANCES:
13  For the Plaintiff:      COUGHLIN STOIA GELLER RUDMAN &
                             ROBBINS LLP
14                          BY: MR. LAWRENCE A. ABEL
                                MR. SPENCER A. BURKHOLZ
15                              MR. MICHAEL J. DOWD
                                MR. DANIEL S. DROSMAN
16                              MS. MAUREEN E. MUELLER
17                          655 West Broadway
                            Suite 1900
18                          San Diego, California  92101
                            (619) 231-1058
19                          COUGHLIN STOIA GELLER RUDMAN &
                             ROBBINS LLP
20                          BY: MR. DAVID CAMERON BAKER
                                MR. LUKE O. BROOKS
21                              MR. JASON C. DAVIS
                                MS. AZRA Z. MEHDI
22                          100 Pine Street
                            Suite 2600
23                          San Francisco, California  94111
                            (415) 288-4545
24
25

4554

1  APPEARANCES:  (Continued)
2  For the Plaintiff:      MILLER LAW LLC
                           BY: MR. MARVIN ALAN MILLER
3                          115 South LaSalle Street
                           Suite 2910
4                          Chicago, Illinois  60603
                           (312) 332-3400
5
6  For the Defendants:     EIMER STAHL KLEVORN & SOLBERG
                           BY: MR. ADAM B. DEUTSCH
7                          224 South Michigan Avenue
                           Suite 1100
8                          Chicago, Illinois  60604
                           (312) 660-7600
9                          CAHILL GORDON & REINDEL LLP
                           BY: MS. SUSAN BUCKLEY
10                             MS. PATRICIA FARREN
                               MR. THOMAS J. KAVALER
11                             MR. DAVID R. OWEN
                               MR. HOWARD G. SLOANE
12                             MS. JANET A. BEER
                               MR. JASON M. HALL
13                             MR. JOSHUA M. NEWVILLE
                               MS. LAUREN PERLGUT
14                             MS. KIM A. SMITH
                               MR. MICHAEL J. WERNKE
15                         80 Pine Street
                           New York, New York  10005
16                         (212) 701-3000
17
18
19
20
21
22  Court Reporter:        NANCY C. LaBELLA, CSR, RMR, CRR
                           Official Court Reporter
23                         219 South Dearborn Street
                           Room 1222
24                         Chicago, Illinois  60604
                           (312) 435-6890
25                         Nancy_LaBella@ilnd.uscourts.gov

4579

1  matter of time before it wound up in the press, and that's
2  when Bill said I'm done with this. Let's find out what it
3  costs to get rid of it and move on.
4      Okay. And the company settled -- this is an
5  interesting fact -- for precisely the same reason the state
6  settled. Mr. Cross testified in his videotaped deposition, he
7  said we wanted to get it behind us. We didn't want to spend
8  years in the courtroom. We don't want to spend the state's
9  resources. That's the same thing Bill said.
10     So the two of them came up with a number, and they
11  did a deal. And the investors knew all these facts, and some
12  of them even labeled them correct. You remember my analogy
13  about me being 200 pounds and I say I'm 200 and you can decide
14  if I'm thin or fat because you get to label. I just tell you
15  the facts.
16     It would be enough if we told the investors the facts
17  and they could label it predatory or not predatory, and we
18  certainly did that. There's no question that we told them all
19  the facts as we went along; but here there were some investors
20  who labeled the facts exactly the same way that Mrs. Ghiglieri
21  came here and testified and Mr. Dowd says the investors were
22  incapable of doing.
23     Remember the theory of the case, the investors didn't
24  know that what you were doing was predatory. Yes, they knew
25  you were a subprime lender, but they didn't know you were

4580

1  predatory. That's the whole point, right? That was what he
2  said in the opening, didn't come out until the AG settlement
3  in October 2002. At no time, he said in his opening, before
4  October of 2002 did my clients know what you knew all along,
5  Mr. Aldinger, that this was a predatory enterprise. That's
6  what he said.
7      Well, the problem with that is back in March of 2001,
8  about a year and a half before, Julie Goodrich knew because
9  she submitted a proposal to Household to be included in the
10  proxy statement. And the proposal said I want management to
11  pay more attention to this predatory lending problem.
12     And then in May of 2001, she appeared before an
13  annual meeting of the shareholders. The shareholders meet
14  once a year to vote on the directors, they vote on the
15  auditors; and in May 2001, she got up in front of an annual
16  meeting of the shareholders. You saw her on the videotape.
17  She's right there on that screen. And she spoke for a couple
18  of minutes, two-and-a-half minutes, I think. Bill Aldinger
19  stood there waiting politely for her to finish. Camera was on
20  him, and you heard her voice.
21     What did she say to her fellow shareholders in May
22  of 2001? She said our company is engaged in predatory
23  lending. I don't want them to be. We should vote to make the
24  board pay more attention to this. The board should tie
25  compensation of senior management more closely to their

4581

1  efforts to combat predatory lending.
2      So she knew the facts. She knew how to label it.
3  She wasn't fooled. She knew everything. She's not one of
4  those Wall Street companies. She's an individual investor, a
5  small fund of some sort. And her fellow shareholders, these
6  people, voted against that proposal by 90 percent, 90 to 10.
7  Today they come in here and sue us, saying you didn't tell us
8  what you were doing.
9      Mr. Dowd talked to you about an important month. He
10  said two things happened in that month: The 2000 10-K was
11  filed and Schoenholz wrote a memo about Kahr memos. The mo
12  was March 2001, ladies and gentlemen. And the third thing
13  that happened that month is very important: Julie Goodrich
14  filed her request to be heard at the annual meeting on the
15  subject of predatory lending. She knew. They all knew. Wall
16  Street knew.
17     Let me talk about re-aging. There are some parts of
18  this case where the parties are ships passing in the night.
19  Re-aging is one of them. The plaintiffs have told you half a
20  story about re-aging and the wrong story. All right?
21     The re-aging story they're telling you doesn't matter
22  at all. Both Bill and Dave told you whether or not an account
23  has been re-aged, whether it's re-aged once or re-aged twice,
24  it's taken into account in setting the loss reserves.
25     The loss reserves are the real story in this part of

4582

1  the case. That's what's important. It's the only story that
2  mattered to the investors. Bill told you when he went around
3  talking to the investors, they always wanted to know about
4  loss reserves. Bill and Dave told you that's what the
5  investors care about. That's what they looked at. Dave
6  testified, "Two-Plus statistics taken by themselves wouldn't
7  be of great interest to a reader of Household's financial
8  statements. I think it would be of interest in the context of
9  loss reserves of the company to get a full picture of the
10  credit position of the company."
11     All right. And Dave also explained it this way, "So
12  if an account is re-aged, it would have a reserve against it,
13  and it would have a bigger reserve, a higher reserve, rather,
14  against it than if it had not been re-aged such that from a
15  financial point of view and from earnings that investors would
16  see, that was irrelevant."
17     The earnings were properly stated because the
18  reserves were properly stated. The issue here is reserves,
19  ladies and gentlemen. Bill testified two-plus gets
20  incorporated in reserves. There's a formula. They put
21  reserves in related to what your two-plus are, and then he
22  said then we add another bit of the reserves for re-age.
23     So, in other words, whatever is going on with the
24  re-age down there, when they do the reserves which hit income,
25  they take account of it, all right?

4583

1    And Bill and Dave both told you when investors asked
2  questions, the questions were about the reserves, not about
3  the two-plus, all right?
4    And Bill described what he was doing was building a
5  fortress balance sheet.  That's what he told investors at the
6  Goldman Sachs conference.  He explained that to you.  He said
7  the two things I emphasized were strong reserves and strong
8  equity capital, and he said we were a high risk company --
9  higher risk company, and we believe we wanted to have a very
10  strong reserve and very strong equity capital, and we had it.
11    And the best evidence, ladies and gentlemen, that the
12  reserves were always adequate is there was never a blowup.
13  There was never a time when they had to go back and add money
14  to the reserves.  And Bill and Dave both told you that means
15  there was never a need to adjust the reserves; therefore, the
16  reserves were right in the first place; therefore, the
17  two-plus was okay.  It was fine.  Whatever they were doing
18  down there, it was fine.
19    What they were doing, by the way, has to do with what
20  Mr. Dowd said this morning, plan.  Every company makes plans.
21  They were trying to meet plan, no question.  But they weren't
22  impacting the financial statement.  The financial statement
23  focuses on the reserves.
24    Now, I know you listened very carefully to Mr. Dowd's
25  statement this morning, and I know he goes again after me, so

4584

1  who knows what he'll say next, but I didn't hear him say the
2  reserves were inadequate.  He talked about two-plus, but he
3  didn't say the reserves were inadequate because if he did, he
4  would have a hard time pointing to any evidence in the case
5  because although two-plus is an important internal matter,
6  reserves is the important external matter.  And here's a list
7  of the people who Bill told you reviewed the reserves and
8  never said there was a problem:  The internal auditors, the
9  Audit Committee, the outside independent auditors, both
10  Andersen and KPMG, the analysts.  There's not a single person
11  who ever stepped up and said the reserves are not adequate.
12    Well, you might ask yourself I'm sure the plaintiffs
13  solved that problem.  They had an expert witness who was an
14  accountant.  He must have said that, Mr. Devor.
15    Well, actually he didn't say that.  The question was
16  asked of him -- where's my question?  The question was asked
17  whether he had an opinion about reserves, and he said, "That's
18  way beyond the scope of my engagement."
19    Okay.  So he had a chance to come in here and say the
20  reserves are inadequate.  He didn't say it either.  Nobody has
21  said the reserves are inadequate, okay?
22    The reason I say the investors are telling you half a
23  story here is because they keep talking about two-plus and
24  delinquent loans because they don't want you to focus on the
25  fact that the undisputed testimony from everybody who knows

4585

1  anything about it is we took the reserve to take into account
2  that there are -- that there's re-aging going on, all right?
3    Dave explained it to you.  He said the one other
4  point I would make, though, is there could be an assumption
5  that we're doing re-aging to defer credit losses, but that's
6  just not the case, I mean, because we reserved for those
7  accounts.  So if an account was re-aged, it would have a
8  reserve against it, and it would have a higher reserve against
9  it than if it had not been re-aged, such that from a financial
10  point of view and from an earnings that investors would see,
11  that was irrelevant.  Then he continued, "The earnings were
12  properly stated because the reserves were properly stated."
13    All right.  Now, look, there's nothing wrong with
14  re-aging.  Mr. Devor, their expert, admitted that re-aging can
15  be a "good thing to do in terms of helping customers."  And he
16  said, "I mean there may be very good business reasons why
17  companies would re-age and give their customers a break and
18  give them time to cure whatever problem it is that caused them
19  to go delinquent."  And he admitted that other companies
20  besides Household re-age also.
21    Re-age, ladies and gentlemen, is not an accounting
22  policy or a financial policy.  It's an operational policy.
23  It's good for customers, it's good for the investors, it
24  maximizes cash flow, and you saw Dave's e-mail, which is
25  Plaintiffs' Exhibit 1115 -- about to see it, there it is -- he

4586

1  says, "I want to make sure we're doing the right thing for the
2  customer and making a good economic decision."  In other
3  words, good for the customer, good for the shareholders.
4    The undisputed evidence in this case, ladies and
5  gentlemen, is that re-aging worked because it resulted in more
6  money for the investors.  You heard Walt Rybak testify, and he
7  told you that Consumer Lending did studies that showed that
8  re-aging maximized cash flow to the investors.  He said, "We
9  basically saw that more dollars were collected, that more cash
10  was collected, and fewer accounts rolled into later
11  delinquency."
12    Finally, plaintiffs tell you that we didn't tell them
13  that there was automatic or automated re-aging, and it was
14  only disclosed in the company's securitization prospectuses.
15  This morning Mr. Dowd spent a lot of time telling you that
16  Dave Schoenholz knew at the time of the 2001 10-K that
17  Household did one-payment re-ages.  That was -- he made a big
18  point of that.  That's his main argument against Dave
19  Schoenholz.  When the 2001 10-K was filed, Dave knew that
20  Household did one-payment re-ages.
21    You know who else knew?  The plaintiffs.  Look at
22  Defendants' Exhibit 695.
23    That's the securitization prospectus.  It talks about
24  one-payment re-ages.  There's another securitization
25  prospectus in 1999.  Household disclosed this fact.  It

4587

1  disclosed it in securitization prospectuses because at that
2  point in history, no one, no company, the evidence shows, put
3  this particular kind of detail in their 10-K.  But Household
4  put it in their securitization prospectuses.
5       Now, some of the analysts you know quoted the
6  securitization prospectuses.  They said I looked at the
7  securitization prospectus, and here's what I learned about
8  Household.  And that's how it works.  Household discloses it,
9  the analysts read it.  They discuss it with other people, and
10  on it goes.
11       But there's another significant point about those
12  securitization prospectuses, and that's this:  You can't have
13  in your mind simultaneously the intent to conceal something
14  and reveal it, and you certainly can't do that, act on the
15  reveal impulse and then conceal it.
16       Once I tell you I weigh 200 pounds, I stand here in
17  this room and I say to you I weigh 200 pounds, I can't turn
18  around and say to Ms. Farren over here I'm not going to tell
19  you how much I weigh.  It's a secret.  It's too late, I told
20  her.  We're done.
21       Household indicated of those two mindsets that you
22  can have, conceal, reveal, it indicated it had a disclosure
23  mentality by disclosing.  Back in 1999 they put this very
24  fact, the very fact that Mr. Dowd is saying that
25  Mr. Schoenholz concealed later, two years later, they put it

4588

1  in a securitization prospectus, filed with the SEC for the
2  whole world to see.
3       He's got the burden of proving an intent to conceal.
4  How could the company have intended to conceal in 2001
5  something it had publicly disclosed in 1999?  It doesn't work.
6       If he said it wasn't in the 2001 document, that might
7  be right.  That might be right.  But it was revealed, it was
8  publicly known, the analysts were talking about it; and,
9  therefore, his clients were not fooled.  That's a different
10  question.  These are very subtle gradations.  You've got to
11  watch very carefully what he's telling you.
12       Let me touch on a couple points that relate to the
13  re-aging subject.  Mr. Dowd mentioned briefly, he mentioned in
14  one of his mini-summations Elaine Markell.  He said we circled
15  the wagons.  Remember all that?
16       Mrs. Markell's own admissions on the witness stand in
17  this case are that she knows nothing about the reserves.  She
18  has no knowledge or understanding of the subprime business.
19  She worked for ten companies before Household, none of which
20  did anything with reserving.  She has no experience with
21  re-aging.  She doesn't know -- that's not her expertise.
22  Whatever her expertise is, that ain't it, okay?
23       She admitted there's nothing inappropriate or wrong
24  about restructuring accounts.  She said that Household's
25  policies were designed to protect borrowers from losing their

4589

1  homes in foreclosure.  It doesn't matter what you thought of
2  Mrs. Markell.  You might have thought she was truthful.  You
3  might have thought she was confused.  Whether she's a
4  believable witness or not, it doesn't matter.  It doesn't
5  matter.  Just like Mr. Dowd said she's outside the circle,
6  she's outside the wall, all right?  She's also outside the
7  circle of people who know something about reserves.  She said
8  so.
9       Remember Mr. Sloane asked her a series of questions.
10  She said no, no, no, no.  She just doesn't know anything about
11  reserves, and the issue here is reserves, all right?
12       What about mistakes?  Mr. Dowd referred to the
13  Financial Relations Conference, and he said that
14  Mr. Schoenholz made a mistake about the re-aging practices.
15  Okay.  I already discussed that with you.  I talked about the
16  fact it was not a material mistake.
17       Also, there's no showing that Mr. Schoenholz did it
18  on purpose.  All right?  He got it from Pantelis.  Pantelis
19  hasn't been here.  We haven't talked to Pantelis.  We don't
20  know what Pantelis was thinking.  All Dave did is he repeated
21  what Pantelis told him.  That's his testimony, all right?
22  And, secondly, it was not material as we discussed it
23  earlier -- as we discussed earlier.
24       Okay.  I can skip some of this because I think I've
25  covered it already.

4590

1       Bill also told you that when Household began
2  disclosing more about restructuring and re-aging, it was the
3  first company to do so.  It was the very first company to make
4  any disclosure in this area at all, and here are the
5  defendants, the plaintiffs, rather, accusing the defendants of
6  fraud over, first of all, a mistake, a mere mistake, and,
7  secondly, a mistake they made in an effort to get further
8  information to the public and give out more information than
9  any other company was giving anybody, and for that they get
10  sued for fraud.
11       All right.  It was well known that Household was a
12  leader in this disclosure.  Let's look at a DB Alex. Brown
13  analyst report, which is Defendants' Exhibit 526.  "Few
14  companies provide even the detail that Household provides.
15  Many of the large competitors, including CitiFinancial and
16  Wells Fargo Financial, provide less information than Household
17  on policies such as re-aging and recency."
18       All right?  That's exactly what I just said.
19       So the real story, the real story here is, the story
20  the plaintiffs aren't telling you, they want to talk about
21  re-age down here.  I'm suggesting you focus on reserves up
22  here.  If you focus on reserves, you know there was never a
23  problem.  There was no intent to deceive.  There was no
24  concealment.  They disclosed it elsewhere.  None of the
25  elements come together, notwithstanding that people made

4591

1  mistakes.  Walt Rybak said he made a mistake.  People make
2  mistakes.
3       Wells Fargo.  Mr. Dowd spoke about Wells Fargo.
4  There's no question the company talked to Wells Fargo about a
5  possible transaction.  Well, look, there's also no question
6  Wells Fargo is a bank.  Household was finance company.  How
7  many times have you heard this in this case?  They operate
8  under different accounting rules and different government
9  regulations, all right?  Although apparently Mr. Devor,
10  plaintiffs' accounting expert, didn't know that.  But everyone
11  else knows that.
12       And Wells Fargo was constrained in its re-aging
13  activity with its customers by a practice called the FFIEC
14  regulations.  Under FFIEC, the banks have to be pretty strict
15  with their borrowers, so you miss a couple of payments,
16  foreclosure city for you.
17       The finance companies, as you've heard over and over
18  again, are more lenient with their borrowers because they're
19  not subject to FFIEC.  They don't have to foreclose.  They
20  don't have to close out -- write off that loan on their books,
21  all right?  So that's why Household can lend to people with
22  less substantial credit than Wells Fargo.
23       So if Wells Fargo had acquired Household, you'd have
24  to combine these two different accounting systems somehow.
25  What Wells Fargo was talking about, they were not measuring

4592

1  the difference between Household and a compliant culture.  I
2  mean Mr. Dowd talked about a bubble.  That's not what they're
3  measuring.  They were measuring the difference between
4  Household and Wells Fargo, a bank and a finance company, and
5  they're saying if we acquire them and we have to convert them
6  to bank accounting, what's it going to cost?  It was also very
7  hard to do.  It's not that easy to put two different kinds of
8  things together, okay?
9       So that's an understandable problem, and then what
10  eventually happened is Mr. Aldinger and Mr. Kovacevich had a
11  meeting which Mr. May was not at -- Todd May said he never met
12  Bill, Bill said he never met Todd -- and in the meeting, one
13  of the participants of that meeting, Bill, testified.  He came
14  here.  He told you what happened.  He said he told
15  Mr. Kovacevich no more.  We're done.  Been dragging on too
16  long, annual meeting season is coming up.  I don't want this
17  hanging out there.  We're done.
18       Mr. Dowd says that's not true.  Based on what, ladies
19  and gentlemen?  Based on Kovacevich's testimony?  He wasn't
20  here.  Based on May's testimony?  He wasn't there.  Two people
21  in the room, Kovacevich, Aldinger.  You have Aldinger's
22  version and Mr. Dowd's disbelief.
23       The restatement claim.  I was listening to Mr. Dowd
24  this morning and something struck me that hadn't struck me
25  before.  The restatement arises out of accounting decisions

4593

1  first made in 1992.  Mr. Dowd says the motive was so that
2  later, years later, it would be easier for these guys to hit
3  their targets and get their bonuses.  Remember he went through
4  this exercise with you this morning, and he showed you with
5  the restatement, they made it.  Without the restatement, they
6  didn't make it.
7       I passed it, Bill explained why that's not true.
8  Because when you restate a series of years, all the numbers,
9  it's like going down a stairway, all the numbers go down.  The
10  size of each tread remains the same.  So the difference
11  between year to year, they would have made it anyway.
12       I also passed Bill's testimony the way the bonus pool
13  worked, there's a lot of room there, and they weren't
14  exhausting it.  But forget all that.
15       So Mr. Dowd's theory this morning is 1992, these guys
16  did bad accounting so that in 1999 and 2000, they could reap
17  the benefits.  It's a good theory.
18       Bill came to the company in 1994.  Uh-oh, theory
19  doesn't work.  What about Gary?  Gary came in 1998.  He was in
20  London.  So whoever did this in '92 not only can see ten years
21  into the future, but he was doing it to benefit a CEO they
22  hadn't hired yet and a guy who worked in London who didn't run
23  Consumer Lending.  That's his theory.
24       Look, the restatement is very simple.  It's really
25  very simple, and it amounts to this:  Household was a leader

4594

1  in the development of something called affinity credit cards.
2  Today they're very common.  I'm sure each of you has one in
3  your wallet.  You know, it's an airline or a gas company.  You
4  get points.  You get some kind of bennies from whoever the
5  affinity partner is, and the bank and the partner have some
6  kind of an arrangement, and somebody pays somebody.  And the
7  you have to account for it.  The bank and the partner have to
8  account for it.
9       As usual, Household was the leader in this.  They
10  came up with the first one of these.  The first one
11  involved -- the first two were GM.  There's a card for owners
12  of GM cars.  You got points towards your next GM car, and
13  AFL-CIO, a card for the union members.  They made a deal with
14  the AFL-CIO.  And then they had these other cards.  And under
15  these arrangements, money was paid back and forth, fees
16  pursuant to contracts.
17       And the question was how do you account for this?
18  Well, there was no guidance in the accounting literature
19  because it was a new product.  So Household turned to
20  Andersen, their longstanding outside auditors, very
21  prestigious firm, and they said what should we do here?
22       Andersen thought about it, and they came back and
23  they said we'll do this, and Household said okay, fine.  So
24  they did.  And for years, for years, Household accounted for
25  these transactions in exactly the way Andersen had approved,

4595

1    and Andersen signed off on their financial statements year
2    after year after year, gave a completely clean bill of health,
3    including this stuff.
4         Three witnesses in this case have addressed this
5    subject. Mr. Devor, the plaintiffs' accounting expert, all
6    right, and Bill and Dave. All three of them agree what
7    happened was nothing but a professional disagreement. After
8    Andersen had been their accountants for years, Andersen, not
9    Household, Andersen got in trouble. Nothing to do with
10   Household. They didn't do anything wrong on the Household
11   account.
12        They were the auditors for a company called Enron.
13   Enron imploded. It was front-page stories for months in the
14   Wall Street Journal, local papers, national news magazines.
15   It was Household's concern that here comes more headline risk,
16   what do we need this for? Why should my auditor be Enron's
17   auditor?
18        So Household, it turns out, was the first company,
19   one of the first companies, Bill told you, in America to say
20   to Andersen you're very nice guys, thank you very much, you're
21   fired, we're done. The shareholders approved in one of their
22   annual votes the hiring of KPMG.
23        So KPMG -- another big accounting firm -- KPMG comes
24   in, and they have to re-audit several years back, all right?
25   And they look at '99, 2000, 2001. The only thing they come

4596

1    up, the only thing they say is this, everything else is fine,
2    this you've got to re-do this, you've got to restate this.
3         Bill testifies he says what? I did what Andersen
4    told me for all these years. Now you're telling me something
5    different? How come? The answer becomes impenetrable. Who
6    knows how come? Because the accountants disagree. Even
7    Mr. Devor, their expert, described it as a dispute between
8    professional accountants.
9         And Bill told you what the problem was. Household is
10   not a bank, as we just discussed. They don't have a vault
11   downstairs with depositors' money. If they're going to be in
12   the business of lending money to borrowers, they have to
13   borrow money in the financial markets themselves. And Bill
14   told you to borrow money in the financial markets, you have to
15   have a current set of financial statements on file with the
16   SEC.
17        To file your financial statements with the SEC, you
18   need a seal of approval from an accounting firm. If you're a
19   big company, it has to be a big accounting firm. In America,
20   there are four big accounting firms. They just got rid of
21   Andersen. They had a conflict with another one. That left
22   them two. They picked one of those two. That was KPMG. They
23   paid KPMG millions of dollars to do the audit, and then KPMG
24   comes in and says got to restate this. Bill says, what am I
25   going to do? Okay. So they restate.

4597

1    And that's where Mr. Dowd got hung up when he was
2    talking to you this morning because he started to say, "And
3    they had the right kind of --" and he stopped. Because they
4    had no intent. There's no intent to defraud. This is the
5    opposite, ladies and gentlemen, of an intent to defraud. When
6    you intend to commit financial fraud if you're a company who
7    is the first person you have to fool? The auditors, right?
8         If you're pretending you have widgets in a warehouse,
9    you're making up widgets and you're putting them on your
10   balance sheet, one thing you've got to do is make sure the
11   accountants don't go down in the basement to count the widgets
12   because then the game is over. You know, it's like a sitcom.
13   No, no, don't go in the basement, don't go in the basement.
14   Oh, the basement's flooded. Don't go in the basement, because
15   once the auditors find out, you're done.
16        Here you have just the opposite. They went to the
17   auditors. First they went to Andersen and they said, what do
18   you want to do? Then later they went to KPMG. And you also
19   heard Bill and Dave discussed this with the OCC, the Office of
20   the Comptroller of the Currency.
21        Does that sound like they're hiding stuff? They're
22   talking to our government. And then they discussed it with
23   the ombudsman of the OCC. That's another guy in the
24   government who settles disputes you have with the OCC.
25        Well, talking to all these people, just going to

4598

1    these people is the opposite of an intent to conceal. It's
2    also interesting, every one of the people they talked to had a
3    different opinion, it turned out.
4         The OCC originally thought Andersen was right. Then
5    later they thought KPMG was right. The ombudsman thought the
6    OCC was right. Then they thought they were wrong. Then
7    Mr. Devor had an opinion. He thought KPMG was right. It's
8    not fraud. It may be chaos. It may be confusion. It may be,
9    as Bill said, disappointment. It may be frustration. Where's
10   the intent to defraud? Where is the -- who are you
11   defrauding? The auditors know what you're doing. They're
12   doing it with you. It's not fraud.
13        It's not a mistake either. Don't sit there and
14   think, oh, he's always saying it's a mistake. It's not a
15   mistake. It was a careful, conscious, professional decision
16   by a terrific accounting firm with which another terrific
17   accounting firm ten years later disagreed. And in both cases
18   Household said whatever you say.
19        It's not fraud. And if it's not fraud, ladies and
20   gentlemen, then everything that Mr. Dowd says follows from it
21   doesn't follow at all. When he says and you carry it all the
22   way back in every K and every Q, every three months for years
23   and years and years, they're all false, no, no. They all
24   represent Andersen's accounting judgment. And then after a
25   date, they represent KPMG's accounting judgment. But part of

4599

1  accounting is you have to go back and restate the
2  Andersen-approved ones the way KPMG now says you've got to d
3  it. So you wind up with a restatement.
4      And even Mr. Devor, plaintiffs' accounting expert,
5  testified just because there's a restatement doesn't mean
6  there's a fraud. That's all they have here. They have a
7  restatement.
8      As Mr. Bley said, are they giving you 15 states ten
9  minutes ago? I'd have given you a restatement an hour ago.
10  There's no fraud. There's no intent to deceive. It's just a
11  restatement.
12      That's a restatement that comes out of the credit
13  card business, ladies and gentlemen. You remember there
14  was -- plaintiffs have I think it's 897-01. All right, this
15  is defendants'. They have one, we have one.
16      See over there down on the bottom row on the left,
17  credit card services. That's where it comes from.
18  Private-label credit card, one of the credit card businesses.
19  See in the middle Consumer Lending? That's Gary. So Gary has
20  nothing to do with this.
21      This is a Dave and Bill issue because it's the
22  financial statements of the parent company up above. It has
23  nothing to do with Gary. He has no responsibility for it. He
24  committed no fraud. He committed no nothing. They sued him,
25  too. They named him on the restatement claims, also.

4600

1      Let me talk about loss causation. I think as I was
2  listening to Mr. Dowd, I may have gotten the impression that
3  he said loss causation is something like damages. Make no
4  mistake about it, ladies and gentlemen, loss causation is not
5  damages. Loss causation is an element of a securities fraud
6  claim. It's the part -- loss causation is a word lawyers use
7  and professors like Professor Fischel and Professor Bajaj
8  used.
9      When they're talking about the element of the claim,
10  causal connection to economic loss, loss causation is just
11  academic speak for that. So we sometimes lapse into the
12  jargon of the academics, but it's not damages. It's an
13  element of the claim. In other words, if they don't prove it,
14  they don't have a claim. It's not a measure of the damages.
15  It's part of their case.
16      Remember I told you earlier, there are four elements
17  to their case. They have to prove each of them. They have to
18  prove each of them for every one of the 40 statements that
19  Mr. Dowd was talking about. There are 40 statements going to
20  be attached to your verdict form. For each statement they
21  have to prove falsity, omission, material, intent to
22  manipulate and loss causation.
23      Okay. Let me see if I can walk through this. Loss
24  causation is where the rubber meets the road in a securities
25  fraud claim because all these other things you can argue

4601

1  about. Reasonable people can argue about them. Mr. Dowd and
2  I can argue. You can argue among yourselves.
3      Loss causation, you have to have an expert. They
4  have an expert. We have an expert. You saw the testimony of
5  the experts. I couldn't have done that. Mr. Dowd couldn't
6  have done that. Nobody can do that but an expert. Both
7  highly qualified guys. They both seem to like each other.
8  They know each other. They talk the same language. They just
9  have a difference of opinion.
10      By the way, it's interesting, part of Professor
11  Bajaj's opinion is that Professor Fischel made a mistake. He
12  used the wrong index, and he used the wrong, what did he call
13  it, some kind of window in the middle there.
14      Part of Professor Fischel's opinion is that Professor
15  Bajaj made a mistake. He says he used the wrong index.
16  Neither one of them accuses the other of fraud. Neither
17  Mr. Dowd nor I accuses either of these professors of fraud.
18  They're just one of them or the other or both, for all I know,
19  made a mistake. Mistakes are common. Fraud is pretty rare.
20      Okay. I know it's late in my appearance here. I'll
21  see if I can get through this pretty quickly. I'll try to be
22  as simple as I can. But it's very important because if I'm
23  right about loss causation, ladies and gentlemen, then nothing
24  else matters.
25      If the plaintiffs cannot establish loss causation; in

4602

1  other words, if they can't show you that what they're talking
2  about here actually caused harm in the marketplace to the
3  price of the stock, then we're just wasting a lot of time
4  here. There's nothing to it.
5      We watched Professor Fischel and Professor Bajaj
6  debate the issue for several days altogether. They're both,
7  you know, really smart guys; but underneath all of this
8  academic stuff is some common-sense concepts. And if you
9  apply the common-sense concepts to part of this case, I think
10  you'll conclude that your verdict needs to be for the
11  defendants on all counts on this issue alone.
12      This is actually the clearest issue. It sounds
13  counter-intuitive, but it's the clearest issue because you
14  really don't have a dispute between Professor Bajaj and
15  Professor Fischel on the bottom line. They completely dispute
16  how you get there, but they're actually saying the same thing.
17      Why do we have to look at loss causation in a
18  securities fraud case? Because we need to isolate out the
19  movements in the stock price that were caused by the alleged
20  fraud as opposed to what Professor Bajaj described as noise or
21  as he described market movements. For instance, on Mr. Dowd's
22  chart today when I went over and sat in the corner and looked
23  at it, that big red decline after September 11. That's the
24  whole market, the whole stock market declining. If that's all
25  he's showing you, he's just telling you Household is a company

4631

1    THE COURT:  It is indeed.
2    MR. KAVALER:  Thank you, your Honor.
3    THE COURT:  15-minute break.
4    (Jury exits courtroom.)
5    THE COURT:  Recess for 15 minutes.
6    (Recess taken.)
7    THE COURT:  Ready?
8    Bring them out, please.
9    (Jury in.)
10    THE COURT:  Counsel.
11    MR. KAVALER:  Thank you, your Honor.
12    Ladies and gentlemen, one last time, just for a few
13    minutes.
14    You've heard me say several times this afternoon,
15    plaintiffs have the burden on each element.  These are the --
16    this is not the verdict form.  We'll look at the verdict form
17    together in a minute.  These are the three theories, predatory
18    lending, re-age, restatement.  These are the elements, false,
19    material, intent to deceive or conceal and loss causation.
20    For Mr. Dowd -- for the plaintiffs to prevail, he
21    needs a four or a four or a four, going down, all four boxes
22    in any column or all the columns or two columns.
23    What we just spent a lot of time talking about, the
24    testimony of Professors Fischel and Bajaj, means this:  You
25    can't get there in this row.  You can't get past loss

4632

1    causation.  So he might get one or more of these nine boxes up
2    here.  It doesn't matter.  These are the elements.  He's got
3    to prove all of them.  I said this to you a number of times
4    today.  And the best he can do -- I don't think he can do
5    that.  But the best he can get is threes, a three, a three and
6    a three.  No good.
7    The way you're going to be asked to reflect that and
8    judge this verdict form, the same one Mr. Dowd showed you, is
9    this:  Loss causation is an element of a 10b-5 claim.  It's
10    part of the claim.  It's not damages.  It's part of the claim.
11    No loss causation, no claim.
12    Now, the activity that's being claimed didn't cause
13    it.  So what you do is you go up here to question number one,
14    first of 40 pages because there are 40 statements, you go in
15    the first column.  Statement number one.  Go to the box next
16    to Household and check no.  They haven't proven loss
17    causation, therefore, they haven't proven an element of the
18    claim.  Then you go to the box for Gilmer and check no.  Then
19    you go to the box for Schoenholz, you check no.  And then you
20    go to the box for Aldinger, you check no.  You've now
21    finished -- if you agree with me -- with this page.  Turn to
22    the next page, do it again.  39 more times.
23    You don't have to go to question number two or
24    question number three if you're checking no.  If you're not
25    checking no, then you have to work your way through the boxes.

4633

1    My point is:  Since he's got to get all four, loss
2    causation turns out to be the simplest one, doesn't it?  After
3    all that talk, it turns out to be pretty easy because Fischel
4    already did it for you with the red Xs.  Check no.  All right.
5    That's the box chart and the verdict form.
6    One final note on Professor Fischel's charts.  You
7    know, ladies and gentlemen, and your common sense tells you,
8    all these lawyers haven't been sitting around this room all
9    these weeks taking up your valuable time for $7.97.  I suspect
10    we all know there's some larger number involved.  Maybe none
11    of us are quite sure what it is.  But you know in this case
12    every number winds up being a gigantic number.
13    For example, what Bill was telling you, how he came
14    up with the 3 and a half billion dollar increase in the stock
15    price, which compared to the $484 million for the attorney
16    generals' settlement, he said there were 500 million shares
17    outstanding.  The stock went up about seven bucks.  He
18    multiplied 500 million by $7 and he came up with 3 and a half
19    billion dollars.  And that puts the settlement in perspective
20    for you.
21    Every number in this case is very large because the
22    company is very large.  I don't want you to think -- first of
23    all, I think you'll never think this because I don't believe
24    you'll ever get to the point of picking a number off this
25    chart.  And, secondly, if you are picking a number, you can't

4634

1    pick a number because Fischel didn't tell you how to do it.
2    But when you look at Fischel's chart, I don't want you to ever
3    think, well, it's only $7.97; what's the harm.  There's a lot
4    of harm.
5    The last point.  Mr. Dowd told you before, he always
6    goes first and I go last and today it's different.  He's
7    absolutely right.  Absolutely correct.  This is my last chance
8    to speak to you.  No matter what he says now, I don't get to
9    respond.  So I'm going to rely on you.  When you go in the
10    jury room there, you'll have his words ringing in your ears,
11    and I suspect they will be ringing.  And you'll say to
12    yourself, what would Mr. Kavaler say if he got one last
13    response.  You know my answers to everything because they've
14    been consistent throughout this case.  I told you in the mini
15    summations.  You know the questions I've asked.  Whatever he
16    says now, I want you to go in the room and say to yourself, if
17    Kavaler got to speak one more time, what would he say, how
18    would he respond.  Because you know we have a response to
19    everything he says.  So you go in there and you make my
20    response for me, if you will.
21    The reason I don't get to go again is exactly what
22    Mr. Dowd said.  It's his burden.  If the scales are equal, he
23    loses.  So if he can't persuade you, if he can't explain it to
24    you, and that's why he needs another opportunity to speak,
25    because he's not quite there yet.  I don't think he's going to

4705

1    Can you bring them out, please, Carole.
2    MR. KAVALER:  Your Honor, we got the revised jury
3    instructions.  I don't believe we got the revised verdict
4    form.
5    THE COURT:  Revised?  The verdict form was --
6    MR. KAVALER:  Or final.  If there's any -- I just
7    want to be clear.  If you're under the impression we've seen a
8    verdict form since Friday, we have not.
9    THE COURT:  It's the same verdict form.  I haven't
10   made any changes.  I don't think anybody requested any
11   changes, did they?
12   MR. KAVALER:  No.  I just thought we were going to
13   see what we were going to see at 9:00 o'clock this morning.
14   We did get a set of jury instructions.  That's my only point.
15   Just so there's no confusion as to what we have.
16   THE COURT:  The jury instructions you got because we
17   never had a clean set without the captions, and there was
18   never -- and what you had was not placed in the order that I
19   was going to read them to the jury.  These instructions that
20   you've gotten are the same instructions without the captions
21   and in the order that I intend to read them.  The verdict form
22   remains exactly the same.  It hasn't been changed.
23   All right.  Bring them out.
24   (Jury in.)
25   THE COURT:  Good morning, ladies and gentlemen.

4706

1    I want you to know that I have received your note,
2    which asks me to be loud, clear and to speak slowly.  And I
3    will certainly try to do that.
4    You will receive to take with you copies for each of
5    you of the jury instructions I'm about to read.  So you do not
6    need to take notes with regards to the jury instructions.
7    Members of the jury, you have seen and heard all the
8    evidence and arguments of the attorneys.  Now I will instruct
9    you on the law.
10   You have two duties as a jury.  Your first duty is to
11   decide the facts from the evidence in the case.  This is your
12   job and yours alone.
13   Your second duty is to apply the law that I give you
14   to the facts.  You must follow these instructions, even if you
15   disagree with them.  Each of the instructions is important,
16   and you must follow all of them.
17   Perform these duties fairly and impartially.  Do not
18   allow sympathy, prejudice, fear or public opinion to influence
19   you.  You should not be influenced by any person's race,
20   color, religion, national ancestry or sex.
21   Nothing I say now, and nothing I said or did during
22   the trial, is meant to indicate any opinion on my part about
23   what the facts are or about what your verdict should be.
24   In this case, defendants William Aldinger, David
25   Schoenholz and Gary Gilmer are individuals, defendant

4707

1    Household is a corporation and plaintiffs are entities that
2    purchased Household stock that represent a class of others
3    similarly situated.  All parties are equal before the law.
4    Defendants and plaintiffs are entitled to the same fair
5    consideration.
6    The evidence consists of the testimony of the
7    witnesses, the exhibits admitted in evidence, and
8    stipulations.
9    During the trial, certain testimony was presented to
10   you by the reading of a deposition and video.  You should give
11   this testimony the same consideration you would give it had
12   the witness appeared and testified here in court.
13   A stipulation is an agreement between both sides that
14   certain facts are true.  If the parties have stipulated to a
15   fact, you must accept that fact as proved.
16   In determining whether any fact has been proved, you
17   should consider all of the evidence bearing on the question
18   regardless of who introduced it.
19   Certain things are not to be considered as evidence.
20   I will list them for you.
21   First, if I told you to disregard any testimony or
22   exhibits or struck any testimony or exhibits from the record,
23   such testimony or exhibits are not evidence and must not be
24   considered.
25   Second, anything you may have seen or heard outside

4708

1    the courtroom is not evidence and must be entirely
2    disregarded.  This includes any press, radio, Internet or
3    television reports you may have seen or heard.  Such reports
4    are not evidence and your verdict must not be influenced in
5    any way by such publicity.
6    Third, questions and objections or comments by the
7    lawyers are not evidence.  Lawyers have a duty to object when
8    they believe a question is improper.  You should not be
9    influenced by any objection, and you should not infer from my
10   rulings that I have any view as to how you should decide the
11   case.
12   Fourth, the lawyers' opening statements, periodic
13   summations and closing arguments to you are not evidence.
14   Their purpose is to discuss the issues and the evidence.  If
15   the evidence as you remember it differs from what the lawyers
16   said, your memory is what counts.
17   You will recall that during the course of this trial
18   I instructed you that I admitted certain evidence only for a
19   limited purpose.  You must consider this evidence only for the
20   limited purpose for which it was admitted.
21   During the trial I provided you with a written copy
22   of the limiting instructions that apply to certain categories
23   of evidence, including analyst reports, investor relations
24   reports, presentations to investors, ratings agency reports,
25   newspaper and magazine articles, complaints and settlements in

4709

1 other legal proceedings, and individual customer complaints.
2 I will not read those instructions again, but they are
3 included in the instructions that you will take to the jury
4 room and that you must follow in your deliberations.
5     Some evidence was admitted for the limited purpose of
6 assisting you to evaluate an expert witness' opinion. Such
7 evidence must not be used by you for any other purpose.
8     Each party is entitled to have the case decided
9 solely on the evidence that applies to that party.
10     Any notes that you have taken during the trial are
11 only aids to your memory. The notes are not evidence. If you
12 have not taken notes, you should rely on your independent
13 recollection of the evidence and not be unduly influenced by
14 the notes of other jurors. Notes are not entitled to any
15 greater weight than the recollections or impressions of each
16 juror about the testimony.
17     You should use common sense in weighing the evidence
18 and consider the evidence in light of your own observations in
19 life.
20     In our lives, we often look at one fact and conclude
21 from it that another fact exists. In law we call this
22 "inference." A jury is allowed to make reasonable inferences.
23 Any inference you make must be reasonable and must be based
24 the evidence in the case.
25     You may have heard the phrases "direct evidence" and

4710

1 "circumstantial evidence." Direct evidence is proof that does
2 not require an inference, such as the testimony of someone who
3 claims to have personal knowledge of a fact. Circumstantial
4 evidence is proof of a fact, or a series of facts, that tends
5 to show that some other fact is true.
6     As an example, direct evidence that it is raining is
7 testimony from a witness who says, "I was outside a minute ago
8 and I saw it raining." Circumstantial evidence that it is
9 raining is the observation of someone entering a room carrying
10 a wet umbrella.
11     The law makes no distinction between the weight to be
12 given to either direct or circumstantial evidence. You should
13 decide how much weight to give any evidence. In reaching your
14 verdict, you should consider all the evidence in the case,
15 including the circumstantial evidence.
16     You must decide whether the testimony of each of the
17 witnesses is truthful and accurate, in part, in whole, or not
18 at all. You must also -- you also must decide what weight, if
19 any, you give to the testimony of each witness.
20     In evaluating the testimony of any witness, including
21 any party to the case, you may consider, among other things:
22 The ability and opportunity the witness had to see, hear, or
23 know the things the witness testified about; the witness'
24 memory; any interest, bias, or prejudice the witness may have;
25 the witness' intelligence; the manner of the witness while

4711

1 testifying; and the reasonableness of the witness' testimony
2 in light of all of the evidence in the case.
3     You may consider the statements given by any party or
4 witness who testified under oath before trial as evidence of
5 the truth of what he or she said in the earlier statements, as
6 well as in deciding what weight to give his or her testimony.
7     With respect to other witnesses, the law is
8 different. If you decide that, before the trial, one of these
9 witnesses made a statement not under oath or acted in a manner
10 that is inconsistent with his testimony here in court, you may
11 consider the earlier statement or conduct only in deciding
12 whether his testimony here in court was true and what weight
13 to give to his testimony here in court.
14     In considering a prior inconsistent statement or
15 conduct, you should consider whether it was simply an innocent
16 error or an intentional falsehood and whether it concerns an
17 important fact or an unimportant detail.
18     It is proper for a lawyer to meet with any witness in
19 preparation for trial.
20     You may find the testimony of one witness or a few
21 witnesses more persuasive than the testimony of a larger
22 number. You need not accept the testimony of the larger
23 number of witnesses.
24     The law does not require any party to call as a
25 witness every person who might have knowledge of the facts

4712

1 related to this trial. Similarly, the law does not require
2 any party to present all exhibits -- all papers and materials
3 mentioned during this trial.
4     I'm sorry. Let me reread that.
5     Similarly, the law does not require any party to
6 present as exhibits all papers and materials mentioned during
7 this trial.
8     Plaintiffs contend that defendants at one time
9 destroyed documents regarding Andrew Kahr's recommendations
10 for Household and documents regarding use of the effective
11 rate presentation. However, defendants contend that they did
12 not destroy any documents regarding Andrew Kahr's
13 recommendations, and whatever they did with regard to
14 documents relating to the effective rate presentation was for
15 legitimate business purposes.
16     Defendants' destruction of a document, standing
17 alone, does not warrant an inference that the document
18 contained information that is unfavorable to the defendants.
19 You may assume that such evidence would have been unfavorab
20 to defendants only if you find by a preponderance of the
21 evidence that:
22     One, defendants intentionally destroyed evidence or
23 caused evidence relevant to plaintiffs' claims to be
24 destroyed; and, two, defendants destroyed the evidence or
25 caused the evidence to be destroyed in bad faith, in other

4713

1  words, for the purpose of hiding adverse information.
2      You have heard witnesses give opinions about matters
3  requiring special knowledge or skill.  You should judge this
4  testimony in the same way that you judge the testimony of any
5  other witness.  The fact that such a person has given an
6  opinion does not mean that you are required to accept it.
7  Give the testimony whatever weight you think it deserves,
8  considering the reasons given for the opinion, the witness'
9  qualifications, and all of the other evidence in the case.
10      Certain demonstrative exhibits have been shown to
11  you.  Those exhibits are used for convenience and to help
12  explain the facts of the case.  They are not themselves
13  evidence or proof of any facts.
14      You must give separate consideration to each claim
15  and each party in this case.
16      When I say a particular party must prove something by
17  "a preponderance of the evidence" or when I use the expression
18  "if you find" or "if you decide," this is what I mean:  When
19  you have considered all the evidence in the case, you must be
20  persuaded that it is more probably true than not true.
21      Plaintiffs contend that defendants Household, William
22  Aldinger, David Schoenholz and Gary Gilmer violated Section
23  10(b) of the Securities Exchange Act and the Securities
24  Exchange Commission or SEC's Rule 10b-5.  From now on, I will
25  use 10b-5 to refer to both the section and the rule.

4714

1      To prevail on their 10b-5 claim against any
2  defendant, plaintiffs must prove each of the following
3  elements by a preponderance of the evidence as to that
4  defendant:
5      One, the defendant made, approved or furnished
6  information to be included in a false statement of fact or
7  omitted a fact that was necessary, in light of the
8  circumstances, to prevent a statement that was made from being
9  false or misleading during the relevant time period between
10  July 30, 1999, and October 11, 2002;
11      Two, the false statement or omission was material;
12      Three, the defendant acted with a particular state of
13  mind; and
14      Four, the defendant's statement or omission was a
15  substantial factor in causing plaintiffs' economic loss.
16      If you find that the plaintiffs have proved each of
17  the above elements as to any defendant, your verdict should be
18  for the plaintiffs and against that defendant.  If you find
19  that the plaintiffs have not proved each of the above elements
20  as to any defendant, your verdict should be for that defendant
21  and against the plaintiffs.
22      To meet the first element of their 10b-5 claim
23  against any defendant, plaintiffs must prove that during the
24  relevant time period, the defendant made a false or misleading
25  statement of fact or omitted a fact that was necessary to

4715

1  prevent a statement that was being made from being misleading.
2      Table A to the verdict form that you will be given
3  sets forth the statements that plaintiffs claim are false and
4  misleading.
5      In determining whether a statement of fact is false
6  or misleading, you must consider the statement in light of the
7  circumstances that existed at the time it was made.
8      An omission violates 10b-5 only if the defendant has
9  a duty to disclose the omitted fact.  The defendants do not
10  have a duty to disclose every fact they possess about
11  Household or any fact that is in the public domain.  But each
12  defendant has a duty to disclose a fact if a prior or
13  contemporaneous statement he or it made about the same subjec
14  would be misleading if the fact is not disclosed.  If a
15  defendant does not have a duty to disclose a fact but chooses
16  to make a statement about it, the statement must be truthful
17  and not misleading.
18      Defendant Household is required to file with the SEC
19  an annual report, called a 10-K, and quarterly reports, called
20  10-Qs, for the first three quarters of each year.  These
21  reports include financial statements and other disclosures.
22  Financial statements present a company's financial position at
23  one point in time, or its operating results and cash flows for
24  a specified period.  Household has no duty to update its 10-Q
25  reports on any cycle other than quarterly.

4716

1      Household is required to prepare its financial
2  statements regarding the delinquency status of loans and the
3  accounting for its credit card agreements in accordance with
4  Generally Accepted Accounting Principles or G-A-A-P, GAAP.
5  GAAP are the accepted rules and procedures used by accountan
6  in preparing financial statements.  If you find that any of
7  Household's financial statements regarding the delinquency
8  status of loans and the accounting for its credit card
9  agreements was not prepared in accordance with GAAP, you may
10  presume that that portion of the financial statement is false
11  or misleading.
12      To meet the second element of their 10b-5 claim
13  against any defendant, plaintiffs must prove that the false or
14  misleading statement of fact that the defendant made, or
15  failed to make, was material.
16      A statement of fact or omission is material if there
17  is a substantial likelihood that a reasonable investor would
18  have considered it important in deciding whether to buy or
19  sell Household stock.  An important statement or omission is
20  one that a reasonable investor would view as significantly
21  altering the total mix of information to be considered in
22  deciding whether to buy or sell Household stock.
23      A reasonable investor is presumed to have ordinary
24  intelligence and is presumed to have information available in
25  the public domain.

4717

1    In determining whether a statement or omission is
2  material, you must consider it in light of the circumstances
3  that existed at the time the statement was made or the fact
4  was omitted.
5    To meet the third element of their 10b-5 claim
6  against any defendant, plaintiffs must prove that the
7  defendant acted with a specific state of mind.  Defendants
8  William Aldinger, David Schoenholz, Gary Gilmer acted with the
9  required state of mind in making a statement of material fact
10  if he made the statement knowing that it was false or
11  misleading or with reckless disregard for a substantial risk
12  that it was false or misleading.
13    Defendants William Aldinger, David Schoenholz or Gary
14  Gilmer acted with the required state of mind in failing to
15  disclose a material fact if he knew that the omission would
16  make another statement he made on the same subject misleading
17  or he recklessly disregarded a substantial risk that the
18  omission would make another statement he made on the same
19  subject misleading.
20    A defendant's conduct is reckless if it is an extreme
21  departure from the standards of ordinary care and he knows
22  that it presents a risk of misleading investors or the risk is
23  so obvious that he had to have been aware of it.
24    A finding that any defendant acted with the required
25  state of mind depends on what he knew or should have known

4718

1  when he made a particular statement or omission.
2    Defendant Household, which can only act through its
3  employees, had the required state of mind with respect to a
4  false statement or omission if defendants William Aldinger,
5  David Schoenholz, Gary Gilmer or any other Household employee
6  made the statement or omission with the required state of mind
7  while acting within the scope of his or her employment.
8    The fact that Household restated certain financial
9  statements does not, by itself, prove that any defendant acted
10  knowingly or recklessly with respect to the information in the
11  original financial statements.  However, you may consider it
12  along with any other evidence to determine whether any
13  defendant acted knowingly or recklessly.
14    The intent of a person or the knowledge that a person
15  possesses at any given time may not ordinarily be proved
16  directly because there is no way of directly scrutinizing the
17  workings of the human mind.  In determining the issue of what
18  a person knew or what a person intended at a particular time,
19  you may consider any statements made or acts done by that
20  person and all other facts and circumstances received in
21  evidence which may aid in your determination of that person's
22  knowledge or intent.
23    You may infer, but you are certainly not required to
24  infer, that a person intends the natural and probable
25  consequences of acts knowingly done or knowingly omitted.  It

4719

1  is entirely up to you, however, to decide what facts to find
2  from the evidence received during this trial.
3    To meet the last element of their 10b-5 claim against
4  any defendant as to any false or misleading statement or
5  omission of material fact, plaintiffs must prove that the
6  defendant's particular statement or omission was a substantial
7  cause of the economic loss plaintiffs suffered.  Plaintiffs do
8  not have to prove that any statement or omission was the sole
9  cause of plaintiffs' loss.
10    A statement or omission of material fact is a
11  substantial cause of plaintiffs' loss if, one, it causes
12  Household's stock price to be higher than it would be if the
13  statement had not been made or the concealed fact had been
14  disclosed; and, two, the market's discovery of the truth about
15  that statement or omission causes Household's stock price to
16  decrease.  The truth may be revealed to the market through a
17  single disclosure or a series of disclosures made by any
18  person or entity.
19    Household is liable for any violation of 10b-5 that
20  you find defendants William Aldinger, David Schoenholz, Gary
21  Gilmer or any other Household employee committed while acting
22  within the scope of his or her employment and trying to
23  further Household's goals.  A Household officer or employee
24  acts within the scope of his or her employment when
25  transacting business Household assigned to him or her or doing

4720

1  anything that can reasonably be considered to be a part of his
2  or her employment.
3    If you find that plaintiffs have not proved all of
4  the elements of their 10b-5 claim against any defendant, then
5  you should not consider the question of damages.
6    If you find that plaintiffs have proved all of the
7  elements of their 10b-5 claim against any defendant, then you
8  must determine the amount of per-share damages, if any, to
9  which plaintiffs are entitled.  Plaintiffs can recover only
10  actual damages, which is the difference between the price
11  plaintiffs paid for each share of Household stock and the
12  price each share would have cost if no false or misleading
13  statement or omission of material fact had occurred, in other
14  words, the measure of inflation in the stock price.  This is
15  the only damages calculation you will be asked to make in this
16  case.  Any damages you award must have a reasonable basis in
17  the evidence.  Damages need not be proved with mathematical
18  certainty but there must be enough evidence for you to make a
19  reasonable estimate of the damages.
20    Under Section 20(a) of the Securities Exchange Act, a
21  defendant may be liable for what is called a "secondary
22  violation," even if he did not violate Rule 10b-5, if he had
23  the authority to control another defendant who violated 10b-5.
24  Plaintiffs claim that each of the individual defendants,
25  William Aldinger, David Schoenholz and Gary Gilmer, is liable

5-7-09  Trial Day 26 Verdict  8:54:00 AM

4769

```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION
3  LAWRENCE E. JAFFE PENSION PLAN, )
   on behalf of itself and all    )
4  others similarly situated,      )
5            Plaintiff,            )
6     vs.                          )  No. 02 C 5893
7  HOUSEHOLD INTERNATIONAL, INC., )
   et al.,                         )  Chicago, Illinois
8            Defendants.           )  May 7, 2009
9                                     10:30 a.m.
                    VOLUME 26
10          TRANSCRIPT OF PROCEEDINGS - TRIAL
       BEFORE THE HONORABLE RONALD A. GUZMAN, and a ju
11
   APPEARANCES:
12
13 For the Plaintiff:     COUGHLIN STOIA GELLER RUDMAN &
                          ROBBINS LLP
14                  BY:   MR. LAWRENCE A. ABEL
                          MR. SPENCER A. BURKHOLZ
15                        MR. MICHAEL J. DOWD
                          MR. DANIEL S. DROSMAN
16                        MS. MAUREEN E. MUELLER
17                        655 West Broadway
                          Suite 1900
18                        San Diego, California  92101
                          (619) 231-1058
19                        COUGHLIN STOIA GELLER RUDMAN &
                          ROBBINS LLP
20                  BY:   MR. DAVID CAMERON BAKER
                          MR. LUKE O. BROOKS
21                        MR. JASON C. DAVIS
                          MS. AZRA Z. MEHDI
22                        100 Pine Street
                          Suite 2600
23                        San Francisco, California  94111
                          (415) 288-4545
24
25
```

4770

```
1  APPEARANCES:  (Continued)
2  For the Plaintiff:     MILLER LAW LLC
                    BY:   MR. MARVIN ALAN MILLER
3                         115 South LaSalle Street
                          Suite 2910
4                         Chicago, Illinois  60603
                          (312) 332-3400
5
6  For the Defendants:    EIMER STAHL KLEVORN & SOLBERG
                    BY:   MR. ADAM B. DEUTSCH
7                         224 South Michigan Avenue
                          Suite 1100
8                         Chicago, Illinois  60604
                          (312) 660-7600
9                         CAHILL, GORDON & REINDEL LLP
                    BY:   MS. SUSAN BUCKLEY
10                        MS. PATRICIA FARREN
                          MR. THOMAS J. KAVALER
11                        MR. DAVID R. OWEN
                          MR. HOWARD G. SLOANE
12                        MS. JANET A. BEER
                          MR. JASON M. HALL
13                        MR. JOSHUA M. NEWVILLE
                          MS. LAUREN PERLGUT
14                        MS. KIM A. SMITH
                          MR. MICHAEL J. WERNKE
15                        80 Pine Street
                          New York, New York  10005
16                        (212) 701-3000
17
18
19
20
21
22 Court Reporter:        NANCY C. LaBELLA, CSR, RMR, CRR
                          Official Court Reporter
23                        219 South Dearborn Street
                          Room 1222
24                        Chicago, Illinois  60604
                          (312) 435-6890
25                        Nancy_LaBella@ilnd.uscourts.gov
```

4771

```
1       THE CLERK:  02 C 5893, Jaffe v. Household.
2       THE COURT:  We have a note from the jury.  9:40 --
3  9:50.  It reads as follows:  Lawsuit date parameters, colon,
4  can the beginning date in determining any guilt have a
5  beginning date subsequent to July 30, 1999?
6       If so, does each and every statement within the
7  period require the unanimous, quote, yes, unquote, vote of the
8  jurors to render a valid verdict by this jury?
9       I'll read it again.
10      Lawsuit date parameters:  Can the beginning date in
11 determining any guilt have a beginning date subsequent to July
12 30, 1999?
13      If so, does each and every statement within --
14 statement is in quotation marks -- within the period require
15 the unanimous, quote, yes, end quote, vote of the jurors to
16 render a valid verdict by this jury?
17      Plaintiff?
18      MR. DOWD:  I think it's yes and yes, your Honor.
19      MR. KAVALER:  We agree, your Honor.
20      MR. DOWD:  Could I have a moment?
21  (Brief pause.)
22      MR. DOWD:  Yes and yes.  We're still there.
23      MR. KAVALER:  As are we, your Honor.
24      THE COURT:  Okay.  So they have to vote yes on each
25 of the alleged false statements for a valid verdict?
```

4772

```
1       MR. DOWD:  I think that's a slightly different
2  question.
3       THE COURT:  If so, does each and every statement
4  within the period require the unanimous, quote, yes, unquote,
5  vote of the jurors to render a valid verdict by this jury?
6       MR. DOWD:  You're reading that a different way from
7  me, your Honor.  I thought they meant do they have to decide
8  each statement unanimously.
9       THE COURT:  Write it down the way I read it.
10      If so, comma, does each -- the word each is
11 underlined -- and every -- the word every is underlined --
12 statement -- the word statement is both underlined and in
13 quotation marks -- within that period require the unanimous
14 yes -- the word yes is in quotations -- vote of the jurors to
15 render a valid verdict by this jury.
16      MR. DOWD:  I'm still yes on the --
17  (Brief pause.)
18      MR. DOWD:  I think, your Honor, it's yes as to the
19 first one.  I think on the second one, I think maybe what we
20 should tell them is it should be unanimous yes or no as to --
21 it should be unanimous yes or no as to the remaining
22 statements, but you don't need a verdict as to each statement
23 to have a valid verdict.  But I don't know how you explain
24 that to them.
25      THE COURT:  Well, why don't we answer the question
```

5-7-09  Trial Day 26 Verdict  8:54:00 AM

4781

1  We certainly are not going to agree to a shifting of the
2  burden.  And we certainly are not going to agree that there's
3  some burden on the jury to find a unanimous no.  A failure to
4  find a unanimous yes is a defense win.  That means the
5  plaintiffs failed to carry their burden of proof.  I don't
6  think you can tell them that.  That's why we took "no" out of
7  the first sentence.  But it seems to me that -- and that's why
8  we took the second sentence out entirely.  But if you're going
9  to put something like the second sentence back in, you can't
10  shift the burden of proof or you can't -- let me say it
11  differently.  You can't relieve the plaintiffs of the burden
12  of proof.
13        MR. DOWD:  Your Honor, just a response for the
14  record.  Under that theory, there would never be a hung jury;
15  so I don't understand it.
16        THE COURT:  Well, I think, in view of the comments of
17  the parties, that the instruction I'm prepared to give the
18  jury is this:  With regards to the first question, the
19  instruction I will give them is as follows:  The answer to
20  that question -- well, let me read the question so that we're
21  clear.  I will read the question, which is:  Can the beginning
22  date in determining any guilt have a beginning date subsequent
23  to July 30, 1999?
24        The answer to that question is yes.  You need only
25  find that a false statement was made on or after July 30,

4782

1  1999, which caused Household's stock price to become inflated.
2        I think the question clearly relates to only one
3  aspect and, that is, the date, beginning date.  And the
4  response clearly now relates to only one aspect, and, that is,
5  the beginning date of the false statements.  So I'm satisfied
6  with that answer, that it's clear as to what it refers to.  It
7  does not in any way indicate that the other elements of
8  liability, since it strikes the word liability from it, can be
9  ignored.
10        And I'm also -- I also believe, contrary to the
11  plaintiffs' proposal, that we need to make clear to the jury
12  what we're talking about here, which is the beginning date of
13  the false statements.
14        The second part, I'll read the question:  If so, does
15  each and every statement within the period require the
16  unanimous yes vote of jurors to render a valid verdict by this
17  jury?
18        The answer to that question is as follows:  A vote of
19  yes or no as to any statement must be unanimous.  However, you
20  need not vote yes as to each of the alleged false or
21  misleading statements in order for your verdict to be valid.
22  You may vote yes as to some and no as to others and your
23  verdict will still be valid.
24        I will mark the submissions by the plaintiffs and the
25  defendants as exhibits, and they'll become part of the record.

4783

1        Let's bring the jury out.
2        MR. KAVALER:  Your Honor, just for the record, we
3  object to both of those instructions as you proposed to give
4  them.
5        And I further note that this confusion -- or this
6  note is the direct and proximate cause of the matter we
7  discussed in the jury conference, which I think would have
8  been obviated if we had left the time period concept in the
9  loss causation element.  It's the consequence of taking the
10  time period piece out of the loss causation instruction that
11  has caused this issue to arise.
12        But, in any event, we object to these instructions.
13        THE COURT:  Okay.  Bring the jury out.
14  (Jury in.)
15        THE COURT:  Be seated, please.
16        Good morning, folks.
17        We have your question.  We have discussed it, and I
18  have an answer for you.
19        Your question has two parts.  I will read the first
20  part.  Can the beginning date in determining any guilt have a
21  beginning date subsequent to 7/30/99?
22        The answer to that question is yes.  You need only
23  find that a false statement was made on or after 7/30/99 which
24  caused Household's stock price to become inflated.
25        I will read the second part.  If so, does each and

4784

1  every statement within that period require the unanimous,
2  quote, yes, unquote, vote of the jurors to render a valid
3  verdict by this jury?
4        The answer to that question is as follows:  A vote of
5  yes or no to any statement must be unanimous.  However, you
6  need not vote yes as to each of the alleged false or
7  misleading statements in order for your verdict to be valid.
8  You may vote yes as to some and no as to others and your
9  verdict will still be valid.
10        With that, ladies and gentlemen, I ask you to
11  continue your deliberations.
12  (Jury out.)
13        THE COURT:  Okay.  We will let you folks know.
14        MR. DOWD:  Thank you, your Honor.
15        MR. KAVALER:  Thank you, your Honor.
16  (Whereupon a recess was taken at 11:38, after which the
17  following further proceedings were had at 2:09 p.m.:)

4805

1  individual verdicts in all respects?
2      JUROR GALVAN:  Yes.
3      THE COURT:  Next.
4      JUROR KAMINSKI:  Joe Kaminski.
5      THE COURT:  Sir, did you hear the verdicts as
6  published by the Court?
7      JUROR KAMINSKI:  Yes.
8      THE COURT:  And do these verdicts constitute your
9  individual verdicts in all respects?
10     JUROR KAMINSKI:  Yes.
11     THE COURT:  Sir.
12     JUROR DAVIS:  Charles Davis.
13     THE COURT:  Sir, did you hear the verdicts as
14  published by the Court?
15     JUROR DAVIS:  Yes.
16     THE COURT:  And do these verdicts constitute your
17  individual verdicts in all respects?
18     JUROR DAVIS:  Yes.
19     JUROR HODGES:  Renee Hodges.
20     THE COURT:  Ma'am, did you hear the verdicts as
21  published in open court?
22     JUROR HODGES:  Yes.
23     THE COURT:  And do these verdicts constitute your
24  individual verdicts in all respects?
25     JUROR HODGES:  Yes.

4806

1      JUROR STUBBS:  Gail Stubbs.
2      THE COURT:  Ma'am, did you hear the verdicts as
3  published by the Court?
4      JUROR STUBBS:  Yes.
5      THE COURT:  And do these verdicts constitute your
6  individual verdicts in all respects?
7      JUROR STUBBS:  Yes.
8      JUROR BERARD:  James Berard.
9      THE COURT:  Sir, did you hear the verdicts as
10  published by the Court?
11     JUROR BERARD:  Yes.
12     THE COURT:  And do these verdicts constitute your
13  individual verdicts in all respects?
14     JUROR BERARD:  Yes.
15     JUROR HUNT:  David Hunt.
16     THE COURT:  Sir, did you hear the verdicts as
17  published by the Court?
18     JUROR HUNT:  Yes.
19     THE COURT:  And do these verdicts constitute your
20  individual verdicts in all respects?
21     JUROR HUNT:  Yes.
22     THE COURT:  Very well.
23  Any other motions before I release the jury?
24     MR. DOWD:  None from the plaintiffs, your Honor.
25     MR. KAVALER:  Yes, your Honor.  We believe the

4807

1  verdict is fatally inconsistent in a number of ways, which
2  we're prepared to detail to the Court.  I'm not sure if you
3  need the jury to be present.  Obviously it's up to you.
4      Primarily it's the interspersal of the yeses and nos
5  when juxtaposed again Professor Fischel's leakage model,
6  whatever the -- whatever our position on the leakage model ab
7  initio might have been, it certainly doesn't work that way.
8  And certainly a verdict which contains both yeses and nos but
9  nevertheless adopts Professor Fischel's leakage damage model
10  is fatally flawed and internally inconsistent.
11     THE COURT:  Okay.
12     MR. KAVALER:  We have other things we'll say at the
13  appropriate time, but that is something which I thought should
14  be mentioned before the jury retires.
15     THE COURT:  All right.  Does the plaintiff have
16  anything to say?
17     MR. DOWD:  No, your Honor.  We think the verdicts are
18  consistent.
19     THE COURT:  Very well.
20     Ladies and gentlemen, that constitutes your jury
21  service in this case.  And I might add, quite a long, diligent
22  and some might even say heroic service it has been.  I want to
23  personally thank you for your patience, your attentiveness and
24  your persistence as jurors in this case.  I don't need to tell
25  you, it has been a difficult case.  It has been a long case.

4808

1  It has been a complicated case.  But it has been an important
2  case.  And as such, I thank you for having taken the time out
3  of your lives at what I know is considerable cost both
4  personal and pecuniary to many of you to do this.
5      I also tell you that you should consider yourselves
6  to some -- in some respect fortunate to have had the
7  opportunity to take part in what is a fundamental aspect of
8  our democratic way of life.  You have served your country
9  today without having to join the military, pay anything extra
10  in taxes or volunteer for community service.  And we very much
11  appreciate it, and you should be proud of it.
12     We'll be back for any of you who wish to stick around
13  to talk to you if you want to -- have any questions for me, if
14  there's anything you want to ask, anything you want me to
15  explain.  But you need not stick around.
16     Now, you are not required to and I would advise you
17  not to speak to anyone about your jury service after you leave
18  here today.  It's done.  You have done your duty.  You have
19  finished.  You have done it well.  Put it behind you and move
20  on.
21     Retire to the jury room.
22  (Jury out.)
23     THE COURT:  Date for motions?
24  (Brief pause.)
25     THE COURT:  Does anybody need a date for motions?