# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF ILLINOIS

# EASTERN DIVISION

|  |  |
|---|---|
| LAWRENCE E. JAFFE PENSION PLAN, On Behalf of Itself and All Others Similarly Situated, <br><br>                        Plaintiffs,<br><br>          - against -<br><br>HOUSEHOLD INTERNATIONAL, INC., ET AL.,<br><br>                       Defendants. | Lead Case No. 02-C-5893 (Consolidated)<br><br>CLASS ACTION<br><br>Judge Ronald A. Guzmán |

## REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTIONS FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50(b) OR, IN THE ALTERNATIVE, FOR A NEW TRIAL PURSUANT TO RULE 59

CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York  10005
(212) 701-3000

EIMER STAHL KLEVORN & SOLBERG LLP
224 South Michigan Ave.
Suite 1100
Chicago, Illinois 60604
(312) 660-7600

*Attorneys for Defendants*
*Household International, Inc., William F.*
*Aldinger, David A. Schoenholz and Gary*
*Gilmer*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES..................................................................................iv

INTRODUCTION ..............................................................................................1

ARGUMENT

I.      PLAINTIFFS' FAILURE TO PROVE LOSS CAUSATION
ENTITLES DEFENDANTS TO JUDGMENT AS A MATTER
OF LAW..............................................................................................2

      A.    Fischel Admittedly Failed to Eliminate the Effect of Non-
Fraud Factors ............................................................................2

      B.    The Trial Record Is Devoid of Evidence That $23.94 of
Inflation Was Introduced into Household's Stock Price by
the March 23, 2001 Statement ..................................................6

      C.    The Jury's Verdict Reflects Inflation Increases That Bear
No Connection to the Alleged False Statements.........................7

      D.    The Leakage Model Resulted in Irrational Verdicts
Attributing All Inflation Regarding Three Discrete Theories
of Fraud to a Single Statement Related to Only One of
Those Theories.........................................................................8

II.     PLAINTIFFS' RULE 10b-5 CLAIMS ARE TIME BARRED
BECAUSE INFLATION NEVER INCREASED DURING THE
RELEVANT PERIOD .......................................................................10

III.    PLAINTIFFS' FAILURE TO PROVE INFLATIONARY
INCREASES RENDERS ALLEGED MISSTATEMENTS
IMMATERIAL..................................................................................11

IV.    PLAINTIFFS FAILED TO PROVE THAT HOUSEHOLD'S
RESTATEMENT RESULTED FROM FRAUDULENT
ACCOUNTING.................................................................................11

V.     PLAINTIFFS' "PREDATORY LENDING" THEORY WAS
UNTENABLE AS A MATTER OF LAW .............................................14

VI.    PLAINTIFFS FAILED TO PROVE THEIR THEORY OF
"CREDIT QUALITY CONCEALMENT".............................................16

VII.   PLAINTIFFS FAILED TO ESTABLISH PRIMARY LIABILITY
AGAINST GARY GILMER ...............................................................17

VIII.  THE JURY'S VERDICTS ARE IRRECONCILABLY
INCONSISTENT...............................................................................18

      A.    Defendants Preserved Their Objections to the Jury's
Inconsistent Verdicts ...............................................................18

Page

    B.    Attributing the Maximum Inflation to the First False Statement Does Not Render the Jury's Findings of Inflation and Liability Consistent ............................................................... 19

    C.    There Is No Rational Explanation for the Jury's Inconsistent Findings Regarding the Alleged Restatement-Related Fraud ...................................................................................... 20

    D.    The Jury's Verdicts Were Inconsistent in Other Material Respects ...................................................................................... 20

IX.    ADMITTING UNRELIABLE EXPERT TESTIMONY WITH NO ADEQUATE LIMITING INSTRUCTIONS DEPRIVED DEFENDANTS OF A FAIR TRIAL ................................................ 21

    A.    Plaintiffs Cannot Justify the Admission of Ghiglieri's Testimony ................................................................................... 22

    B.    Plaintiffs Cannot Justify the Admission of Opinions Outside the Scope of Devor's Expertise and Contrary to Governing Law ............................................................................. 23

    C.    The Prejudice That Followed from the Court's Erroneous *Daubert* Rulings Was Exacerbated by the Lack of Suitable Limiting Instructions ........................................................... 24

X.    IMPROPER JUDICIAL RULINGS AND PLAINTIFFS' CIRCUMVENTION OF PROPER EXCLUSION ORDERS RESULTED IN AN UNFAIR TRIAL ........................................... 24

    A.    Plaintiffs Built their Predatory Lending Case on Prejudicial and Inadmissible Hearsay ...................................................... 24

    B.    Plaintiffs Deliberately and Repeatedly Violated the Court's Exclusion of Settlement Evidence Pursuant to Rule 408 ......... 25

    C.    Fischel Gave Testimony That Had Not Been Disclosed in His Expert Report .................................................................. 25

XI.    PREJUDICIAL ERRORS IN THE JURY INSTRUCTIONS AND VERDICT FORM REQUIRE A NEW TRIAL ............................... 26

    A.    Plaintiffs Have Provided No Justification for Instructing the Jury That It Could Find Liability If "the Defendant Made, Approved, or Furnished Information to Be Included in a False Statement" ..................................................................... 26

    B.    Plaintiffs Have Not Demonstrated that a Defendant Has a Duty to Disclose Information if Its Omission Would Render a "Prior Statement" Misleading ................................... 27

    C.    Plaintiffs Have Not Demonstrated that "Knew or Should Have Known" Has Any Place in a Scienter Instruction ........... 28

Page

D.    Contrary to Plaintiffs' Argument, Defendants Did Not
Accept Use of "Damages" as a Replacement for "Inflation" ...................29

E.    That an Alleged Misstatement Should Be Viewed "In
Context" Does Not Justify the Aggregation of Distinct
Statements on the Verdict Form ............................................................29

CONCLUSION .................................................................................................................30

# TABLE OF AUTHORITIES

**Cases**                                                                                                                       **Page**

*Abrams* v. *Baker Hughes Inc.*, 292 F.3d 424 (5th Cir. 2002) .................................................... 18

*Adams Labs., Inc.* v. *Jacobs Eng'g Co.*, 761 F.2d 1218 (7th Cir. 1985) .................................... 21

*Barrie* v. *Intervoice-Brite, Inc.*, 409 F.3d 653 (5th Cir. 2005) ................................................. n. 19

*Blanchard* v. *EdgeMark Fin. Corp.*, 1999 WL 59994 (N.D. Ill. Feb. 3, 1999) ...................... n. 33

*Carter* v. *Chicago Police Officers*, 165 F.3d 1071 (7th Cir. 1998) ............................................ 19

*Central Laborers' Pension Fund* v. *SIRVA, Inc.,* 2006 WL 2787520
   (N.D. Ill. Sept. 22, 2006) .................................................................................................. 13

*Davis* v. *SPSS, Inc.* 385 F. Supp. 2d 697 (N.D. Ill. 2005) .......................................................... 13

*Dawson* v. *New York Life Ins. Co.*, 135 F.3d 1158 (7th Cir. 1998) ............................................ 26

*DiLeo* v. *Ernst & Young*, 901 F.2d 624 (7th Cir. 1990) .............................................................. 16

*Dolphin & Bradbury, Inc.* v. *SEC*, 512 F.3d 634 (D.C. Cir. 2008) ............................................ 29

*Dura Pharmaceuticals* v. *Broudo*, 544 U.S. 336 (2005) ................................................. 1, 2, 3, 7

*Fener* v. *Operating Eng's Construction Industry and Miscellaneous Pension Fund*,
   2009 WL 2450674 (5th Cir. Aug. 12, 2009) ........................................................................ 3

*Foster* v. *DeLuca*, 545 F.3d 582 (7th Cir. 2008) ..................................................................... n. 24

*Fox* v. *Hayes*, 2008 WL 4411574 (N.D. Ill. Sept. 25, 2008) .................................................. n. 21

*Frymire-Brinati* v. *KPMG Peat Marwick*, 2 F.3d 183 (7th Cir. 1993) ....................................... 21

*Geffon* v. *Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001) ................................................................ 29

*Globis Capital Partners* v. *Stonepath Group, Inc.*, 2007 WL 1977236 (3d Cir. 2007) .............. 14

*Hardnick* v. *United States*, 2009 U.S. Dist. LEXIS 53739 (N.D. Ill. June 25, 2009) ............. n. 29

*In re Anicom Sec. Litig.*, No. 00 C4391, 2001 U.S. Dist. LEXIS 6607
   (N.D. Ill. May 18, 2001) ................................................................................................... n. 9

*In re Cabletron Systems*, 311 F.3d 11 (1st Cir. 2002) ............................................................... n. 9

*In re Career Educ. Corp.*, 2007 WL 1029092 (N.D. Ill. Mar. 26, 2007) ............................. 12, 18

*In re Credit Suisse First Boston Corp. (Lantronix, Inc.) Analyst Sec. Litig.*,
   250 F.R.D. 137 (S.D.N.Y. 2008) ....................................................................................... n. 8

*In re Discovery Zone Sec. Litig.*, 943 F. Supp. 924 (N.D. Ill. 1996) .......................................... n. 9

*In re eSpeed Inc. Sec. Litig.*, 457 F. Supp. 2d 266 (S.D.N.Y. 2006) ........................................ n. 14

*In re Flag Telecom Holdings Ltd. Sec. Litig.*, 574 F.3d 29 (2d Cir. 2009) ........................... passim

*In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913 (S.D. Ind. 2008) ...................................... 15

*In re Int'l Rectifier Corp. Sec. Litig.*, 2008 WL 4555794 (C.D. Cal. May 23, 2008) ................. 27

*In re IPO Sec. Litig.*, 544 F. Supp. 2d 277 (S.D.N.Y. 2008) .................................................. n. 14

*In re IPO Sec. Litig.*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003) .................................................. n. 33

*In re James Wilson Associates*, 965 F.2d 160 (7th Cir. 1992) ..............................13, 15, 16, n. 29

*In re Lake States Commodities, Inc.*, 271 B.R. 575 (Bankr. N.D. Ill. 2002) ..............................24

*In re Northern Telecom Ltd. Sec. Litig.,* 116 F.Supp.2d 446 (S.D.N.Y.2000) ........................... n. 8

*In re Williams Securities Litigation - WCG Subclass*, 558 F.3d 1130 (10th Cir. 2009) ......... 3, n. 3

*Johnson* v. *Tellabs, Inc.*, 262 F. Supp. 2d 937 (N.D. Ill. 2003) .................................................. 18

*Jones* v. *Lincoln Electric Co.*, 188 F.3d 709 (7th Cir. 1999) .................................................... n. 26

*Joseph* v. *Brierton*, 739 F.2d 1244 (7th Cir. 1984) ....................................................................23

*Kansas* v. *Marsh*, 548 U.S. 163 (2006) ................................................................................ n. 22

*Knollenberg* v. *Harmonic, Inc.*, 152 Fed. Appx. 674 (9th Cir. 2005) ........................................29

*Kosmynka* v. *Polaris Industries, Inc.*, 462 F.3d 74 (2d Cir. 2006) ............................................19

*Makor Issues & Rights, Ltd.* v. *Tellabs, Inc.*, 437 F.3d 588 (7th Cir. 2006) .............15, n. 32, n. 33

*Makor Issues & Rights, Ltd.* v. *Tellabs, Inc.*, 513 F.3d 702 (7th Cir. 2008) ...................... n. 18, 27

*Metzler Investment GMBH* v. *Corinthian Colleges, Inc.¸* 540 F.3d 1049 (9th Cir. 2008) ......... n. 3

*Nachtsheim* v. *Beech Aircraft Corp.,* 847 F.2d 1261 (7th Cir. 1988) ........................................25

*Oran* v. *Stafford,*  226 F.3d 275 (3d. Cir. 2000) ................................................................ 11, 28

*Pearson* v. *Welborn*, 471 F.3d 732 (7th Cir. 2006) ..................................................................19

*Provenz* v. *Miller*, 102 F.3d 1478 (9th Cir. 1996) .................................................................. n. 9

*Pugh* v. *Tribune Co.*, 521 F.3d 686 (7th Cir. 2008) .................................................. 15, 17, n. 31

*Ray* v. *Citigroup Global Markets, Inc.*, 482 F.3d 991 (7th Cir. 2007) ........................ 2, n. 3, 7, 20

*Robin* v. *Arthur Young & Co.*, 915 F.2d 1120 (7th Cir. 1990) ...................................................28

*Sears, Roebuck and Co.* v. *Savoy Reinsurance Co. Ltd.*, 1991 WL 247583
   (N.D. Ill. Nov. 8, 1991) ........................................................................................24

*Solaia Technology LLC* v. *Arvinmeritor, Inc.*, 361 F.Supp.2d 797 (N.D. Ill. 2005) ...................23

*Southland Sec. Corp.* v. *Inspire Ins. Solutions Inc.*, 365 F.3d 353 (5th Cir. 2004) ......................27

*Stavros* v. *Exelon Corp.*, 266 F. Supp. 2d 833 (N.D. Ill. 2003) ...................................................13

*Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008) ................. 17, 26

*Stransky* v. *Cummins Engine Co., Inc.*, 51 F.3d 1329 (7th Cir. 1995) .........................................28

*Strauss* v. *Stratojac Corp.*, 810 F.2d 679 (7th Cir. 1987) .......................................................n. 21

*Susan Wakeen Doll Co.* v. *Ashton-Drake Galleries*, 272 F.3d 441 (7th Cir. 2001) ..............26, 29

*Tellabs Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ..............................................13

*Timm* v. *Progressive Steel Treating, Inc.*, 137 F.3d 1008 (7th Cir. 1998)....................................19

*Tricontinental Indus., Ltd.* v. *PricewaterhouseCoopers, LLP*, 475 F.3d 824
   (7th Cir. 2007) ...................................................................................................... passim

*Tuchman* v. *DSC Communications Corp.*, 14 F.3d 1061 (5th Cir. 1994)....................................14

*U.S.* v. *Riddle*, 103 F.3d 423 (5th Cir. 1997)......................................................................23, 24

*U.S.* v. *Santos*, 201 F.3d 953 (7th Cir. 2000) .............................................................................21

*Virginia Bankshares, Inc.* v. *Sandberg*, 501 U.S. 1083 (1991)...................................................18

*Will* v. *Comprehensive Accounting Corp.*, 776 F.2d 665 (7th Cir. 1985) ...............................n. 21

*Wipf* v. *Kowalski*, 519 F.3d 380 (7th Cir. 2008)........................................................ n. 25, n. 30

**Statutes**                                                              **Page**

17 C.F.R. § 240.10b-5...................................................................................................17

**Rules**                                                                   **Page**

Fed. R. Evid. 703 advisory committee's notes (2000)..............................................................25

Defendants Household International, Inc., William F. Aldinger, David A. Schoenholz and Gary Gilmer (collectively, "Defendants") respectfully submit this Reply Memorandum in support of their motions for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure or, in the alternative, for a new trial pursuant to Rule 59.

## INTRODUCTION

Plaintiffs' opposition does not cure the fundamental defects in Plaintiffs' theory and proof of liability for the simple reason that it cannot. Instead of addressing the merits, Plaintiffs attempt to obscure the glaring gaps in their proof on essential elements by dwelling on irrelevant aspects of trial strategy, falling back on assertions of waiver despite Defendants' scrupulous preservation of objections, and talismanically invoking deference to jury findings as a catch-all mantra. The fact that the jury made certain findings only begs the core question at issue on these motions. The crucial inquiry is not whether the jury *did* find liability, but rather whether a reasonable jury properly *could* find liability on the record that was put before the jury in this case. For all the reasons set forth below and in Defendants' opening memorandum, the answer to that question is a resounding "no." Like their experts, Plaintiffs constantly rely on *ipse dixit*, making bare assertions that they proved some fact or another, with no citation to record evidence (because in each case there is none). Because the record evidence is insufficient to support the jury's verdicts, judgment for Defendants as a matter of law is required.

Plaintiffs' opposition makes patently clear, for example, that they are not able to articulate a legally viable theory of loss causation. Their "leakage model" cannot withstand scrutiny. Plaintiffs' own expert admitted that the leakage model includes inflation that is "not at all fraud related," an incurable flaw that taints every aspect of Plaintiffs' loss causation showing. Plaintiffs have failed to disaggregate the effects of their three discrete theories of fraud (predatory lending, reaging, and restatement), and they have not linked any truthful disclosures regarding any of those three theories to declines in artificial inflation. Plaintiffs cannot sidestep the lack of a nexus between particular instances of fraud and claimed losses by simply announcing that the revelation of fraud "leaked out" gradually over a 330-day period. Because such vague generalities do not satisfy the requirements set by the Supreme Court in *Dura Pharmaceuticals* v. *Broudo*, 544 U.S. 336 (2005) ("*Dura*"), and applied by courts in this Circuit, judgment for Defendants is required as a matter of law.

Plaintiffs intentionally blur the distinctions among their three discrete theories of fraud in order to mask their failure to prove each required Rule 10b-5 element as to each alleged fraud and each alleged false statement. The risk of prejudice and confusion inherent in Plaintiffs' deliberately amorphous approach was exacerbated by improvident evidentiary rulings and by imprecision and errors in the jury instructions and verdict form, at minimum entitling Defendants to a new trial under Rule 59.

## ARGUMENT

## I.    PLAINTIFFS' FAILURE TO PROVE LOSS CAUSATION ENTITLES DEFENDANTS TO JUDGMENT AS A MATTER OF LAW

### A.    Fischel Admittedly Failed to Eliminate the Effect of Non-Fraud Factors

Under *Dura*, loss causation cannot be found unless firm-specific non-fraud explanations for a stock price decline are excluded. 544 U.S. at 342-43. That is precisely what Fischel's leakage model admittedly failed to do. Plaintiffs' burden was to present sufficient evidence from which a reasonable jury could conclude that price declines corresponding to reduction in inflation of Household's stock price resulted from fraud-related disclosures. *Ray* v. *Citigroup Global Markets, Inc.*, 482 F.3d 991, 995 (7th Cir. 2007) (in order to succeed in a fraud-on-the-market complaint "plaintiffs must show both that the defendants' alleged misrepresentations artificially inflated the price of the stock and that the value of the stock declined once the market learned of the deception."); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) ("to establish loss causation, *Dura* requires plaintiffs to disaggregate those losses caused by 'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events' from disclosures of the truth behind the alleged misstatements.") (citations omitted).

Plaintiffs' expert Fischel admitted at trial that his leakage model (which the jury adopted) fails to exclude non-fraud, firm-specific explanations for stock price declines as *Dura* requires:

Q. *And were there some [stock price movements], any, that had no-fraud related aspect?*

A. It's a matter of judgment as to whether something has a fraud-related aspect or not. I would say there were a few, but there were also, I would say, a significant number of the statistically significant movements that had this combined aspect. But just to be clear, under the Leakage Model, whether they did – *whether they were purely fraud related, combined fraud related or not at all fraud related, they were all included in the Leakage Model.*

(Tr. 2959:24-2960:17 (emphasis added))  Fischel's admission that his leakage model adopted by the jury did not exclude losses caused by factors that were "not at all fraud related" mandates judgment in Defendants' favor.[1] *Dura*, 544 U.S. at 342-43; *Tricontinental Indus., Ltd.* v. *PricewaterhouseCoopers, LLP*, 475 F.3d 824, 843 (7th Cir. 2007) (plaintiff must demonstrate a "causal connection between the material misrepresentation and the loss").  Both Courts of Appeals that have considered leakage models determined that such models fail to satisfy *Dura*'s requirements when they do not exclude non-fraud firm-specific explanations for price declines. *Flag Telecom*, 574 F.3d at 36; *In re Williams Securities Litigation - WCG Subclass*, 558 F.3d 1130, 1137 (10th Cir. 2009) ("Even if the truth has made its way into the marketplace, *Dura* requires that a plaintiff show that it was this revelation that caused the loss and not one of the 'tangle of factors' that affect price.").  Lacking any legal authority to support Fischel's use of his leakage model, Plaintiffs rely on an academic paper by UCLA professor Brad Cornell discussing the use of such models.  This thin support is further diluted by the fact that Professor Cornell has (1) acknowledged that such models are inherently incapable of excluding non-fraud firm-specific factors and (2) considered and rejected the very leakage model Fischel used in this case.

Plaintiffs assert vaguely that Fischel's leakage model "does not reflect any material non-fraud company specific declines." (Pl. Br. 8)  But this is simply not true, as the very testimony quoted by Plaintiffs demonstrates.  Fischel explained that it was "impossible to conclude" whether his inflation quantification would have remained the same if he had removed all non-fraud-related information. (Tr. 2683:17-2684:6)  Because adducing such standalone proof was precisely Plaintiffs' burden at trial, this concession is fatal.  Fischel's admission that he was unable to (and therefore did not) separate the effect of fraud-related information on Household's stock price from the entire bundle of firm-specific information released on a given day is dispositive proof that Plaintiffs did not meet their burden.[2] *Tricontinental*, 475 F.3d at 843; *Fener* v.

---

[1]  Fischel's trial testimony reiterated what he had already acknowledged during pretrial discovery: that the leakage model fails to exclude non-fraud factors. (Kavaler 8/3/09 Dec. Ex. 3 at 57:12-16 ("Q: So there are a bunch of stock price movements that were significant under your regression analysis that were not attributable to fraud related disclosures?  A: Correct.")).

[2]  Plaintiffs refer to Fischel's leakage model as an "event study," a form of statistical analysis frequently conducted to evaluate how a company's stock price reacted to a particular event after controlling for market and industry factors.  Yet as Fischel acknowledged, his leakage model treats a 330-day period – nearly a full year – as a single "event." (Pl. Br. 7)  One need not reflect long on the number of events that actually occurred within this 330-day period to understand how implausible it is to treat all events within a 330-day period as a single event, as Plaintiffs concede Fischel's leakage model does. (Pl. Br. 7)

*Operating Eng's Constr. Indus. and Misc. Pension Fund*, 2009 WL 2450674, at \*5 (5th Cir. Aug. 12, 2009) ("We reject any event study that shows only how a 'stock reacted to the *entire bundle* of negative information,' rather than examining the 'evidence linking the *culpable* disclosure to the stock price movement.'") (emphasis in original, citation omitted).

The inflation quantification the jury adopted would, if accepted, lead to recovery for class members in amounts admittedly having no connection to the alleged fraud. For example, as Defendants pointed out in their opening memorandum (Def. Br. 7 n.8), Fischel calculated a $2.52 decline in inflation over a 10-day period in July 2002 for which he identified no disclosure of fraud. In fact, Fischel identified no disclosure *at all* during this period. (PX 1391 at 40, 1395 at 16) In response to Defendants' motion, Plaintiffs were unable to point to a single disclosure during this period. Plaintiffs' discussion of analyst commentary (Pl. Br. 5-6) makes no effort to link any price declines to any particular fraud-related disclosure. The decline can only have resulted from non-fraud factors, and Plaintiffs' only response to this dispositive point is to reassert their erroneous legal position:

> Defendants argue that since daily inflation declined between 7/5/02-7/15/02 when there was no identifiable news, the leakage model is faulty. Defs' Brf. at 7 n.8. **Yet inflation declines during this period because of leakage which dissipates inflation**.

(Pl. Br. 9 n.8) (emphasis added). Plaintiffs thus advance the proposition that a compensable loss attributed only to unspecified "leakage" can occur in the absence of any disclosure. This contention is vastly more extreme than the holdings of the cases Plaintiffs cite (Pl. Br. 5), which stand for no more than the unremarkable proposition that the truth of a fraud can be revealed through more than one partial *disclosure* of a claimed fraud. Plaintiffs' position that no disclosure is required has never been accepted by any post-*Dura* court and, indeed, has consistently been rejected in this Circuit and others.[3]

---

[3]    *Tricontinental*, 475 F.3d at 843 (liability only attaches when the facts "become generally known and as a result share value depreciate[s]") (internal quotations and citations omitted); *Ray*, 482 F.3d at 996 (summary judgment for defendant is "inevitable" where the alleged corrective disclosure occurred after the value of the subject stock had already declined); *Flag Telecom*, 574 F.3d at 35 ("To prove loss causation, a plaintiff must demonstrate 'that the misstatement or omission concealed something from the market that, when disclosed negatively affected the value of the security.'") (citation omitted); *Williams*, 558 F.3d at 1138 ("To satisfy the requirements of *Dura*, however, any theory – even a leakage theory that posits a gradual exposure of the fraud rather than a full and immediate disclosure – will have to show some mechanism for how the truth was revealed."); *Metzler Investment GMBH* v. *Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008) ("the complaint must allege that the practices that the plaintiff contends are fraudulent were revealed to the market and caused the resulting losses.").

Consider the application of Plaintiffs' leakage theory to the potential claims of class members. A class member that purchased shares of Household stock on July 5, 2002 and sold those shares on July 15, 2002 would, under the inflation quantification adopted by the jury, recover $2.52 in "damages" per share even though this economic loss was not attributed to any disclosure of fraud.[4] Nor is the 10-day period in July 2002 the only instance of this evidentiary void. To the contrary, in Fischel's quantification instances of loss without any corresponding disclosures are ubiquitous. Other representative examples include the following:

- Between December 28, 2001 and January 2, 2002, Fischel's quantification includes a $1.36 loss despite the fact that no revelation, "leak," or disclosure of any kind is claimed to have occurred during this period. (PX 1391 at 31-32, 1395 at 13)

- Between January 7 and January 10, 2002, Fischel's quantification includes a $1.49 loss despite the fact that no revelation, "leak," or disclosure of any kind is claimed to have occurred during this period. (PX 1391 at 32, 1395 at 14)

- Between May 2 and May 6, 2002, Fischel's quantification includes a $0.92 loss despite the fact that no revelation, "leak," or disclosure of any kind is claimed to have occurred during this period. (PX 1391 at 38, 1395 at 15)

Plaintiffs cannot and do not dispute that Fischel's leakage quantification contains declines in inflation that are unrelated to the alleged fraud. That alone entitles Defendants to judgment – notwithstanding Plaintiffs' dismissive argument that such errors are harmless because in the aggregate these declines "cancel each other out" (*i.e.*, any erroneous amounts are offset at other times by non-fraud related inflation increases). (Pl. Br. 8) This is no answer at all. First, Plaintiffs' acknowledgment that the leakage quantification includes unspecified *increases* in inflation that are not attributable to the alleged fraud admits the very flaw which Plaintiffs otherwise deny. *See* Part I.C, *infra*. Moreover, even assuming *arguendo* that there were non-fraud related increases that might in the aggregate counteract the admitted inclusion of non-fraud amounts in the inflation calculations, that speculative and unproven contention would not shore up the integrity of this leakage model. Whether some subsequent non-fraud related increase may or may not have occurred does not change the fact that, under the inflation quantification adopted by the jury, class members would recover "damages" that were not caused by any disclosure of any alleged fraud.

---

[4] Because Household had approximately 500 million shares outstanding on any given day during that time period (Tr. 3345:25-3346:2), this error would be further multiplied.

In an attempt to distract attention from their speculative fudging of the required calcula-
tion, Plaintiffs make irrelevant references to dates analyzed in Fischel's "specific disclosure"
model, which was not adopted by the jury and which produced a vastly lower quantification of
inflation.  Impermissibly muddling his two discrete models, Plaintiffs argue that "Professor
Fischel not only identified 14 specific disclosures of the fraud that were statistically significant,
but identified other third-party disclosures (*i.e.*, analyst reports/media articles) discussing House-
hold's predatory lending and reaging practices that were corrective disclosures that caused the
stock price decline." (Pl. Br. 10)  None of those 14 "specific disclosures" or the unspecified
"other third-party disclosures" explains any of the declines discussed above that are incorporated
in the "leakage" model the jury actually adopted.  As to those declines, and others like them, that
occurred during the 330-day "leakage period," Fischel attributed the losses to ***no disclosures at
all***.  On hundreds of days during the "leakage" period, Fischel calculated actionable declines in
the absence of any fraud-related disclosure.  Having failed to link losses to disclosures, Fischel's
leakage approach necessarily failed to link the losses to the alleged fraudulent statements as
*Dura* and *Tricontinental* require. *Tricontinental*, 475 F.3d at 843 ("there must be a causal con-
nection between the material misrepresentation and the loss").

### B.    The Trial Record Is Devoid of Evidence That $23.94 of Inflation Was Introduced into Household's Stock Price by the March 23, 2001 Statement

No record evidence attributes a $23.94 increase of inflation to any of the 17 statements
the jury found false or misleading.  Plaintiffs argue, however, that "[i]f the full amount of infla-
tion (in this case the $23.94 cap) is already in Household's stock price from the first false state-
ment (3/23/01), subsequent false statements do not increase inflation but rather cause inflation to
remain in the stock." (Pl. Br. 11)  Although this "response" proves Defendants' point that Plain-
tiffs failed to meet their loss causation burden as to those subsequent statements (*see* Def. Br. 10-
11), it begs the question of how and when that $23.94 allegedly entered the price of Household
stock.  There is no record evidence to support the jury's finding that $23.94 of inflation was in-
troduced by the statement on March 23, 2001 (or by any statement on any other day), and Plain-
tiffs point to none.  Instead, Plaintiffs assert that "the jury adopted Fischel's table and found
Household's stock price was inflated by $23.94 on [March 23, 2001]." (Pl. Br. 12)  So it did.
But that is the problem, not the solution.  The flaw in Plaintiffs' response is that without a shred
of evidence the jury could not *properly* determine that $23.94 of inflation that was not there at all
the day before was introduced into Household's stock price on March 23, 2001.

Even Fischel recognized that the only way for the jury to find that inflation entered the stock price on any particular day was to ignore the only record support for Plaintiffs' inflation figure – that is, Fischel's own leakage quantification – and insert zeroes instead. (*See, e.g.*, Pl. Br. 12.) Fischel's leakage quantification concluded that as a result of the disclosure on March 23, 2001 the inflation in Household's stock price increased by only $0.67 from $23.27 the previous day to $23.94.[5]

| 03/22/01 | $23.27 |
| 03/23/01 | $23.94 |

PX 1395 at 9. The jury disagreed, concluding that as a result of the disclosure on March 23, 2001, the inflation increased from $0 the previous day to $23.94.

| 03/22/01 | $ _____0_____ per share |
| 03/23/01 | $ _23.94_ per share |

(Dkt. 1611, Table B, at 83) To prove loss causation, "plaintiffs must show both that the defendants' alleged misrepresentations artificially inflated the price of the stock and that the value of the stock declined once the market learned of the deception." *Ray*, 482 F.3d at 995. Here, however, *no* evidence supports the jury's finding that $23.94 of inflation was introduced on March 23, 2001, and the evidence introduced by Plaintiffs is fatally inconsistent with that result. By following Fischel's suggestion that it substitute its own quantification, the jury reached a result that was devoid of record support and at odds with governing legal requirements.

C. **The Jury's Verdict Reflects Inflation Increases That Bear No Connection to the Alleged False Statements**

Only an actionable false statement can introduce inflation in a company's stock price. *Dura*, 544 U.S. at 343 (allegations that misrepresentations or omissions artificially inflated a company's stock price were necessary but not sufficient to prove loss causation). Fischel's leakage quantification as adopted by the jury, however, indicates numerous inflation increases during the "leakage period" on dates when no false statements occurred. Examples include:

- On March 4, 2002, Fischel's leakage quantification as adopted by the jury identifies a $3.19 increase in artificial inflation from $19.02 on March 1 (the preceding trading day) to $22.21 on March 4. Plaintiffs did not allege or prove any false statement on this date, and the jury found none.

_____

[5]  Even the $0.67 of inflation was not attributed to any fraud, as Plaintiffs acknowledge that it was only an artifact of Fischel's model. (Pl. Br. 11)

- On June 6, 2002, Fischel's leakage quantification as adopted by the jury identifies a $1.92 increase in artificial inflation from $17.91 on June 5 to $19.83 on June 6. Plaintiffs did not allege or prove any false statement on this date, and the jury found none.

- On July 24, 2002, Fischel's leakage quantification as adopted by the jury identifies a $2.38 increase in artificial inflation from $9.30 on July 23 to $11.68 on July 24. Plaintiffs did not allege or prove any false statement on this date, and the jury found none.

Consider two hypothetical class members. Class Member A purchased a share of Household stock on July 23, 2002 at $9.30 of inflation. Class Member B purchased a share of Household stock on July 24, 2002 at $11.68 of inflation. Both held their shares until the end of the Relevant Period, when inflation was reduced to zero. Based on Fischel's leakage model as adopted by the jury, Class Member B would recover $2.38 more per share than Class Member A despite the fact that no false statement caused inflation to increase between the time of Class Member A's purchase and the time of Class Member B's purchase. Plaintiffs imply that such non-fraud related fluctuations in 2002 result from Fischel's use of a "constant percentage approach." (Pl. Br. 11) This is false. Fischel's use of a "constant percentage" approach applies only to the period prior to November 15, 2001. *Id.*; Kavaler 8/3/09 Dec. Ex. 1 at ¶¶ 41-42. As Plaintiffs acknowledge, residual movements after November 15, 2001 reflect Fischel's conclusion as to the effect of all company-specific news (fraud-related as well as non-fraud related) on Household's stock price and are not mere modeling artifacts. (Pl. Br. 7) Plaintiffs are not entitled to recover under any model that admittedly includes inflation increases such as these (and many others) that are not attributed or attributable to any of the statements that the jury found to be false.

### D. The Leakage Model Resulted in Irrational Verdicts Attributing All Inflation Regarding Three Discrete Theories of Fraud to a Single Statement Related to Only One of Those Theories

Fischel's leakage quantification states that Household's stock price was inflated by $23.94 due to three discrete types of fraud related, respectively, to predatory lending, reaging, and the credit card accounting that resulted in the restatement (setting aside the "inflation" caused by non-fraud factors). (Tr. 2854:20-2855:23) Nevertheless, the jury found that this $23.94 of inflation entered the stock price on March 23, 2001 as a result of a statement (No. 14) that it found related to *only one* of the three theories of fraud: predatory lending. (Dkt. 1611 at 14; Dkt. 1611, Table B, at 83) The jury's attribution of the full $23.94 of inflation to the March 23 statement when the verdict form itself identifies only the predatory lending theory at issue on

that day is internally inconsistent and irrational. A statement about only one of three frauds could not have caused all of the inflation that the jury attributed to all three frauds.

Plaintiffs attempt to sidestep this facially inconsistent verdict by arguing that "the jury properly considered the fraud as one integrated fraud" (Pl. Br. 12), contending that the jury's finding of liability as to any one of the three frauds is equivalent to a finding of liability as to all three types of fraud.[6] As demonstrated above, Plaintiffs' position is directly contradicted by the face of the verdict form itself. It is also legally irreconcilable with Plaintiffs' burden of proving loss causation. *Flag Telecom*, 574 F.3d at 37 ("disaggregation requires that a cause be assigned to each piece of a stock price decline and precludes assigning two different causes to the same quantum of loss."). Moreover, this Court previously considered and rejected the very "integrated fraud" position that Plaintiffs now advance, recognizing it as "a formula for reversal":

> THE COURT: Well, let me tell you why we need to do that because you just brought it up. Statement number one includes how many different issues as to which the jury . . . could find that the statement was false?
>
> MR. DROSMAN: Three.
>
> THE COURT: How do we know which one? How could we know that all of them agreed to one?
>
> MR. DROSMAN: We don't.
>
> THE COURT: Maybe two agreed to delinquency restatements and eight agreed -- disagreed with that.
>
> MR. DROSMAN: Right.
>
> THE COURT: And agreed to predatory lending, and we have no unanimity of a finding.
>
> MR. DROSMAN: But we do. We have unanimity.
>
> THE COURT: No, we don't.
>
> MR. DROSMAN: What you have is you have unanimity that they made a materially false and misleading statement. You don't need unanimity as to the reason that that statement was false and misleading.
>
> THE COURT: I disagree, period. I disagree.
>
> MS. BEER: The other danger, your Honor --
>
> THE COURT: I think that's a formula for reversal.
>
> MR. DROSMAN: I'm sorry?
>
> THE COURT: I think that's a formula for reversal.

---

[6] Plaintiffs' unfounded contention that Defendants waived this argument as to the inconsistency of the jury's verdict is addressed in Part VIII.A, *infra. See* note 20 at page 19.

(Tr. 4068:4-4070:5)  As the Court recognized, Plaintiffs' case involved three distinct theories of fraud.  Both the Court and Plaintiffs' counsel explained to the jury that the verdict form required them to parse the three types of fraud. (Tr. 4723:15-17 (the Court); Tr. 4523:25-4524:6 (Plaintiffs' counsel))  *See Tricontinental*, 475 F.3d at 842-43 (expressly rejecting "on-going scheme" liability and holding that plaintiff must "specify each misleading statement"); *Flag Telecom*, 574 F.3d at 36 (plaintiff must "disaggregate" non-fraud losses from corrective disclosures).  The verdict form, as structured by Plaintiffs themselves, correctly indicated that the March 23 statement could relate only to predatory lending (*see* Kavaler 9/18/09 Dec. Ex. 1 at 3; Dkt. 1611), which is facially inconsistent with the inflation amount the jury attributed to that statement.

Plaintiffs acknowledge this inconsistency but nevertheless defend it by referring to a separate statement on March 28. (Pl. Br. 12)  Plaintiffs apparently contend that the verdict is only a little bit inconsistent because "Household made another false statement on 3/28/01 (Household's 2000 10-K), which clearly related to all three theories and caused inflation of $23.94." (*Id.*)  Plaintiffs cannot manufacture factual consistency by changing the facts.  Because the March 23 statement related only to Plaintiffs' predatory lending theory, it was impermissible for the jury to determine that the full measure of inflation Fischel attributed to all three theories of fraud arose as a result of that statement.  And because the jury did not find the introduction of $23.94 of inflation on March 28, 2001 (in fact it found zero new inflation for that day), Plaintiffs cannot pretend that it did.  This irreconcilable inconsistency mandates a new trial.

## II.    PLAINTIFFS' RULE 10b-5 CLAIMS ARE TIME BARRED BECAUSE INFLATION NEVER INCREASED DURING THE RELEVANT PERIOD

No rational jury could find that a Relevant Period disclosure defect caused the claimed losses.  Fischel's leakage model explicitly demonstrated that all of the alleged artificial inflation was incorporated into Household's stock price before the first day of the Relevant Period. (PX 1395 at 1; Tr. 2936:11-2937:24)  Plaintiffs admit that all fluctuations in the amount of inflation before November 15, 2001 were simply the result of a "constant percentage" modeling artifact — and thus were *not* caused by any of the 17 statements the jury found fraudulent.  (Pl. Br. 11)  Fischel admitted that none of the alleged false statements introduced inflation into the stock price: "Because Household made all those statements and ***reiterated the same statements*** from the beginning until later in the class period, of course, ***the market didn't react because Household is saying the same thing over and over and over again*** . . . ." (Tr. 2963:21-2964:13 (em-

phasis added)).  None of the 17 statements could possibly have introduced inflation during the Relevant Period.  Plaintiffs are mistaken that Fischel's imprimatur permitted the jurors simply to pick their own start date for the inception of inflation and assign an unproven amount of inflation to that date without any factual basis. (*See* Part I.B, *supra*.)  As the Court properly ruled, that "would be creating their own theory of liability." (Tr. 4367:20-4368:2)

## III.  PLAINTIFFS' FAILURE TO PROVE INFLATIONARY INCREASES RENDERS ALLEGED MISSTATEMENTS IMMATERIAL

"[I]f a company's disclosure of information has no effect on stock prices, 'it follows that the information disclosed was immaterial as a matter of law.'" *Oran* v. *Stafford*, 226 F.3d 275, 282 (3d. Cir. 2000).  Assuming it were permissible for the jury to find "total inflation of $23.94 on the first false statement (3/23/01)" (Pl. Br. 34) (*but see* Part I.B. *supra*), and passing the total absence of any evidence that inflation increased by $23.94 on March 23, 2001, that jury finding precludes any showing of materiality for statements relating to Plaintiffs' two other theories. Because the jury found that the maximum amount of inflation arose from the March 23, 2001 statement which addressed only "predatory lending," it is impossible for subsequent statements relating to the restatement or reaging theories to be material, as they did not cause inflation.[7] Plaintiffs' assertion that the statements after March 23, 2001 maintained the initial inflation defies logic.  Even if Plaintiffs' inflation maintenance theory were legally viable,[8] it would at least require that the later statements address the same subject matter as the initial statement.

## IV.  PLAINTIFFS FAILED TO PROVE THAT HOUSEHOLD'S RESTATEMENT RESULTED FROM FRAUDULENT ACCOUNTING

Plaintiffs do not dispute that the accounting treatment for Household's innovative credit card servicing contracts was determined well before the Relevant Period began and that for many years before the start of the Relevant Period Household relied on the accounting treatment approved by its outside auditor Arthur Andersen.  Plaintiffs adduced zero evidence that the original accounting treatment was adopted or applied with any intent to deceive or defraud investors.  Al-

---

[7]    Conversely, attributing the full $23.94 of inflation to later statements relating to all three theories would simply highlight that Fischel's calculation of "inflation" on March 23, 2001 necessarily includes non-fraud related factors.

[8]    *But see In re Credit Suisse First Boston Corp. (Lantronix, Inc.) Analyst Sec. Litig.*, 250 F.R.D. 137, 143-44 (S.D.N.Y. 2008) (rejecting theory that statements "stave[d] off a decline in price"); *In re Northern Telecom Ltd. Sec. Litig.,* 116 F. Supp. 2d 446, 460 (S.D.N.Y. 2000) (rejecting maintenance theory where there was "no evidence that the statements had any effect whatsoever on the stock price").

though Plaintiffs agree that scienter cannot be inferred from the mere fact of the restatement it-self (Pl. Br. 14 n.10), that is all they ever proved on this subject.[9]

Although Plaintiffs state that the record contains "red flags received by management" (Pl. Br. 14), all they can point to is a single question in one *1998* report of examination by the Office of the Comptroller of the Currency (PX 712), a document that predates numerous accounting-related statements that the jury found to be non-actionable, and predates by more than two years any statement on which the jury found liability under Plaintiffs' restatement theory. Because the method of accounting for the credit card contracts remained unchanged, and the revenues from the contracts were disclosed in exactly the same fashion, from well before the Relevant Period until the restatement in August 2002, no reasonable jury could find that this 1998 document con-stitutes evidence of scienter for a fraud that purportedly began in March 2001. (Def. Br. 15 n.20) Straining to fill this evidentiary void, Plaintiffs toss in a gratuitous reference to Schoenholz's March 12, 2001 note recommending destruction of Andrew Kahr's memoranda. Whatever this document may mean, it certainly cannot constitute "evidence" of scienter as to the accounting treatment for credit card servicing contracts. It does not mention the restatement or any relevant accounting issues, and neither the note nor any of the documents discussed in it has anything to do with the accounting for credit card servicing contracts. (PX 1007)[10]

The other items cited by Plaintiffs do not, even in combination, constitute "evidence" of scienter. *In re Career Education Corp.*, 2007 WL 1029092, at *8-*10 (N.D. Ill. Mar. 29, 2007) (in the absence of specific "red flags" demonstrating knowledge of falsity, the fact of a restate-ment, magnitude of a GAAP violation, defendants' positions as high-ranking executives and bo-nuses based on performance could not support an inference of scienter). Plaintiffs attempt to dis-tinguish the multiple authorities holding that "even a very large restatement is not itself evidence

---

[9]    Plaintiffs omit that in the four pre-*Tellabs* cases they cite, a restatement was accompanied by sig-nificant red flags indicating fraudulent intent. *In re Cabletron Systems*, 311 F.3d 11, 24 (1st Cir. 2002) (defendants engaged in insider trading, deliberately booked fictitious sales, and knowingly booked liabili-ties later than incurred); *Provenz* v. *Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996) (defendants engaged in insider trading, withheld material information from their accountants, violated their own accounting prac-tices); *In re Anicom Sec. Litig.*, No. 00 C4391, 2001 U.S. Dist. LEXIS 6607, at *15-*16 (N.D. Ill. May 18, 2001) (defendants deliberately prebilled for goods and services not provided, deferred credits due to customers, understated expense and inventory costs); *In re Discovery Zone Sec. Litig.*, 943 F. Supp. 924, 937 (N.D. Ill. 1996) (defendants engaged in insider trading, some selling over 95% of their holdings).

[10]    That a summary of the accounting treatment was among the dozens of items raised in yearly pres-entations to the audit committee hardly deserves mention. Plaintiffs did not identify in their brief (or at trial) any "red flag" in these presentations because none exists. (PX 176; 694; Pl. Br. 15 n. 11)

of scienter" (Def. Br. 16 n.21) by noting that those cases use the "strong inference" standard at the pleading stage. (Pl. Br. 14 n.10)  Yet the standard at trial is *at least* as stringent as the pleading standard.  *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 328 (2007).  If the mere fact of a restatement cannot constitute evidence of scienter for pleading purposes, *a fortiori* it is not sufficient evidence of scienter at trial.

Furthermore, Plaintiffs cite no record evidence calling into question Defendants' reliance in good faith upon Andersen's knowledge and approval of the accounting for the contracts (and resulting clean opinions every relevant year). (Def. Br. 16)[11]  Instead, Plaintiffs cite only the unsubstantiated non-percipient "expert" opinion of Harris Devor that Andersen was "not comfortable with the accounting" for one of the credit card contracts and that "[i]t doesn't look like [they] looked at" the revenue recognition issue relating to another.[12] (Pl. Br. 17)  Plaintiffs provided no evidentiary support for Devor's speculation, which is not competent evidence, was not admitted for the truth, and did not establish any facts concerning Defendants' state of mind. Plaintiffs may not use an expert as a mouthpiece to "circumvent[] the rules of evidence" or to create facts not in the record. *In re James Wilson Assocs.*, 965 F.2d 160, 172-73 (7th Cir. 1992). In any event, Devor confirmed that Andersen, after reviewing the relevant information, issued a clean opinion allowing the accounting treatment. (Tr. 2521:21-2522:5)

Plaintiffs' contention that scienter was supported by Defendants' desire to meet individual and corporate performance goals should be summarily rejected.  Generalized profit motives common to all corporate officers (such as a desire to maintain or increase executive compensation) are legally insufficient to demonstrate scienter.

> The desire to increase the value of a company and attain the benefits that result, such as meeting analyst expectations and reaping higher compensation, are basic motivations not only of fraud, but of running a successful corporation. Were courts to accept these motives as sufficient to establish *scienter,* most corporate executives would be subject to such allegations. . . .

*Davis* v. *SPSS, Inc*., 385 F. Supp. 2d 697, 714 (N.D. Ill. 2005). *Accord Central Laborers' Pension Fund* v. *SIRVA, Inc.,* 2006 WL 2787520, at *16 (N.D. Ill. Sept. 22, 2006) (Guzmán, J.) (inference of scienter not supported by director's alleged motive to inflate the stock offering price

---

[11]  Plaintiffs failed to respond to, and thus concede, that Defendants' retention of KPMG to re-audit all of its Relevant Period results itself negates a finding of scienter. (Def. Br. 16)

[12]  On cross examination, Devor admitted that he only had a "vague recollection" and that he did not "specifically recall" this matter. (Tr. 2544:9-25)

because of his controlling financial interest); *Stavros* v. *Exelon Corp.*, 266 F. Supp. 2d 833, 848 (N.D. Ill. 2003) (goal of maximizing compensation "do[es] not even remotely suggest fraudulent motivation"); *Globis Capital Partners* v. *Stonepath Group, Inc.*, 2007 WL 1977236, at *3-*4 (3d Cir. 2007); *Tuchman* v. *DSC Communications Corp.*, 14 F.3d 1061, 1068-69 (5th Cir. 1994).

## V.   PLAINTIFFS' "PREDATORY LENDING" THEORY WAS UNTENABLE AS A MATTER OF LAW

The evidence introduced by Plaintiffs during the trial proved only that there were disputed allegations of which the market was well aware – and no more.  Plaintiffs' failure to prove a massive predatory lending scheme is reflected in the jury's finding that numerous statements relating to this theory were not fraudulent. (Dkt. 1611, Nos. 25-26, 30-31, 33-35, 39-40)

Plaintiffs attempt to salvage their legally unsustainable "predatory lending" theory by imputing a duty to disclose from a statement they elected not to include in their list of alleged false statements. (Pl. Br. 19 n.15)  Yet this Court ruled that Plaintiffs could not add, for purposes of arguing a duty to disclose, statements not included on their original list of alleged false statements. (Tr. 4402:4-4403:15)[13]  Because the newly identified section of the 2000 10-K was not presented to the jury or referenced at trial, it may not be considered on this motion.

Plaintiffs also contend that a challenged statement in Household's 2000 10-K regarding their reaging theory – "We have a process which we believe gives us a reasonable basis for predicting the credit quality of new accounts" – triggered a duty to disclose "predatory lending." Plaintiffs strain to conflate this statement with their predatory lending theory by asserting that "rampant predatory lending led to a declining credit quality portfolio." (Pl. Br. 19)  However, they cite no evidence either of this alleged trend or of any supposed causal connection, and in-

---

[13] Plaintiffs' assertions that Defendants waived their legal objections to Plaintiffs' "predatory lending" theory (Pl. Br. 18 n.14, 19 n.16-17) are without merit.  Defendants argued in their Rule 50(a) Motion that the revenue and earnings statements at issue did not give rise to a duty to disclose that Household's lending practices were allegedly illegal or "predatory." (Dkt. 1569-2 at 29-31)  The legal issue was also preserved upon the Court's definitive ruling during the jury instruction conference on April 17, 2009 that the statements in Household's 2000 and 2001 10-Ks were not puffery and gave rise to a duty to disclose alleged "predatory lending." (Tr. 2716:10-2717:12; 2723:13-25)  The colloquy Plaintiffs characterize as "tactical" simply refers to Defendants' understandable reluctance to disclose the content of their sufficiency of the evidence challenge before Plaintiffs rested. (Tr. 2733:21-2734:11)

As for Devor's testimony that Household's filings were misleading for failure to disclose revenue from "predatory lending," Defendants moved *in limine* to exclude his "revenue recognition" testimony (Dkt. 1358-4 at 21-22), and the Court ruled in Defendants' favor. (Dkt. 1528)  Defendants objected repeatedly to Plaintiffs' attempts to resurrect this theory during pretrial proceedings. (PTC Tr. 800:24-808:11, 811:2-812:10) and at trial (Tr. 2409:20-24, 2410:22-2413:20, 2579:20-2585:25)

stead rely solely on Ghiglieri's unfounded non-percipient speculation, which is not competent proof and was not admitted as fact. *James Wilson Assocs.*, 965 F.2d at 172-73.

Plaintiffs argue that the numerous disclosures identified by Defendants were not conveyed with sufficient intensity and credibility. (Pl. Br. 20)  The trial record, however, reflects without contradiction actual information publicized to the market in analyst reports and general circulation periodicals. (Def. Br. 19-20)  Plaintiffs did not present any evidence at trial indicating that the disclosures identified by Defendants did not reach market participants or were not credible.  Plaintiffs' contention that third-party disclosures are inferior to disclosures by the company itself (Pl. Br. 21) is truly ironic, as Plaintiffs' own expert posited that the "truth" was disclosed almost entirely by third-party disclosures. (PX. 1391)[14]

Plaintiffs' evidence of scienter also suffers from fatal deficiencies.  As shown in Part IV, *supra*, generalized profit motives common to all corporate officers (such as a desire to maintain or increase executive compensation) are legally insufficient to demonstrate scienter.  Plaintiffs' theatrical presentation of isolated stock sales out of context does not support an inference of scienter.  In fact, the shares of stock that Aldinger and Gilmer sold for cash during the Relevant Period only constituted between two and four percent of their total holdings at the time of sale.[15] Executives' stock sales are common,  and plaintiffs must demonstrate that sales are unusual or suspicious to constitute circumstantial evidence of scienter. *Pugh* v. *Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008); *Makor Issues & Rights, Ltd.,* v. *Tellabs, Inc.*, 437 F.3d 588, 604 (7th Cir. 2006), *vacated and remanded on other grounds*, 127 S. Ct. 2499 (2007) (sale of 1% of executive's stock does not establish strong inference of scienter); *In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 931 (S.D. Ind. 2008) (stock sales not unusual or suspicious where they constituted small percentages of the individual defendants' holdings).  Despite Plaintiffs' attempt to prejudice the jury by asserting that the individual Defendants made "millions of dollars" by exer-

---

[14]  "*Dura* imposed no requirement that corrective disclosures emanate from the company itself, so long as the truth is disclosed in some fashion." *In re eSpeed Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 297 (S.D.N.Y. 2006); *In re IPO Sec. Litig.*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008).

[15]  For example, although Aldinger exercised 250,000 options in August 2000 and sold 246,000 shares, 146,000 shares were sold to pay exercise price and tax liability for the options; the remaining 100,000 shares sold on the open market constituted only **2.6%** of his total holdings. (Tr. 3072:13-3073:7, 3208:10-3211:9; DX 774; DDX 189-04)  *See also* Tr. 3074:14-3075:11, 3208:10-3211:9; DX 775; DDX. 189-04 (Aldinger); Tr. 1424:24-1426:10, 1360:20-1363:10; DX 759, DDX 189-06 (Gilmer); Tr. 1427:13-1428:3, 1360:20-1363:10; DX 763; DDX. 189-06 (Gilmer).

cising options, the undisputed fact that the Defendants *held* the vast majority of their total hold-ings renders any finding of scienter inconsistent with the facts presented at trial.

## VI.  PLAINTIFFS FAILED TO PROVE THEIR THEORY OF "CREDIT QUALITY CONCEALMENT"

Plaintiffs have no response to the undisputed fact that the minor misstatements at the April 9, 2002 FRC[16] and in the 2001 10-K (filed in March 2002) (which they made the corner-stones of their reaging theory) were *never* corrected during the Relevant Period. (Def. Br. 26)

Plaintiffs do not dispute that Household's reported 2+ delinquency and charge-off figures were never shown to be incorrect and were never restated. Thus their "credit quality conceal-ment" theory depended entirely on the premise that Household's disclosures were misleading because the underlying *purpose* of reaging policy changes was not disclosed. (*E.g.*, Pl. Br. 25, asserting that the undisclosed information was the alleged "use of reaging . . . to artificially re-duce the level of reported 2+ delinquent accounts" and the "aggressive and constantly changing" practices.)  Plaintiffs do not dispute that Household made detailed disclosures regarding reserves and the probability of loan defaults, but rather argue that those key disclosures were irrelevant because reserves are merely estimates of future loss, not "actual numbers reported based on cur-rent data" such as 2+ statistics. (Pl. Br. 26)  But that is precisely the point.  The actual reported 2+ figures and reserves were never shown to be incorrect or restated, reducing Plaintiffs' theory to nothing more than a dispute about the purpose of management's reage decisions.  As the Court of Appeals held in *DiLeo* v. *Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990), disputes about the timing of a writeoff do not rise to the level of fraud.[17]

---

[16]  Plaintiffs' suggestion that the inadvertent discrepancy in loans reaged either once or multiple times resulted in a $3 billion difference is incorrect. (Pl. Br. 27)  The company had already reported this subset of loans as reaged once.  Since the outstanding loan principal does not disappear upon a second reage, the difference to investors is only whether the loans were reported in the single or multiple reage category. (Def. Br. 25)  Plaintiffs' assertion that product line recidivism statistics were incorrect (Pl. Br. 28) rests on a similar distortion of the record.  The definition of recidivism used by Household did not include subsequent reages. (Def. Br. 25 n.29)  Furthermore, Plaintiffs do not contest, and thus concede, that they were required to prove that a Defendant *knew* that an undisclosed fact *was material to investors* in order to prove scienter. (Def. Br. 26)  Because Plaintiffs offered no evidence calling into question De-fendants' justified belief that the FRC mistakes were immaterial, there is no evidence of scienter.

[17]  Plaintiffs assert that *DiLeo* does not control because the plaintiff there alleged a failure to increase reported reserves rather than reported 2+ and charge-off figures. (Pl. Br. 26 n.33)  Plaintiffs offer a dis-tinction without consequence — whether allegations involve the timing of establishing reserves or timing of reaging / charge-off decisions, the dispute is simply a question of judgment.

Plaintiffs' current allegation that Household's reserves were "unreliable" or "under-stated" (Pl. Br. 27) was never substantiated, conflicts with undisputed percipient witness testi-mony, and depends solely on the testimony of Devor, who provided no factual support whatso-ever for his non-percipient speculation. Indeed, Devor testified that he did *not* offer any opinion as to the adequacy of reserves and that this was "way beyond the scope of [his] engagement." (Tr. 2564:25-2567:11) In any event, Devor's unsupported assertions of fact could not have been considered by the jury for their truth. *James Wilson Assocs.*, 965 F.2d at 172-73.

## VII. PLAINTIFFS FAILED TO ESTABLISH PRIMARY LIABILITY AGAINST GARY GILMER

Plaintiffs did not demonstrate that Gilmer *made* any actionable false or misleading state-ments, as required by Rule 10b-5. *See* 17 C.F.R. § 240.10b-5. The evidence does not support Plaintiffs' contention that Gilmer is primarily liable for statements made in Household's 10-Qs or 10-Ks. As the Court of Appeals recently confirmed, "an indirect chain to the contents of false public statements is too remote to establish primary liability." *Pugh*, 521 F.3d at 697 (citing *Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008)). Gilmer's indi-rect involvement (responsibility over one of the business units that submitted financial data and the opportunity to review the financial statements) is insufficient under *Pugh,* where the Court of Appeals found it dispositive that (as here) the individual had not personally participated in the preparation or dissemination of a false statement. 521 F.3d at 697.[18] Plaintiffs cite no evidence that Gilmer was responsible for facts or figures from other business units, or that he ever re-viewed final drafts of the financial statements, which were subject to seven further levels of scru-tiny after comments from department heads. (Tr. 2106:21-2109:16; DDX 802-01) Plaintiffs also failed to offer any evidence in support of finding Gilmer primarily liable for Schoenholz's state-ments at the FRC simply because he was there. (Pl. Br. 30) The question is not whether Gilmer attended the conference, but whether he had knowledge of the statements' alleged falsity, *i.e.*, scienter. Plaintiffs chose not to ask Gilmer any questions about the FRC, and the record is de-

---

[18] Plaintiffs' argument that a defendant may be liable under Rule 10b-5 for the remote acts of ap-proving or furnishing information does not comport with applicable law. (*See* Part XI.A, *infra*.) Plain-tiffs' invocation of *Makor Issues & Rights, Ltd.* v. *Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008), which held that the pleading requirements for *corporate* scienter may be satisfied without being able to name the individuals who perpetrated the alleged fraud, is unavailing as to Gilmer's *individual* scienter.

void of any evidence that he had any role in making or authorizing the challenged statements or that he had reason to believe that any part of the presentation was incorrect.[19]

Nor have Plaintiffs provided any evidence establishing Gilmer's liability under their restatement theory. Contrary to Plaintiffs' attempt to reverse the burden of proof (Pl. Br. 30, arguing that the evidence "does not establish a lack of knowledge"), the onus was on Plaintiffs to offer evidence of Gilmer's purported responsibility for statements regarding the credit card accounting. The credit card business did not report to Gilmer (Tr. 1358:7-13; 3218:24-3219:6), and Plaintiffs cannot point to any evidence that Gilmer had any knowledge of the accounting issues that led to the restatement or any reason to doubt such accounting. The mere fact that Gilmer held a high position is not enough to establish a "strong inference of scienter" at the pleading stage, let alone prove scienter at trial. *E.g.*, *Johnson* v. *Tellabs, Inc.*, 262 F. Supp. 2d 937, 957 (N.D. Ill. 2003) ("scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company") (quoting *Abrams* v. *Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir.2002)); *Career Educ. Corp.*, 2007 WL 1029092, at *8 (same). Gilmer's "involvement" in activities related to Plaintiffs' other two distinct theories of fraud is likewise irrelevant, yet another example of Plaintiffs' impermissible conflation of their theories (a "formula for reversal," *see* Part I.D, *supra*).

No matter how it may be characterized by counsel, Gilmer's March 23, 2001 statement in *Origination News* was a "soft" statement of this opinion, actionable "solely as a misstatement of the psychological fact of the speaker's belief." *Virginia Bankshares, Inc.* v. *Sandberg*, 501 U.S. 1083, 1095 (1991). Gilmer's colloquial expression of his honestly held belief that it was "an accurate statement of facts" does not turn puffery or opinion into hard fact under Rule 10b-5.

## VIII.   THE JURY'S VERDICTS ARE IRRECONCILABLY INCONSISTENT

### A.   Defendants Preserved Their Objections to the Jury's Inconsistent Verdicts

Plaintiffs grossly mischaracterize both the record and the law in arguing that Defendants waived objections to the jury's inconsistent verdicts. Defendants asked the Court to retain the jury and clearly objected to the inconsistencies prior to the jury's discharge – and the Court stated on the record that Defendants had preserved any issues they wished to raise in a written

---

[19] *Barrie* v. *Intervoice-Brite, Inc.*, 409 F.3d 653, 656 (5th Cir. 2005) is inapposite, because liability for failing to correct another's statement requires knowledge that the statement is false.

motion. (Tr. 4806:25-4809:18)[20]  Plaintiffs' argument that Defendants needed to "object to dis-charge of the jury" has been rejected by courts that have considered it. *E.g., Kosmynka* v. *Polaris Industries, Inc.*, 462 F.3d 74, 83 (2d Cir. 2006) ("[T]here is no authority to support plaintiffs' contentions that, when faced with an inconsistent verdict, the onus is on the 'dissatisfied party' to *ensure* that the court keep the jury. . . .  A litigant preserves the issue for appeal by exposing the inconsistency before the jury is dismissed.") (citing cases).  Indeed, the Court of Appeals has "never specifically endorsed" the view that an objection to inconsistent verdicts prior to the jury's discharge is required. *E.g., Pearson* v. *Welborn*, 471 F.3d 732, 739 (7th Cir. 2006) (citing *Carter* v. *Chicago Police Officers*, 165 F.3d 1071, 1079-80 (7th Cir. 1998)).  An inconsistent verdict may justify a new trial even where not identified until after the jury was discharged. *Timm* v. *Progressive Steel Treating, Inc.*, 137 F.3d 1008, 1010 (7th Cir. 1998).[21]

### B.    Attributing the Maximum Inflation to the First False Statement Does Not Render the Jury's Findings of Inflation and Liability Consistent

Faced with the logical (and legal) impossibility of total inflation of $23.94 arising on the date of the first false statement (March 23, 2001), Plaintiffs argue that because this amount "was the 'cap' per Fischel's model, by necessity there would be no further increase in inflation on sub-sequent false statement dates." (Pl. Br. 34)  Instead of reconciling the inconsistency, this asser-tion merely highlights the problem with the jury's finding of no new inflation after March 23, 2001, and the deficiencies of the leakage model, which merely carries forward the *same* inflation

---

[20]    After being informed that the jury had reached a verdict, counsel for Defendants stated: "we may need a few minutes to review it and caucus ourselves, during which time it probably would be advisable to keep the jury but -- send them back to the jury room while counsel review the verdict form." (Tr. 4787:22-4788:21)  The Court stated that after reviewing the verdict form it would "ask [counsel] if you have any motions to make before I discharge the jury." (Tr. 4788:17-18)  The Court then reviewed the form, stated that it was consistent, and published the verdict. (Tr. 4790:3-4792:25)  Counsel for Defen-dants objected on the record and in the presence of the jury: "We believe the verdict is fatally inconsistent in a number of ways, which we're prepared to detail to the Court. . . .  We have other things we'll say at the appropriate time, but that is something which I thought should be mentioned before the jury retires." (Tr. 4806:25-4807:14)  Nevertheless, the jury was discharged and sent to the jury room, and counsel for Defendants began to outline additional objections to the verdict.  The Court interjected and stated: "**I'm ruling that you're reserving any issues you wish to raise in a written motion**." (Tr. 4809:6-18) (em-phasis added)

[21]    The older cases cited by Plaintiffs do not involve inconsistent general verdicts (like the verdict form here), but instead focus on inconsistencies among special interrogatories under Rule 49(b).  In *Strauss* v. *Stratojac Corp.*, 810 F.2d 679, 683-84 (7th Cir. 1987), the court merely held that the failure to object to inconsistent interrogatories *or* to the discharge of the jury constituted a waiver. *Will* v. *Compre-hensive Accounting Corp.*, 776 F.2d 665, 678 n.6 (7th Cir. 1985), noted in dicta that objections to special verdicts may be waived, but stated: "[w]e need not decide whether this is also the rule for inconsistent general verdicts." *Fox* v. *Hayes*, 2008 WL 4411574, at*10 (N.D. Ill. Sept. 25, 2008), only focused on the *timing* of the objection.  In any event, Defendants timely objected to the inconsistencies.

from before the start of the Relevant Period to November 15, 2001. (*See* Parts I-III, *supra*.) The implication that there *might* have been additional increases in inflation absent Fischel's self-created "cap" is mere speculation. Rule 10b-5 liability can only attach where a plaintiff proves that a false statement *caused* the stock price to become artificially inflated. The only evidence in the record connected to the jury's loss causation findings is the figures contained in the leakage model. By definition, Plaintiffs did not prove loss causation for statements on days on which the jury found no inflation increase, *Ray*, 482 F.3d at 995; *Tricontinental*, 475 F.3d at 843, and as to each statement for which the jury imposed liability but found no increase in inflation (or found deflation), the verdict is irreconcilably inconsistent as well as legally untenable.

### C.     There Is No Rational Explanation for the Jury's Inconsistent Findings Regarding the Alleged Restatement-Related Fraud

The jury drew an irrational distinction between disclosures of identical financial information derived from the same accounting methodology. (Def. Br. 30) Plaintiffs try to explain away the inconsistency by theorizing that scienter must have arisen between January and March 2001. (Pl. Br. 34) But theory is not proof and, as demonstrated in Part IV, *supra*, Plaintiffs adduced *no* evidence of scienter as to the accounting treatment prior to the restatement (either during January-March 2001 or at any time during the Relevant Period). The jury's verdicts are thus irreconcilably inconsistent.[22]

### D.     The Jury's Verdicts Were Inconsistent in Other Material Respects

The jury irrationally found Defendants liable for statements of financial results in Household's 2000 10-K, issued on March 28, 2001, while finding no liability for identical statements in a press release dated January 17, 2001. Plaintiffs argue that the disclosures were "hardly 'identical'" because the 10-K included footnotes (not on their list of false statements) and was longer than the press release. (Pl. Br. 35) Yet Plaintiffs' burden at trial was to prove that the *specific statements* they challenged (which the Court instructed them to identify with specificity prior to trial under pain of preclusion (Kavaler 9/18/09 Dec. Ex. 2, 12/16/08 Tr. at 16:4-21; Tr. 4402:4-4403:15), were defective. The statements from the 2000 10-K and the press release that Plaintiffs chose to include in Table A were substantially identical with respect to the financial infor-

---

[22] Plaintiffs' academic argument that "the jury never made a finding exonerating Household for the period 7/99-1/01" and their reliance on the concurring opinion in *Kansas* v. *Marsh*, 548 U.S. 163, 194 (2006) (discussing the constitutionality of Kansas's death penalty statute), are simply beside the point (Pl. Br. 34). A finding of liability during the latter part of the Relevant Period is inconsistent with a finding of no liability during the former part of the Relevant Period.

mation upon which Plaintiffs based their claims. Plaintiffs may not now decide that their claims were instead based on the footnotes to the financial statements that were *not* included in their list.[23]

Finally, the jury's sole finding of a "knowing" violation (Dkt. 1611, No. 14) cannot be reconciled with its finding that none of the other statements was a "knowing" violation. The March 23, 2001 statement (Dkt. 1611, No. 14) and the March 28, 2001 statement (Dkt. 1611, No. 15) both related to Plaintiffs' "predatory lending" theory, under which Plaintiffs contended that all statements were misleading for failure to disclose "the existence and nature of [Household's] predatory lending practices." (Pl. Br. 18) When asked whether Aldinger and Household acted with knowledge on March 23, the jury responded "yes," but when asked whether Aldinger and Household acted with knowledge on March 28, the jury responded "no." This inconsistency cannot be reconciled, and Plaintiffs offer no factual explanation to the contrary.

## IX.    ADMITTING UNRELIABLE EXPERT TESTIMONY WITH NO ADEQUATE LIMITING INSTRUCTIONS DEPRIVED DEFENDANTS OF A FAIR TRIAL

Plaintiffs repeatedly (and incorrectly) assert that Defendants have not demonstrated prejudice, but they offer no response to the well-established legal principle that a new trial is required where, as here, the cumulative effect of multiple errors is a fundamentally unfair trial, even if individual errors standing alone might be viewed as harmless. *Frymire-Brinati* v. *KPMG Peat Marwick*, 2 F.3d 183, 188 (7th Cir. 1993) (reversing and remanding for new trial because while "[o]ne or two" of the trial errors "might have been excused as harmless," taken together "they presented the jury such a skewed picture that the verdict is unreliable"); *accord U.S.* v. *Santos*, 201 F.3d 953, 962-65 (7th Cir. 2000); *Adams Labs., Inc.* v. *Jacobs Eng'g Co.*, 761 F.2d 1218, 1227 (7th Cir. 1985). Notwithstanding Plaintiffs' baseless objection to revisiting "old matters" (Pl. Br. 36),[24] Defendants' motion necessarily outlines the cumulative effect of multiple evidentiary errors at trial. The issues anticipated in Defendants' *Daubert* and *in limine* motions unfolded at trial and the combined prejudicial effect resulted in a fundamentally unfair result.

---

[23] Plaintiffs also argue that scienter arose as to all three theories upon Schoenholz's March 21, 2001 note regarding Kahr. (PX 1007; Pl. Br. 35) Yet this document has absolutely nothing to do with the only theories implicated by the reported financial results -- Plaintiffs' restatement and reaging theories.

[24] Plaintiffs cite only inapposite cases that discuss the "extraordinary remed[y]" of reconsideration under Rule 59(e). *Foster* v. *DeLuca*, 545 F.3d 582, 584 (7th Cir. 2008). Apparently in Plaintiffs' view, if Defendants did not raise an issue before, it is a waiver, but if they did, it is an "old matter" – anything to avoid having the Court focus on the merits of Defendants' largely unanswered arguments.

## A.     Plaintiffs Cannot Justify the Admission of Ghiglieri's Testimony

Unable to respond to Defendants' critique of Ghiglieri's methodology and testimony at trial, Plaintiffs posit a "limited" judicial gatekeeping process (Pl. Br. 36) that does not comport with *Daubert* or its progeny in this Circuit, seeking to circumscribe the critical role the Court must play to prevent the jury from being swayed by unreliable expert testimony.[25]

Rather than showing that Ghiglieri's methodology was adequate, Plaintiffs merely cite a catalog of documents. (Pl. Br. 37)  Yet as Plaintiffs themselves recognize, an expert's reliability depends on the methodological rigor with which she analyzes the facts (*id.*), and the very problem with Ghiglieri's lack of any discernable methodology is that her testimony was nothing more than an unsubstantiated summary of Plaintiffs' predatory lending allegations by a non-percipient witness.[26]  Plaintiffs' bald assertion that Ghiglieri quantified "customer harm" (Pl. Br. 37 n.47) stands in sharp contrast to Ghiglieri's repeated admissions that she had no idea how many Household customers or what percentage of Household loans may have been affected by any of the practices she claimed to be "predatory." (Def. Br. 36)  Plaintiffs point to no evidence that Ghiglieri performed any mathematical calculations or statistical analysis to quantify harm (instead, she simply adopted the amount of the AG settlement as proof of materiality, in violation of F.R.E. 408).  In any event, it was Plaintiffs' burden to prove as a matter of fact that alleged predatory lending was "systemic," "widespread," and "companywide," and their exclusive reliance on Ghiglieri's non-percipient say-so on that essential issue rendered the admission of her testimony highly prejudicial.

Ghiglieri did not perform a "traditional analysis," but instead "ignore[d] accepted methodology in the field of consumer credit regulation." (Kavaler 9/18/09 Dec. Ex. 3 (Bley Report),

---

[25]  Defendants have repeatedly taken issue with Ghiglieri's methodology (or lack thereof), in particular the lack of analytical rigor or quantifiable metrics in her process (*e.g.,* Dkt. 1356), and with her use of and reliance upon unverified complaints and reports.  Defendants moved to exclude Ghiglieri's testimony in its entirety under *Daubert* and the Court's definitive ruling denying that motion (Dkt. 1515) abrogated the need to repeat this objection at trial. *Wipf* v. *Kowalski*, 519 F.3d 380, 385 (7th Cir. 2008).

[26]  Plaintiffs mischaracterize the record in arguing that Ghiglieri did not opine that Household misled Spanish-speaking customers. (Pl. Br. 37 n.45; *see* Tr. 569:1-15, 837:5-839:13)  To support their assertion that Household's interest rates were not competitive (Pl. Br. 37 n.48; Tr. 434:23-436:24), Plaintiffs use a hypothetical example from Hueman's unauthorized training video, which used a fictional competitor named "Billy Bob Brokerage Firm" for pedagogical purposes. (PX 1383)  Plaintiffs ignore Ghiglieri's improper parroting of Charles Cross's views. (Def. Br. 38); *Jones* v. *Lincoln Elec. Co.*, 188 F.3d 709, 724 (7th Cir. 1999).  And they make no attempt to defend the absence of any expert basis for her unqualified opinion that Household *consciously* masked delinquencies. (Def. Br. 36 n. 36)

15)  Plaintiffs assert (erroneously and without record citation) that Defendants' expert "con-

ceded" Ghiglieri's methodology (Pl. Br. 37); their contention that Bley agreed that an examiner's

methodology "often utilized 'only . . . the materials reviewed by Ghiglieri'" (*id.*) seriously mis-

characterizes his lengthy description of the field examination process. (Bley Report 8)

### B.    Plaintiffs Cannot Justify the Admission of Opinions Outside the Scope of Devor's Expertise and Contrary to Governing Law

Plaintiffs fail to explain how an accountant has the expertise to identify or quantify reve-

nue attributable to "predatory lending" (Pl. Br. 39-40), particularly when Devor admitted he had

no expertise. (Tr. 2408:13-18, 2511:2-7, 2569:7-11; Def. Br. 40)  Exclusion is appropriate for

purported expert testimony on matters beyond the witness's expertise. *Lincoln Elec. Co.*, 188

F.3d at 724; *Solaia Technology LLC* v. *Arvinmeritor, Inc.*, 361 F.Supp.2d 797, 813-14 (N.D. Ill.

2005).  Plaintiffs also cannot justify their reliance on PX 681.  Plaintiffs' unsupported assertion

that "there was never a real dispute about the purpose of PX 681" does not excuse their failure to

demonstrate the purpose and significance of the document through admissible evidence at trial.[27]

Plaintiffs erroneously assert that Defendants made no objection to Devor's impermissible

testimony equating a GAAP violation with a finding of fraud under Rule 10b-5.  Defendants

multiple objections to this testimony led to the Court's instructing the jury to disregard Devor's

testimony.[28]  As in *U. S.* v. *Riddle*, 103 F.3d 423, 434 (5th Cir. 1997), however, the court's limit-

ing instructions did not counteract the prejudicial effect of allowing Devor to testify at length

about the supposed implication of a GAAP violation. *Accord Joseph* v. *Brierton*, 739 F.2d 1244,

1247 (7th Cir. 1984) ("the efficacy of such an instruction is always uncertain").  Moreover, be-

cause the error was severe enough to be raised repeatedly not only by Defendants but by the

Court, the attempted curative instruction was insufficient. *Joseph*, 739 F.2d at 1248.

Plaintiffs' argument that Devor's testimony was not comparable to the violation in *Jo-

seph* is unconvincing. (Pl. Br. 42 n.53)  Devor opined that Defendants violated GAAP by not

identifying Household as a systemic "predatory lender" and that that was, in effect, commensu-

---

[27]  One assumes the lack of a "real dispute" refers to something other than a stipulation.

[28]  Defendants objected on the basis of the Court's *Daubert* ruling on revenue recognition on April 15, 2009 and subsequent occasions. (Tr. 2409:22-24, 2410:22-2413:20, 2579:20-22, 2582:16-2583:12) The Court requested written submissions, remarking that the expert's testimony appeared to be an "end run around the Court's ruling." (Tr. 2705:20-2706:17)  The Court gave an attempted curative instruction (Tr. 3811:14-3812:1), and Defendants unsuccessfully requested a further instruction at the close of trial. (Tr. 4007:21-4008:15, 4009:23-4010:8)

rate with a finding of fraud under Rule 10b-5. (Tr. 2400:14-2406:3, 2408:8-11, 2416:15-18, 2420:9-17)  The testimony was highly prejudicial and, as the Court correctly explained, legally incorrect. (Tr. 2712:21-2713:9; Dkt. 1528)

>    **C.    The Prejudice That Followed from the Court's Erroneous *Daubert* Rulings Was Exacerbated by the Lack of Suitable Limiting Instructions**

The jury should have been clearly and adequately instructed that Plaintiffs may not satisfy their factual burden of proof with unsupported factual assertions of non-percipient experts.[29] *In re Lake States Commodities, Inc.*, 271 B.R. 575, 585-86 (Bankr. N.D. Ill. 2002) ("the admissibility of the expert's opinion does not equate with its utility in satisfying a burden of proof"; declining to give weight to expert's evidence, which was "the only evidence in this case to prove a fact"); *Sears, Roebuck and Co.* v. *Savoy Reinsurance Co. Ltd.*, 1991 WL 247583, at *5 (N.D. Ill. Nov. 8, 1991) (expert opinion "carries no weight unless the facts he relies on to reach his conclusions are also proven.").  The jury was inundated with prejudicial expert testimony that was not put into proper context by a sufficient limiting instruction explaining that the experts' opinions were not to be treated as fact in determining whether Plaintiffs had met their burden of proof.

>    **X.    IMPROPER JUDICIAL RULINGS AND PLAINTIFFS' CIRCUMVENTION OF PROPER EXCLUSION ORDERS RESULTED IN AN UNFAIR TRIAL**

>    **A.    Plaintiffs Built their Predatory Lending Case on Prejudicial and Inadmissible Hearsay**

As was the case here, the extensive and indiscriminate use of limited-purpose evidence can be "misleading to the jury, not because the jury [is] not discerning but because the evidence [was] offered in such a large and unchecked way that its permissible limited use was overwhelmed." *Riddle*, 103 F.3d at 434.  It is for this very reason that a court, when overruling an objection made to an expert's reading into evidence the documents underlying his opinion, must indicate that it has weighed the potential prejudice of this evidence against its probative value. *Nachtsheim* v. *Beech Aircraft Corp.,* 847 F.2d 1261, 1270 (7th Cir. 1988); Fed. R. Evid. 703 advisory committee's notes (2000).  Defendants moved *in limine* to exclude customer complaints and complaints filed in other civil cases. (Dkt. 1349)  The Court ruled that complaints could be

---

[29]    To support their assertion that expert testimony can satisfy a party's burden of proof, Plaintiffs cite an inapposite case, *Hardnick* v. *United States*, 2009 U.S. Dist. LEXIS 53739, at *19-*20 (N.D. Ill. June 25, 2009), a medical malpractice case which held that a trier of fact may rely on expert testimony to determine the appropriate "standard of care."  The case in no way supports the proposition that an expert opinion can serve as a proxy for proving the underlying facts.  Those facts must be independently proved, not "created" by non-percipient expert testimony. *James Wilson Assocs.*, 965 F.2d at 172-73.

used to counter the argument that the problems involved a rogue office.[30] (Dkt. 1516 at 5)  However, Plaintiffs' expert Ghiglieri spent more than two days simply reading the documents aloud, thus inundating the jury with unadjudicated complaints that were never shown to be statistically significant and were unsubstantiated hearsay offered through a non-percipient witness for its truth. (*See* Tr. 496:16-643:1, 652:21-700:10.)  That the sponsor of this inadmissible showing was a supposed expert compounded the resulting prejudice.

### B.    Plaintiffs Deliberately and Repeatedly Violated the Court's Exclusion of Settlement Evidence Pursuant to Rule 408

Plaintiffs' characterization of the record regarding Plaintiffs' use of the AG Settlement is insupportable.  The Court ruled *in limine* that Plaintiffs' use of the Settlement would be limited to testimony by Fischel as to the "date, time, means and nature of the [settlement] disclosure . . . without requiring introduction of any actual settlement documents or any documents or testimony concerning allegations that were settled or the settlement terms or negotiations." (Dkt. 1516 at 6)  The record demonstrates that Plaintiffs intentionally chipped away at the protection granted by the Court and mandated by Federal Rules of Evidence 403 and 408, by repeatedly introducing testimony and exhibits relating to the excluded aspects of the Settlement through their "experts" and through lay witnesses — in each instance with the overt implication that the Settlement and related documents proved Household's alleged liability for widespread predatory lending.  Defendants identified numerous examples of these breaches. (Def. Br. 45-48)  Permitting Plaintiffs incrementally to push the door further and further open allowed the jury to reach its verdict based on Plaintiffs' appeal to prejudice, depriving Defendants of a fair trial.

### C.    Fischel Gave Testimony That Had Not Been Disclosed in His Expert Report

Plaintiffs assert that Fischel's newly-offered trial opinions were disclosed (Pl. Br. 49), yet fail to identify when and how.  The sections of Fischel's Rebuttal Report that Plaintiffs cite (¶¶37-38) do not mention the "significant growth strategy" that Fischel expounded upon at trial (mirroring Plaintiffs' opening statement).  Plaintiffs also provide no citation for their assertion that Fischel disclosed his pivotal opinion that the jurors could reject his inflation quantifications and insert zeros where they chose.  This theory was newly minted for trial to deal with fatal defects in Fischel's loss causation studies, and there was no prior disclosure.

---

[30]  The Court's Order abrogated the need to repeat this objection at trial. *Wipf*, 519 F.3d at 385.

-25-

## XI.    PREJUDICIAL ERRORS IN THE JURY INSTRUCTIONS AND VERDICT FORM REQUIRE A NEW TRIAL

Defendants are entitled to a new trial if "[their] tendered instruction was correct; the instruction the court gave misinformed the jury; and the misinformation prejudiced the objecting party." *Dawson* v. *New York Life Ins. Co*., 135 F.3d 1158, 1167 (7th Cir. 1998).  Citing *Susan Wakeen Doll Co.* v. *Ashton-Drake Galleries*, 272 F.3d 441, 454 (7th Cir. 2001), Plaintiffs assert that Defendants have not shown prejudice, only speculation that the outcome could have been more favorable with different jury instructions. (Pl. Br. 50, 52, 53, 54-55, 60)  Defendants are entitled to a new trial not because they speculate that the outcome could have been *different*, but because on this record the charge and verdict form were legally incorrect and led to a demonstrably *untenable* outcome.  Even if correct instructions might be found somewhere in the trial record, that is insufficient where, as here, the instructions lead to confusion about the law.  "An incorrect instruction calls for a new trial even if the jury could have based its verdict on a different, properly instructed theory." *Dawson*, 135 F.3d at 1165.  The Court cannot assume that the jury based its decision on a correct legal theory where *both a correct and incorrect theory were instructed*.  "Prejudice to the complaining party includes the *possibility* that the jury based its decision on incorrect law."  *Id*. (emphasis added).

### A.    Plaintiffs Have Provided No Justification for Instructing the Jury That It Could Find Liability If "the Defendant Made, Approved, or Furnished Information to Be Included in a False Statement"

Plaintiffs challenge Defendants' reliance on *Stoneridge Inv. Partners*, 128 S. Ct. 761, because the secondary actors in that case were suppliers and customers who had "no role in preparing or disseminating the financial statements." (Pl. Br. 51-52)  By focusing on the outside status of the secondary actors, Plaintiffs have missed the point.  The Supreme Court held in *Stoneridge* that a secondary actor's "deceptive acts, which were not disclosed to the investing public," are inactionable because they are "too remote to satisfy the requirement of reliance." *Id*. at 770.  The Court's instruction was contrary to *Stoneridge* because it directed the jury to find liability under Rule 10b-5 not only for making a false statement, but for the remote acts of approving or furnishing information.[31]

---

[31]    It is telling that Plaintiffs make no effort to distinguish *Pugh*, 521 F.3d at 697, a case cited in their own brief (Pl. Br. 51).  In *Pugh*, the Court of Appeals refused to impose 10b-5 liability on an officer of a subsidiary company, explaining that the officer's conduct was too remote from the actual issuance of the alleged false statement to ground liability.

The instruction's reference to the furnishing or approval of information was transplanted from a discussion of corporate scienter. The Court of Appeals, in articulating the limits of the collective scienter doctrine, used the phrase as follows:

> To establish corporate liability for a violation of Rule 10b-5 requires "look[ing] to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) . . . ."

*Makor Issues & Rights, Ltd.* v. *Tellabs, Inc.*, 513 F.3d 702, 708 (7th Cir. 2008) (quoting *Southland Sec. Corp.* v. *Inspire Ins. Solutions Inc.*, 365 F.3d 353, 366 (5th Cir. 2004)). The argument that *Southland* implied that individuals may be liable under Section 10(b) for furnishing information that caused a company to issue false or misleading statements – the same rationale that underlies this Court's instruction – was later explicitly rejected by the Central District of California in *In re Int'l Rectifier Corp. Sec. Litig.*, 2008 WL 4555794, at *11 (C.D. Cal. May 23, 2008).

This erroneous instruction permitted the jury, *inter alia*, to find Gilmer liable for statements in Household's 10-Ks, 10-Qs, and related press releases – statements that he did not make and to which he had only an indirect chain. Straining to justify that inexplicable outcome, Plaintiffs erroneously assert that "Aldinger testified that Gilmer was responsible for the consumer lending disclosures contained in Household's Form 10-K." (Pl. Br. 52 (citing Tr. 3427:16-22)) Not only do Plaintiffs mischaracterize Aldinger's testimony, they also ignore Schoenholz's testimony that 10-Ks were subject to seven additional levels of scrutiny after review by department heads. (*See* Tr. 2106:21-2110:23 and DDX 802-01.)

### B. Plaintiffs Have Not Demonstrated that a Defendant Has a Duty to Disclose Information if Its Omission Would Render a "Prior Statement" Misleading

It is well-settled that the requirement of concurrent disclosure of all material facts necessary to prevent a given statement from being misleading applies only to the statement in question and does not impose a duty to correct allegedly fraudulent prior statements whenever a new statement is made. *Oran*, 226 F.3d at 286; *Stransky* v. *Cummins Engine Co., Inc.*, 51 F.3d 1329, 1331 (7th Cir. 1995). The Court's instruction, in contravention of this clear principle, creates a perpetual duty to correct prior statements and thereby renders the statute of repose meaningless. Unable to dispute Defendants' position that there is no reviving duty to correct, Plaintiffs instead toss in a red herring by asserting that "Defendants' fears about the statute of repose are completely unfounded. The Court advised the jury that defendants could only be liable for statements or omissions during the relevant period." (Pl. Br. 54) This is of no consequence because

-27-

there is no reviving duty to correct statements made even *within* the Relevant Period. In addition, because Plaintiffs have argued a legally unfounded theory of inflation maintenance, asserting that the alleged frauds are failures to correct prior statements, the Court's attempt to confine the jury was ineffectual. The Court limited the jury to considering alleged misstatements or omissions made during the Relevant Period, but under the "prior statement" instruction each of those statements could relate back to prior statements made outside that period.

### C. Plaintiffs Have Not Demonstrated that "Knew or Should Have Known" Has Any Place in a Scienter Instruction

In response to Defendants' argument that the Court's scienter instruction was improperly diluted because, *inter alia*, it charged that "the required state of mind depends on what [a defendant] knew *or should have known* when he made a particular statement or omission," Plaintiffs argue that "[c]ourts use the phrase 'should have known' to describe this temporal aspect of scienter." (Pl. Br. 55-56) Nowhere in any of the cases Plaintiffs cite does any court link the "should have known" phrase to any purported temporal aspect.[32] Eliminating the phrase "should have known" – as Defendants requested – would have had no effect on the temporal limits of scienter, which was conveyed by the phrase "when he made a particular statement or omission."

Plaintiffs inexplicably assert that "defendants cite no case law demonstrating that inclusion of this sentence was legally erroneous." (Pl. Br. 56) To the contrary, Defendants cited multiple cases that are directly on point. (*See* Def. Br. 56, n. 60 (citing, *e.g.*, *Robin* v. *Arthur Young & Co.*, 915 F.2d 1120, 1127 (7th Cir. 1990) ("bare allegations that [defendant] should have known or that its knowledge was due to a reckless disregard of the truth are not sufficient to turn a possible negligence or malpractice action into an action for securities fraud"); *Dolphin & Bradbury, Inc.* v. *SEC*, 512 F.3d 634, 639 (D.C. Cir. 2008) ("Extreme recklessness 'is not merely a heightened form of ordinary negligence,' and does not involve a 'should have known' standard.") (citations omitted); *Knollenberg* v. *Harmonic, Inc.*, 2005 WL 2980628, at *2, 678 (9th Cir. 2005) ("Claims that a defendant 'could have' or 'should have' known that the statements were false are insufficient to satisfy the standard for either forward-looking or non-forward-looking statements."); *Geffon* v. *Micrion Corp.*, 249 F.3d 29, 36, 36 n.8 (1st Cir. 2001) (affirm-

---

[32] In *Makor Issues & Rights, Ltd.* v. *Tellabs, Inc.*, 437 F.3d 588, 604 (7th Cir. 2006), the Court of Appeals expressly rejected Plaintiffs' theory that scienter includes what a defendant "should have known," stating that "[a]lthough Birck *should have assured himself* that the numbers being represented were accurate, his trust in his CEO *does not constitute* the level of recklessness that the statute requires."

ing summary judgment for defendants because the evidence did not "support a finding that defendants *knew* the statements would materially mislead the investing public"; experts' opinions, offered to prove scienter, were "inadequate evidence of scienter because they only establish (at best) that defendants should have known that they were making misleading statements")).

Plaintiffs argue that "[t]here was no improper 'negligence' option on the verdict form" (Pl. Br. 56), but the absence of the word "negligence" is meaningless if "recklessness" is improperly defined, because the jury could find that Defendants engaged in conduct that amounted to mere negligence and denominate their finding as "recklessness." Unlike *Wakeen*, 272 F.3d at 454, cited by Plaintiffs, the verdict form here did not eliminate any confusion.

**D.     Contrary to Plaintiffs' Argument, Defendants Did Not Accept Use of "Damages" as a Replacement for "Inflation"**

Plaintiffs argue incorrectly that "defendants agreed to the modified [damages] instruction as given" (Pl. Br. 57) and that Defendants were "satisfied with the instruction." (*Id.* (citing Tr. 4049:3-6)) Read in context, the transcript demonstrates that Defendants were "satisfied" only with the Court's solution to a concern that the jury realize they were not calculating damages for each investor. Defendants did not waive their objection to the conceptual conflation of damages and inflation, an objection that Defendants reiterated later in the trial. (Tr. 4678:21-4679:11)

**E.     That an Alleged Misstatement Should Be Viewed "In Context" Does Not Justify the Aggregation of Distinct Statements on the Verdict Form**

In their opening brief, Defendants demonstrated that the aggregation of distinct and unrelated statements in Table A of the verdict form impermissibly reduced Plaintiffs' burden of proof by permitting the jury to find liability as to a given aggregate "statement" without having to find that Plaintiffs had proved each Rule 10b-5 element as to each of Plaintiffs' separate fraud theories. Instead of responding to Defendants' argument, Plaintiffs simply recite the inapposite truism that "in securities fraud cases, false statements and omissions are properly viewed and analyzed in context." (Pl. Br. 60) None of the cases cited in support of this proposition[33] even remotely suggests that a jury may properly render a verdict as to liability by considering discrete

---

[33] *Makor Issues & Rights, Ltd.*, 437 F.3d at 596, explained that "[t]he crux of materiality is whether, in context, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company." *In re IPO Sec. Litig.*, 241 F. Supp. 2d 281, 379-80 (S.D.N.Y. 2003), analyzed whether plaintiffs had properly pleaded statements that were materially misleading. *Blanchard* v. *EdgeMark Fin. Corp.*, 1999 WL 59994, at *6 (N.D. Ill. Feb. 3, 1999), explained that "the pertinent inquiry is whether the statements, viewed in light of the circumstances under which they were made and in the context of all other material information, were rendered misleading by the alleged omissions."

statements in the aggregate; and none of the cases Plaintiffs cited pertains to jury instructions or the construction and content of a verdict form. Nor is there any support for Plaintiffs' suggestion that grouping the alleged false statements together on the verdict form was either necessary or effective in providing "context." Each of the documents from which the alleged fraudulent statements were excerpted was introduced into evidence at trial, so the jury could readily have consulted the source documents had it needed "context" during its deliberations.

## CONCLUSION

For the foregoing reasons, and for each of the reasons set forth in Defendants' opening memorandum, the Court should resolve all claims in Defendants' favor and grant Defendants' Motion for Judgment as a Matter of Law Pursuant to Rule 50(b). In the alternative, the Court should grant Defendants' Motion for New Trial Pursuant to Rule 59.

Dated:  September 18, 2009

Respectfully submitted,

CAHILL GORDON & REINDEL LLP

By:   /s/Thomas J. Kavaler
     Thomas J. Kavaler
      Bar No. 1269927
     Howard G. Sloane
      Bar No. 1197391
     Patricia Farren
      Bar No. 1198498
     Susan Buckley
      Bar No. 1198696
     Landis C. Best
     David R. Owen

80 Pine Street
New York, New York  10005
(212) 701-3000

    -and-

EIMER STAHL KLEVORN & SOLBERG LLP
224 South Michigan Ave.
Suite 1100
Chicago, Illinois  60604
(312) 660-7600

*Attorneys for Defendants Household International, Inc., William F. Aldinger, David A. Schoenholz, and Gary Gilmer*

-30-