# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF ILLINOIS

### EASTERN DIVISION

_____
)
LAWRENCE E. JAFFE PENSION PLAN, ON )
BEHALF OF ITSELF AND ALL OTHERS SIMILARLY )
SITUATED, )
                    )
           Plaintiffs, )
                    )
    - *against* - )
                    )
HOUSEHOLD INTERNATIONAL, INC., ET AL., )
                    )
           Defendants. )
_____)

Lead Case No. 02-C-5893
(Consolidated)

CLASS ACTION

Judge Ronald A. Guzmán

**SUPPLEMENTAL APPENDIX OF TRANSCRIPT EXCERPTS IN SUPPORT OF DEFENDANTS'
MOTIONS FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50(b) OR, IN THE
ALTERNATIVE, FOR A NEW TRIAL PURSUANT TO RULE 59**

CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York  10005
(212) 701-3000

EIMER STAHL KLEVORN & SOLBERG LLP
224 South Michigan Ave.
Suite 1100
Chicago, Illinois 60604
(312) 660-7600

*Attorneys for Defendants*
*Household International, Inc., William F. Aldinger, David
A. Schoenholz and Gary Gilmer*

September 18, 2009

## SUPPLEMENTAL APPENDIX OF TRANSCRIPT EXCERPTS

**Description**                                                                                    **Tab**

**Pretrial Transcripts**

Excerpts from the Transcript of Pre-Trial Conference March 26, 2009
   (Pre-Trial Tr. 794-906) ...............................................................................    1

**Trial Transcripts**

Excerpts from the Transcript of Trial March 31, 2009 (Tr. 253-468) ..................    2
Excerpts from the Transcript of Trial April 1, 2009 (Tr. 469-646) ......................    3
Excerpts from the Transcript of Trial April 2, 2009 (Tr. 647-880) ......................    4
Excerpts from the Transcript of Trial April 8, 2009 (Tr. 1323-1566)...................    5
Excerpts from the Transcript of Trial April 14, 2009 (Tr. 1959-2219) ................    6
Excerpts from the Transcript of Trial April 15, 2009 (Tr. 2220-2476) ................    7
Excerpts from the Transcript of Trial April 16, 2009 (Tr. 2477-2695) ................    8
Excerpts from the Transcript of Jury Instructions Conference April 17, 2009
   (Tr. 2696-2801) .....................................................................................    9
Excerpts from the Transcript of Trial April 20, 2009 (Tr. 2802-3012)................   10
Excerpts from the Transcript of Trial April 21, 2009 (Tr. 3013-3281)................   11
Excerpts from the Transcript of Trial April 21, 2009 (Tr. 3282-3564)................   12
Excerpts from the Transcript of Jury Instructions Conference April 24, 2009
   (Tr. 3824-3965) .....................................................................................   13
Excerpts from the Transcript of Jury Instructions Conference April 27, 2009
   (Tr. 3966-4073) .....................................................................................   14
Excerpts from the Transcript of Trial April 29, 2009 (Tr. 4304-4426)................   15
Excerpts from the Transcript of Trial April 30, 2009 (Tr. 4427-4671)................   16
Excerpts from the Transcript of Jury Instructions Conference May 1, 2009
   (Tr. 4672-4700) .....................................................................................   17
Excerpts from the Transcript of Verdict May 7, 2009 (Tr. 4769-4813)...............   18

TAB 1

794

```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all    )
 4   others similarly situated,      )
                                     )
 5             Plaintiff,            )
                                     )
 6     vs.                           ) No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC., )
     et al.,                         ) Chicago, Illinois
 8             Defendants.           ) March 26, 2009
                                     ) 9:30 a.m.
 9                          VOLUME 8
10        TRANSCRIPT OF PROCEEDINGS - PRETRIAL CONFERENCE
             BEFORE THE HONORABLE RONALD A. GUZMAN
11

12   APPEARANCES:

13   For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
14                             BY:  MR. SPENCER A. BURKHOLZ
                                    MR. MICHAEL J. DOWD
15                                  MR. DANIEL S. DROSMAN
                                    MS. MAUREEN E. MUELLER
16                             655 West Broadway
                               Suite 1900
17                             San Diego, California  92101
                               (619) 231-1058
18
                               COUGHLIN STOIA GELLER RUDMAN &
19                             ROBBINS LLP
                               BY:  MR. DAVID CAMERON BAKER
20                                  MR. LUKE O. BROOKS
                                    MR. JASON C. DAVIS
21                                  MS. AZRA Z. MEHDI
                               100 Pine Street
22                             Suite 2600
                               San Francisco, California  94111
23                             (415) 288-4545

24

25
```

1    where they are.  He's the one that they consulted with.

2             THE COURT:  How is the chart going to be used?

3             MR. DOWD:  I believe, your Honor, this chart -- it

4    may be used in opening statements, just to give the jurors

5    some feel for where these different people are.  And it may

6    also be used, I assume, in closing statement just -- closing

7    arguments just to remind the jury of the different witnesses

8    who appeared and testified.

9             THE COURT:  Okay.  I don't see what's objectionable

10   here.  If counsel wants to say in his opening statements that

11   Mr. Kahr was really at the top of the corporate structure

12   because he ran the whole show in terms of his proposals, and

13   he wants to then argue that he proved that at the end of the

14   trial, he can do that.  This chart is nothing more than an

15   extension of his argument.  This is what he's going to argue

16   the evidence will show.  If he does it that way, it's

17   appropriate.

18             If he attempts somehow to imply that this is an

19   organizational chart that comes from Household International

20   or that is accepted by Household International, then you have

21   a problem.  But if he's going to use it the way he described,

22   I don't see a problem.

23             MR. HALL:  Understood, your Honor.  Thank you.

24             Your Honor, turning to plaintiffs' demonstrative

25   No. 40, this is a document and -- this is a document, your

801

1    Honor, that relies -- and plaintiffs intend to use apparently

2    with their expert, their accounting expert, Mr. Devor.  The

3    underlying documents here, your Honor, that support these

4    numbers have both been excluded from evidence under Rule 408

5    pursuant to one of defendants' motions in limine related to

6    the settlement.  Defendants don't believe it's appropriate for

7    Mr. Devor then to --

8         THE COURT:  I'm sorry.  What numbers are you

9    referring to?

10        MR. HALL:  Your Honor, in the middle of the table on

11   this exhibit, there are numbers that say amount attributable

12   to improper lending practices.  Those numbers their expert

13   drew from two documents essentially, both of which have been

14   excluded from evidence.

15        THE COURT:  What documents are those?

16        MR. HALL:  Your Honor, it's essentially the

17   settlement agreement itself, the $484 million, and a document

18   that had previously been used in this case that was created by

19   Carin Rodemoyer, who was an employee of the consumer lending

20   business.  And I can get your Honor the exhibit numbers in a

21   moment.

22        MR. DOWD:  Your Honor, I think this is a fairly

23   straightforward issue.  The defendants filed a Daubert motion

24   on Harris Devor, our accounting expert.  And the Court issued

25   a two-page opinion on the 23rd of March.  And what the

1    Court -- initially the Court had said that we couldn't use

2    what's been called in this case Rodemoyer 17.  I believe if

3    the Court wants to look, it's actually Plaintiffs' Exhibit

4    681.  It was a calculation.  And I have a copy if the Court

5    wants or Mr. Hall needs it as well.

6        (Tendered.)

7            MR. DOWD:  And essentially, your Honor, Mr. Devor in

8    rendering his opinion -- and I have no dispute with counsel

9    that the Court said we couldn't offer Rodemoyer 17, which is

10   the Plaintiffs' Exhibit 681 that the Court is looking at.  It

11   was an internal calculation of potential refunds from improper

12   lending practices that Ms. Rodemoyer prepared in the summer of

13   2002.

14           As to Mr. Devor, he took Rodemoyer 17 and he took the

15   bottom line number, the 484 million of the settlement, and

16   what he said was, there are two ways that one could look to

17   see how much money Household generated from improper lending

18   practices.  He says one way is look at the 484, the dollar

19   amount of the settlement.  That's one number you could put on

20   it.  He says the second number you could put on it is the

21   internal calculations that the company did, which were

22   performed by Ms. Rodemoyer.  Defendants addressed both of

23   those issues in their Daubert motion.

24           Ultimately, your Honor, in your opinion, you said

25   that Mr. Devor could testify, could give his opinion about how

803

1     much of the revenue Household reported for 1999 through the

2     second quarter of 2002 was attributable to predatory lending

3     practices.  And these are the documents -- this is the

4     evidence that Mr. Devor relied on to give that opinion.

5          The Court goes on to say in the opinion, Defendants

6     can explore on cross-examination the extent to which the

7     documents on which Devor relies -- Household's estimate of the

8     refunds it might have to make -- that's Rodemoyer 17 or

9     Plaintiffs' Exhibit 681 -- or the multistate investigation

10    settlement agreement -- which is the 484 -- are sufficient to

11    support his opinion.

12         Here's my understanding of what the Court was telling

13    me I could do:  That doesn't allow me to go back and say the

14    Court's earlier opinion that I can't put in Plaintiffs'

15    Exhibit 681 is now overruled by the subsequent opinion.  I

16    will not offer Rodemoyer 17.  What I'm going to have to do is

17    ask Mr. Devor, Have you tried to quantify how much money was

18    derived from these predatory lending practices?  Yes, I have.

19    And, sir, what is your opinion as to how much revenue was

20    derived from predatory lending practices based on the

21    documents you reviewed?  He's got two choices.  He can say 484

22    for the jury; he can say the -- I think it adds up to 3.2

23    billion, your Honor.

24         And at that point, the second part of the Court's

25    order kicks it.  It's up to the defendants then to figure out

1    how they want to cross him, how they want to do it, whether

2    they want to use the document itself, whether they want to use

3    Ms. Rodemoyer's deposition testimony, where, to a certain

4    extent, she says, well, I think I was doing this or whatever

5    that testimony may be that helps them.  We think it helps us.

6    Certainly they think it helps them.  That's my understanding

7    of what the Court is allowing us to do.

8        MR. HALL:  Your Honor, to the extent Mr. Devor has an

9    opinion about the amount of revenue that was attributable to

10   these practices that's independent of documents the Court has

11   excluded, defendants wouldn't seek to argue that he shouldn't

12   be permitted to do that.  But where here, these demonstrative

13   exhibits are clearly indicating an effort of Mr. Devor to

14   stand up and say I've relied now on the amount of the

15   settlement, which the Court has explicitly held is out of this

16   case, and the amount of this quantification that was part of

17   the settlement negotiation process, which this Court has

18   explicitly held is out of the case.  Defendants think it's

19   inappropriate to put up a demonstrative exhibit which

20   essentially holds those numbers up for their truth.

21       MR. DOWD:  Your Honor, I think in response to that,

22   first of all, we don't think the Court has said the amount of

23   the settlement is out.  I mean, clearly it's going to be

24   integral to the damages issues in this case.  And Mr. Burkholz

25   will address that when we get to it I take it.

1          Second, I mean, you look at 681, your Honor, and I'm

2     not -- I don't want to reargue the old motions.  I just don't

3     think that's appropriate.  However, this is what he based his

4     opinion on.  I mean, this is what his opinion was based on.

5     So I assume that the Court understood that because the

6     defendants probably spent 20 pages explaining it in their

7     Daubert motion.  So he's allowed to give his opinion.  His

8     opinion is based on those two things.  That's the evidence

9     that Household produced that would allow someone to quantify

10    the amount attributable to predatory lending practices.

11         THE COURT:  This is the problem we face with all of

12    the exhibits and all of the information regarding the various

13    settlements, the negotiations for settlements, the proposals

14    to settle, the results of the settlements, et cetera.  The

15    rule against allowing these things into evidence as such is

16    based upon the desire to promote settlement.  Period.

17         But the law is also clear that if it's not being

18    offered to prove liability or acceptance of liability or the

19    types of things that will cause a litigant to not want to

20    engage in settlement conferences because they're afraid that

21    that will harm them further on down the line, if the evidence

22    is being offered to prove other things, then it's admissible.

23         To the extent possible, I am trying to keep out any

24    gratuitous presentation of the settlements, the amount of the

25    settlements and negotiations.  And I think my rulings reflect

806

1    that.

2         On the other hand, when experts rely upon this

3    information and when the information becomes the best and

4    maybe the only way to show damages in this case with respect

5    to certain alleged improper acts, we have a countervailing

6    interest.  And to the extent that the information is used for

7    that purpose, it's going to come in.  To the extent that

8    experts relied upon it -- properly relied upon it, used it in

9    their calculations, it's going to be -- it's going to be

10   coming in.

11        And the damages issue in this case really is a large

12   factor to take into account in determining how much of this

13   evidence comes before the jury.  I've said that before.  It's

14   the only way to prove damages.

15        MR. HALL:  May I respond briefly to that, your Honor?

16        THE COURT:  Sure.

17        MR. HALL:  I think that there are two issues.  One is

18   the issue that Mr. Dowd alluded to, including whether and to

19   what extent plaintiffs' damages expert, their loss causation

20   expert, Professor Fischel, will be allowed to rely on the

21   terms of the settlement.  And that's an issue that's not

22   presented by this demonstrative.

23        Another issue is whether their accounting expert, who

24   is here on the liability side of the case to prove falsity and

25   the other elements of their 10(b) claim, is going to be

1    defendants.

2          And I believe the next proposed demonstrative at

3    issue is fairly similar to the one that we discussed dealing

4    with Mr. Devor's opinion.  We're talking about No. 52.

5          I think an issue that we're going to have going

6    forward on these similar types of exhibits is that based on

7    your Honor's ruling on the Devor Daubert motion, he is not

8    allowed to opine that the financial statements falsely report

9    revenues.  The title of this demonstrative is the impact of

10   improper lending practices on Household's financial

11   statements.  How that doesn't fall squarely within the

12   prohibition in your opinion is beyond me.  And I think that

13   that problem will be apparent every time he takes what he

14   estimates as the amount attributable to improper lending

15   practices and compares it to the financial statements.  That's

16   the only conclusion that he can be drawing from an opinion and

17   a demonstrative such as this.

18          MR. DOWD:  Your Honor, I think -- in response, your

19   Honor, the Court says that Mr. Devor can give his opinion

20   about how much of the revenue Household reported from '99

21   through the second quarter of 2002 was attributable to

22   predatory lending practices.  And that's what we're doing in

23   these demonstratives, is showing that.

24          What the Court has said is, relying on Sofamor Danek

25   and some other cases, that Mr. Devor can't give his next

812

1    opinion, which is, when you do things that are illegal and you

2    derive revenue from illegal practices, you shouldn't have

3    booked it in the first instance.  And we respect that part of

4    the Court's opinion.  We're not going to do it.  We pulled the

5    demonstratives that related to it.  And -- but we are entitled

6    to show what -- how much revenue Household reported for '99

7    through the second quarter of '02 was attributable to

8    predatory lending practices.

9           THE COURT:  I agree with him.  The objection is

10   overruled.

11          MR. NEWVILLE:  Your Honor, another issue that

12   defendants have on these demonstratives purporting to show the

13   impact of improper --

14          THE COURT:  You're going to have to go exhibit by

15   exhibit.  There's no way I can rule on "these demonstratives"

16   or exhibits that show X, Y or Z because nobody knows what I

17   have ruled then.

18          MR. NEWVILLE:  Yes, your Honor.

19          MR. DOWD:  So we were talking about 52.  And I assume

20   we're done with that?

21          THE COURT:  The objection is overruled, unless

22   there's another objection to 52.

23          MR. NEWVILLE:  Your Honor --

24          THE COURT:  I didn't mean to cut you off there.

25          MR. NEWVILLE:  The objection is that --

TAB 2

Ghiglieri – direct

434

1   the limited purpose of showing you –– or assisting you to

2   evaluate the expert witness' opinion and how sound that

3   opinion is.

4           The underlying opinion must not be used by you for

03:45:03   5   any other purpose than to evaluate the opinion of the expert

6   witness.

7           You may proceed.

8           MR. DROSMAN:  Thank you, your Honor.

9   BY MR. DROSMAN:

03:45:15  10   Q.  Ms. Ghiglieri, before the break I asked you whether you

11   prepared a demonstrative exhibit to assist you in explaining

12   your conclusion that Household engaged in a variety of

13   predatory practices during the 1999-to-2002 time frame.

14           Did you prepare such an exhibit?

03:45:33  15   A.  I did.

16   Q.  Would that assist you in explaining your testimony?

17   A.  Yes, it would.

18   Q.  At this time I will show you what has been marked as

19   Plaintiffs' Demonstrative Exhibit 29 for identification.

03:45:45  20           What are the entries on Plaintiffs' Exhibit 29?

21   A.  These are the various predatory lending practices that I

22   found when I was reviewing all of the documents.

23   Q.  Let's take the first predatory lending practice listed,

24   the effective or equivalent rate.

03:46:06  25           Can you tell the jury what that is?

Ghiglieri - direct

435

1   A.  Yes.  Household's rates were higher than its competitors.

2   So in order for it to be able to make loans, they came up with

3   a way of describing their rates as effective rates.

4           Basically what they would do is tell the customer,

03:46:25  5   you can pay your mortgage payment -- half of your mortgage

6   payment every two weeks instead of making your mortgage

7   payment once a month.  And in that way, you will pay it off

8   faster.  And that's true because you make 13 payments instead

9   of 12 payments if you make a half of a payment every other

03:46:48 10   week.

11          But what they would do is, they would then calculate

12   what they called an effective rate and compare it to someone

13   that's making their payment once a month for 30 years.  And

14   they would say, because you are paying less interest, you are

03:47:02 15   paying a lower interest rate, which is not true.

16          If I took out a 30-year mortgage and I refinanced it

17   somewhere else after two years, the amount of interest I would

18   pay to the first lender would be less than if I would have

19   stayed there for 30 years and paid it.  But my interest rate

03:47:20 20   didn't change.

21          So Household used what they called this effective

22   rate.  Sometimes they would call it equivalent rate.

23   Sometimes they would call it comparative rate.  But they would

24   couch this, their higher rate, in terms of this biweekly

03:47:37 25   payment plan and say, you know, your effect rate is lower.  So

Ghiglieri – direct

436

1    this is an example.

2         Someone would come in, apply for a loan or refinance

3    their current loan.  Household would do this effective rate

4    calculation based on the biweekly payment plan.  And they

03:47:55 5   would say, well, you currently have an 8 percent rate.  But if

6    you come and refinance with us, the effective rate would be

7    7 percent.  And the customer would say, oh, that's great; I am

8    going to refinance.  But really what would happen is, the

9    interest rate would still be, you know, 12 and a half or

03:48:11 10  13 percent.

11        So Household used this predatory lending practice to

12   get people to come in and borrow from them, even though their

13   rates were not competitive.  If they would have said, if you

14   pay your loan every two weeks on the current loan, the rate

03:48:30 15  would be 4 percent, you know, as compared to our 7 percent.

16        So the reason why Regulation Z is in place, as I said

17   this morning or earlier –– I am sorry –– this afternoon is

18   lenders are required to only use the annual percentage rate so

19   that customers can compare from lender to lender what the

03:48:50 20  rates are so they can compare apples to apples.  Regulation Z

21   is violated when you come up with all these different sorts of

22   rates to give to the customer.  So that was the effective

23   equivalent rate scam that Household was running during this

24   1999–to–2002 time frame.

03:49:08 25  Q.  Now, we have touched on the second practice, insurance

TAB 3

```
 1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all    )
 4   others similarly situated,      )
                                     )
 5              Plaintiff,           )
                                     )
 6      vs.                          ) No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         ) Chicago, Illinois
 8              Defendants.          ) April 1, 2009
                                     ) 9:55 a.m.
 9                            VOLUME 3
10                   TRANSCRIPT OF PROCEEDINGS - TRIAL
             BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
14                             BY:  MR. LAWRENCE A. ABEL
                                    MR. SPENCER A. BURKHOLZ
15                                  MR. MICHAEL J. DOWD
                                    MR. DANIEL S. DROSMAN
16                                  MS. MAUREEN E. MUELLER
                               655 West Broadway
17                             Suite 1900
                               San Diego, California  92101
18                             (619) 231-1058

19                             COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
20                             BY:  MR. DAVID CAMERON BAKER
                                    MR. LUKE O. BROOKS
21                                  MR. JASON C. DAVIS
                                    MS. AZRA Z. MEHDI
22                             100 Pine Street
                               Suite 2600
23                             San Francisco, California  94111
                               (415) 288-4545
24

25
```

Ghiglieri - direct

496

1    executives -- to work up the numbers so that they could do

2    comparisons.  The worksheet was not to be distributed to the

3    customers.

4    Q.  So this shows that the equivalent rate training was rolled

11:26:02  5    out in July of 1999; is that right?

6    A.  Yes.  It was part of that First Mortgage Sales document

7    that I looked at.

8    Q.  And why is that significant to your opinions in this case?

9    A.  Well, because Household always said in its responses to

11:26:15 10    the regulators and its public discussions in the press that

11    this particular practice among others were the result of a

12    rogue employee or a rogue branch.  And that wasn't true.  This

13    was what the employees were trained to do nationwide.  And I

14    saw evidence of it all over the country in many locations.

11:26:40 15    And, here, they're talking about it in Florida.

16    Q.  Now, when you say rogue employee, you're talking about

17    some bad apple at Household; is that what you mean?

18    A.  Well, that's what I assume Household meant by saying rogue

19    employee or rogue branch.  It only happened over there.

11:26:56 20    Q.  And if you turn to page ending 077, there appears to be

21    another e-mail with a catalog of some customer complaints.

22         Can you tell me whether that's significant to your

23    opinion?

24    A.  Yes, it is.

11:27:19 25    Q.  And what's significant about page ending 077 to your

Ghiglieri – direct

497

```
          1   opinion?

          2   A.  Well, this is a -- let's see if we can --

          3   Q.  You can just testify to it.

          4   A.  Okay.  This is an articulation of several complaints.

11:27:36  5   On -- the customer was complaining that -- one, for example,

          6   was a customer named Edwards.  And it says, Customer claims

          7   HFC promised a fix rate of 7.38 for an 18-year mortgage.  The

          8   contract states 30 years for 13.7 APR.

          9           And several more like that.

11:27:59 10           A customer named Osmel, customer says -- said sales

         11   office told him the rate would be 6.4 for 16 years, but

         12   instead the contract shows a rate of 10.554 for 30 years.

         13           So this is just an example of how -- and it's up

         14   there now -- the effective rate was being given to the

11:28:19 15   customer instead of the annual percentage rate, which is the

         16   APR, which is the only rate that's supposed to be given to the

         17   customer.

         18   Q.  And why is that significant to your opinion?

         19   A.  Well, especially in the location, this was in the

11:28:32 20   southeast, in Florida and South Carolina -- and, again,

         21   Household would say, well, it's only one branch or it's only

         22   one employee.  But what I saw from the complaints, this was

         23   taking place in a lot of places.  And it was the same -- the

         24   same scheme.  They would say they told me this for a shorter

11:28:54 25   period of years when, in fact, the contract rate was higher
```

Ghiglieri – direct

498

1    for 30 years.  So it was the effective rate training that the

2    employees received in the Lew Walter training First Mortgage

3    Sales.

4    Q.  If you turn to page ending 080.

11:29:13  5         Can you tell us what this is?

6    A.  This is actually -- this is actually a document that

7    some -- even though it says that they weren't supposed to get

8    it, that some customers did receive the effective rate in

9    writing.  And that's pretty hard to read, but it says, The

11:29:38 10   above-referenced account 15-year contractual agreement is

11   17.99 percent.  Upon entering the EZ Pay Plus Program -- and

12   that's where you paid twice -- half of your mortgage payment

13   every other week; that's what Household called it, the EZ Pay

14   Plus Program -- the account will only incur a 10.15 percent

11:30:01 15   effective rate for the duration of the payment period, which

16   will be 11.2 years.

17         So here they're giving the effective rate actually in

18   writing, and this -- there are several of these that I've

19   seen.

11:30:14 20   Q.  So what is the contract -- can you determine what the

21   contract rate is from this document?

22   A.  It says that the contract rate was 17.99 percent.  This is

23   on a 15-year amortization.

24   Q.  And what did Household list the effective rate at?

11:30:30 25   A.  10.15 for 11.2 years.

Ghiglieri - direct

499

1   Q.  Now, if, in fact, this customer -- I believe it's

2   Mr. Ortega -- paid his loan off over a shorter period of year

3   than 15 years, would his rate actually decline?

4   A.  No.  Your rate never goes down.  Paying more quickly than

11:30:50 5   the amortization schedule does not affect your interest rate.

6   Your interest rate is your interest rate.  If I take a loan

7   out and two months later I pay it off, I still have the same

8   APR; but I didn't pay as much interest as I would have if I

9   had it over 30 years.

11:31:06 10       So this is just a way of deceiving the customer into

11   thinking that Household had more competitive rates because

12   their rates were higher than their competitors.

13   Q.  If you could turn to page ending 085.

14       And can you tell me what this document is?

11:31:26 15   A.  This is a letter sent by an account executive to this

16   borrower who was questioning why the loan balance hasn't gone

17   down.  And what he's saying to her is what the effective rate

18   training was.  If you pay half of your $945 payment -- so that

19   is the second to the last sentence there.  If you could

11:32:06 20   highlight that and then the last sentence.  See if you can

21   read that a little better.

22       By simply sending half of your $945 payment every two

23   weeks, your mortgage will be paid off in 18 years; and you

24   will be paying a comparable 6.5 APR.

11:32:27 25       Sometimes they use effective rate.  Sometimes they

Ghiglieri – direct

500

1    use comparable rate.  It's the same thing.

2            You will actually save 99,965 throughout the loan by

3    simply paying 472.50 every two weeks.

4    Q.  So you mentioned that sometimes they call the equivalent

11:32:43  5    rate a comparable rate?

6    A.  Yes, equivalent, comparable, effective.  Those were

7    different terms that I saw for this same program, to deceive

8    the customers into thinking they were getting a lower rate

9    when, in fact, they were being charged a higher rate.

11:32:59  10    Q.  And how is this text that you've just read significant to

11    your opinion in this case?

12    A.  Well, here you have someone actually putting it in

13    writing.  And at one point, Household went through and took

14    everything out of the files that had to do with effective

11:33:15  15    rate.  So it's hard to find a document like this because of

16    the document destruction that they did.  But this is where a

17    customer actually got in writing what the effective rate was.

18    Q.  Could you turn to page ending 090.

19            This appears to be an e-mail from a person named

11:33:39  20    Ronald Davis at Household; is that right?

21    A.  Yes.

22    Q.  And the subject is Ortega; is that correct?

23    A.  Yes.

24    Q.  Does the first paragraph there have any significance to

11:33:48  25    your opinion?

Ghiglieri – direct

501

           1   A.  Let's see.  Yes.  Highlight the first -- okay.

           2           It says, We gave this customer a written statement,

           3   which I will fax to you, that clearly stated that their

           4   effective interest rate would be 10.15 if they paid the EZ

11:34:08   5   way -- and that's the EZ Pay Plus.  This letter was sent prior

           6   to us destroying all sales material other than HFC-approved

           7   material.  Our branches had previously approved tax charts as

           8   well as real estate master booklets that encouraged them to

           9   use effective rates, which is where this letter derived from.

11:34:29  10   Q.  Now, if you take a look at the second to last sentence on

          11   this page.

          12           Does that have any significance to your opinion?

          13   A.  Yes.  This says, No corrective action was given, as this

          14   was enforced from HFC training materials that existed at the

11:34:45  15   time.

          16   Q.  Why is that significant?

          17   A.  Well, it's significant because the training was authorized

          18   by the headquarters.  And the -- Lew Walter went to all the

          19   districts except the southwest, which had some separate

11:35:02  20   training.  But all of the ideas were the same; and, that is,

          21   come up with this effective rate to show that the Household

          22   rates were competitive, when they were not.

          23   Q.  And then the indication that no corrective action was

          24   given, what do you understand that to mean?

11:35:16  25   A.  That the employee was not disciplined is how I interpret

Ghiglieri – direct

502

1    this because it was an authorized activity or it was something

2    that was condoned by Household.

3    Q.  And go ahead and turn if you would to page ending 092.

4           This appears to be a letter regarding Antonio Ortega

11:35:40 5  or to -- from Antonio Ortega.  I'm sorry.  Do you recognize

6    this letter?

7    A.  I do.

8    Q.  And is this significant to your opinion?

9    A.  Yes.  This is -- again, this is a complaint.  This is a

11:35:53 10  good example of a complaint where Mr. Ortega from Florida

11   filed a complaint with the state comptroller's office.  And

12   that's where the banking commissioner resides.  The state

13   comptroller actually has the title instead of banking

14   commissioner.

11:36:11 15        So he complained to the Florida, basically,

16   Department of Financial Institutions, that -- and I think --

17   my copy is very hard to read, but I think if you look at the

18   second or third -- yes.  I'm sorry.  It says, if you can read

19   that, She went back and -- first, he went in for a debt

11:36:38 20  consolidation loan and was told he could get one for 18

21   percent.  But the account executive, it says here, She went

22   back and checked and came back and told me if you can make

23   payments every two weeks, we can get you a loan for 10.15

24   percent, but remember you must pay every two weeks or it will

11:36:57 25  revert back to 18 percent.

Ghiglieri – direct

503

1   Q.   Why is that significant to your opinion?

2   A.   Because, once again, the annual percentage rate must have

3   been 18 percent.  And what they were trying to do was deceive

4   the customer into thinking if you make your payment every

11:37:15  5   other week -- half of your payment every other week, your

6   effective rate will be 10.15 percent, when that's not true.

7   It was never going to be anything other than 18 percent.

8   Q.   Now, we've talked about some training that Lew Walter

9   provided in this case.  Why don't I show you Plaintiffs'

11:37:43  10   Exhibit 899 for identification.

11        (Tendered.)

12            THE COURT:  I'm sorry.  What number was that?

13            MR. DROSMAN:  899, your Honor.

14            THE COURT:  Thank you.

11:38:08  15   BY MR. DROSMAN:

16   Q.   Ms. Ghiglieri, do you recognize Plaintiffs' Exhibit 899?

17   A.   I do.

18   Q.   What is it?

19   A.   This is a training material called First Mortgage Sales.

11:38:16  20   And this one says HFC northeastern division.  They had

21   different ones, and it would have a different division; but

22   this one says northeastern division.

23   Q.   And why do you recognize this?

24   A.   I reviewed these training manuals in formulating my

11:38:32  25   opinions.

Ghiglieri – direct

504

1          MR. DROSMAN:  Plaintiffs offer Exhibit 899 into

2    evidence, your Honor.

3          THE COURT:  It will be admitted.

4    BY MR. DROSMAN:

11:38:42 5    Q.  If you go ahead and take a look at page ending 773 of

6    Exhibit 899.

7          Well, before we do that, why don't we look at 740.

8    And that's the second page of the document.

9          What does this show?

11:38:56 10   A.  And this is what I just held up.  This is the title of the

11   training, First Mortgage Sales.  And this one says HFC

12   northeastern division.  And they had different ones that I

13   reviewed that would say, you know, northwestern division,

14   other parts of the country.  And this was the Lew Walter

11:39:14 15   training on the effective rate.

16   Q.  Is there a date on that document?

17   A.  Well, there's a handwritten date here that says June/July

18   1999.

19   Q.  And then if you turn to page 773.

11:39:30 20         Can you tell us what this is?

21   A.  This is an example of the effective rate calculation.

22   This is how the employees were taught to actually calculate

23   the effective rate.  And here it's called equivalent rate, but

24   they would use equivalent or effective or comparable.  They

11:39:53 25   would use all those terms for this sort of a calculation.

Ghiglieri - direct

505

1    Q.  I know it's sort of -- the copy didn't come out so well,

2    but does this say biweekly versus 30 years up at top?

3    A.  Yes.

4    Q.  And then tell us what this particular document was used

11:40:08  5    for.

6    A.  This was used to train the employees on how to calculate

7    the effective rate.  So how to, in effect, deceive people --

8    get them in the door by thinking that their rate was lower

9    than it really was because Household's rates were not

11:40:25  10   competitive with their competitors.

11   Q.  And the effective rate is something other than the APR

12   interest rate that the loan has?

13   A.  Right.  The APR would -- all of the complaints and all the

14   documentation that I saw would be higher than what the current

11:40:45  15   rate was that the borrower had.  And so what they would do is

16   use this calculation to deceive the borrower into thinking

17   that they had a lower rate than they were actually going to

18   get because otherwise they never would have refinanced at

19   Household because they had a lower -- they had an actual lower

11:41:02  20   rate than Household's loan.

21   Q.  I'm showing you what has been marked as Plaintiffs'

22   Exhibit 900 for identification.

23     (Tendered.)

24   BY MR. DROSMAN:

11:41:31  25   Q.  Do you recognize Plaintiffs' Exhibit 900?

Ghiglieri – direct

506

```
            1   A.  I do.

            2   Q.  What is it?

            3   A.  This is an e-mail from Ken Walker, who was the quality

            4   assurance manager, to Rob O'Han, dated May 5, 2001.  And the

11:41:45    5   subject is comparable/effective rate.

            6   Q.  Is it comparable/equivalent rate?

            7   A.  Oh, yes.  I'm sorry.  Comparable/equivalent rate.

            8   Q.  And why do you recognize Plaintiffs' 900?

            9   A.  This is one of the documents that I reviewed in

11:42:00   10   formulating my opinions.

           11          MR. DROSMAN:  Plaintiffs offer Exhibit 900 into

           12   evidence.

           13          THE COURT:  It will be admitted.

           14   BY MR. DROSMAN:

11:42:08   15   Q.  Tell us what the significance of this document is to your

           16   opinion.

           17   A.  Well, in -- I'll read the first paragraph, if you could

           18   highlight that.

           19   Q.  Before you do that, why don't we back up for just one

11:42:25   20   moment.  You can tell us --

           21   A.  Sure.

           22   Q.  I know the author of this e-mail is a man named Ken

           23   Walker.  Do you know who Ken Walker is?

           24   A.  Yes, he was the quality assurance manager.

11:42:34   25   Q.  And what does that mean, quality assurance, at Household?
```

Ghiglieri – direct

507

         1   A.  Well, they were supposed to be looking at whether or not

         2   Household, you know, complied with various laws and with

         3   company policies.

         4          But in 1999, they actually disbanded the field

11:42:55 5   portion of the quality assurance and control division.  And

         6   they gave that -- those duties to the people in the field who

         7   were responsible for meeting the sales goals of the company.

         8   And so it was -- the field quality assurance team was

         9   reinstituted back in mid 2001.

11:43:20 10         But Ken Walker is looking into why they're having

        11   this issue with the comparable/equivalent rate.  And he is

        12   reporting back to Rob O'Han some information that he found.

        13   Q.  And Rob O'Han, again, is the senior executive in the sales

        14   department --

11:43:38 15  A.  Yes.

        16   Q.  -- in the consumer lending division?

        17   A.  Yes.

        18   Q.  Can you tell us why this is significant to your opinion?

        19   A.  Well, because it says, Spoke to Tom Schneider and he

11:43:47 20  indicated we cannot quote the customer a comparable or

        21   equivalent interest rate.  He did say you can verbally tell

        22   the customer due to the reduced term and interest, it would be

        23   like getting a lower interest rate; but we must stay away from

        24   quoting an actual lower rate other than the contract rate or

11:44:05 25  APR the customer is to receive.  He indicates that there have

Ghiglieri - direct

508

1    been an increasing number of complaints in this area, and all

2    the customer remembers is that they thought they were getting

3    a lower rate.  This is one of the many issues he is addressing

4    in Washington.

11:44:20  5         So I found it unbelievable that -- and Mr. Schneider

6    was in charge of policy and compliance, I think was his

7    title -- unbelievable that he would say, well, you can tell

8    them that you're going to get this effective rate, but you

9    just can't give it to them in writing.  I mean, that's still

11:44:37 10   deceiving the customer.

11   Q.  And this e-mail is dated May 25, 2001; is that correct?

12   A.  Yes.

13   Q.  And the training that we saw earlier from Lew Walter on

14   the effective rate, what was the date of that training?

11:44:53 15   A.  That was in mid 1999.  So two years later, they're still

16   having this issue of the effective rate, equivalent rate,

17   comparable rate.

18   Q.  Was there any other -- we talked about the Lew Walter

19   training and so forth.  Was there any other training materials

11:45:11 20   that you considered in reaching your conclusions in this case?

21   A.  Well, I looked at the other documents like this that were

22   from around the country or that's what they were entitled.

23   And I also looked at insurance training that they received.

24   Q.  Did you look at any training videos in reaching your

11:45:26 25   conclusions in this case?

Ghiglieri - direct

509

1   A.  Yes.  And I also looked -- I viewed a training video that

2   was prepared by the manager of the southwestern division.  His

3   name was Dennis Hueman.  And he prepared a video that

4   contained many of the same elements as this selling first

11:45:45  5   mortgages document -- training document that I looked at that

6   was developed by Lew Walter.

7          MR. DROSMAN:  I'm showing the witness a DVD that has

8   been marked as Plaintiffs' Exhibit 1383 for identification.

9   (Tendered.)

11:46:11  10  BY MR. DROSMAN:

11   Q.  Now, have you had an opportunity to review the contents of

12   Plaintiffs' Exhibit 1383, this DVD?

13   A.  Yes, I watched this DVD.

14   Q.  And after you watched the DVD, were you able to determine

11:46:31  15  who created it?

16   A.  Yes, Dennis -- well, and also I read his deposition and he

17   has stated -- he testified that he created this as a sales

18   tool for his staff.

19   Q.  And so what is Plaintiffs' Exhibit 1383?

11:46:45  20  A.  This is a video training on various ways of selling

21   Household's mortgages.  And it was developed in 2001, which is

22   almost two years after the training that Lew Walter developed

23   here on First Mortgage Sales.

24   Q.  And did you consider this DVD in reaching the conclusions

11:47:13  25  in your case -- in this case?

Ghiglieri – direct

510

1    A.  I did.

2            MR. DROSMAN:  At this time, plaintiffs offer 1383

3    into evidence.

4            THE COURT:  It will be admitted.

11:47:22  5            MR. KAVALER:  May I have voir dire?

6            THE COURT:  Sure.

7            MR. DROSMAN:  There's no objection to this, your

8    Honor.

9            THE COURT:  Was there an objection?

11:47:31 10            MR. KAVALER:  I just wanted to know if she viewed the

11    entire DVD.

12            THE COURT:  Was that objection stated in the pretrial

13    order?

14            MR. KAVALER:  No, your Honor.

11:47:39 15            THE COURT:  Okay.  Objection is overruled.

16            MR. KAVALER:  Thank you, your Honor.

17    BY MR. DROSMAN:

18    Q.  Approximately how long is this training video?

19    A.  I think it's about an hour.  It's been a while since I

11:47:49 20    looked at it.

21    Q.  And do you know to whom this video was distributed, 1383?

22    A.  It was distributed to the branch -- I believe it was

23    distributed to the branch -- branches in the southwest.

24    Q.  Are there parts of the video that you'd like to show the

11:48:08 25    jury to assist you in explaining your conclusions in this

Ghiglieri – direct

511

1    case?

2    A.  Yes.  There are three excerpts that I would like to show.

3    Q.  What is the first excerpt?

4    A.  The first excerpt is Mr. Hueman discussing how Household's

11:48:21  5    rates were not competitive with their competitors and what to

6    do about that.  It's approximately three minutes.

7    Q.  Why don't we take a look at that.

8      (Whereupon said tape was played in open court.)

9    BY MR. DROSMAN:

11:52:14 10    Q.  What's significant about what we just watched to your

11    opinion?

12    A.  Well, it just demonstrates that they had to come up with

13    some way of making their rates look more competitive.  And

14    this is how they did it.  They came up with this effective

11:52:27 15    rate calculation so that they could show that their rates were

16    equal to or less than the competition.

17    Q.  Is there another clip that you'd like to show the jury to

18    assist you in explaining the basis for your opinions?

19    A.  Yes.  The next one is where Mr. Hueman discusses what's

11:52:45 20    known -- what he calls the trap sale.  And this is about eight

21    minutes, I believe.

22    Q.  And is this an example of the effective rate in action?

23    A.  Yes, on -- what they should do to tell the customer about

24    it, how they should sell it.

11:53:00 25    Q.  Why don't we play that clip.

Ghiglieri – direct

512

1     (Whereupon said tape was played in open court.)

2     BY MR. DROSMAN:

3     Q.  This trap sale, the T bar, is that the effective rate

4     presentation?

12:02:47   5     A.  Yes, that's -- that's the effective rate presentation.

6     And that was in --

7     Q.  Why is this clip that we've just watched significant to

8     your opinion?

9     A.  It's significant because the First Mortgage Sales training

12:03:00  10     was developed in 1999 and launched around the country in mid

11     1999.  And two years later, Mr. Hueman develops this video

12     that has the same concepts in it.  It's, you know, verbal

13     training rather than looking here, reading it.  But it has the

14     same concepts two years later that were in the First Mortgage

12:03:30  15     Sales.

16          And in a lot of the complaints -- and some of the

17     newspaper articles -- you would see that "if I could do that,

18     would you be interested" language.  So it -- it was -- it told

19     me, by looking at everything, that it was pervasive, not this

12:03:47  20     rogue officer or rogue branch as Household claimed that it

21     was.

22     Q.  Now, is what we just watched from Mr. Hueman, in your

23     view, is that deceptive?

24     A.  Yes.  Because you're trying to deceive the customer into

12:03:59  25     thinking that what they're going to get is actually lower than

Ghiglieri – direct

513

1    it is.  And, you know, they had to do something in order to

2    make their rates more competitive.  As Mr. Hueman said, we

3    charge 8 -- 11 percent; our competitors charge 8 percent.

4    They're never going to be able to book a loan with that unless

12:04:17 5    they do something to deceive the customer into thinking that

6    they could get a lower rate.

7    Q.  Have you prepared one last short clip you'd like to show

8    the jury?

9    A.  Yes.  This is only a three-minute clip.  And it's where

12:04:29 10    Mr. Hueman compares the customers to a fish and reeling them

11    in.

12    Q.  Why don't we take a look at that.

13    (Whereupon said tape was played in open court.)

14    BY MR. DROSMAN:

12:08:13 15    Q.  So this guy, Dennis Hueman, he was in charge of the entire

16    southwest division of Household?

17    A.  Yes.

18    Q.  Training all the people who worked in the various branches

19    in the entire southwest; is that right?

12:08:24 20    A.  Yes.

21    Q.  And why is this significant, what we just watched, to your

22    opinion?

23    A.  Well, I think it's significant for a couple of reasons.

24    One is, it had the same sort of effective rate training -- and

12:08:35 25    he was doing it verbally -- that was developed two years

Ghiglieri – direct

514

             1   prior.  So for those two years, this is what was being done in

             2   Household.  And he decided that he needed to have some sort of

             3   a training mechanism to train his staff in to better deceiving

             4   the customers into thinking that they were going to have a

12:08:54     5   better rate, so he developed this video.  So it -- it just

             6   showed me that the training was pervasive in Household and

             7   wasn't just the work of a rogue employee or a rogue branch.

             8   Q.  Did you prepare a demonstrative to assist you in

             9   explaining the geographic breadth of this effective rate

12:09:16    10   training?

            11   A.  Yes.

            12   Q.  Why don't I show you what we'll mark as Plaintiffs'

            13   Demonstrative Exhibit 28.

            14        Can you tell us what this exhibit shows?

12:09:23    15   A.  Yes.  That's Mr. Walter there.  He rolled out his

            16   training -- and that's what's highlighted there.  Lew Walter

            17   rolled out the First Mortgage Sales workshop to all HFC sales

            18   divisions, with the exception of the southwest, in July and

            19   August of 1999.  And then the video we just saw was

12:09:39    20   Mr. Hueman, who is in the southwest -- the left-lower corner

            21   of the United States there that we just saw on the tape --

            22   speaking to his employees about how to put this in place in

            23   the branches.

            24   Q.  So there were six sales divisions at Household; is that

12:09:58    25   right?

Ghiglieri – direct

515

1   A.  Yes.

2   Q.  And does this demonstrative show that Mr. Walter rolled

3   out his effective rate training to five of the six?

4   A.  Yes.

12:10:06  5   Q.  And then the sixth, was that covered by Mr. Hueman's

6   training?

7   A.  Yes.  But the training had to already be there somehow

8   because the concepts were the same as what Mr. Walter rolled

9   out.

12:10:20 10          MR. DROSMAN:  Your Honor, is this a good time for a

11   lunch break or would you like to go later?

12          THE COURT:  How much longer do you have to go?

13          MR. DROSMAN:  I can start on a new topic.

14          THE COURT:  And the new topic will take how long?

12:10:34 15          MR. DROSMAN:  As long as you like.  I can stop at any

16   point.

17          THE COURT:  If you continue through, how much longer

18   do you have with this witness?  That's all I'm asking.

19          MR. DROSMAN:  Oh, she'll be on after lunch as well,

12:10:44 20   for probably the remainder of the day.

21          THE COURT:  Okay.  Then we'll break for lunch at this

22   point.  No use waiting.

23          We'll break for lunch, ladies and gentlemen.  We'll

24   resume the testimony at 1:15.  Have a good lunch.  We'll see

12:10:56 25   you then.

Ghiglieri – direct

516

```
           1    (Jury out.)

           2         THE COURT:  You may step down, ma'am.

           3         THE WITNESS:  Thank you.

           4         THE COURT:  Anything that you folks have for us to
12:12:09   5    take up before we break for lunch?

           6         MR. DROSMAN:  Nothing from the plaintiffs, your

           7    Honor.

           8         MR. KAVALER:  Nothing for the defendants, your Honor.

           9         THE COURT:  Excuse me?

12:12:16  10         MR. KAVALER:  Nothing from the defendants, your

          11    Honor.

          12         THE COURT:  I want to bring up two points.  One is, I

          13    do have these two requests from the jurors.  I'll read them to

          14    you now.

12:12:29  15         Your Honor, if possible could we please be excused at

          16    4:20 p.m.?  I missed the 4:45 train yesterday.  The next train

          17    leaves at 5:11.  I still arrived home at 6:45 p.m. last night.

          18         Second one:  Judge, can you allow us to leave at 4:20

          19    p.m.?  My train leaves at 4:50, and I just barely have enough

12:13:01  20    time to catch this train.  I live in Joliet.  If I miss this

          21    4:50 p.m. train, the next train would be 5:25 p.m.  I would

          22    arrive in Joliet at 6:25 p.m., then wait for the 7:10 bus.  It

          23    takes me a half hour to walk home from where the bus stops, so

          24    I would get home at 8:00 p.m.

12:13:26  25         And we have one new note from the jurors, which is
```

Ghiglieri – direct

517

1    not signed.  We'll make sure we get them signed from now on.

2    It's a question:  Were training logs listing names, dates of

3    employees participating in these training sessions taken and

4    kept?  Same question would apply to any other training

12:13:58   5    sessions and classes conducted and used as evidence in this

6    case.

7             So why don't you take the lunch period to think about

8    what your suggestions are for responding to these interesting

9    notes.  And we'll see you all maybe just five minutes before

12:14:20  10    we start the evidence so we can discuss this.

11             MR. DOWD:  About 1:10, your Honor?

12             THE COURT:  Yes.

13             Have a good lunch.

14             MR. KAVALER:  Thank you, your Honor.

15       (Trial recessed until 1:10 p.m. of the same day.)

16

17

18

19

20

21

22

23

24

25

Ghiglieri – direct

518

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3  LAWRENCE E. JAFFE PENSION PLAN, )
    on behalf of itself and all    )
 4  others similarly situated,      )
                                    )
 5              Plaintiff,          )
                                    )
 6    vs.                           ) No. 02 C 5893
                                    )
 7  HOUSEHOLD INTERNATIONAL, INC.,  )
    et al.,                         ) Chicago, Illinois
 8              Defendants.         ) April 1, 2009
                                    ) 1:25 o'clock p.m.
 9

10            TRANSCRIPT OF TRIAL PROCEEDINGS
        BEFORE THE HONORABLE RONALD A. GUZMAN, AND A JURY
11

12  APPEARANCES:

13  For the Plaintiff:      COUGHLIN STOIA GELLER RUDMAN &
                            ROBBINS LLP
14                          BY:  MR. SPENCER A. BURKHOLZ
                                 MR. MICHAEL J. DOWD
15                               MR. DANIEL S. DROSMAN
                                 MS. MAUREEN E. MUELLER
16                          655 West Broadway
                            Suite 1900
17                          San Diego, California  92101
                            (619) 231-1058
18
                            COUGHLIN STOIA GELLER RUDMAN &
19                          ROBBINS LLP
                            BY:  MR. DAVID CAMERON BAKER
20                               MR. LUKE O. BROOKS
                                 MR. JASON C. DAVIS
21                               MS. AZRA Z. MEHDI
                            100 Pine Street
22                          Suite 2600
                            San Francisco, California  94111
23                          (415) 288-4545

24

25
```

Ghiglieri – direct

519

```
 1   APPEARANCES:  (Continued)

 2   For the Plaintiff:          MILLER LAW LLC
                                 BY:  MR. MARVIN ALAN MILLER
 3                               115 South LaSalle Street
                                 Suite 2910
 4                               Chicago, Illinois  60603
                                 (312) 332-3400
 5
     For the Defendants:         CAHILL, GORDON & REINDEL LLP
 6                               BY:  MR. THOMAS J. KAVALER
                                      MS. PATRICIA FARREN
 7                                    MR. DAVID R. OWEN
                                      MS. JANET A. BEER
 8                                    MR. JASON M. HALL
                                      MR. JOSHUA M. NEWVILLE
 9                                    MS. KIM A. SMITH
                                      MS. SUSAN BUCKLEY
10                               80 Pine Street
                                 New York, New York  10005
11                               (212) 701-3000

12

13

14

15

16

17

18

19

20

21

22   Court Reporter:            NANCY C. LaBELLA, CSR, RMR, CRR
                                 Official Court Reporter
23                               219 South Dearborn Street
                                 Room 1222
24                               Chicago, Illinois  60604
                                 (312) 435-6890
25                               Nancy_LaBella@ilnd.uscourts.gov
```

Ghiglieri – direct

520

```
            1        THE CLERK:  02 C 5893, Jaffe vs. Household

            2   International.

            3        THE COURT:  Ready for the jury?

            4        MR. KAVALER:  Yes, your Honor.

01:22:02    5        MR. DOWD:  Yes, your Honor.

            6        THE COURT:  Bring them out.

            7        (Jury in.)

            8        THE COURT:  Welcome back, ladies and gentlemen.

            9   We're ready to proceed.

01:23:14   10        MR. DROSMAN:  Thank you, your Honor.

           11   CATHERINE A. GHIGLIERI, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

           12              DIRECT EXAMINATION - Resumed

           13   BY MR. DROSMAN:

           14   Q.  Ms. Ghiglieri, before the lunch break, we spoke about

01:23:20   15   Household's training on the effective rate.

           16        Did you review any additional documents in which you

           17   saw evidence that Household actually engaged in use of the

           18   effective rate scheme?

           19   A.  Other than what we've talked about today?

01:23:36   20   Q.  Yes.

           21   A.  I may have.  I can't think of any right now.

           22   Q.  Let me show you Plaintiffs' Exhibit 901 for

           23   identification.

           24        (Document tendered.)

           25   BY MR. DROSMAN:
```

Ghiglieri – direct

521

1    Q.  Do you recognize Plaintiffs' Exhibit 901?

2    A.  I do.

3    Q.  What is it?

4    A.  This is an e-mail memo regarding the effective rate.

01:24:16  5    Q.  And what is the date of it?

6    A.  The date is May 17th, 2001.

7    Q.  And why do you recognize this document?

8    A.  This is one of the documents I reviewed in formulating my

9    opinions.

01:24:30 10         MR. DROSMAN:  Plaintiffs offer Exhibit 901 into

11    evidence, your Honor.

12         THE COURT:  It will be admitted.

13         (Plaintiffs' Exhibit No. 901 received in evidence.)

14    BY MR. DROSMAN:

01:24:38 15    Q.  Who is the author of this particular e-mail?

16         This is an e-mail string; is that correct?

17    A.  It's an e-mail string.

18         The -- if you want to look at the bottom part first,

19    it's from Phillip Swetz to Paul Pichoske -- if I'm saying his

01:24:58 20    name correctly -- dated May 17th, 2001.  And the subject is:

21    "Effective Rate."

22    Q.  And is there anything significant about that particular

23    e-mail to your opinions?

24    A.  Yes.

01:25:10 25         If -- and I'll read it because I don't know if they

Ghiglieri – direct

522

1   can see it.

2           It says, "HFC 30-year mortgage with Pay Right

3   Rewards -- " and that's the -- well, let me start over.

4           "HFC 30-year mortgage with Pay Right Rewards at 11.05

01:25:27  5   percent is equivalent to a 30-year mortgage at 8.89 percent.

6   Why?  Our 30-year mortgage with Pay Right Rewards pays off in

7   25 years."

8           And, then, there's the calculation.

9           And, then, it says, "Find someone who goes 100

01:25:44 10   percent loan to value, at 8.89 percent fixed, with a secured

11   side of $15,000.  We have the best game in town."

12   Q.  Okay.

13           "LTV," you said "Loan to Value."  What's that?

14   A.  "Loan to Value" is how much the mortgage loan is in

01:26:05 15   relation to the value of the home.

16           So, if you have a hundred thousand dollar valued home

17   and you have an $80,000 mortgage, your loan to value -- or LTV

18   -- would be 80 percent.  So, that's what that means.

19   Q.  Okay.

01:26:17 20           So, if you had a hundred percent LTV and a hundred

21   thousand dollar home, what would your loan be?

22   A.  Then your loan amount would be a hundred thousand.

23           If you have a 125 percent loan to value, your

24   mortgage would be 125,000, but the value of your home would

01:26:32 25   only be a hundred.

Ghiglieri – direct

523

1          So, you would have negative equity of $25,000.

2          So, that's -- that's -- how that works with the loan

3     to value ratios.

4     Q.  And why is what you've just read to us significant to your

01:26:45  5     opinion?

6     A.  Well, because I think this demonstrates that once, again,

7     Household had to use some method of showing that their

8     interest rates were competitive with their competitors',

9     because they were not.

01:27:00 10          And the fact is that, you know, they're saying, "We

11     go to a hundred percent loan to value," which traps them at

12     Household because no one would refinance since there was no

13     equity there, "at 8.89 percent fixed" -- and, of course, we

14     know that that's the equivalent rate -- "with a secured side."

01:27:20 15          And that's just another product that they did to go

16     up to a hundred percent.

17          So, this is deceptive to the customer and it also

18     traps them at Household because they can't refinance anywhere

19     else.

01:27:30 20     Q.  "The secured side at 15K," do you understand "15K" to be

21     15,000?

22     A.  $15,000, yeah.

23     Q.  And what does "the secured side of 15,000" refer to?

24     A.  Well, I talked about yesterday about loan splitting.  And,

01:27:44 25     so, when they would come to the closing table, they would

Ghiglieri – direct

524

1    apply for a mortgage.  And there would be not one loan there,

2    but two loans.  And they would split it into a secured side

3    oftentimes because they would get up to, you know, whatever

4    their level was of loan-to-value on the first mortgage,

01:28:02  5    because they were adding so many points and fees and insurance

6    premiums.

7           So, oftentimes, this second mortgage was actually the

8    fees and the premiums that was put on the first.  So, they

9    would close both of these loans together, in effect, stripping

01:28:16  10   away equity, trapping them at Household.

11   Q.  Now, it looks like this e-mail we've just been talking to

12   was forwarded to a man named Paul Pichoske above that.

13          Do you see that?

14   A.  Yes.

01:28:28  15          So, then, Paul Pichoske is writing to Rob O'Han dated

16   May 24th, 2001, "Effective Rate," again.

17          And it says, "Rob, this is a scenario that my group

18   has been using.  They have been terming it 'equivalent rate,'

19   which I thought was okay.  Should we discontinue this?

01:28:46  20          "Paul."

21          And this was May of 2001.

22   Q.  And Paul Pichoske, he's a DSM; is that right?

23   A.  Yes, in the northeast.

24          So, this is in, yet, another location where they were

01:28:58  25   using this in the northeast.

Ghiglieri – direct

525

1    Q.   And a "DSM" is a "Division Sales Manager"?

2    A.   I think it's called "District Sales Manager."

3    Q.   And Rob O'Han was a senior executive in the Sales

4    Department at Consumer Lending?

01:29:08  5    A.   Yes.

6              I can't remember his exact title.  "District General

7    Manager," or something like that.

8    Q.   I'll show you what has been marked as Plaintiffs' Exhibit

9    898 for identification.

10             (Document tendered.)

11   BY MR. DROSMAN:

12   Q.   Do you recognize Plaintiffs' Exhibit 898?

13   A.   I do.

14   Q.   What is it?

01:29:45  15   A.   This is the Insurance Training Manual that I referred to

16   earlier, that I looked at in formulating my opinions.

17   Q.   And is it a -- does it contain a cover memo?

18   A.   Yes, it contains a cover memo.

19   Q.   What is the date of the cover memo?

01:30:05  20   A.   The cover memo date is May 12th, 2000.

21   Q.   And to whom is the cover memo addressed?

22   A.   "All HFC Branch Sales Managers."

23   Q.   What's the subject?

24   A.   "Insurance Service Staff Meeting."

01:30:17  25             MR. DROSMAN:  Your Honor, Plaintiffs offer Exhibit

Ghiglieri - direct

526

1    898 into evidence.

2              THE COURT:  It will be admitted.

3        (Plaintiffs' Exhibit No. 898 received in evidence.)

4    BY MR. DROSMAN:

01:30:24  5    Q.  Now, we spoke about the effective rate.  Let's turn to

6    insurance, which we've also touched on.

7              Is this document significant to your opinions

8    regarding -- or your conclusion -- that Household engaged in

9    insurance packing?

01:30:38 10    A.  Yes.

11    Q.  Okay.

12              Let's take a look at the first page of the document.

13              Is there anything significant about that document or

14    that page that's significant to your opinion?

01:30:46 15    A.  Yes, a couple of things.

16              In the first paragraph, the last sentence, it says,

17    "In addition, the company benefits from a profitability and

18    growth standpoint; and, of course, you benefit from an

19    incentive compensation standpoint."

01:31:04 20    Q.  Why is that significant?

21    A.  This is significant because part of the compensation

22    program at HFC -- or, I'm sorry, at Household -- rewarded

23    employees for packing on as much insurance as possible.  And

24    they're articulating that in the front of this training

01:31:21 25    manual.

Ghiglieri – direct

527

```
            1   Q.  What about the second to the last paragraph on this page?

            2   A.  Right.

            3        The second to the last paragraph says, "To assist you

            4   in achieving these goals -- " oh, are you talking about -- oh,

01:31:37    5   the second to last.  Sorry.

            6        Anyway, this was -- this particular document was --

            7   so that they could conduct training in their individual

            8   locations.

            9        The second to the last paragraph that's highlighted

01:31:48   10   up there says, "I look forward to you achieving 100

           11   percent-plus of your -- " and I don't know what that means

           12   "NWP" -- "goals in both credit and non-credit products, and to

           13   a 75 percent customer acceptance rate in all branches."

           14   Q.  And do you know what a "75 percent customer acceptance

01:32:04   15   rate" refers to?

           16   A.  Yes.  That was what, in regulatory parlance, we talk about

           17   as penetration ratios.  And what they wanted was 75 percent of

           18   any loan that was made to have this insurance product added

           19   onto it.  And we call that as -- in the regulatory field --

01:32:21   20   "penetration ratio."

           21   Q.  And they were seeking a 75 percent penetration --

           22   A.  Yes.

           23   Q.  -- ratio?

           24   A.  Yes.

01:32:27   25        And, from a regulatory perspective, that's very, very
```

Ghiglieri – direct

528

1   high.

2           Whenever you –– and I used to go into banks and

3   examine for this very thing, to see if Regulation Z was being

4   complied with.  Because if insurance is required, they have

01:32:43  5   to disclose it in a separate location than if it's not

6   required.

7           And, so, what we would look at is if the bank would

8   say, "Oh, no, we don't require it," we would look at

9   penetration ratios to determine if, in fact, they do require

01:32:56  10  it, but they're just saying that.

11          And anything above 50 percent –– that was sort of our

12  rule of thumb –– was considered very high and could be

13  indications of insurance packing, and that insurance was

14  required.

01:33:09  15  Q.  Let me direct your attention to the page ending "493."

16          And if you could take a look at that page and let me

17  know if there's anything on this page that appears to be part

18  of a training manual for insurance that is significant to your

19  opinion?

01:33:33  20  A.  Yes.

21          Are they pulling it up?

22  Q.  Yes.  Just go ahead and testify.

23  A.  In the second paragraph, it says –– they're talking about

24  selling insurance:  "A good way to do this is by using the

01:33:46  25  assumptive close," and I've talked about that a couple times

Ghiglieri - direct

529

1  during my testimony.  And that's where you assume that they're

2  going to take it.  And, so, you add it to the insurance

3  papers.

4          "A good way to do this is by using the assumptive

01:33:59  5  close that assumes the customer still has the intention of

6  proceeding on the loan with the Income Protection Plan

7  included.  You might get started by saying something like

8  this," and it trains them how to actually do the assumptive

9  close.

01:34:14  10  Q.  And, so, what is the assumptive close?

11  A.  That's where the sales staff was taught to assume that

12  the borrower was going to take the insurance and have it on

13  the loan papers, so that either they wouldn't notice it was

14  on there or, if they did question it, you could say -- they

01:34:34  15  were trained to say -- "Well, you can cancel after 30 days";

16  or, sometimes they would even tell them it was required.

17  Q.  Okay.

18          Was there also a tactic where they would tell the

19  customer they had to re-run all the loan papers and that would

01:34:48  20  take a few days to do?

21  A.  Yes.

22          I mean, that would be another thing they would say

23  to try and dissuade them from taking it off the loan

24  documents.

01:34:56  25  Q.  How would that work?

Ghiglieri – direct

530

```
          1    A.  Well, you know how you have so many loan documents when

          2    you're closing on a home loan?  And they would say, "Sorry,

          3    we're going to have to run all these, again.  You'll have to

          4    come back," or "You'll have to sit here and wait a couple

01:35:10  5    hours or whatever."  Anything to dissuade them from taking the

          6    premium off.  Because, remember, Household's goal was growth.

          7    And the insurance premium was considered, you know, an

          8    increase in the loan portfolio of Household.

          9         So, this is something that was important to them.

01:35:28 10    Q.  Let's turn to the subject of prepayment penalties.

         11         We talked earlier about your opinion that Household

         12    used prepayment penalties as part of their overall predatory

         13    lending practice.

         14         Did you review additional evidence that Household

01:35:43 15    engaged or used prepayment penalties?

         16    A.  Yes.

         17    Q.  Let me show you what's been marked as Plaintiffs' Exhibit

         18    965 for identification?

         19       (Document tendered.)

         20    BY MR. DROSMAN:

         21    Q.  Go ahead and take a look at Exhibit 965.

         22         Do you recognize this document?

         23    A.  I do.

         24    Q.  What is it?

01:36:28 25    A.  This is an e-mail string regarding AMTPA, which is the
```

Ghiglieri – direct

531

                    1   Parity Act that I talked about previously, and it's dated

                    2   November 27th, '01, from Tom Schneider to Robin Allcock, and

                    3   others.

                    4   Q.  Why do you recognize this document?

01:36:48     5   A.  This is one of the documents that I looked at in

                    6   formulating my opinions.

                    7            MR. DROSMAN:  Plaintiffs move Exhibit 965 into

                    8   evidence.

                    9            THE COURT:  Admitted.

                   10     (Plaintiffs' Exhibit No. 965 received in evidence.)

                   11   BY MR. DROSMAN:

                   12   Q.  Can you tell us the significance of Plaintiffs' Exhibit

                   13   965 to your opinions regarding the use of prepayment

                   14   penalties?

01:37:08    15   A.  Yes.

                   16            If you look at the bottom paragraph that starts with

                   17   "Robin," it says, "The following list encompasses those states

                   18   that at one time or another have strongly questioned our

                   19   ability to assess prepayment penalties" -- that's what "PPP"

01:37:22    20   stands for -- "under AMTPA," which is the Alternative Mortgage

                   21   Protection -- well, actually, that's not spelled right.

                   22            It's the Alternative Mortgage Transaction Parity Act.

                   23   Sorry.

                   24            That says "AMTPA" and that's how everybody says it;

01:37:41    25   but, actually, that's not spelled correctly.

Ghiglieri – direct

532

1           And back to the e-mail, it says, "Typically they

2    have argued that our Pay Right Reward Program is not a

3    variable rate loan and thereby does not qualify, of the

4    federal preemption, or that our fixed rate RL loans don't

01:37:59  5    qualify."

6    Q.  Okay.

7           First, let's talk -- what's the Pay Rights Rewards

8    Program that's referred to in that case?

9    A.  The Pay Right Reward Program was their performance-based

01:38:11 10    program, where -- I talked about this previously -- if a

11    borrower paid 36 months of timely payments either on time or

12    within the grace period, that they would reduce the interest

13    rate 50 basis points, or a half a percent; and, then, if they

14    would do it again 12 months later, they would reduce their

01:38:31 15    interest rate.

16           So, Household developed this product in order to make

17    it look like it's a variable rate loan.

18           This is one of the things that you can offer to

19    qualify for the Parity Act; and, what that allows a state

01:38:47 20    licensed lender to do is to charge fees and prepayment

21    penalties and other things that are otherwise prohibited by

22    state law.

23           So, this was an attempt by Household to comply with

24    the federal law allowing them to circumvent state law.

01:39:03 25    Q.  And was this one of the initiatives that Andrew Kahr came

Ghiglieri – direct

533

1    up with?

2    A.  Yes.

3    Q.  Did the states agree with Andrew Kahr's idea to ignore

4    state law and impose these prepayment penalties?

01:39:17  5    A.  No.  Many states did not agree with that.

6             And this is a listing of some of the states that

7    either, at one time or another, this e-mail says has strongly

8    questioned our ability to do this.

9             And the e-mail above it says, "Has Virginia

01:39:35 10    complained, also?"

11             So, there were a number of states that said, "We do

12    not agree with that."

13    Q.  I'll show you -- before I show you the next document, I'd

14    like to sort of change gears and talk about the predatory

01:39:52 15    lending practice that you talked about earlier -- the failure

16    to properly disclose.

17             Did you review additional documents relating to

18    "failure to properly disclose"?

19    A.  Yes.

01:40:02 20    Q.  Let me show you what's been marked as Plaintiffs' Exhibit

21    964 for identification.

22         (Document tendered.)

23    BY MR. DROSMAN:

24    Q.  Do you recognize Plaintiffs' Exhibit 964?

01:40:29 25    A.  I do.

Ghiglieri – direct

534

1  Q.  What is it?

2  A.  This is an Examination Information Correspondence from the

3  state of New Jersey to Household.

4  Q.  And what's the date of it?

01:40:42  5  A.  April 23rd, 2002.

6  Q.  And to whom is it addressed?

7  A.  It's addressed to "Tom Schneider, Policy and Compliance."

8  Q.  And is that somebody who works at Household?

9  A.  Yes.

01:40:52  10     He was in charge of coordinating information with the

11  regulators, as I understand it.

12  Q.  And why do you recognize this document?

13  A.  This is one of the documents that I looked at in

14  formulating my opinions.

01:41:06  15     MR. DROSMAN:  Plaintiffs offer Exhibit 964 into

16  evidence.

17     THE COURT:  It will be admitted.

18     (Plaintiff' Exhibit 964 received in evidence.)

19  BY MR. DROSMAN:

01:41:15  20  Q.  Now, you mentioned that this is from the State of New

21  Jersey to Household's Director of Policy, Compliance and

22  Support.

23     What's significant about this document to your

24  opinions?

01:41:25  25  A.  This document talks about various concerns that the State

Ghiglieri – direct

535

 1    of New Jersey had with Household's practices.

 2    Q.  Okay.

 3         And, specifically, if I could direct your attention

 4    to the page ending "805."

01:41:47  5         Actually, "804," if you'd look at that page.

 6         If you look at that page, it appears to be another

 7    letter to Tom Schneider, the Director of Policy and Compliance

 8    of Household, mfrom the State of New Jersey; is that right?

 9    A.  Yes.

01:41:59 10         And I'd like to point out something in the first

11    paragraph, too of that.

12         The last sentence says, "These findings are furnished

13    to the licensee for your confidential information and

14    consideration and the understanding that it's not to be made

01:42:16 15    public."

16         And I talked about that yesterday -- that these

17    examination reports are confidential -- and that the licensees

18    are not supposed to make them public.

19    Q.  And this is a -- is this a -- Report of Examination?

01:42:27 20    A.  Yes.

21         This document it says, "Official Examination."

22    Q.  Okay.

23         And if you turn to the next page of the report, Page

24    805.

01:42:39 25         Is there anything of significance to your opinion on

Ghiglieri – direct

536

1    that page?

2    A.  Yes.  They're talking about the criticisms that they have

3    regarding Household.

4    Q.  And, specifically, the first criticism?

01:42:52  5    A.  Yes.  This is regarding AMTPA and the prepayment

6    penalties.  And it says, "Prepayment penalties equivalent to

7    six months interest at the contract rate on the original

8    amount of the loan are being charged on closed-end, Pay Right

9    Reward first and second mortgage loans that are paid off in

01:43:06  10   advance.

11          "This is predicated upon Household's position that

12   these loans are variable rate loans covered by the preemptive

13   authority of the Alternative Mortgage Transactions Parity

14   Act."

01:43:17  15   Q.  So, this is that same Act that would allow Household to

16   ignore state law that prohibits prepayment penalties and

17   impose them, anyway?

18   A.  Yes.

19          If they comply with the federal law, they can ignore

01:43:31  20   state law to the contrary and impose certain fees and

21   prepayment penalties.

22   Q.  What about the State of New Jersey?  Did they believe that

23   Household could ignore state law under their Andrew Kahr

24   product?

01:43:43  25   A.  No.  They were saying that they don't believe that it

Ghiglieri - direct

537

1    qualifies under AMTPA.

2    Q.  What about No. 5 -- the criticism No. 5 -- there?  Is that

3    significant to your opinion?

4    A.  Yes.

01:43:53  5        And I talked about the wide range of closing costs

6    that Household would give to the applicants on a good-faith

7    estimate that's required by RESPA.  And this says, "Points

8    charged to borrowers at closing exceeded the amount reflected

9    on the good-faith estimate in 55 percent of the cases

01:44:14 10   reviewed."

11        And, so, not only did they give them a wide range,

12   but they, in 55 percent of the cases that New Jersey

13   reviewed -- the State of New Jersey -- they exceeded it.

14   Q.  Okay.

01:44:24 15       So, they'd give them a range of zero to $8,000, for

16   example, on their good-faith estimate and, then, they would

17   impose fees or points that were higher than $8,000?

18   A.  That's right, in 55 percent of the ones that they

19   reviewed.

01:44:36 20  Q.  Why don't I show you what has been marked as Plaintiffs'

21   Exhibit 324 for identification.

22        (Document tendered.)

23   BY MR. DROSMAN:

24   Q.  Do you recognize Exhibit 324?

01:45:09 25  A.  I do.

Ghiglieri – direct

538

         1    Q.  What is it?

         2    A.  This is correspondence and examination information being

         3    transmitted to Household from the State of Minnesota.

         4    Q.  Why do you recognize this document?

01:45:21 5    A.  This is a document that I considered in formulating my

         6    opinions.

         7    Q.  And was this an Examination --

         8    A.  Yes.

         9    Q.  -- Report?

01:45:29 10             What was the date of it?

        11    A.  It was actually a compliance examination.

        12             And the date -- let's see.

        13             The date of the cover letter -- let's see if there's

        14    a date of the examination here.

01:45:41 15             The date of the cover letter was September 23rd,

        16    2002; and, the examination, the close of business March 31st,

        17    2002.

        18    Q.  And to whom was it sent?

        19    A.  To the Board of Directors of Household.

01:45:57 20   Q.  And to whose attention at Household was it sent?

        21    A.  Mr. Schneider.

        22    Q.  That's the Tom Schneider we spoke of before?

        23    A.  Yes.

        24    Q.  The Director of Policy and Compliance?

01:46:05 25   A.  Yes.

Ghiglieri – direct

539

1              MR. DROSMAN:  Plaintiffs move Exhibit --

2       BY MR. DROSMAN:

3       Q.  Let me ask you:  Did you consider this document in

4       formulating your opinions in this case?

01:46:14  5     A.  I did.

6              MR. DROSMAN:  Plaintiffs move Exhibit 324 into

7       evidence.

8              THE COURT:  It will be admitted.

9         (Plaintiffs' Exhibit No. 324 received in evidence.)

10      BY MR. DROSMAN:

11      Q.  Now, if you could turn to the page ending "007."

12             Is there any significance of the information on Page

13      007 to the opinions you rendered in this case?

14      A.  Yes.

01:46:42  15            If you -- these are all violations of Minnesota

16      statute regarding the good-faith estimate.

17      Q.  Specifically, if you look at the heading, "Good-Faith

18      Estimate" in the middle of the page, and there appears to be a

19      range underneath it of zero to $7,650.

01:47:06  20            Do you see that?

21      A.  Yes.

22      Q.  Is that significant to your opinion?

23      A.  Yes.  This is -- this is -- typical of what Household was

24      doing.  They were giving a wide range of closing costs.  So,

01:47:17  25    in this case, this customer, Mr. Cain, received a range of

Ghiglieri – direct

540

1    from zero to 7,650.  And they were actually charged, if you

2    look at the next column over -- if you could highlight that,

3    so maybe they could see it -- it's 9,591.90.

4         And Minnesota actually calculated the percent above

01:47:41 5   the range of 25.38 percent.  So, it was about 25 percent

6    higher that they were charged than the range.

7    Q.  If you could turn to the next page, the page ending "078."

8         Is there anything significant about the information

9    on that page to your opinion?

01:48:02 10  A.  Yes.

11        I mean, these good-faith estimate ranges -- and

12   there's many pages of them, where they're showing for each

13   customer the good-faith estimate range and, then, what they

14   actually got charged -- and the first one is a high

01:48:20 15  percentage, but it's a low dollar amount.  But it's a hundred

16   dollars to three hundred dollars is the range.

17        And, then, they were actually charged $531, and it

18   was 77 percent above the range.

19        There are some other ones in here that are large

01:48:36 20  dollar amounts, that they were charged over the range.

21        If you look to the fourth one down, for example,

22   Mr. Merzwski -- or something -- the range was from zero to

23   11,250, and they were actually charged 12,945.

24        And there's just page after page of that in this

01:49:02 25  Report of Examination.

Ghiglieri – direct

541

         1    Q.  What about the next page, Page 079?

         2    A.  079, the same thing.

         3         The first one, Mr. Gray, was charged –– the range was

         4    disclosed on the good-faith estimate, of from zero to 4912;

01:49:20 5    and, he was actually charged 9,349, which is a 90 percent

         6    above the range.

         7         And, remember, the range of closing costs must be

         8    given to the applicant three days after the completed

         9    application is accepted by the lender.  They're supposed to

01:49:37 10   give this good-faith estimate, so that the borrower has three

         11   days to consider whether they want to do the loan.

         12   Q.  Now, this document that they're provided is called a

         13   "Good-Faith Estimate," correct?

         14   A.  Yes.

01:49:45 15   Q.  Sometimes it's abbreviated as "GFE"?

         16   A.  "GFE."

         17   Q.  Is it your opinion that when you give somebody a range of

         18   zero to $11,000, that that's a good-faith estimate of their

         19   closing costs?

01:49:57 20   A.  No.

         21        In fact, if, on a large percentage basis, during a

         22   compliance exam that I would do as a bank examiner, if I would

         23   see that the good-faith estimate was always either at the very

         24   top of the range or above the range, then that would tell me

01:50:12 25   that there wasn't good faith in giving this estimate.

Ghiglieri – direct

542

1    Q.  I'm going to show you what has been marked as Plaintiffs'

2    Exhibit 333 for identification.

3         (Document tendered.)

4    BY MR. DROSMAN:

01:50:44  5    Q.  Do you recognize Plaintiffs' Exhibit 333 for

6    identification?

7    A.  I do.

8    Q.  And what is this document?

9    A.  This is Examination Report issued by the Commonwealth of

01:50:55 10    Virginia.

11    Q.  What's the date on it?

12    A.  And the date is March 11th, 2002.

13    Q.  And to whom did Virginia send a Report of Examination?

14    A.  Mr. Schneider, the head of Policy and Compliance.

01:51:09 15    Q.  That's at Household -- Mr. Schneider at Household?

16    A.  Yes.

17    Q.  Why do you recognize this document?

18    A.  This is one of the documents that I reviewed in

19    formulating my opinions.

01:51:18 20         MR. DROSMAN:  Plaintiffs move 333 into evidence, your

21    Honor.

22         THE COURT:  It will be admitted.

23         (Plaintiffs' Exhibit No. 333 received in evidence.)

24    BY MR. DROSMAN:

01:51:25 25    Q.  Now, on the first page of this document, the second to the

Ghiglieri – direct

543

1    last paragraph, does that have any significance to your

2    opinion?

3    A.  The second to the last paragraph?  It talks about citing

4    previous examination violations as a previous examination.

01:51:51  5    Q.  And it indicates that the violations cited in this report

6    are similar to violations cited in previous examinations?

7    A.  That's right.

8    Q.  Okay.

9         Is that significant to your opinion?

01:52:00  10    A.  Well, repeated violations are frowned upon by the

11    regulators.

12         When the regulators identify violations of law, they

13    expect that the institution will take corrective action; and,

14    if they don't, they will consider taking enforcement

01:52:14  15    authority.  And we talked about that yesterday -- doing a

16    cease and desist order, for example; fining them; making them

17    do refunds or even changing management.

18    Q.  Why is it significant, then, that apparently this is

19    similar to other violations for which the Commonwealth of

01:52:31  20    Virginia has already told Household about?

21    A.  Because they expect compliance and they don't expect to

22    see repeat violations of law.

23    Q.  And if you turn to the page ending "741," there's a number

24    of different loan customers listed on that page.

01:52:54  25         Starting with customer Ambrister, is that significant

Ghiglieri – direct

544

1    to your opinion at all?

2    A.  Yes.

3         On this one, it says, "Licensee failed to disclose

4    points charged to borrower on the good-faith estimate

01:53:06  5    disclosure."

6         So, this is where they didn't disclose them at all.

7    And, as I said yesterday, there were many failure-to-disclose

8    issues.  I only talked about the range of good-faith estimate

9    closing costs and prepayment penalties, but there were

01:53:21  10   instances that I noted where they didn't disclose the good-

11   faith estimate at all.

12   Q.  What about the next customer, customer Ayers?

13   A.  And on this one it says, "Licensee failed to disclose a

14   reasonable estimate of the points charged."  This is the range

01:53:36  15   issue.

16        The points charged were 6,930 -- I'm sorry, 6,393;

17   and, the points disclosed, the range was -- or in this one it

18   wasn't actually a range.  They actually disclosed one dollar

19   amount and they disclosed 3,522.

01:53:52  20   Q.  So, they told this customer Ayers that they were going to

21   charge $3500 in points, and how much did they actually charge?

22   A.  6,393.

23   Q.  What about the other customers on that page, Barbour and

24   Blaney?

01:54:07  25   A.  Well, Mr. Barbour didn't receive the good-faith estimate

Ghiglieri – direct

545

1    at all; and, then, Mr. Blaney, the same thing.  He was

2    disclosed 2,380 and he was charged 4,139.

3    Q.  If you turn to the next page, the page ending "742."

4         Can you tell us the significance of the information

01:54:25  5    on that page to your opinions?

6    A.  Yes.  Two of the loan files that they looked at did not

7    have any disclosure, and that was the fourth one down and the

8    sixth one down.  And, then, the rest of them were given a

9    specific dollar amount and charged higher than that dollar

01:54:45  10   amount, with the exception of the third one.

11        And they were given a range of four to five thousand

12   and charged 10,519.

13   Q.  I'll show you what has been marked as Plaintiffs' Exhibit

14   956 for identification.

15      (Document tendered.)

16   BY MR. DROSMAN:

17   Q.  Do you recognize Plaintiffs' Exhibit 956?

18   A.  I do.

19   Q.  What is it?

01:55:32  20   A.  This is the Kansas Examination Report.

21   Q.  And is there a fax cover sheet on top of the Kansas --

22   A.  Yes.

23   Q.  And what does that show?

24        To whom was it sent?

01:55:48  25   A.  The fax cover sheet is from Carla Madura to Robin Allcock.

Ghiglieri – direct

546

1    The date, July 25th, 2002.

2    Q.  And are these both Household employees?

3    A.  Yes.

4    Q.  Why do you recognize Plaintiffs' Exhibit 956?

01:56:02  5    A.  This is one of the documents that I reviewed in

6    formulating my opinions.

7    Q.  And what is the date of this particular examination on

8    Page 184?

9    A.  Yeah.

01:56:22  10           The examination date is April 29th, 2002.

11   Q.  And, then, if you turn to the page ending "192"; and, if

12   you'd look at the last sentence of the first paragraph -- I'm

13   sorry, the second paragraph -- and tell us whether that's of

14   any significance to your opinion?

01:56:45  15           The last sentence of the --

16   A.  Yes.

17   Q.  -- second paragraph.

18   A.  It says -- excuse me -- "HUD," which is the Housing and

19   Urban Development -- "believes that a pattern or practice of

01:57:02  20   quoting GFE" -- good-faith estimate -- "amounts that are lower

21   than the corresponding amounts later shown on the settlement

22   statements, may serve as evidence that the disclosures were

23   not made in good faith."

24   Q.  So, still on the page ending "192," tell me what that

01:57:19  25   means.

Ghiglieri – direct

547

1    A.   On the sentence that I just read?

2    Q.   Yeah.  Tell me why that's significant.

3    A.   Yeah.

4         And just what I said previously.  When you see a

01:57:29  5    pattern where the lender is disclosing the closing costs in a

6    range; and, if all the -- especially when the range is from

7    zero to a high number, when the closing costs are always at

8    the top end of the range or exceeding the range, then you have

9    to conclude that it's not good faith in giving the estimate of

01:57:49 10    the closing costs.

11        And that's what HUD concluded here.  HUD believes

12   that a pattern or practice of quoting GFE amounts that are

13   lower than the corresponding amounts later shown on the

14   settlement statements may serve as evidence that the

01:58:05 15   disclosures were not made in good faith.

16   Q.   Is the next sentence of this Examination Report of any

17   significance to your opinion?

18   A.   Yes.

19        And, so, in Kansas, when they were looking at loan

01:58:17 20   files, if -- you can highlight the group of loans below it,

21   also.

22        It says, "The following loans have good-faith

23   estimates with origination fees that were consistently lower

24   than those actually charged on the settlement statement."

01:58:34 25   Q.   And what is -- what do those groups of loans show?

Ghiglieri - direct

548

1    A.  And the next sentence is, "Estimates that are consistently

2    lower may serve as proof that the estimates are not made in

3    good faith."

4           And, so, these are a list of the loans that they

01:58:48  5    articulated in the Examination Report.

6           So, for example, the first one is Mr. Barbieri.  His

7    good-faith estimate was 12,700, and he was actually charged

8    13,194.

9           And, so, there's three ways that the regulators will

01:59:09 10    cite violations of the good-faith estimate:  Failure to give

11    it at all; the instance that we show here, where you give it

12    at a certain number, but you charge more than that; or, where

13    you give it in a range, and the range is either too wide or

14    you charge more than the range.

01:59:27 15           So, there are various iterations of why they cite

16    violations of the good-faith estimate.

17           MR. DROSMAN:  Plaintiffs move Exhibit 956 into

18    evidence.

19           THE COURT:  It will be admitted.

20        (Plaintiffs' Exhibit No. 956 received in evidence.)

21    BY MR. DROSMAN:

22    Q.  I'd like to show you Plaintiffs' Exhibit 269 for

23    identification.

24           Before we do that -- now, we've talked about some of

01:59:49 25    the predatory lending practices in which Household engaged.

Ghiglieri – direct

549

1    Did you also evaluate Household's compensation practices

2    during the 1999 to 2002 time frame?

3    A.  I did.

4    Q.  And what sources did you use to evaluate Household's

02:00:03  5    compensation practices?

6    A.  I looked at the compensation plans for each of those years

7    and various internal memos and e-mails concerning those

8    compensation plans.

9    Q.  Why did you evaluate Household's compensation plan?

02:00:17 10    A.  Well, one of the things that I regularly did, as an

11    examiner -- and, of course, as a senior official at the OCC

12    and as the Texas Banking Commissioner -- you wanted to see

13    what was driving the behavior at a particular institution.

14         And there are two places to look for that.  One is

02:00:36 15    their compensation plan and one is their training.  Because if

16    the employees are told, "We want you to meet these targets and

17    you're going to be compensated if you do or if you go over

18    those targets," then that's what's going to drive their

19    behavior.

02:00:50 20         And, so, as a regular routine, we would look at the

21    compensation plans to see how people were being rewarded for

22    what type of behavior.

23         And, so, when I was looking at this whole file for

24    Household, I particularly was interested in their compensation

02:01:07 25    plans.

Ghiglieri – direct

550

```
          1   Q.  Did you draw any conclusions from your examination of

          2   Household's compensation practices during the '99 to 2002 time

          3   frame?

          4   A.  Yes.

02:01:15  5   Q.  What conclusions did you draw?

          6   A.  My conclusions, based on how the employees were rewarded

          7   and what they were rewarded for, was that they were being

          8   rewarded for predatory lending practices that I've described

          9   so far.

02:01:27 10   Q.  I'm going to show you Exhibit -- Plaintiffs' Exhibit --

         11   269 for identification.

         12       (Document tendered.)

         13   BY MR. DROSMAN:

         14   Q.  Do you recognize Plaintiffs' Exhibit 269?

02:01:53 15   A.  I do.

         16   Q.  What is it?

         17   A.  This is the compensation plan for 2000 --

         18   Q.  For what --

         19   A.  -- for Household.

02:02:01 20   Q.  -- entity?

         21   A.  For their sales staff.

         22   Q.  Is this for HFC, in particular?

         23   A.  That's what this is entitled, yes.

         24   Q.  And did you review another plan for Beneficial?

02:02:09 25   A.  Yes.  I reviewed all the plans that were produced in these
```

Ghiglieri – direct

551

1   years, 1999 to 202.

2   Q.  And this is for HFC for the year 19- -- or 2000; is that

3   correct?

4   A.  Yes.

02:02:23  5   Q.  And you considered this in reaching your conclusions in

6   this case?

7   A.  I did.

8            MR. DROSMAN:  Plaintiffs move Exhibit 269 into

9   evidence.

02:02:34 10            THE COURT:  It will be admitted.

11         (Plaintiffs' Exhibit No. 269 received in evidence.)

12   BY MR. DROSMAN:

13   Q.  Can you tell me the significance -- now, it looks like

14   there's various components set forth in this plan; is that

02:02:41 15   right?

16   A.  Yes.  There are five components to the Household plan.

17   And let me just tell you what those are first, before we go

18   through each one of them.

19            The first one is the "New Money Component."  The

02:02:58 20   second one is the "Loan Volume Component."  The third one is

21   the "Loan Account Gain Component."  The fourth one is the

22   "Margin Component."  And the fifth one is the "Insurance

23   Component."

24            And, so, we can go through them each.

02:03:14 25   Q.  Let's take them one at a time.

Ghiglieri - direct

552

1    A.  Okay.

2    Q.  You talked about -- you spoke about -- the "New Money

3    Component"?

4    A.  Yes.

02:03:19  5    Q.  And that's a component of the compensation plan for the

6    sales staff at HFC?

7    A.  Yes.

8         And, basically, what this rewards the sales staff for

9    doing is booking as many loans as possible.  And they are

02:03:33 10    rewarded based on the amount of new money that is booked.

11         And, so, for example, if someone comes in and makes a

12    new loan, that goes towards the "New Money Component."

13         If it's refinance, only the amount of fees and points

14    and insurance they can pack on there goes into this "New Money

02:03:50 15    Component."

16         So, that's what it is.  The amount of new money

17    that's booked.

18    Q.  The "Loan Volume Component," that's what's that?

19    A.  The "Loan Volume Component" -- and there's various

02:04:04 20    iterations of this, but, basically, the employees were

21    rewarded for how many loans they booked.  And, so, if you just

22    think about loan splitting, if they were being rewarded for

23    how many loans they were being booked, booking two loans was

24    going to reward them more than booking one.  So, this is the

02:04:23 25    component that rewarded them for how many loans they were

Ghiglieri – direct

553

         1   booking.

         2   Q.  So, all other things being equal, if a salesperson at

         3   Household books two loans for a hundred thousand dollars --

         4   say, an 80,000 and a $20,000 loan -- versus one $100,000 loan,

02:04:40  5   is he or she compensated more --

         6   A.  Yes.

         7   Q.  -- on one or the other?

         8   A.  Using certain calculations, yes.  There is a minimum

         9   amount that they had to get over first; but, basically, yes.

02:04:50 10   Q.  Which would they be compensated more for booking?

        11   A.  Well, over- – in certain years, they were compensated the

        12   most for booking, which up there you can see "PHLs," which

        13   were personal home loans.  And these were loans that, you

        14   know, they could charge the high interest -- the 25 percent.

02:05:10 15   They were compensated three points.

        16        The real estate secured, they were compensated one.

        17        So, if they split that loan into two, with the first

        18   mortgage and the PHL -- the personal home loan -- as a second

        19   loan, they could get five points right there.

02:05:25 20        And I believe they had to get nine points to start

        21   this compensation.

        22        I can't see it right off the bat, but I believe

        23   that's right.  I think -- oh, yeah, they had to get nine

        24   points to start off with.

02:05:39 25        So, if they only split a few of those loans, they

Ghiglieri - direct

554

1    could get that nine points pretty fast.

2         They made some changes to this component in the

3    different years; but, basically, the thrust was the more the

4    number of loans that you booked, the more you were going to be

02:05:56  5  compensated.

6    Q.  The next component on the page ending "226" is the "Net

7    Loan Account Gain Component"?

8    A.  Yes.

9    Q.  And what's that?

02:06:05 10  A.  This rewards the employees for low attrition.  And we

11   talked about yesterday "attrition" means that people are

12   coming in to pay off their loans, or they're paying more down

13   on their loans than the payment amount.

14        And, so, they wanted to halt attrition.  They wanted

02:06:25 15  their loan portfolio to grow instead of go down.

16        And, so, the sales staff was rewarded for keeping

17   those loans on the books.  And, of course, we talked about

18   various ways of doing that:  Going up to a hundred percent

19   loan to value; adding on the prepayment penalty; packing it

02:06:44 20  full of fees and insurance premiums and stripping away the

21   equity.

22        So, there's a variety of practices that they could

23   engage in to be rewarded for loan account gain.

24   Q.  The next page -- the page ending "227" -- has at the top a

02:07:04 25  component called the "Margin Component"?

Ghiglieri – direct

555

1    A.   Right.

2    Q.   Can you tell us what that is?

3    A.   Yes.

4         Household had a matrix that, basically, took into

02:07:18  5    consideration the credit quality of the borrower.  And just

6    like we all have a credit score, Household had a variety of

7    credit scoring devices that they would assign a score to each

8    individual borrower.

9         And they would come up with a benchmark rate below

02:07:34 10    which they would not want to make this loan to that person.

11        So, the employees were rewarded for how much they

12    could increase that benchmark rate.  And that's what this

13    "Margin Component" is.

14        And, so, the higher that they could go with the

02:07:50 15    interest rate, the more that they were rewarded.

16    Q.   Now, you mentioned a "benchmark rate."  Was the benchmark

17    rate -- you said it was some sort of matrix, where they'd

18    calculate what the appropriate interest rate should be for a

19    particular customer?

02:08:04 20    A.   Right.

21        So --

22    Q.   And that was based on all the risks and so forth --

23    A.   Yes.

24    Q.   -- that that customer might pose?

02:08:11 25    A.   Yes.

Ghiglieri – direct

556

1        That's like your credit score is just a good example.

2        I know that Household had a variety of credit-scoring

3    mechanisms, which all lenders do; and, they would set a rate

4    below which they would not want to go, based on the risk of

02:08:26  5    the borrower.

6        And, then, if you can highlight the first paragraph

7    there (indicating), it says, "Part of your incentive is

8    derived from the combination of rate and points that you

9    sell," so anything that they could do to increase that

02:08:39 10    benchmark rate with interest rate and points, they got

11    rewarded for.

12    Q.  Now, so, this benchmark rate -- which was the appropriate

13    rate that should be charged to a customer -- were salespeople

14    compensated for going above the benchmark rate?

02:08:53 15    A.  That's right.

16        So, how much ever -- you know, they knew what the

17    benchmark rate was and they knew they couldn't make the loan

18    below that.  So, anything that they could add-on to that, they

19    would be compensated for.

02:09:04 20    Q.  And the benchmark rate was the fair rate for the customer;

21    is that right?

22    A.  Well, that's the rate that was based on the risk of the

23    borrower.

24    Q.  If you turn to the next component, it's on "228."

02:09:20 25        I think it says, "Insurance Component" toward the

Ghiglieri – direct

557

1    bottom of the page there?

2    A.  Right, "Insurance."

3        I found this component to be particularly interesting

4    because not only did it reward the individual salesperson for

02:09:32 5   packing on insurance of a variety of kinds -- credit life,

6    single premium credit, accident and health; you know,

7    whatever -- but there was a portion of the incentive went into

8    a pool for all branch employees.

9        So, it helped produce peer pressure for the branch

02:09:57 10  for everyone to do this particular practice.  So, this

11   component I found particularly interesting.

12   Q.  What is this?  Were they offered additional compensation

13   for the more insurance they sold?

14   A.  Yes.

02:10:10 15      And the branch was, too, if they met certain goals.

16       Remember the penetration ratio that they wanted in

17   that other document was 75 percent.  So, they wanted 75

18   percent of all the loans that they made to have some sort of

19   insurance packed on there.

02:10:23 20  Q.  Now, did you prepare a demonstrative exhibit to assist you

21   in explaining how Household's compensation practices

22   encouraged predatory lending practices?

23   A.  Yes.

24   Q.  I'm showing you what has been marked as Plaintiffs'

02:10:37 25  Demonstrative Exhibit 32 for identification.

Ghiglieri - direct

558

         1        Can you tell us what this exhibit shows?

         2    A.  What this exhibit shows is the various incentives on the

         3    left.  We talked about "New Money Volume," "Loan Account

         4    Gain" -- I should use my clicker here -- "Margin and

02:11:02 5    Insurance."

         6        And these are the predatory lending practices that

         7    they encouraged.  So, let's just take them one at a time or --

         8    is that okay?

         9    Q.  Sure.  That's fine.

02:11:19 10       Why don't we take the first one, "New Money

        11    Incentive."  Tell us what practices that encouraged?

        12    A.  Okay.  "New Money Incentive," so here we have -- remember,

        13    this is an incentive based on how much new money is booked.

        14        And, so, what it encouraged was loan flipping because

02:11:35 15   each time they did these rapid refinances or continual

        16    refinances, they would add on points, they would add on

        17    insurance premiums and they would add on fees.

        18        So, it encouraged loan flipping; it encouraged equity

        19    stripping, because every time they added on points and fees

02:11:50 20   and insurance premiums, of course, it stripped off the equity;

        21    it encouraged insurance packing, because insurance was part of

        22    the new money; and, it encouraged putting maximum points on,

        23    because that was also part of the new money.

        24        The second one is "Loan" -- is "Volume" -- "Loan

02:12:11 25   Volume Incentive."  And these are the number of loans,

Ghiglieri – direct

559

1    remember.  And, so, that encouraged loan flipping and loan

2    splitting.  Because for each new loan that they booked, they

3    got a certain number of points.

4         If they split it into two, they got more points.  And

02:12:26  5    when they split it into certain kinds of loans, they got even

6    more points.  And that kind of changed over the course of

7    time.

8         The third one -- "Loan Account Gain" -- that

9    encouraged -- remember, now, this is the attrition.  This is

02:12:39 10    -- if the overall book of business goes down, you don't get

11    your incentives.  So, they were trying to prevent attrition,

12    trying to prevent anybody from paying off their loan too fast.

13        And this encouraged loan flipping because every time

14    that, you know, the loan needed to be refinanced or whatever,

02:13:03 15    it kept the loan balances going up with the extra products and

16    points and everything being added on.

17        Of course, equity stripping, because when all that

18    was added on, it stripped away equity; and, insurance packing,

19    because that added to the loan balances.

02:13:21 20        So, "Loan Account Gain" encouraged those types of

21    predatory lending practices.

22        For "Margin Incentive," we talked about that.

23    Everyone -- every applicant -- that came to Household had a

24    benchmark rate that was calculated based on the

02:13:35 25    creditworthiness of the borrower.

Ghiglieri – direct

560

1          And the sales executives were incentivized by

2     increasing that as much as possible.  So, at the highest rate

3     possible, adding on as many points as possible.

4          And, then, the last one:  "Insurance Packing" --

02:13:54   5     "Insurance Incentive."  Not only were the individuals

6     rewarded, but they could be rewarded based on sort of the peer

7     pressure of the branch, and that encouraged insurance packing.

8     Q.  All right.

9          As a regulator now, let's talk about -- we talked a

02:14:10  10     little bit about the Quality Assurance and Control Department

11     at Household?

12     A.  Yes.

13     Q.  Often abbreviated as the "QAC" Department.

14          Are you familiar with Quality and Assurance Control

02:14:22  15     Departments at various lenders that you've examined over the

16     years?

17     A.  Yes.

18     Q.  And what are the purpose of these QAC Departments,

19     generally?

02:14:28  20     A.  Well, generally, the purpose is to make sure that the

21     lender is complying with various laws; and, you would need

22     someone to go and look at the loan files to determine that.

23          And, then, the second thing would be to make sure

24     that they're complying with Household's policies or the

02:14:47  25     company's policies.

Ghiglieri – direct

561

1            So, it's a multi-prong review that your Quality

2   Assurance folks would do.

3   Q.  And how did these Quality Assurance -- or QAC -- people

4   operate?  How do they make sure that things are working the

02:15:01  5   way they're supposed to work?

6   A.  Well, there's almost no way to do it unless they go into

7   the branchs.  And, so -- and pull loan files and look at the

8   closing documents, to make sure that Regulation Z and RESPA

9   and all of the regulations are being complied with.

02:15:18 10            And, then, they also need to determine if company

11  policies are being complied with -- the issuances that the

12  headquarters office is making.

13            So, it would be a dual function, if you will.

14  Q.  I'll show you what has been marked as Plaintiffs' Exhibit

02:15:37 15  717 for identification.

16       (Document tendered.)

17  BY MR. DROSMAN:

18  Q.  Do you recognize Exhibit 717?

19  A.  I do.

02:16:00 20  Q.  What is it?

21  A.  This is the 1999 Consolidated Internal Audit Plan for

22  Household.

23  Q.  And what's an Internal Audit Plan?

24  A.  Every, especially publicly-traded companies, have a

02:16:13 25  Internal Audit Department that will audit the various areas of

Ghiglieri – direct

562

 1    the company.  And they'll formulate an Internal Audit Plan

 2    that will be approved by the Board of Directors.

 3         And I looked at all the Audit Plans for the time

 4    period and the one I have in my hand is for 1999.

02:16:29  5    Q.  Okay.

 6         Did you review this document in coming to the

 7    conclusions in this case?

 8    A.  I did.

 9         MR. DROSMAN:  I move Exhibit 717 into evidence.

02:16:40 10         THE COURT:  Admitted without objection.

11    (Plaintiffs' Exhibit No. 717 received in evidence.)

12    BY MR. DROSMAN:

13    Q.  If you'd turn to the page ending "759," it looks like the

14    heading at the top of the page says, "Audit Plan Overview";

02:16:55 15    and, then, there's a couple of bullet points on the page.

16         Is the second bullet point on that page of any

17    significance to your opinion in this case?

18    A.  Can you ask me that, again?  I'm sorry.

19    Q.  Sure.

02:17:07 20         Is the second bullet point of any significance to

21    your opinion in this case?

22    A.  Yes.

23    Q.  What is the significance of the second bullet point to

24    your opinion?

02:17:15 25    A.  This is discussing the transfer of the QAC Field Staff to

Ghiglieri – direct

563

1    the District Sales Managers.

2         And I should say it this way:  The functions that the

3    QAC staff perform was being transferred in 1999, in the first

4    quarter, to the District Sales Managers.  And these are the

02:17:39  5    people that the branch personnel reported up to.

6    Q.  Why does that matter?

7    A.  Well, when you give responsibility for compliance and for

8    checking to make sure things are right, to the very people

9    that you're looking to, to increase sales, it's like asking

02:18:01  10   the fox to guard the hen house-type thing.

11        This is not considered a good thing to do from a

12   regulatory standpoint, from an auditing standpoint, really

13   from any standpoint.

14        And I think even here the internal auditor said --

02:18:17  15   the second sentence -- well, the first sentence first:  "The

16   1999 Internal Audit Plan incorporates three additional

17   auditors to address the increase in risk resulting from

18   changes being made in the HFC and Beneficial branch network.

19   During the first quarter of 1999, HFC will transfer branch

02:18:36  20   audit and training responsibilities to the District Sales

21   Managers from the Quality Assurance and Control QAC

22   Department.  QAC had performed these functions for HFC since

23   1996, to allow HFC DSMs to focus on the sales-related

24   functions."

02:18:54  25   Q.  Who are the DSMs?

Ghiglieri – direct

564

1    A.  So, those are the people that the branch sales staff

2    reported up to.

3    Q.  Okay.

4         Now, you read a part about "Increase in Risk."  What

02:19:05 5    do you understand that to mean?

6    A.  Well, it's always an increase in risk when you're asking

7    the very people that are making the loans to do the checking

8    on themselves.  So, you know that you're going to increase

9    risk because if -- they're being asked to do two things that

02:19:21 10   are at odds.  They're being asked to increase the loan volume

11   and they're being asked to comply with the law.  And they're

12   being compensated for increasing the sale -- the loan --

13   volume.

14        So, which are they going to do?  That's what the risk

02:19:35 15   is when you ask people to do an audit of themselves.

16   Q.  If you look at the next paragraph, the first sentence, is

17   that of any significance to your opinion in this case?

18   A.  Yes.

19        And I think this might be more articulate than I just

02:19:47 20   said:  "The transfer of these audit responsibilities back to

21   the DSMs creates additional risk, as aggressive 1999 loan

22   growth objectives can operate in direct contrast to loan

23   quality objectives."

24   Q.  Explain what that means.

02:20:06 25   A.  So, that means you're giving the sales staff two competing

Ghiglieri – direct

565

1    objectives and you're asking them to check themselves.

2          So, you're saying, "We want you to grow the loans.

3    We're going to compensate you for growing the loans.  We're

4    going to train you how to grow the loans in these predatory

02:20:27  5    ways.  And, at the same token, we want you to check for

6    compliance with the laws and policies of the company," and

7    they conflict.  And it increases risk to the company.

8    Q.  Now, in addition to the documents that we've already

9    reviewed, have you seen any customer complaints that suggest

02:20:44 10    that defendants were aware of the predatory lending practices

11    during the 1999 to 2002 time frame?

12    A.  Yes.  I reviewed a number of complaints.

13    Q.  Let's look at a couple.

14          I'll show you a document that has been marked as

02:20:58 15    Plaintiffs' Exhibit 276 for identification.

16          (Document tendered.)

17    BY MR. DROSMAN:

18    Q.  Do you recognize Plaintiffs' Exhibit 276?

19    A.  I do.

02:21:30 20    Q.  And what is it?

21    A.  This is a complaint filed by José Nanez to the Arizona

22    Attorney General's office.  And this is a document that I

23    looked at in formulating my opinions.

24    Q.  What's the date of the complaint?

02:21:41 25    A.  February 20th, 2002, it was signed.

Ghiglieri – direct

566

```
              1        MR. DROSMAN:  Your Honor, plaintiffs move Exhibit 276

              2   into evidence.

              3        MR. KAVALER:  I believe this is one of those limited

              4   documents, your Honor.

02:21:56      5        THE COURT:  It will be admitted.

              6        MR. DROSMAN:  Thank you, your Honor.

              7        (Plaintiffs' Exhibit No. 276 received in evidence.)

              8   BY MR. DROSMAN:

              9   Q.  Now, can you tell us what this is -- what this shows?

02:22:06     10   A.  This is a typical complaint.  When someone has a complaint

             11   against a regulated entity and they call the regulator -- and

             12   I used to have staff in Atlanta that would take all the

             13   complaints for National Bank in the southeast -- the first

             14   thing that you tell them do is, "Put it in writing."

02:22:24     15        And the purpose for that is because not only does a

             16   regulator want to be able to look at it -- the person in the

             17   office -- but they'll send it to the examiner for the scope of

             18   the next examination.  But, also, they want to send it to the

             19   regulated entity, so that they can get their side of the

02:22:41     20   story.

             21        And, so, this is a typical complaint form that

             22   regulators use across the country.  We used it at the OCC and

             23   in Texas -- something similar -- and it lays out what their

             24   complaint was regarding their particular loan.

02:22:58     25   Q.  When you say that you'd also want to send it to the
```

Ghiglieri - direct

567

1   regulated entity, what's that?

2   A.  Well, the regulator's not going to just take this

3   complaint and say, "Everything in here is true."  They want to

4   get the regulated entity's side of the story; and, then,

02:23:13  5   they'll take the two and figure out if a violation has

6   occurred or not.

7   Q.  What is the regulated entity?

8   A.  Well, in this case, it's Household.

9        In the case when I was in Atlanta, it would be the

02:23:23  10  National banks in the nine southeastern states.

11  Q.  So, whatever --

12  A.  Whatever your jurisdiction is.

13  Q.  So, whatever lender a person's complaining about would

14  also get a copy of this complaint; is that right?

02:23:34  15  A.  Yes, with a specific request from the regulator to say,

16  "Please respond to this complaint.  Tell us what your side of

17  the story is."

18  Q.  This particular complaint is filed by a man named José

19  Nanez; is that right?

02:23:49  20  A.  Yes.

21  Q.  And let's take a look at the first entry he has -- or the

22  first number on his complaint.

23  A.  This person lives in Phoenix, Arizona, and he's Hispanic,

24  he says, and his primary language is Spanish.  And his

02:24:08  25  daughter was serving as interpreter.

Ghiglieri – direct

568

1       And he says, "Our home was purchased in February,

2   1997, and financed with a 30-year home loan at a 7 percent

3   fixed interest rate."

4   Q.  And No. 2, what's his --

02:24:25  5   A.  And, then, he received a solicitation from Household with

6   a $5,000 check, which they later cashed; and, then, they

7   called Household about refinancing.

8   Q.  And what does No. 3 indicate?

9   A.  No. 3 indicates that they went to talk to Household and:

02:24:43 10   "Beulah Jordan, a Household sales representative, told us that

11   Household had a special loan program under which we could

12   consolidate all our bills into one loan; get the cash we

13   wanted; and, save a lot of money in paying off our bills.

14   Jordan gave us a quote for Household's biweekly payment (or EZ

02:25:00 15   Payment Plus) plan.

16       "Under this plan, Jordan said that if we made

17   payments every two weeks, our loan would be paid out like a

18   7.58 percent 30-year loan, only we would get to pay it off

19   much sooner than 30 years.

02:25:14 20       "She also told us that we could get single premium

21   credit insurance in order to get the loan."

22   Q.  Is there a --

23   A.  I'm sorry, I misspoke.

24       She said, "We had to get single premium credit

02:25:28 25   insurance in order to get the loan."

Ghiglieri – direct

569

1    Q.  Now, is there anything significant about that complaint to

2    your opinions in this case?

3    A.  Well, what I found interesting about this complaint was,

4    first of all, non-English speakers, if you remember the OCCs

02:25:46  5    issuance, it talked about sometimes you have non-English

6    speakers, and that's a particular class that can be taken

7    advantage of.

8         And here we have the Hispanic non-English speaker,

9    the daughter serving as an interpreter.  So, that kind of

02:26:03 10    perks your ears up for possible predatory lending.

11         And, then, of course, again, we've got the biweekly

12    payment plan with the EZ Pay.  This is in Phoenix, Arizona.

13         You know, we've seen these in different places around

14    the country.  And, you know, the effective rate presentation,

02:26:20 15    again.

16    Q.  Why do you think that this is the effective rate

17    presentation?

18    A.  Because they're talking about, "If you pay off your loan

19    every two weeks, it will pay out like a 7.58 percent 30-year

02:26:32 20    loan, only you pay it off much sooner."

21         The one thing that's missing here from the

22    presentation is how many years sooner is it paid off?  18?

23    17?  Whatever.

24         And, then, they talk about single premium credit

02:26:44 25    insurance, which is a particularly predatory product because,

Ghiglieri - direct

570

1    remember, it tacks on to your 30-year loan, but it goes away

2    in five years.  And, so, that's been prohibited by a lot of

3    states.

4    Q.  So, they were told that they would have this 7.58 percent

02:27:04  5    interest rate with their loan?

6    A.  Yes.

7    Q.  Turn to the next page, the page ending "765".

8    A.  The first sentence says, "Respondents did not tell us

9    their biweekly payment quote did not include transaction fees,

02:27:21 10    property taxes or homeowners insurance on their home."

11         That's something I saw in a lot of the complaints --

12    and we haven't really talked about that -- but when you're

13    making a comparison of apples to apples, you want to make sure

14    that your mortgage payment, in fact, is the same -- contains

02:27:33 15    the same -- things as your current mortgage payment.

16         And this was a complaint that a lot of consumers had,

17    was that Household would not include their taxes and

18    insurance, and that's what their current one included.

19         So, when they were saying, "We'll give you a smaller

02:27:50 20    payment," that wasn't true.

21         And, then, the second sentence says, "Respondents

22    also did not explain that our loan included substantial loan

23    origination fees, substantial upfront insurance premiums and

24    an actual interest rate of 11.79 percent, a prepayment penalty

02:28:08 25    if we tried to pay off our loan before five years."

Ghiglieri – direct

571

1    Q.  So, what predatory practices were employed by Household

2    with respect to this person, José Nanez?

3    A.  Well, they have the effective rate presentation given to

4    them.  They had single premium insurance being required -- and

02:28:25  5    that's particularly predatory.  They had failure to disclose

6    the -- that the insurance and taxes were not in the new

7    payment, as were on the old, so they could compare.  And they

8    didn't -- failure to disclose the prepayment penalty.

9    Q.  And what does the last sentence of this complaint say?

02:28:46 10    A.  The last sentence says, "We believe the respondents

11    targeted us for predatory loans due to our national origin:

12    Hispanic.  As a result of their predatory lending, respondents

13    have stripped away part of our loam equity and we are in

14    danger of losing our home."

02:29:00 15              So, that's the equity stripping, again, that we

16    talked about.

17    Q.  Why don't I show you what's been marked as Plaintiffs'

18    Exhibit 1096 for identification.

19        (Document tendered.)

02:29:30 20    BY MR. DROSMAN:

21    Q.  Do you recognize Plaintiffs' Exhibit 1096?

22    A.  I do.

23    Q.  What is it?

24    A.  This is a complaint from Amy Adams in New Cumberland,

02:29:39 25    Pennsylvania.  It's dated September 10th, 2002, and it's

Ghiglieri – direct

572

1    addressed to Household.

2    Q.  And why do you recognize 1096?

3    A.  This is one of the documents that I looked at in

4    formulating my opinions.

02:29:51  5           MR. DROSMAN:  Plaintiffs offer Plaintiffs' Exhibit

6    1096 into evidence.

7           MR. KAVALER:  Your Honor, this is another one of

8    those limited documents.

9           THE COURT:  Okay.

02:29:59 10           It will be admitted.

11           MR. DROSMAN:  Thank you, your Honor.

12           THE COURT:  The jury has been instructed on the

13    documents.

14           MR. KAVALER:  Thank you, your Honor.

15      (Plaintiffs' Exhibit No. 1096 received in evidence.)

16    BY MR. DROSMAN:

17    Q.  Let's take a look at the first page of the document.  You

18    said that this document was sent to Household.

19           What was the date it was sent to Household?

02:30:15 20    A.  September 10th, 2002.

21    Q.  If you look at the second paragraph of the letter, what --

22    A.  Now, this is a complaint that's not on the complaint form,

23    that -- she actually wrote this letter herself.

24    Q.  And if you look at the last page of the letter -- the page

02:30:34 25    ending "448" -- why don't we look at the page ending "448" of

Ghiglieri – direct

573

1        the letter?  It's the third page in.

2            Can you tell me:  Did she it to anybody in particular

3        at Household?

4        A.  Yes.  She sent it to Mr. Aldinger, Mr. Gilmer,

02:30:52  5   Mr. Schoenholz and Mr. Streem.

6        Q.  She cc'd all those people?

7        A.  Yes.

8        Q.  Why don't we take a look again at the first page of 1096,

9        the second paragraph, and tell us if that's of any

02:31:09 10   significance to your opinion.

11       A.  Yes.

12           This is a case where she questioned the prepayment

13       penalty at the time of the closing.  And she says, "The

14       salesman who was handling our refinance very nonchalantly

02:31:23 15   glossed over this issue and communicated to my husband and me

16       that this would typically be about a $3,000 fee, given our 6

17       percent interest rate, which really turned out to be 9.49

18       percent -- more on this later -- and that these fees can be

19       waived for job-related relocations.  As we are now facing

02:31:39 20   selling our house due to relocation, I have since found this

21       not to be the case."

22       Q.  What does that mean?

23       A.  Well, this is the failure to disclose what's going on with

24       the prepayment penalty.

02:31:51 25           Here's someone that sees the prepayment penalty,

Ghiglieri - direct

574

1    asked about it and they say, "We can waive it."  And this

2    was -- I saw this in other complaints -- this very action.

3    Q.  Why don't we take a look at the next page, the page ending

4    "447."

02:32:10  5        And if you look at the first non-indented paragraph,

6    it begins, "To add insult to injury," can you tell us if

7    there's any significance of that information to your opinion?

8    A.  Yes.

9        And this says, "To add insult to injury, the salesman

02:32:26 10   who sold us this deal capitalized on the fact that we were

11   receiving a 6 percent interest rate by participating in the

12   biweekly EZ Pay Program.

13       "When I questioned the 9.49 percent rate listed on

14   our contract at the signing, I was told that was the rate for

02:32:40 15   people not participating in the biweekly payment program.

16   When I asked where the 6 percent interest rate was quoted in

17   the agreement, I was told it was assumed in the EZ Pay

18   Program, so that was why I wouldn't find it in the contract."

19       So, this is the whole effective rate presentation,

02:32:58 20   where the customers were being deceived into thinking it was

21   lower rate than they were actually getting.

22       Here was a customer questioning, you know:  "Why is

23   this different than my contract rate," and the employee's

24   telling them from Pennsylvania that, "Don't worry.  That's for

02:33:16 25   people that aren't participating in this biweekly payment

Ghiglieri – direct

575

1      program."

2      Q.  Then it looks like there's a series of bullet points on

3      that page and, then, another paragraph underneath that.

4           Can you take a look at that?

02:33:27  5      A.  Yes.

6      Q.  It begins --

7      A.  "I am responsible -- "

8      Q.  "I am a responsible consumer."

9      A.  "I'm a responsible consumer with good credit who was duped

02:33:38 10      through your slick sales techniques into refinancing a 7

11      percent FHA mortgage to your 9.49 percent unconventional loan,

12      losing $12,000 equity I had built up in my home and now I am

13      facing being further penalized for selling my home to support

14      a job move."

02:33:57 15      Q.  What significance is that to your opinion?

16      A.  So, she had a 7 percent mortgage.  She was told that she

17      could get a 6 percent interest rate through the biweekly

18      payment program; and, in fact, it turns out to be 9.49

19      percent.  And that's a typical --

02:34:14 20      Q.  She went from a 7 percent loan to a 9-point-something

21      percent loan?

22      A.  Yes, 9.49 percent.

23      Q.  And why does she say she did that?

24           Why would anybody go from a lower rate loan to a

02:34:25 25      higher rate loan?

Ghiglieri – direct

576

1   A.  You wouldn't do it.

2       Plus, she had an FHA mortgage and now she has an

3   unconventional.  And the FHA would be more attractive.

4       So -- well, you wouldn't do it.  You wouldn't

02:34:37  5   willingly pay more money on your loan.  I mean, for, what?

6   What would be the point of that?

7   Q.  Does this support your opinion that this woman, Ms. Adams,

8   was deceived by Household?

9   A.  Yes.

02:34:48  10  Q.  What predatory lending practices do you see reflected in

11  this complaint?

12  A.  Well, the non-disclosure or the -- discussing that the

13  prepayment penalty would be waived, that's one.  And, then,

14  the effective rate presentation would be two.  Equity

02:35:03  15  stripping would be three.

16  Q.  And did Ms. Adams attach anything to this complaint that

17  she sent to Mr. Aldinger and Mr. Gilmer and Mr. Schoenholz?

18  A.  Yes.

19      She attached a newspaper article -- actually, a

02:35:17  20  magazine article -- from Forbes entitled, "Home Wrecker" and

21  it's dated September 2nd, 2002.

22  Q.  Have you reviewed this article?

23  A.  Yes.

24      I actually reviewed this article separate from this

02:35:33  25  complaint because I was taking the -- I was canvassing

Ghiglieri – direct

577

1    everything that was out there regarding predatory lending

2    during the 1999/2002 time frame.  And I came across this

3    myself.

4         But she goes through and highlights some things in

02:35:44  5    here that are similar to what I found in looking at this file.

6    Q.  And the first thing that she highlights in the "Home

7    Wrecker" article in Forbes Magazine, what's that?

8    A.  Well, she's talking about a William Meyers, a borrower,

9    paid off his credit card debt by refinancing his loan with

02:36:07  10   Household.

11        "He says his new lender, Household International,

12   charged him 11 percent interest, not the 7.2 percent interest

13   as promised.  Then it added 14,400 in fees and insurance to

14   his $80,100 loan, and stuck him with a $15,000 second mortgage

02:36:23  15   at 20 percent.  He didn't notice it until the first bill," a

16   lot of the issues we've been talking about yesterday and

17   today.

18   Q.  What about, in particular, in Ms. Adams' complaint?  Is

19   there any similarities between Ms. Adams' complaint and this

02:36:37  20   information in Forbes Magazine; specifically, with the 11

21   percent interest --

22   A.  Yeah.

23   Q.  -- promised?

24   A.  Right.

02:36:44  25   Q.  I'm sorry, the 7.25 percent interest promised, when it's

Ghiglieri - direct

578

1    really an 11 percent interest rate?

2    A.  Yes.

3          This was the effective rate presentation, where

4    they're trying to make their rates look more competitive.

02:36:56  5    And, so, they're saying, "If you pay half of your mortgage

6    every other week, your rate's going to be 7.2," but really it

7    was 11 percent.

8    Q.  Let's look at the next spot.  I think it's the fourth

9    paragraph in the article that Ms. Meyers highlighted,

02:37:11  10   apparently to show similarities.

11         Can you tell us what that says?

12   A.  It's the one up above that.

13   Q.  The fourth paragraph down?

14   A.  Yeah.

02:37:19  15        There you go.

16         Now, this is what happened -- this is what she claims

17   happened -- to her.  "Household is under fire for myriad

18   tactics.  In addition to the bait-and-switch on interest

19   rates, it charges high prepayment penalties and service fees.

02:37:36  20   It lures clients with proposals showing monthly savings that,

21   at times, fail to materialize."

22         So, she's talking about the high -- or this article

23   is talking about the high -- prepayment penalties; and, then,

24   the effective rate presentation, which she talks about, too.

02:37:54  25   Q.  The next spot in the article -- the Forbes article -- that

Ghiglieri – direct

579

1     Ms. Adams highlighted, can you tell us about that?

2     A.  Actually, the last part of that sentence also is things

3     that we were talking about today, too, if you'd go back to

4     that.

02:38:08  5          And it says, "And it structures mortgages to include

6     last-minute second loans that make it difficult for borrowers

7     to defect and get refinancing elsewhere.  Household agents

8     call it 'Closing the Back Door.'"

9          So, that's -- we've been talking about closing the

02:38:21 10  back door here.

11    Q.  Did you call it "Blocking the Back Door"?

12    A.  "Blocking the Back Door," yes.

13    Q.  Is there a difference between "Blocking the Back Door" and

14    "Closing the Back Door"?

02:38:29 15  A.  No, it's the same thing.

16    Q.  Take a look at the next paragraph that Ms. Adams

17    highlighted.

18    A.  In this -- this -- is something else that we've been

19    talking about:  "But Household's questionable practices seem

02:38:40 20  to be in far wider use than that.  For one thing, Meyers lives

21    in Dayton, Ohio, not Bellingham, Washington."

22         And this refers to the paragraph above which says,

23    "Household says such complaints represent a minuscule fraction

24    of its 100 billion in outstanding loans."

02:38:59 25         It also says, "Gripes about the interest-rate-trick

Ghiglieri – direct

580

1    that fooled Meyers are largely confined to its office in

2    Bellingham, Washington."

3    Q.  So, that's the few-bad-apple argument?

4    A.  The rogue branch, rogue employee.

02:39:10  5         If you go down, then -- going back to what's

6    highlighted here -- "The Household pitch was so effective, it

7    even lured customers with good credit, including Meyers.

8    Customers and some ex-employees tell of the same interest rate

9    trick in a dozen states."

02:39:24  10        So, Ms. Adams has good credit and, so, she's

11   highlighting this because it says, "Even some people with good

12   credit are being lured by this."

13   Q.  The next sentence, I think, is a quote from a regulator in

14   Minnesota.  What does he have to say about the few-bad-apple

02:39:44  15   argument that Household made?

16   A.  The Commissioner in Minnesota -- the Commerce Commissioner

17   -- says, "Household encourages -- or at least tolerates --

18   these abuses.  It's not just an occasional rogue loan officer

19   or rogue office.  It has to do with corporate culture."

02:40:05  20   Q.  Is that consistent with or different from the conclusions

21   you drew in this case?

22   A.  No, it's consistent.

23   Q.  Okay.

24        Let's look at the next page, the page ending "450."

02:40:18  25        And, then, it looks like Ms. Adams has highlighted

Ghiglieri - direct

581

1    some more paragraphs from the Forbes article on that page.

2    Let's talk about the first one.

3    A.  Okay.

4        This one says, "Household also began EZ Pay Plus, a

02:40:32 5    program under which many borrowers, like Meyers, were lured

6    with lower interest rates, but were really charged higher

7    ones.  EZ Pay Plus also quotes Karina Galindo, a Teacher's

8    Assistant in Phoenix.

9        "In April, 2000, Household offered to replace her

02:40:49 10   $67,300 mortgage -- a Chase Manhattan Bank loan at 8.5

11   percent -- with a bigger, but seemingly cheaper one:  $86,300

12   at an effective rate of 7.6 percent, enough to pay off the old

13   mortgage, and a $12,200 personal loan she was paying off at

14   15.7 percent.  At least this is how she read a worksheet from

02:41:11 15   a Household loan officer.

16       "Galindo signed up.  Four days later, she says she

17   got nervous and reviewed the 80-page agreement, signed and

18   initialed in two dozen places, and spotted the real interest

19   rate:  12.2 percent.

02:41:25 20       "How did it happen?  Galindo says her agent, José

21   Avila, handed her the worksheet entitled 'Biweekly Payment

22   Quote" with this sentence at the bottom:  'If I can put

23   together a loan that pays out like a 7.579 percent a year

24   loan, but has a total term of 18.63 years, would you be

02:41:45 25   interested?"

Ghiglieri - direct

582

1    Q.  Let me stop you there.

2         That language that you just read, do you recognize

3    that language?

4    A.  That's from the Dennis Hueman video.

02:41:55  5    Q.  Okay.

6         And what is this article talking about?  What's the

7    passage you just read?

8    A.  This is the effective rate presentation on how Household,

9    in trying to make their mortgages look for competitive, would

02:42:09 10    do this effective rate presentation and lure these people in,

11    thinking they were going to get a lower interest rate.  Then

12    they find out that they have, in fact, a higher interest rate.

13         And here, you know, there's more interest and fees

14    and premiums tacked on.  So, it strips out your equity; it

02:42:25 15    keeps you there because no one else will refinance you, so

16    that the back door is blocked.

17         So, this paragraph goes to a lot of the things that

18    we've been talking about today.

19    Q.  Now, in your evaluation of Household's lending practices,

02:42:40 20    did you also review Reports of Examinations written by state

21    and federal regulators?

22    A.  I did.

23    Q.  Why did you review Reports of Examinations by regulators?

24    A.  Well, I wanted to see what the regulators thought.  I

02:42:55 25    looked at the documentation and I wanted to see if they -- if

Ghiglieri – direct

583

1   their findings supported my opinions.

2   Q.  Which regulators issued Reports of Examination that you

3   reviewed?

4   A.  I reviewed the OTS reports for the Federal Thrift that

02:43:11  5   Household had -- Household Bank FSB -- and, then, I reviewed

6   the State Examination Reports from the finance company.

7        And I also reviewed -- FDIC did a separate exam and,

8   then, I think they did a joint one with the OTS.

9        So, I reviewed any of the examination reports that

02:43:35  10  were available.

11  Q.  And how many State Examination Reports did you review

12  approximately?

13  A.  I would say maybe 30.

14       I'm not sure.  I know at one point I reviewed some

02:43:46  15  and, then, had to send some back.  So, I'm not exactly sure

16  how many.  Maybe 30.

17  Q.  And from what different states did these Examination

18  Reports come?

19  A.  New Jersey, Virginia, Kansas, Washington, Minnesota -- all

02:44:03  20  over the country.

21  Q.  Other states you haven't mentioned?

22  A.  Yes, uh-huh.

23  Q.  Why don't I show you what's been marked as Plaintiffs'

24  Exhibit 1205 for identification.

25       (Document tendered.)

Ghiglieri – direct

584

       1  BY MR. DROSMAN:

       2  Q.  Do you recognize Plaintiffs' Exhibit 1205?

       3  A.  I do.

       4  Q.  And what is 1205?

02:44:47  5  A.  This is the Special Compliance Examination that was

       6  performed by the Office of Thrift Supervision, which is the

       7  regulator of the Federal Thrift, dated January 16th, 2003.

       8  Q.  And did this examination also examine the finance company

       9  at Household?

02:45:06 10  A.  Yes.

     11  Q.  So, it examined both the Thrift and the Finance Company?

     12  A.  That's right.

     13  Q.  And why do you recognize this document?

     14  A.  This was one of the documents that I reviewed in

02:45:16 15  formulating my opinions.

     16  Q.  And who authored the document?

     17  A.  The Office of Thrift Supervision.

     18       MR. DROSMAN:  Plaintiffs offer Exhibit 1205 into

     19  evidence.

02:45:27 20       THE COURT:  It will be admitted.

     21     (Plaintiffs' Exhibit 1205 received in evidence.)

     22  BY MR. DROSMAN:

     23  Q.  So, why don't we take a look at the first page.  It

     24  indicates that the subject concerns both the bank and the

02:45:39 25  finance company; is that right?

Ghiglieri - direct

585

             1   A.  Yes.

             2        If you look at the bottom, it says, "Household Bank,

             3   FSB," that's the Federal Thrift, and, then, "Household Finance

             4   Corporation."

02:45:47     5        This is a Special Compliance Exam and the federal

             6   regulators have the authority to go beyond the entity that

             7   they regulate, if it's affiliated with the regulate -- the

             8   entity that they regulate.

             9        And the OTS decided to do that in this case because

02:46:03    10   of concerns that they had.

            11   Q.  So, even though they wouldn't ordinarily regulate the

            12   finance company, they decided to do a special examination of

            13   Household Finance Company in this case?

            14   A.  That's right.

02:46:14    15        And we used to do that at the OCC if we were worried

            16   about an affiliate.  We would go on and examine that

            17   affiliate.

            18   Q.  Go ahead, if you would, and turn to the page ending "063."

            19        It looks like the heading on that page is, "Special

02:46:31    20   Compliance Examination."

            21        And, then, the date is June 3rd, 2002?

            22   A.  Yes.

            23   Q.  Does the first sentence of that document have any

            24   significance to your opinion?

02:46:41    25   A.  "A Special Compliance Examination of Household Bank FSB

Ghiglieri – direct

586

1    commenced on June 3rd, 2002"?  That sentence?

2    Q.  Right.

3         Does this tell you when the actual examination took

4    place?

02:46:54 5    A.  Yes.

6    Q.  When was that?

7    A.  June 3rd, 2002.

8    Q.  So, in the middle of 2002, they performed this

9    examination?

02:47:01 10    A.  Yes.

11    Q.  And when did they issue their report, then?

12         Does the first page indicate January 16th, 2003?

13    A.  Yes, January 16th, 2003.

14    Q.  Okay.

02:47:20 15         If you could go down to the bottom of the page ending

16    "063," where it talks about the "overall findings for the

17    exam," and look at the first arrow there.

18    A.  Yes.

19         And, first, the second sentence of the first

02:47:33 20    paragraph at the top of the page says, "The focus of this

21    Special Examination was a variety of predatory lending and

22    insurance sales issues."

23         And, so, they're articulating what the scope of their

24    Special Compliance Examination was.

02:47:49 25    Q.  And what was the scope?

Ghiglieri - direct

587

            1   A.  The scope is:  "The focus of this Special Examination was

            2   a variety of predatory lending and insurance sales issues."

            3   Q.  Okay.

            4        If you take a look, then, at the bottom of that first

02:48:02    5   page, under, "Overall Examination Summary and Findings."

            6   A.  Okay.

            7        So, the first one is:  "There is evidence of

            8   insurance packing.  HFC" -- and "HB" is Household Bank.  So,

            9   that's the Federal Thrift.

02:48:16   10        "HFC/HB sold insurance products, personal property,

           11   disability, life and involuntary unemployment to a very high

           12   percentage of borrowers for both real estate and non-real

           13   estate-secured lending.  There -- " I think that's the wrong

           14   word.  It should be "T-h-e-i-r."

02:48:36   15        But, anyway, "There most egregious issue is sales of

           16   personal property insurance for, essentially, unsecured

           17   non-real estate loans."

           18   Q.  Does that text that you just read have any significance to

           19   your opinions in this case?

02:48:47   20   A.  Well, yes.

           21        My conclusion is that Household engaged in insurance

           22   packing.  And this is what the OTS is saying, also.

           23   Q.  Okay.

           24        If you'd turn to the page ending "065."

02:49:02   25        It looks like the second arrow on that page indicates

Ghiglieri - direct

588

1   that, "Some of the most significant concerns"; is that right?

2   A.  (No response.)

3   Q.  The second arrow on Page --

4   A.  Yes.

02:49:14  5   Q.  -- 065?

6   A.  And, then, they're articulated here.

7   Q.  So, let's talk about some of the most significant concerns

8   that the federal regulator -- in this case, the Office of

9   Thrift Supervision -- found.

02:49:28 10   A.  Okay -- excuse me.

11         So, the first box -- they have little boxes on this

12   side -- "Many cases of multiple -- " the first box there

13   (indicating) -- "Many cases of multiple and frequent

14   refinancing/debt consolidations in short time frames."

02:49:46 15         So, this would be loan flipping.

16   Q.  What's the next box or bullet that they have indicated?

17   A.  "Routine payment of high levels of loan fees associated

18   with frequent refinancings.

19         "In many instances, refinances offered marginal

02:50:02 20   benefit."

21         That would be to the borrower.  This is another issue

22   about loan flipping and charging the high level of loan fees.

23   Q.  This talks about -- the next one -- the next bullet on

24   that page -- what is that?

02:50:16 25   A.  This is on insurance.  It says, "Aggressive sales

Ghiglieri – direct

589

1    practices, with frequent sales of single payment credit life

2    insurance."

3           And, remember, that was the one that got tacked onto

4    your loan for 30 years, but it ran out after five years, in

02:50:31  5    terms of the term of it.  And you were still paying for the

6    next 25.

7           It says, "Also, frequent sales of personal property

8    insurance, involuntary unemployment insurance and disability

9    insurance.  Loans commonly rolled into new or additional loans

02:50:44  10   with credit insurance routinely included.  The credit life

11   insurance was typically for a maximum of five years, with a

12   single payment fee collected up front."

13          And, of course, tacked on the loan and amortized over

14   the 30 years.

02:50:58  15   Q.  And these are all OTS' significant concerns; is that

16   right?

17   A.  Yes.

18   Q.  What's the next significant concern that the OTS had?

19   A.  The next one is:  "High Loan to Value Lending.  Household

02:51:07  20   offered loans well in excess of a hundred percent of the

21   underlying collateral."

22          And that's, of course, equity stripping, where the

23   value of your house is a hundred thousand and they would lend

24   up to a hundred percent of the value of your house.

02:51:23  25          So, you would have no equity when you walked out of

Ghiglieri – direct

590

1    there.

2    Q.  And is that a predatory lending practice?

3    A.  Yes.

4    Q.  Is that also known as equity stripping?

02:51:33 5    A.  Equity stripping.

6    Q.  What's the next significant concern that the OTS had?

7    A.  The next one is:  "Cases of significantly declining home

8    equity due to increasing consumer debt."

9         And that's, basically, equity stripping, again.

02:51:47 10   Q.  Tell us what that means.

11   A.  It means that if you are consolidating your loans or if

12   you go to Household and you refinance your loan and they add

13   on points and fees and premiums to your loan, and you walk out

14   of there with a hundred percent loan to value, you've,

02:52:05 15   essentially, stripped away any equity that you had in your

16   house.

17   Q.  Turn to the next page -- the page ending "066" -- and look

18   at -- there's a "Significant Concern" in the box at the top of

19   the page?

02:52:17 20   A.  "Use of Household's EZ Pay Plus electronic payment product

21   through Fort Knox National Bank as a means of misinforming

22   applicants about the realities/benefits of increased biweekly

23   payments."

24        This is the effective rate presentation.

02:52:38 25   Q.  And that was a significant concern of the OTS?

Ghiglieri – direct

591

         1   A.  Yes.

         2   Q.  If you'd turn to the page ending "091," it looks like that

         3   page indicates, "Examination Summary and Findings"; and, then,

         4   there's some summary of the findings that were provided to

02:52:57 5   HFC, the finance company.

         6        Can you look at the first arrow on Page 091 and tell

         7   me whether that's significant to your opinion?

         8   A.  It says, "There is evidence of insurance packing.  This is

         9   based on loan file reviews, as well as analysis of data

02:53:14 10  relating to insurance sales.  HFC sold insurance products,

        11   personal property, disability, life and involuntary

        12   unemployment at its HFC/Beneficial offices to a very high

        13   percentage of eligible borrowers for both real estate and

        14   non-real estate secured lending.  There is a major concern

02:53:33 15  with the practice of selling personal property insurance on

        16   what are, essentially, unsecured loans."

        17   Q.  Why is that significant to your opinion?

        18   A.  It just -- it supports my opinion that they engaged in

        19   insurance packing.

02:53:47 20  Q.  If you turn to the page ending "093," on the third arrow

        21   on that page, if you can tell me whether that's significant to

        22   your opinion?

        23   A.  Yes.  This concerns the good-faith estimate issues that

        24   we've been talking about.

02:54:04 25       "A review of various loan files found that good-faith

Ghiglieri – direct

592

1    estimates often disclosed a very wide range of costs when

2    estimating the potential charges to the borrower.  The use of

3    such wide ranges easily led to confusion for the applicants.

4    The examiners believe that the regular use of wide ranges for

02:54:21  5    loan cost estimates is an unfair and deceptive practice.  A

6    recent policy change at Household should correct this

7    situation."

8    Q.  Okay.

9         And why is that significant to your opinion?

02:54:32 10    A.  Because this supports my opinions that Household used the

11    wide range to mislead the borrowers and, then, charged them at

12    the high end of the range or above the range.

13    Q.  If you'd turn to the page ending "095," it looks like, in

14    this case, the federal regulators are listing a number of

02:54:59 15    different civil complaints and state investigations, and

16    they're set forth in the arrows?

17    A.  Yes.

18    Q.  Do those -- are those relevant to your opinions?

19    A.  Yes.  And these are many of the same things that we've

02:55:10 20    been talking about here.

21    Q.  Let's look at the first arrow.

22    A.  "Many cases of multiple and frequent refinancings, debt

23    consolidations in short time frames."

24         That's loan flipping.

02:55:21 25    Q.  And what are all these things?

Ghiglieri - direct

593

1    A.  These are concerns that various civil complaints and state

2    regulators -- they're summarizing what their concerns are.

3    Q.  So, the OTS has looked at the various complaints in the

4    state investigations and they're sort of summarizing what they

02:55:39  5    found?

6    A.  Yes.

7    Q.  And what's the next thing they summarize?

8    A.  "Routine payment of high levels of loan fees associated

9    with frequent refinancings."

02:55:47 10    Q.  What is that?

11    A.  And that's where you pack on points and fees and insurance

12    premiums every time you flip the loan.

13        So, it's what we've been talking about today:  Equity

14    stripping and loan flipping, insurance packing.

02:56:04 15    Q.  So, the frequent refinancings, that's the loan flipping

16    that you've been speaking --

17    A.  Loan flipping, yes.

18    Q.  What's the next arrow on the page?

19    A.  "Borrowers paying a high price for frequent refinancings.

02:56:16 20    In many instances, refinances offered marginal or

21    insignificant benefit."

22        And that's the loan flipping; and, every time you

23    flip it, adding on -- or every time Household would flip the

24    loan, they would add on -- insurance, points and high fees.

02:56:29 25    Q.  And was that -- did that benefit the borrower -- these

Ghiglieri - direct

594

1    frequent refinancings?

2    A.  No.

3    Q.  What's the next arrow?

4    A.  "Aggressive Sales Practices."

02:56:41 5    Q.  And the next one?

6    A.  "Loans commonly rolled into new or additional loans and

7    credit insurance routinely included with the loan product."

8         So, this would be insurance packing every time the

9    loan was flipped.

02:56:52 10   Q.  And the next concern that the federal regulators found

11   when they were looking at all the different state

12   investigations, what's that?

13   A.  This is:  "Frequent sales of single payment credit life

14   insurance.  Also, frequent sales of personal property

02:57:07 15  insurance, unemployment insurance and disability insurance."

16        So, this is the egregious practice of selling that

17   single payment credit life insurance, which many states have

18   outlawed; and, then, insurance packing.

19   Q.  And the next arrow?

02:57:21 20  A.  "The credit life insurance was typically for a maximum of

21   five years, with a single payment collected upfront."

22        That's what they said before of what they found; and,

23   of course, that's the egregious part of this product.

24   Q.  The next summarized concern from all the state

02:57:36 25  investigations, what is that?

Ghiglieri – direct

595

1    A.  "High Loan to Value Lending.  Household offered loans well

2    in excess of a hundred percent of the underlying collateral."

3        Of course, we talked about that -- stripping away the

4    equity.  Even -- they even offered one that went above a

02:57:51  5    hundred percent.

6    Q.  And, then, the next summarized concern from all the state

7    investigations?

8    A.  "Cases of declining home equity because of increasing

9    consumer debt."

02:58:05  10        That's equity stripping.

11    Q.  What is that?

12    A.  Pulling out the equity because of adding on high points in

13    insurance premiums and other closing costs.

14    Q.  And, then, if you look at -- we'll skip a few of them.

02:58:23  15        If you look at the bottom arrow -- I know there's

16    many -- what is that bottom arrow:

17    A.  This is that good-faith estimate issue:  "Use of wide

18    ranges on good-faith estimate disclosures."

19        This practice was determined to be an unfair and

02:58:37  20    deceptive practice.

21    Q.  And the "GFE" in that sentence refers to, what?

22    A.  "Good-faith estimate."

23    Q.  And the state investigations found that --

24    A.  That's what they concluded, yes.

02:58:45  25    Q.  If you could turn to the page ending "120."

Ghiglieri – direct

596

                1          And it looks like there's a heading, No. 5:

                2    "Examiner Review of Real Estate Secured Lending:  High Loan

                3    Fees."

                4          Can you tell me what the last paragraph on that page

02:59:07  5    -- "120" -- shows?

                6    A.  I'm sorry, I'm on the wrong place.  Let me get it.

                7    Q.  "120."

                8    A.  Can you tell me what -- where -- you're directing me?

                9    I --

02:59:22 10    Q.  Sure.  If you'd look at the page ending "120"?

               11    A.  Okay.

               12    Q.  And, then, there's a heading on that page:  "Examiner

               13    Review of Real Estate Secured Lending"?

               14    A.  Oh, okay.

02:59:31 15    Q.  "High Loan Fees."

               16    A.  Yes.

               17    Q.  Is the last paragraph on that page of any significance to

               18    your opinion?

               19    A.  The last paragraph says, "The distinguishable pattern from

02:59:48 20    this sample is the high number of loans, 15 of 21 -- or 71.4

               21    percent -- with origination fees of 7 percent or more.  Loan

               22    fees of 7 percent are considered extremely high and are

               23    indicative of a high fee structure."

               24    Q.  Can you tell us what because that means?

03:00:05 25    A.  Yes.

Ghiglieri – direct

597

1          Now, we talked about Household charging discount

2      points, and that would normally be a negotiation between the

3      borrower and the lender, and the borrower may decide to pay

4      one discount point to lower the discount rate, say, 25 basis

03:00:24  5      points.

6          Household would charge -- the majority of their loans

7      were charged at the high end of what state law would allow.

8      Usually, either 5 percent or 7 to 7-and-a-half percent.  And

9      what the regulators are saying here -- the OTS is saying

03:00:39  10     here -- is that they consider loan fees of 7 percent to be

11     extremely high and indicative of a high fee structure.

12         So, just to put it in perspective.

13     Q.  So, if you had loan fees of 7 percent on a $100,000 loan,

14     what would your fee be?

03:00:56  15     A.  $7,000.

16         So, a discount point is one percent of the loan

17     balance.

18     Q.  And the regulators considered that to be, in their words,

19     extremely high?

03:01:06  20     A.  Extremely high.

21     Q.  If you turn to the next page, the page ending "121," take

22     a look at the top -- the heading at the top.

23         No. 6 is:  "Deceptive Acts."  Do you see that?

24     A.  Yes.

03:01:20  25     Q.  And, then, if you look down into that paragraph under

Ghiglieri – direct

598

1    "Deceptive Acts," the second paragraph -- the second sentence

2    of that paragraph -- is that of any significance to your

3    opinion?

4    A.   The second sentence says, "However, examiners believe that

03:01:38  5    HFC has engaged in unfair and deceptive acts, as described in

6    Section 3, relating to insurance sales."

7    Q.   What about the next sentence?

8    A.   "Also, although not a technical RESPA violation, the

9    examiners believe that the wide ranges for good-faith

03:01:54 10    estimates was also a deceptive act."

11    Q.   Is this significant -- this information significant -- to

12    your opinions in this case?

13    A.   Yes.

14    Q.   How?

03:02:01 15    A.   It supports my opinions that not only were they engaged in

16    insurance packing; but, also, that they -- the range, the wide

17    range that they -- gave borrowers, and, then, charged either

18    at the high end of the range or in excess of the range --

19    which would be a violation of RESPA -- supports my opinions.

03:02:22 20    Q.   I'll show you what has been marked as Plaintiffs' Exhibit

21    1333 for identification.

22        (Document tendered.)

23    BY MR. DROSMAN:

24    Q.   Do you recognize Plaintiffs' Exhibit 1333?

03:02:57 25    A.   I do.

Ghiglieri – direct

599

1    Q.   What is it?

2    A.   This is a letter from the Washington Department of

3    Financial Institutions to Household dated May 17th, 2002.

4    Q.   Why do you recognize it?

03:03:07  5    A.   This is one of the documents that I looked at in

6    formulating my opinions.

7         MR. DROSMAN:   Plaintiffs move Exhibit 1333 into

8    evidence.

9         THE COURT:   It will be admitted.

10        (Plaintiffs' Exhibit No. 1333 received in evidence.)

11   BY MR. DROSMAN:

12   Q.   Let's take a look at this document.

13        To whom was the letter addressed?

14   A.   To Tom Schneider.

03:03:27 15   Q.   And what's the subject of the letter?

16   A.   "Expanded Report of Examination."

17   Q.   And who is Mr. Schneider?

18   A.   He is in charge of Policy and Compliance for Household.

19   Q.   What is Policy and Compliance?

03:03:38 20   A.   My understanding was that he -- his area coordinated

21   Household's activities with the regulators.

22        And, then, it also at one point he would look at some

23   of the complaints from the Better Business Bureau and the AG's

24   office and things like that.

03:03:55 25   Q.   And, then, if you look at the second paragraph of the

Ghiglieri – direct

600

1    letter, is that significant to your opinion?

2    A.   Yes.

3    Q.   Tell me why.

4    A.   It says, "This report identifies significant patterns and

03:04:11  5   practices that the Department finds unacceptable.  The report

6    also carries serious allegations of wrongdoing with Washington

7    consumers.

8         "Contrary to Household's prior explanations, the

9    Department has found that the patterns, practices and alleged

03:04:25 10   harmful acts are not isolated to an individual office in

11   Washington.

12        "Further, the patterns and practices discussed in the

13   report appear to occur from Household offices across the

14   country."

03:04:38 15   Q.   This paragraph that you just read, is this relevant to

16   your conclusion that this wasn't one or two bad apples at

17   Household?

18   A.   Yes.  It supports my opinion that Household engaged in

19   predatory lending practices company-wide, nation-wide, and it

03:04:55 20   was a systemic practice -- a systemic issue.

21   Q.   Now, the subject here is:  "Expanded Report of

22   Investigation" -- or "Examination," I apologize.

23        And the letter indicates that there's an enclosure.

24        Did you review the expanded Report of Examination

03:05:11 25   from the Department of Financial Institutions at Washington?

601

1  A.  Yes.

2  Q.  I'll show you what has been marked as Plaintiffs' Exhibit

3  290 for identification.

4      (Document tendered.)

03:05:32  5      THE COURT:  I think that probably at this point,

6  before we get into the new exhibit, it might be a good time to

7  take our afternoon break.  We're five minutes past 3:00

8  o'clock.  So, we'll do that at this time.

9      We will take a 20-minute break, ladies and gentlemen,

03:05:43  10  and resume at 25 after.

11      (Jury out.)

12      THE COURT:  Before we break, I think it's a good time

13  to ask if the attorneys have any suggestions with respect to

14  the outstanding timing issues with the jurors, and the one

03:06:37  15  question regarding training logs, et cetera.

16      MR. DOWD:  I think, your Honor, it sounded like the

17  Court was inclined to break a little early today, anyway.  But

18  if we're going to break earlier for the jurors, then I think

19  it would make sense to start earlier.

03:06:57  20      And I think one time, when you were speaking to the

21  jury this morning, you said, "We're going to start at 10:30."

22  I think you just misspoke.

23      THE COURT:  I misspoke.  It should have been "10:00

24  o'clock," if I said that.

03:07:06  25      MR. DOWD:  I understood that.  I just think we should

602

1    remind them, especially after this morning.

2          THE COURT:  Yes, I think I better.

3          (Laughter.)

4          MR. KAVALER:  Your Honor, I agree with Mr. Dowd on

03:07:17  5    both those points.

6          THE COURT:  Well, I guess my inclination, frankly, is

7    not to quit any earlier.  I really -- I don't know how we'd do

8    it.

9          We already have one juror -- who is on, I guess,

03:07:39 10    probationary status for the week -- complaining about having

11    to get here as early as she has to get here, because of her

12    duties with her son, and so on.

13          If we start asking them to come earlier at this

14    point, we may get a whole new series of objections that we

03:07:56 15    haven't even thought about.

16          I'm inclined to tell them that these are the hours

17    and that's the way it's going to have to stay, unless they all

18    agree that they're willing to stay here for six to eight weeks

19    instead of four to six weeks, which I don't think is realistic

03:08:16 20    for anyone.

21          And I think with all due respect to your suggestions,

22    that's what I'm going to do.  I think that's what we have to

23    do at this point.

24          It may be actually necessary at some point in time to

03:08:27 25    start earlier, but to keep the same closing time.  That would

603

1    have been my preference down the road; but, at this point in

2    time, I don't think it's -- I'd hate to open up that can of

3    worms.

4         It leaves us with the intriguing query about the logs

03:08:49  5    and names of employees participating in training sessions.

6         Do you want me to read it, again, to you?

7         MR. DOWD:  I have it in mind.  I'm sure Mr. --

8         MR. KAVALER:  As do I, your Honor.

9         THE COURT:  Okay.

03:09:03 10    Suggestions?

11        MR. DOWD:  Well, your Honor, I think ultimately -- if

12   I remember correctly from the jury instructions -- the Court's

13   probably going to instruct the jurors on, you know, both what

14   is evidence, what is not evidence, absence of evidence,

03:09:15 15    parties producing evidence.

16        You know, I don't think that the jurors get to see

17   that type of evidence that they're asking for, based on my

18   review of the exhibits in the case, on both our exhibit list

19   and defendants' exhibit list.

03:09:30 20        THE COURT:  All true, but what should I tell the

21   jury?  What's your suggestion?

22        MR. DOWD:  I think I would just tell the jurors that

23   they should decide the case on the evidence that's presented,

24   and the Court will instruct them later on evidence that they

03:09:42 25    may not see.

604

1          THE COURT:  Am I going to tell them something on

2     evidence they may not see?

3          MR. DOWD:  I think there is an instruction on absence

4     of evidence or, you know, parties putting forth evidence.

03:09:54  5     Maybe I'm wrong.  I don't have any instructions with

6     me, unfortunately, your Honor.

7          THE COURT:  No, I think actually, you're correct.

8     There is an instruction that no party is required to produce

9     all of the documents or all of the exhibits or witnesses,

03:10:08 10   which sort of touches on that.

11         Okay.

12         MR. KAVALER:  Let me address it in two parts, your

13    Honor.  Let me start by telling you what I believe the

14    evidence will show, whether or not there are documents.

03:10:20 15        First, with regard to the Hueman videotape, as I

16    told them in the opening, no one was ever trained using that

17    tape because the tape never made it to the field.

18         Mr. Detelich found out about it promptly after

19    Mr. Hueman made it.  The evidence will be that it was

03:10:35 20   unauthorized.  The evidence will be that Mr. Detelich was

21    outraged.  The evidence will be that Mr. Detelich caused all

22    copies to be retrieved and destroyed.

23         And there's no person -- notwithstanding the bootless

24    testimony of this witness, who was trained on that tape --

03:10:50 25   that's the issue I was talking about this morning, your Honor:

605

1    The jury will find that out later, from Mr. Detelich, or

2    perhaps in the cross-examination of this witness.

3        Secondly, as to authorized training, there might be

4    testimony as to what the practices and policies were with

03:11:05  5    regard to authorized training -- whether people were required

6    to sign anything in connection with the receipt of their

7    training; whether those lists were -- those signed documents

8    were -- maintained, where they're maintained, et cetera.

9        So, the evidence will be what the evidence of will

03:11:20 10    be.

11        Now, those are the facts I'm simply --

12        THE COURT:  It's usually the case.

13        MR. DOWD:  Can I say something, your Honor?  That had

14    nothing to do with the question.

03:11:27 15        But as Mr. Hueman said on the videotape, they've been

16    trained that way for years.

17        THE COURT:  You know, if you want me to be the jury,

18    I will an happy to hear this argument, all the evidence and

19    decide the case.

03:11:36 20        Otherwise, let's get to the bottom line.  What I want

21    to know is what you want me to tell the jury, not what you

22    think the evidence is going to show and why your client's

23    going to win.

24        MR. KAVALER:  Well, your Honor, I think you should

03:11:45 25    tell the jury that you received their question and the lawyers

606

```
          1   have told you that there will be further evidence in the case
          2   bearing on that issue and they should wait for it.
          3          THE COURT:  You think I should interject my opinion
          4   that there will be further evidence?
03:12:00  5          MR. KAVALER:  You can say you've been told there will
          6   be.
          7          THE COURT:  I'm sorry?
          8          MR. KAVALER:  You can say you've been told by the
          9   lawyers or one lawyer -- however you want to put it.
03:12:07 10          I mean, the problem, your Honor, is twofold, I think.
         11   You don't want to encourage a plethora of such questions.
         12          On the other hand, you don't want to discourage the
         13   person who submitted this one.
         14          THE COURT:  Well, I don't think I'm going to tell the
03:12:24 15   jurors what the lawyers believe the evidence will be.  You've
         16   already done that.  I think it's called opening statements.
         17          I am going to tell this juror that he should decide
         18   the evidence -- the case -- based on the evidence that he
         19   hears; and, that I cannot answer for him questions about
03:12:43 20   evidence that is or is not presented during the course of the
         21   trial -- that that's a consideration he should take into the
         22   jury room with him when he deliberates.
         23          Any objection to that?
         24          MR. DOWD:  None, your Honor.
03:12:57 25          MR. KAVALER:  It sounds fine.
```

607

```
         1          THE COURT:  Okay.  That's what we'll do.

         2          See you folks in about 15 minutes.

         3          MR. KAVALER:  Thank you, your Honor.

         4          MR. DOWD:  Thank you, your Honor.

03:13:04 5     (Brief recess.)

         6          THE COURT:  Please bring the jury out.

         7     (Jury in.)

         8          THE COURT:  Before we commence, ladies and gentlemen,

         9     there is one question that I received from you earlier that I

03:36:19 10    would like to answer.  I'll read the question so that you all

         11    know what it is.

         12         It states:  Were training logs listing names, dates

         13    of employees participating in these training sessions taken

         14    and kept?  Same question would apply to any other training

03:36:40 15    sessions and classes conducted and used as evidence in this

         16    case.

         17         The answer to that question is this, ladies and

         18    gentlemen:  I cannot answer for you questions about what the

         19    evidence is, what evidence has been presented or what evidence

03:36:58 20    has not been presented.  The lawyers will take care of

         21    presenting the evidence.  And it is for you to decide the case

         22    after all the evidence has been heard based on the evidence

         23    that's been presented to you and your deliberations with your

         24    fellow jurors.  The evidence that you will consider will be

03:37:17 25    the evidence that is actually presented by the lawyers.  And
```

Ghiglieri - direct

608

1    based upon that, you must make your determination.

2            Proceed.

3            MR. DROSMAN:  Thank you, your Honor.

4    BY MR. DROSMAN:

03:37:27 5    Q.  When we broke, I had provided you with Plaintiffs' Exhibit

6    290 for identification.

7            Do you recognize Plaintiffs' Exhibit 290?

8    A.  I do.

9    Q.  And what is this?

03:37:37 10   A.  This is the Washington Department of Financial

11   Institutions expanded report of examination, dated as of April

12   30, 2002.

13   Q.  We saw a cover letter a moment ago, Plaintiffs' Exhibit

14   1333.  Is this the report of -- expanded report of examination

03:38:00 15   that the cover letter, 1333, referred to?

16   A.  Yes.

17   Q.  And why do you recognize Plaintiffs' Exhibit 290?

18   A.  This was a document that I considered in formulating my

19   opinion.

03:38:14 20           MR. DROSMAN:  Plaintiffs offer Exhibit 290 into

21   evidence.

22           MR. KAVALER:  This is another one of those limited

23   documents, your Honor.

24           MR. DROSMAN:  Actually it isn't, your Honor.  There's

03:38:22 25   no objection to this document, your Honor.

Ghiglieri – direct

609

1          MR. KAVALER:  I believe it's covered by limiting

2     instruction No. 2, your Honor.

3          THE COURT:  Let's take a look.

4          MR. DROSMAN:  Withdrawn, your Honor.  There's another

03:38:43 5     exhibit that's identical to this to which there was no

6     objection.  So that's my mistake.  This one, however, has a

7     limiting instruction.

8          THE COURT:  Very well.  The jury has been instructed

9     on the limited use of evidence as to certain documents.  The

03:38:55 10    document will be admitted with that instruction.

11    BY MR. DROSMAN:

12    Q.  Now, let's look at the first page of Exhibit 290.

13         What is an expanded report of investigation?

14    A.  Well, in this case, instead of just doing a regular

03:39:14 15    examination, they expanded it to take into consideration

16    certain things that they were interested in looking at.

17    Q.  And what was the date that they conducted this

18    examination?

19    A.  It says it's dated April 30, 2002.

03:39:29 20    Q.  And if you turn to -- we'll take a look inside the

21    expanded report of examination.  If you take a look at the

22    page ending 668, the first paragraph on that page.

23         Is that significant to your opinions in this case?

24    A.  Yes.  Is it the first -- my copy doesn't show -- the first

03:40:01 25    full paragraph starts with, While the misrepresentation.

Ghiglieri – direct

610

1  Q.  Yes, the first partial paragraph.

2  A.  Okay.

3  Q.  Is that significant to your opinion in this case?

4  A.  Yes.

03:40:16  5  Q.  Can you tell us why?

6  A.  Well, it says -- let's see if we can --

7  Q.  The sentence there begins, After reviewing the complaints.

8  A.  Yeah, I was just looking at the previous sentence here.

9      After reviewing the complaints, HFC's responses to

03:40:39  10  the complaints and documents relative to the complaints, the

11  Department believes that HFC representatives have employed

12  sales tactics intended to mislead, misdirect or confuse the

13  borrower.  As discussed below, this belief is supported by the

14  Department's own test originations of loans at three different

03:40:56  15  HFC branches in Washington.

16  Q.  What about the first sentence that you read, why is that

17  supportive of your opinion in this case?

18  A.  After reviewing the complaints, because the -- my opinions

19  go to misleading, misdirecting or confusing the borrower; and

03:41:17  20  so this would support my opinions.

21  Q.  And did the Washington Department of Financial

22  Institutions come to that same conclusion?

23  A.  Yes.

24  Q.  What about the second sentence that you read?

03:41:27  25  A.  Well, the second sentence is very unusual.  The Department

Ghiglieri - direct

611

1    in Washington State actually went out and did mystery

2    shopping, if you know what that is, where you go into the

3    store to see if -- you know, how the sales staff treats you

4    and report back to the company.  They were getting so many

03:41:47  5    complaints, they decided to go out and do some mystery

6    shopping themselves.  But when you do this as an examiner, you

7    actually apply for a loan.  And it actually makes your credit

8    rating go down.  So this is a very extreme step to take as a

9    regulator.  We did it at the OCC a handful of times in the 18

03:42:05  10   years I was there.

11            And so this is what they did.  That's what this

12   sentence means, As discussed below, this belief is supported

13   by the Department's own test originations of loans at three

14   different HFC branches in Washington.

03:42:19  15           So they went a really extra step in actually applying

16   for loans at three different branches to see what their sales

17   techniques were going to be.

18   Q.  And what did they conclude when they went and engaged in

19   this mystery shopping?

03:42:32  20   A.  Well, in some respects, the disclosures that were supposed

21   to be given to them were not given to them.  Or in another

22   respect, somebody put their arm over the disclosures.  But

23   they found many of the same practices that we've discussed

24   here in the last couple of days.

03:42:49  25   Q.  Did they conclude when they engaged in this mystery

Ghiglieri – direct

612

1    shopping that the Household/HFC sales representatives engaged

2    in sales tactics intended to mislead, misdirect or confuse the

3    borrower?

4    A.  Yes.

03:43:03 5   Q.  If you take a look down at the heading number two,

6    confusion over rates, points and fees.

7    A.  Yes.

8    Q.  Does that have any bearing on your opinion in this case?

9    A.  It does.  And it says, Consumers complain that they were

03:43:18 10  somehow confused or misled about the rates, points or fees

11   offered by HFC.  Some consumers apparently believed that their

12   rate would either be lower than what it was or that somehow

13   the effective rate would be lower due to the payment

14   structure.  Other consumers were alarmed at the amount of fees

03:43:35 15  they were required to pay in the transaction, indicating that

16   they must have somehow been confused about the fees they would

17   pay.

18   Q.  So why is that supportive of your opinion?

19   A.  Well, because this whole effective rate scheme was

03:43:52 20  developed to make -- so that Household could compare their

21   otherwise high interest rate loan with a competitor's lower

22   interest rate loan.  And we've seen examples of effective rate

23   presentations being made around the country.  So it further

24   supports my opinions that Household engaged in systemic

03:44:13 25  predatory practices.

Ghiglieri - direct

613

1    Q.  Did it bear on your opinion that the predatory practice

2    specifically in this case, the use of effective rate or

3    equivalent rate, was widespread?

4    A.  Yes.

03:44:25 5    Q.  And how does it support -- in what way does it support

6    your opinion?

7    A.  Well, they went -- they actually went and did tests

8    themselves to see if what the complaints that they were

9    receiving about this effective rate presentation were true.

03:44:40 10   And they've concluded that, in fact, that the way that

11   Household was structuring their rates were intended to

12   mislead, misdirect and confuse the borrower or deceptive sales

13   practices, which is part of the definition of predatory -- or

14   covers -- the predatory lending term covers deceptive sales

03:45:04 15   practices.

16   Q.  If you look at the next paragraph, third sentence in, it

17   begins, A subpattern of this pattern of confusion.

18   A.  Yes.

19   Q.  Does that have any bearing on your conclusions in this

03:45:16 20   case?

21   A.  It does.  It says, A subpattern of this pattern of

22   confusion has been identified by the Department in HFC's

23   misuse of the good faith estimate and what appears to be

24   intentional confusion about discount points charged on certain

03:45:30 25   loans.  This subpattern of confusion has been identified by

Ghiglieri - direct

614

1   the Department in over half of the recent complaints and is

2   discussed in greater depth below.

3   Q.  How does that bear on your opinion in this case?

4   A.  Well, my opinion is that they used the good faith estimate

03:45:45   5   to confuse the borrower by showing a wide range of closing

6   costs when, in fact, they were going to be charged at the

7   higher rate or possibly greater than the range.  And this

8   supports my opinion.

9   Q.  If you could turn to page ending 670.  And I guess the

03:46:03   10   first -- the second full paragraph on that page.  It begins,

11   The Department has also identified three additional concerns.

12        Does that have any significance to your opinions in

13   this case?

14   A.  Yes.

03:46:18   15   Q.  Why?

16   A.  This says that, The Department has identified three

17   additional concerns resulting from borrower confusion over the

18   biweekly and bimonthly program.  One, borrowers have been told

19   that by accepting the biweekly payment program, they can

03:46:32   20   effectively reduce the interest rate on their loan from

21   approximately 14 percent down to 7 percent.  The Department

22   has encountered reference to this 14 to 7 percent statement a

23   number of times and addressed the problem directly with HFC

24   management in mid 2001.  HFC informed the Department that the

03:46:50   25   practice was isolated to a single branch in Washington and

Ghiglieri - direct

615

1    that the matter was not a corporate practice.  However, the

2    Department has identified the practice to other branches in

3    Washington and has received reports from other regulators in

4    other states concerning the practice.  Contrary to HFC's

03:47:06  5    claims, the Department does not believe the practice is

6    isolated.

7    Q.  How is that relevant or significant to your opinions in

8    this case?

9    A.  They're concluding that this effective rate presentation

03:47:18 10    is cropping up in other than just the Bellingham, Washington,

11    office, which is what HF- -- Household would always say that's

12    the rogue office, Bellingham, Washington; and that they're

13    hearing from regulators around the country that this is

14    cropping up there too.  And that supports my opinion that

03:47:35 15    Household engaged in systemic and companywide predatory

16    lending practices.

17    Q.  If you turn to the page ending 671.  It's a continuation

18    of identify patterns that the Department of Financial

19    Institutions in Washington has observed.  If you look at

03:47:55 20    number five on that page.  It's the second paragraph there.

21    It's entitled prepayment penalty.

22    A.  Yes.

23    Q.  The first sentence of that paragraph, does that support

24    your opinion in this case?

03:48:06 25    A.  Yes.  It says, Consumers complained that they were unaware

Ghiglieri – direct

616

1    of a prepayment penalty or that they were told they did not

2    have a prepayment penalty.  However, their loans did contain a

3    prepayment penalty.

4    Q.  And if you take a look at the next page, page ending 672.

03:48:26  5    The heading number six indicates an insurance packing.  Do you

6    see that?

7    A.  Yes.

8    Q.  Did the Washington DFI or Department of Financial

9    Institutions also find indications of insurance packing?

03:48:40 10    A.  Yes.

11    Q.  And if you take a look down at seven, upselling loans.

12    A.  Yes.

13    Q.  The first sentence under seven, upselling loans, does that

14    support your opinion in this case?

03:48:53 15    A.  It does.  And this is basically the loan splitting.  The

16    Department found that HFC attempts to provide both a first and

17    a second mortgage to borrowers regardless of the borrower's

18    desire or need for two loans.

19        And that's the loan splitting that we talked about.

03:49:10 20    Q.  I'll show you what has been marked as Plaintiffs' Exhibit

21    445 for identification.

22    (Tendered.)

23    BY MR. DROSMAN:

24    Q.  Do you recognize Plaintiffs' Exhibit 445?

03:49:38 25    A.  I do.

Ghiglieri – direct

617

1    Q.  What is it?

2    A.  This is a memo.  It's been -- it's an attachment to an

3    e-mail from Stephen Hicks to a variety of people at Household.

4    And the subject is Meeting with Michigan regulators.  And it's

03:49:58  5    dated June 18, 2002.

6    Q.  Why do you recognize this document?

7    A.  This was a document that I looked at in formulating my

8    opinions.

9           MR. DROSMAN:  Plaintiffs offer Exhibit 455 in

03:50:14 10    evidence.

11           THE COURT:  It will be admitted.

12    BY MR. DROSMAN:

13    Q.  And, specifically, this particular document, this was sent

14    by Stephen Hicks, it indicates?

03:50:24 15    A.  Yes.

16    Q.  And if you look at the page ending 592, it appears to be a

17    memo that Mr. Hicks sent?

18    A.  Yes.

19    Q.  Who is Mr. Hicks?

03:50:34 20    A.  He was an official at Household.

21    Q.  And was he in the policy and compliance department?

22    A.  I believe so.

23    Q.  And that's the department that interfaces with the

24    regulators?

03:50:44 25    A.  Yes, Mr. Schneider's department.

Ghiglieri – direct

618

1    Q.  And the subject indicates Meeting with Michigan

2    regulators?

3    A.  Yes.

4    Q.  On what date was the meeting with the Michigan regulators?

03:50:53  5    A.  June 7, 2002, it says.

6    Q.  And if you look at the second to last sentence of the

7    first paragraph, were there two significant issues for the

8    Michigan regulators?

9    A.  Yes.  They talked about the good faith estimate and proper

03:51:10  10   disclosure, and they talked about prepayment penalties.

11   Q.  The first significant issue for the Michigan regulators

12   reads GFE and proper disclosure there?

13   A.  Yes.

14   Q.  Can you tell us whether that's significant to your

03:51:25  15   opinion?

16   A.  It's similar findings to what I saw in other states.  And

17   it says, The examiners -- and this is Michigan regulators now.

18   The examiners reviewed approximately 60 loan files and

19   identified six where the GFE was missing, fees were not

03:51:41  20   disclosed or the difference in fees disclosed versus the

21   HUD-1 -- which is the good faith estimate -- or which is

22   the -- the HUD-1 is your closing document -- was significant.

23   So let me read that again.

24        The examiners reviewed 60 loan files and identified

03:51:56  25   six where the GFE -- which is the good faith estimate given

Ghiglieri - direct

619

1    three days after the completed application -- was missing,

2    fees were not disclosed or the difference in the fees

3    disclosed versus the HUD-1 -- which is the closing document --

4    was significant.

03:52:11  5    Q.  What does the next sentence say?

6    A.  With a 10 percent error rate, they indicated that they

7    would require corrective action.

8    Q.  And why is this significant to your opinion?

9    A.  Because this is the type of activity that I saw in other

03:52:26 10    states to draw the conclusion that Household engaged in

11    systemic and companywide predatory lending practices.

12    Q.  And in this case, specifically, with failure to disclose

13    and the good faith estimate?

14    A.  Yes.

03:52:40 15    Q.  Can you look at the last full paragraph on that page.  It

16    begins, This repeat examination issue.

17    A.  This repeat examination issue was also noted in their

18    March 2000 examination.  The examiners expressed concern over

19    our lack of action in getting this issue resolved.

03:52:57 20    Q.  Is that significant to your opinion in this case?

21    A.  Yes.  Examiners expect -- and regulators expect if they

22    find something, that it's going to be corrected at the next

23    examination.  And here, this is a repeat examination, which

24    can lead to an enforcement action, anywhere from a cease and

03:53:16 25    desist order, requiring refunds, civil money penalties or even

Ghiglieri – direct

620

1    change in management.

2    Q.  So a year earlier, they found the same things, is that

3    essentially what these people are saying?

4    A.  Yes.

03:53:31  5    Q.  If you could turn to the next page, page ending 593.  One

6    of the concerns that the Michigan regulators expressed -- it's

7    the third one on the page -- is credit insurance

8    cancellations?

9    A.  Yes.  It says, The examiners indicated that they are

03:53:44 10    alarmed with significant numbers of cancellations of mortgage

11    insurance.  They indicated that the cancellation rate

12    suggested our sales practices may be inappropriate.  They

13    indicated that the rate was much higher than any of their

14    other regulated lenders.  They estimated that our cancellation

03:53:59 15    rate was 50 percent within the first three months of the loan.

16    They asked us to look into it.

17    Q.  How is that significant?

18    A.  If you remember, the free look that the Household sales

19    staff was trained to do -- so, in other words, if -- assume

03:54:16 20    that the customer wants the insurance, the insurance would be

21    put on the loan documents.  When the borrower would look at it

22    and say, well, what is that?  Is that credit insurance?  I

23    don't want that; they were trained to say, don't worry, you

24    can keep it for 30 days and then cancel it.

03:54:34 25        So what as a regulator you're trained to do is you

Ghiglieri – direct

621

1    look at the penetration ratios to see if insurance is

2    required; and, that is, how many loans that were booked in a

3    given time frame had insurance.  Or you look to see if there's

4    an excessive number of cancellations.  And that's what they

03:54:52  5    did in Michigan.  They noticed that there's an excessive

6    number of cancellations, and that could be indicative that

7    there's insurance packing going on and these people are

8    canceling it.

9    Q.  And then the next item there, prepayment penalties?

03:55:06  10    A.  Prepayment penalties.  It says here, The examiners

11    indicated that based on a review of our complaints, we need to

12    better disclose to our customers the terms of the loan.  They

13    indicated that there seems to be a lot of confusion among our

14    customers regarding terms.  They indicate that several

03:55:21  15    complaints mention that our branch personnel make many

16    inappropriate comments when questioned about prepayment

17    penalties.  For example, it was noted that our branch

18    personnel say, Don't worry about the penalty.

19        And I've seen that in other places where they say

03:55:36  20    don't worry, it will be waived.  And we saw that in one of the

21    complaints from Ms. Adams, that she was told it would be

22    waived for a job relocation.

23    Q.  And Ms. Adams was from Pennsylvania, right?

24    A.  I believe so.

03:55:49  25    Q.  And this is the Michigan regulators?

Ghiglieri – direct

622

```
              1    A.  This is Michigan.

              2    Q.  Identifying the same practice --

              3    A.  Yes.

              4    Q.  -- that Ms. Adams complained about?

03:55:55      5    A.  That's right.

              6    Q.  I'll show you what has been marked as Plaintiffs' Exhibit

              7    19 for identification.

              8      (Tendered.)

              9    BY MR. DROSMAN:

03:56:24     10    Q.  Do you recognize Plaintiffs' Exhibit 19?

             11    A.  Yes.

             12    Q.  And what is it?

             13    A.  This is an FDIC/OTS concurrent examination report.

             14    Q.  What's the date of it?

03:56:35     15    A.  August 27, 2001.

             16    Q.  Why do you recognize it?

             17    A.  This is one of the documents that I looked at in

             18    formulating my opinions.

             19        MR. DROSMAN:  Your Honor, plaintiffs offer Exhibit 19

03:56:47     20    into evidence.

             21        THE COURT:  It will be admitted.

             22    BY MR. DROSMAN:

             23    Q.  Let's take a look at the first page.

             24        What does the FDIC stand for?

03:56:56     25    A.  The FDIC is the Federal Deposit Insurance Corporation.
```

Ghiglieri – direct

623

1    And they are the federal agency that insures the deposits of

2    depository institutions in the United States.

3    Q.  And then if you look below -- apparently that's their

4    seal?

03:57:16 5    A.  Yes.

6    Q.  If you look below the seal, it says FDIC review concurrent

7    with OTS exam?

8    A.  That's right.

9    Q.  What does that mean?

03:57:22 10   A.  That means that the FDIC has backup regulatory authority

11   for any entity that they are insuring the deposits.  In this

12   case Household's bank, FSB stands for Federal Savings Bank.

13   And so the FDIC went in concurrently with the OTS to do a

14   joint examination.

03:57:42 15   Q.  And concurrently means at the same time?

16   A.  At the same time.

17   Q.  If you turn to page ending 689.  There looks like there

18   have been some portions of this document which have been

19   redacted or deleted.  But if you look at the bottom portion of

03:58:00 20   the document, the first two sentences there, is that

21   significant to your opinion?

22   A.  Yes.  It says, The thrift appears to be involved in -- to

23   some extent in predatory lending.  Further, a consumer

24   advocacy group has named Household organization the 2001

03:58:19 25   predatory shark lender of the year.

Ghiglieri - direct

624

            1   Q.  And then if you go ahead and turn to page ending 699.  And

            2   there's a small section of text on that page.  I think the

            3   rest has been deleted or redacted.

            4        Can you tell me whether that's significant to your

03:58:38    5   opinion?

            6   A.  The OTS and the FDIC examiners believe that insurance

            7   sales practices are predatory.  Community affairs specialist

            8   Glenn Brewer is currently reviewing practices and will be

            9   preparing a memo.  The penetration rate of insurance sales of

03:58:54   10   property, credit, life, unemployment and disability insurance

           11   are all considered high, as illustrated in the table below.

           12   Q.  And unfortunately we don't have that table.  But what does

           13   the OTS refer to in that sentence?

           14   A.  That's the Office of Thrift Supervision.  That's the

03:59:10   15   primary federal regulator of the Federal Savings Bank.

           16   Q.  I'll show you what has been marked as Plaintiffs' Exhibit

           17   550 for identification.

           18     (Tendered.)

           19   BY MR. DROSMAN:

03:59:43   20   Q.  Do you recognize Exhibit 550?

           21   A.  I do.

           22   Q.  What is it?

           23   A.  It is a document attached to an e-mail.  The e-mail is

           24   dated August 15, 2002.  It's from David Huey, which is -- he's

04:00:08   25   at the Washington State AG's office, to Kathleen Curtin and

Ghiglieri – direct

625

1    others.  And it's -- the subject is multistate working group

2    reply to HFC.

3    Q.  Why do you recognize this document?

4    A.  This is one of the documents I reviewed in formulating my

04:00:26  5    opinions.

6          MR. DROSMAN:  Plaintiffs offer Exhibit 550 into

7    evidence.

8          THE COURT:  It will be admitted.

9    BY MR. DROSMAN:

04:00:34 10    Q.  Let's take a look at the first page.  You said that it was

11    from David Huey from the Washington State AG.  What does AG

12    stand for?

13    A.  Attorney general.

14    Q.  And it looks like on the right there to Mr. Huey's name,

04:00:47 15    there's a cc to a number of other people.  Do you see that?

16    A.  Yes.

17    Q.  Who are those other people?

18    A.  I think those are all of the other members of the

19    multistate working group, it looks like to me.

04:01:03 20    Q.  Are those others attorneys general?

21    A.  Yes.

22    Q.  And you mentioned a multistate working group.  Can you

23    tell us what that is?

24    A.  Well, in the case -- in this case, the attorneys general

04:01:18 25    from various states got together because they were all

Ghiglieri – direct

626

1    receiving this -- similar complaints regarding Household.  And

2    they got together to discuss what they needed to do.  And so

3    this is part of that discussion with Household on the

4    complaints and the regulatory issues that they were seeing in

04:01:38  5    various states.

6    Q.  So the right-hand column there lists the names and e-mail

7    addresses of different attorneys generals from states all

8    across the United States?

9    A.  Yes.

04:01:50 10    Q.  Iowa is there; is that right?

11    A.  Iowa, New York, Michigan, Ohio, New Mexico, California,

12    Florida, Minnesota, Michigan.

13    Q.  And then if you take a look, it appears that the e-mail

14    attaches a memo, is that correct, on page ending 756?

04:02:24 15    A.  Yes.

16    Q.  And this memo was addressed to Kathleen Curtin; is that

17    right?

18    A.  Yes.

19    Q.  Who is Kathleen Curtin?

04:02:32 20    A.  She was the lawyer for -- general counsel for the consumer

21    finance section of Household.  It says HFC/Beneficial.

22    Q.  So she's the vice president and general counsel of HFC?

23    A.  Yes.

24    Q.  And what was the date of the memo?

04:02:52 25    A.  The date is -- August 15 is the e-mail.  And the memo is

Ghiglieri – direct

627

```
            1   August 14 --
            2   Q.  And --
            3   A.  -- 2002.
            4   Q.  And who is writing this particular memo?
04:03:06    5   A.  And the memo is being written by David Huey on behalf of
            6   the multistate working group.
            7   Q.  And David Huey was the assistant attorney general from the
            8   State of Washington?
            9   A.  Right, from Washington State.
04:03:20   10   Q.  And he was sort of the representative of all the different
           11   attorneys generals across the United States?
           12   A.  Right.
           13   Q.  And if you take a look at the second -- third paragraph on
           14   that page, it's the third sentence in, can you tell us whether
04:03:38   15   that has any significance to your opinions in this case?
           16   A.  It says, Household's hope that the states would reconsider
           17   their position that some of Household's practices are
           18   problematic is understandable.  However, we believe that your
           19   company may have underestimated our understanding of how its
04:03:55   20   practices are actually implemented where it counts, at the
           21   interface with your customers.
           22        The explanations and rationales Household articulated
           23   on July 9 and in the July 17 letter have not given us any
           24   reason to reconsider our position that the practices we
04:04:11   25   earlier identified present serious problems under a variety of
```

Ghiglieri - direct

628

1    consumer protection and regulatory laws.

2         Further, the responses provided no information which

3    has led us to change our position that those identified

4    practices warrant changes in the future and relief for

04:04:27  5    Household's customers who suffered from them in the past.

6    Q.  Is that significant to your opinion in this case?

7    A.  Yes.

8    Q.  Why?

9    A.  Because my opinions are that Household engaged in systemic

04:04:41 10    and companywide predatory lending.  And that's what they were

11    saying, it's more pervasive than Household wants to admit.

12    Q.  If you could turn to the page ending 757 and take a look

13    at the fourth paragraph on that page.

14    A.  And it begins with what?  I want --

04:05:08 15    Q.  We had hoped for the -- that the July 17 letter would have

16    been more responsive.

17    A.  We had hoped that the July 17 letter would have been more

18    responsive to the proposed framework for settlement rather

19    than purely defensive.  Indeed, the letter seems to indicate a

04:05:23 20    continued denial concerning what we have found to be

21    nationwide common practices.  While Household might like to

22    maintain the belief that these are isolated instances with

23    rogue offices and loan officers, the coast-to-coast usage of

24    common forms and sales techniques belie any such position.

04:05:41 25    Q.  Tell us why that's significant to your opinion.

Ghiglieri – direct

629

1   A.  And it supports my position -- my opinions that Household

2   engaged in companywide and systemic predatory lending; that

3   the excuse that it's a rogue officer or a rogue branch in

4   Bellingham, Washington, for example, doesn't hold water when

04:06:02 5   you look at the sum total of the documentation.

6   Q.  So this is essentially the multistate AGs, the attorneys

7   generals from all across the United States, rejecting

8   Household's explanation that it was just a few bad apples?

9   A.  Yes.

04:06:17 10   Q.  Then if you could turn to the next page, page ending 758,

11   and look at the first paragraph there.  It's a partial

12   paragraph.  It begins, These figures are, to put it mildly,

13   large.

14       Can you tell us whether the rest of that paragraph

04:06:33 15   supports your opinion in this case?

16   A.  Yes.  We note that several of the most insidiously

17   deceptive sales practices, which attracted regulatory

18   attention to Household practices at the outset, relate to

19   products and practices initiated by Household in 1999.

04:06:48 20   Industry figures indicate that since 1999, Household's

21   originations have nearly doubled.  Almost assuredly the

22   misleading sales practices the states have identified have

23   contributed to that growth.  Ultimately the value of

24   restitution and reformation must be viewed against that

04:07:12 25   backdrop.

Ghiglieri - direct

630

1    Q.  Why does this particular information support your opinion

2    in this case?

3    A.  Well, because my opinions outline that when Gary Gilmer

4    came to Household in 1998, the focus turned to growth; and

04:07:31  5    that for 1999, there was an obsession about growth.  And they

6    hired Andrew Kahr.  They developed these predatory products

7    and services, which they implemented.  And they did grow.  As

8    it shows here, Household's originations nearly doubled.  And

9    the conclusion of the regulators supports my conclusion that

04:07:56 10    they engaged in predatory lending practices and that they were

11    systemic and companywide.

12    Q.  This growth that you said, that they doubled their loan

13    originations, right?  What are loan originations?

14    A.  Those are new loans that they booked.  And we talked about

04:08:10 15    how the employees were being compensated for booking more

16    loans and for booking more dollars.  And that's what they're

17    talking about.  The number of new loans, the dollar amount of

18    new loans that they booked doubled and -- since 1999.  And the

19    date of this was August of 2002.

04:08:27 20    Q.  And what does the Washington State attorneys generals

21    attribute that huge doubling of loan originations to?

22    A.  To these deceptive sales practices that have -- that they

23    implemented and that they were using.

24    Q.  And is that consistent with your opinion in this case?

04:08:45 25    A.  Yes.

Ghiglieri – direct

631

1    Q.  I'll show you what has been marked as 1013 for

2    identification.

3      (Tendered.)

4    BY MR. DROSMAN:

04:09:20  5    Q.  Before we turn to Exhibit 1013, we've just looked at a

6    host of regulatory examination reports.  What was Household's

7    response to these regulatory reports?

8    A.  Their response was that it was a rogue employee or a rogue

9    office.  And I can remember reading Chuck Cross' deposition

04:09:45 10   where he said, they would say that even to Washington State.

11   Or they had just dealt with them on the very same issue in

12   another branch.  And they were in denial.  They just kept

13   saying that over and over to all these different regulators.

14   But the regulators then got together and compared notes and

04:10:05 15   realized that, in fact, it was occurring all over the country.

16   Q.  And you mentioned a guy named Chuck Cross?

17   A.  Yes.

18   Q.  Who is that?

19   A.  He was -- in one of these documents that we looked at, he

04:10:14 20   was an investigator for the Washington State Department of

21   Financial Institutions; and he specialized in predatory

22   lending investigations.

23   Q.  And you considered Household's responses to the regulatory

24   reports of examinations in coming to your conclusions in this

04:10:31 25   case?

Ghiglieri – direct

632

1    A.  I did.

2    Q.  Why don't we take a look at Exhibit 1013.

3         Do you recognize this document?

4    A.  I do.

04:10:39 5    Q.  What is it?

6    A.  This is an e-mail from Stephen Hicks to officials at

7    Household regarding the Minnesota examination.  And it's dated

8    June 24, 2002.

9    Q.  Why do you recognize it?

04:10:58 10    A.  This is one of the documents I reviewed in formulating my

11    opinions.

12         MR. DROSMAN:  Plaintiffs offer Exhibit 1013 into

13    evidence.

14         THE COURT:  It will be admitted.

04:11:07 15    BY MR. DROSMAN:

16    Q.  Who is Mr. Hicks?

17    A.  He was in policy and compliance.

18    Q.  Is that at Household?

19    A.  At Household, yes.

04:11:16 20    Q.  And policy and compliance, was that the department that

21    interfaced with the regulators?

22    A.  Yes.

23    Q.  Why is this particular document, Plaintiffs' Exhibit 1013,

24    significant to your opinions?

04:11:30 25    A.  It's significant in two ways.  The first thing that's

Ghiglieri – direct

633

1    significant is he says, This has to be one of the worst

2    examinations we've ever had.

3            And that's really saying something because we've seen

4    some examinations that had a lot of criticism.

04:11:45  5            In the last sentence, he says, We need to think long

6    and hard about how we want to respond.  I'm sorry, second to

7    last sentence.

8            And the last sentence says, We either need to spin

9    these problems differently, provide no response or admit we

04:12:01 10   had a problem.

11           And this is typical of some of the responses that I

12   saw from Household, of just trying to spin consumer

13   complaints, for example, to say, you know, they had -- they

14   had to misunderstand; but it was never Household's fault.

04:12:21 15  Q.  So the director here of policy and compliance from

16   Household, he's discussing ways in which to respond to this

17   Minnesota examination; is that right?

18   A.  Right.  We need to spin these problems differently,

19   provide no response or admit we had a problem.

04:12:35 20  Q.  And one of his suggestions is spin these problems

21   differently.  Do you have an understanding as to what that

22   means?

23   A.  Well, just talk about them differently to make Household

24   look better than they really are.

04:12:48 25  Q.  And why is this significant to your opinion?

Ghiglieri – direct

634

1    A.  Because when I looked at the responses that Household gave

2    to the regulators, they would -- they were not always truthful

3    with what they were saying.  And this documents for me that

4    they're not beyond spinning their responses, which, you know,

04:13:11  5    are not necessarily truthful responses.  Regulators really

6    frown upon that, if they realize that the regulated entity is

7    spinning one of their responses.

8    Q.  The regulated entity in this case is Household, right?

9    A.  Yes.

04:13:25  10   Q.  And the regulators expect Household to provide forthright,

11   truthful responses, right?

12   A.  That's what they expect.

13   Q.  And not spin the responses, correct?

14   A.  That's right.

04:13:35  15   Q.  I'm going to show you what's been marked as Plaintiffs'

16   Exhibit 499.

17     (Tendered.)

18   BY MR. DROSMAN:

19   Q.  Do you recognize Exhibit 499?

04:13:59  20   A.  I do.

21   Q.  What is it?

22   A.  This is an outline for a board meeting that Bill Aldinger

23   sent to Dave Schoenholz, David Schoenholz, on January 3, 2001.

24   Q.  Do you have it backwards?  Did David Schoenholz send this

04:14:22  25   to Bill Aldinger?

Ghiglieri – direct

635

1    A.  Maybe I do have it backwards.  Yes, I think I do.

2    Q.  And you said the date was January 3, 2001?

3    A.  Yes.

4    Q.  Why do you recognize this document?

04:14:32  5    A.  This document was one of the documents that I looked at in

6    formulating my opinions.

7            MR. DROSMAN:  Your Honor, plaintiffs move Exhibit 499

8    into evidence.

9            THE COURT:  It will be admitted.

04:14:42 10   BY MR. DROSMAN:

11   Q.  And if you look at the first page, you said it looks like

12   it's David Schoenholz -- he's one of the defendants in this

13   case -- sending a document to Bill Aldinger; is that correct?

14   A.  Yes.

04:14:57 15   Q.  And if you flip to the next page of the document, the

16   heading there is plan issues.  Do you see that?

17   A.  Yes.

18   Q.  What do you understand that to mean?

19   A.  I think the board of directors was looking over these --

04:15:12 20   this listing of issues to -- for their planning purposes for

21   2001.

22   Q.  And if you go down, there's a heading five down on the

23   page, which reads "managing predatory lending issues."  Do you

24   see that?

04:15:30 25   A.  Yes.

Ghiglieri – direct

636

1    Q.  So what was Household's response to the predatory lending

2    issues in this case?

3    A.  Well, they always would say that they didn't engage in

4    predatory lending.  I saw document after document that talked

04:15:42  5    about, you know, other people engaged in predatory lending,

6    but not us.  And here, at the board meeting, at the board

7    level, they were discussing managing predatory lending issues,

8    such as single premium life insurance, which is prohibited by

9    a lot of states and really frowned upon by the regulators;

04:16:03 10    maintaining pricing; and the impact of disclosures on volume.

11    Q.  You talked about single premium life insurance.

12            Maintaining pricing, what do you understand that to

13    mean?

14    A.  Well, my understanding of it, based on everything I've

04:16:18 15    seen, is that Household's pricing was higher than its

16    competitors.  And they had to figure out a way to maintain

17    that pricing while still maintaining growth.

18    Q.  And then impact of disclosures on volume.

19    A.  Yes.  If you remember some of the Andrew Kahr memos and

04:16:36 20    the newspaper report on how he disdained disclosure, he talked

21    about when you actually make the proper disclosure, it has an

22    effect on volume because people don't like the rate or they

23    don't like the fact that there's a prepayment penalty, so

24    you're not able to book as many loans.  And I believe that

04:16:57 25    that's what that means.

Ghiglieri – direct

637

1    Q.  So volume, you belive, refers to volume of loans?

2    A.  Loan volume, yes.

3    Q.  The greater the volume, the more loans you're selling?

4    A.  The greater the volume, the more loans will be on your

04:17:10  5  books.  The more loans on your books, the more money you make.

6    Q.  And they're looking at the impact of disclosures on how

7    many loans they can sell?

8    A.  Yes.

9    Q.  What do you understand disclosures to mean in that

04:17:19 10  context?

11   A.  Disclosure of the existence of a prepayment penalty,

12   instead of being buried in really fine print somewhere;

13   disclosure of the actual closing costs, instead of the wide

14   range of the good faith estimate; disclosure of the actual

04:17:35 15  annual percentage rate, rather than the effective rate.  Those

16   types of disclosures.  And the impact that they would have on

17   loan volume, which would be negative if they were actually

18   disclosed.

19   Q.  Explain that to me.  What's the relationship between

04:17:49 20  disclosure and selling more loans or loan volume?

21   A.  Well, if you -- if you're a lender that has high rates and

22   you properly disclose your high rates and borrowers can

23   otherwise find another lender that's going to give them a

24   lower rate, it has a negative effect on volume.  You can't

04:18:06 25  book as many loans because people aren't going to agree to it.

Ghiglieri - direct

638

1          Or if you properly disclose that you have a

2     prepayment penalty, that if you pay your loan within the first

3     five years, it's going to be six months' worth of interest as

4     a penalty and the borrower can go down the street and get

04:18:25  5     some -- a loan that doesn't have a prepayment penalty, where

6     are they going to go?

7          Same with the closing costs.  If you disclose what

8     you actually think the closing costs are going to be, which is

9     what the regulation requires, rather than a wide range when

04:18:40 10     you know you're going to charge at the top or above the range,

11     people are not going to agree to take a loan out with you.

12          And so there's an inverse relationship, if you're

13     that kind of a lender, to proper disclosure and how many loans

14     you'll be able to book.

04:18:57 15     Q.  And then if you take a look at page ending 391, in the

16     same document.  This is, again, from Mr. Schoenholz to

17     Mr. Aldinger.

18          Does this information have any significance to you?

19     A.  Well, it just tells me that they were talking at the board

04:19:16 20     level, at the very highest level of Household, about predatory

21     lending in 2001.

22     Q.  And what did they view -- the heading up there says major

23     issues and obstacles.  What did they view predatory lending

24     as?

04:19:30 25     A.  I'm assuming they viewed it as --

Ghiglieri – direct

639

```
           1        MR. KAVALER:  Objection, your Honor.

           2        THE COURT:  Sustained.

           3   BY MR. DROSMAN:

           4   Q.  What's your understanding as to how major issues and

04:19:37   5   obstacles relates to predatory lending on that page?

           6   A.  They were listing the major issues and obstacles to their

           7   loan growth and their profitability.  And so they have several

           8   listed here, and one of them is predatory lending.

           9   Q.  So they highlighted that as a major issue and obstacle to

04:19:58  10   loan growth?

          11   A.  Or to their operating plan, what their goals were for

          12   2001.

          13   Q.  Let's talk a little bit about ways in which you went about

          14   reaching your conclusions in this case.

04:20:19  15        Did you ever look at, for example, the total number

          16   of Household's loans, on the one hand, and then the number of

          17   complaints on the other and try to calculate some sort of

          18   complaint-to-open-loan ratio or percentage?

          19   A.  No.

04:20:35  20   Q.  Why not?

          21   A.  Because that ratio is meaningless.  Regulators look at

          22   complaints on a complaint-by-complaint basis because it's very

          23   difficult for people to file a complaint.  It takes a lot of

          24   energy.  They have to put something in writing.  They have to

04:20:52  25   get all their documentation together.  And so when someone
```

Ghiglieri - direct

640

1    complains, the regulators take it seriously.  Even if there's

2    a handful of complaints, the regulators take them seriously.

3         They look at each complaint.  They get the response

4    from the lender, in this case Household.  And they come to

04:21:12  5    some conclusion whether laws had been violated or deceptive

6    practices have been foisted on the borrower, whatever the

7    issue might be.  And so the -- the complaint framework and the

8    complaint-based review of a lender does not lend itself to a

9    ratio analysis of complaints to open loans.  It's -- that's

04:21:41 10    not meaningful.

11    Q.  Now, when you were -- you were a lender for 25 -- I mean

12    you were a regulator for 25 years; is that right?

13    A.  Yes.

14    Q.  And first you were a regulator with the OCC, the federal

04:21:52 15    government; is that right?

16    A.  That's right, the regulator of national banks.

17    Q.  And then a regulator for the Texas State Banking

18    Commission; is that right?

19    A.  Right.  I was the Texas banking commissioner.

04:22:02 20    Q.  You headed that department?

21    A.  Yes.

22    Q.  Did you ever calculate this ratio of complaints to open

23    loans during your 25 years of regulatory experience?

24    A.  No.

04:22:12 25    Q.  Did you ever have anybody underneath you say calculate

Ghiglieri – direct

641

1    this ratio?

2    A.   No.

3    Q.   When you were a regulator for 25 years, did you ever see

4    this ratio being calculated?

04:22:23  5    A.   No, because it's not meaningful.  It's not a meaningful

6    ratio to calculate.

7    Q.   What did you look at as a regulator?

8    A.   Well, what you would do -- and we had some very large

9    banks that we regulated, you know, like Sun Trust.  When I was

04:22:36 10    a field examiner, we regulated Continental, Illinois National

11    Bank, First National Bank of Chicago.  We regulated Exchange

12    National Bank.  And, of course, they would have more

13    complaints than the smaller banks just in terms of number.

14    But it doesn't mean that we would look at the smaller banks or

04:22:55 15    the larger banks any differently.

16         We would look at the nature of the complaints.  We

17    would look at geographic dispersion, especially for a bank --

18    when I was in Atlanta, for example -- that operated in

19    multiple states to see how widespread the practice was.  We

04:23:13 20    would look at the -- not only the nature and the geographic

21    dispersion, but just how common it was, how many complaints we

22    were getting in a particular area.  And then we would give the

23    information to the examiners so that they could widen their

24    scope in that particular area.

04:23:32 25         So it's something that's taken very seriously and is

Ghiglieri - direct

642

1      looked on a complaint-by-complaint basis.

2      Q.  And when you said you would look at the nature of the

3      complaints, you would look at whether they were very serious

4      complaints or not so serious complaints?

04:23:47  5    A.  Yes.  You would look at -- I mean, just using Household as

6      a example, you know, I thought I was going to get a low

7      interest rate loan, but really I have a high interest loan.

8      And so you would look at how many of those complaints are you

9      getting, where are they coming from, what law does that

04:24:04 10    violate, you know, and how serious do you view that.  People

11     being deceived is viewed more seriously than a typo in a loan

12     document, for example.  So, you know, we would weigh how

13     serious it was, of course, taking into consideration the

14     response from the lender.

04:24:24 15    Q.  So not all complaints are viewed equally, correct?

16     A.  That's right.

17     Q.  And when you say geographic dispersion, you look at --

18     what do you mean by that, geographic dispersion?

19     A.  Like, for example, we didn't have branch banking in

04:24:36 20    Illinois when I was a field examiner.  But when I was in

21     Atlanta at the OCC, we had banks operating in five states.  So

22     we would look to see if it was isolated to a particular state

23     because state laws vary, you know, depending on what the issue

24     was; or was it a companywide issue that we had to deal with at

04:24:55 25    the headquarters office.  So just how widely dispersed are the

Ghiglieri – direct

643

1    complaints and are the issues.

2        THE COURT:  Let me interrupt you here.  We're five

3    minutes from 4:30, and I want to have just a minute or two to

4    talk to the jury.  So you may step down at this point, ma'am.

04:25:18  5        Folks, I've talked this over with the attorneys and I

6    have calculated and recalculated the number of hours in a day

7    and the amount of work we have to get done.  And it does not

8    appear to me that we can quit before 4:30 on a regular basis

9    unless we can start before 10:00 o'clock.  If all of you are

04:25:39 10    in agreement that we can start before 10:00 o'clock, we can

11    quit a little bit earlier; otherwise in order to get this case

12    finished within the time period that we quoted to you in the

13    notice we sent out, we have to go to at least 4:30 every day;

14    and that's pushing the limit.

04:25:58 15        So let me put the question to you:  Is there anyone

16    who would be adverse to coming in and starting at, say, 9:45

17    instead of 10:00 o'clock?

18        Are you all in agreement with that?  Give me a show

19    of hands if you cannot do that.

04:26:22 20        So we'll try it one more time just to make sure.

21        Anybody that cannot do that?

22        All right.  Then let's start tomorrow at –– we'll try

23    it tomorrow and see if everyone can get here on time and we

24    can actually get started.  At 9:45, we will commence with the

04:26:38 25    evidence and we will quit at –– I think you folks wanted to

TAB 4

647

```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all     )
 4   others similarly situated,      )
                                     )
 5              Plaintiff,           )
                                     )
 6     vs.                           ) No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         ) Chicago, Illinois
 8              Defendants.          ) April 2, 2009
                                     ) 9:45 a.m.
 9                       VOLUME 4
10              TRANSCRIPT OF PROCEEDINGS - TRIAL
          BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:       COUGHLIN STOIA GELLER RUDMAN &
                              ROBBINS LLP
14                            BY:  MR. LAWRENCE A. ABEL
                                   MR. SPENCER A. BURKHOLZ
15                                 MR. MICHAEL J. DOWD
                                   MR. DANIEL S. DROSMAN
16                                 MS. MAUREEN E. MUELLER
                              655 West Broadway
17                            Suite 1900
                              San Diego, California  92101
18                            (619) 231-1058

19                            COUGHLIN STOIA GELLER RUDMAN &
                              ROBBINS LLP
20                            BY:  MR. DAVID CAMERON BAKER
                                   MR. LUKE O. BROOKS
21                                 MR. JASON C. DAVIS
                                   MS. AZRA Z. MEHDI
22                            100 Pine Street
                              Suite 2600
23                            San Francisco, California  94111
                              (415) 288-4545
24

25
```

Ghiglieri – direct

652

1    put me on a straight shift, left paren, no Saturday, Sunday,

2    right paren.  I regret that I'm making this request of you,

3    but I must.

4          Your thoughts.

09:52:21  5          MR. DOWD:  It's a tough one, your Honor.  Maybe I

6    could talk to Mr. Kavaler over the break and see if there's

7    something that we could agree on.

8          MR. KAVALER:  I'm certainly happy to talk to

9    Mr. Dowd.

09:52:36 10          THE COURT:  All right.  We'll postpone the issue

11    until the break.

12          Carole, let's bring the jury out, please.

13     (Jury in.)

14          THE COURT:  Good morning, ladies and gentlemen.

09:55:00 15    Welcome back.  We're ready to proceed.

16          Counsel.

17          MR. DROSMAN:  Thank you, your Honor.

18      CATHERINE GHIGLIERI, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

19               DIRECT EXAMINATION (Resumed)

20    BY MR. DROSMAN:

21    Q.  Good morning, Ms. Ghiglieri.

22    A.  Good morning.

23    Q.  When we broke for the day yesterday, we were talking about

24    why you didn't think it made sense -- you had never seen

09:55:16 25    anybody calculate a ratio or a percentage of complaints to

Ghiglieri – direct

653

1    open loans.

2           Do you recall that?

3    A.  I do.

4    Q.  And you talked about the fact that you looked at the

09:55:30  5    seriousness of the allegations, the geographic dispersion or

6    spread of those allegations.

7           Did you look at anything else when assessing

8    complaints, customer complaints?

9    A.  Well, in the Household case or just as a regulator?

09:55:45 10    Q.  As a regulator.

11    A.  As a regulator, I would look at the nature of the

12    complaint, what type of a complaint was it, what were the

13    allegations in terms of violations of law; and, of course,

14    then how widespread was it in the particular lender, how

09:56:00 15    serious was it, what was the response of the company.  So you

16    try and take everything into consideration.

17    Q.  Did you also look at the trend of complaints, whether they

18    were increasing or decreasing over time?

19    A.  Yes.

09:56:12 20    Q.  And why did you do that?

21    A.  Well, because if -- whenever a complaint would come in, we

22    would always send it to the regulated entity.  In the case --

23    in my case, that would be national banks or state banks.  And

24    we would ask, you know, how -- what do you think about this

09:56:29 25    complaint; and if it's valid, how are you going to resolve it.

Ghiglieri – direct

654

1    And so you would expect if it was a legitimate issue, for it

2    to be corrected.  So if we continued to see complaints of the

3    same nature, you know, then we might send an examiner out to

4    do a special investigation, for example.  Or we would

09:56:49  5    definitely send the complaints to the examiners in case they

6    wanted to expand the scope of their examination.

7    Q.  And in this particular case, when you were examining the

8    documents to arrive at your conclusions, did you look at all

9    three of these issues with respect to the complaints that

09:57:07  10    customers made about Household?

11    A.  Yes.

12    Q.  Are there other reasons that a ratio of complaints to open

13    loans wouldn't provide you with useful information?

14    A.  Well, it doesn't lend itself to a ratio analysis, such as

09:57:27  15    looking at how many loans in a loan portfolio are past due,

16    because people who have been taken advantage of often don't

17    know they've been taken advantage of so they don't know to

18    complain.  And a lot of people that are mad about something,

19    for example, I've been taken advantage of, won't go to the

09:57:44  20    effort to write it down and send it in.  And that's what we've

21    known over the course of time.  So it's just not something

22    that lends itself to a ratio analysis.

23        You have to take every complaint seriously.  You have

24    to analyze every complaint.  And you have to get the

09:58:00  25    explanation from the lender to find out why are we getting

Ghiglieri – direct

655

1    these complaints as a regulator, why -- do they continue to

2    come, why are they escalating or whatever.

3    Q.  So if a person were deceived by Household, say, by the

4    effective rate scheme or insurance was packed on, and they

09:58:18  5    never realized they were deceived, would you expect that

6    person to complain?

7    A.  No, because --

8              MR. KAVALER:  Objection, your Honor.

9              THE COURT:  Basis of the objection?

09:58:26 10              MR. KAVALER:  Requires a state of mind of customers,

11    other people who might or might not -- do or do not -- it's

12    hard to understand what expertise she has that enables her to

13    do this.

14              THE COURT:  Sustained.

09:58:40 15    BY MR. DROSMAN:

16    Q.  Why is it that -- based on your expert experience, would

17    you expect or -- a person who had been deceived, did you see

18    those people and they never recognized that they had been

19    deceived when you were an expert, did you see those people

09:58:54 20    file complaints?

21              MR. KAVALER:  Objection, your Honor.

22              THE COURT:  Sustained.

23    BY MR. DROSMAN:

24    Q.  Let's talk about Household in particular.  Were all the

09:59:05 25    complaints that customers filed at Household, were those all

Ghiglieri - direct

656

1    logged?

2    A.   No.  The complaints that were filed with the field, the

3    branch sales staff, were not logged into the system for a long

4    time, I should say.  I think they tried to log some of those

09:59:24  5    in later on at the end of 2002.  But in the beginning of the

6    time period that I was looking at, 1999 to mid 2002, anything

7    that was filed -- any complaint that was filed with the

8    branches was not logged.  It was only the ones that weren't

9    resolved at the branches that made it into the general log

09:59:46 10    system.

11           And I might add, there were some issues about people

12    not logging even those in.  There were a lot of e-mails back

13    and forth with some senior management officials saying, you

14    know, we've noticed that in this particular area, the

10:00:02 15    complaints aren't being logged.  And that went on throughout

16    almost the whole time period I was looking at.

17    Q.   I'll show you what we'll mark as Plaintiffs' Exhibit 1148

18    for identification.

19      (Tendered.)

10:00:22 20    BY MR. DROSMAN:

21    Q.   Do you recognize Plaintiffs' Exhibit 1148?

22    A.   I do.

23    Q.   And what is this document?

24    A.   This is a document that discusses the logging of

10:00:45 25    complaints.  And it's an e-mail string.  The last e-mail is

Ghiglieri – direct

657

```
         1  dated August 28, 2002.

         2  Q.  And who sent this e-mail string, the bottom one?

         3  A.  The bottom one is sent from Stephen Hicks of Household to

         4  Tom Detelich, Robin Allcock, James Kauffman and others.

10:01:04 5  Q.  Why do you recognize Plaintiffs' Exhibit 1148?

         6  A.  This is one of the e-mails that I saw that talked about

         7  their inability to be able to get all of the complaints

         8  logged.

         9        MR. DROSMAN:  Plaintiffs offer Exhibit 1148 into

10:01:19 10 evidence.

         11       THE COURT:  It will be admitted.

         12 BY MR. DROSMAN:

         13 Q.  Let's go ahead and take a look at Plaintiffs' Exhibit

         14 1148.

10:01:26 15       And you spoke about the e-mail from Mr. Hicks.  Who

         16 is Mr. Hicks?

         17 A.  He's an official at Household.

         18 Q.  The director of policy and compliance there?

         19 A.  Yes.

10:01:36 20 Q.  And it was his job to interface with the regulators?

         21 A.  Yes.

         22 Q.  And then is -- the first paragraph there in the e-mail

         23 that Mr. Hicks sent, it's entitled complaints.  Do you see

         24 that?

10:01:49 25 A.  I do.
```

Ghiglieri - direct

658

1   Q.  Is there any significance to that paragraph to your

2   opinion?

3   A.  Yes.  This is what I was talking about.  It says, I spoke

4   at length with the clerk and the manager of the rapid response

10:01:59  5   team regarding unlogged complaints.  The clerk admitted that

6   she might not have communicated the complete context of her

7   conversation with Mike Pinto.  She indicates that on several

8   occasions, Mike has forwarded complaints to her which he has

9   worked but not resolved.  In those instances, she has asked

10:02:16  10   him if he had logged them into the database and he has

11   indicated no.  She and others in the department speculated on

12   the number of unlogged complaints he might be holding and

13   whether the ones he resolved were ever logged in.  It was also

14   speculation as to the reasons why he might not log them in.  I

10:02:31  15   apologize for this confusion.

16   Q.  What's the date of this e-mail?

17   A.  August 28, 2002.

18   Q.  Why is this significant to your opinion?

19   A.  Because this is at about the end of the time frame that I

10:02:45  20   looked at.  And this is one of the criticisms in my report,

21   was that Household didn't know the sum total of the complaints

22   that they had on any given topic because they weren't being

23   logged.  The ones that were in the branches were not being

24   logged if they were resolved at the branches.  And so there

10:03:05  25   was no way for Household really to understand what the

Ghiglieri – direct

659

1    magnitude of the complaints were.

2    Q.  And if you take a look at the next page, page ending 201.

3    And the first paragraph, fourth sentence begins Jada Howard,

4    manager of the RRT.

10:03:25  5        Do you see that?

6    A.  Yes, I do.

7    Q.  Can you tell me whether that's significant to your opinion

8    in this case?

9    A.  It is because it says Ms. Howard, manager of the RRT --

10:03:34  10   which is rapid response team -- indicates that Mike is not the

11   only DMG -- which is the district general manager -- who does

12   not log in complaints when they are received.  She indicates

13   that on many occasions, she receives complaints from other

14   district general managers that have been worked but not

10:03:51  15   resolved which have not been logged into the complaint

16   tracking database.

17   Q.  Is there significance to that?

18   A.  Yes.  Household continued to tell the regulators in the

19   documents that I looked at that this was an isolated instance,

10:04:07  20   whatever the complaint was.  It was a rogue employee.  It was

21   a rogue branch.  And this demonstrates that they did not have

22   an idea of the magnitude of the complaints on any given issue.

23   Q.  Now, yesterday we spoke about compensation, various

24   components of the compensation plan that you said encouraged

10:04:30  25   certain predatory lending practices.  Do you recall that

Ghiglieri – direct

660

1   discussion?

2   A.  Yes.

3   Q.  And did you prepare a demonstrative that showed the

4   percentage of compensation in which an employee could expect

10:04:40  5   to receive through incentive compensation?

6   A.  I did.

7   Q.  I'll show you what has been marked as Plaintiffs'

8   Demonstrative Exhibit 33 for identification.

9        What does this exhibit show?

10:05:02 10  A.  What this is, it shows that the sales staff received 60

11  percent base salary and then 40 percent incentive.  And so the

12  base salary, they would get regardless.  The incentive portion

13  of this, they would receive based on the insurance incentive,

14  the margin incentive, the loan account incentive, the loan

10:05:29 15  volume incentive and the loan dollar -- I can't remember what

16  the first one was -- incentive.  And so during the 1992 -- I'm

17  going to try this to see if I can get it to work.  During the

18  1992 --

19  Q.  Do you mean 1999?

10:05:48 20  A.  I'm sorry.  1999 to 2002 time frame, the average incentive

21  award was between $1,000 and $2,500 per month.  And that's

22  significant because on the left-hand side, you'll see the base

23  salary for account executives, and this was the frontline

24  sales staff, was only $2,000 a month.  So they could either

10:06:11 25  increase their salary or compensation by between 50 percent

Ghiglieri - direct

661

1   and 150 percent depending on if they met these targets.  So

2   they could receive a significant amount of compensation for

3   engaging in those predatory lending practices that we talked

4   about.

10:06:33  5   Q.  And was one of the ways that they could more than double

6   their base monthly salary by packing insurance on?

7   A.  Right, and meeting the insurance incentive.

8   Q.  Now, we also spoke about the difference between an

9   examination and an investigation.  And we looked at some

10:06:53 10   reports of examinations yesterday.

11          Did you also see instances in which states instituted

12   investigations of Household?

13   A.  Yes.

14   Q.  Did you prepare a demonstrative to show a timeline of the

10:07:05 15   investigations that states engaged in?

16   A.  I did.

17   Q.  I'll show you what has been marked as Plaintiffs'

18   Demonstrative Exhibit 30 for identification.

19          And these are fairly small bubbles.  Can you tell us

10:07:20 20   what this demonstrative shows?

21   A.  Yes.  Let me just read -- I'll read from the -- let's see

22   if I can get this to work.

23          I'll read from the top left-hand box because they're

24   very difficult to read.  That one says May -- oh, good.  May

10:07:39 25   21, 2001, Washington State provides Household with a summary

Ghiglieri – direct

662

            1    of complaint investigation.

            2           So this -- they did a special investigation because

            3    of the number of complaints that they received regarding these

            4    predatory lending practices.  And this is where they provided

10:07:58    5    Household with the summary information.

            6           The next one is September 25, 2001.  And that is

            7    coming from Minnesota where they issued a subpoena for records

            8    regarding these practices.

            9    Q.  Can you tell me what that means, issues a subpoena for

10:08:17   10    records?

           11    A.  It's not often done by a regulator because normally they

           12    can get information from the regulated entity.  But in this

           13    case, Minnesota felt like they weren't getting what they

           14    needed, and so they issued a subpoena requiring Household to

10:08:31   15    give them certain information.

           16    Q.  And a subpoena commands or compels Household to turn over

           17    documents?

           18    A.  Yes.

           19           The next one is November 14, 2001.  And the State of

10:08:46   20    California sues Household for various practices that they

           21    deemed were predatory and in violation of their laws.

           22           The next one, December 4, 2001.  Minnesota is now

           23    providing Household with a summary of its investigation, and

           24    that would include the documents that they looked at under the

10:09:07   25    subpoena.

Ghiglieri - direct

663

1         The next one is January 18, 2002.  And this is where

2    the State of Illinois writes to Household concerning their

3    open-end loans.

4    Q.  What does that mean?

10:09:19 5    A.  And that means -- we haven't talked very much about this.

6    But when the borrower would go to the closing table and

7    instead of having one loan and there would be two loans -- and

8    I described that as loan splitting -- oftentimes that second

9    loan was an open-end loan.  And that's where it's a line of

10:09:37 10    credit and there's no maturity at the end.  And they were

11    doing this so they could escape some of the disclosure

12    provisions regarding HOPA, which is another federal law.

13         The next one, February 22, 2002.  The State of

14    Washington issues a subpoena for certain records regarding

10:10:02 15    Household's lending practices.

16         And the next one is March 5, 2002.  Florida issues a

17    subpoena for certain records regarding Household's lending

18    practices.

19    Q.  And these are all initiations of investigations --

10:10:18 20    A.  Yes.

21    Q.  -- by these different states?

22         What's the next one?

23    A.  This is April 30, 2002.  The State of Washington issues an

24    expanded report of examination in which they detail widespread

10:10:33 25    predatory lending practices.

Ghiglieri – direct

664

1    Q.  Is that the expanded report of investigation that we

2    looked at yesterday?

3    A.  Yes.

4    Q.  It's been admitted into evidence.

10:10:40  5         What's the next one?

6    A.  The next one, and the last one I have on this chart, is

7    May 23, 2002.  This was a meeting between Household and the

8    State of Washington.  And at this meeting, the State of

9    Washington informs Household that there is a multistate group

10:10:56 10   of attorneys general that's investigating Household.  And

11   based on the information that I looked at, it looks like this

12   is the first time that they realized that they were up against

13   more than just sort of isolated states, that the states had

14   gotten together and were investigating Household's lending

10:11:13 15   practices.

16   Q.  Now, during your review and examination of the boxes and

17   boxes of documents that you looked at about Household in

18   coming to your conclusions, did you come across any instances

19   in which Household would deny allegations of predatory

10:11:41 20   lending?

21   A.  Yes.  They would -- most often, they would say, We don't

22   condone predatory lending.  It's a rogue officer.  It's a

23   rogue branch.  That's not how we do business.  That was often

24   their response.

10:11:56 25   Q.  And did you consider those documents in reaching your

Ghiglieri – direct

665

1    conclusions in this case?

2    A.  Yes, I did.

3    Q.  And did Household's denials of predatory lending, did that

4    alter or change your view that Household engaged in widespread

10:12:10  5    systemic predatory lending practices?

6    A.  Well, I looked at the documents prior to formulating my

7    opinions.  I took all of the information into consideration in

8    formulating my opinions.  And the more documents that I looked

9    at, the less persuasive that argument became in my mind.  And

10:12:31 10    I concluded at the end of looking at all the information that

11    Household engaged in widespread and systemic and companywide

12    predatory lending, notwithstanding their claims that it was --

13    you know, that they didn't or that it was a rogue employee or

14    a rogue branch.

10:12:49 15    Q.  Why didn't the Household's denials that they engaged in

16    predatory lending, why didn't that change your view that they

17    did, in fact, engage in widespread, systemic predatory lending

18    practices?

19    A.  Well, there were several reasons why that didn't change my

10:13:07 20    view.  The first one is because, as these complaints started

21    to escalate, I didn't see from Household any attempt at trying

22    to identify the root causes of these complaints.  I would see

23    an issuance here or an e-mail there that would say we don't

24    engage in predatory lending or everyone else in the industry

10:13:29 25    engages in it but us.

Ghiglieri – direct

666

1      And there was no attempt to look at how compensation

2      was driving the behavior of the employees.  There was no

3      attempt to look at the fact that they trained their employees

4      to engage in predatory lending practices and change that.

10:13:46  5      There was no attempt to change the compensation plans.

6          And so when I looked at everything all together, it

7      just didn't seem to me that they were serious about addressing

8      the root causes.  They were more interested in just spinning

9      what their responses were to the regulators and just denying

10:14:05  10     that they were engaged in predatory lending.

11     Q.  Did you consider Household's denial or response that

12     predatory lending practices were a result of a few bad apples

13     in various branches?

14     A.  I did.

10:14:19  15     Q.  Did that change your view that Household engaged in

16     widespread, systemic predatory lending?

17     A.  No, because the more documents that I looked at and the

18     more I could see the complaints coming from different places

19     around the country -- and they would have similar issues; and

10:14:33  20     oftentimes they would use similar words; and no one gives an

21     effective rate or a comparable rate or a comparative rate as

22     the interest rate on the loan.  And so when you see this in

23     the complaints, it makes you realize -- or it made me realize

24     that the employees were telling the potential borrowers this,

10:14:59  25     not the borrowers making this up out of their own -- you know,

Ghiglieri - direct

667

1    out of whole cloth because they wouldn't know to say these

2    words.  And the similarity of complaints in various parts of

3    the country told me that this was a widespread issue.

4           And as I looked at the training and as I looked at

10:15:18  5    the compensation, how they were being compensated and how much

6    money they could make, it offset any of Household's policy

7    that says we're ethical, we believe in ethical lending.  It

8    offset any of the e-mails that I saw that said we don't engage

9    in predatory lending or this is a rogue officer.

10:15:39 10    Q.  Did you consider Household's response that it did not

11    engage in insurance packing, for example, because the

12    insurance penetration rates were incorrectly calculated?

13    A.  Well, they would say that they don't require insurance.

14    And they would say we don't require insurance, see, look at

10:15:58 15    our policies that say we don't require insurance or look at

16    this document that we're having the consumer sign that says we

17    don't require insurance.

18           But what regulators do when they go in to look at a

19    lender is they look at the penetration ratios.  There was one

10:16:16 20    piece of correspondence that I saw where Household was trying

21    to persuade the regulator to use ineligible borrowers as part

22    of the calculation.  And what that is, is a person who doesn't

23    qualify for insurance.  And so if you're calculating a

24    penetration ratio, you can't use ineligible borrowers because

10:16:38 25    that gives you an unrealistic penetration ratio.

Ghiglieri – direct

668

1          So there were a lot of things.  And I just kind of

2     attribute that to maybe a little spin.  But there were a lot

3     of things that regulators do to make sure that what the

4     lenders are telling them is valid.  And in the case of

10:16:55  5     insurance packing, the regulators will look at the penetration

6     ratios.

7     Q.  Did you consider Household's response that the range of

8     fees and points in a good faith estimate were actually

9     reasonable?

10:17:08 10     A.  Did I -- say --

11     Q.  Consider Household's explanation that the range of fees

12     and points that they provided in the good faith estimate were

13     actually reasonable?

14     A.  No.  I mean, it's unreasonable because, as the Housing and

10:17:24 15     Urban Development agency opined, when you see borrowers being

16     charged at the high end of the range or even in excess of the

17     range, which is a violation of RESPA, it gives you the

18     impression that there's not good faith there with how they're

19     disclosing to the borrower what their closing costs are going

10:17:46 20     to be.  So that explanation, that closing costs in that wide

21     of a range from zero to, you know, $8,500 was reasonable, was

22     not persuasive.

23     Q.  Did you consider Household's response that it launched a

24     full investigation of complaints regarding effective rate?

10:18:04 25     A.  I did consider that.

Ghiglieri – direct

669

1    Q.  And did that explanation change your view that Household

2    engaged in widespread, systemic predatory lending practices?

3    A.  No, for several reasons.  If you recall, complaints are

4    not logged at the branches.  That's one problem.  So all the

10:18:21 5    effective rate complaints, they would have no way of knowing

6    what the magnitude of that is.

7              Also, in May of 2001, they went on a document

8    destruction binge where they said, if there's anything in the

9    file regarding effective rate, we want it to be destroyed.  So

10:18:40 10   there was no way for them to know how many borrowers' files

11   had had that effective rate presentation taken out.

12             And I had one other point, but I lost it.

13   Q.  Did you see instances, for example, where Household went

14   out and tried to reach out to all of the people who had been

10:19:04 15   scammed by the effective rate?

16   A.  Well, there was no way for them to know that because they

17   didn't do a full investigation of looking at the compensation,

18   looking at the training.  The documents in this particular

19   area were purged.  And there was just no way for them to know

10:19:23 20   who had been affected.

21             From the documents that I saw, the branches in

22   handling the complaints -- there was no central office

23   compliance review person that would actually reach out to the

24   customers.  So there was never a confirmation that these folks

10:19:42 25   were being taken advantage of on the effective rate.  They

Ghiglieri - direct

670

1    were relying on the branch folks for that.  And --

2    Q.  You said that the documents were purged.  What do you mean

3    by that?

4    A.  There were some documents that I looked at, some e-mails

10:19:58  5    that went out and said if we have anything regarding effective

6    rates, we want to get that out of the files.  And there were

7    some documents to indicate that it wasn't just the blank forms

8    that were destroyed, but actual information in the loan files

9    if there was an effective rate presentation.  That's why if

10:20:18 10    they went back and looked at who was taken advantage of

11    regarding the effective rate, there was -- would be no way for

12    them to know the universe of those people.

13        The other thing is they did look at -- in mid 2002

14    when they were dealing with the states attorneys general, they

10:20:47 15    did look at the effective rate.  And they came up with I

16    believe it was 46 complaints out of -- you know, I don't know

17    how many they were looking at.  But this was late in the game,

18    and all these other things had taken place; so there was no

19    way that that study was effective in my opinion.

10:21:07 20    Q.  The study you're talking about, these are people who had

21    complained about the effective rate?

22    A.  Yes.

23    Q.  Were people who had been scammed by the effective rate but

24    didn't realize they had been scammed, were they included in

10:21:18 25    that study?

Ghiglieri - direct

671

|           |    |                                                              |
|-----------|----|--------------------------------------------------------------|
|           | 1  | MR. KAVALER:  Objection, your Honor.                         |
|           | 2  | THE COURT:  Basis?                                           |
|           | 3  | MR. KAVALER:  How could she possibly know what people        |
|           | 4  | who weren't included in the study did or didn't think or do. |
| 10:21:26  | 5  | This is the same problem as before, she's reading the minds of |
|           | 6  | the people who made no objective --                          |
|           | 7  | THE COURT:  You can just make a legal objection.             |
|           | 8  | MR. KAVALER:  Speculation.                                   |
|           | 9  | THE COURT:  Sustained.                                       |
| 10:21:36  | 10 | MR. KAVALER:  Thank you, your Honor.                         |
|           | 11 | BY MR. DROSMAN:                                              |
|           | 12 | Q.  Did you see any evidence as to whether people who had been |
|           | 13 | scammed by the effective rate but didn't realize that they had |
|           | 14 | been scammed, that they were included in this study?        |
| 10:21:47  | 15 | MR. KAVALER:  Same objection, your Honor.                    |
|           | 16 | THE COURT:  Sustained.                                       |
|           | 17 | BY MR. DROSMAN:                                              |
|           | 18 | Q.  One of the things that you mentioned before that you     |
|           | 19 | thought made any sort of ratio of complaints to open loans  |
| 10:22:07  | 20 | nonsensical in terms of reviewing was that people who had been |
|           | 21 | scammed but never realized they had been scammed wouldn't file |
|           | 22 | complaints.  Can you explain what you mean by that?          |
|           | 23 | A.  Right.  It takes a lot of energy to file a complaint in  |
|           | 24 | the first place.  So even people that know they've been taken |
| 10:22:24  | 25 | advantage of often don't file a complaint.                   |

Ghiglieri - direct

672

1          The effective rate presentation was very difficult to

2     understand.  It looks great on the surface if you don't

3     realize that that lower rate is not what you're going to pay.

4     The interest rate never changes.  And so this particular scam

10:22:40 5     was difficult to understand that you were being scammed.  And

6     also it was -- it appeared favorable to the borrowers.

7          So my thought is -- just based on managing complaints

8     over 25 years at the OCC and at the Department of Banking --

9     is that there are going to be people out there that don't

10:23:00 10    realize that they've been scammed, and so they never were able

11    to make a complaint.

12    Q.  Let's talk a little bit about your compensation in this

13    case.

14          When were you retained by the plaintiffs?

10:23:11 15    A.  I was retained in March of 2006.

16    Q.  How many hours have you worked on the case since you were

17    retained?

18    A.  Close to a thousand.

19    Q.  And are you being compensated for your work as an expert?

10:23:24 20    A.  I am.

21    Q.  How much are you being compensated?

22    A.  I charge 375 for non-testimony time and $475 for testimony

23    time.

24    Q.  Is your compensation in this case dependent in any way on

10:23:41 25    the opinions that you express?

Ghiglieri – direct

673

1    A.  No.

2    Q.  Is your compensation in this case dependent in any way on

3    the outcome of this trial?

4    A.  No.

10:23:49  5    Q.  Have you ever been named as a defendant in any civil

6    action?

7    A.  I have.

8    Q.  In what case were you named a defendant?

9    A.  Net Bank.

10:24:04 10    Q.  And are you still a defendant in that case?

11    A.  No, I was dismissed.

12    Q.  How long after you were named as a defendant were you

13    dismissed?

14    A.  Well, I found out about it in mid June, and I was

10:24:14 15    dismissed by the beginning of September.  So seven or eight

16    weeks, I guess.

17    Q.  Let's change gears now and talk about your second opinion,

18    your opinion regarding the credit -- or the quality of the

19    loans that Household gave.

10:24:33 20        Can you explain to the jury what loan -- the phrase

21    loan quality means?

22    A.  Loan quality means how sound the loans are.  And that

23    means how many of the loans in the loan portfolio are paying

24    on time.  So if you have a large percentage of loans that are

10:25:01 25    past due, in that, the borrowers haven't paid them in a timely

Ghiglieri – direct

674

1  manner, then you would have poor loan quality.  If only a very

2  small percentage of those loans are past due, then the loan

3  portfolio would be good quality.

4  Q.  And as a regulator when examining a lending institution,

10:25:19  5  were you concerned with a lender's loan quality?

6  A.  Yes, very much concerned.

7  Q.  Why?

8  A.  Because the loan quality -- first of all, remember the

9  loan portfolio is the largest asset of a bank and of a finance

10:25:35 10  company, generally the largest asset of any lender.  And so

11  the loan quality is a predictor of future health of the

12  lender.  And it's also an indication of the current health.

13  And so that's one of the first things that as a regulator we

14  would look at, even to develop the scope of the exam.

10:25:59 15       So if we had a bank that had a very high percentage

16  of past due loans, we would send in more examiners, we would

17  spend more time there because we knew that probably we were

18  going to end up having to do some sort of enforcement action.

19  Banks that have low percentage of past due, we wouldn't send

10:26:16 20  as many examiners there and we wouldn't spend as much time on

21  the bank.

22  Q.  What are some of the indicators of loan quality that are

23  significant to regulators?

24  A.  Well, two of the main indicators are the percent of loans

10:26:29 25  past due or delinquencies is an omnibus term that we use.  And

Ghiglieri – direct

675

1    then we would also look at charged-off loans.  And those would

2    be loans that would have not paid for so long that the lender

3    just doesn't think they're ever going to get paid, and so

4    they're actually taken off the books; so those would be called

10:26:48  5    charged-off loans.

6    Q.  What is a delinquent loan?

7    A.  A delinquent loan is a loan that has not paid in

8    accordance with its terms.  And Household used a term that

9    other lenders use and it's called a two-plus delinquencies,

10:27:03 10    and that's a loan that hasn't been paid for two months or 60

11    days.

12    Q.  And that's the two-plus delinquency number that you're

13    referring to --

14    A.  Yes.

10:27:14 15    Q.  -- at Household?

16         Did Household report the amount or the number of

17    two-plus delinquent loans or the percentage of two-plus

18    delinquent loans?

19    A.  Yes.

10:27:25 20    Q.  What does it mean for a loan to be two-plus delinquent?

21    A.  It means that the borrower hasn't paid for two months or

22    60 days.

23    Q.  What if the borrower hasn't paid for three months or 90

24    days, would the loan be two-plus delinquent then?

10:27:43 25    A.  Right.  It means two months delinquent or more basically.

Ghiglieri – direct

676

1    Q.  So did Household report this as a percentage, this

2    two-plus delinquency number?

3    A.  Yes.

4    Q.  And if Household reported that its two-plus delinquency

10:27:56  5    percentage was, for example, 4.5 percent, what did that mean?

6    A.  That meant that 4 percent of the loans in the portfolio

7    were greater than 60 days past due or two months past due.

8    Q.  What is the significance of a lender reporting its

9    two-plus delinquency number statistic?

10:28:13  10    A.  This is -- this is a vital statistic that lenders report

11    because it's a predictor of future financial health and also

12    gives you an indication of the current condition of the

13    lender.

14    Q.  And you mentioned the charge-off as another indicator of

10:28:29  15    loan quality?

16    A.  Yes.

17    Q.  What is that?

18    A.  That's where the loan becomes so far past due that the

19    lender says we're just not going to get paid on this loan, so

10:28:39  20    they'll actually take it off the books.  They'll charge it off

21    the books.

22    Q.  Did you prepare a demonstrative exhibit to assist you in

23    explaining how loans go from being current to being two-plus

24    delinquent to being charged off?

10:28:52  25    A.  I did.

Ghiglieri – direct

1    Q.  I'll show you what's been marked as Plaintiffs'

2    Demonstrative Exhibit 36 for identification.

3           Can you tell us what this exhibit shows?

4    A.  Right.  So if you look at the current bucket here -- we'll

10:29:09  5    just call these buckets.  That's what Household called them.

6    And you have all the current loans here.  As a regulator, this

7    is where you hope all their loans are, but realistically you

8    know they're going to have some that aren't going to pay.

9           So when a person doesn't pay two months' worth of

10:29:25 10    payments, it goes into the second bucket, which is the

11    two-plus bucket.  And that's missing payments for 60 days or

12    two months.

13           And then as time goes on and they keep missing more

14    and more payments, at some point, it will fall into the

10:29:42 15    charge-off bucket when the lender has no expectation of

16    further collection.

17    Q.  Is there a relationship between two-plus delinquency

18    numbers and loan quality?

19    A.  Yes.  There's a direct correlation between the two-plus

10:29:57 20    numbers and loan quality.  The higher the two-plus number, the

21    worse the loan quality.  So the more delinquencies that a

22    lender has, the worse their loan quality.

23    Q.  Now, did Household report these two-plus delinquency

24    numbers in its form 10-K annual report?

10:30:13 25    A.  Yes.

Ghiglieri – direct

678

1  Q.  Can you explain for the jury what it means to re-age a

2  loan?

3  A.  Re-aging a loan means you do something to the loan to take

4  it from being delinquent to putting it back on a current

10:30:26 5  basis.  It could be a variety of things.  If a person has

6  gotten sick and now they're back to work, you have a

7  discussion with them as a lender and you say, okay, well, why

8  don't we sort of start fresh.  And there's a variety of ways

9  to do it.  But you can start fresh, and they can start paying

10:30:47 10  again after not paying for a certain time; and that would be

11  re-age.  There would be a memo in the file discussing why the

12  loan was re-aged, and it would be something done on a

13  case-by-case basis.

14  Q.  Was there -- did Household re-age loans?

10:31:04 15  A.  Yes.  Household re-aged loans in a variety of ways and

16  didn't have individual discussions.  Some of them were -- they

17  would re-age whole portfolios automatically.  They engaged in

18  a variety of things.

19  Q.  When you said they would re-age whole portfolios

10:31:23 20  automatically, did they engage in this sort of call to the

21  borrower and ask them whether they're back on their feet and

22  maybe we can give you a break; was that how Household did it?

23  A.  No.  They would engage in a variety of practices where

24  they would automatically re-age.  They would send the

10:31:38 25  borrowers an offer that said we'll let you skip the next

Ghiglieri - direct

679

1    payment.  If we don't hear from you, we'll take that as a yes.

2    And then, you know, it allowed them to re-age whole

3    portfolios.

4    Q.  Did Household engage in automatic re-aging?

10:31:58  5    A.  Yes.

6    Q.  What is automatic re-aging?

7    A.  Automatic re-aging is -- what Household did is if a loan

8    met a certain criteria, they would re-age the whole entire

9    portfolio; and the borrowers wouldn't even know they had been

10:32:08 10    re-aged.

11    Q.  So the borrower might be 60, 90 days delinquent; and all

12    of a sudden, they were current?

13    A.  Yes.

14    Q.  And Household just did that automatically?

10:32:19 15    A.  Yes.

16    Q.  Now, is there a relationship between re-aging loans and

17    two-plus delinquencies?

18    A.  Yes.  There's a direct correlation between the two.

19    Q.  Did you prepare a demonstrative to show you the

10:32:32 20    relationship between two-plus delinquency and re-aging loans?

21    A.  I did.

22    Q.  I'll show you what's been marked as Plaintiffs'

23    Demonstrative Exhibits 26 and 27 for identification.

24         26 and 27.

10:33:01 25         Can you tell us what this demonstrative shows?

Ghiglieri – direct

680

1   A.  So as re-agings go up, as loans are re-aged, which is

2   taken out of the two-plus bucket and put back in current, the

3   number of two-plus delinquencies goes down.  So this is taking

4   loans from the two-plus bucket and putting them over into the

10:33:30  5   current bucket.  So there's an inverse relationship between

6   re-aging and delinquent -- two-plus delinquencies.

7   Q.  What if two-plus delinquencies go up instead of down, what

8   is the effect on re-aging?

9   A.  Well, if they -- if Household stopped re-aging, for

10:33:48  10   example, or diminished the amount of their re-aging, the

11   re-aging would go down and the delinquencies would go up

12   because then the -- there was no way to make those loans

13   current.  So here re-aging is going down and the two-plus

14   numbers are going up, so it's a direct inverse relationship.

10:34:05  15   Q.  And is re-aging of loans significant to a regulator?

16   A.  Yes.  When I was a field examiner, this is one of the

17   things that we looked at in particular to determine if a

18   lender was masking their delinquencies.  We would look at a

19   variety of tactics that they could use, for example, rewriting

10:34:27  20   the loan, forbearance, a variety of things.  And we would look

21   to see how prevalent that was in the loan portfolio because

22   the more they were doing that, the more it would lead us to

23   conclude that they were masking delinquencies.

24   Q.  Now, during your reviews as an expert in this case, did

10:34:47  25   you determine whether Household used re-aging to manipulate

Ghiglieri – direct

681

1    its two-plus delinquency number?

2    A.  Yes, that was one of my conclusions, was that Household

3    used various re-aging tactics and practices to mask their

4    delinquencies.

10:35:02  5    Q.  I'll show you what has been marked as Plaintiffs' Exhibit

6    1387 for identification.

7        (Tendered.)

8    BY MR. DROSMAN:

9    Q.  Do you recognize Plaintiffs' Exhibit 1387?

10:35:34 10    A.  I do.

11    Q.  What is it?

12    A.  This is an e-mail from Elaine Markell to Rich Peters and

13    others at Household -- she was at Household -- regarding the

14    Re-aging Fitch Servicer Presentation Slides, dated November

10:35:48 15    12, 2002.

16    Q.  Why do you recognize this document?

17    A.  This was one of the documents that I looked at in

18    formulating my opinions on the re-aging issues.

19        MR. DROSMAN:  Plaintiffs move Exhibit 1387 into

10:36:02 20    evidence.

21        THE COURT:  It will be admitted.

22    BY MR. DROSMAN:

23    Q.  Why don't we start at the bottom e-mail, I guess, the

24    first in the string.  And can you tell us, first, who Elaine

10:36:12 25    Markell is in this e-mail?

Ghiglieri - direct

682

1    A.  Elaine Markell is a woman who worked in the mortgage

2    services division, which was kind of the sister division of

3    consumer lending.

4    Q.  And was she the vice president of default services in that

10:36:29  5    mortgage services business unit?

6    A.  Yes.

7    Q.  And it looks like she's sending an e-mail to Rich Peters.

8    Was he the vice president of credit risk for Household

9    mortgage services?

10:36:40  10    A.  Yes.

11    Q.  What's significant to you about this e-mail that

12    Ms. Markell is sending?

13    A.  Well, if the -- if you could highlight this -- the

14    paragraph here.  It says, Rich, you need to change the slides

10:36:56  15    for the presentation.

16         And this is for the presentation to Fitch.

17         First of all, what you have on the slides does not

18    represent the policies in place since September 27 when I was

19    directed to add back EZ pay restructures and restructures on

10:37:13  20    bankruptcies 13.

21         That means Chapter 13 bankruptcies.

22         The bankruptcy 13 restructures were done upon receipt

23    of the plan without the payment of funds.  In addition to

24    that, restructures were done on any Chapter 13 where one

10:37:29  25    payment was made in the past 60 days.  Since there was no

Ghiglieri – direct

683

1    other reason for the implementation of these restructure

2    policies other than to make the predetermined delinquency

3    number, you must take the bullet point out that restructures

4    are not done to defer loss recognition since it clearly does.

10:37:47  5    Presenting the true facts about restructures to Fitch is

6    equally as important as stating the true and unadjusted

7    delinquency which we have discussed before.

8    Q.  One of the sentences you read there said, Since there's no

9    other reason for the implementation of these restructure

10:38:06  10   policies other than to make the predetermined delinquency

11   number.

12              What's the difference between restructuring and

13   re-aging?

14   A.  Household used them interchangeably.

10:38:15  15   Q.  So why is that significant to you, that Ms. Markell

16   thought that there was no other reason for the implementation

17   of these re-aging or restructuring policies other than to make

18   the predetermined delinquency number?

19   A.  Because Household was trying to hit a delinquency target.

10:38:31  20   Because at this point in time, in November 2002, they were

21   reporting certain delinquency numbers and certain of their

22   policies.  And Fitch is a reporting agency that was coming in

23   to give them a more fuller investigation.

24   Q.  Does this suggest or support your opinion that Household

10:38:56  25   was using re-aging to manipulate its two-plus delinquency

Ghiglieri – direct

684

```
          1   number?

          2   A.  Yes.

          3   Q.  How does it do that?

          4   A.  Well, because she's saying here there's no other reason

10:39:03  5   for us to be doing these restructures with Chapter 13

          6   bankruptcy accounts and doing all these shenanigans if it

          7   wasn't to make a certain number.

          8   Q.  And the delinquency number in this case, is that the

          9   two-plus delinquency number?

10:39:20 10   A.  Yes.

         11   Q.  I'll show you what has been marked as Plaintiffs' Exhibit

         12   77 for identification.

         13    (Tendered.)

         14   BY MR. DROSMAN:

10:39:49 15   Q.  Do you recognize Exhibit 77?

         16   A.  I do.

         17   Q.  What is it?

         18   A.  This is an e-mail string regarding the re-aging, on how

         19   many loans had been re-aged one time versus multiple times,

10:40:01 20   with a chart attached showing that very thing.

         21   Q.  What's the date of the e-mail?

         22   A.  The date is September 11, 2002.

         23   Q.  And why do you recognize this document?

         24   A.  This is one of the documents that I looked at to analyze

10:40:19 25   and formulate my opinions regarding re-aging.
```

Ghiglieri – direct

685

1      MR. DROSMAN:  Plaintiffs offer Exhibit 77 into

2  evidence.

3      THE COURT:  It's admitted.

4  BY MR. DROSMAN:

10:40:30 5  Q.  Why don't we take a look -- you said it's two pages, an

6  e-mail with an attachment.  Why don't we look at the e-mail.

7      Can you tell us the significance of the e-mail to

8  your opinion?

9  A.  Yes.  The bottom says, For your information.

10:40:44 10  Mr. Schoenholz asked for a ratio -- and that should say of --

11  domestic multiple re-ages as a percentage of total re-age.

12  The question came to me via Gary -- which I assume is

13  Gilmer -- and we provided Mr. Schoenholz with the ratio of

14  47.9 percent over the phone.

10:41:02 15      And then if you look at the second page and look at

16  the bottom line.  If you could highlight the very bottom line,

17  you can see -- let's see if -- okay.  This line right here

18  shows total re-age loans of $15 billion of a total portfolio

19  of $98 billion.

10:41:35 20  Q.  What does that mean?

21  A.  Or 47.9 percent of these loans have been re-aged multiple

22  times.  So of the re-age section -- let me start all over

23  again.

24      Of the loans that Household had that had been

10:41:56 25  re-aged, 47.9 percent of them had been re-aged more than one

Ghiglieri – direct

686

1    time.

2    Q.  So let's start -- starting in this $98 billion number,

3    this signifies all of the loans that Household had at that

4    time?

10:42:09  5    A.  Yes.

6    Q.  And then what does this $15.9 billion number signify?

7    A.  And that signifies how many had been re-aged.  And that

8    would have been 16 percent of their whole portfolio had been

9    re-aged.

10:42:23 10    Q.  And then this 47.9 percent number, what does that mean?

11    A.  Of the 15 billion, 47.9 percent had been re-aged, almost

12    half of the 15 billion had been re-aged multiple times.

13    Q.  And what does that mean, re-aged multiple times?

14    A.  Well, it's really -- when you re-age something, you know,

10:42:44 15    you're taking it out of the delinquency and you're putting it

16    into the current bucket.  And then they're not paying again,

17    and then you re-age it again and you re-age it again.  And so

18    you are, in effect, masking your past due because there's no

19    way for the customer -- the customer is not paying.  You're

10:43:02 20    just re-aging it to take it out of the delinquency bucket.

21    And that's what Household was doing.

22    Q.  So re-aging multiple times means you've re-aged a loan

23    once already, you're re-aging it again, perhaps again and

24    again --

10:43:14 25    A.  Right.

Ghiglieri - direct

687

1    Q.  -- just to take it out of the delinquent bucket repeatedly

2    and put it back in the current?

3    A.  Right.  And the time frame is, it's in the two-plus bucket

4    and you re-age so it goes back to current.  So it takes a

10:43:26  5    number of months.  It takes two months to get it back in the

6    two-plus bucket.  Then you re-age it and it goes into the

7    current.  Then it takes a couple of months to get back there.

8    So once they re-age, they have a little bit of time before

9    they have to deal with it again.

10:43:41 10    Q.  And who is asking for this information, this ratio of how

11    many loans had been re-aged multiple times?

12    A.  It says Mr. Schoenholz is asking for it.

13    Q.  And that's David Schoenholz, the CFO of the company?

14    A.  Yes.

10:43:58 15    Q.  I'll show you what has been marked as Plaintiffs' Exhibit

16    654 for identification.

17      (Tendered.)

18    BY MR. DROSMAN:

19    Q.  Do you recognize Plaintiffs' Exhibit 654?

10:44:28 20    A.  I do.

21    Q.  And what is this?

22    A.  This is an e-mail from Dave Stockdale to various managers

23    or senior -- senior managers at Household.  And the subject is

24    retail services re-age policy.  And the date is September 4,

10:44:51 25    2001.

Ghiglieri – direct

688

1    Q.  And why do you recognize this document?

2    A.  This is one of the documents I looked at in formulating my

3    opinions.

4         MR. DROSMAN:  Plaintiffs offer Exhibit 654 into

10:45:03  5    evidence.

6         THE COURT:  It's admitted.

7    BY MR. DROSMAN:

8    Q.  Why don't we take a look at this.  The bottom e-mail

9    appears to be from Dave Stockdale; is that right?

10:45:15 10    A.  It looks like it's from Dave Stockdale to Paul

11   "Markawitz."

12   Q.  Paul Makowski?

13   A.  I'm sorry.  I'm mispronouncing his name.  Makowski, yes.

14   Q.  Mr. Makowski was the chief credit officer; is that

10:45:30 15   correct?

16   A.  Yes.

17   Q.  If you take a look at the second paragraph of the e-mail,

18   does that have any significance to your opinion?

19   A.  Yes.  This is what I was talking about.  This says, For

10:45:41 20   maximum benefit to year-end, retail sales should perform the

21   re-age between the customer cycle date and the month-end with

22   a sweep at month-end.  This will ensure that all September

23   re-ages will be unable to reach two-plus by year-end.

24         In other words, they're going to take all of them at

10:45:57 25   a certain time because then it would prevent them from

Ghiglieri – direct

689

1    progressing back to the two-plus number by year-end when they

2    have to report it on their 10-K.

3    Q.  So is this significant to your opinion that Household

4    manipulated its two-plus delinquency number through the use of

10:46:13  5    re-aging?

6    A.  Yes.

7    Q.  Why?

8    A.  Well, because they're discussing how they're going to

9    manipulate their delinquency number by using the re-age

10:46:21 10    practice at a certain -- and they're even planning when

11    they're going to use it so that these loans won't then become

12    delinquent and show up again in the two-plus bucket at

13    year-end.

14    Q.  Then the last sentence there says, This will ensure that

10:46:36 15    all September re-ages will be unable to reach two-plus at

16    year-end.

17    A.  Yes.

18    Q.  Do you see that?

19         What do you understand that to mean?

10:46:44 20    A.  Well, they were timing the re-ages so that they could

21    prevent the ones in this particular category from becoming

22    delinquent again, such that it reaches that two-plus bucket at

23    year-end so they don't have to disclose it as delinquent.

24    Q.  They have to disclose all the delinquent loans at the

10:47:03 25    year-end in their form 10-K, their annual report?

Ghiglieri - direct

690

1   A.  Yes.

2   Q.  And so what's your conclusion about why -- what this means

3   here?

4   A.  So they're timing these re-ages so that this group of

10:47:12  5   loans will not show up as two-plus delinquent at year-end.

6   Q.  And they do that by re-aging those loans?

7   A.  Yes, at a certain time.  They're timing it because they

8   know that the progression will be that it will go to 30 days

9   past due, then 60 days past due, in which case it's going to

10:47:29  10   end up in the two-plus bucket.  So they're timing it so that

11   doesn't happen until January so they don't have to disclose

12   it.

13   Q.  I'll show you what has been marked as Plaintiffs' Exhibit

14   454 for identification.

10:47:47  15   (Tendered.)

16   BY MR. DROSMAN:

17   Q.  Before we actually get to 454, there was one issue on that

18   last exhibit that we were talking about that I wanted to

19   discuss with you.

10:48:01  20           If we can put back up 654, the first page.

21           And this is the example of the timing of the re-ages

22   so that they wouldn't be delinquent at year-end.  If you look

23   at the top e-mail, it looks like it was forwarded by

24   Mr. Makowski?

10:48:21  25   A.  Yes.

Ghiglieri – direct

691

1    Q.  And was it forwarded to Mr. Schoenholz?

2    A.  Yes.  He was cc'd on it.

3    Q.  Perhaps we can zoom in on that so we can see whether it

4    was forwarded to Mr. Schoenholz.

10:48:35  5         So you said Mr. Schoenholz received a copy of this

6    e-mail?

7    A.  Yes.

8    Q.  Why don't we turn now to Plaintiffs' Exhibit 454 for

9    identification.

10:48:52 10        Do you recognize Plaintiffs' Exhibit 454?

11   A.  I do.

12   Q.  What is it?

13   A.  This is a document.  It's an e-mail string.  And it's got

14   some handwritten notes and then a chart attached to it.

10:49:08 15   Q.  And the e-mail string that you talked about, who is the

16   e-mail from?

17   A.  Well, there are several e-mails, but some of them are from

18   Gary Gilmer.

19   Q.  And what are the dates?

10:49:22 20   A.  The date of the bottom e-mail is February 22, 2000.

21   Q.  And what's the subject of the e-mail?

22   A.  And the subject is "cut."

23   Q.  Why do you recognize Plaintiffs' Exhibit 454?

24   A.  This was one of the documents that I looked at in

10:49:39 25   formulating my opinions.

Ghiglieri - direct

692

1          MR. DROSMAN:  Plaintiffs offer Exhibit 454 into

2     evidence.

3          THE COURT:  It will be admitted.

4     BY MR. DROSMAN:

10:49:50  5     Q.  Let's take a look at the bottom e-mail on page ending 417

6     that you said is entitled "cut."

7          That's from Dick Schaffer; is that right?

8     A.  Yes, and he's sending this to Gary Gilmer.

9     Q.  And that's the defendant in this case?

10:50:06 10     A.  Yes.

11     Q.  And Dick Schaffer is the managing director of operations

12     for the consumer lending division; is that correct?

13     A.  Yes.

14     Q.  Can you tell me what's significant about the text of that

10:50:18 15     e-mail?

16     A.  Well, he's saying here, I just revisited the two-plus

17     forecast with each of my guys.  Bottom line looks like a $25

18     million cut without the magic, parentheses, grace period, and

19     75,000 with it.  We are a little afraid of the 29-day month so

10:50:32 20     we aren't being overly aggressive with this forecast.  It

21     looks pretty solid.

22     Q.  Let's just focus on the first two sentences of that

23     e-mail.  Bottom line looks like a $25 million cut without the

24     magic, parens, grace period, and $75 million with it.

10:50:57 25          Is he talking about the two-plus delinquency number

Ghiglieri – direct

693

1    in this case?

2    A.  Yes.

3    Q.  And is he talking about a cut to the two-plus delinquency

4    number?

10:51:04  5    A.  Yes.

6    Q.  So what do you understand this to mean here?

7    A.  Well, what Household did is they would give their

8    borrowers 15 days after the date that the payment was due as a

9    grace period to make their payment.  And so, unlike other

10:51:19 10    lenders who just report delinquencies straight up, what they

11    would do is, say, for example, a loan was 74 days past due,

12    they would deduct 15 days from that and that would bring it

13    back down to 59 days and so they wouldn't report that as a

14    two-plus number, a loan that's in the two-plus bucket.

10:51:40 15            So they would use grace periods as a way to mask past

16    due by deducting 15 days from how many ever days the loans

17    were past due in the two-plus bucket and bringing them back

18    into the current bucket.

19            And so what he's saying here is that without the

10:51:56 20    magic of the grace period, they would not be -- it would look

21    like their delinquencies would be cut 25 million; but with

22    using this grace period tactic, they would be able to cut

23    two-plus numbers 75 million.

24    Q.  So they could cut $50 million from their two-plus numbers

10:52:17 25    by using the magic of the grace period; is that right?

Ghiglieri - direct

694

1    A.  Yes, yes.

2    Q.  And does this -- is this significant to your opinion that

3    Household used re-aging practices like the grace period to

4    manipulate its two-plus numbers?

10:52:31 5    A.  Yes.  I mean, there's no reason to do that unless you were

6    manipulating your delinquencies.

7    Q.  Who is receiving this particular e-mail?

8    A.  Mr. Schaffer was sending it to Gary Gilmer.

9    Q.  I'll show you what has been marked as Plaintiffs' Exhibit

10:52:53 10   262 for identification.

11    (Tendered.)

12   BY MR. DROSMAN:

13   Q.  Do you recognize Plaintiffs' Exhibit 262?

14   A.  I do.

10:53:17 15   Q.  And what is Plaintiffs' Exhibit 262?

16   A.  This is a series of e-mails that describes the cut in

17   delinquencies using this tactic for the grace periods, of

18   deducting the 15 days and pushing it back into the current

19   bucket.  And they're quantifying it from a dollar perspective

10:53:39 20   each month.  There's a series of them.

21   Q.  And who is the recipient of these e-mails?

22   A.  Let's see here.  It looks like Douglas Friedrich.

23   Q.  And he's the managing director, the head honcho, of

24   mortgage services at Household; is that right?

10:54:00 25   A.  Yes.

Ghiglieri – direct

695

1    Q.  And why do you recognize Plaintiffs' Exhibit 262?

2    A.  This is one of the documents that I reviewed in

3    formulating my opinions.

4         MR. DROSMAN:  Plaintiffs offer Exhibit 262 into

10:54:12  5    evidence.

6         THE COURT:  Admitted.

7    BY MR. DROSMAN:

8    Q.  Why don't we take a look at the first page of this series

9    of e-mails.

10:54:19 10        What's the title of the e-mail?

11    A.  So the title of the e-mail is two-plus reconciliation.

12    Q.  And what does this particular e-mail show?

13    A.  It shows that the adjustment for the 15-day grace period

14    was $19 million in this case for this month, the month of --

10:54:42 15    it would be the prior month, so January 2001.

16    Q.  So that the re-aged number was actually 431, is that

17    right, according to Sarah's figure?

18    A.  Yes.

19    Q.  And then they're deducting or lowering that re-age number

10:54:56 20    by 19.7 million; is that right?

21    A.  Actually the number is the two-plus number and so then

22    they're taking out the 15-day grace period.  So they're

23    adjusting the two-plus number.

24    Q.  And what are the parens around the 19.7 million?

10:55:11 25    A.  That means they're taking it out.  It's negative.

Ghiglieri – direct

696

1   Q.  The final two-plus delinquency number that they come up

2   with after taking out the grace period is what?

3   A.  418 million.

4   Q.  And you said that this e-mail was sent on 2/6/01, so it

10:55:24 5   would be for the month of January, right?

6   A.  Right.

7   Q.  Let's look at the next page, page ending 842.

8        And this e-mail was sent on March 7, 2001; is that

9   right?

10:55:40 10   A.  Yes.

11   Q.  Again, sent to Doug Friedrich, the head of Household's

12   mortgage services unit; is that right?

13   A.  Right.

14   Q.  And what's this showing here?

10:55:48 15   A.  And this is the two-plus reconciliation again.  So it

16   shows that the two-plus numbers for the grace period

17   adjustment were being reduced by 16 million.

18   Q.  Again, lowering the two-plus numbers by 16.1 million

19   for --

10:56:04 20   A.  Right, for that month.

21   Q.  For that month.

22        What about the next page?

23   A.  This is similar.  These are all these same sort of

24   reconciliations.  So here the grace period adjustment is

10:56:17 25   17,483,000.  So two-plus numbers are being reduced by this

Ghiglieri – direct

697

```
          1   grace period adjustment.

          2   Q.  And what's the date of this e-mail?

          3   A.  August 7, 2001.  So this would be for July.

          4   Q.  And do the rest of the e-mails show the same thing?
10:56:36  5   A.  Yes.

          6   Q.  Does this -- is this significant to your opinion that

          7   Household used re-aging tactics like the use of the grace

          8   period to manipulate its two-plus delinquency numbers?

          9   A.  Yes.
10:56:48 10   Q.  Why?

         11   A.  Well, because there's no reason to make this kind of

         12   adjustment.  Other lenders just do a straight-up deal.  Here,

         13   what they were doing is using their grace period to move loans

         14   from the two-plus bucket back to current.  And the pass --
10:57:03 15   these sorts of delinquency numbers are very important to

         16   regulators and others because it shows the condition of the

         17   loan portfolio.

         18   Q.  Is this grace period right here, is this the same grace

         19   period we heard referred to earlier in an earlier e-mail as
10:57:21 20   the magic?

         21   A.  Yes.

         22   Q.  Now, is there a relationship between predatory lending on

         23   the one hand -- we talked quite a bit about that yesterday --

         24   and the use of practices like re-aging to hide the true
10:57:34 25   quality of Household's loans on the other?
```

Ghiglieri - direct

698

1    A.  Yes, there is a relationship.

2    Q.  Did you prepare a demonstrative to assist you in

3    explaining the relationship between predatory lending

4    practices on the one hand and hiding the quality of

10:57:46  5    Household's loans on the other?

6    A.  I did.

7    Q.  I'll show you what has been marked as Plaintiffs'

8    Demonstrative Exhibit 31 for identification.

9         Can you tell us what this exhibit shows?

10:58:05  10    A.  Yes.  Household starts out making a predatory loan.  And

11    remember, they're packing on fees and insurance premiums and

12    stripping away the equity.  And what happens is, the borrower

13    cannot pay the loan.  It's too large for the borrower to pay.

14         So Household has one of two choices.  They can either

10:58:26  15    re-age it so that it's not showing up on their two-plus

16    bucket.  Or they can refinance it or rewrite it down below,

17    which is flipping it, adding more insurance, adding more fees

18    to it.

19         And then --

10:58:39  20    Q.  Let me just pause there.  To refinance it or rewrite it,

21    does that take it out of the two-plus bucket as well?

22    A.  Right.  And it brings it back to current.  So they can

23    either re-age it using some sort of tactic that we've already

24    talked about or they can actually rewrite it and make a new

10:58:56  25    loan and start over.

Ghiglieri – direct

699

1  Q.  Okay.

2  A.  And then, no matter what, the borrower still can't pay

3  because the loan is so packed full of products, premiums and

4  fees and can't go anywhere else because the equity has been

10:59:11  5  stripped and the loan to value is too high so they're stuck.

6  And Household then has one of two choices.  They can either

7  rewrite it on the top, which is flip it again and add more

8  fees and premiums, insurance premiums to it, or they can

9  re-age it using one of the tactics, like the grace period or

10:59:30 10  one of their other tactics.

11  Q.  So if they rewrite it right here, does that -- again, that

12  takes it out of the delinquent bucket; now all of a sudden

13  they have a brand new loan so it's current again?

14  A.  Yes.  So whether they re-age it or they rewrite it, that's

10:59:47 15  going to bring it to the current bucket.  But rewriting it

16  allows them to pack on more fees and insurance premiums.  So

17  they can do -- they can either re-age it or rewrite it.

18  Q.  And you talked -- is there a predatory lending practice

19  that this implicates right here?

11:00:02 20  A.  Yes.  I mean, it implicates all sorts of predatory lending

21  practices, loan flipping because they're re-aging it multiple

22  times, insurance packing, equity stripping.  If they rewrite

23  it into two loans, that would be loan splitting.  You know,

24  originally they're reeling them in with the effective rate, as

11:00:22 25  Dennis Hueman would say, and blocking the back door with the

Ghiglieri – cross

700

1    prepayment penalty so that -- and because they've stripped out

2    the equity, there's nowhere for them to go to refinance.

3    Q.  So what's the last step?

4    A.  So the borrower still can't pay, and the cycle starts over

11:00:39 5    again and go on one of two paths.  So there's a correlation

6    between predatory lending practices and the need for Household

7    to re-age and mask their delinquencies.

8    Q.  Thank you, Ms. Ghiglieri.

9        MR. DROSMAN:  I have no further questions at this

11:00:57 10    time.

11        THE COURT:  You may cross-examine.

12        MR. KAVALER:  Thank you.

13                      CROSS-EXAMINATION

14    BY MR. KAVALER:

11:01:22 15    Q.  Good morning, Ms. Ghiglieri.

16        As you know, I'm Tom Kavaler, and I represent the

17    defendants.  And we've met before, correct?

18    A.  Yes.

19    Q.  Okay.  I'm going to ask you a few questions today about

11:02:07 20    the same subject matter you've been talking about for the past

21    couple of days.  And my time is sort of limited, so I'm going

22    to try and ask you questions that can be answered yes or no.

23    If I do that, will you answer them yes or no?

24    A.  If I can answer them with a yes or a no.

11:02:20 25    Q.  Perfect.  Thank you.

Ghiglieri – cross

701

1          Now, it's correct that you never worked at Household

2    International?

3    A.   Correct.

4    Q.   And, in fact, you've never worked at any company in the

11:02:32  5    private sector, only in the government?

6    A.   Incorrect.

7    Q.   Okay.  Where did you work in the private sector?

8    A.   Well, I launched Rate Genius, which is a company that

9    refinances automobile loans.  And I also worked at our family

11:02:49 10    bank when I was in high school and college.

11    Q.   Okay.  And you were never a customer of Household

12    International?

13    A.   That's correct.

14    Q.   And when you were the head of the Texas Department of

11:03:05 15    Banking, you didn't personally regulate Household; someone

16    else did that, correct?

17    A.   A sister agency regulated it, the Consumer Credit

18    Commissioner.

19    Q.   Right.  And am I correct that you never met Bill Aldinger

11:03:20 20    or Gary Gilmer or Dave Schoenholz personally?

21    A.   That's correct.

22    Q.   And you never met Tom Detelich or Lisa Sodeika either?

23    A.   That's correct.

24    Q.   You never met or spoke with anyone else whom you

11:03:38 25    understood to be an employee of Household at the time you were

Ghiglieri - cross

837

        1    testimony yesterday.

        2           MR. KAVALER:  I am having difficulty with the

        3    transcript.

        4    BY MR. KAVALER:

03:42:29 5   Q.  Let me do it this way:  This document, 1080, is headed

        6    "Optional Credit Insurance Disclosure."

        7           Do you see that?

        8    A.  I see that.

        9    Q.  And first thing it says after the name of the creditor,

03:42:37 10  the name of the borrowers and some boxes with some amounts in

        11   it, is a sentence that begins in capital letters, "No credit

        12   insurance is required to obtain this loan."

        13          Do you see that?

        14   A.  I do.

03:42:46 15  Q.  All right.

        16          And this is the document signed by the borrowers --

        17   the Nanezes -- on the next page, correct?

        18   A.  Yes.

        19   Q.  So, they received a written disclosure from Household

03:42:58 20  which says on the top, it's an "Optional Credit Insurance

        21   Agreement" and says in the beginning of the text in capital

        22   letters, "No credit insurance is required to obtain this

        23   loan."

        24          Do you see that?

03:43:10 25  A.  I see it.

Ghiglieri – cross

838

1    Q.   Okay.

2         And that would alert them to the fact this credit

3    insurance is both optional and not required to obtain the

4    loan, correct?

03:43:18  5  A.   If they spoke English.  They're Spanish speakers.

6    Q.   Do you know that for a fact or you just assuming that?

7    A.   Well, I'm reading it from the complaints.  I pulled the

8    complaint out.

9    Q.   Okay.

03:43:30 10  A.   "We are Hispanic and our primary language is Spanish."

11   Q.   Okay.

12        And your point is:  This document is in English?

13   A.   It is in English.

14   Q.   Okay.

03:43:38 15        So, as a regulator, what would you like to see?

16        Would you like to see Household provided them with a

17   disclosure in Spanish?

18   A.   Well, there are a couple things.

19        One, if you are lending money to someone that doesn't

03:43:55 20  speak English, at least I know -- from the bank's

21   standpoint -- they've got forms.  All of their documents are

22   in all the different languages of the clients that they serve.

23        The second thing is Household always claimed that

24   their insurance was optional; but, if you remember, I talked

03:44:12 25  about the penetration ratios.

Ghiglieri – cross

839

1        When you look at how many loans were made and how

2    many insurance policies were written on those loans, if it

3    gets above 50 percent, the regulators think that credit

4    insurance is actually required.

03:44:29  5        In this complaint, it actually says that:  "The

6    Household's representative told us that we had to get single

7    premium credit insurance."

8        So, it conflicts with the language in this document,

9    which, if they spoke English, they would have been able to

03:44:47 10   read and maybe ask a question about.

11        But, notwithstanding that, this is symptomatic of

12   insurance packing that was complained of in various states

13   around the country.

14   Q.  All right.

03:44:59 15        So, part of the problem is the document is in English

16   and you believe they spoke Spanish?

17   A.  Well, they said they spoke Spanish.  I'm just looking at

18   their complaint.

19        I don't know them personally.

03:45:10 20   Q.  Understood.

21        So, let's look at the other document in the loan

22   file, which is the Loan Payment and Security Agreement.

23        We'll mark this as Defendants' 1081 for

24   identification.

25        (Document tendered.)

TAB 5

1323

```
1                IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
2                        EASTERN DIVISION

3   LAWRENCE E. JAFFE PENSION PLAN, )
    on behalf of itself and all    )
4   others similarly situated,     )
                                   )
5              Plaintiff,          )
                                   )
6     vs.                          ) No. 02 C 5893
                                   )
7   HOUSEHOLD INTERNATIONAL, INC., )
    et al.,                        ) Chicago, Illinois
8              Defendants.         ) April 8, 2009
                                   ) 9:45 a.m.
9                         VOLUME 7
10              TRANSCRIPT OF PROCEEDINGS - TRIAL
          BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12  APPEARANCES:

13  For the Plaintiff:      COUGHLIN STOIA GELLER RUDMAN &
                            ROBBINS LLP
14                          BY:  MR. LAWRENCE A. ABEL
                                 MR. SPENCER A. BURKHOLZ
15                               MR. MICHAEL J. DOWD
                                 MR. DANIEL S. DROSMAN
16                               MS. MAUREEN E. MUELLER
                            655 West Broadway
17                          Suite 1900
                            San Diego, California  92101
18                          (619) 231-1058

19                          COUGHLIN STOIA GELLER RUDMAN &
                            ROBBINS LLP
20                          BY:  MR. DAVID CAMERON BAKER
                                 MR. LUKE O. BROOKS
21                               MR. JASON C. DAVIS
                                 MS. AZRA Z. MEHDI
22                          100 Pine Street
                            Suite 2600
23                          San Francisco, California  94111
                            (415) 288-4545
24

25
```

Gilmer - redirect

1424

| | | |
|---|---|---|
| | 1 | 14th, 2000; is that right, sir? |
| | 2 | A.  I'm sure there's a date on it, Mr. Dowd. |
| | 3 | Q.  It's on the second page, sir, right next to your |
| | 4 | electronic signature. |
| 11:48:05 | 5 | A.  Okay.  It says February 14, 2000. |
| | 6 | Q.  Okay.  So that's a Form 4 that you're required to file |
| | 7 | with the Securities and Exchange Commission; is that right? |
| | 8 | A.  I believe -- I'm not a lawyer, obviously, but I think |
| | 9 | these are required. |
| 11:48:18 | 10 | Q.  And you did file them during this relevant time period, |
| | 11 | didn't you, sir? |
| | 12 | A.  I'm sure that I did. |
| | 13 | Q.  758 is one of them; am I right? |
| | 14 | A.  I'm sorry? |
| 11:48:26 | 15 | Q.  And 758 is one of those; is that right, sir? |
| | 16 | A.  It appears to be. |
| | 17 | MR. DOWD:  And I'd offer 758, your Honor. |
| | 18 | THE COURT:  It will be admitted. |
| | 19 | BY MR. DOWD: |
| 11:48:46 | 20 | Q.  Sir, I'll show you what's been marked as Defendants' |
| | 21 | Exhibit 759 and ask you to take a look at that. |
| | 22 | (Tendered.) |
| | 23 | BY MR. DOWD: |
| | 24 | Q.  And do you recognize Exhibit 759 to be another Form 4 |
| 11:49:04 | 25 | signed by you on October the 19th, 2000, sir? |

Gilmer - redirect

1425

1   A.  It does appear to be.

2   Q.  And, again, you were required to file this by the SEC; is

3   that right?

4   A.  I believe that is correct.

11:49:16  5   Q.  Doesn't it, sir, show you that on October 18, 2000, you

6   exercised options at a strike price of $11.12 to buy 16,500

7   shares; is that right, sir?

8   A.  That is correct.

9   Q.  And then later that same day apparently, you acquired

11:49:36  10  through an option exercise at a price of $13.62 another 33,500

11   shares; is that right?

12   A.  I believe that is correct.

13   Q.  Okay.  So you bought -- you exercised options -- old

14   options, is that right, sir, from before the relevant time

11:49:55  15  period?

16   A.  I don't know when these options were granted, Mr. --

17   Mr. Dowd.

18   Q.  Come on, sir.  You're not going to tell me that you think

19   that sometime after June 30, '99, your stock was trading at 11

11:50:10  20  bucks?

21   A.  No, I did -- did I say that, Mr. Dowd?

22   Q.  I don't know.  Maybe I just misunderstood.

23   A.  Maybe you did, so let me explain what I said.  I said I'm

24   not sure when these options were granted.  That's all I said.

11:50:22  25  Q.  Okay.  It was sometime prior to June 30, 1999, right, sir?

Gilmer - redirect

1426

1    A.  I believe it probably would have been, yes.

2    Q.  Okay.  So on that day, October 18, 2000, when you

3    exercised your rights to buy this stock using options that had

4    been granted to you in the past, 50,000 shares, you paid

11:50:39 5    $11.12 and $13.62; is that right, sir?

6    A.  That's what that says, yes, it does.

7    Q.  Okay.  And then when you sold those shares that same

8    day -- because you sold 50,000, right?

9         You bought 50 and you sold 50, right?

11:50:56 10    A.  That appears to be correct.

11    Q.  Okay.  When you sold them that same day, you sold them at

12    $47 and $50 a share, is that right, on the 18th and 19th?

13    A.  That is exactly right.  That's the way a stock option

14    works.

11:51:11 15    Q.  Right.  So, in other words, when my clients were paying

16    $47 or $50 on those two days to buy those shares, you were

17    buying them for 11 and 12 and 13 bucks; is that right?

18    A.  No.  I was granted these shares, as you pointed out

19    correctly, years before.  So I wasn't buying in the market any

11:51:32 20    shares.  I would have paid the $47 and $50 respectively in the

21    market on that day, exactly like your clients would have.

22    Q.  But you didn't, sir?

23    A.  That's right, I did not buy stock in the open market on

24    that day.

11:51:47 25    Q.  You just exercised your options and bought it at 11 and

Gilmer – redirect

1427

1    13; is that right?

2    A.  That's what I've been trying to tell you, Mr. Dowd.

3    That's the way a stock option works.

4    Q.  Right.  No, I understand that.  It's just that your

11:51:56   5    counsel asked you today something about me asking about you

6    exercising that 11 bucks.  I just want to make sure we

7    understand that's exactly what you did during the relevant

8    time period, right, sir?

9         MR. KAVALER:  Objection to the form, your Honor.

11:52:07 10         THE COURT:  I'll sustain the objection as to the form

11    of the question.

12    BY MR. DOWD:

13    Q.  Mr. Gilmer, let me show you one more.  I'll show you

14    what's been marked as Defendants' Exhibit 763.

15    (Tendered.)

16    BY MR. DOWD:

17    Q.  And is that again, sir, a Form 4 that you filed with the

18    SEC?

19    A.  Yes, sir, it is.

11:52:48 20    Q.  Okay.  And that's your signature there on the second page?

21    A.  It is.

22    Q.  Okay.  And you were required to file these forms with the

23    SEC?  This one too, right?

24    A.  As I've said, I believe it is a requirement, yes.

11:53:03 25    Q.  And, sir, on July 18, 2001, you exercised some more

Gilmer – redirect

1428

1 options at 17 -- for 17,500 shares and, again, for 7,500

2 shares; is that right, sir?

3 A. That is correct.

4 Q. And you were paying $13.62 for the 17,500 shares and then

11:53:25 5 $19.87 for the 7,500 shares; is that right, sir?

6 A. That -- that is the strike price on the -- on the stock

7 options that I exercised.

8 Q. That's what you paid, right?

9 A. That's the way a stock option works, yes.

11:53:39 10 Q. And when you sold those shares that same day, you got

11 $68.84, $69 and $69; is that right, sir?

12 A. That's right. That's how much the stock had gone up since

13 I was granted the options. And so that's what I was able to

14 sell them for in the open market on that day, that's true.

11:53:59 15 Q. In other words, that's what my clients paid when they

16 bought them on that day, right?

17 A. Which is exactly the same I would have paid if I had been

18 in the open market on that day.

19 Q. Right. But you weren't in the open market; you were

11:54:09 20 exercising options, right, sir?

21 A. On that particular day. I had been in the open market

22 since 1972.

23 Q. I'm not asking about what you did in 1972, sir. I'm

24 asking you what you did on July 18, 2001.

11:54:20 25 A. That document actually -- accurately describes what I did

TAB 6

1959

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3  LAWRENCE E. JAFFE PENSION PLAN, )
    on behalf of itself and all    )
 4  others similarly situated,      )
                                    )
 5            Plaintiff,            )
                                    )
 6    vs.                           ) No. 02 C 5893
                                    )
 7  HOUSEHOLD INTERNATIONAL, INC.,  )
    et al.,                         ) Chicago, Illinois
 8                                  ) April 14, 2009
              Defendants.           ) 8:45 a.m.
 9
                            VOLUME 10
10            TRANSCRIPT OF PROCEEDINGS - TRIAL
        BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12  APPEARANCES:

13  For the Plaintiff:      COUGHLIN STOIA GELLER RUDMAN &
                            ROBBINS LLP
14                          BY:  MR. LAWRENCE A. ABEL
                                 MR. SPENCER A. BURKHOLZ
15                               MR. MICHAEL J. DOWD
                                 MR. DANIEL S. DROSMAN
16                               MS. MAUREEN E. MUELLER
                            655 West Broadway
17                          Suite 1900
                            San Diego, California  92101
18                          (619) 231-1058

19                          COUGHLIN STOIA GELLER RUDMAN &
                            ROBBINS LLP
20                          BY:  MR. DAVID CAMERON BAKER
                                 MR. LUKE O. BROOKS
21                               MR. JASON C. DAVIS
                                 MS. AZRA Z. MEHDI
22                          100 Pine Street
                            Suite 2600
23                          San Francisco, California  94111
                            (415) 288-4545
24

25
```

Schoenholz - cross

2106

1    Q.  Now, counsel asked you about a big stack of documents that

2    are piled up here (indicating) on the table -- various 10-Ks

3    and 10-Qs and other public filings.  Do you recall that?

4    A.  I do.

01:37:39 5    Q.  Now, would you explain to the jury and to the Court the

6    process by which --

7            MR. SLOANE:  Let me withdraw that.

8    BY MR. SLOANE:

9    Q.  Did you write those documents?

01:37:52 10    A.  I did not.

11    Q.  Would you explain to the Court and to the jury what was

12    the process by which those documents were created?

13    A.  Let me start with the 10-K document because that's a more

14    comprehensive document.

01:38:10 15    Q.  Let me interrupt you one second.

16            MR. SLOANE:  Your Honor, we have a demonstrative

17    exhibit, 802-01.  May we publish that on the board, please?

18            I don't believe there's any objection to it.

19            THE COURT:  If there's no objection, yes.

20    BY MR. SLOANE:

21    Q.  Perhaps this can serve as an aid to the jury and to you,

22    Mr. Schoenholz.

23            So, why don't you walk us through this document, if

24    you would.

01:38:38 25    A.  Okay.

Schoenholz – cross

2107

1          Well, in this time frame, what it means is that the

2     10-K draft would have been initially prepared, generated by

3     the Corporate Controller's group with input from Investor

4     Relations, from the Treasury Department, from the Credit Risk

01:38:59    5     Department, clearly on the types of disclosures we've been

6     talking about would be drafted by the Credit Risk people; and,

7     also, would include initial input from the external auditors.

8          It would then be reviewed, after it was actually

9     drafted, by other people in the Corporate Controller's group.

01:39:17   10     I think that says "Internal Audit."

11          A draft would then go to Mr. McDonald, who was the

12     Chief Accounting Officer.

13     Q.  Mr. McDonald was the person that Mr. Dowd asked you about

14     in connection with certain of the exhibits you saw this

01:39:32   15     morning?

16     A.  Yes, sir.

17          He would then review the draft thoroughly, provide

18     his input, his comments, his direction, at which time he would

19     then circulate a 10-K document to all of those people listed:

01:39:46   20     Basically, senior business unit, operating managers, as well

21     as financial managers and functional heads within the

22     corporate office.

23          They were charged with reviewing the 10-K,

24     particularly as it related to disclosures that they had

01:40:07   25     specific informed knowledge on.  They provided their input

Schoenholz - cross

2108

1    back to what we had was called a Disclosure Committee.  And

2    that Disclosure Committee consisted -- my recollection is it

3    consisted -- of McDonald; the treasurer; representatives of

4    the legal group that were, like, the SEC experts; as well as

01:40:32 5    some people -- a couple business unit financial people -- I

6    believe.

7            They would take it, digest it, come up with a draft

8    that they were happy with.  There would be then kind of a

9    summary meeting with Aldinger, myself, McDonald, and that says

01:40:51 10   Schwartz, who was kind of the SEC counsel in this time frame,

11   to talk about any issues, anything that we needed to revolve

12   at a higher level.

13           KPMG, the auditors, would then review that draft.

14   Although they had provided input at the very beginning part of

01:41:10 15   the process, but they would review it and, in essence, sign

16   off on that as part of their audit processes.  That would

17   include reviewing the MD&A and all those types of disclosures,

18   as well.

19           I would then get a draft and I'd review it very

01:41:27 20   carefully; generally, kind of in the late December time frame

21   and, then, probably updated in the late January time frame.

22           It would go to Mr. Aldinger.  Mr. Aldinger would take

23   and review it and provide whatever comments he had.  Then we

24   provided a draft of the 10-K to the Audit Committee generally

01:41:52 25   at the end of January for a meeting when the auditors would

Schoenholz - cross

2109

1    present the results of their audit.

2            Mr. McDonald would take and talk about the financial

3    statements.

4            Prior to the meeting with the Audit Committee, we had

01:42:10  5    a separate advanced meeting -- this is pre-Audit Committee

6    meeting -- with Mr. Levy, who was the Chairman of the of Audit

7    Committee.

8            Mr. Levy was a retired senior technical partner with

9    KPMG and was a very -- truly an expert in this area of

01:42:29 10    financial reporting and disclosures.

11            He wanted to have a -- he wanted to have a -- private

12    advanced meeting with myself, McDonald, the internal auditors,

13    the external auditors.  And then he would meet privately just

14    with the internal auditors and privately just with the

01:42:48 15    external auditors, would get his input and then present it to

16    the Audit Committee and then get their input.

17    Q.  Let me be sure I understand this.

18            Did all of the 10-Ks and 10-Qs, after July 30, 2002,

19    go through this same process?

01:43:11 20    A.  That's correct.

21    Q.  Now, what was the process -- what's the significance of

22    the July 30, 2002, date, in your mind?

23    A.  That was when Sarbanes-Oxley came in.

24    Q.  What does that mean?

01:43:23 25    A.  Sarbanes-Oxley was legislation introduced on creating a

Schoenholz – cross

2110

1    requirement for the Senior Chief Executive Officer and

2    principal Financial Officer.  So, in essence, certify

3    financial statements that were filed with the SEC.

4         And in response to that requirement to have that

01:43:47  5    certification, we created a sub-certification process that, in

6    essence, that had everybody in the business -- and there were,

7    I don't know, 40 or 50 people -- had to certify, in essence,

8    to Mr. Aldinger and myself the same things that we would have

9    to certify to the outside world.

01:44:10  10         That's why July -- that's the significance of July

11    30.

12    Q.  So, that was after July 30th, after this law got passed;

13    is that right?

14    A.  Right.

01:44:19  15    Q.  What was the process like before this law got passed?

16    A.  It was, essentially, the same process.  The difference

17    would be there wasn't a formal certification process and we

18    didn't have a formal disclosure committee.  So, it was more

19    like McDonald -- it would be the same where he would send it

01:44:38  20    out to the different business units and the functional heads,

21    but he would get the input back himself and working with his

22    department, giving it to KPMG; and, then, really are the rest

23    of the process was the same.

24    Q.  Now, when you signed these documents -- these 10-Ks or

01:44:59  25    10-Qs that Mr. Dowd showed you -- did you draw any comfort or

TAB 7

2220

```
 1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3    LAWRENCE E. JAFFE PENSION PLAN, )
      on behalf of itself and all     )
 4    others similarly situated,      )
                                      )
 5              Plaintiff,            )
                                      )
 6      vs.                           ) No. 02 C 5893
                                      )
 7    HOUSEHOLD INTERNATIONAL, INC.,  )
      et al.,                         ) Chicago, Illinois
 8              Defendants.           ) April 15, 2009
                                      ) 8:55 a.m.
 9
                            VOLUME 11
10               TRANSCRIPT OF PROCEEDINGS - TRIAL
            BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12    APPEARANCES:

13    For the Plaintiff:       COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
14                             BY:  MR. LAWRENCE A. ABEL
                                    MR. SPENCER A. BURKHOLZ
15                                  MR. MICHAEL J. DOWD
                                    MR. DANIEL S. DROSMAN
16                                  MS. MAUREEN E. MUELLER
                               655 West Broadway
17                             Suite 1900
                               San Diego, California  92101
18                             (619) 231-1058

19                             COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
20                             BY:  MR. DAVID CAMERON BAKER
                                    MR. LUKE O. BROOKS
21                                  MR. JASON C. DAVIS
                                    MS. AZRA Z. MEHDI
22                             100 Pine Street
                               Suite 2600
23                             San Francisco, California  94111
                               (415) 288-4545
24

25
```

Devor - direct

2411

1    BY MR. DOWD:

2    Q.  You can answer.

3            THE COURT:  Well, we're going to have a sidebar.

4    Counsel's asked for a sidebar.

02:41:33  5            MR. DOWD:  Oh.

6        (Proceedings had at sidebar:)

7            THE COURT:  Yes?

8            MS. BUCKLEY:  Your Honor, I thought we had gone

9    through this yesterday morning in the context of commenting on

02:42:05 10   counsel's questions to Mr. Schoenholz.  We pointed out that by

11   comparing this number of what they claim was gathered by

12   Household through the use of alleged predatory lending

13   practices to financial statements is exactly what they're

14   doing in making a revenue recognition comparison, when they

02:42:28 15   put it up against the financial statements.

16           If he wants to make some broad argument about what he

17   thinks predatory lending brought into Household's --

18           THE COURT:  Let me just interrupt you for a second.

19           What was the question you just asked?  Maybe I

02:42:43 20   misunderstood it.

21           MR. DOWD:  I think what I asked, your Honor, was

22   something along the lines of:  Did you look at the 3.2 billion

23   compared to the revenue for 1999 through the first two

24   quarters percentage-wise?

02:42:54 25           MS. BUCKLEY:  And I thought --

Devor – direct

2412

```
              1        THE COURT:  Compared to the entire revenue?

              2        MR. DOWD:  I think that's what I asked, yes.

              3        THE COURT:  All right.  Give me just a second.

              4    (Brief pause.)

02:43:12      5        THE COURT:  Yeah, I don't think that's -- I don't

              6   think that's -- inappropriate.  What's inappropriate is any

              7   question that might imply that because a total number -- the

              8   total amount -- of revenue included revenue allegedly

              9   attributable to predatory lending practices, that the

02:43:33     10   statement that's a total amount of revenue is false.  That

             11   type of an implication I've said cannot be made.

             12        But he can point out to what degree predatory lending

             13   practices were engaged in by quantifying the amount of the

             14   total revenue that was attributable to predatory lending

02:43:57     15   practices and a comparison to the total amount of revenue that

             16   was reported.

             17        That goes to the issue of how pervasive the practices

             18   were, not to whether the revenues were falsely reported.

             19        MS. BUCKLEY:  As your Honor said yesterday, it's one

02:44:16     20   thing to ask him how much of the money was attributable to

             21   predatory lending, but it's another to ask him to put in the

             22   10-K that this amount of money was attributable to predatory

             23   lending.  Those are two different things.

             24        I'm quoting the Court by making that last question --

02:44:31     25   by asking that question -- "How much of the 10-K was
```

TAB 8

2477

```
 1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all    )
 4   others similarly situated,      )
                                     )
 5             Plaintiff,            )
                                     )
 6     vs.                          ) No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC., )
     et al.,                        ) Chicago, Illinois
 8             Defendants.           ) April 16, 2009
                                     ) 9:18 a.m.
 9
                              VOLUME 12
10                 TRANSCRIPT OF PROCEEDINGS - TRIAL
            BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:       COUGHLIN STOIA GELLER RUDMAN &
                              ROBBINS LLP
14                            BY:  MR. LAWRENCE A. ABEL
                                   MR. SPENCER A. BURKHOLZ
15                                 MR. MICHAEL J. DOWD
                                   MR. DANIEL S. DROSMAN
16                                 MS. MAUREEN E. MUELLER
                              655 West Broadway
17                            Suite 1900
                              San Diego, California  92101
18                            (619) 231-1058

19                            COUGHLIN STOIA GELLER RUDMAN &
                              ROBBINS LLP
20                            BY:  MR. DAVID CAMERON BAKER
                                   MR. LUKE O. BROOKS
21                                 MR. JASON C. DAVIS
                                   MS. AZRA Z. MEHDI
22                            100 Pine Street
                              Suite 2600
23                            San Francisco, California  94111
                              (415) 288-4545
24

25
```

Devor – cross

2544

1    whether the payments were appropriate and, you know, they

2    agreed to the agreement.  That kind of thing.  But I don't

3    think -- I think they were silent on the issue of whether the

4    revenue recognition by Kessler was actually appropriate.  I

11:21:03  5    don't recall seeing anything where they actually touched on

6    that.  I could be wrong -- and please refresh my memory with a

7    document -- but I don't believe they went to the revenue

8    recognition issue.

9    Q.  So you're not entirely clear as to where AA was on this;

11:21:17 10    is that fair?

11    A.  On "this"?  What do you mean?

12    Q.  Kessler.

13    A.  It looks like it's an issue that Andersen missed or

14    just -- you know, flew by Andersen.  It doesn't look like they

11:21:32 15    looked at the revenue recognition issue that ultimately

16    resulted in the company restating.

17    Q.  You understand that Arthur Andersen looked at this

18    transaction at the time; do you not?

19    A.  Vague recollection, yes.

11:21:46 20    Q.  And you understand that Arthur Andersen approved

21    Household's accounting treatment for this contract at the

22    time, correct?

23    A.  Again, I don't specifically recall that they did and

24    looked at the revenue recognition issue.  I don't recall them

11:22:00 25    overtly doing that.

Devor - cross

2564

1    Q.  You don't think it was important when presenting the issue
2    of Wells Fargo acquisition that the -- your opinion also
3    include the notion that there was a different regulatory
4    environment?
11:48:26  5    A.  I was not commenting on the need to book anything that the
6    company had with respect to -- first of all, I wasn't talking
7    about reserves.  I was talking about the fact that their
8    re-aging was so significant and aggressive, which I think they
9    say.  And, secondly, I wasn't taking issue with the regulatory
11:48:50 10    requirements.  So why would I comment on it?  I wasn't at all
11    taking issue with that.
12    Q.  You just mentioned reserves, Mr. Devor.  You'll agree,
13    will you not, that Household's loan loss reserves were not
14    inadequate during this period, correct?
11:49:07 15    A.  I would not -- I would not agree with that statement.  I
16    would not agree with that statement at all.
17    Q.  You don't agree that Household's loan loss reserves were
18    not inadequate during the relevant period?
19    A.  I believe I concluded in my report that the method that
11:49:27 20    the company used to estimate its reserves, to come up with its
21    reserve number, was unreliable.  And, furthermore, there were
22    significant indications in the record that it was also
23    understated.  So when you asked me if I would agree that it
24    was fine, of course, I wouldn't agree that it's fine.
11:49:48 25    Q.  You have not offered an opinion in this case that

Devor - cross

2565

1    Household's loan loss reserves are inadequate, have you?

2    A.  I just gave my opinion.  The answer is no, I have not

3    given that opinion.  Instead I've said it's unreliable the way

4    they did, and there are indications that it is understated.  I

11:50:04  5    can't quantify it because I don't have enough information.

6    Q.  As a matter of fact, you told us, didn't you, Mr. Devor,

7    that the issue of Household's loan loss reserves was way

8    beyond the scope of your retention in this case, right?

9    A.  I -- if you're referring to deposition testimony, you

11:50:22 10    know, it was a year and a half ago.  I don't remember if I

11    said that or not.

12    Q.  Was --

13    A.  Again, the focus of my attention was on the reporting of

14    the two-plus delinquency numbers, the improper lending and the

11:50:34 15    revenue issues with respect to that and the restatement.

16    Those are my opinions.

17    Q.  I understand your opinions, Mr. Devor.  I'm asking if the

18    issue of the adequacy of Household's loan loss reserves was

19    way beyond the scope of your engagement in this case, yes or

11:50:57 20    no?

21    A.  I don't -- I mean, I would think you would not mislead the

22    Court by saying that I said that without me saying it.  So I'm

23    sure if I looked at my testimony, I may have said it.  But,

24    again, it doesn't --

11:51:07 25    Q.  Is it true or false, Mr. Devor?

Devor - cross

2566

1    A.  Well, it doesn't -- it doesn't enter into any of my

2    conclusions.  We looked at it.  And in my report, it is very

3    apparent that we looked at it.  And it was part of the scope

4    because we comment on it for pages and pages in my report.  I

11:51:23  5    commented on it.

6    Q.  Was the adequacy of Household's loan loss reserves way

7    beyond the scope of your report, yes or no, please?

8            MR. DOWD:  Objection, your Honor, asked and answered.

9            THE COURT:  Overruled.  You can answer that yes or

11:51:38 10    no.

11    BY THE WITNESS:

12    A.  The answer is, it wasn't beyond the scope because I didn't

13    look at it.  And I -- and I actually gave conclusions in my

14    report on it.  In the end, did it impact my decisions and

11:51:53 15    conclusions surrounding those three items that I indicated

16    were my conclusions?  The answer is, it didn't have any impact

17    on those.

18    BY MS. BUCKLEY:

19    Q.  Let's play --

20    A.  I --

21    Q.  I'm sorry.  I thought you were finished.

22    A.  So, I mean, obviously if you look at my report, my report

23    indicates that, of course, I looked at it.  You know, whether

24    it was within the scope or not, it ended up -- I ended up

11:52:17 25    looking at it, of course.  I opined -- I have a lot of

TAB 9

2696

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all    )
 4   others similarly situated,      )
                                     )
 5             Plaintiff,            )
                                     )
 6     vs.                           ) No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC., )
     et al.,                         ) Chicago, Illinois
 8             Defendants.           ) April 17, 2009
                                     ) 1:25 o'clock p.m.
 9
                         VOLUME 13
10             TRANSCRIPT OF TRIAL PROCEEDINGS
             BEFORE THE HONORABLE RONALD A. GUZMAN
11

12   APPEARANCES:

13   For the Plaintiff:      COUGHLIN STOIA GELLER RUDMAN &
                             ROBBINS LLP
14                           BY:  MR. SPENCER A. BURKHOLZ
                                  MR. MICHAEL J. DOWD
15                                MR. DANIEL S. DROSMAN
                                  MS. MAUREEN E. MUELLER
16                           655 West Broadway
                             Suite 1900
17                           San Diego, California  92101
                             (619) 231-1058
18
                             COUGHLIN STOIA GELLER RUDMAN &
19                           ROBBINS LLP
                             BY:  MR. DAVID CAMERON BAKER
20                                MR. LUKE O. BROOKS
                                  MR. JASON C. DAVIS
21                                MS. AZRA Z. MEHDI
                             100 Pine Street
22                           Suite 2600
                             San Francisco, California  94111
23                           (415) 288-4545

24

25
```

2723

1    bootstrap the prior press statements and other statements into

2    that 10-Q and say that those trigger a requirement in the 10-Q

3    to make statements that wouldn't otherwise be required.

4            MR. DOWD:  When I talked about puffery, your Honor,

01:59:31 5    that's what the Galati court, itself, said.

6            THE COURT:  I know.

7            MR. DOWD:  Oh, sorry.

8            THE COURT:  I've got it here in front of me, too.

9    That's what they said.  I'm telling you I'm not sure I would

01:59:39 10    have found that one statement to be puffery.  I think that,

11    given all the circumstances, I don't know that that statement

12    would have been puffery in this case.

13            But, at any rate, what I'm telling you is that where

14    you've made those statements -- where those statements have

02:00:02 15    been made here -- in the two occasions that I find them, I

16    find them to be not puffery, but actual statements which could

17    trigger the requirement for full disclosure.

18            And I think once you have that, then your expert's

19    testimony with regard to the use of the GAAP -- that is, how

02:00:20 20    they disclose what they have a duty to disclose -- becomes

21    applicable.

22            If they didn't disclose it the way the GAAP

23    principles would require them to, in a meaningful way, then --

24    and you can convince the jury of that -- then I think you've

02:00:35 25    got a cause of action there.

2733

1          THE COURT:  I think that I don't quarrel with

2     anything you said, if they can't establish the basic

3     predicates then.

4          But when we talk about how we're going to instruct

02:11:32  5     the jury, you know, we have to instruct them in terms of,

6     "What happens if you find these things."  At what point is

7     there liability?

8          They, then, are free to determine whether they found

9     those elements or not, but I think we have to give them the

02:11:44 10     appropriate instructions.

11          And, as it turns out -- luckily for your client --

12     it's my impression at this point -- it's my opinion -- that

13     with respect to all but two of the 10-K filings, that there

14     was no -- 10-K or 10-Q filings; that there was no --

02:12:14 15     explanation of predatory lending practices, assuming such

16     existed and assuming your clients knew about them, is not an

17     issue that's even going to get to the jury because I don't

18     believe there was a duty in regard to those 10-Ks -- the other

19     10-Ks -- and 10-Qs for them to disclose those facts, even if

02:12:40 20     it existed and even if they knew about it.

21          MR. KAVALER:  And, your Honor, just so you don't look

22     book at the transcript later and say, "Mr. Kavaler had a duty

23     to speak at this point," let me echo something Mr. Dowd said.

24          I'm very reluctant to say what I'm thinking right now

25     because we're still in the middle of the plaintiffs' case.

2734

                    1          THE COURT REPORTER:  Slow down.

                    2          MR. KAVALER:  I'm sorry.

                    3          I'm very reluctant to say what I'm thinking, which

                    4    would only encourage you to think what you are thinking,

02:13:00    5    because we're still in the middle of the plaintiffs' case, and

                    6    we are letting them put on their case as they wish and we will

                    7    respond.

                    8          But there is a -- there are, we think, fatal defects

                    9    in this case, which we will point out to your Honor once

02:13:13   10    they've rested.

                  11          Rule 50 talks about when a party --

                  12          THE COURT:  You have been telling me that for a

                  13    while.  I know.

                  14          MR. KAVALER:  Your Honor, I believe we're there.  I

02:13:19   15    believe we're going to be there.  But I could be wrong.

                  16          But all I'm saying is I don't want you to read this

                  17    transcript later and say, "Well, why didn't you say that

                  18    then?"

                  19          I mean -- because it's not the right time to say

02:13:29   20    that, your Honor.  But I do agree it's a question of

                  21    instructing the jury.  I think, however -- much as I think

                  22    it's a great idea to have this conference today -- the

                  23    instructions conference -- some things will not be clear until

                  24    closer to the end of the plaintiffs' case, as to what the

02:13:44   25    instruction needs to be.

# TAB 10

2802

```
 1                   IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3    LAWRENCE E. JAFFE PENSION PLAN, )
      on behalf of itself and all    )
 4    others similarly situated,     )
                                     )
 5             Plaintiff,            )
                                     )
 6       vs.                         ) No. 02 C 5893
                                     )
 7    HOUSEHOLD INTERNATIONAL, INC., )
      et al.,                        ) Chicago, Illinois
 8                                   ) April 20, 2009
               Defendants.           ) 9:00 a.m.
 9
                             VOLUME 14
10                  TRANSCRIPT OF PROCEEDINGS - TRIAL
            BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12    APPEARANCES:

13    For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
14                              BY:  MR. LAWRENCE A. ABEL
                                     MR. SPENCER A. BURKHOLZ
15                                   MR. MICHAEL J. DOWD
                                     MR. DANIEL S. DROSMAN
16                                   MS. MAUREEN E. MUELLER
                                655 West Broadway
17                              Suite 1900
                                San Diego, California  92101
18                              (619) 231-1058

19                              COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
20                              BY:  MR. DAVID CAMERON BAKER
                                     MR. LUKE O. BROOKS
21                                   MR. JASON C. DAVIS
                                     MS. AZRA Z. MEHDI
22                              100 Pine Street
                                Suite 2600
23                              San Francisco, California  94111
                                (415) 288-4545
24

25
```

Fischel – cross

2936

1          (Document tendered.)

2               MR. KAVALER:  Now, let's do 154.

3               Copies, please.

4          (Brief pause.)

02:35:15  5          MR. KAVALER:  Let the record reflect I'm handing the

6     witness 154.

7               THE WITNESS:  Thank you.

8               MR. KAVALER:  And a copy for counsel.

9          (Document tendered.)

10     BY MR. KAVALER:

11     Q.  The same series of questions, Professor Fischel.

12               Once again, the horizontal axis shows at the extreme

13     left-hand end July 30, 1999, correct?

14     A.  Correct, sir.

02:35:36  15  Q.  And you go up that axis, you see a blue line (indicating),

16     which is the true value; a red line (indicating), which is

17     price; and, a pink -- it looks blue up there (indicating) --

18     whatever color it is, the area between the lines is shaded in?

19     A.  Yeah.

02:35:54  20               That corresponds precisely to the table that we were

21     just looking at on the amount of inflation.  So -- well, since

22     we haven't talked about this yet, if you just put the other

23     one up on the screen for a second?

24     Q.  Okay.  Sure.

02:36:23  25               Go back to 151.

Fischel - cross

2937

1     (Brief pause.)

2     BY THE WITNESS:

3     A.  So, what the -- the red line is the actual price, and you

4     can see what it was relative to -- the level of the price

02:36:24  5     relative to -- the vertical axis on price.

6          And the blue line is the true value.

7          So, what this predicts is that the price fluctuates

8     every day; but, the true value, based on my calculations, is

9     $7.97 lower than the actual price until November 15th of 2001;

02:36:53 10     and, then, it gets more or less than -- the inflations

11     increases or decreases based on the specific disclosure.

12     BY MR. KAVALER:

13     Q.  I hear you.  None of that is my question.

14          I want to go back to -- I put up 151 because you

02:37:03 15     wanted me to.  I want to go to 154 for a minute.

16     A.  I apologize.

17          Okay.  Thank you.

18     Q.  154, my only question is:  You prepared this chart?

19     A.  I did.

02:37:11 20     Q.  Okay.

21          On this chart, as on the other one, the blue line,

22     the red line and the shaded-in space all butt right up against

23     July 30, 1999, correct?

24     A.  Correct, for the reasons I've stated.

02:37:24 25          MR. KAVALER:  Your Honor, I offer Plaintiffs'

TAB 11

3013

```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3    LAWRENCE E. JAFFE PENSION PLAN, )
      on behalf of itself and all     )
 4    others similarly situated,      )
                                      )
 5              Plaintiff,            )
                                      )
 6      vs.                           ) No. 02 C 5893
                                      )
 7    HOUSEHOLD INTERNATIONAL, INC., )
      et al.,                         ) Chicago, Illinois
 8              Defendants.           ) April 21, 2009
                                      ) 9:00 a.m.
 9
                              VOLUME 15
10                  TRANSCRIPT OF PROCEEDINGS – TRIAL
            BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12    APPEARANCES:

13    For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
14                              BY:  MR. LAWRENCE A. ABEL
                                     MR. SPENCER A. BURKHOLZ
15                                   MR. MICHAEL J. DOWD
                                     MR. DANIEL S. DROSMAN
16                                   MS. MAUREEN E. MUELLER
                                655 West Broadway
17                              Suite 1900
                                San Diego, California  92101
18                              (619) 231-1058

19                              COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
20                              BY:  MR. DAVID CAMERON BAKER
                                     MR. LUKE O. BROOKS
21                                   MR. JASON C. DAVIS
                                     MS. AZRA Z. MEHDI
22                              100 Pine Street
                                Suite 2600
23                              San Francisco, California  94111
                                (415) 288-4545
24

25
```

Aldinger - direct

3072

1          That wasn't what the stock was trading in the open

2   market on that day, was it?

3   A.  No, that's -- that's right.  This was several years later.

4   Q.  That's what you paid for it that day, correct?

10:48:56  5   A.  That's correct.

6   Q.  So, you paid $12.68 for 250 shares, right?

7   A.  That's right.

8   Q.  Okay.

9          MR. KAVALER:  Objection, your Honor.  I think the

10:49:06 10   number is 250,000 shares.

11          MR. DROSMAN:  That's correct.

12   BY MR. DROSMAN:

13   Q.  250,000 shares, right?

14   A.  That's correct.

10:49:11 15   Q.  Okay.

16          So, when you paid $12.68 for 250,000 shares, you

17   spent about $3 million, didn't you?

18   A.  Yeah, that's about right.  Yes.

19   Q.  And, then, you sold shares, didn't you?

10:49:27 20   A.  Yes.

21   Q.  You sold shares over the following week, correct?

22   A.  That's correct.

23   Q.  And you sold shares at between $48 and $46 a share,

24   correct?

10:49:37 25   A.  That's right.

Aldinger – direct

3073

1    Q.  So, on each share of stock that you sold, you got between

2    34 and $36 per share, correct?

3    A.  That's correct.  That's the way options work.

4    Q.  And you bought 250,000 shares, correct?

10:49:51  5    A.  Yes.

6    Q.  And you sold 246,000 shares, correct?

7    A.  That's correct.

8    Q.  Okay.

9         And when you sold your shares of stock, you sold

10:50:01 10    those for about $11.8 million, didn't you?

11    A.  I don't remember the exact number, but it's a $36 spread,

12    whatever it is, approximately.

13    Q.  Okay.

14         So, if you sold for $11.8 million and you bought for

10:50:14 15    $3 million, it stands to reason that you made $7.8 million in

16    cash --

17    A.  That sounds right.

18    Q.  -- on that date, correct?

19    A.  That sounds right, yeah.

10:50:23 20    Q.  Okay.

21    A.  We should point out that the way options work --

22    Q.  I don't think there's a question pending, sir.

23    A.  -- shareholders made about 15 billion during that period.

24    Q.  I'll show you what's been marked as Defendants' Exhibit

10:50:36 25    775 for identification.

Aldinger - direct

3074

1          (Document tendered to counsel and the witness.)

2     BY MR. DROSMAN:

3     Q.  Let's talk more about the cash that you made during 1999

4     to 2000, okay?

10:51:04 5    A.  Yes.

6     Q.  And Plaintiffs' Exhibit 7- -- or Defendants' Exhibit 775

7     is another Form 4, right?

8     A.  Yes.

9     Q.  Okay.

10:51:14 10         MR. DROSMAN:  Plaintiffs move 775 into evidence.

11              THE COURT:  Admitted.

12         (Defendants' Exhibit No. 775 received in evidence.)

13    BY MR. DROSMAN:

14    Q.  And if you look at the second page of Exhibit 775, you see

10:51:23 15   that you signed it, correct?

16    A.  Yes.

17    Q.  And you signed it on January 19th, 2001; is that right?

18    A.  Yes.

19    Q.  Okay.

10:51:29 20         And, once again, you were exercising stock options,

21    correct?

22    A.  That's correct.

23    Q.  And, in this case, you exercised 300,000 stock options,

24    correct?

10:51:39 25   A.  That's right.

Aldinger – direct

3075

1   Q.  And that was on January 17th, 2001?

2   A.  That's right.

3   Q.  And, then, you turned around and you sold options, didn't

4   you?

10:51:48  5   A.  That's right.

6   Q.  In fact, you sold 289,947, correct?

7   A.  I think that's right.

8   Q.  Okay.

9        And, so, when -- you were purchasing options at about

10:52:02 10   $12.68 on that day, correct?

11   A.  That's correct.

12   Q.  That wasn't the price the stock was trading for on the

13   open market?

14   A.  No.  That's the way options work.  We value them at the

10:52:12 15   front end as compensation and, then, later on, if the stock

16   goes up, you can make money; and, if the stock stays the same,

17   you don't make any money; and, if the stock goes down, you

18   make nothing.

19        In this case, the fact that I made money,

10:52:26 20   shareholders made approximately $15 billion in incremental

21   value during this period.

22   Q.  Let me just make sure I understand.

23        When shareholders purchased stock on January 17th,

24   2001, they weren't purchasing it for $12.68 a share, were

10:52:43 25   they?

Aldinger - cross

3208

1    Q.  Mr. Drosman was using an example this morning, I think, of

2    48 or 58 or $68.  I forget which.  If you had bought some of

3    your $2 million worth of stock on that day, what price would

4    you have paid?

5    A.  I would have paid those prices.

6    Q.  Okay.  Now, have we prepared a demonstrative to help you

7    explain what your holdings were at various times in the class

8    period?

9    A.  I believe we have.

10   Q.  Can we see DDX 189-04.

11           Mr. Aldinger, what does this chart show us?

12           First of all, what's the time period here?

13   A.  It's '99 through 2002.

14   Q.  Okay.  And at the beginning -- withdrawn.

15           The left-hand axis is labeled William Aldinger's

16   total holdings quarter-end.

17           Do you see that?

18   A.  Yes.

19   Q.  What does total holdings include?

20   A.  Well, in this case it means shares actually owned as well

21   as options, I believe, that are in the money.

22   Q.  What does in the money mean?

23   A.  I'm sorry.  Vested options, I believe.

24   Q.  What does vested mean?

25   A.  It means that you've covered your three-year period to

Aldinger - cross

1    vest.  And I could be wrong on that.  This could include just

2    all options and my direct shares.

3    Q.  Why would you include options in a schedule of your

4    holdings?

5    A.  I think because that's the way it would appear in the

6    proxy.

7    Q.  In other words, you were talking to Mr. Drosman this

8    morning and he was showing you the bottom line with that 25

9    million dollar number --

10   A.  Yes.

11   Q.  -- and you said something about that's theoretical value?

12   A.  Right, that's right.

13   Q.  The proxy is organized the same way you just told us,

14   salary and bonus and options?

15   A.  That's right.

16   Q.  And the bottom line number adds them all up?

17   A.  That's correct.

18   Q.  But you don't actually get the cash for the options then?

19   A.  No, you don't.

20   Q.  But this tracks the proxy statements?

21   A.  That's correct.

22   Q.  Now, Mr. Aldinger, plaintiffs in this case claim that you,

23   Mr. Gilmer, Mr. Schoenholz made fraudulent statements about

24   the company, drove up the price of the stock, I seem to recall

25   from the opening, et cetera, and was unsustainable and

Aldinger – cross

1    eventually it would come crumbling down.

2            Do you understand that to be their theory of the

3    case?

4    A.  I do.

5    Q.  If that were true, Mr. Aldinger, if you knew that was

6    going on and you were a rational economic actor, what would

7    you have done with all of your stock, all of your options that

8    you were free to sell, everything else that you held during

9    this time period?

10   A.  You would have sold as much as you could.

11   Q.  Did you sell as much as you could, Mr. Aldinger?

12   A.  I sure didn't.

13   Q.  Look at the right-hand side of this chart, October 11,

14   2002.  Can you tell us roughly how much in available stock and

15   options you had at the end of the period that you did not sell

16   at a time when the plaintiffs say you knew that fraudulent

17   statements being made by you and Gary and Dave were propping

18   up the price of this stock which would inevitably crash?

19   A.  Well, this chart talks about four and a half million

20   shares, which is largely options and some shares I owned.  But

21   my recollection is that at the end of 2001, that I had 400,000

22   shares I owned that I kept and about $70 million in gains that

23   I didn't sell, most of which I lost during the same period the

24   investors did.

25   Q.  In other words, when the price declined for the investors,

Aldinger – cross

3211

1    it declined for you as well?

2    A.  In a big way, in a very big way.

3    Q.  If you had known that that was going to happen,

4    Mr. Aldinger, what would you have done?

5    A.  I guess I would have been smart enough to sell, but --

6    Q.  Did you sell?

7    A.  I did not.

8    Q.  Did you know?

9    A.  I didn't know.  I believed in the company.

10   Q.  Mr. Aldinger, was there a requirement of the board of

11   directors that officers own a certain amount of Household

12   stock?

13   A.  Yes, there was.  The board wanted us to each own some

14   increment of salary.  I think mine was five times salary.

15   Q.  So you had to own shares equal in value to five times your

16   annual compensation?

17   A.  Yes, and keep at least that much, yes.

18   Q.  Were those shares that you could purchase through the

19   option program or did you have to buy those for cash?

20   A.  You could purchase them any way you wanted.

21   Q.  So in your case, you satisfied that requirement?

22   A.  Many times over.

23   Q.  And that also was contained in the annual proxy sent to

24   all shareholders?

25   A.  Yes, it is.

# TAB 12

3282

```
 1                   IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                             EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all    )
 4   others similarly situated,      )
                                     )
 5              Plaintiff,           )
                                     )
 6     vs.                           )  No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )  Chicago, Illinois
 8                                   )  April 22, 2009
                Defendants.          )  9:10 a.m.
 9
                             VOLUME 16
10                  TRANSCRIPT OF PROCEEDINGS - TRIAL
             BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
14                             BY:  MR. LAWRENCE A. ABEL
                                    MR. SPENCER A. BURKHOLZ
15                                  MR. MICHAEL J. DOWD
                                    MR. DANIEL S. DROSMAN
16                                  MS. MAUREEN E. MUELLER
                               655 West Broadway
17                             Suite 1900
                               San Diego, California  92101
18                             (619) 231-1058

19                             COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
20                             BY:  MR. DAVID CAMERON BAKER
                                    MR. LUKE O. BROOKS
21                                  MR. JASON C. DAVIS
                                    MS. AZRA Z. MEHDI
22                             100 Pine Street
                               Suite 2600
23                             San Francisco, California  94111
                               (415) 288-4545
24

25
```

Aldinger – cross

3345

1    Household stock price per share.

2             Do you see that?

3    A.  Yes, I do.

4    Q.  And what does this show us?

10:29:30 5    A.  Well, this shows the stock price going up over a two-day

6    period.

7    Q.  What do you understand those two days to be?

8    A.  One was, I think, the day before we announced, but the

9    leak was out, and the second was after we announced.

10:29:42 10    Q.  And by how much did the stock price go up over those two

11    days?

12    A.  The value -- well, the stock price went from 28 -- $21 to

13    28.20, but the value of the company went up by over $3

14    billion, $3.2 billion.

10:29:59 15    Q.  First of all, tell me what percentage increase that is

16    from 21 to 28.

17    A.  Well, it's about a 30 percent increase plus, a third.

18    Q.  And do you know whether that was a significant increase

19    for Household?

10:30:14 20    A.  That may have been the biggest increase I ever saw in my

21    eight years as CEO in any two-day period.

22    Q.  Secondly, you told us the value of Household increased by

23    in excess of $3 billion?

24    A.  That's correct.

10:30:27 25    Q.  Tell us how you got to that calculation.

Aldinger – cross

3346

1  A.  Well, we had 500 million shares, so basically it was north

2  of $3 billion.

3  Q.  It's the basically part that I'm not getting.  Do the math

4  for me.

10:30:38  5  A.  Well, if you've got 500 million shares and your stock goes

6  up by about $7, I was understating it.  It's about 3.5 billion

7  incremental value.

8  Q.  To all the shareholders?

9  A.  To all the shareholders.

10:30:51 10  Q.  Including you?

11  A.  Absolutely.

12  Q.  Including the plaintiffs?

13  A.  Yes.

14  Q.  And how much did Household -- withdrawn.

10:31:01 15          Is that the result you were anticipating and hoping

16  for?

17  A.  It is.

18  Q.  Is that the result you were working to achieve?

19  A.  Yes.

10:31:13 20  Q.  How much did Household pay the attorneys general to

21  achieve this increase in value for all the shareholders,

22  including yourself, and the plaintiffs of $3-1/2 billion?

23  A.  $484 million.

24  Q.  Were you satisfied that that was a good deal,

10:31:31 25  Mr. Aldinger?

TAB 13

3824

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all     )
 4   others similarly situated,      )
                                     )
 5              Plaintiff,           )
                                     )
 6     vs.                           )  No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )  Chicago, Illinois
 8                                   )  April 24, 2009
       Defendants.                   )  11:00 o'clock a.m.
 9
                           VOLUME 18
10              TRANSCRIPT OF TRIAL PROCEEDINGS
            BEFORE THE HONORABLE RONALD A. GUZMAN
11

12   APPEARANCES:

13   For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
14                             BY:  MR. SPENCER A. BURKHOLZ
                                    MR. MICHAEL J. DOWD
15                                  MR. DANIEL S. DROSMAN
                                    MS. MAUREEN E. MUELLER
16                             655 West Broadway
                               Suite 1900
17                             San Diego, California  92101
                               (619) 231-1058
18
                               COUGHLIN STOIA GELLER RUDMAN &
19                             ROBBINS LLP
                               BY:  MR. DAVID CAMERON BAKER
20                                  MR. LUKE O. BROOKS
                                    MR. JASON C. DAVIS
21                                  MS. AZRA Z. MEHDI
                               100 Pine Street
22                             Suite 2600
                               San Francisco, California  94111
23                             (415) 288-4545

24

25
```

3961

1          MR. BURKHOLZ:  40.  We've put in evidence of 40.

2          THE COURT:  40.  Those 40.  But only in the form that

3   they're in in the chart that we used to make our rulings -- no

4   additions.  I suppose you can delete things if you want that

04:42:41 5   you don't want the jury to consider.  But no additions, just

6   that verbiage -- in a form that will be useful for the jury so

7   that they can make a determination as to whether each

8   defendant violated Rule 10(b), 10b-5, Section 10(b) with

9   respect to that statement or not.  And, if so, if yes, whether

04:43:17 10   the violation was -- whether the finding of a violation was

11   based upon the issue regarding predatory lending, re-aging or

12   restatement.

13          And -- I guess the Xerox machine is working.  I'll

14   give you each a copy.

04:44:11 15   (Tendered.)

16          THE COURT:  That verdict form does not reflect the

17   need to differentiate between predatory lending, re-aging or

18   restatement.

19          And Table B is the -- let me see where that comes in.

04:45:31 20          Table B is the table of dates, which essentially, I

21   think, we already have; but it may have to be tweaked a little

22   bit to be useful to the jury in the verdict form.

23          And I think that we have after today's argument by

24   the defense on the question of calculating -- the need to

04:46:05 25   calculate the cap on possible damages, we also need to have a

TAB 14

3966

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all    )
 4   others similarly situated,      )
                                     )
 5              Plaintiff,           )
                                     )
 6     vs.                           ) No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         ) Chicago, Illinois
 8                                   ) April 27, 2009
                Defendants.          ) 1:25 p.m.
 9
                         VOLUME 19
10            TRANSCRIPT OF PROCEEDINGS - TRIAL
          BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
14                             BY:  MR. LAWRENCE A. ABEL
                                    MR. SPENCER A. BURKHOLZ
15                                  MR. MICHAEL J. DOWD
                                    MR. DANIEL S. DROSMAN
16                                  MS. MAUREEN E. MUELLER
                               655 West Broadway
17                             Suite 1900
                               San Diego, California  92101
18                             (619) 231-1058

19                             COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
20                             BY:  MR. DAVID CAMERON BAKER
                                    MR. LUKE O. BROOKS
21                                  MR. JASON C. DAVIS
                                    MS. AZRA Z. MEHDI
22                             100 Pine Street
                               Suite 2600
23                             San Francisco, California  94111
                               (415) 288-4545
24

25
```

4009

1    able to find that.

2     (Recess taken.)

3        THE COURT:  Well, I was only partially successful in

4    finding my marked-up version.

03:11:47  5        So what's the plaintiffs' response to defendants'

6    proposed false or misleading statement instruction?

7        MR. BROOKS:  Judge, we think the instruction that --

8        THE COURT:  Look up, speak loudly.

9        MR. BROOKS:  We think the instruction, your Honor,

03:12:14 10   that has been edited by plaintiffs and submitted is proper.

11       There's a lot in here in defendants' instruction

12   especially on the duty and reiterating the instruction that

13   the Court has already given once to the jury about Mr. Devor's

14   testimony is completely improper, both legally, you know, from

03:12:37 15   a duty standpoint and also improper in the way that it's

16   phrased for a jury instruction.  Essentially they're telling

17   the jury what to find on duty, which, of course, is not

18   correct.

19       So we object wholesale, Judge, to this substitution

03:12:53 20   instruction and advance our edits that I believe are the

21   result of the discussion last week to instruction -- former

22   instruction 23 on false and misleading.

23       MS. BEER:  The two instructions, your Honor, are

24   really not all that different; and I believe in a case that

03:13:25 25   principally relies on alleged omissions, it is important for

4010

1    the jury to receive clear instructions on when a duty to

2    disclose arises.

3         We've already had some confusion on that, and that's

4    the reason for the instruction concerning Mr. Devor's

03:13:43  5    testimony.  That's the reason for repeating the instruction on

6    Mr. Devor's testimony in the final instructions that are given

7    to the jury to ensure that it's an instruction that they will

8    remember.

9         The edits that are incorporated in the version that

03:14:00 10    plaintiffs circulated last night include actually one sentence

11    that's completely backwards and the statement that an omission

12    is misleading only if the defendant has a duty to disclose the

13    omitted fact.

14         We've twisted and teased this language so much that

03:14:19 15    we've just gotten it completely backwards.  The omission is

16    not misleading if there's a duty.  There is a duty if the

17    statement with the omission is misleading.

18         Much of the rest of the instruction on the --

19    Household is required to file with the SEC, Household is

03:14:44 20    required to prepare its financial statements regarding GAAP,

21    the two instructions really don't differ very much on those,

22    if at all.

23         MR. BURKHOLZ:  I'll just point out that defendants'

24    instruction also took out what the Court had worked up as a

03:15:09 25    sentence, but each defendant has a duty to disclose a fact if

4049

1              MR. DROSMAN:  I don't think we object to that, your

2    Honor.

3              THE COURT:  Does that satisfy you?

4              MS. BEER:  That's fine.

04:24:17 5              THE COURT:  Is that a yes?

6              MR. OWEN:  Yes.

7              THE COURT:  Okay.  All right.

8              Okay.  Next is Court's Number 31, previously Court's

9    29, the Section 20(a) elements.

04:25:14 10              MS. BEER:  No objection from the defendants, your

11    Honor.

12              THE COURT:  Okay.  Next is Court's 32, previously

13    Court's 30, controlling person, two-part test.

14              MR. BURKHOLZ:  I incorporated defendants' language

04:25:54 15    into that instruction.

16              MS. BEER:  We have no objection, your Honor.

17              THE COURT:  Very well.

18              Court's Number 33, previously 31, selection of

19    presiding juror, verdict form.

04:26:30 20              MS. BEER:  I believe, your Honor, this is going to

21    depend a lot on what the verdict form is.

22              THE COURT:  Well, this language won't.  This is

23    language I'll use no matter what the verdict form is.  Whether

24    it's long, short, in Greek, it won't matter.  I'm going to

04:26:45 25    tell them, hey, we prepared a verdict form for you, here it

4068

                    1    you have a lively discussion, let's just hypothetically say on

                    2    statement number one.

                    3            THE COURT:  Question number three is?

                    4            MR. DROSMAN:  Question number three is check all that

04:56:58    5    apply.  For each of the statements to which you answered yes,

                    6    why was the statement false or misleading?  Check each that

                    7    applies.

                    8            So then you've got statement number one, predatory

                    9    lending, two-plus delinquency or restatement.  And you could

04:57:09   10    imagine a scenario where the jurors go back there and five

                   11    feel very strongly that it was false and misleading for all

                   12    three of those reasons, and five feel very strongly that it's

                   13    false and misleading for only one of the reasons, and then you

                   14    have a hung jury over an issue that isn't even a requirement

04:57:27   15    under the statute, and that's the concern.

                   16            THE COURT:  Well, let me tell you why we need to do

                   17    that because you just brought it up.

                   18            Statement number one includes how many different

                   19    issues as to which the jury you could find that the statement

04:57:38   20    was false?

                   21            MR. DROSMAN:  Three.

                   22            THE COURT:  How do we know which one?  How could we

                   23    know that all of them agreed to one?

                   24            MR. DROSMAN:  We don't.

04:57:46   25            THE COURT:  Maybe two agreed to delinquency

4069

1    restatements and eight agreed -- disagreed with that.

2              MR. DROSMAN:  Right.

3              THE COURT:  And agreed to predatory lending, and we

4    have no unanimity of a finding.

04:57:59  5              MR. DROSMAN:  But we do.  We have unanimity.

6              THE COURT:  No, we don't.

7              MR. DROSMAN:  What you have is you have unanimity

8    that they made a materially false and misleading statement.

9    You don't need unanimity as to the reason that that statement

04:58:13  10   was false and misleading.

11             THE COURT:  I disagree, period.  I disagree.

12             MS. BEER:  The other danger, your Honor --

13             THE COURT:  I think that's a formula for reversal.

14             MR. DROSMAN:  I'm sorry?

04:58:19  15             THE COURT:  I think that's a formula for reversal.

16             MR. DROSMAN:  I searched the cases.  There's nothing

17   I could find that talked about that issue.

18             THE COURT:  How many cases did you find that talk

19   about it at all?

04:58:30  20             MR. DROSMAN:  36 discuss -- you know, had something

21   to do with the issue.

22             THE COURT:  And how many made findings and how many

23   went up and were either confirmed or reversed?

24             MR. DROSMAN:  Yeah, I mean there's no case on point.

04:58:43  25   I freely admit that.

4070

```
                 1          THE COURT:  That's right.  That's right.

                 2          You want to break out each one of these statements

                 3  and make it 80 statements or 120, otherwise, we're going to

                 4  check as to what -- which statement and why.  I think it's the

04:59:01         5  only way to do it.  I just think it's the only way to do it.

                 6          Will we be through tomorrow with the evidence?

                 7          MR. KAVALER:  Your Honor, we, as I mentioned earlier,

                 8  we're calling one more witness.  We've told them who it is,

                 9  Professor Bajaj.  There's no secret about it.  Then we're

04:59:21        10  going to rest.

                11          I understand they may or may not call Professor

                12  Fischel.  It's my expectation we'll be through with all the

                13  evidence tomorrow, as far as we imagine either one of our

                14  times, Professor Bajaj won't take any more than that.

04:59:33        15          THE COURT:  Okay.  Well, then, if that's the case, I

                16  suspect that we're going to have to give the jury a day off

                17  while we finalize the instructions and then bring them back on

                18  one day for closing arguments and instructions.

                19          MR. KAVALER:  I'm sorry.  Today is Monday, so if we

04:59:46        20  finish the evidence tomorrow, give them a day off, it will be

                21  Thursday.

                22          MR. BURKHOLZ:  That makes sense, your Honor.

                23          MR. KAVALER:  Okay.

                24          THE COURT:  Yeah, it will be.  I mean if you think

04:59:56        25  that we can finish the instructions --
```

TAB 15

4304

```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3    LAWRENCE E. JAFFE PENSION PLAN, )
      on behalf of itself and all    )
 4    others similarly situated,     )
                                     )
 5               Plaintiff,          )
                                     )
 6       vs.                         ) No. 02 C 5893
                                     )
 7    HOUSEHOLD INTERNATIONAL, INC., )
      et al.,                        ) Chicago, Illinois
 8                                   ) April 29, 2009
                 Defendants.         ) 9:12 a.m.
 9
                              VOLUME 21
10                  TRANSCRIPT OF PROCEEDINGS - TRIAL
            BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12    APPEARANCES:

13    For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
14                              BY:  MR. LAWRENCE A. ABEL
                                     MR. SPENCER A. BURKHOLZ
15                                   MR. MICHAEL J. DOWD
                                     MR. DANIEL S. DROSMAN
16                                   MS. MAUREEN E. MUELLER
                                655 West Broadway
17                              Suite 1900
                                San Diego, California  92101
18                              (619) 231-1058

19                              COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
20                              BY:  MR. DAVID CAMERON BAKER
                                     MR. LUKE O. BROOKS
21                                   MR. JASON C. DAVIS
                                     MS. AZRA Z. MEHDI
22                              100 Pine Street
                                Suite 2600
23                              San Francisco, California  94111
                                (415) 288-4545
24

25
```

4402

1    respect to the false statements.  I think plaintiffs'

2    motions -- or defendants' motions are essentially requests for

3    rulings on these false statements as a matter of law.

4         And I have reviewed the submissions of the

03:00:20  5    plaintiffs, specifically the submission regarding all of the

6    statements and evidence that the Court should take into

7    account in determining whether the 10-Q and 10-K financial

8    statements reporting net income and EPS should be included in

9    the alleged false statements submitted to the jury.

03:00:50  10    And essentially I'll tell you now the determination

11    that we've come to is that with the exception of the two

12    statements that we previously identified, 10-Q and 10-K

13    statements that we previously identified, I don't find that

14    there's a basis for submitting any of the other statements of

03:01:17  15    reported net income and EPS to the jury as false statements.

16         The submission on behalf of the plaintiffs regarding

17    these 10-Q and 10-K statements of net income and EPS were

18    other statements, for the most part, other statements

19    contained in the 10-Qs and 10-Ks themselves regarding growth,

03:01:45  20    almost exclusively regarding growth figures and the basis for

21    growth in the company.  And, essentially, the Court finds,

22    first, that these statements don't relate to the alleged false

23    statement of net income and EPS.  Statements of net income and

24    EPS are just that.  They're not statements as to growth.  With

03:02:14  25    the two exceptions that we previously noted, they don't

4403

1  include any explanation as to growth or the basis for the net

2  income or the EPS being reported.

3        Those statements in and of themselves are not

4  inaccurate and, frankly, it seems to me pretty clear that the

03:02:36  5  statements being submitted by the plaintiffs to bolster their

6  argument that this statement of earnings or EPS in the 10-Qs

7  and 10-Ks is misleading, those statements are the ones that

8  ought to have been cited by the plaintiff as misleading or

9  false statements.  Why they weren't, I don't know, but they

03:02:56  10  weren't.  They weren't included.

11        And to allow them to now come in as an argument that

12  because of these other statements, the statements that were

13  designated are false and misleading, seems to me just to be

14  trying to get in the back door statements that were never

03:03:16  15  properly identified as misleading and false statements.

16        So, for example, Statement No. 1 in the Table A

17  entitled Household 10-Q, the statement that reads, "Household

18  10-Q for quarter ending 6-30-99:  Household reported net

19  income of 326.9 million for the quarter ended June 30, 1999,

03:03:48  20  and EPS of 67¢."  That statement is disallowed.

21        MR. BROOKS:  Judge, we had this conversation, I

22  think, last time we talked about this, and I just want to make

23  it clear for the record that when you're saying the statement

24  is disallowed, you're talking as to the predatory lending

03:04:10  25  allegations.

TAB 16

4427

```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all    )
 4   others similarly situated,     )
                                    )
 5             Plaintiff,           )
                                    )
 6    vs.                           ) No. 02 C 5893
                                    )
 7   HOUSEHOLD INTERNATIONAL, INC., )
     et al.,                        ) Chicago, Illinois
 8             Defendants.          ) April 30, 2009
                                    ) 8:41 a.m.
 9
                           VOLUME 22
10              TRANSCRIPT OF PROCEEDINGS - TRIAL
          BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:       COUGHLIN STOIA GELLER RUDMAN &
                              ROBBINS LLP
14                            BY:  MR. LAWRENCE A. ABEL
                                   MR. SPENCER A. BURKHOLZ
15                                 MR. MICHAEL J. DOWD
                                   MR. DANIEL S. DROSMAN
16                                 MS. MAUREEN E. MUELLER
                              655 West Broadway
17                            Suite 1900
                              San Diego, California  92101
18                            (619) 231-1058

19                            COUGHLIN STOIA GELLER RUDMAN &
                              ROBBINS LLP
20                            BY:  MR. DAVID CAMERON BAKER
                                   MR. LUKE O. BROOKS
21                                 MR. JASON C. DAVIS
                                   MS. AZRA Z. MEHDI
22                            100 Pine Street
                              Suite 2600
23                            San Francisco, California  94111
                              (415) 288-4545
24

25
```

Dowd - closing

4523

1    credit card accounting, I'd be talking to you about damages if

2    I were them, too.  Okay?  But we'll come back to it in

3    rebuttal, ladies and gentlemen, and talk to you about it some

4    more.

11:24:53  5         The last thing I want to talk to you a little bit

6    about is the verdict form.  And the Judge is going to walk you

7    through the verdict form.  But when you look at it, you're

8    going to see -- and I think it's near final, but what you're

9    going to see -- is you're going to be asked a series of

11:25:05 10   questions.  And this thing is long.  You're going to have

11   to -- you've got a tough job.  You always have a tough job,

12   but the verdict form is going to be a tougher job, too.  And

13   really you're going to be asked, you know, statement by

14   statement -- there's, like, 40 different statements that we

11:25:19 15   allege, okay -- over this entire relevant time period.  And

16   you're going to be asked, Statement No. 1, and then you've got

17   to go to this table, I think it's Table A.  It's Table A for

18   the false statements.

19        So, you're going to have to look at the False

11:25:33 20   Statement Table and then go back to the front and say, "Okay,

21   that's Statement One, the one on August 16th, 1999."

22        And, then, you've got to answer for each of the four

23   statements:  "Did plaintiffs prove the Rule 10b-5, Household,

24   Schoenholz, Gilmer, Aldinger?"

11:25:48 25        And, then, you're going to be asked:  "Why was the

Dowd - closing

4524

1    statement false?  Was it false because of two-plus delinquency

2    and re-aging or was it false because of the restatement?"  And

3    on some occasions you're going to be asked, "Was it false

4    because of the predatory lending?"  Okay?

11:25:58 5          And you're going to have to make that determination,

6    as well.

7          And, then, the last question is knowingly vs.

8    Recklessly, which is really just an issue that you have to

9    decide based on what you're going to hear about the

11:26:09 10   definitions of "knowing" versus "reckless."  All right?

11         But let's take a look at a couple of these

12   statements, just to give you an example, just so you

13   understand, you know, why we say it false.

14         I'm pretty sure you got a pretty good idea what we're

11:26:24 15  saying; but, just to make sure, can we turn to the August

16   16th, '99, statement in Table A.

17         Okay.  This Table A, that identifies the false

18   statements, is going to look just like that (indicating).

19   Okay?

11:26:40 20        And this one is the statements made on August 16th,

21   1999.  Okay?  It's a Household 10-Q.  We gave you the exhibit

22   number, so you can go find it, and you'll have this back in

23   the jury room so you can look up exactly what they say.  And

24   it even has those Bates numbers.  Those are those numbers in

11:26:56 25  the bottom right-hand corner of all the exhibits.  Like, you

TAB 17

4672

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all    )
 4   others similarly situated,      )
                                     )
 5              Plaintiff,           )
                                     )
 6     vs.                           ) No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         ) Chicago, Illinois
 8              Defendants.          ) May 1, 2009
                                     ) 1:20 p.m.
 9
                         VOLUME 23
10      TRANSCRIPT OF PROCEEDINGS - JURY INSTRUCTIONS CONFERENCE
                 BEFORE THE HONORABLE RONALD A. GUZMAN
11

12   APPEARANCES:

13   For the Plaintiff:      COUGHLIN STOIA GELLER RUDMAN &
                             ROBBINS LLP
14                           BY:  MR. LAWRENCE A. ABEL
                                  MR. SPENCER A. BURKHOLZ
15                                MR. MICHAEL J. DOWD
                                  MR. DANIEL S. DROSMAN
16                                MS. MAUREEN E. MUELLER
                             655 West Broadway
17                           Suite 1900
                             San Diego, California  92101
18                           (619) 231-1058

19                           COUGHLIN STOIA GELLER RUDMAN &
                             ROBBINS LLP
20                           BY:  MR. DAVID CAMERON BAKER
                                  MR. LUKE O. BROOKS
21                                MR. JASON C. DAVIS
                                  MS. AZRA Z. MEHDI
22                           100 Pine Street
                             Suite 2600
23                           San Francisco, California  94111
                             (415) 288-4545
24

25
```

4678

             1    for 10b-5; it's an element of the 10b-5 claim.  It's going to

             2    be read to them as an element of the 10b-5 claim.  And then

             3    they're going to be deciding what the reasonable amount of

             4    loss per share is.  And that's what that thing in the back is.

01:32:18     5         Now, what Mr. Kavaler is saying is that he wants to

             6    them decide this loss causation question twice, I guess.  I

             7    don't understand exactly where he's going with this.

             8         THE COURT:  I think it's a slightly different

             9    concept, but I don't think it requires a change -- the change

01:32:30    10    Mr. Kavaler is arguing for.

            11         In any tort, one of the elements of the tort is harm

            12    to the plaintiff; something the jury has to find before they

            13    determine the damages.  The damages is a quantification of the

            14    harm.  That's all.  And this is a similar situation.  Part of

01:32:51    15    the damages calculation is inflation.  That's what we're doing

            16    here.  We're calculating that portion of the damages.

            17         MR. KAVALER:  Just to be clear --

            18         THE COURT:  But the harm has to be found as one of

            19    the elements, and that's the loss causation.  There's no harm

01:33:05    20    if there's no loss causation.

            21         MR. KAVALER:  I agree with that, your Honor.  I

            22    disagree with Mr. Brooks when he said then they're going to

            23    calculate damages.  They're not going to calculate damages.

            24    That's the second phase.

01:33:14    25         THE COURT:  Well, I think that they're going to

4679

1    calculate an element of damages.

2            MR. KAVALER:  Your Honor, they're going to calculate

3    inflation.

4            THE COURT:  You can call it an inflation element of

01:33:23  5    damages or you can just call it damages for the sake of this

6    jury.  They don't know the difference, and it won't make any

7    difference to them.  The calculation they're being asked to

8    make will serve our purposes in the next round.

9            MR. KAVALER:  It may serve some purpose, your Honor.

01:33:34  10   It will not serve the purpose of either accuracy of the law or

11   fairness.  Those are my concerns.

12           THE COURT:  Well, I don't think --

13           MR. KAVALER:  I believe it's unfair, and I believe

14   it's inaccurate.  I believe it's error.  And I respectfully

01:33:45  15   ask you to reconsider.  And if the only argument against it is

16   retyping a portion of the charge, you know, we'll do what we

17   can to alleviate the burden.  We're not trying to make work

18   for you.

19           THE COURT:  I understand.  It's not merely a question

01:33:58  20   of retyping a few words, as you know.  Everything has a

21   trickle effect in these instructions.  Everything.  We would

22   have to review the entire set of instructions.  And we'd have

23   to consider whether the language you're asking us to use

24   comports with the language that was used during the course of

01:34:13  25   the trial.  And I'm not sure that it does.  I think the term

1    read through portions of the charge.  And you can have two

2    different versions, one with numbers and one without numbers.

3              THE COURT:  Are you contemplating making other

4    objections you haven't already made?

02:03:42  5              MR. KAVALER:  No, your Honor.  I believe we have to

6    do that to preserve our record.  I believe after you give the

7    instructions, we need to object to the inclusion of things

8    that we didn't want you to include and the exclusion of things

9    that you --

02:03:50 10              THE COURT:  No, you don't have to do that.  The

11   record will reflect that you've made those objections, and

12   they're preserved.  They're preserved without your having to

13   object after I read them.

14              Does the plaintiff have any problem with that

02:04:05 15   concept?

16              MR. BURKHOLZ:  No, your Honor.

17              MR. DOWD:  No, your Honor.  That's always --

18              THE COURT:  Do you waive any objection you would have

19   to them not having objected after the instructions were

02:04:13 20   actually read?

21              MR. DOWD:  Yes, your Honor, that's fine.

22              THE COURT:  Okay.

23              MR. KAVALER:  I'm simply referring to Rule 51(a) --

24   I'm sorry, (b)(2), which I believe imposes a duty on us, which

02:04:23 25   I guess your Honor can relieve us of and I gather has relieved

4697

1    us of with the plaintiffs' consent.  I want to be clear, I

2    don't want to hear later from the plaintiffs or anyone else

3    that there's some defect in the procedure because I'm quite

4    willing to comply with the rule.  The rule says the Court must

02:04:37 5    give the parties an opportunity to object on the record and

6    out of the jury's hearing before the instructions and

7    arguments are delivered.  And then it says in (c), objections,

8    how to make, a party who objects to an instruction or failure

9    to give an instruction must do so on the record stating

02:04:59 10    distinctly the matter objected to and the grounds for the

11    objection.

12         My understanding, your Honor, is that we have to

13    actually listen to the charge that you give and then go to the

14    sidebar and lodge those objections.  If you're telling me we

02:05:10 15    don't have to do that and if the plaintiffs are agreeing that

16    our failure to do that either at that point or elsewhere is

17    not any kind of an omission on our part or a waiver, I'll take

18    that into account.  But absent that, I believe we have to do

19    it.

02:05:22 20         THE COURT:  As a preliminary matter, you certainly

21    won't hear if from me.  I never object to my procedures.  I

22    think they're almost always right.

23         But let's just be clear.  I mean, if I deviate from

24    the instructions that I've given you prior to reading them to

02:05:40 25    the jury when I read them and you find that deviation

4698

```
             1   objectionable, that objection you have to make after I give
             2   the instruction.
             3        But if I give the instructions as I've given them to
             4   you -- and one of the reasons we have the final pretrial
02:05:52     5   conference is so you can make your record -- or the final jury
             6   instruction conference is so you can make your record.  And
             7   you've made your record as to the instructions that I've
             8   indicated I'm going to give, and you don't need to make your
             9   record again after I give them.  In fact, given the number of
02:06:07    10   objections, we might be here a long time if you want to object
            11   to all of them.
            12        MR. KAVALER:  That's why I wanted to do it by number,
            13   your Honor, given the amount of error.
            14        THE COURT:  Okay.  We'll relieve you of that
02:06:19    15   responsibility or pleasure, whichever it may be.
            16        MR. KAVALER:  Unfortunately it's a burden, your
            17   Honor, but I appreciate you relieving me of it.
            18        THE COURT:  Okay.
            19        Is there anything else anyone wishes to bring up?
02:06:42    20        MR. DOWD:  No, your Honor.
            21        MR. KAVALER:  No, your Honor.
            22        THE COURT:  Okay.  Then Monday at 9:00 o'clock, we
            23   will read the jury the instructions and send them back to
            24   deliberate.
02:06:54    25        Oh, do you want to have prepared whatever exhibits --
```

TAB 18

4769

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all    )
 4   others similarly situated,      )
                                     )
 5             Plaintiff,            )
                                     )
 6     vs.                           ) No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         ) Chicago, Illinois
 8             Defendants.           ) May 7, 2009
                                     ) 10:30 a.m.
 9
                              VOLUME 26
10                  TRANSCRIPT OF PROCEEDINGS – TRIAL
              BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
14                             BY:  MR. LAWRENCE A. ABEL
                                    MR. SPENCER A. BURKHOLZ
15                                  MR. MICHAEL J. DOWD
                                    MR. DANIEL S. DROSMAN
16                                  MS. MAUREEN E. MUELLER
                               655 West Broadway
17                             Suite 1900
                               San Diego, California  92101
18                             (619) 231-1058

19                             COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
20                             BY:  MR. DAVID CAMERON BAKER
                                    MR. LUKE O. BROOKS
21                                  MR. JASON C. DAVIS
                                    MS. AZRA Z. MEHDI
22                             100 Pine Street
                               Suite 2600
23                             San Francisco, California  94111
                               (415) 288-4545
24

25
```

4787

```
         1          THE CLERK:  02 C 5893, Jaffe v. Household

         2    International, Incorporated.

         3          THE COURT:  Folks, we have a note from the verdict --

         4    from the jury, which I just gave away.  The jury has reached a

02:09:17 5    verdict.

         6          Generally speaking, I now ask you if there's any

         7    reason why we shouldn't bring the jury out to return the

         8    verdict.  In this situation, I might also ask another

         9    question, which is, after the jury returns the verdict in open

02:09:34 10   court, it may be desirable to have them retire to the jury

         11   room while the Court reviews the verdict and allows -- raises

         12   with the attorneys any inconsistencies or improprieties that

         13   the Court finds, rather than having the jury sit out here.

         14   Then we can call them back in and announce the verdict to the

02:09:59 15   court.

         16          Does anybody have an objection to that process?

         17          MR. DOWD:  Not from the plaintiffs, your Honor.  We

         18   agree.

         19          MR. KAVALER:  I'm not sure I understood it, your

02:10:08 20   Honor.  You're going to review the verdict without showing it

         21   to us and you're going to decide --

         22          THE COURT:  Well, I always review the verdict without

         23   showing it to the attorneys.  The question is do we do it with

         24   the jury sitting here in the jury box or do we let them retire

02:10:20 25   back to the jury room.
```

4788

1          MR. KAVALER:  Certainly have them retire.  I'm simply

2     suggesting you may need a second round of the same thing after

3     you show it to us because depending on what it says, it may or

4     may not be immediately apparent to us if we have a response to

02:10:30 5    make on either side or we may need a few minutes to review it

6     and caucus ourselves, during which time it probably would be

7     advisable to keep the jury but -- send them back to the jury

8     room while counsel review the verdict form.

9          THE COURT:  At the risk of making complicated

02:10:47 10   something that ought not to be, here's what I envision the

11     process will be:  I'll call the jury out, ensure that they

12     have, in fact, reached a verdict, take the verdict from them,

13     ask them to retire to the jury room, review the verdict,

14     announce to you folks whether I find any problems or

02:11:05 15   improprieties.  If not, I will ask the jury to come back.  I

16     will then publish the verdict to the jury.  And at that point,

17     after it's been published, I will, as usual, ask you folks if

18     you have any motions to make before I discharge the jury.

19          MR. KAVALER:  All I'm saying, your Honor, is

02:11:20 20   depending on what you publish to us, at that point, we may

21     need a few minutes to figure out what to say.

22          THE COURT:  Okay.  If you feel you need that, you can

23     ask for it and then we can, I guess, ask the jury to retire

24     back to the jury room while you do that.

02:11:35 25        MR. KAVALER:  That was all I was suggesting, your

4789

```
          1    Honor.  Thank you.

          2              THE COURT:  All right.  Very well.

          3              Let's bring the jury out.

          4       (Jury in.)

02:12:27  5              THE COURT:  Good afternoon, ladies and gentlemen.

          6              Let me inquire:  Who speaks for the jury?

          7              JUROR MATONIK:  I do.

          8              THE COURT:  And you are Ms. Matonik?

          9              JUROR MATONIK:  Gail Matonik, yes.

02:13:39 10              THE COURT:  Ms. Matonik, has the jury reached a

         11    verdict?

         12              JUROR MATONIK:  Yes, we have.

         13              THE COURT:  And is the verdict unanimous?

         14              JUROR MATONIK:  Yes, it is.

02:13:45 15              THE COURT:  Will you please hand the verdict forms to

         16    the Court Security Officer.

         17       (Tendered.)

         18       (Brief pause.)

         19              THE COURT:  Ladies and gentlemen, ordinarily I

02:14:38 20    announce the verdict to the court.  But because I have to

         21    review the verdict form first, and it's such a long one, I'm

         22    going to ask you folks just to retire back to the jury room to

         23    give me a few minutes to do that.  And then we will call you

         24    right back out again.  All right.

02:14:57 25       (Jury out.)
```

4790

```
               1         THE COURT:  Be seated, folks.

               2    (Brief pause.)

               3         THE COURT:  Okay.  I have reviewed the verdict form.

               4    I find that it is filled out consistently and completely and

02:19:34       5    that it is signed and dated by all of the jurors.  It's my

               6    intention now to call the jury back and publish the verdict to

               7    the court.

               8         Bring the jury out.

               9    (Jury in.)

02:20:56      10         THE COURT:  Be seated.

              11         Ladies and gentlemen, I have reviewed the verdict

              12    form, and I have concluded that the verdict form is

              13    appropriately filled out with respect to all of the questions

              14    with the exception of question number four regarding damages.

02:21:56      15    So I'm not going to publish the verdict form at this time.

              16    I'm going to ask you to retire to the jury room.  I'm going to

              17    consult with the attorneys about a specific instruction to you

              18    with regard to that question.  And after we have done that, we

              19    will ask you with respect to that question to continue your

02:22:14      20    deliberations.

              21         Please retire to the jury room.

              22    (Jury out.)

              23         THE COURT:  Folks, the verdict form has been filled

              24    out correctly -- you may be seated -- with respect to all of

02:22:54      25    the issues except the direction under question number four,
```

4791

1      which requires the jury to write the amount of loss per share,

2      if any, that, according to the model you have chosen, any

3      defendant's conduct caused plaintiffs to suffer on each of the

4      dates set forth in Table B.

02:23:25  5              In that regard, it's the Court's opinion that the

6      amounts filled in by the jurors do not correspond to the

7      amounts in plaintiffs' exhibit which corresponds to the model

8      that they have indicated they have chosen to follow.

9              So there is an instruction needed to the jury

02:24:02 10      instructing them specifically how to correlate the -- how to

11      use the plaintiffs' exhibit that corresponds to the model of

12      damages that they have chosen.

13              I'm open to suggestions.

14              MR. KAVALER:  Your Honor, may we inquire:  Have they

02:24:25 15      checked any of the boxes under question four or none?  Or is

16      your point that there's a discrepancy --

17              THE COURT:  No, they have selected a model of

18      damages.  They have applied it to each and every date in

19      verdict form Table B.  But the amounts that they have filled

02:24:47 20      in does not appear to correspond to the amounts on the

21      plaintiffs' exhibit which corresponds to that particular

22      damages model.

23              Does that answer your question?

24              MR. KAVALER:  Yes, it does your Honor.  Thank you.

02:25:46 25              MR. DOWD:  Your Honor, our suggestion would be that

4792

1    the jurors be told if they've selected one of the two

2    plaintiffs' models of damages, that they should fill in the

3    amounts from the artificial inflation column in either 1397 or

4    1395.  I think there used to be language like that in question

02:26:09  5    four, and it was taken out; and maybe they got confused by the

6    columns.

7              THE COURT:  I think you might be right.  I did not

8    bring out here with me the two plaintiffs' exhibits that

9    correspond.  Do you have copies?

02:26:22 10              MR. DOWD:  I have one copy, your Honor.

11              THE COURT:  Okay.  All I have is partial exhibits.

12    (Tendered.)

13              MR. DOWD:  And they're not stapled.

14    (Brief pause.)

02:27:50 15              THE COURT:  Okay.  Well, it appears that the jury may

16    have understood the verdict form better than I did.  No, this

17    can be reconciled.  Folks, I'm going to bring them out and

18    announce the verdict.

19              Bring them out.

02:28:16 20    (Jury in.)

21              THE COURT:  Upon further review of the verdict form,

22    ladies and gentlemen, I feel that it is appropriately filled

23    out and I need only publish it now.

24              Please listen carefully as I publish your verdict to

02:29:43 25    the court.

4809

```
           1            MR. KAVALER:  Your Honor, I'm waiting to hear if
           2   Mr. Dowd has anything to say.
           3            MR. DOWD:  Not at this time, your Honor.  Did you
ask
           4   for a date for motions?
03:05:16   5            THE COURT:  Motions, yes.
           6            MR. KAVALER:  Your Honor, we will be making formal
           7   motions.  But at this time, I want to renew the 50(a)
motion.
           8   And specifically I want to observe to the Court that --
           9   there's a couple of points.  Professor -- the jury has
03:05:35  10   selected Professor Fischel's more dubious by far, legally
and
          11   economically, damage model to the exclusion of anything
else.
          12   So we renew the motion on that ground since that model, in
our
          13   view, is not legally permissible and cannot sustain a
          14   judgment.
03:05:48  15            Secondly --
          16            THE COURT:  Let me ask you to -- I mean, the record
          17   will reflect that you have reserved -- I'm ruling that
you're
          18   reserving any issues you wish to raise in a written motion.
          19   So how much time do you want to file a motion?  That's
really
03:06:04  20   what we need to --
          21            MR. KAVALER:  Your Honor, let me say this:  I won't
          22   repeat everything I've said previously.  And I appreciate
your
          23   Honor's comment.
          24            To the extent the jury has found against the
03:06:14  25   defendant Gilmer on restatement, I believe the record
contains
```