**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

| | |
|---|---|
| LAWRENCE E. JAFFE PENSION PLAN, On Behalf of Itself and All Others Similarly Situated,<br><br>                Plaintiff,<br><br>  vs.<br><br>HOUSEHOLD INTERNATIONAL, INC., et al.,<br><br>                Defendants. | Lead Case No. 02-C-5893<br>(Consolidated)<br><br><u>CLASS ACTION</u><br><br>Judge Ronald A. Guzman<br>Magistrate Judge Nan R. Nolan |

**<u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'<br>MOTION FOR ENTRY OF JUDGMENT</u>**

478252_3

## TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | STATEMENT OF FACTS | 2 |
| III. | ARGUMENT | 6 |
| IV. | CONCLUSION | 10 |

## TABLE OF AUTHORITIES

Page

**CASES**

*Backman v. Polaroid*,
   No. 79-1031 Mc, 1988 U.S. Dist. LEXIS 15834
   (D. Mass June 28, 1988) ..................................................................................8

*Boeing v. Van Gemert*,
   444 U.S. 472 (1980) ........................................................................................9

*Buchanan v. United States*,
   82 F.3d 706 (7th Cir. 1996) .............................................................................7

*In re Apollo Group Inc. Sec. Litig.*,
   No. CV-04-2147 PHX, 2008 WL 410625
   (D. Az. Feb. 13, 2008) ............................................................................2, 8, 10

*Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Ironworkers' Local
   Union 75 v. Madison Indus., Inc.*,
   733 F.2d 656 (9th Cir. 1984) ...........................................................................7

*Local 504 v. Roadmaster Corp.*,
   954 F.2d 1397 (7th Cir. 1992) .........................................................................9

*Parks v. Pavkovic*,
   753 F.2d 1397 (7th Cir. 1985) ..................................................................2, 8, 9

*Winston Networks, Inc. v. Indiana H.B.R. Co.*,
   944 F.2d 1351 (7th Cir. 1991) .........................................................................9

**STATUTES, RULES AND REGULATIONS**

Federal Rule of Civil Procedure
   Rule 50(b) .......................................................................................................10
   Rule 50(5)(b) ....................................................................................................8
   Rule 58 .............................................................................................................7
   Rule 58(a) ....................................................................................................7, 10
   Rule 58(b) .........................................................................................................7
   Rule 58(d) .....................................................................................................1, 7
   Rule 59 ............................................................................................................10
   Rule 62(b) ........................................................................................................10

**I.      INTRODUCTION**

Lead Plaintiffs respectfully request that the Court enter the attached judgment pursuant to Federal Rule of Civil Procedure 58(d).  *See* Proposed Judgment, attached hereto as Ex. A.  Lead Plaintiffs' request is driven by Household's financial condition and HSBC's express intention to ignore any judgment in this case.  In early 2009, HSBC announced it was abandoning its main business – making loans – shutting down almost all of Household's consumer lending operations and closing all 800 Household branch offices.  In addition, Household has been transferring billions in assets to other HSBC affiliates or subsidiaries, leaving Household itself in a precarious financial condition.  More importantly, Household and HSBC's public statements about this litigation suggest that they have no intention of ever honoring the jury's verdict in this case.  Household has repeatedly stated in its post-verdict SEC filings that it expects to prevail on its outstanding motions in this Court or on appeal in the Seventh Circuit.  And, to make matters worse, Household has refused to establish any litigation reserve for this case – despite the potential loss of in excess of $1 billion.  Household's parent company behaves no differently.  HSBC has consistently made statements in its SEC filings that it will contest the enforceability of any judgments obtained against it or its subsidiaries in American courts based on the civil liability provisions of United States securities laws despite the fact that it generates billions in revenues from U.S. citizens.  In short, this Court is faced with an arrogant, recalcitrant defendant, which refuses to admit wrongdoing and actively dissipates its assets – while thumbing its nose at the verdict and the American legal system.

As a result of all of these uncertainties, Lead Plaintiffs believe it is in the best interests of the Class to seek entry of judgment and require Household to post a bond equal to at least 50% of the potential total claims in this case.  As set forth in Plaintiff's Post-Verdict Submission, there should be no discovery of class members on the issue of defendants' rebuttal of the presumption of reliance.  Evidence from the trial clearly established that defendants did ***not*** share any adverse non-public

- 1 -

478252_3

information with any class member which is the only basis to rebut the presumption. *See* Plaintiffs' Post-Verdict Submission at 4-15 [Dkt. No. 1622].

Lead Plaintiffs' request is not without precedent. Entry of judgment after verdict and prior to resolution of post-trial motions and completion of the claims process was recently ordered by the Court in the *Apollo* securities case. *See Apollo* Jan. 30, 2008 Judgment.[1] In *Apollo*, a class action case, the jury returned a verdict in January 2008 of $5.55 per share in damages for each day of the Class Period. The *Apollo* trial court subsequently entered judgment. A week later the *Apollo* court required defendants to post a bond of $95 million, which was 50% of the estimated total claims of $190 million. *See In re Apollo Group Inc. Sec. Litig.*, No. CV-04-2147 PHX, 2008 WL 410625 (D. Az. Feb. 13, 2008), Burkholz Decl., Ex. 2. This Court should enter a similar order. *See also Parks v. Pavkovic*, 753 F.2d 1397 (7th Cir. 1985) (entry of judgment by trial court appropriate and appeal proceeds while trial court retains jurisdiction to determine the amount of each individual class member's claim). In addition to entering judgment, the Court should award prejudgment and post-judgment interest, approve the damages formula and plan of allocation to calculate class members' claims, and approve the notice to send to class members, as set forth in Plaintiffs' Post-Verdict Submission, which was filed on May 28, 2009. The Court can retain jurisdiction over the claims administration process and any subsequent request for attorneys' fees and costs, and to modify the judgment to reflect the total amount of the judgment after class members' claims are determined.

## II.    STATEMENT OF FACTS

On November 14, 2002, after this action was filed, defendant Household International, Inc. and HSBC Holdings plc announced a merger. Following shareholder approval of the transaction on

---

[1] Attached as Exhibit 1 to the Declaration of Spencer A. Burkholz in Support of Plaintiffs' Motion for Entry of Judgment ("Burkholz Decl."), filed herewith.

March 28, 2003, Household became a wholly owned subsidiary of HSBC by way of a stock-for-stock merger. In 2004, HSBC reorganized some of its subsidiaries, including Household. As a result, HSBC became the owner of HSBC North America Holdings Inc., which became the owner of Household, which was renamed HSBC Finance. Household 2009 Form 10-K, at 4, 25, Burkholz Decl., Ex. 3.[2]

On March 2, 2009, HSBC announced that it was going to close almost all of Household's consumer lending operations. To that end, HSBC wrote off 100 percent of the remaining $10.6 billion in goodwill it recorded when it acquired Household. HSBC also stopped writing any loans through Household, and announced it would close 800 branches and terminate approximately 6,100 employees, and that it would "run off" its loan business over the next few years. HSBC Holdings plc, Mar. 2, 2009 Form 6-K, at 12, Burkholz Decl., Ex. 4.

Household's only business is its credit card originations, and even a portion of that business is being sold off on a daily basis to HSBC Bank USA. September 30, 2009 Form 10-Q at 61, Burkholz Decl., Ex. 5. As a result, Household is no longer a "core" business of HSBC according to the rating agencies, who have lowered their ratings of Household debt due to concerns that HSBC will not continue to support Household's operations. Household 2009 Form 10-K at 31, Burkholz Decl., Ex. 3.

During an investor conference call on March 2, 2009, HSBC stated it wished it had never acquired Household. HSBC's CEO explained:

> As you know, we tell it as it is, and today will be no exception. Therefore, I say that with a benefit of hindsight the Group wishes that [we] hadn't made this investment [*i.e.*, hadn't acquired Household]. And that is recognized by the write-off in full of the goodwill arising on this deal. ***But we are where we are and we believe that the***

---

[2]    Lead Plaintiffs will continue to refer to HSBC Finance as Household in this memorandum of law.

> *majority of our shareholders wish us to collect these assets which are now non-core and then move on*.

HSBC Q4 2008 Conference Call Transcript dated March 2, 2009, at 8 (emphasis added), Burkholz Decl., Ex. 6. HSBC's CFO also stated that the fair value of Household's consumer loan assets was "minus mid-40s billion" (at that time) because there is no market for the assets. Conference Call Transcript at 17. The value of Household's remaining subprime assets cannot even support its operations. During the same call, HSBC's CEO explained "[a]s the revenues fall from a lower base of assets and impairments remain elevated, the next two years will be challenging, and further capital will need to be injected." *Id.* at 9.

Household remains in a precarious financial condition. It reported a net loss of $7.4 billion in 2009 (2009 Form 10-K at 23), and expects to generate losses for at least the next two years. 2009 Form 10-K at 28.[3]

Despite its financial problems – or more likely because of them – Household is transferring dividends to HSBC and assets to other HSBC affiliates. In January 2009, for example, Household made a bulk sale of $15.4 billion in better quality credit card and auto receivables to an HSBC affiliate, HSBC Bank USA. 2009 Form 10-K at 7, 8, 30, 51 (notes 3, 4), 204. As part of the agreement, all new credit originations are sold on a daily basis by Household to HSBC Bank USA – this amount was in excess of $11 billion in 2009. 2009 Form 10-K at 104. Household has made

---

[3]  Although Household reported in its 2009 Form 10-K that it had $94 billion in assets, with $86 billion in liabilities, the difference of $7.8 billion in net equity "value" is misleading because the overwhelming majority of Household's assets are its subprime mortgages and personal loans that are worth far less than their stated value. 2009 Form 10-K at 139. In fact, Household's recent 10-K reflects that the fair value of consumer receivables was minus $26 billion. (Carrying value of $76 billion versus fair value of $50 billion.) 2009 Form 10-K at 218.

similar transfers in the past.[4]  2008 Form 10-K, at 31, Burkholz Decl., Ex. 7; 2009 Form 10-K at 7, 8, 30, 51 (notes 3, 4), 204.

HSBC has stated that it will stand behind the bondholders of Household, even though its debts are non-recourse to HSBC.  *HSBC*, FT.com, Mar. 2, 2009, Burkholz Decl., Ex. 8.  However, there is no guarantee that HSBC will maintain this position and continue to fund Household which is dependent on such funding for its survival.  HSBC may allow Household to file bankruptcy, or continue to transfer all or most of its assets to other HSBC entities, or do a "bulk sale" of Household's mortgages and leave Household as a shell entity.  If any of these scenarios unfold, plaintiffs will become either unsecured creditors in a Household bankruptcy or face a shell entity, and potentially recover nothing from Household.  In fact, in a recent 10-Q, Household stated that there will be "further strategic actions that may include changes to our legal structure, additional asset sales."  September 30, 2009 Form 10-Q at 61.  Although Household claims it has "no intent to execute bulk sales of our run-off receivables," it also states that "should market pricing improve in the future, our intent may change."  2009 Form 10-K at 54.  In sum, Household could "wind down" its business next year by selling off its portfolio if conditions improve, resulting in minimal assets left over at Household.  The fact that Household's net receivables have declined from $98 billion at 12/31/08 to $78 billion at 12/31/09 – over 20% – increases the likelihood that Household could do a bulk sale which would wipe out Household's remaining assets.  The "run-off" mode would become "ran-off," with no assets for investors to collect.

And HSBC has made it clear that no matter what happens, it will desperately try to avoid paying the plaintiffs.  In its 2009 annual report, HSBC stated that a judgment in favor of plaintiffs is

---

[4]   In 2008, Household sold 19.3 billion of credit card receivables to HSBC Bank USA.  Household 2009 10-K at 104.

unenforceable against HSBC even though HSBC purchased the assets and liabilities of Household – including the contingent liability of this case, stating:

> [I]t may not be possible . . . to enforce judgments obtained in US courts against [HSBC directors and executive officers] or HSBC Holdings based on civil liability provisions of the securities laws of the US. There is doubt as to whether English courts would enforce:
>
> - certain civil liabilities under US securities laws in original actions; or
> - judgments of US courts based upon these civil liability provisions.

HSBC Holdings plc, 2009 Annual Report, at 472, Burkholz Decl., Ex. 9. In short, plaintiffs can expect HSBC to fight every action to hold them responsible for the judgment in this case.

Finally, Household refuses to accept the jury's verdict. In its recent 10-K, Household stated that "[d]espite the verdict at the District Court level, we continue to believe, after consultation with counsel, that neither Household nor its former officers committed any wrongdoing and that we will either prevail on our outstanding motions to dismiss or that the Seventh Circuit will reverse the trial Court verdict upon appeal." Household 2009 Form 10-K at 221. Household also has refused to establish any litigation reserve as a result of the verdict. *Id.* Household's decision is an extraordinary one. In stark contrast, Vivendi Corporation, the defendant in another securities class action lawsuit, recently took a litigation reserve of 550 million Euros following a January 29, 2010 per share verdict of $.13 to $10.00, despite its statement that it intends to appeal the verdict. *See Vivendi* Disclosure at 10, 145, Burkholz Decl., Ex. 10.

### III. ARGUMENT

The jury found that defendants Household International, William Aldinger, David Schoenholz, and Gary Gilmer violated the federal securities laws and determined per share damages for the period March 23, 2001 through October 11, 2002 ("Damage Period"). The only remaining uncertainty is the total amount of valid claims that will be filed by class members. Lead Plaintiffs estimate that defendants will be obligated to pay somewhere between $2.4-$3.2 billion to class

- 6 -

members. *See* Second Supplemental Declaration of Bjorn Steinholt, CFA ("Steinholt Decl."), ¶¶2-18, Burkholz Decl., Ex. 11. Although this sum certain will not be finalized until the completion of the claims process (which could take 1-2 years depending on a number of factors), judgment should be entered now, and a bond required to protect the verdict.

Federal Rule of Civil Procedure 58(d) provides that "[a] party may request that judgment be set out in a separate document as required by Rule 58(a)." Rule 58(a), in turn, provides that "[e]very judgment and amended judgment must be set out in a separate document," but for certain exceptions not relevant here. "Rule 58 is designed to encourage all reasonable speed in formulating and entering the judgment when the case has been decided." Fed. R. Civ. P. 58 Advisory Committee Note, 1963 Amendment.

Pursuant to Federal Rule of Civil Procedure 58(b), judgment should be entered when the jury returns a general verdict. The Seventh Circuit explained that a judgment is final when it specifies "either the amount of money due the plaintiff or a formula by which that amount of money could be computed in mechanical fashion." *Buchanan v. United States*, 82 F.3d 706, 707 (7th Cir. 1996). Here, the jury has already determined per share inflation for each day that Household's stock was affected by defendants' fraud (March 23, 2001 through October 11, 2002). The amount of money due the plaintiffs and class members can be calculated by the claims administrator using a straightforward, mechanical damage formula determined by the Court. Plaintiffs submitted a proposed damage formula and plan of allocation to the Court in Plaintiffs' Post-Verdict Submission, which was filed on May 28, 2009. Thus, entry of final judgment is appropriate in this case.[5]

---

[5] For the purposes of overseeing the claims procedure, this Court should retain jurisdiction over the claims procedure as well as the nature and amount of the distribution to be made to members of the Class who file valid claims. This Court should also retain jurisdiction over any award to the class representatives and their counsel of attorneys' fees and costs in this action. *See, e.g., Int'l Ass'n of Bridge, Structural,*

- 7 -

478252_3

Where a per-share damages award is determinable based upon a jury's verdict, judgment may be entered. This case mirrors *In re Apollo Group Inc. Securities Litigation* in which the District Court of Arizona entered judgment in favor of plaintiffs even though the total dollar amount of the judgment could not be determined. *In re Apollo Group Inc. Sec. Litig.,* Judgment, No. 2:04-cv-02147-JAT (D. Az. Jan. 30, 2008). In *Apollo*, the judgment was based on a per-share damages award identical to the per-share damages award in this case. *In re Apollo Group Inc. Sec. Litig.*, No. 2:04-cv-02147-JAT, 2008 WL 410625, at *1 (D. Az. Feb. 13, 2008) (order granting stay of execution) ("On January 30, 2008, this Court entered judgment jointly and severally against Defendants in an amount up to $5.55 per share for all qualifying shares. Because of the per-share nature of the damages, the total amount of this judgment will not be known until the claims process is completed.").[6] Similar to *Apollo*, in the present case the jury found damages on a per-share basis for the Damages Period. This Court has discretion to enter judgment in favor of plaintiffs based on the per-share dollar amount of damages found by the jury.[7]

*Apollo* does not stand alone. In *Parks*, 753 F.2d 1397, the Seventh Circuit approved a similar judgment entered by the trial court. In *Parks*, a class action on behalf of handicapped children and their parents, the state was ordered to reimburse class members for certain living expenses. *Parks*, 753 F.2d at 1401. The trial court did not compute the amount of reimbursement due, but the appeals

---

*Ornamental & Reinforcing Ironworkers' Local Union 75 v. Madison Indus., Inc.*, 733 F.2d 656, 658-59 (9th Cir. 1984) (judgment on merits is final where court reserves question of fees for later consideration).

[6] In another securities class action case tried to a jury, the district court entered judgment following a verdict of $9.75 per share. *Backman v. Polaroid*, No. 79-1031 Mc, 1988 U.S. Dist. LEXIS 15834 (D. Mass June 28, 1988). Although the jury verdict in *Backman* was later *reversed on other grounds* at 910 F.2d 10 (1st Cir. 1990), a copy of the original judgment is submitted herewith for the Court's consideration. Burkholz Decl., Ex. 12.

[7] In *Apollo*, seven months after judgment, the court granted defendants' motion for judgment under Rule 50(5)(b). *See Apollo* Aug. 4, 2008 Order, Burkholz Decl., Ex. 13.

court was informed it was between $1.5 million and $3 million. *Id*. The Seventh Circuit Court of Appeals found that the entry of judgment in these circumstances was proper and that it had jurisdiction over the appeal. The Court held "if the determination of damages will be mechanical and uncontroversial, so that the issues the defendant wants to appeal before that determination is made are very unlikely to be mooted or altered by it – in legal jargon, if only a 'ministerial' task remains for the district court to perform – then immediate appeal is allowed." *Id*. (citing *Boeing v. Van Gemert*, 444 U.S. 472, 479 (1980)). In this case, defendants' liability has been determined and a proposed damages formula and plan of allocation has been submitted to the Court for consideration. If this Court adopts the damages formula and plan of allocation, the claims administrator can simply follow this Court's "ministerial" task of determining each class member's claim.

Similarly, in *Local 504 v. Roadmaster Corp.*, 954 F.2d 1397 (7th Cir. 1992), the Seventh Circuit followed the *Parks* rule and affirmed entry of judgment even when the judgment failed to fix the precise amount of damages. *Id.* at 1402. In *Roadmaster*, the district court ruled that defendants' amendments to the company pension plan were invalid, and ordered defendants to pay past benefits back into the plan but did not quantify the amount. *Id.* at 1401. The court held that the amount of benefit was set by a formula in the plan and the post-judgment calculation of accrual benefits would not make the appeal moot or affect the issues on appeal. *Id.* at 1402. *See also Winston Networks, Inc. v. Indiana H.B.R. Co.*, 944 F.2d 1351, 1356 (7th Cir. 1991) (upholding jurisdiction and finding the district court's entry of "final" judgment proper even though the district court retained jurisdiction for the purpose of calculating damages).

In short, HSBC is intentionally winding down Household's business and transferring or selling off more valuable Household assets. As set forth above, HSBC's actions may affect plaintiffs' ability to ultimately obtain relief if judgment is not entered and defendants are not forced

- 9 -

to post a bond soon. Entry of judgment will protect the Class and allow the appellate process to commence.[8]

**IV. CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court enter judgment in this action pursuant to Federal Rule of Civil Procedure 58(a).

DATED: March 22, 2010

Respectfully submitted,

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
PATRICK J. COUGHLIN (111070)
MICHAEL J. DOWD (135628)
SPENCER A. BURKHOLZ (147029)
DANIEL S. DROSMAN (200643)
MAUREEN E. MUELLER (253431)


              /s/ SPENCER A. BURKHOLZ
             SPENCER A. BURKHOLZ

---

[8] Should the Court enter judgment in favor of plaintiffs as requested, plaintiffs anticipate that defendants will file a motion for stay of execution pending the Court's disposition of defendant's consolidated Rule 50(b) and 59 motion and the class member claims process. If a stay is granted, plaintiffs request that defendants be required to post a proper security as expressly contemplated by Rule 62(b). A bond is needed to protect plaintiffs' interests during the pendency of the post-trial motions and claims process. Since this case involves a per-share judgment, the value of the security should be based on an estimate of the judgment determined by the expected number of qualifying shares and the expected number of claims that will be submitted. In the *Apollo* securities class action case, the Court required defendants to post a bond of $95 million based on the jury's findings of $5.55 per-share damages multiplied by the number of qualifying shares and a claim recovery rate of 50%. *In re Apollo Group*, 2008 WL 410625, at *2. Because this case involves a high percentage of institutional investors, which historically turn in a higher percentage of claims than individual investors, a claims rate at least as high as the 50% predicted in *Apollo* should be expected. Total damages in this case are estimated to be $3.2 billion – not including prejudgment interest. *See* Steinholt Decl., ¶2-18. Applying a 50% claims rule would result in total claims of $1.6 billion, not including prejudgment interest. Plaintiffs therefore believe a total bond of at least $1.6 billion should be required as security for judgment pursuant to Rule 62(b).

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
LUKE O. BROOKS (90785469)
JASON C. DAVIS (253370)
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiffs

MILLER LAW LLC
MARVIN A. MILLER
LORI A. FANNING
115 S. LaSalle Street, Suite 2910
Chicago, IL  60603
Telephone:  312/332-3400
312/676-2676 (fax)

Liaison Counsel

LAW OFFICES OF LAWRENCE G.
  SOICHER
LAWRENCE G. SOICHER
110 East 59th Street, 25th Floor
New York, NY  10022
Telephone:  212/883-8000
212/355-6900 (fax)

Attorneys for Plaintiff

- 11 -

478252_3

DECLARATION OF SERVICE BY ELECTRONIC MAIL AND BY U.S. MAIL

I, the undersigned, declare:

1. That declarant is and was, at all times herein mentioned, a citizen of the United States and employed in the City and County of San Diego, State of California, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2. That on March 22, 2010, declarant served by electronic mail and by U.S. Mail to the parties the MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR ENTRY OF JUDGMENT.

The parties' email addresses are as follows:

| | |
|---|---|
| TKavaler@cahill.com<br>PSloane@cahill.com<br>PFarren@cahill.com<br>LBest@cahill.com<br>DOwen@cahill.com | NEimer@EimerStahl.com<br>ADeutsch@EimerStahl.com<br>MMiller@MillerLawLLC.com<br>LFanning@MillerLawLLC.com |

and by U.S. Mail to:

| | |
|---|---|
| Lawrence G. Soicher, Esq.<br>Law Offices of Lawrence G. Soicher<br>110 East 59th Street, 25th Floor<br>New York, NY 10022 | David R. Scott, Esq.<br>Scott & Scott LLC<br>108 Norwich Avenue<br>Colchester, CT  06415 |

I declare under penalty of perjury that the foregoing is true and correct. Executed this 22nd day of March, 2010, at San Diego, California.

                                                                        /s/ Mo Maloney
                                                                          Mo Maloney