IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| LAWRENCE E. JAFFE PENSION | ) | |
| PLAN, on Behalf of Itself and All Others | ) | |
| Similarly Situated, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 02 C 5893 (Consolidated) |
| | ) | |
| HOUSEHOLD INTERNATIONAL, INC., | ) | Judge Ronald A. Guzmán |
| MERRILL LYNCH, PIERCE, FENNER, | ) | |
| & SMITH, INC., GOLDMAN SACHS & | ) | |
| CO., INC., ARTHUR ANDERSEN, L.L.P., | ) | |
| WILLIAM F. ALDINGER, DAVID A. | ) | |
| SCHOENHOLZ, GARY GILMER, | ) | |
| J.A. VOZAR, ROBERT J. DARNALL, | ) | |
| GARY G. DILLON, JOHN A. | ) | |
| EDWARDSON, MARY JOHNSTON | ) | |
| EVANS, J. DUDLEY FISHBURN, | ) | |
| CYRUS F. FREIDHEIM, LOUIS E. LEVY, | ) | |
| GEORGE A. LORCH, JOHN D. | ) | |
| NICHOLS, JAMES B. PITBLADO, | ) | |
| S. JAY STEWART, and LOUIS W. | ) | |

| SULLIVAN, | ) |
| | ) |
| **Defendants.** | ) |

## **MEMORANDUM OPINION AND ORDER**

Before the Court are the parties' submissions regarding post-verdict Phase II of this case. This Order addresses the parties' concerns and creates the protocol for Phase II, as well as the appropriate method of calculating damages with respect to each class member's claims.

## **Background**

On May 7, 2009, the jury found that defendants Household International, Inc., William Aldinger, David Schoenholz and Gary Gilmer violated 15 U.S.C. § 78(j)(b) ("§ 10(b)") of the Exchange Act of 1934 ("1934 Act")), and 17 C.F.R. § 240.10b-5 ("Rule 10b-5") and 15 U.S.C. § 78(t)(a) ("§ 20(a)") with respect to statements made from March 23, 2001 to October 11, 2002. In addition, the jury determined the inflation per share from March 23, 2001 to October 11, 2002.

We now move to Phase II of the class action. Previously, Magistrate Judge Nan R. Nolan bifurcated class discovery and held that discovery as to any individual plaintiff's reliance would occur after a determination of class-wide liability and the applicability of the fraud-on-the-market theory. Neither party filed objections to that ruling. Accordingly, Phase II shall address the issue of defendant's rebuttal of the presumption of reliance as to particular individuals as well as the calculation of damages as to each plaintiff. In creating a Phase II

2

protocol, this Court receives very little guidance from other courts because securities fraud class actions have rarely proceeded to trial, let alone reached subsequent proceedings. *See, e.g.*, *Edward J. Bartolo Corp. v. Coopers & Lybrand*, 928 F. Supp. 557, 560 (W.D. Pa. 1996).

On one hand, plaintiffs contend that the only remaining tasks are implementing the procedure by which defendants will exercise the right to rebut the presumption of reliance and determining the formula for calculating class members' claims and calculating damages. Plaintiffs ask the Court to approve a notice to be sent to class members advising them of the verdict and their right to file a claim for recovery along with an interrogatory addressing the issue of reliance.

On the other hand, defendants argue that due process guarantees their right to a jury trial as well as pretrial discovery regarding the contested individual issues of reliance. Defendants contend that there is no reasonable substitute for the consideration of class members' actual trading history to quantify damages.

## Discussion

### I.  Rebutting the Presumption of Reliance

Having prevailed on their fraud-on-the-market theory, plaintiffs are entitled to a presumption of reliance. *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988). In *Basic*, the Court explained the fraud-on-the-market doctrine as follows:

An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market

price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action. *Id.* The fraud-on-the-market doctrine provides "a practical resolution to the problem of balancing the substantive requirement of proof of reliance in securities cases against the procedural requisites of [Federal Rule of Civil Procedure] 23." *Id*. at 242 (alteration in original). Following *Basic*, the Seventh Circuit has explained that the reliance required for a Rule 10b-5 action is not reliance as used in the lay sense of the term:

> "[R]eliance" is a synthetic term. It refers not to the investor's state of mind but to the effect produced by a material misstatement or omission. Reliance is the confluence of materiality and causation. The fraud on the market doctrine is the best example; a material misstatement affects the security's price, which injures investors who did not know of the misstatement.

*Eckstein v. Balcor Film Investors*, 58 F.3d 1162, 1170 (7th Cir. 1995).

> When someone makes a false (or true) statement that adds to the supply of available information, that news passes to each investor through the price of the stock. And since all stock trades at the same price at any one time, every investor effectively possesses the same supply of information. The price both transmits the information and causes the loss.

*Schleicher v. Wendt*, __ F.3d ____, No. 09-2154, 2010 WL 3271964, at *1 (7th Cir. Aug. 20, 2010). Thus, when the fraud-on-the-market theory applies, "the plaintiff has indirect knowledge of the misrepresentation or omission underlying the fraud. He is reacting to a change in price, and the change was induced by a misrepresentation, so he receives as it were the distant signal of the misrepresentation and acts in response to it." *Hartmann v. Prudential Ins. Co. of Am.*, 9 F.3d 1207, 1213 (7th Cir. 1993). Accordingly, "[w]hen a company's stock trades in a large and

4

efficient market, the contestable elements of the Rule 10b-5 claim reduce to falsehood, scienter, materiality, and loss." *Schleicher*, 2010 WL 3271964, at *1.

In order to rebut the presumption of reliance, defendants must show that in purchasing Household shares, class members did not rely on the integrity of Household's stock price. The *Basic* Court said a defendant could rebut the presumption by making a showing that: (1) "the 'market makers' were privy to the truth . . . , and thus that the market price would not be affected by [defendants'] misrepresentations"; (2) the truth had "credibly entered the market and dissipated the effects of the misstatements"; or (3) something severed "the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff." *Id*. at 248-49.

At trial, defendants addressed the first two methods when they raised a "truth-on-the-market" defense and attempted to prove that the truth about Household's predatory lending practices and credit quality manipulation was well known. (*See* Trial Tr. at 1264:21-23 (testimony by Gary Gilmer, then-Vice-Chairman of Consumer Lending and Group Executive of U.S. Consumer Finance, that there was a discussion in the marketplace about Household's use of prepayment penalties); *id.* at 1266:20-1269:2 (discussing press coverage of Household's use of origination points); *id.* at 1268:25-1269:3 ("A: It is true that the things that we have been discussing were well publicized. Q: No secret. A: None whatsoever."); *id.* at 1287:11-1288:3 (stating that Household never "hid" the fact that it often placed a second mortgage on top of first mortgages); *id.* at 1292:7-15 (discussing that the market was aware of Household's use of the high loan-to-value ("LTV") loan (loan amount that exceeds or nearly exceeds the value of the house that is used as collateral); *id.* at 1308:6-10 (testifying that the "world knew" that Household loans had prepayment penalties); *id.* at 1385:8-1387:20 (stating that the market was aware that Household utilized incentive compensation methods with its employees); *id.* at

1283:9-17 (discussing analyst report recommending "sell" due to ACORN lawsuit and questioning Household's lending practices); *id.* at 1284-1286:21 (stating information about the ACORN lawsuit was "out in the marketplace" and "available to the shareholders"); *id.* at 1341:17-1345:7 (testifying that Household's lending practices were criticized routinely in the press); *id.* at 1391:10-1394:15 (stating that there was discussion "in the press and in the marketplace about Household's customer complaints"); *id.* at 1403:22-1406:3 (testifying that investors knew that Household faced headline risk); *id.* at 1410:5-1412:7 (stating that there was an awareness in the marketplace that Household was facing a "more onerous regulatory environment"); *id.* at 1711:4-20, 1713:6-10; (discussing that investors knew about the debate in the market on the subject of predatory lending, knew what Household's products were, knew that Household's employees violated Company policy and knew that state and federal regulators "were on to that"); *id.* at 2133:16-23 (stating that Household's one-payment reage and automatic reage policies were disclosed to the public in securitization documents); *id.* at 2137:5-18; 2152:16-2153:4 (testimony by David Schoenholz, then-President and COO and Chairman of the Board, stating that Household utilized a "two-pronged disclosure approach" regarding its re-aging policies in 2002); *id.* at 2147:13-22, 3265:22-3266:2 (arguing that Household's reage policies were explained to the investment community at the April 9, 2002 Financial Relations Conference); *id.* at 3085:8-15 (testimony by William Aldinger, then-CEO and Chairman of the Board, explaining that "professional investors — and individual investors, in fact — rely on [analyst] reports," such as the Legg Mason report, in making their investment decisions."); *id.* at 3100:12-14 (stating that it was his "understanding that a document filed with the SEC is available to everybody"); *id.* at 3156:17-3158:9 (testifying that while there was no disclosure in the 2001 Form 10-K of Household's one-payment practice, this practice was disclosed in a

November 12, 1999 securitization prospectus); *id.* at 3158:13-3159:24 (explaining that while Household did not disclose its automatic reage practice in the 2001 Form 10-K, the practice was disclosed in a securitization document filed with the SEC on August 3, 2001); *id.* at 3159:23-24 (stating, "It's hard to conceal anything that you've filed with the SEC. It's a public record after that."); *id.* at 3185:2-3193:21 (discussing the Legg Mason analyst report that analyzed Household's use of high LTV loans and other Household lending practices); *id.* at 3251:24-3254:23 (arguing that Household had been disclosing its re-aging policies for quite some time); Defs.' Trial Ex. ("Defs.' Ex.") 91 (analyst report discussing Household's growth strategy of writing the largest home equity loan it prudently could write); Defs.' Ex. 222 (Salomon Smith Barney analyst report discussing Household's predatory lending-rebated headline risk); Defs.' Ex. 338 (*American Banker* article discussing Household's predatory lending-related headline risk); Defs.' Ex. 230 (discussing Goldman Sachs analyst report that defendants claim made the market aware of Household's incentive compensation programs); Defs.' Ex. 534 (analyst report discussing lawsuit filed by ACORN); Defs.' Ex. 613 (newspaper article discussing ACORN complaints); Defs.' Ex. 624 (news article questioning predatory lending); Defs.' Ex. 695 at HHT0002335 (stating that "[d]elinquent accounts may be restructured (deemed current) every six months. Accounts are automatically restructured if the customer has made the equivalent of one payment equal to at least 95% of a full standard payment. Once restructured, the account is deemed current; however, the credit limit is zero."); Defs.' Ex. 852 at F11-ITOO15798 ("Our policies . . . permit reset of the contractual delinquency status of an account to current, subject to certain limits, if a predetermined number of consecutive payments has been received and there is evidence that the reason for the delinquency has been cured."); Defs.' Ex. 880 at HHTOO17968 (providing that "[t]he master servicer may in its discretion . . . treat a home equity loan as current

if the borrower has made one scheduled payment to cure the delinquency status of the home equity loan").

Throughout the trial, defendants presented evidence that the investors in Household stock were among the most sophisticated in the world and could not have been fooled by the alleged misrepresentations regarding Household's predatory lending and re-aging practices and their impact on its credit quality. Unfortunately for defendants, however, the jury concluded otherwise. The jury found that defendants made material false statements or omissions and caused plaintiffs' economic loss on a class-wide basis, in other words, that the truth did not enter the market and dissipate the effects of defendants' false statements or omissions. Thus, the issues with regard to the first two of the three methods of rebutting the presumption of reliance have been litigated and defendants will not be afforded a second bite at the apple, regardless of how they frame the issue.

As to the third method of rebutting the presumption of reliance, however, Phase II will afford defendants an opportunity to rebut the presumption using the third method set forth in *Basic*, *i.e.*, that the link between the alleged misrepresentations and either the price received or paid by the plaintiff was severed. Plaintiffs argue that it is difficult to imagine a circumstance in which a class member would have purchased Household stock with actual knowledge of defendants' fraud and that there is no basis to believe that any class member did so. The Court agrees. The evidence establishes that defendants did not provide any material nonpublic information to any investors (except Wells Fargo). Thus, there is no evidence that any class member purchased Household stock with actual knowledge that its price had been artificially inflated by defendants' fraud. However, that does not foreclose the remote possibility that some

class member may have purchased Household stock for a reason totally unrelated to its value as reflected by the market price.

Accordingly, the Notice and Preliminary Claim Questionnaire to plaintiffs will require each class member to answer, under the penalty of perjury, the following question:

> If you had known at the time of your purchase of Household stock that defendants' false and misleading statements had the effect of inflating the price of Household stock and thereby caused you to pay more for Household stock than you should have paid, would you have still purchased the stock at the inflated price that you paid? YES ___ NO ___.

(Court's Modified Proof of Claim and Release.) This question goes to the heart of the issue of individual reliance.[1] If the answer is "no," it does not matter whether the individual plaintiff purchased or sold any Household share (1) via an options contract, (2) as a day trader, (3) to hedge another tracking strategy, (4) through an automatic dividend reinvestment program or (5) pursuant to a proprietary trading model. However, if the answer is "yes," defendants will have evidence that helps them rebut the presumption of reliance. Defendants may issue additional interrogatories to plaintiffs answering "yes" to obtain convincing proof that price paid no part whatsoever in their decision-making. This protocol sensibly resolves the tension between the rebuttable presumption of reliance and the practicalities and purposes behind Federal Rule of Civil Procedure 23.

There is one exception to this protocol: Wells Fargo. Defendants already have reason to suspect that Wells Fargo, as part of its due diligence investigation of a potential (but

---

[1] Defendants concede that they have no incentive to waste time and money on examining small shareholders who do not indicate that they would have purchased stock regardless of whether they knew of defendants' false and misleading statements.

unconsummated) merger with Household in 2002, was privy to non-public information regarding Household's pervasive and aggressive write-off, expense deferral and re-aging policies, which ultimately scotched the merger. As to Wells Fargo, the Court will allow discovery as to whether its knowledge of these policies in 2002 severs the link between Household's misrepresentations and either the price received (or paid) by Wells Fargo for Household stock. Defendants will be permitted to proceed with discovery as to Wells Fargo without waiting for Wells Fargo to return its completed questionnaire.

## II.     Calculating Damages

### A.     The Netting Approach

Next, the Court addresses threshold damages issues with regard to the calculation of the class members' claims. Although damages cannot be based on pure speculation, they need not be calculated with mathematical precision. *Hoefferle Truck Sales, Inc. v. Divco-Wayne Corp.*, 523 F.2d 543, 553 (7th Cir. 1975); *see, e.g.*, *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 383 (7th Cir. 1986) ("Speculation has its place in estimating damages, and doubts should be resolved against the wrongdoer."). The parties agree that the correct measure of damages in a Rule 10b-5 case is out-of-pocket loss. *See Associated Randall Bank v. Griffen, Kubik, Stephens & Thompson, Inc.*, 3 F.3d 208, 214 (7th Cir. 1993); 5E ARNOLD S. JACOBS, *Out of Pocket Measure of Damages*, *in* DISCLOSURE AND REMEDIES UNDER THE SECURITIES LAWS § 20:7 (2010). Under this measure, damages are defined as the difference between the purchase price and the price that would have been received but for the alleged fraud. *Harris Trust & Sav. Bank v. Ellis*, 810 F.2d 700, 706-07 (7th Cir. 1987). Defendants argue that recovery should be

limited to "actual damages," which would require plaintiffs' out-of-pocket losses to be netted against any of plaintiffs' inflationary gains attributable to defendants' fraud. (Defs.' Resp. 8. (arguing that actual damages are calculated by netting inflation-related gains against losses).) Plaintiffs argue that gains made with respect to the sale of shares are irrelevant because their claims are based on losses that resulted solely from purchases (as opposed to sales) of Household shares. (Pls.' Post-Verdict Submission 18.; *see In re Schering-Plough Corp. Sec. Litig.*, No. 1-029, 2003 U.S. Dist. LEXIS 26297, at *26 (D.N.J. Oct. 9, 2003).

While the Seventh Circuit has yet to address whether out-of-pocket damages are limited to "actual damages" in Rule 10b-5 cases, the Second, Fifth, Ninth and Tenth Circuits have held that they are and require that plaintiffs' losses be netted against their profits attributable to the same fraud.[2] *See Byrnes v. Faulkner, Dawkins & Sullivan*, 550 F.2d 1303, 1313-14 (2d Cir. 1977); *Abrahamson v. Gleschner*, 568 F.2d 862, 878-79 (2d Cir. 1976); *Blackie v. Barrack*, 524 F.2d 891, 908-09 (9th Cir. 1975) (holding that if the stock is resold at an inflated price the purchaser-seller's damages should be offset by any profits recovered due to inflation in the stock price attributable to the fraud); *Wolf v. Frank*, 477 F.2d 467, 478-79 (5th Cir. 1973); *Richardson v. MacArthur*, 451 F.2d 35, 43-44 (10th Cir. 1971). Courts in this district have also generally held that damages should be offset by any inflationary gains attributable to the defendant's fraud. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 599 (N.D. Ill. 2009) (netting plaintiffs' losses with gains from inflated stock prices attributable to fraud); *In re Comodisco Sec. Litig.*, 150 F. Supp. 2d 943, 945-46 (N.D. Ill. 2001) (holding the same). This Court agrees that in a Rule 10b-5 action out-of-pocket damages should be limited to actual damages because it is a better measurement of the true economic loss sustained by plaintiffs due to defendants'

---

[2] These courts said that conclusion was dictated by the Securities Exchange Act of 1934, which states that "no person . . . shall recover, [] a total amount in excess of his *actual damages* on account of the act complained of." § 78bb(a) (emphasis added). Rule 10b-5 does not endorse any specific theory or methodology of quantifying economic loss.

fraud.  *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (stating that securities laws are not designed to provide investors with insurance against market losses, but to protect them against economic losses that misrepresentations actually cause); *Arenson v. Broadcom Corp.*, No. SA CV 02-301GLT, 2004 WL 3253646, at *2 (C.D. Cal. Dec. 6, 2004) (holding that where a plaintiff engages in multiple purchases and sales during the period in which the stock is inflated, the proper damages methodology is to take all the inflation losses resulting from all purchases at the inflated price and reduce this amount by all the inflation gain resulting from all sales at the inflated price); *see also* Frank H. Easterbrook & Daniel R. Fischel, *Optimal Damages in Securities Cases*, 52 U. CHI. L. REV. 611, 651-52 (1985) (basing damages on the net harm that an offender's acts cause should achieve optimal deterrence).  Therefore, this Court holds that out-of-pocket damages are limited to actual damages such that plaintiffs' losses must be netted against any of their profits attributable to the same fraud.

The jury has already determined the per share inflation for each day Household's stock was affected by defendants' fraud—March 23, 2001 through October 11, 2002 ("Damages Period").  Accordingly, the measure of each plaintiff's out-of-pocket damages depends on when, and if, he bought and sold shares during the Damages Period.  Consistent with the standard set forth above, damages in this case will be as follows:  (1) for shares purchased during the Damages Period but not sold, damages will be the amount of artificial inflation at the time of purchase; (2) for shares purchased before the class period and sold during the Damages Period at a gain or a loss damages will be plaintiff's out-of-pocket loss less any gain obtained or loss avoided because of  artificial inflation at the time of the sale; and (3) for shares purchased during the Damages Period, damages will be the artificial inflation at the time of purchase less the artificial inflation at the time of sale.

Further, plaintiffs' damages will be limited by the mathematical formula provided in the 90-Day Bounce Back Rule. The Private Securities Litigation Reform Act of 1995 ("PSLRA") 90-Day Bounce Back Rule provides that damages:

> [S]hall not exceed the difference between the purchase . . . price paid . . . by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market.

§ 78u-4(e)(1). For purposes of the 90-Day Bounce Back Rule, the "mean trading price" of a security shall be an average of the daily trading price of that security, determined as of the close of the market each day during the 90-day period. § 78u-4(e)(3).

Here, the 90-day period begins on October 11, 2002, the date the jury found defendants' fraud no longer affected Household's stock. Consistent with the formula set forth above, recoverable damages in this case will be limited by the 90-Day Bounce Back Rule as follows: (1) no limitation for Household shares sold prior to October 11, 2002; (2) for Household shares sold during the 90-Day Bounce Back period from October 11, 2002 through January 8, 2003, damages will be limited to the purchase price per share less the average closing price from October 11, 2002 through the day of the sale; and (3) for Household shares retained at the end of January 8, 2003, damages will be limited to the purchase price per share less the 90-day average closing price from October 11, 2002 through January 8, 2003. § 78u-4(e)(1)-(3).

### B. FIFO v. LIFO

The parties also disagree as to the appropriate method for matching purchases and sales when a shareholder has engaged in multiple transactions. Here, the parties propose two

opposing theories for matching transactions: the first-in first-out ("FIFO") method and the last-in first-out ("LIFO") method. Each method, however, clearly favors one party over the other. The LIFO method favors the defendants by taking into consideration gains that might have accrued to plaintiffs during the class period. *See In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 101-02 (S.D.N.Y. 2005) (explaining that LIFO leads to lower damages by offsetting gains). Under LIFO, sales of the defendant's stock during the class period are matched against the last shares purchased. *Id.* at 102. Because both the purchase and sale occurred during the class period, it is likely that both transactions were affected by the fraud. *See id.* Thus, any gains that might have accrued to plaintiffs through the sale of stock during the class period because of fraud related inflation in the stock price are offset from plaintiff's total losses during the class period, thereby lowering plaintiff's total damages. *Id.*

The FIFO method, however, often gives plaintiffs a windfall by not taking into consideration gains they obtained from sales of stock during the class period at a price that was inflated by fraud. *In re Schering-Plough.*, 2003 U.S. Dist. Lexis 26297, at *26. Under FIFO, plaintiff's sales are matched first against the earliest purchases of stock, often matching sales during a class period with stock purchased prior to the class period. *Hodges v. Akeena Solar, Inc.*, 263 F.R.D. 528, 532 (N.D. Cal. 2009). Because some of the sales are matched with pre-class period stock, courts applying FIFO exclude such transactions from the damage calculations (including any gains from such transactions), thus usually resulting in a higher damages for the plaintiffs.[3] *Johnson v. Dana Corp. et al.*, No. 3:05 CV 7388, 2006 WL 782746, at *1-3 (N.D.

---

[3] Courts that find deterrence to be the primary objective of Rule 10b-5 tend to use FIFO because it creates higher damage awards, while courts emphasizing compensation as the primary objective tend to use LIFO. *Compare Kane v. Shearson Loeb Rohades, Inc.*, No. 86-551-CIV, 1989 U.S. Dist. LEXIS 19022, at *15, *23 (S.D. Fla. May 3, 1989), *with S.E.C. v. Bear, Stearns & Co., Inc.*, No. 03 Civ. 2937, 2005 WL 217018, at *7 (S.D.N.Y. Jan. 31, 2005). This Court attempts to apply a solution that reasonably and fairly accomplishes both objectives.

Ohio May 24, 2006) (explaining that FIFO does not provide for netting of inflation-related gains). Consequently, the major reason (if not the only reason) why numerous courts have held that LIFO is the appropriate method for matching transactions in securities fraud cases is because it takes into account inflation related gains due to the fraud, and therefore, is a more accurate reflection of plaintiff's damages. *See In re eSpeed*, 232 F.R.D. at 102. If, however, as this Court provides, plaintiffs' gains attributable to defendants' fraud are netted from the plaintiffs' total loss, then such gains are taken into consideration and utilizing FIFO as a method of matching does not produce a windfall to the plaintiffs. *See* RAYMUND WONG, NERA ECON. CONSULTING, PURCHASE-SALE MATCHING IN SECURITIES LITIGATION: FIFO, LIFO, AND OFFSETS 9, 17, 22-23 (2008) (noting that many court decisions reveal that losses claimed by plaintiffs in securities class action cases should be offset by gains related to the alleged fraud regardless of whether FIFO or LIFO is used to avoid a windfall to plaintiff, even if these gains were from sales of securities purchased prior to the class period), *available at* http://www.nera.com/image/PUB_Purchase_Sale_Matching_Wong_1008.pdf.

Further, FIFO has historically been the accounting method of choice for governmental institutions. For instance, FIFO has been used by courts and the Internal Revenue Service ("IRS") to determine losses and gains for tax purposes. Treas. Reg. § 1.1012-1(c); *see Holmes v. Comm'r of Internal Revenue*, 134 F.2d 219, 221 (3d Cir. 1943) ("[FIFO] is so old and well known . . . it is incorporated in [the tax code]. It is sufficient to say that it establishes a presumption to be followed."); *Thompson v. Shaw Group, Inc.*, No. 04-1685, 2004 U.S. Dist. Lexis 25641, at *14 n.5 (E.D. La. Dec. 15, 2004) ("Many federal appeal courts and commentators regard FIFO, which the IRS consistently uses, as a firmly established

methodology for calculating loss for tax purposes in the context of securities investments.").
FIFO also has been the preferred method of calculating losses by the IRS "where shares of stock cannot be identified with any particular lots purchased." *Helvering v. Campbell*, 313 U.S. 15, 20-21 (1941). Further, because of the convergence between Generally Accepted Accounting Principles ("GAAP") and International Financial Reporting Standards ("IFRS"), which do not permit the use of LIFO as an inventory method, LIFO will likely become obsolete for both financial reporting and tax purposes in the near future.[4] FIFO has been established as a reasonable measure for computing losses or gains from stock purchases or sales in the past, and as such this Court holds that FIFO is the appropriate method for matching purchases and sales given the tax laws and recent developments in the accounting world.

In sum, by utilizing netting this Court has avoided applying FIFO in a way that will result in a windfall to the plaintiffs. Therefore, this Court holds that the fair and reasonable method for calculating damages in this class action is to apply FIFO for the method of matching purchases and sales while netting plaintiffs' losses against any profits attributable to defendants' fraud.

## Conclusion

---

[4] Although GAAP is currently authoritative in the United States, IFRS has been developing a set of accounting standards that are becoming the global standard. *IFRS Resources*, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, www.ifrs.com/updates/FASB-IASB_Projects.html (last visited Oct. 21, 2010). These standards do not permit the use of LIFO as an inventory method. IASB International Accounting Standard 2.25. The SEC, backed by the American Institute of Certified Public Accountants ("AICPA") and others, have agreed to a series of steps that could require the use of IFRS by publicly traded companies in the United States by 2014. Roadmap for the Potential Use of Financial Statements Prepared in Accordance with International Financial Reporting Standards by U.S. Issuers, 73 Fed. Reg. 70,816, 70,825 (proposed Nov. 21, 2008) (to be codified at 17 C.F.R. pts. 210, 229, 230, 240, 244 & 249).

16

As outlined herein, the Court has addressed the parties' arguments regarding the protocol for Phase II and determined the appropriate method of calculating damages with respect to each class member's claims. The Court approves lead plaintiff's proof of claim form and release as modified by the Court's rulings herein. Plaintiffs shall prepare and file a final version that includes the proposed schedule for mailing the form and release to the class as well as the deadline for responses thereto prior to the status hearing of January 5, 2011.

**SO ORDERED.**     ENTERED: November 22, 2010

_____

**HON. RONALD A. GUZMAN**

**United States District Judge**