**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LAWRENCE E. JAFFE PENSION PLAN, on behalf of itself and all others similarly situated,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **02 C 5893 (Consolidated)** |
| **HOUSEHOLD INTERNATIONAL, INC., MERRILL LYNCH, PIERCE, FENNER, & SMITH, INC., GOLDMAN SACHS & CO., INC., ARTHUR ANDERSEN, L.L.P., WILLIAM F. ALDINGER, DAVID A. SCHOENHOLZ, GARY GILMER, J.A. VOZAR, ROBERT J. DARNALL, GARY G. DILLON, JOHN A. EDWARDSON, MARY JOHNSTON EVANS, J. DUDLEY FISHBURN, CYRUS F. FREIDHEIM, LOUIS E. LEVY, GEORGE A. LORCH, JOHN D. NICHOLS, JAMES B. PITBLADO, S. JAY STEWART, and LOUIS W. SULLIVAN,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **Judge Ronald A. Guzmán** |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

In phase one of this bifurcated case, a jury returned a verdict in favor of plaintiffs and against

some or all of the defendants on the Section 10(b)/Rule 10b-5 claims as to Statement Nos. 14-18,

20-24, 27-29, 32, 36-38 ("the seventeen statements"). (Verdict Form at 14-18, 20-24, 27-29, 32, 36-

38; *id.*, Table A, Alleged False or Misleading Statements at 11-26.) This means the jury found that

the statements made and/or facts withheld regarding predatory lending, 2+ delinquency/re-aging, and

the Restatement were false or misleading, material, made with the requisite state of mind, and

substantially caused the economic loss plaintiffs suffered. (*See id.*; *see also* Jury Instructions at 25-

32.) In addition, the jury credited the Leakage Model of damages presented by plaintiffs' expert Daniel Fischel. (*See* Verdict Form at 41.) At trial, defendants offered, and the jury rejected, two of the three types of evidence that can be used to rebut the presumption of reliance, *i.e.*, that market makers were privy to the truth, and the truth had credibly entered the market and dissipated the effects of the omissions and misstatements. Thus, in phase two, the focus has been on the third kind of rebuttal evidence, that which severs the link between the alleged omissions and misstatements and either the price paid or received by any claimant. Accordingly, each claimant was required to respond "yes" or "no" to the following inquiry: "If you had known at the time of your purchase of Household stock that defendants' false and misleading statements had the effect of inflating the price of Household stock and thereby caused you to pay more for Household stock than you should have paid, would you have still purchased the stock at the inflated price that you paid?" (hereinafter "claim form question"). (1/11/11 Order, Ex. 2 at 8.) The Court also permitted the custodian banks and third-party claim filers to send claimants with an allowed loss greater than $250,000.00 a supplemental form that asked the same question. (5/31/11 Order.) In addition, the parties were afforded discovery to meet their respective burdens with regard to the presumption of reliance. The parties now present the individual claims as to which they contend there is no triable issue with regard to reliance.

There are three categories of claimants: (1) those that responded "no" to the claim form question;[1] (2) those that responded "yes" to the claim form question; and (3) those that returned the

---

[1] When the Court uses the term "claim form question" it refers to the question that appeared in Section III of the initial proof-of-claim notice to all plaintiffs and/or the supplemental form sent to those plaintiffs with an allowed loss of greater than $250,000.00.

claim form but did not answer the claim form question.[2]

If a claimant responded "no" to the claim form question, and defendants do not point to any evidence that reasonably suggests "no" does not mean "no," that claimant is entitled to judgment as to liability because defendants have not created a triable issue of fact as to his reliance on price. Defendants argue that anything short of a jury trial on all issues relating to an award of statutory damages is a deprivation of their Seventh Amendment rights. *See* U.S. Const. amend. VII (stating that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved"). It is well settled, however, that summary disposition procedures do not violate the Seventh Amendment. *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 759 (7th Cir. 2006). Thus, if there are no factual issues to be resolved, the claims can be adjudicated short of trial without running afoul of the Seventh Amendment.

Defendants also argue that the jury verdict itself rebuts the presumption of market reliance as to the entire class because the dates on which the actionable misstatements/opinions occurred do not correspond to an increase in inflationary impact on Household stock. However, the expert testimony credited by the jury was that a misstatement or omission may cause inflation in the stock price merely by maintaining the market expectations or preventing them from falling further, even if the inflation does not increase on the date the misstatement or omission is made. (*See, e.g.*, Trial Tr. at 2605 (plaintiffs' expert Fischel stating that stock is inflated where stock is prevented from falling to a lower level)); *see Schleicher v. Wendt*, 618 F.3d 679, 683 (7th Cir. 2010) (price can be inflated by false statement or omission when it stops price from declining); *Nathenson v. Zonagen*

---

[2]Claimants who answered "yes" or "no" to the claim form question, but explained that they did not make the contested investment decision are included in this category.

*Inc.*, 267 F.3d 400, 419 (5th Cir. 2001) (statement actionable with no price increase); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 562 (S.D.N.Y. 2011) ("[A] statement can cause inflation by causing the stock price to be artificially maintained at a level that does not reflect its true value."). Thus, the fact that the artificial inflation did not increase each day on which the jury found an actionable misstatement or omission occurred does not mean that there is a triable issue as to whether the presumption of reliance has been rebutted.

Defendants also argue that the jury verdict itself rebuts the presumption of market reliance as to the entire class because the Leakage Model did not isolate as to any given day the inflation caused by a misstatement or omission regarding each of the three subjects presented to the jury, *i.e.*, predatory lending vs. 2+ delinquency/re-aging vs. Restatement, and thus plaintiffs have failed to show that the actionable misstatement or omission about a particular subject caused an independent inflationary price impact. (Defs.' Submission Regarding Rebuttal Presumption Reliance at 3-17.) As the evidence at trial demonstrated, the actionable misstatements or omissions on these three subjects were inextricably intertwined. The jury found that defendants made actionable misstatements about re-aging to cover up their predatory lending practices and, in turn, made actionable Restatement misstatements to cover up their re-aging methods. Moreover, as Fischel explained, the inflated price of Household's stock at any given time reflected the ever-changing mix of information that was publicly available. Given the interdependence of the fraudulent statements and the volatility of the information mix, it would be virtually impossible to parse out the damages by topic.

Fortunately, the law does not require the impossible. Rather, it gives a jury discretion to determine a damages award, as long as the award has a reasonable basis in the evidence. *See Am.*

4

*Nat'l Bank & Trust Co. v. Reg'l Transp. Auth.*, 125 F.3d 420, 435-40 (7th Cir. 1997); *Dresser Indus., Inc. v. Gradall Co.*, 965 F.2d 1442, 1447 (7th Cir. 1992) (per curiam); *First Nat'l Bank of Kenosha v. United States*, 763 F.2d 891, 896 (7th Cir. 1985); (*see also* Jury Instructions 34 ("Any damages you award must have a reasonable basis in the evidence. Damages must not be proved with mathematical certainty but there must be enough evidence for you to make a reasonable estimate of damages.")). In this case, there were multiple statements and partial disclosures over an extended time period, and the parties' experts provided testimony in support of their positions regarding whether the stock price was affected by misrepresentations or omissions and the estimate of damages stemming therefrom, and the jury chose to credit Fischel's Leakage Model of damages (discounting industry, market or company-specific non-fraud declines unrelated to the actionable misstatements or omissions) over defendants' counter-arguments. Here, all of the evidence, including Fischel's testimony about the amount of artificial inflation, provided a reasonable basis for the jury's damages award.

Defendants also argue that they have rebutted the presumption of reliance as to index funds that answered "no" to the claim form question because the evidence shows that the price of stock has no impact on their purchasing decisions. (*See, e.g.*, Defs.' Ex. 7, The Munder Institutional Funds Prospectus at MCM 0000410 (stating that it "attempts to duplicate the investment composition and performance of the particular index through statistical procedures").) The Court disagrees. The weight of each stock in a capitalization-weighted index is proportional to each company's market capitalization, *i.e.*, its market price multiplied by the number of outstanding shares. *See* Reuters.com, Financial Glossary, http://glossary.reuters.com/index.php/Capitalization-Weighted_Index &

http://glossary.reuters.com/index.php/Market_Capitalization (last visited Sept. 20, 2012).[3] In other words, indexes rely on investor opinion as reflected in market price to assign weight to stocks. Likewise, the index funds, which adjust their portfolios to match a target index, rely on investor opinion as reflected in stock price each time they make an adjustment. (*See* Defs.' Ex. 9, Rule 30(b)(6) Dep. State Street at 43-44 ("[W]e wouldn't have purchased the stock in any of the portfolios which were found to be fraudulent.").) In short, the evidence about the investment goals of index funds, which is all that defendants offer, does not support the inference that such funds are indifferent to market price. *See In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 602 (C.D. Cal. 2009) ("Defendants argue that because index purchases seek to match a predetermined index of securities, such purchases are not made in reliance on any misrepresentation. To the contrary: because index purchases seek only to match the index and exclude other considerations (such as, for example, reliance on nonpublic information or other idiosyncratic motivations), index purchases rely exclusively upon the market to impound any representations (including misrepresentations) into securities' prices."); *see also In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 578 (N.D. Cal. 2009) (rejecting argument that plaintiff, which made some of its trades "based on a computer program that was designed to mirror a stock index," was not typical of the class of investors because there was no evidence suggesting "that the index did not . . . rely on the integrity of the market"). Defendants have not, therefore, created a triable issue of fact as to the reliance of index investors that responded "no" to the claim form question.

The same is true for Capital Guardian Trust Co., Capital Research & Management Co. and

---

[3]Defendants have not offered any evidence that suggests any of these investors are something other than capitalization-weighted index funds.

Davis Select Advisors ("DSA"), claimants who gave a "no" answer to the claim form question but testified that they rejected or doubted the validity of the efficient capital market theory. (*See* Pls.' Ex. 13, Capital Guardian Trust Co. Rule 30(b)(6) Dep. at 68-69 ("[H]istory . . . show[s] that the efficient capital markets pricing theory" that "all current available information has already been factored into the stock price[,]" is "not always accurate."); Pls.' Ex. 14, Capital Research & Management Co. Rule 30(b)(6) Dep. at 37-38 (testifying that its "investment philosophy" suggests it is "not true" that "the price of a stock reflects all the information available at that time"); Pls.' Ex. 12, DSA Rule 30(b)(6) Dep. at 45-46 (stating that it "cannot be correct," given the stock market's history, that "stocks are fairly priced at all times because [the market price] immediately reflects all information in the public domain")). Given the parties' stipulation that "Household common stock traded in an efficient market" (Final Pretrial Order, Ex. A, Uncontested Fact No. 10), whether these claimants fully subscribe to the efficient market theory is irrelevant. What is relevant is whether they would have traded in Household stock if they had known about the fraud. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 248 (1988). Each of them unequivocally answered "no." (*See* Pls.' Ex. 12, DSA Rule 30(b)(6) Dep. at 143 ("It is definitely not appropriate to invest in companies run by crooked executives."); Pls.' Ex. 13, Capital Guardian Trust Co. Rule 30(b)(6) Dep. at 35 ("If we'd ever known that a management had knowingly misled or misstated or produced false statements, I think that would almost, . . . automatically exclude us from wanting to invest in – with such a company."); Pls.' Ex. 14, Capital Research & Management Co. Rule 30(b)(6) Dep. at 71-73 (deponent testifying that he could not "imagine a scenario where [he] would have bought . . . Household stock knowing that it was inflated above its true value" because "part of our investment philosophy is to find undervalued assets . . . . [and] that involves the values of the enterprise, the

7

strength of the fundamentals and a sense of trust in the management"); *id.* at 74 ("[I]f we would have known [the price of Household stock] was inflated, we wouldn't have purchased the stock.").) Thus, these claimants' testimony about efficient market theory does not create a triable issue as to whether they relied on price when they engaged in the stock transactions at issue in this case.

Alternatively, defendants argue that DSA could not have relied on any Restatement misstatement in purchasing Household stock because the Restatement affected earnings near term and DSA judges its performance over a three- to ten-year term. (*See* Defs.' Ex. 13, DSA Rule 30(b)(6) Dep. at 95, 185.) But DSA does not say that it would have purchased Household stock even if it had known of the fraud. On the contrary, DSA testified that "one of the biggest parts of an investment decision is the price of the stock and management's integrity and what they are telling you." (*Id.* at 185.) Thus, no reasonable jury could infer solely from DSA's emphasis on long-term performance that it did not rely on the integrity of the Household stock price. Defendants have not, therefore, raised a triable issue as to DSA's reliance on the Restatement misstatements.

Defendants also argue that they have created a triable issue as to whether lead plaintiff Glickenhaus & Co. and claimants for which it made investment decisions relied on the March 23, 2001 *Origination News* article misstatement. (*See* Verdict Form, Table A at 11 ("Gary Gilmer, president and chief executive of Household's subsidiaries HFC and Beneficial said the company's position on predatory lending is perfectly clear. Unethical lending practices of any type are abhorrent to our company, our employees and most importantly our customers.") In support, defendants cite to Glickenhaus' deposition testimony that it would not "necessarily believe that [an *Origination News* quote is] accurate or true," but believes that Household's press releases are true and "relies on [them] in making investment decisions." (Defs.' Ex. 8, Glickenhaus Rule 30(b)(6) Dep. at 58-65.)

8

It is undisputed, however, that the quote from the *Origination News* article appeared in a Household press release. (*Id.*) Thus, viewing the facts in defendants' favor, no reasonable jury could find that Glickenhaus did not rely on Gilmer's quote. The Court, therefore, holds that defendants have not created a triable issue of fact as to Glickenhaus' reliance.

Defendants have, however, created a triable issue of fact as to the reliance of claimants who: (1) responded "yes" to the claim form question; (2) submitted duplicate claims with conflicting answers to the claim form question; and (3) submitted multiple claims with different answers to the claim form question. These claims must be resolved at trial.

That leaves the claims of those who did not answer the claim form question and/or supplemental interrogatory. Defendants contend that, by failing to respond to discovery, these claimants have forfeited their claims. Plaintiffs argue that summary dismissal is too harsh a sanction and contend that these claims should be tried. The parties' arguments underscore the challenge of balancing defendants' right to gather information for their defense with the class members' right not to be subjected to abusive discovery. (*See, e.g.*, 3/12/09 Hr'g Tr. at 34.)

Initially, the task did not seem daunting, as defendants said their discovery needs were slight:

[T]he institutional investors who owned the lion's share of Household stock were big major sophisticated banks and other funds . . . . We could capture information about 50 percent of stock ownership by deposing only 10 of them. We could capture 60 percent by deposing only 15 of them. It may be that one or two sample depositions will tell us what we need to know and whether this is a worthwhile defense or not.

 . . . .

We need to know what the 15 big institutional investors – what they did, whether or not they can prove reliance on an individual basis, whether we can – I should put it correctly. Whether we can rebut the rebuttable presumption of reliance as to them by simply finding out the facts that were denied during fact discovery.

(*Id.* at 27, 33.) Accordingly, the Court ordered that Notice of the Verdict and Claim Form be sent to the class and gave defendants 120 days to take discovery of any class member. (*See* 11/22/10 Mem. Op. & Order at 9; 1/5/11 Hr'g Tr. at 20, 25-26.)

Among other things, the Notice sent to the class members states you "must submit a valid Proof of Claim form enclosed with this notice no later than May 24, 2011" to be able to recover under the verdict. (1/11/11 Order, Ex. 1 at 6.) Moreover, the Proof of Claim form itself states: (1) if you fail to submit a properly addressed . . . Proof of Claim and Release, your claim may be rejected and you may be precluded from any recovery pursuant to the verdict"; (2) "**YOU MUST ANSWER THE QUESTIONS IN PART III OF THE CLAIM FORM IN ORDER TO BE ELIGIBLE TO RECOVER PURSUANT TO THE VERDICT**"; and (3) "**YOU MUST ALSO ANSWER THE** [Claim Form] **QUESTION IN ORDER TO BE ELIGIBLE FOR RECOVERY ON YOUR CLAIM PURSUANT TO THE VERDICT**." (*Id.*, Ex. 2 at 1, 3, 8) (emphasis original).

Subsequently, defendants served document production requests, interrogatories and Rule 30(b)(6) deposition notices on ninety-eight institutional class members. Plaintiffs argued that the discovery was overly burdensome and harassing and asked the Court for a protective order. The Court granted plaintiffs' motion in part and ordered that defendants take no more than fifteen depositions, the number defendants initially said they would need, before the claim forms were returned. (*See* 1/31/11 Order at 4.)

In early April 2011, plaintiffs told the Court that:

[S]everal custodian banks have expressed concern regarding the difficulty of obtaining the investor clients' answers to a discovery inquiry on the claim form prior to the claim deadline of May 24, 2011. This difficulty arises from the fact that although these custodian banks are authorized to file claims on behalf of their clients, they were not the decision-makers regarding the relevant investments as to those

clients. Thus, to obtain an answer to the discovery inquiry, such custodian banks must identify, and transmit the discovery inquiry to, each relevant decision-maker.

(4/11/11 Order at 1-2) (footnote omitted). Consequently, the Court ordered plaintiffs "to propose a plan . . . as to the most efficient way to . . . obtain responses" to the claim form question from this group of claimants. (*Id.* at 2.)

Plaintiffs reported that thirty-eight custodian banks and third-party filing services had filed multiple claims, "12,506 [of which] generate an allowed loss . . . of $1,248,357,070." (Lead Pls.' Proposed Plan Obtaining Resp. Disc. Inquiry Proof Claim Form at 2.) 11,760 of these claims had an allowed loss of $250,000.00 or less, 326 had an allowed loss of $250,001.00-$500,000.00, 204 had an allowed loss of $500,001.00-$1,000,000.00 and 216 had an allowed loss of more than $1,000,000.00. (*Id.*) Given this information, plaintiffs proposed that the custodian banks only be required to obtain an answer to the claim form question from the claimants whose losses accounted for the bulk of the claimed damages, those with an allowed loss in excess of $250,000.00 (*Id.* at 5-6.)

Defendants objected to the plan because it did not require the custodian banks to obtain answers from the 11,760 claimants whose allowed loss was less than $250,000.00. (*See* Defs.' Resp. Pls.' Proposed Plan Obtaining Resp. Disc. Inquiry Proof Claim at 1.) They urged the Court to reject the plan and order that "the Proof of Claim form, or a Court-approved follow-up notice, be sent to *all* beneficial owners on whose behalf custodian banks or other nominees submitted Proof of Claim forms that do not contain an answer to the reliance question." (*Id.* at 3) (emphasis original).

The Court considered the parties' arguments in light of defendants' need for the information, the class members' need to be protected from unduly burdensome discovery and the unique

11

circumstances of the case and, with certain modifications, adopted plaintiffs' plan:

> We now know that discovery of 80% of the claimed losses can be achieved by addressing only 6% of the claims. This, coupled with the other avenues of discovery the court has already approved, constitutes a reasonable approach to balancing the needs of the defendants for discovery with the need to protect class members from discouragement and the need to move this already 9 year-old case towards a conclusion.

(5/31/11 Order at 7.) Thus, class members with claims of more than $250,000.00 that were filed by custodian banks were sent a second notice that contained the claim form question and said: "**TO RECOVER FROM THE VERDICT FUND YOU MUST ANSWER THE QUESTION.**" (*See id.* at 7-8; Lead Pls.' Proposed Plan Obtaining Resp. Discovery Inquiry Proof Claim Form, Ex. B.) (emphasis original).

Though they were told repeatedly that they could recover in this suit only if they answered the claim form question, a substantial number of claimants did not. Plaintiffs argue that the Court should ignore this noncompliance and set the claims for trial. That the Court will not do. The Court carefully structured the discovery process to enable defendants to get the information they needed without overburdening the members of the class. Toward that end, each claimant was given the opportunity, larger claimants got two, to perfect his claim by answering "yes" or "no" to one simple discovery question. Given these unique circumstances, the only appropriate sanction for a claimant's failure to answer the question is dismissal of his claim. *See Newman v. Metro. Pier & Exposition Auth.*, 962 F.2d 589, 591 (7th Cir. 1992) ("A plaintiff's failure to comply with discovery orders is properly sanctioned by dismissal of the suit, a defendant's by entry of a default judgment."). Thus, defendants are entitled to judgment on any claims for which the claimant did not answer the claim form question.

12

To facilitate resolution of the claims that need not be tried, the Court appoints Phillip S. Stenger of Stenger & Stenger as special master to identify in accordance with this Order:  (1) the claims on which plaintiffs are entitled to judgment as a matter of law and the amount of each such allowed claim; (2) the claims on which defendants are entitled to judgment as a matter of law; and (3) the claims that must be resolved at trial.

**SO ORDERED**                                   **ENTERED:  September 21, 2012**


**HON. RONALD A. GUZMAN**
**United States District Court Judge**