**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

LAWRENCE E. JAFFE PENSION PLAN, ON
BEHALF OF ITSELF AND ALL OTHERS
SIMILARLY SITUATED,

        Plaintiffs,

        v.

HOUSEHOLD INTERNATIONAL, INC., ET
AL.,

        Defendants.

Lead Case No. 02-C-5893
(Consolidated)

CLASS ACTION

Judge Ronald A. Guzman

**REPLY IN SUPPORT OF DEFENDANTS' RENEWED**
**MOTION FOR JUDGMENT AS A MATTER OF LAW OR,**
**IN THE ALTERNATIVE, A NEW TRIAL**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT ................................................................................................................................. 1

I.  PLAINTIFFS FAILED TO ESTABLISH LOSS CAUSATION AS A MATTER OF
    LAW, REQUIRING JUDGMENT FOR DEFENDANTS. ...................................................... 1

    A.  Plaintiffs Failed To Identify The Misrepresentations Alleged To Have Introduced
        Inflation Into Household's Stock Price. ............................................................................ 3

    B.  Plaintiffs Failed To Establish A Causal Connection Between Their Losses And
        The Misrepresentations Found By The Jury. .................................................................... 5

    C.  Plaintiffs' Leakage Model Failed To Account Properly For Stock Price Declines
        Resulting From Non-Fraud Firm-Specific Factors. ......................................................... 6

II. THE JURY'S REPURPOSING OF THE LEAKAGE MODEL RESULTED IN AN
    IRRATIONAL AND UNSUPPORTED VERDICT, REQUIRING A NEW TRIAL. ........... 11

    A.  The Jury's Finding That The March 23, 2001 Statement Introduced The Total
        Sum Of Inflation Into The Stock Price Requires A New Trial. ...................................... 11

    B.  The Jury's Attribution Of $23.94 Of Inflation To A Single Statement Regarding
        Predatory Lending Has No Basis In The Evidence. ........................................................ 15

III. MULTIPLE ERRORS IN THE JURY INSTRUCTIONS AND VERDICT FORM
     ENTITLE DEFENDANTS TO A NEW TRIAL. .................................................................. 16

    A.  The Instruction On The First Element of Plaintiffs' Rule 10b-5 Claim Was
        Erroneous And Resulted In Clear Prejudice To Defendants. ......................................... 17

    B.  The Instruction On The Second Element Of Plaintiffs' Rule 10b-5 Claim Also
        Was Erroneous And Prejudiced Defendants. .................................................................. 24

    C.  Defendants Also Were Prejudiced By Defects In The Verdict Form. ............................ 26

IV. THE  AGGREGATE  IMPACT  OF  ERRONEOUS  JUDICIAL  RULINGS
    RESULTED IN AN UNFAIR TRIAL. ................................................................................. 28

V.  THE PHASE II PROCEEDINGS DEPRIVED DEFENDANTS OF THE RIGHT TO
    A PROPER ADJUDICATION OF THE ELEMENT OF RELIANCE. ................................. 30

CONCLUSION ........................................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
    133 S. Ct. 1184 (2013) ........................................................................... 30

*Barrie v. Intervoice-Brite, Inc.*,
    409 F.3d 653 (5th Cir. 2005) ............................................................... 23

*Byrd v. Ill. Dep't of Pub. Health*,
    423 F.3d 696 (7th Cir. 2005) ............................................................... 21

*Carter v. Chi. Police Officers*,
    165 F.3d 1071 (7th Cir. 1998) ............................................................. 14

*Cent. Bank of Denver, N.A. v. First Interstate Bank, N.A.*,
    511 U.S. 164 (1994) ............................................................................. 18

*City of Pontiac General Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012) ......................................... 20, 22

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
    814 F. Supp. 2d 395 (S.D.N.Y. 2011) .............................................. 23

*CIVIX-DDI, LLC v. Cellco P'ship*,
    387 F. Supp. 2d 869 (N.D. Ill. 2005) ................................................. 8

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013) ............................................................ 1, 11, 13

*Dawson v. N.Y. Life Ins. Co.*,
    135 F.3d 1158 (7th Cir. 1998) ................................................ 16, 21, 26

*Dura Pharm. v. Broudo*,
    544 U.S. 336 (2005) ......................................................... 2, 6, 7, 10

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    131 S. Ct. 2179 (2011) ............................................................ 1, 2, 3, 5

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976) ............................................................................. 24

*Frymire-Brinati v. KPMG Peat Marwick*,
    2 F.3d 183 (7th Cir. 1993) ................................................................... 28

*Fulton Cnty. Emps. Ret. Sys. v. MGIC Inv. Corp.*,
    675 F.3d 1047 (7th Cir. 2012) ............................................................. 23

*Global-Tech Appliances, Inc. v. SEB S.A.*,
   131 S. Ct. 2060 (2011) ............................................................................................. 25

*Harrison v. Dean Witter Reynolds, Inc.*,
   974 F.2d 873 (7th Cir. 1992) ................................................................................... 27

*Higginbotham v. Baxter Int'l, Inc.*,
   495 F.3d 753 (7th Cir. 2007) ................................................................................... 24

*In re Pfizer Inc. Sec. Litig.*,
   No. 04 Civ. 9866(LTS)(HPB), 2013 WL 1285173 (S.D.N.Y. Mar. 28, 2013) ..................... 20

*In re Satyam Computer Servs. Secs. Litig.*,
   915 F. Supp. 2d 450 (S.D.N.Y. 2013)....................................................................... 20

*In re Smith Barney Transfer Agent Litig.*,
   884 F. Supp. 2d 152 (S.D.N.Y. 2012).................................................................. 20, 22

*In re UBS Ag Securities Litigation*,
   Master File No. 07 Civ. 11225(RJS),
   2012 U.S. Dist. LEXIS 141449 (S.D.N.Y. Sept. 28, 2012)............................... 19, 22

*In re Williams Sec. Litig. – WCG Subclass*,
   558 F.3d 1130 (10th Cir. 2009) ................................................................................ 5

*Janus Capital Grp., Inc. v. First Derivative Traders*,
   131 S. Ct. 2296 (2011) ................................................................... 1, 17, 19, 21

*Javier v. City of Milwaukee*,
   670 F.3d 823 (7th Cir. 2012) ................................................................................... 22

*Kosmynka v. Polaris Indus., Inc.*,
   462 F.3d 74 (2d Cir. 2006)....................................................................................... 13

*Lapsley v. Xtec, Inc.*,
   689 F.3d 802 (7th Cir. 2012) ................................................................................... 10

*Loftin v. Bande (In re Flag Telecom Holdings, Ltd. Sec. Litig.)*,
   574 F.3d 29 (2d Cir. 2009) ...................................................................................... 15

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ................................................................................... 17

*Matrixx Initiatives, Inc. v. Siracusano*,
   131 S. Ct. 1309 (2011)............................................................................................. 24

*McCloud v. Goodyear Dunlop Tires North America Ltd.*,
   No. 04-cv-1118, 2008 WL 2323792 (C.D. Ill. June 2, 2008)................................ 28

*Moro v. Shell Oil Co.*,
  91 F.3d 872 (7th Cir. 1996) ............................................................... 28

*Newby v. Enron Corp.* (*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*),
  236 F.R.D. 313 (S.D. Tex. 2006) ....................................................... 27

*Ong ex rel. Ong v. Sears, Roebuck & Co.*,
  No. 03 C 4142, 2005 WL 2284285 (N.D. Ill. Sept. 14, 2005) .............. 25

*Oto v. Metro. Life Ins. Co.*,
  224 F.3d 601 (7th Cir. 2000) ............................................................... 28

*Pickett v. Prince*,
  5 F. Supp. 2d 595 (N.D. Ill. 1998) ....................................................... 30

*Pugh v. Tribune Co.*,
  521 F.3d 686 (7th Cir. 2008) ............................................................... 17

*Ray v. Citigroup Global Mkts., Inc.*,
  482 F.3d 991 (7th Cir. 2007) ................................................................. 3

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000) ............................................................................... 3

*Regents of Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*,
  482 F.3d 372 (5th Cir. 2007) ............................................................... 27

*Rowe v. Maremont Corp.*,
  850 F.2d 1226 (7th Cir. 1988) ............................................................. 14

*Scarver v. Litscher*,
  434 F.3d 972 (7th Cir. 2006) ............................................................... 25

*Schleicher v. Wendt*,
  618 F.3d 679 (7th Cir. 2010) .......................................................... 4, 10

*Searls v. Glasser*,
  64 F.3d 1061 (7th Cir. 1995) ............................................................... 12

*SEC v. Benger*,
  No. 09 C 676, 2013 WL 1150578 (N.D. Ill. Mar. 21, 2013) ................. 21

*SEC v. Carter*,
  No. 10 C 6145, 2011 WL 5980966 (N.D. Ill. Nov. 28, 2011) ............... 21

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
  552 U.S. 148 (2008) ............................................................................. 18

*Strauss v. Sratojac Corp.*,
  810 F.2d 679 (7th Cir. 1987) .......................................................................... 14

*Timm v. Progressive Steel Treating, Inc.*,
  137 F.3d 1008 (7th Cir. 1998) ........................................................................ 14

*Tricontinental Indus., Ltd. v. Pricewaterhouse-Coopers, LLP*,
  475 F.3d 824 (7th Cir. 2007) ..................................................................... 2, 5, 6

*United States v. Ladish Malting Co.*,
  135 F.3d 484 (7th Cir. 1998) ........................................................................... 25

*United States v. Riddle*,
  103 F.3d 423 (5th Cir. 1997) ........................................................................... 30

*Wipf v. Kowalski*,
  519 F.3d 380 (7th Cir. 2008) ........................................................................... 28

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
  395 F.3d 416 (7th Cir. 2005) ........................................................................... 29

**Statutes**

15 U.S.C. § 78u-4(b)(4) ............................................................................. 2, 6, 10

15 U.S.C § 78u-4(f)(2)(A) ................................................................................. 22

15 U.S.C. § 78u-4(f)(3)(A) ................................................................................ 27

15 U.S.C. § 78u-4(f)(3)(C) ................................................................................ 24

**Other Authorities**

Bradford Cornell & R. Gregory Morgan,
  *Using Finance Theory to Measure Damages in Fraud on the Market Cases*,
  37 UCLA L. Rev. 883 (1990) ............................................................................. 9

9 Judson Lobdell & Nicholas Napolitan,
  *Apportionment of Liability Under the PSLRA*, Sec. Litig. Report (May 2012) ...................... 27

Defendants Household International, Inc., William F. Aldinger, David A. Schoenholz, and Gary Gilmer (collectively "Defendants") respectfully submit this reply in support of their renewed motion for judgment as a matter of law or, in the alternative, a new trial.

## PRELIMINARY STATEMENT

Plaintiffs dedicate the vast majority of their response to discussing minutiae, inventing waivers, ignoring that they bore the burden of proving all elements of their claims, and knocking down straw men. In doing so, they fail to address the main legal contentions advanced by Defendants and fail to distinguish intervening Supreme Court decisions that fatally undermine the verdict. Plaintiffs do not identify record evidence proving loss causation as required by governing precedent; do not explain how their failure to exclude the impact of firm-specific non-fraud related factors in their loss causation analysis can be squared with *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179 (2011); and cannot justify the jury's attribution of the sum total of inflation based on the combined effect of their three alleged theories of fraud to a single statement based on only one of those theories, especially in light of *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013). And Plaintiffs fail to present even a plausible argument as to how the Court's instruction on who could be held liable for the alleged misstatements in this case can be reconciled with *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011). These and the other failures discussed make plain that Defendants are entitled to judgment as a matter of law or, at a minimum, a new trial.

## ARGUMENT

## I.   PLAINTIFFS FAILED TO ESTABLISH LOSS CAUSATION AS A MATTER OF LAW, REQUIRING JUDGMENT FOR DEFENDANTS.

To establish loss causation, Plaintiffs needed to "prove that the decline in [Household's] stock was 'because of the correction to a prior misleading statement' and 'that the subsequent

loss could not otherwise be explained by some additional factors revealed then to the market.'"
*Halliburton*, 131 S. Ct. at 2185 (2011); *Tricontinental Indus., Ltd. v. Pricewaterhouse-Coopers, LLP*, 475 F.3d 824, 842 (7th Cir. 2007) (Supreme Court precedent "stresses that the complaint must specify each misleading statement, and that there must be a causal connection between the material misrepresentation and the loss." (internal quotations and citation omitted)). Plaintiffs proceed as if—because courts have endorsed leakage theories in some instances—presenting a leakage model itself suffices to prove loss causation. But that ignores both Defendants' actual argument (which assailed the particular model used in this case and the jury's application of that model, not the viability of a leakage theory in the abstract) and at least half of Plaintiffs' burden. Loss causation is not proven by simply *assuming* "maintained" inflation and introducing a model addressing the purported dissipation of that inflation.

Plaintiffs' response confirms that they failed to present evidence sufficient to support a finding of loss causation under their leakage model—the only model the jury did not reject outright.[1] Plaintiffs effectively concede that the only proof of loss causation they offered was the testimony of Professor Daniel R. Fischel. But that testimony standing alone falls well short of satisfying Plaintiffs' burden. *See Dura Pharm. v. Broudo*, 544 U.S. 336, 345-46 (2005) ("the statute expressly imposes on the plaintiffs 'the burden of proving' that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover'" (quoting 15 U.S.C. § 78u-4(b)(4)); *Tricontintental*, 475 F.3d at 843. As Plaintiffs acknowledge, Fischel did not attempt to establish when and how inflation entered Household's stock price or the details

---

[1] Plaintiffs reference the proof they offered in association with their specific disclosures model as proof of loss causation, and state that the specific disclosures model "alone was sufficient to establish the element of loss causation and economic loss." Doc. 1876 at 8. The jury did not credit the specific disclosures model, and thus it cannot serve as a basis for denying Defendants judgment based on the flaws in Plaintiffs' leakage theory. As the Court has already recognized, the two theories are separate. *See* Tr. 4367:20-4368:2.

regarding how much of that inflation, at any specific point in time, was attributed to Defendants' alleged fraud as opposed to non-fraud related firm-specific factors. Plaintiffs point to no other evidence that can make up for these shortcomings. As a result, there is simply "'no legally sufficient evidentiary basis'" for the jury's verdict, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000), entitling Defendants to judgment as a matter of law.[2]

### A. Plaintiffs Failed To Identify The Misrepresentations Alleged To Have Introduced Inflation Into Household's Stock Price.

As the first step in proving loss causation, Plaintiffs were required to establish that Household's "alleged misrepresentations artificially inflated the price of" Household's stock. *Ray v. Citigroup Global Mkts., Inc.*, 482 F.3d 991, 995 (7th Cir. 2007). Rather than attempt to establish that fact, Plaintiffs' leakage model simply assumed that inflation was in Household's stock price on the first day of the Class Period. Professor Fischel acknowledged that his "analysis [wa]s premised on [this] assumption." Tr. 2936:11-2937:24; Doc. 1361-6, Ex. 3 (Fischel Rebuttal Rep.) at 25-26; *see also* Doc. 1361-5, Ex. 2 (Fischel Dep. Tr.) at 84:3-7, 127:18-24. And though Plaintiffs' discussion of the matter is somewhat confused, they appear to admit that inflation was assumed, not proved. *See* Doc. 1876 at 7 ("Fischel properly assumed that inflation would exist on the first day the jury found a false statement."); *id.* at 16 ("Fischel testified that Household's stock price was inflated when the jury determined the first false or misleading statement.").

Rather than confront this assumption of the leakage model, Plaintiffs assert that "[t]he use of a leakage theory to establish loss causation" does not run afoul of Supreme Court or

---

[2] Plaintiffs' failure to address Defendants' arguments head on may flow, at least in part, from a misapprehension of the loss causation standard. Citing *Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991, 994-95 (7th Cir. 2007), Plaintiffs suggest that they were merely required to establish that Defendants' "actions **had something to do** with the drop in value" of Household's stock. Doc. 1876 at 4 (emphasis added). *Ray* itself, however, makes clear that Plaintiffs had to do more: "it is not enough to show that shares were purchased at a high price … and later sold at a much lower price." *Ray*, 482 F.3d at 994. Plaintiffs were required to prove that "the loss in value of" Household's shares was "caused by defendants' alleged misrepresentations." *Id.*; *See Halliburton*, 131 S. Ct. at 2186 (plaintiff must show "that a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss.").

Seventh Circuit precedent. *Id*. at 4. But that responds to a straw man, not an argument Defendants actually made. Defendants' moving papers acknowledged that "the Seventh Circuit has recognized that such a theory of loss causation may be relied on by a securities plaintiff." Doc. 1867 at 14 (citing *Schleicher v. Wendt*, 618 F.3d 679, 681-82 (7th Cir. 2010)). The problem is not with leakage models in securities cases generally, but with the particular leakage model in this case and the way Plaintiffs and the jury misused that leakage model. Leakage models reflect the possibility that inflation may leak out over time through a series of partial disclosures as accurate information is gradually revealed to the market, as opposed to a more straightforward case where a single corrective disclosure causes an immediate and precipitous drop in the share price. But no authority suggests that a leakage model obviates the first half of the loss causation requirement—proving how and when inflation actually entered the share price. *See, e.g.*, *Schleicher*, 618 F.3d at 687 (the court must "pin down *when* the stock's price was affected by any fraud"). The reason for that requirement is straightforward: if the original source of the alleged inflation is unknown, literally any public statement could be said to have "maintained" that preexisting inflation, transforming any statement into a misstatement for purposes of securities liability. To permit an untethered "maintenance" theory renders the statute of repose and "duty to correct" jurisprudence meaningless. *See* Doc. 1867 at 10 & n.4.

Plaintiffs argue that "experts are allowed to make certain assumptions based on the facts of the case." Doc. 1876 at 7-8 n.5. Fair enough. But at some point, Plaintiffs had to definitively establish that the assumptions underlying the leakage model were warranted through the submission of credible evidence and testimony. It is one thing for a leakage model primarily designed to demonstrate how inflation leaked out to assume that inflation was present, as long as there is other evidence demonstrating how inflation entered the share price. But here Plaintiffs

failed to supplement the model with proof justifying the model's inflation-related assumptions. They simply assumed the very thing they needed to prove to the jury.

Fischel's model and testimony were the only evidence of loss causation offered by Plaintiffs in support of their leakage theory, and thus the jury was left with only his assumptions—not a shred of evidence—to support Plaintiffs' allegations that the stock price was inflated. Plaintiffs underscore Fischel's failure to address how inflation entered the share price by contending that Fischel was not permitted to draw conclusions about when and how inflation entered Household's stock price. *See id.* ("no expert should opine on an issue that is within the province of the jury"). But when an expert is offered to provide the only evidence to support a necessary element of a claim, his failure to address that issue renders that claim legally deficient.

### B. Plaintiffs Failed To Establish A Causal Connection Between Their Losses And The Misrepresentations Found By The Jury.

The leakage model was not designed to and did not provide the requisite causal link between *specific* misrepresentations in the Class Period and the subsequent loss caused by those *specific* misrepresentations. "Loss causation … requires a plaintiff to show that a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss." *Halliburton*, 131 S. Ct. at 2186; *In re Williams Sec. Litig. – WCG Subclass*, 558 F.3d 1130, 1137 (10th Cir. 2009) ("Without showing a causal connection that specifically links losses to misrepresentations, [Plaintiff] cannot succeed."); *Tricontinental*, 475 F.3d at 843 (plaintiffs must "specify each misleading statement" and then demonstrate that there was "a causal connection between the material misrepresentation and the loss"). Thus, the leakage model failed, as a matter of law, to provide the requisite proof of a causal nexus between the particular misrepresentations ultimately found by the jury and loss. As set forth *infra*, **no** evidence supports the March 23, 2001

*Origination News* statement being a cause of the sum total of *all* inflation in the stock price (an inflationary amount assumed to pre-exist, on an *aggregated basis*, by the leakage model).

Again, Plaintiffs really have no answer. As a result, they simply point to what they claim "was undisputed evidence of leakage in this case that caused *some* of Household's stock price decline." Doc. 1876 at 9 (emphasis added). But Plaintiffs' discussion of analyst commentary makes no effort to link any of the price declines identified by the leakage model with any particular misstatement. Proof that some market participants concluded that Household engaged in wrongdoing is not the same thing as evidence establishing a causal connection between the specific misstatements found by the jury and Plaintiffs' alleged losses. It is the latter that the law requires.

Moreover, even if that "undisputed evidence" could be linked to Plaintiffs' leakage model in some meaningful way—and it cannot—the fact that there was evidence that leakage of information about Defendants' alleged fraud "caused *some* of Household's stock price decline" is insufficient to support the jury's verdict. Doc. 1876 at 9 (emphasis added). Plaintiffs bore "the burden of proving that the act or omission of the defendant alleged to violate this chapter caused," not just some economic harm, but "the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). Establishing that an inflated purchase price "touches upon" a later economic loss falls well short of meeting *Dura*'s requirements. *Dura*, 544 U.S. at 343; *see Tricontinental*, 475 F.3d at 842 (plaintiff must establish "a causal connection between the material misrepresentation and the loss, … not simply that the misrepresentation 'touches upon' a later economic loss"). Plaintiffs' failure of proof requires judgment for Defendants.

### C. Plaintiffs' Leakage Model Failed To Account Properly For Stock Price Declines Resulting From Non-Fraud Firm-Specific Factors.

Plaintiffs' leakage model did not account adequately for non-fraud firm-specific explanations for the decline in Household's stock price. That failure made it impossible for the

jury to determine just how much, if any, of Household's stock price decline was attributable to the dissipation of misrepresentation-induced artificial inflation, as opposed to unrelated firm-specific negative information. The Supreme Court has clearly held that securities plaintiffs must prove that their claimed losses were caused by a defendant's alleged misconduct and not one of the numerous other factors, such as "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific factors, conditions, or other events" that "taken separately or together [may] account for some or all of th[e] lower price." *Dura*, 544 U.S. at 342-43. Plaintiffs' failure to heed the Court's clear command, and the resulting lack of evidence to support the jury verdict, require judgment for Defendants.

Professor Fischel admitted that the leakage model failed to exclude stock price movements that were "not at all fraud related." Tr. 2960:16-17. Plaintiffs nonetheless halfheartedly contend that Fischel did, in fact, "rule[] out any non-fraud reasons for" Household's stock price decline. Doc. 1876 at 13. As Plaintiffs' acknowledge later in their response, however, that is simply not true. *See id*. at 15 (conceding that the leakage model did not isolate fraud-related disclosures, but contending that Fischel speculated that the non-fraud related disclosures "cancel each other out" (quoting Tr. 2683:13-2694:6)). The case law required Plaintiffs to prove that the losses they sought to attribute to fraud were in fact attributable to fraud and fraud alone. They failed to do so.

Even if Fischel's speculation—unsupported by any record evidence—that the positive and negative impacts of non-fraud firm-specific information canceled each other out over the relevant period turned out to be true, that would still not salvage Plaintiffs' case or the jury's verdict. That is because during any given segment of the class period there would be no way to tell how much (or how little) of this alleged canceling out had taken place, resulting in recovery

7

for individual plaintiffs for losses not caused by fraud. Even if non-fraud firm-specific price increases "canceled each other out" over the entire class period—something Plaintiffs never even attempted to prove—that would still mean that damages for securities bought and sold within the class period would not accurately reflect the damage caused by Defendants' alleged fraud.

As discussed in Defendants' moving papers, the author of the sole authority on which Fischel relied in developing his leakage model concluded—without qualification—that the model was incapable of isolating the price impact of Defendants' alleged fraud: "Fischel's leakage model assumes, without demonstrating, that all the news items that affect Household's stock price are related to the fraud," which "does not provide adequate evidence, indeed it really provides no evidence, that the stock price decline was caused by leakage of fraud related information rather than disclosure of other firm specific news." Doc. 1361-7, Ex. 9 at 4-5.

Plaintiffs make no serious attempt to rebut Professor Cornell's identification and explanation of this fatal defect. Instead, Plaintiffs argue that Professor Cornell's views "should not even be considered by this Court" because "Cornell was not a designated expert in the case." Doc. 1876 at 15 n.14. Setting aside the absurdity of the suggestion that the author of the sole authority on which the leakage model was based (Fischel cited Professor Cornell nearly a dozen times in his report) is not qualified to opine on Fischel's use of the leakage model, the single case cited by Plaintiffs in support of this Court turning a blind eye to Professor Cornell's views provides no basis for doing so. *See id.* (citing *CIVIX-DDI, LLC v. Cellco P'ship*, 387 F. Supp. 2d 869, 884 (N.D. Ill. 2005)). What is more, Plaintiffs simply repeat the same mistake that they make throughout their response when they observe that "Cornell does not repudiate his article or criticize Fischel for adopting his approach or the ***method*** Fischel used in following Cornell's leakage approach." *Id.* That is true, but beside the point. Neither Defendants nor Professor Cornell contend that a leakage

model like that described in Bradford Cornell's and R. Gregory Morgan's *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. Rev. 883 (1990), cannot be utilized in a securities fraud case. But Defendants and Professor Cornell agree that the methodology outlined in *Using Finance Theory* was misapplied here, resulting in an economic model that "does not provide adequate evidence, indeed it really provides no evidence, that [Household's] stock price decline was caused by leakage of fraud related information rather than disclosure of other firm specific news.…" Doc. 1361-7, Ex. 9 at 4-5.

Unable to answer for their failure to isolate the price impact of Defendants' alleged fraud under the leakage model, Plaintiffs suggest that Defendants "have waived" this objection by "fail[ing] at trial to cross-examine Fischel" on the matter. Doc. 1876 at 14-15. Plaintiffs are wrong on the facts and the law. On the facts, Defendants did cross examine Fischel on exactly this issue, as reflected in the following colloquy:

> Q: And you agree there are a bunch of stock price movements that were significant under your regression analysis that were not attributable to fraud-related disclosures, don't you?
>
> A: There were probably some, both positive and negative, but a lot of the significant movements were combined disclosures of—they had some fraud-related aspect and then they had some other aspect in addition to the fraud-related aspect.
>
> Q: And were there some, any, that had no fraud-related aspect?
>
> A: It's a matter of judgment as to whether something has a fraud-related aspect or not. I would say there were a few, but there were also, I would say, a significant number of the statistically significant movements that had this combined aspect.
>
> ***But just be to clear, under the leakage model, whether they did— whether they were purely fraud related, combined fraud related or not at all fraud related, they were all included in the leakage model.***

Tr. 2959:24-2960:17 (emphasis added). As Fischel's testimony on cross examination makes clear, the leakage model made no effort to separate out the non-fraud related aspects of combined

disclosures, or even disclosures "not at all fraud related"; so long as they were company specific, they were included. Perhaps for this reason, the overwhelming focus of Plaintiffs' direct testimony with Fischel was the specific disclosures model, rather than the leakage model.

In all events, Plaintiffs' waiver argument is unfounded because they misrepresent the holding of the case they cite in support of their waiver argument. *Lapsley v. Xtec, Inc.*, 689 F.3d 802 (7th Cir. 2012), does not hold—as Plaintiffs suggest—that a failure to cross examine a witness on a specific issue amounts to waiver. Indeed, one searches in vain for a discussion of waiver in *Lapsley*, which merely affirmed the denial of a defendant's *Daubert* motion and motion for judgment as a matter of law. More fundamentally, Plaintiffs' waiver arguments cannot be taken seriously given the fact that Defendants have objected to Plaintiffs' leakage model and its use in this litigation at every stage of this case, including motions for summary judgment, *Daubert* motions, at trial, and in motions for judgment pursuant to Rule 50(a). *See* Docs. 1235, 1249, 1364, 1488, 1569, 1597.

Plaintiffs fault Defendants for failing to adduce any evidence at trial that Household's stock price declines were due to non-fraud company specific reasons. Plaintiffs' position on this score—which is repeated throughout their response—gets the law exactly backwards. It was Plaintiffs' burden to prove that their losses were attributable to the alleged fraud; the law does not mandate that Defendants prove that Household's stock price decline was caused by non-fraud firm-specific factors. Seventh Circuit precedent is unequivocal: "plaintiffs bear the burden of persuasion" and must establish how and when artificial inflation entered and exited the stock. *Schleicher*, 618 F.3d at 687; *see Dura*, 544 U.S. at 345 ("the statute expressly imposes on the plaintiffs 'the burden of proving' that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover'" (quoting 15 U.S.C. § 78u-4(b)(4)). Plaintiffs' failure to carry their burden means that "the class loses outright." *Schleicher*, 618 F.3d at 687.

## II. THE JURY'S REPURPOSING OF THE LEAKAGE MODEL RESULTED IN AN IRRATIONAL AND UNSUPPORTED VERDICT, REQUIRING A NEW TRIAL.

As explained in Defendants' moving papers, the jury misapplied Plaintiffs' leakage model, which resulted in an irrational and unsupported verdict. *See* Doc. 1867 at 22-24. The fundamental problem is that the leakage model (flawed as it was) was designed to assess the "deflation" of assumed inflation pre-existing in the stock price, yet the jury attempted to employ it to measure the inflation purportedly "introduced" by specific statements during the Class Period. Plaintiffs now concede as much. *See* Doc. 1876 at 16 ("The jury found that the first false statement on March 23, 2001 ***introduced*** inflation into Household's stock price." (emphasis added)).

Whatever its defects as a mode of proving deflationary leakage, attempting to repurpose the model to attribute the "introduction" of inflation to specific statements was a complete disaster. According to the jury verdict, a single statement—a third-party reprint of a 10-day-old statement— somehow caused Household's stock to go from having zero of its $54.72 per share price attributable to inflation on March 22, 2001, to having $23.94 of its $58.12 per share price attributable to inflation on March 23, 2001. Verdict Form, Table B; PX1395. That facially absurd finding was wholly precluded by the leakage model itself, which determined $23.94 to be the maximum amount of inflation attributable to the combined impact of Plaintiffs' three fraud theories over the entire Class Period—the leakage model only attributed 67 cents of inflation to the March 23, 2001 statement. The jury's attribution of the entire $23.94 to a single theory of fraud demonstrates that the jury fundamentally misapplied the model and demands a new trial. *Cf. Comcast*, 133 S. Ct. 1426.

### A. The Jury's Finding That The March 23, 2001 Statement Introduced The Total Sum Of Inflation Into The Stock Price Requires A New Trial.

Professor Fischel based his leakage model on the assumption that Household's stock price was inflated by three discrete types of fraud—predatory lending, re-aging, and the credit

card accounting that resulted in the restatement, *see* Tr. 2854:20-2855:23—and the leakage model (as opposed to the specific disclosures model which the jury rejected) lacked a mechanism to disaggregate the impact of those three theories. As a result, the jury's assignment of the full $23.94 of inflation to a statement relating only to predatory lending is problematic for several reasons. *See* Doc. 1867 at 25-29. Most fundamentally, even if the jury could have relied on Professor Fischel's leakage model in a manner contrary to its design—to assign an artificial inflation amount to a misrepresentation involving only one of Plaintiffs' three fraud theories—it is legally impossible to assign the entire $23.94 to a statement relating solely to predatory lending. Professor Fischel calculated $23.94 to be the maximum aggregate inflationary stock price impact based on the combined effect of all three alleged frauds. PX1395. The notion that the full $23.94 is attributable to a single theory of fraud, let alone a single repeated statement addressing only predatory lending, is irreconcilable with Fischel's own testimony and the premises behind the leakage model itself.[3]

This error was problematic enough even before the Supreme Court's decision in *Comcast*, but *Comcast* makes plain that the jury's verdict cannot be sustained. All Plaintiffs have to say in response is that "[u]nlike in *Comcast*, the jury found defendants liable for all three different types of misstatements." Doc. 1876 at 21. But that is a distinction without a difference. The jury did find that *later* statements supported different theories of fraud, but that does not somehow excuse the jury for attributing the inflation associated with all three theories to a single statement pertaining to a single theory. The jury's finding of loss causation and damages is

---

[3] Plaintiffs assert that there is no way that the March 23, 2001 statement can be mere puffery because Gilmer stated at trial that "he believed it 'an accurate statement of facts.'" Doc. 1876 at 20 n.18. Plaintiffs cite no case for the proposition that a lay witness's statement about whether something is fact or opinion is material for purposes of assessing whether a statement constitutes puffery. The March 23, 2001 statement about Household's lending practices is exactly the sort of statement that courts have held "contains no useful information upon which a reasonable investor would base a decision to invest." *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995).

premised on the March 23 statement that reflected only one of the three theories. As in *Comcast*, there is "no question that the model failed to measure damages resulting from the particular" theory "on which [Defendant's] liability in this action is premised." 133 S. Ct. at 1433. The leakage model did not offer any mechanism for isolating the economic impact of a single theory of fraud, let alone a single statement.

Plaintiffs contend that Defendants' argument on this score is waived because Defendants did not ask the jury to return to deliberate and correct its mistakes. Again, Plaintiffs are mistaken on the facts and the law. Defendants did not waive their objections to the jury's inconsistent verdict. Contrary to Plaintiffs' assertion, Defendants asked the Court to retain the jury and expressly objected to the verdict's inconsistencies before the jury's discharge. Indeed, the Court stated on the record that Defendants had preserved any issue they wished to raise in a written motion. *See* Tr. 4806:25-4809:18.[4] And Plaintiffs' argument that Defendants were required to "ask the Court to order the jury to return to deliberate and rectify the supposed conflict" in this case, Doc. 1876 at 20, is without merit. *See, e.g.*, *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 83 (2d Cir. 2006) ("[T]here is no authority to support plaintiffs' contention that, when faced with an inconsistent verdict, the onus is on the 'dissatisfied party' to *ensure* that the court keep the jury.… A litigant preserves the issue for appeal by exposing the inconsistency before the jury is dismissed."). Indeed, the Seventh Circuit has "never specifically endorsed" the view that an

---

[4] After being informed that the jury had reached a verdict, counsel for Defendants stated: "we may need a few minutes to review it and caucus ourselves, during which time it probably would be advisable to keep the jury but— send them back to the jury room while counsel review the verdict form." Tr. 4787:22-4788:21. The Court stated that after reviewing the verdict form it would "ask [counsel] if you have any motions to make before I discharge the jury." Tr. 4788:17-18. The Court then reviewed the form, stated that it was consistent, and published the verdict. Tr. 4790:3-4792:25. Counsel for Defendants then objected on the record and in the presence of the jury: "We believe the verdict is fatally inconsistent in a number of ways, which we're prepared to detail to the Court.… We have other things we'll say at the appropriate time, but that is something which I thought should be mentioned before the jury retires." Tr. 4806:25-4807:14. The jury was discharged and sent back to the jury room, and counsel for Defendants began to outline additional objections to the verdict. The Court interjected and stated: "*I'm ruling that you're reserving any issues you wish to raise in a written motion*." Tr. 4809:6-18 (emphasis added).

objection to inconsistent verdicts prior to the jury's discharge is required, *Carter v. Chi. Police Officers*, 165 F.3d 1071, 1079-80 (7th Cir. 1998), and recognized that an inconsistent verdict can justify a new trial even where the inconsistency is not identified until after the jury is discharged, *see Timm v. Progressive Steel Treating, Inc.*, 137 F.3d 1008, 1010 (7th Cir. 1998).[5]

Plaintiffs also attempt to minimize the import of the jury's impossible findings by citing case law stating that damages "calculations need not be exact." Doc. 1876 at 12. To be sure, Plaintiffs were not required to establish the amount by which Household's stock price was inflated due to Defendants' alleged fraud to the nth decimal place. And the jury was not required to make such a precise finding. *See, e.g.*, *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1243 (7th Cir. 1988). But, as Plaintiffs note, the jury verdict must be "set aside" if it lacks "a reasonable basis … in the record." Doc. 1876 at 3. And here, the attribution of $23.94 to the March 23, 2001 statement is much more than a mere imprecise calculation—it is completely without ***any*** basis in the record. Indeed, the only relevant record evidence indicates that there was a mere 67 cent inflationary increase on that day, which was attributable to a modeling artifact—not fraud.

Plaintiffs next contend that "Defendants did not put forth any alternative inflation amount for" March 23, 2001. Doc. 1876 at 20. As discussed *supra*, this is merely another example of Plaintiffs confusing which party bore the burden in this case. It was Plaintiffs, and Defendants were not required to present evidence of alternative inflation amounts in response to Plaintiffs' various theories.

Plaintiffs assert that the jury's attribution of the sum total of artificial inflation to a single statement related to only one theory of fraud is unobjectionable because "the jury properly

---

[5] The case cited by Plaintiffs in support of their waiver argument does not involve inconsistent general verdicts—like the verdict at issue here—but instead focuses on inconsistencies among special interrogatories under Rule 49(b). In *Strauss v. Sratojac Corp.*, 810 F.2d 679 (7th Cir. 1987), the court merely held that the failure to object to inconsistent interrogatories ***or*** to the discharge of the jury constituted waiver.

considered the evidence as proving one integrated fraud." Doc. 1876 at 20. That position, however, is critically undermined by the verdict form itself, which required the jury to identify the specific theory of fraud germane to each of its findings. *See* Doc. 1611 at 41. Plaintiffs' position is also in direct conflict with loss causation case law, which requires Plaintiffs to do more than present a mélange of fraud allegations and then leave the jury to its own devices. *See, e.g.*, *Loftin v. Bande* (*In re Flag Telecom Holdings, Ltd. Sec. Litig.*), 574 F.3d 29, 37 (2d Cir. 2009) ("'disaggregation requires that a cause be assigned to each piece of a stock price decline and precludes assigning two different causes to the same quantum of loss'"). Moreover, at least at one point during this litigation, this Court correctly rejected Plaintiffs' "integrated fraud" theory as "a formula for reversal." Tr. 4068:4-4070:5. Regardless, the theory is also in direct conflict with Fischel's own testimony, which stated that the separate theories of fraud had independent price impacts when considered with respect to specific disclosures. *See, e.g.*, Tr. 2631:1-2666:8.

Taking a different tack, Plaintiffs assert that—at most—the jury verdict is only a little bit inconsistent because the jury found that Household made another false statement related to all three theories of inflation on March 28, 2001. Doc. 1876 at 21. But the jury's finding with respect to March 28, 2001, only underscores the absurdity of the verdict. The jury found zero additional inflation on that day.[6]

### B. The Jury's Attribution Of $23.94 Of Inflation To A Single Statement Regarding Predatory Lending Has No Basis In The Evidence.

There was simply *no* evidence—none—to support a finding that $23.94 of inflation was introduced into Household's stock price on March 23, 2001. As noted, Professor Fischel found

---

[6] Plaintiffs also offer up the jury's findings regarding March 28, 2001, as justification for denying judgment as a matter of law for Schoenholz. *See* Doc. 1876 at 17 n.16. Though Plaintiffs clearly wish it were otherwise, they cannot shuffle dates and findings post hoc to make sense of a jury verdict that is nonsensical. The jury's finding that all the inflation in Household's stock price was attributable to the March 23 statement, but that Schoenholz was not liable for that statement, entitles Schoenholz to judgment as a matter of law.

15

only a 67 cent inflationary increase that day, and testified that Gilmer's statement about predatory lending did *not* have an independent inflationary impact on the stock price—the 67 cent increase was not caused by any false statement, but was the product of a modeling artifact resulting from the method Fischel used to calculate inflation for all dates prior to November 15, 2001. *See* PX1395 (describing the use of the constant percentage approach). Given this complete absence of evidence, the jury could not properly determine that Household's stock price went from having zero of its $54.72 per share price attributable to inflation on March 22, 2001, to having $23.94 of its $58.12 per share price attributable to inflation on March 23, 2001.

## III. MULTIPLE ERRORS IN THE JURY INSTRUCTIONS AND VERDICT FORM ENTITLE DEFENDANTS TO A NEW TRIAL.

Plaintiffs' response misstates Seventh Circuit law governing instructional error on an essential element of a claim and wholly ignores *Dawson v. New York Life Insurance Co.*, 135 F.3d 1158 (7th Cir. 1998). Plaintiffs suggest that evidence in the record could be construed to support a verdict under a correct statement of law. Plaintiffs have it wrong. "When a jury could have based its verdict on either correct or incorrect statements of law, 'its verdict must be set aside even if the verdict may have been based on a theory on which the jury was properly instructed.'" *Id.* at 1165. Here, the instruction on when a defendant is considered to have "made" a false statement, and the instruction on the scienter element of Plaintiffs' Rule 10b-5 claim, are contrary to the law of this Circuit and controlling Supreme Court authority. *Dawson* mandates a new trial. Moreover, the prejudicial impact of the erroneous instructions of law permeates the verdict. The erroneous jury instructions on these elements of Plaintiffs' securities fraud claim resulted in legally incorrect and unsupportable determinations of primary liability, secondary liability, and allocation of liability among the Defendants.

16

**A.     The Instruction On The First Element of Plaintiffs' Rule 10b-5 Claim Was Erroneous And Resulted In Clear Prejudice To Defendants.**

In *Janus Capital Group Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011), the Supreme Court squarely held that one who furnishes "'the false or misleading information that another person then puts into the statement,'" or who provides "'substantial assistance'" in formulating the content of a representation, does not thereby "'make'" the statement as required to meet the first element of a Rule 10b-5 claim. *Id.* at 2301-03. In the face of *Janus,* Plaintiffs argue that the instruction on the first element of Plaintiffs' Rule 10b-5 claim—that Plaintiffs needed to prove that a Defendant "made, approved or furnished information to be included in a false statement of fact"—is not a misstatement of law because it "was taken directly from controlling Seventh Circuit authority." Doc. 1876 at 37 (citing *Makor Issues & Rights, Ltd. v. Tellabs Inc.,* 513 F.3d 702 (7th Cir. 2008)). Plaintiffs' argument is incorrect.

First, *Makor* predates *Janus*. Second, *Makor* did not even address when a defendant can be deemed to have "made" a false statement, but rather addressed the issue of *corporate scienter*. *See Makor*, 513 F.3d at 707-08. In *Makor*, moreover, the Seventh Circuit explicitly rejected the "group pleading doctrine," which is "a judicial presumption that statements in group-published documents including annual reports and press releases are attributable to officers and directors who have day-to-day control or involvement in regular company operations." *Id.* at 710 (internal quotations omitted). The Seventh Circuit reiterated that holding in *Pugh v. Tribune Co.*, 521 F.3d 686, 693-94 (7th Cir. 2008).

At the jury instruction conference, the Court and Plaintiffs made clear that the "approved or furnished" language was meant to address responsibility for the "making" of a statement. Tr. 3850-52. The Court held that this language needed to be included in the instruction on the first element of Plaintiffs' Rule 10b-5 claim to instruct the jury on responsibility for making a

statement based on "substantial participation." Tr. 3852:15-19. Defendants repeatedly objected to the addition of the "approved or furnished" language to the instruction on the first element of a Rule 10b-5 claim, Tr. 3853, 3859, 3862, and stated: "We know of no authority, Your Honor, and I don't believe plaintiffs have provided any, for the imposition of Rule 10b-5 liability on any actor who has not made a material misrepresentation or false or misleading statement." Tr. 4004:13-16. In particular, counsel directed the Court's attention to the Supreme Court's decision in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008). Tr. 4004:18-23. In *Stoneridge*, the Supreme Court discussed its earlier decision in *Central Bank of Denver, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164 (1994), and reiterated: "The § 10(b) implied private right of action does not extend to aiders and abettors. The conduct of a secondary actor must satisfy each of the elements or preconditions for liability." *Stoneridge*, 552 U.S. at 158. This Court responded: "This is the same argument we had before, and I think the defendants have made a pretty clear record." Tr. 4005:23-25.

The instruction on the first element of Plaintiffs' Rule 10b-5 claim was inconsistent with the Seventh Circuit's repudiation of the group pleading doctrine in *Makor* and *Pugh*, and the Supreme Court's decisions in *Central Bank* and *Stoneridge.* The error of law is now patent in the wake of *Janus*. As Defendants demonstrated in their opening memorandum, *Janus* unequivocally holds that only a defendant who actually *made* a false statement of material fact can be held liable under Section 10(b) and Rule 10b-5, and that "substantial assistance" or the "furnishing" of information to be included in a false statement is not legally sufficient to meet the first element of a private right of action for violation of Section 10(b) and Rule 10b-5. *See* Doc. 1867 at 40-41. The Supreme Court explained that the rule enunciated in *Janus* follows from the Court's decision in *Central Bank*, in which the Court held that there is no private right

18

of action against aiders and abettors, *i.e.*, persons who "contribute 'substantial assistance' to the making of a statement but do not actually make it." *Janus*, 131 S. Ct. at 2302.

Plaintiffs suggest that this Court corrected the erroneous summary instruction by omitting the "approved or furnished" language from a later instruction on the first element. Doc. 1876 at 36. The omission of the language in the subsequent instruction, however, did nothing to correct the misstatement of law that was conveyed to the jury. The summary instruction was *more detailed* than the subsequent instruction and informed the jury about the various circumstances in which (under the incorrect view of the law) a defendant could be considered to be the "maker" of a false statement. When the jury was given the immediately following instruction on the first element of Plaintiffs' Rule 10b-5 claim, the jury necessarily would have understood the requirement to be met by proof that a Defendant either "made, approved, or furnished information to be included in a false statement of fact." And in fact, as discussed below, the verdict manifests that the jury did understand the instruction in that legally incorrect manner.

Plaintiffs also attempt to argue that *Janus*'s holding is limited to the specific facts of that case, which dealt with statements by a third party, and that *Janus* does not apply in cases involving corporate officers or "quintessential insiders." Doc. 1876 at 37-38. Nothing in *Janus* supports such a strained limitation and courts have appropriately rejected attempts to limit *Janus*'s holding in this manner. For example, in *In re UBS Ag Securities Litigation*, Master File No. 07 Civ. 11225(RJS), 2012 U.S. Dist. LEXIS 141449, at *31-32 (S.D.N.Y. Sept. 28, 2012), the court addressed and rejected the very same argument Plaintiffs make here:

> In its opposition brief, Lead Plaintiff attempts to read into *Janus* a distinction that does not appear in the opinion—namely, that although the opinion applies to a third-party advisor, it does not apply to "corporate insider[s] responsible for the day-to-day affairs" of a company.… However, while it is true that *Janus* might "not alter the well-established rule that 'a corporation can act only through its employees and agents,'" *In re Merck & Co. Sec., Derivative & "ERISA" Litig.*,

19

MDL No. 1658(SRC), 2011 WL 3444199, at *25 (D.N.J. Aug. 8, 2011) (citation omitted), it is nonetheless also true that a theory of liability premised on treating corporate insiders as a group cannot survive a plain reading of the *Janus* decision.

In support of their erroneous attempt to suggest that *Janus* only applies to third-parties, Plaintiffs cite inapposite district court cases dealing with circumstances in which corporate officers directly responsible for the "making" of a statement (such as signing a securities filing) attempted to suggest that only the *corporation* could be held to have "made" the statement. Doc. 1876 at 38. As one court recently noted: "After *Janus*, defendants who signed misleading disclosure documents have often contended that only their company or its board of directors— and not they themselves—possessed 'ultimate authority.' But courts in this district and across the country have rejected this argument." *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 163 (S.D.N.Y. 2012). Here, Defendants make no such argument. Instead, Defendants have argued correctly that, under *Janus*, one executive cannot be held liable for a statement made by another executive, nor can an executive be held liable for corporate statements over which the executive did not have "ultimate authority."

None of Plaintiffs' authorities supports Plaintiffs' proposition that, notwithstanding *Janus*, one corporate "insider" can be held liable for a statement actually made by another corporate "insider." Instead, Plaintiffs' authorities (many of which also explicitly rely upon the "group pleading" doctrine expressly rejected in the Seventh Circuit) simply hold, as did the court in *Smith Barney*, that a corporate executive who has direct responsibility for a statement issued *by the corporation* (such as signing an SEC filing) is nonetheless also personally liable as the "maker" of the corporate statement.[7]

---

[7] *See City of Pontiac General Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012); *In re Pfizer Inc. Sec. Litig.*, No. 04 Civ. 9866(LTS)(HPB), 2013 WL 1285173, at*11 (S.D.N.Y. Mar. 28, 2013); *In re Satyam Computer Servs. Secs. Litig.*, 915 F. Supp. 2d 450, 477 n.16 (S.D.N.Y. 2013); *SEC v. Carter*,

Refusing to even acknowledge *Dawson*, Plaintiffs argue that no prejudice can be shown with respect to the misstatement of law. Plaintiffs' argument is incorrect both legally and factually. First, prejudice exists as a matter of law where, as here, the jury might have premised its verdict on the incorrect theory of law contained in the erroneous instruction. "Prejudice to the complaining party includes the possibility that the jury based its decision on incorrect law." *Dawson,* 135 F.3d at 1165; *see also Byrd v. Ill. Dep't of Pub. Health*, 423 F.3d 696, 709 (7th Cir. 2005).

Second, the verdict itself manifests the prejudice. For instance, the jury found that Aldinger "made" the March 23, 2001 statement published in *Origination News*, which on its face was made by and attributed to Gilmer alone. Doc. 1611 at 14 and Table A, No. 14. As explained in *Janus*, "in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—*and only by*—the party to whom it is attributed." 131 S. Ct. at 2302 (emphasis added). Gilmer testified directly that statement was his own and made based on his own firmly held beliefs. Tr. 1134:11-1136:1. Properly instructed, the jury could not have found Aldinger liable as a "maker" of the March 23 statement.

The fact that the jury found Aldinger liable with respect to other statements does not, as Plaintiffs suggest, eliminate the prejudice from the jury's determination with respect to the March 23 statement. Doc. 1876 at 39-40. Having erroneously found that Aldinger was a maker of the March 23 statement, the jury then concluded that Aldinger "knowingly" made the March 23 statement (and consequently that Household also "knowingly" made the statement), *even though* Gilmer, the actual "maker" of the statement, was found only to have done so "recklessly." Doc. 1611 at 14. Gilmer was not a "controlling" person with respect to Household. *Id.* at 43. As to all other statements for which the jury found Aldinger or Household liable, the jury determined that

---

No. 10 C 6145, 2011 WL 5980966, at *2-3 (N.D. Ill. Nov. 28, 2011); *SEC v. Benger,* No. 09 C 676, 2013 WL 1150578, at *1-2 (N.D. Ill. Mar. 21, 2013).

they acted only recklessly. Doc. 1611. Thus, as a result of the jury's determination with respect to the March 23 statement, Aldinger and Household would be jointly and severally liable for the entire amount of the verdict. *See* 15 U.S.C § 78u-4(f)(2)(A). The prejudice is plain.[8]

The jury also found Gilmer liable as a "maker" of the 16 alleged misstatements contained in Household's Forms 10-K, 10-Q, and related press releases—notwithstanding that Gilmer did not sign any of the filings, was not a control person of Household, and Plaintiffs failed to present any evidence that Gilmer was responsible for the preparation of those SEC filings. Doc. 1867 at 41. Plaintiffs cite *Lockheed Martin* for the proposition that "it is not inconsistent with Janus Capital to *presume* that multiple people in a single corporation have the joint authority to 'make' an SEC filing." *Id.* n.60 (emphasis added). Significantly, the court in *Lockheed Martin* based its holding on the group-pleading doctrine. *Lockheed Martin*, 875 F. Supp. 2d at 373-74. As discussed above, the Seventh Circuit expressly rejected that doctrine even before the Supreme Court issued its decision in *Janus*.[9]

Had the jury been correctly instructed on the first element of Plaintiffs' Rule 10b-5 claim, the jury could not have found Gilmer liable as a "maker" of Household's SEC filings. *See*, *e.g.*, *Smith Barney*, 884 F. Supp. 2d at 165 ("Because [Daidone] did not sign those filings, he did not 'make' the statements they contained."); *City of Roseville Emps.' Ret. Sys. v. EnergySolutions,*

---

[8] Plaintiffs assert that, even if the jury had found Aldinger and Household to be only recklessly liable for the March 23, 2001 statement, Household would still be responsible for 100% of the verdict under principles of *respondeat superior*. Doc. 1876 at 40 n.55. This assertion is incorrect. Under principles of *respondeat superior*, a principal is liable to the same extent as its agent. *See*, *e.g.*, *Javier v. City of Milwaukee*, 670 F.3d 823, 828 (7th Cir. 2012). As previously discussed, the jury's misapplication of Fischel's leakage model resulted in the entire $23.94 of inflation being attributed solely to the March 23, 2001 statement that, under *Janus*, was made by Gilmer alone. The jury found Gilmer responsible for 10% of the verdict amount. Doc. 1611 at 42. Thus, if Household were held liable on a *respondeat superior* theory for Gilmer's March 23 statement, Household's total share of the liability would be 65% of the verdict amount (the 55% share for which the jury found Household directly liable plus Gilmer's 10% share of responsibility). Furthermore, no court has yet addressed whether a *respondeat superior* theory of liability is compatible with the PSLRA's apportionment of liability provisions.

[9] In *UBS*, the court noted that the majority view in the Southern District of New York is that the group-pleading doctrine survived *Janus*. *UBS*, 2012 WL 4471265, at *10. The UBS court further observed that this view "is wholly at odds with the view of each circuit court to have squarely addressed the issue prior to *Janus*." *Id.*

*Inc.*, 814 F. Supp. 2d 395, 417 (S.D.N.Y. 2011) (holding, under *Janus*, individuals did not sign the registration statement could not be held liable).

Based on the erroneous instruction on the first element of Plaintiffs' Rule 10b-5 claim, the jury also found that: (1) Gilmer and Schoenholz "made" a statement that was made only by Aldinger at a conference; and (2) Gilmer and Aldinger "made" statements that were made only by Schoenholz at conferences. Doc. 1867 at 42. Plaintiffs assert that the jury correctly found the non-speaking Defendants liable for the statements made by other Defendants because the non-speaking Defendants were present when the alleged misstatements were made but failed to correct them. Doc. 1876 at 43-44. Notably, *Barrie v. Intervoice-Brite, Inc.*, 409 F.3d 653 (5th Cir. 2005), on which Plaintiffs rely for the proposition that a corporate official "cannot sit quietly" while another corporate official makes a misstatement, predates *Janus* and is inconsistent with Seventh Circuit law. As Defendants discussed in their opening memorandum, the Seventh Circuit has squarely held that a plaintiff cannot "get around" *Janus* by asserting that a defendant who did not "make" a statement had a duty to correct a statement made by another defendant. Doc. 1867 at 41 (quoting *Fulton Cnty. Emps. Ret. Sys. v. MGIC Inv. Corp.*, 675 F.3d 1047, 1051-52 (7th Cir. 2012)). In *Fulton*, the Seventh Circuit stated that "no statute or rule creates such a duty" and observed that "if there were one, *Janus Capital* itself would have come out the other way." *Id.* Plaintiffs' only response to this point, is to argue, incorrectly and in a footnote, that *Fulton* applies only in cases involving statements by third parties. Doc. 1876 at 44 n.63. Nothing in *Fulton* supports Plaintiffs' attempt to limit its holding in this way.

The jury's determination of which Defendants "made" which statements necessarily impacted the jury's determination of the relative fault of the four Defendants. In assessing relative fault, a jury must consider "the nature and extent of the causal relationship between the

conduct of each such person and the damages incurred by the plaintiffs or plaintiffs." 15 U.S.C. § 78u-4(f)(3)(C). To properly assess the "nature and extent of the causal relationship," requires, in the first instance, that the jury accurately determine who is legally responsible for the respective actionable misstatements.

**B. The Instruction On The Second Element Of Plaintiffs' Rule 10b-5 Claim Also Was Erroneous And Prejudiced Defendants.**

As Defendants discussed in their opening memorandum, the Court *sua sponte* and over Defendants' objection added the "knew or should have known" language to the jury instruction on scienter and refused Defendants' request to use the definition of scienter set forth by the Supreme Court in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976), *i.e.*, "'scienter refers to a mental state embracing intent to deceive, manipulate, or defraud." Doc. 1867 at 44-45. Plaintiffs contend that the language used by the Supreme Court in *Ernst & Ernst* no longer represents a correct statement of the law because, subsequent to *Ernst & Ernst*, this Court and others held that scienter can be established by a showing of recklessness. Doc. 1876 at 47 n.65. Plaintiffs' assertion is meritless. The Supreme Court repeatedly has reiterated the *Ernst & Ernst* scienter standard, most recently in *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1323-24 (2011). Furthermore, it is beyond dispute that, for conduct to be reckless, as opposed to merely negligent, the conduct must meet the *Ernst & Ernst* scienter standard. *See Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007) (citing *Ernst & Ernst* and explaining that the "'required state of mind'" for a § 10(b) claim "is an *intent to deceive*, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false" (emphasis added)).

Plaintiffs' authorities provide no support for the assertion that the words "should have known" merely refer to the "temporal aspect" of scienter and are meant to prevent claims based on "fraud by hindsight." Doc. 1876 at 46. Indeed of the four cases cited by Plaintiffs, the only

one that even employs the phrase "should have known" is *Ong ex rel. Ong v. Sears, Roebuck & Co.*, No. 03 C 4142, 2005 WL 2284285 (N.D. Ill. Sept. 14, 2005). *Ong* involved a motion to dismiss—not a jury trial—and it is clear from the opinion that the court based its decision on the legally correct definition of "recklessness." *See id*. at *18, *22.

Here, there can be no assurance that the jury did not understand the "should have known" language to mean that Defendants could be held liable for conduct that did not rise to the level of "recklessness." Indeed, the "should have known" language is the classic definition of negligence. *See, e.g.*, *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070-71 (2011); *Scarver v. Litscher*, 434 F.3d 972, 975 (7th Cir. 2006); *see also, e.g.*, *United States v. Ladish Malting Co.*, 135 F.3d 484, 488 (7th Cir. 1998) ("No case of which we are aware treats what a person 'should have known' as knowledge or willfulness.").

Plaintiffs argue that the jury would not have been confused by the inclusion of the "knew or should have known" language in the scienter instruction because *Plaintiffs' counsel* advised the jury that Plaintiffs needed to prove that Defendants "acted knowingly or recklessly." Doc. 1876 at 47. This begs the question of what the jury understood "recklessly" to mean. Furthermore, it is the Court's role, not counsel's, to instruct the jury on the law. The scienter instruction incorrectly included the "knew or should have known" language and, unlike in *Wakeen Doll*, on which Plaintiffs rely, Doc. 1876 at 47, the verdict form here did not eliminate any confusion caused by the insertion of the "knew or should have known" language into the scienter instruction. Instead, the verdict form merely set forth the word "recklessly" that had been improperly defined in the instructions.

Blurring the distinction between recklessness and negligence was particularly prejudicial here because the jury found *all* 17 actionable statements were made "recklessly." (As discussed

*supra*, the jury found that the March 23 statement was made "recklessly" by Gilmer, and only found it to have been made "knowingly" based upon incorrectly holding Aldinger to be a "maker" of the statement). Given the erroneous scienter instruction, there is no way to determine whether the jury based its finding that these statements were made "recklessly" on a negligence theory that Defendants "should have known" that the statements were false. The Court cannot *assume* that the jury based its decision on a correct legal theory where both a correct and incorrect theory were instructed. *Dawson*, 135 F.3d at 1165. "Prejudice to the complaining party includes the possibility that the jury based its decision on incorrect law." *Id.*

### C. Defendants Also Were Prejudiced By Defects In The Verdict Form.

Plaintiffs attempt to distinguish Defendants' authorities regarding the combined prejudicial effect of erroneous jury instructions and a defective verdict form by asserting that, here, the defects in the verdict form were unrelated to the erroneous jury instructions. Doc. 1876 at 48 n.66. Plaintiffs wholly ignore that the overarching defect in the verdict form, as Defendants pointed out in their opening memorandum, was that the Court refused Defendants' request to require the jury to find that the specific elements of Plaintiffs' Section 10(b) and 20(a) claims with respect to each alleged misstatement and each Defendant. Doc. 1867 at 47.[10]

This defect in the verdict form also allowed the jury to find a Defendant liable as a control person without determining that the Defendant had the power to control *the specific transaction at issue*, which, as Plaintiffs acknowledge, is a necessary predicate for liability under Section 20(a). Doc. 1876 at 51. Although showing the actual exercise of control may not be a required, it must be shown that the power to control existed for the specific statement at issue.

---

[10] Defendants proposed a verdict form that, unlike the verdict form ultimately used, did not group together disparate statements on different subject matters. Doc. 1546-6; 1546-7. If Defendants' form had been used, the jury would have considered each separate statement and would have indicated its findings as to the elements of each claim as to each statement and each Defendant. The Court declined to use Defendants' proposed verdict form. Tr. 3895.

*Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 877 (7th Cir. 1992). Here there was no evidence that Schoenholz had the power to control statements made by his boss, Aldinger.

In addition to this central defect in the verdict form, Defendants were further prejudiced by the exclusion of Arthur Andersen LLP in the apportionment of responsibility section of the verdict form. The only case that Plaintiffs cite in support of their assertion that Andersen was properly excluded from the verdict form is *Newby v. Enron Corp.* (*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*), 236 F.R.D. 313 (S.D. Tex. 2006), *reversed and remanded, Regents of Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372 (5th Cir. 2007). In that case, the court held that the party seeking to have a portion of the liability apportioned to a non-defendant (or a settling defendant) has the burden of demonstrating that such defendant violated Rule 10b-5. *Id.* at 319. That holding, however, is contrary to the plain language of the PSLRA's proportionate liability provisions, which provide for apportionment of liability among "each covered person and each of the other persons *claimed by any of the parties to have caused or contributed to the loss incurred by the plaintiff*, including persons who have entered into settlements with the plaintiff or plaintiffs." 15 U.S.C. § 78u-4(f)(3)(A) (emphasis added); *see also* 9 Judson Lobdell & Nicholas Napolitan, *Apportionment of Liability Under the PSLRA*, Sec. Litig. Report (May 2012) (discussing why the *Enron* decision is inconsistent with the PSLRA's apportionment of liability provisions). In any event, there was ample evidence that Andersen acted at least recklessly with respect to the events leading to Household's restatement of earnings. Doc. 1876 at 48-49. The prejudice to Defendants from excluding Andersen from the verdict form is clear, requiring a new trial.[11]

---

[11] As discussed, Defendants did not waive their objections to the inconsistencies and irrationality of the jury verdict. *See supra* p. 13 n.4.

## IV. THE AGGREGATE IMPACT OF ERRONEOUS JUDICIAL RULINGS RESULTED IN AN UNFAIR TRIAL.

Plaintiffs cannot—and do not attempt to—dispute the well-established legal principle that a new trial is required where the cumulative effect of multiple errors is a fundamentally unfair trial. *Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 188 (7th Cir. 1993). Nor do Plaintiffs seriously contest that, if Defendants are correct that the multiple erroneous evidentiary rulings were made, these errors cumulatively resulted in an unfair trial.

Rather, Plaintiffs attempt to distract the Court from the merits of Defendants' largely unanswered arguments that multiple erroneous evidentiary rulings were made. As a threshold matter, Plaintiffs repeatedly assert that all but one of the errors that Defendants identify were issues Defendants raised in their *Daubert* and *in limine* motions and therefore are "old matters" that should not be relitigated now. Doc. 1876 at 54. Plaintiffs' authority consists of inapposite cases that discuss the extraordinary remedy of altering or amending a judgment under Rule 59(e), a standard and procedural posture not at issue here.[12] Furthermore, while Plaintiffs argue that the Court is barred from considering arguments previously raised, it simultaneously asserts—incorrectly—that any "new" arguments have been waived.[13] The problems identified in the *Daubert* and *in limine* motions unfolded as predicted at trial and the combined prejudicial effect of these errors resulted in a fundamentally unfair result. Plaintiffs generally misstate the

---

[12] Plaintiffs citation to *Oto v. Metropolitan Life Insurance Co.*, 224 F.3d 601, 606 (7th Cir. 2000), is inapposite because that case analyzed a motion to alter or amend a judgment under Rule 59(e). The decision in *McCloud v. Goodyear Dunlop Tires North America Ltd.*, No. 04-cv-1118, 2008 WL 2323792, at *4 (C.D. Ill. June 2, 2008), also is inapplicable because it relies on *Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir. 1996), which applied the standard for a motion to alter or amend a judgment under Rule 59(e).

[13] Plaintiffs assert that Defendants' "new" argument regarding Ghiglieri's testimony about reaging was waived because defendants failed to object to the testimony at issue during trial. Doc. 1876 at 54 n.75. This argument is specious because Defendants have repeatedly objected to, and moved to exclude, Ghiglieri's testimony in its entirety, and the Court's definitive pre-trial ruling denying that motion. Doc. 1515, eliminated the need to repeat this objection at trial. *Wipf v. Kowalski*, 519 F.3d 380, 385 (7th Cir. 2008). Likewise, there is no merit to Plaintiffs' argument that Defendants failed to object to the improper use of examination reports, Doc. 1876 at 60, because Defendants moved *in limine* to exclude these documents and the Court ruled on that motion. *Wipf*, 519 F.3d at 385.

role of this Court as only a "*limited* gatekeeping function with respect to expert testimony … 'focus[ing] on an examination of the expert's methodology.'" Doc. 1876 at 53 (emphasis added). Any characterization of this Court's gatekeeping function as "limited" is inconsistent with Supreme Court and Seventh Circuit jurisprudence. *See* Doc. 1867 at 52-53. Moreover, here, the "methodologies" employed are fundamentally deficient.

With respect to Ghiglieri, Plaintiffs suggest "[i]t is undisputed that she performed the traditional analysis performed by regulators across the country," and that this was conceded by Defendants' own expert. Doc. 1876 at 55. Contrary to this bald assertion, Defendants' expert opined that Ghiglieri did not perform a "traditional analysis" but instead "[i]gnored accepted methodology in the field of consumer credit regulation." Doc. 1669, Ex. 3 (Bley Report). Plaintiffs are unable to show that Ghiglieri's testimony followed any particular methodology, or was anything more than an unsubstantiated summary of Plaintiffs' predatory lending and re-aging allegations by a non-percipient witness. *See, e.g.*, *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005). With respect to Devor, he did not actually employ a methodology to measure revenues or income attributable to "improper practices." Plaintiffs do not address this defect, discussing only whether he improperly relied on certain documents in forming his opinion. In that regard, Plaintiffs fail to make any plausible argument that it was not error for Devor to base his estimate of earnings from "improper practices" on document PX681, a document of unknown origin and significance, lacking in proper foundation.[14]

Plaintiffs' primary response to their evident use of experts as a vehicle to introduce otherwise inadmissible evidence, in contravention of this Court's pre-trial rulings and the governing law, is to state that the jury instructions protected Defendants. However, the limited

---

[14] The document was admitted over Defendants' objection, notwithstanding that the witness it was presented to, Mr. Aldinger, testified that he did not recognize it and had never heard of the author. Tr. 3479:19-22; 3480:25-3481:9.

instructions were inadequate. *See United States v. Riddle*, 103 F.3d 423, 434 (5th Cir. 1997).[15]

## V. THE PHASE II PROCEEDINGS DEPRIVED DEFENDANTS OF THE RIGHT TO A PROPER ADJUDICATION OF THE ELEMENT OF RELIANCE.

With respect to the errors in the "Phase II" proceedings, Plaintiffs do not substantively address the arguments set forth in Defendants' opening memorandum, *see* Doc. 1867 at 61-65, instead resting upon their prior briefing on the issue and this Court's Order of September 21, 2012. *See* Doc. 1876 at 63-65. For the reasons set forth, and given *inter alia* the Supreme Court's intervening authority in *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S. Ct. 1184, 1194-96 (2013) (making clear that statements that do not independently "affect market price [] cannot be relied upon indirectly by investors who, as the fraud-on-the-market theory presumes, rely on the market price's integrity"), the Court's prior ruling is in error and should now be corrected.[16] Based on the irrational and unsupported jury verdict, statements relating to the Restatement and Re-Aging did not "affect market price" because *all* inflation ("affect [on] market price") was attributed to a statement concerning solely Predatory Lending.

## CONCLUSION

For the reasons set forth herein and in Defendants' opening memorandum, the Court should resolve all claims in Defendants' favor and grant Defendants' Renewed Motion for Judgment as a Matter of Law. Alternatively, the Court should grant Defendants' Motion for a New Trial.

---

[15] For example, although this Court ruled that customer complaints and complaints filed in other civil cases could be used for only a limited purpose, Doc. 1516 at 5, Ghiglieri spent more than two days simply reading Plaintiffs' chosen complaints aloud, thus inundating the jury with select, unadjudicated complaints and other hearsay. Plaintiffs' counsel compounded this problem by repeatedly referring to such testimony during closing.

[16] Plaintiffs mistakenly cite to precedent addressing motions for reconsideration of case dispositive rulings on the pleadings, such as *Pickett v. Prince*, 5 F. Supp. 2d 595 (N.D. Ill. 1998), rather than Rule 50/59 motions in the context of bifurcated proceedings in which the required elements of a plaintiffs' claim were bifurcated into separate "phases." That said, Defendants' agree that the underlying issues were previously presented to and addressed by the Court, and stated such in the Memorandum of Law. Doc. 1867 at 61-62.

Dated: September 13, 2013

/s/ Paul D. Clement
Paul D. Clement
BANCROFT PLLC
1919 M Street, NW, Suite 470
Washington, DC 20036
(202) 234-0090
pclement@bancroftpllc.com

R. Ryan Stoll
Mark E. Rakoczy
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM
155 North Wacker Drive
Chicago, IL 60606
(312) 407-0700

Thomas J. Kavaler
Patricia Farren
Jason M. Hall
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, NY 10005
(212) 701-3000

*Attorneys for Defendants Household
International, Inc., William F. Aldinger,
David A. Schoenholz, and Gary Gilmer*

## CERTIFICATE OF SERVICE

Paul D. Clement, an attorney, hereby certifies that on September 13, 2013, he caused true and correct copies of the foregoing Reply in Support of Defendants' Renewed Motion for Judgment as a Matter of Law or, in the Alternative, a New Trial to be served via the Court's ECF filing system on the following counsel of record in this action:

Michael J. Dowd
Daniel S. Drosman
Spencer A. Burkholz
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

Marvin A. Miller
Lori A. Fanning
MILLER LAW LLC
115 South LaSalle Street, Suite 2910
Chicago, IL 60603

*/s/ Paul D. Clement*
Paul D. Clement