# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **LAWRENCE E. JAFFE PENSION PLAN, on behalf of itself and all others similarly situated,** | ) ) ) | |
| | ) | **02 C 5893** |
| **Plaintiff,** | ) | **Judge Jorge L. Alonso** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **HOUSEHOLD INTERNATIONAL, INC., et al.,** | ) ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

The case is before the Court on three motions: (1) plaintiffs' motion to preclude defendants from substituting experts; (2) plaintiffs' motion to strike the rebuttal reports of defendants' experts; and (3) defendants' *Daubert* motion to exclude the testimony of plaintiff's expert, Professor Fischel. For the reasons set forth below, the Court denies all of the motions.


## <u>Motion to Preclude Defendants from Substituting Experts</u>

Plaintiffs ask the Court to preclude defendants from using new expert witnesses in the second trial, citing a Tenth Circuit case holding that a district court has the discretion to do so. *See Cleveland ex rel. Cleveland v. Piper Aircraft Corp.*, 985 F.2d 1438, 1449 (10th Cir. 1993). However, the district court in *Cleveland* made that decision because the new evidence "[was] cumulative and redundant of that which was produced before" and allowing its use "would require extensive additional discovery." *Id.* at 1450. That is not the case here. Rather, the Seventh Circuit's decision contemplates that there will be additional expert testimony concerning Fischel's loss causation models. *See Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 422 (7th Cir. 2015), *reh'g*

*denied*, (July 1, 2015). Moreover, because the parties will have the opportunity to explore the experts' opinions in depositions before the case is retried, no one will be prejudiced if the new experts testify at the second trial. Thus, given the circumstances of this case, the Court exercises its discretion to allow defendants to substitute experts.

## Motion to Strike Defendants' Experts' Rebuttal Reports

Plaintiffs ask the Court to strike the expert rebuttal reports defendants filed in support of their *Daubert* reply brief because the scheduling order does not contemplate such a filing. (*See* 9/8/15 Order, ECF No. 2042.) Defendants say permission to file rebuttal reports is implicit in the scheduling order, which states that "the Seventh Circuit agrees with defendants" that "[the] Daubert motion . . . as to Dr. Fischel . . . should be filed and decided before [defendants] serve their expert report." (*Id.* at 5.) Regardless of how the order is interpreted, however, it does not permit defendants to file one set of expert reports in support of their opening *Daubert* brief and a second set in support of their *Daubert* reply brief, which is what they did. Thus, the Court will not consider defendants' rebuttal reports in deciding the *Daubert* motion.

But the Court will not strike the reports either. Because of the perceived ambiguity in the scheduling order, and the fact that, as discussed below, the Court denies the *Daubert* motion, the Court will allow the rebuttal reports to stand and give plaintiffs an opportunity to file a sur-rebuttal.

## Motion to Exclude Fischel's Testimony

Before turning to the parties' arguments, the Court reviews what the Seventh Circuit said about Fischel's testimony. First, it recognized that both of Fischel's models, the specific disclosure model and the leakage model, were potentially viable methods of proving loss causation.

*Glickenhaus*, 787 F.3d at 416-22. The court also recognized that "Fischel's models controlled for market and industry factors and general trends in the economy." *Id.* at 421. However, the court said, the problem was that "the leakage model . . . didn't account for the extent to which firm-specific, nonfraud related information may have contributed to the decline in Household's share price," and the specific disclosure model "might encounter the same problem, if . . . there was some additional negative firm-specific, nonfraud related information on the same day as a specific disclosure." *Id.* at 421 & 422 n.7. Thus, the court concluded, on remand, Fischel's testimony could go to the jury if "[he] testifies that no firm-specific, nonfraud related information contributed to the decline in stock price during the relevant time period and explains in nonconclusory terms the basis for this opinion" and (1) defendants do not "identify[] some significant, firm-specific, nonfraud related information that could have affected the stock price"; or (2) defendants identify such information, and Fischel "account[s] for that . . . information" or "exclude[s] from [his] model's calculation any days identified by the defendants on which significant, firm-specific, nonfraud related information was released." *Id.* at 422-23.

In accordance with the Seventh Circuit's instructions, Fischel used his event study to identify twenty-seven days (that were not included in his specific disclosures model) during the leakage period, *i.e.*, November 15, 2001 to October 11, 2002, on which there were statistically significant declines in Household's stock price. He then analyzed 15,000 pages of market information disclosed on those days and concluded that, with the exception of January 11, 2002, when debt ratings agency Fitch's revised its long-term rating outlook for Household to negative from stable, Household-specific, nonfraud information could not reasonably explain the price declines. Moreover, he said that the decline on January 11, 2002 was canceled out by the statistically significant increase on January 15, 2002, two trading days later, when Credit Suisse First Boston analysts opined that the

Fitch revision was unwarranted.  Thus, Fischel concluded that no adjustment to his leakage model was required.   He went through the same process for the dates identified in his specific disclosure model and concluded that no adjustment was required to that model either.

Defendants argue that Fischel was required to analyze each day in the leakage period, not just the days on which his event study showed that there was a statistically significant price decline.  But a stock price decline on a given day can be attributed to firm-specific disclosures only if the decline is statistically significant, *see* Marge S. Thorsen, Richard A. Kaplan, and Scott Kahala, *Rediscovering the Economics of Loss Causation*, 6 J. Bus. & Sec. L. 93, 109 (2006), and the Seventh Circuit said Fischel had to exclude from his model only "days . . . on which *significant*, firm-specific, nonfraud related information was released," *Glickenhaus*, 787 F.3d at 422-23 (emphasis added).   Thus, Fischel's failure to address days on which the price of Household stock increased or did not experience a statistically significant decrease does not make his testimony about the leakage model inadmissible.

Defendants also contend that Fischel's second supplemental report flunks the *Daubert* test because it "fails to set forth any methodology addressing the universe of firm-specific, nonfraud-related information that Fischel conceded existed." (Defs.' Mem. Law Supp. Mot. Exclude Fischel Testimony at 15-16); *see Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 592-94 (1993). But analyzing market information about Household was a step in the methodology Fischel used (an event study), not the methodology itself.  *See, e.g.,* Thorsen, et al., *Rediscovering the Economics of Loss Causation*, 6 J. Bus. & Sec. L. at 109 ("The first [stage in an event study] is [a] review of all available public information, on a qualitative basis, to identify what investors would find 'material.' This stage is guided by economic principles, literature, and the experience of the researcher.").

Moreover, analyzing market data based on their expertise is what economic experts do, as evidenced by the report of defendants' expert Professor Ferrell, who did the same thing.

Alternatively, defendants attack the validity of the leakage model generally as a method for quantifying artificial inflation, saying that it does not comport with the academic literature, violates accepted economic standards, improperly includes net inflation both from the days on which there was no statistically significant stock price decline and on the days that there was, and uses the wrong peer index. (Defs.' Mem. Law Supp. Mot. Exclude Fischel at 17-19, 22.) These arguments, however, were rejected by Judge Guzmán and/or the Court of Appeals, and defendants provide no basis for revisiting them now. (*See* Defs.' Mot. Leave File Instanter Mem. Law Excess Fifteen Pages Supp. Defs.' *Daubert* Mot. Exclude Expert Testimony Daniel Fischel, Ex. A, Mem. Law Supp. Defs.' *Daubert* Mot. Exclude Expert Testimony Daniel Fischel at 28-36, ECF No. 1364; 3/23/09 Minute Order Denying Defs.' *Daubert* Mot. Exclude Fischel Testimony, ECF No. 1527); *see also Glickenhaus*, 787 F.3d at 415-419.

Because Fischel has sufficiently opined that no firm-specific, nonfraud-related information contributed to the decline in stock price during the relevant time period, the burden shifts to defendants to identify firm-specific, nonfraud-related information that could have affected the stock price. As an initial matter, much of the information defense expert Ferrell discusses was disclosed well before or well after the days on which Fischel's event study shows that there was a statistically significant stock price decline. (*See, e.g.*, Materials Requested Court's Minute Order 12/22/15 ("Defs.' Exs."), Tab 23, Deutsche Banc Alex. Brown Credit Card Quarterly, May 25, 2001; *id.*, Tab 31, CIBC World Markets Equity Research Report on Household, June 20, 2002; *id.*, Tab 33, William Blair & Co. Report on Household, Apr. 17, 2002; *id.*, Tab 34, A.G. Edwards, Specialty Finance Quarterly, Fourth Quarter 2001, Jan. 2, 2002; *id.*, Tab 35, Salomon Smith Barney Report on

Household, Jan. 16, 2002; *id.*, Tab 36, Federal Open Market Committee, Current Economic and Financial Conditions, June 20, 2002; *id.*, Tab 38, CIBC World Markets Equity Research Report on Household, Oct. 16, 2002; *id.*, Tab 39, A.G. Edwards Credit Card Industry Review Third-Quarter 2001, Nov. 28, 2001; *id.*, Tab 40, USbancorp Piper Jaffray Report on Household, Jan. 16, 2002; *id.*, Tab 41, Fox-Pitt, Kelton U.S. Specialty Finance Report on Household, *HI Gets Bum Rap for Decent 4Q01*, Jan. 17, 2002; *id.*, Tab 42, Bernstein Research, *Household International: Effect of Increasing Losses Overstated*, Feb. 1, 2002; *id.*, Tab 43, Fox-Pitt, Kelton, Credit Cards, May 31, 2002; *id.*, Tab 46, Credit Suisse First Boston, Market Flash: Finance Companies, *Household International (Buy) [–] Tops Estimates on Way to 15th Consecutive Quarterly Record; Balance Sheet Significantly Strengthened*, Apr. 17, 2002; *id.*, Tab 48, Deutsche Banc Alex. Brown, U.S. Specialty Report, Mar. 28, 2002; *id.*, Tab 53, LaBranche & Co. Report on Household, Mar. 5, 2002; *id.*, Tab 55, Bernstein Research Call, *HI[:] Joe Luna of Washington State*, May 20, 2002; *id.*, Tab 92, Lehman Brothers Report on Household, Sept. 30, 2002; *id.*, Tab 112, Bernstein Research Call U.S. Consumer Finance report on Household, Feb. 13, 2002; *id.*, Tab 113, Wachovia Securities Report on Household, May 31, 2002.) Because the parties stipulated that Household's stock trades in an efficient market, *i.e.*, that "the value of new information is . . . reflected in [stock] prices quickly after release," *Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010), it is not clear how such disclosures can explain the statistically significant price declines.

In any event, the categories of disclosures that defendants characterize as firm-specific and unrelated to fraud are neither. (*See* Defs.' Mem. Supp. Mot. Exclude Fischel at 21.) The issues addressed in the first and second categories identified by defendants, disclosures regarding "Household's liquidity, access to capital markets, and widening bond spreads" and its "credit quality" (*id.*), were attributed both by defendants and market analysts to the alleged fraud (Household's re-

aging and predatory lending practices and the restatement of its earnings) and/or the state of the economy or industry. (*See, e.g.*, Defs.' Exs., Tab 27, *A Double Dip? – Monetary Policy in the United States*, The Economist, Aug. 17, 2002 ("Another cause for concern is tighter conditions for corporate credit. Borrowing in the corporate-bond market has also got much tougher. Interest-rate spreads . . . have widened sharply. As a result, many firms face a higher cost of capital . . . ."); *id*., Tab 28, Morgan Stanley Report on Household, Oct. 10, 2002 (""[S]hould Household settle predatory lending allegations, the stock might recover nicely, and so might the bonds . . . ."); *id.*, Tab 29, CIBC World Markets Earnings Update on Household, July 17, 2002 ("Household has sought to improve its liquidity and reduce its reliance on commercial paper as a source of funds given the volatile market conditions."); *id.*, Tab 31, CIBC World Markets Equity Research Report on Household at 3, June 20, 2002 ("[T]he weakening economy presented its own set of challenges [to Household] largely with respect to credit quality trends. Furthermore, given that the non-prime customers targeted by the company are generally more economically sensitive and less interest rate driven, rising unemployment levels had a significant impact on the portfolio's credit performance."); *id.*, Tab 32, Salomon Smith Barney, *HI: 2Q02 EPS A Mixed Bag Trimming Ests, Target to Be Prudent*, July 18, 2002 (noting that charge offs had increased in the "other unsecured segment" of Household's business, which "[m]anagement attributed . . . to the demographics of borrowers. . . . [who are] "the most affected during a downturn in the economy," and saying, "[g]iven the uncertainty of the current macro-economic picture, the risks that Household faces include: rising credit costs given its largely non-prime customer base in a slowing economy, slowing loan growth due to more cautious consumers and increasing prepayments, competitive end markets, and a slowing pace of help from interest rate reductions."); *id.*, Tab 33, William Blair & Co., *Household International: Strong First Quarter, Up 20%; Raising Estimates*, Apr. 17, 2002 ("We expect investors to continue to focus on

the economic environment and credit. Consumer credit quality should weaken in 2002, given weak economic backdrop, high level of bankruptcies, and residual impact from higher unemployment."); *id.*, Tab 38, CIBC World Markets Report on Household, Oct. 16, 2002 (saying that "the elevated personal bankruptcy filing activity is largely to blame for the higher losses during the quarter" and, as that activity abates, "credit quality should stabilize"); *id.*, Tab 40, USbancorp Piper Jaffray Report on Household, Jan. 16, 2002 ("[I]nvestors need to be cognizant of individual consumer's [sic] balance sheet and trends affecting them such as higher unemployment, lower consumer confidence, and lower spending levels which can keep a lid on HI's shares in the near term."); *id.*, Tab 41, Fox-Pitt, Kelton U.S. Specialty Finance Report on Household, *HI Gets Bum Rap for Decent 4Q01*, Jan. 17, 2002 ("Credit quality held up reasonably well, particularly in light of the poor performance of other players in the sub-prime and near-prime markets . . . ."); *id.*, Tab 42, Bernstein Research, *Household International: Effect of Increasing Losses Overstated*, Feb. 1, 2002 (saying that "Household['s] . . . stock price has become over-discounted due to media attention around accounting practices (with concerns exaggerated), a predatory-lending lawsuit in California (now settled), a negative change in rating outlook by Fitch (no impact on debt spreads or liquidity) and deteriorating [auto portfolio] loss trends, which are "related to price weakness in the used car market," "seasonal effects" and "lax underwriting," which Household was expected to "tighten" during the year, and "maintain[ing] [the] outperform rating on [Household's] stock"); *id.*, Tab 44, Credit Suisse First Boston, Market Flash: Finance Companies, *Household International (Buy) – Headlines Hang Over Name*, Jan. 15, 2002 (noting that Household "is having a difficult run of things of late" because of "questions (overblown, in our view) about the company's accounting standards" and the decrease in Fitch rating due to Fitch's "Negative outlook for the broader consumer finance business"); *id.*, Tab 45, Deutsche Banc Alex. Brown Inc., *Household International, Inc. . . . Unsubstantiated Claims Continue to Haunt*

*Stock*, Feb. 7, 2002 ("The shares of Household International continue to plummet on unsubstantiated claims, in our opinion, of issues with liquidity, accounting and lawsuits. . . . This market is extremely emotional and sensitive. There are serious issues heightened by well-publicized events of Enron and Tyco, among others. Household appears to have been caught up in the maelstrom."); *id.*, Tab 46, Credit Suisse First Boston, Market Flash: Finance Companies, *Household International (Buy) [–] Tops Estimates on Way to 15th Consecutive Quarterly Record; Balance Sheet Significantly Strengthened*, Apr. 17, 2002 ("The company . . . took steps to enhance its liquidity position in the wake of the first quarter's volatile funding environment."); *id.*, Tab 47, Goldman Sachs Report on Household, Aug. 14, 2002 ("While [Household's] debt spreads are quite high . . . this reflects the troubled state of debt capital markets, the 'baggage' associated with 'subprime' and the specialty finance sector in general, and the uncertainties related to the weaker economic market. . . . We believe that longer term the regulatory/predatory lending [issue] will remain an important investor issue."); *id.*, Tab 57, Jonathon R. Laing, *Doubting Tyco*, Barron's, Jan. 28, 2002 (stating that "[a]mong [Jim Chanos'] current shorts are lenders with large exposures to the sub-prime credit market, including Household . . . . [because] [a] rotten economy has exposed their borrower base to hard times" and "[t]he sector has . . . engaged in aggressive accounting to burnish results"); *id.*, Tab 61, Bear Stearns & Co., *Household International . . . More Bad Publicity . . . How Much Worse Can It Get?*, Feb. 6, 2002 (stating that Household's share price decline "appears to reflect a severe bout of accounting and liquidity panic" and that, "[a]s a company that relies on the capital markets for funding, Household remains vulnerable to these crises of confidence"); *id.*, Tab 62, A.G. Edwards Analyst Report on Household, Feb. 6, 2002 (attributing "weakness in HI shares to industry credit quality concerns and accounting-related concerns" and stating that "investor sentiment on the consumer finance sector is poor today"); *id.*, Tab 63, Erick Bergquist, *Consumer Finance Firms'*

*Outlook Bleak, Fitch Says*, American Banker, Feb. 21, 2002 ("Prospects are still poor for consumer

finance companies . . . .  With capital markets volatile, competition keen, and the economy slogging

through its first recession in a decade, investors have turned against finance companies."); *id.*, Tab

66, Ventana Capital, LLC, *Household International* "*Looking for Quality Earnings? You Won't Find

It Here*!," Apr. 25, 2002 (stating that "reported delinquencies, charge-offs, reserves, cash flow and

earnings mean absolutely nothing when taking into consideration the massive amount of reaging in

Household's portfolio" and "the massive amount of reaging at Household signifies . . . that there is

an underwriting problem that needs to be fixed"); *id.*, Tab 68, *Fitch Ratings Report: Finance

Company Capital Standards*, Business Wire, Apr. 29, 2002 (noting that Fitch made adjustments to

risk-based capitalization "in unsecured consumer assets, subprime real estate, and manufactured

housing loans" and that "concern over relative asset liquidity, noticeable deterioration in some

consumer assets classes, mainly subprime unsecured and manufactured housing lending, caused a rise

in those given risk weights for 2002"); *id.*, Tab 73, Tara Seigel Bernard, *Card Cos 2Q EPS Produce

Mixed Bag: Trends Mostly Stable*, Dow Jones Newswires, July 1, 2002 ("[T]he investment

community . . . says it will be looking for updates regarding legal claims against [Household] alleging

predatory lending."); *id.*, Tab 80, Deutsche Bank Securities Inc. Report at 9, July 18, 2002 (lowering

its EPS estimates for Household for 2002 and 2003 "[g]iven the lower market valuations and cloud

overhanging all subprime lenders"); *id.*, Tab 81, Ted Cornwell, *Subprime Forecast: Defaults Will

Edge Up on Today's Loans*, Mortgage Servicing News, July 19, 2002 ("The weak economy is

causing the risk of default on newly originated, nonprime credit quality mortgages to rise again . .

. ."); *id.*, Tab 82, Credit Suisse First Boston Finance Companies Market Flash, *The Most Puzzling

Bond of All*, July 26, 2002 (stating that "markets [were] punishing investor perception of the brokers

and regulators becoming more vigilant in their oversight of banks," and that Household's bonds had

"been swept out to historic wides" because "short sellers can draw a line, however vague, between Capital One . . . and Household"); *id.*, Tab 83, Portales Partners, LLC, *Household International[:] What's Wrong with this Picture?*, Aug. 5, 2002 (noting that Household has "increased loan-to-value ratios of home equity loans in pursuit of growth" and saying: "At a minimum, we believe the changing risk profile could lead to substantially higher losses in the current weak economic environment. At most, the rising loan-to-value ratios would suggest a strategy on the part of the company to increase loan-to-value ratios to a point where consumers would be unable to refinance any mortgage away from Household, a practice that is increasingly consider[ed] predatory."); *id.*, Tab 86, UBS Warburg Report on Household, Sept. 18, 2002 (stating that "[Household] shares have come under considerable pressure recently as investors fret over the company's capital levels, blowups at competitor companies and legal actions surrounding predatory lending" and "persistent predatory lending issues could increase [Household's] borrowing costs in the near term."); *id.*, Tab 95, CIBC World Markets Report on Household, Oct. 7, 2002 ("Although the bankcard and private label card portfolios have reported credit deterioration, the magnitude has been roughly as expected given the weak economy and consumer leverage."); *id.*, Tab 98, Jenny Wiggins, *Finance Company Spreads Widen*, FT.com, Oct. 8, 2002 ("Credit spreads for specialty US finance companies [including Household] have widened sharply this week as concern grows over their ability to continue accessing the capital markets."); *id.*, Tab 102, William Blair & Co., *Household International Restates Financials for Credit Card Business*, Aug. 14, 2002 (noting that the restatement caused a capital decline of $386 million and stating that Household's management "raised its targeted capital ratio" and to achieve it, "suspended its current stock-buyback" and will "consider whole loans sales and, if need be, raising capital"); *id.*, Tab 103, Bear, Stearns & Co., Inc., *Restatement Should Have Modest Impact on Household*, Aug. 14, 2002 (noting, in light of the restatement, that Household "will

temporarily stop buying back stock, and may issue equity-like capital securities in the near-term" and that "the bigger issues, going forward, . . . relate to liquidity, leverage and of course the regulatory environment. . . . things that have been on investors['] minds for some time now"); *id.*, Tab 104, Salomon Smith Barney, *HI: Certifies Statements, But Restates $386 Million Past Incom[e]*, Aug. 14, 2002 (stating that, because of the restatement, "Household will suspend its buyback plan . . . to rebuild capital," "management credibility may continue to be banged up a bit in the minds of investors. . . . [a]nd with the continuing backdrop of predatory lending discussions, it is difficult to identify a near-term catalyst that will move the stock higher," and "the biggest risk to the Household story is that jittery debt markets make the company's cost of funding prohibitive or mechanically difficult."); *id.*, Tab 105, Fitch Ratings, *Fitch Affirms Household at 'A' Following Announcement*, Aug. 14, 2002 ("Concerns with Household continue to center on the company's ability to demonstrate effective portfolio liquidity, particularly in times of economic stress"); *id.*, Tab 106, A.G. Edwards, *HI Restates Earnings Due to Accounting Issues – Estimates and PO Change*, Aug. 16, 2002 (stating that "we are adjusting our earnings estimates to reflect the restatement and slightly lowered expectations based on a weaker than expected macro-economic environment"); *id.*, Tab 110, Christine Richard, *Finance Co. Bonds Slide Despite 41-Yr Low in Tsy Yields*, Dow Jones Newswires, Sept. 23, 2002 ("[B]onds issued by finance companies have been some of the worst performers in the corporate bond market."); Brooks Decl., Vol. 1, Ex. 1, Fischel 2d Rebuttal Report, Ex. 1, Janet Kidd Stewart, *HSBC Adds Household to Holdings*, Chicago Tribune, Nov. 15, 2002 (reporting that Household would be acquired by HSBC and that Household CEO Aldinger "said the company's weaker share price and higher borrowing costs as a result of [the predatory lending] allegations helped spur the deal"); *id.*, Ex. 4, Moody's Investors Service Press Release, Oct. 11, 2002 ("Moody's noted that the cloud of uncertainty surrounding Household's potential legal liability for alleged

'predatory lending' abuses pushed the company's bond spreads out to unprecedented levels and raised market concerns about funding access over time."); *id.*, Ex. 6, Credit Suisse First Boston, Non-Bank Financial and Broker/Dealer SpreadWatch, Oct. 16, 2002 ("'[N]ews of [Household's] settlement with state regulators over its business practices drove spreads more than 100 bps tighter . . . ."); *id.*, Ex. 25, Justin Pope, *Tyco Shares Plunge Again on Accounting Worries*, Associated Press, Feb. 4, 2002 ("On a conference call with investors, Tyco Capital officials acknowledged they have been shut out of the corporate bond market in recent days on accounting worries."); *id.*, Ex. 27, Tammy Williamson, *Household Says It Can Get Capital for Loans*, Chicago Sun-Times, Feb. 8, 2002 (reporting that Household held a conference call with investors "amid fast and furious rumors this week that [it] and other finance companies, which lend to higher-risk borrowers, could suffer losses as borrowers find it more difficult to repay loans in a recessionary economy" and investor "skittish[ness] [about] whether [such] companies will have accounting problems similar to those of Enron"); *id.*, Ex. 29, Steve Maich, *'Attack Mentality' Has Markets on the Run:  Another Bad Week*, National Post, Feb. 9, 2002 ("Fallout from the Enron debacle is quickly developing into what investors have called a 'crisis of confidence' in the state of financial disclosure and accounting in the United States."); *id.*, Ex. 72, Dow Jones, Household International Investor Conference Call - Final, Aug. 14, 2002 (Household officials tying the restatement to capital and liquidity issues).)

The third through sixth[1] categories of disclosures, *i.e.*, those regarding "increased capital requirements for subprime lend[ers]," "future regulatory and legislative changes," "matters specific to [Household's] auto and credit services business lines," and "the disproportionate impact of the 'double-dip' recession on consumer lenders serving primarily subprime consumers," are also industry wide, related to fraud and/or dismissed as concerns by both analysts and Household management. (*See* Defs.' Mem. Supp. Mot. Exclude Fischel at 21; *see* Defs.' Exs., Tab 26, Deutsche Bank Securities, Inc., 2Q02 Quarterly Preview, July 1, 2002 (noting that stock issuers "in the subprime space did not weather the 'single dip' recession of last fall so well, and are hardly prepared for another scoop of bad credits," stating that analysts saw "upside potential at . . . Household"); *id.*, Tab 28, Morgan Stanley Report on Household, Oct. 10, 2002 (stating that "credit risk in a weak economy is a legitimate concern," "[t]he recent uptick in weekly unemployment claims signals the possibility of higher credit costs for Household and other lenders," auto losses were projected to increase "with used car prices falling another notch," and that Morgan Stanley had "explicitly factor[ed] in the risk of a 'double dip' recession into [its] price target"); *id.*, Tab 30, CIBC World Markets Specialty Finance – Third-Quarter 2002 Preview at 28, Oct. 3, 2002[2] ("Credit losses should continue to rise, particularly within [Household's] bankcard portfolio, as the managed portfolio seasons and the

---

[1]Defendants also say that "firm-specific 'random noise'" could be responsible for the stock price movement. (*See* Defs.' Mem. Supp. Mot. Exclude Fischel at 21; *see* Ferrell Report ¶ 112 ("[I]f a price movement is not statistically significant on a particular day, then firm-specific random noise could be the reason for the price movement.").) The Court does not address this argument because defendants unsuccessfully raised it before Judge Guzmán. (*See* Defs.' Mot. Leave File Instanter Mem. Law Excess Fifteen Pages Supp. Defs.' *Daubert* Mot. Exclude Expert Testimony Daniel Fischel, Ex. A, Mem. Law Supp. Defs.' *Daubert* Mot. Exclude Expert Testimony Daniel Fischel, ECF No. 1364 at 28-29; 3/23/09 Minute Order Denying Defs.' *Daubert* Mot. Exclude Fischel Testimony, ECF No. 1527.)

[2]The same material appears at Tab 50.

economy remains weak. Heightened concern also exists regarding the auto finance portfolio record-high reserve levels, however, should be more than adequate to absorb any future losses."); *id.*, Tab 31, CIBC World Markets Equity Research Report on Household at 15, 19, 24, June 20, 2002 (stating that: (1) "scrutiny of non-conventional lending practices has grown in recent years throughout the industry as an increasing number of non-prime consumers have complained of unfair and fraudulent lending practices by consumer finance companies. . . . [P]otentially more damaging, legislators have become increasingly skeptical of nonprime lending and . . . . [s]everal states . . . have enacted individual legislation in order to limit lending abuses"; (2) "Similar to many of the credit card issuers within the bankcard industry, Household has reported significant credit quality deterioration over the past year as the economy has weakened"; and (3) "During the second-half of 2001 . . . , the auto finance business reported a significant acceleration in loss trends, prompted by a combination of the weakening economy, September 11 terrorist attacks and the weakness in the used car market."); *id.*, Tab 33, William Blair & Co., *Household International: Strong First Quarter, Up 20%; Raising Estimates*, Apr. 17, 2002 (noting that "[c]redit quality deteriorated in [Household's credit card] portfolio . . . , reflecting the weaker economic environment" and losses in auto finance were up "reflect[ing] weakening industry fundamentals," as well as "internal issues" that Household appeared to have ameliorated); *id.*, Tab 34, A.G. Edwards, Specialty Finance Quarterly, Fourth Quarter 2001 at 7 (saying that "[t]he current slowing economy has, as expected created an environment where [credit card] industry charge-offs and delinquencies have increased" and "if weakness in the economic environment continues, it will continue to negatively impact the consumer credit environment"); *id.*, Tab 35, Salomon Smith Barney Report on Household, Jan. 16, 2002 (stating that "[c]redit deterioration in the auto finance portfolio stood out on the quarter, however its impact on the overall portfolio is modest and other drivers were positive," and "reiterat[ing] [the] Outperform

rating on [Household's] shares"); *id.*, Tab 36, Federal Open Market Committee, Current Economic and Financial Conditions, June 20, 2002 (noting that, nationally, "delinquencies on pools of nonprime automobile loans rose sharply in March from an already high level and the delinquency rate on subprime mortgages remained very elevated"); *id.*, Tab 38, CIBC World Markets Report on Household, Oct. 16, 2002 (stating that "we believe long-term growth could be adversely impacted by the higher costs related to the additional controls added as part of the legal settlement [of the predatory lending suits]" and "[o]ur remaining fundamental concerns were primarily relate dot credit quality trends, particularly with respect to the auto finance portfolios given difficulties recently reported by independent auto finance companies within the non-prime market niche," but "[d]espite our concern, Household reported credit quality improvement for the second consecutive quarter within the auto finance portfolio"); *id.*, Tab 40, USbancorp Piper Jaffray Report on Household, Jan. 16, 2002 ("We are somewhat concerned over the growth in the auto finance portfolio, as competition has picked up according to other auto finance companies, and because of the weak outlook for consumer credit in this slowing economy."); *id.*, Tab 41, Fox-Pitt, Kelton U.S. Specialty Finance Report on Household, *HI Gets Bum Rap for Decent 4Q01*, Jan. 17, 2002 (discussing rise in losses in Household's auto finance portfolio and saying that "the auto finance business is currently a hot button with investors," "[i]t is no secret that the used car market has been weak, with prices falling given the glut of cars from rental company liquidations following September 11th and an increase in trade-ins following the 0% financing by the Big 3," and Household's performance in auto finance "strengthen[ed] [the analysts'] belief that even sharply higher losses in this tough business [would] not disrupt [their] expectations for [Household]"); *id.*, Tab 49, Bear Stearns Equity Research Report

on Household, July 17, 2002[3] ("[Household's] shares appear to have suffered along with those of other financials in reaction to bank regulators imposing higher reserve and capital requirements on sub-prime lenders."); *id.*, Tab 51, Fox-Pitt, Kelton U.S. Specialty Finance Report on Household, July 18, 2002 ("HI shares were under pressure yesterday in sympathy with its consumer finance peers. Specifically, Capital One . . . disclosed it is entering into a MOU [Memorandum of Understanding] with the national banking authorities. We think this bombshell announcement signals an era of lower returns, increased capital intensity, and heightened regulatory oversight for consumer lenders of all types."); *id.*, Tab 52, Banc One Capital Markets, Inc. Report on Household, July 18, 2002 (". . . HI's bonds have widened on news that Capital One has [entered into an agreement] with banking regulators . . . . This agreement has sparked fears that other subprime lenders will come under regulatory scrutiny and risk . . . ."); *id.*, Tab 53, LaBranche & Co. Report on Household, Mar. 5, 2002 ("Our concern with Household is that legal threats [concerning predatory lending] increase structural risk to the business model and reduce near-term earnings flexibility. . . . The near-term earnings risk is that the changes in Household's lending practices have material cumulative impact on earnings flexibility in terms of fee income, spread margin, and origination volume."); *id.*, Tab 54, Bernstein Research, *Household International: Risk to Business Model Increasing*, May 10, 2002 ("[C]onflicting legislative factors . . . create legal risk for both predatory and legitimate subprime lenders. Aside from the potential legal costs, the need to manage legal risk will lead to changes in subprime lending practices even more far-reaching than those adopted by Household. These will, in turn, erode the profitability of business models because either returns are reduced or it simply becomes uneconomical to lend to higher-risk customers . . . ."); *id.*, Tab 55, Bernstein Research Call,

---

[3]The same material appears at Tab 76.

*HI[:] Joe Luna of Washington State*, May 20, 2002 ("The risk to Household is that its sales practices are now being investigated and challenged by private plaintiffs, consumer advocacy groups . . . , and likely by State attorney generals. . . . [,] illustrat[ing] the specific vulnerabilities of Household's business model."); *id.*, Tab 58, Reuters, *Credit Card Stocks Fall on Metris, Sub-prime Worries*, Jan. 28, 2002 ("Shares of credit card companies [including Household] slid on Monday, as Metris Cos Inc. was downgraded by analysts amid worries that the subprime lender's growing exposure to bad loans may signal an industrywide trend."); *id.*, Tab 62, A.G. Edwards Report on Household, Feb. 6, 2002 (saying that Household "[m]anagement attributed" deterioration in auto finance credit quality to "accelerated disposition of vehicles and was adamant that loss rates would begin to decline," and noting, "[i]n any event, auto receivables only comprise 6% of [Household's] total receivables"); *id.*, Tab 67, Burney Simpson, *Keeping the Lid on Subprime Exposure*, Credit Card Management, Apr. 25, 2002 (stating that "[t]he current economic slowdown seems to be proving that businesses that appeal to troubled consumers just might get into trouble themselves" and "many within and outside the [sub-prime credit] card industry question the viability of such programs"); *id.*, Tab 69, *Credit Card Delinquency Soars*, CNN, Apr. 29, 2002 ("We've never been through a recession with the subprime market, and so we're beginning to see the effects of that."); *id.*, Tab 73, Tara Seigel Bernard, *Card Cos 2Q EPS Produce Mixed Bag: Trends Mostly Stable*, Dow Jones Newswires, July 1, 2002 ("While credit-card companies with thus-far healthy track records . . . are expected to continue that course, a few companies that issue cars to those with checkered credit histories – which have been operating under regulatory scrutiny given concern over rising losses from uncollectible loans – won't fare as well."); *id.*, Tab 74, Fox-Pitt, Kelton U.S. Specialty Finance Credit Card Industry Update, July 17, 2002 ("[T]he announcement of the regulators' imposition of a Memorandum of Understanding on Capital One Financial represents a profoundly significant

18

development for the consumer credit industry, the ramifications of which could lead to lower returns, increased capital intensity, and greater regulatory uncertainty in the future. The news throws into question the long-term sustainability of the business model."); *id.*, Tab 75, Philip Klein, *Update 2 – Credit Card Stocks Dive on Consumer Default Fears*, Reuters, July 17, 2002 (stating that "[t]he stocks of credit card issuers and consumer finance companies are extremely sensitive to any news on the quality of credit," regulators' taking action against Capital One caused credit card company shares to get "hammered," and "credit quality fears spilled over to affect the broader consumer finance sector," including Household); *id.*, Tab 77, Merrill Lynch Global Securities Research, *Household International, Inc.[:] Nice Quarter, Wrong Day*, July 18, 2002 (noting that "Household's shares were weak over investor concerns about possible regulatory scrutiny of its bank's capital adequacy, reserve adequacy, and operating practices a la Capital One, Metris and Providian" and that "nervous investors . . . focused . . . on whether regulators would soon be knocking on [Household's] door after having just finished with [Capital One]"); *id.*, Tab 78, Erick Bergquist, *2Q Earnings: Another Record at Household as 2Q Net Increase by 17%*, American Banker, July 18, 2002 ("Despite the strong results, Household's share price dropped 7.9% on Wednesday . . . amid a credit card stock fallout."); *id.*, Tab 79, Carrick Mollenkamp, *Capital One Sees Shares Fall 40% on Fed Warning*, The Wall Street Journal, July 18, 2002 (noting that "credit-card and lending stocks," including Household, fell "amid heightened scrutiny from federal regulators, who have become increasingly concerned that credit companies are too thinly capitalized to protect against consumer defaults."); *id.*, Tab 87, Fox-Pitt, Kelton, *The Card Game*, Aug. 22, 2002 ("Our recent cautious stance on the US Specialty Finance group reflects, in part, our concern that stock market volatility and loss of investor confidence in corporate America has damaged consumer confidence and, thus, the economy."); *id.*, Tab 88, Luke Collins, *US Puts Screws on Consumer Credit*, The Australian Financial Review, Aug.

23, 2002 ("[T]he federal Government has begun pressuring lenders in the booming sub-prime market, which caters to consumers with low incomes or poor credit ratings and comprises about a third of the total credit card sector."); *id.*, Tab 90, A.G. Edwards, *Lowering Rating on HI to Hold from Buy*, Sept. 18, 2002 ("The political and legal environment for [Household] has been miserable for much of the last 12 months. [Household] is the last, biggest issuer of [subprime] consumer credit . . . and has had a 'bulls-eye' on its back since the merger of Citigroup and Associates First Capital in 2000. Also unfortunate is once it became the only player, the economy sank into a recession and the natural cycle of borrowers, lawyers and politicians looking for a culprit all had their sights set on [Household]. . . . [T]he effect the negative press has on the shares could be very material."); *id.*, Tab 93, *Update 1 – U.S. Financial Stocks Fall in Weak Economy*, Reuters, Oct. 7, 2002 (saying that "U.S. financial shares [including Household] dropped on Monday on growing concerns a weak economy would leave banks and credit card issuers with unpaid loans and also dent stock businesses at Wall Street Firms" and that "[Goldman Sachs] also cited uncertainty surrounding predatory lending litigation as a reason behind [the] Household downgrade"); *id.*, Tab 95, CIBC World Markets Report on Household, Oct. 7, 2002 (saying that: (1) the bankcard and auto finance portfolios reported credit deterioration, "issues [that were not] new to Household," but "ongoing market weakness and economic uncertainty ha[d] resulted in further pullback by investors"; and (2) "valuations have collapsed across-the-board [for auto finance companies] and [Household] is no exception"); *id.*, Tab 96, Tara Siegel Bernard, *Credit Cards 3Q Results Mixed:  Focus on New Regulations*, Dow Jones Newswires, Oct. 7, 2002 (stating that "a few subprime companies, including those that issue plastic to individuals with tarnished or limited credit histories and which have been operating under regulators' watch . . . will continue to suffer"); *id.*, Tab 97, UBS Warburg, Global Equity Research Report on Household, Oct. 8, 2002 (stating that: (1) "any agreement with the FTC or Attorneys General [concerning lending practices]"

would make Household "[un]able to sustain its current level of balance sheet growth or profit margins"; (2) "[c]oncerns about the auto portfolio have . . . surfaced following announcements made by rival subprime auto lender Americredit that it is bringing all of its auto loans back on balance sheet," but a similar move by Household was "a remote possibility" and "would have limited impact on [Household's] financials"; and (3) "some level of deterioration" was expected in Household's credit card portfolio but high levels of credit losses "are [un]likely in the absence of a significant decline in the economy"); *id.*, Tab 107, Keefe, Bruyette & Woods, Inc., *Initiating Coverage of Household International With a Market Perform Rating[:] Yet Another Un-Investable Situation*, Aug. 27, 2002 (stating that: (1) Household's "[a]ccess to deposits has been reduced . . . as result of the increased regulatory scrutiny of the funding of sub-prime consumer loans with FDIC uninsured deposits"; (2) "[s]preads . . . in the term debt market have increased, thereby increasing the company's cost of debt capital"; (3) "the company's efforts to improve profitability and reduce regulatory risk . . . have increased liquidity risk at an inopportune time"; (4) "[w]e can't help but think that the implementation of the company's best practices [in response to predatory lending accusations] could reduce the future profitability of a Household home equity loan"; and (5) "[we] expect charge-offs to rise from current levels" in Household's auto finance portfolio and others, "but nothing to sound-off the alarms"); *id.*, Tab 109, CIBC World Markets Report on Household, Sept. 22, 2002 ("Risks to our rating include the possibility of additional regulatory investigations . . . . as the regulatory witch-hunt among sub-prime lenders continues"); *id.*, Tab 110, Christine Richard, *Finance Co. Bonds Slide Despite 41-Yr Low in Tsy Yields*, Dow Jones Newswires, Sept. 23, 2002 ("[W]orries about the prospects for a double-dip consumer-lead recession are being concentrated on the finance companies . . . ."); *id.*, Tab 111, Ventana Capital, LLC, *Used Car Pileup*, Nov. 30, 2001 (stating that Household's subprime auto finance business was growing despite waning consumer

demand and falling used car prices and that the company was using "[a]ggressive accounting [to] embellish[] [those] earnings" and "may be [using] . . . liberal chargeoff policies" to "mask" "asset quality issues"); *id.*, Tab 112, Bernstein Research Call U.S. Consumer Finance, Feb. 13, 2002 ("[T]he credit performance of [Household's] auto-loan portfolio . . . is disappointing[, but] the problem is contained and we expect improvement from Q2 02 onwards.").)

In short, defendants have not identified "significant, firm-specific, nonfraud related information that could have affected the [Household] stock price." *Glickenhaus*, 787 F.3d at 421. Accordingly, their motion to exclude Fischel's testimony is denied.


### Conclusion

For the reasons set forth above, the Court denies plaintiffs' motion to preclude defendants from substituting experts [2068], plaintiffs' motion to strike defendants' expert rebuttal reports [2086], and defendants' motion to exclude Fischel's testimony [2058]. In light of this order, the parties are directed to file on or before February 8, 2016 a joint proposed schedule for the case going forward.

**SO ORDERED.**                                    **ENTERED:  February 1, 2016**

_____
**HON.  JORGE L. ALONSO**
**United States District Judge**