# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF ILLINOIS

# EASTERN DIVISION

| | |
|---|---|
| LAWRENCE E. JAFFE PENSION PLAN, On Behalf of Itself and All Others Similarly Situated,<br><br>      Plaintiff,<br><br>  vs.<br><br>HOUSEHOLD INTERNATIONAL, INC., et al.,<br><br>      Defendants. | Lead Case No. 02-C-5893 (Consolidated)<br><br><u>CLASS ACTION</u><br><br>Honorable Jorge L. Alonso |

## <u>PLAINTIFFS' OMNIBUS MOTION TO EXCLUDE DEFENDANTS' EXPERTS</u>

1131309_1

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ....................................................................................................1

II.    DEFENDANTS' EXPERTS SHOULD BE PRECLUDED FROM TESTIFYING AT TRIAL .......................................................................................................4

    A.    Standard for Admissibility of Expert Testimony ......................................4

    B.    Ferrell and James Should Not Be Allowed to Testify at Trial About the Factors They Incorrectly Characterize as Company-Specific, Nonfraud-Related Information .........................................................................5

        1.    Ferrell and James Did Not Identify Any Significant Negative Company-Specific, Nonfraud Information ...................................5

        2.    Ferrell's and James' Opinions About Supposed Company-Specific, Nonfraud Information are Impermissibly Speculative and Unreliable...............................................................9

        3.    Ferrell's and James' Opinions Should Be Excluded Because They Contradict the Record Evidence ............................10

    C.    Ferrell's Failure to Consider the Underlying Fraud Compounded by Defendants' Discovery Violations Warrants Exclusion .........................12

    D.    Ferrell Should Be Excluded for Violating Fed. R. Civ. P. 26(a)(2) by Failing to Disclose the Basis and Reasons for Certain Opinions and the Facts and Data He Considered .................................................................18

    E.    James Should Not be Allowed to Testify at Trial..............................22

    F.    Cornell's Opinion that Fischel Failed to Account for Confounding Information Is Classic *Ipse Dixit* and Should Be Excluded.................26

III.   DEFENDANTS' EXPERTS SHOULD BE PRECLUDED FROM OFFERING OPINIONS FIRST RAISED IN THEIR REBUTTAL REPORTS ...................29

IV.   DEFENDANTS SHOULD BE PRECLUDED FROM TENDERING CUMULATIVE EXPERT TESTIMONY AT TRIAL......................................32

V.    CONCLUSION..............................................................................................36

- i -

# TABLE OF AUTHORITIES

**Page**

## CASES

*Amorgianos v. Amtrak*,
303 F.3d 256 (2d Cir. 2002)....................................................................24

*Baker v. Indian Prairie Community Unit*,
No. 96 C 3927, 1999 WL 988799
(N.D. Ill. Oct. 26, 1999)......................................................................22

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
No. 03 C 7713, 2005 WL 1300763
(N.D. Ill. Feb. 22, 2005).....................................................................31

*Barber v. United Airlines, Inc.*,
17 Fed. Appx. 433 (7th Cir. 2001)....................................................11, 16

*Benuzzi v. Bd. of Educ.*,
119 F. Supp. 3d 917
(N.D. Ill. 2015).............................................................................14

*Brown v. Burlington Northern Santa Fe Ry. Co.*,
No. 09-1380, 2013 WL 1729046
(C.D. Ill. Apr. 22, 2013).....................................................................9

*Ciomber v. Coop. Plus, Inc.*,
527 F.3d 635 (7th Cir. 2008) ..............................................................14

*Clark v. Takata Corp.*,
192 F.3d 750 (7th Cir. 1999) ...........................................................5, 26

*Dahlin v. Evangelical Child & Family Agency*,
No. 1 C 1182, 2002 WL 31834881
(N.D. Ill. Dec. 18, 2002) ...................................................................35

*Daubert v. Merrell Dow Pharms.*,
509 U.S. 579 (1993)................................................................. *passim*

*Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*,
285 F.3d 609 (7th Cir. 2002) ...........................................................3, 29

*Ervin v. Johnson & Johnson, Inc.*,
492 F.3d 901 (7th Cir. 2007) ................................................................5

- ii -

**Page**

*Fairley v. Andrews*,
No. 03 C 5207, 2011 WL 2142800
(N.D. Ill. May 31, 2011) ......................................................................8

*GE v. Joiner*,
522 U.S. 136 (1997).............................................................................29

*George v. Kraft Foods Global, Inc.*,
800 F. Supp. 2d 928 (N.D. Ill. 2011) ...................................................8

*Glickenhaus & Co. v. Household Int'l, Inc.*,
787 F.3d 408 (7th Cir. 2015) ..................................................... *passim*

*Harbor Ins. Co. v. Continental Bank Corp.*,
No. 95 C 7081, 1991 WL 222260
(N.D. Ill. Oct. 25, 1991).....................................................................35

*Houston v. Hyatt Regency Indianapolis*,
302 F.R.D. 268 (S.D. Ind. 2014).........................................................17

*Huey v. UPS*,
165 F.3d 1084 (7th Cir. 1999) ......................................................27, 28

*Hulsey v. HomeTeam Pest Def. LLC*,
No. 2:10-cv-03265-DCN, 2012 WL 1533759
(D.S.C. May 1, 2012) ..........................................................................13

*In re Longtop Fin. Techs. Sec. Litig.*,
32 F. Supp. 3d 453, 462 (S.D.N.Y. 2014)...........................................11

*In re Novatel Wireless Sec. Litig.*,
846 F. Supp. 2d 1104 (S.D. Cal. 2012)...............................................28

*Kumho Tire Co. Ltd. v. Carmichael*,
526 U.S. 137 (1999)..........................................................................3, 5

*Lava Trading, Inc. v. Hartford Fire Ins. Co.*,
03 CIV 7037 (PKC)(MHD), 2005 U.S. Dist. LEXIS 4566
(S.D.N.Y. Feb. 14, 2005).....................................................................11

*LM Insurance Corp. v. ACEO, Inc.*,
275 F.R.D. 490 (N.D. Ill. 2011)..........................................................13

*Loeffel Steel Products, Inc. v. Delta Brands, Inc.*,
387 F. Supp. 2d 794 (N.D. Ill. 2005) ..............................................4, 29

- iii -

**Page**

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558 (S.D.N.Y. 2007)........................................................28

*Mason v. City of Chicago*,
631 F. Supp. 2d 1052 (N.D. Ill. 2009) ......................................................10

*McCauley v. Nucor Corp.*,
No. 1:05-cv-00424-TAB-RLY, 2007 WL 2316463
(S.D. Ind. Aug. 10, 2007).......................................................................8, 35

*Medline Indus. v. Sullivan*,
No. 08-C-5867, 2009 U.S. Dist. LEXIS 93970
(N.D. Ill. Oct. 6, 2009)..........................................................................13, 14

*Minasian v. Standard Chartered Bank, PLC*,
109 F.3d 1212 (7th Cir. 1997) ...................................................................5

*Musser v. Gentiva Health Servs.*,
356 F.3d 751 (7th Cir. 2004) ....................................................................18

*Negrete v. Allianz Life Ins. Co.*,
No. CV 05-6838 CAS, 2013 WL 6535164
(C.D. Cal. Dec. 9, 2013) ...........................................................................28

*Noffsinger v. Valspar Corp.*,
09 C 916, 2011 WL 9795
(N.D. Ill. Jan. 3, 2011) .............................................................................30

*Novak v. Bd. of Trs.*,
777 F.3d 966 (7th Cir. 2015) ....................................................................18

*Nunez v. BNSF Ry. Co.*,
No. 09-4037, 2012 WL 2874059
(C.D. Ill. July 13, 2012) ............................................................................16

*NutraSweet Co. v. X-L Eng'g Co.*,
227 F.3d 776 (7th Cir. 2000) ...............................................................18, 20

*Paramount Media Group, Inc. v. Vill. of Bellwood*,
308 F.R.D. 162 (N.D. Ill. 2015)................................................................29

*Paramount Media Group, Inc. v. Vill. of Bellwood*,
No. 13 C 3994, 2015 WL 7008132
(N.D. Ill. Nov. 10, 2015)...........................................................................23

**Page**

*Paramount Media Group, Inc. v. Village of Bellwood*,
No. 13 C 3994, 2015 WL 5307483
(N.D. Ill. Sept. 10, 2015) ................................................................................. *passim*

*Peals v. Terre Haute Police Dep't*,
535 F.3d 621 (7th Cir. 2008) ....................................................................................29

*Price v. Fox Entm't Group, Inc.*,
499 F. Supp. 2d 382 (S.D.N.Y. 2007)........................................................................34

*Redwood v. Dobson*,
476 F.3d 462 (7th Cir. 2007) ....................................................................................13

*Salgado by Salgado v. GMC*,
150 F.3d 735 (7th Cir. 1998) ....................................................................................18

*Shen Wei (USA) Inc. v. Sempermed USA, Inc.*,
No. 05-C-6004, 2009 WL 674364
(N.D. Ill. Mar. 12, 2009)..........................................................................................30

*Silver Point Fin., LLC v. Deutsche Bank Trust Co. Ams.*
*(In re K-V Discovery Solutions, Inc.)*,
496 B.R. 330 (Bankr. S.D.N.Y. 2013).......................................................................28

*Sloan Valve Co. v. Zurn Indus.*,
No. 10 C 204, 2013 WL 3147349
(N.D. Ill. June 19, 2013) ..........................................................................................30

*Stanfield v. Dart*,
No. 10 C 6569, 2013 WL 589222
(N.D. Ill. Feb. 14, 2013)......................................................................................30, 31

*Sunstar, Inc. v. Alberto-Culver Co., Inc.*,
No. 01 C 0736, 01 C 5825, 2004 WL 1899927
(N.D. Ill. Aug. 23, 2004)................................................................................32, 33, 35

*Sys. Dev. Integration, LLC v. Computer Scis. Corp.*,
886 F. Supp. 2d 873 (N.D. Ill. 2012) ..........................................................................9

*Thompson v. City of Chicago*,
472 F.3d 444 (7th Cir. 2006) ...........................................................................5, 8, 32

*United States EEOC v. Rockwell Int'l Corp.*,
60 F. Supp. 2d 791 (N.D. Ill. 1999) ..........................................................................24

- v -

**Page**

*United States v. Martoma*,
   993 F. Supp. 2d 452 (S.D.N.Y. 2014)......................................................................8

*United States v. Miles*,
   207 F.3d 988 (7th Cir. 2000) .........................................................................36

*United States v. Wintermute*,
   443 F.3d 993 (8th Cir. 2001) ..........................................................................8

*Virnetx Inc. v. Cisco Systems, Inc.*,
   No. 10-CV-417, 2012 WL 7997962
   (E.D. Tex. Aug. 8, 2012) ...............................................................................17

*Welch v. Eli Lilly & Co.*,
   No. 06-cv-0641, 2009 WL 700199
   (S.D. Ind. Mar. 16, 2009)...............................................................................31

*Wilson v. Sundstrand Corp.*,
   No. 99 C 6944, 2003 WL 21961359
   (N.D. Ill. Aug. 18, 2003)................................................................................17

*Witners v. Aurora Foods*, *Inc.*,
   No. 405-CJP, 2003 WL 25764893
   (S.D. Ill. Sept. 2, 2003) .................................................................................10

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
   Rule 26............................................................................................................18
   Rule 26(a).......................................................................................................22
   Rule 26(a)(2)..................................................................................2, 18, 20, 22
   Rule 26(a)(2)(B).............................................................................................19
   Rule 26(a)(2)(B)(i).........................................................................................18
   Rule 26(a)(2)(B)(ii)........................................................................................18
   Rule 26(a)(2)(D)(ii)........................................................................................29
   Rule 30(c)................................................................................................12, 16
   Rule 30(c)(2)............................................................................................2, 13
   Rule 30(d)(2)..................................................................................................13
   Rule 30(d)(3)..................................................................................................13
   Rule 37(c)(1)..................................................................................................18

**Page**

Federal Rules of Evidence
Rule 401 ...........................................................................................................8
Rule 403 ...........................................................................................5, 8, 32, 33
Rule 702 ...........................................................................................1, 4, 8, 32
Rule 702(b) ......................................................................................................11

Local Rules
Form LR 16.1.1 ...............................................................................................32
Form LR 16.1.1 n. 7 ..................................................................................33, 34
Rule 37.2 .....................................................................................................16, 1

## SECONDARY AUTHORITIES

Ferrell and Saha, The Loss Causation Requirement for Rule 10b-5 Causes of
    Action: The Implications of *Dura Pharms. Inc. v. Broudo*
    63 Bus. Law 163 (Nov. 2007) ..................................................................25

1131309_1

## I.    INTRODUCTION

On remand from the Seventh Circuit, plaintiffs' loss causation expert Professor Daniel R. Fischel ("Fischel") submitted three supplemental expert reports establishing that his artificial inflation quantifications were not distorted by firm-specific, nonfraud information and explaining in "nonconclusory terms" the basis for his opinions. *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 422 (7th Cir. 2015); *see also* 2/1/16 Order (denying motion to exclude Fischel) (Dkt. No. 2102). In an effort to "shoulder the burden of identifying some significant, firm-specific, nonfraud related information that could have affected the stock price," *Glickenhaus*, 787 F.3d at 422, defendants jettisoned their prior loss causation expert Mukesh Bajaj ("Bajaj") and retained ***three*** new experts to rebut Fischel's opinions, Professors Allen Ferrell ("Ferrell"), Christopher M. James ("James") and Bradford Cornell ("Cornell").

As the Seventh Circuit made clear, defendants had to provide "significant negative information about Household unrelated to the[] corrective disclosures (and not attributable to market or industry trends)." *Glickenhaus*, 787 F.3d at 419. That is because "Fischel's models controlled for market and industry factors and general trends in the economy – the regression analysis took care of that." *Id.* at 421. To that end, Ferrell, James and Cornell purported to identify company-specific, nonfraud information that they claimed could have affected Household's stock price during the Leakage Period. But defendants failed to "shoulder their burden"; this Court held that "defendants have not identified 'significant, firm-specific, nonfraud related information that could have affected [Household's] stock price.'" 2/1/16 Order at 22 (quoting *Glickenhaus*, 787 F.3d at 421).

Defendants, as the proponents of expert testimony, bear the burden of demonstrating that the proposed testimony of Ferrell, James and Cornell meets the requirements for admissibility under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993). As set forth below, defendants have come up short, and there are numerous grounds on which to exclude the testimony of their three experts at trial.

***First***, Ferrell and James should be precluded from testifying at trial about the "numerous" disclosures they contend are company-specific, nonfraud-related. In light of this Court's holding

that "the categories of disclosures that defendants characterize as firm-specific and unrelated to the fraud are neither," such testimony will neither help the jury nor "determine a fact in issue." To the contrary, testimony by Ferrell and James that there was firm-specific, nonfraud information that distorted Fischel's models would confuse the jury and prejudice plaintiffs. Such testimony is also unreliable and must be excluded because it contradicts the overwhelming evidence in this case, as reaffirmed by the Seventh Circuit. *See Glickenhaus*, 787 F.3d at 420. Ferrell's and James' opinions that certain information "may have" or "could have" contributed to Household's stock price decline – opinions unsupported by any quantitative analysis – are also inadmissible, as they are too speculative to satisfy *Daubert's* reliability threshold and will not assist the jury.

*Second*, Ferrell should be excluded because defendants made a tactical decision which kept Ferrell ignorant of the reasons why defendants' statements and omissions were false and misleading, rendering his opinion that certain events were not fraud-related utterly unreliable. Defendants compounded their flawed strategy by instructing Ferrell not to answer questions at his February 27, 2016 deposition. Defendants' conduct at the deposition is a clear violation of Rule 30(c)(2), which also justifies his exclusion.

*Third*, at his deposition, Ferrell also ambushed plaintiffs by disclosing, for the first time, the "basis and reasons" and the "facts or data [he] considered" in selecting the companies listed in the CSFB Specialty Finance Universe to create his own peer index, which serves as the lynchpin for many of his opinions, in violation of Rule 26(a)(2). Again, this discovery violation, standing alone, is severe enough to warrant Ferrell's exclusion.

*Fourth*, James should be precluded from testifying at trial that Household's stock price declined during the Leakage Period (11/15/01 - 10/11/02) as a result of company-specific, nonfraud information, an opinion purportedly demonstrated by his comparison of Household to the common stock price of a "peer group" consisting of five subprime lenders in the credit card and auto finance industries. Like Ferrell, James' selection of the "peer group" identified in his rebuttal report was entirely subjective, unreliable and admittedly inconsistent with his own methodology, as he ignored the accepted sources from which he and other experts in his field (including Ferrell) generally select

peer groups. Further, in comparing Household to his cherry-picked "peer group," James employed no event study or regression analysis, instead adopting an approach "similar in spirit" to a "propensity score matching technique" – a supposedly "alternative scientific approach" that James concedes appears **nowhere** in his reports or in academic articles on loss causation and damages. Because James failed to employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," his opinion must be excluded. *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

**Fifth**, Cornell's opinion that Fischel fails to "reliably control for value-relevant, firm-specific, non-fraud information" (*i.e.*, confounding information) during the Leakage Period, which he concludes renders Fischel's estimation of inflation based on the leakage model "unreliable," is classic *ipse dixit* that must be excluded. Indeed, following Cornell's deposition, defendants abandoned Cornell's analysis of the only two instances of supposedly "firm-specific, nonfraud information" identified in his report, leaving only Cornell's unsupported conclusion which he concedes is based **entirely** on Ferrell's work. But the law in Seventh Circuit is clear: an expert may not serve as the "mouthpiece" of another expert, which is exactly what Cornell attempts to do here. *See Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 613-14 (7th Cir. 2002). Accordingly, Cornell's opinion must be excluded.

**Sixth**, all three of defendants' experts should be precluded from offering expert testimony at trial on those issues which they inappropriately raised for the first time in their rebuttal reports. Although it is well settled that an expert rebuttal report is only permitted to "contradict, impeach or defuse the impact of evidence" disclosed in an adverse expert's report, the rebuttal reports of Ferrell, James and Cornell are replete with opinions that they easily could have, and should have, raised in their initial reports. As an example, on rebuttal Ferrell proposes an "alternative" quantifications of inflation, opining that damages in this action are a maximum of $4.19 per share – the very first time defendants have proffered an inflation figure in **fourteen years** of litigation. James and Cornell also advance new opinions on rebuttal that should have been raised initially, such as James' attack on Fischel's 228-trading day leakage window and Cornell's criticism that Fischel's reliance on his

- 3 -

article with Morgan is misplaced because it was authored prior to the Supreme Court's 2005 decision in *Dura Pharmaceuticals* and the 1995 enactment of the PSLRA. These, and all other opinions raised for the first time on rebuttal that do not "contradict, impeach or defuse the impact" of Fischel's opinions in the preceding expert report.

**Finally**, if defendants' experts are not excluded on the grounds discussed *supra*, defendants should be precluded from putting on needlessly cumulative expert testimony at trial. Although defendants have previously claimed that three experts are required to respond to the purportedly "distinct issues" raised in Fischel's prior trial testimony and supplemental reports (*see, e.g.*, Dkt. No. 2072 at 8), all three experts offer the same opinion: they claim Fischel's quantification including leakage does not reliably estimate damages. The cumulative, overlapping and often identical expert testimony, as shown in the attached table, demonstrates that defendants are improperly attempting to "outnumber" Fischel. *See* Ex. 1 to the Declaration of Daniel S. Drosman in Support of Plaintiffs' Omnibus Motion to Exclude Defendants' Experts ("Drosman Decl."). Defendants should not be permitted to parade three separate experts in front of the jury, and their decision to use just one loss causation expert at the last trial confirms that the purportedly "distinct issues" Fischel raises can be addressed by a ***single*** loss causation expert at trial.

By retaining three new experts to criticize Fischel's quantification including leakage, defendants clearly sought a second, third and fourth bite at the apple. But defendants have failed to meet their burden of establishing the admissibility of their experts' opinions. For the reasons set forth below, this Court should exercise its gatekeeping responsibilities and preclude defendants' experts from testifying at trial.

## II. DEFENDANTS' EXPERTS SHOULD BE PRECLUDED FROM TESTIFYING AT TRIAL

### A. Standard for Admissibility of Expert Testimony

The Federal Rules set high standards for expert testimony, and for good reason. An expert can hold considerable sway over a jury, and an unreliable expert can undermine the "integrity of the judicial process." *See Loeffel Steel Products, Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 800 (N.D. Ill. 2005). For that reason, the admissibility of expert testimony under Federal Rule of

- 4 -

Evidence 702 is a three-step process. *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). Not only must the expert be qualified to render his opinions, his methodology and the data relied upon must be reliable, and the testimony must assist the trier of fact to understand the evidence and determine a fact in issue. *Id.* The Seventh Circuit has underscored "how vital it is that judges not be deceived by the assertions of experts who offer credentials rather than analysis." *See Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997). Even a "supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*." *See Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999). The proponent of the expert testimony – here, defendants – bears the burden of demonstrating that it satisfies the *Daubert* standard. *Daubert*, 509 U.S. at 592; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). In short, the trial court is vested with the responsibility to act as a gatekeeper to ensure that the testimony is both relevant and reliable.

Even if expert testimony is otherwise admissible, it is nonetheless improper if it would confuse the jury, as even relevant evidence will be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Fed. R. Evid. 403; *Thompson v. City of Chicago*, 472 F.3d 444, 457-58 (7th Cir. 2006).

Defendants failed to meet their burden. As a result, the testimony of Ferrell, James and Cornell should be excluded.

### B. Ferrell and James Should Not Be Allowed to Testify at Trial About the Factors They Incorrectly Characterize as Company-Specific, Nonfraud-Related Information

#### 1. Ferrell and James Did Not Identify Any Significant Negative Company-Specific, Nonfraud Information

Ferrell and James should be precluded from offering expert testimony at trial about the disclosures they characterize as "firm-specific and unrelated to fraud," or opining that those disclosures distorted Fischel's leakage and specific disclosures models. This testimony is unhelpful, unreliable and would mislead the jury because, as this Court concluded, defendants' experts failed to

- 5 -

identify "'significant, firm-specific, nonfraud related information that could have affected [Household's] stock price.'" 2/1/16 Order at 3.[1]

Ferrell and James seek to testify at trial that there are "numerous examples of significant firm-specific, nonfraud information" that could have affected the price of Household stock, and which Fischel's leakage model purportedly failed to take into account.[2] *See, e.g.*, Ferrell Report, ¶¶15, 33, 56 (Dkt. No. 2060-3); James Report, ¶11 (Dkt. No. 2060-4). To reach this conclusion, Ferrell and James contorted the definition of "firm-specific, nonfraud factors" to include "information that impacts narrower segments of the financial services industry important to Household and that is not captured by Fischel's industry index" ***in addition to*** "factors specific to Household alone." Ferrell Report, ¶28; *see also* James Rebuttal Report, ¶3 (Dkt. No. 2074-4) (defining firm-specific, nonfraud factors as those that "may have disproportionately affected Household relative to indices such as the S&P 500 Index or the S&P Financials Index"). Using this incorrect definition, Ferrell and James then identified six categories of disclosures they claim are firm-specific, nonfraud and that Fischel failed to take into account: (1) Household's liquidity, access to capital markets, and widening bond spreads; (2) credit quality; (3) increased capital requirements for subprime lending institutions; (4) concerns regarding future regulatory and legislative changes; (5) matters specific to Household's auto and credit services business lines; and (6) the disproportionate impact of the double-dip recession on subprime lenders. *See* 2/1/16 Order at 6, 14; Ferrell Report, ¶¶44-54; James Report, ¶¶24-57; Dkt. No. 2059 at 20-21.

After analyzing each of the six categories of disclosures, this Court held that "defendants have not identified 'significant, firm-specific, nonfraud related information that could have affected [Household's] stock price.'" 2/1/16 Order at 22. To begin, this Court acknowledged the Seventh Circuit's holding that "'Fischel's models controlled for market and industry factors and general trends in the economy.'" 2/1/16 Order at 3 (quoting *Glickenhaus*, 787 F.3d at 421). With respect to

---

[1]   Here, as elsewhere, unless noted otherwise, citations are omitted and emphasis is added.

[2]   As set forth below in §IV, defendants should also be precluded from putting on cumulative expert testimony.

"disclosures regarding 'Household's liquidity, access to capital markets, and widening bond spreads'" and its "credit quality" (*see, e.g.*, Ferrell Report, ¶¶47, 49), this Court concluded that both the defendants and market analysts attributed these issues to the alleged fraud "(Household's reaging and predatory lending practices and the restatement of its earnings) and/or the state of the economy or industry." *See* 2/1/16 Order at 6-14; *see also* Fischel Second Rebuttal Report, ¶13 (Dkt. No. 2067-1) (issues regarding credit quality were due to reaging while widening bond spreads were attributed to Household's predatory lending practices).[3] The remaining supposedly company-specific, nonfraud categories of disclosures Ferrell and James identified "are also industry wide, related to fraud and/or dismissed as concerns by both analysts and Household management." 2/1/16 Order at 14-22. Thus, in assessing whether defendants sufficiently "shoulder[ed] the burden of identifying some significant, firm-specific, nonfraud related information that could have affected [Household's] stock price" *Glickenhaus*, 787 F.3d at 422, this Court determined that "the categories of disclosures that defendants characterize as firm-specific and unrelated to fraud *are neither*." 2/1/16 Order at 6-7, 14; *Glickenhaus*, 787 F.3d at 419 (requiring defendants to provide "significant negative information about Household unrelated to these corrective disclosures (and not attributable to market or industry trends))."

In light of this Court's ruling, Ferrell and James should be precluded from testifying at trial about the disclosures they contend are company-specific and nonfraud-related, or asserting that such disclosures impacted Fischel's inflation quantifications, because that testimony would mislead and confuse the jury. *See, e.g.*, Ferrell Report, ¶¶33-55; James Report, ¶¶11, 24-57. This Court's holding establishes that Ferrell's and James' opinions would be entirely *unhelpful* to the jury because their testimony *does not relate* to, and *is not probative of*, whether company-specific, nonfraud information distorted Fischel's models. *Daubert*, 509 U.S. at 587 (defining "'relevant evidence'" as that which has "'any tendency to make the existence of any fact that is of consequence

---

[3]     *Accord Glickenhaus*, 787 F.3d at 413 (observing that the "company's growth was driven by predatory lending practices. This in turn increased the delinquency rate of Household's loan, which the executives then tried to mask with creative accounting. Their technique was to 're-age' delinquent loans to distort a popular metric that investors use to gauge the quality of loan portfolios: the percentage of loans that are two or more months delinquent").

to the determination of the action more probable or less probable than it would be without the evidence'") (citing Fed. R. Evid. 401). Instead, testimony by Ferrell and James regarding these categories of disclosures – disclosures that this Court has said were neither nonfraud nor company-specific – runs the very real danger of misleading the jury. Because Ferrell's and James' opinions do not meet the requirement of Rule 702 that expert testimony "help the trier of fact to understand the evidence or to determine a fact in issue," their opinions should be excluded at trial. *United States v. Martoma*, 993 F. Supp. 2d 452, 457-59 (S.D.N.Y. 2014) (excluding the defendants' proposed loss causation expert testimony that was not probative on the central question of materiality).[4]

Even if admissible under Federal Rule of Evidence 702, Ferrell's and James' testimony concerning the six categories of disclosures should be excluded under Federal Rule of Evidence 403 because any probative value is outweighed by the danger of misleading the jury or confusing the issues. In *Daubert*, the Supreme Court cautioned that judges assessing the admissibility of expert testimony under Rule 702 "should also be mindful of other applicable rules," such as Rule 403. *Daubert*, 509 U.S. at 595. Because "'[e]xpert evidence can be both powerful and quite misleading . . . the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses.'" *Id.* Thus, testimony that will confuse the issues or mislead the jury, even if relevant, must be excluded. *See* Fed. R. Evid. 403; *Thompson*, 472 F.3d at 456 (observing that the district court has discretion to exclude expert evidence under Rule 403).

As the Seventh Circuit found, "Fischel's models controlled for market and industry factors and general trends in the economy – the regression analysis took care of that." *Glickenhaus*, 787 F.3d at 421. Thus, if Ferrell and James were permitted to testify about the "numerous"

---

[4] *See also United States v. Wintermute*, 443 F.3d 993, 1001 (8th Cir. 2001) (excluding expert testimony that would result in "misconstruing the legal question at issue [because such] testimony [would] not [be] relevant" and thus, "would have served to confuse rather than assist the jury in the jury's attempt to understand the evidence on this issue"); *Fairley v. Andrews*, No. 03 C 5207, 2011 WL 2142800, at *4 (N.D. Ill. May 31, 2011) (excluding testimony of expert witness on the grounds that the "factual link" between the testimony and the remaining issues in the lawsuit was "tenuous at best"); *George v. Kraft Foods Global, Inc.*, 800 F. Supp. 2d 928, 934 (N.D. Ill. 2011) (finding that expert's opinion, to the extent it sought to establish liability for non-actionable breaches of fiduciary duty, was irrelevant and inadmissible in light of court's prior ruling that any alleged breach of fiduciary duty was time-barred); *McCauley v. Nucor Corp.*, No. 1:05-cv-00424-TAB-RLY, 2007 WL 2316463, at *7 (S.D. Ind. Aug. 10, 2007) (excluding expert opinion where the court had already ruled on the issue the expert intended to opine on).

macroeconomic and industry-related disclosures in their reports, the jury would be confused or misled into believing that these disclosures could have distorted Fischel's models despite this Court's determination that these disclosures "are neither" company-specific nor related to the fraud. 2/1/16 Order at 6. Accordingly, this Court should exclude Ferrell's and James' testimony concerning nonfraud factors in order to protect the jury from unreliable and irrelevant testimony that might infect their decision-making.

> ### 2. Ferrell's and James' Opinions About Supposed Company-Specific, Nonfraud Information are Impermissibly Speculative and Unreliable

Ferrell's and James' opinions should also be excluded because they are impermissibly speculative. "Even where a witness is an expert in the relevant field, the evidentiary reliability demanded by *Daubert* is not present when his or her opinion is speculative." *Sys. Dev. Integration, LLC v. Computer Scis. Corp.*, 886 F. Supp. 2d 873, 880 (N.D. Ill. 2012); *see also Brown v. Burlington Northern Santa Fe Ry. Co.*, No. 09-1380, 2013 WL 1729046, at *8, *11 (C.D. Ill. Apr. 22, 2013) ("Speculative opinions are not admissible."). Ferrell and James both opine that firm-specific, nonfraud-related information **may have** or **could have** contributed to Household's stock price decline on various days during the Leakage Period. *See, e.g.*, Ferrell Depo. Tr. at 293:23-294:4, Drosman Decl., Ex. 2 ("Q. You found that there were firm-specific non-fraud disclosures on this date that contributed to the decline, correct? A. . . . in this report, my initial report, I said **may have**.");[5] James Report, ¶58 ("I have found numerous types of nonfraud information . . . that **could have** affected . . . the stock price of Household.").[6] Neither expert conducts any quantitative analysis

---

[5] *See also* Ferrell Report, ¶56 ("I will provide numerous examples of significant firm-specific, nonfraud information that **could have** affected Household's stock price"); *id.*, ¶¶62-63 (identified information **may have** contributed to Household's stock price decline); *id.*, ¶¶64, 66, 71, 74, 79, 81-82, 84, 88, 90, 93, 96, 100, 102-195 (same).

[6] *See also* James Rebuttal Report, ¶25 ("what the regression model measures as 'firm-specific' returns on each day **may** in fact include the effect of market and industry events"); *id.*, ¶28 ("the sensitivity coefficient of Household to its industry peers measured over a control period like Fischel's, which includes announcement as well as non-announcement days, **may** understate Household's sensitivity to its peers on announcement days"); *id.*, ¶28 ("As such, Household's estimated 'firm-specific' return **may** include the effect of industry news not captured by the regression model on peer announcement days"); *id.*, ¶30 ("analysis of the stock price responses of Household and the Subprime Lenders relative to that of Fischel's broad S&P Financials Index . . . also support the **observation** that such news **may** have disproportionately affected Household and the

to support these opinions in their initial reports, or assesses the likelihood that any particular information they identify did or did not contribute to Household's stock price decline.[7] Such testimony is far too speculative to satisfy *Daubert*'s reliability threshold or to be helpful to the jury. *See Mason v. City of Chicago*, 631 F. Supp. 2d 1052, 1060 (N.D. Ill. 2009) (expert testimony that plaintiff "may have" been affected by drugs "purely speculative" and so inadmissible); *Witners v. Aurora Foods, Inc.*, No. 405-CJP, 2003 WL 25764893, at *3-*4 (S.D. Ill. Sept. 2, 2003) (where expert merely speculated as to what the result of the relevant analysis would have been, without conducting any analysis himself, his opinion was too speculative to be admitted).

### 3. Ferrell's and James' Opinions Should Be Excluded Because They Contradict the Record Evidence

Ferrell's and James' opinions that certain factors and disclosures were firm-specific and unrelated to the fraud are unreliable and should be excluded for the additional reason that they are contradicted by the overwhelming evidence in this case, including "e-mails and reports from Household's executives attributing the entirety of the stock's decline to the fraud-related disclosures" along with "various reports from market analysts primarily focused on this information." *Glickenhaus*, 787 F.3d at 420; *see also* 2/1/16 Order at 6-22 (describing evidence that contradicts Ferrell's and James' opinions that certain disclosures were company-specific and unrelated to the fraud); Plaintiffs' Trial Exs. 198-199, 820, 201-202, 1156, Drosman Decl., Exs. 3-8.[8] Notwithstanding the evidence presented to the jury, including the testimony of defendants, and the Seventh Circuit's findings, Ferrell and James offer expert opinions that contradict or wholly ignore the evidence in this case.

---

Subprime Lenders"); *id.*, ¶32 ("Because the estimated 'firm-specific' return may reflect the effect of market and industry news, it is important to review the market and industry news . . . to determine whether that market and industry news ***may*** have contributed to the estimated firm-specific return on a given day.").

[7]     As explained in §III, *infra*, to the extent that Ferrell and James purport to belatedly provide more concrete opinions in their rebuttal reports, such opinions are inadmissible and fail to cure the speculative nature of their initial opinions. *See* Ferrell Depo. Tr. at 293:23-294:4; James Depo. Tr. at 15:5-13, Drosman Decl., Ex. 9.

[8]     "[O]ther evidence loosely corroborates the inflation figure produced by the leakage model ($23.94). For example, when Household embarked on its aggressive growth strategy" defendant Gilmer "suggested that the stock price could increase by 'over 22 dollars a share.'" *Glickenhaus*, 787 F.3d at 420.

- 10 -

For example, both Ferrell and James opine that regulatory actions were not related to the fraud and "may have" negatively impacted Household's stock price during the Leakage Period (*see, e.g.*, Ferrell Report, ¶¶50-55, James Report, ¶¶44, 48, 53-55), but the regulatory actions were related to the fraud since they were designed to prevent predatory lending – the very activity Household was engaged in but concealed from investors. In addition, defendant Aldinger specifically denied that regulatory actions had any effect on Household's business. *See* Fischel Second Rebuttal Report, Ex. 7 at 8 ("the impact on us of those changed laws has been virtually nill (sic) or minimal . . . we don't think that it's going to impact our model"). Moreover, although both Ferrell and James contend that concerns about the new FFIEC guidelines had an adverse effect on Household's stock price (Ferrell Report, ¶51, James Report, ¶55), at the first trial defendants sought to establish that the FFIEC rules did ***not*** apply to Household.[9] Expert testimony that is contradicted by the evidence, like the opinions offered by Ferrell and James here, is unreliable and inadmissible. *See In re Longtop Fin. Techs. Sec. Litig.*, 32 F. Supp. 3d 453, 462 (S.D.N.Y. 2014) (excluding as "inherently unreliable" expert testimony that was directly contradicted by record evidence); Fed. R. Evid. 702(b) (requiring that expert testimony be based on sufficient facts and data); *Barber v. United Airlines, Inc.*, 17 Fed. Appx. 433, 441 (7th Cir. 2001) (affirming exclusion of expert witness that ignored certain facts and data); *Lava Trading, Inc. v. Hartford Fire Ins. Co.*, 03 CIV 7037 (PKC)(MHD), 2005 U.S. Dist. LEXIS 4566, at *62 (S.D.N.Y. Feb. 14, 2005) (excluding expert whose analysis was premised "on a number of crucial factual assumptions that are dramatically belied by the record before us").

This Court should exercise its gatekeeping function and preclude Ferrell and James from opining at trial that any of the disclosures they identify are company-specific nonfraud related, or that those disclosures impacted Fischel's models, as such testimony is unhelpful, unreliable, speculative, and could mislead the jury.

---

[9]    *See, e.g.*, Trial Tr. at 3242:17-24 (testifying that the FFIEC rules applied to Wells Fargo); Trial Tr. at 1276:12-21 (testimony by defendant Gilmer that the FFIEC did not apply to Household, which purportedly gave Household "greater flexibility in some area[s] than the banks"); Trial Tr. at 2560:20-2561:14 (using leading questions to elicit testimony on cross examination from plaintiffs' accounting expert that Household was not governed by the FFIEC rules). (Trial transcript excerpts referenced throughout are attached as Ex. 10 to the Drosman Decl.)

### C. Ferrell's Failure to Consider the Underlying Fraud Compounded by Defendants' Discovery Violations Warrants Exclusion

Ferrell purports to opine on "whether there was 'some significant firm-specific, ***nonfraud related*** information that could have affected [Household's] stock price.'" Ferrell Report, ¶14; Ferrell Rebuttal Report, ¶9 (Dkt. No. 2074-3). Ferrell concedes that "in order to determine whether something is fraud-related or not, one has to understand the fraud." *Id.* at 162:3-6. Nevertheless, Ferrell failed to explain what information he believes is fraud-related in either of his reports, and he and defendants actively frustrated any attempt to explore his views on the topic at Ferrell's deposition.

> Q. Why are you so reluctant to say whether this is fraud-related information or not?
>
> A. Because I wasn't asked to opine on what the fraud was. I was – I'm assuming the – the misrepresentations in the jury verdict, without opining on it. So that was my hesitation, is not to be viewed as providing an opinion on what – on what the fraud actually is, if there is any, rather than just noting – merely noting what's on the jury verdict, without providing an opinion on that.

Ferrell Depo. Tr. at 161:15-162:1; *see also id.* at 186:2-12 (evading question as to whether he made judgments about whether disclosures were fraud-related); *id.* at 190:6-191:10 (failing to identify where he had defined "nonfraud-related" in either of his reports). Ferrell's failure to consider a key component underlying his proffered opinions warrants his exclusion from trial.

Apparently, defendants' hope is to try this case in a sanitized forum – where the scope of the trial is improperly limited simply to a battle of experts who will opine on loss causation and damages without any reference to the fraud itself. As part of this strategy, defendants directed Ferrell not to review the evidence – both trial testimony and exhibits – of the fraud. As defense counsel said at Ferrell's deposition, "he's not here to testify as to whether the fraud happened or didn't happen or how it happened." Ferrell Depo. Tr. at 150:17-19. In doing so, defendants devised an unworkable game plan – Ferrell can't or won't describe the fraud in this case, which renders his opinion that certain information is unrelated to the fraud utterly unreliable. Defendants compounded their flawed strategy by directing Ferrell not to answer questions about the fraud in violation of Rule 30(c). Defendants' interference with plaintiffs' attempts to examine Ferrell about the fraud also warrants

- 12 -

exclusion. *See* Fed. R. Civ. P. 30(d)(2) ("The court may impose an appropriate sanction . . . on a person who impedes, delays, or frustrates the fair examination of the deponent.").

During Ferrell's deposition, defense counsel improperly instructed Ferrell not to answer questions concerning the Seventh Circuit's summary of the trial evidence in this action more than ***twenty times***. *See* Ferrell Depo. Tr. at 69:14-77:25; 38:3-39:10. Counsel's sole justification for the instructions was that the questions were outside the scope of Ferrell's assignment in this case. *See, e.g.*, *id.* at 69:21-70:5, 71:7-14. Ferrell followed defense counsel's instructions in each instance, refusing to answer the questions, notwithstanding the fact that Ferrell relied on the Opinion to form his own opinions and cited it repeatedly throughout his reports. *Id.* Counsel's and Ferrell's conduct was highly inappropriate and warrants exclusion.

Rule 30(c)(2) states that "[a] person may instruct a deponent not to answer ***only*** when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)." As the Seventh Circuit has repeatedly held, an instruction not to answer for ***any*** purpose other than those set forth in Rule 30(c)(2) is impermissible and serves only to obstruct proper discovery. *See Redwood v. Dobson*, 476 F.3d 462, 467-68 (7th Cir. 2007). Indeed, as Judge Easterbrook wrote, even in a case (unlike this one) where the questions were so harassing that the deponent "would have been entitled to stalk out of the room," end the deposition, and seek sanctions, counsel's instruction not to answer "was untenable ***as no claim of privilege had been advanced***." *Redwood*, 476 F.3d at 468; *see also LM Insurance Corp. v. ACEO, Inc.*, 275 F.R.D. 490, 491 (N.D. Ill. 2011) (absent a claim of privilege, instructing a witness not to answer deposition questions through either explicit instruction or coaching is improper); *Medline Indus. v. Sullivan*, No. 08-C-5867, 2009 U.S. Dist. LEXIS 93970, at *5-*6 (N.D. Ill. Oct. 6, 2009) (relevance not proper grounds for instruction not to answer); *Hulsey v. HomeTeam Pest Def. LLC*, No. 2:10-cv-03265-DCN, 2012 WL 1533759, at *1 (D.S.C. May 1, 2012) (instruction not to answer questions purportedly outside the scope of the expert's report unacceptable).

Defense counsel's underlying objection – that plaintiffs' questions about the Seventh Circuit's factual findings were outside the scope of his assignment – is meritless. Ferrell identified

- 13 -

the Seventh Circuit Opinion as one of the materials he relied on in deriving the opinions in both his initial and rebuttal reports. Ferrell Report, Appx. B; Ferrell Rebuttal Report, Appx. B (Dkt. No. 2074-3). In the body of his reports, Ferrell cited the Seventh Circuit Opinion approximately **thirty times** – by far his most-cited reference, other than Fischel's report. Furthermore, the Seventh Circuit's findings are the law of this case. *See Benuzzi v. Bd. of Educ.*, 119 F. Supp. 3d 917, 923-24 (N.D. Ill. 2015) (when a court of appeals has reversed a final judgment and remanded the case, the express or implied rulings of the appellate court become the law of the case). It is entirely within the scope of an expert deposition to seek discovery regarding the expert's underlying assumptions, facts and methodology that led him to reach his conclusions – indeed, an expert is required to provide that information before his testimony can be admitted. *See, e.g.*, *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 641 (7th Cir. 2008). *See also Medline*, 2009 U.S. Dist. LEXIS 93970, at *11 (instructions not to answer wholly unsupported where disputed questions related to issues that were subject of the case).

The questions Ferrell refused to answer bear directly on the details, scope and impact of defendants' fraud. Ferrell Depo. Tr. at 72:3-76:6. For example, Ferrell refused to answer questions concerning whether he agreed, disagreed, or even understood the Seventh Circuit's findings that:

- "In 1999, company executives implemented an aggressive growth strategy in pursuit of a higher stock price." (Tr. at 69:14-72:1)

- "Over the next two years, the stock price rose dramatically but the company's growth was driven by predatory lending practices." (Tr. at 72:2-12)

- "This, in turn, increased the delinquency rate of Household's loans, which the executives then tried to mask with creative accounting." (Tr. at 72:14-73:18)

- "[Defendants'] technique was to reage delinquent loans to distort a popular metric that investors use to gauge the quality of loan portfolios, the percentage of loans that are two or more months delinquent." (Tr. at 73:20-75:3)

- "Household also improperly recorded the revenue from four credit card agreements that would ultimately issue corrections in August 2002." (Tr. at 75:5-76:6)

These questions were designed to explore whether Ferrell – who purports to opine about whether information is related to defendants' fraud – understood the nature of defendants' fraud, and

- 14 -

whether, how and why Ferrell's assumptions departed from the Seventh Circuit's findings, which are the law of the case. The second, third and fourth points above are quoted in Fischel's Second Rebuttal Report as support for his opinion that Ferrell and James had failed to establish that Household's supposedly deteriorating credit quality was not fraud-related. Fischel Second Rebuttal, ¶15 n.21. Although Ferrell's assignment was to respond to Fischel, he would not even answer whether he understood what those findings meant. Ferrell Depo. Tr. at 73:14-73:18. All of plaintiffs' questions are germane to Ferrell's analysis of whether Fischel properly accounted for nonfraud-related information. Indeed, Ferrell conceded as much. *See* Ferrell Depo. Tr. at 61:11-12 ("Again, what's important for me and my scope is what constitutes the fraud."). Plaintiffs' questions could hardly have fallen more squarely ***within*** the scope of the deposition.

Each of the 20-plus instructions not to answer, and Ferrell's decision to comply with those directives, was a violation of the Federal Rules of Civil Procedure and frustrated plaintiffs' ability to examine Ferrell about his opinions and the foundation for them. If defendants did not understand the impropriety of their instructions, plaintiffs' counsel reminded them that the Seventh Circuit's Opinion is "one of [Ferrell's] reliance materials," that plaintiffs were "entitled to examine him on it," and that it was "completely inappropriate to instruct him not to answer." Ferrell Depo. Tr. at 70:18-20; 71:15-17.[10] Nevertheless, defendants' counsel simply would not allow Ferrell to answer plaintiffs' questions because he could not adequately respond. In fact, Ferrell admitted later in his deposition that he had no idea why the 17 statements and omissions at issue in the case were false and misleading:

> Q. And, in addition, the defendants in this case falsely denied that they were engaged in predatory lending throughout the leakage period, didn't they?
>
> [Defendants' Counsel]: Objection. He's not here as a fact witness. Whatever the Seventh Circuit found or whatever the jury found, it is what it is. He's not here to testify that it did or did not happen.

---

[10] At defendants' request, plaintiffs agreed to take Ferrell's deposition on a Saturday to accommodate Ferrell's schedule; thus, plaintiffs were unable to seek the Court's intervention during the deposition. At subsequent depositions taken on weekdays, defense counsel were not as brazen in their disregard for the Rules. *See, e.g.*, Cornell Depo. Tr. at 162:12-163:19; 176:18-177:1 (allowing Cornell to respond to questions about the Seventh Circuit Opinion), Drosman Decl., Ex. 11.

A. ***I don't have a view on what constituted the misrepresentations beyond noting what's on the jury verdict form***.

Ferrell Depo. at 147:21-148:7.

And defendants' instructions not to answer were not just an error in judgment. Despite the clear mandate of Fed. R. Civ. P. 30(c), during the parties' Local Rule 37.2 meet-and-confer, defendants maintained that their instructions not to answer were proper. In short, defendants made a tactical decision to prevent Ferrell from answering questions about defendants' fraudulent conduct – while simultaneously offering him as an expert on what was (or was not) fraud-related. Defendants must now live with the consequences of this failed strategy. Ferrell's testimony should be excluded. *Nunez v. BNSF Ry. Co.*, No. 09-4037, 2012 WL 2874059, at *4 (C.D. Ill. July 13, 2012) ("An expert may not simply ignore evidence that does not support his opinion.") (citing *Barber v. United Airlines, Inc.*, 17 Fed. Appx. 433 (7th Cir. 2001)).

Further, when permitted to answer, Ferrell obstructed Plaintiffs' discovery by repeatedly providing evasive, purposely unresponsive answers to numerous deposition questions. Ferrell used this tactic to avoid answering factual questions about whether he agreed that there was fraud-related information that leaked into the market during the Leakage Period. Ferrell Depo. Tr. at 148:9-155:16. In responding, Ferrell repeatedly grafted onto the question a requirement that such information cause a residual stock-price decline which is exactly what is not required for leakage. *Id.* Ferrell likewise evaded over a dozen questions as to whether he considered particular pieces of information "fraud-related." [11] *See* Ferrell Depo. Tr. at 160:6-161:13; 162:7-25; 174:6-179:15; 181:10-20; 183:5-16; 183:24-184:14; 185:18-23; 186:17-187:1; 198:13-23; 200:4-18; 300:18-25. Ferrell's refusal to answer these questions as posed is not surprising – there are reams of fraud-related disclosures during the Leakage Period, but admitting this fact undercuts Ferrell's opinion that there is no basis for Fischel's leakage analysis. However, Ferrell is not entitled to change the question simply because answering the one asked would be harmful. His refusal to identify information that entered the market as fraud-related – including information that he had voluntarily

---

[11] Counsel encouraged Ferrell's evasive behavior. *See, e.g.*, Ferrell Depo. Tr. at 150:11-25; 153:19-24; 154:12-18; 138:22-139:9; 142:23-143:8.

included in his report (*see, e.g.*, *id.* at 301:3-16) – disqualifies him from opining on loss causation issues.

Although courts can impose less drastic sanctions, such as allowing a renewed deposition, that remedy is insufficient in this case. A renewed deposition would only allow defendants to revise their failed strategy, instruct Ferrell to learn about the fraud, and script his answers. *See Virnetx Inc. v. Cisco Systems, Inc.*, No. 10-CV-417, 2012 WL 7997962, at *4 (E.D. Tex. Aug. 8, 2012) (concluding that the defendants' lawyer's obstructive conduct at the deposition "was to provide an opportunity to 'woodshed' the witness, rather than to protect the witness from any unfair conduct or questioning by opposing counsel"). Thus, "the damage cannot fairly be undone simply by sending plaintiffs back to the drawing board," and an alternative sanction – preclusion – is warranted. *Wilson v. Sundstrand Corp.*, No. 99 C 6944, 2003 WL 21961359, at *14 (N.D. Ill. Aug. 18, 2003) (deeming critical evidence admitted because of improper interference with deposition). Otherwise, defendants "would have accomplished what [they] conceivably wanted – disruption of the deposition and an opportunity to visit with the witness regarding his testimony." *Virnetx*, 2012 WL 7997962, at *5. In short, "[w]hen one side impedes the other side's access to relevant evidence, as [defendants have] done here, it must lie in the bed it has made." *Wilson*, 2003 WL 21961359, at *14.

In this instance, Ferrell's failure to consider the underlying fraud renders his opinions unreliable, defense counsel's and Ferrell's conduct was improper throughout the deposition, and defendants never moved for a protective order. Plaintiffs have been significantly prejudiced by the denial of necessary discovery, and defendants would gain a significant advantage by the imposition of a lesser sanction. Thus, excluding Ferrell is the ***only*** sanction proportionate to the discovery abuse and sufficient to deter future unprofessional conduct. *See Houston v. Hyatt Regency Indianapolis*, 302 F.R.D. 268, 281 (S.D. Ind. 2014) (appropriate discovery sanctions should serve both to penalize and deter).

**D.** **Ferrell Should Be Excluded for Violating Fed. R. Civ. P. 26(a)(2) by Failing to Disclose the Basis and Reasons for Certain Opinions and the Facts and Data He Considered**

Ferrell should also be excluded as a sanction for violations of Rule 26(a)(2). He did so by failing to disclose the "basis and reasons" and the "facts or data [he] considered" in selecting the companies listed in the CSFB Specialty Finance Universe to create his own peer index, a decision critical to most of his opinions. Ferrell's omission of this information from his reports – even after Fischel criticized Ferrell's peer index selection – violated Fed. R. Civ. P. 26(a)(2). *See* Fed. R. Civ. P. 26(a)(2)(B)(i), (ii).

Under Rule 26(a)(2), an expert witness is required to disclose "all opinions the witness will express and the basis and reasons for them" along with "the facts or data considered by the witness in forming" his opinions. Fed. R. Civ. P. 26(a)(2)(B)(i), (ii). Thus, expert reports "must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions" and what the expert "considered, read, thought about or relied upon in reaching the conclusions and opinions contained within the report." *Salgado by Salgado v. GMC*, 150 F.3d 735, 742 n.6 (7th Cir. 1998). The disclosure requirement of Rule 26(a)(2) was designed to avoid "ambush at trial," (*id.*) and a party that fails to provide the information required by the rule may be barred from using that *witness* at trial. *See* Fed. R. Civ. P. 37(c)(1); *Paramount Media Group, Inc. v. Village of Bellwood*, No. 13 C 3994, 2015 WL 5307483, at *5 n.4 (N.D. Ill. Sept. 10, 2015) (Alonso, J.). The sanction of exclusion is "automatic and mandatory" unless the party to be sanctioned can show that its violation was substantially justified or harmless. *Novak v. Bd. of Trs.*, 777 F.3d 966, 973-74 (7th Cir. 2015) (affirming exclusion of expert witnesses who failed to comply with Rule 26(a)(2)); *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 785-86 (7th Cir. 2000) (same); *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004) (observing that the formal requirements of Rule 26 are not pointless).

Ferrell relies on a peer index he created from the CSFB Specialty Finance Universe for his opinion that firm-specific, nonfraud-related information could have affected Household's stock price during the Leakage Period. *See, e.g.*, Ferrell Report, ¶42. This index is also critical to Ferrell's

"corrected" market model, from which he derives his alternative quantification of inflation. *See* Ferrell Rebuttal Report, ¶75. Ferrell opines that his "corrected" market model "better explains Household's stock price movements" during the Leakage Period because it more appropriately captures "the effects of macroeconomic conditions on consumer finance firms" than does the S&P Financials Index alone. Ferrell Rebuttal Report, ¶62; Ferrell Depo. Tr. at 226:21-227:4.

Noticeably absent from Ferrell's two expert reports is ***any*** explanation as to how or why he chose the CSFB Specialty Finance Universe to create his index, instead of different companies listed in other analyst reports. At Ferrell's deposition, when asked to explain the process for selecting the CSFB Specialty Finance Universe, he revealed, for the very first time, that "consistent" with some unspecified "academic literature," he consulted "Institutional Investor" magazine (a publication that supposedly "ranks" analysts), from which he identified the "star" analyst from 2001, an analyst from CSFB. Ferrell Depo. Tr. at 227:8-228:11. After identifying the "star" analyst, "because presumably the star analyst is the best analyst" (based on a single publication), he selected a single report from that analyst which contains the CSFB Specialty Finance Universe companies.[12] Ferrell Depo. Tr. at 231:23-232:14. According to Ferrell, "the academic literature regularly uses this source, the 'Institutional Investor' magazine, to identify star analysts" for some vague "analytical purposes." *Id.* at 228:5-229:4. When asked if he was stating that any of the undisclosed academic literature "refers to star analysts' selection of peer indices for experts, in cases like this one, to adopt a peer index," Ferrell responded, "[t]hat is not my testimony." *Id.* at 230:21-24; *see also id.* at 231:13-22. Inexplicably, as Ferrell admitted, his report does not discuss the "academic literature" or the "Institutional Investor" magazine on which he purportedly relied in selecting the CSFB Specialty Finance Universe companies, he did not disclose either among the materials he relied on in forming his opinions, as Rule 26(a)(2)(B) requires, and during his deposition, he could not (or would not) identify the "academic literature." *See* Ferrell Report, Appendix B; Ferrell Rebuttal Report,

---

[12] The CSFB report from which Ferrell selected his index actually lists three analysts as the authors; Ferrell did not specify which, of these three, is the "star" analyst. *See* Fischel Sur-Rebuttal Report, Ex. 1, Drosman Decl., Ex. 12.

Appendix B; Ferrell Depo. Tr. at 229:5-230:19 (confirming that he "did not cite the academic articles" or Institutional Investor magazine).

After realizing his error, Ferrell tried to walk back from his earlier testimony that he relied on the "academic literature" in consulting "Institutional Investor" magazine, claiming instead that the academic literature is merely "part of my background knowledge." Ferrell Depo. Tr. at 230:25-231:17. Ferrell's attempt to back-pedal on his testimony should be rejected. *See Paramount*, 2015 WL 5307483, at *6 ("an expert cannot simply fall back on his experience when he acknowledges that he relied on particular data in forming an opinion yet fails to disclose that information"). In any event, Ferrell admits he also failed to disclose "Institutional Investor" magazine, thus, exclusion of his testimony is "'automatic and mandatory'" because, as discussed below, defendants cannot demonstrate that Ferrell's violation of Rule 26(a)(2) was justified or harmless. *NutraSweet Co.*, 227 F.3d at 785-86.

Ferrell's failure to disclose this critical information was not substantially justified. Indeed, Ferrell has served as an expert over a dozen times just in the last four years, and is clearly well aware of Rule 26(a)(2)'s disclosure requirements. *See* Ferrell Report, Appendix A. As Ferrell testified, the criteria he used to select the CSFB Specialty Finance Universe companies, "consistent with the academic literature," was the analyst ranking set forth in "Institutional Investor" magazine, which he claims was "an objective way to identify comparables." Ferrell Depo. Tr. at 227:8-228:11. Given the self-proclaimed "importan[ce]" of the "academic literature" and "Institutional Investor" magazine to Ferrell's opinions, his wholesale failure to disclose these materials is inexcusable, and defendants cannot provide any credible explanation for Ferrell's failing. *Id.*

Further, Ferrell's noncompliance with Rule 26(a)(2) is not harmless, as the CSFB Specialty Finance Universe he used to create his own index serves as the lynchpin of most of Ferrell's opinions. His creation of that index also raises a number of questions due to inconsistencies between Ferrell's choice of index and the indices used by other analysts, Household, defendants' prior loss

causation expert, Bajaj, and their current (cumulative) expert James.[13]  As Ferrell concedes, the nine

companies he selected were not a consumer peer group that was universal among analysts, and

Ferrell's own report cites numerous analyst reports that used universes of "specialty finance"

companies other than the group set forth in the CSFB Specialty Finance Universe index.[14]  *See*

Ferrell Depo. Tr. at 239:24-240:13; Ferrell Depo. Exs. 11, 12, Drosman Decl., Exs. 14-15.  Even in

the CSFB universe, Household is identified as a "Diversified Financial" company along with

American Express and CitiGroup, while the other seven companies are specifically classified by

CSFB as credit card or auto finance companies.  *See* Fischel Sur-Rebuttal Report, Ex. 1 at 18,

Drosman Decl., Ex. 12.  Moreover, Ferrell's CSFB Specialty Finance Universe index is inconsistent

with the peer groups against which Household compared its own stock price performance, both

internally and in SEC filings, and conflicts with the indices used by defendants' prior loss causation

expert, Bajaj, and their current (cumulative) expert, James.[15]  *See* Plaintiffs' Trial Ex. 820; Ferrell

---

[13]    As Ferrell's own article confirms, "proper choice of an industry index" is an "important" issue "that must be considered in undertaking a rigorous event study analysis."  *See* Ferrell Depo., Ex. 8 at 167, Drosman Decl., Ex. 13.  Ferrell's own article claims that a proper peer group should be selected from either: (1) the Company's own public filings (such as Household's proxy that identified the S&P Financials Index used by Fischel); (2) equity analyst reports; and (3) constituents of a widely-used industry index (such as the S&P Financials Index).  *Id.*  Indeed, Ferrell recognizes that, "[i]n selecting an appropriate industry index, it is important to pay particular attention to which firms are truly 'comparable' in terms of their line of business and hence should be included in the industry index."  *See id.*; *see also* Ferrell Depo. Tr. at 224:11-15.  Failing to heed his own advice, Ferrell employed a subjective, unscientific methodology in selecting the CSFB Specialty Finance Universe index, as he conceded he is unaware of any instances in which "Institutional Investor" magazine's "Star Analyst" was used to identify a peer group for use in a regression analysis like the one Ferrell conducts here.  Ferrell Depo. Tr. at 231:13-22.

[14]    For example, Ferrell cites a report titled, "CIBC World Markets Specialty Finance Universe Summary," dated October 3, 2002, which lists 22 companies in its specialty finance universe.  Ferrell Depo. Ex. 11.  Household is listed as a diversified financial company.  Ferrell Depo. Ex. 11, at 2.  Ferrell also cites a January 2, 2002 AG Edwards report titled "Specialty Finance Quarterly Fourth Quarter 2001," which identified 14 specialty finance companies, only five of which were in Ferrell's peer group.  Ferrell Depo. Ex. 12, at 4.  And, he cites a Fox-Pitt Kelton U.S. Specialty Finance report, dated May 31, 2002 with 12 companies, only five of which overlap with Ferrell's peer group.

[15]    In internal company documents, Household compared its performance with a peer group consisting of nine companies, only four of which appear in Ferrell's CSFB Specialty Finance Universe index.  *See* Plaintiffs' Trial Ex. 820; Ferrell Depo. Tr. at 251:13-253:9.  In its SEC filings, Household identified the S&P Financials Index as the appropriate industry index against which to compare the Company's stock price performance.  Fischel Second Rebuttal Report, ¶10.  Bajaj criticized Fischel's use of the S&P Financials Index and argued for the use of an alternative "Consumer Finance Index," comprised of six companies (excluding Household), only four of which appear on the CSFB Specialty Finance Universe index.  *See* Bajaj Report, Ex. 5, Drosman Decl., Ex. 16; Trial Ex. 4138:15-4140:3; Ferrell Rebuttal Report, Ex. 6; Ferrell

Depo. Tr. at 251:13-253:9; Fischel Second Rebuttal Report, ¶10; Bajaj Report, Ex. 5; Trial Tr. at 4138:15-4140:3; Ferrell Rebuttal Report, Ex. 6; Ferrell Depo. Tr. at 260:7-12.

Given that Ferrell's peer group diverges so completely from other peer groups, and given the importance of the peer group to Ferrell's opinions, the ability to effectively examine Ferrell on his selection of the CSFB Specialty Finance Universe was imperative. "One of the primary goals of the federal civil discovery rules and Rule 26(a) is to 'eliminate surprise,'" yet this is exactly what defendants have done here by sandbagging plaintiffs with additional "bas[es] and reasons" for Ferrell's opinions after the time to respond to those opinions has passed. *Baker v. Indian Prairie Community Unit*, No. 96 C 3927, 1999 WL 988799, at *3 (N.D. Ill. Oct. 26, 1999) (preventing plaintiffs from "ambush[ing]" defendants by striking untimely expert opinions and data). Because Ferrell's failure to comply with Rule 26(a)(2) was not substantially justified or harmless, this Court should exclude him as a witness. *Paramount*, 2015 WL 5307483, at *5 (overruling objection to Magistrate Judge's order excluding plaintiff's expert witness). At a minimum, Ferrell should not be allowed to testify about any opinion or issue that refers to or relies upon the index he created from the CSFB analyst report.

### E.  James Should Not be Allowed to Testify at Trial

In rendering his opinion, Christopher James asserted for the first time in his rebuttal report that the common stock price of five subprime lenders in the credit card and auto finance industry declined in a similar fashion to Household during the Leakage Period. James Rebuttal Report, ¶¶12-14. James then claims that this "comparison" somehow demonstrates that Household's stock price decline during the Leakage Period was not due to the fraud but rather resulted from company-specific nonfraud information. *Id.*, ¶9. Putting aside the obvious problem with his analysis – that this opinion actually addresses macroeconomic and industry impacts, as opposed to company specific information – James' opinion should also be excluded because it is not tethered to any

---

Depo. Tr. at 260:7-12. James initially identified four firms (other than Household) in the consumer finance subsector of the S&P Financials Index as similar to Household (James Report, Ex. 4), Drosman Decl., Ex. 17, and then switched to a new group of five companies that only included two of his original four. James Rebuttal Report, ¶13.

accepted scientific methodology. James, like Bajaj at the first trial and Ferrell now, simply cherrypicks a "peer" group for analytical purposes without any scientific approach. James then compares Household to this peer group without applying any accepted methodology. His unreliable opinion should, therefore, be excluded. *Paramount Media Group, Inc. v. Vill. of Bellwood*, No. 13 C 3994, 2015 WL 7008132, at *7 (N.D. Ill. Nov. 10, 2015) (failure of an expert to "explain his methodology in any meaningful fashion leaves the court no choice" but to exclude his testimony).

James, like Ferrell, claims that the S&P Financials Index is too broad and, therefore, Fischel should not have used it to control for the effect of macroeconomic and regulatory changes on Household's industry. James Report, ¶¶11(b); 21-23; James Depo. Tr. at 118:12-119:13. In his initial report, James suggested that the S&P Financials Index included only "a handful of companies similar to Household as well as many others with different characteristics." James Report, ¶21 and Ex. 4 thereto. James identified the "handful" of similar companies as the consumer finance subsector of the S&P Financials Index, which included Household, as well as MBNA Corp., American Express Co., Providian Financial Corp. and Capital One Financial Corp. James Report, Ex. 4 n.3. Based on this assertion, James criticized Fischel's decision to use the S&P Financials Index as the appropriate peer group in controlling for industry effects, claiming only the consumer finance subsector of that index really consisted of "companies similar to Household."[16]

Unfortunately for defendants, James failed to analyze how the four consumer-finance-subsector companies in the S&P Financials fared during the Leakage Period compared to Household. In his Second Rebuttal Report, Fischel answered that question: MBNA, American Express, Providian and Capital One vastly outperformed Household between November 15, 2001 and October 11, 2002, declining only 16% compared to Household's 53% decline. Fischel Second Rebuttal Report, ¶11. Indeed, had Fischel used James' consumer finance subsector as his peer group,

---

[16] Again, James' opinion is a rehash of arguments that defendants made at the first trial regarding Fischel's peer group selection. In tendering James' opinion, defendants ignore the Court of Appeals' finding that Defendants had to provide "significant negative information about Household unrelated to these corrective disclosures (and *not attributable to market or industry trends*)." *Glickenhaus*, 787 F.3d at 419. Arguments about macroeconomic issues and the proper industry peer group should not be an issue at the re-trial.

damages would have been higher than the damages calculation generated by using the S&P Financials Index. *Id.*, ¶12. Faced with this harsh reality, James had to change his opinion.

In doing so, James was forced to scramble in both his Rebuttal Report and his deposition. First, James claimed that in using the phrase "companies similar to Household" in his initial report, he only meant Providian and Capital One, jettisoning his now inconvenient reference to the S&P consumer finance subsector as a whole, which also included MBNA and American Express – companies that vastly outperformed Household. James Depo. Tr. at 167:1-7. Second, in his Rebuttal Report, James switched his peer group. In rebuttal, James compared Household to a new peer group he dubbed the "Subprime Lenders Index," consisting of Providian, Capital One, Metris, Compucredit and Americredit. In identifying this new peer group on rebuttal, James ignored the fact that Capital One, Providian, Metris and Compucredit were exclusively credit card companies and Americredit was an auto finance company – none of those companies were primarily mortgage lenders like Household. *See* Ferrell Rebuttal Report, Exs. 2K and 2L. In short, faced with Fischel's analysis of the performance of the consumer finance subsector vis-à-vis Household, James simply cherrypicked a new peer group of five companies.

James' selection of his "Subprime Lenders" peer group is flawed and unreliable. First, James conceded that in the past, in analyzing loss causation and damages, he has selected peer groups from the companies listed as competitors in a company's proxy statement (as Fischel did here in selecting the S&P Financials Index) or from peer groups identified in contemporaneous analyst reports. James Depo. Tr. at 82:23-83:6; 85:1-5; 86:4-87:3; 88:10-14; 89:11-15. Here, James took neither approach. *United States EEOC v. Rockwell Int'l Corp.*, 60 F. Supp. 2d 791, 797 (N.D. Ill. 1999) (excluding expert testimony as unreliable where the expert failed to follow the methodology and principles normally applied by other experts in the field and that he himself normally applied, and in fact "employ[ed] principles that contradicted his normal methodology in various respects"); *Amorgianos v. Amtrak*, 303 F.3d 256, 268-69 (2d Cir. 2002) (affirming exclusion of expert testimony where expert failed to reliably apply his own methodology). Moreover, James' cherry-picked selection of his "Subprime Lenders" index is completely inconsistent with the methodology outlined in academic

- 24 -

articles, including one authored by his co-expert Ferrell. Ferrell's article states that a proper peer group should be selected from either: (1) the company's own public filings (such as Household's Form 10-K or proxy which identifies the S&P Financials Index); (2) equity analyst reports; and (3) constituents of widely used industry indices (such as the S&P Financials Index). Ferrell and Saha, *The Loss Causation Requirement for Rule 10b-5 Causes of Action: The Implications of Dura Pharms. Inc. v. Broudo*, 63 Bus. Law 163, at 4 (Nov. 2007), Drosman Decl., Ex. 13. James eschewed Household's public filings, widely used industry indices, and failed to identify a single analyst report that lists only these five companies as Household's peer group.

Finally, James' use of his "Subprime Lenders" peer group, and his claim that the group is similar to Household is contradicted by the evidence in this case. At his deposition, James was confronted with the fact that these five companies were not primarily mortgage lenders like Household. James Depo. Tr. at 250:4-251:8. James had no answer for the fact that Household, during the Leakage Period, informed investors that only one percent of its managed receivables arose from subprime credit card customers – as opposed to the clearly subprime credit card lenders, Capital One, Providian, Metris and Compucredit. James Depo. Tr. at 111:16-25; 112:13-22. *See also* Fischel Second Rebuttal Report, Ex. 47 ("the company disclosed that its subprime card portfolio totaled $1.3 billion or less than 1% of managed receivables"). Similarly, Household's auto finance business, unlike its alleged peer, AmeriCredit, was a minor part of its business – constituting only 6% of Household's portfolio. James Report, ¶11(a). Put bluntly, none of these companies had real estate or mortgage services lines of business, which were 62% of Household's portfolio. *See also* Ferrell Rebuttal Report, Ex. 2K. In sum, these five companies are not peers of Household – James just made it up. Without a sound methodology, James should not be allowed to present his five companies as peers of Household.

To compound his flawed peer group selection, at his deposition, James conceded that in comparing Household to his cherry-picked group, he used no event study and no regression analysis, while admitting that these were typical economic approaches to analyzing loss causation and damages. *See* James Depo. Tr. at 79:7-13; 76:2-3 (James admits he did not do an event study or

- 25 -

regression analysis); *id.* at 81:4-7 (James admits he has done an event study and regression analysis in prior cases when testifying about loss causation and damages but not in this case). Again, faced with the fact that his opinion was pulled out of thin air, James claimed that his analysis was "an alternative scientific approach . . . it's **very much in the spirit of a propensity score matching technique** where you really look at the difference between the performance of a treatment group, where here the treated group is – is Household – and a control group, which is firms with the same business focus – financial firms with the same business focus as – as Household, who would be impacted in a similar way to developments that were occurring in the economy and in the segment of the business that was associated with the Household business model." James Depo. Tr. at 79:7-80:1.

However, James was forced to admit that neither of his reports contained the phrase "propensity score matching technique." James Depo. Tr. at 262:13-16, 269:3-7. James also admitted, after much hemming and hawing, that the words "propensity score technique" do not appear in a single academic article that relates to loss causation and damages. *Id.* at 268:11-269:7. Again, James' "methodology" is no methodology at all – and, whatever it may be, it has no application to loss causation and damages.

In making these damaging admissions, James concedes that he failed to use an accepted methodology to select his rebuttal report peer group, failed to perform an event study or regression analysis, relying instead on the alternative "similar in spirit" to a propensity score technique, which has never been adopted for use in analyzing loss causation and damages. James Depo. Tr. at 209:3-7; 267:2-268:19. James' entire analysis is unreliable, has no support in the academic literature, and is not based on any recognized scientific method. As such, James should not be permitted to "waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable." *Clark*, 192 F.3d at 759 n.5. James' opinion should be excluded.

### F. Cornell's Opinion that Fischel Failed to Account for Confounding Information Is Classic *Ipse Dixit* and Should Be Excluded

In his initial report, Cornell opines that Fischel fails to "reliably control for value-relevant, firm-specific, non-fraud information" (*i.e.*, confounding information) during the Leakage Period, which renders Fischel's estimation of inflation based on the leakage model unreliable. *See* Cornell

Report, ¶¶17, 20-23 (Dkt. No. 2060-2). The sole basis for Cornell's opinion is his "cursory review" of Fischel's September 15, 2015 report, which purportedly "demonstrates that firm-specific, nonfraud information affected Household's stock price on days that [Fischel] identifies as having a statistically significant decline during the Observation Window." Cornell Report, ¶21. In support, Cornell points to just two articles, which discuss concerns regarding "Household's liquidity and generally depressed market multiples for financials," and which Cornell contends are not related to the fraud. *Id.*, ¶22. Cornell's opinion is classic *ipse dixit* and should be excluded.

Three days after Cornell's March 10, 2016 deposition, defense counsel sent an e-mail to plaintiffs advising that "Cornell will not testify at trial regarding the two examples" of nonfraud, company-specific information set forth in his report. *See* Drosman Decl., Ex. 18 ("Cornell will not be offering testimony at trial with respect to paragraph 22 . . . of his October 23 report."). Thus, when Cornell's "analysis" of the two articles is removed from his report (Cornell Report, ¶22), the only thing left is Cornell's unsupported conclusion that "Fischel's failure to reliably control for value-relevant, firm-specific, non-fraud information during the relevant period . . . means that Prof. Fischel's Leakage Model does not reliably estimate inflation." Cornell Report, ¶23. "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process," yet that is exactly what Cornell has done here. *Huey v. UPS*, 165 F.3d 1084, 1087 (7th Cir. 1999) (affirming exclusion of expert testimony).

Indeed, as Cornell admits, his conclusion is not the result of any scientific analysis whatsoever, as he has not "done the work" necessary to determine whether certain information is fraud-related or not fraud-related (and conceded that he "did not have a full understanding of the fraud"), did not perform his own event study, "didn't attempt to do a systematic study" of the information Fischel cites, did not even read the entirety of the two articles cited in his report, and concedes that the two (now-abandoned) examples he provided are insufficient to support a scientific opinion. Cornell Depo. Tr. at 105:14-106:17; 118:13-16 ("I did no systematic review of analyst reports."); 118:21-119:1 (same); 136:1-18 ("It was not the basis of any formal analysis."); 137:21-

- 27 -

138:9; 140:18-142:3; 142:4-144:6. "[A]n expert must 'substantiate his opinion; providing only an ultimate conclusion with no analysis is meaningless.'" *Huey*, 165 F.3d at 1087.[17]

Nor can Cornell simply parrot the conclusions of defendants' two other experts for his opinion. Cornell Report, ¶¶17, 20-23; Cornell Depo. Tr. at 110:9-19 ("I'm basing that conclusion on [Ferrell's] work"); 111:17-112:12 (same); 119:15-120:9. Cornell admits that he did not make any judgments about whether certain information was fraud-related because he had no understanding of the underlying fraud in this case. Cornell Depo. Tr. at 105:14-23. Indeed, Cornell was unable to describe the fraud relating to predatory lending, reaging or restatement, did not even identify trial testimony or trial exhibits in his reliance materials (other than the testimony of Bajaj and Fischel), and identified defendants Schoenholz and Gilmer as "Schoenfield" and "Gilman." Cornell Depo. Tr. at 79:22-87:23, 91:17-102:14. Simply put, Cornell was not equipped to determine whether information was fraud related: "Q. Did you do anything to learn the details of Defendants' fraud? A. Not the details." *Id.* at 87:24-88:2. Rather, Cornell relied exclusively on ***Ferrell's*** analysis and ***Ferrell's*** conclusion "that there are value-relevant, firm-specific, non-fraud events" that Fischel's leakage model does not take into account.[18] Cornell Depo. Tr. at 105:14-106:3; 110:9-111:4; 111:17-112:12.

---

[17] Other courts have found Cornell's opinions unreliable or inadmissible. *See, e.g.*, *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 675-76 (S.D.N.Y. 2007) (excluding Cornell's regression analysis as unreliable because his "conclusory statement that it is standard procedure" to do two regressions rather than one "is not sufficient to justify its admission; ***that is simply the ipse dixit of the expert***"); *In re Novatel Wireless Sec. Litig.*, 846 F. Supp. 2d 1104 (S.D. Cal. 2012) (excluding Cornell on the grounds that his loss causation opinions were based on an erroneous legal standard); *Silver Point Fin., LLC v. Deutsche Bank Trust Co. Ams. (In re K-V Discovery Solutions, Inc.)*, 496 B.R. 330 (Bankr. S.D.N.Y. 2013) (discounting Cornell's expert testimony because it was unsupported by the record evidence in the case); *Negrete v. Allianz Life Ins. Co.*, No. CV 05-6838 CAS, 2013 WL 6535164, at *7-*8 (C.D. Cal. Dec. 9, 2013) (precluding Cornell from testifying about the subjective value of defendants' annuities because such testimony rested on an erroneous theory of damages).

[18] Cornell's testimony that he "relied" on Ferrell's report in forming the opinion set forth in his own report is curious given that Ferrell's and Cornell's reports were served on the same day, and Cornell testified that he did not obtain Ferrell's report until after it was filed. Cornell Depo. Tr. at 121:5-14. Cornell later clarified that someone at Cornerstone, the company behind the curtain that supported all three experts, told him "that Professor Ferrell had found systematic evidence of firm-specific, value-relevant, non-fraud information," Cornell Depo. Tr. at 122:23-123:16; 124:2-21, and it was on this oral representation by a third-party consultant that he relied.

However, it is well settled in the Seventh Circuit that one expert cannot serve as the "mouthpiece" for another expert, particularly where "the soundness of the underlying expert judgment is in issue"; Cornell's attempt to serve as a mouthpiece for Ferrell here should be rejected. *See Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 613-14 (7th Cir. 2002); *Paramount Media Group, Inc. v. Vill. of Bellwood*, 308 F.R.D. 162, 164-65 (N.D. Ill. 2015) (excluding testimony where the expert was "just a spokesman for someone else" and could do nothing more than "recite" that person's "bottom line") (decision adopted by and objection overruled by *Paramount*, 2015 WL 5307483); *Loeffel Steel Prods.*, 387 F. Supp. 2d at 808 (granting motion to bar expert testimony because the expert was merely "vouching for the truth of what another expert told him").

In sum, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *GE v. Joiner*, 522 U.S. 136, 146 (1997). Because Cornell's opinion rests on nothing but *ipse dixit*, it should be excluded.

### III. DEFENDANTS' EXPERTS SHOULD BE PRECLUDED FROM OFFERING OPINIONS FIRST RAISED IN THEIR REBUTTAL REPORTS

All three of defendants' experts should be precluded from offering expert testimony at trial on those issues which they inappropriately raised for the first time in their rebuttal reports. An expert rebuttal report is designed to "contradict, impeach or defuse the impact of the evidence" disclosed in an adverse expert's report, in this instance Professor Fischel's Second Rebuttal Report.[19] Fed. R. Civ. P. 26(a)(2)(D)(ii); *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 630 (7th Cir. 2008). "'[T]he rebuttal expert report is ***no place for presenting new arguments***, unless presenting those arguments is substantially justified and causes no prejudice.'" *Paramount*, 2015 WL 5307483, at *8. Nevertheless, defendants' experts' rebuttal reports each set forth new opinions or analyses

---

[19] Professor Fischel's Second Rebuttal Report expressly responds to defendants' experts' criticisms of his Second Supplemental Report.

wholly unrelated to the arguments and evidence Professor Fischel presents, and which could easily have been raised in their initial reports.

For example, Ferrell uses his rebuttal report to argue, for the first time, that the Specific Disclosure Model is the only appropriate method of calculating damages in this action. But, in opining on the alleged advantages of the Specific Disclosure Model, Ferrell plainly is not attempting to "contradict or rebut evidence offered" by Fischel in his Second Rebuttal – Fischel has been offering both methods for estimating inflation in this case for many years. Instead, Ferrell is belatedly promoting defendants' preferred damages methodology. *See Paramount*, 2015 WL 5307483, at *8 (striking portions of expert's rebuttal report because it did not address opinions raised in initial expert's report, and as such, was improper rebuttal evidence); *Stanfield v. Dart*, No. 10 C 6569, 2013 WL 589222, at *3 (N.D. Ill. Feb. 14, 2013) ("A party may not offer testimony under the guise of 'rebuttal' only to provide additional support for his case in chief."); *Noffsinger v. Valspar Corp.*, 09 C 916, 2011 WL 9795, at *6 (N.D. Ill. Jan. 3, 2011) (same).

Ferrell also conducts a wholly new damages quantifications in his rebuttal, opining that the maximum per share damages in this action should be only $4.19. *See* Ferrell Rebuttal, ¶¶97-98 & Exs. 8 and 9 thereto. Ferrell offers no reason why he did not, or could not, provide this analysis in his initial report. He identifies no new information that became available to him after the filing of his initial report that was necessary to conduct his alternative damages calculation. *See id.*, ¶¶97-100. It appears that Ferrell simply chose not to present his quantification in his initial report – a wholly inadequate justification, particularly in light of the prejudicial effect it has had on plaintiffs. Ferrell's alternative damages quantification is the first such quantification that defendants have proffered in **fourteen years** of litigation; including it in an expert rebuttal report is simply unacceptable. *See Sloan Valve Co. v. Zurn Indus.*, No. 10 C 204, 2013 WL 3147349, at *3-*4 (N.D. Ill. June 19, 2013) (excluding expert's new damages calculations, raised for first time in reply expert report); *Shen Wei (USA) Inc. v. Sempermed USA, Inc.*, No. 05-C-6004, 2009 WL 674364, at *1 (N.D. Ill. Mar. 12, 2009) (striking sur-rebuttal reports that introduced new evidence, offered for first time in years of litigation, in effort to refute adverse expert's opinions).

Finally, as referenced in §II.B.2, *supra*, Ferrell – perhaps recognizing the improperly speculative nature of his original opinions – claims his rebuttal report analyzed whether any of the purported nonfraud related information he identifies actually had a quantifiable impact on Household's stock price. *See* Ferrell Depo Tr. at 293:23-294:4 (noting that in his initial report he said firm-specific nonfraud disclosures "may have" contributed to Household's stock price decline, but in his "second report, [he] quantif[ied] it"). Even setting aside the flaws with this analysis as discussed herein, his analysis constitutes an entirely new opinion, and this on its own merits exclusion. The fact that Ferrell could certainly have tested his theories in his initial report, but waited until after Fischel had submitted his own rebuttal to do so, further militates for exclusion of the additional opinions. A rebuttal is no place for belated attempts to cure defects in an initial report. *See Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, No. 03 C 7713, 2005 WL 1300763, at *3 (N.D. Ill. Feb. 22, 2005) (striking portions of rebuttal that should have been disclosed in expert's initial report); *Welch v. Eli Lilly & Co.*, No. 06-cv-0641, 2009 WL 700199, at *4 (S.D. Ind. Mar. 16, 2009) ("The fact that entirely new analyses were conducted demonstrates the report cannot be characterized as . . . a rebuttal report.").

James and Cornell also raise opinions for the first time on rebuttal that are unrelated to Fischel's analysis or criticisms of their initial reports. For example, James, whose assignment supposedly was limited to "respond[ing] to the assertions regarding [his] Initial Report discussed in Fischel's Second Rebuttal Report," criticizes the length of Fischel's leakage window, expounds on a body of academic literature that purportedly supports his assertion, and offers a new peer group. *See* James Rebuttal, ¶¶5, 14, 20-22. If James wanted to criticize the length of Fischel's leakage window, relying on publicly available academic literature to do so, he should have disclosed that opinion in his initial report. *See Stanfield*, 2013 WL 589222, at *3.

Similarly, Cornell suggests in his rebuttal that Fischel's reliance on Cornell and Morgan is misplaced since the paper was written prior to *Dura Pharmaceuticals* and the passage of the PSLRA. Cornell Rebuttal, ¶16 (Dkt. No. 2074-2). Even setting aside the impropriety of offering a legal opinion as to whether Fischel's model proves loss causation, Cornell's opinion merits exclusion

because it is simply unacceptable to raise a new argument on rebuttal – particularly where, as here, the materials relied upon in forming the opinion have been available *since 2005*. *See* Cornell Rebuttal, ¶16 (citing his understanding of the "2005 *Dura Pharmaceuticals* decision").

In sum, to the extent that defendants' experts raise new arguments, opinions and analyses in their rebuttal reports which could have been raised in their initial reports, those opinions must be excluded in order to prevent further prejudice to plaintiffs.

## IV. DEFENDANTS SHOULD BE PRECLUDED FROM TENDERING CUMULATIVE EXPERT TESTIMONY AT TRIAL

The rule in this District is clear: "Only one F.R. Evid. 702 witness on each subject for each party will be permitted to testify absent good cause shown." Form LR 16.1.1. Final Pretrial Order Form n.7. Ferrell, James and Cornell proffer opinions on the same subject matter that are largely cumulative of one another and reach the same overarching conclusion, each contending that Fischel's quantification including leakage does not reliably estimate damages. *See* Ex. 1 (table demonstrating cumulative expert opinions). Defendants should not be permitted to parade three experts in front of the jury to challenge plaintiffs' one expert, as Rule 403 prohibits cumulative expert testimony like the testimony offered by defendants' experts here. If the Court does not exclude defendants' experts on other grounds (*see infra*), given the overlapping testimony of Ferrell, James and Cornell, this Court should limit defendants to *one* loss causation expert at trial.

This Court has broad discretion to exclude relevant evidence under Rule 403 if its probative value is substantially outweighed by the danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *Thompson*, 472 F.3d at 456. As one court in this district aptly observed, "[m]ultiple expert witnesses expressing the same opinions on a subject *is a waste of time and needlessly cumulative*. It also raises the unfair possibility that jurors will resolve competing expert testimony by 'counting heads' rather than evaluating the quality and credibility of the testimony." *Sunstar, Inc. v. Alberto-Culver Co., Inc.*, No. 01 C 0736, 01 C 5825, 2004 WL 1899927, at *25 (N.D. Ill. Aug. 23,

2004).[20]  Accordingly, "this district generally prohibits a party from offering multiple experts to express the same opinions on a subject."  *Id.*; *see also* Form LR 16.1.1 n.7.

Defendants are well aware of the prohibition on cumulative expert testimony, as their earlier attempt to call multiple expert witnesses for one topic was rejected before the last trial.  *See* Dkt. No. 1507 (granting motion *in limine* to preclude cumulative expert witness testimony and requiring defendants to choose **one** expert to testify about predatory lending at trial).  Defendants' current attempt to "outnumber" plaintiffs' loss causation expert fares no better the second time around, as the proposed trial testimony of Ferrell, James and Cornell is exactly the type of needlessly cumulative and unfairly prejudicial evidence Rule 403 was designed to eliminate; all three opine that Fischel's quantification including leakage does not reliably estimate damages.

Indeed, as set forth in the attached table, Ferrell and James take a nearly identical path to that conclusion.  *See* Ex. 1.  **Both** Ferrell and James offer the same incorrect definition of firm-specific nonfraud information by opining that industry news that would be accounted for in a regression model is somehow "firm specific" to Household because Fischel's industry index is too broad.  *See* Ex. 1, No. 5; Ferrell Report, ¶¶33-34, 40-41; James Report, ¶¶10, 21, 23.  Their opinions cover the same type of industry or market information that they contend could have affected Household's stock price during the Leakage Period – the recession; potential double-dip recession; overall industry credit quality issues; an increase in bankruptcy filings and unemployment; the difficult funding environment; increased capital requirements; new FFIEC guidelines for credit card companies; and changes in regulations for subprime lenders.  *See* Ex. 1, Nos. 8-10, 11, 13, 15-16; Ferrell Report, ¶¶39-43, 44-46, 47-48, 49, 50-54; James Report, ¶¶24, 28-29, 31, 33, 38-39, 43-45, 49, 50-52, 54, 55; James Rebuttal Report, ¶¶17-18, 35-43.  Both experts also attack Fischel's opinion that firm-specific information released by Household in its quarterly earnings announcements was positive.  *See* Ex. 1, No. 18; Ferrell Rebuttal Report, ¶¶44-47; James Rebuttal Report, ¶¶44-46.

---

[20]  Although the *Sunstar* court permitted one testifying expert on each subject of Japanese law, here, all three of defendants' experts would testify on the same subject: Fischel's application of the leakage model in this case.  *Sunstar*, 2004 WL 1899927, at *25.  Defendants' experts should be precluded from doing so.

To support their identical opinions, in many instances Ferrell and James cite the very same analyst reports. *See, e.g.*, Ferrell Report, ¶52 (discussing Capital One's MOU and quoting a July 18, 2002 Fox-Pitt Kelton analyst report); James Report, ¶54 (same); Ferrell Rebuttal Report, ¶¶39-43 (opining that widening debt spreads were not purely fraud related and quoting an October 9, 2002 Deutsche Bank analyst report); James Rebuttal Report, ¶¶36-37 (same); Ferrell Report, ¶¶45-46 (opining that the "double-dip" recession had a disproportionate adverse impact on Household and quoting a June 20, 2002 CIBC World Markets analyst report and a July 18, 2002 Salomon Smith Barney analyst report); James Report, ¶29 (same). James and Ferrell also both challenge Fischel's quantification under his leakage model, including his use of the capital asset pricing adjustment, and his cap on inflation. *See* Ex. 1, No. 21; James Depo. at 44:10-45:5; Ferrell Report, ¶¶20-21; Ferrell Depo. Tr. at 305:2-11. Allowing both Ferrell and James to testify on the same subjects and to provide similar opinions would be prejudicial to plaintiffs.

The same is true with respect to Ferrell and Cornell. *See* Ex. 1. For example, both Ferrell ***and*** Cornell opine that Fischel's leakage model fails to control for confounding information, by using an event window that was too long. *See id.*, No. 28. Both experts claim Fischel's leakage model (1) does not account for statistical noise (*id.*, No. 25); (2) improperly attributes leakage of the fraud to the declines on 171 days with no statistical significant price changes (*id.*, No. 26); (3) improperly attributes the fraud to 15 statistically significant days (*id.*, 27); and (4) Fischel's event window results in compounding of errors (*id.*, Nos. 3, 28). Cornell even admits that his conclusions are "based on [his] reading of Professor Ferrell's work," evidencing the "needlessly" cumulative nature of his opinions. Cornell Depo. Tr. at 110:10-19.

***All three experts*** criticize Fischel's opinions by claiming that his application of the leakage model in this case lacks academic support, attacking Fischel's regression analysis, and claiming that Fischel's use of a 228-trading day event window is unsupported and results in compounding of errors. *See* Ex. 1, Nos. 2-4. Given that Ferrell, James and Cornell offer the same opinion and use an almost identical approach to reach their conclusions, defendants cannot demonstrate "good cause" to justify the presentation of ***three*** loss causation experts at trial. Form LR 16.1.1 n.7; *Price v. Fox*

- 34 -

*Entm't Group, Inc.*, 499 F. Supp. 2d 382, 390 (S.D.N.Y. 2007) (precluding cumulative expert testimony at trial).

Any attempt by defendants to distinguish Ferrell, James and Cornell by arguing that they have disparate backgrounds should be rejected, as any distinction in their respective backgrounds cannot overcome the fact that all three offer the same opinion: Fischel's quantification including leakage does not reliably estimate damages. *See, e.g.*, *Harbor Ins. Co. v. Continental Bank Corp.*, No. 95 C 7081, 1991 WL 222260, at *5-*7 (N.D. Ill. Oct. 25, 1991) (excluding cumulative expert witness testimony because "the testimony of three expert witnesses on the same issue is not acceptable" and dismissing as "meritless" the argument that the expert witness' testimony was not cumulative because each expert examined the issues from a different perspective and expertise). Further, any argument that defendants need three experts to respond to the "distinct issues" raised by Fischel's reports rings hollow, as defendants' decision to engage just ***one*** loss causation expert for the last trial confirms that the purportedly "distinct issues" Fischel raises can easily be addressed by a ***single*** loss causation expert. Limiting defendants to a single loss causation expert will not result in any prejudice to defendants, as there is nothing James or Cornell have said in this case that Ferrell has not also said, and if allowed to testify, could not say on the witness stand.[21] *See McCauley*, 2007 WL 2316463, at *7 (excluding cumulative expert testimony that was already covered by other experts).

By contrast, if all three of defendants' loss causation experts are permitted to testify, plaintiffs will be severely prejudiced, as the jury may improperly give more weight to defendants' experts simply because they outnumber plaintiffs' expert. *See Sunstar*, 2004 WL 1899927, at *25 (observing that the jury should resolve competing expert testimony on its quality and credibility, not by "counting heads"); *Dahlin v. Evangelical Child & Family Agency*, No. 1 C 1182, 2002 WL

---

[21] Defendants contend that James "will address issues regarding the manner in which certain economic events differentially impact financial institutions in the subprime lending sector," while Cornell "will explain to the jury how Fischel misapplied the methodology described in Professor Cornell's article." *See* Dkt. No. 2072 at 2-3 n.1. As Ferrell's reports and testimony make clear, however, his opinions cover both of the issues that James and Cornell purport to address. *See* Ferrell Report, ¶¶43-55; Ferrell Rebuttal Report, ¶¶12-25; Ferrell Depo. Tr. at 207:20-215:12; 194:6-20; Ex. 1.

31834881, at *5 (N.D. Ill. Dec. 18, 2002) (excluding cumulative testimony). Additionally, allowing all three witnesses to testify will waste the Court's and jury's time by requiring the jury to hear the same testimony *three* separate times. Because the probative value of defendants' repetitive expert testimony is substantially outweighed by the danger of unfair prejudice, the testimony should be excluded and defendants should be forced to pick *one* loss causation expert for trial. *See United States v. Miles*, 207 F.3d 988, 992 (7th Cir. 2000) ("Evidence is unfairly prejudicial 'if it will induce the jury to decide the case on an improper basis . . . rather than on the evidence presented.'").

## V.    CONCLUSION

For the foregoing reasons, Ferrell, James and Cornell should be precluded from testifying. If defendants' experts are permitted to testify, defendants should be precluded from tendering cumulative testimony at trial.

DATED:  March 30, 2016                    Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
MICHAEL J. DOWD (135628)
SPENCER A. BURKHOLZ (147029)
DANIEL S. DROSMAN (200643)
LUKE O. BROOKS (90785469)
LAWRENCE A. ABEL (129596)
HILLARY B. STAKEM (286152)


                    s/ Daniel S. Drosman
                  DANIEL S. DROSMAN

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
JASON C. DAVIS (253370)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

- 36 -

ROBBINS GELLER RUDMAN
  &amp; DOWD LLP
MAUREEN E. MUELLER
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)

Lead Counsel for Plaintiffs

MILLER LAW LLC
MARVIN A. MILLER
LORI A. FANNING
115 S. LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone: 312/332-3400
312/676-2676 (fax)

Liaison Counsel

<u>STATEMENT OF COMPLIANCE WITH LOCAL RULE 37.2</u>

In compliance with Local Rule 37.2, the parties conferred telephonically in good faith on March 25, 2016, at 3:30 p.m. CDT, regarding plaintiffs' intention to move to exclude the trial testimony of defendants' experts, Alan Ferrell and Christopher James, as a result of defendants' and their experts' discovery violations. Plaintiffs were represented on the call by Michael Dowd, Spencer Burkholz, Daniel Drosman and Luke Brooks of Robbins Geller Rudman & Dowd LLP. Defendants were represented by Ryan Stoll of Skadden, Arps, Slates, Meagher & Flom LLP and Steven Farina of Williams & Connolly LLP.

During the conference, plaintiffs' counsel explained that defendants had failed to satisfy their discovery obligations with respect to Ferrell and James, as demonstrated by (1) Ferrell's refusal to answer certain deposition questions on the improper instruction of counsel, and his evasiveness in answering others; (2) Ferrell's failure to disclose the "Institutional Investor" magazine and unspecified academic literature used to select his peer group; and (3) James' failure to identify in his report the methodology he employed in selecting his comparable peer index and in analyzing the performance of that index as compared with that of Household. Defense counsel disagreed that the bases for Ferrell's and James' opinions were inadequately disclosed. They also maintained that defense counsel's instructions not to answer at Ferrell's February 27, 2016 deposition were properly made. Mr. Brooks responded that he had, several times, informed defense counsel the impropriety of his instructions not to answer to Ferrell at the time he issued them.

It being evident that the parties' good faith discussions had reached an impasse, plaintiffs' counsel thereafter advised defense counsel that they intended to seek relief on these matters from the Court.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 30, 2016, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses for counsel of record denoted on the attached Service List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 30, 2016.

<u>s/ Daniel S. Drosman</u>
DANIEL S. DROSMAN

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: DanD@rgrdlaw.com

*Jaffe v. Household Int'l, Inc.*, No. 02-5893 (N.D. Ill.)
Service List

| Counsel | E-mail address |
|---|---|
| Stewart Theodore Kusper<br>Giovanni Antonio Raimondi<br>THE KUSPER LAW GROUP, LTD.<br>20 North Clark Street, Suite 3000<br>Chicago, IL 60602<br>(312) 204-7938<br><br>Tim S. Leonard<br>JACKSON WALKER L.L.P.<br>1401 McKinney Street, Ste. 1900<br>Houston, TX 77010<br>(713)752-4439 | Stewart.Kusper@Kusperlaw.com<br>Giovanni.Raimondi@Kusperlaw.com<br>tleonard@jw.com |
| Counsel for Defendant David A. Schoenholz | |
| Dawn Marie Canty<br>Gil M. Soffer<br>KATTEN MUCHIN ROSENMAN LLP<br>525 West Monroe Street<br>Chicago, Illinois 60661<br>(312)902-5253 | dawn.canty@kattenlaw.com<br>gil.soffer@kattenlaw.com |
| Counsel for Defendant William F. Aldinger | |
| David S. Rosenbloom<br>C. Maeve Kendall<br>McDERMOTT WILL & EMERY, LLP<br>227 West Monroe Street<br>Chicago, IL 60606<br>(312) 984-2175 | drosenbloom@mwe.com<br>makendall@mwe.com |
| Counsel for Defendant Gary Gilmer | |

- 1 -

| Counsel | E-mail address |
|---|---|
| R. Ryan Stoll<br>Mark E. Rakoczy<br>Andrew J. Fuchs<br>Donna L. McDevitt<br>Patrick Fitzgerald<br>SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP<br>155 North Wacker Drive<br>Chicago, IL 60606<br>(312)407-0700<br><br>Paul D. Clement<br>D. Zachary Hudson<br>BANCROFT PLLC<br>1919 M Street NW, Ste. 470<br>Washington, DC 20036<br>(202)234-0090<br><br>Thomas J. Kavaler<br>Jason M. Hall<br>CAHILL GORDON & REINDEL LLP<br>80 Pine Street<br>New York, NY 10005<br>(212)701-3000<br><br>Dane H. Butswinkas<br>Steven M. Farina<br>Leslie C. Mahaffey<br>Amanda M. MacDonald<br>WILLIAMS & CONNOLLY LLP<br>725 Twelfth Street NW<br>Washington  DC 20005<br>202-434-5000<br><br>Luke DeGrand<br>Tracey L. Wolfe<br>DEGRAND & WOLFE, P.C.<br>20 South Clark Street<br>Suite 2620<br>Chicago, Illinois 60603<br>(312) 236-9200<br>(312) 236-9201 (fax) | rstoll@skadden.com<br>mrakoczy@skadden.com<br>Andrew.Fuchs@skadden.com<br>Donna.McDevitt@skadden.com<br>Patrick.Fitzgerald@skadden.com<br>pclement@bancroftpllc.com<br>zhudson@bancroftpllc.com<br>TKavaler@cahill.com<br>Jhall@cahill.com<br>dbutswinkas@wc.com<br>sfarina@wc.com<br>lmahaffey@wc.com<br>amacdonald@wc.com<br>twolfe@degrandwolfe.com<br>ldegrand@degrandwolfe.com |
| Counsel for Defendant Household International Inc. | |

1131309_1

| Counsel | E-mail address |
|---|---|
| Michael J. Dowd<br>Spencer A. Burkholz<br>Daniel S. Drosman<br>Luke O. Brooks<br>Hillary B. Stakem<br>ROBBINS GELLER RUDMAN & DOWD LLP<br>655 West Broadway, Suite 1900<br>San Diego, CA 92101<br>(619)231-1058<br>619/231-7423 (fax)<br><br>Jason C. Davis<br>ROBBINS GELLER RUDMAN & DOWD LLP<br>Post Montgomery Center<br>One Montgomery Street, Suite 1800<br>San Francisco, CA 94104<br>(415)288-4545<br>(415)288-4534 (fax)<br><br>Maureen E. Mueller<br>ROBBINS GELLER RUDMAN & DOWD LLP<br>120 East Palmetto Park Road, Suite 500<br>Boca Raton, FL 33432<br>(561)750-3000<br>(561)750-3364 (fax) | miked@rgrdlaw.com<br>spenceb@rgrdlaw.com<br>dand@rgrdlaw.com<br>lukeb@rgrdlaw.com<br>hstakem@rgrdlaw.com<br>jdavis@rgrdlaw.com<br>mmueller@rgrdlaw.com |
| Lead Counsel for Plaintiffs | |
| Marvin A. Miller<br>Lori A. Fanning<br>MILLER LAW LLC<br>115 S. LaSalle Street, Suite 2910<br>Chicago, IL 60603<br>(312)332-3400<br>(312)676-2676 (fax) | Mmiller@millerlawllc.com<br>Lfanning@millerlawllc.com |
| Liaison Counsel for Plaintiffs | |

1131309_1