EXHIBIT 2

Case: 1:02-cv-05893 Document #: 2130-2 Filed: 03/30/16 Page 2 of 47 PageID #:82025

**Frank Ferrell, III**

**Lawrence E. Jaffe Pension Plan vs. Household International, Inc.**

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE NORTHERN DISTRICT OF ILLINOIS
 3            No. 1:02-CV-05893
 4    - - - - - - - - - - - - - - - - - - - -
 5   LAWRENCE E. JAFFE PENSION PLAN, on behalf
 6   of itself and all others similarly situated,
 7            Plaintiffs,
 8        vs.
 9   HOUSEHOLD INTERNATIONAL, INC., et al.,
10            Defendants.
11    - - - - - - - - - - - - - - - - - - - -
12          VIDEOTAPED DEPOSITION OF
13          FRANK ALLEN FERRELL, III
14      Saturday, February 27, 2016 9:02 a.m.
15            Skadden Arps LLP
16       500 Boylston Street, Boston, MA 02116
17
18
19
20
21   Reported by:
22   Janet Sambataro, RMR, CRR, CLR
23   Job No. 10022056
24
25
```

Page 2

```
 1
 2
 3
 4
 5           February 27, 2016
 6           9:02 a.m.
 7
 8
 9
10      Videotaped deposition of FRANK ALLEN
11   FERRELL, III, held at the offices of Skadden Arps
12   LLP, 500 Boylston Street, Boston, Massachusetts,
13   pursuant to Agreement before Janet Sambataro, a
14   Registered Merit Reporter, Certified Realtime
15   Reporter, Certified LiveNote Reporter, and a
16   Notary Public within and for the Commonwealth of
17   Massachusetts.
18
19
20
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES:
 2
 3
 4   ROBBINS, GELLER, RUDMAN & DOWD LLP
 5   (By Luke O. Brooks, Esquire)
 6   Post Montgomery Center
 7   One Montgomery Street
 8   San Francisco, California 94104
 9   415.288.4534
10   lukeb@rgrdlaw.com
11   Counsel for the Plaintiffs
12
13   - and -
14
15   ROBBINS, GELLER, RUDMAN & DOWD LLP
16   (By Michael J. Dowd, Esquire)
17   655 W. Broadway
18   San Diego, California 92101
19   619.231.1058
20   miked@rgrdlaw.com
21   Counsel for the Plaintiffs
22
23
24   - Continued -
25
```

Page 4

```
 1   APPEARANCES:  (Continued)
 2
 3   SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
 4   (By Patrick Fitzgerald, Esquire, and
 5   Andrew J. Fuchs, Esquire)
 6   155 N. Wacker Drive
 7   Chicago, Illinois 60606
 8   312.407.0700
 9   patrick.fitzgerald@skadden.com
10   andrew.fuchs@skadden.com
11   Counsel for the Defendant, Household
12   International, Inc.
13
14   - and -
15
16   WILLIAMS & CONNOLLY
17   (By Steven M. Farina, Esquire, and
18   Leslie Cooper Mahaffey, Esquire)
19   725 Twelfth Street, N.W.
20   Washington, D.C. 20005
21   202.434.5526
22   sfarina@wc.com
23   lmahaffey@wc.com
24   Counsel for the Defendant, Household International,
25   Inc.
```

Page 1..4

Page 29

1  my instructions and supervision. I did have
2  Cornerstone, for some of the non-fraud
3  information, I asked them to sort of put in the
4  block quotes that I had selected. There was some
5  editing, grammatical work that they helped me on.
6  But with those caveats, I wrote the report.
7      Q.  You know Professor Fischel personally.
8  Correct?
9      A.  I do.
10     Q.  And you have a contract to do work for
11 his company, Lexecon. Is that right?
12     A.  I do have a contract with Lexecon.
13     Q.  And that contract gives Lexecon a right
14 of first refusal to support your expert work. Is
15 that right?
16     A.  Yes.
17     Q.  And you often use Lexecon's support
18 staff to support your expert work. Correct?
19     A.  Yes.
20     Q.  And, in fact, you're currently using
21 Lexecon support staff to support some of your
22 expert work. Right?
23     A.  Yes.
24         MR. FITZGERALD: Objection to form.
25 You mean in other cases?

Page 30

1          MR. BROOKS: In other cases.
2      A.  So with the clarification, I want to
3  clarify for the record, not in this case.
4  BY MR. BROOKS:
5      Q.  And does that include Mike Keable at
6  Lexecon?
7      A.  Yes.
8      Q.  And what is your opinion of Mike Keable
9  as an economist?
10     A.  I like Mike and I think -- I think --
11 and I think highly of Mike.
12     Q.  Is he reliable?
13     A.  In the cases I've worked on, I found
14 him to be reliable.
15     Q.  Do you think he's talented?
16     A.  I do.
17     Q.  Do you think he's honest?
18     A.  I do.
19     Q.  Do you think that -- withdrawn.
20         And have you worked with Peter Clayburgh
21 before?
22     A.  I have.
23     Q.  And what do you think of Mr. Clayburgh?
24     A.  I like him, and I think he's smart.
25     Q.  Is he reliable?

Page 31

1      A.  In the -- I don't have as much
2  experience with him that I have with others, but
3  in the few matters I worked with him, I found him
4  to be reliable on the cases that I worked on.
5      Q.  Did you find him to be talented?
6      A.  Yes.
7      Q.  And honest?
8      A.  Yes. I wouldn't work with somebody I
9  didn't think was honest.
10     Q.  And have you worked with David
11 Strahlberg?
12     A.  I know I've talked to him. It's
13 possible I worked on a case with him, but I don't
14 recall, offhand, working with him on a case.
15 Again, I could be misremembering. It's possible
16 that he was involved in some capacity on a matter
17 that I was involved in, but I don't have a
18 specific recollection of him working on a case.
19     Q.  What is your opinion of
20 Professor Fischel as an economist?
21     A.  I think he is very smart and talented,
22 and I like him.
23     Q.  Would you say he's brilliant?
24     A.  I would say he's a brilliant legal
25 academic.

Page 32

1      Q.  And do you think Professor Fischel is
2  honest?
3      A.  I do.
4      Q.  So turning to Paragraph 14 in your
5  report, Exhibit 1 here, this is your assignment.
6  Correct?
7      A.  The assignment in this report is
8  reflected in Paragraph 14.
9      Q.  And who defined the assignment?
10     A.  Counsel for Household.
11     Q.  And I see that you cited the appellate
12 order in Footnote 21 in that paragraph. Do you
13 see that?
14     A.  I do.
15     Q.  And that's the Seventh Circuit's
16 appellate order in this case. Right?
17     A.  Yes.
18     Q.  And was your assignment informed by the
19 appellate order?
20     A.  Well, as I said, the assignment was
21 defined by counsel for Household. And that was
22 to assess Professor Fischel's second supplemental
23 report. And in the second supplemental report,
24 he references the appellate order, is my memory.
25     Q.  Was the scope of your work informed by

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 33

1  the appellate order?
2      MR. FITZGERALD:  Objection to form.  Go
3  ahead.
4      A.  I'm sorry.  So in the sense that I was
5  asked to assess the second supplemental report,
6  and my memory is Professor Fischel references the
7  appellate order in how he defines his scope in
8  the second supplemental report.
9  BY MR. BROOKS:
10     Q.  Did you read the appellate order?
11     A.  I did.
12     Q.  Did you read it carefully?
13     A.  Yes.
14     Q.  Do you believe that you adhered to the
15  Seventh Circuit's opinion in performing your
16  analysis?
17     A.  That calls for a legal opinion.  I'm
18  not going to offer a legal opinion.  All I can
19  say is this was the scope of my assignment, as
20  defined by counsel for Household.
21     Q.  What did you do to prepare for the
22  deposition today?
23     A.  I reviewed my reports.  I reviewed
24  Professor Fischel's reports.  I listened to
25  Professor Fischel's deposition.  I reviewed the

Page 34

1  surreply report.  I looked at underlying
2  documents, and I met with counsel.
3      Q.  When did you meet with counsel?
4      A.  So I met with counsel yesterday.  And I
5  met with counsel several times in person before
6  that, as well.
7      Q.  To prepare for the deposition?
8      A.  Correct.
9      Q.  How many times?
10     A.  So I met with counsel in Chicago a few
11  days ago.  I remember meeting with counsel -- I'm
12  just going to blank on the location, but I did
13  also, prior to Chicago, meet with counsel in
14  person, as well.  So that's three meetings.  So
15  there might be a fourth.  I just -- I don't have
16  a clear recollect --
17     Q.  How long --
18     A.  -- a clear recollection.
19     Q.  How long was the meeting before the
20  Chicago meeting?
21     A.  I want to say a day or a part of a day.
22     Q.  How about the meeting in Chicago?
23     A.  So I -- so that was two days, but just
24  to be clear, I met -- I believe it was two days.
25  I can be misremembering the exact length of time.

Page 35

1  I do remember meeting with counsel in Chicago for
2  a day and then the second day I was listening to
3  Professor Fischel.
4      Q.  So you met on Tuesday and listened to
5  Professor Fischel's deposition on Wednesday?
6      A.  Yes.  And now you reminded me.  I
7  actually didn't meet the entire day.  I flew out
8  Tuesday morning.  So I actually -- now that I
9  remember, I got to Chicago midday on Tuesday.
10  And then you can remind -- my memory is that --
11  then that Professor Fischel was deposed the
12  following day, the Wednesday.
13     Q.  That's my memory too.
14     Was anyone at these meetings, other than
15  counsel for the defendants?
16     A.  Yes.
17     Q.  Who else was there?
18     A.  There was -- I don't know.  I'm not
19  exactly clear on how you define counsel for
20  defendants.  But counsel from HSBC was there as
21  well.
22     Q.  Anyone else?
23     A.  No.
24     Q.  How many lawyers were at these
25  meetings, approximately?

Page 36

1      A.  I mean, it varied.
2      Q.  What was the most?
3      A.  So counsel present here were at some of
4  the meetings, and the other person that comes to
5  mind is Ryan Stoll from Skadden Arps.
6      Q.  So five or six?
7      A.  Well, just to be clear, all five or six
8  were not present in every meeting.  So it was --
9  but those -- as well as counsel for HSBC.  But
10  I'm not saying they were all present for every
11  meeting.  That's not accurate.
12     Q.  Do you know Dr. Mukesh Bajaj?
13     A.  I do not.
14     Q.  Do you understand he was Household's
15  prior expert in this case on loss causation and
16  damages?
17     A.  I believe that's right.
18     Q.  You read his reports and transcripts,
19  right?
20     A.  I did.
21     Q.  So you know he was their expert, don't
22  you?
23     A.  Yes.  I was just pausing, because I
24  don't remember how he characterized who he was --
25  whether he was retained by counsel or by

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 37

1 Household directly; but yes, he performed those
2 types of analysis.
3     Q.   So you read all of his reports.  Is
4 that right?
5     A.   Yes.
6     Q.   And you read his trial testimony.
7 Correct?
8     A.   I did.
9     Q.   You read his deposition testimony.
10 Correct?
11     A.   I did.
12     Q.   And was there anything that stood out
13 to you about his methodology that was incorrect,
14 in your opinion?
15         MR. FITZGERALD:  Objection to scope
16 here.
17     A.   So you can look at Paragraph 14 in my
18 original report and Paragraph 7 of my second
19 report.  That was not within the scope of my
20 assignment.  So you can direct me to particular
21 portions of what he said, but it was something
22 that I did not focus on.
23 BY MR. BROOKS:
24     Q.   You read all his stuff.  Right?
25     A.   I did read it back in the summer, last

Page 38

1 year.  But again, assessing his work is outside
2 the scope of these two reports.
3     Q.   So I'm not asking you whether it was in
4 the scope of your reports.  I'm asking whether
5 there was anything you disagreed with from a
6 methodological perspective about Dr. Bajaj's
7 reports?
8         MR. FITZGERALD:  I object.  Going down
9 the line of inquiry, if he's not retained to
10 analyze Dr. Bajaj's testimony, you have an
11 expert, asking him to do it on the fly doesn't
12 seem to me to be appropriate.
13         MR. BROOKS:  Are you going to instruct
14 him not to answer?  I think I'm entitled to ask.
15         MR. FITZGERALD:  You're asking him to
16 critique somebody he wasn't asked to critique
17 before on the fly, which I don't think is
18 appropriate.
19         MR. BROOKS:  You can instruct him not
20 to answer.  I don't think it's proper.  But I
21 don't want to get in a big discussion with you.
22         MR. FITZGERALD:  Why don't we move on
23 from this.  Let me talk to co-counsel at a break
24 as to what the understanding is, so we can
25 revisit it.  I just don't -- I just don't think

Page 39

1 you have a right to take an expert who is
2 testifying about a topic, then make your expert
3 analyze something else.  But why don't we talk
4 about it at a break, so I don't run the clock on
5 you?  You move on and we'll come back.
6         MR. BROOKS:  I mean, he's testifying
7 about loss causation and damages.  That's what
8 Dr. Bajaj testified about.  Right?
9         MR. FITZGERALD:  Right.
10         MR. BROOKS:  It's the same topic.
11 BY MR. BROOKS:
12     Q.   In performing your work, did you
13 believe it was important to stay consistent with
14 Dr. Bajaj's prior opinions?
15     A.   No.  My understanding of my role is I
16 was to provide my own independent expert analysis
17 within the scope, as defined in Paragraph 7 of
18 my -- of my rebuttal report, and Paragraph 14 of
19 my original report.
20     Q.   You understand that Dr. Bajaj worked
21 with Cornerstone, just like you're working with
22 Cornerstone, don't you?
23     A.   That, I didn't know.
24     Q.   His deposition?
25     A.   You know, that could well be the case,

Page 40

1 but I don't have a recollection of that.
2     Q.   So you didn't think it was important to
3 stay consistent with Dr. Bajaj's opinions because
4 that wasn't the scope of your work.  Is that your
5 testimony?
6         MR. FITZGERALD:  Objection to form.
7 You can answer.
8     A.   My -- my role, as I understand it, is
9 to provide my -- my own best independent analysis
10 within the scope of my assignment, as defined in
11 Paragraph 14 of my original report and
12 Paragraph 7 of my rebuttal report.
13 BY MR. BROOKS:
14     Q.   So whether or not you conflicted with
15 prior evidence that Household had put on at the
16 previous trial was not your concern?
17         MR. FITZGERALD:  Objection --
18 BY MR. BROOKS:
19     Q.   Is that fair to say?
20         MR. FITZGERALD:  -- to form.
21     A.   That's not fair to say.  I reviewed the
22 evidence and provided an independent analysis of
23 the evidence within the scope.  And the scope,
24 again, is to assess -- reading from my original
25 report, to assess Professor Fischel's second

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 41

1  supplemental report.  So that would obviously
2  include his analysis, his statements in that
3  report.  And then Paragraph 7 of the rebuttal, I
4  was asked to assess Professor Fischel's second
5  rebuttal report.  And so that was my scope.
6      Q.  Do you know who William Aldinger is?
7      A.  Yes.  Generally speaking.
8      Q.  Who is that?
9      A.  He's a Household official, and I think
10  I have a footnote where I list the individual
11  defendants.  I don't -- I didn't memorize them.
12  But he's -- he was, at some point, a Household
13  official.
14      Q.  Did you read his trial testimony?
15      A.  My memory is -- my memory is that
16  Professor Fischel cites to -- I would have to
17  review Professor Fischel.
18      My memory he does cite to some trial
19  testimony.  It might have been of that
20  individual.  I just -- I just would have to look
21  again to refresh my recollection.
22      Q.  I asked if you read his trial
23  testimony, Mr. Aldinger's?
24      A.  Yeah.  So my memory is that
25  Professor Fischel cites to some of that trial

Page 42

1  testimony, and I did review that.  But I would
2  have to look at that to refresh my recollection.
3  But that's my best recollection.
4      Q.  You reviewed the portion that
5  Professor Fischel cited to?
6      A.  Well, I reviewed the portion and then
7  obviously the context in which it's been -- the
8  back and forth.  So that's my best recollection.
9      Q.  You didn't read his entire testimony.
10  Is that correct?
11      A.  That's -- that's right.  So my memory
12  is -- and again, I could be mistaken.  There's a
13  lot of documents in this case.  My memory is that
14  Professor Fischel cited to certain portions.  I
15  skimmed through the transcript, but I focused on
16  what he's citing to and in the context.  Anyway,
17  that's my best recollection.
18      Q.  Did you read Mr. Aldinger's deposition
19  transcripts in this case?
20      A.  Again, my memory -- and there's a lot
21  of documents in this case.  I'm just --
22      Q.  Let me ask a different question.  Did
23  you read Mr. Aldinger's complete deposition
24  testimony?
25      A.  My memory is -- give me one second

Page 43

1  here.
2      So my memory is that when Professor Fischel
3  cited to depositions or transcripts, that I
4  focused on those portions in the context in which
5  they're happening and that I skimmed the rest.
6  But it's fair to say I focused on the portions
7  and the context that he is citing to as a basis
8  for his opinion.
9      Q.  Do you think you skimmed the rest of
10  Mr. Aldinger's trial and deposition testimony?
11      A.  I remember I received, for the day, the
12  trial transcript.  And I remember skimming
13  through -- I'm not representing I did every day.
14  But the transcript that he's citing to, I did
15  receive.
16      Q.  Who is David Schoenholz?
17      A.  My memory is that he was a Household
18  official.  But again -- and I don't remember
19  whether he was an individual defendant or not --
20      Q.  He is.
21      A.  -- in this litigation.  But I have a
22  footnote listing those individuals.
23      Q.  Without looking at that footnote, you
24  don't know his position.  Is that fair to say?
25      A.  I don't recall, offhand.  I do remember

Page 44

1  that he was a Household official, and
2  Professor Fischel cites to various statements by
3  him for -- as evidence of certain propositions.
4      Q.  And did you read Mr. Schoenholz' trial
5  testimony?
6      A.  Same answer as before.  So I'm going to
7  have the same answer with respect to the
8  citations by Dr. Fischel to -- that he has for
9  certain propositions in his -- in his various
10  reports.
11      Q.  Have you spoken to Mr. Schoenholz about
12  this case?
13      A.  No.
14      Q.  Have you spoken to any current or
15  former Household employees, other than lawyers,
16  about this case?
17      A.  No.
18      Q.  And your answer is the same, I take it,
19  for Mr. Schoenholz' deposition transcripts, if
20  Professor Fischel cited them, you reviewed the
21  citation and the areas around it.  Is that fair
22  to say?
23      A.  Well, that wasn't my testimony.  I
24  received -- my memory is I received the
25  transcript that he's citing to.  I skimmed

**Frank Ferrell, III**

Page 45

1  through it, but it's fair to say I focused on the
2  portions that he's relying upon and obviously the
3  context in which it's happening.  So it's the
4  same answer.
5      Q.   And what about Gary Gilmer, what was
6  his position at Household?
7      A.  I don't recall, offhand.
8      Q.   Did you read any of his trial
9  testimony?
10     A.  Again, same answer, I don't -- I
11  haven't mem- -- you know, Professor Fischel, in
12  all these various reports, cites to a lot of
13  things.  I did review the citations he has.  And
14  it would be the same testimony that I gave
15  earlier.
16     Q.   You didn't think it was important to
17  review Household's executives' testimony for
18  anything other than what Professor Fischel cited?
19     A.  Well, Professor Fischel cites a lot, so
20  I did review a lot of transcripts, and I felt
21  that was sufficient for my assignment, which was
22  to assess Professor Fischel's second supplemental
23  report, and then in the expert rebuttal report,
24  to assess Professor Fischel's rebuttal report.
25  Make sure I'm getting that right.

Page 46

1      Yeah, so -- so it is fair to say that I'm
2  focused on what Professor Fischel's analysis is
3  and whether -- and to provide an assessment of
4  that.
5      Q.   Were you provided exhibits with the
6  testimony that you -- that you received?
7      A.  I do remember -- I do remember
8  receiving exhibits.
9      Q.   Which exhibits did you receive?
10     A.  Now -- now you're beyond my memory.  I
11  do remember receiving exhibits.
12     Q.   Who is Edgar Ancona?
13     A.  I don't recall, offhand.
14     Q.   You never read his deposition
15  transcript.  Is that correct?
16     A.  Again --
17     Q.   He's not cited in Professor Fischel's
18  report.
19     A.  So if it's not cited in Professor -- if
20  it's not something cited in Professor Fischel's
21  report, and it's not otherwise cited in my
22  documents relied upon list, then I have not
23  reviewed it.
24     Q.   So you haven't read any deposition
25  testimony or trial transcripts from anyone other

Page 47

1  than those people who are cited in your documents
2  relied upon?
3      A.  I didn't --
4          MR. FITZGERALD:  Object to the form.
5  You can answer.
6      A.  That was not my testimony.  So my
7  testimony was that I obviously reviewed the
8  depositions listed.  I also reviewed
9  Professor Fischel's -- the materials that he's
10  relying upon, which did include, as I remember
11  it, citations to transcripts.
12     Q.   Okay.  So why don't you turn to
13  Exhibit B [sic] to your initial report.
14         (Witness complies.)
15         MR. FITZGERALD:  Do you mean
16  Appendix B?
17         MR. BROOKS:  Appendix B.
18  BY MR. BROOKS:
19     Q.   Appendix B, it's before the exhibits.
20     A.  Do you want me to be in the initial
21  report or --
22     Q.   In the initial report, yeah.
23     A.  Okay.
24     Q.   So for the initial report, you list
25  deposition testimony of Professor Fischel,

Page 48

1  Dr. Bajaj, trial testimony of Professor Fischel,
2  trial testimony of Dr. Bajaj, and the rebuttal
3  trial testimony of Professor Fischel.  Do you see
4  that?
5      A.  I do.
6      Q.   So for the initial report, you didn't
7  read any other deposition transcripts or trial
8  testimony.  Is that correct?
9      A.  That's not --
10         MR. FITZGERALD:  Object to form.
11     A.  That's not correct, so --
12  BY MR. BROOKS:
13     Q.   Okay.  So in addition to what you've
14  listed here, is it true that the only deposition
15  or trial testimony that you read was testimony
16  that was cited in Professor Fischel's first
17  report?
18     A.  That's not quite accurate, because I
19  testified that I obviously read what he's citing
20  to, but also the surrounding context.  So with
21  that -- you know, so incorporating my earlier
22  answer to your question, that's accurate.
23     Q.   And let's just take a look at
24  Appendix B.  For your rebuttal report, there's no
25  deposition or trial testimony relied upon.

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 53

1      A.   So I'm just -- I'm utilizing, for this
2  purpose, the Consolidated Class Action Complaint
3  and Professor Fischel's characterization, and I
4  think those documents characterize it as reaging
5  the restatement or the account -- I'll leave it
6  at that.  The restatement and the predatory
7  lending.
8      Q.   So describe your understanding of the
9  predatory lending fraud that defendants
10 committed.
11     A.   You're testing my memory here.  I
12 would -- to give an accurate answer, I would just
13 go to the jury verdict form.  So there's 17
14 misstatements that have been specifically
15 identified on the verdict -- verdict form.  And I
16 really would not be able to add beyond that.
17     Q.   So you don't understand any of the
18 details underlying the false statements relating
19 to predatory lending.  Is that your testimony?
20        MR. FITZGERALD:  Objection to form.
21     A.   That's not what I said.
22 BY MR. BROOKS:
23     Q.   What are the details that you
24 understand about the predatory lending fraud that
25 the defendants committed?

Page 54

1      A.   Well --
2        MR. FITZGERALD:  Objection.  Asked and
3  answered.
4      A.   So the predatory lending fraud, my
5  understanding is the material misstatements that
6  the jury found on the jury verdict form, which is
7  listed in my Appendix B, that relate to predatory
8  lending.  And that would be the most accurate and
9  complete answer to your question, as to what
10 constitutes the fraud with respect to predatory
11 lending.
12 BY MR. BROOKS:
13     Q.   Can you state for me any details
14 related to the widespread predatory lending that
15 Household was engaged in that you're aware of?
16        MR. FITZGERALD:  Objection to form and
17 asked and answered.
18     A.   So, again, you know, if you're asking
19 me to recall, off the top of my head, the jury
20 verdict form, I did review that very carefully,
21 and there are misstatements and
22 misrepresentations that the jury found that
23 related to predatory lending.  And so the most
24 accurate and complete answer would be to look at
25 the specific misstatements the jury found to be

Page 55

1  materially misleading.
2  BY MR. BROOKS:
3      Q.   What types of predatory lending did
4  Household engage in?
5        MR. FITZGERALD:  Objection.  Asked and
6  answered.  You can answer.
7      A.   You know, again, I would just go to the
8  jury verdict form for the fraud that was found by
9  the jury as relates to predatory lending.
10 BY MR. BROOKS:
11     Q.   Well, you understand that the fraud is
12 securities fraud.  Right?
13     A.   Yes.
14     Q.   Defendants committed securities fraud?
15     A.   That's my understanding.
16     Q.   And those are false statements and
17 omissions.  Right?
18     A.   I'm not here to provide a legal
19 opinion, but that is accurate.
20     Q.   That is your understanding?
21     A.   It is.
22     Q.   And those false statements and
23 omissions were about certain business practices.
24 Right?
25     A.   Agreed.

Page 56

1      Q.   So the verdict form lists the false
2  statements and omissions.  You understand that,
3  right?
4      A.   Right.
5      Q.   But the verdict form doesn't list the
6  details of the fraudulent business practices.
7        MR. FITZGERALD:  Objection to --
8  BY MR. BROOKS:
9      Q.   Do you understand that?
10        MR. FITZGERALD:  Objection to form.
11     A.   I disagree with that characterization.
12 The fraud -- the fraud that was found by the jury
13 is specifically identified by the jury on the
14 jury verdict form.  My understanding, but I'm not
15 giving a legal opinion, is that that constitutes
16 the entirety of the fraud at issue in this case.
17 That is, the 17 material misrepresentations and
18 omissions, as found by the jury.  I do not -- my
19 understanding, but I'm not providing a legal
20 opinion, is that there's not other fraud beyond
21 that.
22 BY MR. BROOKS:
23     Q.   So you understand that the jury, on the
24 verdict form, checked a box for each statement as
25 to which part of the fraud applied to that

Page 57

1  statement.  Right?
2         MR. FITZGERALD:  Objection to form.
3     A.  My memory -- you'll have to show me the
4  jury verdict form to refresh my recollection, but
5  my memory of the jury verdict form is they
6  identified the material misstatements and
7  omissions.
8  BY MR. BROOKS:
9     Q.  And you don't remember one way or
10  another whether they identified if material
11  misstatements or omissions dealt with predatory
12  lending, reaging, or the restatement?
13     A.  I do remember that.  So my memory, not
14  having the jury verdict form in front of me, is
15  that's consistent with my memory.
16     Q.  And what you're saying is other than
17  what's on the jury verdict form, you have no idea
18  what that predatory lending box means.  Correct?
19         MR. FITZGERALD:  Objection to form.
20     A.  Again, I think you're asking me a legal
21  opinion.  My understanding of the jury verdict
22  form, but I'm not providing a legal opinion, is
23  that it was identifying the nature of the
24  material or what category the material
25  misrepresentation fell into, according to the

Page 58

1  jury.
2  BY MR. BROOKS:
3     Q.  You didn't look for details about the
4  fraud from any source, other than the jury
5  verdict form?
6         MR. FITZGERALD:  Objection to form.
7     A.  I don't understand the question.  My
8  understanding, but I'm not giving a legal
9  opinion, is that the actionable -- not the
10  actionable -- the material misstatements and
11  omissions that forms the basis for liability in
12  this case are the material misstatements and
13  omissions as find -- found by the jury on the
14  jury verdict form.
15     My understanding, without giving a legal
16  opinion, is that there's not other fraud beyond
17  that that would form a basis for liability.
18  Without providing a legal opinion, I'm just
19  giving you my understanding of what constitutes
20  the fraud.
21  BY MR. BROOKS:
22     Q.  So can you tell me what reaging was?
23         MR. FITZGERALD:  If we're going to move
24  to reaging, do you want to take a break?  We've
25  been going about an hour.

Page 59

1         MR. BROOKS:  Let's just get through a
2  couple more questions.
3         MR. FITZGERALD:  Okay.
4  BY MR. BROOKS:
5     Q.  Can you tell me what reaging was?
6     A.  So, again, the complaint and
7  Professor Fischel discusses this, so my memory of
8  their discussion, the complaint, and the -- and
9  Professor Fischel's discussion of reaging
10  involved whether a certain -- how certain
11  accounts were treated in terms of delinquencies
12  and the timing thereof.  So at a very general
13  level.
14     But, again, the specific answer would be the
15  reaging fraud or the fraud relating to reaging as
16  found by the jury.  So the specific material
17  misrepresentations and omissions relating to
18  reaging, as found by the jury.
19     Q.  So reaging was a practice that
20  Household engaged in.  Do you understand that?
21     A.  That's my --
22         MR. FITZGERALD:  Objection to form.
23     A.  That's my general understanding.
24  BY MR. BROOKS:
25     Q.  And how did it work?

Page 60

1     A.  Well, again, my understanding is that
2  the jury found certain statements concerning
3  reaging constituted fraud.  And --
4     Q.  I'm asking --
5     A.  -- so that's what -- that's what I'm
6  focused on in terms of thinking about damages and
7  loss causation.
8     Q.  Do you understand how reaging worked?
9  Yes or no?
10     A.  I --
11         MR. FITZGERALD:  Just objection to
12  scope.  He's being offered on a damages case, and
13  objection, asked and answered.
14     A.  I did review the complaint and
15  Professor Fischel's description of that.  I
16  reviewed Household's 10-Ks and 10-Qs, where they
17  talk about treatment of certain accounts and how
18  those are going to be reported.  But again, for
19  purposes of my analysis, I was focused on the
20  fraud and how to properly and scientifically
21  think about damages and loss causation in that
22  context.
23  BY MR. BROOKS:
24     Q.  What financial metrics did reaging
25  impact at Household?

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 61

1    MR. FITZGERALD:  Same objection.
2    A.  So, again, my understanding is the
3  jury -- you know, if you want to put the jury
4  verdict form in front of me to remind me of the
5  specific material misrepresentations about
6  reaging, that would be helpful.  But my memory
7  from the complaint and Professor Fischel is that
8  it involved whether an account was delinquent or
9  not or whether it was going to be caught up in
10  some sense.  But that's a very general
11  understanding.  Again, what's important for me
12  and my scope is what constitutes the fraud.
13  BY MR. BROOKS:
14    Q.  You understand that reaging impacted
15  Household's two plus delinquency statistics.
16  Right?
17    MR. FITZGERALD:  Objection to scope.
18  If you're going to ask him about the findings and
19  the fraud, we should probably put the exhibit in
20  front of him.
21    MR. BROOKS:  I'm just asking about
22  reaging.
23  BY MR. BROOKS:
24    Q.  You understand that reaging impacted
25  Household's two plus delinquency statistics.

Page 62

1  Right?
2    MR. FITZGERALD:  Same objection to
3  scope.
4    A.  You know, my -- that's consistent with
5  my general memory, but I would want to -- you
6  know, I would need to confirm that.  So -- but
7  that's generally consistent with my memory.  But,
8  again, what's relevant for my purposes is what
9  actually constitutes the fraud.
10    MR. BROOKS:  Okay.  We can take a
11  break.
12    MR. FITZGERALD:  Great.
13    THE VIDEOGRAPHER:  The time is two
14  minutes after 10:00.  We're off the record.
15    (A recess was taken.)
16    THE VIDEOGRAPHER:  We are back on the
17  record.  The time is 10:18.
18    THE WITNESS:  Can I make a clarify --
19  there's something I remembered in response to an
20  earlier question, if I could, which you had asked
21  me if there was other people at the meeting when
22  I met with counsel, and I should have added, I
23  just remembered, is that personnel from
24  Cornerstone were at those meetings, as well.  So
25  I wanted to add that to my earlier answer.

Page 63

1  BY MR. BROOKS:
2    Q.  Who from Cornerstone was at the meeting
3  or meetings?
4    A.  So Kristin Feitzinger was there.  I
5  mangled that.  Also present was Nick Yavorsky,
6  Yavorsky.  I'm just trying to remember if there's
7  anybody else.  Those are the two -- those are the
8  two names that come to mind.
9    Q.  Are they senior people from
10  Cornerstone?
11    A.  Yes.  I believe so.  I would say
12  Kristin Feitzinger, Feitzinger is certainly a
13  senior person.  As I understand it, she's a
14  principal at Cornerstone.
15    Q.  You divided them between senior and
16  junior --
17    A.  Yes.
18    Q.  -- people for compensation, so that's
19  why I asked it that way.
20    A.  Sure.
21    Q.  Who else from Cornerstone?
22    A.  Well, just to be clear, I don't -- I
23  know that my understanding is that Kristin is --
24  is senior, is my understanding.
25    Q.  And what are her credentials?

Page 64

1    A.  She went to Stanford.  She has a
2  master's from Stanford.  I believe she also has
3  an MBA from Stanford.
4    Q.  What's her master's in?
5    A.  I don't know.  You asked about her
6  credentials.  I also know that she's been
7  working -- has done work for the last 20 some
8  years in the -- in the area of damages and event
9  studies and that general area.
10    Q.  Sorry.  What about Nick Yavorsky?  What
11  are his credentials?
12    A.  So, again, my understanding is for the
13  last seven, eight years, he's been working in
14  this area.  This area being damages, event study,
15  loss causation, economics, in that.  And I
16  believe he has an MBA.  I'm blanking on the name
17  of the school now.
18    Q.  Where are they based?
19    A.  Los Angeles.
20    Q.  Who else from Cornerstone has worked on
21  this engagement with you?
22    A.  So to my knowledge, in terms of people
23  that I've interacted with, in addition to those
24  two people, I would add Jamie Lee and Katie
25  Galli.

Case: 1:02-cv-05893 Document #: 2130-2 Filed: 03/30/16 Page 11 of 47 PageID #:82034

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 65

1    Q.   And are they senior or junior?
2    A.   Well, Katie Galli, again -- this is my
3  understanding, I could be mistaken -- heads or
4  coheads the LA office.  And Jamie Lee, I know, is
5  less senior, but I don't -- frankly, I don't know
6  where he is in the hierarchy.
7    Q.   What are Katie Galli's credentials?
8    A.   So I know she went to Stanford.  I know
9  that she worked at Stanford doing research.  I
10  don't recall what her graduate degrees are in.
11  Let me restate that.  I know she did work -- she
12  worked at Stanford doing research.  And I also
13  know that for several decades now, she's --
14  20 years or so, 15, 20 years, she's been working
15  in this area.
16    Q.   What about Jamie Lee, what are his
17  credentials?
18    A.   So Jamie Lee, as I remember it, has a
19  Ph.D. in economics from Harvard.  I don't
20  remember where he went undergraduate.  And I
21  don't know how long he's been working at
22  Cornerstone.
23    Q.   Cornerstone is supporting defendants'
24  other two experts in this case.  Is that correct?
25    A.   That's my general understanding.

Page 66

1    Q.   Mr. James and Cornell.  Is that right?
2    A.   That's my general understanding, for
3  what it's worth.
4    Q.   And are the same folks supporting
5  Christopher James as are supporting you?
6    A.   I don't know.
7    Q.   And what about Cornell, are the same
8  folks supporting Cornell?
9    A.   I don't know.
10    Q.   And you don't know one way or the other
11  whether anyone from this team at Cornerstone
12  worked with Dr. Bajaj previously.  Is that your
13  testimony?
14    A.   It is.
15    Q.   Do you have an understanding as to
16  whether anyone on this Cornerstone team was
17  working on Household before you were retained?
18    A.   I don't know either way.
19    Q.   How did you select Cornerstone, if you
20  did?
21        MR. FITZGERALD:  Objection to form.
22    A.   So as we discussed earlier, I do have a
23  contract with Compass Lexecon, and unless --
24  sorry, I would use them unless they're
25  conflicted.  That's obviously the case here.  And

Page 67

1  I've worked with Cornerstone, and more
2  specifically the Cornerstone LA office on a -- on
3  several matters in the past.  So I had a high
4  level of confidence in the quality of the work
5  and the support that I would receive.
6  BY MR. BROOKS:
7    Q.   So did you choose Cornerstone or did
8  counsel suggest them?
9    A.   My -- again, this is going back to the
10  summer.  My memory was it was a conversation
11  about what would make sense in terms of support.
12  I gave my views.  And I just remember there was a
13  back and forth.  So I don't remember it as being
14  a directive from either party.
15    Q.   So Compass Lexecon is your first choice
16  provider of support for these expert engagements.
17  Correct?
18        MR. FITZGERALD:  Objection to form.
19    A.   That's not quite my testimony.  My
20  testimony is I have a contractual obligation to
21  use them as support unless they're conflicted,
22  which -- which was the case here.
23  BY MR. BROOKS:
24    Q.   So you entered into a contract
25  requiring you to make Compass Lexecon your first

Page 68

1  choice on expert engagements.  Right?
2        MR. FITZGERALD:  Objection to form.
3    A.   Well, if it's a contract, it's not a
4  choice.  So, yes, I do use Compass Lexecon unless
5  they're conflicted or for whatever other reasons
6  Compass Lexecon decides not to provide support.
7  BY MR. BROOKS:
8    Q.   You entered into this contract with
9  Compass Lexecon on your own freewill.  Is that
10  right?
11    A.   Yes.
12    Q.   That was a choice you made?
13    A.   It is.
14        MR. FITZGERALD:  Objection to form.
15  BY MR. BROOKS:
16    Q.   And that contract that requires you to
17  go to Compass Lexecon first for support.  Right?
18    A.   Yes.  They have a right of first
19  refusal pursuant to my contract.
20        (United States Court of Appeals
21      for the Seventh Circuit Opinion, No. 13-3532
22      marked Exhibit 3.)
23  BY MR. BROOKS:
24    Q.   The court reporter has handed you
25  Exhibit 3.  This is the Seventh Circuit's opinion

Case: 1:02-cv-05893 Document #: 2130-2 Filed: 03/30/16 Page 12 of 47 PageID #:82035

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 69

1 in this case, which is listed in your reliance
2 materials. Right?
3    A.  Correct.
4    Q.  So turn to Page 2 of Exhibit 3.  And in
5 the last paragraph, in the first column, it
6 begins "Between."  Do you see that?
7    A.  I do.
8    Q.  It says, "Between the summers of 1999
9 and 2001, Household's stock rose from around $40
10 per share to the mid 60s and by July of 2001 was
11 trading as high as $69," and you agree with that.
12 Right?
13    A.  I have no reason to disagree with that.
14    Q.  And then looking up to the prior
15 paragraph it says, in the second sentence, "In
16 1999, company executives implemented an
17 aggressive growth strategy in pursuit of a higher
18 stock price."  Do you see that?
19    A.  I do.
20    Q.  Do you disagree with that finding?
21    MR. FITZGERALD:  So let me stop you
22 here.  Are you asking him to verify what the
23 words are on the Seventh Circuit opinion or --
24 he's not offered, I mean, to ask him to agree or
25 disagree with facts and opinion.  That's not the

Page 70

1 scope of his testimony.  He's here to offer
2 testimony about damages that flow from a finding.
3 And asking him if the judge found it was raining
4 on a certain day, agree or disagree, it's beyond
5 the scope.
6    MR. BROOKS:  Okay.  You can answer.
7    MR. FITZGERALD:  He's not here to offer
8 an opinion on facts -- we can all argue about
9 what the legal significance of the findings.  But
10 I don't understand why you're going to ask him to
11 opine on whether or not sentences in a legal
12 opinion are true.  That's not within the scope.
13 BY MR. BROOKS:
14    Q.  Go ahead and answer.  Just answer the
15 question.
16    MR. BROOKS:  Are you going to instruct
17 him not to answer?  This isn't a 30(b)(6)
18 deposition.  This is one of his reliance
19 materials and I'm entitled to examine him on it.
20 He relied on this.
21    MR. FITZGERALD:  Okay.
22    MR. BROOKS:  He said he read it
23 carefully.
24    MR. FITZGERALD:  What are you asking?
25 Are you asking --

Page 71

1    MR. BROOKS:  I'm asking him whether he
2 agrees with these findings.  If he agrees with
3 them, he can say yes.  If he doesn't, he can say
4 no.
5    MR. FITZGERALD:  And on what basis --
6    MR. BROOKS:  And then we'll follow up.
7    MR. FITZGERALD:  Okay.  I'm going to
8 direct him not to answer.  He's not here to offer
9 factual opinions.  He's here to offer a
10 scientific method to calculate damages based upon
11 a finding of liability.  And to ask an expert
12 witness, agree or disagree with fact findings, if
13 that's what they are, from the Seventh Circuit
14 opinion, I don't think is appropriate.
15    MR. BROOKS:  Okay.  I think it's
16 completely inappropriate to instruct him not to
17 answer.  If that's your instruction, that's fine.
18 I'm going to ask my questions and you can
19 instruct him or not instruct him.  All right?
20    MR. FITZGERALD:  Okay.
21 BY MR. BROOKS:
22    Q.  So you're not going to answer that
23 question?
24    MR. FITZGERALD:  I'm directing him not
25 to answer that question.

Page 72

1    A.  I will follow the instruction.
2 BY MR. BROOKS:
3    Q.  The next sentence reads, "Over the next
4 two years, the stock price rose dramatically but
5 the company's growth was driven by predatory
6 lending practices."  Do you see that?
7    A.  I do.
8    Q.  Do you disagree with that finding by
9 the Seventh Circuit?
10    MR. FITZGERALD:  Same objection.  Same
11 instruction.
12    A.  I'll follow the instruction.
13 BY MR. BROOKS:
14    Q.  The Seventh Circuit continued, "This,
15 in turn, increased the delinquency rate of
16 Household's loans, which the executives then
17 tried to mask with creative accounting."  Do you
18 agree with that?
19    MR. FITZGERALD:  Same instruct -- same
20 objection.  Same instruction.
21 BY MR. BROOKS:
22    Q.  Do you disagree with it?
23    MR. FITZGERALD:  Same objection.  Same
24 instruction.
25

**Frank Ferrell, III**

Page 73

1 BY MR. BROOKS:
2    Q.  Do you understand what that means, sir?
3       MR. FITZGERALD: Same objection. Do
4 you --
5 BY MR. BROOKS:
6    Q.  Do you understand what it means that
7 Household's predatory lending increased the
8 delinquency rate of Household's loans, which the
9 executives then tried to mask with creative
10 accounting?
11      MR. FITZGERALD: Same objection. Same
12 instruction.
13 BY MR. BROOKS:
14    Q.  Do you have any understanding as to
15 what that means, sir?
16      MR. FITZGERALD: Same objection. Same
17 instruction. You're going to have him opine on
18 an opinion --
19 BY MR. BROOKS:
20    Q.  They continue, "Their technique was to
21 reage delinquent loans to distort a popular
22 metric that investors use to gauge the quality of
23 loan portfolios, the percentage of loans that are
24 two or more months delinquent." Do you see that,
25 sir?

Page 74

1    A.  I do see that.
2    Q.  Do you agree with that?
3       MR. FITZGERALD: Same objection. Same
4 instruction.
5    A.  I'll follow the instruction.
6 BY MR. BROOKS:
7    Q.  Do you dispute that finding by the
8 Seventh Circuit?
9       MR. FITZGERALD: Same objection. Same
10 industry.
11    A.  I'll follow the instruction.
12 BY MR. BROOKS:
13    Q.  Do you understand what that means, sir,
14 that sentence?
15      MR. FITZGERALD: Same objection. Same
16 industry.
17    A.  I'll follow the instruction.
18 BY MR. BROOKS:
19    Q.  Do you have any idea what it means that
20 Household and the executives' technique was to
21 reage delinquent loans to distort a popular
22 metric that investors used to gauge the quality
23 of loan portfolios, the percentage of loans that
24 are two or more months delinquent? Do you have
25 any idea what that means?

Page 75

1       MR. FITZGERALD: Same objection.
2 Continuing instruction.
3    A.  I'll follow the instruction.
4 BY MR. BROOKS:
5    Q.  They continued, "Household also
6 improperly recorded the revenue from four credit
7 card agreements that would ultimately issue
8 corrections in August 2002." Do you see that?
9    A.  I do see that.
10    Q.  That was the restatement. Right?
11      MR. FITZGERALD: Same objection. Same
12 instruction.
13    A.  I'll follow the instruction.
14 BY MR. BROOKS:
15    Q.  You don't know whether that was a
16 restatement. Is that fair to say?
17      MR. FITZGERALD: Same objection. Same
18 instruction.
19    A.  I'll follow the instruction.
20 BY MR. BROOKS:
21    Q.  Do you have any idea what that sentence
22 means, sir?
23      MR. FITZGERALD: Same objection. Same
24 instruction.
25

Page 76

1 BY MR. BROOKS:
2    Q.  You're unwilling to tell me whether you
3 know what that means?
4       MR. FITZGERALD: Same objection. Same
5 instruction.
6    A.  I'll follow the instruction.
7 BY MR. BROOKS:
8    Q.  Turning to the next paragraph, skipping
9 the sentence we already covered, the Court
10 continued, "But the reality of Household's
11 situation" --
12    A.  I'm sorry. Where are you?
13    Q.  In the next paragraph.
14    A.  On the second column?
15    Q.  Second sentence, first column.
16    A.  Okay. First column.
17      MR. FITZGERALD: Is it okay if I point
18 him to it?
19      MR. BROOKS: Yeah.
20      MR. FITZGERALD: He's over here
21 (indicating), the truth --
22      THE WITNESS: Oh, but the reality, is
23 that what --
24      MR. FITZGERALD: Yes.
25      THE WITNESS: Okay. I see that. Sorry

**Page 73..76**

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 77

1  about that.
2  BY MR. BROOKS:
3     Q.  The Court wrote, "But the reality of
4  Household's situation eventually caught up with
5  its stock price.  The truth came to light over a
6  period of about a year through a series of
7  disclosures that began when California sued
8  Household over its predatory lending."
9     Do you see that?
10    A.  I do.
11    Q.  Do you understand what that means, sir?
12       MR. FITZGERALD:  Objection.  Same
13  objection.
14  BY MR. BROOKS:
15    Q.  Do you agree or disagree that the --
16    A.  I follow -- I'll follow the
17  instruction.
18    Q.  Do you agree or disagree that the truth
19  came to light over a period of about a year
20  through a series of disclosures that began when
21  California sued Household over its predatory
22  lending?
23       MR. FITZGERALD:  Same objection.  Same
24  instruction.
25    A.  I'll follow the instruction.

Page 78

1  BY MR. BROOKS:
2     Q.  Independent of this document, do you
3  agree that the truth about Household's fraud came
4  to light over a period of about a year through a
5  series of disclosures that began when California
6  sued Household over its predatory lending?
7       MR. FITZGERALD:  Objection to form.
8     A.  So in my report, and I would go to my
9  rebuttal report, I do have a specific disclosure
10  model where I analyze Professor Fischel's
11  14 purported specific disclosure days.  And it is
12  true that those 14 days are over a period of
13  time, but on specific days.  I believe the first
14  of those 14 -- but I would just go to my
15  Exhibit 3a and 3b of my rebuttal report.
16    So looking at Exhibit 3a of my rebuttal
17  report, the first purported corrective disclosure
18  in Professor Fischel's specific disclosure model
19  is November 15th.  And in Professor Fischel's
20  specific disclosure model, it ends on October 11,
21  2002.  And, of course, I also have my corrected
22  Fischel regression with respect to these dates.
23       MR. BROOKS:  So I'll move to strike
24  that as nonresponsive.
25

Page 79

1  BY MR. BROOKS:
2     Q.  My question is:  Do you agree that the
3  truth about Household's fraud came to light over
4  a period of about a year through a series of
5  disclosures that began when California sued
6  Household over its predatory lending?
7       MR. FITZGERALD:  And same objection.
8  If you're reading the Seventh Circuit opinion and
9  asking whether he agrees with the fact-findings
10  or not, same instruction.  If you want to ask him
11  questions independently of the Seventh Circuit
12  opinion as to when the disclosure period was, I
13  think he properly answered it.  You can ask him
14  that.
15  BY MR. BROOKS:
16    Q.  Do you agree or not that the truth
17  about Household's fraud came to light over a
18  period of about a year?
19    A.  That's a very general statement.  My --
20  my specific analysis, my scientifically based
21  rigorous methodology for analyzing the disclosure
22  period, you know, is reflected in Exhibit 3a,
23  among other exhibits, and discussion that I have
24  in the report.  And it is true that the first
25  date in that model is November 15th, 2001.

Page 80

1     Q.  Is it your opinion that the truth about
2  Household's fraud emerged at any point and
3  impacted Household's stock price?
4     A.  Well, yeah, I -- yes, in the sense that
5  I specifically -- and spent a great deal of time
6  discussing my report, the 14 purported corrected
7  disclosure dates, the six that are actually
8  statistically significant using a proper and
9  scientifically rigorous methodology, and the
10  confounding information on four of those six.
11  That's my analysis of that question.
12    Q.  I'd like an answer to the question.  Do
13  you agree that the truth came out about
14  Household's fraud and impacted Household's stock
15  price?
16       MR. FITZGERALD:  I object to the
17  statement.  You had an answer.  Just so we
18  understand, when he talks about the fraud, he's
19  accepting whatever the jury findings were.  And I
20  assume you're asking that without him stating
21  whether it's a fraud or not.  He's accepting the
22  jury's findings.  I think he just gave an answer
23  about how information emerged during the
24  disclosure period.
25    A.  I do want to make clear in my answer

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 137

1  BY MR. BROOKS:
2      Q.  You're correct.
3      A.  Okay.
4      Q.  So with that in mind and with the
5  period of November 15th to October 11th, 2002 in
6  mind, November 15, 2001 to October 11, 2002, do
7  you agree with the Court's observation there?
8      A.  I'm not going to comment on the
9  Court -- what the Court is saying or not saying.
10  I guess I'm hesitant to opine on whether it
11  overstates or understates, based on my opinion,
12  because the model is fundamentally misspecified.
13  So I wouldn't work within the model.  I would say
14  that the leakage model, as defined by
15  Professor Fischel, is fundamentally flawed and I
16  would use a specific disclosure model.  And so in
17  that sense, it does overstate it, because I come
18  up with $4.19, putting aside the confounding
19  information, whereas he comes up with $23.94.
20      Q.  So you can't say one way or the other
21  whether it's true that if during the relevant
22  period, there was significant negative
23  information about Household unrelated to these
24  corrective disclosures and not attributable to
25  market or industry trends, then the model would

Page 138

1  overstate the effect of the disclosures and, in
2  turn, of the false statements.  Correct?
3          MR. FITZGERALD:  Objection to form.
4      A.  Well, my understanding of the leakage
5  model is that Professor Fischel is automatically
6  attributing every residual to the fraud or
7  revelation of the fraud or fraud-related
8  information.  So I guess in the sense that he's
9  attributing every negative residual to
10  fraud-related information automatically in his
11  model, it would increase the estimates of
12  inflation in his model.  But again, I just
13  fundamentally reject the model, to begin with.
14  BY MR. BROOKS:
15      Q.  So you can't say whether or not this
16  Court's statement is true that I just read.
17  Right?
18          MR. FITZGERALD:  Objection to
19  commenting on the Court's statement.
20          MR. BROOKS:  Withdrawn.
21  BY MR. BROOKS:
22      Q.  You can't say whether or not the
23  sentence I just read from the Seventh Circuit's
24  opinion is something you agree with.  Right?
25          MR. FITZGERALD:  I'm objecting to

Page 139

1  these -- he's already answered the question.  If
2  you want to ask him what the effect of certain
3  things will have on the model, but he's not going
4  to opine on whether or not the Seventh Circuit is
5  right or wrong in a sentence from context --
6  sentence removed from an opinion where he's not
7  here giving a legal opinion.  I'm fine with you
8  asking him about if X or Y happens, what happens
9  to inflation.  But he's not going to comment
10  on --
11          MR. BROOKS:  I think it's completely
12  inappropriate for you to interfere.
13          MR. FITZGERALD:  You can ask the
14  substance of the question.  But if you're going
15  to frame him as a witness to opine on what the
16  Seventh Circuit said and what they meant and
17  whether they got it right or wrong, I have a
18  problem with it.  If you want to ask him the
19  effect of what alleged leakage does or doesn't
20  do, I'm fine with that.
21      A.  Could you reread the --
22  BY MR. BROOKS:
23      Q.  You can't say one way or another
24  whether the sentence that we've been discussing
25  from the Seventh Circuit's opinion is something

Page 140

1  you agree with.  Correct?
2      A.  I agree --
3          MR. FITZGERALD:  Same objection.
4      A.  I agree with it in the sense of my
5  earlier question -- my earlier answer, which is
6  in the model, which I fundamentally reject as
7  inconsistent with the evidence in this case and
8  the academic literature, in the context of this
9  model, where you're automatically associating
10  every residual to the fraud or fraud-related
11  information as he defines it, then I think it's
12  mathematically true, in his -- the context of his
13  model that the more negative residuals you have,
14  that that would result in a greater inflation
15  calculation, under his model, which is
16  fundamentally flawed to begin with.
17  BY MR. BROOKS:
18      Q.  Do you agree or disagree with the next
19  observation that the Seventh Circuit made in this
20  paragraph, which was, of course, this can cut
21  both ways, if, during the relevant period, there
22  was significant positive information about
23  Household, then the model would understate the
24  effect of the disclosures?
25          MR. FITZGERALD:  I have the same

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 141

1 objection about asking him to agree or disagree
2 with the Seventh Circuit. You can ask him if X
3 happens, does Y happen, I'm fine with that. But
4 he shouldn't be opining on what he thinks of a
5 legal -- of a Court opinion.
6     A. So I have two response -- two parts to
7 my answer. One is I agree that in his model,
8 which is fundamentally flawed, that if there's
9 more positive residuals, then that would decrease
10 inflation -- that would result in a decrease in
11 inflation that he would otherwise calculate in
12 that model. I disagree with the statement that
13 it would understate the effect of revelation of
14 the fraud, assuming there's revelation of the
15 fraud, because the model, itself, is
16 fundamentally flawed.
17     So I'm not agreeing that -- you know, I'm
18 not -- so what happens to the residuals does
19 affect the model, Professor Fischel's leakage
20 model calculations. But I don't -- whether it
21 goes up or down, the whole model is flawed.
22 BY MR. BROOKS:
23     Q. Go ahead and turn to Page 8.
24         (Witness complies.)
25

Page 142

1 BY MR. BROOKS:
2     Q. And on Page 8, the second paragraph
3 from the bottom on the left, it starts,
4 "Fischel's models."
5     A. Mm-hmm.
6     Q. "The Court found Fischel's models
7 controlled for market and industry factors and
8 general trends in the economy. The regression
9 analysis took care of that." You disagree with
10 that finding. Correct?
11         MR. FITZGERALD: Objection. He's not
12 going to opine on whether he disagrees or --
13 agrees or disagrees with the Seventh Circuit
14 findings. You can ask him whether the model
15 controls for X or Y, but you shouldn't be asking
16 him to opine on an opinion by the Seventh
17 Circuit.
18 BY MR. BROOKS:
19     Q. You reject this finding that Fischel's
20 models controlled for market and industry factors
21 and general trends in the economy, the regression
22 analysis took care of that --
23         MR. FITZGERALD: Same objection. I
24 direct him not to answer whether he agrees with
25 the finding as stated. I don't know the full

Page 143

1 context, but as stated language in the opinions.
2 If you want to ask him the underlying facts, does
3 he think that Fischel's model controlled for
4 something or not, I have no objection to him
5 answering that. But to frame the answer to a
6 witness, who is testifying about a damage
7 calculation, as to interpret particular sentences
8 in an opinion, I -- I direct him not to do that.
9 BY MR. BROOKS:
10     Q. Do you agree or disagree that Fischel's
11 model controlled for market and industry factors
12 and general trends in the economy because the
13 regression analysis took care of that?
14     A. I guess -- you know, putting aside --
15 I'm not opining on what the Court meant or didn't
16 mean, whether there's a finding or non-finding.
17 I'm not opining on the meaning of the Seventh
18 Circuit opinion. Whether -- what is reflected in
19 the residual in a market model, in a regression
20 model is going -- is going to be a function of
21 how you control for market and industry.
22     And so in Professor Fischel's model, as I
23 spent a lot of time talking about in my report,
24 he has a two-factor model. And given his
25 definition of "industry," there would be industry

Page 144

1 effects in the sense of affecting a subgroup of
2 firms that would show up in the residual. So,
3 for -- not to leave this at 1,000 feet, or
4 30,000 feet. So, for example, in his model, if
5 there's effects on subprime lenders -- so I have
6 five in my report, subprime consumer finance
7 companies -- then, as a general matter, that
8 would not be controlled for in his regression
9 with, because he has a two-factor model.
10     So it controls for industry in the sense of
11 he's controlled for S&P 500 financials. It would
12 not include industry effects such as the subprime
13 group.
14     Q. So with that in mind, do you agree or
15 disagree that Fischel's model controlled for
16 market and industry factors and general trends in
17 the economy because the regression analysis took
18 care of that?
19         MR. FITZGERALD: Objection to form.
20     A. You know, I agree with that in the
21 context of my answer. It would not control, and
22 I -- I understand his testimony to agree with
23 this. It would not control for effects on
24 Household's business that are -- that have a
25 disproportionate effect.

Case: 1:02-cv-05893 Document #: 2130-2 Filed: 03/30/16 Page 17 of 47 PageID #:82040

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 145

1     So, for example, impact on the subprime
2   consumer finance companies, that would not be
3   controlled for in his industry control.  You can
4   consider that industry effect.  And in that sense
5   it would not be controlled for.  Effects that are
6   mediated through the S&P 500 financials would be
7   controlled for.
8     Q.   You agree that it's possible for news
9   to impact a stock price even if the price
10   reaction is not statistically significant.
11   Correct?
12     A.   As a general matter, that could be
13   true, depending on the facts and circumstances.
14   But you would want a scientifically rigorous
15   basis to make -- to make that -- in order to
16   reach that conclusion.
17     Q.   But it's possible that news affects a
18   stock price in ways that's, you know, not
19   necessarily statistically significant.  Right?
20     A.   Framed at that level of generality, I
21   agree with that.
22     Q.   And in some circumstances, market
23   agents learn about valuation relevant events from
24   many sources over a long period of time.
25   Correct?

Page 146

1     A.   Can you reread the question?
2     Q.   In some circumstances, market agents
3   learn about valuation relevant events from many
4   sources over a long period of time.  Correct?
5     A.   That could be true, depending on the
6   facts and circumstances.
7     Q.   So information can reach the market
8   gradually through many sources.  Right?
9       MR. FITZGERALD:  Objection to form.
10     A.   I don't know what you mean by the word
11   "gradually," but -- but I agree that in an
12   efficient market, all publicly-available
13   information will be reflecting in the stock
14   price.
15   BY MR. BROOKS:
16     Q.   And if information is released
17   gradually about a certain topic, it can reach the
18   market gradually through many sources.  Right?
19       MR. FITZGERALD:  Form objection.
20     A.   I agree that in an efficient market,
21   the source for public information could be many
22   sources.
23   BY MR. BROOKS:
24     Q.   And that information, if -- about a
25   certain topic, if released gradually, will reach

Page 147

1   the market gradually.  Right?
2       MR. FITZGERALD:  Form objection.
3     A.   You know, I just would say that the
4   public information set can change in an efficient
5   market from day-to-day, from many different
6   sources.  I do want to be clear that when you say
7   gradually, I would not view a change in the
8   public information set that's being impounded in
9   the stock price to -- to consist of the same
10   information that's been expressed earlier.
11   BY MR. BROOKS:
12     Q.   Well, in this case, Professor Fischel
13   opines that information about Household's
14   predatory lending practices reached the market at
15   various points during the leakage period.  You
16   understand that.  Right?
17       MR. FITZGERALD:  Form objection.
18     A.   That's consistent with my memory of
19   what he's saying.
20   BY MR. BROOKS:
21     Q.   And, in addition, the defendants in
22   this case falsely denied that they were engaged
23   in predatory lending throughout the leakage
24   period, didn't they?
25       MR. FITZGERALD:  Objection.  He's not

Page 148

1   here as a fact witness.  Whatever the Seventh
2   Circuit found or whatever the jury found, it is
3   what it is.  He's not here to testify that it did
4   or did not happen.
5     A.   I don't have a view on what constituted
6   the misrepresentations beyond noting what's on
7   the jury verdict form.
8   BY MR. BROOKS:
9     Q.   Do you dispute in this case that there
10   was a continuous flow of fraud-related
11   information that occurred in the face of ongoing
12   company denials over the disclosure period?
13       MR. FITZGERALD:  Form objection.
14     A.   If what you're referring to in your
15   question is Professor Fischel's justification for
16   his leakage model, what he calls his leakage
17   model, then I very much disagree.
18   BY MR. BROOKS:
19     Q.   I'm asking a factual question.  Do you
20   dispute that there was a continuous flow of
21   fraud-related information that occurred in the
22   face of company denials over the disclosure
23   period?
24       MR. FITZGERALD:  Objection to form.
25     A.   I disagree with --

Case: 1:02-cv-05893 Document #: 2130-2 Filed: 03/30/16 Page 18 of 47 PageID #:82041

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 149

1      MR. FITZGERALD: You can answer.
2      A. I disagree with that in the context of
3  how Professor Fischel is defining that.
4  BY MR. BROOKS:
5      Q. Outside of Professor Fischel's context,
6  okay, as a factual matter, do you dispute that
7  there was a continuous flow of fraud-related
8  information that occurred in the face of ongoing
9  company denials over the disclosure period?
10      MR. FITZGERALD: Objection to form.
11      A. I don't have a view beyond what I say
12  about Professor Fischel's analysis, which he
13  claims that there's continuous flow of
14  information that is causing all the residuals in
15  Household's stock price. And I disagree with
16  that.
17  BY MR. BROOKS:
18      Q. So separating what Professor Fischel
19  claims caused the residuals in Household's stock
20  price, okay?
21      A. Okay.
22      Q. He also claims that there was a
23  continuous flow of fraud-related information that
24  occurred in the face of ongoing company denials,
25  as a factual matter. Do you dispute that?

Page 150

1      MR. FITZGERALD: Objection to form.
2      A. I dispute -- I reject as inconsistent
3  with the economic evidence the claim that there's
4  continuous leakage that's causing the residuals
5  in his market model.
6  BY MR. BROOKS:
7      Q. I asked you to separate what
8  Professor Fischel claims caused the residuals in
9  his market model. Okay?
10      A. Yeah.
11      Q. I'm asking you as a factual question,
12  do you dispute that there was a continuous flow
13  of fraud-related information that occurred in the
14  face of ongoing company denials over the
15  disclosure period?
16      MR. FITZGERALD: Standing objection
17  that he's not here to testify as to whether the
18  fraud happened or didn't happen or how it
19  happened. We're proceeding from the jury's
20  verdict. And that's the objection to form since
21  it's compound.
22      Are you asking him about the facts of
23  what happened or are you asking him about the
24  facts of information and what effect it has on
25  the market? You've got two questions in there.

Page 151

1  BY MR. BROOKS:
2      Q. Do you understand my question, sir?
3      A. I don't.
4      Q. Okay.
5      A. If you could read it.
6      Q. My question is: As a factual matter,
7  do you dispute that there was a continuous flow
8  of fraud-related information that occurred in the
9  face of ongoing company denials over the
10  disclosure period?
11      MR. FITZGERALD: Again, the same
12  objection.
13      A. So I analyzed that question in the
14  context of Professor Fischel's so-called leakage
15  model. And I do dispute that there's a
16  continuous flow of so-called fraud-related
17  information that's impacting the stock price on a
18  continuous basis. There's no factual predicate
19  or rigorous scientific analysis to establish
20  that. Basically, Fischel is assuming leakage to
21  find leakage.
22  BY MR. BROOKS:
23      Q. Okay. So as a predicate for his
24  conclusions, Professor Fischel has observed a
25  continuous flow of fraud-related information that

Page 152

1  occurred in the face of ongoing company denials
2  over the disclosure period. You agree with that,
3  don't you? That Professor Fischel has observed
4  that as a predicate for his analysis?
5      A. My understanding -- I mean, maybe
6  it's -- we're meaning the same thing. My
7  understanding of the predicate that he needs,
8  among other things, for his leakage model, his
9  so-called leakage model is that every single day,
10  the entire residual in his model is due to
11  leakage of the fraud. And there's no factual
12  predicate to establish that.
13      Q. I don't understand why you won't answer
14  my question.
15      MR. FITZGERALD: Objection.
16  BY MR. BROOKS:
17      Q. I've asked you to set aside your
18  opinions about is the residuals in his model.
19  Okay?
20      A. Yeah.
21      Q. There are two parts. And you've
22  answered every time with the residuals. So just
23  answer my question.
24      MR. FITZGERALD: Objection.
25

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 153

1  BY MR. BROOKS:
2      Q.  Do you dispute --
3          MR. FITZGERALD:  Just ask a question.
4  We don't need to lecture him.  He's trying to
5  answer a compound question --
6          MR. BROOKS:  You've been lecturing me
7  all day.
8          MR. FITZGERALD:  I haven't lectured all
9  day.  What I'm saying is you're asking a compound
10  question, and he's not going to answer a compound
11  question --
12         MR. BROOKS:  The question is not
13  compound.
14  BY MR. BROOKS:
15     Q.  Do you dispute that there was a
16  continuous flow of fraud-related information that
17  occurred in the face of ongoing company denials,
18  as observed by Professor Fischel?
19         MR. FITZGERALD:  That is a compound
20  question.  And if you're going to ask him a
21  compound question that he's going to answer, he's
22  got to explain so he doesn't take in multiple
23  assumptions in his question, and there's nothing
24  improper about that.
25         MR. BROOKS:  We've -- we've been very

Page 154

1  clear about separating the impact of those
2  fraud-related -- of the fraud-related information
3  from this question.  Okay?  There's no doubt
4  about that, because I've said it seven times.  So
5  separate that impact out and answer this
6  question.
7  BY MR. BROOKS:
8      Q.  Was there, in your opinion, a
9  continuous flow of fraud-related information that
10  occurred in the face of ongoing company denials
11  over the disclosure period?
12         MR. FITZGERALD:  Just -- my objection,
13  you still haven't -- there are assumptions about
14  what denials are and who's making denials, which
15  he's not here as a fact witness.  If you want to
16  talk about information flowing, if you're going
17  to ask a compound question, he's going to answer
18  appropriately.
19     A.  So my understanding of what
20  Professor Fischel is saying in his reports is
21  that there's a continuous leakage of
22  fraud-related information, as he defines
23  fraud-related information, that's causing -- and
24  I'm going to use the word again -- the residuals.
25  That's the factual predicate that he needs, among

Page 155

1  other things, not solely that, or he claims he
2  needs for his model.  And, for that, there's
3  no -- that's flatly inconsistent with economic
4  evidence.  It's just an assertion.
5  BY MR. BROOKS:
6      Q.  Do you agree that there was
7  fraud-related information that leaked into the
8  market during the disclosure period?
9      A.  Well, I would define "fraud-related
10  information" as information -- reasonably that
11  information, new information is reaching the
12  market every day that's causing the residual.
13  And there's no factual basis for that.  And
14  that's the reason, among other things, that his
15  so-called leakage model is fundamentally flawed
16  and unsupported.
17         (Cumulative Residual Price
18  Change on Fraud Related Event Dates
19  Identified in Company Investor Relations
20  Reports marked Exhibit 4.)
21  BY MR. BROOKS:
22     Q.  I've handed you Exhibit 4, which is a
23  document that we created that summarizes
24  Household's investor relations reports, parts of
25  them during the leakage period.  Okay?  Have you

Page 156

1  ever reviewed the investor relations reports?
2      A.  I have.
3      Q.  And so these are --
4      A.  I'm not representing -- I have reviewed
5  some investor relations reports.
6      Q.  They're cited in the various expert
7  reports.  Right?
8      A.  That's correct.
9      Q.  Okay.  And in the trial testimony?
10     A.  That's correct.
11     Q.  So you're familiar with them?
12     A.  Generally speaking, yes, but -- and the
13  specific context that Professor Fischel is
14  utilizing them.
15     Q.  Okay.  You understand that they contain
16  comments from the company's investor relations
17  department about Household's stock price movement
18  and why the price was moving over time?
19     A.  There's a lot of comments in those
20  reports.  You can just direct me to specific
21  comments.  I don't have an overall
22  characterization of the nature of the comments.
23  They say a lot of different things in a lot of
24  the different reports.
25     Q.  So this exhibit is a compendium of

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 157

1  comments that are related to the fraud and the
2  residual price change per Fischel's second
3  supplemental Exhibit 1 over the leakage period.
4  Okay?
5      A.  Understood.
6      Q.  Okay.  And take a look at the
7  cumulative residual price change on Page 5.
8          (Witness complies.)
9      A.  Okay.
10 BY MR. BROOKS:
11     Q.  It's $23.91.  Correct?
12     A.  That's what this document says.
13     Q.  And that's very close to the artificial
14 inflation that Household -- that Fischel's
15 leakage model calculates.  Correct?
16     A.  Without having Professor Fischel's
17 report in front of me, my memory, such as it is,
18 is $23.94, if you start at the beginning of the
19 disclosure period.
20     Q.  That's the cap.  Right?
21     A.  That's one of his ad hoc fixes to his
22 model.  Yes.
23     Q.  The highest amount of inflation that
24 Professor Fischel finds is $23.94.  Right?
25     A.  That is consistent with my memory.

Page 158

1      Q.  So it's 3 cents for the residual price
2  change using the specific disclosures model from
3  the dates in this report --
4          MR. FITZGERALD:  Objection to form.
5  BY MR. BROOKS:
6      Q.  -- in this exhibit?
7      A.  I don't understand the question.  Are
8  you asking --
9          MR. BROOKS:  Withdrawn.
10     A.  -- me to opine where the $23.91 is
11 coming from?
12 BY MR. BROOKS:
13     Q.  No.  I'm representing to you that the
14 23.91 is the cumulative price change for the
15 dates that are shown in the second column in this
16 report.  Okay?
17     A.  The fourth column?
18     Q.  The second column.  See the dates in
19 the second column?
20     A.  Oh, I see.  Okay.  I understand your
21 representation.
22     Q.  Okay.  So I want to go through this, so
23 I'm not going to have you look at every single
24 entry and ask you some questions.  The first
25 entry --

Page 159

1          MR. FITZGERALD:  One question.  Are the
2  entries verbatim from the reports or are they
3  abstracts when you have --
4          MR. BROOKS:  No, they're -- they're cut
5  and pasted from the report.
6          MR. FITZGERALD:  Thank you.
7      A.  So I didn't follow that.  So these are
8  verbatim from the report?
9  BY MR. BROOKS:
10     Q.  My understanding is they're cut and
11 pasted.  Yeah.
12     A.  Okay.
13     Q.  First is on November 15th, Household
14 responds to a lawsuit filed by California
15 Department of Corporations alleging that HFC and
16 Beneficial overcharged various fees and the stock
17 dropped from $60.91 on November 14th to 57.80 on
18 November 16th on over 5.8 million shares traded.
19 Do you see that?
20     A.  I do.
21     Q.  Okay.
22     A.  On the 15th and the 16th.
23     Q.  Correct.  Do you consider this to be
24 fraud-related information?
25     A.  I do have, in my Exhibit 3,

Page 160

1  November 15th as a non-confounded statistically
2  significant residual of $2.21.  The one caveat is
3  I do note in my report that there's an earlier
4  disclosure, I believe, on November 9th, that
5  reflected all or most of this information.
6      Q.  My question is simpler.  Do you
7  consider this information about the California
8  Department of Corporations lawsuit to be
9  fraud-related information?
10         MR. FITZGERALD:  Form objection.
11     A.  So I do view this as a specific
12 disclosure day that's not confounded.  But the
13 question -- but the question I raise in my report
14 is whether, you know, there's an issue as to
15 whether this residual is due to this information
16 given the November 9th disclosure.  So that would
17 affect my judgment as to whether all or any of
18 the residual is attributable to this information
19 that's being disclosed on this day.
20 BY MR. BROOKS:
21     Q.  So because you view this as a specific
22 disclosure day that's not confounded, you agree
23 that it's fraud-related information.  Right?
24         MR. FITZGERALD:  Objection to form.
25     A.  I believe it's a specific disclosure

**Frank Ferrell, III**

Page 161

1  date that's not confounded with the caveat that
2  there's a November 9th disclosure.
3  BY MR. BROOKS:
4     Q.  If it was not fraud-related, it would
5  not be a specific disclosure date.  Right?
6        MR. FITZGERALD:  Objection to form.
7     A.  So I'm assuming in the report that this
8  is corrective information, but -- but -- let me
9  put it this way:  In my report, this is not a
10  confounded day.  The issue that I raise with this
11  date is the November 9th.  And there's nothing
12  else I have to say about November 9th --
13  November 15th.
14  BY MR. BROOKS:
15     Q.  Why are you so reluctant to say whether
16  this is fraud-related information or not?
17        MR. FITZGERALD:  Objection to form.
18     A.  Because I wasn't asked to opine on what
19  the fraud was.  I was -- I'm assuming the -- the
20  misrepresentations in the jury verdict, without
21  opining on it.  So that was my hesitation, is not
22  to be viewed as providing an opinion on what --
23  on what the fraud actually is, if there is any,
24  rather than just noting -- merely noting what's
25  on the jury verdict, without providing an opinion

Page 162

1  on that.
2  BY MR. BROOKS:
3     Q.  Do you agree that in order to determine
4  whether something is fraud-related or not, one
5  has to understand the fraud?
6     A.  I agree with that.
7     Q.  Skipping down to December 3rd, 2001,
8  this is an entry discussing "articles published
9  by "Barron's" and "Business Week" that alleged
10  Household's strong results were in part driven by
11  aggressive chargeoff policies."  Do you agree
12  that this is a fraud-related disclosure?
13        MR. FITZGERALD:  What day are we on?
14  12/3/01?
15        MR. BROOKS:  Yeah.
16     A.  You know --
17        MR. FITZGERALD:  Thank you.
18     A.  -- I don't have the investor relations
19  report.  You know, I -- I feel uncomfortable
20  commenting on a sentence that's been cut and
21  pasted from a larger report without knowing the
22  context.  So I'm just not going to provide an
23  opinion on the investor relation report without
24  being given an opportunity to read the whole
25  thing, what the basis is for this in the report.

Page 163

1     I do talk about December 3rd in my report,
2  and I'll be happy to talk about what I do say
3  about December 3rd.
4  BY MR. BROOKS:
5     Q.  Well, yeah.  I mean, I'm asking you
6  about the disclosures, as summarized here.
7  Right?  So you understand that there were
8  disclosures on December 3rd, 2001, don't you?
9     A.  I have in my report a discussion of
10  December 3rd.  That's correct.
11     Q.  And a discussion of disclosures on
12  December 3rd?
13     A.  I believe so.
14     Q.  And were those --
15     A.  You know, hold on a second.  So there's
16  a lot of dates here.  I mean, I do have in my
17  Exhibit 3a, December 3rd.  So let me -- let me
18  restate my answer.
19     So I do have December 3rd in my Exhibit 3a.
20  And I just don't remember if I have a specific
21  discussion of that.  I have to -- let me flip
22  through my report.
23     I certainly reviewed Professor Fischel's
24  claimed disclosures on that date.  But I'm
25  flipping through my report to see, beyond my

Page 164

1  Exhibit 3a, if I have a discussion of that.  So
2  I'm looking at my initial report.
3     It looks like my first specific disclosure
4  date is December 12th.  And I'm looking at my
5  rebuttal.  And I'm looking at Page 32 of my
6  rebuttal.  Oh, so I do have December -- are we
7  talking about December 12?  So it's on page --
8     Q.  We're not talking about December 12.
9     A.  I'm sorry.  December 3rd.  So I won't
10  eat up any more time.  I'm just flipping through
11  it.  I can't readily find December 3rd, but I do
12  have, on Exhibit 3a, the statistical significance
13  on that date.  And I did review Professor
14  Fischel's discussion and citations on this date.
15     Q.  Did you review the "Barron's" and
16  "Business Week" articles?
17     A.  I believe so.
18     Q.  And --
19     A.  My memory is certainly the "Barron's"
20  is discussed in Fischel.  I reviewed a lot of
21  articles.  I -- I -- I probably reviewed it.  I
22  certainly reviewed it if it's discussed in
23  Professor Fischel, but I certainly reviewed this
24  date.
25        MR. FARINA:  The lunch is here if you

**Frank Ferrell, III**

Page 173

1    A.  I'm sure I did, because I read this
2  report in its entirety.  And it's an exhibit to
3  it.  So I did review it at some point.
4    Q.  And without reading Exhibit 8, you
5  can't tell me whether an article referencing the
6  fact that Household tricked and trapped customers
7  is fraud-related.  Is that your testimony?
8      MR. FITZGERALD:  Objection to form.
9    A.  It is my testimony that I will not
10 comment on an article without refreshing my
11 recollection about the entire article.
12      (Exhibits to Professor Fischel's
13   August 15, 2007 report marked Exhibit 6.)
14 BY MR. BROOKS:
15   Q.  We'll mark as Exhibit 6 the exhibits to
16 Professor Fischel's August 15, 2007 report.
17 There's Exhibit 8 for you.
18   A.  Thank you.  So I'm going to -- I'll
19 read Exhibit 8.
20   Q.  If that's what you need to do to tell
21 me an article about tricking and trapping
22 customers is related to fraud, sir, then go
23 ahead.
24   A.  I will read Exhibit 8.
25      MR. FITZGERALD:  Objection to form.

Page 174

1    A.  Okay.  I've read the document.
2  BY MR. BROOKS:
3    Q.  What's the answer?
4    A.  Could you restate -- if you could
5  reread it, that would be helpful.
6    Q.  Is this February 18, 2002 National
7  Mortgage News article referenced in Paragraph 14
8  about California subsidiaries of Household
9  tricking and trapping customers into high-cost
10 mortgages fraud-related, in your opinion?
11      MR. FITZGERALD:  Objection to form.
12   A.  So if -- I want to be clear on this
13 language of fraud-related information.  If, by
14 "fraud-related information," one means corrective
15 information, corrective of the misstatements, as
16 identified by the jury verdict, there will be a
17 series of questions that one would want to ask.
18 So, number one, I would want to know whether this
19 document and the statements in it are new
20 information.  If it's not new information, then
21 it's not news.
22   So just reading this document, by itself,
23 one would not be able to conclude that is a
24 corrective information in the sense of
25 representing new information to the market.

Page 175

1    Q.  I think you've --
2    A.  Now --
3    Q.  -- misinterpreted my question.
4      MR. FITZGERALD:  Let him finish.
5    Q.  You misinterpreted --
6    A.  So I --
7    Q.  -- my question.  I'm not asking about
8  whether it's corrective information.  I want you
9  to listen very carefully.  I'm asking --
10   A.  I wasn't finished.
11   Q.  -- about whether the information in
12 this article --
13   A.  I wasn't finished --
14   Q.  -- relates to the fraud.
15      MR. FITZGERALD:  And he was explaining
16 how he understood the terms, and --
17      MR. BROOKS:  And I'm telling him he's
18 wrong.  Why are we wasting time if he's answering
19 the wrong question?
20      MR. FITZGERALD:  He's explaining to you
21 what was ambiguous about the words you used in
22 your question, so he's not answering the wrong
23 question.  He's addressing the question you
24 asked.
25   A.  So if by -- as I was saying, if by

Page 176

1  "fraud-related information" we mean corrective --
2    Q.  I do not mean that.
3    A.  -- information --
4    Q.  I don't mean that.
5    A.  -- then -- or information that would
6  elicit a stock price reaction to which one could
7  attribute damages or inflation, one would want to
8  know whether this is new information.  Otherwise,
9  it would not be fraud-related information in that
10 sense.
11   One would want -- so one would want to make
12 the comparison to the informational environment
13 before this publication to know whether it's new
14 information that could conceivably move the
15 market.
16   And one would also want to know whether, on
17 this date, there is a statistically significant
18 price reaction so that -- so one could ascertain
19 whether there is any price movement to be
20 explained.  So, again, I think this -- this
21 language of "fraud-related," and if we define it
22 as corrective disclosure, one would need to
23 engage in that analysis.
24   And I would finally note, and then I'm done,
25 is this is not a date that Professor Fischel has

**Page 173..176**

Case: 1:02-cv-05893 Document #: 2130-2 Filed: 03/30/16 Page 23 of 47 PageID #:82046

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 177

1  identified anywhere as resulting in a stock price
2  movement that reflects dissipation of inflation.
3       MR. BROOKS:  I'll move to strike that
4  answer as nonresponsive.
5  BY MR. BROOKS:
6       Q.  By "fraud-related" I mean, does it
7  disclose information related to the fraud?  Do
8  you understand that?
9       A.  And how --
10      Q.  Do you understand that definition?
11      MR. FITZGERALD:  Objection to form.
12      A.  Well, I would want to know your
13  definition of "fraud."  I know that -- and I
14  asked because Professor Fischel defined "fraud"
15  as somehow untethered or more than what was
16  identified in the jury verdict form.
17  BY MR. BROOKS:
18      Q.  Based on your understanding of the
19  fraud in this case, your understanding of it, you
20  do have an understanding of it.  Right?
21      A.  I -- I'm not opining on fraud.
22      Q.  I'm asking if you have an understanding
23  of it.
24      A.  I have an understanding of the
25  misstatement -- I reviewed the misstatements and

Page 178

1  omissions found in the jury verdict form.
2       Q.  Based on your understanding of the
3  fraud in this case, do you consider this
4  information to be fraud-related?
5       MR. FITZGERALD:  Objection to form.
6       A.  I find no basis to say this is
7  fraud-related in the relevant sense, which is new
8  information to the market that would result in a
9  stock price reaction that is statistically
10  significant and could be ascribed to this
11  document.  And that's the only relevant sense
12  when we're talking about Professor Fischel's
13  so-called leakage model.
14  BY MR. BROOKS:
15      Q.  It's a very simple question, and you
16  keep adding additional definitions to it that you
17  shouldn't.  Okay?  So listen pretty carefully to
18  me.
19      MR. FITZGERALD:  Objection.
20  BY MR. BROOKS:
21      Q.  Is the information that was disclosed
22  in this article related to the fraud in this
23  case, in your opinion?
24      MR. FITZGERALD:  Objection to form.
25  And asked and answered.

Page 179

1       A.  So my definition, given that you're
2  asking my opinion, of "fraud-related information"
3  that's relevant to assessing Professor Fischel's
4  leakage model, and so that's a definition I'm
5  using, is new information that would result in a
6  stock price reaction that is statistically
7  significant.  And I would note Professor Fischel,
8  himself, has not identified this as a date either
9  consistent with leakage or in a specific
10  disclosure model.
11      And I should add:  And, therefore, he's not
12  reasonably confident -- given that it's not a
13  specific disclosure date, he's not reasonably
14  confident that this has elicited a stock price
15  reaction on that day.
16  BY MR. BROOKS:
17      Q.  So your opinion is that this article
18  that discusses a California subsidiary tricking
19  and trapping customers into high-cost mortgages
20  in amounts so large in relation to the value of
21  their homes that the borrower could not refinance
22  with a competitor --
23      A.  Are you reading from the document?  I'm
24  sorry.  Go ahead.
25      Q.  -- is not fraud-related.  Correct?

Page 180

1       MR. FITZGERALD:  Object to form.  Asked
2  and answered.
3       A.  So, yeah, I read -- you didn't cite the
4  entire document.  So I would --
5  BY MR. BROOKS:
6       Q.  I'm reading from Professor Fischel's
7  report, which you claim every answer is
8  responsive to, sir.
9       A.  Right.  So my opinion is that this
10  document, there's no basis to associate this
11  document with a stock price reaction.  And, in
12  fact, that's consistent with Professor Fischel in
13  the sense that he, himself, is not reasonably
14  confident that on this date -- and I'll just
15  double-check his specific disclosure dates, that
16  on this date this represented new information to
17  the market that elicited a stock price reaction.
18      Q.  I'm not asking if it's new information,
19  and I'm not asking about the stock price
20  reaction.  Do you understand that?  I'm telling
21  you that.
22      MR. FITZGERALD:  Object to the form.
23  BY MR. BROOKS:
24      Q.  Do you understand what that means?
25      A.  I understand.

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 181

1     Q.  Okay.  So without respect to the
2  question of whether it's new information and
3  without respect to whether there was a stock
4  price reaction, does this article disclosing a
5  lawsuit, a class action lawsuit alleging that
6  Household's California subsidiaries tricked and
7  trapped customers, relate to the fraud, in your
8  opinion?
9        MR. FITZGERALD:  Objection to form.
10     A.  So you're paraphrasing the article.
11  The article has one, two, three, four, five, six,
12  seven, eight, nine, ten, 11, 12, 13, 14 -- 15
13  paragraphs.  And it's not fraud-related for my
14  purposes in the sense that it in no way supports
15  Professor Fischel's inflation band under either
16  theory.  And so that's what is relevant for my
17  purposes.  And there's no basis to say that this
18  is fraud-related in the sense of corrective
19  information that would support his inflation
20  band.
21     Q.  So you're simply refusing to tell me
22  whether you think that the information in this
23  article relates to the fraud?  Is that right,
24  sir?
25        MR. FITZGERALD:  Objection.

Page 182

1     Q.  Is that your answer?
2        MR. FITZGERALD:  Objection.
3     A.  I've already answered it.  I could
4  answer -- I'll give you the same answer, which is
5  for purposes of assessing Professor Fischel's
6  inflation band, whether it's under a so-called
7  leakage model or a specific disclosure model,
8  there's no basis to say that this -- there's no
9  basis to say that this document supports that
10  calculation.
11  BY MR. BROOKS:
12     Q.  Okay.  So in order for a disclosure,
13  for purposes of your report, to be fraud-related,
14  that disclosure has to be new information and
15  cause a statistically significant stock price
16  decline.  Is that correct?
17     A.  So to support the conclusion that --
18  that the residual on this day in a properly
19  specified model should be attributed to so-called
20  leakage on this day, you would have to have some
21  basis to say it's new information.  So that is
22  correct.
23     Q.  So --
24     A.  So in an efficient market, the only
25  thing that will move a stock price is new

Page 183

1  information.  So if we're talking about an
2  inflation calculation, then one needs to point to
3  new information rather than endlessly repeating
4  the same statements.
5     Q.  So is any new information that comes
6  out during the leakage period that creates a
7  statistically significant stock price decline
8  fraud-related, under your definition?
9        MR. FITZGERALD:  Objection to form.
10     A.  So if there's additional specific
11  disclosure dates that Professor Fischel believes
12  represents new information to the market, and
13  that the stock price reaction to that cannot be
14  explained by industry market factors, you know,
15  he was free -- you know, he doesn't do that on
16  this date.  So --
17     Q.  I'm asking about your definition --
18     A.  Yeah.
19     Q.  -- which is a very strange definition
20  of "fraud-related."  I'm trying to get to the
21  bottom of it.  Okay?
22        MR. FITZGERALD:  Objection.
23  BY MR. BROOKS:
24     Q.  Keep that in mind.  Is any disclosure
25  that's new information and that creates a

Page 184

1  statistically significant stock price decline
2  during the leakage period, in your opinion,
3  fraud-related, or is something else required?
4        MR. FITZGERALD:  Objection to form.
5     A.  So the proper methodology is to have a
6  specific disclosure methodology using the
7  standard model.  Professor Fischel's identified
8  14 days, and only 14 days, in which he's
9  reasonably confident the price reaction is
10  attributed to information on that day.
11     So, by definition, February 18th, which is
12  not among those 14, cannot be -- the price reaction,
13  if any, on this date cannot be reasonably
14  attributed to this document.
15     Q.  So you've completely ignored my
16  question once again.  My question is --
17        MR. FITZGERALD:  Objection to the
18  comment.
19     Q.  With respect to your definition of
20  fraud-related, as used in your report, okay, do
21  you have that in mind?  Do you have that in mind?
22     A.  I don't.  You have to -- if you ask me
23  about a specific page or paragraph in my report,
24  I'll be happy to take a look.
25     Q.  So you -- as you sit here today, you

**Frank Ferrell, III**

1 can't answer a question about what you mean by
2 "fraud-related" in your report. Is that what
3 you're saying?
4       MR. FITZGERALD: Objection to form.
5    Q. I have to point you to something?
6    A. I thought in your question you were --
7 you were -- you were asking a question about a
8 specific part of my report, because you
9 referenced it. But I gave you my definition, in
10 terms of assessing Professor Fischel's damage
11 calculation, which again is ascribing every
12 residual, every movement in the stock price
13 that's not describable by the market and industry
14 in its misspecified model to new information
15 or -- I'm sorry, to -- to -- to inflation.
16    Q. You have opinions in your report --
17 withdrawn.
18       In your analysis for this case, did you make
19 judgments about whether information was
20 fraud-related or not fraud-related?
21    A. So I certainly made judgments as to
22 whether with his so-called leakage model is -- is
23 supported by the economic evidence.
24    Q. In the process of doing that, did you
25 make any judgments about whether evidence --

1 withdrawn.
2       In the process of doing that, did you make
3 any judgments about whether disclosures were
4 fraud-related or not fraud-related?
5    A. Again, you keep on using this phrase
6 "fraud-related." Again, I think that's -- one
7 has to define that.
8       So for purposes of Professor Fischel's
9 model, to ascribe inflation to -- on every day,
10 to the -- to -- to the damages calculation, you
11 have to have new information revealed on that day
12 that is causing that price reaction.
13    Q. And that information also has to be
14 related to the fraud. It can't just be any
15 random information. Right?
16    A. I agree it can't be random information.
17    Q. Okay. It has to be related to the
18 fraud. Right?
19    A. Again, I want to be careful about the
20 "it" here. So Professor Fischel's model,
21 so-called leakage model, among other flaws,
22 simply assumes that all the price reactions that
23 he can't describe in his misspecified model is
24 due to so-called leakage. And I do have the
25 opinion that that's unsupported by the facts and

1 circumstances of this case.
2    Q. Do you have an opinion one way or
3 another whether information relating to the fraud
4 leaked out during the leakage period?
5       MR. FITZGERALD: Form objection.
6    A. I don't agree with the terminology. So
7 I don't want to answer and implicitly agree with
8 the term leakage model -- "leakage period."
9       So during the disclosure period, I do have
10 the opinion that economic evidence is
11 inconsistent with his extreme and unsupported
12 so-called leakage model.
13 BY MR. BROOKS:
14    Q. Do you have an opinion one way or
15 another whether information relating to the fraud
16 was disclosed to the market during what you're
17 calling the disclosure period?
18    A. Well, so I do analyze the 14 specific
19 disclosure days and address whether those days
20 represent days where new information is reaching
21 the market that is eliciting a stock price
22 reaction that can reasonably be attributed to a
23 disclosure on that day.
24       And, again, I would just go back to the
25 point that Professor Fischel himself is not

1 reasonably confident that this date and any
2 residual on this date is attributable to this
3 information.
4    Q. So in his supplemental report, Fischel
5 identified 11 dates on which there was a
6 statistically significant residual stock price
7 decline and information consistent with leakage
8 was released to the stock market. Right?
9    A. That's my general memory --
10    Q. Okay.
11    A. -- of what he's saying in that report.
12    Q. And for any of those days, do you
13 disagree that the information he says was related
14 to the fraud was, in fact, not related --
15 withdrawn. Let me just reask the questions.
16       For any of those days, do you contend that
17 the information that he says was related to the
18 fraud was, in fact, not related to the fraud?
19    A. Yes. I do disagree. So in terms of --
20    Q. Which days?
21    A. Well, eight out of the 11 are not
22 statistically significant, so there's no new
23 information that's fraud-related that is moving
24 the market on that day in the way that I've
25 defined it.

**Page 185..188**

Case: 1:02-cv-05893 Document #: 2130-2 Filed: 03/30/16 Page 26 of 47 PageID #:82049

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 189

1    There are three days in a properly specified
2  model that is statistically significant, and then
3  I spend some time discussing those three
4  particular days.
5    Q.  On days where you found confounding
6  information, how would you characterize the
7  information that was not confounding?
8    A.  Which days do you have in mind?
9    Q.  Any of the days.  How you would you
10  refer to those days, that information?
11    A.  Well, I have four days under the
12  specific disclosure model, the standard model to
13  estimate damages that are confounded.  So I would
14  refer to that information as non-fraud
15  information.
16    Q.  And how would you refer to the other
17  information?
18    A.  The other information for those four
19  days, I'm assuming to be corrective information.
20    Q.  Corrective?
21    A.  Yes.
22    Q.  Why is -- why are they corrective?
23  What criteria do they fall under?
24    A.  So in my report, I'm not offering the
25  opinion that on those four days, the four days

Page 190

1  that are confounded in the specific disclosure
2  model are corrective.  I'm assuming that they --
3  I'm assuming they're corrective information, and
4  asking the question whether there's also
5  non-fraud-related information on those days.
6    Q.  Well, how do you define
7  non-fraud-related information?
8    A.  I define it in my report.
9    Q.  How?
10    A.  So if you turn to Page 44 of my
11  rebuttal report, I have a discussion of non-fraud
12  information on September 23, 2002, one of the
13  four -- I believe it's one of the four confounded
14  days in my specific disclosure model.  Let me
15  just double-check if that's accurate.  Correct.
16    Q.  I'm sorry.  What paragraph are you
17  referring to?
18    A.  Sure.  I'm sorry.  I should have given
19  you the paragraph number.  It's Paragraph 96.
20      MR. FITZGERALD:  It's Page 44.  I did
21  the same thing.
22    A.  I would also reference Exhibit 2I,
23  which accompanies my discussion of
24  September 23rd, one of the exhibits to the
25  rebuttal report.

Page 191

1    Q.  So where does this give a definition of
2  non-fraud-related information?
3    A.  Well, I -- maybe I misspoke.  I
4  didn't -- what I -- what I meant to say or hope I
5  said is I identified non-fraud information on
6  this date.
7    So on this date, I identify information that
8  is affecting a subgroup of my CSFB index, thereby
9  demonstrating that there is non-fraud information
10  on this date.
11    Q.  So when you -- I asked you previously
12  how you define non-fraud-related information.
13  And you said, I define it in my report, and you
14  pointed to Page 44.  That was incorrect.  Right?
15  You don't define non-fraud-related information
16  there, do you?
17    A.  I disagree with your characterization.
18  By identifying the non-fraud information, that's
19  reflecting my -- you know, reflecting the concept
20  of non-fraud information.
21    Q.  What was your criteria for non-fraud
22  information in selecting it?
23    A.  Right.  So that's going to depend on --
24    Q.  Go ahead.
25    A.  So that's going to depend on the date

Page 192

1  that we're talking, because the informational
2  environment is changing.  And information that's
3  coming out is changing on different days.
4    Q.  So from date to date, you did not apply
5  a consistent definition of "non-fraud
6  information"?
7    A.  That's --
8      MR. FITZGERALD:  Objection to form.
9    A.  That's mischaracterizing my testimony.
10  BY MR. BROOKS:
11    Q.  Well, you say it depends on the date.
12  I asked you what your definition was, and you
13  said it depended on the date.
14    So from date to date, you apply a different
15  definition.  Right, sir?
16      MR. FITZGERALD:  Objection to form.
17    A.  That's a false statement about my --
18  that's absolutely false.  What -- what my report
19  does is that on different dates, the non-fraud
20  information is different.  And so, for example,
21  on September 23rd, I identify information that's
22  affecting Household, but also a subgroup of the
23  CSFB index.
24    So what the non-fraud information is on a
25  particular date, you know, might be different

Page 193

1    than the non-fraud information on another date.
2        Q.   But what criteria do you use to select
3    what's non-fraud information?
4        A.   So on this date, it would include
5    information that has a disproportionate effect on
6    a subgroup of the industry index at issue.
7        Q.   So any --
8        A.   So on Exhibit 2I, I go out of my way to
9    identify subprime companies that are being
10   affected on this particular date.
11       Q.   So --
12       A.   So that would be --
13       MR. FARINA:  Could you not interrupt
14   him?  You interrupt him constantly.
15       MR. BROOKS:  Well, he never answers my
16   question.
17       MR. FARINA:  Please.  Please.
18       MR. DOWD:  Well, let's not have more
19   than one guy talk.  I'll start talking too.
20       MR. FITZGERALD:  All right.  Why don't
21   we take it back --
22       MR. BROOKS:  Let's just do that, then.
23       MR. FITZGERALD:  Everyone calm down.
24   Just if we could let him finish the answer.  You
25   follow up.

Page 194

1        A.   Okay.  So non-fraud information
2    includes information that is affecting
3    disproportionally a subgroup of the industry
4    index.  And I do that in Exhibit 2I.
5    BY MR. BROOKS:
6        Q.   So any information that's disclosed
7    that disproportionally impacts your subgroup of
8    the industry, under your definition, is
9    non-fraud-related.  Is that correct?
10       A.   That's too strong.  So the evidence --
11   that would be evidence that there's information
12   that's coming out that's affecting not just
13   Household, but the sector that -- you know, some
14   subsector.
15       So, for example, on September 23rd, I
16   identify subprime companies being affected on
17   that date.  So that would be non-fraud
18   information.  It's not specific to Household.
19   It's not general to the industry index, but it's
20   affecting this subgroup.
21       Q.   Turning back to Professor Fischel's
22   Exhibit 5.
23       A.   Exhibit?
24       Q.   I'm sorry.  His report, which is
25   Exhibit 5.

Page 195

1        A.   Okay.
2        Q.   In Paragraph 16, he discusses
3    information leaking out about the contents of a
4    report by Washington's Department of Financial
5    Institutions.  Take a look at that paragraph and
6    let me know when you've read it.
7        MR. FITZGERALD:  If you need this, let
8    me know.  I moved it.
9        A.   Okay.  I finished reading the
10   paragraph.
11       Q.   Okay.  The paragraph identifies
12   articles generally discussing that the DFI report
13   has leaked out.  Correct?
14       A.   I -- I can't characterize these
15   documents without reading them.  So I would want
16   to read Exhibits 11, 12, and 13 if you want me to
17   make a general characterization rather than the
18   snippets that are quoted here by
19   Professor Fischel.
20       Q.   Do you understand what this paragraph
21   is discussing?  Can you comprehend it?
22       MR. FITZGERALD:  Objection.
23       A.   I can.  Yes.  I can read the paragraph.
24       Q.   Okay.  Generally, the paragraph
25   discusses that the Washington DFI report leaked

Page 196

1    out.  Right?
2        MR. FITZGERALD:  Objection to form.
3        Q.   The paragraph discusses that, doesn't
4    it?
5        A.   I see that -- I can read the words
6    where Professor Fischel says "Moreover,
7    information leaked out about the contents of a
8    report."  I won't read the whole sentence.
9        But if you're asking me to
10   characterize these documents and whether that's
11   consistent with his characterization, I would
12   need to reread those documents.
13       Q.   Okay.  I'm just asking you about his
14   characterization.  He says that the Washington
15   DFI report leaked out, as reported in these
16   various articles.  Doesn't he?
17       A.   He says what he says.  "Moreover,
18   information" -- quoting Professor Fischel,
19   "Moreover, information leaked out about the
20   contents of a report by Washington State's
21   Department of Financial Institutions."
22       So he does say that.  I agree that that's
23   what the words say.
24       Q.   And you don't have a factual dispute
25   that the -- that information leaked out about the

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 197

1   contents of the Washington DFI report in this
2   time frame.  Do you?
3        MR. FITZGERALD:  Objection to form.
4        A.  I do have a factual dispute as to
5   whether he has established the necessary factual
6   predicate for saying there was leakage in the
7   sense that he's using it, which is there's
8   information that's being revealed that's new to
9   the market that's causing the stock price to
10  change.
11       Q.  Do you have a factual dispute that
12  information was disclosed about the Washington
13  DFI to the -- to the market -- withdrawn.
14       Do you have a factual dispute that
15  information was disclosed about the Washington
16  DFI report to the market during this time frame?
17       MR. FITZGERALD:  Objection to form.
18       A.  During this time frame, that's a very
19  general statement.  I mean, I could -- if you
20  have a specific document or disclosure that you
21  want me to look at, I'll be happy to.
22       Q.  Well, the time frame is April 18, 2002
23  through August 27, 2002.  That's the time frame
24  in the paragraph.  You can see that.  Right?
25       A.  I do see that.

Page 198

1        Q.  Okay.  So do you have a factual dispute
2   that information was disclosed about the
3   Washington DFI report to the market during the
4   April 18, 2002 through August 27, 2002 time
5   frame?
6        MR. FITZGERALD:  Objection to form.
7        A.  Yeah.  That's a very broad time frame.
8   So I -- the documents say what they say.  I do
9   have a factual dispute that there's been leakage
10  in the way that he's using it that's causing the
11  stock price to change in a way that justifies his
12  model.
13       Q.  And under your definition of
14  "fraud-related," is the information that's
15  discussed in Paragraph 16 fraud-related?
16       A.  Okay.  So I have -- so one of the
17  documents is August 27th, 2002, the Bellingham
18  Herald.  And I do have a discussion of that in my
19  report.
20       That's one of the specific disclosure days
21  that he has.  But it's not statistically
22  significant.  So I do have a discussion of
23  that -- of that date, in particular.
24       Q.  I didn't ask if you have a discussion
25  of the date.  I asked under your definition

Page 199

1   "fraud-related," is any of the information
2   discussed in Paragraph 16 fraud-related?
3        A.  It's not fraud-related in the sense
4   that it's a corrective disclosure or there's an
5   economic basis, rather than just assertion
6   that -- that this -- these documents are causing
7   a price reaction.  He's just assuming leakage to
8   find leakage.
9        Q.  Is it fraud-related in any other sense?
10       MR. FITZGERALD:  Objection to form.
11       A.  That's the relevant sense for assessing
12  his inflation band.  There would have to be new
13  information where there's a basis for saying that
14  the stock price reaction is not explained by the
15  industry and market, and that traders or the
16  market is reacting to that new information.
17       Q.  My question was:  Is it fraud-related
18  in any other sense?
19       MR. FITZGERALD:  Same objection.
20       A.  So I gave you the sense in which I'm
21  using it for purposes of assessing Professor
22  Fischel's inflation bands.
23       Q.  And I'm asking you in any other sense,
24  is this information, in your opinion,
25  fraud-related?

Page 200

1        MR. FITZGERALD:  I'm objecting to form.
2        A.  I -- for purposes of my report, gave
3   you the complete answer.
4        Q.  So for purposes of your report, this
5   information in Paragraph 16 is, in no sense,
6   fraud-related.  Correct?
7        MR. FITZGERALD:  Objection to form.
8   Asked and answered.
9        A.  So, again, there's no basis to say that
10  this information is corrective information or
11  that this is information that is moving the
12  market.
13       So putting aside, you know -- so, for
14  example, August 18th is not a date that
15  Professor Fischel, himself, is willing to ascribe
16  or -- April 18th is not a date that
17  Professor Fischel himself is reasonably confident
18  caused a price reaction.
19       (Discussion off the record.)
20       Q.  Did you ever attempt to quantify the
21  impact of leakage in this case, if any?
22       A.  I did carefully review the economic
23  evidence and the appropriateness of using a
24  leakage model or the appropriateness of Professor
25  Fischel's leakage model.  I did find leakage on

**Frank Ferrell, III**

Page 201

1  October 10th.  And that met the criteria -- the
2  objective scientific criteria for associating a
3  price change with leakage.
4      Q.  So October 10th -- the price change on
5  October 10th is your quantification of the impact
6  of leakage in this case?
7      MR. FITZGERALD:  Objection to form.
8      A.  Well, what I'm saying is October 10th
9  is an example of a date on which there is
10 leakage.  There's a statistically significant
11 price reaction.  There's strong evidence that the
12 market is reacting to information about the
13 settlement.  But those conditions were not met
14 over the -- you know, for Professor Fischel's
15 so-called leakage period.  It's just an assertion
16 that all these stock price changes over such a
17 long period of time are just the result of the
18 market learning new information.  There's no
19 basis for it.
20     Q.  What you're calling the leakage on
21 October 10th caused the stock price to increase.
22 Right?
23     A.  I believe so.
24     Q.  And there was a statistically
25 significant positive residual return on that

Page 202

1  date?
2      A.  Correct.
3      Q.  So the only evidence that you found of
4  leakage related to the fraud was information that
5  caused the stock price to increase.  Right?
6      A.  That's the only date -- I do find a
7  number of days where there's a statistically
8  negative residual for days identified as -- as
9  corrective disclosures or specific disclosures.
10 But you're correct that besides that date, the
11 factual predicates for associating stock returns
12 changes with leakage is -- is lacking.  It's just
13 an assertion.
14     Q.  In your -- one of your prior answers --
15 and I'm not quoting you directly, I'm just
16 referring you to the answer.  You said that you
17 reviewed the economic evidence carefully and the
18 appropriateness of using a leakage model, and
19 October 10th was the only date that met the
20 criteria, the objective scientific criteria for
21 associating a price change with leakage.
22     Do you remember that testimony?
23     A.  Yes.
24     Q.  Okay.  What was the objective
25 scientific criteria for associating a price

Page 203

1  change with leakage that you used?
2      A.  On October 10th?
3      Q.  No.  As a general matter, what is the
4  objective scientific criteria for associating
5  price change with leakage, in your opinion?
6      A.  So the criteria I used to identify
7  October 10th is that the stock price change on
8  that day is not explainable by market and
9  industry.  It's not explainable by non-fraud
10 information.  And that there's a -- there's
11 evidence -- actual evidence that the market is
12 reacting to new information on that day that's
13 not -- that isn't non-fraud.
14     Q.  So is that the objective criteria that
15 you require to find leakage?
16     A.  That's certainly the -- yes.  I would
17 say, just to be clear, the criteria would be
18 there would have to be a basis for saying the
19 stock price changes caused by new information
20 that the market is getting that's causing the
21 stock price changes, that's not explainable by
22 non-fraud information, including, but not limited
23 to industry and market.
24     Now, in this case, it's very easy, because
25 at the end of the day, the so-called leakage

Page 204

1  model is just based on the assertion that the
2  movement in the stock prices are being caused by
3  new information reaching the market.  But there's
4  no economic basis for that.
5      Q.  So part of the criteria is that there
6  has to be a basis for saying the stock price
7  changes are caused by new information.  For
8  October 10th, you used a statistically
9  significant residual return.  Right?  That was
10 the basis?
11     A.  Well, I mentioned a couple of things
12 for October 10th.
13     Q.  I want to focus on the part of the
14 criteria that requires a basis for saying stock
15 price changes are caused by new information that
16 the market is getting that's causing stock price
17 changes.  Okay?
18     A.  Understood.
19     Q.  How do you determine that the stock
20 price changes are caused by new information that
21 the market is getting that's causing the stock
22 price changes?
23     MR. FITZGERALD:  Objection only to
24 form.
25     A.  So, again, it has to be new

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 205

1  information, because we're talking about an
2  efficient market. So, by definition, it would
3  have to be new information. If it isn't new,
4  it's not news.
5      And so how would you attribute a stock price
6  movement not explained by the market and
7  industry, not otherwise explained by non-fraud
8  information to -- you know, to the market
9  learning something new? You would have to have a
10  factual basis for that.
11      So for October 10th, my memory is that there
12  are documents that talk about rumors in the
13  marketplace on that day and the market reacting
14  to those rumors.
15      I'm characterizing the evidence on
16  October 10th in a general way. And so there
17  might be some imprecision there. But that
18  fairly -- you know, that's my memory of the
19  evidence on that day.
20      Q. Under your criteria for leakage, is a
21  statistically significant stock price movement
22  required?
23      A. It's certainly important evidence. But
24  I would also want to -- I would want to consider
25  all the evidence together. So if it's not

Page 206

1  statistically significant, I think it becomes
2  extraordinarily difficult to say it's not
3  explained by the industry and market.
4      So we discussed earlier today that
5  hypothetically, there could be information that
6  would not be picked up in the statistical test.
7  But you would have to have a rigorous basis for
8  saying that stock price movement, if it's not
9  statistically significant, is caused by something
10  other than the market and industry.
11      Q. Can you give me an example of such a
12  rigorous basis?
13      A. Sure. So there's academic articles
14  that look at leakage in the sense of new
15  information changing market prices in the M&A
16  context.
17      So a question that you could ask is, there's
18  a merger announcement, an announcement of a
19  merger on a particular day, and you could look at
20  the stock run-up in the day or a couple of days
21  leading up to that announcement, and you could
22  ask the question that even if an individual day
23  is not statistically significant, maybe two or
24  three days is statistically significant. And
25  it's a run-up to this announcement.

Page 207

1      And so that would be a situation where there
2  might be leakage, given that there's a specific
3  announcement. There's a run-up. You have
4  cumulative statistical significance for a handful
5  of days, and hopefully other evidence that this
6  is what's going on in the marketplace.
7      Q. Take a look at your rebuttal report,
8  Paragraph 18.
9      (Witness complies.)
10      Q. You state in the first sentence that
11  none of the papers Professor Fischel cites that
12  discusses a single firm -- let me start over.
13      You say in Paragraph 18, "Indeed, none of
14  the papers Professor Fischel cites that discusses
15  single firm event studies uses an event
16  window of the length of Professor Fischel's
17  228-trading-day leakage period window." Do you
18  see that?
19      A. I do.
20      Q. And you've read the Cornell and Morgan
21  paper that Professor Fischel's model is based
22  upon. Haven't you?
23      A. Well, I disagree with the assumption in
24  your question. His -- Professor Fischel's
25  so-called leakage model is not a faithful

Page 208

1  application of Cornell and Morgan. But I have
2  read the article.
3      (Cornell and Morgan article in
4  the "UCLA Law Review," June 1990 marked
5  Exhibit 7.)
6      MR. FITZGERALD: I think I have a copy,
7  if you need one for someone else.
8      MR. BROOKS: He seems desperate to read
9  this, Mike.
10      THE WITNESS: Are you talking about me?
11      MR. FITZGERALD: No. Mr. Dowd.
12  BY MR. BROOKS:
13      Q. Okay. This is Cornell and Morgan's
14  article "Using Finance Theory to Measure Damages
15  and Fraud on the Market Cases." Correct?
16      A. Yes. That's right.
17      Q. Okay. And you're familiar with this
18  article. Right?
19      A. I am.
20      Q. And Fischel cited this article, didn't
21  he?
22      A. Yes.
23      Q. Okay. So go ahead and turn to Page 906
24  of the article.
25      (Witness complies.)

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 209

1    A.  Yes.
2    Q.  And just take a look to familiarize
3  yourself with this page.
4    A.  You want me to read -- look at the
5  entire page?
6    Q.  Just the middle paragraph.
7    A.  Okay.
8        (Witness complies.)
9    A.  I've read the middle paragraph.
10    Q.  Okay.  So they're discussing the
11  appropriate window to use in conducting a leakage
12  analysis.  Right?
13        MR. FITZGERALD:  Objection to form.
14    A.  Well, it is talking about the window.
15  Yes.
16    Q.  And the window should begin far enough
17  in advance of the disclosure for the analysts to
18  be reasonably confident that no significant
19  information leakage has occurred, and notes that
20  the window can cover the entire class period.
21  Right?
22        MR. FITZGERALD:  Objection to form.
23    A.  It doesn't say that.  It says it's a
24  limiting case in which the observation window is
25  expanded to cover the entire class period.

Page 210

1    Q.  How is that different, in your opinion,
2  from what I said?
3    A.  So I don't interpret this article to
4  say that you can, in the facts and circumstances
5  of this case, use a 228-day window, or that
6  it's -- I'll leave it at that.
7    Q.  But how is -- you said it was
8  incorrect, my statement that the article notes
9  that the window can cover the entire class
10  period.  Why is that incorrect?
11    A.  Oh, I was --
12        MR. FITZGERALD:  Objection to form.
13    A.  I was just putting in the qualifier of
14  it's a limiting case.  So all I was trying to say
15  is the actual language in this paragraph is
16  talking about a limiting case.  And that's all --
17  that's all I meant.
18    Q.  And how is that different from the
19  article noting that the window can cover the
20  entire class period?
21    A.  Well, it's just that this is an
22  extreme -- you know, this is a limit of this
23  extension.  That's all I was trying to say.
24    Q.  The outer bounds are a window covering
25  the entire class period.  Right?

Page 211

1    A.  Well, it's talking in this paragraph
2  about a generic class period.
3    Q.  The entire generic class period,
4  though?
5    A.  Well, it's talking in the abstract
6  about a class period in talking about this
7  concept of -- of -- this section is -- you know,
8  the comparable index in the event study
9  approaches is the section.
10    Q.  And at the bottom of Page 906, Cornell
11  and Morgan wrote, "Conversely, in a case such as
12  WPPSS in which there is a continuous leakage of
13  information, it may be necessary to use the
14  comparable index approach."  Right?
15    A.  I agree that those are the words.
16    Q.  Okay.  That's the example that they
17  gave after saying the limiting case is to use the
18  entire class period.  Correct?
19        MR. FITZGERALD:  Objection to form.
20    A.  It does come after that language.
21    Q.  Okay.  And you understand that the
22  class period in the WPPSS case was over three
23  years.  Don't you?
24    A.  Yes.  So it's March 2001 -- oh, I'm
25  sorry.  I thought -- I got confused.  I thought

Page 212

1  you were talking about the Household litigation.
2  Can you restate -- can you reread the question.
3    Q.  You understand that the class period in
4  WPPSS was more than four years long.  Isn't that
5  right?
6        MR. FITZGERALD:  Objection to form.
7    A.  I remember it's more than a year.  But
8  it could be four years.  I just don't have a
9  clear recollection in this --
10    Q.  Okay.  Turn to Page 892.
11    A.  892?
12    Q.  Mm-hmm.
13    A.  Okay.
14        (Witness complies.)
15    A.  Yes.  I'm there.
16    Q.  Okay.  Look at the middle paragraph.
17        (Witness complies.)
18    A.  Yes.
19    Q.  Do you see the last sentence says
20  "Between March 1, 1977 and March 17, 1981,
21  WPPSS," and then it continues.  Do you see that?
22    A.  Yes.
23    Q.  So you see that it's more than four
24  years, the class period?
25    A.  So you're referring to March 1, 1977 to

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 213

1 March 17, 1981. Yeah. So assuming that's the
2 class.
3         MR. FITZGERALD: Objection to form. Go
4 ahead.
5     A.   So assuming that's the class period,
6 then I agree it's -- it's about four years.
7         MR. FITZGERALD: I don't want to
8 interrupt you, but when you get to a natural
9 break point...
10        MR. BROOKS: Okay.
11    Q.   And you agree that this article cites
12 the WPPSS case as a case where it may be
13 necessary to use the comparable index approach.
14 Right?
15    A.   It does say that. But you're
16 leaving -- it's misleading to leave it at that,
17 because in Footnote 16 on Page 888, Cornell and
18 Morgan quite rightly, in my view, have a
19 qualifier where they say -- and I'll read from
20 the article, "Our primary concern is with
21 conceptual and legal issues rather than with
22 financial and statistical ones."
23     So I don't read this article to be
24 advocating that this -- to be addressing the
25 statistical issues inherent in using an event

Page 214

1 window so long.
2     And I would also note Footnote 41 and 42 and
3 47, where, you know, they're saying -- and I'm
4 going to paraphrase -- that this index approach
5 assumes that the parties agree on the proper
6 model --
7         (Phone interruption.)
8     A.   -- that this index approach is
9 appropriate where the experts agree on the model,
10 which is clearly not the case here. Anyway...
11    Q.   Any other caveats?
12    A.   Yeah. So Footnote 47, they also note
13 that -- and I'll just read from Footnote 47 --
14 "Over longer periods of time, though
15 misspecification errors accumulate and become
16 more important, thus proper specification of the
17 model is more important than when using the comparable
18 index approach than when using the event study
19 approach."
20     So they caveat -- they have lots of -- they
21 have a very important qualifications [sic] on
22 their discussion.
23    Q.   You agree that Fischel did not use the
24 entire class period for his observation window.
25 Right?

Page 215

1     A.   I agree.
2     Q.   So his observation window is inside of
3 the limiting case that's discussed on Page 906.
4 Right?
5         MR. FITZGERALD: Objection to form.
6     A.   If you're asking me is four years
7 longer than 228 days, I agree with that. I don't
8 agree that this is an appropriate -- citing to
9 this article is an appropriate basis for that,
10 given what I just said about the qualification --
11 you know, the -- that language that I just
12 pointed to.
13        MR. BROOKS: Okay.
14        THE VIDEOGRAPHER: Okay. The time is
15 2:18. We're off the record.
16        (A recess was taken.)
17        (Article entitled "The Loss
18 Causation Requirement for Rule 10b-5 Causes
19 of Action: The Implications of Dura
20 Pharmaceuticals, Inc. v. Broudo marked
21 Exhibit 8.)
22        THE VIDEOGRAPHER: Okay. We're back on
23 the record. The time is 2:35.
24 BY MR. BROOKS:
25    Q.   You have Exhibit 8 in front of you.

Page 216

1     A.   I do.
2     Q.   And what is Exhibit 8?
3     A.   An article that I cowrote in "The
4 Business Lawyer."
5     Q.   This is the article that you referred
6 to earlier that the Seventh Circuit cited to. Is
7 that right?
8     A.   Yes.
9     Q.   And it's titled "The Loss Causation
10 Requirement for Rule 10b-5 Causes of Action: The
11 Implications of Dura Pharmaceuticals, Inc. vs.
12 Broudo." Right?
13    A.   Yes.
14    Q.   Turn to Page 167.
15        (Witness complies.)
16    Q.   There's a section there -- well, before
17 we go there, sorry, what was the purpose of the
18 article, generally?
19    A.   You know, it was really to talk about
20 Dura Pharmaceuticals in the context of loss
21 causation. So I think this article was 2007, if
22 I remember, and I think Dura came out in '05.
23    Q.   Do you still stand by the article?
24    A.   Yes.
25    Q.   Is there anything you'd change in the

**Page 213..216**

Case: 1:02-cv-05893 Document #: 2130-2 Filed: 03/30/16 Page 33 of 47 PageID #:82056

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 221

1    (Excerpt from Household
2  International, Inc. Form 10-K for year ending
3  December 31, 2001 marked Exhibit 9.)
4      MR. FITZGERALD:  This is number?
5      MR. BROOKS:  Number 9.
6      MR. FITZGERALD:  Thanks.
7  BY MR. BROOKS:
8      Q.  I've handed you Exhibit 9, which is an
9  excerpt from Household's Form 10-K for the fiscal
10  year ended December 31, 2001.  Do you see that?
11      A.  I do.
12      Q.  Okay.  Turn to the second page of the
13  exhibit, which says Page 9 of 20 at the top.
14      A.  I'm there.
15      Q.  Okay.  Do you see there's a heading
16  "Competition"?
17      A.  I do.
18      Q.  Read that to yourself, if you would.
19         (Witness complies.)
20      A.  I'm finished.
21      Q.  Okay.  So Household told the market
22  that the consumer finance services industry in
23  which it operates is highly fragmented and
24  intensely competitive.  Right?
25      A.  Yes.

Page 222

1      Q.  And continued, "We generally compete
2  with banks, thrifts, insurance companies, credit
3  unions, mortgage lenders and brokers, finance
4  companies, securities brokers and dealers, and
5  other domestic and foreign financial institution
6  in the United States, Canada and the United
7  Kingdom."  Right?
8      A.  That's what it says.
9      Q.  Okay.  So these types of companies that
10  Household is telling the market it competes with
11  are the same types of companies that are in the
12  S&P financials index.  Right?
13      A.  I believe that's accurate.
14      Q.  And you don't disagree with this
15  statement about who Household competes with.
16  Right?
17      A.  Well, at a general level, I don't
18  disagree with that.
19      Q.  I mean, they're telling the market this
20  is who we compete with.  Correct?
21      MR. FITZGERALD:  Objection to form.
22      A.  The document says we generally compete
23  with these institutions.  That's what the
24  document says.
25      Q.  And you're not saying that this

Page 223

1  document is false in any way?
2      A.  No.
3      Q.  Is it false by omission?
4      MR. FITZGERALD:  Objection to form.
5      A.  I'm not saying this document is false
6  in any sense.  That's -- no.
7      Q.  Do you think they should have offered a
8  more specific group to tell investors to they
9  were competing with?
10      MR. FITZGERALD:  Objection to scope and
11  form.
12      A.  Well, it's outside my scope.  I would
13  assume the answer to that would depend on SEC
14  regulations in terms of what needs to be
15  disclosed and discussed in the 10-K.
16      Q.  Well, in order to not mislead
17  investors, should they have identified subprime
18  consumer finance companies here?
19      MR. FITZGERALD:  Objection to scope
20  again.
21      A.  No.  I'm not -- I'm not provide
22  something an opinion, nor does my choice of
23  industry index lead to any conclusions about
24  whether a particular document or the 10-Ks is
25  misleading or not.  You know, I know, generally

Page 224

1  speaking, there's regulations about the 10-K so I
2  would assume one would look to those in
3  understanding the 10-K.  But I'm certainly not
4  providing the opinion that this is a
5  misrepresentation.
6      Q.  Is an appropriate source from which to
7  choose an index.  Right?  Or a comparables?
8      A.  You can certainly use -- one potential
9  choice is the firm's own financial filings.  And,
10  as I said, we both use S&P 500 financials.
11      Q.  And the goal, reading back from Exhibit
12  eight, is to find firms that are truly comparable
13  in terms of their line of business.  That's
14  right.  Isn't it?  Is?
15      A.  Correct.
16      Q.  Okay.  And these are the firms that
17  Household is saying are truly comparable in terms
18  of line of business.  Aren't they?
19      MR. FITZGERALD:  Objection to form.
20      A.  You're mischaracterizing the document.
21      Q.  Which one?
22      A.  The Exhibit 8.
23      Q.  In what way?
24      A.  So you changed the wording.  The
25  wording here is "we generally compete," I'm

Case: 1:02-cv-05893 Document #: 2130-2 Filed: 03/30/16 Page 34 of 47 PageID #:82057

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 225

1  reading from 10-K. "We generally compete with
2  banks, thrifts, insurance companies, credit
3  unions, mortgage lenders and brokers, finance
4  companies, securities brokers and dealers and
5  other domestic and foreign financial institutions
6  in the United States, Canada and the United
7  Kingdom." So that's what it says. And I
8  wouldn't change the wording of it.
9       MR. FITZGERALD: I think you referred
10  to Exhibit 8. I think you meant Exhibit 9.
11  Otherwise, I don't want to interrupt.
12     A. Oh, yeah. I thought you were directing
13  me to the 10-K.
14     Q. The 10-K, for the record, is Exhibit 9.
15  The article is Exhibit 8.
16     A. Okay.
17     Q. You were discussing the 10-K in your
18  last answer?
19     A. Correct. There might have been some
20  confusion. I thought you were -- my
21  understanding of the question was you were
22  characterizing the 10-K.
23       MR. FITZGERALD: I only interrupted,
24  you referred to the wrong exhibit number it. You
25  were reading from a document that was Exhibit 9.

Page 226

1     A. Okay.
2       MR. FITZGERALD: You said you were
3  reading from Exhibit 8. And Mr. Brooks and I
4  both understood that. We just wanted the record
5  to be clear.
6       THE WITNESS: Okay. Sorry.
7       MR. BROOKS: No.
8     Q. So you're saying that when Household
9  tells the market we generally compete with these
10  lines of business, they're not saying that
11  they're comparable to these lines of business.
12  Is that your testimony is this is?
13       MR. FITZGERALD: Objection.
14     Q. That's how I'm quote mischaracterizing
15  the document?
16       MR. FITZGERALD: Objection to form.
17     A. Well, it doesn't say lines of business.
18  It says different institutions they generally
19  compete with. So that's -- that's what the
20  document says.
21     Q. Well, looking at the list in
22  Household's 10-K, is there any one of these
23  examples that you think is not a comparable, in
24  terms of their line of business?
25     A. I think that it's fine, and, in fact, I

Page 227

1  do use S&P 500 financials, which as we discussed,
2  includes these institutions. But it's important
3  to include the consumer finance companies as
4  well. And it's a better specified model.
5     Q. And specifically, the consumer finance
6  companies that CSFB selected. Right?
7     A. Correct.
8     Q. What was your process for landing on
9  that particular group of consumer finance
10  companies?
11     A. Sure. So the process was, it was very
12  important to me to use a third-party
13  identification of comparables contemporaneous
14  with the time period. Not to use -- not to be
15  accused of constructing something for the
16  purposes of litigation, but to use a third-party
17  identifying of comparables during the relevant --
18  contemporaneous with the -- with the time period
19  at issue. So that was criteria one. Criterion
20  one. The second criterion is consistent with the
21  academic literature, and I'll explain that in a
22  minute, I went to the "Institutional Investor"
23  magazine, which ranks analysts. I identified the
24  star analyst, according to "Institutional
25  Investor" magazine, for 2001. I'm going to

Page 228

1  mispronounce the gentleman's name, but it's the
2  person who produced or whose name is on the CSFB
3  report. So was identified for 2001 as the star
4  analyst, and I went to his report, where he
5  identifies those firms. And the final thing I
6  would note, which was important to my thinking,
7  is that the academic literature regularly uses
8  this source, the "Institutional Investor"
9  magazine, to identify star analysts. And so I
10  felt that was an objective way to identify
11  comparables.
12     Q. Where in your report can I see that
13  academic literature?
14     A. I don't cite the academic literature.
15  It's just something I'm familiar with as general
16  background information.
17     Q. What literature are you referring to?
18     A. So I don't have article citations off
19  the top of my head but there's a number of
20  articles that cite, that use "Institutional
21  Investor" magazine or this publication to
22  identify the star analysts and do various types
23  of analyses.
24     So some papers look at, do the star analysts
25  do a good job predicting future, you know, the

Case: 1:02-cv-05893 Document #: 2130-2 Filed: 03/30/16 Page 35 of 47 PageID #:82058

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 229

1 future accounting returns or the future
2 performance of the firm at issue, in some sense.
3 So there's a number papers or -- that use that --
4 that ranking for analytical purposes.
5    Q.  So you relied on "Institutional
6 Investor" magazine.  Why didn't you include it in
7 the documents that you relied on?
8    A.  I believe it is there.  My memory is
9 it's there, in some form or another.  I'm sorry.
10 I'm in the wrong document.  That's -- my memory
11 is it was there, but I could be mistaken.
12    Q.  Well, let's turn to --
13    A.  So it would be in the rebuttal.  Oh,
14 no.  Maybe it would be in the -- I think we have
15 to look at both.
16    Q.  Why don't you take a look at Appendix B
17 to your original report.  I don't see anything
18 about "Institutional Investor" magazine.  Do you
19 agree that it's not there?
20    A.  Are you now --
21    Q.  My question was why don't you look at
22 Appendix B to your original report.  I don't see
23 anything about "Institutional Investor" magazine.
24 Do you agree it's not there in the original
25 report, Professor?

Page 230

1    A.  So I'm not finding it here.  My memory
2 was -- I thought it was contained somewhere here
3 in some form, but I'm not seeing it right here,
4 right now.
5    Q.  It's not in the rebuttal report,
6 either, is it?
7    A.  I'm not finding it right now.
8    Q.  Do you think that you cited the
9 academic articles that refer experts to
10 "Institutional Investor" magazine in your
11 reports?
12    A.  No.  I did not cite the academic
13 articles.  So my testimony on that was that it's
14 just my general background information.  So I
15 would want to spend more time to confirm that
16 it's not here.  So there's references to produced
17 files and so forth.  But it is correct that,
18 sitting here right now, I don't -- I don't
19 readily -- I don't see it.
20    Q.  So is it your testimony that the
21 academic literature refers to star analysts'
22 selection of peer indices for experts, in cases
23 like this one, to adopt a peer index?
24    A.  That is not my testimony.
25    Q.  Okay.  What does the academic

Page 231

1 literature that you can't tell us about
2 specifically -- withdrawn.
3    What does the academic literature that you
4 relied on but didn't disclose to us say that you
5 were relying on in going to "Institutional
6 Investor" magazine?
7    MR. FITZGERALD:  Objection to form.
8    A.  Yeah.  So I -- so I'm not saying I
9 relied upon it.  I'm saying it's part of my
10 background knowledge.  It's a publication that
11 ranks analysts.  And I did use that to identify
12 this particular analyst.
13    So -- but in terms of the academic
14 literature, there's articles -- I don't have them
15 memorized, off the top of my head -- that use
16 that ranking to identify star analysts for
17 various purposes.
18 BY MR. BROOKS:
19    Q.  None of those purposes are for
20 identifying a peer group.  Correct?
21    A.  That, I don't know.  I'm not -- I'm not
22 making that representation.
23    Q.  Why did you try to identify the
24 star analyst?
25    A.  Because presumably the star analyst is

Page 232

1 the best analyst, at least according to that
2 ranking.  There's a number of analysts.  And so
3 you would want some objective criteria --
4 criterion to identify one of those analysts.
5    Q.  Was this your idea or Cornerstone's
6 idea?
7    A.  It was my idea.
8    Q.  What exactly is the CSFB Specialty
9 Finance Index?
10    A.  Well, it's a group of nine firms
11 identified, I believe, in a March 2001
12 publication -- let me just make sure I'm not
13 getting the date wrong -- that -- you know, that
14 are listed in that document, in the CSFB report.
15    Q.  Is it a traded index?
16    A.  Not to my knowledge.
17       (Sur-Rebuttal Report of Daniel
18    R. Fischel marked Exhibit 10.)
19    MR. BROOKS:  I'm going to mark as
20 Exhibit 10 Fischel's surrebuttal report.
21    THE WITNESS:  Okay.
22 BY MR. BROOKS:
23    Q.  Exhibit 1 to this report --
24    A.  To the surreply.
25    Q.  To the surrebuttal report.  That's the

Page 233

1  Credit Suisse First Boston Specialty Finance
2  Monthly article from which you pulled your index.
3  Correct?
4      A.  Yes.
5      Q.  Okay.
6          (Discussion off the record.).
7          MR. BROOKS:  Do you want me to wait?
8          MR. FITZGERALD:  What are you looking
9  for?  Fischel's surrebuttal?  What day is that?
10         MR. BROOKS:  The last one.
11         MR. FITZGERALD:  The last one.
12         MR. FARINA:  Why don't we take a break.
13         THE VIDEOGRAPHER:  Do you want to take
14  a break?
15         MR. FARINA:  A short one.
16         THE VIDEOGRAPHER:  The time is 2:59.
17  We're off the record.
18         (A recess was taken.)
19         THE VIDEOGRAPHER:  Okay.  We are back
20  on the record.  The time is 3:06.
21  BY MR. BROOKS:
22     Q.  Okay.  So we're still looking at
23  Professor Fischel's surrebuttal report and
24  Exhibit 1, which is the Specialty Finance Monthly
25  from which you pulled your peer index.  Correct?

Page 234

1      A.  Yes.
2      Q.  And if you could turn to Exhibit 17.
3      A.  You mean Page 17?
4      Q.  Well, Exhibit 17 to --
5      A.  Oh, I see.
6      Q.  -- Exhibit 1.
7      A.  Oh, I see.  Yes.
8      Q.  This is the specialty finance universe
9  that you adopted.  Right?
10     A.  Yes.
11     Q.  Okay.  And it's comprised of credit
12  card companies, correct?
13     A.  Yes.
14     Q.  Diversified financials, right?
15     A.  Yes.
16     Q.  And auto finance.
17     A.  Yes.
18     Q.  And Household is identified as a
19  diversified financial company.  Right?
20     A.  As part of the subgroup.  Yes.
21     Q.  Okay.  And within the CSFB specialty
22  finance universe, you focused on subprime
23  companies as well.  Haven't you?
24     A.  I have, at points.  Yes.
25     Q.  And the subprime companies are not

Page 235

1  diversified financial companies, the ones you
2  focused on.  Right?
3          MR. FITZGERALD:  Objection to form.
4      A.  Well, it's true that's not in the
5  diversified financials group here.  That's
6  correct.
7  BY MR. BROOKS:
8      Q.  In fact -- well, can you tell me from
9  looking at this which are the subprime companies?
10     A.  Well, okay, so my memory is Capital
11  One, CompuCredit, AmeriCredit, Metris and
12  Providian is my memory.
13     Q.  Okay.  So all either credit card
14  companies or auto finance companies.  Right?
15     A.  As identified here.  Yes.
16     Q.  When you say "as identified here," why
17  the qualifier?
18     A.  No.  I mean, this is -- I'm just
19  pointing out that it's not a qualifier.  It's
20  just that's the categories in this Exhibit 17.
21     Q.  I mean, you, yourself, have said that
22  the subprime companies are all either credit card
23  companies or auto finance companies.  Right?
24     A.  Correct.  I identified that, and I
25  think there's an Exhibit 2L where I talk about

Page 236

1  the subprime description of their business.
2      Q.  Exhibit 2K to your rebuttal report --
3      A.  Yes.
4      Q.  -- is that what you're referring to?
5      A.  Well -- well, I was also referring to
6  2L, as well, where there's a -- some more
7  information on that.
8      Q.  And is it your understanding that
9  Household's auto lending business was a subprime
10  business?
11     A.  No.  I'm not -- that's not my -- I
12  don't have a view on that.  My memory is that
13  Household generally, to some significant extent,
14  was focused on the record subprime and nonprime
15  customers.  But I don't have a view as to how
16  that breaks out across these categories.
17     Q.  So with respect to the credit card
18  business, you don't have a view on what portion
19  of that business was subprime versus prime credit
20  card lending?
21     A.  No.  I don't, beyond the general
22  observation that I just made.
23     Q.  And your testimony is that that's not
24  relevant somehow.  Is that right?
25         MR. FITZGERALD:  Objection to form.

Page 233..236

Case: 1:02-cv-05893 Document #: 2130-2 Filed: 03/30/16 Page 37 of 47 PageID #:82060

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 237

1    A.  I disagree with that characterization.
2 BY MR. BROOKS:
3    Q.  When you say -- so a question ago, I
4 asked you whether you had a view on what portion
5 of the credit card business was prime versus
6 subprime, and you said beyond the general
7 observation that you made, you don't have a view.
8       And what was the general observation?
9    A.  The general observation was the
10 description in the 10-K that -- or I believe it
11 was -- I shouldn't say that.  My memory is
12 that -- that the market viewed, and in
13 Household's disclosures, they talked about
14 subprime and nonprime customers.  And let me just
15 be -- to give a more complete answer --
16       MR. FITZGERALD:  What are you looking
17 for?
18    A.  So Paragraph 5 of Professor Fischel's
19 report, which is Exhibit 5, he says, and I agree,
20 "across these segments," so he has segments,
21 which are consumer credit card services and
22 international -- I'm sorry.  I'll wait until
23 you're there.
24 BY MR. BROOKS:
25    Q.  No.  No.  Go ahead.

Page 238

1    A.  Then he states, "Across these segments,
2 Household generally served non-conforming and
3 nonprime subprime customers; i.e., those who have
4 limited credit histories, modest income, high
5 debt-to-income ratios, high loan-to-value ratios
6 or have experienced credit problems caused by
7 occasional delinquencies, prior charge-offs or
8 credit-related actions."
9       So that's the general observation that I was
10 making that is reflected here as well.
11    Q.  So you're saying that Fischel says that
12 in his report.  That's actually from Household's
13 disclosures.  Right?
14    A.  That's my understanding.  So just to be
15 clear, he is citing, in this paragraph, and I
16 also have in my initial report, which I should
17 also go to, a citation to the 2002 10-K.  I
18 believe I have similar language in my report as
19 well.  But I agree with, you know, this
20 characterization.
21    Q.  You didn't perform any additional
22 investigation to see if that was true with
23 respect to auto or credit card.  Correct?
24    A.  I looked at the 10-K and how Household
25 characterized its customers.  And

Page 239

1 Professor Fischel is correct.
2    Q.  Did you look at what analysts said
3 about the credit card business and its subprime
4 components?
5    A.  I do remember seeing analyst reports
6 talking about credit cards and Household.  I
7 don't specifically remember -- you know, there's
8 so many documents in this case -- about analyst
9 reports that talk about credit cards and
10 subprime, about Household.
11    Q.  Why did you choose -- earlier you said
12 you thought it was important to choose a
13 third-party's peer group selection.  What do you
14 mean by "third party"?
15    A.  Well, it was important for the purposes
16 that I'm using it.  I thought that was beneficial
17 to use, given what I'm using it for -- now I've
18 forgotten the question.  I apologize.
19    Q.  My question is, what did you mean by
20 "third party"?
21    A.  So all I meant by that was, you know, a
22 third party that's identified in a group, which
23 would include an analyst.
24    Q.  And you understand that even in your
25 own expert reports, you've cited analyst reports

Page 240

1 that have much different specialty finance
2 indexes, including Household.  Don't you?
3       MR. FITZGERALD:  Objection to form.
4    A.  Well, there are analysts that have --
5 that do cite to other firms, but I would
6 characterize the analyst reports as often focused
7 on these companies.
8       So it is true that there are -- you can find
9 analyst reports that have a -- that have a
10 different mix of companies, but it's also true
11 that these companies are often referred to in the
12 analyst commentary in connection with Household
13 is how I would generally characterize it.
14 BY MR. BROOKS:
15    Q.  There was no analyst consensus on a
16 peer group for Household.  Was there?
17    A.  I don't know what you would mean by a
18 consensus.  Beyond -- I would just refer back to
19 my earlier answer about -- that this particular
20 group of nine is consistent with the general
21 analyst commentary on Household.
22       (CIBC World Markets Industry
23    Update entitled "Specialty Finance -
24    Third-Quarter 2002 Preview" marked
25    Exhibit 11.)

Case: 1:02-cv-05893 Document #: 2130-2 Filed: 03/30/16 Page 38 of 47 PageID #:82061

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 241

1      THE WITNESS:  My report is coming
2  apart.
3      MR. FITZGERALD:  Thank you.  This is
4  11?
5      MR. BROOKS:  11.
6      (Phone interruption.)
7  BY MR. BROOKS:
8      Q.  You have Exhibit 11 in front of you.
9  This is an October 3, 2002, CIBC Equity Research
10  Report titled "Specialty Finance - Third-Quarter
11  2002 Preview."  Correct?
12      A.  Yes.
13      Q.  And I can represent to you this is an
14  analyst report that you cited in your reports --
15      A.  Okay.
16      Q.  -- I believe in Footnote 69.
17      A.  Thank you.
18      Q.  Okay?  Turn to Exhibit 1, which is on
19  the third page -- the fourth page of this
20  exhibit.
21      (Witness complies.)
22      A.  The fourth page?
23      Q.  Yup.
24      A.  Okay.
25      Q.  This is Exhibit 1.  CIBC World Markets

Page 242

1  Specialty Finance Universe Summary.  Right?
2      A.  Mm-hmm.  I see that.
3      Q.  And there are 22 companies here.
4  Right?
5      A.  Yes.
6      Q.  Okay.  That's more than twice the size
7  of the index you selected.  Correct?
8      A.  I agree that 22 is more than twice the
9  nine.
10      Q.  Did you consider selecting the CIBC
11  World Markets Specialty Finance universe?
12      A.  No.  I followed the approach I
13  described earlier.
14      Q.  You didn't look at any other analyst
15  reports --
16      A.  That's false.
17      Q.  -- in making the selection?
18      A.  So my review of the analyst -- my
19  general view of the analyst reports, in their
20  totality, is it's consistent with the nine that
21  I'm using.
22      I'm not saying that there aren't analyst
23  reports that reference other companies, but in my
24  judgment, it was consistent with the nine firms
25  that I've used.

Page 243

1      Q.  So your testimony is that the 22
2  companies here are consistent with the nine that
3  you used?
4      MR. FITZGERALD:  Objection to form.
5      A.  That's a mischaracterization of my
6  testimony.
7      Q.  That's not your testimony?
8      A.  No.  My testimony was about the general
9  analyst commentary was consistent, in my
10  judgment, with the nine.  But again, I want to go
11  back to the -- how I went about selecting these
12  nine.  And I would also mention that
13  statistically, the statistics show that it's a
14  better model.
15      Q.  Better model than with the 22 here?
16  You tested that?
17      A.  That's not my testimony.  My testimony
18  is with -- relative to Professor Fischel's model.
19      Q.  With all the other adjustments you made
20  or not?
21      A.  Well, I was referring, in my answer,
22  to -- excuse me.  In Exhibit 6, the adjusted
23  R-squares.
24      Q.  So turning to the next page of this
25  report, Exhibit 11.

Page 244

1      A.  Page 5?
2      Q.  Page 6.  Sorry.
3      A.  Okay.  Page 6.
4      Q.  An analyst report, and the heading is
5  "New FFIEC guidelines could have far-reaching
6  implications for the credit card issuers."
7  Right?
8      A.  I see that.
9      Q.  And when you turn back, Household is
10  not among those credit card issuers, is it?
11      A.  I'm confused.  What should I be looking
12  at?
13      Q.  Turn back to Page 4.
14      A.  Okay.  Page 4?
15      Q.  And do you see Household is not among
16  the credit card issuers?
17      A.  Well, I see in this document that
18  there's four that are listed here on Page 4, and
19  that does not include Household.  I don't know
20  whether, in this different section of the report,
21  that they're referring to those four or to other
22  firms.  And I would need to review the document
23  to confirm that.
24      Q.  It does say "the credit card issuers,"
25  right, in the heading there?

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 249

1 companies. Right?
2 A. I would just have to go back. I don't
3 remember if CIT has credit cards or not.
4 MR. FITZGERALD: Objection to form.
5 A. Well, I agree that Capital One and
6 CompuCredit, Metris, and Providian have credit
7 card.
8 (A.G. Edwards report entitled
9 "Specialty Finance Quarterly Fourth Quarter
10 2001" marked Exhibit 12.)
11 MR. FITZGERALD: Thanks. Exhibit 12, I
12 assume?
13 MR. BROOKS: Exhibit 12.
14 BY MR. BROOKS:
15 Q. Exhibit 12 is another analyst report
16 that you cited. It's a January 2nd, 2002
17 specialty finance quarterly for the fourth
18 quarter of 2001 from A.G. Edwards. Do you see
19 that?
20 A. I do.
21 Q. And if you turn to Page 4 -- so turn to
22 Page 15, if you would.
23 A. You want me to be on Page 15?
24 Q. Yeah.
25 A. Okay.

Page 250

1 Q. Is this A.G. Edwards specialty finance
2 universe?
3 A. I don't know. I mean, is Exhibit 16
4 that says specialty finance valuation?
5 Q. Did you consider this A.G. Edwards
6 analyst report in selecting your peer group?
7 A. So I told you how I arrived at the
8 March 2001 analyst report. I did -- as I
9 testified, it was consistent with what I saw on
10 other analyst reports. So I reviewed a number.
11 But -- but -- so I really don't have anything to
12 add to that.
13 Q. Go back to Page 4 of this document.
14 (Witness complies.)
15 Q. Do you see there are, in Figure 3, 14
16 companies, including Household?
17 A. I see 14 companies.
18 Q. Household is on there. Right?
19 A. Yes.
20 Q. And they're listed as a diversified
21 financial company. Correct?
22 A. Yes.
23 Q. And of your peer group, there are only
24 four, Capital One, MBNA, Providian and American
25 Express, in this particular group. Correct?

Page 251

1 A. Well, I see AmeriCredit. So that's
2 another. So I see one, two, three, four -- so by
3 my count, five.
4 MR. BROOKS: You can set that aside.
5 (Witness complies.)
6 BY MR. BROOKS:
7 Q. You understand that in Household's
8 investor relations reports, they used a peer
9 group that was different from yours. Correct?
10 A. I don't know the -- if they used the
11 words "peer group," but -- I'm not saying they
12 didn't. I just don't remember the exact wording.
13 Q. I show you what was previously marked
14 as Plaintiffs' Trial Exhibit 820.
15 MR. FITZGERALD: Thank you. Do you
16 want to mark this with an exhibit number?
17 MR. BROOKS: No.
18 MR. FITZGERALD: Okay. That's fine.
19 BY MR. BROOKS:
20 Q. This is the investor relations report
21 from November to December, 2001. Correct?
22 A. Yes.
23 Q. You recognize the form of this
24 document, don't you?
25 A. I do.

Page 252

1 Q. So turn to Page 5, which is Exhibit 1
2 in the report.
3 (Witness complies.)
4 A. Yes.
5 Q. Do you see it says "Household
6 International Peer Group Stock Price Report"?
7 A. I do.
8 Q. Okay. So they do refer to it as a peer
9 group. Right?
10 A. I agree.
11 Q. And tell me -- take a look at the peer
12 group and tell me which, if any, of these
13 companies are in your peer group.
14 A. Well, you're going to test my memory of
15 the ticker symbols.
16 MR. FITZGERALD: Do you mind if I --
17 A. Yeah. I just don't have a good enough
18 memory of the ticker symbols. I'm guessing PVN
19 is Providian, but, you know, I would -- I could
20 be wrong. I haven't memorized the
21 ticker symbols.
22 BY MR. BROOKS:
23 Q. AXP is American Express. Right?
24 A. That sounds reasonable.
25 Q. And COF is Capital One?

Case: 1:02-cv-05893 Document #: 2130-2 Filed: 03/30/16 Page 40 of 47 PageID #:82063

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 253

1     A.   That sounds reasonable.
2     Q.   KRB is MBNA.  I can represent that to
3  you.
4     A.   Okay.  Fine.
5     Q.   And PVN is Providian.
6     A.   Okay.
7     Q.   So there are four that were in this
8  particular peer group.  Right?
9     A.   That appears to be correct.
10    Q.   And some of the companies that weren't
11 in the peer group are AIG --
12    A.   I'm sorry.  So could you just go
13 through -- I'm sorry.  So there's American --
14 okay.  And what was KRP again?
15    Q.   That is MBNA.  KRB.
16    A.   Okay.  So American Express, among
17 others, and MBNA are on here.
18    Q.   AIG is not in your peer group.  Right?
19    A.   That's correct.
20    Q.   Citigroup was not in your peer group,
21 was it?
22    A.   That's correct, although with a caveat.
23 I should -- it's not in my CSFB peer group.
24 That's true.  But, you know, I would say, and I
25 should have said this earlier, that I do have the

Page 254

1  S&P 500 financials in my peer group, as an
2  industry control as well.  And that might well
3  incorporate -- you know, reflect some of these
4  companies, such as Citigroup.
5     Q.   US Bank is not in your peer group?
6     A.   It's not in the CSFB peer group.  But
7  again, I would reference my earlier answer about
8  the S&P 500 industry index.
9     Q.   And Wells Fargo is not in your peer
10 group either.  Correct?
11    A.   It's not in my nine, but again I would
12 reference my earlier answer about the S&P 500
13 Financials Index.
14    Q.   Providian and Capital One outperformed
15 Household during the leakage period.  Are you
16 aware of that?
17    A.   So I believe Paragraph 60 of my report
18 has some of those figures.  So which two
19 companies were you talking about?  I'm sorry, if
20 you could repeat the question.
21    Q.   Providian and Capital One.
22    A.   So Capital One fell by 44 percent, and
23 Household fell by 54 percent.  So, yes, I agree
24 with that.  Providian, I don't know.  Or I don't
25 know, offhand.

Page 255

1        (Exhibit 2a, Exhibit 8a and 8B
2     marked Exhibit 13.)
3  BY MR. BROOKS:
4     Q.   You read Professor James' reports.
5  Right?
6     A.   Yes.
7     Q.   And you relied on Professor James'
8  analysis for your analysis, didn't you?
9     A.   I did reference Chris James' report for
10 certain propositions.
11    Q.   Okay.  I'm going to hand you
12 Exhibit 13, which is three exhibits from
13 Professor James' rebuttal report, Exhibit 2A,
14 Exhibit 8A, and Exhibit 8B.
15    A.   Yes.
16    Q.   So you see that Professor James has
17 compared Household's stock price over the leakage
18 period to a few of the members of your peer
19 group.  Right?
20    A.   Well, in this Exhibit 2A, he's -- he
21 has the five subprime companies.
22    Q.   Okay.  And you --
23    A.   Subprime consumer finance companies.
24    Q.   You can see from this exhibit that
25 Household -- withdrawn.

Page 256

1     You can see from this Exhibit 2A that
2  Providian outperformed Household.  Right?
3     A.   That appears to be true.
4     Q.   Okay.  And you understand that American
5  Express outperformed Household over the leakage
6  period?
7     A.   That sounds right.
8     Q.   And you also understand that MBNA
9  outperformed Household over the leakage period?
10    A.   My best recollection is that's true.
11    Q.   Okay.  So all of the peers that are
12 identified in -- by Household that are also in
13 your peer group outperformed Household.  Didn't
14 they?
15       MR. FITZGERALD:  Objection to form.
16    A.   I would have to go back to the list.  I
17 mean, so Capital One outperformed in the sense of
18 falling a little bit less.  I agree with that.
19 Just based -- looking at my Paragraph 60.
20    Q.   You just said American Express did.
21 Right?
22    A.   That's my best recollection.  What was
23 the third one?
24    Q.   MBNA and Providian.
25    A.   Providian, looking at Exhibit 2A, looks

Case: 1:02-cv-05893 Document #: 2130-2 Filed: 03/30/16 Page 41 of 47 PageID #:82064

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 257

1 like it out -- it did better, in terms of raw
2 returns. And what was the last one?
3    Q. MBNA, which you testified outperformed
4 Household.
5    A. That was my best recollection. I mean,
6 there's no need to go off my memory. It's -- you
7 know, the stock returns are what they are.
8    Q. So you'll agree that the four peers
9 that were included in the companies' investor
10 relations reports outperformed Household that
11 are -- it appears that are also in your group.
12 Right?
13      MR. FITZGERALD: Objection to form
14 only.
15    A. Well, when you're using the words
16 "outperform" or "underperform," these are just
17 looking at raw, unadjusted returns rather than
18 residuals. So, yes, as I understand Exhibit 2A,
19 that was just looking at the raw returns.
20    Q. Is it appropriate to look at the raw
21 returns?
22    A. It depends on for what purpose you're
23 doing that.
24    Q. To determine relative performance.
25    A. Why are you looking at relative

Page 258

1 performance? If you want to look at relative
2 abnormal performance, you would want to look at
3 residuals.
4    Q. Okay.
5    A. If that's the research question that
6 you have.
7    Q. Turning to the next page of Exhibit 13,
8 you agree that Household was much, much bigger
9 than the subprime lenders in your peer group, at
10 least as you and Professor James have classified
11 them?
12      MR. FITZGERALD: Objection to form. Go
13 ahead.
14    A. It is -- the assets as measured in
15 Exhibit 8A are bigger than the other -- than the
16 other five. The five -- just to be clear, the
17 five subprime that form five out of the nine.
18    And I would incorporate in my answer my
19 Footnote 130 to my rebuttal report, where I note
20 that given the value weighting of my CSFB, that
21 American Express and MBNA are going to drive a
22 lot of what's going on.
23    So if you look at Page 43 of my rebuttal,
24 what I'm saying is American Express and MBNA are
25 81 and 83 percent of my value weighted index, and

Page 259

1 so to the extent that what was going on in the
2 market is concerns about subprime, my index will
3 be conservative, given the weighting on MBNA and
4 American Express.
5    Q. Conservative in what sense?
6    A. Conservative in the sense that there
7 could be subprime -- concerns in the marketplace
8 about subprime, and American Express and MBNA are
9 not subprime. And they -- they constitute 81,
10 83 percent of the value weighted.
11    So it's going to be conservative relative to
12 the concerns in the marketplace, which were
13 obviously very concerned about subprime during
14 this period.
15    Q. Your --
16    A. And I would note -- one final note, and
17 then I'll stop, is as we discussed, American
18 Express and MBNA performed relatively well. The
19 subprime five, which is being underweighted, so
20 to speak, in my index or have relatively -- you
21 know, 19 and 17 -- you know, are going to be a
22 minority of my weighting, I believe they had
23 declines around 46 percent during the disclosure
24 period.
25    Q. Turning to 8B, Household's growth was

Page 260

1 much greater during 2002 than four of the
2 so-called subprime five in your peer group.
3 Right?
4    A. Yes. It's definitely greater,
5 according to Exhibit 8B. And this is, just
6 reading the title of the exhibit, over 2002.
7    Q. You understand that your peer group is
8 different than the peer group that defendants'
9 expert, Bajaj, testified was the appropriate peer
10 group at the last trial, don't you?
11      MR. FITZGERALD: Objection to form.
12    A. That's consistent with my memory.
13      MR. BROOKS: I'd like to take a break.
14      MR. FITZGERALD: Sure.
15      THE VIDEOGRAPHER: The time is 3:43.
16 We're off the record.
17      (A recess was taken.)
18      (Second Rebuttal Report of
19    Daniel R. Fischel marked Exhibit 14.)
20      THE VIDEOGRAPHER: Okay. We're back on
21 the record. The time is 3:54.
22 BY MR. BROOKS:
23    Q. Okay. You have Exhibit 14, which is
24 Professor Fischel's second rebuttal report?
25    A. I do.

Case: 1:02-cv-05893 Document #: 2130-2 Filed: 03/30/16 Page 42 of 47 PageID #:82065

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 261

1    Q.   Yeah.  Turn to the report.
2    A.   Oh, you want me to go to the report?
3    Q.   Yeah.
4    A.   Oh.  Sorry.
5         (Witness complies.)
6    Q.   And take a look at Paragraph 11.
7         (Witness complies.)
8    A.   Yes.  I see that.
9    Q.   And do you see at the bottom, where
10   Professor Fischel references Exhibit 2, which
11   shows that Household's stock fell 53 percent
12   while indexes --
13   A.   I'm sorry.  I'm not -- I don't mean to
14   interrupt.  But can you direct me again to where
15   you're --
16   Q.   Paragraph 11.
17        MR. FITZGERALD:  Can I point?
18   A.   Okay.  I see that.
19   Q.   "Household's stock fell 53 percent
20   while the indexes of the firms identified by
21   Professors Ferrell and James declined 19 percent
22   and 16 percent respectively."
23   Do you see that?
24   A.   I do see that.
25   Q.   And you agree that your CSFB index

Page 262

1    declined by 19 percent.  Right?
2    A.   I have no reason to disagree.
3    Q.   And that's much less than Household's
4    stock fell.  Isn't it?
5    A.   I agree that 19 is less than 53.
6    Q.   And the CSFB index also outperformed
7    the S&P financials index, which fell 21 percent.
8    Right?
9    A.   I agree that 19 is less than 21.
10   Q.   You don't dispute Professor Fischel's
11   calculations in this report?
12   A.   I'm not endorsing all his calculations,
13   but I have no reason to take issue with these raw
14   return numbers.
15   Q.   Right.  These calculations that we're
16   discussing, the return numbers, you don't dispute
17   them.  Do you?
18   A.   I have no reason to dispute.  The
19   returns are what they are.  It's an objective
20   fact.
21   Q.   And take a look at Paragraph 12.
22        (Witness complies.)
23   A.   Okay.
24   Q.   Let me know when you're ready to talk
25   about Paragraph 12.

Page 263

1    A.   You want me to read it?
2    Q.   Sure.
3    A.   Okay.
4         (Witness complies.)
5    A.   Okay.  I read it.
6    Q.   Okay.  So incorporating the CSFB index
7    into the leakage model did not impact the results
8    of the leakage model.  Isn't that right,
9    according to Professor Fischel?
10   A.   Well, according to Professor Fischel,
11   it would change the artificial inflation,
12   according to him, to 27.52 or 27.60, but, you
13   know, these are meaningless results.
14   Q.   Artificial inflation would go up.
15   Right?
16   A.   Well, he is saying that, in his
17   regression, using his faulty and flawed model and
18   the incorrect estimation window that he has this
19   output.
20   Q.   And you don't dispute the output with
21   the caveats that you just had in your last
22   answer.  Right?
23   A.   I dispute the output in the sense of
24   this is a meaningless result.
25   Q.   So turning back to your rebuttal

Page 264

1    report --
2         (Witness complies.)
3    A.   Okay.
4    Q.   -- and Exhibit 2K.
5    A.   Yes.
6    Q.   These are the business lines of
7    companies with a subprime customer focus.  Right?
8    A.   Correct.
9    Q.   We looked at this a little bit before?
10   A.   Correct.
11   Q.   Why did you set these companies apart
12   from the rest of your peer group?
13   A.   Because, generally speaking, it was
14   clear from the market commentary, the analysts,
15   that there was significant concerns during the
16   disclosure period, starting in the fall of 2001
17   and going forward, about subprime exposure.  And
18   so given the market concerns about this -- this
19   type of exposure, it was worthwhile identifying
20   those subprime consumer finance companies within
21   CSFB 9.
22   Q.   And four of the five companies are
23   credit card companies.  Right?
24   A.   Correct.
25   Q.   Okay.  So turn to Exhibit 17 of

Case: 1:02-cv-05893 Document #: 2130-2 Filed: 03/30/16 Page 43 of 47 PageID #:82066

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

1    I don't understand how Professor Fischel
2  would conclude that fraud, according to him, is
3  increasing the systemic risk, and, therefore,
4  affecting the beta.  So it's very unclear to me
5  and puzzling what the theory is for why
6  firm-specific alleged corrective information
7  would manifest itself in a changed beta, which is
8  what the structural break is showing.
9  BY MR. BROOKS:
10    Q.  Anything else?
11    A.  That's my general response.  But I
12  would incorporate the analyses in my reports.
13    Q.  You've identified six general
14  categories of what you opine are company-specific
15  non-fraud negative news released during the
16  leakage period that may have impacted Household's
17  stock price.  Right?
18        MR. FITZGERALD:  Objection to form.
19    A.  I don't think I break it out into the
20  six categories, unless I'm misremembering.  I'm
21  not saying that's inaccurate.  I'm just saying
22  that's not how I bucketed the information.
23  Again, I'm not saying it's an inaccurate, you
24  know, bucketing; but it's not one that I deploy
25  in my report.

1  BY MR. BROOKS:
2    Q.  You don't dispute that bucketing?  You
3  don't think it would be misleading?  Is that what
4  you're saying?
5    A.  I would need to review all the
6  non-fraud information that I point to and match
7  it up.
8    I would emphasize the most -- a very
9  important category would be subprime and nonprime
10  and the concerns that the market had during this
11  period in connection with Household's business.
12    Q.  You're saying that --
13    A.  And I would also add the barring cost,
14  the reliance of Household on the commercial paper
15  market.
16    Q.  So the concerns that the market had
17  about subprime and nonprime and the borrowing
18  costs are the two most significant factors.  Is
19  that your opinion?
20        MR. FITZGERALD:  Objection to form.
21    A.  I would say that was -- you know,
22  that's -- you know, sitting here, those are two
23  themes that come out of the market commentary.
24  But I would just simply point to my reports,
25  where I identify on specific days non-fraud

1  information.  And so that would be the most
2  complete characterization.
3    Those are just two important themes that
4  come out of -- or two market concerns that are
5  reflected in the market commentary during this --
6  during this period.
7  BY MR. BROOKS:
8    Q.  So you haven't done anything to
9  quantify the dollar impact of any of these
10  concerns that you claim are company-specific,
11  non-fraud.  Right?
12        MR. FITZGERALD:  Objection to form.
13    A.  No.  I have my Exhibit 3a and 3b.
14    Q.  Exhibits 3a and 3b quantify the dollar
15  impact of the company-specific non-fraud
16  information?
17    A.  Oh, I misunderstood you.  So those
18  exhibits are showing -- okay.  So for the dates
19  in Exhibit 3a and 3b, they're showing dates that
20  are statistically significant.  And so for those
21  days, you would want to ask the question whether
22  there's, you know, non-fraud information or
23  corrective information.
24    Q.  My question is whether you've done
25  anything to quantify the impact of what you're

1  calling company-specific non-fraud information on
2  Household's stock during the disclosure period.
3        MR. FITZGERALD:  Objection to form.
4    A.  So an important piece of terminology,
5  company-specific I would define as residuals in a
6  model.  And the residuals that I have in my
7  Exhibit 3a and 3b, I do have residuals --
8  statistically significant residuals in that.  And
9  I do discuss, for example, on August 7th, on
10  September 16th, and on October 8th, whether those
11  residuals are explainable by non-fraud
12  information.
13  BY MR. BROOKS:
14    Q.  Is it your opinion that Household's
15  worsening credit quality was a company-specific
16  non-fraud factor that was impacting Household's
17  stock during the disclosure period?
18    A.  So I would refer to my specific
19  discussions of the -- you know, as a partial
20  answer to that, of the residuals in Exhibit 3b.
21  So those would be days which are company-specific
22  in the sense that I'm using the term and the
23  nature of the non-fraud information I identify on
24  those days.
25    I can't remember every day off the top of my

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 293

1  head, but I would go to that as examples of
2  company-specific, in the sense of a statistically
3  significant residual, that's explainable by
4  non-fraud information.
5      Q.  So why don't you turn to Paragraph 62
6  of your original report.
7          (Witness complies.)
8      A.  Okay.  I'm there.  Is this the
9  January 28th?  I just want to make sure I'm at
10 the right place.
11     Q.  January 28th.  Right.
12     A.  Okay.
13     Q.  This is one of those dates that was
14 statistically significant under Professor
15 Fischel's analysis.  Right?
16     A.  Correct.
17     Q.  And you found that there were
18 company-specific, non-fraud disclosures that
19 contributed to the decline.  Right?
20     A.  I have to review to refresh my
21 recollection.
22         Okay.  Could you repeat the question.
23     Q.  You found that there were firm-specific
24 non-fraud disclosures on this date that
25 contributed to the decline.  Correct?

Page 294

1      A.  That's not -- that's actually not
2  accurate.  So in this report, my initial report,
3  I said may have.  In the second report, I
4  quantify it.
5      So I want to be very clear here.  So for
6  firm-specific non-fraud in this report, the
7  initial report is firm-specific, non-fraud in the
8  context of Fischel's regression.  So he has a
9  statistically significant residual on this date.
10 And the question is, in his residual, given his
11 model, is there firm-specific, non-fraud
12 information.
13     Now, when you properly control, you have a
14 properly specified model, it's not statistically
15 significant, proving or establishing that what I
16 identified as firm-specific, non-fraud
17 information in the context of Fischel's model is
18 accurate.
19     Q.  Doesn't the fact that it's not
20 statistically significant show that, under your
21 model, it was industry factors that caused the
22 decline?
23     A.  Yes.  But, again, what -- this is a
24 very important point.  What I'm saying is, in
25 Professor Fischel's model, there's a

Page 295

1  statistically significant residual on this day.
2  Okay.  And in this initial report, I'm pointing
3  out, on this date, that, in his model, in his
4  residual, there's non-fraud, firm-specific
5  information that's in his residual.  And then I
6  discuss that.
7      In a properly specified model, when you --
8  which controls for some credit card issues,
9  subprime, as reflected in the CSFB, it's no
10 longer statistically significant.  So that proves
11 that in his residual, there was non-fraud
12 information that's removed -- that's being
13 removed by the corrective model.
14     Q.  What it proves is that the information,
15 at least if you're right, was not
16 company-specific.  Right?  Because when there's
17 no statistically significant decline, that means
18 that it was not company-specific information that
19 caused the decline.  Isn't that right?
20         MR. FITZGERALD:  Objection to form.
21     A.  This is missing a very important point,
22 which is company-specific, as I define it, and as
23 is relevant in this case, you know, in assessing
24 Professor Fischel's reports, means the residual
25 in a model.

Page 296

1      So the -- so it's the -- there's a
2  firm-specific effect in his model on
3  January 28th.  You're right, in my model there's
4  no longer a firm-specific effect, and that is
5  proof that what he is labeling a firm-specific
6  effect that's fraud -- that's caused by fraud or
7  fraud information is, in fact, just capturing
8  industry information in a better specified model.
9  BY MR. BROOKS:
10     Q.  Using your --
11     A.  I have a discussion of this in the
12 report that I can find, if that would be helpful.
13     Q.  Including your index that you claim has
14 a tighter peer group, but leaving all the other
15 specifications the same, Professor Fischel found
16 that it didn't impact his statistically
17 significant --
18         MR. FITZGERALD:  Objection to form.
19 BY MR. BROOKS:
20     Q.  -- dates.  Isn't that right?
21     A.  So are you saying that when he includes
22 my peer index in his estimation window that
23 January 28th remains statistically significant?
24     Q.  Isn't that what he's found?
25     A.  I don't recall that specifically.  I

**Page 293..296**

Case: 1:02-cv-05893 Document #: 2130-2 Filed: 03/30/16 Page 45 of 47 PageID #:82068

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 297

1 don't recall that exhibit. I could be
2 misremembering. But I don't recall that.
3     Q. So turning back to Paragraph 62, what
4 is the non-fraud information that you claim is
5 company-specific in this paragraph?
6     A. Concern -- you know, I would generally
7 characterize it as concerns about subprime.
8     Q. Well, I'd like you to point to the
9 language.
10     A. Sure. So -- well, I would point to all
11 the language. "Rotten economy has exposed their
12 borrower base to hard times. Their borrower base
13 is significantly subprime and nonprime, as
14 Professor Fischel himself states. And "the
15 growing deterioration" -- now I'm just reading
16 from the report. "The growing deterioration in
17 subprime lending, it should be noted, has already
18 been -- has already laid low other former Chanos
19 shorts, including AmeriCredit, Conseco and
20 Providian."
21     Q. What is --
22     A. And then there's a Reuters report,
23 "Credit card stocks fall in Metris, subprime
24 worries."
25     Q. What does growing deterioration in

Page 298

1 subprime lending mean?
2     A. Well, I would just go back to the
3 article to get the full context. But there's
4 concerns about subprime lending, is the way I
5 would interpret it.
6     Q. That's how you interpret growing
7 deterioration, subprime lending is just general
8 concerns about subprime lending?
9     A. No. There's a couple of articles here
10 that are evidence, at least that -- in the
11 context of Fischel's model, Professor Fischel's
12 model, that his residual is capturing concerns in
13 the marketplace about subprime, about credit
14 cards. But I think, you know, what appears to be
15 most important here is subprime.
16     Q. So --
17     A. But there's concern about credit cards
18 as well.
19     Q. So your conclusion here is that this
20 information may have impacted Household's stock
21 price. Right?
22     A. In my initial report, it may have. If
23 you go to paragraph 35 of my rebuttal, I point
24 out that what I identify here as "could have" is
25 now, in fact, as proved by the corrected model,

Page 299

1 that what he's capturing in his residual are the
2 subprime and credit card concerns, as evidenced
3 by the fact that once you control for that with a
4 better index, his statistically significant
5 residual goes away. So what that means is that
6 his residual is capturing these non-fraud
7 factors.
8     Maybe I can be helpful here. So
9 Paragraph 36 of my rebuttal -- and I'll just read
10 the language, and this is what I'm referring
11 to --
12     Q. I don't need you to do that. I
13 understand what you're saying.
14     Turn to Paragraph 65 of your initial report.
15     (Witness complies.)
16     A. Okay.
17     Q. Just let me know when you've read that.
18     A. Okay. I'm sorry. Paragraph 65?
19     Q. Sixty-five.
20     A. Oh, okay. Okay. I've read it.
21     Q. Okay. This is February 6th, 2002,
22 which is another statistically significant
23 decline under Professor Fischel's model. Right?
24     A. Correct.
25     Q. And in Paragraph 65, you cite an

Page 300

1 A.G. Edwards report, which is Exhibit 31, that
2 refers to industry credit quality concerns and
3 accounting concerns. Right?
4     A. Correct.
5     Q. So do you agree that the accounting
6 concerns were fraud-related information?
7     A. Well, again, we're going to get back to
8 our discussion about what "fraud-related" means.
9     So it's not fraud-related in the sense of
10 corrective information. So if somebody -- if the
11 market hears about the litigation -- you know,
12 the lawsuit on November 15, 2001, and the market
13 keeps -- you know, market actors, analysts keep
14 saying, hey, there's this litigation and they
15 keep on saying that, repeatedly, that's not new
16 information that would account for stock price
17 declines.
18     Q. Is it your opinion that the
19 accounting-related concerns addressed in the
20 A.G. Edwards report were company-specific
21 non-fraud concerns?
22     A. No. I don't agree with that, because
23 in my corrected model, there's no statistically
24 significant residual which shows that these
25 concerns --

**Page 297..300**

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 301

1    Q.  I think you misheard my question.
2    A.  Okay.
3    Q.  My question is, is it your opinion that
4   the accounting-related concerns in
5   Paragraph 65 -- that you cite in Paragraph 65
6   were company-specific non-fraud concerns?
7    A.  In whose model?  In my model, they're
8   not company-specific, because there's no
9   statistically significant residual.
10    Q.  So in your model, accounting concerns
11   about Household are not company-specific?
12       MR. FITZGERALD:  Objection to form.
13    A.  That's not what I'm saying.  I'm saying
14   in these paragraphs that there appears to be
15   concerns in the marketplace about the consumer
16   finance sector.
17   BY MR. BROOKS:
18    Q.  I'm asking you about a specific piece.
19   And I'll read it to be clear.  Because you said
20   that A.G. Edwards also issued a report on
21   February 6, 2002, stating that it "attributes
22   weakness in Household shares to industry credit
23   quality concerns and accounting-related concerns.
24   And that, to be sure, investor sentiment on the
25   consumer finance sector is poor today."

Page 302

1    A.  Yes.
2    Q.  You see that?
3    A.  I do.
4    Q.  You voluntarily chose to include that
5   in your report?
6    A.  Correct.
7    Q.  Okay.  Is it your opinion that the
8   accounting-related concerns in Paragraph 65 are
9   non-fraud-related, company-specific concerns?
10       MR. FITZGERALD:  Objection to form.
11    A.  Not in my model.
12   BY MR. BROOKS:
13    Q.  What else would it be?
14    A.  And I would also -- in my earlier
15   answer, there's no reason to believe that market
16   actors repeating the same concern is new
17   corrective information that could possibly
18   explain stock price changes.
19    Q.  So are industry credit quality
20   concerns, as referenced here on the A.G. Edwards
21   report, company-specific, non-fraud concerns --
22       MR. FITZGERALD:  Objection to form.
23   BY MR. BROOKS:
24    Q.  -- in your opinion?
25    A.  In whose model?  In Fischel's model,

Page 303

1   yes, it would be captured by the residual.  In my
2   model, with a better specified model, these
3   industry concerns are actually captured by the
4   model.
5    Q.  So in your --
6    A.  So it's proof what he is saying is
7   caused by corrective information, as evidenced by
8   his residual, is, in fact, industry concerns once
9   you have a better specified model.
10    Q.  So the content of the information
11   doesn't matter whatsoever to your opinion.  It's
12   just what the model says?
13       MR. FITZGERALD:  Objection to form.
14   BY MR. BROOKS:
15    Q.  Is that fair?
16    A.  No.  That's not fair.
17    Q.  Are you aware that in your report you
18   cite -- and I'm talking about your initial
19   report --
20    A.  Okay.
21    Q.  -- you cite a number of articles that
22   don't even mention Household and say that they
23   are company-specific, non-fraud information?
24    A.  I do cite -- I do remember citing to
25   some that don't specifically mention Household.

Page 304

1   But beyond that, you would have to point me to
2   specific references in my report.
3    Q.  In any of your prior expert
4   engagements, have you attributed stock price
5   declines to a company based on disclosures that
6   don't even discuss the company?
7       MR. FITZGERALD:  Objection to form.
8    A.  I mean, I would have to look back.  I
9   mean, there's nothing surprising about that.  In
10   fact, Professor Fischel does that himself.  That
11   is, there could be information in the model that
12   is not -- there could be information --
13   information in the context of the model that is
14   not properly being controlled for.
15       MR. BROOKS:  Why don't we take a break.
16       THE VIDEOGRAPHER:  The time is 4:54.
17   We're off the record.
18       (A recess was taken.)
19       THE VIDEOGRAPHER:  We are back on the
20   record.  The time is 5:08.
21       MR. BROOKS:  I'm done, subject to any
22   further examination.
23       MR. FITZGERALD:  Thank you.
24          CROSS-EXAMINATION
25

**Page 301..304**

**Frank Ferrell, III**

Page 305

1 BY MR. FITZGERALD:
2    Q.  So, Professor Ferrell, at some point
3 during your testimony today, you referred to a
4 couple of ad hoc adjustments that
5 Professor Fischel made.  Do you recall the
6 substance of that testimony?
7    A.  Yes.
8    Q.  What were you referring to?
9    A.  I was referring to his ad hoc so-called
10 leakage cap and his ad hoc so-called cap M
11 adjustment.
12    Q.  Okay.  And why do you call the cap M
13 adjustment that he described so-called?
14    A.  Because the explanation and the
15 justification he gave for it in his deposition
16 made no sense.  It's not the capital asset
17 pricing model that's, as he says, the most
18 established in the academic literature.  It's --
19 and it's not -- and it doesn't actually represent
20 the context in which that article is doing it.
21 So it's not cap M.  And the explanation for why
22 he's doing it made no sense.
23      MR. FITZGERALD:  Okay.  I have nothing
24 further.
25      MR. BROOKS:  Nothing further.

Page 306

1      MR. FITZGERALD:  Okay.  Thank you.
2      THE VIDEOGRAPHER:  Okay.  The time is
3 5:09.  We're off the record.
4      (Deposition concluded at 5:09 p.m.)

Page 307

1      DECLARATION UNDER PENALTY OF PERJURY
2 Case Name: Lawrence E. Jaffe Pension Plan
          vs. Household International, Inc.
3 Date of Deposition: 02/27/2016
4 Job No.: 10022056
5
6      I, FRANK FERRELL, III, hereby certify
7 under penalty of perjury under the laws of the State of
8 _____ that the foregoing is true and correct.
9      Executed this _____ day of
10 _____, 2016, at _____.
11
12
13      _____
14           FRANK FERRELL, III
15
16 NOTARIZATION (If Required)
17 State of _____
18 County of _____
19 Subscribed and sworn to (or affirmed) before me on
20 this _____ day of _____, 20__,
21 by_____,   proved to me on the
22 basis of satisfactory evidence to be the person
23 who appeared before me.
24 Signature: _____ (Seal)
25

Page 308

1           C E R T I F I C A T E
2 COMMONWEALTH OF MASSACHUSETTS
3 SUFFOLK, SS.
4      I, Janet M. McHugh, a Registered Merit
5 Reporter and a Notary Public within and for the
6 Commonwealth of Massachusetts do hereby certify:
7      THAT FRANK ALLEN FERRELL, III, the
8 witness whose testimony is hereinbefore set
9 forth, was duly sworn by me and that such
10 testimony is a true and accurate record of my
11 stenotype notes taken in the foregoing matter, to
12 the best of my knowledge, skill and ability.
13      I further certify that I am not
14 related to any parties to this action by blood or
15 marriage; and that I am in no way interested in
16 the outcome of this matter.
17      IN WITNESS WHEREOF, I have hereunto set
18 my hand this 28th day of February, 2016.
19
20      _____
                JANET M. SAMBATARO
21           Notary Public
22
23 My Commission Expires:
24 July 16, 2021
25