# EXHIBIT 1

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

|  | Page 1 |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | FOR THE NORTHERN DISTRICT OF ILLINOIS |
| 3 | No. 1:02-CV-05893 |
| 4 | - - - - - - - - - - - - - - - - - - - - |
| 5 | LAWRENCE E. JAFFE PENSION PLAN, on behalf |
| 6 | of itself and all others similarly situated, |
| 7 | Plaintiffs, |
| 8 | vs. |
| 9 | HOUSEHOLD INTERNATIONAL, INC., et al., |
| 10 | Defendants. |
| 11 | - - - - - - - - - - - - - - - - - - - - |
| 12 | VIDEOTAPED DEPOSITION OF |
| 13 | FRANK ALLEN FERRELL, III |
| 14 | Saturday, February 27, 2016 9:02 a.m. |
| 15 | Skadden Arps LLP |
| 16 | 500 Boylston Street, Boston, MA 02116 |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | Reported by: |
| 22 | Janet Sambataro, RMR, CRR, CLR |
| 23 | Job No. 10022056 |
| 24 | |
| 25 | |

|  | Page 2 |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | February 27, 2016 |
| 6 | 9:02 a.m. |
| 7 | |
| 8 | |
| 9 | |
| 10 | Videotaped deposition of FRANK ALLEN |
| 11 | FERRELL, III, held at the offices of Skadden Arps |
| 12 | LLP, 500 Boylston Street, Boston, Massachusetts, |
| 13 | pursuant to Agreement before Janet Sambataro, a |
| 14 | Registered Merit Reporter, Certified Realtime |
| 15 | Reporter, Certified LiveNote Reporter, and a |
| 16 | Notary Public within and for the Commonwealth of |
| 17 | Massachusetts. |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

|  | Page 3 |
|---|---|
| 1 | APPEARANCES: |
| 2 | |
| 3 | |
| 4 | ROBBINS, GELLER, RUDMAN & DOWD LLP |
| 5 | (By Luke O. Brooks, Esquire) |
| 6 | Post Montgomery Center |
| 7 | One Montgomery Street |
| 8 | San Francisco, California 94104 |
| 9 | 415.288.4534 |
| 10 | lukeb@rgrdlaw.com |
| 11 | Counsel for the Plaintiffs |
| 12 | |
| 13 | - and - |
| 14 | |
| 15 | ROBBINS, GELLER, RUDMAN & DOWD LLP |
| 16 | (By Michael J. Dowd, Esquire) |
| 17 | 655 W. Broadway |
| 18 | San Diego, California 92101 |
| 19 | 619.231.1058 |
| 20 | miked@rgrdlaw.com |
| 21 | Counsel for the Plaintiffs |
| 22 | |
| 23 | |
| 24 | - Continued - |
| 25 | |

|  | Page 4 |
|---|---|
| 1 | APPEARANCES: (Continued) |
| 2 | |
| 3 | SKADDEN ARPS SLATE MEAGHER & FLOM, LLP |
| 4 | (By Patrick Fitzgerald, Esquire, and |
| 5 | Andrew J. Fuchs, Esquire) |
| 6 | 155 N. Wacker Drive |
| 7 | Chicago, Illinois 60606 |
| 8 | 312.407.0700 |
| 9 | patrick.fitzgerald@skadden.com |
| 10 | andrew.fuchs@skadden.com |
| 11 | Counsel for the Defendant, Household |
| 12 | International, Inc. |
| 13 | |
| 14 | - and - |
| 15 | |
| 16 | WILLIAMS & CONNOLLY |
| 17 | (By Steven M. Farina, Esquire, and |
| 18 | Leslie Cooper Mahaffey, Esquire) |
| 19 | 725 Twelfth Street, N.W. |
| 20 | Washington, D.C. 20005 |
| 21 | 202.434.5526 |
| 22 | sfarina@wc.com |
| 23 | lmahaffey@wc.com |
| 24 | Counsel for the Defendant, Household International, |
| 25 | Inc. |

**Frank Ferrell, III**

Page 5

```
1    APPEARANCES:  (Continued)
2
3    MCDERMOTT, WILL & EMERY LLP
4    (By David S. Rosenbloom, Esquire) (Via Telephone)
5    227 West Monroe Street
6    Chicago, Illinois 60606-5096
7    312.372.2000
8    drosenbloom@mwe.com
9    Counsel for the Defendant, Gary Gilmer
10
11
12   KATTEN MUCHIN ROSENMAN LLP
13   (By Dawn M. Canty, Esquire)  (Via Telephone)
14   525 West Monroe Street
15   Chicago, IL 60661-3693.
16   312.902.5200
17   dawn.canty@kattenlaw.com
18   Counsel for the Defendant, William F. Aldinger
19
20
21   ALSO PRESENT:
22   Mark LoSacco, HSBC (Via Videoconference)
23   Shawn Budd, Videographer
24
25
```

Page 6

```
1              I N D E X
2    WITNESS          DIRECT     CROSS
3    FRANK ALLEN FERRELL, III
4    By Mr. Brooks          10
5    By Mr. Fitzgerald            304
6
7          E X H I B I T S
8    Number      Description          Page
9    Exhibit 1  Expert Report of Professor
10       Allen Ferrell            11
11   Exhibit 2  Expert Rebuttal Report of
12       Professor Allen Ferrell
13       with exhibits            11
14   Exhibit 3  United States Court of Appeals
15       for the Seventh Circuit Opinion,
16       No. 13-3532              68
17   Exhibit 4  Cumulative Residual Price Change
18       on Fraud Related Event Dates
19       Identified in Company Investor
20       Relations Reports       155
21   Exhibit 5  Report of Daniel R. Fischel,
22       dated August 15, 2007     165
23   Exhibit 6  Exhibits to Professor Fischel's
24       August 15, 2007 report    173
25       - Continued -
```

Page 7

```
1          E X H I B I T S
2    Number      Description          Page
3    Exhibit 7  Cornell and Morgan article in
4        the "UCLA Law Review"
5        June 1990            208
6    Exhibit 8  Article entitled "The Loss
7        Causation Requirement for
8        Rule 10b-5 Causes of Action:
9        The Implications of Dura
10       Pharmaceutical, Inc. v.
11       Broudo"              215
12   Exhibit 9  Excerpt from Household
13       International, Inc. Form 10-K
14       for year ending
15       December 31, 2001     221
16   Exhibit 10 Sur-Rebuttal Report of
17       Daniel R. Fischel      232
18   Exhibit 11 CIBC World Markets Industry
19       Update entitled "Specialty
20       Finance - Third-Quarter 2002
21       Preview"             240
22   Exhibit 12 A.G. Edwards report entitled
23       "Specialty Finance Quarterly
24       Fourth Quarter 2001"   249
25       - Continued -
```

Page 8

```
1          E X H I B I T S
2    Number      Description          Page
3    Exhibit 13 Exhibit 2a, Exhibit 8a and 8B    255
4    Exhibit 14 Second Rebuttal Report of
5        Daniel R. Fischel     260
6
7
8          PREVIOUSLY MARKED EXHIBITS
9    Number      Description          Page
10   Exhibit 820 Document Bates-stamped
11       HHS 03237027 through -7042    251
12   Exhibit 198 Document Bates-stamped
13       HHS 02075630 through -5650    277
14   Exhibit 199 Document Bates-stamped
15       HHS 02075738 through -5763    281
16
17
18
19
20
21
22
23
24
25
```

Case: 1:02-cv-05893 Document #: 2142-1 Filed: 04/22/16 Page 4 of 15 PageID #:82567

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

1      P R O C E E D I N G S
2      THE VIDEOGRAPHER: Okay. We are on the
3 record. This is the video operator speaking,
4 Shawn Budd with Aptus Court Reporting.
5      Today's date is February 27th, 2016, and
6 the time is 9:02 a.m. We are here in Boston,
7 Massachusetts to take the video deposition of
8 Allen Ferrell in the matter of Lawrence E. Jaffe
9 Pension Plan versus Household International, Inc.
10      Would counsel please introduce
11 themselves.
12      MR. BROOKS: Luke Brooks from Robbins
13 Geller Rudman & Dowd for the plaintiffs.
14      MR. DOWD: Mike Dowd from Robbins
15 Geller.
16      MR. FITZGERALD: Pat Fitzgerald from
17 Skadden Arps for defendant, Household.
18      MR. FUCHS: Andrew Fuchs for Household.
19      MR. FARINA: Steve Farina, Williams &
20 Connolly, for Household.
21      MS. MAHAFFEY: Leslie Mahaffey from
22 Williams & Connolly, for Household.
23      THE VIDEOGRAPHER: Will the court
24 reporter please swear in the witness.
25      MR. BROOKS: We have people on the

1 phone.
2      MR. FITZGERALD: Will people on the
3 phone take themselves off mute for a moment and
4 identify themselves, that would be great.
5      MR. ROSENBLOOM: David Rosenbloom,
6 McDermott Will & Emery.
7      COURT REPORTER: I can't hear. David
8 Rosenbloom?
9      MR. FITZGERALD: Yes.
10      MR. FUCHS: Anyone else?
11      MS. CANTY: Dawn Canty.
12      MR. FITZGERALD: I think it's Dawn
13 Canty for defendant, Bill Aldinger.
14      MR. ROSENBLOOM: And David Rosenbloom
15 for defendant, Gary Gilmer.
16      (Reporter clarification.)
17      THE VIDEOGRAPHER: And will the court
18 reporter please swear in the witness.
19      FRANK ALLEN FERRELL, III,
20 having been duly sworn, after presenting
21 identification in the form of a driver's license,
22 deposes and says as follows:
23      DIRECT EXAMINATION
24 BY MR. BROOKS:
25      Q. Good morning. Would you state your

1 full name for the record, please.
2      A. Frank Allen Ferrell, III.
3      Q. And how would you like to be addressed
4 in this deposition?
5      A. Professor Ferrell is fine.
6      Q. What is your current business address?
7      A. My home address is
8 41 Bloomfield Street, Lexington, MA 02421. My
9 office is Harvard Law School, Griswold 303,
10 1525 Massachusetts Ave., Cambridge, MA 02138.
11      Q. And we've introduced, off the record,
12 Exhibits 1 and 2. Exhibit 1 is the Expert Report
13 of Professor Allen Ferrell and Exhibit 2 is the
14 Expert Rebuttal Report of Professor Allen Ferrell
15 with the exhibits.
16      Do you have those in front of you? Correct?
17      (Expert Report of Professor
18 Allen Ferrell marked Exhibit 1.)
19      (Expert Rebuttal Report of
20 Professor Allen Ferrell with exhibits marked
21 Exhibit 2.)
22      A. Yes.
23 BY MR. BROOKS:
24      Q. So according to Exhibit A of your
25 report, you've been deposed 15 times in the last

1 four years. Does that sound about right?
2      A. Which -- which report are you referring
3 to?
4      Q. The original report.
5      MR. FITZGERALD: While he's looking
6 through that, Mark LoSacco, L-O-S-A-C-C-O from
7 HSBC, may patch in at certain times, but I don't
8 know if he's on now. But you asked for counsel.
9 But we should be aware of that.
10      A. So there appears to be 17, but that
11 would include testimony at arbitration.
12 BY MR. BROOKS:
13      Q. We can skip discussing how a deposition
14 works. Is that fair to say?
15      A. Sure.
16      Q. Okay. You understand you're under
17 oath. Right?
18      A. Yes.
19      Q. Subject to the penalty of perjury?
20      A. Yes.
21      Q. And you're going to testify truthfully
22 today?
23      A. Yes.
24      Q. Have you ever been retained by
25 plaintiffs' counsel in a securities fraud class

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 49

1   Correct?
2       A.   That's correct.  It also includes
3   production from Fischel.  But I don't remember
4   whether that production included -- I'm not
5   saying that production included transcripts.
6   But -- but, again, it's the same answer that I
7   gave earlier.
8       Q.   Do you know who Joe Vozar is?
9       A.   I don't have a specific recollection.
10  I do know that Professor Fischel cites to various
11  statements by Household officials at different
12  times.  So I did review that.  But I haven't
13  memorized the positions of everybody in
14  Household.
15      Q.   You didn't read the deposition or trial
16  testimony of plaintiff's expert, Harris Devor,
17  did you?
18      A.   I don't have a specific recollection of
19  that.
20      Q.   And you didn't read the trial testimony
21  or deposition testimony of plaintiff's expert
22  Catherine Ghiglieri?
23      A.   Again, I don't have a specific
24  recollection of that, but I would incorporate my
25  earlier answer in terms of the process by which I

Page 50

1   reviewed these types of materials.
2       Q.   If a person is not mentioned in
3   Fischel's reports, you didn't read their
4   testimony?
5       A.   Not quite what I said.  If it's not
6   relied upon or pointed to as a basis in
7   Professor Fischel's various reports, and it's not
8   otherwise listed on these two Appendix Bs, then I
9   believe it's accurate that I did not otherwise
10  review it.
11      Q.   Did anyone on your behalf speak to any
12  current or former Household employees about this
13  case?
14          MR. FITZGERALD:  Object to form.
15      A.   Not that I --
16          MR. FITZGERALD:  Go ahead.
17          THE WITNESS:  Sorry.
18      A.   Not to my knowledge.
19  BY MR. BROOKS:
20      Q.   So other than the information that's
21  listed in Appendix B to both reports, you didn't
22  rely on information from current or former
23  Household employees to form your opinion.  Is
24  that fair to say?
25      A.   Yes.  It's fair to say -- just to be

Page 51

1   clear, it's fair to say that I'm not relying upon
2   conversations I had or conversations that
3   somebody on my behalf had with Household
4   officials.
5       Q.   In fact, you're not aware of any such
6   conversations?
7       A.   That's right.  Ergo, I would not be
8   relying on it.  Yes.
9       Q.   What did you do to learn about the
10  details of defendants' fraud, if anything?
11      A.   Well, I spent a significant amount of
12  time reading the -- I read the Corrected Amended
13  Consolidated Class Action Complaint for violation
14  of the federal securities law.  I read the jury
15  verdict form, where the jury specifically found
16  17 misrepresentations, also rejected a number of
17  other misrepresentations.  So my understanding is
18  that's the finding that has not been vacated, at
19  least -- I'm not providing legal opinion, but
20  that's my understanding.
21      And I did read some of the court orders to
22  get an understanding of the context.  And I did
23  review a number of materials from the initial
24  litigation, if I can call it that.
25      Q.   Did you read the District Court's most

Page 52

1   recent opinion denying defendants' motion to
2   exclude Professor Fischel?
3       A.   I did.
4       Q.   You didn't review plaintiff's trial
5   brief.  Is that correct?
6       A.   I don't believe so.
7       Q.   Did you review the opening statements
8   at the trial?
9       A.   I don't believe so.
10      Q.   What about the closing arguments?
11      A.   I don't believe so.
12      Q.   You didn't have all the trial exhibits,
13  did you?
14      A.   I did receive a lot of trial exhibits,
15  but I don't -- I'm not representing it was all
16  the trial exhibits.  And, again, I would
17  reiterate, I did review the jury verdict form
18  that represents the finding of the jury, as I
19  understand it.
20      Q.   So you understand that the jury found
21  defendants made material false and misleading
22  statements and omissions about three categories.
23  Right?
24      A.   Yes.
25      Q.   And what were those categories?

Case: 1:02-cv-05893 Document #: 2142-1 Filed: 04/22/16 Page 6 of 15 PageID #:82569

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 57

1  statement. Right?
2       MR. FITZGERALD: Objection to form.
3    A. My memory -- you'll have to show me the
4  jury verdict form to refresh my recollection, but
5  my memory of the jury verdict form is they
6  identified the material misstatements and
7  omissions.
8  BY MR. BROOKS:
9    Q. And you don't remember one way or
10  another whether they identified if material
11  misstatements or omissions dealt with predatory
12  lending, reaging, or the restatement?
13    A. I do remember that. So my memory, not
14  having the jury verdict form in front of me, is
15  that's consistent with my memory.
16    Q. And what you're saying is other than
17  what's on the jury verdict form, you have no idea
18  what that predatory lending box means. Correct?
19       MR. FITZGERALD: Objection to form.
20    A. Again, I think you're asking me a legal
21  opinion. My understanding of the jury verdict
22  form, but I'm not providing a legal opinion, is
23  that it was identifying the nature of the
24  material or what category the material
25  misrepresentation fell into, according to the

Page 58

1  jury.
2  BY MR. BROOKS:
3    Q. You didn't look for details about the
4  fraud from any source, other than the jury
5  verdict form?
6       MR. FITZGERALD: Objection to form.
7    A. I don't understand the question. My
8  understanding, but I'm not giving a legal
9  opinion, is that the actionable -- not the
10  actionable -- the material misstatements and
11  omissions that forms the basis for liability in
12  this case are the material misstatements and
13  omissions as find -- found by the jury on the
14  jury verdict form.
15       My understanding, without giving a legal
16  opinion, is that there's not other fraud beyond
17  that that would form a basis for liability.
18  Without providing a legal opinion, I'm just
19  giving you my understanding of what constitutes
20  the fraud.
21  BY MR. BROOKS:
22    Q. So can you tell me what reaging was?
23       MR. FITZGERALD: If we're going to move
24  to reaging, do you want to take a break? We've
25  been going about an hour.

Page 59

1       MR. BROOKS: Let's just get through a
2  couple more questions.
3       MR. FITZGERALD: Okay.
4  BY MR. BROOKS:
5    Q. Can you tell me what reaging was?
6    A. So, again, the complaint and
7  Professor Fischel discusses this, so my memory of
8  their discussion, the complaint, and the -- and
9  Professor Fischel's discussion of reaging
10  involved whether a certain -- how certain
11  accounts were treated in terms of delinquencies
12  and the timing thereof. So at a very general
13  level.
14       But, again, the specific answer would be the
15  reaging fraud or the fraud relating to reaging as
16  found by the jury. So the specific material
17  misrepresentations and omissions relating to
18  reaging, as found by the jury.
19    Q. So reaging was a practice that
20  Household engaged in. Do you understand that?
21    A. That's my --
22       MR. FITZGERALD: Objection to form.
23    A. That's my general understanding.
24  BY MR. BROOKS:
25    Q. And how did it work?

Page 60

1    A. Well, again, my understanding is that
2  the jury found certain statements concerning
3  reaging constituted fraud. And --
4    Q. I'm asking --
5    A. -- so that's what -- that's what I'm
6  focused on in terms of thinking about damages and
7  loss causation.
8    Q. Do you understand how reaging worked?
9  Yes or no?
10    A. I --
11       MR. FITZGERALD: Just objection to
12  scope. He's being offered on a damages case, and
13  objection, asked and answered.
14    A. I did review the complaint and
15  Professor Fischel's description of that. I
16  reviewed Household's 10-Ks and 10-Qs, where they
17  talk about treatment of certain accounts and how
18  those are going to be reported. But again, for
19  purposes of my analysis, I was focused on the
20  fraud and how to properly and scientifically
21  think about damages and loss causation in that
22  context.
23  BY MR. BROOKS:
24    Q. What financial metrics did reaging
25  impact at Household?

Case: 1:02-cv-05893 Document #: 2142-1 Filed: 04/22/16 Page 7 of 15 PageID #:82570

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 61

1    MR. FITZGERALD:  Same objection.
2    A.  So, again, my understanding is the
3  jury -- you know, if you want to put the jury
4  verdict form in front of me to remind me of the
5  specific material misrepresentations about
6  reaging, that would be helpful.  But my memory
7  from the complaint and Professor Fischel is that
8  it involved whether an account was delinquent or
9  not or whether it was going to be caught up in
10  some sense.  But that's a very general
11  understanding.  Again, what's important for me
12  and my scope is what constitutes the fraud.
13  BY MR. BROOKS:
14    Q.  You understand that reaging impacted
15  Household's two plus delinquency statistics.
16  Right?
17    MR. FITZGERALD:  Objection to scope.
18  If you're going to ask him about the findings and
19  the fraud, we should probably put the exhibit in
20  front of him.
21    MR. BROOKS:  I'm just asking about
22  reaging.
23  BY MR. BROOKS:
24    Q.  You understand that reaging impacted
25  Household's two plus delinquency statistics.

Page 62

1  Right?
2    MR. FITZGERALD:  Same objection to
3  scope.
4    A.  You know, my -- that's consistent with
5  my general memory, but I would want to -- you
6  know, I would need to confirm that.  So -- but
7  that's generally consistent with my memory.  But,
8  again, what's relevant for my purposes is what
9  actually constitutes the fraud.
10    MR. BROOKS:  Okay.  We can take a
11  break.
12    MR. FITZGERALD:  Great.
13    THE VIDEOGRAPHER:  The time is two
14  minutes after 10:00.  We're off the record.
15    (A recess was taken.)
16    THE VIDEOGRAPHER:  We are back on the
17  record.  The time is 10:18.
18    THE WITNESS:  Can I make a clarify --
19  there's something I remembered in response to an
20  earlier question, if I could, which you had asked
21  me if there was other people at the meeting when
22  I met with counsel, and I should have added, I
23  just remembered, is that personnel from
24  Cornerstone were at those meetings, as well.  So
25  I wanted to add that to my earlier answer.

Page 63

1  BY MR. BROOKS:
2    Q.  Who from Cornerstone was at the meeting
3  or meetings?
4    A.  So Kristin Feitzinger was there.  I
5  mangled that.  Also present was Nick Yavorsky,
6  Yavorsky.  I'm just trying to remember if there's
7  anybody else.  Those are the two -- those are the
8  two names that come to mind.
9    Q.  Are they senior people from
10  Cornerstone?
11    A.  Yes.  I believe so.  I would say
12  Kristin Feitzinger, Feitzinger is certainly a
13  senior person.  As I understand it, she's a
14  principal at Cornerstone.
15    Q.  You divided them between senior and
16  junior --
17    A.  Yes.
18    Q.  -- people for compensation, so that's
19  why I asked it that way.
20    A.  Sure.
21    Q.  Who else from Cornerstone?
22    A.  Well, just to be clear, I don't -- I
23  know that my understanding is that Kristin is --
24  is senior, is my understanding.
25    Q.  And what are her credentials?

Page 64

1    A.  She went to Stanford.  She has a
2  master's from Stanford.  I believe she also has
3  an MBA from Stanford.
4    Q.  What's her master's in?
5    A.  I don't know.  You asked about her
6  credentials.  I also know that she's been
7  working -- has done work for the last 20 some
8  years in the -- in the area of damages and event
9  studies and that general area.
10    Q.  Sorry.  What about Nick Yavorsky?  What
11  are his credentials?
12    A.  So, again, my understanding is for the
13  last seven, eight years, he's been working in
14  this area.  This area being damages, event study,
15  loss causation, economics, in that.  And I
16  believe he has an MBA.  I'm blanking on the name
17  of the school now.
18    Q.  Where are they based?
19    A.  Los Angeles.
20    Q.  Who else from Cornerstone has worked on
21  this engagement with you?
22    A.  So to my knowledge, in terms of people
23  that I've interacted with, in addition to those
24  two people, I would add Jamie Lee and Katie
25  Galli.

Frank Ferrell, III

Page 97

1  know -- and so one would have to deal with the
2  confounding information.  So all I'm saying is
3  Professor Fischel hasn't done it.  And to
4  ascertain damages, one would have to make an
5  assumption or articulate an approach to do the
6  disentanglement.
7  BY MR. BROOKS:
8      Q.  You haven't done it for those days that
9  you claim are confounded, but use in your $4.19
10  calculation.  Correct?
11     A.  I have not --
12         MR. FITZGERALD:  Object to the form.
13     A.  I have not done it.  My job was to
14  assess Professor Fischel.  Professor Fischel says
15  he's reliably estimated damages.  And this is one
16  way in which he hasn't done so.
17  BY MR. BROOKS:
18     Q.  And one of the suggestions in your
19  academic writing for dealing with confounded
20  information is to remove the dates from the
21  analysis.  Right?
22     A.  So I want to be very careful here.  My
23  article is very clear on this.  I say, as a
24  general matter -- you know, I'm not talking about
25  a particular case, as a general matter, one

Page 98

1  potential tool, depending on the facts and
2  circumstances of the case, is to remove the date.
3  So, for example, if you have seven corrective
4  disclosures in a hypothetical case, there's five
5  with statistically significant declines and
6  they're not confounded.  The other two are.  One
7  approach, depending on the facts and
8  circumstances, would be to drop those dates.
9      I'm not saying, and I'm not saying in this
10  case, that the automatic or the appropriate
11  approach is to necessarily or unthinkingly drop
12  the dates.
13     Q.  Dropping the dates that you claim are
14  confounded from your model would result in
15  negative inflation from the fraud.  Correct?
16         MR. FITZGERALD:  Objection to form.
17     A.  No.  I would not call that inflation.
18  Because I'm not opining that on those four
19  dates -- I'm not -- I'm not -- not offering the
20  opinion that on those four dates there isn't
21  corrective information.  I'm not opining on that
22  issue.  So I would not draw the conclusion that
23  there's negative inflation.  I don't say that and
24  I don't believe it.  And it's simply not the
25  case.

Page 99

1  BY MR. BROOKS:
2      Q.  Well, if you remove those four dates
3  from your model, the calculation would be that
4  the inflation was negative.  Right?
5         MR. FITZGERALD:  Objection.  Only to
6  form.
7      A.  No.  Because you are -- you know, I'm
8  not -- first of all, I don't agree with
9  automatically dropping dates.  I don't say that
10  in my article.  And I agree that a negative
11  inflation number throughout the class period
12  doesn't make sense and I don't say that.  And I'm
13  not saying that.  And the suggestion otherwise is
14  false.
15  BY MR. BROOKS:
16     Q.  But if you remove the residual declines
17  on those four days from your model, the model
18  would spit out a negative inflation number,
19  wouldn't it?
20         MR. FITZGERALD:  Objection to form.
21     A.  Well --
22  BY MR. BROOKS:
23     Q.  It's mathematics.  Right?
24         MR. FITZGERALD:  Let him answer the
25  question.  Objection to form.

Page 100

1      A.  Well, you have to understand what --
2  you know, in order to make an inference from
3  what -- in order to make an inference about
4  inflation, you have to understand what you're
5  doing.  So if you're dropping -- so I say -- let
6  me back up.
7      In my article cited by the Seventh Circuit,
8  I say that if you drop confounding days, you are
9  losing something valuable, which is potentially
10  corrective information that has an impact.  So if
11  you were to drop confounding information --
12  confounding days, you're losing something,
13  potentially.  And so I would not draw the
14  inference that a negative number means negative
15  inflation.  That's a non sequitur.
16  BY MR. BROOKS:
17     Q.  The model is designed to estimate
18  inflation in the stock, correct?
19     A.  The -- well, the purpose of my model is
20  to assess Professor Fischel.  And it's presented
21  in that light, in light of what does a properly
22  specified model generate.  And on the confounding
23  issue, I'm merely pointing out that
24  Professor Fischel has not done the job of a
25  damages experts, which is to reliably estimate

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 101

1 damages. It's not my job to do that. My job was
2 to assess whether Professor Fischel has done so.
3    Q.   So if you turn to Exhibit 8 to your
4 rebuttal report.
5    A.   Yes.
6    Q.   This is maximum alleged inflation using
7 a specific disclosure model. Right?
8    A.   Correct.
9    Q.   And why is this presented as a maximum?
10   A.   So this is using -- I just want to
11 double-check this. So if you go to Page 1 of
12 Exhibit 8, you'll see on November 14th, 2001,
13 four dollars and 19 dollars -- sorry, $4.19 of
14 inflation as of that date. So this is utilizing
15 the full residual price declines associated with
16 the six days. So in that sense, it's the
17 maximum, because it's including the entire
18 residual on the four confounding days and
19 treating it as solely a price reaction to
20 corrective information.
21   Q.   Now, I noticed on this chart that it
22 doesn't go back to the beginning of the class
23 period that the jury found.
24   A.   Correct.
25   Q.   Why is that?

Page 102

1    A.   Well, so this is the disclosure period.
2 So the first disclosure is November 15th, and so
3 I'm analyzing the disclosure period here. I
4 point out in my report, and I'll just go to the
5 language in the report, that to go back, one
6 would need to allocate that inflation, the $4.19,
7 to the various material misrepresentations and
8 omissions, accepting the jury verdict as
9 reflective of the jury verdict form.
10   Q.   And you haven't attempted to do that.
11 Correct.
12   A.   I want to get the exact language in my
13 report. I believe it's towards the end. So give
14 me one second.
15   Okay. So that -- I'm referring to
16 Paragraph 100. I'll tell you what Paragraph 100
17 says. It's on Page 46. My understanding is that
18 one would need to allocate the inflation, in my
19 Exhibit -- Exhibit A would be $4.19 to the
20 different alleged misrepresentations or,
21 accepting the jury verdict, the 17 misstatements
22 that the jury found.
23   Q.   Why is it your understanding that one
24 would need to allocate?
25       MR. FITZGERALD:  Objection. You can

Page 103

1 answer.
2    A.   So my understanding of the damages and
3 inflation exercise is that there's different
4 misstatements occurring at different points in
5 time. So the 17 are spaced over time, and there
6 could be different inflation for different
7 misrepresentations because they're occurring at
8 different points. So the level of inflation
9 could potentially be different as of the first
10 misrepresentation relative to the last
11 misrepresentation, because -- you know, because
12 there's 17 by that point versus one. And the
13 nature of the misrepresentation varies.
14 BY MR. BROOKS:
15   Q.   And you haven't looked at the nature of
16 the misrepresentation to determine what's
17 appropriate. Is that right?
18       MR. FITZGERALD:  Objection to form.
19   A.   That's correct. But I want to read the
20 exact -- correct, with this understanding, which
21 is it's an exercise, it's an allocation exercise,
22 my understanding it is the plaintiff's burden to
23 perform. So, again, my role was to assess Dr. --
24 Professor Fischel's analysis, and this is another
25 way in which he's failed to do his job. It's not

Page 104

1 my job.
2 BY MR. BROOKS:
3    Q.   Well, Professor Fischel has taken his
4 inflation estimation back to March 23, the first
5 day of the -- the first false statement in the
6 case. You understand that. Right?
7    A.   Correct.
8    Q.   And you had that information. Right?
9    A.   Correct.
10   Q.   And you're not saying, one way or
11 another, whether he was incorrect in assigning
12 the full amount of inflation, starting March 28,
13 2001. Is that correct?
14       MR. FITZGERALD:  Objection to form.
15   A.   I wouldn't -- no, it's not correct.
16 What I'm saying in Paragraph 100 is he hasn't
17 done any analysis to support that allocation, the
18 allocation being that each misrepresentation date
19 is associated with the same quantum of inflation.
20 BY MR. BROOKS:
21   Q.   Do you agree that plaintiffs proved at
22 the first trial that Household's share price
23 declined after the truth about defendants' fraud
24 came out?
25       MR. FITZGERALD:  Objection to scope of

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 105

1  what he's testifying to.
2      A.  It's outside my scope.  I haven't
3  analyzed that.  What I do know, without -- I was
4  not asked to opine on whether there was fraud or
5  not.  I do know that there's a jury verdict that
6  reflects 17 misstatements, as identified by the
7  jury.  And also I would add, a number of
8  misrepresentation dates that were rejected by the
9  jury.
10  BY MR. BROOKS:
11      Q.  So you don't dispute that plaintiffs
12  proved at the first trial that Household's share
13  price declined after the truth about defendants'
14  fraud came out, do you?
15          MR. FITZGERALD:  Same objection.
16      A.  That's outside my scope.
17  BY MR. BROOKS:
18      Q.  You don't dispute it?
19      A.  My -- well, my --
20      Q.  It's outside your scope, so you don't
21  dispute it.  Right?
22          MR. FITZGERALD:  Objection.
23      A.  I don't have an opinion on that,
24  because it's outside my scope.  My scope was to
25  provide my own independent opinion using standard

Page 106

1  rigorous methodology to assess what
2  Professor Fischel is offering in his report,
3  second supplemental rebuttal and surreply.
4  BY MR. BROOKS:
5      Q.  You can't dispute it if you don't have
6  an opinion about it.  Right, sir?
7          MR. FITZGERALD:  Objection.
8      A.  I have opinions about what
9  Professor Fischel is doing.
10  BY MR. BROOKS:
11      Q.  Do you have an opinion as to whether
12  defendants' materially false and misleading
13  statements and omissions found by the jury were a
14  substantial factor in causing investors who
15  purchased Household's stock between March 23rd
16  2001 and October 11th, 2002 losses?
17      A.  You know, that's a very imprecise
18  question.  I quantify inflation under -- in my
19  specific disclosure model.  And I'll just refer
20  back to that.  So if you ignore the confounding
21  information, it's $4.19 and that would be the
22  maximum inflation under that assumption as
23  reflected in my Exhibit 8.
24      Q.  So you don't dispute that defendants'
25  materially false and misleading statements and

Page 107

1  omissions, as found by the jury, were a
2  substantial factor in causing investors who
3  purchased Household's stock between March 23rd,
4  2001 and October 11th, 2002 losses.  Correct?
5          MR. FITZGERALD:  Object to the form.
6      A.  I don't know what you mean by
7  "substantial factor."  I quantify the inflation
8  using the specific disclosure model.  And that's
9  my opinion.
10  BY MR. BROOKS:
11      Q.  And that's the quantification reflected
12  in Exhibit 3a.  Correct?
13      A.  Well, it's reflected in my report.
14      Q.  Sorry.  Exhibit A?
15      A.  Exhibit A.  But also -- I mean, I have
16  other analyses in my report.  $4.19 is the
17  maximum, ignoring confounding information, using
18  a standard, appropriate methodology with a
19  well-specified model.
20      Q.  Do you have an opinion as to whether
21  there was loss causation in this case?
22      A.  Well, Professor Fischel -- I'm just
23  opining on what Professor Fischel has done.  Has
24  Professor Fischel established loss causation with
25  respect to the inflation that he finds?  And the

Page 108

1  answer to that is no.
2      Q.  You haven't developed an opinion as to
3  loss causation as to any other inflation.  Is
4  that your testimony?
5          MR. FITZGERALD:  Objection to form.
6      A.  My testimony is I was asked to assess
7  Professor Fischel's analysis.  And in the course
8  of that, I do provide a specific disclosure model
9  that is appropriate and scientifically rigorous.
10  BY MR. BROOKS:
11      Q.  And in assessing whether
12  Professor Fischel established loss causation with
13  respect to the inflation that he finds, what
14  definition of loss causation did you use?
15      A.  So Professor Fischel opines that -- I'm
16  going to forget the exact figures, 23, $24 is
17  caused by what he calls leakage.  And, therefore,
18  according to him, it constitutes recoverable
19  damages, damages for which, according to him,
20  there's loss causation.  And I have any number of
21  reasons for why that opinion is wrong and
22  fundamentally wrong.
23      Q.  So my question was:  In assessing
24  whether Professor Fischel established loss
25  causation with respect to the inflation that he

**Page 105..108**

**Frank Ferrell, III**

Page 161

1  date that's not confounded with the caveat that
2  there's a November 9th disclosure.
3  BY MR. BROOKS:
4      Q.  If it was not fraud-related, it would
5  not be a specific disclosure date.  Right?
6          MR. FITZGERALD:  Objection to form.
7      A.  So I'm assuming in the report that this
8  is corrective information, but -- but -- let me
9  put it this way:  In my report, this is not a
10  confounded day.  The issue that I raise with this
11  date is the November 9th.  And there's nothing
12  else I have to say about November 9th --
13  November 15th.
14  BY MR. BROOKS:
15      Q.  Why are you so reluctant to say whether
16  this is fraud-related information or not?
17          MR. FITZGERALD:  Objection to form.
18      A.  Because I wasn't asked to opine on what
19  the fraud was.  I was -- I'm assuming the -- the
20  misrepresentations in the jury verdict, without
21  opining on it.  So that was my hesitation, is not
22  to be viewed as providing an opinion on what --
23  on what the fraud actually is, if there is any,
24  rather than just noting -- merely noting what's
25  on the jury verdict, without providing an opinion

Page 162

1  on that.
2  BY MR. BROOKS:
3      Q.  Do you agree that in order to determine
4  whether something is fraud-related or not, one
5  has to understand the fraud?
6      A.  I agree with that.
7      Q.  Skipping down to December 3rd, 2001,
8  this is an entry discussing "articles published
9  by "Barron's" and "Business Week" that alleged
10  Household's strong results were in part driven by
11  aggressive chargeoff policies."  Do you agree
12  that this is a fraud-related disclosure?
13          MR. FITZGERALD:  What day are we on?
14  12/3/01?
15          MR. BROOKS:  Yeah.
16      A.  You know --
17          MR. FITZGERALD:  Thank you.
18      A.  -- I don't have the investor relations
19  report.  You know, I -- I feel uncomfortable
20  commenting on a sentence that's been cut and
21  pasted from a larger report without knowing the
22  context.  So I'm just not going to provide an
23  opinion on the investor relation report without
24  being given an opportunity to read the whole
25  thing, what the basis is for this in the report.

Page 163

1      I do talk about December 3rd in my report,
2  and I'll be happy to talk about what I do say
3  about December 3rd.
4  BY MR. BROOKS:
5      Q.  Well, yeah.  I mean, I'm asking you
6  about the disclosures, as summarized here.
7  Right?  So you understand that there were
8  disclosures on December 3rd, 2001, don't you?
9      A.  I have in my report a discussion of
10  December 3rd.  That's correct.
11      Q.  And a discussion of disclosures on
12  December 3rd?
13      A.  I believe so.
14      Q.  And were those --
15      A.  You know, hold on a second.  So there's
16  a lot of dates here.  I mean, I do have in my
17  Exhibit 3a, December 3rd.  So let me -- let me
18  restate my answer.
19      So I do have December 3rd in my Exhibit 3a.
20  And I just don't remember if I have a specific
21  discussion of that.  I have to -- let me flip
22  through my report.
23      I certainly reviewed Professor Fischel's
24  claimed disclosures on that date.  But I'm
25  flipping through my report to see, beyond my

Page 164

1  Exhibit 3a, if I have a discussion of that.  So
2  I'm looking at my initial report.
3      It looks like my first specific disclosure
4  date is December 12th.  And I'm looking at my
5  rebuttal.  And I'm looking at Page 32 of my
6  rebuttal.  Oh, so I do have December -- are we
7  talking about December 12?  So it's on page --
8      Q.  We're not talking about December 12.
9      A.  I'm sorry.  December 3rd.  So I won't
10  eat up any more time.  I'm just flipping through
11  it.  I can't readily find December 3rd, but I do
12  have, on Exhibit 3a, the statistical significance
13  on that date.  And I did review Professor
14  Fischel's discussion and citations on this date.
15      Q.  Did you review the "Barron's" and
16  "Business Week" articles?
17      A.  I believe so.
18      Q.  And --
19      A.  My memory is certainly the "Barron's"
20  is discussed in Fischel.  I reviewed a lot of
21  articles.  I -- I -- I probably reviewed it.  I
22  certainly reviewed it if it's discussed in
23  Professor Fischel, but I certainly reviewed this
24  date.
25          MR. FARINA:  The lunch is here if you

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 225

1 reading from 10-K. "We generally compete with
2 banks, thrifts, insurance companies, credit
3 unions, mortgage lenders and brokers, finance
4 companies, securities brokers and dealers and
5 other domestic and foreign financial institutions
6 in the United States, Canada and the United
7 Kingdom." So that's what it says. And I
8 wouldn't change the wording of it.
9      MR. FITZGERALD: I think you referred
10 to Exhibit 8. I think you meant Exhibit 9.
11 Otherwise, I don't want to interrupt.
12   A. Oh, yeah. I thought you were directing
13 me to the 10-K.
14   Q. The 10-K, for the record, is Exhibit 9.
15 The article is Exhibit 8.
16   A. Okay.
17   Q. You were discussing the 10-K in your
18 last answer?
19   A. Correct. There might have been some
20 confusion. I thought you were -- my
21 understanding of the question was you were
22 characterizing the 10-K.
23      MR. FITZGERALD: I only interrupted,
24 you referred to the wrong exhibit number it. You
25 were reading from a document that was Exhibit 9.

Page 226

1   A. Okay.
2      MR. FITZGERALD: You said you were
3 reading from Exhibit 8. And Mr. Brooks and I
4 both understood that. We just wanted the record
5 to be clear.
6      THE WITNESS: Okay. Sorry.
7      MR. BROOKS: No.
8   Q. So you're saying that when Household
9 tells the market we generally compete with these
10 lines of business, they're not saying that
11 they're comparable to these lines of business.
12 Is that your testimony is this is?
13      MR. FITZGERALD: Objection.
14   Q. That's how I'm quote mischaracterizing
15 the document?
16      MR. FITZGERALD: Objection to form.
17   A. Well, it doesn't say lines of business.
18 It says different institutions they generally
19 compete with. So that's -- that's what the
20 document says.
21   Q. Well, looking at the list in
22 Household's 10-K, is there any one of these
23 examples that you think is not a comparable, in
24 terms of their line of business?
25   A. I think that it's fine, and, in fact, I

Page 227

1 do use S&P 500 financials, which as we discussed,
2 includes these institutions. But it's important
3 to include the consumer finance companies as
4 well. And it's a better specified model.
5   Q. And specifically, the consumer finance
6 companies that CSFB selected. Right?
7   A. Correct.
8   Q. What was your process for landing on
9 that particular group of consumer finance
10 companies?
11   A. Sure. So the process was, it was very
12 important to me to use a third-party
13 identification of comparables contemporaneous
14 with the time period. Not to use -- not to be
15 accused of constructing something for the
16 purposes of litigation, but to use a third-party
17 identifying of comparables during the relevant --
18 contemporaneous with the -- with the time period
19 at issue. So that was criteria one. Criterion
20 one. The second criterion is consistent with the
21 academic literature, and I'll explain that in a
22 minute, I went to the "Institutional Investor"
23 magazine, which ranks analysts. I identified the
24 star analyst, according to "Institutional
25 Investor" magazine, for 2001. I'm going to

Page 228

1 mispronounce the gentleman's name, but it's the
2 person who produced or whose name is on the CSFB
3 report. So was identified for 2001 as the star
4 analyst, and I went to his report, where he
5 identifies those firms. And the final thing I
6 would note, which was important to my thinking,
7 is that the academic literature regularly uses
8 this source, the "Institutional Investor"
9 magazine, to identify star analysts. And so I
10 felt that was an objective way to identify
11 comparables.
12   Q. Where in your report can I see that
13 academic literature?
14   A. I don't cite the academic literature.
15 It's just something I'm familiar with as general
16 background information.
17   Q. What literature are you referring to?
18   A. So I don't have article citations off
19 the top of my head but there's a number of
20 articles that cite, that use "Institutional
21 Investor" magazine or this publication to
22 identify the star analysts and do various types
23 of analyses.
24      So some papers look at, do the star analysts
25 do a good job predicting future, you know, the

Case: 1:02-cv-05893 Document #: 2142-1 Filed: 04/22/16 Page 13 of 15 PageID #:82576

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 229

1  future accounting returns or the future
2  performance of the firm at issue, in some sense.
3  So there's a number papers or -- that use that --
4  that ranking for analytical purposes.
5      Q.  So you relied on "Institutional
6  Investor" magazine.  Why didn't you include it in
7  the documents that you relied on?
8      A.  I believe it is there.  My memory is
9  it's there, in some form or another.  I'm sorry.
10  I'm in the wrong document.  That's -- my memory
11  is it was there, but I could be mistaken.
12      Q.  Well, let's turn to --
13      A.  So it would be in the rebuttal.  Oh,
14  no.  Maybe it would be in the -- I think we have
15  to look at both.
16      Q.  Why don't you take a look at Appendix B
17  to your original report.  I don't see anything
18  about "Institutional Investor" magazine.  Do you
19  agree that it's not there?
20      A.  Are you now --
21      Q.  My question was why don't you look at
22  Appendix B to your original report.  I don't see
23  anything about "Institutional Investor" magazine.
24  Do you agree it's not there in the original
25  report, Professor?

Page 230

1      A.  So I'm not finding it here.  My memory
2  was -- I thought it was contained somewhere here
3  in some form, but I'm not seeing it right here,
4  right now.
5      Q.  It's not in the rebuttal report,
6  either, is it?
7      A.  I'm not finding it right now.
8      Q.  Do you think that you cited the
9  academic articles that refer experts to
10  "Institutional Investor" magazine in your
11  reports?
12      A.  No.  I did not cite the academic
13  articles.  So my testimony on that was that it's
14  just my general background information.  So I
15  would want to spend more time to confirm that
16  it's not here.  So there's references to produced
17  files and so forth.  But it is correct that,
18  sitting here right now, I don't -- I don't
19  readily -- I don't see it.
20      Q.  So is it your testimony that the
21  academic literature refers to star analysts'
22  selection of peer indices for experts, in cases
23  like this one, to adopt a peer index?
24      A.  That is not my testimony.
25      Q.  Okay.  What does the academic

Page 231

1  literature that you can't tell us about
2  specifically -- withdrawn.
3      What does the academic literature that you
4  relied on but didn't disclose to us say that you
5  were relying on in going to "Institutional
6  Investor" magazine?
7          MR. FITZGERALD:  Objection to form.
8      A.  Yeah.  So I -- so I'm not saying I
9  relied upon it.  I'm saying it's part of my
10  background knowledge.  It's a publication that
11  ranks analysts.  And I did use that to identify
12  this particular analyst.
13      So -- but in terms of the academic
14  literature, there's articles -- I don't have them
15  memorized, off the top of my head -- that use
16  that ranking to identify star analysts for
17  various purposes.
18  BY MR. BROOKS:
19      Q.  None of those purposes are for
20  identifying a peer group.  Correct?
21      A.  That, I don't know.  I'm not -- I'm not
22  making that representation.
23      Q.  Why did you try to identify the
24  star analyst?
25      A.  Because presumably the star analyst is

Page 232

1  the best analyst, at least according to that
2  ranking.  There's a number of analysts.  And so
3  you would want some objective criteria --
4  criterion to identify one of those analysts.
5      Q.  Was this your idea or Cornerstone's
6  idea?
7      A.  It was my idea.
8      Q.  What exactly is the CSFB Specialty
9  Finance Index?
10      A.  Well, it's a group of nine firms
11  identified, I believe, in a March 2001
12  publication -- let me just make sure I'm not
13  getting the date wrong -- that -- you know, that
14  are listed in that document, in the CSFB report.
15      Q.  Is it a traded index?
16      A.  Not to my knowledge.
17          (Sur-Rebuttal Report of Daniel
18      R. Fischel marked Exhibit 10.)
19          MR. BROOKS:  I'm going to mark as
20  Exhibit 10 Fischel's surrebuttal report.
21          THE WITNESS:  Okay.
22  BY MR. BROOKS:
23      Q.  Exhibit 1 to this report --
24      A.  To the surreply.
25      Q.  To the surrebuttal report.  That's the

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 289

1    I don't understand how Professor Fischel
2  would conclude that fraud, according to him, is
3  increasing the systemic risk, and, therefore,
4  affecting the beta. So it's very unclear to me
5  and puzzling what the theory is for why
6  firm-specific alleged corrective information
7  would manifest itself in a changed beta, which is
8  what the structural break is showing.
9  BY MR. BROOKS:
10    Q.  Anything else?
11    A.  That's my general response. But I
12  would incorporate the analyses in my reports.
13    Q.  You've identified six general
14  categories of what you opine are company-specific
15  non-fraud negative news released during the
16  leakage period that may have impacted Household's
17  stock price. Right?
18        MR. FITZGERALD: Objection to form.
19    A.  I don't think I break it out into the
20  six categories, unless I'm misremembering. I'm
21  not saying that's inaccurate. I'm just saying
22  that's not how I bucketed the information.
23  Again, I'm not saying it's an inaccurate, you
24  know, bucketing; but it's not one that I deploy
25  in my report.

Page 290

1  BY MR. BROOKS:
2    Q.  You don't dispute that bucketing? You
3  don't think it would be misleading? Is that what
4  you're saying?
5    A.  I would need to review all the
6  non-fraud information that I point to and match
7  it up.
8    I would emphasize the most -- a very
9  important category would be subprime and nonprime
10  and the concerns that the market had during this
11  period in connection with Household's business.
12    Q.  You're saying that --
13    A.  And I would also add the barring cost,
14  the reliance of Household on the commercial paper
15  market.
16    Q.  So the concerns that the market had
17  about subprime and nonprime and the borrowing
18  costs are the two most significant factors. Is
19  that your opinion?
20        MR. FITZGERALD: Objection to form.
21    A.  I would say that was -- you know,
22  that's -- you know, sitting here, those are two
23  themes that come out of the market commentary.
24  But I would just simply point to my reports,
25  where I identify on specific days non-fraud

Page 291

1  information. And so that would be the most
2  complete characterization.
3    Those are just two important themes that
4  come out of -- or two market concerns that are
5  reflected in the market commentary during this --
6  during this period.
7  BY MR. BROOKS:
8    Q.  So you haven't done anything to
9  quantify the dollar impact of any of these
10  concerns that you claim are company-specific,
11  non-fraud. Right?
12        MR. FITZGERALD: Objection to form.
13    A.  No. I have my Exhibit 3a and 3b.
14    Q.  Exhibits 3a and 3b quantify the dollar
15  impact of the company-specific non-fraud
16  information?
17    A.  Oh, I misunderstood you. So those
18  exhibits are showing -- okay. So for the dates
19  in Exhibit 3a and 3b, they're showing dates that
20  are statistically significant. And so for those
21  days, you would want to ask the question whether
22  there's, you know, non-fraud information or
23  corrective information.
24    Q.  My question is whether you've done
25  anything to quantify the impact of what you're

Page 292

1  calling company-specific non-fraud information on
2  Household's stock during the disclosure period.
3        MR. FITZGERALD: Objection to form.
4    A.  So an important piece of terminology,
5  company-specific I would define as residuals in a
6  model. And the residuals that I have in my
7  Exhibit 3a and 3b, I do have residuals --
8  statistically significant residuals in that. And
9  I do discuss, for example, on August 7th, on
10  September 16th, and on October 8th, whether those
11  residuals are explainable by non-fraud
12  information.
13  BY MR. BROOKS:
14    Q.  Is it your opinion that Household's
15  worsening credit quality was a company-specific
16  non-fraud factor that was impacting Household's
17  stock during the disclosure period?
18    A.  So I would refer to my specific
19  discussions of the -- you know, as a partial
20  answer to that, of the residuals in Exhibit 3b.
21  So those would be days which are company-specific
22  in the sense that I'm using the term and the
23  nature of the non-fraud information I identify on
24  those days.
25    I can't remember every day off the top of my

**Page 289..292**

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 293

1  head, but I would go to that as examples of
2  company-specific, in the sense of a statistically
3  significant residual, that's explainable by
4  non-fraud information.
5      Q.  So why don't you turn to Paragraph 62
6  of your original report.
7          (Witness complies.)
8      A.  Okay.  I'm there.  Is this the
9  January 28th?  I just want to make sure I'm at
10  the right place.
11     Q.  January 28th.  Right.
12     A.  Okay.
13     Q.  This is one of those dates that was
14  statistically significant under Professor
15  Fischel's analysis.  Right?
16     A.  Correct.
17     Q.  And you found that there were
18  company-specific, non-fraud disclosures that
19  contributed to the decline.  Right?
20     A.  I have to review to refresh my
21  recollection.
22         Okay.  Could you repeat the question.
23     Q.  You found that there were firm-specific
24  non-fraud disclosures on this date that
25  contributed to the decline.  Correct?

Page 294

1      A.  That's not -- that's actually not
2  accurate.  So in this report, my initial report,
3  I said may have.  In the second report, I
4  quantify it.
5      So I want to be very clear here.  So for
6  firm-specific non-fraud in this report, the
7  initial report is firm-specific, non-fraud in the
8  context of Fischel's regression.  So he has a
9  statistically significant residual on this date.
10  And the question is, in his residual, given his
11  model, is there firm-specific, non-fraud
12  information.
13     Now, when you properly control, you have a
14  properly specified model, it's not statistically
15  significant, proving or establishing that what I
16  identified as firm-specific, non-fraud
17  information in the context of Fischel's model is
18  accurate.
19     Q.  Doesn't the fact that it's not
20  statistically significant show that, under your
21  model, it was industry factors that caused the
22  decline?
23     A.  Yes.  But, again, what -- this is a
24  very important point.  What I'm saying is, in
25  Professor Fischel's model, there's a

Page 295

1  statistically significant residual on this day.
2  Okay.  And in this initial report, I'm pointing
3  out, on this date, that, in his model, in his
4  residual, there's non-fraud, firm-specific
5  information that's in his residual.  And then I
6  discuss that.
7      In a properly specified model, when you --
8  which controls for some credit card issues,
9  subprime, as reflected in the CSFB, it's no
10  longer statistically significant.  So that proves
11  that in his residual, there was non-fraud
12  information that's removed -- that's being
13  removed by the corrective model.
14     Q.  What it proves is that the information,
15  at least if you're right, was not
16  company-specific.  Right?  Because when there's
17  no statistically significant decline, that means
18  that it was not company-specific information that
19  caused the decline.  Isn't that right?
20         MR. FITZGERALD:  Objection to form.
21     A.  This is missing a very important point,
22  which is company-specific, as I define it, and as
23  is relevant in this case, you know, in assessing
24  Professor Fischel's reports, means the residual
25  in a model.

Page 296

1      So the -- so it's the -- there's a
2  firm-specific effect in his model on
3  January 28th.  You're right, in my model there's
4  no longer a firm-specific effect, and that is
5  proof that what he is labeling a firm-specific
6  effect that's fraud -- that's caused by fraud or
7  fraud information is, in fact, just capturing
8  industry information in a better specified model.
9  BY MR. BROOKS:
10     Q.  Using your --
11     A.  I have a discussion of this in the
12  report that I can find, if that would be helpful.
13     Q.  Including your index that you claim has
14  a tighter peer group, but leaving all the other
15  specifications the same, Professor Fischel found
16  that it didn't impact his statistically
17  significant --
18         MR. FITZGERALD:  Objection to form.
19  BY MR. BROOKS:
20     Q.  -- dates.  Isn't that right?
21     A.  So are you saying that when he includes
22  my peer index in his estimation window that
23  January 28th remains statistically significant?
24     Q.  Isn't that what he's found?
25     A.  I don't recall that specifically.  I