# EXHIBIT 5

1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

LAWRENCE E. JAFFE PENSION    )
PLAN, On Behalf of Itself    )
and All Others Similarly     )
Situated,                    )
            Plaintiffs,  )  Lead Case No.
    vs.                      )  1:02-CV-05893
HOUSEHOLD INTERNATIONAL,     )
INC., et al.,                )
            Defendants.  )


VIDEOTAPED DEPOSITION OF DANIEL FISCHEL, Ph.D.

February 24, 2016

Chicago, Illinois

9:00 a.m.


Reported By:
Sheri E. Liss, CRR
Job No. 42823

**Page 2**

```
 1        The videotaped deposition of DANIEL
 2   FISCHEL, Ph.D., called by the Defendant for
 3   examination, taken pursuant to the Code of Civil
 4   Procedure and the Rules of the Supreme Court of the
 5   State of Illinois pertaining to the taking of
 6   depositions for the purposes of evidence, taken
 7   before Sheri E. Liss, CSR NO. 084-002600, a
 8   Certified Shorthand Reporter within and for the
 9   State of Illinois, Registered Professional Reporter,
10   Certified Realtime Reporter, at the offices of
11   Skadden, Arps, Slate, Meagher & Flom, LLP,. 155
12   North Wacker Drive, Chicago, Illinois, on
13   February 24, 2016 at the hour 9:00 o'clock a.m.
```

**Page 3**

```
 1   APPEARANCES:
 2   ON BEHALF OF THE PLAINTIFFS:
 3        ROBBINS GELLER RUDMAN & DOWD, LLP
 4        655 West Broadway, Suite 1900
 5        San Diego, CA 92101
 6        (619) 231-1058
 7        BY:  SPENCER BURKHOLZ, ESQ.
 8           spenceb@rgrdlaw.com
 9           LUKE BROOKS, ESQ.
10           LukeB@rgrdlaw.com
11           MICHAEL DOWD, ESQ.
12           miked@rgrdlaw.com
13
14
15   ON BEHALF OF HOUSEHOLD INTERNATIONAL, INC.:
16        WILLIAMS & CONNOLLY, LLP
17        725 Twelfth Street, N.W.
18        Washington, D.C. 20005
19        BY:  STEVEN M. FARINA, ESQ.
20           sfarina@wc.com
21           LESLIE COOPER MAHAFFEY, ESQ.
22           lmahaffey@wc.com
23
24             -and-
25
```

**Page 4**

```
 1   APPEARANCES (continued):
 2        SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
 3        155 North Wacker Drive
 4        Chicago, IL 60606
 5        BY:  PATRICK FITZGERALD, ESQ.
 6           patrick.fitzgerald@skadden.com
 7           ANDREW J. FUCHS, ESQ.
 8           andrew.fuchs@skadden.com
 9           RYAN STOLL, ESQ.
10           ryan.stoll@skadden.com
11
12
13   ON BEHALF OF WILLIAM ALDINGER:
14        KATTEN MUCHIN ROSENMAN, LLP
15        525 West Monroe Street
16        Chicago, IL 60661
17        BY:  GIL M. SOFFER, ESQ.
18           gil.soffer@kattenlaw.com
```

**Page 5**

```
 1   ON BEHALF OF GARY GILMER;
 2        McDERMOTT WILL & EMERY
 3        227 West Monroe Street
 4        Chicago, IL 60606
 5        BY:  DAVID S. ROSENBLOOM, ESQ.
 6           drosenbloom@mwe.com
 7           C. MAEVE KENDALL, ESQ.
 8           makendall@mwe.com
 9
10
11   ON BEHALF OF DAVE SCHOENHOLZ;
12        JACKSON WALKER, LLP
13        1401 McKinney Street, Suite 1900
14        Houston, TX 77010
15        BY:  TIM S. LEONARD, ESQ.
16           tleonard@jw.com
17
18
19   ALSO PRESENT:
20        MARK LoSACCO, HSBC
21        KRISTIN FEITZINGER, Cornerstone
22        STUART ALDERTY (Telephonically)
23        NICK YAVORSKY (Telephonically)
24        ALLEN FERRELL (Via LiveDeposition Feed)
25        JEREMY MANGAN, Videographer
```

2 (Pages 2 to 5)

Page 6

I N D E X

| | Page |
|---|---|
| By Mr. Farina | 8 |

E X H I B I T S

| No. | Page |
|---|---|
| Exhibit 1 | 9 |
| Exhibit 2 | 22 |
| Exhibit 3 | 47 |
| Exhibit 4 | 59 |
| Exhibit 5 | 85 |
| Exhibit 6 | 93 |
| Exhibit 7 | 108 |
| Exhibit 8 | 118 |
| Exhibit 9 | 123 |
| Exhibit 10 | 142 |
| Exhibit 11 | 155 |
| Exhibit 12 | 161 |
| Exhibit 13 | 161 |
| Exhibit 14 | 189 |
| Exhibit 15 | 192 |
| Exhibit 16 | 195 |

Page 7

E X H I B I T S (continued)

| No. | Page |
|---|---|
| Exhibit 17 | 205 |
| Exhibit 18 | 208 |
| Exhibit 19 | 222 |
| Exhibit 20 | 224 |
| Exhibit 21 | 256 |
| Exhibit 22 | 259 |
| Exhibit 23 | 268 |
| Exhibit 24 | 269 |
| Exhibit 25 | 271 |

Page 8

THE VIDEOGRAPHER: We are now on the record. This marks the beginning of Media No. 1 in the deposition of Daniel Fischel in the matter of Lawrence E. Jaffe, et al., versus Household International, et al., in the U.S. District Court, Northern District of Illinois, Eastern Division. This deposition is being held at 155 North Wacker Drive, Chicago, Illinois on February 24, 2016 and the time is now 9:10 a.m. All attorneys present will be noted on the stenographic record. Will the court reporter please swear in the witness.

(Whereupon, the witness was duly sworn.)

DANIEL FISCHEL, Ph.D., having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. FARINA:

Q. Good morning, Professor Fischel.

A. Good morning.

Q. Let me start by handing you what we've marked as Exhibit 1, and we're going to start at 1 and run consecutively.

A. Okay.

Page 9

(Whereupon, Exhibit 1 marked.)
(Whereupon, the document was tendered.)

BY MR. FARINA:

Q. You're familiar with that document?

A. No, I'm not actually. I don't know what this is.

Q. I'll tell you this is the verdict form from the first trial. It's the one that the jury actually filled out.

Have you looked at this verdict form since the first trial?

A. No, I didn't look at it at the time or I -- and I haven't look at it subsequently.

Q. So you haven't used this verdict form in any way in creating your damages models?

A. I have not. My damages models predated the existence of this form.

Q. Now, when you presented your damages models in the first trial, you were making certain assumptions about liability; is that correct?

A. That's probably fair to say. That's correct.

Q. And the jury in the first trial actually made findings as to liability. And at the time, the

3 (Pages 6 to 9)

10

1  plaintiffs were presenting 40 separate alleged
2  misstatements.
3        Do you recall that?
4     A.   No, I don't.
5     Q.   Okay.
6     A.   I'm not disagreeing, I just don't recall
7  it one way or the other.
8     Q.   And you understand that the jury in the
9  first trial agreed with the plaintiffs as to 17 of
10 the alleged misstatements and disagreed with the
11 plaintiffs as to 23 of the alleged misstatements.
12    A.   Again, that may be right. I don't know.
13 But I don't have any familiarity with that one way
14 or the other.
15    Q.   So that's not something that you've
16 taken into account in presenting your damages model
17 in the retrial?
18    A.   I haven't specifically taken that into
19 account, no.
20    Q.   Could you take a look at the document
21 that's before you? And if you want to peruse the
22 document, that's fine with me, but I would like to
23 direct you to Page 40 of the document.
24    A.   Okay. All right. I have it.
25    Q.   So the way this is laid out, there is a

11

1  separate question for each of the 40 alleged
2  misstatements. And the jury decided whether or not
3  Household and the individuals had made misstatements
4  that were actionable or not made misstatements, and
5  this particular page goes to statement No. 40.
6        Do you see that?
7     A.   I see it, yes.
8     Q.   And do you see that the jury rejected
9  the alleged misstatement No. 40?
10    A.   I do.
11    Q.   All right. Now, did you make any
12 adjustment to your damages analysis to take into
13 account that the jury had rejected this alleged
14 misstatement?
15    A.   As I said, I didn't look at this
16 document. I think I adjusted my -- the dates for
17 the beginning of my damage calculations using the
18 exact same model with one slight adjustment for the
19 first three days. That's all I did.
20    Q.   So I'll represent to you that the
21 statements run chronologically, so statement No. 40
22 would be the last alleged misstatement. And if you
23 want to verify that I can walk you through the
24 document.
25    A.   You could do whatever you'd like. I've

12

1  never looked at this document. And like I said, it
2  didn't play any role in the damage analysis that I
3  did either at the trial or what I have presented in
4  my reports in connection with the potential retrial.
5     Q.   All right. If you would flip to Page
6  39.
7     A.   Okay. I have it.
8     Q.   So this is statement 39. You'll see the
9  jury rejected that alleged misstatement as well?
10    A.   I see that.
11    Q.   And I take it your answer is the same,
12 you haven't reduced your damages in any way to take
13 into account that the jury rejected this particular
14 alleged misstatement?
15    A.   It's really the same answer. This
16 document played -- this particular document played
17 no role in my analysis of my damage model or
18 calculations. The only adjustments I made are the
19 ones that I've stated.
20    Q.   Okay. But it's not just this document.
21 Your model doesn't take into account the fact that
22 the jury rejected this alleged misstatement.
23    A.   I can't speak to this alleged
24 misstatement because I don't know what this
25 particular misstatement means in the connection --

13

1  in connection with the case. I did modify my model
2  to have a different starting date because of what I
3  understood the jury found with respect to what the
4  jury considered to be the first false and misleading
5  statement so I did take the -- my understanding of
6  the jury verdict into account in that way.
7        I also made a slight adjustment for
8  the first three days of the class period based on
9  what -- I guess what I call the new class period
10 based on my understanding of the 7th Circuit
11 opinion. But other than that, I kept everything the
12 same.
13    Q.   And if you would turn to Page 14 of the
14 document.
15    A.   Okay. I have it.
16    Q.   That is statement No. 14, and you'll see
17 that there are "yes" boxes checked or "yes" lines
18 checked. I'll represent to you that that's the
19 first alleged misstatement that the jury found.
20       So your testimony is you took this
21 particular misstatement into account by adjusting
22 the starting point for your model; is that fair?
23    A.   I don't know if it's fair or not. I
24 don't want to comment on this particular document
25 because, as I said, I've never seen it, I didn't

4 (Pages 10 to 13)

                                                                14
 1    review it.  I've already told you what I did in
 2    connection with my damage model in this part of the
 3    proceeding as opposed to what I did at the time of
 4    the original retrial.
 5           And I guess I would also say, my
 6    understanding at this point, the existence of the
 7    fraud has been established by the jury verdict and
 8    subsequent judicial ruling so it's no longer an
 9    assumption.
10        Q.   I agree with that.  What's been
11    established are the 17 specific misstatements that
12    the jury found.
13           Would you agree with that?
14        A.   You know, I've already said, I don't
15    have a specific understanding, without checking, of
16    exactly how many misstatements the jury found to be
17    false and misleading.
18        Q.   But you understand that the jury
19    accepted certain misstatements and rejected others?
20        A.   I guess on some general level I
21    understand that.
22        Q.   All right.
23        A.   And that -- again, that is really the
24    motivation for the change in the starting date for
25    purposes of my damage model.

                                                                15
 1        Q.   Would you agree that your role as an
 2    expert in the retrial is to help the jury determine
 3    whether the 17 misstatements caused any injury and
 4    to help quantify those damages?
 5        A.   Well, I don't want to keep repeating
 6    myself.  I don't know whether 17 is the right
 7    number, the wrong number.  But I agree, my role in
 8    the retrial, subject to the Court's rulings and what
 9    the jury determines, is to analyze the artificial
10    inflation resulting from the fraud committed by
11    Household and its executives.
12        Q.   Well, to be more precise, it's analyzing
13    the damages that you believe were caused by the --
14    however many number, whatever the number is, I'll
15    represent to you it's 17, it's trying to determine
16    the damages that were caused by those 17
17    misstatements, correct?
18        A.   Actually, I prefer my own formulation in
19    my last answer.  My analysis was to measure the
20    existence and magnitude of artificial inflation
21    under two different damage models, and that's what I
22    did.
23        Q.   But the fraud that you're measuring
24    damages for has been fixed by the jury as being
25    comprised of those misstatements.

                                                                16
 1           Would you agree with that?
 2        A.   Well, you keep using the word "damages."
 3    I'm using the word "inflation" because I think there
 4    is a difference.
 5           But apart from that, my role, to
 6    the extent that it's permitted by the Court, is to
 7    do exactly what I said, to measure the existence of
 8    artificial inflation under two different damage
 9    models resulting from the fraud committed by
10    Household and its executives.
11        Q.   Would you agree that any damages model
12    that you offer to the jury in the second trial has
13    to be based upon and consistent with the jury's
14    findings in the first trial that were not vacated on
15    appeal?
16        A.   You keep using the words "damages."  I
17    can start my answer every single time by talking
18    about inflation as opposed to damages so I'll do it
19    again.
20           But apart from that, it sounds like
21    you're asking for a legal opinion.  I've already
22    described what my understanding of my role is and
23    I've already said it's subject to whatever judicial
24    rulings the Court makes about the relevance of my
25    analysis of inflation under my two different models

                                                                17
 1    in connection with the fraud that's been established
 2    against Household and its executives.
 3        Q.   I'll ask it this way:  Did you attempt
 4    to conform your models of inflation to the findings
 5    that were found by the jury?
 6        A.   I would say yes in the way that I've
 7    described.
 8        Q.   And you would agree that for your models
 9    to be helpful to the jury in determining damages in
10    this case that was caused by the 17 misstatements,
11    you would have to be offering a model that is
12    predicated on the jury's actual findings?
13        A.   You know, you've asked me that question
14    multiple times now in different ways and I will give
15    you the same answer every time.  I've told you what
16    I've done, and whether that is consistent with the
17    Court's rulings will be determined by the Court.
18    Whether it's helpful to the jury, assuming it's
19    permitted by the Court, will be determined by the
20    jury.  And I really don't have anything to add
21    beyond that.
22        Q.   Okay.  If you go to -- let's just take
23    one, let's go to statement 38 on Page 38.
24           MR. BURKHOLZ:  Can you actually show him
25    the statement you're talking about?

18

1  MR. FARINA: Sure. It's actually in the
2  document.
3  BY MR. FARINA:
4  Q.  The way this works is you have the --
5  it's broken out in different sections.  The section
6  we're in right now is just a list of the statements.
7  But if you go further in the document, you'll see
8  that the statements are actually laid out.  So it's
9  towards the back.  So 38 is on Page 26 of the second
10 part of the document.
11 A.  Okay.  I have it.
12 Q.  Actually, it runs on two.
13     MR. BURKHOLZ: Is it 38 you're asking
14 him about?
15     MR. FARINA: Yes.
16 BY MR. FARINA:
17 Q.  So you see the statement 38?
18 A.  I do.
19 Q.  So how did the misrepresentation that is
20 statement 38 cause inflation in Household's stock
21 according to your model?
22 A.  I'm not sure how to answer that other
23 than what I've already said.  My understanding is
24 that the jury found that Household and its
25 executives executed a massive fraud.  The first

19

1  false and misleading statement in connection with
2  that fraud was on March 23, if I remember correctly,
3  2001, with the fraud fully revealed I think October
4  11, 2002.
5      The fraud involved fraudulent
6  statements in three areas and that -- where the
7  first false and misleading statement with pred- --
8  dealt with predatory lending.  Other false and
9  misleading statements dealt with some combination of
10 the three areas of the fraud.
11     And based on that understanding,
12 which was originally an assumption, as you stated,
13 but later determined to be a fraud in those three
14 areas in the way that I said, I calculated by two
15 particular models of inflation.
16 Q.  Did statement No. 38 cause inflation in
17 Household's stock?  And I'm focusing particularly on
18 statement 38.
19 A.  Well, as I sit here, I don't have an
20 opinion one way or the other, other than the subject
21 matter of statement 38, to the extent it involved
22 one of the three areas found to be fraudulent by the
23 jury, I would say did cause an inflation in
24 Household's stock, even if the nature of that fraud
25 was a failure to make corrective statements about

20

1  this subject or subjects at earlier points in time
2  in a fraudulent way as determined by the jury.
3  Q.  If the jury had rejected statement
4  No. 38 as it did statements No. 39 and 40, that
5  wouldn't have changed the inflation generated by
6  your models, correct?
7      MR. BURKHOLZ: Objection to form.
8  BY THE WITNESS:
9  A.  I'm not sure I would be able to give an
10 answer to that question.  But in terms of my model,
11 I've already told you what I did and what it was
12 based on.
13 BY MR. FARINA:
14 Q.  You didn't make any adjustment to take
15 into account that the jury rejected statements 39
16 and 40, correct?
17     MR. BURKHOLZ: Objection.  Asked and
18 answered about five times.
19 BY THE WITNESS:
20 A.  As I said, I didn't look at this
21 particular form at any point in time.  This is the
22 first time I've seen it, to the best of my knowledge
23 today, and I've told you what I did.
24 BY MR. FARINA:
25 Q.  Okay.  So with respect to all of the

21

1  statements that were rejected by the jury that come
2  after the first misstatement found by the jury, the
3  fact that the jury rejected those misstatements did
4  not cause you to change in any way your opinion?
5      MR. BURKHOLZ: Objection.  Asked and
6  answered.
7  BY THE WITNESS:
8  A.  Well, I mentioned that I did make an
9  adjustment for the first three days based on my
10 understanding of the holding of the court of appeals
11 and because the jury found that Household and its
12 executives committed a massive fraud in the three
13 areas that I identified, which was originally
14 assumption and now is established by the jury in
15 subsequent judicial rulings, other than changing the
16 starting date and making the adjustment for the
17 three days, that's what I did.
18 BY MR. FARINA:
19 Q.  All right.  So the jury's -- if you
20 could take that document, open it up again to Page
21 35.
22 A.  Okay.
23 Q.  I'll try to run through this quickly,
24 but the jury's finding as to statement No. 35 didn't
25 impact your model in any way?

22

1  A.  It's really the same answers to all of
2  these different questions.  I haven't looked at this
3  document before.  It's the first time I've ever seen
4  it.  I've already described what I did, what changes
5  I made and I can't be any more specific than that.
6  Q.  That's fine.  Same answer for statement
7  No. 34?
8  A.  Same answer for any statement that you
9  ask me about.
10  Q.  Okay.
11  A.  Other than what I've already described.
12  Q.  Professor Fischel, you are offering two
13  different damages or inflation models for the jury's
14  consideration in this case; is that fair?
15  A.  Correct.
16  Q.  And one of which I'll refer to, I think
17  you refer to it also, as a specific disclosure
18  model?
19  A.  Correct.
20  Q.  And one is a leakage model?
21  A.  Correct.
22  Q.  All right.
23         (Whereupon, Exhibit 2 marked.)
24         (Whereupon, the document was
25          tendered.)

23

1  BY MR. FARINA:
2  Q.  I'll hand what you we've marked as
3  Exhibit No. 2.
4  A.  Thank you.
5  Q.  Exhibit No. 2 is Exhibit 25 to your
6  second supplemental report.  Do you see that?
7  A.  I do.
8  Q.  And this document sets forth the
9  inflation that's calculated by your two models,
10  correct?
11  A.  That's right.
12  Q.  And if you go to the first page of the
13  chart, there's a column "Artificial Inflation" under
14  "Quantification Using Specific Disclosures."
15      Do you see that?
16  A.  I do.
17  Q.  And to the far right there's another
18  column, "Artificial Inflation," and that's under the
19  heading "Quantification Including Leakage," correct?
20  A.  Correct.
21  Q.  So those two columns set forth the
22  amount of inflation according to your two different
23  models, correct?
24  A.  That's right.
25  Q.  And there are also columns for true

24

1  value which is what your models tell you the true
2  value of Household's stock was during this period of
3  time?
4  A.  Correct.
5  Q.  Now, your two models offer very
6  different results as to the amount of inflation that
7  was allegedly present in Household's stock during
8  this period.
9      Would you agree with that?
10  A.  I would for reasons that I've testified
11  about at the first trial.
12  Q.  So by way of example, on the first page,
13  the inflation according to your leakage model is
14  $23.94 on every day on that first page apart from
15  the first three days; is that correct?
16  A.  That's right.
17  Q.  And under your other model, the amount
18  of inflation is about a third of that, it's 7.97 on
19  every day, other than the first three days of this
20  period?
21  A.  Correct.
22  Q.  So if you take a look, for example, at
23  let's pick April 25, 2001.  According to one of your
24  models, Household stock had a fair value of $56.78?
25  A.  Had a true value, that's right.

25

1  Q.  And according to your other model,
2  Household's true value was $40.81 per share?
3  A.  Correct.
4  Q.  And the disparity between the outputs of
5  your two models continues all the way through up
6  until the last two days of your leakage period,
7  correct?
8  A.  Correct.
9  Q.  So, for example, if you take a look at
10  January 4, 2002, the artificial inflation under your
11  leakage model is $23.94?
12  A.  January 1?
13  Q.  January 4.
14  A.  I'm sorry.  Correct.
15  Q.  Okay.  And the inflation under your
16  other model is $3.66, correct?
17  A.  Correct.
18  Q.  So the inflation under your leakage
19  model is about 6-1/2 times greater than what your
20  other model says the inflation is?
21  A.  On that date, correct.
22  Q.  On that date.  So if you take a look at,
23  let's just take another date, August 22, 2002.
24  A.  Okay.  I see it.
25  Q.  What's the artificial inflation

Page 26

1  according to your specific disclosure model?
2  A. 32 cents.
3  Q. What's your artificial inflation
4  according to your leakage model?
5  A. $8.14.
6  Q. So that's more than 25 times greater
7  than what your other model is telling you the
8  inflation is?
9  A. I haven't done the arithmetic but it
10 looks approximately right.
11 Q. And as you walk through this exhibit,
12 you'll see that there are days when the inflation
13 goes up on one model but doesn't go up on the other
14 model.
15 A. That's possible.
16 Q. And there are days when the inflation
17 goes down on one model but not on the other model.
18 A. That's also possible.
19 Q. And there's only it looks like five days
20 out of 389 days where your two models actually
21 generate consistent results.
22     MR. BURKHOLZ: Objection. I don't even
23 know what you mean by "consistent results." It's a
24 vague question.
25 BY MR. FARINA:

Page 27

1  Q. There are only five days out of 398 days
2  where your two models say that the inflation is the
3  same.
4      MR. BURKHOLZ: Same objection.
5  BY THE WITNESS:
6  A. You know, I haven't counted. I guess I
7  can if you ask me to, but the two models are
8  measuring inflation in different ways.
9      You know, again, for reasons that I
10 explained in the first trial and as found and
11 endorsed by the jury and my understanding affirmed
12 by the 7th Circuit and also by the new judge on
13 remand.
14 BY MR. FARINA:
15 Q. Both of your models are attempting to
16 calculate the amount of inflation in Household
17 stock, correct?
18 A. That's right. Under different
19 assumptions, again, as explained by me during the
20 first trial.
21 Q. Take a look, if you would, at 11/5/01.
22 A. Okay.
23 Q. Do you recall the significance of
24 11/5/01? That's the first specific disclosure that
25 you found. Do you recall that?

Page 28

1      MR. BURKHOLZ: Object to the --
2      MR. FARINA: I might have misspoken.
3  11/15.
4  BY THE WITNESS:
5  A. I see. 11/15/01 as I recall is the
6  first corrected disclosure.
7  BY MR. FARINA:
8  Q. Got it. So on 11/15/01 there was
9  information that was disclosed to the markets that,
10 according to you, corrected some of the prior
11 misinformation that the markets had.
12 A. Yes. But I think at this point I think
13 that was also as found by the jury.
14 Q. Is it your understanding that the jury
15 made specific findings about days on which there was
16 a corrective disclosure?
17 A. I think the jury, by accepting my
18 testimony, either explicitly or implicitly made that
19 finding.
20 Q. You understand that the findings as to
21 causation and damages have been vacated and are
22 going to be retried which is why we're here.
23 A. You know, I'll leave the legal
24 characterization to others. I understand there is a
25 retrial on certain issues.

Page 29

1  Q. Okay. So on 11/15/01, because of the
2  corrective disclosure, the inflation under your
3  specific disclosure model goes down by $1.86; is
4  that correct?
5  A. Correct.
6  Q. Now, what happens to the inflation under
7  your other model?
8  A. It stays the same.
9  Q. So there's a corrective disclosure made
10 to the markets and under one of your models the
11 inflation goes down and under your other model it
12 doesn't budge.
13 A. That's right.
14 Q. So your two models are telling you two
15 different things about what's happening to Household
16 on that day.
17 A. They're measuring different things using
18 different methodologies for reasons based on the
19 factual circumstances in the case as now found to be
20 those circumstances constituting a massive fraud by
21 Household and its executives. And I already
22 explained at the first trial the nature of the
23 different methodologies employed in the two models
24 and which one I thought was more reliable.
25     And as I said, I'm aware there's

8 (Pages 26 to 29)

|  | 78 |
|---|---|
| 1 | those indices both declined during your leakage |
| 2 | period. Your point is that Household declined more, |
| 3 | correct? |
| 4 | A. I think that is something I stated in my |
| 5 | reports. I think that's correct. |
| 6 | Q. All right. |
| 7 | A. And possibly at the trial as well. |
| 8 | Q. So any time the performance of |
| 9 | Household's stock on any day during your leakage |
| 10 | period was different than the predicted return, you |
| 11 | attributed that difference to the leakage of |
| 12 | fraud-related information, correct? |
| 13 | A. It is true that the -- in the leakage |
| 14 | period, the actual return on every day is replaced |
| 15 | by a predicted return produced by a particular |
| 16 | regression, and that difference is an input into the |
| 17 | calculation of artificial inflation under the |
| 18 | leakage model, that's correct. |
| 19 | Q. Okay. So any time there is a departure |
| 20 | from the predicted return, that is attributed by |
| 21 | your model to artificial inflation? |
| 22 | A. Well, during a period of leakage -- |
| 23 | Q. During a period of leakage. |
| 24 | A. When there is no leakage, actual returns |
| 25 | are used in the calculation. And I don't want to |

|  | 79 |
|---|---|
| 1 | keep adding this caveat to what you keep saying in |
| 2 | your question, but it is true that I applied a |
| 3 | leakage model and I concluded that it was |
| 4 | appropriate to apply under the facts and |
| 5 | circumstances of this case, but I don't want to |
| 6 | claim credit for the existence of the model, which I |
| 7 | think was developed in an article by Cornell and |
| 8 | Morgan. |
| 9 | Q. Professor Fischel, just mechanically, |
| 10 | during your 228 trading day leakage period, |
| 11 | mechanically the way your model works is that any |
| 12 | residual on any day, that residual is attributed to |
| 13 | the leakage of fraud-related information. That's |
| 14 | just how your model works, correct? |
| 15 | MR. BURKHOLZ: Objection. Compound and |
| 16 | asked and answered. |
| 17 | BY THE WITNESS: |
| 18 | A. Well, I'm just going to repeat what I |
| 19 | just said, that it is true that during the leakage |
| 20 | period, as part of the calculation of the |
| 21 | quantification of leakage, actual returns are |
| 22 | replaced by predicted returns. And the difference |
| 23 | between actual returns and predicted returns |
| 24 | residuals are input into the calculation of the |
| 25 | quantification of leakage. |

|  | 80 |
|---|---|
| 1 | But I also think it's important |
| 2 | when you keep referring to my model, it is my |
| 3 | quantification of leakage but the model originated |
| 4 | with -- in an article by Cornell and Morgan which I |
| 5 | concluded was appropriate to use under the facts and |
| 6 | circumstances of this case. |
| 7 | BY MR. FARINA: |
| 8 | Q. Your model, the way it works, rejects |
| 9 | the possibility that any departure from the |
| 10 | predicted return could have been caused by something |
| 11 | other than the leakage of fraud-related information; |
| 12 | isn't that true? |
| 13 | A. I'm not going to keep repeating the |
| 14 | caveat when you keep referring to the term "my |
| 15 | model," but that's my quantification of leakage. If |
| 16 | you use that language, then we won't have to have |
| 17 | this modification of your question every time you |
| 18 | ask it. |
| 19 | But the way that the leakage model |
| 20 | works is exactly as you describe, you know, with the |
| 21 | result that positive divergences, as well as |
| 22 | negative divergences between actual and predicted |
| 23 | returns are all factored into the quantification of |
| 24 | leakage. |
| 25 | Q. The fraud inflation pursuant to your |

|  | 81 |
|---|---|
| 1 | quantification is unrelated in any way to the actual |
| 2 | misstatements found by the jury; isn't that correct? |
| 3 | MR. BURKHOLZ: Objection. Vague. |
| 4 | BY THE WITNESS: |
| 5 | A. I'm sorry. I didn't understand that |
| 6 | question. |
| 7 | BY MR. FARINA: |
| 8 | Q. Sure. The model that you're offering to |
| 9 | calculate damages, the leakage model, calculates |
| 10 | inflation by reference to the residuals during every |
| 11 | day in your leakage period, that's what we've just |
| 12 | been discussing. |
| 13 | So what doesn't factor into that |
| 14 | analysis are the jury's findings of particular |
| 15 | misstatements on particular days, correct? |
| 16 | A. I'm not sure I understood what you mean |
| 17 | by it doesn't factor into the analysis because the |
| 18 | quantification of leakage is a quantification of the |
| 19 | leakage of information following the fraudulent |
| 20 | disclosures by Household and its executives. So to |
| 21 | say it doesn't relate I think really does not |
| 22 | capture the reality of the exercise or why the |
| 23 | quantification of leakage is being performed. |
| 24 | Q. Well, when we started this deposition, |
| 25 | you were not even aware of the 17 misstatements that |

21 (Pages 78 to 81)

Page 82

1  were actually found by the jury, and you testified
2  that you didn't take into account the statements
3  that were accepted or rejected in your leakage
4  period; isn't that true?
5      MR. BURKHOLZ: Objection. Misstates the
6  testimony. You asked him about the verdict form,
7  not about the jury verdict.
8  BY THE WITNESS:
9      A. I think you've mischaracterized my
10 testimony. I think I described what I did in
11 response to the jury verdict and my understanding of
12 that verdict and subsequent judicial rulings.
13     My understanding again, as I've
14 stated without any intention to give a legal
15 opinion, is that because the -- there was a
16 fraudulent disclosure which covered all three
17 aspects of the fraud three days after the first
18 fraudulent disclosure by Household, there wasn't any
19 need for any further allocation among the three
20 elements of the fraud and therefore I didn't perform
21 any separate allocation other than for the first
22 three days, as I described. But beyond that, as I
23 testified, I don't have any particular familiarity
24 with the verdict form which I never looked at before
25 today.

Page 83

1  BY MR. FARINA:
2      Q. So just to be clear, take a look at
3  Exhibit 2. That includes your artificial inflation
4  pursuant to your quantification including leakage.
5      A. Okay. I see that.
6      Q. All right. Your disclosure period
7  starts on 11/15/01, correct?
8      A. My disclosure period?
9      Q. Your leakage period.
10     A. Well, the disclosure period and the
11 leakage period are not the same thing, so which one
12 are you asking me about?
13     Q. Don't they both start on 11/15/01 and
14 continue through 10/11/02?
15     A. No. No, they don't. The first false
16 and misleading disclosure, my understanding, is
17 found by the jury was in March of -- March 23 of
18 2001. And the first corrective disclosure is on
19 November 15, 2001. Those are not the same thing.
20     Q. I was referring to the corrective
21 disclosure period under your specific disclosure
22 model. Both your --
23     A. Excuse me. You may have been referring
24 to it but you didn't say it.
25     Q. That's fair, fair enough. The different

Page 84

1  experts refer to these periods differently.
2      Your leakage period starts on
3  11/15/01, correct?
4      A. That's correct.
5      Q. That is also your specific disclosure
6  period, correct? It starts on 11/15/01?
7      A. Well, I wouldn't put it exactly that
8  way. I would say all of the corrective disclosures
9  that are used in the specific disclosure model
10 occurred during the leakage period beginning on
11 November 15, 2001, that's correct.
12     Q. The artificial inflation that the model
13 calculates during the leakage period, 11/15/01
14 through 10/11/02 is no different now than it was
15 when you first presented the model to the jury in
16 the first trial, correct?
17     MR. BURKHOLZ: Objection. Asked and
18 answered. He already explained it, the modification
19 he made.
20     MR. FARINA: There is no modification in
21 that period. That's the point.
22 BY THE WITNESS:
23     A. There's no modification to the testimony
24 about what I consider the first corrective
25 disclosure to be, so in that sense I agree with your

Page 85

1  question.
2  BY MR. FARINA:
3      Q. All right.
4      MR. BURKHOLZ: Is this a good time to
5  break? We've been going just over an hour.
6      MR. FARINA: That's fine.
7      THE VIDEOGRAPHER: Off the record. The
8  time is now 11:12 a.m.
9          (There was an intermission
10          from 11:12 a.m. to 11:27 a.m.)
11     THE VIDEOGRAPHER: Going on the record.
12 This marks the beginning of Media No. 3. The time
13 is now 11:27 a.m.
14 BY MR. FARINA:
15     Q. Professor Fischel, let me hand you what
16 we've marked as Exhibit 5.
17         (Whereupon, Exhibit 5 marked.)
18         (Whereupon, the document was
19         tendered.)
20 BY MR. FARINA:
21     Q. Exhibit 5 is your Exhibit 25, and what
22 we've done is we've highlighted the days on which
23 the jury found a misrepresentation. That's the
24 difference between Exhibit 5 and Exhibit 2.
25     A. Okay.

22 (Pages 82 to 85)

86

1  Q. Take a look, if you would, at the period
2  February 6, 2002 through March 8, 2002.
3  A. February 6, 2002?
4  Q. Yes. So on February 6, 2002, the
5  inflation according to your leakage model was
6  $12.47?
7  A. Correct.
8  Q. All right. Now, if you look at 3/8/02,
9  your inflation had gone from $12 to almost $24,
10 correct?
11 A. Correct.
12 Q. So your inflation goes up by 11.47,
13 nearly doubling; is that right?
14 A. Correct.
15 Q. Was there any misrepresentation found by
16 the jury during this period when your fraud
17 inflation almost doubles?
18 A. Well, I can't really speak what was
19 found by the jury. Just again, I just accept your
20 representation about this highlighting, but as I
21 said, I can't speak to what was found by the jury
22 other than the jury found the existence of leakage
23 and agreed with my quantification of leakage. So in
24 that sense, my understanding of what the jury
25 concluded is consistent with the methodology that I

87

1  employed and the conclusions that I reached.
2  Q. You understand that that portion of the
3  jury's findings have been vacated by the 7th
4  Circuit?
5  A. Well, you just asked me what I -- about
6  what the jury found. So if you want to ask me
7  something else, obviously feel free to do it. But
8  if you're asking me what the jury found, that's not
9  a function of what the court of appeals subsequently
10 did.
11 Q. Your model pumps nearly $12 of
12 artificial inflation into the price of Household
13 stock during a period when there was no
14 misrepresentation found by the jury; isn't that
15 true?
16     MR. BURKHOLZ: Objection. The question
17 is vague, what you mean by "pumps."
18 BY THE WITNESS:
19 A. Well, again, it's a loaded question with
20 rhetoric which I don't want to adopt by
21 acquiescence. But I am not sure now because you
22 keep asking me what the jury found and what was
23 vacated by the jury. Which are you asking me about?
24 BY MR. FARINA:
25 Q. There are 17 misrepresentations that

88

1  were found by the jury and 23 that were rejected.
2  We've highlighted the 17 -- the days on which there
3  was one of the 17 misrepresentations found by the
4  jury. And there is no misrepresentation found by
5  the jury during the period when your model says that
6  the artificial inflation in Household stock went
7  from $12.47 to $23.94; isn't that correct?
8  A. It's a highly misleading question
9  because first of all, it ignores the fact that the
10 jury also found the existence of leakage, since you
11 keep asking me what the jury found, and because of
12 the jury finding of leakage, its findings are not
13 limited to particular alleged false and misleading
14 statements.
15     And secondly, it is my
16 quantification of leakage but it's based on a model
17 developed by Cornell and Morgan which I concluded
18 was appropriate to use under the facts and
19 circumstances of this case.
20 Q. The output of the model as reflected in
21 this exhibit is that the inflation nearly doubles
22 during a period when there was no misrepresentation
23 found by the jury; isn't that true?
24 A. I think I just answered that question.
25 There's no highlighted yellow date, but the question

89

1  as stated is highly misleading because it does not
2  take into account that the jury also found the
3  existence of leakage during the particular period
4  that you are asking me about in your question.
5  Q. According to the model, the amount of
6  inflation in Household's shares is not going down
7  because of leakage. Somehow it manages to go up by
8  $11.47 during a period where there was no
9  misrepresentation; isn't that true?
10     MR. BURKHOLZ: Objection. Asked and
11 answered.
12     Go ahead.
13 BY THE WITNESS:
14 A. I can't really add to what I said. I
15 used the standard methodology in the way that I've
16 described and have produced the results that are
17 produced. The jury, my understanding is, agreed
18 with my quantification of inflation using the
19 leakage model. And I think it's a fundamental
20 misunderstanding of the leakage model to suggest
21 that changes in the measure of the quantification of
22 inflation can only occur when there are specific
23 false and misleading statements.
24     The whole concept of leakage is
25 premised on the idea that inflation can vary, it can

23 (Pages 86 to 89)

182

1  the relationship to the jury's findings about false
2  and misleading disclosures.
3  BY MR. FARINA:
4      Q.   If your quantification including leakage
5  was inconsistent with the jury's specific findings
6  as to misrepresentations, would you agree that is a
7  problem?
8      A.   You know, again, I'm not sure how to
9  answer that question because I don't understand it.
10 But whether or not there is a problem, to use your
11 phrase, I guess will be determined by the court and
12 the jury when I present my testimony, if I'm asked
13 to give it, about one or both of my quantifications.
14     Q.   But if your quantification including
15 leakage is inconsistent with the jury's specific
16 findings as to the misrepresentations in this case,
17 would you personally have -- believe that to be a
18 problem?
19         MR. BURKHOLZ:  Objection.  Asked and
20 answered.
21 BY THE WITNESS:
22     A.   I don't understand that question as to
23 what inconsistency is that you're referring to.  I
24 don't know there's any inconsistency.  But
25 ultimately, the judge of that will be the court and

183

1  the jury.
2  BY MR. FARINA:
3      Q.   So I don't know that we're going to
4  agree as to whether there is an inconsistency so
5  that's not what I'm asking you.
6          But you would agree if there is an
7  inconsistency, that is a problem because a damages
8  and causation model needs to match up with the
9  actual liability findings, correct?
10         MR. BURKHOLZ:  Objection.  It's vague
11 and it's been asked and answered twice now.
12 BY THE WITNESS:
13     A.   I absolutely agree there has to be a
14 relationship between a quantification of inflation
15 and the relevant facts and circumstances in the
16 case.  I think that's correct.
17 BY MR. FARINA:
18     Q.   That's not what I asked though.  I asked
19 whether there has to be a relationship between the
20 quantification including leakage and the jury's
21 specific findings that are reflected in that verdict
22 form that we looked at.  That's my question.
23         MR. BURKHOLZ:  Same objection.  Asked
24 and answered three times now.
25 BY THE WITNESS:

184

1      A.   It's the same answer.  I don't think
2  there's any inconsistency.  I've already described I
3  don't think there's any inconsistency.  I've already
4  described the basis of the standard methodology that
5  I used under both my quantification based on leakage
6  and my quantification based on specific disclosures
7  if my conclusion on those issues is ultimately
8  adopted as a function of what the court and the jury
9  ultimately decide, assuming that I'm asked to give
10 that testimony.
11 BY MR. FARINA:
12     Q.   Let's change gears.
13         I'm going to give you a
14 hypothetical and I'm going to ask you a couple
15 questions.
16         So a study is published in a
17 medical journal and the study calls into question
18 the safety or efficacy of a class of drugs.  Okay?
19 And there are some manufacturers, some
20 pharmaceutical companies that make those class of
21 drugs and some that don't.
22         Is that firm-specific information,
23 the publication of this study questioning the
24 efficacy or safety of a particular class of drugs?
25     A.   I want to analyze all the facts and

185

1  circumstances of your hypothetical, but to the
2  extent it's a regulatory action affecting an
3  industry, I would say it's a regulatory action
4  affecting an industry as opposed to affecting a
5  single specific firm.
6      Q.   Well, that wasn't exactly my question.
7  Let me try again.
8          So let's say that there is a study
9  published that says that cox-2 drugs give rise to
10 coronary hazards.  And there are 12 pharmaceutical
11 companies that are in some pharmaceutical index and
12 only four of them make cox-2 drugs.  And the study's
13 bad.  So it has an impact on the four pharmaceutical
14 companies that sell cox-2 drugs, but it has an
15 opposite effect on the other companies in that
16 industry that don't sell cox-2 drugs because if
17 patients are not going to be using cox-2 drugs,
18 maybe they'll use alternatives that they
19 manufacture.
20         So it's information that
21 disproportionately impacts a small number of
22 companies within an industry but doesn't impact the
23 entire industry the same way.
24         Is that firm-specific or not?
25     A.   The way you described it, if I

47 (Pages 182 to 185)