# EXHIBIT 1

Case: 1:02-cv-05893 Document #: 2186-1 Filed: 05/13/16 Page 2 of 5 PageID #:85628

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2           FOR THE NORTHERN DISTRICT OF ILLINOIS
 3                     No. 1:02-CV-05893
 4    - - - - - - - - - - - - - - - - - - - -
 5    LAWRENCE E. JAFFE PENSION PLAN, on behalf
 6    of itself and all others similarly situated,
 7                    Plaintiffs,
 8      vs.
 9    HOUSEHOLD INTERNATIONAL, INC., et al.,
10                    Defendants.
11    - - - - - - - - - - - - - - - - - - - -
12               VIDEOTAPED DEPOSITION OF
13                 FRANK ALLEN FERRELL, III
14         Saturday, February 27, 2016 9:02 a.m.
15                    Skadden Arps LLP
16         500 Boylston Street, Boston, MA 02116
17
18
19
20
21    Reported by:
22    Janet Sambataro, RMR, CRR, CLR
23    Job No. 10022056
24
25
```

Page 2

```
 5                  February 27, 2016
 6                     9:02 a.m.
10         Videotaped deposition of FRANK ALLEN
11    FERRELL, III, held at the offices of Skadden Arps
12    LLP, 500 Boylston Street, Boston, Massachusetts,
13    pursuant to Agreement before Janet Sambataro, a
14    Registered Merit Reporter, Certified Realtime
15    Reporter, Certified LiveNote Reporter, and a
16    Notary Public within and for the Commonwealth of
17    Massachusetts.
```

Page 3

```
 1    APPEARANCES:
 4    ROBBINS, GELLER, RUDMAN & DOWD LLP
 5    (By Luke O. Brooks, Esquire)
 6    Post Montgomery Center
 7    One Montgomery Street
 8    San Francisco, California 94104
 9    415.288.4534
10    lukeb@rgrdlaw.com
11    Counsel for the Plaintiffs
13    - and -
15    ROBBINS, GELLER, RUDMAN & DOWD LLP
16    (By Michael J. Dowd, Esquire)
17    655 W. Broadway
18    San Diego, California 92101
19    619.231.1058
20    miked@rgrdlaw.com
21    Counsel for the Plaintiffs
24    - Continued -
25
```

Page 4

```
 1    APPEARANCES:  (Continued)
 3    SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
 4    (By Patrick Fitzgerald, Esquire, and
 5    Andrew J. Fuchs, Esquire)
 6    155 N. Wacker Drive
 7    Chicago, Illinois 60606
 8    312.407.0700
 9    patrick.fitzgerald@skadden.com
10    andrew.fuchs@skadden.com
11    Counsel for the Defendant, Household
12    International, Inc.
14    - and -
16    WILLIAMS & CONNOLLY
17    (By Steven M. Farina, Esquire, and
18    Leslie Cooper Mahaffey, Esquire)
19    725 Twelfth Street, N.W.
20    Washington, D.C. 20005
21    202.434.5526
22    sfarina@wc.com
23    lmahaffey@wc.com
24    Counsel for the Defendant, Household International,
25    Inc.
```

Case: 1:02-cv-05893 Document #: 2186-1 Filed: 05/13/16 Page 3 of 5 PageID #:85629

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 213

1  March 17, 1981.  Yeah.  So assuming that's the
2  class.
3       MR. FITZGERALD:  Objection to form.  Go
4  ahead.
5    A.  So assuming that's the class period,
6  then I agree it's -- it's about four years.
7       MR. FITZGERALD:  I don't want to
8  interrupt you, but when you get to a natural
9  break point...
10       MR. BROOKS:  Okay.
11    Q.  And you agree that this article cites
12  the WPPSS case as a case where it may be
13  necessary to use the comparable index approach.
14  Right?
15    A.  It does say that.  But you're
16  leaving -- it's misleading to leave it at that,
17  because in Footnote 16 on Page 888, Cornell and
18  Morgan quite rightly, in my view, have a
19  qualifier where they say -- and I'll read from
20  the article, "Our primary concern is with
21  conceptual and legal issues rather than with
22  financial and statistical ones."
23       So I don't read this article to be
24  advocating that this -- to be addressing the
25  statistical issues inherent in using an event

Page 214

1  window so long.
2       And I would also note Footnote 41 and 42 and
3  47, where, you know, they're saying -- and I'm
4  going to paraphrase -- that this index approach
5  assumes that the parties agree on the proper
6  model --
7       (Phone interruption.)
8    A.  -- that this index approach is
9  appropriate where the experts agree on the model,
10  which is clearly not the case here.  Anyway...
11    Q.  Any other caveats?
12    A.  Yeah.  So Footnote 47, they also note
13  that -- and I'll just read from Footnote 47 --
14  "Over longer periods of time, though
15  misspecification errors accumulate and become
16  more important, thus proper specification of the
17  model is more important when using the comparable
18  index approach than when using the event study
19  approach."
20       So they caveat -- they have lots of -- they
21  have a very important qualifications [sic] on
22  their discussion.
23    Q.  You agree that Fischel did not use the
24  entire class period for his observation window.
25  Right?

Page 215

1    A.  I agree.
2    Q.  So his observation window is inside of
3  the limiting case that's discussed on Page 906.
4  Right?
5       MR. FITZGERALD:  Objection to form.
6    A.  If you're asking me is four years
7  longer than 228 days, I agree with that.  I don't
8  agree that this is an appropriate -- citing to
9  this article is an appropriate basis for that,
10  given what I just said about the qualification --
11  you know, the -- that language that I just
12  pointed to.
13       MR. BROOKS:  Okay.
14       THE VIDEOGRAPHER:  Okay.  The time is
15  2:18.  We're off the record.
16       (A recess was taken.)
17       (Article entitled "The Loss
18  Causation Requirement for Rule 10b-5 Causes
19  of Action:  The Implications of Dura
20  Pharmaceuticals, Inc. v. Broudo marked
21  Exhibit 8.)
22       THE VIDEOGRAPHER:  Okay.  We're back on
23  the record.  The time is 2:35.
24  BY MR. BROOKS:
25    Q.  You have Exhibit 8 in front of you.

Page 216

1    A.  I do.
2    Q.  And what is Exhibit 8?
3    A.  An article that I cowrote in "The
4  Business Lawyer."
5    Q.  This is the article that you referred
6  to earlier that the Seventh Circuit cited to.  Is
7  that right?
8    A.  Yes.
9    Q.  And it's titled "The Loss Causation
10  Requirement for Rule 10b-5 Causes of Action:  The
11  Implications of Dura Pharmaceuticals, Inc. vs.
12  Broudo."  Right?
13    A.  Yes.
14    Q.  Turn to Page 167.
15       (Witness complies.)
16    Q.  There's a section there -- well, before
17  we go there, sorry, what was the purpose of the
18  article, generally?
19    A.  You know, it was really to talk about
20  Dura Pharmaceuticals in the context of loss
21  causation.  So I think this article was 2007, if
22  I remember, and I think Dura came out in '05.
23    Q.  Do you still stand by the article?
24    A.  Yes.
25    Q.  Is there anything you'd change in the

Case: 1:02-cv-05893 Document #: 2186-1 Filed: 05/13/16 Page 4 of 5 PageID #:85630

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 217

1  article, given the ensuing years?
2      A.  No.
3      Q.  So Page 167, there's a section on
4  proper choice of an industry index.  Right?
5      A.  Yes.
6      Q.  And you note that it's important in
7  selecting the index to find -- to pay attention
8  to which firms are truly comparable.  Right?
9      A.  Yes.
10     Q.  Okay.  Why is that important?
11     A.  Well, because if -- because what's
12 going to be in your residual or your abnormal
13 return will be a function of what you're
14 controlling for.
15     And so, you know, if you don't have a
16 comparable industry index, or the less precise
17 your industry index is, the more it's going to be
18 captured by your residual.
19     Q.  Okay.  And you wrote --
20     A.  Just to be clear, when I say
21 "residual," I mean abnormal return estimate.
22     Q.  Okay.  And what should be comparable
23 are the lines of business between the index and
24 the company that you're analyzing.  Right?
25     A.  Yes, and that's how I phrased it here.

Page 218

1      Q.  And you wrote in this paragraph that
2  the information source for the selection of firms
3  to be used as industry comparables can include
4  the firm's own financial filings and (10-K and
5  10-Q), equity analyst reports, and the
6  constituents of widely used industry indexes such
7  as the Dow Jones, Internet Index or the S&P
8  Telecom Index.  Do you see that?
9      A.  I do.
10     Q.  And that's still true today.  Right?
11     A.  Yes.
12     Q.  So the first choice here is to collect
13 comparables from the firm's own financial
14 filings.  Right?
15         MR. FITZGERALD:  Objection to form.
16     A.  Yes.  But I want to be clear on my
17 answer.  You said first.  Yes, it's the first
18 that's mentioned, but we don't have a ranking
19 of -- of one is better than the other.  These are
20 examples of how one might construct an industry
21 comparable.
22     Q.  So Professor Fischel used the S&P
23 financial -- financials index as his industry
24 comparable.  Right?
25     A.  Yes.

Page 219

1      Q.  And that's something you've criticized
2  him for?
3      A.  No.  I use -- well, just to be clear, I
4  used the S&P 500 Financials Index as well.
5      Q.  So you're not criticizing
6  Professor Fischel for choosing the S&P 500
7  index -- withdrawn.
8      You're not criticizing Professor Fischel
9  for using the S&P financials index as the
10 comparable index in his regression?
11         MR. FITZGERALD:  Objection to form.
12     A.  Well, I'm not criticizing him in the
13 sense that we both use it.  I do criticize him
14 for using that model -- excuse me, for using that
15 model and failing to recognize that model will
16 necessarily have in the residuals calculated from
17 that model information, non-fraud information for
18 lines of business of Household that affect
19 similarly situated firms.
20     Q.  Just so we're clear, Professor Fischel
21 was correct to use the S&P 500 -- withdrawn.
22     Professor Fischel was correct to use the S&P
23 financials as a comparable peer index?  That's
24 your testimony?
25         MR. FITZGERALD:  Objection to form.

Page 220

1      A.  He's correct to use it in the sense
2  that I use it too.  He's incorrect -- but I
3  think -- so the problem with his model is not
4  using the S&P 500 financials.  I use that too.
5  It's that his inferences from that model are
6  incorrect, and there's a better model which
7  includes another index.
8      Q.  And that model -- withdrawn.
9      That index is the CSFB index that you cite
10 in your report.  Is that right?
11     A.  Correct.
12     Q.  You understand that Household competed
13 with banks.  Right?
14         MR. FITZGERALD:  Objection to form.
15     A.  I mean, at some general level, that
16 might be true.  At a more specific level, it's a
17 consumer finance company.
18     Q.  Do you understand that they competed
19 with thrifts?
20     A.  You know, at that -- you know, you
21 could put it in those general level, that at some
22 level that might be true.  But for the time that
23 we're talking about, the fact that it's a
24 consumer finance company and that has subprime
25 and nonprime exposure is -- is very important.

Case: 1:02-cv-05893 Document #: 2186-1 Filed: 05/13/16 Page 5 of 5 PageID #:85631

Frank Ferrell, III

Lawrence E. Jaffe Pension Plan
vs. Household International, Inc.

Page 221

1  (Excerpt from Household
2  International, Inc. Form 10-K for year ending
3  December 31, 2001 marked Exhibit 9.)
4      MR. FITZGERALD: This is number?
5      MR. BROOKS: Number 9.
6      MR. FITZGERALD: Thanks.
7  BY MR. BROOKS:
8      Q. I've handed you Exhibit 9, which is an
9  excerpt from Household's Form 10-K for the fiscal
10 year ended December 31, 2001. Do you see that?
11     A. I do.
12     Q. Okay. Turn to the second page of the
13 exhibit, which says Page 9 of 20 at the top.
14     A. I'm there.
15     Q. Okay. Do you see there's a heading
16 "Competition"?
17     A. I do.
18     Q. Read that to yourself, if you would.
19        (Witness complies.)
20     A. I'm finished.
21     Q. Okay. So Household told the market
22 that the consumer finance services industry in
23 which it operates is highly fragmented and
24 intensely competitive. Right?
25     A. Yes.

Page 222

1      Q. And continued, "We generally compete
2  with banks, thrifts, insurance companies, credit
3  unions, mortgage lenders and brokers, finance
4  companies, securities brokers and dealers, and
5  other domestic and foreign financial institution
6  in the United States, Canada and the United
7  Kingdom." Right?
8      A. That's what it says.
9      Q. Okay. So these types of companies that
10 Household is telling the market it competes with
11 are the same types of companies that are in the
12 S&P financials index. Right?
13     A. I believe that's accurate.
14     Q. And you don't disagree with this
15 statement about who Household competes with.
16 Right?
17     A. Well, at a general level, I don't
18 disagree with that.
19     Q. I mean, they're telling the market this
20 is who we compete with. Correct?
21     MR. FITZGERALD: Objection to form.
22     A. The document says we generally compete
23 with these institutions. That's what the
24 document says.
25     Q. And you're not saying that this

Page 223

1  document is false in any way?
2      A. No.
3      Q. Is it false by omission?
4      MR. FITZGERALD: Objection to form.
5      A. I'm not saying this document is false
6  in any sense. That's -- no.
7      Q. Do you think they should have offered a
8  more specific group to tell investors to they
9  were competing with?
10     MR. FITZGERALD: Objection to scope and
11 form.
12     A. Well, it's outside my scope. I would
13 assume the answer to that would depend on SEC
14 regulations in terms of what needs to be
15 disclosed and discussed in the 10-K.
16     Q. Well, in order to not mislead
17 investors, should they have identified subprime
18 consumer finance companies here?
19     MR. FITZGERALD: Objection to scope
20 again.
21     A. No. I'm not -- I'm not provide
22 something an opinion, nor does my choice of
23 industry index lead to any conclusions about
24 whether a particular document or the 10-Ks is
25 misleading or not. You know, I know, generally

Page 224

1  speaking, there's regulations about the 10-K so I
2  would assume one would look to those in
3  understanding the 10-K. But I'm certainly not
4  providing the opinion that this is a
5  misrepresentation.
6      Q. Is an appropriate source from which to
7  choose an index. Right? Or a comparables?
8      A. You can certainly use -- one potential
9  choice is the firm's own financial filings. And,
10 as I said, we both use S&P 500 financials.
11     Q. And the goal, reading back from Exhibit
12 eight, is to find firms that are truly comparable
13 in terms of their line of business. That's
14 right. Isn't it? Is?
15     A. Correct.
16     Q. Okay. And these are the firms that
17 Household is saying are truly comparable in terms
18 of line of business. Aren't they?
19     MR. FITZGERALD: Objection to form.
20     A. You're mischaracterizing the document.
21     Q. Which one?
22     A. The Exhibit 8.
23     Q. In what way?
24     A. So you changed the wording. The
25 wording here is "we generally compete," I'm

Page 221..224