```
 1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                              EASTERN DIVISION

 3    LAWRENCE E. JAFFE PENSION PLAN, )
      on behalf of itself and all    )
 4    others similarly situated,      )
                                      )
 5               Plaintiffs,          )
                                      )
 6      v.                            )  No. 02 C 5893
                                      )
 7    HOUSEHOLD INTERNATIONAL, INC.,  )
      et al.,                         )  Chicago, Illinois
 8                                    )  May 18, 2016
                 Defendants.          )  11:00 a.m.
 9

10       TRANSCRIPT OF TRIAL PROCEEDINGS - PRETRIAL CONFERENCE
                   BEFORE THE HONORABLE JORGE L. ALONSO
11

12    APPEARANCES:

13    For the Plaintiffs:        ROBBINS GELLER RUDMAN & DOWD LLP
                                 BY:  MR. MICHAEL J. DOWD
14                                    MR. SPENCER A. BURKHOLZ
                                      MR. DANIEL S. DROSMAN
15                                    MR. LUKE O. BROOKS
                                      MS. HILLARY B. STAKEM
16                               655 West Broadway
                                 Suite 1900
17                               San Diego, California  92101
                                 (619) 231-1058
18
                                 ROBBINS GELLER RUDMAN & DOWD LLP
19                               BY:  MS. MAUREEN E. MUELLER
                                 120 East Palmetto Park Road
20                               Suite 500
                                 Boca Raton, Florida  33432
21                               (561) 750-3000

22                               MILLER LAW LLC
                                 BY:  MR. MARVIN ALAN MILLER
23                                    MS. LORI A. FANNING
                                 115 South LaSalle Street
24                               Suite 2910
                                 Chicago, Illinois  60603
25                               (312) 332-3400
```

```
 1    APPEARANCES:  (Continued)

 2    For the Defendant            SKADDEN ARPS SLATE MEAGHER & FLOM,
      Household:                   LLP
 3                                 BY:  MR. PATRICK J. FITZGERALD
                                        MR. R. RYAN STOLL
 4                                      MS. DONNA L. McDEVITT
                                        MR. ANDREW J. FUCHS
 5                                 155 North Wacker Drive
                                   Suite 2700
 6                                 Chicago, Illinois  60606
                                   (312) 407-0700
 7
                                   WILLIAMS & CONNOLLY LLP
 8                                 BY:  MR. DANE H. BUTSWINKAS
                                        MR. STEVEN M. FARINA
 9                                      MS. AMANDA M. MacDONALD
                                        MS. LESLIE C. MAHAFFEY
10                                 725 Twelfth Street, N.W.
                                   Washington, D.C.  20005
11                                 (202) 434-5000

12    For the Defendant            KATTEN MUCHIN ROSENMAN LLP
      Aldinger:                    BY:  MR. GIL M. SOFFER
13                                      MS. DAWN MARIE CANTY
                                   525 West Monroe Street
14                                 Chicago, Illinois  60661
                                   (312) 902-5200
15
      For the Defendant            McDERMOTT WILL & EMERY, LLP
16    Gilmer:                      BY:  MR. DAVID S. ROSENBLOOM
                                        MS. C. MAEVE KENDALL
17                                 227 West Monroe Street
                                   Chicago, Illinois  60606
18                                 (312) 984-7759

19    For the Defendant            JACKSON WALKER LLP
      Schoenholz:                  BY:  MR. TIM S. LEONARD
20                                 1401 McKinney Street
                                   Suite 1900
21                                 Houston, Texas  77010
                                   (713) 752-4439
22

23

24

25
```

3

1          THE CLERK:  02 C 5893, Jaffe v. Household
2     International.
3          MR. DOWD:  Good morning, Your Honor.  Michael Dowd
4     from Robbins Geller for the plaintiffs.  I have with me this
5     morning my partners Dan Drosman, Luke Brooks, Spence Burkholz,
6     Maureen Mueller.  We also have one of our associates who may
7     argue, depending on what the Court wants to hear, Hillary
8     Stakem, and our local counsel Marvin Miller.
9          THE COURT:  And, Mr. Miller, you are local counsel
10    from the firm of?
11         MR. MILLER:  Miller Law.
12         THE COURT:  All right.  So that is the team for the
13    plaintiffs.
14         And for -- let's start with the defendant Household.
15         MR. STOLL:  Yes, Your Honor.  Good morning.  Ryan
16    Stoll on behalf of defendant Household.  With me is my
17    colleague Pat Fitzgerald.  We also have at our table, from
18    Williams & Connolly, Steve Farina, Amanda MacDonald, Dane
19    Butswinkas, and Leslie Mahaffey.
20         THE COURT:  All right.  Thank you.
21         And for Mr. Aldinger?
22         MR. SOFFER:  Yes.  Good morning, Your Honor.  Gil
23    Soffer on behalf of William Aldinger.  And with me is my
24    colleague Dawn Canty.
25         THE COURT:  And for Mr. Schoenholz?

1        MR. LEONARD:  Good morning, Your Honor.  Tim Leonard

2   on behalf of Mr. Schoenholz.

3        THE COURT:  From Jackson Walker, correct, sir?

4        MR. LEONARD:  Yes, Your Honor.

10:57:32   5        THE COURT:  And for individual defendant Gilmer?

6        MR. ROSENBLOOM:  Good morning, Your Honor.  David

7   Rosenbloom.  And with me is my colleague Maeve Kendall.

8        THE COURT:  Welcome, everyone.  Welcome back.  Many

9   of you were here the first time, some of you weren't, but

10:57:47  10   welcome back.  We're back in the same courtroom where the case

11   was originally tried.  I was not involved in the original

12   trial, but we are on -- I guess the most important news of the

13   day is that we are on schedule to begin trial on June 6th.

14   We've got a lot to get through before we get there.  I do not

10:58:09  15   believe that we're going to get through our pretrial

16   conference and resolve all the issues that need to be resolved

17   today.  That is especially true because unfortunately I only

18   have a couple of hours for the case.  So I hope to break about

19   1:00 o'clock and then give the parties more information about

10:58:29  20   what's next and when we can reconvene before trial.

21        The parties do not exactly agree on how long trial

22   will be.  But the plaintiff has a more optimistic view of how

23   quickly things can get done?  And I know a lot of this

24   involves rulings on the motions in limine.

10:58:50  25        MR. DOWD:  I think a lot will be dependent on the

1   motions in limine rulings.  We thought 12 to 15 court days.

2   We were figuring about five and a half hours a day.  I think

3   the defendants thought seven to nine court days.

4          MR. STOLL:  That's correct, Your Honor.  We actually

5   believe it should be a shorter trial.  Seven to nine days is

6   what we anticipate.

7          THE COURT:  All right.  And we start on the 6th.  We

8   will pick on the 6th.

9          There is some guidance for the attorneys in terms of

10  jury selection on our web page, but much of it does not apply

11  to this case.  The parties have suggested a jury

12  questionnaire, which is not the usual practice; but the

13  parties agree that that's the way we should proceed in the

14  case, and we will proceed that way.  I will look at the

15  questions that the parties have suggested.  There's much

16  agreement on that questionnaire.  I think it's too late to do

17  something before the jury comes in.

18         We'll talk about specifics, but that morning they'll

19  be presented with the questionnaire.  They'll fill it out.

20  The attorneys will have a certain amount of time to review

21  those answers obviously, and then we'll go into the process of

22  jury selection.

23         Also, the number of jurors.  My web page says eight

24  on a civil case.  That won't be the case here.  I'm

25  thinking -- I'll hear from the attorneys, but either 12 or 14

1    is how we'll start.  As long as we wind up with six or more

2    after three weeks, we'll be okay.  Of course, there won't be

3    alternate jurors.  Whoever remains at the end of those three

4    or so weeks will deliberate.

11:00:23   5          MR. DOWD:  Does the Court want to hear on that issue

6    now?

7          THE COURT:  Sure.

8          MR. DOWD:  I just think, Your Honor, it's -- you

9    know, the defendants want 12.  I mean, it's tops a three-week

11:00:30  10   trial.  I think that -- you know, we asked for eight.  I mean,

11   if the Court went to nine, I could certainly understand it.

12   But, you know, we don't want to begin with 12.  I mean, I

13   think the odds of us losing six jurors in two weeks is, you

14   know, pretty unlikely, almost very unlikely.  And, you know,

11:00:48  15   obviously they all sit if they're still there; and it really

16   changes the dynamics on unanimity.  I mean, I get it.  They

17   want as many possible.  If there were 30 jurors, they'd be

18   happy.  But I think that --

19          THE COURT:  Mr. Dowd, how many jurors sat on the

11:01:03  20   first trial?

21          MR. DOWD:  Your Honor, I believe there were ten that

22   ended up on the jury.

23          THE COURT:  So it sounds like Judge Guzman started

24   with about 12 also?

11:01:14  25          MR. DOWD:  I think so, Your Honor.  But that was a

1   longer trial too.  I think we went about five and a half weeks

2   that time.  So we only lost two, and I think that's the key

3   point.

4           MR. FITZGERALD:  And, Your Honor, we would suggest

11:01:24   5   that 12 is appropriate, given the stakes in this case, with

6   $3.6 billion; and particularly since that's a personal

7   judgment with regard to individual defendants.  We think it

8   would be appropriate, given the magnitude of the case, in a

9   case that they forecast as going as long as three weeks, that

11:01:39   10   we sit 12 jurors, as we did last time.

11           THE COURT:  So over the plaintiffs' objection, we

12   will sit 12 jurors.  And we will talk more about the specifics

13   of jury selection.  But as a general matter, we are going to

14   proceed.

11:01:57   15           They are going to be provided with a questionnaire

16   that morning -- early that morning, and we will get to the

17   process of jury selection and follow the outline on the web

18   page in terms of my standing orders.  But obviously the number

19   of jurors doesn't apply; but in terms of motions for cause,

11:02:19   20   peremptory motions, I believe the parties have agreed there

21   also that Judge Guzman's prior order will stand in terms of

22   the number of peremptories.

23           MR. DOWD:  Yes, Your Honor.  It's three peremptories

24   per side.

11:02:33   25           THE COURT:  Okay.  So three for the plaintiff and 12?

1          MR. DOWD:  No.  Three for the defendants

2     collectively.

3          THE COURT:  That's the agreement?

4          Okay.  So the attorneys will have time to powwow

11:02:47    5     about how they exercise those three, as we have a lot of --

6     many attorneys for the defense.

7          All right, that is part of the motion in limine.  I'm

8     going to strive this morning to keep us on track, although I

9     know that's going to be hard to do because these motions in

11:03:08   10     limine implicate other motions in limine and other issues in

11     the pretrial order.  But that's the way I hope to go forward,

12     is by addressing the motions in limine.

13          And in terms of an opportunity to be heard, I will

14     say that I have read all of the motions, all of the responses

11:03:35   15     to the motions, and all of the replies, as well as the

16     declarations.  So at least at first, at least for some of the

17     more in-depth, dense issues, I am going to rule based on what

18     I've read already.  Okay?

19          And we are going to start with the omnibus motion of

20     the plaintiff.  We'll start with the defendants' motions --

21     I'm sorry -- with the plaintiffs' motions, beginning with the

22     omnibus motion to exclude defendants' experts.

23          MR. DOWD:  Your Honor, my partner, Mr. Brooks, is

24     addressing that and the related motion in limine.

11:04:26   25          THE COURT:  And, Mr. Brooks, you have filed that

1    omnibus motion.  And, Mr. Brooks, you bring up many different

2    grounds.  The first ground is that -- your argument that

3    plaintiffs -- your argument that my Daubert ruling with

4    respect to Fischel precludes defense experts Ferrell and James

11:04:53    5    from testifying about the disclosures they characterize as

6    firm-specific and unrelated to fraud or opining that those

7    disclosures distorted Fischel's leakage and specific

8    disclosure models, correct, Mr. Brooks?  That's the first

9    argument?

11:05:14    10    MR. BROOKS:  Your Honor, mostly correct.  It's the

11    substance of the Court's order and not the order itself that

12    we're relying on.

13    One of their arguments in response to the motion is

14    that that order isn't binding on a separate motion on their

11:05:29    15    experts, but the substance hasn't changed.  There is no

16    company-specific, non-fraud information that they've

17    identified.  In fact, what they've done is pointed to what

18    they call the major dispute in this case, and they've said

19    that that's whether information disproportionately impacted

11:05:49    20    the industry that Household was in, a smaller set than the

21    regression that Fischel used in the S&P 500.  So they've sort

22    of pivoted from company-specific, non-fraud -- which was the

23    basis for the remand -- and they've argued that the

24    fundamental dispute is whether or not the selection of

11:06:08    25    variables in the regression accounts for the effect of

1 non-fraud factors; and it doesn't have to be company-specific.

2   And as we wrote in our papers, Judge, the Seventh

3 Circuit has ruled that out.  The Seventh Circuit expressly

4 found that Fischel's regression accounted for market and

11:06:25 5 industry factors and general impact of the economy.  So their

6 experts can't come in and now testify in the second trial

7 about industry factors.

8   And another argument that they make, Your Honor, is

9 that somehow our argument conflicts with the ruling that the

11:06:43 10 Court already made about the scope of the trial.  We disagree

11 with that.  We understand that the Court has ordered we have

12 to establish loss causation affirmatively in this case.  And

13 that's what we plan to do.  But that doesn't mean that

14 everything the Seventh Circuit said about Fischel's models and

11:06:58 15 about what was proven in the first case and not overturned is

16 just tossed out.

17   So there are many things -- and this relates to

18 another motion in limine -- that the Court found relating to

19 Fischel's analysis, relating to the models.  These are, you

11:07:15 20 know, the Seventh Circuit making rulings on their broad issues

21 that they brought and that the court rejected.  And they

22 rejected -- the judges rejected -- the Seventh Circuit

23 rejected it, and now we're back down with the narrow issue,

24 which is company-specific, non-fraud information.

11:07:33 25   And they basically concede in their opposition that

1    their experts don't intend to put that on.  What they intend

2    to put on is in contravention of what the Seventh Circuit has

3    already found.

4         So that's a summary of what we're -- what our

11:07:47    5    position is on that first piece of the motion.

6         THE COURT:  Mr. Stoll?

7         MR. STOLL:  Yes, Your Honor.  First of all, at a

8    broad level, the assertion that the Seventh Circuit's

9    background information or your Court's ruling on the Daubert

11:08:00    10    are somehow conclusively and binding determinations of fact is

11    squarely contrary to the law.

12         Manpower, in particular, Your Honor, I would direct

13    the Court's attention to, which deals with this issue with

14    respect to attempts to exclude experts at trial as opposed to

11:08:17    15    effective cross-examination of them.

16         But if I could take a step back, Your Honor, just to

17    give a little bit broader context and then focus in on that

18    specific legal issue that goes to the import of the Seventh

19    Circuit's background and Your Honor's prior Daubert ruling in

11:08:37    20    the case.

21         First of all, Your Honor, the central issue that's to

22    be tried, as Your Honor is aware, is loss causation and the

23    issue of inflation.  And while there are disagreements

24    regarding certain aspects of the jury instruction and verdict

11:08:53    25    form that will be given to the jury, one thing that there is

1   no dispute about is that the central question which will be

2   going to the jury with regard to those issues is, first of

3   all, whether or not loss causation has been established.

4           And then, second, the jury will be instructed on the

11:09:09   5   inflation side that they're to determine the difference

6   between the price plaintiffs paid for each share of Household

7   stock and the price each share would have cost if no false or

8   misleading statement or omission of material fact had

9   occurred.  That's what they'll be asked to decide.

11:09:27   10          Now, defendants' experts, the three that we have put

11   forward, go squarely to that issue, the appropriate

12   measurement of the amount of inflation.  And Professor Fischel

13   has put forward what is known as a regression analysis to do

14   that.  That's the methodology that is used.  He has two

11:09:48   15   different versions of it:  A specific disclosure and a

16   leakage.  But the issue that's before the jury is whether or

17   not the models that he proposes best and most appropriately

18   capture that issue.

19          We have Professor Cornell -- and just to give a

11:10:07   20   little bit of background, at his deposition, Professor Fischel

21   said more than 90 times, My leakage model is based on an

22   article by Cornell and Morgan.  Your Honor, it defies belief

23   that it's not appropriate for the jury to have Professor

24   Cornell, who wrote the article, come before the jury and say,

11:10:26   25   when Professor Fischel tells you that he's relying upon my

article, he's not; he's got it wrong.

Second, Professor Fischel is not a financial institutions expert.  Professor James is.  And Professor James serves a very specific purpose here; which is, to indicate when you're dealing with financial institutions, you need to appropriately distinguish between the type of financial institution it is.

I don't want to belabor this with the Court, but so the Court is aware, Household is a lender which is in the consumer finance area.  And what that means is they don't get deposits like a bank.  They have to go out and borrow through the capital markets the funds that they're using to then go out and give to others.  That has meaningful effects regarding how the market looks at an entity like that, what type of factors are influencing an entity like that.

And when he comes in and testifies and says, I'm a financial expert who actually looks at this, has analyzed this, has served on the appropriate bodies for this -- and it's important that when the jury is looking at what Professor Fischel has done here that they understand the distinctions between a bank and a financial institution.

And then finally, Your Honor, Professor Ferrell.  He has a Ph.D. in economics.  He authored the article which the Seventh Circuit referenced specifically with regard to how to account for confounding information.  Professor Fischel does

1   not have an advanced degree in economics.  And he comes in and

2   talks about the regression analysis and says, here are some

3   problems with it; it's using the wrong control period; you

4   need to be more refined in terms of the indices you're using,

11:12:16   5   et cetera; you need to address confounding information.

6        Now, why do I say that Manpower in particular, given

7   that array of expert testimony, is something the Court should

8   give careful attention to?  Well, Manpower directly addresses

9   precisely what Professor Fischel is doing here -- a regression

11:12:34   10   analysis -- and addresses precisely the question that will be

11   before the jury, which is, does his model pick the right

12   independent variables, the right measures to use to accurately

13   get an outcome that he's looking to give, which is the outcome

14   the jury will be asked, what amount is attributable to the

11:12:57   15   fraud and what amount is not.

16        And what did the Seventh Circuit say?  The following,

17   Your Honor:  Regression analysis permits the comparison

18   between an outcome, called the dependent variable, and one or

19   more factors, called independent variables, that may be

11:13:12   20   related to that outcome.  As such, the choice of independent

21   variables to include in a regression analysis is critical to

22   the probative value of that analysis.

23        And here, Your Honor, is the particular important

24   phrase:  Nevertheless, the Supreme Court and this Circuit have

11:13:30   25   confirmed on a number of occasions that the selection of the

1    variables to include in a regression analysis is normally a

2    question that goes to the probative weight of the analysis

3    rather than its admissibility.

4         It string cites the Supreme Court and other Seventh

11:13:46   5    Circuit cases and then says the following:  These precedents

6    teach that arguments about how the selection of data inputs

7    affects the merits of the conclusions produced by an accepted

8    methodology should normally be left to the jury.

9         That is precisely the testimony that is at issue and

11:14:08  10    which they're seeking to exclude, which is, he says he applied

11    a model that's my model; it's not.  He says his indices are

12    the right ones; they're not, because they don't address the

13    particulars of this financial institution.  And then, finally,

14    Professor Ferrell saying he's got these other flaws with his

11:14:26  15    control period and if you measure it appropriately, here's how

16    it should come out.

17         Now, what do defendants have to -- or plaintiffs have

18    to say about Manpower?  They have a footnote in their reply

19    which just says it shouldn't be -- I think the direct quote is

11:14:43  20    that the reliance on it is misplaced.

21         Now, Your Honor, there are several other Seventh

22    Circuit decisions that we brought to your attention.  There's

23    the Stollings case, there's the Smith case, and there's the

24    Walker case, all of which go to this fundamental issue that

11:15:00  25    it's one thing for a court within the relevant burden of proof

1   that's applicable to say, he's adequately accounted for market

2   and industry factors such that the model is admissible.  It's

3   another thing entirely to say, I, the court, am resolving that

4   factual issue and I, the court, am deciding what regression

11:15:23   5   must be presented to the jury and only that one.

6        Now, when the Seventh Circuit was evaluating

7   Professor Fischel, they were appropriately evaluating it

8   within the context of was the evidence offered sufficient to

9   support the verdict that was rendered.  And consistent with

11:15:42   10   Manpower, consistent with Your Honor's analysis, the court

11   said, look, there's not a fundamental defect here that he

12   didn't select a market or industry variable.  He did.

13   Nonetheless, there's still a problem.

14        Your Honor went through and said, look, we pointed

11:15:59   15   out things which we believe are firm-specific, non-fraud

16   information and Your Honor concluded, under the relevant

17   burden of proof, that's not sufficient to preclude his

18   testimony; I find his testimony about this to be sufficient to

19   be presented.  That's a far cry -- and no precedent would

11:16:23   20   support, Your Honor, the construction that either the Seventh

21   Circuit or you directed that that issue is not to be placed

22   before the jury.  That's precisely the issue that's before the

23   jury.

24        So I would respectfully submit, Your Honor, that with

11:16:37   25   regard to the construction that they're trying to give that

1   would have both the Seventh Circuit usurping the role of the

2   jury on remand, which it certainly would not have done -- and,

3   Your Honor, we raised it in a status conference the first time

4   we were here, the Bright decision by Judge Easterbrook, where

5   he said, our first decision set aside the entire judgment; and

6   the court on remand had tried to construe, well, there's any

7   number of things I have to take as a given.  And Judge

8   Easterbrook said the jury's verdict was annulled; it has no

9   continuing force; it's regrettable to try any suit three

10   times, but here it is necessary.

11          Your Honor, with due respect, this is an issue that

12   should be tried before the jury.  It's an issue that goes to

13   the fundamental question that they're to address.  And it

14   would be absolutely improper under the law to preclude that

15   issue from being placed before them.

16          MR. BROOKS:  Your Honor, if I could respond.

17          This issue was tried before the jury.  It was tried

18   before the jury the first time.  They attacked Professor

19   Fischel's peer group.  They asserted that it didn't eliminate

20   all of the non-fraud information that it had to eliminate.

21   The case went up on appeal.  The Seventh Circuit -- the

22   defendants focused their appeal on company-specific, non-fraud

23   information.  They made challenges about Fischel's regression

24   analysis.  They cited the Williams case, Your Honor, which is

25   a Tenth Circuit.  It was a leakage case.  And in that case,

1  the expert did not account for market and industry factors.

2  The Seventh Circuit expressly addressed Williams and said,

3  this leakage model is okay here because Professor Fischel

4  accounted for industry and market factors.

11:18:23  5  So, Your Honor, this has been tried to a jury.  This

6  is either part of their appeal and was rejected or it wasn't

7  part of their appeal.  It's one or the other, Your Honor.  And

8  the law of the case doctrine clearly says we can't address

9  this on remand.  So they want to -- they went up to the

11:18:40  10  Seventh Circuit and they said Professor Fischel has not

11  addressed company-specific, non-fraud information.  They

12  convinced the court that there was something there.  And when

13  it came back down, there was nothing there, company-specific

14  and non-fraud.  So they've pivoted to a new theory, but that

11:18:56  15  theory is foreclosed by the Seventh Circuit's opinion.  And

16  it's not in the background.  It's in the opinion.  It's on

17  page 419 of the opinion.

18  There's other disputes over background facts in

19  different motions in limine.  But the court's finding that the

11:19:12  20  regression model took care of that is binding on this case,

21  and we can't relitigate it on remand.  We are relitigating

22  loss causation, consistent with the court's order.  But we are

23  not -- we are not allowed to get into whether his regression

24  eliminated market and industry.  The only thing at issue with

11:19:30  25  respect to the regression is company-specific, non-fraud

1    information.

2         And we've cited cases that are law of the case cases.

3    The Barnes case:  If this court remands to correct a discrete,

4    particular error that could be corrected without a

11:19:45    5    determination of other issues, the district court is limited

6    to correcting that error.  Barnes is quoting Parker:  A party

7    cannot use the accident of a remand to raise in a second

8    appeal an issue that he could just as well have raised in a

9    first appeal because the remand did not affect it.

11:20:01    10        So, Your Honor, they haven't cited a single case that

11    says that when the Seventh Circuit reverses, finds certain

12    parts of an element are proven and remands on a narrow issue,

13    that you have to blow up an entire element and ignore

14    everything they wrote in a 47-page opinion.

11:20:21    15        So the issue really comes down on this one, Judge, is

16    it binding, is it the law of the case, or do they get to

17    reopen this on an accident for something that was never

18    reversed on to try in this case?

19        MR. STOLL:  Your Honor, just two brief points, if I

11:20:40    20    may.

21        I think Judge St. Eve's discussion in Van de Sande,

22    which we provided to the Court, regarding how one interprets a

23    mandate in a Seventh Circuit decision, is very instructive and

24    goes through.  So, Your Honor, I think Judge St. Eve's

11:20:56    25    viewpoint on that in Van de Sande makes sense.

1       You'll also notice with Barnes and Parker, criminal

2   cases that are dealing with a very limited issue on

3   sentencing.  Those are wholly inapplicable here.

4       Benuzzi, which they cite, was dealing with a

5   circumstance in which the Seventh Circuit said you cannot get

6   summary judgment and sent it back for a trial and the

7   defendant tried to renew the motions for summary judgment.

8   And that, Your Honor, does go squarely to the mandate.

9       But here there is no basis, Your Honor, to take a

10  snippet from the Seventh Circuit, when they're evaluating

11  under the relevant burden at the time as to whether or not the

12  evidence supported the verdict when it simply says that he

13  accounted for market and industry factors, to interpret that

14  to overrule Manpower and to take away from the jury any

15  evidence going to the probative value of the indices selected

16  or the probative value of the regression run.  That, Your

17  Honor, would be plain legal error; and that is not a basis for

18  precluding that issue from the jury.

19      THE COURT:  Mr. Brooks, as I pointed out earlier,

20  there are multiple theories here under which you seek to

21  exclude the defendants' experts.  And right now I am just

22  talking about your motion to preclude Ferrell and James from

23  testifying about the disclosures they characterize as firm-

24  specific and unrelated to fraud.  You're also seeking to bar

25  them from opining that those disclosures distorted Fischel's

leakage and specific disclosure models.

You allude to my prior ruling, the Daubert order.
And in that order, of course I followed the Seventh Circuit's
directions in determining whether Fischel's testimony could go
to the jury. That was the issue. After reviewing Fischel's
supplemental report, I concluded that his testimony was
admissible because he had sufficiently opined that no
firm-specific, non-fraud-related information contributed to
the decline in stock price during the relevant time period and
that defendants had not identified significant firm-specific,
non-fraud-related information that could have affected the
stock price.

However, my ruling was only that under the framework
that the Seventh Circuit laid out, Dr. Fischel's testimony was
admissible. I did not make any factual findings or determine
that Fischel's testimony should be accorded conclusive weight.
I agree with the defense here that the jury will determine
what weight, if any, to give Dr. Fischel's testimony and
whether defendants have proven that significant firm-specific,
non-fraud information impacted the price of the stock.

In short, I don't believe that my ruling regarding
admissibility of Fischel's testimony is a basis for barring
the defense experts from testifying.

The next theory is that plaintiffs -- in plaintiffs'
motion is that Ferrell and James should be precluded from

1   testifying that industry or market factors impacted the stock

2   price because the Seventh Circuit said that Fischel's models

3   controlled for market and industry factors and general trends

4   in the economy.  The appellate court did make that finding.

11:24:25   5   And I believe that an instruction can be crafted to tell the

6   jury that that finding has been made in determining loss

7   causation and damages.  They'll be told that in determining

8   loss causation and damages, that they should disregard

9   evidence about market and industry factors and general trends

11:24:48   10   in the economy.  However, all of the experts are permitted to

11   give their opinions on which information reflects factors

12   common to the industry or economy at large and which is unique

13   to Household.

14          So the jury will then determine what information, if

11:25:07   15   any, is unique to Household.

16          Any questions on that?  I want to be as clear as I

17   can.

18          MR. STOLL:  So, Your Honor, I understand the Court's

19   ruling.  I think that depending upon what that -- obviously

11:25:26   20   there will be meaningful disputes over the framing of that

21   instruction.  And I'm confident that the Court, consistent

22   with Manpower, in not giving undue weight to the Seventh

23   Circuit decision here, which ultimately we all know, Your

24   Honor, reversed and remanded because loss causation was not

11:25:43   25   proven at the last trial.  But we can -- I understand the

1    Court's ruling, and we'll attempt to figure out with regard to

2    an instruction, with regard to objections to that --

3              THE COURT:  Okay.

4              MR. STOLL:  I think there may be difficulties.

11:25:57    5              THE COURT:  Absolutely.

6              MR. BROOKS:  I have a question, Your Honor.

7              THE COURT:  Yes, sir.

8              MR. BROOKS:  And we may as well take care of it now.

9              Large portions of the experts' opinions are that

11:26:06   10    information affected Household and its peers or companies like

11    Household.  Is that information that is -- are those opinions

12    that you're ruling are admissible and you're going to instruct

13    the jury to disregard them?  Or are those opinions that are --

14    you know, because they've reconstituted what company-specific,

11:26:28   15    non-fraud information is, are those out because they're not

16    actually company-specific; they're talking about an

17    industry -- and I'm talking about when they're expressly

18    saying, this information had a disproportionate impact on

19    Household's peers and, thus, we expect it to have a

11:26:45   20    disproportionate impact on Household or, thus, it did have a

21    disproportionate affect on Household.

22              MR. STOLL:  Your Honor, may I.

23              I think it would be inappropriate for Your Honor to

24    be attempting to resolve this issue in the abstract right now.

11:26:56   25    And let me give a little bit of backdrop.  And I don't know

1   Your Honor's depth of familiarity with the regression issues

2   and the rest.  But one of the things that Your Honor will hear

3   is that the concept of whether something is industry or firm

4   specific is necessarily dependent upon the variables which are

11:27:19  5   selected, in part, in the analysis.  And that's what Manpower,

6   in fact itself is directly addressing as well -- which is this

7   whole concept of what is your regression doing, what is the

8   value of the inputs, what are the potential flaws with it --

9   is something that affects the output and is something that is

11:27:42  10   appropriate for the jury to address.

11       So, Your Honor, I think, for instance, as I talked

12   about, basic issues like Cornell saying, it's not my model --

13   he didn't apply it -- that's a separate issue; James being

14   able to say, here's why one needs to account for certain

11:28:01  15   aspects of this particular financial institution is critical

16   to the jury's assessment of that probative issue; and, then,

17   of course, Professor Ferrell's analysis regarding a proper

18   regression and the limitations of this one.

19       So there's no basis here to preclude the opinions

11:28:19  20   that are central to that issue.  And I just think, Your Honor,

21   we need to see what the proposed instruction would look like

22   and have appropriate framing around that so that Your Honor is

23   not addressing it in the abstract.

24       THE COURT:  I agree with Mr. Stoll that it's not

11:28:37  25   possible to get more specific or more concrete at this point

1    in the abstract; but, again, defining it, that the jury will

2    be told they should disregard evidence about market and

3    industry factors and general trends in the economy.

4         However, the experts will be permitted to give their

11:28:54    5    opinions as to which -- or what information reflects common

6    factors in the industry or economy at large and which, in

7    fact, are unique to Household, and then the jury will decide

8    who is right on that issue.

9         Plaintiff also argues that the experts should be

11:29:12    10    excluded because their testimony is speculative; that is, that

11    the experts opine in their initial reports that non-fraud

12    information may have or could have contributed to the decline

13    in the stock, not that it actually did so.  However, Cornell

14    and James' initial reports only address the admissibility of

11:29:43    15    Fischel's testimony under the framework set forth by the

16    Seventh Circuit, which was if the plaintiffs' expert testifies

17    that no firm-specific, non-fraud-related information

18    contributed to the decline in stock price during the relevant

19    time period and explains in non-conclusory terms the basis for

11:30:06    20    his opinion, then it's reasonable to expect the defendant to

21    shoulder the burden of identifying some significant

22    firm-specific, non-fraud-related information that could have

23    affected the stock price.  That is the language contained in

24    the Seventh Circuit's opinion.  Therefore, their failure to

11:30:30    25    opine in their initial reports that specific, non-fraud

1    factors caused the stock price to decline is not a basis for

2    excluding their testimony.

3         Next, the plaintiff argues that Ferrell and James'

4    testimony should be excluded because their opinions, quote,

11:30:50    5    are contradicted by the overwhelming evidence in the case,

6    close quote.  And of course if that is true, then that will

7    provide ammunition for cross-examination.  However, I do not

8    believe that that is a reason to exclude their testimony.

9         Next, plaintiffs argue that Ferrell's testimony

11:31:15    10   should be excluded, specifically Ferrell, because he purports

11   to identify information that is not fraud related but did not

12   say in his report or deposition that information he considers

13   to be fraud related -- I'm sorry -- he does not say in his

14   reports or deposition what information he considers to be

11:31:34    15   fraud related.

16        Since he could not or would not identify fraud-

17   related information, plaintiffs say that he has no basis for

18   testifying about what is not fraud related.  Whether he would

19   say -- whether he would say so or not -- or identify or not

11:32:11    20   identify with more specificity -- the subjects of the fraud in

21   question here were determined by the first jury, and those

22   determinations were affirmed by the Seventh Circuit and are

23   binding on Ferrell.  It's my finding that his refusal to

24   acknowledge the fact -- or that fact is not explicable.  And

11:32:38    25   to the extent that he tries to deny that defendants made

1    misstatements or omissions about predatory lending, the

2    two-plus delinquency or re-aging issues and their credit card

3    accounting, his testimony will be stricken.

4         So, again, that's something that I'll deal with if it

11:32:55    5    comes up.  But to the extent that he attempts to deny those

6    binding findings by the prior jury, his testimony will be

7    stricken.

8         MR. STOLL:  And he will not, Your Honor.  In fact, he

9    explicitly has indicated -- and did so -- that the 17

11:33:12    10    misstatements at issue are obviously fixed and accepted.  So,

11    Your Honor, we will be able to navigate that appropriately.

12         THE COURT:  Next, Mr. Brooks, we get to the issue

13    regarding the deposition and the instruction not to answer

14    questions?

11:33:41    15         MR. BROOKS:  Correct, Your Honor.  It's both an

16    instruction not to answer questions and a refusal to answer

17    questions as asked by Dr. Ferrell during the deposition.

18         The questions were about -- and we sort of connected

19    the last issue with this issue because the questions were

11:34:01    20    about what the fraud was and seeking to gain an understanding

21    of what he considered to be fraud-related information, since

22    his testimony was that non-fraud-related information had

23    contributed to the stock price decline or at least may have

24    contributed to the stock price decline; I used the Seventh

11:34:23    25    Circuit's opinion, their summary of what the jury had found,

1    which is upheld.  And also he cited the Seventh Circuit's

2    opinion 30 times in his report.  And they instructed him not

3    to answer.

4         I don't think they seriously contest that those

11:34:41    5    instructions were proper.  They weren't.  There was no

6    protective order sought.  The deposition wasn't stopped.  The

7    reason was essentially relevance.  So it was a major

8    violation.  It disrupted the deposition.  And ultimately we

9    never got an understanding of what Dr. Fischel understood the

11:34:59   10    fraud to be.

11         So it was this combination of both his failure to put

12    it in the report, his refusal to consider anything other than

13    what was on the face of the jury verdict's form, and these

14    instructions not to answer that led us to conclude that he

11:35:18   15    doesn't know what's fraud related and what isn't; and that's

16    why we brought our motion.

17         You know, the remedy of exclusion here, I think, is

18    appropriate, Judge, because it's very clear to us that this is

19    a tactical decision that the defendants made, which is,

11:35:34   20    they're going to refer to the jury verdict form and say that's

21    the limit of the fraud.  They've done it all across their

22    papers.  Whether they're correct or not, they can't prevent

23    him from answering questions based on the Seventh Circuit's

24    opinion about what the fraud actually was, how the stock

11:35:51   25    became inflated, why the stock was inflated, what the

1    mechanics were of the three areas of the fraud that the

2    company lied about for its securities fraud violations.  We

3    cited, you know, several cases.  I think Caremark -- Ferrell

4    himself says you need to understand the fraud in order to

11:36:09   5    opine what's related to it and what isn't.

6         And basically they've obstructed our ability to

7    discern this information through the deposition.  And then in

8    their opposition brief, they say, well, Your Honor, it's a big

9    case so this would be an extreme remedy because it's a big

11:36:27   10   case.  But it's a big case for us too.  And we need to know

11   what their experts are going to say.  And the deposition was

12   the time to do that.

13        We've now gone through the deposition, filed our

14   Daubert motions, moved to Chicago, and we still don't know

11:36:40   15   what he's going to say about company-specific -- about the

16   fraud and what it is.  And so we've asked for him to be

17   excluded not just because of the instructions not to answer,

18   and it has nothing to do with whether those -- the background

19   is binding or not.  I think it is, Your Honor, because it is a

11:36:58   20   summary of what the prior jury found and the court was saying

21   these are the issues that are resolved and, frankly, weren't

22   appealed, most of them, and then went on to discuss the rest

23   of it in the background section.

24        But it doesn't matter whether the background section

11:37:15   25   is binding or whether it's just a summary of the fraud.  The

1    fact of the matter is, Professor Ferrell cited this -- the

2    opinion -- I don't know -- 30 times or more in his reports;

3    and we're entitled to examine him on it.  We're also entitled

4    to determine what the fraud is.

11:37:30    5         I had a ten-page attempt to figure out, Judge,

6    whether he thought a disclosure that related to Household

7    tricking and trapping customers related to the fraud.  It's

8    pages 173 to 183 of his deposition.  And he wouldn't answer

9    the question without saying, When you say relate, it has to

11:37:55   10    include a statistically significant decline.  I told him over

11    and over again, that's not what I'm asking.  I'm asking does

12    this relate to the fraud.  And he wouldn't answer the

13    question.

14         So it's the instructions and it was his refusal to

11:38:09   15    answer the questions as asked, well beyond what a normal

16    expert would do.  He -- you know, he simply wouldn't answer

17    the questions.  That has left us in the dark as to what he

18    thinks is related to the fraud.  And it's not appropriate to

19    do in a case like this.  This is a huge case, and this is a

11:38:25   20    primary case; what's related to the fraud and what isn't.

21         THE COURT:  But there's no question at this point

22    that he is bound by the findings of the jury in that regard,

23    right?

24         MR. STOLL:  That's correct, Your Honor.

11:38:36   25         THE COURT:  All right.  So it's my finding that even

1   though the instruction was not proper, it was inappropriate,

2   and his refusal to answer the question was inappropriate, that

3   at this point, there's not prejudice to counsel based upon the

4   fact that Ferrell is going to be bound by the jury's findings

11:38:56   5   with respect to the fraud.  So it is not a basis to exclude

6   his testimony under that theory.

7        The next theory is one where the plaintiff argues

8   that Ferrell's testimony should be excluded because he

9   violated Rule 26(a)(2) by disclosing for the first time at his

11:39:17   10   deposition that he chose the Credit Suisse First Boston

11   Specialty Finance Universe to create his peer index after

12   consulting Institutional Investor magazine and some

13   unspecified, quote/unquote, academic literature.

14        I agree with the plaintiff here that his failure to

11:39:44   15   disclose this information and to identify specifically the

16   academic literature violates 26(a).  Therefore, Dr. Ferrell

17   may not use that information at trial unless his failure to

18   disclose it was justified or is harmless.

19        Plaintiff does not believe that it was harmless,

11:40:17   20   correct, Mr. Brooks?

21        MR. BROOKS:  That's correct, Your Honor.  It's not

22   harmless.  And the selection of the peer group that he used

23   for his regression in his rebuttal report, which leads to the

24   first quantification of damages in this case by the defendants

11:40:30   25   for the first time in 14 years, is a critical issue because

1   there are so many peer groups that the defendants have

2   selected over the years of this case.

3         Their prior expert selected a peer group that was

4   different from the one that Ferrell selected.  James used the

11:40:47   5   peer group that Ferrell selected and then changed it to a

6   different one.  There are peer groups that are identified in

7   Household's SEC disclosures that are different from the one

8   that James used.  And he used a methodology of selecting a

9   peer group from analyst reports -- and his report cites a

11:41:08   10   number of analyst reports; we included some of them in our

11   brief -- that have completely different peer groups.

12         And it's critical for us to understand his basis for

13   selecting the peer group.  And saying, some unidentified

14   academic literature led me to Institutional Investor

11:41:25   15   magazine's top analyst isn't sufficient.  And it wasn't in his

16   report.

17         And so if these reports are going to mean anything --

18   and they should; they should allow us to prepare for

19   depositions and to examine the expert witnesses on their basis

11:41:37   20   for their opinions -- this opinion -- this particular opinion,

21   it doesn't go to the whole thing; it's just the peer group --

22   has to be excluded.

23         And, Judge, just -- you know, they may seek to

24   minimize the import of the unidentified academic literature,

11:41:55   25   but I'd point out, they've hired an expert -- Cornell --

1    solely to testify on the academic literature that our expert

2    relied on.  So for them to say that it's harmless for us to

3    not know why and how Professor Ferrell derived his peer group

4    is just incorrect.

5          THE COURT:  But the issue was testified -- he was

6    cross-examined during the deposition about these issues?

7          MR. BROOKS:  Well, he was cross-examined during the

8    deposition about Institutional Investor magazine with no

9    preparation.  So just, you know, he said, I chose it through

10   Institutional Investor magazine based on academic literature.

11   And then I said, What was the academic literature?  And he

12   said either he didn't remember or he wouldn't disclose.  I

13   can't remember which.  And then I asked, Was this academic

14   literature literature that directs you to use Institutional

15   Investor magazine for the purposes of identifying a peer group

16   for a loss causation situation like we're in now?  And he said

17   no.

18         And the bottom line is, what's going to happen at

19   trial, Your Honor, is we're going to cross-examine Ferrell on

20   how he selected his peer group and he's going to sit up there

21   and he's going to say, well, I chose the top analysts from

22   Institutional Investor magazine based on the academic

23   literature.  And that's completely unfair because they haven't

24   disclosed the academic literature.  When I deposed him, I had

25   no idea what Institutional Investor magazine's criteria was

1    for a top investor.  I had honestly never heard of

2    Institutional Investor magazine until he said it.

3          So to say that it's harmless is just incorrect.  And

4    it just, you know, encourages this type of thing where they

11:43:36    5    spring opinions on you either during the deposition, after the

6    deposition, or at trial; and it's exactly what Rule 26 is

7    designed to prevent.

8          MR. STOLL:  Your Honor, may I briefly respond?

9          THE COURT:  Yes.

11:43:48    10          Mr. Brooks, did Dr. Fischel respond in the rebuttal

11    report on this issue?

12          MR. BROOKS:  Professor Fischel has responded on the

13    issue of the peer group.  I don't know that he had enough

14    information to respond on the issue of selecting the peer

11:44:07    15    group through Institutional Investor magazine.  But his

16    belief, for a number of reasons, is that the peer group is

17    incorrect.

18          But it's not just the correctness.  It's the musical

19    chairs of the peer groups, the changing of the peer groups and

11:44:22    20    why they're coming into court a second time around arguing

21    that the appropriate peer group -- and Mr. Stoll has indicated

22    they think it's a very important thing, the selection of the

23    data that goes into the regression -- why they're changing it.

24    And that's a -- you know, frankly, that's a problem for them.

11:44:40    25    And I think they're trying to get around it with this

1   Institutional Investor magazine thing, but they never

2   disclosed it.

3           THE COURT:  Mr. Brooks, what about a re-deposition on

4   that limited issue?  We're still two weeks out.

11:44:56   5           MR. BROOKS:  Well, Your Honor, they'd have to tell us

6   what the Institutional Investor magazine or what the --

7   sorry -- the academic literature was beforehand.  I don't --

8   they've never told us, so I don't know what he was referring

9   to.  So I'd like to take a look at the academic literature.  I

11:45:16  10   would like to avoid a second deposition but maybe reserve my

11   right to take one.

12           And if we're taking a second deposition, I'd like to

13   be able to ask him about what he considers to be the fraud for

14   purposes of this case as it relates to the last issue that we

11:45:29  15   discussed, so that we know going into our cross-examination

16   what he's going to say.  But without the academic literature,

17   I'm not sure what I can do with him in a second deposition.

18           THE COURT:  Mr. Stoll, your position is that it's

19   harmless?

11:45:47  20           MR. STOLL:  Well, Your Honor, a couple of things.

21   One, the use of the index was fully disclosed.  It was part of

22   the report.  He explained why he needed to use it.  This is a

23   very limited issue, which is, how in particular was the CSFB

24   selected.  That was an issue which was probed at deposition,

11:46:05  25   as one would expect.

1      Your Honor, yes, with regard to, on this narrow

2  issue, is there any prejudice or harmfulness, there is not,

3  Your Honor.  And, in fact, I would direct the Court's

4  attention to -- but I'm sure you're already aware of it --

11:46:24  5  Judge St. Eve's discussion in Rabin, which goes to directly

6  what Your Honor is addressing here:  If someone is raising

7  something of this nature, you need to appropriately evaluate

8  it within the context of the case and the harmlessness and

9  figure out if there are intervening measures.

11:46:38  10      I would submit to your Court, they're fully prepared

11  to be able to cross-examine him on this issue.  Certainly it's

12  not a basis to exclude.  Your Honor, it would certainly not be

13  a basis to exclude Professor Ferrell's entire regression

14  analysis -- which is what they seem to be doing -- on this

11:46:56  15  very limited issue of underlying support for this particular

16  selection of the CSFB.  There are interim or more narrow

17  measures, as your Court indicated.  We can certainly provide

18  the academic literature, of which it readily exists, to

19  counsel; and that's an appropriate subject of

11:47:18  20  cross-examination at trial.

21      THE COURT:  Okay.  So you're prepared to do that?

22  What answer did he actually give?  "I don't remember" or "I

23  don't know"?

24      MR. STOLL:  No, he explained -- so what he said, Your

11:47:29  25  Honor, is, I selected the CSFB because I wanted some objective

1  criteria.  I looked at Institutional Investor magazine, which

2  I know has been referenced in other academic literature; and

3  so it was an objective measure that could be used.  The

4  question was then:  What is the specific piece of literature

11:47:50  5  that you're referring to?  He couldn't recall at that time.

6  We'll certainly provide that to counsel.  We have no issues

7  with that.

8         THE COURT:  All right.  Mr. Brooks?

9         MR. BROOKS:  Well, Your Honor, I'd like to get that

11:48:02  10  material and, if necessary, ask Dr. Ferrell about it and

11  why --

12         MR. STOLL:  If I could, Mr. Brooks?

13         I apologize, Your Honor.  I misspoke on my last --

14  Mr. Fitzgerald, who actually defended the deposition, wanted

11:48:19  15  to clarify one matter that I misspoke with respect to.

16         MR. FITZGERALD:  Thank you, Judge.

17         My understanding -- my recollection is that Professor

18  Ferrell didn't say there was a particular piece of literature

19  he was relying upon that said you must use the peer index from

11:48:34  20  the star analysts group.  And, in fact, when he was asked at

21  the deposition whether or not he -- there was a particular

22  piece of literature, he said that's his general background.

23         My way of looking at it, Judge, is it's as if someone

24  said, I cited to Webster's Dictionary because I understood

11:48:48  25  people cite to Webster's Dictionary.  He wasn't saying there's

1    one particular article out there that says you should do it.

2         Nonetheless, there is academic literature out there

3    consistent with Professor Ferrell's testimony, which we'll

4    provide.  His testimony was that academic -- academics refer

11:49:02   5    to Institutional Investor in lots of articles where they've

6    used that magazine for different purposes; it wasn't geared to

7    the peer group.  We can pull articles that -- where

8    Institutional Investor refers to academic articles.  We'll

9    share them with plaintiffs' counsel.

10        THE COURT:  So he wasn't --

11        MR. FITZGERALD:  I just wanted --

12        MR. BROOKS:  Your Honor --

13        THE COURT:  He wasn't saying that he consulted

14   international investor -- Institutional Investor and

11:49:24  15   unspecified academic literature?  He was saying that he

16   consulted Institutional Investor, which is referenced?

17        MR. FITZGERALD:  I --

18        MR. BROOKS:  I have his testimony right here, Judge.

19        THE COURT:  Sure.

11:49:37  20        MR. BROOKS:  I said:  What was your process for

21   landing on that particular group of consumer finance

22   companies?

23        And he responded:  Sure.  So the process was -- and

24   this is at page 227 and 228.

11:49:47  25        MR. FITZGERALD:  Thank you.

1       MR. BROOKS:  So the process was, it was very

2   important to me to use a third-party identification of

3   comparables contemporaneous with the time period, so that was

4   criteria one.

11:49:58   5       The second criterion is, consistent with the academic

6   literature -- and I'll explain that in a minute -- I went to

7   the Institutional Investor magazine, which ranks analysts.  I

8   identified the star analyst according to Institutional

9   Investor magazine.  I went to his report where he identifies

11:50:13   10  those firms.  And the final thing I would note -- which is

11  important to my thinking -- is that the academic literature

12  regularly uses this source, the Institutional Investor

13  magazine, to identify the star analysts.

14      And then I followed up on, what do they -- what does

11:50:27   15  the academic literature recommend using this source for and

16  got very vague answers that I don't have right in front of me.

17      So that's what he said about the academic literature,

18  as a source for Institutional Investor magazine.  And there

19  are cases, Judge, that we cited in our brief that say once an

11:50:44   20  expert tells you this is his source, he can't back away

21  because of challenges that he didn't disclose it and just say

22  he's relying on his expertise.  That's not appropriate, Your

23  Honor.

24      These defendants and Professor Ferrell have now

11:51:00   25  violated Rule 26.  The only thing this implicates is the

1    regression analysis.  He uses it in the rebuttal report to

2    quantify the inflation.  This is not a central part of the

3    case.  If it was, it wouldn't be in the rebuttal report, Your

4    Honor; it wouldn't be showing up for the first time in

11:51:18    5    14 years.  And so the remedy of exclusion is entirely

6    appropriate.

7            MR. FITZGERALD:  Your Honor, just to clarify, there

8    were follow-up questions.  I don't think the answers were

9    vague.  I think the answers clarify it.  I will read from

11:51:32    10    page 231.

11            The question put to Professor Ferrell was:  What does

12    the academic literature that you relied on, but didn't

13    disclose to us, say that you were relying on in going to

14    Institutional Investor magazine?

11:51:45    15            His answer:  Yeah.  So I'm not saying I relied upon

16    it.  I'm saying it's part of my background knowledge.  It's a

17    publication that ranks analysts.  And I did use that to

18    identify this particular analyst.

19            And then he says:  So -- but in terms of the academic

11:52:00    20    literature, there's articles -- I don't have them memorized

21    off the top of my head -- that use that ranking to identify

22    star analysts for various purposes.

23            The follow-up question was:  None of those purposes

24    are for identifying a peer group, correct?

11:52:13    25            That, I don't know.  I'm not -- I'm not making that

1     representation.

2             He later says on page 230 -- earlier:  The testimony

3     on that was it's my general background information.

4             All I want to do is make clear what the expectations

11:52:25    5     are.  We will produce the academic articles.  But he's not

6     saying there's an academic article that says you pick the peer

7     group from the magazine.  What he's saying is he picked the

8     peer group from Institutional Investor because he knew that

9     lots of academic articles turn to that magazine.  And we can

11:52:41    10    provide those articles.  But it's not as if --

11            THE COURT:  Mr. Fitzgerald, what's the framework for

12    providing those articles?  Are you simply doing the research

13    and saying, here's what I believe the articles -- the relevant

14    articles are or the relevant literature is that would lead one

11:53:01    15    to Institutional Investor; or, are you saying, I spoke to my

16    witness and he says these are the articles or this is the

17    literature?

18            MR. FITZGERALD:  We can do it either way, Your Honor;

19    whatever framework you'd like.  If you would like us to go to

11:53:15    20    Professor Ferrell and say, look for the articles you described

21    generally.  My only point being, it's not as if he said

22    there's a particular article he's citing.  He's saying there

23    are articles out there.  Whether we provide articles that are

24    out there independently or through Professor Ferrell, I'm fine

11:53:28    25    either way.

1          MR. BROOKS:  Your Honor, if that's true, then he has

2     no basis for his selection.  If he's now backing away from

3     this unidentified academic literature, he's got no basis for

4     going to this particular analyst's report and selecting from a

11:53:41   5     star analyst -- there are contemporaneous analysts' reports

6     that have completely different peer groups, completely

7     different companies that the analysts cover.

8          So he cited this as his basis.  And now they want to

9     say, well, because we didn't produce it, he didn't rely on it

11:53:58   10     when he said the academic literature regularly uses this

11     source, the Institutional Investor magazine, to identify the

12     star analysts, in the context of -- the question was, What was

13     your process for landing on that particular peer group of

14     consumer finance companies?

11:54:14   15          So either he relied on it and didn't produce it or he

16     doesn't have a basis for landing on that particular peer

17     group.  Either way, he shouldn't be able to use a regression

18     and testify about a peer group without any basis, Judge.

19          MR. FITZGERALD:  Your Honor, he was clear that he

11:54:34   20     relied upon Institutional Investor, and he specified that

21     particular article.  And then he said why -- they asked the

22     further question, Why did you pick that magazine,

23     Institutional Investor; and he said because, generally,

24     academic literature discusses Institutional Investor in a

11:54:49   25     variety of different contexts.  So he was specific that he

1    relied upon Institutional Investor.  And he said his opinion

2    of Institutional Investor came from general background.

3            MR. BROOKS:  He said, first:  The second criterion

4    is, consistent with the academic literature -- and I'll

11:55:03    5    explain that in a minute -- I went to the Institutional

6    Investor.

7            He's got a two-step process:  Academic literature to

8    the Institutional Investor to take the star analysts, go find

9    some companies in his report and use those.  That's what he

11:55:16    10   said.  But what he didn't provide is the academic literature.

11   And if he didn't rely on academic literature, then he has

12   another problem.  It's not a problem that we briefed

13   expressly, Your Honor, but he's got no basis for his peer

14   group.  So it's one or the other.

11:55:30    15           And providing the academic literature at this point

16   in time, I'm not sure that remedies the problem, Judge,

17   especially now, if he's backing away from having relied on it.

18           THE COURT:  All right.  As I stated earlier, the

19   failure to disclose is violative of 26(a); however, under

11:55:48    20   30(c)(1), I find that it's harmless.

21           That being said, if the plaintiff wants to re-depose

22   Professor Ferrell, they can do that on this very limited

23   issue.  If they want to, they can re-depose him.  I assume as

24   a practical matter that can get done in the next ten days or

11:56:08    25   so.  They may choose not to as a matter of strategy.  But if

1   they want to, they can re-depose him on this very limited

2   issue of his underlying support for turning to Institutional

3   Investor.

4            And, Mr. Fitzgerald, you will provide what you

11:56:27   5   believe is relevant on that issue also?

6            MR. FITZGERALD:  Yes, Your Honor.

7            THE COURT:  And if they are satisfied, they won't ask

8   for the deposition.  The deposition, in any case, shall not

9   exceed two hours.

11:56:38   10            MR. BROOKS:  Judge, we've all relocated to Chicago

11   for this trial.  Can we have the deposition in Chicago?

12            THE COURT:  Sure.  And where is the witness?

13            MR. FITZGERALD:  He's in Boston, Your Honor, but

14   we'll get -- if a deposition is necessary, we'll arrange it in

11:56:53   15   Chicago.

16            THE COURT:  Okay.  All right, so the motion to

17   exclude under that theory is going to be denied with that

18   understanding.

19            Next, plaintiffs' argue that Ferrell should be

11:57:03   20   precluded from testifying about subjects that he could and

21   should have raised in his opening report but did not address

22   until his rebuttal.  More specifically, plaintiffs say that

23   Ferrell should be precluded from testifying about the

24   following things:  One, the damages qualification --

11:57:23   25   quantification that he made for the first time in his rebuttal

1    report; and, two, that the specific disclosure model is the

2    only appropriate way to calculate damages in this case.

3            Plaintiffs have raised this issue in a motion to

4    strike, which was previously denied.  Instead, plaintiff was

11:57:46   5    given an opportunity to submit a surrebuttal report.

6    Plaintiffs' ability to file a surrebuttal report, in my

7    opinion, cured any prejudice regarding the timing of Ferrell's

8    opinions -- cured any prejudice that would have occurred based

9    upon that timing.  So that motion is going to be denied.

11:58:14   10           Next, plaintiff contends that expert James -- that

11   his testimony should be barred because he cherry-picked --

12   quote/unquote, cherry-picked a peer group without any

13   scientific approach and compares Household to this peer group

14   without applying any accepted methodology.

11:58:40   15           MR. BROOKS:  Your Honor, Professor James, whose

16   testimony is also almost entirely duplicative of Professor

17   Ferrell's, has no methodology whatsoever.  There's an accepted

18   methodology for assessing and measuring the impact of

19   disclosure on stock prices; and, as we know from this case,

11:59:00   20   that's to run a regression and make a determination.

21           We cited the Zenith case, Your Honor, in which Judge

22   Easterbrook upheld the exclusion of an expert who was opining

23   on how much business a cable company would have gotten had

24   they gotten correct cable boxes.  And the expert went into

11:59:26   25   court, had all the qualifications, and basically made an

1    observation of the market and reached conclusions, just like

2    James has.  And Judge Easterbrook wrote, he's relying on

3    intuition, which just won't do.  And he criticized that expert

4    for exactly the same thing that James hasn't done, which is

11:59:46   5    failing to run a multivariant regression.  So he relies on his

6    industry expertise rather than run a regression, which is the

7    standard methodology in the industry.

8        So James has no methodology.  He doesn't have a

9    methodology for picking his peers.  He started with the CSFB

12:00:10   10   peer group, as well, in his opening report; and then he cut it

11   down to four companies or five companies in his rebuttal

12   report.  And that's -- and he wants to testify about disparate

13   impact on Household and those five companies, but he has no

14   methodology.  And when he was asked about it at his

12:00:28   15   deposition, he said it was something akin to a propensity

16   score matching technique; words, again, that have never

17   appeared in his report.

18       So, Your Honor, he wants to just essentially go out

19   there and bolster Ferrell's testimony.  It's -- they rely on

12:00:47   20   the exact same stuff.  They say the exact same thing, except

21   Ferrell, at least for some of his opinions, runs the standard

22   methodology -- setting aside the criticisms that we have of

23   it -- he runs the standard methodology.  James does nothing.

24       So he picked a peer group apparently at random and

12:01:06   25   then switched it after Professor Fischel, in his response, ran

1    the peer group through the regression and showed that if you

2    included James' peer group, the damages would actually go up;

3    then he abandoned the peer group for a different one in his

4    rebuttal report; and, now he just wants to compare Household

12:01:26    5    to that peer group without any methodology whatsoever.  And

6    under Zenith and Daubert and Rule 702, it's improper.

7                THE COURT:  All right.  Mr. Stoll?

8                MR. STOLL:  Yes, Your Honor.

9                The argument, which has combined both some

12:01:41    10   cumulativeness and also this methodology thing, is precisely

11   confusing the very specific role that Professor James plays

12   here.

13               In Zenith, Judge Easterbrook was appropriately

14   addressing the circumstance that if you need to apply a

12:01:58    15   methodology, you need to do it in an appropriate fashion.

16   Professor James is not running the regression analysis.

17   That's Professor Ferrell's responsibility.

18               Professor James serves a very distinct and

19   appropriate and necessary purpose here, which is, I'm an

12:02:18    20   expert who knows financial institutions.  Professor Fischel is

21   not an expert in financial institutions.  What he does is he

22   says that what Professor Fischel is using for his analysis

23   does not appropriately distinguish between the types of

24   financial institutions that are at issue.

12:02:38    25               There's no -- it -- we've cited to you abundant

48

1    Seventh Circuit authority which says time and again that an

2    expert who comes in to testify regarding an area in which he

3    has particular experience, that is an appropriate and

4    principal basis to testify.

12:02:57    5    What Professor James did is he said, you need to

6    distinguish between these relevant types of financial

7    institutions; and here within the index that's at issue are

8    the relevant institutions that are like Household, that are

9    non-depository institutions involved with funding in the

12:03:18    10    subprime space.  And all he did was something very simple.  He

11    said, and if you look at that subset of institutions that are

12    the appropriate ones to look at, you see that during the

13    period, they fall dramatically, as well.  That's all.  He's

14    not running a regression.  He's not doing anything else.

12:03:35    15    It's appropriate and necessary and, frankly,

16    essential for the jury to understand what's going on with

17    Fischel's regression analysis to have a financial -- a person

18    with expertise regarding financial institutions to be able to

19    say, here's why these institutions differ from those.  And

12:03:56    20    that's what he does.

21    MR. BROOKS:  It's misleading, Your Honor, to compare

22    stock price declines by small -- you know, five companies, all

23    of them subprime credit card companies and one auto company,

24    against Household without -- setting aside the problem with

12:04:11    25    the peer group -- but just without any methodology.  It's

1      misleading.  That's why you run a regression analysis.

2            The expert in Zenith tried to do the exact same

3      thing.  The cases that they cite where experts come in and

4      rely on their expertise, that's where there is no standard

12:04:27   5      methodology available for accomplishing the task that needs to

6      be accomplished.  And, here, the task that needs to be

7      accomplished is to determine what caused Household's stock

8      price to decline.  Was it company-specific information that

9      was non-fraud or was it other information?  And you can't do

12:04:44  10      that, Your Honor, in the context of this case without doing at

11      least some analytical work.  And all he's done is pick some

12      companies and then he's got some charts and he says, look, on

13      this day, their stock price fell.  It doesn't tell you

14      anything about the relative decline against the market, the

12:05:04  15      industry or anything else that all of the cases teach us needs

16      to be done.

17            If I walked into court, Judge, with a plaintiffs'

18      expert and said, Stock price declined on this day; here are

19      three companies whose prices didn't decline that I -- are

12:05:19  20      tangentially related to the defendant company and therefore I

21      should get the difference in damages, no one would ever say

22      that passes muster.  There has to be some analytic rigor.  And

23      James has none.

24            MR. STOLL:  Your Honor, if I --

12:05:36  25            THE COURT:  Yes, Mr. Stoll.

1          MR. STOLL:  Briefly with regard to that.

2          Your Honor, the concept that it is -- it would not be

3    probative of Professor Fischel's analysis for a financial

4    expert -- a financial institutions expert to be able to

12:05:48    5    testify, here are the relevant differences between financial

6    institutions that must be taken into account and that the

7    market takes into account, that's central to the jury being

8    able to fairly evaluate what Professor Fischel has done.  And

9    the fact that we have a financial institutions expert who

12:06:08    10    focuses solely on that issue, what are the differences between

11    financial institutions that must be accounted for -- and

12    precisely because we did not want cumulative testimony does

13    not run the regression analysis that Ferrell does -- that's an

14    appropriate allocation of experts, Your Honor.  It's no basis

12:06:29    15    to exclude Professor James, who will educate the jury in a

16    very important manner about what are the distinctions between

17    the financial institutions that are at issue.  That's

18    fundamental to their evaluation of the issue that's before

19    them, Your Honor.  And he does it with appropriate expertise

12:06:45    20    and he does it in an appropriate and rigorous manner.

21          That's, frankly, a mischaracterization because what

22    they've done is they've said because he doesn't do a

23    regression analysis, you should exclude him.  But the very

24    reason he doesn't do a regression analysis is that's not what

12:07:03    25    he's being called for, Your Honor.  He's being called to

1    educate the jury about the differences in financial

2    institutions and why those differences are significant to the

3    marketplace.  It is essential testimony, Your Honor.  And it

4    would be improper to strike it on an issue that is not what is

12:07:21    5    the subject matter of his testimony.

6             THE COURT:  I agree with the plaintiff.  The motion

7    is going to be granted regarding the witness James, Dr. James,

8    Professor James.  I don't believe that under Daubert it would

9    be appropriate for him to testify.  I don't believe that the

12:07:41    10   reasoning or methodology underlying his testimony is -- has

11   been shown to be scientifically valid under Daubert.  So that

12   testimony is going to be excluded.

13            Next, we move to Professor Cornell.  Plaintiff seeks

14   to exclude the testimony of Cornell who will testify that

12:08:04    15   Fischel's leakage model is flawed because it does not, first

16   of all, follow the method set forth in Cornell's papers as it

17   purports to do.  We've spoken about this a little bit.

18            Secondly, it does not adequately measure inflation.

19            My ruling is that Cornell can testify on the former

12:08:26    20   topic.  He can talk about the fact that, in fact, Fischel did

21   not follow the method set forth in Cornell's paper, the method

22   apparently that Fischel is going to say he did follow.

23   However, he cannot testify about the latter subject regarding

24   the measurement of inflation because that conclusion is based

12:08:50    25   on his opinion that Fischel's model fails to account for

firm-specific, non-fraud information.  And Cornell did testify

that he did not make judgments about whether information was

fraud related or not fraud related.  He also testified that he

did not do a detailed analysis of the facts in the case.

12:09:13   Also, that he did not perform a regression analysis or event

study.  Also his conclusion that Fischel's model does not

adequately account for non-fraud information was based on

Professor Ferrell's work.  And he did not do any work to

determine what the proper peer index would be or should be;

12:09:44   and also his opinion that Fischel's model is misspecified was

based on the works of James and Ferrell.

So in short, he did no independent analysis to

support the latter opinion and is simply echoing the opinions

of others.  So even if this topic on this second or latter

12:10:07   topic were admissible under Daubert, I find that it would be

cumulative, needlessly cumulative.

So he can testify as to Fischel's failure to follow

the method that he lays out but not as to the adequacy of the

measurement of inflation.

12:10:44   That takes care of the omnibus order.  Let's turn to

plaintiffs' --

MR. BROOKS:  Your Honor --

THE COURT:  -- numbered --

Yes, sir?

12:10:58   MR. BROOKS:  I'm sorry.  There's just one other

1   thing. I think with the rulings, the only cumulative issue

2   left would be Ferrell's criticism of Fischel for the way he

3   implements Professor Cornell's model. We would ask that they

4   pick either Professor Ferrell or Professor Cornell to talk

12:11:17   5   about the use of the model and how it's supposed to be used.

6          THE COURT: Mr. Stoll?

7          MR. STOLL: Your Honor, we understand the limitations

8   of Local Rule 16.1.1, and we will ensure that there's not

9   cumulative testimony. There may be different attributes that

12:11:35   10   the two would focus on, but we will ensure there's not

11   overlap.

12          THE COURT: All right, let's go to the numbered

13   motions in limine.

14          No. 1.

12:11:58   15          MR. FARINA: Good afternoon, Your Honor. Steven

16   Farina for Household.

17          MR. DROSMAN: Good afternoon, Your Honor. Daniel

18   Drosman on behalf of plaintiffs.

19          MR. FARINA: Your Honor, we have two No. 1s. They

12:12:13   20   are overlapping in subject matter, relating to what evidence

21   from the first trial should be admitted in the second trial.

22   So both the plaintiffs' motion in limine No. 1 and defendants'

23   motion in limine No. 1 address the same issues. I think our

24   motion in limine No. 1 breaks it into specific categories,

12:12:35   25   whereas plaintiffs' motion in limine No. 1 is a little more

1  generic in its approach.  But I think they essentially deal

2  with the same issues.

3          THE COURT:  Mr. Drosman?

4          MR. DROSMAN:  Yeah, I think that they're sort of two

12:12:49    5  sides of the same coin.  We're seeking to admit, consistent

6  with the Seventh Circuit's decision in Watts, evidence and

7  statements of the prior proceedings.  And as I understand

8  their motion, they're seeking largely to exclude it, with the

9  exception of a very watered-down statement of prior

12:13:11   10  proceedings, which they contend is sufficient but clearly is

11  not.

12          MR. FARINA:  So, Your Honor, on our motion in limine

13  No. 1, there are specific categories of evidence.  We don't

14  disagree with the concept that relevant evidence should be

12:13:24   15  presented to the jury.  The question is what evidence is truly

16  relevant to the issues on retrial.  And what we've done is

17  we've broken out categories.  We tried to organize this for

18  Your Honor and for the plaintiffs where we find that certain

19  evidence that was either not admitted in the first trial or

12:13:41   20  admitted in the first trial for a very particular purpose that

21  is no longer relevant to the retrial should be excluded.  And

22  we've walked through a number of examples.

23          If you go back to the original rulings on many of

24  these categories of evidence, the court in the first trial

12:13:56   25  admitted them, for example, for purposes of establishing

1    scienter.  And we cited to the original evidentiary rulings.

2    Well, scienter, of course, is an issue that this jury cannot

3    decide because it's already been decided.  We are not going to

4    try to retry the issue of scienter.  They should not be

12:14:14    5    allowed to retry the issue of scienter.  Therefore, if

6    evidence was only admitted in the first trial because it went

7    to scienter and would have otherwise been excluded, then it

8    certainly has no place in the second trial.

9         So we -- I mean, we think the details matter,

12:14:31    10    reviewing the individual documents and the individual

11    categories of documents matter.  We think many of the

12    documents that they intend to use are prejudicial, irrelevant

13    to the issues on retrial, and would needlessly prolong the

14    trial.

12:14:46    15         One of the things that the Seventh Circuit has said,

16    and we agree, is to the extent the jury needs background

17    information about what happened in the first trial, that can

18    and should be provided by stipulations or a statement of the

19    prior proceedings.  We have drafted a statement of the prior

12:15:04    20    proceedings.  The plaintiffs have drafted a statement of the

21    prior proceedings.  We think their statement of the prior

22    proceedings reads like Mr. Dowd's closing argument, and it

23    would be improper for the Court to endorse the plaintiffs'

24    view of certain issues that aren't, in fact, contested.  In

12:15:22    25    fact, their statement of the prior proceedings goes into

1    leakage and effectively endorses -- would have Your Honor

2    endorsing the leakage model.  It should be factual, it should

3    be tied to the actual findings that have not been vacated; and

4    that would be appropriate for informing the jury.

12:15:41  5    To the extent that evidence that was admitted in the

6    retrial, belongs in this trial, absolutely, it should be

7    admitted.  But you need -- you can't just say everything that

8    came in the first time should come in the second time because

9    that would be improper.  That would be prejudicial.  And we've

12:15:56  10   tried to walk through the specific categories to identify what

11   we think doesn't belong in this trial.

12   THE COURT:  Well, the competing No. 1s for each side

13   are closely related.  The defense gets into some very concrete

14   areas.  The plaintiffs' motion is more generic.  So I'm going

12:16:21  15   to stick to our attempt at organization here.  We're going to

16   talk about the plaintiffs' motions.  When we get to the

17   defense motions, then we'll talk about specific areas where I

18   will agree with the defense even if I agree with the plaintiff

19   on the bigger issue here, which is the relevance of some of

12:16:45  20   this evidence relating to fraud.  Here, the defendant argues

21   that the evidence relating to fraud is irrelevant.

22   Mr. Farina, what about the issue of allocating

23   responsibility in this case?  How does the jury deal with

24   that?

12:17:00  25   MR. FARINA:  Your Honor, with all due respect to

1    the -- my colleagues here, I think that is, in some sense, a

2    pretext for admitting evidence that doesn't belong.

3         The plaintiffs have taken the position in the joint

4    status report that was filed with the Court previously that

12:17:11    5    allocation is not -- is a moot issue.  They've taken the

6    position that Household is jointly and severally liable for

7    the entire judgment, as it was when the first judgment was

8    entered.  They say that Household is jointly and severally

9    liable on the basis of respondeat superior.  We have told the

12:17:30    10    plaintiffs that we do not contest that; that we are jointly

11    and severally liable for the entire judgment because of

12    respondeat superior.

13         With respect to the individuals, the plaintiff is

14    taking the position that Mr. Aldinger and Mr. Schoenholz are

12:17:43    15    jointly and severally liable by virtue of the finding on the

16    20(a) control person liability and, therefore, the issue as to

17    them is moot.  And, Your Honor, what I'm referring to is the

18    joint status report filed August 25th, 2015, footnote 4.

19         It says, Plaintiffs' view is that the resolution of

12:18:03    20    this question is also academic -- the allocation question --

21    since Household is liable for every statement, did not appeal

22    from the portion of the judgment holding Household, Aldinger,

23    and Schoenholz are jointly and severally liable for the

24    verdict, and promised in the appeal bond to satisfy the

12:18:21    25    judgment on behalf of all defendants.

1       Additionally --

2           THE COURT:  Is that consistent with the proposed jury

3   instructions or verdict form that the defense has submitted?

4           MR. FARINA:  That the defense has submitted?  Your

12:18:32   5   Honor, we have told the plaintiffs that we think that the

6   issue of allocation should be removed from the case.  We have

7   made that offer.  We've told them we would be jointly and

8   severally liable.  And the verdict form that would result from

9   that would be to remove it -- actually remove it from the

12:18:47   10   verdict form.  They have not yet taken us up on our offer.

11   But that has been an offer that we've made.  It's consistent

12   with the position that the plaintiffs previously took in the

13   joint status report, and it would moot the issue.

14           THE COURT:  What about Mr. Gilmer?

12:19:02   15           MR. FARINA:  Mr. Gilmer is liable on one statement,

16   the first statement that he would be responsible, at most for,

17   $3.06.  We have offered to take responsibility for

18   Mr. Gilmer's portion of the judgment.  That was the first

19   offer we made to the plaintiffs.

12:19:19   20           MR. DROSMAN:  Your Honor, if I could just very

21   briefly respond on this issue.

22           What defendants offered was joint and several

23   liability for Household only.  We responded that Household is

24   one of four defendants in this case.  We said, well, what

12:19:30   25   about the individuals?  They read a portion from our joint

1    status report.  I note -- and your question is very

2    probative -- they haven't offered to stipulate that Aldinger

3    and Schoenholz are jointly and severally liable.  They hotly

4    contest that notion.  And so we said look, you know, Household

12:19:47  5    is one of four defendants in this case; are you stipulating

6    that all four defendants are jointly and severally liable?  If

7    that's your stipulation, we could probably dispose of the

8    proportionate liability issue.  And they said, no, we can't do

9    that or we won't do that.  So that's where the parties left

12:20:04  10   off.

11           The point is proportionate liability asks the jury to

12   look at the defendants' liability, their percentage of

13   responsibility for what caused plaintiffs' losses.  Okay.  If

14   we don't put in liability evidence, it would be impossible for

12:20:25  15   the jury to apportion liability using any sort of analytical

16   process.  I mean, I reread all their papers last night or the

17   night before and, really, I got the idea that apparently the

18   jury should be left to count the number of statements that

19   each defendant made and then apportion liability based solely

12:20:49  20   on that.  That is not what the statute says.  That is not what

21   is done.  It's a gestalt view of all of the liability

22   evidence.

23           So we're not retrying scienter.  Nobody is going to

24   dispute that.  That does not mean that scienter evidence or

12:21:07  25   evidence that relates to scienter wouldn't be absolutely

1    relevant to their proportionate liability, along with loss

2    causation and damages as well.

3         You know, this -- we didn't appeal proportionate

4    liability.  This is something the defendants brought up in

12:21:24   5    their appellate brief, and they have to live with the

6    consequences.  The Ninth Circuit said, you're right, you're

7    right on this Janus issue; I'm going to send it back down;

8    we're going to, you know, give the jury a correct instruction

9    on Janus.  And because of this error the defendants raised,

12:21:37  10    we're going to have to redo the proportionate liability issue.

11    We haven't stipulated to proportionate liability.  Not even

12    close.  In that case, the jury has got to see evidence in

13    order to have some basis for a proportionate liability

14    finding.

12:21:51  15         MR. FARINA:  Your Honor, we've offered a

16    hundred percent allocation to Household.  I said I could not

17    say that the other defendants are jointly and severally liable

18    because I don't represent the other defendants.  But we will

19    take a hundred percent allocation.  It moots the issue.  It

12:22:06  20    adopts the plaintiffs' position from the joint status report.

21    It provides them a solvent defendant to collect the judgment

22    from.  It's the exact same defendant who was on the judgment

23    in the first place.

24         The only reason why they want to keep this issue

12:22:19  25    alive is to put in evidence they know doesn't belong in the

1    case.

2            THE COURT:  Mr. Drosman, if that's the case, is it

3    still relevant, this idea of the jury deserves or needs some

4    context in order to decide the issue?

12:22:34    5            MR. DROSMAN:  Right.  I mean, we're not -- their

6    offer obviously was not adequate.  We're not removing the

7    proportionate liability issue from the case.  The jury will be

8    asked to assign relative culpability, relative percentages of

9    culpability.  In that case, they have to see evidence in order

12:22:50   10    to perform that task.  There's no way around that.

11            THE COURT:  If that issue were removed -- I

12    understand the parties are not in agreement.  But Mr. Farina

13    seems to indicate that perhaps the parties could reach an

14    agreement or at least an offer could be made.

12:23:01   15            MR. DROSMAN:  When I spoke to Mr. Farina about this

16    issue, I was told that the individual defendants will not

17    stipulate to joint and several liability.  That's what I was

18    told.  Now, maybe they'll stand up in court today and agree to

19    joint and several liability.  They're all here.  They can do

12:23:17   20    that.

21            THE COURT:  And if that happens?

22            MR. DROSMAN:  Then I think it's off the table.

23            THE COURT:  Okay.  So the way things stand now, the

24    motion is going to be granted.  It's the motion to permit

12:23:29   25    plaintiff to present evidence on the fraud.  The parties have

1    also referred to it as evidence on liability or liability

2    evidence.  I think it is relevant, at least it is relevant on

3    this issue of allocation of responsibility.  If that issue

4    goes away, we will revisit this issue.  But right now the

12:23:50    5    motion is granted.

6         And, Mr. Farina, I don't think -- we're not going to

7    jump ahead to your No. 1.  Let's keep going here with

8    plaintiffs' No. 2.

9         Plaintiffs' No. 2 is a motion to preclude the

12:24:06    10   defendant from relitigating falsity, materiality, scienter,

11   and reliance.  It is also a motion -- well, let's stick to

12   that portion of it first.

13        MR. FARINA:  Your Honor, I hope I can make this

14   somewhat simple.  We have no intention of relitigating

12:24:27    15   falsity, materiality, scienter, and reliance.  That's our

16   whole point as to why the evidence that comes into the second

17   trial appropriately should be tailored to the issues that are

18   remaining, causation and damages.

19        I understand Your Honor is ruling that that could

12:24:41    20   include some element of evidence about the fraud.  But, again,

21   if we're not going to be relitigating falsity, materiality,

22   scienter, and reliance, neither should the plaintiffs and

23   neither should the plaintiffs be introducing evidence that is

24   solely admissible for the purpose of falsity, materiality, or

12:25:02    25   scienter, which was the basis for admission of most of the

1    evidence that's at issue here in the first trial.

2         So we do not disagree -- the jury's findings on

3    falsity, the 17 statements that were false, the 23 statements

4    that were not false -- the Seventh Circuit made abundantly

12:25:19    5    clear that neither side should be relitigating that issue.

6    We're not relitigating scienter.  The parties have reached

7    stipulations on the state of mind of all the defendants for

8    all the statements.  We're not going to be relitigating

9    reliance.  Reliance for the class members is a Phase II issue.

12:25:37    10   So we don't disagree.  But, frankly, we think that that

11   principle warrants a narrowing of the case to the evidence

12   that is in fact relevant to the issues that are hotly

13   contested, causation and damages.

14        THE COURT:  All right, Mr. Brooks, you agree to some

12:25:54    15   extent that just because there is relevance to some of that

16   liability evidence, it doesn't mean you're going to get into

17   everything you got into last time.  It's going to be

18   streamlined.  We'll talk about how when we get to the

19   defense's motions.

12:26:09    20        MR. BROOKS:  Yes.  We don't have the intention and we

21   haven't put on our exhibit list all the exhibits that we

22   introduced at the last trial.  If we can reach an agreement on

23   something close to our prior statement of the case, as we

24   attached to No. 1, we could eliminate a lot of evidence that

12:26:26    25   we would put in and a number of witnesses.  But --

1          THE COURT:  And that attachment is also in the

2    proposed pretrial order?

3          MR. BROOKS:  It is, Your Honor.

4          THE COURT:  That's B-4?  B-3?

12:26:39  5          MR. BROOKS:  It is B-3, Judge, I think.  We filed --

6    with our reply brief -- they sort of insinuated that what we

7    had written in the prior statement -- or the statement of the

8    prior proceedings wasn't supported.  So along with our reply

9    brief, we submitted an annotated version with evidentiary

12:26:56  10   support, either through documents, testimony, or from direct

11   statements by the Seventh Circuit for everything that we put

12   in there.  So you also have that, Judge.  It came in with our

13   reply brief on motion No. 1.

14         We do agree --

12:27:10  15         THE COURT:  Let me give to the parties a copy of

16   something that I'm proposing as a starting point.  I'll give

17   that to the attorneys and we'll revisit it on a subsequent

18   court date.

19         MR. BROOKS:  But with respect to No. 2, Your Honor,

12:27:49  20   our concern --

21         THE COURT:  It's one of those areas where the parties

22   almost agree, kind of agree; but --

23         MR. BROOKS:  Well, we kind of agree.

24         THE COURT:  -- it's not good enough.  The defense

12:27:58  25   does want to get into -- and you sense that the defense wants

1    to get into what specific area?

2         MR. BROOKS:  Well, I think that the defense has put

3    exhibits on its exhibit list, and we list them in our brief,

4    that indicate they want to get into denials of liability.  And

12:28:12    5    we understand, Judge, that for proportionate liability, there

6    could be a little finger-pointing going on, saying, you know,

7    this defendant was more culpable; Household was more culpable;

8    et cetera, et cetera.  But denials of responsibility, there

9    was no fraud, that's not appropriate.

12:28:28   10         And the exhibits that we identified go more towards

11   the denial of responsibility than the defense of proportionate

12   liability.  Now, I think, as the Court recognizes, even if

13   proportionate liability goes away, we will be coming back to

14   talk about what evidence comes in as relates to loss

12:28:50   15   causation.  And it's hard to tell whether these exhibits would

16   be gone in that circumstance or whether they would still want

17   to put them on if we get evidence describing a fraud that's

18   related to loss causation and damages if proportionate

19   liability goes away, which obviously has not happened yet.

12:29:09   20         MR. FARINA:  Your Honor, we did our exhibits in

21   phases in advance of the pretrial order.  We offered up the

22   exhibits that we would affirmatively use on the causation and

23   damages issues.  I was very transparent.  I told counsel that

24   we think those are the exhibits that would go to a properly

12:29:25   25   scoped trial.  If you guys are going to try to retry the fraud

1   case, then we're obviously not going to sit there and have you

2   make assertions of things that were found that we don't think

3   were ever found.  Remember, there were -- most of -- a

4   majority of the statements that were alleged to be false were

12:29:41   5   rejected by the jury.

6         THE COURT:  23.

7         MR. FARINA:  Exactly.  Out of 40.  So we said, if the

8   trial is not properly scoped and we are going to be

9   relitigating issues, we are going to need to have evidence

12:29:55  10   because some of what you say -- in fact, much of what you say

11  we contest and we don't think was ever actually found by the

12  jury.  Or it certainly cannot be said that the jury made that

13  specific finding that they say the jury made when all we know

14  for a fact is that the jury found 17 misstatements and

12:30:11  15  rejected 23.

16        But we have been very transparent that much of that

17  evidence that relates to the fraud we would have no intention

18  of using in a trial that is limited to causation and damages.

19        So, again, the devil is in the details.  Once we sort

12:30:26  20  of hammer out what's on the table for retrial and what's not,

21  I think a lot of this evidence will fall away.  It certainly

22  will on our side.

23        MR. BROOKS:  Your Honor, we know much more than that

24  the jury found 17 false statements.  The jury found that the

12:30:40  25  defendants acted with a culpable state of mind.  The jury

1    found that they either lied about or omitted their engagement

2    in predatory lending, re-aging, manipulated their two-plus

3    delinquency numbers.  There's much more to the fraud than is

4    just -- than is just reflected on the verdict form.  And it

12:30:58    5    would not be appropriate for them to make arguments such as

6    the predatory lending that Household engaged in was not

7    widespread.  That finding was one that the jury had to make in

8    order to find that they lied about their predatory lending.

9         THE COURT:  What about loss causation?  Are they

12:31:19    10    allowed to present evidence as to loss causation in the case?

11        MR. BROOKS:  They are allowed to present evidence as

12    to loss causation, Your Honor.  That's one of the -- one of

13    the major points in the trial.  But the thing they point out

14    when they say they want to present evidence that information

12:31:35    15    on the -- they say they're not going to pursue a truth-on-

16    the-market defense; but then they say, well, but we want to

17    present information -- or evidence that information was in the

18    market.  That's truth-on-the-market.  And they say, well, no,

19    that goes to loss causation or damages.  That could prove that

12:31:49    20    information was stale.  But that's something that was tried in

21    the last case and not appealed, and it's out of play.  So

22    whether they're putting it in under the guise of

23    truth-on-the-market or whether they're putting it in under the

24    guise of staleness, this is the type of information -- or the

12:32:06    25    type of evidence that they shouldn't be allowed to sneak in.

1      This has at least a colorable connection to what

2  would be loss causation if we didn't have the Seventh

3  Circuit's decision.  But the evidence that Gary Gilmer wrote a

4  memo and circulated it saying, We have ethical practices at

12:32:25   5  this company has nothing to do with anything, Your Honor.  And

6  our strong suspicion is that they're going to put that on, and

7  Gary Gilmer is going to try to get up there and deny that he

8  engaged in predatory lending or knew that the company was

9  engaged in predatory lending.  And these are the types of

12:32:42  10  exhibits that they've put on to the exhibit list.

11      MR. FARINA:  Your Honor, we've offered to stipulate

12  to all those things.  It's in our proposal.  I promise you,

13  you will not hear us relitigating the fraud if they don't

14  relitigate the fraud.  Again, there were two years of

12:32:57  15  misstatements that were rejected by the jury.  And they want

16  to dump all the evidence in from 1998 and 1999 and 2000.  And

17  if they're going to do that, it is not appropriate to

18  completely disarm us.  We don't think that the jury should

19  consider any of that evidence.  They can be properly informed

12:33:17  20  of the state of the mind of the individuals, these statements

21  that were false and why they were false; and that would be the

22  appropriate mechanism to have an efficient and fair trial.

23      THE COURT:  Mr. Farina, you keep arguing as if I

24  didn't already grant their first motion.  You understand that

12:33:31  25  the plaintiffs' first motion -- we're going to talk about the

1    details, you're right, and that's going to be ultimately very,

2    very important; but as a general approach, I agreed with them

3    that, in fact, they are going to be allowed to get into some

4    of those issues; again, with this caveat, that if the parties

12:33:48   5    all agree that that becomes irrelevant, then we revisit that;

6    if it becomes irrelevant because there's some sort of

7    stipulation between the parties regarding allocation --

8            MR. FARINA:  Okay.

9            THE COURT:  -- of responsibility.

12:34:01   10           MR. ROSENBLOOM:  Your Honor --

11           THE COURT:  Yes, sir.

12           MR. ROSENBLOOM:  -- on behalf of Mr. Gilmer -- I'm

13   mindful of the time.  I just want to preserve the issue so it

14   doesn't go uncommented on.  But plaintiffs' counsel just made

12:34:09   15   the statement that he expects Mr. Gilmer is going to get up

16   and deny that he was -- made a statement knowingly and that he

17   will deny that he knew about the predatory lending.  You bet I

18   will and it will be error if they say otherwise because the

19   jury rejected the claim that he made any knowing

12:34:25   20   misstatements.  His one misstatement was found to be made

21   recklessly.  And so I want to preserve that because I don't

22   dispute any of the rulings that have been made -- I don't want

23   to contest them -- but there are going to probably need to be

24   a number of limiting instructions, given the case the

12:34:39   25   plaintiffs want to try and put in purportedly as to allocation

1    as to the entire period of the class, when Mr. Gilmer's in it

2    for one statement one time.

3          So I just wanted to preserve that issue and make sure

4    it's clear.

12:34:52    5          THE COURT:  All right.  Thank you.

6          So we have much agreement as to No. 2.  Although, in

7    a vacuum, it is hard for me to rule with specificity here.

8    What is clear is that whatever evidence is being introduced by

9    the defense will have to be relevant to loss causation,

12:35:29    10   damages, or allocation of responsibility or a mix of those

11   elements.

12         We are still on No. 2.  And in the second part of

13   No. 2, plaintiff says there are two sets of findings of fact

14   or law that the Seventh Circuit made about and which the jury

12:36:01    15   should be instructed.  The first group includes that the best

16   way to determine the impact of a false statement is to observe

17   what happens when the truth is finally disclosed and to use

18   that to work backwards.

19         Secondly, that a stock can be inflated even if the

12:36:25    20   price remains the same or declines after a false statement

21   because the price might have fallen even more if the truth was

22   disclosed.  So the movement of a stock price immediately after

23   a false statement often tells us very little about how much

24   inflation the false statement caused.

12:36:46    25         Next, that at a prior proceeding, plaintiff proved

1    that defendants' false statements caused the stock price to

2    remain higher than it would have been had the statements been

3    truthful; that Professor Fischel's models calculated the

4    effect of the truth once it was fully revealed; and that

12:37:05    5    plaintiffs proved that defendants concealed the truth through

6    false statements.

7         Four, that -- or next, that every false statement

8    after March 28th of '01 caused the full amount of inflation to

9    remain in the stock price even if the price did not change at

12:37:23    10    all because, had the truth become known, the price would have

11    fallen then.

12         Next, that -- or, five, how the stock became inflated

13    in the first place is irrelevant because each subsequent false

14    statement prevented the price from falling to its true value

12:37:38    15    and therefore caused the price to remain elevated.

16         Six, fraud-induced inflation can go from zero to a

17    very large number, even if the stock price does not change at

18    all.

19         And, seven, Professor Fischel's leakage and specific

12:37:58    20    disclosure models controlled for market and industry factors

21    and general trends in the economy.  His regression analysis

22    took care of that.

23         All right, there are what I've called seven different

24    assertions here.  I agree with the plaintiff only as to the

12:38:20    25    last one.  I believe that, in fact, the Seventh Circuit did

1    make a finding that Professor Fischel's leakage and specific

2    disclosure model controlled for market and industry factors

3    and general trends in the economy.  In essence, that his

4    regression analysis took care of that.  I agree with the

5    plaintiff as to that assertion.

6            As to the rest, I do not believe that these are

7    findings.  For one thing, they are not verbatim statements

8    from the Seventh Circuit's opinion.  They are, in essence,

9    reformulations of what the Seventh Circuit said.  Also, most

10   of the alleged findings are simply background discussion that

11   is not necessary to the actual disposition of the case by that

12   court.  I believe only that final finding is implicit in the

13   Seventh Circuit's opinion.

14           Mr. Farina, what say you on that final ground?

15           MR. FARINA:  Your Honor, the Seventh Circuit vacated

16   the judgment and sent the matter back for a retrial on

17   causation and damages.  There's nothing in the Seventh

18   Circuit's decision or mandate that suggests that the Seventh

19   Circuit intended to decide how the jury should find on any

20   causation or damages issue.  They were actually very explicit

21   in saying what was not up for grabs in the retrial.  And they

22   focused on the false statements and the allegedly false

23   statements that were not found to be false.  They were very

24   specific that those issues were not to be retried.  I think

25   the Seventh Circuit would be very surprised if they learned

12:38:41

12:38:58

12:39:23

12:39:43

12:39:59

1    that they had somehow decided issues that were supposed to be

2    going back to the jury.

3            The jury is supposed to decide causation.  The jury,

4    in order to decide causation, has to evaluate Professor

12:40:16    5    Fischel's model.  The mere fact that Professor Fischel's model

6    might have been sufficient in certain respects to have

7    supported a jury's verdict does not mean that the jury had to

8    find that way or that the jury has to find that way back on

9    remand.  So when the case goes back to the jury, the jury

12:40:37   10    could find that Professor Fischel's leakage model and specific

11    disclosure model do not adequately account for industry and

12    market information.  That is a finding that the jury is free

13    to make.  I agree that we are not allowed to say that as a

14    matter of law the jury couldn't make that finding because that

12:40:57   15    is the thing and the only thing that the Seventh Circuit said.

16    The Seventh Circuit did not say that the jury has to accept

17    that.

18            And, Your Honor, that's the issue that's to be

19    retried.  You're basically taking the retrial on causation and

12:41:13   20    saying that it's already been decided.  That is the flaw.

21    That is the flaw that we are -- we should be entitled to

22    present to the jury.  If the jury agrees with us, then his

23    model should be rejected.  If the jury doesn't agree with us,

24    then if we take that back up on appeal, we would be foreclosed

12:41:30   25    on law of the case from arguing number seven.  But we are not

1    foreclosed from arguing that to the jury.  And there's nothing

2    in the Seventh Circuit opinion that suggests that.

3            And, Your Honor, I submit it would be legal error to

4    deprive that issue from the jury and to strip that issue from

12:41:46   5    the trial and to say that the defendants are not allowed to

6    contest it with the jury because that's not what the Seventh

7    Circuit said.

8            THE COURT:  Mr. Brooks?

9            MR. BROOKS:  Your Honor, this is the same finding

12:41:59  10    that the Court indicated earlier it was going to instruct the

11    jury on.  So my understanding is we're talking now about

12    whether we can use this as an undisputed statement in --

13    during the trial.

14            THE COURT:  Same issue.  I would take care of it

12:42:12  15    through an instruction.

16            MR. BROOKS:  So this is the instruction that the

17    Court already indicated it would give.  I'm happy to make

18    additional argument on --

19            THE COURT:  Sure, briefly.

12:42:22  20            MR. BROOKS:  Yes, Your Honor.

21            Mr. Farina, and Mr. Stoll before him, argued that

22    this is what the jury is here to find.  It's not the case.

23    The Seventh Circuit looked at this issue as part of its

24    decision and made a specific finding about Fischel's leakage

12:42:41  25    and specific disclosures models and the fact that they

1    eliminated and controlled for market and industry factors.

2    That finding was made.

3            The issue on remand, and the only issue on remand,

4    was company-specific, non-fraud information.  That's the

12:42:57    5    reason that they convinced the court to remand this case.  And

6    so to come back now and challenge Professor Fischel's model,

7    which the Seventh Circuit has -- which a prior jury found and

8    the Seventh Circuit upheld as sufficiently taking care of

9    market and industry factors, that would be error because

12:43:19   10    that's the law of the case.

11           As we sit here today -- again, as I said during the

12    Daubert argument, we're not asking the Court to revisit the

13    scope of the trial in light of -- you know, that it wrote

14    after the status conference the first time.  This is

12:43:37   15    different.  We're here.  We are going to establish loss

16    causation.  But there are certain guidelines that have to

17    govern that.  Our view was that all seven of these are

18    guidelines governing the loss causation trial as it came down

19    from the Seventh Circuit.  This is all guidance from the

12:43:51   20    Seventh Circuit.

21           I understand the Court doesn't agree on one through

22    six.  But on number seven, it's in black and white, Judge.

23    The -- either the sentence before or the sentence after this

24    is the one that discusses that Professor Fischel's model

12:44:05   25    itself does not account for company-specific, non-fraud

1   information.  They're paired together in the decision.  It

2   does account for this; but it doesn't account for that; and he

3   didn't explain it adequately, therefore, we're going to remand

4   on these issues only; and we're going to remand for a new

12:44:21   5   trial on loss causation, granted, but on these particular

6   issues.  You don't ignore what the Seventh Circuit found in

7   the retrial.

8          MR. FARINA:  Your Honor, with all due respect, that

9   is not what the Seventh Circuit said.  The Seventh Circuit

12:44:32   10   said, we're remanding to retry causation.  It is not law of

11   the case, some nuanced issue that was presented in the context

12   of a different tack when the judgment was vacated because the

13   plaintiffs failed to establish loss causation.

14          The finding as to the misstatements is law of the

12:44:51   15   case.  The finding as to scienter would be law of the case.

16   Those issues were not upset on appeal.  Causation was vacated

17   and sent back for a new trial.  At the new trial, the jury is

18   free to disagree with Fischel's model.  They're free to

19   disagree with Fischel's model with respect to this very issue.

12:45:09   20          Think of it this way:  If the jury had rejected

21   Fischel's model because it did not adequately account for this

22   information, would the Seventh Circuit have said that was

23   legal error; that the jury wasn't entitled to do that?  The

24   Seventh Circuit was examining the findings that were made by

12:45:24   25   the jury in the context of an appeal.  Once that judgment is

1   vacated and the issue of loss causation is sent back, that

2   issue is sent back for a retrial.  There's no suggestion that

3   the Seventh Circuit wanted to put any handcuffs on the

4   defendants and their ability to argue the issue that is to be

12:45:43   5   retried.  And that's why we think it would be reversible

6   error.

7         MR. BROOKS:  Your Honor, loss causation is an

8   element.  There are issues within that element.  The court

9   wrote a 47-page opinion discussing these issues, the Janus

12:45:54   10   issues, and the other issues.  The court made a finding.  And

11   I'll point the Court just to the beginning of the opinion,

12   which reads, on page 413, Defendants broadly attack the

13   expert's loss causation model.  They also make the more modest

14   claim that his testimony did not adequately address whether

12:46:13   15   firm-specific, non-fraud factors contributed to the collapse

16   in Household stock price during the relevant time period.

17   This latter argument has merit, as we explain below.  Then it

18   discusses the Janus issue.  And then the court says, The

19   remaining challenges fail.  A new trial is warranted on these

12:46:31   20   two issues only.  We remand for further proceedings consistent

21   with this opinion.

22         And, Your Honor, in making that determination, they

23   also made the determination that his models accounted for

24   company-specific -- or sorry, Judge.  His models accounted for

12:46:47   25   industry and market and general economic factors.  And the

 1    finding is there in black and white.  The mandate is here in

 2    black and white, Your Honor.  Loss causation is an element.

 3    Company-specific, non-fraud information is an issue.  And

 4    that's the issue that the remand was on.  That's what they

12:47:04    5    convinced the court was deficient about the prior verdict.

 6    The jury considered all of it, found that there was loss

 7    causation, found that there was damages.  They appealed and

 8    the jury reversed on one narrow part of loss causation and

 9    made specific findings about much of the rest of it.  And

12:47:19   10    that's what we're asking this Court to apply in the new trial.

11             MR. FARINA:  Your Honor, they sent it back for a

12    trial on loss causation.  And Your Honor addressed this issue

13    when it came back on remand.  And there were two formulations

14    that were proposed as to what the retrial was about; and they

12:47:34   15    proposed the narrow version, that it was just to address this

16    specific issue.  And Your Honor found, correctly we think,

17    that, no, the element of loss causation is to be retried --

18    not some piece of the element of loss causation -- the element

19    of loss causation is to be retried because the judgment was

12:47:52   20    vacated because the plaintiffs had failed to establish loss

21    causation.

22             MR. BROOKS:  Your Honor, what our --

23             THE COURT:  Mr. Brooks, I'm going to cut you off

24    because you won.  I agree with you.  I don't agree that it's

12:48:03   25    in black and white, but I agree that it is a finding.  I agree

1    that it's been established.  It's an implicit one.  And I

2    think had it not been so, I think that the court would have

3    rejected Dr. Fischel's testimony completely.  So I think it's

4    an implicit finding.  And the jury will be instructed and

12:48:21    5    we'll take care of it by way of a jury instruction.

6           However, again, the other six statements are not

7    findings.

8           There is a second group; and there are four elements

9    there, if you will.  First, collectively, defendants made 17

12:48:44    10   false statements of material fact or omitted material facts

11   necessary under the circumstances to keep the statements that

12   were made from being misleading.

13          Two, in making the 17 false statements, defendants

14   acted either knowingly or recklessly.

12:49:00    15          Three, plaintiffs relied on defendants' false

16   statements of material facts.

17          Four, defendants used or caused the use of an

18   instrumentality of interstate commerce, such as the mails, the

19   telephone, or any facility of a national securities exchange

12:49:22    20   in connection with the purchase or sale of the securities.

21          And, Mr. Farina, do we have agreement on this?

22          MR. FARINA:  I agree as to one, two, and four, which

23   are in the verdict form.  Three I'm not even sure I

24   understand.  The reliance issue is a Phase II issue.  And

12:49:40    25   there actually has been a finding that some of the class

12:49:55

1    members relied and there's been a finding that some of them

2    haven't.  It's the subject of the Phase II proceedings.

3    Frankly, I don't think it's relevant to the retrial because it

4    is the subject of the Phase II proceedings.  But the blanket

5    statement is literally not accurate.

6            MR. BROOKS:  Classwide reliance, Judge, is not

7    contested.  It was established at the last trial.  It wasn't

8    appealed.  Individual reliance, granted, there's still

9    proceedings going.  I'm not sure that that impacts the

12:50:11

10   statement that plaintiffs relied on defendants' false

11   statements of material facts.

12           MR. FARINA:  I don't think there's any such thing.

13   Reliance is an individual issue, which is why you have the

14   Phase II proceedings.

12:50:24

15           MR. BROOKS:  There was classwide reliance.  It was

16   established through the fraud-on-the-market and through the

17   jury's rejection of things, including defendants' truth-on-

18   the-market defense.  That's been established.  There are some

19   individualized reliance issues that are still in play.  I can

12:50:39

20   concede that, Your Honor.  I think maybe we can reframe the --

21   reframe number three if it's a concern.

22           MR. FARINA:  It's conspicuous that the first, the

23   second, and the fourth are all drawn from the verdict form.

24   And I don't object to any of that.  But the third is not, and

12:50:57

25   I don't think that it's, frankly, relevant to the retrial or

1    appropriate, certainly as written.

2         THE COURT:  So without objection, one, two, and four

3    are granted.  Three is going to be entered and continued.  And

4    I will see if the parties can come to an agreement, if perhaps

5    there is more of an explanation there as to what is meant by

6    relied, and we'll see if the parties agree.  But that is one

7    issue to revisit.

8         In that area also, I'll point out again that we did

9    not make a finding that there was no firm-specific, non-fraud-

10   related information that specifically distorted Professor

11   Fischel's leakage or specific disclosure model.  My finding

12   was that defendants have not identified significant

13   firm-specific, non-fraud-related information that could have

14   affected the stock price.  So this was not a finding.  That's

15   going to be denied.

16        That gets us to the final portion of plaintiffs'

17   No. 2 motion in limine.  Plaintiffs ask the defendants be

18   barred from referencing the fact that a prior jury did not

19   find them liable for 23 alleged misstatements.

20        Defense, you're saying that such evidence is relevant

21   to is the issue of loss causation, specifically to show that

22   Fischel's quantifications of inflation are flawed because they

23   are based on the assumption that the defendants made all 40,

24   not 17 misstatements.  Is that correct?

25        MR. FARINA:  Your Honor, there's two points.  That

1   is -- you're correct, that is one of them.  He built his model

2   when he was assuming all 40 misstatements.  He made that very

3   clear in the first trial.  Obviously the jury rejected 23.  He

4   continues to have essentially the same model with the same

12:53:21   5   amount of inflation.  This is an issue for the jury.  The jury

6   can decide whether that is a flaw with his model.  I think

7   it's an appropriate topic for cross-examination.  They can try

8   to explain why his model is appropriate in not changing the

9   amount of inflation based on the fact that there were 23

12:53:40   10   misstatements that were rejected.  But it's not something that

11   should be hidden from the jury.

12          The second point, Your Honor, is that -- again, if

13   the plaintiffs are going to try to introduce evidence from

14   1999 and 2000 and January and February of 2001 to try to

12:53:58   15   support this idea that there was a massive fraud going all the

16   way back to that period, we would be entitled to show that,

17   no, in fact, they argued that to the first jury; it was

18   rejected.  And the first jury found that there was no

19   misstatement in 1999.  There was no misstatement in 2000.  The

12:54:14   20   first misstatement comes in March of 2001.

21          And, therefore, again, if they're not going to try to

22   argue that there was a fraud going back prior to March

23   of 2001, then we would not need the misstatements or alleged

24   misstatements that were rejected from prior to that.  But we

12:54:33   25   do need them to cross-examine Professor Fischel about whether

1  his model made an appropriate adjustment to take into account

2  the specific findings by the jury, which is his job.

3          MR. BROOKS:  So, Your Honor --

4          MR. FARINA:  That's our position, Your Honor.

12:54:46  5          MR. BROOKS:  -- two points.

6          The first on the -- Mr. Farina is characterizing the

7  jury's findings as a finding that there was no misstatement.

8  That's not what they found.  They found no violation of 10(b).

9  It could have been because the maker was someone who was a

12:55:01  10  press operator, you know, press officer for the company, and

11  the jury found that they didn't have authority to make a

12  statement or didn't have the requisite scienter.  So they want

13  to introduce this information and say there are -- these

14  aren't misstatements.  And that's absolutely -- you can't

12:55:14  15  derive that from the jury's verdict form.

16          But on the loss causation part, Your Honor, this is

17  the same exact place where we were at the end of the trial.

18  The jury had rejected 23 statements.  Most of them were before

19  2001, before March 23rd, 2001.  Then had adopted Professor

12:55:33  20  Fischel's model.  And on the appeal, defendants argued -- they

21  challenged this application to the model, and they said the

22  jury found 17 statements were actionable and the other 23 were

23  not; and the results were a predictable and predicted

24  disaster.  And they argued this to the appellate court.  And

12:55:59  25  this was part of the argument tied into this argument that

1      they made that the introduction of inflation hadn't been

2      proven, that the first statement was only about predatory

3      lending and therefore the entire case should be thrown out.

4      This was part and parcel.

12:56:14    5          They argued that because Professor Fischel's model

6      did not allow for the jury to adjust based on misstatements

7      that weren't found, that the entire case should be thrown out.

8      This was one of the main thrusts of their appeal, and it was

9      rejected entirely.  And what the court found -- entirely, with

12:56:34   10    one exception -- the court found that for three days, the

11     first three days, Professor Fischel had to adjust his model to

12     account for predatory lending only; and that after March 28th,

13     because -- March 28th, 2001 -- because of the way the model

14     operated, it operated backward.  It's a lot of these

12:56:50   15    statements that we asked to be adopted in our -- in this same

16     motion in limine.

17          But because of the way the model operated and what

18     the model measures, which is the value of the truth, it

19     doesn't matter if there were interspersals of yes's and no's

12:57:07   20    on the verdict form.  Because if there was a yes on March 28th

21     as to all three parts of the fraud, had they told the truth on

22     that date, the stock price would have dropped to its true

23     value.  Skipping down a few days, if there was a yes a month

24     later, the same thing would have happened; the stock -- if

12:57:23   25    they had told the truth like they were required to do on those

1    days, the stock price would have declined.  If you have a

2    misstatement in the middle where there's no liability in

3    between those two points, nothing changes.  The inflation

4    stays the same because you have full inflation as of March

12:57:39   5    28th, 2001; and a month later, you still have full inflation.

6    And so the misstatements and the interspersals were completely

7    rejected.  This was one of their theories on their appeal, and

8    they lost.

9          And the reason we made this motion is because, first

12:57:58   10   of all, they -- the only reason -- the only valid reason --

11   not even valid.  The only reason they want to get this in is

12   to suggest that the fraud wasn't as bad as it was.  That's

13   what we wrote in our opening paper.  They came back and said

14   it's relevant to loss causation.  That conflicts entirely with

12:58:14   15   what the court of appeals found.  That hasn't been the focus

16   of the argument here.  But that conflicts entirely with one of

17   the major theories of their appeal.

18         And if you go back and read what the court said about

19   the way these models operate, it's very clear that if there

12:58:29   20   are some interspersed findings of no causation -- or, sorry --

21   of interspersed findings of no violation, which you can't

22   infer, by the way, that there's no misstatement -- but if

23   there's no violation interspersed, it makes no difference

24   whatsoever.  And that's why the -- if it did make a

12:58:45   25   difference, again, we wouldn't be back here, Judge.

1      MR. FARINA:  Your Honor, if they want to make an

2  argument as to why it doesn't matter that he failed to make

3  adjustments to take into account the jury's findings, they can

4  make that argument.  They can explain that to the jury.

12:58:59  5      It is appropriate for the jury to understand what he

6  did and didn't do.  I started his deposition by handing him

7  the verdict form and saying, Did you take into account that

8  the jury rejected this misstatement, accepted this

9  misstatement, rejected that.  He told me he didn't look at the

12:59:16  10  verdict form.  The jury is entitled to know that.  The jury is

11  entitled to know what he didn't do.  If they want to try to

12  excuse what he didn't do by making an argument or by having

13  Professor Fischel explain it, they are welcome to do it.  But

14  the jury is entitled to hear our criticism that he did not

12:59:31  15  even look at the jury verdict in deciding whether or not

16  adjustments were required to his model.  That's all we're

17  arguing.

18      MR. BROOKS:  Your Honor, he read the Seventh

19  Circuit's opinion.  He understood what it meant.  He

12:59:42  20  understands it's what he testified to.

21      It doesn't matter if there are gaps between the false

22  statements.  It doesn't matter if there was a false statement

23  on June 1st that the jury found wasn't a violation.  Because

24  all that means is that the defendants didn't have an

12:59:59  25  obligation to tell the truth on that day.  Nothing happened.

1    It just -- the inflation remained the same.  And then the next

2    time someone had an obligation to tell the truth, had they

3    told the truth, the stock price would have fallen.  That's the

4    theory.  That's how it works.  So these gaps make no

01:00:14  5    difference whatsoever.  And they were there since the jury

6    rendered its verdict.

7           MR. FARINA:  If there's an economic basis --

8           THE COURT:  I agree that the defense should be

9    allowed to cross-examine Fischel about what impact, if any,

01:00:32  10    these findings by the jury, the 23 statements, may have had.

11    That's the only relevance.  So the objection is going to be

12    overruled -- or the motion is going to be overruled barring

13    the defense.  But the defense can only get into it in cross-

14    examining Fischel.

01:00:53  15          And, furthermore, I'm going to order that they limit

16    the questioning to these 23 statements as a group rather than

17    permitting lengthy questioning about each of the 23

18    statements.

19          That gets us to No. 3.

01:01:16  20          It's clear that we're not going to get very far or

21    very much farther.  Are there specific motions in limine that

22    the parties think would be particularly helpful in going

23    forward with the case on to our next step?  Perhaps defense

24    No. 1?

01:01:33  25          MR. FARINA:  Yeah, I think that would be very

1    helpful.  Whether we do it today or whether Your Honor would

2    like to set a time to do it, I think before the openings, it

3    would be helpful to have some of those issues resolved as to

4    which categories are appropriate and which are not.

01:01:54    5        THE COURT:  Mr. Brooks, Mr. Dowd, what do you think?

6    Anything from the plaintiffs' group?  Or do you agree with

7    Mr. Farina that defense No. 1 could be helpful?

8        MR. DOWD:  I think defense No. 1 --

9        THE COURT:  I'm going to send the parties home with

01:02:07    10   more work.  And a big chunk of that is going to be revisiting

11   exhibits, paring that down.  So let's -- it sounds like we

12   have some agreement there.  Let's go to defense No. 1.

13       MR. FARINA:  Your Honor, the motion itself lists the

14   nine categories of documents; and that's how we organized it.

01:02:47    15   I think it makes the most sense to walk through those

16   categories.  And then what we've done is we have an appendix

17   that identifies the specific documents that fall within each

18   category.  I suppose it's possible that there could be some

19   dispute as to whether a document does or doesn't belong in

01:03:04    20   that category.  But I think the larger dispute is on the issue

21   of principle.

22       With respect to category -- well, would Your Honor

23   like us just to walk through the different categories?

24       THE COURT:  Sure.

01:03:16    25       MR. FARINA:  Okay.  So with respect to category A,

1    evidence relating to defendant Household's retention of

2    consultant Andrew Kahr, this was an issue that was addressed

3    in the first trial.  The court in the first trial said that

4    certain memoranda that were drafted by Mr. Kahr, who was

01:03:36    5    retained by Household in late 1998, could be admitted for the

6    purpose of showing intent.  Intent is an issue that is no

7    longer in the trial.

8            There was a hot dispute as to whether the ideas of

9    Mr. Kahr were actually ever implemented.  I think the fact

01:03:56    10    that the class period as a result of the jury's findings has

11    been dramatically shortened also decreases substantially the

12    relevance, if there ever was any relevance, of that

13    information.  Mr. Kahr was retained in late '98.  The first

14    memos were in '99.  The class period now starts in 2001.

01:04:15    15            But following the rationale of Judge Guzman, the

16    evidence was relevant for the issue of intent.  Intent is not

17    at issue in this case anymore because of the findings and the

18    stipulations on scienter.

19            To the extent that the plaintiffs want to argue that

01:04:32    20    there needs to be information about the predatory lending

21    practices, there are much better ways of dealing with that,

22    particularly since -- it's defendants' position that the vast

23    majority of the topics discussed in the Kahr memoranda were

24    never actually implemented as predatory lending practices.  If

01:04:50    25    you want to look at the actual settlement with the attorneys

1  general, that lays out what they think are the predatory

2  lending practices.  That would be a far more efficient

3  mechanism than litigating the issue of whether Mr. Kahr's

4  recommendations were ever actually implemented, when they were

01:05:09  5  implemented.  We think it's a frolic and detour that's not

6  supported by the judge's original rulings.

7      THE COURT:  Mr. Farina, is there anything here -- you

8  used letters A through I.  Anything here that was not

9  introduced at the first trial?  I see F, the SEC decree,

01:05:27  10  right?

11      MR. FARINA:  Yes, there actually are quite a few.

12      So the issue of Project -- well --

13      THE COURT:  Project Whiskey?

14      MR. FARINA:  Project Whiskey is a little more

01:05:38  15  complicated.  Some of those were not admitted, some of them

16  were on the issue of scienter.

17      But evidence -- the consent decree was not admitted

18  in the first trial.  So F was not admitted.  E was not

19  admitted, evidence relating to the entry of various state and

01:05:59  20  regulatory settlements, that was precluded under 408.  I think

21  there was one document that was ultimately admitted, F,

22  because defendant Aldinger opened the door.  We are not going

23  to open the door on that issue now.  But E and F were both

24  excluded from the first trial.

01:06:17  25      And there are certainly other documents within the

1    other categories that were also excluded from the first trial.

2    But in terms of wholesale categories, I believe it's E and F.

3              THE COURT:  Mr. Drosman, what about E and F, sir?

4              MR. DROSMAN:  Well --

01:06:32    5              THE COURT:  Do you have a separate motion in limine

6    regarding F?

7              MR. DROSMAN:  Yeah, I mean, we discuss the consent

8    decree in our papers.  It's clearly relevant.

9              And I think if you go back and look at Judge Guzman's

01:06:45    10    opinion before, he said, look, this is a settlement document

11    and therefore under 408, I'm going to exclude it.

12              Here's why that doesn't apply anymore:  Obviously the

13    policy underlying 408 is you shouldn't be bitten if you -- you

14    know, you shouldn't have your settlement negotiations come

01:07:04    15    back and bite you because that might chill, you know, free and

16    open settlement discussions.

17              Here, defendants have already been bitten.  They've

18    already been held liable for fraud, specifically with respect

19    to the SEC consent decree, re-aging fraud.  Okay.  So there's

01:07:20    20    no risk that putting in this document, which really does -- I

21    don't know if you've taken a look at it -- but it really

22    succinctly sets forth the re-aging fraud; why their statements

23    that their FRC in April were false and misleading; why their

24    statements in their prior SEC filings relating to re-aging

01:07:36    25    were false and misleading; what they knew at the time they

1   commissioned this benchmark study that told them, hey, guys,

2   you can't make those statements because they're demonstrably

3   false.  And they made them anyway on more than one occasion.

4   So it really succinctly sets forth all of this falsity.  And

5   it goes directly to the proportionate liability issue.

6          The policy underlying 408 doesn't apply because

7   there's no risk that the jury might hold them liable for

8   re-aging fraud here.  They've been held liable for re-aging

9   fraud.  The jury is not going to be asked to determine that

10  issue.

11         It's also directly relevant to loss causation

12  because, you know, here you've got an issue where the

13  defendants are concealing their re-aging fraud.  As you know,

14  whether or not certain disclosures are fraud related is going

15  to be hotly contested.  It is hotly contested.  Defendants

16  say, oh, no, it has nothing to do with the fraud.  Our expert

17  appropriately says it's directly related to the fraud.

18         Well, in order to understand that issue, you have to

19  understand the re-aging fraud in detail.  You also have to

20  understand why this was so important to the market; why it is

21  that re-aging fraud and predatory lending fraud would have

22  such an impact on the market that, for example, debt -- their

23  debt spreads would actually widen and that it might cause

24  liquidity concerns.  In other words, the entire viability of

25  this company -- their business model really is being thrown in

1    doubt, questioned.  The entire viability of this company is

2    being questioned based on these frauds, which are

3    interrelated; you make bad loans, the loans go bad, you have

4    to re-age them or you have to disclose the fact that your

01:09:21    5    delinquency levels are climbing.

6         So it really is -- the SEC consent decree really is

7    part of this case.  You know, it's something the jury

8    should -- should understand.  It's something the jury needs to

9    understand when apportioning liability.  And it's something

01:09:34    10    the jury needs to understand for the purposes of loss

11    causation.

12         MR. FARINA:  Your Honor, there's black letter law

13    that it's inadmissible under Rule 408.  Judge Guzman cited

14    that.  SEC judgments are inadmissible under FRE 408.

01:09:44    15         There's no exception that applies here in the rule.

16    It's not admissible.

17         And also, parenthetically, it was entered into after

18    the end of the class period.  So there can be no argument that

19    the disclosure of the consent decree had any impact on the

01:09:58    20    price of the stock and therefore is relevant to causation.

21         We agree that the actual settlement with the

22    attorneys general that was disclosed in the class period, that

23    the actual settlement is relevant because that could or --

24    could have affected the share price.  But this consent decree

01:10:18    25    happened five months after the end of the class period.  It

1   can't be a corrective disclosure.  Professor Fischel doesn't

2   say it's a corrective disclosure.  And it's inadmissible.

3          THE COURT:  All right, E and F are out.

4          MR. DROSMAN:  Your Honor, if I could just speak

01:10:29   5   briefly on the issue of E.  I don't think we talked about E.

6   E had to do with the settlements.  And those were -- those --

7   I think Exhibit 550 was a document that came in at the last

8   trial.  It's extraordinarily important to this case, and it

9   should come in again.

01:10:43  10          It's really illogical that this jury should be less

11   well-informed than the last jury on issues relating to

12   proportionate liability.  I mean, they should at least be able

13   to see 550.  It was a settlement document that came in.  It

14   sets forth exactly what the attorneys general found.  They

01:11:01  15   found widespread predatory lending.  You know, defendants

16   argued for a long time -- and in their false statements they

17   said, this is just an isolated incident; it's a rogue loan

18   officer.  In that document, they say it absolutely is not.

19   And it's the leakage of the fact that it's not an isolated

01:11:17  20   incident, not a rogue loan officer that's causing -- it's the

21   constant leakage, the constant drumbeat that's causing this

22   stock price to trend down throughout 2002.  And if you deprive

23   the jury of this information, you really provide them with an

24   understanding of why it would be that this predatory lending

01:11:34  25   was so significant that just its leakage would cause the stock

1   price to trend down so dramatically from, you know, $65 a

2   share all the way to 28.50 in some five months.

3           THE COURT:  What was Judge Guzman's ruling regarding

4   550?

5           MR. DROSMAN:  Well, with respect to 550, what he said

6   is, that's not admissible.  Defendants then came back --

7   because it's a settlement document.  Defendants then came back

8   and they put William Aldinger on the stand.  And Mr. Aldinger

9   explained that they just settled because it was a distraction

10  and they wanted to eliminate the overhang.  And the judge

11  said, you know, if this was your idea all along, that you were

12  just going to make this tactical choice and put Mr. Aldinger

13  on and -- after I barred plaintiffs from even using this

14  document, then I really, really am very angry about that

15  because I spent quite a bit of time on this; plaintiffs can

16  cross-examine Mr. Aldinger on the settlement document now that

17  you've opened the door to it.  And that was his ruling.  And

18  we fully vetted it.  It was discussed with Mr. Aldinger.  It

19  was discussed in closing arguments.  It was obviously a part

20  of the jury's consideration when they determined liability,

21  when they determined causation and proportionate liability in

22  the last trial.

23          MR. FARINA:  Your Honor --

24          THE COURT:  I'm going to agree with Judge Guzman.

25  I'll follow his lead.  If the door is opened again, we will

1    walk through it again.

2            MR. FARINA:  We will not be opening that door.

3            THE COURT:  But E and F are excluded, including 550.

4            Mr. Drosman, anything where we agree here?  I mean,

01:13:00   5    in general, you agree that we're going to be more streamlined

6    on these issues and that the relevance is limited?  Is there

7    anything that -- perhaps Project Whiskey that you agree should

8    be out?  Or Hueman?

9            MR. DROSMAN:  Well, look, I mean, the fact of the

01:13:13  10    Wells Fargo potential acquisition and the due diligence later

11    is absolutely critical to the jury.  So will that come up --

12            THE COURT:  Is there anything that's not absolutely

13    critical, not the most important --

14            MR. DROSMAN:  Well, look, my point is, we may not use

01:13:27  15    all the documents, all the evidence.  Depending on what Your

16    Honor reads to the jury, it may not be necessary to put in the

17    documents that we put in last time about Wells Fargo.  But

18    they do need to understand what happened.  And so, you know,

19    there will be documents that we will put in about the Wells

01:13:44  20    Fargo case.  And if that's -- if it's a matter of just

21    streamlining it, we're going to do that because -- we're going

22    to do that for a couple of reasons.

23            We understand that Your Honor's -- we're not going to

24    spend five, six weeks trying this case.  We're going to spend,

01:13:57  25    you know, two, two and a half weeks.  And so just as a matter

1   of time, we have to make choices about which evidence is most

2   important.  So instead of putting in, you know, seven

3   documents about the Wells Fargo merger, we may put in three.

4   But -- the Wells Fargo merger discussions.  But we're

01:14:15   5   certainly going to let the jury know about this Wells Fargo

6   merger discussion where, as you know, Wells Fargo offered --

7   was contemplating buying the company for in the mid 60s.  They

8   took a look under the hood and they discovered that

9   essentially the transmission was about to fall out and they

01:14:30   10   walked away.

11         MR. FARINA:  Your Honor --

12         MR. DROSMAN:  So it's absolutely vital because

13   this -- the jury has to know, look, this is what is being

14   concealed.  The defendants know, and they stood to gain very

01:14:42   15   handsomely, as you know, a hundred million dollars on this

16   Wells Fargo deal.  So the defendants had every incentive to

17   prop that stock price up, to keep it artificially inflated.

18   And then the air starts to come out of the tires.  And by the

19   time that HSBC looks at the deal, they're not willing to even

01:14:57   20   pay half of what Wells Fargo was going to pay for the deal.

21        So it's absolutely vital to loss causation theory

22   that the jury see this.  This is real world.  This is common

23   sense.  They say there's $4 of inflation, maybe zero in the

24   stock.  We can show the jury, that doesn't even make sense.

01:15:13   25   It's not even plausible.

1          MR. FARINA:  Your Honor, it has nothing to do with

2     loss causation.  Judge Guzman didn't think it had anything to

3     do with loss causation.  He admitted it for the limited

4     purposes of establishing scienter.  He said it provided a

01:15:28     5     motive for the fraud and that's why he admitted it.  In the

6     context of that, he noted that all the documents -- the Wells

7     Fargo's documents are hearsay; their conclusions about the

8     accounting are all hearsay.  And the plaintiffs said, oh, no,

9     we're not offering it for the truth of the matter asserted;

01:15:40     10     we're not offering it to show that the transmission was about

11     to fall out; we're offering it to show motive.  And Judge

12     Guzman said, okay, I will admit the documents for purposes of

13     scienter.

14          Scienter is not in the case anymore.  And this has

01:15:50     15     nothing to do with loss causation.  No one ever thought it

16     did.  They didn't argue before that it did.  They argued it

17     was relevant to scienter.  And they specifically said they

18     weren't offering it to show the transmission was about to fall

19     out because that would be hearsay.

01:16:02     20          THE COURT:  Mr. Drosman, anything that you agree with

21     the defense about here in terms of exclusion?

22          MR. DROSMAN:  I mean, I think that --

23          THE COURT:  Mr. Hueman, H-u-e-m-a-n.

24          MR. DROSMAN:  Right.  I'm not sure if you've had a

01:16:16     25     chance -- I know we've provided the videotape.  I know there's

1    a ton of documents.  I don't know if you've watched any of --

2             THE COURT:  I have, yes.

3             MR. DROSMAN:  -- Mr. Hueman's videotape.

4             So you've seen what Mr. Hueman has to say.  You've

5    also seen that he's said, look, I've been going around at

6    least the southwest region, Texas, Arizona, and southern

7    California, and this is the training that I've been giving.

8    Okay.  So now I've decided I would just take the time to

9    document it in a videotape so that I didn't have to be all

10   these places at one time.

11            They want to pretend as though it didn't make a big

12   difference.  It's absolutely, absolutely relevant to

13   proportionate liability.  I mean, the fact is after this came

14   to light, you would have expected, at a minimum, for

15   Mr. Hueman to have been disciplined.  Okay.  I would have

16   expected that he would be fired for something like this.

17   Neither occurred.  Okay.  The defendants learned of it and

18   they did nothing.  You would think that the jury would be able

19   to take that into consideration when they're determining

20   relative culpability, that this individual, who I think -- you

21   know, Matt Taibbi describes as a suburban Skeletor -- is

22   allowed to go around the country and give this sort of

23   presentation about trapping customers and then none of the

24   defendants actually fire him or discipline him?  It goes

25   directly to their relative culpability.

                    MR. FARINA:  I think this is an area that is hotly
disputed and, again, is another sort of sideshow.  The video
was admitted for purposes of scienter.  That was Judge
Guzman's ruling.  The defendants' position was that the video
01:17:45    was actually never used as a training video.  My understanding
is that the individual defendants -- I could be wrong about
this, but I believe the individual defendants had nothing to
do with it.  So I don't see how it's relevant to allocation.
The argument that Hueman should have been fired and that
01:17:59    somehow makes them culpable, it's going to be a sideshow.  How
much was the video actually shown?  Was it ever used?  Who
used it?  Who knew about it?  It's not the issue that should
be the subject of the retrial.  And it's prejudicial.  And it
was only admitted for purposes of scienter, and scienter is
01:18:14    not an issue in the case anymore, so --

                    THE COURT:  This is the defense's first motion in
limine.  And it's going to be granted as to E, F, and G.  So
we're going to keep out Wells Fargo and Project Whiskey.  But
as to A, B, C, D, including Dennis Hueman, H, and I, the
01:18:38    motion is going to be denied.  This is all evidence that was
introduced for limited reasons or for different reasons.  They
will be admitted again.  I believe that the plaintiff will
make every effort to streamline.  As the issues have changed
so has what is relevant.  But the motion is granted only as to
01:19:00    E, F, and G.

1      MR. FARINA:  Your Honor, may I just be heard on C,

2  which is compensation?

3      THE COURT:  Yes.

4      MR. FARINA:  So compensation -- you know, this is the

01:19:09   5  classic piece of evidence that when it's admitted is evidence

6  of scienter.  It's to show motive for -- the Second Circuit,

7  it's motive and opportunity.  There's absolutely no relevance

8  of how much the individual defendants were paid to any issue

9  on retrial.  It has absolutely no relevance to causation.  It

01:19:28  10  has absolutely no -- it doesn't even have any relevance to

11  allocation.  It is highly prejudicial.  All they want to do is

12  to show the jury that these guys made a lot of money and get

13  the jury mad.  It is highly prejudicial.  There is no

14  probative value of it now that scienter is not in the case.

01:19:44  15      Frankly, of all of the different items of evidence on

16  this, the one that has the least place in the retrial and is

17  the most prejudicial is compensation.  They got paid a lot of

18  money.  And it's going to inflame the jury.  And there's no

19  conceivable relevance.  When it was admitted, it was admitted

01:20:01  20  for purposes of scienter.  It really, really doesn't belong in

21  the trial.

22      THE COURT:  I think it's referenced in another one of

23  your motions.

24      MR. FARINA:  Yes, Your Honor.

01:20:08  25      THE COURT:  But go ahead and respond.

1          MR. DROSMAN:  Yeah, that's absolutely incorrect.  I

2    mean, it's relative -- it's relevant on a number of grounds.

3    Let's just talk about some of the issues that it talks about.

4    We've got defendants' Form 4s, for example.  This is not how

01:20:29    5    much they got paid.  These are public documents, public

6    documents available on the internet that show defendants'

7    stock transactions.  Okay.  That's what they show.  They show

8    when defendants believed that they should sell their stock.

9    And that's absolutely relevant.  It's circumstantial evidence.

01:20:44   10    It may not be conclusive, definitive evidence that the

11    defendants knew their stock price was inflated.  It's

12    certainly circumstantial evidence that defendants themselves

13    understood that the stock price was inflated -- a jury could

14    infer that -- and therefore sold their stock at that point in

01:21:02   15    time.

16          There's nothing prejudicial about putting in public

17    documents that the world has access to to show that they

18    exercised their stock.

19          Let me talk about something else that's really

01:21:13   20    important.  And this is PX 772 and 774.  These are

21    compensation committee meetings.  Okay.  This is where the

22    board is meeting in an effort to determine how much they're

23    going to pay their senior executives.  And when they do that,

24    they take a look at other companies.  These are peers of

01:21:33   25    Household.  They say we need to compare ourselves to our peers

1    to determine whether our executives are paid too much or too

2    little.  This is only one of two types of documents that are

3    internal to the company that contain peer group information.

4            At the last trial, Professor Fischel talked about

01:21:52    5    these specific documents when he said these were the peer

6    groups that Household itself compared itself to internally.

7    The other internal peer groups are in these investor relation

8    reports.  So they take a bunch of big financial institutions

9    and they say these are our peers; we're going to compare

01:22:08    10    ourselves to them for the purposes of determining

11    compensation.  It's certainly fair and it goes directly to

12    loss causation whether that particular peer group that

13    Professor Fischel chose using the S&P financials is

14    appropriate versus these tiny unheard of companies that

01:22:26    15    defendants' experts chose.

16            I understand why they want it out.  They don't want

17    these companies anywhere near the jury because it shows that

18    their own peer groups are absolutely inadequate, but that's

19    not a reason for exclusion.

01:22:39    20            MR. FARINA:  We have no problem with the use of the

21    peer groups.  That's not the point.

22            The thing that they want to do is they want to splash

23    big numbers to get the jury mad at the individuals and get

24    them mad at the company.  We have no problem with them using

01:22:52    25    documents in an appropriate way which may need to include

excerpting information to show what companies were in fact

used in determining compensation. But the amount of

compensation is just a device to inflame the jury. They can

have Professor Fischel talk about the peer group companies

01:23:11    that were used for purposes of compensation. We have no

problem with that.

          And I'll pass it on to counsel for the individuals.

          MR. SOFFER: Your Honor, you correctly noted that

this overlaps with another motion. That was our motion on

01:23:26    behalf of the individual defendants.

          THE COURT: I'm having a hard time finding it,

Mr. Soffer. Could you lead me to the number, please.

          MR. SOFFER: You know, I don't know that it was

actually -- has a number. It's simply titled motion to

01:23:37    exclude financial --

          THE COURT: There you go. Okay.

          MR. SOFFER: I had that same difficulty myself a few

moments ago, Your Honor.

          Apart from echoing my colleague's comments, let me

01:23:45    make this observation: I've heard plaintiffs' counsel argue

why it is that the compensation evidence is relevant. But I

don't understand because I don't think it is explicable how it

is relevant to the question that's on retrial.

          On loss causation in particular, which is what we've

01:24:03    heard as a justification for this evidence, the question is,

1    is there inflation in the stock that is attributable to false

2    statements and, if so, by what amount, to what degree.  The

3    defendants' motive to engage in the conduct to have -- to have

4    made the false statements doesn't answer that question.  It's

01:24:22    5    not relevant to that question.  So there is no basis for the

6    argument.

7            What -- and it's illuminating, I think, Your Honor,

8    to look at the transcripts of the closings from the first

9    trial because they make a good deal of the compensation

01:24:38    10    evidence.  And to be clear what we're talking about, Judge,

11    it's -- just to cite William Aldinger as an illustration,

12    total compensation in 2001 of $25 million; total compensation

13    in 2000 of $18 million.  This was front and center of the

14    plaintiffs' closing argument in the first trial.  And it

01:24:56    15    wasn't advanced to support loss causation.  It wasn't advanced

16    to support the notion that the losses can be attributed to the

17    false statements.  It was advanced to support their argument

18    on underlying liability and on scienter.  Those are not at

19    issue in this retrial.

01:25:13    20            The only issues on this retrial -- you know what they

21    are, Your Honor.  It is absolutely irrelevant.  And of course

22    relevance is only the first inquiry.  The second is, how do we

23    weigh the prejudice against the probative value.  And even if

24    it were somehow deemed relevant -- and I cannot understand how

01:25:30    25    it could be -- to the issues on retrial, it is wildly

1    prejudicial.  It is why they made it a centerpiece of their

2    closing argument in the first trial.  It would serve no

3    legitimate purpose at this trial.

4         THE COURT:  Okay.  Well, I understand the arguments

01:25:46    5    and the concerns of the defense regarding what you listed in

6    your motion as class resentments.  But the jury is going to be

7    instructed, among other things, that all litigants are equal

8    before the law.  If the defense wants something more specific,

9    something I've never seen, I will entertain it.  I think it's

01:26:07   10    appropriate, as that sort of bias or motivation shouldn't

11    be -- shouldn't have anything to do with the jury's

12    deliberations.  So if the defense wants to suggest something

13    regarding how unfair it would be for the jury to consider or

14    hold something like that against the defendants, then I will

01:26:30   15    consider it and it seems to make sense.

16         MR. FARINA:  Your Honor, to be clear.  We don't

17    object to the two uses of the documents, the only two uses

18    that have been offered by the plaintiffs' lawyer.  If they

19    want to say that they sold stock on a particular day, we have

01:26:44   20    no problem with them bringing that out.  If they want to say

21    that these particular peer companies were used, we have no

22    problem with that.

23         So the only things that they have offered --

24    literally the only things they have offered as to why it's of

01:26:56   25    any relevance, we're willing to let them use that.  So the

1   only thing left are just the numbers, the large numbers.  And

2   they're not even saying it's relevant.  And it's clearly

3   prejudicial.  It doesn't belong in the case.  If they get the

4   information for the purposes they say they need it, then the

01:27:12   5   numbers should not come in.

6         THE COURT:  Mr. Drosman, that's fair.  Tell us again

7   why those numbers are relevant.

8         MR. DROSMAN:  Sure.  Your Honor, I understood that

9   you had read all the papers so I didn't want to repeat

01:27:21   10   everything that we had said in our papers.  But we certainly

11   explain that in our papers.

12       I mean, you know, I understand defense counsel

13   doesn't see any relevance to the numbers.  But the reason he

14   doesn't see any relevance is because he pretends as though

01:27:33   15   this issue of proportionate liability doesn't exist.  I didn't

16   hear him mention that when he talked about the issues that

17   we're going to be retrying.

18       Now, let's talk about an individual's salary.  Is

19   it -- it makes sense that how much somebody is paid goes to

01:27:48   20   how much relative responsibility that person has in the

21   company.  We understand that a CEO is typically paid more than

22   a secretary.  And the reason that's the case is because the

23   CEO has much more responsibility.  The buck falls with the

24   CEO.  Now, the jury might think, well, Mr. Schoenholz, he's

01:28:04   25   second in command; I mean, he's the CFO.  In fact,

1   Mr. Schoenholz was paid less than Mr. Gilmer -- or the same as

2   Mr. Gilmer.  The point is it's absolutely, you know, relevant

3   to the jury's assessment of relative culpability when they're

4   looking at who really is at fault, who's really responsible

01:28:23   5   for this.

6          THE COURT:  Over defense objection, you can get into

7   that; the plaintiffs can get into that.

8          All right, we have got even more left than I

9   anticipated we would have left.

01:29:10   10          So what I'm hearing is that everyone is in town now

11   and everyone is available on Monday.  We did not get through

12   as much as I wanted to get through.  And Monday is

13   particularly tempting because I don't have a status call so we

14   could start at 9:00 o'clock.  Can everyone -- any reason not

01:29:25   15   to continue the case until Monday at 9:00 o'clock?

16          MR. DOWD:  That's fine with the plaintiffs, Your

17   Honor.

18          THE COURT:  All right.  So --

19          MR. STOLL:  It works for the defendants also, Your

01:29:35   20   Honor.

21          THE COURT:  We've got a lot that's outstanding.

22          Today I shared a proposed introduction, just in terms

23   of this issue of what the jury should be told.  The plaintiff

24   has sort of addressed it in terms of -- or both sides have

01:29:48   25   addressed it in terms of a short statement of the case, which

1    we typically read in every civil case.  And aside from that,

2    this issue of what the jury should be told in any case, that's

3    sort of the bigger issue, is how much should they or can they

4    be told or must they be told.  So I'll ask the attorneys to

01:30:04    5    take a look at what I've proposed and to see if the parties

6    can agree.  It's a middle ground between the two positions of

7    the parties, at least I believe that it is.

8            I asked the parties to go back to the exhibits.  Go

9    back to the exhibits, look at them again in light of the

01:30:34    10    rulings today, and to realistically look at what they seek to

11    introduce as opposed to what they're seeking to disclose to

12    one another and get that list down.  I think the plaintiff has

13    69 pages of exhibits and the defense has 30-some-odd pages or

14    30 pages.  So I'll ask the parties to continue to look at

01:30:59    15    that, to continue to meet and to discuss and confer and

16    hopefully agree regarding those exhibits; to revisit the issue

17    of their may call and will call lists.  Looks like there's

18    going to be a deposition, so the sooner the better -- or a

19    re-deposition if in fact it takes place.  The sooner the

01:31:22    20    better on that.  And everything else will be entered and

21    continued until Monday.  This case will be passed until

22    May 23rd at 9:00 o'clock right back here.

23            MR. DOWD:  Your Honor, can I ask you just a couple of

24    quick questions?

25            THE COURT:  Sure.

1        MR. DOWD:  Does the Court want to talk about jury

2   instructions on Monday or is that something the Court prefers

3   to do a little later on?

4        THE COURT:  I think that will probably go later on,

01:31:46  5   and I expect that to be an ongoing situation.  When we get

6   going on trial, it's very important that we finish by that

7   third week.  So unless the attorneys change their view of how

8   long this is likely to take, my intention is to work Monday

9   through Friday, although it would have been very nice to have

01:32:12  10   Fridays to talk about things such as jury instructions.

11   Perhaps I will let the jury out early on Friday so that

12   there's plenty of time for us to talk without holding up the

13   jurors on those Fridays.  But right now because it's

14   imperative that we finish by the 23rd or 24th, let's plan on

01:32:32  15   working the five days.  Okay.

16        MR. DOWD:  That was my other question, Your Honor.

17   Thank you.

18        THE COURT:  Thank you.

19        And Mondays are better because Mondays and Fridays we

01:32:39  20   can start at 9:00, otherwise we will try and start by

21   10:00 o'clock.

22        MR. DOWD:  Thank you, Your Honor.

23        MR. STOLL:  Thank you, Your Honor.

24        THE COURT:  All right.  Thank you.

25    (Hearing adjourned until May 23, 2016, at 9:00 a.m.)

1                    *    *    *    *    *

2

3    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
4

5
     /s/ Nancy C. LaBella              May 20, 2016
6    Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25